FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2005 FEB 10  P 12: 08

MICHAEL P. HUBERT, Individually and
On Behalf Of All Persons Similarly Situated

05  1 0 2 6 9 RWZ

　　Plaintiffs,

v.

MAGISTRATE JUDGE

MEDICAL INFORMATION TECHNOLOGY
PROFIT SHARING PLAN,
A. NEIL PAPPALARDO,, LAWRENCE A.
PALIMINO, ROLAND L. DRISCOLL,
EDWARD B. ROBERTS, MORTON E.
RUDERMAN, AND L.P. DAN VICENTE,

　　Defendants.

**CLASS ACTION
COMPLAINT
AND
DEMAND FOR
JURY TRIAL**

RECEIPT # 62012
AMOUNT $
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 1/10/05

## INTRODUCTION

This is an action brought against the Medical Information Profit Sharing Plan, an

ERISA plan, and its fiduciaries, based on the defendants' failure to pay benefits due Plan

participants from at least January 1, 1998 to present, upon the participants' termination of

their employment due to a deliberate and/or reckless under-pricing of the Plan's primary

asset -- shares of MEDITECH stock. As a result, participants have not received their

benefits in violation of law, as set forth below.

## PARTIES

1.　　Plaintiff Michael P. Hubert is a resident of Quincy, Massachusetts. At all

relevant times, Hubert was a participant in the Medical Information Technology, Inc.

Profit Sharing Plan ("the Plan") up and through July 2004. As a wholly vested

participant, Hubert was entitled to all of the benefits due him under the terms of the Plan.

2.     Upon information and belief, Defendant the Medical Information Profit Sharing Plan is a Massachusetts business trust (hereinafter referred to as "the Plan") which was sponsored by Medical Information Technology, Inc. ("MEDITECH"), a Massachusetts corporation with its corporate offices in Westwood, and other Massachusetts locations. The Plan was at all relevant times governed by the Employee Retirement Income Security Act ("ERISA") Title 29 U.S.C. 1001, et. seq.

3.     Defendant A. Neil Pappalardo is a resident of Boston, Massachusetts. Pappalardo is a founder, chairman of the Board of Directors, and chief executive officer of MEDITECH. As the sole Trustee of the Plan, Pappalardo is a fiduciary.

4.     Defendants Lawrence A. Polimino, Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman and L.P. Dan Vicente were at all relevant times directors of MEDITECH.

5.     As detailed below, the individual defendants set the price of MEDITECH stock for purposes of redeeming the interests of a beneficiary/participant at the time of termination of their employment with MEDITECH. Thus, for that purpose, the defendant directors were fiduciaries of the Plan.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the claims asserted herein under 29 U.S.C. Section 1132(e).

7.     Venue is proper in this district under 29 U.S.C. 1132(e)(2), as the Plan is administered here and the breaches of fiduciary duties occurred here. Further, all of the defendants reside or do business in this district.

2

## RELEVANT BACKGROUND

8.    Sometime in the 1970's, MEDITECH, acting through its Board of Directors, created a profit sharing plan with the plan's assets to be placed in a trust ("the Plan"). Pursuant to the terms of the Plan, MEDITECH agreed to contribute stock and/or cash to the Plan for the benefit of MEDITECH's employees. As an employee pension benefit plan designed to provide retirement income for MEDITECH's employees, the Plan is governed by ERISA , 29 U.S.C. 1001, et. seq., and the Internal Revenue Code, 26 U.S.C. 401, et. seq.,. A copy of the 1980's version of the Plan is attached here as Ex. A.

9.    The Plan is required to file an informational federal tax return on Form 5500. A copy of the MEDITECH's 2002 Form 5500 is attached hereto as Ex. B.

10.    All MEDITECH employees participate in the Plan on January 1st following their date of hire after one year of service with the Company, unless they elect otherwise.

11.    MEDITECH employees make no contribution to the Plan.

12.    Benefits under the Plan are considered deferred compensation and become fully vested after five years of participation in the plan.

13.    According to the Plan, at the time of retirement, or upon termination of employment, a participant's vested interest is valued as of the end of the preceding calendar year and the participant receives a cash payment equivalent to his/her interest in the Plan, plus interest.

14.    A substantial portion (about 85%) of the Plan's assets consists of common stock of MEDITECH.

3

15.     For purposes of MEDITECH's stock contribution to the Plan, as well as for selling stock to employees and for redemption purposes, the individual defendants value the stock as of December 31st of each calendar year and occasionally on an interim basis.

16.     Defendants are fiduciaries in valuing MEDITECH's common stock for purposes of redemption and payment of a participant's benefits under the Plan.

17.     If vested, participants receive a check from the Plan at the time of retirement or termination of employment. Participants are not advised as to the process by which their interest is valued. Participants are not advised of any administrative right to a hearing to contest the valuation of their interest, nor are participants given documents setting forth the methodology for calculating valuation. For all intents and purposes, the Plan's administrative procedures for contesting a denied benefit are a nullity. Indeed, the Plan Administrator ignored and did not even respond to Hubert's September 2004 letter questioning the valuation of his benefits.

18.     Since at least January 1, 1998 the defendants have not paid retiring or terminating participants the fair value of their interest in the Plan. Instead, the defendants have undervalued participants' interest in the Plan and have not paid participants the fair value of MEDITECH stock.

19.     Further, contrary to ERISA, those whose interests in the Plan exceed $1,000,000 are forced to roll out the "excess" to an IRA or to withdraw their "excess" interest entirely. These individuals' interests have been undervalued in violation of ERISA.

4

## DESCRIPTION OF THE CLASS

20.     Upon information and belief, since January 1, 1998, there are a substantial number of participants who have been harmed by not receiving the fair value of their benefits from the Plan at the time of full or partial termination due to the defendants' deliberate and/or reckless undervaluation of MEDITECH common stock. According to Defendant Pappalardo, turnover of employees is about 15% annually. Upon information and belief, a substantial portion of these departing employees were vested yet were not paid the fair value of their interest in the Plan. The company has had over 2000 employees in the last several years. Thus, upon information and belief, the class consists of several hundred individuals.

21.     Substantial monies are involved. Participants who have cashed out their interests in the Plan since 1998 have received over $45 million.

22.     Plaintiff Michael Hubert is a member of the class. Hubert has been a participant in the Plan since the 1980's, and was entitled to his beneficial share of the Plan upon the termination of his employment in July 2004. Hubert's proportionate share of the Plan was undervalued by the defendants. As a result, Hubert did not receive the fair value of his vested benefits in the Plan.

23.     Class certification is proper in that: (a) joinder of all claims is impracticable because there are numerous employees who were not paid fair value of their vested benefits in the Plan; (b) Hubert's claims are typical of those of the putative class; (c) there are common questions of law and fact that predominate, namely, whether the defendants fairly valued the benefits due to members of the putative class; and (d)

5

Hubert will fairly and adequately represent the interests of the members of the putative

class.

24.    A class action is superior to other available litigation methods for the fair

and efficient adjudication of this controversy. In the absence of a class action, many

participants harmed by the Plan's conduct will not be compensated for their injuries

because it is too expensive to prosecute litigation individually. Even if individual class

members could afford to prosecute this litigation alone, the Court could be inundated

with hundreds of lawsuits involving identical issues. Individual litigation magnifies the

delay and expense to all parties and to the court system of resolving the controversy. By

contrast, a class action presents fewer case management problems and provides the

benefits of unitary adjudication, economies of scale and comprehensive supervision by a

single court.

