## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually and On Behalf Of All Persons Similarly Situated | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., A. NEIL PAPPALARDO, LAWRENCE A. POLIMENO, ROLAND L. DRISCOLL, EDWARD B. ROBERTS, MORTON E. RUDERMAN, AND L.P. DAN VALENTE, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Civil Case No. 05-10269-RWZ

_____

### INTRODUCTION

This is an action brought against the Medical Information Profit Sharing Plan, an ERISA plan, and its fiduciaries, based on the defendants' failure to pay benefits due to Plan participants from at least January 1, 1998 to the present, upon the participants' termination of their employment, due to a deliberate and/or reckless under-pricing of the Plan's primary asset -- shares of MEDITECH stock. As a result, participants have not received their full benefits, in violation of law, as set forth below.

### PARTIES

1.     Plaintiff Michael P. Hubert is a resident of Quincy, Massachusetts. At all relevant times, Hubert was a participant in the Medical Information Technology, Inc.

Profit Sharing Plan ("the Plan") up and through July 2004.  As a wholly vested participant, Hubert was entitled to all of the benefits due him under the terms of the Plan.

      2.      Plaintiff William Trainor is a resident of Wrentham, Massachusetts.  At all relevant times, Trainor was a participant in the Plan up and through March 1998.  As a wholly vested participant, Trainor was entitled to all of the benefits due him under the terms of the Plan.

      3.      Plaintiff David Hinchliffe is a resident of Boston, Massachusetts.  At all relevant times, Hinchliffe was a participant in the Plan up and through January 1998.  As a wholly vested participant, Hinchliffe was entitled to all of the benefits due him under the terms of the Plan.

      4.      Defendant Medical Information Technology, Inc. ("MEDITECH" or "the Company") is a Massachusetts corporation with its corporate offices in Westwood, Massachusetts, and other Massachusetts locations.  MEDITECH is a named fiduciary of the Medical Information Profit Sharing Plan.

      5.      Defendant Medical Information Profit Sharing Plan ("the Plan") is a Massachusetts business trust which is sponsored by defendant MEDITECH. The Plan was at all relevant times governed by the Employee Retirement Income Security Act ("ERISA") Title 29 U.S.C. 1001, et. seq.

      6.      Defendant A. Neil Pappalardo is a resident of Boston, Massachusetts.  Pappalardo is a founder, chairman of the Board of Directors, and chief executive officer of MEDITECH.  As the sole Trustee of the Plan, Pappalardo is both a named fiduciary and a functional fiduciary for purposes of this lawsuit.

7.      Defendants Lawrence A. Polimeno, Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman and L.P. Dan Valente were at all relevant times directors of MEDITECH (collectively, the "Director Defendants").  As detailed below, the Director Defendants functioned as fiduciaries for purposes of carrying out defendant MEDITECH's obligations to administer the Plan, including but not limited to monitoring the Trustee, valuing the company stock, and approving the allocation and/or distribution of the Plan's assets to Plan participants.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the claims asserted herein under 29 U.S.C. Section 1132(e).

9.      Venue is proper in this district under 29 U.S.C. 1132(e)(2), as the Plan is administered here and the breaches of fiduciary duties occurred here.  Further, all of the defendants reside or do business in this district.

## RELEVANT BACKGROUND

The Plan

10.      Sometime in the 1970's, MEDITECH, acting through its Board of Directors, created a profit sharing plan with the plan's assets to be placed in a trust ("the Plan").  Pursuant to the terms of the Plan, MEDITECH agreed to contribute stock and/or cash to the Plan for the benefit of MEDITECH's employees.  As an employee pension benefit plan designed to provide retirement income for MEDITECH's employees, the Plan is governed by ERISA , 29 U.S.C. 1001, et. seq., and the Internal Revenue Code, 26 U.S.C. 401, et. seq.  A copy of the 1980's version of the Plan is attached as Ex. A.

11.    The Plan is required to file an informational federal tax return on Form 5500. Copies of MEDITECH's Form 5500 for 2002 and 2003 are attached as Ex. B.

12.    The Director Defendants are responsible for deciding the amount of the annual company contributions to the Plan, as well as deciding whether the company will make its annual contribution in cash, stock, or a combination of cash and stock.

13.    The Company can deduct the amount of the contribution from its taxes, irrespective of whether the contribution is made in cash, stock, or a combination of cash and stock.

14.    On information and belief, one of the reasons the Director Defendants contribute to the Plan in the form of stock is to minimize the cost to the Company of maintaining the Plan. Unlike cash contributions (which must be paid at the time of contribution), the Company need not pay the value of the stock unless and until the Plan needs to liquidate the stock in order to pay distributions to departing participants. Thus, for purposes of contributions, the only "cost" of contributing stock is the potential dilution of the control value of the stock owned by other shareholders.

15.    For six of the last seven years, MEDITECH has contributed exactly 80,000 shares of common stock to the Plan each year. In 2001, MEDITECH contributed 75,000 shares – only 5,000 shares less than the customary contribution.

16.    A substantial portion (about 85%) of the Plan's total assets consists of MEDITECH common stock.

17.    At all relevant times, the Director Defendants had a fiduciary obligation to ensure that Pappalardo was fulfilling his obligations as the Plan's sole Trustee. As a part

4

of this obligation, the Director Defendants were required to review and approve all transactions made with Plan assets.

18.     Defendant Pappalardo is responsible for valuing the fair market value of the Plan's assets on an annual basis, allocating the Plan's assets to the Plan participants' individual accounts, and determining the amounts due to Plan participants upon distribution.

19.     In addition, Pappalardo is required to submit a written account to the Director Defendants every year, detailing every transaction made with the Plan's assets.

20.     According to the Plan, at the time of retirement, or upon termination of employment, a participant's vested interest must be valued by Pappalardo as of the end of the preceding calendar year and the participant is entitled to receive a cash payment equivalent to his/her vested interest in the Plan, plus interest.

21.     In fact, according to company documents, Pappalardo and the Director Defendants act together in setting the price of MEDITECH stock on an annual basis, knowing and intending that that price be used for purposes of determining MEDITECH's annual contribution to the Plan, and also for purposes of valuing a participant's interest in the Plan.

The Participants

22.     All MEDITECH employees become Plan participants on the first day of January after they complete one year of employment with the Company, unless they elect not to participate.

23.     MEDITECH employees are not permitted to contribute any money to the Plan.  Rather, benefits under the Plan are considered deferred compensation.

24.    Under the terms of the Plan, each participant is assigned an individual account, into which the Trustee allocates that participant's proportional share of the Company's annual contribution.

25.    An employee's interest becomes fully vested after five years of participation in the Plan.

26.    When a vested participant retires or terminates employment with MEDITECH, the participant does not, and is not asked to, file any claim for benefits from the Plan.  In fact, there are no regulations regarding how to file such a claim.  Instead, on or around the time of separation of employment, the participant receives a letter purporting to represent his or her proportional interest in the Plan's assets and a benefits election form, permitting them to elect the manner in which their interest will be distributed to them.

27.    Participants are not advised as to how their interest is calculated, nor are participants advised of any administrative right to contest the valuation of their interest.

28.    Plaintiffs Michael Hubert, William Trainor, and David Hinchliffe each received the distribution of their purported interest in the Plan at or around the time they terminated their employment with MEDITECH without submitting any claim for benefits.  None of the named plaintiffs received information describing how their interest was calculated, nor did they receive notice of how to appeal the calculation.  In addition, none of the named plaintiffs has ever received a copy of the Medical Information Technology Inc. Profit Sharing Plan, Amended and Restated Trust Agreement (As of January 1, 1998).

29.     On information and belief, all members of the putative class had the same or a similar experience when receiving their distributions.

30.     The Plan's administrative procedures for contesting a denied benefit, if any exist at all, are a nullity.   Indeed, the Plan Administrator ignored and did not even respond to Plaintiff Hubert's September 2004 letter questioning the valuation of his benefits.

31.     Since at least January 1, 1998, the defendants have not paid retiring or terminating participants the fair value of their interest in the Plan.  Instead, the defendants have undervalued participants' interest in the Plan due to their undervaluing of MEDITECH stock, the primary asset in the Plan.

32.     Further, contrary to ERISA, those whose interests in the Plan exceed $1,000,000 are forced to roll out the "excess" to an IRA or to withdraw their "excess" interest entirely.  These individuals' interests were also undervalued at the time of rollout in violation of ERISA.

## DESCRIPTION OF THE CLASS

33.     Upon information and belief, since January 1, 1998, there are a substantial number of participants who have been harmed by not receiving the fair value of their benefits from the Plan at the time of their termination of employment due to the defendants' deliberate and/or reckless undervaluation of MEDITECH common stock.

34.     The company has had over 2000 employees in the last several years. According to Pappalardo, turnover of employees is about 15% annually.

35.     Upon information and belief, a substantial portion of these departing employees were fully vested yet were not paid the fair value of their interest in the Plan. Thus, upon information and belief, the class consists of several hundred individuals.

36.     Substantial monies are involved.  Participants who have cashed out their interests in the Plan since 1998 have received over $45 million.

37.     Plaintiff Michael Hubert is a member of the class.  Hubert has been a participant in the Plan since the 1980s, and was entitled to his fully vested beneficial share of the Plan upon the termination of his employment in July 2004.  Hubert's proportionate share of the Plan was undervalued by the defendants.  As a result, Hubert did not receive the fair value of his vested benefits in the Plan.

38.     Plaintiff William Trainor is a member of the class.  Trainor has been a participant in the Plan since the 1970s, and was entitled to his fully vested beneficial share of the Plan upon termination of his employment in March 1998.  Trainor's proportionate share of the Plan was undervalued by the defendants.  As a result, Trainor did not receive the fair value of his vested benefits in the Plan.

39.     Plaintiff David Hinchliffe is also a member of the class.  Hinchliffe has been a participant in the Plan since the 1970s, and was entitled to his fully vested beneficial share of the Plan upon termination of his employment in January 1998.  Hinchliffe's proportionate share of the Plan was undervalued by the defendants.  As a result, Hinchliffe did not receive the fair value of his vested benefits in the Plan.

40.     Class certification is proper in that: (a) joinder of all claims is impracticable because there are numerous employees who were not paid fair value of their vested benefits in the Plan; (b) the named plaintiffs' claims are typical of those of

the putative class; (c) there are common questions of law and fact that predominate, namely, whether the defendants fairly valued the benefits due to members of the putative class; and (d) the named plaintiffs will fairly and adequately represent the interests of the members of the putative class.

41.     A class action is superior to other available litigation methods for the fair and efficient adjudication of this controversy.  In the absence of a class action, many participants harmed by the Plan's conduct will not be compensated for their injuries because it is too expensive to prosecute litigation individually.  Even if individual class members could afford to prosecute this litigation alone, the Court could be inundated with hundreds of lawsuits involving identical issues.  Individual litigation magnifies the delay and expense to all parties and to the court system of resolving the controversy.  By contrast, a class action presents fewer case management problems and provides the benefits of unitary adjudication, economies of scale and comprehensive supervision by a single court.

42.     The named plaintiffs requests that this court certify the following class:

> "All participants in the MEDITECH Profit Sharing Plan who have received any distribution since January 1, 1998 and who did not receive the fair value of their benefits."

### MEDITECH's BUSINESSES

43.     MEDITECH is a successful and profitable creator and licensor of medical information software to hospitals and similar types of health related businesses.  In addition, MEDITECH owns five pieces of developed real estate in Massachusetts which are shown on the company's balance sheet at cost when in fact the real estate is far more

valuable than cost.  In fact, MEDITECH rents approximately 40% of the real estate it owns to commercial tenants and holds about 20 acres available for future development.

44.    MEDITECH has substantial excess cash and marketable securities not needed for the business that adds to the company's value.  This excess figure is estimated at over $170,000,000 as of December 31, 2003, or about $5 per share.

45.    As shown in the table below, MEDITECH is a conservatively run company that has produced net profits over the last seven years as follows:

| YEAR | REVENUES | NET PROFIT (After taxes) |
|------|----------|--------------------------|
| 1998 | $203 million | $53.3 million |
| 1999 | $225 million | $60 million |
| 2000 | $217 million | $55 million |
| 2001 | $223 million | $56 million |
| 2002 | $256 million | $64 million |
| 2003 | $270 million | $67 million |
| 2004 | $280 million | $71.5 million |

46.    As shown in the table below, MEDITECH has declared a dividend in each of those years of over 6% on its set market price.

| YEAR | STOCK PRICE | DIVIDEND (post May, 2001 split) |
|------|-------------|----------------------------------|
| 1998 | $14.50 | $.94 |
| 1999 | $16.00 | $1.00 |
| 2000 | $17.00 | $1.16 |
| 2001 | $19.00 | $1.24 |
| 2002 | $22.00 | $1.36 |
| 2003 | $26.00 | $1.56 |
| 2004 | $29.00 | $1.80 |

## PROCESS OF VALUATION

47.    According to information distributed by MEDITECH, the Board of Directors set the MEDITECH share price at the end of each year, in anticipation of a stock contribution in late December or early January.

48.     Upon information and belief, Defendant Pappalardo sets the price and that price is rubberstamped by the other defendants.  Despite having a fiduciary duty to the participants in the Plan, none of the Director Defendants conduct a separate inquiry as to the fair value of Meditech stock, and simply acquiesce in the price set by defendant Pappalardo.

49.     For at least eight years, the defendants have knowingly valued MEDITECH stock at less than fair market value.

50.     On information and belief, in or around 2002, one of the members of the Board of Directors began asking the other members of the Board, including the Director Defendants and defendant Pappalardo, whether the Board was violating its fiduciary duties by relying on an outdated methodology that did not accurately reflect the value of the stock.

51.     In 2002, this Board member publicly questioned whether the stock values were being set at an "artificially low price" and whether the Board ought not hire an independent appraiser to verify the stock's value rather than "relying on an outdated valuation methodology that does not properly reflect the Issuer's current fair value."

