## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually and On Behalf Of All Persons Similarly Situated | ) ) ) ) |  |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Case No. 05-10269-RWZ |
| MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, et al. | ) ) ) | |
| Defendants. | ) ) | |

_____)

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

This case raises the issue of whether a company and its executives can establish a profit sharing plan for the sole benefit of their employees, and then systematically undervalue that plan's main asset – the company's stock – to allow company executives to purchase their own stock at the artificially low price. The defendants – who consist of an employee benefit plan governed by ERISA, the plan's Trustee, the directors who administer the plan, and the company whose stock is the primary asset of the plan – argue that under plan documents and federal law, they have been given the "discretion" to behave in such a manner and that no beneficiary may challenge their actions, such that this case ought to be dismissed for failure to state a claim for relief. Defendants have misinterpreted their own Plan, ignored the Plaintiffs' allegations, and misapplied the governing law. For the reasons that follow, this Court should deny the defendants' motions.

**FACTS**

In the 1970s, Medical Information Technology, Inc. ("MEDITECH" or "the Company"), acting through its Board of Directors, created a profit sharing plan ("the Plan") with the Plan's assets to be placed in a trust "for the exclusive benefit of the eligible Employees and their beneficiaries". See Am. Compl. ¶ 10[1]; Tr. Agr. ¶ 1.02.[2]  The Plan was intended to invest substantially in MEDITECH shares "so as to permit the participating employees to share in any growth of the Company."  Tr. Agr. ¶ 1.02.  All MEDITECH employees are eligible to participate in the Plan after one full year of employment.  Am. Compl. ¶ 22; Tr. Agr. ¶ 3.01.  Each participant is assigned an individual account, into which the Trustee allocates a share of the company contribution on an annual basis based upon certain criteria.  Am. Compl. ¶ 24; Tr. Agr. ¶¶ 5.01, 5.03.  The Plan is funded solely through the annual company contribution and the individual accounts are treated as deferred compensation; participants are not permitted to contribute to the Plan.  Am. Compl. ¶ 23; Tr. Agr. ¶ 4.05.

Under Article VI of the Trust Agreement, a participant's interest is fully vested after completing five years as a MEDITECH employee.  Am. Compl. ¶ 25; Tr. Agr. ¶ 6.04.  Typically, the Trustee must distribute a participant's benefits upon the participant's retirement, disability, or death, or upon termination of the participant's employment.  Am. Compl. ¶¶ 26-29; Tr. Agr. ¶¶ 6.01-6.04.  No claim for benefits is necessary to trigger this responsibility; to the contrary, "whenever a Member's account balance becomes distributable pursuant to Sections 6.01 through

---

[1] Citations to "Am. Compl. ¶ __" refer to the corresponding paragraphs contained in the Amended Complaint, which has been filed contemporaneous with this Opposition pursuant to Fed. R. Civ. P. 15(a).

[2] Citations to "Tr. Agr. ¶ __" refer to the corresponding paragraphs contained in the Medical Information Technology Inc. Profit Sharing Plan, Amended and Restated Trust Agreement (As of January 1, 1998) that was attached to the defendants' dismissal motions.  Although the use of documents outside of those attached to a complaint is typically inappropriate on a dismissal motion, plaintiffs recognize that in the context of ERISA litigation, courts routinely rely upon plan documents, including trust agreements and plan summaries, when deciding whether a complaint has stated a viable claim.  Beddall v. State Street Bank and Trust Co., 137 F.3d 12, 17 (1st Cir. 1998).  It should be noted, however, that this litigation marks the first time that the defendants have seen fit to disseminate the Trust Agreement to any Plan participants.

6.04 . . . distribution of said account balance *shall be made* by the payment, in cash, or either one lump sum, a direct Rollover (as described in Section 6.11) or a combination of both." Am. Compl. ¶ 26; Tr. Agr. ¶ 6.06(a) (emphasis added).

Plan participants and plaintiffs Michael Hubert, William Trainor, and David Hinchliffe ("the Plaintiffs") participated in the Plan, and had a fully vested interest in their individual accounts at the time they terminated employment with MEDITECH. Am. Compl. ¶¶ 1-3, 37-39. Each received their distribution without having to submit a claim, without a description of the manner in which the distribution had been calculated, and without notice of any means by which they could appeal the calculation. Id. at ¶ 28.

According to ¶ 11.11 of the Trust Agreement, "[t]he named fiduciaries with respect to the Plan shall be the Company and the Trustee." Am. Compl. ¶¶ 4, 6; Tr. Agr. ¶ 11.11. In addition, "[t]he Company is the Plan Administrator for all purposes of ERISA." Am. Compl. ¶ 4; Tr. Agr. ¶ 11.11. Actions permitted or required to be taken by the Company must be carried out under the terms of the Trust Agreement by the Board of Directors or a person designated by the Board of Directors. Am. Compl. ¶ 7; Tr. Agr. ¶ 9.04. Defendants Lawrence A. Polimeno, Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman, and L.P. Dan Valente (collectively the "Director Defendants") were all members of the Board of Directors for the time period relevant to this lawsuit. Am. Compl. ¶ 7. Defendant A. Neil Pappalardo ("Defendant Pappalardo") has been the Chairman of MEDITECH's Board of Directors and MEDITECH's Chief Executive Officer – as well as the sole Trustee of the Plan – for the entire relevant time period. Am. Compl. ¶ 6.

Under the Trust Agreement, the Director Defendants are responsible for appointing and removing Defendant Pappalardo. Am. Compl. ¶¶ 7, 17; Tr. Agr. ¶ 8.16. In addition, the

Director Defendants must monitor Defendant Pappalardo by reviewing and approving all Plan transactions as presented in his detailed annual accounting. Am. Compl. ¶ 17; Tr. Agr. ¶ 8.13. The Director Defendants must also determine the amount that the Company wishes to contribute to the Plan on an annual basis. Am. Compl. ¶ 12; Tr. Agr. ¶ 4.01. Finally, the Director Defendants and Defendant Pappalardo work together in valuing the stock of the company, which is the primary asset in the trust. Am. Compl. ¶ 16, 21.

