UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually And On Behalf Of All Persons Similarly Situated, <br><br>        Plaintiffs, <br><br>    v. <br><br> MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., A. NEIL PAPPALARDO, LAWRENCE A. POLIMENO, ROLAND L. DRISCOLL, EDWARD B. ROBERTS, MORTON E. RUDERMAN, AND L.P. DAN VALENTE, <br><br>        Defendants. | Civil Action No. 05-10269RWZ |

**MEMORANDUM IN SUPPORT OF DEFENDANTS MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC. AND A. NEIL PAPPALARDO'S MOTION TO DISMISS**

Stephen D. Poss, P.C. (BBO # 551760)
Kevin P. Martin (BBO # 655222)
Jennifer W. Fischesser (BBO # 651480)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

*Attorneys for Medical Information Technology, Inc. Profit Sharing Plan, Medical Information Technology, Inc. and A. Neil Pappalardo.*

Dated: July 1, 2005

## TABLE OF CONTENTS

PAGE

BACKGROUND ........................................................................................................ 5

I.     THE MEDITECH PROFIT-SHARING PLAN ....................................................... 5

II.    PLAINTIFFS' AMENDED COMPLAINT ............................................................. 8

ARGUMENT ............................................................................................................ 9

I.     PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM, AS WELL AS THE
BENEFITS CLAIMS OF PLAINTIFFS TRAINOR AND HINCHLIFFE AND A
PORTION OF THE PUTATIVE CLASS, ARE BARRED BY THE STATUTE
OF LIMITATIONS AND BY THE PLAN .......................................................... 10

II.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR BREACH OF
FIDUCIARY DUTY ........................................................................................... 13

     A.    Plaintiffs' Breach-of-Fiduciary-Duty Claim is Really a Benefits Claim .. 14

     B.    Plaintiffs Do Not Allege Unjust Enrichment at the Expense of the Plan or
Plan Participants ........................................................................................... 16

     C.    Plaintiffs Lack Standing to Seek Prospective Injunctive Relief ............... 17

III.    PLAINTIFFS HAVE NOT STATED A CLAIM FOR ADDITIONAL BENEFITS
UNDER ERISA OR THE PLAN ......................................................................... 17

     A.    As a Matter of Law, ERISA Does Not Require Valuing Shares in a
Manner that Dilutes Remaining Plan Participants' Interests .................... 18

     B.    ERISA Does Not Require Valuing Stock for Distributions in a Manner
Inconsistent with the Value Used in Other Transactions .......................... 21

     C.    Plaintiffs' Allegations of Decreased Benefits Are Wholly Conclusory and
Not Supported by the Factual Allegations in the Amended Complaint.... 22

          1.    Under the Plan, A Higher FMV Simply Results In Proportionately
Fewer Shares Being Contributed to the Trust ............................... 23

          2.    The Amended Complaint is Internally Inconsistent Because it
Completely Ignores the Impact of Increased Distributions on
Subsequent Recipients of Benefits and on the FMV of Meditech
Stock ............................................................................................... 24

D.    Plaintiffs' Allegations Concerning the Internal Revenue Code and Proposed Department of Labor Regulations are Belied by Those Documents ............................................................................ 27

IV.    PLAINTIFFS LACK STANDING ........................................................ 29

V.    PLAINTIFFS' ALLEGATIONS DO NOT RISE TO THE LEVEL OF ARBITRARY AND CAPRICIOUS CONDUCT .................................. 31

VI.    PLAINTIFFS FAILED TO EXHAUST THEIR REMEDIES UNDER THE PLAN ...................................................................................... 34

CONCLUSION ............................................................................................ 35

# <u>TABLE OF AUTHORITIES</u>

Page

**Federal Cases**

*Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12 (1st Cir. 1998) ....................... 5, 10

*Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49 (1st Cir. 1990) .............................. 10

*Crawford v. Lamantia*, 34 F.3d 28 (1st Cir. 1994) .................................................... passim

*Day v. Fallon Community Health Plan, Inc.*, 917 F.Supp. 72 (D.Mass. 1996) ................. 9

*Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004) ... 9, 27

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) .................................... 29, 31

*Fletcher v. Tufts University*, 367 F.Supp.2d 99 (D.Mass. 2005) ...................................... 15

*Foltz v. U.S. News & World Report, Inc.*, 663 F.Supp. 1494 (D.D.C. 1987) . 19, 20, 32, 33

*Foltz v. U.S. News & World Report, Inc.*, 865 F.2d 364 (D.C. Cir. 1989) ...................... 20

*Giannone v. Metropolitan Life Ins. Co.*, 311 F.Supp.2d 168 (D.Mass. 2004) ................. 32

*Gluck v. Unisys Corp.*, 960 F.2d 1168 (3d Cir. 1992) ..................................................... 12

*Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450 (3d Cir. 2003) ..................... 30

*Husvar v. Rapoport*, 337 F.3d 603 (6th Cir. 2003) .......................................................... 16

*I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.*, 7 F.Supp.2d 79 (D.Mass. 1998) ........ 12

*Impress Communications v. Unumprovident Corp.*, 335 F.Supp.2d 1053
   (C.D.Ca. 2003) ............................................................................................................ 17

*In re Schering-Plough Corp. Erisa Litigation*, 2004 WL 1774760 (D.N.J. 2004) ........... 16

*Jasper v. M.H. & B.L. Jasper D.D.S., P.C. Profit Sharing Trust*, 340 F.Supp.2d 1017
   (E.D. Mo. 2004) ......................................................................................................... 20

*Kowalski v. Tesmer*, 125 S.Ct. 564 (2005) ..................................................................... 30

*LaChappelle v. Berkshire Life Ins. Co.*, 142 F.3d 507 (1st Cir. 1998) ............................ 10

*LaRocca v. Borden, Inc.*, 276 F.3d 22 (1st Cir. 2002) ..................................................... 15

*Mueller v. CBS, Inc.*, 200 F.R.D. 227 (W.D.Pa. 2001) ........................................................... 17

*Perry v. New England Business Service, Inc.*, 347 F.3d 343 (1st Cir. 2003) .................. 10

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987) ............................................................. 22

*Rivera-Diaz v. American Airlines, Inc.*, 2000 WL 1022888 (1st Cir. 2000) ................... 35

*Selby v. Principal Mutual Life Insurance Co.*, 197 F.R.D. 48 (S.D.N.Y. 2000) ............. 17

*Tavares v. Unum Corp.*, 17 F.Supp.2d 69 (D.R.I. 1998) ................................................... 32

*Terry v. Bayer Corp.*, 145 F.3d 28 (1st Cir. 1998) ............................................................. 34

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ...................................................................... 14

*Watson v. Deaconess Waltham Hospital*, 141 F.Supp.2d 145 (D.Mass. 2001) ............... 14

*Winninger v. Wilcox Fuel, Inc.*, 2004 WL 97626 (D.Conn. 2004) .................................. 31

**Federal Statutes**

26 U.S.C. § 401(a)(22) ......................................................................................................... 28

26 U.S.C. § 401(a)(23) ......................................................................................................... 28

26 U.S.C. § 401(a)(28)(C) .................................................................................................... 28

26 U.S.C. § 409(h) ................................................................................................................ 28

26 U.S.C. § 4975(e)(7) .......................................................................................................... 28

29 U.S.C. § 1001 ..................................................................................................................... 1

29 U.S.C. § 1104 ..................................................................................................................... 9

29 U.S.C. § 1113 ................................................................................................................... 11

29 U.S.C. § 1132(a)(1)(B) ............................................................................................. passim

29 U.S.C. § 1132(a)(2) ......................................................................................................... 13

29 U.S.C. § 1132(a)(3) ................................................................................................... passim

**Federal Rules**

Federal Rule of Civil Procedure 12(b)(6) ........................................................................ 1, 5

**State Statutes**

Mass. Gen. Laws ch. 149, § 150 (2005) ........................................................................ 12

**Miscellaneous**

Proposed Department of Labor Regulation Relating to the Definition of Adequate
   Consideration, 53 F.R. 17632 (May 19, 1988) ............................................................. 27

Defendants Medical Information Technology, Inc. Profit Sharing Plan (the "Plan"), Medical Information Technology, Inc. ("Meditech" or the "Company") and Meditech's Chairman and CEO, A. Neil Pappalardo (together, the "Trust Defendants") submit this Memorandum in Support of their Motion to Dismiss the amended class-action complaint (the "Amended Complaint") filed against them by plaintiffs Michael Hubert, William Trainor and David Hinchliffe under Federal Rule of Civil Procedure 12(b)(6).

This case concerns administration of the Plan, a profit-sharing plan generously established by Meditech to enable its employees to share in its profits, and valuation of assets contributed by Meditech to the trust established under the Plan, the Medical Information Technology, Inc. Profit Sharing Trust (the "Trust"). Under the Plan, Meditech may, but is not required to, make an annual contribution of cash and/or Meditech stock to the Trust. The trustee of the Trust (the "Trustee"), currently defendant Pappalardo, is solely responsible for valuing the cash, Meditech stock – Meditech is a privately-held company the stock of which is not publicly traded on any exchange – and other assets held by the Trust. He is also solely responsible for allocating the value of the Trust to the accounts of the Plan participants, the vested portion of which is paid to participants as a distribution of benefits upon their leaving employment with Meditech.

Plaintiffs are three former employees of Meditech who, upon termination of their employment in 1998 and 2004, each received a distribution of benefits from the Trust in accordance with the terms of the Plan. Now, in an improper attempt to enrich themselves at the expense of Plan participants who are currently employed by Meditech, Plaintiffs have filed a complaint under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"), against the Trust Defendants and individual members of the

Meditech Board of Directors (the "Director Defendants" and, together with the Trust Defendants, the "Defendants").[1]  Plaintiffs allege that the distributions they received were smaller than they were entitled to under the Plan because, they claim, the Defendants have persistently undervalued its holdings of Meditech stock.  Each year, Plaintiffs allege, Pappalardo and the Director Defendants determine a fair market value for Meditech stock (the "FMV") for the purpose of determining how many shares to contribute to the Trust, and then Pappalardo, in his capacity as Trustee, uses the same FMV to value the Trust's holdings of Meditech stock.  According to Plaintiffs, since at least January 1, 1998, Pappalardo and the Director Defendants have determined the FMV in a manner that results in FMVs that are too low, as conclusively demonstrated by a comparison to the stock prices of a single, alleged, publicly-traded competitor of Meditech.  If the FMV of non-publicly traded Meditech stock had reflected the same price-earnings ("P/E") ratios as the stock of this publicly-traded competitor, Plaintiffs allege, the distributions of benefits they received would have been three to five times larger.

        This allegation forms the basis for both counts in Plaintiffs' Amended Complaint:  Count One, brought against the Trust Defendants for benefits under 29 U.S.C. § 1132(a)(1)(B), and Count Two, brought against Pappalardo and the Director Defendants for alleged breaches of fiduciary duty.  Plaintiffs demand that the Defendants pay additional benefits to a putative class of former Plan participants in an amount several times the generous benefits they have already received, relief which they allege would

---

[1]    The Director Defendants are Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman, L.P. Dan Valente, and Lawrence A. Polimeno.

wipe out the Trust's cash and require it to sell off its assets, and demand an injunction governing administration of the Plan on a perpetual "going forward" basis.

As explained herein, there are several separate and independently sufficient reasons why both counts of Plaintiffs' Amended Complaint should be dismissed against the Trust Defendants.[2]  First, on the face of the complaint, Count Two is wholly barred by the statute of limitations, as is Count One with respect to plaintiffs Hinchliffe, Trainor, and much of the putative class.  Second, Count Two must be dismissed because the alleged breach of fiduciary duty underlying the count – failure to pay benefits due under the terms of an ERISA plan – is, as a matter of law, not a basis for a breach of fiduciary duty claim under ERISA.  Moreover, the "make whole" remedy Plaintiffs seek is, as a matter of law, not available in an ERISA breach of fiduciary duty action, and as former Plan participants Plaintiffs lack standing to pursue an injunction with respect to future Plan administration.

Third, with respect to both counts of the Amended Complaint, Plaintiffs have not stated a claim that they were entitled to additional benefits beyond those already received. Nothing in the Plan or ERISA requires the payment of increased benefits to departing plan participants if that would result in the payment of inequitably smaller distributions to remaining participants, yet under the facts alleged by the Amended Complaint that result would inevitably follow if Plaintiffs obtained the relief they seek.  In any event, because under the Plan the number of shares contributed by Meditech to the Trust is dependent upon the value assigned to those shares – the higher the shares are valued, the

---

[2]     The Director Defendants have also moved to dismiss the Amended Complaint.  In order to avoid duplication, the discussion and arguments contained in this Memorandum in Support are expressly incorporated by reference in the separate Memorandum in Support filed by the Director Defendants.

proportionately fewer shares are contributed – Plaintiffs cannot and do not allege facts showing how the Defendants' allegedly consistent assignment of "too low" a value to Meditech shares has prejudiced Plan participants; if the values assigned had been consistently higher, the Trust would just own fewer shares.  Moreover, while the Amended Complaint purports to support its claim of "denied benefits" with over 40 paragraphs of financial data concerning Meditech and an allegedly comparable company, none of the data concerning Meditech would exist in the alternate "high valuation" universe posited by Plaintiffs; Plaintiffs' allegation that, if higher values had been assigned to Meditech stock, Meditech would have been required to funnel tens of millions of dollars into the Trust to pay for the putative class's inflated benefits guarantees that Meditech would not have the earnings and assets attributed to it by Plaintiffs.  The Amended Complaint is thus devoid of allegations concerning Meditech's finances, not contradicted by other allegations in the pleading, to support Plaintiffs' claim that the assignment of consistently higher values to Meditech stock would have resulted in their receipt of greater distributions of benefits.

Fourth, because Plaintiffs lack a "colorable claim" for additional benefits under ERISA, they lack standing under both ERISA and Article III of the Constitution.  Fifth, even accepting Plaintiffs' allegations as true, they have not alleged facts sufficient to constitute arbitrary and capricious conduct in violation of ERISA.  And, finally, Plaintiffs failed to exhaust the administrative remedies available to them under the Plan, as is required to bring a benefits claim under ERISA.  For each of these independently sufficient reasons, the Amended Complaint should be dismissed.

## BACKGROUND

## I.    THE MEDITECH PROFIT-SHARING PLAN

Meditech is a corporation organized under Massachusetts law with a principal place of business in Westwood, Massachusetts.  *See* Amended Complaint ¶ 4 (hereinafter, "Am. Compl. ¶ __").[3]  Meditech stock is not traded on a public exchange, though it may be bought and sold freely subject only to the Company's right of first refusal.

Meditech's Board of Directors, including Pappalardo and the Director Defendants, generously established the Plan, and has annually voted to have the Company contribute Meditech stock and cash to the Trust for the purpose of "providing retirement and other benefits to the employees of the Company from the profits of the Company's business."   Plan ¶ 1.02. (A copy of the Plan, as amended, is appended hereto at Tab A).[4]  The Plan is "designed to invest substantially in shares of the Common Stock of the Company so as to permit the participating employees to share in any growth of the Company."  *Id*.

Pursuant to the terms of the Plan, each year Meditech may make a contribution of cash and Meditech stock to the Trust in an amount determined by the Board of Meditech.  *See* Plan ¶ 4.01.[5]  Importantly, the Plan explicitly states that "[e]ach contribution by the Company shall be voluntary."  Plan ¶ 9.02.  Nowhere in the Plan is there any requirement

---

[3]    The facts alleged in the Amended Complaint are accepted as true only for purposes of this motion under Rule 12(b)(6).

[4]    Because the Amended Complaint refers repeatedly to and relies upon the Plan document (indeed, it attaches a "1980's version of the Plan," Am. Compl. ¶ 10), it is integral to the Amended Complaint and therefore may be referenced and relied upon for purposes of this Motion to Dismiss.  *See, e.g., Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

[5]    Only the Company, not Plan participants, makes contributions to the Trust.  Plan ¶ 4.05.

that the Company contribute any cash or stock at all to the Trust, or contribute any cash

to the Trust to cover any liquidity shortfall of the Trust, or that the Company ever

purchase from the Trust any shares previously contributed to the Trust.

The method by which the Board determines the contribution is set out clearly in

the Plan:

> For each plan year, the Company shall pay to the Trustee in
> trust herein from the net income of the Company for such
> Plan Year or its earnings and profits accumulated prior to
> such Plan Year such amount as may be voted by its Board
> of Directors with respect to that Plan Year.  The amount of
> the Company's contribution shall be paid to the Trustee in
> cash *and/or that number of shares of Common Stock having*
> *a fair market value on the date of contribution equal to the*
> *contribution amount (or portion thereof to be contributed*
> *in shares of Common Stock)* voted by the Board of
> Directors as provided herein.

Plan ¶ 4.01 (emphasis added).  Thus, the Plan provides that the Meditech Board, in

making each year's contribution to the Trust, sets a total dollar amount for the

contribution.  According to the Amended Complaint, each year during the class period

the Board has voted to contribute a total of either $3,500,000 or $4,000,000 to the Trust.

Am. Compl. ¶¶ 66, 72, 78, 85, 91, 97.  Under the Plan, the Board then determines in what

form that contribution amount will be provided:  how much in cash, and how much in

Meditech shares.  The number of shares contributed is a function of the overall size of the

contribution, the portion of the contribution the Board wishes to contribute in stock, and

the fair market value (the "FMV") per share assigned to Meditech stock by the Board for

purposes of the contribution.

The Plan provides for a Trustee, currently defendant Pappalardo, to administer the

Plan.  *See* Am. Compl. ¶ 6.  Once the Company makes a contribution to the Trust, the

Trustee is solely responsible for apportioning it to the accounts of individual Plan

participants according to a formula set forth in the Plan.  *See* Plan ¶ 5.03 (allocations are proportionate to relative compensation of Plan participants).  The Trustee is also responsible for valuing the assets of the Trust, including its holdings of Meditech stock, on an annual basis.   The Trustee's determination of the value of the Trust's assets is "conclusive and binding on all persons."  Plan ¶ 5.04.  The Plan states:

> [T]he trustee shall determine the total net worth of the Trust by evaluating all of its assets and liabilities as of that date exclusive of any amounts segregated into separate accounts for terminated members …. [I]n determining the net worth of the Trust or any portion thereof, the Trustee shall value the Trust assets at their fair market value. … *A determination by the Trustee of the fair market value of any of the Trust assets, or of the net worth of the Trust or any component thereof, shall be conclusive and binding upon all persons.*

Plan ¶ 5.04 (emphasis added).

Upon termination of their employment, Plan participants receive a cash distribution of their vested interest in the Trust's assets.  *See* Plan ¶ 6.04.  The Trustee is solely responsible for determining the distribution to be made to eligible plan participants.  *See id*., ¶ 6.04(b) ("The determination of the amount to which a terminated Member is entitled shall be made in accordance with the rules set forth in this Article, and the Trustee's determination shall be conclusive and binding on all persons").

If a participant disagrees with the amount of his or her distribution of benefits, the Plan sets out the steps available to obtain review of the Trustee's determination.  The Plan states that "[a]ll claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such procedures as the Trustee shall reasonably establish."  Plan, Second Amendment, ¶ 11.10(a).  Where such a claim is filed, the Plan contains procedures for its consideration, including an additional appeal to the Trustee.  *Id*.,

¶11.10(b)-(d).  Similar information is also found in the Summary Plan Description attached to Plaintiffs' Amended Complaint.  *See* Am. Compl., Ex. A, Summary Plan Description, at 8.

## II.    PLAINTIFFS' AMENDED COMPLAINT

This case arises from the Plan's payment of benefits to plaintiffs Hinchliffe, Trainor, and Hubert upon their termination as employees of Meditech in January and March 1998, and July 2004, respectively.  Am. Compl. ¶¶ 37–39.  Plaintiffs do not allege that upon termination they did not receive their full vested benefits as determined by the Trustee.  In addition, Plaintiffs do not allege that they submitted a claim for additional benefits with the Trustee in accordance with the procedures set out in the Plan, and that such a claim was denied.

