# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————

|  |  |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually and On Behalf Of All Persons Similarly Situated | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Case No. 05-10269-RWZ ) |
| MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, et al. | ) ) ) ) |
| Defendants. | ) ) |

———————————————————————

## PLAINTIFFS' SECOND OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT

This case involves violations of the Employee Retirement Income Security Program (ERISA), 29 U.S.C. § 1001, et seq., a statute designed to protect employees' vested interests in the benefit plans established by their employers.

The three plaintiffs in this case – Michael Hubert, William Trainor, and David Hinchliffe (collectively, "the Plaintiffs") – each worked for the defendant Medical Information Technology, Inc. ("Meditech") for over twenty years. At the time they left their employment with Meditech, each was a fully vested participant of Meditech's Profit Sharing Plan ("the Plan"), into which Meditech had annually contributed a deferred portion of their compensation. As fully vested participants in the Plan, the Plaintiffs had a right under both the Plan documents and ERISA to receive the fair value of their interests. The defendants in this case – which include Meditech, the Plan, and the Plan's fiduciaries (collectively, "the Defendants") – breached that right by intentionally valuing Meditech's stock, which comprised 85 % of the Plan's total assets, at an artificially low price in order to benefit themselves and their company at the expense of Plan

participants.  By calculating and paying the Plaintiffs' interests in the Plan at this artificially low level, the Defendants breached their fiduciary obligations to the Plaintiffs and gave them less than the full amount of the benefits to which they were entitled.

## PROCEDURAL BACKGROUND

On February 10, 2005, Mr. Hubert filed this class action lawsuit alleging two causes of action under ERISA.  First, Mr. Hubert alleged that as a result of the Defendants' undervaluing of the Plan's assets, the Plan participants had not received the full amount of the benefits due them under the terms of the Plan in violation of 29 U.S.C. § 1132(a)(1)(B).  Second, Mr. Hubert alleged that the Plan fiduciaries' conduct in knowingly undervaluing the stock held by the Plan breached ERISA's fiduciary obligations, codified at 29 U.S.C. § 1104(a), in violation of 29 U.S.C. § 1132(a)(3).

On April 15, 2005, Defendants divided themselves into two groups and filed separate dismissal motions.[1]  The first group consisted of Meditech, the Plan, and defendant A. Neil Pappalardo (Mr. Pappalardo), who serves as Meditech's Chief Executive Officer, Chairman of its Board of Directors, and the Plan's sole Trustee; the second consisted of defendants Lawrence A. Polimeno, Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman, and L.P. Dan Valente (collectively, "the Director Defendants"), all of whom hold executive positions at Meditech and serve on Meditech's Board of Directors.  In those motions, the Defendants argued that Count One should be dismissed because (1) the Plaintiffs were not due any benefits under the plan, (2) the Plaintiffs did not have standing to raise a claim under ERISA; (3) the Defendants' valuation decisions were not arbitrary and capricious, and (4) the Plaintiffs had not

---

[1] Citations to "First Def. Memo" refer to the Memorandum in Support of Defendants Medical Information Technology Profit Sharing Plan and Neil Pappalardo's Motion to Dismiss, filed on April 15, 2005.  Citations to "Second Def. Memo" refer to the Memorandum in Support of Defendants Roland L. Driscoll, Edward Roberts, and Morton Ruderman's Motion to Dismiss, also filed on April 15, 2005.

exhausted their administrative remedies.  With respect to Count Two, the Defendants argued that the Plaintiffs were barred from bringing a claim for the Defendants' fiduciary breaches where those breaches were alleged to have resulted in the failure to pay all benefits due, and that the Director Defendants were not fiduciaries for purposes of ERISA liability.

The Plaintiffs responded by filing the Amended Complaint, which named Mr. Trainor and Mr. Hinchliffe as additional plaintiffs, elaborated on the Defendants' respective roles as fiduciaries (Am. Compl. ¶¶ 4, 6-7, 17-19, 110) and the lack of any meaningful claims or appeals procedures (Am. Compl. ¶¶ 26-30), and further clarified the equitable relief sought under the fiduciary breach claim (Am. Compl. ¶¶ 111-13).  Simultaneously, the Plaintiffs filed an Opposition to the Defendant's Motions to Dismiss ("First Opposition"), which was supported by citations to the Amended Complaint and to numerous cases in this district and elsewhere that have rejected the dismissal theories relied upon by the Defendants.  The Defendants have now responded by filing two additional motions to dismiss, curiously repeating many of their previous arguments (and adding a few new ones) without discussing – or even acknowledging – any of the cases cited by Plaintiffs in their First Opposition.

### FACTUAL BACKGROUND

For the sake of efficiency, the Plaintiffs incorporate by reference the factual background and citations to the Amended Complaint that are contained in the Facts section of the First Opposition.  See First Opp., pp. 2-6.  What follows below is a brief discussion of only those background facts particularly relevant to the Defendants' most recent dismissal arguments.

Approximately 30 years ago, Meditech established a profit sharing plan ("the Plan") for the exclusive benefit of its employees.  Am. Compl. ¶ 10.  Under the terms of the Plan, Meditech agreed to contribute a portion of its annual profits as deferred employee compensation to the

Plan, which would then hold those assets in trust for the Plan's participants. Am. Compl. ¶ 10, 23. Like all profit-sharing plans, the Plan benefited Meditech by increasing Meditech's ability to attract and retain top employees. The Plan was expressly designed to provide an incentive for Meditech employees to maximize the company's profits by permiting Plan participants – who comprise essentially all non-executive company employees – to share in "any growth" that the company enjoyed as a result of their efforts. Tr. Agr. ¶ 1.02.[2]

Under the Plan, Meditech was permitted to make its annual contribution in cash and/or an amount of stock with a fair market value equal to the total amount to be contributed. Am. Compl. ¶ 12. By contributing stock rather than cash, the company has been able to reap the benefits of employee loyalty and productivity while minimizing the actual cost of maintaining the Plan. In turn, the Plan was designed to ensure that participants receive the full benefit of the company's growth by requiring that the Trustee determine the "fair market value" of the stock when allocating it amongst the participants' accounts and when distributing the vested interests in those accounts to participants upon termination of the employment relationship. Tr. Agr. ¶ 5.04. The Trustee's actions in this respect are subject to the annual review and final approval of the Board of Directors. Tr. Agr. ¶ 8.13.

Despite these supposed safeguards, the Individual Defendants have taken advantage of their positions as insiders to knowingly assign an artificially low value to Meditech stock, which allows them to purchase large quantities of stock for their own use. Am. Compl. ¶¶ 49-58. In so doing, the Individual Defendants have breached the general fiduciary obligations of loyalty, good faith, and prudence, and caused the Plan to pay its withdrawing participants less than the amount due to them under the Plan documents. Am. Compl. ¶ 31. The Defendants have managed to

---

[2] Citation to "Tr. Agr." refer to the Medical Information Technology, Inc. Profit Sharing Plan, Amended and Restated Trust Agreement (As of January 1, 1998), which was attached to the First and Second Def. Memos.

4

continue this conduct for a number of years by concealing the basis of their valuation methodology from Plan participants, refusing to hire independent appraisers, and retaliating against insiders who question their methods.  Am. Compl. ¶¶ 27-29, 50-53.

