UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL P. HUBERT, WILLIAM
TRAINOR, and DAVID HINCHLIFFE,
Individually And On Behalf Of All Persons
Similarly Situated,

        Plaintiffs,

    v.

MEDICAL INFORMATION TECHNOLOGY
PROFIT SHARING PLAN, MEDICAL
INFORMATION TECHNOLOGY, INC., A.
NEIL PAPPALARDO, LAWRENCE A.
POLIMENO, ROLAND L. DRISCOLL,
EDWARD B. ROBERTS, MORTON E.
RUDERMAN, AND L.P. DAN VALENTE,

        Defendants.

Civil Action No. 05-10269RWZ

## DEFENDANTS' JOINT REPLY TO PLAINTIFFS' "SECOND" OPPOSITION TO THEIR MOTIONS TO DISMISS

Stephen D. Poss, P.C. (BBO # 551760)
Kevin P. Martin (BBO # 655222)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated: September 6, 2005

Defendants Medical Information Technology Profit Sharing Plan (the "Plan"), Medical Information Technology, Inc. ("Meditech" or the "Company"), A. Neil Pappalardo (the "Trustee," and together with the Plan and Meditech, the "Trust Defendants"), and defendants Lawrence A. Polimeno, Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman, and L.P. Dan Valente (together the "Director Defendants," and together with the Trust Defendants, the "Defendants") hereby submit this joint reply to the "Second" Opposition filed by Plaintiffs Michael P. Hubert, William Trainor, and David Hinchiffe (together, "Plaintiffs") with respect to the Trust Defendants' and Director Defendants' respective motions to dismiss the Amended Complaint.[1] For the reasons given herein, Plaintiffs' explanations for why their Amended Complaint should not be dismissed are meritless. For the reasons given in the separate motions to dismiss and memoranda in support filed by the Trust Defendants and Director Defendants, the Defendants are entitled, as a matter of law, to dismissal of the Amended Complaint.

## I.    PLAINTIFFS' ARGUMENTS THAT THEIR CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS ARE MERITLESS

In their motion to dismiss, the Trust Defendants argued that the Plaintiffs' breach of fiduciary duty claim (Count Two), as well as the benefits claims (Count One) of plaintiffs Trainor and Hinchliffe (who received benefits in 1998) and a substantial portion of the putative class, are barred by the statute of limitations. *See* Memorandum in Support of Defendants Medical Information Technology, Inc. Profit Sharing Plan, Medical Information Technology, Inc. and A. Neil Pappalardo's Motion to Dismiss at 10-12 (hereinafter "Trust Memo. at __"). In

---

[1]    An initial complaint was filed in this matter by plaintiff Hubert, and the Director Defendants and Trust Defendants filed motions to dismiss it. In response, Hubert, now joined by Hinchliffe and Trainor, filed an Amended Complaint, together with an opposition to the motions to dismiss the original complaint. Since the original complaint had been replaced by the Amended Complaint, the Defendants of course filed new motions to dismiss the Amended Complaint. Plaintiffs' "Second" Opposition to the motions to dismiss is hence really only their first opposition to the motions to dismiss the Amended Complaint. Plaintiffs' decision to continue relying upon their "First" Opposition, which refers to no-longer-operative motions to dismiss a replaced complaint, has confused matters immeasurably.

1

their Second Opposition, Plaintiffs purport to present arguments why each of their claims is entitled to proceed notwithstanding the statute of limitations. *See* Plaintiffs' Second Opposition to Defendants' Motion to Dismiss at 22-30 (hereinafter "Second Opp. at __"). As explained herein, the arguments Plaintiffs put forward in an effort to avoid the statute of limitations are each meritless, and Defendants are entitled to dismissal of Count Two, and Count One with respect to named plaintiffs Hinchliffe, Trainor, and each putative class member who received benefits before February 10, 2002.

### A.    Benefits Claim

In their motion to dismiss, the Trust Defendants observed that the applicable statute of limitations for benefits claims brought under 29 U.S.C. § 1132 is the most analogous state limitations period, and that for Plaintiffs' benefits claim for what is alleged to be "deferred compensation" this would be the three-year limitations period for wage actions under Massachusetts law. Under that statute of limitations, the seven-year-old claims of named plaintiffs Hinchliffe and Trainor, and each putative class member who received benefits from the Plan before February 10, 2002, are time-barred.

In response, Plaintiffs make two arguments. First, they argue that under Massachusetts law the "deferred compensation" that they seek does not constitute wages, and therefore the six-year limitations period generally applicable to contract actions should apply to their benefits claim. *See* Second Opp. at 22-24. Second, since even this longer period would do plaintiffs Hinchliffe and Trainor no good, Plaintiffs also argue that the statute of limitations has never started running on their benefits claims, because, they assert, the Defendants violated 29 U.S.C. § 1133 and 29 C.F.R. §§ 1560.503-1(f)-(g) by not providing Plaintiffs a "formal denial" of their claim for benefits, or notice of any "adverse decision," wherefore their benefits claim has not yet "accrued." *See* Second Opp. at 24-28. Each of these arguments is meritless.

