UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL P. HUBERT, WILLIAM
TRAINOR, and DAVID HINCHLIFFE,
Individually And On Behalf Of All Persons
Similarly Situated,

               Plaintiffs,

    v.

MEDICAL INFORMATION TECHNOLOGY
PROFIT SHARING PLAN, MEDICAL
INFORMATION TECHNOLOGY, INC., and
A. NEIL PAPPALARDO,

            Defendants.

Civil Action No. 05-10269RWZ

**REDACTED**

### DEFENDANTS' OPPOSITION TO
### PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Stephen D. Poss, P.C. (BBO # 551760)
Kevin P. Martin (BBO # 655222)
Michael P. Sugrue (BBO #655727)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated: September 15, 2006

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 5

    I.     MEDICAL INFORMATION TECHNOLOGY, INC. .......................... 5

    II.    THE MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT
          SHARING PLAN .......................................................................... 6

    III.   VALUATION OF MEDITECH STOCK ........................................ 8

    IV.   THE PLAN HAS PROVIDED SUBSTANTIAL BENEFITS TO
          PARTICIPANTS ........................................................................ 8

ARGUMENT ...................................................................................................... 10

    I.     PLAINTIFFS HAVE NOT MET THEIR BURDEN OF ESTABLISHING
          THAT THEY ARE ADEQUATE AND TYPICAL CLASS
          REPRESENTATIVES ................................................................ 10

         A.    Hubert's Scheme to Sell Meditech Information for Personal Profit
             Renders Him an Inadequate and Atypical Class Representative ............. 11

         B.    Trainor Is Inadequate Because He Knows Almost Nothing About
             the Litigation or his Duties as a Named Plaintiff ..................................... 14

         C.    Hinchliffe is Inadequate Because He Admittedly Cares Nothing
             About Absent Class Members ................................................................. 16

         D.    The Interests of the Named Plaintiffs Conflict with Those of
             Absent Class Members ........................................................................... 17

            1.    The Volatility in Plaintiffs' Valuation Method Prejudices
                 Absent Class Members ................................................................. 17

            2.    Plaintiffs' Proposed Valuation Method Could Cause the
                 Trust to Run Out of Cash ............................................................. 19

         E.    Plaintiffs' Conflict with Current Plan Participants Further
             Demonstrates Their Inadequacy ............................................................. 20

         F.    Hubert Disagrees With Central Allegations in the Amended
             Complaint ............................................................................................. 22

         G.    Plaintiffs are Inadequate Because They Failed to Exhaust Their
             Claims ................................................................................................... 23

      H.     Hinchliffe and Trainor are Inadequate Class Representatives Because their Claims are Likely Barred by the Statute of Limitations ........................................................................................... 25

II.    INDIVIDUAL ISSUES WILL PREDOMINATE ............................................. 26

      A.     Statute of Limitations ............................................................ 27

      B.     Laches ..................................................................................... 28

      C.     Waiver and Estoppel .............................................................. 30

CONCLUSION .......................................................................................................... 30

# TABLE OF AUTHORITIES

CASES

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................... 10, 17

*Brandon v. Aetna Servs., Inc.*, 156 F.Supp.2d 167 (D. Conn. 2000) ............................ 20

*Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949) ................................. 10

*Cook v. City of Chicago*, 192 F.3d 693 (7th Cir. 1999) ................................................. 29

*Davenport v. Harry N. Abrams, Inc.*, 249 F.3d 130 (2d Cir. 2001)................................ 24

*Drinkwater v. Metropolitan Life Ins. Co.*, 846 F.2d 821 (1st Cir. 1988) ........................ 23

*Ellenburg v. Brockway, Inc.*, 763 F.2d 1091 (9th Cir. 1985) ......................................... 13

*General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982) ..................... 10

*Gillis* v. *Hoeschst Celanese Corp.*, Civ. A. No. 90-5542, 1992 WL 68333 (E.D.
    Pa. Apr. 1, 1992) .......................................... ................................................. 22

*Iglesias v. Mutual Life Ins. Co.*, 156 F.3d 237 (1st Cir. 1998) ................................. 28, 29

*In re ADC Telecom. ERISA Litigation*, 2005 WL 2250782 (D. Minn. 2005) ............ 13, 14

*In re Bank of Boston Corp. Securities Litig.*, 762 F.Supp. 1525 (D. Mass. 1991) 10, 15, 25

*In re Biogen Securities Litig.*, 179 F.R.D. 25 (D. Mass. 1997) ..................................... 10

*In re Commonwealth Oil/Tesoro Petroleum Securities Litig.*, 484 F.Supp. 253
    (W.D. Tex. 1979) ........................................ ...................................................14

*Koppel v. 4987 Corp.*, 191 F.R.D. 360 (S.D.N.Y. 2000) …………........................... 11, 12

*Margaret Hall Foundation, Inc. v. Atlantic Financial Management, Inc.*, 1987
    WL 15884 (D. Mass. Jul. 30, 1987) ................... ................................................. 12

*McDaniel v. County of Schenectady*, 2005 WL 1745566 (N.D.N.Y. 2005) ................... 15

*New England Overall Co. v. Woltmann*, 176 N.E.2d 193 (Mass. 1961)......................... 13

*Preston v. Am. Fed. of Television & Radio Artists*, 2002 WL 1009458 (S.D.N.Y.
    2002)................................................... ............................................. 28, 30

*Randle v. Spectran*, 129 F.R.D. 386 (D. Mass. 1988)... ................................................ 11

*Robinson v. Sheriff of Cook County*, 167 F.3d 1155 (7th Cir. 1999)........................ 23, 25

*Savino v. Computer Credit, Inc.*, 164 F.3d 81 (2d Cir. 1998) .................................. 11, 12

*Scott v. New York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353
    (S.D.N.Y. 2004) ...................................... .................................................. 14

*Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371 (11th Cir. 1984)............................ 13

*Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32 (1st Cir. 2003) .............. 9

*Swack v. Credit Suisse First Boston*, 230 F.R.D. 250 (D. Mass. 2005)........................... 10

*Teamsters & Employers Welfare Trust of Illinois v. Gorman Brothers Ready Mix*,
283 F.3d 877 (7th Cir. 2002)...................... ................................................ 28

*Weissman v. Darneille*, 78 F.R.D. 669 (S.D.N.Y. 1978) ................................ 16

STATUTES AND RULES

29 U.S.C. § 1132(a)(1)(B).............................. ............................................ 20, 25

Federal Rule of Civil Procedure 23(a)(1).................. ................................. 10, 13

Federal Rule of Civil Procedure 23(a)(3).................. ................................. 10, 14

Federal Rule of Civil Procedure 23(b)(3).................. ................................. 10, 26

OTHER

Defendants' Motion to Compel Compliance With the Subpoena *Duces Tecum* for
Michael Collora (Docket No. 52).................... ................................ 13

Defendants' Motion for Protective Order Governing Treatment of Documents and
Information (Docket No. 46) ..................... ................................ 11

March 20, 2006 Memorandum of Decision (Docket No. 38) .................................. 21, 26

Medical Information Technology, Inc. Profit Sharing Plan Amended and Restated
Trust Agreement (As of January 1, 1998)

¶ 1.02 ............................................... ................................................ 6

¶ 4.01 ............................................... ................................................ 8

¶ 4.05 ............................................... ................................................ 7

¶ 5.03 ............................................... ................................................ 7

¶ 5.04 ............................................... ................................................ 8

¶ 5.05 ............................................... ................................................ 7, 8

¶ 6.06 ............................................... ................................................ 7

¶ 6.12 ............................................... ................................................ 7

¶ 7.01 ............................................... ................................................ 6

¶ 9.02 ............................................... ................................................ 7

¶ 11.10 ............................................. ................................................ 25

Order Concerning Protective Order, entered July 28, 2006 (Docket No. 49).........3, 11, 12

Plaintiffs' Second Opp. to Defendants' Motion to Dismiss the Amend. Compl.
(Docket No. 31)..................................... ................................................ 21

# INTRODUCTION

This is a case about the greed and ingratitude of the three named plaintiffs – Michael P. Hubert, who initially filed this action, and William Trainor and David Hinchliffe, whom Hubert recruited to join as additional named plaintiffs ("Plaintiffs"). Plaintiffs were beneficiaries of a voluntary profit sharing plan sponsored by their former employer, defendant Medical Information Technology, Inc. ("Meditech" or the "Company"), under which Meditech made voluntary contributions of cash and company stock to a trust (the "Trust") established for the sole benefit of employees. Although they contributed not a penny to the Trust, Hubert and Hinchliffe each received more that $1 million in distributions from it, and Trainor received more than $900,000. Plaintiffs concede that the Meditech stock held by the Plan was a great investment, and separate and apart from the profit sharing plan, Plaintiffs all purchased Meditech stock from the Company and each made hundreds of thousands of dollars in dividends and capital gains by purchasing stock from the Company and voluntarily selling it to the Trust.

