UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually And On Behalf Of All Persons Similarly Situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO,<br><br>        Defendants. | Civil Action No. 05-10269RWZ<br><br><br>**REDACTED** |

**AFFIDAVIT OF MICHAEL P. SUGRUE
IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Michael P. Sugrue, depose and state as follows:

1.      I am an attorney admitted to practice in the Commonwealth of Massachusetts. I am an associate at Goodwin Procter LLP, counsel for Defendants Medical Information Technology, Inc. Profit Sharing Plan (the "Plan"), Medical Information Technology, Inc. ("Meditech" or the "Company") and A. Neil Pappalardo ("Pappalardo," and together with the Plan and Meditech, the "Defendants") in this matter.

2.      I make this affidavit in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification.

3.      I have personal knowledge of the matters described in this Affidavit.

4.      Attached as Exhibit A is a true and accurate copy of excerpts from the deposition transcript of Michael Hubert in the above-captioned action, conducted on July 26, 2006 (the

"Hubert Deposition").  For the Court's convenience, I used Adobe Acrobat software to insert a box around the relevant text that is referenced in Defendants' Opposition brief.

     5.      Attached as Exhibit B is a true and accurate copy of

**REDACTED**

     6.      Attached as Exhibit C is a true and accurate copy of

**REDACTED**

     7.      Attached as Exhibit D is a true and accurate copy of excerpts from the deposition transcript of A. Neil Pappalardo in the above-captioned action, conducted on July 21, 2006 (the "Pappalardo Deposition").  For the Court's convenience, I used Adobe Acrobat software to insert a box around the relevant text that is referenced in Defendants' Opposition brief.

     8.      Attached as Exhibit E is a true and accurate copy of the Medical Information Technology, Inc. Profit Sharing Plan Amended and Restated Trust Agreement (As of January 1, 1998), as produced by Defendants in this action and as introduced as Ex. 6 at the Pappalardo Deposition.  Mr. Pappalardo authenticated Exhibit E at pages 52-53 of his deposition transcript, which is attached hereto as Exhibit D.

2

9.      Attached as Exhibit F is a true and accurate copy of the Summary Plan Description of the Medical Information Technology, Inc. Profit Sharing Plan, dated January 1, 1998, as produced by Plaintiffs in this action.

10.     Attached as Exhibit G  is a true and accurate copy of excerpts from the deposition transcript of William Trainor in the above-captioned action, conducted on July 24, 2006 (the "Trainor Deposition"). For the Court's convenience, I used Adobe Acrobat software to insert a box around the relevant text that is referenced in Defendants' Opposition brief.

11.     Attached as Exhibit H  is a true and accurate copy of excerpts from the deposition transcript of David W. Hinchliffe in the above-captioned action, conducted July 27, 2006 (the "Hinchliffe Deposition"). For the Court's convenience, I used Adobe Acrobat software to insert a box around the relevant text that is referenced in Defendants' Opposition brief.

12.     Attached as Exhibit I is a true and accurate copy of an email from erisa@mediaone.net, signed by "Bob," to a list of recipients dated February 18, 2002, as introduced as Exhibit 3 at the Hubert Deposition and authenticated by Mr. Hubert at pages 29-30 of his deposition transcript, which is attached hereto as Exhibit A.

13.     Attached as Exhibit J are two true and accurate copies of a Contingent Fee Agreement between William Trainor and Dwyer & Collora, LLP, dated March 2, 2005.  The first copy, bates-labeled TRN 001-02, was produced by Plaintiffs and introduced as Exhibit 2 at the Trainor Deposition.   Mr. Trainor authenticated Exhibit J at pages 35-36 of his deposition transcript, which is attached hereto as Exhibit G.  The second copy, bates-labeled TRN 003-04, is a fully-executed copy of the same agreement that was produced by Plaintiffs after the Trainor Deposition.

3

14.     Attached as Exhibit K is a true and accurate copy of excerpts from the deposition transcript of Michael P. Hubert in *Grossman v. Medical Information Technology, Inc. et al*., No. 03-1872-BLS2 (Mass. Super.), conducted on July 14, 2006 ("Hubert State Court Depo."). For the Court's convenience, I used Adobe Acrobat software to insert a box around the relevant text that is referenced in Defendants' Opposition brief.

15.     Attached as Exhibit L is a true and accurate copy of a letter from Michael P. Hubert to Barbara A. Manzolillo dated September 7, 2004, as introduced as Exhibit 9 at the Hubert Deposition and authenticated by Mr. Hubert at pages 91-92 of his deposition transcript, which is attached hereto as Exhibit A. For the Court's convenience, I used Adobe Acrobat software to insert a box around the relevant text that is referenced in Defendants' Opposition brief.

16.     Attached as Exhibit M is a true and accurate print-out of a website entitled "Now Anybody can own MEDITECH stock. Guaranteed," accessible at www.MEDITECHstock.com, which was introduced as Exhibit 17 at the Hubert Deposition and authenticated by Mr. Hubert at pages 142-43 of his deposition transcript, which is attached hereto as Exhibit A. For the Court's convenience, I used Adobe Acrobat software to insert a box around the relevant text that is referenced in Defendants' Opposition brief.

17.     Attached as Exhibit N is a true and accurate copy of the Summary Plan Description of the Medical Information Technology, Inc. Profit Sharing Plan, dated August 1, 1983, as produced by Plaintiffs in this action.

18.     Attached as Exhibit O is a true and accurate copy of a printout from a website entitled "Fortune 5 Hundred Ranked By Performance," which was introduced as Exhibit 12 at

the Hubert Deposition and authenticated by Mr. Hubert at pages 124-25 of his deposition transcript, which is attached hereto as Exhibit A.

19.    Attached as Exhibit P is a true and accurate copy of a printout from a website entitled "Who Owns SAIC Stock," which was introduced as Exhibit 13 at the Hubert Deposition and authenticated by Mr. Hubert at pages 126-27 of his deposition transcript, which is attached hereto as Exhibit A.

20.    Attached as Exhibit Q is a true and accurate copy of a printout from a website entitled "Turning Employees Into Stakeholders," which was introduced as Exhibit 14 at the Hubert Deposition and authenticated by Mr. Hubert at pages 128-29 of his deposition transcript, which is attached hereto as Exhibit A.

21.    Attached as Exhibit R is a true and accurate copy of a printout from the Meditech intranet entitled "MEDITECH Financial History," which was introduced as Exhibit 15 at the Hubert Deposition and authenticated by Mr. Hubert at page 131 of his deposition transcript, which is attached hereto as Exhibit A.

22.    Attached as Exhibit S is a true and accurate copy of Plaintiffs' Responses to Defendants' First Set of Interrogatories.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 15, 2006.


/s/  Michael P. Sugrue
Michael P. Sugrue



ORIGINAL

1

Volume 1, Pages 1-240, Exhibits: 1-35

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL P. HUBERT, et al.,

             Plaintiffs

vs.                          Docket No. 05-10269-RWZ

MEDICAL INFORMATION TECHNOLOGY

PROFIT SHARING PLAN, MEDICAL

INFORMATION TECHNOLOGY, INC., and

A. NEIL PAPPALARDO

            Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF MICHAEL P. HUBERT

Wednesday, July 26, 2006, 10:11 a.m.

Goodwin Procter LLP

53 State Street - 17th Floor

Boston, Massachusetts

- - - - - - -Reporter:  Alan H. Brock, RDR, CRR- - - - - - -

abrock@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

2

```
 1   APPEARANCES:

 2        Dwyer & Collora, LLP

 3        Michael A. Collora, Esq.

 4        600 Atlantic Avenue

 5        Boston, Massachusetts 02210-2211

 6        617.371.1000  fax: 617.371.1037

 7        mcollora@dwyercollora.com

 8        for Plaintiffs

 9

10        Goodwin Procter LLP

11        Stephen D. Poss, Esq.

12        Michael P. Sugrue, Esq.

13        53  State Street, Exchange Place

14        Boston, Massachusetts 02109

15        617.750.1000  fax: 617.523.1231

16        sposs@goodwinprocter.com

17        msugrue@goodwinprocter.com

18        for Defendants

19

20   ALSO PRESENT:

21        Adam Cook, Videograph, National Video Reporters

22

23

24
```

FARMER ARSENAULT BROCK LLC

3

1        July 26, 2006    10:11 a.m.

2        P R O C E E D I N G S

3        (Exhibits MH 1 and MH 2 marked for

4    identification.)

10:11:39    5        THE VIDEOGRAPHER:  We are now recording

6    and on the record.  My name is Adam Cook.  I am a

7    Certified Legal Video Specialist for National Video

8    Reporters.  Our business address is 58 Batterymarch

9    Street, Suite 243, Boston, Massachusetts 02110.

10:12:04   10    Today is July 26th, 2006, and the time is 10:12 a.m.

11        This is the deposition of Michael P.

12    Hubert in the matter of Michael P. Hubert, William

13    Trainor, and David Hinchliffe, individually and on

14    behalf of all persons similarly situated, versus

10:12:28   15    Medical Information Technology Profit Sharing Plan,

16    Medical Information Technology, Inc., and A. Neil

17    Pappalardo, in the United States District Court for

18    the District of Massachusetts, No. 05-10269-RWZ.

19        This deposition is being taken at 53

10:12:50   20    State Street, Boston, Massachusetts, on behalf of

21    the defendant.  The court reporter is Alan Brock, of

22    Farmer Arsenault Brock.

23        Counsel will state their appearances,

24    and the court reporter will administer the oath.

4

|  | |
|---|---|
| 1 | MR. POSS: Yes, good morning. My name |
| 2 | is Poss, and my associate, Michael Sugrue, is here |
| 3 | with me, both from Goodwin Procter, counsel for the |
| 4 | defendants. |
| 10:13:12  5 | MR. COLLORA: Michael Collora, counsel |
| 6 | for the plaintiffs. |
| 7 | THE WITNESS: And Michael Hubert, |
| 8 | plaintiff. |
| 9 | MICHAEL P. HUBERT, Sworn |
| 10:13:31  10 | MR. POSS: Before we start, Mr. Hubert, |
| 11 | just a few housekeeping issues for your lawyer. |
| 12 | Mike, in the last deposition we did we |
| 13 | had made a few simple stipulations -- one, that the |
| 14 | witness would read and sign the transcript within 30 |
| 10:13:50  15 | days or it would be deemed accurate; and second, |
| 16 | that objections were reserved except as to form. |
| 17 | Are those the same stipulations you would like |
| 18 | today? |
| 19 | MR. COLLORA: Those are fine. |
| 10:13:59  20 | MR. POSS: In addition, I realized this |
| 21 | morning that when Mr. Hubert was last deposed in the |
| 22 | Grossman litigation, all of his exhibit stickers |
| 23 | said Hubert No. 1, Hubert No. 2, et cetera. In |
| 24 | order to avoid confusion, what we're going to do is |

10

1    popped up was the proposed regulation to define

2    "adequate consideration."  So that's how it started.

3        Q.    And I take it you were interested in

4    adequate consideration and the Department of Labor

10:21:39    5    regulation that may concern adequate regulation

6    because of your interest in the value of MEDITECH

7    stock.

8        A.    Yes.

9        Q.    Mr. Hubert, let me ask you to turn to Page

10:21:53    10    4, the page that's stamped at the bottom HUB 472.

11        A.    Yes.

12        Q.    If we look at the upper right-hand corner

13    there, there's an entry.  Could you read that entry

14    for me, please.

10:22:08    15        A.    Upper right-hand --

16        Q.    I'm sorry, upper left-hand corner.

17        A.    It's dated October 2, 2002, and I made a

18    note that Grossman had told me that --

19             MR. COLLORA:  Well, do you want -- I

10:22:28    20    would ask the witness to focus on the question.  He

21    asked you to read it.  Then he may want to ask you

22    questions.

23             MR. POSS:  Thank you.

24        A.    Thank you.  "Grossman said payments to me

11

1    could result in countersuit."  Continue reading?

2         Q.    Yes, please.

3         A.    "Need to find way to work together but

4    without conspiring against company" -- "co" is

10:22:52  5    "company" -- "and not provide privileged

6    information.  Need way to make stock liquid.  No. 1,

7    law passed, adequate consideration.  2, law passed

8    limiting stock in trust.  3, CO," meaning "company,"

9    "or someone needs to buy trust stock at full value.

10:23:19  10    4, trust no longer buying stock.  5, if company buys

11    stock, $150 million assets go down in stock."

12    Sometimes I can't read my own writing.

13         Q.    It's a down arrow, is it not?

14         A.    It's probably a down arrow.  I'd have to

10:23:41  15    look at my original, but you're probably right.  So

16    the stock goes down.

17              "6, no money to protect employee salary.

18    Need detailed plan for trust.  7, company needs to

19    pay more cash to trust or not stock.  8, if not,

10:24:10  20    employees dissatisfied.  9, trust could" -- I'm not

21    sure what it says.  Sometimes I can't read my own

22    writing.  "Trust could not purchase," perhaps,

23    "purchase more stock or it would be in violation of

24    law.  10, since there is no market for trust and

12

```
 1   dividends cut in half, company would have to create
 2   market or sell company."  Then there's a plus sign.
 3   It could say "Gets sued by former employees."
```

```
 4          Q.   Could it --
 5          A.   I think it says "Neil."
 6          Q.   Does it say "Neil"?
 7          A.   I think it says "Neil."
 8          Q.   "Neil gets sued by former employees"?
 9          A.   Yes.
10          Q.   And there's a little star after the word
11   "suit"?
12          A.   A plus sign, I believe.  I'm sorry, a star
13   next to the word "suit."
14          Q.   This numbered list that you've read, 1
15   through 10, and then the statement after it that
16   says "company gets sued," what do these notes
17   reflect?
18          A.   Well, we'll start in the beginning.  I'm
19   sure you know I talked to Dr. Grossman about
20   somehow -- he was, of course, interested in getting
21   the stock independently valued, or perhaps valued at
22   a higher price.  I had approached him about working
23   together in some manner to pursue the same goals.  I
24   was interested in myself and fellow employees, and I
```

10:24:58  (line 5)
10:25:04  (line 10)
10:25:13  (line 15)
10:25:32  (line 20)

13

1    had suggested that this was a way we could work

2    together, but I couldn't do this and jeopardize my

3    financial future and my family.  And he had gotten

4    back to me saying there wasn't any way we could work

10:26:11    5    on any sort of arrangement because he could be

6    subject to a countersuit for actions or discussions

7    we might have had.  So that was pretty much the end

8    of the discussions.

9          But I wrote that there needed to be ways

10:26:31    10    for us to work together without conspiring against

11    the company, just simply working together for goals,

12    and I wrote these ideas down without discussions

13    with Dr. Grossman, without further transmittal of

14    information to Dr. Grossman.

10:26:51    15        Q.    Going up to the top of the page.

16        A.    Yes.

17        Q.    The first entry, where it says, "Grossman

18    called.  Payments to me would result in

19    countersuit."  The next paragraph reads, "Need to

10:27:03    20    find way to work together."  Do you see that?

21        A.    Yep.

22        Q.    Wasn't that Dr. Grossman speaking to you?

23        A.    I don't believe so.

24        Q.    "In a defined way"?

24

1  as privileged as the relationship is.  He is seeking

2  advice, he said, trying to get an opinion.  I think

3  his consultations are privileged.  Also, I don't

4  think it advances your case whatsoever.

10:41:47  5    Q.  Is that the basis for your not answering

6  these questions, Mr. Hubert?

7    A.  Yes, it is.

8    Q.  Thank you.  Aside from making phone calls

9  to attorneys, trying to retain an attorney, did you

10:42:06  10  use any other methods to try and find an attorney?

11    A.  I met in person with attorneys, in addition

12  to telephone calls.

13    Q.  Did you use any other methods?

14    A.  Correspondence.  Ask me what you want to

10:42:20  15  know.

16    Q.  I'm trying to find out what you remember

17  about how you embarked on this search for an

18  attorney.

19    A.  I searched the Yellow Pages.  I searched

10:42:28  20  the Internet.  When I would meet with an attorney,

21  they might suggest another attorney.

22    Q.  Did you send an anonymous email to a list

23  of attorneys?

24    A.  No, never.

FARMER ARSENAULT BROCK LLC

29

1   Department of Labor, about contacting them and

2   different lawyers, and it was a surprise to me that

3   I realized that it mentioned Dr. Grossman in this

4   document.

10:48:24  5        MR. POSS:  I'd ask the court reporter to

6   mark as Exhibit MH 3 a two-page document.  It's

7   dated February 18, 2002.

8        (Exhibit MH 3 marked for

9   identification.)

10:48:55 10   Q.   Mr. Hubert, please take a look at Exhibit

11  MH 3 and tell me whether you have ever seen this

12  before.

13  A.   Well, I stand mistaken.

14       MR. COLLORA:  The question is have you

10:49:36 15  seen it before.

16  A.   I agree; yes, I have.

17  Q.   What is Exhibit MH 3?

18  A.   This is a document from more than four

19  years ago that I sent to some attorneys interested

10:49:57 20  in a case against a Massachusetts employer.

21  Q.   So let's look at this exhibit.  At the top

22  it says "from, ERISA," and then in brackets "mailed

23  to erisa@mediaone.net."  What does that mean?

24  A.   "From ERISA, mailed to...."

30

| | | |
|---|---|---|
| | 1 | This is a document that -- |
| | 2 | Q.   It came from you, did it not? |
| | 3 | A.   It did come from me. |
| | 4 | Q.   And is erisa@mediaone.net an email address |
| 10:50:38 | 5 | you had set up? |
| | 6 | A.   It was an email address I set up a long |
| | 7 | time ago. |
| | 8 | Q.   When did you set that email address up? |
| | 9 | A.   I don't recall.  This is possibly the only |
| 10:50:47 | 10 | email that ever came out of that email address. |
| | 11 | Q.   Did you set up that email address to enable |
| | 12 | you to send emails without disclosing your identity? |
| | 13 | A.   Yes. |
| | 14 | Q.   Now, it says "sent Monday, February 18, |
| 10:51:06 | 15 | 2002, 3:01 a.m."  Do you see that? |
| | 16 | A.   Yes, I do. |
| | 17 | Q.   Is that when you sent this email? |
| | 18 | A.   Yes, apparently. |
| | 19 | Q.   And do you know approximately how long |
| 10:51:16 | 20 | before February 18, 2002, you set up the |
| | 21 | erisa@mediaone.net email address? |
| | 22 | A.   No, I don't. |
| | 23 | Q.   Do you have any records concerning setting |
| | 24 | up that address? |

FARMER ARSENAULT BROCK LLC

41

1      Q.    Why not?

2      A.    It never came to be a serious -- I never

3   got replies that resulted in serious further

4   discussions.

11:04:05   5      Q.    Now, it states here, quote, "If you wish

6   further information, please respond to this email."

7   Did you receive responses?

8      A.    I don't recall.  I don't recall.  I might

9   have gotten telephone calls.  I might have gotten

11:04:17   10   emails.

11      Q.    In connection with the request for

12   production of documents in this case, did you search

13   your email records to determine whether you had any

14   electronic mail messages responsive to this email or

11:04:32   15   otherwise requested by our document request?

16      A.    I've not used this account in years.  This

17   account was set up as an ERISA account.  It says

18   "ERISA" in the name.  It was, you know, closed out

19   or left ignored years ago.  I haven't signed on to

11:04:53   20   it, forgot it existed.  And I have no access to that

21   information right now.  I have no idea what the

22   password is.

23      Q.    The next sentence of your email reads,

24   quote, "Since I am still working at this firm" --

FARMER ARSENAULT BROCK LLC

54

1    distribution?

2        A.    Yes.

3        Q.    Did Mr. Collora or anyone from his firm

4    assist you, represent you, or advise you in

5    connection with that letter?

6        A.    No, they did not.

7        Q.    Did you seek legal advice from Mr. Collora

8    or anyone at his firm concerning that communication?

9        A.    No, I did not.

10            MR. POSS:  Do you want to take a break?

11            MR. COLLORA:  Yes.  Let's take five

12   minutes.

13            THE VIDEOGRAPHER:  The time is 11:21

14   a.m.  This is the end of Cassette No. 1.  We are off

15   the record.

16            (Recess taken.)

17            THE VIDEOGRAPHER:  The time is 11:29

18   a.m.  This is the beginning of Cassette No. 2 in the

19   deposition of Michael P. Hubert.  We are on the

20   record.

21       Q.    Mr. Hubert, I am going to ask the reporter

22   to mark as Exhibit MH 5 a document that is stamped

23   in very small letters, numbers, it looks like

24   JG 001684 through 1689.

FARMER ARSENAULT BROCK LLC

55

1          (Exhibit MH 5 marked for

2    identification.)

3          Q.   Mr. Hubert, if you will look at Exhibit MH

4    No. 5, you will see on the first page there is

11:29:57    5    another stamp that says "Hubert 1" on it.  This is a

6    document that was marked as Exhibit No. 1 in your

7    deposition in the Grossman litigation in July of

8    2005.  Do you recall that?

9          A.   Yes, I do.

11:30:11   10          Q.   I take it you've seen this document before?

11          A.   Yes, I have.

12          Q.   And you testified concerning this document

13    at your deposition last year?

14          A.   Yes, I did.

11:30:22   15          Q.   The email on the front, which is the first

16    page of Exhibit MH 5, is an email from you to Dr.

17    Jerry Grossman of October 1, 2002, is it not?

18          A.   Yes.

19          Q.   And the remainder of this exhibit is a

11:30:47   20    document that you -- or documents that you attached

21    to this email.  Is that also correct?

22          A.   Yes.

23          Q.   And in fact, if we look on the first page

24    of Exhibit MH 5, there's a little box under the line

66

1    A.    Yes.

2    Q.    And who else?

3    A.    Mr. David Guadagrol; I'm not sure how you

4  spell it.  Something like G-u-a-d-a-g-r-o-l, but

11:44:21    5  that spelling is probably wrong.

6    Q.    Now, Mr. Chase and Mr. Guadagrol at

7  Sullivan & Worcester, for what services did you pay

8  them?

9    A.    I paid them to listen to what I knew about

11:44:37    10  MEDITECH, to evaluate some papers that I had, and to

11  consider further pursuing this matter.

12    Q.    How much did you pay them?

13    A.    Approximately 250; I don't recall exactly.

14    Q.    $250, approximately?

11:44:55    15    A.    Yes.

16    Q.    And when did you do that?

17    A.    I don't remember.  2002 or 2003.

18    Q.    Was that before or after you sent this

19  proposal to Dr. Grossman that you obtained legal

11:45:14    20  advice from Sullivan & Worcester and paid them a

21  fee?

22    A.    I don't recall.

23         MR. POSS:  Now I will ask the reporter

24  to mark as Exhibit 6 a document stamped JG 1690

FARMER ARSENAULT BROCK LLC

67

1     through 1700.

2                    (Exhibit MH 6 marked for

3     identification.)

4         Q.    Mr. Hubert, if you'd look at what we've

11:46:12   5     marked as Exhibit 6, it is a document that you can

6     see was previously marked as Exhibit 2 to your

7     deposition in the Grossman litigation last July.  Is

8     the first page of Exhibit No. 6 an email, a copy of

9     an email message sent from you to Jerome Grossman on

11:46:32   10    or about November 26, 2002?

11        A.    Yes.

12        Q.    And this is following -- a message you sent

13    to Dr. Grossman following up on a meeting you had

14    with him?

11:46:49   15        A.    Yes.

16        Q.    And you recall that you were asked

17    questions about this in your deposition last year in

18    the Grossman litigation?

19        A.    Yes, I was.

11:46:56   20        Q.    Did you answer those questions truthfully?

21        A.    Yes, I did.

22        Q.    Now, if we look on the first page of this

23    exhibit, you can see three little numbered

24    paragraphs, and then there's a paragraph that starts

FARMER ARSENAULT BROCK LLC

91

1    A.   Then I choose not to answer that question

2  further.

3    Q.   Is that based on your attorney's

4  instruction?

12:22:36  5    A.   Yes, it is.

6    Q.   Mr. Hubert, the amended -- strike that.

7        MR. POSS:  Mr. Hubert, we will mark as

8  the next exhibit, which I believe is No. 9 -- am I

9  correct there --

12:24:22  10        (Discussion off the record.)

11        MR. POSS:  We're going to mark a

12  document that has been produced by Mr. Hubert's

13  counsel.  It's stamped HUB 238 and 239.  This will

14  be Exhibit MH No. 9.

12:24:39  15        (Exhibit MH 9 marked for

16  identification.)

17    Q.   Mr. Hubert, have you seen Exhibit No. 9

18  before?

19    A.   Yes, I have.

12:25:18  20    Q.   What is Exhibit No. 9?

21    A.   It is a letter I wrote to Barbara

22  Manzolillo on September 7, 2004.

23    Q.   Did you write this letter, Mr. Hubert?

24    A.   Yes, I did.

92

1      Q.   Did you discuss this letter with anyone

2   before you sent it to Ms. Manzolillo?

3      A.   No, I did not.

4      Q.   Did you review this letter with Mr. Collora

12:25:46   5   before you sent it to Ms. Manzolillo?

6      A.   No, I did not.

7      Q.   Why not?

8      A.   I had been fired some, you know, seven days

9   prior to that or ten days prior to that, and I

12:26:07   10   wanted to get this out in a timely manner.  And I

11   didn't -- you know, I had to write the letter in

12   order to get my funds.  I couldn't delay the

13   process.  And I, you know, didn't know that this

14   would be a matter of discussion with Mr. Collora.

12:26:31   15   Q.   Mr. Collora was your lawyer as of this

16   time, was he not?

17      A.   Yes, he was.

18           Well, we had not, again, signed papers

19   in that regards.  But yes.

12:26:44   20   Q.   After you were notified by MEDITECH that

21   your employment was being terminated --

22      A.   Yes.

23      Q.   -- and before you sent this letter dated

24   September 7, 2004, did you have any communications

FARMER ARSENAULT BROCK LLC

106

1    A.    It had no bearing on their involvement with

2    the case against MEDITECH.  I think that they had

3    adequate reason to be a plaintiff.

4    Q.    Do you believe that the other members of

01:36:21    5    the class that your amended complaint says exists

6    here should be informed of your proposal to Dr.

7    Grossman, so that they can decide whether they want

8    you to represent them in this case?

9    A.    I think it's irrelevant, and I don't think

01:36:37    10    it's appropriate to share that with others.

11    Q.    Do you have any objection to other members

12    of the class that you claim exists in this case

13    being informed of your proposal to Dr. Grossman so

14    that they can decide whether they want you

01:36:53    15    representing their interests?

16    MR. COLLORA:    Objection.  I'm going to

17    instruct the witness not to answer.  I think it's

18    irrelevant.

19    Q.    Will you answer the question, please?

01:37:02    20    MR. COLLORA:    I'm instructing him not to

21    answer.

22    A.    I will not answer the question.

23    Q.    So you won't tell me whether you object or

24    do not object to other members of the class being

107

1   shown your proposal to Dr. Grossman?

2            MR. COLLORA:  I think that's a legal

3   issue.

4        A.   I will not answer the question.

01:37:20  5        Q.   Do you believe that other members of the

6   class that you claim exists in this case would want

7   to know that the person who claims to represent them

8   offered to provide MEDITECH information to Dr.

9   Grossman in return for money while he was still

01:37:42  10   employed by MEDITECH?

11        A.   Do they have the what?  Can you repeat the

12   question, please?

13        Q.   Do you believe that other members of the

14   class that you claim exists in this case would want

01:37:51  15   to know that the person who claims to represent

16   their interests offered to provide MEDITECH

17   information to Dr. Grossman when he was suing the

18   company in return for money?

19        A.   I don't know.  I don't know what other

01:38:03  20   people want to know.

21        Q.   Would you want to know that if you were a

22   member of the class and someone was purporting to

23   represent you?

24        A.   I don't know.

FARMER ARSENAULT BROCK LLC

111

1    shareholders include every member of the trust.

2        Q.    If you'll turn to Page 14, Mr. Hubert, of

3    your amended complaint, and look at Paragraph 69.

4    If you could read Paragraph 69 to yourself.   I'm

01:43:44    5    going to ask you a question or two about it.   Just

6    let me know when you've had a chance to read it.

7        A.    Okay.

8             I've read it.

9        Q.    Mr. Hubert, the amended complaint says in

01:44:07   10    Paragraph 69 that, quote, "if employees were paid a

11    fair price for their assets in the plan, the plan

12    would have soon run out of cash," period, close

13    quote.   Do you believe that to be an accurate

14    statement?

01:44:20   15        A.    Yes.   It might not happen for that year,

16    but if it was done for a number of years and there

17    weren't other changes that were made in the

18    management of the plan, they would run out of cash.

19        Q.    Have you ever calculated or considered,

01:44:34   20    based on the values that you allege should have been

21    used for the MEDITECH stock in your complaint, when

22    the plan would have run out of cash?

23        A.    It would vary on when you entered the plan.

24    It would vary on when you valued the stock.   For

112

1   example, let's say -- I'm picking a very round

2   number -- if the stock was valued at $25 a share by

3   the company and in fact it was $50 a share -- and

4   I'm only using this for an example -- the people who

01:45:06   5   left the plan in a given year would receive almost

6   twice the amount of money that they had gotten in

7   fact.  And if they gave out twice as much money,

8   they would have the same number of shares, of

9   course, but they'd have fewer dollars.  And if the

01:45:20  10   contributions to the plan remained the same in terms

11   of stock and cash, they would run out of money in a

12   few years.

13       Q.   And when you said "if they gave out twice

14   as much money, they would have the same number of

01:45:39  15   shares, of course, but they'd have fewer dollars,"

16   by "they" you were referring to the plan; correct?

17       A.   Yes.

18           MR. COLLORA:  I'll take responsibility

19   for any misspellings.

01:45:56  20       Q.   If the plan ran out of cash, would the

21   company have any obligation to put more money or

22   stock into the plan?

23           MR. COLLORA:  Objection.  You can answer

24   if you can.

FARMER ARSENAULT BROCK LLC

113

1    A.   I don't know what the legal obligations

2  would be, but I would say from a business

3  standpoint, sure.  If the plan ran out of cash,

4  employees would expect their distributions, and they

01:46:25   5  would say, "Where is it going to come from?"  So the

6  plan, needing cash, would have to turn to the

7  company and ask for more money or the plan would

8  have to sell stock and raise cash to distribute to

9  employees.

01:46:37   10           I guess the other alternative is the

11  plan could give stock to the employees when they

12  left, as opposed to cash, and I don't think that

13  would settle well with employees.

14    Q.   Why not?

01:46:52   15    A.   People like to get money.  That's what they

16  always expected.  That's what had always been done.

17  I think it would be a disappointment for some people

18  to get stock instead of cash when they left.

19  There's -- that's all.

01:47:15   20    Q.   Does MEDITECH have any obligation to

21  contribute any stock or cash to the plan in any

22  year?

23    A.   No.

24           MR. COLLORA:  Objection, you may answer.

114

1       THE WITNESS:  I may answer?

2       A.   I think that they have no legal obligation

3    at all.  The plan is completely voluntary.

4    Everybody knows that.  But people also, having

01:47:36   5    worked at the company a number of years, have

6    certain expectations, or hopes, I should say, that

7    the money that's in the plan is going to increase

8    each year.  And that is a very firm benefit for

9    employees.  People know that if that money is not

01:47:54  10    put in the plan for them, or stock is not put in the

11    plan, they would have further incentive to decide to

12    work elsewhere.  It's just a common benefit for

13    employees.

14       Q.   Mr. Hubert, we've marked as Exhibit 10 to

01:48:36  15    your deposition a copy of plaintiffs' responses to

16    defendants' first set of interrogatories.  Let me

17    show that to you.  Mr. Hubert, have you seen Exhibit

18    MH 10 before?

19       A.   Yes.

01:48:56  20       Q.   When did you see it?

21       A.   I imagine soon after it was filed with the

22    courthouse.  I either got a copy from Mr. Collora or

23    I've got a password to get this directly from the

24    courthouse.  I probably got it from Mr. Collora.

FARMER ARSENAULT BROCK LLC

121

1    to administration and asked about how the valuation

2    of the stock occurred.

3                 Now, prior to that --

4                 MR. COLLORA:  Prior to what?  Just so

02:01:12    5    you're --

6                 THE WITNESS:  I'm sorry.

7         A.    Prior to partnering with SAIC, we used to

8    get every year a spreadsheet showing the company's

9    performance financially.  It would show the gross

02:01:24    10   sales, the profits.  It would show the fair market

11   value.  They used to call it fair market value.

12   They don't call it that nowadays.  They use some

13   other term.  But they used to also have the

14   price/earnings ratio every year provided on the

02:01:41    15   spreadsheet.  And every year the price/earnings

16   ratio for the stock was almost always right around

17   8.5.  Word of mouth was, well, they use that

18   price/earnings ratio to help set the value of the

19   stock.  It never came from the administration, and I

02:02:00    20   never questioned the administration about it, other

21   than that one time with Mr. Messing.

22        Q.    When did you first look at the SAIC formula

23   and plug in the MEDITECH numbers?

24        A.    I don't know.  I'd say '98, '99.  But I

FARMER ARSENAULT BROCK LLC

122

1    don't know.

2        Q.   When did you first compare the price/

3    earnings ratio of MEDITECH to other companies?

4        A.   Oh, I don't know.  I'm going to say 20

02:02:48    5    years ago.

6                MR. POSS:  We'll ask the reporter to

7    mark as the next exhibit, No. 11, a document stamped

8    HUB 491 through 5026789.

9                (Exhibit MH 11 marked for

02:04:00    10   identification.)

11       Q.   Mr. Hubert, we've placed before you Exhibit

12   No. 11.  It's a document produced by you.  Can you

13   tell me what this exhibit is?

14       A.   This is a document that I printed out from

02:04:11    15   a Web page called fed.org.  It is a case study about

16   SAIC, and it talks a little bit about how they value

17   the stock.

18       Q.   And are these various notes -- are these

19   various notes on this document yours?

02:04:37    20       A.   Yes, they are.

21       Q.   If you look at the page stamped HUB 498.

22       A.   Yes.

23       Q.   There are some calculations kind of toward

24   the lower right third of the page.

124

1   number is low.  If that number uses post-tax profits

2   as opposed to pretax profits, the number could be

3   significantly higher.

4       Q.    And again this handwriting, where it says,

02:07:00   5   "10.3 plus 24 equals 34.3, or 32 more than 26 set by

6   MEDITECH," that's your handwriting; is that correct?

7       A.    Yes, it is.

8       Q.    And you were saying 32 percent more than

9   the 26 dollars per share which is the value set by

02:07:20   10   MEDITECH?

11       A.    Yes.

12           MR. POSS:  Mr. Hubert, I'll ask the

13   reporter to mark as the next exhibit, No. 12, a

14   document stamped HUB 489.

02:08:11   15           (Exhibit MH 12 marked for

16   identification.)

17       Q.    Mr. Hubert, what is Exhibit No. 12?

18       A.    This is a copy of a report in Fortune

19   Magazine, and it lists various companies and how

02:08:48   20   they ranked in terms of revenue, assets, and

21   shareholder equity.

22       Q.    And this is from the Fortune of April 27,

23   1998; is that correct?

24       A.    Yes, it is.

125

1    Q.    Is the handwriting on this document yours?

2    A.    Yes, it is.

3    Q.    Is this something you looked at in or about

4    the year 1998?

02:09:14    5    A.    It could have been '99.  This report comes

6    out once a year, and I probably -- I might have

7    gotten the most current Fortune 500 document.  It

8    could have been '99.  No later than that.

9    Q.    Why did you make a notation on this

02:09:32    10    document?

11    A.    Well, I was interested -- I'm a

12    salesperson, or sales manager, and I'm always

13    interested in knowing how MEDITECH ranks in the

14    world and how we compare to other vendors.  And

02:09:46    15    sometimes I might use this information for my own

16    benefit.  Sometimes I'd use this information that I

17    might use to present to a customer, to say we're a

18    successful, viable company.  People always question

19    should they buy products from a small company like

02:10:01    20    MEDITECH compared to our much larger competitors.

21    And I thought it would be an interesting thing to go

22    and see how MEDITECH compares against other

23    companies in terms of their profits, assets, and

24    shareholder equity.  That's it.

126

1    Q.   Did you keep this document in a file or

2    folder or some other method, such that you still

3    have it from 1998?

4    A.   Yes.

02:10:28    5    Q.   And what file or folder was that?

6    A.   Just in my desk, with all my MEDITECH, you

7    know, stock reports and things.

8    Q.   Now, 1998 was the time frame you've

9    testified you believe you first started using the

02:10:45    10   SAIC formula to compare the MEDITECH stock valuation

11   as well; is that correct?

