UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
MICHAEL P. HUBERT, WILLIAM TRAINOR,         )
and DAVID HINCHLIFFE, Individually and      )
On Behalf Of All Persons Similarly Situated )
                                            )
        Plaintiffs,                         )
                                            )  Civil Case No. 05-10269-RWZ
    v.                                      )
                                            )
MEDICAL INFORMATION TECHNOLOGY              )
PROFIT SHARING PLAN, et al.                 )
                                            )
        Defendants.                         )
_____)

### MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
### FOR CLASS CERTIFICATION

Plaintiffs Michael Hubert ("Mr. Hubert"), William Trainor ("Mr. Trainor") and David Hinchliffe ("Mr. Hinchliffe") (collectively, "the Plaintiffs") submit this memorandum in support of their motion for class certification. The lawsuit alleges that for years the Defendants – (i) an employee benefit plan governed by ERISA, 29 U.S.C. 1001, *et. seq.*, (ii) the company that administered the plan, and (iii) the plan's trustee – have intentionally set the value of company stock at an artificially low level for the personal benefit of company insiders (such as the trustee). Because the employee benefit plan holds large amounts of company stock in trust (in 2005, company stock represented over 80% of the trust assets), this artificially low stock value has resulted in the Defendants paying terminating Plan members far less than the fair value of their interest in the plan, in violation of the plan documents and ERISA.

The plaintiff plan participants now seek certification of the following class ("the

1

Proposed Class"):

> All participants in the MEDITECH Profit Sharing Plan who have received a distribution of any portion of their interest in that Plan from January 1, 1998 to the present.

As more fully explained below, the instant lawsuit is ideally suited to class action treatment because there are numerous affected individuals whose claims raise identical issues of fact and law and because class action treatment will produce the fairest and most efficient adjudication.

## RELEVANT BACKGROUND

A.  <u>The Defendants</u>

In 1973, Defendant Medical Information Technology, Inc. ("Meditech") established the Meditech Profit Sharing Plan ("the Plan"), which is governed by ERISA. The Plan is the sole retirement plan offered to Meditech employees. <u>See</u> Tab C (Pappalardo Deposition) at 45-46.[1] The rights and obligations arising under the Plan are set forth in a document entitled the Meditech Profit Sharing Plan, Amended and Restated Trust Agreement ("Trust Agreement"). <u>See</u> Tab G (Trust Agreements). The Trust Agreement has been restated and amended at least twice since its creation, but the essence of it has remained the same throughout its existence. <u>Id.</u>

Meditech is the named administrator of the Plan. <u>See</u> Tab C at 27. Barbara Manzolillo, Meditech's Chief Financial Officer and Treasurer, has administered the Trust on behalf of Meditech since the early 1980s (<u>id.</u> at 123-24), while Defendant A. Neil Pappalardo ("Mr. Pappalardo"), Meditech's founder, CEO and Chairman of the Board, has always been the Plan's sole Trustee since its creation (<u>id.</u> at 12, 23-24).

---

[1] Citations to Tabs refer to the corresponding Tabs attached to the Affidavit of Michael A. Collora, which has been filed contemporaneous with this Memorandum.

B.    The Plan

Under the Plan, participants are entitled to receive their fully vested share of the "fair market value" of all Plan assets. See Tab G(1)-(2) at §§ 5.03-5.05, 6.01-04.[2] A substantial portion of the Plan's assets consist of Meditech stock, see Tab C at 46-47, so the amount of benefits paid to Plan participants is in large part determined by the stock value. By 2005, the stock represented approximately 80% of the Plan assets. See Tab C at 110.

The stock is valued the same way every year. As of December 31st, Mr. Pappalardo, acting as Plan Trustee personally determines the total net worth of the Plan's assets, including the per share value of the Meditech stock held by the Plan. Id. at 24, 39-40; Tab G(1)-(2) at § 5.04; Tab L (Annual Valuations, dated 1996-2005). That stated value corresponds perfectly to the share value determined earlier in October by the Board of Directors. See Tab C at 49, 90, 124-25. That Board value, in turn, is arrived at each year on the basis of criteria and reports presented to the Board by Mr. Pappalardo acting not as the Plan Trustee, but instead as CEO of Meditech and Chairman of the Board. Id. at 153, 158-62. The value assigned to Meditech stock has never been verified by an independent third-party appraiser or even by Meditech's own auditors. Id. at 105-08.

