**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, | ) | |
| and DAVID HINCHLIFFE, Individually and | ) | |
| On Behalf Of All Persons Similarly Situated | ) | |
|  | ) | |
|     Plaintiffs, | ) | |
|  | ) | Civil Case No. 05-10269-RWZ |
|     v. | ) | |
|  | ) | |
| MEDICAL INFORMATION TECHNOLOGY | ) | |
| PROFIT SHARING PLAN, et al. | ) | |
|  | ) | |
|     Defendants. | ) | |

_____

### PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

In an attempt to avoid liability to all of the people they have shortchanged over the years, Defendants have launched *ad hominum* attacks on Plaintiffs and their ability to adequately represent the interests of the proposed class. Calling them "greedy" and "ungrateful," Defendants waste the Court's time by going through a shameless litany of every employment benefit earned by Plaintiffs for which they allegedly paid "nothing," as though, to paraphrase Samuel Johnson, these long-term employees ought to be grateful for anything short of a hanging.

Setting aside the arrogance of Defendants' position, the truth is that *all* of the money contributed to the Plan was *deferred compensation* that Defendants would otherwise have had to pay out of pocket to their employees. See Tab A (Chairman's Comments) at 14 ("In addition to directly selling stock to employees, we provide deferred compensation through a Profit Sharing Trust").[1] More to the point, this case is not about whether Plaintiffs received *any* benefits from their many years of service to Meditech., but whether they and the proposed class received the

---

[1] Citations to "Tab __" refer to the corresponding tabs attached to the Affidavit of Michael A. Collora, that has been filed contemporaneous with this memorandum.

benefits that Defendants legally obligated themselves to provide. And the issue currently before the Court is even more limited: whether this litigation ought best to proceed as a class action.

Defendants do not dispute that Plaintiffs have shown the numerosity and commonality of the class required under Fed. R. Civ. P. 23(a)(1)-(2), and that a class action is the superior mechanism by which to bring their claim under Fed. R. Civ. P. 23(b)(3). In other words, the claim itself is appropriate for class treatment; the only question is whether these Plaintiffs are proper representatives to bring it. Plaintiffs respectfully submit that the overwhelming evidence is that they should.

**A.**      **These Three Plaintiffs Will Adequately Represent the Interests of the Class.**

 Defendants again attack Mr. Hubert for his relationship in 2002 with Meditech founder and shareholder Dr. Jerome Grossman and his subsequent termination. In order to show that Mr. Hubert is inadequate on this ground, there must be proof that the evidence is relevant, that is that it "goes to the specific issues in controversy." Caranci v. Blue Cross & Blue Shield of R.I., 194 F.R.D. 27, 41 (D. R.I. 2000).

Purported employee misconduct is no defense to a claim for unpaid pension benefits. Guidry v. Sheet Metal Workers National Pension Fund, 493 U.S. 365, 376-77 (1990). In Guidry, the question before the Supreme Court was whether a constructive trust could be imposed on vested pension benefits to repay a union for funds that its faithless employee had embezzled. Id. at 367. The Supreme Court began by noting that ERISA contains a provision precluding the alienation or assignment of vested pension rights. Id. at 371-72. It then rejected the employer's argument that given the employee's misconduct, an equitable exception could be made to that rule. Noting that "[a]s a general matter, courts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text," the Court

decided that because the statute is clear with regard to an employer's obligation to pay vested

benefits, "the identification of any exception should be left to Congress." Id. at 376-77; Fremont

v. McGraw-Edison Co., 606 F.2d 752, 754, 757 (7th Cir. 1979) (affirming summary judgment for

unpaid benefits to employee pursuant to ERISA's nonforfeiture provision despite fact that

employee stole valuable trade secrets and confidential information).[2]  Because Mr. Hubert's

conduct as an employee is "legally irrelevant" to his claim for unpaid benefits, Crausman v.

