UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10269-RWZ

MICHAEL P. HUBERT, DAVID HINCHLIFFE and WILLIAM TRAINOR

v.

MEDICAL INFORMATION TECHNOLOGY, INC., et al.

MEMORANDUM OF DECISION

March 20, 2007

ZOBEL, D.J.

**I.      Introduction**

Plaintiffs, beneficiaries of a software company profit sharing plan, contend that for at least the last eight years the plan's trustee deliberately undervalued the primary asset in the plan, company stock. As a result, the lump sum distributions they received on termination of employment were significantly less than what they would have been under a more accurate valuation. Plaintiffs now seek certification of a class of all employees who received distributions from the plan during the relevant period. Based on the parties' papers and their written and oral arguments, I am persuaded that plaintiffs cannot adequately represent the proposed class and therefore deny their motion for class certification.

**II.     Background**

In 1973, defendant Medical Information Technology, Inc. ("Meditech," or "Company"), a Massachusetts corporation, established a profit sharing plan on behalf

of its employees in order to provide pension benefits upon retirement. The Medical Information Technology Profit Sharing Plan (the "Plan") is governed by the Employment Retirement Income Security Act of 1974 ("ERISA").[1] Meditech makes cash and stock contributions to the Plan, and upon termination of employment, each employee normally receives a lump-sum cash payment in the amount of that employee's vested interest in the Plan. If the Plan lacks sufficient cash, however, it may defer payment up to three years or distribute Meditech stock instead. Employees with more than 20 years of service may choose to make partial, or "in-service," withdrawals from their accounts while still employed by the Company.

Because Meditech stock accounts for approximately 85 percent of the Plan's assets, the total value of an employee's interest upon leaving Meditech depends largely upon the value of Company stock. As the stock is not publicly traded, its market value is not readily available. The valuation of the stock is the responsibility of the sole trustee of the Plan, defendant A. Neil Pappalardo ("Pappalardo"). He oversees the Plan in cooperation with Meditech's directors, former defendants Lawrence A. Polimeno, Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman and L.P. Dan Valente (collectively, the "Directors").

Plaintiff Michael P. Hubert worked for Meditech until 2004, while his coworkers and co-plaintiffs David Hinchliffe and William Trainor each left in 1998. According to plaintiffs, Pappalardo has knowingly undervalued Meditech's stock for at least the past

---

[1] Pub. L. No. 93-406, 88 Stat. 832 (1974) (codified as amended at 29 U.S.C. §§ 1001-1461).

eight years, and the Directors have approved this undervaluation.  As a result, plaintiffs received smaller cash payments from the Plan upon termination than would be due if Pappalardo had valued the Company stock in compliance with plaintiffs' proposed methodology.[2]  Plaintiffs assert that these Plan payments do not fairly reflect the Company's financial success and, inferentially, the value of their respective interests. They filed the instant suit for failure to pay benefits due under the Plan in violation of ERISA (Count 1) and for breach of fiduciary duty owed under ERISA (Count 2).  After defendants moved to dismiss, plaintiffs filed an amended complaint (Docket #15, "Am. Compl.") and defendants moved for dismissal of the amended complaint as well.  On March 30, 2006, I granted defendants' motion as to Count 2, leaving only the Company, Pappalardo, and the Plan as defendants under the remaining claim, Count 1.

Plaintiffs now seek certification of a class comprising "All participants in the MEDITECH Profit Sharing Plan who have received a distribution of any portion of their interest in that Plan from January 1, 1998 to the present."  (Docket #55.)  Plaintiffs ask to be appointed representatives of this class.

Defendants oppose class certification on a number of grounds, which largely coalesce into objections to plaintiffs' ability to fairly and adequately protect the interests of the class.

**III.   The Plan**

---

[2]The record reflects that each of the named plaintiffs received benefits of more than $900,000, but, based on their amended complaint, they claim additional amounts of thousands, perhaps millions, of dollars.

The Plan is voluntary on the Company's part. It may terminate the Plan at any time and it may choose not to contribute to it in a given year. The Plan is non-contributory, meaning participants are not permitted to make direct contributions to it. The only additions to it come from the Company's contributions and income from the Plan assets, including dividends paid on Company stock held by the Plan.

