## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually and On Behalf Of All Persons Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Case No. 05-10269-RWZ<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ASSENTED TO MOTION FOR LEAVE TO FILE REDACTED MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION OF DENIAL OF CLASS CERTIFICATION**

Plaintiffs Michael Hubert ("Mr. Hubert"), David Hinchliffe ("Mr. Hinchliffe") and William Trainor ("Mr. Trainor") (collectively, "the Plaintiffs") move this Court for leave to file a redacted Memorandum in Support of Plaintiffs' Motion for Reconsideration of Denial of Class Certification ("Memorandum"). A copy of the proposed redacted Memorandum has been attached to this Motion at Attachment A.

As grounds for this Motion, the Plaintiffs state that they utilized and quoted from information that the Defendants designated "Confidential" or "Confidential/Attorneys." Thus, Plaintiffs redacted the portions of the Memorandum that specifically contained direct references to those materials.

While the Plaintiffs agree that the Defendants' confidential business information ought not to be publicly disseminated, they emphatically do not agree with the Defendants' over-inclusive definition of what constitutes "confidential" information. Given that every single

document produced in this litigation by the Defendants has been stamped either "Confidential" or "Confidential/Attorneys," the Plaintiffs question whether the Defendants have confused "confidential" information with information that supports the Plaintiffs' claims. Despite the Plaintiffs' strong disagreement with the Defendants' position, however, they acknowledge that pursuant to the draft agreement between the parties, it is arguably their burden to seek leave to file their Memorandum in redacted form.

WHEREFORE, the Plaintiffs respectfully request that this Court grant them leave to electronically file their Memorandum in the form attached to this Motion at Attachment A, and to file with the Clerk's Office an un-redacted version of the Memorandum in a sealed envelope that indicates that it shall be kept confidential and revealed only to court personnel until further order by the Court.

Respectfully submitted,
**Michael P. Hubert,**
**William Trainor, and**
**David Hinchliffe,**
By their attorneys,

   /s/ Jennifer M. Ryan
Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Jennifer M. Ryan (BBO #661498)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA  02210
671-371-1000
671-371-1037

Dated:     April 2, 2007

## CERTIFICATION PURSUANT TO L.R. 7.1(a)(2)

The undersigned certifies that she has conferred with Michael Sugrue, counsel for the defendants, and he assents to this motion.

## CERTIFICATE OF SERVICE

I, Jennifer M. Ryan, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on this 2nd day of April, 2007.

          /s/ Jennifer M. Ryan
Jennifer M. Ryan

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL P. HUBERT, WILLIAM TRAINOR, and
DAVID HINCHLIFFE, Individually and On Behalf
Of All Persons Similarly Situated,

    Plaintiffs,

        v.

MEDICAL INFORMATION TECHNOLOGY
PROFIT SHARING PLAN, MEDICAL
INFORMATION TECHNOLOGY, INC., A. NEIL
PAPPALARDO, LAWRENCE A. POLIMENO,
ROLAND L. DRISCOLL, EDWARD B. ROBERTS,
MORTON E. RUDERMAN, AND L.P. DAN
VALENTE,

    Defendants.

C.A. No. 05-10269-RWZ

REDACTED

**PLAINTIFFS' MEMORANDUM SUPPORTING MOTION FOR
<u>RECONSIDERATION OF DENIAL OF CLASS CERTIFICATION</u>**

Plaintiffs seek reconsideration of the Court's Order of March 20, 2007 [Docket # 92] denying class certification. The Court has made several inaccurate, material factual assumptions which have led it to an incorrect legal conclusion – that the suggested class cannot be certified. Plaintiffs believe it can be certified.

This memorandum suggests that using correct methodologies of valuation of privately held company stock will demonstrate that the Trustee markedly undervalued Meditech stock in the period 19996 – 2001 and less so in the period 2001 – 2004. Plaintiffs now identify the valuation method that they actually propose to use going forward. The Court incorrectly assumed that the Plaintiffs identified and selected the valuation method in their Amended

Complaint and the Court focused on that method to conclude that plaintiffs could not be appropriate class representatives. The suggested valuation method uses and combines two types of valuation should not create any conflict between the years in question. Of course, there will be differences in damages among the years in question; first because the stock was worth more in 2004 than 1997, and second because the stock was more greatly undervalued in the period 1996 – 2000 than in latter periods. However, the commonalities dictate that the case should go forward as a class action. Moreover, the class plaintiffs are adequate representatives of the class because the methodology selected does not favor them over other potential class members.

