UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually And On Behalf Of All Persons Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO, <br><br> Defendants. | Civil Action No. 05-10269RWZ |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION

On March 20, 2007, this Court entered an order denying Plaintiffs' motion for class certification  (the "Class Certification Decision") in the above-captioned Employee Retirement Income Security Act ("ERISA") case.   Plaintiffs responded by filing a "Motion for Reconsideration" of that order pursuant to Federal Rule of Civil Procedure 60, a Rule that the First Circuit has repeatedly stated provides for reconsideration only under "exceptional circumstances."  Plaintiffs never argue that this case presents any "exceptional circumstances"; instead, they simply argue that this Court made a number of mistakes in denying their motion for class certification, such as failing to understand Plaintiffs' allegations and arguments in support of their motion for class certification, failing to understand the terms of the ERISA plan that is the subject of this case, and failing to consider evidence that Plaintiffs had in their possession,

but never put before the Court. Each of Plaintiffs' arguments is patently meritless, and the Motion for Reconsideration should be denied.[1]

That Plaintiffs' Motion for Reconsideration is meritless is apparent on its face. First, Plaintiffs seek to introduce "new" evidence in support of their Motion for Reconsideration, but Rule 60(b)(2) limits motions for reconsideration to "newly discovered" evidence, and all of the evidence submitted by Plaintiffs was either in their possession before they even filed suit, or produced by defendants during discovery well in advance of briefing on Plaintiffs' motion for class certification.

Second, the principal "mistake" in this Court's order identified by Plaintiffs—the Court's supposed failure to understand their valuation methodology—is based on a blatant misrepresentation of their Amended Complaint, Plaintiffs' sworn testimony, and the introduction, for the first time, of a "new" valuation methodology Plaintiffs were well aware of but admit to *never having put before the Court* in support of their class certification motion.

Third, even assuming this new valuation methodology were properly before the Court, Plaintiffs' argument that their "new" method overcomes the Rule 23(a) adequacy problems identified by this Court is wrong.

Fourth, Plaintiffs argue that the Court made a mistake in observing that the defendants other than the ERISA plan in this case are not liable for any damages in a benefits action, but the Court's ruling was not mistaken and, in any event, First Circuit case law is clear that an error of law is not reviewable as a "mistake" on a motion for reconsideration.

---

[1] Plaintiffs' Motion for Reconsideration only addresses this Court's denial of their motion for class certification. In the same order in which this Court denied the motion for class certification, it also denied as moot Plaintiffs' motion to strike two affidavits submitted by Defendants in opposition to the class certification motion. Defendants have filed an opposition to the motion to strike, and if this Court should reconsider that motion, Defendants would rely on their earlier-filed opposition.

Fifth, this Court did not, as Plaintiffs contend, commit a mistake in understanding how stock is contributed by defendant Medical Information Technology, Inc. ("Meditech"), to the trust set up under the ERISA plan.

And finally, Plaintiffs are wrong that a common issue in this case is the knowledge of putative class members concerning stock valuation.

In their briefing on the Motion for Reconsideration, Plaintiffs never discuss the requirements of Rule 60 and never discuss the standards governing such motions. That is unsurprising, because, as explained herein, the Motion for Reconsideration is clearly an improper, cynical attempt to supplement the record with material not properly before the Court. Plaintiffs had all of the information, including their "new" valuation methodology, well before they filed their motion for class certification, but elected to go forward on another theory of the case. That theory having been rejected by the Court as not satisfying the Rule 23(a) adequacy requirement, Plaintiffs are now trying to switch horses midstream. Rule 60 does not exist so that Plaintiffs can come back with an entirely different theory of the case, based on information previously in their possession, forcing Defendants to spend money belonging to Meditech and its shareholders (including the very putative class members Plaintiffs purport to represent) relitigating issues that already were decided correctly by this Court. For the reasons given herein, the Motion for Reconsideration should be denied.

## BACKGROUND

## I.    PLAINTIFFS' AMENDED COMPLAINT AND CLASS DISCOVERY

This case involves claims brought under ERISA by Plaintiffs Michael Hubert, William Trainor, and David Hinchliffe, who allege that they were paid too little in benefits by defendant

Medical Information Technology, Inc. Profit Sharing Plan (the "Plan") upon termination of their employment with Meditech, the former employer of each plaintiff.

The Amended Complaint contained numerous allegations concerning the value of Meditech's non-publicly traded stock, including the valuation methodology Plaintiffs alleged should have been used in valuing Meditech stock, and specific values that Plaintiffs alleged would have been "fair" values for use in determining the benefits of Plan participants. For example, Plaintiffs alleged, among other things, that:

- "An accepted valuation procedure is to compare the stock price of publicly traded companies similar to that of Meditech and arrive at a per share value." Amended Complaint, ¶ 62.

