## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                )
MICHAEL P. HUBERT, WILLIAM TRAINOR,             )
and DAVID HINCHLIFFE, Individually and          )
On Behalf Of All Persons Similarly Situated     )
                                                )
        Plaintiffs,                             )
                                                )  Civil Case No. 05-10269-RWZ
        v.                                      )
                                                )
MEDICAL INFORMATION TECHNOLOGY                  )
PROFIT SHARING PLAN, et al.                     )
                                                )
        Defendants.                             )
_____         )

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' AMENDED MOTION
## FOR CLASS CERTIFICATION

### Introduction

This second motion for class certification addresses the difficulties the Court perceived

with the earlier motion, which sought to certify a class covering all plan participants over a nearly

decade long period. Plaintiffs now seek to certify a narrower class, limited to those who received

a distribution of any portion of their interest in the Plan from January 1, 1998 through December

31, 1998. Limiting the class to a single year eliminates the concerns that moved the Court to deny

the earlier motion.  As more fully explained below, this narrower group of claimants is ideally

suited to class action treatment.

### Prior Proceedings

Plaintiffs William Trainor ("Mr. Trainor") and David Hinchliffe ("Mr. Hinchliffe")

(collectively, "the Plaintiffs")  submit this memorandum in support of their motion for class

certification.

On February 10, 2005, Plaintiffs filed a complaint in the United States District Court for the District of Massachusetts against the Medical Information Profit Sharing Plan ("Meditech"), an ERISA plan, and its fiduciaries. The Complaint alleged that from at least January 1, 1998 to the present, the defendants failed to pay benefits due to those Plan participants terminating their employment at Meditech. The underpayment was allegedly attributable to deliberate and/or reckless under-pricing of the Plan's primary asset -- shares of MEDITECH stock.   As a result, participants claimed, they had not received their full benefits in violation of 29 U.S.C. 1132(a)(1)(B). See Amended Complaint at Docket No 15.  Both the Complaint and the Amended Complaint indicated that the plaintiffs sought certification of a class.

Plaintiffs sought to certify a class of all participants in the MEDITECH Profit Sharing Plan who have received a distribution of any portion of their interest in that Plan from January 1, 1998 to the present. See Motion to Certify Class at Docket No. 55. The Court denied their motion for class certification on March 20, 2007 and their motion for reconsideration on May 3, 2007. See Docket Nos. 92 and entry dated May 5, 2003.

In denying class certification, this Court expressed certain reservations about the proposed class. Most notably, the Court expressed concern that the method of valuation chosen may impact differently upon individuals who exited the trust in different years.   The Court went on to conclude that the proposed class representatives could not adequately represent the proposed class.   Specifically, the Court noted that the "proper method to value Company stock in the Plan—results in radically different recoveries for class members depending on the valuation method chosen, the year the member exited the Plan, as well as the year that the member entered

the Plan." The order did not foreclose class certification for a subset of the proposed class.

In accordance with the rationale of this Court's earlier ruling, therefore, the plaintiffs propose to represent only those Plan members that exited the Plan in the same year that they did and are thus all subject to the same undervaluation of the stock. Plaintiffs Hinchliffe and Trainor now seek certification of the following class ("the Proposed Class"):

> All participants in the MEDITECH Profit Sharing Plan who have received a distribution of any portion of their interest in that Plan from January 1, 1998 to December 31, 1998.

At this stage in the litigation, the plaintiffs' expert has opined on the value of the stock as of December 31, 1997, using both the Discounted Cash Flow Method and the Guideline Public Company Method, two of the three generally accepted approaches to business valuation.[1] As a result of the expert's analysis, he has come to the conclusion that the trustee undervalued the stock in the year in question, finding that the fair market value of the stock as of December 31, 1997 was over sixty percent higher than the value chosen by the trustee.[2] The year that these members entered the Plan is not at issue because each Plan member will simply receive reimbursement dependant upon the percentage of their interest in the Plan at the time of distribution.

