UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually And On Behalf Of All Persons Similarly Situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO,<br><br>      Defendants. | Civil Action No. 05-10269RWZ |

**AFFIDAVIT OF KEVIN P. MARTIN IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION**

I, Kevin P. Martin, depose and state as follows:

1.     I am an attorney admitted to practice in the Commonwealth of Massachusetts.  I

am a Partner at Goodwin Procter LLP, counsel for Defendants Medical Information Technology,

Inc. Profit Sharing Plan (the "Plan"), Medical Information Technology, Inc. ("Meditech" or the

"Company") and A. Neil Pappalardo ("Pappalardo," and together with the Plan and Meditech,

the "Defendants") in this matter.

2.     I make this Affidavit in support of Defendants' Opposition to Plaintiffs' Amended

Motion for Class Certification.

3.     I have personal knowledge of the matters described in this Affidavit.

4.     Attached as Exhibit 1 is a true and accurate copy of excerpts from the deposition

transcript of David Hinchliffe in the above-captioned action, conducted on July 27, 2006.

5.      Attached as Exhibit 2 is a true and accurate copy of excerpts from the deposition transcript of William Trainor in the above-captioned action, conducted on July 24, 2006.

6.      Attached as Exhibit 3 is a true and accurate copy of excerpts from the deposition transcript of Michael Hubert in the above-captioned action, conducted on July 26, 2006.

7.      Attached as Exhibit 4 is a true and accurate copy of Defendants' Opposition to Plaintiffs' Motion for Class Certification, filed September 15, 2006 (Docket No. 65).

8.      Attached as Exhibit 5 is a true and accurate copy of the Court's Memorandum and Order Denying Plaintiffs' Motion for Class Certification, dated March 20, 2007 (Docket No. 92).

9.      Attached as Exhibit 6 is a true and accurate copy of the Court's Order Granting in part and Denying in part Defendants' Motion to Dismiss, dated March 20, 2006 (Docket No. 38).

10.      Attached as Exhibit 7 is a true and accurate copy of a set of Defendants' Class Certification Visual Aids, used at a hearing on Plaintiffs' first Motion for Class Certification on October 17, 2006.

11.      Attached as Exhibit 8 is a true and accurate copy of an email dated April 4, 2008 from Michael Collora, attorney for Plaintiffs, to Kevin Martin, attorney for Defendants, announcing Plaintiffs' intention to amend their claim by removing Michael Hubert as a Plaintiff.

12.      Attached as Exhibit 9 is a true and accurate copy of an email from erisa@mediaone.net, signed by "Bob," to a list of recipients, dated February 18, 2002, as introduced as Exhibit 3 at the Hubert Deposition and authenticated by Mr. Hubert at pages 29-30 of his deposition transcript.

13.      Attached as Exhibit 10 is a true and accurate copy of the Court's Scheduling Order regarding class certification, dated May 15, 2006 (Docket No. 42).

14.     Attached as Exhibit 11 is a true and accurate copy of the Affidavit of Barbara Manzolillo in Support of Plaintiffs' Motion for Class Certification, filed on September 15, 2006.

15.     Attached as Exhibit 12 is a true and accurate copy of the Affidavit of A. Neil Pappalardo in Support of Plaintiffs' Motion for Class Certification, filed on September 15, 2006.

16.     Attached as Exhibit 13 is a true and accurate copy of the Medical Information Technology, Inc. Profit Sharing Plan Amended and Restated Trust Agreement, dated January 1, 1998.

17.     Attached as Exhibit 14 is a true and accurate copy of the Summary Plan Description of the Medical Information Technology, Inc. Profit Sharing Plan, dated January 1, 1998.

18.     Attached as Exhibit 15 is a true and accurate copy of *In re New Motor Vehicles Canadian Antitrust Litigation*, __ F.3d __, 2008 WL 820922 (1st Cir. Mar. 28, 2008).


I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 8, 2008.


/s/  Kevin P. Martin
Kevin P. Martin

# EXHIBIT 1

# ORIGINAL

1

Volume 1, Pages 1-62, Exhibits : 1-12

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL P. HUBERT , WILLIAM

TRAINOR , and DAVID HINCHLIFFE ,

individually and on behalf of all

persons similarly situated , et

al.,

Plaintiffs

vs.                              Docket No. 05-10269-RWZ

MEDICAL INFORMATION TECHNOLOGY

PROFIT SHARING PLAN , MEDICAL

INFORMATION TECHNOLOGY , INC., and

A. NEIL PAPPALARDO ,

Defendants

VIDEOTAPED DEPOSITION OF DAVID W. HINCHLIFFE

Thursday , July 27, 2006 , 10:06 a.m.

Goodwin Procter LLP

53 State Street - 17th Floor

Boston , Massachusetts

-------Reporter : Alan H. Brock , RDR , CRR-------

Farmer Arsenault Brock LLC, 50 Congress Street ,

Suite 415 , Boston , Massachusetts 02109

617.728.4404   fax 617.728.4403

2

1   APPEARANCES :

2       Dwyer  &  Collora , LLP

3       Sara  E.  Noonan , Esq .

4       600  Atlantic   Avenue

5       Boston , Massachusetts   02210 -2211

6       617 . 371 . 1000   fax :  617 . 371 . 1037

7       senoonan @dwyercollora  .com

8       for  Plaintiffs

9

10      Goodwin   Procter  LLP

11      Stephen   D.  Poss , Esq .

12      Michael  P.  Sugrue , Esq .

13      53  State   Street , Exchange   Place

14      Boston , Massachusetts   02109

15      617 . 750 . 1000   fax :  617 . 523 . 1231

16      sposs @goodwinprocter  .com

17      msugrue @goodwinprocter  .com

18      for  Defendants

19

20  ALSO  PRESENT :

21      Adam  Cook , Videographer  , National  Video

22          Reporters

23

24

FARMER  ARSENAULT  BROCK  LLC

14

1    A.  He just discussed what he was doing and the

2  reasons why, and he discussed some of the research

3  that he had done. And we just talked about it.

4    Q.  Did you have one conversation with

10:20:24  5  Mr. Hubert on the possibility of joining the

6  litigation or more than one?

7    A.  I had one very long conversation. I've had

8  subsequent conversations with Mr. Hubert, but it was

9  after I already decided to join.

10:20:38  10    Q.  Going back to that one long conversation

11  you had with Mr. Hubert before you decided to join

12  the litigation: Do you recall anything you said to

13  Mr. Hubert in that conversation?

14    A.  Well, we just had a general discussion. I

10:20:54  15  don't know specifically what you're looking for.

16    Q.  I'm looking for your recollection of

17  everything you said to him in that conversation.

18    A.  Well, I probably said lots of things. I

19  was very interested to hear what he had to say about

10:21:10  20  the stock valuation, and we talked back and forth

21  about that.

22    Q.  Can you recall anything you said to

23  Mr. Hubert in that conversation?

24    A.  I -- I can't give you specifics. I mean,

FARMER ARSENAULT BROCK LLC

15

1    it was a long time ago, and we talked for a long

2    time. But, you know, I can assure you that we

3    talked about our feelings about the stock and

4    whether we thought it was low or high or whatever.

10:21:51  5        Q.  What feelings did you have about the stock

6    that you expressed to Mr. Hubert?

7        A.  I always felt that it was valued low. We

8    all did. Everybody in the company did. It's just,

9    you know, you couldn't do anything about it.

10:22:06  10        Q.  Now, when you say you always felt that the

11    stock was valued low, when did you first come to

12    have that belief?

13        A.  Well, first of all, I mean, none of us ever

14    knew how they decided to value the stock.

10:22:21  15        Q.  Well, that's not the question I asked you.

16    So when did you first come to the belief that the

17    stock was valued low? In other words, I'm trying to

18    put a time frame around your use of the word

19    "always."

10:22:36  20        A.  Well, I mean, it's always a general

21    feeling. There is never anything like, you know, I

22    feel this is so low I want to try to do anything

23    about it. It's just, you know, general office talk.

24    It goes back a while.

FARMER ARSENAULT BROCK LLC

16

1    Q.    Do you recall when you first came to
2    believe that MEDITECH stock was, in your words,
3    valued low?

4    A.    In what kind of way? I never got to the
10:23:12    5    point where I would think that I would want to try
6    to do something about it or thought I ever could do
7    something about it.

8    Q.    That's not the question I asked you,
9    Mr. Hinchliffe.

10:23:20    10    A.    As far as a very general answer, I don't
11    know. Sometime in the late '80s, early '90s; I
12    don't know, something like that.

13    Q.    So at some point in the late '80s, early
14    '90s, you came to believe that MEDITECH stock was
10:23:38    15    valued low; is that fair to say?

16    A.    I think that's stretching it a little bit.
17    Let's say it's fair to say that I began to wonder
18    about it, would be more accurate.

19    Q.    Mr. Hinchliffe, earlier in this deposition
10:23:49    20    you said that you had always believed that the stock
21    was valued low. During what period of time did you
22    work at MEDITECH?

23    A.    1975 through 1998.

24    Q.    So at some point between 1975 and 1998 you

FARMER ARSENAULT BROCK LLC

17

1  came to believe that the stock was valued low; is

2  that correct?

3      A.   I came to question the value of the stock.

4      Q.   Well, when did you come to believe it was

10:24:21  5  valued low?

6      A.   Truly believe, so that I knew for sure?

7      Q.   No, just believe.

8      A.   Probably when I talked to Michael Hubert a

9  year and a half ago.

10:24:29  10     Q.   Well, you told me that when you were

11  speaking to Michael Hubert a year and a half ago you

12  had always believed that the stock was valued low.

13          MS. NOONAN:  Objection.  Steve, I think

14  there's a confusion between --

10:24:40  15          MR. POSS:  No, there isn't any

16  confusion -- don't coach the witness.  If you want

17  to object, say "objection."  But I'm trying to ask

18  him questions, and he's not answering them.

19          MS. NOONAN:  Steve, he's answering them

10:24:50  20  to the best of his ability.  You're quibbling.

21          MR. POSS:  Fine.  Then say "objection."

22  And I'm not quibbling, and that's not a proper

23  objection.

24     Q.   Mr. Hinchliffe, when did you come to

FARMER ARSENAULT BROCK LLC

18

1   believe that the stock was valued low?

2          MS. NOONAN :   Objection .

3      A.   You know , there 's a huge difference  between

4   believing  the stock is low such that I could do

10:25:17   5   something  about  it and just having  a general  feeling

6   that , you know , maybe this stock should  be valued

7   higher .

8      Q.   When did you have that general  feeling ?

9      A.   And I answered  your question , and I said

10:25:30  10   the late '80s to early '90s.

11      Q.   So in the late '80s to early '90s, you had

12   a convenient  feeling  that the stock was low and

13   should  be valued  higher ; is that correct ?

14      A.   Perhaps  should  be valued  higher ; yes ,

10:25:41  15   that 's correct .

16      Q.   And you said that -- also said that

17   everyone  believed  it was low.  What was the basis

18   for that statement ?

19      A.   It 's just based on conversations  with

10:25:52  20   people  here and there .  Obviously , it can 't be

21   everybody  in the company  because  I haven 't spoken  to

22   everybody  in the company .

23      Q.   But in general , people  you spoke with in

24   the company  while you were employed  at MEDITECH

FARMER  ARSENAULT  BROCK  LLC

19

1  believed  that  the  stock  was  low; is  that  your

2  testimony ?

3       A.    They  questioned   the  value  of  the  stock .

4       Q.    When  you  say  they  questioned   the  value , do

10:26:17  5  you  mean  they  questioned   that  it  was  too  high  or

6  they  questioned   that  it  perhaps  might  be  valued  too

7  low?

8       A.    They  questioned  how  it  was  valued  and

9  whether   it  was  valued  properly .

10:26:29  10       Q.    And  was  it  your  sense  that , at  least  among

11  your  circle  of  acquaintances   when  you  were  employed

12  at  MEDITECH , that  the  people  you  knew  questioned

13  whether  the  stock  was  valued  too  low?

14              MS.  NOONAN :   Objection .

10:26:48  15       A.    There  were  certainly  questions  about  how  it

16  was  valued , and  obviously , if  we  have  questions

17  about  its  value , we  think  it's  valued  too  low .

18       Q.    When  you  spoke  with  Mr. Hubert  about  the

19  possibility  of  joining  this  lawsuit  a  year  and  a

10:27:08  20  half  ago , did  you  tell  Mr. Hubert  you  believed  that

21  MEDITECH  stock  was  under valued ?

22       A.    I'm  sure  I  agreed  with  him  at  that  time .

23       Q.    And  when  you  say  you  agreed  with  him , does

24  that  mean  you  agreed  with  him  that  the  MEDITECH

FARMER  ARSENAULT  BROCK  LLC

20

1    stock was under valued?

2        A.    He gave me some information on research

3    that he had done, and after our conversation I was

4    convinced that, yeah, it was low.

10:27:41    5        Q.    What information --

6        A.    But that's the first time that I had some

7    fairly conclusive information that would help me

8    make that decision.

9        Q.    What was the fairly conclusive information

10:27:53    10    that Mr. Hubert gave you in that phone call that

11    helped you make that decision that the stock was

12    under valued?

13        A.    He just told me some research that he did.

14    I don't remember the specific terms, the specific

10:28:09    15    company that he cited, or anything like that. But

16    it was something that was quite interesting.

17        Q.    Again, I want to focus on this fairly

18    conclusive information that you've testified

19    Mr. Hubert gave you in that phone call. Did that

10:28:27    20    information include a comparison of P/E or price/

21    earnings ratios of MEDITECH to some other company or

22    companies?

23        A.    Yes. It compared earnings of other

24    companies and their assets and what their stock was

FARMER ARSENAULT BROCK LLC

34

A.   I believe there was a range there,
depending on -- this was some reference to Cerner.
I don't recall the exact number.

Q.   Do you agree that the value of MEDITECH's

10:48:01   stock in 2001 should have been substantially lower
than its value in 1998?

MS. NOONAN:  Objection.

A.   I wasn't with the company in 2001, so I
don't even know how the company did in 2001.

10:48:15   Q.   Since you became a plaintiff in this case,
have you looked at any information about how the
company has done since you left?

A.   Just what was provided for me.  Yes, I have
looked at that.

10:48:30   Q.   Do you know whether MEDITECH earned more or
less in 2001 compared to 1998?

A.   I don't recall that.  I just know when I
was there each subsequent year they earned more than
the previous year.  My understanding is they've

10:48:44   continued to maintain profitability.

Q.   Does the amended complaint allege that the
value of MEDITECH's stock should have been lower in
2001 than it should have been in 1998?

MS. NOONAN:  Objection.

FARMER ARSENAULT BROCK LLC

35

1     A.   I don't recall that.

2     Q.   Do you think it would be fair for someone

3  who left MEDITECH in 2001 or 2002 and took a

4  distribution at that time to receive a smaller

10:49:12  5  distribution from the trust based on a per-share

6  value lower than someone who left in 1998, the year

7  you left?

8          MS. NOONAN:  Objection.

9     A.   I mean, I'm not concerned, really, with

10:49:25  10  people that left in 2000.  I'm concerned with me.

11     Q.   While you were employed at MEDITECH, you

12  received a copy of a summary plan description of the

13  MEDITECH profit sharing plan; is that true?

14     A.   That is correct.

10:49:53  15     Q.   Did you read that summary plan description?

16     A.   Yes, sir.

17     Q.   How many different summary plan

18  descriptions did you receive when you were employed?

19     A.   I couldn't tell you.  I don't know.

10:50:14  20     Q.   More than one, I take it?

21     A.   I can't -- I don't know.  It could have

22  been; I don't know.

23          MR. POSS:  I ask the reporter to mark as

24  the next exhibit, which I believe is No. 4, a copy

FARMER ARSENAULT BROCK LLC

36

1  of the amended class-action complaint in this

2  lawsuit.

3              (Exhibit Hinchliffe 4 marked for

4  identification.)

10:50:51  5      Q.    Have you seen this before, Mr. Hinchliffe?

6      A.    Yes.

7      Q.    And this is the amended class-action

8  complaint that is filed on behalf of you and others;

9  is that correct?

10:51:05  10      A.    That is correct.

11      Q.    Now, what I'd like to do, actually, is turn

12  to one of the exhibits that was provided with it.

13  So if you go -- if you flip through the complaint,

14  all the way to Page 23, and then after Page 23

10:51:26  15  you'll see something that says Exhibit A, or Tab A.

16      A.    Yes.

17      Q.    And then there's a document that says

18  Summary Plan Description.

19      A.    Yes.

10:51:37  20      Q.    Were you provided with this summary plan

21  description while you were employed at MEDITECH?

22      A.    Yes.

23      Q.    And you've testified -- strike that.

24              When you left the company and

51

1    A.   Yes.

2    Q.   Did you receive all of the documents in

3  Exhibit No. 12 while you were employed at MEDITECH?

4    A.   Yes.

11:19:51  5    Q.   If we look at the third page of this

6  exhibit -- and there's a little number at the bottom

7  right-hand corner that says HIN 003. Do you see

8  that?

9    A.   Yes, I do.

11:20:10  10    Q.   If you look at the -- strike that. You've

11  testified this is a document you received while you

12  were employed at MEDITECH. Do you see the third

13  paragraph of this document, where it talks about a

14  meeting to be held in the auditorium to discuss the

11:20:24  15  implications of purchasing stock in MEDITECH?

16    A.   Yes.

17    Q.   Did you attend that meeting?

18    A.   No.

19    Q.   Did you receive invitations or notices of a

11:20:38  20  meeting of this sort each year while you were

21  employed?

22    A.   No. This was a more recent service that

23  they had. When we were first offered stock, they

24  didn't have this type of meeting.

FARMER ARSENAULT BROCK LLC

52

1      Q.   But at least as early as February of 1994,

2   you received notice of such a meeting.

3      A.   Yes.

4      Q.   And were you aware that similar meetings

11:21:06   5   were held --

6           MS. NOONAN:   Objection.  Steve, this

7   document seems to be internally inconsistent.  It's

8   labeled 1995, and it's --

9           MR. POSS:   It's not internally

11:21:14  10   inconsistent.  If you knew anything about the facts,

11   you'd realize -- and if you'd read the document,

12   you'd realize it's perfectly consistent.

13           MS. NOONAN:   I'm looking down at the

14   second-to-last paragraph, which also refers to 1995.

11:21:32  15           MR. POSS:   If you're unfamiliar with the

16   documents, I can't help you.  But do you have an

17   objection?

18           MS. NOONAN:   Yeah.  My objection is that

19   it's not clear that this document is what you've

11:21:42  20   just purported it to be in your question.

21           MR. POSS:   Well, you've made your

22   objection.

23      Q.   Mr. Hinchliffe, why did you not attend the

24   meeting that you were invited to?

FARMER ARSENAULT BROCK LLC

53

1          A.    Because I already knew that it was mainly

2    for -- the meeting was mainly for new purchasers of

3    the stock.  People that have already purchased stock

4    already knew everything, knew what they were getting

11:22:17   5    into, knew what it was all about, and had no need to

6    attend the meeting.

7          Q.    But you knew you could attend if you

8    wanted; is that correct?

9          A.    Yes, sure.

11:22:23  10          Q.    And there was another, similar, meeting

11   held in '95 --

12          A.    Once they --

13          Q.    You need to wait until I'm done talking

14   Mr. Hinchliffe, before you start answering.  Let me

11:22:34  15   start my question over again.

16                Were there similar meetings held in '95

17   and '96 and 1997?

18                MS. NOONAN:   Objection.

19          A.    Yes, I assume there were.

11:22:44  20          Q.    And did you attend any of those?

21          A.    No.

22          Q.    You understood, however, that you were

23   entitled to attend those meetings as a shareholder

24   of the company if you wanted to; is that correct?

54

    1      A.   I believe so, but it was primarily geared

    2   to new stock purchasers, and it was very clear.  But

    3   they certainly wouldn't throw me out of the meeting

    4   if I attended.

11:23:10    5      Q.   Did you ever attend any of these meetings?

    6      A.   No.

    7      Q.   Now, if you look at the fifth paragraph of

    8   this document, you'll see where it says, quote, "It

    9   is noted that MEDITECH is a closely held private

11:23:32   10   company and there is no public market for its

   11   shares.  Thus, there can be no absolute assurance of

   12   a future resale," period, close quote.  Do you see

   13   that sentence?

   14      A.   Yes, I do.

11:23:43   15      Q.   Were you aware of that when you purchased

   16   stock from MEDITECH?

   17      A.   Yes.

   18      Q.   And were you aware of that throughout your

   19   period of employment at MEDITECH?

11:23:53   20      A.   Yes, I was.

   21      Q.   Do you know why the company provided that

   22   information to employees who were about to purchase

   23   or had purchased stock in the company?

   24      A.   I would presume so that they can make an

# EXHIBIT 2

ORIGINAL

1

Volume 1, Pages 1-112, Exhibits: 1-8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL P. HUBERT, WILLIAM

TRAINOR, and DAVID HINCHLIFFE,

individually and on behalf of all

persons similarly situated et al.,

            Plaintiffs

vs.                Docket No. 05-10269-RWZ

MEDICAL INFORMATION TECHNOLOGY

PROFIT SHARING PLAN, MEDICAL

INFORMATION TECHNOLOGY, INC., and

A. NEIL PAPPALARDO

          Defendants

VIDEOTAPED DEPOSITION OF WILLIAM TRAINOR

Monday, July 24, 2006, 10:08 a.m.

Goodwin Procter LLP

53 State Street - 17th Floor

Boston, Massachusetts

- - - - - - - Reporter:  Alan H. Brock -- RDR, CRR - - - - - - -

Farmer Arsenault Brock LLC, 50 Congress Street,

Suite 415, Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

2

1    APPEARANCES:

2        Dwyer & Collora, LLP

3        Sara E. Noonan, Esq.

4        600 Atlantic Avenue

5        Boston, Massachusetts 02210-2211

6        617.371.1000   fax: 617.371.1037

7        senoonan@dwyercollora.com

8        for Plaintiffs

9

10       Goodwin Procter LLP

11       Stephen D. Poss, Esq.

12       Kevin P. Martin, Esq.

13       Exchange Place

14       53 State Street

15       Boston, Massachusetts 02109

16       617.750.1000   fax: 617.523.1231

17       sposs@goodwinprocter.com

18       kmartin@goodwinprocter.com

19       for Defendants

20

21   ALSO PRESENT:

22       Adam Cook, Videograph, National Video Reporters

23

24

FARMER ARSENAULT BROCK LLC

29

| | | |
|---|---|---|
| 10:42:07 | 1 | A.   I get it wrong every time.  I get the Dwyer |
| 10:42:10 | 2 | right, because I have a relative Dwyer. |
| 10:42:12 | 3 | Q.   If we look at the first page of Exhibit 1, |
| 10:42:15 | 4 | Mr. Trainor, you see kind of a box up there in the |
| 10:42:18 | 5 | left upper side of the page? |
| 10:42:20 | 6 | A.   Yes. |
| 10:42:20 | 7 | Q.   Are you the William Trainor whose name |
| 10:42:22 | 8 | appears in that box? |
| 10:42:24 | 9 | A.   Yes. |
| 10:42:26 | 10 | Q.   If you turn to Page 2 of Exhibit 1, there |
| 10:42:35 | 11 | is a paragraph that talks about Plaintiff William |
| 10:42:39 | 12 | Trainor.  Is that you? |
| 10:42:40 | 13 | A.   Yes. |
| 10:42:40 | 14 | Q.   Are those facts accurate? |
| 10:42:43 | 15 | A.   Yes. |
| 10:42:50 | 16 | Q.   If you turn to Page 8 of Exhibit No. 1, |
| 10:42:54 | 17 | Mr. Trainor, you'll see a Paragraph No. 38 that |
| 10:43:01 | 18 | refers to Plaintiff William Trainor.  Is that you? |
| 10:43:04 | 19 | A.   Yes. |
| 10:43:04 | 20 | Q.   Are the facts in that paragraph accurate? |
| 10:43:10 | 21 | A.   Yes. |
| 10:43:24 | 22 | Q.   Going back to the first page of Exhibit 1, |
| 10:43:33 | 23 | do you see up in the top in the caption it says, |
| 10:43:35 | 24 | "Michael P. Hubert, William Trainor, and David |

30

| | | |
|---|---|---|
| 10:43:38 | 1 | Hinchliffe, individually and on behalf of all |
| 10:43:42 | 2 | persons similarly situated"?  Do you see that? |
| 10:43:45 | 3 | A.   Yes. |
| 10:43:45 | 4 | Q.   Do you know what it means that you are a |
| 10:43:47 | 5 | plaintiff both individually and on behalf of all |
| 10:43:50 | 6 | persons similarly situated? |
| 10:43:52 | 7 | A.   I understand the "individually."  "On |
| 10:44:00 | 8 | behalf of all persons similarly situated," I'm not |
| 10:44:03 | 9 | really clear. |
| 10:44:04 | 10 | Q.   What are your responsibilities as a named |
| 10:44:08 | 11 | plaintiff in this class action case? |
| 10:44:12 | 12 | A.   I don't know.  To answer questions |
| 10:44:18 | 13 | honestly. |
| 10:44:25 | 14 | Q.   Are you prepared to testify in court if |
| 10:44:32 | 15 | this case goes to trial? |
| 10:44:34 | 16 | A.   If need be. |
| 10:44:38 | 17 | Q.   Did you ever attempt to learn what |
| 10:44:51 | 18 | responsibilities, if any, you have as a plaintiff in |
| 10:44:56 | 19 | this case? |
| 10:44:57 | 20 | A.   No. |
| 10:45:08 | 21 | Q.   Has anyone informed you of what |
| 10:45:11 | 22 | responsibilities, if any, you have as a plaintiff in |
| 10:45:13 | 23 | this case? |
| 10:45:14 | 24 | A.   No. |

FARMER ARSENAULT BROCK LLC

31

| | | |
|---|---|---|
| 10:45:15 | 1 | Q.   Are you prepared to pay any portion of the |
| 10:45:25 | 2 | expenses of prosecuting this case? |
| 10:45:28 | 3 | A.   Yes. |
| 10:45:31 | 4 | Q.   Have you paid any expenses of this case so |
| 10:45:33 | 5 | far? |
| 10:45:34 | 6 | A.   Yes. |
| 10:45:34 | 7 | Q.   What have you paid? |
| 10:45:38 | 8 | A.   $125. |
| 10:45:40 | 9 | Q.   When did you pay $125? |
| 10:45:48 | 10 | A.   Back when I joined the case. |
| 10:45:50 | 11 | Q.   And what was that for? |
| 10:45:54 | 12 |         MS. NOONAN:   Objection.   I think he |
| 10:45:55 | 13 | already said expenses. |
| 10:45:58 | 14 | Q.   Do you recall what particular expenses the |
| 10:45:59 | 15 | $125 was for? |
| 10:46:03 | 16 | A.   No. |
| 10:46:06 | 17 | Q.   Have you paid anything since the $125 first |
| 10:46:08 | 18 | payment? |
| 10:46:09 | 19 | A.   No. |
| 10:46:11 | 20 | Q.   Have you been informed of what the expenses |
| 10:46:20 | 21 | to date have been in this case? |
| 10:46:21 | 22 | A.   No. |
| 10:46:22 | 23 | Q.   Have you entered into any written |
| 10:46:49 | 24 | agreements with the Dwyer Collora firm about this |

FARMER ARSENAULT BROCK LLC

32

| | | |
|---|---|---|
| 10:46:51 | 1 | case -- written contracts or agreements? |
| 10:47:01 | 2 | A.   I think I must have signed something. |
| 10:47:05 | 3 | Q.   Do you know what you signed, if anything? |
| 10:47:11 | 4 | A.   A letter saying I would be part of it, |
| 10:47:13 | 5 | probably. |
| 10:47:14 | 6 | Q.   You don't recall? |
| 10:47:15 | 7 | A.   Not really. |
| 10:47:16 | 8 | Q.   Do you have a copy -- |
| 10:47:18 | 9 | A.   I think I sent a letter with the check. |
| 10:47:20 | 10 | Q.   Do you have a copy of what you signed? |
| 10:47:24 | 11 | A.   I must have it at home. |
| 10:47:30 | 12 | Q.   Did your lawyers ask you at any time to |
| 10:47:35 | 13 | gather and provide to them copies of documents you |
| 10:47:37 | 14 | have concerning this lawsuit? |
| 10:47:40 | 15 | MS. NOONAN:  Objection.  You don't need |
| 10:47:41 | 16 | to answer that. |
| 10:47:43 | 17 | Q.   Would you answer the question, please? |
| 10:47:44 | 18 | MS. NOONAN:  No, he doesn't need to |
| 10:47:46 | 19 | answer that. |
| 10:47:46 | 20 | Q.   Are you going to refuse to answer the |
| 10:47:48 | 21 | question based on the instructions of your lawyer? |
| 10:47:50 | 22 | A.   Yes. |
| 10:47:51 | 23 | MS. NOONAN:  It's |
| 10:47:52 | 24 | attorney-client-privileged.  You asked him what we |

FARMER ARSENAULT BROCK LLC

33

| | | |
|---|---|---|
| 10:47:54 | 1 | asked him to do.  That's a privileged communication. |
| 10:47:56 | 2 | MR. POSS:  I understand that.  I'm just |
| 10:47:57 | 3 | building a record that he's following your |
| 10:47:59 | 4 | instructions. |
| 10:47:59 | 5 | Q.  Are you going to follow your lawyer's |
| 10:48:00 | 6 | instructions -- |
| 10:48:01 | 7 | A.  Yes. |
| 10:48:02 | 8 | Q.  -- and not answer that question? |
| 10:48:03 | 9 | A.  Yes. |
| 10:48:04 | 10 | Q.  Have you provided any of your personal |
| 10:48:05 | 11 | files or documents concerning this case to the Dwyer |
| 10:48:09 | 12 | Collora firm? |
| 10:48:10 | 13 | MS. NOONAN:  Objection. |
| 10:48:12 | 14 | Q.  You can answer unless she instructs you not |
| 10:48:13 | 15 | to. |
| 10:48:14 | 16 | MS. NOONAN:  I'm going to instruct you |
| 10:48:15 | 17 | not to answer. |
| 10:48:16 | 18 | Q.  Are you going to follow your lawyer's |
| 10:48:18 | 19 | instructions to not answer that question? |
| 10:48:20 | 20 | A.  Yes. |
| 10:48:32 | 21 | Q.  What do you understand your responsibility |
| 10:48:34 | 22 | to be for the expenses of this matter? |
| 10:48:40 | 23 | A.  I think the only thing that I've committed |
| 10:48:42 | 24 | to is sometime down the line paying $1,000 more than |

FARMER ARSENAULT BROCK LLC

34

| | | |
|---|---|---|
| 10:48:48 | 1 | the $125 that I paid. |
| 10:48:52 | 2 | Q.   What if the expenses are more than $1,000? |
| 10:48:55 | 3 | A.   I agreed to $1,000. |
| 10:48:58 | 4 | Q.   Why are you sure -- strike that. |
| 10:49:00 | 5 | Are you sure you agreed to $1,000? |
| 10:49:02 | 6 | A.   It's the only number I remember. |
| 10:49:07 | 7 | Q.   Do you have any responsibility if the |
| 10:49:09 | 8 | expenses are more than $1,000? |
| 10:49:11 | 9 | A.   I don't believe so. |
| 10:49:12 | 10 | Q.   Do you think the expenses in this case have |
| 10:49:14 | 11 | been more than $1,000 so far? |
| 10:49:15 | 12 | A.   I don't know. |
| 10:49:18 | 13 | Q.   Do you know how many pages of documents |
| 10:49:19 | 14 | have been produced by the defendants in this case? |
| 10:49:21 | 15 | A.   No. |
| 10:49:24 | 16 | Q.   Do you know what the cost is that the |
| 10:49:29 | 17 | plaintiffs' lawyers will have to reimburse the |
| 10:49:31 | 18 | defendants for copying those documents? |
| 10:49:34 | 19 | A.   No. |
| 10:49:34 | 20 | Q.   What does the Dwyer & Collora law firm get |
| 10:49:47 | 21 | out of this case, to your knowledge? |
| 10:49:48 | 22 | MS. NOONAN:  Objection. |
| 10:49:49 | 23 | A.   I don't know. |
| 10:49:49 | 24 | Q.   Do they get paid a fee if the case is |

FARMER ARSENAULT BROCK LLC

35

10:49:52  1  successful?

10:49:53  2      A.   I would imagine so.

10:49:54  3      Q.   Do you know?

10:49:54  4      A.   I don't know.  I don't know what the

10:49:57  5  agreement would be with Mike Hubert.  I would think

10:50:00  6  he would know.

10:50:00  7      Q.   Do you know whether the Dwyer Collora law

10:50:03  8  firm gets paid a fee if the case is not successful?

10:50:07  9      A.   No, I don't know the answer.

10:50:11  10     Q.   Do you know how any fee to be paid by Dwyer

10:50:15  11  & Collora would be calculated?

10:50:16  12     A.   No.

10:50:16  13     Q.   Do you believe that you have any

10:50:19  14  responsibility in connection with the issue of what

10:50:22  15  the Dwyer Collora firm would be paid and how much?

10:50:28  16     A.   No.

10:50:39  17          MR. POSS:  I'm going to ask the reporter

10:50:41  18  to mark as the next exhibit Trainor No. 2, a

10:50:43  19  document stamped TRN 001 through 002.

10:50:49  20          (Exhibit Trainor 2 marked for

10:51:09  21  identification.)

10:51:09  22     Q.   Mr. Trainor, have you seen the document

10:51:16  23  that's been placed in front of you, called Trainor

10:51:20  24  Exhibit 2, before?

FARMER ARSENAULT BROCK LLC

37

| | | |
|---|---|---|
| 10:52:35 | 1 | desk in a folder. |
| 10:52:36 | 2 | Q. If you'd look at Paragraph 3.1 of this |
| 10:52:43 | 3 | agreement, Mr. Trainor. It's on the first page. It |
| 10:52:46 | 4 | says, quote, "The client shall in any event be |
| 10:52:54 | 5 | liable to the attorneys for his pro-rata share of |
| 10:52:58 | 6 | reasonable expenses and disbursements, such as the |
| 10:53:01 | 7 | filing fee, travel, postage, fax, express mail, |
| 10:53:07 | 8 | class notices, his deposition transcript, and copy |
| 10:53:10 | 9 | costs." |
| 10:53:13 | 10 | A. Yeah. |
| 10:53:13 | 11 | Q. Close quote. Do you see that? |
| 10:53:15 | 12 | A. Yeah. |
| 10:53:16 | 13 | Q. What do you understand that to mean? |
| 10:53:19 | 14 | A. Paperwork. |
| 10:53:21 | 15 | Q. What do you understand this to mean when it |
| 10:53:23 | 16 | refers to your pro-rata share of expenses? |
| 10:53:27 | 17 | A. It doesn't really mean anything to me. |
| 10:53:33 | 18 | Q. Well, do you understand that you're |
| 10:53:35 | 19 | responsible for a third of expenses? |
| 10:53:37 | 20 | A. No. |
| 10:53:37 | 21 | Q. A half? |
| 10:53:38 | 22 | A. No. |
| 10:53:40 | 23 | Q. Any idea what percentage of expenses you're |
| 10:53:42 | 24 | responsible for? |

38

| | | |
|---|---|---|
| 10:53:43 | 1 | A.   No. |
| 10:53:43 | 2 | Q.   The $125 you paid, do you know if anyone |
| 10:53:50 | 3 | else paid $125 in connection with this lawsuit? |
| 10:53:53 | 4 | A.   I don't know. |
| 10:53:54 | 5 | Q.   Now, the next sentence of Paragraph 3.1 |
| 10:54:01 | 6 | says, quote, "The client agrees to pay $2,500 when |
| 10:54:06 | 7 | he is financially able to do so in payment towards |
| 10:54:09 | 8 | expenses in the lawsuit," period, close quote.  Do |
| 10:54:13 | 9 | you see that sentence? |
| 10:54:14 | 10 | A.   Yes. |
| 10:54:15 | 11 | Q.   Do you understand that you have agreed to |
| 10:54:16 | 12 | pay $2,500? |
| 10:54:17 | 13 | A.   I do now. |
| 10:54:21 | 14 | Q.   Have you made any payments toward that |
| 10:54:25 | 15 | $2,500 other than the $125? |
| 10:54:27 | 16 | A.   No. |
| 10:54:30 | 17 | Q.   When, if ever, do you expect to make any |
| 10:54:33 | 18 | additional payments? |
| 10:54:34 | 19 | A.   It hasn't been discussed. |
| 10:54:37 | 20 | Q.   What happens if the expenses are more than |
| 10:54:44 | 21 | $2500?  Do you understand that you have to pay more |
| 10:54:48 | 22 | than the $2500 if the expenses ultimately are more |
| 10:54:51 | 23 | than that? |
| 10:54:51 | 24 | MS. NOONAN:  Objection. |

FARMER ARSENAULT BROCK LLC

39

| | | |
|---|---|---|
| 10:54:52 | 1 | A.    No. |
| 10:54:54 | 2 | Q.    So do you believe that your total |
| 10:54:58 | 3 | obligation to pay expenses in this case is limited |
| 10:55:00 | 4 | to $2500? |
| 10:55:02 | 5 | A.    Yes. |
| 10:55:02 | 6 | Q.    That's your understanding?  Yes? |
| 10:55:05 | 7 | A.    Yes. |
| 10:55:06 | 8 | Q.    Why did you think you had agreed to pay |
| 10:55:09 | 9 | $1,000? |
| 10:55:09 | 10 | A.    It was just a number that stuck in my mind. |
| 10:55:15 | 11 | Q.    When do you expect to be -- strike that. |
| 10:55:18 | 12 |         Are you now financially able to pay the |
| 10:55:22 | 13 | remainder of the $2500 set forth in Paragraph 3.1 of |
| 10:55:26 | 14 | Exhibit 2? |
| 10:55:29 | 15 | A.    If I had to, yes. |
| 10:55:31 | 16 | Q.    If you look at Paragraph 4 of Exhibit 2. |
| 10:55:46 | 17 | It says, quote, "Reasonable compensation on the |
| 10:55:49 | 18 | foregoing contingency shall be paid by the class |
| 10:55:52 | 19 | from a common fund established for, or on behalf of |
| 10:55:54 | 20 | the class, or by the Court, or by the defendants |
| 10:55:58 | 21 | with the approval of the Court after notice to the |
| 10:56:00 | 22 | class," period, close quote.  Do you see that? |
| 10:56:04 | 23 | A.    Uh-huh. |
| 10:56:04 | 24 | Q.    What do you understand that to provide for? |

FARMER ARSENAULT BROCK LLC

40

| 10:56:07 | 1 | A. I don't know. |
| 10:56:08 | 2 | Q. Have you had any discussion with the Dwyer |
| 10:56:13 | 3 | Collora law firm about what percentage of any |
| 10:56:18 | 4 | recovery in this case they would seek? |
| 10:56:20 | 5 | A. No. |
| 10:56:21 | 6 | Q. Has anyone informed you about what |
| 10:56:26 | 7 | percentage fee the Dwyer Collora law firm will seek |
| 10:56:31 | 8 | if they are successful in this case? |
| 10:56:32 | 9 | A. No. |
| 10:56:33 | 10 | Q. Has anyone informed you or discussed with |
| 10:56:36 | 11 | you what fee Dwyer Collora will seek if the case is |
| 10:56:39 | 12 | not successful? |
| 10:56:41 | 13 | A. No. |
| 10:56:41 | 14 | Q. We asked for -- your lawyers for a copy of |
| 10:57:03 | 15 | all agreements on the subject matter of your |
| 10:57:05 | 16 | relationship with the Dwyer Collora firm before this |
| 10:57:09 | 17 | deposition, and this is all they gave us. Do you |
| 10:57:12 | 18 | know why they haven't given us a copy with your |
| 10:57:14 | 19 | signature on it? |
| 10:57:15 | 20 | A. As I said earlier, I don't remember too |
| 10:57:18 | 21 | many papers. There's only been a few conversations |
| 10:57:21 | 22 | and a few packages that I've received. So there |
| 10:57:26 | 23 | hasn't been a lot of paperwork. I'm not sure what, |
| 10:57:29 | 24 | if anything, would have my signature on it, other |

FARMER ARSENAULT BROCK LLC

44

| | | |
|---|---|---|
| 11:02:51 | 1 | Q.   You said that the company is doing |
| 11:02:53 | 2 | extremely well, from what you understand.  What is |
| 11:02:55 | 3 | your understanding about how the company is doing |
| 11:02:57 | 4 | today? |
| 11:02:58 | 5 | A.   I haven't heard anything, but I haven't |
| 11:03:06 | 6 | heard anything negative, so I assume they're doing |
| 11:03:08 | 7 | very, very well as a company.  They have a great |
| 11:03:11 | 8 | product and a lot of good customers. |
| 11:03:13 | 9 | Q.   When you said to me, quote, "I mean, the |
| 11:03:17 | 10 | company is doing extremely well, from what I |
| 11:03:20 | 11 | understand," close quote, what was the basis of that |
| 11:03:22 | 12 | statement? |
| 11:03:23 | 13 | MS. NOONAN:   Objection.   Go ahead. |
| 11:03:24 | 14 | A.   I've heard nothing negative to believe that |
| 11:03:29 | 15 | anything has changed. |
| 11:03:30 | 16 | Q.   Have you heard anything positive? |
| 11:03:32 | 17 | A.   No, but I've heard nothing negative, which |
| 11:03:35 | 18 | leads me to believe that they're still doing very |
| 11:03:37 | 19 | well as a company. |
| 11:03:38 | 20 | Q.   Do you have any other basis for your |
| 11:03:40 | 21 | statement you made that you believe the company is |
| 11:03:42 | 22 | doing very well? |
| 11:03:43 | 23 | A.   No, not really. |
| 11:03:44 | 24 | Q.   If you and Mr. Hubert and Mr. Hinchliffe |

FARMER ARSENAULT BROCK LLC

45

| | | |
|---|---|---|
| 11:04:03 | 1 | win this lawsuit and the trust for the MEDITECH |
| 11:04:10 | 2 | profit sharing plan needs to pay out a great deal of |
| 11:04:20 | 3 | money to the plaintiffs in this lawsuit, will that |
| 11:04:22 | 4 | have any effect on the ability of the people |
| 11:04:24 | 5 | currently participating in the MEDITECH profit |
| 11:04:28 | 6 | sharing plan to obtain a distribution when they |
| 11:04:31 | 7 | leave the company? |
| 11:04:33 | 8 | MS. NOONAN:  Objection. |
| 11:04:35 | 9 | A.   I don't know. |
| 11:04:36 | 10 | Q.   Have you ever thought about that? |
| 11:04:38 | 11 | A.   Not really. |
| 11:04:48 | 12 | Q.   Do you understand that this is a class |
| 11:04:50 | 13 | action complaint? |
| 11:04:52 | 14 | A.   Yes. |
| 11:04:54 | 15 | Q.   And who do you understand to be members of |
| 11:04:57 | 16 | the class in this class action complaint? |
| 11:04:59 | 17 | A.   Mike Hubert, Dave Hinchliffe, and myself. |
| 11:05:02 | 18 | Q.   Who else?  Anyone? |
| 11:05:04 | 19 | A.   That's all. |
| 11:05:05 | 20 | Q.   You believe that this case is brought |
| 11:05:09 | 21 | solely concerning you, Mr. Hubert, and |
| 11:05:13 | 22 | Mr. Hinchliffe.  Is that correct? |
| 11:05:15 | 23 | A.   Yes. |
| 11:05:21 | 24 | Q.   So if this case is successful, in your |

46

| 11:05:24 | 1 | view, who will receive money as a result of this |
| 11:05:26 | 2 | case, in addition to yourself? |
| 11:05:30 | 3 | A.   Mike Hubert, Dave Hinchliffe. |
| 11:05:31 | 4 | Q.   Anyone else? |
| 11:05:32 | 5 | A.   And the lawyers. |
| 11:05:33 | 6 | Q.   And the lawyers.  Anyone else? |
| 11:05:36 | 7 | A.   No. |
| 11:05:36 | 8 | Q.   Mr. Trainor, let's look back at Exhibit |
| 11:06:41 | 9 | No. 1, which is the amended class action complaint |
| 11:06:51 | 10 | in this case.  Did you see a draft or other version |
| 11:06:57 | 11 | of this amended class action complaint before it was |
| 11:07:00 | 12 | finalized? |
| 11:07:07 | 13 | A.   I think I have two copies of this, so one |
| 11:07:12 | 14 | other. |
| 11:07:15 | 15 | Q.   Have you ever seen the original complaint |
| 11:07:17 | 16 | in this case? |
| 11:07:20 | 17 | A.   I don't believe so. |
| 11:07:24 | 18 | Q.   Do you understand that this amended |
| 11:07:26 | 19 | complaint is the second complaint in this case, |
| 11:07:28 | 20 | filed after the original complaint filed by |
| 11:07:31 | 21 | Mr. Hubert? |
| 11:07:32 | 22 | A.   I don't know that, but okay. |
| 11:07:36 | 23 | Q.   Well, do you have any understanding of that |
| 11:07:37 | 24 | at all? |

FARMER ARSENAULT BROCK LLC

47

| 11:07:38 | 1 | A.    Of what it means? |

A.    Of what it means?

11:07:40    2    Q.    No, of whether there was an original

11:07:43    3    complaint and then, after you joined the case, this

11:07:46    4    was this new complaint.

11:07:47    5    A.    Well, like I said, I think I have two

11:07:49    6    copies.  So if there's only two, I probably have

11:07:52    7    both of them.

11:07:53    8    Q.    Were you asked to review this amended

11:07:55    9    complaint before it was filed?

11:07:57    10    A.    Yes.

11:07:57    11    Q.    Did you provide any comments to the Dwyer

11:08:02    12    Collora law firm on the amended complaint before it

11:08:06    13    was filed?

11:08:07    14         MS. NOONAN:  Objection.  You don't need

11:08:08    15    to answer that.

11:08:09    16         MR.  POSS:  Actually, he does.  He can

11:08:10    17    answer yes or no.  I'm not going to ask him what

11:08:15    18    those comments were.

11:08:17    19         MS. NOONAN:  Okay, fine.

11:08:18    20         MR. POSS:  But he certainly can answer

11:08:20    21    the question.

11:08:20    22    Q.    So Mr. Trainor, let me ask it again.  Did

11:08:23    23    you provide any comments to the Dwyer Collora

11:08:26    24    lawyers on the amended complaint before it was

FARMER  ARSENAULT  BROCK  LLC

57

| 11:23:52 | 1 | yourself.  You said you didn't think anybody knows. |
| 11:23:55 | 2 | Was there any basis for that statement? |
| 11:23:56 | 3 | MS. NOONAN:  Objection. |
| 11:23:57 | 4 | A.   No.  It was probably a bad choice of words. |
| 11:24:03 | 5 | Q.   Is there anything else at all you recall |
| 11:24:07 | 6 | about discussions you've had either with the other |
| 11:24:09 | 7 | plaintiffs in this case or with coworkers while you |
| 11:24:11 | 8 | were at MEDITECH or after you left MEDITECH in which |
| 11:24:15 | 9 | you would, as it says here, wonder how the |
| 11:24:18 | 10 | defendants and/or the dismissed defendants had |
| 11:24:21 | 11 | arrived at the assigned value? |
| 11:24:27 | 12 | A.   No. |
| 11:24:29 | 13 | Q.   Did you ever -- strike that.  When you were |
| 11:24:32 | 14 | employed at the company and having these |
| 11:24:34 | 15 | conversations in which you were wondering about the |
| 11:24:36 | 16 | value of the stock, did you think the stock was |
| 11:24:40 | 17 | valued too low? |
| 11:24:41 | 18 | A.   My only observation was that our |
| 11:24:47 | 19 | competitors' stock was higher, and I had thought we |
| 11:24:50 | 20 | were a better company.  And that led me to wonder |
| 11:24:53 | 21 | why our stock was lower than their stock. |
| 11:24:57 | 22 | Q.   When you say your competitors, which |
| 11:24:59 | 23 | competitors are you referring to? |
| 11:25:00 | 24 | A.   Oh, God.  Like I said, I've been out of the |

FARMER ARSENAULT BROCK LLC

58

| | | |
|---|---|---|
| 11:25:05 | 1 | company for eight years.  I'm not in work mode any |
| 11:25:09 | 2 | more.  I remember HBO.  I think one.  Competitors |
| 11:25:15 | 3 | was SMS, and I couldn't tell you what either one |
| 11:25:21 | 4 | stands for. |
| 11:25:25 | 5 | Q.   Do you remember a competitor called Cerner? |
| 11:25:28 | 6 | A.   Cerner. |
| 11:25:28 | 7 | Q.   Was that one that you thought of? |
| 11:25:30 | 8 | A.   Now that you say the name, yes, I remember |
| 11:25:32 | 9 | Cerner. |
| 11:25:32 | 10 | Q.   And was that one of the competitors that |
| 11:25:33 | 11 | you thought at the time that you were employed at |
| 11:25:38 | 12 | MEDITECH that its stock was valued more highly and |
| 11:25:41 | 13 | you wondered why MEDITECH's was not valued as much? |
| 11:25:44 | 14 | A.   I believe so.  I don't remember much about |
| 11:25:47 | 15 | working days any more.  Like I said, I can't even |
| 11:25:49 | 16 | remember most of the people's names any more. |
| 11:25:51 | 17 | Q.   When did you first notice or consider that, |
| 11:25:59 | 18 | as you've put it, that you observed that the stock |
| 11:26:01 | 19 | of MEDITECH's competitors was valued more highly? |
| 11:26:07 | 20 | A.   While I was working there. |
| 11:26:09 | 21 | Q.   So sometime before you left the company, in |
| 11:26:13 | 22 | 1998? |
| 11:26:14 | 23 | A.   Yes. |
| 11:26:14 | 24 | Q.   How long before you left? |

FARMER ARSENAULT BROCK LLC

59

| | | |
|---|---|---|
| 11:26:15 | 1 | A.   Oh, probably at least a couple of years. |
| 11:26:23 | 2 | Q.   So at least back into the 1996 time frame, |
| 11:26:26 | 3 | then. |
| 11:26:27 | 4 | A.   Yeah. |
| 11:26:32 | 5 | Q.   Did you do anything to investigate or look |
| 11:26:34 | 6 | into the valuation issue you've told me about, that |
| 11:26:40 | 7 | of the competitors being valued more highly? |
| 11:26:42 | 8 | A.   No. |
| 11:26:43 | 9 | Q.   Did you ever ask anyone in MEDITECH |
| 11:26:50 | 10 | management how the company or the trust valued |
| 11:27:06 | 11 | MEDITECH stock? |
| 11:27:07 | 12 | A.   No. |
| 11:27:32 | 13 | Q.   Do you have any expertise, Mr. Trainor, in |
| 11:27:35 | 14 | how stock of companies is to be valued? |
| 11:27:38 | 15 | A.   No. |
| 11:27:49 | 16 | (Mr. Martin left the deposition room.) |
| 11:28:04 | 17 | Q.   I'd like to direct your attention to Page 9 |
| 11:28:12 | 18 | of Exhibit 3, Mr. Trainor.  At the top of the page |
| 11:28:28 | 19 | there's a little paragraph -- a paragraph with a |
| 11:28:32 | 20 | little letter (g) in front of it.  Do you see that? |
| 11:28:34 | 21 | A.   Yes. |
| 11:28:34 | 22 | Q.   It says, quote, "In addition to the annual |
| 11:28:37 | 23 | communications reflected in the defendants' document |
| 11:28:40 | 24 | production, the plaintiffs had numerous |

FARMER ARSENAULT BROCK LLC

60

| 11:28:44 | 1 | conversations during the years they were employed at |
| 11:28:46 | 2 | MEDITECH about the contribution of stock by MEDITECH |
| 11:28:50 | 3 | to the trust and/or the sale of MEDITECH stock by |
| 11:28:54 | 4 | MEDITECH to MEDITECH employees." |
| 11:28:58 | 5 | A.   Uh-huh. |
| 11:28:59 | 6 | Q.   "Mr. Hinchliffe and Mr. Trainor do not |
| 11:29:01 | 7 | recall the details of any such conversations," |
| 11:29:03 | 8 | period, close quote.  Do you see that? |
| 11:29:05 | 9 | A.   Yes. |
| 11:29:06 | 10 | Q.   What conversations did you have when you |
| 11:29:13 | 11 | were employed at MEDITECH about the contribution of |
| 11:29:16 | 12 | stock by MEDITECH to the trust? |
| 11:29:17 | 13 | A.   I don't really remember any conversations. |
| 11:29:25 | 14 | I'm sure we had them, but details I don't remember. |
| 11:29:28 | 15 | Q.   Why are you sure you had them? |
| 11:29:30 | 16 | A.   Because we talked about the stock over the |
| 11:29:32 | 17 | years and wondered how, you know, it got its value |
| 11:29:37 | 18 | and all.  But again, that was during, you know, when |
| 11:29:40 | 19 | we had like stockholders' meetings or something that |
| 11:29:43 | 20 | would be stock-related.  It wasn't something that |
| 11:29:50 | 21 | would come up every day. |
| 11:29:51 | 22 | Q.   Do you remember any conversations you had |
| 11:29:53 | 23 | when you were employed at MEDITECH about the |
| 11:29:55 | 24 | contribution of stock by MEDITECH to the trust? |

92

| | | |
|---|---|---|
| 12:23:39 | 1 | A.   I would have remembered that, I think.   I |
| 12:23:43 | 2 | don't think I ever got another copy. |
| 12:23:44 | 3 | Q.   You're not certain, though, are you? |
| 12:24:04 | 4 | A.   I'm not 100 percent certain.   I mean, I |
| 12:24:07 | 5 | could have got a copy sometime over the years, but |
| 12:24:11 | 6 | it would have been one or two at best, because I |
| 12:24:13 | 7 | don't even remember one. |
| 12:24:14 | 8 | Q.   Did you ever ask for an updated summary |
| 12:24:18 | 9 | plan description? |
| 12:24:19 | 10 | A.   No. |
| 12:24:19 | 11 | Q.   Did you ever ask to see the plan itself? |
| 12:24:22 | 12 | A.   No. |
| 12:24:25 | 13 | Q.   If someone said that from time to time |
| 12:24:28 | 14 | after you first began participating in the plan you |
| 12:24:30 | 15 | may have been given updated versions of the summary |
| 12:24:33 | 16 | plan description, would that person be lying? |
| 12:24:36 | 17 | MS. NOONAN:  Objection.   You can answer. |
| 12:24:41 | 18 | A.   Would they be lying? |
| 12:24:43 | 19 | Q.   Yes. |
| 12:24:45 | 20 | A.   Not necessarily. |
| 12:24:47 | 21 | Q.   So if someone said that from time to time |
| 12:24:58 | 22 | after you began participating in the plan you may |
| 12:25:02 | 23 | also have been given updated versions of the summary |
| 12:25:05 | 24 | plan description, that person might be telling the |

93

| | | |
|---|---|---|
| 12:25:07 | 1 | truth; is that correct? |
| 12:25:09 | 2 | MS. NOONAN:  Objection. |
| 12:25:12 | 3 | A.  They may be. |
| 12:25:13 | 4 | Q.  And you don't know, do you? |
| 12:25:14 | 5 | A.  I just don't remember ever getting another |
| 12:25:17 | 6 | one. |
| 12:25:19 | 7 | Q.  Mr. Trainor, if the trustee of the MEDITECH |
| 12:25:52 | 8 | profit sharing plan had valued the stock in the plan |
| 12:26:01 | 9 | at the amount he should have valued in 1998 and |
| 12:26:06 | 10 | 1999, what would have happened to the trust's cash? |
| 12:26:20 | 11 | A.  Well, for one thing, I don't know that he |
| 12:26:23 | 12 | did or didn't value it at what it was worth.  That |
| 12:26:25 | 13 | was only a question in my mind over the years, how |
| 12:26:29 | 14 | it got valued.  I don't know what effect it would |
| 12:26:36 | 15 | have on the trust at all. |
| 12:26:38 | 16 | Q.  Is there some valuation point at which, if |
| 12:26:42 | 17 | the trustee had paid people in the trust out in '98 |
| 12:26:46 | 18 | and '99, the plan would have run out of cash? |
| 12:26:49 | 19 | A.  No. |
| 12:26:49 | 20 | Q.  Why do you say that? |
| 12:26:53 | 21 | A.  It wasn't like the whole company was |
| 12:26:54 | 22 | leaving on the same day.  I mean, if only a handful |
| 12:26:58 | 23 | of people left, that's not going to break the trust |
| 12:27:02 | 24 | or the company.  It wouldn't have affected the |

FARMER ARSENAULT BROCK LLC

94

| | | |
|---|---|---|
| 12:27:07 | 1 | company at all, I don't think. |
| 12:27:08 | 2 | Q.   If the trust runs out of cash, is the |
| 12:27:11 | 3 | company required to provide it with any more? |
| 12:27:16 | 4 | A.   I don't know.   I don't know how that |
| 12:27:18 | 5 | worked. |
| 12:27:19 | 6 | Q.   Since you left MEDITECH in 1998 and took |
| 12:27:51 | 7 | your distribution from the trust, I take it other |
| 12:27:57 | 8 | employees have since left the company and similarly |
| 12:28:00 | 9 | received their distributions since 1998; is that |
| 12:28:02 | 10 | fair to say? |
| 12:28:03 | 11 | A.   That's fair to say. |
| 12:28:07 | 12 | Q.   Aside from Mr. Hubert and Mr. Hinchliffe, |
| 12:28:18 | 13 | are you aware of any other former MEDITECH employees |
| 12:28:23 | 14 | who have left the company since you left who agree |
| 12:28:32 | 15 | with or support this lawsuit you've brought against |
| 12:28:35 | 16 | the defendants? |
| 12:28:37 | 17 | A.   I don't know.   I haven't talked to anybody. |
| 12:29:12 | 18 | MR. POSS:   Why don't we take our lunch |
| 12:29:14 | 19 | break now.   It's just about 12:30.   Do you want to |
| 12:29:21 | 20 | reconvene at 1:15? |
| 12:29:23 | 21 | MS. NOONAN:   That's fine.   We could |
| 12:29:24 | 22 | probably be back at 1:00 -- |
| 12:29:26 | 23 | MR. POSS:   I've got a meeting I've got |
| 12:29:28 | 24 | to go to over the lunch break, so let's do 1:15. |

FARMER ARSENAULT BROCK LLC

96

| | | |
|---|---|---|
| 01:25:05 | 1 | answers and asked to verify that that's what I said, |
| 01:25:09 | 2 | which it was.  And that's when I emailed it back and |
| 01:25:14 | 3 | sent the typewritten -- the signed page at the end |
| 01:25:17 | 4 | of it. |
| 01:25:22 | 5 | Q.   Anything else you'd like to add on that? |
| 01:25:24 | 6 | A.   No, that was it. |
| 01:25:27 | 7 | Q.   And how was your recollection refreshed |
| 01:25:30 | 8 | between the time you left for lunch and now? |
| 01:25:32 | 9 | A.   Well, that was a question I had had when I |
| 01:25:35 | 10 | asked to step out of the room earlier.  And I was |
| 01:25:38 | 11 | just thinking about it and thinking, trying to think |
| 01:25:40 | 12 | what the order was, where did I get the questions. |
| 01:25:44 | 13 | And it just finally came to me, the sequence of |
| 01:25:47 | 14 | events. |
| 01:25:51 | 15 | I just couldn't remember how I was asked |
| 01:25:53 | 16 | the questions, but the questions were something we |
| 01:25:55 | 17 | had talked about, and then the email was the |
| 01:25:57 | 18 | typewritten -- what I had responded to the |
| 01:26:02 | 19 | questions. |
| 01:26:07 | 20 | Q.   Thank you, Mr. Trainor. |
| 01:26:10 | 21 | Does Mr. Hubert still work at MEDITECH? |
| 01:26:20 | 22 | A.   No. |
| 01:26:22 | 23 | Q.   When did he leave MEDITECH? |
| 01:26:26 | 24 | A.   I don't know. |

97

| | | |
|---|---|---|
| 01:26:27 | 1 | Q.   Why did Mr. Hubert leave MEDITECH? |
| 01:26:29 | 2 | A.   I don't know. |
| 01:26:29 | 3 | Q.   Did Mr. Hubert resign from MEDITECH? |
| 01:26:35 | 4 | A.   I don't -- we never spoke.  We never talked |
| 01:26:37 | 5 | about it.  I just know he's not there. |
| 01:26:40 | 6 | Q.   Was Mr. Hubert fired from MEDITECH? |
| 01:26:44 | 7 | MS. NOONAN:  Objection. |
| 01:26:45 | 8 | A.   I don't know. |
| 01:26:48 | 9 | Q.   Has Mr. Hubert ever provided you any |
| 01:26:51 | 10 | information about the circumstances of his leaving |
| 01:26:54 | 11 | MEDITECH? |
| 01:26:54 | 12 | A.   No. |
| 01:27:36 | 13 | Q.   Who are the defendants in this case? |
| 01:27:39 | 14 | A.   Mike Hubert, Dave Hinchliffe, and myself. |
| 01:27:45 | 15 | Q.   Those are the plaintiffs.  I'm asking who |
| 01:27:49 | 16 | are the defendants?  Who are you suing, Mr. Trainor? |
| 01:27:53 | 17 | A.   The MEDITECH trust fund profit sharing |
| 01:27:56 | 18 | plan. |
| 01:27:56 | 19 | Q.   Anyone else? |
| 01:27:57 | 20 | A.   I think that's it. |
| 01:27:59 | 21 | Q.   Now, you've said several times today that |
| 01:28:07 | 22 | you loved MEDITECH. |
| 01:28:08 | 23 | A.   Uh-huh. |
| 01:28:09 | 24 | Q.   So why are you bringing this lawsuit? |

FARMER ARSENAULT BROCK LLC

98

| | | |
|---|---|---|
| 01:28:13 | 1 | MS. NOONAN:  Objection. |
| 01:28:19 | 2 | A.   I don't think one has anything to do with |
| 01:28:21 | 3 | the other. |
| 01:28:22 | 4 | Q.   Why not? |
| 01:28:27 | 5 | A.   Well, I still believe it was a great |
| 01:28:30 | 6 | company when I worked there, with a great product. |
| 01:28:32 | 7 | The question that was presented to me about this |
| 01:28:36 | 8 | case was strictly about did I ever wonder if the |
| 01:28:44 | 9 | stock was undervalued, and my answer to that was |
| 01:28:46 | 10 | yes.  And my understanding is that's what this case |
| 01:28:49 | 11 | is all about, and only that. |
| 01:28:52 | 12 | Q.   And when you just said "did I ever wonder |
| 01:29:04 | 13 | if the stock" -- strike that.  When you just said |
| 01:29:08 | 14 | that the question that was presented to you about |
| 01:29:10 | 15 | this case was strictly did you ever wonder if the |
| 01:29:13 | 16 | stock was undervalued and your answer to that was |
| 01:29:15 | 17 | yes, I take it you did mean yes, you did wonder |
| 01:29:19 | 18 | whether it was undervalued; is that correct? |
| 01:29:21 | 19 | A.   Yes. |
| 01:29:31 | 20 | Q.   What obligations do you understand, if any, |
| 01:29:42 | 21 | that you have as a plaintiff in this case concerning |
| 01:29:48 | 22 | information that you learned from the defendants in |
| 01:29:53 | 23 | this case that is designated as confidential? |
| 01:29:59 | 24 | A.   You'll have to explain that one to me.  I'm |

FARMER ARSENAULT BROCK LLC

101

| | | |
|---|---|---|
| 01:33:22 | 1 | this looks like stuff that I've never -- I've never |
| 01:33:26 | 2 | seen. |
| 01:33:28 | 3 | Q. What information was provided to you in the |
| 01:33:31 | 4 | financial reports you received concerning the |
| 01:33:33 | 5 | MEDITECH profit sharing trust? |
| 01:33:36 | 6 | A. I don't really remember. I remember seeing |
| 01:33:41 | 7 | financial reports, I'm guessing at the stockholders |
| 01:33:48 | 8 | meeting. I'm sure we got a package, as |
| 01:33:52 | 9 | stockholders, and I'm sure it had that information. |
| 01:33:56 | 10 | Q. Did you get information each year about the |
| 01:33:58 | 11 | value of your interest in the profit sharing trust? |
| 01:34:02 | 12 | A. Yes that was at bonus time. |
| 01:34:05 | 13 | Q. Yes. And was there attached to that a |
| 01:34:07 | 14 | financial report for the profit sharing trust? |
| 01:34:09 | 15 | A. There could have been. It's been so |
| 01:34:24 | 16 | long -- I'm not sure whether we got it during the |
| 01:34:26 | 17 | shareholders' meeting -- stockholders meeting or |
| 01:34:30 | 18 | during the bonus period, because I'm thinking |
| 01:34:37 | 19 | employees that just started wouldn't be in the trust |
| 01:34:40 | 20 | fund yet, so they may not receive that. |
| 01:34:42 | 21 | I'm not totally sure. I could have. |
| 01:34:47 | 22 | Q. You left MEDITECH in 1998, you've |
| 01:35:19 | 23 | testified. |
| 01:35:21 | 24 | A. Yes. |

FARMER ARSENAULT BROCK LLC

102

| | | |
|---|---|---|
| 01:35:24 | 1 | Q.    Do you care what the proper value of |
| 01:35:27 | 2 | MEDITECH's stock was in 2001? |
| 01:35:31 | 3 | A.    No. |
| 01:35:32 | 4 | Q.    Would that affect you in any way? |
| 01:35:35 | 5 | A.    No. |
| 01:35:35 | 6 | Q.    What about 2000? |
| 01:35:48 | 7 | A.    No. |
| 01:35:50 | 8 | Q.    So I take it for any years after the last |
| 01:35:58 | 9 | year at which you worked at the company, the fair |
| 01:36:00 | 10 | value of MEDITECH's stock as set by the trustee is |
| 01:36:04 | 11 | not something that concerns you. |
| 01:36:06 | 12 | A.    It didn't until I heard that Jerry |
| 01:36:11 | 13 | Grossman, who was a member of the board of |
| 01:36:12 | 14 | directors, was suing the company for what I |
| 01:36:18 | 15 | understand is he felt the stock was undervalued, and |
| 01:36:21 | 16 | I think that was the first time that I even thought |
| 01:36:23 | 17 | about it. |
| 01:36:24 | 18 | Q.    Maybe my question wasn't clear.  Let me try |
| 01:36:28 | 19 | and ask it again, because that wasn't what I was |
| 01:36:30 | 20 | asking. |
| 01:36:31 | 21 | A.    Okay. |
| 01:36:38 | 22 | Q.    You left MEDITECH in 1998, and you received |
| 01:36:40 | 23 | a payout from the trust in 1998 -- |
| 01:36:43 | 24 | A.    Yes. |

FARMER ARSENAULT BROCK LLC

103

01:36:44   1          Q.   -- based on the fair value as determined by

01:36:47   2     the trustee at the end of 1997; is that correct?

01:36:50   3          A.   Yes.

01:36:54   4          Q.   And that's what you're suing about, is it

01:36:56   5     not, that value?

01:36:58   6          A.   Yes.

01:36:59   7          Q.   Now does it matter to you what value the

01:37:08   8     trustee of the MEDITECH profit sharing plan assigned

01:37:14   9     to MEDITECH stock in years after you left the

01:37:17  10     company -- in other words, 2000, 2001, 2002, 2003?

01:37:23  11     Does that affect you in any way?

01:37:24  12          A.   No, not those years.

01:37:25  13          Q.   And that's because you had already been

01:37:27  14     paid out based on the '97 number; correct?

01:37:29  15          A.   Yes.

01:37:31  16          Q.   So do you care what the trustee did in

01:37:34  17     years after you left?

01:37:37  18          A.   I do once I had heard about the Jerry

01:37:40  19     Grossman case.

01:37:43  20          Q.   Again, is there any impact to you, based on

01:37:50  21     what number the trustee assigned for the value of

01:37:53  22     the MEDITECH stock in the trust in years after you

01:37:58  23     left the company?  Does it matter to you?

01:38:05  24          A.   Only in the last two years.


FARMER ARSENAULT BROCK LLC

# EXHIBIT 3

ORIGINAL

1

Volume 1, Pages 1-240, Exhibits: 1-35

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------

MICHAEL P. HUBERT, et al.,

                Plaintiffs

vs.                         Docket No. 05-10269-RWZ

MEDICAL INFORMATION TECHNOLOGY

PROFIT SHARING PLAN, MEDICAL

INFORMATION TECHNOLOGY, INC., and

A. NEIL PAPPALARDO

                Defendants

-----------------------------

VIDEOTAPED DEPOSITION OF MICHAEL P. HUBERT

Wednesday, July 26, 2006, 10:11 a.m.

Goodwin Procter LLP

53 State Street - 17th Floor

Boston, Massachusetts

-------Reporter:  Alan H. Brock, RDR, CRR-------

abrock@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

2

```
 1    APPEARANCES:

 2         Dwyer & Collora, LLP

 3         Michael A. Collora, Esq.

 4         600 Atlantic Avenue

 5         Boston, Massachusetts 02210-2211

 6         617.371.1000  fax: 617.371.1037

 7         mcollora@dwyercollora.com

 8         for Plaintiffs

 9

10         Goodwin Procter LLP

11         Stephen D. Poss, Esq.

12         Michael P. Sugrue, Esq.

13         53  State Street, Exchange Place

14         Boston, Massachusetts 02109

15         617.750.1000  fax: 617.523.1231

16         sposs@goodwinprocter.com

17         msugrue@goodwinprocter.com

18         for Defendants

19

20    ALSO PRESENT:

21         Adam Cook, Videograph, National Video Reporters

22

23

24
```

FARMER ARSENAULT BROCK LLC

28

1     MR. COLLORA:  I would like to point out

2  at this point we objected to some of the production,

3  in order to have the -- if you're going to go into

4  what he produced then as opposed to what he produced

10:46:48   5  now, you're going to have to incorporate our

6  objections both at the deposition and prior to.

7     Q.   Mr. Hubert, when you received and responded

8  to this subpoena last year and when you were deposed

9  in July, you never provided to us this notebook

10:47:17  10  that's produced --

11     A.   No, I did not.

12     Q.   -- that we've marked today as MH 1.  Why

13  not?

14     A.   At the time I had forgotten where this

10:47:26  15  document was or even what it included.  This is a

16  small document.  It's only a 16th of an inch thick.

17  It was in the bottom of a file case that I had.  I

18  hadn't made recent notation in this document.  And I

19  honestly didn't recall that it had any reference to

10:47:49  20  Dr. Grossman in it until more recently, when I was

21  going through it for purposes of complying with

22  documents for this deposition, that I realized that

23  this document mentioned Dr. Grossman in it.  The

24  document is largely about inquiries to the

FARMER ARSENAULT BROCK LLC

29

1    Department of Labor, about contacting them and

2    different lawyers, and it was a surprise to me that

3    I realized that it mentioned Dr. Grossman in this

4    document.

10:48:24    5            MR. POSS:  I'd ask the court reporter to

6    mark as Exhibit MH 3 a two-page document.  It's

7    dated February 18, 2002.

8            (Exhibit MH 3 marked for

9    identification.)

10:48:55    10       Q.   Mr. Hubert, please take a look at Exhibit

11   MH 3 and tell me whether you have ever seen this

12   before.

13       A.   Well, I stand mistaken.

14            MR. COLLORA:  The question is have you

10:49:36    15   seen it before.

16       A.   I agree; yes, I have.

17       Q.   What is Exhibit MH 3?

18       A.   This is a document from more than four

19   years ago that I sent to some attorneys interested

10:49:57    20   in a case against a Massachusetts employer.

21       Q.   So let's look at this exhibit.  At the top

22   it says "from, ERISA," and then in brackets "mailed

23   to erisa@mediaone.net."  What does that mean?

24       A.   "From ERISA, mailed to...."

30

1           This is a document that --

2      Q.   It came from you, did it not?

3      A.   It did come from me.

4      Q.   And is erisa@mediaone.net an email address

5 you had set up?

6      A.   It was an email address I set up a long

7 time ago.

8      Q.   When did you set that email address up?

9      A.   I don't recall.  This is possibly the only

10 email that ever came out of that email address.

11      Q.   Did you set up that email address to enable

12 you to send emails without disclosing your identity?

13      A.   Yes.

14      Q.   Now, it says "sent Monday, February 18,

15 2002, 3:01 a.m."  Do you see that?

16      A.   Yes, I do.

17      Q.   Is that when you sent this email?

18      A.   Yes, apparently.

19      Q.   And do you know approximately how long

20 before February 18, 2002, you set up the

21 erisa@mediaone.net email address?

22      A.   No, I don't.

23      Q.   Do you have any records concerning setting

24 up that address?

FARMER ARSENAULT BROCK LLC

31

1      A.    None.

2      Q.    Then there is a "to" list, and there are a

3   list of names there.

4      A.    Correct.

10:51:36   5      Q.    Are those lawyers or law firms?

6      A.    Yes, they are.

7      Q.    In fact, if we look back at Exhibit No. 1,

8   we can find some of these names in the notes that we

9   went over, can we not?  For example, you had

10:52:04  10   referred to a Bianchi, and there is an A.J. Bianchi

11   in this email.  Is that the same Bianchi?

12      A.    Likely so, yes.

13      Q.    And you referred to a Cleary at Goodwin

14   Procter, and there's a Cleary at Goodwin Procter in

10:52:19  15   this email?

16      A.    Yes, there is.

17      Q.    And those notes refer to Mr. Collora, and

18   here you have an email addressed to

19   info@dwyercollora.com?

10:52:28  20      A.    Yes, I do.

21      Q.    And also, C, it looks like Montilio at

22   Dwyer Collora; is that correct?

23      A.    Yes.

24      Q.    Then you say, "Dear sir or madam, I believe

FARMER ARSENAULT BROCK LLC

121

1    to administration and asked about how the valuation

2    of the stock occurred.

3           Now, prior to that --

4           MR. COLLORA:  Prior to what?  Just so

02:01:12   5    you're --

6           THE WITNESS:  I'm sorry.

7       A.   Prior to partnering with SAIC, we used to

8    get every year a spreadsheet showing the company's

9    performance financially.  It would show the gross

02:01:24  10    sales, the profits.  It would show the fair market

11    value.  They used to call it fair market value.

12    They don't call it that nowadays.  They use some

13    other term.  But they used to also have the

14    price/earnings ratio every year provided on the

02:01:41  15    spreadsheet.  And every year the price/earnings

16    ratio for the stock was almost always right around

17    8.5.  Word of mouth was, well, they use that

18    price/earnings ratio to help set the value of the

19    stock.  It never came from the administration, and I

02:02:00  20    never questioned the administration about it, other

21    than that one time with Mr. Messing.

22       Q.   When did you first look at the SAIC formula

23    and plug in the MEDITECH numbers?

24       A.   I don't know.  I'd say '98, '99.  But I

FARMER ARSENAULT BROCK LLC

122

1    don't know.

2        Q.   When did you first compare the price/

3    earnings ratio of MEDITECH to other companies?

4        A.   Oh, I don't know.  I'm going to say 20

02:02:48  5    years ago.

6            MR. POSS:  We'll ask the reporter to

7    mark as the next exhibit, No. 11, a document stamped

8    HUB 491 through 5026789.

9            (Exhibit MH 11 marked for

02:04:00  10   identification.)

11       Q.   Mr. Hubert, we've placed before you Exhibit

12   No. 11.  It's a document produced by you.  Can you

13   tell me what this exhibit is?

14       A.   This is a document that I printed out from

02:04:11  15   a Web page called fed.org.  It is a case study about

16   SAIC, and it talks a little bit about how they value

17   the stock.

18       Q.   And are these various notes -- are these

19   various notes on this document yours?

02:04:37  20       A.   Yes, they are.

21       Q.   If you look at the page stamped HUB 498.

22       A.   Yes.

23       Q.   There are some calculations kind of toward

24   the lower right third of the page.

131

| | |
|---|---|
| | 1 |  reporter mark as Exhibit 15 a document stamped HUB |
| | 2 |  475. |
| | 3 |                  (Exhibit MH 15 marked for |
| | 4 |  identification.) |
| 02:18:49 | 5 |                  (Discussion off the record.) |
| | 6 |       Q.   Mr. Hubert, Exhibit 15 comes from your |
| | 7 |  files; isn't that correct? |
| | 8 |       A.   Yes, it does. |
| | 9 |       Q.   And this is a document that was printed out |
| 02:19:05 | 10 |  by you on April 21, 1998; correct? |
| | 11 |       A.   Yes, it is. |
| | 12 |       Q.   And that's the same date as you printed out |
| | 13 |  some of the information about SAIC that we've been |
| | 14 |  looking at; is that correct? |
| 02:19:14 | 15 |       A.   Yes, it is. |
| | 16 |       Q.   And is this your handwriting? |
| | 17 |       A.   Yes, it is. |
| | 18 |       Q.   And does this document show you calculating |
| | 19 |  P/E ratios for MEDITECH on or about April 21, 1998? |
| 02:19:30 | 20 |       A.   It could have been weeks, months, |
| | 21 |  afterwards.  But yes. |
| | 22 |       Q.   Certainly during that time frame of 1998; |
| | 23 |  isn't that correct? |
| | 24 |       A.   Yes, it is. |

134

| | |
|---|---|
| 1 | Q. Now, if we look at this statement of stock |
| 2 | ownership -- we'll just pick some numbers out. It |
| 3 | shows that -- look at the year 1995. |
| 4 | A. Yes. |
| 02:23:15 5 | Q. It says here that on February 28, 1995, you |
| 6 | purchased 700 shares at a share price of $17, total |
| 7 | cost of $11,900, from MEDITECH. Is that correct? |
| 8 | A. Yes. |
| 9 | Q. Similarly, if we look at 1999, it shows |
| 02:23:37 10 | that you purchased February 25, 1999, 700 shares of |
| 11 | MEDITECH stock at a share price of $29, for a total |
| 12 | cost of $20,300, from the company? |
| 13 | A. Yes. |
| 14 | Q. The other -- similar entries in here read |
| 02:24:04 15 | the same, where it says the date, number of shares, |
| 16 | share price, and amount bought? |
| 17 | A. Yes. |
| 18 | Q. Now, does this show any sales of stock? |
| 19 | A. It does one. |
| 02:24:11 20 | Q. And what is that? |
| 21 | A. It is in 2003, I sold 1,000 shares for |
| 22 | $23,000. |
| 23 | Q. And then you bought more stock again in |
| 24 | 2004? |

135

1    A.    Yes.

2    Q.    Why did you sell stock in 2003?

3    A.    I had bought a house.  I had expenses.  I

4    needed to --

02:24:41    5    Hold on.  No, that was not selling

6    those.  That was tuition for school for my two sons.

7    I had two boys in private school.

8    Q.    At the time you bought this stock, you

9    bought the MEDITECH stock, during the years we've

02:25:27    10    discussed, you thought it was a good value, did you

11    not?

12    A.    I didn't know.  Many years I bought the

13    stock, I thought it was a fair price.  I didn't

14    know.

02:25:37    15    Q.    Well, didn't you tell people if they asked

16    you about whether they should purchase MEDITECH's

17    stock that it was undervalued and it was a good buy?

18    A.    Not necessarily.  I think that in the very,

19    very early years I wouldn't have a clue and I

02:25:53    20    wouldn't be able to recommend to anybody.  Maybe in

21    the later years I told people that it's up to them,

22    again.  If people asked me, I would tell them, yes,

23    I would be buying the stock and indications are that

24    the stock is going to go up.  I wouldn't necessarily

136

1    say it's a good value, because who knows?  I just

2    know, being in sales, I knew the company was selling

3    product well and servicing customers well.  I

4    thought the stock was going to go up.  It's very

02:26:22    5    difficult to say it's a good value.  I think you

6    have to buy stock based on whether you think it's

7    going to go up or down.

8        Q.    And you bought the stock thinking it would

9    go up; correct?

02:26:30   10        A.    Yes.

11        Q.    And did it go up?

12        A.    Yes.

13        Q.    It went up every year, didn't it?

14        A.    Yes, it did.

02:26:37   15        Q.    And there came a point in time when people

16    asked you, "Should I buy more stock" in a given

17    year, and you said to them, "It's undervalued, it's

18    a good value"?

19        A.    I don't know that I said it's undervalued.

02:26:53   20    I think it's going to go up.  If someone asked me if

21    they should buy stock, I would say -- generally I

22    would be encouraging someone to buy stock, as

23    opposing to being neutral.  I don't recall if I said

24    it's undervalued.  I would say it's, you know,

137

1    likely to go up.

2            One of the big things about MEDITECH, I

3    have to say, is that they have a significant

4    backlog, and they know very well -- and I as a

02:27:23  5    share -- as a salesperson would have a very good

6    expectation of what revenues and profits would be

7    for the coming year.  And I would say, "I suspect

8    the stock is going to go up."  And if people bought

9    stock based on that -- I wouldn't go tell people to

02:27:39  10   buy it, ever.  But if people came to me and asked, I

11   would say I would expect the stock is going to go up

12   and I'm buying.  People would ask me, and I'd say

13   yeah, I'm buying.

14            In the end, I had so much MEDITECH stock

02:27:55  15   that I didn't mind selling some.  And the last years

16   at MEDITECH I bought stock, but it was the fewest

17   number of shares and the smallest -- it was the

18   smallest investment in stock I had made since 1989,

19   and I had an opportunity to purchase much more, but

02:28:12  20   I bought less my last year.

21       Q.   Have you sold MEDITECH stock since you left

22   the company?

23       A.   No, I have not.

24       Q.   Have you tried to sell it?

FARMER ARSENAULT BROCK LLC

EXHIBIT 4
(FILED UNDER SEAL)

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10269-RWZ

MICHAEL P. HUBERT, DAVID HINCHLIFFE and WILLIAM TRAINOR

v.

MEDICAL INFORMATION TECHNOLOGY, INC., et al.

MEMORANDUM OF DECISION

March 20, 2007

ZOBEL, D.J.

I.      **Introduction**

Plaintiffs, beneficiaries of a software company profit sharing plan, contend that

for at least the last eight years the plan's trustee deliberately undervalued the primary

asset in the plan, company stock.  As a result, the lump sum distributions they received

on termination of employment were significantly less than what they would have been

under a more accurate valuation.  Plaintiffs now seek certification of a class of all

employees who received distributions from the plan during the relevant period.  Based

on the parties' papers and their written and oral arguments, I am persuaded that

plaintiffs cannot adequately represent the proposed class and therefore deny their

motion for class certification.

II.     **Background**

In 1973, defendant Medical Information Technology, Inc. ("Meditech," or

"Company"), a Massachusetts corporation, established a profit sharing plan on behalf

of its employees in order to provide pension benefits upon retirement.  The Medical

Information Technology Profit Sharing Plan (the "Plan") is governed by the Employment

Retirement Income Security Act of 1974 ("ERISA").[1]  Meditech makes cash and stock

contributions to the Plan, and upon termination of employment, each employee

normally receives a lump-sum cash payment in the amount of that employee's vested

interest in the Plan.  If the Plan lacks sufficient cash, however, it may defer payment up

to three years or distribute Meditech stock instead.  Employees with more than 20

years of service may choose to make partial, or "in-service," withdrawals from their

accounts while still employed by the Company.

    Because Meditech stock accounts for approximately 85 percent of the Plan's

assets, the total value of an employee's interest upon leaving Meditech depends

largely upon the value of Company stock.  As the stock is not publicly traded, its market

value is not readily available.  The valuation of the stock is the responsibility of the sole

trustee of the Plan, defendant A. Neil Pappalardo ("Pappalardo").  He oversees the

Plan in cooperation with Meditech's directors, former defendants Lawrence A.

Polimeno, Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman and L.P. Dan

Valente (collectively, the "Directors").

    Plaintiff Michael P. Hubert worked for Meditech until 2004, while his coworkers

and co-plaintiffs David Hinchliffe and William Trainor each left in 1998.  According to

plaintiffs, Pappalardo has knowingly undervalued Meditech's stock for at least the past

---

[1] Pub. L. No. 93-406, 88 Stat. 832 (1974) (codified as amended at 29 U.S.C. §§ 1001-1461).

eight years, and the Directors have approved this undervaluation.  As a result, plaintiffs received smaller cash payments from the Plan upon termination than would be due if Pappalardo had valued the Company stock in compliance with plaintiffs' proposed methodology.[2]  Plaintiffs assert that these Plan payments do not fairly reflect the Company's financial success and, inferentially, the value of their respective interests. They filed the instant suit for failure to pay benefits due under the Plan in violation of ERISA (Count 1) and for breach of fiduciary duty owed under ERISA (Count 2).  After defendants moved to dismiss, plaintiffs filed an amended complaint (Docket #15, "Am. Compl.") and defendants moved for dismissal of the amended complaint as well.  On March 30, 2006, I granted defendants' motion as to Count 2, leaving only the Company, Pappalardo, and the Plan as defendants under the remaining claim, Count 1.

Plaintiffs now seek certification of a class comprising "All participants in the MEDITECH Profit Sharing Plan who have received a distribution of any portion of their interest in that Plan from January 1, 1998 to the present."  (Docket #55.)  Plaintiffs ask to be appointed representatives of this class.

Defendants oppose class certification on a number of grounds, which largely coalesce into objections to plaintiffs' ability to fairly and adequately protect the interests of the class.

## III.    The Plan

---

[2]The record reflects that each of the named plaintiffs received benefits of more than $900,000, but, based on their amended complaint, they claim additional amounts of thousands, perhaps millions, of dollars.

3

The Plan is voluntary on the Company's part.  It may terminate the Plan at any time and it may choose not to contribute to it in a given year.  The Plan is non-contributory, meaning participants are not permitted to make direct contributions to it.  The only additions to it come from the Company's contributions and income from the Plan assets, including dividends paid on Company stock held by the Plan.

Each year, the Directors decide the amount to contribute to the Plan and an allocation of that contribution between cash and stock.  They also determine a value for the Company stock and divide the share value into the dollar amount of the contribution allocated to stock to calculate the number of shares to be added to the Plan.  The cash and shares contributed to the Plan are apportioned to the account of each participant based on his/her income.  Each employee's interest in his or her account vests over five years, after which the employee is fully vested and entitled to his or her full beneficial share of the Plan.

Company stock is not publicly traded, however, employees may purchase some shares at the same value set by the Directors to calculate the number of shares to be added to the Plan.  The Plan further provides a market for employees who wish to sell their shares.

The Plan Trust Agreement (Docket #84, Ex. 1) requires the trustee to value the Plan assets to ascertain the value of each employee's account and to determine the amount of redemptions.  Plaintiffs question the independence of the trustee's valuation and point out that the share value he determines corresponds exactly with that assigned by the Directors for the annual contribution.

4

## IV.   Legal Standard

To certify a class under Fed. R. Civ. P. 23(a), a court must find that: (1) "the class is so numerous that joinder is impracticable, (2) there are questions of law and fact common to the class, (3) the claims and defenses of the class representative are typical of the class, and (4) the representatives will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

In addition, the requirements of Rule 23(b)(3) must be met, namely that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that "a class action is the superior method of resolving the dispute."  Fed. R. Civ. P. 23(b)(3);[3] In re Eaton Vance Corp. Sec. Litig., 219 F.R.D. 38, 42-43 (D. Mass. 2003).

Plaintiffs have the burden to establish that the requisites of Rule 23 are met.  Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 38 (1st Cir. 2003).  The parties do not seriously disagree that the proposed class is numerous and that the commonality requirement is met.  Typicality, although not conceded, may exist.  The decisive and contested issue is the adequacy of plaintiffs as the proposed class representatives.

## V.   Adequacy of Proposed Class Representatives

---

[3] While plaintiffs note that once the prerequisites of Fed. R. Civ. P. 23(a) have been met, "a class may be maintained under any one of three alternative bases," they only address the requirements of Fed. R. Civ. P. 23(b)(3) in support of class certification.  (Docket #76, 8, 17.)  Because plaintiffs fail to meet the requirements of Fed. R Civ. P. 23(a), it is unnecessary to examine any of the additional requirements of Fed. R. Civ. P. 23(b).

To demonstrate adequacy, lead plaintiffs must show first, "that the interests of the representative party will not conflict with the interests of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). No objection has been raised about the competency of plaintiffs' counsel, nor their qualifications and experience. Instead, the question is whether the interests of the three plaintiffs conflict with those of putative class members.

Since all members of the class are bound by the judgment, courts have held that it would be a violation of due process if the class representatives' interests "are not necessarily or even probably the same" as those of absent class members. Hansberry v. Lee, 311 U.S. 32, 45 (1940). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). In Amchem, the Court affirmed a Third Circuit decision holding that a single class of representatives could not adequately protect both the interests of plaintiffs suffering current injuries caused by exposure to asbestos as well as the interests of plaintiffs who had been exposed to asbestos, but without manifest injury. Id. at 610. While both groups of plaintiffs had the common goal of obtaining the maximum recovery for their asbestos related claims, the court below pointed out that the settlement did more than provide a recovery fund, "[r]ather it makes important judgments on how recovery is to be allocated among different kinds of plaintiffs, decisions that necessarily favor some

6

claimants over others." Id. (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 630 (3d Cir. 1996)).  The Supreme Court agreed, noting that even though the fund to pay claims was not limited, a conflict still existed between the members of the class because "the terms of the settlement reflect essential allocation decisions . . . ." Id. at 626.  A similar problem exists in the instant case.  While all members of the proposed class may "have an identical interest in proving that the Defendants intentionally undervalued the stock held by the Plan," the choice of a particular alternate methodology to value the stock pits class members against one another and places them in direct conflict with the proposed class representatives.  (Mem. in Supp. of Pls.' Mot. for Class Cert. (Docket #76) 14.)

A.   **Alignment of Interests**

In a typical securities or product-based class action, the named plaintiffs are motivated to maximize their individual recovery by seeking the highest per-share or per-product settlement.  This automatically aligns their interest with that of absent class members, who also stand to gain the same per-share or per-product recovery.  While the amount of the recovery may vary among the class members because of differing number of shares owned or number of products purchased, each absent class member's recovery is directly proportional to the recovery of the named plaintiffs. Absent unusual circumstances, there is unlikely to be any fundamental conflict that would preclude class certification.

In the instant case, however, the very issue to be decided -- the proper method to value Company stock in the Plan -- results in radically different recoveries for class

7

members depending on the valuation method chosen, the year the member exited the

Plan, as well as the year the member entered the Plan.  Plaintiffs' proposed valuation

methodology, for example, maximizes the stock valuation in the years each terminated

the Plan at the expense of the valuation in other years.  This places plaintiffs in

fundamental conflict with absent class members who would receive a greater recovery

from an alternate methodology.  See In re Pharm. Indus. Average Wholesale Price

Litig., 230 F.R.D. 61, 81 (D. Mass. 2005) ("The conflict that will prevent a plaintiff

meeting the [adequacy of representation] prerequisite must be fundamental . . . .")

(quoting Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir. 2001)).

### B.    Stock Valuation Methodologies

Valuing the equity of a private company is an "art," not simply a matter of

plugging numbers into a formula.  Jonathan Burton, Making Sure the Price Is Right,

Bus. Wk., March 29, 1999 (available at 1999 WLNR 4688610) (noting that each

business is different, even those in the same industry, and that factors such as free

cash flow, whether the company is public or private, and intangibles can influence the

value of a company).  Different appraisers can come to significantly different valuations

based on the same set of facts.  See Alison Stein Wellner, The Number Cruncher

Versus the Vision Guy, Inc., Jan. 2006 (describing two professional appraisers valuing

the same software company on the same facts at $14 million and $30 million

respectively).[4]

### 1.    Defendants' Valuation Methodology

--------

[4] Available at http://www.inc.com/magazine/20060101/valuation-guide-intro.html.

According to plaintiffs' amended complaint, between 1998 and 2004 the stock price as set by the Plan doubled from $14.50 to $29.00 per share, reflecting a yearly increase varying between a minimum of 6% and a maximum of 18% per year. It appears that Meditech set its stock price to provide a monotonically increasing value and to maintain an approximately 6% dividend rate, at least in the years at issue.[5] Throughout this period, the Company experienced steady growth in both revenue and net profit. (Am. Compl. ¶¶ 45-46.) A 2002 posting on the Company intranet described a component of the formula used to determine share value as the product of eleven times net income. (Id. ¶ 55.) The use of a constant multiplier times net income reduces fluctuations in value from year-to-year for a company with steady earnings growth compared to a valuation based on a comparison with prices for similar publicly traded companies. Thus, the Company appears to employ a valuation methodology that looks to internal financial measures to determine share value, without any comparison to the then current share price or financial ratios of similar publicly traded companies. Based on this methodology, vested employees would likely see a regular increase in the value of their Plan balances from year-to-year, with no drastic increases or decreases in any one year.[6]

---

[5] One possible methodology to set the share value of a non-publicly traded, but dividend-paying, stock is to look at the dividend per share in dollars paid out by the company, then select a reasonable percentage dividend rate. Dividing the dividend amount by the chosen rate yields the calculated share value. Because dividends are typically paid out of net earnings, this methodology is closely related to valuation methods based on a multiple of earnings.

[6] The court makes no assumptions concerning the validity of the multiplier used by the Company or whether the ultimate valuation accurately reflects share value.

### 2. **Plaintiffs' Valuation Methodology**

Plaintiffs argued at the hearing on their motion that their complaint did not "pick a method" for valuing Company stock, but merely provided "analogies" and "suggest[ed] valuations, different techniques."  (Hr'g Tr. 47:15-20, Oct. 17, 2006.)  Nevertheless, all of these suggestions appear to rely on a comparison of Meditech's Price-to-Earnings ("P/E") ratio with that of publicly traded companies, or on a direct comparison with the share price of publicly traded companies.  Plaintiffs' own examples illustrate the divergence of their respective interests.

### (1) P/E Ratios Changed Over Time Resulting in Wildly Fluctuating Share Values from Year to Year

The amended complaint notes that shares of comparable publicly owned companies in the late 1990s sold for P/E ratios of over forty, suggesting a valuation of $75.00 per share, not the $14.50 to $16.00 used by the Plan in 1998 and 1999.  (Am. Compl. ¶ 70.)  By 2000, however, plaintiffs indicate a fair valuation of Meditech's stock would have dropped to a P/E ratio of fifteen, or $25.50 per share.  (Id. ¶ 81.)  As the markets recovered from the tech sell-off, valuations rose, with plaintiffs estimating a minimum value of $41.00 in 2002 and a fair value of Meditech stock of $74.00 per share based on a competitive P/E ratio of about 35 plus their estimate of $5.00 in retained cash in 2003 and 2004.[7]  (Id. ¶¶ 95, 101.)  Thus, the valuation methodologies described by plaintiffs result in a three-to-one dip and recovery in share value over the

---

[7] The amended complaint does not offer an estimated share valuation for year 2001, other than to predict that it "would have been worth far more than $19 attributed to it by the defendants."  (Am. Compl. ¶ 88.)

11

class period, creating significant volatility in vested employees' Plan balances from year-to-year.  In particular, under the share valuation described in the amended complaint, an employee terminated in 2000 would a receive approximately one-third of the payout of someone with the same vested share balance terminated the previous year.

### (2) Since the Number of Shares Contributed to the Plan Rely on the Same Valuation, Plaintiffs' Methodology Also Impacts the Size of Any Employees's Individual Account, Benefitting Some and Harming Others

Plaintiffs respond that, since they estimate a share value that always exceeds the value used by the Plan for the years in question, all class members would benefit from their representation.  (Docket #76, 14.)  The obvious flaw in this argument is that it ignores the class representatives' responsibility to "fairly and adequately protect the interests of the class," not merely to ensure that all class members receive some nominal benefit from the action.  Fed. R. Civ. P. 23(a)(4).  Even if plaintiffs' assertion that the Company valuation is too low is correct, class members who received a distribution in 2000 would likely benefit more from a valuation calculated using the Company's valuation methodology, but with a higher multiplier, than from plaintiffs' proposed market analysis valuation.  The three plaintiffs received their distributions in 1998 and 2004, years in which the market valuation described in the amended complaint provides the highest recovery.  Using the Company's methodology, but increasing the net earnings multiplier each year, would increase the valuation for all years proportionally rather than favoring the years in which the plaintiffs received their

distributions.  The distribution per share in 2000 would then be larger than the distribution in 1998.  Thus, an actual conflict exists between at least those absent class members who received distributions in years 2000 through 2002 and the two plaintiffs who received their distribution in 1998.  It is also possible that, by reducing the volatility in share price, the per share valuation in 2004 using the Company methodology but with a steadily increasing multiplier would be lower than that proposed by plaintiffs, creating a conflict between class members and the plaintiff receiving the 2004 distribution.

Less obviously, some class members could actually be harmed if plaintiffs' valuation methodology is adopted.  Plaintiffs imply that the proper resolution of their suit is merely to revalue upwards the share price for each year at issue and multiply that price by the vested share balance of each class member who received a distribution (subtracting the distribution they have already received) to calculate the proper per-member recovery.  But as I noted in my earlier decision, the number of shares owned by each class member was calculated based on the allegedly undervalued price.  Had the plaintiffs' pricing methodology been used when the shares were originally contributed to the Plan, fewer high-priced shares would have been allocated to each employees' account based on the same total dollar contribution by the Company.  Thus, while the per-share value at redemption would be higher, the total number of shares owned would be lower.  As I stated previously, the actual issue to be decided in this case is whether "the parties' competing valuation methodologies []

13

involve different rates of growth (or decline) over time, so that the difference in actual share values would not necessarily be a constant margin."  (Docket #38, 3.)

Contrary to plaintiffs' assertions that all proposed class members would benefit from their representation, it is likely that the value of some members' benefits under plaintiffs' valuation could be less than what they actually received under the Company's valuation, particularly employees who took their distribution in 2002 after a relatively short period of employment.  The D.C. Circuit noted that "the foundations of maintenance of a class action are undermined" where "the action may be taken as conferring economic benefits or working economic harm, depending on the circumstances of the individual [class member]."  Phillips v. Klassen, 502 F.2d 362, 367 (D.C. Cir. 1974) (refusing to certify a class where the theory offered by class representatives would expose some absent class members to a legal liability to return a previously received separation bonus).  Plaintiffs cannot adequately represent absent class members who would suffer harm from a valuation they advocate.

Simply adding additional named plaintiffs to include representatives of distributions for each of the years in question does not resolve the conflict.  The only way to calculate the proper payout under any alternate valuation methodology is to revalue the shares from the beginning of the Plan.  This is because differing year-to-year values result in differing percentage ownership of the shares in the Plan at redemption.[8]  Thus, the only employees guaranteed to have identical interests in

---

[8] Consider the simplified case of a single employee participating in the first year of the Plan and two similarly situated employees in the second year.  In each year the Company contributes $1,000 to the Plan.  Assume a share valuation of $1 per share in

choosing a valuation methodology are those who entered the Plan in the same year and who later exited the Plan in the same year.[9]  See Klassen, 502 F.2d at 367 (noting that where there were conflicting interests in a group of employees party to a common termination agreement, it was "impossible to say, solely because they are parties to it, that any two of them are of the same class.")

### (3) For the Reasons Articulated in (2) Above, Plaintiffs' Methodology Creates Conflicts with Continuing Plan Members

The proposed class includes current Company employees who have taken in-service withdrawals in the years in question but are still participants in the Plan. Defendants assert that, under ERISA, any recovery by plaintiffs must come from the assets of the Plan, and that plaintiffs' suggested valuation results in a recovery that

---

the first year.  After the first year, Employee 1 owns 100% of the 1,000 shares in the Plan.  If, in the second year, the share valuation has not changed, both employees receive 500 shares, and Employee 1 owns 1,500 shares (75% of shares in the Plan), and Employee 2 owns 500 shares (25% of shares in the Plan).  If, however, an alternate valuation places the value of the shares at $2 per share the second year, each employee receives 250 shares, and Employee 1 now owns 1,250 shares (83% of shares in the Plan), and Employee 2 owns 250 shares (17% of shares in the Plan).  If, however, the share value drops to $0.50 in the second year, Employee 1 owns 2,000 shares (66%), while Employee 2 owns 1,000 shares (33%).  Because the Company contributes a fixed dollar amount each year, but the Plan's assets are valued based on share valuation at the time of the contribution, the percentage of Plan assets allocated to each participant is dependent on the valuation methodology used from Plan inception.  Employees generally would prefer high share valuations prior to their entering the Plan, low share valuations during the period in which the Company makes allocations to their account, and very high valuations in the year they withdraw their Plan balances.

[9] Even this oversimplifies the analysis, since employees have an interest in the lowest share valuation in years in which they had the highest dollar contributions to the plan.  To the extent two employees entering and exiting in the same years have differing high earning years (and thus larger Plan contributions), they might prefer different valuation methodologies.

depletes Plan cash.  Plaintiffs admit as much.  (See Am. Compl. ¶ 69 (stating that if employees terminating in 1998 and 1999 "were paid a fair price for their assets in the Plan, the Plan would have soon run out of cash.").)  If the Plan runs out of cash, existing Plan participants could be forced to delay receipt of benefits or to accept stock in lieu of cash under the terms of the Plan.  An employee who stands to receive only a small cash recovery in this action for the increased value of their in-service withdrawal at the expense of a distribution of the bulk of their benefit in unmarketable stock will be harmed by plaintiffs' proposed valuation.  This places absent class members who are still in the Plan in direct conflict with the proposed class representatives.  Therefore, plaintiffs, who have no interest in the future financial security of the Plan, cannot adequately represent class members who still have vested balances in the Plan.[10]

### C.  Lack of Congruence in Desired Relief

The First Circuit analyzed a similar conflict between two groups desiring different valuations methodologies for a pension benefit under a combined typicality and adequacy analysis.  See Dierks v. Thompson, 414 F.2d 453, 456 (1st Cir. 1969) ("In order to maintain a class suit plaintiffs must be truly representational," citing to both Fed. R. Civ. P. 23(a)(3) and (4)); see also Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996) (noting that the Rule 23 requirements of typicality and

_____

[10] It is not difficult to postulate additional reasons that existing employees' interests would be at odds with plaintiffs' interests.  By creating extreme variability in benefits from one year to the next, plaintiffs valuation methodology could harm the Company's ability to attract and retain a competent work force.  The resulting decline in Company profitability and competitiveness would likely have a negative impact on existing employees' interests in job security and continued contributions to the Plan.

adequacy are closely related, "both look to the potential for conflicts in the class.").  In

Dierks, benefits due former company employees were held in trust by a non-

contributory company profit-sharing plan until paid out at death, disability or the former

employee reached age 65.  Plaintiff employees brought a class action against

defendant trustees of the plan seeking one of two alternate valuations for their vested

benefits, both different from that used by defendants.  One construction favored by a

portion of the class fixed the benefit amount at the employee's termination, while the

other set the benefit as a percentage of the fund, changing with market conditions until

paid.  Even though the parties had stipulated in the court below that class

representation was proper, the First Circuit held, as a matter of equity and due process,

that plaintiffs who advocated the market method of determining valuation could not

represent the group that preferred a fixed valuation.  Dierks, 414 F.2d at 456.  "Unless

the relief sought by the particular plaintiffs who bring the suit can be thought to be what

would be desired by the other members of the class, it would be inequitable to

recognize plaintiffs as representative, and a violation of due process to permit them to

obtain a judgment binding absent plaintiffs."  Id. (emphasis added).

Here, plaintiffs argue that they are typical of all class members because "[t]hey

have been injured in the same way (e.g., received less than the amount they were due

under the Plan), and have claims based on the same legal theories (e.g., the

Defendants intentionally undervalued the stock held by the Plan . . .)," and that they will

adequately represent the class because they "have no interests antagonistic to those of

the other class members."  (Docket #76, 12, 14.)  However, plaintiffs admit that "the

17

lion's share of litigation resources on both sides will be invested in competing expert testimony on the issue of 'fair value' of Meditech stock throughout the years." (Id. at 18.)  Yet, it is precisely on the choice of what methodology to pursue to establish "fair value" that plaintiffs cannot "be thought to be [seeking the same relief that] would be desired by the other members of the class." Dierks, 414 F.2d at 456.  Plaintiffs describe a methodology of valuation that benefits employees terminated in the beginning and end of the class period at the expense of those receiving distributions in the middle of the period.  This choice places plaintiffs in direct conflict with those absent class members who would benefit from a valuation methodology which provides a larger recovery in 2000 through 2002 at the expense of the years in which plaintiffs received their distributions.  "[D]iverse and potentially conflicting interests within the class are incompatible with the maintenance of a true class action." Id.; see also Amchem, 521 U.S. at 625 (holding that the common goal of obtaining the maximum recovery alone does not justify class certification where the proposed class members have conflicting goals for relief); Dierks, 414 F.2d at 456 ("Under such circumstances, [where suing plaintiffs desired a market valuation but some absent class members could have preferred an obligation in a fixed amount,] the court could not have found that plaintiffs were 'typical' of the former [] employees whom they purported to represent; they were typical of only one of two conflicting groups.").

## VI.    Conclusion

Members of plaintiffs' proposed class have divergent and conflicting interests in the selection of the appropriate valuation methodology for Meditech stock which are

incompatible with the maintenance of a class action.  Plaintiffs cannot be representative of all class members because the class itself has no single desired choice of share valuation.  Any particular choice necessarily allocates recovery in ways that benefit some class members at the expense of others.  Under these circumstances, plaintiffs cannot "fairly and adequately protect the interests of the class," and class certification is inappropriate.  Fed. R. Civ. P. 23(a)(4).

Accordingly, plaintiffs' motion to certify class (Docket #55) is DENIED.  Plaintiffs' motion to strike affidavits (Docket #81) is DENIED as moot.[11]


_____March 20, 2007_____                    _____/s/Rya W. Zobel_____
             DATE                                          RYA W. ZOBEL
                                               UNITED STATES DISTRICT JUDGE


---

[11] Plaintiffs seek to strike the affidavits of A. Neal Pappalardo and Barbara A. Manzolillo as exceeding this courts' order limiting discovery to the issue of class certification only.  My decision to deny class certification does not rely on the information attested to in these affidavits, and thus the motion is moot.

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10269-RWZ

MICHAEL P. HUBERT, DAVID HINCHLIFFE and WILLIAM TRAINOR

v.

MEDICAL INFORMATION TECHNOLOGY, INC.,
MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN,
A. NEIL PAPPALARDO, LAWRENCE A. POLIMENO, RONALD L. DRISCOLL,
EDWARD B. ROBERTS, MORTON E. RUDERMAN and L.P. DAN VALENTE

MEMORANDUM OF DECISION

March 20, 2006

ZOBEL, D.J.

In 1973, defendant Medical Information Technology, Inc. ("Meditech," or

"Company"), a Massachusetts corporation, established a profit sharing plan on behalf

of its employees in order to provide pension benefits upon retirement.  The Medical

Information Technology Profit Sharing Plan (the "Plan") is governed by the Employment

Retirement Income Security Act ("ERISA").  Meditech makes cash and stock

contributions to the Plan, and upon termination of employment, each employee

receives a cash payment in the amount of that employee's vested interest in the Plan.

Because Meditech stock accounts for approximately 85 percent of the Plan's holdings,

the total value of an employee's interest upon leaving Meditech depends largely upon

valuation of the stock held in the employee's Plan account.  Such valuation, among

other responsibilities for the Plan, is handled by the sole trustee of the Plan, defendant

A. Neil Pappalardo ("Pappalardo"), who oversees the Plan in cooperation with

Meditech's directors, defendants Lawrence A. Polimeno, Roland L. Driscoll, Edward B.

Roberts, Morton E. Ruderman and L.P. Dan Valente (collectively, the "Directors").

Plaintiff Michael P. Hubert worked for Meditech until 2004, while his coworkers

and co-plaintiffs David Hinchliffe and William Trainor each left in 1998.  According to

plaintiffs, Pappalardo has knowingly undervalued Meditech's stock for at least the past

eight years, and the Directors have approved this undervaluation.  As a result, plaintiffs

received smaller cash payments from the Plan upon termination than otherwise due if

Pappalardo had valued the Company stock in compliance with a modern methodology

for appraising fair market value.  According to plaintiffs, these Plan payments do not

fairly reflect the true value of plaintiffs' interests as a function of the Company's

financial success.  In an effort to recover the balance, plaintiffs filed the instant suit for

failure to pay benefits due under the Plan in violation of ERISA (Count 1) and for

breach of fiduciary duty owed under ERISA (Count 2).  After defendants filed a Motion

to Dismiss, plaintiffs filed an Amended Complaint.  Defendants now move for dismissal

of the Amended Complaint.

Defendants raise several grounds for dismissal.  First, they argue that the facts

alleged in the Amended Complaint, even if true, do not establish plaintiffs' rights to any

additional benefits as alleged in Count 1.  Defendants assert this ground as a matter of

logic, essentially arguing that the Company's annual contributions were fixed amounts,

and higher valuation of the stock would have simply led to fewer shares actually being

allocated to the Plan.  They argue that plaintiffs seek to benefit from both a low

valuation at the time stock is contributed to the Plan, so that more shares are assigned,

2

and a high valuation at the time stock is distributed from the Plan, so that termination payments would reflect higher values without having reduced the number of shares originally contributed to the Plan and allocable to the individual plaintiffs. However, defendants' theory does not foreclose the possibility that an original contribution of fewer, more highly valued shares would, by the time plaintiffs terminated their employment and under an independent appraisal, still have increased in value more quickly than reflected by defendants' methodology, especially given plaintiffs' claims of Meditech's financial strength. In other words, the parties' competing valuation methodologies may involve different rates of growth (or decline) over time, so that the difference in actual share values each year would not necessarily be a constant margin. Defendants' assertion that plaintiffs' have not adequately pled a loss in benefits is, thus, not persuasive. Their second argument that regards standing but also relies upon this first argument similarly fails.

Third, defendants claim that the Amended Complaint fails to allege sufficiently arbitrary and capricious conduct by defendants in making discretionary decisions regarding benefits valuations. While defendants correctly identify the standard of review to be arbitrary and capricious, plaintiffs appropriately note that "[i]n applying [this standard], . . . the existence of a conflict of interest on the part of the administrator is a factor which must be considered." Wright v. R.R. Donnelly & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005). On the face of the Amended Complaint, plaintiffs have alleged such a conflict. (See Am. Compl. ¶¶ 56-58). Further fact-finding

3

as to whether plaintiffs can sustain their assertion is, at this stage in the litigation, premature.  Accordingly, defendant's motion on this basis is denied.

Fourth, defendants note that plaintiffs did not exhaust their remedies under the Plan prior to filing the instant suit.  "Before a plaintiff asserts an ERISA claim, . . . he must first exhaust his administrative remedies."  Madera v. Marsh USA, 426 F.3d 56, 61 (1st Cir. 2005).  Plaintiffs do not dispute that they never filed a formal claim for review of the issues addressed in the instant suit.  However, they challenge the existence of administrative remedies, as the Plan alluded to "rules . . . for filing a claim" that allegedly never materialized, and further deny that they ever received notice that such remedies were available.  (See Am. Compl. ¶¶ 26-30; Ex. A, at 8).  If plaintiffs' allegations are true, then they may qualify for relief or exception from the exhaustion requirement.  See Madera, 426 F.3d at 61-62.  On the present record, dismissal for failure to exhaust is inappropriate.

Next, defendants challenge Count 2 as an attempt by plaintiffs to repackage Count 1 as a fiduciary duty claim, even though "individuals cannot obtain compensatory or punitive damages for breach of fiduciary duty."  Watson v. Deaconess Waltham Hosp., 141 F. Supp. 2d 145, 150 (D. Mass. 2001).  Plaintiffs argue that Count 2 differs from Count 1 in that the latter pleads a contractual breach while the former pleads a breach of defendants' statutory duties of loyalty and care.  To remedy a fiduciary breach under ERISA, plaintiffs may only obtain "appropriate equitable relief."  29 U.S.C. § 1132(a)(3).  In Count 2, plaintiffs seek three remedies: (1) restitution, (2) disgorgement of unjust enrichment, and (3) an injunction that requires defendants to

4

hire an outside appraiser for future valuations of Company stock.  As to the first, "for restitution to lie in equity, the action must generally seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."  See Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 214 (2002).  Although plaintiffs characterize their restitution as seeking to "make whole the named plaintiffs," the remedy derives from benefits that plaintiffs believe they are entitled to under the terms of the Plan.  It is, as defendants contend, essentially the same compensation sought in Count 1.  As such, it amounts to legal restitution, not equitable restitution, and "this fine distinction between restitution at law and restitution in equity" forecloses plaintiffs' ability to obtain legal restitution for the alleged fiduciary breach.  Id.

With respect to plaintiffs' second remedy that defendants be ordered to disgorge unjust enrichment, a problem arises with the requirement that restitution in equity be able to "clearly be traced to particular funds or property in the defendant's possession." Id. at 213.  In the context of a suit by an ERISA plan to recover funds already paid to a beneficiary, "courts have applied a three-part test: 'Does [plaintiff] seek to recover funds (1) that are specifically identifiable, (2) that belong in good conscience to [plaintiff], and (3) that are within the possession and control of the [defendant]?'" Admin. Comm. of the Wal-Mart Assoc. Health and Welfare Plan v. Willard, 393 F.3d 1119, 1122 (10th Cir. 2004).  Here, it is not at all clear how plaintiffs could prove that defendants in fact purchased more shares as a result of the alleged undervaluation than they otherwise would have bought.  Additionally, as a practical matter, defendants

5

will not realize profit from these holdings until they sell their shares, and there is no way

to determine at this time what the eventual selling price will be.  Thus, the actual

amount by which defendants may be allegedly unjustly enriched, and thus to be

disgorged, is not, according to any allegation set forth by plaintiffs, specifically

identifiable or susceptible to reasonable calculation.  Moreover, regarding the second

prong of the test, defendants argue that plaintiffs fail to explain at whose expense

defendants allegedly unjustly enriched themselves and whether or how anyone was, in

fact, harmed by the conduct.  Plaintiffs' allegation that Pappalardo and other "insiders"

purchased more stock and therefore retained tighter control over the company because

the price was artificially low necessarily implies that defendants obtained such control

improperly as against other Company owners, namely the other shareholders (including

plaintiffs and the Plan).  Again, though defendants may still have purchased the same

number of shares at a higher price, and even if the difference between the purchase

prices may be characterized as unjust enrichment, plaintiffs have not clarified whether

or why this amount would belong to them.  Thus, the portion of Count 2 regarding

unjust enrichment is dismissed.

The remaining plea for prospective relief through an injunction requiring outside

appraisal of the stock for future valuations may qualify as equitable, but plaintiffs have

not demonstrated standing to obtain this remedy.  Under Article III of the Constitution,

"[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly

unlawful conduct and likely to be redressed by the requested relief."  Allen v. Wright,

468 U.S. 737, 751 (1984).  As defendants argue, the injunctive relief sought in Count 2

cannot redress plaintiffs' alleged injuries, because the relief sought is prospective and plaintiffs are no longer members of the Plan.  Plaintiffs have sought class certification, but in defining the "putative class" as those individuals who "had the same or similar experience when receiving their [Plan] distributions," they necessarily include only former Company employees in the class.  Because neither plaintiffs nor any of the putative members of the asserted class would benefit from the order of an injunction affecting the future administration of the Plan, plaintiffs do not have standing to seek this relief.  Because none of the remedies sought by plaintiffs in Count 2 is permitted under relevant legal authority, "their suit [on this claim] is not authorized" under ERISA. Great-West Life, 534 U.S. at 218.  The motion to dismiss Count 2 is allowed as to all defendants.

Defendants raise a statute of limitations defense as an additional basis for dismissing both Counts 1 and 2.  As Count 2 is dismissed, only the arguments with respect to Count 1 are considered.  "Because Congress did not provide a statute of limitations in the ERISA statute for [benefits] claims, federal courts must apply the limitations period of the state-law cause of action most analogous to the federal claim." Muldoon v. C.J. Muldoon & Sons, 278 F.3d 31, 32 (1st Cir. 2002).  Plaintiffs urge analogy to the six-year limitations period for contract actions under Massachusetts law, while defendants recommend the three-year limitations period under the Massachusetts wage payment statute.  Defendants rely upon a thoroughly-reasoned Third Circuit decision that found "[c]laims for recalculation of benefits already paid are essentially claims for past due 'wages' . . . [and] are subject to the Pennsylvania Wage

7

Payment and Collection Law's three-year limitation on actions for wages past due."

Gluck v. Unisys Corp., 960 F.2d 1168, 1182 (3rd Cir. 1992).  However, the Third Circuit

also acknowledged that "where the ERISA claims asserted differ from those presented

in [prior cases], [the court] should not rotely apply the same limitations period . . . ."  Id.

at 1180.  For example, the Third Circuit found the Pennsylvania statute of limitations for

contracts actions applied to claims for benefits that were bargained for, but noted that

the Pennsylvania wage law limitations period might apply to claims for wages due on

regular paydays.  Id. at 1180-81.  Of relevance in this case, the Third Circuit also

distinguished, for statute of limitations purposes, between claims for past due wages

and claims for benefits pursuant to "an ERISA violation," finding these "not analogous."

Id.

> An employer's delinquency or an employee's receipt of diminished
> payment gives immediate, obvious notice to an employee that something
> is amiss, but an ERISA violation or a reduction in future benefits may be
> subtle and will go unnoticed far more often than delinquency.
> Furthermore, the analogy in [prior cases] between the 'wages' covered by
> Pennsylvania law and the delinquent employer contributions – which had
> been collectively bargained for – becomes inoperable when ERISA claims
> are based on statutory violations, plan interpretation and future benefits.

Id.

For the reasons articulated by the Third Circuit in Gluck, plaintiffs' claim for

benefits is distinguishable from a claim for past due wages and renders inapposite the

statute of limitations established by the Massachusetts wage payment statute.

Additionally, as plaintiffs' contend, to the extent that the payments at issue constitute

deferred compensation, "deferred compensation contributions are not 'wages' under

the weekly wage law." Boston Police Patrolmen's Ass'n, Inc. v. City of Boston, 435
Mass. 718, 721 (2002). Defendants argue that the characterization of deferred
compensation as not constituting wages applies only when the contributions are not
property of the employee, and that the Plan contributions were, to the contrary,
plaintiffs' property. The characterization in Boston Police was driven, however, not by
whether the contributions were employee property, but rather by the original intent
behind the deferred compensation plan, namely, to withhold a portion of participating
employees' salaries for later payment and "the benefit of a tax deferment." Id. at 720.
If the deferred compensation constituted wages, then the tax benefit would not be
available. Here, defendants do not allege that the contributions to the Plan on behalf of
participants were intended to be wages, in the sense that tax would be due and owing
upon contribution. Accordingly, the reasoning that supported the characterization in
Boston Police dictates the same result in the instant case.

While Gluck declined to apply the Pennsylvania contracts statute of limitations
because the benefits at issue had not been bargained for, Massachusetts courts have
ruled otherwise. When a plaintiff sues for benefits that "are incidents of the plaintiff's
employment," and are provided "under an employment contract . . . the appropriate
statute of limitations is six years [in accordance with the statute of limitations for
contract actions]." Chambers v. Lemuel Shattuck Hosp., 41 Mass. App. Ct. 211, 212-
213 (1996), citing Jones v. Wayland, 374 Mass. 249, 260 (1978)(finding payments for
leave when incapacitated are "incidents of [plaintiff's] employment and are contingent
on the continued employment of [plaintiff]," such that "[plaintiff]'s resignation . . .

9

operated to terminate his right to continued compensation . . ."). The <u>Chambers</u> court applied the statute of limitations for contractual disputes, because the benefits sought were originally provided as a result of the plaintiff's status as an employee, even though the benefits sought were mandated by statute and not the employee's contract. Similarly, in the instant case, defendants authorized contributions to the Plan on plaintiffs' behalf simply because plaintiffs were employees. Logically, then, plaintiffs' suit regarding Plan contributions is analogous to suits for payments that are incidents of employment, and the appropriate state statute of limitations is the six-year period for contracts claims as applied by the Massachusetts state courts.

With respect to determining the date on which plaintiffs' action accrued, "[c]onsistent with the [federal] discovery rule, the general rule in an ERISA action is that a cause of action accrues after a claim for benefits has been made and has been formally denied." <u>Union Pacific R. Co. v. Beckham</u>, 138 F.3d 325, 330 (8th Cir. 1998). Because plaintiffs never formally filed a claim for benefits, the appropriate date for accrual is less clear. Plaintiffs assert that defendants' conduct constituted a continuing violation, since the undervaluation occurred on an annual basis. This theory is unsatisfactory, because it places no burden on the plaintiffs to exercise reasonable diligence. Defendants argue that the action accrued on the date that the allegedly discounted payments were distributed by the Plan to the plaintiffs, since the amount itself should have raised plaintiffs' awareness of an issue. This suggestion better incorporates the expectation for reasonable diligence and is consistent with a rule set forth by the First Circuit in a case somewhat similar to the facts at hand. See <u>Geo.</u>

10

Knight & Co., Inc. v. Watson Wyatt & Co., 170 F.3d 210 (1st Cir. 1999).  In that case, the plaintiff was an employer that established an ERISA plan, made contributions in amounts recommended by the defendant actuarial services company, and sued the company under state law when the plan was found to be underfunded.  In determining, under the discovery rule, when the employer's action accrued, the First Circuit placed the burden on the employer to demonstrate when it "knew, or in the exercise of reasonable diligence should have known, about the Plan's 'underfunded' status," and based its finding on documentation that was available for review by the employer.  Id. at 214.

Although the instant case concerns different underlying legal claims and the burden remains on defendants, as the asserting party, to demonstrate why Count 1 falls outside the statute of limitations, these differences do not undermine the relevance of the similar circumstances from which plaintiffs' Count 1 claim arose.  Because plaintiffs derived their claim from data summarized over several years after 1998, the complaint as pled does not clearly fall outside the statute of limitations.  The motion to dismiss is denied.

The defendant Directors filed separate motions to dismiss on an additional basis.  Because these defendants were named only in Count 2, and Count 2 is dismissed, the separate motions are moot.

Accordingly, defendants' Motions to Dismiss the Amended Complaint (#5 and #24 on the docket) are denied as to Count 1 but are allowed as Count 2.  Defendants' separate Motions to Dismiss (#3 and #26 on the docket) are moot.

11

_____          /s/ Rya W. Zobel
        DATE                      RYA W. ZOBEL
                                  UNITED STATES DISTRICT JUDGE

# EXHIBIT 7
# (FILED UNDER SEAL)

# EXHIBIT 8

| | |
|---|---|
| **From:** | Collora, Michael [mcollora@dwyercollora.com] |
| **Sent:** | Friday, April 04, 2008 10:40 AM |
| **To:** | Martin, Kevin P |
| **Cc:** | Ryan, Jennifer |
| **Subject:** | Parties Pre Trial Memorandum |
| **Follow Up Flag:** | Review |
| **Flag Status:** | Flagged |
| **Attachments:** | 94424_1.doc |

Kevin: Please review the attached. This is our first shot at what we think should be submitted to the Court, but of course it does not contain your comments. If you agree that the plaintiffs exhibits are admissible as business records under the federal rules referred to in our admissions(aside from the obvious non business ones such as pleadings), then we will resend only those  admissions related to other matters.  Please advise us also as to what if any of the proposed exhibits you will object to on relevency or any other grounds, and all of the rest of the items can then be marked as trial exhibits, and can just go into evidence. We do not yet have MHubert's permission to drop his portion of the claim and it may be an issue at the hearing. I will further advise you as to that

# EXHIBIT 9



EXHIBIT

MH 3

AHS 7/26/06

-----Original Message-----
**From:** ERISA [mailto:erisa@mediaone.net]
**Sent:** Monday, February 18, 2002 3:01 AM
**To:** marcia@mwagner.net; aliazos@mwe.com; info@dwyercollora.com;
cmontilio@dwyercollora.com; jcleary@goodwinprocter.com; mtse@goodwinprocter.com;
kbilezerian@mwe.com; ajbianchi@MirickOConnell.com; tkolb@erisaboston.com;
wfitzgerald@mbbf.com; isunshine@sandw.com; edwards@mc-ed.com; friedler@aol.com
**Subject:** ERISA Suit

Dear Sir or Madam:

I believe a have a case against a Massachusetts employer that could settle for more than $20,000,000.

My employer is a private company with qualified contribution plan. The plan judiciary is also the founder and the major stockholder of the company. The plan is mostly invested in company stock. The judiciary sets the value of the stock, despite the fact they have no experience in this matter. The auditors simply accept the value of "fair market value". It is acknowledged by all that the stock value is set low so that employees will purchase the

stock.  When the plan makes distributions, employees receive much less than they should.  If the real "fair market value" was used to compute the distribution, the plan would have no cash.

The plan has distributed more than $20,000,000 within the last five years, and the stock value is set at about one-third of companies our size in our industry.  The fudiciary has assets of more than $50,000,000.

I hope that you or your firm would be interested in reviewing this case on a contingency basis.  As an employee of this firm, bringing this case to you, and willing to be active in the case, I wish be receive financial consideration for my efforts.  If you wish further information, please respond to this email.  Since I am still working at this firm, and wish to remain so, I regret that I cannot yet identify myself or my company.

Thank you for your consideration.

Bob

# EXHIBIT 10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10269-RWZ

MICHAEL P. HUBERT, et al.

v.

MEDICAL INFORMATION TECHNOLOGY
PROFIT SHARING, et al.

<u>SCHEDULING ORDER</u>

May 15, 2006

ZOBEL, D. J.

This matter having come before the court at a scheduling conference held pursuant to Rule

16, Fed. R. Civ. P., 28 U.S.C., and Michael A. Collora and Sara E. Noonan having appeared as

counsel for plaintiffs Michael P. Hubert, et al; and Kevin P. Martin and Stephen D. Poss having

appeared as counsel for defendants Medical Information Technology Profit Sharing Plan, et al.,

the following action was taken:

1.    The parties agreed to complete all discovery pertaining to class certification by

July 31, 2006.

2.    The motion for class certification shall be filed by August 15, 2006; the opposition,

by September 15, 2006, and a reply of no more than five pages, by September 27, 2006.

Hearing on the motion will be on October 17, 2006 at 2 p.m.

3.    Counsel agreed to work out an appropriate protective order and to make available

documents from the Grossman case.

_____        /s/ Rya W. Zobel
        DATE                           RYA W. ZOBEL
                              UNITED STATES DISTRICT JUDGE

# EXHIBIT 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually And On Behalf Of All Persons Similarly Situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO,<br><br>        Defendants. | Civil Action No. 05-10269RWZ |

## AFFIDAVIT OF BARBARA A. MANZOLILLO

I, Barbara A. Manzolillo, do hereby depose and state:

1.    I am the Chief Financial Officer ("CFO"), Treasurer, and Clerk of Medical Information Technology, Inc. ("Meditech" or the "Company"). I have served as the Treasurer since 1986, the CFO since 1996, and the Clerk since 2002. I have been employed at Meditech since 1975.

2.    I also serve on behalf of Meditech as the Administrator of the Medical Information Technology, Inc. Profit Sharing Plan (the "Plan"), and the trust (the "Trust") established pursuant to the Plan. I assumed this role in 1990. As Administrator, it is my duty to assist the Plan's Trustee, A. Neil Pappalardo, in the day-to-day operation of the Plan and the Trust.

3.    I submit this affidavit, which is based on my personal knowledge and review of Company files, in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification.

1

**MEDITECH STOCK**

4.      Meditech is a privately held company. Meditech's stock has never been traded on any public exchange. There are, however, transactions in Meditech Stock. Among other transactions, the Company has sold stock to most eligible employees, and the Trust creates a market for Meditech stock by purchasing shares from employees or prior employees who wish to liquidate some or all of their holdings.

5.      Each of the named plaintiffs in this lawsuit – Michael Hubert, David Hinchliffe, and William Trainor (the "Plaintiffs") – has purchased stock from the Company, and sold stock to the Trust when he wanted to liquidate some or all of his holdings.

**MICHAEL HUBERT'S BENEFITS FROM MEDITECH STOCK**

6.      Mr. Hubert was an active purchaser of Meditech stock until his termination from the Company in 2004.

7.      Between 1985, when Mr. Hubert first purchased shares from the Company, and 2004, when his employment with Meditech was terminated, Mr. Hubert purchased a total of 24,300 split-adjusted shares from the Company, for which he paid a total of $197,425.

8.      Mr. Hubert has earned a significant return on his purchases of Meditech stock. In 2003, Mr. Hubert sold 1,000 shares of Meditech stock to the Trust for $23,000. He still holds 23,300 shares. At the current fair value of Meditech stock determined by the Board of Directors as well as the Trustee at year end 2005 ($32), those shares are worth a total of $745,600. Between his sale in 2003 and the increase in value on his remaining shares, Mr. Hubert has gained $571,175 on his initial investment of $197,425, a return of about 289%.

9.      In addition, Meditech pays a dividend on its stock. Over the years, Mr. Hubert has been paid more than $310,000 in dividends on his shares of Meditech stock, including

2

$46,600 in 2005 alone  Between these dividends, Mr. Hubert's sale of stock to the Trust, and the appreciation in value of Mr. Hubert's remaining shares, Mr Hubert has gained approximately $881,000 on his $197,425 investment in Meditech stock

10    In addition to the large sums Mr. Hubert has earned through his personal investment in Meditech stock, Mr. Hubert received a substantial payout from the Trust.  Mr. Hubert's 2004 Trust distributions were based in large part both on the voluntary contributions of Meditech stock to the Trust by the Company, and on the appreciation in the value of that stock while Mr. Hubert was a Plan participant.  Mr. Hubert made a voluntary in-service withdrawal from the Trust in early 2004 in the amount of $39,086.04 plus interest of $390.86.  When his employment with Meditech was later terminated, Mr. Hubert also received a payout of his remaining balance in the Trust, $1,000,000, plus interest of $40,000.  Thus, Mr. Hubert received total distributions from the Trust of $1,079,476.90, for which he paid nothing

11.    Altogether, between his distributions from the Trust, and the returns Mr. Hubert has earned through his own investments in Meditech stock, Mr. Hubert has gained over $1.9 million dollars, an amount that continues to increase through Mr. Hubert's continued receipt of tens of thousands in dividends each year on his remaining 23,300 shares of Meditech stock.

12    I find it noteworthy that Mr. Hubert continued purchasing Meditech stock, at the fair values determined by the Company's Board of Directors, even after he decided that the stock was being undervalued, and even after he decided to sue the Defendants based on this alleged undervaluation

13.    It is my understanding that Mr. Hubert first came to believe that Meditech stock was undervalued at least by the mid-1990s.  During the class period alleged in the Plaintiffs' Amended Complaint in this lawsuit (1998 and forward), during which Plaintiffs allege that the

3

Defendants have undervalued Meditech stock, Mr. Hubert purchased a total of 5,800 split-adjusted shares of Meditech stock for a total of $97,100. Those shares, at the year-end 2005 fair value for Meditech stock determined by the Trustee, are worth $185,600.

14.     It is my understanding that on February 18, 2002, Mr. Hubert sent an anonymous email to various lawyers offering to provide them details concerning a potential lawsuit against the Trustee based on the alleged undervaluation of Meditech stock. Following that email, Mr. Hubert continued buying shares from the Company at prices that he believed had been intentionally set too low. Two days after sending the email, on February 20, 2002, Mr. Hubert purchased 400 shares of Meditech stock from the Company at $19 per share. In February 2003 Mr. Hubert purchased 1,000 shares from the Company at the $22 per share value determined at year-end 2002; in their Amended Complaint, Plaintiffs allege that the per share value was actually $41 at year-end 2002. In February 2004, Mr. Hubert purchased an additional 200 shares from the Company at the $26 per share value determined at year-end 2003; in their Amended Complaint, Plaintiffs allege that the per share value was actually at least $74 at year end 2003.

### DAVID HINCHLIFFE'S BENEFITS FROM MEDITECH STOCK

15.     Mr. Hinchliffe, like Mr. Hubert, earned significant returns on purchases of Meditech stock from the Company.

16.     During his tenure with Meditech, which ended in 1998, Mr. Hinchliffe purchased shares of Meditech stock from the Company for a total of $16,400. He eventually sold all of these shares to the Trust, which paid him $301,100, a profit of $284,700 representing a gain of 1736% on his investment.

17.     Mr. Hinchliffe also received dividends on his stock while he held it. Mr. Hinchliffe received $92,899.50 in dividends, which, together with the appreciation in the value

4

of the stock before he sold it to the Trust, provided him a total return of approximately $377,000 on an investment of $16,400.

18.    Also like Mr. Hubert, Mr. Hinchliffe received a significant distribution from the Trust. When his employment with Meditech terminated in 1998, Mr. Hinchliffe received a distribution from the Trust in the amount of $1,123,639.39, for which he paid nothing. This distribution, together with the returns on his personal investment in Meditech stock from dividends and the sale to the Trust, provided Mr. Hinchliffe approximately $1.5 million.

## WILLIAM TRAINOR'S BENEFITS FROM MEDITECH STOCK

19.    Mr. Trainor, like Mr. Hubert and Mr. Hinchliffe, benefited handsomely from his association with Meditech, which ended in 1998.

20.    Mr. Trainor purchased shares from the Company for a total of $16,950. Mr. Trainor then sold all of these shares to the Trust, which paid him a total of $310,150. Mr. Trainor thus earned a profit of $293,200 just on the purchase and sale, representing a gain of 1730%.

21.    Mr. Trainor, like the other shareholders, also received a dividend on his shares while he held them. All told, Mr. Trainor received $114,384.75 in dividends. These dividends, together with the appreciation on his stock, provided Mr. Trainor a total return of approximately $407,000 on his $16,950 investment.

22.    Mr. Trainor, of course, also received a significant distribution from the Trust upon termination of his employment with Meditech in 1998: $929,943.41, for which he paid nothing. This distribution, together with the returns Mr. Trainor received on his personal investment in Meditech stock, provided Mr. Trainor with more than $1.3 million.

## VALUE OF MEDITECH STOCK DETERMINED BY THE TRUSTEE

23      Plaintiffs allege that the Trustee has intentionally undervalued Meditech stock

held by the Trust  The year-end value of Meditech stock, however, as determined by the Trustee

for purposes of valuing the Trust and, thereby, the value of the account of each individual Plan

participant, has been on a consistent upward trajectory, and, as evidenced by the distributions

provided to the Plaintiffs, has resulted in substantial benefits being paid to Plan participants

24      The following chart reflects, for each year beginning in 1992, six years before the

putative class period begins, and 2006 (all data is not available for all years)  (a) Meditech's

earnings per share, (b) the dividend per share, (c) the year-end value of Meditech stock

determined by the Trustee, which was used for valuing the Trust and thereby determining

distributions in the following year, and (d) the year-end value of Meditech stock that Plaintiffs

allege in their Amended Complaint should have been used in each year

| YEAR | Meditech Earnings Per Share | Dividend per Share | Year End Fair Value per Trustee | Year End Fair Value per Plaintiffs |
|------|------|------|------|------|
| 1992 | $0 75 | $0 34 | $6 33 | N/A |
| 1993 | $0 96 | $0 43 | $7 00 | N/A |
| 1994 | $1 03 | $0 52 | $8 50 | N/A |
| 1995 | $1 18 | $0 62 | $10 00 | N/A |
| 1996 | $1 40 | $0 70 | $12 00 | N/A |
| 1997 | $1 57 | $0 84 | $13 50 | $75 00 |
| 1998 | $1 64 | $0 94 | $14 50 | $75 00 |
| 1999 | $1 83 | $1 00 | $16 00 | N/A |
| 2000 | $1 66 | $1 16 | $17 00 | $25 50 |
| 2001 | $1 70 | $1 24 | $19 00 | N/A |
| 2002 | $1 89 | $1 36 | $22 00 | $41 00 |
| 2003 | $1 98 | $1 56 | $26 00 | $74 00 |
| 2004 | $2 08 | $1 80 | $29 00 | N/A |
| 2005 | $2 24 | $2 00 | $32 00 | N/A |
| 2006 | N/A | $2 16 | N/A | N/A |

25.     Notably, the fair value determined by the Trustee between year end 1997 (as relevant to distributions made to Plan participants in 1998, the beginning of the class period) and year end 2005, increased from $13.50 to $32, a gain of 137%. Between 1997 and 2005, Meditech's earnings per share grew by 43%, from $1.57 to $2.24. It is my understanding that in determining a year-end fair value for Meditech stock, the Trustee takes into consideration the per-share dividends to be paid by the Company in the following year. Between 1998 and 2006, the dividends paid per share on Meditech stock grew from $0.94 to $2.16, a gain of 129%. Thus, the Trustee has been increasing the value of Meditech stock at a rate in excess of the rate of Meditech's earnings growth per share, and consistent with the growth in dividends paid per share, during the period in which Plaintiffs allege the value of the stock has been artificially depressed.

26.     Indeed, the year-end value of Meditech stock determined by the Trustee has been increasing at a rate exceeding growth in earnings per share, and consistent with dividends paid per share in the following year, since well before the class period began. For example, between year-end 1992, five years before the start of the putative class period, and year-end 2005, the value of Meditech stock used by the Trustee increased from $6.33 to $32 (an increase of 405%), while Meditech's earnings per share increased from $0.75 in 1992 to $2.24 in 2005 (an increase of 198%), and the dividends paid per share grew from $0.43 in 1993 to $2.16 in 2006 (an increase of 402%).

27.     The Trust has also avoided the negative volatility that, Plaintiffs allege, should have been present during the class period. As reflected in the above chart, the Amended Complaint specifically alleges that the "actual" fair value of Meditech stock was $75 at year end 1997 (used for distributions to Plan participants in 1998), dropping to $25.50 at year end 2000,

7

and $41 at year end 2002, before finally returning to $74 at year end 2003. Thus, under the valuation method employed by the Amended Complaint, employees would not only fail to share in the Company's growth in earnings per share between 1997 and 2003 (from $1.57 to $1.98, an increase of 26%), but employees in years such as 2001 and 2003 would receive distributions from the Trust based on year-end fair values lower than the year-end fair value in 1997, even though Meditech's earnings per share were higher in 2000 and 2002 than they were in 1997.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 15, 2006.

/s/ Barbara A. Manzolillo
Barbara A. Manzolillo

# EXHIBIT 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually And On Behalf Of All Persons Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO,<br><br>Defendants. | Civil Action No. 05-10269RWZ |

## AFFIDAVIT OF A. NEIL PAPPALARDO

I, A. Neil Pappalardo, do hereby depose and state:

1.      I am the founder, Chairman and Chief Executive Officer ("CEO") of Medical Information Technology, Inc. ("Meditech" or the "Company").

2.      I also serve as the trustee (the "Trustee") of the Medical Information Technology, Inc. Profit Sharing Trust (the "Trust"), which was established pursuant to the Medical Information Technology, Inc. Profit Sharing Plan (the "Plan," and together with myself and Meditech, the "Defendants"). I have served as Trustee since the Trust's inception in 1973.

3.      I submit this affidavit, which is based on my personal knowledge and review of Company files, in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification.

1

**MEDITECH**

4.      I founded Meditech in 1969, together with four other individuals, to develop and market information system software for the hospital industry.  The Company today is a leading provider of software used in hospitals around the globe.  Meditech currently has more than 2400 employees, spread across 6 facilities, all in Massachusetts.

5.      It is important to myself and the other members of the Board of Directors of Meditech that the Company's employees have a stake in its growth and in its future.  To this end, we have for decades voted to have the Company sell shares of Meditech stock to the Company's employees at the fair value for the stock determined by the Board.  We do not wish to take advantage of our employees, so in determining the fair value for purposes of these sales we seek to arrive at a reasonable value that is neither aggressively high, nor aggressively low.

6.      We also indirectly provide for employee share ownership through the Plan, to which (as described below) the Company has been contributing Meditech stock and cash for over 30 years.  In valuing our contribution of stock to the Trust, we use the same fair value per share that we use in selling shares to employees.  This valuation of the contribution is the basis for a tax deduction by the Company, another reason why the Board of Directors seeks to determine a reasonable, not aggressively high fair value for the stock.

7.      Through contributions of stock to the Trust and sales of shares to employees, the percentage of shares held directly or indirectly by Meditech's current and former employees (excluding myself, although as CEO I am an employee) has increased dramatically over time.  By 1985 year end, the Trust and current and former employees owned 18.6% of the Company.  By 1995 year end, this figure had grown to 25.6%, and by 2005 year end, the Trust and current and former employees owned 32.2% of the Company.  While this has diluted myself and the

2

other founders of the Company (despite my having purchased shares from the Company like other employees, my percentage ownership of the Company has declined from 26.8% at 1996 year end to 25.7% at 2005 year end), we believe that continued growth in employee ownership of the Company is essential to the Company's long-term well being, and it is an important part of our employment and retention strategy.

### THE PLAN

8.     The Plan was established by the Board of Directors of Meditech in 1973.  The stated purpose of the Plan is to provide "retirement and other benefits to the employees of the Company," and the Plan explicitly states that it was "designed to invest substantially in shares of the Common Stock of the Company so as to permit the participating employees to share in any growth of the Company."

9.     Under the Plan, the Trust was formed to hold contributions made by the Company for the sole benefit of the Plan's employee participants.  The Plan was specifically drafted so that, although as CEO I am an employee of Meditech, I am not a participant in the Plan and do not derive any direct financial benefit from it in any way.

10.     The Plan is entirely voluntary:  it was not established pursuant to any collective bargaining agreement or employment contract, and the Plan provides that the Company may terminate the Plan at any time.  Moreover, the Plan provides that all contributions by the Company to the Trust are voluntary; in any given year, the Board of Directors could vote not to contribute anything to the Trust.

11.     Although the Plan explicitly provides that the Trust may hold up to 100% Meditech stock, contributions by the Company to the Trust have historically been made in the form of cash and Meditech stock.

3

12.    Pursuant to the terms of the Plan, the Trust pays out the value of a participant's account in a lump sum payment upon termination of the participant's employment with Meditech, either directly to the participant or (more commonly) to another retirement account of the participant's choosing. We also permit participants to withdraw some (or even all) of their account balance prior to termination of their employment if they establish that they are facing a hardship, or if the employee has more than 20 years of service with the Company. Each of these "in-service withdrawal" mechanisms is entirely voluntary on the part of participants. With respect to those participants with more than 20 years service, I encourage them to withdraw their Trust balance in excess of $1 million each year and to invest it themselves, in preparation for the day when they leave Meditech and must become responsible for investing their entire distribution from the Trust, but make very clear that no one is required to make such an in-service withdrawal.

### VALUATION OF MEDITECH STOCK

13.    Because Meditech stock is not publicly traded, the Meditech Board of Directors, in deciding what to contribute to the Trust each year end, must determine a per share value for the stock. Under the explicit terms of the Plan, the Board first sets an overall contribution amount, and then decides how much of that overall contribution will be in stock, and how much in cash. The number of shares contributed to the Plan is therefore dependent upon the value determined for those shares by the Board. For example, if the Board voted to make an overall contribution to the Trust of $4 million, it could not then vote to donate 80,000 shares at $75 per share (i.e., $6 million worth of stock).

14.    As the Trustee, I must also determine a fair value per share for the stock as of December 31 of each year for purposes of establishing the overall value of the Trust; this overall

4

value is then used in determining the value of the accounts of individual Plan participants. In determining the fair value of the stock for purposes of the Trust, I consider many of the same factors considered by the Board of Directors of the Company when it makes its determination, but am not bound by the Board's determination.

15.    In valuing Meditech stock in my capacity as Trustee and as a member of the Board, I consider many factors, including Meditech's total revenue, net income, total equity, dividends paid and the growth rate of each. I also compare Meditech's market capitalization to that of Meditech's competitors. Typically however, the year-end share value determined by the Board and myself as Trustee is determined primarily in concert with the dividend that Meditech will pay the following year. The current dividend yield on Meditech stock is 6.75%, based on the fair value determined as of December 31, 2005 ($32), and the current dividend rate for 2006 ($2.16). This dividend yield compares favorably with the approximately 5% yield paid by the U.S. government on long-term Treasury notes, and is justified based on Meditech's illiquid stock and the higher risk inherent in an investment in Meditech compared to an investment in the Federal government.

16.    As demonstrated in the affidavit of Barbara A. Manzolillo, Meditech's CFO and the Plan's administrator, which is also being submitted in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, the year-end values I have determined for Meditech stock have been steadily increasing over time. The values I have determined reflect an appreciation in Meditech's stock value greater than the growth in Meditech's earnings per share during the period in which Plaintiffs claim I have been intentionally undervaluing the stock, and are consistent with the growth in dividends paid per share. My valuation methodology has made many millionaires of Meditech's employees, including each of the named Plaintiffs.

5

17.    It is my understanding Plaintiffs assert that if their method of valuing Meditech stock had been used, the Trust would quickly run out of cash.  Such a result would be undesirable from the perspective of the Plan's participants, as well as Meditech's shareholders (most of whom are or were Plan participants).  If the Trust lacked any cash, it could not make a cash distribution to terminating employees, nor would it be able to fund in-service withdrawals or make loans to Plan participants.  Under the terms of the Plan, when the Trust lacks sufficient cash to make distributions, it may defer distributions to participants by up to three years and distribute stock instead of cash.  A three-year delay in receiving Trust distributions would no doubt be undesirable to most if not all Plan participants.  Moreover, although Meditech stock has been an excellent investment, a distribution of stock would be problematic because the most significant market for small amounts of non-publicly traded Meditech stock is the Trust itself – it has typically purchased stock from shareholders (including each of the Plaintiffs) who wish to liquidate some or all of their holdings.  If the Trust were to distribute stock because it lacked any cash, the same lack of cash would prevent it from purchasing any stock from Meditech's shareholders.  Plan participants would thus receive a distribution of stock that they may not be able to sell, and existing shareholders might be unable to find a buyer should they wish to liquidate some or all of their holdings.  For Plan participants and existing shareholders who need to raise cash to pay expenses (such as college tuition, a down payment for a residence, or medical bills), an inability to sell their Meditech stock to the Trust could cause hardship.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 15, 2006.

/s/ A. Neil Pappalardo
A. Neil Pappalardo

6

# EXHIBIT 13

# MEDICAL INFORMATION TECHNOLOGY, INC.

## PROFIT SHARING PLAN

Amended and Restated Trust Agreement

(As of January 1, 1998)

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003580

Confidential-Subject to Protective Order

# TABLE OF CONTENTS

**ARTICLE I**

The Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.01  Creation of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.02  Interpretation of Trust Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**ARTICLE II**

Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.01  "Affiliated Company" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.02  "Agreement" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.03  "Anniversary Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.04  "Beneficiary" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.05  "Board of Directors" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.06  "Break in Service" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.07  "Common Stock" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.08  "Company" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.09  "Compensation" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.10  "Effective Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.11  "Employee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.12  "Employment Commencement Date" . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.13  "Hour of Service" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.14  "Member" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.15  "Plan" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.16  "Plan Year" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.17  "Reemployment Commencement Date" . . . . . . . . . . . . . . . . . . . . . . . 6
2.18  "Service" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.19  "Trust" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.20  "Trustee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.21  "Valuation Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**ARTICLE III**

Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.01  Eligibility for Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.02  Determination of Eligibility by Trustee . . . . . . . . . . . . . . . . . . . . . . . 7
3.03  Duration of Active Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.04  Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.05  Military Leaves of Absence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
3.06  USERRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

i

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003581

ARTICLE IV

Contributions under the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.01 Company Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.02 Determination of Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.03 Payment of Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.04 Reversion of Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.05 Members' Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE V

Members' Accounts;
Allocation of Assets and Contributions . . . . . . . . . . . . . . . . . . . . . . . . 12
5.01 Members' Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5.02 Compensation Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5.03 Allocation of Contributions and Forfeitures. . . . . . . . . . . . . . . . . . . 12
5.04 Valuation of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
5.05 Allocation of Trust Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
5.06 Distributions and Forfeitures . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
5.07 Limitations on Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
5.08 Sources of Forfeiture Restorations . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE VI

Payments to or for the Accounts of
Members or Terminated Members . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.01 Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.02 Disability Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.03 Death Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
6.04 Termination of Employment Prior to Retirement, Disability, or Death . . . . . 19
6.05 Reemployment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
6.06 Manner and Timing of Distributions . . . . . . . . . . . . . . . . . . . . . . . 22
6.07 Additional Restrictions on Distributions . . . . . . . . . . . . . . . . . . . . . 24
6.08 Discharge of Trustee's Obligation to Make Payments . . . . . . . . . . . . 26
6.09 Investment of Segregated Funds . . . . . . . . . . . . . . . . . . . . . . . . . . 26
6.10 Loans to Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
6.11 Direct Rollovers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
6.12 In-Service Withdrawals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE VII

Amendment and Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
7.01 Right to Amend or Terminate . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
7.02 Amendment for Tax Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . 33
7.03 Liquidation of Trust in Event of Termination . . . . . . . . . . . . . . . . . . 33
7.04 Termination of Plan and Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ii

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003582

DEF000086

ARTICLE VIII
    Rights and Duties of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    8.01  Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    8.02  Powers of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    8.03  Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    8.04  Method of Purchasing, Holding and Selling Securities . . . . . . . . . . . . . . . 36
    8.05  Exercise of Voting Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    8.06  Power to Borrow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    8.07  Reliance on Trustee as Owner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    8.08  Liquidation of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    8.09  Evidence on which Trustee may Act . . . . . . . . . . . . . . . . . . . . . . . . . 37
    8.10  Action by Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    8.11  Discretionary Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    8.12  Employment of Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    8.13  Records and Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    8.14  Payment of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    8.15  Compensation and Expenses of Trustee . . . . . . . . . . . . . . . . . . . . . . 40
    8.16  Resignation or Removal of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . 41
    8.17  Legal Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    8.18  Indemnification of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

ARTICLE IX
    The Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    9.01  No Contract of Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    9.02  No Contract to Maintain Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    9.03  Liability of Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    9.04  Action by Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    9.05  Successor to Business of Company . . . . . . . . . . . . . . . . . . . . . . . . . 43
    9.06  Dissolution of the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

ARTICLE X
    Top-Heavy Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    10.01  Article Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    10.02  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    10.03  Top-Heavy Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    10.04  Minimum Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    10.05  Vesting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    10.06  Termination of Top-Heavy Status . . . . . . . . . . . . . . . . . . . . . . . . . . 49

iii

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003583

ARTICLE XI

Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
11.01  Limitation of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
11.02  Spendthrift Provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
11.03  Appointment of Person to Receive Payment . . . . . . . . . . . . . . . . . . . . . . 50
11.04  Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
11.05  Impossibility of Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
11.06  Adjustment for Fractional Interests . . . . . . . . . . . . . . . . . . . . . . . . . . 51
11.07  Definition of Words . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
11.08  Titles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
11.09  Merger or Consolidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
11.10  Claims Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
11.11  Allocation and Delegation of Responsibilities . . . . . . . . . . . . . . . . . . . . 53
11.12  Special Provisions for Certain Leased Employees . . . . . . . . . . . . . . . . . . 53
11.13  Execution of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

iv

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003584

## MEDICAL INFORMATION TECHNOLOGY, INC.

### AMENDED AND RESTATED PROFIT SHARING PLAN AND TRUST

The Trust Agreement made the 31st day of December, 1973, by and between MEDICAL INFORMATION TECHNOLOGY, INC., a Massachusetts corporation having its principal place of business in Westwood, Massachusetts (the "Company") and A. NEIL PAPPALARDO of Boston, Massachusetts, (the "Trustee"), which has been subsequently restated and amended from time to time, is now amended and restated in its entirety as follows:

### WITNESSETH THAT:

WHEREAS, the Company recognizes the continuing contribution being made to the successful operation of its business by its employees and desires to reward such contribution by continuing its maintenance of a profit sharing plan for its employees who are or shall hereafter become eligible as Members under the Plan embodied herein;

WHEREAS the Company amended and restated said Plan to comply with the Tax Reform Act of 1986 and to make certain other changes;

WHEREAS the Plan was subsequently amended by the First, Second and Third Amendments thereto;

WHEREAS the Company now desires to amend and restate said Plan to comply with recent legislation and to make certain other changes;

NOW, THEREFORE, the parties hereto each in consideration of the covenants, agreements and declarations of the other, mutually covenant, agree and declare the Trust Agreement dated December 31, 1973, as subsequently amended and restated, is hereby further

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003585

Confidential-Subject to Protective Order

amended and restated as provided herein effective January 1, 1998 except that the changes made

to Sections 3.06, 6.07(b) and 11.12 shall be effective as of January 1, 1997. In determining a

Member's rights and benefits under the Plan up to such effective date, the provisions of the Plan

as previously in effect shall apply:

## ARTICLE I

### The Trust

1.01 <u>Creation of Trust</u>. There has been established hereunder a trust which shall be

known as the "MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING

TRUST." The Trustee shall receive any contributions paid to the Trust, and all contributions so

received, together with the income therefrom, shall be held, managed, and administered as a

fund in trust pursuant to the terms of this Agreement. The Trustee hereby affirms his

acceptance of the Trust created hereunder and agrees to perform the provisions of this

Agreement on his part to be performed.

1.02 <u>Interpretation of Trust Agreement</u>. The Trust is established for the purpose of

providing retirement and other benefits to the employees of the Company from the profits of the

Company's business, and for the exclusive benefit of the eligible Employees and their

beneficiaries, and is designed to invest substantially in shares of the Common Stock of the

Company so as to permit the participating employees to share in any growth of the Company.

So far as possible, this Agreement shall be interpreted in a manner consistent with this intent

and with the intent of the Company that the Trust established hereunder shall satisfy the

provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), and those of

2

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003586

Confidential-Subject to Protective Order                                    DEF000090

the Internal Revenue Code of 1986 (the "Code") relating to exempt employees' profit sharing trusts, as either of those statutes may from time to time be amended. Except as provided in Section 4.04, under no circumstances shall any property of the Trust, or any contributions made by the Company, ever revert to or be used or enjoyed by the Company or be used for any purpose other than for the exclusive benefit of the eligible employees or their beneficiaries.

## ARTICLE II

### Definitions

Whenever used in this Agreement, unless the context clearly indicates otherwise, the following words shall have the following meanings:

2.01 "Affiliated Company" means (a) a member of a controlled group of corporations of which Medical Information Technology, Inc. is a member, (b) an unincorporated trade or business which is under common control with Medical Information Technology, Inc. as determined in accordance with Section 414(c) of the Code and regulations issued thereunder, (c) a member of an "affiliated service group" (within the meaning of Section 414(m) of the Code) of which Medical Information Technology, Inc. is a member, or (d) an organization which is required to be aggregated with Medical Information Technology, Inc. pursuant to regulations promulgated under Section 414(o) of the Code. For purposes hereof, a "controlled group of corporations" shall mean a controlled group of corporations as defined in Section 1563(a) of the Code, determined without regard to Section 1563(a)(4) and (e)(3)(C) of the Code.

2.02 "Agreement" means this Agreement as the same may be amended from time to time.

2.03 "Anniversary Date" means December 31 in each year after the Effective Date.

3

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003587

2.04 "Beneficiary" means the person or persons designated by a Member, pursuant to the provisions of Section·6.03 of this Agreement, to receive distribution of such Member's share upon his death, and includes a co-beneficiary or a contingent beneficiary. The term "Beneficiary" shall also include a Member's surviving spouse if such spouse is deemed to be the Member's Beneficiary pursuant to Section 6.03(c).

2.05 "Board of Directors" means the board of directors of the Company in office from time to time.

2.06 "Break in Service" means any "twelve-consecutive month period" (as determined under this Section) during which an individual does not perform any Hours of Service for the Company or an Affiliated Company. The "twelve-consecutive month period" used to determine whether a Break in Service has occurred shall commence on the earlier of the following dates, and anniversaries thereof: (i) the date the individual's employment with the Company or an Affiliated Company terminates by reason of quit, discharge, or retirement, or (ii) the first twelve-month anniversary of the date the individual was first absent from employment with the Company or an Affiliated Company by reason other than quit, discharge, or retirement; provided, however, that in the case of an individual who is absent from work for "maternity or paternity reasons", the twelve-consecutive month period beginning on the first anniversary of the first date of such absence shall not constitute a Break in Service. For purposes of this Section, an individual's absence is for "maternity or paternity reasons" if the individual is absent from work by reason of pregnancy, birth, or adoption of his child or for the purpose of caring for such child for a period beginning immediately following such birth or adoption.

2.07 "Common Stock" means the common stock of the Company.

4

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003588

Confidential-Subject to Protective Order                                    DEF000092

2.08 "Company" means MEDICAL INFORMATION TECHNOLOGY, INC. and any successor to all or a major portion of its business which adopts this Plan and Trust pursuant to Section 9.05.

2.09 "Compensation" includes salaries, wages, bonuses, overtime, commissions and all other forms of direct remuneration paid to a Member by the Company but excludes (a) any amount paid to an Employee prior to his becoming a Member under the Plan and (b) any contributions by the Company to or benefits under the Plan. A Member's Compensation shall not be taken into account for any purpose of the Plan (other than Section 5.07 and Article X) to the extent such Compensation exceeds $100,000.

2.10 "Effective Date" means the effective date of the amendment and restatement of this Plan, which is January 1, 1998, unless otherwise specifically provided.

2.11 "Employee" means any person who is employed by the Company as a common law employee. An Employee shall become an Employee on his Employment Commencement Date.

2.12 "Employment Commencement Date" means the first date on which the individual performs an Hour of Service.

2.13 "Hour of Service" means each hour for which an Employee is directly or indirectly paid or entitled to payment by the Company or an Affiliated Company for the performance of duties.

2.14 "Member" means any Employee who is eligible to participate in the Plan as determined under Article III of this Agreement.

5

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003589

Confidential-Subject to Protective Order

2.15 "Plan" means the "MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN" as set forth herein, together with any and all amendments hereto.

2.16 "Plan Year" means the fiscal year of the Trust, and the Company, being the twelve (12) months ending on the Anniversary Date of each year.

2.17 "Reemployment Commencement Date" means the first date on which the individual performs an Hour of Service following a Break in Service which is not counted as Service.

2.18 "Service" of an Employee means the period of time determined in accordance with Article III.

2.19 "Trust" means the trust created by this Agreement.

2.20 "Trustee" means the trustee herein named and any duly appointed successor trustee or trustees.

2.21 "Valuation Date" means December 31 of each Plan Year, and any other date which the Trustee may select for the valuation of the Trust and adjustment of accounts determined in accordance with Section 5.04 and 5.05, respectively.

6

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003590

Confidential-Subject to Protective Order

## ARTICLE III

### Membership

3.01  Eligibility for Membership.  Each Employee who is a Member on January 1, 1998 shall continue to be a Member under the Plan.  Each other Employee, including each future Employee, shall become a Member under the Plan on the first day of the month coincident with or next following his completion of one year of Service.  In the event an individual has completed the foregoing eligibility requirements but is not an Employee on the applicable entry date, such individual shall not become a Member of the Plan at that time.  If such individual thereafter becomes an Employee, such individual shall become a Member on the date he subsequently becomes an Employee.

3.02  Determination of Eligibility by Trustee.  The determination of an Employee's eligibility for membership under the Plan shall be made by the Trustee from the Company's records; and the Trustee's determination shall be conclusive and binding on all persons.

3.03  Duration of Active Membership.  An active Member shall continue as such until his employment with the Company is terminated, except as otherwise provided in Sections 5.02 and 5.03 in the case of a Member whose employment terminates on account of retirement, disability or death.  A former active Member shall once again become an active Member on his Reemployment Commencement Date.

3.04  Service.  The "Service" of an Employee means, with respect to each Employee, the most recent period of time, determined in years and days, which commences on an Employee's Employment Commencement Date, or Reemployment Commencement Date, during which there occurs no Break in Service.  If an Employee with at least one year of Service

7

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003591

Confidential-Subject to Protective Order

DEF000095

terminates his employment with the Company, incurs a Break in Service and is subsequently

reemployed, then the "Service" of such Employee for all purposes of the Plan after his

reemployment shall include Service accumulated both before and after such Break in Service.

Except as provided in Section 6.05, Service accumulated after such Break in Service shall not

be taken into account for the purpose of determining such Employee's severance benefit under

Section 6.04 at the time of such Break in Service. An Employee shall receive credit for Service

with an Affiliated Company for the purposes of determining (a) his eligibility to participate in

the Plan pursuant to Section 3.01, (b) the amount of his vested benefit under Section 6.04 and

(c) his Breaks in Service, but such Service shall not be taken into consideration for any other

Plan purpose.

3.05 Military Leaves of Absence. Except as otherwise specifically provided, an

Employee who leaves the Company to enter the armed services of the United States of America

and who returns to its employ at or before the expiration of ninety (90) days after the date on

which he is first entitled to be released from active duty in the armed services (or at such later

date as the Company may approve or as may be required by law) shall be deemed to have been

in the continuous employ of the Company throughout and the period of such military absence

shall be included in his period of Service for all purposes of this Plan. If any Employee shall

fail to return from a military leave of absence as required by the Company in accordance with

the Plan, he shall be deemed to have quit the Company on the date such military leave of

absence began; provided, however, that any resultant forfeitures from his account shall be

deemed to occur on the Anniversary Date subsequent to the date of his failure to return from his

military leave of absence as required by the Company.

8

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003592

3.06  <u>USERRA</u>.  Notwithstanding any provision of this Plan to the contrary, contributions, benefits and service credits with respect to qualified military service shall be provided in accordance with section 414(u) of the Code.

9

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003593

## ARTICLE IV

### Contributions under the Plan

4.01  Company Contributions.  For each Plan Year, the Company shall pay to the Trustee in trust hereunder from the net income of the Company for such Plan Year or its earnings and profits accumulated prior to such Plan Year such amount as may be voted by its Board of Directors with respect to that Plan Year.  The amount of the Company's contribution shall be paid to the Trustee in cash and/or that number of shares of Common Stock having a fair market value on the date of contribution equal to the contribution amount (or portion thereof to be contributed in shares of Common Stock) voted by the Board of Directors as provided herein. As used in this Section, "net income" and "accumulated earnings and profits" of the Company mean the net income and accumulated earnings and profits as shown by the Company's books before deducting Federal and State taxes measured in part or in whole by income.

4.02  Determination of Contribution.  The amount of the Company's contribution for each Plan Year shall be subject to final determination by the Company and verification by the Company's independent public accountants.  The amount of such contribution, as determined by the Company and verified by such accountants, shall be conclusive and binding on all persons.

4.03  Payment of Contribution.  The Company's contribution to the Trust for each Plan Year shall be paid within the time required by law in order to obtain a deduction of the amount of the Company's contribution to the Trust for Federal income tax purposes for such Plan Year.

4.04  Reversion of Contributions.  In the event that the Company shall make a contribution to the Trust on the basis of a mistake of fact, the Company may direct the Trustee to return such contribution to the Company at any time within the twelve-month period

10

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003594

commencing on the date of contribution. All contributions under the Plan are conditioned upon

the deductibility thereof by the Company under Section 404 of the Code. To the extent that any

such deduction is disallowed, the Company may direct the Trustee to return such contribution

(to the extent disallowed) to the Company at any time within the twelve-month period

commencing on the date of disallowance.

 4.05 <u>Members' Contributions</u>. Contributions by Members shall not be permitted.

11

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003595

Confidential-Subject to Protective Order

DEF000099

ARTICLE V
Members' Accounts;
Allocation of Assets and Contributions

5.01  Members' Accounts.  The Trustee shall maintain a book account for amounts
credited from time to time to each Member under the Plan.  Any contributions made by the
Company for a Member pursuant to Section 4.01 shall be allocated to each Member's account
pursuant to Section 5.03.

5.02  Compensation Schedule.  As soon as practicable after the end of each Plan Year,
the Company shall deliver to the Trustee a schedule showing the name of each Member who
was either an Employee on the Anniversary Date of such Plan Year or an Employee who
retired, became disabled or died within the meaning of Sections 6.01 to 6.03 during such Plan
Year, and opposite the name of each such Member the amount of Compensation paid to him by
the Company during such Plan Year.  Notwithstanding anything to the contrary elsewhere
herein, no Employee who owns (excluding any beneficial ownership under the Trust) ten
percent (10%) or more of the outstanding Common Stock of the Company on an Anniversary
Date shall be listed on the schedule required by this Section 5.02 with respect to such
Anniversary Date.  The schedule shall also include such other information as the Trustee may
reasonably require for the proper administration of the Plan.

5.03  Allocation of Contributions and Forfeitures.  Upon receiving such schedule and the
total contribution made by the Company for the Plan Year, and after the account balances of the
Members have been adjusted as provided in Section 5.05 and forfeitures determined under
Section 6.04, the Trustee shall credit to the account of each Member listed on such schedule a
portion of the Company's contribution and a portion of the total amount of forfeitures arising

12

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003596

from the accounts of terminated Members pursuant to Section 6.04 which bears the same ratio to such total amounts as the Member's Compensation listed on such schedule bears to the Compensation listed on said schedule for all such Members.

Notwithstanding the foregoing provisions of Section 5.02 and this Section 5.03, the Company may, in its discretion and as necessary to cause the Plan to satisfy the requirements of Section 410(b)(1)(B) of the Code for any Plan Year, expand the schedule provided pursuant to Section 5.02 for such Plan Year to include the name of each Member (including each former Member whose employment terminated during such Plan Year) who received any Compensation during such Plan Year (but excluding any Employee who owns 10% or more of the outstanding Common Stock of the Company), and direct the Trustee to allocate Company contributions and/or forfeitures for such Plan Year to the accounts of all Members listed on such expanded schedule in proportion to the Compensation of each such Member for such Plan Year as reflected on such expanded schedule.

5.04  Valuation of Trust. As of each Valuation Date, the Trustee shall determine the total net worth of the Trust by evaluating all of its assets and liabilities as of that date exclusive of any amounts segregated into separate accounts for terminated Members pursuant to Section 6.06(b) and the contribution made by the Company with respect to its Plan Year current with or ending on said Valuation Date. In determining the net worth of the Trust or any portion thereof, the Trustee shall value the Trust assets at their fair market value. There shall be included as of the Valuation Date, without implied limitation, income on hand, income accrued, dividends payable but not paid, and uninvested cash, whether income or principal; and there shall be deducted as of the Valuation Date, without implied limitation, liabilities accrued. A

13

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003597

Confidential-Subject to Protective Order

DEF000101

determination by the Trustee of the fair market value of any of the Trust assets, or of the net

worth of the Trust or any component thereof shall be conclusive and binding upon all persons.

5.05 Allocation of Trust Assets. The total net worth of the Trust as determined on each

Valuation Date shall be compared with the total of all amounts standing to the credit of the

accounts of all Members of the Plan, as of such Valuation Date, excluding from the accounts of

said Members, in the case of a December 31 Valuation Date, any amounts credited from the

contribution of the Company with respect to such Plan Year. The excess or deficiency of the

total net worth of the Trust as so compared with the total account balances of all Members shall

be credited or charged to the accounts in the proportion that each such account balance bears to

the total of all such account balances.

5.06 Distributions and Forfeitures. Whenever the Trustee shall make any distribution

to or in behalf of a Member in accordance with the provisions of Article VI, and whenever a

Member shall forfeit all or a portion of the amount standing to the credit of his account in

accordance with the provisions of Section 6.04, such Member's account shall be charged with

the amount of such distribution or forfeiture. Whenever part or all of the amount standing to

the credit of a Member's account is to be segregated into a separate account for a terminated

Member pursuant to Section 6.06(b), such Member's account shall be charged with the amount

segregated.

5.07 Limitations on Allocations. Notwithstanding anything hereinabove to the contrary,

the amount credited to the account of any Member for any Plan Year pursuant to Section 5.03

or pursuant to this Section 5.07 (excluding any Company contributions and forfeitures which are

credited to a Member's account pursuant to Section 6.05 in order to restore previously forfeited

14

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003598

amounts) shall be reduced to the extent that such amount would cause the Company contributions and forfeitures credited to the account of such Member under this Plan for such Plan Year and the employer contributions and forfeitures allocated to the account of such Member under any defined contribution plan maintained by the Company or any Affiliated Company to exceed the lesser of

    (A)    $30,000 (as adjusted pursuant to Section 415(d) of the Code), or

    (B)    twenty-five percent (25%) of such Member's compensation within the meaning of Section 415 of the Code and regulations thereunder for such Plan Year from the Company and any Affiliated Company.

Any reductions required pursuant to the foregoing sentence shall be made from the Company contributions and forfeitures allocated to the Member's account pursuant to Section 5.03. In the event any reduction is required pursuant to the preceding sentence, the amount of such reduction shall be allocated and credited pursuant to the procedures outlined in Section 5.03 above to the accounts of remaining Members exclusive of any other Member for whom a reduction for such Plan Year has been required pursuant to this Section 5.07. Any reductions which cannot be so allocated shall be held unallocated by the Trustee and shall be treated as a forfeiture to be allocated under Section 5.03 with respect to the succeeding Plan Year.

    5.08 <u>Sources of Forfeiture Restorations</u>. Notwithstanding anything in this Article to the contrary, whenever a previously forfeited amount is required to be restored to a reemployed Member's account pursuant to Section 6.05, the Trustee shall effect such restoration as of the last day of the Plan Year of such Member's reemployment. In effecting such restoration, the

15

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003599

Confidential-Subject to Protective Order

Trustee shall first utilize any amounts forfeited from the accounts of terminated Members pursuant to Section 6.04 during such Plan Year and then, if necessary, Company contributions made pursuant to Section 4.01 for such Plan Year.

16

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003600

Confidential-Subject to Protective Order

DEF000104

## ARTICLE VI

### Payments to or for the Accounts of
### Members or Terminated Members

No shares of Common Stock or other property of the Trust shall be paid out or distributed by the Trustee except (a) for the purchase or other acquisition of Common Stock or other appropriate investments, (b) for defraying expenses, including taxes, if any, of administering the Trust as elsewhere herein provided, (c) for the repayment of any indebtedness incurred by the Trustee pursuant to Section 8.06, (d) as a return of Company contributions pursuant to Section 4.04, or (e) for the purpose of making distributions to or for the account of Members in accordance with the provisions of this Article VI.

6.01 <u>Retirement</u>. Upon retirement of a Member, which shall be deemed to mean any termination of his employment with the Company at or after his reaching age sixty (60), the Trustee shall distribute, in accordance with the provisions of Section 6.06, the full amount standing to the credit of such Member's account. A Member who remains in the active employ of the Company after attaining the age of sixty (60) shall continue as a Member for all purposes of the Plan until the date of his actual retirement.

6.02 <u>Disability Retirement</u>. If a Member incurs a permanent disability, the Trustee shall distribute, in accordance with the provisions of Sections 6.06 and 6.07, the full amount standing to the credit of such Member's account. For purposes of this Section 6.02, a Member shall incur a "permanent disability" if such Member is unable to engage in substantial gainful activity due to total and permanent physical or mental impairment that, in the opinion of a physician who is mutually acceptable to the Member and the Company, can be expected to

17

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003601

Confidential-Subject to Protective Order

result in death, or can be expected to last or has lasted for at least twelve (12) consecutive months. The Trustee's determination as to whether a Member has incurred a permanent disability shall be conclusive and binding upon all persons.

6.03 Death Benefits.

(a)     Subject to paragraph (c) of this Section, each Member shall have the right to designate one or more Beneficiaries, including contingent Beneficiaries, to receive the amount payable in behalf of such Member under the provisions of this Plan in the event of death of such Member. Such designation shall be made in writing in such manner as the Trustee shall determine. Subject to the spousal consent requirement set forth in paragraph (c) below, a Member may change such designation from time to time, and may revoke such designation. If a Member dies without having designated a Beneficiary, or if none of the designated Beneficiaries survives the Member, or if the Trustee is in doubt as to the effective status of a Beneficiary designation, then, except as provided in paragraph (c) below, the duly appointed executor or administrator of the estate of such Member shall be deemed to be his Beneficiary.

(b)     Upon the death of any Member, the Trustee shall distribute, for the benefit of such Member's Beneficiary or Beneficiaries and in accordance with the provisions of Section 6.06, the full amount standing to the credit of the Member's account. If a Beneficiary entitled to receive any amount payable in behalf of a Member under the Plan dies prior to having received the entire amount, the undistributed balance shall be distributed to such Beneficiary's estate.

(c)     If a Member is married on the date of his death, the Member's surviving spouse shall be deemed to be his sole Beneficiary to receive the entirety of the death benefits

18

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003602

payable under this Section 6.03 in respect of such Member, unless (i) such Member has elected in writing to designate one or more other Beneficiaries other than his spouse, and (A) the Member's surviving spouse has consented to such election in a writing, (B) such election designates a Beneficiary which may not be changed without the consent of the spouse (or the consent of the spouse expressly permits changes in Beneficiary designation by the Member without any requirement of further consent by the spouse), and (C) the spouse's consent acknowledges the effect of such election and is witnessed by a Plan representative or notary public, or (ii) it is established to the satisfaction of the Trustee that the consent of the spouse cannot be obtained because there is no spouse, because the spouse cannot be located, or because of other circumstances prescribed by regulations under Section 417(a)(2) of the Code.

A former spouse shall be treated as a surviving spouse to the extent benefits must be paid to such former spouse upon the Member's death pursuant to a qualified domestic relations order (as defined in Section 414(p) of the Code), except that no consent shall be required from such former spouse with respect to the designation of a Beneficiary to receive benefits not subject to said order.

6.04  <u>Termination of Employment Prior to Retirement, Disability, or Death</u>.

(a)  If any Member's employment with the Company terminates under circumstances other than by reason of retirement, disability or death, as provided for under Sections 6.01 through 6.03, he shall be entitled to a vested benefit equal to the amount standing to the credit of his account based on his period of Service as follows:

19

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003603

Confidential-Subject to Protective Order                                     DEF000107

| Years of Service | | Percentage |
|---|---|---|
| At Least | But Less Than | |
| | 2 | NONE |
| 2 | 3 | 10% |
| 3 | 4 | 30% |
| 4 | 5 | 60% |
| 5 | | 100% |

The vested benefit determined in accordance with the foregoing provision shall never be adjusted on account of any Service which a Member might complete upon reemployment with the Company or an Affiliated Company after a Break in Service, except as provided in Section 6.05.

(b)    The determination of the amount to which a terminated Member is entitled shall be made in accordance with the rules set forth in this Article, and the Trustee's determination shall be conclusive and binding on all persons.

(c)    The Trustee shall distribute the vested benefit to which any such Member is entitled, in accordance with Section 6.06, as soon as practicable after the Member's termination, subject to the requirements of Section 6.07.

(d)    Any amount which is not vested under this Section 6.04 at the time of a Member's termination of employment shall be forfeited by him upon the earlier of (i) the payment of the full amount to which such Member is entitled under the Plan, or (ii) the occurrence of five (5) consecutive Breaks in Service by the Member.  For the purposes of the preceding sentence, a terminated Member who is not entitled to receive any amount under the Plan shall be deemed to have received the entire amount to which he is entitled on the date his employment terminates and shall forfeit his entire account as of that date.  At the close of the

20

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003604

Plan Year in which such forfeiture occurs, all such forfeited amounts shall be reallocated as of the end of the Plan Year in which such forfeitures occur among the accounts of the other Members in accordance with the provisions of Section 5.03.

6.05 <u>Reemployment</u>. If a terminated Member is reemployed by the Company, he shall again become an active Member upon his Reemployment Commencement Date pursuant to Section 3.03, future Company contributions on his behalf shall be credited to his account, and subject to (a) and (b) below, his prior Service shall be restored for the purpose of calculating the vested portion of such account.

If such a reemployed Member was not 100% vested under Section 6.04(a) at the time of his prior termination, the following special provisions shall apply:

(a)     If such a terminated Member is reemployed before incurring five (5) consecutive Breaks in Service, the full amount which was forfeited from his account as a result of his prior termination shall be restored to his account as of the end of the Plan Year of his reemployment.

(b)     If a reemployed Member to whom paragraph (a) of this Section applies had received a distribution, prior to his reemployment, of all or any part of the vested portion of his account, the vested portion of his account shall thereafter be determined by (i) adding the amount previously distributed to his current account balance, (ii) multiplying the resulting sum by his current vesting percentage, and (iii) subtracting from the resulting product the amount previously distributed.

(c)     If such a terminated Member is reemployed after incurring five (5) consecutive Breaks in Service, he shall have no rights with respect to any amounts previously

21

CONFIDENTIAL–SUBJECT TO
PROTECTIVE ORDER
M 0003605

forfeited from his account, and any portion of his account which has not been distributed shall

be held in a separate, fully vested account until such Member becomes 100% vested under

Section 6.04(a), whereupon it shall be merged with the account otherwise maintained for him.

6.06  Manner and Timing of Distributions.

(a)     Except as otherwise provided in Sections 6.06(b) and (d) below and subject

to the requirements of Section 6.07, whenever a Member's account balance becomes

distributable pursuant to Sections 6.01 through 6.04 hereof to such Member or his Beneficiary,

distribution of said account balance shall be made by the payment, in cash, of either one lump

sum, a direct Rollover (as described in Section 6.11), or a combination of both.  Such

distribution shall be made within a reasonable time after the date of such retirement, disability,

death or termination of employment but not earlier than 30 days after the notice required under

Section 1.411(a)-11(c) of the Income Tax Regulations is given unless (i) the Trustee clearly

informs the Member that the Member has a right to a period of at least 30 days after receiving

the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a

particular distribution option), and (ii) the Member, after receiving the notice, affirmatively

elects a distribution.  Any additional amount thereafter credited to his account shall be

distributed in accordance with this Section 6.06(a) after that amount is ascertained.

(b)     Notwithstanding anything to the contrary elsewhere herein, if the aggregate

benefit payable to a Member exceeds $5,000, such benefit shall not be distributed prior to such

Member's sixty-second (62nd) birthday or death, whichever is earlier, unless such Member

consents in writing to an earlier distribution.  In the absence of such a consent, such Member's

22

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003606

Confidential-Subject to Protective Order

account shall be segregated into a separate account established pursuant to Section 6.09 at the time such account would otherwise have been distributable under Section 6.06(a) above.

(c)     Whenever a Member's account is to be distributed or segregated into a separate account established pursuant to Section 6.09, such Member's account shall first be credited with interest at the prevailing short-term rate as determined by the Trustee for the period from the next preceding Valuation Date to the last day of the month preceding such distribution or segregation.

(d)     Notwithstanding anything to the contrary elsewhere herein, if the Trustee determines that the assets of the Trust do not provide sufficient liquidity to permit the Member's account balance to be distributed in cash pursuant to this Section 6.06, distribution of such account balance shall be deferred until the Trustee determines there is sufficient liquidity or until the "deferred distribution date", whichever is earlier. Any such account balance shall remain invested in the general assets of the Trust and shall continue to be evaluated and adjusted as of each Valuation Date pursuant to Sections 5.04 and 5.05. For this purpose, the "deferred distribution date" shall be the earliest of (i) the third (3rd) anniversary of a Member's retirement, disability, death or termination of employment, (ii) the sixtieth (60th) day following the close of the first Plan Year in which such Member is both not an Employee and older than sixty (60), and (iii)the Member's Required Distribution Date as defined in Section 6.07(b). If distribution of such a Member's account has not been made by such deferred distribution date, then distribution of such account shall be made on such deferred distribution date (subject to the notice and time limitations under Section 6.06(a)) in cash (to the extent available) and shares of

23

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003607

Common Stock (to the extent sufficient cash is not available) in a lump sum, direct rollover (as described in Section 6.11) or a combination of both.

6.07 <u>Additional Restrictions on Distributions</u>. Notwithstanding any provision elsewhere herein to the contrary and solely to comply with the applicable provisions of the Code and ERISA:

(a)    In no event shall the distribution of a Member's account, unless such Member or Beneficiary otherwise consents, begin later than the sixtieth (60th) day after the close of the Plan Year in which the latest of the following events occurs:

(i)    the Member's sixtieth (60th) birthday; or

(ii)    the Member's termination of employment with the Company.

(b)    In no event shall distribution of benefits to a Participant who attains age 70½ after 1998 begin later than the April 1 next following the calendar year in which such Participant (A) attains age 70½ or (B) terminates employment with the Company, whichever is later (the "Required Distribution Date"). Clause (B) shall not apply in the case of a Participant who is a "five percent owner" at any time during the Plan Year ending in the calendar year in which the Participant attains age 70½. If the Participant becomes a "five percent owner" during any subsequent Plan Year, the required distribution date shall be April 1 of the calendar year following such Plan Year. For purposes of this subsection, a "five percent owner" is defined in Section 416(i)(1)(B)(i) of the Code.

Distribution of benefits to a Participant who attains or attained 70½ before 1999 shall begin no later than the April 1 next following the calendar year in which such Participant attains age 70½ (the "Required Distribution Date"); provided, a Participant who is not a five percent

24

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003608

owner may elect to defer distribution of benefits until after his termination of employment with the Company by filing written notice with the Trustee at least 60 days (or such shorter period as determined by the Trustee in accordance with the provisions of Section 8.11) prior to his Required Distribution Date.

(c)     If a Member dies before his Required Distribution Date, and his surviving spouse is not his designated Beneficiary, the distribution of benefits shall be paid to such Member's beneficiary in a lump sum no later than December 31 of the calendar year containing the fifth (5th) anniversary of such Member's death. If the Member's designated Beneficiary is his surviving spouse, distribution of his benefits shall commence no later than the date the Member would have attained age seventy and one-half (70½).

(d)     If a Member dies on or after his Required Distribution Date, the Member's remaining interest in the Plan shall be distributed at least as rapidly as under the method of distribution being used as of the date of death.

(e)     If, and to the extent that, any portion of a Member's accounts are payable to a former spouse or dependent pursuant to a qualified domestic relations order within the meaning of Sections 401(a)(13)(B) and 414(p) of the Code, the provisions of said order shall govern the distribution thereof. Such an order may provide for payments to a spouse or dependent from a Member's vested account balance even though the Member is still employed by the Employer or is otherwise not eligible for the distribution of benefits under the Plan. In addition, the amount distributed shall be credited with interest at the prevailing short-term rate as determined by the Trustee for the period from the Valuation Date immediately preceding the

25

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003609

Confidential-Subject to Protective Order

date of such distribution to the last day of the calendar month immediately preceding such distribution.

6.08 <u>Discharge of Trustee's Obligation to Make Payments</u>. Whenever the Trustee is required to make any payment or payments to any person in accordance with the provisions of this Article VI or Article VII, the Company shall notify the Trustee in writing of such person's last known address as it appears in the Company's records; and the obligation of the Trustee to make such payment or payments shall be fully discharged by mailing the same to the address specified by the Company.

6.09 <u>Investment of Segregated Funds</u>. Whenever any amount standing to the credit of a Member's account is to be segregated into a separate account for such Member, the Trustee shall keep the unpaid balance of such fund invested for the benefit of such Member in savings bank accounts and/or other investments specified as permissible investments for the Trust funds in Section 8.03; provided that the Trustee, with the consent of such Member, may retain the value of any such Member's account without segregation as an individual interest in the Trust fund, in which event such account shall participate in revaluations of the Trust pursuant to Sections 5.04 and 5.05.

6.10 <u>Loans to Members</u>. Upon written application of a Member, the Trustee may lend to the Member such amount or amounts and upon such terms and conditions as the Trustee may determine proper, provided that the aggregate amount of all outstanding loans to such Member, including accrued interest thereon, shall not exceed the lesser of (a) $50,000, reduced by any loan repayment made during the one (1) year period ending on the day before the date such loan is made, or (b) fifty percent (50%) of the vested amount of said Member's account (determined

26

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003610

Confidential-Subject to Protective Order

at the time the loan is made). Loans pursuant to this Section 6.10 shall be made available to all Members on a reasonably equivalent basis.

Each such loan shall be made at such reasonable rate of interest as the Trustee may determine. Each such loan shall be subject to such other terms and conditions as the Trustee may determine. Each such loan shall be evidenced by the promissory note (the "Note") of the Member and shall be secured by fifty percent (50%) of such Member's vested interest in the Plan. Each such loan shall be repaid by payroll deduction or by such other means as may be authorized by the Trustee. Each such loan shall include the written consent of the Member to an immediate distribution in payment of the entire outstanding loan principal and any interest theretofore accrued, in the event such Member defaults pursuant to the terms of the note at any time subsequent to terminating employment with the Company. Each such loan shall be amortized over the term of the loan in level principal payments made not less frequently than quarterly, and shall be repaid within such time period as may be established by the Trustee but not longer than five (5) years unless such loan is used to acquire a dwelling unit which within a reasonable time is to be used (determined at the time the loan is made) as the principal residence of the Member.

All such loans shall be general investments of the Trust and the interest income thereon shall be included in the determination of the net worth of the Trust pursuant to Section 5.04.

If any part or all of the amount standing to the credit of a Member's account under the Plan shall become distributable to such Member or his Beneficiary while a loan to such Member under this Section 6.10 is outstanding, the Trustee shall apply the amount of such distribution in

27

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003611

Confidential-Subject to Protective Order

payment of the outstanding loan principal, whether or not then due, and of any interest theretofore accrued, before distributing the balance, if any, to the Member or his Beneficiary.

All expenses incurred by the Trustee, including reasonable attorneys' fees and court costs, as a result of a default by a Member shall be charged against the Member's interest in the Plan.

6.11 <u>Direct Rollovers</u>. Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this Section, a distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

Such distributions shall be subject to the notice and time limitations under Section 6.06(a).

Whenever used in this Section, the following words shall have the following meanings:

(1)    <u>Eligible Rollover Distribution</u>: An Eligible Rollover Distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an Eligible Rollover Distribution does not include:  any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under section 401(a)(9) of the Code; and the portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities).

(2)    <u>Eligible Retirement Plan</u>: An Eligible Retirement Plan is an individual retirement account described in section 408(a) of the Code, an individual retirement annuity described in

28

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003612

Confidential-Subject to Protective Order                                    DEF000116

section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified trust described in section 401(a) of the Code, that accepts the distributee's Eligible Rollover Distribution. However, in the case of an Eligible Rollover Distribution to the surviving spouse, an Eligible Retirement Plan is an individual retirement account or individual retirement annuity.

(3)     Distributee: A Distributee includes an Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, are Distributees with regard to the interest of the spouse or former spouse.

(4)     Direct Rollover: A Direct Rollover is a payment by the Plan to an Eligible Retirement Plan specified by the Distributee.

6.12 In-Service Withdrawals. An active Member who is currently employed with the Company may make in-service withdrawals from the vested portion of his account under the Plan in accordance with subparagraphs (a) and/or (b) below. All withdrawal elections shall be made in such form and pursuant to such procedures as may be required by the Trustee. The valuation of a Member's account balance shall be made as of the Valuation Date immediately preceding the date of distribution. In addition, the amount withdrawn shall be credited with interest at the prevailing short-term rate as determined by the Trustee for the period from the Valuation Date immediately preceding the date of such distribution to the last day of the calendar month preceding such distribution.

29

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003613

Confidential-Subject to Protective Order                                              DEF000117

(a)     An active Member who is currently employed by the Company and who has been credited with 20 or more years of Service may elect to withdraw all or any portion of his account under the Plan subject to the following conditions:

(1)     A Member may make only one withdrawal per Plan Year pursuant to this Section 6.12(a); and

(2)     If the Trustee determines that the assets of the Trust do not provide sufficient liquidity to permit the requested withdrawal amount to be fully paid in cash, distribution of such withdrawal amount shall be deferred until the Trustee determines that there is sufficient liquidity or until the third (3rd) anniversary of the date of the Trustee's receipt of the Member's withdrawal election (the "deferred distribution date"), whichever is earlier. Any such deferred withdrawal amount shall remain invested in the general assets of the Trust and shall continue to be evaluated and adjusted as of each Valuation Date pursuant to Section 5.04 and 5.05. If distribution of the Member's withdrawal amount has not been made by such deferred distribution date, then distribution of such amount shall be made on such deferred distribution date in cash (to the extent available) and shares of Common Stock (to the extent sufficient cash is not available).

(b)     An active Member who is currently employed with the Company may elect to withdraw all or a portion of his vested account balance under the Plan in order to meet a "Financial Hardship," subject to the following conditions:

(1)     Any such withdrawal shall be limited to the amount required to meet such Financial Hardship increased by (i) any amounts necessary to pay any federal, state

30

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003614

or local income taxes or penalties reasonably anticipated to result from the distribution and (ii) interest (determined pursuant to the first paragraph of this Section 6.12);

(2)    Any such withdrawal shall be made only to the extent the Trustee determines there is sufficient liquidity in the Trust to pay such withdrawal amount in cash.

For purposes of this Section 6.12(b), a "Financial Hardship" will be deemed to exist only with respect to: (i) expenses for medical care (as described in Section 213(d) of the Code) of the Member, the Member's spouse or any dependent of the Member (as defined in Section 152 of the Code) or expenses necessary for such persons to obtain such medical care, (ii) the purchase of a principal residence of the Member, (iii) the need to prevent eviction of the Member from his principal residence or foreclosure on the mortgage of the Member's principal residence, (iv) payment of expenses related to the renovation of the Member's principal residence, (v) payment of educational expenses for the Member, the Member's spouse or any dependent of the Member (as defined in Section 152 of the Code), (vi) the need to pay the funeral expenses (including burial expenses) of a family member of the Member, or (vii) payment of significant amounts of current debt incurred as a result of any one or more of the foregoing. The determination that the Member is faced with a Financial Hardship and the amount required to meet such Financial Hardship shall be made by the Trustee in accordance with uniform and nondiscriminatory standards or policies which shall be adopted by the Trustee and consistently applied to each application for a withdrawal pursuant to this Section 6.12(b), and the Trustee may

31

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003615

Confidential-Subject to Protective Order

reasonably rely upon the validity of any and all documentation submitted by the Member in accordance with such standards or policies.

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003616

Confidential-Subject to Protective Order

## ARTICLE VII

### Amendment and Termination

7.01 <u>Right to Amend or Terminate</u>. The Company reserves the right at any time and from time to time to amend this Agreement, or discontinue or terminate the Plan and Trust by delivering to the Trustee a copy of an amendment or appropriate Board of Directors' resolution of discontinuance or termination certified by an officer of the Company; provided, however, that except as provided in Section 7.02, the Company shall have no power to amend or terminate this Agreement in such manner as would cause or permit (a) any of the Trust assets to be diverted to purposes other than for the exclusive benefit of the Employees of the Company or their Beneficiaries or estates; (b) any reduction in the amount theretofore credited to any Member or former Member; (c) any portion of the Trust assets to revert to or become the property of the Company; (d) the duties or liabilities of the Trustee to be changed without his written consent; and (e) the elimination of an optional form of benefit with respect to amounts credited to a Member's accounts prior to the amendment.

7.02 <u>Amendment for Tax Exemption</u>. The Company reserves the right to amend this Agreement and the Plan and Trust hereunder in such manner as may be necessary or advisable so that said Trust may qualify and continue to qualify as an exempt employees' trust under the provisions of the Internal Revenue Code as now in force or as it may hereafter be changed or amended; and any such amendment may be made retroactively.

7.03 <u>Liquidation of Trust in Event of Termination</u>. In the event of termination or partial termination (as determined by an Internal Revenue Service ruling or by a court of proper jurisdiction, as to which all rights of appeal have expired) of this Plan and Trust, or complete

33

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003617

Confidential-Subject to Protective Order

discontinuance of contributions thereto by the Company, the rights of all Members (or in the case of a partial termination, the Members affected thereby) to amounts theretofore credited to their accounts shall be fully vested and nonforfeitable. In the event of termination, the Trustee shall (a) reduce to cash such part of the Trust fund as he may deem appropriate; (b) pay the liabilities, if any, of the Trust; (c) value the remaining assets of the Trust as of the date of termination and adjust Members' account balances in the same manner as provided in Section 5.05; (d) distribute such assets in cash or partly in shares of Common Stock and partly in cash to or in behalf of the Members in liquidation in proportion to the amounts standing to the credit of their respective accounts as of the termination date.

7.04 <u>Termination of Plan and Trust</u>. This Agreement and the Plan and Trust hereunder shall in any event terminate whenever all property held by the Trustee shall have been distributed in accordance with the terms hereof. Until such time as the Trust is fully distributed, the Trustee shall continue to have the powers, immunities and exemptions which he had during the existence of the Trust, to the extent permitted by law.

34

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003618

Confidential-Subject to Protective Order

## ARTICLE VIII

### Rights and Duties of Trustee

8.01 <u>Trustees</u>. There shall be such number of Trustees of this Trust as the Company may determine, any or all of whom may be officers or employees of the Company or any other individuals or entities.

8.02 <u>Powers of Trustee</u>. It shall be the duty of the Trustee to hold the Common Stock of the Company or other property contributed to and acquired by the Trust, and to make distributions therefrom in accordance with the Plan. The Trustee is hereby vested with all powers and authority necessary in order to carry out his duties and responsibilities in connection with the administration of the Plan and Trust as herein provided, and is authorized to make such rules and regulations as he may deem necessary to carry out the provisions of the Plan and Trust. The Trustee shall determine any question arising in the administration, interpretation and application of the Plan and Trust, and the decision of the Trustee shall be conclusive and binding on all persons.

8.03 <u>Investments</u>. The Trustee shall invest and reinvest the funds of the Trust and keep the same invested, without distinction between principal and income, in such stocks, bonds or other securities or certificates of participation or shares of any mutual investment company, trust or fund, or any other property of any kind, real or personal, tangible or intangible, as he may deem advisable, provided that the Trustee may hold funds of the Trust uninvested if and to the extent that he may deem advisable from time to time. Notwithstanding the foregoing, and in accordance with the purposes of the Plan, the Trustee is specifically authorized to invest all or any portion of the Trust assets in shares of Common Stock. It is intended that a substantial

35

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003619

Confidential-Subject to Protective Order

DEF000123

portion of the assets of the Trust (up to 100%) shall be invested in shares of Common Stock, to the extent that such Common Stock is reasonably available.

8.04  Method of Purchasing, Holding and Selling Securities. The Trustee may purchase Common Stock from the Company or from any stockholder of the Company at a price equal to the fair market value of the Common Stock at the time of purchase. The Trustee may keep the Common Stock and any other securities or other property of the Trust in the name of some other person, firm or corporation or his own name without disclosing fiduciary capacity. The Trustee may purchase or sell at public auction or by private contract, redeem, or otherwise realize upon such Common Stock, securities, or other property and for such purposes may execute such instruments and writings and do such things as he shall deem proper.

8.05  Exercise of Voting Rights. The Trustee is hereby authorized to vote the Common Stock and any other securities comprising the Trust fund or otherwise consent to or request any action on the part of the Company or the issuer of such other securities, and to give general or special proxies or powers of attorney, with or without power of substitution, and to participate in reorganizations, recapitalizations, consolidations, mergers and similar transactions with respect to such securities; to deposit such Common Stock or other securities in any voting trust, or with any protective or like committee, or with a trustee, or with depositaries designated thereby; and generally to exercise any of the powers of an owner with respect to the Common Stock, securities, and other assets which the Trustee deems to be for the best interests of the Trust to exercise.

8.06  Power to Borrow. The Trustee is hereby authorized to borrow money for the purpose of this Trust upon such terms and conditions as he may determine, and for any amount

36

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003620

Confidential-Subject to Protective Order

so borrowed to issue the promissory note of the Trustee and to secure the repayment thereof by pledge, mortgage or hypothecation of all or any part of the property of the Trust, and no person loaning money to the Trustee shall be bound to see to the application of the money loaned or to inquire into the validity of any such borrowing.

8.07 <u>Reliance on Trustee as Owner</u>. No person dealing with the Trustee shall be required to take any notice of this Agreement, but all persons so dealing shall be protected in treating the Trustee as the absolute owner with full power of disposition of all the monies, Common Stock and other property of the Trust, and all persons dealing with the Trustee are released from inquiry into the decision or authority of the Trustee and from seeing to the application of monies, Common Stock or other property paid or delivered to the Trustee.

8.08 <u>Liquidation of Assets</u>. In the event that cash is required by the Trustee to effect any action or distribution under this Trust, or to pay any expenses of this Trust, or for any other reason deemed sufficient by the Trustee, the Trustee shall take such action as to the sale or other disposition of Common Stock or other property forming a part of the Trust as will provide the amount of cash necessary for such payments.

8.09 <u>Evidence on which Trustee may Act</u>. In taking any action or determining any fact or question which may arise under this Trust, the Trustee may, with respect to the affairs of the Company or its Employees, rely upon any statement by the Company with respect thereto. In the event that any dispute may arise regarding the payment of any sums or regarding any act to be performed by the Trustee, the Trustee may retain such payment or postpone the performance of such act until actual adjudication of such act shall have been made in a court of competent jurisdiction; or until he shall have been indemnified against loss to his satisfaction; <u>provided</u>,

37

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003621

however, that in the event of any such dispute, the Trustee may rely upon and act in accordance with any directions received from the Company.

8.10 <u>Action by Trustees</u>. In the event there are two or more individual Trustees of this Trust, the Trustees shall act by a majority of their number at the time in office and such action may be taken either by vote at a meeting or in writing without a meeting. The Trustees may by such majority action authorize any one or more of their number to execute any document or documents or to take any other action on behalf of the Trustees, and in such event any one of the Trustees may certify in writing to any person the taking of such action and the name or names of the Trustee or Trustees so authorized, including himself. Any such person shall be protected in accepting and relying upon any such document or certificate and is released from inquiry into the authority of any of the Trustees.

8.11 <u>Discretionary Action</u>. Wherever under the provisions of this Agreement the Trustee is given any discretionary power or powers, such power or powers shall not be exercised in such manner as to cause any discrimination in favor of or against any Employee or class of Employees. Any discretionary action taken by the Trustee hereunder shall be consistent with any prior discretionary action taken by him under similar circumstances and to this end the Trustee shall keep a record of all discretionary action taken by him under any provision hereof.

8.12 <u>Employment of Agents</u>. The Trustee may employ agents, including, but not limited to, custodians, accountants or attorneys, to perform such services and duties (including any fiduciary responsibilities other than trustee responsibilities) in connection with the administration of the Trust as he may direct. The compensation of such agents shall be an expense chargeable in accordance with Section 8.15. The Trustee shall be fully protected in

38

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003622

Confidential-Subject to Protective Order

DEF000126

acting upon the advice of any such agent, in whole or in part, and, except as may be required by applicable Federal law, shall not be liable for any act or omission of any such agent, the Trustee's only duty being to use reasonable care in the selection of such agent.

8.13 <u>Records and Accounting</u>.  The Trustee shall keep accurate and detailed records of his transactions hereunder and all his accounts, books and records relating thereto shall be open at all reasonable times to the inspection of the Company and its authorized representatives.  The Trustee shall render in writing at least once each twelve (12) months, accounts of his transactions under this Agreement to the Company and the Company may approve such accounts of the Trustee by an instrument in writing delivered to the Trustee. In the absence of the filing in writing with the Trustee by the Company of exceptions or objections to any such account within sixty (60) days after the receipt by the Company of any such account the Company shall be deemed to have approved such account; and in such case, or upon the written approval of the Company of any such account, the Trustee shall be released, relieved and discharged with respect to all matters and things set forth in such account.  Except as may otherwise be required by applicable Federal law, no person interested in the Trust or otherwise other than the Company may require an accounting or bring any action against the Trustee with respect to the Trust and his actions as Trustee.  In any proceeding instituted by the Trustee and/or the Company with respect to these accounts, only the Company and the Trustee shall be the necessary parties.  The Trustee shall from time to time make such other reports and furnish such other information concerning the Trust as the Company may in writing reasonably request or as may be required by applicable Federal law.

39

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003623

Confidential-Subject to Protective Order

8.14 <u>Payment of Taxes</u>. The Trustee shall upon direction of the Company pay out of the Trust fund any and all taxes of any and all kinds, including without limitation property taxes and income taxes levied or assessed under existing or future laws upon or in respect of the Trust or any monies, securities or other property forming a part thereof or the income therefrom subject to the terms of any agreements or contracts made with respect to trust investments which make other provision for such tax payments. The Trustee may assume that any taxes assessed on or in respect of the Trust or its income are lawfully assessed unless the Company shall in writing advise the Trustee that in the opinion of counsel for the Company such taxes are or may be unlawfully assessed. In the event that the Company shall so advise the Trustee, the Trustee will, if so requested in writing by the Company, contest the validity of such taxes in any manner deemed appropriate by the Company or its counsel but at the expense of the Trust; or the Company may itself contest the validity of any such taxes at the expense of the Trust and in the name of the Trustee; and the Trustee agrees to execute all documents, instruments, claims and petitions necessary or advisable in the opinion of the Company or its counsel for the refund, abatement, reduction or elimination of any such taxes.

8.15 <u>Compensation and Expenses of Trustee</u>. The Trustee shall serve without compensation for his services as such, but all expenses of the Trust shall be paid from the assets of the Trust unless the Company, in its sole discretion, elects to pay such expenses. Such expenses shall include any expenses incident to the functioning of the Plan, including, but not limited to attorneys fees and the compensation of other agents, accounting and clerical charges, the cost of obtaining any bonds required by ERISA and other costs of administering the Plan.

40

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003624

8.16  Resignation or Removal of Trustee.  Any Trustee acting hereunder may resign at any time upon written notice to the Company and, if applicable, to the remaining Trustees and the Company may remove any Trustee at any time upon written notice to such Trustee and, if applicable, the remaining Trustees.  If any Trustee shall die, resign, be removed or for any other reason cease to be Trustee, he shall be replaced by a successor to be selected by the Board of Directors and until he is so replaced, the remaining Trustees shall exercise all of the powers of the Trustees.  The appointment of a successor Trustee shall be effective upon written notification to the Company and to the Trustees of his acceptance of such appointment.

8.17  Legal Action.  The Trustee shall not be required to institute any legal action or to appear or participate in any legal action to which he may be a party, except to contest taxes, unless he shall have been first indemnified to his satisfaction by the Company for all loss, cost and liability.

8.18  Indemnification of Trustee.  The Company either through insurance or otherwise shall indemnify and hold harmless the Trustee from any and all claims, loss, damages, expenses (including reasonable counsel fees approved by the Company), and liability (including any reasonable amounts paid in settlement with the Company's approval), arising from any act or omission of the Trustee, except when the same is judicially determined to be due to the willful misconduct of the Trustee.

41

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003625

Confidential-Subject to Protective Order

## ARTICLE IX

### The Company

9.01  No Contract of Employment.  This Trust shall not be construed as creating any contract of employment between the Company and any Member, Employee or other person, and nothing herein contained shall give any person the right to be retained in the employ of the Company or otherwise restrain the Company's right to deal with its employees, including Members and Employees, and their hiring, discharge, layoff, compensation, and all other conditions of employment in all respects as though this Trust did not exist.

9.02  No Contract to Maintain Plan.  The Company by the creation of the Trust does not enter into any agreement to maintain the Trust or to make any further contributions thereto or reimbursement of expenses incurred hereunder.  Each contribution by the Company shall be voluntary, and the Company reserves the right to suspend payment of its contributions hereunder, and no party hereto or Member or any other person shall have any cause or right of action against the Company by reason of failure by the Company to make contributions to the Trust, or by reason of any action by the Company in terminating the Plan and Trust.

9.03  Liability of Company.  Subject to its agreement to indemnify the Trustee as provided in Section 8.18 and except as otherwise provided by applicable Federal law, neither the Company nor any person acting in behalf of the Company shall be liable for any act or omission on the part of the Trustee, or for any act performed or the failure to perform any act by any person with respect to this Agreement, the Plan or Trust, the Company's only duty being to use reasonable care in the selection of the Trustee.

42

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003626

Confidential-Subject to Protective Order

9.04 _Action by Company_. Whenever under the terms of this Agreement, the Company is permitted or required to take any action, such action shall be taken by the Board of Directors or by any officer of the Company thereunto duly authorized by the Board of Directors or otherwise. In such event, any such officer may certify to the Trustee or any person the taking of such action and the name or names of the officers so authorized, including himself. The execution of any direction, document or certificate in behalf of the Company by any of its officers shall constitute his certification of his authority with respect thereto, and the Trustee or other person shall be protected in accepting and relying upon any such direction, document or certificate and are released from inquiry into the authority of any officer of the Company.

9.05 _Successor to Business of Company_. Unless this Plan and Trust be sooner terminated, a successor to the business of the Company, by whatever form or manner resulting, may continue the Plan and Trust by executing an appropriate supplementary agreement and such successor shall _ipso facto_ succeed to all the rights, powers and duties of the Company hereunder. The employment of any Employee who has continued in the employ of such successor shall not be deemed to have been terminated or severed for any purposes hereunder if such supplemental agreement so provides.

9.06 _Dissolution of the Company_. In the event that the Company is dissolved by reason of bankruptcy or insolvency or otherwise, without any provision being made for the continuation of this Plan and Trust by a successor to the business of the Company, the Plan and Trust hereunder shall terminate, and the Trustee shall proceed in the same manner as though the Plan and Trust were being terminated by the Company as provided in Section 7.03.

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003627

Confidential-Subject to Protective Order                    DEF000131

## ARTICLE X

### Top-Heavy Provisions

10.01 Article Controls. Any provisions of any Plan to the contrary notwithstanding, the provisions of this Article X shall control the Plan to the extent required to cause the Plan to comply with the requirements imposed by Section 416 of the Code.

10.02 Definitions. Where the following words and phrases appear in this Article X, they shall have the respective meanings set forth below, unless their context clearly indicates to the contrary:

(a)  Account Balance. As of any Valuation Date, the aggregate amount credited to an individual's account or accounts under a qualified defined contribution plan (excluding employee contributions which were deductible within the meaning of Section 219 of the Code and rollover or transfer contributions made by or on behalf of such individual to such plan from another qualified plan, sponsored by an entity other than the Company or an Affiliated Company) increased by (i) the aggregate distributions made to such individual from such plan during a five (5) year period ending on the Determination Date, and (ii) the amount of any contributions due as of the Determination Date immediately following such Valuation Date;

(b)  Aggregation Group. The group of qualified plans maintained by the Company and each Affiliated Company consisting of (i) each plan in which a Key Employee participates and each other plan which enables a plan in which a Key Employee participates to meet the requirements of Sections 401(a)(4) and 410 of the Code, or (ii) each plan in which a Key Employee participates, each other plan which enables a plan in which a Key Employee participates to meet the requirements of Sections 401(a)(4) and 410 of the Code, and any other

44

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003628

plan which the Company elects to include as a part of such group; provided, however, that the Company may not elect to include a plan in such a group if its inclusion would cause the group to fail to meet the requirements of Sections 401(a)(4) and 410 of the Code.

(c)    Compensation. For the purposes of this Article X, an individual's earned income, wages, salaries, and other amounts actually paid by the Company or an Affiliated Company to such individual during a Plan Year for personal services actually rendered in the course of employment with the Company or an Affiliated Company (subject to exclusion of amounts specified by regulations promulgated under Section 415 of the Code). In no event shall a Member's Compensation exceed $150,000 for any Plan Year (or such other amount as the Secretary of the Treasury or his delegate may determine for such Plan Year under Section 401(a)(17) of the Code).

(d)    Determination Date. For the first Plan Year of any plan, the last day of such Plan Year, and for each subsequent Plan Year of such plan, the last day of the preceding Plan Year.

(e)    Former Key Employee. With respect to any Plan Year, any individual who was a Key Employee in a previous Plan Year but who is not a Key Employee with respect to such Plan Year. For purposes of this definition, a beneficiary (who would not otherwise be a Key Employee) of a deceased former Key Employee shall be deemed to be a Former Key Employee in substitution for such deceased Former Key Employee.

(f)    Key Employee. With respect to any Plan Year, any individual who at any time during such Plan Year or during any of the four (4) Plan Years immediately preceding such Plan Year was (i) an officer (within the meaning of Section 416 of the Code) of the Company or

45

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003629

Confidential-Subject to Protective Order                    DEF000133

an Affiliated Company with Compensation greater than 150% of the amount in effect under Section 415(c)(1)(A) for such Plan Year, (ii) one of the ten (10) employees with Compensation greater than such amount and owning the largest interests in the Company or an Affiliated Company, (iii) an owner of more than five percent (5%) of the outstanding stock of the Company or an Affiliated Company or of stock possessing more than five percent (5%) of the total combined voting power of all the stock of the Company or an Affiliated Company, or (iv) an employee whose Compensation (during the calendar year including the Determination Date) exceeded $150,000 and who was an owner of more than one percent (1%) of the outstanding stock of the Company or an Affiliated Company or of stock possessing more than one percent (1%) of the total combined voting power of all of the stock of the Company or an Affiliated Company. For purposes of this definition, (i) an individual shall be deemed to own stock owned by others as provided in Section 318 of the Code, (ii) a beneficiary (who would not otherwise be a Key Employee) of a deceased Key Employee shall be deemed to be a Key Employee in substitution for such deceased Key Employee, and (iii) the total number of Key Employees who are officers of the Company and the Affiliated Companies shall be limited to the fifty (50) (or, if lesser, the greater of three (3) or ten percent (10%) of the employees) officers with the highest Compensation.

(g)     Plan Year. With respect to any plan, the annual accounting period used by such plan for annual reporting purposes.

(h)     Valuation Date. With respect to any Plan Year of any defined contribution plan, the most recent date within the twelve (12) month period ending on a Determination Date

46

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003630

Confidential-Subject to Protective Order

as of which the trust fund established under such plan was valued and the net income (or loss) thereof allocated to members' accounts.

10.03  Top-Heavy Status. The Plan shall be deemed to be top-heavy if, as of any Determination Date, (i) the sum of the Account Balances of Members who are Key Employees exceeds sixty percent (60%) of the sum of the Account Balances of all Members (excluding in both cases the Account Balances of all Former Key Employees and of those former Employees who have not performed any services for the Company or any Affiliated Company at any time during the five-year period ending on the Determination Date) unless the Plan is part of an Aggregation Group or (ii) an Aggregation Group including the Plan is top-heavy.  An Aggregation Group shall be deemed to be top-heavy as of a Determination Date if the sum (computed in accordance with Section 416(g)(2)(B) of the Code and the regulations promulgated thereunder) of the Account Balances of Key Employees under all defined contribution plans included in the Aggregation Group exceeds sixty percent (60%) of the sum of the Account Balances of all individuals under such plans (excluding in both cases the Account Balances of all Former Key Employees and of those former Employees who have not performed any services for the Company or any Affiliated Company at any time during the five-year period ending on the Determination Date).

10.04  Minimum Contribution. If the Plan is determined to be top-heavy for a Plan Year, the Company shall make an additional Company contribution to the Plan on behalf of each Employee who is a Member of the Plan, who is not a Key Employee, and who has not terminated his employment as of the last day of such Plan Year, equal to that amount which when added to the aggregate amount of Company contributions and forfeitures (excluding

47

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003631

Confidential-Subject to Protective Order                                                    DEF000135

amounts credited to the account of such Member pursuant to Sections 5.08 and 6.05) allocated to such Member's accounts for such Plan Year will cause the sum of all such contributions and forfeitures to equal the lesser of

      (a)    three percent (3%) of such Member's Compensation for such Plan Year, or

      (b)    a percent of such Member's Compensation for such Plan Year equal to the greatest percent obtained by dividing for each Key Employee the aggregate amount of Company contributions and forfeitures (excluding amounts credited to the account of any such Key Employee pursuant to Sections 5.08 and 6.05) allocated to such Key Employee's accounts for such Plan Year by such Key Employee's Compensation for such Plan Year.

      10.05  Vesting.  If the Plan is determined to be top-heavy for a Plan Year, the vested benefit of any Member who terminates his employment with the Company during such Plan Year shall be determined in accordance with Section 6.04, but using the following vesting schedule in lieu of the schedule appearing in Section 6.04:

| Years of Service | | Percentage |
| --- | --- | --- |
| At Least | But Less Than | |
| | 2 | NONE |
| 2 | 3 | 20% |
| 3 | 4 | 40% |
| 4 | 5 | 60% |
| 5 | | 100% |

      In the event that the Plan ceases to be top-heavy in a subsequent Plan Year, the vested benefit of any Member who terminates his employment with the Company after the Plan has ceased to be top-heavy shall be determined in accordance with the vesting schedule in Section 6.04; except that (a) the vesting percentage of any such Member shall not be less than the

48

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003632

vesting percentage which such Member achieved under the schedule set forth in this Section

10.05 of the last day of the last Plan Year for which the Plan was top-heavy, and (b) the vesting

percentage of a Member who has been credited with three (3) or more years of Service as of the

last day of the last Plan Year for which the Plan was top-heavy shall continue to be determined

in accordance with the vesting schedule set forth in this Section 10.05.

10.06  <u>Termination of Top-Heavy Status</u>.  Except as specifically provided in Section

10.05, if the Plan has been deemed to be top-heavy for one or more Plan Years and thereafter

ceases to be top-heavy, the provisions of this Article X shall cease to apply to the Plan effective

as of the day following the Determination Date on which it is determined to no longer be top-

heavy.

49

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003633

Confidential-Subject to Protective Order

DEF000137

## ARTICLE XI

### Miscellaneous

11.01  Limitation of Rights.  The establishment of the Trust shall not be considered as giving any Member or Employee or any other person any legal or equitable rights as against the Company or the Trustee, nor shall any person be responsible for the sufficiency of the Trust to provide benefits under the Plan, but each person interested shall look solely to the assets of the Trust for benefits payable subject to the terms and conditions of the Plan.

11.02  Spendthrift Provision.  Beneficial interests of Members or their Beneficiaries in the Trust shall not be assignable or subject to attachment nor receivership, nor shall they pass to any trustee in bankruptcy or be reached or applied by any legal process for the payment of any obligations of any such person, except as provided by Section 6.10 in the case of a loan to a Member from the Trust.  Nothing in this Section 11.02 shall prevent or restrict the creation, assignment or recognition of a right to any benefit payable with respect to a Member pursuant to a "qualified domestic relations order" (within the meaning of Sections 401(a)(13) and 414(p) of the Code).

11.03  Appointment of Person to Receive Payment.  In the event any amount shall become payable hereunder to any person (or his Beneficiary or estate), and if after written notice from the Trustee mailed to such person's last known address as shown on the Company's records, such person or his personal representative shall not have presented himself to the Trustee or notified the Trustee in writing of his address within one (1) year after the mailing of such notice, then the Trustee shall in his discretion appoint one or more of the spouse and blood relatives of such person to receive such amount, including any amount thereafter becoming due

50

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003634

Confidential-Subject to Protective Order                                                    DEF000138

to such person (or his estate), in the proportions determined by him.  Any action of the Trustee hereunder shall be binding and conclusive upon all persons.

11.04  Construction.  In any question of interpretation or other matter of doubt, the Trustee and the Company may rely upon the opinion of counsel for the Company or any other attorney at law designated by the Company with the approval of the Trustee.  The provisions of this Agreement shall be construed, administered and enforced according to the laws of the United States and, to the extent permitted by such laws, by the laws of the Commonwealth of Massachusetts.  All contributions to the Trust shall be deemed to be made in the Commonwealth of Massachusetts.

11.05  Impossibility of Performance.  In case it becomes impossible for the Company or the Trustee to perform any act under this Plan and Trust, that act shall be performed which in the judgment of the Trustee will most nearly carry out the intent and purpose of this Plan and Trust.  All parties to this Agreement or in any way interested in this Plan and Trust shall be bound by any acts performed under such condition.

11.06  Adjustment for Fractional Interests.  Notwithstanding any other provision of this Plan to the contrary, the amount of any contribution of Common Stock shall be adjusted by adding such part of a fractional share of the Common Stock thereto as is necessary to bring the total shares of Common Stock held by the Trustee to a whole number.

11.07  Definition of Words.  Feminine or neuter pronouns shall be substituted for those of the masculine form, and the plural shall be substituted for the singular, in any place or places herein where the context may require such substitution or substitutions.

51

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003635

11.08 <u>Titles</u>. The titles of articles and sections are included only for convenience and shall not be construed as a part of this Agreement or in any respect affecting or modifying its provisions.

11.09 <u>Merger or Consolidation</u>. In the event that this Plan is merged with or consolidated with any other plan, or the assets or liabilities accrued under this Plan are transferred to any other plan, each Member's benefit under such other plan shall be at least as great immediately after such merger, consolidation or transfer (if such plan were then to terminate) as the benefit to which he would have been entitled under this Plan immediately before such merger, consolidation or transfer (if the Plan were then to terminate).

11.10 <u>Claims Procedure</u>. In accordance with Section 503 of the ERISA and the regulations of the Secretary of Labor prescribed thereunder,

(1)    All claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such regulations as the Trustee shall reasonably establish.

(2)    The Trustee shall, within sixty (60) days of submission of a claim, provide adequate notice in writing to any claimant whose claim for benefits under the Plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the claimant,

(3)    The Trustee shall, within a reasonable period of time and upon request by a claimant, afford a reasonable opportunity to any claimant, whose claim for benefits has been denied, for a full and fair review by the Trustee of the decision denying the claim, and

52

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003636

Confidential-Subject to Protective Order

(4)    The Trustee shall, within 60 days of receipt of a request for a review, render a written decision on his review setting forth the specific reasons for such decision, written in a manner to be understood by the claimant.

11.11   Allocation and Delegation of Responsibilities.  The named fiduciaries with respect to the Plan shall be the Company and the Trustee.  The Company is the Plan Administrator for all purposes of ERISA.  The responsibilities of the named fiduciaries shall be allocated as provided herein, and each such fiduciary shall have only those responsibilities and obligations that are specifically imposed upon him by this Trust Agreement.  It is intended that each of the named fiduciaries shall be responsible for the proper exercise of his own powers, duties, responsibilities and obligations under the Plan and shall not be responsible for any act or omission of any other fiduciary.  Each named fiduciary shall be entitled to delegate all or any part of his fiduciary responsibilities and obligations (except those related to the management of the assets held hereunder) to any other person or entity.  In the event of any such delegation, (i) the named fiduciary shall not be liable for any act or omission of the person to whom the responsibility has been delegated as long as the selection and retention of such person is prudent and (ii) the person to whom the fiduciary powers and obligations are delegated shall be responsible only for the proper exercise of the powers, duties, responsibilities and obligations that have been specifically delegated to him.

11.12   Special Provisions for Certain Leased Employees.  A "leased employee" shall receive credit for Service which shall be recognized in determining the Employee's credit for Service for the entire period during which he is a leased employee of the Company as if he were an Employee of the Company; provided, however, that a leased employee shall not be eligible

53

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003637

Confidential-Subject to Protective Order

to participate in the Plan as long as he remains a leased employee. For purpose of this Section 11.12, the term "leased employee" means any person (a) who is not an Employee of the Company and (b) who pursuant to an agreement between the Company and any other person (a "leasing organization") has performed services for the Company on a substantially full-time basis for a period of at least one (1) year and such services are performed under the primary direction or control of the Company, and (c) who is not covered by a money purchase pension plan maintained by the leasing organization which provides a nonintegrated employer contribution rate of at least ten percent (10%) of compensation, immediate participation, and full and immediate vesting. If leased employees constitute more than twenty percent (20%) of the Company's nonhighly compensated workforce (as defined in Section 414(n)(5)(C)(ii) of the Code) without regard to clause (c) of the preceding sentence, then clause (c) shall not apply.

11.13 <u>Execution of Agreement</u>. This Agreement may be executed in any number of counterparts and each fully executed counterpart shall be deemed an original.

54

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003638

Confidential-Subject to Protective Order

DEF000142

IN WITNESS WHEREOF these presents have been signed and sealed for and in behalf of the parties hereto, in the case of the Company by its duly authorized officer, this 27th day of

_JULY_ , 1998.

COMPANY:       MEDICAL INFORMATION
                         TECHNOLOGY INC.

By _____
Title: CHIEF FINANCIAL OFFICER + TREAS.

TRUSTEE:       _____
                          A. Neil Pappalardo

DOCSB\520071.2

55

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003639

Confidential-Subject to Protective Order

DEF000143

# EXHIBIT 14

SUMMARY PLAN DESCRIPTION
OF THE
MEDICAL INFORMATION TECHNOLOGY, INC.
PROFIT SHARING PLAN

January 1, 1998

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003568

Confidential-Subject to Protective Order

DEF000072

## TABLE OF CONTENTS

Page

I.    BACKGROUND AND PURPOSE OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . 1

II.   GENERAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  PARTICIPATION IN THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      A.    Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      B.    Rules for Crediting Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      C.    Choosing a Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.   CONTRIBUTIONS AND ALLOCATIONS . . . . . . . . . . . . . . . . . . . . . . . . 3
      A.    Employer Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      B.    Employee Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      C.    Trust Gains and Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V.    BENEFITS PROVIDED UNDER THE PLAN . . . . . . . . . . . . . . . . . . . . . 4
      A.    Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      B.    Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      C.    Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      D.    Other Termination of Employment . . . . . . . . . . . . . . . . . . . . . . . 5
      E.    Manner and Timing of Benefit Payments . . . . . . . . . . . . . . . . . . 6
      F.    Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      G.    In-Service Withdrawals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

VI.   AMENDMENT AND TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VII.  SPECIAL RULES FOR TOP-HEAVY PLANS . . . . . . . . . . . . . . . . . . . . 8

IX.   YOUR RIGHTS UNDER ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003569

**Confidential-Subject to Protective Order**                                              **DEF000073**

## I.  BACKGROUND AND PURPOSE OF THE PLAN

The Medical Information Technology, Inc. Profit Sharing Plan (which will be referred to as the "Plan") is designed to help provide future financial security for you and your family by allowing you to share in the profits of Medical Information Technology, Inc. (the "Employer").

Under present federal and state law, all amounts contributed to the Plan by the Employer, and all income earned on Plan investments, are tax deferred until they are distributed to you.  This deferral of income tax is an important benefit of the Plan.

The Plan is a defined contribution plan.  Your benefit is based solely upon the value of the balance of the account established for you under the Plan.  Benefits under this type of plan are not insured by the Pension Benefit Guaranty Corporation.

This Summary Plan Description contains basic information about the main features of the Plan, but it does not attempt to describe in detail every rule of the Plan.  Accordingly, all decisions with respect to your benefits must be made based on the Plan document itself; if there is any conflict between this summary and the official Plan document, the Plan document will control.  Please read this Summary Plan Description carefully so that you will be aware of the Plan's principal features.  Please address any questions you may have about the operation of the Plan to the Plan Administrator.

## II.  GENERAL INFORMATION

| | |
|---|---|
| Name of Plan: | Medical Information Technology, Inc. Profit Sharing Plan |
| Employer: | Medical Information Technology, Inc.<br>MEDITECH CIRCLE<br>Westwood, MA 02090<br>(781) 821-3000 |
| Employer<br>Identification Number: | 04-2455639 |
| Plan Administrator: | The Employer is the Plan Administrator. |
| Trustee: | Mr. A. Neil Pappalardo<br>Trustee of the Medical Information Technology, Inc.<br>Profit Sharing Plan<br>MEDITECH CIRCLE |

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003570

Westwood, MA 02090
(781) 821-3000

<u>Plan Year</u>:                    January 1 - December 31

<u>Plan Number</u>:               The Plan Number is 001

Agent for Service
<u>of Legal Process</u>:           Service of legal process may be made upon the Plan
                                Administrator or the Trustee, at the address set forth above.


### III.  <u>PARTICIPATION IN THE PLAN</u>


A.    <u>Eligibility</u>

If you are an employee of the Employer (other than a "leased employee"), you will become a Member in the Plan on the first day of the month after you complete one year of Service.  Once you meet the Service requirement, you will automatically become a Member of the Plan; you are not allowed to elect not to participate in the Plan.  Your active membership in the Plan terminates when you are no longer an employee of the Employer.  A former Member who is reemployed by the Employer will become a Member immediately upon reemployment.

B.    <u>Rules for Crediting Service</u>

Your Service is equal to the most recent period of time, measured in years and days, in which you are employed by the Employer or any of its affiliates without incurring a "break in service."  You incur a "break in service" if you do not perform any hours of service for the Employer or any of its affiliates during any consecutive 12 month period.  An "hour of service" is each hour you are directly or indirectly paid or entitled to payment by the Employer for the performance of duties.  Special rules may apply in situations involving leaves of absence or reemployment after a "break in service;" you should consult the Plan Administrator if these special rules may be applicable to you.

C.    <u>Choosing a Beneficiary</u>

Upon becoming a Plan Member, you will be asked to complete a beneficiary designation form on which you will specify the person or persons who will receive the full value of your account in the Plan in the event of your death.  Except for the special rule for married Members described below, you may name any person or persons as a beneficiary and you can change your beneficiary at any time by completing a new beneficiary designation form.

2

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003571

If you are married at the time of your death, your surviving spouse will generally be your sole beneficiary. However, with the written consent of your spouse, you may designate some other person or persons as the beneficiary of all or part of your account. Your spouse's consent must be notarized or witnessed by a Plan representative and must acknowledge the effect of the designation of another beneficiary. Your spouse's consent will generally apply only to the designation of a particular beneficiary. Therefore, you must obtain spousal consent each time you change your beneficiary designation and designate someone other than your spouse, unless your spouse has expressly permitted additional changes without further consent. Note: If you are single, designate a beneficiary and later marry, your spouse automatically becomes your sole beneficiary. You must obtain your spouse's consent before you may name another beneficiary.

If, at your death, you have not designated a beneficiary, your designated beneficiary has predeceased you, or the Trustee determines your beneficiary designation is not effective, your beneficiary will be your spouse if you are married and your estate if you are unmarried.

## IV.    CONTRIBUTIONS AND ALLOCATIONS

A.    Employer Contributions

For each Plan Year, the Board of Directors of the Employer determines the amount, if any, that the Employer will contribute to the Trust. The contribution is made from the net income of the Employer for that Plan Year, or from the earnings and profits accumulated by the Employer prior to that Plan Year. The Employer's contribution to the Trust will be paid in cash and/or in shares of the Employer's common stock.

The Employer's contribution, if any, for each Plan Year is allocated to the individual accounts of all Members who were employees of the Employer on December 31 of that Plan Year. In addition, any Member who retired (as defined in V.A. below), became disabled (as defined in V.B. below), or died during that Plan Year will also be credited with an allocation of the Employer contribution, if any, for that Plan Year. However, if you own 10% or more of the outstanding common stock of the Employer on December 31 of a given Plan Year, no portion of the Employer contribution for that Plan Year will be allocated to your account.

The Employer contribution is credited to your account in proportion to your compensation for that Plan Year, as compared to the total compensation of all eligible Members for that Plan Year. Compensation includes salaries, wages, bonuses, overtime, and commissions, but excludes any contributions or benefits you receive under the Plan as well as any amounts paid to you prior to the date you became a Member under the Plan. For Plan Years beginning on or after January 1, 1989, the maximum level of compensation which will be taken into account is $100,000; any compensation in excess of $100,000 will be disregarded in determining your share of any Employer Contribution.

3

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003572

Forfeitures from the accounts of Members who are not fully vested ("vesting" is explained in V.D. below) when they leave the Employer are reallocated to the accounts of remaining Members on the same basis as Employer contributions (as explained above).

There are legal limits on the aggregate amount of contributions and forfeitures that may be allocated to your account under this Plan. Although it is unlikely that these limits will apply to the Plan, they could require a reduction in the amount allocated to your account.

B.    Employee Contributions

Contributions by Members are not permitted.

C.    Trust Gains and Losses

The Trustee is specifically authorized to invest up to 100% of the Trust assets in shares of common stock of the Employer, and it is intended that a substantial portion of the assets of the Trust will be invested in such common stock. One of the major purposes of the Plan is to give each Member a stake in the success of the Employer. Because a substantial portion of the Trust's assets are invested in the Employer's common stock, the value of your benefit under the Plan is significantly dependent on the value of that stock.

The assets and liabilities of the Trust will be evaluated as of December 31 each Plan Year. Any increases in the value of the Trust will be credited to your individual account in proportion to the relative size of your existing account balance. Any decrease in the value of the Trust will be charged to your account on the same basis. The Trustee may cause the assets and liabilities to be evaluated, and the accounts of the Members adjusted accordingly, as of any other date during the Plan Year.

## V.    BENEFITS PROVIDED UNDER THE PLAN

A.    Retirement

If you retire at or after age 60, you will be entitled to receive the entire amount credited to your account, plus interest credited at the prevailing short-term rate from the preceding valuation date through the last day of the month preceding distribution of your account.

B.    Disability

If you are unable to continue working for the Employer because of disability, you will be entitled to receive the entire amount credited to your account, plus interest credited at the prevailing short-term rate from the preceding valuation date through the last day of the month preceding distribution of your account. For purposes of the Plan, "disability" means a total

4

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
M 0003573

and permanent physical or mental impairment which is likely to result in death or last at least twelve months. The Trustee determines, on the basis of such medical evidence as the Trustee requires, whether you are disabled for purposes of the Plan.

C.    Death

If your employment with the Employer terminates on account of your death, your designated beneficiary will be entitled to receive the entire amount credited to your account, plus interest credited at the prevailing short-term rate from the preceding valuation date through the last day of the month preceding distribution of your account. If you die after you have terminated your employment with the Employer, but before the distribution of the vested portion of your account, the vested portion of your account will be distributed to your designated beneficiary.

If your beneficiary dies before receiving the entire amount payable from your account, the undistributed balance will go to your beneficiary's estate.

D.    Other Termination of Employment

If you terminate your employment with the Employer prior to age 60 for any reason other than disability or death, you will be entitled to a benefit equal to the vested portion of your account, plus interest thereon credited at the prevailing short-term rate from the preceding valuation date through the last day of the month preceding distribution of your account. The vested portion of your account is equal to a percentage of the amount standing to the credit of your account, based on your years of Service with the Employer, as follows:

| Years of Service | Vested Percentage |
|---|---|
| Less than 2 | None |
| 2 | 10% |
| 3 | 30% |
| 4 | 60% |
| 5 or more | 100% |

Amounts which are not vested at the time of your termination will be forfeited once the vested portion of your account has been distributed or after you have had five consecutive "breaks in service," whichever is earlier. If you have zero vesting, you will automatically be deemed to have received a distribution, with the result that your entire account will be forfeited upon termination of employment. Forfeited amounts will be allocated to the remaining eligible Members as explained in IV.A. above.

If you return to work with the Employer before incurring five consecutive "breaks in service," any amount that was previously forfeited from your account will be reinstated in full.

5

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003574

If you return to work after incurring five consecutive breaks in service, you will not be entitled to a reinstatement of any previously forfeited amount.

### E.    Manner and Timing of Benefit Payments

Benefit payments under the Plan are generally payable as a lump sum in cash and will be made within a reasonable period of time after the date of your retirement, death, disability, or other termination of employment. However, instead of such total lump sum distribution you can elect to have all or part of your payment transferred directly to an individual retirement arrangement or other qualified retirement plan as a direct rollover. Any amount you choose to receive (as opposed to have transferred as a direct rollover) is subject to 20% federal income tax withholding (and applicable state tax withholding) and may be subject to an additional 10% early withdrawal tax if you are under age 59 ½. Before receiving a distribution from the Plan, the Trustee will provide you with additional information on Federal tax withholding and direct rollovers. However, you should consult your tax advisor before making any benefit distribution decision.

Note that, if your account balance exceeds $5,000 and you terminate employment before reaching age 62, you must consent in writing to any distribution from the Plan. Otherwise, the Trustee will defer distribution of your account until you reach age 62 or die, whichever occurs first. In this event, the Trustee will segregate your account and invest it in bank deposits or other investments selected by the Trustee. Moreover, if you are a 5% owner of the Employer and are still employed by the Employer when you reach age 70 ½, Federal law requires that your account balance be distributed no later than April 1 of the next calendar year.

If the Trust's assets are not sufficiently liquid to permit distribution to you in cash, the Trustee may defer distribution to you, as described in the Plan, and thereafter may distribute all or a portion of your account balance in shares of Stock (instead of cash) at the end of that period.

### F.    Loans

Upon written application to the Trustee, the Trustee may allow you to take a loan from the Trust. The maximum amount of loans which you can have outstanding from the Plan at any time is the lesser of (a) $50,000, reduced by any loan repayment made during the previous year, or (b) 50% of the vested amount in your account. All loans will be made at a reasonable rate of interest and must be secured by fifty percent of your vested account balance. Loans must be repaid within 5 years; however, this period can be extended if you use the loan in connection with the purchase of your principal residence. Loans will generally be required to be repaid by payroll deduction. If your account becomes payable while you have a loan(s) outstanding, the Trustee will deduct the outstanding loan balance (including any unpaid interest) from your account before distributing the remainder of your account. Any expenses incurred by the Trustee in connection with a loan to you (including any collection expenses in the case of a default) will be charged against your account.

6

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003575

G.    In-Service Withdrawals

While you are employed by the Employer, you may make withdrawals from your vested account under the Plan if you have at least 20 years of Service or if you incur a "financial hardship." All withdrawals must be made in accordance with procedures established by the Trustee. Any amount you withdraw will be credited with interest at the prevailing short-term rate from the preceding valuation date to the last day of the month preceding distribution of your withdrawal amount. Your withdrawal amount is taxable income and is subject to 20% Federal income tax withholding (and applicable state tax withholding) and may be subject to an additional 10% early withdrawal tax if you are under age 59 ½.

If you have at least 20 years of Service, you may withdraw all or part of your account for any reason. However, you can only make one such withdrawal during any Plan Year. Generally, your withdrawal amount will be paid to you as soon as feasible after your withdrawal request. However, if the Trustee determines there is not sufficient available cash in the Trust to pay your full withdrawal amount, the Trustee can postpone payment to you for up to three years whereupon distribution will be made to you in cash and, if necessary, in shares of Stock.

If you incur a "financial hardship," you may withdraw from your vested account balance an amount not to exceed the amount needed to pay for such "financial hardship" plus the amount of any taxes or penalties on such withdrawal amount. Hardship withdrawals are payable only in cash, and the Trustee will deny a "financial hardship" withdrawal request to the extent cash is not available in the Trust for such distribution. For Plan purposes, "financial hardship" is defined to include the following:

- medical expenses incurred by you, your spouse or any of your dependents;

- your purchase of a principal residence;

- the need to prevent eviction from, or foreclosure on, your principal residence;

- renovation expenses for your principal residence;

- educational expenses incurred by you, your spouse or any of your dependents;

- funeral expenses (including burial expenses) of a member of your family;

- the need to pay significant amounts of current debt incurred as a result of any one or more of the above.

7

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003576

Confidential-Subject to Protective Order                                                      DEF000080

H.    <u>Assignment of Account Balance</u>

You may not assign your account balance, nor may you pledge any part of your account balance as security for a loan (other than a loan from the Trust). However, this rule does not prevent the payment of any portion of your account to a spouse, former spouse, or dependent under a "qualified domestic relations order" -- <u>i.e.</u>, a court order that provides for child support, alimony, or the division of marital property and that satisfies certain technical requirements. The order must be filed with the Trustee, who then determines whether the order meets the requirements for qualified domestic relations orders. You should contact the Trustee if you receive a domestic relations order or if you have any questions about the procedure used to determine whether a domestic relations order is qualified.

## VI.  <u>AMENDMENT AND TERMINATION</u>

The Employer expects to continue the Plan on a permanent basis, but it necessarily reserves the right to terminate the Plan, or completely discontinue contributions under the Plan, at any time. The Employer also reserves the right to amend the Plan at any time. The Plan may not be amended or terminated in such a way as to divert the Plan assets to the benefit of anyone except Members or their beneficiaries, or to reduce any amount previously credited to the account of a Member. If there is a termination or partial termination of the Plan, all affected Members will become fully vested in their accounts.

## VII.  <u>SPECIAL RULES FOR TOP-HEAVY PLANS</u>

If the Plan ever becomes top-heavy (i.e., a disproportionate amount of contributions are allocated to the accounts of certain highly paid employees), you may be eligible for a minimum contribution or faster vesting of your account balance. However, it is unlikely the Plan will ever be top-heavy.

## VIII.  <u>CLAIMS PROCEDURE</u>

If you believe you are (or in the case of your death, if your beneficiary believes he or she is) entitled to Plan benefits and you have not received notification from the Trustee as to the time and manner of distribution of benefits, or if you receive notice from the Trustee with regard to the amount and form of payment of your benefits and you believe there is an error in the notice, then you may submit a claim to the Trustee. If you believe you are entitled to Plan benefits under a domestic relations order, you may submit a claim to the Trustee for a

8

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003577

Confidential-Subject to Protective Order                    DEF000081

determination of the qualified status of the domestic relations order.  Your claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim.

If the Trustee denies your claim, he will, within 60 days of the date he received the claim, notify you in writing of his denial, explain the reasons on which his decision is based and let you know if there are any additional facts or materials which you should supply to support your claim.

If, after receiving the Trustee's explanation of his denial, you still believe you have a right to benefits which have been denied, you may request in writing, within a reasonable period of time after the denial, that the Trustee review his decision.  The Trustee will, within 60 days of receipt of a written request for review, send you a written decision on his review explaining the specific reasons for his decision.

## IX.  YOUR RIGHTS UNDER ERISA

As a Member of the Medical Information Technology, Inc. Profit Sharing Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA).  ERISA provides that all Plan Member shall be entitled to:

(1)     Examine, without charge, at the Plan Administrator's office, all plan documents and copies of documents filed with the U.S. Department of Labor, such as annual reports and plan descriptions.

(2)     Obtain copies of all plan documents and other plan information by writing the Plan Administrator.  There may be a reasonable charge for the copies.

(3)     Receive a summary of the Plan's annual financial report.  The Plan Administrator will give you a copy of this report each year.

(4)     Obtain a statement telling you whether you would have a right to a vested benefit under the Plan and how much that benefit would be.  If you do not have the right to a vested benefit, the statement will tell you how many more years you have to work before you do have a vested benefit.  You can write for a benefit statement once a year and the Plan Administrator will provide one free of charge.

In addition to creating rights for Plan Members, ERISA imposes duties upon the people who are responsible for the operation of the Plan.  The people who operate the Plan, who are called "fiduciaries," have a duty to do so prudently and in the interest of Plan Members and beneficiaries.

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003578

Confidential-Subject to Protective Order                                    DEF000082

No one, including the Employer or any other person, may fire a Member or otherwise discriminate against him or her in any way to prevent him or her from obtaining a benefit from the Plan or exercising his or her rights under ERISA.

Under ERISA there are steps a Member can take to enforce the above rights.

For instance, if a Member requests materials from the Plan and does not receive them within 30 days, he or she may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay the Member up to $100 a day until he or she receives the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If a Member or beneficiary has a claim for benefits which is denied or ignored, in whole or in part, and the Member has taken the appropriate action through the claims process, he or she may file suit in a state or federal court.

If a Member believes that Plan fiduciaries are misusing the Plan's money, or if a Member is discriminated against for asserting his or her rights, the Member may seek assistance from the U.S. Department of Labor or may file suit in a federal court.

In addition to deciding what damages, if any, should be awarded, the court will decide who should pay court costs and fees. If the Member is successful, the court may order the party sued to pay these costs and fees. If the Member loses, the court may order the Member to pay the costs and fees, for example, if it finds the claim is frivolous.

If you have any questions about the Plan, you should contact the Plan Administrator at (781) 821-3000.

If you have any questions about this statement or about your rights under ERISA, you should contact the nearest office of the Pension and Welfare Benefits Administration, U. S. Department of Labor.

DOCSB\531435.1

10

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003579

Confidential-Subject to Protective Order

DEF000083

# EXHIBIT 15

Westlaw.

--- F.3d ----                                                                                          Page 1
--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))
**(Cite as: --- F.3d ----)**

H

In re New Motor Vehicles Canadian Export Anti-
trust Litigation;
C.A.1 (Me.),2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,First Circuit.
In re NEW MOTOR VEHICLES CANADIAN EX-
PORT ANTITRUST LITIGATION,
William H. Brown, et al., Plaintiffs, Appellees,
v.
American Honda, et al., Defendants, Appellants.
In re New Motor Vehicles Canadian Export Anti-
trust Litigation,
William H. Brown, et al., Plaintiffs, Appellees,
v.
General Motors Corporation, et al., Defendants,
Appellants.
In re New Motor Vehicles Canadian Export Anti-
trust Litigation,
William H. Brown, et al., Plaintiffs, Appellees,
v.
Ford Motor Company, et al., Defendants, Appel-
lants.
Nos. 07-2257, 07-2258, 07-2259.

Heard Oct. 3, 2007.
Decided March 28, 2008.

**Background:** New-automobile purchasers and less-
ees brought class action against American and Ca-
nadian automobile manufacturers, alleging conspir-
acy among manufacturers and dealer associations to
prevent lower-priced Canadian cars from being ex-
ported to United States, in violation of antitrust and
consumer protection laws. The District Court, 235
F.R.D. 127, 241 F.R.D. 77, and 243 F.R.D.
20,Hornby, J., certified class seeking damages un-
der antitrust and consumer protection laws of 20
states, and certified nationwide class seeking in-
junctive relief under Clayton Act. Defendants
sought interlocutory appeal.

**Holdings:** The Court of Appeals, Lynch, Circuit
Judge, held that:

(1) purchasers lacked standing to seek injunctive
relief under Clayton Act, and
(2) in deciding predominance criterion as to dam-
ages class, district court should have undertaken
more searching inquiry into theory of injury.

Reversed in part, vacated in part and remanded in
part.

Torruella, Circuit Judge, filed opinion concurring in
part and dissenting in part.

**[1] Antitrust and Trade Regulation 29T ⬚0**

29T Antitrust and Trade Regulation
In order to satisfy "threatened loss or damage" cri-
terion for seeking injunctive relief under Clayton
Act, plaintiff must demonstrate significant threat of
injury from impending violation or from contem-
porary violation likely to continue or recur, and
threatened injury must be one for which plaintiff
would be entitled to compensation if injury actually
occurred. Clayton Act, 15 U.S.C.A. § 26.

**[2] Antitrust and Trade Regulation 29T ⬚0**

29T Antitrust and Trade Regulation
Automobile purchasers and lessees lacked standing
to bring class action seeking injunctive relief under
Clayton Act against American and Canadian auto-
mobile manufacturers based on alleged horizontal
restraints of trade that prevented lower-priced Ca-
nadian cars from being exported to United States,
since no "threatened injury" existed at time stand-
ing was evaluated; there was no live controversy,
given change in currency exchange rate that had
ended arbitrage opportunities that allegedly had
triggered restraints of trade, and possibility of fu-
ture arbitrage opportunities was speculative.
U.S.C.A. Const. Art. 3, § 2; Sherman Act, 15
U.S.C.A. § 1; 15 U.S.C.A. § 26.

**[3] Federal Courts 170B ⬚0**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

**170B** Federal Courts

Court of Appeals reviews district court's class certification rulings for abuse of discretion, reviews de novo pure issues of law underlying ruling, and reviews mixed questions of law and fact non-deferentially where law-dominated and for clear error where fact-dominated.

**[4]** Federal Civil Procedure 170A ⚖0

170A Federal Civil Procedure

Court has power to test disputed premises at class action certification stage, if and when class action would be proper on one premise but not another.

**[5]** Federal Civil Procedure 170A ⚖0

170A Federal Civil Procedure

In antitrust class actions, common issues do not predominate, for purposes of class action certification, if fact of antitrust violation and fact of antitrust impact cannot be established through common proof. Fed.Rule Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[6]** Federal Civil Procedure 170A ⚖0

170A Federal Civil Procedure

When requirement for class action certification relies on novel or complex theory as to injury, district court must engage in searching inquiry into viability of that theory and existence of facts necessary for theory to succeed. Fed.Rule Civ.Proc.Rule 23, 28 U.S.C.A.

**[7]** Federal Civil Procedure 170A ⚖0

170A Federal Civil Procedure

In determining predominance criterion on motion for class action certification, in automobile purchasers' state antitrust action against manufacturers alleging conspiracy to prevent lower-priced Canadian cars from being exported to United States, district court should have undertaken more searching inquiry into purchasers' theory of injury, given its novelty and complexity, rather than preliminarily certifying class before completion of discovery and

before theory was fully formulated; theory depended on two-stage showing of, first, higher dealer prices, and second, that those prices in turn affected purchasers. Fed.Rule Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

Appeals from the United States District Court for the District of Maine, D. Brock Hornby, U.S. District Judge.

William J. Kayatta, Jr. with whom Clifford H. Ruprecht, Pierce Atwood LLP, James C. Egan, Jr., Kirsten A. Lockhart, Carrie M. Anderson, and Weil Gotshal & Manges were on brief for appellants Chrysler LLC, Chrysler Motors LLC, Chrysler Canada Inc., and Mercedes-Benz USA LLC.

Richard C. Godfrey, P.C., David J. Zott, P.C., Daniel E. Laytin, and Kirkland & Ellis LLP were on brief for appellants General Motors Corp. and General Motors of Canada, Ltd.

Margaret M. Zwisler, William R. Sherman, and Latham & Watkins LLP were on brief for appellants Ford Motor Company and Ford Motor Company of Canada, Ltd.

John H. Rich III, Perkins Thompson, P.A., Robert A. Van Nest, Ragesh K. Tangri, Rachael E. Meny, Daniel Purcell, and Keker & Van Nest, LLP were on brief for appellants American Honda and Honda Canada Inc.

Peter Sullivan, Joshua Lipton, Gibson Dunn & Crutcher LLP, Harold J. Friedman, Laurence H. Leavitt, and Friedman Gaythwaite Wolf & Leavitt LLP were on brief for appellant Nissan North America, Inc.

Joseph J. Tabacco, Jr. with whom Glen DeValerio, Peter A. Pease, Todd A. Seaver, Matthew D. Pearson, Berman DeValerio Pease Tabacco Burt & Pucillo, Michael M. Buchman, J. Douglas Richards, Pomerantz Haudek Block Grossman & Gross, LLP, Robert S. Frank, and Harvey & Frank were on brief for appellees.

Before TORRUELLA, Circuit Judge, SELYA, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

**\*1** This multi-district consumer action alleges a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))
**(Cite as: --- F.3d ----)**

conspiracy by automobile manufacturers to illegally block lower-priced imports from Canada, which is alleged to have inflated the price of new cars sold in America. We granted this interlocutory appeal under Federal Rule of Civil Procedure 23(f) from the district court's certifications of (1) a nationwide plaintiff class seeking injunctive relief under section 16 of the Clayton Act and Rule 23(b)(2), and (2) a class seeking damages under the antitrust and consumer protection laws of twenty states and Rule 23(b)(3).

Interlocutory appeals from class certification under Rule 23(f) are especially appropriate where the plaintiffs' theory is novel or where a doubtful class certification results in financial exposure to defendants so great as to provide substantial incentives for defendants to settle non-meritorious cases in an effort to avoid both risk of liability and litigation expense. *Tardiff v. Knox County,* 365 F.3d 1, 3 (1st Cir.2004); *Waste Mgmt. Holdings, Inc. v. Mowbray,* 208 F.3d 288, 293 (1st Cir.2000); *see also West v. Prudential Sec., Inc.,* 282 F.3d 935, 937 (7th Cir.2002) ("The effect of a class certification in inducing settlement to curtail the risk of large awards provides a powerful reason to take an interlocutory appeal."). The defendants assert that the amount at stake in the damages classes alone, counting treble damages, could be as much as $3 billion, and these classes include roughly thirteen million car purchasers. There is no reliable means for measuring the size of the injunctive class, but it is potentially massive. FN1

By the same token, an erroneous failure to certify a class where individual claims are small may deprive plaintiffs of the only realistic mechanism to vindicate meritorious claims. *See, e.g., Tardiff,* 365 F.3d at 7 (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). All of these concerns are very much implicated here.

We summarize our holdings. We reverse the certification of the injunctive class under the Clayton Act for lack of a live controversy and order dis-

missal of the claim. Because there is no jurisdiction under the Clayton Act, we remand to the district court for determination of the several issues concerning the existence of federal jurisdiction. On the representation of the parties that there is diversity jurisdiction over at least some of the state damages claims, we review the certification of the damages classes. We vacate that certification; the district court is free to reconsider the class certification orders on a more complete record.

## I.

### Background

The extensive background of this case is recited in many thoughtful decisions of the district court. *See, e.g., In re New Motor Vehicles Canadian Export Antitrust Litig. (Motor Vehicles I ),* 307 F.Supp.2d 136 (D.Me.2004) (dismissing federal antitrust damages claims); *In re New Motor Vehicles Canadian Export Antitrust Litig. (Motor Vehicles II ),* 335 F.Supp.2d 126 (D.Me.2004) (asserting pendent personal and supplemental subject matter jurisdiction over state law claims); *In re New Motor Vehicles Canadian Export Antitrust Litig. (Motor Vehicles III ),* 350 F.Supp.2d 160 (D.Me.2004) (denying in part motion to dismiss); *In re New Motor Vehicles Canadian Export Antitrust Litig . (Motor Vehicles IV ),* No. MDL 1532, 2006 WL 623591 (D.Me. Mar.10, 2006) (certifying federal injunctive relief class); *In re New Motor Vehicles Canadian Export Antitrust Litig. (Motor Vehicles V ),* 235 F.R.D. 127 (D.Me.2006) (certifying six exemplar state damages classes); *In re New Motor Vehicles Canadian Export Antitrust Litig. (Motor Vehicles VI ),* 241 F.R.D. 77 (D.Me.2007) (supplemental order on certification of state damages classes); *In re New Motor Vehicles Canadian Export Antitrust Litig . (Motor Vehicles VII ),* 243 F.R.D. 20 (D.Me.2007) (order certifying class action and appointing class counsel); *In re New Motor Vehicles Canadian Export Antitrust Litig. (Motor Vehicles VIII ),* 243

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))
**(Cite as: --- F.3d ----)**

F.R.D. 17 (D.Me.2007) (memorandum order in support of class certification order). Before describing the class certification issues, we sketch the outline of the underlying case.

**\*2** The plaintiffs' claim is that from at least 2001 through 2003, the currency exchange rate differential between the strong United States dollar and the cheaper Canadian dollar created arbitrage opportunities [FN2] in the gray market [FN3] to sell lower-priced Canadian cars in the United States. These arbitrage opportunities arose from the difference between the price at which a broker could buy a vehicle in Canada (plus the costs of exporting the vehicle to the United States) and the price at which the broker could resell the vehicle, whether to a dealer or consumer, in the United States. These arbitrage opportunities were enhanced by liberal trade agreements and the harmonization of automotive safety and environmental standards between the two countries in the 1990s. As a result, an exporter could make most new cars sold in Canada physically indistinguishable from comparable models sold in the United States by replacing the speedometer and odometer with gauges that measured miles instead of kilometers. All of these circumstances converged in what plaintiffs refer to as a "perfect storm" of cross-border arbitrage opportunities.

Plaintiffs allege that individual automobile manufacturers engaged in business practices, both legal and illegal, designed to restrict the flow of Canadian cars into the United States. Manufacturers allegedly refused to honor warranties on Canadian cars in the United States and discouraged dealers from installing domestic gauges on Canadian cars; they mandated "no export" clauses in sales agreements between dealers and consumers and required Canadian dealers to conduct due diligence into whether potential customers were likely to export their cars out of Canada; and they withheld information about safety recalls from exporting customers. Manufacturers also allegedly imposed disciplinary measures on Canadian dealers who sold to exporting customers. When Canadian cars were dis-

covered in the United States, automakers would impose a "chargeback," a monetary penalty sometimes amounting to thousands of dollars, on the Canadian dealer who sold the car; manufacturers threatened to withhold inventory of desirable models from offending dealerships; and they threatened to terminate dealerships that sold to exporters.

Plaintiffs allege that these business practices had the effect of suppressing the supply of Canadian cars in the United States. This stifling of supply led to increases in two key prices in the domestic United States automobile market: the Manufacturer's Suggested Retail Price ("MSRP") and the dealer invoice price. The MSRP represents the retail price presented to the public. The dealer invoice price represents the manufacturer-determined net wholesale price to dealers. [FN4] Both the MSRP and the list dealer invoice price are determined annually by manufacturers and apply nationally. Under plaintiffs' theory, these two prices in turn define the bargaining parameters for the price actually paid by consumers. Actual sales prices vary according to individual negotiations between dealers and consumers, but plaintiffs assume that negotiated prices fall within the range between the dealer invoice price and the MSRP.

**\*3** Defendants [FN5] take the position that the business practices described above amount to vertical restraints between manufacturers and their dealers that do not violate the antitrust laws. Plaintiffs, however, allege that defendants violated section 1 of the Sherman Act by conspiring to coordinate their anti-export business practices across the industry in response to increased arbitrage opportunities after 2000. Plaintiffs allege that defendants accomplished the illegal conspiracy over the course of several meetings and through dissemination of best practices and other information through the dealer associations. These illegal horizontal agreements allegedly enhanced the effectiveness of the extant legal vertical restraints. According to plaintiffs' theory, "but for" the illegal horizontal conspiracy and its suppression of inter-brand competition, Americ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

an consumers would have paid lower prices and have thus suffered antitrust-type injury.

For example, the plaintiffs allege that Ford's 2002 Windstar LX minivan had an MSRP of $16,448 (USD) in Canada and $22,340 (USD) in the United States-a difference of 26%. The MSRP for a 2002 Lexus SC430 was 13% lower in Canada than in the United States. Plaintiffs claim that if the car-makers had not conspired to impede arbitrageurs from exporting Canadian cars to the United States, the manufacturers could not maintain these pricing gaps and instead would have been forced to compete by lowering prices across the United States.

To summarize, plaintiffs' theory of antitrust impact operates in two stages. In the first stage, the horizontal conspiracy allowed the manufacturers to maintain artificially inflated national MSRPs and dealer invoice prices within the United States. In the second stage, the higher official pricing resulted in higher purchase prices paid by individual consumers.

Throughout the proceedings in the district court, the defendants have denied any conspiracy. They have also argued that even if such a conspiracy existed, it would not have impacted the domestic market in any case due to the effects of the entirely legal vertical restraints.[FN6] Defendants have also argued that contrary to plaintiffs' theory, there would have been no flood of Canadian cars into the United States given the number of new cars sold in Canada, the limited opportunities for arbitrage, and the small size and spottiness of the gray market. Defendants assert that even if there were some impact on MSRPs and dealer invoice prices in the American market, there was no widespread antitrust impact on consumers, and plaintiffs have no viable theory to show either causation or damages that would apply to the plaintiff classes.

## II.

*Nationwide Injunctive Relief Plaintiff Class*

Defendants challenge the certification of the injunctive class on the basis that plaintiffs lack standing to sue for injunctive relief under the federal antitrust laws. Because standing is a threshold consideration, the resolution of which may render subsequent arguments irrelevant, we discuss it first.FN7 *Warth v. Seldin,* 422 U.S. 490, 498-99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

**\*4** Plaintiffs seek federal injunctive relief pursuant to section 16 of the Clayton Act on behalf of a nationwide class under Rule 23(b)(2) for alleged violations of section 1 of the Sherman Act. Section 16 makes available injunctive relief "against threatened loss or damage by a violation of the antitrust laws."15 U.S.C. § 26; *see also Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 110-11, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). Plaintiffs allege that injunctive relief is necessary because the conspiracy is ongoing and will continue unless enjoined by the court.

Specifically, plaintiffs seek an injunction that would require defendants to honor warranties in the United States on all new motor vehicles sold in Canada; enjoin the defendants from blacklisting Canadian exporters; enjoin the defendants from exchanging certain information with each other, including blacklists and methods for avoiding export sales; enjoin chargebacks to Canadian dealers; enjoin the tracking of Canadian cars' Vehicle Identification Numbers ("VINs"); enjoin American manufacturers from penalizing American dealers for buying or selling Canadian vehicles; enjoin the Canadian Automobile Dealers' Association ("CADA") and the National Automobile Dealers' Association ("NADA") from discouraging or acting to prevent Canadian exports; and enjoin the defendants from withholding safety recall information based on a vehicle's export status. *Motor Vehicles IV,* 2006 WL 623591, at \*1-2.

On March 10, 2006, the district court issued an order certifying a nationwide injunctive class under Rule 23(b)(2).[FN8] *Id.* at \*1. In doing so, the court noted that a national injunction was the only relief

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----    Page 6
--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))
**(Cite as: --- F.3d ----)**

available to members of the proposed class who reside in twenty-seven states because the court had previously dismissed a proposed nationwide class for damages under the federal antitrust laws as well as state-law damages claims for all but twenty-three states and the District of Columbia. *Id.* at *7. The district court has, with the agreement of the parties, stayed determination of class notice issues pending this appeal.

The district court addressed the scope of standing to seek injunctive relief under section 16 of the Clayton Act in the course of analyzing the typicality requirement of Rule 23(a)(3).*Motor Vehicles IV,* 2006 WL 623591, at *3-4. Defendants had argued that some named plaintiffs did not have standing to sue for an injunction because not all named plaintiffs actually paid an overcharge due to the alleged conspiracy, and some actually paid less because of it.*Id.* at *3.

The court correctly held that a plaintiff seeking relief under section 16 need not show actual antitrust damages but only a "threatened loss or damage." 15 U.S.C. § 26; *see also Cargill,* 479 U.S. at 111;*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.,* 883 F.2d 1101, 1106 (1st Cir.1989). This in turn means that the requirements for standing for injunctive relief are less stringent than those under section 4 of the Clayton Act, 15 U.S.C. § 15, for standing to pursue damages claims. *Cia Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 407-08 (1st Cir.1985) ("Congress empowered a broader range of plaintiffs to bring § 16 actions because the standards to be met are less exacting than those under § 4; under § 16, a plaintiff need show only a threat of injury rather than an accrued injury.").

**\*5** **[1]** Plaintiffs must demonstrate "a significant threat of injury from an impending violation ... or from a contemporary violation likely to continue or recur."*Mid-West Paper Prods. Co. v. Cont'l Group, Inc.,* 596 F.2d 573, 591 (3rd Cir.1979) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129

(1969)) (internal quotation marks omitted). The threatened injury must be an injury for which the plaintiff would be entitled to compensation if the injury actually occurred. *Cargill,* 479 U.S. at 110-13. There is no doubt that the types of injuries alleged here-consumers paying artificially inflated prices due to antitrust violations-are antitrust injuries. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); *see also Motor Vehicles IV,* 2006 WL 623591, at *3 ("Higher prices for consumers resulting from antitrust violations are antitrust injuries.").

**[2]** The district court rejected the defendants' standing argument, reasoning that whether or not the named plaintiffs suffered an actual overcharge, "[t]hey confront or confronted a threatened loss or damage resulting from restrictions on competition ... [that] the antitrust laws were designed to prevent."*Id.* at *4. The district court relied on two propositions that are now called into question. First, the court reasoned that "whether exchange rates during some periods [within the class period] *temporarily* made Canadian cars more expensive and therefore not price competitive, does not affect the standing of these plaintiffs to seek an injunction against continuation of such a conspiracy."[FN9] *Id.* (emphasis added). Second, the court noted in an opinion now two years old that "[t]here is no indication that exchange-related arbitrage opportunities have permanently ended."*Id.*

As the defendants point out on appeal, the standing issue emanates from Article III's requirement that there remain a live case or controversy throughout the course of a litigation. *Golden v. Zwickler,* 394 U.S. 103, 108-09, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). If a named plaintiff fails to establish such a continuing controversy, she normally may not invoke the power of the federal courts to seek relief on her own behalf or that of other members of a putative class. *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *see also Sosna v. Iowa,* 419 U.S. 393, 402, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) ("There must not only be a

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

named plaintiff who has ... a case or controversy at the time the complaint is filed, and at the time the class action is certified by the District Court ... but there must be a live controversy at the time this Court reviews the case."). Under certain circumstances, a court may find that the requisite controversy exists "between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot" due to that plaintiff's individual circumstances. *Sosna,* 419 U.S. at 402.

The defendants contend that even if the named plaintiffs had standing to seek injunctive relief at some time in the past, circumstances have changed such that there is no longer a live controversy between named plaintiffs and the defendants to bolster plaintiffs' standing to seek injunctive relief. We agree.

**\*6** Section 16's requirement of "threatened injury," 15 U.S.C. § 26, dovetails with Article III's requirement that in order to obtain forward-looking relief, a plaintiff must face a threat of injury that is both " 'real and immediate,' not 'conjectural' or 'hypothetical.' " *O'Shea,* 414 U.S. at 494 (quoting *Golden,* 394 U.S. at 109-10). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* at 495-96.

As with the other elements of standing, it is plaintiffs who, by invoking federal jurisdiction, bear the burden of establishing the presence of a threat of injury. *McInnis-Misenor v. Me. Med. Ctr.,* 319 F.3d 63, 67 (1st Cir.2003) (citing *Bennett v. Spear,* 520 U.S. 154, 167-68, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)). "There must be some immediacy or imminence to the threatened injury." *Id.* at 68 (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)).

Plaintiffs have failed to establish the continuing presence of the requisite threatened injury. The "perfect storm" that allegedly precipitated massive

arbitrage opportunities for selling Canadian cars in the United States ceased long ago. Plaintiffs' theory of antitrust violation posits that exceptional arbitrage opportunities arose early in this decade due to a combination of relaxed trade restrictions between the United States and Canada, physical harmonization of cars manufactured for the two markets, and a differential between the values of American and Canadian currencies. The last factor has varied since the beginning of the class period, and plaintiffs themselves measure windows of actual arbitrage opportunity in large part according to undulations in exchange rates.

After the district court certified the injunctive class, it ordered the parties to make submissions regarding proposed end dates for the damages classes. Plaintiffs' expert submitted an affidavit indicating that arbitrage opportunities for Canadian cars significant enough to impact United States prices for new vehicles ended in May 2003. The district court accordingly adopted April 30, 2003 as the endpoint for the state damages classes. *Motor Vehicles VI,* 241 F.R.D. at 79. Plaintiffs have not made any effort since the district court's ruling to demonstrate whether or when prevailing conditions-primarily, exchange rates between Canada and the United States-might reasonably be expected once again to resemble those during the class period. This is for good reason, as the value of the United States dollar relative to the Canadian dollar in the years 1998-2003 hit an apex unseen in at least the last half century.[FN10] In the nearly five years since April 2003, the time at which plaintiffs concede actual injury to the damages classes abated, the exchange rate has fallen in favor of the Canadian dollar.[FN11] In the circumstances of this case, that alone eliminates any realistic current threat.

**\*7** The speculative nature of the claim that exchange rates could one day create additional arbitrage opportunities is reinforced by a second contingency inherent in the plaintiffs' theory of threatened future harm. In order for antitrust injury to befall a class member, she must also intend to purchase a

new car at a time when arbitrage opportunities are ripe for exploitation. The district court certified an injunctive class defined as "[a]ll persons ... who purchased or leased or intended to purchase or lease a new motor vehicle manufactured by a defendant from a United States dealer during the period from January 1, 2001, to March 10, 2006."The complaint names thirty-six individuals who bought or leased new cars in the United States during the class period. Nowhere, however, does the complaint make any allegation regarding a named plaintiff's intention to buy or lease another new vehicle within such a time frame as could be deemed imminent. The fact that the injunctive class has been restricted to a period of time covering 2001 to early 2006 underscores the speculative nature of the plaintiffs' hypothetical future injury.

In *McInnis-Misenor v. Maine Medical Center,* this court inquired whether the plaintiff faced an "immedia[te] or imminen[t]" threat of injury that would support standing in federal court. *319 F.3d at 68.* We held that standing was lacking where any possible injury to the plaintiff was "contingent on several events which may or may not happen."*Id. at 72.*Here, there is nothing to suggest that any named plaintiff harbors an "imminent" intention to buy a new car in coincidence with another "perfect storm" of arbitrage-friendly market conditions.

Plaintiffs attempt to revive the controversy by arguing that the defendants' conspiracy to hinder cross-border sales is ongoing. Even if this were true, the argument ignores the point that the relevant question is whether plaintiffs suffer a realistic threat of injury stemming from those alleged antitrust violations. An antitrust violation and standing are distinct and independently necessary prerequisites for the relief sought by the injunctive class. *See* II Areeda & Hovenkamp, *Antitrust Law* ¶ 335f, at 297 (2d ed.2000); *cf. SAS of P.R., Inc. v. P.R. Tel. Co.,* 48 F.3d 39, 43 (1st Cir.1995).

The Rule 23(b)(2) class is vacated for lack of a live controversy between the parties such as would justify an injunctive remedy. The injunctive relief

claim is dismissed.

III.

*Jurisdiction over Remaining Plaintiff Classes*

The claim for injunctive relief under the Clayton Act provided the federal jurisdictional spine of this case. That basis for federal jurisdiction is now gone, and the question of federal jurisdiction over the state-law damages claims presents itself. It may be that the district court could retain jurisdiction over the state damages claims on either of two theories, but we leave it to the district court to decide on remand whether there is jurisdiction .FN12

**8** The parties and the district court have referred to diversity, *see*28 U.S.C. § 1332,FN13 as a basis for maintaining the state damages claims in federal court. To this point in the proceedings, however, the state damages claims have been analyzed as within the court's supplemental jurisdiction based on the presence of the federal claim. *See, e.g., Motor Vehicles II,* 335 F.Supp.2d 126.FN14Whether the diversity basis is sound has not been tested.

At oral argument, the defendants pointed out that proceeding on the basis of diversity jurisdiction would require analysis of each individual state-based class. Defendants also conceded that diversity could provide an independent basis for federal jurisdiction for at least some of the state-law damages classes. The district court has not had the opportunity to assess whether each state class satisfies the requirements of § 1332 and may do so on remand.

The district court may, in the alternative, consider whether to exercise its discretion to continue exerting supplemental jurisdiction, *see*28 U.S.C. § 1367, over the state damages claims. *See Rodríguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1177 (1st Cir.1995) ("In an appropriate situation, a federal court may retain [supplemental] jurisdiction over

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

state-law claims notwithstanding the early demise of all foundational federal claims."). In weighing this option, the district court should consider "the totality of the attendant circumstances," including considerations of judicial economy, fairness to the parties, and the nature of the applicable state law. *Id.*

On the assumption that there is some basis for federal jurisdiction over at least some remaining state class claims, we turn to the certification of the state damages classes.

IV.

*Standards of Review of Class Certification Decisions*

[3] We review class certification rulings, including those for damages classes, for abuse of discretion. *Mowbray,* 208 F.3d at 295. This standard has teeth:

An abuse occurs when a court, in making a discretionary ruling, relies upon an improper factor, omits consideration of a factor entitled to substantial weight, or mulls the correct mix of factors but makes a clear error of judgment in assaying them. An abuse of discretion also occurs if the court adopts an incorrect legal rule.

*Id.* (citation omitted). Furthermore, a class certification appeal "can pose pure issues of law reviewed *de novo.*" *Tardiff,* 365 F.3d at 4. Review of mixed questions of law and fact varies from non-deferential review for law-dominated issues to deferential clear-error review for fact-dominated ones. *In re PolyMedica Corp. Sec. Litig. (PolyMedica ),* 432 F.3d 1, 4 (1st Cir.2005) (citing *Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1132 (1st Cir.1995)).

[4] Intertwined with the scope of our review on appeal is the question of how far a district court should go in testing legal and factual premises at the class certification stage. When such premises

are disputed, the court may "probe behind the pleadings," *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), to "formulate some prediction as to how specific issues will play out" in order to assess whether the proposed class meets the legal requirements for certification, *Mowbray,* 208 F.3d at 298. In short, "a court has the power to test disputed premises [at the certification stage] if and when the class action would be proper on one premise but not another."*Tardiff,* 365 F.3d at 4-5. Here, the premises are challenged as to both steps of plaintiffs' theory.

**\*9** In performing this predictive function and in "[e]xercising its broad discretion, ... the district court must evaluate the plaintiff's evidence ... critically without allowing the defendant to turn the class-certification proceeding into an *unwieldy* trial on the merits."*PolyMedica,* 432 F.3d at 17. However, as both we and other circuit courts have emphasized, weighing whether to certify a plaintiff class may inevitably overlap with some critical assessment regarding the merits of the case. *See, e.g., Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.,* 482 F.3d 372, 380 (5th Cir.2007), *cert. denied,*--- U.S. ----, 128 S.Ct. 1120, --- L.Ed.2d ----, 2008 WL 169504 (Jan. 22, 2008). It would be contrary to the "rigorous analysis of the prerequisites established by Rule 23 before certifying a class" to put blinders on as to an issue simply because it implicates the merits of the case. *Smilow v. Sw. Bell Mobile Sys., Inc.,* 323 F.3d 32, 38 (1st Cir.2003). Our review of a Rule 23(f) appeal necessarily includes "review [of] the merits of the district court's theory of liability insofar as they also concern issues relevant to class certification."*Credit Suisse,* 482 F.3d at 381.

V.

*State Damages Classes*

A. *Procedural History*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

Applying *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the district court dismissed the plaintiffs' federal antitrust damages claims in March 2004 because plaintiffs were indirect purchasers. *Motor Vehicles I,* 307 F.Supp.2d at 137. *Illinois Brick* embodies a policy judgment that the reach of damages for federal antitrust violations does not extend to indirect purchasers, even if they have suffered some impact in fact. *See* II Areeda & Hovenkamp, *supra,* ¶ 395, at 554-55.

After dismissal of the federal damages claim, plaintiffs filed a second amended complaint which added damages claims under common and statutory law for all fifty states and the District of Columbia. *Motor Vehicles III,* 350 F.Supp.2d at 168, 207. FN15 After considering for each disputed state whether plaintiffs had pled facts sufficient to state a claim under that state's laws, the district court dismissed the state law damages claims for all but twenty-three states and the District of Columbia. *Id.* at 168. The propriety of that dismissal is not now before us. This appeal is from three orders that did certify state damages classes.

Before discovery was completed, the plaintiffs moved on July 29, 2005, to certify six exemplar classes of state damages claims. FN16 On May 12, 2006, the court preliminarily certified five of the six exemplar state damages classes under Rule 23(b)(3) and asked for additional materials regarding the date on which the class period should end. *Motor Vehicles IV,* 235 F.R.D. at 129. FN17 On March 21, 2007, the court issued a supplemental order concluding that the class period for the state damages claims should end on April 30, 2003, and certifying fifteen additional state damages classes for a total of twenty. *Motor Vehicles VI,* 241 F.R.D. at 79, 84. On June 15, 2007, the court issued an order and explanatory memorandum under Rule 23(c)(1)(B) defining the class and class claims, issues, and defenses. *Motor Vehicles VII,* 243 F.R.D. 17; *Motor Vehicles VIII,* 243 F.R.D. 20.

*1. Requirements for Class Certification*

**\*10** To certify the statewide damages classes, the district court had to evaluate whether the four threshold requirements of Rule 23(a) were met, as well as whether Rule 23(b)(3)'s two additional prerequisites were satisfied. *Amchem,* 521 U.S. at 614; *Smilow,* 323 F.3d at 38. Rule 23(a) requires that (1) there be numerosity, (2) there be common questions of law or fact, (3) the class representative's claims be typical of the class, and (4) the representative's representation of the class be adequate. Fed.R.Civ.P. 23(a). To certify a class under Rule 23(b)(3), a judge must further find "that the questions of law or fact common to class members predominate over any questions affecting only individual members" ("predominance"), and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" ("superiority"). Fed.R.Civ.P. 23(b)(3). In classes certified under Rule 23(b)(3), the Rules "invite[ ] a close look at the case before it is accepted as a class action." *Amchem,* 521 U.S. at 615 (quoting B. Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I),* 81 Harv. L.Rev. 356, 390 (1967)).

The court held that numerosity was not disputed and that adequacy was established. *Motor Vehicles V,* 235 F.R.D. at 130, 141. It also concluded that a class action was by far the superior method for proceeding. *Id.* at 148. The real dispute revolved around whether common evidence could be used to prove the impact of the alleged conspiracy on U.S. consumers ("common impact") and any resulting damages ("common proof of damages"). *Id.* at 129, 132. FN18 The court noted it did not yet have enough evidence to determine the merits question of whether the plaintiff classes actually suffered antitrust or consumer protection injury. It repeatedly emphasized it would address that question later on a proper record-for example, at summary judgment. FN19 *Id.* at 131, 136, 139.

As the district court noted, there is some overlap

Case 1:05-cv-10269-RWZ    Document 126-16    Filed 04/08/2008    Page 12 of 26
--- Page ---
--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

(Cite as: --- F.3d ----)

among the certification criteria of commonality, Rule 23(a)(2), typicality, Rule 23(a)(3), and predominance, Rule 23(b)(3).*Id.* at 130 n. 4 ("[I]f the proof of impact is not common across the class, then not only is the named plaintiffs' claim of injury not typical, but the predominance assessment is also affected."); *see also Amchem,* 521 U.S. at 623 n. 18 (predominance and typicality are similar in some respects); 6 A. Conte & H.B. Newberg, *Newberg on Class Actions* § 18:8, at 24 n. 2 (4th ed.2002). The questions in this case of common impact (antitrust-type causation) and common proof of damages are relevant to all three criteria.

Rule 23(a)'s requirement of commonality is a low bar, and courts have generally given it a "permissive application." 7A C.A. Wright et al., *Federal Practice and Procedure* § 1763, at 221 (3d ed.2005). The district court did not have trouble finding sufficient commonality in this case. The court pointed to the common questions of whether there was a conspiracy; if so, whether it affected either dealer invoice prices or MSRPs; and whether there was any violation of state antitrust or consumer protection laws. *Motor Vehicles V,* 235 F.R.D. at 130;*see also* 6 Conte & Newberg, *supra,* § 18:5, at 14 & n. 3 (gathering cases that hold that "allegations concerning the existence, scope, and efficacy of an alleged conspiracy present questions adequately common to class members to satisfy the commonality requirement").

**\*11** **[5]**"[T]he predominance criterion is far more demanding," however, than the commonality requirement. *Amchem,* 521 U.S. at 624. Under the predominance inquiry, "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case."*Mowbray,* 208 F.3d at 298. In antitrust class actions, common issues do not predominate if the fact of antitrust violation and the fact of antitrust impact cannot be established through common proof. *See Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir.2005). The district court did not find

predominance and typicality as easily established as commonality. The court chose to analyze under the heading of typicality whether plaintiffs were asserting sufficiently common proof of impact, *Motor Vehicles V,* 235 F.R.D. at 130-40, and it considered under the heading of predominance whether any resulting damages would likewise be established by sufficiently common proof, *id.* at 142-45.In consideration of these issues, the district court relied on the submissions of the parties' experts.

2. *Submissions of Expert Witnesses*

Plaintiffs relied primarily on their expert Professor Robert E. Hall of Stanford University and the Hoover Institute, who, along with the defense expert, assumed that plaintiffs' allegations of conspiracy were true. In his July 2005 report, Professor Hall noted that collectively the defendants' sales accounted for 89% of the U.S. market and 84% of the Canadian market. He concluded that "if defendants were unable to impose export restraints or were less effective in imposing them, they would [have] lower[ed] U.S. [dealer] invoice prices and MSRPs for most, if not all, of their vehicles."Expert Report of Robert E. Hall, Ph.D. ¶ 51. Even though retail sales of cars are individually negotiated, Professor Hall opined that class members would have experienced common impact from the changed MSRPs and dealer invoice prices because a change in these prices would shift the entire negotiating range, benefitting (or harming) essentially all consumers.

Professor Hall initially proposed two different approaches to establishing common evidence of damages to class members. The first approach would be to rely on statistical models ("Nash equilibriums") used in the auto industry to predict market outcomes. Under his second approach, a benchmark method, the U.S.-Canadian market would be evaluated against a comparable market not affected by the challenged conduct. Both approaches, Professor Hall asserted, would account for "heterogeneity across vehicles, dealers, consumers, and time, [and] they can be used to identify cars or time periods for

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

which there are no damages."*Id.* ¶ 62.Professor Hall also asserted that data existed that would allow him to implement these models, though the most detailed data were in the hands of defendants.

The defense expert, Professor Joseph P. Kalt of Harvard University, filed his expert report on September 30, 2005. Even assuming a conspiracy, he disputed that there was any common impact on either the national manufacturer-to-dealer prices or the individual dealer-to-consumer sales. His critique focused on a description of the actual gray market for Canadian vehicles in the United States, which he asserted was spotty, erratic, and too insignificant to affect the national market, even absent any collusive activity. He also criticized Professor Hall for not distinguishing between the effects of the manufacturers' legal vertical restraints and those of the alleged horizontal conspiracy. As to damages, he disputed that there were any common methods of proof and asserted that Professor Hall's suggested approach of employing Nash equilibriums was just "an empty phrase." Expert Report of Joseph P. Kalt, Ph.D. 63-64.

**\*12** In reply to Professor Kalt's critique, Professor Hall submitted a rebuttal report on December 20, 2005. He took issue with Professor Kalt's conclusions regarding the gray market [FN20] and, applying regression analysis to Professor Kalt's data on arbitrage opportunity and export activity, concluded that "a larger price gap [between Canadian and United States car prices] is associated with greater export activity and that this relationship is not the result of randomness."Rebuttal Report of Robert E. Hall, Ph.D. ¶ 25. Specifically, his regressions suggested that "a $1,000 increase in the price gap for a given model [of car] is, on average, associated with an increase in exports of at least 33 percent."*Id.* ¶ 24.The minor increase in gray market sales in 2001-2002 despite the conceded greater arbitrage opportunities, then, did not indicate the lack of a conspiracy, but rather suggested an effective one.

Professor Hall argued that a Nash equilibrium model could distinguish the effects of unilateral re-

straints from those of any horizontal conspiracy, and he also suggested that further discovery might reduce the need for modeling by yielding direct evidence on the effectiveness of the unilateral and alleged horizontal constraints. He stated that he had offered preliminary mathematical formulas at his deposition to establish the viability of both his approach and the approach of his proposed damages model, and he included the preliminary damages model in his rebuttal report. Professor Hall again asserted his view that there were methods based on common evidence, such as the econometric model he was proposing, that could account for the "major dimensions in which damages might vary among potential class members."*Id.* ¶ 50.

### 3. *Typicality and Predominance*

On this evidence, the district court preliminarily certified five exemplar state classes. The court held that the presentation by Professor Hall, supported by extrinsic economic studies, sufficed for purposes of showing common proof of impact. [FN21] The court found "unexceptionable" the plaintiffs' theory that other things being equal, a restriction on the supply of lower-priced cars coming into the United States market will exert an upward pressure on domestic car prices. *Motor Vehicles V,* 235 F.R.D. at 137. This pressure will apply both to the prices dealers pay to manufacturers and to the prices paid by consumers to dealers. While individual negotiations may determine the final price, the starting point for most negotiations is the MSRP, and the final purchase price for most consumers is between the dealer invoice price and the MSRP. *Id.*In effect, the overall negotiating range would be elevated, resulting in higher consumer prices across the board. *Id.* at 138-39.The court accepted some of these contentions as adequate to demonstrate that the named plaintiffs' claims would be typical of the class, although the court was careful to note that it was not then deciding whether plaintiffs' proof of impact was sufficient to withstand a motion for summary judgment. *Id.* at 139.

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

**\*13** The court was also careful to note that the proffered common proof of impact might be insufficient under some states' laws. *Id .* at 132.The court sua sponte examined the laws of five of the exemplar states to determine what level of proof of consumer impact each state required and what inferences were acceptable to show impact.[FN22]The court concluded that there was a range. California, at one end, permitted "an inference of antitrust impact, even as to indirect purchasers, from the existence of the conspiracy."[FN23]*Id.* at 135;*see also id.*("In the consumer context, at least a portion of the illegal overcharge by a manufacturer will presumably be passed on by the independent distributors to consumer class members in the form of higher prices."(quoting *Global Minerals & Metals Corp. v. Superior Court,* 113 Cal.App.4th 836, 7 Cal.Rptr.3d 28, 44-45 (Ct.App.2003)) (internal quotation marks omitted)).

Maine was at the other end of the spectrum, requiring evidence, not inference, of impact. While the Maine antitrust statute explicitly permits recovery for indirect injury, *Me.Rev.Stat. Ann. tit. 10, § 1104,* the Maine Law Court has not yet commented on what indirect purchasers must show to establish impact or causation. *Motor Vehicles V,* 235 F.R.D. at 132. The district court turned to Maine superior court decisions, which the court summarized as holding that "indirect purchasers in Maine must produce specific proof that they paid higher prices as a result of the conspiracy (in the face of the possibility that all such increases were absorbed at the retailer level)."*Id.* at 134;*see also id.*("Because indirect purchasers must demonstrate that overcharges have been passed on to them, such claims present an entirely separate level of evidence and proof than that found in a direct purchaser claim."(quoting *Melnick v. Microsoft Corp.,* Nos. CV-99-709, CV-99-752, 2001 WL 1012261, at \*6 (Me.Super.Ct. Aug. 24, 2001))). Likewise, the Maine consumer protection statute, *Me.Rev.Stat. Ann. tit. 5, §§ 205-A to 214,* allows indirect purchasers to recover, but injury is not presumed. *Motor Vehicles V,* 235 F.R.D. at 135 (citing *State v.*

*Weinschenk,* 868 A.2d 200 (Me.2005)).

The court also discussed the states that fell between those two poles. New Mexico, it concluded, seems to allow indirect purchasers to establish antitrust impact through correlation analysis. *See id.* at 136.Tennessee and Vermont have not yet fully addressed the question. *See id.*The court noted that in states like Maine where the passing on of an antitrust or consumer protection injury to indirect purchasers cannot be presumed, plaintiffs might have difficulty proving injury to individual consumers if their common proof can establish only an inference of injury. *See id.* at 139.

Turning to the question of predominance under Rule 23(b)(3), the court found there were at least five common disputed issues weighing in favor of class certification.[FN24]*Id.* at 142.Defendants argued that the lack of common impact at both stages of plaintiffs' theory and the lack of common proof of damages defeat predominance. The court reiterated that it had found plaintiffs' proposal to prove impact through common proof preliminarily sufficient, and it pointed out that the existence of a common disputed issue weighs in favor of class certification, not against it. *Id.* at 142 (citing *Tardiff,* 365 F.3d at 4-5). The adequacy of plaintiffs' proof of common impact, and whether the impact even constitutes cognizable antitrust or consumer protection injury, "are merits determinations that are common in each [state] class" and would be resolved at trial. *Id.*

**\*14** The court also disagreed that the question of individual damages defeats the predominance of common questions. First, the court noted that "[w]here, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain ."*Id.* at 143 (quoting *Smilow,* 323 F.3d at 40). Second, the court stated that it would not determine at the class certification stage whether plaintiffs' method of proving damages was adequate. *Id.* at 144.The mere fact that there are differences among members of a class

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

regarding their individual amounts of damages does not preclude class certification. *Smilow,* 323 F.3d at 40 ("The individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3)."); 7AA Wright et al., *supra,* § 1781, at 235. Often those variations can be determined according to a universal mathematical or formulaic calculation, obviating the need for evidentiary hearings on each individual claim.*Smilow,* 323 F.3d at 40. Plaintiffs proposed to use such an approach here.*Motor Vehicles V,* 235 F.R.D. at 143-44. The district court noted that it was "not overwhelmed by the plaintiffs' offer of damage calculation models," but it "conclude[d] that damages [were] not yet a ground to deny certification."*Id.* at 144-45;*see also id.* at 145 n. 63 (specifying some of the problems plaintiffs' damages models faced).

Finally, the district court raised the question of the end date for the damages classes. *Id.* at 140.Another round of expert reports ensued, accompanied by briefing repeating many of the same arguments. The court focused on the choice of end date in its March 21, 2007 order; it commented that the defendants' individual critiques did not alter its views that a class should be certified.**FN25***Motor Vehicles VI,* 241 F.R.D. at 80-82. Over defendants' insistence that the court determine whether the "alleged horizontal conspiracy actually impacted American car prices," the court refused to reexamine the issue-as well as the related issue of "what vertical restraints the individual manufacturers maintained, their legality and their effect"-at that time. *Id.* at 80-82 & n. 5. On June 15, 2007, the court entered an order of class certification in compliance with Rule 23(c)(1)(B).

**B.** *Defendants' Appeals from Certification of the Damages Classes*

In challenging the certification of the state damages classes, defendants primarily argue that the district court did not engage in a sufficiently searching inquiry into the relevant merits issues. It is a settled question that some inquiry into the merits at the

class certification stage is not only permissible but appropriate to the extent that the merits overlap the Rule 23 criteria. *Falcon,* 457 U.S. at 160;*PolyMedica,* 432 F.3d at 6;*Mowbray,* 208 F.3d at 297-98. It is less settled what degree of merits inquiry is *required* at the class certification stage, and the Supreme Court has not yet addressed the issue.

**\*15** [6] Our sister circuits agree that when class criteria and merits overlap, the district court must conduct a searching inquiry regarding the Rule 23 criteria, but how they articulate the necessary degree of inquiry ranges along a spectrum which suggests substantial differences. The Second, Fourth, Fifth, and Seventh Circuits coalesce around the more rigorous end of this spectrum, forbidding district courts from relying on plaintiffs' allegations of sufficiently common proof and requiring the courts to make specific findings that each Rule 23 criterion is met. *Miles v. Merrill Lynch & Co.* (*In re Initial Pub. Offering Sec. Litig.*), 471 F.3d 24, 33, 41 (2d Cir.2006) [hereinafter *In re IPO* ] (requiring a "definitive assessment of Rule 23 requirements," including the resolution of relevant factual disputes); *Unger v. Amedisys Inc.,* 401 F.3d 316, 321-22 (5th Cir.2005) (requiring courts to find facts favoring class certification through the use of "rigorous, though preliminary, standards of proof"); *Gariety v. Grant Thornton, LLP,* 368 F.3d 356, 366 (4th Cir.2004) (requiring that "the factors spelled out in Rule 23... be addressed through findings"); *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 675-76 (7th Cir.2001) (requiring "whatever factual and legal inquiries are necessary under Rule 23" to "resolve the disputes before deciding whether to certify the class"). These circuits' use of the term "findings" in this context should not be confused with binding findings on the merits. The judge's consideration of merits issues at the class certification stage pertains only to that stage; the ultimate factfinder, whether judge or jury, must still reach its own determination on these issues. *In re IPO,* 471 F.3d at 39;*Gariety,* 368 F.3d at 366.

On the other end of the spectrum, the Third and

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

Eighth Circuits sometimes require an inquiry into and preliminary resolution of disputes, but they do not require findings and do not hold that such inquiry will always be necessary.*Blades,* 400 F.3d at 567, 575 (holding that sometimes courts will be required to resolve factual disputes preliminarily at the class certification stage but voicing caution); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 166 (3d Cir.2001) ("A class certification decision requires a thorough examination of the factual and legal allegations ."); *id.* at 168 ("In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action.").

This court has grappled with this issue as well. We have said in *Smilow* that "a district court must conduct a rigorous analysis" of Rule 23's prerequisites, 323 F.3d at 38, and in *Mowbray* that "a district court must formulate some prediction as to how specific issues will play out,"208 F.3d at 298. *See also Tardiff,* 365 F.3d at 4-5 (noting that the common presumption at early stages of litigation that "the complaint's allegations are necessarily controlling" does not apply in class certification situations because "class action machinery is expensive and in our view a court has the power to test disputed premises early on if and when the class action would be proper on one premise but not another").

**\*16** In *PolyMedica,* a securities class action, we said that the court "was entitled to look beyond the pleadings in its evaluation" of both the question of class certification generally and the applicability of the fraud-on-the-market presumption specifically, even though those questions overlapped with the merits of the case. *PolyMedica,* 432 F.3d at 6. The fraud-on-the-market presumption in securities class actions allows plaintiffs to establish the necessary element of reliance through common proof. If the market is efficient, the theory goes, market prices will incorporate all publicly available information, including material misrepresentations, so that an investor who buys or sells stock in reliance on the in-

tegrity of the market price is in fact buying or selling stock in reliance on the material misrepresentations. *See id.* at 7-8.Because common issues would no longer predominate in a securities class action if plaintiffs could not at trial establish reliance through the common proof of the fraud-on-the-market presumption, courts at the class certification stage probe the factual basis of the fraud-on-the-market presumption to make sure it will be a viable form of proof in a given case.

In both *PolyMedica* and its companion case, *Stuebler v. Xcelera.Com (In re Xcelera.Com Sec. Litig.),* 430 F.3d 503 (1st Cir.2005), we, along with the district court, rigorously tested the evidence submitted by both sides to determine whether the fraud-on-the-market presumption was reasonably applicable, specifically whether the plaintiffs would be able to demonstrate that the market was efficient. At the class certification stage, we noted, plaintiffs needed to present "basic facts" that the fraud-on-the-market presumption could be invoked, even though its actual applicability was to be resolved at trial. *PolyMedica,* 432 F.3d at 19. Our review of the district court's determination of whether or not the fraud-on-the-market presumption could be invoked was based not on the level of detail in the district court's explanation, but on "whether the evidence supports its determination to apply the presumption."*Xcelera,* 430 F.3d at 512. In *Xcelera,* for example, the district court actively evaluated the testimony of two competing experts and preliminarily credited the plaintiffs' expert, a determination this court upheld-after surveying the expert testimony ourselves-on clear error review.*Id.* at 512-16.

*PolyMedica* and *Xcelera* could be read, but we think not properly, as limiting this requirement that district courts probe into the viability of the premises of plaintiffs' theory of injury to cases employing only legal presumptions of injury. Under this circuit's approach, in our view, a searching inquiry is in order where there are not only disputed basic facts, but also a novel theory of legally cognizable injury. Plaintiffs cannot make their case

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

without common proof of causation, and they can only prove causation through common means if their novel theory is viable; that viability in turn depends on their ability to establish-whether through mathematical models or further data or other means-the key logical steps behind their theory. Such reliance on a novel theory to establish a primary element of a claim necessitates a more searching inquiry into whether plaintiffs will be able to prove the pivotal elements of their theory at trial. This is especially so when a case implicates the sort of factors that we have deemed important in the Rule 23(f) calculus, namely, when the granting of class status "raises the stakes of litigation so substantially that the defendant likely will feel irresistible pressure to settle." *Mowbray,* 208 F.3d at 293.

**\*17** We do not need to resolve now whether "findings" regarding the class certification criteria are ever necessary, but we do hold that when a Rule 23 requirement relies on a novel or complex theory as to injury, as the predominance inquiry does in this case, the district court must engage in a searching inquiry into the viability of that theory and the existence of the facts necessary for the theory to succeed.

[7] Contrary to defendants' assertions, the district court did not believe itself limited by *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), to non-merits inquiries. Instead, the court attempted to meet its obligations under *PolyMedica, Mowbray,* and our other cases to conduct a rigorous analysis at the certification stage. *See Motor Vehicles V,* 241 F.R.D. at 81 n. 7. The court's ability to probe into the viability of plaintiffs' proffered theory and to formulate some predictions as to how key issues in this novel and complex case would develop was hampered, however, by the incomplete record at the time, as well as by the fact that plaintiffs' expert had not yet fully formulated all aspects of his analysis. The court pointed out that it was ruling on class certification before discovery was completed and was relying upon the plaintiffs' representation that they

would fill in the gaps in their evidence with further discovery and further work. It repeatedly said that it was willing to take another look at these questions when the record was more complete.[FN26]

This court has had little occasion to discuss the timing of the issuance of class certification orders, much less of damages classes under Rule 23(b)(3).*See Mowbray,* 208 F.3d at 299 n. 7. Rule 23(c)(1)(A) says only that the court must act "at an early practicable time." Rule 23(c)(1)(C) also provides that a class certification order may be altered or amended before final judgment.[FN27] A district court which has taken an initial look at the merits is not foreclosed from later entertaining, post-discovery, a summary judgment motion from defendants asserting that plaintiffs cannot establish the requisite antitrust and consumer protection impact through common means. *See* 3 Conte & Newberg, *supra,* § 7:15, at 48-57. Indeed, it is not uncommon to defer final decision on certifications pending completion of relevant discovery. *Id.* § 7:16, at 57-59.

When the decision on class certification is made before full class discovery has been completed, as here, it is necessarily more predictive. As the Eighth Circuit has noted, the decision may require revisiting upon completion of full discovery. *Blades,* 400 F.3d at 567;*see also Gariety,* 368 F.3d at 368.

In another case, this posture of certification being decided before completion of class discovery might not raise any concerns. In this case it does because of the novelty and complexity of the theories advanced and the gaps in the evidence proferred. The district court expressed multiple times its concern about the adequacy of several of plaintiffs' showings and expressed a willingness to revisit the question once it had a better record in front of it. We share those concerns.

**\*18** Plaintiffs' theory of impact on indirect purchasers is both novel and complex. Injury in price-fixing cases is sometimes not difficult to establish.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

Plaintiffs do not, however, advance such a price-fixing theory. Rather, the plaintiffs' theory is that the higher prices are the result of a "but-for" world. In step one of plaintiff's theory, but for the defendants' illegal stifling of competition, the manufacturers would have had to set dealer invoice prices and MSRPs lower to avoid losing sales to the lower-priced Canadian cars coming across the border for resale in the United States. In step two, the higher dealer invoice prices and MSRPs enabled by this stifling of competition resulted in injury to consumers in the form of higher retail prices.

The first step of plaintiffs' theory requires demonstrating that the defendants' actions did result in an increase in dealer invoice prices and MSRPs in the United States. This in turn depends on at least two factors. First, there would have had to be, in this but-for world, a flood of significantly lower-priced Canadian cars coming across the border for resale in the United States during times of arbitrage opportunities, enough cars to cause manufacturers to take steps to protect the American market from this competition by decreasing nationally set prices. As plaintiffs themselves note, without a very large number of cars poised to cross the border, a nationwide impact on the automobile market of the sort required by plaintiffs' theory is implausible, and the theory collapses. In our view, plaintiffs' expert Professor Hall had not yet, at the time of class certification, fully answered such potentially relevant questions as how the size of the but-for influx of cars would be established or how large that influx would have to be to affect the national market sufficiently to raise effective dealer invoice prices and MSRPs.

Second, the plaintiffs must be able to sort out the effects of any permissible vertical restraints from the effects of the alleged, impermissible horizontal conspiracy. This question was raised below but was not fully addressed. Professor Hall asserted in a purely conclusory manner that the effects could be separated out using the concept of Nash equilibriums. If plaintiffs do not have a viable means for

distinguishing between these two sets of effects, they cannot show that it was the horizontal conspiracy that caused the impact on the domestic national market upon which their theory depends.[FN28]

As for the second step of plaintiffs' theory, it must include some means of determining that each member of the class was in fact injured, even if the amount of each individual injury could be determined in a separate proceeding. Predominance is not defeated by individual damages questions as long as liability is still subject to common proof. *Tardiff, 365 F.3d at 6;Smilow, 323 F.3d at 40;* 6 Conte & Newberg, *supra,* § 18:27, at 91. This is because the class action can be limited to the question of liability, leaving damages for later individualized determinations. *See Tardiff, 365 F.3d at 7;Smilow, 323 F.3d at 41;* 6 Conte & Newberg, *supra,* § 18:53, at 179 & n. 10, § 18:56, at 190-92.[FN29] Establishing liability, however, still requires showing that class members were injured at the consumer level. It is unclear to us how plaintiffs intend to make this connection.

**\*19** The plaintiffs might intend to use their damages model to prove both fact of damages and the measure of those damages. If so, the district court would need enough information to evaluate preliminarily whether the proposed model will be able to establish, without need for individual determinations for the many millions of potential class members, which consumers were impacted by the alleged antitrust violation and which were not. *See, e.g., Blades, 400 F.3d at 570* (affirming denial of class status where the actual prices paid by class members could not be determined via common proof because "[t]he amount of premiums paid, if any, is relevant to a determination of impact ... and is not merely an assessment of the amount of damages, which may be properly ascertained at a later time"); *Newton, 259 F.3d at 187-88* (affirming denial of class status where plaintiffs had not only provided no model formula for measuring damages, but more fundamentally had also not demonstrated the *fact* of damages)."The ability to calculate the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

aggregate amount of damages," as plaintiffs propose to do here, "does not absolve plaintiffs from the duty to prove each [class member] was harmed by the defendants' practice."*Newton*, 259 F.3d at 188.

The district court, while expressing skepticism regarding plaintiffs' proposal for measuring damages, relied on this court's consideration in *Smilow* of an incomplete damages model. It noted that in *Smilow*, this court had accepted as sufficient a representation by plaintiffs' expert that he "could fashion" a computerized method of calculating class damages. *Motor Vehicles V*, 235 F.R.D. at 144 (quoting *Smilow*, 323 F.3d at 40) (internal quotation marks omitted). The proposed computerized model in *Smilow* would draw from the defendant's records, which listed the consumers who were charged the allegedly illegal fees. *Smilow*, 323 F.3d at 40-41. That is, the model would have relied on data that clearly established which consumers suffered injury. Professor Hall similarly claimed that data in defendants' hands would provide the information he would need for his damages model; whether that data will be sufficient to establish consumer-level impact for each class member is a question that can now be answered with discovery completed.

Plaintiffs seem to rely on an inference that any upward pressure on national pricing would necessarily raise the prices actually paid by individual consumers. There is intuitive appeal to this theory, but intuitive appeal is not enough. Even if it is fair to assume that hard bargainers will usually pay prices closer to the dealer invoice price and poor negotiators will usually pay prices closer to the MSRP, a minimal increase in national pricing would not necessarily mean that *all* consumers would pay more. Too many factors play into an individual negotiation to allow an assumption-at least without further theoretical development-that any price increase or decrease will always have the same magnitude of effect on the final price paid. Even if Professor Hall's proposed models could determine when MSRPs and dealer invoice prices were affected for

which models and to what degree, it is a further question whether it can be presumed that all purchasers of those affected cars paid higher retail prices.

**\*20** Some courts have allowed a presumption of class-wide impact in price-fixing cases when "the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions."*Winoff Indus. Inc. v. Stone Container Corp.* (*In re Linderboard Antitrust Litig.*), 305 F.3d 145, 151 (3d Cir.2002) (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 455 (3d Cir.1977)). If effective dealer invoice prices in the real world were equal to or greater than the effective MSRPs in the but-for world-that is, if the entire negotiating range in the but-for world would have been below the entire negotiating range in the real world-it would be easier to presume that all consumers suffered impact. The district court discussed the *Bogosian* presumption in its May 12, 2006 order, *Motor Vehicles V*, 235 F.R.D. at 138 n .35, but plaintiffs disclaim any intent to rely on the *Bogosian* model.

It is true that the validity of plaintiffs' theory is a common disputed issue. *Cf. Tardiff*, 365 F.3d at 4-5. It will be for the fact finder to decide whether this theory is persuasive. At the class certification stage, however, the district court must still ensure that the plaintiffs' presentation of their case will be through means amenable to the class action mechanism. We are looking here not for hard factual proof, but for a more thorough explanation of *how* the pivotal evidence behind plaintiff's theory can be established. If there is no realistic means of proof, many resources will be wasted setting up a trial that plaintiffs cannot win.

In sum, the district court's oft-expressed instinct that aspects of plaintiffs' theory remained to be developed dovetails with our own. At the time of class certification, more work remained to be done

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in the building of plaintiffs' damages model and the filling out of all steps of plaintiffs' theory of impact. Time has now passed: it is almost two years since the district court's May 12, 2006 order, and all discovery was scheduled to be completed by March 3, 2008. The plaintiffs should now have the evidence they need to put their best foot forward, and they have had additional time to work out their models and formulas. The district court should now have a complete record before it from which to test the viability of plaintiffs' novel theory for proving common impact.

We thus vacate and remand the certification of the state damages classes so that the district court, which has handled this case admirably so far, may reconsider those class certification orders in light of this opinion and the more fully developed record.

We reverse in part, vacate in part, remand in part, and order dismissal of the Clayton Act injunctive relief claim. All parties shall bear their own costs.

TORRUELLA, Circuit Judge, (Concurring in part, Dissenting in part).

*21 Although I concur with the majority regarding the injunctive class, I respectfully dissent from the discussion of the state damages classes.FN30 In my view, the opinion erodes the discretion which we are required to afford to the district court in class certification proceedings. A district court's decision to certify a class is reviewed under the deferential abuse of discretion standard. *See Smilow,* 323 F.3d at 37 ("Orders certifying or decertifying a class are reviewed for abuse of discretion.") (citing *Califano v. Yamasaki,* 442 U.S. 682, 703, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)); *see also Blyden v. Mancusi,* 186 F.3d 252, 269 (2d Cir.1999) ("A district court's decision to certify a class is reviewed for abuse of discretion, and '[a] reviewing court must exercise even greater deference when the district court has certified a class than when it has declined to do so.'" (citation omitted)).

Rule 23 grants the district court broad discretion to determine whether a class should be certified. Fed.R.Civ.P. 23. Our review is, therefore, focused on whether the district court properly applied the criteria set out in Rule 23. *See Mowbray,* 208 F.3d at 295 ("An abuse occurs when a court, in making a discretionary ruling, relies upon an improper factor, omits consideration of a factor entitled to substantial weight, or mulls the correct mix of factors but makes a clear error of judgment in assaying them."). Importantly, a district court remains free at a later stage to modify or even decertify a class if later evidence disproves the plaintiffs' assertions regarding, for example, the predominance of common issues. *See Falcon,* 457 U.S. at 160 ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."); *In re Visa Check/ MasterMoney Antitrust Litig.,* 280 F.3d 124, 141 (2d Cir.2001).

In this case, the district court addressed all of the Rule 23 requirements: numerosity of the class members; commonality of the questions of law or fact; typicality of the claims or defenses; adequacy of representation; predominance of common questions; and the superiority of the class action as an adjudicative vehicle. And, as required in this circuit, the district court "conduct[ed] a rigorous analysis of the prerequisites established by Rule 23,"*Smilow,* 323 F.3d at 38, and "formulate[d] some prediction as to how specific issues w [ould] play out in order to determine whether common or individual issues predominate,"*Mowbray,* 208 F.3d at 298.

The majority does not question the rigor with which the court conducted its analysis. Indeed, the opinion applauds the court's "attempt[ ] to meet its obligations ... to conduct a rigorous analysis at the certification stage."Slip op. at 44. Rather, the basis for the majority's remand on the certification of the damages classes is the insufficiency of evidence available to the district court. Although the opinion faults the timing of the certification (and, thus the incompleteness of the record), I am concerned that in vacating and remanding the certification order for reconsideration with additional evidence from

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

the plaintiffs, the opinion stands for the proposition that we now *require* a high level of fact-finding before certification.

**\*22** I agree with the district court that our case law does not "mandat[e] a particular level of factfinding by the district judge at the certification stage."*Motor Vehicles VI,* 241 F.R.D. at 82 n. 7. On the contrary, in *PolyMedica,* we stated that:

> The question of how much evidence ... is necessary for a court to accept the [theory of reliance] at the class certification stage is therefore one of degree. District courts must *draw these lines sensibly....* We have no illusions that this line-drawing is easy. Knowing the high stakes in the class-certification decision, the parties will try to move the court in different directions, with plaintiffs arguing for less evidence ... and defendants for more ... the district court must evaluate the plaintiff's evidence ... critically without allowing the defendant to turn the class certification proceeding into an *unwieldy trial on the merits.*

432 F.3d at 17 (emphasis added). The district court drew those lines sensibly in this case. We are not entitled to second-guess that decision in the absence of evidence that it engaged in an abuse of discretion. Our decision to vacate and remand the certification of the damages classes to allow the district court the benefit of full discovery, effectively overrides the district court's assessment of how much evidence it needed to certify the class. Under the banner of a "novel and complex" theory in a class certification proceeding, we now appear to require district courts to fully vet and test the underpinnings of a plaintiff's legal theory. *See* slip op. at 44 ("[I]n our view, a searching inquiry is in order where there are not only disputed basic facts, but also a novel theory of legally cognizable injury.").

At issue in this case are questions regarding the plaintiffs' theory of impact. Although the district court admitted some concern about whether the plaintiffs' proof of impact would be "sufficient to withstand a motion for summary judgment or for

judgment as a matter of law at trial,"*Motor Vehicles V,* 235 F.R.D. at 139, the district court properly remained focused on the certification requirements and concluded that "the plaintiffs' proof does meet the commonality and typicality standard."*Id.* The majority even admits that these questions regarding the plaintiffs' theory of impact "are themselves susceptible to common proof (the potential size of the gray market and the distinction between the effects of horizontal and vertical restraints)." Slip op. at 48 n. 29. The opinion goes on, however, to conclude that a more searching inquiry into the *factual basis* of that theory is required here. I disagree.

In this case, the questions regarding the viability of the plaintiffs' theory of impact are not limited to certification issues, but go to the merits of the plaintiffs' claim. I disagree with the majority's reading of *PolyMedica* and *Xcelera,* which they cite in support of their position that "factual bases of theories of common proof are appropriately, although preliminarily, tested at the class certification stage."*Id. PolyMedica* and *Xcelera* were securities class actions in which the plaintiffs sought to use the fraud-on-the-market presumption to demonstrate market efficiency. Those class actions were brought under § 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, which require that each plaintiff prove that he or she individually relied on the alleged misrepresentation. A requirement of individualized reliance "would effectively preclude securities fraud class actions under Rule 23(b)(3) [because] [i]ndividual issues of reliance would necessarily overwhelm the common ones."*Xcelera,* 430 F.3d at 507. The applicability of the fraud-on-the-market theory is central to the appropriateness of the class action as a vehicle for litigation: under the theory, plaintiffs are no longer required to prove individualized reliance.*See PolyMedica,* 432 F.3d at 18-19 (vacating and remanding the class certification after concluding that the district court had committed error in adopting the incorrect definition of "market efficiency," one of the elements for invoking the fraud-on-the-market presumption). In this antitrust case,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

the majority points to no legal error committed by the district court in assessing the appropriateness of certification.

***23** In remanding the certification of the damages classes for reconsideration with the benefit of additional evidence, the majority conflates the dispute as to the viability of the plaintiffs' theory with the specific inquiries required at class certification. As we noted in *PolyMedica,* "a court has the power to test disputed premises early on *if and when the class action would be proper on one premise but not another.*" *PolyMedica,* 432 F.3d at 6 (quoting *Tardiff,* 365 F.3d at 4-5) (emphasis added). Indeed, insofar as those premises are not preclusive of the class action as a vehicle, we have no basis for requiring a district court to inquire further into the merits of the case. While the plaintiffs' theory of antitrust impact is novel and complex, it, unlike the fraud-on-the-market theory, is not determinative of whether a class action is proper or not. Indeed, the identified uncertainties within the plaintiffs' theory challenge only the ability of the plaintiffs (as a group) to successfully prove their theory of impact. Slip op. at 46-49. In this case, an inquiry that tests each stage of the plaintiffs' theory is, in effect, an assessment of the case's merits. As such, we are putting the cart before the horse and turning the class certification stage into a motion for summary judgment proceeding-the appropriate juncture at which to fully vet the viability of the plaintiffs' theory. In so holding today, I fear that we are removing the underpinnings of the discretion we grant district courts to draw sensible lines and further blurring the distinction between the certification inquiry and a trial on the merits. I believe this course is erroneous and contrary to established precedent, and thus dissent.

FN1. The district court observed that "it is reasonable to infer that the proposed federal injunctive class numbers in the millions"; the defendants have represented to the district court that the proposed class includes "more than a hundred million

American consumers." *In re New Motor Vehicles Canadian Export Antitrust Litig.* (*Motor Vehicles IV* ), No. MDL 1532, 2006 WL 623591, at *2 & n. 19 (D.Me. Mar.10, 2006).

FN2. Arbitrage describes the practice of simultaneously buying and selling identical securities, currency, or other assets in different markets, "with the hope of profiting from the price difference in those markets." *Black's Law Dictionary* 112 (8th ed.2004).

FN3. A gray market is one "in which the seller uses legal but sometimes unethical methods to avoid a manufacturer's distribution chain and thereby sell goods (esp. imported goods) at prices lower than those envisioned by the manufacturer." *Black's Law Dictionary* 989 (8th ed.2004).

FN4. Plaintiffs distinguish between list and effective dealer invoice prices. The list dealer invoice price is determined annually for the national market by the manufacturers. Effective dealer invoice prices reflect dealer- or regions-specific incentives provided by the manufacturers. Similarly, the effective MSRP takes into account direct manufacturer-to-consumer incentives, such as cash back offers. This distinction is crucial to plaintiffs' theory of antitrust impact.

FN5. Defendants on appeal include Ford Motor Company, Ford Motor Company of Canada, Ltd., General Motors Corp., General Motors of Canada, Ltd., Honda Motor Co., Honda Canada, Inc., Nissan North America, Inc., Chrysler LLC, Chrysler Motors LLC, Chrysler Canada Inc., and Mercedes-Benz USA, LLC. In addition, the plaintiffs named two automobile dealers' associations, the domestic National Automobile Dealers Association

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

("NADA") and the Canadian Automobile Dealers Association ("CADA"). Two auto-makers originally named as defendants are no longer in the case: Toyota Motor Sales U.S.A., Inc. entered into a settlement agreement with plaintiffs, and plaintiffs voluntarily dismissed BMW of North America, LLC.

FN6. The district court has not decided this issue, deeming it a merits inquiry that it would be premature to resolve at the class certification stage. *Motor Vehicles V,* 235 F.R.D. at 131 n. 10.

FN7. Plaintiffs object that defendants cannot raise a standing challenge to the Rule 23(b)(2) class on appeal because they failed to present the argument to the district court. For their part, defendants claim they previously raised the issue in oral argument. Either way, courts must be vigilant about compliance with standing requirements regardless of what the parties argue, *see Pagán v. Calderón,* 448 F.3d 16, 26 (1st Cir.2006), and must remain so throughout the entire life cycle of a case. *See generally* II Areeda & Hovenkamp, *Antitrust Law* ¶ 335b, at 289 (2d ed.2000). The issue has not been waived.

FN8. The court found the injunctive relief class met the requirements of Rule 23(a)-numerosity, commonality, typicality, and adequacy-then turned to the requirements of Rule 23(b)(2). Fed.R.Civ.P. 23(a); *Motor Vehicles IV,* 2006 WL 623591, at *2-6. Rule 23(b)(2) allows for class actions when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."Fed.R.Civ.P. 23(b)(2). The court held that the defendants fall within the language of Rule 23(b)(2) because they had

acted or refused to act on grounds generally applicable to the class.*Motor Vehicles IV,* 2006 WL 623591, at *7. The court further held that the proposed class satisfied the rule's requirement that injunctive relief be "appropriate ... with respect to the class as a whole."*Id.* at *7-10.

FN9. The district court noted the defendants' position that because the complained-of export restrictions operated to restrict the flow of American cars into Canada as well as vice versa, consumers buying cars in the United States during periods when the value of the Canadian dollar and the prices of Canadian cars rose were actually protected from higher domestic prices. Plaintiffs' expert conceded that the defendants' two-way restrictions could protect American consumers in such a scenario. *Motor Vehicles IV,* 2006 WL 623591, at *3 n. 23.

FN10. We take judicial notice of these undisputed facts. Between 1950 and the present, it has generally cost between $0.96 and $1.40 Canadian dollar ("CAD") to purchase one United States dollar ("USD"). During that period, the exchange rate has risen significantly above $1.40 CAD to $1.00 USD only once for any length of time. This occurred between the years 1998 and 2003, when the rate ranged between $1.40 and $1.61 CAD to $1.00 USD. 5E *Historical Statistics of the United States* 5-572 to 5-574 (S. Carter et al. eds., 2006); Federal Reserve Statistical Release: Historical Rates for Canada, http://www.federalreserve.gov/releases/h10/hist/dat00-ca.htm. This deviation corresponds with the period during which plaintiffs' alleged arbitrage opportunities occurred.

FN11. The exchange rate on April 30, 2003 was $1.43 CAD to $1.00 USD, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 23
--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))
(Cite as: --- F.3d ----)

as of publication of this opinion, the exchange rate has not once returned to that level. Instead, the relative value of the domestic dollar has been in more or less steady decline. On September 28, 2007, the value of the Canadian dollar surpassed that of the United States dollar. As of February 1, 2008, the exchange rate was $0.90 CAD to $1.00 USD. Federal Reserve Statistical Release: Historical Rates for Canada, http://www.federalreserve.gov/releases/h10/hist/dat00-ca.htm.

FN12. Although the defendants challenge plaintiffs' standing to maintain the injunctive class, neither side addressed to this court any of the jurisdictional issues that might arise in the event that we vacated the federal injunctive class. We do not purport to raise an exhaustive checklist of questions to address on remand, but advert to some salient issues.

FN13. The Class Action Fairness Act of 2005 ("CAFA"), Pub.L. 109-2, 119 Stat. at 4 (amending 28 U.S.C. § 1332) was enacted after the complaints in this action were filed. The existence of diversity jurisdiction must therefore, under the express terms of the CAFA, be determined under the pre-CAFA diversity statute. See CAFA § 9, 119 Stat. 14 ("[CAFA] shall apply to any civil action commenced on or after the date of enactment of this Act.").

FN14. In its September 7, 2004 order addressing supplemental jurisdiction over the state-law claims, the district court in addition asserted pendent personal jurisdiction over certain Canadian defendants based on the personal jurisdiction created by the federal antitrust claim.Motor Vehicles II, 335 F.Supp.2d at 128;see also In re New Motor Vehicles Canadian Export Antitrust Litig., 307 F.Supp.2d 145, 147-48

(D.Me.2004) (finding personal jurisdiction over certain Canadian defendants). To the extent that the district court relied on the existence of the federal claim, personal jurisdiction may yet be an issue on remand.

FN15. The defendants did not move to dismiss all the state claims, and the plaintiffs consented to the dismissal of some of the state claims.Motor Vehicles III, 350 F.Supp.2d at 168, 175.

FN16. The district court had requested, in a March 15, 2005 order, that each side designate three exemplar states. The plaintiffs selected Maine, Kansas, and Vermont, and the defendants chose California, New Mexico, and Tennessee.

FN17. The Kansas class was not certified because plaintiffs conceded that the class representative had not in fact been injured by the alleged conspiracy and thus lacked standing. Motor Vehicles V, 235 F.R.D. at 131.

FN18. To establish an antitrust claim, plaintiffs typically must prove (1) a violation of the antitrust laws, (2) an injury they suffered as a result of that violation, and (3) an estimated measure of damages.Sullivan v. Nat'l Football League, 34 F.3d 1091, 1103 (1st Cir.1994). For a class action to be appropriate, "plaintiffs need to demonstrate that common issues prevail as to [both] the existence of a conspiracy and the fact of injury."Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir.2005). If these two elements are established by common proof, the measure of damages can sometimes be left to individual proof, as we discuss further below.

The element of injury in the antitrust context is often referred to as "impact" or "fact of damage." Alabama v. Blue Bird Body Co., 573 F.2d 309, 317 & n. 18 (5th Cir.1978). It is the causal link

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

between the antitrust violation and the damages sought by plaintiffs. *Sullivan,* 34 F.3d at 1103. It thus requires both injury-in-fact and a showing that the injury is the result of the antitrust activity. *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 106 (2d Cir.2007).

FN19. The court reiterated in its March 21, 2007 order that it would not "make a *final* determination of the existence of antitrust impact at the certification stage."*Motor Vehicles VI,* 241 F.R.D. at 80 (emphasis added)."Whether an illegal agreement halting Canadian imports (or removing their threat) produced antitrust causation or retail purchase price impact remains to be proven at trial or demonstrated at summary judgment."*Id.* at 82 n. 5.

FN20. Professor Kalt had described the contours of the gray market in 2000, 2001, and 2002. Professor Hall argued that the gray market in 2001 and 2002 would reflect the impact of the alleged horizontal conspiracy and that the relevant arbitrage opportunities were not present in 2000.

FN21. For example, Professor Hall cited a study showing that dealers tend to pass on to consumers at least some pricing incentives given by manufacturers. *Motor Vehicles V,* 235 F.R.D. at 137 (citing M. Busse et al., *$1000 Cash Back: Asymmetric Information in Auto Manufacturer Promotions* 45 (Nat'l Bureau of Econ. Res. Working Paper Series No. 10887, 2004)).

FN22. The parties filed briefs on these issues of state substantive law before the March 21, 2007 order. The court found that the parties' briefing did not cause it to change its prior views.

FN23. Defendants say this is not an accurate representation of California law, but do

not press the point on appeal.

FN24. Those issues were:

(a) Was there a horizontal agreement to restrict supply?

(b) Was it illegal under that particular state's laws?

(c) ... Did the illegal agreement have antitrust or consumer protection impact in that state as the plaintiffs propose to prove it?

(d) If so, is that impact sufficient to confer standing under the particular state's laws?

(e) How long did the conspiracy and its impact last?

*Motor Vehicles V,* 235 F.R.D. at 142 (footnote omitted).

FN25. In a footnote, the district court explained that it believed it had complied with the First Circuit requirement that the district court "formulate some prediction as to how specific issues will play out,"*Mowbray,* 208 F.3d at 298, that it conduct a "rigorous analysis" of the Rule 23 criteria, *Smilow,* 323 F.3d at 38, and that it test the disputed premises "early on," *Tardiff,* 365 F.3d at 4. *Motor Vehicle VI,* 241 F.R.D. at 81 n .7. The court noted that *PolyMedica* did not mandate a particular level of fact-finding by the district judge at the certification stage. *Id.*

FN26. Defendants attempt to answer this problem by saying these statements demonstrate that the district court failed to inquire adequately into the record; that answer is a mismatch with the problem presented of an incomplete record and of incomplete work by the plaintiffs' expert.

FN27. The 2003 amendments to Rule 23 deleted the provision allowing class certi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

**(Cite as: --- F.3d ----)**

fications to be conditional. The advisory committee notes explain that "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met."This does not prevent a judge from modifying its certification if it becomes clear, as the case develops, that the class action vehicle is in fact inappropriate.

FN28. While these are both questions that are themselves susceptible to common proof (the potential size of the gray market and the distinction between the effects of horizontal and vertical restraints), they go to the viability of a novel theory upon which plaintiffs rely to establish an element of their claim through common means. In that sense, these factual questions are akin to the question of market efficiency in securities class actions employing the fraud-on-the-market presumption of reliance. Cases like *PolyMedica* and *Xcelera* demonstrate that such factual bases of theories of common proof are appropriately, although preliminarily, tested at the class certification stage.

FN29. The district court noted that "some states permit consumers to recover the full purchase price once liability is proven," further simplifying the calculation of individual damages awards. *Motor Vehicles V, 235 F.R.D. at 143 n. 53.*

FN30. I agree that the case is properly remanded to the district court so that it can first establish whether there is jurisdiction under § 1332 or § 1367.

C.A.1 (Me.),2008.
In re New Motor Vehicles Canadian Export Antitrust Litigation;
--- F.3d ----, 2008 WL 820922 (C.A.1 (Me.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.