UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE,<br><br>       Plaintiffs,<br><br>   v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO,<br><br>       Defendants. | Civil Action No. 05-10269RWZ |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Stephen D. Poss (BBO # 551760)
Kevin P. Martin (BBO # 655222)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated: April 18, 2008

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................3

I.      MEDICAL INFORMATION TECHNOLOGY, INC. ...........................................3

II.     THE MEDITECH PROFIT SHARING PLAN ......................................................5

     A.    Terms of the Plan ......................................................................................5

     B.    Valuation of Meditech Stock for purposes of the plan ...............................6

     C.    The Annual Provision of Information to Plan Participants.........................7

III.    THE TRUST'S DISTRIBUTION OF BENEFITS TO THE NAMED
       PLAINTIFFS .............................................................................................8

ARGUMENT ...................................................................................................9

I.      HINCHLIFFE'S AND TRAINOR'S CLAIMS ARE BARRED BY THE
      STATUTE OF LIMITATIONS .............................................................................10

II.     PLAINTIFFS FAILED TO PROVIDE EVIDENCE SUFFICIENT TO
      PROVE THAT THEY RECEIVED ANY LESS IN BENEFITS THAN
      THEY WERE DUE .............................................................................................13

     A.    Defendants Should be Granted Summary Judgment Against Hubert........14

     B.    Defendants Are Entitled To Summary Judgment Against All
         Plaintiffs Because Plaintiffs Only Provided a Valuation under their
         Alternate Method for December 31, 1997 .................................................16

     C.    Summary Judgment Is Appropriate Even Assuming That No Fewer
         Shares Would Have Been Contributed to the Trust Using
         Plaintiffs' Valuations .............................................................................18

III.    PLAINTIFFS FAILED TO EXHAUST THEIR CLAIMS ...................................19

 CONCLUSION...................................................................................................20

# TABLE OF AUTHORITIES

CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................9

*Brown v. Armstrong*, 957 F. Supp. 1293 (D. Mass. 1997)..............................9

*Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H & Co. KG*, 510 F.3d 77 (1st Cir. 2007) .................................13

*Carriero v. Frank*, 789 F. Supp. 465 (D. Mass. 1992) .....................................17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................9

*Cole v. Cox*, 41 Fed. Appx. 826, 2002 WL 1832722 (6th Cir. 2002)...............13

*Cotton v. Washington Metro. Area Transp. Auth.*, 2004 WL 473658 (D.D.C 2004) ..............................................................................................15

*Daly v. Raytheon Co.*, 2001 WL 227328 (1st Cir. 2001) .................................19

*Denmark v. Liberty Life Assurance Co. of Boston*, 481 F.3d 16 (1st Cir. 2007)...........................................................................................................9

*Drinkwater v. Metropolitan Life Ins. Co.*, 846 F.2d 821 (1st Cir. 1988)..........19

*Hershey v. Donaldson, Lufkin & Jenrette Securities Corp.*, 317 F.3d 16 (1st Cir. 2003) ..........................................................................................17

*Hess v. Reg-Ellen Machine Tool Corp. Employee Stock Ownership Plan*, 502 F.3d 725 (7th Cir. 2007) ....................................................................20

*Holloman v. Mail-Well Corp.*, 443 F.3d 832 (11th Cir. 2006) .........................17

*Imperial Credit Indus., Inc. v. Securities Litig.*, 252 F. Supp. 2d 1005 (C.D. Cal. 2003)........................................................................................14

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416 (S.D.N.Y. 2003)................................................................................13

*J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245 (1st Cir. 1996)..........................................................................13

*Lindemann v. Mobil Oil Corp.*, 79 F.3d 647 (7th Cir. 1996)............................20

*Plymouth Rubber Co. v. Uniroyal, Inc.*, 1992 WL 93223 (D. Mass 1992) .....................15

*Stock v. Integrated Health Plan, Inc.*, 2007 WL 2304055 (N.D. Ill. 2007)..........15

*Tarr v. State Mutual Life Assurance Co.*, 913 F. Supp. 40 (D. Mass. 1996)......................19

STATUTES AND RULES

Fed. R. Civ. P. 26.................................................................................14, 15

Fed. R. Civ. P. 56.......................................................................................9

## INTRODUCTION

For three years, Defendants have been forced to defend this frivolous Employee Retirement Income Security Act ("ERISA") lawsuit. With fact and expert discovery now closed, Plaintiffs have failed to provide evidence supporting any credible theory of liability, and have even announced their intention to abandon the claim of the original named Plaintiff in this matter, proceeding only with two tag-along Plaintiffs whose claims are clearly time-barred. Rather than force Defendants and the Court to waste time and resources at a trial Plaintiffs cannot possibly win, summary judgment should now be granted to Defendants.

This case concerns a profit sharing plan (the "Plan") sponsored by Medical Information Technology, Inc. ("Meditech" or the "Company"), under which Meditech has made voluntary contributions of cash and non-publicly traded Meditech stock to a established under the Plan for the benefit of Meditech employees (the "Trust"). Former Meditech employees Michael Hubert, David Hinchliffe, and William Trainor ("Plaintiffs") brought this lawsuit under ERISA against defendants Meditech, the Plan, A. Neil Pappalardo (Meditech's CEO and Chairman and trustee of the Trust, and together with Meditech and the Plan, "Defendants"), and four of the five other members of the Meditech board. According to the Complaint, a simple comparison of Meditech's price-to-earnings ratios ("P/E ratio") of Meditech stock to the P/E ratios one of its its publicly-traded competitors reveals that Defendants, in breach of their fiduciary duties, undervalued the Meditech stock held by the Trust, causing Plan participants to receive less in benefits than they were due.

