UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE,<br><br>      Plaintiffs,<br><br>  v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO,<br><br>      Defendants. | Civil Action No. 05-10269RWZ |

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure 56.1, Defendants Medical Information Technology, Inc. (the "Company" or "Meditech"), the Medical Information Technology, Inc. Profit Sharing Plan (the "Plan") and A. Neil Pappalardo submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment. All pleadings, deposition transcripts, deposition exhibits, and other documents cited to herein are appended to the Attorney's Affidavit of Kevin P. Martin submitted herewith (hereinafter "Martin Affidavit, Ex. __").

### I.    MEDITECH

1.    Meditech, a software company, was founded in 1969, and currently employs over 2,800 individuals.  *See* Medical Information Technology, Inc. Form 10-K for the Fiscal Year Ended December 31, 2007 at page 3 of 30 (hereinafter "2007 Form 10-K") (Martin Affidavit, Ex. 9).

2.     Meditech is a privately-held company, its shares are not traded on any stock exchange and, therefore, have no price set by a public market. *See* 2007 Form 10-K at page 7 of 30.

3.     While Meditech is a privately-held company, nonetheless it has been a public reporting company since 1996, and thus is required to submit, among other things, Forms 10-Q and 10-K to the SEC, which are then available to anyone in the public wishing to view a copy. *See generally*, *e.g.*, 2007 Form 10-K.

4.     Meditech's Form 10-K for 1997, filed publicly on March 26, 1998, contains a chart reporting, *inter alia*, the Company's revenue, operating income, net income, earnings per share, cash and cash equivalents, total assets, total liabilities, book value per share, working capital, cash flows, and cash dividends per share as of December 31 for each year 1993 through 1997. *See* Medical Information Technology, Inc. Form 10-K for the Fiscal Year Ended December 31, 1997, DEF003619 at DEF003625 (hereinafter "1997 Form 10-K") (Martin Affidavit, Ex. 10).

5.     Meditech's 1997 Form 10-K contained a section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," discussing factors influencing the business such as "a decrease in the product revenue attributable to a slowdown in implementations for Columbia/HCA," a major customer. *See* 1997 Form 10-K at DEF003626.

6.     Meditech's 1997 Form 10-K contained the audited financials of the company, which include among other things a three-year history of Company contributions to the trust set up under the Plan (the "Trust"). *See* 1997 Form 10-K at DEF003642.

7.     The price-earnings ratios ("P/E ratio") of publicly traded companies can be computed using publicly available information.

8.      In 1998 Plaintiffs could have calculated Meditech's P/E ratio as of December 31, 1997, using information made available to them by the company and/or the 1997 Form 10-K.

## II.      PLAINTIFFS' TRANSACTIONS IN MEDITECH STOCK

9.      The Company has sold Meditech stock to most employees, including each of the named Plaintiffs.   *See* Affidavit of Barbara A. Manzolillo (hereinafter "Manzolillo Affidavit") ¶¶ 4, 5 (Martin Affidavit, Ex. 13).

10.      Plaintiff David Hinchliffe (hereinafter "Hinchliffe") purchased shares of Meditech stock from the Company for a total payment of $16,400.  *See* Statement of Stock Ownership of David Hinchliffe ("Hinchliffe Statement of Stock Ownership," marked as Exhibit 11 at Hinchliffe's Deposition in this action) (Martin Affidavit, Ex. 14).  Hinchliffe later sold all of the Meditech stock he purchased to the Trust for a total of $301,100.  *See id.*  Among other sales, Hinchliffe sold 13,200 split-adjusted shares to the Trust in 1998 at a split-adjusted price of $13.50 per share.  *See id.*

11.      Plaintiff William Trainor (hereinafter "Trainor") purchased shares of Meditech stock from the Company for a total payment of $16,950.  *See* Statement of Stock Ownership of William Trainor ("Trainor Statement of Stock Ownership," marked as Exhibit 4 at Trainor's Deposition in this action) (Martin Affidavit, Ex. 15).  Trainor later sold all of the Meditech stock he purchased to the Trust for a total of $310,150.  *See id.*  Among other sales, Trainor sold 20,900 split-adjusted shares to the Trust in 1998 at a split-adjusted price of $13.50 per share.  *See id.*