25.    Hubert requests that this court certify the following class:

> "All participants in the MEDITECH Profit Sharing Plan who have
> received any distribution since January 1, 1998 and who did not
> receive the fair value of their benefits."

## MEDITECH's BUSINESSES

26.    MEDITECH is a successful and profitable creator and licensor of medical

information software to hospitals and similar types of health related businesses.

MEDITECH owns five pieces of developed real estate in Massachusetts which are shown

on the company's balance sheet at cost when in fact the real estate is far more valuable

than cost. In fact, MEDITECH rents approximately 40% of the real estate it owns to

commercial tenants and holds about 20 acres available for future development.

6

27.     MEDITECH has substantial excess cash and marketable securities not needed for the business that adds to the company's value.  This excess figure is estimated at over $170,000,000 as of December 31, 2003, or about $5 per share.

28.     As shown in the table below, MEDITECH is a conservatively run company that has produced net profits over the last seven years as follows:

| YEAR | REVENUES | NET PROFIT (After taxes) |
|------|----------|--------------------------|
| 1998 | $203 million | $53.3 million |
| 1999 | $225 million | $60 million |
| 2000 | $217 million | $55 million |
| 2001 | $223 million | $56 million |
| 2002 | $256 million | $64 million |
| 2003 | $270 million | $67 million |
| 2004 | $280 million | $71.5 million |

29.     As shown in the table below, MEDITECH has declared a dividend in each of those years of over 6% on its set market price.

| YEAR | STOCK PRICE | DIVIDEND (post May, 2001 split) |
|------|-------------|---------------------------------|
| 1998 | $14.50 | $.94 |
| 1999 | $16.00 | $1.00 |
| 2000 | $17.00 | $1.16 |
| 2001 | $19.00 | $1.24 |
| 2002 | $22.00 | $1.36 |
| 2003 | $26.00 | $1.56 |
| 2004 | $29.00 | $1.80 |

## PROCESS OF VALUATION

30.     According to information distributed by MEDITECH, the Board of Directors sets the MEDITECH share price in October of each year, in anticipation of a stock contribution in December.

31.     Upon information and belief, Defendant Pappalardo sets the price and that price is rubberstamped by the other defendants. Despite having a fiduciary duty to the participants in the Plan, the other individual defendants conduct no separate inquiry as to fair value, and simply acquiesce in the price set by defendant Pappalardo. No outside independent appraiser is used. Upon information and belief, prior to setting each year's value of MEDITECH stock, Pappalardo does not consult experienced independent business appraisers.

32.     On one occasion in 2002, Pappalardo described his formula, components of which were not standard in the business appraisal area. Pappalardo's formula, posted on the Company intranet in September 2002, had as one of its components, *inter alia*, a formula of eleven times net income. Such formula did not fairly price MEDITECH's securities. In the class years, the common stock of several competitors such as Cerner Corp. have sold at much higher multiples of income, despite not being as profitable as MEDITECH, nor paying a dividend like MEDITECH.

33.     Upon information and belief, MEDITECH's founders and controlling shareholders, including some of the individual defendants, have been buyers of the common stock and have benefited from the low price established by Pappalardo and rubberstamped by the director defendants. For example, Pappalardo bought 50,000 shares of MEDITECH stock in February 2003 at $22 per share, a bargain price compared to comparable shares of stock sold on the open market by competitors.

34.     Under Department of Labor proposed regulation §2510.3-18 entitled Adequate Consideration, in valuing the assets of a plan, a fiduciary does not act in good

8

faith unless he is independent of all parties to the transaction or relies on the report of an independent appraiser. Pappalardo is not independent, nor has he, nor the director defendants, relied upon an independent appraiser.

35.     ERISA requires that the assets in the Plan be fairly valued.

36.     Under the Internal Revenue Code, if a plan seeks to qualify under 26 U.S.C. 401(a) as a stock bonus plan, thus permitting it to deduct from company income all contributions made to the plan as well as dividends paid upon its securities, the plan must meet the requirements of Section 409(h) which gives a put to the participant to require that the plan repurchase employees' securities under a fair valuation formula.

37.     Fair valuation at the time of payment of benefits means that in determining the value of a participant's stock interest in the plan, the fiduciaries should arrive at the value of the company as a whole and then divide that value by the shareholder's ratable portion of the company, without lack of liquidity or minority discounts. An accepted valuation procedure is to compare the stock price of publicly held companies similar to that of MEDITECH and arrive at a per share value. In addition, cash and real estate not needed in the business should be added to that value.

38.     Defendants have not fairly valued the MEDITECH stock in the Plan. This can be demonstrated by comparison to publicly traded companies in the same industry which are not as profitable and which do not pay a dividend, but whose stock trades at higher multiples of earnings to that of MEDITECH.

9

## **1998 VALUES**

39.     In or about late December 1998, Pappalardo, acting together with the other individual defendants, valued the common stock of MEDITECH for purposes of contributions by the company of its stock at $14.50 per share (post May 2001 split). Such value would be used for redemption purposes by the Plan Administrator in the following calendar year.

40.     This estimate valued the company at $471,715,000.

41.     As of December 31, 1998, MEDITECH made a contribution to the Plan of

> $2,340,000 Cash
> $1,100,000  Stock ($14.50/share post split)
>
> $3,500,000 TOTAL

42.     MEDITECH paid a dividend per share of 94 cents in 1998 and $1.00 in 1999 (post split). It had earnings per share of $1.64 per share in 1998 and $1.83 in 1999.

43.     MEDITECH had little or no debt in this time period.

44.     In truth and fact, the Plan Trustee and other defendants undervalued the shares of MEDITECH in the Plan so that participants who terminate employment in 1998 and 1999 would not receive the fair value of their assets in the Plan. In part this was done because if employees were paid a fair price for their assets in the Plan, the Plan would have soon run out of cash. This would require the company to donate more cash to the Plan or buy shares from the Plan.

45.     In 1998 and 1999, the company's price to earnings ratio was only 8.8. Comparable publicly owned companies such as Cerner, which had substantial debt and

paid no dividend, had P/E ratios of over forty (40) in this time period and were highly valued. A similar ratio would have resulted in a value for MEDITECH stock equal to $75/share, not $14.50 or $16.

### 1999 Valuation

46.     In or about December 1999, the defendants valued the common stock of MEDITECH for purposes of contribution by the company of the stock at $16.00 per share (post May 2001 split). Such value would be used for redemption purposes in the following year by the plan administrator.

47.     As of December 31, 1999, MEDITECH made a contribution to the Plan of

> $2,720,000 in cash and
> $1,280,000 in shares (80,000 shares at $16 post split)
>
> $4,000,000 Total

48.     Upon information and belief, defendants also used that figure in arriving at the amount to be distributed as a cash benefit to retiring and/or terminating employees at that value.

49.     This estimate valued the company at only $526,624.000.

50.     MEDITECH had a profit of $59,000,000 in 1999, or $1.83 per share (post May, 2001 split) and paid a dividend of $1/ share in 1999 (post split).

51.     The shares of MEDITECH stock held in the Plan post 1999 were substantially undervalued. Cerner, its major publicly traded competitor, actually lost money in 1999, yet its shares traded as high as $29 and ended at $19.70 on December 31, 1999. Its market value as of December 31, 1999 was over $772,000,000. Cerner paid no dividend and had substantial debt, and its cash earned from operations was only $27

million compared to MEDITECH'S $91 million. In fact, MEDITECH earned $1.83 per

share while Cerner lost 20 cents per share. In all respects MEDITECH was the more

valuable company and deserved a much higher fair value than $16.