52.     That Board member was subsequently removed from the Board.  A copy of an Amended Complaint, which was filed by the ousted Board member against the defendants in May 2003, is attached at Ex. C.

53.     In the relevant time period, no outside independent appraiser has been used to value MEDITECH's stock either at the time of contribution or at the time of distribution.

54.     MEDITECH has repeatedly acknowledged in documents filed with the federal government that the Plan's assets are not valued by an independent third party. For example, in 2003, MEDITECH reported that the Plan's assets included employer securities worth $101,297,482.  In that same filing, MEDITECH reported that $101,297,482 of the Plan's assets had a value that was neither readily ascertainable nor set by an independent third party appraiser.

55.     On one occasion in 2002, Pappalardo described his valuation formula, components of which are not standard in the business appraisal area.  Pappalardo's formula, posted on the Company intranet in September 2002, had as one of its components, *inter alia,* a formula of eleven times net income.  Such a formula did not fairly price MEDITECH's securities.  In the class years, the common stock of several competitors including its principal competitor  Cerner Corp. have sold at much higher multiples of income, despite not being as profitable as MEDITECH, nor paying a dividend like MEDITECH.

56.     MEDITECH's founders and controlling shareholders, including at least some of the individual defendants, have been buyers of the common stock and have thus benefited from the undervalued stock by purchasing shares of MEDITECH at bargain prices compared to shares of stock sold on the open market by comparable competitors

57.     For example, Pappalardo bought 50,000 shares of MEDITECH stock in February 2003 at $22 per share, 25,000 shares at $26 per share in March 2004, and 25,000 shares at $29 per share in February 2005.

58.     Upon information and belief, one of the reasons that the defendants knowingly undervalue the stock is to ensure that stock prices remain low enough for

insiders such as defendant Pappalardo to purchase large amounts of company stock and thereby retain tight control of the Company.

59.     ERISA requires that the assets in the Plan be fairly valued.

60.     Under Department of Labor proposed regulation §2510.3-18 entitled Adequate Consideration, in valuing the assets of a plan, a fiduciary does not act in good faith unless he is independent of all parties to the transaction or relies on the report of an independent appraiser.  Pappalardo is not independent, nor has he or the director defendants relied upon an independent appraiser.

61.     Under the Internal Revenue Code, if a plan seeks to qualify under 26 U.S.C. 401(a) as a stock bonus plan, thus permitting it to deduct from company income all contributions made to the plan as well as dividends paid upon its securities, the plan must meet the requirements of Section 409(h) which gives a put to the participant to require that the plan repurchase employees' securities under a fair valuation formula.

62.     Fair valuation at the time of payment of benefits means that in determining the value of a participant's stock interest in the plan, the fiduciaries should arrive at the value of the company as a whole and then divide that value by the shareholder's ratable portion of the company, without lack of liquidity or minority discounts.  An accepted valuation procedure is to compare the stock price of publicly held companies similar to that of MEDITECH and arrive at a per share value.  In addition, cash and real estate not needed in the business should be added to that value.

63.     Defendants have not fairly valued the MEDITECH stock in the Plan.  This can be demonstrated by comparison to publicly traded companies in the same industry

which are not as profitable and which do not pay a dividend, but whose stock trades at much higher multiples of earnings to that of MEDITECH.

### **1998 VALUES**

64.     In or about late December 1998, Pappalardo, acting together with the other individual defendants, valued the common stock of MEDITECH for purposes of contributions by the company of its stock at $14.50 per share (post May 2001 split). Such value would be used for redemption purposes by the Plan Administrator in the following calendar year.

65.     This estimate valued the company at $471,715,000.

66.     As of December 31, 1998, MEDITECH made a contribution to the Plan of

> $2,340,000 Cash
> $1,100,000  Stock ($14.50/share post split)
>
> $3,500,000 TOTAL

67.     MEDITECH paid a dividend per share of 94 cents in 1998 and $1.00 in 1999 (post split).  It had earnings per share of $1.64 per share in 1998 and $1.83 in 1999.

68.     MEDITECH had little or no debt in this time period.

69.     In truth and fact, the Plan Trustee and other defendants undervalued the shares of MEDITECH in the Plan so that participants who terminate employment in 1998 and 1999 would not receive the fair value of their assets in the Plan.  In part this was done because if employees were paid a fair price for their assets in the Plan, the Plan would have soon run out of cash.  This would require the company to donate more cash to the Plan or buy shares from the Plan.

70.    In 1998 and 1999, the company's stock price to earnings ratio ("PE") was only 8.8.  Comparable publicly owned companies such as Cerner, which had substantial debt and paid no dividend, had P/E ratios of over forty (40) in this time period and were highly valued.  A similar ratio would have resulted in a value for MEDITECH stock equal to $75/share, not $14.50 or $16.

### 1999 Valuation

71.    In or about December 1999, the defendants valued the common stock of MEDITECH for purposes of contribution by the company of the stock at $16.00 per share (post May 2001 split).  Such value would be used for redemption purposes in the following year by the plan administrator.

72.    As of December 31, 1999, MEDITECH made a contribution to the Plan of

$2,720,000 in cash and
$1,280,000 in shares (80,000 shares at $16 post split)

$4,000,000 Total

73.    Upon information and belief, defendants also used that figure in arriving at the amount to be distributed as a cash benefit to retiring and/or terminating employees at that value.

74.    This estimate valued the company at only $526,624.000.

75.    MEDITECH had a profit of $59,000,000 in 1999, or $1.83 per share (post May, 2001 split) and paid a dividend of $1/ share in 1999 (post split).

76.    The shares of MEDITECH stock held in the Plan post 1999 were substantially undervalued.  Cerner, its major publicly traded competitor, actually lost money in 1999, yet its shares traded as high as $29 and ended at $19.70 on December 31,

1999.  Its market value as of December 31, 1999 was over $772,000,000.  Cerner paid no

dividend and had substantial debt, and cash earned from its operations was only $27

million compared to MEDITECH'S $91 million.  In fact, MEDITECH earned $1.83 per

share while Cerner lost 20 cents per share.  In all respects MEDITECH was the more

valuable company and deserved a much higher fair value than $16.

**2000 Valuation**

77.    At the end of December 2000 the defendants valued the stock of

MEDITECH at $17 per share (post split) for purposes of the next year's valuation by the

Plan, as well as for contributions to the Plan.  Using this figure, MEDITECH was valued

at about $565,000,000

78.    In December, 2000, MEDITECH made a contribution to the Plan of:

| | |
|---|---|
| 80,000 shares ($17 per share) | $1,360,000 |
| Cash | $2,140,000 |
| Total | $3,500,000 |

79.    In 2000, MEDITECH earned $1.66 per share and the price to earnings per

share ratio was approximately ten(10)

80.    In 2000, the stock paid a dividend of $1.16, about 6% of its share price.

81.    The shares were undervalued as of this time.  For example, in 2000 a

competitor, Cerner, had its shares listed on the NASDQ national stock exchange at a

price/earning multiple of 15.  As of December 31, 2000, its stock ended at $46.25 with

earnings of $3/share.  Yet, Cerner did not pay a dividend.  If MEDITECH's common

stock had been fairly valued at a P/E of 15, it would be worth $25.50/share, not $17.00,

and the company would be valued at $831,375,000, not $565,000,000.  By comparison

16

MEDITECH was better managed, paid a dividend, had no debt, was generally more profitable, and had a substantial cash reserve. In all respects it was a more valuable company than Cerner.

82.    As a result, participants who retired or terminated employment at MEDITECH after December, 2000, did not receive all of their benefits from the Plan due to the undervaluation of MEDITECH'S shares.

## 2001 Valuation

83.    At the end of December 2001, for transfer purposes and for purposes of a fair valuation of the Plan's interest in MEDITECH stock, the defendants valued MEDITECH'S stock at $19.00 (post split) with 33,797,439 shares outstanding, thus, the company's overall value was $642,000,000.

84.    The defendants knew or should have known that MEDITECH actually had a much higher value in the marketplace. For example, on information and belief, in or around 2001, MEDITECH received several offers to purchase the company, including at least one offer to purchase the company for $2 billion dollars.

85.    MEDITECH made a contribution to the Plan at the end of 2001 as follows:

|  |  |
|---|---|
| 75,000 shares ($19 per share) | $1,425,000 |
| Cash | $2,075,000 |
| Total | $3,500,000 |

86.    In 2001, MEDITECH had a profit of $56 million and paid a dividend of $1.24 per share (post split). The price to earnings ratio was only 11.2.

87.    Its major competitor, Cerner, by comparison, at December 31, 2001, had a negative P/E since it lost $42 million in 2001, yet its stock was valued at $50.00 per

share with about the same number of shares.  It also did not pay a dividend and had substantial debt.

88.    In 2001, the MEDITECH shares in the Plan were undervalued.  Persons in the class who retired or terminated employment in 2002 received only $19 per share for their stock interest in the Plan (plus their percentage of the cash).  Had MEDITECH shares been fairly valued equivalent to Cerner in 2001, its stock would have been worth far more than $19 attributed to it by the defendants.

89.    Thus, participants terminating employment in 2002 did not receive all of the benefits to which they were entitled.

## 2002 Valuation

90.    In December 2002, for transfer purposes and for purposes of a fair valuation of the Plan's interest in MEDITECH stock in 2003, the defendants valued the shares of MEDITECH at $22.00 per share, giving it a market value of $745,303,000.

91.    In 2002, MEDITECH made a contribution to the Plan as follows:

|  |  |
|---|---|
| 80,000 shares ($22 per share) | $1,760,000 |
| Cash | $2,240,000 |
| Total | $4,000,000 |

92.    In 2002 the Company had earned $64,000,000 or $1.89 per share, and paid a dividend of $1.36 or over 6% of its declared stock price.  Its price to earnings ratio was only 11.6.  MEDITECH contributed 80,000 shares to the Plan at the end of 2002, together with cash of $1,340,000.

93.    The MEDITECH shares in the Plan were not fairly valued in 2003.  Members of the putative class who had their interest in the Plan liquidated in 2003 did not receive all of the benefits to which they were entitled.

94.     In 2002, Cerner, for example, made only $48 million on greater revenue, or $1.36 per share. Cerner paid no dividend. Yet, its stock price was $29.50 as of December 31, 2002 and it had a P/E of 21.7.

95.     If MEDITECH, a more profitable company, which paid a dividend, had no debt and had substantial extra cash, had a P/E ratio of over 21, like Cerner, its stock value would have been a minimum of $41 not $22, and the company would have a fair value of almost $1.4 billion.

## 2003 Valuation

96.     In December 2003 for transfer purposes and purposes of a fair valuation of the Plan's interest in MEDITECH in 2004, the defendants valued the shares of MEDITECH at $26 or the Company value at $889,754,000.

97.     MEDITECH contributed its usual 80,000 shares to the Plan at year-end, along with cash of just over $2 million.

98.     It had a net profit of $67.4 million, or $1.98/share and paid a dividend of $1.56, approximately 6% of its share price. Its P/E ratio was 13.3.

99.     In 2003, the MEDITECH shares in the Plan were not fairly valued .

100.     MEDITECH's 2003 Form 10K listed some of its competitors as Cerner Corp., IDX Systems, and Eclipsys. Cerner, for example, had greater revenues at $839,587,000, compared to MEDITECH'S revenue of $270 million, but it only had a profit of $42,791,000 and a P/E ratio as of December 31, 2003 of 28.

101.     These and related competitors had a P/E ratio set by the national stock markets at about 35. On that basis, the stock of MEDITECH would be fairly valued at $69.00 not $26.00. In addition, upon information and belief, in 2003, MEDITECH also

had about $5/share in marketable securities not needed for its business, which could be added to its share price, plus excess real estate. Thus, MEDITECH shares should have been fairly valued at over $74.00 in 2004, not $26.00.

102.    As a consequence, members of the class who had their interest in the Plan liquidated in 2004 did not receive the fair value of the benefits to which they were entitled.

103.    MEDITECH has continued to be quite profitable in 2004. It had record revenues, net profit and earnings per share in 2004. Its shares were undervalued in 2004 at $26 per share.

## COUNT I

### Failure to Pay Benefits Due Under the Plan in Violation of ERISA
### (Against Defendants MEDITECH, Pappalardo, and the Plan)

104.    Plaintiffs incorporate by reference the allegations in all previous paragraphs as if set forth in full herein.

105.    By failing to fairly value the benefits due each employee participating in the Plan upon his or her termination, defendant Pappalardo, individually, the Company as administrator, and the Plan violated their duties to the participants of the Plan.

106.    Plaintiffs and members of the class are due benefits from the Plan.

107.    Pursuant to ERISA, § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), plaintiffs bring this action to recover benefits due them and the Class from the Plan and from all those who participated in the failure to properly pay Class members the fair value of their Plan benefits.

## COUNT II

**Breach of Fiduciary Duty in Violation of ERISA**
**(Against the Individual Defendants)**

108.    Plaintiffs incorporate by reference the allegations in all previous paragraphs as if set forth in full herein.

109.    Section 404 of ERISA, Title U.S.C. § 1104, imposes fiduciary duties upon those defendants who were Plan fiduciaries.

110.    Due to the actions they took or failed to take relative to the Plan, the Trustee -- defendant Pappalardo – and all other individual defendants, each of whom assisted him in not fairly valuing the assets in the Plan and/or failed to adequately monitor or remove defendant Pappalardo from his role as sole Trustee -- have breached their fiduciary duties to the plaintiffs and all others in the class who have been harmed as a consequence.

111.    The individual defendants are liable as fiduciaries and/or co-fiduciaries to make whole the named plaintiffs and all members of the class as a remedy for the harm they caused by undervaluing the Plan's assets.

112.    The individual defendants are also liable as fiduciaries and/or co-fiduciaries for any unjust enrichment they have received as a result of their failure to properly value the Plan's assets.