The Trust Agreement contemplates that the Director Defendants will accomplish this by first determining the appropriate amount to contribute, and thereafter paying that amount to the Plan in cash and/or an amount of MEDITECH stock equal to "the fair market value" of the amount to be contributed for that year. Am. Compl. ¶ 12; Tr. Agr. ¶ 4.01. Contrary to this design, however, the Director Defendants have approached their obligation to contribute to the Plan in reverse. The Defendant Directors seemingly have a standing agreement to contribute about 80,000 shares of MEDITECH stock per year, irrespective of their value. Am. Compl. ¶ 15. The Director Defendants do this, at least in part, to minimize the cost to the company of maintaining the Plan. Am. Compl. ¶ 14. Contributions made to a profit-sharing plan are tax deductible whether the contributions are made in cash or in stock. Id. Unlike cash contributions, however, stock contributions actually cost the company nothing. Id. Contributing stock to the Plan does, however, have the potential to dilute the control value of the stock owned by the other shareholders. Id. The Director Defendants and Defendant Pappalardo get around this potential problem by working together to assign a "value" to the shares at an amount that admittedly reflects an increase in the stock value from the previous year but that is still far less than fair market value. Am. Compl. ¶ 49. This ensures that certain shareholders, including Defendant Pappalardo, can purchase large amounts of company stock for themselves at low prices, thereby

maintaining their control of the company.  Am. Compl. ¶ 56-58.  Throughout the relevant timeframe, approximately 85% of the Plan's total assets have consisted of MEDITECH stock. Am. Compl. ¶ 16.

As Trustee, Defendant Pappalardo has his own separate duties under the Trust Agreement, which include responsibility for valuing the Plan's assets on an annual basis, allocating those assets appropriately to each employee's individual account, and distributing the employee's full vested interest upon separation of employment.  Am. Compl. ¶ 18; Tr. Agr., Articles V and VI generally.  Under the plain language of the Trust Agreement, Defendant Pappalardo is obligated to value the Plan's assets (including the company stock) at fair market value for purposes of allocation and distribution.  Am. Compl. ¶ 18; Tr. Agr. ¶ 5.04.  While this duty is seemingly separate and distinct from the Director Defendants' obligation to determine the stock's fair market value for contribution purposes, see Tr. Agr. at ¶¶ 4.01, 5.04, in practice, Defendant Pappalardo does not actually separately determine the fair market value of the Plan's assets but, instead, uses the same valuation for distribution purposes that is used for purposes of the Company's contribution.  Am. Compl. ¶ 21.  Defendant Pappalardo does this, in part, to ensure that he personally can purchase large quantities of stock at low prices and to retain tight control over the Company.  Am. Compl. ¶ 58.  In the last three years, MEDITECH has contributed 240,000 shares of stock to the Plan for the benefit of all participants; during the same time frame, Defendant Pappalardo has purchased 100,000 shares of MEDITECH stock for his own use.  Am. Compl. ¶¶ 15, 57.

Despite the Plan's clear intent that MEDITECH employees "share in any growth of the company," see Tr. Agr. ¶ 1.02, the defendants have resisted any attempts to verify the fair market value of the company's stock.  In fact, in 2002, a Board member was removed from the Board

after questioning whether the Board of Directors (including the Director Defendants and Defendant Pappalardo) was valuing company stock at an "artificially low price" and whether the company ought not hire an independent appraiser rather than "relying on an outdated valuation methodology that does not properly reflect the Issuer's current fair value." Am. Compl. ¶ 50-52 and Ex. C. By systematically undervaluing the company stock, which constitutes 85% of the Plan's total assets, the defendants have breached their fiduciary duties and caused harm to the Plan participants, including those participants who received distributions based on the undervalued stock. Am. Compl. ¶¶ 104-113.

## ARGUMENT

In a studied effort to ignore the plain meaning of the Amended Complaint, the defendants collectively raise four arguments in support of their motions to dismiss the complaint for failure to state a claim.

First, the defendants argue that Count 1, which alleges a claim for benefits due under the Plan, must be dismissed because Plaintiffs have not adequately alleged that they are still due benefits under the Plan and therefore have no standing to challenge the undervaluing of Plan assets.

Second, the defendants argue that Count 2, which alleges a claim for breach of fiduciary duty, must be dismissed because Plaintiffs cannot seek redress for the defendants' breaches if one of those breaches involved the failure to pay them their fair share of the Plan's assets, even though the Amended Complaint also seeks equitable relief.

Third, the defendants argue that pre-discovery dismissal is appropriate because Plaintiffs have not demonstrated that the defendants' decisions with respect to plan valuation were arbitrary and capricious, which, they argue, is outcome determinative.

<u>Fourth</u>, the defendants argue that dismissal is appropriate because Plaintiffs failed to exhaust their administrative remedies as required by the Plan.

<u>Finally</u>, the Director Defendants argue separately that, contrary to Plaintiffs' allegations, they are not actually fiduciaries for purposes of ERISA liability.

### Standard of Review

"When considering a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations of the complaint as true." <u>Hishon v. King & Spaulding</u>, 467 U.S. 69, 73 (1984). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." <u>Id.</u> (citations omitted). "Plaintiffs are not required to plead a specific legal theory; all that is necessary is that the facts, if proved, would entitled the party to relief under some viable theory." <u>Demoulis v. Sullivan</u>, 1993 WL 81500 at *1, Civ. No. 91-12533-Z (D. Mass. (Feb. 26, 1993)). For the following reasons, this Court should deny the Defendants' motions.