The gist of Plaintiffs' Amended Complaint is that the Defendants failed "to pay benefits due Plan participants from at least January 1, 1998 to present, upon the participants' termination of their employment, due to a deliberate and/or reckless under-pricing of the Plan's primary asset – shares of Meditech stock.  As a result, participants have not received their full benefits, in violation of law …."  Am. Compl., Introduction. The bulk of the factual allegations in the Amended Complaint consists of a description of the  yearly financial data of Meditech and a single company, publicly-traded Cerner Corp., which Plaintiffs allege is a Meditech competitor.  *See id.*, ¶¶ 63–103.  The Amended Complaint pays almost singular attention to the comparative P/E ratios of Meditech and Cerner stock.  As a matter of law, Plaintiffs allege, the FMV assigned to non-publicly traded Meditech shares should reflect a P/E ratio equal to that of publicly-traded Cerner's stock.  *See, e.g.*, *id.*, ¶ 81.

On the basis of these allegations alone, Plaintiffs claim to be entitled under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), to the payment of additional benefits from the Trust, and to be "made whole" under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for the "harm" they suffered as a result of the undervaluation. They also allege that the individual defendants (other than Pappalardo) breached a fiduciary duty to Plan participants under ERISA, § 404, 29 U.S.C.§ 1104, by "assist[ing] [Pappalardo] in not fairly valuing the assets in the Plan and/or fail[ing] to adequately monitor or remove defendant Pappalardo from his role as sole Trustee." Am. Compl. ¶¶ 84, 85. Notably, Plaintiffs claim that if they and the putative class members were to recover the additional benefits they seek then the Trust would "soon run out of cash," in which case Meditech would be "required" to either fund the Trust's liquidity shortfall, or to purchase shares from the Trust. Am. Compl. ¶ 69. Plaintiffs also seek an injunction requiring an outside appraiser to value Meditech stock "on a yearly basis going forward" into perpetuity, and seek removal of Pappalardo as Trustee.

## ARGUMENT

In considering a motion to dismiss, a court must treat all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiffs. That said, "12(b)(6) is not an entirely toothless tiger." *Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61, 67 (1st Cir. 2004) (internal quotation marks and citation omitted). A motion to dismiss cannot be defeated by "bald assertions" and "unsupportable conclusions." *Id.* at 68. When ruling on a motion to dismiss "the Court will not accept any unsupported conclusions or interpretations of law;" instead, "it is the plaintiff's burden to make sufficient *factual* allegations in order to survive a Rule 12(b)(6) motion." *Day v. Fallon Community Health Plan, Inc.*, 917 F.Supp. 72, 75 (D.Mass. 1996) (emphasis added).

9

"[I]t is only when such conclusions are logically compelled, or at least supported, by the stated facts, that is, when the suggested inference rises to what experience indicates is an acceptable level of probability, that conclusions become facts for pleading purposes." *Correa-Martinez v. Arrillaga-Belendez,* 903 F.2d 49, 53 (1st Cir. 1990) (overruled on other grounds by *Educadores Puertorriquenos, supra*).

In addition, because Plaintiffs rely upon the terms of the Plan in their Amended Complaint, the actual terms of that Plan can and should be considered in weighing the motion, and the Court should disregard any allegations concerning the Plan that are contradicted by the Plan itself. *See, e.g., Beddall v. State Street Bank & Trust Co.,* 137 F.3d 12, 17 (1st Cir. 1998); *Perry v. New England Business Service, Inc.,* 347 F.3d 343, 345-46 (1st Cir. 2003) (affirming district court's Rule 12(b)(6) dismissal of complaint because plaintiff's allegation that she was an ERISA plan participant "flies in the face of the unambiguous terms of the Plan").

## I. PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM, AS WELL AS THE BENEFITS CLAIMS OF PLAINTIFFS TRAINOR AND HINCHLIFFE AND A PORTION OF THE PUTATIVE CLASS, ARE BARRED BY THE STATUTE OF LIMITATIONS AND BY THE PLAN

The first ground for dismissal, in part, of the Amended Complaint is the statute of limitations. "Granting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred." *LaChappelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998).

As an initial matter, Plaintiffs' breach-of-fiduciary-duty claim (Count Two) must be dismissed in its entirety. Under ERISA, a claim alleging breach of fiduciary duty must be brought by "the earlier of" (1) "six years after … the date of the last action which constituted a part of the breach or violation," (2) "three years after the earliest date on

10

which the plaintiff had actual knowledge of the breach or violation," except that, in the case of "fraud or concealment," the six-year prong of the statute of limitations is tolled. 29 U.S.C. § 1113.[6]

According to the Amended Complaint, "the individual defendants" have violated "their fiduciary duties to the Plan *since at least 1998*" by "not fairly valuing the assets in the Plan and/or fail[ing] to adequately monitor or remove defendant Pappalardo from his role as sole Trustee." Am. Compl. ¶¶ 110, 113 (emphasis added); *id*., ¶ 31 ("Since at least January 1, 1998, the defendants … have undervalued participants' interest in the Plan due to their undervaluing of Meditech stock, the primary asset in the Plan"); *see also id*., ¶ 49 ("For at least eight years, the defendants have knowingly valued Meditech stock at less than fair market value").  Accordingly, Plaintiffs were required to bring any breach-of-fiduciary duty action within six years of the time that Pappalardo and the Director Defendants had allegedly "not fairly valu[ed] the assets in the Plan" – *i.e*., at the latest, by January 1, 2004.  The original complaint in this action, however, was filed on February 10, 2005, and the Amended Complaint on May 23, 2005.  Accordingly, Count Two must be dismissed with prejudice as to all Plaintiffs.[7]

Moreover, Count One of the Amended Complaint, alleging denial of benefits, *see* Am. Compl. ¶¶ 104-107, must be dismissed with respect to plaintiffs Hinchliffe and Trainor, and a portion of the putative class.  A benefits claim ordinarily must be brought within the time allowed by the most analogous state statute of limitations; with respect to

---

[6]    The Amended Complaint nowhere alleges any fraud or concealment, nor could it.

[7]    While, for the reasons given above, ERISA's six-year statute of limitations disposes of Count Two of the Amended Complaint as to all members of the putative class, Defendants explicitly reserve the right to argue, if necessary and at an appropriate time, that the three-year "actual knowledge" prong of ERISA's statute of limitations also bars the claims of some or all members of the putative class.

Plaintiffs' claim to have been denied "deferred compensation," that is the three-year limitations period for actions under the Massachusetts wage payment statute, MASS. GEN. LAWS ch. 149, § 150 (2005). *See, e.g.*, *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1182 (3d Cir. 1992) ("[c]laims for recalculation of benefits already paid are essentially claims for past due 'wages'" and are subject to the limitations period of the state wage payment statute); *see also* Am. Compl. ¶ 23 ("benefits under the Plan are considered deferred compensation"). Under this limitations period the claims of Hinchliffe and Trainor, who were terminated by Meditech and allegedly received their distributions in or around January and March 1998, respectively, should have been filed by 2001, and the claim of any putative class member who received a distribution before February 10, 2002 is likewise barred. *See* Am. Compl. ¶¶ 2, 3, 28.

The Meditech Plan, moreover, has its own limitation period for actions regarding "entitlement to benefits or any aspect of benefits under the Plan," requiring such claims to be brought no later than "the earliest of" one year after payment of a lump-sum benefit, one year after denial of an appeal from a decision by the Trustee, or the latest date otherwise prescribed by applicable law. *See* Plan, Second Amendment, ¶ 11.10(f). Under this provision in the Plan, which became effective January 1, 2002, and which expressly supersedes any longer statutory limitations period, the claim of any putative class member who received a distribution before February 10, 2004 is barred. *See, e.g.*, *I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.*, 7 F.Supp.2d 79, 86 (D.Mass. 1998) (Ponsor, J.).

## II.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY

In Count Two of the Amended Complaint, Plaintiffs allege that the individual Defendants breached fiduciary duties owed to "plaintiffs and all the others in the class." Am. Compl. ¶ 110.  Although Plaintiffs do not cite the statutory basis for their breach of fiduciary duty claim, fiduciary duty claims on behalf of individual plan participants may only be brought under 29 U.S.C. § 1132(a)(3).[8]

According to Plaintiffs, Pappalardo (together with the Director Defendants) breached his fiduciary duty to Plaintiffs by "not fairly valuing the assets in the Plan," thereby causing unspecified "harm" to Plaintiffs and the putative class.  *See* Am. Compl. ¶ 110.  For this unspecified "harm," Plaintiffs seek a three-pronged remedy.  First, they ask to be made whole for harm "caused by undervaluing the Plan's assets."  *See id*., ¶ 111.  Second, they demand that the individual defendants be liable "for any unjust enrichment they have received as a result of their failure to properly value the Plan's assets."  *See id*., ¶ 112.  Finally, they insist that Defendants be required to pay for "an outside appraisal of the assets of the Plan, at the cost to these defendants, to be done on a yearly basis going forward, for purposes of determining the value of the Plan assets," and for the removal of Pappalardo as Trustee.  *Id.*, ¶ 113, Prayer for Relief.

For the reasons given herein, Count Two should be dismissed in its entirety against defendant Pappalardo.  First, a claim by a plan participant to be made whole for benefits allegedly still due under an ERISA plan may not be brought under Section 1132(a)(3); it must be brought as a benefits claim under Section 1132(a)(1)(B).  Second,

---

[8]    Such actions brought on behalf of a plan as a whole are governed by Section 1132(a)(2).  Claims for benefits alleged to be owed under the terms of a plan are brought under Section 1132(a)(1)(B).

there are no allegations in the Amended Complaint supporting an ERISA cause of action for Plaintiffs with respect to any unjust enrichment.   Finally, Plaintiffs lack standing to pursue the injunctive relief they seek.

### A.    *Plaintiffs' Breach-of-Fiduciary-Duty Claim is Really a Benefits Claim*

As noted above, Plaintiffs refer vaguely in Count Two to the "harm" they have suffered from Defendants' allegedly "not fairly valuing the assets in the Plan," and request, *inter alia*, that they be made whole.   The only harm alleged in the Amended Complaint for which Plaintiffs could be made whole is Plaintiffs' allegedly "not receiving the fair value of their benefits from the Plan at the time of their termination of employment due to the defendants' deliberate and/or reckless undervaluation of Meditech common stock," Am. Compl. ¶ 33.   As a matter of black-letter ERISA law, however, the alleged underpayment of benefits under the terms of a plan cannot be the basis for an action under 29 U.S.C. § 1132(a)(3).

The breach of fiduciary duty claim available to individual plan participants under Section 1132(a)(3) is limited to cases in which the plaintiff does not claim to be entitled to benefits *under the plan*.  *See Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996).   Breach of fiduciary duty claims brought under Section 1132(a)(3) for "benefits" typically involve a claim that plaintiff, while receiving all his or her benefits under the plan, was tricked by a fiduciary into accepting an employment status (*e.g.*, early retirement or part-time status) that caused plaintiff to lose the right to additional benefits under the plan.   In such a case the plaintiff, having inarguably received all of the benefits he or she was due under the plan, has no "benefits" claim, and so is permitted to proceed under Section 1132(a)(3). *See, e.g., Watson v. Deaconess Waltham Hospital*, 141 F.Supp.2d 145 (D.Mass. 2001), *aff'd*, 298 F.3d 102 (1st Cir. 2002).

Where, however, a plaintiff claims to still be owed benefits under the terms of the plan, an action can be brought under Section 1132(a)(1)(B), and a cause of action under Section 1132(a)(3) is not available.  The First Circuit has stated this clearly: "when the plaintiff can bring a claim for benefits under Section a(1), equitable relief would not be appropriate and she *does not have a cause of action* under Section a(3)." *LaRocca v. Borden, Inc.*, 276 F.3d 22, 29 (1st Cir. 2002) (emphasis added) (internal quotation marks and citations omitted).  And this Court has as well:  "29 U.S.C. § 1132(a)(3) can only be used if no other portion of section 1132 is applicable.  Because Fletcher claims that the defendants improperly classified her disability as mental rather than physical in violation of § 1132(a)(1), I hold that section 1132(a)(3) is unavailable to her.  She must proceed, if at all, under § 1132(a)(1)."  *Fletcher v. Tufts University*, 367 F.Supp.2d 99, 116 (D.Mass. 2005) (Lindsay, J.).

Plaintiffs' "breach of fiduciary duty" claim against Pappalardo (and the Director Defendants) is of precisely the type that can only be brought as a benefits action under Section 1132(a)(1)(B).  The Amended Complaint contains no allegations of any "harm" for which Plaintiffs could be "made whole" other than "not receiving the fair value of their benefits from the Plan."  Am. Compl. ¶ 33; *see also id*., Introduction ("This is an action … based on the defendants' *failure to pay benefits due* to Plan participants ….  As a result, participants have not received their *full benefits* ….") (emphases added). Accordingly, the theory underlying the "make whole" prong of Count Two is indistinguishable from that which should underlie a benefits claim – and in fact Plaintiffs also bring a benefits claim alleging the same "harm" in Count One.  *See* Am. Compl. ¶ 107 ("plaintiffs bring this action to recover benefits due them and the Class from the Plan

and from all those who participated in the failure to properly pay Class members the fair value of their Plan benefits.").

It is clear from the face of the Amended Complaint that the "make whole" prong of Plaintiffs' breach of fiduciary duty claim is really an improperly-pled claim for benefits alleged to be due under the terms of the Plan. Accordingly, under *LaRocca* and *Fletcher*, this prong of Count Two must be dismissed as a matter of law.

**B.    *Plaintiffs Do Not Allege Unjust Enrichment at the Expense of the Plan or Plan Participants***

In Count Two, Plaintiffs also assert that the "individual defendants are liable as fiduciaries and/or co-fiduciaries for any unjust enrichment they received as a result of their failure to properly value the Plan's assets." Am. Compl. ¶ 112. This portion of Count II is simply a *non sequitor*. The Amended Complaint contains *no* factual allegations that *any* Defendant engaged in *any* transaction with the Plan involving the purchase of *any* Plan assets, such that "failure to properly value" the assets led to unjust enrichment at the expense of the Plan or Plan participants.[9] Accordingly, the allegation of unjust enrichment is precisely the sort of unsupported, conclusory allegation that cannot survive a motion to dismiss, and to the extent Count Two pleads unjust enrichment, it must be dismissed. *See supra* at 9-10.

---

[9]    The Amended Complaint does contain vague allegations that some Defendants have "purchased stock," *see* Am. Compl. ¶¶ 56–58, but it does not allege from whom these purchases were made. There is thus no allegation that any purchases were made from the Plan, or that they are in any way connected to Plan administration. Defendants are aware of no case finding a cause of action under Section 1132(a)(3) for plan participants to seek redress of unjust enrichment suffered by some other entity – including a plan sponsor – in non-plan related transactions. *Cf. Husvar v. Rapoport*, 337 F.3d 603, 608 (6th Cir. 2003) (even though the actions in question "affected the value of the company stock that comprised the employees' benefit plan assets, that fact alone does not transform a state-law breach of fiduciary duty claim into an ERISA action"); *In re Schering-Plough Corp. Erisa Litigation,* 2004 WL 1774760 at * 6 (D.N.J. 2004) (same).

C.    *Plaintiffs Lack Standing to Seek Prospective Injunctive Relief*

Plaintiffs also ask the Court to issue a perpetual prospective injunction "ordering an outside appraisal of the assets of the Plan, at the cost to these defendants, to be done on a yearly basis going forward, for purposes of determining the value of the Plan assets," and to order the removal of Pappalardo as Trustee.  Am. Compl. ¶ 113, Prayer for Relief.  While this remedy is objectionable for several reasons – including that there is no legal requirement for an outside appraisal – Count Two must be dismissed to the extent it is based on this requested injunction because these Plaintiffs and the putative class members have no standing to seek it.  Each Plaintiff is a former employee of the Company, and the putative class consists entirely of individuals whose employment with Meditech has been terminated.  *See id.*, ¶¶ 33, 35, 36.  Former employees who have already "cashed out their interest" in a plan have no standing under ERISA to seek an outside appraisal conducted "on a yearly basis going forward" or any other injunctive relief.  *See Impress Communications v. Unumprovident Corp.,* 335 F.Supp.2d 1053, 1060 (C.D.Ca. 2003) (holding that former plan participants had no standing to seek injunctive relief with respect to plan administration); *Mueller v. CBS, Inc.*, 200 F.R.D. 227, 241 (W.D.Pa. 2001) (same); *Selby v. Principal Mutual Life Insurance Co.*, 197 F.R.D. 48, 64 (S.D.N.Y. 2000) (same).  Only a current participant in the Plan could seek such an injunction, and, notably, none have joined Plaintiffs' action.

III.    **PLAINTIFFS HAVE NOT STATED A CLAIM FOR ADDITIONAL BENEFITS UNDER ERISA OR THE PLAN**

Count One of the Amended Complaint explicitly seeks the payment of additional benefits to Plaintiffs; Count Two, as discussed above, seeks the same result through its request that Plaintiffs be "made whole."  As discussed herein, both Counts, to the extent

17

they seek additional benefits, fail, for each of several independently sufficient reasons, to state a claim under ERISA.

**A.**     *As a Matter of Law, ERISA Does Not Require Valuing Shares in a Manner that Dilutes Remaining Plan Participants' Interests*

First, Plaintiffs' allege that under ERISA and the terms of the Plan they should have received a distribution of benefits that was several times larger than what they actually received. Plaintiffs, however, also allege that if this had happened, the Trust would have "soon run out of cash" and either Meditech would have been required to "donate more cash" to the Trust, or the Trust would have been forced to sell off its Meditech stock, in order to pay benefits to departing Plan participants:

> The Plan Trustee and other defendants undervalued the shares of Meditech in the Plan so that participants who terminate employment in 1998 and 1999 would not receive the fair value of their assets in the Plan. In part this was done because if employees were paid a fair price for their assets in the Plan, the Plan would have soon run out of cash. This would require the company to donate more cash to the Plan or buy shares from the Plan.

Am. Compl. ¶ 69. Meditech, however, as explained above, is not obliged by the terms of the Plan to contribute anything at all to the Plan, much less contribute additional cash to the plan to fund inflated distributions to Plan participants, or to repurchase any shares that it had previously contributed to the Plan. *See supra* at 5-6. All Plan participants are entitled to is a distribution of benefits from the Trust, in an amount equal to their share of the Trust's assets.

Accordingly, if, as Plaintiffs allege, the Trust were to become illiquid in the late 1990s by attempting to pay inflated distributions to departing Plan participants, it could only raise cash for distributions to departing Plan participants by attempting to sell Meditech stock to a willing third party. The allegations in the Amended Complaint,

however, reveal that this would inevitably lead to an inequitable dilution of the interest of remaining Plan participants. That is because Plaintiffs do not allege that any transactions in non-publicly traded Meditech shares have ever occurred at the FMVs they seek – they only allege transactions at the FMVs used by the Trustee. *See* Am Compl. ¶¶ 21, 46, 57. There is thus no allegation that the Trust could find a buyer for non-publicly traded Meditech stock at the inflated FMVs which Plaintiffs allege must be used. This is unsurprising, since Plaintiffs clearly allege that their FMVs do not take into account any illiquidity or minority discounts, and are based solely on the P/E ratios of a single, publicly-traded competitor of Meditech. *See* Am. Compl. ¶¶ 62; *see also id.*, ¶¶ 64-103; *cf. Foltz v. U.S. News & World Report, Inc.*, 663 F.Supp. 1494, 1533–34 (D.D.C. 1987), aff'd, 865 F.2d 364 (D.C. Cir. 1989) (appraiser did not violate ERISA in applying marketability discount to valuation of non-publicly traded shares). If, however, the Trust could only find a buyer for Meditech shares at prices lower than the non-discounted FMVs Plaintiffs insist must be used in valuing the Trust for purposes of distributions, it would need to sell *more* than the departing participants' proportionate share of its holdings of Meditech stock to raise sufficient funds to pay their distributions. This disproportionate sale of stock would, of course, dilute the interests of remaining Plan participants.