On or around the time the Plaintiffs left their employment with Meditech, they each received a letter from the company summarizing their vested interest in the Plan; shortly thereafter, they each received a check purporting to reflect this interest.  Am. Compl. ¶¶ 26, 28. Neither the Plaintiffs nor, upon information and belief, the rest of the class were not told how their interests had been calculated, nor were they advised of any substantive or procedural right to contest the calculation.  Id.  In fact, when Mr. Hubert wrote a letter questioning the manner in which his interest had been calculated, the Defendants did not respond.  Am. Compl. ¶ 30.  Prior to this lawsuit, none of the Plaintiffs had ever received a copy of the Trust Agreement.  Am. Compl. ¶ 28.

## ARGUMENT

"When considering a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations of the complaint as true."  Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984).  "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  Id. (citations omitted). "Plaintiffs are not required to plead a specific legal theory; all that is necessary is that the facts, if proved, would entitled the party to relief under some viable theory."  Demoulis v. Sullivan, 1993 WL 81500 at *1, Civ. No. 91-12533-Z (D. Mass. (Feb. 26, 1993)).

For the most part, Defendants ignore this fundamental principle and base their dismissal arguments not on the Plaintiffs' allegations, but on unsupported assertions of fact that are nowhere to be found in the Amended Complaint.  In a similar fashion, they overstate the law that

they claim supports them, and wholly ignore all of the cases – including numerous cases from

this district – that have considered and rejected their theories of dismissal.  For the reasons set

forth in the Plaintiffs' First Opposition and herein, this Court should deny the Defendants'

motions.

A.  **Count One Properly Alleges a Claim for Unpaid Benefits Under ERISA, 29 U.S.C. § 1132(a)(1)(B).**

Count One alleges that by failing to fairly value the benefits due to each Plan participant

upon his or her termination, the Trustee (Pappalardo), the Administrator (Meditech), and the Plan

violated their duties to the Plan participants and failed to pay all of the benefits due to them

under the terms of the Plan.  Count One seeks recovery of all unpaid benefits for the class.  In

their Third and Fourth Def. Memos,[3] the Defendants move to dismiss Count One by essentially

repeating the same arguments that they made in their first two motions, without even

acknowledging – much less responding to – the Plaintiffs' opposition.  Specifically, they argue

yet again that Count One should be dismissed because the Plaintiffs are not entitled to additional

benefits, because they lack standing, because they have not sufficiently alleged that the

Defendants' valuation decisions were arbitrary and capricious, and because they have not

exhausted their administrative remedies.

The Plaintiffs responded to most of the arguments put forth in this latest round of

dismissal motions in their First Opposition, which showed that Count One adequately alleges a

claim for additional benefits under 29 U.S.C. § 1132(a)(1)(B).  See First Opp., pp. 7-19.  In that

Opposition, the Plaintiffs first demonstrated that they are "participants" within the meaning of

---

[3] Citations to the "Third Def. Memo" refer to the Memorandum in Support of Defendants Medical Information Technology, Inc. Profit Sharing Plan, Medical Information Technology, Inc. and A. Neil Pappalardo's Motion to Dismiss, filed on July 1, 2005.  Citations to the "Fourth Def. Memo" refer to the Memorandum in Support of Defendants Lawrence A. Polimeno, Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman, and L. P. Dan Valenta's Motion to Dismiss, also filed on July 1, 2005.

ERISA's civil enforcement provisions, such that they have standing to sue under § 1132(a).  Id., pp. 8-10.  Second, they explained that because the Defendants have wholly failed to comply with ERISA's statutory and regulatory requirements for instituting an adequate administrative appeal procedure, they cannot raise a defense of exhaustion.  Id., pp. 10-14.  Third, they pointed out that the Defendants' attempt to argue the merits of their valuation decisions was inappropriate at this stage and that, in any event, the allegations made clear that the Defendants were not entitled to the deference they sought.  Id., pp. 14-17.  Finally, the Plaintiffs responded to the Defendants' argument that the Plaintiffs were not entitled to additional benefits by demonstrating through a hypothetical, as well as by references to the Amended Complaint and the Plan documents, that the Defendants' position was factually wrong and logically flawed.  Id., pp. 17-19.

Rather than go through the exercise of repeating these prior arguments, the Plaintiffs incorporate them by reference into this Memorandum, and write separately only to the extent necessary to respond to the Defendants' newest arguments.

1.  The Plaintiffs rest on their prior arguments relating to their exhaustion of administrative remedies and the applicability of the "arbitrary and capricious" standard of review to the Defendants' alleged conduct.

The Defendants have simply copied their dismissal arguments on exhaustion and the "arbitrary and capricious" standard from their earlier brief into their latest.  Accordingly, the Plaintiffs are content to rest on the arguments and legal authority set out in their First Opposition, which the Defendants have not challenged.

2.  The Plaintiffs have standing to bring suit under § 1132(a).

In arguing that the Plaintiffs do not have standing to proceed with Count One under § 1132(a)(1)(B), the Defendants rely upon Crawford v. Lamantia, 34 F.3d 28 (1st Cir. 1994).

Contrary to their assertions, applying <u>Crawford</u> to the allegations set forth in the Amended Complaint demonstrates that the Plaintiffs have standing to bring this claim.

In <u>Crawford</u>, the plaintiff did not allege that he had received less than the full amount of his interest in the assets held by the plan at the time those assets were distributed to him.  Instead, the plaintiff sought additional benefits by arguing that he was entitled to a proportionate share of the value of the assets that *would have been* in the plan but for the defendants' fiduciary breach. Unlike the <u>Crawford</u> plaintiff, the Plaintiffs do not state a claim for assets that should have been in the Plan but were not.  The asset at issue here – Meditech's stock – was in the Plan all along, but the Plaintiffs did not receive the full amount of their vested interest in that asset because the Defendants' intentionally assigned an artificially low value to it.

This distinction was determinative in <u>Crawford</u>.  In finding that the plaintiff did not have standing to bring his claim under § 1132(a)(1)(B), the First Circuit distinguished it from the case of <u>Sommers Drug Stores Co Employee Profit Sharing v. Corrigan</u>, 883 F.2d 345, 350 (5th Cir. 1989), in which the court found that the plaintiffs *did* have a colorable claim to benefits and thus standing to sue:

> In <u>Sommers</u> . . . [p]laintiffs claimed that their lump sum payments were less than the amount due because the trustees had sold the trust stock for less than fair market value. Each claimant had a set number of shares which were undervalued when it came time to cash them in.  Thus, they were not paid the full extent of their benefits.

<u>Crawford</u>, 34 F.3d at 33.  Like the plaintiffs in <u>Sommers</u>, the Plaintiffs have alleged that their lump sum payments were less than the amount due because the Defendants valued the trust stock at less than fair market value.  Am. Compl. ¶ 31.  The Plan had a set number of shares, which had been allocated to their accounts and which were undervalued when it came time to cash them in.  Am. Compl. ¶¶ 24, 31.  Thus, the Plaintiffs were not paid the full extent of their benefits.