First, in arguing that the "deferred compensation" they seek from the Plan is not analogous to "wages" under Massachusetts law, Plaintiffs rely entirely on a case that suggests exactly the opposite. *Boston Police Patrolmen's Ass'n, Inc., v. City of Boston*, 435 Mass. 718, 720 (2002) involved a program under which "all compensation deferred under [the] plan is solely the property of the employer until the funds are distributed to the participant at a later time." The Court distinguished this from a situation in which the deferred compensation became the "employees' property," in which case it would be "wages." *See id.* at 721 ("If we were to construe deferred compensation contributions as 'wages,' which would be the employees' property ...."). Here, of course, the Amended Complaint specifically alleges that the "deferred compensation" Plaintiffs seek is the property of the Plan and its participants, not Meditech. *See* Second Opp. at 10 ("once the employer contributes an asset, the plan, or rather the plan's participants, own it.") Hence, under *Boston Police*, if the Trust assets are the property of the Plan and its participants, the "deferred compensation" that Plaintiffs claim they are still owed constitutes "wages." Accordingly, the three-year limitations period for wage claims under Massachusetts law is the most analogous, and the benefits class should be limited to only those plan participants who received benefits after February 10, 2002. *See Gluck v. Unisys Corp.*, 960 F.2d 1168, 1182 (3rd Cir. 1992). This excludes Plaintiffs Hinchliffe and Trainor, and a substantial portion of the putative class.

Second, Plaintiffs' argument that the statute of limitations never started running because their benefits claim has not yet "accrued" is both self-defeating and made in reliance on wholly irrelevant federal law. It is self-defeating because if Plaintiffs' claim has not yet "accrued," they have no claim, and the Amended Complaint should be dismissed for that reason alone.

Moreover, the statute, regulations, and cases cited by Plaintiffs in support of this argument all involve the wholly irrelevant situation of a plan participant filing a claim for benefits that is denied. *See, e.g., Veltri v. Building Service 32B-J Pension Fund*, 393 F.3d 318, 321 (2nd Cir. 2004) (plan denied plaintiff's specific request for pension based on service during periods from 1957-1969 and 1980-1992, awarding pension based on service only in the latter period); *see also* 29 C.F.R. § 2560.503-1(e), (f) (regulation applies to a "claim for benefits," defined as "a request for a plan benefit or benefits made by a claimant in accordance with a plan's reasonable procedure for filing benefit claims"); 29 U.S.C. § 1133 (applicable when a "claim for benefits under the plan has been denied"). In the instant case, Plaintiffs have never filed a claim with the Plan, a fact that Plaintiffs readily admit. *See* Amended Complaint ¶ 28 (hereinafter "Am. Compl. ¶ __") ("Plaintiffs … each received the distribution of their purported interest in the Plan … without submitting any claim for benefits").

Where, as here, there was never a claim for benefits that could be denied, courts have held that the statute of limitations begins to run "when there has been a repudiation [of the employee's claim for benefits] by the fiduciary which is clear and made known to the beneficiary." *Bolduc v. National Semiconductor Corp.*, 35 F.Supp.2d 106, 119 (D.Me. 1998) ("the statute of limitations in an ERISA action is not tolled simply because a plaintiff did not file a claim for benefits"). In the instant case, putting aside for sake of argument Plaintiffs' failure to comply with the administrative remedies that were available to them, the distribution of the allegedly "too small" benefit would have triggered the limitations period. Plaintiffs assert that the benefits they were paid provide no "objective indication that the defendants 'denied' any portion of what the plaintiffs were entitled to receive under the Plan." Second Opp. at 26. This assertion runs contrary to the vast bulk of Plaintiffs' Amended Complaint, which presents a

theory that a simple comparison of the fair market value ("FMV") of Meditech stock to the publicly-available share price of publicly-traded Cerner Corp. reveals that Plaintiffs have been denied benefits. *See* Am. Compl. ¶ 63 ("Defendants have not fairly valued the Meditech stock in the Plan. This can be demonstrated by comparison to publicly traded companies in the same industry which are not as profitable and which do not pay a dividend, but whose stock trades at much higher multiples of earnings to that of Meditech"); *id.* at ¶¶ 64-103 (purporting to establish Plaintiffs' entitlement to benefits on basis of publicly available information concerning Meditech and Cerner Corp.). Since the information in Paragraphs 64 through 103 of the Amended Complaint has all been available in any daily newspaper or public filings with the SEC, Plaintiffs had always had access to all the "objective" information they now assert is sufficient to state their claims against Defendants.