In an effort to obtain even more free money from the Trust, Plaintiffs now claim that defendants intentionally undervalued the Meditech stock held by the Trust, and they demand to be paid millions more – Hinchliffe testifying that he personally expects to win $500,000 to $5 million in this suit. Although the Plaintiffs believe that they stand to gain millions, they brought their claims in the form of a putative class action under the Employee Retirement Income Security Act ("ERISA"), and now seek to certify a class under Fed. R. Civ. P. 23(b)(3).

Perhaps more remarkable than Plaintiffs' greed is their failure to even remotely meet the criteria for serving as adequate representatives of the class – criteria on which the Plaintiffs bear the burden of proof. The Supreme Court has described class representatives as "fiduciaries," and it is difficult to imagine three worse fiduciaries for the putative class. One of the Plaintiffs,

Trainor, who left Meditech in 1998, was not even aware at his deposition that this was a class action – he testified that the class consisted of only the three named Plaintiffs.  He was unaware that he had any responsibilities as a named plaintiff in a class action.  He testified that he did "nothing" to prepare for the deposition, and made clear that his role in the case so far has been *de minimis*.  Trainor did not know who the defendants were in this case, and was unaware of how much money his signed retainer agreement called for him to pay class counsel.  Trainor repeatedly testified that he was not sure whether the central allegation of the Complaint – that Defendant A. Neil Pappalardo, the trustee of the Trust (the "Trustee"), intentionally undervalued the Trust's Meditech stock – is even true.  And when asked whether he cared about the actual value of Meditech stock in 2001, an arguably determinative issue for many absent class members, Trainor answered "No."

Another of the named Plaintiffs, Hinchliffe, who left Meditech in 1998, displayed a similar disregard for the interests of absent class members.  Hinchliffe was asked whether the Amended Complaint's allegation that the value of Meditech stock should have been higher in 1998 (when Hinchliffe received his distribution from the Trust) than in certain subsequent years was fair to absent class members who received a distribution in the later years.  Hinchliffe's remarkably blunt response under oath – "I'm not concerned, really, with people that left in 2000.  I'm concerned with me" – confirms that he cares only about himself and so cannot be trusted to fairly and adequately represent absent class members.  Hinchliffe also testified under oath that he was not aware of any responsibilities he had as a named Plaintiff to fellow class members.

Finally, the third purported class representative, Hubert, is a liar and deceiver who, while still employed by Meditech, offered to sell Company documents to someone preparing a lawsuit

2

against the Company in return for a personal payoff of more than one million dollars.[1]  In presenting this offer, Hubert acknowledged in writing that his actions would harm the Company and its employees, including many members of the purported class in this Action.  Hubert has conceded in deposition testimony that his plan was to fraudulently conceal his treachery while continuing to draw a salary at Meditech and receiving the benefits of membership in the profit sharing plan.  Indeed, Hubert never even informed his fellow named Plaintiffs about this sordid history.  Hubert has repeatedly dissembled under oath, testifying falsely about his scheme to sell Meditech information and about an anonymous email that he sent to numerous lawyers in 2002 seeking to sell potential class counsel information about the very claims brought in this case.

Even putting aside these and other deficiencies of the proposed class representatives discussed herein, certification of the putative class – all members of the profit sharing plan who received any distribution of benefits from the Trust from 1998 to the present and even beyond, including current employees – would be inappropriate.  The Amended Complaint unambiguously alleges that a share valuation method should have been used that prejudices absent class members, creating irreconcilable conflicts between the named Plaintiffs and the class.  Moreover, in this case litigation of affirmative defenses such as the statute of limitations, laches, waiver and estoppel cannot be resolved through common proof, and so will require testimony from each member of the putative class that will predominate over any common issues in this litigation.  For these and the other reasons discussed herein, Plaintiffs cannot meet their burden of demonstrating that the proposed class should be certified.

In support of their flawed motion for class certification, Plaintiffs have filed a memorandum that is filled with gross mischaracterizations of the record.  For example, Plaintiffs

---

[1]     Hubert's scheme is well-known to the Court.  *See generally* Order Concerning Protective Order, entered July 28, 2006 ("Order Concerning Protective Order") (Docket No. 49).

assert that the statute of limitations question raised by this case is subject to common proof because "no Plan participant could reasonably have known of a possible misconduct in connection with Meditech stock valuations before February 2002, when Dr. Grossman filed his Form 3-D [sic]" with the SEC.  Plaintiffs' Memo. in Support at 12.  Hubert admitted at his deposition, however, that in 2002 he sent an anonymous email to numerous attorneys *before* Grossman's SEC filing, seeking to find a lawyer to bring the very ERISA claim now before the Court.[2]  Moreover, the named Plaintiffs all testified that they believed Meditech stock to be undervalued by the 1990s.  Plaintiffs' statement about what Plan participants "could reasonably have known" before Grossman's SEC filing is simply false; the statute of limitations issue in this case is not susceptible to common proof.  *See infra* at 27.

Similarly, in seeking to avoid certification barriers arising from a failure-to-exhaust defense, Plaintiffs baldly assert that "the claims procedure under the Plan is non-existent," and repeatedly assert that Plan participants are not told of their right to challenge their distribution of benefits from the Plan.  *See* Plaintiffs' Memo. in Support at 12.  Plaintiffs produced, however – indeed, attached to their Amended Complaint as an exhibit – copies of the Plan's summary plan description that describe the claims procedure.  Plaintiffs' argument is thus entirely contradicted by the record, as well as case law stating that a description of the claims procedure in a summary plan description constitutes sufficient notice to participants.  *See infra* at 24.

---

[2]    Defendants were only aware of this unsolicited, anonymous email because one of the recipients was a lawyer at Goodwin Procter, as was putative class counsel, Michael Collora.  Plaintiffs did not produce this email during discovery, and Hubert denied under oath at his deposition ever sending such an email until it was placed before him, after which he claimed to have forgotten it.  *See* Transcript of the Deposition of Michael P. Hubert, July 26, 2006, at 24 ("Hubert Depo."), a copy of which is appended to the Attorney's Affidavit of Michael P. Sugrue in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification as Exhibit A (hereinafter, "Sugrue Aff., Ex. __") ("Q:  Did you send an anonymous email to a list of attorneys?  A:  No, never."); *id.* at 29 ("Well, I stand mistaken"); *id.* at 41 (offering several reasons why he had "forgot[ten]" the email).  This email raises yet another serious issue about Hubert's integrity, even when under oath.  Can one really forget setting up an anonymous email account and using it to write a group of lawyers offering to sell information to be used in suing one's own employer for tens of millions of dollars?

4

Defendants expect to eventually vindicate themselves on the merits in this lawsuit. In the meantime, for the reasons give herein, Plaintiffs' motion for class certification should be denied.