12   A.   No, I don't think I said '98.  Sometime --

13   it could have been later than that.  It could have

14   been '99.  It could have been 2000.  I don't know

02:10:59    15   exactly when.  I don't know when I started doing

16   that.

17        MR. POSS:  Let me ask the reporter to

18   mark as Exhibit No. 13 a document stamped HUB 516.

19        (Exhibit MH 13 marked for

02:11:50    20   identification.)

21   Q.   This is from your files, Mr. Hubert, is it

22   not?

23   A.   Yes, it is.

24   Q.   And this is a document that you printed out

127

| | |
|---|---|
| 1 | in April of 1998? |
| 2 | A.   Yes.  Well -- yes. |

3     Q.   Does this refresh your recollection as to

4 this being the time frame when you started looking

02:12:10   5 at the SAIC formula and plugging in MEDITECH's

6 numbers?

7     A.   Not necessarily.  This is probably when

8 MEDITECH was first looking to build its relationship

9 with SAIC.  It was sometime after that that I

02:12:29  10 started plugging the numbers in the formula; I don't

11 even remember when.

12     Q.   Why do you say that it's sometime after

13 April 21 of 1998 that you started plugging the

14 numbers into the formula?

02:12:42  15     A.   Well, that's the date printed on the

16 document.  I don't know -- I can't imagine it doing

17 sooner than that, because this is probably when I

18 first found out about SAIC.

19     Q.   What makes you think that April 21, 1998,

02:13:01  20 is when you first found out about SAIC?

21     A.   Because when I went to their Web page, I

22 thought, "Gee, this is interesting information," and

23 I printed it out, because what you see today might

24 not be there next week or next month, and I thought

128

1    I might like to know about SAIC and save this

2    information.  I thought it was interesting about

3    SAIC and being a private company like MEDITECH.

4        Q.   Is April 21, 1998, the first time you ever

02:13:34    5    printed out anything about SAIC?

6        A.   I don't know.  I don't know.  I really

7    don't know.

8        Q.   And do you know whether you first started

9    putting the MEDITECH numbers into the SAIC formula

02:13:58    10    before or after April 21 of 1998?

11        A.   I don't know.  It was a long time ago.  I

12    might not have found the formula for some time

13    afterwards.  I don't know.

14                MR. POSS:  Let me ask the reporter to

02:14:25    15    mark as the next exhibit, No. 14, a document stamped

16    HUB 503 through 506.

17                (Exhibit MH 14 marked for

18    identification.)

19        Q.   Mr. Hubert, Exhibit No. 14 comes from your

02:15:10    20    files; is that correct?

21        A.   Yes, it does.

22        Q.   And what is Exhibit No. 14?

23        A.   Exhibit 14 is an article from Forbes

24    magazine, and it's from a listing of the biggest

129

```
 1   private companies and talks about -- it's titled
 2   Turning Employees Into Stakeholders.  It talks about
 3   SAIC specifically.
 4       Q.   And Exhibit No. 14 is a document that you
 5   printed out on April 21, 1998; is that correct?
 6       A.   Yes, it is.
 7       Q.   Now, if we look at the page stamped HUB
 8   504.
 9       A.   Yes.
10       Q.   The bottom paragraph in that page starts,
11   quote, "The SAIC board sets its company's stock
12   price four times a year, using a formula based on
13   net income, shares outstanding, and a 'market
14   factor' monitored by investment bank Houlihan Lokey
15   Howard & Zukin."  We're continuing now at the top of
16   the page stamped HUB 505.  And it continues, quote,
17   "The market factor values the stock at a multiple
18   consistent with publicly traded peers, such as
19   Computer Sciences and Electronic Data Systems,"
20   close quote.  Do you see that?
21       A.   Yes, I did.
22       Q.   You've drawn a little bracket in the left
23   margin at some of that information; is that correct?
24       A.   Yes, I do.
```

131

1    reporter mark as Exhibit 15 a document stamped HUB

2    475.

3                        (Exhibit MH 15 marked for

4    identification.)

02:18:49    5                        (Discussion off the record.)

6        Q.    Mr. Hubert, Exhibit 15 comes from your

7    files; isn't that correct?

8        A.    Yes, it does.

9        Q.    And this is a document that was printed out

02:19:05    10   by you on April 21, 1998; correct?

11       A.    Yes, it is.

12       Q.    And that's the same date as you printed out

13   some of the information about SAIC that we've been

14   hooking at; is that correct?

02:19:14    15       A.    Yes, it is.

16       Q.    And is this your handwriting?

17       A.    Yes, it is.

18       Q.    And does this document show you calculating

19   P/E ratios for MEDITECH on or about April 21, 1998?

02:19:30    20       A.    It could have been weeks, months,

21   afterwards.  But yes.

22       Q.    Certainly during that time frame of 1998;

23   isn't that correct?

24       A.    Yes, it is.

FARMER ARSENAULT BROCK LLC

138

1      A.   Yes, I have.

2      Q.   Has anyone offered to purchase your

3   MEDITECH stock?

4      A.   Yes, they have.

02:28:36   5      Q.   Why don't you tell me what offers you have

6   received to purchase your stock.

7      A.   I've had two informal offers.  One was from

8   a MEDITECH employee who asked to buy all my stock --

9            I'm sorry, I was only offering 500

02:28:57  10   shares.  They asked to buy all 500 shares at $32 a

11   share.

12      Q.   When was that?

13      A.   February of this year.

14      Q.   February of 2006?

02:29:13  15      A.   Yes.

16      Q.   And did you sell that person 500 shares of

17   your stock at $32 a share?

18      A.   No.  I told them I thought it was worth

19   more, and we had a verbal agreement on Friday

02:29:32  20   evening that they were going to buy the stock, 250

21   shares, at $42 a share.  And I had a firm

22   commitment, no qualifications, to purchase the stock

23   on Friday night.

24      Q.   And that was from this person who made a

139

1    firm commitment to you with no qualifications on

2    that Friday night to purchase 250 shares of your

3    MEDITECH stock at $42 a share?

4        A.    Exactly.

02:30:09    5        Q.    And then what happened?

6        A.    On Saturday they called me and said, "Gee,

7    I really still want to buy the stock, but I'm going

8    to go to the office and make sure that it's okay,

9    I'm not breaking any rules."  And I knew right then

02:30:24    10   and there I wasn't going to make the sale, because

11   once they went in back and talked to anybody at

12   MEDITECH, I would think that they would perhaps be

13   discouraged from purchasing the stock from me at

14   that price.  As it was, I never got a call back, and

02:30:47    15   I never pursued it.

16       Q.    Now, this agreement to sell 250 shares of

17   your MEDITECH stock at $42, was that also in

18   February of 2006?

19       A.    Everything happened in February of 2006.

02:30:58    20       Q.    So you said you had two informal offers.

21   Is this one of those two offers?

22       A.    I'm sorry.  The other offer was --

23       Q.    I don't want to go to the other offer yet.

24   You've told me you received two informal offers to

FARMER ARSENAULT BROCK LLC

142

1    February of 2006, has anyone else made any offers to
2    purchase your MEDITECH stock?
3         A.   No, they did not.
4         Q.   What have you done to try to sell your
02:33:04    5    MEDITECH stock?
6         A.   I have placed 500 sales for share on a Web
7    page called meditechstock.com.
8         Q.   Do you think it's appropriate to apply a
9    discount when one values private companies' stock as
02:33:49    10   opposed to publicly traded stock?
11              MR. COLLORA:   Objection.   You may
12   answer.
13        A.   In some cases, yes.
14        Q.   When did you create your website,
02:34:06    15   meditechstock.com?
16        A.   Around January of this year, maybe December
17   of last year.   But it was within that window of 60
18   days or so.
19        Q.   So somewhere in the December 2005 to
02:34:17    20   January 2006 time frame?
21        A.   To February.
22        Q.   To February 2006?
23        A.   Yeah.   It could have been any of those
24   three months.

143

1    Q.   Did you create the content on the website

2  yourself?

3    A.   Yes, I did.

4    Q.   And why did you create the website?

02:34:28   5    A.   Because I wanted to sell my stock.

6         MR. POSS:   I ask the reporter to mark as

7  the next exhibit, No. 17.

8         (Exhibit MH 17 marked for

9  identification.)

02:35:37  10    Q.   Mr. Hubert, we've printed this off of your

11  website.

12    A.   Thank you for visiting.

13    Q.   Would you just take a look at it and verify

14  that this is in fact the content that has been up on

02:35:52  15  your website, meditechstock.com?

16    A.   It looks accurate.

17    Q.   Now, if we look at the second page of this

18  exhibit, there's a page headed Stock Valuation.

19    A.   Yes.

02:36:19  20    Q.   Who wrote the information on this page?

21    A.   I did.

22    Q.   The next page, the page that has the words

23  "MEDITECH is a money machine," did you write the

24  words on that page?

FARMER ARSENAULT BROCK LLC

146

1    asked to attend a meeting with Neil Pappalardo,

2    chairman of the board, in regards to our money in

3    the profit sharing plan.  Now, we knew it was

4    coming.

02:48:14    5              MR. COLLORA:  Just --

6              THE WITNESS:  Keep to the facts.

7              MR. COLLORA:  Yes.

8              THE WITNESS:  Okay.

9         A.   At that meeting we met with Neil Pappalardo

02:48:27    10   and Barbara Manzolillo.  We were the seven or eight

11   employees who at that year whose funds in the trust

12   were going to exceed a million dollars, given the

13   assessment of the stock at the end of the year.  So

14   it was known in November what the value of the stock

02:48:55    15   was going to be in December for determining the

16   valuation of the stock contributed to the plan, and

17   it was determined ahead of time what our balance was

18   going to be, and we were asked to remove funds in

19   excess of a million dollars into our personal

02:49:20    20   IRAs -- if we hadn't one already, to set one up --

21   so that we could do this in anticipation of the

22   rollover come March 1st.

23        Q.   Who asked you to do this?

24        A.   Neil Pappalardo.

FARMER ARSENAULT BROCK LLC

147

1    Q.    And what did he say to you in that regard?

2    A.    He said that the value of the stock was

3    going to be X number of dollars, that we're each now

4    going to have more than a million dollars in the

02:49:48    5    trust, and that he went around the room and told

6    everybody to the dollar how much money they would

7    have in the trust at the end of the year and how

8    many dollars they should roll over into a personal

9    IRA account so that we would all have a million

02:50:05    10    dollars in the trust at the end of the year, with

11    expectation that we would do this in future years,

12    just as other employees had done in prior years.

13         He was doing this because he said that

14    he wanted us to get accustomed to managing our own

02:50:23    15    funds, so that in the event that we were to leave

16    MEDITECH at some time, had he not done this, we

17    might someday be leaving with $2 million or some

18    larger amount and not be equipped to manage it.  So

19    this way we would be managing a small amount of the

02:50:42    20    money in preparation for the day when we would later

21    be managing a larger amount of money.

22    Q.    What else, if anything, did Mr. Pappalardo

23    say at that meeting?

24    A.    Well, people asked about why the stock was

148

1   going so much -- increasing so much in value.  Not

2   myself, but someone else, I don't recall, asked why

3   was it the stock was going up so much, because some

4   of them, including myself, didn't anticipate

02:51:11   5   necessarily being at that meeting that year, maybe

6   the following meeting.  And he explained, well, this

7   was a one-time adjustment.  Even though the numbers

8   wouldn't ordinarily support this increase in stock,

9   given the increase in assets and earnings, it was

02:51:32   10   thought that they would increase the stock as a

11   one-time adjustment and not to expect the value of

12   the stock to increase so much in subsequent years.

13            There was some discussion about that.

14   There was some discussions about other matters.  I

02:51:50   15   believe someone asked why so much money was being

16   used for dividends.  But in the end, when the

17   questions were all done and no one else asked -- and

18   until that point it really had become an imperative.

19   It was expected that we were all going to roll our

02:52:05   20   funds over into our personal IRAs.  I'd been

21   thinking the whole time, this is very unusual, this

22   is really not what I wanted to do.  I frankly didn't

23   want to do it.  And I asked Neil, I said, "Neil, do

24   we really and truly have to do this?  Do we have to

149

1    roll over the funds, as you've asked us to?" And

2    his answer was, "Well, I can't make you do it," but

3    words to the effect that he really thought it would

4    be best if we rolled over the funds as he directed.

5            And, of course, it was one of those

6    questions that no one else would ask, but I asked.

7    And I thought it was inappropriate, but --

8        Q.   He didn't use the word "directed," did he?

9        A.   I don't know what word he used, but the

10   message was extremely clear.  I can't say what word

11   he used.  But we were effectively told to.  There

12   was no question that there was any alternative but

13   to put the money in excess of a million dollars into

14   a trust.  If he didn't use the word "directed," I

15   don't know what he used.  But it was very clear that

16   it was expected of you and only did any alternative

17   even remotely come across the discussions, when I

18   asked the question, the last question, because I was

19   hoping someone else would, or he would volunteer we

20   didn't have to do it -- only then did I ask, "Do we

21   really have to do it," and only then did he say,

22   "Well, I can't make you."  He didn't really say we

23   had a choice.  His words were, "I can't make you do

24   this."  But I interpreted that to be I really ought

02:52:41 (line 5)
02:52:59 (line 10)
02:53:22 (line 15)
02:53:40 (line 20)

150

1    to do it.

2        Q.   Why didn't you want to take this

3    distribution from the trust?

4        A.   Because I knew the trust was going up

02:54:04  5    about, I'll say, a round number, 20 percent per

6    year, and I knew as well as anybody possibly could

7    that the trust was going to go up another 20 percent

8    the coming year, and it did.  And I took that money

9    out, and I felt as though I was effectively giving

02:54:22  10   money away because I was having to take my money out

11   of the trust and put it into something else that was

12   not going to earn me a 20 percent return on my

13   money.

14       Q.   Why didn't you just find another investment

02:54:34  15   that was better than MEDITECH stock?

16       A.   I don't know any.

17       Q.   What do you mean when you say you don't

18   know any?

19       A.   If I were asked today to find an investment

02:54:49  20   that's going to give me better than 20 percent

21   return, with 99 percent assuredness, I couldn't do

22   it.  I can't do it now, I couldn't do it then, and I

23   can't imagine anybody can do that.  My money should

24   have stayed in the MEDITECH account.  And while I

151

1    don't know where other people put their money, I

2    think that the MEDITECH investment would have been

3    far better.  I think that the stock has been going

4    up each year.  I think there's a lot of pressure to

02:55:21    5    make the stock go up.

6    Again, I knew the backlog.  I worked in

7    sales.  I knew I can't get delivery dates for

8    products because everything is sold for next year,

9    probably.  I know the product is going to go out.  I

02:55:36    10    know the money is going to come in.  I knew as well

11    as anybody could the stock is going to go up, and I

12    would get a 20 percent return on my money, or close

13    to that.  I don't know exactly.  But I knew I was

14    going to do very, very well.  That's why I have the

02:55:52    15    million dollars in there.  It was a good investment.

16    Q.    Now, this $1,039,086.04 that you had as of

17    December 31, 2003, as the vested portion of your

18    account balance in the MEDITECH Profit Sharing

19    Trust, how much did you pay for that?

02:56:09    20    A.    Zero.

21    MR. POSS:  Mark the next exhibit,

22    No. 19, I believe, a document stamped HUB 249.

23    (Exhibit MH 19 marked for

24    identification.)

166

1    refer to on the first page?

2        A.   Yes.

3        Q.   Now, there's Paragraph 1, 2, 3, 4, 5.

4    Let's go down to Paragraph 5.  There's two

03:17:48  5    paragraphs in Paragraph 5, and if we look at the

6    second one --

7        A.   Yes.

8        Q.   It says, quote, "The MEDITECH plan has few

9    guarantees.  For example, if cash is not available

03:17:59  10   for distribution, the plan can delay distributions

11   up to three years and distribute stock instead of

12   cash, if necessary," period, close quote.  And you

13   wrote that?

14       A.   Yes, I did.

03:18:08  15       Q.   And how did you know that?

16       A.   It's in the summary.

17       Q.   It's in the plan description summary that

18   you produced from your files; correct?

19       A.   Yes.

03:18:19  20       Q.   And that's actually the statement on

21   stamped page HUB 009 that you put a little bracket

22   around.

23       A.   Yes.

24       Q.   So you were familiar with this portion of

FARMER ARSENAULT BROCK LLC

167

```
 1   the summary plan description in 2002 when you wrote

 2   your email to Dr. Grossman.

 3       A.   Yes.
```

```
 4       Q.   Going back to Exhibit 20, the summary plan

 5   description that you provided to us:  On Page 8

 6   there's a section called Claims Procedure.

 7       A.   Yes.

 8       Q.   That continues on to Page 9.  Did you read

 9   this carefully, Mr. Hubert, when you were an

10   employee of the company?

11       A.   Probably not.

12       Q.   And did you take this to your lawyer,

13   Mr. Collora, when you found you were being

14   terminated from the company and ask him to advise

15   you how to comply with this procedure?

16       A.   No, I did not.

17       Q.   If we look at Roman numeral No. 9, your

18   rights under ERISA.

19       A.   Yes.

20       Q.   It says here that you have a right to

21   examine without charge at the plan administrator's

22   office all plan documents.  Do you see that?

23       A.   Yes.

24       Q.   And then it also says you can obtain copies
```

03:18:40 (line 5)
03:19:01 (line 10)
03:19:16 (line 15)
03:19:25 (line 20)

168

| | |
|---|---|
| 1 | if you want to pay a reasonable charge. |
| 2 | A.  Sure. |
| 3 | Q.  Did you ask to examine without charge at |
| 4 | the plan administrator's office all plan documents |
| 03:19:49  5 | and copies of documents filed with the U.S. |
| 6 | Department of Labor concerning the plan? |
| 7 | A.  I asked for a copy of the report, of the |
| 8 | plan. |
| 9 | Q.  You did not ask to examine the plan without |
| 03:19:59 10 | charge at the administrator's office, did you? |
| 11 | A.  No, I did not. |
| 12 | Q.  And on the last page of this exhibit, |
| 13 | stamped HUB 12, Page 10, did you review any of this |
| 14 | material carefully while you were an employee of the |
| 03:20:28 15 | company? |
| 16 | A.  Some, maybe not all. |
| 17 | Q.  Well, do you remember reviewing any of it |
| 18 | while you were an employee, anything on Page 10, |
| 19 | Mr. Hubert? |
| 03:20:36 20 | A.  No, I do not. |
| 21 | Q.  Going back to your letter to Ms. |
| 22 | Manzolillo. |
| 23 | A.  Yes. |
| 24 | Q.  Did you say anywhere in that letter that |

FARMER ARSENAULT BROCK LLC

169

1    the stock was worth $74 a share?

2        A.    Can you tell me what exhibit that is?

3        Q.    Let's figure that out.  Let's find it for

4    you.  It's in here somewhere.

5                MR. COLLORA:    Exhibit 9.

03:21:32

6        Q.    Do you see anywhere in that letter where

7    you state that the stock is worth $74 a share?

8        A.    Did you say 74?  Is that what I'm looking

9    for?

03:22:50

10       Q.    Yes.  Did you say anywhere in that letter

11   that you believed the company owed you 74 bucks a

12   share for your stock?

13       A.    No, of course not.

14       Q.    Why not?

15       A.    Where did you get 74?

03:22:58

16       Q.    Do you believe the MEDITECH stock in 2004

17   was worth $74 a share?

18       A.    I don't know what it's worth.

19       Q.    Who is John Roy?

20       A.    John Roy is a regional sales director at

03:24:04

21   MEDITECH.

22       Q.    And what communications have you had with

23   Mr. Roy about methods for valuing corporations?

24       A.    Back maybe around 2000 I had told him that

# Ex. B

# Document Sealed

# Ex. C

# Document Sealed

# Ex. D

# Document Sealed





MEDICAL INFORMATION TECHNOLOGY, INC.

PROFIT SHARING PLAN

Amended and Restated Trust Agreement

(As of January 1, 1998)

CONFIDENTIAL–SUBJECT TO
PROTECTIVE ORDER
M 0003588

DEF000084
Confidential-Subject
to Protective Order

## TABLE OF CONTENTS

**ARTICLE I**

The Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.01 Creation of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.02 Interpretation of Trust Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**ARTICLE II**

Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.01 "Affiliated Company" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.02 "Agreement" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.03 "Anniversary Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.04 "Beneficiary" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.05 "Board of Directors" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.06 "Break in Service" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.07 "Common Stock" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.08 "Company" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.09 "Compensation" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.10 "Effective Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.11 "Employee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.12 "Employment Commencement Date" . . . . . . . . . . . . . . . . . . . . . . . . 5
2.13 "Hour of Service" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.14 "Member" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.15 "Plan" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.16 "Plan Year" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.17 "Reemployment Commencement Date" . . . . . . . . . . . . . . . . . . . . . . 6
2.18 "Service" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.19 "Trust" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.20 "Trustee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.21 "Valuation Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**ARTICLE III**

Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.01 Eligibility for Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.02 Determination of Eligibility by Trustee . . . . . . . . . . . . . . . . . . . . . . . 7
3.03 Duration of Active Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.04 Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.05 Military Leaves of Absence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
3.06 USERRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

i

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003581

DEF000085
Confidential-Subject
to Protective Order

ARTICLE IV

Contributions under the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.01 Company Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.02 Determination of Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.03 Payment of Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.04 Reversion of Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.05 Members' Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE V

Members' Accounts;
Allocation of Assets and Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5.01 Members' Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5.02 Compensation Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5.03 Allocation of Contributions and Forfeitures. . . . . . . . . . . . . . . . . . . . . 12
5.04 Valuation of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
5.05 Allocation of Trust Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
5.06 Distributions and Forfeitures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
5.07 Limitations on Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
5.08 Sources of Forfeiture Restorations . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE VI

Payments to or for the Accounts of
Members or Terminated Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.01 Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.02 Disability Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.03 Death Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
6.04 Termination of Employment Prior to Retirement, Disability, or Death . . . . . 19
6.05 Reemployment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
6.06 Manner and Timing of Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . 22
6.07 Additional Restrictions on Distributions . . . . . . . . . . . . . . . . . . . . . . . 24
6.08 Discharge of Trustee's Obligation to Make Payments . . . . . . . . . . . . . . . 26
6.09 Investment of Segregated Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
6.10 Loans to Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
6.11 Direct Rollovers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
6.12 In-Service Withdrawals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE VII

Amendment and Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
7.01 Right to Amend or Terminate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
7.02 Amendment for Tax Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
7.03 Liquidation of Trust in Event of Termination . . . . . . . . . . . . . . . . . . . . 33
7.04 Termination of Plan and Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ii

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003582

DEF000086
Confidential-Subject
to Protective Order

**ARTICLE VIII**

Rights and Duties of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
8.01  Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
8.02  Powers of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
8.03  Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
8.04  Method of Purchasing, Holding and Selling Securities . . . . . . . . . . . . . . . . 36
8.05  Exercise of Voting Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
8.06  Power to Borrow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
8.07  Reliance on Trustee as Owner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
8.08  Liquidation of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
8.09  Evidence on which Trustee may Act . . . . . . . . . . . . . . . . . . . . . . . . . . 37
8.10  Action by Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
8.11  Discretionary Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
8.12  Employment of Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
8.13  Records and Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
8.14  Payment of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
8.15  Compensation and Expenses of Trustee . . . . . . . . . . . . . . . . . . . . . . . . 40
8.16  Resignation or Removal of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . 41
8.17  Legal Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
8.18  Indemnification of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**ARTICLE IX**

The Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
9.01  No Contract of Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
9.02  No Contract to Maintain Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
9.03  Liability of Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
9.04  Action by Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
9.05  Successor to Business of Company . . . . . . . . . . . . . . . . . . . . . . . . . . 43
9.06  Dissolution of the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**ARTICLE X**

Top-Heavy Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
10.01  Article Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
10.02  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
10.03  Top-Heavy Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
10.04  Minimum Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
10.05  Vesting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
10.06  Termination of Top-Heavy Status . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003583

DEF000087
Confidential-Subject
to Protective Order

ARTICLE XI

Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
11.01  Limitation of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
11.02  Spendthrift Provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
11.03  Appointment of Person to Receive Payment . . . . . . . . . . . . . . . . . . . . . 50
11.04  Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
11.05  Impossibility of Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
11.06  Adjustment for Fractional Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
11.07  Definition of Words . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
11.08  Titles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
11.09  Merger or Consolidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
11.10  Claims Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
11.11  Allocation and Delegation of Responsibilities . . . . . . . . . . . . . . . . . . . 53
11.12  Special Provisions for Certain Leased Employees . . . . . . . . . . . . . . . . 53
11.13  Execution of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003584

DEF000088
Confidential-Subject
to Protective Order

MEDICAL INFORMATION TECHNOLOGY, INC.

AMENDED AND RESTATED PROFIT SHARING PLAN
AND TRUST

The Trust Agreement made the 31st day of December, 1973, by and between

MEDICAL INFORMATION TECHNOLOGY, INC., a Massachusetts corporation having its

principal place of business in Westwood, Massachusetts (the "Company") and A. NEIL

PAPPALARDO of Boston, Massachusetts, (the "Trustee"), which has been subsequently

restated and amended from time to time, is now amended and restated in its entirety as follows:

WITNESSETH THAT:

WHEREAS, the Company recognizes the continuing contribution being made to the

successful operation of its business by its employees and desires to reward such contribution by

continuing its maintenance of a profit sharing plan for its employees who are or shall hereafter

become eligible as Members under the Plan embodied herein;

WHEREAS the Company amended and restated said Plan to comply with the Tax

Reform Act of 1986 and to make certain other changes;

WHEREAS the Plan was subsequently amended by the First, Second and Third

Amendments thereto;

WHEREAS the Company now desires to amend and restate said Plan to comply with

recent legislation and to make certain other changes;

NOW, THEREFORE, the parties hereto each in consideration of the covenants,

agreements and declarations of the other, mutually covenant, agree and declare the Trust

Agreement dated December 31, 1973, as subsequently amended and restated, is hereby further

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003585

DEF000089
Confidential-Subject
to Protective Order

amended and restated as provided herein effective January 1, 1998 except that the changes made
to Sections 3.06, 6.07(b) and 11.12 shall be effective as of January 1, 1997. In determining a
Member's rights and benefits under the Plan up to such effective date, the provisions of the Plan
as previously in effect shall apply:

## ARTICLE I

### The Trust

1.01  Creation of Trust.  There has been established hereunder a trust which shall be
known as the "MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING
TRUST." The Trustee shall receive any contributions paid to the Trust, and all contributions so
received, together with the income therefrom, shall be held, managed, and administered as a
fund in trust pursuant to the terms of this Agreement. The Trustee hereby affirms his
acceptance of the Trust created hereunder and agrees to perform the provisions of this
Agreement on his part to be performed.

1.02  Interpretation of Trust Agreement.  The Trust is established for the purpose of
providing retirement and other benefits to the employees of the Company from the profits of the
Company's business, and for the exclusive benefit of the eligible Employees and their
beneficiaries, and is designed to invest substantially in shares of the Common Stock of the
Company so as to permit the participating employees to share in any growth of the Company.
So far as possible, this Agreement shall be interpreted in a manner consistent with this intent
and with the intent of the Company that the Trust established hereunder shall satisfy the
provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), and those of

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003586

DEF000090
Confidential-Subject
to Protective Order

the Internal Revenue Code of 1986 (the "Code") relating to exempt employees' profit sharing trusts, as either of those statutes may from time to time be amended. Except as provided in Section 4.04, under no circumstances shall any property of the Trust, or any contributions made by the Company, ever revert to or be used or enjoyed by the Company or be used for any purpose other than for the exclusive benefit of the eligible employees or their beneficiaries.

## ARTICLE II

### Definitions

Whenever used in this Agreement, unless the context clearly indicates otherwise, the following words shall have the following meanings:

2.01 "Affiliated Company" means (a) a member of a controlled group of corporations of which Medical Information Technology, Inc. is a member, (b) an unincorporated trade or business which is under common control with Medical Information Technology, Inc. as determined in accordance with Section 414(c) of the Code and regulations issued thereunder, (c) a member of an "affiliated service group" (within the meaning of Section 414(m) of the Code) of which Medical Information Technology, Inc. is a member, or (d) an organization which is required to be aggregated with Medical Information Technology, Inc. pursuant to regulations promulgated under Section 414(o) of the Code. For purposes hereof, a "controlled group of corporations" shall mean a controlled group of corporations as defined in Section 1563(a) of the Code, determined without regard to Section 1563(a)(4) and (e)(3)(C) of the Code.

2.02 "Agreement" means this Agreement as the same may be amended from time to time.

2.03 "Anniversary Date" means December 31 in each year after the Effective Date.

3

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003587

DEF000091
Confidential-Subject
to Protective Order

2.04 "Beneficiary" means the person or persons designated by a Member, pursuant to the provisions of Section 6.03 of this Agreement, to receive distribution of such Member's share upon his death, and includes a co-beneficiary or a contingent beneficiary. The term "Beneficiary" shall also include a Member's surviving spouse if such spouse is deemed to be the Member's Beneficiary pursuant to Section 6.03(c).

2.05 "Board of Directors" means the board of directors of the Company in office from time to time.

2.06 "Break in Service" means any "twelve-consecutive month period" (as determined under this Section) during which an individual does not perform any Hours of Service for the Company or an Affiliated Company. The "twelve-consecutive month period" used to determine whether a Break in Service has occurred shall commence on the earlier of the following dates, and anniversaries thereof: (i) the date the individual's employment with the Company or an Affiliated Company terminates by reason of quit, discharge, or retirement, or (ii) the first twelve-month anniversary of the date the individual was first absent from employment with the Company or an Affiliated Company by reason other than quit, discharge, or retirement; provided, however, that in the case of an individual who is absent from work for "maternity or paternity reasons", the twelve-consecutive month period beginning on the first anniversary of the first date of such absence shall not constitute a Break in Service. For purposes of this Section, an individual's absence is for "maternity or paternity reasons" if the individual is absent from work by reason of pregnancy, birth, or adoption of his child or for the purpose of caring for such child for a period beginning immediately following such birth or adoption.

2.07 "Common Stock" means the common stock of the Company.

4

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003588

DEF000092
Confidential-Subject
to Protective Order

2.08 "Company" means MEDICAL INFORMATION TECHNOLOGY, INC. and any successor to all or a major portion of its business which adopts this Plan and Trust pursuant to Section 9.05.

2.09 "Compensation" includes salaries, wages, bonuses, overtime, commissions and all other forms of direct remuneration paid to a Member by the Company but excludes (a) any amount paid to an Employee prior to his becoming a Member under the Plan and (b) any contributions by the Company to or benefits under the Plan. A Member's Compensation shall not be taken into account for any purpose of the Plan (other than Section 5.07 and Article X) to the extent such Compensation exceeds $100,000.

2.10 "Effective Date" means the effective date of the amendment and restatement of this Plan, which is January 1, 1998, unless otherwise specifically provided.

2.11 "Employee" means any person who is employed by the Company as a common law employee. An Employee shall become an Employee on his Employment Commencement Date.

2.12 "Employment Commencement Date" means the first date on which the individual performs an Hour of Service.

2.13 "Hour of Service" means each hour for which an Employee is directly or indirectly paid or entitled to payment by the Company or an Affiliated Company for the performance of duties.

2.14 "Member" means any Employee who is eligible to participate in the Plan as determined under Article III of this Agreement.

5

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003589

DEF000093
Confidential-Subject
to Protective Order

2.15 "Plan" means the "MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN" as set forth herein, together with any and all amendments hereto.

2.16 "Plan Year" means the fiscal year of the Trust, and the Company, being the twelve (12) months ending on the Anniversary Date of each year.

2.17 "Reemployment Commencement Date" means the first date on which the individual performs an Hour of Service following a Break in Service which is not counted as Service.

2.18 "Service" of an Employee means the period of time determined in accordance with Article III.

2.19 "Trust" means the trust created by this Agreement.

2.20 "Trustee" means the trustee herein named and any duly appointed successor trustee or trustees.

2.21 "Valuation Date" means December 31 of each Plan Year, and any other date which the Trustee may select for the valuation of the Trust and adjustment of accounts determined in accordance with Section 5.04 and 5.05, respectively.

6

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003598

DEF000094
Confidential-Subject
to Protective Order

## ARTICLE III

### Membership

3.01 _Eligibility for Membership_. Each Employee who is a Member on January 1, 1998 shall continue to be a Member under the Plan. Each other Employee, including each future Employee, shall become a Member under the Plan on the first day of the month coincident with or next following his completion of one year of Service. In the event an individual has completed the foregoing eligibility requirements but is not an Employee on the applicable entry date, such individual shall not become a Member of the Plan at that time. If such individual thereafter becomes an Employee, such individual shall become a Member on the date he subsequently becomes an Employee.

3.02 _Determination of Eligibility by Trustee_. The determination of an Employee's eligibility for membership under the Plan shall be made by the Trustee from the Company's records; and the Trustee's determination shall be conclusive and binding on all persons.

3.03 _Duration of Active Membership_. An active Member shall continue as such until his employment with the Company is terminated, except as otherwise provided in Sections 5.02 and 5.03 in the case of a Member whose employment terminates on account of retirement, disability or death. A former active Member shall once again become an active Member on his Reemployment Commencement Date.

3.04 _Service_. The "Service" of an Employee means, with respect to each Employee, the most recent period of time, determined in years and days, which commences on an Employee's Employment Commencement Date, or Reemployment Commencement Date, during which there occurs no Break in Service. If an Employee with at least one year of Service

7

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003591

DEF000095
Confidential-Subject
to Protective Order

terminates his employment with the Company, incurs a Break in Service and is subsequently reemployed, then the "Service" of such Employee for all purposes of the Plan after his reemployment shall include Service accumulated both before and after such Break in Service. Except as provided in Section 6.05, Service accumulated after such Break in Service shall not be taken into account for the purpose of determining such Employee's severance benefit under Section 6.04 at the time of such Break in Service. An Employee shall receive credit for Service with an Affiliated Company for the purposes of determining (a) his eligibility to participate in the Plan pursuant to Section 3.01, (b) the amount of his vested benefit under Section 6.04 and (c) his Breaks in Service, but such Service shall not be taken into consideration for any other Plan purpose.

3.05  Military Leaves of Absence.  Except as otherwise specifically provided, an Employee who leaves the Company to enter the armed services of the United States of America and who returns to its employ at or before the expiration of ninety (90) days after the date on which he is first entitled to be released from active duty in the armed services (or at such later date as the Company may approve or as may be required by law) shall be deemed to have been in the continuous employ of the Company throughout and the period of such military absence shall be included in his period of Service for all purposes of this Plan. If any Employee shall fail to return from a military leave of absence as required by the Company in accordance with the Plan, he shall be deemed to have quit the Company on the date such military leave of absence began; provided, however, that any resultant forfeitures from his account shall be deemed to occur on the Anniversary Date subsequent to the date of his failure to return from his military leave of absence as required by the Company.

8

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003592

DEF000096
Confidential-Subject
to Protective Order

3.06  USERRA.  Notwithstanding any provision of this Plan to the contrary,

contributions, benefits and service credits with respect to qualified military service shall be

provided in accordance with section 414(u) of the Code.

9

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003593

DEF000097
Confidential-Subject
to Protective Order

## ARTICLE IV

### Contributions under the Plan

4.01  Company Contributions.  For each Plan Year, the Company shall pay to the Trustee in trust hereunder from the net income of the Company for such Plan Year or its earnings and profits accumulated prior to such Plan Year such amount as may be voted by its Board of Directors with respect to that Plan Year.  The amount of the Company's contribution shall be paid to the Trustee in cash and/or that number of shares of Common Stock having a fair market value on the date of contribution equal to the contribution amount (or portion thereof to be contributed in shares of Common Stock) voted by the Board of Directors as provided herein. As used in this Section, "net income" and "accumulated earnings and profits" of the Company mean the net income and accumulated earnings and profits as shown by the Company's books before deducting Federal and State taxes measured in part or in whole by income.

4.02  Determination of Contribution.  The amount of the Company's contribution for each Plan Year shall be subject to final determination by the Company and verification by the Company's independent public accountants.  The amount of such contribution, as determined by the Company and verified by such accountants, shall be conclusive and binding on all persons.

4.03  Payment of Contribution.  The Company's contribution to the Trust for each Plan Year shall be paid within the time required by law in order to obtain a deduction of the amount of the Company's contribution to the Trust for Federal income tax purposes for such Plan Year.

4.04  Reversion of Contributions.  In the event that the Company shall make a contribution to the Trust on the basis of a mistake of fact, the Company may direct the Trustee to return such contribution to the Company at any time within the twelve-month period

10

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003594

DEF000098
Confidential-Subject
to Protective Order

commencing on the date of contribution. All contributions under the Plan are conditioned upon the deductibility thereof by the Company under Section 404 of the Code. To the extent that any such deduction is disallowed, the Company may direct the Trustee to return such contribution (to the extent disallowed) to the Company at any time within the twelve-month period commencing on the date of disallowance.