There are two ways in which Plan participants receive distributions of their benefits. First and most obviously, benefits are distributed to those participants who have ended their employment at Meditech. See Tab G(1)-(2) at §§6.01-6.04. The process for these distributions is the same irrespective of why the employment ends (e.g., death. disability, retirement,

---

[2] The relevant background relating to the eligibility rules and the specific rights and obligations of Plan participants has been previously briefed in the Plaintiffs' First and Second Oppositions to the Defendants' four Motions to Dismiss. For efficiency's sake, those background facts are expressly incorporated by reference into this Memorandum.

resignation, or termination for cause).  Id.; Tab C at 111-14, 120-21.  When ending their employment, Plan participants are informed of the cash value of their vested interest in the Plan.  See Tab C at 113-14.  Mr. Pappalardo calculates the amount due using the stock value arrived at the preceding December, and Plan participants therefore do not receive the benefit of any changes in value to the stock that may have occurred in the interim.  Id. at 39-40, 47-49, 151-52.

Since 1999, the Plan has also permitted participants with more than twenty years' participation in the Plan to withdraw a portion of their interest upon request, known as "in-service withdrawals" Id. at 111.  Although denied by Mr. Pappalardo, the evidence suggests that the Defendants have a practice of requiring participants to withdraw that portion of their interest in the Plan that is in excess of $1,000,000, whether or not the Plan participant subjectively desires to do so.  Id. at 95-96, 101-02, 143-45, **ADDITIONAL CITATIONS REDACTED PER DEFENDANTS.**

Throughout the relevant timeframe, the Defendants have universally failed to provide meaningful information to Plan participants about their rights and obligations under the Plan.  Plan participants do not receive a copy of the Trust Agreement.  See Tab C at 42-44.[3]  Mr. Hubert testified that when he asked for copy of the Trust Agreement while employed at Meditech, he was discouraged from obtaining one.  See Tab F (Hubert Deposition) at 157-58, 167-68.  Plan participants have never been told how Mr. Pappalardo or the Board arrives at the annual value assigned to Meditech stock.  See Tab C at 47-49, 75-76, 124-25, 162.  And when receiving their

---

[3] Barbara Manzolillo, the Plan Administrator, testified that she has only two copies of the Trust Agreement: the original, which is kept in a safe, and her own marked-up copy.  Unfortunately, the Plaintiffs have not yet received a transcript of Ms. Manzolillo's testimony due to the fact that the Defendants did not produce her for her deposition until August 8, 2006.  The Plaintiffs will supplement their evidence with the relevant portions of that transcript as soon as they receive it from the stenographer.

benefits, Plan participants are not asked to file any sort of claim or advised that they have a right to contest the amount that is going to be sent to them, but are simply informed of the amount that they will receive and asked to choose how they would like to receive it. Id. at 114-21.

This is likely because the claims procedure under the Plan is non-existent. The Plan requires that "[a]ll claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such regulations as the Trustee shall reasonably establish". See Tab G(1)-(2) at § 11.10(1); see also Tab H(1) at §IV(1) ("The claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim"); Tab H(2) at § VII ("Your claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim."); Tab H(3) at § VIII (same). Mr. Pappalardo admitted, however, that he has never established any regulations or rules for filing a claim. See Tab C at 41, 57, 124. By not telling participants at the time they receive a disbursement that they have a right to contest the amount and how to do so, the Defendants are able to avoid requests for information that they would otherwise be obligated to provide. For instance, when Mr. Hubert wrote to Ms. Manzolillo at the time of his disbursement that he believed he was entitled to additional benefits, the Defendants chose to treat that letter as "expressing concern" rather than as a claim for benefits and simply ignored it. Id. at 147-50; see also Tab F at 153-157; Tab K(3) (Documents relating to Hubert disbursement).

The Defendants have similarly failed to inform Plan participants of their attempts to curtail the participants' legal rights. On December 15, 2002, the Defendants purported to amend the Trust Agreement to cut off Plan participants' rights of appeal in certain circumstances and to set forth a contractual statute of limitations for benefits claims. See Tab G(3) (Amendment No.