Curtis-Wright Corp., 676 F.Supp. 1302, 1305 (D. N.J. 1988), it is equally irrelevant to

determining whether he is an adequate representative of the class. Caranci, 194 F.R.D. at 41.[3]

As for Dave Hinchliffe, Defendants can muster only that he is not sufficiently

"concerned" about absent class members.  Class representatives do not have to be altruistic in

their pursuit of an action, they just have to avoid conflicts with absent class members.  In both

instances cited by Defendants as demonstrating a lack of concern, Mr. Hinchliffe was actually

responding appropriately to improper and irrelevant questions from defense counsel.  In the first

instance, Mr. Hinchliffe was asked whether he thought it would be "fair" for someone who left in

a later year to have their interest based on a lower stock value than someone in an earlier year.

See Tab B (Hinchliffe Depo.) at 35.  In the second, Mr. Hinchliffe was asked what he thought

might happen to current participants if the Plan had to pay a judgment as a result of this

---

[2] Defendants cite only one case, Ellenburg v. Brockway, Inc., 763 F.2d 1091 (9th Cir. 1985), for the proposition that they may raise an equitable defense to Mr. Hubert's claim.  There, however, the defense was linked directly to the question of whether or not the plaintiff was even eligible to receive benefits.  Here, there is no dispute that Mr. Hubert was entitled to receive his benefits.  In any event, Ellenburg was decided five years before Guidry, and is necessarily limited by Guidry's holding that equity cannot supply a defense for a failure to pay vested benefits where ERISA does not.  Guidry, 493 U.S. at 376-77.

[3] In In re ADC Telecom, ERISA Litig., 2005 WL 2250782 (D. Minn. 2005), the court found the representative inadequate because the circumstances surrounding his termination would subject him to rigorous cross-examination. It did so, however, without analyzing the relevance of those circumstances to the class claim and without distinguishing either Guidry or Winer v. Edison Bros. Stores Pension Plan, 593 F.2d 307, 311 (8th Cir. 1979), in which the Eighth Circuit held that ERISA's non-forfeiture provision, 29 U.S.C. § 1053(a)(2)(A), bars employers from asserting a defense of employee misconduct to a claim for vested benefits.  Given the court's failure to fully analyze the issue, including its failure to acknowledge contrary and binding case law, the case ought not to carry any weight in this Court.

litigation.  Id. at 25-26.  That Mr. Hinchliffe refused to allow himself to be guilt-tripped by defense counsel speaks volumes about his ability to vigorously fight for his and the class's rights. And given the nature of the questions at issue, he should not be disqualified for his answers.

Defendants launch a similar attack on Bill Trainor.  During the deposition, defense counsel asked Mr. Trainor whether he "cared" about later stock values and whether those values would "affect" him (to which he correctly answered, "No").  See Tab C (Trainor Depo.) at 102-03.  But when defense counsel tried to lead Mr. Trainor to admit that he was not concerned about the fair value of Meditech's stock in years after he left, Mr. Trainor answered: "It didn't [concern me] until I heard that Jerry Grossman, who was a member of the board of directors, was suing the company for what I understand is he felt the stock was undervalued, and I think was the first time I thought about it."  Id.  Thus, it is clear from his answer that Mr. Trainor thought that he was being asked whether, during those years, he was concerned that his own stock had been undervalued.  At no time did he testify, as Defendants assert, that he does not care about absent class members, or that is he "unwilling" to pay his share of the litigation.  Id. at 38.

Defendants also attack Mr. Trainor, a high school graduate, for his lack of sophistication in understanding legal terms and procedure.  Mr. Trainor is not a lawyer or a professional plaintiff – in fact, has never before sued anyone – and he is entitled to rely on counsel's expertise in framing the legal issues.  Rosen v. Textron, Inc., 369 F.Supp.2d 204, 215-16 (D. R.I. 2005). But whatever Mr. Trainor's testimony may have lacked in legal acumen, he more than made up for in honesty.  When asked directly whether he knew that the stock was undervalued, he honestly answered that he did not and that he relied on the information provided to him by Mr. Hubert in deciding to join the suit.  See Tab C at 6, 11-12.  Any other answer would have been patently false – Mr. Trainor is by his own admission "not a stock person" (id. at 62) – yet

Defendants ask this Court to find him inadequate precisely because of his honesty.  But see Surowitz v. Hilton Hotel Corp., 383 U.S. 363, 373-74 (1966) (dismissal based on ignorance of class representative improper where no indication of improper motive or trickery on plaintiff's part).  Mr. Trainor is willing and able to represent this class, and should be allowed to do so.