Each year, the Directors decide the amount to contribute to the Plan and an allocation of that contribution between cash and stock. They also determine a value for the Company stock and divide the share value into the dollar amount of the contribution allocated to stock to calculate the number of shares to be added to the Plan. The cash and shares contributed to the Plan are apportioned to the account of each participant based on his/her income. Each employee's interest in his or her account vests over five years, after which the employee is fully vested and entitled to his or her full beneficial share of the Plan.

Company stock is not publicly traded, however, employees may purchase some shares at the same value set by the Directors to calculate the number of shares to be added to the Plan. The Plan further provides a market for employees who wish to sell their shares.

The Plan Trust Agreement (Docket #84, Ex. 1) requires the trustee to value the Plan assets to ascertain the value of each employee's account and to determine the amount of redemptions. Plaintiffs question the independence of the trustee's valuation and point out that the share value he determines corresponds exactly with that assigned by the Directors for the annual contribution.

**IV.    Legal Standard**

To certify a class under Fed. R. Civ. P. 23(a), a court must find that: (1) "the class is so numerous that joinder is impracticable, (2) there are questions of law and fact common to the class, (3) the claims and defenses of the class representative are typical of the class, and (4) the representatives will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

In addition, the requirements of Rule 23(b)(3) must be met, namely that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that "a class action is the superior method of resolving the dispute."  Fed. R. Civ. P. 23(b)(3);[3] In re Eaton Vance Corp. Sec. Litig., 219 F.R.D. 38, 42-43 (D. Mass. 2003).

Plaintiffs have the burden to establish that the requisites of Rule 23 are met. Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 38 (1st Cir. 2003).  The parties do not seriously disagree that the proposed class is numerous and that the commonality requirement is met.  Typicality, although not conceded, may exist.  The decisive and contested issue is the adequacy of plaintiffs as the proposed class representatives.

**V.    Adequacy of Proposed Class Representatives**

---

[3] While plaintiffs note that once the prerequisites of Fed. R. Civ. P. 23(a) have been met, "a class may be maintained under any one of three alternative bases," they only address the requirements of Fed. R. Civ. P. 23(b)(3) in support of class certification.  (Docket #76, 8, 17.)  Because plaintiffs fail to meet the requirements of Fed. R Civ. P. 23(a), it is unnecessary to examine any of the additional requirements of Fed. R. Civ. P. 23(b).

To demonstrate adequacy, lead plaintiffs must show first, "that the interests of the representative party will not conflict with the interests of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). No objection has been raised about the competency of plaintiffs' counsel, nor their qualifications and experience. Instead, the question is whether the interests of the three plaintiffs conflict with those of putative class members.

Since all members of the class are bound by the judgment, courts have held that it would be a violation of due process if the class representatives' interests "are not necessarily or even probably the same" as those of absent class members. Hansberry v. Lee, 311 U.S. 32, 45 (1940). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). In Amchem, the Court affirmed a Third Circuit decision holding that a single class of representatives could not adequately protect both the interests of plaintiffs suffering current injuries caused by exposure to asbestos as well as the interests of plaintiffs who had been exposed to asbestos, but without manifest injury. Id. at 610. While both groups of plaintiffs had the common goal of obtaining the maximum recovery for their asbestos related claims, the court below pointed out that the settlement did more than provide a recovery fund, "[r]ather it makes important judgments on how recovery is to be allocated among different kinds of plaintiffs, decisions that necessarily favor some

6

claimants over others." Id. (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 630 (3d Cir. 1996)). The Supreme Court agreed, noting that even though the fund to pay claims was not limited, a conflict still existed between the members of the class because "the terms of the settlement reflect essential allocation decisions . . . ." Id. at 626. A similar problem exists in the instant case. While all members of the proposed class may "have an identical interest in proving that the Defendants intentionally undervalued the stock held by the Plan," the choice of a particular alternate methodology to value the stock pits class members against one another and places them in direct conflict with the proposed class representatives. (Mem. in Supp. of Pls.' Mot. for Class Cert. (Docket #76) 14.)