## **The Plan**

Before turning to how this Court made incorrect assumptions in its Order, the plaintiffs believe it would help to review the Plan once more.

The 1998 Plan (Exhibit A to Amended Complaint) permits 100% vesting in full by a member after six full years of employment and partial vesting before that; in any event, a departing member of the Trust receives their entire allocated interest in the Plan (whether 100% or less) at termination of employment. Amounts not fully vested are forfeited by that member and are re-allocated (¶6.04). Payment is typically in cash.

The assets in the Plan consist primarily of Meditech stock, and liquid securities. In 2004, the Plan's assets were worth $139,978,184 of which $115,749,495 was Meditech stock, or slightly over 80% (see Form 5500 for year end 2004, attached as Tab A). According to the Plan, the Trustee is required to value trust assets at fair market value at year end (¶ 5.04). *See* Tab B, Pappalardo Depo. at p. 40.

A member has a percentage of the Plan allocated to him, but owns no particular asset in the Plan. A member receives a yearly notice from the Plan of his or her financial interest in the

Trust expressed in dollars. They are not told their percentage of the Trust's assets -- that calculation is up to them (Pappalardo Depo., 7/21/06, pp. 80-82, attached as Tab B). When a member receives a distribution there is a deduction from his account of his percentage of the assets in the Trust at year end, plus interest from December 31.

### Common Elements of Class

During the relevant time period, 1997-2005, the three named plaintiffs had the following in common with the other purported members of the class:

1. all worked for Meditech;

2. all had been members of the Plan and there was only one plan;

3. all had vested in the Plan, in whole or in part;

4. all had terminated employment[1] and received their percentage interest in the Plan;

5. all were paid in cash by the Trust, using the values reached by the Trustee for that previous year;

6. the same trustee was involved in all valuations;

7. no trust participant before 2002 (when Director Pappalardo filed a 13D with the SEC noting problems with stock pricing) received an explanation of how the Trustee valued the stock (*See* testimony of Trust Administrator B. Manzolillo, 8/8/06 at pp. 128-129, Tab C to Collora Affidavit);

8. no trust participant ever received a copy of the Plan except one (Testimony of Manzolillo, Id.);

---

[1] For these purposes we accept the Court's ruling we cannot represent current members who took an in-service distribution although plaintiffs do not believe any judgment will exceed cash in the Plan. (Opinion, p. 16).

3

9. the Trustee never told a member how the Meditech stock was valued (Tab B, pp. 47-49); and

10. from 1996 to at least 2002, the valuation by the Trustee was based upon a template, copies of which are attached as part of Tab C**.** (Manzolillo Depo. pp. 118 to 127 plus attached Depo. Exhibits 20-27).

The Court's Opinion seems to misunderstand how the Plan worked. No member owns anything but a percentage interest in the Trust. No member owns a share, but only a right to be paid his or her vested interest. Every year, a Member's interest in the Trust will change, due to additional incoming or departing Members. Also, the Trust itself changes in value, due to changes in valuation. This is a defined benefit plan – each member shares market risk, and at time of withdrawal, receives solely their percentage interest in the Trust. *See* 29 U.S.C. 1002(34) (benefits due under defined contribution plans are based solely upon the amount contributed to the participant's account <u>and</u> any income expenses, gains and losses).

We believe the only difference among class members is what they will receive if judgment is in their favor. A share in 1997 was valued at $13.50; in 2004 it was $29.00. Since the shares constitute 80% of the value of the Trust, someone in 1997 would have received less money than a member in 2004, even if their percentage interest was the same. However, each class member has been "harmed" in the same respect: the consistent undervaluation of the stock resulted in each member receiving a smaller benefit than he or she was entitled to under the Plan and ERISA.