- "Defendants have not fairly valued the Meditech stock in the Plan. *This can be demonstrated by comparison to publicly traded companies in the same industry …* whose stock trades at much higher multiples of earnings to that of Meditech." Amended Complaint, ¶ 63 (emphasis added).

- Applying the "P/E ratios" of "[c]omparable publicly owned companies such as Cerner" to Meditech stock in 1998 and 1999 "would have resulted in a value for Meditech stock equal to $75/share, not $14.50 or $16." Amended Complaint, ¶ 70.

- "If Meditech's common stock *had been fairly valued* at a P/E of 15" in December 2000 "it would be worth $25.50/share." Amended Complaint, ¶ 81 (emphasis added).

- "If Meditech … had a P/E ratio of over 21, like Cerner, its stock value would have been a minimum of $41 not $22 …." Amended Complaint, ¶ 95.

- In December 2003, "Meditech stock *would be fairly valued* at $69.00 not $26.00" if the "P/E ratio set by the national stock markets" for Meditech's "related competitors" had been used, or $74 taking into consideration real estate, stock and other assets. Amended Complaint, ¶ 101 (emphasis added).

After this Court dismissed Plaintiffs' breach of fiduciary duty claim on March 20, 2006, the parties engaged in discovery limited to the issues of class certification and the methodologies used by Defendants to value non-publicly traded Meditech stock for the purposes of Meditech contributing stock to the Plan, and the Plan making distributions of benefits to Plan participants. During the course of discovery Defendants produced thousands of pages of documents to

Plaintiffs.  Such documents, produced well in advance of Plaintiffs' submission of their motion for class certification on August 15, 2006, provided all of the information newly relied upon by Plaintiffs, for the first time, in support of their Motion for Reconsideration.

As an initial matter, in support of their Motion for Reconsideration Plaintiffs newly rely upon, and attach to the Affidavit of Michael Collora (the "Collora Affidavit"), a putative expert valuation report prepared by Robert F. Reilly of Willamette Associates (the "Willamette Report") on behalf of the plaintiff in a state court case against Meditech, *Grossman v. Medical Information Technology, Inc. et al.*, No. 03-1872-BLS2 (Mass. Super.) (the "Grossman Case"), who, like Plaintiffs in the instant case, alleged Meditech had undervalued its non-publicly traded stock.[2]  *See* Affidavit of Michael A. Collora, Tab E ("Collora Affidavit").  This Report had been specifically requested by Plaintiffs in discovery and was produced by Defendants to Plaintiffs on June 16, 2006, two months before Plaintiffs filed their motion for class certification.  *See* Affidavit of Michael P. Sugrue, ¶ 11 ("Sugrue Affidavit").  Defendants also produced to Plaintiffs, though Plaintiffs fail to mention it, an expert report from PriceWaterhouseCoopers ("PWC Report"), commissioned by defendants in the Grossman Case, explaining how Willamette had made elementary mistakes in applying his own published method for valuing stock, and that if these errors were corrected, and certain other assumptions made more reasonable, the Willamette method would actually result in share valuations below those

---

[2]    In no year does the value of Meditech stock as determined in the Willamette Report correspond with the value alleged in the Amended Complaint in this case as the minimum fair value.  While, for example Plaintiffs alleged that the Defendants breached their fiduciary duties to Plan participants by valuing the stock at anything less than $74 as of December 2003—the valuation date relevant to named plaintiff Michael Hubert's distribution of benefits from the Plan—the Willamette Report asserted that the value of the stock as of that date was $33, less than half that alleged by Plaintiffs and a value much closer to the Trustee's valuation of $26.  *See* Willamette Report at DEF 005249 (Collora Aff., Ex. E). The same is also true for the December 2002 valuation:  Plaintiffs alleged that a fair value should have been "a minimum of $41," Amended Complaint ¶ 95, but the Willamette Report estimated a value of $30, *see* Willamette Report at DEF 005248 (Collora Aff., Ex. E).  (The Plan assigned a value of $22).

determined by the Defendants.  *See* Sugrue Affidavit, Exhibit E (appending the PWC Report).
The PWC Report was produced to Plaintiffs on June 8, 2006.  *See* Sugrue Affidavit, ¶¶ 14-15.
(As Defendants informed the Court by letter dated February 9, 2006, the Grossman case settled,
with defendants making absolutely no payments to Grossman, after service of the PWC Report
and defendants' motion for summary judgment.  *See* Sugrue Affidavit, Exhibit F).