As more fully explained below, this proposed class of plan participants is ideally suited to class action treatment because there are numerous affected individuals whose claims raise identical issues of fact and law and because class action treatment will produce the fairest and

---

[1] The third accepted approach to business valuation, asset approach, was not utilized by the expert because Meditech was a profitable going-concern business enterprise, appraisals of Meditech's tangible and intangible assets were not available, the objective of the assignment is to estimate the value of a fractional equity interest that did not have the unilateral authority to liquidate the assets of Meditech and Meditech was not operating as an asset holding company.

[2] The Expert Damages Opinion is attached the the Affidavit of Michael Collora, which has been filed

most efficient adjudication.

## Relevant Factual Background

A.    The Defendants

In 1973, Defendant Medical Information Technology, Inc. ("Meditech") established the

Meditech Profit Sharing Plan ("the Plan"), which is governed by ERISA.  The Plan is the sole

retirement plan offered to Meditech employees.  See Tab A (Pappalardo Deposition) at 45-46.[3]

The rights and obligations arising under the Plan are set forth in a document entitled the Meditech

Profit Sharing Plan, Amended and Restated Trust Agreement ("Trust Agreement").  See Tab B

(Trust Agreements).  The Trust Agreement has been restated and amended at least twice since its

creation, but the essence of it has remained the same throughout its existence.  Id.

Meditech is the named administrator of the Plan.  See Tab A at 27.  Barbara Manzolillo,

Meditech's Chief Financial Officer and Treasurer, has administered the Trust on behalf of

Meditech since the early 1980s (id. at 123-24), while Defendant A. Neil Pappalardo ("Mr.

Pappalardo"), Meditech's founder, CEO and Chairman of the Board, has always been the Plan's

sole Trustee since its creation (id. at 12, 23-24).

B.    The Plan

Under the Plan, participants are entitled to receive their fully vested share of the "fair

market value" of all Plan assets.  See Tab B(1)-(2) at §§ 5.03-5.05, 6.01-04.[4]  A substantial

portion of the Plan's assets consist of Meditech stock, see Tab A at 46-47, so the amount of

---

contemporaneously with this Motion.  The Expert Damages Opinion is located at Tab L.

[3] Citations to Tabs refer to the corresponding Tabs attached to the Affidavit of Michael A. Collora, which has been filed contemporaneous with this Memorandum.

[4] The relevant background relating to the eligibility rules and the specific rights and obligations of Plan participants has been previously briefed in the Plaintiffs' First and Second Oppositions to the Defendants' four Motions to Dismiss.  For efficiency's sake, those background facts are expressly incorporated by reference into this

benefits paid to Plan participants is in large part determined by the stock value. By 2005, the stock represented approximately 80% of the Plan assets. See Tab A at 110.

The stock is valued the same way every year. As of December 31st, Mr. Pappalardo, acting as Plan Trustee personally determines the total net worth of the Plan's assets, including the per share value of the Meditech stock held by the Plan. Id. at 24, 39-40; Tab B(1)-(2) at § 5.04; Tab C (Annual Valuations, dated 1996-2005). That stated value corresponds perfectly to the share value determined earlier in October by the Board of Directors. See Tab A at 49, 90, 124-25. That Board value, in turn, is arrived at each year on the basis of criteria and reports presented to the Board by Mr. Pappalardo acting not as the Plan Trustee, but instead as CEO of Meditech and Chairman of the Board. Id. at 153, 158-62. The value assigned to Meditech stock has never been verified by an independent third-party appraiser or even by Meditech's own auditors. Id. at 105-08.

There are two ways in which Plan participants receive distributions of their benefits. First and most obviously, benefits are distributed to those participants who have ended their employment at Meditech. See Tab B(1)-(2) at §§6.01-6.04. The process for these distributions is the same irrespective of why the employment ends (e.g., death. disability, retirement, resignation, or termination for cause). Id.; Tab A at 111-14, 120-21. When ending their employment, Plan participants are informed of the cash value of their vested interest in the Plan. See Tab A at 113-14. Mr. Pappalardo calculates the amount due using the stock value arrived at the preceding December, and Plan participants therefore do not receive the benefit of any changes in value to the stock that may have occurred in the interim. Id. at 39-40, 47-49, 151-52. Thus, the stock

Memorandum.

value was the same for all participants who exited the trust during calendar year 1998.