On March 20, 2006, this Court granted in part Defendants' motions to dismiss, dismissing Plaintiffs' breach of fiduciary duty claim and the members of the board of directors as defendants, leaving only Plaintiffs' ERISA benefits claim. *See* Memorandum of Decision dated

March 20, 2006 (Docket No. 38) ("Motion to Dismiss Order") (appended to the Affidavit of Kevin P. Martin ("Martin Aff.") as Exhibit 4). Then, on March 20, 2007, the Court – finding that Plaintiffs cannot "fairly and adequately protect the interests of the class" – denied Plaintiffs' motion for class certification. *See* Memorandum of Decision dated March 20, 2007 (Docket No. 92) ("Class Certification Decision") (Martin Aff., Ex. 5).

Now, for any one of the independently sufficient reasons discussed herein, Defendants are entitled to summary judgment on Plaintiffs' sole remaining benefits claim.

First, Hinchliffe's and Trainor's claims are barred by the statute of limitations. While they received their supposedly insufficient distributions of benefits in 1998, Plaintiffs did not file the Complaint in this case until February 2005, more than six years later and thus outside the six-year statute of limitations that this Court held is applicable (Defendants had argued for three years). Hinchliffe and Trainor both admitted believing that Meditech stock was undervalued even before 1998. And, alternatively, the exercise of reasonable diligence would have revealed the claim pled in the Complaint more than six years before suit was filed.

Second, Plaintiffs did not provide evidence sufficient to support Hubert's allegations – not even an expert report proposing an alternate valuation of Meditech stock as of December 31, 2003, the date relevant to Hubert's claim. Moreover, the method used in the expert report that Plaintiffs did disclose (the "Van Vleet Report") confirms that Defendants did not deny Hubert benefits. Accordingly, summary judgment should enter for Defendants against Hubert.[1]

Third, the Van Vleet Report does not support any Plaintiff's claim. This Court has properly held that for Plaintiffs to establish an entitlement to additional benefits by application of

---

[1] Perhaps because, on April 4, 2008, after more than three years of proceedings, Plaintiffs' counsel unexpectedly announced an intention to dismiss Hubert's claim, apparently over Hubert's objection. Plaintiffs finally filed a motion to dismiss without prejudice on April 17, 2008, a motion that Defendants will oppose.

a different valuation method, they must apply their method throughout the history of the Trust, analyzing the effect of using that method on the number of shares contributed by the Company to the Trust and on distributions from the Trust to other beneficiaries in earlier years. Only such an analysis can demonstrate whether the value of Plaintiffs' benefits would have been greater had the alternate method been used. Plaintiffs, however, made *no* effort to provide this analysis. Instead, the Van Vleet Report does precisely what the Court said would be insufficient: purport to value the stock only for the year that Hinchliffe and Trainor received benefits, and apply that value to the stock actually held by the Trust. (While not necessary for the purposes of this motion, should this case proceed to trial Defendants will demonstrate that the Van Vleet Report is unscientific, inaccurate, and inadmissible). A finder of fact can only speculate what Plaintiffs' valuation method would have revealed had it been applied in each year of the Trust's existence, and such speculation is insufficient to survive summary judgment.

Finally, each Plaintiff failed to exhaust his claim. The Plan requires participants to file a claim in writing if they believe they are entitled to additional benefits. Neither Hinchliffe nor Trainor filed any claim for additional benefits prior to the filing of the Complaint. Hubert did send a letter complaining about the valuation date used in calculating distributions, but never filed any claim seeking more benefits under the Amended Complaint's theory. The Plaintiffs thus failed to exhaust their claims, providing another reason to grant summary judgment.

## BACKGROUND

### I.    MEDICAL INFORMATION TECHNOLOGY, INC.

Defendant Meditech was founded in 1969 and currently employs over 2,800 individuals. Defendants' Memorandum of Undisputed Material Facts, ¶ 1 ("Undisputed Facts").

While Meditech is a privately-held company, nonetheless it is a public reporting company (due to its number of shareholders), and thus is required to submit, among other things, Forms 10-Q and 10-K to the SEC, which are then available to anyone in the public wishing to view a copy. *See* Undisputed Facts, ¶ 3. These public filings contain substantial information concerning Meditech's business and finances. For instance, Meditech's 10-K for 1997, publicly filed on March 26, 1998, contains a chart stating, *inter alia*, the Company's revenue, operating income, net income, earnings per share, cash and cash equivalents, total assets, total liabilities, book value per share, working capital, cash flows, and cash dividends per share as of December 31 for each year 1993 through 1997. *Id*., ¶ 4. (The same presentation was also available in Meditech's 10-K for 1996, filed in 1997). The 1997 10-K also contained a section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," discussing factors influencing the business such as "a decrease in the product revenue attributable to a slowdown in implementations for Columbia/HCA," a major customer. *Id*., ¶ 5. Finally, the 10-K contained the audited financials of the Company, which include among other things a three-year history of Company contributions to the Trust. *Id*., ¶ 6.