12.      Plaintiff Michael P. Hubert (hereinafter "Hubert") purchased shares of Meditech stock from the Company for a total payment of $197,425.  *See* Statement of Stock Ownership of Michael Hubert ("Hubert Statement of Stock Ownership," marked as Exhibit 16 at Hubert's

deposition in this action) (Martin Affidavit, Ex. 16). Hubert sold 1,000 of his shares to the Trust for $23,000. *See id.* Hubert continues to hold 23,300 shares, worth a total of $862,100 at the $37 per share valuation last determined by the Company's board of directors as of December 31, 2007. *See id.*; *see also* 2007 Form 10-K at 21 of 30.

13. During the years they were eligible to purchase stock (including 1998), Plaintiffs received "Stock Purchase Instructions" from the Company. *See, e.g.,* 1998 Stock Purchase Instructions, DEF001396-DEF001405 at DEF001401 ("1998 Stock Purchase Instructions") (Martin Affidavit, Ex. 17). The 1998 Stock Purchase Instructions stated on their face "Please note that MEDITECH is a closely-held private company and there is no public market for its shares. Thus there can be no absolute assurance of a future re-sale." *See id.* They invited the recipient to a "meeting … to discuss the implications of buying stock in MEDITECH," to which "any existing shareholder is welcome." *Id.* And they were accompanied by a "10 Year Financial History" intended to "aid you in your investment decision." *Id* at DEF001400.

14. Trainor does not recall ever attending one of the annual meetings held in conjunction with Meditech's annual share offer to employees. *See* Deposition of William Trainor at 84-85 ("Trainor Depo.") (Martin Affidavit, Ex. 1). Beginning in at least 1994 Hinchliffe did not attend any of these meetings.

> Q. Mr. Hinchliffe, why did you not attend the meeting that you were invited too?
>
> A. Because I already knew that it was mainly for – the meeting was mainly for new purchasers of the stock. That that have already purchased stock already knew everything, knew what they were getting into, knew what it was all about, and had no need to attend the meeting.

Deposition of David Hinchliffe at 52-54 ("Hinchliffe Depo.") (Martin Affidavit, Ex. 2).  Hubert

attended a meeting only in or around 1984.  *See* Deposition of Michael Hubert at 212 ("Hubert

Depo.") (Martin Affidavit, Ex. 3).

## III.   THE MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN

15.    In 1973 the Company established the Plan for the stated purpose of providing

"retirement and other benefits to the employees of the Company."   *See*, *e.g.*, Medical

Information Technology, Inc. Profit Sharing Plan, Amended and Restated Trust Agreement (As

of January 1, 1998) at ¶ 1.02. ("Plan Document") (Martin Affidavit., Ex. 6).   The Plan is

"designed to invest substantially in shares of the Common Stock of the Company so as to permit

the participating employees to share in any growth of the Company."  *See ibid*.

16.    Pursuant to the Plan, the Trust was created to hold contributions of cash and stock

received from the Company.    *See* Plan Document ¶1.01.   Individual employees are neither

required nor permitted to make contributions to the Trust.  *See id*., ¶ 4.05.

17.    The Plan is entirely voluntary on the Company's part.   The Plan document

provides that the Company may terminate the Plan at any time.  *See* Plan Document ¶ 7.01.  The

Plan provides that all contributions by the Company to the Trust are voluntary; in any given year,

the Company could elect to contribute nothing.  *See id*., ¶ 9.02.

18.    The value of each year's contribution to the Trust is allocated to the accounts of

participants according to a formula based on the income of each participant.  Plan Document ¶

5.03.  Each year the Trustee revalues the Plan's existing assets, and the pro-rata increase in the

value of those assets is allocated to the account of each plan participant*. See id*., ¶ 5.05.