**2000 Valuation**

52.     At the end of December 2000 the defendants valued the stock of

MEDITECH at $17 per share (post split) for purposes of the next year's valuation by the

Plan, as well as for contributions to the Plan. Using this figure, MEDITECH was valued

at about $565,000,000

53.     In December, 2000, MEDITECH made a contribution to the Plan of:

| | |
|---|---|
| 80,000 shares ($17 per share) | $1,360,000 |
| Cash | $2,140,000 |
| Total | $3,500,000 |

54.     In 2000, MEDITECH earned $1.66 per share and the price to earnings per

share ratio was approximately ten(10)

55.     In 2000, the stock paid a dividend of $1.16, about 6% of its share price.

56.     The shares were undervalued as of this time. For example, in 2000 a

competitor, Cerner, had its shares listed on the NASDQ national stock exchange at a

price/earning multiple of 15. As of December 31, 2000, its stock ended at $46.25 with

earnings of $3/share. Yet, Cerner did not pay a dividend. If MEDITECH's common

stock had been fairly valued at a P/E of 15, it would be worth $25.50/share, not $17.00,

and the company would be valued at $831,375,000, not $565,000,000. By comparison

MEDITECH was better managed, paid a dividend, had no debt, was generally more

12

profitable, and had a substantial cash reserve. In all respects it was a more valuable
company than Cerner.

57.     As a result, participants who retired or terminated employment at
MEDITECH after December, 2000, did not receive all of their benefits from the Plan due
to the undervaluation of MEDITECH'S shares.

## 2001 Valuation

58.     At the end of December 2001, for transfer purposes and for purposes of a
fair valuation of the Plan's interest in MEDITECH stock, the defendants valued
MEDITECH'S stock at $19.00 (post split) with 33,797,439 shares outstanding, thus, the
company's overall value was $642,000,000.

59.     MEDITECH made a contribution to the Plan at the end of 20012 as
follows:

|  |  |
|---|---|
| 75,000 shares ($19 per share) | $1,425,000 |
| Cash | $2,075,000 |
| Total | $3,500,000 |

60.     In 2001, MEDITECH had a profit of $56 million and paid a dividend of
$1.24 per share (post split). The price to earnings ratio was only 11.2.

61.     Its major competitor, Cerner, by comparison, at December 31, 2001, had
a negative P/E since it lost $42 million in 2001, yet its stock was valued at $50.00 per
share with about the same number of shares. It also did not pay a dividend and had
substantial debt.

62.     In 2001, the MEDITECH shares in the Plan were undervalued. Persons in
the class who retired or terminated employment in 2002 received only $19 per share for
their stock interest in the Plan (plus their percentage of the cash). Had MEDITECH

shares been fairly valued equivalent to Cerner in 2001, its stock would have been worth far more than $19 attributed to it by the defendants.

63.    Thus, participants terminating employment in 2002 did not receive all of the benefits to which they were entitled.

### 2002 Valuation

64.    In December 2002, for transfer purposes and for purposes of a fair valuation of the Plan's interest in MEDITECH sock in 2003, the defendants valued the shares of MEDITECH at $22.00 per share, giving it a market value of $745,303,000.

65.    In 2002, MEDITECH made a contribution to the Plan as follows:

| | |
|---|---|
| 80,000 shares ($22 per share) | $1,760,000 |
| Cash | $2,240,000 |
| Total | $4,000,000 |

66.    In 2002 the Company had earned $64,000,000 or $1.89 per share, and had paid a dividend of $1.36 or over 6% of its declared stock price. Its price to earnings ratio was only 11.6. MEDITECH contributed 80,000 shares to the Plan at the end of 2002, together with cash of $1,340,000.

67.    The MEDITECH shares in the Plan were not fairly valued in 2003. Members of the putative class who had their interest in the Plan liquidated in 2003 did not receive all of the benefits to which they were entitled.

68.    In 2002, Cerner, for example, made only $48 million on greater revenue, or $1.36 per share. Cerner paid no dividend. Yet, its stock price was $29.50 as of December 31, 2002 and it had a P/E of 21.7.

69.    If MEDITECH, a more profitable company, which paid a dividend, had no debt and had substantial extra cash, had a P/E ratio of over 21, like Cerner, its stock value

14

would have been a minimum of $41 not $22, and the company would have a fair value of almost $1.4 billion.

**2003 Valuation**

70.    In December 2003 for transfer purposes and purposes of a fair valuation of the Plan's interest in MEDITECH in 2004, the defendants valued the shares of MEDITECH at $26 or the Company value at $889,754,000.

71.    MEDITECH contributed 80,000 shares to the Plan at year-end, along with cash of just over $2 million.

72.    It had a net profit of $67.4 million, or $1.98/share and paid a dividend of $1.56, approximately 6% of its share price. Its P/E ratio was 13.3.

73.    In 2003, the MEDITECH shares in the Plan were not fairly valued .

74.    MEDITECH's 2003 Form 10K listed some of its competitors as Cerner Corp., IDX Systems, and Eclipsys. Cerner, for example, had greater revenues at $839,587,000, compared to MEDITECH'S revenue of $270 million, but it only had a profit of $42,791,000 and a P/E ratio as of December 31, 2003 of 28.

75.    These and related competitors had a P/E ratio set by the national stock markets at about 35. On that basis, the stock of MEDITECH would be fairly valued at $69.00 not $26.00. In addition, upon information and belief, in 2003, MEDITECH also had about $5/share in marketable securities not needed for its business, which could be added to its share price, plus excess real estate. Thus, MEDITECH shares should have been fairly valued at over $74.00 in 2004, not $26.00.

76.    As a consequence, members of the class who had their interest in the Plan liquidated in 2004 did not receive the fair value of the benefits to which they were entitled.

77.    MEDITECH has continued to be quite profitable in 2004. It had record revenues, net profit and earnings per share in 2004. Its shares were undervalued in 2004 at $26 per share.

## COUNT I

### (Against All Defendants)

78.    Plaintiff incorporates by reference the allegations in all previous paragraphs as if set forth in full herein.

79.    By failing to fairly value the benefits due each employee participating in the Plan upon his or her termination, the defendants violated their duties to the participants of the Plan.

80.    Plaintiff, and members of the class are due benefits from the Plan.

81.    Pursuant to ERISA, § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), plaintiff brings this action to recover benefits due him and the Class from the Plan and from all those who participated in the failure to properly pay Class members the fair value of their Plan benefits.

## COUNT II

### Breach of Fiduciary Duty in Violation of ERISA

### (Against the Individual Defendants)

82.    Plaintiff incorporates by reference the allegations in all previous paragraphs as if set forth in full herein.

83.    Section 404 of ERISA, Title U.S.C. § 1104, imposes a fiduciary duty upon those individual defendants who were fiduciaries to act solely in the interest of the Plan's participants and beneficiaries.

84.    Due to the actions they took or failed to take, relative to the Plan, the Trustee -- defendant Pappalardo -- and all other individual defendants who assisted him in not fairly valuing the assets in the Plan -- have breached their fiduciary duty to the plaintiff and all others in the class who have been harmed as a consequence.

85.    The defendants are liable for the harm in causing the Plan to underpay the benefits due plaintiff and all members of the class

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for the following relief:

(a)    certification of this case as a class action;

(b)    enter judgment against the defendants;

(c)    enter a permanent injunction ordering the Plan to consult an outside appraiser in valuing the assets of the Plan ;

(d)    removal of A. Neil Pappalardo as the Plan Trustee.