113.    Furthermore, due to the individual defendants' continuous violation of their fiduciary duties to the Plan since at least 1998, an injunction should issue ordering an outside appraisal of the assets of the Plan, at the cost to these defendants, to be done on a yearly basis going forward, for purposes of determining the value of the Plan assets.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs pray for the following relief:

(a)    certification of this case as a class action;

(b)    judgment against the Plan, the Company, and defendant Pappalardo for the benefits due the class;

(c)    removal of A. Neil Pappalardo as the Plan Trustee;

(d)    a permanent injunction ordering the Plan fiduciaries to consult an outside appraiser in valuing the assets of the Plan;

(e)    judgment against the individual fiduciaries for any losses to the class members or unjust enrichment of the Plan fiduciaries due to their breaches of fiduciary duty;

(f)    pre- and post-judgment interest;

(g)    reasonable attorneys' fees and costs pursuant to the common benefit doctrine, or, alternatively, ERISA § 502(g), 29 U.S.C. § 1332(g); and

(h)    any other relief this Court deems just, proper and equitable.

Respectfully submitted,
**Michael P. Hubert,**
**William Trainor, and**
**David Hinchliffe,**
By their attorneys,


_____/s/ Sara Noonan_____
Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Sara Noonan (BBO #645293)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA  02210
671-371-1000
671-371-1037

May 23, 2005

**Plaintiffs request a jury trial on all issues so triable.**


**Certificate of Service**

I, Sara E. Noonan, hereby certify that I have, on this 23rd day of May, 2005, caused the above document to be served electronically upon all counsel of record.


_____/s/_____
Sara E. Noonan

Summary Plan Description
of the
Medical Information Technology, Inc.
Profit Sharing Plan

As amended through August 1, 1983

## TABLE OF CONTENTS

Page

I.     INTRODUCTION                                                    1

II.    GENERAL INFORMATION                                            2

III.   PARTICIPATION IN THE PLAN                                      3

IV.    CONTRIBUTIONS TO THE PLAN                                      4

       1.  Source of Contribution                                    4
       2.  Allocation of Contributions                               4
       3.  Allocation of Forfeitures                                 4
       4.  Allocation of Trust Gains and Losses                      4
       5.  Amendment and Termination                                 5

V.     BENEFITS PROVIDED UNDER THE PLAN                              6

       1.  Retirement                                                6
       2.  Disability                                                6
       3.  Death                                                     6
       4.  Termination of Employment                                 6
       5.  Manner of Benefits Payment                                7
       6.  Time of Benefits Payment                                  7
       7.  Benefits Not Insured                                      7
       8.  Loans to Members                                          7

VI.    CLAIMS PROCEDURE                                              8

VII.   YOUR RIGHTS UNDER ERISA                                       9

# I.  INTRODUCTION

The Medical Information Technology, Inc. Profit Sharing Plan (which will be referred to as the "Plan") is designed to help provide future financial security for you and your family by allowing you to share in the profits of Medical Information Technology, Inc. (the "Company").

This booklet has been prepared to explain and summarize the major provisions of the Plan, as amended effective August 1, 1983.  Please take the time to read the booklet so that you will thoroughly understand the benefits provided by the Plan.  The booklet functions as a summary plan description for your information, but all rights of employees and others under the Plan are governed in all respects by the detailed terms of the Plan and Trust Agreement.

## II.  GENERAL INFORMATION

1. Employer.  The Employer is Medical Information Technology, Inc., located at 255 Bent Street, Cambridge, Massachusetts 02138. Its Employer Identification Number is 04-2455639.

2. Plan.  The Plan is the Medical Information Technology, Inc. Profit Sharing Plan.  The Plan Number is 001, and the Plan is a profit sharing plan administered by a Trustee.  The Plan Year ends on December 31.

3. Plan Administrator.  The Plan Administrator is Medical Information Technology, Inc., located at 255 Bent Street, Cambridge, Massachusetts 02138.  The telephone number is (617) 354-3000.

4. Agent for Service of Legal Process.  The President of Medical Information Technology, Inc. shall serve as the Plan's agent for service of legal process.  Service of legal process may also be made upon the Plan Administrator or the Trustee.

5. Trustee.  The current Trustee is Mr. A. Neil Pappalardo, President, who may be contacted at Medical Information Technology, Inc., 255 Bent Street, Cambridge, Massachusetts 02138 (telephone: 617-354-3000).

## III.  PARTICIPATION IN THE PLAN

1.  <u>Eligibility</u>.  You are eligible to participate in the Plan on the first day of the month after you complete one year of Service with the Company.  One year of Service is a period of twelve (12) consecutive months of employment with the Company.

2.  <u>Duration of Membership</u>.  Once you become a Member you will continue to be a Member as long as you are employed by the Company.  A former Member who is reemployed by the Company will become a Member immediately upon reemployment.

3.  <u>Election Not to Participate</u>.  A Member may elect not to participate in the Plan during any Plan Year.  You must notify the Trustee in writing, before the first day of the new Plan Year, that you do not wish to participate.  You will then be excluded from the allocation of Company contributions and forfeitures.  Your account will remain in the Trust, however, and will share in the income, expense, appreciation, and depreciation of the Trust.

## IV.  CONTRIBUTIONS TO THE PLAN

1. Source of Contributions.  For each Plan Year, the Board of Directors determines and votes the amount, if any, that the Company will contribute to the Trust.  The contribution is made from the net income of the Company for that year, or from the earnings and profits accumulated by the Company prior to that Plan Year. Contributions by Members are not permitted.  The Company's contribution to the Trust will be paid in cash and/or in the number of shares of the Company's common stock whose fair market value on the date of contribution is equal to the contribution amount. Company contributions are held and accumulated in the Trust.

2. Allocation of Contributions.  The Company's contribution, if any, for each year is allocated to the individual accounts of all Members who were Employees of the Company on December 31 of that Plan Year.  Also, any Employees who retired, became disabled, or died during that Plan Year also have the Company contribution allocated to their account.

   The Company contribution is credited to your account in proportion to your compensation for that Plan Year, as compared to the total compensation of all Members sharing in the Company contribution for that year.  Compensation includes salaries, wages, bonuses, overtime, and commissions, but excludes any contributions or benefits you receive under the Plan as well as any amounts paid to you prior to the date you became a Member under the Plan.  If you own 10% or more of the outstanding Common Stock of the Company on December 31 of that Plan Year, however, you will not have any portion of the Company contribution allocated to your account.

3. Allocation of Forfeitures.  Forfeitures from the accounts of Members who are not fully vested ("vesting" is explained on p. 6) when they leave the Company are relocated on the same basis as explained above in Section IV(2).

4. Allocation of Trust Gains and Losses.  The Trustee is specifically authorized to invest all or any portion of the Trust assets in shares of the Company's common stock, and the Company intends that a substantial portion of the assets of the Trust be invested in its common stock.  One of the major purposes of the Plan is to give each Member a stake in the success of the Company.  Because a substantial portion of the Plan's assets are invested in the Company's common stock, the value of your benefit under the Plan is significantly dependent on the value of that stock.

   The assets and liabilities of the Trust will be evaluated as of December 31st of each Plan Year.  Any increases in the value of the Trust will be credited to your individual account in proportion to the relative size of your existing account balance. Any decrease in the value of the Trust will be charged to your account on the same basis.

-4-

5.  <u>Amendment and Termination</u>.  The Company expects to continue the Plan
     on a permanent basis, but it necessarily reserves the right to
     terminate the Plan, or completely discontinue contributions under
     the Plan, at any time.  The Company also reserves the right to
     amend the Plan at any time.  The Plan may not be amended or
     terminated in such a way as to divert the Trust assets to the
     benefit of anyone except employees or their beneficiaries, or to
     reduce any amount previously credited to the account of an employee.

## V.  BENEFITS PROVIDED UNDER THE PLAN

1. Retirement.  If you retire at or after age 60, you will receive the entire amount credited to your account.

2. Disability.  If you are unable to continue working for the Company because of sickness or disability, you will receive the entire amount credited to your account.  The Trustee determines, on the basis of medical evidence, whether you are disabled for purposes of the Plan.

3. Death.  Upon your death, the Trustee will distribute the entire amount credited to your account to your designated Beneficiary or Beneficiaries.  You must notify the Trustee in writing of your choice of Beneficiary, and you may change your designation from time to time.  If your Beneficiary dies before receiving the entire amount payable from your account, the undistributed balance will go to your Beneficiary's estate.  If you have not designated a Beneficiary, the entire amount credited to your account will be paid to the executor of your estate.

4. Termination of Employment.  If you leave the Company for any reason other than (1) - (3) listed above, you will be entitled to a severance benefit if you have at least 2 years of service with the Company.  If you have a period of Service with the Company of at least five (5) years, you will be entitled to the full amount credited to your account.  If you have a period of Service with the Company of less than fice (5) years, when you leave the Company you will be entitled to receive the vested portion of your account.  The vested portion of your account is equal to a percentage of the amount standing to the credit of your account, based on your period of Service, as follows:

| Years of Service | | Vested Percentage |
|---|---|---|
| At Least | But Less Than | |
| | 2 | None |
| 2 | 3 | 10% |
| 3 | 4 | 30% |
| 4 | 5 | 60% |

If you do not return as an employee of the Company within twelve months  the remainder of your account is then forfeited, and allocated as explained in Section IV(3).

5. <u>Manner of Benefits Payment</u>.  Whenever your account is to be distributed, as explained in (1) - (4) above, the Trustee shall make the payments in one of the following ways:

    a.   One lump sum payment in cash and/or shares of the Company's common stock.

    b.   Installments of cash and/or shares of the Company's common stock, to be paid out over a period not exceeding fifteen (15) years.

6. <u>Time of Benefits Payment</u>.  Benefit payments under the Plan will be made, or commenced, within a reasonable period of time after the date of retirement, death, disability, or other termination.

7. <u>Benefits Not Insured</u>.  The benefits provided by the Plan are determined solely by the value of your account at the time the benefits became payable.  Because the Plan is not a defined benefit plan, benefits are not insured by the Pension Benefit Guaranty Corporation. There are no provisions under Title IV of the Employee Retirement Income Security Act of 1974 (ERISA) which insure benefits under this type of Plan.

8. <u>Loans to Members</u>.  The Trustee has discretion to make loans to Members from the Trust.  Any such loan is limited to 50% of the Member's vested interest in the Trust, subject to a $50,000 overall limitation, and must bear a reasonable rate of interest and generally must be repaid within 5 years.  The Trustee decides whether a loan will be made and, if a loan is to be made, the Trustee decides the amount and the terms of the loan.

## VI.  CLAIMS PROCEDURE

1.  <u>Filing Claims for Benefits</u>.  If you or your Beneficiary believes you are entitled to receive benefits under the Plan, and you have not received notification from the Trustee concerning the time and manner of payment of your benefits, or if you believe the Trustee's notice concerning the amount and form of payment of your benefits is incorrect,  you may file a claim for your benefits with the Trustee.  The claim must be filed in writing with the Trustee, in accordance with the rules he establishes for filing a claim.

2.  <u>Notification of Denial of Claim</u>.  Within sixty (60) days after you submit a claim for benefits, the Trustee must tell you (in writing) the specific reasons for denying your claim.

3.  <u>Right to Review</u>.  Within a reasonable period of time after your claim for benefits has been denied, you may request the Trustee to make a full and fair review of the decision denying your claim.

4.  <u>Decision on Review</u>.  Within sixty (60) days after receiving your request for a review, the Trustee must give you a written explanation of the reasons for his decision on the review.

## VII. YOUR RIGHTS UNDER ERISA

As a Member of the Medical Information Technology, Inc. Profit Sharing Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan Members shall be entitled to:

(i) Examine, without charge, at the Plan Administrator's office, all Plan documents, including copies of all documents filed by the Plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions.

(ii) Obtain copies of all Plan documents and other plan information upon written request to the Plan Administrator.

(iii) Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

(iv) Obtain a statement telling you whether you have a right to receive a plan benefit, and if so, what your benefit would be if you were to stop working for the company. If you do not have a vested right to a plan benefit the statement will tell you how many more years you have to work to get a vested right to a plan benefit. This statement must be requested in writing and is not required to be given more than once a year. The Plan must provide the statement free of charge.

In addition to creating rights for Plan Members, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate the Plan, called "fiduciaries", have a duty to do so prudently and in the interest of you and other Plan Members and beneficiaries.

No one, including your employer, or any other person, may fire you or otherwise discreminate against you in any way to prevent you from obtaining a plan benefit or exercising your rights under ERISA. If your claim for a plan benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the Trustee review and reconsider your claim.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement of your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor-Management Service Administration, Department of Labor.

**NOTICE: You appear to be viewing this data with Netscape. Please note that due to factors beyond our control, Netscape takes longer to display these complex tables than Internet Explorer. Please allow up to 30 seconds for forms to appear... or try using Internet Explorer. Thanks for your patience.**



### Quicklinks

**Back to Company Detail page | New Search**
**Form 5500 | Schedule C | Schedule H | Schedule P | Schedule T | Other Documents |**

| | | |
|---|---|---|
| Form **5500**<br>Department of the Treasury<br>Internal Revenue Service<br><br>Department of Labor<br>Pension and Welfare Benefits<br>Administration<br><br>Pension Benefit Guaranty Corporation | **Annual Return/Report of Employee Benefit Plan**<br>This form is required to be filed under sections 104 and 4065 of the<br>Employee Retirement Income Security Act of 1974 (ERISA) and sections<br>6039D, 6047(e), 6057(b), and 6058(a) of the Internal Revenue Code (the<br>Code).<br>Complete all entries in accordance with<br>the instructions to the Form 5500. | Official Use Only<br>OMB Nos. 1210 - 0110<br>1210 - 0089<br><br>**2002**<br><br>This Form is Open to<br>Public Inspection |

**Part I    Annual Report Identification Information**

For the calendar plan year 2002 or fiscal plan year beginning January 01, 2002, and ending December 31, 2002

**A** This return/report is for:
(1) ☐ a multiemployer plan;
(2) ☒ a single-employer plan (other than a multiple-employer plan);
(3) ☐ a multiple-employer plan;
(4) ☐ a DFE (specify)

**B** This return/report is:
(1) ☐ the first return/report filed for the plan;
(2) ☐ the amended return/report;
(3) ☐ the final return/report filed for the plan;
(4) ☐ a short plan year return/report (less than 12 months).