### A. The Complaint Properly Alleges a Claim for Unpaid Benefits Under ERISA, 29 U.S.C. § 1132(a)(1)(B).

There is no dispute that the Plan is an employee benefit plan, governed by ERISA. <u>See</u> 29 U.S.C. § 1002(3). Because the Plan is governed by ERISA, the Plan and its fiduciaries are subject to ERISA's civil enforcement provisions, codified at 29 U.S.C. § 1132(a). Under 29 U.S.C. § 1132(a)(1), a civil action may be brought "by a participant or beneficiary . . . (B) to recover benefits due him under the terms of his plan [or] to enforce his rights under the terms of the plan . . . ." <u>See</u> 29 U.S.C. § 1132(a)(1)(B). Count 1 alleges that MEDITECH and Defendant Pappalardo's actions in undervaluing the stock held by the Plan has resulted in the continual failure since at least 1998 to pay the full vested amount due and owing to plan participants – including the named Plaintiffs – at the time that they received their distributions. Am. Compl. ¶¶

104-107. It thus alleges a straightforward claim under 29 U.S.C. § 1132(a)(1)(B). See, e.g.,

Foltz v. U.S. News & World Report, Inc., 613 F.Supp. 634, 640 (D.D.C. 1985) ("Foltz I") ("If

proven at trial, the liquidation of the plaintiffs' interests [in profit-sharing plan] at undervalued

rates constitutes a withholding of benefits due under the terms of a plan, and is arbitrary and

capricious.").

1. Plaintiffs are "participants" within the meaning of 29 U.S.C. § 1132(a)(1)(B).

Plaintiffs are all "participants" within the meaning of § 1132(a)(1)(B) and thus have

standing to bring a claim under ERISA. ERISA defines the term "participant" to mean, in

relevant part, "any former employee . . .who is or may become eligible to receive a benefit of any

type from an employee benefit plan . . . ." 29 U.S.C. § 1002(7). The Supreme Court has

interpreted this definition to apply to "former employees who have a colorable claim to vested

benefits." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 117-18 (1989). Because the

Plan is a defined contribution plan under 29 U.S.C. § 1002(34), the "accrued benefit" to which a

participant is a statutorily entitled is "the balance of the individual's account." See 29 U.S.C. §

1002(23)(B). Indeed, in a defined contribution plan, "by definition there can never be an

insufficiency of funds in the plan to cover promised benefits since each beneficiary is entitled to

whatever assets are dedicated to his individual account." See Hughes Aircraft Co. v. Jacobson,

525 U.S. 432, 439 (1999) (citations and internal punctuation omitted).

Under the terms of the Trust Agreement, each participant had a right to a proportional

allocation of "the total net worth of the Trust" to be credited to his or her account. Tr. Agr. ¶

5.05. In determining the total net worth of the Trust for purposes of making these allocations,

the Trustee was instructed that he "shall value the Trust assets at their fair market value." Id. at ¶

5.04. Plaintiffs were all fully vested in their proportional share of the Trust assets when they

received their distributions.  Am. Compl. ¶¶ 1-3.  They allege, however, that the Plan's main

asset – the company's stock – was undervalued by the defendants and thus that they did not

receive the full amount of benefits due to them under the terms of the Plan.  Id. ¶¶ 37-39, 105-06.

Thus, a fair reading of the Amended Complaint compels the conclusion that Plaintiffs are

"participants" for purposes of asserting a claim under 29 U.S.C. § 1132(a)(1)(B).

Because Plaintiffs satisfy the statutory definition of "participants," they have standing to

sue under § 1132(a)(1)(B).  In Laurenzano v. Blue Cross and Blue Shield of Massachusetts, Inc.

Retirement Income Trust, 134 F.Supp.2d 189, 194-95 (D. Mass. 2001), Chief Judge Young held

that a former employee who alleged that Cost of Living Adjustments should have been included

in his lump sum distribution had standing to sue under both § 1132(a)(1)(B) and § 1132(a)(3).

See Laurenzano, 134 F.Supp.2d at 193.  In so holding, Judge Young flatly rejected the same

argument that the defendants have raised before this Court – that is, that because the plaintiff had

received a lump sum distribution, he was no longer a "participant" under § 1132(a)(1)(B) and

thus lacked standing to sue.  Id.  Finding the defense argument "too clever by half," the court

"had no trouble concluding that Laurenzano has standing to correct an alleged underpayment of

his benefits."  Id.; see also Vartanian v. Monsanto Co., 14 F.3d 697, 702 (1st Cir. 1994) (former

employee who received retirement benefits has standing where to hold otherwise "would enable

an employer to defeat the employee's right to sue for a breach of fiduciary duty by . . .

distributing a lump sum and terminating benefits before the employee can file suit").

Here, Plaintiffs have alleged facts to show that at the time they received their

distributions from the Plan, they were fully vested and were entitled to the fair market value of

the assets in their accounts at the time those assets were distributed to them.  Am. Compl. ¶ 1-3,

37-39.  The Plaintiffs further allege that, despite the obligation to fairly value Plan assets for

purposes of allocation and distribution, the defendants knowingly valued (or knowingly permitted others to value) the stock at less than fair value at the time that the stock was being allocated to the individual participants' accounts and at the time of distribution.  Am. Compl. ¶¶ 17-18, 21, 31, 48, 49.  The Plaintiffs further allege that the defendants did so, in part, to benefit the company and themselves at the Plan participants' expense.  Am. Compl. ¶¶ 58.  Finally, Plaintiffs allege that as a result of this wrongful conduct, they did not receive the fair value of the benefits to which they were entitled.  Am. Compl. ¶¶ 31, 37-39.