This result – the dilution of the interest of remaining Plan participants – is not required by the Plan or permitted by ERISA. As the District Court for the District of Columbia noted in the landmark case *Foltz v. U.S. News & World Report, Inc.*, "[i]t is not the purpose of ERISA to require that plan fiduciaries maximize the benefits paid to departing employees." 663 F.Supp. at 1518. In *Foltz*, the court rejected a claim that

shares in a non-publicly traded company should have been valued several times higher, explaining:

> *such a [many-times higher] valuation could have resulted in an improper dilution of the interests of participants who remained in the Plan.* Specifically, persons leaving the Plan would have received benefits based upon value in the Plan that was not to be realized. Insofar as payment of such benefits would have drained cash from the Plan, the Plan might have been forced to sell off parcels of stock at a minority price, which would have left remaining participants receiving less per share so that departing participants could be paid more.

*Foltz*, 663 F.Supp.2d at 1526 (emphasis added).

The D.C. Circuit agreed, stating:

> even if we supposed that § 404 called for exclusive pursuit of pecuniary advantages for plan beneficiaries, the disputed valuation decisions are consistent with such an aim. The plaintiffs were not the only beneficiaries of the Plan. Plan wealth that was not distributed to them was available for distribution to other Plan beneficiaries. Indeed, the worst that can be said of the Plan is that it was administered to favor a rolling class of future beneficiaries over those present and past. Nothing in § 404 requires that one set of beneficiaries be favored over another.

*Foltz*, 865 F.2d at 374.

The concern that payments to some participants not result in depletion of plan assets has also led courts, for example, to hold that when share prices are falling, a plan fiduciary may select a new valuation date to avoid a distribution to some participants that eliminates assets available for other participants. *See Jasper v. M.H. & B.L. Jasper D.D.S., P.C. Profit Sharing Trust*, 340 F.Supp.2d 1017 (E.D. Mo. 2004).

Moreover, even assuming for sake of argument that Meditech had been required by the Plan to fund any liquidity shortfall of the Trust, this too would have resulted in a dilution of the interest of remaining Plan participants. That is because the resulting

20

transfer of up to $180 million would have caused Meditech's earnings to fall by up to 40%. *See* Am. Compl. ¶ 45 (Meditech's after-tax profits in the class period were approximately $417 million). Under Plaintiffs' P/E-centric theory of the case, this would have caused the FMV to fall as well. Hence, the remaining Plan participants would find themselves holding less valuable Meditech stock so that those participants leaving the Company earliest could receive an unrealistically high payout of benefits. Nothing in the Plan or ERISA requires this result. Nor would encouraging employees to jump ship early be in the best interests of the Plan or the Company.

Accordingly, because, under the terms of the Amended Complaint itself the relief Plaintiffs seek would result in an "improper dilution" of the interests of current Plan participants, Plaintiffs' Amended Complaint should be dismissed with prejudice.

**B.     *ERISA Does Not Require Valuing Stock for Distributions in a Manner Inconsistent with the Value Used in Other Transactions***

In the instant case, the Amended Complaint describes three categories of transactions involving Meditech shares: contributions by Meditech to the Plan, distributions from the Plan to participants, and purchases by defendant Pappalardo. *See* Am. Compl. ¶¶ 46, 57. According to the Amended Complaint, the same method is used to value Meditech stock for purposes of each of these transactions. *See* Am. Compl. ¶ 21, 57. In addition, the Plan authorizes the Trustee to "purchase Common Stock from the Company or from any stockholder of the Company at a price equal to the fair market value of the Common stock at the time of purchase." Plan ¶ 8.04. The Amended Complaint nowhere alleges that any transactions in Meditech stock have ever occurred at any price other than the FMV determined by the Board and/or the Trustee for that period.

Plaintiffs nonetheless allege that they were denied benefits, and the individual

defendants breached their fiduciary duties, because the Trustee did not use FMVs for purposes of distribution that were up to five times greater than the FMVs used by the Company for other purposes. There does not appear to be any reported decision, however, holding that ERISA plan participants were denied benefits, or that plan fiduciaries breached their duties, because a profit-sharing-plan trustee valued non-publicly traded stock using the same valuation method that had been used when the stock was valued for the purpose of contributing it to the trust. Certainly, nothing in ERISA evinces any Congressional intent to require a windfall for plan participants – and, as discussed above, a dilution of the interests of others – where it is determined that the method used to assign fair market values to the plan sponsor's stock results, with respect to both contributions and distributions, in valuations that are uniformly too low. Indeed, to the extent Plaintiffs suggest that a plan sponsor could be forced to fund such a windfall, *see* Am. Compl. ¶ 69, their requested relief runs directly counter to the Congressional policy of encouraging the formation of ERISA plans. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987).

Accordingly, because Plaintiffs seek an unprecedented windfall from requiring the Plan to use a valuation method for distributions that is not used for contributions or any other purpose, the Amended Complaint should be dismissed with prejudice.

## C.    *Plaintiffs' Allegations of Decreased Benefits Are Wholly Conclusory and Not Supported by the Factual Allegations in the Amended Complaint*

Third, Plaintiffs conclude that the alleged "under-pricing" of Meditech stock caused the members of the putative class to receive less in benefits than they otherwise would have. *See, e.g*., Am. Compl., Introduction ("This is an action … based on the defendants' failure to pay benefits due to Plan participants … due to a deliberate and/or

reckless under-pricing of the Plan's primary asset – shares of Meditech stock.  As a

result, participants have not received their full benefits, in violation of law").  As

discussed herein, however, the Amended Complaint does not contain factual allegations

that support this conclusion.

           1.       <u>Under the Plan, A Higher FMV Simply Results In Proportionately<br>Fewer Shares Being Contributed to the Trust</u>

     First, as discussed above, Plaintiffs allege that the method used to value Meditech

stock for purposes of determining distributions to Plan participants is the same method

used to value the stock for purposes of determining contributions by Meditech to the

Plan.  *See supra* at 21.  Because of this alleged fact, however, Plaintiffs cannot show how

they have been denied benefits by the alleged practice of "undervaluation."  That is

because, under the Plan, the number of shares held by the Trust is dependent upon the

FMV assigned the shares at the time of contribution.

> The amount of the Company's contribution shall be paid to
> the Trustee in cash and/or *that number of shares of
> Common Stock having a fair market value on the date of
> contribution equal to the contribution amount (or portion
> thereof to be contributed in shares of Common Stock)* voted
> by the Board of Directors as provided herein.

Plan ¶ 4.01 (emphasis added).  Under the Plan, the lower the FMV, the proportionately

more shares are necessary to equal the contribution amount.  Conversely, the higher the

FMV, the proportionately fewer shares are necessary.  If Defendants had not engaged in

the alleged practice of undervaluing the shares for purposes of both contributions and

distributions, the Trust would hold proportionately fewer shares.

     The Amended Complaint contains no allegations explaining in any way how the

Trust holding more, proportionately less highly-valued shares caused Plaintiffs to receive

lesser benefits from the Trust.  Indeed, to the extent Plaintiffs repeatedly rely on the fact

that Meditech pays a substantial dividend in arguing that the FMV should be higher – *see*

Am. Compl. ¶¶ 46, 63, 70, 76, 81, 87, 94 – they must acknowledge that the fewer shares

the Trust holds, the less dividend income it collects, and the smaller the distribution to

Plan participants.  Hence, if Defendants historically had used a valuation method that

resulted in higher FMVs it would, all else being equal, have caused Plaintiffs to receive

*less* in benefits from the Trust upon termination of their employment.

Plaintiffs' theory of injury depends on their receiving the benefit *both* of the

"low" fair market valuation method historically used in determining the number of shares

to be contributed to the Trust, *and* their proposed "high" fair market valuation method for

use in determining distributions of benefits.  But Plaintiffs cannot have it both ways.

First, as discussed above, there is nothing in ERISA that requires the resulting windfall

for some plan participants.  Second, and more fundamentally, for Plaintiffs to show that

they have been denied benefits as a result of the allegedly too-low valuation method, they

would need to show this method resulted in their receiving less in benefits.  But they

cannot make such a showing, because if the higher valuation method that Plaintiffs allege

is required had been used consistently, the total contribution each year by Meditech to the

Trust would have been no greater.  There would simply have been proportionately fewer

shares contributed to the Trust.  *See Crawford v. Lamantia*, 34 F.3d 28, 33 (1st Cir.

1994).

2.    The Amended Complaint is Internally Inconsistent Because it
Completely Ignores the Impact of Increased Distributions on
Subsequent Recipients of Benefits and on the FMV of Meditech
Stock

Second, even assuming Plaintiffs were somehow entitled to take advantage of

both of the "too low" valuation method historically used for determining contributions

and the higher valuation method they propose for use of determining distributions, their claim to have received less in benefits than they were due would still be entirely speculative.

As an initial matter, the Amended Complaint nowhere accounts for the impact of increasing distributions on Meditech itself and, consequently, the value of the Trust's Meditech stock holdings. Plaintiffs allege that Meditech would be required to direct sufficient cash to the Trust to permit it to pay Plaintiffs their windfall. *See* Am. Compl. ¶ 69. If Meditech had done so, however, its profits would have declined by as much as 40%. *See supra* at 21. Were that to occur, however, the value of Meditech stock, under Plaintiffs' own P/E-centered model, *see* Am. Compl. ¶¶ 63–103, would decline by a like amount. This effect is completely ignored by the Amended Complaint: when Plaintiffs neatly allege, *e.g.*, that in 2003 Meditech "had a net profit of $67.4 million, or $1.98 share," wherefore "Meditech shares should have been fairly valued at over $74 in 2004, not $26," *see id.*, ¶¶ 98, 101, those numbers are not adjusted to take into account the massive additional cash flows Plaintiffs would have going from Meditech to the Trust to fund distributions to departing Plan participants. Accordingly, the Amended Complaint effectively contains no allegations, not contradicted by the implications of Plaintiffs' own Paragraph 69, concerning the appropriate FMV of Meditech stock in different years.

Similarly, the Amended Complaint nowhere accounts for the impact of increasing distributions in any one year on the Trust's assets available for distribution to the remaining participants. As demonstrated above, *see supra* at 19, because the Amended Complaint does not allege that any market exists for Meditech stock at the FMVs Plaintiffs allege should be used for determining distributions, any sale of stock to pay the

inflated benefits Plaintiffs seek would result in the Trust being required to sell a disproportionate number of shares to raise the necessary cash. Plaintiffs' allegations concerning subsequent years, however, assume – without comment – no impact on the Trust's asset base from such sales in earlier years. Importantly, Plaintiffs allege that Defendants used a too-low valuation method in the years preceding the class period. *See, e.g.*, Am. Compl. ¶ 113 (alleging a breach of fiduciary duty "since at least 1998"); *id*., ¶ 49 (alleging the underpayment of benefits for "at least eight years"). In light of these allegations, what the asset-base of the Trust would have been at the beginning of the class period is entirely speculative; the payment of the windfall Plaintiffs seek for themselves to departing participants in earlier years may have eroded the Trust's assets to the point that Plaintiffs themselves could receive little or nothing from the Trust.

All told, Plaintiffs purport in Paragraphs 63 to 103 of the Amended Complaint to provide significant detail supporting their conclusory allegation that Defendants' "too low" valuation method resulted in Plaintiffs' receipt of less benefits than they were due. Those Paragraphs are effectively meaningless, however, because Plaintiffs' ignore the implications of their own allegations concerning Trust liquidity in Paragraph 69. In Plaintiffs' alternate universe, they allege, the Trust would run out of cash, and Meditech would transfer large amounts of cash to the Trust each year to cover its liquidity shortfall. The numbers put forward in Paragraphs 63 to 103, however, simply would not exist if Meditech were making additional contributions to the Trust, a fact Plaintiffs must admit because it follows inevitably from their own pleading. Likewise, Plaintiffs nowhere account for the disproportionate erosion of the Trust's asset base that would occur if distributions were based on FMVs for Meditech stock that could not be obtained in the

market.  Hence, the Amended Complaint contains no factual allegations to support its wholly conclusory allegation that Plaintiffs received less in benefits than they were due, and must for that reason be dismissed for failure to state a claim.  As noted above, Rule 12(b)(6)'s pleading standard is not "toothless."  *Educadores Puertorriquenos*, 367 F.3d at 67.  Accordingly, the Amended Complaint should be dismissed with prejudice for failure to state a claim as a matter of law.

D.    ***Plaintiffs' Allegations Concerning the Internal Revenue Code and Proposed Department of Labor Regulations are Belied by Those Documents***

In support of Plaintiffs' claim for a higher valuation for purposes of distribution, the Amended Complaint relies upon two supposed legal authorities:  a proposed Department of Labor regulation, and a provision of the Internal Revenue Code (the "IRC").   Neither of these, however, is relevant in any way to the alleged facts of this case or to Plaintiffs' claims, and, as a matter of law, neither can form the basis for any claim in the Amended Complaint.

First, Plaintiffs allege, in reliance on a 1988 proposal for a new Department of Labor regulation that was never adopted, that Pappalardo has acted in bad faith as a fiduciary by not retaining an outside appraiser to value the Trust's Meditech stock holdings.  *See* Am. Compl. ¶ 60.  As this proposed regulation has never been adopted, no requirement to obtain an outside appraiser exists.  Even if this proposed regulation had been adopted, however, it would have nothing to do with this case, because it concerned solely the wholly separate issue of what constitutes "adequate consideration" in sales of employer securities between an ERISA plan and a party in interest with respect to that plan (*e.g.*, the plan sponsor or a plan fiduciary).  *See* Proposed Regulation Relating to the Definition of Adequate Consideration, 53 F.R. 17632 (May 19, 1988).  In the instant

27

case, there is no allegation that any party in interest has engaged in any securities transactions with the Plan, and therefore the proposed regulation cannot support any allegation that an outside appraisal must be used by the Trustee.

Plaintiffs also allege, in reliance on the IRC, that Meditech must provide Plan participants "a put … to require that the plan repurchase employees' securities under a fair valuation formula."  Am. Compl. ¶ 61.  As with the proposed regulation discussed above, Plaintiffs' reliance on the IRC is, for several independent reasons, simply a *non sequitor*.  First, this provision applies only to "tax credit employee stock ownership plans," "employee stock ownership plans" and "stock bonus plans," and not to profit-sharing plans such as the Plan.  *See* 26 U.S.C. §§ 409(h), 401(a)(23) and 4975(e)(7).  Under the Meditech Plan (unlike a stock bonus or employee stock ownership plan), employees do not receive securities that they can then "sell" back to the plan sponsor; instead the Trust receives stock and cash and the employee receives the right to a distribution of benefits from the Trust upon termination of employment.  *See* Plan ¶ 6.06(a).  Second, this provision of the IRC does not provide any answer to the question how to determine the FMV of the shares.  And third, this provision of the IRC does not, in any event, provide a cause of action to employees.  Indeed, it bears noting that to the extent the IRC provides for appraisals of the non-publicly traded shares held by a plan for all plan purposes, this is an "additional requirement" that Congress placed on types of defined contribution plans other than profit-sharing plans such as Meditech's.  *See* 26 U.S.C. § 401(a)(22); see also 26 U.S.C. § 401(a)(28)(C).  Thus, as a matter of law, the two authorities upon which Plaintiffs attempt to rely are inapplicable.

## IV.    PLAINTIFFS LACK STANDING

As discussed in the preceding section, Plaintiffs have failed to state a claim for additional benefits for several independently sufficient reasons, including Plaintiffs' failure to allege facts showing how the purported use of a low-valuation method for determining contributions and distributions resulted in their receiving any less in benefits. This failure of pleading also results in Plaintiffs lacking standing under both ERISA and Article III of the Constitution.

Under ERISA, only a plan "participant" or "beneficiary" may bring a claim for benefits under Section 1132(a)(1)(B).  Plaintiffs, as former employees, are no longer Plan participants under the terms of the Plan.  *See* Plan ¶ 3.03.  Former employees may qualify as participants entitled to bring a benefits action, but only to the extent they have a "colorable claim" to additional benefits under the Plan.  *See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117 (1989).*  The requirement that a claim for benefits be "colorable" is not toothless.  Where a plaintiff's claim for benefits is speculative, he or she will not be deemed a "participant" entitled to bring suit under Section 1132(a)(1)(B). *See Crawford v. Lamantia*, 34 F.3d 28 (1st Cir. 1994).

The decision of the First Circuit in *Crawford* bears directly on the instant case.  In *Crawford*, plaintiff claimed that the trust in which he had been a participant paid too much for shares of the employer, and therefore that the excess funds – which had been borrowed from the employer specifically to make the stock purchase – should be distributed to plan participants.  Concluding that plaintiff had not shown a "direct and inevitable effect on his benefits" from this scenario – if the shares had been priced lower, the excess money likely never would have been borrowed in the first place – the First Circuit concluded that plaintiff lacked standing as a participant under ERISA.  *See*

*Crawford*, 34 F.3d at 33.  So too here; for the reasons given above, Plaintiffs have not alleged facts sufficient to show how a decision to assign a higher FMV to Meditech stock would have increased their benefits, let alone that such an increase would be "direct and inevitable."  Accordingly, as did plaintiff in *Crawford*, Plaintiffs lack a colorable claim to additional benefits, and so standing under Section 1132(a)(1)(B).

Moreover, it is black-letter constitutional law that "[t]o satisfy Article III, a party must demonstrate an 'injury in fact'; a causal connection between the injury and the conduct of which the party complains." *Kowalski v. Tesmer,* 125 S.Ct. 564, 567 n.2 (2005) (*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).  Here, as explained above, Plaintiffs have failed to allege a causal connection between any "injury" and the "conduct of which [they] complain":  even if Plaintiffs could establish that the FMV should be higher, they would be entitled to no relief unless the finder of fact made the wholly speculative assumption, unsupported by the Amended Complaint, and contrary to the terms of the Plan, that the same number of shares would have been contributed to the Trust regardless of the FMV of the shares.  *See Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450, 457 (3rd Cir. 2003) (plaintiff lacked Article III standing to bring ERISA claim for individual damages where she could not show that her company, allegedly overcharged for health benefits, "would have passed these savings on to its employees in the form of a higher salary or additional benefits," an occurrence the court deemed "far too speculative").  Accordingly, the Amended Complaint should be dismissed for lack of Article III standing.

## V.    PLAINTIFFS' ALLEGATIONS DO NOT RISE TO THE LEVEL OF ARBITRARY AND CAPRICIOUS CONDUCT

The Trustee Defendants' fifth ground for dismissal of both counts is that, even assuming Plaintiffs had sufficiently alleged that the benefits they were provided upon termination were lower than they could have been, they have not alleged facts sufficient to support a claim that Defendants' valuation decisions were arbitrary and capricious, wherefore the Amended Complaint must still be dismissed for failure to state a claim.

Under ERISA, the standard of review applied to a benefits determination made by a plan fiduciary varies with the discretion accorded the fiduciary.  "A denial of benefits is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).  "If the plan grants the administrator discretionary powers to decide questions of pension benefits, then the question is whether the fiduciaries' interpretation of the contract was arbitrary and capricious."  *Winninger v. Wilcox Fuel, Inc.*, 2004 WL 97626 (D.Conn. 2004).

With respect to the Meditech Plan, the Plan vests sole discretion in the Trustee to decide questions of benefits and to construe the terms of the Plan, including by valuing the assets of the Trust.  Paragraph 5.04 states:

> In determining the net worth of the Trust or any portion thereof, the Trustee shall value the Trust assets at their fair market value. … A determination by the Trustee of the fair market value of any of the Trust assets, or of the net worth of the Trust or any component thereof shall be conclusive and binding upon all persons.

In addition, Paragraph 8.02 of the Plan, as amended, states more generally that

> The Trustee is hereby vested with all discretionary powers and authority necessary in order to carry out his duties and responsibilities in connection with the administration of the

31

> Plan and Trust as herein provided, and is authorized to
> make such rules and regulations as he may deem necessary
> to carry out the provisions of the Plan and Trust. The
> Trustee shall have the discretionary power and authority to
> determine any questions of fact and any questions arising in
> the administration, interpretation and application of the
> Plan and Trust, and the decision of the Trustee shall be
> conclusive and binding on all persons.