Am. Compl. ¶ 31.  Accordingly, even under the Defendants' lead case, the Plaintiffs have standing to bring the claim alleged in Count One.

The remainder of the Defendants' argument on standing is identical to the argument set forth in its First and Second Dismissal Motions.  In response, the Plaintiffs rest on the arguments and authority presented in their First Opposition, which the Defendants have not challenged.

    3.  <u>The Plaintiffs have alleged sufficient facts to show that they did not receive the fair value of their interest in the Trust, such that they are due additional benefits.</u>

The Defendants spend the vast majority of their Third Defense Memo speculating wildly about the "inevitable" results and "unavoidable" consequences of the Plaintiffs' claims in an attempt to show that even if the Defendants had intentionally undervalued their interest in the Plan, the Plaintiffs are not due any additional benefits.  In so doing, the Defendants hypothesize about ways in which a decision to use a valuation methodology that, in their words, "results . . . in valuations that are uniformly too low," <u>see</u> Third Def. Memo, pp. 22, may nonetheless be considered appropriate under ERISA.  But that is not the standard they must meet to succeed. Dismissal is appropriate *not* whenever the defendant can imagine some scenario in which he may be able to avoid liability, but only if "it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief."  <u>See</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957) (emphasis added).  The Defendants' attempt to speculate their way out of this lawsuit is clearly improper and should be summarily rejected.

That said, throughout the Third Defense Memo, the Defendants make several assertions that are patently inaccurate and thus bear correcting.  First, the Defendants are wrong as a matter of fact and law when they state that paying the Plaintiffs the fair value of their vested interest in the Plan would have "inevitably" diluted other participants' interests.  See Third Def. Memo, pp 18-19.  The Defendants intentionally designed the Plan to be a "defined contribution" plan under

29 U.S.C. § 1002(34), meaning that the "accrued benefit" to which a participant is a statutorily entitled is "the balance of the individual's account." See 29 U.S.C. § 1002(23)(B). Under the Plan, the balance of an individual's account is the participant's vested share in the "fair market value" of the Plan's assets. Tr. Agr. ¶¶ 5.04, 5.05.

In a defined contribution plan, such as the Plan, "by definition there can *never* be an insufficiency of funds in the plan to cover promised benefits since each beneficiary is *entitled* to whatever assets are dedicated to his individual account." See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 439 (1999) (citations and internal punctuation omitted) (emphases added). Indeed, once the employer contributes an asset, the plan or, rather, the plan's participants own it. They bear the full risk and are entitled to the full benefit of the market's forces on the value of that asset.[4] For purposes of this lawsuit, this means that once the Defendants contributed some thing of value to the Plan, be it stock, bonds, property, or some other non-cash asset, the Plan owned the asset and the Plan's vested participants were entitled to receive the equivalent of its fair market value when calculating their interests at the time of distribution. See 29 U.S.C. § 1002(23)(B); Tr. Agr. ¶ 5.04; see also John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan, 26 F.3d 360, 363 (2nd Cir. 1994) (defendants breached fiduciary duty to defined contribution plan participants by failing to accurately reflect the "full investment experience" of the plan's assets when transferring funds from one plan to another).

In other words, the mere act of contribution is supposed to ensure that the Plan has sufficient funds to pay out on those individual accounts at the time of distribution. Indeed, had

---

[4] The alternative to a defined contribution plan is a "defined benefit" plan. Under those types of plans, the employer promises to pay benefits in a particular amount irrespective of whether the actual value of the plan's assets fall above or below the promised benefit amount. Thus, in a defined benefit plan, the investment risk is placed on the employer, not the participant.

the Defendants chosen to provide only cash contributions, or more cash than stock, there would

have been no issue with any liquidity shortfall. Alternatively, had the Defendants decided to

distribute benefits in the form of company stock rather than or in combination with cash, the

liquidity problem they speculate about would not have existed. Or the Defendants could have

simply followed the Trust Agreement, which explicitly permits the Trustee to defer distribution

to a withdrawing Plan participant "if the Trustee determines that the assets of the Trust do not

provide sufficient liquidity . . . ." Tr. Agr. ¶ 6.06(d). The Defendants choose none of these

alternatives, however. Instead, they intentionally decided year after year to primarily contribute

stock rather than cash to the individual accounts created under the Plan, which stock has

increased in value, with the result that 85% of the Plan's total assets are now solely in company

stock. This allowed them to reap the benefits of employee loyalty and productivity, as well as

certain tax benefits granted under the Internal Revenue Code, while minimizing the actual cost of

maintaining the Plan, thus providing them with significant benefits. They also ran the risk,

however, that the fair market value of the contributed privately held stock would greatly increase

over time, such that future distributions of a participant's interest would need to reflect this

increase in value.

 The Plan does not permit the Defendants to treat shares of their own company differently

than any other asset held by the Plan. Imagine, for example, that the Trustee had used the Plan's

cash assets to purchase a plot of land as an investment for $100,000, that at some point in time

oil was discovered on the land, and that as a result the value of that investment increased to

$1,000,000. There is no question that the Plan's participants would be entitled to receive the

benefit of that increase in the investment. Imagine further that rather than the Plan purchasing

the plot of land as an investment, the Defendants decided to contribute it to the Plan in lieu of

contributing $100,000 in cash. If, again, oil was discovered, and the land's fair market value

skyrocketed to $1,000,000, the Defendants could not, under any interpretation of either the Plan

documents or ERISA itself, simply decide to ignore that fair market value and continue to value

the Plan's assets at a more "manageable" figure – reflecting perhaps *some* increase in value but

less than the fair value – for purposes of deciding how much money to pay out to the individual

participants. And yet, that is exactly what they are asking this Court to find that they are entitled

to do with respect to the company's stock.

       In addition to misrepresenting the "risks" of fairly valuing the Plaintiffs' interest in the

Plan, the Defendants repeatedly craft hypothetical situations that have little to do with – or

directly contradict – the Plaintiffs' theory of liability as alleged in the Amended Complaint. The

Plaintiffs do not allege that the Defendants are babes in the woods who innocently bumbled into

the briar patch of artificially low valuation years ago. Nor do they allege that the Defendants

were driven to undervalue Meditech's stock out of benevolent concern for the overall health of

the Plan. Rather, the Amended Complaint shows that for years the Defendants have intentionally

valued the company's stock at artificially low levels in order to benefit the company and

themselves, knowing that this undervaluing came at the expense of participants departing the

Plan. Am. Compl. ¶¶ 31, 49-58. As a result of this conduct, the Plaintiffs and all those

terminating their interest in the Plan since at least 1998 have not received the full amount of their

vested interest in the Plan because they did not receive the benefit of the "fair market value" of

the Plan's assets at the time that those assets were distributed to them, a benefit to which they

were entitled under the Plan and under ERISA. Am. Compl. ¶ 31. The Plaintiffs have further

alleged facts to show that the Defendants have been able to get away with this wrongful conduct

for so long because they have limited the information given to Plan participants in violation of

federal law (Am. Compl. ¶¶ 27-29), steadfastly refused to permit a single independent third-party appraisal of the company (Am, Compl. ¶ 53), and retaliated against insiders who questioned their methods (Am. Compl. ¶¶ 50-52).  The Defendants simply have not mustered any argument that *these* allegations, taken as true, fail to state a claim for relief under § 1132(a)(1)(B).