Accordingly, because the Plaintiffs' benefits claim is governed by a three-year statute of limitations, and Plaintiffs' argument that their benefits claim has not yet "accrued" is both self-defeating and wrong as a matter of law, the benefits claims of named plaintiffs Hinchliffe and Trainor, and each putative class member who was paid benefits before February 10, 2002, must be dismissed.

**B.    Breach of Fiduciary Duty Claim**

ERISA has an explicit statute of limitations for breach of fiduciary duty claims: either six years from the date of the last action constituting the breach, or three years from plaintiffs' obtaining actual knowledge of the breach. For purposes of their motion to dismiss only, the Trust Defendants argued that Plaintiffs' complaint was filed more than six years after the point at which, according to the Amended Complaint, the Defendants had undervalued Meditech stock. *See* Trust Memo. at 10-11. In response, Plaintiffs make two arguments: that the Amended Complaint "alleges a continuing violation of ERISA in that the Defendants continue to breach

5

their fiduciary duties of loyalty, care, and prudence every time they engage in the annual process of valuing the stock at less than fair market value," and that Defendants' supposed failure to comply with 29 C.F.R. § 2560.503-1 constitutes "concealment" of the breach tolling the limitations period. *See* Second Opp. at 28-30. Each of these arguments is meritless.

First, the First Circuit recently declined to decide whether there can be a "continuing" breach of fiduciary duty under ERISA, *see Edes v. Verizon Communications, Inc.*, 417 F.3d 133, 139-140 (1st Cir. Aug. 2, 2005), but made it is clear that even if such a theory were eventually to be accepted, as a matter of law Plaintiffs would not be entitled to take advantage of it. In *Edes*, plaintiffs sought to invoke the continuing violation theory to evade the statute of limitations, arguing that each time defendants mailed them a benefits check determined in accordance with a misclassification of the employees, this constituted a continuing part of the alleged breach. The district court, in a holding affirmed by the First Circuit, rejected plaintiffs' theory, citing cases from other jurisdictions requiring, *inter alia*, a showing that "each overt act results in a new injury to the plaintiff." *Edes v. Verizon Communications, Inc.*, 288 F.Supp.2d 55, 62 (D.Mass. 2003) (Saris., J.) (internal quotation marks and citation omitted), *aff'd by Edes*, 417 F.3d at 139. Because the alleged injury flowed from the misclassification of the employees seven years before suit was filed, Judge Saris concluded that the subsequent mailing of the checks did not constitute a "continuing" breach of ERISA.

Under *Edes*, Plaintiffs' effort to invoke a "continuing" breach theory is meritless as a matter of law. Here, there is not even a continued mailing of checks. Plaintiffs Trainor and Hinchliffe, who received their sole distribution of benefits in 1998, obviously cannot allege that any valuation since 1998 has caused them *any* injury, let alone "new injury," because the value of their benefits is based on the value of Meditech stock in 1998. Moreover, according to the

allegations in the Amended Complaint, plaintiff Hubert and the remaining putative class members also suffered any alleged injury in 1998, and have not suffered any "new injury" within the meaning of *Edes* since that time. That is because the Amended Complaint alleges that the disparity between the FMV determined by the Trustee, and the value Plaintiffs allege should have been set, has been shrinking since 1998. Plaintiffs allege that in 1998 the FMV determined by the Trustee was $14.50 and should have been $75. While the FMV determined by the Trustee has increased each year and in 2004 was $29, Plaintiffs' allegations concerning what the value should have been over this period never place it above $75 – indeed, they allege that the value should have declined precipitously in 2000 and 2002 – and they allege simply that the value should be "over $74" today. *See* Am. Compl. ¶¶ 46, 70, 81, 95, 101. Hence, to the extent the Defendants have allegedly undervalued the stock, according to the allegations in the Amended Complaint all of the "injury" was inflicted by 1998. Plaintiffs therefore are not entitled to take advantage of the continuing violations theory, even assuming that it applies to ERISA.

Second, Plaintiffs' argument that the statute of limitations on their breach of fiduciary duty claim should be tolled because Defendants supposedly failed to comply with 29 C.F.R. § 2560.503-1 and therefore "concealed" the breach from Plaintiffs is meritless for the reasons given *supra* at 4-5; simply put, Defendants were never required to comply with this regulation, because the Plaintiffs never filed a claim for the benefits they are now seeking in this action. Even putting aside the regulation, Plaintiffs could not allege that Defendants concealed the alleged breach because the very information on which Plaintiffs base their claim, *see* Am. Compl. ¶¶ 64-103, has all been publicly available.

### C.    Conclusion

In summary, for the reasons given in the Trust Defendants' memorandum in support, Count Two is time-barred as to all named plaintiffs and the entire putative class, and Count One

is time-barred with respect to named plaintiffs Hinchliffe and Trainor, and each putative class member who received a distribution of benefits before February 10, 2002. Plaintiffs' argument that they could sit on their alleged rights for an indefinitely long period after receiving their distribution of benefits – already seven years for Hinchliffe and Trainor – because the Trustee could not read their minds; divine that Plaintiffs thought the value of Meditech stock should track that of a single, publicly-traded competitor of Meditech; and so send them a notice that their non-existent claim for additional benefits had been denied, has no basis in the law and must be rejected.