## BACKGROUND

### I.    MEDICAL INFORMATION TECHNOLOGY, INC.

Defendant Meditech, a software company, was founded in 1969 by defendant Pappalardo and four other individuals. *See* Affidavit of A. Neil Pappalardo in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, ¶ 4 ("Pappalardo Aff., ¶ __"). The Company currently employs over 2,400 individuals, all in Massachusetts. *Id.*

Meditech is privately held:  its shares are not traded on any stock exchange, and so have no price set by a "market." There are, however, transactions in Meditech stock. The Company has sold stock to most employees, including each of the named Plaintiffs:  Hinchliffe purchased shares from the Company for $16,400; Trainor purchased shares from the Company for $16,950; and Hubert purchased shares from the Company $197,425. *See* Affidavit of Barbara A. Manzolillo in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, ¶¶ 7, 16, 20 ("Manzolillo Aff., ¶ __").

In addition, the Trust has created a market for employees who wish to sell their stock. Hinchliffe sold all of the shares he purchased from the Company to the Trust for $301,100, a profit of $284,700; and Trainor sold all of his shares to the Trust for $310,150, a profit of $293,200. Manzolillo Aff., ¶¶ 16, 20. Hubert sold 1,000 of his shares to the Trust for $23,000, and continues to hold 23,300 shares, worth a total of $745,600 at the "too low" valuation allegedly used by the defendants, representing an overall gain of $571,175. *Id.*, ¶ 8.

Meditech has also provided returns to its shareholders in the form of dividends. Over the years, Hubert has received more than $310,000 in dividends; Hinchliffe received $92,899.50;

and Trainor received $114,384.75.  Manzolillo Aff., ¶¶ 9, 17, 21.  Between dividends and share

value appreciation, Hinchliffe has gained approximately $377,000 through his ownership of

Meditech stock that he purchased; Trainor, $407,000; and Hubert, $881,000.  *Id.*

      Plaintiffs allege that Trustee has harmed the class by undervaluing Meditech stock.  As

the above figures show, however, Meditech stock has been an extraordinarily good investment.

Indeed, Hubert repeatedly has stated that there is no better.  *See* Hubert Depo. at 150 (referring to

Meditech stock, "If I were asked today to find an investment that's going to give me better than

20 percent return, with 99 percent assuredness, I couldn't do it.  I can't do it now, I couldn't do it

then, and I can't imagine anybody can do that"); **REDACTED**


## II.    THE MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN

      In 1973 the Company established the defendant Medical Information Technology, Inc.

Profit Sharing Plan ("the Plan," and together with Meditech and Pappalardo, the "Defendants"),

for the stated purpose of providing "retirement and other benefits to the employees of the

Company."  *See* Medical Information Technology, Inc. Profit Sharing Plan Amended and

Restated Trust Agreement (As of January 1, 1998) ¶ 1.02 (the "Plan Document") (Sugrue Aff.,

Ex. E).  The Plan is "designed to invest substantially in shares of the Common Stock of the

Company so as to permit the participating employees to share in any growth of the Company."

*Id.*, ¶ 1.02.  Pursuant to the Plan, the Trust was created to hold contributions of cash and stock

received from the Company.

      The Plan is entirely voluntary on the Company's part.  It provides that the Company may

terminate the Plan at any time.  Plan Document, ¶ 7.01.  Similarly, the Plan provides that all

contributions by the Company to the Trust are voluntary; in any given year, the Company could

elect to contribute nothing to the Trust. *Id.*, ¶ 9.02. The Plan does not require, and in fact does not permit, contributions to the Trust by individual Plan participants. *Id*., ¶ 4.05.

The Plan is established for the sole benefit of Meditech's employees, excluding defendant Pappalardo. Pappalardo Aff., ¶ 9. The value of each year's contribution to the Trust is allocated to the accounts of participants according to a formula based on the income of each participant. Plan Document, ¶ 5.03. Similarly, each year the Trustee revalues the Plan's existing assets, and the pro-rata increase in the value of those assets is allocated to the account of each plan participant. *Id*., ¶ 5.05.

Under the terms of the Plan, the Trust makes payments to Plan participants in a lump sum cash payment upon termination of the participant's employment with Meditech. Pappalardo Aff., ¶ 12. The Plan also grants employees with more than 20 years service the choice to make "in service withdrawals."[3] The Plan provides, however, that if the Trust lacks sufficient cash to make a payment, the Trust may defer payment by up to three years and, if still necessary, distribute Meditech stock instead of cash. Plan Document, ¶¶ 6.06(d), 6.12(a)(2).

The Plan contains a claims procedure. As described (in relevant part) in the summary plan descriptions distributed to all Plan participants, including each of the named plaintiffs:

> if you receive notice from the Trustee with respect to the amount and form of your benefits and you believe there is an error in the notice, then you may submit a claim to the Trustee. … Your claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim.

*See* Summary Plan Description of the Medical Information Technology, Inc. Profit Sharing Plan, January 1, 1998, at ¶ VIII ("1998 Summary Plan Description") (Sugrue Aff., Ex. F).

---

[3]     Plan Document, ¶ 6.12. Plaintiffs suggest that the Defendants force Plan participants to make in-service withdrawals. *See* Plaintiffs' Memo. in Support at 4. Hubert has conceded, however, that Plan participants are told that such withdrawals are voluntary. Hubert Depo. at 148-50.

### III.     VALUATION OF MEDITECH STOCK

Because Meditech stock is not publicly traded, two valuations are made at year end for purposes of the Plan.  First, the Meditech Board of Directors, in deciding how many shares of stock will make up any stock portion of the Company's voluntary contribution to the Trust in a given year, determines a value for the stock at year's end.  Pappalardo Aff., ¶ 13.  Under the terms of the Plan, the Board sets an overall dollar contribution amount, then decides how much of that overall contribution, if any, will be in stock, and how much in cash.  Plan Document, ¶ 4.01.  The number of shares contributed to the Plan is thereby dependent upon the value determined for those shares by the Board; if the Board voted to make an overall contribution to the Trust of $4 million, for example, it could not then contribute 80,000 shares at $75 per share (*i.e*., $6 million worth of stock).  Pappalardo Aff., ¶ 13.  This same per share value is also used by the Company in selling Meditech stock early the next year to employees.  *Id*., ¶ 6.

Simultaneous with the Board's valuation, each year end the Trustee values the shares held by the Trust in order to determine the overall value of the Trust and, thereby, the Trust account balance of each Plan participant.  Plan Document, ¶¶ 5.04, 5.05.

### IV.     THE PLAN HAS PROVIDED SUBSTANTIAL BENEFITS TO PARTICIPANTS

While Plaintiffs complain in this litigation that Defendants intentionally undervalued Meditech stock and that the Plaintiffs, as a consequence, received too little from the Trust, the Trust has provided substantial, non-volatile benefits to plan participants.  Hubert received total distributions from the Trust totaling $1,079,476.90; Hinchliffe received a distribution of $1,123,639.39; and Trainor received $929,943.41.  Manzolillo Aff., ¶¶ 10, 18, 22.  Between their distributions from the Trust, the appreciation in value of Meditech stock they purchased from the Company, and dividends on their Meditech stock, Hinchliffe gained approximately $1.5 million;

Trainor gained approximately $1.3 million; and Hubert has gained, to date, approximately $1.9 million. Manzolillo Aff., ¶¶ 10, 18, 22.[4]

Notably, the value of Meditech stock determined by the Trustee between year-end 1997 (as relevant to Plan participants receiving distributions in 1998, the start of the putative class period) through year-end 2005, has increased from $13.50 to $32, a gain of 137%. Manzolillo Aff., ¶ 25. Between 1997 and 2005, Meditech's earnings per share grew by 43%, from $1.57 to $2.24. *Id.* Thus, the Trustee has increased the value of Meditech stock at a rate greater than Meditech's earnings growth during the period in which Plaintiffs allege the value has been artificially depressed. Indeed, the Trustee's valuation has been increasing more than earnings growth since well before the class period began: between year-end 1992 and year-end 2005, for example, the value determined by the Trustee increased from $6.33 to $32 (405%), while Meditech's earnings per share grew from $0.75 in 1992 to $2.24 in 2005 (198%). *Id.*, ¶ 26.