4.05  Members' Contributions. Contributions by Members shall not be permitted.

11

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003595

DEF000099
Confidential-Subject
to Protective Order

### ARTICLE V
Members' Accounts;
Allocation of Assets and Contributions

5.01  Members' Accounts.  The Trustee shall maintain a book account for amounts
credited from time to time to each Member under the Plan.  Any contributions made by the
Company for a Member pursuant to Section 4.01 shall be allocated to each Member's account
pursuant to Section 5.03.

5.02  Compensation Schedule.  As soon as practicable after the end of each Plan Year,
the Company shall deliver to the Trustee a schedule showing the name of each Member who
was either an Employee on the Anniversary Date of such Plan Year or an Employee who
retired, became disabled or died within the meaning of Sections 6.01 to 6.03 during such Plan
Year, and opposite the name of each such Member the amount of Compensation paid to him by
the Company during such Plan Year.  Notwithstanding anything to the contrary elsewhere
herein, no Employee who owns (excluding any beneficial ownership under the Trust) ten
percent (10%) or more of the outstanding Common Stock of the Company on an Anniversary
Date shall be listed on the schedule required by this Section 5.02 with respect to such
Anniversary Date.  The schedule shall also include such other information as the Trustee may
reasonably require for the proper administration of the Plan.

5.03  Allocation of Contributions and Forfeitures.  Upon receiving such schedule and the
total contribution made by the Company for the Plan Year, and after the account balances of the
Members have been adjusted as provided in Section 5.05 and forfeitures determined under
Section 6.04, the Trustee shall credit to the account of each Member listed on such schedule a
portion of the Company's contribution and a portion of the total amount of forfeitures arising

12

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003596

DEF000100
Confidential-Subject
to Protective Order

from the accounts of terminated Members pursuant to Section 6.04 which bears the same ratio to such total amounts as the Member's Compensation listed on such schedule bears to the Compensation listed on said schedule for all such Members.

Notwithstanding the foregoing provisions of Section 5.02 and this Section 5.03, the Company may, in its discretion and as necessary to cause the Plan to satisfy the requirements of Section 410(b)(1)(B) of the Code for any Plan Year, expand the schedule provided pursuant to Section 5.02 for such Plan Year to include the name of each Member (including each former Member whose employment terminated during such Plan Year) who received any Compensation during such Plan Year (but excluding any Employee who owns 10% or more of the outstanding Common Stock of the Company), and direct the Trustee to allocate Company contributions and/or forfeitures for such Plan Year to the accounts of all Members listed on such expanded schedule in proportion to the Compensation of each such Member for such Plan Year as reflected on such expanded schedule.

5.04  Valuation of Trust. As of each Valuation Date, the Trustee shall determine the total net worth of the Trust by evaluating all of its assets and liabilities as of that date exclusive of any amounts segregated into separate accounts for terminated Members pursuant to Section 6.06(b) and the contribution made by the Company with respect to its Plan Year current with or ending on said Valuation Date. In determining the net worth of the Trust or any portion thereof, the Trustee shall value the Trust assets at their fair market value. There shall be included as of the Valuation Date, without implied limitation, income on hand, income accrued, dividends payable but not paid, and uninvested cash, whether income or principal; and there shall be deducted as of the Valuation Date, without implied limitation, liabilities accrued. A

13

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003597

DEF000101
Confidential-Subject
to Protective Order

determination by the Trustee of the fair market value of any of the Trust assets, or of the net worth of the Trust or any component thereof shall be conclusive and binding upon all persons.

5.05  Allocation of Trust Assets.  The total net worth of the Trust as determined on each Valuation Date shall be compared with the total of all amounts standing to the credit of the accounts of all Members of the Plan, as of such Valuation Date, excluding from the accounts of said Members, in the case of a December 31 Valuation Date, any amounts credited from the contribution of the Company with respect to such Plan Year.  The excess or deficiency of the total net worth of the Trust as so compared with the total account balances of all Members shall be credited or charged to the accounts in the proportion that each such account balance bears to the total of all such account balances.

5.06  Distributions and Forfeitures.  Whenever the Trustee shall make any distribution to or in behalf of a Member in accordance with the provisions of Article VI, and whenever a Member shall forfeit all or a portion of the amount standing to the credit of his account in accordance with the provisions of Section 6.04, such Member's account shall be charged with the amount of such distribution or forfeiture.  Whenever part or all of the amount standing to the credit of a Member's account is to be segregated into a separate account for a terminated Member pursuant to Section 6.06(b), such Member's account shall be charged with the amount segregated.

5.07  Limitations on Allocations.  Notwithstanding anything hereinabove to the contrary, the amount credited to the account of any Member for any Plan Year pursuant to Section 5.03 or pursuant to this Section 5.07 (excluding any Company contributions and forfeitures which are credited to a Member's account pursuant to Section 6.05 in order to restore previously forfeited

14

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003598

DEF000102
Confidential-Subject
to Protective Order

amounts) shall be reduced to the extent that such amount would cause the Company contributions and forfeitures credited to the account of such Member under this Plan for such Plan Year and the employer contributions and forfeitures allocated to the account of such Member under any defined contribution plan maintained by the Company or any Affiliated Company to exceed the lesser of

      (A)    $30,000 (as adjusted pursuant to Section 415(d) of the Code), or

      (B)    twenty-five percent (25%) of such Member's compensation within the meaning of Section 415 of the Code and regulations thereunder for such Plan Year from the Company and any Affiliated Company.

Any reductions required pursuant to the foregoing sentence shall be made from the Company contributions and forfeitures allocated to the Member's account pursuant to Section 5.03. In the event any reduction is required pursuant to the preceding sentence, the amount of such reduction shall be allocated and credited pursuant to the procedures outlined in Section 5.03 above to the accounts of remaining Members exclusive of any other Member for whom a reduction for such Plan Year has been required pursuant to this Section 5.07. Any reductions which cannot be so allocated shall be held unallocated by the Trustee and shall be treated as a forfeiture to be allocated under Section 5.03 with respect to the succeeding Plan Year.

    5.08 _Sources of Forfeiture Restorations_. Notwithstanding anything in this Article to the contrary, whenever a previously forfeited amount is required to be restored to a reemployed Member's account pursuant to Section 6.05, the Trustee shall effect such restoration as of the last day of the Plan Year of such Member's reemployment. In effecting such restoration, the

15

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003599

DEF000103
Confidential-Subject
to Protective Order

Trustee shall first utilize any amounts forfeited from the accounts of terminated Members

pursuant to Section 6.04 during such Plan Year and then, if necessary, Company contributions

made pursuant to Section 4.01 for such Plan Year.

16

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003600

DEF000104
Confidential-Subject
to Protective Order

## ARTICLE VI

### Payments to or for the Accounts of
### Members or Terminated Members

No shares of Common Stock or other property of the Trust shall be paid out or distributed by the Trustee except (a) for the purchase or other acquisition of Common Stock or other appropriate investments, (b) for defraying expenses, including taxes, if any, of administering the Trust as elsewhere herein provided, (c) for the repayment of any indebtedness incurred by the Trustee pursuant to Section 8.06, (d) as a return of Company contributions pursuant to Section 4.04, or (e) for the purpose of making distributions to or for the account of Members in accordance with the provisions of this Article VI.

6.01  Retirement.  Upon retirement of a Member, which shall be deemed to mean any termination of his employment with the Company at or after his reaching age sixty (60), the Trustee shall distribute, in accordance with the provisions of Section 6.06, the full amount standing to the credit of such Member's account.  A Member who remains in the active employ of the Company after attaining the age of sixty (60) shall continue as a Member for all purposes of the Plan until the date of his actual retirement.

6.02  Disability Retirement.  If a Member incurs a permanent disability, the Trustee shall distribute, in accordance with the provisions of Sections 6.06 and 6.07, the full amount standing to the credit of such Member's account.  For purposes of this Section 6.02, a Member shall incur a "permanent disability" if such Member is unable to engage in substantial gainful activity due to total and permanent physical or mental impairment that, in the opinion of a physician who is mutually acceptable to the Member and the Company, can be expected to

17

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003601

DEF000105
Confidential-Subject
to Protective Order

result in death, or can be expected to last or has lasted for at least twelve (12) consecutive months. The Trustee's determination as to whether a Member has incurred a permanent disability shall be conclusive and binding upon all persons.

6.03 Death Benefits.

(a)    Subject to paragraph (c) of this Section, each Member shall have the right to designate one or more Beneficiaries, including contingent Beneficiaries, to receive the amount payable in behalf of such Member under the provisions of this Plan in the event of death of such Member. Such designation shall be made in writing in such manner as the Trustee shall determine. Subject to the spousal consent requirement set forth in paragraph (c) below, a Member may change such designation from time to time, and may revoke such designation. If a Member dies without having designated a Beneficiary, or if none of the designated Beneficiaries survives the Member, or if the Trustee is in doubt as to the effective status of a Beneficiary designation, then, except as provided in paragraph (c) below, the duly appointed executor or administrator of the estate of such Member shall be deemed to be his Beneficiary.

(b)    Upon the death of any Member, the Trustee shall distribute, for the benefit of such Member's Beneficiary or Beneficiaries and in accordance with the provisions of Section 6.06, the full amount standing to the credit of the Member's account. If a Beneficiary entitled to receive any amount payable in behalf of a Member under the Plan dies prior to having received the entire amount, the undistributed balance shall be distributed to such Beneficiary's estate.

(c)    If a Member is married on the date of his death, the Member's surviving spouse shall be deemed to be his sole Beneficiary to receive the entirety of the death benefits

18

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003602

DEF000106
Confidential-Subject
to Protective Order

payable under this Section 6.03 in respect of such Member, unless (i) such Member has elected in writing to designate one or more other Beneficiaries other than his spouse, and (A) the Member's surviving spouse has consented to such election in a writing, (B) such election designates a Beneficiary which may not be changed without the consent of the spouse (or the consent of the spouse expressly permits changes in Beneficiary designation by the Member without any requirement of further consent by the spouse), and (C) the spouse's consent acknowledges the effect of such election and is witnessed by a Plan representative or notary public, or (ii) it is established to the satisfaction of the Trustee that the consent of the spouse cannot be obtained because there is no spouse, because the spouse cannot be located, or because of other circumstances prescribed by regulations under Section 417(a)(2) of the Code.

A former spouse shall be treated as a surviving spouse to the extent benefits must be paid to such former spouse upon the Member's death pursuant to a qualified domestic relations order (as defined in Section 414(p) of the Code), except that no consent shall be required from such former spouse with respect to the designation of a Beneficiary to receive benefits not subject to said order.

6.04  Termination of Employment Prior to Retirement, Disability, or Death.

(a)     If any Member's employment with the Company terminates under circumstances other than by reason of retirement, disability or death, as provided for under Sections 6.01 through 6.03, he shall be entitled to a vested benefit equal to the amount standing to the credit of his account based on his period of Service as follows:

19

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003603

DEF000107
Confidential-Subject
to Protective Order

| Years of Service | | Percentage |
|---|---|---|
| At Least | But Less Than | |
| | 2 | NONE |
| 2 | 3 | 10% |
| 3 | 4 | 30% |
| 4 | 5 | 60% |
| 5 | | 100% |

The vested benefit determined in accordance with the foregoing provision shall never be adjusted on account of any Service which a Member might complete upon reemployment with the Company or an Affiliated Company after a Break in Service, except as provided in Section 6.05.

(b)    The determination of the amount to which a terminated Member is entitled shall be made in accordance with the rules set forth in this Article, and the Trustee's determination shall be conclusive and binding on all persons.

(c)    The Trustee shall distribute the vested benefit to which any such Member is entitled, in accordance with Section 6.06, as soon as practicable after the Member's termination, subject to the requirements of Section 6.07.

(d)    Any amount which is not vested under this Section 6.04 at the time of a Member's termination of employment shall be forfeited by him upon the earlier of (i) the payment of the full amount to which such Member is entitled under the Plan, or (ii) the occurrence of five (5) consecutive Breaks in Service by the Member. For the purposes of the preceding sentence, a terminated Member who is not entitled to receive any amount under the Plan shall be deemed to have received the entire amount to which he is entitled on the date his employment terminates and shall forfeit his entire account as of that date. At the close of the

20

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003604

DEF000108
Confidential-Subject
to Protective Order

Plan Year in which such forfeiture occurs, all such forfeited amounts shall be reallocated as of the end of the Plan Year in which such forfeitures occur among the accounts of the other Members in accordance with the provisions of Section 5.03.

6.05 <u>Reemployment</u>. If a terminated Member is reemployed by the Company, he shall again become an active Member upon his Reemployment Commencement Date pursuant to Section 3.03, future Company contributions on his behalf shall be credited to his account, and subject to (a) and (b) below, his prior Service shall be restored for the purpose of calculating the vested portion of such account.

If such a reemployed Member was not 100% vested under Section 6.04(a) at the time of his prior termination, the following special provisions shall apply:

(a)    If such a terminated Member is reemployed before incurring five (5) consecutive Breaks in Service, the full amount which was forfeited from his account as a result of his prior termination shall be restored to his account as of the end of the Plan Year of his reemployment.

(b)    If a reemployed Member to whom paragraph (a) of this Section applies had received a distribution, prior to his reemployment, of all or any part of the vested portion of his account, the vested portion of his account shall thereafter be determined by (i) adding the amount previously distributed to his current account balance, (ii) multiplying the resulting sum by his current vesting percentage, and (iii) subtracting from the resulting product the amount previously distributed.

(c)    If such a terminated Member is reemployed after incurring five (5) consecutive Breaks in Service, he shall have no rights with respect to any amounts previously

21

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003605

DEF000109
Confidential-Subject
to Protective Order

forfeited from his account, and any portion of his account which has not been distributed shall

be held in a separate, fully vested account until such Member becomes 100% vested under

Section 6.04(a), whereupon it shall be merged with the account otherwise maintained for him.

6.06 <u>Manner and Timing of Distributions</u>.

(a)    Except as otherwise provided in Sections 6.06(b) and (d) below and subject

to the requirements of Section 6.07, whenever a Member's account balance becomes

distributable pursuant to Sections 6.01 through 6.04 hereof to such Member or his Beneficiary,

distribution of said account balance shall be made by the payment, in cash, of either one lump

sum, a direct Rollover (as described in Section 6.11), or a combination of both.  Such

distribution shall be made within a reasonable time after the date of such retirement, disability,

death or termination of employment but not earlier than 30 days after the notice required under

Section 1.411(a)-11(c) of the Income Tax Regulations is given unless (i) the Trustee clearly

informs the Member that the Member has a right to a period of at least 30 days after receiving

the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a

particular distribution option), and (ii) the Member, after receiving the notice, affirmatively

elects a distribution.  Any additional amount thereafter credited to his account shall be

distributed in accordance with this Section 6.06(a) after that amount is ascertained.

(b)    Notwithstanding anything to the contrary elsewhere herein, if the aggregate

benefit payable to a Member exceeds $5,000, such benefit shall not be distributed prior to such

Member's sixty-second (62nd) birthday or death, whichever is earlier, unless such Member

consents in writing to an earlier distribution.  In the absence of such a consent, such Member's

22

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 6003606

DEF000110
Confidential-Subject
to Protective Order

account shall be segregated into a separate account established pursuant to Section 6.09 at the time such account would otherwise have been distributable under Section 6.06(a) above.

      (c)     Whenever a Member's account is to be distributed or segregated into a separate account established pursuant to Section 6.09, such Member's account shall first be credited with interest at the prevailing short-term rate as determined by the Trustee for the period from the next preceding Valuation Date to the last day of the month preceding such distribution or segregation.

      (d)     Notwithstanding anything to the contrary elsewhere herein, if the Trustee determines that the assets of the Trust do not provide sufficient liquidity to permit the Member's account balance to be distributed in cash pursuant to this Section 6.06, distribution of such account balance shall be deferred until the Trustee determines there is sufficient liquidity or until the "deferred distribution date", whichever is earlier. Any such account balance shall remain invested in the general assets of the Trust and shall continue to be evaluated and adjusted as of each Valuation Date pursuant to Sections 5.04 and 5.05. For this purpose, the "deferred distribution date" shall be the earliest of (i) the third (3rd) anniversary of a Member's retirement, disability, death or termination of employment, (ii) the sixtieth (60th) day following the close of the first Plan Year in which such Member is both not an Employee and older than sixty (60), and (iii)the Member's Required Distribution Date as defined in Section 6.07(b). If distribution of such a Member's account has not been made by such deferred distribution date, then distribution of such account shall be made on such deferred distribution date (subject to the notice and time limitations under Section 6.06(a)) in cash (to the extent available) and shares of

23

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003607

DEF000111
Confidential-Subject
to Protective Order

Common Stock (to the extent sufficient cash is not available) in a lump sum, direct rollover (as described in Section 6.11) or a combination of both.

6.07  Additional Restrictions on Distributions.  Notwithstanding any provision elsewhere herein to the contrary and solely to comply with the applicable provisions of the Code and ERISA:

 (a) In no event shall the distribution of a Member's account, unless such Member or Beneficiary otherwise consents, begin later than the sixtieth (60th) day after the close of the Plan Year in which the latest of the following events occurs:

  (i) the Member's sixtieth (60th) birthday; or

  (ii) the Member's termination of employment with the Company.

 (b) In no event shall distribution of benefits to a Participant who attains age 70½ after 1998 begin later than the April 1 next following the calendar year in which such Participant (A) attains age 70½ or (B) terminates employment with the Company, whichever is later (the "Required Distribution Date").  Clause (B) shall not apply in the case of a Participant who is a "five percent owner" at any time during the Plan Year ending in the calendar year in which the Participant attains age 70½.  If the Participant becomes a "five percent owner" during any subsequent Plan Year, the required distribution date shall be April 1 of the calendar year following such Plan Year.  For purposes of this subsection, a "five percent owner" is defined in Section 416(i)(1)(B)(i) of the Code.

Distribution of benefits to a Participant who attains or attained 70½ before 1999 shall begin no later than the April 1 next following the calendar year in which such Participant attains age 70½ (the "Required Distribution Date"); provided, a Participant who is not a five percent

24

CONFIDENTIAL-SUBJECT TO<br/>PROTECTIVE ORDER<br/>M 0003608

DEF000112<br/>Confidential-Subject<br/>to Protective Order

owner may elect to defer distribution of benefits until after his termination of employment with the Company by filing written notice with the Trustee at least 60 days (or such shorter period as determined by the Trustee in accordance with the provisions of Section 8.11) prior to his Required Distribution Date.

(c)    If a Member dies before his Required Distribution Date, and his surviving spouse is not his designated Beneficiary, the distribution of benefits shall be paid to such Member's beneficiary in a lump sum no later than December 31 of the calendar year containing the fifth (5th) anniversary of such Member's death.  If the Member's designated Beneficiary is his surviving spouse, distribution of his benefits shall commence no later than the date the Member would have attained age seventy and one-half (70½).

(d)    If a Member dies on or after his Required Distribution Date, the Member's remaining interest in the Plan shall be distributed at least as rapidly as under the method of distribution being used as of the date of death.

(e)    If, and to the extent that, any portion of a Member's accounts are payable to a former spouse or dependent pursuant to a qualified domestic relations order within the meaning of Sections 401(a)(13)(B) and 414(p) of the Code, the provisions of said order shall govern the distribution thereof.  Such an order may provide for payments to a spouse or dependent from a Member's vested account balance even though the Member is still employed by the Employer or is otherwise not eligible for the distribution of benefits under the Plan.  In addition, the amount distributed shall be credited with interest at the prevailing short-term rate as determined by the Trustee for the period from the Valuation Date immediately preceding the

25

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003609

DEF000113
Confidential-Subject
to Protective Order

date of such distribution to the last day of the calendar month immediately preceding such distribution.

6.08 <u>Discharge of Trustee's Obligation to Make Payments</u>. Whenever the Trustee is required to make any payment or payments to any person in accordance with the provisions of this Article VI or Article VII, the Company shall notify the Trustee in writing of such person's last known address as it appears in the Company's records; and the obligation of the Trustee to make such payment or payments shall be fully discharged by mailing the same to the address specified by the Company.

6.09 <u>Investment of Segregated Funds</u>. Whenever any amount standing to the credit of a Member's account is to be segregated into a separate account for such Member, the Trustee shall keep the unpaid balance of such fund invested for the benefit of such Member in savings bank accounts and/or other investments specified as permissible investments for the Trust funds in Section 8.03; provided that the Trustee, with the consent of such Member, may retain the value of any such Member's account without segregation as an individual interest in the Trust fund, in which event such account shall participate in revaluations of the Trust pursuant to Sections 5.04 and 5.05.

6.10 <u>Loans to Members</u>. Upon written application of a Member, the Trustee may lend to the Member such amount or amounts and upon such terms and conditions as the Trustee may determine proper, provided that the aggregate amount of all outstanding loans to such Member, including accrued interest thereon, shall not exceed the lesser of (a) $50,000, reduced by any loan repayment made during the one (1) year period ending on the day before the date such loan is made, or (b) fifty percent (50%) of the vested amount of said Member's account (determined

26

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003610

DEF000114
Confidential-Subject
to Protective Order

at the time the loan is made). Loans pursuant to this Section 6.10 shall be made available to all Members on a reasonably equivalent basis.

Each such loan shall be made at such reasonable rate of interest as the Trustee may determine. Each such loan shall be subject to such other terms and conditions as the Trustee may determine. Each such loan shall be evidenced by the promissory note (the "Note") of the Member and shall be secured by fifty percent (50%) of such Member's vested interest in the Plan. Each such loan shall be repaid by payroll deduction or by such other means as may be authorized by the Trustee. Each such loan shall include the written consent of the Member to an immediate distribution in payment of the entire outstanding loan principal and any interest theretofore accrued, in the event such Member defaults pursuant to the terms of the note at any time subsequent to terminating employment with the Company. Each such loan shall be amortized over the term of the loan in level principal payments made not less frequently than quarterly, and shall be repaid within such time period as may be established by the Trustee but not longer than five (5) years unless such loan is used to acquire a dwelling unit which within a reasonable time is to be used (determined at the time the loan is made) as the principal residence of the Member.

All such loans shall be general investments of the Trust and the interest income thereon shall be included in the determination of the net worth of the Trust pursuant to Section 5.04.

If any part or all of the amount standing to the credit of a Member's account under the Plan shall become distributable to such Member or his Beneficiary while a loan to such Member under this Section 6.10 is outstanding, the Trustee shall apply the amount of such distribution in

27

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003611

DEF000115
Confidential-Subject
to Protective Order

payment of the outstanding loan principal, whether or not then due, and of any interest theretofore accrued, before distributing the balance, if any, to the Member or his Beneficiary.

All expenses incurred by the Trustee, including reasonable attorneys' fees and court costs, as a result of a default by a Member shall be charged against the Member's interest in the Plan.

6.11 Direct Rollovers. Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this Section, a distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

Such distributions shall be subject to the notice and time limitations under Section 6.06(a).

Whenever used in this Section, the following words shall have the following meanings:

(1)     Eligible Rollover Distribution: An Eligible Rollover Distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an Eligible Rollover Distribution does not include:  any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under section 401(a)(9) of the Code; and the portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities).

(2)     Eligible Retirement Plan: An Eligible Retirement Plan is an individual retirement account described in section 408(a) of the Code, an individual retirement annuity described in

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003612


DEF000116
Confidential-Subject
to Protective Order

section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified trust described in section 401(a) of the Code, that accepts the distributee's Eligible Rollover Distribution. However, in the case of an Eligible Rollover Distribution to the surviving spouse, an Eligible Retirement Plan is an individual retirement account or individual retirement annuity.

(3)    Distributee: A Distributee includes an Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, are Distributees with regard to the interest of the spouse or former spouse.

(4)    Direct Rollover: A Direct Rollover is a payment by the Plan to an Eligible Retirement Plan specified by the Distributee.

6.12  In-Service Withdrawals. An active Member who is currently employed with the Company may make in-service withdrawals from the vested portion of his account under the Plan in accordance with subparagraphs (a) and/or (b) below. All withdrawal elections shall be made in such form and pursuant to such procedures as may be required by the Trustee. The valuation of a Member's account balance shall be made as of the Valuation Date immediately preceding the date of distribution. In addition, the amount withdrawn shall be credited with interest at the prevailing short-term rate as determined by the Trustee for the period from the Valuation Date immediately preceding the date of such distribution to the last day of the calendar month preceding such distribution.

29

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003613

DEF000117
Confidential-Subject
to Protective Order

(a)    An active Member who is currently employed by the Company and who has been credited with 20 or more years of Service may elect to withdraw all or any portion of his account under the Plan subject to the following conditions:

(1)    A Member may make only one withdrawal per Plan Year pursuant to this Section 6.12(a); and

(2)    If the Trustee determines that the assets of the Trust do not provide sufficient liquidity to permit the requested withdrawal amount to be fully paid in cash, distribution of such withdrawal amount shall be deferred until the Trustee determines that there is sufficient liquidity or until the third (3rd) anniversary of the date of the Trustee's receipt of the Member's withdrawal election (the "deferred distribution date"), whichever is earlier. Any such deferred withdrawal amount shall remain invested in the general assets of the Trust and shall continue to be evaluated and adjusted as of each Valuation Date pursuant to Section 5.04 and 5.05. If distribution of the Member's withdrawal amount has not been made by such deferred distribution date, then distribution of such amount shall be made on such deferred distribution date in cash (to the extent available) and shares of Common Stock (to the extent sufficient cash is not available).

(b)    An active Member who is currently employed with the Company may elect to withdraw all or a portion of his vested account balance under the Plan in order to meet a "Financial Hardship," subject to the following conditions:

(1)    Any such withdrawal shall be limited to the amount required to meet such Financial Hardship increased by (i) any amounts necessary to pay any federal, state

30

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003614

DEF000118
Confidential-Subject
to Protective Order

or local income taxes or penalties reasonably anticipated to result from the
distribution and (ii) interest (determined pursuant to the first paragraph of this
Section 6.12);

(2)      Any such withdrawal shall be made only to the extent the Trustee
determines there is sufficient liquidity in the Trust to pay such withdrawal amount
in cash.

For purposes of this Section 6.12(b), a "Financial Hardship" will be deemed to exist only
with respect to: (i) expenses for medical care (as described in Section 213(d) of the Code)
of the Member, the Member's spouse or any dependent of the Member (as defined in
Section 152 of the Code) or expenses necessary for such persons to obtain such medical
care, (ii) the purchase of a principal residence of the Member, (iii) the need to prevent
eviction of the Member from his principal residence or foreclosure on the mortgage of the
Member's principal residence, (iv) payment of expenses related to the renovation of the
Member's principal residence, (v) payment of educational expenses for the Member, the
Member's spouse or any dependent of the Member (as defined in Section 152 of the
Code), (vi) the need to pay the funeral expenses (including burial expenses) of a family
member of the Member, or (vii) payment of significant amounts of current debt incurred
as a result of any one or more of the foregoing. The determination that the Member is
faced with a Financial Hardship and the amount required to meet such Financial Hardship
shall be made by the Trustee in accordance with uniform and nondiscriminatory standards
or policies which shall be adopted by the Trustee and consistently applied to each
application for a withdrawal pursuant to this Section 6.12(b), and the Trustee may

31

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003615

DEF000119
Confidential-Subject
to Protective Order

reasonably rely upon the validity of any and all documentation submitted by the Member

in accordance with such standards or policies.

32

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003616

DEF000120
Confidential-Subject
to Protective Order

## ARTICLE VII

### Amendment and Termination

7.01 Right to Amend or Terminate. The Company reserves the right at any time and from time to time to amend this Agreement, or discontinue or terminate the Plan and Trust by delivering to the Trustee a copy of an amendment or appropriate Board of Directors' resolution of discontinuance or termination certified by an officer of the Company; provided, however, that except as provided in Section 7.02, the Company shall have no power to amend or terminate this Agreement in such manner as would cause or permit (a) any of the Trust assets to be diverted to purposes other than for the exclusive benefit of the Employees of the Company or their Beneficiaries or estates; (b) any reduction in the amount theretofore credited to any Member or former Member; (c) any portion of the Trust assets to revert to or become the property of the Company; (d) the duties or liabilities of the Trustee to be changed without his written consent; and (e) the elimination of an optional form of benefit with respect to amounts credited to a Member's accounts prior to the amendment.

7.02 Amendment for Tax Exemption. The Company reserves the right to amend this Agreement and the Plan and Trust hereunder in such manner as may be necessary or advisable so that said Trust may qualify and continue to qualify as an exempt employees' trust under the provisions of the Internal Revenue Code as now in force or as it may hereafter be changed or amended; and any such amendment may be made retroactively.

7.03 Liquidation of Trust in Event of Termination. In the event of termination or partial termination (as determined by an Internal Revenue Service ruling or by a court of proper jurisdiction, as to which all rights of appeal have expired) of this Plan and Trust, or complete

33

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003617

DEF000121
Confidential-Subject
to Protective Order

discontinuance of contributions thereto by the Company, the rights of all Members (or in the case of a partial termination, the Members affected thereby) to amounts theretofore credited to their accounts shall be fully vested and nonforfeitable. In the event of termination, the Trustee shall (a) reduce to cash such part of the Trust fund as he may deem appropriate; (b) pay the liabilities, if any, of the Trust; (c) value the remaining assets of the Trust as of the date of termination and adjust Members' account balances in the same manner as provided in Section 5.05; (d) distribute such assets in cash or partly in shares of Common Stock and partly in cash to or in behalf of the Members in liquidation in proportion to the amounts standing to the credit of their respective accounts as of the termination date.

7.04  Termination of Plan and Trust. This Agreement and the Plan and Trust hereunder shall in any event terminate whenever all property held by the Trustee shall have been distributed in accordance with the terms hereof. Until such time as the Trust is fully distributed, the Trustee shall continue to have the powers, immunities and exemptions which he had during the existence of the Trust, to the extent permitted by law.

34

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003618

DEF000122
Confidential-Subject
to Protective Order

## ARTICLE VIII

### Rights and Duties of Trustee

8.01  Trustees.  There shall be such number of Trustees of this Trust as the Company may determine, any or all of whom may be officers or employees of the Company or any other individuals or entities.

8.02  Powers of Trustee.  It shall be the duty of the Trustee to hold the Common Stock of the Company or other property contributed to and acquired by the Trust, and to make distributions therefrom in accordance with the Plan.  The Trustee is hereby vested with all powers and authority necessary in order to carry out his duties and responsibilities in connection with the administration of the Plan and Trust as herein provided, and is authorized to make such rules and regulations as he may deem necessary to carry out the provisions of the Plan and Trust.  The Trustee shall determine any question arising in the administration, interpretation and application of the Plan and Trust, and the decision of the Trustee shall be conclusive and binding on all persons.

8.03  Investments.  The Trustee shall invest and reinvest the funds of the Trust and keep the same invested, without distinction between principal and income, in such stocks, bonds or other securities or certificates of participation or shares of any mutual investment company, trust or fund, or any other property of any kind, real or personal, tangible or intangible, as he may deem advisable, provided that the Trustee may hold funds of the Trust uninvested if and to the extent that he may deem advisable from time to time.  Notwithstanding the foregoing, and in accordance with the purposes of the Plan, the Trustee is specifically authorized to invest all or any portion of the Trust assets in shares of Common Stock.  It is intended that a substantial

35

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003619

DEF000123
Confidential-Subject
to Protective Order

portion of the assets of the Trust (up to 100%) shall be invested in shares of Common Stock, to the extent that such Common Stock is reasonably available.

8.04 Method of Purchasing, Holding and Selling Securities. The Trustee may purchase Common Stock from the Company or from any stockholder of the Company at a price equal to the fair market value of the Common Stock at the time of purchase. The Trustee may keep the Common Stock and any other securities or other property of the Trust in the name of some other person, firm or corporation or his own name without disclosing fiduciary capacity. The Trustee may purchase or sell at public auction or by private contract, redeem, or otherwise realize upon such Common Stock, securities, or other property and for such purposes may execute such instruments and writings and do such things as he shall deem proper.

8.05 Exercise of Voting Rights. The Trustee is hereby authorized to vote the Common Stock and any other securities comprising the Trust fund or otherwise consent to or request any action on the part of the Company or the issuer of such other securities, and to give general or special proxies or powers of attorney, with or without power of substitution, and to participate in reorganizations, recapitalizations, consolidations, mergers and similar transactions with respect to such securities; to deposit such Common Stock or other securities in any voting trust, or with any protective or like committee, or with a trustee, or with depositaries designated thereby; and generally to exercise any of the powers of an owner with respect to the Common Stock, securities, and other assets which the Trustee deems to be for the best interests of the Trust to exercise.

8.06 Power to Borrow. The Trustee is hereby authorized to borrow money for the purpose of this Trust upon such terms and conditions as he may determine, and for any amount

36

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003620

DEF000124
Confidential-Subject
to Protective Order

so borrowed to issue the promissory note of the Trustee and to secure the repayment thereof by pledge, mortgage or hypothecation of all or any part of the property of the Trust, and no person loaning money to the Trustee shall be bound to see to the application of the money loaned or to inquire into the validity of any such borrowing.

8.07  Reliance on Trustee as Owner.  No person dealing with the Trustee shall be required to take any notice of this Agreement, but all persons so dealing shall be protected in treating the Trustee as the absolute owner with full power of disposition of all the monies, Common Stock and other property of the Trust, and all persons dealing with the Trustee are released from inquiry into the decision or authority of the Trustee and from seeing to the application of monies, Common Stock or other property paid or delivered to the Trustee.

8.08  Liquidation of Assets.  In the event that cash is required by the Trustee to effect any action or distribution under this Trust, or to pay any expenses of this Trust, or for any other reason deemed sufficient by the Trustee, the Trustee shall take such action as to the sale or other disposition of Common Stock or other property forming a part of the Trust as will provide the amount of cash necessary for such payments.

8.09  Evidence on which Trustee may Act.  In taking any action or determining any fact or question which may arise under this Trust, the Trustee may, with respect to the affairs of the Company or its Employees, rely upon any statement by the Company with respect thereto. In the event that any dispute may arise regarding the payment of any sums or regarding any act to be performed by the Trustee, the Trustee may retain such payment or postpone the performance of such act until actual adjudication of such act shall have been made in a court of competent jurisdiction; or until he shall have been indemnified against loss to his satisfaction; provided,

37

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003621

DEF000125
Confidential-Subject
to Protective Order

however, that in the event of any such dispute, the Trustee may rely upon and act in accordance with any directions received from the Company.

8.10 Action by Trustees. In the event there are two or more individual Trustees of this Trust, the Trustees shall act by a majority of their number at the time in office and such action may be taken either by vote at a meeting or in writing without a meeting. The Trustees may by such majority action authorize any one or more of their number to execute any document or documents or to take any other action on behalf of the Trustees, and in such event any one of the Trustees may certify in writing to any person the taking of such action and the name or names of the Trustee or Trustees so authorized, including himself. Any such person shall be protected in accepting and relying upon any such document or certificate and is released from inquiry into the authority of any of the Trustees.

8.11 Discretionary Action. Wherever under the provisions of this Agreement the Trustee is given any discretionary power or powers, such power or powers shall not be exercised in such manner as to cause any discrimination in favor of or against any Employee or class of Employees. Any discretionary action taken by the Trustee hereunder shall be consistent with any prior discretionary action taken by him under similar circumstances and to this end the Trustee shall keep a record of all discretionary action taken by him under any provision hereof.

8.12 Employment of Agents. The Trustee may employ agents, including, but not limited to, custodians, accountants or attorneys, to perform such services and duties (including any fiduciary responsibilities other than trustee responsibilities) in connection with the administration of the Trust as he may direct. The compensation of such agents shall be an expense chargeable in accordance with Section 8.15. The Trustee shall be fully protected in

38

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003622

DEF000126
Confidential-Subject
to Protective Order

acting upon the advice of any such agent, in whole or in part, and, except as may be required by applicable Federal law, shall not be liable for any act or omission of any such agent, the Trustee's only duty being to use reasonable care in the selection of such agent.