2) at §§ 16(c), 16(f).  However, the Defendants did not produce any document in which the Plan participants received notice of these important changes, and neither Mr. Pappalardo nor Ms. Manzolillo could testify that notice had otherwise been given.  See Tab C at 62-67

      The timing of the Amendment was convenient, to say the least; earlier that same year, on February 27, 2002, Meditech founder and former Board member Jerome Grossman had filed a Form 13-D with the Securities & Exchange Commission, publicly questioning the Board's stock valuation methods, which he believed resulted in "artificially low" stock values.  See Tab I (Form 13-D filed by Dr. Grossman) at pp. 9, Item 4(i).  This filing marked the first time that anyone with knowledge of how Meditech stock is valued had alleged potential misconduct in a forum that was at least theoretically available to Plan participants.  See Tab C at 182, 210-11; see also Tab J (Message from the Chairman).

C.    The Plaintiffs

      Dave Hinchliffe worked as a computer programmer at Meditech from 1975 until approximately April 15, 1998.  See Tab D (Hinchliffe deposition) at 40; Tab K(1) (Documents relating to Hinchliffe disbursements).  When he left Meditech, Mr. Hinchliffe was informed that he had a vested interest in the Plan of $1,101,907, plus interest, which calculation was based in large part on the stock value adopted by Mr. Pappalardo on December 1, 1997.  See Tab C at 136-37; Tab K(1).  Mr. Pappalardo personally discussed Mr. Hinchliffe's benefit payout options with him.  Id.  Mr. Pappalardo did not tell Mr. Hinchliffe how the Plan's assets were valued.  Id. at 137-38.  In addition, Mr. Hinchliffe was not told at the time he received his disbursement either that he had a right to challenge his benefits calculation or how to go about doing so.  Id. at 139.

Sometime after graduating from Revere High School, Bill Trainor joined Meditech in 1975, where he was responsible for maintaining Meditech's computers and buildings until he resigned on March 13, 1998. See Tab E (Trainor Deposition) at 22, 70-71. At that time, Mr. Trainor was informed that he was entitled to $911,957 in benefits, plus interest, which was again based in large part upon the value that Mr. Pappalardo had assigned to the stock on December 1, 1997. Id. at 140-41; Tab K(2) (Documents relating to Trainor disbursements). Mr. Trainor was not told how that value had been calculated or that there was anything wrong it. See Tab E at 79.

Michael Hubert worked as a salesperson at Meditech from 1981 until 2004. See Tab F at 91-92, 197. On September 16, 2004, following his termination, Mr. Hubert was informed that he would be receiving a distribution of approximately $1,039,000 representing his interest in the Plan, based in large part on the value Mr. Pappalardo had assigned to Meditech's stock on December 31, 2003. See Tab C at 142; Tab K(3). In a letter addressed to Ms. Manzolillo and copied to Mr. Pappalardo, Mr. Hubert questioned whether the amount calculated as his due represented less than the fair value of his vested interest in the Plan. See Tab F at 153-57; Tab K(3). After waiting five months and not receiving any response from any of the Defendants (other than a check for the originally calculated amount), Mr. Hubert filed the initial Complaint in this matter on February 10, 2005, and Mr. Hinchliffe and Mr. Trainor joined the litigation in the Amended Complaint, which was filed on May 23, 2005.[4]

**ARGUMENT**

A. <u>**The Legal Standard for Class Certification**</u>

Rule 23 class actions "enable . . . litigation to go forward with maximum effectiveness

---

[4] For efficiency's sake, the allegations contained in the Complaint and the Amended Complaint are expressly incorporated by reference into this Memorandum.

from the viewpoint of judicial administration." Yaffe v. Powers, 454 F.2d 1362, 1367 (1st Cir. 1972), and "[vindicate] the rights of individuals who otherwise might not consider it worth the candle to embark on [costly] litigation." Gulf Oil Co. v. Bernard, 452 U.S. 89, 99, n.11 (1981) (quoting Deposit Guaranty Nat'l Bank v. Roper, 445 U.S. 326, 338 (1980)). To serve these objectives, Rule 23 sets out four prerequisites to the maintenance of a class action, often labeled "numerosity," "commonality," "typicality," and "adequacy." See Fed. R. Civ. P. 23(a). If these four prerequisites are present, a class may be maintained under any one of three alternative bases. See Fed. R. Civ. P. 23(b)(1)-(3).