**B.    There Is No Conflict Between the Class and the Class Representatives.**

After obtaining an order from this Court limiting Plaintiffs to the pursuit of only class (rather than merits) discovery during this litigation phase, Defendants have submitted two lengthy affidavits in which Mr. Pappalardo and Meditech's Chief Financial Officer Barbara Manzolillo purport to justify the validity of Defendants' valuation decisions, the core factual issue in this case.  This blatant gamesmanship should not be countenanced and the affidavits should be stricken.  See Plaintiffs' Motion to Strike Affidavits of A. Neal Pappalardo and Barbara A. Manzolillo, filed September 27, 2006.  Even if analyzed on their merits, however, Defendants' arguments relating to valuation do not defeat Plaintiffs' motion, because hypothetical conflicts and factual issues that require resolution through expert testimony do not pose any difficulty to class certification.  In re Relafen Antitrust Litig., 218 F.R.D. 337, 344-45 (D. Mass. 2003); Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21, 28 (D. Mass. 2003).

Defendants first argue that valuing Meditech stock at fair market value creates differences in damage awards that preclude class certification.  They do not, however, distinguish the well-established rule that "[i]ndividual differences in damages suffered do not create a class conflict when recovery varies in direct proportion to the amount of individual damages incurred."  In re Lupron Marketing and Sales Practices Litig., 228 F.R.D. 75, 90 (D. Mass. 2005).  Instead, they rely on Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997) as their sole legal authority for denying certification on this ground.

Amchem did not concern the standard class certification inquiry under Fed. R. Civ. P. 23(a) and (b), as Defendants suggest. Rather it addressed the standards for certifying a class for settlement purposes, which requires simultaneously analyzing the class under Fed. R. Civ. P. 23(a) and (b) and approving the settlement under Fed. R. Civ. P. 23(e). Amchem, 521 U.S. at 618. Indeed, Amchem explicitly approved of "heightened" judicial review under Rule 23 in the settlement class context because "a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." Id. at 620; see also In re Relafon Antitrust Litig., 231 F.R.D. 52, 68 (D. Mass. 2005). Where, as here, Plaintiffs are not seeking to simultaneously certify and bind a class to a previously negotiated settlement, Amchem's heightened review standard does not apply and the general rule permitting certification despite individual damage issues controls.[4]

Defendants' factual assertions in which they attempt to explain and justify their valuation decisions go directly to the merits in this case and are inappropriate at the certification stage. Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 177 (1974); Relafon, 218 F.R.D. at 344-45 (it is "unwise and unfair" to resolve a factual dispute requiring expert testimony at the certification stage) (citations omitted). Even if they were otherwise proper, however, the facts asserted by Defendants' affidavits actually confirm that Defendants have been violating ERISA for years. ERISA requires plan fiduciaries, like Mr. Pappalardo and Meditech, to administer employee benefit plans in accordance with the Plan documents. 29 U.S.C. § 1104(a)(1)(D) (fiduciary must act "in accordance with the documents and instruments governing the plan"). The Plan documents require Mr. Pappalardo to "value the Trust assets at their fair market value." See Tab

---

[4] Amchem is also distinguishable on the facts, involving as it did a proposed nationwide class in which class members "were exposed to different asbestos-containing products, in different ways, over different periods, and for different amounts of time . . . ." Amchem, 521 U.S. at 609-610. Here, there is no dispute that Defendants administered the Plan, and made their valuation decisions, in the same manner for all class members during the relevant timeframe.