   A.   **Alignment of Interests**

In a typical securities or product-based class action, the named plaintiffs are motivated to maximize their individual recovery by seeking the highest per-share or per-product settlement. This automatically aligns their interest with that of absent class members, who also stand to gain the same per-share or per-product recovery. While the amount of the recovery may vary among the class members because of differing number of shares owned or number of products purchased, each absent class member's recovery is directly proportional to the recovery of the named plaintiffs. Absent unusual circumstances, there is unlikely to be any fundamental conflict that would preclude class certification.

In the instant case, however, the very issue to be decided -- the proper method to value Company stock in the Plan -- results in radically different recoveries for class

members depending on the valuation method chosen, the year the member exited the Plan, as well as the year the member entered the Plan. Plaintiffs' proposed valuation methodology, for example, maximizes the stock valuation in the years each terminated the Plan at the expense of the valuation in other years. This places plaintiffs in fundamental conflict with absent class members who would receive a greater recovery from an alternate methodology. See In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 81 (D. Mass. 2005) ("The conflict that will prevent a plaintiff meeting the [adequacy of representation] prerequisite must be fundamental . . . .") (quoting Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir. 2001)).

### B. Stock Valuation Methodologies

Valuing the equity of a private company is an "art," not simply a matter of plugging numbers into a formula. Jonathan Burton, Making Sure the Price Is Right, Bus. Wk., March 29, 1999 (available at 1999 WLNR 4688610) (noting that each business is different, even those in the same industry, and that factors such as free cash flow, whether the company is public or private, and intangibles can influence the value of a company). Different appraisers can come to significantly different valuations based on the same set of facts. See Alison Stein Wellner, The Number Cruncher Versus the Vision Guy, Inc., Jan. 2006 (describing two professional appraisers valuing the same software company on the same facts at $14 million and $30 million respectively).[4]

#### 1. Defendants' Valuation Methodology

---

[4] Available at http://www.inc.com/magazine/20060101/valuation-guide-intro.html.

According to plaintiffs' amended complaint, between 1998 and 2004 the stock price as set by the Plan doubled from $14.50 to $29.00 per share, reflecting a yearly increase varying between a minimum of 6% and a maximum of 18% per year.  It appears that Meditech set its stock price to provide a monotonically increasing value and to maintain an approximately 6% dividend rate, at least in the years at issue.[5]  Throughout this period, the Company experienced steady growth in both revenue and net profit.  (Am. Compl. ¶¶ 45-46.)  A 2002 posting on the Company intranet described a component of the formula used to determine share value as the product of eleven times net income.  (Id. ¶ 55.)  The use of a constant multiplier times net income reduces fluctuations in value from year-to-year for a company with steady earnings growth compared to a valuation based on a comparison with prices for similar publicly traded companies.  Thus, the Company appears to employ a valuation methodology that looks to internal financial measures to determine share value, without any comparison to the then current share price or financial ratios of similar publicly traded companies.  Based on this methodology, vested employees would likely see a regular increase in the value of their Plan balances from year-to-year, with no drastic increases or decreases in any one year.[6]

---

[5] One possible methodology to set the share value of a non-publicly traded, but dividend-paying, stock is to look at the dividend per share in dollars paid out by the company, then select a reasonable percentage dividend rate.  Dividing the dividend amount by the chosen rate yields the calculated share value.  Because dividends are typically paid out of net earnings, this methodology is closely related to valuation methods based on a multiple of earnings.

[6] The court makes no assumptions concerning the validity of the multiplier used by the Company or whether the ultimate valuation accurately reflects share value.

## 2. Plaintiffs' Valuation Methodology

Plaintiffs argued at the hearing on their motion that their complaint did not "pick a method" for valuing Company stock, but merely provided "analogies" and "suggest[ed] valuations, different techniques."  (Hr'g Tr. 47:15-20, Oct. 17, 2006.) Nevertheless, all of these suggestions appear to rely on a comparison of Meditech's Price-to-Earnings ("P/E") ratio with that of publicly traded companies, or on a direct comparison with the share price of publicly traded companies.  Plaintiffs' own examples illustrate the divergence of their respective interests.