## The Amended Complaint

The Amended Complaint alleges the Trustee continuously and systematically undervalued the stock in the Trust in violation of his statutory and contractual mandate – resulting in an underpayment to each departing member, beginning at least with 1997, (¶ 33 of Amended Complaint). To demonstrate this, plaintiffs used the P/E of a similar company, Cerner which traded on a national exchange and had a stock price which P/E ratio (i.e. stock price compared to earnings per share) was far greater than Meditech through these years. The Amended Complaint pointed out Cerner was less profitable and paid no dividend, and by contrast Meditech paid a 6%-7% dividend and had no debt. Cerner's P/E over the years at year end ranged from over 40 in 1998 to 28 in 2003, *see* Amended Complaint, ¶¶ 70, 76, 81, 87 & 95; by contrast, Meditech's was only about 8.5 (1997) to 14 (2004). *See* chart, Tab D to Collora Affidavit.

In their Amended Complaint plaintiffs never picked a value or a method other than by illustration. For example, in reviewing the prices for year 2000, plaintiffs alleged:

> "The shares of Meditech stock held in the Plan post 1999 were substantially undervalued. Cerner, its major competitor, actually lost money in 1999 yet its shares traded as high as $29 and ended at $19.70 on December 31, 1999. Its market value was $742,000,000. Cerner paid no dividends and had substantial debt and cash earned from its operations was only $27 million compared to Meditech's $91 million. In all respects Meditech was the more valuable company and deserved a much higher value than $16. (Amended Complaint, ¶ 81).

That type of allegation established probable cause for undervaluation – it did not pick a method or a figure.

## The Opinion

This Court was disturbed by the suggested methodology of value in the Amended Complaint, concluding that if solely P/E ratios were used, there would be significant volatility in

5

the share valuation and someone in 2000 could receive less than someone in 1999. (Opinion, 11-13).

However, no one, including plaintiffs, would think a simple P/E ratio as set forth in the Amended Complaint would suffice to demonstrate damages at a hearing. The Amended Complaint merely suggested that because P/Es of comparable companies were so much higher than that selected by the trustee, his valuation of Meditech stock and his good faith became suspect. Plaintiffs were bolstered in this belief by the filing of a lawsuit in 2003 by a former director complaining of the low stock price and methodology. *See* Exhibit C to Amended Complaint.

To prove this low valuation plaintiffs intend to use valuation experts employed by the former Meditech director Grossman, Willamette Mgt. Assoc. of Chicago, Illinois. Their opinion as of June 2005 expresses value for Meditech stock much higher than the Trustee's valuation, for the period 2001-2004 (*See* Willamette Opinion, Tab E to Collora Affidavit, and charts showing comparison, Tabs F to I).

In their Guideline Publicly Traded Company Method (i.e. comparable companies), Willamette identified 4 or 5 companies such as Cerner that were comparable but it then made adjustments to the financials of each based upon growth and profitability and then used a five-year average to arrive at a market value (*See* Tab E to Collora Affidavit, pp. 19 through 23 of the Report). Using this method for the year end 2001 for example, Willamette found the value of Meditech as $1.419 billion for a marketable but non-controlling interest (Tab E to Collora Affidavit, Report p. 31). By contrast, the trustee's figure was only $637,000,000 (*See* Tab F to Collora Affidavit).

6

In addition to this method, for each year of its valuation Willamette used a variant of the income approach called Direct Capitalization, projecting net cash flow over a given period (five years) plus capitalizing the last year to estimate the value of a business. It adjusted Meditech's cash flow to account for variables (in 2001 it was $63.7 million) and using a capitalization rate of 5% reached a value in 2001 of $1,273 billion, close to the comparable companies figure.

The Willamette methodology averaged both figures – in 2001 that resulted in an overall total of $1,447,000 for the value of the company (*See* Tab F and Tab E, the Report, p. 35).

Meditech had no debt – and Willamette concluded it had cash not needed in the business -- that excess cash of over $100,000,000 was added to the above figures.