In addition, on June 8, 2006, more than two months before Plaintiffs filed their class
certification motion, Defendants produced the IRS Form 5500 attached by Plaintiffs to the
Collora Affidavit at Tab A.  *See* Sugrue Affidavit, ¶ 6.  Plaintiffs introduce deposition testimony
from Barbara Manzolillo, Meditech's CFO, and additional deposition testimony from Neil
Pappalardo (pages 80-82 of the transcript) not submitted in support of the motion for class
certification; these depositions were taken by Plaintiffs on August 8, 2006 and July 21, 2006,
before Plaintiffs filed their motion for class certification on August 15, 20006.  *See* Collora
Affidavit, Tabs B, C; Sugrue Affidavit, ¶ 7-8.  Plaintiffs newly rely on excerpts from reports
prepared for the Meditech board, which they attach to the Collora Affidavit at Tab K.
Defendants produced these board reports to Plaintiffs on June 8, 2006, more than two months
before Plaintiffs moved for class certification; indeed, all of these reports were identified as
exhibits at the deposition of defendant Pappalardo which took place on July 21, 2006, about a
month before Plaintiffs filed their motion.  *See* Sugrue Affidavit, ¶ 13.  And Plaintiffs attach to
the Collora Affidavit, and newly rely upon, a number of charts created by Plaintiffs' counsel
containing information concerning Meditech's finances and share value.  *See* Collora Affidavit,
¶¶ 4–7, and Tabs D, F through I.  These charts state, on their face, that they were created using
information from the Amended Complaint, from the Willamette Report (which, as noted above,
was produced on June 16, 2006), and from Meditech's Form 10-Ks, which are publicly available

6

on the SEC website and were, in any event, also produced by Defendants to Plaintiffs on June 12, 2006, more than two months before Plaintiffs filed their motion for class certification. *See* Sugrue Affidavit, ¶¶ 9-12.

## II.  THE MOTION FOR CLASS CERTIFICATION

Plaintiffs filed their motion for class certification on August 15, 2006.  Plaintiffs sought certification of one undifferentiated class consisting of all Plan participants (including current Plan participants) who, from January 1, 1998 to the present, received any distribution of benefits from the Plan.

In their motion, memorandum in support, and reply brief, Plaintiffs never discussed the Willamette Report, nor was the Willamette Report submitted as an exhibit by Plaintiffs. Plaintiffs also did not rely upon the Form 5500 attached to the Collora Affidavit; on the excerpts of deposition testimony from the Manzolillo deposition and pages 80-82 of the Pappalardo deposition attached to the Collora Affidavit; on the excerpts from the Meditech board reports attached to the Collora Affidavit; or on any of the various charts newly created by Plaintiffs' counsel and attached to the Collora Affidavit as Tabs D and F through I.

Plaintiffs' decision not to rely on the Willamette Report in their class certification papers was unsurprising, given that the December 2003 valuation in the Willamette Report would have cut Hubert's purported injury by more than half from the amount alleged in the Amended Complaint. *See supra* at 5 n. 1.  Instead, Plaintiffs specifically relied upon the allegations in their Amended Complaint that the value of Meditech stock should have had particular values in given years.  In their Reply Brief, for instance, Plaintiffs asserted:

> Defendants also fail to show how volatile share prices create an *actual* conflict. Compare Opposition, pp. 18-19 (arguing that, under Plaintiffs' theory, class members departing in 2001 and 2003 "were paid 'too much,' and will recover nothing in this suit") with Am. Compl. ¶¶ 77, 81 (class members in 2001 paid $17 per share,

> where market would suggest $25.50) and id.¶¶ 90, 93-95 (class members in 2003 paid $22 per share, where market would suggest $41).

Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for Class Certification, at 8.

## III.    THE COURT'S ORDER DENYING CLASS CERTIFICATION

On March 20, 2007, this Court entered an order denying Plaintiffs' motion for class certification. While Defendants had raised numerous reasons for denying that motion, this Court did not need to address most of them. Instead, the Court focused on one reason, conflicts between the named representatives and absent class members based on the many possible methods that exist for valuing the stock of a privately-held company, such as Meditech, which prevented named plaintiffs from satisfying the adequacy requirement of Federal Rule of Civil Procedure 23(a).