Throughout the relevant timeframe, the Defendants have universally failed to provide meaningful information to Plan participants about their rights and obligations under the Plan. Plan participants do not receive a copy of the Trust Agreement. <u>See</u> Tab A at 42-44.[5] Plan participants have never been told how Mr. Pappalardo or the Board arrives at the annual value assigned to Meditech stock. <u>See</u> Tab A at 47-49, 75-76, 124-25, 162. And when receiving their benefits, Plan participants are not asked to file any sort of claim or advised that they have a right to contest the amount that is going to be sent to them, but are simply informed of the amount that they will receive and asked to choose how they would like to receive it. <u>Id.</u> at 114-21.

This is likely because the claims procedure under the Plan is non-existent. The Plan requires that "[a]ll claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such regulations as the Trustee shall reasonably establish". <u>See</u> Tab B(1)-(2) at § 11.10(1); <u>see also</u> Tab D(1) at §IV(1) ("The claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim"); Tab D(2) at § VII ("Your claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim."); Tab D(3) at § VIII (same). Mr. Pappalardo admitted, however, that he has never established any regulations or rules for filing a claim. <u>See</u> Tab A at 41, 57, 124. By not telling participants at the time they receive a disbursement that they have a right to contest the amount and how to do so, the Defendants are able to avoid requests for information that they would otherwise be obligated to provide.

The Defendants have similarly failed to inform Plan participants of their attempts to curtail

---

[5] Barbara Manzolillo, the Plan Administrator, testified that she has only two copies of the Trust Agreement: the original, which is kept in a safe, and her own marked-up copy. See Tab E.

the participants' legal rights.  On December 15, 2002, the Defendants purported to amend the

Trust Agreement to cut off Plan participants' rights of appeal in certain circumstances and to set

forth a contractual statute of limitations for benefits claims.  See Tab B(3) (Amendment No. 2) at

§§ 16(c), 16(f).  However, the Defendants did not produce any document in which the Plan

participants received notice of these important changes, and neither Mr. Pappalardo nor Ms.

Manzolillo could testify that notice had otherwise been given.  See Tab A at 62-67

 The timing of the Amendment was convenient, to say the least; earlier that same year, on

February 27, 2002, Meditech founder and former Board member Jerome Grossman had filed a

Form 13-D with the Securities & Exchange Commission, publicly questioning the Board's stock

valuation methods, which he believed resulted in "artificially low" stock values.  See Tab F (Form

13-D filed by Dr. Grossman) at pp. 9, Item 4(i).  This filing marked the first time that anyone with

knowledge of how Meditech stock is valued had alleged potential misconduct in a forum that was

at least theoretically available to Plan participants.  See Tab A at 182, 210-11; see also Tab G

(Message from the Chairman).

C. Class Representatives

 Dave Hinchliffe worked as a computer programmer at Meditech from 1975 until

approximately April 15, 1998.  See Tab H (Hinchliffe deposition) at 40; Tab I(1) (Documents

relating to Hinchliffe disbursements).  When he left Meditech, Mr. Hinchliffe was informed that he

had a vested interest in the Plan of $1,101,907, plus interest, which calculation was based in large

part on the stock value adopted by Mr. Pappalardo on December 1, 1997.  See Tab A at 136-37;

Tab I(1).  Mr. Pappalardo personally discussed Mr. Hinchliffe's benefit payout options with him.

Id.  Mr. Pappalardo did not tell Mr. Hinchliffe how the Plan's assets were valued.  Id. at 137-38.

In addition, Mr. Hinchliffe was not told at the time he received his disbursement either that he had a right to challenge his benefits calculation or how to go about doing so.  Id. at 139.