Because Meditech is privately held, its shares are not traded on any stock exchange, and so have no price set by a public "market." *Id*., ¶ 2. There are, however, transactions in Meditech stock. The Company has sold stock to most employees, including each named Plaintiff: over the years Hinchliffe purchased shares for $16,400; Trainor purchased shares for $16,950; and Hubert purchased shares from the Company for $197,425. Undisputed Facts, ¶¶ 9, 10, 11, 12. Hinchliffe and Trainor later voluntarily sold all of the shares they purchased from the Company to the Trust for $301,100 and $310,150, respectively. *Id*., ¶¶ 10, 11. In fact, in 1998 Hinchliffe and Trainor voluntarily sold 13,200 and 20,900 shares to the Trust, respectively, at a split-

adjusted price of $13.50, the very price that Plaintiffs and their expert now claim does not fairly reflect the fair *market* value of Meditech stock in that year. *Id.*, ¶¶ 10, 11. Hubert later sold 1,000 of his shares to the Trust for $23,000, and continues to hold 23,300 shares, worth a total of $862,100 at the $37 per share valuation last determined by Defendants. *Id.*, ¶ 12.

In the course of offering shares for sale to employees each year, the Company provides substantial information concerning the market for Meditech stock. For example, during the years they were eligible to purchase stock (including 1998), Plaintiffs received "Stock Purchase Instructions" from the Company. Undisputed Facts, ¶ 13. The 1998 Stock Purchase Instructions stated on their face "Please note that MEDITECH is a closely-held private company and there is no public market for its shares. Thus there can be no absolute assurance of a future re-sale." *See Id.* They also invited the recipients to a "meeting … to discuss the implications of buying stock in MEDITECH," to which "any existing shareholder is welcome." *Id.* And they were accompanied by a "10 Year Financial History" to "aid you in your investment decision." *Id.*

## II.   THE MEDITECH PROFIT SHARING PLAN

### A.   Terms of the Plan

In 1973 the Company established the Plan for the purpose of providing "retirement and other benefits to the employees of the Company." The Plan is "designed to invest substantially in shares of the Common Stock of the Company so as to permit the participating employees to share in any growth of the Company." Pursuant to the Plan, the Trust was created to hold contributions of cash and stock received from the Company. *See* Undisputed Facts, ¶¶ 15, 16.

The Plan is entirely voluntary on the Company's part. It provides that the Company may terminate the Plan at any time. Similarly, the Plan provides that all contributions by the Company to the Trust are voluntary; in any given year, the Company could elect to contribute nothing. The Plan neither requires nor permits contributions to the Trust by individual Plan

participants. The value of each year's contribution to the Trust is allocated to the accounts of participants according to a formula based on the income of each participant. Similarly, each year the Trustee revalues the Plan's existing assets, and the pro-rata increase in the value of those assets is allocated to the account of each Plan participant. Undisputed Facts, ¶¶ 17, 18.

Under the terms of the Plan, the Trust makes payments to Plan participants in a lump sum cash payment upon termination of the participant's employment with Meditech. The Plan provides, however, that if the Trust lacks sufficient cash to make a payment, the Trust may defer payment by up to three years and, if still necessary, distribute Meditech stock instead of cash. Undisputed Facts, ¶ 18.

The Plan requires written claim for additional benefits if a participant believes that the distribution received was too small. As described (in relevant part) in the summary plan descriptions distributed to Plan participants, including each of the Plaintiffs:

> if you receive notice from the Trustee with regard to the amount and form of payment of your benefits and you believe there is an error in the notice, then you may submit a claim to the Trustee. … Your claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim.

*See* Undisputed Facts, ¶ 19.

### B. Valuation of Meditech Stock for Purposes of the Plan

Because Meditech stock is not publicly traded, two valuations are made as of December 31 each year for purposes of the Plan. First, Meditech's Board of Directors, in deciding how many shares of stock will make up any stock portion of the Company's voluntary contribution to the Trust in a given year, determines a value for the stock. Under the terms of the Plan, the Board sets an overall dollar contribution amount, then decides how much of that overall contribution, if any, will be in cash, and how much in stock. The number of shares contributed to the Plan each year is thereby dependent upon the value determined for those shares by the

Board; if, for example, the Board voted to make an overall contribution to the Trust of $4 million, and wanted $2 million of the contribution to be in cash and $2 million in stock, and the stock was valued at $25, it would contribute 80,000 shares. This same value is also used by the Company in selling Meditech stock early the next year to employees. Undisputed Facts, ¶ 22.

Each year end the Trustee also values the Trust's shares in order to determine the value of the Trust and, thereby, the Trust account balance of Plan participants. Under the Plan, the Trustee is independently obligated to value stock held by the Trust, and he is not obliged to use the Board's value. The Trustee's valuations, however, historically have been the same as those determined by the Board. Undisputed Facts, ¶ 23.