19.    Under the terms of the Plan, the Trust makes payments to Plan participants in a

lump sum cash payment upon termination of the participant's employment with Meditech.  *See*

Plan Document ¶ 6.04. The Plan provides, however, that if the Trust lacks sufficient cash to make a payment, the Trust may defer payment by up to three years and, if still necessary, distribute Meditech stock instead of cash. *See id.*, ¶¶ 6.06(d), 6.12(a)(2). There is no requirement under the Plan that the Company make any contributions to the Trust to fund Trust cash shortfalls.

20. The Plan contains a claims procedure, which is described (in relevant part) in the summary plan descriptions distributed to Plan participants, including each of the Plaintiffs. *See* , *e.g.*, Summary Plan Description of the Medical Information Technology, Inc., Profit Sharing Plan (as Amended through August 1, 1983), HUB 052 ("1983 Summary Plan Description") (Martin Affidavit, Ex. 7) (produced by Hubert during discovery); Summary Plan Description of the Medical Information Technology, Inc. Profit Sharing Plan (January 1, 1998) HUB 081 ("1998 Summary Plan Description") (Martin Affidavit, Ex. 8) (produced by Hubert during discovery); *see also* Trainor Depo. at 91 (admitting receiving a summary plan description at least in 1975); Hinchliffe Depo. at 35-36 (admitting receiving and reading the summary plan description including the 1983 Summary Plan Description). The 1983 Summary Plan Description and 1998 Summary Plan Description both state, in substantively similar language: "if you receive notice from the Trustee with regard to the amount and form of payment of your benefits and you believe there is an error in the notice, then you may submit a claim to the Trustee. … Your claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim." 1983 Summary Plan Description at HUB 061; 1998 Summary Plan Description at HUB 090-91.

21. While they were employed at the Company, Hinchliffe and Trainor never sought to obtain a copy of the Plan document. *See* Hinchliffe Depo. at 37; Trainor Depo. at 92. Neither

Hubert, Hinchliffe, nor Trainor ever asked Defendants if there were any rules established by the Trustee for filing a claim in writing for additional benefits.

## IV.    THE VALUATION OF MEDITECH STOCK

22.    Two valuations of Meditech stock are made at year end for purposes of the Plan. First, Meditech's Board of Directors determines a value for the stock.  Under the terms of the Plan, the Board sets an overall dollar contribution amount, then decides how much of that overall contribution, if any, will be in cash, and how much in stock.  The Board's valuation for Meditech stock is used by the Board in calculating how many shares of stock will make up any stock portion of the Company's voluntary contribution to the Trust in a given year.  *See* Affidavit of A. Neil Pappalardo dated September 15, 2006, ¶ 13 (Docket No. 68) ("Pappalardo Affidavit") (Martin Aff., Ex. 12); *see also* Plan Document, ¶ 4.01 ("The amount of the Company's contribution shall be paid to the Trustee in cash and/or that number of shares of Common Stock having a fair market value on the date of contribution equal to the contribution amount (or portion thereof to be contributed in shares of Common Stock) voted by the Board of Directors as provided herein"); *cf.* Profit Sharing Trust:  Philosophies, January 24, 1996, DEF001251 (Martin Aff., Ex. 38) ("The formula which determines the company contribution to members' Trust accounts is based upon a standard percent of the company's operating profits"); *see also id.* ("Typically, however, the company's contribution to the Trust is a combination of stock and cash.  At the time of contribution is made, the amount of cash contributed is far greater than the value of the stock that is contributed").  This same per share value is also used by the Company in selling Meditech stock early the next year to employees. *See id*., ¶ 6.

23.    Each year end the Trustee also values the Trust's shares in order to determine the value of the Trust and, thereby, the Trust account balance of Plan participants.  Plan Document,

¶¶ 5.04, 5.05.  Under the Plan, the Trustee is independently obligated to value stock held by the Trust, and he is not obliged to use the Board's value.  *Ibid*.; *see also* Pappalardo Affidavit, ¶ 14. The Trustee's valuations, however, historically have been the same as those determined by the Board.  For example, as of December 31, 1997, both the Board and Trustee determined the value of Meditech stock to be $13.50 on a split-adjusted basis.