(e)    pre- and post-judgment interest;

(f)    reasonable attorneys' fees and costs pursuant to the common benefit doctrine, or, alternatively, ERISA § 502(g), 29 U.S.C. § 1332(g); and

17

(g)    any other relief this Court deems just, proper and equitable.

Respectfully submitted,

Michael P. Hubert,

By his attorneys,

Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Sara Noonan (BBO #645293)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA  02210
671-371-1000
671-371-1037

February 10, 2005

**Plaintiff requests a jury trial on all issues so triable.**

## TABLE OF CONTENTS

Page

I.    INTRODUCTION                                                    1

II.   GENERAL INFORMATION                                            2

III.  PARTICIPATION IN THE PLAN                                      3

IV.   CONTRIBUTIONS TO THE PLAN                                      4

      1.  Source of Contribution                                    4
      2.  Allocation of Contributions                               4
      3.  Allocation of Forfeitures                                 4
      4.  Allocation of Trust Gains and Losses                      4
      5.  Amendment and Termination                                 5

V.    BENEFITS PROVIDED UNDER THE PLAN                              6

      1.  Retirement                                                6
      2.  Disability                                                6
      3.  Death                                                     6
      4.  Termination of Employment                                 6
      5.  Manner of Benefits Payment                                7
      6.  Time of Benefits Payment                                  7
      7.  Benefits Not Insured                                      7
      8.  Loans to Members                                          7

VI.   CLAIMS PROCEDURE                                              8

VII.  YOUR RIGHTS UNDER ERISA                                       9

## I.  INTRODUCTION

The Medical Information Technology, Inc. Profit Sharing Plan (which will be referred to as the "Plan"), is designed to help provide future financial security for you and your family by allowing you to share in the profits of Medical Information Technology, Inc. (the "Company").

This booklet has been prepared to explain and summarize the major provisions of the Plan, as amended effective August 1, 1983.  Please take the time to read the booklet so that you will thoroughly understand the benefits provided by the Plan.  The booklet functions as a summary plan description for your information, but all rights of employees and others under the Plan are governed in all respects by the detailed terms of the Plan and Trust Agreement.

## II.  GENERAL INFORMATION

1. <u>Employer</u>.  The Employer is Medical Information Technology, Inc., located at 255 Bent Street, Cambridge, Massachusetts 02138. Its Employer Identification Number is 04-2455639.

2. <u>Plan</u>.  The Plan is the Medical Information Technology, Inc. Profit Sharing Plan.  The Plan Number is 001, and the Plan is a profit sharing plan administered by a Trustee.  The Plan Year ends on December 31.

3. <u>Plan Administrator</u>.  The Plan Administrator is Medical Information Technology, Inc., located at 255 Bent Street, Cambridge, Massachusetts 02138.  The telephone number is (617) 354-3000.

4. <u>Agent for Service of Legal Process</u>.  The President of Medical Information Technology, Inc. shall serve as the Plan's agent for service of legal process.  Service of legal process may also be made upon the Plan Administrator or the Trustee.

5. <u>Trustee</u>.  The current Trustee is Mr. A. Neil Pappalardo, President, who may be contacted at Medical Information Technology, Inc., 255 Bent Street, Cambridge, Massachusetts 02138 (telephone: 617-354-3000).

## III. <u>PARTICIPATION IN THE PLAN</u>

1. <u>Eligibility.</u>  You are eligible to participate in the Plan on the first day of the month after you complete one year of Service with the Company.  One year of Service is a period of twelve (12) consecutive months of employment with the Company.

2. <u>Duration of Membership.</u>  Once you become a Member you will continue to be a Member as long as you are employed by the Company.  A former Member who is reemployed by the Company will become a Member immediately upon reemployment.

3. <u>Election Not to Participate.</u>  A Member may elect not to participate in the Plan during any Plan Year.  You must notify the Trustee in writing, before the first day of the new Plan Year, that you do not wish to participate.  You will then be excluded from the allocation of Company contributions and forfeitures.  Your account will remain in the Trust, however, and will share in the income, expense, appreciation, and depreciation of the Trust.

## IV.  CONTRIBUTIONS TO THE PLAN

1. Source of Contributions.  For each Plan Year, the Board of Directors
determines and votes the amount, if any, that the Company will
contribute to the Trust.  The contribution is made from the net
income of the Company for that year, or from the earnings and
profits accumulated by the Company prior to that Plan Year.
Contributions by Members are not permitted.  The Company's con-
tribution to the Trust will be paid in cash and/or in the number
of shares of the Company's common stock whose fair market value on
the date of contribution is equal to the contribution amount.
Company contributions are held and accumulated in the Trust.

2. Allocation of Contributions.  The Company's contribution, if any, for
each year is allocated to the individual accounts of all Members
who were Employees of the Company on December 31 of that Plan
Year.  Also, any Employees who retired, became disabled, or died
during that Plan Year also have the Company contribution allocated
to their account.

   The Company contribution is credited to your account in pro-
portion to your compensation for that Plan Year, as compared to the
total compensation of all Members sharing in the Company contribu-
tion for that year.  Compensation includes salaries, wages, bonuses,
overtime, and commissions, but excludes any contributions or benefits
you receive under the Plan as well as any amounts paid to you prior
to the date you became a Member under the Plan.  If you own 10% or
more of the outstanding Common Stock of the Company on December 31
of that Plan Year, however, you will not have any portion of the
Company contribution allocated to your account.

3. Allocation of Forfeitures.  Forfeitures from the accounts of Members
who are not fully vested ("vesting" is explained on p. 6) when
they leave the Company are relocated on the same basis as
explained above in Section IV(2).

4. Allocation of Trust Gains and Losses.  The Trustee is specifically
authorized to invest all or any portion of the Trust assets in
shares of the Company's common stock, and the Company intends that
a substantial portion of the assets of the Trust be invested in
its common stock.  One of the major purposes of the Plan is to
give each Member a stake in the success of the Company.  Because
a substantial portion of the Plan's assets are invested in the
Company's common stock, the value of your benefit under the Plan
is significantly dependent on the value of that stock.

   The assets and liabilities of the Trust will be evaluated as
of December 31st of each Plan Year.  Any increases in the value
of the Trust will be credited to your individual account in pro-
portion to the relative size of your existing account balance.
Any decrease in the value of the Trust will be charged to your
account on the same basis.

-4-

5. <u>Amendment and Termination</u>. The Company expects to continue the Plan on a permanent basis, but it necessarily reserves the right to terminate the Plan, or completely discontinue contributions under the Plan, at any time. The Company also reserves the right to amend the Plan at any time. The Plan may not be amended or terminated in such a way as to divert the Trust assets to the benefit of anyone except employees or their beneficiaries, or to reduce any amount previously credited to the account of an employee.

## V.  BENEFITS PROVIDED UNDER THE PLAN

1. <u>Retirement</u>.  If you retire at or after age 60, you will receive the entire amount credited to your account.

2. <u>Disability</u>.  If you are unable to continue working for the Company because of sickness or disability, you will receive the entire amount credited to your account.  The Trustee determines, on the basis of medical evidence, whether you are disabled for purposes of the Plan.

3. <u>Death</u>.  Upon your death, the Trustee will distribute the entire amount credited to your account to your designated Beneficiary or Beneficiaries.  You must notify the Trustee in writing of your choice of Beneficiary, and you may change your designation from time to time.  If your Beneficiary dies before receiving the entire amount payable from your account, the undistributed balance will go to your Beneficiary's estate.  If you have not designated a Beneficiary, the entire amount credited to your account will be paid to the executor of your estate.