**C** If the plan is a collectively-bargained plan, check here ☐

**D** If you filed for an extension of time to file, check the box and attach a copy of the extension application ☐

**Part II    Basic Plan Information -- enter all requested information.**

**1a** Name of plan

MEDICAL INFORMATION TECHNOLOGY, INC PROFIT SHARING PLAN

**1b** Three-digit plan number (PN)   001

**1c** Effective date of plan (mo., day, yr.)
December 31, 1973

**2a** Plan sponsor's name and address (employer, if for a single-employer plan) (Address should include room or suite no.)

MEDICAL INFORMATION TECHNOLOGY, INC
MEDITECH CIRCLE
WESTWOOD, MA 02090-1542

**2b** Employer Identification Number (EIN)
04-2455639

**2c** Sponsor's telephone number
781-821-3000

**2d** Business code (see instructions)
339900

**Caution:** A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established. Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, and to the best of my knowledge and belief, it is true, correct, and complete.

| | 07/24/2003 | BARBARA A. MANSOLILLO |
|---|---|---|
| Signature of plan administrator | Date | Typed or printed name of individual signing as plan administrator |
| | 07/24/2003 | BARBARA A. MANSOLILLO |
| Signature of employer/plan sponsor/DFE | Date | Typed or printed name of individual signing as employer, plan sponsor or DFE as applicable |

**For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.**    v2.3

Form **5500** (2002)

**3a** Plan administrator's name and address (if same as plan sponsor, enter"Same")

SAME

**3b** Administrator's EIN
04-2455639

**3c** Administrator's telephone number
781-821-3000

**4** If the name and/or EIN of the plan sponsor has changed since the last return/report filed for this plan, enter the name, EIN and the plan number from the last return/report below:

**a** Sponsor's name

**b** EIN

**c** PN

**5** Preparer information (optional)  **a** Name (including firm name, if applicable) and address

**b** EIN

**c** Telephone no.

| | | | |
|---|---|---|---|
| **6** Total number of participants at the beginning of the plan year | | **6** | 1,522 |
| **7** Number of participants as of the end of the plan year (welfare plans complete only lines **7a, 7b, 7c,** and **7d**) | | | |
| **a** Active participants | | **a** | 1,697 |
| **b** Retired or separated participants receiving benefits | | **b** | |
| **c** Other retired or separated participants entitled to future benefits | | **c** | |
| **d** Subtotal. Add lines **7a, 7b,** and **7c** | | **d** | 1,697 |
| **e** Deceased participants whose beneficiaries are receiving or are entitled to receive benefits | | **e** | 1 |
| **f** Total. Add lines **7d** and **7e** | | **f** | 1,698 |
| **g** Number of participants with account balances as of the end of the plan year (only defined contribution plans complete this item) | | **g** | 1,698 |
| **h** Number of participants that terminated employment during the plan year with accrued benefits that were less than 100% vested | | **h** | 48 |
| **i** If any participant(s) separated from service with a deferred vested benefit, enter the number of separated participants required to be reported on a Schedule SSA (Form 5500) | | **i** | |

**8** Benefits provided under the plan (complete 8a through 8c, as applicable)

**a** ☒ Pension benefits (check this box if the plan provides pension benefits and enter the applicable pension feature codes from the List of Plan Characteristics Codes (printed in the instructions)):

2E

**b** ☐ Welfare benefits (check this box if the plan provides welfare benefits and enter the applicable welfare feature codes from the List of Plan Characteristics Codes (printed in the instructions)):

**9a** Plan funding arrangement (check all that apply)

   **(1)** ☐ Insurance
   **(2)** ☐ Section 412(i) insurance contracts
   **(3)** ☒ Trust
   **(4)** ☐ General assets of the sponsor

**9b** Plan benefit arrangement (check all that apply)

   **(1)** ☐ Insurance
   **(2)** ☐ Section 412(i) insurance contracts
   **(3)** ☒ Trust
   **(4)** ☐ General assets of the sponsor

**10** Schedules attached (Check all applicable boxes and, where indicated, enter the number attached. See instructions.)

**a** **Pension Benefit Schedules**

   **(1)** ☐ **R** (Retirement Plan Information)
   **(2)** ☒ 2 **T** (Qualified Pension Plan Coverage Information)

      If a Schedule T is not attached because the plan is relying on coverage testing information for a prior year, enter the year

   **(3)** ☐ **B** (Actuarial Information)
   **(4)** ☐ **E** (ESOP Annual Information)
   **(5)** ☐ **SSA** (Separated Vested participant Information)

**b** **Financial Schedules**

   **(1)** ☒ **H** (Financial Information)
   **(2)** ☐ **I** (Financial Information -- Small Plan)
   **(3)** ☐ **A** (Insurance Information)
   **(4)** ☒ **C** (Service Provider Information)
   **(5)** ☐ **D** (DFE/Participating Plan Information)
   **(6)** ☐ **G** (Financial Transaction Schedules)
   **(7)** ☒ 1 **P** (Trust Fiduciary Information)

**Back to Top**

**NOTICE: You appear to be viewing this data with Netscape. Please note that due to factors beyond our control, Netscape takes longer to display these complex tables than Internet Explorer. Please allow up to 30 seconds for forms to appear... or try using Internet Explorer. Thanks for your patience.**



**Quicklinks**

**Back to Company Detail page | New Search**
**Form 5500 | Schedule C | Schedule H | Schedule P | Schedule T | Other Documents |**

| | | |
|---|---|---|
| **SCHEDULE C**<br>**(Form 5500)**<br>Department of the Treasury<br>Internal Revenue Service<br>Department of Labor<br>Pension and Welfare Benefits Administration<br>Pension Benefit Guaranty Corporation | **Service Provider Information**<br><br>This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974.<br><br>**File as an attachment to Form 5500.** | Official Use Only<br>OMB No. 1210 - 0110<br><br>**2002**<br><br>**This Form is Open to Public Inspection** |

**For the calendar plan year 2002 or fiscal plan year beginning** January 01, 2002 **and ending** December 31, 2002

**A** Name of plan
MEDICAL INFORMATION TECHNOLOGY, INC PROFIT SHARING PLAN

**B** Three digit
plan number          001

**C** Plan sponsor's name as shown on line 2a of Form 5500
MEDICAL INFORMATION TECHNOLOGY, INC

**D Employer Identification Number**
04-2455639

**Part I     Service Provider Information (see instructions)**

**1** Enter the total dollar amount of compensation paid by the plan to all persons, other than those listed below who received compensation during the plan year: **1**

**2** On the first item below list the contract administrator, if any, as defined in the instructions. On the other items, list service providers in descending order of the compensation they received for the services rendered during the plan year. List only the top 40. 103-12 IEs should enter N/A in columns (c) and (d).

| **(a)** Name | **(b)** Employer identification number (see instructions) | **(c)** Official plan position |
|---|---|---|
| | | CONTRACT ADMINISTRATOR |

| **(d)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(e)** Gross salary or allowances paid by plan | **(f)** Fees and commissions paid by plan | **(g)** Nature of service code(s) (see instructions) |
|---|---|---|---|
| | | | 12 |

| **(a)** Name | **(b)** Employer identification number (see instructions) | **(c)** Official plan position |
|---|---|---|
| | | |

| **(d)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(e)** Gross salary or allowances paid by plan | **(f)** Fees and commissions paid by plan | **(g)** Nature of service code(s) (see instructions) |
|---|---|---|---|
| | | | 11 |

**Part II     Termination Information on Accountants and Enrolled Actuaries (see instructions)**

| | |
|---|---|
| (a) Name | ARTHUR ANDERSON LLP   **(b)** EIN 36-0732690 |
| (c) Position | AUDITOR |
| (d) Address | 225 FRASNKLIN ST<br>BOSTON, MA 02110-2812 |
| (e) Telephone No.<br>Explanation | COMAAMSSOMED. |

**For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.**   v2.3

**Schedule C (Form 5500)**
**2002**

**Back to Top**

NOTICE: You appear to be viewing this data with Netscape. Please note that due to factors beyond our control, Netscape takes longer to display these complex tables than Internet Explorer. Please allow up to 30 seconds for forms to appear... or try using Internet Explorer. Thanks for your patience.



**Quicklinks**

Back to Company Detail page| New Search
Form 5500 | Schedule C | Schedule H | Schedule P | Schedule T | Other Documents |

| SCHEDULE H | **Financial Information** | Official Use Only OMB No. 1210 - 0110 |
|---|---|---|
| **(Form 5500)** Department of the Treasury Internal Revenue Service | This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA) and section 6058(a) of the Internal Revenue Code (the Code). | **2002** |
| Department of Labor Pension and Welfare Benefits Administration | **File as an attachment to Form 5500.** | **This Form is Open to Public Inspection** |
| Pension Benefit Guaranty Corporation | | |

For the calendar plan year 2002 or fiscal plan year beginning January 01, 2002 and ending December 31, 2002

**A** Name of plan
MEDICAL INFORMATION TECHNOLOGY, INC PROFIT SHARING PLAN

**B** Three digit plan number  001

**C** Plan sponsor's name as shown on line 2a of Form 5500 or 5500-EZ
MEDICAL INFORMATION TECHNOLOGY, INC

**D** Employer Identification Number
04-2455639

### Part I Asset and Liability Statement

1 Current value of plan assets and liabilities at the beginning and end of the plan year. Combine the value of plan assets held in more than one trust. Report the value of the plan's interest in a commingled fund containing the assets of more than one plan on a line-by-line basis unless the value is reportable on lines c(9) through c(14). Do not enter the value of that portion of an insurance contract which guarantees, during this plan year, to pay a specific dollar benefit at a future date. Round off amounts to the nearest dollar, DFEs do not complete lines 1b(1), 1b(2), 1c(8), 1g, 1h, 1i, and, except for master trust investment accounts, also do not complete lines 1d and 1e. See instructions.

| Assets | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|
| **a** Total noninterest-bearing cash | **a** | $31,313 | $4,913 |
| **b** Receivables (less allowance for doubtful accounts): | | | |
| (1) Employer contributions | **b(1)** | | |
| (2) Participant contributions | **b(2)** | | |
| (3) Other | **b(3)** | $216,416 | $190,306 |
| **c** General investments: | | | |
| (1) Interest-bearing cash (incl. money market accounts and certificates of deposit) | **c(1)** | $2,081,298 | $111,011 |
| (2) U.S. Government securities | **c(2)** | $16,540,117 | $17,389,516 |
| (3) Corporate debt instruments (other than employer securities): | | | |
| (A) Preferred | **c(3)A** | | |
| (B) All other | **c(3)B** | | |
| (4) Corporate stocks (other than employer securities): | | | |
| (A) Preferred | **c(4)A** | | |
| (B) Common | **c(4)B** | | |
| (5) Partnership/joint venture interests | **c(5)** | | |
| (6) Real Estate (other than employer real property) | **c(6)** | | |
| (7) Loans (other than to participants) | **c(7)** | | |
| (8) Participant loans | **c(8)** | $1,337,700 | $1,490,350 |
| (9) Value of interest in common/collective trusts | **c(9)** | | |
| (10) Value of interest in pooled separate accounts | **c(10)** | | |
| (11) Value of interest in master trust investment accounts | **c(11)** | | |
| (12) Value of interest in 103-12 investment entities | **c(12)** | | |
| (13) Value of interest in registered investment companies (e.g., mutual funds) | **c(13)** | | |
| (14) Value of funds held in insurance co. general account (unallocated contracts) | **c(14)** | | |
| (15) Other | **c(15)** | | |
| **d** Employer-related investments: | | | |
| (1) Employer securities | **d(1)** | $65,535,515 | $82,570,170 |
| (2) Employer real property | **d(2)** | | |
| **e** Buildings and other property used in plan operation | **e** | | |
| **f** Total assets (add all amounts in lines 1a through 1e) | **f** | $85,742,359 | $101,756,266 |
| **Liabilities** | | | |
| **g** Benefit claims payable | **g** | | |
| **h** Operating payables | **h** | | |
| **i** Acquisition indebtedness | **i** | | |
| **j** Other liabilities | **j** | | |
| **k** Total liabilities (add all amounts in lines 1g through 1j) | **k** | | |
| **Net Assets** | | | |
| **l** Net assets (subtract line 1k from line 1f) | **l** | $85,742,359 | $101,756,266 |