Taking all of these allegations as true, the Plaintiffs have pled sufficient facts to allege a cause of action under 29 U.S.C. § 1132(a)(1)(B).[3]  See, e.g., Foltz I, 613 F.Supp. at 640 ("[T]he plaintiffs have made a colorable claim that the undervaluation of [certain plan assets] resulted in appraisals which underestimated the value of the plaintiffs' interest in the Plan.  These appraisals were in turn relied on by the Plan's fiduciaries in paying the plaintiffs less than the true value of their interests in the Plan.  If proven at trial, the liquidation of the Plaintiffs' interests at undervalued rates constitutes a withholding of benefits due under the terms of a plan, and is arbitrary and capricious.") (citations omitted).[4]

2.  Plaintiffs have exhausted the administrative remedies that were made available to them as a matter of law.

The defendants argue that even if all of Plaintiffs' allegations are true, the claim must be dismissed because Plaintiffs failed to exhaust some vaguely defined avenue for appeal under the Plan (Def. Memo at pp. 21-22).  This argument flatly contradicts the Amended Complaint's

---

[3] For the same reason, Plaintiffs have also satisfied Article III's standing requirements.  Clearly, the harm of which Plaintiffs complain – that they did not receive all of the benefits due to them under the Plan – is "likely to be redressed" by a judgment in the Plaintiffs' favor.  See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1982).

[4] Viewed in this light, it becomes readily apparent that the defendants' attack on the Amended Complaint's citations to various departmental regulations is nothing more than a red herring.  Whether or not the regulations should or should not apply to the defendants' conduct is irrelevant to the only question properly before the Court – whether Plaintiffs have pled facts that, if taken as true, would support a claim for relief under 1132(a)(1)(B).

allegations that the defendants failed to advise them of their administrative remedies and is therefore improper in the context of a dismissal motion.  See Demoulis, 1993 WL 81500 at * 5 (denying dismissal motion because argument involved question of fact "that must be resolved in favor of plaintiffs for purposes of this motion to dismiss").  Of course, even if the argument were appropriate, it is also wrong.

ERISA does not explicitly require plaintiffs to exhaust their administrative remedies.  See Drinkwater v. Metropolitan Life Ins. Co., 846 F.2d 821, 825 (1st Cir. 1988); Conley v. Pitney Bowes, 34 F.3d 714, 716 (8th Cir. 1994).  Rather, the parameters of exhaustion are governed by the specific language of the particular plan involved.  Conley, 34 F.3d at 716.  Where plan documents confer upon a claimant a right to information about the appeals procedure, that information must be included with the notice of denial of benefits.  Id. at 718; see also 29 U.S.C. § 1133.  "Because the exhaustion requirement rests on the assumption that notice of denial has been provided, a fiduciary who has not provided notice that benefits have been denied is foreclosed from insisting upon exhaustion of administrative remedies." Corsini v. United Healthcare Corp., 965 F.Supp. 265, 269 (D. R.I. 1997).

Under the plain language of the Trust Agreement, Plan participants such as Plaintiffs were not required to "file a claim for benefits" in order to receive their distribution.  To the contrary, in the section that governs "Payments to or for the Accounts of Members or Terminated Members," the Trust Agreement directs that "whenever a Member's account becomes distributable pursuant to [retirement, disability, death, or separation from employment], distribution of said account balance *shall be made* by the payment, in cash, of either one lump sum, a direct Rollover (as described in Section 6.11), or a combination of both."  Tr. Agr. ¶

6.06(a) (emphasis added). Paragraph 6.06(a) further provides that such distributions "*shall be made* within a reasonable time" after the separation from employment. Id. (emphasis added).

In addition, nothing in that section addresses how or to whom a participant should appeal the calculation of his or her benefits. The only discussion of the issue can be found in ¶ 6.04(b), which states, "The determination of the amount to which a terminated Member is entitled shall be made in accordance with the rules set forth in this Article, and the Trustee's determination shall be conclusive and binding on all persons." If anything, this provision suggests that there are no appeal procedures. To be sure, in the back of the Trust Agreement (which Plaintiffs did not receive while employed at MEDITECH, see Am. Compl. ¶ 28), there is a boilerplate section that states, "All claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such regulations as the Trustee shall reasonably establish" and goes on to provide general information on how to appeal a decision from such a claim. Tr. Agr. ¶ 11.10. In practice, however, Defendant Pappalardo never actually established *any* regulations for filing a claim. A. Compl. ¶ 26.

Indeed, despite the fact that ERISA requires such procedures to be incorporated into any employee benefit plan, see 29 U.S.C. § 1133, none of the defendants have ever established a claims procedure. Am. Compl ¶ 26. The Department of Labor has interpreted § 1133 to require, at a minimum, that a plan fiduciary notify a claimant in writing of any adverse decision on a claim, giving the specific reasons for the adverse determination, referring to the specific plan provision on which the decision was based, describing whatever additional material or information is necessary to perfect the claim (with an explanation of why it is necessary), and providing a description of the review procedures, applicable time limits, and rights to file a law suit. See 29 C.F.R. §§ 2560.503-1(f)-(g). The regulations go on to provide a detailed list of

what the appeals procedure must permit in order to comply with § 1133's requirement for a "full and fair review". 29 C.F.R. § 2560.503-1(h).

The defendants have never established procedures for "filing a claim," much less provided any information on how to make a claim for any "denied" benefits or to otherwise challenge the calculation of their interest in the Plan. See Am. Compl. at ¶¶ 26-30; cf. 29 U.S.C. § 1133; 29 C.F.R. § 2560.530-1. Because the defendants wholly failed to comply with the governing regulations, Plaintiffs have exhausted their remedies as a matter of law. See 29 C.F.R. § 2560.503-1(l) ("In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of [29 C.F.R. § 2560.503-1], a claimant shall be deemed to have exhausted the administrative remedies under the plan and shall be entitled to pursue all available remedies under [29 U.S.C. § 1132(a)"); see also Corsini, 965 F.Supp. at 269 ("a fiduciary who has not provided notice that benefits have been denied is foreclosed from insisting upon exhaustion of administrative remedies").