This language is sufficient to invoke the arbitrary and capricious standard of review for decisions by the Trustee. *See Giannone v. Metropolitan Life Ins. Co.*, 311 F.Supp.2d 168, 176 (D.Mass. 2004) (Stearns, J.); *see also Tavares v. Unum Corp.*, 17 F.Supp.2d 69, 75-76 (D.R.I. 1998).

Taking all of the allegations in the Amended Complaint as true, Plaintiffs have not alleged facts sufficient to support a conclusion that the Trust was valued arbitrarily and capriciously. First, Plaintiffs' claims are based entirely on the disparity between the P/E ratio derived from Meditech's FMV and Cerner's P/E ratio in any given year. But there is nothing in ERISA requiring as a matter of law that the shares of a non-publicly traded company be valued as if they were publicly traded or that a particular competitor's transient market value must be used to set the value of a plan's assets. *See Foltz*, 663 F.Supp. at 1533-34 (appraiser did not violate ERISA in applying marketability discount to valuation of non-publicly traded shares).

Second, to the extent Plaintiffs complain of the lack of an independent appraiser, nothing in ERISA requires the use of an independent appraiser to value the assets of a profit-sharing plan for purposes of distributions to plan participants. Indeed, the Amended Complaint's reliance upon an irrelevant proposed regulation and an irrelevant provision of the IRC demonstrates the absence of any basis to assert that not using an outside appraiser constitutes arbitrary and capricious conduct. *See supra* at 27-28.

Third, the Amended Complaint alleges that the FMVs used for distributions have been consistent with the FMVs used for contributions to the plan.  *See*, *e.g.*, Am. Compl. ¶ 21.  This is not a case in which the valuation method used for distributions results in lower values than are used with respect to the same asset in other transactions or contexts.

Fourth, as discussed above, it is proper for a plan fiduciary to take into consideration how the payment of benefits to some departing participants will affect those remaining in the plan.  *See supra* at 19-20 (discussing *Foltz*).  Nothing in ERISA requires depleting plan cash or forcing a plan to sell off assets, let alone makes failure to do so arbitrary and capricious.

Fifth, Plaintiffs argue that *as a matter of law* the FMV of Meditech stock should be as variable and volatile as Cerner's – the P/E ratio of which has lurched from 40 to 15, and back up to the high 20's.  There is no requirement under ERISA that trustees follow the vagaries of the volatile market for publicly-traded securities when valuing holdings of non-publicly traded shares.  *See Foltz*, 663 F.Supp. at 1533-34.  Avoiding such volatility is one reason why some companies elect not to go public.  Moreover, the valuation method used for Meditech stock has resulted in P/E ratios that are relatively stable.  It cannot, as a matter of law, be arbitrary and capricious for the Trustee to employ a valuation method that treats employees retiring in different years more equally and equitably than would the highly-variable "copy Cerner" method proposed by Plaintiffs.

In summary, because both Counts of the Amended Complaint hinge on a conclusion that Plaintiffs benefits were arbitrarily and capriciously low, and Plaintiffs have not alleged facts sufficient as a matter of law to support such a conclusion, the Amended Complaint should be dismissed as a matter of law for failure to state a claim.

33

**VI.    PLAINTIFFS FAILED TO EXHAUST THEIR REMEDIES UNDER THE PLAN**

The final reason supporting dismissal of the Amended Complaint is Plaintiffs' failure to exhaust their avenues for appeal under the Plan.  *See*, *e.g.*, *Terry v. Bayer Corp.,* 145 F.3d 28 (1st Cir. 1998) (explaining exhaustion requirement for benefits claims).

The Meditech Plan (including both the current Plan and the "1980's version" attached by Plaintiffs to the Amended Complaint) lays out in simple terms the steps that a Plan participant must take to claim benefits.  It states that "[a]ll claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such procedures as the Trustee shall reasonably establish."  Plan, Second Amendment, ¶ 11.10(a).  Where such a claim is filed, the Trustee shall, "within 90 days of submission of a claim, provide adequate notice in writing to any Claimant whose claim for benefits under the Plan has been denied," setting forth, among other things, "the specific reasons for the denial of the claim."  *Id.*, ¶11.10(b).  Should the claimant disagree with the Trustee's determination, he or she may then request a "full and fair review by the Trustee of the decision denying the claim."  *Id.*, ¶ 11.10(c).  In response to such a request for a review, the Trustee has 60 days to "render its decision on the request for review," providing written notice if the claim is denied in whole or in part. *Id.*, ¶ 11.10(d).

Here, Plaintiffs have not alleged that they filed a claim for benefits with the Trustee – indeed, they affirmatively allege that they did not.  *See* Am. Compl. ¶ 28.  Nor do Plaintiffs allege ever asking the Trustee to reconsider his determination of their benefits.  Indeed, while Hubert alleges that he sent a "letter questioning the valuation of his benefits" to the "Plan administrator," Am. Compl. ¶ 30, that letter not only failed to comply with the procedures set out in the Plan, it also did not take the form of a claim for

benefits. The letter, which being referenced in the Complaint may be considered for purposes of this Motion to Dismiss, simply asks Meditech's CFO for her "assistance and/or insight" with respect to the issues it raises, while explicitly leaving open Hubert's seeking "further resolution to these matters." *See* Letter from Michael Hubert to Barbara Manzolillo dated September 7, 2004 (attached hereto at Tab B).

Accordingly, because Plaintiffs have not exhausted their remedies within the Plan, as required to bring a benefits claim under ERISA, Count One should be dismissed with prejudice. *See Rivera-Diaz v. American Airlines, Inc.*, 2000 WL 1022888 (1st Cir. 2000). Likewise, because Count Two is, as discussed above, effectively a disguised benefits claim, that Count also should be dismissed with prejudice.

**CONCLUSION**

For all of the foregoing reasons, the Trustee Defendants respectfully request this Court grant their Motion to Dismiss the Amended Complaint with prejudice, together with such other relief as the Court deems to be just and equitable.

Respectfully submitted,

MEDICAL INFORMATION
TECHNOLOGY INC. PROFIT SHARING
PLAN, MEDICAL INFORMATION
TECHNOLOGY, INC. and A. NEIL
PAPPALARDO.

By their attorneys,

 /s/  Stephen D. Poss, P.C.
Stephen D. Poss, P.C. (BBO # 551760)
Kevin P. Martin (BBO # 655222)
Jennifer W. Fischesser (BBO # 651480)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated: July 1, 2005
LIBA/1554582.8

MEDICAL INFORMATION TECHNOLOGY, INC.

PROFIT SHARING PLAN

Amended and Restated Trust Agreement

(As of January 1, 1998)

# TABLE OF CONTENTS

**ARTICLE I**

The Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.01 Creation of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.02 Interpretation of Trust Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**ARTICLE II**

Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.01 "Affiliated Company" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.02 "Agreement" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.03 "Anniversary Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.04 "Beneficiary" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.05 "Board of Directors" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.06 "Break in Service" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.07 "Common Stock" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.08 "Company" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.09 "Compensation" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.10 "Effective Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.11 "Employee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.12 "Employment Commencement Date" . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.13 "Hour of Service" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.14 "Member" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.15 "Plan" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.16 "Plan Year" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.17 "Reemployment Commencement Date" . . . . . . . . . . . . . . . . . . . . . . . . 6
2.18 "Service" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.19 "Trust" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.20 "Trustee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.21 "Valuation Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**ARTICLE III**

Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.01 Eligibility for Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.02 Determination of Eligibility by Trustee . . . . . . . . . . . . . . . . . . . . . . . . 7
3.03 Duration of Active Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.04 Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.05 Military Leaves of Absence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
3.06 USERRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE IV
   Contributions under the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   4.01 Company Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   4.02 Determination of Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   4.03 Payment of Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   4.04 Reversion of Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   4.05 Members' Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE V
   Members' Accounts;
   Allocation of Assets and Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   5.01 Members' Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   5.02 Compensation Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   5.03 Allocation of Contributions and Forfeitures. . . . . . . . . . . . . . . . . . . . . . 12
   5.04 Valuation of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   5.05 Allocation of Trust Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   5.06 Distributions and Forfeitures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   5.07 Limitations on Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   5.08 Sources of Forfeiture Restorations . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE VI
   Payments to or for the Accounts of
   Members or Terminated Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
   6.01 Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
   6.02 Disability Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
   6.03 Death Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
   6.04 Termination of Employment Prior to Retirement, Disability, or Death . . . . . . 19
   6.05 Reemployment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   6.06 Manner and Timing of Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . 22
   6.07 Additional Restrictions on Distributions . . . . . . . . . . . . . . . . . . . . . . . . 24
   6.08 Discharge of Trustee's Obligation to Make Payments . . . . . . . . . . . . . . . . 26
   6.09 Investment of Segregated Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   6.10 Loans to Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   6.11 Direct Rollovers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
   6.12 In-Service Withdrawals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE VII
   Amendment and Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
   7.01 Right to Amend or Terminate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
   7.02 Amendment for Tax Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
   7.03 Liquidation of Trust in Event of Termination . . . . . . . . . . . . . . . . . . . . . 33
   7.04 Termination of Plan and Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ARTICLE VIII
   Rights and Duties of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   8.01  Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   8.02  Powers of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   8.03  Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   8.04  Method of Purchasing, Holding and Selling Securities . . . . . . . . . . . . . . . . 36
   8.05  Exercise of Voting Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
   8.06  Power to Borrow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
   8.07  Reliance on Trustee as Owner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   8.08  Liquidation of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   8.09  Evidence on which Trustee may Act . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   8.10  Action by Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   8.11  Discretionary Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   8.12  Employment of Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   8.13  Records and Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   8.14  Payment of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
   8.15  Compensation and Expenses of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . 40
   8.16  Resignation or Removal of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   8.17  Legal Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   8.18  Indemnification of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

ARTICLE IX
   The Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
   9.01  No Contract of Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
   9.02  No Contract to Maintain Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
   9.03  Liability of Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
   9.04  Action by Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
   9.05  Successor to Business of Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
   9.06  Dissolution of the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

ARTICLE X
   Top-Heavy Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   10.01  Article Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   10.02  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   10.03  Top-Heavy Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
   10.04  Minimum Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
   10.05  Vesting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
   10.06  Termination of Top-Heavy Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

ARTICLE XI

Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
11.01 Limitation of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
11.02 Spendthrift Provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
11.03 Appointment of Person to Receive Payment . . . . . . . . . . . . . . . . . . . . . . 50
11.04 Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
11.05 Impossibility of Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
11.06 Adjustment for Fractional Interests . . . . . . . . . . . . . . . . . . . . . . . . . . 51
11.07 Definition of Words . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
11.08 Titles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
11.09 Merger or Consolidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
11.10 Claims Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
11.11 Allocation and Delegation of Responsibilities . . . . . . . . . . . . . . . . . . . . 53
11.12 Special Provisions for Certain Leased Employees . . . . . . . . . . . . . . . . . . 53
11.13 Execution of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

# MEDICAL INFORMATION TECHNOLOGY, INC.

## AMENDED AND RESTATED PROFIT SHARING PLAN AND TRUST

The Trust Agreement made the 31st day of December, 1973, by and between

MEDICAL INFORMATION TECHNOLOGY, INC., a Massachusetts corporation having its

principal place of business in Westwood, Massachusetts (the "Company") and A. NEIL

PAPPALARDO of Boston, Massachusetts, (the "Trustee"), which has been subsequently

restated and amended from time to time, is now amended and restated in its entirety as follows:

## W I T N E S S E T H   T H A T:

WHEREAS, the Company recognizes the continuing contribution being made to the

successful operation of its business by its employees and desires to reward such contribution by

continuing its maintenance of a profit sharing plan for its employees who are or shall hereafter

become eligible as Members under the Plan embodied herein;

WHEREAS the Company amended and restated said Plan to comply with the Tax

Reform Act of 1986 and to make certain other changes;

WHEREAS the Plan was subsequently amended by the First, Second and Third

Amendments thereto;

WHEREAS the Company now desires to amend and restate said Plan to comply with

recent legislation and to make certain other changes;

NOW, THEREFORE, the parties hereto each in consideration of the covenants,

agreements and declarations of the other, mutually covenant, agree and declare the Trust

Agreement dated December 31, 1973, as subsequently amended and restated, is hereby further

amended and restated as provided herein effective January 1, 1998 except that the changes made to Sections 3.06, 6.07(b) and 11.12 shall be effective as of January 1, 1997. In determining a Member's rights and benefits under the Plan up to such effective date, the provisions of the Plan as previously in effect shall apply:

## ARTICLE I

### The Trust

1.01  Creation of Trust. There has been established hereunder a trust which shall be known as the "MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING TRUST." The Trustee shall receive any contributions paid to the Trust, and all contributions so received, together with the income therefrom, shall be held, managed, and administered as a fund in trust pursuant to the terms of this Agreement. The Trustee hereby affirms his acceptance of the Trust created hereunder and agrees to perform the provisions of this Agreement on his part to be performed.

1.02  Interpretation of Trust Agreement. The Trust is established for the purpose of providing retirement and other benefits to the employees of the Company from the profits of the Company's business, and for the exclusive benefit of the eligible Employees and their beneficiaries, and is designed to invest substantially in shares of the Common Stock of the Company so as to permit the participating employees to share in any growth of the Company. So far as possible, this Agreement shall be interpreted in a manner consistent with this intent and with the intent of the Company that the Trust established hereunder shall satisfy the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), and those of

2

the Internal Revenue Code of 1986 (the "Code") relating to exempt employees' profit sharing trusts, as either of those statutes may from time to time be amended. Except as provided in Section 4.04, under no circumstances shall any property of the Trust, or any contributions made by the Company, ever revert to or be used or enjoyed by the Company or be used for any purpose other than for the exclusive benefit of the eligible employees or their beneficiaries.

## ARTICLE II

### Definitions

Whenever used in this Agreement, unless the context clearly indicates otherwise, the following words shall have the following meanings:

2.01 "Affiliated Company" means (a) a member of a controlled group of corporations of which Medical Information Technology, Inc. is a member, (b) an unincorporated trade or business which is under common control with Medical Information Technology, Inc. as determined in accordance with Section 414(c) of the Code and regulations issued thereunder, (c) a member of an "affiliated service group" (within the meaning of Section 414(m) of the Code) of which Medical Information Technology, Inc. is a member, or (d) an organization which is required to be aggregated with Medical Information Technology, Inc. pursuant to regulations promulgated under Section 414(o) of the Code. For purposes hereof, a "controlled group of corporations" shall mean a controlled group of corporations as defined in Section 1563(a) of the Code, determined without regard to Section 1563(a)(4) and (e)(3)(C) of the Code.

2.02 "Agreement" means this Agreement as the same may be amended from time to time.

2.03 "Anniversary Date" means December 31 in each year after the Effective Date.

3

2.04  "Beneficiary" means the person or persons designated by a Member, pursuant to the provisions of Section 6.03 of this Agreement, to receive distribution of such Member's share upon his death, and includes a co-beneficiary or a contingent beneficiary. The term "Beneficiary" shall also include a Member's surviving spouse if such spouse is deemed to be the Member's Beneficiary pursuant to Section 6.03(c).

2.05  "Board of Directors" means the board of directors of the Company in office from time to time.

2.06  "Break in Service" means any "twelve-consecutive month period" (as determined under this Section) during which an individual does not perform any Hours of Service for the Company or an Affiliated Company. The "twelve-consecutive month period" used to determine whether a Break in Service has occurred shall commence on the earlier of the following dates, and anniversaries thereof:  (i) the date the individual's employment with the Company or an Affiliated Company terminates by reason of quit, discharge, or retirement, or (ii) the first twelve-month anniversary of the date the individual was first absent from employment with the Company or an Affiliated Company by reason other than quit, discharge, or retirement; provided, however, that in the case of an individual who is absent from work for "maternity or paternity reasons", the twelve-consecutive month period beginning on the first anniversary of the first date of such absence shall not constitute a Break in Service.  For purposes of this Section, an individual's absence is for "maternity or paternity reasons" if the individual is absent from work by reason of pregnancy, birth, or adoption of his child or for the purpose of caring for such child for a period beginning immediately following such birth or adoption.

2.07  "Common Stock" means the common stock of the Company.

4

2.08 "Company" means MEDICAL INFORMATION TECHNOLOGY, INC. and any successor to all or a major portion of its business which adopts this Plan and Trust pursuant to Section 9.05.

2.09 "Compensation" includes salaries, wages, bonuses, overtime, commissions and all other forms of direct remuneration paid to a Member by the Company but excludes (a) any amount paid to an Employee prior to his becoming a Member under the Plan and (b) any contributions by the Company to or benefits under the Plan. A Member's Compensation shall not be taken into account for any purpose of the Plan (other than Section 5.07 and Article X) to the extent such Compensation exceeds $100,000.

2.10 "Effective Date" means the effective date of the amendment and restatement of this Plan, which is January 1, 1998, unless otherwise specifically provided.

2.11 "Employee" means any person who is employed by the Company as a common law employee. An Employee shall become an Employee on his Employment Commencement Date.

2.12 "Employment Commencement Date" means the first date on which the individual performs an Hour of Service.

2.13 "Hour of Service" means each hour for which an Employee is directly or indirectly paid or entitled to payment by the Company or an Affiliated Company for the performance of duties.

2.14 "Member" means any Employee who is eligible to participate in the Plan as determined under Article III of this Agreement.

5

2.15 "Plan" means the "MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN" as set forth herein, together with any and all amendments hereto.

2.16 "Plan Year" means the fiscal year of the Trust, and the Company, being the twelve (12) months ending on the Anniversary Date of each year.

2.17 "Reemployment Commencement Date" means the first date on which the individual performs an Hour of Service following a Break in Service which is not counted as Service.

2.18 "Service" of an Employee means the period of time determined in accordance with Article III.

2.19 "Trust" means the trust created by this Agreement.

2.20 "Trustee" means the trustee herein named and any duly appointed successor trustee or trustees.

2.21 "Valuation Date" means December 31 of each Plan Year, and any other date which the Trustee may select for the valuation of the Trust and adjustment of accounts determined in accordance with Section 5.04 and 5.05, respectively.

# ARTICLE III

## Membership

3.01  <u>Eligibility for Membership</u>.  Each Employee who is a Member on January 1, 1998 shall continue to be a Member under the Plan.  Each other Employee, including each future Employee, shall become a Member under the Plan on the first day of the month coincident with or next following his completion of one year of Service.  In the event an individual has completed the foregoing eligibility requirements but is not an Employee on the applicable entry date, such individual shall not become a Member of the Plan at that time.  If such individual thereafter becomes an Employee, such individual shall become a Member on the date he subsequently becomes an Employee.

3.02  <u>Determination of Eligibility by Trustee</u>.  The determination of an Employee's eligibility for membership under the Plan shall be made by the Trustee from the Company's records; and the Trustee's determination shall be conclusive and binding on all persons.

3.03  <u>Duration of Active Membership</u>.  An active Member shall continue as such until his employment with the Company is terminated, except as otherwise provided in Sections 5.02 and 5.03 in the case of a Member whose employment terminates on account of retirement, disability or death.  A former active Member shall once again become an active Member on his Reemployment Commencement Date.

3.04  <u>Service</u>.  The "Service" of an Employee means, with respect to each Employee, the most recent period of time, determined in years and days, which commences on an Employee's Employment Commencement Date, or Reemployment Commencement Date, during which there occurs no Break in Service.  If an Employee with at least one year of Service

7

terminates his employment with the Company, incurs a Break in Service and is subsequently reemployed, then the "Service" of such Employee for all purposes of the Plan after his reemployment shall include Service accumulated both before and after such Break in Service. Except as provided in Section 6.05, Service accumulated after such Break in Service shall not be taken into account for the purpose of determining such Employee's severance benefit under Section 6.04 at the time of such Break in Service. An Employee shall receive credit for Service with an Affiliated Company for the purposes of determining (a) his eligibility to participate in the Plan pursuant to Section 3.01, (b) the amount of his vested benefit under Section 6.04 and (c) his Breaks in Service, but such Service shall not be taken into consideration for any other Plan purpose.