Instead, the Defendants seek to align themselves with the defendants in <u>Foltz v. U.S. News & World Report, Inc.,</u> 663 F.Supp. 1494, 1533-34 (D.D.C. 1987).  It is true that in <u>Foltz</u>, the court upheld the defendants' valuation decisions.  That holding arose not in the context of a dismissal motion, however, but following a lengthy bench trial.  <u>Id.</u> at 1512.  Indeed, the same court had previously denied the defendants' motions for summary judgment, finding that if the defendants had in fact intentionally undervalued the company stock, as alleged by the plaintiffs in that case (and the Plaintiffs in this case), they would clearly have violated the duties imposed by ERISA.  <u>See</u> <u>Foltz v. U.S. News & World Report, Inc.,</u> 627 F.Supp. 1143, 1167 (D. D.C. 1986) (allegations that defendants undervalued profit-sharing plan's assets stated claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3) because "the effect of undervaluation [of the plan's assets] would have been to deprive then-retiring Plan participants of a portion of the value due them from the Plan corpus, just as if the Plan fiduciaries had wrongfully sold off some of its assets").[5]

---

[5] It bears noting that the facts before the <u>Foltz</u> court were also markedly different from the allegations of the Amended Complaint.  For example, the <u>Foltz</u> court relied rather heavily on the validity of the numerous third-party appraisals commissioned by the defendants to find that the defendants did not intentionally engage in wrongful conduct.  <u>See</u> <u>Foltz</u>, 663 F.Supp. at 1507; <u>id.</u> at 1515, n.27 ("Throughout the history of the Company, it was the practice always to retain an appraiser, rather than to seek an agreement on the proper price.").  Our Defendants, of course, have never permitted an independent third-party to value Meditech's stock; to the contrary, they ousted a former Board member for suggesting that such an appraisal might be appropriate.  Am. Compl. ¶¶ 50-52; <u>cf.</u> <u>Leigh v. Engel</u>, 727 F.2d 113, 127-29 (7th Cir. 1984) (finding breach of § 1104(a)'s duty of loyalty, in part, because defendant fiduciaries "faced conflicting loyalties and . . . made no effort to obtain independent advice" regarding investment of plan assets and interests of plan beneficiaries).

The Defendants are welcome to try and muster as persuasive a defense at trial as the <u>Foltz</u> defendants. What they cannot do, however, is to parrot the valuation justifications that were proven by the <u>Foltz</u> defendants and thereby obtain dismissal of the Plaintiffs' suit. Courts appropriately prefer to decide matters "in the concrete and not the abstract. This is in part because . . . the facts are likely to contribute to a more sensitive assessment of what the law 'is' (which, absent decisive precedent, means what it 'should be')." <u>Doe v. Walker</u>, 193 F.3d 42, 46 (1st Cir. 1999) (citations omitted). Where as here the Plaintiffs have clearly alleged facts that, taken as true, support a claim for unpaid benefits under 29 U.S.C. § 1132(a)(1)(A), they are entitled to proceed with their claim. For all of the foregoing reasons, and for all of the reasons set forth in the First Opposition, the Plaintiffs respectfully request that this Court deny the Defendants' several motions to dismiss Count One.

## B. Count Two Properly Alleges a Claim for Breach of Fiduciary Duty Under ERISA, 29 U.S.C. § 1132(a)(3).

In Count Two of the Amended Complaint, the Plaintiffs allege that Pappalardo, Polimeno, Driscoll, Roberts, Ruderman, and Valente (collectively, "the Individual Defendants") breached their fiduciary duties to the Plan participants when they failed to fairly value the assets in the Plan. Count Two seeks equitable relief from the Individual Defendants' breach, including an order precluding the Individual Defendants from being unjustly enriched by their conduct and an order that they retain an outside appraisal of the Plan's assets.

In the Third and Fourth Defense Motions, the Defendants repeat their arguments in support of their previous motions: that the Director Defendants were not, in fact, fiduciaries when they engaged in their wrongful conduct, and that the Plaintiffs are precluded from alleging a cause of action for both unpaid benefits and breach of fiduciary duty. They also add a new

argument, challenging the propriety of the equitable remedies sought by the Plaintiffs in the Amended Complaint.

In the First Opposition, the Plaintiffs showed that Count Two of the Amended Complaint properly pleads a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3).  See First Opp., pp. 19-25.  First, the Plaintiffs explained how the Individual Defendants were all fiduciaries for purposes of the conduct alleged in the Amended Complaint; Defendant Pappalardo as the named Trustee was directly responsible for valuing, allocating, and distributing the Plan's assets to the Plan participants, and the Director Defendants, acting for the Plan Administrator, were responsible for monitoring Defendant Pappalardo's conduct in general and for reviewing and approving his handling of the Plan's assets in particular.  First Opp., pp. 19-21.  Next, the Plaintiffs explained how the Individual Defendants' conduct in jointly valuing Meditech's stock at an artificially low price in order to benefit themselves personally (by allowing them to purchase large quantities of stock at bargain prices) and professionally (by making their bosses happy) violated their fiduciary duties of care and loyalty under 29 U.S.C. § 1104(a).  First Opp., pp. 21-22.  Finally, the Plaintiffs demonstrated through case law from this district that they are not precluded from raising their breach of fiduciary claim simply because those fiduciary breaches have also given rise to a claim for unpaid benefits.  First Opp., pp. 23-25.

As with their arguments pertaining to Count One's viability, Plaintiffs incorporate by reference all of these arguments into this Second Opposition, none of which have been refuted by the Defendants, and write separately only to the extent necessary to respond to the Defendants' newest arguments.

1.    <u>The Director Defendants are liable for breaching their fiduciary duties.</u>

With respect to the Director Defendants' fiduciary status, the Plaintiffs rest on their prior brief, except to make two brief points.  First, the Defendants are simply wrong when they say that nothing in the Plan gives them discretionary authority over Plan assets.  Section 8.13 of the Trust Agreement specifically requires the Director Defendants (acting as the Company) to review and approve every decision Defendant Pappalardo makes with respect to the Plan's assets.  Approval authority is discretionary authority for purposes of ERISA fiduciary liability.  <u>See</u> 29 U.S.C. § 1002(21)(A)(i) ("[A] person is a fiduciary to the extent he exercises . . . *any* authority or control respecting management or disposition of [a plan's] assets") (emphasis added).