## II.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER COUNT TWO, AND LACK STANDING FOR THE REQUESTED INJUNCTIVE RELIEF

In their motion to dismiss, the Trust Defendants argued that the Plaintiffs' claim in Count Two must be dismissed because, among other reasons, it sought, in principal part, benefits alleged to be due under the terms of a plan, and under ERISA a claim for benefits cannot be pled as a breach of fiduciary duty. *See* Trust Memo. at 14-16. In addition, the Trust Defendants explained that Plaintiffs lacked standing to seek the remaining relief sought under Count Two: they had not alleged that the Defendants had been unjustly enriched at the expense of the Plan or Plan participants, and as individuals whose accounts in the Plan had already been distributed, they lacked any basis to seek an appraisal of the Plan's assets "on a yearly basis going forward" and removal of defendant Pappalardo as Trustee. *See* Trust Memo. at 16-17. Plaintiffs' efforts to avoid these arguments are wrong as a matter of law, and Defendants are entitled to dismissal of Count Two in its entirety.

First, Plaintiffs' attempt in both their First and Second Oppositions to dispute the well-settled rule that where a plan participant seeks benefits allegedly due under a plan, his or her only recourse is through the benefits cause of action set out in 29 U.S.C. § 1132(a)(1)(B), not the

breach of fiduciary duty cause of action found in 29 U.S.C. § 1132(a)(3). *See* Opposition to Defendants' Motions to Dismiss at 23-25 (hereinafter "First Opp. at __"); Second Opp. at 17-18. In doing so, Plaintiffs seek to distinguish the dispositive case, *LaRocca v. Borden, Inc.*, 276 F.3d 22 (1st Cir. 2002), as one involving only "remedies," not the question whether a cause of action even exists. Indeed, Plaintiffs go so far as to assert that *LaRocca* "says *nothing at all* about whether plaintiffs are barred from bringing claims" for alleged breaches of fiduciary duty connected to a failure to pay benefits. *See* Second Opp. at 17-18 (emphasis added). Unfortunately for Plaintiffs, the language in *LaRocca* directly contradicts their description of it: the First Circuit unambiguously held that "when the plaintiff can bring a claim for benefits under Section a(1), equitable relief would not be appropriate and she does not have *a cause of action* under Section a(3)." *LaRocca*, 276 F.3d at 29 (emphasis added).

For the same reason, Plaintiffs' effort to distinguish this court's recent decision in *Fletcher v. Tufts University,* 367 F.Supp.2d 99 (D.Mass. 2004) (Linday, J.), as involving fewer allegations of perfidy, is meritless. In *Fletcher,* Judge Lindsay did not rule that plaintiff had not included sufficient allegations of misconduct to constitute a breach of fiduciary duty. Rather, he held that because "29 U.S.C. § 1132(a)(3) can only be used if no other portion of section 1132 is applicable," and plaintiff could have sought benefits under § 1132(a)(1), "section 1132(a)(3) is unavailable" to obtain benefits. *See id.* at 116.

Second, with respect to Count Two's allegations of unjust enrichment, Plaintiffs nowhere respond to the Trust Defendants' observation that the Amended Complaint alleges no transactions between any individual Defendant and the Plan from which unjust enrichment at the Plan participants' expense could arise. *See* Trust Memo. at 16. In their Second Opposition, Plaintiffs refer to the alleged purchase of shares by some Defendants, but these purchases are not

alleged to have been made from the Plan or Plan participants. *See* Trust Memo. at 16 n.9. There is no basis in logic or law – or in the Amended Complaint – for Plaintiffs' to recover for "unjust enrichment" obtained by the Defendants not from Plan participants, but from some other party.

Third, with respect to their requested injunctive relief, Plaintiffs assert vaguely that because they allegedly remain participants in the Plan, they have standing to seek injunctive relief with respect to it. As a matter of law, however, they are only "participants" in the Plan, if at all, *see* Trust Memo. at 29-30, for the limited purpose of determining whether the benefits paid them were too low based on valuations that occurred in *prior* years. In their Oppositions Plaintiffs do not even attempt to show how the value assigned to the stock in, for example, 2008 could be relevant to the distributions made to the named plaintiffs in 1998 and 2004. Indeed, because the class is defined to include only individuals who have already received a distribution of their Plan account, there is no member of the class to whom a future valuation is at all relevant. *See* Am. Compl. ¶ 42. Nor do Plaintiffs attempt to show how Pappalardo's continued service as Trustee affects them. Accordingly, they lack standing to seek the injunctive relief sought under Count Two. *See* Trust Memo. at 17.