The Trust has also avoided the volatility that, Plaintiffs allege, should have been present during the class period. The Amended Complaint alleges that the "actual" fair value of Meditech stock was $75 at year end 1997 (used for distributions for Plan participants in 1998), dropped to $25.50 at year end 2000 and $41 at year end 2002, before finally returning to $74 at year end 2003. Manzolillo Aff., ¶ 27. Under Plaintiffs' valuations, employees would fail to share in the Company's growth in earnings per share between 1997 and 2003 (from $1.57 to $1.98, an increase of 26%), and employees in years such as 2001 and 2003 would receive distributions from the Trust based on year-end values lower than the year-end value in 1997, even though Meditech's earnings per share were higher in 2000 and 2002 than they were in 1997. *Id.*

---

[4]    The First Circuit has stated that "[t]he core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation." *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 41 (1st Cir. 2003). This core purpose is not advanced by permitting these plaintiffs to bring their individual claims for millions of dollars each as a class action.

**ARGUMENT**

Plaintiffs seek to certify a class under Fed. R. Civ. P. 23(b)(3).  For a class to be certified under Rule 23(b)(3), this Court must conclude that the four requirements of Rule 23(a) – adequacy, commonality, typicality, and numerosity – are satisfied, as well as the two requirements of Fed. R. Civ. P. 23(b)(3), predominance and superiority.

Plaintiffs bear the burden of establishing the requirements of Rule 23.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *In re Biogen Securities Litig.*, 179 F.R.D. 25, 40 (D. Mass. 1997).  Before certifying a class, this court must conduct a "rigorous analysis" of the prerequisites of Rule 23(a).  *See General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982); *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 257 (D. Mass. 2005).  In examining questions of predominance and superiority, a court is required to take a "close look" at the difficulties likely to be encountered managing the action.  *Amchem*, 521 U.S. at 615-16.

## I.    PLAINTIFFS HAVE NOT MET THEIR BURDEN OF ESTABLISHING THAT THEY ARE ADEQUATE AND TYPICAL CLASS REPRESENTATIVES

Under Rule 23(a)(1), Plaintiffs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class."  A class representative is a "fiduciary," and the interests of the class are "dependent upon his diligence, wisdom and integrity."  *See Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 549-50 (1949).  In addition, a class can only be certified if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "[W]here a named plaintiff may be subject to unique defenses that would divert attention from the common claims of the class, that plaintiff cannot be considered typical of the class."  *In re Bank of Boston Corp. Securities Litig.*, 762 F.Supp. 1525, 1532 (D. Mass. 1991).  Plaintiffs in this case have not demonstrated that they will "fairly and adequately protect the interests of the class," nor that their claims are typical.

A.    **Hubert's Scheme to Sell Meditech Information for Personal Profit Renders Him an Inadequate and Atypical Class Representative**

The foremost reason Hubert is an inadequate and atypical class representative is his demonstrated lack of honesty and credibility. *See Randle v. Spectran*, 129 F.R.D. 386, 392 (D. Mass. 1988) (representative is inadequate if his "credibility is called into question by his conduct in this or related litigation or situations"); *see also Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) ("courts may consider the honesty and trustworthiness of the named plaintiff").

The Defendants have described, in moving for a protective order with respect to sensitive business and personal information produced during discovery, Hubert's scheme in 2002 to enrich himself by selling Meditech information to a third party (Jerome Grossman) engaged in a dispute with Meditech in return for a $1 million-plus payment. *See* Defendants' Motion for Protective Order Governing Treatment of Documents and Information, at 5-7 (Docket No. 46); Order Concerning Protective Order, July 28, 2006 ("Order Concerning Protective Order") (Docket No. 49). In light of this scheme, Hubert cannot be trusted to protect the interests of absent class members, including current Meditech employees: Hubert told Grossman that, with Hubert's help, Grossman could set in motion a sequence of events that, even if unsuccessful, would demoralize Meditech employees and that, if successful, would cause the Plan to defer or even stop cash distributions to Plan participants, an outcome that Hubert has conceded would not be desired by Plan participants. *See* Hubert Depo. at 10-13, 112-13; **REDACTED**

Many of those same participants are members of the putative class whose interests Hubert now purports to represent.[5]

---

[5]    *Koppel v. 4987 Corp.*, 191 F.R.D. 360 (S.D.N.Y. 2000), cited by Plaintiffs, in inapposite. In *Koppel*, the court found that 15-year old allegations were "too unsubstantiated and attenuated, in time and subject matter," to be

It is worth noting the reaction of Hubert's fellow named plaintiff, Trainor, when he learned of the scheme for the first time at his deposition. Trainor stated that he would never engage in similar conduct because "I love that company." Transcript of the Deposition of William Trainor, July 24, 2006, at 23 ("Trainor Depo.") (Sugrue Aff., Ex. G). And Trainor testified "Absolutely" when asked whether selling Company information would be wrong, *Id.* Trainor's testimony confirms the relevance of Hubert's scheme to the issue whether Hubert possesses the necessary "honesty and trustworthiness" to represent the proposed class. *Savino*, 164 F.3d at 87. Indeed, Hubert resorted to answering "I don't know" when asked whether, if he were an absent class member, he would want to know about the scheme. Hubert Depo. at 107.

In addition to Hubert's conduct, his recent, evasive testimony under oath, in which he disavowed his own written proposal by claiming not to be offering to sell Meditech information for personal gain, is another basis for finding Hubert to be an inadequate class representative. *See Margaret Hall Foundation, Inc. v. Atlantic Financial Management, Inc.*, 1987 WL 15884, at *7, n. 3 (D. Mass. Jul. 30, 1987) ("the mere fact that the representative plaintiffs gave incredible testimony in their deposition is reason enough to disqualify them as representatives"); *see also* Order Concerning Protective Order (finding Hubert's testimony to be "not very persuasive"). The same is true of Hubert's testimony that he never sent an anonymous email to potential counsel, and – after being confronted with it – that he forgot doing so. *See supra* at 4 & n.2.

Hubert's inadequacy is also demonstrated by the involvement of his personal lawyer (and putative class counsel), Michael Collora, in Hubert's scheme. Collora negotiated with counsel for Grossman, and Hubert repeatedly waived the attorney-client privilege on the subject of the valuation of Meditech stock in his own direct communications with Grossman. *See* Defendants'

---

relevant to the adequacy analysis. *Id.* at 368. Hubert's misconduct is both admitted, recent, and directly connected to the interests of the putative class members he seeks to represent.

Motion to Compel Compliance With the Subpoena *Duces Tecum* for Michael Collora, at 2-6 (Docket No. 52).[6]  Collora could be called to testify about the scheme and Hubert's belief that Meditech stock is undervalued, as relevant to defenses such as unclean hands and laches.  The potential that Collora could be a witness precludes a finding of adequacy for Hubert.  *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1376 n. 4 (11th Cir. 1984) (potential that class counsel would need to testify concerning proposed class representatives "alone would be a sufficient ground for a court to conclude that [they] were inadequate representatives of the class").

    In addition to demonstrating his inadequacy under Rule 23(a)(1), Hubert's scheme also subjects him to a unique unclean hands defense not applicable to absent class members, making his claims atypical of those of the class.  Unclean hands bars recovery under ERISA when "the manner of dirtying renders inequitable the assertion of such rights against the defendants." *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985).  When Hubert offered to sell Meditech information to Grossman for personal gain, he breached duties owed Meditech as his employer.  *New England Overall Co. v. Woltmann*, 176 N.E.2d 193, 198 (Mass. 1961).  He also intended to hurt the Plan and his fellow participants:  Hubert told Grossman that he could help Grossman demoralize Meditech employees and, if the share value were suddenly raised, as Hubert desired, that the Plan would run out of cash to make distributions.  *See supra* at 11. Defendants will argue, at an appropriate time, that equity cannot permit Hubert to ask this Court to impose the same undesirable consequences he sought to secure through his unlawful scheme.