8.13  Records and Accounting.  The Trustee shall keep accurate and detailed records of his transactions hereunder and all his accounts, books and records relating thereto shall be open at all reasonable times to the inspection of the Company and its authorized representatives.  The Trustee shall render in writing at least once each twelve (12) months, accounts of his transactions under this Agreement to the Company and the Company may approve such accounts of the Trustee by an instrument in writing delivered to the Trustee. In the absence of the filing in writing with the Trustee by the Company of exceptions or objections to any such account within sixty (60) days after the receipt by the Company of any such account the Company shall be deemed to have approved such account; and in such case, or upon the written approval of the Company of any such account, the Trustee shall be released, relieved and discharged with respect to all matters and things set forth in such account.  Except as may otherwise be required by applicable Federal law, no person interested in the Trust or otherwise other than the Company may require an accounting or bring any action against the Trustee with respect to the Trust and his actions as Trustee.  In any proceeding instituted by the Trustee and/or the Company with respect to these accounts, only the Company and the Trustee shall be the necessary parties. The Trustee shall from time to time make such other reports and furnish such other information concerning the Trust as the Company may in writing reasonably request or as may be required by applicable Federal law.

39

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003623

DEF000127
Confidential-Subject
to Protective Order

8.14 Payment of Taxes. The Trustee shall upon direction of the Company pay out of the Trust fund any and all taxes of any and all kinds, including without limitation property taxes and income taxes levied or assessed under existing or future laws upon or in respect of the Trust or any monies, securities or other property forming a part thereof or the income therefrom subject to the terms of any agreements or contracts made with respect to trust investments which make other provision for such tax payments. The Trustee may assume that any taxes assessed on or in respect of the Trust or its income are lawfully assessed unless the Company shall in writing advise the Trustee that in the opinion of counsel for the Company such taxes are or may be unlawfully assessed. In the event that the Company shall so advise the Trustee, the Trustee will, if so requested in writing by the Company, contest the validity of such taxes in any manner deemed appropriate by the Company or its counsel but at the expense of the Trust; or the Company may itself contest the validity of any such taxes at the expense of the Trust and in the name of the Trustee; and the Trustee agrees to execute all documents, instruments, claims and petitions necessary or advisable in the opinion of the Company or its counsel for the refund, abatement, reduction or elimination of any such taxes.

8.15 Compensation and Expenses of Trustee. The Trustee shall serve without compensation for his services as such, but all expenses of the Trust shall be paid from the assets of the Trust unless the Company, in its sole discretion, elects to pay such expenses. Such expenses shall include any expenses incident to the functioning of the Plan, including, but not limited to attorneys fees and the compensation of other agents, accounting and clerical charges, the cost of obtaining any bonds required by ERISA and other costs of administering the Plan.

40

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003624

DEF000128
Confidential-Subject
to Protective Order

8.16 <u>Resignation or Removal of Trustee</u>. Any Trustee acting hereunder may resign at any time upon written notice to the Company and, if applicable, to the remaining Trustees and the Company may remove any Trustee at any time upon written notice to such Trustee and, if applicable, the remaining Trustees. If any Trustee shall die, resign, be removed or for any other reason cease to be Trustee, he shall be replaced by a successor to be selected by the Board of Directors and until he is so replaced, the remaining Trustees shall exercise all of the powers of the Trustees. The appointment of a successor Trustee shall be effective upon written notification to the Company and to the Trustees of his acceptance of such appointment.

8.17 <u>Legal Action</u>. The Trustee shall not be required to institute any legal action or to appear or participate in any legal action to which he may be a party, except to contest taxes, unless he shall have been first indemnified to his satisfaction by the Company for all loss, cost and liability.

8.18 <u>Indemnification of Trustee</u>. The Company either through insurance or otherwise shall indemnify and hold harmless the Trustee from any and all claims, loss, damages, expenses (including reasonable counsel fees approved by the Company), and liability (including any reasonable amounts paid in settlement with the Company's approval), arising from any act or omission of the Trustee, except when the same is judicially determined to be due to the willful misconduct of the Trustee.

41

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003625

DEF000129
Confidential-Subject
to Protective Order

## ARTICLE IX

### The Company

9.01  No Contract of Employment.  This Trust shall not be construed as creating any contract of employment between the Company and any Member, Employee or other person, and nothing herein contained shall give any person the right to be retained in the employ of the Company or otherwise restrain the Company's right to deal with its employees, including Members and Employees, and their hiring, discharge, layoff, compensation, and all other conditions of employment in all respects as though this Trust did not exist.

9.02  No Contract to Maintain Plan.  The Company by the creation of the Trust does not enter into any agreement to maintain the Trust or to make any further contributions thereto or reimbursement of expenses incurred hereunder.  Each contribution by the Company shall be voluntary, and the Company reserves the right to suspend payment of its contributions hereunder, and no party hereto or Member or any other person shall have any cause or right of action against the Company by reason of failure by the Company to make contributions to the Trust, or by reason of any action by the Company in terminating the Plan and Trust.

9.03  Liability of Company.  Subject to its agreement to indemnify the Trustee as provided in Section 8.18 and except as otherwise provided by applicable Federal law, neither the Company nor any person acting in behalf of the Company shall be liable for any act or omission on the part of the Trustee, or for any act performed or the failure to perform any act by any person with respect to this Agreement, the Plan or Trust, the Company's only duty being to use reasonable care in the selection of the Trustee.

42

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003626

DEF000130
Confidential-Subject
to Protective Order

9.04  Action by Company.  Whenever under the terms of this Agreement, the Company is permitted or required to take any action, such action shall be taken by the Board of Directors or by any officer of the Company thereunto duly authorized by the Board of Directors or otherwise.  In such event, any such officer may certify to the Trustee or any person the taking of such action and the name or names of the officers so authorized, including himself.  The execution of any direction, document or certificate in behalf of the Company by any of its officers shall constitute his certification of his authority with respect thereto, and the Trustee or other person shall be protected in accepting and relying upon any such direction, document or certificate and are released from inquiry into the authority of any officer of the Company.

9.05  Successor to Business of Company.  Unless this Plan and Trust be sooner terminated, a successor to the business of the Company, by whatever form or manner resulting, may continue the Plan and Trust by executing an appropriate supplementary agreement and such successor shall ipso facto succeed to all the rights, powers and duties of the Company hereunder.  The employment of any Employee who has continued in the employ of such successor shall not be deemed to have been terminated or severed for any purposes hereunder if such supplemental agreement so provides.

9.06  Dissolution of the Company.  In the event that the Company is dissolved by reason of bankruptcy or insolvency or otherwise, without any provision being made for the continuation of this Plan and Trust by a successor to the business of the Company, the Plan and Trust hereunder shall terminate, and the Trustee shall proceed in the same manner as though the Plan and Trust were being terminated by the Company as provided in Section 7.03.

43

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003627

DEF000131
Confidential-Subject
to Protective Order

ARTICLE X

Top-Heavy Provisions

10.01 Article Controls. Any provisions of any Plan to the contrary notwithstanding, the provisions of this Article X shall control the Plan to the extent required to cause the Plan to comply with the requirements imposed by Section 416 of the Code.

10.02 Definitions. Where the following words and phrases appear in this Article X, they shall have the respective meanings set forth below, unless their context clearly indicates to the contrary:

(a)    Account Balance. As of any Valuation Date, the aggregate amount credited to an individual's account or accounts under a qualified defined contribution plan (excluding employee contributions which were deductible within the meaning of Section 219 of the Code and rollover or transfer contributions made by or on behalf of such individual to such plan from another qualified plan, sponsored by an entity other than the Company or an Affiliated Company) increased by (i) the aggregate distributions made to such individual from such plan during a five (5) year period ending on the Determination Date, and (ii) the amount of any contributions due as of the Determination Date immediately following such Valuation Date;

(b)    Aggregation Group. The group of qualified plans maintained by the Company and each Affiliated Company consisting of (i) each plan in which a Key Employee participates and each other plan which enables a plan in which a Key Employee participates to meet the requirements of Sections 401(a)(4) and 410 of the Code, or (ii) each plan in which a Key Employee participates, each other plan which enables a plan in which a Key Employee participates to meet the requirements of Sections 401(a)(4) and 410 of the Code, and any other

44

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003628

DEF000132
Confidential-Subject
to Protective Order

plan which the Company elects to include as a part of such group; provided, however, that the Company may not elect to include a plan in such a group if its inclusion would cause the group to fail to meet the requirements of Sections 401(a)(4) and 410 of the Code.

(c)    Compensation. For the purposes of this Article X, an individual's earned income, wages, salaries, and other amounts actually paid by the Company or an Affiliated Company to such individual during a Plan Year for personal services actually rendered in the course of employment with the Company or an Affiliated Company (subject to exclusion of amounts specified by regulations promulgated under Section 415 of the Code. In no event shall a Member's Compensation exceed $150,000 for any Plan Year (or such other amount as the Secretary of the Treasury or his delegate may determine for such Plan Year under Section 401(a)(17) of the Code).

(d)    Determination Date. For the first Plan Year of any plan, the last day of such Plan Year, and for each subsequent Plan Year of such plan, the last day of the preceding Plan Year.

(e)    Former Key Employee. With respect to any Plan Year, any individual who was a Key Employee in a previous Plan Year but who is not a Key Employee with respect to such Plan Year. For purposes of this definition, a beneficiary (who would not otherwise be a Key Employee) of a deceased former Key Employee shall be deemed to be a Former Key Employee in substitution for such deceased Former Key Employee.

(f)    Key Employee. With respect to any Plan Year, any individual who at any time during such Plan Year or during any of the four (4) Plan Years immediately preceding such Plan Year was (i) an officer (within the meaning of Section 416 of the Code) of the Company or

45

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003629

DEF000133
Confidential-Subject
to Protective Order

an Affiliated Company with Compensation greater than 150% of the amount in effect under Section 415(c)(1)(A) for such Plan Year, (ii) one of the ten (10) employees with Compensation greater than such amount and owning the largest interests in the Company or an Affiliated Company, (iii) an owner of more than five percent (5%) of the outstanding stock of the Company or an Affiliated Company or of stock possessing more than five percent (5%) of the total combined voting power of all the stock of the Company or an Affiliated Company, or (iv) an employee whose Compensation (during the calendar year including the Determination Date) exceeded $150,000 and who was an owner of more than one percent (1%) of the outstanding stock of the Company or an Affiliated Company or of stock possessing more than one percent (1%) of the total combined voting power of all of the stock of the Company or an Affiliated Company. For purposes of this definition, (i) an individual shall be deemed to own stock owned by others as provided in Section 318 of the Code, (ii) a beneficiary (who would not otherwise be a Key Employee) of a deceased Key Employee shall be deemed to be a Key Employee in substitution for such deceased Key Employee, and (iii) the total number of Key Employees who are officers of the Company and the Affiliated Companies shall be limited to the fifty (50) (or, if lesser, the greater of three (3) or ten percent (10%) of the employees) officers with the highest Compensation.

(g)    Plan Year. With respect to any plan, the annual accounting period used by such plan for annual reporting purposes.

(h)    Valuation Date. With respect to any Plan Year of any defined contribution plan, the most recent date within the twelve (12) month period ending on a Determination Date

46

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003630

DEF000134
Confidential-Subject
to Protective Order

as of which the trust fund established under such plan was valued and the net income (or loss) thereof allocated to members' accounts.

10.03 <u>Top-Heavy Status</u>. The Plan shall be deemed to be top-heavy if, as of any Determination Date, (i) the sum of the Account Balances of Members who are Key Employees exceeds sixty percent (60%) of the sum of the Account Balances of all Members (excluding in both cases the Account Balances of all Former Key Employees and of those former Employees who have not performed any services for the Company or any Affiliated Company at any time during the five-year period ending on the Determination Date) unless the Plan is part of an Aggregation Group or (ii) an Aggregation Group including the Plan is top-heavy.  An Aggregation Group shall be deemed to be top-heavy as of a Determination Date if the sum (computed in accordance with Section 416(g)(2)(B) of the Code and the regulations promulgated thereunder) of the Account Balances of Key Employees under all defined contribution plans included in the Aggregation Group exceeds sixty percent (60%) of the sum of the Account Balances of all individuals under such plans (excluding in both cases the Account Balances of all Former Key Employees and of those former Employees who have not performed any services for the Company or any Affiliated Company at any time during the five-year period ending on the Determination Date).

10.04 <u>Minimum Contribution</u>. If the Plan is determined to be top-heavy for a Plan Year, the Company shall make an additional Company contribution to the Plan on behalf of each Employee who is a Member of the Plan, who is not a Key Employee, and who has not terminated his employment as of the last day of such Plan Year, equal to that amount which when added to the aggregate amount of Company contributions and forfeitures (excluding

47

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003631

DEF000135
Confidential-Subject
to Protective Order

amounts credited to the account of such Member pursuant to Sections 5.08 and 6.05) allocated to such Member's accounts for such Plan Year will cause the sum of all such contributions and forfeitures to equal the lesser of

      (a)    three percent (3%) of such Member's Compensation for such Plan Year, or

      (b)    a percent of such Member's Compensation for such Plan Year equal to the greatest percent obtained by dividing for each Key Employee the aggregate amount of Company contributions and forfeitures (excluding amounts credited to the account of any such Key Employee pursuant to Sections 5.08 and 6.05) allocated to such Key Employee's accounts for such Plan Year by such Key Employee's Compensation for such Plan Year.

    10.05  <u>Vesting</u>. If the Plan is determined to be top-heavy for a Plan Year, the vested benefit of any Member who terminates his employment with the Company during such Plan Year shall be determined in accordance with Section 6.04, but using the following vesting schedule in lieu of the schedule appearing in Section 6.04:

| Years of Service | | Percentage |
|---|---|---|
| At Least | But Less Than | |
| | 2 | NONE |
| 2 | 3 | 20% |
| 3 | 4 | 40% |
| 4 | 5 | 60% |
| 5 | | 100% |

    In the event that the Plan ceases to be top-heavy in a subsequent Plan Year, the vested benefit of any Member who terminates his employment with the Company after the Plan has ceased to be top-heavy shall be determined in accordance with the vesting schedule in Section 6.04; except that (a) the vesting percentage of any such Member shall not be less than the

48

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003632

DEF000136
Confidential-Subject
to Protective Order

vesting percentage which such Member achieved under the schedule set forth in this Section 10.05 of the last day of the last Plan Year for which the Plan was top-heavy, and (b) the vesting percentage of a Member who has been credited with three (3) or more years of Service as of the last day of the last Plan Year for which the Plan was top-heavy shall continue to be determined in accordance with the vesting schedule set forth in this Section 10.05.

10.06 Termination of Top-Heavy Status. Except as specifically provided in Section 10.05, if the Plan has been deemed to be top-heavy for one or more Plan Years and thereafter ceases to be top-heavy, the provisions of this Article X shall cease to apply to the Plan effective as of the day following the Determination Date on which it is determined to no longer be top-heavy.

49

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003633

DEF000137
Confidential-Subject
to Protective Order

## ARTICLE XI

### Miscellaneous

11.01 Limitation of Rights. The establishment of the Trust shall not be considered as giving any Member or Employee or any other person any legal or equitable rights as against the Company or the Trustee, nor shall any person be responsible for the sufficiency of the Trust to provide benefits under the Plan, but each person interested shall look solely to the assets of the Trust for benefits payable subject to the terms and conditions of the Plan.

11.02 Spendthrift Provision. Beneficial interests of Members or their Beneficiaries in the Trust shall not be assignable or subject to attachment nor receivership, nor shall they pass to any trustee in bankruptcy or be reached or applied by any legal process for the payment of any obligations of any such person, except as provided by Section 6.10 in the case of a loan to a Member from the Trust. Nothing in this Section 11.02 shall prevent or restrict the creation, assignment or recognition of a right to any benefit payable with respect to a Member pursuant to a "qualified domestic relations order" (within the meaning of Sections 401(a)(13) and 414(p) of the Code).

11.03 Appointment of Person to Receive Payment. In the event any amount shall become payable hereunder to any person (or his Beneficiary or estate), and if after written notice from the Trustee mailed to such person's last known address as shown on the Company's records, such person or his personal representative shall not have presented himself to the Trustee or notified the Trustee in writing of his address within one (1) year after the mailing of such notice, then the Trustee shall in his discretion appoint one or more of the spouse and blood relatives of such person to receive such amount, including any amount thereafter becoming due

50

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003634

DEF000138
Confidential-Subject
to Protective Order

to such person (or his estate), in the proportions determined by him. Any action of the Trustee hereunder shall be binding and conclusive upon all persons.

11.04  Construction.  In any question of interpretation or other matter of doubt, the Trustee and the Company may rely upon the opinion of counsel for the Company or any other attorney at law designated by the Company with the approval of the Trustee. The provisions of this Agreement shall be construed, administered and enforced according to the laws of the United States and, to the extent permitted by such laws, by the laws of the Commonwealth of Massachusetts. All contributions to the Trust shall be deemed to be made in the Commonwealth of Massachusetts.

11.05  Impossibility of Performance.  In case it becomes impossible for the Company or the Trustee to perform any act under this Plan and Trust, that act shall be performed which in the judgment of the Trustee will most nearly carry out the intent and purpose of this Plan and Trust. All parties to this Agreement or in any way interested in this Plan and Trust shall be bound by any acts performed under such condition.

11.06  Adjustment for Fractional Interests.  Notwithstanding any other provision of this Plan to the contrary, the amount of any contribution of Common Stock shall be adjusted by adding such part of a fractional share of the Common Stock thereto as is necessary to bring the total shares of Common Stock held by the Trustee to a whole number.

11.07  Definition of Words.  Feminine or neuter pronouns shall be substituted for those of the masculine form, and the plural shall be substituted for the singular, in any place or places herein where the context may require such substitution or substitutions.

51

CONFIDENTIAL–SUBJECT TO
PROTECTIVE ORDER
M 0003635

DEF000139
Confidential-Subject
to Protective Order

11.08 Titles. The titles of articles and sections are included only for convenience and shall not be construed as a part of this Agreement or in any respect affecting or modifying its provisions.

11.09 Merger or Consolidation. In the event that this Plan is merged with or consolidated with any other plan, or the assets or liabilities accrued under this Plan are transferred to any other plan, each Member's benefit under such other plan shall be at least as great immediately after such merger, consolidation or transfer (if such plan were then to terminate) as the benefit to which he would have been entitled under this Plan immediately before such merger, consolidation or transfer (if the Plan were then to terminate).

11.10 Claims Procedure. In accordance with Section 503 of the ERISA and the regulations of the Secretary of Labor prescribed thereunder,

(1)     All claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such regulations as the Trustee shall reasonably establish.

(2)     The Trustee shall, within sixty (60) days of submission of a claim, provide adequate notice in writing to any claimant whose claim for benefits under the Plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the claimant,

(3)     The Trustee shall, within a reasonable period of time and upon request by a claimant, afford a reasonable opportunity to any claimant, whose claim for benefits has been denied, for a full and fair review by the Trustee of the decision denying the claim, and

52

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003636

DEF000140
Confidential-Subject
to Protective Order

(4)    The Trustee shall, within 60 days of receipt of a request for a review, render a written decision on his review setting forth the specific reasons for such decision, written in a manner to be understood by the claimant.

11.11  Allocation and Delegation of Responsibilities.  The named fiduciaries with respect to the Plan shall be the Company and the Trustee. The Company is the Plan Administrator for all purposes of ERISA. The responsibilities of the named fiduciaries shall be allocated as provided herein, and each such fiduciary shall have only those responsibilities and obligations that are specifically imposed upon him by this Trust Agreement. It is intended that each of the named fiduciaries shall be responsible for the proper exercise of his own powers, duties, responsibilities and obligations under the Plan and shall not be responsible for any act or omission of any other fiduciary. Each named fiduciary shall be entitled to delegate all or any part of his fiduciary responsibilities and obligations (except those related to the management of the assets held hereunder) to any other person or entity. In the event of any such delegation, (i) the named fiduciary shall not be liable for any act or omission of the person to whom the responsibility has been delegated as long as the selection and retention of such person is prudent and (ii) the person to whom the fiduciary powers and obligations are delegated shall be responsible only for the proper exercise of the powers, duties, responsibilities and obligations that have been specifically delegated to him.

11.12  Special Provisions for Certain Leased Employees.  A "leased employee" shall receive credit for Service which shall be recognized in determining the Employee's credit for Service for the entire period during which he is a leased employee of the Company as if he were an Employee of the Company; provided, however, that a leased employee shall not be eligible

53

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003637

DEF000141
Confidential-Subject
to Protective Order

to participate in the Plan as long as he remains a leased employee. For purpose of this Section 11.12, the term "leased employee" means any person (a) who is not an Employee of the Company and (b) who pursuant to an agreement between the Company and any other person (a "leasing organization") has performed services for the Company on a substantially full-time basis for a period of at least one (1) year and such services are performed under the primary direction or control of the Company, and (c) who is not covered by a money purchase pension plan maintained by the leasing organization which provides a nonintegrated employer contribution rate of at least ten percent (10%) of compensation, immediate participation, and full and immediate vesting. If leased employees constitute more than twenty percent (20%) of the Company's nonhighly compensated workforce (as defined in Section 414(n)(5)(C)(ii) of the Code) without regard to clause (c) of the preceding sentence, then clause (c) shall not apply.

11.13 <u>Execution of Agreement</u>. This Agreement may be executed in any number of counterparts and each fully executed counterpart shall be deemed an original.

54

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003638

DEF000142
Confidential-Subject
to Protective Order

IN WITNESS WHEREOF these presents have been signed and sealed for and in behalf of

the parties hereto, in the case of the Company by its duly authorized officer, this 27th day of

_July_, 1998.

COMPANY:        MEDICAL INFORMATION
                TECHNOLOGY INC.

                By _[signature]_
                Title: CHIEF FINANCIAL OFFICER + TREAS.

TRUSTEE:        _[signature]_
                A. Neil Pappalardo

DOCSB\520071.2

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003639

DEF000143
Confidential-Subject
to Protective Order



SUMMARY PLAN DESCRIPTION
OF THE
MEDICAL INFORMATION TECHNOLOGY, INC.
PROFIT SHARING PLAN

January 1, 1998

**HUB 001**

# TABLE OF CONTENTS

Page

I.   BACKGROUND AND PURPOSE OF THE PLAN . . . . . . . . . . . . . . . . . . . . . 1

II.  GENERAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. PARTICIPATION IN THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.   Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.   Rules for Crediting Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     C.   Choosing a Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  CONTRIBUTIONS AND ALLOCATIONS . . . . . . . . . . . . . . . . . . . . . . . . 3
     A.   Employer Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     B.   Employee Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     C.   Trust Gains and Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V.   BENEFITS PROVIDED UNDER THE PLAN . . . . . . . . . . . . . . . . . . . . . 4
     A.   Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     B.   Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     C.   Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     D.   Other Termination of Employment . . . . . . . . . . . . . . . . . . . . . . . 5
     E.   Manner and Timing of Benefit Payments . . . . . . . . . . . . . . . . . . 6
     F.   Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     G.   In-Service Withdrawals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

VI.  AMENDMENT AND TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VII. SPECIAL RULES FOR TOP-HEAVY PLANS . . . . . . . . . . . . . . . . . . . . 8

IX.  YOUR RIGHTS UNDER ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

HUB 002

## I.  BACKGROUND AND PURPOSE OF THE PLAN

The Medical Information Technology, Inc. Profit Sharing Plan (which will be referred to as the "Plan") is designed to help provide future financial security for you and your family by allowing you to share in the profits of Medical Information Technology, Inc. (the "Employer").

Under present federal and state law, all amounts contributed to the Plan by the Employer, and all income earned on Plan investments, are tax deferred until they are distributed to you.  This deferral of income tax is an important benefit of the Plan.

The Plan is a defined contribution plan.  Your benefit is based solely upon the value of the balance of the account established for you under the Plan.  Benefits under this type of plan are not insured by the Pension Benefit Guaranty Corporation.

This Summary Plan Description contains basic information about the main features of the Plan, but it does not attempt to describe in detail every rule of the Plan.  Accordingly, all decisions with respect to your benefits must be made based on the Plan document itself; if there is any conflict between this summary and the official Plan document, the Plan document will control.  Please read this Summary Plan Description carefully so that you will be aware of the Plan's principal features.  Please address any questions you may have about the operation of the Plan to the Plan Administrator.

## II.  GENERAL INFORMATION

| | |
|---|---|
| Name of Plan: | Medical Information Technology, Inc. Profit Sharing Plan |
| Employer: | Medical Information Technology, Inc.<br>MEDITECH CIRCLE<br>Westwood, MA 02090<br>(781) 821-3000 |
| Employer<br>Identification Number: | 04-2455639 |
| Plan Administrator: | The Employer is the Plan Administrator. |
| Trustee: | Mr. A. Neil Pappalardo<br>Trustee of the Medical Information Technology, Inc.<br>Profit Sharing Plan<br>MEDITECH CIRCLE |

**HUB 003**

Westwood, MA 02090
(781) 821-3000

Plan Year: ·                  January 1 - December 31

Plan Number:                 The Plan Number is 001

Agent for Service
of Legal Process:            Service of legal process may be made upon the Plan
                             Administrator or the Trustee, at the address set forth above.


### III.  PARTICIPATION IN THE PLAN


A.    Eligibility

If you are an employee of the Employer (other than a "leased employee"), you will
become a Member in the Plan on the first day of the month after you complete one year of
Service.  Once you meet the Service requirement, you will automatically become a Member of
the Plan; you are not allowed to elect not to participate in the Plan.  Your active membership
in the Plan terminates when you are no longer an employee of the Employer.  A former
Member who is reemployed by the Employer will become a Member immediately upon
reemployment.

B.    Rules for Crediting Service

Your Service is equal to the most recent period of time, measured in years and days, in
which you are employed by the Employer or any of its affiliates without incurring a "break in
service."  You incur a "break in service" if you do not perform any hours of service for the
Employer or any of its affiliates during any consecutive 12 month period.  An "hour of
service" is each hour you are directly or indirectly paid or entitled to payment by the Employer
for the performance of duties.  Special rules may apply in situations involving leaves of
absence or reemployment after a "break in service;" you should consult the Plan Administrator
if these special rules may be applicable to you.

C.    Choosing a Beneficiary

Upon becoming a Plan Member, you will be asked to complete a beneficiary
designation form on which you will specify the person or persons who will receive the full
value of your account in the Plan in the event of your death.  Except for the special rule for
married Members described below, you may name any person or persons as a beneficiary and
you can change your beneficiary at any time by completing a new beneficiary designation
form.

2

**HUB 004**

If you are married at the time of your death, your surviving spouse will generally be your sole beneficiary. However, with the written consent of your spouse, you may designate some other person or persons as the beneficiary of all or part of your account. Your spouse's consent must be notarized or witnessed by a Plan representative and must acknowledge the effect of the designation of another beneficiary. Your spouse's consent will generally apply only to the designation of a particular beneficiary. Therefore, you must obtain spousal consent each time you change your beneficiary designation and designate someone other than your spouse, unless your spouse has expressly permitted additional changes without further consent. Note: If you are single, designate a beneficiary and later marry, your spouse automatically becomes your sole beneficiary. You must obtain your spouse's consent before you may name another beneficiary.

If, at your death, you have not designated a beneficiary, your designated beneficiary has predeceased you, or the Trustee determines your beneficiary designation is not effective, your beneficiary will be your spouse if you are married and your estate if you are unmarried.

## IV. CONTRIBUTIONS AND ALLOCATIONS

### A. Employer Contributions

For each Plan Year, the Board of Directors of the Employer determines the amount, if any, that the Employer will contribute to the Trust. The contribution is made from the net income of the Employer for that Plan Year, or from the earnings and profits accumulated by the Employer prior to that Plan Year. The Employer's contribution to the Trust will be paid in cash and/or in shares of the Employer's common stock.

The Employer's contribution, if any, for each Plan Year is allocated to the individual accounts of all Members who were employees of the Employer on December 31 of that Plan Year. In addition, any Member who retired (as defined in V.A. below), became disabled (as defined in V.B. below), or died during that Plan Year will also be credited with an allocation of the Employer contribution, if any, for that Plan Year. However, if you own 10% or more of the outstanding common stock of the Employer on December 31 of a given Plan Year, no portion of the Employer contribution for that Plan Year will be allocated to your account.

The Employer contribution is credited to your account in proportion to your compensation for that Plan Year, as compared to the total compensation of all eligible Members for that Plan Year. Compensation includes salaries, wages, bonuses, overtime, and commissions, but excludes any contributions or benefits you receive under the Plan as well as any amounts paid to you prior to the date you became a Member under the Plan. For Plan Years beginning on or after January 1, 1989, the maximum level of compensation which will be taken into account is $100,000; any compensation in excess of $100,000 will be disregarded in determining your share of any Employer Contribution.

3

HUB 005

Forfeitures from the accounts of Members who are not fully vested ("vesting" is explained in V.D. below) when they leave the Employer are reallocated to the accounts of remaining Members on the same basis as Employer contributions (as explained above).

There are legal limits on the aggregate amount of contributions and forfeitures that may be allocated to your account under this Plan. Although it is unlikely that these limits will apply to the Plan, they could require a reduction in the amount allocated to your account.

B.    <u>Employee Contributions</u>

Contributions by Members are not permitted.

C.    <u>Trust Gains and Losses</u>

The Trustee is specifically authorized to invest up to 100% of the Trust assets in shares of common stock of the Employer, and it is intended that a substantial portion of the assets of the Trust will be invested in such common stock. One of the major purposes of the Plan is to give each Member a stake in the success of the Employer. Because a substantial portion of the Trust's assets are invested in the Employer's common stock, the value of your benefit under the Plan is significantly dependent on the value of that stock.

The assets and liabilities of the Trust will be evaluated as of December 31 each Plan Year. Any increases in the value of the Trust will be credited to your individual account in proportion to the relative size of your existing account balance. Any decrease in the value of the Trust will be charged to your account on the same basis. The Trustee may cause the assets and liabilities to be evaluated, and the accounts of the Members adjusted accordingly, as of any other date during the Plan Year.

## V.  <u>BENEFITS PROVIDED UNDER THE PLAN</u>

A.    <u>Retirement</u>

If you retire at or after age 60, you will be entitled to receive the entire amount credited to your account, plus interest credited at the prevailing short-term rate from the preceding valuation date through the last day of the month preceding distribution of your account.

B.    <u>Disability</u>

If you are unable to continue working for the Employer because of disability, you will be entitled to receive the entire amount credited to your account, plus interest credited at the prevailing short-term rate from the preceding valuation date through the last day of the month preceding distribution of your account. For purposes of the Plan, "disability" means a total

4

HUB 006

and permanent physical or mental impairment which is likely to result in death or last at least twelve months. The Trustee determines, on the basis of such medical evidence as the Trustee requires, whether you are disabled for purposes of the Plan.

C.   Death

If your employment with the Employer terminates on account of your death, your designated beneficiary will be entitled to receive the entire amount credited to your account, plus interest credited at the prevailing short-term rate from the preceding valuation date through the last day of the month preceding distribution of your account. If you die after you have terminated your employment with the Employer, but before the distribution of the vested portion of your account, the vested portion of your account will be distributed to your designated beneficiary.

If your beneficiary dies before receiving the entire amount payable from your account, the undistributed balance will go to your beneficiary's estate.

D.   Other Termination of Employment

If you terminate your employment with the Employer prior to age 60 for any reason other than disability or death, you will be entitled to a benefit equal to the vested portion of your account, plus interest thereon credited at the prevailing short-term rate from the preceding valuation date through the last day of the month preceding distribution of your account. The vested portion of your account is equal to a percentage of the amount standing to the credit of your account, based on your years of Service with the Employer, as follows:

| Years of Service | Vested Percentage |
|---|---|
| Less than 2 | None |
| 2 | 10% |
| 3 | 30% |
| 4 | 60% |
| 5 or more | 100% |

Amounts which are not vested at the time of your termination will be forfeited once the vested portion of your account has been distributed or after you have had five consecutive "breaks in service," whichever is earlier. If you have zero vesting, you will automatically be deemed to have received a distribution, with the result that your entire account will be forfeited upon termination of employment. Forfeited amounts will be allocated to the remaining eligible Members as explained in IV.A. above.

If you return to work with the Employer before incurring five consecutive "breaks in service," any amount that was previously forfeited from your account will be reinstated in full.

HUB 007

If you return to work after incurring five consecutive breaks in service, you will not be entitled to a reinstatement of any previously forfeited amount.

### E.    Manner and Timing of Benefit Payments

Benefit payments under the Plan are generally payable as a lump sum in cash and will be made within a reasonable period of time after the date of your retirement, death, disability, or other termination of employment. However, instead of such total lump sum distribution you can elect to have all or part of your payment transferred directly to an individual retirement arrangement or other qualified retirement plan as a direct rollover. Any amount you choose to receive (as opposed to have transferred as a direct rollover) is subject to 20% federal income tax withholding (and applicable state tax withholding) and may be subject to an additional 10% early withdrawal tax if you are under age 59 ½. Before receiving a distribution from the Plan, the Trustee will provide you with additional information on Federal tax withholding and direct rollovers. However, you should consult your tax advisor before making any benefit distribution decision.

Note that, if your account balance exceeds $5,000 and you terminate employment before reaching age 62, you must consent in writing to any distribution from the Plan. Otherwise, the Trustee will defer distribution of your account until you reach age 62 or die, whichever occurs first. In this event, the Trustee will segregate your account and invest it in bank deposits or other investments selected by the Trustee. Moreover, if you are a 5% owner of the Employer and are still employed by the Employer when you reach age 70 ½, Federal law requires that your account balance be distributed no later than April 1 of the next calendar year.

If the Trust's assets are not sufficiently liquid to permit distribution to you in cash, the Trustee may defer distribution to you, as described in the Plan, and thereafter may distribute all or a portion of your account balance in shares of Stock (instead of cash) at the end of that period.

### F.    Loans

Upon written application to the Trustee, the Trustee may allow you to take a loan from the Trust. The maximum amount of loans which you can have outstanding from the Plan at any time is the lesser of (a) $50,000, reduced by any loan repayment made during the previous year, or (b) 50% of the vested amount in your account. All loans will be made at a reasonable rate of interest and must be secured by fifty percent of your vested account balance. Loans must be repaid within 5 years; however, this period can be extended if you use the loan in connection with the purchase of your principal residence. Loans will generally be required to be repaid by payroll deduction. If your account becomes payable while you have a loan(s) outstanding, the Trustee will deduct the outstanding loan balance (including any unpaid interest) from your account before distributing the remainder of your account. Any expenses incurred by the Trustee in connection with a loan to you (including any collection expenses in the case of a default) will be charged against your account.

6

HUB 008

G.    In-Service Withdrawals

While you are employed by the Employer, you may make withdrawals from your vested account under the Plan if you have at least 20 years of Service or if you incur a "financial hardship." All withdrawals must be made in accordance with procedures established by the Trustee. Any amount you withdraw will be credited with interest at the prevailing short-term rate from the preceding valuation date to the last day of the month preceding distribution of your withdrawal amount. Your withdrawal amount is taxable income and is subject to 20% Federal income tax withholding (and applicable state tax withholding) and may be subject to an additional 10% early withdrawal tax if you are under age 59 ½.

If you have at least 20 years of Service, you may withdraw all or part of your account for any reason. However, you can only make one such withdrawal during any Plan Year. Generally, your withdrawal amount will be paid to you as soon as feasible after your withdrawal request. However, if the Trustee determines there is not sufficient available cash in the Trust to pay your full withdrawal amount, the Trustee can postpone payment to you for up to three years whereupon distribution will be made to you in cash and, if necessary, in shares of Stock.

If you incur a "financial hardship," you may withdraw from your vested account balance an amount not to exceed the amount needed to pay for such "financial hardship" plus the amount of any taxes or penalties on such withdrawal amount. Hardship withdrawals are payable only in cash, and the Trustee will deny a "financial hardship" withdrawal request to the extent cash is not available in the Trust for such distribution. For Plan purposes, "financial hardship" is defined to include the following:

- medical expenses incurred by you, your spouse or any of your dependents;

- your purchase of a principal residence;

- the need to prevent eviction from, or foreclosure on, your principal residence;

- renovation expenses for your principal residence;

- educational expenses incurred by you, your spouse or any of your dependents;

- funeral expenses (including burial expenses) of a member of your family;

- the need to pay significant amounts of current debt incurred as a result of any one or more of the above.

7

**HUB 009**

H.    Assignment of Account Balance

You may not assign your account balance, nor may you pledge any part of your account balance as security for a loan (other than a loan from the Trust). However, this rule does not prevent the payment of any portion of your account to a spouse, former spouse, or dependent under a "qualified domestic relations order" — i.e., a court order that provides for child support, alimony, or the division of marital property and that satisfies certain technical requirements. The order must be filed with the Trustee, who then determines whether the order meets the requirements for qualified domestic relations orders. You should contact the Trustee if you receive a domestic relations order or if you have any questions about the procedure used to determine whether a domestic relations order is qualified.