"A decision on class certification does not involve an examination of the merits of the underlying dispute, but rather serves the limited purpose of determining whether a class action is the most appropriate mode of adjudication." Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21, 24 (D. Mass. 2003). The question of whether a class ought to be certified is left to the sound discretion of the Court, and "doubts should be resolved in favor of certification, particularly in early stages of the litigation." Id. at 25.

**B.      The Proposed Class Satisfies the Requirements of Rule 23(a).**

   1.     Numerosity

Rule 23(a)(1) requires that the class "be so numerous that joinder of all members is impracticable." The First Circuit has long recognized that "impracticable" within the meaning of Rule 23(a)(1) means that the joining of all members of the class would be difficult or inconvenient. See Advertising Specialty Nat'l Ass'n v. Federal Trade Comm'n, 238 F.2d 108, 119 (1st Cir. 1956); see also Payne, 216 F.R.D. at 25.

Discovery thus far has shown that the Proposed Class numbers at least 1,039 people who

have received a payout of their total interest in the Plan between 1998 and 2005. See Tab A (Responses to Interrogatories) at Exhibit A; Tab C at 97-99, 126-28. In addition, there have been 128 "in-service withdrawals" for various reasons since 1998, representing potentially 24 to 35 additional class members. See id. And, of course, present employees who terminate their interest in the Plan up to the date of judgment will continue to increase this number. The sheer numbers of potential class members thus easily establish the numerosity required for class certification under Rule 23(a). See, e.g., Gorsey v. I.M. Simon & Co., Inc., 121 F.R.D. 135, 138 (D. Mass. 1988) (joinder of 800 to 900 people would be impracticable).

    2.    Commonality

Rule 23(a)(2) requires that there be common questions of law or fact. A single common legal or factual issue can suffice to establish commonality. See Payne, 216 F.R.D. at 25; see also Forbush v. JC Penney Co., Inc., 994 F.2d 1101, 1106 (5th Cir. 1993) (commonality exists where ERISA plaintiff alleged general practice of overestimating social security benefits even though four different pension plans were involved). The Proposed Class more than satisfies this requirement.

The factual questions involved in answering whether the Proposed Class members received the fair value of their vested interest in the Plan are identical for all Proposed Class members. The same Plan has been in existence since 1973 and, under that Plan, the Proposed Class members all had the same rights and obligations. See Tab G(1)-(2); Smilow v. Southwestern Bell Mobile Systems, Inc., 323 F.3d 32, 39 (1st Cir. 2003) (commonality shown "in the terms of the contract, which are identical for all class members."). Every participant's interest in the Plan was calculated in the same manner by the same Trustee for each member in

each year at issue. Although those calculations might require individualized information to determine the individual's share of the Plan, the valuation decisions were applied equally to all Plan participants. See Tab A at 16 (Response No. 3) ("the value of Meditech stock held by the Plan is not 'calculated . . . per Plan participant per year'").[5]

Likewise, the legal issues raised by the Amended Complaint are common to all Proposed Class members. The Plaintiffs have alleged (1) that the Defendants had fiduciary obligations, including obligations to act in accordance with the Plan documents and pursuant to the best interest of Plan members, (2) that they violated those obligations by intentionally valuing the stock held by the Plan at an artificially low level to benefit themselves at Plan members' expense, and (3) that, as a result, all of the Proposed Class members received less than the fair value of their vested share in the Plan in violation of ERISA. See 29 U.S.C. §§ 1104(a), 1132(a)(1)(B). The law applies equally to all of the Plan's participants and, thus, the commonality requirement is satisfied on this basis as well.

The affirmative defenses raised by the Defendants are equally common to the Proposed Class. Regarding first the defense of failure to exhaust administrative remedies, discovery has confirmed that the Defendants have universally applied (or rather failed to apply) the same procedures to all Plan participants. The Plan itself is not readily available. The Defendants have never informed any Plan participants (including the Plaintiffs) of the methodology by which Meditech stock is valued. And when making distributions, the Defendants have never notified

---

[5] Because the Plaintiffs have challenged actions that the Defendants universally took with respect to all proposed class members, they have a commonality of interest with all other Plan participants irrespective of the year in which they received their distributions. See Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 422 (6th Cir. 1998) (where ERISA class representative establishes individual standing to sue under his own plan for alleged wrongful general practices of defendants, he has standing to represent members of other plans in which he was not a participant so long as those plans were administered by the same defendants); Forbush, 994 F.2d at 1106 (same); Alves v. Harvard Pilgrim Health Care, Inc., 204 F.Supp.2d 198, 205 (D. Mass. 2002) (same).

any Plan participants that they have a right to challenge the amount being paid to them or established any regulations that would permit them to do so. See Tab C at 41-42, 57, 114-21.[6] Even Mr. Pappalardo, testifying as the 30(b)(6) witness for Meditech and the Plan, admitted that he "really do[es] not know for a fact" to whom a participant should direct questions about the calculation of their benefit amount. Id. at 124.