D (Trust Agreement) at ¶ 5.04.  In his affidavit, Mr. Pappalardo does *not* say that the Plan's stock was actually valued at its fair market price at *any* time during the relevant time period.  Instead, he claims that "the year-end share value determined by the Board and myself as Trustee is determined primarily in concert with the dividend that Meditech will pay the following year."  See Pappalardo Aff. at ¶ 15.  Not only is this testimony irrelevant to the motion, it is contrary to contemporary documents from the class period where he focused on the price earnings ratio as a justification for the price of the stock.  See Tab E (1999 Chairman's Report) at 9.  Moreover, during the suggested class period he personally scooped up about 500,000 shares at what Plaintiffs claim were bargain prices.  See Tab F (Pappalardo Depo.) at 167.  And, of course, as the largest stock owner, Mr. Pappalardo also receives the greatest personal benefit from dividend payments, earning over $17,000,000 in 2005 from stock dividends alone – a classic conflict of interest giving rise to ERISA liability.  Leigh v. Engle, 727 F.2d 113, 125-26 (7th Cir. 1984); Tab G (Statement of Changes in Beneficial Ownership).[5]  His affidavit should be ignored.

Nor can Defendants escape class liability by justifying their valuation decisions on the need to "protect" Plan participants from "volatile" share prices.  ERISA permits employers to offer two types of pension benefit plans: "defined benefit" plans and "defined contribution" plans.  29 U.S.C. §§ 1002(34)-(35).  A defined benefit plan guarantees a particular dollar amount to a plan participant, while a defined contribution guarantees a proportionate share of the plan's assets.  Edward A. Zelinsky, The Defined Contribution Paradigm, 114 Yale L. J. 451, 455 (2004).  Defendants chose to create the Plan as a defined contribution plan, which allowed them significant corporate benefits, including relief from having to: (1) fund the Plan should the Plan's assets lose market value; (2) contribute a set amount to the Plan every year; and (3) maintain no

---

[5] These figures put the lie to Defendants' complaints about the few hundred shares of stock purchased by Plaintiffs over their twenty-plus years of service to the company.

more than 10% of the Plan's assets in company stock.  Id. at 456-58, 471-80; Pappalardo Aff. at

¶ 8, 10-11.[6]  In exchange for these features, which place the full investment risk on Plan

participants, Defendants were obligated to allow those participants to realize the full investment

benefit.  "[T]he assignment of risk *and reward* to the individual account holder is a *critical*

feature of the defined contribution paradigm."  Zelinsky, supra., at 454 (emphases added); John

Blair Comm., Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan, 26 F.3d

360, 363 (2nd Cir. 1994) (defendants violated ERISA by failing to accurately reflect the "full

investment experience" of plan assets).  ERISA reflects this "critical" feature, as do the Plan

documents.  29 U.S.C. § 1002(34) (benefits due under defined contribution plans are "based

solely upon the amount contributed to the participant's account, and *any* income, expenses, gains

and losses") (emphasis added); Tab D at ¶¶ 5.04, 5.05 (participants entitled to proportionate

share of "fair market value" of Plan assets).  Thus, it is the very structure of the Plan, not

Plaintiffs' allegations, that results (or ought to result) in varying levels of damages depending on

the market forces in any given year.

Defendants also fail to show how volatile share prices create an *actual* conflict.  Compare

Opposition, pp. 18-19 (arguing that, under Plaintiffs' theory, class members departing in 2001

and 2003 "were paid 'too much,' and will recover nothing in this suit") with Am. Compl. ¶¶ 77,

81 (class members in 2001 paid $17 per share, where market would suggest $25.50) and id.¶¶

90, 93-95 (class members in 2003 paid $22 per share, where market would suggest $41).

Whether Plan participants who departed in 2001 would receive less than those departing in 2003

or 1999 or any other year is not the issue; the issue is whether they received all that they were

contractually due from Defendants.  Since Plaintiffs allege that no one did since at least 1998, no

---

[6] Mr. Pappalardo's claim that the directors first decide how much money to contribute, and then decide how much of
that amount should be in stock, is not credible given that Defendants have contributed about 80,000 shares of
MEDITECH stock every single year of the proposed class period.  Am. Compl. ¶ 15.

actual conflict exists between proposed class members.  Similarly, Defendants' veiled threat to withdraw some or all of the shares contributed to the Plan since 1997 should they lose this lawsuit is an empty one.  ERISA strictly regulates when an employer can remove assets contributed to a benefit plan, including requiring a good faith mistake of fact or law.  29 U.S.C. § 1103(c)(2)(A)(i)-(ii).  These Defendants will not be able to make that showing given that they have acted knowingly and intentionally all along.  See, e.g., Tab A at 15 (report from Mr. Pappalardo in January 2000 refusing to reconsider stock valuation methodology).