### (1) P/E Ratios Changed Over Time Resulting in Wildly Fluctuating Share Values from Year to Year

The amended complaint notes that shares of comparable publicly owned companies in the late 1990s sold for P/E ratios of over forty, suggesting a valuation of $75.00 per share, not the $14.50 to $16.00 used by the Plan in 1998 and 1999.  (Am. Compl. ¶ 70.)  By 2000, however, plaintiffs indicate a fair valuation of Meditech's stock would have dropped to a P/E ratio of fifteen, or $25.50 per share.  (Id. ¶ 81.)  As the markets recovered from the tech sell-off, valuations rose, with plaintiffs estimating a minimum value of $41.00 in 2002 and a fair value of Meditech stock of $74.00 per share based on a competitive P/E ratio of about 35 plus their estimate of $5.00 in retained cash in 2003 and 2004.[7]  (Id. ¶¶ 95, 101.)  Thus, the valuation methodologies described by plaintiffs result in a three-to-one dip and recovery in share value over the

---

[7] The amended complaint does not offer an estimated share valuation for year 2001, other than to predict that it "would have been worth far more than $19 attributed to it by the defendants."  (Am. Compl. ¶ 88.)

11

class period, creating significant volatility in vested employees' Plan balances from year-to-year. In particular, under the share valuation described in the amended complaint, an employee terminated in 2000 would a receive approximately one-third of the payout of someone with the same vested share balance terminated the previous year.

### (2) Since the Number of Shares Contributed to the Plan Rely on the Same Valuation, Plaintiffs' Methodology Also Impacts the Size of Any Employees's Individual Account, Benefitting Some and Harming Others

Plaintiffs respond that, since they estimate a share value that always exceeds the value used by the Plan for the years in question, all class members would benefit from their representation. (Docket #76, 14.) The obvious flaw in this argument is that it ignores the class representatives' responsibility to "fairly and adequately protect the interests of the class," not merely to ensure that all class members receive some nominal benefit from the action. Fed. R. Civ. P. 23(a)(4). Even if plaintiffs' assertion that the Company valuation is too low is correct, class members who received a distribution in 2000 would likely benefit more from a valuation calculated using the Company's valuation methodology, but with a higher multiplier, than from plaintiffs' proposed market analysis valuation. The three plaintiffs received their distributions in 1998 and 2004, years in which the market valuation described in the amended complaint provides the highest recovery. Using the Company's methodology, but increasing the net earnings multiplier each year, would increase the valuation for all years proportionally rather than favoring the years in which the plaintiffs received their

distributions. The distribution per share in 2000 would then be larger than the distribution in 1998. Thus, an actual conflict exists between at least those absent class members who received distributions in years 2000 through 2002 and the two plaintiffs who received their distribution in 1998. It is also possible that, by reducing the volatility in share price, the per share valuation in 2004 using the Company methodology but with a steadily increasing multiplier would be lower than that proposed by plaintiffs, creating a conflict between class members and the plaintiff receiving the 2004 distribution.

Less obviously, some class members could actually be harmed if plaintiffs' valuation methodology is adopted. Plaintiffs imply that the proper resolution of their suit is merely to revalue upwards the share price for each year at issue and multiply that price by the vested share balance of each class member who received a distribution (subtracting the distribution they have already received) to calculate the proper per-member recovery. But as I noted in my earlier decision, the number of shares owned by each class member was calculated based on the allegedly undervalued price. Had the plaintiffs' pricing methodology been used when the shares were originally contributed to the Plan, fewer high-priced shares would have been allocated to each employees' account based on the same total dollar contribution by the Company. Thus, while the per-share value at redemption would be higher, the total number of shares owned would be lower. As I stated previously, the actual issue to be decided in this case is whether "the parties' competing valuation methodologies []

involve different rates of growth (or decline) over time, so that the difference in actual share values would not necessarily be a constant margin." (Docket #38, 3.)