Finally, this averaged value for each of the years was discounted 30% for lack of marketability based upon Willamette's studies of various private sales (which had a range of 25 – 35% discount) and also by taking into account the history of dividends, other stock transactions, restrictions on the stock and the like.

Overall, Willamette saw a substantial gap between its value and that of the Trustee in both 2001 and 2002, but this gap decreased percentage-wise from 2001-2004. (*See* Tabs F,G, H and I to Collora Affidavit). Plaintiffs suggest the Trustee was trying to catch up to a true value, given the pressure of the ex-Director Grossman who complained privately to the Directors in 2000, filed a 13D SEC report in 2002, and a civil lawsuit for damages in 2003. This likely means that when Willamette does a 1997-2001 analysis, the percentage gap will be even larger compared to the Trustee's alleged "fair market value".

The two methodologies selected by Willamette were the comparable public companies and income approach methods. These approaches are supported by caselaw. Numerous ERISA cases involving evaluation of private company stock, primarily ESOP valuations, use both the

7

comparable company or income approach to value a company (and thus its stock). *See* e.g. *Reich v. Hall Holding Co.*, 60 F. Supp.2d 755 (N.D.Ohio, 1999) (court relied on comparable company and discounted cash flow methods).

All of the factors considered by Willamette are relevant in valuing privately held stock in an ERISA situation. *See* e.g. *Horn v. McQueen,* 353 F. Supp. 785, 791-792 (W.D.Ky. 2004). *See* e.g. *In re Radiology,* 611 n.2d 485 (Del.1991) where the Court rejected the comparable company approach because of lack of comparables (there were only two) but affirmed its general validity. Id. at 48. It chose instead the discounted cash flow method, but noted company projections are necessary (Willamette did not use this approach because it did not have them – *see* Tab E, Report, p. 25).

Of course, properly valuing Meditech stock means it could go down in a particular year if solely the comparable company method is used. Plaintiffs believe that the lower value of a properly valued stock in any one year will still be greater than the Trustee's value and thus still benefit each potential class member. First, Meditech revenues and profit went down only slightly in one two-year period from 1996 through 2005 (that was in 1999-2001, *See* Tab J to Collora Affidavit). In that short period it had only a decrease in gross revenues of $15 million (about 6%) and net profit of $4 million (about 6% as well), so Meditech avoided the problems of other companies.[2] It continued its dividend. For these reasons, the values of Meditech from 1997 – 2001 were very likely undervalued far more than later years, and those departing former members were likely harmed even more so by the Trustee's deliberate undervaluation. *See* Tab D to Collora Affidavit, which notes the change in the stock prices from $12 to $32 in ten years (a 265% + increase) although earnings less than doubled. The Trustee changed the P/E ratio, almost doubling it, without explanation. There is no doubt under Willamette valuation that every

---

[2] Inexplicably, the Trustee raised the stock price in those years and thus the PE went up as well.

year from 2001 – 2004 was undervalued. However, looking at the procedure and the Trustee's manipulations of the P/E, that the most undervalued years were likely in 1996-1999. After 2002, the Trustee's efforts to catch up lessened but did not eliminate the harm to departing members.

Thus, the Court's fears that the selected methodology will result in different payments with one part of the class pitted against another is unfounded. Moreover, the Court's fears that the three named Plaintiffs are not adequate representatives can be laid to rest since plaintiffs are not using the assumed valuation method utilized by the Court in her order. The three named Plaintiffs do not stand to benefit significantly more than other members of the class based on the suggested expert methodology. Rather, the three named plaintiffs and the rest of the class have all suffered a harm by virtue of the persistent undervaluation of the stock which will be remedied most efficiently by a class action lawsuit.

### Valuation Requirement

There is a requirement in the Plan, and in ERISA, to objectively value the assets each year. As stated by the Court in *Montgomery v. Aetna Plywood*, 39 F. Supp. 915, 936 (N.D. Ill., 1998) citing sec. 1002(18)(B) of ERISA, 29 U.S.C.:

> . . . in the case of a plan asset, other than a security for which there is a generally recognized market, adequate consideration means fair market value determined in good faith according to the terms of the plan . . . Fair market value is defined as 'the price at which the asset would change hands, between a willing buyer and a willing seller when [not under any compulsion] and both parties are able and willing to trade and are well informed. . . .'