In reaching this conclusion, the Court carefully explained the method under which voluntary contributions of stock and cash are made from Meditech to the Plan; how the contributions are allocated among Plan participants, who are credited a percentage amount of each contribution based upon their relative salary; and how benefits paid to Plan participants are determined, based upon a valuation of Meditech stock made by the Plan's Trustee. *See* Class Certification Decision at 4. This Court explained, "[v]aluing the equity of a private company is an 'art,' not simply a matter of plugging numbers into a formula," and "[d]ifferent appraisers can come to significantly different valuations based on the same set of facts." *Id*. at 8. This Court thus concluded, citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 610, 630 (1997), that:

> In the instant case … the very issue to be decided – the proper method to value Company stock in the Plan – results in radically different recoveries for class members depending on the valuation method chosen, the year the member exited the Plan, as well as the year the member entered the Plan. Plaintiffs' proposed valuation methodology, for example, maximizes the stock valuation in the years each terminated the Plan at the expense of valuation in other

> years. This places plaintiffs in fundamental conflict with absent
> class members who would receive a greater recovery from an
> alternate methodology.

Class Certification Decision at 8 (citation omitted).

## ARGUMENT

### I.     STANDARD OF REVIEW OF A MOTION FOR RECONSIDERATION

Plaintiffs bring their Motion for Reconsideration under Federal Rule of Civil Procedure 60 ("Relief from Judgment or Order"), and in particular Rules 60(b)(1) and 60(b)(6). *See* Plaintiffs' Motion for Reconsideration at 1. Rule 60 provides, in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

The First Circuit has long cautioned that a motion for reconsideration under Rule 60(b) constitutes "extraordinary relief," and that such a motion should be granted only under "exceptional circumstances." *Aguiar-Carrasquillo v. Agosto-Alicea*, 445 F.3d 19, 28 (1st Cir. 2006) (quoting *Lepore* v. *Vidockler*, 792 F.2d 272, 274 (1st Cir. 1986)). "There must be an end to litigation someday," *Ackermann v. United States*, 340 U.S. 193, 198 (1950), and a court should not be continually forced to second-guess its decisions. *Ahmed v. Rosenblatt*, 118 F.3d 886, 891-92 (1st Cir. 1997)

Rule 60(b)(1) provides four separate bases for relief from an order; Plaintiffs argue only "mistake." A district court obviously cannot have committed a mistake by "failing" to consider

facts or argument that was not put before it in support of the underlying motion. Moreover, First Circuit case law unambiguously holds that an "error of law" is not a "mistake" within the meaning of Rule 60(b)(1). *See Ahmed*, 118 F.3d at 891 ("in this Circuit, wrongly deciding a point of law is not a 'mistake' as we have defined that term under Rule 60(b)(1)").

Rule 60(b)(6) only provides relief under "the most exceptional circumstances." *Cotto v. United States*, 993 F.2d 274, 278 (1st Cir. 1993); *Simon v. Navon*, 116 F.3d 1, 5 (1st Cir. 1997) ("Appellant faces formidable hurdles in pursuing a 60(b)(6) claim. There must exist 'exceptional' circumstances that justify 'extraordinary' relief"). "Since Rule 60(b)(6) is designed as a catchall, a motion under it is appropriate only when none of the first five sections pertain, and section (6) may not be used as [a] means to circumvent those five preceding sections." *Ahmed*, 118 F.3d 891 n. 9; *Simon*, 116 F.3d at 5 (same). For example, in *Cotto*, the First Circuit, invoking the "bedrock principle that clause (6) may not be used as a vehicle for circumventing clauses (1) through (5)," affirmed denial of an untimely motion for reconsideration under Rule 60(b)(6) based on a theory of excusable neglect, which is the proper subject of Rule 60(b)(1) and subject to that Rule's one-year filing deadline. *Cotto*, 993 F.2d at 278. Similarly, a party could not use Rule 60(b)(6) to get around the requirement of Rule 60(b)(2) that evidence introduced for the first time in support of a motion for reconsideration be "newly discovered," and incapable of earlier discovery through the exercise of "due diligence." *See Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3rd Cir. 1985) ("Where evidence is not newly discovered, a party may not submit that evidence in support of a motion for reconsideration.")

## II.    PLAINTIFFS' REQUEST FOR RELIEF UNDER RULE 60(B)(1) IS MERITLESS

To the extent Plaintiffs base their Motion for Reconsideration on supposed "mistakes" made by this Court in ruling on the motion for class certification, it is clear that no errors were

made. Indeed, this Court should not even address most of Plaintiffs' claims of mistake because they rely on evidence improperly before the Court on a motion for reconsideration.