Sometime after graduating from Revere High School, Bill Trainor joined Meditech in 1975, where he was responsible for maintaining Meditech's computers and buildings until he resigned on March 13, 1998.  See Tab J (Trainor Deposition) at 22, 70-71.  At that time, Mr. Trainor was informed that he was entitled to $911,957 in benefits, plus interest, which was again based in large part upon the value that Mr. Pappalardo had assigned to the stock on December 31, 1997.  Id. at 140-41; Tab I(2) (Documents relating to Trainor disbursements).  Mr. Trainor was not told how that value had been calculated or that he could contest the value of the stock.  See Tab J at 79.

Mr. Hinchliffe and Mr. Trainor joined the litigation in the Amended Complaint, which was filed on May 23, 2005.[6]

**Argument**

A.    The Legal Standard for Class Certification

Rule 23 class actions "enable . . . litigation to go forward with maximum effectiveness from the viewpoint of judicial administration."  Yaffe v. Powers, 454 F.2d 1362, 1367 (1st Cir. 1972), and "[vindicate] the rights of individuals who otherwise might not consider it worth the candle to embark on [costly] litigation."  Gulf Oil Co. v. Bernard, 452 U.S. 89, 99, n.11 (1981) (quoting Deposit Guaranty Nat'l Bank v. Roper, 445 U.S. 326, 338 (1980)).  To serve these objectives, Rule 23 sets out four prerequisites to the maintenance of a class action, often labeled "numerosity," "commonality," "typicality," and "adequacy."  See Fed. R. Civ. P. 23(a).  If these

---

[6] For efficiency's sake, the allegations contained in the Complaint and the Amended Complaint are expressly incorporated by reference into this Memorandum.

four prerequisites are present, a class may be maintained under any one of three alternative bases. See Fed. R. Civ. P. 23(b)(1)-(3).

"A decision on class certification does not involve an examination of the merits of the underlying dispute, but rather serves the limited purpose of determining whether a class action is the most appropriate mode of adjudication." Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21, 24 (D. Mass. 2003). The question of whether a class ought to be certified is left to the sound discretion of the Court, and "doubts should be resolved in favor of certification." Id. at 25.

B.    The Proposed Class Satisfies the Requirements of Rule 23(a).

1.    Numerosity[7]

Rule 23(a)(1) requires that the class "be so numerous that joinder of all members is impracticable." The First Circuit has long recognized that "impracticable" within the meaning of Rule 23(a)(1) means that the joining of all members of the class would be difficult or inconvenient. See Advertising Specialty Nat'l Ass'n v. Federal Trade Comm'n, 238 F.2d 108, 119 (1st Cir. 1956); see also Payne, 216 F.R.D. at 25.

Discovery thus far has shown that the Proposed Class numbers at least 106 people who have received a payout of their total interest in the Plan in 1998. See Tab K (Responses to Interrogatories) at Exhibit A; Tab A at 97-99, 126-28. Given the low threshold for numerosity, the potential class members easily establish the numerosity required for class certification under Rule 23(a). See, e.g., Holton v. Rothschild, 118 F.R.D. 280, 282 (D. Mass. 1987) (holding that a class of 50 or 60 is sufficiently large).

---

[7] The Court noted in its March 20, 2007 Order that the parties did not seriously disagree that the proposed class is numerous and that the commonality requirement is met. See Docket No. 92. While the proposed class is somewhat smaller, it still easily meets the requirement for numerosity. Moreover, commonality is the same if not strengthened by the fact that the proposed class is limited to those receiving distributions in 1998.

2.    <u>Commonality</u>

Rule 23(a)(2) requires that there be common questions of law or fact.  A single common

legal or factual issue can suffice to establish commonality.  <u>See</u> <u>Payne</u>, 216 F.R.D. at 25; <u>see</u> <u>also</u>

<u>Forbush v. JC Penney Co., Inc.</u>, 994 F.2d 1101, 1106 (5th Cir. 1993) (commonality exists where

ERISA plaintiff alleged general practice of overestimating social security benefits even though

four different pension plans were involved).  The Proposed Class more than satisfies this

requirement.