### C.    The Annual Provision of Information to Plan Participants

Each year the Plan provides substantial information to Plan members concerning their accounts and the Trust's assets. For instance, on or about January 30, 1998, each of the Plaintiffs received a form from the Plan informing him of his account balance as of December 31, 1996; his share of Trust income and revaluations during 1997; his share of Company contributions to the Trust and forfeitures during 1997; and his resulting account balance as of December 31, 1997. Undisputed Facts, ¶ 26. The form also noted the value of Meditech stock as determined by Defendants as of December 31, 1997 (the split-adjusted $13.50 of which Plaintiffs now complain), and the estimated dividend to be paid on Meditech stock in 1998. *See id.*

Similarly, Defendants also provided Plan participants a "Meditech Profit Sharing Trust Financial Report for 1997" – Hubert also printed the report from the Company intranet on January 28, 1998. Undisputed Facts, ¶ 27. The Report noted, among other things, the amount of the Company's contribution to the Trust in 1997, including the breakdown between cash and stock, and contained three charts: one showing the Trust's assets as of December 31, 1996 (broken down into cash, U.S. Treasuries, interest and outstanding loans, and shares of Meditech

stock including the per share value); a second showing Trust activity during the year (income, revaluation of Meditech stock, distributions and forfeitures, and the Company's contribution); and a third showing the resulting Trust assets as of December 31, 1997 (again showing the number of shares of Meditech stock held and the per share value assigned to them). *See id.*

## III.   THE TRUST'S DISTRIBUTION OF BENEFITS TO THE NAMED PLAINTIFFS

Trainor, who was eventually promoted to be Meditech's director of building and computer operations, joined Meditech in 1975. Over the years, through contributions of cash and stock by Meditech to the Trust, increases in the value of the Meditech stock and other assets held by the Trust and the Trust's receipt of dividends from the Company and other income on investments, the value of Trainor's Trust account increased significantly. Trainor left Meditech in March 1998. On May 28, 1998, he received a distribution from the Trust in the amount of $929,943. Under the terms of the Plan, the amount of this distribution was based on the value of his Trust account as of December 31, 1997, plus interest through the distribution date. Undisputed Facts, ¶ 28. Trainor never filed any claim with Defendants seeking any additional benefits before the Complaint was filed in February 2005. *Id.*, ¶ 29.

Hinchliffe, who was eventually promoted to be Meditech's director of operations for computer programming, joined Meditech in 1975, and his employment with Meditech terminated in early 1998. On May 28, 1998, Hinchliffe received a distribution from the Trust in the amount of $1,123,639. Hinchliffe never filed any claim with Defendants seeking additional benefits before the Complaint was filed in February 2005. Undisputed Facts, ¶¶ 30, 31.

Hubert, who when he was fired served as a regional sales manager for Meditech, joined the Company in 1981. On March 1, 2004, Hubert withdrew $39,086 from his Trust account. Undisputed Facts, ¶¶ 34, 35. Hubert was fired by Meditech on July 26, 2004, for offering to sell confidential Meditech information to a third party involved in a dispute with Meditech. *Id.*, ¶ 36.

On September 16, 2004, Hubert received a final distribution from the Trust in the amount of $1,040,000. The amount of this distribution was based on the value of his Trust account as of December 31, 2003 plus interest. Undisputed Facts, ¶ 37. On September 7, 2004, Hubert sent a letter to the Plan administrator noting briefly that he thought the Trust had undervalued the stock by some indeterminate amount, but principally complaining that distributions were based on the value of Trust assets as of December 31; he suggested that a better method would be to revalue the Trust assets as of the time of the distribution. *Id.*, ¶ 38. He did not submit a claim to Defendants seeking additional benefits under the theory pled in the Amended Complaint until he filed the Complaint in February 2005.

## ARGUMENT

A motion for summary judgment shall be granted if the court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Denmark v. Liberty Life Assurance Co. of Boston*, 481 F.3d 16, 26 (1st Cir. 2007). Where the nonmoving party bears the burden of proof at trial, there is no "genuine issue of material fact" unless sufficient evidence exists for the finder of fact to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The court must grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The non-moving party cannot " 'rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue.' " *Brown v. Armstrong*, 957 F. Supp. 1293, 1299 (D. Mass. 1997) (quoting *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir. 1989)); *see also* Fed. R. Civ. P. 56(e) (same).

# I.    HINCHLIFFE'S AND TRAINOR'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

In this case, the undisputed evidence demonstrates that both Hinchliffe and Trainor failed to file within the limitations period and their claims therefore are time-barred.

Hinchliffe and Trainor each received their distributions from the Trust on or about May 28, 1998 – more than six years before the Complaint was filed in February, 2005. *See supra* at 8. ERISA does not include an express limitations period for benefits claims. In deciding Defendants' Motion to Dismiss, however, this Court agreed with Plaintiffs that the appropriate limitations period is six years rather than three, but agreed with Defendants that the limitations period began to run at the latest from the time at which Plaintiffs, through the exercise of "reasonable diligence," could have known of their claims. *See* Motion to Dismiss Order at 10.

While Defendants continue to believe that the limitations period should be three years, the undisputed evidence demonstrates that even under a six-year limitations period the claims of Hinchliffe and Trainor are time barred. Hinchliffe and Trainor knew the amount of their distribution of benefits when they received their checks from the company in 1998, and no action taken by any Defendant after 1998 had any effect on that distribution of benefits. Undisputed Facts, ¶ 33. The only question is whether Plaintiffs knew, or could have known through the exercise of reasonable diligence, that they had the purported claim for additional benefits, based on the "undervaluation" of Meditech stock, asserted in the Amended Complaint in this case. The answer to that question is indisputably "yes."