24.    The Trustee determined a value for Meditech stock of $13.50 as of December 31, 1997.  The Trustee determined a value for Meditech stock of $26 as of December 31, 2003. Between December 31, 1997 and December 31, 2003, the value for Meditech stock as determined by the Trustee increased by 93%.  *See*  Manzolillo Affidavit ¶ 24.

25.    Plaintiffs' putative expert Daniel Van Vleet estimated a value for Meditech stock of $21.62 as of December 31, 1997.  *See* Van Vleet Report at 13 (Martin Aff., Ex. 33)  Plaintiff's expert in *Grossman v. Medical Information Technology, Inc., et al*., Civil Action No. 03-1872 (Mass. Superior), Robert Reilly, determined a value for Meditech stock of $33 as of December 31, 2003.  Between December 31, 1997 and December 31, 2003, the value for Meditech stock as determined by Van Vleet for December 31, 1997 and Reilly for December 31, 2003 increased by 53%.

## V.    THE ANNUAL PROVISION OF INFORMATION TO PLAN PARTICIPANTS

26.    Each year, Defendants provide Plan participants (including, while they were eligible, each of the Plaintiffs) a report on the status of their Trust account balances.  On or about January 30, 1998, Defendants sent each of the Plaintiffs a document informing him of his account balance as of December 31, 1996; his share of Trust income and revaluations during 1997; his share of Company contributions to the Trust and forfeitures during 1997; and his resulting account balance as of December 31, 1997.  *See, e.g.,* Letter from Meditech to David

Hinchliffe dated January 30, 1998, DEF001341 ("Hinchliffe 1998 Benefits Letter") (Martin Affidavit, Ex. 18); *see also, e.g.,* Hinchliffe Depo. at 31 (admitting receiving "a communication as to the value of [his] proportionate interest in the trust assets"). The same form also included the value of Meditech stock as determined by Defendants of December 31, 1997, and the estimated dividend to be paid on Meditech stock in 1998. *See id.*

27. Defendants also provided to Plan participants each year a "Financial Report" for the Trust. For example, in 1998 each Plaintiff received a "Meditech Profit Sharing Trust Financial Report for 1997." Hubert also printed the report from the Company intranet on January 28, 1998. *See* Meditech Profit Sharing Trust Financial Report for 1997, HUB 079 ("1997 Trust Financial Report") (Martin Affidavit, Ex. 19); *see also, e.g.,* Hinchliffe Depo. at 31 (admitting receiving "an annual report each year … that told [him] the value of the trust's assets); *id.* at 55–56 (admitting receiving this report on an annual basis while employed at Meditech); Trainor Depo. at 100 (admitting receiving Trust financial reports while employed by Meditech). The Report noted, among other things, the amount of the Company's contribution to the Trust in 1997, including the breakdown between cash and stock, and contained three charts: one showing the Trusts assets as of December 31, 1996 (broken down into cash, U.S. Treasuries, interest and outstanding loans, and shares of Meditech stock including the per share value); a second showing Trust activity during the year (income, revaluation of Meditech stock, distributions and forfeitures, and the Company's contribution); and a third showing the resulting Trust assets as of December 31, 1997 (again showing the number of shares of Meditech stock held and the per share value assigned to them). *See generally* 1997 Trust Financial Report.