4. <u>Termination of Employment</u>.  If you leave the Company for any reason other than (1) - (3) listed above, you will be entitled to a severance benefit if you have at least 2 years of service with the Company.  If you have a period of Service with the Company of at least five (5) years, you will be entitled to the full amount credited to your account.  If you have a period of Service with the Company of less than fice (5) years, when you leave the Company you will be entitled to receive the vested portion of your account.  The vested portion of your account is equal to a percentage of the amount standing to the credit of your account, based on your period of Service, as follows:

<u>Years of Service</u>

| At Least | But Less Than | Vested Percentage |
|----------|---------------|-------------------|
|          | 2             | None              |
| 2        | 3             | 10%               |
| 3        | 4             | 30%               |
| 4        | 5             | 60%               |

If you do not return as an employee of the Company within twelve months  the remainder of your account is then forfeited, and allocated as explained in Section IV(3).

5.  Manner of Benefits Payment.  Whenever your account is to be distributed, as explained in (1) - (4) above, the Trustee shall make the payments in one of the following ways:

    a.  One lump sum payment in cash and/or shares of the Company's common stock.

    b.  Installments of cash and/or shares of the Company's common stock, to be paid out over a period not exceeding fifteen (15) years.

6.  Time of Benefits Payment.  Benefit payments under the Plan will be made, or commenced, within a reasonable period of time after the date of retirement, death, disability, or other termination.

7.  Benefits Not Insured.  The benefits provided by the Plan are determined solely by the value of your account at the time the benefits became payable.  Because the Plan is not a defined benefit plan, benefits are not insured by the Pension Benefit Guaranty Corporation. There are no provisions under Title IV of the Employee Retirement Income Security Act of 1974 (ERISA) which insure benefits under this type of Plan.

8.  Loans to Members.  The Trustee has discretion to make loans to Members from the Trust.  Any such loan is limited to 50% of the Member's vested interest in the Trust, subject to a $50,000 overall limitation, and must bear a reasonable rate of interest and generally must be repaid within 5 years.  The Trustee decides whether a loan will be made and, if a loan is to be made, the Trustee decides the amount and the terms of the loan.

## VI.  CLAIMS PROCEDURE

1.  <u>Filing Claims for Benefits</u>.  If you or your Beneficiary believes you are entitled to receive benefits under the Plan, and you have not received notification from the Trustee concerning the time and manner of payment of your benefits, or if you believe the Trustee's notice concerning the amount and form of payment of your benefits is incorrect,  you may file a claim for your benefits with the Trustee.  The claim must be filed in writing with the Trustee, in accordance with the rules he establishes for filing a claim.

2.  <u>Notification of Denial of Claim</u>.  Within sixty (60) days after you submit a claim for benefits, the Trustee must tell you (in writing) the specific reasons for denying your claim.

3.  <u>Right to Review</u>.  Within a reasonable period of time after your claim for benefits has been denied, you may request the Trustee to make a full and fair review of the decision denying your claim.

4.  <u>Decision on Review</u>.  Within sixty (60) days after receiving your request for a review, the Trustee must give you a written explanation of the reasons for his decision on the review.

## VII.  YOUR RIGHTS UNDER ERISA

As a Member of the Medical Information Technology, Inc. Profit Sharing Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan Members shall be entitled to:

(i)  Examine, without charge, at the Plan Administrator's office, all Plan documents, including copies of all documents filed by the Plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions.

(ii)  Obtain copies of all Plan documents and other plan information upon written request to the Plan Administrator.

(iii)  Receive a summary of the Plan's annual financial report. The Plan Administrator is  required by law to furnish each participant with a copy of this summary annual report.

(iv)  Obtain a statement telling you whether you have a right to receive a plan benefit, and if so, what your benefit would be if you were to stop working for the company.  If you do not have a vested right to a plan benefit the statement will tell you how many more years you have to work to get a vested right to a plan benefit.  This statement must be requested in writing and is not required to be given more than once a year.  The Plan must provide the statement free of charge.

In addition to creating rights for Plan Members, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.  The people who operate the Plan, called "fiduciaries", have a duty to do so prudently and in the interest of you and other Plan Members and beneficiaries.

No one, including your employer, or any other person, may fire you or otherwise discreminate against you in any way to prevent you from obtaining a plan benefit or exercising your rights under ERISA.  If your claim for a plan benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial.  You have the right to have the Trustee review and reconsider your claim.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are success-ful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement of your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor-Management Service Administration, Department of Labor.

```
8403732723
189.05.0008
04
```
Official Use Only

**SCHEDULE P**
**(Form 5500)**

# Annual Return of Fiduciary
# of Employee Benefit Trust

OMB No. 1210-0110

**This schedule may be filed to satisfy the requirements under section 6033(a) for an annual information return from every section 401(a) organization exempt from tax under section 501(a).**

**Filing this form will start the running of the statute of limitations under section 6501(a) for any trust described in section 401(a) that is exempt from tax under section 501(a).**

Department of the Treasury
Internal Revenue Service

▶ **File as an attachment to Form 5500 or 5500-EZ.**

# 2002

**This Form is Open to Public Inspection.**

For the trust calendar year 2002
or fiscal trust year beginning                                    and ending

**Please type or print**

**1a** Name of trustee or custodian

   A. Neil Pappalardo

**b** Number, street, and room or suite no. (If a P.O. box, see the instructions for Form 5500 or 5500-EZ.)

   MEDITECH Circle

**c** City or town

   Westwood

| | State | ZIP code |
|---|---|---|
| | MA | 02090 |

**2a** Name of trust

   Medical Information Technology, Inc.

   Profit Sharing Trust

**b** Trust's employer identification number          0 4      2 4 5 5 6 3 9

**3** Name of plan if different from name of trust

   Medical Information Technology, Inc.

   Profit Sharing Plan

**4** Have you furnished the participating employee benefit plan(s) with the trust financial information required to be reported by the plan(s)? ......................................................................................................     X    Yes          No

**5** Enter the plan sponsor's employer identification number as shown on Form 5500 or 5500-EZ .... ▶    0 4      2 4 5 5 6 3 9

*Under penalties of perjury, I declare that I have examined this schedule, and to the best of my knowledge and belief it is true, correct, and complete.*
**Signature of fiduciary**

**SIGN HERE** ▶    *C. Neil Pappalardo, Trustee*    Date ▶    07  24  2003

For Paperwork Reduction Act Notice and OMB Control Nos., see the inst. for Form 5500 or 5500-EZ.    Cat. No. 13504X    **Schedule P (Form 5500) 2002**



2 5 0 2 A B 0 1 0 V

v5.0

8403732723
189.05.0009
04

Official Use Only

OMB No. 1210-0110

# Qualified Pension Plan Coverage Information

**SCHEDULE T
(Form 5500)**

Department of the Treasury
Internal Revenue Service

This form is required to be filed under section 6058(a) of the
Internal Revenue Code (the Code).

▶ **File as an attachment to Form 5500.**

# 2002

This Form Is Open to
Public Inspection.

For the calendar plan year 2002
or fiscal plan year beginning _____ and ending _____

**A** Name of plan

    Medical Information Technology, Inc.
    Profit Sharing Plan

**B** Three-digit
plan number ▶  0 0 1

**C** Plan sponsor's name as shown on line 2a of Form 5500

    Medical Information Technology, Inc.

**D** Employer Identification Number

    0 4    2 4 5 5 6 3 9

**Note:** *If the plan is maintained by:*
- More than one employer and benefits employees who are not collectively-bargained employees, a separate Schedule T may be required for each employer (see the instructions for line 1).
- An employer that operates qualified separate lines of business (QSLOBs) under Code section 414(r), a separate Schedule T may be required for each QSLOB (see the instructions for line 2).