### Part II Income and Expense Statement

2 Plan income, expenses, and changes in net assets for the year. Include all income and expenses of the plan, including any trust(s) or separately maintained fund(s) and any payments/receipts to/from insurance carriers. Round off amounts to the nearest dollar. DFEs do not complete lines 2a, 2b(1)(E), 2e, 2f, and 2g

| Income | | (a) Amount | (b) Total |
|---|---|---|---|
| **a** Contributions | | | |
| (1) Received or receivable in cash from: (A) Employers | **a(1)(A)** | $2,340,000 | |
| (B) Participants | **a(1)(B)** | | |
| (C) Others (including rollovers) | **a(1)(C)** | | |
| (2) Noncash contributions | **a(2)** | $1,760,000 | |
| (3) Total contributions. Add lines 2a(1)(A), (B), (C), and line 2a(2) | **a(3)** | | $4,100,000 |
| **b** Earnings on investments: | | | |
| (1) Interest: | | | |
| (A) Interest-bearing cash (including money market accounts and certificates of deposit) | **b(1)(A)** | $10,533 | |
| (B) U.S. Government securities | **b(1)(B)** | $741,747 | |
| (C) Corporate debt instruments | **b(1)(C)** | | |
| (D) Loans (other than to participants) | **b(1)(D)** | | |
| (E) Participant loans | **b(1)(E)** | $88,744 | |
| (F) Other | **b(1)(F)** | | |
| (G) Total interest. Add lines 2b(1)(A) through (F) | **b(1)(G)** | | $841,024 |
| (2) Dividends (A) Preferred stock | **b(2)(A)** | | |
| (B) Common stock | **b(2)(B)** | $4,972,237 | |
| (C) Total dividends. Add lines 2b(2)(A) and (B) | **b(2)(C)** | | $4,972,237 |
| (3) Rents | **b(3)** | | |

| | | | |
|---|---|---|---|
| **(4)** Net gain (loss) on sale of assets: **(A)** Aggregate proceeds | b(4)(A) | | |
| **(B)** Aggregate carrying amount (see instructions) | b(4)(B) | | |
| **(C)** Subtract line 2b(4)(B) from line 2b(4)(A) | b(4)(C) | | |
| **(5)** Unrealized appreciation (depreciation) of assets: **(A)** Real Estate | b(5)(A) | | |
| **(B)** Other | b(5)(B) | $11,156,822 | |
| **(C)** Total unrealized appreciation of assets. Add line 2b(5)(A) and (B) | b(5)(C) | | $11,156,822 |
| **(6)** Net investment gain (loss) from common/collective trusts | b(6) | | |
| **(7)** Net investment gain (loss) from pooled separate accounts | b(7) | | |
| **(8)** Net investment gain (loss) from master trust investment accounts | b(8) | | |
| **(9)** Net investment gain (loss) from 103-12 investment entities | b(9) | | |
| **(10)** Net investment gain (loss) from registered investment companies (e.g., mutual funds) | b(10) | | |
| **c** Other Income | c | | |
| **d** Total income. Add all income amounts in column (b) and enter total | d | | $21,070,083 |
| **Expenses** | | | |
| **e** Benefit payment and payments to provide benefits: | | | |
| **(1)** Directly to participants or beneficiaries, including direct rollovers | e(1) | $5,056,176 | |
| **(2)** To insurance carriers for the provision of benefits | e(2) | | |
| **(3)** Other | e(3) | | |
| **(4)** Total benefit payments. Add line 2e(1) through (3) | e(4) | | $5,056,176 |
| **f** Corrective distributions (see instructions) | f | | |
| **g** Certain deemed distributions of participant loans (see instructions) | g | | |
| **h** Interest expense | h | | |
| **i** Administrative expenses: **(1)** Professional fees | i(1) | | |
| **(2)** Contract administrator fees | i(2) | | |
| **(3)** Investment advisory and management fees | i(3) | | |
| **(4)** Other | i(4) | | |
| **(5)** Total administrative expenses. Add line i(1) through (4) | i(5) | | |
| **j** Total expenses. Add all expense amounts in column (b) and enter total | j | | $5,056,176 |
| **Net Income and Reconciliation** | | | |
| **k** Net income (loss) (subtract line 2j from line 2d) | k | | $16,013,907 |
| **l** Transfers of assets | | | |
| **(1)** To this plan | l(1) | | |
| **(2)** From this plan | l(2) | | |

## Part III    Accountant's Opinion

**3** The opinion of an independent qualified public accountant for this plan is (see instructions):

**a** Attached to this Form 5500 and the opinion is — **(1)** ☐ Unqualified **(2)** ☒ Qualified **(3)** ☐ Disclaimer **(4)** ☐ Adverse

**b** Not attached because:
**(1)** ☐ the Form 5500 is filed for a CCT, PSA, or MTIA
**(2)** ☐ the opinion will be attached to the next Form 5500 pursuant to 29 CFR 2520.104-50

**c** Check this box if the accountant performed a limited scope audit pursuant to 29 CFR 2520.103-8 and/or 2520.103-12 ☐

**d** If an accountant's opinion is attached, enter the name and EIN of the accountant (or accounting firm)
ERNST & YOUNG LLP   34-6565596

## Part IV    Transactions During Plan Year

**4** CCTs and PSAs do not complete Part IV. MTIAs, 103-12 IEs, and GIAs do not complete 4a, 4e, 4f, 4g, 4h, 4k, or 5. 103-12 IEs also do not complete 4j.

| During the plan year: | | Yes | No | Amount |
|---|---|---|---|---|
| **a** Did the employer fail to transmit to the plan any participant contributions within the maximum time period described in 29 CFR 2510.3-102? (see instructions) | a | ☐ Yes | ☒ No | |
| **b** Were any loans by the plan or fixed income obligations due the plan in default as of the close of plan year or classified during the year as uncollectible? Disregard participant loans secured by participant's account balance. (Attach Schedule G (Form 5500) Part I if "Yes" is checked) | b | ☐ Yes | ☒ No | |
| **c** Were any leases to which the plan was a party in default or classified during the year as uncollectible? (Attach Schedule G (Form 5500) Part II if "Yes" is checked) | c | ☐ Yes | ☒ No | |
| **d** Did the plan engage in any nonexempt transaction with any party-in-interest? (Attach Schedule G (Form 5500) Part III if "Yes" is checked) | d | ☐ Yes | ☒ No | |
| **e** Was this plan covered by a fidelity bond? | e | ☒ Yes | ☐ No | $500,000 |
| **f** Did the plan have a loss, whether or not reimbursed by the plan's fidelity bond, that caused by fraud or dishonesty? | f | ☐ Yes | ☒ No | |
| **g** Did the plan hold any assets whose current value was neither readily determinable on an established market nor set by an independent third party appraiser? | g | ☒ Yes | ☐ No | $82,570,170 |
| **h** Did the plan receive any noncash contributions whose value was neither readily determinable on an established market nor set by an independent third party appraiser? | h | ☒ Yes | ☐ No | $1,760,000 |
| **i** Did the plan have assets held for investment? (Attach schedule(s) of assets if "Yes" is checked, and see instructions for format requirements) | i | ☒ Yes | ☐ No | |
| **j** Were any plan transactions or series of transactions in excess of 5% of the current value of plan assets? (Attach schedule of transactions if "Yes" is checked, and see instructions for format requirements) | j | ☒ Yes | ☐ No | |
| **k** Were all the plan assets either distributed to participants or beneficiaries, transferred to another plan or brought under the control of the PBGC? | k | ☐ Yes | ☒ No | |

**5a** Has a resolution to terminate the plan been adopted during the plan year or any prior plan year? If yes, enter the amount of any plan assets that reverted to the employer this year ☐ Yes ☒ No Amount

**5b** If, during this plan year, any assets or liabilities were transferred from this plan to another plan(s), identify the plan(s) to which assets or liabilities were transferred. (See instructions)

**5b(1)** Name of plan(s)     **5b(2)** EIN(s)     **5b(3)** PN(s)

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.   v2.3

Schedule H (Form 5500) 2002

**Back to Top**

**NOTICE: You appear to be viewing this data with Netscape. Please note that due to factors beyond our control, Netscape takes longer to display these complex tables than Internet Explorer. Please allow up to 30 seconds for forms to appear... or try using Internet Explorer. Thanks for your patience.**



**Quicklinks**

**Back to Company Detail page | New Search**
**Form 5500 | Schedule C | Schedule H | Schedule P | Schedule T | Other Documents |**

### Annual Return of Fiduciary
### of Employee Benefit Trust

Official Use Only
OMB No. 1210 - 0110

**Schedule P
(Form 5500)**
Department of the Treasury
Internal Revenue Service

This schedule may be filed to satisfy the requirements under section 6033(a) for an annual information return from every section 401(a) organization exempt from tax section 501(a).
Filing this form will start the running of the statute of limitations under section 6501(a) for any trust described in section 401(a) that is exempt from tax under section 501(a).

**2002**

**This Form is Open to Public Inspection**

**File as an Attachment to Form 5500 or 5500-EZ.**

For the calendar plan year 2002 or fiscal plan year beginning January 01, 2002 and ending December 31, 2002

**1a** Name of trustee or custodian A. NEIL PAPPALARDO

**b** Number, street, and room or suite no. (If a P.O. box, see the instructions for Form 5500 or 5500-EZ.)
MEDITECH CIRCLE

**c** City or town, state, and ZIP code WESTWOOD, MA 02090-0000

**2a** Name of trust MEDICAL INFORMATION TECHNOLOGY INC.  PROFIT SHARING TRUST

**b** Trust's employer identification number 04-2455639

**3** Name of plan if different from name of trust MEDICAL INFORMATION TECHNOLOGY INC.  PROFIT SHARING PLAN

**4** Have you furnished the participating employee benefit plan(s) with the trust financial information required to be reported by the plan(s)?............................................................................................................[X] Yes [ ] No

**5** Enter the plan sponsor's employer identification number as shown on Form 5500 or 5500-EZ 04-2455639

Under penalties of perjury, I declare that I have examined this schedule, and to the best of my knowledge and belief it is true, correct, and complete.

Signature of fiduciary                                                Date July 24, 2003

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500 or 5500-EZ

v2.3        Schedule P Form 5500 (2002)

**Back to Top**

**NOTICE:** You appear to be viewing this data with Netscape. Please note that due to factors beyond our control, Netscape takes longer to display these complex tables than Internet Explorer. Please allow up to 30 seconds for forms to appear... or try using Internet Explorer. Thanks for your patience.



Quicklinks

**Back to Company Detail page | New Search**
**Form 5500 | Schedule C | Schedule H | Schedule P | Schedule T | Other Documents |**

| Schedule T (Form 5500) | Qualified Pension Plan Coverage Information | Official Use Only OMB No. 1210 - 0110 |
|---|---|---|

| | This form is required to be filed under section 6058(a) of the Internal Revenue Code (the Code). | **2002** |
|---|---|---|
| Department of the Treasury Internal Revenue Service | **File as an attachment to Form 5500.** | **This Form is Open to Public Inspection** |

**For the calendar plan year 2002 or fiscal plan year beginning** January 01, 2002, **and ending** December 31, 2002

**A** Name of plan
MEDICAL INFORMATION TECHNOLOGY, INC PROFIT SHARING PLAN

**B** Three-digit plan number        001

**C** Plan sponsor's name as shown on line 2a of Form 5500
MEDICAL INFORMATION TECHNOLOGY, INC

**D** Employer Identification Number
04-2455639

Note: If the plan is maintained by:
More than one employer and benefits employees who are not collectively-bargained employees, a separate Schedule T may be required for
each employer (see the instruction for line 1).

An employer that operates qualified separate lines of business (QSLOBs) under Code section 414(r), a separate Schedule T may be required for each QSLOB (see the instruction for line 2).

**1** If this schedule is being filed to provide coverage information regarding the noncollectively bargained employees of an employer participating in a plan maintained by more than one employer, enter the name and EIN of the participating employer:

**1 a** Name of participating employer

**1 b** Employer Identification Number

**2** If the employer maintaining the plan operates QSLOBs, enter the following information:

**a** The number of QSLOBs that the employer operates is .

**b** The number of such QSLOBs that have employees benefiting under this plan is.

**c** Does the employer apply the minimum coverage requirements to this plan on an employer-wide rather than a QSLOB basi ☐ Yes ☐ No

**d** If the entry on line 2b is two or more and line 2c is "No," identify the QSLOB to which the coverage information given on line 3 or 4 relates.

**3** Exceptions -- Check the box before each statement that describes the plan or the employer.
If you check any box, do not complete the rest of this Schedule.

**a** ☐ The employer employs only highly compensated employees (HCEs).

**b** ☐ No HCEs benefited under the plan at anytime during the plan year.

**c** ☐ The plan benefits only collectively-bargained employees.

**d** ☒ The plan benefits all nonexcludable nonhighly compensated employees of the employer (as defined in Code sections 414(b), (c), and
(m)), including leased employees and self-employed individuals.

**e** ☐ The plan is treated as satisfying the minimum coverage requirements under Code section 410(b)(6)(C).

**For Paperwork Reduction Act Notice and OMB Control Numbers,
see the instructions for Form 5500** v2.3

Schedule T Form 5500 (2002)

**4** Enter the date the plan year began for which coverage data is being submitted.
January 01, 2002

**a** Did any leased employees perform services for the employer at any time during the plan year?    ☐ Yes ☒ No

**b** In testing whether the plan satisfies the coverage and nondiscrimination tests of Code sections 410(b) and 401(a)(4), does the employer aggregate plans?    ☐ Yes ☒ No

**c** Complete the following:

| | | |
|---|---|---|
| (1) Total number of employees of the employer (as defined in Code section 414(b), (c), and (m)), including leased employees and self-employed individuals | **c(1)** | 2077 |
| (2) Number of excludable employees as defined in IRS regulations (see instructions) | **c(2)** | 380 |
| (3) Number of nonexcludable employees. (Subtract line 4c(2) from line 4c(1)) | **c(3)** | 1697 |
| (4) Number of nonexcludable employees (line 4c(3)) who are HCEs | **c(4)** | 101 |
| (5) Number of nonexcludable employees (line 4c(3)) who benefit under the plan | **c(5)** | 1697 |

(6) Number of benefiting nonexcludable employees (line 4c(5)) who are HCEs     **c(6)**    101

| **Disaggregation Part:** | **Ratio Percentage:** | **Exception:** |
| --- | --- | --- |
| (1) | | |
| (2) | | |
| (3) | | 1 |

**f** This plan satisfies the coverage requirements on the basis of (check one) ☐ the ratio percentage test  ☐ average benefit test

**Back to Top**

**NOTICE: You appear to be viewing this data with Netscape. Please note that due to factors beyond our control, Netscape takes longer to display these complex tables than Internet Explorer. Please allow up to 30 seconds for forms to appear... or try using Internet Explorer. Thanks for your patience.**



**Quicklinks**

Back to Company Detail page | New Search
Form 5500 | Schedule H | Schedule P | Schedule T | Other Documents |

| | | |
|---|---|---|
| Form **5500**<br>Department of the Treasury<br>Internal Revenue Service<br><br>Department of Labor<br>Pension and Welfare Benefits<br>Administration<br><br>Pension Benefit Guaranty Corporation | **Annual Return/Report of Employee Benefit Plan**<br>**This form is required to be filed under sections 104 and 4065 of the**<br>**Employee Retirement Income Security Act of 1974 (ERISA) and sections**<br>**6039D, 6047(e), 6057(b), and 6058(a) of the Internal Revenue Code (the**<br>**Code).**<br>**Complete all entries in accordance with**<br>**the instructions to the Form 5500.** | Official Use Only<br>OMB Nos. 1210 - 0110<br>1210 - 0089<br><br>**2003**<br><br>This Form is Open to<br>**Public Inspection** |

**Part I    Annual Report Identification Information**

For the calendar plan year 2003 or fiscal plan year beginning January 01, 2003 and ending December 31, 2003

**A** This return/report is for:
- (1) ☐ a multiemployer plan;
- (2) ☒ a single-employer plan (other than a multiple-employer plan);
- (3) ☐ a multiple-employer plan;
- (4) ☐ a DFE (specify)

**B** This return/report is:
- (1) ☐ the first return/report filed for the plan;
- (2) ☐ the amended return/report;
- (3) ☐ the final return/report filed for the plan;
- (4) ☐ a short plan year return/report (less than 12 months).