Finally, even if the defendants were able to raise a defense of exhaustion, "an ERISA plan subscriber need not exhaust the plan's administrative remedies when such action would be futile." Corsini, 965 F.Supp. at 269. In Corsini, the Court held that it would be futile to require the plaintiffs to pursue an administrative appeal for two reasons. First, "the challenged practice represents a long-standing policy that has been applied consistently in calculating the co-payment obligations of all Plan participants." Id. Second, "by vigorously defending that policy in this litigation and in similar litigation pending in other jurisdictions, the defendants have made it clear that there is virtually no possibility that they will voluntarily abandon the policy." Id. As a result of these two factors, the Court found it "inconceivable that resort to the administrative

review process would result in anything other than a denial of the plaintiff's claim."  Id. at 269-70.

As in Corsini, Plaintiffs have challenged a long-standing practice by the defendants to undervalue the Plan's assets and to distribute to participants far less than the fair market value of their vested interest in those assets.  Not only do the defendants appear set to vigorously defense this lawsuit, they have ignored requests from all quarters to stop valuing the stock at an "artificially low price" and to establish safeguards against abuse by hiring an independent appraiser.  Am. Compl. ¶¶ 30, 50-52.  Indeed, the defendants have been vigorously defending a lawsuit brought by the ousted former Board member who complained about their valuation methodology over two years ago.  See Am. Compl. at Ex. C.  These two Corsini factors, coupled with the fact that the defendants have established no appeal procedures other than a vague offer that Plan participants such as Plaintiffs will have an opportunity for a "full and fair review" by Defendant Pappalardo (which, according to the Plan documents, "shall be conclusive and binding on all persons"), militate in favor of a finding that any requirement of exhaustion, even if otherwise appropriate, would be futile.  See Corsini, 965 F.Supp. at 269; see also Berger v. Edgewater Steel Co., 911 F.2d 911, 917 (3d Cir. 1990) (exhaustion would be futile where plaintiffs challenged company-wide policy regarding retirement benefits and responsible company officials were aware of plaintiffs' concerns prior to suit).[5]

4.    The defendants are not entitled to any deference at this stage in the litigation.

The defendants' final argument for dismissing Count 1 – that Plaintiffs have not alleged facts sufficient to support a conclusion that the defendants' valuation decisions were arbitrary

---

[5] Defendants raise, in a footnote, that Plaintiffs have not alleged that any other member of the putative class has exhausted his or her administrative remedies (Def. Memo pp. 22 n.8).  Of course, this ignores Plaintiffs' allegation that the defendants failed to establish any administrative procedures at all.  Am. Compl. ¶ 26-27.  In any event, in an ERISA class action, "all that matters is whether the lead plaintiff has exhausted his remedies."  Laurenzano, 134 F.Supp.2d at 211.  For all of the reasons given above, Plaintiffs have clearly done so.

and capricious (Def. Memo. pp. 17) – is frankly inappropriate in the context of a dismissal

motion.  See Black v. Unumprovident Corp., 2003 WL 21524703, Civ. No. 102-176-P-S, at *2

(D. Maine (June 27, 2003)) (holding, "I do not agree that the standard of review bears on the

question presented in" a 12(b)(6) motion to dismiss an ERISA claim).

      Simply put, whether or not plan assets were properly or improperly valued is a question

of fact that is dependent on a number of factors.  See, e.g, Horn, 353 F.Supp.2d at 791 (in

determining whether plan assets were properly valued, court looks to number of factors including

nature of industry, industry outlook, earning capacity, and price of comparable companies'

stock); Montgomery, 39 F.Supp.2d at 927 (noting that "the details of the stock and financial

transactions . . .are relevant to the prudence of the [fiduciary's] investigation, the fairness of the

transaction to the ESOP participants and the specific nature of the conflict of interest of the

defendants"); Demoulis, 1993 WL 81500 at * 2 (recognizing that prudence is a flexible standard

to be evaluated according to the circumstances of each case, and that courts frequently consider

such factors as "whether the fiduciary executed a proper investigation, acted as would others

familiar with such matters, and exercised independent judgment").  Plaintiffs have alleged

sufficient facts to show that the defendants have improperly valued MEDITECH's stock.  Am.

Compl. ¶¶ 49-55.  Indeed, the Amended Complaint demonstrates that comparable companies

assign a much higher value to their stock than the defendants have placed on MEDITECH stock

through nothing more than application of a standard valuation method that has received prior

court approval.  Am. Compl. ¶¶ 63-103; see also Horn, 353 F.Supp.2d at 825-29.

      Moreover, contrary to their arguments, it is not at all clear from the Trust Agreement that

the defendants possessed the level of discretion they claim.  For example, under ¶ 4.01, the

amount of the annual contribution "*shall* be paid to the Trustee in cash and/or that number of

shares of Common Stock having a fair market value on the date of contribution equal to the contribution amount (or portion thereof to be contributed in shares of Common Stock) voted by the Board of Directors as provided herein" (emphasis added).  Similarly, under ¶ 5.04 , "[i]n determining the net worth of the Trust or any portion thereof, the Trustee *shall* value the Trust assets at their fair market value" (emphasis added).  Indeed, the portion of ¶ 5.04 relied upon by the defendants to establish Defendant Pappalardo's discretion appears to be less about his discretion and more about the inability of Plan participants to appeal his calculations.  See id. (listing numerous tasks Trustee "shall" perform in valuing Plan assets before asserting that "[a] determination by the Trustee of the fair market value of any of the Trust assets, or of the net worth of the Trust or any component thereof shall be conclusive and binding upon all persons").

In any event, even if it would generally be appropriate for this Court to determine what standard of review to apply to the improper conduct alleged here without the benefit of fact finding, it would not be appropriate at this juncture because the Amended Complaint has alleged facts sufficient to show a conflict of interest on the part of the defendants.  Am. Compl. ¶¶ 56-58; see also Firestone Tire, 489 U.S. at 115 (noting that even where a benefit plan gives the fiduciary discretion, if that fiduciary "is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion"); see also Leigh, 727 F.2d at 128 (finding that where plan fiduciaries clearly faced potential conflicts of interests and continued to exercise control over the plan assets in ways that benefited non-participants, "it was virtually impossible for the plan fiduciaries to act with complete loyalty to" the participants).