    3.05  <u>Military Leaves of Absence</u>.  Except as otherwise specifically provided, an Employee who leaves the Company to enter the armed services of the United States of America and who returns to its employ at or before the expiration of ninety (90) days after the date on which he is first entitled to be released from active duty in the armed services (or at such later date as the Company may approve or as may be required by law) shall be deemed to have been in the continuous employ of the Company throughout and the period of such military absence shall be included in his period of Service for all purposes of this Plan. If any Employee shall fail to return from a military leave of absence as required by the Company in accordance with the Plan, he shall be deemed to have quit the Company on the date such military leave of absence began; provided, however, that any resultant forfeitures from his account shall be deemed to occur on the Anniversary Date subsequent to the date of his failure to return from his military leave of absence as required by the Company.

3.06  <u>USERRA</u>.  Notwithstanding any provision of this Plan to the contrary,

contributions, benefits and service credits with respect to qualified military service shall be

provided in accordance with section 414(u) of the Code.

<u>ARTICLE IV</u>

<u>Contributions under the Plan</u>

4.01  <u>Company Contributions</u>.  For each Plan Year, the Company shall pay to the

Trustee in trust hereunder from the net income of the Company for such Plan Year or its

earnings and profits accumulated prior to such Plan Year such amount as may be voted by its

Board of Directors with respect to that Plan Year.  The amount of the Company's contribution

shall be paid to the Trustee in cash and/or that number of shares of Common Stock having a fair

market value on the date of contribution equal to the contribution amount (or portion thereof to

be contributed in shares of Common Stock) voted by the Board of Directors as provided herein.

As used in this Section, "net income" and "accumulated earnings and profits" of the Company

mean the net income and accumulated earnings and profits as shown by the Company's books

before deducting Federal and State taxes measured in part or in whole by income.

4.02  <u>Determination of Contribution</u>.  The amount of the Company's contribution for

each Plan Year shall be subject to final determination by the Company and verification by the

Company's independent public accountants.  The amount of such contribution, as determined by

the Company and verified by such accountants, shall be conclusive and binding on all persons.

4.03  <u>Payment of Contribution</u>.  The Company's contribution to the Trust for each Plan

Year shall be paid within the time required by law in order to obtain a deduction of the amount

of the Company's contribution to the Trust for Federal income tax purposes for such Plan Year.

4.04  <u>Reversion of Contributions</u>.  In the event that the Company shall make a

contribution to the Trust on the basis of a mistake of fact, the Company may direct the Trustee

to return such contribution to the Company at any time within the twelve-month period

10

commencing on the date of contribution.  All contributions under the Plan are conditioned upon

the deductibility thereof by the Company under Section 404 of the Code.  To the extent that any

such deduction is disallowed, the Company may direct the Trustee to return such contribution

(to the extent disallowed) to the Company at any time within the twelve-month period

commencing on the date of disallowance.

    4.05  <u>Members' Contributions</u>.  Contributions by Members shall not be permitted.

## ARTICLE V
### Members' Accounts;
### Allocation of Assets and Contributions

5.01 <u>Members' Accounts</u>. The Trustee shall maintain a book account for amounts credited from time to time to each Member under the Plan. Any contributions made by the Company for a Member pursuant to Section 4.01 shall be allocated to each Member's account pursuant to Section 5.03.

5.02 <u>Compensation Schedule</u>. As soon as practicable after the end of each Plan Year, the Company shall deliver to the Trustee a schedule showing the name of each Member who was either an Employee on the Anniversary Date of such Plan Year or an Employee who retired, became disabled or died within the meaning of Sections 6.01 to 6.03 during such Plan Year, and opposite the name of each such Member the amount of Compensation paid to him by the Company during such Plan Year. Notwithstanding anything to the contrary elsewhere herein, no Employee who owns (excluding any beneficial ownership under the Trust) ten percent (10%) or more of the outstanding Common Stock of the Company on an Anniversary Date shall be listed on the schedule required by this Section 5.02 with respect to such Anniversary Date. The schedule shall also include such other information as the Trustee may reasonably require for the proper administration of the Plan.

5.03 <u>Allocation of Contributions and Forfeitures.</u> Upon receiving such schedule and the total contribution made by the Company for the Plan Year, and after the account balances of the Members have been adjusted as provided in Section 5.05 and forfeitures determined under Section 6.04, the Trustee shall credit to the account of each Member listed on such schedule a portion of the Company's contribution and a portion of the total amount of forfeitures arising

12

from the accounts of terminated Members pursuant to Section 6.04 which bears the same ratio to such total amounts as the Member's Compensation listed on such schedule bears to the Compensation listed on said schedule for all such Members.

Notwithstanding the foregoing provisions of Section 5.02 and this Section 5.03, the Company may, in its discretion and as necessary to cause the Plan to satisfy the requirements of Section 410(b)(1)(B) of the Code for any Plan Year, expand the schedule provided pursuant to Section 5.02 for such Plan Year to include the name of each Member (including each former Member whose employment terminated during such Plan Year) who received any Compensation during such Plan Year (but excluding any Employee who owns 10% or more of the outstanding Common Stock of the Company), and direct the Trustee to allocate Company contributions and/or forfeitures for such Plan Year to the accounts of all Members listed on such expanded schedule in proportion to the Compensation of each such Member for such Plan Year as reflected on such expanded schedule.

5.04  Valuation of Trust.  As of each Valuation Date, the Trustee shall determine the total net worth of the Trust by evaluating all of its assets and liabilities as of that date exclusive of any amounts segregated into separate accounts for terminated Members pursuant to Section 6.06(b) and the contribution made by the Company with respect to its Plan Year current with or ending on said Valuation Date.  In determining the net worth of the Trust or any portion thereof, the Trustee shall value the Trust assets at their fair market value.  There shall be included as of the Valuation Date, without implied limitation, income on hand, income accrued, dividends payable but not paid, and uninvested cash, whether income or principal; and there shall be deducted as of the Valuation Date, without implied limitation, liabilities accrued.  A

13

determination by the Trustee of the fair market value of any of the Trust assets, or of the net

worth of the Trust or any component thereof shall be conclusive and binding upon all persons.

5.05  Allocation of Trust Assets.  The total net worth of the Trust as determined on each

Valuation Date shall be compared with the total of all amounts standing to the credit of the

accounts of all Members of the Plan, as of such Valuation Date, excluding from the accounts of

said Members, in the case of a December 31 Valuation Date, any amounts credited from the

contribution of the Company with respect to such Plan Year.  The excess or deficiency of the

total net worth of the Trust as so compared with the total account balances of all Members shall

be credited or charged to the accounts in the proportion that each such account balance bears to

the total of all such account balances.

5.06  Distributions and Forfeitures.  Whenever the Trustee shall make any distribution

to or in behalf of a Member in accordance with the provisions of Article VI, and whenever a

Member shall forfeit all or a portion of the amount standing to the credit of his account in

accordance with the provisions of Section 6.04, such Member's account shall be charged with

the amount of such distribution or forfeiture.  Whenever part or all of the amount standing to

the credit of a Member's account is to be segregated into a separate account for a terminated

Member pursuant to Section 6.06(b), such Member's account shall be charged with the amount

segregated.

5.07  Limitations on Allocations.  Notwithstanding anything hereinabove to the contrary,

the amount credited to the account of any Member for any Plan Year pursuant to Section 5.03

or pursuant to this Section 5.07 (excluding any Company contributions and forfeitures which are

credited to a Member's account pursuant to Section 6.05 in order to restore previously forfeited

amounts) shall be reduced to the extent that such amount would cause the Company

contributions and forfeitures credited to the account of such Member under this Plan for such

Plan Year and the employer contributions and forfeitures allocated to the account of such

Member under any defined contribution plan maintained by the Company or any Affiliated

Company to exceed the lesser of

      (A)    $30,000 (as adjusted pursuant to Section 415(d) of the Code), or

      (B)    twenty-five percent (25%) of such Member's compensation within the

meaning of Section 415 of the Code and regulations thereunder for such Plan Year from

the Company and any Affiliated Company.

Any reductions required pursuant to the foregoing sentence shall be made from the Company

contributions and forfeitures allocated to the Member's account pursuant to Section 5.03.  In the

event any reduction is required pursuant to the preceding sentence, the amount of such reduction

shall be allocated and credited pursuant to the procedures outlined in Section 5.03 above to the

accounts of remaining Members exclusive of any other Member for whom a reduction for such

Plan Year has been required pursuant to this Section 5.07.  Any reductions which cannot be so

allocated shall be held unallocated by the Trustee and shall be treated as a forfeiture to be

allocated under Section 5.03 with respect to the succeeding Plan Year.

      5.08  <u>Sources of Forfeiture Restorations</u>.  Notwithstanding anything in this Article to the

contrary, whenever a previously forfeited amount is required to be restored to a reemployed

Member's account pursuant to Section 6.05, the Trustee shall effect such restoration as of the

last day of the Plan Year of such Member's reemployment.  In effecting such restoration, the

15

Trustee shall first utilize any amounts forfeited from the accounts of terminated Members pursuant to Section 6.04 during such Plan Year and then, if necessary, Company contributions made pursuant to Section 4.01 for such Plan Year.

## ARTICLE VI

Payments to or for the Accounts of
Members or Terminated Members

No shares of Common Stock or other property of the Trust shall be paid out or distributed by the Trustee except (a) for the purchase or other acquisition of Common Stock or other appropriate investments, (b) for defraying expenses, including taxes, if any, of administering the Trust as elsewhere herein provided, (c) for the repayment of any indebtedness incurred by the Trustee pursuant to Section 8.06, (d) as a return of Company contributions pursuant to Section 4.04, or (e) for the purpose of making distributions to or for the account of Members in accordance with the provisions of this Article VI.

6.01 <u>Retirement</u>.  Upon retirement of a Member, which shall be deemed to mean any termination of his employment with the Company at or after his reaching age sixty (60), the Trustee shall distribute, in accordance with the provisions of Section 6.06, the full amount standing to the credit of such Member's account.  A Member who remains in the active employ of the Company after attaining the age of sixty (60) shall continue as a Member for all purposes of the Plan until the date of his actual retirement.

6.02 <u>Disability Retirement</u>.  If a Member incurs a permanent disability, the Trustee shall distribute, in accordance with the provisions of Sections 6.06 and 6.07, the full amount standing to the credit of such Member's account.  For purposes of this Section 6.02, a Member shall incur a "permanent disability" if such Member is unable to engage in substantial gainful activity due to total and permanent physical or mental impairment that, in the opinion of a physician who is mutually acceptable to the Member and the Company, can be expected to

result in death, or can be expected to last or has lasted for at least twelve (12) consecutive months. The Trustee's determination as to whether a Member has incurred a permanent disability shall be conclusive and binding upon all persons.

6.03  Death Benefits.

(a)    Subject to paragraph (c) of this Section, each Member shall have the right to designate one or more Beneficiaries, including contingent Beneficiaries, to receive the amount payable in behalf of such Member under the provisions of this Plan in the event of death of such Member. Such designation shall be made in writing in such manner as the Trustee shall determine. Subject to the spousal consent requirement set forth in paragraph (c) below, a Member may change such designation from time to time, and may revoke such designation. If a Member dies without having designated a Beneficiary, or if none of the designated Beneficiaries survives the Member, or if the Trustee is in doubt as to the effective status of a Beneficiary designation, then, except as provided in paragraph (c) below, the duly appointed executor or administrator of the estate of such Member shall be deemed to be his Beneficiary.

(b)    Upon the death of any Member, the Trustee shall distribute, for the benefit of such Member's Beneficiary or Beneficiaries and in accordance with the provisions of Section 6.06, the full amount standing to the credit of the Member's account. If a Beneficiary entitled to receive any amount payable in behalf of a Member under the Plan dies prior to having received the entire amount, the undistributed balance shall be distributed to such Beneficiary's estate.

(c)    If a Member is married on the date of his death, the Member's surviving spouse shall be deemed to be his sole Beneficiary to receive the entirety of the death benefits

· 18

payable under this Section 6.03 in respect of such Member, unless (i) such Member has elected in writing to designate one or more other Beneficiaries other than his spouse, and (A) the Member's surviving spouse has consented to such election in a writing, (B) such election designates a Beneficiary which may not be changed without the consent of the spouse (or the consent of the spouse expressly permits changes in Beneficiary designation by the Member without any requirement of further consent by the spouse), and (C) the spouse's consent acknowledges the effect of such election and is witnessed by a Plan representative or notary public, or (ii) it is established to the satisfaction of the Trustee that the consent of the spouse cannot be obtained because there is no spouse, because the spouse cannot be located, or because of other circumstances prescribed by regulations under Section 417(a)(2) of the Code.

A former spouse shall be treated as a surviving spouse to the extent benefits must be paid to such former spouse upon the Member's death pursuant to a qualified domestic relations order (as defined in Section 414(p) of the Code), except that no consent shall be required from such former spouse with respect to the designation of a Beneficiary to receive benefits not subject to said order.

6.04  Termination of Employment Prior to Retirement, Disability, or Death.

(a)     If any Member's employment with the Company terminates under circumstances other than by reason of retirement, disability or death, as provided for under Sections 6.01 through 6.03, he shall be entitled to a vested benefit equal to the amount standing to the credit of his account based on his period of Service as follows:

19

| Years of Service | | Percentage |
|---|---|---|
| At Least | But Less Than | |
| | 2 | NONE |
| 2 | 3 | 10% |
| 3 | 4 | 30% |
| 4 | 5 | 60% |
| 5 | | 100% |

The vested benefit determined in accordance with the foregoing provision shall never be adjusted on account of any Service which a Member might complete upon reemployment with the Company or an Affiliated Company after a Break in Service, except as provided in Section 6.05.

(b)     The determination of the amount to which a terminated Member is entitled shall be made in accordance with the rules set forth in this Article, and the Trustee's determination shall be conclusive and binding on all persons.

(c)     The Trustee shall distribute the vested benefit to which any such Member is entitled, in accordance with Section 6.06, as soon as practicable after the Member's termination, subject to the requirements of Section 6.07.

(d)     Any amount which is not vested under this Section 6.04 at the time of a Member's termination of employment shall be forfeited by him upon the earlier of (i) the payment of the full amount to which such Member is entitled under the Plan, or (ii) the occurrence of five (5) consecutive Breaks in Service by the Member.  For the purposes of the preceding sentence, a terminated Member who is not entitled to receive any amount under the Plan shall be deemed to have received the entire amount to which he is entitled on the date his employment terminates and shall forfeit his entire account as of that date.  At the close of the

20

Plan Year in which such forfeiture occurs, all such forfeited amounts shall be reallocated as of the end of the Plan Year in which such forfeitures occur among the accounts of the other Members in accordance with the provisions of Section 5.03.

6.05  Reemployment.  If a terminated Member is reemployed by the Company, he shall again become an active Member upon his Reemployment Commencement Date pursuant to Section 3.03, future Company contributions on his behalf shall be credited to his account, and subject to (a) and (b) below, his prior Service shall be restored for the purpose of calculating the vested portion of such account.

If such a reemployed Member was not 100% vested under Section 6.04(a) at the time of his prior termination, the following special provisions shall apply:

(a)    If such a terminated Member is reemployed before incurring five (5) consecutive Breaks in Service, the full amount which was forfeited from his account as a result of his prior termination shall be restored to his account as of the end of the Plan Year of his reemployment.

(b)    If a reemployed Member to whom paragraph (a) of this Section applies had received a distribution, prior to his reemployment, of all or any part of the vested portion of his account, the vested portion of his account shall thereafter be determined by (i) adding the amount previously distributed to his current account balance, (ii) multiplying the resulting sum by his current vesting percentage, and (iii) subtracting from the resulting product the amount previously distributed.

(c)    If such a terminated Member is reemployed after incurring five (5) consecutive Breaks in Service, he shall have no rights with respect to any amounts previously

21

forfeited from his account, and any portion of his account which has not been distributed shall

be held in a separate, fully vested account until such Member becomes 100% vested under

Section 6.04(a), whereupon it shall be merged with the account otherwise maintained for him.

6.06  Manner and Timing of Distributions.

(a)    Except as otherwise provided in Sections 6.06(b) and (d) below and subject

to the requirements of Section 6.07, whenever a Member's account balance becomes

distributable pursuant to Sections 6.01 through 6.04 hereof to such Member or his Beneficiary,

distribution of said account balance shall be made by the payment, in cash, of either one lump

sum, a direct Rollover (as described in Section 6.11), or a combination of both.  Such

distribution shall be made within a reasonable time after the date of such retirement, disability,

death or termination of employment but not earlier than 30 days after the notice required under

Section 1.411(a)-11(c) of the Income Tax Regulations is given unless (i) the Trustee clearly

informs the Member that the Member has a right to a period of at least 30 days after receiving

the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a

particular distribution option), and (ii) the Member, after receiving the notice, affirmatively

elects a distribution.  Any additional amount thereafter credited to his account shall be

distributed in accordance with this Section 6.06(a) after that amount is ascertained.

(b)    Notwithstanding anything to the contrary elsewhere herein, if the aggregate

benefit payable to a Member exceeds $5,000, such benefit shall not be distributed prior to such

Member's sixty-second (62nd) birthday or death, whichever is earlier, unless such Member

consents in writing to an earlier distribution.  In the absence of such a consent, such Member's

22

account shall be segregated into a separate account established pursuant to Section 6.09 at the time such account would otherwise have been distributable under Section 6.06(a) above.

(c)    Whenever a Member's account is to be distributed or segregated into a separate account established pursuant to Section 6.09, such Member's account shall first be credited with interest at the prevailing short-term rate as determined by the Trustee for the period from the next preceding Valuation Date to the last day of the month preceding such distribution or segregation.

(d)    Notwithstanding anything to the contrary elsewhere herein, if the Trustee determines that the assets of the Trust do not provide sufficient liquidity to permit the Member's account balance to be distributed in cash pursuant to this Section 6.06, distribution of such account balance shall be deferred until the Trustee determines there is sufficient liquidity or until the "deferred distribution date", whichever is earlier.  Any such account balance shall remain invested in the general assets of the Trust and shall continue to be evaluated and adjusted as of each Valuation Date pursuant to Sections 5.04 and 5.05.  For this purpose, the "deferred distribution date" shall be the earliest of (i) the third (3rd) anniversary of a Member's retirement, disability, death or termination of employment, (ii) the sixtieth (60th) day following the close of the first Plan Year in which such Member is both not an Employee and older than sixty (60), and (iii) the Member's Required Distribution Date as defined in Section 6.07(b).  If distribution of such a Member's account has not been made by such deferred distribution date, then distribution of such account shall be made on such deferred distribution date (subject to the notice and time limitations under Section 6.06(a)) in cash (to the extent available) and shares of

23

Common Stock (to the extent sufficient cash is not available) in a lump sum, direct rollover (as described in Section 6.11) or a combination of both.

6.07  Additional Restrictions on Distributions.  Notwithstanding any provision elsewhere herein to the contrary and solely to comply with the applicable provisions of the Code and ERISA:

(a)    In no event shall the distribution of a Member's account, unless such Member or Beneficiary otherwise consents, begin later than the sixtieth (60th) day after the close of the Plan Year in which the latest of the following events occurs:

(i)    the Member's sixtieth (60th) birthday; or

(ii)    the Member's termination of employment with the Company.

(b)    In no event shall distribution of benefits to a Participant who attains age 70½ after 1998 begin later than the April 1 next following the calendar year in which such Participant (A) attains age 70½ or (B) terminates employment with the Company, whichever is later (the "Required Distribution Date").  Clause (B) shall not apply in the case of a Participant who is a "five percent owner" at any time during the Plan Year ending in the calendar year in which the Participant attains age 70½.  If the Participant becomes a "five percent owner" during any subsequent Plan Year, the required distribution date shall be April 1 of the calendar year following such Plan Year.  For purposes of this subsection, a "five percent owner" is defined in Section 416(i)(1)(B)(i) of the Code.