Second, the Director Defendants' argument that they cannot be held liable for failing to adequately monitor Defendant Pappalardo is directly contrary to the leading case of <u>Leigh v. Engel</u>, 727 F.2d 113, 135-36 (7th Cir. 1984) and to case law from this district.  In <u>Leigh</u>, the Seventh Circuit held that once on notice that other plan fiduciaries were operating under a potential conflict of interest, the director defendant was "obliged to take reasonable and prudent action to determine whether the administrators were fulfilling their fiduciary obligations," and that he could not insulate himself from fiduciary liability simply by limiting his role in the administration of the plan.  <u>Id.</u> at 135-36.  Here, the Plaintiffs have alleged that the Director Defendants never conducted an independent inquiry into the fair value of Meditech stock, despite being specifically warned that stock values were being set at an "artificially low price" and that they ought to hire an independent appraiser rather than continue "relying on an outdated valuation methodology that does not properly reflect the Issuer's current fair value."  Am. Compl. ¶¶ 48, 50-53.  Indeed, the Director Defendants have knowingly participated in

16

undervaluing Meditech stock, and have done so, in part, to ensure that insiders like Defendant Pappalardo can continue to purchase large quantities of stock for themselves at bargain prices. Am. Compl. ¶¶ 56-58. This is clearly sufficient to show the same type of breach found to violate ERISA in Leigh. See also Kling v. Fidelity Management Trust Co., 323 F.Supp.2d 132, 142-43 (D. Mass. 2004) (responsibility for appointing and removing trustee carries with it responsibility to monitor and correct trustee's conduct); 29 U.S.C. §§ 1105(a)(1)-(3) (fiduciaries are liable under ERISA when they knowingly participate in a co-fiduciary's breach, breach their own duties in such a way as to permit a co-fiduciary to commit a breach, or fail to take reasonable efforts to remedy a co-fiduciary's known breach).

    *2.*    <u>Plaintiffs may bring a claim for breach of fiduciary duty in addition to a claim for unpaid benefits.</u>

The Plaintiffs also rest on that portion of their prior brief showing that they are not precluded from raising a claim for breach of fiduciary duty, and write separately simply to address the legal authority cited by the Defendants in support of their position. First, the Defendants incorrectly cite LaRocca v. Borden, Inc., 276 F.3d 22 (1st Cir. 2002) as standing for the proposition that a plaintiff with a cause of action under § 1132(a)(1)(B) is precluded from also filing a cause of action under § 1132(a)(3). See Third Def. Mem., pp. 15. In LaRocca, where the parties had previously stipulated to liability, the only issue before the court was whether "the plaintiffs were eligible for equitable relief beyond the relief offered by [the defendant] in settlement negotiations." LaRocca, 276 F.3d at 25. Indeed, LaRocca opens with the statement, "This case concerns the *remedies due* for violations of [ERISA]." Id. at 24 (emphasis added). This explains why the First Circuit resolved the case under such headings as "Plaintiffs' Demands for Relief" and "Remedies Available Under ERISA." Id. at 26, 27. Thus, contrary to the Defendants' assertion, LaRocca merely stands for the unremarkable rule that a

plaintiff who has a *remedy* for withheld benefits under § 1132(a)(1)(B) cannot also recover *further relief* under § 1132(a)(3); it says nothing at all about whether plaintiffs are barred from bringing *claims* under both sections.  To the extent the Defendants argue otherwise, they are simply wrong.

The Defendants also cite the recent decision in Fletcher v. Tufts University, 367 F.Supp.2d 99, 115-16 (D. Mass. 2005), in which Judge Lindsay held that the plaintiff's claim that the defendant had "improperly classified her disability as mental rather than physical," must proceed, if at all, under § 1132(a)(1)(B).  Id.  The Plaintiffs agree with this holding: a claim for a denial of medical benefits does not, without more, properly allege a claim for breach of fiduciary duty.  Here, however, the Plaintiffs have alleged far more than that the Defendants simply did not pay them the money they were due under the Plan.  Specifically, the Amended Complaint shows that the Individual Defendants all participated in valuing the company's stock, knowing that the values at which they were jointly arriving did not accurately reflect the stock's fair value and did so, in part, to benefit themselves and their employers.  Am. Compl. ¶¶ 21, 49, 58.  Indeed, despite receiving specific notice from a colleague in 2002 that the stock was being valued at an "artificially low price" pursuant to "an outdated valuation methodology that does not properly reflect the Issuer's current fair value," the Individual Defendants continued their conduct, refusing even to verify the stock's fair value with an independent third-party.[6]  Am. Compl. ¶¶ 50-53; see also Leigh, 727 F.2d at 128-29 (fiduciaries' interest in maintaining a low stock price clearly conflicted with plan participants' interest in acheiving high stock prices, such that failure to seek independent advice constituted breach of fiduciary duty).  Fletcher's holding is simply inapplicable to this type of claim, which is clearly viable under 29 U.S.C. § 1132(a)(3).

---

[6] To be fair, it now appears that the Individual Defendants did take one act in response to this specific notice of potential wrongdoing: they attempted to amend the Plan documents to cut off the Plan participants' right to sue.  See Part C(3), *infra*.

3.    <u>Count Two seeks appropriate remedies</u>

Finally, the Defendants challenge two of the remedies requested under Count Two: a judgment against the Individual Defendants for any unjust enrichment, and an injunction ordering the Individual Defendants to consult an outside appraiser in valuing the Plan's assets.

Unjust enrichment is a form of restitution, which is itself an appropriate remedy for claims brought under § 1132(a)(3). See Restatement (Third) of Restitution, § 3 ("A person who interferes with the legally protected rights of another . . . is liable to the other for any profit realized by such interference."); <u>Laurenzano</u>, 134 F.Supp.2d at 196 (permitting plaintiff to seek money judgment as restitution under § 1132(a)(3) because defendant had been "unjustly enriched" by wrongful conduct).

Under the doctrine of unjust enrichment, "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." <u>Massachusetts v. Mylan Laboratories</u>, 357 F.Supp.2d 314, 323 (D. Mass. 2005). "Unjust enrichment does not require that a defendant receive direct payments from the plaintiff." <u>Id.</u> Rather, a plaintiff may seek "restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable." <u>Id.</u>

Here, the Plaintiffs have alleged sufficient facts to show that the Individual Defendants have enriched themselves at the expense of Plan participants. As alleged in the Amended Complaint, over the past eight years, the fair market value of Meditech's stock was actually much higher than the value set by the Individual Defendants. <u>See</u> <u>e.g.</u>, Am. Compl. ¶¶ 64-103. Yet as a result of their fiduciary breaches, the departing participants in the Plan have received far less than the fair value of their vested interests. For example, in 1998, the Defendants paid Mr. Trainor and Mr. Hinchliffe their vested interest in the Plan, which they calculated at $14.50 per

share.  A standard valuation method that has received prior court approval, see Horn v. McQueen, 353 F.Supp.2d 785, 825-29 (W.D. Ky. 2004), would have yielded a value of approximately $75 per share, five times higher than the number the Defendants used to calculate the benefits due to Mr. Hinchliffe, Mr. Trainor, and all other departing Plan participants in that year.  See Am. Compl. ¶¶ 38-39, 64-70.  And the Amended Complaint shows the same type of disparity for every other year as well.  Am. Compl. ¶¶ 71-103.

The Amended Complaint also shows that the Individual Defendants caused this huge disparity between what was fair and what was paid in order to enrich themselves.  Specifically, they knowingly maintained an artificially low price for Meditech stock to ensure that they could afford to purchase large quantities of stock.  Am. Compl. ¶¶ 56-58.  For example, in the last three years alone, Defendant Pappalardo has personally purchased approximately 100,000 shares of Meditech stock – almost half of the total amount of shares contributed to the Plan in the same timeframe.  Am. Compl. ¶¶ 15, 57.  Ironically, as a result of these large stock purchases, Defendant Pappalardo and, on information and belief, the other Individual Defendants stand to gain a huge financial windfall even if they lose this litigation.  The rising tide of fair value will raise all stockholder ships – even the Individual Defendants' whose fiduciary breaches necessitated this lawsuit.  To allow them to profit from their misconduct would be a textbook example of an unconscionable result, and one that the doctrine of unjust enrichment is perfectly suited to remedy.