## III.    PLAINTIFFS' CLAIM THAT THE DIRECTOR DEFENDANTS HAVE DISCRETIONARY AUTHORITY OVER PLAN ASSETS MISSTATES THE PLAN DOCUMENT

The Director Defendants established in their opening brief that they have no discretionary authority with respect to valuation of Trust assets, and so are not Plan fiduciaries with respect to valuation. *See* Memorandum of Law in Support of Director Defendants' Motion to Dismiss at 7-9 (hereinafter, "Directors Memo. at __"). In response, Plaintiffs assert that "Section 8.13 of the [Plan] specifically *requires* the Director Defendants (acting as the Company) to review and approve every decision Defendant Pappalardo makes with respect to the Plan's assets," and argue that such "[a]pproval authority is discretionary authority for purposes of ERISA fiduciary

liability." Second Opp. at 16 (emphasis added). Paragraph 8.13 of the Plan, however, does not "require" the Board to "approve" the Trustee's "every decision," and certainly does not grant the Board discretionary authority over Trust assets. Paragraph 8.13 simply states that the Company "*may* approve" the Trustee's account of his transactions under the Agreement, and provides that if the Company either explicitly approves the accounts, or implicitly approves them by not filing written objections within sixty days, the Trustee "shall be released, relieved, and discharged with respect to all matters and things set forth in such account." Plan, ¶ 8.13. Neither Paragraph 8.13, nor any other provision in the Plan, provides the Company authority to overturn any action by the Trustee with respect to Trust assets, or to direct the Trustee to take any action.

## IV.    PLAINTIFFS FAIL TO SHOW HOW THEY WERE DENIED BENEFITS BY DEFENDANTS' VALUATION DECISIONS

As explained in the Trust Defendants' opening brief, the benefits and breach of fiduciary duty claims of the entire class must be dismissed as a matter of law because the Amended Complaint does not allege how Plan participants have been denied any benefits as a result of the Defendants' supposed undervaluation of Meditech stock. In their Oppositions, Plaintiffs make four arguments purporting to show how they might have been injured by the Defendants' valuation decisions, none of which have any merit. Because Plaintiffs have failed, as a matter of law, to state a claim for any additional benefits, the Amended Complaint should be dismissed.

### A.    Plan Participants Are Sharing in the Growth of the Company

First, Plaintiffs in their Oppositions attempt to rely upon an injury not even pled in the Amended Complaint: that the Defendants determined FMVs in such a way that Meditech employees were not able to "share in any growth of the company," in violation of the explicit intent of the Plan. *See* First Opp. at 19; Second Opp. at 7 (incorporating this portion of the First Opposition). Perhaps because this allegation is not even made in the Amended Complaint, it

should not be surprising that the actual allegations in the Amended Complaint reveal it to be wholly frivolous.

As the following chart (compiled using only numbers alleged in the Amended Complaint) shows, the valuation method alleged to be employed by the Board in contributing stock to the Trust, and the Trustee in valuing the stock in the Trust, results in an obvious long-term relationship between Meditech's growth and the value of Meditech stock:

| Year | Meditech Earnings | Board/Trustee FMV | Plaintiffs' FMV |
|------|-------------------|-------------------|-----------------|
| 1998 | $53.3 million | $14.50 | $75.00 |
| 1999 | $60 million | $16.00 | $75.00 |
| 2000 | $55 million | $17.00 | $25.50 |
| 2001 | $56 million | $19.00 | N/A |
| 2002 | $64 million | $22.00 | $41.00 |
| 2003 | $67 million | $26.00 | $74.00 |
| 2004 | $71.5 million | $29.00 | N/A |

See Am. Compl. ¶¶ 45, 46, 70, 81, 95, 101.

As the chart clearly demonstrates, Plaintiffs' claim that the Defendants' valuations somehow have robbed Plan participants of their share in the growth of the Company is fatuous. Between 1998 and 2004, Meditech's earnings went up by approximately 34%, while the FMV assigned by the Trustee went up 100%. The very allegations in the Amended Complaint refute any argument or claim that Plan participants have not "share[d] in the growth of the company" under the Trustee's valuations. Indeed, if anything, the valuation method used by the Trustee has been "too generous," increasing the FMV far more than earnings during the period in which Plaintiffs allege that Defendants were artificially depressing the stock price, and not decreasing the FMV in years (2000, 2001) during which Meditech's earnings were down from prior levels.