    A proposed class representative was found atypical under less sinister circumstances in *In re ADC Telecom. ERISA Litigation*, 2005 WL 2250782 (D. Minn. 2005). In *ADC Telecom.*, the

---

[6]   Collora has refused to be appear at this subpoenaed deposition, forcing Defendants to file their pending motion to compel and denying them the benefit of Collora's testimony in opposing Plaintiffs' motion for class certification.

named plaintiff in an ERISA action was terminated for breaching obligations of confidentiality owed his employer. *Id.* at *4. The defendant argued that he "poses issues of forthrightness and credibility not shared by members of the proposed class." *Id.* The court agreed, noting "there is a concern that Carnahan's past actions could subject him to a vigorous cross-examination which would be disadvantageous to other class members. Accordingly, Carnahan will not be certified as the class representative." *Id.*

This Court need not decide, for purposes of class certification, the merits of the unclean hands defense. For present purposes, Defendants submit that the defense will divert attention from any common issues in this litigation to the prejudice of absent class members, and that Hubert therefore cannot meet the typicality prong of Rule 23(a)(3).

**B.    Trainor Is Inadequate Because He Knows Almost Nothing About the Litigation or his Duties as a Named Plaintiff**

Plaintiffs cannot demonstrate that Trainor is an adequate class representative because, among other reasons, he has paid no attention to this litigation. Trainor was not even aware that this case was a class action; asked the question several different ways, he repeatedly testified at his deposition that the "class" consisted only of the three named plaintiffs. Trainor Depo. at 45-46; *see also Scott v. New York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D.N.Y. 2004) ("Spillers' deposition makes equally clear that he is unsuited to be a class representative. He did not know what a class action is, nor that his case was such an action"). Trainor also testified that he was unaware of his responsibilities as a named plaintiff, and had undertaken no effort to find out what they are. Trainor Depo. at 30; *see also In re Commonwealth Oil/Tesoro Petroleum Securities Litig.*, 484 F.Supp. 253, 263-66 (W.D. Tex. 1979) (denying class certification in part because the named plaintiffs were not aware of any duties they might have as class representatives).

Indicative of Trainor's general disinterest in the case, he testified that he had done "nothing" to prepare for his deposition. *Id.* at 41; *see also McDaniel v. County of Schenectady*, 2005 WL 1745566, *3 (N.D.N.Y. 2005) ("Assuming this fiduciary role, the class representative must vigorously pursue all facets of the litigation in the interest of the class," including attendance at depositions). He was unaware of basic facts concerning the litigation. He could not name the three defendants in the case, insisting that the only defendant was the Plan. Trainor Depo. at 97. The central allegation in the Amended Complaint is that defendant Pappalardo intentionally undervalued Meditech stock held by the Trust; Trainor testified at his deposition "I don't know that he did or didn't value it at what it was worth." *Id.* at 93.

Moreover, although Trainor received a Trust distribution of approximately $930,000, an amount Plaintiffs now claim was several times too small, he has so far contributed only $125 toward the cost of this litigation, and is unwilling to contribute any more than $1,125 total. Trainor Depo. at 31, 33-34; *see also In re Bank of Boston Corp.*, 762 F.Supp. at 1535 ("*some* financial commitment" by the named Plaintiff is necessary to "ensure that the representative will be conscientious and attentive to the interests of all members of the class"). Indeed, Trainor was unaware of the terms of his own signed retainer agreement – including the fact that it requires him to pay $2,500 – confirming that he cannot be trusted to monitor the performance of class counsel. Trainor Depo. at 38-39.

Trainor not only appears to care very little about vigorously prosecuting his own claim, he admitted not caring about the claims of absent class members. Plaintiffs allege that Defendants underpaid benefits due the class by undervaluing Meditech stock each year. When Trainor was asked, however, "Do you care what the proper value of Meditech's stock was in 2001?" – a potentially determinative fact for Plan participants who received distributions that

year – he simply answered "No." Trainor Depo. at 102. It is inconceivable that Trainor can be trusted to fairly and adequately protect absent class members when he admits not caring about the key facts underlying their claims.

Any one of the above facts about Trainor would be a sufficient basis to find him an inadequate class representative. Together, they demonstrate that Trainor is utterly and completely inadequate. *See Weissman v. Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978) (denying class certification where plaintiff had "done little more in this action than write an initial letter to his counsel, sign a retainer and submit to a deposition").

## C.     Hinchliffe is Inadequate Because He Admittedly Cares Nothing About Absent Class Members

Hinchliffe's inadequacy as a class representative is shown, *inter alia*, by two remarkably candid statements he made during his deposition. Hinchliffe, who received a distribution from the Plan in 1998, was asked to consider his interests versus those of absent class members who left in later years. He responded "I'm not concerned, really, with people that left in 2000. I'm concerned with me." Transcript of the Deposition of David Hinchliffe, July 27, 2006, at 35 ("Hinchliffe Depo.") (Sugrue Aff., Ex. H). In addition, when Hinchliffe was asked what he thought would happen to people still participating in the Plan – members of the class proposed by the Plaintiffs – "if you win this lawsuit and the plan pays out the kind of money that you are talking about," he answered "Quite frankly, I'm just concerned about this case." *Id*. at 25-26.

In light of Hinchliffe's testimony, it is amazing that Plaintiffs' counsel put him forward as someone who will "fairly and adequately protect the interests" of any absent class members, let alone those who received distributions in 2000 or current Plan participants. In addition, Hinchliffe, like Trainor, was not aware of his responsibilities as a named plaintiff in a class action, such as the duty to monitor the performance of class counsel. *Id*. at 8.

**D.    The Interests of the Named Plaintiffs Conflict with Those of Absent Class Members**

Plaintiffs also cannot show that Hinchliffe and Trainor (who received distributions from the Trust in 1998) and Hubert (who received distributions in 2004) are adequate class representatives because the valuation method proposed by the Amended Complaint arbitrarily discriminates against absent class members who received distributions in different years.

In its landmark class action decision in *Amchem*, the Supreme Court made clear that, in determining adequacy, a court must consider how the named plaintiffs would allocate damages amongst the class.  In *Amchem* the Third Circuit had reversed the district court's certification of a settlement class, holding that even though "the members of the class are united in seeking the maximum possible recovery for their … claims," the settlement made "important judgments on how recovery is to be allocated *among different kinds of plaintiffs*, decisions that necessarily favor some claimants over others."  521 U.S. at 610-11 (emphasis supplied).  The Supreme Court affirmed the Circuit Court, refusing to allow the named plaintiffs to make such "essential allocation decisions" among class members where the goal of one group of class members "tugs against" the interest of another.  *Id.* at 626-27.

As described herein, the valuation method proposed by Plaintiffs in their Amended Complaint prejudices absent class members in at least two ways, and thus runs afoul of *Amchem*.

1.    *The Volatility in Plaintiffs' Valuation Method Prejudices Absent Class Members*

First, Plaintiffs run afoul of *Amchem* because of the extreme volatility in share prices arrived at under the method that they allege, in their Amended Complaint, should have been used by Defendants to value Meditech stock.

As described above, under Defendants' valuation method the year-end value determined for the stock each year has risen steadily over time and has even outpaced Meditech's earnings

growth. *See supra* at 9. Plaintiffs' valuation method, on the other hand, sets the value for the stock higher than the Defendants' method, but the values it provides are extremely volatile and bear little resemblance to the company's steady growth in earnings. In fact, the year-end value Plaintiffs propose for 2000 (as relevant to those class members who left the Company in 2001) is only one-third the value that they propose for year end 1997 (as relevant to Hinchliffe and Trainor) and year end 2003 (as relevant to Hubert), even though Meditech's earnings were higher in 2000 than in 1997. This certainly puts into context Hinchliffe's testimony "I'm not concerned, really, with people that left in 2000. I'm concerned with me." *See supra* at 16. Under *Amchem*, Plaintiffs' selection of a valuation method that prejudices absent class members in such an arbitrary fashion is sufficient grounds for denying class certification.