## VI.  AMENDMENT AND TERMINATION

The Employer expects to continue the Plan on a permanent basis, but it necessarily reserves the right to terminate the Plan, or completely discontinue contributions under the Plan, at any time. The Employer also reserves the right to amend the Plan at any time. The Plan may not be amended or terminated in such a way as to divert the Plan assets to the benefit of anyone except Members or their beneficiaries, or to reduce any amount previously credited to the account of a Member. If there is a termination or partial termination of the Plan, all affected Members will become fully vested in their accounts.

## VII.  SPECIAL RULES FOR TOP-HEAVY PLANS

If the Plan ever becomes top-heavy (i.e., a disproportionate amount of contributions are allocated to the accounts of certain highly paid employees), you may be eligible for a minimum contribution or faster vesting of your account balance. However, it is unlikely the Plan will ever be top-heavy.

## VIII.  CLAIMS PROCEDURE

If you believe you are (or in the case of your death, if your beneficiary believes he or she is) entitled to Plan benefits and you have not received notification from the Trustee as to the time and manner of distribution of benefits, or if you receive notice from the Trustee with regard to the amount and form of payment of your benefits and you believe there is an error in the notice, then you may submit a claim to the Trustee. If you believe you are entitled to Plan benefits under a domestic relations order, you may submit a claim to the Trustee for a

8

HUB 010

determination of the qualified status of the domestic relations order. Your claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim.

If the Trustee denies your claim, he will, within 60 days of the date he received the claim, notify you in writing of his denial, explain the reasons on which his decision is based and let you know if there are any additional facts or materials which you should supply to support your claim.

If, after receiving the Trustee's explanation of his denial, you still believe you have a right to benefits which have been denied, you may request in writing, within a reasonable period of time after the denial, that the Trustee review his decision. The Trustee will, within 60 days of receipt of a written request for review, send you a written decision on his review explaining the specific reasons for his decision.

## IX.  YOUR RIGHTS UNDER ERISA

As a Member of the Medical Information Technology, Inc. Profit Sharing Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan Member shall be entitled to:

(1)   Examine, without charge, at the Plan Administrator's office, all plan documents and copies of documents filed with the U.S. Department of Labor, such as annual reports and plan descriptions.

(2)   Obtain copies of all plan documents and other plan information by writing the Plan Administrator. There may be a reasonable charge for the copies.

(3)   Receive a summary of the Plan's annual financial report. The Plan Administrator will give you a copy of this report each year.

(4)   Obtain a statement telling you whether you would have a right to a vested benefit under the Plan and how much that benefit would be. If you do not have the right to a vested benefit, the statement will tell you how many more years you have to work before you do have a vested benefit. You can write for a benefit statement once a year and the Plan Administrator will provide one free of charge.

In addition to creating rights for Plan Members, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate the Plan, who are called "fiduciaries," have a duty to do so prudently and in the interest of Plan Members and beneficiaries.

9

**HUB 011**

No one, including the Employer or any other person, may fire a Member or otherwise discriminate against him or her in any way to prevent him or her from obtaining a benefit from the Plan or exercising his or her rights under ERISA.

Under ERISA there are steps a Member can take to enforce the above rights.

For instance, if a Member requests materials from the Plan and does not receive them within 30 days, he or she may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay the Member up to $100 a day until he or she receives the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If a Member or beneficiary has a claim for benefits which is denied or ignored, in whole or in part, and the Member has taken the appropriate action through the claims process, he or she may file suit in a state or federal court.

If a Member believes that Plan fiduciaries are misusing the Plan's money, or if a Member is discriminated against for asserting his or her rights, the Member may seek assistance from the U.S. Department of Labor or may file suit in a federal court.

In addition to deciding what damages, if any, should be awarded, the court will decide who should pay court costs and fees. If the Member is successful, the court may order the party sued to pay these costs and fees. If the Member loses, the court may order the Member to pay the costs and fees, for example, if it finds the claim is frivolous.

If you have any questions about the Plan, you should contact the Plan Administrator at (781) 821-3000.

If you have any questions about this statement or about your rights under ERISA, you should contact the nearest office of the Pension and Welfare Benefits Administration, U. S. Department of Labor.

DOCSB\531435.1

10

**HUB 012**



1

Volume 1, Pages 1-112, Exhibits: 1-8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL P. HUBERT, WILLIAM

TRAINOR, and DAVID HINCHLIFFE,

individually and on behalf of all

persons similarly situated et al.,

Plaintiffs

vs.                    Docket No. 05-10269-RWZ

MEDICAL INFORMATION TECHNOLOGY

PROFIT SHARING PLAN, MEDICAL

INFORMATION TECHNOLOGY, INC., and

A. NEIL PAPPALARDO

Defendants

VIDEOTAPED DEPOSITION OF WILLIAM TRAINOR

Monday, July 24, 2006, 10:08 a.m.

Goodwin Procter LLP

53 State Street - 17th Floor

Boston, Massachusetts

- - - - - - -Reporter:  Alan H. Brock -- RDR, CRR- - - - - - -

Farmer Arsenault Brock LLC, 50 Congress Street,

Suite 415, Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

2

```
1    APPEARANCES:

2        Dwyer & Collora, LLP

3        Sara E. Noonan, Esq.

4        600 Atlantic Avenue

5        Boston, Massachusetts 02210-2211

6        617.371.1000  fax: 617.371.1037

7        senoonan@dwyercollora.com

8        for Plaintiffs

9

10       Goodwin Procter LLP

11       Stephen D. Poss, Esq.

12       Kevin P. Martin, Esq.

13       Exchange Place

14       53 State Street

15       Boston, Massachusetts 02109

16       617.750.1000  fax: 617.523.1231

17       sposs@goodwinprocter.com

18       kmartin@goodwinprocter.com

19       for Defendants

20

21   ALSO PRESENT:

22       Adam Cook, Videograph, National Video Reporters

23

24
```

FARMER ARSENAULT BROCK LLC

3

| | | |
|---|---|---|
| 09:52:51 | 1 | 24, 2006    10:08 a.m. |
| 09:53:00 | 2 | P R O C E E D I N G S |
| 10:08:13 | 3 | THE VIDEOGRAPHER:  We are now recording |
| 10:08:16 | 4 | and on the record.  My name is Adam Cook.  I am a |
| 10:08:19 | 5 | Certified Legal Video Specialist for National Video |
| 10:08:25 | 6 | Reporters.  Our business address is 58 Batterymarch |
| 10:08:28 | 7 | Street, Suite 243, Boston, Massachusetts 02110. |
| 10:08:33 | 8 | Today is July 24th, 2006, and the time is 10:08 a.m. |
| 10:08:37 | 9 | This is the deposition of William |
| 10:08:39 | 10 | Trainor in the matter of Michael P. Hubert, William |
| 10:08:43 | 11 | Trainor, and David Hinchliffe, individual and on |
| 10:08:48 | 12 | behalf of all persons similarly situated, versus |
| 10:08:52 | 13 | Medical Information Technology Profit Sharing Plan, |
| 10:08:56 | 14 | Medical Information Technology, Inc., and A. Neil |
| 10:09:00 | 15 | Pappalardo, in the United States District Court for |
| 10:09:04 | 16 | the District of Massachusetts, No. 05-10269-RWZ. |
| 10:09:10 | 17 | This deposition is being taken at 53 |
| 10:09:13 | 18 | State Street, in Boston, Massachusetts, on behalf of |
| 10:09:16 | 19 | the defendant.  The court reporter is Alan Brock, of |
| 10:09:19 | 20 | Farmer Arsenault Brock. |
| 10:09:21 | 21 | Counsel will state their appearances, |
| 10:09:23 | 22 | and the court reporter will administer the oath. |
| 10:09:26 | 23 | MR. POSS:  Good morning.  Steve Poss and |
| 10:09:29 | 24 | Kevin Martin, from Goodwin Procter, are here today |

FARMER ARSENAULT BROCK LLC

4

| | | |
|---|---|---|
| 10:09:32 | 1 | representing the defendants. |
| 10:09:33 | 2 | MS. NOONAN:  Sara Noonan here, |
| 10:09:35 | 3 | representing the plaintiffs.  With me is William |
| 10:09:37 | 4 | Trainor. |
| 10:09:49 | 5 | EXAMINATION |
| 10:09:49 | 6 | BY MR. POSS: |
| 10:09:50 | 7 | Q.   Good morning, Mr. Trainor. |
| 10:09:52 | 8 | A.   Good morning. |
| 10:09:52 | 9 | Q.   My name is Steve Poss.  My law firm, |
| 10:09:58 | 10 | Goodwin Procter, represents the defendants in this |
| 10:10:01 | 11 | action.  I'll be taking your deposition here today. |
| 10:10:03 | 12 | Would you please state your name for the |
| 10:10:05 | 13 | record. |
| 10:10:05 | 14 | A.   William George Trainor. |
| 10:10:07 | 15 | Q.   Would you spell your last name, sir. |
| 10:10:09 | 16 | A.   T-r-a-i-n-o-r. |
| 10:10:12 | 17 | Q.   What is your current residence address? |
| 10:10:14 | 18 | A.   485 West Street, Wrentham, Mass. 02093. |
| 10:10:19 | 19 | Q.   What is your date of birth? |
| 10:10:20 | 20 | A.   11/23/1946. |
| 10:10:26 | 21 | Q.   Mr. Trainor, have you ever had your |
| 10:10:28 | 22 | deposition taken before? |
| 10:10:30 | 23 | A.   Once. |
| 10:10:31 | 24 | Q.   How long ago was that? |

FARMER ARSENAULT BROCK LLC

23

| | | |
|---|---|---|
| 10:34:13 | 1 | documents or information you obtained or learned |
| 10:34:16 | 2 | while an employee of the company to someone outside |
| 10:34:19 | 3 | the company for personal profit? |
| 10:34:21 | 4 | A.   No. |
| 10:34:22 | 5 | Q.   Did you ever offer to disclose or reveal |
| 10:34:28 | 6 | information about MEDITECH to someone for personal |
| 10:34:34 | 7 | profit? |
| 10:34:34 | 8 | A.   No. |
| 10:34:34 | 9 | Q.   Why not? |
| 10:34:38 | 10 | A.   I love that company. |
| 10:34:40 | 11 | Q.   Would that have been wrong? |
| 10:34:41 | 12 | A.   Absolutely. |
| 10:34:46 | 13 | Q.   While you were employed at MEDITECH, did |
| 10:34:48 | 14 | you ever try to cover up or conceal any actions that |
| 10:34:53 | 15 | you took that were against company policy or |
| 10:34:55 | 16 | improper? |
| 10:34:56 | 17 |         MS. NOONAN:   Objection. |
| 10:34:57 | 18 | A.   No. |
| 10:34:59 | 19 | Q.   Would that have been wrong? |
| 10:35:01 | 20 | A.   Absolutely. |
| 10:35:09 | 21 | Q.   If you and the other plaintiffs win this |
| 10:35:32 | 22 | case, do you expect to receive money? |
| 10:35:34 | 23 | A.   Yes. |
| 10:35:37 | 24 | Q.   Where do you believe that money would come |

30

| 10:43:38 | 1 | Hinchliffe, individually and on behalf of all |
| 10:43:42 | 2 | persons similarly situated"?  Do you see that? |
| 10:43:45 | 3 | A.   Yes. |
| 10:43:45 | 4 | Q.   Do you know what it means that you are a |
| 10:43:47 | 5 | plaintiff both individually and on behalf of all |
| 10:43:50 | 6 | persons similarly situated? |
| 10:43:52 | 7 | A.   I understand the "individually."  "On |
| 10:44:00 | 8 | behalf of all persons similarly situated," I'm not |
| 10:44:03 | 9 | really clear. |
| 10:44:04 | 10 | Q.   What are your responsibilities as a named |
| 10:44:08 | 11 | plaintiff in this class action case? |
| 10:44:12 | 12 | A.   I don't know.  To answer questions |
| 10:44:18 | 13 | honestly. |
| 10:44:25 | 14 | Q.   Are you prepared to testify in court if |
| 10:44:32 | 15 | this case goes to trial? |
| 10:44:34 | 16 | A.   If need be. |
| 10:44:38 | 17 | Q.   Did you ever attempt to learn what |
| 10:44:51 | 18 | responsibilities, if any, you have as a plaintiff in |
| 10:44:56 | 19 | this case? |
| 10:44:57 | 20 | A.   No. |
| 10:45:08 | 21 | Q.   Has anyone informed you of what |
| 10:45:11 | 22 | responsibilities, if any, you have as a plaintiff in |
| 10:45:13 | 23 | this case? |
| 10:45:14 | 24 | A.   No. |

31

| | | |
|---|---|---|
| 10:45:15 | 1 | Q. Are you prepared to pay any portion of the |
| 10:45:25 | 2 | expenses of prosecuting this case? |
| 10:45:28 | 3 | A. Yes. |
| 10:45:31 | 4 | Q. Have you paid any expenses of this case so |
| 10:45:33 | 5 | far? |
| 10:45:34 | 6 | A. Yes. |
| 10:45:34 | 7 | Q. What have you paid? |
| 10:45:38 | 8 | A. $125. |
| 10:45:40 | 9 | Q. When did you pay $125? |
| 10:45:48 | 10 | A. Back when I joined the case. |
| 10:45:50 | 11 | Q. And what was that for? |
| 10:45:54 | 12 | MS. NOONAN: Objection. I think he |
| 10:45:55 | 13 | already said expenses. |
| 10:45:58 | 14 | Q. Do you recall what particular expenses the |
| 10:45:59 | 15 | $125 was for? |
| 10:46:03 | 16 | A. No. |
| 10:46:06 | 17 | Q. Have you paid anything since the $125 first |
| 10:46:08 | 18 | payment? |
| 10:46:09 | 19 | A. No. |
| 10:46:11 | 20 | Q. Have you been informed of what the expenses |
| 10:46:20 | 21 | to date have been in this case? |
| 10:46:21 | 22 | A. No. |
| 10:46:22 | 23 | Q. Have you entered into any written |
| 10:46:49 | 24 | agreements with the Dwyer Collora firm about this |

FARMER ARSENAULT BROCK LLC

33

| | | |
|---|---|---|
| 10:47:54 | 1 | asked him to do.  That's a privileged communication. |
| 10:47:56 | 2 | MR. POSS:  I understand that.  I'm just |
| 10:47:57 | 3 | building a record that he's following your |
| 10:47:59 | 4 | instructions. |
| 10:47:59 | 5 | Q.  Are you going to follow your lawyer's |
| 10:48:00 | 6 | instructions -- |
| 10:48:01 | 7 | A.  Yes. |
| 10:48:02 | 8 | Q.  -- and not answer that question? |
| 10:48:03 | 9 | A.  Yes. |
| 10:48:04 | 10 | Q.  Have you provided any of your personal |
| 10:48:05 | 11 | files or documents concerning this case to the Dwyer |
| 10:48:09 | 12 | Collora firm? |
| 10:48:10 | 13 | MS. NOONAN:  Objection. |
| 10:48:12 | 14 | Q.  You can answer unless she instructs you not |
| 10:48:13 | 15 | to. |
| 10:48:14 | 16 | MS. NOONAN:  I'm going to instruct you |
| 10:48:15 | 17 | not to answer. |
| 10:48:16 | 18 | Q.  Are you going to follow your lawyer's |
| 10:48:18 | 19 | instructions to not answer that question? |
| 10:48:20 | 20 | A.  Yes. |
| 10:48:32 | 21 | Q.  What do you understand your responsibility |
| 10:48:34 | 22 | to be for the expenses of this matter? |
| 10:48:40 | 23 | A.  I think the only thing that I've committed |
| 10:48:42 | 24 | to is sometime down the line paying $1,000 more than |

FARMER ARSENAULT BROCK LLC

34

| | | |
|---|---|---|
| 10:48:48 | 1 | the $125 that I paid. |
| 10:48:52 | 2 | Q. What if the expenses are more than $1,000? |
| 10:48:55 | 3 | A. I agreed to $1,000. |
| 10:48:58 | 4 | Q. Why are you sure -- strike that. |
| 10:49:00 | 5 | Are you sure you agreed to $1,000? |
| 10:49:02 | 6 | A. It's the only number I remember. |
| 10:49:07 | 7 | Q. Do you have any responsibility if the |
| 10:49:09 | 8 | expenses are more than $1,000? |
| 10:49:11 | 9 | A. I don't believe so. |
| 10:49:12 | 10 | Q. Do you think the expenses in this case have |
| 10:49:14 | 11 | been more than $1,000 so far? |
| 10:49:15 | 12 | A. I don't know. |
| 10:49:18 | 13 | Q. Do you know how many pages of documents |
| 10:49:19 | 14 | have been produced by the defendants in this case? |
| 10:49:21 | 15 | A. No. |
| 10:49:24 | 16 | Q. Do you know what the cost is that the |
| 10:49:29 | 17 | plaintiffs' lawyers will have to reimburse the |
| 10:49:31 | 18 | defendants for copying those documents? |
| 10:49:34 | 19 | A. No. |
| 10:49:34 | 20 | Q. What does the Dwyer & Collora law firm get |
| 10:49:47 | 21 | out of this case, to your knowledge? |
| 10:49:48 | 22 | MS. NOONAN: Objection. |
| 10:49:49 | 23 | A. I don't know. |
| 10:49:49 | 24 | Q. Do they get paid a fee if the case is |

35

| | | |
|---|---|---|
| 10:49:52 | 1 | successful? |
| 10:49:53 | 2 | A. I would imagine so. |
| 10:49:54 | 3 | Q. Do you know? |
| 10:49:54 | 4 | A. I don't know. I don't know what the |
| 10:49:57 | 5 | agreement would be with Mike Hubert. I would think |
| 10:50:00 | 6 | he would know. |
| 10:50:00 | 7 | Q. Do you know whether the Dwyer Collora law |
| 10:50:03 | 8 | firm gets paid a fee if the case is not successful? |
| 10:50:07 | 9 | A. No, I don't know the answer. |
| 10:50:11 | 10 | Q. Do you know how any fee to be paid by Dwyer |
| 10:50:15 | 11 | & Collora would be calculated? |
| 10:50:16 | 12 | A. No. |
| 10:50:16 | 13 | Q. Do you believe that you have any |
| 10:50:19 | 14 | responsibility in connection with the issue of what |
| 10:50:22 | 15 | the Dwyer Collora firm would be paid and how much? |
| 10:50:28 | 16 | A. No. |
| 10:50:39 | 17 | MR. POSS: I'm going to ask the reporter |
| 10:50:41 | 18 | to mark as the next exhibit Trainor No. 2, a |
| 10:50:43 | 19 | document stamped TRN 001 through 002. |
| 10:50:49 | 20 | (Exhibit Trainor 2 marked for |
| 10:51:09 | 21 | identification.) |
| 10:51:09 | 22 | Q. Mr. Trainor, have you seen the document |
| 10:51:16 | 23 | that's been placed in front of you, called Trainor |
| 10:51:20 | 24 | Exhibit 2, before? |

36

| | | |
|---|---|---|
| 10:51:28 | 1 | A.  Yeah, it looks familiar.  Yeah. |
| 10:51:35 | 2 | Q.  Have you ever signed this agreement? |
| 10:51:37 | 3 | A.  I believe so. |
| 10:51:38 | 4 | Q.  Do you have a signed copy in your |
| 10:51:40 | 5 | possession? |
| 10:51:42 | 6 | A.  I'm going to say yes. |
| 10:51:44 | 7 | Q.  Do you know when you signed this? |
| 10:51:47 | 8 | A.  It says March 2nd, 2005.  That sounds |
| 10:51:52 | 9 | right. |
| 10:51:53 | 10 | Q.  What's the basis for your belief that that |
| 10:51:57 | 11 | date sounds right? |
| 10:51:58 | 12 | A.  Well, you said the case started in |
| 10:52:02 | 13 | February, and I believe I joined shortly after.  So |
| 10:52:05 | 14 | that would have been around March. |
| 10:52:06 | 15 | Q.  Did Mr. Collora sign your copy of this |
| 10:52:13 | 16 | agreement? |
| 10:52:14 | 17 | A.  I don't know. |
| 10:52:14 | 18 | Q.  When is the last time you saw your copy of |
| 10:52:16 | 19 | this agreement? |
| 10:52:17 | 20 | A.  It would have been back -- when I got it, |
| 10:52:19 | 21 | back then. |
| 10:52:21 | 22 | Q.  You haven't looked for it since then? |
| 10:52:23 | 23 | A.  No.  Like I said, I don't really think |
| 10:52:25 | 24 | about this case very much.  It's just papers on my |

FARMER ARSENAULT BROCK LLC

38

10:53:43    1        A.    No.

10:53:43    2        Q.    The $125 you paid, do you know if anyone

10:53:50    3    else paid $125 in connection with this lawsuit?

10:53:53    4        A.    I don't know.

10:53:54    5        Q.    Now, the next sentence of Paragraph 3.1

10:54:01    6    says, quote, "The client agrees to pay $2,500 when

10:54:06    7    he is financially able to do so in payment towards

10:54:09    8    expenses in the lawsuit," period, close quote.   Do

10:54:13    9    you see that sentence?

10:54:14    10       A.    Yes.

10:54:15    11       Q.    Do you understand that you have agreed to

10:54:16    12   pay $2,500?

10:54:17    13       A.    I do now.

10:54:21    14       Q.    Have you made any payments toward that

10:54:25    15   $2,500 other than the $125?

10:54:27    16       A.    No.

10:54:30    17       Q.    When, if ever, do you expect to make any

10:54:33    18   additional payments?

10:54:34    19       A.    It hasn't been discussed.

10:54:37    20       Q.    What happens if the expenses are more than

10:54:44    21   $2500?  Do you understand that you have to pay more

10:54:48    22   than the $2500 if the expenses ultimately are more

10:54:51    23   than that?

10:54:51    24               MS. NOONAN:   Objection.

FARMER ARSENAULT BROCK LLC

39

| | |
|---|---|
| 10:54:52 | 1 |
| 10:54:54 | 2 |
| 10:54:58 | 3 |
| 10:55:00 | 4 |
| 10:55:02 | 5 |
| 10:55:02 | 6 |
| 10:55:05 | 7 |
| 10:55:06 | 8 |
| 10:55:09 | 9 |
| 10:55:09 | 10 |
| 10:55:15 | 11 |
| 10:55:18 | 12 |
| 10:55:22 | 13 |
| 10:55:26 | 14 |
| 10:55:29 | 15 |
| 10:55:31 | 16 |
| 10:55:46 | 17 |
| 10:55:49 | 18 |
| 10:55:52 | 19 |
| 10:55:54 | 20 |
| 10:55:58 | 21 |
| 10:56:00 | 22 |
| 10:56:04 | 23 |
| 10:56:04 | 24 |

A.   No.

Q.   So do you believe that your total obligation to pay expenses in this case is limited to $2500?

A.   Yes.

Q.   That's your understanding?  Yes?

A.   Yes.

Q.   Why did you think you had agreed to pay $1,000?

A.   It was just a number that stuck in my mind.

Q.   When do you expect to be -- strike that.

Are you now financially able to pay the remainder of the $2500 set forth in Paragraph 3.1 of Exhibit 2?

A.   If I had to, yes.

Q.   If you look at Paragraph 4 of Exhibit 2. It says, quote, "Reasonable compensation on the foregoing contingency shall be paid by the class from a common fund established for, or on behalf of the class, or by the Court, or by the defendants with the approval of the Court after notice to the class," period, close quote.  Do you see that?

A.   Uh-huh.

Q.   What do you understand that to provide for?

FARMER ARSENAULT BROCK LLC

41

| | | |
|---|---|---|
| 10:57:32 | 1 | than that first paper that you showed me -- |
| 10:57:34 | 2 | Q. Well -- |
| 10:57:36 | 3 | A. -- when I joined. |
| 10:57:38 | 4 | Q. What do you mean when you say the first |
| 10:57:42 | 5 | paper when you joined? Are you talking about |
| 10:57:45 | 6 | Exhibit 1 or Exhibit 2? That's all that I've showed |
| 10:57:48 | 7 | you so far. |
| 10:57:49 | 8 | A. Yeah, Exhibit 2. |
| 10:57:50 | 9 | Q. So you recall signing Exhibit 2; you |
| 10:57:53 | 10 | just -- |
| 10:57:53 | 11 | A. I don't recall, but I'm sure I have it. |
| 10:58:20 | 12 | Q. Are you being compensated in any way for |
| 10:58:22 | 13 | your participation in this case? |
| 10:58:24 | 14 | A. No. |
| 10:58:24 | 15 | Q. Are you being reimbursed for any expenses |
| 10:58:26 | 16 | that you may incur for participating in this case, |
| 10:58:29 | 17 | by anyone? |
| 10:58:30 | 18 | A. No. |
| 10:58:40 | 19 | Q. Did you review any files in preparation for |
| 10:58:50 | 20 | this deposition? |
| 10:58:51 | 21 | A. No. |
| 10:58:52 | 22 | Q. What, if anything, did you do to prepare |
| 10:58:54 | 23 | for this deposition? |
| 10:58:55 | 24 | A. Nothing. |

FARMER ARSENAULT BROCK LLC

45

| 11:04:03 | 1 | win this lawsuit and the trust for the MEDITECH |
| 11:04:10 | 2 | profit sharing plan needs to pay out a great deal of |
| 11:04:20 | 3 | money to the plaintiffs in this lawsuit, will that |
| 11:04:22 | 4 | have any effect on the ability of the people |
| 11:04:24 | 5 | currently participating in the MEDITECH profit |
| 11:04:28 | 6 | sharing plan to obtain a distribution when they |
| 11:04:31 | 7 | leave the company? |
| 11:04:33 | 8 | MS. NOONAN:  Objection. |
| 11:04:35 | 9 | A.   I don't know. |
| 11:04:36 | 10 | Q.   Have you ever thought about that? |
| 11:04:38 | 11 | A.   Not really. |
| 11:04:48 | 12 | Q.   Do you understand that this is a class |
| 11:04:50 | 13 | action complaint? |
| 11:04:52 | 14 | A.   Yes. |
| 11:04:54 | 15 | Q.   And who do you understand to be members of |
| 11:04:57 | 16 | the class in this class action complaint? |
| 11:04:59 | 17 | A.   Mike Hubert, Dave Hinchliffe, and myself. |
| 11:05:02 | 18 | Q.   Who else?  Anyone? |
| 11:05:04 | 19 | A.   That's all. |
| 11:05:05 | 20 | Q.   You believe that this case is brought |
| 11:05:09 | 21 | solely concerning you, Mr. Hubert, and |
| 11:05:13 | 22 | Mr. Hinchliffe.  Is that correct? |
| 11:05:15 | 23 | A.   Yes. |
| 11:05:21 | 24 | Q.   So if this case is successful, in your |

FARMER ARSENAULT BROCK LLC

46

| | |
|---|---|
| 11:05:24 | 1 |
| 11:05:26 | 2 |
| 11:05:30 | 3 |
| 11:05:31 | 4 |
| 11:05:32 | 5 |
| 11:05:33 | 6 |
| 11:05:36 | 7 |

view, who will receive money as a result of this

case, in addition to yourself?

    A.    Mike Hubert, Dave Hinchliffe.

    Q.    Anyone else?

    A.    And the lawyers.

    Q.    And the lawyers.  Anyone else?

    A.    No.

11:05:36  8    Q.    Mr. Trainor, let's look back at Exhibit

11:06:41  9  No. 1, which is the amended class action complaint

11:06:51  10  in this case.  Did you see a draft or other version

11:06:57  11  of this amended class action complaint before it was

11:07:00  12  finalized?

11:07:07  13    A.    I think I have two copies of this, so one

11:07:12  14  other.

11:07:15  15    Q.    Have you ever seen the original complaint

11:07:17  16  in this case?

11:07:20  17    A.    I don't believe so.

11:07:24  18    Q.    Do you understand that this amended

11:07:26  19  complaint is the second complaint in this case,

11:07:28  20  filed after the original complaint filed by

11:07:31  21  Mr. Hubert?

11:07:32  22    A.    I don't know that, but okay.

11:07:36  23    Q.    Well, do you have any understanding of that

11:07:37  24  at all?

FARMER ARSENAULT BROCK LLC

58

| | | |
|---|---|---|
| 11:25:05 | 1 | company for eight years.  I'm not in work mode any |
| 11:25:09 | 2 | more.  I remember HBO.  I think one.  Competitors |
| 11:25:15 | 3 | was SMS, and I couldn't tell you what either one |
| 11:25:21 | 4 | stands for. |
| 11:25:25 | 5 | Q.  Do you remember a competitor called Cerner? |
| 11:25:28 | 6 | A.  Cerner. |
| 11:25:28 | 7 | Q.  Was that one that you thought of? |
| 11:25:30 | 8 | A.  Now that you say the name, yes, I remember |
| 11:25:32 | 9 | Cerner. |
| 11:25:32 | 10 | Q.  And was that one of the competitors that |
| 11:25:33 | 11 | you thought at the time that you were employed at |
| 11:25:38 | 12 | MEDITECH that its stock was valued more highly and |
| 11:25:41 | 13 | you wondered why MEDITECH's was not valued as much? |
| 11:25:44 | 14 | A.  I believe so.  I don't remember much about |
| 11:25:47 | 15 | working days any more.  Like I said, I can't even |
| 11:25:49 | 16 | remember most of the people's names any more. |
| 11:25:51 | 17 | Q.  When did you first notice or consider that, |
| 11:25:59 | 18 | as you've put it, that you observed that the stock |
| 11:26:01 | 19 | of MEDITECH's competitors was valued more highly? |
| 11:26:07 | 20 | A.  While I was working there. |
| 11:26:09 | 21 | Q.  So sometime before you left the company, in |
| 11:26:13 | 22 | 1998? |
| 11:26:14 | 23 | A.  Yes. |
| 11:26:14 | 24 | Q.  How long before you left? |

59

| | |
|---|---|
| 11:26:15 | 1 |
| 11:26:23 | 2 |
| 11:26:26 | 3 |
| 11:26:27 | 4 |
| 11:26:32 | 5 |
| 11:26:34 | 6 |
| 11:26:40 | 7 |
| 11:26:42 | 8 |
| 11:26:43 | 9 |
| 11:26:50 | 10 |
| 11:27:06 | 11 |
| 11:27:07 | 12 |
| 11:27:32 | 13 |
| 11:27:35 | 14 |
| 11:27:38 | 15 |
| 11:27:49 | 16 |
| 11:28:04 | 17 |
| 11:28:12 | 18 |
| 11:28:28 | 19 |
| 11:28:32 | 20 |
| 11:28:34 | 21 |
| 11:28:34 | 22 |
| 11:28:37 | 23 |
| 11:28:40 | 24 |

A.    Oh, probably at least a couple of years.

Q.    So at least back into the 1996 time frame, then.

A.    Yeah.

Q.    Did you do anything to investigate or look into the valuation issue you've told me about, that of the competitors being valued more highly?

A.    No.

Q.    Did you ever ask anyone in MEDITECH management how the company or the trust valued MEDITECH stock?

A.    No.

Q.    Do you have any expertise, Mr. Trainor, in how stock of companies is to be valued?

A.    No.

        (Mr. Martin left the deposition room.)

Q.    I'd like to direct your attention to Page 9 of Exhibit 3, Mr. Trainor.  At the top of the page there's a little paragraph -- a paragraph with a little letter (g) in front of it.  Do you see that?

A.    Yes.

Q.    It says, quote, "In addition to the annual communications reflected in the defendants' document production, the plaintiffs had numerous

60

| 11:28:44 | 1 | conversations during the years they were employed at |
| 11:28:46 | 2 | MEDITECH about the contribution of stock by MEDITECH |
| 11:28:50 | 3 | to the trust and/or the sale of MEDITECH stock by |
| 11:28:54 | 4 | MEDITECH to MEDITECH employees." |
| 11:28:58 | 5 | A.   Uh-huh. |
| 11:28:59 | 6 | Q.   "Mr. Hinchliffe and Mr. Trainor do not |
| 11:29:01 | 7 | recall the details of any such conversations," |
| 11:29:03 | 8 | period, close quote.  Do you see that? |
| 11:29:05 | 9 | A.   Yes. |
| 11:29:06 | 10 | Q.   What conversations did you have when you |
| 11:29:13 | 11 | were employed at MEDITECH about the contribution of |
| 11:29:16 | 12 | stock by MEDITECH to the trust? |
| 11:29:17 | 13 | A.   I don't really remember any conversations. |
| 11:29:25 | 14 | I'm sure we had them, but details I don't remember. |
| 11:29:28 | 15 | Q.   Why are you sure you had them? |
| 11:29:30 | 16 | A.   Because we talked about the stock over the |
| 11:29:32 | 17 | years and wondered how, you know, it got its value |
| 11:29:37 | 18 | and all.  But again, that was during, you know, when |
| 11:29:40 | 19 | we had like stockholders' meetings or something that |
| 11:29:43 | 20 | would be stock-related.  It wasn't something that |
| 11:29:50 | 21 | would come up every day. |
| 11:29:51 | 22 | Q.   Do you remember any conversations you had |
| 11:29:53 | 23 | when you were employed at MEDITECH about the |
| 11:29:55 | 24 | contribution of stock by MEDITECH to the trust? |

FARMER ARSENAULT BROCK LLC

80

| 12:01:34 | 1 | at that time, and each January, when we got our |
| 12:01:38 | 2 | bonus, they had our trust fund amount on that paper, |
| 12:01:43 | 3 | and I knew that value was consistent with what |
| 12:01:47 | 4 | January's paper said was my portion of the trust. |
| 12:01:50 | 5 | Q.  Did you think that that value for the stock |
| 12:01:53 | 6 | at that time was too low? |
| 12:01:55 | 7 | A.  I didn't think anything about it. |
| 12:01:56 | 8 | Q.  Did you ever file a claim or complaint |
| 12:02:04 | 9 | about this distribution from the trust? |
| 12:02:06 | 10 | A.  No. |
| 12:02:07 | 11 | Q.  Did you ever tell the trustee of the trust |
| 12:02:10 | 12 | that you thought you should be receiving more from |
| 12:02:12 | 13 | the trust than what you got? |
| 12:02:14 | 14 | A.  No. |
| 12:02:14 | 15 | Q.  Do you know who the trustee of the trust |
| 12:02:16 | 16 | was? |
| 12:02:17 | 17 | A.  Yes. |
| 12:02:17 | 18 | Q.  Who was that? |
| 12:02:18 | 19 | A.  Neil Pappalardo. |
| 12:02:24 | 20 | Q.  Did you ever tell anyone at the company at |
| 12:02:27 | 21 | the time that you received this payment or |
| 12:02:29 | 22 | thereafter that you thought you should have received |
| 12:02:31 | 23 | more from the trust? |
| 12:02:32 | 24 | A.  No. |

FARMER ARSENAULT BROCK LLC

93

| 12:25:07 | 1 | truth; is that correct? |
| 12:25:09 | 2 | MS. NOONAN:  Objection. |
| 12:25:12 | 3 | A.  They may be. |
| 12:25:13 | 4 | Q.  And you don't know, do you? |
| 12:25:14 | 5 | A.  I just don't remember ever getting another |
| 12:25:17 | 6 | one. |
| 12:25:19 | 7 | Q.  Mr. Trainor, if the trustee of the MEDITECH |
| 12:25:52 | 8 | profit sharing plan had valued the stock in the plan |
| 12:26:01 | 9 | at the amount he should have valued in 1998 and |
| 12:26:06 | 10 | 1999, what would have happened to the trust's cash? |
| 12:26:20 | 11 | A.  Well, for one thing, I don't know that he |
| 12:26:23 | 12 | did or didn't value it at what it was worth.  That |
| 12:26:25 | 13 | was only a question in my mind over the years, how |
| 12:26:29 | 14 | it got valued.  I don't know what effect it would |
| 12:26:36 | 15 | have on the trust at all. |
| 12:26:38 | 16 | Q.  Is there some valuation point at which, if |
| 12:26:42 | 17 | the trustee had paid people in the trust out in '98 |
| 12:26:46 | 18 | and '99, the plan would have run out of cash? |
| 12:26:49 | 19 | A.  No. |
| 12:26:49 | 20 | Q.  Why do you say that? |
| 12:26:53 | 21 | A.  It wasn't like the whole company was |
| 12:26:54 | 22 | leaving on the same day.  I mean, if only a handful |
| 12:26:58 | 23 | of people left, that's not going to break the trust |
| 12:27:02 | 24 | or the company.  It wouldn't have affected the |

FARMER ARSENAULT BROCK LLC

97

| | | |
|---|---|---|
| 01:26:27 | 1 | Q. Why did Mr. Hubert leave MEDITECH? |
| 01:26:29 | 2 | A. I don't know. |
| 01:26:29 | 3 | Q. Did Mr. Hubert resign from MEDITECH? |
| 01:26:35 | 4 | A. I don't -- we never spoke. We never talked |
| 01:26:37 | 5 | about it. I just know he's not there. |
| 01:26:40 | 6 | Q. Was Mr. Hubert fired from MEDITECH? |
| 01:26:44 | 7 | MS. NOONAN: Objection. |
| 01:26:45 | 8 | A. I don't know. |
| 01:26:48 | 9 | Q. Has Mr. Hubert ever provided you any |
| 01:26:51 | 10 | information about the circumstances of his leaving |
| 01:26:54 | 11 | MEDITECH? |
| 01:26:54 | 12 | A. No. |
| 01:27:36 | 13 | Q. Who are the defendants in this case? |
| 01:27:39 | 14 | A. Mike Hubert, Dave Hinchliffe, and myself. |
| 01:27:45 | 15 | Q. Those are the plaintiffs. I'm asking who |
| 01:27:49 | 16 | are the defendants? Who are you suing, Mr. Trainor? |
| 01:27:53 | 17 | A. The MEDITECH trust fund profit sharing |
| 01:27:56 | 18 | plan. |
| 01:27:56 | 19 | Q. Anyone else? |
| 01:27:57 | 20 | A. I think that's it. |
| 01:27:59 | 21 | Q. Now, you've said several times today that |
| 01:28:07 | 22 | you loved MEDITECH. |
| 01:28:08 | 23 | A. Uh-huh. |
| 01:28:09 | 24 | Q. So why are you bringing this lawsuit? |

FARMER ARSENAULT BROCK LLC

102

| | | |
|---|---|---|
| 01:35:24 | 1 | Q.   Do you care what the proper value of |
| 01:35:27 | 2 | MEDITECH's stock was in 2001? |
| 01:35:31 | 3 | A.   No. |
| 01:35:32 | 4 | Q.   Would that affect you in any way? |
| 01:35:35 | 5 | A.   No. |
| 01:35:35 | 6 | Q.   What about 2000? |
| 01:35:48 | 7 | A.   No. |
| 01:35:50 | 8 | Q.   So I take it for any years after the last |
| 01:35:58 | 9 | year at which you worked at the company, the fair |
| 01:36:00 | 10 | value of MEDITECH's stock as set by the trustee is |
| 01:36:04 | 11 | not something that concerns you. |
| 01:36:06 | 12 | A.   It didn't until I heard that Jerry |
| 01:36:11 | 13 | Grossman, who was a member of the board of |
| 01:36:12 | 14 | directors, was suing the company for what I |
| 01:36:18 | 15 | understand is he felt the stock was undervalued, and |
| 01:36:21 | 16 | I think that was the first time that I even thought |
| 01:36:23 | 17 | about it. |
| 01:36:24 | 18 | Q.   Maybe my question wasn't clear.  Let me try |
| 01:36:28 | 19 | and ask it again, because that wasn't what I was |
| 01:36:30 | 20 | asking. |
| 01:36:31 | 21 | A.   Okay. |
| 01:36:38 | 22 | Q.   You left MEDITECH in 1998, and you received |
| 01:36:40 | 23 | a payout from the trust in 1998 -- |
| 01:36:43 | 24 | A.   Yes. |

FARMER ARSENAULT BROCK LLC



ORIGINAL

1

Volume 1, Pages 1-62, Exhibits : 1-12

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL P. HUBERT, WILLIAM

TRAINOR, and DAVID HINCHLIFFE,

individually and on behalf of all

persons similarly situated, et

al.,

Plaintiffs

vs.                    Docket No. 05-10269-RWZ

MEDICAL INFORMATION TECHNOLOGY

PROFIT SHARING PLAN, MEDICAL

INFORMATION TECHNOLOGY, INC., and

A. NEIL PAPPALARDO,

Defendants

VIDEOTAPED DEPOSITION OF DAVID W. HINCHLIFFE

Thursday, July 27, 2006, 10:06 a.m.