The Defendants' asserted statute of limitations defense is also common to the Proposed Class as a whole. The members of the Proposed Class all received the same types of communications from the Defendants regarding their rights and obligations under the Plan, none of which included information on how the Plan's assets had been valued. See Tab C at 47-49, 75-76, 124-25, 162. Moreover, no Plan participant could reasonably have known of a possible misconduct in connection with the Meditech stock valuations before February 2002, when Dr. Grossman filed his Form 3-D. See Tab C at 107-08 (recalling that during relevant timeframe auditors "would comment that there is no way they can know for a fact what the actual value is or isn't"); Tab I. These common issues of fact and law satisfy Rule 23(a)(2).

3.  Typicality

Rule 23(a)(3) requires that the Plaintiffs' claims be typical of the claims of the members of the class – that is, "that a class representative have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." Swack v. Credit Suisse First Boston, 230 F.R.D. 250, 263 (D.

---

[6] Not only does this demonstrate the requisite common experience of the Proposed Class, it precludes the Defendants from raising an exhaustion defense in this litigation against any of the class members. See 29 CFR § 2560.503-1(*l*) ("In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan . . . .").

Mass. 2005) (*quoting* In re Oxford Health Plans Inc. Securities Litig., 199 F.R.D. 119, 123 (S.D.N.Y. 2001)).  Defenses unique to the named plaintiffs will defeat a showing of typicality only when those defenses threaten to become the focus of the litigation.  See id. at 264.

In pressing their own rights, the Plaintiffs will necessarily present the claims of the other class members.  They have been injured in the same way (e.g., received less than the amount they were due under the Plan), and have claims based on the same legal theories (e.g., the Defendants intentionally undervalued the stock held by the Plan in order to benefit the Plan Trustee and other company insiders), as the other members of the Proposed Class.

No unique defenses threaten to become the focus of the litigation.  Despite the Defendants' asserted belief that the circumstances surrounding the termination of Mr. Hubert's employment somehow renders him an atypical plaintiff in this ERISA action, see Def. Motion for Protective Order, filed July 12, 2006, pp. 13, Mr. Pappalardo has himself conceded that the manner in which an employee terminates employment with Meditech has absolutely nothing to do with the calculation of the benefits due to that person under the Plan.  See Tab C at 113-14, 120.  This is consistent with the Plan, which requires that vested benefits be paid to the departing employee irrespective of the reason for the employee's departure.  See Tab G(1)-(2) at § 6.04(a); see also 29 U.S.C. § 1002(19), 1002(23)(B).  Simply put, the circumstances regarding Mr. Hubert's termination are not relevant to the claims in this case and he cannot be judged an atypical ERISA plaintiff on this irrelevant basis.

The Defendants may also try to argue that they have a statute of limitations defense unique to Mr. Hinchliffe and Mr. Trainor, who received their disbursements in 1998.  But as shown in Part B(2), *supra*., this defense applies not to Mr. Hinchliffe and Mr. Trainor

individually but rather to the entire class (or at least that portion of the class who received disbursements before February 10, 1999) and thus does not alter the typicality analysis. Moreover, given this Court's previous ruling that the proper statute of limitations is six years from the time Plan participants knew or should have known of a potential ERISA violation, the class members would have at a minimum had six years from the date of Dr. Grossman's SEC filing – that is, until at least February 2008 – to file this lawsuit regardless of when they received their disbursements.[7] The initial complaint was filed in February 2005, well within the statutory period for all participants.