No conflict exists between those class members who were "encouraged" by Mr. Pappalardo to rollover that portion of their interest in the Plan worth over $1 million and those who terminated their interest altogether.  Defendants hypothesize that a damages award might deplete the Plan's assets for current members.  That is impossible because in a defined contribution plan, the "accrued benefit" to which a participant is statutorily entitled is "the balance of the individual's account."  29 U.S.C. §§ 1002(23)(B); 1002(34).  Accordingly, "by definition there can *never* be an insufficiency of funds in the plan to cover promised benefits since each beneficiary is entitled to whatever assets are dedicated to his individual account." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 439 (1999) (citations and internal punctuation omitted) (emphasis added).  The Plan may very well have a liquidity issue as a result of Defendants' persistent refusal to contribute a sufficient amount of cash, but it cannot run out of the assets themselves.[7]  And even if there had been some evidence that the Plan's ability to pay vested benefits would be affected, Plan participants would be entitled to seek recovery from the Plan's fiduciaries.  29 U.S.C. §§ 1053(a)(1)(A), 1132(a)(3).  Defendants have not shown why this demonstrably harmed class should be precluded from sharing in any recovery to Plaintiffs.

---

[7] Moreover, the Plan has provisions for just such an eventuality and, of course, should any class members have a concern, they would be free to opt out of the class, just as the Court is always free to adjust the class should any actual, as opposed to hypothetical, conflict develop.  Fed. R. Civ. P. 23(c)(2)(B), 23(d).

C.    **No Individualized Defenses Threaten to Defeat the Predominance of Class Issues.**

As demonstrated in Part A(1), Defendants are precluded from defending their conduct on equitable grounds. The evidence is clear that Defendants never established rules for filing claims, or told Plan participants the basis for the stock valuation or how to challenge it. They certainly never told anyone that they were purposefully setting the price at an artificially low value; the first time anyone did that was Dr. Grossman in February 2002.[8]   To the extent that any affirmative defenses are even viable, they will require class-wide proof and class certification is therefore appropriate at this stage.

<div style="margin-left:40%">

Respectfully submitted,
**Michael P. Hubert, William Trainor, and**
**David Hinchliffe,**
By their attorneys,


   /s/ Sara Noonan
Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Sara Noonan (BBO #645293)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA  02210
617-371-1000
617-371-1037

</div>

Dated: September 27, 2006

---

[8] Defendants are wrong when they state that knowing Meditech stock was priced much lower than its competitors' stock is the legal equivalent of knowing that the Plan fiduciaries were intentionally setting the stock price at an artificially low number.  See In re Dynergy, Inc. ERISA Litig., 309 F.Supp.2d 861, 880-81 n.31 (S.D. Tex. 2004) (accepting allegation that defendants "should have known" about ERISA breach only because their high positions in the company gave them access to closely-held information about sham transactions, phony trades, price manipulation, and overstatement of revenues).  None of the class members had access to the closely-held information regarding Defendants' stock valuation methods, at least until Dr. Grossman broke the silence.  Mr. Pappalardo himself testified that given the private nature of the company, even the accountants auditing the Plan's assets "would comment that there is no way they can know for a fact what the actual value is or isn't."  See Tab F (Pappalardo Depo.) at 106-07.  If professional accountants and auditors could not tell that something was seriously amiss, there is no basis on which to find that the class members should have known.

**CERTIFICATE OF SERVICE**

     I, Sara E. Noonan, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on this 27th day of September, 2006.


                                       /s/ Sara Noonan
                                 Sara E. Noonan