Contrary to plaintiffs' assertions that all proposed class members would benefit from their representation, it is likely that the value of some members' benefits under plaintiffs' valuation could be less than what they actually received under the Company's valuation, particularly employees who took their distribution in 2002 after a relatively short period of employment. The D.C. Circuit noted that "the foundations of maintenance of a class action are undermined" where "the action may be taken as conferring economic benefits or working economic harm, depending on the circumstances of the individual [class member]." Phillips v. Klassen, 502 F.2d 362, 367 (D.C. Cir. 1974) (refusing to certify a class where the theory offered by class representatives would expose some absent class members to a legal liability to return a previously received separation bonus). Plaintiffs cannot adequately represent absent class members who would suffer harm from a valuation they advocate.

Simply adding additional named plaintiffs to include representatives of distributions for each of the years in question does not resolve the conflict. The only way to calculate the proper payout under any alternate valuation methodology is to revalue the shares from the <u>beginning</u> of the Plan. This is because differing year-to-year values result in differing percentage ownership of the shares in the Plan at redemption.[8] Thus, the only employees guaranteed to have identical interests in

---

[8] Consider the simplified case of a single employee participating in the first year of the Plan and two similarly situated employees in the second year. In each year the Company contributes $1,000 to the Plan. Assume a share valuation of $1 per share in

choosing a valuation methodology are those who entered the Plan in the same year and who later exited the Plan in the same year.[9]  See Klassen, 502 F.2d at 367 (noting that where there were conflicting interests in a group of employees party to a common termination agreement, it was "impossible to say, solely because they are parties to it, that any two of them are of the same class.")

### (3) For the Reasons Articulated in (2) Above, Plaintiffs' Methodology Creates Conflicts with Continuing Plan Members

The proposed class includes current Company employees who have taken in-service withdrawals in the years in question but are still participants in the Plan. Defendants assert that, under ERISA, any recovery by plaintiffs must come from the assets of the Plan, and that plaintiffs' suggested valuation results in a recovery that

---

the first year.  After the first year, Employee 1 owns 100% of the 1,000 shares in the Plan.  If, in the second year, the share valuation has not changed, both employees receive 500 shares, and Employee 1 owns 1,500 shares (75% of shares in the Plan), and Employee 2 owns 500 shares (25% of shares in the Plan).  If, however, an alternate valuation places the value of the shares at $2 per share the second year, each employee receives 250 shares, and Employee 1 now owns 1,250 shares (83% of shares in the Plan), and Employee 2 owns 250 shares (17% of shares in the Plan).  If, however, the share value drops to $0.50 in the second year, Employee 1 owns 2,000 shares (66%), while Employee 2 owns 1,000 shares (33%).  Because the Company contributes a fixed dollar amount each year, but the Plan's assets are valued based on share valuation at the time of the contribution, the percentage of Plan assets allocated to each participant is dependent on the valuation methodology used from Plan inception.  Employees generally would prefer high share valuations prior to their entering the Plan, low share valuations during the period in which the Company makes allocations to their account, and very high valuations in the year they withdraw their Plan balances.

[9] Even this oversimplifies the analysis, since employees have an interest in the lowest share valuation in years in which they had the highest dollar contributions to the plan.  To the extent two employees entering and exiting in the same years have differing high earning years (and thus larger Plan contributions), they might prefer different valuation methodologies.

depletes Plan cash. Plaintiffs admit as much. (See Am. Compl. ¶ 69 (stating that if employees terminating in 1998 and 1999 "were paid a fair price for their assets in the Plan, the Plan would have soon run out of cash.").) If the Plan runs out of cash, existing Plan participants could be forced to delay receipt of benefits or to accept stock in lieu of cash under the terms of the Plan. An employee who stands to receive only a small cash recovery in this action for the increased value of their in-service withdrawal at the expense of a distribution of the bulk of their benefit in unmarketable stock will be harmed by plaintiffs' proposed valuation. This places absent class members who are still in the Plan in direct conflict with the proposed class representatives. Therefore, plaintiffs, who have no interest in the future financial security of the Plan, cannot adequately represent class members who still have vested balances in the Plan.[10]

### C. Lack of Congruence in Desired Relief

The First Circuit analyzed a similar conflict between two groups desiring different valuations methodologies for a pension benefit under a combined typicality and adequacy analysis. See Dierks v. Thompson, 414 F.2d 453, 456 (1st Cir. 1969) ("In order to maintain a class suit plaintiffs must be truly representational," citing to both Fed. R. Civ. P. 23(a)(3) and (4)); see also Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996) (noting that the Rule 23 requirements of typicality and