Chairman Pappalardo in his Affidavit dated 09/15/96 at ¶ 13, (which plaintiffs moved to strike) claimed the Board arrived at a dollar figure of the amount to be contributed to the Plan, then decided on the number of shares to be contributed. The Court seemed to latch onto this idea (Opinion, p. 13) in saying if the plaintiffs are right, they would not have the shares they got. The facts do not support defendant's assertion and they are now irrelevant. We submit that no one

9

can go back and guess what the Company would have done if the stock had been properly valued.

This proposition advanced by defendants is quite debatable. Since 1996, regardless of price, the Board had transferred about 80,000 shares plus cash to the Trust. *See* Chart, Tab J to Collora Affidavit. While this amount might seem generous, this contribution is a non-cash item to the Company and has no effect on its financial statements other than it permits a deduction for its value – so a higher figure would be better for shareholders.. Issuance of treasury stock dilutes present shareholders of course, but otherwise the price of stock is irrelevant. *See generally* 26 U.S.C.A. §§ 401-404 (2007).

Secondly, the Chairman's messages to the Board seem to suggest a share number came first. In late 1999, he said:

> **QUOTATION REDACTED**
> Tab K.

His assertion that less shares would have been contributed is his view only – and a tainted one at that. Let us look at what he did.

In the Complaint, the plaintiffs allege as Trustee's motive for undervaluing the stock, his continued personal purchases of stock from the Company or others at a bargain price (¶¶ 56 and 57 of Amended Complaint).

Another motive appeared in discovery and has more to do with control of the Company. The Chairman admitted in his Report to Directors dated 01/24/00 (Tab K to Collora Affidavit).

> **QUOTATION REDACTED**

Additionally, Pappalardo, acting as Chairman (but also as Trustee of the Board) wrote the Board of Directors in January 2002:

10

**QUOTATION  REDACTED**

*See* Tab K, Collora Affidavit.

Willamette commented on the Trustee's methods of valuation. It said among other things, absent from his stock valuation section was various types of information normally reviewed and analyzed such as (i) a discussion of historical trends in Meditech, revenue operating and net income, cash flow, assets, and book value; (ii) a comparison of Meditech financial performance to other competitors; or (iii) consideration of potential adjustments for non-recurring and/or extraordinary income and expense items.  (Tab E, Report, pp. 97 and 98).

In commenting on the Trustee's disdain for using comparative company data in his 2004 valuation (Tab E, Report p. 99) Willamette answered one of the Court's questions as to how to handle extreme volatility in model prices when using the comparable company approach.  It noted Pappalardo said  **QUOTATION REDACTED**

But Willamette thought this betrayed Pappalardo's lack of expertise:

**QUOTATION REDACTED**

For these reasons, the Court cannot rely on Pappalardo.

Finally, the Court seemed concerned about or who might pay damages and in what amount. We submit the Plan, the Administrator and the Trustee are liable for this undervaluation. *See Rosen v. TRW, Inc.*, 979 F.2d 191, 193-4 (11th Cir. 1992) (a company that administers the plan can be liable for ERISA violations).  Although ERISA provides that a money judgment is only enforceable against the plan as an entity, it does allow for liability against some other person so long as the other person is a plan administrator and thus responsible for decisions regarding benefits. Id. at 192; see 29 U.S.C. § 1132(d)(1).  Both the trustee and the company functioned as plan administrators and had the responsibility for decision regarding the benefits

such as valuation of the stock in the plan. Secondly, if underpayments average 50% for the last ten years, these will owe the class $15 million plus interest – amounts that can easily be paid by any of the defendants. *See* Chart showing over 980 individual withdrawals in the Class period totaling $31 million. Thus, the Court's contention that the Plan would be depleted by the litigation is not necessarily the case because the plan, the company and the trustee are also jointly and severally liable.

### Argument

The issue before this Court is whether to certify the class and "doubts should be resolved in favor of certification, particularly in early stages of the litigation." *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003). The proposed class satisfies the requirements of Rule 23.