### A.    Most of the Evidence Relied Upon in the Motion for Reconsideration is Not Properly Before the Court

As discussed above, precedent is clear that a motion for reconsideration can only be based on "new" evidence if it was "newly discovered," and could not previously have been discovered through the exercise of due diligence. *See supra* at 10. A motion for reconsideration does not provide plaintiffs a second bite at the apple, in which they can rely upon evidence that was previously in their possession, but that they had decided not to rely upon.

Yet that is precisely what Plaintiffs seek to do here. As detailed above, Defendants produced to Plaintiffs nearly all of the documents and information appended to the Collora Affidavit, upon which Plaintiffs base their Motion for Reconsideration, two months or more before they filed their motion for class certification. *See supra* at 5-7.

There is thus nothing "new" about the documents and information attached to the Collora Affidavit, other than Plaintiffs' decision to rely upon them for the first time in support of the Motion for Reconsideration. Accordingly, because Plaintiffs are attempting to make an end-run against the explicit strictures of Rule 60(b)(2) concerning "new" evidence, the Motion for Reconsideration must be denied to the extent it makes arguments based on the Willamette Report; the Plan's IRS Form 5500 for 2004; the Manzolillo deposition excerpts and pages 80-82 of the Pappalardo deposition transcript; the Meditech board reports; and any of the charts newly created by counsel for Plaintiffs found in the Collora Affidavit at Tabs D and F though I.

### B.    This Court Did Not Misconstrue Plaintiffs' Position on Stock Valuation

The principal "mistake" identified by Plaintiffs is this Court's supposedly faulty "assumption" that Plaintiffs had identified, in their Amended Complaint, a method that should

have been used by Defendants in valuing Meditech stock, and particular values or minimum values that, in Plaintiffs' estimation, were necessary to be fair. *See* Plaintiffs' Memorandum in Support at 1-2, 5. According to Plaintiffs, the Amended Complaint does no such thing, and in any event no one could fairly understand Plaintiffs to have bought into the ludicrous share valuation methodology set forth in Plaintiffs' own Amended Complaint. *See id.* at 6.

This argument is based on a flagrant misrepresentation both of the Amended Complaint and of the sworn deposition testimony of the named Plaintiffs in this case. First, Plaintiffs assert that "In their Amended Complaint plaintiffs *never* picked a value or a method other than by illustration" and "did not pick a method of figure," and quote as support their vague allegation that in December 1999 the value should have been much higher than $16. *See* Memorandum in Support at 5. What Plaintiffs leave out are the many very specific allegations in the Amended Complaint that *did* "pick[] a value": as set out above, Plaintiffs quite plainly alleged that, *e.g.*, "If Meditech's common stock *had been fairly valued* at a P/E of 15" in December 2000 "it would be worth $25.50/share," and that "Meditech stock *would be fairly valued* at $69.00 not $26.00" based upon the "P/E ratio set by the national stock markets" for Meditech's "related competitors" had been used. *See supra* at 4. Plaintiffs also referred to the very specific values alleged in the Amended Complaint in their reply brief on class certification. *See supra* at 7-8. Plaintiffs' counsel's clumsy effort to mislead the Court about the plain allegations in the Amended Complaint by quoting only the allegations about the December 1999 valuation did not work when he attempted it at oral argument on class certification—*see* Class Certification Decision at 11—and it is remarkable that Plaintiffs' counsel would think that the ruse is worth trying again.

Perhaps even more outrageous, however, is the effort by Plaintiffs' counsel to hide from the Amended Complaint's selection of a valuation methodology by asserting in their

Memorandum in Support that "No one, *including plaintiffs*, would think a simple P/E ratio as set forth in the Amended Complaint would suffice to demonstrate damages at a hearing." Memorandum in Support at 6 (emphasis added). This is contradicted on the very face of the Amended Complaint, which plainly states "Defendants have not fairly valued the Meditech stock in the Plan. This *can be demonstrated* by comparison to publicly traded companies in the same industry … whose stock trades at much higher multiples of earnings to that of Meditech." Amended Complaint, ¶ 63 (emphasis added). It is also contradicted by the Amended Complaint's very specific allegations that Defendants breached their fiduciary duties to the plaintiff class by failing to value the stock at levels determined using the Amended Complaint's valuation methodology. *See supra* at 4.