The factual questions involved in answering whether the Proposed Class members

received the fair value of their vested interest in the Plan are identical for all Proposed Class

members.  The same Plan has been in existence since 1973 and, under that Plan, the Proposed

Class members all had the same rights and obligations.  <u>See</u> Tab B(1)-(2); <u>Smilow v.</u>

<u>Southwestern Bell Mobile Systems, Inc.</u>, 323 F.3d 32, 39 (1st Cir. 2003) (commonality shown "in

the terms of the contract, which are identical for all class members.").  Every participant's interest

in the Plan was calculated in the same manner by the same Trustee.  Although those calculations

might require individualized information to determine the individual's share of the Plan, the

valuation decisions, were applied equally to all Plan participants that exited the Plan in 1998.  <u>See</u>

Tab K at 16 (Response No. 3) ("the value of Meditech stock held by the Plan is not 'calculated . .

. per Plan participant per year'").  Further, all Proposed Class members received distributions in

calendar year 1998 and were subject to the same valuation of the stock, namely the value

identified by the Trustee in December of 1997.

Likewise, the legal issues raised by the Amended Complaint are common to all Proposed

Class members.  The Plaintiffs have alleged (1) that the Defendants had fiduciary obligations,

including obligations to act in accordance with the Plan documents and pursuant to the best interest of Plan members, (2) that they violated those obligations by intentionally valuing the stock held by the Plan at an artificially low level to benefit themselves at Plan members' expense, and (3) that, as a result, all of the Proposed Class members received less than the fair value of their vested share in the Plan in violation of ERISA. See 29 U.S.C. §§ 1104(a), 1132(a)(1)(B). The law applies equally to all of the Plan's participants and, thus, the commonality requirement is satisfied on this basis as well.

The affirmative defenses raised by the Defendants are equally common to the Proposed Class. Regarding first the defense of failure to exhaust administrative remedies, discovery has confirmed that the Defendants have universally applied (or rather failed to apply) the same procedures to all Plan participants. The Plan itself is not readily available. The Defendants have never informed any Plan participants (including the Plaintiffs) of the methodology by which Meditech stock is valued. And when making distributions, the Defendants have never notified any Plan participants that they have a right to challenge the amount being paid to them or established any regulations that would permit them to do so. See Tab A at 41-42, 57, 114-21.[8] Even Mr. Pappalardo, testifying as the 30(b)(6) witness for Meditech and the Plan, admitted that he "really do[es] not know for a fact" to whom a participant should direct questions about the calculation of their benefit amount. Id. at 124.

The Defendants' asserted statute of limitations defense is also common to the Proposed Class as a whole. The members of the Proposed Class all received the same types of

---

[8] Not only does this demonstrate the requisite common experience of the Proposed Class, it precludes the Defendants from raising an exhaustion defense in this litigation against any of the class members. See 29 CFR § 2560.503-1(*l*) ("In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available

communications from the Defendants regarding their rights and obligations under the Plan, none

of which included information on how the Plan's assets had been valued.  <u>See</u> Tab A at 47-49, 75-

76, 124-25, 162.  Moreover, no Plan participant could reasonably have known of a possible

misconduct in connection with the Meditech stock valuations before February 2002, when Dr.

Grossman filed his Form 3-D.[9]  <u>See</u> Tab A at 107-08 (recalling that during relevant timeframe

auditors "would comment that there is no way they can know for a fact what the actual value is or

isn't"); Tab F.  These common issues of fact and law satisfy Rule 23(a)(2).

    3.    <u>Typicality</u>[10]

Rule 23(a)(3) requires that the Plaintiffs' claims be typical of the claims of the members of

the class – that is, "that a class representative have the incentive to prove all the elements of the

cause of action which would be presented by the individual members of the class were they

initiating individualized actions."  <u>Swack v. Credit Suisse First Boston</u>, 230 F.R.D. 250, 263 (D.

Mass. 2005) (<i>quoting</i> <u>In re Oxford Health Plans Inc. Securities Litig.</u>, 199 F.R.D. 119, 123

(S.D.N.Y. 2001)).  Defenses unique to the named plaintiffs will defeat a showing of typicality only

when those defenses threaten to become the focus of the litigation.  <u>See</u> <u>id</u>. at 264.