First, both Plaintiffs had actual knowledge of the alleged undervaluation of the stock more than six years before the Complaint was filed in 2005. Hinchliffe and Trainor both testified at their depositions that they thought even before they received their benefits from the Trust in 1998 that Meditech stock either was or might be undervalued. Hinchliffe believed that

Meditech stock was undervalued and should perhaps be valued higher by the "late '80s, early '90s," and testified "I always felt that it was valued low. We all did. Everybody in the company did." Undisputed Facts, ¶ 39. Trainor, for his part, had compared the value of Meditech stock to that of Meditech's competitors, including Cerner, by about 1996 and wondered why Meditech stock was valued lower than the competitors' stock. *See* Undisputed Facts, ¶¶ 41, 42.

Second, even if one were to ignore Plaintiffs' sworn testimony, if Plaintiffs had not actually believed that Meditech stock was undervalued by 1998 then the exercise of "reasonable diligence" would have revealed to them the precise claim brought in this lawsuit. The Amended Complaint compares the P/E ratio of Meditech to that of one of Meditech's publicly-traded competitors, Cerner, and alleges that Meditech stock was undervalued because it did not have a P/E ratio at least as high as Cerner's. *See, e.g.,* Amended Complaint ¶ 81 (Docket No. 15) ("[Meditech] shares were undervalued as of this time. For example, in 2000 a competitor, Cerner, had its shares listed on the NASDAQ national stock exchange at a price/earning multiple of 15. … If MEDITECH's common stock had been fairly valued at a P/E of 15, it would be worth $25.50/share, not $17.00"). Indeed, the Amended Complaint plainly admits that Plaintiffs' claim could have been brought simply on the basis of comparing Meditech's P/E to that of publicly-traded companies, alleging: "Defendants have not fairly valued the MEDITECH stock in the Plan. *This can be demonstrated by comparison to publicly traded companies in the same industry* which are not as profitable and which do not pay a dividend, but whose stock trades at much higher multiples of earnings to that of MEDITECH." *Id.*, ¶ 63 (emphasis added). Similarly, Hinchliffe conceded at his deposition that Plaintiffs' claim could be fairly conclusively proven using public information concerning "other companies and their assets and what their stock was versus what Meditech's was." *See* Undisputed Facts, ¶ 40. And Plaintiffs

stated in an interrogatory response, without qualification, that "[b]ased upon comparative company data, Plaintiffs submit Meditech Stock has been undervalued since 1996." *See* Plaintiffs' Supplemental Responses to Defendants' Second Set of Interrogatories at 3-4 ("Plaintiffs' Supplemental Responses") (Martin Aff., Ex. 11) (answer to Interrogatory No. 2).

The P/E ratios of public companies can be computed using readily available public information, and it is indisputable that, while they were employed by Meditech, the Company provided Plaintiffs with Meditech share price and earnings information (which was also publicly available) that Plaintiffs could have used to calculate Meditech's P/E ratio. Undisputed Facts, ¶¶ 7, 8, 45; *see also supra* at 4. Comparing Meditech's P/E ratio to that of public companies thus was something Plaintiffs easily could have done by 1998. Hubert was comparing Meditech's P/E ratio to that of public companies by the mid-1980s. *See id.*, ¶ 45. And Trainor was comparing Meditech stock's value to that of Cerner by 1996. *See* Undisputed Facts, ¶¶ 41, 42.

Most tellingly, in April 1998, one month before Hinchliffe and Trainor received their Trust distributions, Hubert calculated the P/E ratios of both Meditech and Cerner, noting that Cerner's was 48 and Meditech's was 8.7. *See id.*, ¶¶ 46, 47. Hubert was also considering how Meditech values its stock compared to the method used by another private company, SAIC Corp. *See id.*, ¶ 49. And Plaintiffs have stated in response to an interrogatory that "the basis for their contention that the stock has been undervalued is supported" by a number of public documents that Hubert collected in 1998, including a *Fortune* article dated April 27, 1998, a *Forbes* article dated December 1, 1997, and SAIC's public filings with the SEC in 1998 such as forms 10-K and 8-K. *See* Plaintiffs' Supplemental Responses at 4 (answer to Interrogatory No. 2; *see also* Martin Aff., Ex. 28–32; Undisputed Facts, ¶¶ 48, 49, 50. All of the materials collected by Hubert in early 1998 were available to Meditech employees such as the other Plaintiffs and/or publicly available and were either in the possession of, or could have been obtained by, Hinchliffe and

Trainor. *Id.*, ¶ 51. Had they used such materials to investigate their admitted belief at the time that Meditech stock either was or might be undervalued, they would have observed the "undervaluation" alleged in the Complaint more than six years before filing it in 2005.[2]

In the end, whether Hinchliffe and Trainor actually "knew" that Meditech stock was "undervalued" more than six years before the Complaint was filed, or merely should have been able to discover the alleged undervaluation through the exercise of reasonable diligence, in either case summary judgment is required. *See, e.g.*, *Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H & Co. KG*, 510 F.3d 77, 91 (1st Cir. 2007) (affirming summary judgment because publicly available documents in the Copyright Office and prior litigation were sufficient to trigger the statute of limitations); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 423 (S.D.N.Y. 2003) ("there was clearly enough publicly available information to put the plaintiffs on inquiry notice of their claims"); *Cole v. Cox*, 41 Fed. Appx. 826, 2002 WL 1832722, at *1 (6th Cir 2002) (same); *see also J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1258 (1st Cir. 1996).