## VI.    THE DISTRIBUTION OF BENEFITS TO PLAINTIFFS

28.    Trainor began working at Meditech in 1975.  *See* Trainor Trust Distribution at DEF001047 (Martin Affidavit, Ex. 20).  Over the years, the value of Trainor's Trust account increased through, *inter alia*, contributions of cash and Meditech stock by Meditech to the Trust, increases in the value of the Meditech stock and other assets held by the Trust and the Trust's receipt of dividends from the Company and other income on investments.  In accordance with the terms of the Plan, Trainor did not make any contributions into the Trust.  Trainor's employment with Meditech terminated in March 1998.  *Ibid.*  On May 28, 1998, Trainor received a distribution from the Trust in the amount of $929,943.  *See* Trainor Trust Distribution Check at DEF001045 (Martin Affidavit, Ex. 21).  Under the terms of the Plan, the amount of this distribution was based on the value of Trainor's Trust account as of December 31, 1997, plus interest through the date of the distribution.

29.    Trainor never filed any claim with Defendants seeking any benefits beyond those paid to him on May 28, 1998, and never told Defendants that he thought he should have received more from the Trust, before the Complaint was filed in February 2005.  *See* Trainor Depo. at 80.

30.    Hinchliffe began working at Meditech in 1975, and his employment with Meditech terminated in early 1998.  *See* Hinchliffe Trust Distribution at DEF001053 (Martin Affidavit, Ex. 22).  Over the years, the value of Hinchliffe's Trust account increased through, *inter alia*, contributions of cash and Meditech stock by Meditech to the Trust, increases in the value of the Meditech stock and other assets held by the Trust and the Trust's receipt of dividends from the Company and other income on investments.  In accordance with the terms of the Plan, Hinchliffe did not make any contributions into the Trust.  On May 28, 1998, Hinchliffe received a distribution from the Trust in the amount of $1,123,639.  *See* Hinchliffe Trust

Distribution Check at DEF001051 (Martin Affidavit, Ex. 23). Under the terms of the Plan, the amount of this distribution was based on the value of Hinchliffe's Trust account as of December 31, 1997, plus interest through the date of the distribution.

31.    Hinchliffe never filed any claim with Defendants seeking any benefits beyond those paid to him on May 28, 1998, and never informed Defendants that the amount of his distribution was incorrect, before the Complaint was filed in February 2005. *See* Hinchliffe Depo. at 37, 44.

32.    Hinchliffe and Trainor each received their distributions of benefits from the Trust more than six years before the Complaint was filed in this lawsuit. *Compare* Trainor Trust Distribution Check at DEF001045 (dated May 28, 1998) *and* Hinchliffe Trust Distribution Check at DEF001051 (dated May 28, 1998) *with* Complaint (Docket No. 1) (dated February 10, 2005).

33.    Hinchliffe and Trainor knew the amount of their distributions of benefits when they received their checks from the company in 1998. *See* Trainor Trust Distribution Check at DEF001045 (dated May 28, 1998); Hinchliffe Trust Distribution Check at DEF001051 (dated May 28, 1998). No action taken by any Defendant after 1998 has had any effect on Hinchliffe's and Trainor's distributions of benefits.

> Q. Do you care what the proper value of Meditech's stock was in 2001?
>
> A. No.
>
> Q. Would that affect you in any way?
>
> A. No.

Trainor Depo. at 102.

34.    Hubert began working at Meditech in 1981.  *See* Hubert Trust Distribution at DEF001041 (Martin Affidavit, Ex. 24).  Over the years, the value of Hubert's Trust account increased through, *inter alia*, contributions of cash and Meditech stock by Meditech to the Trust, increases in the value of the Meditech stock and other assets held by the Trust and the Trust's receipt of dividends from the Company and other income on investments.  In accordance with the terms of the Plan, Hubert did not make any contributions into the Trust.

35.    On March 1, 2004, Hubert withdrew $39,086 from the Trust.  *See* Hubert Trust Distribution Check at DEF001040 (Martin Affidavit, Ex. 25) ("Hubert Distribution").

36.    Hubert was fired by Meditech on July 26, 2004, for offering to sell confidential Meditech information to a third party involved in a dispute with Meditech.  *See* Letter to Hubert from Howard Messing, dated July 26, 2004, at HU PF 000015 (Martin Affidavit Ex. 26).