**1**  If this schedule is being filed to provide coverage information regarding the noncollectively-bargained employees of an employer participating in a plan maintained by more than one employer, enter the name and EIN of the participating employer:

**1a** Name of participating employer

**1b** Employer Identification number

**2**  If the employer maintaining the plan operates QSLOBs, enter the following information:

**a**  The number of QSLOBs that the employer operates is ...........................................................................................

**b**  The number of such QSLOBs that have employees benefiting under this plan is ......................................................

**c**  Does the employer apply the minimum coverage requirements to this plan on an
employer-wide rather than a QSLOB basis? .........................................................................................    Yes    No

**d**  If the entry on line 2b is two or more and line 2c is "No," identify the QSLOB to which the coverage information given on line 3 or 4 relates.

▶

**3**  Exceptions—Check the box before each statement that describes the plan or the employer. Also see instructions.
**If you check any box, do not complete the rest of this Schedule.**

**a** _____  The employer employs only highly compensated employees (HCEs).

**b** _____  No HCEs benefited under the plan at any time during the plan year.

**c** _____  The plan benefits only collectively-bargained employees.

**d**  X   The plan benefits all nonexcludable nonhighly compensated employees of the employer (as defined in Code sections 414(b), (c), and (m)), including leased employees and self-employed individuals.

**e** _____  The plan is treated as satisfying the minimum coverage requirements under Code section 410(b)(6)(C).

For Paperwork Reduction Act Notice and OMB Control Numbers, see the Instructions for Form 5500.  Cat. No. 22770R  Schedule T (Form 5500) 2002



2 7 0 2 A B 0 1 0 X

v5.0

Schedule T (Form 5500) 2002                                                    Page **2**

Official Use Only

**4**   Enter the date the plan year began for which coverage data is being submitted ..............................   0 1    0 1    2 0 0 2

**a**   Did any leased employees perform services for the employer at any time during the plan year? ...............   Yes    X   No

**b**   In testing whether the plan satisfies the coverage and nondiscrimination tests of
Code sections 410(b) and 401(a)(4), does the employer aggregate plans? .......................................   Yes    X   No

**c**   Complete the following:

   **(1)**   Total number of employees of the employer (as defined in Code section 414(b), (c), and (m)),
including leased employees and self-employed individuals ....................................................   207

   **(2)**   Number of excludable employees as defined in IRS regulations (see instructions) .................................   38

   **(3)**   Number of nonexcludable employees. (Subtract line 4c(2) from line 4c(1)) ...............................   169

   **(4)**   Number of nonexcludable employees (line 4c(3)) who are HCEs ..................................................   10

   **(5)**   Number of nonexcludable employees (line 4c(3)) who benefit under the plan .........................   169

   **(6)**   Number of benefiting nonexcludable employees (line 4c(5)) who are HCEs ...........................   10

**d**   Enter the plan's ratio percentage and, if applicable, identify below the disaggregated
part of the plan to which the information on lines 4c and 4d pertains (see instructions) ...................................   100 . 0

▶

**e**   Identify any disaggregated part of the plan and enter the ratio percentage or exception (see instructions).

      **Disaggregated Part:**                              **Ratio Percentage:**            **Exception:**

 **(1)**                                                                          .

 **(2)**                                                                          .

 **(3)**                                                                          .

**f**   This plan satisfies the coverage requirements on the basis of (check one):

    **(1)**        the ratio percentage test             **(2)**        average benefit test



**Name of Plan**
Medical Information Technology, Inc. Profit Sharing Plan

**Three-digit Plan Number**
04                                    001

8403732723
169.05.0011

**Plan sponsor's name as shown on line 2a of Form 5500**
Medical Information Technology, Inc.

**Employer ID Number**
04-2455639

**Form 5500**
**Schedule H Line 4i**

## Schedule of Investment Assets Both Acquired and Disposed of Within The Plan Year

| (a)<br>Indentity of issue, borrower lessor, or similar party | (b)<br>Description of investment including maturity date, rate of interest, collateral, par or maturity value | (c)<br>Cost of acquisitions | (d)<br>Proceeds of dispositions |
|---|---|---|---|
| 56 Plan Participants | Loans:  6.0% Interest 1/1/02-12/31/02<br>$245,800 borrowed and paid during 2002 | | |

| Name of Plan: | Three-digit |
|---|---|
| Medical Information Technology, Inc. Profit Sharing Plan | Plan Number ~~002732723~~  0<br>189.05.0012 |

| Plan sponsor's name as shown on line 2a of Form 5500 | Employer ID Number |
|---|---|
| Medical Information Technology, Inc. | 04-2455639 |

**Form 5500**

**Schedule H Line 4i**

## Schedule of Assets Held for Investment Purposes at End of Year

| (a) | (b)<br>Identity of issue, borrower,<br>lessor, or similar party | (c)<br>Description of investment including maturity date<br>Rate of interest, collateral, par or maturity value | | | (d)<br>Cost | (e)<br>Current Value |
|---|---|---|---|---|---|---|
| | | Maturity<br>Date | Interest<br>Rate | Face<br>Amount | | |
| | US Treasury Note | 02/15/03 | 6 1/4 | 500,000 | 508,516 | 502,8 |
| | "    "    " | 02/15/03 | 6 1/4 | 350,000 | 363,398 | 351,9 |
| | "    "    " | 02/15/03 | 6 1/4 | 1,000,000 | 1,013,080 | 1,005,6 |
| | "    "    " | 08/15/03 | 5 3/4 | 1,350,000 | 1,356,539 | 1,387,5 |
| | "    "    " | 08/15/03 | 5 3/4 | 350,000 | 345,023 | 359,7 |
| | "    "    " | 05/15/05 | 6 1/2 | 400,000 | 402,375 | 444,2 |
| | "    "    " | 08/15/05 | 6 1/2 | 625,000 | 623,240 | 699,4 |
| | "    "    " | 05/15/06 | 6 7/8 | 500,000 | 501,641 | 575,9 |
| | "    "    " | 05/15/06 | 4 5/8 | 3,400,000 | 3,413,281 | 3,672,0 |
| | "    "    " | 05/15/06 | 4 5/8 | 2,200,000 | 2,214,437 | 2,376,0 |
| | "    "    " | 11/15/07 | 3 | 2,275,000 | 2,290,641 | 2,306,2 |
| | "    "    " | 11/15/08 | 4 3/4 | 1,375,000 | 1,363,183 | 1,504,3 |
| | "    "    " | 02/15/11 | 5 | 1,650,000 | 1,640,461 | 1,818,6 |
| | "    "    " | 08/15/11 | 5 | 350,000 | 347,375 | 385,0 |
| | Total US Treasury Notes | | | 16,325,000 | 16,383,190 | 17,389,5 |
| * | Medical Information<br> Technology, Inc. | 3,800,547 shares Common Stock $1.00 Par Value<br>Right of First Refusal Restrictions | | | 22,680,188 | 82,570,1 |
| | Fleet Bank | Interest-bearing savings account (1.49%) | | | 111,011 | 111,0 |
| * | 233 Plan Participant Loans | Maturity Dates Range  1/31/2003-11/30/2007<br>Int Rate: 6.0% 1/1/02-12/31/02<br>Collateral:  50% of vested balance Account Balance | | | 0 | 1,490,3 |
| | Total Assets Held for<br>Investment at 12/31/2002 | | | | 39,174,389 | 101,561,0 |