**C** If the plan is a collectively-bargained plan, check here ☐

**D** If you filed for an extension of time to file, check the box and attach a copy of the extension applicat ☐

**Part II    Basic Plan Information -- enter all requested information.**

**1a** Name of plan

MEDICAL INFORMATION TECHNOLOGY, INC PROFIT SHARING PLAN

**1b** Three-digit plan number (PN)    001

**1c** Effective date of plan (mo., day, yr.)
December 31, 1973

**2a** Plan sponsor's name and address (employer, if for a single-employer plan) (Address should include room or suite no.)

MEDICAL INFORMATION TECHNOLOGY, INC
MEDITECH CIRCLE
WESTWOOD, MA 02090-0000

**2b** Employer Identification Number (EIN)
04-2455639

**2c** Sponsor's telephone number
781-821-3000

**2d** Business code (see instructions)
339900

**Caution:** A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established. Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, and to the best of my knowledge and belief, it is true, correct, and complete.

| | | |
|---|---|---|
| | 07/28/2004 | BARBARA A. MANZOLILLO |
| Signature of plan administrator | Date | Typed or printed name of individual signing as plan administrator |
| | 07/28/2004 | BARBARA A. MANZOLILLO |
| Signature of employer/plan sponsor/DFE | Date | Typed or printed name of individual signing as employer, plan sponsor or DFE as applicable |

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form **5500.**    v2.3

Form **5500** (2003)

**3a** Plan administrator's name and address (if same as plan sponsor, enter"Same")    **3b** Administrator's EIN

SAME

**3c** Administrator's telephone number

**4** If the name and/or EIN of the plan sponsor has changed since the last return/report filed for this plan, enter the name, EIN and the plan number from the last return/report below:    **b** EIN

**c** PN

**a** Sponsor's name

**5** Preparer information (optional)   **a** Name (including firm name, if applicable) and address    **b** EIN

**c** Telephone no.

| | | | |
|---|---|---|---|
| **6** Total number of participants at the beginning of the plan year | **6** | | 1,698 |
| **7** Number of participants as of the end of the plan year (welfare plans complete only lines **7a, 7b, 7c,** and **7d**) | | | |
| **a** Active participants | | **a** | 1,923 |
| **b** Retired or separated participants receiving benefits | | **b** | |
| **c** Other retired or separated participants entitled to future benefits | | **c** | |
| **d** Subtotal. Add lines **7a, 7b,** and **7c** | | **d** | 1,923 |
| **e** Deceased participants whose beneficiaries are receiving or are entitled to receive benefits | | **e** | 1 |
| **f** Total. Add lines **7d** and **7e** | | **f** | 1,924 |
| **g** Number of participants with account balances as of the end of the plan year (only defined contribution plans complete this item) | | **g** | 1,923 |
| **h** Number of participants that terminated employment during the plan year with accrued benefits that were less than 100% vested | | **h** | 56 |
| **i** If any participant(s) separated from service with a deferred vested benefit, enter the number of separated participants required to be reported on a Schedule SSA (Form 5500) | | **i** | |

**8** Benefits provided under the plan (complete 8a through 8c, as applicable)

**a** ☒ Pension benefits (check this box if the plan provides pension benefits and enter the applicable pension feature codes from the List of Plan Characteristics Codes (printed in the instructions)):

2E

**b** ☐ Welfare benefits (check this box if the plan provides welfare benefits and enter the applicable welfare feature codes from the List of Plan Characteristics Codes (printed in the instructions)):

**9a** Plan funding arrangement (check all that apply)      **9b** Plan benefit arrangement (check all that apply)

| | |
|---|---|
| **(1)** ☐ Insurance | **(1)** ☐ Insurance |
| **(2)** ☐ Section 412(i) insurance contracts | **(2)** ☐ Section 412(i) insurance contracts |
| **(3)** ☒ Trust | **(3)** ☒ Trust |
| **(4)** ☐ General assets of the sponsor | **(4)** ☐ General assets of the sponsor |

**10** Schedules attached (Check all applicable boxes and, where indicated, enter the number attached. See instructions.)

**a Pension Benefit Schedules**

**(1)** ☐ **R** (Retirement Plan Information)

**(2)** ☒ 1 **T** (Qualified Pension Plan Coverage Information)

If a Schedule T is not attached because the plan is relying on coverage testing information for a prior year, enter the year

**(3)** ☐ **B** (Actuarial Information)

**(4)** ☐ **E** (ESOP Annual Information)

**(5)** ☐ **SSA** (Separated Vested participant Information)

**b Financial Schedules**

**(1)** ☒ **H** (Financial Information)

**(2)** ☐ **I** (Financial Information -- Small Plan)

**(3)** ☐ **A** (Insurance Information)

**(4)** ☐ **C** (Service Provider Information)

**(5)** ☐ **D** (DFE/Participating Plan Information)

**(6)** ☐ **G** (Financial Transaction Schedules)

**(7)** ☒ 1 **P** (Trust Fiduciary Information)

**[Back to Top](#)**

NOTICE: You appear to be viewing this data with Netscape. Please note that due to factors beyond our control, Netscape takes longer to display these complex tables than Internet Explorer. Please allow up to 30 seconds for forms to appear... or try using Internet Explorer. Thanks for your patience.



**Quicklinks**

Back to Company Detail page | New Search
Form 5500 | Schedule H | Schedule P | Schedule T | Other Documents |

| SCHEDULE H (Form 5500) | Financial Information | Official Use Only OMB No. 1210 - 0110 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA) and section 6058(a) of the Internal Revenue Code (the Code). | 2003 |
| Department of Labor Pension and Welfare Benefits Administration | **File as an attachment to Form 5500.** | This Form is Open to Public Inspection |
| Pension Benefit Guaranty Corporation | | |

For the calendar plan year 2003 or fiscal plan year beginning January 01, 2003 and ending December 31, 2003

**A** Name of plan
MEDICAL INFORMATION TECHNOLOGY, INC PROFIT SHARING PLAN

**B** Three digit plan number    001

**C** Plan sponsor's name as shown on line 2a of Form 5500 or 5500-EZ
MEDICAL INFORMATION TECHNOLOGY, INC

**D** Employer Identification Number
04-2455639

### Part I    Asset and Liability Statement

1 Current value of plan assets and liabilities at the beginning and end of the plan year. Combine the value of plan assets held in more than one trust. Report the value of the plan's interest in a commingled fund containing the assets of more than one plan on a line-by-line basis unless the value is reportable on lines c(9) through c(14). Do not enter the value of that portion of an insurance contract which guarantees, during this plan year, to pay a specific dollar benefit at a future date. Round off amounts to the nearest dollar. DFEs do not complete lines 1b(1), 1b(2), 1c(8), 1g, 1h, 1i, and, except for master trust investment accounts, also do not complete lines 1d and 1e. See instructions.

| Assets | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|
| **a** Total noninterest-bearing cash | a | $4,913 | $4,093 |
| **b** Receivables (less allowance for doubtful accounts): | | | |
| (1) Employer contributions | b(1) | | |
| (2) Participant contributions | b(2) | | |
| (3) Other | b(3) | $190,306 | $162,008 |
| **c** General investments: | | | |
| (1) Interest-bearing cash (incl. money market accounts and certificates of deposit) | c(1) | $111,011 | $2,266,618 |
| (2) U.S. Government securities | c(2) | $17,389,516 | $18,042,516 |
| (3) Corporate debt instruments (other than employer securities): | | | |
| (A) Preferred | c(3)A | | |
| (B) All other | c(3)B | | |
| (4) Corporate stocks (other than employer securities): | | | |
| (A) Preferred | c(4)A | | |
| (B) Common | c(4)B | | |
| (5) Partnership/joint venture interests | c(5) | | |
| (6) Real Estate (other than employer real property) | c(6) | | |
| (7) Loans (other than to participants) | c(7) | | |
| (8) Participant loans | c(8) | $1,490,350 | $1,458,450 |
| (9) Value of interest in common/collective trusts | c(9) | | |
| (10) Value of interest in pooled separate accounts | c(10) | | |
| (11) Value of interest in master trust investment accounts | c(11) | | |
| (12) Value of interest in 103-12 investment entities | c(12) | | |
| (13) Value of interest in registered investment companies (e.g., mutual funds) | c(13) | | |
| (14) Value of funds held in insurance co. general account (unallocated contracts) | c(14) | | |
| (15) Other | c(15) | | |
| **d** Employer-related investments: | | | |
| (1) Employer securities | d(1) | $82,570,170 | $101,297,482 |
| (2) Employer real property | d(2) | | |
| **e** Buildings and other property used in plan operation | e | | |
| **f** Total assets (add all amounts in lines 1a through 1e) | f | $101,756,266 | $123,231,167 |
| **Liabilities** | | | |
| **g** Benefit claims payable | g | | |
| **h** Operating payables | h | | |
| **i** Acquisition indebtedness | i | | |
| **j** Other liabilities | j | | |
| **k** Total liabilities (add all amounts in lines 1g through 1j) | k | | |
| **Net Assets** | | | |
| **l** Net assets (subtract line 1k from line 1f) | l | $101,756,266 | $123,231,167 |

### Part II    Income and Expense Statement

2 Plan income, expenses, and changes in net assets for the year. Include all income and expenses of the plan, including any trust(s) or separately maintained fund(s) and any payments/receipts to/from insurance carriers. Round off amounts to the nearest dollar. DFEs do not complete lines 2a, 2b(1)(E), 2e, 2f, and 2g.

| Income | | (a) Amount | (b) Total |
|---|---|---|---|
| **a** Contributions | | | |
| (1) Received or receivable in cash from: (A) Employers | a(1)(A) | $2,020,000 | |
| (B) Participants | a(1)(B) | | |
| (C) Others (including rollovers) | a(1)(C) | | |
| (2) Noncash contributions | a(2) | $2,080,000 | |
| (3) Total contributions. Add lines 2a(1)(A), (B), (C), and line 2a(2) | a(3) | | $4,100,000 |
| **b** Earnings on investments: | | | |
| (1) Interest: | | | |
| (A) Interest-bearing cash (including money market accounts and certificates of deposit) | b(1)(A) | $15,903 | |
| (B) U.S. Government securities | b(1)(B) | $694,206 | |
| (C) Corporate debt instruments | b(1)(C) | | |
| (D) Loans (other than to participants) | b(1)(D) | | |
| (E) Participant loans | b(1)(E) | $93,825 | |
| (F) Other | b(1)(F) | | |
| (G) Total interest. Add lines 2b(1)(A) through (F) | b(1)(G) | | $803,934 |
| (2) Dividends    (A) Preferred stock | b(2)(A) | | |
| (B) Common stock | b(2)(B) | $5,939,598 | |
| (C) Total dividends. Add lines 2b(2)(A) and (B) | b(2)(C) | | $5,939,598 |
| (3) Rents | b(3) | | |

| | | | |
|---|---|---|---|
| (4) Net gain (loss) on sale of assets: (A) Aggregate proceeds | b(4)(A) | | |
| (B) Aggregate carrying amount (see instructions) | b(4)(B) | | |
| (C) Subtract line 2b(4)(B) from line 2b(4)(A) | b(4)(C) | | |
| (5) Unrealized appreciation (depreciation) of assets: (A) Real Estate | b(5)(A) | | |
| (B) Other | b(5)(B) | $16,019,330 | |
| (C) Total unrealized appreciation of assets. Add lines 2b(5)(A) and (B) | b(5)(C) | | $16,019,330 |
| (6) Net investment gain (loss) from common/collective trusts | b(6) | | |
| (7) Net investment gain (loss) from pooled separate accounts | b(7) | | |
| (8) Net investment gain (loss) from master trust investment accounts | b(8) | | |
| (9) Net investment gain (loss) from 103-12 investment entities | b(9) | | |
| (10) Net investment gain (loss) from registered investment companies (e.g., mutual funds) | b(10) | | |
| c Other Income | c | | |
| d Total income. Add all income amounts in column (b) and enter total | d | | $26,862,862 |