The First Circuit applies a sliding scale approach to standards of review of fiduciaries' actions in conflict-of-interest cases: "If a court concludes there is an improper motivation amounting to a conflict of interest, the court 'may cede a diminished degree of deference – or no

deference at all – to the administrator's determinations.'" <u>Wright v. R. R. Donnelley & Sons Co.</u>

<u>Grp. Benefits Plan</u>, 402 F.3dd 67, 74 (1st Cir. 2004). In other words, assuming as it must that the

allegations in the Amended Complaint are true, this Court ought not to give the defendants any

deference at all as a matter of law. Rather, the Court must assume for now that the defendants

improperly valued the MEDITECH's stock and that the Court is authorized to review their

valuation decisions <u>de</u> <u>novo</u>. <u>See</u> <u>id.</u>; <u>see also</u> <u>Leigh</u>, 727 F.2d at 128.

     5.    <u>Plaintiffs' claim is appropriate as a matter of logic as well as law.</u>

Recognizing that they cannot win on the law, the defendants turn to logic, asserting that

Count 1 must be dismissed because it "does not take into account – or, more likely, purposefully

ignores – the fact that under the Plan the number of shares held by the Trust is directly dependent

upon the fair market value assigned the shares at the time of contribution" (Def. Memo. pp 11).

Defendants go on to hypothetically demonstrate what can fairly be termed the "two wrongs *do*

make a right!" dismissal argument – that is, that even if the defendants did in fact systematically

and intentionally undervalue the fair market value of the stock held by the Plan, they must have

done so at the time of contribution as well as at the time of distribution. The argument continues

that: (1) if the defendants had actually complied with their obligations to fairly value the stock

for purposes of distribution (as required by both the Plan and the statute), they surely would have

done so for purposes of contribution as well; (2) the amount to be contributed would have

remained exactly the same, regardless of how valuable the company's stock was determined to

be; and (3) the Plan would have received less stock. Based upon these unsupported assertions of

fact, the defendants claim that, as a matter of law, there could not have been any impact on the

amount of benefits that Plaintiffs ultimately received in distribution.

Contrary to the defendants' premise, the Amended Complaint clearly alleges that the amount of stock contributed to the Plan on an annual basis was *not* dependent on the total amount of funds to be contributed. Quite the opposite, the defendants have contributed the exact same number of shares to the Plan – 80,000 – for six of the last seven years (in the seventh year, the defendants contributed 75,000 shares). Am. Compl. ¶ 15. Because the defendants' dismissal argument hinges on an unsupported assertion (that they determine how much stock to contribute only after deciding upon the total value of the contribution) that flatly contradicts the Amended Complaint's allegations, it cannot serve as the basis for dismissing the complaint. See Demoulis, 1993 WL 81500 at * 5 (denying dismissal motion because argument involved question of fact "that must be resolved in favor of plaintiffs for purposes of this motion to dismiss").

Moreover, the defendants' hypothetical is logically flawed because it wrongly assumes that the Plan does not hold onto shares from year to year. For example, assume that the defendants decide to contribute $100,000 in stock to the plan one year, set the stock value at the artificially low price of $100 per share, and contribute 1,000 shares. The next year, the defendants again decide to contribute $100,000 in stock, but actually comply with their fiduciary obligations to ensure the stock is fairly valued, and come up with a value of $1,000 per share. Even if the defendants then decide to contribute only 100 shares that year, the Plan still holds the 1,000 shares from the year before. Unless the defendants change their minds about complying with their fiduciary obligations (which they could not do without facing liability under ERISA), those shares must also be fairly valued for purposes of allocation and distribution. Assuming that the fair value for purposes of contribution is also fair for purposes of allocation and distribution, the Plan would hold assets not worth $200,000, as the defendants appear to assume, but rather assets worth $1,100,000 (1,100 shares of stock worth $1,000 per share).

The above hypothetical also demonstrates an important aspect of the Plan that the defendants seem not to recognize. The Plan "is designed to invest substantially in shares of the Common Stock of the Company so as to permit the participating employees to share in *any* growth of the Company." Tr. Agr. ¶ 1.02 (emphasis added). But the participants can only share in the company's growth to the extent that the defendants value the Plan's assets in such a way as to reflect that growth – that is, at the assets' fair market value. That is exactly what the defendants were obligated to do under the Plan (see Tr. Agr. ¶ 5.04), and what they did not do. Am. Compl. ¶¶ 49, 63. As a result of the defendants' conduct, the Plan's assets were not fairly valued at the time that Plaintiffs received their distributions, resulting in their receipt of less than their vested interests due under the terms of the Plan. Am. Compl. ¶¶ 31, 35, 27-29. For all of the foregoing reasons, Plaintiffs respectfully request that this Court deny the defendants' motions to dismiss Count 1.

**B.   The Complaint Properly Alleges a Claim for Breach of Fiduciary Duties Under ERISA, 29 U.S.C. § 1132(a)(3).**

Count 2 alleges that the Director Defendants and Defendant Pappalardo (collectively, the "Individual Defendants") breached several of their fiduciary duties to the Plan participants by knowingly undervaluing the Plan's assets in violation of 29 U.S.C. § 1132(a)(3). Am. Compl. ¶¶ 108-113. This section permits a participant to bring an action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to address such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." As demonstrated in Part A(1), Plaintiffs are "participants" within the meaning of § 1132(a)'s civil enforcement provisions.