Distribution of benefits to a Participant who attains or attained 70½ before 1999 shall begin no later than the April 1 next following the calendar year in which such Participant attains age 70½ (the "Required Distribution Date"); provided, a Participant who is not a five percent

24

owner may elect to defer distribution of benefits until after his termination of employment with

the Company by filing written notice with the Trustee at least 60 days (or such shorter period as

determined by the Trustee in accordance with the provisions of Section 8.11) prior to his

Required Distribution Date.

(c)     If a Member dies before his Required Distribution Date, and his surviving

spouse is not his designated Beneficiary, the distribution of benefits shall be paid to such

Member's beneficiary in a lump sum no later than December 31 of the calendar year containing

the fifth (5th) anniversary of such Member's death. If the Member's designated Beneficiary is

his surviving spouse, distribution of his benefits shall commence no later than the date the

Member would have attained age seventy and one-half (70½).

(d)     If a Member dies on or after his Required Distribution Date, the Member's

remaining interest in the Plan shall be distributed at least as rapidly as under the method of

distribution being used as of the date of death.

(e)     If, and to the extent that, any portion of a Member's accounts are payable

to a former spouse or dependent pursuant to a qualified domestic relations order within the

meaning of Sections 401(a)(13)(B) and 414(p) of the Code, the provisions of said order shall

govern the distribution thereof. Such an order may provide for payments to a spouse or

dependent from a Member's vested account balance even though the Member is still employed

by the Employer or is otherwise not eligible for the distribution of benefits under the Plan. In

addition, the amount distributed shall be credited with interest at the prevailing short-term rate

as determined by the Trustee for the period from the Valuation Date immediately preceding the

date of such distribution to the last day of the calendar month immediately preceding such distribution.

6.08  Discharge of Trustee's Obligation to Make Payments.  Whenever the Trustee is required to make any payment or payments to any person in accordance with the provisions of this Article VI or Article VII, the Company shall notify the Trustee in writing of such person's last known address as it appears in the Company's records; and the obligation of the Trustee to make such payment or payments shall be fully discharged by mailing the same to the address specified by the Company.

6.09  Investment of Segregated Funds.  Whenever any amount standing to the credit of a Member's account is to be segregated into a separate account for such Member, the Trustee shall keep the unpaid balance of such fund invested for the benefit of such Member in savings bank accounts and/or other investments specified as permissible investments for the Trust funds in Section 8.03; provided that the Trustee, with the consent of such Member, may retain the value of any such Member's account without segregation as an individual interest in the Trust fund, in which event such account shall participate in revaluations of the Trust pursuant to Sections 5.04 and 5.05.

6.10  Loans to Members.  Upon written application of a Member, the Trustee may lend to the Member such amount or amounts and upon such terms and conditions as the Trustee may determine proper, provided that the aggregate amount of all outstanding loans to such Member, including accrued interest thereon, shall not exceed the lesser of (a) $50,000, reduced by any loan repayment made during the one (1) year period ending on the day before the date such loan is made, or (b) fifty percent (50%) of the vested amount of said Member's account (determined

at the time the loan is made). Loans pursuant to this Section 6.10 shall be made available to all Members on a reasonably equivalent basis.

Each such loan shall be made at such reasonable rate of interest as the Trustee may determine. Each such loan shall be subject to such other terms and conditions as the Trustee may determine. Each such loan shall be evidenced by the promissory note (the "Note") of the Member and shall be secured by fifty percent (50%) of such Member's vested interest in the Plan. Each such loan shall be repaid by payroll deduction or by such other means as may be authorized by the Trustee. Each such loan shall include the written consent of the Member to an immediate distribution in payment of the entire outstanding loan principal and any interest theretofore accrued, in the event such Member defaults pursuant to the terms of the note at any time subsequent to terminating employment with the Company. Each such loan shall be amortized over the term of the loan in level principal payments made not less frequently than quarterly, and shall be repaid within such time period as may be established by the Trustee but not longer than five (5) years unless such loan is used to acquire a dwelling unit which within a reasonable time is to be used (determined at the time the loan is made) as the principal residence of the Member.

All such loans shall be general investments of the Trust and the interest income thereon shall be included in the determination of the net worth of the Trust pursuant to Section 5.04.

If any part or all of the amount standing to the credit of a Member's account under the Plan shall become distributable to such Member or his Beneficiary while a loan to such Member under this Section 6.10 is outstanding, the Trustee shall apply the amount of such distribution in



payment of the outstanding loan principal, whether or not then due, and of any interest theretofore accrued, before distributing the balance, if any, to the Member or his Beneficiary.

All expenses incurred by the Trustee, including reasonable attorneys' fees and court costs, as a result of a default by a Member shall be charged against the Member's interest in the Plan.

6.11  Direct Rollovers.  Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this Section, a distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

Such distributions shall be subject to the notice and time limitations under Section 6.06(a).

Whenever used in this Section, the following words shall have the following meanings:

(1)    Eligible Rollover Distribution:  An Eligible Rollover Distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an Eligible Rollover Distribution does not include:  any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under section 401(a)(9) of the Code; and the portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities).

(2)    Eligible Retirement Plan:  An Eligible Retirement Plan is an individual retirement account described in section 408(a) of the Code, an individual retirement annuity described in

28



section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified trust described in section 401(a) of the Code, that accepts the distributee's Eligible Rollover Distribution. However, in the case of an Eligible Rollover Distribution to the surviving spouse, an Eligible Retirement Plan is an individual retirement account or individual retirement annuity.

(3)    Distributee:  A Distributee includes an Employee or former Employee.  In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, are Distributees with regard to the interest of the spouse or former spouse.

(4)    Direct Rollover:  A Direct Rollover is a payment by the Plan to an Eligible Retirement Plan specified by the Distributee.

6.12  In-Service Withdrawals.  An active Member who is currently employed with the Company may make in-service withdrawals from the vested portion of his account under the Plan in accordance with subparagraphs (a) and/or (b) below.  All withdrawal elections shall be made in such form and pursuant to such procedures as may be required by the Trustee.  The valuation of a Member's account balance shall be made as of the Valuation Date immediately preceding the date of distribution.  In addition, the amount withdrawn shall be credited with interest at the prevailing short-term rate as determined by the Trustee for the period from the Valuation Date immediately preceding the date of such distribution to the last day of the calendar month preceding such distribution.

29

(a)    An active Member who is currently employed by the Company and who has been credited with 20 or more years of Service may elect to withdraw all or any portion of his account under the Plan subject to the following conditions:

(1)    A Member may make only one withdrawal per Plan Year pursuant to this Section 6.12(a); and

(2)    If the Trustee determines that the assets of the Trust do not provide sufficient liquidity to permit the requested withdrawal amount to be fully paid in cash, distribution of such withdrawal amount shall be deferred until the Trustee determines that there is sufficient liquidity or until the third (3rd) anniversary of the date of the Trustee's receipt of the Member's withdrawal election (the "deferred distribution date"), whichever is earlier.  Any such deferred withdrawal amount shall remain invested in the general assets of the Trust and shall continue to be evaluated and adjusted as of each Valuation Date pursuant to Section 5.04 and 5.05.  If distribution of the Member's withdrawal amount has not been made by such deferred distribution date, then distribution of such amount shall be made on such deferred distribution date in cash (to the extent available) and shares of Common Stock (to the extent sufficient cash is not available).

(b)    An active Member who is currently employed with the Company may elect to withdraw all or a portion of his vested account balance under the Plan in order to meet a "Financial Hardship," subject to the following conditions:

(1)    Any such withdrawal shall be limited to the amount required to meet such Financial Hardship increased by (i) any amounts necessary to pay any federal, state

30

or local income taxes or penalties reasonably anticipated to result from the
distribution and (ii) interest (determined pursuant to the first paragraph of this
Section 6.12);

(2)    Any such withdrawal shall be made only to the extent the Trustee
determines there is sufficient liquidity in the Trust to pay such withdrawal amount
in cash.

For purposes of this Section 6.12(b), a "Financial Hardship" will be deemed to exist only
with respect to:  (i) expenses for medical care (as described in Section 213(d) of the Code)
of the Member, the Member's spouse or any dependent of the Member (as defined in
Section 152 of the Code) or expenses necessary for such persons to obtain such medical
care, (ii) the purchase of a principal residence of the Member, (iii) the need to prevent
eviction of the Member from his principal residence or foreclosure on the mortgage of the
Member's principal residence, (iv) payment of expenses related to the renovation of the
Member's principal residence, (v) payment of educational expenses for the Member, the
Member's spouse or any dependent of the Member (as defined in Section 152 of the
Code), (vi) the need to pay the funeral expenses (including burial expenses) of a family
member of the Member, or (vii) payment of significant amounts of current debt incurred
as a result of any one or more of the foregoing.  The determination that the Member is
faced with a Financial Hardship and the amount required to meet such Financial Hardship
shall be made by the Trustee in accordance with uniform and nondiscriminatory standards
or policies which shall be adopted by the Trustee and consistently applied to each
application for a withdrawal pursuant to this Section 6.12(b), and the Trustee may

31

reasonably rely upon the validity of any and all documentation submitted by the Member

in accordance with such standards or policies.

## ARTICLE VII

### Amendment and Termination

7.01 <u>Right to Amend or Terminate</u>. The Company reserves the right at any time and from time to time to amend this Agreement, or discontinue or terminate the Plan and Trust by delivering to the Trustee a copy of an amendment or appropriate Board of Directors' resolution of discontinuance or termination certified by an officer of the Company; <u>provided</u>, however, that except as provided in Section 7.02, the Company shall have no power to amend or terminate this Agreement in such manner as would cause or permit (a) any of the Trust assets to be diverted to purposes other than for the exclusive benefit of the Employees of the Company or their Beneficiaries or estates; (b) any reduction in the amount theretofore credited to any Member or former Member; (c) any portion of the Trust assets to revert to or become the property of the Company; (d) the duties or liabilities of the Trustee to be changed without his written consent; and (e) the elimination of an optional form of benefit with respect to amounts credited to a Member's accounts prior to the amendment.

7.02 <u>Amendment for Tax Exemption</u>. The Company reserves the right to amend this Agreement and the Plan and Trust hereunder in such manner as may be necessary or advisable so that said Trust may qualify and continue to qualify as an exempt employees' trust under the provisions of the Internal Revenue Code as now in force or as it may hereafter be changed or amended; and any such amendment may be made retroactively.

7.03 <u>Liquidation of Trust in Event of Termination</u>. In the event of termination or partial termination (as determined by an Internal Revenue Service ruling or by a court of proper jurisdiction, as to which all rights of appeal have expired) of this Plan and Trust, or complete

discontinuance of contributions thereto by the Company, the rights of all Members (or in the case of a partial termination, the Members affected thereby) to amounts theretofore credited to their accounts shall be fully vested and nonforfeitable. In the event of termination, the Trustee shall (a) reduce to cash such part of the Trust fund as he may deem appropriate; (b) pay the liabilities, if any, of the Trust; (c) value the remaining assets of the Trust as of the date of termination and adjust Members' account balances in the same manner as provided in Section 5.05; (d) distribute such assets in cash or partly in shares of Common Stock and partly in cash to or in behalf of the Members in liquidation in proportion to the amounts standing to the credit of their respective accounts as of the termination date.

7.04 <u>Termination of Plan and Trust</u>. This Agreement and the Plan and Trust hereunder shall in any event terminate whenever all property held by the Trustee shall have been distributed in accordance with the terms hereof. Until such time as the Trust is fully distributed, the Trustee shall continue to have the powers, immunities and exemptions which he had during the existence of the Trust, to the extent permitted by law.

34

## ARTICLE VIII

### Rights and Duties of Trustee

8.01 <u>Trustees</u>. There shall be such number of Trustees of this Trust as the Company may determine, any or all of whom may be officers or employees of the Company or any other individuals or entities.

8.02 <u>Powers of Trustee</u>. It shall be the duty of the Trustee to hold the Common Stock of the Company or other property contributed to and acquired by the Trust, and to make distributions therefrom in accordance with the Plan. The Trustee is hereby vested with all powers and authority necessary in order to carry out his duties and responsibilities in connection with the administration of the Plan and Trust as herein provided, and is authorized to make such rules and regulations as he may deem necessary to carry out the provisions of the Plan and Trust. The Trustee shall determine any question arising in the administration, interpretation and application of the Plan and Trust, and the decision of the Trustee shall be conclusive and binding on all persons.

8.03 <u>Investments</u>. The Trustee shall invest and reinvest the funds of the Trust and keep the same invested, without distinction between principal and income, in such stocks, bonds or other securities or certificates of participation or shares of any mutual investment company, trust or fund, or any other property of any kind, real or personal, tangible or intangible, as he may deem advisable, provided that the Trustee may hold funds of the Trust uninvested if and to the extent that he may deem advisable from time to time. Notwithstanding the foregoing, and in accordance with the purposes of the Plan, the Trustee is specifically authorized to invest all or any portion of the Trust assets in shares of Common Stock. It is intended that a substantial

35

portion of the assets of the Trust (up to 100%) shall be invested in shares of Common Stock, to the extent that such Common Stock is reasonably available.

8.04  Method of Purchasing, Holding and Selling Securities.  The Trustee may purchase Common Stock from the Company or from any stockholder of the Company at a price equal to the fair market value of the Common Stock at the time of purchase.  The Trustee may keep the Common Stock and any other securities or other property of the Trust in the name of some other person, firm or corporation or his own name without disclosing fiduciary capacity.  The Trustee may purchase or sell at public auction or by private contract, redeem, or otherwise realize upon such Common Stock, securities, or other property and for such purposes may execute such instruments and writings and do such things as he shall deem proper.

8.05  Exercise of Voting Rights.  The Trustee is hereby authorized to vote the Common Stock and any other securities comprising the Trust fund or otherwise consent to or request any action on the part of the Company or the issuer of such other securities, and to give general or special proxies or powers of attorney, with or without power of substitution, and to participate in reorganizations, recapitalizations, consolidations, mergers and similar transactions with respect to such securities; to deposit such Common Stock or other securities in any voting trust, or with any protective or like committee, or with a trustee, or with depositaries designated thereby; and generally to exercise any of the powers of an owner with respect to the Common Stock, securities, and other assets which the Trustee deems to be for the best interests of the Trust to exercise.

8.06  Power to Borrow.  The Trustee is hereby authorized to borrow money for the purpose of this Trust upon such terms and conditions as he may determine, and for any amount

36

so borrowed to issue the promissory note of the Trustee and to secure the repayment thereof by pledge, mortgage or hypothecation of all or any part of the property of the Trust, and no person loaning money to the Trustee shall be bound to see to the application of the money loaned or to inquire into the validity of any such borrowing.

8.07 <u>Reliance on Trustee as Owner</u>.  No person dealing with the Trustee shall be required to take any notice of this Agreement, but all persons so dealing shall be protected in treating the Trustee as the absolute owner with full power of disposition of all the monies, Common Stock and other property of the Trust, and all persons dealing with the Trustee are released from inquiry into the decision or authority of the Trustee and from seeing to the application of monies, Common Stock or other property paid or delivered to the Trustee.

8.08 <u>Liquidation of Assets</u>.  In the event that cash is required by the Trustee to effect any action or distribution under this Trust, or to pay any expenses of this Trust, or for any other reason deemed sufficient by the Trustee, the Trustee shall take such action as to the sale or other disposition of Common Stock or other property forming a part of the Trust as will provide the amount of cash necessary for such payments.

8.09 <u>Evidence on which Trustee may Act</u>.  In taking any action or determining any fact or question which may arise under this Trust, the Trustee may, with respect to the affairs of the Company or its Employees, rely upon any statement by the Company with respect thereto.  In the event that any dispute may arise regarding the payment of any sums or regarding any act to be performed by the Trustee, the Trustee may retain such payment or postpone the performance of such act until actual adjudication of such act shall have been made in a court of competent jurisdiction; or until he shall have been indemnified against loss to his satisfaction; <u>provided</u>,

37

however, that in the event of any such dispute, the Trustee may rely upon and act in accordance with any directions received from the Company.

8.10  Action by Trustees.  In the event there are two or more individual Trustees of this Trust, the Trustees shall act by a majority of their number at the time in office and such action may be taken either by vote at a meeting or in writing without a meeting.  The Trustees may by such majority action authorize any one or more of their number to execute any document or documents or to take any other action on behalf of the Trustees, and in such event any one of the Trustees may certify in writing to any person the taking of such action and the name or names of the Trustee or Trustees so authorized, including himself.  Any such person shall be protected in accepting and relying upon any such document or certificate and is released from inquiry into the authority of any of the Trustees.

8.11  Discretionary Action.  Wherever under the provisions of this Agreement the Trustee is given any discretionary power or powers, such power or powers shall not be exercised in such manner as to cause any discrimination in favor of or against any Employee or class of Employees.  Any discretionary action taken by the Trustee hereunder shall be consistent with any prior discretionary action taken by him under similar circumstances and to this end the Trustee shall keep a record of all discretionary action taken by him under any provision hereof.

8.12  Employment of Agents.  The Trustee may employ agents, including, but not limited to, custodians, accountants or attorneys, to perform such services and duties (including any fiduciary responsibilities other than trustee responsibilities) in connection with the administration of the Trust as he may direct.  The compensation of such agents shall be an expense chargeable in accordance with Section 8.15.  The Trustee shall be fully protected in

38

acting upon the advice of any such agent, in whole or in part, and, except as may be required by applicable Federal law, shall not be liable for any act or omission of any such agent, the Trustee's only duty being to use reasonable care in the selection of such agent.

8.13 _Records and Accounting_. The Trustee shall keep accurate and detailed records of his transactions hereunder and all his accounts, books and records relating thereto shall be open at all reasonable times to the inspection of the Company and its authorized representatives. The Trustee shall render in writing at least once each twelve (12) months, accounts of his transactions under this Agreement to the Company and the Company may approve such accounts of the Trustee by an instrument in writing delivered to the Trustee. In the absence of the filing in writing with the Trustee by the Company of exceptions or objections to any such account within sixty (60) days after the receipt by the Company of any such account the Company shall be deemed to have approved such account; and in such case, or upon the written approval of the Company of any such account, the Trustee shall be released, relieved and discharged with respect to all matters and things set forth in such account. Except as may otherwise be required by applicable Federal law, no person interested in the Trust or otherwise other than the Company may require an accounting or bring any action against the Trustee with respect to the Trust and his actions as Trustee. In any proceeding instituted by the Trustee and/or the Company with respect to these accounts, only the Company and the Trustee shall be the necessary parties. The Trustee shall from time to time make such other reports and furnish such other information concerning the Trust as the Company may in writing reasonably request or as may be required by applicable Federal law.

8.14 <u>Payment of Taxes</u>.  The Trustee shall upon direction of the Company pay out of the Trust fund any and all taxes of any and all kinds, including without limitation property taxes and income taxes levied or assessed under existing or future laws upon or in respect of the Trust or any monies, securities or other property forming a part thereof or the income therefrom subject to the terms of any agreements or contracts made with respect to trust investments which make other provision for such tax payments.  The Trustee may assume that any taxes assessed on or in respect of the Trust or its income are lawfully assessed unless the Company shall in writing advise the Trustee that in the opinion of counsel for the Company such taxes are or may be unlawfully assessed.  In the event that the Company shall so advise the Trustee, the Trustee will, if so requested in writing by the Company, contest the validity of such taxes in any manner deemed appropriate by the Company or its counsel but at the expense of the Trust; or the Company may itself contest the validity of any such taxes at the expense of the Trust and in the name of the Trustee; and the Trustee agrees to execute all documents, instruments, claims and petitions necessary or advisable in the opinion of the Company or its counsel for the refund, abatement, reduction or elimination of any such taxes.

8.15 <u>Compensation and Expenses of Trustee</u>.  The Trustee shall serve without compensation for his services as such, but all expenses of the Trust shall be paid from the assets of the Trust unless the Company, in its sole discretion, elects to pay such expenses.  Such expenses shall include any expenses incident to the functioning of the Plan, including, but not limited to attorneys fees and the compensation of other agents, accounting and clerical charges, the cost of obtaining any bonds required by ERISA and other costs of administering the Plan.