The Plaintiffs' request for a permanent injunction requiring the Individual Defendants to consult an outside appraiser is also proper.  It is well established that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing."  Warth v. Seldin, 422 U.S. 490, 500 (1975).  A plan participant has a

right to have plan fiduciaries comply with the fiduciary obligations created by ERISA. See Horvath v. Keystone Health Plan East, Inc., 333 F.3d 450, 456 (3rd Cir. 2003). If a plan fiduciary breaches its obligations under ERISA, plan participants are entitled to seek injunctive relief to remedy the breach. Id.; see also Adair v. Johnston, 221 F.R.D. 573, 580 (M.D. Ala. 2004) (former employee has standing as "participant" to seek injunctive relief for violations of statutory rights).

As the Plaintiffs demonstrated in the First Opposition, they are "participants" in the Plan within the meaning of ERISA. See First Opp., pp. 8-10. As such, they have a right to have the Individual Defendants comply with ERISA's fiduciary obligations. In particular, the Plaintiffs have a right under both the Plan (Tr. Agr. ¶ 5.04) and ERISA (29 U.S.C. § 1002(26)) to have the Plan assets fairly valued. The Defendants have repeatedly and continuously deprived the Plaintiffs (and all other Plan participants) of this right by knowingly undervaluing the company stock held by the Plan (which comprises 85% of the Plan's total assets) each year and by resisting any outside scrutiny of the stock's actual fair value. A court order requiring the Defendants to verify their valuations with an objective third party will remedy that harm. Accordingly, the Plaintiffs have standing to seek the requested injunction in order to remedy the harms caused by the Individual Defendants' unfair and secretive valuation methods.[7]

**C.  The Plaintiffs Filed Their Complaint Within the Applicable Limitations Period.**

In a last ditch effort to limit this lawsuit, the Defendants spend a brief two pages arguing that portions of the Plaintiffs' claims are barred by the statute of limitations. As with many of

---

[7] The cases cited by the Defendants are inapplicable to the Plaintiffs' claim under Count Two. In Impress Communications v. Unumprovident Corp., 335 F.Supp.2d 1053 (C.D. Cal. 2003), the plaintiffs conceded that they had never sought benefits under the insurance policies at issue, were never denied benefits under the policies, and no longer owned any of the policies. Id. at 1059-60. Not surprisingly, the court found that the plaintiffs did not have standing to pursue any remedy under ERISA – not just an injunction. The other two cases cited by the Defendants dealt with the issue of class certification, not standing, and consequently did not consider or discuss the long-standing concept of statutory harm as a means to demonstrate standing. See Mueller v. CBS, Inc., 200 F.R.D. 227, 229 (W.D. Penn. 2001); Selby v. Principal Mutual Life Ins. Co., 197 F.R.D. 48, 52 (S.D. N.Y. 2000).

the other dismissal arguments, this scanty statute of limitations claim is a merits-based defense

that is frankly improper at this early stage of litigation.  See Foltz, 627 F.Supp. at 1149-50.  Even

if this Court were to reach the merits of the statute of limitations argument, however, the

argument must be rejected because it is fundamentally flawed.

        1.        <u>Claims for unpaid benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B), have<br>a statute of limitations period of six years.</u>

ERISA does not contain a statute of limitations for claims such as Count One that are

brought under 29 U.S.C. § 1132(a)(1)(B).  As a result, courts apply the limitations period found

in the most analogous cause of action under state law.  <u>Salcedo v. John Hancock Mutual Life Ins.</u>

<u>Co.</u>, 38 F.Supp.2d 37, 40 (D. Mass. 1998).  Virtually every court to have done so, including

those courts that have done so in this district, has held that claims for unpaid benefits brought

under § 1132(a)(1)(B) are most analogous to contract claims.  <u>See</u>, <u>e.g.</u>, <u>Nazario Martinez v.</u>

<u>Johnson & Johnson Baby Products, Inc.</u>, 184 F.Supp.2d 157, 160-62 (D. P.R. 2002) (collecting

cases); <u>Laurenzano</u>, 134 F.Supp.2d at 206 (noting that "[t]he courts of appeals are all in

agreement that [§ 1132(a)(1)(B)] is most analogous in general to a contract claim . . . ."); 

<u>Salcedo</u>, 38 F.Supp.2d at 40.  This makes sense because claims under § 1132(a)(1)(B) "arise

from a contract for providing benefits to employees."  <u>Nazario Martinez</u>, 184 F.Supp.2d at 160.

Massachusetts applies a six-year limitation period to contract claims.  <u>See</u> M.G.L. ch.

260, § 2.  Courts in this district thus routinely apply that six-year limitation period to claims for

unpaid benefits brought under § 1132(a)(1)(B).  <u>See</u>, <u>e.g.</u>, <u>Laurenzano</u>, 134 F.Supp.2d at 206

(plaintiff's claim for recalculation of benefits due him is more analogous to contract action than

Wage Act claim).  Ignoring <u>Laurenzano</u>, the Defendants contend that this Court ought to break

from that precedent and find that the claim for unpaid benefits alleged in Count One is analogous

to a claim under the Massachusetts Wage Act and, thus, that the Wage Act's three-year statute of limitations should apply.  See Third Def. Memo, pp. 11-12.

In support of this argument, the Defendants correctly point out that the money contributed to the Plan (and withheld from the Plaintiffs) is "deferred compensation."  Id.; see also Am. Compl. ¶ 23.  They neglect to mention, however, that the Massachusetts Wage Act does not apply to deferred-compensation claims.  See Boston Police Patrolmen's Assoc., Inc. v. City of Boston, 435 Mass. 718, 721 (2002) ("[D]eferred compensation contributions are not 'wages' under the weekly wage law").  Therefore, contrary to the Defendants' argument, the claim in Count One is explicitly disallowed under the Wage Act, and thus the Wage Act's limitations period is wholly inapplicable to that claim.  See Salcedo, 38 F.Supp.2d at 40 (Massachusetts statute cannot supply the appropriate statute of limitations under ERISA if it would not apply to plaintiff's claim because the exclusion reflects "a judgment that different standards are appropriate for" plaintiff's claim, as well as "a determination not to shorten the limitations period applicable to" plaintiff's claim).  Thus, here, as in other § 1132(a)(1)(B) claims in this district, the appropriate statute of limitations is the six-year limitation on general contract claims.  See  Laurenzano, 134 F.Supp.2d at 206.

The Defendants' reliance on Gluck v. Unisys Corp., 960 F.2d 1168, 1182 (3rd Cir. 1992) is misplaced.  Gluck held that certain of the plaintiffs' ERISA claims – but by no means all of them – were appropriately analogized to claims brought under Pennsylvania's Wage Payment and Collection Laws, and the court therefore applied the statute of limitation contained in those laws to those particular claims.  But whether Pennsylvania's wage laws would or would not cover a claim such as that made in Count One is irrelevant.  Here, the parties agree that Massachusetts's law, not Pennsylvania's, governs the terms of the Plan.  See Tr. Agr. § 11.04.