Under the alternate valuations that Plaintiffs allege would be "fair," on the other hand, it appears that *no* member of the class would have shared in the growth of the Company during this

period.  Plaintiffs allege that in 1998, when Meditech earned approximately $53 million, its share price should have been $75.00.  Yet they allege that in 2003, when Meditech earned $67 million (19% more than in 1998), its stock price should have been approximately the same:  $74.00.  More egregiously, while Plaintiffs allege that the FMV should have been $75.00 per share in 1998, they allege that it should have been only $25.50 – only one-third of the 1998 value – in 2000, despite the fact that Meditech earnings were *higher* in 2000 than in 1998.  Similarly, Plaintiffs allege that the FMV should have been almost twice as high in 1999 as in 2002, despite the fact that, again, earnings were higher in 2002 than 1999.  Plaintiffs' claim to represent the interest of employees in sharing in the growth of the Company is, on the face of the Amended Complaint, palpably absurd, as is their allegation that to be "fair" the value of Meditech stock must mimic the volatile ups and downs of the stock of publicly-traded Cerner Corp.  As a matter of law, this claim should be rejected.

> **B.     If a Higher Valuation Method Had Been Used, Proportionately Fewer Shares Would Have Been Contributed to the Trust**

In their opening memorandum, the Trust Defendants observed that the plain terms of the Plan direct the Meditech board to make its voluntary contributions of cash and stock to the Trust by first setting a total contribution amount, and next determining how many Meditech shares are necessary to constitute the portion of the total contribution to be made in stock.  *See* Plan, ¶ 4.01.  As the Trust Defendants explained, because the use of a valuation methodology that results in higher share values would result in proportionately fewer shares being contributed to the Trust, Plaintiffs could not show how the Defendants' supposed assignment of "artificially low" values to Meditech stock had caused Plan participants to receive any less in benefits; if Meditech had assigned higher values to the stock, the Trust would simply hold proportionately fewer shares.  *See* Trust Memo. at 23-24.

To counter this argument, the Plaintiffs claim to have alleged that the Board would not have contributed any fewer shares at the much higher share values Plaintiffs claim should have been used. *See* First Opp. at 17-18. This argument is contrary to the plain terms of the Plan, entirely speculative, and unsupported by any allegations in the Amended Complaint. The only support in the Amended Complaint Plaintiffs can cite are their allegations that the Board had a policy of voting to contribute 75,000 or 80,000 shares each year during the class period. *See* First Opp. at 18. Even assuming that to be true, it is entirely irrelevant, because Plaintiffs also allege that the Board voted to contribute a total of $3.5 or $4 million in cash and stock to the Trust each year, and (obviously), at the FMVs the Board assigned to Meditech stock, the total value of the stock contributed fit within the overall contribution amount. *See* Am. Compl. ¶¶ 66, 72, 78, 85, 91. Plaintiffs do not allege, and it would be entirely speculative to conclude, that if the Meditech board had used the higher FMV's Plaintiffs demand, such that the value of 75,000 or 80,000 shares would be greater than the total dollar amount the Board had voted to contribute, that the Board would have voted to raise the overall contribution amount.[2] Indeed, because under the Plan the amount to be contributed to the Trust is entirely within the discretion of Meditech's Board, and the Amended Complaint accuses the individual Defendants, in the strongest possible terms, of harming Meditech's employees in order to enrich themselves, it is somewhat silly for them to argue in their Oppositions that the supposedly malevolent Board would have voted to increase the overall contribution amount to accommodate a higher per-share value, instead of, in accordance with the Plan, simply contributing proportionately fewer shares.

The utterly speculative nature of Plaintiffs' argument is akin to that of plaintiff in *Crawford v. Lamantia*, 34 F.3d 28 (1st Cir. 1994), in which the First Circuit concluded that

---

[2]    In 1999, for example, the 80,000 shares contributed by Meditech to the Trust would be worth $6 million at the $75 per share valuation sought by Plaintiffs, well over the $4 million total contribution voted by the Board.

plaintiff's theory that if the plan had not overpaid for stock, it nonetheless would have borrowed the same amount used to pay for it and retained the cash for distribution to plan participants, was so speculative that plaintiff lacked standing under ERISA to make it. *See* Trust Memo. at 23, 29-30. Indeed, in the instant case Plaintiffs' allegations concerning Defendants' virulent anti-employee motivations make even more speculative any assertion that a higher FMV would not have led – in accordance with the plain terms of the Plan document – to proportionately fewer shares being contributed, but instead to a greater total contribution.

Plaintiffs' effort to find support in *Sommers Drug Stores Co. Employee Profit Sharing v. Corrigan*, 883 F.2d 345 (5th Cir. 1989), and to distinguish *Crawford*, is unavailing. *See* Second Opp. at 7–9. In *Sommers*, the employee plan in question is simply described as holding 20% of the employer's stock, which plaintiffs claimed to have been undervalued when the plan was liquidated; there is no discussion of how the stock came to be acquired by the plan or the value assigned to it at the time of acquisition. *See generally Sommers*, 883 F.2d at 345 *et seq.* Because *Sommers* describes no connection between the value at which the plan obtained the stock and the value at which the plan was liquidated, if the liquidation value had been higher, the positive effect on the plaintiffs' benefits would have been "direct and inevitable." *Crawford*, 34 F.3d at 33. That was not the case in *Crawford* (if the value were lower, less money would have been borrowed), and that is not the case here: if the value were higher, fewer shares would have been contributed.