Indeed, while the Amended Complaint alleges that Meditech stock was worth more than the value determined by the Trustee throughout the class period, the volatility under Plaintiffs' valuation method would cause many class members to recover nothing in this action. First, the number of shares contributed to the Trust depends upon the total contribution amount and the value of Meditech stock – if the value per share is five times higher, one-fifth as many shares will be contributed; the overall contribution amount does not change. *See supra* at 8. Second, the value of the stock determined is applied not only to the shares being contributed, but to the shares already held by the Trust. Because the contribution amounts are the same and the share value applies to all shares held by the Trust, a method of valuing shares that results in "lower" but increasing valuations produces total Trust valuations greater than a method that produces "higher," but stagnant or decreasing valuations. For example, participants are better off having 100 shares contributed at $10 per share – a $1,000 contribution – with the share value increasing the next year to $20 (for a $2,000 Trust value), than having 10 shares contributed at $100 per

share – an identical $1,000 contribution – with the share value falling to $80 (for an $800 Trust value).  That the share values in the second scenario ($100 and $80) are higher than those in the first ($10 and $20) does not result in a higher Trust value, as Plaintiffs erroneously assume.

That is exactly the situation here.  The valuation method used by the Trustee resulted in the value of Meditech stock increasing throughout the class period, indeed since well before the class period began.  *See supra* at 9.  Plaintiffs' chosen method, on the other hand, has the value of the stock plunging between year end 1997 and year end 2000, not returning to the year end 1997 level until year end 2003.  Had Plaintiffs' method been used, the Trust would hold fewer shares than it does, and the share price would have been stagnant since year end 1997.  It is possible that no class members would be better off under Plaintiffs' method, but it is certain that class members who received distributions in years such as 2001 and 2003, when Plaintiffs allege the value used for distributions should have fallen from prior years, would not be.  Under Plaintiffs' method, such class members were paid "too much," and will recover nothing in this suit.  For this further reason, the prejudicial allocation decision made by Plaintiffs through their selection of a valuation method shows that the proposed class is inappropriate under *Amchem*.[7]

2.    *Plaintiffs' Proposed Valuation Method Could Cause the Trust to Run Out of Cash*

Plaintiffs' proposed method causes additional conflicts between the named Plaintiffs and absent class members because, Plaintiffs allege, had their method been employed by the Trustee beginning in 1998, "the Plan would have soon run out of cash."  Amend. Compl. ¶ 69; *see also* Email dated February 18, 2002 ("Anonymous Hubert Email") (Sugrue Aff., Ex. I), at 2 ("[i]f the real 'fair market value' was used to compute the [amount of] distribution[s], the plan would have

---

[7]    Plaintiffs cite three cases in support of an assertion that they have a "commonality of interest with all other Plan participants irrespective of the year in which they received their distribution."  Plaintiffs' Memo. in Support at 10 n. 5.  None of the cases cited supports that proposition, or addresses the conflicts present here.

no cash"); **REDACTED**

That, of course, begs the question where *any* distribution to putative class members who left Meditech after the Plan ran out of cash, including current Plan participants, would come from. Under ERISA, the only entity liable to pay a judgment for additional benefits would be the Plan itself. *See Brandon v. Aetna Servs., Inc.*, 156 F.Supp.2d 167, 171 (D. Conn. 2000) ("Section 1132(a)(1)(B) only permits a participant to recover benefits directly from the Plan as an entity"). Typical of Plaintiffs' failure to consider the interests of absent class members is Hinchliffe's remarkable suggestion that the Trustee – who Plaintiffs argue "intentionally set the value of company stock at an artificially low level for the personal benefit of company insiders (such as the trustee)," Plaintiffs' Memo. in Support at 1 – would bail out the Plan with his own savings. Hinchliffe Depo. at 26-27 ("I know that Mr. Pappalardo is an incredibly wealthy man, and I'm sure he would take care of the people, even if he had to take it out of his own funds"). Hubert likewise testified that the Company would volunteer to fund any shortfall, although not obligated to do so under the Plan. Hubert Depo. at 112-14. Alternatively, he testified, the Trust could stop making cash distributions to employees and instead distribute shares, an outcome that, Hubert testified, would not be desired by Plan participants. *See id.* at 113 ("I don't think that would settle well with employees"); *see also* **REDACTED**

### E.    Plaintiffs' Conflict with Current Plan Participants Further Demonstrates Their Inadequacy

Plaintiffs explicitly seek certification of a class including current Plan participants. *See* Plaintiffs' Memo. in Support at 8-9. Defendants believe that no class should be certified, but a class including current Plan participants would be especially inappropriate.

As an initial matter, Plaintiffs' had previously limited their class to former Plan participants. The Amended Complaint limited the class to participants who had received a distribution "upon the participants' *termination* of their employment." *See* Amend. Compl. "Introduction" (emphasis added); *see also id*., ¶¶ 33, 35, 69, 82, 88, 89, 105; Plaintiffs' Second Opp. to Defendants' Motion to Dismiss the Amend. Compl. at 12 (Docket No. 31); Mar. 20, 2006 Memorandum of Decision at 7 (Docket No. 38) ("in defining the 'putative class' as those individuals who 'had the same or similar experience when receiving their distributions,' they necessarily include only former Company employees in the class").

Moreover, two of the three named Plaintiffs were not even aware at their depositions that they might be representing current participants in the Plan: Trainor testified that there were no absent class members, *see supra* at 14, and Hinchliffe testified that the class only consisted of "anybody who terminated employment." Hinchliffe Depo. at 29. The "confusion" is understandable, since the Plaintiffs' retainer agreements with putative class counsel only call for a class consisting of plaintiffs and "(and those similarly situated) who have claims of not having been paid in full the value of their stock in a stock benefit plan after employment was terminated at Meditech." *See*, *e.g.,* Contingent Fee Agreement between William Trainor and Dwyer & Collora, LLP, ¶ 1 (Sugrue Aff. Ex. J). Not even being aware that they seek to represent current Plan participants, Hinchliffe and Trainor can scarcely be said to adequately represent such individuals.

In any event, Plaintiffs, as former Plan participants, have no interest in the current or future financial security of the Plan; their goal is maximizing the amount paid out by the Trust in this action. Current Plan participants, however, who by definition are current Meditech employees, will want to avoid diluting Trust assets, thereby maximizing the amount available

when they ultimately leave the Company and receive a final distribution from the Trust.  Such a conflict of interest forecloses the Plaintiffs from representing current Plan participants.  *See Gillis* v. *Hoeschst Celanese Corp.*, Civ. A. No. 90-5542, 1992 WL 68333, at *2 (E.D. Pa. Apr. 1, 1992) (class certification inappropriate where former employees "will be trying to pull as much cash as possible from the [corporation's] pension fund, and at the same time, the present … employees will be seeking to preserve that fund").

### F.    Hubert Disagrees With Central Allegations in the Amended Complaint

Hubert's atypicality is also seen in his disagreement with key allegations in the Amended Complaint.  The Amended Complaint alleges that the Trustee should have valued Meditech stock at $75 at year end 1997 (nearly 6 times higher than the $13.50 value he determined) and at least $74 at year end 2003 (nearly three times higher than the $26 value he determined).  *See* Am. Compl. ¶¶ 70, 101.  Hubert, however, has repeatedly opined that Meditech stock is undervalued only by 25-50%.  *See* **REDACTED**

; Letter from Michael P. Hubert to Barbara A. Manzolillo, September 7, 2004 ("Hubert Letter to Manzolillo") at HUB 239 (Sugrue Aff., Ex. L) (complaining that his Trust distribution might be $1.3 million if Meditech stock were "independent[ly]" valued, only 25% more than he received).  Hubert offered to sell his stock for $42 per share in February of 2006, when Defendants valued it at $32 – a difference of only 31%. Hubert Depo. at 138.  And at his deposition Hubert scoffed at the notion that Meditech stock was worth $74 per share at year end 2003.  *See id.* at 168-69 ("Q:  Did you say anywhere in that letter that you believed the company owed you 74 bucks a share for your stock?  A.  No, of course not. Q:  Why not?  A.  Where did you get $74?").