Goodwin Procter LLP

53 State Street - 17th Floor

Boston, Massachusetts

-------Reporter : Alan H. Brock, RDR, CRR-------

Farmer Arsenault Brock LLC, 50 Congress Street,

Suite 415, Boston, Massachusetts  02109

617.728.4404   fax 617.728.4403

```
                                                          2
 1   APPEARANCES :

 2       Dwyer & Collora , LLP

 3       Sara E. Noonan , Esq .

 4       600 Atlantic  Avenue

 5       Boston , Massachusetts   02210 -2211

 6       617 .371 .1000   fax : 617 .371 .1037

 7       senoonan @dwyercollora  .com

 8       for Plaintiffs

 9

10       Goodwin  Procter  LLP

11       Stephen  D. Poss , Esq .

12       Michael  P. Sugrue , Esq .

13       53 State  Street , Exchange  Place

14       Boston , Massachusetts   02109

15       617 .750 .1000   fax : 617 .523 .1231

16       sposs @goodwinprocter  .com

17       msugrue @goodwinprocter  .com

18       for Defendants

19

20   ALSO  PRESENT :

21       Adam  Cook , Videographer , National  Video

22          Reporters

23

24
```

FARMER  ARSENAULT  BROCK  LLC

3

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:06:24 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:06:45 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 10:07:04 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 10:07:22 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |

1    July 27, 2006    10:06 a.m.

2    P R O C E E D I N G S

3    THE VIDEOGRAPHER : We are now recording

4    and on the record . My name is Adam Cook . I am a

5    Certified Legal Video Specialist for National Video

6    Reporters . Our business address is 58 Batterymarch

7    Street , Suite 243 , Boston , Massachusetts 02110.

8    Today is July 27th, 2006 , and the time is 10:07 a.m.

9    This is the deposition of David Hinchliffe , in the

10    matter of Michael P. Hubert , William Trainor , and

11    David Hinchliffe , individually and on behalf of all

12    persons similarly situated , versus Medical

13    Information Technology Profit Sharing Plan , Medical

14    Information Technology , Inc., and A. Neil

15    Pappalardo , in the United States District Court ,

16    District of Massachusetts , No. 05-10269-RWZ.

17    This deposition is being taken at 53

18    State Street in Boston , Massachusetts , on behalf of

19    the defendants . The court reporter is Alan Brock ,

20    of Farmer Arsenault Brock . Counsel will state their

21    appearances , and the court reporter will administer

22    the oath .

23    MR. POSS : Good morning . My name is

24    Steve Poss . My associate , Michael Sugrue , is with

4

1    me.  We're both with Goodwin Procter LLP, counsel

2    for the defendants in this action.

3              MS. NOONAN:  Good morning.  Sara Noonan,

4    from Dwyer & Collora on behalf of the plaintiffs;

10:07:45   5    and with me is David Hinchliffe.

6              DAVID W. HINCHLIFFE, Sworn

7              MR. POSS:  Sara, shall we use the same

8    agreements we've had in the other depositions:  the

9    witness will read and sign within 30 days or

10:08:10  10    otherwise the transcript is deemed accurate, and

11    objections reserved except as to form?

12              MS. NOONAN:  That's fine.

13              MR. POSS:  Thank you.

14              EXAMINATION

10:08:17  15    BY MR. POSS:

16       Q.   Good morning, Mr. Hinchliffe.  My name is

17    Steve Poss.  I'm a lawyer with Goodwin Procter.  We

18    represent the defendants in this action.  I will be

19    taking your deposition today.

10:08:28  20              Would you please state your full name

21    for the record, including the spelling of your last

22    name.

23       A.   Yes.  My name is David W. Hinchliffe.

24    That's H-i-n-c-h-l-i-f-f-e.

FARMER ARSENAULT BROCK LLC

8

1       A.   Yes , I understand .

2       Q.   What do you understand , if any , to be your

3   responsibilities  as a named plaintiff  in this case ?

4       A.   One of the main things is to be here for

10:12:15   5   the deposition  and to testify  in court  if I'm so

6   asked .

7       Q.   Anything  else ?

8       A.   Just to answer  the appropriate  questions  as

9   to what I know .  That 's it .

10:12:43  10       Q.   Are you being represented  by counsel  as a

11  plaintiff  in this case ?

12       A.   This is Dwyer & Collora .

13       Q.   Mr . Hinchliffe , we will show you a document

14  that 's been produced  by your attorneys  stamped  HIN

10:13:09  15  20 through  21.

16            (Exhibit  Hinchliffe  1 marked  for

17  identification  .)

18       Q.   This will be Hinchliffe  No . 1.  Do you know

19  what Exhibit  No . 1 is, Mr . Hinchliffe ?

10:13:32  20       A.   This is the contingency  agreement .  That 's

21  where I agree to pay $500 upfront , and should  the

22  case be certified  as a class action , then I agree to

23  pay another  $2,000 .

24       Q.   What if the expenses  in the case exceed

FARMER ARSENAULT BROCK LLC

15

| | | |
|---|---|---|
| | 1 | it was a long time ago, and we talked for a long |
| | 2 | time. But, you know, I can assure you that we |
| | 3 | talked about our feelings about the stock and |
| | 4 | whether we thought it was low or high or whatever. |
| 10:21:51 | 5 | Q.    What feelings did you have about the stock |
| | 6 | that you expressed to Mr. Hubert? |
| | 7 | A.    I always felt that it was valued low.  We |
| | 8 | all did.  Everybody in the company did.  It's just, |
| | 9 | you know, you couldn't do anything about it. |
| 10:22:06 | 10 | Q.    Now, when you say you always felt that the |
| | 11 | stock was valued low, when did you first come to |
| | 12 | have that belief? |
| | 13 | A.    Well, first of all, I mean, none of us ever |
| | 14 | knew how they decided to value the stock. |
| 10:22:21 | 15 | Q.    Well, that's not the question I asked you. |
| | 16 | So when did you first come to the belief that the |
| | 17 | stock was valued low?  In other words, I'm trying to |
| | 18 | put a time frame around your use of the word |
| | 19 | "always." |
| 10:22:36 | 20 | A.    Well, I mean, it's always a general |
| | 21 | feeling.  There is never anything like, you know, I |
| | 22 | feel this is so low I want to try to do anything |
| | 23 | about it.  It's just, you know, general office talk. |
| | 24 | It goes back a while. |

FARMER ARSENAULT BROCK LLC

16

     Q.   Do you recall when you first came to
believe that MEDITECH stock was, in your words,
valued low?

     A.   In what kind of way? I never got to the
10:23:12   point where I would think that I would want to try
to do something about it or thought I ever could do
something about it.

     Q.   That's not the question I asked you,
Mr. Hinchliffe.

10:23:20   A.   As far as a very general answer, I don't
know. Sometime in the late '80s, early '90s; I
don't know, something like that.

     Q.   So at some point in the late '80s, early
'90s, you came to believe that MEDITECH stock was
10:23:38   valued low; is that fair to say?

     A.   I think that's stretching it a little bit.
Let's say it's fair to say that I began to wonder
about it, would be more accurate.

     Q.   Mr. Hinchliffe, earlier in this deposition
10:23:49   you said that you had always believed that the stock
was valued low. During what period of time did you
work at MEDITECH?

     A.   1975 through 1998.

     Q.   So at some point between 1975 and 1998 you

FARMER ARSENAULT BROCK LLC

17

1    came to believe that the stock was valued low; is

2    that correct?

3        A.   I came to question the value of the stock.

4        Q.   Well, when did you come to believe it was

5    valued low?

6        A.   Truly believe, so that I knew for sure?

7        Q.   No, just believe.

8        A.   Probably when I talked to Michael Hubert a

9    year and a half ago.

10        Q.   Well, you told me that when you were

11    speaking to Michael Hubert a year and a half ago you

12    had always believed that the stock was valued low.

13            MS. NOONAN:  Objection.  Steve, I think

14    there's a confusion between --

15            MR. POSS:  No, there isn't any

16    confusion -- don't coach the witness.  If you want

17    to object, say "objection."  But I'm trying to ask

18    him questions, and he's not answering them.

19            MS. NOONAN:  Steve, he's answering them

20    to the best of his ability.  You're quibbling.

21            MR. POSS:  Fine.  Then say "objection."

22    And I'm not quibbling, and that's not a proper

23    objection.

24        Q.   Mr. Hinchliffe, when did you come to

FARMER ARSENAULT BROCK LLC

18

1    believe that the stock was valued low?

2              MS. NOONAN :   Objection .

3         A.    You know , there 's a huge difference  between

4    believing  the stock is low such  that I could  do

10:25:17    5    something  about  it and just having a general  feeling

6    that , you know , maybe this stock should be valued

7    higher .

8         Q.    When did you have that general  feeling ?

9         A.    And I answered  your question , and I said

10:25:30   10   the late '80s to early '90s .

11        Q.    So in the late '80s to early '90s , you had

12   a convenient  feeling that the stock was low and

13   should be valued higher ; is that correct ?

14        A.    Perhaps  should be valued higher ; yes ,

10:25:41   15   that 's correct .

16        Q.    And you said that -- also said that

17   everyone  believed it was low . What was the basis

18   for that statement ?

19        A.    It 's just based on conversations  with

10:25:52   20   people here and there . Obviously , it can 't be

21   everybody  in the company  because I haven 't spoken  to

22   everybody  in the company .

23        Q.    But in general , people you spoke with in

24   the company  while you were employed  at MEDITECH

19

1  believed  that  the  stock  was  low;  is  that  your

2  testimony?

3      A.    They  questioned  the  value  of  the  stock.

4      Q.    When  you  say  they  questioned  the  value,  do

10:26:17  5  you  mean  they  questioned  that  it  was  too  high  or

6  they  questioned  that  it  perhaps  might  be  valued  too

7  low?

8      A.    They  questioned  how  it  was  valued  and

9  whether  it  was  valued  properly.

10:26:29  10      Q.    And  was  it  your  sense  that,  at  least  among

11  your  circle  of  acquaintances  when  you  were  employed

12  at  MEDITECH,  that  the  people  you  knew  questioned

13  whether  the  stock  was  valued  too  low?

14          MS.  NOONAN:    Objection.

10:26:48  15      A.    There  were  certainly  questions  about  how  it

16  was  valued,  and  obviously,  if  we  have  questions

17  about  its  value,  we  think  it's  valued  too  low.

18      Q.    When  you  spoke  with  Mr.  Hubert  about  the

19  possibility  of  joining  this  lawsuit  a  year  and  a

10:27:08  20  half  ago,  did  you  tell  Mr.  Hubert  you  believed  that

21  MEDITECH  stock  was  under valued?

22      A.    I'm  sure  I  agreed  with  him  at  that  time.

23      Q.    And  when  you  say  you  agreed  with  him,  does

24  that  mean  you  agreed  with  him  that  the  MEDITECH

FARMER  ARSENAULT  BROCK  LLC

20

1    stock was under valued ?

2        A.    He gave me some information on research

3    that he had done, and after our conversation I was

4    convinced that, yeah, it was low.

10:27:41    5        Q.    What information  --

6        A.    But that's the first time that I had some

7    fairly conclusive information that would help me

8    make that decision.

9        Q.    What was the fairly conclusive information

10:27:53    10    that Mr. Hubert gave you in that phone call that

11    helped you make that decision that the stock was

12    under valued ?

13        A.    He just told me some research that he did.

14    I don't remember the specific terms, the specific

10:28:09    15    company that he cited, or anything like that.  But

16    it was something that was quite interesting.

17        Q.    Again, I want to focus on this fairly

18    conclusive information that you've testified

19    Mr. Hubert gave you in that phone call.  Did that

10:28:27    20    information include a comparison of P/E or price /

21    earnings ratios of MEDITECH to some other company or

22    companies ?

23        A.    Yes.  It compared earnings of other

24    companies and their assets and what their stock was

FARMER ARSENAULT BROCK LLC

21

1    versus  what  MEDITECH 's  was .

2        Q.    Was  one  of  those  companies  Cerner ?

3        A.    I  don't  remember  any  of  the  names  that  he

4    said .

10:28:58    5        Q.    But  aside  from  not  recalling  the  names ,  it

6    was  a  comparison  of  earnings ,  assets ,  and  stock

7    values  of  other  companies  versus  MEDITECH  stock ;

8    correct ?

9        A.    That's  my  recollection ;  yes ,  sir .

10:29:14   10        Q.    And  was  that  the  information  that  you've

11   told  me  was  fairly  conclusive  that  helped  you  make

12   the  decision  that  the  stock  was  undervalued ?

13       A.    That's  correct .

14       Q.    What  do  you  personally  expect  to  get  out  of

10:29:38   15   this  lawsuit  if  it's  successful ?

16       A.    Whatever  the  Court  deems  appropriate .

17       Q.    Well ,  do  you  expect  to  get  money  if  the

18   case  is  successful ?

19       A.    Obviously .

10:29:55   20       Q.    So  the  answer  is  yes?

21       A.    The  answer  is  yes .

22       Q.    And  how  much  money  do  you  expect  to  get  if

23   the  case  is  successful ?

24       A.    I  have  no  idea .

24

1    percent more, to as much as five times. Those are

2    the numbers that I've thrown about.

3        Q.    And based on your consideration  of the

4    stock as being potentially  valued anywhere  from 50

10:32:36    5    percent more to five times as much, for purposes  of

6    calculating  your distribution  from the profit

7    sharing  plan have you calculated  what that range

8    would mean for you in terms of an award in this

9    case?

10:32:48    10        MS. NOONAN :   Objection .

11        A.    Yes, of course  I have.

12        Q.    What have you calculated  that range to be?

13        A.    Just apply the numbers.  You have it there.

14    I mean, it could be anywhere from five or six

10:33:02    15    hundred  thousand  to 5 million, about.

16        Q.    Were you aware of the possibility  of this

17    lawsuit  before Mr. Hubert  first  filed  it?

18        A.    Before  I first -- before he filed  it?

19        Q.    Yes.

10:33:36    20        A.    No, not at all.

21        Q.    So you first came to hear about it after

22    Mr. Hubert  filed the original  complaint ?

23        A.    Yes, that's correct .

24        Q.    Did Mr. Hubert  ever tell you that while he

25

1    was employed by MEDITECH he secretly offered to sell

2    MEDITECH information to Dr. Jerry Grossman, who was

3    then suing the company?

4              MS. NOONAN: Objection.

10:34:08    5         A.   No.

6         Q.   What do you think will happen to people

7    currently participating as members of the MEDITECH

8    profit sharing plan if you win this lawsuit and the

9    plan pays out the kind of money that you are talking

10:34:56   10    about to you and to others who left earlier?

11              MS. NOONAN: Objection.

12         A.   Can you repeat or rephrase? Are you

13    talking about people that are currently in the plan

14    or people that have left the company that were in

10:35:07   15    the plan?

16         Q.   People who are currently in the plan today.

17    What do you think would happen to them if you win

18    this lawsuit and the plan needs to pay out money to

19    you and other former plan participants?

10:35:24   20              MS. NOONAN: Objection.

21         A.   I'm not sure.

22         Q.   Have you thought about that?

23         A.   I've thought about it.

24         Q.   And what have your thoughts been?

FARMER ARSENAULT BROCK LLC

26

1          MS. NOONAN :    Objection .

2     A.    Quite  frankly ,  I'm just  concerned  about

3   this case .

4     Q.    What  have  your  thoughts  been  about  people

10:35:49   5   who  are  currently  participating  in the  plan  and  what

6   effect  this  case  might  have  on  them ?

7          MS. NOONAN :    Objection .

8     A.    The  company  has  plenty  of  money .   I'm  sure

9   it will  all  work  out  just  fine .   In  other  words ,  I'm

10:36:07   10  not  worried  about  it .

11    Q.    What  do  you  think  would  happen  to  people

12  who  left  the  company  and  took  distributions  from  the

13  plan  in  years  subsequent  to  your  leaving  the

14  company ,  in  1998 ,  but  before  now ?   What  impact  would

10:36:25   15  your  suit  have  on  those  people ?

16    A.    My  understanding ,  it's  a  class  action ,  and

17  that  they  would  also  be  rewarded  a  settlement .

18    Q.    Have  you  analyzed  or  considered ,  for

19  example ,  whether  if  this  case  proceeded  and  the  plan

10:36:42   20  paid  out  money  to  people  who  left  in  '98  and  '99 ,

21  based  on  the  range  of  values  that  you 've  told  me

22  might  be  possible ,  whether  there  would  be  anything

23  left  to  pay  anyone  who  left  the  company  in  2001  or

24  2002  or  2003 ?

FARMER  ARSENAULT  BROCK  LLC

27

```
 1              MS. NOONAN :   Objection .

 2         A.   I'm not privy to what the assets of the

 3    trust are right now .  I know that Mr. Pappalardo  is

 4    an incredibly  wealthy  man , and I'm sure he would
```
10:37:11  ```
 5    take care of the people , even if he had to take it

 6    out of his own funds .
```

```
 7         Q.   Have you considered  whether  there would be

 8    money left to pay people who left in 2001 , 2002 ,

 9    2003 if you and others -- let me finish the
```
10:37:26  ```
10    question , please , Mr. Hinchliffe  -- if you and

11    others were paid out based on the kind of numbers

12    you've mentioned , who left in '98 or '99 or 2000 ?

13              MS. NOONAN :   Objection .

14         Q.   You may answer .
```
10:37:41  ```
15         A.   I'm sorry , I got distracted  when you said

16    "let me finish ."  Can you repeat that , please ?

17         Q.   Yes .  Have you considered  whether  there

18    would be money left to pay people who left the

19    company  and got distributions   from  the plan in 2001 ,
```
10:37:56  ```
20    2002 , or 2003 if you and others who left the plan

21    and received  distributions   earlier  than that were

22    paid out based on the kind of numbers you 've

23    mentioned  in terms of value of the stock ?

24              MS. NOONAN :   Objection . .
```

FARMER ARSENAULT BROCK LLC

29

1    plan were when he left?

2        A.   I don't even know the answer to that.

3        Q.   MEDITECH as a company, does it have any

4    obligation to contribute cash or stock to the plan?

10:39:23  5        A.   No, it does not.

6        Q.   It's completely voluntary, is it not?

7        A.   That is correct.

8        Q.   And does Mr. Pappalardo have any obligation

9    to take money out of his pocket and contribute it to

10:39:31  10   the plan?

11       A.   Absolutely not, none whatsoever.

12       Q.   You understand that this is a class action.

13   You've said that several times.

14       A.   Yes, I understand.

10:39:58  15       Q.   Who are the members of the class? How is

16   it comprised?

17       A.   It's my understanding that it would be

18   anybody who terminated employment after January 1st,

19   1998. And I'm not sure how many people that

10:40:15  20   encompasses.

21            MR. POSS:  Mr. Hinchliffe, we'll ask the

22   reporter to mark as Exhibit No. 2 a document which

23   was provided to us by your lawyers called

24   Plaintiffs' Responses to Defendants' First Set of

FARMER ARSENAULT BROCK LLC

35

1    A.    I don't recall that.

2    Q.    Do you think it would be fair for someone

3    who left MEDITECH in 2001 or 2002 and took a

4    distribution at that time to receive a smaller

10:49:12    5    distribution from the trust based on a per-share

6    value lower than someone who left in 1998, the year

7    you left?

8                MS. NOONAN:    Objection.

9    A.    I mean, I'm not concerned, really, with

10:49:25    10    people that left in 2000.  I'm concerned with me.

11    Q.    While you were employed at MEDITECH, you

12    received a copy of a summary plan description of the

13    MEDITECH profit sharing plan; is that true?

14    A.    That is correct.

10:49:53    15    Q.    Did you read that summary plan description?

16    A.    Yes, sir.

17    Q.    How many different summary plan

18    descriptions did you receive when you were employed?

19    A.    I couldn't tell you.  I don't know.

10:50:14    20    Q.    More than one, I take it?

21    A.    I can't -- I don't know.  It could have

22    been; I don't know.

23                MR. POSS:    I ask the reporter to mark as

24    the next exhibit, which I believe is No. 4, a copy

37

1    received -- strike that. When you left MEDITECH,

2    you received distribution of your interest in the

3    plan; is that correct?

4        A.    That's correct.

10:52:17    5        Q.    Did you file any claim in writing with the

6    plan trustee complaining about that distribution or

7    stating that you believe what you received was

8    incorrect?

9        A.    No, I did not.

10:52:29    10        Q.    While you were employed at MEDITECH, did

11    you ever seek to examine at the plan administrator's

12    office the plan documents, including the plan

13    itself?

14        A.    No, I did not.

10:52:46    15        Q.    Did you ever seek while you were employed

16    at MEDITECH to obtain a copy of the plan?

17        A.    No, I did not.

18        Q.    Mr. Hinchliffe, if you'll look back earlier

19    in Exhibit No. 4 at the amended complaint itself,

10:53:49    20    and I ask you to turn to Page 14. Do you see a

21    heading in your complaint called 1998 Values?

22        A.    Yes, I do.

23        Q.    Now, if we skip down a few paragraphs under

24    that heading, do you see Paragraph 69?

FARMER ARSENAULT BROCK LLC

52

1    Q.    But at least as early as February of 1994,

2    you received notice of such a meeting.

3    A.    Yes.

4    Q.    And were you aware that similar meetings

11:21:06  5    were held --

6                MS. NOONAN:    Objection.    Steve, this

7    document seems to be internally inconsistent.    It's

8    labeled 1995, and it's --

9                MR. POSS:    It's not internally

11:21:14  10   inconsistent.    If you knew anything about the facts,

11   you'd realize -- and if you'd read the document,

12   you'd realize it's perfectly consistent.

13               MS. NOONAN:    I'm looking down at the

14   second-to-last paragraph, which also refers to 1995.

11:21:32  15               MR. POSS:    If you're unfamiliar with the

16   documents, I can't help you.    But do you have an

17   objection?

18               MS. NOONAN:    Yeah.    My objection is that

19   it's not clear that this document is what you've

11:21:42  20   just purported it to be in your question.

21               MR. POSS:    Well, you've made your

22   objection.

23   Q.    Mr. Hinchliffe, why did you not attend the

24   meeting that you were invited to?

FARMER ARSENAULT BROCK LLC

53

A.   Because I already knew that it was mainly for -- the meeting was mainly for new purchasers of the stock . People that have already purchased stock already knew everything , knew what they were getting into , knew what it was all about , and had no need to attend the meeting .

Q.   But you knew you could attend if you wanted ; is that correct ?

A.   Yes , sure .

Q.   And there was another , similar , meeting held in '95 --

A.   Once they --

Q.   You need to wait until I'm done talking Mr . Hinchliffe , before you start answering . Let me start my question over again .

Were there similar meetings held in '95 and '96 and 1997 ?

MS . NOONAN :   Objection .

A.   Yes , I assume there were .

Q.   And did you attend any of those ?

A.   No .

Q.   You understood , however , that you were entitled to attend those meetings as a shareholder of the company if you wanted to ; is that correct ?





EXHIBIT

MH 3

AHB  7/26/06

-----Original Message-----
**From:** ERISA [mailto:erisa@mediaone.net]
**Sent:** Monday, February 18, 2002 3:01 AM
**To:** marcia@mwagner.net; aliazos@mwe.com; info@dwyercollora.com;
cmontilio@dwyercollora.com; jcleary@goodwinprocter.com; mtse@goodwinprocter.com;
kbilezerian@mwe.com; ajbianchi@MirickOConnell.com; tkolb@erisaboston.com;
wfitzgerald@mbbf.com; isunshine@sandw.com; edwards@mc-ed.com; friedler@aol.com
**Subject:** ERISA Suit

Dear Sir or Madam:

I believe a have a case against a Massachusetts employer that could settle for more than
$20,000,000.

My employer is a private company with qualified contribution plan. The plan judiciary is also
the founder and the major stockholder of the company. The plan is mostly invested in
company stock. The judiciary sets the value of the stock, despite the fact they have no
experience in this matter. The auditors simply accept the value of "fair market value". It is
acknowledged by all that the stock value is set low so that employees will purchase the

stock. When the plan makes distributions, employees receive much less than they should. If the real "fair market value" was used to compute the distribution, the plan would have no cash.

The plan has distributed more than $20,000,000 within the last five years, and the stock value is set at about one-third of companies our size in our industry. The fudiciary has assets of more than $50,000,000.

I hope that you or your firm would be interested in reviewing this case on a contingency basis. As an employee of this firm, bringing this case to you, and willing to be active in the case, I wish be receive financial consideration for my efforts. If you wish further information, please respond to this email. Since I am still working at this firm, and wish to remain so, I regret that I cannot yet identify myself or my company.

Thank you for your consideration.

Bob



DEPOSITION
EXHIBIT

Trainor 2
HHB  7/24/06

## CONTINGENT FEE AGREEMENT

William Trainor  (hereinafter the "Client"), hereby retains Dwyer & Collora, LLP

(hereinafter the "Attorneys"), of 600 Atlantic Avenue, Boston, MA 02210, to perform the legal

services described in Paragraph 1 below, and the Attorneys agree to perform such services

faithfully and with due diligence.

     1.     The Attorneys shall counsel and represent the Client and the Class in connection
with filing a class action lawsuit regarding his claim, (and those similarly situated) who have
claims of not having been paid in full the value of their stock in a stock benefit plan after
employment was terminated at Meditech.

     2.     The contingency upon which compensation shall be paid to the Attorneys is the
settlement or judgment on the Class' behalf of the matter referred to in Paragraph 1.

     3.     The Client shall not be liable to pay compensation to the Attorneys other than
from amounts collected on behalf of the Client by the Attorneys, except as follows:

          3.1     The Client shall in any event be liable to the Attorneys for
his pro rata share of reasonable expenses and disbursements such
as a filing fee, travel, postage, fax, express mail, class notices, his
deposition transcript and copy costs. The client agrees to pay
$2,500 when he is financially able to do so in payment towards
expenses in the lawsuit.

          3.2     If the Client discharges the Attorneys at any time prior to
the completion of the matter, the Client shall compensate the
Attorneys for their reasonable time charges through the date of
discharge on a quantum meruit basis, if and only if, he receives a
separate settlement from the defendants. However, the Attorneys
shall be permitted to continue the class action.

     4.     Reasonable compensation on the foregoing contingency shall be paid by the Class
from a common fund established for, or on behalf of the Class, or by the Court, or by the
defendants with the approval of the Court after notice to the Class. This amount shall be in
addition to the Attorneys' reasonable expenses and disbursements as set forth in Section 3.1
above.

     5.     The Client hereby grants exclusive authority to the Attorneys to represent the
Client in the matter described in Paragraph 1, and the Client agrees not to settle the matter
separately without notice to the Attorneys.

**EACH PARTY HERETO ACKNOWLEDGES HAVING READ THE FOREGOING AGREEMENT BEFORE SIGNING IT AND ACKNOWLEDGES RECEIPT OF AN EXECUTED COUNTERPART OF THE AGREEMENT.**

Dated: As of March 2, 2005


_____              _____
Witness                              William Trainor


_____              _____
Witness                              Michael A. Collora
                                     For Dwyer & Collora

2

TRN 002

## CONTINGENT FEE AGREEMENT

William Trainor (hereinafter the "Client"), hereby retains Dwyer & Collora, LLP
(hereinafter the "Attorneys"), of 600 Atlantic Avenue, Boston, MA 02210, to perform the legal
services described in Paragraph 1 below, and the Attorneys agree to perform such services
faithfully and with due diligence.

1.    The Attorneys shall counsel and represent the Client and the Class in connection
with filing a class action lawsuit regarding his claim, (and those similarly situated) who have
claims of not having been paid in full the value of their stock in a stock benefit plan after
employment was terminated at Meditech.

2.    The contingency upon which compensation shall be paid to the Attorneys is the
settlement or judgment on the Class' behalf of the matter referred to in Paragraph 1.

3.    The Client shall not be liable to pay compensation to the Attorneys other than
from amounts collected on behalf of the Client by the Attorneys, except as follows:

> 3.1    The Client shall in any event be liable to the Attorneys for
> his pro rata share of reasonable expenses and disbursements such
> as a filing fee, travel, postage, fax, express mail, class notices, his
> deposition transcript and copy costs. The client agrees to pay
> $2,500 when he is financially able to do so in payment towards
> expenses in the lawsuit.

> 3.2    If the Client discharges the Attorneys at any time prior to
> the completion of the matter, the Client shall compensate the
> Attorneys for their reasonable time charges through the date of
> discharge on a quantum meruit basis, if and only if, he receives a
> separate settlement from the defendants. However, the Attorneys
> shall be permitted to continue the class action.

4.    Reasonable compensation on the foregoing contingency shall be paid by the Class
from a common fund established for, or on behalf of the Class, or by the Court, or by the
defendants with the approval of the Court after notice to the Class. This amount shall be in
addition to the Attorneys' reasonable expenses and disbursements as set forth in Section 3.1
above.

5.    The Client hereby grants exclusive authority to the Attorneys to represent the
Client in the matter described in Paragraph 1, and the Client agrees not to settle the matter
separately without notice to the Attorneys.

**TRN 003**

**EACH PARTY HERETO ACKNOWLEDGES HAVING READ THE FOREGOING AGREEMENT BEFORE SIGNING IT AND ACKNOWLEDGES RECEIPT OF AN EXECUTED COUNTERPART OF THE AGREEMENT.**

Dated: As of March 2, 2005

_____
Witness

William Trainor

_____
Witness

Michael A. Collora
For Dwyer & Collora

2

TRN 004

# Ex. K

# Document Sealed



**EXHIBIT**

MH  9

ATT8  7/26/06

September 7, 2004
48 Narragansett Rd.
Quincy, MA  02169

Barbara Manzolillo
Chief Financial Officer and Treasurer
Medical Information Technology, Inc.
MEDITECH Circle
Westwood, MA  02190

Dear Barbara:

Enclosed is my signed Benefit Election Form authorizing you to rollover my funds from
the Medical Information Technology Profit Sharing Trust to my E*Trade account.
I appreciate your administrative management of the Trust over the years.  It has done
well, but I have two concerns that I hope that you could provide assistance and/or insight.

First, I have been concerned that MEDITECH has been reluctant to use an independent
valuation for the MEDITECH stock.  It is my belief that the MEDITECH stock is
undervalued and thus my distribution will be less than what I should be receiving.
Second, distributions are based upon an individual's account balance of the prior
December 31st (plus 0.5% monthly interest, minus recent distributions) and not the most
recent quarterly valuation.

There is now more than $107,000,000 of MEDITECH stock in the trust (based on
$27/share).  This is 84% of all assets.  Since the value of the MEDITECH stock has a
major impact on distributions, I find it surprising that an independent valuation is has not
been used.

I am also concerned that my distribution will be based upon my account balance of
December 31, 2003, and not the current value.  It is acknowledged that the condensed
description of the Trust describes how the distribution will be made, but it disregards the
subsequent contributions to the plan and increase in the valuation of the MEDITECH
stock.  I find it interesting that when I sold MEDITECH stock on the August 6, 2003,
Neil Pappalardo had determined the price of $23/share.  By January 2004, the stock value
had increased 13% to $26/share.  Interestingly, from the second to the fourth quarter
2003, equity per share went down 5% and net income went down 6%.  Employees that
took distributions from the Trust as late as December 2003, would have received a
distribution based upon the price of $22 per share determined around November 2002.
Employees receiving distributions in December 2003 would receive six percent more
than their December 2002 account balance, but those receiving distribution two months
later would receive about 24% more.  This increase is mostly due to the revaluation of the
MEDITECH stock and not the 2003 share of contributions and forfeitures ($4,255 in my
account).  By making nominal increases in stock value throughout the year, and then

**HUB 238**

making a large increase in the stock valuation at the end of the year, penalizes those that sell stock or receive distributions from the Trust throughout the year.

The recent letter that you sent me regarding the Special Meeting of Shareholders notes that since June of this year, the Trust has been paying $27/share for MEDITECH stock. (This notice was also filed with the SEC.) If Neil has already determined that $27/share is the fair price for the MEDITECH stock, then my distribution, at a minimum, should be based on the June price of $27/share. It appears that the stock value is considered periodically, and if needed it is adjusted up about three times a year. I believe it would be reasonable to recalculate individual account balances each quarter (using the most current stock value) and then making appropriate distributions.

For example, my account balance within the Trust was $1,039,086, on December 31, 2003. As you recall, I and other long-term employees were informed in November that we were to roll over funds in excess of $1,000,000. On March, I rolled over $39,086 (plus one percent interest) into my E*Trade IRA. Since January, the Trust assets have grown significantly more than the 0.5% monthly interest provided to subsequent distributions. The Trust has received at least $4,100,000 in contributions from the company. In addition, the Trust has received at least $3,000,000 in dividends. According to the recent filing with the SEC, the Trust has been purchasing MEDITECH stock at $27/share since June. The Trust owns at least 3,986,286 shares of MEDITECH stock. If each share went up by one dollar, the Trust would have additional assets of $3,986,286. (Of course, I would not know about the fund distributions or other transactions made during the same time.) It would be reasonable to estimate that the Trust assets have grown by about $10,000,000 since December 31st. The largest growth in the Trust assets each year is always the revaluation of the MEDITECH stock. The policy of determining the plan assets once each year, even though the Trust increases the funds paid for MEDITECH stock throughout the year, is detrimental to those employees that receive distributions later within a calendar year. I estimate that my Trust balance at the end of August should be close to $1,100,000 (at $27/share). If an independent valuation of the stock were utilized, my Trust balance might be $1,300,000 or even more.