    4.    <u>Adequacy</u>

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." This element requires a finding that the interests of the named plaintiffs "will not conflict with those of the class members and that . . . counsel is qualified, experienced and able to vigorously conduct the proposed litigation." <u>Payne</u>, 216 F.R.D. at 26. "The conflict that will prevent a plaintiff meeting the adequacy of representation must be fundamental, and speculative conflict should be disregarded at the class certification stage." <u>In re Transkaryotic Therapies, Inc. Sec. Litig.</u>, 2005 WL 3178162 at *4 (D. Mass. Nov. 28, 2005) (citations and internal punctuation omitted). Moreover, "[i]n complex actions such as this one,

---

[7] The Plaintiffs do not mean to suggest that the Court can or should determine at the class certification stage precisely when the Plaintiffs' claims accrued. For purposes of class certification, however, Dr. Grossman's February 2002 Form 13-D filing at least establishes a floor for the running of the limitations period because it marked the first time that anyone with a basis of knowledge publicly accused any of the Defendants with any wrongdoing in the setting of Meditech stock value. See <u>Edes v. Verizon Communications, Inc.</u>, 417 F.3d 133, 142 (1st Cir. 2005) ("there cannot be actual knowledge of a violation for purposes of the limitation period unless a plaintiff knows the essential facts of the transaction or conduct constituting the violation") (citations omitted); <u>Kling v. Fidelity Management Trust Co.</u>, 323 F.Supp.2d 132, 136-37 (D. Mass. 2004) (when determining beginning of limitations period for breach of fiduciary claim under ERISA, "it is not enough that [plaintiffs] had notice that something was awry; [plaintiffs] must have had *specific knowledge of the actual breach of duty* upon which [they sue]") (citation omitted) (emphasis and brackets in original).

named plaintiffs are not required to have expert knowledge of all details of the case . . . and a great deal of reliance on the expertise of counsel is to be expected." In re Lupron Marketing and Sales Practices Litig., 228 F.R.D. 75, 90 (D. Mass. 2005) (*citing* County of Suffolk v. Long Island Lighting Co., 710 F.Supp. 1407, 1416 (E.D. N.Y. 1989)).

The Plaintiffs have no interests antagonistic to those of the other class members. Rather they have an identical interest in proving that the Defendants intentionally undervalued the stock held by the Plan and maximizing the amount due to them from the Defendants. Whether or not members of the Proposed Class suffered greater damage in certain years (and hence will receive a higher payout) will not impact the predominance of that collective goal or otherwise create a conflict between the class members. See In re Lupron., 228 F.R.D. at 90 ("Individual differences in damages suffered do not create a class conflict when recovery varies in direct proportion to the amount of individual damages incurred."); Amended Complaint ¶¶ 64-103 (specifically alleging stock was undervalued each year since at least 1998).

The potential suggestion that Mr. Hubert's attempt to assist Meditech founder Dr. Grossman's efforts to maximize the value of the company's stock in 2002 somehow renders him unable to adequately represent the class is wrong. As the Court is aware, the Plaintiffs vehemently deny the Defendants' characterization of Mr. Hubert's conduct. See Plaintiffs' Opposition to Motion for Protective Order, filed July 26, 2006. Hotly disputed questions of fact are not properly decided at the certification stage. See In re Transkaryotic Therapies, 2005 WL 3178162 at *5. Equally important, as demonstrated above, the circumstances surrounding Mr. Hubert's termination and/or his relationship with Dr. Grossman are wholly irrelevant to the question of whether the manner in which the Defendants calculated and paid out benefits due to

Plan participants violated ERISA.  Because they have no relevance to this lawsuit, they cannot possibly disqualify Mr. Hubert from being an adequate representative for the plaintiff class.  See Caranci v. Blue Cross & Blue Shield of R.I., 194 F.R.D. 27, 41 (D. R.I. 2000) ("A conflict that will prevent a plaintiff from meeting the adequacy requirement . . . must go to the specific issues in controversy"); Koppel v. 4987 Corp., 191 F.R.D. 360, 368 (S.D. N.Y. 2000) ("to defeat class representation, any allegations concerning the representative's adequacy must be relevant to the claims in the litigation and must be directed at improper or questionable conduct arising out of or touching upon the very prosecution of the lawsuit") (citations and internal punctuation omitted).