---

[10] It is not difficult to postulate additional reasons that existing employees' interests would be at odds with plaintiffs' interests. By creating extreme variability in benefits from one year to the next, plaintiffs valuation methodology could harm the Company's ability to attract and retain a competent work force. The resulting decline in Company profitability and competitiveness would likely have a negative impact on existing employees' interests in job security and continued contributions to the Plan.

adequacy are closely related, "both look to the potential for conflicts in the class."). In Dierks, benefits due former company employees were held in trust by a non-contributory company profit-sharing plan until paid out at death, disability or the former employee reached age 65. Plaintiff employees brought a class action against defendant trustees of the plan seeking one of two alternate valuations for their vested benefits, both different from that used by defendants. One construction favored by a portion of the class fixed the benefit amount at the employee's termination, while the other set the benefit as a percentage of the fund, changing with market conditions until paid. Even though the parties had stipulated in the court below that class representation was proper, the First Circuit held, as a matter of equity and due process, that plaintiffs who advocated the market method of determining valuation could not represent the group that preferred a fixed valuation. Dierks, 414 F.2d at 456. "Unless the relief sought by the particular plaintiffs who bring the suit can be thought to be what would be desired by the other members of the class, it would be inequitable to recognize plaintiffs as representative, and a violation of due process to permit them to obtain a judgment binding absent plaintiffs." Id. (emphasis added).

Here, plaintiffs argue that they are typical of all class members because "[t]hey have been injured in the same way (e.g., received less than the amount they were due under the Plan), and have claims based on the same legal theories (e.g., the Defendants intentionally undervalued the stock held by the Plan . . .)," and that they will adequately represent the class because they "have no interests antagonistic to those of the other class members." (Docket #76, 12, 14.) However, plaintiffs admit that "the

lion's share of litigation resources on both sides will be invested in competing expert testimony on the issue of 'fair value' of Meditech stock throughout the years." (Id. at 18.) Yet, it is precisely on the choice of what methodology to pursue to establish "fair value" that plaintiffs cannot "be thought to be [seeking the same relief that] would be desired by the other members of the class." Dierks, 414 F.2d at 456. Plaintiffs describe a methodology of valuation that benefits employees terminated in the beginning and end of the class period at the expense of those receiving distributions in the middle of the period. This choice places plaintiffs in direct conflict with those absent class members who would benefit from a valuation methodology which provides a larger recovery in 2000 through 2002 at the expense of the years in which plaintiffs received their distributions. "[D]iverse and potentially conflicting interests within the class are incompatible with the maintenance of a true class action." Id.; see also Amchem, 521 U.S. at 625 (holding that the common goal of obtaining the maximum recovery alone does not justify class certification where the proposed class members have conflicting goals for relief); Dierks, 414 F.2d at 456 ("Under such circumstances, [where suing plaintiffs desired a market valuation but some absent class members could have preferred an obligation in a fixed amount,] the court could not have found that plaintiffs were 'typical' of the former [] employees whom they purported to represent; they were typical of only one of two conflicting groups.").

## VI.   Conclusion

Members of plaintiffs' proposed class have divergent and conflicting interests in the selection of the appropriate valuation methodology for Meditech stock which are

incompatible with the maintenance of a class action. Plaintiffs cannot be representative of all class members because the class itself has no single desired choice of share valuation. Any particular choice necessarily allocates recovery in ways that benefit some class members at the expense of others. Under these circumstances, plaintiffs cannot "fairly and adequately protect the interests of the class," and class certification is inappropriate. Fed. R. Civ. P. 23(a)(4).

Accordingly, plaintiffs' motion to certify class (Docket #55) is DENIED. Plaintiffs' motion to strike affidavits (Docket #81) is DENIED as moot.[11]

|  |  |
|---|---|
| March 20, 2007 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |

---

[11] Plaintiffs seek to strike the affidavits of A. Neal Pappalardo and Barbara A. Manzolillo as exceeding this courts' order limiting discovery to the issue of class certification only. My decision to deny class certification does not rely on the information attested to in these affidavits, and thus the motion is moot.