The Court focuses on the adequacy requirement in denying the Plaintiffs' Motion for Class Certification. Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." This element requires a finding that the interests of the named plaintiffs "will not conflict with those of the class members and that . . . counsel is qualified, experienced and able to vigorously conduct the proposed litigation." *Payne*, 216 F.R.D. at 26. "The conflict that will prevent a plaintiff meeting the adequacy of representation must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 2005 WL 3178162 at *4 (D. Mass. Nov. 28, 2005) (citations and internal punctuation omitted).

The Court concluded that the members of the proposed class were not adequate because the "choice of a particular alternate methodology to value stock pits class members against one another and places them in direct conflict with the proposed class representatives." At best, we

suggest this was merely a speculative conflict that should have been disregarded at the class certification stage. Moreover, as demonstrated above, the methodology chosen by the Plaintiffs as set forth in its Memorandum only serves to benefit each class member and thus places all members of the class in harmony rather than discord.

      The Plaintiffs have no interests antagonistic to those of the other class members. Rather they have an identical interest in proving that the Defendants intentionally undervalued the stock held by the Plan and maximizing the amount due to them from the Defendants. As demonstrated above, the proposed valuation method does so for each and every member of the putative class action.

      When confronted with a class of individuals who have been defrauded over a period of time by means of various fraudulent practices, courts have taken the logical approach that the class is united by a common interest: determining whether the defendants' court of action is in its broad outlines actionable, which is not defeated by slight differences in class members' positions and that issue may be profitably tried in one suit. *In re Atlantic Financial Federal Securities Litigation*, 1992 WL 50072, *3 (E.D. Pa. 1992) *citing Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975). In *In re Atlantic*, the Court noted that although each plaintiff was not identically situated, they all shared the common interest in showing that the stock price was unlawfully manipulated during the class period. The same as true here, each class members shared the common goal of demonstrating that the stock price was unlawfully valued during the class period.

      Whether or not members of the Proposed Class suffered greater damage in certain years (and hence will receive a higher payout) will not impact the predominance of that collective goal or otherwise create a conflict between the class members. *See In re Lupron Marketing and Sales*

*Practices Litig.*, 228 F.R.D. 75, 90 (D. Mass. 2005) (*citing County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1416 (E.D. N.Y. 1989)) ("Individual differences in damages suffered do not create a class conflict when recovery varies in direct proportion to the amount of individual damages incurred."); Amended Complaint ¶¶ 64-103 (specifically alleging stock was undervalued each year since at least 1998). Moreover, "[b]ecause the conflicts to which Defendants [and the Court] point do not threaten to impair Plaintiffs' ability to represent the class on any issues other than the determination of damages-and because conflicts as to damages can, if necessary, be resolved by the use of subclasses-those conflicts should not prevent certification of the proposed class or of the proposed Plaintiffs as its representatives." *In re Honeywell Intern. Sec. Litigation*, 211 F.R.D. 255, 262 (D.N.J. 2002). Thus, the Court should not be concerned that conflicts as to damages should prevent this class from being certified. Rather, recovery for each member of the class will vary in proportion to the undervaluation for the year in which the class member left the company.

**CONCLUSION**

For all of the reasons stated above, the Plaintiffs respectfully request that this Court grant the Plaintiffs' Motion for Reconsideration and certify the proposed class.

> Respectfully submitted,
> **Michael P. Hubert,**
> **William Trainor, and**
> **David Hinchliffe,**
> Individually and as representatives of a class of all others similarly situated,
> By their attorneys,
>
>   /s/ Jennifer M. Ryan
> Michael A. Collora (BBO #092940)
> David A. Bunis (BBO #550570)
> Jennifer M. Ryan (BBO #661498)
> Dwyer & Collora, LLP
> 600 Atlantic Avenue
> Boston, MA  02210
> 671-371-1000
> 671-371-1037

Dated:  April 2, 2007

**CERTIFICATE OF SERVICE**

I, Jennifer M. Ryan, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on this second day of April, 2007.

>   /s/ Jennifer M. Ryan
> Jennifer M. Ryan

78236.1

78236.1