Plaintiffs' new argument about what "plaintiffs, would think" is also contradicted by the *sworn* deposition testimony of the named plaintiffs themselves, which Plaintiffs' counsel probably should have consulted before suggesting what "plaintiffs, would think." In deposition testimony quoted in Defendants' Opposition to the Motion for Class Certification, for example, plaintiff Hinchliffe testified that Plaintiffs' claim could be "fairly conclusive[ly]" proven using public information concerning "other companies and their assets and what their stock was versus what Meditech's was," the valuation method set out in the Amended Complaint. *See* Defendants' Opposition at 26 (quoting Hinchliffe Depo. at 20-21). Hinchliffe never testified, as Plaintiffs' counsel now asserts, that proof of Plaintiffs' claim would require consideration of a direct-capitalization method for valuing non-public companies. *See* Memorandum in Support at 7.

In summary, in light of all the statements in the Amended Complaint, in Plaintiffs' reply brief on class certification, and in Plaintiffs' own testimony, that they intended to use the

valuation method set out in the Amended Complaint, it is astounding that Plaintiffs' counsel would now accuse the Court of committing a "mistake" by failing to recognize that Plaintiffs would eventually attempt to disavow their own Amended Complaint and use the Willamette method instead.  Clearly, no mistake was made by the Court.

### C.    The Willamette Method Does Not Support the Motion for Reconsideration

Plaintiffs' newfound zeal for the Willamette valuation method, in any event, cannot get them around this Court's class certification decision, and their reliance on it fails to support their Motion for Reconsideration for three independently sufficient reasons.

First, the Willamette Report was produced by Defendants to Plaintiffs during discovery and was therefore in their possession well before class certification briefing began.  Clearly, Plaintiffs made a strategic choice not to rely upon the Willamette Report in their class certification briefing, no doubt because the values it estimates for Meditech stock are far below those alleged to be fair in the Amended Complaint, and indeed are close to the values determined by the Trustee.  *See supra* at 5 n. 1.  Rule 60 and precedent are clear that on a motion for reconsideration new evidence may only be considered if it is "newly discovered" and could not have been previously discovered through "due diligence."  *See supra* at 10.  That description obviously does not apply to a document produced by Defendants to Plaintiffs months before class certification briefing occurred.

Second, Plaintiffs blithely assert that under the Willamette method "the values of Meditech from 1997-2001 were very likely undervalued far more than later years, and those departing former members were likely harmed even more so by the Trustee's deliberate undervaluation."  *See* Memorandum in Support at 8.  This not only presents a new conflict for participants leaving in later years, who doubtless would prefer a method resulting in less alleged

undervaluation in early years and more alleged undervaluation in later years,[3] it undercuts the claims of putative class members on the merits.  This Court has noted that "the actual issue to be decided in this case is whether 'the parties' competing valuation methodologies [] involve different rates of growth (or decline) over time," with Plan participants receiving greater payouts if the rate of growth in share value should have been higher than the rate of growth under the Trustee's methodology.  *See* Class Certification Decision at 13-14.  Plaintiffs are now asserting that they plan to adopt a share valuation methodology that uses a *slower* rate of growth than the Trustee's method for at least the past decade.  This casts doubt not only on the adequacy of the class representatives but also class counsel's ability to understand the issues in this litigation.

Indeed, it does not even appear that Plaintiffs and/or Plaintiffs' counsel are willing to pay Willamette to perform the analysis this Court has stated is necessary for this case to proceed.  This Court clearly explained that "[t]he *only* way to calculate the proper payout under any alternate valuation methodology is to revalue the shares from the <u>beginning</u> of the Plan."  Class Certification Decision at 14 (underlining in original).   In their Memorandum in Support, however, Plaintiffs suggest that they will not pay Willamette to perform this analysis, by making a reference to "when Willamette does a 1997-2001 analysis."  Memorandum in Support at 7.  If Plaintiffs and Plaintiffs' counsel together are not willing to front the cost of the full analysis necessary to try to prove up their claims, they are obviously inadequate.  *See generally Rand v. Monsanto Co.*,  926 F.2d 596 (7th Cir. 1991).

---

[3]     To give one simple example, the Willamette Report shows the value of Meditech stock remaining stagnant between December 2001 and December 2002, while the Trustee had the value increasing from $19 to $22.  Given how stock is contributed to the Plan, a Plan participant receiving a distribution in 2003 (based on the December 2002 valuation) would (all else being equal) likely prefer the Trustee's valuation method to Willamette's.  *See* Class Certification Decision at 13–14.