In pressing their own rights, the Plaintiffs will necessarily present the claims of the other

---

under the plan . . . .").

[9] Defendants are wrong when they claim that knowing Meditech stock was priced much lower than its competitors' stock is the legal equivalent of knowing that the Plan fiduciaries were intentionally setting the stock price at an artificially low number.  <u>See</u> <u>In re Dynergy, Inc. ERISA Litig.</u>, 309 F.Supp.2d 861, 880-81 n.31 (S.D. Tex. 2004) (accepting allegation that defendants "should have known" about ERISA breach only because their high positions in the company gave them access to closely-held information about sham transactions, phony trades, price manipulation, and overstatement of revenues).  None of the class members had access to the closely-held information regarding Defendants' stock valuation methods, at least until Dr. Grossman broke the silence.  Mr. Pappalardo himself testified that given the private nature of the company, even the accountants auditing the Plan's assets "would comment that there is no way they can know for a fact what the actual value is or isn't."  <u>See</u> Tab A (Pappalardo Depo.) at 106-07.  If professional accountants and auditors could not tell that something was seriously amiss, there is no basis on which to find that the class members should have known.
[10] This Court noted in its March 20, 2007 Order that "typicality, although not conceded, may exist." Typicality is also strengthened by the fact that all of the potential class plaintiffs received their distributions in 1998 and have an

class members.  They have been injured in the same way (e.g., received less than the amount they were due under the Plan), and have claims based on the same legal theories (e.g., the Defendants intentionally undervalued the stock held by the Plan in order to benefit the Plan Trustee and other company insiders), as the other members of the Proposed Class, and departed the Trust in the same year so are subject to the same undervaluation of the stock.

The Defendants may try to argue that they have a statute of limitations defense unique to Mr. Hinchliffe and Mr. Trainor.  But as shown in Part B(2), *supra*., this defense applies not to Mr. Hinchliffe and Mr. Trainor individually but rather to the **entire** class and thus does not alter the typicality analysis.  Moreover, given this Court's previous ruling that the proper statute of limitations is six years from the time Plan participants knew or should have known of a potential ERISA violation, the class members would have at a minimum had six years from the date of Dr. Grossman's SEC filing – that is, until at least February 2008 – to file this lawsuit regardless of when they received their disbursements.[11]  The initial complaint was filed in February 2005, well within the statutory period for all participants.

4.    Adequacy

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the

---

incentive to prove all of the elements of the causes of action that would be brought by individual plaintiffs.
[11] The Plaintiffs do not mean to suggest that the Court can or should determine at the class certification stage precisely when the Plaintiffs' claims accrued.  For purposes of class certification, however, Dr. Grossman's February 2002 Form 13-D filing at least establishes a floor for the running of the limitations period because it marked the first time that anyone with a basis of knowledge publicly accused any of the Defendants with any wrongdoing in the setting of Meditech stock value.  See Edes v. Verizon Communications, Inc., 417 F.3d 133, 142 (1st Cir. 2005) ("there cannot be actual knowledge of a violation for purposes of the limitation period unless a plaintiff knows the essential facts of the transaction or conduct constituting the violation") (citations omitted); Kling v. Fidelity Management Trust Co., 323 F.Supp.2d 132, 136-37 (D. Mass. 2004) (when determining beginning of limitations period for breach of fiduciary claim under ERISA, "it is not enough that [plaintiffs] had notice that something was awry; [plaintiffs] must have had *specific knowledge of the actual breach of duty* upon which [they sue]") (citation omitted) (emphasis and brackets in original).

interests of the class." This element requires a finding that the interests of the named plaintiffs

"will not conflict with those of the class members and that . . . counsel is qualified, experienced

and able to vigorously conduct the proposed litigation." Payne, 216 F.R.D. at 26. "The conflict

that will prevent a plaintiff meeting the adequacy of representation must be fundamental, and

speculative conflict should be disregarded at the class certification stage." In re Transkaryotic