## II. PLAINTIFFS FAILED TO PROVIDE EVIDENCE SUFFICIENT TO PROVE THAT THEY RECEIVED ANY LESS IN BENEFITS THAN THEY WERE DUE

Defendants are entitled to summary judgment against all three Plaintiffs for the additional independently sufficient reason that Plaintiffs did not produce evidence that Defendants' alleged undervaluation of Meditech stock caused Plaintiffs not to receive benefits owed them by the

---

[2] Plaintiffs may argue, as they have in their class certification papers, that no Plan participant could have known that Meditech stock was being undervalued until Jerome Grossman, a former Meditech board member, filed a Form 13D with the SEC on February 27, 2002, complaining of the company's valuation practices. That argument is contradicted for all the reasons given above why Hinchliffe and Trainor either knew or should have been able to determine in 1998 that they had the claim asserted here. But it is absolutely demolished by the fact that, on February 18, 2002, *before* Grossman filed his Form 13D, Hubert sent an anonymous email to more than a dozen attorneys and/or law firms – including Dwyer & Collora – seeking to bring an ERISA class action based on the very alleged under-valuations that are the subject of this case. *See* Undisputed Facts, ¶¶ 53, 54, 55.

Trust.  The evidence compiled by Plaintiffs would leave a finder of fact only to speculate whether Plaintiffs were due additional benefits.  Because Plaintiffs bear the burden of proof yet have not produced evidence to support a verdict in their favor, summary judgment must enter.

### A.    Defendants Should be Granted Summary Judgment Against Hubert

Hubert received his Trust distributions in 2004 in an amount based, in part, on the valuation of Meditech stock as of December 31, 2003.  While the Van Vleet Report opines on the value of Meditech stock on December 31, 1997 – the valuation date relevant to Hinchliffe and Trainor – he offers *no* opinion concerning the value on December 31, 2003.  *See generally* Van Vleet Report (Martin Aff., Ex. 33).  Plaintiffs disclosed no other putative experts under Fed. R. Civ. P. 26(a)(2)(B) who will offer testimony in support of Hubert's individual claim.[3]

If Plaintiffs' counsel are unsuccessful in their effort to abandon Hubert's claim, the absence of expert testimony in support of Hubert is grounds alone to grant summary judgment on that claim.  First, in this case, where Plaintiffs allege that Defendants undervalued the shares of a non-publicly traded company and offer a 60-page expert report to establish an oddly precise value of "$21.62" in support of Hinchliffe's and Trainor's claims, *and* complain that Defendants should have consulted an expert to value Meditech's stock, *see* Amended Complaint ¶¶ 53, 54, the absence of expert support for Hubert's claim should be fatal.  *See, e.g., Imperial Credit Indus., Inc. v. Securities Litig.*, 252 F. Supp. 2d 1005, 1012-1014 (C.D. Cal. 2003); *see also*

---

[3]    Although not necessary for purposes of this motion, it is noteworthy that the Van Vleet Report contradicts key allegations in the Amended Complaint.  For example, the Amended Complaint alleges that the value of Meditech stock in 1998 should not have been the $13.50 determined by Defendants, but instead $75.  *See* Amended Complaint, ¶ 70.  The Van Vleet Report, however, now says $21.60, an amount far closer to Defendants' determination than the Amended Complaint's.  The Amended Complaint alleges that in valuing Meditech no discount for lack of liquidity should be applied.  *See* Amended Complaint, ¶ 62.  The Van Vleet Report, however, uses a discount for lack of marketability of 25%.  And the Amended Complaint alleges that the alleged undervaluation of Meditech stock "can be demonstrated" by comparing Meditech's P/E ratio to that of Meditech competitor Cerner.  *See* Amended Complaint, ¶¶ 63–103.  The Van Vleet Report does not adopt that approach, with a "comparable company" analysis being weighed only 25% in its analysis.

*Cotton v. Washington Metro. Area Transp. Auth.*, 2004 WL 473658, at *7 (D.D.C. 2004); *Plymouth Rubber Co. v. Uniroyal, Inc.*, 1992 WL 93223, at *7 & n.5 (D. Mass. 1992).

Second, to the extent Plaintiffs might seek to rely upon the "Reilly Report" – an expert report served in state court litigation (the "Grossman Case") that the plaintiff voluntarily dismissed before trial – a report from an expert not disclosed under Fed. R. Civ. P. 26(a)(2)(B) in the case at hand is not admissible. *See, e.g., Stock v. Integrated Health Plan, Inc.*, 2007 WL 2304055, at *1 (N.D. Ill. 2007) (in granting motion to strike "an expert report … from another case [that] Defendant failed to disclose," observing "[t]o allow the report in … would create a loophole in Rule 26(a)(2)(B) that the Court does not believe was intended").