37.    On September 16, 2004, Hubert received a final distribution from the Trust in the amount of $1,040,000.  *See* Hubert Distribution.  The amount of this distribution was based on the value of his Trust account as of December 31, 2003 plus interest.  *Ibid.*

38.    On September 7, 2004, Hubert sent a letter to the Plan administrator noting that he thought the Trust had undervalued the stock held by the Trust.  The letter also complains that distributions were based on the value of Trust assets as of December 31; Hubert suggested that a better method would be to revalue the Trust assets as of the time of the distribution.  *See* Hubert Depo. at 92; *see also* Letter from Michael Hubert to Barbara Manzolillo dated September 7, 2004, DEF011911 (the "September 7, 2004 Letter") (Martin Affidavit, Ex. 27).

## VII.    HINCHLIFFE AND TRAINOR BELIEVED MEDITECH STOCK WAS UNDERVALUED AT THE LATEST BY 1998, BUT TOOK NO STEPS TO INVESTIGATE ANY CLAIM

39.    Hinchliffe believed by the late 1980s to early 1990s that Meditech stock was "valued too low" and "perhaps should be valued higher."

Q.  What feelings did you have about the stock that you expressed to Mr. Hubert?

A.  I always felt that it was valued low.  We all did.  Everybody in the company did.  It's just, you know, you couldn't do anything about it.

* * *

Q.  Do you recall when you first came to believe that Meditech stock, in your words, valued low?

A.  In what kind of way?  I never got to the point where I would think that I would want to try to do something about it or thought that I ever could do something about it.

Q.  That's not the question I asked you Mr. Hinchliffe?

A.  As far as a very general answer, I don't know.  Sometime in the late '80s, early '90s; I don't know, something like that

* * *

Q.  So in the late '80s to early '90s, you had a convenient feeling that the stock was low and should be valued higher; is that correct?"

A.  Perhaps should be valued higher; yes, that's correct.

* * *

Q.  And was it your sense that, at least among your circle of acquaintances when you were employed at Meditech, that the people you knew questioned whether the stock was valued too low?

Ms. Noonan:  Objection.

A.  There were certainly questions about how it was valued, and obviously, if we have questions about its value, we think it's valued too low.

Hinchliffe Depo. at 15–19.

40.     Hinchliffe admitted at his deposition that one could "fairly conclusive[ly]" determine that Meditech stock was undervalued by comparing the earnings and assets and stock prices of other companies to those of Meditech.

> Q.  [D]oes that mean that you agreed with [Hubert] that the Meditech stock was undervalued?
>
> A.  He gave me some information on research that he had done, and after our conversation I was convinced that, yeah, it was low.
>
> Q.  What information –
>
> A.   But that's the first time that I had some fairly conclusive information that would help me make that decision.
>
> Q.   What was the fairly conclusive information that Mr. Hubert gave you in that phone call that helped you make that decision that the stock was undervalued?
>
> A.  He just told me some research that he did.  I don't remember the specific terms, the specific company that he cited, or anything like that.  But it was something that was quite interesting.
>
> Q.  Again, I want to focus on this fairly conclusive information that you've testified Mr. Hubert gave you in that phone call.  Did that information include a comparison of P/E or price/earnings ratios of Meditech to some other company or companies?
>
> A.  Yes.  It compared earnings of other companies and their assets and what their stock was versus what Meditech's was.
>
> Q.  [I]t was a comparison of earnings, assets, and stock values of other companies versus Meditech stock; correct?
>
> A.  That's my recollection; yes.
>
> * * *
>
> Q.  Aside from not recalling the names, it was a comparison of earnings, assets and stock values of other companies versus Meditech stock; correct?
>
> A.  That's my recollection, yes.

Q.  And was that the information that you've told me was fairly conclusive that helped you make the decision that the stock was undervalued?

A.  That's correct.

Hinchliffe Depo. at 19-21.

41.    By approximately 1996, Trainor had compared the value of Meditech stock to that of Meditech's competitors and wondered why Meditech stock was valued lower than the competitors' stock.