8403732723
789.05.0013
04

**Name of Plan:**
Medical Information Technology, Inc. Profit Sharing Plan

**Plan sponsor's name as shown on line 2a of Form 5500**
Medical Information Technology, Inc.

**Three-digit**
**Plan Number**                                    00

**Employer ID Number**
04-2455639

Form 5500
Schedule H Line 4j

### Schedule of Reportable Transactions

| (a) Identity of Party involved | (b) Description of assets (include interest rate and maturity in case of a loan) | (c) Purchase price | (g) Cost of Asset | (h) Fair Market Value of Asset @ 12/31/02 | (I) Net Gain or (Loss) |
|---|---|---|---|---|---|
| C.W. Marble Trust | MEDITECH Common Stock Purchased 230,104 sh @ $19/sh from shareholder 3/4/02 | 4,371,976 | 4,371,976 | 5,062,288 ($22/sh) | N/A Not Sold |
| 24 Various Shareholders | MEDITECH Common Stock Purchased 331,979 sh @ $19-$22/sh from various shareholders in 2002 | 6,552,420 | 6,552,420 | 7,303,538 ($22/sh) | N/A Not Sold |

NOTE:
There were no selling/leasing rental activity for the above transactions nor were there any expenses incurred with/for these transactions.

840373 2723
189.05.0014
04

# FINANCIAL STATEMENTS AND SUPPLEMENTAL SCHEDULES

Medical Information Technology, Inc. Profit Sharing Plan

*Years ended December 31, 2001 and 2002*

8403732723
189.05.0015
04

# Medical Information Technology, Inc. Profit Sharing Plan

### Financial Statements and
### Supplemental Schedules

Years ended December 31, 2001 and 2002

# Contents

Report of Independent Auditors..................................................................................1

Financial Statements

Statements of Net Assets Available for Benefits.........................................................2
Statements of Changes in Net Assets Available for Benefits ......................................2
Notes to Financial Statements....................................................................................3


Supplemental Schedule

Schedule H, Line 4i—Schedule of Assets (Held at End of Year) .......................................8
Schedule H, Line 4j—Schedule of Reportable Transactions..............................................9

840373 2723
189.05.0017
04

## Medical Information Technology, Inc. Profit Sharing Plan

## Statements of Net Assets Available for Benefits

| | December 31 | |
| | 2001 | 2002 |
|---|---|---|
| **Assets** | | |
| Non-interest bearing cash | $     31,313 | $      4,913 |
| Investments, at fair value *(Note 3)*: | | |
|     Employer common stock | 65,535,515 | 82,570,170 |
|     U.S. Treasury notes | 16,540,117 | 17,389,516 |
|     Participant loans | 1,337,700 | 1,490,350 |
|     Interest bearing cash | 2,081,298 | 111,011 |
| Total investmens | 85,494,630 | 101,561,047 |
| | | |
| Interest receivable | 216,416 | 190,306 |
| Net assets available for benefits | $85,742,359 | $101,756,266 |

## Statements of Changes in Net Assets Available for Benefits

| | Year ended December 31 | |
| | 2001 | 2002 |
|---|---|---|
| **Additions** | | |
| Employer contributions | $   3,500,000 | $    4,100,000 |
| Net appreciation in fair value of employer common stock | 6,785,235 | 11,156,822 |
| Interest income | 1,029,737 | 841,024 |
| Dividend income on employer common stock | 4,187,256 | 4,972,237 |
| Total additions | 15,502,228 | 21,070,083 |
| | | |
| **Deductions** | | |
| Benefits distributed to participants | 5,936,355 | 5,056,176 |
| Net increase | 9,565,873 | 16,013,907 |
| | | |
| Net assets available for benefits at beginning of year | 76,176,486 | 85,742,359 |
| Net assets available for benefits at end of year | $85,742,359 | $101,756,266 |

*See accompanying notes.*

2

8403732723
189.05.0018
04

# Medical Information Technology, Inc. Profit Sharing Plan

## Notes to Financial Statements

### December 31, 2002

## 1. Description of the Plan

The following description of the Medical Information Technology, Inc. Profit Sharing Plan (Plan) provides only general information. Participants should refer to the Summary Plan Description and Plan document for a more complete description of the Plan's provisions.

The Plan is a defined contribution type of profit sharing plan covering all employees of Medical Information Technology, Inc. (the Company) who have at least one year of service. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), as amended.

### (a) Trust and Plan Administration

The Medical Information Technology, Inc. Profit Sharing Trust (the Trust) is administered by A. Neil Pappalardo (the Trustee). The Company, under the guidance of its chief financial officer, is the plan administrator.

### (b) Funding

The Plan is funded by Company contributions of either cash, Company common stock, or both. The Company's Board of Directors, at its sole discretion, determines the amount, if any, to be contributed to the Plan each year. Employee contributions are not permitted. Contributions are allocated to the accounts of active participants based on a ratio of qualifying compensation to aggregate qualifying compensation, as defined. For this purpose, qualifying compensation is capped at $100,000. Additionally, no allocation is made to the account of any participant who owns 10% or more of the outstanding common stock of the Company.

8403732723
189.05.0019
04

## Medical Information Technology, Inc. Profit Sharing Plan

## Notes to Financial Statements (continued)

### 1. Description of the Plan (continued)

### (c) Vesting

Participants' accounts vest as follows:

| Credited Years of Service | Vesting Percentage |
|---|---|
| Less than 2 | 0% |
| 2 but less than 3 | 10 |
| 3 but less than 4 | 30 |
| 4 but less than 5 | 60 |
| 5 or more | 100 |

Participants who retire at or after age 60 or who die or become disabled become fully vested in their account balances.

### (d) Participant Accounts

Each participant's account is credited with allocations of (a) the Company's contributions, (b) forfeitures, and (c) plan earnings, with allocations of the Company's contributions and forfeitures based on participant's compensation, and with allocations of the plan's net earnings based on account balances, as defined. The benefit to which a participant is entitled is the benefit that can be provided from the participant's vested account. If a terminated employee is rehired within 5 years of termination, any forfeiture will be restored to the rehired employee's account. For the years ended December 31, 2001 and 2002, the Company allocated forfeitures totaling $186,182 and $95,314, respectively, to participant accounts.

### (e) Withdrawals and Distributions

Upon termination of employment, the vested portion of the account balance of the terminee is segregated as of the preceding January 1 and is credited with interest through the end of the month prior to distribution. Members who have reached 20 years of service, or members who have incurred a financial hardship may make withdrawals in accordance with procedures established by the Trustee. Such distributions are credited with interest from the preceding January 1 through the end of the month prior to distribution.

4

8403732723
189.05.0020
04

Medical Information Technology, Inc. Profit Sharing Plan

Notes to Financial Statements (continued)

**1. Description of the Plan (continued)**

**(f) Participant Loans**

The Plan is permitted to make interest-bearing loans to participants that are equal to the lesser of $50,000 or 50% of their vested account balance. Loans must be repaid within 5 years unless used for the purchase of a primary residence, in which case the term may be extended. The loans are secured by the vested balance in the participant's account and bear a variable interest rate commensurate with local prevailing rates as determined periodically by the Trustee. Principal and interest is paid through payroll deductions.

**(g) Payment of Benefits**

On termination of service, a participant receives a lump-sum distribution of their vested account balance.

**(h) Plan Termination**

Although it is the intention of the Company to continue the Plan indefinitely, it has the right to discontinue its contributions at any time and to terminate the Plan subject to the provisions of ERISA. In the event of Plan termination, participants become 100 percent vested in their accounts. The Trustee would value the Plan's assets as of the date of termination and distribute such assets in the form of cash or part cash and part common stock of the Company to participants in proportion to the amounts standing to the credit of their accounts.