### Expenses

| | | | |
|---|---|---|---|
| e Benefit payment and payments to provide benefits: | | | |
| (1) Directly to participants or beneficiaries, including direct rollovers | e(1) | $5,387,961 | |
| (2) To insurance carriers for the provision of benefits | e(2) | | |
| (3) Other | e(3) | | |
| (4) Total benefit payments. Add lines 2e(1) through (3) | e(4) | | $5,387,961 |
| f Corrective distributions (see instructions) | f | | |
| g Certain deemed distributions of participant loans (see instructions) | g | | |
| h Interest expense | h | | |
| i Administrative expenses: (1) Professional fees | i(1) | | |
| (2) Contract administrator fees | i(2) | | |
| (3) Investment advisory and management fees | i(3) | | |
| (4) Other | i(4) | | |
| (5) Total administrative expenses. Add lines 2i(1) through (4) | i(5) | | |
| j Total expenses. Add all expense amounts in column (b) and enter total | j | | $5,387,961 |

### Net Income and Reconciliation

| | | | |
|---|---|---|---|
| k Net income (loss) (subtract line 2j from line 2d) | k | | $21,474,901 |
| l Transfers of assets | | | |
| (1) To this plan | l(1) | | |
| (2) From this plan | l(2) | | |

### Part III    Accountant's Opinion

3 The opinion of an independent qualified public accountant for this plan is (see instructions):

a Attached to this Form 5500 and the opinion is -- (1) [X] Unqualified (2) [ ] Qualified (3) [ ] Disclaimer (4) [ ] Adverse

b Not attached because:
(1) [ ] the Form 5500 is filed for a CCT, PSA, or MTIA.
(2) [ ] the opinion will be attached to the next Form 5500 pursuant to 29 CFR 2520.104-50.

c Check this box if the accountant performed a limited scope audit pursuant to 29 CFR 2520.103-8 and/or 2520.103-12 [ ]

d If an accountant's opinion is attached, enter the name and EIN of the accountant (or accounting firm)
ERNST & YOUNG   34-6565596

### Part IV    Transactions During Plan Year

4  CCTs and PSAs do not complete Part IV. MTIAs, 103-12 IEs, and GIAs do not complete 4a, 4e, 4f, 4g, 4h, 4k, or 5. 103-12 IEs also do not complete 4j

| During the plan year: | | Yes | No | Amount |
|---|---|---|---|---|
| a Did the employer fail to transmit to the plan any participant contributions within the maximum time period described in 29 CFR 2510.3-102? (see instructions) | a | [ ] Yes | [X] No | |
| b Were any loans by the plan or fixed income obligations due the plan in default as of the close of plan year or classified during the year as uncollectible? Disregard participant loans secured by participant's account balance. (Attach Schedule G (Form 5500) Part I if "Yes" is checked) | b | [ ] Yes | [X] No | |
| c Were any leases to which the plan was a party in default or classified during the year as uncollectible? (Attach Schedule G (Form 5500) Part II if "Yes" is checked) | c | [ ] Yes | [X] No | |
| d Did the plan engage in any nonexempt transaction with any party-in-interest? (Attach Schedule G (Form 5500) Part III if "Yes" is checked) | d | [ ] Yes | [X] No | |
| e Was this plan covered by a fidelity bond? | e | [X] Yes | [ ] No | $1,000,000 |
| f Did the plan have a loss, whether or not reimbursed by the plan's fidelity bond, that was caused by fraud or dishonesty? | f | [ ] Yes | [X] No | |
| g Did the plan hold any assets whose current value was neither readily determinable on an established market nor set by an independent third party appraiser? | g | [X] Yes | [ ] No | $101,297,482 |
| h Did the plan receive any noncash contributions whose value was neither readily determinable on an established market nor set by an independent third party appraiser? | h | [X] Yes | [ ] No | $2,080,000 |
| i Did the plan have assets held for investment? (Attach schedule(s) of assets if "Yes" is checked, and see instructions for format requirements) | i | [X] Yes | [ ] No | |
| j Were any plan transactions or series of transactions in excess of 5% of the current value of plan assets? (Attach schedule of transactions if "Yes" is checked, and see instructions for format requirements) | j | [X] Yes | [ ] No | |
| k Were all the plan assets either distributed to participants or beneficiaries, transferred to another plan or brought under the control of the PBGC? | k | [ ] Yes | [X] No | |

5a Has a resolution to terminate the plan been adopted during the plan year or any prior plan year? If yes, enter the amount of any plan assets that reverted to the employer this year [ ] Yes [X] No  Amount

5b If, during this plan year, any assets or liabilities were transferred from this plan to another plan(s), identify the plan(s) to which assets or liabilities were transferred. (See instructions).

| 5b(1) Name of plan(s) | 5b(2) EIN(s) | 5b(3) PN(s) |
|---|---|---|
| | | |

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.   v2.3

Schedule H (Form 5500) 2003

**Back to Top**

NOTICE: You appear to be viewing this data with Netscape. Please note that due to factors beyond our control, Netscape takes longer to display these complex tables than Internet Explorer. Please allow up to 30 seconds for forms to appear... or try using Internet Explorer. Thanks for your patience.



**Quicklinks**

**Back to Company Detail page | New Search**
**Form 5500 | Schedule H | Schedule P | Schedule T | Other Documents |**

### Annual Return of Fiduciary
### of Employee Benefit Trust

Official Use Only
OMB No. 1210 - 0110

**Schedule P**
**(Form 5500)**
Department of the Treasury
Internal Revenue Service

This schedule may be filed to satisfy the requirements under section 6033(a) for an annual information return from every section 401(a) organization exempt from tax section 501(a).
Filing this form will start the running of the statute of limitations under section 6501(a) for any trust described in section 401(a) that is exempt from tax under section 501(a).

**2003**

**This Form is Open to Public Inspection**

**File as an Attachment to Form 5500 or 5500-EZ.**

For the calendar plan year 2003 or fiscal plan year beginning January 01, 2003 and ending December 31, 2003

**1a** Name of trustee or custodian A. NEIL PAPPALARDO

  **b** Number, street, and room or suite no. (If a P.O. box, see the instructions for Form 5500 or 5500-EZ.)
     MEDITECH CIRCLE

  **c** City or town, state, and ZIP code WESTWOOD, MA 02090-0000

**2a** Name of trust MEDICAL INFORMATION TECHNOLOGY, INC . PROFIT SHARING TRUST

  **b** Trust's employer identification number 04-2455639

**3** Name of plan if different from name of trust MEDICAL INFORMATION TECHNOLOGY, INC . PRFOIT SHARING PLAN

**4** Have you furnished the participating employee benefit plan(s) with the trust financial information required
  to be reported by the plan(s)?.............................................................................................. [X]. Yes [ ] No

**5** Enter the plan sponsor's employer identification number as shown on Form 5500 or 5500-EZ 04-2455639

Under penalties of perjury, I declare that I have examined this schedule, and to the best of my knowledge and belief it is true, correct, and complete.
Signature of fiduciary                                         Date July 28, 2004

For Paperwork Reduction Act Notice and OMB Control Numbers,
see the instructions for Form 5500 or 5500-EZ                 v2.3      Schedule P Form 5500 (2003)

**Back to Top**

NOTICE: You appear to be viewing this data with Netscape. Please note that due to factors beyond our control, Netscape takes longer to display these complex tables than Internet Explorer. Please allow up to 30 seconds for forms to appear... or try using Internet Explorer. Thanks for your patience.



**Quicklinks**

Back to Company Detail page | New Search
Form 5500 | Schedule H | Schedule P | Schedule T | Other Documents |

| | | |
|---|---|---|
| **Schedule T** **(Form 5500)** | **Qualified Pension Plan Coverage Information** | Official Use Only OMB No. 1210 - 0110 |
| | | **2003** |
| Department of the Treasury Internal Revenue Service | This form is required to be filed under section 6058(a) of the Internal Revenue Code (the Code). File as an attachment to Form 5500. | **This Form is Open to Public Inspection** |

For the calendar plan year 2003 or fiscal plan year beginning January 01, 2003 and ending December 31, 2003

**A** Name of plan
   MEDICAL INFORMATION TECHNOLOGY, INC PROFIT SHARING PLAN

**B** Three-digit plan number     001

**C** Plan sponsor's name as shown on line 2a of Form 5500
   MEDICAL INFORMATION TECHNOLOGY, INC

**D** Employer Identification Number
04-2455639

Note: If the plan is maintained by:
More than one employer and benefits employees who are not collectively-bargained employees, a separate Schedule T may be required for
  each employer (see the instruction for line 1).

An employer that operates qualified separate lines of business (QSLOBs) under Code section 414(r), a separate Schedule T may be required for each QSLOB (see the instruction for line 2).

**1** If this schedule is being filed to provide coverage information regarding the noncollectively bargained employees of an employer participating in a plan maintained by more than one employer, enter the name and EIN of the participating employer:

**1 a** Name of participating employer

**1 b** Employer Identification Number

**2** If the employer maintaining the plan operates QSLOBs, enter the following information:

  **a** The number of QSLOBs that the employer operates is .

  **b** The number of such QSLOBs that have employees benefiting under this plan is.

  **c** Does the employer apply the minimum coverage requirements to this plan on an employer-wide rather than a QSLOB basi ☐
    Yes ☐ No

  **d** If the entry on line 2b is two or more and line 2c is "No," identify the QSLOB to which the coverage information given on line 3 or 4 relates.

**3** Exceptions -- Check the box before each statement that describes the plan or the employer.
  If you check any box, do not complete the rest of this Schedule.

  **a** ☐ The employer employs only highly compensated employees (HCEs).

  **b** ☐ No HCEs benefited under the plan at anytime during the plan year.

  **c** ☐ The plan benefits only collectively-bargained employees.

  **d** ☒ The plan benefits all nonexcludable nonhighly compensated employees of the employer (as defined in Code sections 414(b), (c), and
    (m)), including leased employees and self-employed individuals.

  **e** ☐ The plan is treated as satisfying the minimum coverage requirements under Code section 410(b)(6)(C).

**For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.**v2.3

Schedule T Form 5500 (2003)

**4** Enter the date the plan year began for which coverage data is being submitted.
  January 01, 2003

  **a** Did any leased employees perform services for the employer at any time during the plan year?   ☐ Yes ☒ No

  **b** In testing whether the plan satisfies the coverage and nondiscrimination tests of Code sections 410(b) and 401(a)(4), does the employer aggregate plans?   ☐ Yes ☒ No

  **c** Complete the following:

| | | |
|---|---|---|
| (1) Total number of employees of the employer (as defined in Code section 414(b), (c), and (m)), including leased employees and self-employed individuals | c(1) | 2057 |
| (2) Number of excludable employees as defined in IRS regulations (see instructions) | c(2) | 134 |
| (3) Number of nonexcludable employees. (Subtract line 4c(2) from line 4c(1)) | c(3) | 1923 |
| (4) Number of nonexcludable employees (line 4c(3)) who are HCEs | c(4) | 109 |
| (5) Number of nonexcludable employees (line 4c(3)) who benefit under the plan | c(5) | 1923 |

(6) Number of benefiting nonexcludable employees (line 4c(5)) who are HCEs        **c(6)**        109

| | **Disaggregation Part:** | **Ratio Percentage:** | **Exception:** |
|---|---|---|---|
| (1) | | | |
| (2) | | | |
| (3) | | | 1 |

**f** This plan satisfies the coverage requirements on the basis of (check one☐ the ratio percentage test ☐ average benefit test

**Back to Top**



COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

DR. JEROME H. GROSSMAN,                    )
                                            )
                    Plaintiff,              )
                                            )
v.                                          )
                                            )   Civil Action No. 03-1872 BLS
MEDICAL INFORMATION TECHNOLOGY,            )
    INC., A. NEIL PAPPALARDO, EDWARD B.     )
    ROBERTS, MORTON E. RUDERMAN,           )
    ROLAND L. DRISCOLL, and                 )
    LAWRENCE A. POLIMENO,                    )
                                            )
                    Defendants.             )
                                            )



## AMENDED COMPLAINT

### Preliminary Statement

1.  The plaintiff, Dr. Jerome H. Grossman, is a co-founder of the defendant Medical

Information Technology, Inc. ("Meditech" or the "Company"). For years, he has advocated

more open, more transparent governance for Meditech, including the establishment of an honest,

liquid market for shares of Meditech's common stock. Weary of Dr. Grossman's advocacy, the

defendants, led by A. Neal Pappalardo ("Pappalardo"), retaliated against him in October 2001 by

firing him without any cause as a Meditech consultant and, in April 2002, by removing him

without any cause from the Meditech board on which he had served with distinction for three

decades.

2.  There is no prospect that Pappalardo and the other defendants will treat Dr. Grossman

(or any other shareholder who wishes to sell his shares) fairly. In fact, at Meditech's annual

meeting on April 28, 2003, Pappalardo announced to Meditech shareholders that he and his

directors would continue to fix the price of Meditech shares themselves and not seek any

independent or outside appraisal to determine its fair value. Pappalardo also confirmed that he

and his directors would continue to preserve the illiquid market in Meditech shares because, in

his view, a public market would be inefficient. These statements demonstrate that the defendants

intend to continue their scheme to maintain an artificially low repurchase price for Meditech

shares to the detriment of Dr. Grossman. In light of these statements, and because Dr. Grossman

is no longer in a position either to supervise or to protect his investment in Meditech, having

been removed as both a consultant and a director, and having been frozen out of any other role at

the Company, Dr. Grossman files this Amended Complaint seeking, *inter alia*, an accounting for

the fair value of his Meditech shares.

**Parties**

3.      Dr. Grossman is a Massachusetts citizen currently residing at 72 Spooner Road in

Brookline, Massachusetts.

4.      Dr. Grossman is a nationally recognized authority on software systems and

information technology systems for hospitals. He is the chairman emeritus of the New England

Medical Center, where he served as chairman and chief executive officer from 1979 to 1995, and

is an adjunct professor of medicine at Tufts University School of Medicine and honorary

physician at the Massachusetts General Hospital, where he served full-time from 1966 to 1979.

In addition to his other duties, Dr. Grossman serves today as the director of the Health Care

Delivery Project at Harvard University's Kennedy School of Government.

5.      Dr. Grossman is one of the founders of defendant Medical Information

Technology, Inc, also known as Meditech. During his career, Dr. Grossman has helped to found

a number of health care companies in addition to Meditech, including Tufts Associated Health

- 2 -

Plan, Chartwell Home Therapies, and Transition Systems, Inc. Dr. Grossman has served and continues to serve on both corporate and philanthropic boards in his community where he is valued both for his technical expertise and his experience in corporate governance. These boards include the Stryker Corporation, the Mayo Clinic Foundation, Penn Medicine, Landacorp, Committee for Economic Development, the Massachusetts Institute of Technology, and Wellesley College. He also served on the board of the Federal Reserve Bank of Boston from 1990 to 1997 and as its chairman from 1994 to 1997.

6.      The defendant Medical Information Technology, Inc. is a corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business in Westwood, Massachusetts. Meditech is one of the nation's leading providers of information system software for the hospital industry. Over the last approximately fifteen years, Meditech has grown at a consistent annual rate of 15-20%. The Company's revenue and net income in 2002 exceeded $250 and $60 million, respectively. Currently, Meditech has more than 1,700 hospital customers in the United States and around the world. Although Meditech is a public reporting company, no trading market exists for the approximately 1,221 owners of the Company's common stock.

7.      The defendant A. Neil Pappalardo is the chairman and chief executive officer of Meditech and is one of the Company's six directors. He has been an officer and director since 1969. Pappalardo is a Massachusetts citizen currently residing at 10 Rowes Wharf in Boston, Massachusetts.

8.      The defendant Lawrence A. Polimeno is the vice chairman of Meditech and is one of its directors. He has been a director since 1985 and with the Company since 1969.

Mr. Polimeno is a Massachusetts citizen currently residing at 151 John Street in Tewksbury, Massachusetts.

9.    The defendant Edward B. Roberts is a director of Meditech. He has been a director since 1969. Mr. Roberts is a Massachusetts citizen currently residing at 300 Boylston Street in Boston, Massachusetts.

10.    The defendant Morton E. Ruderman is director of Meditech. Mr. Ruderman has been a director since 1969. He is a Massachusetts citizen currently residing at 5 Wyoma Road in Gloucester, Massachusetts.

11.    The defendant Roland L. Driscoll is a director of Meditech. He has been a director since 1985. Mr. Driscoll is a Massachusetts citizen currently residing at 20 Colby Road in Braintree, Massachusetts.

12.    The individual defendants listed in paragraphs eight through eleven are all directors of Meditech and are hereinafter listed as the "Director Defendants."

**Facts**

*The Founding Of Meditech And Its Status Today As A Public Reporting Company*

13.    In 1969, Dr. Grossman joined with Pappalardo and certain of the Director Defendants to establish Meditech.

14.    Meditech was, at the time of its founding, a closely-held Massachusetts corporation and remains, in effect, a closely-held corporation today. Nearly all its shareholders are employees who own very small amounts of Meditech shares mainly through the Meditech Profit Sharing Trust or through direct purchases of shares offered annually.

15.    In 1996, Meditech became a public reporting company by virtue of the fact that its number of shareholders exceeded five hundred. As such, Meditech is subject to the same

disclosure obligations of any other public company, including those imposed by the Sarbanes-Oxley Act of 2002.

### The Rigging of the Repurchase Price for Meditech Shares

16.     As of February 28, 2003, Pappalardo and the Director Defendants controlled more than 50% of Meditech's shares.  In addition, at Pappalardo's behest, the Defendant Directors have made Pappalardo the sole trustee of the Meditech Profit Sharing Trust so that he is entitled to vote all its shares, which represent approximately 11% of Meditech's stock, in addition to his own, which represent approximately 26%.

17.     There is no public market for Meditech shares and Pappalardo and the Defendant Directors have not pursued any action to make Meditech shares freely tradable.  Instead, Pappalardo and the Defendant Directors have perpetuated a scheme to keep Meditech stock illiquid and its price artificially depressed.

18.     Under this scheme, any Meditech shareholder who wishes to sell his or her shares must first offer them to Meditech and/or its designees, although neither Meditech nor the designees need buy them.  Pappalardo has determined who those designees are.

19.     The price at which Meditech shares "trade" is determined once a year by Pappalardo without any independent or outside appraisal of their fair value.  In dereliction of their fiduciary duties, the Defendant Directors acquiesce to whatever repurchase price Pappalardo determines to be appropriate.  Whether those shares are bought by Pappalardo, or bought by one of Pappalardo's designees if they are bought at all, is again determined exclusively by Pappalardo at the price he exclusively determines.

20.     The most recent repurchase price for Meditech shares, as determined by Pappalardo, was $22 per share.  Given the Company's significant earnings, profitability, and net

worth and its premier reputation in the industry, this repurchase price grossly undervalues Meditech shares. Any independent, objective evaluation of the value of Meditech shares would conclude that a fair repurchase price is more than double $22 per share.

21.     Pappalardo himself typically buys a high percentage of the shares that are offered for sale, which is the reason why he sets an artificially low price for their purchase. For example, in February 2002, Pappalardo purchased 50,000 shares from Meditech at $19 per share and, in February 2003, he purchased another 50,000 shares from Meditech at $22 per share. The fair value of these Meditech shares was far more than the $19 or $22 per share that Pappalardo paid. Pappalardo then offers some of these shares to employees who are loyal to him and who are sold the shares at the artificially depressed price with interest-free loans made personally by Pappalardo.

22.     The rigging of the repurchase price by Pappalardo and the Defendant Directors benefits those shareholders and others who wish to buy but disadvantages shareholders who are required or wish to sell. In particular, the rigging of the repurchase price benefits Pappalardo and those favored employees whom he permits to purchase shares with interest-free loans from Meditech.

23.     Among the beneficiaries of the rigging of the repurchase price is a major local institution that is Pappalardo's favorite charity. That institution, although not itself complicit in Pappalardo's wrongdoing, is allowed to buy Meditech shares at Pappalardo's pre-arranged bargain price.

24.     Because he desires to sell his Meditech shares, Dr. Grossman is disadvantaged by the rigging of the repurchase price. However, he is far from the only shareholder who is disadvantaged by the artificially low repurchase price. In fact, Meditech has many loyal, long-

- 6 -

time employee shareholders who, like Dr. Grossman, are nearing or at retirement age or otherwise wish to leave Meditech and who would benefit from the ability to receive fair market value for their shares. Instead, these employee shareholders are required upon their departure from the company to sell all their holdings in the Meditech Profit Sharing Trust and, in doing so, are forced to accept whatever Pappalardo determines is an appropriate repurchase price.

25.    This rigging of the repurchase price by Pappalardo and the Defendant Directors is perhaps the most egregious but far from the only example of dereliction of fiduciary duty.

26.    The Director Defendants are highly conflicted in addition to being totally dominated by Pappalardo. By way of illustration, Mr. Valente is the chairman of Palomar Medical Technologies, Inc. Pappalardo sits on Palomar's board and on its Compensation Committee and is therefore in a position to determine what Mr. Valente gets paid for serving as chairman. Mr. Roberts has a son who is a franchisee of Panera Breads. Mr. Ruderman sits on the board of that franchisee and is in a position to influence the operation of the franchise.

27.    The Director Defendants beholden to Pappalardo for their positions permit him each year to purchase significant quantities of shares at what they know to be an artificially low price.

28.    Because Pappalardo and the Defendant Directors continue to ignore their fiduciary obligations and other rules of good corporate governance, including transparency, Dr. Grossman and any other shareholders who wish to achieve liquidity for their shares remain trapped. They must offer their shares to Meditech and/or its designees, the Company has no obligation to buy, and, if the Company and/or its designees do buy, they inevitably buy at a price which is, at best, approximately half of what the shares are really worth. No third party will offer to pay more than the artificially low price that Meditech has placed on its own shares.

*Pappalardo And The Defendant Directors Retaliate Against Dr. Grossman For Advocating Enhanced Corporate Governance Procedures*

29.    For many years as a member of the board of directors, Dr. Grossman urged that Meditech adopt enhanced corporate governance procedures for the benefit of any Meditech shareholder, including himself, who was interested in selling his or her shares. The procedures advocated by Dr. Grossman included an honest appraisal of the value of shares, a willingness to evaluate third-party offers for the Company (including a significant expression of interest by a major Fortune 500 company), and the possibility of creating a public market. Pappalardo (and therefore the rest of the Director Defendants) rejected each and every proposal or suggestion made by Dr. Grossman.

30.    In or about January 2001, Meditech turned to Dr. Grossman for consulting advice in order to help build a more comprehensive and integrated hospital information system. For many months thereafter, Dr. Grossman devoted himself to the affairs of the Company and met with senior managers in the service of providing the consulting work for which he was enlisted.

31.    Consistent with his fiduciary duties, Dr. Grossman continued throughout the period of his consultancy to press his fellow directors to improve Meditech's corporate governance procedures. Consistent with their previous attitude, Pappalardo (and therefore the rest of the Director Defendants) continued to reject each and every proposal or suggestion made by Dr. Grossman.

32.    On or about October 1, 2001, Pappalardo fired Dr. Grossman without cause or justification in retaliation for his advocacy for enhanced corporate governance procedures.

33.    Despite his firing, Dr. Grossman, in his on-going capacity as a director, continued to seek changes in Meditech's corporate governance procedures for the betterment of its shareholders. Pappalardo (and therefore the rest of the Director Defendants) continued to reject

each and every proposal or suggestion made by Dr. Grossman. So that they would no longer need to deal with Dr. Grossman's advocacy as a director, Pappalardo (and therefore the rest of the Director Defendants) decided to reduce the board from seven members to six in or about March 2002 and to remove Dr. Grossman from the board effective April 2002. As of April 2002, Dr. Grossman had continuously served on the board of Meditech for approximately 32 years.

### *April 28, 2003 Annual Meeting*

34.    Not only have Pappalardo and the Defendant Directors declined in the past to pursue any action to make Meditech shares freely tradable, Pappalardo told his shareholders at the April 28, 2003 Annual Meeting that such action is "not in the cards" for the future. He further told them that Meditech was a private company with an illiquid market in its shares and that was the way he wanted Meditech to remain.

35.    Pappalardo also told the shareholders that as far as he was concerned, there was no expert who was honest enough, intelligent enough, or trustworthy enough to render any useful advice as to what would be a fair price for the repurchase of Meditech shares by the Company, Pappalardo, or Pappalardo's favored employees. He further said that that was the way it was going to remain, for as long as he was there and that he had no intention of retiring until he was 85 years old – twenty-five years from now.

### COUNT I
### (Breach of Fiduciary Duty Against All Defendants)

36.    Dr. Grossman incorporates by reference the allegations set forth in paragraphs 1 through 35 above.

37.    Meditech is a closely held Massachusetts corporation.

38.    Those who come together to establish a closely held corporation owe each other a duty of utmost good faith and loyalty. Dr. Grossman, at all relevant times, was owed a duty of utmost good faith and loyalty. Pappalardo and the Director Defendants have repeatedly violated their obligations to him in firing him as an employee, removing him as a director, and enforcing a dishonest right of first refusal against him.

## COUNT II
## (Breach of Fiduciary Duty Against All Defendants)

39.    Dr. Grossman incorporates by reference the allegations set forth in paragraphs 1 through 38 above.

40.    Pappalardo and the Defendant Directors have a fiduciary duty to treat all shareholders fairly, including with respect to the purchasing and selling of Meditech shares. In violation of that fiduciary duty, Pappalardo and the Defendant Directors have rigged the market for Meditech shares in favor of those who wish to buy and to the great disadvantage of those who are required or wish to sell.

## COUNT III
## (Breach of Fiduciary Duty Against Pappalardo)

41.    Dr. Grossman incorporates by reference the allegations set forth in paragraphs 1 through 40 above.

42.    Pappalardo, by virtue of his status as chairman of the board, chief executive officer and a shareholder holding approximately 25% of all the outstanding Meditech shares, is the controlling shareholder of Meditech. As a controlling shareholder, he owes to Dr. Grossman and all minority shareholders a fiduciary duty to deal fairly with them, including to administer fairly the Company's right of first refusal. Instead, Pappalardo dominates the board, artificially

depresses the price at which shares are repurchased, and personally benefits from the depressed

repurchase price by regularly purchasing tens of thousands of shares each year for himself.

## COUNT IV
### (Demand for Accounting Against All Defendants)

43.    Dr. Grossman incorporates by reference the allegations set forth in paragraphs 1

through 42 above.

43.    In breach of their fiduciary duty, the defendants have artificially depressed the

price of Meditech's shares and prevented the establishment of a fair market therein.  In doing so,

the defendants have disadvantaged Dr. Grossman and other shareholders who wish to sell some

or all of their holdings.

44.    The precise amount that the defendants have artificially depressed the Meditech's

share price is uncertain because they have refused to seek any independent or outside appraisal to

determine its fair value and because they have declined Dr. Grossman's request to disclose the

price at which the officers and directors of Meditech have traded their shares during the last five

years.


WHEREFORE, the plaintiff requests that the Court enter an Order:

a.    Adjudging that the defendants, and Pappalardo in particular, have

breached their fiduciary duties;

b.    Preliminarily and permanently enjoining the defendants from further

breaches of their fiduciary duties;

c.    Accounting for the fair value of Dr. Grossman's Meditech shares;

d.    Awarding Dr. Grossman damages in an amount to be determined at trial;

and

- 11 -

e.   Awarding such other relief as is fair and just.

DR. JEROME H. GROSSMAN

By his attorneys,

_____
Jeffrey B. Rudman (BBO #433380)
Mark D. Selwyn (BBO #565595)
Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000

Dated:  May 2, 2003