In order to state a claim for a breach of fiduciary duty, Plaintiffs must allege that the defendants were acting as fiduciaries of the Plan when they engaged in the conduct about which

Plaintiffs complain.  See Watson v. Deaconess Waltham Hospital, 141 F.Supp.2d 145, 152 (D. Mass. 2001).  Under ERISA, there are two ways to be identified as a fiduciary.  First, a person can be a "named fiduciary" – that is, the person or entity identified in the plan documents as having "authority to control and manage the operation and administration of the plan."  29 U.S.C. § 1102(a)(1).  Second, a person can be a "functional fiduciary" by virtue of "discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets."  Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 18 (1st Cir. 1998); see also 29 U.S.C. § 1002(21)(A) (a person is a "fiduciary" under ERISA "to the extent that he has any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration" of the plan).

Here, the Amended Complaint alleges that the Individual Defendants were all fiduciaries of the Plan with respect to valuing the MEDITECH stock, a duty that is owed to the Plan's participants and beneficiaries.  Am. Compl. ¶¶ 6-7.  Defendant Pappalardo as the sole Trustee was specifically identified as a "named fiduciary" in the Trust Agreement.  Am. Compl. ¶ 6; Tr. Agr. ¶ 11.11.  In addition, Defendant Pappalardo was specifically charged with ascertaining the fair market value of the stock held by the Plan for purposes of allocation and distribution, making him a "functional fiduciary" with respect to valuing the Plan's assets.  Am. Compl. ¶¶ 6, 18; Tr. Agr. ¶¶ 11.11, 5.04.

Similarly, as members of the Board of Directors, the Director Defendants acted as "the Company" – the other "named fiduciary."  Am. Compl. ¶ 4, 7; Tr. Agr. ¶¶ 11.11, 9.04.  Members of a Board of Directors, acting on behalf of a fiduciary company, are themselves fiduciaries for those purposes under ERISA.  See Kling v. Fidelity Management Trust Co., 323 F.Supp.2d 132,

142-43 (D. Mass. 2004). Here, as one of their fiduciary duties, the Director Defendants were responsible for appointing and monitoring Defendant Pappalardo as Trustee. Am. Compl. ¶ ; Tr. Agr. ¶ 8.16; see also Kling, 323 F.Supp.2d at 142-43 (responsibility for appointing and removing trustee carries with it responsibility to monitor and correct trustee's conduct for purposes of "functional fiduciary" status under ERISA). In fact, under the Trust Agreement, the Director Defendants were required to review and approve all of Defendant Pappalardo's transactions involving the Plan's assets on a yearly basis. Am. Compl. ¶¶ 7, 17; Tr. Agr. ¶ 8.13. Thus, they were specifically charged with exercising "discretionary authority in respect to, or meaningful control over" the Plan's assets for purposes of "functional fiduciary" status. See Beddall, 137 F.3d at 18; 29 U.S.C. § 1002(21)(A).

Count 2 is explicitly premised on the Individual Defendants' violations of the general fiduciary duties of loyalty and care codified at 29 U.S.C. § 1104(a). Am. Compl. ¶109; see also 29 U.S.C. § 1104(a)(1) (requiring that a fiduciary act "solely in the interest of the participants and beneficiaries"); 29 U.S.C. § 1104(a)(1)(A)(i) (requiring that a fiduciary act "for the exclusive purpose of providing benefits to participants"); 29 U.S.C. § 1104(a)(1)(B) (requiring that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing" that a prudent person in similar circumstances would employ); 29 U.S.C. § 1104(a)(1)(D) (requiring fiduciary to act "in accordance with the documents and instruments governing the plan"). There can be no dispute that a breach of any duty identified in § 1104(a) exposes the fiduciary to suit under § 1132(a)(3). See Beddall, 137 F.3d at 18. In addition to being liable for his or her own conduct, a fiduciary can also be held liable for a co-fiduciary's conduct in three circumstances: (1) participating knowingly in, or knowingly undertaking to conceal, a co-fiduciary's breach; (2) violating § 1104(a) in such a way as to enable a co-fiduciary

to commit a breach; or (3) knowing of a co-fiduciary's breach and not taking reasonable efforts under the circumstances to remedy that breach.  <u>See</u> 29 U.S.C. §§ 1105(a)(1)-(3).

The Amended Complaint alleges that despite their fiduciary obligations to the Plan participants, the Individual Defendants repeatedly breached their duties to fairly value the company stock.  Specifically, the Complaint alleges that the Individual Defendants all participated in valuing the company's stock, knowing that the values at which they were jointly arriving did not accurately reflect the stock's fair market value.  Am. Compl. ¶¶ 21, 49.  The Complaint further alleges that the Individual Defendants engaged in this behavior, in part, because undervaluing the stock benefited the company and insiders such as Defendant Pappalardo.  Am .Compl. ¶ 58.  The Complaint also alleges that despite the Individual Defendants' obvious conflict between their duty of loyalty to the Plan participants and keeping themselves and their bosses happy, they have never permitted an independent third party to appraise the value of MEDITECH's stock.  Am. Compl. ¶¶ 53.  This is so even though the stock has consistently been valued far below the stock of comparable companies, and even though the Individual Defendants received specific notice from a colleague that he believed the stock was being valued at an "artificially low price" pursuant to "an outdated valuation methodology that does not properly reflect the Issuer's current fair value."  Am. Compl. ¶¶ 50-52.  <u>Cf</u>. <u>Leigh v. Engle</u>, 727 F.2d 113, 125-26 (7th Cir. 1984) ("Where it might be possible to question the fiduciaries' loyalty, they are obliged *at a minimum* to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries.") (emphasis added).

These facts, taken as true, show among other things that the Individual Defendants (1) did not act solely in the interest of the Plan participants when valuing the company stock; (2) did not

act for the exclusive purpose of providing benefits to participants; and (3) did not act with the

care, skill, prudence, and diligence that a prudent person in similar circumstances would employ,

all in violation of 29 U.S.C. § 1104(a).  Thus it is clear that, contrary to the defendants'

protestations, the theory of fiduciary liability articulated in the Amended Complaint is a

straightforward claim that the Individual Defendants violated their fiduciary duties by "not fairly

valuing the assets in the Plan."  Am. Compl. ¶ 110; see also Perigo v. Hoffer, 354 F.Supp.2d

1145, 1147-48 (E.D. Ca. 2005) (allegations that defendants "personally sought to profit by

breaching their duty of loyalty in grossly undervaluing the Arena stock" state a claim under 29

U.S.C. § 1132(a)(3) for breach of fiduciary duty); Foltz v. U.S. News & World Report, Inc., 627

F.Supp. 1143, 1167 (D. D.C. 1986) ("Foltz II") (allegations that defendants undervalued profit-

sharing plan's assets stated claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3)

because "the effect of undervaluation [of the plan's assets] would have been to deprive then-

retiring Plan participants of a portion of the value due them from the Plan corpus, just as if the

Plan fiduciaries had wrongfully sold off some of its assets"); see also Leigh, 727 F.2d at 127-29

(finding breach of § 1104(a)'s duty of loyalty, in part, because defendant fiduciaries "faced

conflicting loyalties and . . . made no effort to obtain independent advice" regarding investment

of plan assets and interests of plan beneficiaries).

        Without question, by undervaluing the Plan's assets, the defendants harmed the Plaintiffs

when they used artificially low values to calculate the amount due to the Plaintiffs at distribution.

The defendants contend, however, that because they have been harmed in this manner, Plaintiffs

are precluded as a matter of law from bringing a claim under 29 U.S.C. § 1132(a)(3) (Def.

Memo. pp 8).  In support of this proposition, defendants cite Varity Corp. v. Howe, 516 U.S.

489, 515 (1996) and LaRocca v. Borden, Inc., 276 F.3d 22 (1st Cir. 2002), both of which stand

for the unremarkable rule that a plaintiff who has a *remedy* for withheld benefits under §
1132(a)(1)(B) cannot also recover *further relief* under § 1132(a)(3).  Defendants then leap to the
assumption that because Plaintiffs cannot *recover* under both subsections, this means they are
barred from bringing *claims* under both subsections.

Interestingly, the defendants mistake the holding of one of the two cases from this district
that have heard – and rejected – just such an argument, and completely ignore the other.  See
Watson, 141 F.Supp.2d at 152; Laurenzano v. Blue Cross and Blue Shield of Massachusetts, Inc.
Retirement Income Trust, 134 F.Supp.2d 189, 194-95 (D. Mass. 2001).  In Laurenzano, Chief
Judge Young rejected as "too clever by half" the argument that because the plaintiff had stated a
claim under § 1132(a)(1)(B), he could not state a claim under § 1132(a)(3): "Varity does not
force a plaintiff to elect his remedy before filing a complaint, but rather prohibits a plaintiff from
receiving equitable relief under [§ 1132(a)(3)] in addition to some other form of relief."  See
Laurenzano, 134 F.Supp.2d at 194-95.  Laurenzano was explicitly followed by Watson, which
flatly rejected the defendants' argument that if the plaintiff could state a claim under for unpaid
benefits under § 1132(a)(1)(B), he could not bring a claim under § 1132(a)(3).  Watson, 141
F.Supp.2d at 152 (citing Laurenzano, 134 F.Supp.2d at 194).

In fact, contrary to the defendants' unsupported assertion that § 1132(a)(3) claims
"typically involve a claim by a plaintiff who received all his or her benefits under the plan," see
Def. Memo. at 8, Plaintiffs note several cases involving claims that fiduciaries breached their
duties by undervaluing plan assets, all of which have proceeded under § 1132(a)(3).  See, e.g.,
Perigo, 354 F.Supp.2d at 1148 (claim seeking individual relief when fiduciary defendants'
"grossly undervalue" plan stock is appropriate under § 1132(a)(3) because Varity "cautioned
only that, in granting 'appropriate' equitable relief, courts should keep in mind [that] . . . where

24

Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate'") (citations omitted); <u>Foltz v. U.S. News & World Report, Inc.</u>, 627 F.Supp. 1143, 1167 (D. D.C. 1986) ("Foltz II") (allegations that defendants undervalued profit-sharing plan's assets stated claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3)). This understanding is consistent with Fed. R. Civ. P. 8, which permits parties to plead alternative causes of action and to request several different types of relief in one complaint.

Here, Plaintiffs have alleged that the Individual Defendants repeatedly breached their fiduciary duties to the Plan and its beneficiaries by systemically undervaluing the Plan's assets to suit their own interests over a period of many years. As a remedy, Plaintiffs seek the equitable remedies of make whole relief, as well as an injunction requiring the Individual Defendants to retain an outside appraisal, at their own cost, for the purposes of determining the value of the Plan assets. Because Plaintiffs have clearly alleged the essential elements of claims under § 1132(a)(3), this Court should follow the persuasive authority of prior decisions in this district and reject all of the defendants' attempts to avoid this suit.

## CONCLUSION

By controlling the information given to Plan participants, refusing to hire an independent appraiser, and retaliating against insiders who questioned their methods, the defendants have successfully resisted any outside scrutiny of their valuation methods for years. Despite the defendants' attempts to avoid this lawsuit, however, Plaintiffs have clearly alleged sufficient facts which, if proven, will give rise to liability under ERISA. For all of the foregoing reasons, Plaintiffs respectfully request that this Court deny the defendants' motions to dismiss the Amended Complaint.

Respectfully submitted,
**Michael P. Hubert,**
**William Trainor, and**
**David Hinchliffe,**
By their attorneys,


_____/s/ Sara Noonan_____
Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Sara Noonan (BBO #645293)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA  02210
671-371-1000
671-371-1037

May 23, 2005


## Certificate of Service

I, Sara E. Noonan, hereby certify that I have, on this 23rd day of May, 2005, caused the above document to be served electronically upon all counsel of record.

_____/s/_____
            Sara E. Noonan