40

8.16  <u>Resignation or Removal of Trustee</u>.  Any Trustee acting hereunder may resign at

any time upon written notice to the Company and, if applicable, to the remaining Trustees and

the Company may remove any Trustee at any time upon written notice to such Trustee and, if

applicable, the remaining Trustees.  If any Trustee shall die, resign, be removed or for any

other reason cease to be Trustee, he shall be replaced by a successor to be selected by the Board

of Directors and until he is so replaced, the remaining Trustees shall exercise all of the powers

of the Trustees.  The appointment of a successor Trustee shall be effective upon written

notification to the Company and to the Trustees of his acceptance of such appointment.

8.17  <u>Legal Action</u>.  The Trustee shall not be required to institute any legal action or to

appear or participate in any legal action to which he may be a party, except to contest taxes,

unless he shall have been first indemnified to his satisfaction by the Company for all loss, cost

and liability.

8.18  <u>Indemnification of Trustee</u>.  The Company either through insurance or otherwise

shall indemnify and hold harmless the Trustee from any and all claims, loss, damages, expenses

(including reasonable counsel fees approved by the Company), and liability (including any

reasonable amounts paid in settlement with the Company's approval), arising from any act or

omission of the Trustee, except when the same is judicially determined to be due to the willful

misconduct of the Trustee.

41

## ARTICLE IX

### The Company

9.01  <u>No Contract of Employment</u>.  This Trust shall not be construed as creating any contract of employment between the Company and any Member, Employee or other person, and nothing herein contained shall give any person the right to be retained in the employ of the Company or otherwise restrain the Company's right to deal with its employees, including Members and Employees, and their hiring, discharge, layoff, compensation, and all other conditions of employment in all respects as though this Trust did not exist.

9.02  <u>No Contract to Maintain Plan</u>.  The Company by the creation of the Trust does not enter into any agreement to maintain the Trust or to make any further contributions thereto or reimbursement of expenses incurred hereunder.  Each contribution by the Company shall be voluntary, and the Company reserves the right to suspend payment of its contributions hereunder, and no party hereto or Member or any other person shall have any cause or right of action against the Company by reason of failure by the Company to make contributions to the Trust, or by reason of any action by the Company in terminating the Plan and Trust.

9.03  <u>Liability of Company</u>.  Subject to its agreement to indemnify the Trustee as provided in Section 8.18 and except as otherwise provided by applicable Federal law, neither the Company nor any person acting in behalf of the Company shall be liable for any act or omission on the part of the Trustee, or for any act performed or the failure to perform any act by any person with respect to this Agreement, the Plan or Trust, the Company's only duty being to use reasonable care in the selection of the Trustee.

42

9.04  Action by Company.  Whenever under the terms of this Agreement, the Company is permitted or required to take any action, such action shall be taken by the Board of Directors or by any officer of the Company thereunto duly authorized by the Board of Directors or otherwise.  In such event, any such officer may certify to the Trustee or any person the taking of such action and the name or names of the officers so authorized, including himself.  The execution of any direction, document or certificate in behalf of the Company by any of its officers shall constitute his certification of his authority with respect thereto, and the Trustee or other person shall be protected in accepting and relying upon any such direction, document or certificate and are released from inquiry into the authority of any officer of the Company.

9.05  Successor to Business of Company.  Unless this Plan and Trust be sooner terminated, a successor to the business of the Company, by whatever form or manner resulting, may continue the Plan and Trust by executing an appropriate supplementary agreement and such successor shall ipso facto succeed to all the rights, powers and duties of the Company hereunder.  The employment of any Employee who has continued in the employ of such successor shall not be deemed to have been terminated or severed for any purposes hereunder if such supplemental agreement so provides.

9.06  Dissolution of the Company.  In the event that the Company is dissolved by reason of bankruptcy or insolvency or otherwise, without any provision being made for the continuation of this Plan and Trust by a successor to the business of the Company, the Plan and Trust hereunder shall terminate, and the Trustee shall proceed in the same manner as though the Plan and Trust were being terminated by the Company as provided in Section 7.03.

43

# ARTICLE X

## Top-Heavy Provisions

10.01  Article Controls.  Any provisions of any Plan to the contrary notwithstanding, the provisions of this Article X shall control the Plan to the extent required to cause the Plan to comply with the requirements imposed by Section 416 of the Code.

10.02  Definitions.  Where the following words and phrases appear in this Article X, they shall have the respective meanings set forth below, unless their context clearly indicates to the contrary:

(a)    Account Balance.  As of any Valuation Date, the aggregate amount credited to an individual's account or accounts under a qualified defined contribution plan (excluding employee contributions which were deductible within the meaning of Section 219 of the Code and rollover or transfer contributions made by or on behalf of such individual to such plan from another qualified plan, sponsored by an entity other than the Company or an Affiliated Company) increased by (i) the aggregate distributions made to such individual from such plan during a five (5) year period ending on the Determination Date, and (ii) the amount of any contributions due as of the Determination Date immediately following such Valuation Date;

(b)    Aggregation Group.  The group of qualified plans maintained by the Company and each Affiliated Company consisting of (i) each plan in which a Key Employee participates and each other plan which enables a plan in which a Key Employee participates to meet the requirements of Sections 401(a)(4) and 410 of the Code, or (ii) each plan in which a Key Employee participates, each other plan which enables a plan in which a Key Employee participates to meet the requirements of Sections 401(a)(4) and 410 of the Code, and any other

44

plan which the Company elects to include as a part of such group; provided, however, that the Company may not elect to include a plan in such a group if its inclusion would cause the group to fail to meet the requirements of Sections 401(a)(4) and 410 of the Code.

(c) <u>Compensation</u>. For the purposes of this Article X, an individual's earned income, wages, salaries, and other amounts actually paid by the Company or an Affiliated Company to such individual during a Plan Year for personal services actually rendered in the course of employment with the Company or an Affiliated Company (subject to exclusion of amounts specified by regulations promulgated under Section 415 of the Code). In no event shall a Member's Compensation exceed $150,000 for any Plan Year (or such other amount as the Secretary of the Treasury or his delegate may determine for such Plan Year under Section 401(a)(17) of the Code).

(d) <u>Determination Date</u>. For the first Plan Year of any plan, the last day of such Plan Year, and for each subsequent Plan Year of such plan, the last day of the preceding Plan Year.

(e) <u>Former Key Employee</u>. With respect to any Plan Year, any individual who was a Key Employee in a previous Plan Year but who is not a Key Employee with respect to such Plan Year. For purposes of this definition, a beneficiary (who would not otherwise be a Key Employee) of a deceased former Key Employee shall be deemed to be a Former Key Employee in substitution for such deceased Former Key Employee.

(f) <u>Key Employee</u>. With respect to any Plan Year, any individual who at any time during such Plan Year or during any of the four (4) Plan Years immediately preceding such Plan Year was (i) an officer (within the meaning of Section 416 of the Code) of the Company or

45

an Affiliated Company with Compensation greater than 150% of the amount in effect under

Section 415(c)(1)(A) for such Plan Year, (ii) one of the ten (10) employees with Compensation

greater than such amount and owning the largest interests in the Company or an Affiliated

Company, (iii) an owner of more than five percent (5%) of the outstanding stock of the

Company or an Affiliated Company or of stock possessing more than five percent (5%) of the

total combined voting power of all the stock of the Company or an Affiliated Company, or

(iv) an employee whose Compensation (during the calendar year including the Determination

Date) exceeded $150,000 and who was an owner of more than one percent (1%) of the

outstanding stock of the Company or an Affiliated Company or of stock possessing more than

one percent (1%) of the total combined voting power of all of the stock of the Company or an

Affiliated Company.  For purposes of this definition, (i) an individual shall be deemed to own

stock owned by others as provided in Section 318 of the Code, (ii) a beneficiary (who would not

otherwise be a Key Employee) of a deceased Key Employee shall be deemed to be a Key

Employee in substitution for such deceased Key Employee, and (iii) the total number of Key

Employees who are officers of the Company and the Affiliated Companies shall be limited to

the fifty (50) (or, if lesser, the greater of three (3) or ten percent (10%) of the employees)

officers with the highest Compensation.

(g)     Plan Year.  With respect to any plan, the annual accounting period used by

such plan for annual reporting purposes.

(h)     Valuation Date.  With respect to any Plan Year of any defined contribution

plan, the most recent date within the twelve (12) month period ending on a Determination Date

as of which the trust fund established under such plan was valued and the net income (or loss) thereof allocated to members' accounts.

10.03  Top-Heavy Status.  The Plan shall be deemed to be top-heavy if, as of any Determination Date, (i) the sum of the Account Balances of Members who are Key Employees exceeds sixty percent (60%) of the sum of the Account Balances of all Members (excluding in both cases the Account Balances of all Former Key Employees and of those former Employees who have not performed any services for the Company or any Affiliated Company at any time during the five-year period ending on the Determination Date) unless the Plan is part of an Aggregation Group or (ii) an Aggregation Group including the Plan is top-heavy.  An Aggregation Group shall be deemed to be top-heavy as of a Determination Date if the sum (computed in accordance with Section 416(g)(2)(B) of the Code and the regulations promulgated thereunder) of the Account Balances of Key Employees under all defined contribution plans included in the Aggregation Group exceeds sixty percent (60%) of the sum of the Account Balances of all individuals under such plans (excluding in both cases the Account Balances of all Former Key Employees and of those former Employees who have not performed any services for the Company or any Affiliated Company at any time during the five-year period ending on the Determination Date).

10.04  Minimum Contribution.  If the Plan is determined to be top-heavy for a Plan Year, the Company shall make an additional Company contribution to the Plan on behalf of each Employee who is a Member of the Plan, who is not a Key Employee, and who has not terminated his employment as of the last day of such Plan Year, equal to that amount which when added to the aggregate amount of Company contributions and forfeitures (excluding

47

amounts credited to the account of such Member pursuant to Sections 5.08 and 6.05) allocated to such Member's accounts for such Plan Year will cause the sum of all such contributions and forfeitures to equal the lesser of

     (a)     three percent (3%) of such Member's Compensation for such Plan Year, or

     (b)     a percent of such Member's Compensation for such Plan Year equal to the greatest percent obtained by dividing for each Key Employee the aggregate amount of Company contributions and forfeitures (excluding amounts credited to the account of any such Key Employee pursuant to Sections 5.08 and 6.05) allocated to such Key Employee's accounts for such Plan Year by such Key Employee's Compensation for such Plan Year.

     10.05  <u>Vesting</u>.  If the Plan is determined to be top-heavy for a Plan Year, the vested benefit of any Member who terminates his employment with the Company during such Plan Year shall be determined in accordance with Section 6.04, but using the following vesting schedule in lieu of the schedule appearing in Section 6.04:

| <u>Years of Service</u> | | <u>Percentage</u> |
|---|---|---|
| <u>At Least</u> | <u>But Less Than</u> | |
| | 2 | NONE |
| 2 | 3 | 20% |
| 3 | 4 | 40% |
| 4 | 5 | 60% |
| 5 | | 100% |

     In the event that the Plan ceases to be top-heavy in a subsequent Plan Year, the vested benefit of any Member who terminates his employment with the Company after the Plan has ceased to be top-heavy shall be determined in accordance with the vesting schedule in Section 6.04; except that (a) the vesting percentage of any such Member shall not be less than the

48

vesting percentage which such Member achieved under the schedule set forth in this Section 10.05 of the last day of the last Plan Year for which the Plan was top-heavy, and (b) the vesting percentage of a Member who has been credited with three (3) or more years of Service as of the last day of the last Plan Year for which the Plan was top-heavy shall continue to be determined in accordance with the vesting schedule set forth in this Section 10.05.

10.06  <u>Termination of Top-Heavy Status</u>.  Except as specifically provided in Section 10.05, if the Plan has been deemed to be top-heavy for one or more Plan Years and thereafter ceases to be top-heavy, the provisions of this Article X shall cease to apply to the Plan effective as of the day following the Determination Date on which it is determined to no longer be top-heavy.

## ARTICLE XI

### Miscellaneous

11.01  Limitation of Rights.  The establishment of the Trust shall not be considered as giving any Member or Employee or any other person any legal or equitable rights as against the Company or the Trustee, nor shall any person be responsible for the sufficiency of the Trust to provide benefits under the Plan, but each person interested shall look solely to the assets of the Trust for benefits payable subject to the terms and conditions of the Plan.

11.02  Spendthrift Provision.  Beneficial interests of Members or their Beneficiaries in the Trust shall not be assignable or subject to attachment nor receivership, nor shall they pass to any trustee in bankruptcy or be reached or applied by any legal process for the payment of any obligations of any such person, except as provided by Section 6.10 in the case of a loan to a Member from the Trust.  Nothing in this Section 11.02 shall prevent or restrict the creation, assignment or recognition of a right to any benefit payable with respect to a Member pursuant to a "qualified domestic relations order" (within the meaning of Sections 401(a)(13) and 414(p) of the Code).

11.03  Appointment of Person to Receive Payment.  In the event any amount shall become payable hereunder to any person (or his Beneficiary or estate), and if after written notice from the Trustee mailed to such person's last known address as shown on the Company's records, such person or his personal representative shall not have presented himself to the Trustee or notified the Trustee in writing of his address within one (1) year after the mailing of such notice, then the Trustee shall in his discretion appoint one or more of the spouse and blood relatives of such person to receive such amount, including any amount thereafter becoming due

50

to such person (or his estate), in the proportions determined by him.  Any action of the Trustee hereunder shall be binding and conclusive upon all persons.

11.04  <u>Construction</u>.  In any question of interpretation or other matter of doubt, the Trustee and the Company may rely upon the opinion of counsel for the Company or any other attorney at law designated by the Company with the approval of the Trustee.  The provisions of this Agreement shall be construed, administered and enforced according to the laws of the United States and, to the extent permitted by such laws, by the laws of the Commonwealth of Massachusetts.  All contributions to the Trust shall be deemed to be made in the Commonwealth of Massachusetts.

11.05  <u>Impossibility of Performance</u>.  In case it becomes impossible for the Company or the Trustee to perform any act under this Plan and Trust, that act shall be performed which in the judgment of the Trustee will most nearly carry out the intent and purpose of this Plan and Trust.  All parties to this Agreement or in any way interested in this Plan and Trust shall be bound by any acts performed under such condition.

11.06  <u>Adjustment for Fractional Interests</u>.  Notwithstanding any other provision of this Plan to the contrary, the amount of any contribution of Common Stock shall be adjusted by adding such part of a fractional share of the Common Stock thereto as is necessary to bring the total shares of Common Stock held by the Trustee to a whole number.

11.07  <u>Definition of Words</u>.  Feminine or neuter pronouns shall be substituted for those of the masculine form, and the plural shall be substituted for the singular, in any place or places herein where the context may require such substitution or substitutions.

51

11.08  Titles.  The titles of articles and sections are included only for convenience and shall not be construed as a part of this Agreement or in any respect affecting or modifying its provisions.

11.09  Merger or Consolidation.  In the event that this Plan is merged with or consolidated with any other plan, or the assets or liabilities accrued under this Plan are transferred to any other plan, each Member's benefit under such other plan shall be at least as great immediately after such merger, consolidation or transfer (if such plan were then to terminate) as the benefit to which he would have been entitled under this Plan immediately before such merger, consolidation or transfer (if the Plan were then to terminate).

11.10  Claims Procedure.  In accordance with Section 503 of the ERISA and the regulations of the Secretary of Labor prescribed thereunder,

(1)    All claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such regulations as the Trustee shall reasonably establish.

(2)    The Trustee shall, within sixty (60) days of submission of a claim, provide adequate notice in writing to any claimant whose claim for benefits under the Plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the claimant,

(3)    The Trustee shall, within a reasonable period of time and upon request by a claimant, afford a reasonable opportunity to any claimant, whose claim for benefits has been denied, for a full and fair review by the Trustee of the decision denying the claim, and

(4)    The Trustee shall, within 60 days of receipt of a request for a review, render a written decision on his review setting forth the specific reasons for such decision, written in a manner to be understood by the claimant.

11.11  Allocation and Delegation of Responsibilities.  The named fiduciaries with respect to the Plan shall be the Company and the Trustee.  The Company is the Plan Administrator for all purposes of ERISA.  The responsibilities of the named fiduciaries shall be allocated as provided herein, and each such fiduciary shall have only those responsibilities and obligations that are specifically imposed upon him by this Trust Agreement.  It is intended that each of the named fiduciaries shall be responsible for the proper exercise of his own powers, duties, responsibilities and obligations under the Plan and shall not be responsible for any act or omission of any other fiduciary.  Each named fiduciary shall be entitled to delegate all or any part of his fiduciary responsibilities and obligations (except those related to the management of the assets held hereunder) to any other person or entity.  In the event of any such delegation, (i) the named fiduciary shall not be liable for any act or omission of the person to whom the responsibility has been delegated as long as the selection and retention of such person is prudent and (ii) the person to whom the fiduciary powers and obligations are delegated shall be responsible only for the proper exercise of the powers, duties, responsibilities and obligations that have been specifically delegated to him.

11.12  Special Provisions for Certain Leased Employees.  A "leased employee" shall receive credit for Service which shall be recognized in determining the Employee's credit for Service for the entire period during which he is a leased employee of the Company as if he were an Employee of the Company; provided, however, that a leased employee shall not be eligible

53

to participate in the Plan as long as he remains a leased employee. For purpose of this Section 11.12, the term "leased employee" means any person (a) who is not an Employee of the Company and (b) who pursuant to an agreement between the Company and any other person (a "leasing organization") has performed services for the Company on a substantially full-time basis for a period of at least one (1) year and such services are performed under the primary direction or control of the Company, and (c) who is not covered by a money purchase pension plan maintained by the leasing organization which provides a nonintegrated employer contribution rate of at least ten percent (10%) of compensation, immediate participation, and full and immediate vesting. If leased employees constitute more than twenty percent (20%) of the Company's nonhighly compensated workforce (as defined in Section 414(n)(5)(C)(ii) of the Code) without regard to clause (c) of the preceding sentence, then clause (c) shall not apply.

11.13  Execution of Agreement. This Agreement may be executed in any number of counterparts and each fully executed counterpart shall be deemed an original.

IN WITNESS WHEREOF these presents have been signed and sealed for and in behalf of the parties hereto, in the case of the Company by its duly authorized officer, this 17th day of JULY , 1998.

COMPANY:    MEDICAL INFORMATION
            TECHNOLOGY INC.

By _Dabant Mayelill,_

Title: CHIEF FINANCIAL OFFICER + TREAS.

TRUSTEE:    _A. Neil Pappalardo_

A. Neil Pappalardo

DOCSB\520071.2

55

FIRST AMENDMENT
TO
MEDICAL INFORMATION TECHNOLOGY, INC.
PROFIT SHARING PLAN AND TRUST

A.      The Trust Agreement dated July 27, 1998 amending and restating The Medical Information

Technology, Inc. Profit Sharing Plan and Trust, is hereby amended effective January 1, 1998 by

deleting Section 5.07 in its entirety and substituting the following in lieu thereof:

> "5.07   *Limitations on Allocations*.  Notwithstanding anything hereinabove to the
> contrary, the amount credited to the account of any Member for any Plan Year pursuant to
> Section 5.03 or pursuant to this Section 5.07 (excluding any Company contributions and
> forfeitures which are credited to a Member's account pursuant to Section 6.05 in order to
> restore previously forfeited amounts) shall be reduced as provided below to the extent that
> such amount would cause the Company contributions and forfeitures credited to the
> account of such Member under this Plan for such Plan Year and the employer contributions
> and forfeitures allocated to the account of such Member under any defined contribution
> plan maintained by the Company or any Affiliated Company to exceed the lesser of
>
> (A)   $30,000 (as adjusted pursuant to Section 415(d) of the Code), or
> (B)   twenty-five percent (25%) of such Member's compensation within the
>         meaning of Section 415 of the Code and regulations thereunder for such
>         Plan Year from the Company and any Affiliated Company.

If, as a result of the allocation of forfeitures or a reasonable error in estimating the
Member's compensation, a reduction is required pursuant to the foregoing sentence, such
reduction shall be made from the Company contributions and forfeitures allocated to the
Member's account pursuant to Section 5.03.  The amount of such reduction shall be
allocated and credited pursuant to the procedures outlined in Section 5.03 above to the
accounts of remaining Members exclusive of any other Member for whom a reduction for
such Plan Year has been required pursuant to this Section 5.07.  Any reductions which
cannot be so allocated shall be held unallocated by the Trustee and shall be treated as a
forfeiture to be allocated under Section 5.03 with respect to the succeeding Plan Year. "

B.      Said Trust Agreement, as so amended, is hereby confirmed in all other respects.

IN WITNESS WHEREOF, this First Amendment has been signed and sealed for and on behalf of the Company by its duly authorized officer, and by the Trustee, this 23rd day of FEBRUARY, 1999.

COMPANY: MEDICAL INFORMATION
TECHNOLOGY, INC.

By: _____
Barbara A. Manzolillo,
Chief Financial Officer
and Treasurer

TRUSTEE: _____
A. Neil Pappalardo

DOCSB\571391.1

2

**SECOND AMENDMENT**
**TO**
**MEDICAL INFORMATION TECHNOLOGY, INC.**
**PROFIT SHARING PLAN AND TRUST**

A.    The Trust Agreement dated July 27, 1998 amending and restating The Medical

Information Technology, Inc. Profit Sharing Plan and Trust, as subsequently amended by the

First Amendment, is hereby amended as follows:

     1.    Section 2.09 is hereby amended by deleting the first sentence thereof in its

entirety and substituting the following in lieu thereof:

> "'Compensation' includes salary, wages, bonuses, overtime,
> commissions and all other forms of direct remuneration paid to a
> Member by the Company, plus salary reduction amounts of an
> Employee pursuant to Sections 125, 132(f)(4), or 401(k) of the
> Code, but excluding (a) any amount paid to an Employee prior to
> his becoming a Member under the Plan, and (b) any contributions
> by the Company to, or benefits under, the Plan. For purposes of
> the preceding sentence, salary reduction amounts under
> Section 125 of the Code include any amounts not available to a
> Member in cash in lieu of group health coverage because the
> Member is unable to certify he has other health coverage. A salary
> reduction amount will be treated as an amount under Section 125
> of the Code only if the Company does not request or collect
> information regarding the Member's other health coverage as part
> of the enrollment process for the health plan."

     2.    Section 2.11 is hereby amended by deleting the period at the end of the first

sentence and adding the following before the second sentence thereof:

> "; provided however, an individual shall not be an Employee
> unless he is paid as a common law employee on the payroll of the
> Company at the time such individual's services are rendered to the
> Company, has federal income tax withheld by the Company at
> such time, and receives a Form W-2 from the Company in the
> ordinary course with respect to such service."

3.      Section 5.07 is hereby amended by deleting the first sentence thereof in its

entirety and substituting the following in lieu thereof:

> "Notwithstanding anything hereinabove to the contrary, the
> amount credited to the account of any Member for any Plan Year
> pursuant to Section 5.03 or pursuant to this Section 5.07 (excluding
> any Company contributions and forfeitures which are credited to a
> Member's account pursuant to Section 6.05 in order to restore
> previously forfeited amounts) shall be reduced as provided below
> to the extent that such amount would cause the Company
> contributions and forfeitures credited to the account of such
> Member under this Plan for such Plan Year and the employer
> contributions and forfeitures allocated to the account of such
> Member under any other defined contribution plan maintained by
> the Company or any Affiliated Company to exceed the lesser of
>
> (A)    $40,000 (as adjusted pursuant to Section 415(d) of the Code), or
>
> (B)    100% of such Member's compensation within the meaning of Section 415
>          of the Code and regulations thereunder for such Plan Year from the
>          Company and any Affiliated Company."

4.      Section 6.02 is hereby amended by deleting the second sentence thereof in its

entirety and substituting the following in lieu thereof:

> "For purposes of this Section 6.02, a Member shall incur a
> "permanent disability" on the first day of the month following the
> date he is determined to be permanently disabled under the
> Company's long-term disability plan."

5.      Section 6.07(b) is hereby amended by deleting the word "Participant" each time it

appears therein and substituting in lieu thereof the word "Member."

6.      Section 6.07(b) is hereby further amended by adding the following to end thereof:

> "Any distributions payable in accordance with this Section 6.07(b)
> shall be made by distribution of the Member's full account balance
> in cash either in one lump sum, a direct rollover (to the extent
> permitted by law), or a combination of both. If a Member who is
> receiving distributions pursuant to this Section 6.07(b) dies prior to
> receiving his distribution for the year, such distribution shall be
> paid to his designated Beneficiary no later than December 31 of
> such year.

2

For purposes of this Section 6.07(b), the Member's designated Beneficiary shall be determined in accordance with the provisions of the Plan, Section 401(a)(9) of the Code, and Section 1.401(a)(9)-4 of the Treasury regulations."

7.    Section 6.07(c) of the Plan is hereby amended by deleting said section in its entirety and substituting the following in lieu thereof:

"If a Member dies before his Required Distribution Date, and his surviving spouse is not his designated Beneficiary, the distribution of benefits shall be paid to such Member's beneficiary in cash in a lump sum no later than December 31 of the calendar year containing the fifth (5th) anniversary of such Member's death.

If the Member's sole designated Beneficiary is his surviving spouse, the distribution of benefits shall be paid to such Member's spousal beneficiary in cash in a lump sum no later than the later of December 31 of the calendar year containing the fifth (5th) anniversary of such Member's death or December 31 of the calendar year containing the date the Member would have attained age 70½.

For purposes of this Section 6.07(c), the Member's designated Beneficiary shall be determined in accordance with the provisions of the Plan, Section 401(a)(9) of the Code, and Section 1.401(a)(9)-4 of the Treasury regulations."

8.    Section 6.07(d) is hereby amended by deleting said section in its entirety.

9.    Effective for distributions made after December 31, 2001, Section 6.11 is hereby amended by adding the following to the end of definition (1) (Eligible Rollover Distribution) thereof:

"Any amount that is distributed on account of hardship pursuant to Section 6.12(b) shall not be an eligible rollover distribution and the Distributee may not elect to have any portion of such a distribution paid directly to an Eligible Retirement Plan."

3

10. Effective for distributions made after December 31, 2001, Section 6.11 is hereby further amended by deleting the last sentence of definition (2) (Eligible Retirement Plan) thereof, and substituting the following in lieu thereof:

> "An Eligible Retirement Plan shall also mean an annuity contract described in Section 403(b) of the Code and an eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan. The definition of Eligible Retirement Plan shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the alternate payee under a qualified domestic relation order, as defined in Section 414(p) of the Code."

11. Section 8.02 is hereby amended by deleting the second and third sentences thereof in their entirety and substituting the following in lieu thereof:

> "The Trustee is hereby vested with all discretionary powers and authority necessary in order to carry out his duties and responsibilities in connection with the administration of the Plan and Trust as herein provided, and is authorized to make such rules and regulations as he may deem necessary to carry out the provisions of the Plan and Trust. The Trustee shall have the discretionary power and authority to determine any questions of fact and any questions arising in the administration, interpretation and application of the Plan and Trust, and the decision of the Trustee shall be conclusive and binding on all persons."

12. Effective for determining whether the Plan is a Top-Heavy Plan for any Plan Year beginning on or after January 1, 2002, Section 10.02(a) is hereby amended by deleting said section in its entirety and substituting the following in lieu thereof:

> "(a)    Account Balance. As of any Valuation Date, the aggregate amount credited to an individual's account or accounts under a qualified defined contribution plan sponsored by the Company or an Affiliated Company (excluding employee contributions which were deductible within the meaning of Section 219 of the Code and rollover or transfer contributions made by or on behalf of such individual to such plan from another qualified plan sponsored by an entity other than the Company or an Affiliated Company) increased by (i) the aggregate distributions made to such individual

4

from the Plan and any plan aggregated with the Plan under Section 416(g)(2) of the Code during the 1-year period ending on the termination date. This shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Section 416(g)(2)(A)(i) of the Code. In the case of a distribution made for a reason other than separation from service, death, or disability, this provision shall be applied by substituting '5-year period' for '1-year period.' The account balances of any individual who has not performed services for the Company or an Affiliated Company during the 1-year period ending on the Determination Date shall not be taken into account, and (ii) the amount of any contributions due as of the Determination Date immediately following such Valuation Date. "

13.    Effective for determining whether the Plan is a Top-Heavy Plan for any Plan Year beginning on or after January 1, 2002, Section 10.02(c) is hereby amended by deleting "$150,000" in the last sentence thereof and substituting therefore "$200,000".

14.    Effective for determining whether the Plan is a Top-Heavy Plan for any Plan Year beginning on or after January 1, 2002, Section 10.02(f) is hereby amended by deleting said section in its entirety and substituting the following in lieu thereof:

"(f)    Key Employee. With respect to any Plan Year, any individual who at any time during the Plan Year that includes the Determination Date was (i) an officer (within the meaning of Section 416 of the Code) of the Company or an Affiliated Company with annual Compensation greater than $130,000 (as adjusted under Section 416(i)(1) of the Code for Plan Years beginning after December 31, 2002), (ii) an owner of more than five percent (5%) of the outstanding stock of the Company or an Affiliated Company or of stock possessing more than five percent (5%) of the total combined voting power of all the stock of the Company or an Affiliated Company, or (iii) an employee whose Compensation (during the calendar year including the Determination Date) exceeded $150,000 and who was an owner of more than one percent (1%) of the outstanding stock of the Company or an Affiliated Company or of stock possessing more than one percent (1%) of the total combined voting power of all of the stock of the Company or an Affiliated Company. For purposes of this definition, (A) an individual shall be deemed to own stock owned by others as provided in Section 318 of the Code, and (B) a beneficiary (who would not otherwise be a Key Employee) of a deceased Key Employee shall be deemed to be a Key Employee in

5

substitution for such deceased Key Employee. The determination of who is a Key Employee will be made in accordance with Section 416(i)(1) of the Code and the applicable regulations and other guidance of general applicability issued thereunder."

15.    Effective for determining whether the Plan is a Top-Heavy Plan for any Plan Year beginning on or after January 1, 2002, Section 10.03 is hereby amended by deleting the phrase "five-year period" both times it appears therein and substituting in lieu thereof the phrase "one-year period".

16.    Effective for claims filed on or after January 1, 2002, Section 11.10 is hereby amended by deleting said section in its entirety and substituting the following in lieu thereof:

"Claims Procedure. In accordance with Section 503 of the ERISA and the regulations of the Secretary of Labor prescribed thereunder,

(a)    All claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such procedures as the Trustee shall reasonably establish. Claims for benefits shall be filed by the Member, Beneficiary, alternate payee or his authorized representative (hereinafter "Claimant").

(b)    The Trustee shall, within 90 days of submission of a claim, provide adequate notice in writing to any Claimant whose claim for benefits under the Plan has been denied. Such notice shall be written in a manner calculated to be understood by the Claimant, and shall contain the following information: (i) the specific reasons for the denial of the claim; (ii) specific reference to pertinent provisions of the Plan on which the denial is based; (iii) a description of any additional material or information necessary to perfect the claim and an explanation of why such material or information is necessary; (iv) a description of the Plan's claims review procedures, and the time limitations applicable to such procedures; and (v) a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA if the claim denial is reviewed by the Trustee and the Trustee fully or partially denies the claim. If special circumstances apply, the 90-day period may be extended by an additional 90 days; provided, written notice of the extension is provided to the Claimant during the initial 90-day period and such notice indicates the special circumstances requiring an extension of

6

time and the date by which the Trustee expects to render its decision on the claim.

(c)    The Trustee shall, within a reasonable period of time and upon request by a Claimant, afford a reasonable opportunity to any Claimant, whose claim for benefits has been denied, for a full and fair review by the Trustee of the decision denying the claim.

Requests for review must be made within 60 days after receipt of the notice of denial from the Trustee.

Any request for review may set forth written comments, documents, records and other information relating to the claim. In connection with such request for review and upon request by the Claimant, a Claimant may review (or receive free copies of) all documents, records or other information relevant to the Claimant's claim for benefit, all in accordance with such procedures as the Trustee may establish.

If a Claimant fails to file an appeal within the applicable time period described herein, he shall have no further right to appeal.

(d)    A decision by the Trustee on request for a review shall include a review by the Trustee that takes into account all comments, documents, records and other information submitted by the Claimant relating to the claim, without regard to whether such information was submitted or considered in the initial claim determination.

The Trustee shall render its decision on the request for review within 60 days after the receipt by the Trustee of the request for review. If special circumstances apply, the 60-day period may be extended by an additional 60 days; provided, written notice of the extension is provided to the Claimant during the initial 60-day period and such notice indicates the special circumstances requiring an extension of time and the date by which the Trustee expects to render its decision on review.

If the Trustee wholly or partly denies any claim on review, the Trustee shall provide written notice to the Claimant within the applicable time limitations of this Section 11.10(d). Such notice shall be written in a manner to be understood by the Claimant and shall set forth: (v) the specific reasons for the denial of the claim; (vi) specific reference to pertinent provisions of the Plan on which the denial is based; (vii) a statement of the Claimant's right to

7

receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits; and (viii) a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA.

(e)     The foregoing claims procedures described in subsections (a), (b), (c) and (d) shall be administered in accordance with Section 503 of ERISA and guidance issued thereunder. Any written notice required to be given to the Claimant may, at the discretion of the Trustee and in accordance with guidance issued under Section 503 of ERISA, be provided electronically.

(f)     In no event may a claim for benefits be filed by a Claimant more than 120 days after the applicable "Notice Date," as defined in (i) through (iv) below.

(i)     In any case where benefits are paid to the Claimant as a lump sum, the Notice Date shall be the date of payment of the lump sum.

(ii)     In any case where the Trustee (prior to the filing of a claim for benefits under this Article 14) determines that an individual is not entitled to benefits from the Plan and the Trustee provides written notice to such individual of its determination, the Notice Date shall be the date of the individual's receipt of such notice.

(iii)     In any case where the Trustee provides an individual a written statement of his or her vested account balance as of a specific date, the Notice Date shall be the latest date of the Member's receipt of such notice.

In no event may any legal proceeding regarding entitlement to benefits or any aspect of benefits under the Plan be commenced later than the earliest of (i) one (1) year after the applicable Notice Date; or (ii) one (1) year after the date a Claimant receives a decision from the Trustee regarding his appeal; or (iii) the latest date otherwise prescribed by applicable law."

B.     This amendment is adopted to reflect certain provision of the Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA"). This amendment is intended as good faith compliance with the requirements of EGTRRA and is to be construed in accordance with

EGTRRA and guidance issued thereunder. This amendment shall supersede the provision of the Plan to the extent those provisions are inconsistent with the provisions of this amendment.

C.     Except as otherwise provided herein, the effective date of this Second Amendment is January 1, 2002.

D.     Said Trust Agreement, as so amended, is hereby confirmed in all other respects.

IN WITNESS WHEREOF, this Second Amendment has been signed and sealed for and on behalf of the Company by its duly authorized officer, and by the Trustee, this 30ᵗʰ day of DECEMBER, 2002.

COMPANY:     MEDICAL INFORMATION
             TECHNOLOGY, INC.

             By: _____
             Barbara A. Manzolillo,
             Chief Financial Officer and Treasurer

TRUSTEE:     _____
             A. Neil Pappalardo

LIBB/1144435.3

9

September 7, 2004
48 Narragansett Rd.
Quincy, MA  02169

Barbara Manzolillo
Chief Financial Officer and Treasurer
Medical Information Technology, Inc.
MEDITECH Circle
Westwood, MA  02190

Dear Barbara:

Enclosed is my signed Benefit Election Form authorizing you to rollover my funds from
the Medical Information Technology Profit Sharing Trust to my E*Trade account.
I appreciate your administrative management of the Trust over the years.  It has done
well, but I have two concerns that I hope that you could provide assistance and/or insight.

First, I have been concerned that MEDITECH has been reluctant to use an independent
valuation for the MEDITECH stock.  It is my belief that the MEDITECH stock is
undervalued and thus my distribution will be less than what I should be receiving.
Second, distributions are based upon an individual's account balance of the prior
December 31st (plus 0.5% monthly interest, minus recent distributions) and not the most
recent quarterly valuation.

There is now more than $107,000,000 of MEDITECH stock in the trust (based on
$27/share).  This is 84% of all assets.  Since the value of the MEDITECH stock has a
major impact on distributions, I find it surprising that an independent valuation is has not
been used.

I am also concerned that my distribution will be based upon my account balance of
December 31, 2003, and not the current value.  It is acknowledged that the condensed
description of the Trust describes how the distribution will be made, but it disregards the
subsequent contributions to the plan and increase in the valuation of the MEDITECH
stock.  I find it interesting that when I sold MEDITECH stock on the August 6, 2003,
Neil Pappalardo had determined the price of $23/share.  By January 2004, the stock value
had increased 13% to $26/share.  Interestingly, from the second to the fourth quarter
2003, equity per share went down 5% and net income went down 6%.  Employees that
took distributions from the Trust as late as December 2003, would have received a
distribution based upon the price of $22 per share determined around November 2002.
Employees receiving distributions in December 2003 would receive six percent more
than their December 2002 account balance, but those receiving distribution two months
later would receive about 24% more.  This increase is mostly due to the revaluation of the
MEDITECH stock and not the 2003 share of contributions and forfeitures ($4,255 in my
account).  By making nominal increases in stock value throughout the year, and then

Confidential-Subject
to Protective Order

M0002357

making a large increase in the stock valuation at the end of the year, penalizes those that sell stock or receive distributions from the Trust throughout the year.

The recent letter that you sent me regarding the Special Meeting of Shareholders notes that since June of this year, the Trust has been paying $27/share for MEDITECH stock (This notice was also filed with the SEC.) If Neil has already determined that $27/share is the fair price for the MEDITECH stock, then my distribution, at a minimum, should be based on the June price of $27/share. It appears that the stock value is considered periodically, and if needed it is adjusted up about three times a year. I believe it would be reasonable to recalculate individual account balances each quarter (using the most current stock value) and then making appropriate distributions.

For example, my account balance within the Trust was $1,039,086, on December 31, 2003. As you recall, I and other long-term employees were informed in November that we were to roll over funds in excess of $1,000,000. On March, I rolled over $39,086 (plus one percent interest) into my E*Trade IRA. Since January, the Trust assets have grown significantly more than the 0 5% monthly interest provided to subsequent distributions. The Trust has received at least $4,100,000 in contributions from the company. In addition, the Trust has received at least $3,000,000 in dividends. According to the recent filing with the SEC, the Trust has been purchasing MEDITECH stock at $27/share since June. The Trust owns at least 3,986,286 shares of MEDITECH stock. If each share went up by one dollar, the Trust would have additional assets of $3,986,286. (Of course, I would not know about the fund distributions or other transactions made during the same time.) It would be reasonable to estimate that the Trust assets have grown by about $10,000,000 since December 31st. The largest growth in the Trust assets each year is always the revaluation of the MEDITECH stock. The policy of determining the plan assets once each year, even though the Trust increases the funds paid for MEDITECH stock throughout the year, is detrimental to those employees that receive distributions later within a calendar year. I estimate that my Trust balance at the end of August should be close to $1,100,000 (at $27/share). If an independent valuation of the stock were utilized, my Trust balance might be $1,300,000 or even more.

I do not expect that this matter will be resolved quickly. In the interim, please transfer my funds as authorized on the attached form. My acceptance of the transfer of these funds does not limit my ability to seek further resolution to these matters.

Sincerely,

Michael Hubert

Cc: Neil Pappalardo, Chairman and CEO, Medical Information Technology

Confidential-Subject
to Protective Order