Because the Massachusetts Wage Act does not apply to claims of unpaid deferred compensation as a matter of law, Count One cannot appropriately be bound by that Act's limitations period, see Salcedo, 38 F.Supp.2d at 40, and the Defendants' brief argument to the contrary is unavailing.

        2.      <u>Count One was timely filed because nothing triggered the running of the limitations period.</u>

Of course, knowing that the statutory period is appropriately six rather than three years is meaningless without knowing when the period began to run – in other words, when the cause of action reflected in Count One accrued. In their Third and Fourth Defense Memos, however, the Defendants make no argument at all as to when the limitations period began to run on Count One's claim.

Determining the moment when a cause of action accrues is a question of federal common law. See <u>Romero v. The Allstate Corp.</u>, 404 F.3d 212, 221 (3rd Cir. 2005); <u>Laurenzano</u>, 134 F.Supp.2d at 207. In federal question cases, courts typically employ the federal "discovery rule" to determine when the federal claim accrues for limitations purposes. <u>Romero</u>, 404 F.3d at 222. Under the discovery rule, a limitations period begins to run when the plaintiff knew or should have known all of the facts giving rise to a claim for benefits. <u>Id</u>. With respect to a claim for unpaid benefits under § 1132(a)(1)(B), this is typically when the claim for benefits is formally denied. <u>Laurenzano</u>, 134 F.Supp.2d at 207; <u>Salcedo</u>, 38 F.Supp.2d at 42. In this district, the "formal denial" that begins the running of the limitations period occurs upon completion of the statutorily required administrative review procedures. <u>Salcedo</u>, 38 F.Supp.2d at 42.

Here, the clock never started running on the Plaintiffs' claims because the Defendants never provided any of the Plaintiffs (or indeed, any putative class members) with a formal denial. <u>See</u> Am. Compl. ¶¶ 26-30. To the contrary, as shown in the First Opposition, the Defendants wholly failed to comply with ERISA's statutory provisions and regulations, which require, at a

minimum, that employers notify an employee in writing of any adverse decision on a claim, giving the specific reasons for the adverse determination, referring to the specific plan provision on which the decision was based, describing whatever additional material or information is necessary to perfect the claim (with an explanation of why it is necessary), and providing a description of the review procedures, applicable time limits, and rights to file a lawsuit.  See 29 U.S.C. § 1133; 29 C.F.R. §§ 1560.503-1(f)-(g).[8]  Because the Defendants failed to establish and comply with *any* of these procedures, see Am. Compl. ¶¶ 26-30, there was never any formal denial of benefits.  Accordingly, the Plaintiffs' claim did not begin to accrue as a matter of law. See Salcedo, 38 F.Supp.2d at 44 ("Since it seems that [the plaintiff] did not receive notice consonant with the goals of § 1133 until 1994, it is fitting to hold that this is the date on which her cause of action arose."); see also Veltri v. Building Service 32B-J Pension Fund, 393 F.3d 318, 325 (2nd Cir. 2004) (court need not decide when plaintiff's claim actually accrued because employer's failure to comply with 29 C.F.R. § 2560.503-1's notice requirements equitably tolls the limitations period).

Even if this Court were inclined to ignore the Defendants' failure to give the Plaintiffs formal – or, indeed, *any* – notice of an adverse benefits decision, there is nothing in the Amended Complaint from which the Court could choose a date at which the Plaintiffs otherwise should

---

[8] Defendants' failure to comply with § 1133 and the governing regulations also explains why Count One cannot be dismissed on exhaustion grounds.  An employer that violates its duty to adequately inform its employee of an adverse benefits decision is not permitted to raise as a defense to an ERISA action the argument that the employee failed to appeal the adverse decision.  See 29 C.F.R. § 2560.503-1(*l*) ("In the case of a failure of a plan to establish or follow claims procedures consistent with the requirements of [29 C.F.R. § 2560-530-1], a claimant shall be deemed to have exhausted the administrative remedies under the plan . . . ."); Corsini v. United Healthcare Corp., 965 F.Supp. 265, 269 (D. R.I. 1997) ("[A] fiduciary who has not provided notice that benefits have been denied is foreclosed from insisting upon exhaustion of administrative remedies."); see generally First Opposition, pp. 10-14. Thus, the Defendants' failure to comply with § 1133 and its governing regulations means both that the clock never started to run on the Plaintiffs' claims and that the Plaintiffs have exhausted their administrative remedies as a matter of law.

have known that they had a potential ERISA claim.[9]  Instead, they appear to assume that the

Plaintiffs ought to have known that their interest in the Plan had been undervalued when they

received their distributions.  See Third Def. Memo, pp. 11-12 (arguing that Mr. Trainor and Mr.

Hinchliffe's claims must be dismissed based on the approximate date that they received their

distributions).  Although such an approach might be justified in a case where the plaintiff asks

for and does not receive a benefit, it is not applicable here.

Typically, claims for unpaid benefits under § 1132(a)(1)(B) involve a situation where a

plan participant has been denied medical or disability benefits by the plan administrator.  In such

a case, the participant is (or ought to be) well aware of the defendant's denial even if she does

not receive formal notice of that denial because she has suffered some clear deprivation – for

instance, she may be unable to obtain the medical treatment at issue, or her weekly salary checks

may have ceased to arrive.  See, e.g., LaChapelle v. Berkshire Life Ins. Co., 175 F.Supp.2d 507,

510 (1st Cir. 2001) ("The Company did not mislead the appellant, but, rather, told him

straightaway that it intended to stop paying benefits. It then acted on that stated intention. This

should have been a reveille, not a lullaby.").  In such situations, it is appropriate to find that the

participant ought to have known that the defendant refused to provide the requested benefit.

Here, however, the Plaintiffs each received a benefits check, albeit in an amount that

turned out to be far less than what they were entitled to receive under the Plan.  In situations such

as this one – where there is no objective indication that the defendants "denied" any portion of

what the plaintiffs were entitled to receive under the Plan – the Defendants must show at the

least that the Plaintiffs were aware both of their rights under the Plan and that the defendants'

---

[9] The Defendants do not argue that the Court could find that the Plaintiffs had actual knowledge of the Defendants' wrongdoing.  See, e.g., Third Opposition, pp. 11 n.7 (explicitly reserving the right to argue "at an appropriate time" that the Plaintiffs had "actual knowledge" of their claims).  Thus, the only issue is whether, taking all of the Amended Complaint's allegations as true, the Plaintiffs should have known that the Defendants were intentionally undervaluing their interests in the Plan at some particular point in time.

conduct potentially implicated those rights before the clock can have been triggered under the federal discovery rule.  Typically, this means that the plaintiffs must, at the least, have seen the plan documents granting the rights at issue before the limitations period can begin to accrue.  See, e.g., Thomas v. SmithKline Beecham Corp., 297 F.Supp.2d 773, 786 (E.D. Penn. 2003) (statute of limitations for plaintiffs alleging wrongful exclusion from plan did not begin running until plaintiffs saw the plan documents, even though they had been excluded years before; knowledge of rights under plan was essential for plaintiffs' suit because exclusion was not *per se* a violation of ERISA).

As in Thomas, nothing in the act of calculating and paying out profit-sharing benefits is inherently suspect.  To the contrary, in order to know that the Defendants had breached their statutory and Plan-based obligations to evaluate, allocate and pay the fair market value of their vested interests, the Plaintiffs would had to have known at a minimum that they were entitled to have their interest calculated at fair market value and that the Defendants were actually calculating their interests at less than that amount.  Yet the Amended Complaint clearly alleges that the Plaintiffs (like all other participants) were never given the Trust Agreement, never told how their interest was calculated, and never offered the opportunity to question that calculation (for instance, through some sort of appeal procedure).  See Am. Compl. ¶¶ 26-30.  These are precisely the types of allegations that preclude a finding that the Plaintiffs "should have known" that they had a claim for benefits under ERISA at the time they received their disbursements.

In this regard, the Second Circuit's decision in Romero is directly on point.  There the Second Circuit rejected the defendants' contention that they had "clearly repudiated" the plaintiffs' claims for benefits by amending the plan documents years before the plaintiffs brought

27

suit.  In reversing the district court's order dismissing the plaintiffs' ERISA claims, the <u>Romero</u> court stated:

> [T]he Complaint specifically alleges that notice [of defendants' wrongful conduct] was not given to participants and further did not allege facts from which it might be inferred that plaintiffs knew or should have known the effect such [action] would have on their benefits . . . [W]hile facts may be developed from which one could conclude that clear repudiation did occur at a time which renders the subsequent assertion of the claim untimely, it is premature at this point to dismiss Count III on limitations grounds.

<u>Romero</u>, 404 F.3d at 225.  The Defendants are welcome to try and prove that the Plaintiffs should have known about the Defendants' wrongful conduct well before they finally filed suit. As the record now stands, however, the Defendants have utterly failed to carry their heavy burden of proof.[10]

### 3.        Count Two was timely filed as well.

Unlike claims for unpaid benefits under 29 U.S.C. § 1132(a)(1)(B), claims for breaches of fiduciary duties under ERISA are governed by the statute of limitations set out in 29 U.S.C. § 1113.  That section states that a claim for a breach of a fiduciary duty must be brought by the earlier of either "six years after . . . the date of the last action which constituted a part of the breach or violation," or (2) "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."  In the case of fraud or concealment, the statute of limitations is tolled.

---

[10] The Defendants also refer briefly to a recent unilateral amendment made to § 11.10 of the Trust Agreement, which purports to retroactively limit to one year the right of a participant to bring "any legal proceeding regarding entitlement to benefits or any aspect of benefits under the Plan."  <u>See</u> Third Def. Memo at 12.  To the extent they mean to argue that the amendment should be applied to dismiss Count One in its entirety (a request they do not actually make), that request should be summarily denied as the Defendants have done nothing to demonstrate the amendment's reasonableness.  <u>Skipper v. Claims Servs. Intern'l, Unum</u>, 213 F.Supp.2d 4, 6 (D. Mass. 2002) (to be enforceable, a contractual limitations period must be reasonable).  Nor have they shown why it should be applied to limit the Plaintiffs' claims when they did not receive prior notice of the amendment's existence.  <u>See</u> <u>Romero</u>, 404 F.3d at 225 ("It would make no sense, and indeed do a disservice to the underlying purposes of ERISA and its disclosure requirements, to deem a notice claim to have accrued before a plaintiff knows or should have known that an amendment has the effect which triggers the notice requirement."); Am. Compl. ¶ 28 ("[N]one of the named plaintiffs has ever received a copy of the Medical Information Technology, Inc. Profit Sharing Plan, Amended and Restated Trust Agreement (As of January 1, 1998).").

The Defendants concede, at least for purposes of their dismissal motions, that the six-year statute of limitations applies to Count Two of the Amended Complaint. Section 1113 specifically states that the limitations period will run "six years . . . after the date of the *last* action which constituted the breach." Of course, the Amended Complaint does not allege the date that the last action took place. This is because it alleges a continuing violation of ERISA in that the Defendants continue to breach their fiduciary duties of loyalty, care, and prudence every time they engage in the annual process of valuing the stock at less than fair market value. Thus, the "last action" would have occurred, at most, within the last year, bringing Count Two well within the six-year limitation period. The Defendants' argument, which suggests that the Plaintiffs were obligated to bring suit within six years of the date of the *first* action that constituted the breach, is simply wrong.

Even if the Defendants were right to read "last action" as "first action," the Plaintiffs have alleged sufficient facts to show that § 1113's tolling provision would apply. Failure to comply with § 2560.503-1 is sufficient "concealment" to equitably toll the clock on an ERISA claim. See Veltri v. Bulding Service 32B-J Pension Fund, 393 F.3d 318, 323-24 (2nd Cir. 2004) (equitably tolling clock on denial of benefits that occurred eleven years before because defendant failed to comply with notice requirements of 29 C.F.R. § 2560.503-1). Here, the Amended Complaint clearly alleges sufficient facts to show that the Defendants did not comply with even the most basic requirements of 29 C.F.R. § 2560.503-1. Am. Compl. ¶¶ 26-29; see also First Opp., pp. 10-14; Part C(2), *infra*. Indeed, unlike in Veltri, where the plaintiff at least got a timely response (albeit a deficient one), here the Defendants completely ignored Mr. Hubert's request for an explanation as to how his interest had been valued. See Am. Compl. ¶ 30. For all

29

of these reasons, the Defendants have failed to carry their heavy burden of showing that there is no set of facts under which Count Two could have been timely filed.

## CONCLUSION

The claims in this case are not complicated.  The Plaintiffs have alleged that as fully vested participants, they had a right under both the Plan documents and ERISA to receive the fair value of their interests in the Plan.  Yet the Defendants knowingly valued Meditech's stock, which comprised 85 % of the Plan's total assets, at an artificially low price in order to benefit themselves and their company at the expense of Plan participants.  By calculating and paying the withdrawing participants' interests at this artificially low level, the Defendants breached their fiduciary obligations to the Plan's participants (including the Plaintiffs) and distributed to them less than the full amount of the benefits to which they were entitled.  Despite the seventy-plus pages of legal briefing submitted by the Defendants, there is no question that the Plaintiffs have alleged sufficient facts that, if proven, will give rise to liability under ERISA.  For all of the foregoing reasons, and for all of the reasons set forth in the First Opposition, the Plaintiffs respectfully request that this Court deny the Defendants' several motions to dismiss the Amended Complaint.

Respectfully submitted,
**Michael P. Hubert,**
**William Trainor, and**
**David Hinchliffe,**
By their attorneys,


_____/s/ Sara Noonan_____
Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Sara Noonan (BBO #645293)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA  02210
671-371-1000


August 5, 2005




**Certificate of Service**

I, Sara E. Noonan, hereby certify that I have, on this 5th day of August, 2005, caused the above document to be served electronically upon all counsel of record.


_____/s/  Sara E. Noonan_____
        Sara E. Noonan