Plaintiffs' desperation to cast their case as *Sommers* rather than *Crawford* leads them to argue that "[t]he asset at issue here – Meditech stock – was in the Plan all along," and that "the Plan had a set number of shares." Second Opp. at 8. If that were the case, Plaintiffs would not have spent 25 paragraphs of their Amended Complaint discussing the history of stock

contributions to the Trust between 1998 and 2004, and describing the alleged connection between the valuation methodology used in making contributions and that used in determining distributions. *See* Am. Compl. ¶¶ 10, 12, 13, 14, 15, 21, 47, 48, 49, 50, 51, 53, 64, 66, 71, 72, 73, 77, 78, 83, 85, 90, 91, 96, 97.  In short, Plaintiffs' argument is incompatible with the allegations in their own Amended Complaint.

In summary, based on the Plan's explicit method for determining the number of shares to contribute to the Trust, here, as in *Crawford*, there is no "direct and inevitable" effect on Plaintiffs' benefits from the use of a different valuation methodology – except insofar as the contribution of fewer shares would have resulted in the Trust collecting less in dividends, and therefore paying out *less* in benefits.  *See* Trust Memo. at 23-24.  Therefore, as a matter of law, Plaintiffs have failed to state a claim for additional benefits or breach of fiduciary duty and have failed to allege injury, and their Amended Complaint should be dismissed.

**C.      Plaintiffs Have Not Been Denied Benefits By Defendants' Valuation of Meditech Stock**

In a second effort to escape the fact that the number of shares contributed to the Plan by Meditech is directly proportional to the share value, Plaintiffs present a hypothetical argument that they claim demonstrates how their benefits would be higher if the value assigned to Meditech shares were higher.  *See* First Opp. at 18-19; Second Opp. at 7 (incorporating this section of the First Opposition).  All the hypothetical does, however, is make the obvious point that if a larger number of shares are contributed to a trust in an earlier period due to the use of a valuation methodology that results in "artificially low" share values, and that methodology is abandoned in a subsequent period and the large number of shares are now valued at a much higher per share figure, participants in the plan would receive a windfall.  Defendants could hardly dispute that mathematical "insight."

Plaintiffs' hypothetical completely ignores the argument that defendants did make: that no case has ever held that plan participants have a legal right to such a windfall under ERISA, and that Plaintiffs cannot claim, as a matter of law, to have been harmed by the Defendants' alleged breach of fiduciary duty in *consistently* using an "artificially low" valuation methodology, since if the Defendants had *consistently* used a higher valuation methodology, there simply would be proportionately fewer shares in the Trust (and the Trust would have collected less in dividend income). *See* Trust Memo. at 21-24.

**D.    Plaintiffs' Requested Relief Would Unfairly Dilute the Remaining Plan Participants**

Fourth, in response to Defendants' argument that Plaintiffs' requested relief would result in an inequitable dilution of remaining Plan participants that is not permitted under ERISA, Plaintiffs expend much ink arguing that under a defined contribution plan, such as the Plan, it simply is not possible for a payment to any one participant to dilute the amounts available to other participants. *See* Second Opp. at 9–14. That is of course not true. Consider a plan holding 100 shares of non-publicly traded company stock, having ten participants each assigned an equal share of the assets. If the plan trustee determined the value of the stock to be $75 per share for purposes of valuing the plan participants' accounts, each account would be valued at $750. If this valuation, however, did not reflect what buyers would pay for the stock, and the trustee, in selling stock to raise funds for a distribution to a departing participant, could only find a buyer for the stock at $15, he would need to sell not 10 shares, but 50, to raise the $750 in benefits for the departing participant. The trust would now hold only 50 shares, which even at the trustee's valuation would be worth only $3750, and in "real" terms would be worth $750. The remaining nine plan participants' interests in the plan have, under either measure, clearly been diluted.

Under Plaintiffs' Amended Complaint, similar dilution would ineluctably follow to the inequitable detriment of remaining the Plan participants. Meditech is not a publicly-traded company, and the stock values that Plaintiffs allege should have been used in valuing their distributions are not public market prices listed in the Wall Street Journal. As explained in the Trust Defendants' opening brief, there is no allegation that any transaction in non-publicly traded Meditech stock has ever occurred at any price other than the FMVs of which Plaintiffs complain,[3] and no allegation that any market exists for Meditech stock at the higher, mimic-Cerner level that Plaintiffs wrongly allege is required as a matter of law.[4] Plaintiffs' Amended Complaint unambiguously envisions the Plan selling off some or all its stock to pay them their windfall, *see* Am. Compl. ¶ 69, yet it alleges a market for this stock only at a price much lower than that which Plaintiffs demand be used for determining their benefits. Dilution of the remaining Plan participants is, under the allegations of the Amended Complaint, guaranteed. As a matter of law, ERISA neither requires nor permits this result. *See Foltz v. U.S. News & World Report, Inc.*, 1494, 1526 (D.D.C. 1987) (referring to the "improper dilution of the interests of participants who remained in the Plan" from use of an unobtainably high stock valuation).

---

[3]    Plaintiffs' hypothetical involving oil-rich land is simply irrelevant, because presumably there is some market basis for valuing the land at a higher value once oil is discovered. *See* Second Opp. at 11-12. Here, there is no allegation that a buyer could actually be found for Meditech stock at any price higher than the FMVs determined by the Board.

[4]    Plaintiffs argue that courts have accepted the single-competitor, no-discounts model to stock valuation pled in their Amended Complaint. *See* Second Opp. at 20. The cited case, *Horn v. McQueen*, 353 F.Supp.2d 785 (W.D. Ky. 2004), does no such thing. In *Horn*, the ESOP purchased a *majority* interest in the company; hence, the experts agreed that no marketability or minority discount was appropriate. *See id.* at 799. Here, there is no allegation (nor could there be) that the Plan owns a majority of Meditech stock. Moreover, *Horn* nowhere suggests that a proper share value can be determined by simply adopting the price/earnings multiples of a single publicly-traded competitor, as Plaintiffs allege.

## V.    PLAINTIFFS HAVE NOT ALLEGED FACTS SUFFICIENT TO OVERCOME THE DEFERENCE ACCORDED FIDUCIARIES UNDER ERISA

In their Motion to Dismiss, the Trust Defendants argued that the Amended Complaint should be dismissed because the Plan explicitly grants the Trustee discretion with respect to the valuation of Trust assets, and Plaintiffs had not alleged facts sufficient, as a matter of law, to constitute an arbitrary and capricious exercise of this authority.

Seeking to avoid the clear terms of the Plan, Plaintiffs argue that Defendants are subject to a conflict of interest:  their greed, and in particular Defendant Pappalardo's desire to purchase additional stock "and thereby retain tight control of the Company," has led them to undervalue Meditech stock when contributing it to the Trust, and when valuing the Trust for purposes of distributions to departing participants.  *See* First Opp. at 16.  On its face this argument is specious.  As the Amended Complaint obviously relies heavily on Meditech's publicly-filed financial results, including in describing Defendant Pappalardo's stock purchases, *see* Am. Compl. ¶¶ 45, 46, 57, 64–103, it is fair to note that,[5] according to these same documents, Defendant Pappalardo, Meditech's CEO, owned 8,922,500 shares as of December 31, 2004, compared to 8,542,812 split-adjusted shares as of December 31, 1997.  *See* Medical Information Technology, Inc. Jan. 31, 2005 Form 10K at 27 (hereinafter "2005 Annual Report"); Medical Information Technology, Inc. Mar. 26, 1998 Form 10-K at 11 (hereinafter "1998 Annual Report").  Contrary to Plaintiffs' allegation that Defendant Pappalardo is seeking to "retain tight control of the company," the 4.4% increase in his shareholdings over this seven-year period has been accompanied by a *decrease* in his percentage ownership of the Company, from 26.55% to 25.85%.  *See* 1998 Annual Report at 1, 11; 2005 Annual Report at 1, 27.  This is due in significant part to the fact that the number of shares held by the Trust, for the benefit of

---

[5]    *See Watterson v. Page*, 987 F.2d 1, 3-4 (1993) .

employees, has increased significantly (approximately 36%) over this period, from 2,938,020 split-adjusted shares at the end of 1997, to 3,991,362 shares at the end of 2004. *See* 1998 Annual Report at 11; 2005 Annual Report at 27.

Because Plaintiffs' "conflict of interest" argument is wholly belied by the evidence in the public filings on which Plaintiffs rely for their complaint, this Court should apply the deferential arbitrary and capricious standard for purposes of this Motion to Dismiss. Because Plaintiffs have not alleged facts that, as a matter of law, would suffice to constitute arbitrary and capricious valuation decisions, Defendants are entitled to summary judgment with respect to the Amended Complaint. *See* Trust Memo. at 31-33.

Respectfully submitted,

MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., A. NEIL PAPPALARDO, LAWRENCE A. POLIMENO, ROLAND L. DRISCOLL, EDWARD B. ROBERTS, MORTON E. RUDERMAN and L.P. DAN VALENTE.

By their attorneys,

 /s/  Stephen D. Poss, P.C.
Stephen D. Poss, P.C. (BBO # 551760)
Kevin P. Martin (BBO # 655222)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated: September 6, 2005

## CERTIFICATE OF SERVICE

I, Michael P. Sugrue, hereby certify that I have on this 6th day of September, 2005, caused the above document to be served electronically upon all counsel of record.

 /s/  Michael P. Sugrue
Michael P. Sugrue