Second, the "proper" values alleged in the Amended Complaint depend upon Plaintiffs'
allegation that Meditech's non-publicly traded stock should be valued "without lack of liquidity
or minority discounts."  Am. Compl. ¶ 62.  Hubert, however, has repeatedly testified and stated
that a discount for lack of liquidity should be used in valuing the shares of a privately-held
company like Meditech.  *See*, *e.g.,* **REDACTED**


; www.MEDITECHstock.com at 2 (Sugrue Aff. Ex.
M) (Hubert, explaining on a website he owns, that when comparing public and private
companies, "the final price of the private company stock is usually adjusted down").

This Court need not resolve any disputes between Hubert and the Amended Complaint.
For present purposes, it suffices to note that where Hubert's own strongly-held views on stock
valuation contradict the allegations of the Amended Complaint, they will be the subject of
vigorous cross-examination at trial to the prejudice of absent class members, and for that
additional reason Plaintiffs cannot show that Hubert is a typical class member.

### G.    Plaintiffs are Inadequate Because They Failed to Exhaust Their Claims

Under ERISA, plaintiffs must show that they exhausted administrative procedures
available under a plan before filing suit.  *See Drinkwater v. Metropolitan Life Ins. Co.*, 846 F.2d
821, 825-26 (1st Cir. 1988).  A class representative is not adequate if he or she failed to exhaust
the claim.  *See Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1158 (7th Cir. 1999) (failure
to exhaust was a "disabling weakness" making plaintiff an "unsuitable" class representative).

None of the Plaintiffs in this case exhausted his claim.  Hinchliffe and Trainor both
testified that they thought the value of Meditech stock was too low by the time they left in 1998,
but neither filed any claim for additional benefits.  Hinchliffe Depo. at 37; Trainor Depo. at 80.
When Hubert was fired in 2004 he sent a letter to the Plan administrator, but the letter nowhere

stated that it was a claim; nowhere stated an additional amount that Hubert wanted; nowhere alleged that the stock was undervalued to the extent alleged in the Amended Complaint; consisted primarily of an irrelevant complaint about the terms of the Plan itself; and actually requested that he be provided the distribution determined by the Trustee. *See generally* Hubert Letter to Manzolillo. If this letter exhausted anything, it was not the claim brought in this case.

Plaintiffs argue that they and the absent class members were unaware of the claims procedure under the Plan – indeed, that the existence of the procedure was hidden from them. *See* Plaintiffs' Memo. in Support at 4-5; *see also, e.g., id.* at 6; *id.* at 10-11 & n. 6. Since details concerning the claims procedure are found in each of the summary plan descriptions produced *by Plaintiffs* during discovery – which Hinchliffe and Hubert both testified that they had read – this is yet another frivolous argument by plaintiffs.[8] Moreover, Plaintiffs' vague suggestion that the Plan should have reminded them of the claims procedure when they received their distribution is meritless. *See, e.g., Davenport v. Harry N. Abrams, Inc.*, 249 F.3d 130, 132-33 (2d Cir. 2001) (description of the claims procedure in a summary plan description is sufficient under ERISA).

Plaintiffs also argue that the summary plan descriptions call for claims to be "filed in writing with the Trustee in accordance with the rules he establishes," and because the Trustee did not establish any additional "rules," the claims procedure is a nullity. Plaintiffs' Memo. in Support at 10-11 & n. 6. That no additional rules were issued (making filing a claim that much easier), however, does not eliminate the baseline requirement under the Plan, clearly stated in the summary plan descriptions, that a claim be "filed in writing with the Trustee." Plan Document, ¶

---

[8]     *See* 1998 Summary Plan Description at ¶ VIII; Summary Plan Description of the Medical Information Technology, Inc. Profit Sharing Plan, August 1, 1983, at VI ("1983 Summary Plan Description") (Sugrue Aff., Ex. N); *see also* Hinchliffe Depo. at 35; Hubert Depo. at 167.

11.10; 1998 Summary Plan Description at ¶ VIII; 1983 Summary Plan Description at ¶ VI.[9]  If

Plaintiffs had questions about the applicable rules, they could also have directed any questions to

the Plan Administrator.  *See* 1998 Summary Plan Description at ¶¶ I, IX.[10]  They did not.

### H.    Hinchliffe and Trainor are Inadequate Class Representatives Because their Claims are Likely Barred by the Statute of Limitations

In addition to those reasons given above, Hinchliffe and Trainor are inadequate and

atypical class representatives because their claims confront a statute of limitations defense that

makes their individual claims extremely weak, and that is likely to become a focus of the

litigation at the expense of absent class members.  *See Robinson*, 167 F.3d at 1157 ("if when

class certification is sought it is already apparent … that the class representative's claim is

extremely weak, this is an independent reason to doubt the adequacy of his representation,"

because "[o]ne whose own claim is a loser from the start knows that he has nothing to gain from

the victory of the class, and so he has little incentive to assist or cooperate in the litigation"); *In

re Bank of Boston Corp. Securities Litig.*, 762 F.Supp. at 1532.

This case was filed in February, 2005.  ERISA does not include an express statute of

limitations for benefits claims under 25 U.S.C. § 1132(a)(1)(B).  In deciding Defendants' Motion

to Dismiss, this Court agreed with Plaintiffs that the appropriate limitations period is six years

rather than three, but agreed with Defendants that the limitations period begins to run from the

time at which plaintiffs, through the exercise of "reasonable diligence," could have known of

---

[9]    This also disposes of any argument that Defendants did not "establish or follow claims procedures consistent with the requirements" of 29 C.F.R. § 2560.503-1.  *See* Plaintiffs' Memo. in Support at 11 n. 6.  Plaintiffs make no argument that the Plan's claims procedure, as set out in the Plan and described in the summary plan descriptions, is not consistent with Federal regulations.

[10]    Plaintiffs misleadingly quote the Trustee as testifying that he "really do[es] not know for a fact" to whom questions about the Trust "should be" directed.  Plaintiffs' Memo. in Support at 11.  He in fact testified that he was not sure "for a fact who [class members] go to," and then listed several individuals to whom participants "quite often" direct questions.  *See* Deposition of A. Neil Pappalardo, July 21, 2006, at 124 (Sugrue Aff., Ex. D).

their claims. Mar. 20, 2006 Memorandum of Decision at 10 (Docket No. 38). While Defendants continue to believe that the limitations period should be three years, even under a six-year statute of limitations the claims of Hinchliffe and Trainor are likely barred by the statute of limitations.

Hinchliffe and Trainor both received their distributions from the Trust in 1998 – more than six years before this case was filed in 2005. They both testified at their depositions that they thought well before 1998 that Meditech stock might be undervalued. Hinchliffe Depo. at 16-18 (in the "late '80s, early '90s"); Trainor Depo. at 58-59 ("at least a couple of years" before he left the Company in 1998). Even if Plaintiffs did not actually believe Meditech stock was undervalued, the exercise of "reasonable diligence" would have revealed the precise claim brought in this lawsuit. Trainor specifically testified that he had compared the value of Meditech stock to that of Cerner – the purported "comparable company" alleged in the Complaint – by 1998 and noted that Meditech stock was valued lower. Trainor Depo. at 58-59. And Hinchliffe testified that Plaintiffs' claim could be "fairly conclusive[ly]" proven using public information concerning "other companies and their assets and what their stock was versus what Meditech's was." Hinchliffe Depo. at 20-21. Yet Hinchliffe and Trainor took no steps to pursue any claim until they signed on to Hubert's complaint in 2005, seven years after receiving their distributions.

This Court need not actually decide whether Hinchliffe's and Trainor's claims are barred by the statute of limitations. The conclusion is inescapable, however, that the statute of limitations issue renders Hinchliffe and Trainor inadequate and atypical class representatives.

## II.    INDIVIDUAL ISSUES WILL PREDOMINATE

Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Defendants submit that this case involves a number of defenses to the individual claims of class members that are not susceptible to class-wide proof and that would require evidence from

individual class members.  The volume of such evidence will dwarf any evidence on common issues.  Accordingly, Plaintiffs cannot meet their burden of establishing predominance.

### A.      Statute of Limitations

As explained above, *see supra* at 25, the claims of at least plaintiffs Hinchliffe and Trainor are likely barred under the statute of limitations.  There is strong reason to believe that the claims of other class members (including Hubert) also may be barred by the statute of limitations.  Hinchliffe and Trainor both testified that they spoke with other individuals at Meditech about the value of Meditech stock before leaving Meditech in 1998.  Hinchliffe Depo. at 18-19; Trainor Depo. at 60.  Hinchliffe testified "I always felt that it was valued low.  We all did.  Everybody in the company did," and testified that "[p]eople who have already purchased [Meditech] stock already knew everything, knew what they were getting into, knew what it was all about."  Hinchliffe Depo. at 15, 18-19, 52-53.  Hubert also testified, and his documents reveal, that he was comparing Meditech's price-to-earnings ratio to that of other companies by the mid-1980s, and exploring what value Meditech stock would have under the method employed by another privately held company by at least 1998.[11]  All of this information – which Hinchliffe testified "conclusively" demonstrated that Meditech stock was undervalued, *see* Hinchliffe Depo. at 20-21 – was public and might have been considered by other putative class members.

Plaintiffs argue in their motion for class certification that the statute of limitations question in this case does not involve any issues of individual proof because a February 27, 2002 SEC filing by Jerome Grossman, a third party, "establishes a [common] floor for the running of

---

[11]    Hubert Depo. at 121-22, 131; *see also* documents produced by Hubert entitled "Fortune 5 Hundred Ranked By Performance" (April 27, 1998) (Sugrue Aff., Ex. O); "Who Owns SAIC Stock" (dated "4/21/98") (Sugrue Aff., Ex. P); "Turning Employees Into Stakeholders" (dated "4/21/98") (Sugrue Aff., Ex. Q); "MEDITECH Financial History" (dated "4/21/98") (Sugrue Aff., Ex. R).

the limitations period." Plaintiffs' Memo. in Support at 13 n. 7, *see also id*. at 11. In light of the testimony by all three Plaintiffs that they thought Meditech stock was undervalued by the 1990s, this argument is frivolous. Indeed, it is astonishing that Plaintiffs would even make this argument after the revelation, during Hubert's deposition, that Hubert had sent an anonymous email to a number of lawyers on February 18, 2002 – *nine days before* the February 27, 2002 SEC filing that Plaintiffs point to – seeking to sell them information concerning the very ERISA claim raised in this case. Hubert Depo. at 29-30. In this email Hubert wrote, "I believe I have a case against a Massachusetts employer that could settle for more than $20,000,000." Anonymous Hubert Email. Hubert explained that he was a member of a plan holding primarily company stock, and "[i]t is acknowledged by all that the stock value is set low so that employees will purchase the stock." *Id.* Anticipating his later offer to sell Meditech information to Grossman for personal profit, Hubert wrote that he would provide additional information to a responding lawyer, but, "as an employee of this firm, bringing this case to you, and willing to be active in the case, I wish be [sic] receive financial consideration for my efforts." *Id.*

Plaintiffs' own testimony, and Hubert's anonymous email, demonstrate the falsity of Plaintiffs' argument that the statute of limitations question is susceptible to common proof. The statute of limitations issue will require evidence from each putative class member to determine if and when, like Hubert, Hinchliffe, and Trainor, they thought Meditech stock was undervalued.

### B.    Laches

Laches is also a defense for which evidence from each class member will be necessary. *See Teamsters & Employers Welfare Trust of Illinois v. Gorman Brothers Ready Mix*, 283 F.3d 877, 883 (7th Cir. 2002) (ERISA claims are subject to laches); *Preston v. Am. Fed. of Television & Radio Artists*, 2002 WL 1009458, at *3 (S.D.N.Y. 2002). Laches consists of an unreasonable delay in pressing one's rights that prejudices the defendant. *Iglesias v. Mutual Life Ins. Co.*, 156

F.3d 237, 243 (1st Cir. 1998). Prejudice can consist of "economic prejudice," as well prejudice from any increase in defendant's liability while the plaintiff dallies, and prejudice from the staleness of evidence. *Cook v. City of Chicago*, 192 F.3d 693, 695-96 (7th Cir. 1999).

Each of the named plaintiffs thought that Meditech stock was undervalued by at least 1998, *see supra* at 26, and Hubert sought counsel to file suit in 2002. But no suit was filed until 2005. Meanwhile, memories faded: Hinchliffe and Trainor stated that they spoke to other employees about the value of Meditech stock during the 1990s, but cannot remember what anyone said, hindering Defendants' ability to assert defenses such as the statute of limitations. *See* Plaintiffs' Responses to Defendants' First Set of Interrogatories at 6 (Sugrue Aff., Ex. S).

Plaintiffs and potentially other class members also caused Meditech prejudice by purchasing stock from Meditech at per share values they thought "too low." Between 1998 and 2004 Hubert purchased 5,800 shares from Meditech while believing the stock to be undervalued. *See* Manzolillo Aff., ¶ 13. Even after Hubert sent his anonymous email in 2002, he still purchased shares of Meditech stock. On February 20, 2002, two days after sending his anonymous email, Hubert purchased 400 shares of Meditech stock from the Company. He also purchased 1,000 shares at $22 per share in 2003 (when Plaintiffs allege the value was really $41), and 200 shares at $26 per share in 2004 (when they allege the real value was at least $74). *See* Manzolillo Aff., ¶ 14. **REDACTED**

Finally, Defendants have potentially suffered prejudice in the form of increased liability: as described above, *see supra* at 18, under a "low" valuation method tens of thousands more shares are contributed to the Trust than under a "high" valuation method, and Plaintiffs apparently now claim to be entitled to the "high" share value on each of those shares.

Defendants are not asking the Court to decide the laches issue now. Plaintiffs' own testimony, however, suggests that the claims of many putative class members, like the named Plaintiffs', will be subject to laches. Because the knowledge of individual class members is relevant to this issue, *see Preston*, 2002 WL 1009458 at *3, the defense may not be provable on a class wide basis, but will require individual evidence from each putative class member.

### C.    Waiver and Estoppel

As described above, plaintiff Hubert continued purchasing Meditech stock at the value used by Defendants even after he concluded that the stock was undervalued, and even after he had sought counsel to file a claim based on this valuation. *See supra* at 29. Defendants submit that these purchases served to waive and/or estop any claim based on the alleged undervaluation. This defense would be available against other class members who purchased stock believing it to be undervalued, and requires individual evidence concerning their views on the stock value.

### CONCLUSION

Defendants respectfully pray that Plaintiffs' motion for class certification be denied.

Respectfully submitted,

MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC. and A. NEIL PAPPALARDO.

By their attorneys,

/s/ Stephen D. Poss, P.C.
Stephen D. Poss, P.C. (BBO # 551760)
Kevin P. Martin (BBO # 655222)
Michael P. Sugrue (BBO #655727)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
Dated: September 15, 2006          (617) 570-1000

## CERTIFICATE OF SERVICE

  I, Stephen D. Poss, P.C., hereby certify that I caused a true copy of the above document to be served upon the counsel of record for each other party via this Court's ECF System on September 15, 2006.

          /s/  Stephen D. Poss, P.C.   

          Stephen D. Poss, P.C.