I do not expect that this matter will be resolved quickly. In the interim, please transfer my funds as authorized on the attached form. My acceptance of the transfer of these funds does not limit my ability to seek further resolution to these matters.

Sincerely,

Michael Hubert

Cc: Neil Pappalardo, Chairman and CEO, Medical Information Technology

HUB 239





EXHIBIT
MH 17
AHB 7|26|06

Now anybody can own MEDITECH stock.
Guaranteed.

As a former, long-time MEDITECH Sales Director, I
acquired some MEDITECH stock. I now want to sell
just 500 shares.

Unlike other privately held companies, MEDITECH is
very profitable, has over 1100 shareholders, and
must file detailed quarterly financial reports with the
Securities and Exchange Commission. Go to
meditech.com and the view the Shareholder link to
view detailed financial information. With over twenty
years of MEDITECH sales experience, I am seeking
a sales representative, sales management or product
management position. See link at right for resume.

Thanks,
Mike Hubert
781-801-8420
mhubert@gmail.com

- ◘ Home Page
- ◘ Stock Valuation
- ◘ Comparable Stocks
- ◘ Purchasing Instructions
- ◘ Stock Purchase Form
- ◘ Mike Hubert's Resume

Copyright 2006 MEDITECHstock.com.

## Stock Valuation

⊙ Home Page
⊙ Stock Valuation
⊙ Comparable Stocks
⊙ Purchasing Instructions
⊙ Stock Purchase Form
⊙ Mike Hubert's Resume

There are many ways to valuate stock in a private company. Often companies will hire a financial company whose expertise is providing a valuation of private companies. They will compare the private company to similar companies that are publicly traded. They will then project what the price would be for the private company. They will then make adjustments, up or down, as appropriate. When these adjustments are completed, the final price of the private company stock is usually adjusted down, but sometimes a private company stock price will have a total adjustment of higher than similar publicly traded companies. A stock valuation company will often adjust a stock price for the:

Revenue of the company
Size of the market it serves
Trends within the market
Opportunity for future growth
Stability of management
Number of shareholders
Availability of quarterly reports to the shareholders
Management's plans
Dividends
Etc.

Some public companies within MEDITECH's market include Cerner, Eclipsys, and CPSI. McKesson and Seimens are publicly traded, but their healthcare information system revenue is 10% or less of their total revenue. Epic is a private company, but their financial information is not readily available. Other publicly traded companies that serve a niche in healthcare information systems could be compared to MEDITECH.

It is not possible to simply determine the market value (price times number of shares) of MEDITECH by simple methods (such as X times annual revenue) for the following reasons.

## MEDITECH IS A MONEY MACHINE

MEDITECH makes more money than they can spend. They have no mortgages or long term debt. They own outstanding facilities in desirable locations in suburban Boston. MEDITECH shareholder equity is $384,000,000 or $11.03 per share. By comparison, Cerner's equity may be $597,000,000, but more than $240,000,000 of that includes "soft assets" such as software, goodwill, intangible assets, etc. MEDITECH includes only "hard assets" in its financial report. Its sizable real estate holdings are carried at purchase price, and then these real estate holdings have been partially depreciated over the years. (About 40% of MEDITECH's office space is rented out to other companies.) In addition, MEDITECH does not claim a "receivable" until an invoice has been mailed. If MEDITECH used these accounting practices, assets would appear even greater.

## MEDITECH IS SUPER PROFITABLE

MEDITECH's gross profit is $125,900,000 and total revenue is $305,600,000. That leaves them with profits of 41%. After tax profit is still over 25%, yet MEDITECH provides great products and services at costs that are less than most competitors. Annual net income is $2.08 per share and MEDITECH also pays dividends of $2.16 per share. By comparison, Cerner's after tax profit is less than 6% and they pay no dividends.


It is interesting to compare MEDITECH to SAIC

(Science Application International Corporation). They are also a private company, and exhibit regularly at HIMSS.

SAIC has determined the value of their stock with analysis provided by Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("HLHZ"), their independent appraisal firm. They have derived a formula that has been utilized for over twenty years. It is adjusted every quarter with market changes. Their formula is combination of profits, assets and market factors. If you were to use their most recent factors, MEDITECH stock would have a value of $68.74 per share. Of course, one cannot be assured that the same formula could be used for MEDITECH stock.   (MEDITECH pays dividends and SAIC does not.) It is believed that healthcare is only a small percentage of their business. By the way, SAIC plans to have its stock publicly traded in 2006. It would be interesting to see their stock price when it is publicly traded.

Click here for top-of-page and links.

Copyright 2006 MEDITECHstock.com.

Document header

## Comparable Stocks

- Home Page
- Stock Valuation
- Comparable Stocks
- Stock Purchasing Instruc
- Stock Purchase Form
- Mike Hubert's Resume

| As of Feb 10 2006 | | CERNER | CPSI | ECLP | MEDITECH |
|---|---|---|---|---|---|
| Stock Price/share | $ | 42.96 | 44.62 | 20.94 | 50.00* |
| Market Cap. | mil$ | 3,290 | 473 | 1,020 | 1,735 |
| P/E Ratio | % | 38.88 | 32.62 | N/A | 22.30 |
| Profit Margin | % | 7.43 | 13.39 | -2.04 | 25.42 |
| Operating Margin | % | 12.70 | 21.40 | -2.17 | 41.12 |
| | | | | | |
| Total Revenue | mil$ | 1,160 | 198.8 | 365.4 | 304.6 |
| Gross Profits | mil$ | 730.0 | 33.1 | 117.8 | 125.9 |
| Net Income | mil$ | 86.3 | 14.6 | -7.4 | 77.7 |
| Average Shares | mil$ | 76.5 | 10.6 | 48.9 | 34.7 |
| Earnings/Share | $ | 1.11 | 1.37 | -0.16 | 2.08 |
| Dividends/Share | $ | 0.00 | 0.00 | 0.00 | 2.16 |
| (In 2006) | | | | | |

**Balance Sheet**
**Most Recent Quarter**

| | | | | | |
|---|---|---|---|---|---|
| Cash and Equiv. | mil | 274.3 | 21.9 | 107.1 | 233.6 |
| Cash per Share | $ | 3.59 | 2.06 | 2.19 | 6.73 |
| Total Debt | mil | 223.0 | 0.00 | 0.00 | 0.00 |
| Book Value/Share | $ | 9.95 | 3.42 | 2.72 | 11.03 |

* MEDITECH stock is not publicly traded nor has it been independently appraised. The $50.00 price per share is just for computation of other values.

If the MEDITECH stock were $50.00 per share, it would still have a P/E ratio much lower than other vendors, while profit margin, earnings per share, dividends per share, cash per share and book value per share would all be much higher than the other vendors. If the MEDITECH stock was $64 per share, the P/E ration would still only be 30.77.

MEDITECH filings with the SEC list seven competitors. Cerner (CERN), Computer Programs and Systems (CPSI) and Eclipsys (ECLP) are the only three that are publicly traded and have more than 10% of their business providing Healthcare Information Systems.

All information is from yahoo.com or MEDITECH filings with the SEC.

Copyright 2006 MEDITECHstock.com.

## Stock Purchasing Instructions

If interested in purchasing stock, please call me at 781-801-8420. When we agree on the price and deposit, you may then print the Offer to Purchase Stock form on the next web page. (Click link on right.) Please review, print and sign four copies. One copy is for your files. The other three copies should be mailed to me via US Post Office Express Mail (with tracking) or suitable alternative of your choice. When I receive three signed copies, I will sign all three, return one to you, forward one to MEDITECH and I will keep one copy.

- ◯ **Home Page**
- ◯ **Stock Valuation**
- ◯ **Comparable Stocks**
- ◯ **Purchasing Instructions**
- ◯ **Stock Purchase Form**
- ◯ **Mike Hubert's Resume**

Copyright 2006 MEDITECHstock.com.

# MEDITECH Stock Purchase Form

☉ Home Page
☉ Stock Valuation
☉ Comparable Stocks
☉ Purchasing Instructions
☉ Stock Purchase Form
☉ Mike Hubert's Resume

Seller:                        Purchaser (please print):
Michael Hubert              _____
48 Narragansett Rd.         _____
Quincy, MA 02169            _____

It is agreed that the purchaser wishes to purchase (spell out)_____ shares of common stock of Medical Information Technology (MEDITECH) of Westwood, MA, from the seller for the sum of $_____per share, for a total purchase price of $_____. A good faith deposit of $_____dollar deposit has been provided with the signed agreement. The seller will review this agreement and forward it to MEDITECH.

It is acknowledged that MEDITECH has the right of first refusal for all stock sales. This means that MEDITECH cannot refuse this sale to purchaser unless MEDITECH agrees to purchase the stock at the same price and terms of this agreement. If this occurs then the seller will return to the purchaser the initial deposit funds plus an additional guaranteed bonus of $2.00 per share for making the sincere offer to purchase this stock.

If MEDITECH agree to this sale to the purchaser, the seller will notify the purchaser. The remaining purchase funds will be then due within seven days of notification. The seller will then notify MEDITECH of the sale. MEDITECH will then record the sale in their files and notify the purchaser. The purchaser of this stock will be entitled to subsequent quarterly dividends that are now $0.54 per share ($2.16/year).

The purchaser of this stock will be entitled to attend

shareholder meetings and vote on appropriate
shareholder matters. It is also agreed that this stock is
not currently listed on any market. The purchaser may
subsequently sell this stock to anybody, provided they
give MEDITECH the right of first refusal.

No other representation, verbal or otherwise, including
information posted on the MEDITECHstock.com web
page is included within this agreement. This agreement
can only be modified, in writing, and when signed by
both parties.


_____     _____
Purchaser                              Seller


_____     _____
Date                                       Date

**Mike Hubert's Resume - Please call me or email and I can send you a Word formatted or plain text resume of your choice.**

**Michael Hubert**
48 Narragansett Rd.
Quincy, MA 02169
Home Office: (617)769-0001
Cell: (781)801-8420
mhubert@gmail.com

Seeking position in sales, sales management or product management in the health care industry.

**Experience**

Laboratory Corporation of America – LabCorp
Burlington, NC 2004 - August 2005

Executive Director of System Solutions

In this new sales position, I worked with corporate management, clients and other vendors to help develop and promote better interfaces between the LabCorp information system and other vendor's systems in hospitals and physician group practices. Responsibility including training of sales management and staff in the benefits and capabilities of LabCorp's various interfaces and web services. LabCorp is a $3.2B company providing clinical laboratory testing services.

Medical Information Technology – MEDITECH
Westwood, Massachusetts

1998 - 2004 Director of Regional Sales – Eastern U.S.

- Home Page
- Stock Valuation
- Comparable Stocks
- Purchasing Instructions
- Stock Purchase Form
- Mike Hubert's Resume

After a few years as one of most successful
marketing consultants in the Health Care Information
Systems industry, in 1998 MEDITECH's
management promoted me to Manager of Regional
Sales for the Eastern U.S. (Maine to Wisconsin to
Florida). I managed a staff of marketing consultants
that was responsible for sales of medical software
(clinical, financial and administrative) to hospitals and
large multi-hospital health enterprises. Each sale
averaged over $400,000, and occasionally topped
$2,000,000. Sales within the region I managed
increased by 15-20% per year.

Responsibilities included creating a special sales
team focused on existing customers. I pushed for the
development of a new product that helped improve
patient safety and it has become very successful.
Total software revenues for MEDITECH was over
$280,000,000. MEDITECH promoted me to Director
of Regional Sales for the same region in 2002.

1988 - 1998 Senior Marketing Consultant

MEDITECH's management selected me for our most
important local sales territory. My clients included
some of MEDITECH's oldest, largest and most
valuable customers. I worked with the CIOs, CFOs,
and sometimes the CEOs of the largest health care
providers in New England. Some of my customers
with annual revenue exceeding one billion dollars
included: UMass Memorial Health System, Partners
HealthCare, and New England Medical Center. In
addition to selling new information systems, I helped
these customers grow through mergers and
acquisitions. In every instance, I worked with
administration and planned the expansion of the
MEDITECH Health Care Information System across
multiple hospitals.

The systems I licensed and managed included the
most complete and fully integrated Health Care
Information Systems available anywhere. These
systems are at acute care hospitals, sub-acute
facilities, clinics, nursing homes and physician

offices. Often they are supplemented with
MEDITECH's data repository and decision support
systems. My software licensing and service revenue
exceeded $5,000,000 in each of the last three years.
Sales to new customers and existing customers have
grown consistently each year. For several years, I
was MEDITECH's all-time sales leader. I also
received more sales awards than any other
marketing consultant.

1981 - 1998 Marketing Consultant

Sales responsibility from 1983 until 1988 included
Pennsylvania, New Jersey, Delaware, Ohio, and
Maryland. Health Care Information Systems were
licensed and installed at Children's Hospital of
Philadelphia, Hershey Medical Center, and Medical
College of Ohio. From 1981-1983, my sales territory
included all of Canada, Washington, Oregon and
Alaska. My sale to the University of British Columbia
Medical Center was at the time the leading Health
Care Information System in Canada. Another sale at
a single hospital in Spokane, Washington has since
grown to become Inland Northwest Health System
and now includes more than thirty hospitals in three
states.


American Monitor Corporation Indianapolis, Indiana

1976 - 1981 Director of Training

Responsibilities included training of sales staff and
customers in the use of computerized chemistry
instrumentation.


**Education**

Bachelor of Science, University of Massachusetts,
Amherst


**Professional**
Member of the Healthcare Information and

Management Systems Society (HIMSS)



Summary Plan Description
of the
Medical Information Technology, Inc.
Profit Sharing Plan

As amended through August 1, 1983

HUB 052

TABLE OF CONTENTS

Page

I.     INTRODUCTION                                        1

II.    GENERAL INFORMATION                                 2

III.   PARTICIPATION IN THE PLAN                           3

IV.    CONTRIBUTIONS TO THE PLAN                           4

       1.  Source of Contribution                          4
       2.  Allocation of Contributions                     4
       3.  Allocation of Forfeitures                        4
       4.  Allocation of Trust Gains and Losses            4
       5.  Amendment and Termination                       5

V.     BENEFITS PROVIDED UNDER THE PLAN                    6

       1.  Retirement                                      6
       2.  Disability                                      6
       3.  Death                                           6
       4.  Termination of Employment                       6
       5.  Manner of Benefits Payment                      7
       6.  Time of Benefits Payment                        7
       7.  Benefits Not Insured                            7
       8.  Loans to Members                                7

VI.    CLAIMS PROCEDURE                                    8

VII.   YOUR RIGHTS UNDER ERISA                             9

**HUB 053**

## I.  INTRODUCTION

The Medical Information Technology, Inc. Profit Sharing Plan (which will be referred to as the "Plan"), is designed to help provide future financial security for you and your family by allowing you to share in the profits of Medical Information Technology, Inc. (the "Company").

This booklet has been prepared to explain and summarize the major provisions of the Plan, as amended effective August 1, 1983.  Please take the time to read the booklet so that you will thoroughly understand the benefits provided by the Plan.  The booklet functions as a summary plan description for your information, but all rights of employees and others under the Plan are governed in all respects by the detailed terms of the Plan and Trust Agreement.

-1-

HUB 054

## II.  GENERAL INFORMATION

1. <u>Employer</u>.  The Employer is Medical Information Technology, Inc.,
   located at 255 Bent Street, Cambridge, Massachusetts 02138.
   Its Employer Identification Number is 04-2455639.

2. <u>Plan</u>.  The Plan is the Medical Information Technology, Inc. Profit
   Sharing Plan.  The Plan Number is 001, and the Plan is a profit
   sharing plan administered by a Trustee.  The Plan Year ends on
   December 31.

3. <u>Plan Administrator</u>.  The Plan Administrator is Medical Information
   Technology, Inc., located at 255 Bent Street, Cambridge,
   Massachusetts 02138.  The telephone number is (617) 354-3000.

4. <u>Agent for Service of Legal Process</u>.  The President of Medical Information
   Technology, Inc. shall serve as the Plan's agent for service of
   legal process.  Service of legal process may also be made upon
   the Plan Administrator or the Trustee.

5. <u>Trustee</u>.  The current Trustee is Mr. A. Neil Pappalardo, President,
   who may be contacted at Medical Information Technology, Inc.,
   255 Bent Street, Cambridge, Massachusetts 02138 (telephone:
   617-354-3000).

-2-

HUB 055

## III.  PARTICIPATION IN THE PLAN

1. Eligibility.  You are eligible to participate in the Plan on the first day of the month after you complete one year of Service with the Company.  One year of Service is a period of twelve (12) consecutive months of employment with the Company.

2. Duration of Membership.  Once you become a Member you will continue to be a Member as long as you are employed by the Company.  A former Member who is reemployed by the Company will become a Member immediately upon reemployment.

3. Election Not to Participate.  A Member may elect not to participate in the Plan during any Plan Year.  You must notify the Trustee in writing, before the first day of the new Plan Year, that you do not wish to participate.  You will then be excluded from the allocation of Company contributions and forfeitures.  Your account will remain in the Trust, however, and will share in the income, expense, appreciation, and depreciation of the Trust.

HUB 056

## IV.  CONTRIBUTIONS TO THE PLAN

1. Source of Contributions.  For each Plan Year, the Board of Directors determines and votes the amount, if any, that the Company will contribute to the Trust.  The contribution is made from the net income of the Company for that year, or from the earnings and profits accumulated by the Company prior to that Plan Year. Contributions by Members are not permitted.  The Company's contribution to the Trust will be paid in cash and/or in the number of shares of the Company's common stock whose fair market value on the date of contribution is equal to the contribution amount. Company contributions are held and accumulated in the Trust.

2. Allocation of Contributions.  The Company's contribution, if any, for each year is allocated to the individual accounts of all Members who were Employees of the Company on December 31 of that Plan Year.  Also, any Employees who retired, became disabled, or died during that Plan Year also have the Company contribution allocated to their account.

     The Company contribution is credited to your account in proportion to your compensation for that Plan Year, as compared to the total compensation of all Members sharing in the Company contribution for that year.  Compensation includes salaries, wages, bonuses, overtime, and commissions, but excludes any contributions or benefits you receive under the Plan as well as any amounts paid to you prior to the date you became a Member under the Plan.  If you own 10% or more of the outstanding Common Stock of the Company on December 31 of that Plan Year, however, you will not have any portion of the Company contribution allocated to your account.

3. Allocation of Forfeitures.  Forfeitures from the accounts of Members who are not fully vested ("vesting" is explained on p. 6) when they leave the Company are relocated on the same basis as explained above in Section IV(2).

4. Allocation of Trust Gains and Losses.  The Trustee is specifically authorized to invest all or any portion of the Trust assets in shares of the Company's common stock, and the Company intends that a substantial portion of the assets of the Trust be invested in its common stock.  One of the major purposes of the Plan is to give each Member a stake in the success of the Company.  Because a substantial portion of the Plan's assets are invested in the Company's common stock, the value of your benefit under the Plan is significantly dependent on the value of that stock.

     The assets and liabilities of the Trust will be evaluated as of December 31st of each Plan Year.  Any increases in the value of the Trust will be credited to your individual account in proportion to the relative size of your existing account balance. Any decrease in the value of the Trust will be charged to your account on the same basis.

-4-

HUB 057

5.  <u>Amendment and Termination</u>.  The Company expects to continue the Plan on a permanent basis, but it necessarily reserves the right to terminate the Plan, or completely discontinue contributions under the Plan, at any time.  The Company also reserves the right to amend the Plan at any time.  The Plan may not be amended or terminated in such a way as to divert the Trust assets to the benefit of anyone except employees or their beneficiaries, or to reduce any amount previously credited to the account of an employee.

HUB 058

## V.  BENEFITS PROVIDED UNDER THE PLAN

1.  <u>Retirement</u>.  If you retire at or after age 60, you will receive the entire amount credited to your account.

2.  <u>Disability</u>.  If you are unable to continue working for the Company because of sickness or disability, you will receive the entire amount credited to your account.  The Trustee determines, on the basis of medical evidence, whether you are disabled for purposes of the Plan.

3.  <u>Death</u>.  Upon your death, the Trustee will distribute the entire amount credited to your account to your designated Beneficiary or Beneficiaries.  You must notify the Trustee in writing of your choice of Beneficiary, and you may change your designation from time to time.  If your Beneficiary dies before receiving the entire amount payable from your account, the undistributed balance will go to your Beneficiary's estate.  If you have not designated a Beneficiary, the entire amount credited to your account will be paid to the executor of your estate.

4.  <u>Termination of Employment</u>.  If you leave the Company for any reason other than (1) - (3) listed above, you will be entitled to a severance benefit if you have at least 2 years of service with the Company.  If you have a period of Service with the Company of at least five (5) years, you will be entitled to the full amount credited to your account.  If you have a period of Service with the Company of less than fice (5) years, when you leave the Company you will be entitled to receive the vested portion of your account.  The vested portion of your account is equal to a percentage of the amount standing to the credit of your account, based on your period of Service, as follows:

| Years of Service | | Vested Percentage |
|---|---|---|
| At Least | But Less Than | |
| | 2 | None |
| 2 | 3 | 10% |
| 3 | 4 | 30% |
| 4 | 5 | 60% |

If you do not return as an employee of the Company within twelve months  the remainder of your account is then forfeited, and allocated as explained in Section IV(3).

-6-

**HUB 059**

5. <u>Manner of Benefits Payment</u>.  Whenever your account is to be distributed, as explained in (1) - (4) above, the Trustee shall make the payments in one of the following ways:

   a.  One lump sum payment in cash and/or shares of the Company's common stock.

   b.  Installments of cash and/or shares of the Company's common stock, to be paid out over a period not exceeding fifteen (15) years.

6. <u>Time of Benefits Payment</u>.  Benefit payments under the Plan will be made, or commenced, within a reasonable period of time after the date of retirement, death, disability, or other termination.

7. <u>Benefits Not Insured</u>.  The benefits provided by the Plan are determined solely by the value of your account at the time the benefits became payable.  Because the Plan is not a defined benefit plan, benefits are not insured by the Pension Benefit Guaranty Corporation.  There are no provisions under Title IV of the Employee Retirement Income Security Act of 1974 (ERISA) which insure benefits under this type of Plan.

8. <u>Loans to Members</u>.  The Trustee has discretion to make loans to Members from the Trust.  Any such loan is limited to 50% of the Member's vested interest in the Trust, subject to a $50,000 overall limitation, and must bear a reasonable rate of interest and generally must be repaid within 5 years.  The Trustee decides whether a loan will be made and, if a loan is to be made, the Trustee decides the amount and the terms of the loan.

-7-

**HUB 060**

## VI.  CLAIMS PROCEDURE

1.  <u>Filing Claims for Benefits</u>.  If you or your Beneficiary believes you are entitled to receive benefits under the Plan, and you have not received notification from the Trustee concerning the time and manner of payment of your benefits, or if you believe the Trustee's notice concerning the amount and form of payment of your benefits is incorrect,  you may file a claim for your benefits with the Trustee.  The claim must be filed in writing with the Trustee, in accordance with the rules he establishes for filing a claim.

2.  <u>Notification of Denial of Claim</u>.  Within sixty (60) days after you submit a claim for benefits, the Trustee must tell you (in writing) the specific reasons for denying your claim.

3.  <u>Right to Review</u>.  Within a reasonable period of time after your claim for benefits has been denied, you may request the Trustee to make a full and fair review of the decision denying your claim.

4.  <u>Decision on Review</u>.  Within sixty (60) days after receiving your request for a review, the Trustee must give you a written explanation of the reasons for his decision on the review.

**HUB 061**

## VII.  YOUR RIGHTS UNDER ERISA

As a Member of the Medical Information Technology, Inc. Profit Sharing Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan Members shall be entitled to:

(i)  Examine, without charge, at the Plan Administrator's office, all Plan documents, including copies of all documents filed by the Plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions.

(ii)  Obtain copies of all Plan documents and other plan information upon written request to the Plan Administrator.

(iii)  Receive a summary of the Plan's annual financial report. The Plan Administrator is  required by law to furnish each participant with a copy of this summary annual report.

(iv)  Obtain a statement telling you whether you have a right to receive a plan benefit, and if so, what your benefit would be if you were to stop working for the company.  If you do not have a vested right to a plan benefit the statement will tell you how many more years you have to work to get a vested right to a plan benefit.  This statement must be requested in writing and is not required to be given more than once a year.  The Plan must provide the statement free of charge.

In addition to creating rights for Plan Members, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.  The people who operate the Plan, called "fiduciaries", have a duty to do so prudently and in the interest of you and other Plan Members and beneficiaries.

No one, including your employer, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a plan benefit or exercising your rights under ERISA.  If your claim for a plan benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial.  You have the right to have the Trustee review and reconsider your claim.

HUB 062

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement of your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor-Management Service Administration, Department of Labor.

HUB 063



# FORTUNE **5** HUNDRED RANKED BY PERFORMANCE

EXHIBIT
MH 12
AHB 7/26/06



## HIGHEST RETURNS ON ...
### REVENUES

| RANK | | 500 REVENUES RANK | 1997 PROFITS as % of revenues |
|---|---|---|---|
| 1 | MICROSOFT | 137 | 30.4 |
| 2 | INTEL | 38 | 25.7 |
| 3 | COCA-COLA | 68 | 21.9 |
| 4 | SCHERING-PLOUGH | 236 | 21.3 |
| 5 | MERCK | 46 | 19.5 |
| 6 | BANK OF NEW YORK CO. | 279 | 19.4 |
| 7 | BRISTOL-MYERS SQUIBB | 78 | 19.2 |
| 8 | CORESTATES FINANCIAL CORP. | 340 | 18.6 |
| 9 | EMC | 477 | 18.3 |
| 10 | BERKSHIRE HATHAWAY | 150 | 18.2 |
| 11 | PFIZER | 124 | 17.7 |
| 12 | ABBOTT LABORATORIES | 129 | 17.6 |
| 13 | TEXAS INSTRUMENTS | 148 | 17.1 |
| 14 | COMERICA | 451 | 16.7 |
| 15 | CENDANT | 295 | 16.4 |
| 16 | CISCO SYSTEMS | 253 | 16.3 |
| 17 | FLEET FINANCIAL GROUP | 193 | 16.1 |
| 18 | UNITED SERVICES AUTO ASSN. | 207 | 16.0 |
| 19 | BELLSOUTH | 55 | 15.9 |
| 20 | NATIONAL CITY CORP. | 305 | 15.7 |
| 21 | ALLTEL | 437 | 15.6 |
| 22 | PNC BANK CORP. | 231 | 15.3 |
| 23 | FIRST CHICAGO NBD CORP. | 154 | 15.1 |
| 24 | GANNETT | 322 | 15.0 |
| 25 | MELLON BANK CORP. | 306 | 15.0 |
| 26 | JOHNSON & JOHNSON | 49 | 14.6 |
| 27 | SUNTRUST BANKS | 331 | 14.6 |
| 28 | LINCOLN NATIONAL | 254 | 14.5 |
| 29 | ORACLE | 280 | 14.5 |
| 30 | McDONALD'S | 135 | 14.4 |
| 31 | AMERICAN HOME PRODUCTS | 98 | 14.3 |
| 32 | AMERITECH | 82 | 14.3 |
| 33 | GILLETTE | 155 | 14.2 |
| 34 | NATIONSBANK CORP. | 54 | 14.1 |
| 35 | MINNESOTA MINING & MFG. | 89 | 14.1 |
| 36 | KEYCORP | 248 | 14.0 |
| 37 | NORWEST CORP. | 157 | 14.0 |
| 38 | NORFOLK SOUTHERN | 304 | 14.0 |
| 39 | MBNA | 333 | 13.8 |
| 40 | BANKAMERICA CORP. | 47 | 13.6 |
| 41 | SLM HOLDING | 385 | 13.4 |
| 42 | FIRST UNION CORP. | 96 | 13.2 |
| 43 | KNIGHT-RIDDER | 457 | 13.2 |
| 44 | BANKBOSTON CORP. | 238 | 13.1 |
| 45 | CAROLINA POWER & LIGHT | 469 | 12.8 |
| 46 | PITNEY BOWES | 361 | 12.8 |
| 47 | AUTOMATIC DATA PROCESSING | 359 | 12.5 |
| 48 | HOUSEHOLD INTERNATIONAL | 287 | 12.5 |
| 49 | AIRTOUCH COMMUNICATIONS | 406 | 12.5 |
| 50 | ALLSTATE | 39 | 12.4 |
| | THE 500 MEDIAN | | 4.9 |

## HIGHEST RETURNS ON ...
### ASSETS

| RANK | | 500 REVENUES RANK | 1997 PROFITS as % of assets |
|---|---|---|---|
| 1 | COCA-COLA | 68 | 24.4 |
| 2 | INTEL | 38 | 24.0 |
| 3 | MICROSOFT | 137 | 24.0 |
| 4 | SCHERING-PLOUGH | 236 | 22.2 |
| 5 | DELL COMPUTER | 125 | 22.0 |
| 6 | BRISTOL-MYERS SQUIBB | 78 | 21.4 |
| 7 | WESTERN DIGITAL | 350 | 20.5 |
| 8 | CISCO SYSTEMS | 253 | 19.2 |
| 9 | LYONDELL PETROCHEMICAL | 484 | 18.3 |
| 10 | MERCK | 46 | 17.9 |
| 11 | ORACLE | 280 | 17.8 |
| 12 | ABBOTT LABORATORIES | 129 | 17.3 |
| 13 | TEXAS INSTRUMENTS | 148 | 16.9 |
| 14 | 3COM | 455 | 16.5 |
| 15 | SUN MICROSYSTEMS | 184 | 16.2 |
| 16 | MINNESOTA MINING & MFG. | 89 | 16.0 |
| 17 | GAP | 249 | 16.0 |
| 18 | EMC | 477 | 15.4 |
| 19 | JOHNSON & JOHNSON | 49 | 15.4 |
| 20 | AVON PRODUCTS | 308 | 14.9 |
| 21 | NIKE | 168 | 14.8 |
| 22 | PFIZER | 124 | 14.4 |
| 23 | FLEETWOOD ENTERPRISES | 485 | 13.6 |
| 24 | GILLETTE | 155 | 13.1 |
| 25 | COMPAQ COMPUTER | 42 | 12.6 |
| 26 | GENUINE PARTS | 271 | 12.4 |
| 27 | PROCTER & GAMBLE | 20 | 12.4 |
| 28 | DOVER | 332 | 12.4 |
| 29 | US AIRWAYS GROUP | 186 | 12.2 |
| 30 | MORTON INTERNATIONAL | 403 | 12.2 |
| 31 | AUTOMATIC DATA PROCESSING | 359 | 11.7 |
| 32 | TJX | 208 | 11.7 |
| 33 | W.W. GRAINGER | 355 | 11.6 |
| 34 | ALLEGHENY TELEDYNE | 389 | 11.4 |
| 35 | GENERAL MILLS | 284 | 11.4 |
| 36 | PHILIP MORRIS | 9 | 11.3 |
| 37 | KELLOGG | 233 | 11.2 |
| 38 | CAMPBELL SOUP | 195 | 11.0 |
| 39 | ILLINOIS TOOL WORKS | 302 | 10.9 |
| 40 | WARNER-LAMBERT | 192 | 10.8 |
| 41 | PUBLIX SUPER MARKETS | 139 | 10.8 |
| 42 | PEPSICO | 31 | 10.7 |
| 43 | VF | 301 | 10.6 |
| 44 | ESTÉE LAUDER | 425 | 10.5 |
| 45 | ROHM & HAAS | 371 | 10.5 |
| 46 | PPG INDUSTRIES | 209 | 10.4 |
| 47 | HOME DEPOT | 44 | 10.4 |
| 48 | WALGREEN | 108 | 10.4 |
| 49 | GANNETT | 322 | 10.3 |
| 50 | RICHFOOD HOLDINGS | 420 | 10.2 |
| | THE 500 MEDIAN | | 3.9 |

## HIGHEST RETURNS ON ...
### STOCKHOLDERS' EQUITY

| RANK | | 500 REVENUES RANK | 1997 PROFITS as % of equity |
|---|---|---|---|
| 1 | AMERISOURCE HEALTH | 198 | 312.6 |
| 2 | US AIRWAYS GROUP | 186 | 141.3 |
| 3 | AVON PRODUCTS | 308 | 108.9 |
| 4 | USG | 486 | 100.8 |
| 5 | GENERAL MILLS | 284 | 85.5 |
| 6 | SLM HOLDING | 385 | 75.3 |
| 7 | DELL COMPUTER | 125 | 73.0 |
| 8 | COCA-COLA | 68 | 56.5 |
| 9 | W.R. GRACE | 426 | 55.8 |
| 10 | KELLOGG | 233 | 54.7 |
| 11 | SCHERING-PLOUGH | 236 | 53.5 |
| 12 | CAMPBELL SOUP | 195 | 50.2 |
| 13 | LYONDELL PETROCHEMICAL | 484 | 46.3 |
| 14 | RALSTON PURINA | 252 | 46.1 |
| 15 | BRISTOL-MYERS SQUIBB | 78 | 44.6 |
| 16 | WESTERN DIGITAL | 350 | 43.2 |
| 17 | PHILIP MORRIS | 9 | 42.3 |
| 18 | CONTINENTAL AIRLINES | 218 | 42.0 |
| 19 | ABBOTT LABORATORIES | 129 | 41.9 |
| 20 | UAL | 75 | 40.6 |
| 21 | ARAMARK | 261 | 39.5 |
| 22 | HERSHEY FOODS | 345 | 39.4 |
| 23 | READER'S DIGEST ASSOCIATION | 490 | 38.6 |
| 24 | GENERAL MOTORS | 1 | 38.3 |
| 25 | BORDEN | 414 | 36.9 |
| 26 | MERCK | 46 | 36.6 |
| 27 | INTEL | 38 | 36.0 |
| 28 | MINNESOTA MINING & MFG. | 89 | 35.8 |
| 29 | CATERPILLAR | 66 | 35.6 |
| 30 | CORNING | 356 | 35.3 |
| 31 | GTE | 48 | 34.8 |
| 32 | ORACLE | 280 | 34.7 |
| 33 | COLGATE-PALMOLIVE | 171 | 34.0 |
| 34 | GAP | 249 | 33.6 |
| 35 | BESTFOODS | 156 | 33.0 |
| 36 | MICROSOFT | 137 | 32.0 |
| 37 | ESTÉE LAUDER | 425 | 31.8 |
| 38 | MBNA | 333 | 31.6 |
| 39 | SERVICEMASTER | 373 | 31.2 |
| 40 | PEPSICO | 31 | 30.9 |
| 41 | INTL. BUSINESS MACHINES | 6 | 30.7 |
| 42 | WARNER-LAMBERT | 192 | 30.7 |
| 43 | TEXAS INSTRUMENTS | 148 | 30.5 |
| 44 | ALLEGHENY TELEDYNE | 389 | 29.6 |
| 45 | GILLETTE | 155 | 29.5 |
| 46 | MAYTAG | 421 | 29.3 |
| 47 | ANHEUSER-BUSCH | 141 | 29.2 |
| 48 | TIMES MIRROR | 434 | 28.6 |
| 49 | PPG INDUSTRIES | 209 | 28.5 |
| 50 | PROCTER & GAMBLE | 20 | 28.3 |
| | THE 500 MEDIAN | | 13.6 |

CONTINUED





# WHO OWNS SAIC STOCK

*"From Science to Solutions"*

In total, stock owned directly by company employees, consultants, directors, and their family members accounts for 45% of the shares outstanding. Most of the remaining shares, 46%, resides in the various SAIC Retirement Plans on behalf of SAIC employees and retirees. Together employees and the Retirement Plans own 90% of SAIC's stock. The single largest shareholder is SAIC's founder and CEO, Dr. J. Robert Beyster, who owns less than 2% of outstanding shares. Outsiders, who hold 9% of SAIC's stock, consist mainly of employees who left SAIC (or their family members) and who chose to keep the SAIC shares they acquired prior to Oct. 1, 1981. Shares acquired after this date carry the company's "Right of Repurchase", which allows SAIC to buy back shares when individuals leave the company. All shares issued by the Company are subject to SAIC's "Right of First Refusal".



© SAIC, 1997    CONTACT SAIC    SEARCH                    EMPLOYEE OWNERSHIP    HOME

www.saic.com/empown/

EXHIBIT
MH 13
AAB 7/26/06

HUB 516

4/21/98



**FORBES MAGAZINE**    **DECEMBER 01, 1997**

MANAGEMENT, STRATEGIES, TRENDS

## The Biggest Private Companies
The Top 500 Private Companies

Though he owns just 1.5% of SAIC's stock, J. Robert Beyster doesn't have to worry about what Wall Street analysts think of his company. His bosses work for him.

# Turning employees into stakeholders

## By Carolyn T. Geer

J ROBERT BEYSTER, 73, founder and chief executive officer of Science Applications International Corp. in San Diego, Calif., has built one hell of a company. He opened the doors in 1969 as a scientific consulting firm with a dozen employees. Today SAIC is a 25,000-employee, high-tech powerhouse that recently brought its revenues to $3.4 billion by acquiring Bellcore, the Morristown, N.J.-based research arm of the regional Bell operating companies.

Had Beyster kept 100% of SAIC, he'd be worth nearly $2 billion today. Instead he owns just 1.5%, cashable for about $27 million. Most of the rest belongs to employees at all levels. How does Beyster feel about leaving so much money on the table? Pretty good. "How much money can you spend anyway?" asks the nuclear physicist, who carries work home in brown paper bags.

SAIC is a high-technology research and engineering firm, the 55th- largest private company in America before the Bellcore deal. Include that, and SAIC rises to number 41 in the rankings. SAIC sets up and integrates computer and telecommunications networks. It is also on the cutting edge of employee compensation and motivation.

"We turn employees into stakeholders," Beyster says. "I really believe it makes a difference, and I think it's fair." Beyster walks like he talks. Employees own 90% of the company; the other 10% is held by consultants or employees who left in the early days before SAIC instituted a requirement that departing owners sell their shares back to the company.

December 01, 1997
**Table of Contents:**
**On The Cover:**
-The Biggest Private Companies: Spread the wealth
-The Biggest Private Companies: Capitalist populists
-The Biggest Private Companies: Sweaty equity
-The Biggest Private Companies: American original
-The Biggest Private Companies: Wall Street? No way.

**Management, Strategies, Trends:**
-Companies: Dr. Ranieri on call
-Technology: Dell dives
-Leisure: High noon in Vegas
-Profile: Blue-box special

-"Prices are insane"
-Taking lunch
-Panned out?
-Starting Your Own Business: Bytes and billboards
-Up & Comers: Kiddie dollars
-. . .  Something blue
-Hot off the press
-The Kinko's empire
-Prostate problems

**International:**
-Cyber malaise
-Capitalist czars

**Law & Issues:**
-The swampmakers
-The law: Log on and litigate
-G-men as gestapo
-Defending stereotypes
-Nuclear farce

**Technology:**
-Checkmate!
-Quick-change chips
-Tale of the tape

**Departments:**
-Side Lines
-Follow-Through
-On My Mind
-Readers Say
-Fact and Comment
-Other Comments

EXHIBIT

MH 14
AHB 7/26/06

HUB 503

Beyster conducted a study a few years ago and found that among employees who had been at SAIC at least three years, those who had never bought stock had a turnover rate of 12% while those who had bought stock—no matter how little—had a turnover rate of just 5%.

Land a new contract for the firm and you get a chance to buy additional shares, in proportion to the value of the contract. This is just one part of an elaborate system of retirement, stock purchase and stock incentive plans at SAIC; its four different employee-ownership programs are among the most sophisticated in the country.

The retirement plans serve as a base for broad employee ownership. The company's 401(k) plan allows employees to choose between various Vanguard funds and SAIC stock; the company's matching contribution is made in SAIC stock. There's also an Employee Stock Ownership Plan (ESOP) that covers everyone.

Then there are stock incentive programs designed to reward and retain particularly good workers. SAIC sets aside shares each year to be offered as stock options and stock bonuses to employees based on their individual performances—as with the rewards for landing new contracts. By year-end, about half of the employees receive shares. Options and bonuses vest after four years.

Finally, every year 200 employees—identified as future leaders—each get $25,000 in SAIC stock in a trust that vests over seven years. The vesting provides the "glue," as Beyster calls it: what they'd forfeit if they left the company.

Unlike other private companies that require employees to sell their shares back to the company, SAIC-ites can trade with each other through Bull, Inc., SAIC's registered broker-dealer. In short, the company maintains an internal stock market, where employees can buy or sell shares; the only restriction is that the market is limited to people who work at SAIC.

The SAIC board sets its company's stock price four times a year, using a formula based on net income, shares outstanding and a "market factor" monitored by investment bank Houlihan

-Commentary
-Transparent Eyeball
-On-Line Pulse
-Flashbacks
-Thoughts

**Columnists:**
-Business Strategy: Brand-name buildup
-Ideas Matter: The exuberant Wade Cook
-Backseat Driver: The worm in the apple
-The Software Horizon: The Best Multimedia
-Insights: Reno Rewrites Your Operating System

**Money & Investments:**
-The Funds: Stratton Small-Cap
-The Funds: Supply and demand
-The Funds: Bond fund buying
-The Forbes/Barra Wall Street Review
-Streetwalker
-A time to short?

**Investment Columnists:**
-The Contrarian: Volatility is not risk
-Portfolio Strategy: Go slow: Inflation ahead
-Stock Trends: Diagnosticians who can't prescribe
-Market Trends: If it ain't controversial, don't buy it

**The Forbes Life:**
-Outdoors: Tarpon rangers
-Collecting: Not the everyday silver
-The Technologist: Instant Internet
-The Arts: Los Angeles gets artsy
-Journeys: No lazy river
-Re-viewing: Turkish delight

**Chaticle:**
-Bond with bonds

**Management, Strategies, Trends:**
-Jerky turkey

**HUB 504**

factor" monitored by investment bank Houlihan Lokey Howard &Zukin. The market factor values the stock at a multiple consistent with publicly traded peers such as Computer Sciences and Electronic Data Systems.



One thing SAIC stakeholders need not worry about: sudden market crashes. During the 1987 crash, when the stock market fell 20%, SAIC shares dropped only 5%. After this year's October swoon, SAIC stock programs' director Karen Garsson didn't get a single shareholder call.

P/E
30
SAIC         32
Comp. Sciences    29
EDS

Whether because of the nature of ownership or despite it, SAIC has been a terrific growth stock. In the fiscal year ended Jan. 31, 1997, SAIC shares returned 34%, beating the S&P's 26% gain. Over the past five and ten years, the stock posted annualized returns of 18.4% and 14.3%, respectively, in line with the S&P's 17% and 14.5% returns for the same periods.

Several hundred of SAIC's 25,000 employees are millionaires. Many more, undoubtedly, will become rich.

Narri Cooper, 34, a director in SAIC's management information systems' department, has worked at the company for more than a decade. She explains what ownership in the firm means to her: "When I'm making a decision, I don't just make it as an information technology manager, I make it as an owner."

SAIC makes sure she feels like an owner, too. "You have to have a program of participation for the employees as well, whereby they can ask questions, help solve problems, help direct the company," says Beyster. At SAIC, 9 employees sit on the 22-person board, alongside former Defense Department heavyweights like retired U.S. Navy Admiral B.R. Inman. Employees at all levels regularly discuss SAIC's business opportunities in areas such as wireless technology, the year-2000 problem, electronic commerce, computer security and the Internet.

"There is a certain Darwinian chaos that exists within SAIC," explains Brian Weaver, a health care technology expert who joined SAIC three years ago after working at IBM and running his own biotechnology company. "SAIC is an enormous enterprise incubator," Weaver says.

HUB 505

"Good ideas quickly rise to the top of the organization, and you are permitted absolute latitude to assemble the necessary resources and go forward and build your idea. Ultimately you are judged by your performance in the marketplace."

Dr. B., as Beyster is known by close associates, rarely sits for interviews. But he talked with FORBES in good part because he wants to propagate his concepts of employee-ownership. In 1986 he set up a nonprofit organization to promote the idea of employee-owned companies. His La Jolla, Calif. Foundation for Enterprise Development helps companies set up equity compensation plans. Recent private-company converts include two temporary placement agencies that specialize in engineering and financial jobs, a travel agency and a paging company, according to associate director Ronald Bernstein.

Beysterism is spreading. "In the last few years we've seen a dramatic increase in privately held companies that give everybody stock options," reports Corey Rosen, director of the National Center for Employee Ownership. What are these companies finding? That sharing the wealth with their workers works wonders.

**Sidebars:**

- A scientific journey
- The book on Dr. B.

| **back to top** |

**Read more:**

- By Carolyn T. Geer
- On The Cover
- The Biggest Private Companies
- From December 01, 97 Issue



Today @ the Tool | Forbes Magazine | The Toolbox

TECHNOLOGY | PERSONAL FINANCE | STARTUPS
COMPANIES | E-BUSINESS | COOL

Sitemap | Help | Webmaster

© 1998 Forbes Inc. Terms, Conditions and Notices

**HUB 506**

http://www.forbes.com/forbes/97/1201/6012154a.htm                    4/21/98



# MEDITECH Financial History

EXHIBIT
MA 15
AHB 7/26/06



**10 Year Financial History**

Legend: ■ Total Revenue   ■ Operating Income   ■ Net Profit

## In Millions Except for per Share Data

| Year | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Revenue | 24.3 | 31.5 | 49.5 | 54.2 | 64.0 | 71.3 | 84.2 | 98.7 | 115.7 | 131.8 |
| Service Revenue | 15.2 | 17.4 | 19.4 | 23.5 | 28.3 | 34.0 | 40.0 | 45.0 | 52.2 | 62.0 |
| Total Revenue | 39.5 | 48.9 | 68.8 | 77.7 | 92.3 | 105.3 | 124.2 | 143.7 | 167.9 | 193.8 |
| Operating Expense | 21.8 | 27.4 | 38.5 | 47.3 | 55.4 | 64.0 | 73.0 | 85.2 | 98.3 | 115.5 |
| Operating Income | 17.7 | 21.5 | 30.3 | 30.4 | 36.9 | 41.3 | 51.3 | 58.5 | 69.6 | 78.3 |
| Other Income | 2.0 | 2.3 | 0.9 | 1.7 | 1.8 | 8.2 | 2.9 | 6.4 | 8.9 | 12.2 |
| Other Expense | 0.1 | 1.0 | 1.5 | 1.6 | 0.6 | 0.2 | 0.2 | 5.2 | 4.5 | 5.9 |
| Pre-tax Income | 19.6 | 22.8 | 29.7 | 30.5 | 38.1 | 49.3 | 54.0 | 59.7 | 74.0 | 84.6 |
| Income Taxes | 7.4 | 8.5 | 11.3 | 11.7 | 14.9 | 19.7 | 21.8 | 22.6 | 29.6 | 34.4 |
| Net Profit | 12.2 | 14.3 | 18.4 | 18.8 | 23.2 | 29.6 | 32.2 | 37.1 | 44.4 | 50.3 |
| Dividends Paid | 4.3 | 6.1 | 7.1 | 10.2 | 10.3 | 13.4 | 16.3 | 19.6 | 22.2 | 26.9 |
| Total Assets | 47.5 | 69.6 | 92.1 | 94.2 | 99.3 | 118.9 | 137.8 | 198.0 | 218.3 | 263.1 |
| Total Liabilities | 8.9 | 22.0 | 33.3 | 25.7 | 16.9 | 18.9 | 20.0 | 60.2 | 55.9 | 73.6 |
| Shareholder Equity | 38.6 | 47.6 | 58.8 | 68.5 | 82.4 | 100.0 | 117.8 | 137.8 | 162.4 | 189.5 |
| Common Shares | 15.2 | 15.3 | 15.3 | 15.4 | 15.5 | 15.6 | 15.7 | 15.8 | 15.9 | 16.1 |
| Earnings/share | 0.81 | 0.94 | 1.21 | 1.23 | 1.50 | 1.90 | 2.05 | 2.34 | 2.78 | 3.13 |
| Divs Paid/share | 0.29 | 0.40 | 0.47 | 0.67 | 0.67 | 0.87 | 1.04 | 1.24 | 1.40 | 1.68 |
| Book Value/share | 2.54 | 3.11 | 3.85 | 4.46 | 5.33 | 6.43 | 7.51 | 8.71 | 10.19 | 11.78 |
| Fair Value/share | 6.83 | 8.00 | 10.00 | 10.67 | 12.67 | 14.00 | 17.00 | 20.00 | 24.00 | 27.00 |

*Handwritten annotations (right margin):*
$23.8 M
INCREASED OPERATIONS INVESTMENT

1997
131.8
62
193.8
138.7
55.1
12.2
5.9
73.2
34.4
(should be) 39.5
266.9
238.9
73.6
166.3
16.1
2.70
1.68
10.33
27.00

*Handwritten below table:*
P/E Ratio    8.5  8.5  8.3  8.6  8.4  7.4  8.3  8.5  8.6  8.7    10.0
% Return on Revenue    25.8  26.4  (25.9)  22.4

'81    '82    '83  '84  '85  '86  '87
5.6   5.9   6.4  7.8  8.1  8.7  8.5





EXHIBIT

MH   10

AHB 7/26/06

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually and On Behalf Of All Persons Similarly Situated | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Case No. 05-10269-RWZ ) |
| MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, et al. | ) ) ) |
| Defendants. | ) ) |

### PLAINTIFFS' RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs Michael Hubert ("Mr. Hubert"). David Hinchliffe ("Mr. Hinchliffe"), and William Trainor ("Mr. Trainor") (collectively, "the Plaintiffs") hereby object and respond to the First Set of Interrogatories ("the Interrogatories") by defendants Medical Information Technology, Inc. ("Meditech"), the Medical Information Technology Profit Sharing Plan ("the Plan"), and A. Neil Pappalardo ("Mr. Pappalardo") (collectively, "the Defendants") as follows.

### A.    GENERAL OBJECTIONS

1.    Each of the following General Objections is incorporated by reference in each of the specific objections and responses below as if fully set forth therein.

2.    The Plaintiffs object generally to the entirety of the Interrogatories as overbroad, unduly burdensome, unreasonably duplicative, and redundant and unreasonable in scope.

3.    The Plaintiffs object generally on the grounds that the Interrogatories do not comply with Local Rule 26.1(C), which provides that "[f]or purposes of determining the number of interrogatories propounded, subparts of a basic interrogatory which are logical extensions of the basic interrogatory and seek only to obtain specific additional particularized information with respect to the basic interrogatory shall not be counted separately from the basic interrogatory." Under Local Rule 26.1(C), two of the Interrogatories, which purport to consist of a basic interrogatory and multiple subparts, in fact consist of entirely separate interrogatories. See Interrogatory No. 3 ("For each Plaintiff, identify and describe in detail any communications with any other person concerning the subject matter of this Litigation, including but not limited to communications concerning"); Interrogatory No. 4 ("Identify and describe in detail any communications between any of the Plaintiffs and Grossman, and/or Plaintiffs' Counsel and Grossman, concerning the subject matter of this Litigation, including but not limited to communications concerning"). In accordance with Local Rule 26.1(C), the Interrogatories consist of thirty-one Interrogatories, six more than the total of twenty-five (25) permitted by Local Rule 26.1(C). The Plaintiffs will object to any further interrogatories as exceeding the limits on discovery set forth in Local Rule 26.1(C).

4.    The Plaintiffs object generally to the entirety of the Interrogatories because they seek information beyond the scope of discovery in this phase of the case, which was limited by the Court at the Defendants' request to discovery concerning class certification and relevant documents from Grossman v. Meditech et al, Civil Action No. 03-1872 (Suffolk Superior Court, BLS) ("the Grossman Litigation").

5.    The Plaintiffs object generally to each paragraph of the Interrogatories (including the Definitions and Instructions) to the extent that it seeks information and/or documents that are protected by the attorney-client privilege or work-product doctrine or that are protected by any other privilege or doctrine, or otherwise not subject to discovery under the Federal Rules of Civil Procedure.

6.    The Plaintiffs object generally to each paragraph of the Interrogatories (including the Definitions and Instructions) to the extent that it seeks to impose obligations on the Plaintiffs beyond those required by the Federal Rules of Civil Procedure and the Local Rules of the District of Massachusetts.

7.    The Plaintiffs object generally to each paragraph of the Interrogatories (including the Definitions and Instructions) to the extent that it seeks information and/or documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

8.    The Plaintiffs object generally to each paragraph of the Interrogatories (including the Definitions and Instructions) to the extent that it seeks information not limited in time to dates relevant to this litigation on the ground that it is unduly burdensome, oppressive, and not reasonably calculated to lead to the discovery of admissible evidence. Because the Interrogatories were not limited in time in any way, the Plaintiffs have applied the same timeframe to these Responses as were set forth in their discovery requests to the Defendants, with the exception that the Plaintiffs have included information from prior to January 1, 1995 if it is responsive to the Interrogatories.

9.    The Plaintiffs object generally to each paragraph of the Interrogatories (including the Definitions and Instructions) to the extent that it seeks to require

3

information about the Plaintiffs' conversations with family members, including spouses, sons, sons-in-law, daughters, daughters-in-law, brothers, brothers-in-law, sisters, sisters-in-law, grandfathers, grandmothers, grandsons, granddaughters, uncles, aunts, nephews, nieces, and cousins on the ground that it is unduly burdensome, oppressive, and is not reasonably calculated to lead to the discovery of admissible evidence.

10.    Information and/or documents provided by the Plaintiffs are those located, known or discovered after a reasonable search. The Plaintiffs reserve the right to supplement their answers if any additional responsive information and/or documents are later discovered or otherwise become known to the Plaintiffs.

11.    All objections, including without limitation objections as to relevance, authenticity, or admissibility, are expressly reserved.

**B.    RESPONSES AND OBJECTIONS TO SPECIFIC INTERROGATORIES**

**Interrogatory No. 1**

State the basis for your allegations in Paragraph 40 of the Amended Complaint.

**Response to Interrogatory No. 1**

In addition to the General Objections above, the Plaintiffs object to this Interrogatory on the ground that it seeks a legal conclusion. The Plaintiffs further object on the ground that it seeks information that is protected from disclosure by the attorney-client privilege and the work product doctrine. The Plaintiffs further object on the ground that discovery relating to class certification is not yet complete.

Subject to and without waiving the foregoing objections, the Plaintiffs state that Plaintiffs' Counsel will make the legal argument in support of class certification at the time and in the manner set by the Court and the Federal Rules of Civil Procedure.

4

**Interrogatory No. 2**

For each year in which the Trust has held Meditech stock, describe in detail the methodology(ies) that Plaintiffs' claim should have been used in valuing shares of Meditech stock held by the Trust including, but not limited to the sources supporting the methodology(ies) identified, including, but not limited to, each book, treatise, article, paper, publication, communication, expert opinion, or other document from which Plaintiffs' have obtained or derived the methodology.

**Response to Interrogatory No. 2**

In addition to the General Objections above, the Plaintiffs object to this

Interrogatory on the ground that it is beyond the scope of this phase of discovery, which

was limited at the Defendants' request to issues relating to class certification and to the

disclosure of relevant information produced or obtained in the Grossman Litigation. The

Plaintiffs further object to this Interrogatory on the ground that it seeks information that is

protected by the attorney-client privilege and the work-product doctrine. The Plaintiffs

further object to this Interrogatory because it improperly seeks early disclosure of

information regarding potential expert testimony.

Subject to and without waiving the foregoing objections, the Plaintiffs state that

they will provide information relating to anticipated expert testimony at the time and in

the manner set by the Court and the Federal Rules of Civil Procedure.

**Interrogatory No. 3**

For each Plaintiff, identify and describe in detail any communications with any other person concerning the subject matter of this Litigation, including but not limited to communications concerning (a) the valuation and value of Meditech stock; (b) the value of the Trust; (c) any methodology(ies) for valuing a corporation and/or the shares of a corporation; (d) this Action; (e) the Grossman Litigation; (f) any proposal by any of the Plaintiffs to sell or otherwise provide Grossman any documents or information prepared by any officer, director, or employee of Meditech; (g) the contribution of stock by Meditech to the Trust and/or the sale of Meditech stock by Meditech to Meditech employees; (h) any proposal for a vote by the shareholders of Meditech at any annual shareholders meeting, whether submitted for consideration by the shareholders or not, concerning the valuation of Meditech stock, the Plan, any right of first refusal by the

5

Company with respect to Meditech stock, and/or the establishment of a process to evaluate offers to acquire Meditech; (i) the person's participation in this Action and/or any other proposed or potential lawsuit against the Defendants and/or the Dismissed Defendants; and/or (j) the distribution of benefits from the Trust.

**Response to Interrogatory No. 3**

In addition to the General Objections, the Plaintiffs object to this Interrogatory on the ground that the term "the subject matter of this Litigation" is not defined and is vague, ambiguous, and fails to identify with reasonable specificity what information the Defendants seek. Responses to this Interrogatory do not include information about communications subject to the attorney-client privilege or any other privilege.

Subject to and without waiving the foregoing objections, the Plaintiffs state that:

(a)    The Plaintiffs had numerous communications with the Defendants during the time they were employed at Meditech regarding the value of Meditech stock, including receiving an annual report from the company informing them how much the stock is purportedly worth per share. All documents reflecting such communications are in the custody and control of the Defendants. The Plaintiffs have also discussed the value and valuation of Meditech stock with each other. In addition, Mr. Hinchliffe and Mr. Trainor each had communications with various co-workers at Meditech in which they and the other participants would wonder how the Defendants and/or the Dismissed Defendants had arrived at the assigned value, but neither recalls the details of those conversations.

Mr. Hinchliffe recalls Mr. Pappalardo stating at a company meeting that the stock value was based on the company assets and profits. Other than this comment, to the best of Mr. Hinchliffe and Mr. Trainor's knowledge, the Defendants and the Dismissed

6

Defendants have never communicated the method for valuing Meditech stock to any Plan participants

Mr. Hubert has also had numerous conversations with his co-plaintiffs and with various co-workers and others at Meditech wondering how Meditech stock is valued, including communications that Mr. Hubert specifically recalls having while employed at Meditech with Paul Kingston, John Roy, Christopher J. Sullivan, A. Neil Pappalardo, Barbara Manzolillo, and Howard Messing between 1998 and 2004. In addition, Mr. Hubert provided information about communications from the Defendants and/or the Dismissed Defendants regarding how Meditech stock is valued when he was deposed by the Defendants' counsel in the Grossman Litigation on July 14, 2005, and those answers are incorporated by reference into this Response. Since leaving Meditech, Mr. Hubert has spoken with numerous people about how Meditech stock is valued, including Brian Malone, Jeff Ritchie, Steve Genarco, David Devine, Mike Kirby, Paul Comras, Mark Sampson, John Dolan, Hank Jensen, Sue Denniston.

(b)    The Plaintiffs had numerous communications during the time they were employed at Meditech with the Defendants regarding the value of the Trust, including receiving an annual financial report from the Plan describing the value of the Trust's assets, as determined by Mr. Pappalardo as Trustee. They also had numerous discussions with co-workers but do not recall the details of those conversations. In addition, Mr. Hubert has spoken with the above listed people.

(c)    In addition to the above Objections, the Plaintiffs object to this Interrogatory on the ground that it is beyond the scope of this phase of discovery.

Subject to and without waiving any Objections, the Plaintiffs state that to the best of their recollection, Mr. Hinchliffe and Mr. Trainor have not had any conversations about methods for valuing corporations. Mr. Hubert has communicated with John Roy about methods for valuing corporations. Mr. Hubert also provided information regarding communications on methodologies for valuing corporations in his deposition, and those answers are incorporated by reference into this Response.

(d)    The Plaintiffs have spoken with each other about this Action. In addition, Mr. Hubert has spoken with Brian Malone, Jeff Ritchie, Steve Genarco, David Devine, Mike Kerby, Paul Comras, Mark Sampson, John Dolan, Hank Jansen, and Sue Denniston. He also answered questions about this Action during his deposition and those answers are incorporated by reference into this Response.

(e)    Mr. Hinchliffe and Mr. Trainor have spoken with each other and with Mr. Hubert about the Grossman Litigation. Mr. Hubert has spoken with Dr. Jerome Grossman, Christopher J. Sullivan, Katheen Kilroy, and Paul Kingston. Mr. Hubert also answered questions about the Grossman Litigation during his deposition and those answers are incorporated by reference into this Response.

(f)    Mr. Hinchliffe and Mr. Trainor have not had any communications about any proposal by any of the Plaintiffs to sell or otherwise provide Dr. Grossman any documents or information prepared by any officer, director, or employee of Meditech. Mr. Hubert answered questions about proposals to sell or otherwise provide documents or information to Dr. Grossman during his deposition and those answers are incorporated by reference into this Response.

8

(g)    In addition to the annual communications reflected in the Defendants'
document production, the Plaintiffs had numerous conversations during the years they
were employed at Meditech about the contribution of stock by Meditech to the Trust
and/or the sale of Meditech stock by Meditech to Meditech employees. Mr. Hinchliffe
and Mr. Trainor do not recall the details of any such conversations. Mr. Hubert recalls
communications with the above people that involved the value of Meditech stock.

(h)    Mr. Hinchliffe and Mr. Trainor do not recall any communications
regarding any proposal for a vote by the shareholders of Meditech at any annual
shareholders meeting, whether submitted for consideration by the shareholders or not,
concerning the valuation of Meditech stock, the Plan, any right of first refusal by the
Company with respect to Meditech stock, and/or the establishment of a process to
evaluate offers to acquire Meditech. Mr. Hubert is producing documents responsive to
this Interrogatory pursuant to the Defendants' First Set of Requests for Production of
Documents and Things.

(i)    The Plaintiffs have spoken with each other about their participation in this
Action. Mr. Hubert has also spoken with the above listed people.

(j)    The Plaintiffs have spoken with each other and with the Defendants about
the distribution of benefits from the Trust. The documents reflecting those
communications are in the Defendants' custody and control.

## Interrogatory No. 4

For each Plaintiff, identify and describe in detail any communications between any of the
Plaintiffs and Grossman, and/or Plaintiffs' Counsel and Grossman, concerning the subject
matter of this Litigation, including but not limited to communications concerning (a) the
Defendants; (b) the valuation and value of Meditech stock; (c) the value of the Trust; (d)
any methodology(ies) for valuing a corporation and/or the shares of a corporation; (e) this
Action; (f) the Grossman Litigation; (g) any proposal by any of the Plaintiffs to sell or

9

otherwise provide Grossman any documents or information prepared by any officer, director, or employee of Meditech; (h) the contribution of stock by Meditech to the Trust and/or the sale of Meditech stock by Meditech to Meditech employees; (i) any proposal for a vote by the shareholders of Meditech at any annual shareholders meeting, whether submitted for consideration by the shareholders or not, concerning the valuation of Meditech stock, the Plan, any right of first refusal by the Company with respect to Meditech stock, and/or the establishment of a process to evaluate offers to acquire Meditech; (j) Grossman's participation in this Action and/or any other proposed or potential lawsuit against the Defendants and/or the Dismissed Defendants; and/or (k) the distribution of benefits from the Trust.

### Response to Interrogatory No. 4

In addition to the General Objections, the Plaintiffs object to this Interrogatory on the ground that the term "the subject matter of this Litigation" is not defined and is vague, ambiguous, and fails to identify with reasonable specificity what information the Defendants seek. Responses to this Interrogatory do not include information about communications subject to the attorney-client privilege, the work product doctrine, or any other privilege.

Subject to and without waiving the foregoing objections, the Plaintiffs state that Mr. Hinchliffe and Mr. Trainor have not had any communications with Dr. Grossman. With respect to Mr. Hubert, Mr. Hubert discussed all of the communications with Dr. Grossman that are responsive to this Interrogatory during his deposition, and those answers are incorporated by reference into this Response.

### Interrogatory No. 5

Describe in detail how each Plaintiff claims to have gained an understanding that Meditech stock has been undervalued by the board of directors of Meditech and/or the Trustee, including, but not limited to, (a) the date on which the Plaintiff purports to have gained such understanding; (b) the circumstances under which the Plaintiff purports to have gained such understanding; (c) the basis for the Plaintiff's understanding; (d) any documents, communications, and/or other information that informed the Plaintiff's understanding; and (e) any communications in which each Plaintiff informed any other person of having gained his understanding.

10

**Response to Interrogatory No. 5**

In addition to the General Objections, the Plaintiffs object to this Interrogatory on the ground that the term "an understanding" is not defined and is vague, ambiguous, and fails to identify with reasonable specificity what information the Defendants seek. In responding to this Interrogatory, the Plaintiffs have interpreted it to seek information pertaining to when the Plaintiffs first learned that the Defendants and/or the Dismissed Defendants were intentionally undervaluing Meditech stock. Responses to this Interrogatory do not include information about communications subject to the attorney-client privilege or any other privilege.

Subject to and without waiving the foregoing objections, the Plaintiffs state that the first time Mr. Trainor learned that the Defendants and/or the Dismissed Defendants were intentionally undervaluing the price of Meditech stock was when he learned about the Grossman Litigation, which was probably around the time that the lawsuit was filed in 2003. Mr. Trainor recalls learning about the Grossman Litigation from telephone calls from various people, but cannot recall who telephoned him or any of the details pertaining to those calls. Mr. Hinchliffe also recalls hearing about the Grossman Litigation at or around the time it was filed, but knew only that it had something to do with an evaluation of Dr. Grossman's stock and believed at the time that the lawsuit had to do with a power struggle in the Board of Directors. He did not realize that Dr. Grossman's allegations might pertain to current and/or former Plan participants until he spoke with Mr. Trainor and Mr. Hubert about this Action. The first time that Mr. Hubert's suspicions were confirmed that the Meditech stock was being undervalued was when he read the Form 13-D that Dr. Grossman filed with the Securities and Exchange

11

Commission in or around February 2002, in which Dr. Grossman accused the Defendants

and the Dismissed Defendants of intentionally undervaluing the stock.

**Interrogatory No. 6**

Describe in detail the terms by which Plaintiffs have agreed to compensate or be
compensated by Plaintiffs' Counsel, including, but not limited to, all fee agreements,
arrangements or other understandings between Plaintiffs and Plaintiffs' Counsel as to the
payment of attorneys' fees and expenses and/or the division of expenses and legal
expenses in this Action, and/or any agreement, arrangement or other understanding
whereby any of the Plaintiffs will be compensated for their service as named plaintiffs in
the alleged class action and/or for any actions taken in the prosecution of the Action, and
identifying each source of funds to be used in prosecuting this Action on behalf of the
Putative Class.

**Response to Interrogatory No. 6**

For all information pertaining to the manner of compensation for the Plaintiffs

and Plaintiffs' Counsel, the Plaintiffs refer the Defendants to the retainer agreements that

have been produced pursuant to the Defendants' First Request for Production of

Documents.

**Interrogatory No. 7**

Identify each civil action upon which Plaintiffs' Counsel intends to rely as evidence of
Plaintiffs' Counsel's adequacy to serve as counsel for the Putative Class in the Action,
and for each (a) identify the caption; (b) identify the court in which the action was
docketed and/or tried; (c) state the result of any motion for class certification; (d) state the
disposition of the action; and (e) describe in detail the subject matter of the claims
brought by the plaintiffs in the action.

**Response to Interrogatory No. 7**

In addition to the General Objections, the Plaintiffs object to this Interrogatory on

the ground that it calls for information from Plaintiffs' Counsel and not from the

Plaintiffs. The Plaintiffs further object on the ground that the information is publicly

available. All responses to this Interrogatory do not include information about

communications subject to the attorney-client privilege or any other privilege.

12

Subject to and without waiving the foregoing objections, the Plaintiffs state that

Plaintiffs' Counsel have been counsel of record in the following class actions in the U.S.

District Court for the District of Massachusetts: <u>Grabowski et al. v. Bank of Boston</u>, Case

No. 94-11461; <u>In re Centennial Technologies</u>, Case No. 97-10304; <u>Winsor v. Holgerson</u>,

Case No. 89-02527; <u>In re Citigroup, Inc., Capital Accumulation Plan Litigation</u>, Case No.

00-11912, 00-10055, and 00-11863; and <u>John Hancock Life Ins. Co. et al v. Goldman,</u>

<u>Sachs & Co. et al.</u>, Case No. 01-10729.

**Interrogatory No. 8**

Describe in detail the circumstances under which each Plaintiff has at any point obtained,
seen, reviewed, been provided with, or had access to a copy of any document(s)
concerning the terms of the Plan or a summary plan description of the Plan, including but
not limited to (a) the date(s) on which Plaintiff [sic] obtained, saw, reviewed, was
provided, or had access to the document(s); and (b) the method whereby the Plaintiff
obtained, saw, reviewed, was provided, or had access to the document(s).

**Response to Interrogatory No. 8**

The Plaintiffs were each provided their own copy of the Summary Plan

Description at the time that they began participating in the Plan. From time to time, they

may have also been given updated versions of the Summary Plan Description. In

addition, the Plaintiffs each received annual reports from the Plan in the same or similar

form as those that were produced by the Defendants in response to the Plaintiffs' First

Request for Production of Documents. Finally, at the time that the Plaintiffs terminated

their interest in the Plan, they each received a letter telling them the amount of money

that represented their share of the Plan and asking how they would like the money

disbursed. None of the Plaintiffs have ever seen the Trust Agreement. In or around 2001

or 2002, Mr. Hubert asked if he could review the Trust Agreement to give his accountant

some information. He was told that the document was much too large, and was asked

13

what his concern was. After he explained that he had a question, he was given Xeroxed

copies of the page of the Trust Agreement that was relevant to his question. He was not

given the Agreement at that or any other time.

**Interrogatory No. 10**

State the basis for your allegations in Paragraph 29 of the Amended Complaint.

**Response to Interrogatory No. 10**

In addition to the General Objections above, the Plaintiffs object to this

Interrogatory on the ground that it seeks a legal conclusion. The Plaintiffs further object

on the ground that discovery relating to class certification is not yet complete.

Subject to and without waiving the foregoing objections, the Plaintiffs state that

they each had the same experience when receiving their distributions and have never

heard that anyone else had a different experience. Plaintiffs' Counsel's review of the

discovery materials and answers to interrogatories produced by the Defendants has

confirmed to Counsel that the Defendants distributed benefits to all Plan participants who

terminated their interest in the Plan in essentially the same manner as they distributed

benefits to the Plaintiffs.

**Interrogatory No. 11**

State the basis for your allegations in Paragraph 41 of the Amended Complaint that "[i]n
the absence of a class action, many participants harmed by the Plan's conduct will not be
compensated for their injuries because it is too expensive to prosecute litigation
individually."

**Response to Interrogatory No. 11**

In addition to the General Objections above, the Plaintiffs object to this

Interrogatory on the ground that it seeks a legal conclusion. The Plaintiffs further object

on the ground that discovery relating to class certification is not yet complete. The

Plaintiffs further object on the ground that the answer is self-evident.

**Interrogatory No. 12**

Identify all documents and information that Plaintiffs and/or Plaintiffs' Counsel referred
to, reviewed, consulted, or relied upon in responding to any of the foregoing
interrogatories, and each person with whom Plaintiffs and/or Plaintiffs' Counsel
consulted or discussed any of the foregoing interrogatories.

**Response to Interrogatory No. 12**

In addition to the General Objections above, the Plaintiffs object to this

Interrogatory on the ground that it seeks information that is protected by the attorney-

client privilege and the work-product doctrine.

Subject to and without waiving the foregoing objections, the Plaintiffs state that

they relied on documents and information produced by the Defendants in this litigation.

In addition, Mr. Hubert relied on the transcript of his Deposition and the exhibits, as well

as the documents being produced to the Defendants on this date pursuant to the

Defendants' First Set of Requests for Production of Documents and Things.

15

As to Objections,
**Michael P. Hubert,**
**William Trainor, and**
**David Hinchliffe,**
By their attorneys,


_/s/ Sara Noonan_
Michael A. Collora (BBO #092940)
Sara Noonan (BBO #645293)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210
671-371-1000
671-371-1037

Dated: July 17, 2006


As to all Interrogatories,
I certify under penalty of perjury that the
foregoing is true and correct as it pertains to
me,


_/s/ Michael Hubert_
Michael Hubert

Dated: July 17, 2006


As to all Interrogatories,
I certify under penalty of perjury that the
foregoing is true and correct as it pertains to
me,


_/s/ David Hinchliffe_
David Hinchliffe

Dated: July 17, 2006


16

As to all Interrogatories,
I certify under penalty of perjury that the
foregoing is true and correct as it pertains to
me,


___/s/ William Trainor_____
William Trainor

Dated: July 17, 2006


## Certificate of Service

I, Sara E. Noonan, hereby certify that I have, on this 17th day of July, 2006, caused the above document
to be served by hand upon all counsel of record.


_____/s/  Sara Noonan_____
Sara E. Noonan

17