On behalf of himself and other former Meditech employees, Mr. Hubert has vigorously pursued his claims against the Defendants.  He has developed a sophisticated understanding of the issues, in large part through discussions he has had with numerous attorneys dating back to 2002.  See Tab F at 20-22.  He has a similarly sophisticated understanding of the procedural vehicle of a class action (id. at 82-83), and personally contributed much to the substance of the Complaint (id. at 85-86, 108-13).  He has invested $5,000 of his own money in this case (id. at 89) and reached out to other potential class members, including his co-plaintiffs (id. at 173-188, 194).  He has been a willing participant in the discovery process to date, and will continue to participate in this litigation until the conclusion of the case.

Mr. Hinchliffe decided to join the litigation thoughtfully, after discussions with his co-plaintiffs, with counsel, and with his wife.  See Tab D at 12-13, 19-21, 32.  Like the other named plaintiffs, Mr. Hinchliffe has a keen personal interest in vigorously pursuing his claim because his long employment at Meditech means that he stands to recover a large sum if successful.  See id. at 24 (discussing potential damages range for personal damages).  He also has a keen personal

interest in zealously litigating the statute of limitations and exhaustion defenses.  Mr. Hinchliffe understands the allegations in the case (id. at 19-21, 26, 29, 38-39), has reviewed the pleadings (id. at 12, 33-34), participated in the discovery process (id. at 6-7, 30-32), recognizes that he has special obligations as a class representative (id. at 11-12, 29), and has agreed to contribute some of his own limited funds to the costs of the litigation irrespective of whether he receives a favorable outcome (id. at 8-9).

     Mr. Trainor also decided to join this lawsuit after speaking with Mr. Hubert and with counsel, and has participated in the discovery process by reviewing and responding to the interrogatories and document requests and giving a deposition.  See Tab E at 10-15, 65-66, 95-96.  Admittedly, during his deposition, Mr. Trainor did not demonstrate the same familiarity with the intricacies of class action litigation as the other named plaintiffs.  "However, it is inappropriate to attack the adequacy of a class representative simply based on the representative's ignorance of the underlying facts."  Rankin v. Rots, 220 F.R.D. 511, 520-21 (E.D. Mich. 2004) (certifying class despite named plaintiff's admission to "having essentially no knowledge of ERISA, the role of the defendants, or the underlying facts of the case," in part, because such problems are to be expected when unsophisticated investors are harmed); see also Surowitz v. Hilton Hotels Corp., 383 U.S. 363 (1966).  Despite Mr. Trainor's unfamiliarity with stock valuation issues (Tab E at 59, 62, 88, 89) and the mechanics of legal system (id. at 24-25), there was no question that he is familiar with the facts surrounding his own participation in the Plan (id. at 91-93), that he understands that the suit alleges that Meditech stock was undervalued (id. at 6, 10-11, 97-98), that he reviewed the Amended Complaint before it was filed (id. at 47), that he is aware of his obligation to provide truthful information (id. at 30), that he is prepared to

16

invest some of his own resources in the prosecution of this action (id. at 38-39), and that he is prepared to testify at trial (id. at 30). This testimony is sufficient to find Mr. Trainor an adequate class representative. See In re Lupron, 228 F.R.D. at 90 (finding "nothing surprising" in the fact that class representatives "are unschooled in the intricacies of the legal process or the complexities of prescription drug pricing. They are, however, fully aware of the circumstances in which their husbands purchased Lupron"); Rodrigues v. Members Mortgage Co., Inc., 226 F.R.D. 147, 151 (D. Mass. 2005); Koppel, 191 F.R.D. at 367 and n.11; Walco Investment Inc v. Thenan, 168 F.R.D. 315, 328-29 (S.D. Fla. 1996); Modell v. Eliot Savings Bank, 139 FRD 17, 23 (D. Mass. 1991).[8]

Finally, Plaintiffs' counsel is well qualified to conduct the proposed litigation. See Collora Aff ¶¶ 1-9. Counsel are experienced trial attorneys with broad experience in complex civil and criminal litigation, including representing both plaintiffs and defendants in federal class actions. Id. at ¶¶ 3-9. They are aware of their obligations to represent the entire class, and are committed to ensuring that this litigation is prosecuted in a vigorous and efficient fashion. Id. at ¶ 9. For the foregoing reasons, Plaintiffs are fair and adequate representatives of their respective class.

C.      **The Proposed Class Satisfies the Requirements of Rule 23(b)(3).**

Rule 23(b)(3) provides that a class action may be certified if the Court finds that Rule 23(a) has been satisfied and:

[T]he questions of law or fact common to the members of the class predominate over any

---

[8] Moreover, since his deposition, counsel has provided additional advice to Mr. Trainor regarding the class action mechanism and his obligations as a class representative, particularly his obligation to monitor the appropriateness of counsel's activities. Mr. Trainor has expressed that he understands these obligations and that he is prepared to perform them.

questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3). Here as well, the Proposed Class meets Rule 23's requirements.

   1.   <u>Predominance</u>

The predominance requirement cannot "be reduced to a mechanical single-issue test." <u>Waste Management Holdings</u>, 208 F.3d at 296. It focuses "on the legal or factual questions that qualify each class member's case as a genuine controversy . . . ." <u>Amchem Products</u>, 521 U.S. at 623. In this respect, although far more demanding, it is similar to Rule 23(a)(3)'s requirement that the named plaintiffs' claims or defenses be typical of the class claims or defenses. <u>Id.</u> at 623 n.18.

For the same reasons that the Proposed Class meets the "commonality" and "typicality" standards of Rule 23(a), <u>see</u> Parts B(2) and (3), *supra.*, it also meets this standard. The exact same proof will be mustered in support of the exact same statutory arguments, and judgment in the case will affect all class members equally. Indeed, given the nature of the Plaintiffs' claims, it is likely that the lion's share of litigation resources on both sides will be invested in competing expert testimony on the issue of the "fair value" of Meditech stock throughout the years. Thus, it is clear that the core of the Plaintiffs' claims will turn on proof that will be equally necessary to the claims of each of the class members. <u>Accord</u> <u>Payne</u>, 216 F.R.D. at 28 (where plaintiffs and defendants must each present expert testimony to prove a fact at issue in the case, "[t]here is no reason for this issue to be rehashed twenty-five times, or even seven times") (citation omitted).

There will, of course, be variations of proof regarding the amount of individual class members' damages. However, it is well established that individual questions of damages do not

bar class treatment.  See In re Lupron, 228 F.R.D. at 92.  Furthermore, once the Plaintiffs succeed in proving the valuation methodology that should have been used in place of the "artificially low" methodology employed by the Defendants, the individual damages calculations will be relatively simple to resolve.  See Smilow, 323 F.3d at 40 ("Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria – thus rendering unnecessary an evidentiary hearing on each claim.").

Finally, as discussed above, the Defendants' affirmative defenses are applicable on a class-wide basis and, to the extent that at a later point any of the Defendants' affirmative defenses appear viable against any portion of the Proposed Class, the Court has ample procedural mechanisms to adjust the class accordingly.  See Smilow, 323 F.3d at 39-40.

    2.    Superiority

In addition to finding the predominance of common questions, Rule 23(b)(3) requires that the Court determine that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  This involves four factors, all of which argue for certification here: (A) members of the class have little interest in individually controlling separate actions, given the economies possible if the actions are combined into one; (B) no other ERISA litigation has been commenced by or against class members; (C) concentrating the litigation in this forum produces more economies than separate actions given the overlap in discovery needs; and (D) proceeding as a class action will present no special management difficulties because the class, while numerous, has readily identifiable members and is not so large or geographically diverse as to make a class action unwieldy.  See Rule 23(b)(3)(A)-(D).

Requiring numerous separate lawsuits covering the same or substantially similar issues would be an inefficient allocation of judicial resources. To paraphrase one court's succinct analysis of the superiority of class treatment: "I see no necessity for encumbering the judicial process with 1,000 lawsuits, if one will do." Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452, 463 (D. C. Penn. 1968). The class action is the superior procedural vehicle for this claim.

## CONCLUSION

For all of the reasons stated above, the Plaintiffs respectfully request that this Court grant the Plaintiffs' Motion for Class Certification.

Respectfully submitted,
**Michael P. Hubert,**
**William Trainor, and**
**David Hinchliffe,**
Individually and as representatives of a class of all others similarly situated,
By their attorneys,


  /s/ Sara Noonan
Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Sara Noonan (BBO #645293)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA  02210
671-371-1000
671-371-1037

Dated: August 15, 2006

## CERTIFICATE OF SERVICE

I, Sara E. Noonan, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on this 27th day of September, 2006.

/s/ Sara Noonan
Sara E. Noonan