Third, no matter how sophisticated the Willamette method—and, as explained above, it was savaged by the PWC Report, no doubt contributing to the decision by Grossman and his lawyers at WilmerHale to settle—it cannot get around the potential sources of intra-class conflict identified by this Court in the Class Certification Decision. As this Court noted, the valuation of privately-held companies is an "art" and not a science. Willamette's method for valuing stock is certainly no more definitive than the Defendants', and there doubtless are appraisers out there who would arrive at valuations for Meditech stock above and below the Trustee's valuation, and above and below Willamette's. Because the distribution of benefits from the Plan received by any Plan participant depends upon myriad factors—such as when the Plan participant entered the Plan, the value assigned the stock each year stretching back three decades both with respect to contributions and distributions, the percentage of any contribution allocated to a participant in given years, and the relative movement of the stock value over time—the Willamette methodology will not avoid the adequacy problems identified by this Court.[4]

### D.    This Court Did Not Commit a "Mistake" in Concluding that Plaintiffs Cannot Recover from Defendants Other Than the Plan

Plaintiffs also assign as a ground of error the Court's conclusion that a recovery on the ERISA benefits claim still pending in this case can only come from the Plan. *See* Memorandum in Support at 11-12 ("the company and the trustee are also jointly and severally liable"). This basis for reconsideration is meritless for two reasons. First, the Court's conclusion was entirely

---

[4]    Plaintiffs' reliance on *In re Atlantic Federal Securities Litigation*, 1992 WL 50072, * 3 (E.D. Pa 1992), on the subject of adequacy, is misplaced. *Atlantic Federal* was premised on the defendants' failure in that case to assert that any of the individual plaintiffs in the proposed class would have exhibited interests contrary to establishing liability. Plaintiffs in the instant case, on the other hand, have proposed a valuation methodology under which "it is likely that the value of some members' benefits . . . could be less than what they actually received under the Company's valuation." Class Certification Decision at 14.

consistent with the statute and case law. Plaintiffs rely upon an inapposite section of ERISA, *see* 29 U.S.C. § 1132(d)(1),[5] and fail to cite the next subsection, which is directly on point:

> Any money judgment under this subchapter against an employee benefit plan shall be enforceable *only* against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter.

29 U.S.C. § 1132(d)(2) (emphasis added). Other than Plaintiffs' claim for breach of fiduciary duty, which was dismissed by this Court, Plaintiffs have not identified a basis for holding Meditech or Pappalardo liable in their individual capacities, nor does one exist.

Plaintiffs cite *Rosen v. TRW, Inc.*, 979 F.2d 191, 193-94 (11th Cir. 1992), for the proposition that ERISA "does allow for liability against some other person so long as the other person is a plan administrator and thus responsible for decisions regarding benefits." Memorandum in Support at 11. *Rosen*, however, provides no indication under what section of ERISA plaintiff's claim was brought; it does not mention the "joint and several" liability Plaintiffs seek; and it relied on a First Circuit decision, *Law v. Ernst & Young*, 956 F.2d 364 (1st Cir. 1992), concerning not benefits but the provision of information by plan administrators to plan participants under 29 U.S.C. § 1132(c). Precedent is clear that a benefits claim brought under Section 1132(a)(1)(B), like Plaintiffs' here, can only "recover benefits directly from the Plan as an entity." *Brandon v. Aetna Servs., Inc.*, 156 F.Supp.2d 167, 171 (D. Conn. 2000).

Second, even assuming this Court were wrong about this issue of law, if Plaintiffs had bothered to address the standard of review on a motion for reconsideration, they would have been forced to admit, as discussed above, that an error of law is not a "mistake" within the

---

[5] "An employee benefit plan may sue or be sued under this subchapter as an entity. Service of summons, subpoena, or other legal process of a court upon a trustee or an administrator of an employee benefit plan in his capacity as such shall constitute service upon the employee benefit plan."

meaning of Rule 60(b)(1).  *See supra* at 10.  Accordingly, this supposed grounds for reconsideration is not even properly before the Court.

###   E.    This Court Did Not Misconstrue How the Plan Works

Plaintiffs argue that the Court erred in concluding that, under the Plan, the number of shares contributed by the Company to the Plan depends upon the share value.  *See* Memorandum in Support at 9–10.  This Court, however, committed no error: the Plan document explicitly states that the Board first sets an overall contribution amount, and then determines how much will be in cash, and how much in stock, with the stock value determining the number of shares that will be contributed.  *See* Plan Document, ¶ 4.01; Pappalardo Affidavit, ¶ 13 (Docket No. 68).  Plaintiffs' primary argument on the Motion for Reconsideration—that the Board voted to contribute "about 80,000 shares" each year since 1996, although the share price rose—misses the point.  During each of those years, the value of the Meditech stock contributed by the company to the Plan fell within the overall contribution amount determined by Meditech's board.  If the higher share values alleged to be fair by Plaintiffs had been used in these years, the Board would have decreased the number of shares contributed.  *See* Pappalardo Affidavit, ¶ 13.

###   F.    Defendants Do Not Concede that Individual Class Members' Knowledge
         Concerning the Plan is a Common Issue

Plaintiffs assert a number of "common" facts between themselves and other putative class members.  *See* Memorandum in Support at 3-4.  Without conceding that any of the facts listed are in fact common or material, Defendants are astonished that Plaintiffs would claim as two of these "common facts" the following: that "no trust participant before 2002 (when Director Pappalardo [sic, should be Grossman] filed a 13D with the SEC noting problems with stock pricing) received an explanation of how the Trustee valued the stock," and that "the Trustee never told a member how the Meditech stock was valued."  *Id*.  This is astonishing because

Defendants laid out in detail, in their opposition to the motion for class certification, how Hubert had sent an anonymous email to a number of lawyers on February 18, 2002—*nine days before* the February 27, 2002 SEC filing that Plaintiffs point to—seeking to sell them information concerning the very ERISA claim raised in this case.  *See* Defendants' Opposition to Plaintiffs' Motion for Class Certification at 28.  In this email Hubert explained that he was a member of a plan holding primarily company stock, and "[i]t is acknowledged by all that the stock value is set low so that employees will purchase the stock."  *Id*.  Hubert's anonymous email, in which he claims that "[i]t is acknowledged by all" that the stock value is kept low, absolutely undercuts Plaintiffs' effort to suggest that Meditech employees and Plan participants all were kept in the dark on valuation issues.  Thus, as explained in Defendants' class certification opposition, individual issues relating to the statute of limitations, and laches and other equitable defenses, would prevent the finding of predominance required in this Rule 23(b)(3) class action, even if Plaintiffs could get around the disqualifying problems with adequacy that were the basis of this Court's ruling denying Plaintiffs' class certification motion.

## III.    PLAINTIFFS' REQUEST FOR RELIEF UNDER RULE 60(B)(6) IS MERITLESS

While Plaintiffs at least put forward an argument, however frivolous, that they are entitled to reconsideration under Rule 60(b)(1) due to "mistakes" made by this Court, they do not even attempt to argue that they are entitled to relief under Rule 60(b)(6).  Apart from one reference to Rule 60(b)(6) in their motion, the Rule is never mentioned again, and Plaintiffs *never* recite the standard for relief under Rule 60(b)(6) or make *any* argument that they have met the standard— "exceptional circumstances justifying extraordinary relief"—governing that Rule.

It is thus entirely unclear why Plaintiffs' think they are entitled to relied under Rule 60(b)(6).  To the extent Plaintiffs thought a reference to Rule 60(b)(6) could get them around the serious flaws in their motion under Rule 60(b)(1)—or to get in the Willamette Report and other

new documents and information, despite the requirement of Rule 60(b)(2) that any new evidence be "newly discovered" despite the party's prior exercise of "due diligence"—their reliance is misplaced, as case law from the First Circuit unambiguously provides that Rule 60(b)(6) provides no safe harbor from the requirements of other sections of the Rule. *See supra* at 10.

## CONCLUSION

Plaintiffs' Motion for Reconsideration is worse than frivolous—it was filed in direct contravention of the governing rule and case law and as such is sanctionable. For the reasons given above, Defendants respectfully pray that this Court deny Plaintiffs' Motion for Reconsideration, and grant Defendants such other relief as the Court deems appropriate. In any event, should the Court accept any of the grounds put forward by Plaintiffs for reconsideration, Defendants note that the Court did not rule on most of the bases put forward by Defendants for denying class certification, so that the Motion for Reconsideration, even if granted, should at most result in the Court considering the remaining issues presented by Plaintiffs' class certification motion, *not* the granting of class certification.

Respectfully submitted,

MEDICAL INFORMATION TECHNOLOGY,
INC. PROFIT SHARING PLAN, MEDICAL
INFORMATION TECHNOLOGY, INC. and A.
NEIL PAPPALARDO.

By their attorneys,

/s/ Stephen D. Poss, P.C.
Stephen D. Poss, P.C. (BBO # 551760)
Kevin P. Martin (BBO # 655222)
Michael P. Sugrue (BBO #655727)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
Dated: May 1, 2007                    (617) 570-1000

## CERTIFICATE OF SERVICE

      I, Stephen D. Poss, P.C., hereby certify that I caused a true copy of the above document to be served upon the counsel of record for each other party via this Court's ECF System on May 1, 2007.

<div style="margin-left:40%">

/s/  Stephen D. Poss, P.C.
Stephen D. Poss, P.C.

</div>