Therapies, Inc. Sec. Litig., 2005 WL 3178162 at *4 (D. Mass. Nov. 28, 2005) (citations and

internal punctuation omitted). Moreover, "[i]n complex actions such as this one, named plaintiffs

are not required to have expert knowledge of all details of the case . . . and a great deal of reliance

on the expertise of counsel is to be expected." In re Lupron Marketing and Sales Practices Litig.,

228 F.R.D. 75, 90 (D. Mass. 2005) (citing County of Suffolk v. Long Island Lighting Co., 710

F.Supp. 1407, 1416 (E.D. N.Y. 1989)).

       In its March 20, 2007 Order, this Court stated that the "decisive and contested issue is the

adequacy of the plaintiffs as the proposed class plaintiffs." The Court seemed particularly

troubled that a plaintiff who exited the trust in 1998 could adequately represent the interests of an

individual who exited the plan in 2002. By limiting the proposed class to participants of the Plan

who received a distribution in 1998, plaintiffs assert that their interests are exactly the same as the

interests of the proposed class. Moreover, the proposed plaintiffs waited until a complete analysis

was conducted by an expert of the valuation prior to progressing forward with the class

certification. As a result, the plaintiffs will more than adequately represent each and every

member of the proposed class.

       The Plaintiffs have no interests antagonistic to those of the other class members. Rather

they have an identical interest in proving that the Defendants intentionally undervalued the stock

held by the Plan and maximizing the amount due to them from the Defendants. Whether or not members of the Proposed Class suffered greater damage will not impact the predominance of that collective goal or otherwise create a conflict between the class members. See In re Lupron., 228 F.R.D. at 90 ("Individual differences in damages suffered do not create a class conflict when recovery varies in direct proportion to the amount of individual damages incurred."). Similar to a typical securities or product-based class action, the named plaintiffs are motivated to maximize their individual recovery by seeking the highest per-share or per product settlement. See March 20, 2007 Order at 7. Through the work of their experts, plaintiffs will show that the value of the shares was sixty percent lower than it should have been. Using generally accepted approaches to business valuation, the expert's opinion is not only that the stock was vastly undervalued but also that the trustee did not use an accepted method of valuation. Thus, while the amount of recovery may vary among the class members because of differing percentages of ownership in the Trust, each absent class member's recovery is directly proportional to the recover of the named plaintiffs. See March 20, 2007 Order at 7. Thus, "there is unlikely to be any fundamental conflict that would preclude class certification."

The timing of this motion will not postpone resolution. Defendants have been aware from the intitiation of this lawsuit that Plaintiffs intended to proceed as a class action. Defendants will likely argue that resolution will be postponed as the court would be required to reopen discovery to explore each individual's beliefs about the valuation of the stock. Discovery conducted in this case illustrates that this would be an exercise in futility as the Defendants have freely admitted that they never discussed the mode of valuation with employees nor provided any means for challenging the valuation. Defendants will also likely argue that their expert report may need to

15

be changed in light of the class certification. The Defendants' expert, however, will responding to the Plaintiff's expert the same regardless of whether or not the class is certified. Thus, the Defendants will not be unduly prejudiced and the case may proceed as previously scheduled. Moreover, the delay in moving for class certification until after the plaintiff's expert issued his report as to the undervaluation was necessary and pertinent to the class certification motion, in that it confirmed that the plaintiffs would be able to adequately represent a class that conformed with this Court's previous Order. The previous Order raised questions about the valuation method of the stock at issue. Thus, plaintiffs needed to receive the expert opinion as to valuation prior to moving for certification of a different class.

Finally, Plaintiffs' counsel is well qualified to conduct the proposed litigation. <u>See</u> Collora Aff ¶¶ 1-9.[12]

C.    <u>The Proposed Class Satisfies the Requirements of Rule 23(b)(3).</u>

Rule 23(b)(3) provides that a class action may be certified if the Court finds that Rule 23(a) has been satisfied and:

> [T]he questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3). Here as well, the Proposed Class meets Rule 23's requirements.

1.    <u>Predominance</u>

The predominance requirement cannot "be reduced to a mechanical single-issue test."

<u>Waste Management Holdings</u>, 208 F.3d at 296. It focuses "on the legal or factual questions that qualify each class member's case as a genuine controversy . . . ." <u>Amchem Products</u>, 521 U.S. at

---

[12] In its March 20, 2007 Order this Court noted that no objection was raised about the competency of Plaintiff's counsel nor their qualifications and experience.

623. In this respect, although far more demanding, it is similar to Rule 23(a)(3)'s requirement that the named plaintiffs' claims or defenses be typical of the class claims or defenses. Id. at 623 n.18.

For the same reasons that the Proposed Class meets the "commonality" and "typicality" standards of Rule 23(a), see Parts B(2) and (3), *supra*., it also meets this standard. The exact same proof will be mustered in support of the exact same statutory arguments, and judgment in the case will affect all class members equally. Indeed, given the nature of the Plaintiffs' claims, it is likely that the lion's share of litigation resources on both sides will be invested in competing expert testimony on the issue of the "fair value" of Meditech stock in 1997, or for the calendar year 1998. Thus, it is clear that the core of the Plaintiffs' claims will turn on proof that will be equally necessary to the claims of each of the class members. Accord Payne, 216 F.R.D. at 28 (where plaintiffs and defendants must each present expert testimony to prove a fact at issue in the case, "[t]here is no reason for this issue to be rehashed twenty-five times, or even seven times") (citation omitted).

There will, of course, be variations of proof regarding the amount of individual class members' damages. However, it is well established that individual questions of damages do not bar class treatment. See In re Lupron, 228 F.R.D. at 92. Furthermore, once the Plaintiffs succeed in proving the valuation methodology that should have been used in place of the "artificially low" methodology employed by the Defendants, the individual damages calculations will be relatively simple to resolve. See Smilow, 323 F.3d at 40 ("Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria – thus rendering unnecessary an evidentiary hearing on each claim.").

Finally, as discussed above, the Defendants' affirmative defenses are applicable on a class-wide basis and, to the extent that at a later point any of the Defendants' affirmative defenses appear viable against any portion of the Proposed Class, the Court has ample procedural mechanisms to adjust the class accordingly.  See Smilow, 323 F.3d at 39-40.

    2.    Superiority

In addition to finding the predominance of common questions, Rule 23(b)(3) requires that the Court determine that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  This involves four factors, all of which argue for certification here: (A) members of the class have little interest in individually controlling separate actions, given the economies possible if the actions are combined into one; (B) no other ERISA litigation has been commenced by or against class members; (C) concentrating the litigation in this forum produces more economies than separate actions given the overlap in discovery needs; and (D) proceeding as a class action will present no special management difficulties because the class, while numerous, has readily identifiable members and is not so large or geographically diverse as to make a class action unwieldy.  See Rule 23(b)(3)(A)-(D).

Requiring numerous separate lawsuits covering the same or substantially similar issues would be an inefficient allocation of judicial resources.  To paraphrase one court's succinct analysis of the superiority of class treatment: "I see no necessity for encumbering the judicial process with 1,000 lawsuits, if one will do."  Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452, 463 (D. C. Penn. 1968).  The class action is the superior procedural vehicle for this claim.

18

## CONCLUSION

For all of the reasons stated above, the Plaintiffs respectfully request that this Court grant the Plaintiffs' Motion for Class Certification.

Respectfully submitted,

**William Trainor, and
David Hinchliffe,**
Individually and as representatives of a class of all others similarly situated,
By their attorneys,


  /s/ Jennifer M. Ryan
Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Jennifer M. Ryan (BBO #661498)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA  02210
671-371-1000
671-371-1037

Dated: March 25, 2008

## CERTIFICATE OF SERVICE

I, Jennifer M. Ryan, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on this 25 day of March, 2008.

/s/ Jennifer M. Ryan
Jennifer M. Ryan