And third, even if Hubert could rely upon the Reilly Report, a comparison of the Van Vleet and the Reilly Report confirms that Hubert has no claim for additional benefits. As noted below, this Court concluded that "the actual issue to be decided in this case is whether 'the parties' competing valuation methodologies involve different rates of growth (or decline) over time.'" *See infra* at 16. Comparing the values determined by Defendants to those determined by Van Vleet and Reilly demonstrates that Plaintiffs' and Defendants' methodologies do involve different rates of growth over time, and it is *Defendants'* methodology that is more favorable to Hubert. Defendants valued Meditech stock at $13.50 as of December 31, 1997 and $26 as of December 31, 2003 – an increase of 93%. Undisputed Facts, ¶ 24. The increase from Van Vleet's 1997 valuation of $21.62 to Reilly's 2003 valuation of $33, on the other hand, is only 53%. Undisputed Facts, ¶ 25. Thus, Plaintiffs' own evidence, scant as it is, is that Hubert did not receive any less in benefits from the Trust than he was due.

Accordingly, for any one of several independently sufficient reasons, if Hubert's claim is not voluntarily dismissed with prejudice, then summary judgment should enter on it in any event.

**B.    Defendants Are Entitled To Summary Judgment Against All Plaintiffs Because Plaintiffs Only Provided a Valuation under their Alternate Method for December 31, 1997**

The Court has cautioned Plaintiffs throughout this case that they cannot prove an entitlement to additional benefits simply by proving that Meditech shares were undervalued by Defendants in the years Plaintiffs received their benefits:

> Plaintiffs imply that the proper resolution of their suit is merely to revalue upwards the share price for each year at issue and multiply that price by the vested share balance of each class member who received a distribution (subtracting the distribution they have already received) to calculate the per-member recovery.  But as I noted in my earlier decision, the number of shares owned by each class member was calculated based on the allegedly undervalued price.  Had the plaintiffs' pricing methodology been used when the shares were originally contributed to the Plan, fewer high-priced shares would have been allocated to each employees' account based on the same total dollar value contribution by the Company.  Thus, while the per-share value at redemption would be higher, the total number of shares owned would be lower.  As I stated previously, the actual issue to be decided in this case is whether "the parties' competing valuation methodologies involve different rates of growth (or decline) over time, so that the difference in actual share values would not necessarily be a constant margin."

Class Certification Decision at 13–14.  Thus, the Court continued, "*[t]he only proper way* to calculate the proper payout under any alternate valuation methodology is to revalue the shares from the <u>beginning</u> of the Plan."  *Id*. at 14 (italics added, underlining in original).

Plaintiffs made no effort to produce the evidence this Court said was necessary for them to prove their case "the only proper way."  Van Vleet's "alternate valuation methodology" was not used "to revalue the shares from the <u>beginning</u> of the Plan."  Instead, he opined only as to the value of Meditech stock on a *single* date:  December 31, 1997.  *See* Van Vleet Report at 13.  And while the Court expressly rejected "merely … revalu[ing] upwards the share price for each year at issue and multiply[ing] that price by the vested share balance of each class member who

received a distribution . . . to calculate the per-member recovery," the Van Vleet Report proposes

doing precisely that and in nearly so many words:

> As of the Valuation Date, the Trust contained 2,938,020 shares of common stock of Meditech …. If the stock of the Company contained in the Trust had been valued at the $21.62 fair market value price per share as opposed to the $13.50 price per share, the total assets of the Trust would have increased by 36.2 percent. … Consequently, in order to estimate damages suffered in this matter, it is necessary to multiply the amount received by [Hinchliffe and Trainor] by 36.166 percent.

Van Vleet Report, Cover Letter dated February 19, 2008, at 3.

Plaintiffs' failure to provide valuations for any date besides December 31, 1997 denies a

fact finder any basis for determining whether Plaintiffs were denied benefits by Defendants.

There is no way to know whether the decrease in the number of shares contributed to the Trust

from use of a higher valuation method would be outweighed by Plaintiffs' higher December 31,

1997 valuation. And there is no way to know whether "the parties' competing valuation

methodologies involve different rates of growth (or decline) over time," *see supra* at 16, and if so

which method is more favorable to Hinchliffe and Trainor (as discussed *supra* at 15, Hubert was

clearly better off under Defendants' valuation method). A finder of fact can only speculate, and

such speculation is not sufficient for Plaintiffs' claims to survive summary judgment. *See*

*Hershey v. Donaldson, Lufkin & Jenrette Securities Corp.*, 317 F.3d 16, 19 (1st Cir. 2003)

(plaintiff "may not rely upon . . . unsupported speculation to defeat summary judgment");

*Carriero v. Frank*, 789 F. Supp. 465, 469 (D. Mass. 1992) (Zobel, J.) (same); *Holloman v. Mail-*

*Well Corp.*, 443 F.3d 832, 839-840 (11th Cir. 2006) (affirming grant of summary judgment to

defendants because Plaintiff "did not present *any* affirmative evidence to show that the lump-

sum payment was not fully equivalent in value to the future benefits payable…. All that the

Hollomans offered were conclusory assertions that [the employer] had shortchanged them").

In summary, Plaintiffs did exactly what the has held would not be good enough: use their alternate method to value Meditech stock only as of December 31, 1997 and apply that value to the number of shares placed in the Trust using Defendants' supposedly improper valuation method. Plaintiffs' failure to provide any evidence of the "proper" value of Meditech stock in any year but 1997, leaving the finder of fact nothing but speculation to support their claims, is sufficient grounds for entry of summary judgment in favor of Defendants.

**C.     Summary Judgment Is Appropriate Even Assuming That No Fewer Shares Would Have Been Contributed to the Trust Using Plaintiffs' Valuations**

Seeking to obtain the benefit both of the larger number of shares contributed to the Trust under Defendants' valuation method, and application of their own higher valuation method to that full number of shares, Plaintiffs previously have argued that Meditech's board might not have reduced the number of shares contributed to the Trust even had the board used Plaintiffs' higher valuation method. *See* Plaintiffs' Memorandum in Support of Motion for Reconsideration at 9-10 ("Reconsideration Memo.") (Docket No. 94). This argument is flawed for many reasons. It contradicts the terms of the Plan, in which the overall contribution amount is set first, and a substantial increase in the share valuation would require a matching decrease in the number of shares contributed. *See supra* at 6-7. It is inconsistent the Profiting Sharing Trust's written "philosophy," which at the time stated that the total contribution amount was determined by looking at company profits, not by an intent to contribute a set number of shares no matter what. *See* Undisputed Facts, ¶ 22. And most importantly, Plaintiffs have conceded that this argument is based on speculation, and hence it cannot serve as a basis for avoiding summary judgment. *See* Reconsideration Memo. at 10 ("We submit that no one can go back and guess what the Company would have done if the stock had been properly valued.")

In any event, even assuming for sake of argument that the Board would not have decreased the number of shares contributed to the Plan, Defendants would still be entitled to summary judgment. As a matter of common sense, and as demonstrated in the Expert Report of Rick S. Nathan and Christopher C. Barry submitted by Defendants in this case ("Defendants' Expert Report"), the use of higher values for Meditech stock in making contributions to the Trust and paying distributions from the Trust would have resulted in the Trust holding far less in cash than it actually did. *See* Martin Aff., Ex. 34, at 39-40. These lower cash balances would counterbalance and potentially even exceed any benefit to Plaintiffs from use of a higher per share value applied to the shares actually held by the Trust. Because Plaintiffs did not have Van Vleet revalue the stock each year back to the beginning of the Plan, the finder of fact can only speculate whether, for the three Plaintiffs, application of higher share values in the years (1998 and 2004) that they received benefits would outweigh the negative cash effect of Defendants using higher share values in making contributions and paying distributions. Once more, such speculation is not sufficient for Plaintiffs' claims to survive summary judgment. *See supra* at 17.

## III.    PLAINTIFFS FAILED TO EXHAUST THEIR CLAIMS

Under ERISA, Plaintiffs must show that they exhausted administrative procedures available under a plan before filing suit. *See Daly v. Raytheon Co.*, 2001 WL 227328, at *1-*2 (1st Cir. 2001) (affirming summary judgment on plaintiffs' ERISA suit because plaintiffs failed to exhaust); *see also Drinkwater v. Metropolitan Life Ins. Co.*, 846 F.2d 821, 825-26 (1st Cir. 1988). This requirement serves important purposes: "1) the reduction of frivolous litigation, 2) the promotion of consistent treatment of claims, 3) the provision of a non-adversarial method of claims settlement, 4) the minimization of costs of claims settlement, 5) a proper reliance on administrative expertise, and 6) the development of a complete record for review by the courts." *Tarr v. State Mutual Life Assurance Co.*, 913 F. Supp. 40, 44 (D. Mass. 1996).

The undisputed evidence demonstrates that Plaintiffs did not exhaust their claims. Hinchliffe and Trainor did not file a claim for additional benefits at all. *See supra* at 8. And while Hubert did send a letter to the Plan administrator vaguely suggesting that Meditech stock might be undervalued, the letter's actual complaint concerned the manner in which distributions are calculated based on a December 31 valuation; Hubert never submitted a claim to Defendants based on the theory alleged in the Amended Complaint; and the December 31 issue is not part of this case. *See supra* at 9; *see also* Plaintiffs' Supplemental Responses at 8 (answer to Interrogatory No. 7). Precedent is clear that a complaint about one aspect of the Plan will not serve to exhaust a claim based on an entirely different theory. *See Hess v. Reg-Ellen Machine Tool Corp. Employee Stock Ownership Plan*, 502 F.3d 725, 729 (7th Cir. 2007); *Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 649 (7th Cir. 1996). Thus, for the additional and independent reason that no Plaintiff exhausted his claim, Defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, Defendants respectfully pray that this Court grant them summary judgment against each Plaintiff.

Respectfully submitted,

MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC. and A. NEIL PAPPALARDO.

By their attorneys,

/s/ Stephen D. Poss
Stephen D. Poss (BBO # 551760)
Kevin P. Martin (BBO # 655222)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
Dated: April 18, 2008                    (617) 570-1000

**CERTIFICATE OF SERVICE**

I, Stephen D. Poss, hereby certify that I caused a true copy of the above document to be served upon the counsel of record for each other party via this Court's ECF System on April 18, 2008.

/s/  Stephen D. Poss
Stephen D. Poss