Q.  When you were employed at the company and having these conversations in which you were wondering about the value of the stock, did you think the stock was valued too low?

A.  My only observation was that our competitors' stock was higher, and I thought we were a better company.  And that led me to wonder why our stock was lower than their stock.

* * *

Q.  When did you first notice or consider that, as you've put it, that you observed that the stock of Meditech's competitors was valued more highly?

A.  While I was working there.

Q.  So sometime before you left the company in 1998?

A.  Yes.

Q.  How long before you left?

A.  Oh, probably at least a couple of years.

Q.  So at least back into the 1996 time frame?

A.  Yeah.

Trainor Depo. at 57-59.

42.    Among the companies whose values Trainor compared to Meditech's value was Cerner.

Q.  Do you remember a competitor called Cerner?

A.  Cerner.

Q.  Was that one that you thought of?

A.  Now that you say the name, yes, I remember Cerner.

Q.  And was that one of the competitors that you thought at the time you were employed at Meditech that its stock was valued more highly and you wondered why Meditech's was not valued as much?

A.  I believe so.

Trainor Depo. at 58.

43.    For Trainor, wondering whether Meditech stock was undervalued was a reason to join this lawsuit.

Q.  Now, you've said several times today that you loved Meditech.

A.  Uh-huh.

Q.  So why are you bringing this lawsuit?

A.  I don't think one has anything to do with the other.  Q.  Why not?

A.  Well, I still believe it was a great company when I worked there, with a great product.  The question that was presented to me about this case was strictly about did I ever wonder if the stock was undervalued, and my answer to that was yes.  And my understanding is that's what this case is all about, and only that.

Trainor Depo. at 97-98.

44.    Neither Hinchliffe nor Trainor ever asked anyone in Meditech management how the Board or Trust valued Meditech stock.  Neither Hinchliffe nor Trainor did anything to investigate or look into any claim based on the undervaluation of Meditech stock until after Hubert filed the Complaint in this case in February 2005.

16

Q.  Did you do anything to investigate or look into the valuation issue you've told me about, that of the competitors being valued more highly?

A.  No.

Q.  Did you ever ask anyone in Meditech management how the company or the trust valued Meditech stock?

A.  No.

Trainor Depo. at 59.

## VIII.  HUBERT HAD OBSERVED THE UNDERVALUATION ALLEGED IN THE AMENDED COMPLAINT BY AT LEAST APRIL 1998

45.    Hubert was comparing Meditech's P/E ratio to that of public companies by the mid-1980s.

Q.    When did you first compare the price/earnings ratio of Meditech to other companies?

A.  Oh, I don't know.  I'm going to say 20 years ago.

Hubert Depo. at 122.

46.    In April 1998, the month before Hinchliffe and Trainor received their distributions of benefits from the Trust, and more than six years before the Complaint was filed in this case, Hubert calculated the P/E ratio of Meditech and compared it to those of Meditech's competitors.   In particular, on or about April 18, 1998, Hubert calculated the P/E ratios as of that date for Meditech and several other companies, including Meditech competitors such as HBOC, SMS, and Cerner.  *See* HUB 490 (Martin Affidavit, Ex. 31).  He calculated, *inter alia*, that Meditech's P/E ratio was 8.7 and Cerner's was 48.  *See id.*

47.    On April 21, 1998, Hubert printed a document from the Meditech intranet entitled "Meditech Financial History."   *See* HUB 475 (Martin Affidavit, Ex. 28).   This document contained a chart showing, for each year 1988 through 1997, Meditech's product revenue, service revenue, total revenue, operating expense, operating income, other income, other

17

expense, pre-tax income, income taxes, net profit, dividends paid, total assets, total liabilities, shareholder equity, common shares of Meditech stock, earnings per share, dividends per share, book value per share, and the value of the shares determined by Defendants. *See id.*  On or about April 21, Hubert used this document to calculate the P/E ratio for Meditech stock each year from 1988 through 1997. *See id.*

48.     That same day, April 21, 1998, Hubert also printed from the *Forbes* website a story entitled "Turning employees into stakeholders," concerning another non-publicly traded company, SAIC Corp. *See* HUB 503 (Martin Affidavit, Ex. 30).  On his copy of this story Hubert made notes calculating the P/E ratios for SAIC and two other companies, "Comp. Sciences" and "EDS." *See id.*

49.     Hubert also collected a Form 8-K publicly filed by SAIC with the SEC, discussing the "SAIC Stock Value From Formula," dated "April 1998." *See* HUB 507 (Martin Affidavit, Ex. 32).  At this point, Hubert was thinking about how SAIC valued its stock compared with how Meditech valued its stock. *See* Hubert Depo. at 130.

50.     On or about the date of its release, Hubert obtained the April 27, 1998 issue of *Fortune* magazine, which contained charts ranking the Fortune 500 by performance. *See* HUB 489 (Martin Affidavit, Ex. 29).  Hubert noted Meditech's performance relative to the Fortune 500 on such characteristics as profits as percentage of revenues, profits as percentage of assets, and profits as percentage of equity. *See id.*

51.     All of the materials collected by Hubert in or about April 1998, more than six years before the Complaint was filed in this case, and discussed in paragraphs 46–50, *supra*, were publicly available and/or available to Meditech employees, and were either in the possession of, or could have been obtained by, Hinchliffe and Trainor.

52.    Hubert calculated P/E ratios for Meditech and various of its competitors and other companies, and explored how SAIC valued its stock.  However, he never asked Defendants how they valued Meditech stock while he was employed at the company.

> Q.  Why didn't you think you would learn anything new?
>
> A.  [I] had never heard of any explanation as to how the stock was valued in a meaningful way over the many years I was there.  I couldn't imagine I would change my mind in 2000 or 2001.
>
> Q.  But you never asked, did you?
>
> A.  I never asked.

Hubert Depo. at 213.

## IX.    HUBERT SOUGHT COUNSEL TO BRING AN ERISA SUIT AGAINST MEDITECH ON FEBRUARY 18, 2002

53.    On February 18, 2002, Hubert sent an anonymous email to more than a dozen lawyers and/or law firms, including Dwyer & Collora, seeking counsel to bring an ERISA action against Meditech (which is not named in the email) based on the alleged undervaluation of Meditech stock held by the Trust.  *See* Email from erisa@mediaone.net dated February 18, 2002 ("February 18, 2002 Email") (Martin Aff., Ex. 35); Hubert Depo. at 29 (admitting sending this anonymous email, which he authenticated as Exhibit 3 at his deposition).

54.    The February 18, 2002 Email states, inter alia: "It is acknowledged by all that the stock value is set low so that employees will purchase the stock.  When the plan makes distributions, employees receive much less than they should.  If the real 'fair market value' was used to compute the distribution, the plan would have no cash."  *Ibid*.  In the email, Hubert went on to write "As an employee of this firm, bringing this case to you, and willing to be active in the case, I wish be [sic] receive financial consideration for my efforts."  *Ibid*.

55.    Hubert sent the February 18, 2002 Email before Jerome Grossman filed a form 13D with the SEC on February 27, 2002, concerning the valuation of Meditech stock.  *See* Martin Affidavit, Ex. 36 ("Grossman Form 13D").

Respectfully submitted,

MEDICAL INFORMATION
TECHNOLOGY INC. PROFIT SHARING
PLAN, MEDICAL INFORMATION
TECHNOLOGY, INC. and A. NEIL
PAPPALARDO.

By their attorneys,

*/s/* Stephen D. Poss
Stephen D. Poss (BBO # 551760)
Kevin P. Martin (BBO # 655222)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated April 18, 2008

**CERTIFICATE OF SERVICE**

I, Stephen D. Poss, hereby certify that I caused a true copy of the above document to be served upon the counsel of record for each other party via this Court's ECF System on April 18, 2008.

/s/  Stephen D. Poss
Stephen D. Poss