**2. Basis of Accounting**

The financial statements have been prepared on the accrual basis of accounting.

**(a) Investment Valuation and Income Recognition**

The Plan has an annual valuation date of December 31st and all investments are stated at fair value. Investments in U.S. Treasuries are valued at the last reported sales price on the last business day of the plan year. Investments in participant loans are reported as the aggregate amounts outstanding on December 31st. Investments in Company stock is valued at fair value, as determined by the Trustee, at December 31st (see Note 3).

8403732723
189.05.0021
04

## Medical Information Technology, Inc. Profit Sharing Plan

### Notes to Financial Statements (continued)

### 2. Basis of Accounting (continued)

Purchases and sales of securities are recorded on a settlement-date basis. Interest income is recorded on the accrual basis. Dividends are recorded on the date received and amounted to $0.31 and $.34 per share for each quarter of 2001 and 2002, respectively.

### (b) Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires the Trustee to make estimates that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

### (c) Administrative Expenses

All expenses incurred in the administration of the Plan are paid by the Company.

### (d) Reclassification

Certain amounts in the 2001 financial statements have been reclassified to conform with the 2002 presentation.

### 3. Investments

The value of the investment in the Company's common stock (76% and 81% of the net assets available for benefits at December 31, 2001 and 2002, respectively) has been estimated by the Trustee in the absence of a readily ascertainable market value. Because of the inherent uncertainty of valuation, the estimated value may differ significantly from the value that would have been used had a ready market for the security existed, and the difference could be material.

Investments that represent 5% or more of fair value of the Plan's net assets available for benefits are as follows:

|  | December 31 | |
|---|---|---|
|  | 2001 | 2002 |
| Company common stock | $65,535,515 | $82,570,170 |
| U.S. Treasury Note, 4.625%, due 5/15/06 | 5,677,000 | 6,048,000 |

6

8403732723
189.05.0023
04

# Supplemental Schedules



8403732723
189.05.0024
04

## Medical Information Technology, Inc. Profit Sharing Plan

EIN: 04-2455639/Plan Number: 001

Schedule H Line 4i – Schedule of Assets (Held at End of Year)

December 31, 2002

| Identity of Issue or Borrower | Description of investment including maturity date Rate of interest, collateral, par or maturity value | | | | Cost | Current Value |
|---|---|---|---|---|---|---|
| | Maturity Date | Interest Rate % | Face Amount | | | |
| U.S. Treasury Notes | 02/15/03 | 6 1/4 | $ 500,000 | | $ 508,516 | $ 502,813 |
| | 02/15/03 | 6 1/4 | 350,000 | | 363,398 | 351,969 |
| | 02/15/03 | 6 1/4 | 1,000,000 | | 1,013,080 | 1,005,625 |
| | 08/15/03 | 5 3/4 | 1,350,000 | | 1,356,539 | 1,387,547 |
| | 08/15/03 | 5 3/4 | 350,000 | | 345,023 | 359,734 |
| | 05/15/05 | 6 1/2 | 400,000 | | 402,375 | 444,250 |
| | 08/15/05 | 6 1/2 | 625,000 | | 623,240 | 699,414 |
| | 05/15/06 | 6 7/8 | 500,000 | | 501,641 | 575,938 |
| | 05/15/06 | 4 5/8 | 3,400,000 | | 3,413,281 | 3,672,000 |
| | 05/15/06 | 4 5/8 | 2,200,000 | | 2,214,437 | 2,376,000 |
| | 11/15/07 | 3 | 2,275,000 | | 2,290,641 | 2,306,281 |
| | 11/15/08 | 4 3/4 | 1,375,000 | | 1,363,183 | 1,504,336 |
| | 02/15/11 | 5 | 1,650,000 | | 1,640,461 | 1,818,609 |
| | 08/15/11 | 5 | 350,000 | | 347,375 | 385,000 |
| | Total U.S. Treasury Notes | | 16,325,000 | | 16,383,190 | 17,389,516 |
| * Medical Information Technology, Inc. Common Stock | 3,800,547 shares Common Stock $1.00 Par Value Right of First Refusal Restrictions | | | | 22,680,188 | 82,570,170 |
| Fleet Bank | Interest-bearing savings account (1.49%) | | | | 111,011 | 111,011 |
| * 233 Plan Participant Loans | Maturity Dates Ranging 1/31/2003-11/30/2007 Interest Rate 6% Collateral: 50% of vested Account Balance | | | | - | 1,490,350 |
| | | | | | $ 39,174,389 | $ 101,561,047 |

* Indicates party-in-interest to the Plan.

8

Medical Information Technology, Inc. Profit Sharing Plan

EIN: 04-2455639/Plan Number: 001

Schedule H, Line 4j - Schedule of Reportable Transactions

Year ended December 31, 2002

840373 2723
189.05.0025
04

| Identity of Party Involved | Description of Asset | Purchase Price | Selling Price | Cost of Asset | Current Value of Asset on Transaction Date | Net Gain (Loss) |
|---|---|---|---|---|---|---|
| **Category (i)-Individual transactions in excess of 5% of Plan assets** | | | | | | |
| C.W. Marble Trust | Company Common Stock | $ 4,371,976 | | $ 4,371,976 | $ 4,371,976 | |
| **Category (iii)-Series of security transactions in excess of 5% of Plan assets** | | | | | | |
| 24 various Medical Information Technology, Inc. Shareholders | Company Common Stock | 6,552,420 | | 6,552,420 | 6,552,420 | |

There were no category (ii) or (iv) reportable
transactions for the year ended December 31, 2002.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only) __Michael Hubert v. Medical Information Technology__
__Profit Sharing Plan__

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

☒  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,        *Also complete AO 120 or AO 121
         740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.           for patent, trademark or copyright cases

☐  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
         315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
         380, 385, 450, 891.

☐  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
         690, 810, 861-865, 870, 871, 875, 900.

☐  V.    150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

        **NONE**

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                    YES ☐    NO ☒

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

                                                    YES ☐    NO ☒

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                    YES ☐    NO ☐

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                    YES ☐    NO ☒

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                    YES ☒    NO ☐

    A.   If yes, in which division do all of the non-governmental parties reside?

         Eastern Division ☒          Central Division ☐          Western Division ☐

    B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

         Eastern Division ☐          Central Division ☐          Western Division ☐

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                    YES ☐    NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME ___Michael A. Collora___

ADDRESS ___Dwyer & Collora, LLP, 600 Atlantic Ave., Boston, MA 02210___

TELEPHONE NO. ___617-371-1000___

(Coversheetlocal.wpd - 10/17/02)

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Michael Hubert, individually and on behalf of all persons similarly situated

**DEFENDANTS** Medical Information Technology Profit Sharing Plan, A. Neil Pappalardo, Lawrence A. Palimino, Roland L2 Driscoll,*

**(b)** County of Residence of First Listed Plaintiff    Norfolk
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Norfolk
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)    Michael A. Collora, 600 Atlantic Ave., Bostn, MA 02210
617-371-1000

Attorneys (If Known)    *Edward B. Roberts, Morton E. Ruderman and L.P. DAn Vicente attorneys unknown

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☒ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 U.S.C. 1132
Brief description of cause:
Failure to Pay Benefits

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**    NONE
(See instructions):
JUDGE
DOCKET NUMBER

DATE    2-10-05
SIGNATURE OF ATTORNEY OF RECORD    Michael A Collora

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE