UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE<br><br>Plaintiffs,<br><br>v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO,<br><br>Defendants. | Civil Action No. 05-10269RWZ |

**AFFIDAVIT OF KEVIN P. MARTIN IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Kevin P. Martin, depose and state as follows:

1.      I am an attorney admitted to practice in the Commonwealth of Massachusetts.  I am a Partner at Goodwin Procter LLP, counsel for Defendants Medical Information Technology, Inc. Profit Sharing Plan (the "Plan"), Medical Information Technology, Inc. ("Meditech" or the "Company") and A. Neil Pappalardo in this matter.

2.      I make this Affidavit in support of Defendants' Motion for Summary Judgment.

3.      I have personal knowledge of the matters described in this Affidavit.

**Plaintiffs' Deposition Transcripts**

4.      Attached as Exhibit 1 is a true and accurate copy of excerpts from the deposition transcript of William Trainor in the above-captioned action, conducted on July 24, 2006.

5.      Attached as Exhibit 2 is a true and accurate copy of excerpts from the deposition transcript of David Hinchliffe in the above-captioned action, conducted on July 27, 2006.

6.      Attached as Exhibit 3 is a true and accurate copy of excerpts from the deposition transcript of Michael Hubert in the above-captioned action, conducted on July 26, 2006.

## Orders of the Court

7.      Attached as Exhibit 4 is a true and accurate copy of the Court's Memorandum of Decision dated March 20, 2006, granting in part and denying in part Defendants' motions to dismiss, Docket No. 38.

8.      Attached as Exhibit 5 is a true and accurate copy of the Court's Memorandum of Decision dated March 20, 2007, denying Plaintiffs' motion for class certification, Docket No. 92.

## Plan Documents

9.      Attached as Exhibit 6 is a true and accurate copy of the Medical Information Technology, Inc. Profit Sharing Plan, Amended and Restates Trust Agreement (As of January 1, 1998), together with its amendments through December 2005, DEF000084-DEF000155.

10.     Attached as Exhibit 7 is a true and accurate copy of the Summary Plan Description of the Medical Information Technology, Inc. Profit Sharing Plan As amended through August 1, 1983, HUB 052.

11.     Attached as Exhibit 8 is a true and accurate copy of the Summary Plan Description of the Medical Information Technology, Inc. Profit Sharing Plan dated January 1, 1998, HUB 081.

## Meditech Public Filings

12.     Attached as Exhibit 9 is a true and accurate copy of the Medical Information Technology, Inc. Form 10-K for the year ended December 31, 2007.

13.     Attached as Exhibit 10 is a true and accurate copy of the Medical Information Technology, Inc. Form 10-K for the year ended December 31, 1997, DEF003619.

**Pleadings and Affidavits**

14.     Attached as Exhibit 11 is a true and accurate copy of Plaintiffs' Supplemental Responses to Defendants' Second Set of Interrogatories, dated December 27, 2007.

15.     Attached as Exhibit 12 is a true and accurate copy of the Affidavit of A. Neil Pappalardo dated September 15, 2006, previously submitted at Docket No. 68.

16.     Attached as Exhibit 13 is a true and accurate copy of the Affidavit of Barbara A. Manzolillo, dated September 15, 2006, previously submitted at Docket No. 67.

**Plaintiffs' Statements of Stock Ownership**

17.     Attached as Exhibit 14 is a true and accurate copy of the Statement of Stock Ownership of David W. Hinchliffe, marked as Exhibit 11 at Hinchliffe's deposition in this matter.

18.     Attached as Exhibit 15 is a true and accurate copy of the Statement of Stock Ownership of William G. Trainor, marked as Exhibit 4 at Trainor's deposition in this matter.

19.     Attached as Exhibit 16 is a true and accurate copy of the Statement of Stock Ownership of Michael Hubert, marked as Exhibit 16 at Hubert's deposition in this matter.

**Correspondence Between Meditech and Plaintiffs**

20.     Attached as Exhibit 17 is a true and accurate copy of a January30, 1998 Compensation Letter and a January 1998 Year End Financial/ Bonus Package, DEF001396-DEF001405.

21.     Attached as Exhibit 18 is a true and accurate copy of a letter from Meditech to David Hinchliffe dated January 30, 1998, DEF 001341.

22.     Attached as Exhibit 19 is a true and accurate copy of the Meditech Profit Sharing Trust Financial Report for 1997, HUB 079.

23.    Attached as Exhibit 20 is a true and accurate copy of a letter from Meditech to William Trainor dated April 15, 1998, DEF001047, redacted only to remove Plaintiff's social security number.

24.    Attached as Exhibit 21 is a true and accurate copy of a form and check sent by the Trust to William Trainor dated May 28, 1998, DEF001045, redacted only to remove Plaintiff's social security number.

25.    Attached as Exhibit 22 is a true and accurate copy of a letter sent from Meditech to David Hinchliffe dated April 15, 1998, DEF001053, redacted only to remove Plaintiff's social security number.

26.    Attached as Exhibit 23 is a true and accurate copy of a form and check sent by the Trust to David Hinchliffe dated May 28, 1998, DEF001051, redacted only to remove Plaintiff's social security number.

27.    Attached as Exhibit 24 is a true and accurate copy of a letter sent from Meditech to Michael Hubert dated August 11, 2004, DEF001041, redacted only to remove Plaintiff's social security number.

28.    Attached as Exhibit 25 is a true and accurate copy of a form and check sent by the Trust to Michael Hubert dated September 16, 2004, DEF001040, redacted only to remove Plaintiff's social security number.

29.    Attached as Exhibit 26 is a true and accurate copy of a letter sent from Meditech to Michael Hubert, dated July 26, 2004, HU PF 000015.

30.    Attached as Exhibit 27 is a true and accurate copy of a letter sent by Michael Hubert to Meditech dated September 7, 2004, DEF 011911.

## Documents Maintained by Hubert

31.    Attached as Exhibit 28 is a true and accurate copy of a document entitled Meditech Financial History, as printed on April 21, 1998, HUB 475.

32.    Attached as Exhibit 29 is a true and accurate copy of a document entitled Fortune 5 Hundred Ranked by Performance, from *Fortune April 27, 1998*, as produced by Plaintiffs in this action, HUB 489.

33.    Attached as Exhibit 30 is a true and accurate copy of a *Forbes* article entitled Turning employees into shareholders, printed on April 21, 1998, as produced by Plaintiffs in this action, HUB 503.

34.    Attached as Exhibit 31 is a true and accurate copy of a document produced by Plaintiffs in this litigation, HUB 490.

35.    Attached as Exhibit 32 is a true and accurate copy of a document entitled "SAIC Stock Value from Formula – Form 8-K, April 1998," as produced by Plaintiffs in this litigation, HUB 507.

## Expert Disclosures

36.    Attached as Exhibit 33 is a true and accurate copy of a putative expert report written by Daniel Van Vleet dated February 19, 2008, as disclosed by Plaintiffs in this action.

37.    Attached as Exhibit 34 is a true and accurate copy of the Expert Report of Rick S. Nathan and Christopher C. Barry dated April 7, 2008, as disclosed by Defendants in this action.

## Other Documents

38.    Attached as Exhibit 35 is a true and accurate copy of an email sent by Michael Hubert on February 18, 2002, marked as Exhibit 3 at Hubert's deposition in this action.

39.    Attached as Exhibit 36 is a true and accurate copy of a Schedule 13D filed with the SEC on February 27, 2002, by Jerome Grossman, marked as Exhibit 30 at a 30(b)(6) deposition of Meditech and the Plan in this action.

40.    Attached as Exhibit 37 is a true and accurate copy of an email sent to me by Michael Collora, counsel for Plaintiffs, on April 4, 2008.

41.    Attached as Exhibit 38 is a true and accurate copy of a document entitled Profit Sharing Trust:  Philosophies, January 24, 1996, DEF001251.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 18, 2008.


/s/  Kevin P. Martin
Kevin P. Martin

**CERTIFICATE OF SERVICE**

     I, Stephen D. Poss, hereby certify that I caused a true copy of the above document to be served upon the counsel of record for each other party via this Court's ECF System on April 18, 2008.

                                 /s/  Stephen D. Poss_____
                                 Stephen D. Poss

# EXHIBIT 1

ORIGINAL

1

Volume 1, Pages 1-112, Exhibits: 1-8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL P. HUBERT, WILLIAM

TRAINOR, and DAVID HINCHLIFFE,

individually and on behalf of all

persons similarly situated et al.,

Plaintiffs

vs.                    Docket No. 05-10269-RWZ

MEDICAL INFORMATION TECHNOLOGY

PROFIT SHARING PLAN, MEDICAL

INFORMATION TECHNOLOGY, INC., and

A. NEIL PAPPALARDO

Defendants

VIDEOTAPED DEPOSITION OF WILLIAM TRAINOR

Monday, July 24, 2006, 10:08 a.m.

Goodwin Procter LLP

53 State Street - 17th Floor

Boston, Massachusetts

- - - - - - -Reporter:  Alan H. Brock -- RDR, CRR- - - - - - -

Farmer Arsenault Brock LLC, 50 Congress Street,

Suite 415, Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

2

1  APPEARANCES:

2      Dwyer & Collora, LLP

3      Sara E. Noonan, Esq.

4      600 Atlantic Avenue

5      Boston, Massachusetts 02210-2211

6      617.371.1000  fax: 617.371.1037

7      senoonan@dwyercollora.com

8      for Plaintiffs

9

10      Goodwin Procter LLP

11      Stephen D. Poss, Esq.

12      Kevin P. Martin, Esq.

13      Exchange Place

14      53 State Street

15      Boston, Massachusetts 02109

16      617.750.1000  fax: 617.523.1231

17      sposs@goodwinprocter.com

18      kmartin@goodwinprocter.com

19      for Defendants

20

21  ALSO PRESENT:

22      Adam Cook, Videograph, National Video Reporters

23

24

FARMER ARSENAULT BROCK LLC

56

| 11:22:43 | 1 | Q. Well, Mr. Trainor, you said in your last |
| 11:22:47 | 2 | answer, quote, "I don't think to this day anybody |
| 11:22:50 | 3 | knows how it's valued," period, close quote. |
| 11:22:53 | 4 | Setting aside yourself, you said you didn't think |
| 11:22:57 | 5 | anybody knows today how the stock is valued. What's |
| 11:22:59 | 6 | the basis for that? |
| 11:23:01 | 7 | A. There is no basis. |
| 11:23:04 | 8 | Q. Just something you said without any basis? |
| 11:23:06 | 9 | A. I just -- I don't know. I've never heard |
| 11:23:10 | 10 | of anybody that figured out how it was valued. |
| 11:23:12 | 11 | Q. Well, do you know what communications the |
| 11:23:14 | 12 | company has had with its employees about how the |
| 11:23:17 | 13 | stock is valued since you left the company? |
| 11:23:19 | 14 | A. No, no. I sold all of my stock back in |
| 11:23:24 | 15 | '98, so I haven't been to a stockholders' meeting in |
| 11:23:27 | 16 | eight years. So I have no idea what they tell them. |
| 11:23:34 | 17 | Q. So when you said that to this day you don't |
| 11:23:38 | 18 | think anybody knows how the stock is valued, that's |
| 11:23:40 | 19 | just something you said without having any basis; is |
| 11:23:43 | 20 | that correct? |
| 11:23:43 | 21 | A. I'm just saying, nobody ever called me and |
| 11:23:46 | 22 | said, "You know, we finally figured out how the |
| 11:23:48 | 23 | stock is valued." So I don't know. |
| 11:23:50 | 24 | Q. Mr. Trainor, you weren't speaking about |

57

| 11:23:52 | 1 | yourself.  You said you didn't think anybody knows. |
| 11:23:55 | 2 | Was there any basis for that statement? |
| 11:23:56 | 3 | MS. NOONAN:  Objection. |
| 11:23:57 | 4 | A.    No.   It was probably a bad choice of words. |
| 11:24:03 | 5 | Q.    Is there anything else at all you recall |
| 11:24:07 | 6 | about discussions you've had either with the other |
| 11:24:09 | 7 | plaintiffs in this case or with coworkers while you |
| 11:24:11 | 8 | were at MEDITECH or after you left MEDITECH in which |
| 11:24:15 | 9 | you would, as it says here, wonder how the |
| 11:24:18 | 10 | defendants and/or the dismissed defendants had |
| 11:24:21 | 11 | arrived at the assigned value? |
| 11:24:27 | 12 | A.    No. |
| 11:24:29 | 13 | Q.    Did you ever -- strike that.  When you were |
| 11:24:32 | 14 | employed at the company and having these |
| 11:24:34 | 15 | conversations in which you were wondering about the |
| 11:24:36 | 16 | value of the stock, did you think the stock was |
| 11:24:40 | 17 | valued too low? |
| 11:24:41 | 18 | A.    My only observation was that our |
| 11:24:47 | 19 | competitors' stock was higher, and I had thought we |
| 11:24:50 | 20 | were a better company.  And that led me to wonder |
| 11:24:53 | 21 | why our stock was lower than their stock. |
| 11:24:57 | 22 | Q.    When you say your competitors, which |
| 11:24:59 | 23 | competitors are you referring to? |
| 11:25:00 | 24 | A.    Oh, God.  Like I said, I've been out of the |

FARMER ARSENAULT BROCK LLC

58

| | | |
|---|---|---|
| 11:25:05 | 1 | company for eight years.  I'm not in work mode any |
| 11:25:09 | 2 | more.  I remember HBO.  I think one.  Competitors |
| 11:25:15 | 3 | was SMS, and I couldn't tell you what either one |
| 11:25:21 | 4 | stands for. |
| 11:25:25 | 5 | Q.   Do you remember a competitor called Cerner? |
| 11:25:28 | 6 | A.   Cerner. |
| 11:25:28 | 7 | Q.   Was that one that you thought of? |
| 11:25:30 | 8 | A.   Now that you say the name, yes, I remember |
| 11:25:32 | 9 | Cerner. |
| 11:25:32 | 10 | Q.   And was that one of the competitors that |
| 11:25:33 | 11 | you thought at the time that you were employed at |
| 11:25:38 | 12 | MEDITECH that its stock was valued more highly and |
| 11:25:41 | 13 | you wondered why MEDITECH's was not valued as much? |
| 11:25:44 | 14 | A.   I believe so.  I don't remember much about |
| 11:25:47 | 15 | working days any more.  Like I said, I can't even |
| 11:25:49 | 16 | remember most of the people's names any more. |
| 11:25:51 | 17 | Q.   When did you first notice or consider that, |
| 11:25:59 | 18 | as you've put it, that you observed that the stock |
| 11:26:01 | 19 | of MEDITECH's competitors was valued more highly? |
| 11:26:07 | 20 | A.   While I was working there. |
| 11:26:09 | 21 | Q.   So sometime before you left the company, in |
| 11:26:13 | 22 | 1998? |
| 11:26:14 | 23 | A.   Yes. |
| 11:26:14 | 24 | Q.   How long before you left? |

FARMER ARSENAULT BROCK LLC

59

| | | |
|---|---|---|
| 11:26:15 | 1 | A.    Oh, probably at least a couple of years. |
| 11:26:23 | 2 | Q.    So at least back into the 1996 time frame, |
| 11:26:26 | 3 | then. |
| 11:26:27 | 4 | A.    Yeah. |
| 11:26:32 | 5 | Q.    Did you do anything to investigate or look |
| 11:26:34 | 6 | into the valuation issue you've told me about, that |
| 11:26:40 | 7 | of the competitors being valued more highly? |
| 11:26:42 | 8 | A.    No. |
| 11:26:43 | 9 | Q.    Did you ever ask anyone in MEDITECH |
| 11:26:50 | 10 | management how the company or the trust valued |
| 11:27:06 | 11 | MEDITECH stock? |
| 11:27:07 | 12 | A.    No. |
| 11:27:32 | 13 | Q.    Do you have any expertise, Mr. Trainor, in |
| 11:27:35 | 14 | how stock of companies is to be valued? |
| 11:27:38 | 15 | A.    No. |
| 11:27:49 | 16 | (Mr. Martin left the deposition room.) |
| 11:28:04 | 17 | Q.    I'd like to direct your attention to Page 9 |
| 11:28:12 | 18 | of Exhibit 3, Mr. Trainor.  At the top of the page |
| 11:28:28 | 19 | there's a little paragraph -- a paragraph with a |
| 11:28:32 | 20 | little letter (g) in front of it.  Do you see that? |
| 11:28:34 | 21 | A.    Yes. |
| 11:28:34 | 22 | Q.    It says, quote, "In addition to the annual |
| 11:28:37 | 23 | communications reflected in the defendants' document |
| 11:28:40 | 24 | production, the plaintiffs had numerous |

FARMER ARSENAULT BROCK LLC

60

| | | |
|---|---|---|
| 11:28:44 | 1 | conversations during the years they were employed at |
| 11:28:46 | 2 | MEDITECH about the contribution of stock by MEDITECH |
| 11:28:50 | 3 | to the trust and/or the sale of MEDITECH stock by |
| 11:28:54 | 4 | MEDITECH to MEDITECH employees." |
| 11:28:58 | 5 | A.    Uh-huh. |
| 11:28:59 | 6 | Q.    "Mr. Hinchliffe and Mr. Trainor do not |
| 11:29:01 | 7 | recall the details of any such conversations," |
| 11:29:03 | 8 | period, close quote.  Do you see that? |
| 11:29:05 | 9 | A.    Yes. |
| 11:29:06 | 10 | Q.    What conversations did you have when you |
| 11:29:13 | 11 | were employed at MEDITECH about the contribution of |
| 11:29:16 | 12 | stock by MEDITECH to the trust? |
| 11:29:17 | 13 | A.    I don't really remember any conversations. |
| 11:29:25 | 14 | I'm sure we had them, but details I don't remember. |
| 11:29:28 | 15 | Q.    Why are you sure you had them? |
| 11:29:30 | 16 | A.    Because we talked about the stock over the |
| 11:29:32 | 17 | years and wondered how, you know, it got its value |
| 11:29:37 | 18 | and all.  But again, that was during, you know, when |
| 11:29:40 | 19 | we had like stockholders' meetings or something that |
| 11:29:43 | 20 | would be stock-related.  It wasn't something that |
| 11:29:50 | 21 | would come up every day. |
| 11:29:51 | 22 | Q.    Do you remember any conversations you had |
| 11:29:53 | 23 | when you were employed at MEDITECH about the |
| 11:29:55 | 24 | contribution of stock by MEDITECH to the trust? |

FARMER ARSENAULT BROCK LLC

79

| 11:59:56 | 1 | A.   Yes. |
| 11:59:56 | 2 | Q.   At the time you received this payment, did |
| 12:00:16 | 3 | you understand how the value of your account balance |
| 12:00:21 | 4 | as of 12/31/97 was calculated? |
| 12:00:26 | 5 | A.   No. |
| 12:00:27 | 6 | Q.   Did you ask anyone? |
| 12:00:28 | 7 | A.   No. |
| 12:00:30 | 8 | Q.   Did you understand at the time you received |
| 12:00:34 | 9 | this distribution upon leaving the company from the |
| 12:00:39 | 10 | trust what value had been assigned to MEDITECH's |
| 12:00:45 | 11 | stock by the trustee of the profit sharing trust as |
| 12:00:47 | 12 | of December 31, 1997? |
| 12:00:50 | 13 | A.   No. |
| 12:00:54 | 14 | Q.   Did you ask anyone? |
| 12:00:55 | 15 | A.   No. |
| 12:00:55 | 16 | Q.   Did you believe at the time you received |
| 12:01:00 | 17 | this $929,943.41 distribution that the distribution |
| 12:01:07 | 18 | was too low? |
| 12:01:09 | 19 | A.   I had no way of knowing. |
| 12:01:11 | 20 | Q.   Did you believe it was too low? |
| 12:01:19 | 21 | A.   I believed it was what was due to me. |
| 12:01:21 | 22 | Q.   Did you believe at that time that you were |
| 12:01:26 | 23 | owed more by the trust than what you were paid? |
| 12:01:31 | 24 | A.   I only knew what the value of the stock was |

FARMER ARSENAULT BROCK LLC

80

| | | |
|---|---|---|
| 12:01:34 | 1 | at that time, and each January, when we got our |
| 12:01:38 | 2 | bonus, they had our trust fund amount on that paper, |
| 12:01:43 | 3 | and I knew that value was consistent with what |
| 12:01:47 | 4 | January's paper said was my portion of the trust. |
| 12:01:50 | 5 | Q.    Did you think that that value for the stock |
| 12:01:53 | 6 | at that time was too low? |
| 12:01:55 | 7 | A.    I didn't think anything about it. |
| 12:01:56 | 8 | Q.    Did you ever file a claim or complaint |
| 12:02:04 | 9 | about this distribution from the trust? |
| 12:02:06 | 10 | A.    No. |
| 12:02:07 | 11 | Q.    Did you ever tell the trustee of the trust |
| 12:02:10 | 12 | that you thought you should be receiving more from |
| 12:02:12 | 13 | the trust than what you got? |
| 12:02:14 | 14 | A.    No. |
| 12:02:14 | 15 | Q.    Do you know who the trustee of the trust |
| 12:02:16 | 16 | was? |
| 12:02:17 | 17 | A.    Yes. |
| 12:02:17 | 18 | Q.    Who was that? |
| 12:02:18 | 19 | A.    Neil Pappalardo. |
| 12:02:24 | 20 | Q.    Did you ever tell anyone at the company at |
| 12:02:27 | 21 | the time that you received this payment or |
| 12:02:29 | 22 | thereafter that you thought you should have received |
| 12:02:31 | 23 | more from the trust? |
| 12:02:32 | 24 | A.    No. |

FARMER ARSENAULT BROCK LLC

81

| | | |
|---|---|---|
| 12:02:33 | 1 | Q.   By the way, this $929,943.41 that you |
| 12:02:43 | 2 | received when you left MEDITECH from the trust, did |
| 12:02:48 | 3 | you pay anything for that to the trust? |
| 12:02:53 | 4 | A.   Did I pay anything? |
| 12:02:55 | 5 | Q.   Yes. |
| 12:02:56 | 6 | A.   I don't understand. |
| 12:02:58 | 7 | Q.   Did you invest any money -- |
| 12:03:00 | 8 | A.   Oh, no. |
| 12:03:01 | 9 | Q.   -- in the trust? |
| 12:03:03 | 10 | A.   No. |
| 12:03:03 | 11 | Q.   So you personally did not invest any money |
| 12:03:06 | 12 | in you getting $929,000 from the trust. |
| 12:03:09 | 13 | A.   No. |
| 12:03:10 | 14 | Q.   That came from contributions the company |
| 12:03:17 | 15 | made to the trust; is that correct? |
| 12:03:18 | 16 | A.   Yes. |
| 12:04:01 | 17 | (Discussion off the record.) |
| 12:04:21 | 18 | Q.   Did Mr. Pappalardo ever hold meetings at |
| 12:04:23 | 19 | the company to discuss MEDITECH stock? |
| 12:04:30 | 20 | A.   It was the annual stockholders meeting. |
| 12:04:33 | 21 | Q.   Aside from the annual stockholders meeting, |
| 12:04:35 | 22 | did Mr. Pappalardo ever invite employees of MEDITECH |
| 12:04:39 | 23 | to come to a meeting to learn about MEDITECH stock? |
| 12:04:42 | 24 | A.   No. |

FARMER ARSENAULT BROCK LLC

83

| 12:06:33 | 1 | A.    Yes. |

12:06:33  1     A.    Yes.

12:06:33  2     Q.    Did the letter also that you received each

12:06:35  3  year telling you how many shares you could buy and

12:06:37  4  at what price invite you to a meeting to discuss the

12:06:40  5  implications of purchasing stock in MEDITECH?

12:06:42  6     A.    I don't really remember going to any

12:06:49  7  meetings, no, other than the stockholders meeting.

12:06:51  8     Q.    I didn't ask you whether you went to a

12:06:53  9  meeting.  I asked whether you were invited to a

12:06:55  10  meeting.

12:06:55  11     A.    No, I don't remember that.

12:07:07  12          MR. POSS:  I ask the reporter to mark as

12:07:09  13  the next exhibit, No. 6, I believe, a document

12:07:15  14  stamped HUB 402.

12:07:18  15          (Exhibit Trainor 6 marked for

12:07:45  16  identification.)

12:07:45  17     Q.    Now, Mr. Trainor, what I've shown you is a

12:07:49  18  letter addressed to Michael Hubert.

12:07:51  19     A.    Yes.

12:07:51  20     Q.    Not to you.

12:07:52  21     A.    Yes.

12:07:52  22     Q.    But I'm showing it to you to see if you

12:07:57  23  recall --

12:07:58  24     A.    This looks very familiar.

FARMER ARSENAULT BROCK LLC

84

12:07:59   1      Q.    Is this the type of letter you got each

12:08:01   2   year?

12:08:01   3      A.    Yes, I believe so.   It looks very, very,

12:08:03   4   very familiar.

12:08:03   5      Q.    In the third paragraph of this letter it

12:08:05   6   says, quote, "In conjunction with this, there will

12:08:10   7   be a meeting in the boardroom in Westwood on Monday,

12:08:14   8   February 4, 1991 at 3 p.m. to discuss the

12:08:18   9   implications of purchasing stock in MEDITECH."

12:08:21  10      A.    Yes.

12:08:21  11      Q.    "This meeting is especially intended for

12:08:23  12   those who are considering becoming a shareholder for

12:08:27  13   the first time," period, close quote.

12:08:31  14      A.    Yes.

12:08:31  15      Q.    Do you see that?

12:08:32  16      A.    Yes.

12:08:35  17      Q.    Did you receive an invitation to such a

12:08:37  18   meeting each year that you were told you were

12:08:39  19   eligible to buy stock?

12:08:42  20      A.    Yes, I believe, this is the letter that we

12:08:44  21   got.  It looks very, very familiar, especially where

12:08:47  22   it says, "For those who are considering becoming a

12:08:51  23   shareholder."  I think people maybe for the first

12:08:57  24   time went to this meeting.  I'm not sure I ever went

FARMER ARSENAULT BROCK LLC

85

| | | |
|---|---|---|
| 12:09:03 | 1 | to one of these meetings. |
| 12:09:04 | 2 | Q. Do you recall ever going to one of them? |
| 12:09:06 | 3 | A. I don't think I ever did. |
| 12:09:08 | 4 | Q. Now, you understood that all employees |
| 12:09:11 | 5 | were -- strike that. You understood that all |
| 12:09:13 | 6 | existing shareholders were welcome to attend these |
| 12:09:15 | 7 | meetings, did you not? |
| 12:09:16 | 8 | A. According to this letter, yes. |
| 12:09:18 | 9 | Q. So even those who weren't becoming a |
| 12:09:22 | 10 | shareholder for the first time could attend; is that |
| 12:09:24 | 11 | correct? |
| 12:09:24 | 12 | A. I believe if you had shares, yes, you could |
| 12:09:26 | 13 | go to this meeting. |
| 12:09:36 | 14 | MR. POSS: Let's take a break and change |
| 12:09:38 | 15 | the tape. Thank you. |
| 12:09:40 | 16 | THE VIDEOGRAPHER: The time is 12:09 |
| 12:09:42 | 17 | p.m. This is the end of Cassette No. 1, and we are |
| 12:09:44 | 18 | off the record. |
| 12:14:19 | 19 | (Recess taken.) |
| 12:14:19 | 20 | THE VIDEOGRAPHER: The time is 12:14 |
| 12:14:21 | 21 | p.m. this is the beginning of Cassette No. 2 in the |
| 12:14:24 | 22 | deposition of William Trainor. We are on the |
| 12:14:26 | 23 | record. |
| 12:14:34 | 24 | MR. POSS: I would ask the court |

FARMER ARSENAULT BROCK LLC

86

| | |
|---|---|
| 12:14:35 | 1 |
| 12:14:38 | 2 |
| 12:14:47 | 3 |
| 12:15:13 | 4 |
| 12:15:13 | 5 |
| 12:15:15 | 6 |
| 12:15:19 | 7 |
| 12:15:27 | 8 |
| 12:15:34 | 9 |
| 12:15:37 | 10 |
| 12:15:38 | 11 |
| 12:15:46 | 12 |
| 12:15:56 | 13 |
| 12:16:01 | 14 |
| 12:16:02 | 15 |
| 12:16:05 | 16 |
| 12:16:09 | 17 |
| 12:16:15 | 18 |
| 12:16:19 | 19 |
| 12:16:19 | 20 |
| 12:16:23 | 21 |
| 12:16:26 | 22 |
| 12:16:29 | 23 |
| 12:16:34 | 24 |

1  reporter to mark as the next exhibit, No. 7, I

2  believe, a document stamped HUB 390.

3           (Exhibit Trainor 7 marked for

4  identification.)

5      Q.   Mr. Trainor, if you look at Exhibit No. 7

6  to your deposition, this is a document produced to

7  us by Mr. Hubert, not from you.  But I would ask you

8  whether you received in 1997 stock-purchase

9  instructions in this format from MEDITECH.

10     A.   No.

11     Q.   And what is your basis for that answer?

12     A.   This document isn't even ringing a bell.

13     Q.   Let's go back, then, to the one that did

14  ring a bell and look at No. 6.

15     A.   This one does.  This one I remember.

16     Q.   So let's look at Exhibit No. 6.  If you

17  look at Exhibit No. 6, in the fifth paragraph, it

18  says, quote --

19     A.   Yes.

20     Q.   -- "It is noted the company is closely held

21  and there is no public market for its shares and

22  thus there can be no absolute assurance of a future

23  resale."

24     A.   Yes.

90

| 12:20:42 | 1 | A.   You couldn't sell to anybody outside of the |
| 12:20:46 | 2 | company.  The company had first right of refusal, |
| 12:20:50 | 3 | and that was it. |
| 12:20:52 | 4 | Q.   But under the first right of refusal, if |
| 12:20:56 | 5 | you had found someone else to sell your stock to or |
| 12:20:59 | 6 | buy your stock from, the company would either have |
| 12:21:01 | 7 | to let the deal go forward or match the price; is |
| 12:21:04 | 8 | that correct? |
| 12:21:04 | 9 | A.   Yes. |
| 12:21:06 | 10 | (Mr. Martin returned to the deposition.) |
| 12:21:10 | 11 | Q.   So if you had wanted to purchase additional |
| 12:21:11 | 12 | shares of stock over and above what the company said |
| 12:21:13 | 13 | you could purchase from the company, you could have |
| 12:21:15 | 14 | gone to a fellow employee and said, "Hey, I'll buy |
| 12:21:18 | 15 | your stock from you.  At what price would you sell |
| 12:21:22 | 16 | it?"  Is that correct? |
| 12:21:22 | 17 | A.   It could have happened. |
| 12:21:23 | 18 | Q.   Nothing to prevent you from doing that, was |
| 12:21:25 | 19 | there? |
| 12:21:26 | 20 | A.   Not that I know of. |
| 12:21:26 | 21 | Q.   And you never did that, did you? |
| 12:21:28 | 22 | A.   No. |
| 12:21:29 | 23 | Q.   Did anyone ever offer to buy your stock |
| 12:21:35 | 24 | from you directly? |

FARMER ARSENAULT BROCK LLC

91

| | | |
|---|---|---|
| 12:21:38 | 1 | A.    No. |
| 12:22:27 | 2 | Q.    Have you ever seen a copy of the Medical |
| 12:22:31 | 3 | Information Technology, Inc. profit sharing plan? |
| 12:22:33 | 4 | A.    The only thing I've ever seen a copy of was |
| 12:22:38 | 5 | the summary of the plan. |
| 12:22:40 | 6 | Q.    You had a summary provided to you, I take |
| 12:22:42 | 7 | it? |
| 12:22:43 | 8 | A.    When I first joined the company, in '75. |
| 12:22:46 | 9 | Q.    And you also subsequently were provided |
| 12:22:50 | 10 | with later summaries, were you not? |
| 12:22:53 | 11 | A.    I don't believe so. |
| 12:23:03 | 12 | Q.    Did you ever ask for summaries of the plan |
| 12:23:05 | 13 | later on? |
| 12:23:05 | 14 | A.    No. |
| 12:23:07 | 15 | Q.    Now, are you certain that you never |
| 12:23:10 | 16 | received a subsequent summary of the MEDITECH profit |
| 12:23:22 | 17 | sharing plan? |
| 12:23:22 | 18 | A.    To my knowledge, I don't remember ever |
| 12:23:24 | 19 | seeing one, other than the one -- it was in the |
| 12:23:27 | 20 | first package I got from Curt Marble, because he was |
| 12:23:30 | 21 | my first boss.  And that's the only copy I ever had. |
| 12:23:34 | 22 | Q.    Is it possible you may have been given |
| 12:23:36 | 23 | updated versions of the plan description after you |
| 12:23:38 | 24 | began participating? |

FARMER ARSENAULT BROCK LLC

92

12:23:39  1      A.   I would have remembered that, I think.   I

12:23:43  2  don't think I ever got another copy.

12:23:44  3      Q.   You're not certain, though, are you?

12:24:04  4      A.   I'm not 100 percent certain.   I mean, I

12:24:07  5  could have got a copy sometime over the years, but

12:24:11  6  it would have been one or two at best, because I

12:24:13  7  don't even remember one.

12:24:14  8      Q.   Did you ever ask for an updated summary

12:24:18  9  plan description?

12:24:19  10      A.   No.

12:24:19  11      Q.   Did you ever ask to see the plan itself?

12:24:22  12      A.   No.

12:24:25  13      Q.   If someone said that from time to time

12:24:28  14  after you first began participating in the plan you

12:24:30  15  may have been given updated versions of the summary

12:24:33  16  plan description, would that person be lying?

12:24:36  17          MS. NOONAN:   Objection.   You can answer.

12:24:41  18      A.   Would they be lying?

12:24:43  19      Q.   Yes.

12:24:45  20      A.   Not necessarily.

12:24:47  21      Q.   So if someone said that from time to time

12:24:58  22  after you began participating in the plan you may

12:25:02  23  also have been given updated versions of the summary

12:25:05  24  plan description, that person might be telling the

FARMER ARSENAULT BROCK LLC

93

| | |
|---|---|
| 12:25:07 | 1 |
| 12:25:09 | 2 |
| 12:25:12 | 3 |
| 12:25:13 | 4 |
| 12:25:14 | 5 |
| 12:25:17 | 6 |
| 12:25:19 | 7 |
| 12:25:52 | 8 |
| 12:26:01 | 9 |
| 12:26:06 | 10 |
| 12:26:20 | 11 |
| 12:26:23 | 12 |
| 12:26:25 | 13 |
| 12:26:29 | 14 |
| 12:26:36 | 15 |
| 12:26:38 | 16 |
| 12:26:42 | 17 |
| 12:26:46 | 18 |
| 12:26:49 | 19 |
| 12:26:49 | 20 |
| 12:26:53 | 21 |
| 12:26:54 | 22 |
| 12:26:58 | 23 |
| 12:27:02 | 24 |

truth; is that correct?

        MS. NOONAN:  Objection.

    A.   They may be.

    Q.   And you don't know, do you?

    A.   I just don't remember ever getting another one.

    Q.   Mr. Trainor, if the trustee of the MEDITECH profit sharing plan had valued the stock in the plan at the amount he should have valued in 1998 and 1999, what would have happened to the trust's cash?

    A.   Well, for one thing, I don't know that he did or didn't value it at what it was worth.  That was only a question in my mind over the years, how it got valued.  I don't know what effect it would have on the trust at all.

    Q.   Is there some valuation point at which, if the trustee had paid people in the trust out in '98 and '99, the plan would have run out of cash?

    A.   No.

    Q.   Why do you say that?

    A.   It wasn't like the whole company was leaving on the same day.  I mean, if only a handful of people left, that's not going to break the trust or the company.  It wouldn't have affected the

FARMER ARSENAULT BROCK LLC

96

1  answers and asked to verify that that's what I said,

2  which it was.  And that's when I emailed it back and

3  sent the typewritten -- the signed page at the end

4  of it.

5      Q.    Anything else you'd like to add on that?

6      A.    No, that was it.

7      Q.    And how was your recollection refreshed

8  between the time you left for lunch and now?

9      A.    Well, that was a question I had had when I

10  asked to step out of the room earlier.  And I was

11  just thinking about it and thinking, trying to think

12  what the order was, where did I get the questions.

13  And it just finally came to me, the sequence of

14  events.

15          I just couldn't remember how I was asked

16  the questions, but the questions were something we

17  had talked about, and then the email was the

18  typewritten -- what I had responded to the

19  questions.

20      Q.    Thank you, Mr. Trainor.

21          Does Mr. Hubert still work at MEDITECH?

22      A.    No.

23      Q.    When did he leave MEDITECH?

24      A.    I don't know.

FARMER ARSENAULT BROCK LLC

97

| 01:26:27 | 1 | Q.   Why did Mr. Hubert leave MEDITECH? |

Q.   Why did Mr. Hubert leave MEDITECH?

A.   I don't know.

Q.   Did Mr. Hubert resign from MEDITECH?

A.   I don't -- we never spoke.  We never talked about it.  I just know he's not there.

Q.   Was Mr. Hubert fired from MEDITECH?

        MS. NOONAN:   Objection.

A.   I don't know.

Q.   Has Mr. Hubert ever provided you any information about the circumstances of his leaving MEDITECH?

A.   No.

Q.   Who are the defendants in this case?

A.   Mike Hubert, Dave Hinchliffe, and myself.

Q.   Those are the plaintiffs.  I'm asking who are the defendants?  Who are you suing, Mr. Trainor?

A.   The MEDITECH trust fund profit sharing plan.

Q.   Anyone else?

A.   I think that's it.

Q.   Now, you've said several times today that you loved MEDITECH.

A.   Uh-huh.

Q.   So why are you bringing this lawsuit?

FARMER ARSENAULT BROCK LLC

98

01:28:13  1              MS. NOONAN:   Objection.

01:28:19  2        A.   I don't think one has anything to do with

01:28:21  3   the other.

01:28:22  4        Q.   Why not?

01:28:27  5        A.   Well, I still believe it was a great

01:28:30  6   company when I worked there, with a great product.

01:28:32  7   The question that was presented to me about this

01:28:36  8   case was strictly about did I ever wonder if the

01:28:44  9   stock was undervalued, and my answer to that was

01:28:46  10  yes.  And my understanding is that's what this case

01:28:49  11  is all about, and only that.

01:28:52  12       Q.   And when you just said "did I ever wonder

01:29:04  13  if the stock" -- strike that.  When you just said

01:29:08  14  that the question that was presented to you about

01:29:10  15  this case was strictly did you ever wonder if the

01:29:13  16  stock was undervalued and your answer to that was

01:29:15  17  yes, I take it you did mean yes, you did wonder

01:29:19  18  whether it was undervalued; is that correct?

01:29:21  19       A.   Yes.

01:29:31  20       Q.   What obligations do you understand, if any,

01:29:42  21  that you have as a plaintiff in this case concerning

01:29:48  22  information that you learned from the defendants in

01:29:53  23  this case that is designated as confidential?

01:29:59  24       A.   You'll have to explain that one to me.  I'm

FARMER ARSENAULT BROCK LLC

99

01:30:01    1    not sure what you're asking me.

01:30:03    2        Q.    Mr. Trainor, do you understand that in the

01:30:06    3    course of this case you may be provided with

01:30:10    4    information from the defendants in this case about

01:30:17    5    MEDITECH's business, for example?

01:30:18    6        A.    Uh-huh.

01:30:26    7        Q.    Do you understand that you have any

01:30:28    8    obligations or restrictions or requirements as to

01:30:30    9    what you can do with what you learn from other

01:30:36    10   parties in this case?

01:30:37    11           MS. NOONAN:    Objection.    Go ahead.

01:30:42    12       A.    Morally, I understand, yeah.    I would not

01:30:47    13   divulge anything with anybody.    I don't talk to

01:30:52    14   anybody anyways, so....

01:30:56    15       Q.    What's the source -- well, strike that.    So

01:31:01    16   morally, you wouldn't disclose anything that you

01:31:03    17   learn in this case; is that correct?

01:31:04    18       A.    That's correct.    It's nobody else's

01:31:07    19   business.    Ethically, no, I would not pass on

01:31:11    20   anything.

01:31:12    21       Q.    Do you understand that you will have any

01:31:14    22   obligation in this case to maintain confidentiality

01:31:17    23   of information?

01:31:19    24           MS. NOONAN:    Objection.

100

01:31:22    1        A.    I don't know that, but morally, I wouldn't

01:31:25    2    do it.

01:31:45    3        Q.    Have you received any instructions from

01:31:46    4    your counsel on the treatment of confidential

01:31:48    5    information on this case?

01:31:50    6            MS. NOONAN:    Objection.

01:31:53    7        A.    I don't remember receiving anything like

01:31:55    8    that.

01:32:06    9            MR. POSS:    I ask the reporter to mark as

01:32:09   10    the next exhibit, No. 8, a document stamped HUB 079.

01:32:17   11            (Exhibit Trainor 8 marked for

01:32:38   12    identification.)

01:32:38   13        Q.    Mr. Trainor, have you ever seen this

01:32:41   14    document or a similar document?

01:32:43   15        A.    No.

01:32:48   16        Q.    Did you ever receive financial reports for

01:32:53   17    the MEDITECH profit sharing trust while you were

01:32:56   18    employed with the company?

01:32:57   19        A.    Yes.

01:33:01   20        Q.    And how did they differ from this report?

01:33:04   21        A.    Well, everything I've ever seen from the

01:33:06   22    company had that letterhead.    Anything that looks

01:33:11   23    like this, that doesn't have that, I've never seen.

01:33:17   24    This is all I've ever seen with that heading.    So

FARMER ARSENAULT BROCK LLC

101

01:33:22  1   this looks like stuff that I've never -- I've never

01:33:26  2   seen.

01:33:28  3       Q.    What information was provided to you in the

01:33:31  4   financial reports you received concerning the

01:33:33  5   MEDITECH profit sharing trust?

01:33:36  6       A.    I don't really remember.  I remember seeing

01:33:41  7   financial reports, I'm guessing at the stockholders

01:33:48  8   meeting.  I'm sure we got a package, as

01:33:52  9   stockholders, and I'm sure it had that information.

01:33:56  10      Q.    Did you get information each year about the

01:33:58  11  value of your interest in the profit sharing trust?

01:34:02  12      A.    Yes that was at bonus time.

01:34:05  13      Q.    Yes.  And was there attached to that a

01:34:07  14  financial report for the profit sharing trust?

01:34:09  15      A.    There could have been.  It's been so

01:34:24  16  long -- I'm not sure whether we got it during the

01:34:26  17  shareholders' meeting -- stockholders meeting or

01:34:30  18  during the bonus period, because I'm thinking

01:34:37  19  employees that just started wouldn't be in the trust

01:34:40  20  fund yet, so they may not receive that.

01:34:42  21           I'm not totally sure.  I could have.

01:34:47  22      Q.    You left MEDITECH in 1998, you've

01:35:19  23  testified.

01:35:21  24      A.    Yes.

FARMER ARSENAULT BROCK LLC

102

| | | |
|---|---|---|
| 01:35:24 | 1 | Q. Do you care what the proper value of |
| 01:35:27 | 2 | MEDITECH's stock was in 2001? |
| 01:35:31 | 3 | A. No. |
| 01:35:32 | 4 | Q. Would that affect you in any way? |
| 01:35:35 | 5 | A. No. |
| 01:35:35 | 6 | Q. What about 2000? |
| 01:35:48 | 7 | A. No. |
| 01:35:50 | 8 | Q. So I take it for any years after the last |
| 01:35:58 | 9 | year at which you worked at the company, the fair |
| 01:36:00 | 10 | value of MEDITECH's stock as set by the trustee is |
| 01:36:04 | 11 | not something that concerns you. |
| 01:36:06 | 12 | A. It didn't until I heard that Jerry |
| 01:36:11 | 13 | Grossman, who was a member of the board of |
| 01:36:12 | 14 | directors, was suing the company for what I |
| 01:36:18 | 15 | understand is he felt the stock was undervalued, and |
| 01:36:21 | 16 | I think that was the first time that I even thought |
| 01:36:23 | 17 | about it. |
| 01:36:24 | 18 | Q. Maybe my question wasn't clear. Let me try |
| 01:36:28 | 19 | and ask it again, because that wasn't what I was |
| 01:36:30 | 20 | asking. |
| 01:36:31 | 21 | A. Okay. |
| 01:36:38 | 22 | Q. You left MEDITECH in 1998, and you received |
| 01:36:40 | 23 | a payout from the trust in 1998 -- |
| 01:36:43 | 24 | A. Yes. |

FARMER ARSENAULT BROCK LLC

103

| 01:36:44 | 1 | Q.    -- based on the fair value as determined by |
| 01:36:47 | 2 | the trustee at the end of 1997; is that correct? |
| 01:36:50 | 3 | A.    Yes. |
| 01:36:54 | 4 | Q.    And that's what you're suing about, is it |
| 01:36:56 | 5 | not, that value? |
| 01:36:58 | 6 | A.    Yes. |
| 01:36:59 | 7 | Q.    Now does it matter to you what value the |
| 01:37:08 | 8 | trustee of the MEDITECH profit sharing plan assigned |
| 01:37:14 | 9 | to MEDITECH stock in years after you left the |
| 01:37:17 | 10 | company -- in other words, 2000, 2001, 2002, 2003? |
| 01:37:23 | 11 | Does that affect you in any way? |
| 01:37:24 | 12 | A.    No, not those years. |
| 01:37:25 | 13 | Q.    And that's because you had already been |
| 01:37:27 | 14 | paid out based on the '97 number; correct? |
| 01:37:29 | 15 | A.    Yes. |
| 01:37:31 | 16 | Q.    So do you care what the trustee did in |
| 01:37:34 | 17 | years after you left? |
| 01:37:37 | 18 | A.    I do once I had heard about the Jerry |
| 01:37:40 | 19 | Grossman case. |
| 01:37:43 | 20 | Q.    Again, is there any impact to you, based on |
| 01:37:50 | 21 | what number the trustee assigned for the value of |
| 01:37:53 | 22 | the MEDITECH stock in the trust in years after you |
| 01:37:58 | 23 | left the company?  Does it matter to you? |
| 01:38:05 | 24 | A.    Only in the last two years. |

FARMER ARSENAULT BROCK LLC

# EXHIBIT 2

ORIGINAL

1

Volume 1, Pages 1-62, Exhibits : 1-12

UNITED  STATES  DISTRICT  COURT

FOR THE DISTRICT  OF MASSACHUSETTS

MICHAEL  P. HUBERT , WILLIAM

TRAINOR , and DAVID HINCHLIFFE ,

individually  and on behalf of all

persons  similarly  situated , et

al.,

Plaintiffs

vs.                              Docket  No. 05-10269-RWZ

MEDICAL  INFORMATION  TECHNOLOGY

PROFIT  SHARING  PLAN , MEDICAL

INFORMATION  TECHNOLOGY , INC., and

A. NEIL  PAPPALARDO ,

Defendants

VIDEOTAPED  DEPOSITION  OF DAVID  W. HINCHLIFFE

Thursday , July 27, 2006 , 10:06 a.m.

Goodwin  Procter  LLP

53 State  Street  - 17th Floor

Boston , Massachusetts

-------Reporter :  Alan H. Brock , RDR , CRR-------

Farmer  Arsenault  Brock LLC, 50 Congress  Street ,

Suite 415 , Boston , Massachusetts   02109

617.728.4404   fax 617.728.4403

2

```
1   APPEARANCES :

2       Dwyer  &  Collora , LLP

3       Sara  E.  Noonan , Esq.

4       600  Atlantic   Avenue

5       Boston , Massachusetts   02210 -2211

6       617 .371 .1000   fax : 617 .371 .1037

7       senoonan @dwyercollora .com

8       for  Plaintiffs

9

10      Goodwin   Procter  LLP

11      Stephen   D.  Poss , Esq.

12      Michael   P.  Sugrue , Esq.

13      53  State  Street , Exchange   Place

14      Boston , Massachusetts   02109

15      617 .750 .1000   fax : 617 .523 .1231

16      sposs @goodwinprocter  .com

17      msugrue @goodwinprocter  .com

18      for  Defendants

19

20  ALSO  PRESENT :

21      Adam  Cook , Videographer , National  Video

22          Reporters

23

24
```

FARMER  ARSENAULT  BROCK  LLC

14

1    A.    He just discussed what he was doing and the

2    reasons why, and he discussed some of the research

3    that he had done. And we just talked about it.

4    Q.    Did you have one conversation with

10:20:24  5    Mr. Hubert on the possibility of joining the

6    litigation or more than one?

7    A.    I had one very long conversation. I've had

8    subsequent conversations with Mr. Hubert, but it was

9    after I already decided to join.

10:20:38  10    Q.    Going back to that one long conversation

11    you had with Mr. Hubert before you decided to join

12    the litigation: Do you recall anything you said to

13    Mr. Hubert in that conversation?

14    A.    Well, we just had a general discussion. I

10:20:54  15    don't know specifically what you're looking for.

16    Q.    I'm looking for your recollection of

17    everything you said to him in that conversation.

18    A.    Well, I probably said lots of things. I

19    was very interested to hear what he had to say about

10:21:10  20    the stock valuation, and we talked back and forth

21    about that.

22    Q.    Can you recall anything you said to

23    Mr. Hubert in that conversation?

24    A.    I -- I can't give you specifics. I mean,

FARMER ARSENAULT BROCK LLC

15

1    it was a long time ago, and we talked for a long

2    time. But, you know, I can assure you that we

3    talked about our feelings about the stock and

4    whether we thought it was low or high or whatever.

10:21:51    5    Q.    What feelings did you have about the stock

6    that you expressed to Mr. Hubert?

7    A.    I always felt that it was valued low. We

8    all did. Everybody in the company did. It's just,

9    you know, you couldn't do anything about it.

10:22:06    10    Q.    Now, when you say you always felt that the

11    stock was valued low, when did you first come to

12    have that belief?

13    A.    Well, first of all, I mean, none of us ever

14    knew how they decided to value the stock.

10:22:21    15    Q.    Well, that's not the question I asked you.

16    So when did you first come to the belief that the

17    stock was valued low? In other words, I'm trying to

18    put a time frame around your use of the word

19    "always."

10:22:36    20    A.    Well, I mean, it's always a general

21    feeling. There is never anything like, you know, I

22    feel this is so low I want to try to do anything

23    about it. It's just, you know, general office talk.

24    It goes back a while.

FARMER ARSENAULT BROCK LLC

16

1    Q.    Do you recall when you first came to

2    believe that MEDITECH stock was, in your words,

3    valued low?

4    A.    In what kind of way? I never got to the

10:23:12  5    point where I would think that I would want to try

6    to do something about it or thought I ever could do

7    something about it.

8    Q.    That's not the question I asked you,

9    Mr. Hinchliffe.

10:23:20  10    A.    As far as a very general answer, I don't

11    know. Sometime in the late '80s, early '90s; I

12    don't know, something like that.

13    Q.    So at some point in the late '80s, early

14    '90s, you came to believe that MEDITECH stock was

10:23:38  15    valued low; is that fair to say?

16    A.    I think that's stretching it a little bit.

17    Let's say it's fair to say that I began to wonder

18    about it, would be more accurate.

19    Q.    Mr. Hinchliffe, earlier in this deposition

10:23:49  20    you said that you had always believed that the stock

21    was valued low. During what period of time did you

22    work at MEDITECH?

23    A.    1975 through 1998.

24    Q.    So at some point between 1975 and 1998 you

17

1   came to believe that the stock was valued low; is

2   that correct?

3       A.   I came to question the value of the stock.

4       Q.   Well, when did you come to believe it was

10:24:21   5   valued low?

6       A.   Truly believe, so that I knew for sure?

7       Q.   No, just believe.

8       A.   Probably when I talked to Michael Hubert a

9   year and a half ago.

10:24:29  10       Q.   Well, you told me that when you were

11   speaking to Michael Hubert a year and a half ago you

12   had always believed that the stock was valued low.

13          MS. NOONAN:  Objection.  Steve, I think

14   there's a confusion between --

10:24:40  15          MR. POSS:  No, there isn't any

16   confusion -- don't coach the witness.  If you want

17   to object, say "objection."  But I'm trying to ask

18   him questions, and he's not answering them.

19          MS. NOONAN:  Steve, he's answering them

10:24:50  20   to the best of his ability.  You're quibbling.

21          MR. POSS:  Fine.  Then say "objection."

22   And I'm not quibbling, and that's not a proper

23   objection.

24       Q.   Mr. Hinchliffe, when did you come to

FARMER ARSENAULT BROCK LLC

18

1   believe  that  the  stock  was  valued  low?

2          MS. NOONAN :   Objection .

3      A.   You know , there's a huge difference  between

4   believing  the  stock  is  low  such  that  I  could  do

10:25:17   5   something  about  it  and  just  having  a  general  feeling

6   that , you  know , maybe  this  stock  should  be  valued

7   higher .

8      Q.   When  did  you  have  that  general  feeling ?

9      A.   And  I  answered  your  question , and  I  said

10:25:30   10   the  late  '80s  to  early  '90s.

11     Q.   So  in  the  late  '80s  to  early  '90s, you  had

12   a  convenient  feeling  that  the  stock  was  low  and

13   should  be  valued  higher ; is  that  correct ?

14     A.   Perhaps  should  be  valued  higher ; yes ,

10:25:41   15   that's  correct .

16     Q.   And  you  said  that  --  also  said  that

17   everyone  believed  it  was  low . What  was  the  basis

18   for  that  statement ?

19     A.   It's  just  based  on  conversations   with

10:25:52   20   people  here  and  there . Obviously , it  can't  be

21   everybody  in  the  company  because  I  haven't  spoken  to

22   everybody  in  the  company .

23     Q.   But  in  general , people  you  spoke  with  in

24   the  company  while  you  were  employed  at  MEDITECH

FARMER  ARSENAULT  BROCK  LLC

19

1   believed  that  the  stock  was  low; is  that  your

2   testimony ?

3        A.   They  questioned  the  value  of  the  stock .

4        Q.   When  you  say  they  questioned  the  value , do

10:26:17   5   you  mean  they  questioned  that  it  was  too  high  or

6   they  questioned  that  it  perhaps  might  be  valued  too

7   low?

8        A.   They  questioned  how  it  was  valued  and

9   whether  it  was  valued  properly .

10:26:29   10       Q.   And  was  it  your  sense  that , at  least  among

11   your  circle  of  acquaintances  when  you  were  employed

12   at  MEDITECH , that  the  people  you  knew  questioned

13   whether  the  stock  was  valued  too  low?

14            MS . NOONAN :   Objection .

10:26:48   15       A.   There  were  certainly  questions  about  how  it

16   was  valued , and  obviously , if  we  have  questions

17   about  its  value , we  think  it's  valued  too  low.

18       Q.   When  you  spoke  with  Mr. Hubert  about  the

19   possibility  of  joining  this  lawsuit  a  year  and  a

10:27:08   20   half  ago , did  you  tell  Mr. Hubert  you  believed  that

21   MEDITECH  stock  was  under valued ?

22       A.   I'm  sure  I  agreed  with  him  at  that  time .

23       Q.   And  when  you  say  you  agreed  with  him , does

24   that  mean  you  agreed  with  him  that  the  MEDITECH

20

1    stock was under valued ?

2        A.   He gave me some information  on research

3    that he had done , and after our conversation  I was

4    convinced  that , yeah , it was low .

10:27:41   5        Q.   What information   --

6        A.   But that 's the first time that I had some

7    fairly  conclusive  information  that would help me

8    make that decision .

9        Q.   What was the fairly conclusive  information

10:27:53   10   that Mr. Hubert  gave you in that phone call that

11   helped  you make that decision  that the stock was

12   under valued ?

13       A.   He just told me some research  that he did .

14   I don 't remember  the specific  terms , the specific

10:28:09   15   company  that he cited , or anything  like that .  But

16   it was something  that was quite  interesting .

17       Q.   Again , I want to focus on this fairly

18   conclusive  information  that you 've testified

19   Mr. Hubert  gave you in that phone call .  Did that

10:28:27   20   information  include  a comparison  of P/E or price /

21   earnings  ratios  of MEDITECH  to some other company  or

22   companies ?

23       A.   Yes .  It compared  earnings  of other

24   companies  and their  assets  and what their  stock was

21

1    versus what MEDITECH's was.

2        Q.    Was one of those companies Cerner?

3        A.    I don't remember any of the names that he

4    said.

10:28:58   5        Q.    But aside from not recalling the names, it

6    was a comparison of earnings, assets, and stock

7    values of other companies versus MEDITECH stock;

8    correct?

9        A.    That's my recollection; yes, sir.

10:29:14  10        Q.    And was that the information that you've

11   told me was fairly conclusive that helped you make

12   the decision that the stock was undervalued?

13       A.    That's correct.

14       Q.    What do you personally expect to get out of

10:29:38  15   this lawsuit if it's successful?

16       A.    Whatever the Court deems appropriate.

17       Q.    Well, do you expect to get money if the

18   case is successful?

19       A.    Obviously.

10:29:55  20       Q.    So the answer is yes?

21       A.    The answer is yes.

22       Q.    And how much money do you expect to get if

23   the case is successful?

24       A.    I have no idea.

22

1    Q.    Have you thought about it?

2    A.    I wouldn't be human if I didn't think about

3    it. Yes, but I don't have any idea. The Court will

4    decide that -- if any.

10:30:16    5    Q.    Did you discuss with Mr. Hubert how much

6    you might expect to win personally if this lawsuit

7    is successful?

8    A.    No. What we discussed is potentially what

9    the stock could have been valued at potentially at

10:30:31    10    that time. And that's a huge range, so it's

11    impossible to know. I don't know.

12    Q.    What did you discuss with Mr. Hubert as to

13    what potentially the stock would have been valued

14    at?

10:30:47    15    A.    Anywhere from a little bit more to five

16    times as much. Who knows? The courts will decide

17    that.

18    Q.    Well, you left the company in 1998; is that

19    correct?

10:30:54    20    A.    That's correct.

21    Q.    Is that the year that's relevant to you in

22    terms of how much money you would receive, if

23    anything?

24    A.    That would be correct.

FARMER ARSENAULT BROCK LLC

30

1    Interrogatories  .

2                    (Exhibit  Hinchliffe  2 marked  for

3    identification  .)

4        Q.   Mr. Hinchliffe , have  you  seen  Exhibit  No. 2

10:41:15  5    before ?

6        A.   Yes .

7        Q.   When  did  you  see  this ?

8        A.   The  completed  one , about  a week  ago .   I

9    believe  it was  the 17th, to be  exact .

10:41:32  10        Q.   Did  you  sign  these  interrogatory  answers ?

11        A.   Yes , I did .

12        Q.   And  did  you  review  the  interrogatory

13    answers  insofar  as  they  pertain  to you --

14        A.   Yes , I did .

10:41:46  15        Q.   Mr. Hinchliffe , I'm sorry , but you'll need

16    to wait  until  I finish  my questions  before

17    answering .

18                    Did  you  review  the  interrogatory  answers

19    insofar  as they  pertain  to you  to make  sure  they

10:41:57  20    were  true  and  correct  before  you  signed  this ?

21        A.   Yes , I did .

22        Q.   Was  there  anything  in the  interrogatory

23    answers  that  you  did  not  believe  to be  true  and

24    correct ?

FARMER  ARSENAULT  BROCK  LLC

31

1       A.    No.

2       Q.    You received an annual report each year

3    from the MEDITECH profit sharing plan while you were

4    employed at MEDITECH.

10:42:33    5       A.    That is correct.

6       Q.    And that told you the value of the trust's

7    assets each year; is that correct?

8       A.    That's correct.

9       Q.    And did you receive a communication as to

10:42:41    10    the value of your proportionate interest in the

11    trust assets each year that you were employed?

12       A.    Yes.

13            MR. POSS:  I'll ask the reporter to mark

14    as Exhibit No. 3 a document entitled Defendants'

10:43:47    15    First Set of Requests for Production of Documents

16    and Things.

17            (Exhibit Hinchliffe 3 marked for

18    identification.)

19       Q.    Have you seen Exhibit No. 3 before,

10:44:09    20    Mr. Hinchliffe?

21       A.    Yes, I have.

22       Q.    Did you search for documents that you had

23    that were responsive to the questions in this set of

24    document requests?

FARMER ARSENAULT BROCK LLC

32

1    A.    Yes.   I did a complete  search .

2    Q.    Did you provide  those  to  your  attorneys ?

3    A.    I provided  what I found , yes , sir .

4    Q.    Have  you  discussed  with  anyone  else  the

10:44:45    5    possibility  of them  becoming  a plaintiff  in  this

6    lawsuit ?

7    A.    No, I have  not .

8    Q.    Have  you  asked  anyone  to  become  a

9    plaintiff ?

10:44:51    10    A.    No, I have  not .

11    Q.    Have  you  discussed  with  anyone  other  than

12    Mr. Hubert  and  your  attorneys  the  question  of

13    whether  you  should  become  a plaintiff  in  this

14    lawsuit ?

10:45:00    15    A.    Whether  I should  become  a plaintiff ?

16    Q.    Yes , at  the  time  you  were  --

17    A.    No, other  than  my  wife .  My wife  and  I

18    obviously  talked  about  it .

19    Q.    Have  you  ever  looked  at  the  -- strike  that .

10:45:29    20    Have  you  ever  reviewed  the  Medical  Information

21    Technology , Inc . profit  sharing  plan  --

22    A.    The complete  plan ?

23    Q.    Yes .

24    A.    No, sir .

34

1          A.   I believe  there  was  a  range  there ,

2     depending  on -- this  was  some  reference  to  Cerner .

3     I don't  recall  the  exact  number .

4          Q.   Do  you  agree  that  the  value  of  MEDITECH 's

10:48:01   5     stock  in  2001  should  have  been  substantially   lower

6     than  its  value  in  1998 ?

7               MS . NOONAN :   Objection .

8          A.   I wasn't  with  the  company  in  2001 , so  I

9     don't  even  know  how  the  company  did  in  2001 .

10:48:15  10          Q.   Since  you  became  a  plaintiff  in  this  case ,

11     have  you  looked  at  any  information   about  how  the

12     company  has  done  since  you  left ?

13          A.   Just  what  was  provided  for  me .  Yes , I  have

14     looked  at  that .

10:48:30  15          Q.   Do  you  know  whether  MEDITECH  earned  more  or

16     less  in  2001  compared   to  1998 ?

17          A.   I don't  recall  that .  I just  know  when  I

18     was  there  each  subsequent   year  they  earned  more  than

19     the  previous  year .  My  understanding   is  they've

10:48:44  20     continued   to  maintain  profitability .

21          Q.   Does  the  amended  complaint  allege  that  the

22     value  of  MEDITECH 's  stock  should  have  been  lower  in

23     2001  than  it  should  have  been  in  1998 ?

24               MS . NOONAN :   Objection .

FARMER  ARSENAULT  BROCK  LLC

35

1       A.    I don't recall that.

2       Q.    Do you think it would be fair for someone

3  who left MEDITECH in 2001 or 2002 and took a

4  distribution at that time to receive a smaller

10:49:12   5  distribution from the trust based on a per-share

6  value lower than someone who left in 1998, the year

7  you left?

8              MS. NOONAN:  Objection.

9       A.    I mean, I'm not concerned, really, with

10:49:25  10  people that left in 2000.  I'm concerned with me.

11      Q.    While you were employed at MEDITECH, you

12  received a copy of a summary plan description of the

13  MEDITECH profit sharing plan; is that true?

14      A.    That is correct.

10:49:53  15      Q.    Did you read that summary plan description?

16      A.    Yes, sir.

17      Q.    How many different summary plan

18  descriptions did you receive when you were employed?

19      A.    I couldn't tell you.  I don't know.

10:50:14  20      Q.    More than one, I take it?

21      A.    I can't -- I don't know.  It could have

22  been; I don't know.

23              MR. POSS:  I ask the reporter to mark as

24  the next exhibit, which I believe is No. 4, a copy

36

1  of the amended class-action complaint in this

2  lawsuit.

3              (Exhibit Hinchliffe 4 marked for

4  identification.)

10:50:51  5      Q.   Have you seen this before, Mr. Hinchliffe?

6      A.   Yes.

7      Q.   And this is the amended class-action

8  complaint that is filed on behalf of you and others;

9  is that correct?

10:51:05  10     A.   That is correct.

11     Q.   Now, what I'd like to do, actually, is turn

12  to one of the exhibits that was provided with it.

13  So if you go -- if you flip through the complaint,

14  all the way to Page 23, and then after Page 23

10:51:26  15  you'll see something that says Exhibit A, or Tab A.

16     A.   Yes.

17     Q.   And then there's a document that says

18  Summary Plan Description.

19     A.   Yes.

10:51:37  20     Q.   Were you provided with this summary plan

21  description while you were employed at MEDITECH?

22     A.   Yes.

23     Q.   And you've testified -- strike that.

24              When you left the company and

FARMER ARSENAULT BROCK LLC

37

1    received -- strike that. When you left MEDITECH,

2    you received distribution of your interest in the

3    plan; is that correct?

4        A.   That's correct.

10:52:17    5        Q.   Did you file any claim in writing with the

6    plan trustee complaining about that distribution  or

7    stating that you believe what you received  was

8    incorrect?

9        A.   No, I did not.

10:52:29   10        Q.   While you were employed  at MEDITECH, did

11    you ever seek to examine at the plan administrator 's

12    office the plan documents, including  the plan

13    itself?

14        A.   No, I did not.

10:52:46   15        Q.   Did you ever seek while you were employed

16    at MEDITECH  to obtain  a copy of the plan?

17        A.   No, I did not.

18        Q.   Mr. Hinchliffe, if you'll look back earlier

19    in Exhibit No. 4 at the amended  complaint  itself,

10:53:49   20    and I ask you to turn to Page 14. Do you see a

21    heading in your complaint  called 1998 Values?

22        A.   Yes, I do.

23        Q.   Now, if we skip down a few paragraphs  under

24    that heading, do you see Paragraph  69?

FARMER ARSENAULT BROCK LLC

38

1      A.    Yes.

2      Q.    Now, in Paragraph 69 there is language

3  which says -- and I will read it -- but it's part of

4  the second sentence of Paragraph 69 -- that says,

10:54:24  5  quote, "If employees were paid a fair price for

6  their assets in the plan, the plan would soon have

7  run out of cash" --

8             MS. NOONAN:  Objection.

9      Q.    -- period, close quote.  Do you see that?

10:54:36  10  A.    Yes, I see that.

11             MS. NOONAN:  Steve, I think you

12  transposed the "have" and "soon."

13             MR. POSS:  I'm sorry.  Let me read it

14  again if I've read it wrong.

10:54:47  15  Q.    Actually, I'm going to start from the

16  beginning of the paragraph.  Paragraph 69 reads,

17  quote, "In truth and fact, the plan trustee and

18  other defendants undervalued the shares of MEDITECH

19  in the plan so that participants who terminated

10:55:00  20  employment in 1998 and 1999 would not receive the

21  fair value of their assets in the plan.  In part,

22  this was done because, if employees were paid a fair

23  price for their assets in the plan, the plan would

24  have soon run out of cash," period, close quote.

43

1    Q.    Mr. Hinchliffe, if you'd flip through

2    Exhibit No. 7, and please tell me whether you've

3    seen these materials before.

4    A.    The first two pages, absolutely I remember.

11:04:06   5    The other ones just are not coming to memory. But I

6    can tell you that I got the money, so....

7    Q.    So you did receive the $1,123,639.39

8    reflected in this check made out to Vanguard

9    Fiduciary Trust Company, custodian of David A.

11:04:34  10    Hinchliffe IRA?

11    A.    Yes, I did, that is correct.

12    Q.    And if we look at the second page of this

13    exhibit, which is stamped DEF 1052, did you check

14    Option 1, trustee-to-trustee distribution?

11:04:52  15    A.    Yes. That's for the IRA rollover.

16    Q.    And did you fill out the information where

17    it says "IRA Vanguard Group, IRA rollover"?

18    A.    Yes.

19    Q.    Is that your handwriting?

11:05:06  20    A.    Yes, sir.

21    Q.    Is this your signature?

22    A.    Yes, sir.

23    Q.    And if we look at the third page of this

24    exhibit, stamped DEF 1053, were you informed by the

44

1    company before you selected Option 1 that you had

2    various options, including a trustee-to-trustee

3    distribution or the other options on this page?

4         A.    Yes.

11:05:26    5         Q.    When you were notified that there was a

6    contemplated distribution of your vested amount --

7    vested account balance of $1,101,907.57 plus

8    interest, did you complain or communicate to

9    MEDITECH or to the plan or to the trustee or to the

11:06:03    10    plan administrator that that amount was incorrect?

11         A.    No, I did not.

12              MR. POSS:  I'll ask the reporter to mark

13    as the next exhibit, No. 8, a document stamped HIPF

14    000005.

11:06:30    15              (Exhibit Hinchliffe 8 marked for

16    identification.)

17         Q.    Mr. Hinchliffe, is Exhibit No. 8 a copy of

18    a letter you wrote and sent to Mr. Neil Pappalardo

19    on or about June 30 of 1998?

11:06:59    20         A.    Yes.

21         Q.    Is that your signature?

22         A.    Yes, it is.

23         Q.    Thank you.

24              MR. POSS:  I'm going to ask the reporter

FARMER ARSENAULT BROCK LLC

45

1  to mark as the next exhibit, No. 9, a document

2  stamped HIPF 000006.

3          (Exhibit Hinchliffe 9 marked for

4  identification.)

11:07:50  5      Q.  Mr. Hinchliffe, is Exhibit No. 9 a copy of

6  a letter you prepared and sent to Ms. Barbara

7  Manzolillo at MEDITECH on or about June 30 of 1998?

8      A.  Yes.

9      Q.  Is that your signature on this letter?

11:08:05  10     A.  Yes, it is.

11              MR. POSS:  I ask the reporter to mark as

12  the next exhibit, No. 10, a document stamped HIPF

13  000016.

14          (Exhibit Hinchliffe 10 marked for

11:08:53  15  identification.)

16      Q.  Mr. Hinchliffe, is -- let me start that

17  over again.  Mr. Hinchliffe, is Exhibit No. 10 a

18  copy of an employment agreement you signed with

19  MEDITECH in 1995?

11:09:06  20     A.  It sure appears to be.  I'd like to read

21  it.

22      Q.  Take your time and read it.

23      A.  Yes, and I did sign it.

24      Q.  When you were employed at MEDITECH, did you

FARMER ARSENAULT BROCK LLC

51

1    A.    Yes.

2    Q.    Did you receive all of the documents  in

3    Exhibit No. 12 while you were employed  at MEDITECH?

4    A.    Yes.

11:19:51    5    Q.    If we look at the third page of this

6    exhibit -- and there's a little  number  at the bottom

7    right-hand corner  that says HIN 003.  Do you see

8    that?

9    A.    Yes, I do.

11:20:10    10    Q.    If you look at the -- strike that.   You've

11    testified  this is a document  you received  while you

12    were employed  at MEDITECH .  Do you see the third

13    paragraph  of this document , where it talks  about  a

14    meeting  to be held in the auditorium  to discuss  the

11:20:24    15    implications  of purchasing  stock  in MEDITECH ?

16    A.    Yes.

17    Q.    Did you attend  that meeting ?

18    A.    No.

19    Q.    Did you receive  invitations  or notices  of a

11:20:38    20    meeting  of this sort each year while you were

21    employed ?

22    A.    No.  This was a more recent  service  that

23    they had .  When we were first offered  stock , they

24    didn't have  this type of meeting .

52

1    Q.   But at least as early as February of 1994,

2    you received notice of such a meeting.

3    A.   Yes.

4    Q.   And were you aware that similar meetings

11:21:06  5    were held --

6            MS. NOONAN:  Objection.  Steve, this

7    document seems to be internally inconsistent.  It's

8    labeled 1995, and it's --

9            MR. POSS:  It's not internally

11:21:14  10   inconsistent.  If you knew anything about the facts,

11   you'd realize --- and if you'd read the document,

12   you'd realize it's perfectly consistent.

13           MS. NOONAN:  I'm looking down at the

14   second-to-last paragraph, which also refers to 1995.

11:21:32  15           MR. POSS:  If you're unfamiliar with the

16   documents, I can't help you.  But do you have an

17   objection?

18           MS. NOONAN:  Yeah.  My objection is that

19   it's not clear that this document is what you've

11:21:42  20   just purported it to be in your question.

21           MR. POSS:  Well, you've made your

22   objection.

23   Q.   Mr. Hinchliffe, why did you not attend the

24   meeting that you were invited to?

FARMER ARSENAULT BROCK LLC

53

1    A.   Because I already knew that it was mainly

2  for -- the meeting was mainly for new purchasers of

3  the stock.  People that have already purchased stock

4  already knew everything, knew what they were getting

11:22:17   5  into, knew what it was all about, and had no need to

6  attend the meeting.

7    Q.   But you knew you could attend if you

8  wanted; is that correct?

9    A.   Yes, sure.

11:22:23  10    Q.   And there was another, similar, meeting

11  held in '95 --

12    A.   Once they --

13    Q.   You need to wait until I'm done talking

14  Mr. Hinchliffe, before you start answering.  Let me

11:22:34  15  start my question over again.

16         Were there similar meetings held in '95

17  and '96 and 1997?

18         MS. NOONAN:   Objection.

19    A.   Yes, I assume there were.

11:22:44  20    Q.   And did you attend any of those?

21    A.   No.

22    Q.   You understood, however, that you were

23  entitled to attend those meetings as a shareholder

24  of the company if you wanted to; is that correct?

FARMER ARSENAULT BROCK LLC

54

1    A.   I believe so, but it was primarily geared
2    to new stock purchasers, and it was very clear. But
3    they certainly wouldn't throw me out of the meeting
4    if I attended.
5    Q.   Did you ever attend any of these meetings?
6    A.   No.
7    Q.   Now, if you look at the fifth paragraph of
8    this document, you'll see where it says, quote, "It
9    is noted that MEDITECH is a closely held private
10   company and there is no public market for its
11   shares. Thus, there can be no absolute assurance of
12   a future resale," period, close quote. Do you see
13   that sentence?
14   A.   Yes, I do.
15   Q.   Were you aware of that when you purchased
16   stock from MEDITECH?
17   A.   Yes.
18   Q.   And were you aware of that throughout your
19   period of employment at MEDITECH?
20   A.   Yes, I was.
21   Q.   Do you know why the company provided that
22   information to employees who were about to purchase
23   or had purchased stock in the company?
24   A.   I would presume so that they can make an

11:23:10  (line 5)
11:23:32  (line 10)
11:23:43  (line 15)
11:23:53  (line 20)

FARMER ARSENAULT BROCK LLC

55

1   informed  decision  before  they  spend  their  money  on

2   the  company 's  stock .

3       Q.   Now , if you  look  at  the  page  stamped  006 --

4           MS . NOONAN :   It  looks  like  this  document

11:24:55  5   is  internally  inconsistent .

6           MR . POSS :   I  don 't  need  your  comments  on

7   the  documents .   If  you  have  an  objection , make  an

8   objection .   If  you 're  going  to  comment  on  the

9   documents , then  you  can  leave  the  room  and  comment

11:25:04  10  somewhere  else .   Thank  you .

11          MS . NOONAN :   Can  we  go  off  the  record

12  for  a  moment , please ?

13          MR . POSS :   No , we  can 't .

14      Q.   Do  you  know , Mr . Hinchliffe , whether  --

11:25:12  15  strike  that .

16          Is  this  another  meeting  that  you

17  received  notice  of  to  discuss  implications  of  buying

18  stock  in  MEDITECH ?

19      A.   Yes .

11:25:24  20      Q.   If  we  turn  to  Page  008  of  this  exhibit ,

21  where  there 's  a  page  entitled  Medical  Information

22  Technology , Inc . Profit  Sharing  Plan  Financial

23  Report  for  Calendar  Year  1995 , do  you  recall

24  receiving  this  information ?

56

1    A.   Yes.

2    Q.   Did you receive this type of information   on

3    an annual basis when you were employed?

4    A.   Yes, sir.

11:25:59   5    Q.   And is the same true of the pages  stamped

6    009, 10, 11, and 12?

7    A.   Yes.

8    Q.   Did you ever attend the annual

9    shareholders ' meetings?

11:26:16   10    A.   Yes, sir.

11    Q.   Did you ever ask any questions  at those

12    meetings?

13    A.   No, sir.

14    Q.   When you received  the type of financial

11:26:28   15    information  that is in this exhibit , ten-year

16    historical  summary , showing  revenue , operating

17    income , and net profit , earnings  per share ,

18    dividends  paid per share , book value  per share , fair

19    value per share , the information  that's on these

11:26:50   20    documents , did you ever compare  that information   to

21    that of other  companies ?

22    A.   No, I did not.

23    Q.   Mr. Hinchliffe , did there  come a time  when

24    you became  aware that Dr. Jerome Grossman  had sued

57

1    MEDITECH ?

2        A.    Yes.

3        Q.    Did you communicate at any time with Dr.

4    Grossman concerning that lawsuit ?

11:28:24    5        A.    No.

6        Q.    Did Mr. -- strike that. Did you ever learn

7    that Mr. Hubert had sent a written proposal to Dr.

8    Grossman in which Mr. Hubert would provide MEDITECH

9    information that he thought would be helpful to

11:28:51    10    Dr. Grossman and Dr. Grossman would pay Mr. Hubert

11    money upon signing of an agreement ?

12            MS. NOONAN :    Objection .

13        A.    No, I wasn't aware of that at all.

14        Q.    Have you ever seen such a document ?

11:29:04    15        A.    No.

16        Q.    Have you ever seen any correspondence

17    between Mr. Hubert and Dr. Grossman ?

18        A.    No, I have not.

19        Q.    Have you ever -- Mr. Hinchliffe , have you

11:29:51    20    ever reviewed any of MEDITECH 's filings with the

21    Securities and Exchange Commission ?

22        A.    No, I have not.

23        Q.    Did you ever become aware that MEDITECH

24    files forms each year with the SEC?

FARMER ARSENAULT BROCK LLC

# EXHIBIT 3

ORIGINAL

1

Volume 1, Pages 1-240, Exhibits: 1-35

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL P. HUBERT, et al.,

                    Plaintiffs

vs.                              Docket No. 05-10269-RWZ

MEDICAL INFORMATION TECHNOLOGY

PROFIT SHARING PLAN, MEDICAL

INFORMATION TECHNOLOGY, INC., and

A. NEIL PAPPALARDO

                    Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF MICHAEL P. HUBERT

Wednesday, July 26, 2006, 10:11 a.m.

Goodwin Procter LLP

53 State Street - 17th Floor

Boston, Massachusetts

- - - - - - -Reporter:  Alan H. Brock, RDR, CRR- - - - - - -

abrock@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

2

1    APPEARANCES:

2        Dwyer & Collora, LLP

3        Michael A. Collora, Esq.

4        600 Atlantic Avenue

5        Boston, Massachusetts 02210-2211

6        617.371.1000   fax: 617.371.1037

7        mcollora@dwyercollora.com

8        for Plaintiffs

9

10       Goodwin Procter LLP

11       Stephen D. Poss, Esq.

12       Michael P. Sugrue, Esq.

13       53   State Street, Exchange Place

14       Boston, Massachusetts 02109

15       617.750.1000   fax: 617.523.1231

16       sposs@goodwinprocter.com

17       msugrue@goodwinprocter.com

18       for Defendants

19

20   ALSO PRESENT:

21       Adam Cook, Videograph, National Video Reporters

22

23

24

28

1        MR. COLLORA:  I would like to point out

2    at this point we objected to some of the production,

3    in order to have the -- if you're going to go into

4    what he produced then as opposed to what he produced

10:46:48   5    now, you're going to have to incorporate our

6    objections both at the deposition and prior to.

7        Q.   Mr. Hubert, when you received and responded

8    to this subpoena last year and when you were deposed

9    in July, you never provided to us this notebook

10:47:17  10    that's produced --

11        A.   No, I did not.

12        Q.   -- that we've marked today as MH 1.  Why

13    not?

14        A.   At the time I had forgotten where this

10:47:26  15    document was or even what it included.  This is a

16    small document.  It's only a 16th of an inch thick.

17    It was in the bottom of a file case that I had.  I

18    hadn't made recent notation in this document.  And I

19    honestly didn't recall that it had any reference to

10:47:49  20    Dr. Grossman in it until more recently, when I was

21    going through it for purposes of complying with

22    documents for this deposition, that I realized that

23    this document mentioned Dr. Grossman in it.  The

24    document is largely about inquiries to the

29

1    Department of Labor, about contacting them and

2    different lawyers, and it was a surprise to me that

3    I realized that it mentioned Dr. Grossman in this

4    document.

10:48:24    5             MR. POSS:  I'd ask the court reporter to

6    mark as Exhibit MH 3 a two-page document.  It's

7    dated February 18, 2002.

8             (Exhibit MH 3 marked for

9    identification.)

10:48:55    10        Q.   Mr. Hubert, please take a look at Exhibit

11    MH 3 and tell me whether you have ever seen this

12    before.

13        A.   Well, I stand mistaken.

14             MR. COLLORA:  The question is have you

10:49:36    15   seen it before.

16        A.   I agree; yes, I have.

17        Q.   What is Exhibit MH 3?

18        A.   This is a document from more than four

19    years ago that I sent to some attorneys interested

10:49:57    20   in a case against a Massachusetts employer.

21        Q.   So let's look at this exhibit.  At the top

22    it says "from, ERISA," and then in brackets "mailed

23    to erisa@mediaone.net."  What does that mean?

24        A.   "From ERISA, mailed to...."

30

1           This is a document that --

2       Q.   It came from you, did it not?

3       A.   It did come from me.

4       Q.   And is erisa@mediaone.net an email address

5   you had set up?

6       A.   It was an email address I set up a long

7   time ago.

8       Q.   When did you set that email address up?

9       A.   I don't recall.  This is possibly the only

10  email that ever came out of that email address.

11      Q.   Did you set up that email address to enable

12  you to send emails without disclosing your identity?

13      A.   Yes.

14      Q.   Now, it says "sent Monday, February 18,

15  2002, 3:01 a.m."  Do you see that?

16      A.   Yes, I do.

17      Q.   Is that when you sent this email?

18      A.   Yes, apparently.

19      Q.   And do you know approximately how long

20  before February 18, 2002, you set up the

21  erisa@mediaone.net email address?

22      A.   No, I don't.

23      Q.   Do you have any records concerning setting

24  up that address?

91

```
 1        A.   Then I choose not to answer that question
 2   further.
 3        Q.   Is that based on your attorney's
 4   instruction?
 5        A.   Yes, it is.
 6        Q.   Mr. Hubert, the amended -- strike that.
 7             MR. POSS:   Mr. Hubert, we will mark as
 8   the next exhibit, which I believe is No. 9 -- am I
 9   correct there --
10             (Discussion off the record.)
11             MR. POSS:   We're going to mark a
12   document that has been produced by Mr. Hubert's
13   counsel.   It's stamped HUB 238 and 239.   This will
14   be Exhibit MH No. 9.
15             (Exhibit MH 9 marked for
16   identification.)
17        Q.   Mr. Hubert, have you seen Exhibit No. 9
18   before?
19        A.   Yes, I have.
20        Q.   What is Exhibit No. 9?
21        A.   It is a letter I wrote to Barbara
22   Manzolillo on September 7, 2004.
23        Q.   Did you write this letter, Mr. Hubert?
24        A.   Yes, I did.
```

Timestamps in left margin:
12:22:36 (line 5)
12:24:22 (line 10)
12:24:39 (line 15)
12:25:18 (line 20)

92

| | |
|---|---|
| 1 | Q.  Did you discuss this letter with anyone |
| 2 | before you sent it to Ms. Manzolillo? |
| 3 | A.  No, I did not. |
| 4 | Q.  Did you review this letter with Mr. Collora |
| 12:25:46    5 | before you sent it to Ms. Manzolillo? |
| 6 | A.  No, I did not. |
| 7 | Q.  Why not? |
| 8 | A.  I had been fired some, you know, seven days |
| 9 | prior to that or ten days prior to that, and I |
| 12:26:07   10 | wanted to get this out in a timely manner.  And I |
| 11 | didn't -- you know, I had to write the letter in |
| 12 | order to get my funds.  I couldn't delay the |
| 13 | process.  And I, you know, didn't know that this |
| 14 | would be a matter of discussion with Mr. Collora. |
| 12:26:31   15 | Q.  Mr. Collora was your lawyer as of this |
| 16 | time, was he not? |
| 17 | A.  Yes, he was. |
| 18 |      Well, we had not, again, signed papers |
| 19 | in that regards.  But yes. |
| 12:26:44   20 | Q.  After you were notified by MEDITECH that |
| 21 | your employment was being terminated -- |
| 22 | A.  Yes. |
| 23 | Q.  -- and before you sent this letter dated |
| 24 | September 7, 2004, did you have any communications |

FARMER ARSENAULT BROCK LLC

93

1  with Mr. Collora or anyone else at the Dwyer Collora

2  law firm concerning the subject of your termination?

3      A.   I don't recall.  I possibly did.  I was

4  troubled by this matter, but I don't that I

12:27:16  5  discussed this with him.  If it was not prior to

6  that letter date, it was soon thereafter.  It was

7  within the month of September I spoke to him.

8      Q.   So you're not sure whether you spoke to

9  Mr. Collora before or after the September 7 letter.

12:27:33  10         MR. COLLORA:  Before or after -- he

11  testified he didn't discuss it until September,

12  which would have been after.  I just don't want

13  you --

14         Could you rephrase the question?  Maybe

12:27:42  15  that would be the best way.

16         MR. POSS:  Yes.

17      Q.   On what date were you notified that your

18  employment was terminated?

19      A.   It was approximately August 28th.  You've

12:27:53  20  got the letters.

21      Q.   Between the date that you were notified

22  that your employment was terminated and September 7

23  of 2004, did you have any communications with

24  Mr. Collora or anyone else from his law firm

FARMER ARSENAULT BROCK LLC

121

1   to administration and asked about how the valuation

2   of the stock occurred.

3           Now, prior to that --

4           MR. COLLORA:  Prior to what?  Just so

02:01:12   5   you're --

6           THE WITNESS:  I'm sorry.

7       A.   Prior to partnering with SAIC, we used to

8   get every year a spreadsheet showing the company's

9   performance financially.  It would show the gross

02:01:24  10   sales, the profits.  It would show the fair market

11   value.  They used to call it fair market value.

12   They don't call it that nowadays.  They use some

13   other term.  But they used to also have the

14   price/earnings ratio every year provided on the

02:01:41  15   spreadsheet.  And every year the price/earnings

16   ratio for the stock was almost always right around

17   8.5.  Word of mouth was, well, they use that

18   price/earnings ratio to help set the value of the

19   stock.  It never came from the administration, and I

02:02:00  20   never questioned the administration about it, other

21   than that one time with Mr. Messing.

22       Q.   When did you first look at the SAIC formula

23   and plug in the MEDITECH numbers?

24       A.   I don't know.  I'd say '98, '99.  But I

122

1    don't know.

2        Q.    When did you first compare the price/

3    earnings ratio of MEDITECH to other companies?

4        A.    Oh, I don't know.  I'm going to say 20

02:02:48    5    years ago.

6                MR. POSS:  We'll ask the reporter to

7    mark as the next exhibit, No. 11, a document stamped

8    HUB 491 through 5026789.

9                (Exhibit MH 11 marked for

02:04:00    10    identification.)

11        Q.    Mr. Hubert, we've placed before you Exhibit

12    No. 11.  It's a document produced by you.  Can you

13    tell me what this exhibit is?

14        A.    This is a document that I printed out from

02:04:11    15    a Web page called fed.org.  It is a case study about

16    SAIC, and it talks a little bit about how they value

17    the stock.

18        Q.    And are these various notes -- are these

19    various notes on this document yours?

02:04:37    20        A.    Yes, they are.

21        Q.    If you look at the page stamped HUB 498.

22        A.    Yes.

23        Q.    There are some calculations kind of toward

24    the lower right third of the page.

123

1    A.    Yes.

2    Q.    Could you tell me what those refer to?

3    A.    These -- this is where I plugged in

4    MEDITECH's numbers.  I have to tell you now, there's

02:05:23    5    probably a mistake in here.  But this is where I

6    plugged in numbers from MEDITECH's financial

7    statement, apparently from December 31st, 2003, into

8    the SAIC formula, to see what the stock value would

9    be.

02:05:42    10    Q.    And you concluded that, using the SAIC

11    formula, that MEDITECH stock, using their formula,

12    would have been valued 32 percent higher than the

13    value MEDITECH was assigning to the stock; is that

14    correct?

02:05:56    15    A.    Well, not completely correct.  When I did

16    this, I made some mistakes.  And the mistake is that

17    the value that they wanted for MEDITECH's profits

18    was post-tax income -- I'm sorry, the formula

19    requires pretax income, and I was inserting post-tax

02:06:22    20    income probably at this time.  So that on some times

21    when I valuated SAIC and I got a result that was 32

22    percent higher than the rate set by MEDITECH as

23    shown here, I'd have to go back and look at the

24    figures, but there's a reasonable chance that that

129

1       private companies and talks about -- it's titled

2       Turning Employees Into Stakeholders.  It talks about

3       SAIC specifically.

4              Q.    And Exhibit No. 14 is a document that you

02:15:37   5    printed out on April 21, 1998; is that correct?

6              A.    Yes, it is.

7              Q.    Now, if we look at the page stamped HUB

8       504.

9              A.    Yes.

02:16:05   10          Q.    The bottom paragraph in that page starts,

11      quote, "The SAIC board sets its company's stock

12      price four times a year, using a formula based on

13      net income, shares outstanding, and a 'market

14      factor' monitored by investment bank Houlihan Lokey

02:16:26   15   Howard & Zukin."  We're continuing now at the top of

16      the page stamped HUB 505.  And it continues, quote,

17      "The market factor values the stock at a multiple

18      consistent with publicly traded peers, such as

19      Computer Sciences and Electronic Data Systems,"

02:16:44   20   close quote.  Do you see that?

21             A.    Yes, I did.

22             Q.    You've drawn a little bracket in the left

23      margin at some of that information; is that correct?

24             A.    Yes, I do.

130

1    Q.   Is that because you were focused on that

2  paragraph, Mr. Hubert?

3    A.   Yes, it is.

4    Q.   And you were looking at this information

02:16:58  5  about SAIC at this point in time, April 21, 1998,

6  because you were thinking about how SAIC valued its

7  stock compared with how MEDITECH valued its stock;

8  isn't that correct?

9    A.   Yes.

02:17:14  10    Q.   And is the handwriting on Page HUB 505

11  yours?

12    A.   Yes, it is.

13    Q.   And what does that handwriting say?

14    A.   Well, the article references Computer

02:17:31  15  Sciences Corporation as well as EDS.  So on the

16  right-hand side I wrote what the P/E ratio was for

17  those three companies.  And SAIC's P/E ratio was

18  close to the other companies'.

19    Q.   And this is about the time that you looked

02:17:50  20  at MEDITECH's P/E ratio as compared to SAIC, is it

21  not?

22    A.   I don't recall, but there's a good chance I

23  did.

24         MR. POSS:  Mr. Hubert, I'll have the

131

1    reporter mark as Exhibit 15 a document stamped HUB

2    475.

3                    (Exhibit MH 15 marked for

4    identification.)

02:18:49    5                    (Discussion off the record.)

6        Q.    Mr. Hubert, Exhibit 15 comes from your

7    files; isn't that correct?

8        A.    Yes, it does.

9        Q.    And this is a document that was printed out

02:19:05    10    by you on April 21, 1998; correct?

11        A.    Yes, it is.

12        Q.    And that's the same date as you printed out

13    some of the information about SAIC that we've been

14    hooking at; is that correct?

02:19:14    15        A.    Yes, it is.

16        Q.    And is this your handwriting?

17        A.    Yes, it is.

18        Q.    And does this document show you calculating

19    P/E ratios for MEDITECH on or about April 21, 1998?

02:19:30    20        A.    It could have been weeks, months,

21    afterwards.  But yes.

22        Q.    Certainly during that time frame of 1998;

23    isn't that correct?

24        A.    Yes, it is.

211

1    A.    Because the print actually appeared on the

2    second page, and if I had this in a file, I wanted

3    to call attention to the fact why I saved that.    And

4    I saved that piece of paper because those words

04:31:03  5    appear on the second page.    I thought that was

6    interesting.

7        Q.    Did you underline those words on the second

8    page?

9        A.    Yes, I did.

04:31:09  10       Q.    Why?

11       A.    So I could find them later on for

12    convenience.

13       Q.    Why did you want to save this document and

14    be able to find it later on?

04:31:17  15       A.    I save a lot of things, many, many things,

16    obviously.    But this document I saved thinking,

17    "Gee, I've" -- you know, you see so little about how

18    the MEDITECH stock is valued.    It's a question that

19    everybody had over the years.    To see in writing

04:31:39  20    that the stock has kept at a relatively modest price

21    is extremely unique.    I can't imagine a better,

22    definitive explanation of the stock value, of

23    anything I've seen in my prior 20 years working at

24    MEDITECH.

212

1    Q.   Every year Mr. Pappalardo invites employees

2    to a meeting to discuss purchasing MEDITECH stock,

3    does he not?

4    A.   I would say yes.

04:32:08  5    Q.   And each year all employees are told

6    they're welcome to attend that meeting, isn't that

7    the case?  When you were there.

8    A.   Yeah.

9    Q.   In those meetings did Mr. Pappalardo

04:32:20  10   discuss MEDITECH stock and its valuation and how it

11   was valued?

12   A.   Well, I only went to one of those meetings.

13   Q.   Which one did you go to?

14   A.   Probably around 1984, when I was first

04:32:36  15   offered a chance to buy stock.  Because the meetings

16   were really for first-time shareholders.  Anyone was

17   welcome to attend -- I don't want to say they were

18   invited, but they were welcome to attend.  But it

19   was really meant for first-time shareholders or

04:32:53  20   people considering buying stock for the first time.

21   Q.   Well, in 1998 and 1999 and 2000, when you

22   were concerned about the valuation of MEDITECH stock

23   and talking to the Department of Labor and

24   underlining what Mr. Messing said, why didn't you go

213

1   to one of those meetings and say, "Mr. Pappalardo,

2   could you tell me, what methodology is used to value

3   the stock in the trust by the trustee?"

4       A.   Sure.   Those meetings weren't meant for

04:33:24   5   everyone.

6       Q.   That wasn't my question, Mr. Hubert.

7   Answer the question.

8       A.   Why didn't I go?   I -- I didn't go for two

9   reasons.   One is, I didn't feel I was going to learn

04:33:42   10   anything new.   And two, I didn't want to be the one

11   and the only one to ask that type of question.

12       Q.   Why didn't you think you would learn

13   anything new?

14       A.   Because I had never heard of any

04:33:57   15   explanation as to how the stock was valued in a

16   meaningful way over the many years I was there.   I

17   couldn't imagine I would change my mind in 2000 or

18   2001.

19       Q.   But you never asked, did you?

04:34:10   20       A.   I never asked.

21       Q.   Now, at the time you -- you printed this

22   Howard Messing document out, Exhibit 24, in June of

23   2000; is that correct?

24       A.   Yes.

FARMER ARSENAULT BROCK LLC

214

1          Q.    And at this point, at least by this point,

2     did it confirm that you thought the stock was

3     undervalued when you saw this?

4          A.    I don't think it confirmed.  I think it was

04:34:37    5     suspicious.

6          Q.    Didn't you think this was evidence that

7     MEDITECH was intentionally undervaluing the stock?

8          A.    I don't know that -- I don't know if I

9     could call this evidence.  I think it's very

04:34:58   10     suspicious.  What does he mean by "keeping the stock

11     at a relatively modest price"?  I think that's

12     suspicious.

13          Q.    You thought this document would be valuable

14     to Dr. Grossman, didn't you?

04:35:12   15          A.    Not when I printed this out.

16          Q.    When did you?

17          A.    I printed this out in June 2000, and it

18     wasn't until sometime after Dr. Grossman started

19     sending us documents about his feelings that the

04:35:31   20     stock was undervalued.  Now, I never knew how

21     serious he was until he filed his SEC filing.  I

22     think that's when I got more of a confirmation.

23               I think this gave me suspicion, and I

24     think suspicion is about what I felt.  I thought

FARMER ARSENAULT BROCK LLC

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10269-RWZ

MICHAEL P. HUBERT, DAVID HINCHLIFFE and WILLIAM TRAINOR

v.

MEDICAL INFORMATION TECHNOLOGY, INC.,
MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN,
A. NEIL PAPPALARDO, LAWRENCE A. POLIMENO, RONALD L. DRISCOLL,
EDWARD B. ROBERTS, MORTON E. RUDERMAN and L.P. DAN VALENTE

MEMORANDUM OF DECISION

March 20, 2006

ZOBEL, D.J.

In 1973, defendant Medical Information Technology, Inc. ("Meditech," or

"Company"), a Massachusetts corporation, established a profit sharing plan on behalf

of its employees in order to provide pension benefits upon retirement. The Medical

Information Technology Profit Sharing Plan (the "Plan") is governed by the Employment

Retirement Income Security Act ("ERISA"). Meditech makes cash and stock

contributions to the Plan, and upon termination of employment, each employee

receives a cash payment in the amount of that employee's vested interest in the Plan.

Because Meditech stock accounts for approximately 85 percent of the Plan's holdings,

the total value of an employee's interest upon leaving Meditech depends largely upon

valuation of the stock held in the employee's Plan account. Such valuation, among

other responsibilities for the Plan, is handled by the sole trustee of the Plan, defendant

A. Neil Pappalardo ("Pappalardo"), who oversees the Plan in cooperation with

Meditech's directors, defendants Lawrence A. Polimeno, Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman and L.P. Dan Valente (collectively, the "Directors").

Plaintiff Michael P. Hubert worked for Meditech until 2004, while his coworkers and co-plaintiffs David Hinchliffe and William Trainor each left in 1998. According to plaintiffs, Pappalardo has knowingly undervalued Meditech's stock for at least the past eight years, and the Directors have approved this undervaluation. As a result, plaintiffs received smaller cash payments from the Plan upon termination than otherwise due if Pappalardo had valued the Company stock in compliance with a modern methodology for appraising fair market value. According to plaintiffs, these Plan payments do not fairly reflect the true value of plaintiffs' interests as a function of the Company's financial success. In an effort to recover the balance, plaintiffs filed the instant suit for failure to pay benefits due under the Plan in violation of ERISA (Count 1) and for breach of fiduciary duty owed under ERISA (Count 2). After defendants filed a Motion to Dismiss, plaintiffs filed an Amended Complaint. Defendants now move for dismissal of the Amended Complaint.

Defendants raise several grounds for dismissal. First, they argue that the facts alleged in the Amended Complaint, even if true, do not establish plaintiffs' rights to any additional benefits as alleged in Count 1. Defendants assert this ground as a matter of logic, essentially arguing that the Company's annual contributions were fixed amounts, and higher valuation of the stock would have simply led to fewer shares actually being allocated to the Plan. They argue that plaintiffs seek to benefit from both a low valuation at the time stock is contributed to the Plan, so that more shares are assigned,

2

and a high valuation at the time stock is distributed from the Plan, so that termination payments would reflect higher values without having reduced the number of shares originally contributed to the Plan and allocable to the individual plaintiffs. However, defendants' theory does not foreclose the possibility that an original contribution of fewer, more highly valued shares would, by the time plaintiffs terminated their employment and under an independent appraisal, still have increased in value more quickly than reflected by defendants' methodology, especially given plaintiffs' claims of Meditech's financial strength. In other words, the parties' competing valuation methodologies may involve different rates of growth (or decline) over time, so that the difference in actual share values each year would not necessarily be a constant margin. Defendants' assertion that plaintiffs' have not adequately pled a loss in benefits is, thus, not persuasive. Their second argument that regards standing but also relies upon this first argument similarly fails.

Third, defendants claim that the Amended Complaint fails to allege sufficiently arbitrary and capricious conduct by defendants in making discretionary decisions regarding benefits valuations. While defendants correctly identify the standard of review to be arbitrary and capricious, plaintiffs appropriately note that "[i]n applying [this standard], . . . the existence of a conflict of interest on the part of the administrator is a factor which must be considered." Wright v. R.R. Donnelly & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005). On the face of the Amended Complaint, plaintiffs have alleged such a conflict. (See Am. Compl. ¶¶ 56-58). Further fact-finding

3

as to whether plaintiffs can sustain their assertion is, at this stage in the litigation, premature. Accordingly, defendant's motion on this basis is denied.

Fourth, defendants note that plaintiffs did not exhaust their remedies under the Plan prior to filing the instant suit. "Before a plaintiff asserts an ERISA claim, . . . he must first exhaust his administrative remedies." Madera v. Marsh USA, 426 F.3d 56, 61 (1st Cir. 2005). Plaintiffs do not dispute that they never filed a formal claim for review of the issues addressed in the instant suit. However, they challenge the existence of administrative remedies, as the Plan alluded to "rules . . . for filing a claim" that allegedly never materialized, and further deny that they ever received notice that such remedies were available. (See Am. Compl. ¶¶ 26-30; Ex. A, at 8). If plaintiffs' allegations are true, then they may qualify for relief or exception from the exhaustion requirement. See Madera, 426 F.3d at 61-62. On the present record, dismissal for failure to exhaust is inappropriate.

Next, defendants challenge Count 2 as an attempt by plaintiffs to repackage Count 1 as a fiduciary duty claim, even though "individuals cannot obtain compensatory or punitive damages for breach of fiduciary duty." Watson v. Deaconess Waltham Hosp., 141 F. Supp. 2d 145, 150 (D. Mass. 2001). Plaintiffs argue that Count 2 differs from Count 1 in that the latter pleads a contractual breach while the former pleads a breach of defendants' statutory duties of loyalty and care. To remedy a fiduciary breach under ERISA, plaintiffs may only obtain "appropriate equitable relief." 29 U.S.C. § 1132(a)(3). In Count 2, plaintiffs seek three remedies: (1) restitution, (2) disgorgement of unjust enrichment, and (3) an injunction that requires defendants to

4

hire an outside appraiser for future valuations of Company stock. As to the first, "for

restitution to lie in equity, the action must generally seek not to impose personal liability

on the defendant, but to restore to the plaintiff particular funds or property in the

defendant's possession." See Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S.

204, 214 (2002). Although plaintiffs characterize their restitution as seeking to "make

whole the named plaintiffs," the remedy derives from benefits that plaintiffs believe they

are entitled to under the terms of the Plan. It is, as defendants contend, essentially the

same compensation sought in Count 1. As such, it amounts to legal restitution, not

equitable restitution, and "this fine distinction between restitution at law and restitution

in equity" forecloses plaintiffs' ability to obtain legal restitution for the alleged fiduciary

breach. Id.

　　　With respect to plaintiffs' second remedy that defendants be ordered to disgorge

unjust enrichment, a problem arises with the requirement that restitution in equity be

able to "clearly be traced to particular funds or property in the defendant's possession."

Id. at 213. In the context of a suit by an ERISA plan to recover funds already paid to a

beneficiary, "courts have applied a three-part test: 'Does [plaintiff] seek to recover

funds (1) that are specifically identifiable, (2) that belong in good conscience to

[plaintiff], and (3) that are within the possession and control of the [defendant]?'"

Admin. Comm. of the Wal-Mart Assoc. Health and Welfare Plan v. Willard, 393 F.3d

1119, 1122 (10th Cir. 2004). Here, it is not at all clear how plaintiffs could prove that

defendants in fact purchased more shares as a result of the alleged undervaluation

than they otherwise would have bought. Additionally, as a practical matter, defendants

5

will not realize profit from these holdings until they sell their shares, and there is no way to determine at this time what the eventual selling price will be. Thus, the actual amount by which defendants may be allegedly unjustly enriched, and thus to be disgorged, is not, according to any allegation set forth by plaintiffs, specifically identifiable or susceptible to reasonable calculation. Moreover, regarding the second prong of the test, defendants argue that plaintiffs fail to explain at whose expense defendants allegedly unjustly enriched themselves and whether or how anyone was, in fact, harmed by the conduct. Plaintiffs' allegation that Pappalardo and other "insiders" purchased more stock and therefore retained tighter control over the company because the price was artificially low necessarily implies that defendants obtained such control improperly as against other Company owners, namely the other shareholders (including plaintiffs and the Plan). Again, though defendants may still have purchased the same number of shares at a higher price, and even if the difference between the purchase prices may be characterized as unjust enrichment, plaintiffs have not clarified whether or why this amount would belong to them. Thus, the portion of Count 2 regarding unjust enrichment is dismissed.

The remaining plea for prospective relief through an injunction requiring outside appraisal of the stock for future valuations may qualify as equitable, but plaintiffs have not demonstrated standing to obtain this remedy. Under Article III of the Constitution, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751 (1984). As defendants argue, the injunctive relief sought in Count 2

6

cannot redress plaintiffs' alleged injuries, because the relief sought is prospective and plaintiffs are no longer members of the Plan. Plaintiffs have sought class certification, but in defining the "putative class" as those individuals who "had the same or similar experience when receiving their [Plan] distributions," they necessarily include only former Company employees in the class. Because neither plaintiffs nor any of the putative members of the asserted class would benefit from the order of an injunction affecting the future administration of the Plan, plaintiffs do not have standing to seek this relief. Because none of the remedies sought by plaintiffs in Count 2 is permitted under relevant legal authority, "their suit [on this claim] is not authorized" under ERISA. Great-West Life, 534 U.S. at 218. The motion to dismiss Count 2 is allowed as to all defendants.

Defendants raise a statute of limitations defense as an additional basis for dismissing both Counts 1 and 2. As Count 2 is dismissed, only the arguments with respect to Count 1 are considered. "Because Congress did not provide a statute of limitations in the ERISA statute for [benefits] claims, federal courts must apply the limitations period of the state-law cause of action most analogous to the federal claim." Muldoon v. C.J. Muldoon & Sons, 278 F.3d 31, 32 (1st Cir. 2002). Plaintiffs urge analogy to the six-year limitations period for contract actions under Massachusetts law, while defendants recommend the three-year limitations period under the Massachusetts wage payment statute. Defendants rely upon a thoroughly-reasoned Third Circuit decision that found "[c]laims for recalculation of benefits already paid are essentially claims for past due 'wages' . . . [and] are subject to the Pennsylvania Wage

7

Payment and Collection Law's three-year limitation on actions for wages past due."

Gluck v. Unisys Corp., 960 F.2d 1168, 1182 (3rd Cir. 1992). However, the Third Circuit

also acknowledged that "where the ERISA claims asserted differ from those presented

in [prior cases], [the court] should not rotely apply the same limitations period . . . ." Id.

at 1180. For example, the Third Circuit found the Pennsylvania statute of limitations for

contracts actions applied to claims for benefits that were bargained for, but noted that

the Pennsylvania wage law limitations period might apply to claims for wages due on

regular paydays. Id. at 1180-81. Of relevance in this case, the Third Circuit also

distinguished, for statute of limitations purposes, between claims for past due wages

and claims for benefits pursuant to "an ERISA violation," finding these "not analogous."

Id.

> An employer's delinquency or an employee's receipt of diminished
> payment gives immediate, obvious notice to an employee that something
> is amiss, but an ERISA violation or a reduction in future benefits may be
> subtle and will go unnoticed far more often than delinquency.
> Furthermore, the analogy in [prior cases] between the 'wages' covered by
> Pennsylvania law and the delinquent employer contributions – which had
> been collectively bargained for – becomes inoperable when ERISA claims
> are based on statutory violations, plan interpretation and future benefits.

Id.

For the reasons articulated by the Third Circuit in Gluck, plaintiffs' claim for

benefits is distinguishable from a claim for past due wages and renders inapposite the

statute of limitations established by the Massachusetts wage payment statute.

Additionally, as plaintiffs' contend, to the extent that the payments at issue constitute

deferred compensation, "deferred compensation contributions are not 'wages' under

the weekly wage law." Boston Police Patrolmen's Ass'n, Inc. v. City of Boston, 435

Mass. 718, 721 (2002). Defendants argue that the characterization of deferred

compensation as not constituting wages applies only when the contributions are not

property of the employee, and that the Plan contributions were, to the contrary,

plaintiffs' property. The characterization in Boston Police was driven, however, not by

whether the contributions were employee property, but rather by the original intent

behind the deferred compensation plan, namely, to withhold a portion of participating

employees' salaries for later payment and "the benefit of a tax deferment." Id. at 720.

If the deferred compensation constituted wages, then the tax benefit would not be

available. Here, defendants do not allege that the contributions to the Plan on behalf of

participants were intended to be wages, in the sense that tax would be due and owing

upon contribution. Accordingly, the reasoning that supported the characterization in

Boston Police dictates the same result in the instant case.

While Gluck declined to apply the Pennsylvania contracts statute of limitations

because the benefits at issue had not been bargained for, Massachusetts courts have

ruled otherwise. When a plaintiff sues for benefits that "are incidents of the plaintiff's

employment," and are provided "under an employment contract . . . the appropriate

statute of limitations is six years [in accordance with the statute of limitations for

contract actions]." Chambers v. Lemuel Shattuck Hosp., 41 Mass. App. Ct. 211, 212-

213 (1996), citing Jones v. Wayland, 374 Mass. 249, 260 (1978)(finding payments for

leave when incapacitated are "incidents of [plaintiff's] employment and are contingent

on the continued employment of [plaintiff]," such that "[plaintiff]'s resignation . . .

9

operated to terminate his right to continued compensation . . ."). The Chambers court applied the statute of limitations for contractual disputes, because the benefits sought were originally provided as a result of the plaintiff's status as an employee, even though the benefits sought were mandated by statute and not the employee's contract. Similarly, in the instant case, defendants authorized contributions to the Plan on plaintiffs' behalf simply because plaintiffs were employees. Logically, then, plaintiffs' suit regarding Plan contributions is analogous to suits for payments that are incidents of employment, and the appropriate state statute of limitations is the six-year period for contracts claims as applied by the Massachusetts state courts.

With respect to determining the date on which plaintiffs' action accrued, "[c]onsistent with the [federal] discovery rule, the general rule in an ERISA action is that a cause of action accrues after a claim for benefits has been made and has been formally denied." Union Pacific R. Co. v. Beckham, 138 F.3d 325, 330 (8th Cir. 1998). Because plaintiffs never formally filed a claim for benefits, the appropriate date for accrual is less clear. Plaintiffs assert that defendants' conduct constituted a continuing violation, since the undervaluation occurred on an annual basis. This theory is unsatisfactory, because it places no burden on the plaintiffs to exercise reasonable diligence. Defendants argue that the action accrued on the date that the allegedly discounted payments were distributed by the Plan to the plaintiffs, since the amount itself should have raised plaintiffs' awareness of an issue. This suggestion better incorporates the expectation for reasonable diligence and is consistent with a rule set forth by the First Circuit in a case somewhat similar to the facts at hand. See Geo.

10

Knight & Co., Inc. v. Watson Wyatt & Co., 170 F.3d 210 (1st Cir. 1999). In that case, the plaintiff was an employer that established an ERISA plan, made contributions in amounts recommended by the defendant actuarial services company, and sued the company under state law when the plan was found to be underfunded. In determining, under the discovery rule, when the employer's action accrued, the First Circuit placed the burden on the employer to demonstrate when it "knew, or in the exercise of reasonable diligence should have known, about the Plan's 'underfunded' status," and based its finding on documentation that was available for review by the employer. Id. at 214.

Although the instant case concerns different underlying legal claims and the burden remains on defendants, as the asserting party, to demonstrate why Count 1 falls outside the statute of limitations, these differences do not undermine the relevance of the similar circumstances from which plaintiffs' Count 1 claim arose. Because plaintiffs derived their claim from data summarized over several years after 1998, the complaint as pled does not clearly fall outside the statute of limitations. The motion to dismiss is denied.

The defendant Directors filed separate motions to dismiss on an additional basis. Because these defendants were named only in Count 2, and Count 2 is dismissed, the separate motions are moot.

Accordingly, defendants' Motions to Dismiss the Amended Complaint (#5 and #24 on the docket) are denied as to Count 1 but are allowed as Count 2. Defendants' separate Motions to Dismiss (#3 and #26 on the docket) are moot.

11

_____          /s/ Rya W. Zobel_____
     DATE                 RYA W. ZOBEL
                          UNITED STATES DISTRICT JUDGE

12

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10269-RWZ

MICHAEL P. HUBERT, DAVID HINCHLIFFE and WILLIAM TRAINOR

v.

MEDICAL INFORMATION TECHNOLOGY, INC., et al.

MEMORANDUM OF DECISION

March 20, 2007

ZOBEL, D.J.

## I.    Introduction

Plaintiffs, beneficiaries of a software company profit sharing plan, contend that

for at least the last eight years the plan's trustee deliberately undervalued the primary

asset in the plan, company stock. As a result, the lump sum distributions they received

on termination of employment were significantly less than what they would have been

under a more accurate valuation. Plaintiffs now seek certification of a class of all

employees who received distributions from the plan during the relevant period. Based

on the parties' papers and their written and oral arguments, I am persuaded that

plaintiffs cannot adequately represent the proposed class and therefore deny their

motion for class certification.

## II.    Background

In 1973, defendant Medical Information Technology, Inc. ("Meditech," or

"Company"), a Massachusetts corporation, established a profit sharing plan on behalf

of its employees in order to provide pension benefits upon retirement. The Medical Information Technology Profit Sharing Plan (the "Plan") is governed by the Employment Retirement Income Security Act of 1974 ("ERISA").[1] Meditech makes cash and stock contributions to the Plan, and upon termination of employment, each employee normally receives a lump-sum cash payment in the amount of that employee's vested interest in the Plan. If the Plan lacks sufficient cash, however, it may defer payment up to three years or distribute Meditech stock instead. Employees with more than 20 years of service may choose to make partial, or "in-service," withdrawals from their accounts while still employed by the Company.

Because Meditech stock accounts for approximately 85 percent of the Plan's assets, the total value of an employee's interest upon leaving Meditech depends largely upon the value of Company stock. As the stock is not publicly traded, its market value is not readily available. The valuation of the stock is the responsibility of the sole trustee of the Plan, defendant A. Neil Pappalardo ("Pappalardo"). He oversees the Plan in cooperation with Meditech's directors, former defendants Lawrence A. Polimeno, Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman and L.P. Dan Valente (collectively, the "Directors").

Plaintiff Michael P. Hubert worked for Meditech until 2004, while his coworkers and co-plaintiffs David Hinchliffe and William Trainor each left in 1998. According to plaintiffs, Pappalardo has knowingly undervalued Meditech's stock for at least the past

---

[1] Pub. L. No. 93-406, 88 Stat. 832 (1974) (codified as amended at 29 U.S.C. §§ 1001-1461).

2

eight years, and the Directors have approved this undervaluation.  As a result, plaintiffs

received smaller cash payments from the Plan upon termination than would be due if

Pappalardo had valued the Company stock in compliance with plaintiffs' proposed

methodology.[2]  Plaintiffs assert that these Plan payments do not fairly reflect the

Company's financial success and, inferentially, the value of their respective interests.

They filed the instant suit for failure to pay benefits due under the Plan in violation of

ERISA (Count 1) and for breach of fiduciary duty owed under ERISA (Count 2).  After

defendants moved to dismiss, plaintiffs filed an amended complaint (Docket #15, "Am.

Compl.") and defendants moved for dismissal of the amended complaint as well.  On

March 30, 2006, I granted defendants' motion as to Count 2, leaving only the Company,

Pappalardo, and the Plan as defendants under the remaining claim, Count 1.

Plaintiffs now seek certification of a class comprising "All participants in the

MEDITECH Profit Sharing Plan who have received a distribution of any portion of their

interest in that Plan from January 1, 1998 to the present."  (Docket #55.)  Plaintiffs ask

to be appointed representatives of this class.

Defendants oppose class certification on a number of grounds, which largely

coalesce into objections to plaintiffs' ability to fairly and adequately protect the interests

of the class.

**III.    The Plan**

---

[2]The record reflects that each of the named plaintiffs received benefits of more
than $900,000, but, based on their amended complaint, they claim additional amounts
of thousands, perhaps millions, of dollars.

3

The Plan is voluntary on the Company's part. It may terminate the Plan at any time and it may choose not to contribute to it in a given year. The Plan is non-contributory, meaning participants are not permitted to make direct contributions to it. The only additions to it come from the Company's contributions and income from the Plan assets, including dividends paid on Company stock held by the Plan.

Each year, the Directors decide the amount to contribute to the Plan and an allocation of that contribution between cash and stock. They also determine a value for the Company stock and divide the share value into the dollar amount of the contribution allocated to stock to calculate the number of shares to be added to the Plan. The cash and shares contributed to the Plan are apportioned to the account of each participant based on his/her income. Each employee's interest in his or her account vests over five years, after which the employee is fully vested and entitled to his or her full beneficial share of the Plan.

Company stock is not publicly traded, however, employees may purchase some shares at the same value set by the Directors to calculate the number of shares to be added to the Plan. The Plan further provides a market for employees who wish to sell their shares.

The Plan Trust Agreement (Docket #84, Ex. 1) requires the trustee to value the Plan assets to ascertain the value of each employee's account and to determine the amount of redemptions. Plaintiffs question the independence of the trustee's valuation and point out that the share value he determines corresponds exactly with that assigned by the Directors for the annual contribution.

4

## IV.   Legal Standard

To certify a class under Fed. R. Civ. P. 23(a), a court must find that: (1) "the

class is so numerous that joinder is impracticable, (2) there are questions of law and

fact common to the class, (3) the claims and defenses of the class representative are

typical of the class, and (4) the representatives will fairly and adequately protect the

interests of the class." Fed. R. Civ. P. 23(a).

In addition, the requirements of Rule 23(b)(3) must be met, namely that "the

questions of law or fact common to the members of the class predominate over any

questions affecting only individual members," and that "a class action is the superior

method of resolving the dispute." Fed. R. Civ. P. 23(b)(3);[3] In re Eaton Vance Corp.

Sec. Litig., 219 F.R.D. 38, 42-43 (D. Mass. 2003).

Plaintiffs have the burden to establish that the requisites of Rule 23 are met.

Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 38 (1st Cir. 2003).  The parties do not

seriously disagree that the proposed class is numerous and that the commonality

requirement is met.  Typicality, although not conceded, may exist.  The decisive and

contested issue is the adequacy of plaintiffs as the proposed class representatives.

## V.   Adequacy of Proposed Class Representatives

_____

[3] While plaintiffs note that once the prerequisites of Fed. R. Civ. P. 23(a) have
been met, "a class may be maintained under any one of three alternative bases," they
only address the requirements of Fed. R. Civ. P. 23(b)(3) in support of class
certification. (Docket #76, 8, 17.)  Because plaintiffs fail to meet the requirements of
Fed. R Civ. P. 23(a), it is unnecessary to examine any of the additional requirements of
Fed. R. Civ. P. 23(b).

To demonstrate adequacy, lead plaintiffs must show first, "that the interests of the representative party will not conflict with the interests of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). No objection has been raised about the competency of plaintiffs' counsel, nor their qualifications and experience. Instead, the question is whether the interests of the three plaintiffs conflict with those of putative class members.

Since all members of the class are bound by the judgment, courts have held that it would be a violation of due process if the class representatives' interests "are not necessarily or even probably the same" as those of absent class members. Hansberry v. Lee, 311 U.S. 32, 45 (1940). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). In Amchem, the Court affirmed a Third Circuit decision holding that a single class of representatives could not adequately protect both the interests of plaintiffs suffering current injuries caused by exposure to asbestos as well as the interests of plaintiffs who had been exposed to asbestos, but without manifest injury. Id. at 610. While both groups of plaintiffs had the common goal of obtaining the maximum recovery for their asbestos related claims, the court below pointed out that the settlement did more than provide a recovery fund, "[r]ather it makes important judgments on how recovery is to be allocated among different kinds of plaintiffs, decisions that necessarily favor some

6

claimants over others." Id. (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 630
(3d Cir. 1996)).  The Supreme Court agreed, noting that even though the fund to pay
claims was not limited, a conflict still existed between the members of the class
because "the terms of the settlement reflect essential allocation decisions . . . ." Id. at
626.  A similar problem exists in the instant case.  While all members of the proposed
class may "have an identical interest in proving that the Defendants intentionally
undervalued the stock held by the Plan," the choice of a particular alternate
methodology to value the stock pits class members against one another and places
them in direct conflict with the proposed class representatives.  (Mem. in Supp. of Pls.'
Mot. for Class Cert. (Docket #76) 14.)

### A.    Alignment of Interests

In a typical securities or product-based class action, the named plaintiffs are
motivated to maximize their individual recovery by seeking the highest per-share or
per-product settlement. This automatically aligns their interest with that of absent class
members, who also stand to gain the same per-share or per-product recovery.  While
the amount of the recovery may vary among the class members because of differing
number of shares owned or number of products purchased, each absent class
member's recovery is directly proportional to the recovery of the named plaintiffs.
Absent unusual circumstances, there is unlikely to be any fundamental conflict that
would preclude class certification.

In the instant case, however, the very issue to be decided -- the proper method
to value Company stock in the Plan -- results in radically different recoveries for class

7

members depending on the valuation method chosen, the year the member exited the Plan, as well as the year the member entered the Plan. Plaintiffs' proposed valuation methodology, for example, maximizes the stock valuation in the years each terminated the Plan at the expense of the valuation in other years. This places plaintiffs in fundamental conflict with absent class members who would receive a greater recovery from an alternate methodology. See In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 81 (D. Mass. 2005) ("The conflict that will prevent a plaintiff meeting the [adequacy of representation] prerequisite must be fundamental . . . .") (quoting Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir. 2001)).

## B.    Stock Valuation Methodologies

Valuing the equity of a private company is an "art," not simply a matter of plugging numbers into a formula. Jonathan Burton, Making Sure the Price Is Right, Bus. Wk., March 29, 1999 (available at 1999 WLNR 4688610) (noting that each business is different, even those in the same industry, and that factors such as free cash flow, whether the company is public or private, and intangibles can influence the value of a company). Different appraisers can come to significantly different valuations based on the same set of facts. See Alison Stein Wellner, The Number Cruncher Versus the Vision Guy, Inc., Jan. 2006 (describing two professional appraisers valuing the same software company on the same facts at $14 million and $30 million respectively).[4]

### 1.    Defendants' Valuation Methodology

---

[4] Available at http://www.inc.com/magazine/20060101/valuation-guide-intro.html.

8

According to plaintiffs' amended complaint, between 1998 and 2004 the stock price as set by the Plan doubled from $14.50 to $29.00 per share, reflecting a yearly increase varying between a minimum of 6% and a maximum of 18% per year. It appears that Meditech set its stock price to provide a monotonically increasing value and to maintain an approximately 6% dividend rate, at least in the years at issue.[5] Throughout this period, the Company experienced steady growth in both revenue and net profit. (Am. Compl. ¶¶ 45-46.) A 2002 posting on the Company intranet described a component of the formula used to determine share value as the product of eleven times net income. (Id. ¶ 55.) The use of a constant multiplier times net income reduces fluctuations in value from year-to-year for a company with steady earnings growth compared to a valuation based on a comparison with prices for similar publicly traded companies. Thus, the Company appears to employ a valuation methodology that looks to internal financial measures to determine share value, without any comparison to the then current share price or financial ratios of similar publicly traded companies. Based on this methodology, vested employees would likely see a regular increase in the value of their Plan balances from year-to-year, with no drastic increases or decreases in any one year.[6]

---

[5] One possible methodology to set the share value of a non-publicly traded, but dividend-paying, stock is to look at the dividend per share in dollars paid out by the company, then select a reasonable percentage dividend rate. Dividing the dividend amount by the chosen rate yields the calculated share value. Because dividends are typically paid out of net earnings, this methodology is closely related to valuation methods based on a multiple of earnings.

[6] The court makes no assumptions concerning the validity of the multiplier used by the Company or whether the ultimate valuation accurately reflects share value.

9

### 2.    Plaintiffs' Valuation Methodology

Plaintiffs argued at the hearing on their motion that their complaint did not "pick a method" for valuing Company stock, but merely provided "analogies" and "suggest[ed] valuations, different techniques." (Hr'g Tr. 47:15-20, Oct. 17, 2006.) Nevertheless, all of these suggestions appear to rely on a comparison of Meditech's Price-to-Earnings ("P/E") ratio with that of publicly traded companies, or on a direct comparison with the share price of publicly traded companies. Plaintiffs' own examples illustrate the divergence of their respective interests.

### (1) P/E Ratios Changed Over Time Resulting in Wildly Fluctuating Share Values from Year to Year

The amended complaint notes that shares of comparable publicly owned companies in the late 1990s sold for P/E ratios of over forty, suggesting a valuation of $75.00 per share, not the $14.50 to $16.00 used by the Plan in 1998 and 1999. (Am. Compl. ¶ 70.) By 2000, however, plaintiffs indicate a fair valuation of Meditech's stock would have dropped to a P/E ratio of fifteen, or $25.50 per share. (Id. ¶ 81.) As the markets recovered from the tech sell-off, valuations rose, with plaintiffs estimating a minimum value of $41.00 in 2002 and a fair value of Meditech stock of $74.00 per share based on a competitive P/E ratio of about 35 plus their estimate of $5.00 in retained cash in 2003 and 2004.[7] (Id. ¶¶ 95, 101.) Thus, the valuation methodologies described by plaintiffs result in a three-to-one dip and recovery in share value over the

---

[7] The amended complaint does not offer an estimated share valuation for year 2001, other than to predict that it "would have been worth far more than $19 attributed to it by the defendants." (Am. Compl. ¶ 88.)

11

class period, creating significant volatility in vested employees' Plan balances from year-to-year. In particular, under the share valuation described in the amended complaint, an employee terminated in 2000 would a receive approximately one-third of the payout of someone with the same vested share balance terminated the previous year.

### (2) Since the Number of Shares Contributed to the Plan Rely on the Same Valuation, Plaintiffs' Methodology Also Impacts the Size of Any Employees's Individual Account, Benefitting Some and Harming Others

Plaintiffs respond that, since they estimate a share value that always exceeds the value used by the Plan for the years in question, all class members would benefit from their representation. (Docket #76, 14.) The obvious flaw in this argument is that it ignores the class representatives' responsibility to "fairly and adequately protect the interests of the class," not merely to ensure that all class members receive some nominal benefit from the action. Fed. R. Civ. P. 23(a)(4). Even if plaintiffs' assertion that the Company valuation is too low is correct, class members who received a distribution in 2000 would likely benefit more from a valuation calculated using the Company's valuation methodology, but with a higher multiplier, than from plaintiffs' proposed market analysis valuation. The three plaintiffs received their distributions in 1998 and 2004, years in which the market valuation described in the amended complaint provides the highest recovery. Using the Company's methodology, but increasing the net earnings multiplier each year, would increase the valuation for all years proportionally rather than favoring the years in which the plaintiffs received their

distributions. The distribution per share in 2000 would then be larger than the distribution in 1998. Thus, an actual conflict exists between at least those absent class members who received distributions in years 2000 through 2002 and the two plaintiffs who received their distribution in 1998. It is also possible that, by reducing the volatility in share price, the per share valuation in 2004 using the Company methodology but with a steadily increasing multiplier would be lower than that proposed by plaintiffs, creating a conflict between class members and the plaintiff receiving the 2004 distribution.

Less obviously, some class members could actually be harmed if plaintiffs' valuation methodology is adopted. Plaintiffs imply that the proper resolution of their suit is merely to revalue upwards the share price for each year at issue and multiply that price by the vested share balance of each class member who received a distribution (subtracting the distribution they have already received) to calculate the proper per-member recovery. But as I noted in my earlier decision, the number of shares owned by each class member was calculated based on the allegedly undervalued price. Had the plaintiffs' pricing methodology been used when the shares were originally contributed to the Plan, fewer high-priced shares would have been allocated to each employees' account based on the same total dollar contribution by the Company. Thus, while the per-share value at redemption would be higher, the total number of shares owned would be lower. As I stated previously, the actual issue to be decided in this case is whether "the parties' competing valuation methodologies []

involve different rates of growth (or decline) over time, so that the difference in actual share values would not necessarily be a constant margin." (Docket #38, 3.)

Contrary to plaintiffs' assertions that all proposed class members would benefit from their representation, it is likely that the value of some members' benefits under plaintiffs' valuation could be less than what they actually received under the Company's valuation, particularly employees who took their distribution in 2002 after a relatively short period of employment. The D.C. Circuit noted that "the foundations of maintenance of a class action are undermined" where "the action may be taken as conferring economic benefits or working economic harm, depending on the circumstances of the individual [class member]." Phillips v. Klassen, 502 F.2d 362, 367 (D.C. Cir. 1974) (refusing to certify a class where the theory offered by class representatives would expose some absent class members to a legal liability to return a previously received separation bonus). Plaintiffs cannot adequately represent absent class members who would suffer harm from a valuation they advocate.

Simply adding additional named plaintiffs to include representatives of distributions for each of the years in question does not resolve the conflict. The only way to calculate the proper payout under any alternate valuation methodology is to revalue the shares from the beginning of the Plan. This is because differing year-to-year values result in differing percentage ownership of the shares in the Plan at redemption.[8] Thus, the only employees guaranteed to have identical interests in

---

[8] Consider the simplified case of a single employee participating in the first year of the Plan and two similarly situated employees in the second year. In each year the Company contributes $1,000 to the Plan. Assume a share valuation of $1 per share in

choosing a valuation methodology are those who entered the Plan in the same year

and who later exited the Plan in the same year.[9]  See Klassen, 502 F.2d at 367 (noting

that where there were conflicting interests in a group of employees party to a common

termination agreement, it was "impossible to say, solely because they are parties to it,

that any two of them are of the same class.")

### (3) For the Reasons Articulated in (2) Above, Plaintiffs' Methodology Creates Conflicts with Continuing Plan Members

The proposed class includes current Company employees who have taken in-

service withdrawals in the years in question but are still participants in the Plan.

Defendants assert that, under ERISA, any recovery by plaintiffs must come from the

assets of the Plan, and that plaintiffs' suggested valuation results in a recovery that

---

the first year. After the first year, Employee 1 owns 100% of the 1,000 shares in the
Plan. If, in the second year, the share valuation has not changed, both employees
receive 500 shares, and Employee 1 owns 1,500 shares (75% of shares in the Plan),
and Employee 2 owns 500 shares (25% of shares in the Plan). If, however, an
alternate valuation places the value of the shares at $2 per share the second year,
each employee receives 250 shares, and Employee 1 now owns 1,250 shares (83% of
shares in the Plan), and Employee 2 owns 250 shares (17% of shares in the Plan). If,
however, the share value drops to $0.50 in the second year, Employee 1 owns 2,000
shares (66%), while Employee 2 owns 1,000 shares (33%). Because the Company
contributes a fixed dollar amount each year, but the Plan's assets are valued based on
share valuation at the time of the contribution, the percentage of Plan assets allocated
to each participant is dependent on the valuation methodology used from Plan
inception. Employees generally would prefer high share valuations prior to their
entering the Plan, low share valuations during the period in which the Company makes
allocations to their account, and very high valuations in the year they withdraw their
Plan balances.

[9] Even this oversimplifies the analysis, since employees have an interest in the
lowest share valuation in years in which they had the highest dollar contributions to the
plan. To the extent two employees entering and exiting in the same years have
differing high earning years (and thus larger Plan contributions), they might prefer
different valuation methodologies.

depletes Plan cash. Plaintiffs admit as much. (See Am. Compl. ¶ 69 (stating that if

employees terminating in 1998 and 1999 "were paid a fair price for their assets in the

Plan, the Plan would have soon run out of cash.").) If the Plan runs out of cash,

existing Plan participants could be forced to delay receipt of benefits or to accept stock

in lieu of cash under the terms of the Plan.  An employee who stands to receive only a

small cash recovery in this action for the increased value of their in-service withdrawal

at the expense of a distribution of the bulk of their benefit in unmarketable stock will be

harmed by plaintiffs' proposed valuation.  This places absent class members who are

still in the Plan in direct conflict with the proposed class representatives.  Therefore,

plaintiffs, who have no interest in the future financial security of the Plan, cannot

adequately represent class members who still have vested balances in the Plan.[10]

### C.     Lack of Congruence in Desired Relief

The First Circuit analyzed a similar conflict between two groups desiring different

valuations methodologies for a pension benefit under a combined typicality and

adequacy analysis.  See Dierks v. Thompson, 414 F.2d 453, 456 (1st Cir. 1969) ("In

order to maintain a class suit plaintiffs must be truly representational," citing to both

Fed. R. Civ. P. 23(a)(3) and (4)); see also Georgine v. Amchem Prods., Inc., 83 F.3d

610, 632 (3d Cir. 1996) (noting that the Rule 23 requirements of typicality and

---

[10] It is not difficult to postulate additional reasons that existing employees'
interests would be at odds with plaintiffs' interests.  By creating extreme variability in
benefits from one year to the next, plaintiffs valuation methodology could harm the
Company's ability to attract and retain a competent work force.  The resulting decline in
Company profitability and competitiveness would likely have a negative impact on
existing employees' interests in job security and continued contributions to the Plan.

16

adequacy are closely related, "both look to the potential for conflicts in the class."). In
Dierks, benefits due former company employees were held in trust by a non-
contributory company profit-sharing plan until paid out at death, disability or the former
employee reached age 65. Plaintiff employees brought a class action against
defendant trustees of the plan seeking one of two alternate valuations for their vested
benefits, both different from that used by defendants. One construction favored by a
portion of the class fixed the benefit amount at the employee's termination, while the
other set the benefit as a percentage of the fund, changing with market conditions until
paid. Even though the parties had stipulated in the court below that class
representation was proper, the First Circuit held, as a matter of equity and due process,
that plaintiffs who advocated the market method of determining valuation could not
represent the group that preferred a fixed valuation. Dierks, 414 F.2d at 456. "Unless
the relief sought by the particular plaintiffs who bring the suit can be thought to be what
would be desired by the other members of the class, it would be inequitable to
recognize plaintiffs as representative, and a violation of due process to permit them to
obtain a judgment binding absent plaintiffs." Id. (emphasis added).

Here, plaintiffs argue that they are typical of all class members because "[t]hey
have been injured in the same way (e.g., received less than the amount they were due
under the Plan), and have claims based on the same legal theories (e.g., the
Defendants intentionally undervalued the stock held by the Plan . . .)," and that they will
adequately represent the class because they "have no interests antagonistic to those of
the other class members." (Docket #76, 12, 14.) However, plaintiffs admit that "the

17

lion's share of litigation resources on both sides will be invested in competing expert testimony on the issue of 'fair value' of Meditech stock throughout the years." (Id. at 18.) Yet, it is precisely on the choice of what methodology to pursue to establish "fair value" that plaintiffs cannot "be thought to be [seeking the same relief that] would be desired by the other members of the class." Dierks, 414 F.2d at 456. Plaintiffs describe a methodology of valuation that benefits employees terminated in the beginning and end of the class period at the expense of those receiving distributions in the middle of the period. This choice places plaintiffs in direct conflict with those absent class members who would benefit from a valuation methodology which provides a larger recovery in 2000 through 2002 at the expense of the years in which plaintiffs received their distributions. "[D]iverse and potentially conflicting interests within the class are incompatible with the maintenance of a true class action." Id.; see also Amchem, 521 U.S. at 625 (holding that the common goal of obtaining the maximum recovery alone does not justify class certification where the proposed class members have conflicting goals for relief); Dierks, 414 F.2d at 456 ("Under such circumstances, [where suing plaintiffs desired a market valuation but some absent class members could have preferred an obligation in a fixed amount,] the court could not have found that plaintiffs were 'typical' of the former [] employees whom they purported to represent; they were typical of only one of two conflicting groups.").

**VI.   Conclusion**

Members of plaintiffs' proposed class have divergent and conflicting interests in the selection of the appropriate valuation methodology for Meditech stock which are

18

incompatible with the maintenance of a class action. Plaintiffs cannot be representative of all class members because the class itself has no single desired choice of share valuation. Any particular choice necessarily allocates recovery in ways that benefit some class members at the expense of others. Under these circumstances, plaintiffs cannot "fairly and adequately protect the interests of the class," and class certification is inappropriate. Fed. R. Civ. P. 23(a)(4).

Accordingly, plaintiffs' motion to certify class (Docket #55) is DENIED. Plaintiffs' motion to strike affidavits (Docket #81) is DENIED as moot.[11]

<table>
<tr><td>_____March 20, 2007_____<br>DATE</td><td>_____/s/Rya W. Zobel_____<br>RYA W. ZOBEL<br>UNITED STATES DISTRICT JUDGE</td></tr>
</table>

---

[11] Plaintiffs seek to strike the affidavits of A. Neal Pappalardo and Barbara A. Manzolillo as exceeding this courts' order limiting discovery to the issue of class certification only. My decision to deny class certification does not rely on the information attested to in these affidavits, and thus the motion is moot.

19

# EXHIBIT 6

MEDICAL INFORMATION TECHNOLOGY, INC.

PROFIT SHARING PLAN

Amended and Restated Trust Agreement

(As of January 1, 1998)

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003580

# TABLE OF CONTENTS

**ARTICLE I**

The Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.01  Creation of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.02  Interpretation of Trust Agreement . . . . . . . . . . . . . . . . . . . . . . . 2

**ARTICLE II**

Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.01  "Affiliated Company" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.02  "Agreement" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.03  "Anniversary Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.04  "Beneficiary" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.05  "Board of Directors" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.06  "Break in Service" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.07  "Common Stock" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.08  "Company" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.09  "Compensation" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.10  "Effective Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.11  "Employee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.12  "Employment Commencement Date" . . . . . . . . . . . . . . . . . . . . . . 5
2.13  "Hour of Service" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.14  "Member" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.15  "Plan" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.16  "Plan Year" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.17  "Reemployment Commencement Date" . . . . . . . . . . . . . . . . . . . . . 6
2.18  "Service" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.19  "Trust" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.20  "Trustee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.21  "Valuation Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**ARTICLE III**

Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.01  Eligibility for Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.02  Determination of Eligibility by Trustee . . . . . . . . . . . . . . . . . . . . . 7
3.03  Duration of Active Membership . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.04  Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.05  Military Leaves of Absence . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
3.06  USERRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

i

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003581

## ARTICLE IV
Contributions under the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.01  Company Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.02  Determination of Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.03  Payment of Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.04  Reversion of Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.05  Members' Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## ARTICLE V
Members' Accounts;
Allocation of Assets and Contributions . . . . . . . . . . . . . . . . . . . . . . . . . 12
5.01  Members' Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5.02  Compensation Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5.03  Allocation of Contributions and Forfeitures. . . . . . . . . . . . . . . . . . . 12
5.04  Valuation of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
5.05  Allocation of Trust Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
5.06  Distributions and Forfeitures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
5.07  Limitations on Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
5.08  Sources of Forfeiture Restorations . . . . . . . . . . . . . . . . . . . . . . . . . 15

## ARTICLE VI
Payments to or for the Accounts of
Members or Terminated Members  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.01  Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.02  Disability Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.03  Death Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
6.04  Termination of Employment Prior to Retirement, Disability, or Death . . . . . . 19
6.05  Reemployment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
6.06  Manner and Timing of Distributions . . . . . . . . . . . . . . . . . . . . . . . . 22
6.07  Additional Restrictions on Distributions . . . . . . . . . . . . . . . . . . . . . 24
6.08  Discharge of Trustee's Obligation to Make Payments . . . . . . . . . . . . . . 26
6.09  Investment of Segregated Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
6.10  Loans to Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
6.11  Direct Rollovers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
6.12  In-Service Withdrawals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## ARTICLE VII
Amendment and Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
7.01  Right to Amend or Terminate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
7.02  Amendment for Tax Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
7.03  Liquidation of Trust in Event of Termination . . . . . . . . . . . . . . . . . . . 33
7.04  Termination of Plan and Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ii

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003582

**ARTICLE VIII**

Rights and Duties of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
8.01  Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
8.02  Powers of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
8.03  Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
8.04  Method of Purchasing, Holding and Selling Securities . . . . . . . . . . . . . . . . . 36
8.05  Exercise of Voting Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
8.06  Power to Borrow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
8.07  Reliance on Trustee as Owner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
8.08  Liquidation of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
8.09  Evidence on which Trustee may Act . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
8.10  Action by Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
8.11  Discretionary Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
8.12  Employment of Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
8.13  Records and Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
8.14  Payment of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
8.15  Compensation and Expenses of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . 40
8.16  Resignation or Removal of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
8.17  Legal Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
8.18  Indemnification of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**ARTICLE IX**

The Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
9.01  No Contract of Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
9.02  No Contract to Maintain Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
9.03  Liability of Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
9.04  Action by Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
9.05  Successor to Business of Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
9.06  Dissolution of the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**ARTICLE X**

Top-Heavy Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
10.01  Article Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
10.02  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
10.03  Top-Heavy Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
10.04  Minimum Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
10.05  Vesting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
10.06  Termination of Top-Heavy Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

iii

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003583

Confidential-Subject to Protective Order

ARTICLE XI

    Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    11.01 Limitation of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    11.02 Spendthrift Provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    11.03 Appointment of Person to Receive Payment . . . . . . . . . . . . . . . . . . . . . . 50
    11.04 Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
    11.05 Impossibility of Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
    11.06 Adjustment for Fractional Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
    11.07 Definition of Words . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
    11.08 Titles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
    11.09 Merger or Consolidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
    11.10 Claims Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
    11.11 Allocation and Delegation of Responsibilities . . . . . . . . . . . . . . . . . . . . . 53
    11.12 Special Provisions for Certain Leased Employees . . . . . . . . . . . . . . . . . . 53
    11.13 Execution of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

iv

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003584

## MEDICAL INFORMATION TECHNOLOGY, INC.

## AMENDED AND RESTATED PROFIT SHARING PLAN AND TRUST

The Trust Agreement made the 31st day of December, 1973, by and between MEDICAL INFORMATION TECHNOLOGY, INC., a Massachusetts corporation having its principal place of business in Westwood, Massachusetts (the "Company") and A. NEIL PAPPALARDO of Boston, Massachusetts, (the "Trustee"), which has been subsequently restated and amended from time to time, is now amended and restated in its entirety as follows:

### WITNESSETH THAT:

WHEREAS, the Company recognizes the continuing contribution being made to the successful operation of its business by its employees and desires to reward such contribution by continuing its maintenance of a profit sharing plan for its employees who are or shall hereafter become eligible as Members under the Plan embodied herein;

WHEREAS the Company amended and restated said Plan to comply with the Tax Reform Act of 1986 and to make certain other changes;

WHEREAS the Plan was subsequently amended by the First, Second and Third Amendments thereto;

WHEREAS the Company now desires to amend and restate said Plan to comply with recent legislation and to make certain other changes;

NOW, THEREFORE, the parties hereto each in consideration of the covenants, agreements and declarations of the other, mutually covenant, agree and declare the Trust Agreement dated December 31, 1973, as subsequently amended and restated, is hereby further

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003585

amended and restated as provided herein effective January 1, 1998 except that the changes made

to Sections 3.06, 6.07(b) and 11.12 shall be effective as of January 1, 1997. In determining a

Member's rights and benefits under the Plan up to such effective date, the provisions of the Plan

as previously in effect shall apply:

## ARTICLE I

### The Trust

1.01 Creation of Trust. There has been established hereunder a trust which shall be

known as the "MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING

TRUST." The Trustee shall receive any contributions paid to the Trust, and all contributions so

received, together with the income therefrom, shall be held, managed, and administered as a

fund in trust pursuant to the terms of this Agreement. The Trustee hereby affirms his

acceptance of the Trust created hereunder and agrees to perform the provisions of this

Agreement on his part to be performed.

1.02 Interpretation of Trust Agreement. The Trust is established for the purpose of

providing retirement and other benefits to the employees of the Company from the profits of the

Company's business, and for the exclusive benefit of the eligible Employees and their

beneficiaries, and is designed to invest substantially in shares of the Common Stock of the

Company so as to permit the participating employees to share in any growth of the Company.

So far as possible, this Agreement shall be interpreted in a manner consistent with this intent

and with the intent of the Company that the Trust established hereunder shall satisfy the

provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), and those of

2

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003586

DEF000090

the Internal Revenue Code of 1986 (the "Code") relating to exempt employees' profit sharing trusts, as either of those statutes may from time to time be amended. Except as provided in Section 4.04, under no circumstances shall any property of the Trust, or any contributions made by the Company, ever revert to or be used or enjoyed by the Company or be used for any purpose other than for the exclusive benefit of the eligible employees or their beneficiaries.

<div align="center">ARTICLE II</div>

<div align="center">Definitions</div>

Whenever used in this Agreement, unless the context clearly indicates otherwise, the following words shall have the following meanings:

2.01 "Affiliated Company" means (a) a member of a controlled group of corporations of which Medical Information Technology, Inc. is a member, (b) an unincorporated trade or business which is under common control with Medical Information Technology, Inc. as determined in accordance with Section 414(c) of the Code and regulations issued thereunder, (c) a member of an "affiliated service group" (within the meaning of Section 414(m) of the Code) of which Medical Information Technology, Inc. is a member, or (d) an organization which is required to be aggregated with Medical Information Technology, Inc. pursuant to regulations promulgated under Section 414(o) of the Code. For purposes hereof, a "controlled group of corporations" shall mean a controlled group of corporations as defined in Section 1563(a) of the Code, determined without regard to Section 1563(a)(4) and (e)(3)(C) of the Code.

2.02 "Agreement" means this Agreement as the same may be amended from time to time.

2.03 "Anniversary Date" means December 31 in each year after the Effective Date.

<div align="center">3</div>

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003587

Confidential-Subject to Protective Order

2.04 "Beneficiary" means the person or persons designated by a Member, pursuant to the provisions of Section 6.03 of this Agreement, to receive distribution of such Member's share upon his death, and includes a co-beneficiary or a contingent beneficiary. The term "Beneficiary" shall also include a Member's surviving spouse if such spouse is deemed to be the Member's Beneficiary pursuant to Section 6.03(c).

2.05 "Board of Directors" means the board of directors of the Company in office from time to time.

2.06 "Break in Service" means any "twelve-consecutive month period" (as determined under this Section) during which an individual does not perform any Hours of Service for the Company or an Affiliated Company. The "twelve-consecutive month period" used to determine whether a Break in Service has occurred shall commence on the earlier of the following dates, and anniversaries thereof: (i) the date the individual's employment with the Company or an Affiliated Company terminates by reason of quit, discharge, or retirement, or (ii) the first twelve-month anniversary of the date the individual was first absent from employment with the Company or an Affiliated Company by reason other than quit, discharge, or retirement; provided, however, that in the case of an individual who is absent from work for "maternity or paternity reasons", the twelve-consecutive month period beginning on the first anniversary of the first date of such absence shall not constitute a Break in Service. For purposes of this Section, an individual's absence is for "maternity or paternity reasons" if the individual is absent from work by reason of pregnancy, birth, or adoption of his child or for the purpose of caring for such child for a period beginning immediately following such birth or adoption.

2.07 "Common Stock" means the common stock of the Company.

4

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003588

Confidential-Subject to Protective Order                                    DEF000092

2.08  "Company" means MEDICAL INFORMATION TECHNOLOGY, INC. and any successor to all or a major portion of its business which adopts this Plan and Trust pursuant to Section 9.05.

2.09  "Compensation" includes salaries, wages, bonuses, overtime, commissions and all other forms of direct remuneration paid to a Member by the Company but excludes (a) any amount paid to an Employee prior to his becoming a Member under the Plan and (b) any contributions by the Company to or benefits under the Plan.  A Member's Compensation shall not be taken into account for any purpose of the Plan (other than Section 5.07 and Article X) to the extent such Compensation exceeds $100,000.

2.10  "Effective Date" means the effective date of the amendment and restatement of this Plan, which is January 1, 1998, unless otherwise specifically provided.

2.11  "Employee" means any person who is employed by the Company as a common law employee.  An Employee shall become an Employee on his Employment Commencement Date.

2.12  "Employment Commencement Date" means the first date on which the individual performs an Hour of Service.

2.13  "Hour of Service" means each hour for which an Employee is directly or indirectly paid or entitled to payment by the Company or an Affiliated Company for the performance of duties.

2.14  "Member" means any Employee who is eligible to participate in the Plan as determined under Article III of this Agreement.

5

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003589

2.15  "Plan" means the "MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN" as set forth herein, together with any and all amendments hereto.

2.16  "Plan Year" means the fiscal year of the Trust, and the Company, being the twelve (12) months ending on the Anniversary Date of each year.

2.17  "Reemployment Commencement Date" means the first date on which the individual performs an Hour of Service following a Break in Service which is not counted as Service.

2.18  "Service" of an Employee means the period of time determined in accordance with Article III.

2.19  "Trust" means the trust created by this Agreement.

2.20  "Trustee" means the trustee herein named and any duly appointed successor trustee or trustees.

2.21  "Valuation Date" means December 31 of each Plan Year, and any other date which the Trustee may select for the valuation of the Trust and adjustment of accounts determined in accordance with Section 5.04 and 5.05, respectively.

6

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003590

Confidential-Subject to Protective Order

DEF000094

## ARTICLE III

### Membership

3.01  Eligibility for Membership.  Each Employee who is a Member on January 1, 1998 shall continue to be a Member under the Plan.  Each other Employee, including each future Employee, shall become a Member under the Plan on the first day of the month coincident with or next following his completion of one year of Service.  In the event an individual has completed the foregoing eligibility requirements but is not an Employee on the applicable entry date, such individual shall not become a Member of the Plan at that time.  If such individual thereafter becomes an Employee, such individual shall become a Member on the date he subsequently becomes an Employee.

3.02  Determination of Eligibility by Trustee.  The determination of an Employee's eligibility for membership under the Plan shall be made by the Trustee from the Company's records; and the Trustee's determination shall be conclusive and binding on all persons.

3.03  Duration of Active Membership.  An active Member shall continue as such until his employment with the Company is terminated, except as otherwise provided in Sections 5.02 and 5.03 in the case of a Member whose employment terminates on account of retirement, disability or death.  A former active Member shall once again become an active Member on his Reemployment Commencement Date.

3.04  Service.  The "Service" of an Employee means, with respect to each Employee, the most recent period of time, determined in years and days, which commences on an Employee's Employment Commencement Date, or Reemployment Commencement Date, during which there occurs no Break in Service.  If an Employee with at least one year of Service

7

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003591

terminates his employment with the Company, incurs a Break in Service and is subsequently reemployed, then the "Service" of such Employee for all purposes of the Plan after his reemployment shall include Service accumulated both before and after such Break in Service. Except as provided in Section 6.05, Service accumulated after such Break in Service shall not be taken into account for the purpose of determining such Employee's severance benefit under Section 6.04 at the time of such Break in Service. An Employee shall receive credit for Service with an Affiliated Company for the purposes of determining (a) his eligibility to participate in the Plan pursuant to Section 3.01, (b) the amount of his vested benefit under Section 6.04 and (c) his Breaks in Service, but such Service shall not be taken into consideration for any other Plan purpose.

3.05  Military Leaves of Absence.  Except as otherwise specifically provided, an Employee who leaves the Company to enter the armed services of the United States of America and who returns to its employ at or before the expiration of ninety (90) days after the date on which he is first entitled to be released from active duty in the armed services (or at such later date as the Company may approve or as may be required by law) shall be deemed to have been in the continuous employ of the Company throughout and the period of such military absence shall be included in his period of Service for all purposes of this Plan. If any Employee shall fail to return from a military leave of absence as required by the Company in accordance with the Plan, he shall be deemed to have quit the Company on the date such military leave of absence began; provided, however, that any resultant forfeitures from his account shall be deemed to occur on the Anniversary Date subsequent to the date of his failure to return from his military leave of absence as required by the Company.

8

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003592

Confidential-Subject to Protective Order

3.06 <u>USERRA</u>. Notwithstanding any provision of this Plan to the contrary, contributions, benefits and service credits with respect to qualified military service shall be provided in accordance with section 414(u) of the Code.

9

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003593

Confidential-Subject to Protective Order

DEF000097

## ARTICLE IV

### Contributions under the Plan

4.01 <u>Company Contributions</u>. For each Plan Year, the Company shall pay to the Trustee in trust hereunder from the net income of the Company for such Plan Year or its earnings and profits accumulated prior to such Plan Year such amount as may be voted by its Board of Directors with respect to that Plan Year. The amount of the Company's contribution shall be paid to the Trustee in cash and/or that number of shares of Common Stock having a fair market value on the date of contribution equal to the contribution amount (or portion thereof to be contributed in shares of Common Stock) voted by the Board of Directors as provided herein. As used in this Section, "net income" and "accumulated earnings and profits" of the Company mean the net income and accumulated earnings and profits as shown by the Company's books before deducting Federal and State taxes measured in part or in whole by income.

4.02 <u>Determination of Contribution</u>. The amount of the Company's contribution for each Plan Year shall be subject to final determination by the Company and verification by the Company's independent public accountants. The amount of such contribution, as determined by the Company and verified by such accountants, shall be conclusive and binding on all persons.

4.03 <u>Payment of Contribution</u>. The Company's contribution to the Trust for each Plan Year shall be paid within the time required by law in order to obtain a deduction of the amount of the Company's contribution to the Trust for Federal income tax purposes for such Plan Year.

4.04 <u>Reversion of Contributions</u>. In the event that the Company shall make a contribution to the Trust on the basis of a mistake of fact, the Company may direct the Trustee to return such contribution to the Company at any time within the twelve-month period

10

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003594

Confidential-Subject to Protective Order

commencing on the date of contribution. All contributions under the Plan are conditioned upon the deductibility thereof by the Company under Section 404 of the Code. To the extent that any such deduction is disallowed, the Company may direct the Trustee to return such contribution (to the extent disallowed) to the Company at any time within the twelve-month period commencing on the date of disallowance.

    4.05 <u>Members' Contributions</u>.  Contributions by Members shall not be permitted.

11

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003595

Confidential-Subject to Protective Order

DEF000099

## ARTICLE V
### Members' Accounts;
### Allocation of Assets and Contributions

5.01  Members' Accounts.  The Trustee shall maintain a book account for amounts credited from time to time to each Member under the Plan.  Any contributions made by the Company for a Member pursuant to Section 4.01 shall be allocated to each Member's account pursuant to Section 5.03.

5.02  Compensation Schedule.  As soon as practicable after the end of each Plan Year, the Company shall deliver to the Trustee a schedule showing the name of each Member who was either an Employee on the Anniversary Date of such Plan Year or an Employee who retired, became disabled or died within the meaning of Sections 6.01 to 6.03 during such Plan Year, and opposite the name of each such Member the amount of Compensation paid to him by the Company during such Plan Year.  Notwithstanding anything to the contrary elsewhere herein, no Employee who owns (excluding any beneficial ownership under the Trust) ten percent (10%) or more of the outstanding Common Stock of the Company on an Anniversary Date shall be listed on the schedule required by this Section 5.02 with respect to such Anniversary Date.  The schedule shall also include such other information as the Trustee may reasonably require for the proper administration of the Plan.

5.03  Allocation of Contributions and Forfeitures.  Upon receiving such schedule and the total contribution made by the Company for the Plan Year, and after the account balances of the Members have been adjusted as provided in Section 5.05 and forfeitures determined under Section 6.04, the Trustee shall credit to the account of each Member listed on such schedule a portion of the Company's contribution and a portion of the total amount of forfeitures arising

12

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003596

from the accounts of terminated Members pursuant to Section 6.04 which bears the same ratio to such total amounts as the Member's Compensation listed on such schedule bears to the Compensation listed on said schedule for all such Members.

Notwithstanding the foregoing provisions of Section 5.02 and this Section 5.03, the Company may, in its discretion and as necessary to cause the Plan to satisfy the requirements of Section 410(b)(1)(B) of the Code for any Plan Year, expand the schedule provided pursuant to Section 5.02 for such Plan Year to include the name of each Member (including each former Member whose employment terminated during such Plan Year) who received any Compensation during such Plan Year (but excluding any Employee who owns 10% or more of the outstanding Common Stock of the Company), and direct the Trustee to allocate Company contributions and/or forfeitures for such Plan Year to the accounts of all Members listed on such expanded schedule in proportion to the Compensation of each such Member for such Plan Year as reflected on such expanded schedule.

5.04 <u>Valuation of Trust</u>. As of each Valuation Date, the Trustee shall determine the total net worth of the Trust by evaluating all of its assets and liabilities as of that date exclusive of any amounts segregated into separate accounts for terminated Members pursuant to Section 6.06(b) and the contribution made by the Company with respect to its Plan Year current with or ending on said Valuation Date. In determining the net worth of the Trust or any portion thereof, the Trustee shall value the Trust assets at their fair market value. There shall be included as of the Valuation Date, without implied limitation, income on hand, income accrued, dividends payable but not paid, and uninvested cash, whether income or principal; and there shall be deducted as of the Valuation Date, without implied limitation, liabilities accrued. A

13

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003597

Confidential-Subject to Protective Order

determination by the Trustee of the fair market value of any of the Trust assets, or of the net worth of the Trust or any component thereof shall be conclusive and binding upon all persons.

5.05  Allocation of Trust Assets.  The total net worth of the Trust as determined on each Valuation Date shall be compared with the total of all amounts standing to the credit of the accounts of all Members of the Plan, as of such Valuation Date, excluding from the accounts of said Members, in the case of a December 31 Valuation Date, any amounts credited from the contribution of the Company with respect to such Plan Year.  The excess or deficiency of the total net worth of the Trust as so compared with the total account balances of all Members shall be credited or charged to the accounts in the proportion that each such account balance bears to the total of all such account balances.

5.06  Distributions and Forfeitures.  Whenever the Trustee shall make any distribution to or in behalf of a Member in accordance with the provisions of Article VI, and whenever a Member shall forfeit all or a portion of the amount standing to the credit of his account in accordance with the provisions of Section 6.04, such Member's account shall be charged with the amount of such distribution or forfeiture.  Whenever part or all of the amount standing to the credit of a Member's account is to be segregated into a separate account for a terminated Member pursuant to Section 6.06(b), such Member's account shall be charged with the amount segregated.

5.07  Limitations on Allocations.  Notwithstanding anything hereinabove to the contrary, the amount credited to the account of any Member for any Plan Year pursuant to Section 5.03 or pursuant to this Section 5.07 (excluding any Company contributions and forfeitures which are credited to a Member's account pursuant to Section 6.05 in order to restore previously forfeited

14

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003598

Confidential-Subject to Protective Order

amounts) shall be reduced to the extent that such amount would cause the Company contributions and forfeitures credited to the account of such Member under this Plan for such Plan Year and the employer contributions and forfeitures allocated to the account of such Member under any defined contribution plan maintained by the Company or any Affiliated Company to exceed the lesser of

    (A)    $30,000 (as adjusted pursuant to Section 415(d) of the Code), or

    (B)    twenty-five percent (25%) of such Member's compensation within the meaning of Section 415 of the Code and regulations thereunder for such Plan Year from the Company and any Affiliated Company.

Any reductions required pursuant to the foregoing sentence shall be made from the Company contributions and forfeitures allocated to the Member's account pursuant to Section 5.03. In the event any reduction is required pursuant to the preceding sentence, the amount of such reduction shall be allocated and credited pursuant to the procedures outlined in Section 5.03 above to the accounts of remaining Members exclusive of any other Member for whom a reduction for such Plan Year has been required pursuant to this Section 5.07. Any reductions which cannot be so allocated shall be held unallocated by the Trustee and shall be treated as a forfeiture to be allocated under Section 5.03 with respect to the succeeding Plan Year.

    5.08 <u>Sources of Forfeiture Restorations</u>. Notwithstanding anything in this Article to the contrary, whenever a previously forfeited amount is required to be restored to a reemployed Member's account pursuant to Section 6.05, the Trustee shall effect such restoration as of the last day of the Plan Year of such Member's reemployment. In effecting such restoration, the

<div align="center">15</div>

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003599

Confidential-Subject to Protective Order

Trustee shall first utilize any amounts forfeited from the accounts of terminated Members pursuant to Section 6.04 during such Plan Year and then, if necessary, Company contributions made pursuant to Section 4.01 for such Plan Year.

16

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003600

DEF000104

<div align="center">

**ARTICLE VI**

Payments to or for the Accounts of
Members or Terminated Members

</div>

No shares of Common Stock or other property of the Trust shall be paid out or distributed by the Trustee except (a) for the purchase or other acquisition of Common Stock or other appropriate investments, (b) for defraying expenses, including taxes, if any, of administering the Trust as elsewhere herein provided, (c) for the repayment of any indebtedness incurred by the Trustee pursuant to Section 8.06, (d) as a return of Company contributions pursuant to Section 4.04, or (e) for the purpose of making distributions to or for the account of Members in accordance with the provisions of this Article VI.

6.01  Retirement.  Upon retirement of a Member, which shall be deemed to mean any termination of his employment with the Company at or after his reaching age sixty (60), the Trustee shall distribute, in accordance with the provisions of Section 6.06, the full amount standing to the credit of such Member's account.  A Member who remains in the active employ of the Company after attaining the age of sixty (60) shall continue as a Member for all purposes of the Plan until the date of his actual retirement.

6.02  Disability Retirement.  If a Member incurs a permanent disability, the Trustee shall distribute, in accordance with the provisions of Sections 6.06 and 6.07, the full amount standing to the credit of such Member's account.  For purposes of this Section 6.02, a Member shall incur a "permanent disability" if such Member is unable to engage in substantial gainful activity due to total and permanent physical or mental impairment that, in the opinion of a physician who is mutually acceptable to the Member and the Company, can be expected to

<div align="center">17</div>

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003601

Confidential-Subject to Protective Order

result in death, or can be expected to last or has lasted for at least twelve (12) consecutive months. The Trustee's determination as to whether a Member has incurred a permanent disability shall be conclusive and binding upon all persons.

    6.03 <u>Death Benefits</u>.

        (a)    Subject to paragraph (c) of this Section, each Member shall have the right to designate one or more Beneficiaries, including contingent Beneficiaries, to receive the amount payable in behalf of such Member under the provisions of this Plan in the event of death of such Member. Such designation shall be made in writing in such manner as the Trustee shall determine. Subject to the spousal consent requirement set forth in paragraph (c) below, a Member may change such designation from time to time, and may revoke such designation. If a Member dies without having designated a Beneficiary, or if none of the designated Beneficiaries survives the Member, or if the Trustee is in doubt as to the effective status of a Beneficiary designation, then, except as provided in paragraph (c) below, the duly appointed executor or administrator of the estate of such Member shall be deemed to be his Beneficiary.

        (b)    Upon the death of any Member, the Trustee shall distribute, for the benefit of such Member's Beneficiary or Beneficiaries and in accordance with the provisions of Section 6.06, the full amount standing to the credit of the Member's account. If a Beneficiary entitled to receive any amount payable in behalf of a Member under the Plan dies prior to having received the entire amount, the undistributed balance shall be distributed to such Beneficiary's estate.

        (c)    If a Member is married on the date of his death, the Member's surviving spouse shall be deemed to be his sole Beneficiary to receive the entirety of the death benefits

18

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003602

Confidential-Subject to Protective Order

DEF000106

payable under this Section 6.03 in respect of such Member, unless (i) such Member has elected in writing to designate one or more other Beneficiaries other than his spouse, and (A) the Member's surviving spouse has consented to such election in a writing, (B) such election designates a Beneficiary which may not be changed without the consent of the spouse (or the consent of the spouse expressly permits changes in Beneficiary designation by the Member without any requirement of further consent by the spouse), and (C) the spouse's consent acknowledges the effect of such election and is witnessed by a Plan representative or notary public, or (ii) it is established to the satisfaction of the Trustee that the consent of the spouse cannot be obtained because there is no spouse, because the spouse cannot be located, or because of other circumstances prescribed by regulations under Section 417(a)(2) of the Code.

A former spouse shall be treated as a surviving spouse to the extent benefits must be paid to such former spouse upon the Member's death pursuant to a qualified domestic relations order (as defined in Section 414(p) of the Code), except that no consent shall be required from such former spouse with respect to the designation of a Beneficiary to receive benefits not subject to said order.

6.04  Termination of Employment Prior to Retirement, Disability, or Death.

(a)    If any Member's employment with the Company terminates under circumstances other than by reason of retirement, disability or death, as provided for under Sections 6.01 through 6.03, he shall be entitled to a vested benefit equal to the amount standing to the credit of his account based on his period of Service as follows:

19

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003603

Confidential-Subject to Protective Order

DEF000107

| Years of Service | | Percentage |
|---|---|---|
| At Least | But Less Than | |
| | 2 | NONE |
| 2 | 3 | 10% |
| 3 | 4 | 30% |
| 4 | 5 | 60% |
| 5 | | 100% |

The vested benefit determined in accordance with the foregoing provision shall never be adjusted on account of any Service which a Member might complete upon reemployment with the Company or an Affiliated Company after a Break in Service, except as provided in Section 6.05.

(b)    The determination of the amount to which a terminated Member is entitled shall be made in accordance with the rules set forth in this Article, and the Trustee's determination shall be conclusive and binding on all persons.

(c)    The Trustee shall distribute the vested benefit to which any such Member is entitled, in accordance with Section 6.06, as soon as practicable after the Member's termination, subject to the requirements of Section 6.07.

(d)    Any amount which is not vested under this Section 6.04 at the time of a Member's termination of employment shall be forfeited by him upon the earlier of (i) the payment of the full amount to which such Member is entitled under the Plan, or (ii) the occurrence of five (5) consecutive Breaks in Service by the Member.  For the purposes of the preceding sentence, a terminated Member who is not entitled to receive any amount under the Plan shall be deemed to have received the entire amount to which he is entitled on the date his employment terminates and shall forfeit his entire account as of that date.  At the close of the

20

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003604

Confidential-Subject to Protective Order

DEF000108

Plan Year in which such forfeiture occurs, all such forfeited amounts shall be reallocated as of the end of the Plan Year in which such forfeitures occur among the accounts of the other Members in accordance with the provisions of Section 5.03.

6.05  Reemployment.  If a terminated Member is reemployed by the Company, he shall again become an active Member upon his Reemployment Commencement Date pursuant to Section 3.03, future Company contributions on his behalf shall be credited to his account, and subject to (a) and (b) below, his prior Service shall be restored for the purpose of calculating the vested portion of such account.

If such a reemployed Member was not 100% vested under Section 6.04(a) at the time of his prior termination, the following special provisions shall apply:

(a)  If such a terminated Member is reemployed before incurring five (5) consecutive Breaks in Service, the full amount which was forfeited from his account as a result of his prior termination shall be restored to his account as of the end of the Plan Year of his reemployment.

(b)  If a reemployed Member to whom paragraph (a) of this Section applies had received a distribution, prior to his reemployment, of all or any part of the vested portion of his account, the vested portion of his account shall thereafter be determined by (i) adding the amount previously distributed to his current account balance, (ii) multiplying the resulting sum by his current vesting percentage, and (iii) subtracting from the resulting product the amount previously distributed.

(c)  If such a terminated Member is reemployed after incurring five (5) consecutive Breaks in Service, he shall have no rights with respect to any amounts previously

21

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003605

Confidential-Subject to Protective Order

DEF000109

forfeited from his account, and any portion of his account which has not been distributed shall

be held in a separate, fully vested account until such Member becomes 100% vested under

Section 6.04(a), whereupon it shall be merged with the account otherwise maintained for him.

6.06  Manner and Timing of Distributions.

(a)    Except as otherwise provided in Sections 6.06(b) and (d) below and subject

to the requirements of Section 6.07, whenever a Member's account balance becomes

distributable pursuant to Sections 6.01 through 6.04 hereof to such Member or his Beneficiary,

distribution of said account balance shall be made by the payment, in cash, of either one lump

sum, a direct Rollover (as described in Section 6.11), or a combination of both.  Such

distribution shall be made within a reasonable time after the date of such retirement, disability,

death or termination of employment but not earlier than 30 days after the notice required under

Section 1.411(a)-11(c) of the Income Tax Regulations is given unless (i) the Trustee clearly

informs the Member that the Member has a right to a period of at least 30 days after receiving

the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a

particular distribution option), and (ii) the Member, after receiving the notice, affirmatively

elects a distribution.  Any additional amount thereafter credited to his account shall be

distributed in accordance with this Section 6.06(a) after that amount is ascertained.

(b)    Notwithstanding anything to the contrary elsewhere herein, if the aggregate

benefit payable to a Member exceeds $5,000, such benefit shall not be distributed prior to such

Member's sixty-second (62nd) birthday or death, whichever is earlier, unless such Member

consents in writing to an earlier distribution.  In the absence of such a consent, such Member's

22

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003606

Confidential-Subject to Protective Order

account shall be segregated into a separate account established pursuant to Section 6.09 at the time such account would otherwise have been distributable under Section 6.06(a) above.

(c)    Whenever a Member's account is to be distributed or segregated into a separate account established pursuant to Section 6.09, such Member's account shall first be credited with interest at the prevailing short-term rate as determined by the Trustee for the period from the next preceding Valuation Date to the last day of the month preceding such distribution or segregation.

(d)    Notwithstanding anything to the contrary elsewhere herein, if the Trustee determines that the assets of the Trust do not provide sufficient liquidity to permit the Member's account balance to be distributed in cash pursuant to this Section 6.06, distribution of such account balance shall be deferred until the Trustee determines there is sufficient liquidity or until the "deferred distribution date", whichever is earlier. Any such account balance shall remain invested in the general assets of the Trust and shall continue to be evaluated and adjusted as of each Valuation Date pursuant to Sections 5.04 and 5.05. For this purpose, the "deferred distribution date" shall be the earliest of (i) the third (3rd) anniversary of a Member's retirement, disability, death or termination of employment, (ii) the sixtieth (60th) day following the close of the first Plan Year in which such Member is both not an Employee and older than sixty (60), and (iii) the Member's Required Distribution Date as defined in Section 6.07(b). If distribution of such a Member's account has not been made by such deferred distribution date, then distribution of such account shall be made on such deferred distribution date (subject to the notice and time limitations under Section 6.06(a)) in cash (to the extent available) and shares of

23

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003607

Confidential-Subject to Protective Order

Common Stock (to the extent sufficient cash is not available) in a lump sum, direct rollover (as described in Section 6.11) or a combination of both.

6.07  Additional Restrictions on Distributions.  Notwithstanding any provision elsewhere herein to the contrary and solely to comply with the applicable provisions of the Code and ERISA:

      (a)  In no event shall the distribution of a Member's account, unless such Member or Beneficiary otherwise consents, begin later than the sixtieth (60th) day after the close of the Plan Year in which the latest of the following events occurs:

         (i)  the Member's sixtieth (60th) birthday; or

         (ii)  the Member's termination of employment with the Company.

      (b)  In no event shall distribution of benefits to a Participant who attains age 70½ after 1998 begin later than the April 1 next following the calendar year in which such Participant (A) attains age 70½ or (B) terminates employment with the Company, whichever is later (the "Required Distribution Date").  Clause (B) shall not apply in the case of a Participant who is a "five percent owner" at any time during the Plan Year ending in the calendar year in which the Participant attains age 70½.  If the Participant becomes a "five percent owner" during any subsequent Plan Year, the required distribution date shall be April 1 of the calendar year following such Plan Year.  For purposes of this subsection, a "five percent owner" is defined in Section 416(i)(1)(B)(i) of the Code.

Distribution of benefits to a Participant who attains or attained 70½ before 1999 shall begin no later than the April 1 next following the calendar year in which such Participant attains age 70½ (the "Required Distribution Date"); provided, a Participant who is not a five percent

<div align="center">24</div>

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003608

Confidential-Subject to Protective Order

DEF000112

owner may elect to defer distribution of benefits until after his termination of employment with the Company by filing written notice with the Trustee at least 60 days (or such shorter period as determined by the Trustee in accordance with the provisions of Section 8.11) prior to his Required Distribution Date.

(c)     If a Member dies before his Required Distribution Date, and his surviving spouse is not his designated Beneficiary, the distribution of benefits shall be paid to such Member's beneficiary in a lump sum no later than December 31 of the calendar year containing the fifth (5th) anniversary of such Member's death. If the Member's designated Beneficiary is his surviving spouse, distribution of his benefits shall commence no later than the date the Member would have attained age seventy and one-half (70½).

(d)     If a Member dies on or after his Required Distribution Date, the Member's remaining interest in the Plan shall be distributed at least as rapidly as under the method of distribution being used as of the date of death.

(e)     If, and to the extent that, any portion of a Member's accounts are payable to a former spouse or dependent pursuant to a qualified domestic relations order within the meaning of Sections 401(a)(13)(B) and 414(p) of the Code, the provisions of said order shall govern the distribution thereof. Such an order may provide for payments to a spouse or dependent from a Member's vested account balance even though the Member is still employed by the Employer or is otherwise not eligible for the distribution of benefits under the Plan. In addition, the amount distributed shall be credited with interest at the prevailing short-term rate as determined by the Trustee for the period from the Valuation Date immediately preceding the

25

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003609

Confidential-Subject to Protective Order

date of such distribution to the last day of the calendar month immediately preceding such distribution.

6.08  Discharge of Trustee's Obligation to Make Payments.  Whenever the Trustee is required to make any payment or payments to any person in accordance with the provisions of this Article VI or Article VII, the Company shall notify the Trustee in writing of such person's last known address as it appears in the Company's records; and the obligation of the Trustee to make such payment or payments shall be fully discharged by mailing the same to the address specified by the Company.

6.09  Investment of Segregated Funds.  Whenever any amount standing to the credit of a Member's account is to be segregated into a separate account for such Member, the Trustee shall keep the unpaid balance of such fund invested for the benefit of such Member in savings bank accounts and/or other investments specified as permissible investments for the Trust funds in Section 8.03; provided that the Trustee, with the consent of such Member, may retain the value of any such Member's account without segregation as an individual interest in the Trust fund, in which event such account shall participate in revaluations of the Trust pursuant to Sections 5.04 and 5.05.

6.10  Loans to Members.  Upon written application of a Member, the Trustee may lend to the Member such amount or amounts and upon such terms and conditions as the Trustee may determine proper, provided that the aggregate amount of all outstanding loans to such Member, including accrued interest thereon, shall not exceed the lesser of (a) $50,000, reduced by any loan repayment made during the one (1) year period ending on the day before the date such loan is made, or (b) fifty percent (50%) of the vested amount of said Member's account (determined

26

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003610

Confidential-Subject to Protective Order

DEF000114

at the time the loan is made). Loans pursuant to this Section 6.10 shall be made available to all Members on a reasonably equivalent basis.

Each such loan shall be made at such reasonable rate of interest as the Trustee may determine. Each such loan shall be subject to such other terms and conditions as the Trustee may determine. Each such loan shall be evidenced by the promissory note (the "Note") of the Member and shall be secured by fifty percent (50%) of such Member's vested interest in the Plan. Each such loan shall be repaid by payroll deduction or by such other means as may be authorized by the Trustee. Each such loan shall include the written consent of the Member to an immediate distribution in payment of the entire outstanding loan principal and any interest theretofore accrued, in the event such Member defaults pursuant to the terms of the note at any time subsequent to terminating employment with the Company. Each such loan shall be amortized over the term of the loan in level principal payments made not less frequently than quarterly, and shall be repaid within such time period as may be established by the Trustee but not longer than five (5) years unless such loan is used to acquire a dwelling unit which within a reasonable time is to be used (determined at the time the loan is made) as the principal residence of the Member.

All such loans shall be general investments of the Trust and the interest income thereon shall be included in the determination of the net worth of the Trust pursuant to Section 5.04.

If any part or all of the amount standing to the credit of a Member's account under the Plan shall become distributable to such Member or his Beneficiary while a loan to such Member under this Section 6.10 is outstanding, the Trustee shall apply the amount of such distribution in

27

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003611

Confidential-Subject to Protective Order

payment of the outstanding loan principal, whether or not then due, and of any interest theretofore accrued, before distributing the balance, if any, to the Member or his Beneficiary.

All expenses incurred by the Trustee, including reasonable attorneys' fees and court costs, as a result of a default by a Member shall be charged against the Member's interest in the Plan.

6.11  Direct Rollovers.  Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this Section, a distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

Such distributions shall be subject to the notice and time limitations under Section 6.06(a).

Whenever used in this Section, the following words shall have the following meanings:

(1)    Eligible Rollover Distribution:  An Eligible Rollover Distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an Eligible Rollover Distribution does not include:  any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under section 401(a)(9) of the Code; and the portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities).

(2)    Eligible Retirement Plan:  An Eligible Retirement Plan is an individual retirement account described in section 408(a) of the Code, an individual retirement annuity described in

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003612

Confidential-Subject to Protective Order

DEF000116

section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a

qualified trust described in section 401(a) of the Code, that accepts the distributee's Eligible

Rollover Distribution. However, in the case of an Eligible Rollover Distribution to the

surviving spouse, an Eligible Retirement Plan is an individual retirement account or individual

retirement annuity.

(3)     Distributee:  A Distributee includes an Employee or former Employee. In

addition, the Employee's or former Employee's surviving spouse and the Employee's or former

Employee's spouse or former spouse who is the alternate payee under a qualified domestic

relations order, as defined in Section 414(p) of the Code, are Distributees with regard to the

interest of the spouse or former spouse.

(4)     Direct Rollover:  A Direct Rollover is a payment by the Plan to an Eligible

Retirement Plan specified by the Distributee.

6.12  In-Service Withdrawals.  An active Member who is currently employed with the

Company may make in-service withdrawals from the vested portion of his account under the

Plan in accordance with subparagraphs (a) and/or (b) below. All withdrawal elections shall be

made in such form and pursuant to such procedures as may be required by the Trustee. The

valuation of a Member's account balance shall be made as of the Valuation Date immediately

preceding the date of distribution. In addition, the amount withdrawn shall be credited with

interest at the prevailing short-term rate as determined by the Trustee for the period from the

Valuation Date immediately preceding the date of such distribution to the last day of the

calendar month preceding such distribution.

29

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003613

Confidential-Subject to Protective Order

(a)    An active Member who is currently employed by the Company and who has been credited with 20 or more years of Service may elect to withdraw all or any portion of his account under the Plan subject to the following conditions:

(1)    A Member may make only one withdrawal per Plan Year pursuant to this Section 6.12(a); and

(2)    If the Trustee determines that the assets of the Trust do not provide sufficient liquidity to permit the requested withdrawal amount to be fully paid in cash, distribution of such withdrawal amount shall be deferred until the Trustee determines that there is sufficient liquidity or until the third (3rd) anniversary of the date of the Trustee's receipt of the Member's withdrawal election (the "deferred distribution date"), whichever is earlier. Any such deferred withdrawal amount shall remain invested in the general assets of the Trust and shall continue to be evaluated and adjusted as of each Valuation Date pursuant to Section 5.04 and 5.05. If distribution of the Member's withdrawal amount has not been made by such deferred distribution date, then distribution of such amount shall be made on such deferred distribution date in cash (to the extent available) and shares of Common Stock (to the extent sufficient cash is not available).

(b)    An active Member who is currently employed with the Company may elect to withdraw all or a portion of his vested account balance under the Plan in order to meet a "Financial Hardship," subject to the following conditions:

(1)    Any such withdrawal shall be limited to the amount required to meet such Financial Hardship increased by (i) any amounts necessary to pay any federal, state

30

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003614

Confidential-Subject to Protective Order

DEF000118

or local income taxes or penalties reasonably anticipated to result from the

distribution and (ii) interest (determined pursuant to the first paragraph of this

Section 6.12);

(2)    Any such withdrawal shall be made only to the extent the Trustee

determines there is sufficient liquidity in the Trust to pay such withdrawal amount

in cash.

For purposes of this Section 6.12(b), a "Financial Hardship" will be deemed to exist only

with respect to: (i) expenses for medical care (as described in Section 213(d) of the Code)

of the Member, the Member's spouse or any dependent of the Member (as defined in

Section 152 of the Code) or expenses necessary for such persons to obtain such medical

care, (ii) the purchase of a principal residence of the Member, (iii) the need to prevent

eviction of the Member from his principal residence or foreclosure on the mortgage of the

Member's principal residence, (iv) payment of expenses related to the renovation of the

Member's principal residence, (v) payment of educational expenses for the Member, the

Member's spouse or any dependent of the Member (as defined in Section 152 of the

Code), (vi) the need to pay the funeral expenses (including burial expenses) of a family

member of the Member, or (vii) payment of significant amounts of current debt incurred

as a result of any one or more of the foregoing. The determination that the Member is

faced with a Financial Hardship and the amount required to meet such Financial Hardship

shall be made by the Trustee in accordance with uniform and nondiscriminatory standards

or policies which shall be adopted by the Trustee and consistently applied to each

application for a withdrawal pursuant to this Section 6.12(b), and the Trustee may

31

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003615

Confidential-Subject to Protective Order

DEF000119

reasonably rely upon the validity of any and all documentation submitted by the Member in accordance with such standards or policies.

32

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003616

Confidential-Subject to Protective Order

DEF000120

ARTICLE VII

Amendment and Termination

7.01 Right to Amend or Terminate. The Company reserves the right at any time and from time to time to amend this Agreement, or discontinue or terminate the Plan and Trust by delivering to the Trustee a copy of an amendment or appropriate Board of Directors' resolution of discontinuance or termination certified by an officer of the Company; provided, however, that except as provided in Section 7.02, the Company shall have no power to amend or terminate this Agreement in such manner as would cause or permit (a) any of the Trust assets to be diverted to purposes other than for the exclusive benefit of the Employees of the Company or their Beneficiaries or estates; (b) any reduction in the amount theretofore credited to any Member or former Member; (c) any portion of the Trust assets to revert to or become the property of the Company; (d) the duties or liabilities of the Trustee to be changed without his written consent; and (e) the elimination of an optional form of benefit with respect to amounts credited to a Member's accounts prior to the amendment.

7.02 Amendment for Tax Exemption. The Company reserves the right to amend this Agreement and the Plan and Trust hereunder in such manner as may be necessary or advisable so that said Trust may qualify and continue to qualify as an exempt employees' trust under the provisions of the Internal Revenue Code as now in force or as it may hereafter be changed or amended; and any such amendment may be made retroactively.

7.03 Liquidation of Trust in Event of Termination. In the event of termination or partial termination (as determined by an Internal Revenue Service ruling or by a court of proper jurisdiction, as to which all rights of appeal have expired) of this Plan and Trust, or complete

33

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003617

Confidential-Subject to Protective Order

discontinuance of contributions thereto by the Company, the rights of all Members (or in the case of a partial termination, the Members affected thereby) to amounts theretofore credited to their accounts shall be fully vested and nonforfeitable. In the event of termination, the Trustee shall (a) reduce to cash such part of the Trust fund as he may deem appropriate; (b) pay the liabilities, if any, of the Trust; (c) value the remaining assets of the Trust as of the date of termination and adjust Members' account balances in the same manner as provided in Section 5.05; (d) distribute such assets in cash or partly in shares of Common Stock and partly in cash to or in behalf of the Members in liquidation in proportion to the amounts standing to the credit of their respective accounts as of the termination date.

7.04 <u>Termination of Plan and Trust</u>. This Agreement and the Plan and Trust hereunder shall in any event terminate whenever all property held by the Trustee shall have been distributed in accordance with the terms hereof. Until such time as the Trust is fully distributed, the Trustee shall continue to have the powers, immunities and exemptions which he had during the existence of the Trust, to the extent permitted by law.

34

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003618

Confidential-Subject to Protective Order

DEF000122

## ARTICLE VIII

### Rights and Duties of Trustee

8.01 _Trustees_.  There shall be such number of Trustees of this Trust as the Company may determine, any or all of whom may be officers or employees of the Company or any other individuals or entities.

8.02 _Powers of Trustee_.  It shall be the duty of the Trustee to hold the Common Stock of the Company or other property contributed to and acquired by the Trust, and to make distributions therefrom in accordance with the Plan.  The Trustee is hereby vested with all powers and authority necessary in order to carry out his duties and responsibilities in connection with the administration of the Plan and Trust as herein provided, and is authorized to make such rules and regulations as he may deem necessary to carry out the provisions of the Plan and Trust.  The Trustee shall determine any question arising in the administration, interpretation and application of the Plan and Trust, and the decision of the Trustee shall be conclusive and binding on all persons.

8.03 _Investments_.  The Trustee shall invest and reinvest the funds of the Trust and keep the same invested, without distinction between principal and income, in such stocks, bonds or other securities or certificates of participation or shares of any mutual investment company, trust or fund, or any other property of any kind, real or personal, tangible or intangible, as he may deem advisable, provided that the Trustee may hold funds of the Trust uninvested if and to the extent that he may deem advisable from time to time.  Notwithstanding the foregoing, and in accordance with the purposes of the Plan, the Trustee is specifically authorized to invest all or any portion of the Trust assets in shares of Common Stock.  It is intended that a substantial

35

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003619

Confidential-Subject to Protective Order

DEF000123

portion of the assets of the Trust (up to 100%) shall be invested in shares of Common Stock, to the extent that such Common Stock is reasonably available.

8.04  Method of Purchasing, Holding and Selling Securities.  The Trustee may purchase Common Stock from the Company or from any stockholder of the Company at a price equal to the fair market value of the Common Stock at the time of purchase.  The Trustee may keep the Common Stock and any other securities or other property of the Trust in the name of some other person, firm or corporation or his own name without disclosing fiduciary capacity.  The Trustee may purchase or sell at public auction or by private contract, redeem, or otherwise realize upon such Common Stock, securities, or other property and for such purposes may execute such instruments and writings and do such things as he shall deem proper.

8.05  Exercise of Voting Rights.  The Trustee is hereby authorized to vote the Common Stock and any other securities comprising the Trust fund or otherwise consent to or request any action on the part of the Company or the issuer of such other securities, and to give general or special proxies or powers of attorney, with or without power of substitution, and to participate in reorganizations, recapitalizations, consolidations, mergers and similar transactions with respect to such securities; to deposit such Common Stock or other securities in any voting trust, or with any protective or like committee, or with a trustee, or with depositaries designated thereby; and generally to exercise any of the powers of an owner with respect to the Common Stock, securities, and other assets which the Trustee deems to be for the best interests of the Trust to exercise.

8.06  Power to Borrow.  The Trustee is hereby authorized to borrow money for the purpose of this Trust upon such terms and conditions as he may determine, and for any amount

36

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003620

Confidential-Subject to Protective Order

DEF000124

so borrowed to issue the promissory note of the Trustee and to secure the repayment thereof by pledge, mortgage or hypothecation of all or any part of the property of the Trust, and no person loaning money to the Trustee shall be bound to see to the application of the money loaned or to inquire into the validity of any such borrowing.

8.07  Reliance on Trustee as Owner.  No person dealing with the Trustee shall be required to take any notice of this Agreement, but all persons so dealing shall be protected in treating the Trustee as the absolute owner with full power of disposition of all the monies, Common Stock and other property of the Trust, and all persons dealing with the Trustee are released from inquiry into the decision or authority of the Trustee and from seeing to the application of monies, Common Stock or other property paid or delivered to the Trustee.

8.08  Liquidation of Assets.  In the event that cash is required by the Trustee to effect any action or distribution under this Trust, or to pay any expenses of this Trust, or for any other reason deemed sufficient by the Trustee, the Trustee shall take such action as to the sale or other disposition of Common Stock or other property forming a part of the Trust as will provide the amount of cash necessary for such payments.

8.09  Evidence on which Trustee may Act.  In taking any action or determining any fact or question which may arise under this Trust, the Trustee may, with respect to the affairs of the Company or its Employees, rely upon any statement by the Company with respect thereto.  In the event that any dispute may arise regarding the payment of any sums or regarding any act to be performed by the Trustee, the Trustee may retain such payment or postpone the performance of such act until actual adjudication of such act shall have been made in a court of competent jurisdiction; or until he shall have been indemnified against loss to his satisfaction; provided,

37

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003621

DEF000125

however, that in the event of any such dispute, the Trustee may rely upon and act in accordance with any directions received from the Company.

8.10 Action by Trustees. In the event there are two or more individual Trustees of this Trust, the Trustees shall act by a majority of their number at the time in office and such action may be taken either by vote at a meeting or in writing without a meeting. The Trustees may by such majority action authorize any one or more of their number to execute any document or documents or to take any other action on behalf of the Trustees, and in such event any one of the Trustees may certify in writing to any person the taking of such action and the name or names of the Trustee or Trustees so authorized, including himself. Any such person shall be protected in accepting and relying upon any such document or certificate and is released from inquiry into the authority of any of the Trustees.

8.11 Discretionary Action. Wherever under the provisions of this Agreement the Trustee is given any discretionary power or powers, such power or powers shall not be exercised in such manner as to cause any discrimination in favor of or against any Employee or class of Employees. Any discretionary action taken by the Trustee hereunder shall be consistent with any prior discretionary action taken by him under similar circumstances and to this end the Trustee shall keep a record of all discretionary action taken by him under any provision hereof.

8.12 Employment of Agents. The Trustee may employ agents, including, but not limited to, custodians, accountants or attorneys, to perform such services and duties (including any fiduciary responsibilities other than trustee responsibilities) in connection with the administration of the Trust as he may direct. The compensation of such agents shall be an expense chargeable in accordance with Section 8.15. The Trustee shall be fully protected in

38

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003622

Confidential-Subject to Protective Order

DEF000126

acting upon the advice of any such agent, in whole or in part, and, except as may be required by applicable Federal law, shall not be liable for any act or omission of any such agent, the Trustee's only duty being to use reasonable care in the selection of such agent.

8.13 Records and Accounting. The Trustee shall keep accurate and detailed records of his transactions hereunder and all his accounts, books and records relating thereto shall be open at all reasonable times to the inspection of the Company and its authorized representatives. The Trustee shall render in writing at least once each twelve (12) months, accounts of his transactions under this Agreement to the Company and the Company may approve such accounts of the Trustee by an instrument in writing delivered to the Trustee. In the absence of the filing in writing with the Trustee by the Company of exceptions or objections to any such account within sixty (60) days after the receipt by the Company of any such account the Company shall be deemed to have approved such account; and in such case, or upon the written approval of the Company of any such account, the Trustee shall be released, relieved and discharged with respect to all matters and things set forth in such account. Except as may otherwise be required by applicable Federal law, no person interested in the Trust or otherwise other than the Company may require an accounting or bring any action against the Trustee with respect to the Trust and his actions as Trustee. In any proceeding instituted by the Trustee and/or the Company with respect to these accounts, only the Company and the Trustee shall be the necessary parties. The Trustee shall from time to time make such other reports and furnish such other information concerning the Trust as the Company may in writing reasonably request or as may be required by applicable Federal law.

39

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003623

Confidential-Subject to Protective Order

8.14  Payment of Taxes.  The Trustee shall upon direction of the Company pay out of the Trust fund any and all taxes of any and all kinds, including without limitation property taxes and income taxes levied or assessed under existing or future laws upon or in respect of the Trust or any monies, securities or other property forming a part thereof or the income therefrom subject to the terms of any agreements or contracts made with respect to trust investments which make other provision for such tax payments.  The Trustee may assume that any taxes assessed on or in respect of the Trust or its income are lawfully assessed unless the Company shall in writing advise the Trustee that in the opinion of counsel for the Company such taxes are or may be unlawfully assessed.  In the event that the Company shall so advise the Trustee, the Trustee will, if so requested in writing by the Company, contest the validity of such taxes in any manner deemed appropriate by the Company or its counsel but at the expense of the Trust; or the Company may itself contest the validity of any such taxes at the expense of the Trust and in the name of the Trustee; and the Trustee agrees to execute all documents, instruments, claims and petitions necessary or advisable in the opinion of the Company or its counsel for the refund, abatement, reduction or elimination of any such taxes.

8.15  Compensation and Expenses of Trustee.  The Trustee shall serve without compensation for his services as such, but all expenses of the Trust shall be paid from the assets of the Trust unless the Company, in its sole discretion, elects to pay such expenses.  Such expenses shall include any expenses incident to the functioning of the Plan, including, but not limited to attorneys fees and the compensation of other agents, accounting and clerical charges, the cost of obtaining any bonds required by ERISA and other costs of administering the Plan.

40

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003624

8.16  <u>Resignation or Removal of Trustee</u>.  Any Trustee acting hereunder may resign at any time upon written notice to the Company and, if applicable, to the remaining Trustees and the Company may remove any Trustee at any time upon written notice to such Trustee and, if applicable, the remaining Trustees.  If any Trustee shall die, resign, be removed or for any other reason cease to be Trustee, he shall be replaced by a successor to be selected by the Board of Directors and until he is so replaced, the remaining Trustees shall exercise all of the powers of the Trustees.  The appointment of a successor Trustee shall be effective upon written notification to the Company and to the Trustees of his acceptance of such appointment.

8.17  <u>Legal Action</u>.  The Trustee shall not be required to institute any legal action or to appear or participate in any legal action to which he may be a party, except to contest taxes, unless he shall have been first indemnified to his satisfaction by the Company for all loss, cost and liability.

8.18  <u>Indemnification of Trustee</u>.  The Company either through insurance or otherwise shall indemnify and hold harmless the Trustee from any and all claims, loss, damages, expenses (including reasonable counsel fees approved by the Company), and liability (including any reasonable amounts paid in settlement with the Company's approval), arising from any act or omission of the Trustee, except when the same is judicially determined to be due to the willful misconduct of the Trustee.

41

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003625

Confidential-Subject to Protective Order                                              DEF000129

## ARTICLE IX

### The Company

9.01  No Contract of Employment.  This Trust shall not be construed as creating any contract of employment between the Company and any Member, Employee or other person, and nothing herein contained shall give any person the right to be retained in the employ of the Company or otherwise restrain the Company's right to deal with its employees, including Members and Employees, and their hiring, discharge, layoff, compensation, and all other conditions of employment in all respects as though this Trust did not exist.

9.02  No Contract to Maintain Plan.  The Company by the creation of the Trust does not enter into any agreement to maintain the Trust or to make any further contributions thereto or reimbursement of expenses incurred hereunder.  Each contribution by the Company shall be voluntary, and the Company reserves the right to suspend payment of its contributions hereunder, and no party hereto or Member or any other person shall have any cause or right of action against the Company by reason of failure by the Company to make contributions to the Trust, or by reason of any action by the Company in terminating the Plan and Trust.

9.03  Liability of Company.  Subject to its agreement to indemnify the Trustee as provided in Section 8.18 and except as otherwise provided by applicable Federal law, neither the Company nor any person acting in behalf of the Company shall be liable for any act or omission on the part of the Trustee, or for any act performed or the failure to perform any act by any person with respect to this Agreement, the Plan or Trust, the Company's only duty being to use reasonable care in the selection of the Trustee.

42

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003626

9.04  Action by Company.  Whenever under the terms of this Agreement, the Company is permitted or required to take any action, such action shall be taken by the Board of Directors or by any officer of the Company thereunto duly authorized by the Board of Directors or otherwise.  In such event, any such officer may certify to the Trustee or any person the taking of such action and the name or names of the officers so authorized, including himself.  The execution of any direction, document or certificate in behalf of the Company by any of its officers shall constitute his certification of his authority with respect thereto, and the Trustee or other person shall be protected in accepting and relying upon any such direction, document or certificate and are released from inquiry into the authority of any officer of the Company.

9.05  Successor to Business of Company.  Unless this Plan and Trust be sooner terminated, a successor to the business of the Company, by whatever form or manner resulting, may continue the Plan and Trust by executing an appropriate supplementary agreement and such successor shall ipso facto succeed to all the rights, powers and duties of the Company hereunder.  The employment of any Employee who has continued in the employ of such successor shall not be deemed to have been terminated or severed for any purposes hereunder if such supplemental agreement so provides.

9.06  Dissolution of the Company.  In the event that the Company is dissolved by reason of bankruptcy or insolvency or otherwise, without any provision being made for the continuation of this Plan and Trust by a successor to the business of the Company, the Plan and Trust hereunder shall terminate, and the Trustee shall proceed in the same manner as though the Plan and Trust were being terminated by the Company as provided in Section 7.03.

43

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003627

Confidential-Subject to Protective Order                    DEF000131

ARTICLE X

Top-Heavy Provisions

10.01  Article Controls.  Any provisions of any Plan to the contrary notwithstanding, the provisions of this Article X shall control the Plan to the extent required to cause the Plan to comply with the requirements imposed by Section 416 of the Code.

10.02  Definitions.  Where the following words and phrases appear in this Article X, they shall have the respective meanings set forth below, unless their context clearly indicates to the contrary:

(a)    Account Balance.  As of any Valuation Date, the aggregate amount credited to an individual's account or accounts under a qualified defined contribution plan (excluding employee contributions which were deductible within the meaning of Section 219 of the Code and rollover or transfer contributions made by or on behalf of such individual to such plan from another qualified plan, sponsored by an entity other than the Company or an Affiliated Company) increased by (i) the aggregate distributions made to such individual from such plan during a five (5) year period ending on the Determination Date, and (ii) the amount of any contributions due as of the Determination Date immediately following such Valuation Date;

(b)    Aggregation Group.  The group of qualified plans maintained by the Company and each Affiliated Company consisting of (i) each plan in which a Key Employee participates and each other plan which enables a plan in which a Key Employee participates to meet the requirements of Sections 401(a)(4) and 410 of the Code, or (ii) each plan in which a Key Employee participates, each other plan which enables a plan in which a Key Employee participates to meet the requirements of Sections 401(a)(4) and 410 of the Code, and any other

44

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003628

Confidential-Subject to Protective Order

DEF000132

plan which the Company elects to include as a part of such group; provided, however, that the Company may not elect to include a plan in such a group if its inclusion would cause the group to fail to meet the requirements of Sections 401(a)(4) and 410 of the Code.

(c)    Compensation.  For the purposes of this Article X, an individual's earned income, wages, salaries, and other amounts actually paid by the Company or an Affiliated Company to such individual during a Plan Year for personal services actually rendered in the course of employment with the Company or an Affiliated Company (subject to exclusion of amounts specified by regulations promulgated under Section 415 of the Code).  In no event shall a Member's Compensation exceed $150,000 for any Plan Year (or such other amount as the Secretary of the Treasury or his delegate may determine for such Plan Year under Section 401(a)(17) of the Code).

(d)    Determination Date.  For the first Plan Year of any plan, the last day of such Plan Year, and for each subsequent Plan Year of such plan, the last day of the preceding Plan Year.

(e)    Former Key Employee.  With respect to any Plan Year, any individual who was a Key Employee in a previous Plan Year but who is not a Key Employee with respect to such Plan Year.  For purposes of this definition, a beneficiary (who would not otherwise be a Key Employee) of a deceased former Key Employee shall be deemed to be a Former Key Employee in substitution for such deceased Former Key Employee.

(f)    Key Employee.  With respect to any Plan Year, any individual who at any time during such Plan Year or during any of the four (4) Plan Years immediately preceding such Plan Year was (i) an officer (within the meaning of Section 416 of the Code) of the Company or

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003629

Confidential-Subject to Protective Order

an Affiliated Company with Compensation greater than 150% of the amount in effect under

Section 415(c)(1)(A) for such Plan Year, (ii) one of the ten (10) employees with Compensation

greater than such amount and owning the largest interests in the Company or an Affiliated

Company, (iii) an owner of more than five percent (5%) of the outstanding stock of the

Company or an Affiliated Company or of stock possessing more than five percent (5%) of the

total combined voting power of all the stock of the Company or an Affiliated Company, or

(iv) an employee whose Compensation (during the calendar year including the Determination

Date) exceeded $150,000 and who was an owner of more than one percent (1%) of the

outstanding stock of the Company or an Affiliated Company or of stock possessing more than

one percent (1%) of the total combined voting power of all of the stock of the Company or an

Affiliated Company.  For purposes of this definition, (i) an individual shall be deemed to own

stock owned by others as provided in Section 318 of the Code, (ii) a beneficiary (who would not

otherwise be a Key Employee) of a deceased Key Employee shall be deemed to be a Key

Employee in substitution for such deceased Key Employee, and (iii) the total number of Key

Employees who are officers of the Company and the Affiliated Companies shall be limited to

the fifty (50) (or, if lesser, the greater of three (3) or ten percent (10%) of the employees)

officers with the highest Compensation.

     (g)    Plan Year.  With respect to any plan, the annual accounting period used by

such plan for annual reporting purposes.

     (h)    Valuation Date.  With respect to any Plan Year of any defined contribution

plan, the most recent date within the twelve (12) month period ending on a Determination Date

46

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003630

Confidential-Subject to Protective Order

as of which the trust fund established under such plan was valued and the net income (or loss) thereof allocated to members' accounts.

10.03  Top-Heavy Status.  The Plan shall be deemed to be top-heavy if, as of any Determination Date, (i) the sum of the Account Balances of Members who are Key Employees exceeds sixty percent (60%) of the sum of the Account Balances of all Members (excluding in both cases the Account Balances of all Former Key Employees and of those former Employees who have not performed any services for the Company or any Affiliated Company at any time during the five-year period ending on the Determination Date) unless the Plan is part of an Aggregation Group or (ii) an Aggregation Group including the Plan is top-heavy.  An Aggregation Group shall be deemed to be top-heavy as of a Determination Date if the sum (computed in accordance with Section 416(g)(2)(B) of the Code and the regulations promulgated thereunder) of the Account Balances of Key Employees under all defined contribution plans included in the Aggregation Group exceeds sixty percent (60%) of the sum of the Account Balances of all individuals under such plans (excluding in both cases the Account Balances of all Former Key Employees and of those former Employees who have not performed any services for the Company or any Affiliated Company at any time during the five-year period ending on the Determination Date).

10.04  Minimum Contribution.  If the Plan is determined to be top-heavy for a Plan Year, the Company shall make an additional Company contribution to the Plan on behalf of each Employee who is a Member of the Plan, who is not a Key Employee, and who has not terminated his employment as of the last day of such Plan Year, equal to that amount which when added to the aggregate amount of Company contributions and forfeitures (excluding

47

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003631

amounts credited to the account of such Member pursuant to Sections 5.08 and 6.05) allocated to such Member's accounts for such Plan Year will cause the sum of all such contributions and forfeitures to equal the lesser of

      (a)    three percent (3%) of such Member's Compensation for such Plan Year, or

      (b)    a percent of such Member's Compensation for such Plan Year equal to the greatest percent obtained by dividing for each Key Employee the aggregate amount of Company contributions and forfeitures (excluding amounts credited to the account of any such Key Employee pursuant to Sections 5.08 and 6.05) allocated to such Key Employee's accounts for such Plan Year by such Key Employee's Compensation for such Plan Year.

    10.05  <u>Vesting</u>. If the Plan is determined to be top-heavy for a Plan Year, the vested benefit of any Member who terminates his employment with the Company during such Plan Year shall be determined in accordance with Section 6.04, but using the following vesting schedule in lieu of the schedule appearing in Section 6.04:

| <u>Years of Service</u> | | <u>Percentage</u> |
|---|---|---|
| <u>At Least</u> | <u>But Less Than</u> | |
| | 2 | NONE |
| 2 | 3 | 20% |
| 3 | 4 | 40% |
| 4 | 5 | 60% |
| 5 | | 100% |

In the event that the Plan ceases to be top-heavy in a subsequent Plan Year, the vested benefit of any Member who terminates his employment with the Company after the Plan has ceased to be top-heavy shall be determined in accordance with the vesting schedule in Section 6.04; except that (a) the vesting percentage of any such Member shall not be less than the

48

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003632

vesting percentage which such Member achieved under the schedule set forth in this Section 10.05 of the last day of the last Plan Year for which the Plan was top-heavy, and (b) the vesting percentage of a Member who has been credited with three (3) or more years of Service as of the last day of the last Plan Year for which the Plan was top-heavy shall continue to be determined in accordance with the vesting schedule set forth in this Section 10.05.

10.06 <u>Termination of Top-Heavy Status</u>.  Except as specifically provided in Section 10.05, if the Plan has been deemed to be top-heavy for one or more Plan Years and thereafter ceases to be top-heavy, the provisions of this Article X shall cease to apply to the Plan effective as of the day following the Determination Date on which it is determined to no longer be top-heavy.

49

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003633

Confidential-Subject to Protective Order

DEF000137

## ARTICLE XI

### Miscellaneous

11.01  Limitation of Rights.  The establishment of the Trust shall not be considered as giving any Member or Employee or any other person any legal or equitable rights as against the Company or the Trustee, nor shall any person be responsible for the sufficiency of the Trust to provide benefits under the Plan, but each person interested shall look solely to the assets of the Trust for benefits payable subject to the terms and conditions of the Plan.

11.02  Spendthrift Provision.  Beneficial interests of Members or their Beneficiaries in the Trust shall not be assignable or subject to attachment nor receivership, nor shall they pass to any trustee in bankruptcy or be reached or applied by any legal process for the payment of any obligations of any such person, except as provided by Section 6.10 in the case of a loan to a Member from the Trust.  Nothing in this Section 11.02 shall prevent or restrict the creation, assignment or recognition of a right to any benefit payable with respect to a Member pursuant to a "qualified domestic relations order" (within the meaning of Sections 401(a)(13) and 414(p) of the Code).

11.03  Appointment of Person to Receive Payment.  In the event any amount shall become payable hereunder to any person (or his Beneficiary or estate), and if after written notice from the Trustee mailed to such person's last known address as shown on the Company's records, such person or his personal representative shall not have presented himself to the Trustee or notified the Trustee in writing of his address within one (1) year after the mailing of such notice, then the Trustee shall in his discretion appoint one or more of the spouse and blood relatives of such person to receive such amount, including any amount thereafter becoming due

50

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003634

Confidential-Subject to Protective Order

DEF000138

to such person (or his estate), in the proportions determined by him. Any action of the Trustee hereunder shall be binding and conclusive upon all persons.

11.04 Construction. In any question of interpretation or other matter of doubt, the Trustee and the Company may rely upon the opinion of counsel for the Company or any other attorney at law designated by the Company with the approval of the Trustee. The provisions of this Agreement shall be construed, administered and enforced according to the laws of the United States and, to the extent permitted by such laws, by the laws of the Commonwealth of Massachusetts. All contributions to the Trust shall be deemed to be made in the Commonwealth of Massachusetts.

11.05 Impossibility of Performance. In case it becomes impossible for the Company or the Trustee to perform any act under this Plan and Trust, that act shall be performed which in the judgment of the Trustee will most nearly carry out the intent and purpose of this Plan and Trust. All parties to this Agreement or in any way interested in this Plan and Trust shall be bound by any acts performed under such condition.

11.06 Adjustment for Fractional Interests. Notwithstanding any other provision of this Plan to the contrary, the amount of any contribution of Common Stock shall be adjusted by adding such part of a fractional share of the Common Stock thereto as is necessary to bring the total shares of Common Stock held by the Trustee to a whole number.

11.07 Definition of Words. Feminine or neuter pronouns shall be substituted for those of the masculine form, and the plural shall be substituted for the singular, in any place or places herein where the context may require such substitution or substitutions.

51

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003635

DEF000139

11.08  Titles.  The titles of articles and sections are included only for convenience and shall not be construed as a part of this Agreement or in any respect affecting or modifying its provisions.

11.09  Merger or Consolidation.  In the event that this Plan is merged with or consolidated with any other plan, or the assets or liabilities accrued under this Plan are transferred to any other plan, each Member's benefit under such other plan shall be at least as great immediately after such merger, consolidation or transfer (if such plan were then to terminate) as the benefit to which he would have been entitled under this Plan immediately before such merger, consolidation or transfer (if the Plan were then to terminate).

11.10  Claims Procedure.  In accordance with Section 503 of the ERISA and the regulations of the Secretary of Labor prescribed thereunder,

(1)    All claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such regulations as the Trustee shall reasonably establish.

(2)    The Trustee shall, within sixty (60) days of submission of a claim, provide adequate notice in writing to any claimant whose claim for benefits under the Plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the claimant,

(3)    The Trustee shall, within a reasonable period of time and upon request by a claimant, afford a reasonable opportunity to any claimant, whose claim for benefits has been denied, for a full and fair review by the Trustee of the decision denying the claim, and

52

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003636

Confidential-Subject to Protective Order

(4)    The Trustee shall, within 60 days of receipt of a request for a review, render a written decision on his review setting forth the specific reasons for such decision, written in a manner to be understood by the claimant.

11.11  Allocation and Delegation of Responsibilities. The named fiduciaries with respect to the Plan shall be the Company and the Trustee. The Company is the Plan Administrator for all purposes of ERISA. The responsibilities of the named fiduciaries shall be allocated as provided herein, and each such fiduciary shall have only those responsibilities and obligations that are specifically imposed upon him by this Trust Agreement. It is intended that each of the named fiduciaries shall be responsible for the proper exercise of his own powers, duties, responsibilities and obligations under the Plan and shall not be responsible for any act or omission of any other fiduciary. Each named fiduciary shall be entitled to delegate all or any part of his fiduciary responsibilities and obligations (except those related to the management of the assets held hereunder) to any other person or entity. In the event of any such delegation, (i) the named fiduciary shall not be liable for any act or omission of the person to whom the responsibility has been delegated as long as the selection and retention of such person is prudent and (ii) the person to whom the fiduciary powers and obligations are delegated shall be responsible only for the proper exercise of the powers, duties, responsibilities and obligations that have been specifically delegated to him.

11.12  Special Provisions for Certain Leased Employees. A "leased employee" shall receive credit for Service which shall be recognized in determining the Employee's credit for Service for the entire period during which he is a leased employee of the Company as if he were an Employee of the Company; provided, however, that a leased employee shall not be eligible

53

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003637

Confidential-Subject to Protective Order

to participate in the Plan as long as he remains a leased employee. For purpose of this Section 11.12, the term "leased employee" means any person (a) who is not an Employee of the Company and (b) who pursuant to an agreement between the Company and any other person (a "leasing organization") has performed services for the Company on a substantially full-time basis for a period of at least one (1) year and such services are performed under the primary direction or control of the Company, and (c) who is not covered by a money purchase pension plan maintained by the leasing organization which provides a nonintegrated employer contribution rate of at least ten percent (10%) of compensation, immediate participation, and full and immediate vesting. If leased employees constitute more than twenty percent (20%) of the Company's nonhighly compensated workforce (as defined in Section 414(n)(5)(C)(ii) of the Code) without regard to clause (c) of the preceding sentence, then clause (c) shall not apply.

11.13  Execution of Agreement. This Agreement may be executed in any number of counterparts and each fully executed counterpart shall be deemed an original.

54

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003638

Confidential-Subject to Protective Order                                                           DEF000142

IN WITNESS WHEREOF these presents have been signed and sealed for and in behalf of the parties hereto, in the case of the Company by its duly authorized officer, this 21<sup>st</sup> day of

_JULY_ , 1998.

COMPANY:  MEDICAL INFORMATION
          TECHNOLOGY INC.

          By _Dabant Maghill_ ,
          Title: CHIEF FINANCIAL OFFICER + TREAS.

TRUSTEE:  _A. Neil Pappalardo_
          A. Neil Pappalardo

DOCSB\520071.2

55

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0003639

Confidential-Subject to Protective Order

DEF000143

FIRST AMENDMENT
TO
MEDICAL INFORMATION TECHNOLOGY, INC.
PROFIT SHARING PLAN AND TRUST

A.    The Trust Agreement dated July 27, 1998 amending and restating The Medical Information

Technology, Inc. Profit Sharing Plan and Trust, is hereby amended effective January 1, 1998 by

deleting Section 5.07 in its entirety and substituting the following in lieu thereof:

"5.07    Limitations on Allocations. Notwithstanding anything hereinabove to the
contrary, the amount credited to the account of any Member for any Plan Year pursuant to
Section 5.03 or pursuant to this Section 5.07 (excluding any Company contributions and
forfeitures which are credited to a Member's account pursuant to Section 6.05 in order to
restore previously forfeited amounts) shall be reduced as provided below to the extent that
such amount would cause the Company contributions and forfeitures credited to the
account of such Member under this Plan for such Plan Year and the employer contributions
and forfeitures allocated to the account of such Member under any defined contribution
plan maintained by the Company or any Affiliated Company to exceed the lesser of

(A)    $30,000 (as adjusted pursuant to Section 415(d) of the Code), or
(B)    twenty-five percent (25%) of such Member's compensation within the
meaning of Section 415 of the Code and regulations thereunder for such
Plan Year from the Company and any Affiliated Company.

If, as a result of the allocation of forfeitures or a reasonable error in estimating the
Member's compensation, a reduction is required pursuant to the foregoing sentence, such
reduction shall be made from the Company contributions and forfeitures allocated to the
Member's account pursuant to Section 5.03. The amount of such reduction shall be
allocated and credited pursuant to the procedures outlined in Section 5.03 above to the
accounts of remaining Members exclusive of any other Member for whom a reduction for
such Plan Year has been required pursuant to this Section 5.07. Any reductions which
cannot be so allocated shall be held unallocated by the Trustee and shall be treated as a
forfeiture to be allocated under Section 5.03 with respect to the succeeding Plan Year. "

B.    Said Trust Agreement, as so amended, is hereby confirmed in all other respects.

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0002719

Confidential-Subject to Protective Order

IN WITNESS WHEREOF, this First Amendment has been signed and sealed for and on behalf of the Company by its duly authorized officer, and by the Trustee, this $23^{th}$ day of

FEBRUARY, 1999

COMPANY: MEDICAL INFORMATION
TECHNOLOGY, INC.

By: _____
Barbara A. Manzolillo,
Chief Financial Officer
and Treasurer

TRUSTEE: _____
A. Neil Pappalardo

DOCSB\571391.1

2

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0002720

## SECOND AMENDMENT
## TO
## MEDICAL INFORMATION TECHNOLOGY, INC.
## PROFIT SHARING PLAN AND TRUST

A.    The Trust Agreement dated July 27, 1998 amending and restating The Medical

Information Technology, Inc. Profit Sharing Plan and Trust, as subsequently amended by the

First Amendment, is hereby amended as follows:

1.    Section 2.09 is hereby amended by deleting the first sentence thereof in its

entirety and substituting the following in lieu thereof:

> "'Compensation' includes salary, wages, bonuses, overtime,
> commissions and all other forms of direct remuneration paid to a
> Member by the Company, plus salary reduction amounts of an
> Employee pursuant to Sections 125, 132(f)(4), or 401(k) of the
> Code, but excluding (a) any amount paid to an Employee prior to
> his becoming a Member under the Plan, and (b) any contributions
> by the Company to, or benefits under, the Plan. For purposes of
> the preceding sentence, salary reduction amounts under
> Section 125 of the Code include any amounts not available to a
> Member in cash in lieu of group health coverage because the
> Member is unable to certify he has other health coverage. A salary
> reduction amount will be treated as an amount under Section 125
> of the Code only if the Company does not request or collect
> information regarding the Member's other health coverage as part
> of the enrollment process for the health plan."

2.    Section 2.11 is hereby amended by deleting the period at the end of the first

sentence and adding the following before the second sentence thereof:

> "; provided however, an individual shall not be an Employee
> unless he is paid as a common law employee on the payroll of the
> Company at the time such individual's services are rendered to the
> Company, has federal income tax withheld by the Company at
> such time, and receives a Form W-2 from the Company in the
> ordinary course with respect to such service."

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0002710

3.       Section 5.07 is hereby amended by deleting the first sentence thereof in its entirety and substituting the following in lieu thereof:

> "Notwithstanding anything hereinabove to the contrary, the amount credited to the account of any Member for any Plan Year pursuant to Section 5.03 or pursuant to this Section 5.07 (excluding any Company contributions and forfeitures which are credited to a Member's account pursuant to Section 6.05 in order to restore previously forfeited amounts) shall be reduced as provided below to the extent that such amount would cause the Company contributions and forfeitures credited to the account of such Member under this Plan for such Plan Year and the employer contributions and forfeitures allocated to the account of such Member under any other defined contribution plan maintained by the Company or any Affiliated Company to exceed the lesser of
>
> (A)   $40,000 (as adjusted pursuant to Section 415(d) of the Code), or
>
> (B)   100% of such Member's compensation within the meaning of Section 415 of the Code and regulations thereunder for such Plan Year from the Company and any Affiliated Company."

4.       Section 6.02 is hereby amended by deleting the second sentence thereof in its entirety and substituting the following in lieu thereof:

> "For purposes of this Section 6.02, a Member shall incur a "permanent disability" on the first day of the month following the date he is determined to be permanently disabled under the Company's long-term disability plan."

5.       Section 6.07(b) is hereby amended by deleting the word "Participant" each time it appears therein and substituting in lieu thereof the word "Member."

6.       Section 6.07(b) is hereby further amended by adding the following to end thereof:

> "Any distributions payable in accordance with this Section 6.07(b) shall be made by distribution of the Member's full account balance in cash either in one lump sum, a direct rollover (to the extent permitted by law), or a combination of both. If a Member who is receiving distributions pursuant to this Section 6.07(b) dies prior to receiving his distribution for the year, such distribution shall be paid to his designated Beneficiary no later than December 31 of such year.

2

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0002711

Confidential-Subject to Protective Order

For purposes of this Section 6.07(b), the Member's designated
Beneficiary shall be determined in accordance with the provisions
of the Plan, Section 401(a)(9) of the Code, and
Section 1.401(a)(9)-4 of the Treasury regulations."

7.    Section 6.07(c) of the Plan is hereby amended by deleting said section in its

entirety and substituting the following in lieu thereof:

"If a Member dies before his Required Distribution Date, and his
surviving spouse is not his designated Beneficiary, the distribution
of benefits shall be paid to such Member's beneficiary in cash in a
lump sum no later than December 31 of the calendar year
containing the fifth (5th) anniversary of such Member's death.

If the Member's sole designated Beneficiary is his surviving
spouse, the distribution of benefits shall be paid to such Member's
spousal beneficiary in cash in a lump sum no later than the later of
December 31 of the calendar year containing the fifth (5th)
anniversary of such Member's death or December 31 of the
calendar year containing the date the Member would have attained
age 70½.

For purposes of this Section 6.07(c), the Member's designated
Beneficiary shall be determined in accordance with the provisions
of the Plan, Section 401(a)(9) of the Code, and
Section 1.401(a)(9)-4 of the Treasury regulations."

8.    Section 6.07(d) is hereby amended by deleting said section in its entirety.

9.    Effective for distributions made after December 31, 2001, Section 6.11 is hereby

amended by adding the following to the end of definition (1) (Eligible Rollover Distribution)

thereof:

"Any amount that is distributed on account of hardship pursuant to
Section 6.12(b) shall not be an eligible rollover distribution and the
Distributee may not elect to have any portion of such a distribution
paid directly to an Eligible Retirement Plan."

3

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0002712

10.    Effective for distributions made after December 31, 2001, Section 6.11 is hereby

further amended by deleting the last sentence of definition (2) (Eligible Retirement Plan) thereof,

and substituting the following in lieu thereof:

> "An Eligible Retirement Plan shall also mean an annuity contract
> described in Section 403(b) of the Code and an eligible plan under
> Section 457(b) of the Code which is maintained by a state, political
> subdivision of a state, or any agency or instrumentality of a state or
> political subdivision of a state and which agrees to separately
> account for amounts transferred into such plan from this Plan. The
> definition of Eligible Retirement Plan shall also apply in the case
> of a distribution to a surviving spouse, or to a spouse or former
> spouse who is the alternate payee under a qualified domestic
> relation order, as defined in Section 414(p) of the Code."

11.    Section 8.02 is hereby amended by deleting the second and third sentences thereof

in their entirety and substituting the following in lieu thereof:

> "The Trustee is hereby vested with all discretionary powers and
> authority necessary in order to carry out his duties and
> responsibilities in connection with the administration of the Plan
> and Trust as herein provided, and is authorized to make such rules
> and regulations as he may deem necessary to carry out the
> provisions of the Plan and Trust. The Trustee shall have the
> discretionary power and authority to determine any questions of
> fact and any questions arising in the administration, interpretation
> and application of the Plan and Trust, and the decision of the
> Trustee shall be conclusive and binding on all persons."

12.    Effective for determining whether the Plan is a Top-Heavy Plan for any Plan Year

beginning on or after January 1, 2002, Section 10.02(a) is hereby amended by deleting said

section in its entirety and substituting the following in lieu thereof:

> "(a)    Account Balance. As of any Valuation Date, the aggregate
> amount credited to an individual's account or accounts under a
> qualified defined contribution plan sponsored by the Company or
> an Affiliated Company (excluding employee contributions which
> were deductible within the meaning of Section 219 of the Code
> and rollover or transfer contributions made by or on behalf of such
> individual to such plan from another qualified plan sponsored by
> an entity other than the Company or an Affiliated Company)
> increased by (i) the aggregate distributions made to such individual

4

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0002713

Confidential-Subject to Protective Order

DEF000149

from the Plan and any plan aggregated with the Plan under Section 416(g)(2) of the Code during the 1-year period ending on the determination date. This shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Section 416(g)(2)(A)(i) of the Code. In the case of a distribution made for a reason other than separation from service, death, or disability, this provision shall be applied by substituting '5-year period' for '1-year period.' The account balances of any individual who has not performed services for the Company or an Affiliated Company during the 1-year period ending on the Determination Date shall not be taken into account, and (ii) the amount of any contributions due as of the Determination Date immediately following such Valuation Date. "

13.   Effective for determining whether the Plan is a Top-Heavy Plan for any Plan Year beginning on or after January 1, 2002, Section 10.02(c) is hereby amended by deleting "$150,000" in the last sentence thereof and substituting therefore "$200,000".

14.   Effective for determining whether the Plan is a Top-Heavy Plan for any Plan Year beginning on or after January 1, 2002, Section 10.02(f) is hereby amended by deleting said section in its entirety and substituting the following in lieu thereof:

"(f)   Key Employee. With respect to any Plan Year, any individual who at any time during the Plan Year that includes the Determination Date was (i) an officer (within the meaning of Section 416 of the Code) of the Company or an Affiliated Company with annual Compensation greater than $130,000 (as adjusted under Section 416(i)(1) of the Code for Plan Years beginning after December 31, 2002), (ii) an owner of more than five percent (5%) of the outstanding stock of the Company or an Affiliated Company or of stock possessing more than five percent (5%) of the total combined voting power of all the stock of the Company or an Affiliated Company, or (iii) an employee whose Compensation (during the calendar year including the Determination Date) exceeded $150,000 and who was an owner of more than one percent (1%) of the outstanding stock of the Company or an Affiliated Company or of stock possessing more than one percent (1%) of the total combined voting power of all of the stock of the Company or an Affiliated Company. For purposes of this definition, (A) an individual shall be deemed to own stock owned by others as provided in Section 318 of the Code, and (B) a beneficiary (who would not otherwise be a Key Employee) of a deceased Key Employee shall be deemed to be a Key Employee in

5

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER M 0002714

substitution for such deceased Key Employee. The determination of who is a Key Employee will be made in accordance with Section 416(i)(1) of the Code and the applicable regulations and other guidance of general applicability issued thereunder."

15.    Effective for determining whether the Plan is a Top-Heavy Plan for any Plan Year beginning on or after January 1, 2002, Section 10.03 is hereby amended by deleting the phrase "five-year period" both times it appears therein and substituting in lieu thereof the phrase "one-year period".

16.    Effective for claims filed on or after January 1, 2002, Section 11.10 is hereby amended by deleting said section in its entirety and substituting the following in lieu thereof:

"Claims Procedure. In accordance with Section 503 of the ERISA and the regulations of the Secretary of Labor prescribed thereunder,

(a)    All claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such procedures as the Trustee shall reasonably establish. Claims for benefits shall be filed by the Member, Beneficiary, alternate payee or his authorized representative (hereinafter "Claimant").

(b)    The Trustee shall, within 90 days of submission of a claim, provide adequate notice in writing to any Claimant whose claim for benefits under the Plan has been denied. Such notice shall be written in a manner calculated to be understood by the Claimant, and shall contain the following information: (i) the specific reasons for the denial of the claim; (ii) specific reference to pertinent provisions of the Plan on which the denial is based; (iii) a description of any additional material or information necessary to perfect the claim and an explanation of why such material or information is necessary; (iv) a description of the Plan's claims review procedures, and the time limitations applicable to such procedures; and (v) a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA if the claim denial is reviewed by the Trustee and the Trustee fully or partially denies the claim. If special circumstances apply, the 90-day period may be extended by an additional 90 days; provided, written notice of the extension is provided to the Claimant during the initial 90-day period and such notice indicates the special circumstances requiring an extension of

6

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0002715

Confidential-Subject to Protective Order

time and the date by which the Trustee expects to render its decision on the claim.

(c)    The Trustee shall, within a reasonable period of time and upon request by a Claimant, afford a reasonable opportunity to any Claimant, whose claim for benefits has been denied, for a full and fair review by the Trustee of the decision denying the claim.

Requests for review must be made within 60 days after receipt of the notice of denial from the Trustee.

Any request for review may set forth written comments, documents, records and other information relating to the claim. In connection with such request for review and upon request by the Claimant, a Claimant may review (or receive free copies of) all documents, records or other information relevant to the Claimant's claim for benefit, all in accordance with such procedures as the Trustee may establish.

If a Claimant fails to file an appeal within the applicable time period described herein, he shall have no further right to appeal.

(d)    A decision by the Trustee on request for a review shall include a review by the Trustee that takes into account all comments, documents, records and other information submitted by the Claimant relating to the claim, without regard to whether such information was submitted or considered in the initial claim determination.

The Trustee shall render its decision on the request for review within 60 days after the receipt by the Trustee of the request for review. If special circumstances apply, the 60-day period may be extended by an additional 60 days; provided, written notice of the extension is provided to the Claimant during the initial 60-day period and such notice indicates the special circumstances requiring an extension of time and the date by which the Trustee expects to render its decision on review.

If the Trustee wholly or partly denies any claim on review, the Trustee shall provide written notice to the Claimant within the applicable time limitations of this Section 11.10(d). Such notice shall be written in a manner to be understood by the Claimant and shall set forth: (v) the specific reasons for the denial of the claim; (vi) specific reference to pertinent provisions of the Plan on which the denial is based; (vii) a statement of the Claimant's right to

7

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0002716

Confidential-Subject to Protective Order

DEF000152

receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits; and (viii) a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA.

(e)    The foregoing claims procedures described in subsections (a), (b), (c) and (d) shall be administered in accordance with Section 503 of ERISA and guidance issued thereunder. Any written notice required to be given to the Claimant may, at the discretion of the Trustee and in accordance with guidance issued under Section 503 of ERISA, be provided electronically.

(f)    In no event may a claim for benefits be filed by a Claimant more than 120 days after the applicable "Notice Date," as defined in (i) through (iv) below.

(i)    In any case where benefits are paid to the Claimant as a lump sum, the Notice Date shall be the date of payment of the lump sum.

(ii)    In any case where the Trustee (prior to the filing of a claim for benefits under this Article 14) determines that an individual is not entitled to benefits from the Plan and the Trustee provides written notice to such individual of its determination, the Notice Date shall be the date of the individual's receipt of such notice.

(iii)    In any case where the Trustee provides an individual a written statement of his or her vested account balance as of a specific date, the Notice Date shall be the latest date of the Member's receipt of such notice.

In no event may any legal proceeding regarding entitlement to benefits or any aspect of benefits under the Plan be commenced later than the earliest of (i) one (1) year after the applicable Notice Date; or (ii) one (1) year after the date a Claimant receives a decision from the Trustee regarding his appeal; or (iii) the latest date otherwise prescribed by applicable law."

B.    This amendment is adopted to reflect certain provision of the Economic Growth and Tax

Relief Reconciliation Act of 2001 ("EGTRRA"). This amendment is intended as good faith

compliance with the requirements of EGTRRA and is to be construed in accordance with

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0002717

Confidential-Subject to Protective Order                                    DEF000153

EGTRRA and guidance issued thereunder. This amendment shall supersede the provision of the Plan to the extent those provisions are inconsistent with the provisions of this amendment.

C.    Except as otherwise provided herein, the effective date of this Second Amendment is January 1, 2002.

D.    Said Trust Agreement, as so amended, is hereby confirmed in all other respects.

IN WITNESS WHEREOF, this Second Amendment has been signed and sealed for and on behalf of the Company by its duly authorized officer, and by the Trustee, this 30ᵗʰ day of DECEMBER, 2002.

COMPANY:    MEDICAL INFORMATION
TECHNOLOGY, INC.

By: _____
Barbara A. Manzolillo,
Chief Financial Officer and Treasurer

TRUSTEE:    _____
A. Neil Pappalardo

LIBB/1144435.3

9

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER
M 0002718

Confidential-Subject to Protective Order

DEF000154

THIRD AMENDMENT
TO
MEDICAL INFORMATION TECHNOLOGY, INC.
PROFIT SHARING PLAN

A.      The Trust Agreement dated July 27, 1998 amending and restating The Medical

Information Technology, Inc. Profit Sharing Plan, is hereby amended effective March 28, 2005

by adding the following new paragraph at the end of Section 6.06(b):

> "Notwithstanding anything herein to the contrary, if (i) the Member's benefit become
> payable to the Member pursuant to Section 6.02 or 6.03 before the Member attains age
> 62, (ii) such benefit does not exceed $5,000, and (iii) the Member does not elect (within
> such time period as may be established by the Administrator from time to time) to receive
> the benefit in a form described under Section 6.06(a), then subject to Section 6.06(d) the
> Administrator may distribute the Member's benefit to the Member if such benefit does
> not exceed $1,000 and shall roll over the Member's benefit into an individual retirement
> account in accordance with Section 401(a)(31)(B) of the Code if such benefit does
> exceed $1,000."

B.      Said Trust Agreement, as so amended, is hereby confirmed in all other respects.

   IN WITNESS WHEREOF, this Third Amendment has been signed and sealed for and on

behalf of the Company by its duly authorized officer, and by the Trustee, this 15th day of

DECEMBER 2005.

COMPANY:   MEDICAL INFORMATION
TECHNOLOGY, INC.

By: _____
Barbara A. Manzolillo,
Chief Financial Officer
and Treasurer

TRUSTEE: _____
A. Neil Pappalardo

LIBB/1373126.1

Confidential-Subject to Protective Order

# EXHIBIT 7

Summary Plan Description
of the
Medical Information Technology, Inc.
Profit Sharing Plan

As amended through August 1, 1983

HUB 052

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | GENERAL INFORMATION | 2 |
| III. | PARTICIPATION IN THE PLAN | 3 |
| IV. | CONTRIBUTIONS TO THE PLAN | 4 |
| | 1. Source of Contribution | 4 |
| | 2. Allocation of Contributions | 4 |
| | 3. Allocation of Forfeitures | 4 |
| | 4. Allocation of Trust Gains and Losses | 4 |
| | 5. Amendment and Termination | 5 |
| V. | BENEFITS PROVIDED UNDER THE PLAN | 6 |
| | 1. Retirement | 6 |
| | 2. Disability | 6 |
| | 3. Death | 6 |
| | 4. Termination of Employment | 6 |
| | 5. Manner of Benefits Payment | 7 |
| | 6. Time of Benefits Payment | 7 |
| | 7. Benefits Not Insured | 7 |
| | 8. Loans to Members | 7 |
| VI. | CLAIMS PROCEDURE | 8 |
| VII. | YOUR RIGHTS UNDER ERISA | 9 |

HUB 053

## I.  INTRODUCTION

The Medical Information Technology, Inc. Profit Sharing Plan (which will be referred to as the "Plan") is designed to help provide future financial security for you and your family by allowing you to share in the profits of Medical Information Technology, Inc. (the "Company").

This booklet has been prepared to explain and summarize the major provisions of the Plan, as amended effective August 1, 1983.  Please take the time to read the booklet so that you will thoroughly understand the benefits provided by the Plan.  The booklet functions as a summary plan description for your information, but all rights of employees and others under the Plan are governed in all respects by the detailed terms of the Plan and Trust Agreement.

HUB 054

## II.  GENERAL INFORMATION

1. <u>Employer</u>.  The Employer is Medical Information Technology, Inc.,
   located at 255 Bent Street, Cambridge, Massachusetts 02138.
   Its Employer Identification Number is 04-2455639.

2. <u>Plan</u>.  The Plan is the Medical Information Technology, Inc. Profit
   Sharing Plan.  The Plan Number is 001, and the Plan is a profit
   sharing plan administered by a Trustee.  The Plan Year ends on
   December 31.

3. <u>Plan Administrator</u>.  The Plan Administrator is Medical Information
   Technology, Inc., located at 255 Bent Street, Cambridge,
   Massachusetts 02138.  The telephone number is (617) 354-3000.

4. <u>Agent for Service of Legal Process</u>.  The President of Medical Information
   Technology, Inc. shall serve as the Plan's agent for service of
   legal process.  Service of legal process may also be made upon
   the Plan Administrator or the Trustee.

5. <u>Trustee</u>.  The current Trustee is Mr. A. Neil Pappalardo, President,
   who may be contacted at Medical Information Technology, Inc.,
   255 Bent Street, Cambridge, Massachusetts 02138 (telephone:
   617-354-3000).

-2-

HUB 055

### III.  PARTICIPATION IN THE PLAN

1. <u>Eligibility</u>.  You are eligible to participate in the Plan on the first day of the month after you complete one year of Service with the Company.  One year of Service is a period of twelve (12) consecutive months of employment with the Company.

2. <u>Duration of Membership</u>.  Once you become a Member you will continue to be a Member as long as you are employed by the Company.  A former Member who is reemployed by the Company will become a Member immediately upon reemployment.

3. <u>Election Not to Participate</u>.  A Member may elect not to participate in the Plan during any Plan Year.  You must notify the Trustee in writing, before the first day of the new Plan Year, that you do not wish to participate.  You will then be excluded from the allocation of Company contributions and forfeitures.  Your account will remain in the Trust, however, and will share in the income, expense, appreciation, and depreciation of the Trust.

HUB 056

## IV.  CONTRIBUTIONS TO THE PLAN

1.  <u>Source of Contributions.</u>  For each Plan Year, the Board of Directors determines and votes the amount, if any, that the Company will contribute to the Trust.  The contribution is made from the net income of the Company for that year, or from the earnings and profits accumulated by the Company prior to that Plan Year. Contributions by Members are not permitted.  The Company's contribution to the Trust will be paid in cash and/or in the number of shares of the Company's common stock whose fair market value on the date of contribution is equal to the contribution amount. Company contributions are held and accumulated in the Trust.

2.  <u>Allocation of Contributions.</u>  The Company's contribution, if any, for each year is allocated to the individual accounts of all Members who were Employees of the Company on December 31 of that Plan Year.  Also, any Employees who retired, became disabled, or died during that Plan Year also have the Company contribution allocated to their account.

    The Company contribution is credited to your account in proportion to your compensation for that Plan Year, as compared to the total compensation of all Members sharing in the Company contribution for that year.  Compensation includes salaries, wages, bonuses, overtime, and commissions, but excludes any contributions or benefits you receive under the Plan as well as any amounts paid to you prior to the date you became a Member under the Plan.  If you own 10% or more of the outstanding Common Stock of the Company on December 31 of that Plan Year, however, you will not have any portion of the Company contribution allocated to your account.

3.  <u>Allocation of Forfeitures.</u>  Forfeitures from the accounts of Members who are not fully vested ("vesting" is explained on p. 6) when they leave the Company are relocated on the same basis as explained above in Section IV(2).

4.  <u>Allocation of Trust Gains and Losses.</u>  The Trustee is specifically authorized to invest all or any portion of the Trust assets in shares of the Company's common stock, and the Company intends that a substantial portion of the assets of the Trust be invested in its common stock.  One of the major purposes of the Plan is to give each Member a stake in the success of the Company.  Because a substantial portion of the Plan's assets are invested in the Company's common stock, the value of your benefit under the Plan is significantly dependent on the value of that stock.

    The assets and liabilities of the Trust will be evaluated as of December 31st of each Plan Year.  Any increases in the value of the Trust will be credited to your individual account in proportion to the relative size of your existing account balance. Any decrease in the value of the Trust will be charged to your account on the same basis.

-4-

**HUB 057**

5.  <u>Amendment and Termination</u>.  The Company expects to continue the Plan on a permanent basis, but it necessarily reserves the right to terminate the Plan, or completely discontinue contributions under the Plan, at any time.  The Company also reserves the right to amend the Plan at any time.  The Plan may not be amended or terminated in such a way as to divert the Trust assets to the benefit of anyone except employees or their beneficiaries, or to reduce any amount previously credited to the account of an employee.

-5-

HUB 058

## V. BENEFITS PROVIDED UNDER THE PLAN

1. **Retirement.** If you retire at or after age 60, you will receive the entire amount credited to your account.

2. **Disability.** If you are unable to continue working for the Company because of sickness or disability, you will receive the entire amount credited to your account. The Trustee determines, on the basis of medical evidence, whether you are disabled for purposes of the Plan.

3. **Death.** Upon your death, the Trustee will distribute the entire amount credited to your account to your designated Beneficiary or Beneficiaries. You must notify the Trustee in writing of your choice of Beneficiary, and you may change your designation from time to time. If your Beneficiary dies before receiving the entire amount payable from your account, the undistributed balance will go to your Beneficiary's estate. If you have not designated a Beneficiary, the entire amount credited to your account will be paid to the executor of your estate.

4. **Termination of Employment.** If you leave the Company for any reason other than (1) - (3) listed above, you will be entitled to a severance benefit if you have at least 2 years of service with the Company. If you have a period of Service with the Company of at least five (5) years, you will be entitled to the full amount credited to your account. If you have a period of Service with the Company of less than fice (5) years, when you leave the Company you will be entitled to receive the vested portion of your account. The vested portion of your account is equal to a percentage of the amount standing to the credit of your account, based on your period of Service, as follows:

| Years of Service | | Vested Percentage |
|---|---|---|
| At Least | But Less Than | |
| | 2 | None |
| 2 | 3 | 10% |
| 3 | 4 | 30% |
| 4 | 5 | 60% |

If you do not return as an employee of the Company within twelve months the remainder of your account is then forfeited, and allocated as explained in Section IV(3).

-6-

HUB 059

5. <u>Manner of Benefits Payment</u>. Whenever your account is to be distributed, as explained in (1) - (4) above, the Trustee shall make the payments in one of the following ways:

    a. One lump sum payment in cash and/or shares of the Company's common stock.

    b. Installments of cash and/or shares of the Company's common stock, to be paid out over a period not exceeding fifteen (15) years.

6. <u>Time of Benefits Payment</u>. Benefit payments under the Plan will be made, or commenced, within a reasonable period of time after the date of retirement, death, disability, or other termination.

7. <u>Benefits Not Insured</u>. The benefits provided by the Plan are determined solely by the value of your account at the time the benefits became payable. Because the Plan is not a defined benefit plan, benefits are not insured by the Pension Benefit Guaranty Corporation. There are no provisions under Title IV of the Employee Retirement Income Security Act of 1974 (ERISA) which insure benefits under this type of Plan.

8. <u>Loans to Members</u>. The Trustee has discretion to make loans to Members from the Trust. Any such loan is limited to 50% of the Member's vested interest in the Trust, subject to a $50,000 overall limitation, and must bear a reasonable rate of interest and generally must be repaid within 5 years. The Trustee decides whether a loan will be made and, if a loan is to be made, the Trustee decides the amount and the terms of the loan.

HUB 060

## VI.  CLAIMS PROCEDURE

1. <u>Filing Claims for Benefits</u>.  If you or your Beneficiary believes you are entitled to receive benefits under the Plan, and you have not received notification from the Trustee concerning the time and manner of payment of your benefits, or if you believe the Trustee's notice concerning the amount and form of payment of your benefits is incorrect,  you may file a claim for your benefits with the Trustee.  The claim must be filed in writing with the Trustee, in accordance with the rules he establishes for filing a claim.

2. <u>Notification of Denial of Claim</u>.  Within sixty (60) days after you submit a claim for benefits, the Trustee must tell you (in writing) the specific reasons for denying your claim.

3. <u>Right to Review</u>.  Within a reasonable period of time after your claim for benefits has been denied, you may request the Trustee to make a full and fair review of the decision denying your claim.

4. <u>Decision on Review</u>.  Within sixty (60) days after receiving your request for a review, the Trustee must give you a written explanation of the reasons for his decision on the review.

-8-

HUB 061

## VII.  <u>YOUR RIGHTS UNDER ERISA</u>

As a Member of the Medical Information Technology, Inc. Profit Sharing Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan Members shall be entitled to:

(i)  Examine, without charge, at the Plan Administrator's office, all Plan documents, including copies of all documents filed by the Plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions.

(ii)  Obtain copies of all Plan documents and other plan information upon written request to the Plan Administrator.

(iii)  Receive a summary of the Plan's annual financial report. The Plan Administrator is  required by law to furnish each partici- pant with a copy of this summary annual report.

(iv)  Obtain a statement telling you whether you have a right to receive a plan benefit, and if so, what your benefit would be if you were to stop working for the company.  If you do not have a vested right to a plan benefit the statement will tell you how many more years you have to work to get a vested right to a plan benefit.  This statement must be requested in writing and is not required to be given more than once a year.  The Plan must provide the statement free of charge.

In addition to creating rights for Plan Members, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.  The people who operate the Plan, called "fiduciaries", have a duty to do so prudently and in the interest of you and other Plan Members and beneficiaries.

No one, including your employer, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a plan benefit or exercising your rights under ERISA.  If your claim for a plan benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial.  You have the right to have the Trustee review and reconsider your claim.

HUB 062

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement of your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor-Management Service Administration, Department of Labor.

**HUB 063**

# EXHIBIT 8

SUMMARY PLAN DESCRIPTION
OF THE
MEDICAL INFORMATION TECHNOLOGY, INC.
PROFIT SHARING PLAN

January 1, 1998

HUB 081

# TABLE OF CONTENTS

Page

I.      BACKGROUND AND PURPOSE OF THE PLAN . . . . . . . . . . . . . . . . . . . . . 1

II.     GENERAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    PARTICIPATION IN THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        A.      Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        B.      Rules for Crediting Service . . . . . . . . . . . . . . . . . . . . . . . . . 2
        C.      Choosing a Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.     CONTRIBUTIONS AND ALLOCATIONS . . . . . . . . . . . . . . . . . . . . . . . 3
        A.      Employer Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        B.      Employee Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        C.      Trust Gains and Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V.      BENEFITS PROVIDED UNDER THE PLAN . . . . . . . . . . . . . . . . . . . . . 4
        A.      Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        B.      Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        C.      Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        D.      Other Termination of Employment . . . . . . . . . . . . . . . . . . . . 5
        E.      Manner and Timing of Benefit Payments . . . . . . . . . . . . . . . . 6
        F.      Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        G.      In-Service Withdrawals . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

VI.     AMENDMENT AND TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . 8

VII.    SPECIAL RULES FOR TOP-HEAVY PLANS . . . . . . . . . . . . . . . . . . . . 8

IX.     YOUR RIGHTS UNDER ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

HUB 082

## I. BACKGROUND AND PURPOSE OF THE PLAN

The Medical Information Technology, Inc. Profit Sharing Plan (which will be referred to as the "Plan") is designed to help provide future financial security for you and your family by allowing you to share in the profits of Medical Information Technology, Inc. (the "Employer").

Under present federal and state law, all amounts contributed to the Plan by the Employer, and all income earned on Plan investments, are tax deferred until they are distributed to you. This deferral of income tax is an important benefit of the Plan.

The Plan is a defined contribution plan. Your benefit is based solely upon the value of the balance of the account established for you under the Plan. Benefits under this type of plan are not insured by the Pension Benefit Guaranty Corporation.

This Summary Plan Description contains basic information about the main features of the Plan, but it does not attempt to describe in detail every rule of the Plan. Accordingly, all decisions with respect to your benefits must be made based on the Plan document itself; if there is any conflict between this summary and the official Plan document, the Plan document will control. Please read this Summary Plan Description carefully so that you will be aware of the Plan's principal features. Please address any questions you may have about the operation of the Plan to the Plan Administrator.

## II. GENERAL INFORMATION

Name of Plan:    Medical Information Technology, Inc. Profit Sharing Plan

Employer:     Medical Information Technology, Inc.
        MEDITECH CIRCLE
        Westwood, MA 02090
        (781) 821-3000

Employer
Identification Number:  04-2455639

Plan Administrator:   The Employer is the Plan Administrator.

Trustee:      Mr. A. Neil Pappalardo
        Trustee of the Medical Information Technology, Inc.
        Profit Sharing Plan
        MEDITECH CIRCLE

HUB 083

Westwood, MA 02090
(781) 821-3000

| | |
|---|---|
| Plan Year: | January 1 - December 31 |
| Plan Number: | The Plan Number is 001 |
| Agent for Service of Legal Process: | Service of legal process may be made upon the Plan Administrator or the Trustee, at the address set forth above. |

## III. PARTICIPATION IN THE PLAN

### A. Eligibility

If you are an employee of the Employer (other than a "leased employee"), you will become a Member in the Plan on the first day of the month after you complete one year of Service. Once you meet the Service requirement, you will automatically become a Member of the Plan; you are not allowed to elect not to participate in the Plan. Your active membership in the Plan terminates when you are no longer an employee of the Employer. A former Member who is reemployed by the Employer will become a Member immediately upon reemployment.

### B. Rules for Crediting Service

Your Service is equal to the most recent period of time, measured in years and days, in which you are employed by the Employer or any of its affiliates without incurring a "break in service." You incur a "break in service" if you do not perform any hours of service for the Employer or any of its affiliates during any consecutive 12 month period. An "hour of service" is each hour you are directly or indirectly paid or entitled to payment by the Employer for the performance of duties. Special rules may apply in situations involving leaves of absence or reemployment after a "break in service;" you should consult the Plan Administrator if these special rules may be applicable to you.

### C. Choosing a Beneficiary

Upon becoming a Plan Member, you will be asked to complete a beneficiary designation form on which you will specify the person or persons who will receive the full value of your account in the Plan in the event of your death. Except for the special rule for married Members described below, you may name any person or persons as a beneficiary and you can change your beneficiary at any time by completing a new beneficiary designation form.

2

HUB 084

If you are married at the time of your death, your surviving spouse will generally be your sole beneficiary. However, with the written consent of your spouse, you may designate some other person or persons as the beneficiary of all or part of your account. Your spouse's consent must be notarized or witnessed by a Plan representative and must acknowledge the effect of the designation of another beneficiary. Your spouse's consent will generally apply only to the designation of a particular beneficiary. Therefore, you must obtain spousal consent each time you change your beneficiary designation and designate someone other than your spouse, unless your spouse has expressly permitted additional changes without further consent. Note: If you are single, designate a beneficiary and later marry, your spouse automatically becomes your sole beneficiary. You must obtain your spouse's consent before you may name another beneficiary.

If, at your death, you have not designated a beneficiary, your designated beneficiary has predeceased you, or the Trustee determines your beneficiary designation is not effective, your beneficiary will be your spouse if you are married and your estate if you are unmarried.

## IV. CONTRIBUTIONS AND ALLOCATIONS

### A.   Employer Contributions

For each Plan Year, the Board of Directors of the Employer determines the amount, if any, that the Employer will contribute to the Trust. The contribution is made from the net income of the Employer for that Plan Year, or from the earnings and profits accumulated by the Employer prior to that Plan Year. The Employer's contribution to the Trust will be paid in cash and/or in shares of the Employer's common stock.

The Employer's contribution, if any, for each Plan Year is allocated to the individual accounts of all Members who were employees of the Employer on December 31 of that Plan Year. In addition, any Member who retired (as defined in V.A. below), became disabled (as defined in V.B. below), or died during that Plan Year will also be credited with an allocation of the Employer contribution, if any, for that Plan Year. However, if you own 10% or more of the outstanding common stock of the Employer on December 31 of a given Plan Year, no portion of the Employer contribution for that Plan Year will be allocated to your account.

The Employer contribution is credited to your account in proportion to your compensation for that Plan Year, as compared to the total compensation of all eligible Members for that Plan Year. Compensation includes salaries, wages, bonuses, overtime, and commissions, but excludes any contributions or benefits you receive under the Plan as well as any amounts paid to you prior to the date you became a Member under the Plan. For Plan Years beginning on or after January 1, 1989, the maximum level of compensation which will be taken into account is $100,000; any compensation in excess of $100,000 will be disregarded in determining your share of any Employer Contribution.

3

**HUB 085**

Forfeitures from the accounts of Members who are not fully vested ("vesting" is explained in V.D. below) when they leave the Employer are reallocated to the accounts of remaining Members on the same basis as Employer contributions (as explained above).

There are legal limits on the aggregate amount of contributions and forfeitures that may be allocated to your account under this Plan. Although it is unlikely that these limits will apply to the Plan, they could require a reduction in the amount allocated to your account.

B.    Employee Contributions

Contributions by Members are not permitted.

C.    Trust Gains and Losses

The Trustee is specifically authorized to invest up to 100% of the Trust assets in shares of common stock of the Employer, and it is intended that a substantial portion of the assets of the Trust will be invested in such common stock. One of the major purposes of the Plan is to give each Member a stake in the success of the Employer. Because a substantial portion of the Trust's assets are invested in the Employer's common stock, the value of your benefit under the Plan is significantly dependent on the value of that stock.

The assets and liabilities of the Trust will be evaluated as of December 31 each Plan Year. Any increases in the value of the Trust will be credited to your individual account in proportion to the relative size of your existing account balance. Any decrease in the value of the Trust will be charged to your account on the same basis. The Trustee may cause the assets and liabilities to be evaluated, and the accounts of the Members adjusted accordingly, as of any other date during the Plan Year.

## V.  BENEFITS PROVIDED UNDER THE PLAN

A.    Retirement

If you retire at or after age 60, you will be entitled to receive the entire amount credited to your account, plus interest credited at the prevailing short-term rate from the preceding valuation date through the last day of the month preceding distribution of your account.

B.    Disability

If you are unable to continue working for the Employer because of disability, you will be entitled to receive the entire amount credited to your account, plus interest credited at the prevailing short-term rate from the preceding valuation date through the last day of the month preceding distribution of your account. For purposes of the Plan, "disability" means a total

4

HUB 086

and permanent physical or mental impairment which is likely to result in death or last at least twelve months. The Trustee determines, on the basis of such medical evidence as the Trustee requires, whether you are disabled for purposes of the Plan.

C.    Death

If your employment with the Employer terminates on account of your death, your designated beneficiary will be entitled to receive the entire amount credited to your account, plus interest credited at the prevailing short-term rate from the preceding valuation date through the last day of the month preceding distribution of your account. If you die after you have terminated your employment with the Employer, but before the distribution of the vested portion of your account, the vested portion of your account will be distributed to your designated beneficiary.

If your beneficiary dies before receiving the entire amount payable from your account, the undistributed balance will go to your beneficiary's estate.

D.    Other Termination of Employment

If you terminate your employment with the Employer prior to age 60 for any reason other than disability or death, you will be entitled to a benefit equal to the vested portion of your account, plus interest thereon credited at the prevailing short-term rate from the preceding valuation date through the last day of the month preceding distribution of your account. The vested portion of your account is equal to a percentage of the amount standing to the credit of your account, based on your years of Service with the Employer, as follows:

| Years of Service | Vested Percentage |
|------------------|-------------------|
| Less than 2      | None              |
| 2                | 10%               |
| 3                | 30%               |
| 4                | 60%               |
| 5 or more        | 100%              |

Amounts which are not vested at the time of your termination will be forfeited once the vested portion of your account has been distributed or after you have had five consecutive "breaks in service," whichever is earlier. If you have zero vesting, you will automatically be deemed to have received a distribution, with the result that your entire account will be forfeited upon termination of employment. Forfeited amounts will be allocated to the remaining eligible Members as explained in IV.A. above.

If you return to work with the Employer before incurring five consecutive "breaks in service," any amount that was previously forfeited from your account will be reinstated in full.

5

HUB 087

If you return to work after incurring five consecutive breaks in service, you will not be entitled to a reinstatement of any previously forfeited amount.

E.    Manner and Timing of Benefit Payments

Benefit payments under the Plan are generally payable as a lump sum in cash and will be made within a reasonable period of time after the date of your retirement, death, disability, or other termination of employment. However, instead of such total lump sum distribution you can elect to have all or part of your payment transferred directly to an individual retirement arrangement or other qualified retirement plan as a direct rollover. Any amount you choose to receive (as opposed to have transferred as a direct rollover) is subject to 20% federal income tax withholding (and applicable state tax withholding) and may be subject to an additional 10% early withdrawal tax if you are under age 59 ½. Before receiving a distribution from the Plan, the Trustee will provide you with additional information on Federal tax withholding and direct rollovers. However, you should consult your tax advisor before making any benefit distribution decision.

Note that, if your account balance exceeds $5,000 and you terminate employment before reaching age 62, you must consent in writing to any distribution from the Plan. Otherwise, the Trustee will defer distribution of your account until you reach age 62 or die, whichever occurs first. In this event, the Trustee will segregate your account and invest it in bank deposits or other investments selected by the Trustee. Moreover, if you are a 5% owner of the Employer and are still employed by the Employer when you reach age 70 ½, Federal law requires that your account balance be distributed no later than April 1 of the next calendar year.

If the Trust's assets are not sufficiently liquid to permit distribution to you in cash, the Trustee may defer distribution to you, as described in the Plan, and thereafter may distribute all or a portion of your account balance in shares of Stock (instead of cash) at the end of that period.

F.    Loans

Upon written application to the Trustee, the Trustee may allow you to take a loan from the Trust. The maximum amount of loans which you can have outstanding from the Plan at any time is the lesser of (a) $50,000, reduced by any loan repayment made during the previous year, or (b) 50% of the vested amount in your account. All loans will be made at a reasonable rate of interest and must be secured by fifty percent of your vested account balance. Loans must be repaid within 5 years; however, this period can be extended if you use the loan in connection with the purchase of your principal residence. Loans will generally be required to be repaid by payroll deduction. If your account becomes payable while you have a loan(s) outstanding, the Trustee will deduct the outstanding loan balance (including any unpaid interest) from your account before distributing the remainder of your account. Any expenses incurred by the Trustee in connection with a loan to you (including any collection expenses in the case of a default) will be charged against your account.

6

HUB 088

### G.    In-Service Withdrawals

While you are employed by the Employer, you may make withdrawals from your vested account under the Plan if you have at least 20 years of Service or if you incur a "financial hardship." All withdrawals must be made in accordance with procedures established by the Trustee. Any amount you withdraw will be credited with interest at the prevailing short-term rate from the preceding valuation date to the last day of the month preceding distribution of your withdrawal amount. Your withdrawal amount is taxable income and is subject to 20% Federal income tax withholding (and applicable state tax withholding) and may be subject to an additional 10% early withdrawal tax if you are under age 59 ½.

If you have at least 20 years of Service, you may withdraw all or part of your account for any reason. However, you can only make one such withdrawal during any Plan Year. Generally, your withdrawal amount will be paid to you as soon as feasible after your withdrawal request. However, if the Trustee determines there is not sufficient available cash in the Trust to pay your full withdrawal amount, the Trustee can postpone payment to you for up to three years whereupon distribution will be made to you in cash and, if necessary, in shares of Stock.

If you incur a "financial hardship," you may withdraw from your vested account balance an amount not to exceed the amount needed to pay for such "financial hardship" plus the amount of any taxes or penalties on such withdrawal amount. Hardship withdrawals are payable only in cash, and the Trustee will deny a "financial hardship" withdrawal request to the extent cash is not available in the Trust for such distribution. For Plan purposes, "financial hardship" is defined to include the following:

- medical expenses incurred by you, your spouse or any of your dependents;

- your purchase of a principal residence;

- the need to prevent eviction from, or foreclosure on, your principal residence;

- renovation expenses for your principal residence;

- educational expenses incurred by you, your spouse or any of your dependents;

- funeral expenses (including burial expenses) of a member of your family;

- the need to pay significant amounts of current debt incurred as a result of any one or more of the above.

7

**HUB 089**

H.    Assignment of Account Balance

You may not assign your account balance, nor may you pledge any part of your account balance as security for a loan (other than a loan from the Trust). However, this rule does not prevent the payment of any portion of your account to a spouse, former spouse, or dependent under a "qualified domestic relations order" -- i.e., a court order that provides for child support, alimony, or the division of marital property and that satisfies certain technical requirements. The order must be filed with the Trustee, who then determines whether the order meets the requirements for qualified domestic relations orders. You should contact the Trustee if you receive a domestic relations order or if you have any questions about the procedure used to determine whether a domestic relations order is qualified.

## VI. AMENDMENT AND TERMINATION

The Employer expects to continue the Plan on a permanent basis, but it necessarily reserves the right to terminate the Plan, or completely discontinue contributions under the Plan, at any time. The Employer also reserves the right to amend the Plan at any time. The Plan may not be amended or terminated in such a way as to divert the Plan assets to the benefit of anyone except Members or their beneficiaries, or to reduce any amount previously credited to the account of a Member. If there is a termination or partial termination of the Plan, all affected Members will become fully vested in their accounts.

## VII. SPECIAL RULES FOR TOP-HEAVY PLANS

If the Plan ever becomes top-heavy (i.e., a disproportionate amount of contributions are allocated to the accounts of certain highly paid employees), you may be eligible for a minimum contribution or faster vesting of your account balance. However, it is unlikely the Plan will ever be top-heavy.

## VIII. CLAIMS PROCEDURE

If you believe you are (or in the case of your death, if your beneficiary believes he or she is) entitled to Plan benefits and you have not received notification from the Trustee as to the time and manner of distribution of benefits, or if you receive notice from the Trustee with regard to the amount and form of payment of your benefits and you believe there is an error in the notice, then you may submit a claim to the Trustee. If you believe you are entitled to Plan benefits under a domestic relations order, you may submit a claim to the Trustee for a

8

HUB 090

determination of the qualified status of the domestic relations order. Your claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim.

If the Trustee denies your claim, he will, within 60 days of the date he received the claim, notify you in writing of his denial, explain the reasons on which his decision is based and let you know if there are any additional facts or materials which you should supply to support your claim.

If, after receiving the Trustee's explanation of his denial, you still believe you have a right to benefits which have been denied, you may request in writing, within a reasonable period of time after the denial, that the Trustee review his decision. The Trustee will, within 60 days of receipt of a written request for review, send you a written decision on his review explaining the specific reasons for his decision.

## IX.  YOUR RIGHTS UNDER ERISA

As a Member of the Medical Information Technology, Inc. Profit Sharing Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan Member shall be entitled to:

(1)    Examine, without charge, at the Plan Administrator's office, all plan documents and copies of documents filed with the U.S. Department of Labor, such as annual reports and plan descriptions.

(2)    Obtain copies of all plan documents and other plan information by writing the Plan Administrator. There may be a reasonable charge for the copies.

(3)    Receive a summary of the Plan's annual financial report. The Plan Administrator will give you a copy of this report each year.

(4)    Obtain a statement telling you whether you would have a right to a vested benefit under the Plan and how much that benefit would be. If you do not have the right to a vested benefit, the statement will tell you how many more years you have to work before you do have a vested benefit. You can write for a benefit statement once a year and the Plan Administrator will provide one free of charge.

In addition to creating rights for Plan Members, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate the Plan, who are called "fiduciaries," have a duty to do so prudently and in the interest of Plan Members and beneficiaries.

9

**HUB 091**

No one, including the Employer or any other person, may fire a Member or otherwise discriminate against him or her in any way to prevent him or her from obtaining a benefit from the Plan or exercising his or her rights under ERISA.

Under ERISA there are steps a Member can take to enforce the above rights.

For instance, if a Member requests materials from the Plan and does not receive them within 30 days, he or she may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay the Member up to $100 a day until he or she receives the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If a Member or beneficiary has a claim for benefits which is denied or ignored, in whole or in part, and the Member has taken the appropriate action through the claims process, he or she may file suit in a state or federal court.

If a Member believes that Plan fiduciaries are misusing the Plan's money, or if a Member is discriminated against for asserting his or her rights, the Member may seek assistance from the U.S. Department of Labor or may file suit in a federal court.

In addition to deciding what damages, if any, should be awarded, the court will decide who should pay court costs and fees. If the Member is successful, the court may order the party sued to pay these costs and fees. If the Member loses, the court may order the Member to pay the costs and fees, for example, if it finds the claim is frivolous.

If you have any questions about the Plan, you should contact the Plan Administrator at (781) 821-3000.

If you have any questions about this statement or about your rights under ERISA, you should contact the nearest office of the Pension and Welfare Benefits Administration, U. S. Department of Labor.

DOCSB\531435.1

10

HUB 092

# EXHIBIT 9

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-K

ANNUAL REPORT
PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED DECEMBER 31, 2007

0-28092
(Commission file number)

Medical Information Technology, Inc.
(Exact name of registrant as specified in its charter)

Massachusetts
(State of incorporation)

04-2455639
(IRS Employer Identification Number)

MEDITECH Circle, Westwood, MA
(Address of principal executive offices)

02090
(Zip Code)

781-821-3000
(Registrant's telephone number)

Securities registered pursuant to Section 12(b) of the Exchange Act: None

Securities registered pursuant to Section 12(g) of the Exchange Act: Common Stock, par value $1.00 per share

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [ ] No [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes [ ] No [X]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of accelerated filer and large accelerated filer in Rule 12b-2 of the Exchange Act. Large accelerated filer [ ] Accelerated filer [ ] Non accelerated filer [X]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes [ ] No [X]

No public trading market exists for the registrant's common stock. There were 35,481,271 shares of common stock, $1.00 par value, outstanding at December 31, 2007.

|  | Index to Form 10-K | Page |
|---|---|---|
| Part I |  |  |
| Item 1 | Business | 3 |
| Item 1A | Risk Factors | 6 |
| Item 1B | Unresolved Staff Comments | 6 |
| Item 2 | Properties | 6 |
| Item 3 | Legal Proceedings | 6 |
| Item 4 | Submission of Matters to a Vote of Security Holders | 6 |
| Part II |  |  |
| Item 5 | Market for Registrant's Common Equity, Related Shareholder Matters and Issuer Purchases of Equity Securities | 7 |
| Item 6 | Selected Financial Data | 8 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operation | 8 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 9 |
| Item 8 | Financial Statements and Supplementary Data | 10 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 23 |
| Item 9A | Controls and Procedures | 23 |
| Item 9B | Other Information | 24 |
| Part III |  |  |
| Item 10 | Directors, Executive Officers and Corporate Governance | 24 |
| Item 11 | Executive Compensation | 27 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters | 28 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 29 |
| Item 14 | Principal Accounting Fees and Services | 29 |
| Part IV |  |  |
| Item 15 | Exhibits | 30 |
|  | Signatures | 30 |

## Part I

### Item 1 - Business

COMPANY OVERVIEW

Medical Information Technology, Inc. (MEDITECH) was founded in 1969 to develop and market information system software for the hospital industry. For 2007 on a consolidated basis combined product and service revenue was $376.2M, operating income was $126.5M and net income was $88.5M. Product bookings were $175.5M and the resultant year-end product backlog was $216.4M. By year-end MEDITECH had 2,872 staff members, and almost 2,200 active hospital sites throughout the United States, Canada and the United Kingdom.

HOSPITAL SOFTWARE

Initially MEDITECH developed a software product to automate one of the main departments in a hospital, the clinical laboratory which performs various diagnostic tests on blood or urine specimens. Within a few years, this product became standardized, thereby requiring minimal adaptation to meet the individual needs of a typical customer. MEDITECH extended the concept and developed additional software products for the rest of a hospital's clinical departments. Eventually, it moved into the financial area by developing a hospital billing and accounts receivable product as well as various general accounting products. With the acquisition of Patient Care Technologies, Inc. (PtCT) in April 2007, MEDITECH has entered the home health care field.

Although the individual products could be operated in a stand alone fashion, a hospital achieved maximum effectiveness when they were used in an integrated mode, sharing access to the common clinical and financial records of the hospital. This concept ultimately led to MEDITECH developing the so-called hospital information system, a cohesive set of software products designed from the outset to work in conjunction with the overall operation of the hospital and to minimize the need for specialized interfaces.

COMPUTER HARDWARE

Sophisticated software, such as MEDITECH's, requires extensive computer and communication equipment to function. In spite of this, MEDITECH continues to be a pure software company, limiting itself to specifying the aggregate components needed as well as suggesting typical configurations from certain hardware vendors. The responsibility is left to the hospital to purchase the requisite hardware and secure a continuing source of maintenance service for it.

The hardware components traditionally consist of a small set of central medium-sized computers and a large set of display terminals and printers distributed throughout the hospital. All of these elements are interconnected by means of a standard high speed communication network. The computers execute the software and include large disk subsystems containing the permanent and common clinical and financial records of the hospital.

Hardware technology evolves rapidly, and the current trend has been to replace the display terminals with desktop and handheld computers, thereby forming a client server network. In

this mode of operation, the central computers become the file servers while software is executed locally on the client computer which makes file requests to the servers.

Page 3 of 30

## LICENSED SOFTWARE

MEDITECH requires a hospital customer to sign a standard software license agreement prior to product delivery, implementation and subsequent service of the software. This agreement specifies a front end product fee and a front end implementation fee, both of which are payable over the implementation process, and a monthly service fee after the site goes live. In addition to precluding ownership and restricting transfer, the license mandates the customer hold MEDITECH harmless from any liability arising from incorrect operation of the software.

MEDITECH bases its product fee on a customer's net patient revenue across all of its sites, and sets its implementation fee on the total number of sites. As a result larger hospitals pay more than smaller hospitals. The monthly service fees are 1% of the product fees. A typical 150 bed acute care hospital which licenses most of our software might incur a $3,000,000 product fee, a $750,000 implementation fee and a $30,000 monthly service fee. An order is booked when a signed software license and a 10% deposit are received.

## STAFF ORGANIZATION

MEDITECH is organized into functional units grouped around product development, sales, marketing, implementation, customer service, accounting and facility operations. All MEDITECH staff work in company owned facilities in the greater Boston area.

From its inception, MEDITECH utilized communication technology which allowed much of its business activities to be performed by remote access. MEDITECH staff sitting at their desks may access client hospitals, both personnel and computers. As a result, there is no need for remote offices. Although most customer contact is through the phone or e-mail, certain of the sales and implementation staff travel to customer sites.

## PRODUCT DEVELOPMENT

Most of the product development staff is working on the incremental evolution of the current product line, as well as the creation of new products each year. The rest of the staff is developing a set of replacement products utilizing a new software technology. Approximately every ten years, MEDITECH introduces the next generation of products based on the new software technology and gradually updates existing customers.

## SALES AND MARKETING

Most of the direct sales staff, organized into regions, concentrate on new prospects. In addition, some of the sales staff monitor existing customers to expose them to MEDITECH's entire product line. Marketing activities and promotion are low key because hospitals are easily identified, finite in number and generally send a request for proposal to vendors when they contemplate the purchase of a hospital information system.

During the sales process, prospects generally visit MEDITECH to talk to product specialists and to view product demonstrations. Thereafter they are encouraged to visit various MEDITECH customer sites to observe first hand the software in actual operation and to discuss issues of concern with hospital personnel.

Page 4 of 30

IMPLEMENTATION PROCESS

To ensure a successful implementation, the staff must properly train a core group of hospital personnel about the operation of the software and how to use it in their daily activity. To avoid interruptions from normal hospital activities, MEDITECH requires the hospital personnel to come to its offices in the Boston area for intensive training sessions.

As training proceeds, the implementation staff customizes certain dictionaries to fit the specific need of the hospital's environment, provides interfaces to non-MEDITECH systems and assists the hospital in converting data from legacy systems. In addition, MEDITECH delivers, installs and tests the licensed software on the customer's hardware. MEDITECH utilizes remote access communication technology to minimize the need to travel.

CUSTOMER SERVICE

Once a hospital goes live, the responsibility of maintaining the customer is transferred to the service staff. MEDITECH provides 24 hour a day service coverage to these customers in order to respond to problem calls. In addition, the staff updates customers with new releases of the software products as they become available. To ensure the continuing education of the hospital staff, MEDITECH runs seminars on the use of its products.

HCA-THE HEALTHCARE COMPANY

HCA-The Healthcare Company utilizes a MEDITECH clinical information system in over 250 hospitals and has been MEDITECH's largest customer for many years. HCA represented 6% of MEDITECH revenues in 2007.

COMPETITION

The market for health care information systems is subject to the technological imperative. Accordingly, MEDITECH has a completely integrated set of application products, implements them successfully, provides ongoing maintenance including updates and continues the developmental process. MEDITECH's competitors who make similar claims include GE, Siemens, McKesson, Cerner, Eclipsys, CPSI and Epic. MEDITECH does not offer the breadth of products and services which the competition offers to hospitals nor does MEDITECH offer the products and services which the competition offers to related medical enterprises. Instead MEDITECH focuses exclusively in the hospital information system software market and believes it competes favorably in this market.

ACCESS TO SEC FILINGS

"www.meditech.com" is MEDITECH's website address which provides access to its annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K, and all amendments thereof just as soon as such reports are filed with the SEC. The links so

provided allow access to copies of the reports stored on MEDITECH's website, but a link is also provided to allow access to all of MEDITECH's filings stored on the SEC's website as well.

"http://www.sec.gov/cgi-bin/browse-edgar?CIK=1011452&action=getcompany" may be used to access all of MEDITECH's filings stored on the SEC's website instead.

In addition MEDITECH will provide paper copies of these filings free of charge to its shareholders upon request.

Page 5 of 30

## Item 1A - Risk Factors

There are numerous risk factors which may affect future results of operations. The health care industry is highly regulated and is subject to changing economic and political influences. Federal and state legislatures could modify the health care system in respect to reimbursement and financing. Hospitals may respond to these pressures by delaying the purchase of new information systems. Previous volatility in the market place such as that due to Y2K concerns and September 11th could reappear and cause delays. The Health Insurance Portability and Accountability Act of 1996 directly impacts the industry by specifying standards to protect the security and confidentiality of patient information. It may be possible for patients to bring claims against software providers regarding injuries due to errors. Hospitals consolidating into an integrated health care delivery system may be able to negotiate price reductions. Finally, MEDITECH is dependent on a cohesive group of long time senior managers and staff with vast experience in the hospital industry and software technology.

## Item 1B - Unresolved Staff Comments

None.

## Item 2 - Properties

As of December 31, 2007 MEDITECH owned six facilities containing over 1.1 million square feet of office space, all being well maintained Class A properties, five in the greater Boston area and one in Atlanta. MEDITECH occupies 67% of the space and the remaining 33% is leased to various tenants. In addition, MEDITECH is currently constructing a seventh facility outside of Boston and renting office space next door during the construction phase. MEDITECH has adequate space for its reasonable needs over the near future.

## Item 3 - Legal Proceedings

During February 2005 a former employee filed a complaint in the United States District Court for the District of Massachusetts against the Medical Information Technology Profit Sharing Plan and all six of MEDITECH's Directors. The complaint was subsequently amended to add MEDITECH as a defendant. During March 2006 the court dismissed the breach of fiduciary duty claims brought against the individual defendants. The remaining claim is an ERISA benefits claim against the Plan, the Plan's trustee, and MEDITECH. The complaint seeks certification of the case as a class action, a judgment against the defendants, a permanent injunction ordering the Plan to consult an outside appraiser in valuing the Plan's

assets, removal of the Plan Trustee, and damages, interest, attorneys' fees and costs. During March 2007 the court denied the plaintiff's motion for the complaint to be certified as a class action. Subsequently the plaintiff requested reconsideration of the decision, which was also denied. The plaintiff then sought permission to appeal the decision in the United States Court of Appeals for the First Circuit. In July 2007 this was also denied. Discovery was closed on November 27, 2007. A pretrial conference is scheduled for April 22, 2008.

## Item 4 - Submission of Matters to a Vote of Security Holders

None.

Page 6 of 30

---

## PART II

## Item 5 - Market for Registrant's Common Equity, Related Shareholder Matters and Issuer Purchases of Equity Securities

No public trading market exists for MEDITECH's common stock, and accordingly no high and low bid information or quotations are available.

The sale, assignment, transfer, pledge or other disposition of any of MEDITECH's common stock is subject to right of first refusal restrictions set forth in MEDITECH's charter.

There are no shareholder agreements with MEDITECH covering the voting or repurchase of MEDITECH stock.

During February 2007 pursuant to the 2004 Stock Purchase Plan, MEDITECH sold 233,138 shares of its common stock at $35 per share to certain staff members for an aggregate consideration of $8,159,830.

During 2007 MEDITECH did not repurchase any of its shares of common stock.

During the fourth quarter of 2007 the Medical Information Technology, Inc. Profit Sharing Trust purchased 2,200 shares of MEDITECH's common stock for a total of $79,200 in individual private transactions. Below is a table showing the purchases of common stock by the Trust during each month of the fourth quarter of 2007.

| 4th quarter of 2007 | shares purchased | price per share |
|---|---|---|
| October | 0 | |
| November | 1,900 | $36 |
| December | 300 | $36 |

During all of 2007 the Medical Information Technology, Inc. Profit Sharing Trust purchased 21,750 shares of MEDITECH's common stock for a total of $769,775 in individual private transactions.

At December 31, 2007, there were 1,585 shareholders of record of MEDITECH's common stock and 35,481,271 shares outstanding.

MEDITECH has paid quarterly cash dividends continuously since 1980. Dividends paid per share during the last five years are set forth within the table in Item 6.

Page 7 of 30

## Item 6 - Selected Financial Data

Selected financial data for the past 5 years ended December 31 are as follows:

|                        | 2003          | 2004          | 2005          | 2006          | 2007          |
|------------------------|---------------|---------------|---------------|---------------|---------------|
| **Full Year Operations:** |            |               |               |               |               |
| Total revenue          | $270,780,703  | $280,761,569  | $304,568,166  | $344,589,232  | $376,233,882  |
| Operating income       | 99,684,703    | 102,124,728   | 111,420,017   | 124,794,398   | 126,461,550   |
| Net income             | 67,423,596    | 71,441,090    | 77,675,858    | 87,211,362    | 88,542,508    |
| Average shares         | 34,097,342    | 34,381,239    | 34,737,446    | 35,069,992    | 35,388,510    |
| Net income/share       | $1.98         | $2.08         | $2.24         | $2.49         | $2.50         |
| **Year End Position:** |               |               |               |               |               |
| Total assets           | $402,406,776  | $427,315,405  | $449,570,899  | $486,654,412  | $482,489,043  |
| Total liabilities      | 50,708,763    | 57,265,283    | 65,558,627    | 73,344,109    | 69,024,468    |
| Shareholder equity     | 351,698,013   | 370,050,122   | 384,012,272   | 413,310,303   | 413,464,575   |
| Shares outstanding     | 34,221,323    | 34,514,544    | 34,830,437    | 35,168,133    | 35,481,271    |
| Total equity/share     | $10.28        | $10.72        | $11.03        | $11.75        | $11.65        |
| **Other Financial Data:** |            |               |               |               |               |
| Working capital        | $179,764,041  | $182,083,959  | $204,626,809  | $231,033,476  | $201,126,941  |
| Operating cash flow    | 83,227,613    | 85,922,630    | 93,283,102    | 94,626,916    | 108,982,620   |
| Depreciation expense   | 8,421,929     | 7,706,814     | 7,654,226     | 8,128,038     | 8,795,511     |
| Cash dividends/share   | $1.56         | $1.80         | $2.00         | $2.16         | $2.40         |

## Item 7 - Management's Discussion and Analysis of Financial Condition and Results of Operations

Comparison of Fiscal Years ended December 31, 2006 and 2007:

MEDITECH's financial statements for 2007 are presented on a consolidated basis in this 10-K. The results include the effect of the 2nd quarter acquisition of PtCT. In particular, this acquisition increased revenue by $7.6M, but reduced operating income by $1.9M and reduced net income by $1.5M all of which are reflected below.

Total revenue from both existing and new customers increased 9.2% from $344.6 million in 2006 to $376.2 million in 2007. It was composed of a $9.6 million increase in product revenue and a $22.0 million increase in service revenue.

Operating expenses increased 13.6% from $219.8 million in 2006 to $249.8 million in 2007 due to an overall increase in staff and the acquision of PtCT. The resultant operating income increased 1.3% from $124.8 million in 2006 to $126.5 million in 2007.

Other income decreased from $22.6 million in 2006 to $21.0 million in 2007 due primarily to higher losses than gains on marketable securities. Other expense decreased from $8.0 million in 2006 to $7.7 million in 2007 due primarily to lower litigation related legal expenses. The resultant pretax income increased 0.3% from $139.4 million in 2006 to $139.7 million in 2007.

MEDITECH's effective tax rate decreased from 37.4% in 2006 to 36.6% in 2007 due primarily to a higher tax deduction for domestic manufacturing. Net income increased 1.5% from $87.2 million in 2006 to $88.5 million in 2007 due primarily to slightly lower effective tax rate.

Page 8 of 30

Comparison of Fiscal Years ended December 31, 2005 and 2006:

Total revenue from both existing and new customers increased 13.1% from $304.6 million in 2005 to $344.6 million in 2006. It was composed of a $25.8 million increase in product revenue and a $14.2 million increase in service revenue.

Operating expenses increased 13.8% from $193.1 million in 2005 to $219.8 million in 2006 due to an overall increase in staff and additional bonus expense. The resultant operating income increased 12.0% from $111.4 million in 2005 to $124.8 million in 2006.

Other income decreased from $23.7 million in 2005 to $22.6 million in 2006 due primarily to reduced realized gains from the redemption and sale of marketable securities. Other expense decreased from $9.3 million in 2005 to $8.0 million in 2006 due primarily to reduced litigation related legal expenses. The resultant pretax income increased 10.7% from $125.9 million in 2005 to $139.4 million in 2006.

MEDITECH's effective tax rate decreased from 38.3% in 2005 to 37.4% in 2006 due primarily to changes in deferred taxes and tax reserves. Net income increased 12.3% from $77.7 million in 2005 to $87.2 million in 2006 due primarily to the greater increase in revenue compared to expense.

Financial Condition:

Customer deposits increased 7.7% from $23.8 million on December 31, 2006 to $25.6 million on December 31, 2007 due to the acquisition of PtCT.

Liquidity and Capital Resources:

At December 31, 2007 MEDITECH's cash, cash equivalents and marketable securities totaled $262.7 million. Marketable securities consisted of preferred equities, common equities and government notes which can easily be converted to cash. During 2007 cash flow from operations was $109.0 million, cash flow used in investing was $23.4 million and cash flow used in financing was $76.7 million. The payment of $84.8 million in dividends to

shareholders was the primary use of cash generated by operating activities during this period.

MEDITECH has no long-term debt. Shareholder equity at December 31, 2007 was $413.5 million. During 2008 management anticipates expending $15 million for new facilities now under construction as well as continued additions of computer systems for product development, sales and marketing, implementation, service and administrative staff. Management believes existing cash, cash equivalents and marketable securities together with funds generated from operations will be sufficient to meet operating and capital expense requirements for the foreseeable future.

Critical Accounting Policies:

All of our significant accounting policies are described in the notes to the consolidated financial statements included in Item 8 of this report. We believe four of these constitute our most critical policies requiring estimates and judgments by management which are significant in terms of materiality. Reference Note 1(a) for revenue recognition, Note 1(j) for uncertainty in income taxes, Note 2 for marketable securities, Note 3 for doubtful accounts and Note 9 for income taxes.

## Item 7A - Quantitative and Qualitative Disclosures About Market Risk

None.

Page 9 of 30

## Item 8 - Financial Statements and Supplementary Data

Consolidated Financial Statements of Medical Information Technology, Inc.
As of December 31, 2004, 2005 and 2006
Together with Report of Independent Registered Public Accounting Firm

To the Shareholders and Board of Directors of Medical Information Technology, Inc.:

We have audited the accompanying consolidated balance sheets of Medical Information Technology, Inc. (a Massachusetts corporation) and subsidiary as of December 31, 2005, 2006 and 2007, and the related consolidated statements of income, shareholder equity and cash flows for each of the three years in the period ended December 31, 2007. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing

the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 1 to the consolidated financial statements, as January 1, 2007, the Company adopted the provisions of the Financial Accounting Standards Board Interpretation No. 48, Accounting for Uncertainty in Income Taxes.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Medical Information Technology, Inc. and subsidiary as of December 31, 2005, 2006 and 2007, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December, 31, 2007, in conformity with accounting principles generally accepted in the United States.

Ernst & Young LLP
Boston, Massachusetts
January 25, 2008

| Index to Consolidated Financial Statements | Page |
|---|---|
| Consolidated Balance Sheets as of December 31, 2005, 2006 and 2007 | 11 |
| Consolidated Statements of Income for the Years Ended December 31, 2005, 2006 and 2007 | 12 |
| Consolidated Statements of Shareholder Equity for the Years Ended December 31, 2005, 2006 and 2007 | 13 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2005, 2006 and 2007 | 14 |
| Notes to Consolidated Financial Statements | 15-23 |

## Consolidated Balance Sheets as of December 31, 2005, 2006 and 2007

|  | Dec 31, 2005 | Dec 31, 2006 | Dec 31, 2007 |
|---|---|---|---|
| Cash and equivalents (Note 1) | $16,749,452 | $13,660,733 | $22,567,940 |
| Marketable securities (Note 2) | 216,955,323 | 247,407,527 | 210,137,628 |
| Accounts receivable, less reserve of $800,000 in 2005 & 2006 and $1,000,000 in 2007 (Note 3) | 36,480,661 | 43,309,325 | 37,445,841 |
| Current assets | 270,185,436 | 304,377,585 | 270,151,409 |
| Computer equipment | 8,163,198 | 7,729,814 | 9,361,351 |
| Furniture and fixtures | 30,855,824 | 34,739,785 | 38,752,354 |
| Buildings | 140,326,869 | 146,934,058 | 175,130,131 |
| Land | 26,603,703 | 32,604,107 | 33,159,107 |

| | | | |
|---|---|---|---|
| Accumulated depreciation | (74,806,735) | (80,443,541) | (87,690,598) |
| Fixed assets (Note 1) | 131,142,859 | 141,564,223 | 168,712,345 |
| Marketable securities (Note 2) | 39,990,000 | 30,000,000 | 30,000,000 |
| Other assets (Note 1) | 8,252,604 | 10,712,604 | 13,625,289 |
| Total assets | $449,570,899 | $486,654,412 | $482,489,043 |
| | | | |
| Accounts payable | $468,727 | $239,804 | $395,117 |
| Taxes payable | 3,422,826 | 2,226,632 | 5,377,659 |
| Accrued expenses (Note 4) | 27,789,307 | 30,461,088 | 34,475,953 |
| Customer deposits | 21,004,270 | 23,770,417 | 25,604,508 |
| Deferred taxes and tax reserves (Note 9) | 12,873,497 | 16,646,168 | 3,171,231 |
| Total liabilities | 65,558,627 | 73,344,109 | 69,024,468 |
| Common stock, $1.00 par value, authorized 40,000,000 shares, issued and outstanding 34,830,437 shares in 2005, 35,168,133 shares in 2006 and 35,481,271 shares in 2007 | 34,830,437 | 35,168,133 | 35,481,271 |
| Additional paid-in capital | 33,353,809 | 44,062,385 | 54,869,077 |
| Retained income | 306,423,742 | 317,983,893 | 321,703,233 |
| Unrealized security gains, net of tax | 9,404,284 | 16,095,892 | 1,410,994 |
| Shareholder equity | 384,012,272 | 413,310,303 | 413,464,575 |
| Total liabilities and shareholder equity | $449,570,899 | $486,654,412 | $482,489,043 |

The accompanying notes are an integral part of these consolidated financial statements.

Page 11 of 30

---

Consolidated Statements of Income for the Years Ended December 31, 2005, 2006 and 2007

| | Dec 31, 2005 | Dec 31, 2006 | Dec 31, 2007 |
|---|---|---|---|
| Product revenue | $160,093,828 | $185,936,114 | $195,539,439 |
| Service revenue | 144,474,338 | 158,653,118 | 180,694,443 |
| Total revenue | 304,568,166 | 344,589,232 | 376,233,882 |

| | | | |
|---|---|---|---|
| Operations, development | 124,736,719 | 145,059,169 | 168,439,266 |
| Selling, G & A | 68,411,430 | 74,735,665 | 81,333,066 |
| Operating expenses | 193,148,149 | 219,794,834 | 249,772,332 |
| Operating income | 111,420,017 | 124,794,398 | 126,461,550 |
| Other income (Note 8) | 23,747,156 | 22,568,845 | 20,962,020 |
| Other expense (Note 8) | 9,299,827 | 8,009,183 | 7,687,500 |
| Pretax income | 125,867,346 | 139,354,060 | 139,736,070 |
| State income tax | 11,151,377 | 11,687,287 | 11,399,110 |
| Federal income tax | 37,040,111 | 40,455,411 | 39,794,452 |
| Income tax (Note 9) | 48,191,488 | 52,142,698 | 51,193,562 |
| Net income | $77,675,858 | $87,211,362 | $88,542,508 |

The accompanying notes are an integral part of these consolidated financial statements.

Page 12 of 30

## Consolidated Statements of Shareholder Equity for the Years Ended December 31, 2005, 2006 and 2007

| | Common<br># of shares | Stock<br>Paid-in capital | Retained<br>income | Shareholder<br>equity |
|---|---|---|---|---|
| Balance, December 31, 2004 | 34,514,544 | $58,783,349 | $298,130,812 | $370,050,122 |
| Issuance of common stock pursuant to the 2004 | | | | |
| Stock Purchase Plan | 235,893 | 6,840,897 | | 6,840,897 |
| Issuance of common stock | | | | |
| to Profit Sharing Plan | 80,000 | 2,560,000 | | 2,560,000 |
| Net income | | | 77,675,858 | 77,675,858 |
| Unrealized security losses, net of tax | | | | (3,731,677) |
| Dividends paid | | | (69,382,928) | (69,382,928) |
| Balance, December 31, 2005 | 34,830,437 | $68,184,246 | $306,423,742 | $384,012,272 |
| Issuance of common stock pursuant to the 2004 | | | | |

| | | | | |
|---|---|---|---|---|
| Stock Purchase Plan | 257,696 | 8,246,272 | | 8,246,272 |
| Issuance of common stock | | | | |
| to Profit Sharing Plan | 80,000 | 2,800,000 | | 2,800,000 |
| Net income | | | 87,211,362 | 87,211,362 |
| Unrealized security gains, net of tax | | | | 6,691,608 |
| Dividends paid | | | (75,651,211) | (75,651,211) |
| Balance, December 31, 2006 | 35,168,133 | $79,230,518 | $317,983,893 | $413,310,303 |
| Issuance of common stock | | | | |
| pursuant to the 2004 | | | | |
| Stock Purchase Plan | 233,138 | 8,159,830 | | 8,159,830 |
| Issuance of common stock | | | | |
| to Profit Sharing Plan | 80,000 | 2,960,000 | | 2,960,000 |
| Net income | | | 88,542,508 | 88,542,508 |
| Unrealized security losses, net of tax | | | | (14,684,898) |
| Dividends paid | | | (84,823,168) | (84,823,168) |
| Balance, December 31, 2007 | 35,481,271 | 90,350,348 | 321,703,233 | 413,464,575 |

The accompanying notes are an integral part of these consolidated financial statements.

Page 13 of 30

## Consolidated Statements of Cash Flows for the Years Ended December 31, 2005, 2006 and 2007

| | Dec 31, 2005 | Dec 31, 2006 | Dec 31, 2007 |
|---|---|---|---|
| Net income | $77,675,858 | $87,211,362 | $88,542,508 |
| Depreciation expense | 7,654,226 | 8,128,038 | 8,795,511 |
| Gain on sales of marketable securities | (989,543) | (8,230) | (8,173,614) |
| Write-down of marketable securities | | | 9,500,000 |
| Stock contributions to qualified profit sharing plan | 2,560,000 | 2,800,000 | 2,960,000 |
| Allowance for doubtful accounts | 19,421 | | 429,550 |
| Deferred taxes on unrealized securities (gains) losses | 2,487,784 | (4,461,072) | 9,789,935 |
| Change in accounts receivable | (4,417,988) | (6,828,664) | 6,606,717 |
| Change in accounts payable | 187,212 | (228,923) | 25,633 |
| Change in taxes payable | 288,016 | (1,196,194) | 3,150,307 |
| Change in accrued expenses | 2,516,999 | 2,671,781 | 3,162,324 |
| Change in customer deposits | 6,419,272 | 2,766,147 | (2,017,092) |
| Change in deferred taxes and tax reserves | (1,118,155) | 3,772,671 | (13,789,159) |
| Net cash from operating activities | 93,283,102 | 94,626,916 | 108,982,620 |

| | | | |
|---|---|---|---|
| Purchases of marketable securities | (65,217,633) | (57,301,294) | (94,883,413) |
| Sales of marketable securities | 40,743,700 | 48,000,000 | 106,352,092 |
| Purchases of fixed assets | (4,323,526) | (18,549,402) | (31,336,410) |
| Decrease (increase) of mortgage notes receivable | 240,000 | (2,460,000) | (1,038,098) |
| Acquisition of PtCT, net of cash acquired | | | (2,506,246) |
| Net cash used in investing activities | (28,557,459) | (30,310,696) | (23,412,075) |
| Sales of common stock | 6,840,897 | 8,246,272 | 8,159,830 |
| Dividends paid | (69,382,928) | (75,651,211) | (84,823,168) |
| Net cash used in financing activities | (62,542,031) | (67,404,939) | (76,663,338) |
| Net change in cash and equivalents | 2,183,612 | (3,088,719) | 8,907,207 |
| Cash and equivalents at beginning of year | 14,565,840 | 16,749,452 | 13,660,733 |
| Cash and equivalents at end of year | $16,749,452 | $13,660,733 | $22,567,940 |
| Supplemental Disclosure: | | | |
| Cash paid for income taxes | $46,793,927 | $54,402,795 | $53,633,563 |
| Cash paid for interest | $15,589 | $0 | $0 |

The accompanying notes are an integral part of these consolidated financial statements.

Page 14 of 30

Notes to Consolidated Financial Statements December 31, 2007

(1) Operations and Accounting Policies

MEDITECH is engaged in the development, manufacture and licensing of computer software products and related services used in the medical field. The principal market for MEDITECH's products consists of health care providers located primarily in the United States and Canada.

The accompanying consolidated financial statements reflect the application of certain accounting policies discussed below. The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

The consolidated financial statements include MEDITECH's wholly owned subsidiary, Patient Care Technologies, Inc., in accordance with Accounting Research Bulletin No. 51, Consolidation of Financial Statements.

(a) Revenue Recognition

MEDITECH follows the provisions of the American Institute of Certified Public Accountants (AICPA) Statement of Position No. 97-2 (SOP 97-2), Software Revenue Recognition, as amended by SOP 98-9. MEDITECH enters into perpetual software license contracts which provide for a customer deposit upon contract execution, milestone billings and fixed monthly service fees thereafter. MEDITECH classifies product and related implementation fees together as product revenue in the statement of income and recognizes these fees as revenue upon completion of each contract milestone, which approximates the percentage-of-completion method prescribed by SOP 81-1, Accounting for Performance of Construction-type and Certain Production-type Contracts. Software services represent post-implementation support services, which are recognized as the related services are rendered.

MEDITECH follows the provisions of Emerging Issues Task Force's No. 01-14 (EITF 01-14), which requires reimbursements received for out-of-pocket expenses to be characterized as product revenue with offsetting operating expenses included in the consolidated income statement.

(b) Software Development Costs

MEDITECH follows the provisions of Statement of Financial Accounting Standards No. 86 (SFAS 86), Accounting for the Costs of Computer Software to Be Sold, Leased or Otherwise Marketed. SFAS 86 establishes standards for capitalizing software development costs incurred after technological feasibility of the software development projects is established and the realizability of such capitalized costs through future operations is expected, if such costs become material. To date, development costs incurred by MEDITECH after technological feasibility has been established have been immaterial and as such have been charged to operations as incurred.

(c) Fixed Assets

MEDITECH carries all fixed assets on a cost basis and provides for depreciation in amounts estimated to allocate the costs thereof under the following depreciation methods and estimated useful lives:

Page 15 of 30

| Description | Method | Useful Life |
|---|---|---|
| Computer equipment | MACRS | 3-5 years |
| Furniture and fixtures | MACRS | 7 years |
| Furniture and fixtures | SL | 10 years |
| Buildings | SL | 31.5-40 years |

Maintenance costs are expensed as incurred. Improvements are capitalized and depreciated over the asset's useful life.

During 2006 MEDITECH purchased 17 acres of land, then entered into an agreement with an architectural firm for services to be rendered in connection with the production of plans for a 128,000 sq ft four-story building and a 100,000 sq ft two-story parking garage. At December 31, 2007 MEDITECH had capitalized $6,000,404 in land costs, $2,581,695 in architectural or engineering fees, and $28,923,750 in construction costs which are not yet subject to depreciation because the facility is currently not completed and therefore not in use.

(d) Cash and Equivalents

MEDITECH considers all highly liquid investments purchased with original maturities of 90 days or less to be cash equivalents.

(e) Fair Value of Financial Instruments and Concentration of Credit Risk

The carrying value of MEDITECH's cash and cash equivalents, accounts receivable and accounts payable approximates their fair value due to the short-term nature of these financial instruments. MEDITECH's marketable securities are carried at fair value and its US government debt securities are carried at cost (see Note 2).

Financial instruments that potentially subject MEDITECH to concentrations of credit risk are principally cash, cash equivalents, marketable securities and accounts receivable. MEDITECH places its cash and cash equivalents in highly rated institutions. Concentration of credit risk with respect to accounts receivable is limited to certain customers to whom MEDITECH makes substantial sales. To reduce risk, MEDITECH routinely assesses the financial strength of its customers and, as a result, believes that its accounts receivable credit risk exposure is limited. MEDITECH maintains an allowance for potential credit losses but historically has not experienced any significant credit losses related to an individual customer or groups of customers. At December 31, 2005 one customer accounted for 10.8% of the outstanding accounts receivable. As of December 31, 2006 and 2007 no individual customers accounted for greater than 10% of the outstanding accounts receivable.

(f) Other assets

MEDITECH follows the provisions of Financial Accounting Standards Board (FASB) Interpretation No. 46, Consolidation of Variable Interest Entities and as such, accounts for the equity investments in LSS Data Systems Inc. and MEDITECH South Africa in accordance with the cost method. Both companies license MEDITECH's software technology and re-license it to their respective customers. Each serves a market niche which is part of the overall medical market but is outside of the hospital market which MEDITECH serves. Included in these investments is the $2,380,000 balance on a mortgage note from LSS Data Systems Inc. which is fully collateralized by land and buildings owned and occupied as corporate headquarters by the borrower. MEDITECH believes the fair value of these investments which are included in other assets approximates its carrying value of $6,435,702 at December 31, 2007.

Page 16 of 30

(g) Net Income per Common Share

MEDITECH follows the provisions of Statement of Financial Accounting Standards No. 128 (SFAS 128), Earnings per Share. SFAS 128 requires reporting both basic and diluted earnings per share. MEDITECH has no common share equivalents such as preferred stock, warrants or stock options which would dilute earnings per share. Thus, earnings per share computed by dividing net income by the weighted average number of common shares outstanding for the past 3 years ended December 31 is as follows:

| | 2005 | 2006 | 2007 |

| | | | |
|---|---|---|---|
| Net income | $77,675,858 | $87,211,362 | $88,542,508 |
| Average number of shares | 34,737,446 | 35,069,992 | 35,388,510 |
| Earnings per share | $2.24 | $2.49 | $2.50 |

The increase in the average number of shares outstanding during the periods reflects the issuance of common stock pursuant to the 2004 Stock Purchase Plan and the issuance of common stock to the Profit Sharing Plan.

(h) Comprehensive Income

MEDITECH follows the provisions of Statement of Financial Accounting Standards No. 130 (SFAS 130), Reporting Comprehensive Income. SFAS 130 establishes standards for reporting and display of comprehensive income and its components in financial statements. Comprehensive income is the total of net income and all other non-owner changes in equity including items such as unrealized gains (losses), net of tax, on securities classified as available for sale, foreign currency translation adjustments and minimum pension liability adjustments. MEDITECH's comprehensive income including net unrealized gains (losses) on marketable securities for the past 3 years ended December 31 is as follows:

| | 2005 | 2006 | 2007 |
|---|---|---|---|
| Net income | $77,675,858 | $87,211,362 | $88,542,508 |
| Net unrealized gains (losses) | (3,731,677) | 6,691,608 | (14,684,898) |
| Comprehensive income | $73,944,181 | $93,902,970 | $73,857,610 |

(i) Segment, Geographic and Enterprise-Wide Reporting

MEDITECH follows the provisions of Statement of Financial Accounting Standards No. 131 (SFAS 131), Disclosure About Segments of an Enterprise and Related Information. Based on the criteria set forth in SFAS 131, MEDITECH currently operates in one operating segment, medical software and services. MEDITECH derives substantially all of its operating revenue from the sale and support of one group of similar products and services. All of MEDITECH's assets are located within the United States. MEDITECH's operating revenue percentage based on location of customer for the past 3 years ended December 31 is as follows:

Page 17 of 30

| | 2005 | 2006 | 2007 |
|---|---|---|---|
| United States | 87% | 86% | 87% |
| Canada | 11% | 12% | 11% |
| Other | 2% | 2% | 2% |

One customer accounted for approximately 10%, 9% and 6% of total revenue for the past 3 years ended December 31.

(j) Accounting for Uncertainty in Income Taxes

Effective January 1, 2007 MEDITECH adopted FASB Interpretation No. 48 (FIN 48), Accounting for Uncertainty in Income Taxes, which applies to all tax positions related to income taxes subject to SFAS 109, Accounting for Income Taxes. FIN 48 requires a new evaluation process for all tax positions taken. If the probability for sustaining a tax position is greater than 50%, then the tax position is warranted and recognition should be at the highest amount which would be expected to be realized upon ultimate settlement.

The adoption of FIN 48 had no material impact. No changes have been made to MEDITECH's policy on classification of related interest and penalties in our consolidated financial statements. The years 2005 through 2007 are subject to examination by the IRS, and various years are subject to examination by state tax authorities. The tax reserves relate to research credit, domestic production activities deduction, and state nexus. With each year our tax exposure rolls forward with incremental increases expected based on continued growth and no changes are foreseen to this trend at present. Each year's incremental growth is included in our income tax expense. The tax reserves are reported in note 9 include interest and penalties of $7,412,140 on December 31, 2006 and $8,008,180 on December 31, 2007 in addition to the following potential tax assessment. Should these tax reserves be reversed in their entirety, the 2007 effective tax rate of 37% would drop to 27%.

|  | Potential Tax Assessment |
|---|---|
| December 31, 2006 | $5,967,761 |
| Adoption of Fin 48 | 43,722 |
| Current year additions | 115 |
| Prior year additions | 1,149,017 |
| Prior year reductions | (749,812) |
| December 31, 2007 | $6,410,803 |

(k) Recent Accounting Pronouncements

In September 2006 FASB issued Statement No. 157, a standard providing guidance for using fair value to measure assets and liabilities. Under the standard, fair value refers to the price which would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants. MEDITECH will adopt Statement 157 beginning in 2008.

(2) MARKETABLE SECURITIES

MEDITECH follows the provisions of Statement of Financial Accounting Standards No. 115 (SFAS 115), Accounting for Certain Investments in Debt and Equity Securities. SFAS 115 requires companies to classify their investments as trading, available-for-sale or held-to-maturity. MEDITECH's marketable securities consist of common and preferred equities

which have been classified as available-for-sale. These are recorded in the financial statements at fair market value and any unrealized gains (losses) are reported as a component of shareholder equity. In addition MEDITECH holds short and long term U.S. government agency issues which have been classified as held-to-maturity. These are recorded in the financial statements at their cost which approximates their fair value. The fair market value of marketable securities was determined based on quoted market prices. The cost basis net of write-downs, unrealized gains, unrealized losses and fair market value of MEDITECH's holdings for the past 3 years ended December 31 are as follows:

|                        | 2005          | 2006          | 2007          |
|------------------------|---------------|---------------|---------------|
| Net cost of equities   | $171,281,515  | $190,591,039  | $182,785,974  |
| Unrealized gains       | 17,700,139    | 26,840,480    | 16,640,146    |
| Unrealized losses      | (2,026,331)   | (13,992)      | (14,288,492)  |
| Cost of agency issues  | 69,990,000    | 59,990,000    | 55,000,000    |
| Fair market value      | $256,945,323  | $277,407,527  | $240,137,628  |

The gross unrealized loss of $14,288,492 is represented by 10 equities having an original cost of $89,488,570 and a fair market value of $75,200,078. These equities have been in loss status for less than 5 months. MEDITECH considered the effect of changing interest rates and the issuer's current financial position to reach its conclusion that these impairments are temporary in nature at December 31, 2007.

SFAS 115 requires that for each individual security classified as available-for-sale, a company shall determine whether a decline in fair value below the cost basis is other than temporary. If the decline in fair value is judged as such, the cost basis of the individual security shall be written down to fair value as a new cost basis and the amount of the write-down shall be reflected in earnings. During the year ended December 31, 2007, MEDITECH wrote down certain securities by $9,500,000. This was partially offset by MEDITECH selling certain securities resulting in a realized gain of $8,173,414.

(3) ALLOWANCE FOR DOUBTFUL ACCOUNTS

The components of the allowance for doubtful accounts for the past 3 years ended December 31 are as follows:

|                            | 2005      | 2006      | 2007        |
|----------------------------|-----------|-----------|-------------|
| Balance, beginning of year | $800,000  | $800,000  | $800,000    |
| Amounts charged to expense | 19,421    | 0         | 429,550     |
| Amounts written off        | (19,421)  | 0         | (229,550)   |
| Balance, end of year       | $800,000  | $800,000  | $1,000,000  |

Page 19 of 30

## (4) ACCRUED EXPENSES

The components of accrued expenses for the past 3 years ended December 31 are as follows:

|  | 2005 | 2006 | 2007 |
|---|---|---|---|
| Accrued bonuses | $23,600,000 | $26,200,000 | $27,300,000 |
| Accrued vacation | 2,400,000 | 2,650,000 | 3,178,689 |
| Accrued construction |  |  | 2,030,000 |
| Other accrued | 1,789,307 | 1,611,088 | 1,967,264 |
| Accrued expenses | $27,789,307 | $30,461,088 | $34,475,953 |

## (5) COMMON STOCK DIVIDEND POLICY

MEDITECH's Board of Directors has full discretion regarding the timing and amounts of dividends paid on common stock. The annual dividend paid quarterly on shares then outstanding for the past 3 years ended December 31 is $2.00, $2.16 and $2.40 per share.

## (6) ACQUISITION OF PtCT

Patient Care Technologies, Inc. (PtCT of Georgia) is engaged in the development, manufacture and licensing of computer software products and their support for the home health care industry. Prior to the 2nd quarter MEDITECH paid $3,315,000 for approximately 43.5% of the outstanding capital stock of PtCT of Georgia. On April 12, 2007 MEDITECH paid $2,326,443 and acquired additional shares from certain PtCT of Georgia shareholders, thereby increasing its ownership to 90.2%.

On May 31, 2007 PtCT of Georgia was merged with and into PtCT of Massachusetts, a wholly-owned subsidiary of MEDITECH and subsequently MEDITECH paid an additional $784,907 to the remaining PtCT of Georgia shareholders. MEDITECH's total cash investment in PtCT was $6,426,350. At the time of the merger PtCT had $6,433,833 in tangible assets and $8,882,848 in tangible liabilities. The difference of $2,449,015 increased MEDITECH's effective investment in PtCT to $8,875,365. MEDITECH previously recorded a writedown of this investment.

MEDITECH accounts for this acquisition under the purchase method of accounting in accordance with FASB Statement No. 141, Business Combinations. MEDITECH has completed its final purchase price allocation. The values of assets acquired and liabilities assumed, including the identified intangibles, such as developed technology and backlog, are based upon management's estimates of fair value as of the date of acquisition. These identified intangibles are valued at $5,977,801 and will be amortized over their 7 year useful live. A deferred tax liability was recognized to reflect the tax effect of these identified intangibles as such amounts are not deductible for tax purposes. An acquired deferred tax asset was also recognized to reflect the carryforward of net operating losses expected to be realized.

MEDITECH's financial statements for 2007 are presented on a consolidated basis in this 10-K. The results include the effect of the 2nd quarter acquisition of PtCT. In particular, this acquisition increased revenue by $7.6M, but reduced operating income by $1.9M and

reduced net income by $1.5M. This acquisition did not represent a material business combination, thus no pro forma financial information is being provided.

Page 20 of 30

## (7) QUALIFIED PROFIT SHARING PLAN

MEDITECH has no obligation for post-employment or post-retirement benefits. MEDITECH maintains a qualified profit sharing plan that provides deferred compensation to substantially all of its staff members. Contributions to the plan are at the discretion of the Board of Directors and may be in the form of cash or Company stock. The components of year-end contributions for the past 3 years ended December 31 are as follows:

|  | 2005 | 2006 | 2007 |
|---|---|---|---|
| Cash | $2,940,000 | $3,600,000 | $3,640,000 |
| 80,000 shares of MEDITECH common stock at $32, $35 and $37 per share in 2005, 2006 and 2007 respectively | 2,560,000 | 2,800,000 | 2,960,000 |
|  | $5,500,000 | $6,400,000 | $6,600,000 |

## (8) OTHER INCOME AND EXPENSE

The components of Other income consisting of rents, dividends, interest income and realized marketable security gains or losses for the past 3 years ended December 31 are as follows:

|  | 2005 | 2006 | 2007 |
|---|---|---|---|
| Rents | $9,735,148 | $7,729,917 | $6,598,350 |
| Dividends | 9,882,855 | 10,633,290 | 11,668,892 |
| Interest | 3,139,610 | 4,197,408 | 4,021,164 |
| Gains (Losses) | 989,543 | 8,230 | (1,326,386) |
| Other income | $23,747,156 | $22,568,845 | $20,962,020 |

The components of Other expense consisting of rental costs, charitable contributions, certain professional fees and interest expense for the past 3 years ended December 31 are as follows:

|  | 2005 | 2006 | 2007 |
|---|---|---|---|
| Rental costs | $6,789,238 | $6,699,183 | $6,304,666 |
| Charitable contributions | 835,000 | 660,000 | 715,000 |
| Professional fees | 1,660,000 | 650,000 | 667,834 |

| | | | |
|---|---|---|---|
| Interest | 15,589 | | |
| Other expense | $9,299,827 | $8,009,183 | $7,687,500 |

Page 21 of 30

## (9) INCOME TAXES

MEDITECH follows the provisions of SFAS No. 109, Accounting for Income Taxes. The components of Deferred taxes and tax reserves, including reserves which provide for State and Federal income and sales taxes, for the past 3 years ended December 31 are as follows:

| | 2005 | 2006 | 2007 |
|---|---|---|---|
| Deferred tax on unrealized gains (losses) | $3,359,752 | $7,820,824 | ($4,762,422) |
| Prepaid tax on deposits over 1 year | (1,342,543) | (3,174,557) | (4,342,001) |
| Prepaid tax on non-deductible expenses | (1,280,000) | (1,380,000) | (1,580,000) |
| Other | | | (563,329) |
| Tax reserves | 12,136,288 | 13,379,901 | 14,418,983 |
| Deferred taxes and tax reserves | $12,873,497 | $16,646,168 | $3,171,231 |

The current and deferred components of the State and Federal income taxes for the past 3 years ended December 31 are as follows:

| | 2005 | 2006 | 2007 |
|---|---|---|---|
| State current | $11,161,543 | $12,110,963 | $12,701,898 |
| State deferred | (10,166) | (423,676) | (1,302,788) |
| State income tax | $11,151,377 | $11,687,287 | $11,399,110 |
| Federal current | $37,216,251 | $42,120,136 | $43,702,820 |
| Federal deferred | (176,140) | (1,664,725) | (3,908,368) |
| Federal income tax | $37,040,111 | $40,455,411 | $39,794,452 |

The effective income tax rate for the past 3 years ended December 31 is as follows:

| | 2005 | 2006 | 2007 |
|---|---|---|---|
| Statutory U.S. income tax rate | 35.0% | 35.0% | 35.0% |

| | | | |
|---|---|---|---|
| Increase in taxes resulting from state income | | | |
| taxes, net of federal income tax benefit | 5.8% | 5.5% | 5.3% |
| Dividend income exclusion | (1.9%) | (1.9%) | (2.0%) |
| Other | (0.6%) | (1.2%) | (1.7%) |
| | | | |
| Effective tax rate | 38.3% | 37.4% | 36.6% |

Page 22 of 30

## (10) SUPPLEMENTARY DATA

Unaudited operating results by quarter for the three years ended December 31, 2007 are as follows:

| | 1st Q | 2nd Q | 3rd Q | 4th Q | 2005 |
|---|---|---|---|---|---|
| Total revenue | $73,522,242 | $75,654,010 | $75,935,438 | $79,456,476 | $304,568,166 |
| Operating income | 27,144,369 | 27,814,592 | 27,730,994 | 28,730,062 | 111,420,017 |
| Net income | 18,956,078 | 19,167,170 | 18,678,092 | 20,874,518 | 77,675,858 |
| Net income per share | $0.55 | $0.55 | $0.54 | $0.60 | $2.24 |

| | 1st Q | 2nd Q | 3rd Q | 4th Q | 2006 |
|---|---|---|---|---|---|
| Total revenue | $82,189,658 | $85,510,655 | $87,419,158 | $89,469,761 | $344,589,232 |
| Operating income | 29,173,061 | 31,496,430 | 31,261,339 | 32,863,568 | 124,794,398 |
| Net income | 20,200,414 | 20,528,941 | 21,514,523 | 24,967,484 | 87,211,362 |
| Net income per share | $0.58 | $0.59 | $0.61 | $0.71 | $2.49 |

| | 1st Q | 2nd Q | 3rd Q | 4th Q | 2007 |
|---|---|---|---|---|---|
| Total revenue | $91,683,091 | $95,133,885 | $92,712,818 | $96,704,088 | $376,233,882 |
| Operating income | 33,166,303 | 32,005,612 | 29,208,810 | 32,080,825 | 126,461,550 |
| Net income | 22,986,988 | 23,596,234 | 20,963,324 | 20,995,965 | 88,542,508 |
| Net income per share | $0.65 | $0.67 | $0.59 | $0.59 | $2.50 |

## Item 9 – Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## Item 9A – Controls and Procedures

An evaluation was conducted under the supervision and with the participation of MEDITECH's management, including the Chief Executive Officer and Chief Financial Officer, on the effectiveness of MEDITECH's disclosure controls and procedures (as defined in

Exchange Act Rules 13a-15(e) and 15d-15(e)14(c) under the Securities Exchange Act of 1934) as of the end of the period covered by this report. Based on this evaluation, the Chief Executive Officer and Chief Financial Officer have concluded MEDITECH's disclosure controls and procedures are, to the best of their knowledge, effective to ensure information requiring disclosure by MEDITECH in reports which it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms.

MEDITECH's management is responsible for establishing, designing and maintaining internal controls over financial reporting that provide reasonable assurance to our Board of Directors and shareholders that the financial statements prepared are fairly presented. We have set assessment criteria in accordance with the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control's Integrated Framework. For the year ended December 31, 2007 we have made no changes in internal controls and we believe our internal control over financial reporting are effective at a reasonable assurance level based on said criteria.

Page 23 of 30

## Item 9B - Other Information

During its regular January 2008 meeting the Board of Directors approved the issuance of up to 260,000 shares of common stock to be sold to staff members at $37.00 per share pursuant to the MEDITECH 2004 Stock Purchase Plan.

## PART III

## Item 10 - Directors, Executive Officers and Corporate Governance

All Directors are elected each year at the Annual Meeting of Shareholders. All Officers are elected at the first meeting of the Board following the Annual Meeting of Shareholders and hold office for one year. The positions held by each Director and Officer of MEDITECH on December 31, 2007, are shown below. There are no family relationships among the following persons.

| Director or Officer | Age | Position with MEDITECH |
|---|---|---|
| A. Neil Pappalardo | 65 | Chairman, Chief Executive Officer and Director |
| Lawrence A. Polimeno | 66 | Vice Chairman, Prior President and Director |
| Roland L. Driscoll | 78 | Director |
| Edward B. Roberts | 72 | Director |
| Morton E. Ruderman | 71 | Director |
| L. P. Dan Valente | 77 | Director |
| Howard Messing | 55 | President and Chief Operating Officer |
| Barbara A. Manzolillo | 55 | Treasurer, Chief Financial Officer and Clerk |
| Stuart N. Lefthes | 54 | Vice President of Sales |
| Christopher Anschuetz | 55 | Vice President of Technology |
| Robert G. Gale | 61 | Senior Vice President of Product Development |
| Joanne Wood | 54 | Vice President of Client Service |

| Steven B. Koretz | 55 Vice President of Implementation |
| Hoda Sayed-Friel | 49 Vice President of Marketing |
| Michelle O'Connor | 41 Vice President of Product Development |

The following is a description of the business experience during the past five years of each Director and Officer.

A. Neil Pappalardo, founder of MEDITECH, is the Chairman and Chief Executive Officer, and has been a Director since 1969. He is also a Director of Palomar Medical Technologies, Inc.

Lawrence A. Polimeno has been the Vice Chairman since 2002, was President and Chief Operating Officer prior to that, has been a Director since 1985, and has been with MEDITECH since 1969.

Roland L. Driscoll, retired Chief Financial Officer of MEDITECH, has been a Director since 1985.

Page 24 of 30

Edward B. Roberts, co-founder of MEDITECH, is the David Sarnoff Professor of Management of Technology at the Sloan School of Management at the Massachusetts Institute of Technology, and has been a Director since 1969. He is also a Director of Sohu.com Inc.

Morton E. Ruderman, co-founder of MEDITECH, is Chief Executive Officer of CRES Development, a real estate developer, and has been a Director since 1969.

L. P. Dan Valente is Chairman of Palomar Medical Technologies, Inc., and has been a Director since 1972. He is also a Director of MKS Instruments and SurgiLight Inc.

Howard Messing has been the President and Chief Operating Officer since 2002, was the Executive Vice President prior to that, and has been with MEDITECH since 1974.

Barbara A. Manzolillo has been the Treasurer, Chief Financial Officer and Clerk since 1996, was the Treasurer prior to that, and has been with MEDITECH since 1975.

Stuart N. Lefthes has been the Vice President of Sales since 1997, was a Senior Manager prior to that, and has been with MEDITECH since 1983.

Christopher Anschuetz has been the Vice President of Technology since 1995, was a Senior Manager prior to that, and has been with MEDITECH since 1975.

Robert G. Gale has been the Senior Vice President of Product Development since 2007, was a Vice President of Product Development prior to that, and has been with MEDITECH since 1976.

Joanne Wood has been the Vice President of Client Service since 1995, was a Senior Manager prior to that, and has been with MEDITECH since 1983.

Steven B. Koretz has been the Vice President of Implementation since 1997, was a Senior Manager prior to that, and has been with MEDITECH since 1982.

Hoda Sayed-Friel has been the Vice President of Marketing since 2003, was a Senior Manager prior to that, and has been with MEDITECH since 1986.

Michelle O'Connor has been the Vice President of Product Development since 2007, was a Senior Manager prior to that, and has been with MEDITECH since 1988.

The address of all Officers and Directors is in care of Medical Information Technology, Inc., MEDITECH Circle, Westwood, MA 02090.

Page 25 of 30

## THE BOARD OF DIRECTORS AND ITS COMMITTEES

The Board of Directors oversees MEDITECH's business affairs and monitors the performance of management, but is not involved in the day-to-day operations. The Directors meet regularly with the CEO, the COO, the CFO, other officers and our independent registered public accounting firm; read reports and other materials; and participate in Board and committee meetings. The Board currently consists of 6 members. During 2007 the Board held 4 regularly scheduled quarterly meetings and all 6 members attended all 4 meetings. Messrs. Driscoll, Roberts, Ruderman and Valente are "independent" as defined by the rules of the NYSE and NASDAQ.

The Board of Directors has an Audit Committee, an Executive Compensation Committee and a Charitable Contribution Committee. During 2007 each committee member attended all committee meetings. The following is a description of the committees.

The Audit Committee consists of Messrs. Driscoll and Valente. Both members are former CPAs and audit committee financial experts within the meaning of applicable rules under the Securities Exchange Act of 1934, as amended. The committee met 6 times in 2006 to review accounting practices and advise MEDITECH's CFO. In addition, the committee met with MEDITECH's Independent Registered Public Accounting firm and reviewed MEDITECH's business operations, industry, financial performance, business and financial risks, processes and controls, key policies, legal and regulatory requirements, code of ethical conduct and new or unusual transactions. The Committee does not have a written charter. The Committee submits its annual report to the Board of Directors each April.

The Executive Compensation Committee consists of Messrs. Ruderman and Roberts. This committee met once in 2007 to recommend the Chairman and Chief Executive Officer's annual salary, the criteria and amount for his bonus. The full Board of Directors annually approves the salary and bonus amount for each of the officers.

The Charitable Contribution Committee consists of Messrs. Ruderman, Polimeno, Pappalardo and Messing. This committee meets at least 6 times a year to review the criteria for the year's charitable contribution program, meets and evaluates each organization under consideration and determines the amount to be contributed to each organization for the year. During December 2007 the committee contributed $715,000 to 45 cultural, educational and social service organizations within the greater Boston area.

The Board of Directors does not have a nominating committee. Instead, the full Board, because of its small size, carries out the duties of a nominating committee. The Board has not adopted written guidelines regarding nominees for Director.

During 2005 a Code of Ethical Conduct was created by management and adopted by the Board of Directors in an effort to outline the principles established at MEDITECH which help guide the actions of its staff, Officers and Directors. This Code sets forth ethical standards of conduct for all to follow and provides a framework for decision-making. This Code is intended to promote proper conduct at all levels of business in compliance with all applicable laws and regulations as well as to deter wrongdoing. These guiding principles propel MEDITECH forward towards future success in a continued tradition of "ingenuity delivered with integrity" in all of our business relationships. The Code of Ethical Conduct is available on MEDITECH's web site and any waiver for senior management will be disclosed there as well.

Page 26 of 30

## Item 11 - Executive Compensation

There are no employment contracts providing for continued compensation in effect for any Officer of MEDITECH. MEDITECH has no Stock Award programs, no Stock Option programs and no Non-equity Incentive plans. The compensation received by MEDITECH's Chief Executive Officer and the four most highly compensated other Officers for the past 3 years ended December 31 is summarized in the following table. The deferred columns represent both the annual increase in the individual's balance in the MEDITECH Profit Sharing Plan and the individual's share of MEDITECH's annual contribution to this Plan.

| Name and Position | Year | Salary | Bonus | Deferred | Deferred | Total |
|---|---|---|---|---|---|---|
| A. Neil Pappalardo | 2007 | $360,000 | $699,562 | 0 | 0 | $1,059,562 |
| Chairman and Chief | 2006 | 360,000 | 700,921 | 0 | 0 | 1,060,921 |
| Executive Officer | 2005 | 360,000 | 675,139 | 0 | 0 | 1,035,139 |
| Howard Messing | 2007 | $264,000 | $549,562 | $119,586 | $5,074 | $938,222 |
| President and Chief | 2006 | 264,000 | 550,921 | 147,384 | 5,643 | 967,948 |
| Operating Officer | 2005 | 264,000 | 525,139 | 155,135 | 5,378 | 949,652 |
| Lawrence A. Polimeno | 2007 | $180,000 | $499,562 | $119,586 | $5,074 | $804,222 |
| Vice Chairman and | 2006 | 180,000 | 500,921 | 147,384 | 5,643 | 833,948 |
| Prior President | 2005 | 180,000 | 475,139 | 155,135 | 5,378 | 815,652 |
| Stuart N. Lefthes | 2007 | $216,000 | $349,562 | $119,586 | $5,074 | $690,222 |
| Vice President | 2006 | 192,000 | 400,921 | 147,384 | 5,643 | 745,948 |
| of Sales | 2005 | 192,000 | 375,139 | 146,644 | 5,378 | 719,161 |
| Barbara A. Manzolillo | 2007 | $228,000 | $349,562 | $119,586 | $5,074 | $702,222 |
| Treasurer and Chief | 2006 | 228,000 | 350,921 | 147,384 | 5,643 | 731,948 |

| Financial Officer | 2005 | 228,000 | 325,139 | 155,135 | 5,378 | 713,652 |

Annual Cash Bonus: MEDITECH pays a Staff Bonus to all staff members, including officers, in recognition of services rendered by them during each calendar year. The individual portion of the Staff Bonus payable to each recipient is determined by prorating the sum of the recipient's last five years of cash compensation (capped at $600,000). MEDITECH also pays an Officer Bonus solely to the officers, in recognition of services rendered by them during the calendar year. The individual portion of the Officer Bonus payable to each recipient is determined by the Board. Cash bonuses are paid to the designated recipient during the following January.

Profit Sharing Plan: MEDITECH maintains a qualified defined contribution plan for all of MEDITECH's staff known as the Medical Information Technology, Inc. Profit Sharing Plan. All of the staff who have completed one year of service participate in the Plan. The Board of Directors sets the annual contribution which is allocated in proportion to total compensation of all eligible members for the Plan year (capped at $100,000). No allocation is allowable under this Plan to owners of 10% or more of MEDITECH's common stock. Contributions by members are not permitted. Benefits under the Plan are considered deferred compensation and become fully vested after five years of continuous service with MEDITECH. Members who have at least 20 years of service or who have incurred financial hardship may make in service withdrawals. Lump sum cash payment is made upon retirement, death, disability or termination of employment.

Page 27 of 30

Compensation of Directors: The members of the Board of Directors who are not Officers of MEDITECH currently receive a fee of $8,000 for each quarterly meeting fully attended, with such fee being deemed to also cover any special meetings, conference or committee time, and incidental expenses expended by such directors on behalf of MEDITECH during the year.

### Item 12 - Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters

The following table provides information as of December 31, 2007 with respect to the shares of common stock beneficially owned by each person known by MEDITECH to own more than 5% of MEDITECH's outstanding common stock, each Director of MEDITECH, each Executive Officer named in the Compensation Table and by all Directors and Officers of MEDITECH as a group. The number of shares beneficially owned is determined according to rules of the Securities and Exchange Commission. Under such rules, a person's beneficial ownership includes any shares as to which such person has sole or shared voting power or investment power.

| Name of Shareholder, Director or Officer | Number of Shares of Common Stock Beneficially Owned | Percentage of Shares of Common Stock |
|---|---|---|
| A. Neil Pappalardo* | 13,558,632 | 38.21% |
| Morton E. Ruderman | 4,992,704 | 14.07% |
| MEDITECH Profit Sharing Trust* | 4,271,332 | 12.04% |
| Curtis W. Marble | 3,500,000 | 9.86% |

| | | |
|---|---|---|
| Grossman Group | 2,061,144 | 5.81% |
| Lawrence A. Polimeno | 1,043,876 | 2.94% |
| Edward B. Roberts | 829,397 | 2.34% |
| Roland L. Driscoll | 528,000 | 1.49% |
| Howard Messing | 344,000 | 0.97% |
| Barbara A. Manzolillo | 220,000 | 0.62% |
| L. P. Dan Valente | 85,000 | 0.24% |
| Stuart N. Lefthes | 74,700 | 0.21% |
| 15 Directors and Officers as a Group* | 22,011,369 | 62.04% |

*The number of shares indicated for Mr. Pappalardo includes the shares owned by the MEDITECH Profit Sharing Trust. Mr. Pappalardo is the sole Trustee of the MEDITECH Profit Sharing Trust and therefore is entitled to vote its shares in addition to his own 9,287,300 shares. Likewise the number of shares indicated for the 15 Directors and Officers as a Group includes the shares owned by the MEDITECH Profit Sharing Trust.

SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

During 2007, the Medical Information Technology, Inc. Profit Sharing Trust filed Forms 4 for its purchases of MEDITECH stock, but some of these filings were late. To MEDITECH's knowledge, based solely on a review of the reports given to MEDITECH, all other Section 16(a) filing requirements applicable to its executive officers, Directors and greater-than-10% shareholders were satisfied in 2007.

Page 28 of 30

---

## Item 13 - Certain Relationships and Related Transactions, and Director Independence

A. Neil Pappalardo, Chairman, Chief Executive Officer and Director, purchased for cash from MEDITECH 25,000 shares of common stock at $32 per share in March 2006 and 25,000 shares of common stock at $35 per share in February 2007.

Howard Messing, President and Chief Operating Officer, purchased for cash from MEDITECH 15,000 shares of common stock at $32 per share in March 2006 and 15,000 shares of common stock at $35 per share in February 2007.

Barbara A. Manzolillo, Treasurer, Chief Financial Officer and Clerk, purchased for cash from MEDITECH 5,000 shares of common stock at $32 per share in February 2006 and 5,000 shares of common stock at $35 per share in February 2007.

Stuart N. Lefthes, Vice President of Sales, purchased for cash from MEDITECH 5,000 shares of common stock at $32 per share in February 2006 and 5,000 shares of common stock at $35 per share in February 2007.

On December 31, 2007, MEDITECH contributed 80,000 shares of common stock at $37 per share to the MEDITECH Profit Sharing Trust.

## Item 14 - Principal Accounting Fees and Services

During 2007, Ernst & Young LLP's services included auditing MEDITECH's financial statements, reviewing unaudited quarterly financial information and discussing various accounting, tax, and regulatory matters. Fees paid for audit services rendered by Ernst & Young LLP for the three years ended December 31, 2007 is as follows:

|  | 2005 | 2006 | 2007 |
|---|---|---|---|
| Annual audit and quarterly reviews | $127,000 | $128,000 | $207,400 |
| Audit related to Profit Sharing Trust | 11,000 | 11,000 | 12,000 |
| Tax or all other matters | - | 19,500 |  |
|  | $138,000 | $158,500 | $219,400 |

It is the policy of the Audit Committee to pre-approve all audit and non-audit services to be provided to MEDITECH by MEDITECH's Independent Registered Public Accounting Firm.

Page 29 of 30

## PART IV

### Item 15 - Exhibits

Exhibit 3.1: MEDITECH's Articles of Organization, as amended to date, is incorporated by reference to an exhibit to the quarterly report on Form 10-Q for the quarter ended March 31, 2007.

Exhibit 3.2: MEDITECH's By-laws, as amended to date, is incorporated by reference to an exhibit to the annual report on Form 10-K for the year ended December 31, 2001.

Exhibit 10: MEDITECH 2004 Stock Purchase Plan is incorporated by reference to the annual report on Form 10-K for the year ended December 31, 2003.

Exhibit 21: Subsidiaries of the Company, Exhibit 23: Consent of Independent Registered Public Accounting Firm, Exhibit 31: Rule 13a-14(a) Certifications and Exhibit 32: Section 1350 Certifications are appended to this report.

There were no reports filed on Form 8-K during the quarter ended December 31, 2007.

### Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Medical Information Technology, Inc.
(Registrant)

By: Barbara A. Manzolillo, Chief Financial Officer and Treasurer
(Signature)

January 31, 2008
(Date)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on January 31, 2008.

A. Neil Pappalardo, Chief Executive Officer, Chairman and Director
(Signature)

Lawrence A. Polimeno, Vice Chairman and Director
(Signature)

Roland L. Driscoll, Director
(Signature)

Edward B. Roberts, Director
(Signature)

Morton E. Ruderman, Director
(Signature)

L. P. Dan Valente, Director
(Signature)

# EXHIBIT 10

# MEDICAL INFORMATION TECHNOLOGY INC

## FORM 10-K
(Annual Report)

## Filed 3/26/1998 For Period Ending 12/31/1997

| | |
|---|---|
| Address | MEDITECH CIRCLE |
| | WESTWOOD, Massachusetts 02090 |
| Telephone | 781-821-3000 |
| CIK | 0001011452 |
| Fiscal Year | 12/31 |

Generated by EDGAR Online Pro
http pro edgar-online com



Contact EDGAR Online
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT
OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 1997**

*Commission file number 0-28092*

# Medical Information Technology, Inc.

(Exact Name of Registrant as Specified in Its Charter)

**Massachusetts**
(State or Other Jurisdiction of Incorporation or Organization)

04-2455639
(I.R.S. Employer Identification No.)

Meditech Circle, Westwood, MA
(Address of Principal Executive Offices)

02090
(Zip Code)

781-821-3000
(Registrant's Telephone Number)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

The number of shares of Common Stock, $.25 par value, outstanding at December 31, 1997 was 16,087,212

DEF003620

**Part I**

Item 1 - Business Page 3

Item 2 - Properties Page 5

Item 3 - Legal Proceedings Page 6

Item 4 - Submission of Matters to a Vote of Security Holders Page 6

**Part II**

Item 5 - Market for Registrant's Common Equity and Related Stockholder Matters Page 6

Item 6 - Selected Financial Data Page 6

Item 7 - Management's Discussion and Analysis of Financial Condition and Results of Operations Page 7

Item 8 - Financial Statements and Supplementary Data Page 8

Item 9 - Changes in and Disagreements with Accountants on Accounting and Financial Disclosure Page 8

**Part III**

Item 10 - Directors and Executive Officers of the Registrant Page 8

Item 11 - Executive Compensation Page 10

Item 12 - Security Ownership of Certain Beneficial Owners and Management Page 11

Item 13 - Certain Relationships and Related Transactions Page 11

**Part IV**

Item 14 - Exhibits, Financial Statement Schedules, and Reports on Form 8-K Page 12

Signatures Page 12

DEF003621

Item 1 - Business

## COMPANY OVERVIEW

Medical Information Technology, Inc. (MEDITECH or the Company) was founded in 1969 to develop and market information system software for the hospital industry. 1997 revenues reached $193.8 million and at year-end MEDITECH had a product backlog of $130 million and more than 1,800 employees.

By the end of 1997 MEDITECH had over 1,050 active hospital customers throughout the U.S., Canada and the U.K., as well as a backlog of almost 100 hospitals waiting implementation. The implementation process consists of teaching hospital personnel about the operation of the software as well as training them on how to use it in their daily activity. Once the hospital goes live, MEDITECH maintains and updates the software thereafter.

## HOSPITAL SOFTWARE

Initially MEDITECH developed a software product to automate one of the main hospital departments, the clinical laboratory that performs various diagnostic tests on blood and urine specimens. Within a few years, this product became standardized, thereby requiring minimal adaptation to meet the individual needs of a typical customer. MEDITECH extended the concept and developed additional software products for the rest of a hospital's clinical departments. Eventually, it moved into the financial area by developing a hospital billing and accounts receivable product as well as various general accounting products.

Although the individual products could be operated in a stand alone fashion, a hospital achieved maximum effectiveness when they were used in an integrated mode, sharing access to the common clinical and financial records of the hospital. This concept ultimately led to MEDITECH developing the so-called hospital information system, a cohesive set of software products designed from the onset to work in conjunction with the overall operation of the hospital and to minimize the need for specialized interfaces.

## COMPUTER HARDWARE

Software requires extensive computer and communication equipment to function. In spite of this, MEDITECH continues to be a pure software company, limiting itself to specifying the aggregate components needed as well as suggesting typical configurations from certain hardware vendors. The responsibility is left to the hospital to purchase the requisite hardware and secure a continuing source of maintenance service for it.

The hardware components traditionally consist of a small set of central medium- sized computers and a large set of display terminals and printers distributed throughout the hospital. All of these elements are interconnected by means of a standard high speed communication network. The computers execute the software and include large disk subsystems containing the permanent and common clinical and financial records of the hospital.

DEF003622

Hardware technology evolves rapidly, and the current trend is to replace the display terminals with desktop computers, thereby forming a client server network. In this mode of operation, the central computers become the file servers while software is executed locally on the client computer which makes common file requests to the servers.

## LICENSED SOFTWARE

MEDITECH requires a customer to sign a standard software license agreement prior to product delivery, implementation and subsequent service of the software. This agreement specifies a front end product fee and a front end implementation fee both of which are payable over the implementation process, and a monthly service fee after the site goes live. In addition to precluding ownership and restricting transfer, the license mandates the hospital hold MEDITECH harmless from any liability arising from incorrect operation of the software.

MEDITECH bases its product fee on the total number of hospital beds that a customer operates at all of its sites, and sets its implementation fee on the total number of sites. Large hospitals pay more than small hospitals, but incremental fees continue to diminish. The monthly service fees are always 1% of the product fees. A typical 250 bed acute care hospital might incur a $500,000 product fee, $100,000 implementation fee and a $5,000 monthly service fee. An order is booked and goes into the backlog when a signed software license and 10% of both front end fees are received.

## STAFF ORGANIZATION

MEDITECH is organized into functional units grouped around product development, sales and marketing, implementation, customer service, accounting and facility operations. All MEDITECH staff work in company owned buildings located in the greater Boston area.

From its inception, MEDITECH utilized communication technology which allowed much of its business activities to be performed by remote access. MEDITECH staff sitting at their desks may access client hospitals, both personnel and computers. The need for remote offices is thereby negated. Although most customer contact is through the phone, certain of the sales and implementation staff travel to customer sites.

## PRODUCT DEVELOPMENT

Most of the product development staff is working on the incremental evolution of the current product line, as well as creating a few more new products each year. The rest of the staff is developing a set of replacement products utilizing a new technology. Approximately every seven years, the company introduces the next generation of products based on the new technology and gradually updates existing customers.

DEF003623

Most of the direct sales staff, organized into regions, concentrate on new prospects. In addition, some of the sales staff monitor existing customers to expose them to the Company's entire product line. Marketing activities and promotion are low key because hospitals are easily identified, finite in number and generally send an RFP to vendors when they are contemplating the purchase of a hospital information system.

During the sales process, prospects generally visit MEDITECH to talk to product specialists and to view product demonstrations. Thereafter they are encouraged to visit various MEDITECH customer sites to observe first hand the software in actual operation and to discuss issues of concern with hospital personnel.

## IMPLEMENTATION PROCESS

To ensure a successful implementation, the staff must properly train a core group of hospital personnel. To preclude interruptions from normal hospital activities, MEDITECH mandates that the hospital personnel come to Boston for intensive training sessions.

As training proceeds, the implementation staff will customize certain dictionaries to fit the specific need of the hospital's environment, provide interfaces to non-MEDITECH systems and to assist the hospital in converting data from legacy systems. In addition, the licensed software will be delivered, installed and tested on the customer's hardware. MEDITECH will utilize remote access communication technology to minimize or eliminate the need to travel.

## CUSTOMER SERVICE

Once a hospital goes live, the responsibility of maintaining the customer is transferred to the service staff. MEDITECH provides 24 hour a day service coverage to these customers in order to respond to problem calls. In addition, the staff updates customers with new releases of the software products as they become available. To ensure the continuing education of the hospital staff, MEDITECH runs seminars on the use of its products.

## COLUMBIA HEALTH CARE

Columbia/HCA owns and operates over 350 hospitals in the U.S., Canada, and the U.K. and is MEDITECH's largest customer. By the end of 1997 MEDITECH had implemented approximately 300 of their hospitals. They represented about 21% of revenue in 1996 and 1997. In the 3rd quarter of 1997 Columbia/HCA underwent a major change in leadership and since then they have made public statements to the effect that they are undergoing a transition in business strategy and will be downsizing. While it is difficult to predict how this will effect MEDITECH, it may result in a decline in the revenue generated from them.

## ITEM 2 - Properties

As of December 31, 1997 the Company owned five facilities containing about 1.1 million square feet of space, all being well maintained Class A properties in the greater Boston area. The Company occupies 60% of the space and the remaining 40% is leased to various tenants. The Company has adequate space for its reasonable needs over the next few years.

There are no material pending legal proceedings against the Company, nor were any initiated during the year 1997.

### ITEM 4 - Submission of Matters to a Vote of Security Holders

None.

# PART II

### ITEM 5 - Market for Registrant's Common Equity and Related Stockholder Matters

No trading market exists for the Company's Common Stock, and accordingly no high and low bid information or quotations are available with respect to the Company's Common Stock.

The Company's Common Stock is subject to right of first refusal restrictions upon sale, assignment, transfer, pledge or other disposition of any of its shares.

At December 31, 1997 there were 747 holders of record of its Common Stock and 16,087,212 shares outstanding.

The Company paid quarterly cash dividends totaling the following amounts in the most recent three fiscal years:

1995 1996 1997 Per Share $1.24 $1.40 $1.68

### ITEM 6 - Selected Financial Data

For the Five Years Ended December 31, 1997 (in thousands where applicable):

|  | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| **Operations:** | | | | | |
| Revenue | $105,325 | $124,223 | $143,721 | $167,884 | $193,805 |
| Operating Income | 41,285 | 51,255 | 58,513 | 69,550 | 78,286 |
| Net Income | 29,625 | 32,190 | 37,085 | 44,350 | 50,284 |
| Average shares | 15,523 | 15,641 | 15,782 | 15,863 | 16,029 |
| Earnings per share | 1.91 | 2.06 | 2.35 | 2.80 | 3.14 |
| **Financial Position:** | | | | | |
| Cash and cash equivalents | $6,191 | $12,907 | $6,512 | $18,063 | $8,379 |
| Total assets | 118,923 | 137,755 | 197,998 | 218,339 | 263,108 |
| Total liabilities | 18,870 | 20,006 | 60,170 | 55,871 | 73,577 |
| Shareholders' equity | 100,053 | 117,749 | 137,828 | 162,468 | 189,531 |
| Book Value per share | 6.43 | 7.51 | 8.71 | 10.19 | 11.78 |
| Shares outstanding | 15,567 | 15,686 | 15,831 | 15,938 | 16,087 |
| **Other Data:** | | | | | |
| Working Capital | $43,027 | $60,711 | $47,573 | $60,373 | $44,911 |
| Cash flows from operations | 26,615 | 35,218 | 41,443 | 56,413 | 62,195 |
| Depreciation | 3,459 | 3,294 | 4,809 | 6,155 | 9,084 |
| Cash dividends per share | $0.87 | $1.04 | $1.24 | $1.40 | $1.68 |

DEF003625

### Comparison of Fiscal Years Ended December 31, 1996 and 1997:

1997 Revenue increased 15% to $193.8 million, while 1997 Operating Income increased only 13% to $78.3 million. During the 4th quarter the Company experienced a decrease in the product revenue attributable to a slowdown in implementations for Columbia/HCA. During the quarter staff size was not reduced in response. The result of this caused growth in Operating Expenses to exceed growth in Revenue. 1997 Operating Expenses increased 17% to $115.5 million due to a 12% increase in staff size, a moderate increase in employee salary and a significant increase in depreciation.

1997 Other Income, net of Other Expense, increased from $4.4 million to $6.4 million due to an increase of $3.3 million in rental income offset by a one-time gain of $1.4 million on the 1996 sale of our Cambridge facility.

The Company's effective tax rate increased from 40% to 41% in 1997.

### Comparison of Fiscal Years ended December 31, 1995 and 1996:

Revenue increased 17% from $143.7 million in 1995 to $167.9 million in 1996. This increase is a result of increased orders from both existing and new customers, with 28% of the increase attributable to Columbia/HCA, the Company's largest customer.

Operating Expenses increased 15% from $85.2 million in 1995 to $98.3 million in 1996. The primary reason for this increase is the costs associated with a 14% increase in staff size from 1995 to 1996.

Other Income, net of Other Expense, increased from $1.2 million in 1995 to $4.4 million in 1996 due primarily to: a decrease in interest expense on bank note ($1.2 million); an increase in rental income ($0.9 million) and a gain on the sale of our Cambridge facility ($1.4 million).

Income Tax Expense increased from $22.6 million in 1995 to $29.6 million in 1996. 1995's effective tax rate of 38% was a result of an investment tax credit earned in 1995 on property purchased. 1996's effective tax rate was 40%.

DEF003626

The Financial Statements are included as part of Exhibit 13 (Annual Report to Shareholders)

```
OPERATING RESULTS BY QUARTER:

For the Two Years Ended December 31, 1997 (in thousands where applicable):
                                Mar 31    Jun 30    Sep 30    Dec 31
1996
    Revenue                    $38,843   $40,309   $41,856   $46,876
    Operating Income           15,575    16,163    17,278    20,534
    Net Income                  9,745    10,232    11,126    13,247
    Earnings per share           .61       .65       .70       .84
1997
    Revenue                    $46,705   $49,462   $51,184   $46,454
    Operating Income           19,310    20,448    20,998    17,530
    Net income                 12,201    12,838    13,507    11,738
    Earnings per share           .76       .80       .84       .73
```

## ITEM 9 - Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## PART III

## ITEM 10 - Directors and Executive Officers of the Registrant

The positions held by each Director and Officer of the Company are shown below. There are no family relationships among the following persons.

```
Name of Director or Executive  Age    Position with the Company
Officer

A. Neil Pappalardo             55     Chief Executive Officer, Chairman of
                                      the Board and Director
Lawrence A. Polimeno           56     Chief Operating Officer, President and
                                      Director
Morton E. Ruderman             61     Director
Jerome H. Grossman             58     Director
Edward B. Roberts              62     Director
Roland L. Driscoll             67     Director
L.P. Dan Valente               67     Director
Howard Messing                 45     Executive Vice President
Barbara A. Manzolillo          45     Chief Financial Officer, Treasurer and
                                      Assistant Clerk
Edward G. Pisinski             54     Senior Vice President
Roberta E. Grigg               54     Senior Vice President
Christopher J. Anschuetz       45     Vice President
Robert S. Gale                 51     Vice President
Steven B. Koretz               45     Vice President
Stuart N. Lefthes              44     Vice President
Joanne Wood                    44     Vice President
Jane E. Currier                45     Chief Corporate Counsel and Clerk
```

All Directors are elected each year at the annual meeting of shareholders. All executive officers are elected at the first meeting of the Board following the annual meeting of shareholders and hold office for one year. The Board of Directors has an Audit Committee, an Executive Compensation Committee, and a Charitable Contribution Committee.

The following is a description of the business experience during the past five years of each Director and Officer.

A. Neil Pappalardo, founder of the Company, is the Chief Executive Officer and Chairman of the Board, and has been a Director since 1969.

Lawrence A. Polimeno is the President and Chief Operating Officer, has been a Director since 1985, and has been with the Company since 1969.

Morton E. Ruderman, Chief Executive Officer of CRES Development, has been a Director since 1969.

Jerome H. Grossman, Chief Executive Officer of Health Quality, Inc., has been a Director since 1970.

Edward B. Roberts, Professor at Sloan School, Massachusetts Institute of Technology, has been a Director since 1969.

Roland L. Driscoll, retired Chief Financial Officer of the Company, has been a Director since 1985.

L.P. Dan Valente, Chief Executive Officer of Palomar Medical Technologies, Inc., has been a Director since 1972.

Howard Messing has been the Executive Vice President since 1995, was a Vice President prior to that, and has been with the Company since 1974.

Barbara A. Manzolillo has been the Chief Financial Officer since 1996, was the Treasurer prior to that, and has been with the Company since 1975.

Edward G. Pisinski has been a Senior Vice President since 1997, was a Vice President prior to that, and has been with the Company since 1973.

Roberta E. Grigg has been a Senior Vice President since 1997, was a Vice President prior to that, and has been with the Company since 1975.

Christopher J. Anschuetz has been a Vice President since 1995, was a Senior Manager prior to that, and has been with the Company since 1975.

Robert S. Gale has been a Vice President since 1995, was a Senior Manager prior to that, and has been with the Company since 1976.

Steven B. Koretz has been a Vice President since 1997, was a Senior Manager prior to that, and has been with the company since 1982.

Stuart N. Lefthes has been a Vice President since 1997, was a Senior Manager prior to that, and has been with the company since 1983.

Joanne Wood has been a Vice President since 1995, was a Senior Manager prior to that, and has been with the Company since 1983.

Jane E. Currier has been the Chief Corporate Counsel and the Clerk since 1986, and has been with the Company since 1983.

There were no failures to file or late filings under Section 16(a)

## ITEM 11 - Executive Compensation

The following table sets forth the compensation received by the Company's Chief Executive Officer and the four most highly compensated other Officers for the three fiscal years ended December 31, 1995, 1996 and 1997.

## SUMMARY COMPENSATION TABLE

**Name and Principal Position Year Salary ($) Bonus ($) Other ($)**

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Other ($) |
|---|---|---|---|---|
| A. Neil Pappalardo | 1997 | 360,000 | 727,676 | 0 |
| Chairman and Chief | 1996 | 360,000 | 725,000 | 0 |
| Executive Officer | 1995 | 360,000 | 725,000 | 0 |
| Lawrence A. Polimeno | 1997 | 240,000 | 627,676 | 6,042 |
| President and Chief | 1996 | 240,000 | 625,000 | 5,962 |
| Operating Officer | 1995 | 240,000 | 575,000 | 6,130 |
| Howard Messing | 1997 | 180,000 | 377,676 | 6,042 |
| Executive Vice President | 1996 | 156,000 | 375,000 | 5,962 |
| | 1995 | 156,000 | 275,000 | 6,130 |
| Edward G. Pisinski | 1997 | 156,000 | 302,676 | 6,042 |
| Vice President - Marketing | 1996 | 156,000 | 300,000 | 5,962 |
| | 1995 | 156,000 | 225,000 | 6,130 |
| Barbara A. Manzolillo | 1997 | 144,000 | 227,676 | 6,042 |
| Chief Financial Officer | 1996 | 132,000 | 225,000 | 5,962 |
| and Treasurer | 1995 | 132,000 | 175,000 | 6,130 |

Compensation of Executive Officers: There are no employment contracts or agreements in effect for any Officer of the Company. The Board of Directors authorizes and directs the bonus program instituted for the recognition of services rendered by employees. The total amount of the bonus pool is based on a fixed percentage of operating income as set by the Board of Directors. This philosophy aligns the interest of all with the interests of the Company's shareholders.

The Board of Director's Executive Compensation Committee (composed of Mr. Roberts and Mr. Ruderman) sets Mr. Pappalardo's bonus compensation based upon the same criteria for awarding bonuses to all officers and employees.

Pension Plan: The Company maintains a qualified defined contribution plan for all employees known as the Medical Information Technology, Inc. Profit Sharing Plan. All employees of the Company who have completed one year of service participate in the plan. The Company's annual contribution is allocated in proportion to total compensation (capped at $100,000) of all eligible members for the plan year. No allocation is allowable under this plan to owners of 10% or more of the Company's common stock. Contributions by members are not permitted. Benefits under the plan become fully vested after five years of continuous service with the Company. Lump sum cash payment is made upon retirement, death, disability, or termination of employment.

Compensation of Directors: The members of the Board of Directors who are not Officers of the Company currently receive a fee of $7,000 for each fully attended quarterly meeting, with such fee being deemed to also cover any incidental expenses or directorial conference or committee time expended by such directors in behalf of the Company during the year.

## ITEM 12 - Security Ownership of Certain Beneficial Owners and Management

The following table provides information as of December 31, 1997 with respect to the shares of Common Stock beneficially owned by each person known by the Company to own more than 5% of the Company's outstanding Common Stock, each Director of the Company, each Executive Officer named in the Summary Compensation Table and by all Directors and Executive Officers of the Company as a group. The number of shares beneficially owned is determined according to rules of the Securities and Exchange Commission. Under such rules, a person's beneficial ownership includes any shares as to which such person has sole or shared voting power or investment power.

| Name | Number of Shares of Common Stock Beneficially Owned | % of Shares of Common Stock |
|---|---|---|
| A. Neil Pappalardo | 4,271,406 | 26.55% |
| Morton E. Ruderman | 2,357,919 | 14.66% |
| Jerome Grossman | 600,675 | 3.73% |
| Lawrence A. Polimeno | 572,850 | 3.56% |
| Edward B. Roberts | 374,113 | 2.33% |
| Roland L. Driscoll | 264,000 | 1.64% |
| Edward G. Pisinski | 147,500 | <1% |
| Howard Messing | 125,000 | <1% |
| Barbara A. Manzolillo | 80,000 | <1% |
| L. P. Dan Valente | 42,500 | <1% |
| Directors and Executive Officers as a Group (17 persons) | 9,040,113 | 56.19% |
| Curtis W. Marble | 1,865,052 | 11.59% |
| Medical Information Technology Inc. Profit Sharing Trust | 1,469,010 | 9.13% |

The address of all Executive Officers and Directors is in care of the Company, MEDITECH Circle, Westwood, MA 02090.

## ITEM 13 - Certain Relationships and Related Transactions

None.

**ITEM 14 - Exhibits, Financial Statement Schedules, and Reports on Form 8-K**

Exhibit 3i (Articles of Incorporation) and Exhibit 3ii (By-Laws) are incorporated by reference from the registration statement on Form 10 effective April 27, 1996 and from exhibit under Item 6 on Form 10-Q for the quarter ended June 10, 1997 (Amendment to By-Laws), File # 0-28092.

Exhibit 13 (Annual Report to Shareholders) and Exhibit 27 (Financial Data Schedule) are appended to this document.

There were no reports filed on Form 8-K during the quarter ended December 31, 1997.

<div align="center">

**Signatures**

</div>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Medical Information Technology, Inc.**
(Registrant)

March 24, 1998
(Date)

**Barbara A. Manzolillo, Chief Financial Officer and Treasurer**

(Signature)

**MEDICAL INFORMATION TECHNOLOGY, INC.**

Financial Statements
as of December 31, 1996 and 1997
Together with Auditors' Report

DEF003632

Index

|                                                                                               | Page   |
| --------------------------------------------------------------------------------------------- | ------ |
| Report of Independent Public Accountants                                                      | 1      |
| Balance Sheets as of December 31, 1996 and 1997                                               | 2      |
| Statements of Income for the Years Ended December 31, 1995, 1996 and 1997                     | 3      |
| Statements of Stockholders' Investment for the Years Ended December 31, 1995, 1996 and 1997   | 4      |
| Statements of Cash Flows for the Years Ended December 31, 1995, 1996 and 1997                 | 5      |
| Notes to Financial Statements                                                                 | 6-11   |

DEF003633

Report of Independent Public Accountants

To the Stockholders and Board of Directors of

**Medical Information Technology, Inc.:**

We have audited the accompanying balance sheets of Medical Information Technology, Inc. (a Massachusetts corporation) as of December 31, 1996 and 1997, and the related statements of income, stockholders' investment and cash flows for each of the three years in the period ended December 31, 1997. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Medical Information Technology, Inc. as of December 31, 1996 and 1997, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 1997, in conformity with generally accepted accounting principles.

**Arthur Andersen LLP**

Boston, Massachusetts
February 6, 1998

DEF003634

Balance Sheets

|  | December 31, | |
|---|---|---|
|  | 1996 | 1997 |

Assets

Current Assets:

| | | |
|---|---|---|
| Cash and cash equivalents (Note 1) | $ 18,063,262 | $ 8,379,358 |
| Marketable securities (Note 2) | 61,142,110 | 62,348,881 |
| Accounts receivable, less reserve of | | |
| $210,000 in 1996 and $270,000 in 1997 | 21,815,789 | 26,259,940 |
| Prepaid expenses | 90,308 | 99,487 |
| Total current assets | 101,111,469 | 97,087,666 |

Property, Plant and Equipment, at cost (Note 1):

| | | |
|---|---|---|
| Computer equipment | 10,927,224 | 11,887,006 |
| Furniture and fixtures | 12,778,543 | 18,506,896 |
| Buildings and improvements | 99,654,797 | 143,125,594 |
| Land and improvements | 20,403,703 | 26,603,703 |
| | 143,764,267 | 200,123,199 |
| Less Accumulated depreciation | 28,647,632 | 36,154,751 |
| | 115,116,635 | 163,968,448 |

| | | |
|---|---|---|
| Investments | 2,110,883 | 2,051,752 |
| | $218,338,987 | $263,107,866 |

Liabilities and Stockholders' Investment

Current Liabilities:

Current maturities of note payable

| | | |
|---|---|---|
| to a bank (Note 6) | $ 12,000,000 | $ 18,000,000 |
| Accounts payable | 837,495 | 694,869 |
| Accrued taxes | 2,454,951 | 1,748,464 |
| Accrued expenses (Note 5) | 13,609,433 | 15,598,342 |
| Customer deposits | 11,837,423 | 16,135,386 |
| Total current liabilities | 40,739,302 | 52,177,061 |

| | | |
|---|---|---|
| Note Payable to a Bank, less current maturities (Note 6) | 14,000,000 | 19,500,000 |
| Deferred Federal and State Income Taxes (Note 8) | 1,131,663 | 1,900,000 |

Stockholders' Investment:

Common stock, $.25 par value,
Authorized 17,000,000 shares,
Issued and outstanding 15,938,365 shares

| | | |
|---|---|---|
| in 1996 and 16,087,212 shares in 1997 | 3,984,591 | 4,021,803 |
| Additional paid-in capital | 7,680,143 | 11,335,259 |
| Retained earnings | 150,803,288 | 174,173,743 |
| Total stockholders' investment | 162,468,022 | 189,530,805 |
| | $218,338,987 | $263,107,866 |

The accompanying notes are an integral part of these financial statements.

Statements of Income

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 1995 | 1996 | 1997 |
| Operating Revenue: | | | |
| Software products | $ 94,356,333 | $109,316,654 | $126,574,961 |
| Software services | 44,962,747 | 52,154,032 | 62,029,361 |
| Other | 4,401,480 | 6,413,111 | 5,200,180 |
| Total operating revenue | 143,720,560 | 167,883,797 | 193,804,502 |
| Costs and Expenses: | | | |
| Operating and product development | 52,876,661 | 61,453,443 | 74,666,248 |
| Selling, general and administrative | 32,331,072 | 36,880,437 | 40,852,721 |
| Total costs and expenses | 85,207,733 | 98,333,880 | 115,518,969 |
| Income from operations | 58,512,827 | 69,549,917 | 78,285,533 |
| Dividend, Interest and Other Income | 6,400,717 | 8,937,691 | 12,236,282 |
| Interest and Other Expense | 5,248,811 | 4,526,848 | 5,879,160 |
| Income before provision for income taxes | 59,664,733 | 73,960,760 | 84,642,655 |
| Provision for Income Taxes (Note 8): | | | |
| State | 3,835,010 | 6,457,439 | 6,343,141 |
| Federal | 18,744,928 | 23,153,534 | 28,015,459 |
| Net income | $ 37,084,795 | $ 44,349,787 | $ 50,284,055 |
| Basic and Fully Diluted Net Income per Common Share | $2.35 | $2.80 | $3.14 |
| Shares Used in Computing Basic and Fully Diluted Net Income per Share | 15,782,259 | 15,862,838 | 16,029,071 |

The accompanying notes are an integral part of these financial statements.

DEF003636

Statements of Stockholders' Investment

| | Common Stock Number of Shares | Common Stock $.25 Par Value | Additional Paid-in Capital | Retained Earnings | Treasury Stock Cost | Stockholders' Investment |
|---|---|---|---|---|---|---|
| Balance, December 31, 1994 | 15,686,544 | $3,921,636 | $2,705,052 | $111,122,333 | $  - | $117,749,021 |
| Sale of 114,858 shares of common stock | 114,858 | 28,715 | 1,923,871 | - | - | 1,952,586 |
| Issuance of 30,000 shares of common stock to qualified employee profit sharing trust | 30,000 | 7,500 | 592,500 | - | - | 600,000 |
| Net income | - | - | - | 37,084,795 | - | 37,084,795 |
| Dividends | - | - | - | (19,558,133) | - | (19,558,133) |
| Balance, December 31, 1995 | 15,831,402 | 3,957,851 | 5,221,423 | 128,648,995 | - | 137,828,269 |
| Sale of 106,963 shares of common stock | 106,963 | 26,740 | 2,112,520 | - | - | 2,139,260 |
| Purchase of 230,400 shares of treasury stock | - | - | - | - | (4,838,400) | (4,838,400) |
| Sale of 195,400 shares of treasury stock | - | - | 241,200 | - | 4,103,400 | 4,344,600 |
| Issuance of 35,000 shares of treasury stock to qualified employee profit sharing trust | - | - | 105,000 | - | 735,000 | 840,000 |
| Net income | - | - | - | 44,349,787 | - | 44,349,787 |
| Dividends | - | - | - | (22,195,494) | - | (22,195,494) |
| Balance, December 31, 1996 | 15,938,365 | 3,984,591 | 7,680,143 | 150,803,288 | - | 162,468,022 |
| Sale of 108,847 shares of common stock | 108,847 | 27,212 | 2,585,116 | - | - | 2,612,328 |
| Issuance of 40,000 shares of common stock to qualified employee profit sharing trust | 40,000 | 10,000 | 1,070,000 | - | - | 1,080,000 |
| Net income | - | - | - | 50,284,055 | - | 50,284,055 |
| Dividends | - | - | - | (26,913,600) | - | (26,913,600) |
| Balance, December 31, 1997 | 16,087,212 | $4,021,803 | $11,335,259 | $174,173,743 | $  - | $189,530,805 |

The accompanying notes are an integral part of these financial statements.

DEF003637

Statements of Cash Flows

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 1995 | 1996 | 1997 |
| **Cash Flows from Operating Activities:** | | | |
| Net income | $37,084,795 | $44,349,787 | $50,284,055 |
| Adjustments to reconcile net income to net cash provided by operating activities | | | |
| Depreciation | 4,809,482 | 6,155,719 | 9,084,216 |
| Deferred income taxes | 118,897 | 257,850 | 768,337 |
| Stock contributions to employee profit sharing plan | 600,000 | 840,000 | 1,080,000 |
| Net (gain) loss on sale of securities | 9,302 | (3,852) | (6,361) |
| Net gain on sale of fixed assets | - | (1,409,475) | - |
| Write-down of investments | - | 400,000 | - |
| Allowance for doubtful accounts | - | 50,000 | 60,000 |
| Changes in assets and liabilities | | | |
| Accounts receivable | (6,244,288) | (1,682,409) | (4,504,151) |
| Prepaid expenses | 3,019,353 | 12,647 | (9,179) |
| Accounts payable | 121,894 | 516,581 | (142,626) |
| Accrued expenses | 1,190,952 | 2,976,059 | 1,282,422 |
| Customer deposits | 732,835 | 3,950,208 | 4,297,963 |
| Net cash provided by operating activities | 41,443,222 | 56,413,115 | 62,194,676 |
| **Cash Flows from Investing Activities:** | | | |
| Purchases of property, plant and equipment | (64,538,650) | (6,837,576) | (57,936,029) |
| Sales of property, plant and equipment | - | 1,592,466 | - |
| Purchases of marketable securities | (4,588,567) | (11,822,721) | (18,373,509) |
| Sales of marketable securities | 500,000 | 4,756,207 | 17,173,099 |
| Decrease in investments | 393,867 | - | 59,131 |
| Net cash used in investing activities | (68,233,350) | (12,311,624) | (59,077,308) |
| **Cash Flows from Financing Activities:** | | | |
| Borrowings on note payable to a bank | 50,000,000 | - | 43,000,000 |
| Payments of note payable to a bank | (12,000,000) | (12,000,000) | (31,500,000) |
| Sale of common stock | 1,952,586 | 2,139,260 | 2,612,328 |
| Purchase of treasury stock | - | (4,838,400) | - |
| Sale of treasury stock | - | 4,344,600 | - |
| Dividends paid | (19,558,133) | (22,195,494) | (26,913,600) |
| Net cash (used in) provided by financing activities | 20,394,453 | (32,550,034) | (12,801,272) |
| Net (Decrease) Increase in Cash and Cash Equivalents | (6,395,675) | 11,551,457 | (9,683,904) |
| Cash and Cash Equivalents, beginning of year | 12,907,480 | 6,511,805 | 18,063,262 |
| Cash and Cash Equivalents, end of year | $ 6,511,805 | $18,063,262 | $ 8,379,358 |
| **Supplemental Disclosure of Cash Flow Information:** | | | |
| Cash paid for Income taxes | $22,739,708 | $28,761,470 | $34,482,284 |
| Cash paid for Interest | $ 3,946,750 | $ 2,733,229 | $ 2,394,030 |

The accompanying notes are an integral part of these financial statements.

Notes to Financial Statements
December 31, 1997

(1) Operations and Accounting Policies

Medical Information Technology, Inc. (the Company) is engaged in the development, manufacture and licensing of computer software products and related services used in the medical field. The principal market for the Company's products are health care providers primarily located in the U.S. and Canada.

The accompanying financial statements reflect the application of certain accounting policies discussed below. The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

(a) Revenue Recognition

The Company enters into software product contracts that provide for a customer deposit upon contract execution, milestone billings and fixed monthly service fees thereafter. Product revenue is recognized at the completion of each milestone and service revenue is recognized as services are rendered.

(b) Software Development and Production Costs

In accordance with Statement of Financial Accounting Standards (SFAS) No. 86, Accounting for the Costs of Computer Software To Be Sold, Leased or Otherwise Marketed, the Company will capitalize software development costs incurred after technological feasibility of the software development projects is established and the realizability of such capitalized costs through future operations is expected if such costs become material. To date, all of the Company's costs for research and development of software products have been charged to operations as incurred, since the amount of software development costs incurred subsequent to the establishment of technological feasibility has been immaterial.

(c) Depreciation

The Company provides for depreciation on its property, plant and equipment in amounts estimated to allocate the costs thereof under various depreciation methods over the following estimated useful lives:

| Description | Useful Life |
|---|---|
| Computer equipment | 5 years |
| Furniture and fixtures | 7-10 years |
| Buildings and improvements | 15-40 years |

The Company considers all highly liquid investments purchased with original maturities of three months or less to be cash equivalents.

Cash equivalents include certificates of deposit and European time deposits of approximately $17,650,000 and $5,700,000 at December 31, 1996 and 1997, respectively.

(e) Concentration of Credit Risk

Financial instruments that potentially subject the Company to concentrations of credit risk are principally cash, cash equivalents, short-term investments and accounts receivable. The Company places its investments in highly rated institutions. Concentration of credit risk with respect to accounts receivable is limited to certain customers to whom the Company makes substantial sales. To reduce risk, the Company routinely assesses the financial strength of its customers and, as a result, believes that its accounts receivable credit risk exposure is limited. The Company maintains an allowance for potential credit losses but historically has not experienced any significant credit losses related to an individual customer or groups of customers.

(f) Net Income per Common Share

On March 31, 1997, the Financial Accounting Standards Board (FASB) issued SFAS No, 128, Earnings Per Share. SFAS No. 128 establishes standards for computing and presenting earnings per share (EPS), and applies to entities with publicly held common stock or potential common stock. During the year ended December 31, 1997, the Company adopted SFAS No. 128 and is now required to report both basic and diluted earnings per share. Basic EPS is computed by dividing net income by the weighted-average number of common shares outstanding during the period. Diluted EPS reflects the potential dilution, if any, from common stock equivalents. At December 31, 1997, the Company had no common stock equivalents outstanding. Accordingly, diluted EPS and basic EPS are the same.

(g) New Accounting Standards

In June 1997, the FASB issued SFAS No. 130, Reporting Comprehensive Income. SFAS No. 130 requires disclosure of all components of comprehensive income on an annual and interim basis. Comprehensive income is defined as any changes in the Company's equity that are not generated by or from ownership transactions or sources. SFAS No. 130 is effective for fiscal years beginning after December 15, 1997.

In July 1997, the FASB issued SFAS No. 131, Disclosures About Segments of an Enterprise and Related Information. SFAS No. 131 requires certain financial and supplemental information to be disclosed on an annual and interim basis for each reportable business segment of an enterprise. SFAS No. 131 is effective for fiscal years beginning after December 15, 1997. Unless impracticable, companies would be required to restate prior period information upon adoption.

(2) Marketable Securities

The Company accounts for its investments in accordance with SFAS No. 115, Accounting for Certain Investments in Debt and Equity Securities. SFAS No. 115 requires companies to classify their short-term investments as either trading, available-for-sale or held-to-maturity. The Company's marketable securities consist primarily of preferred equity securities that are callable by the issuer. The Company has classified the securities as available for sale and, as such, they should be carried at fair market value. The fair market value of these equity securities as of December 31, 1996 and 1997 was approximately $65,952,000 and $68,773,000, respectively. The Company, however, has elected to record these investments at amortized cost since the differences between fair market value and amortized cost are not material to the financial statements.

(3) Allowance for Doubtful Accounts

A summary of the allowance for doubtful accounts activity is as follows:

|                               | 1995       | 1996       | 1997       |
|-------------------------------|------------|------------|------------|
| Balance, beginning of period  | $160,000   | $160,000   | $210,000   |
| Amounts charged to expense    | 19,200     | 50,000     | 66,900     |
| Amounts written off           | (19,200)   | -          | (6,900)    |
| Balance, end of period        | $160,000   | $210,000   | $270,000   |

(4) Purchase of Real Estate

In August 1997, the Company purchased real property consisting of 287,600 square feet of office space with parking located on 37 acres in Westwood, Massachusetts for $51,700,000.

Accrued expenses consist of the following:

|  | 1996 | 1997 |
|---|---|---|
| Accrued vacation | $ 1,314,885 | $ 1,500,000 |
| Accrued bonus | 11,100,000 | 13,100,000 |
| Other accruals | 1,194,548 | 998,342 |
|  | $13,609,433 | $15,598,342 |

#### (6) Note Payable to a Bank

In connection with the purchase of real estate described in Note 4, in August 1997, the Company amended its loan agreement and entered into a new unsecured note payable with a bank. The amount of the new note payable was $54,000,000, of which $37,500,000 was outstanding at December 31, 1997. The note is payable in monthly installments of $1,500,000 plus accrued interest. Interest on the outstanding principal balance is payable at the bank's prime rate less 1% (7.5% at December 31, 1997). In connection with this note, the Company must maintain certain levels of net income, as defined. At December 31, 1997, the Company was in compliance with the required covenant.

#### (7) Qualified Profit Sharing Plan

The Company has no obligation for postemployment or postretirement benefits. The Company maintains a qualified profit sharing plan that provides deferred compensation to substantially all of its employees. Contributions to the plan are at the discretion of the Board of Directors and may be in the form of Company stock or cash. A summary of contributions made during the last three years is as follows:

|  | 1995 | 1996 | 1997 |
|---|---|---|---|
| Cash | $1,800,000 | $2,060,000 | $2,320,000 |
| Company common stock |  |  |  |
| 30,000 shares at $20/share | 600,000 | - | - |
| 35,000 shares at $24/share | - | 840,000 | - |
| 40,000 shares at $27/share | - | - | 1,080,000 |
|  | $2,400,000 | $2,900,000 | $3,400,000 |

The Company follows the provisions of SFAS No. 109, Accounting for Income Taxes. The components of the net deferred tax liability recognized in the accompanying balance sheets are as follows:

|  | 1996 | 1997 |
|---|---|---|
| Depreciation | $1,490,064 | $ 670,500 |
| Other reserves and expenses | (676,254) | (708,000) |
| Deferred revenue | (519,725) | (1,195,500) |
| Tax reserves | 837,578 | 3,133,000 |
| Total net deferred tax liability | $1,131,663 | $1,900,000 |

The components of the provision for income taxes shown on the accompanying statements of income consist of the following:

|  | 1995 | 1996 | 1997 |
|---|---|---|---|
| **State** |  |  |  |
| Current | $ 3,807,824 | $ 6,508,839 | $ 6,151,057 |
| Deferred | 27,186 | (51,400) | 192,084 |
|  | $ 3,835,010 | $ 6,457,439 | $ 6,343,141 |
| **Federal** |  |  |  |
| Current | $18,653,218 | $22,844,284 | $27,439,206 |
| Deferred | 91,710 | 309,250 | 576,253 |
|  | $18,744,928 | $23,153,534 | $28,015,459 |

The effective income tax rate varies from the amount computed using the statutory U.S. income tax rate as follows:

|  | 1995 | 1996 | 1997 |
|---|---|---|---|
| Statutory tax rate | 35.0% | 35.0% | 35.0% |
| Increase in taxes resulting from state income taxes, net of federal income tax benefit | 4.2 | 5.7 | 4.9 |
| Dividend income exclusion | (1.7) | (1.4) | (1.4) |
| Other nondeductible expenses | 0.3 | 0.7 | 2.1 |
|  | 37.8% | 40.0% | 40.6% |

DEF003643

Export sales (primarily to Canada) accounted for approximately 11%, 13% and 10% of operating revenue during the years ended December 31, 1995, 1996 and 1997, respectively.

(10) Significant Customers

During the fiscal years ended December 31, 1995, 1996 and 1997, one customer accounted for approximately 20%, 21% and 21% of operating revenue, respectively.

ARTICLE 5

MULTIPLIER: 1,000

| | |
|---|---|
| PERIOD TYPE | 12 MOS |
| FISCAL YEAR END | DEC 31 1997 |
| PERIOD END | DEC 31 1997 |
| CASH | 8,379 |
| SECURITIES | 66,349 |
| RECEIVABLES | 24,341 |
| ALLOWANCES | 270 |
| INVENTORY | 0 |
| CURRENT ASSETS | 97,088 |
| PP&E | 200,123 |
| DEPRECIATION | 36,155 |
| TOTAL ASSETS | 263,108 |
| CURRENT LIABILITIES | 52,177 |
| BONDS | 19,500 |
| PREFERRED MANDATORY | 0 |
| PREFERRED | 0 |
| COMMON | 4,022 |
| OTHER SE | 185,509 |
| TOTAL LIABILITY AND EQUITY | 263,108 |
| SALES | 126,575 |
| TOTAL REVENUES | 193,805 |
| CGS | 0 |
| TOTAL COSTS | 115,519 |
| OTHER EXPENSES | 3,485 |
| LOSS PROVISION | 0 |
| INTEREST EXPENSE | 2,394 |
| INCOME PRETAX | 84,643 |
| INCOME TAX | 34,359 |
| INCOME CONTINUING | 50,284 |
| DISCONTINUED | 0 |
| EXTRAORDINARY | 0 |
| CHANGES | 0 |
| NET INCOME | 50,284 |
| EPS PRIMARY | 3.14 |
| EPS DILUTED | 3.14 |

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

DEF003645

stock. When the plan makes distributions, employees receive much less than they should. If the real "fair market value" was used to compute the distribution, the plan would have no cash.

The plan has distributed more than $20,000,000 within the last five years, and the stock value is set at about one-third of companies our size in our industry. The fudiciary has assets of more than $50,000,000.

I hope that you or your firm would be interested in reviewing this case on a contingency basis. As an employee of this firm, bringing this case to you, and willing to be active in the case, I wish be receive financial consideration for my efforts. If you wish further information, please respond to this email. Since I am still working at this firm, and wish to remain so, I regret that I cannot yet identify myself or my company.

Thank you for your consideration.

Bob

# EXHIBIT 11

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually and On Behalf Of All Persons Similarly Situated<br><br>Plaintiffs,<br><br>v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Case No. 05-10269-RWZ<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
## DEFENDANTS' SECOND SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs Michael Hubert ("Mr. Hubert"). David Hinchliffe ("Mr. Hinchliffe"), and William Trainor ("Mr. Trainor") (collectively, "the Plaintiffs") hereby object and respond to the First Set of Interrogatories ("the Interrogatories") by defendants Medical Information Technology, Inc. ("Meditech"), the Medical Information Technology Profit Sharing Plan ("the Plan"), and A. Neil Pappalardo ("Mr. Pappalardo") (collectively, "the Defendants") as follows.

### A.    GENERAL OBJECTIONS

1.    The Plaintiffs object generally to the entirety of the Interrogatories as overbroad, unduly burdensome, unreasonably duplicative, and redundant and unreasonable in scope.

2.    The Plaintiffs object generally to each paragraph of the Interrogatories (including the Definitions and Instructions) to the extent that it seeks to impose obligations on the Plaintiffs

1

beyond those required by the Federal Rules of Civil Procedure and the Local Rules of the District of Massachusetts.

3.    The Plaintiffs object generally to each paragraph of the Interrogatories (including the Definitions and Instructions) to the extent that it seeks information and/or documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

4.    The Plaintiffs object generally to each paragraph of the Interrogatories (including the Definitions and Instructions) to the extent that it seeks information not limited in time to dates relevant to this litigation on the ground that it is unduly burdensome, oppressive, and not reasonably calculated to lead to the discovery of admissible evidence. Because the Interrogatories were not limited in time in any way, the Plaintiffs have applied the same timeframe to these Responses as were set forth in their discovery requests to the Defendants, with the exception that the Plaintiffs have included information from prior to January 1, 1995 if it is responsive to the Interrogatories.

5.    Information and/or documents provided by the Plaintiffs are those located, known or discovered after a reasonable search. The Plaintiffs reserve the right to supplement their answers if any additional responsive information and/or documents are later discovered or otherwise become known to the Plaintiffs.

6.    All objections, including without limitation objections as to relevance, authenticity, or admissibility, are expressly reserved.

2

**B.    RESPONSES AND OBJECTIONS TO SPECIFIC INTERROGATORIES**

<u>Interrogatory No. 1</u>

State the basis for your allegation in paragraph 49 of the Amended Complaint that "For at least eight years, the defendants have knowingly valued MEDITECH stock at less than fair market value."

<u>Response to Interrogatory No. 1</u>

The plaintiffs object to this Interrogatory on the grounds that this interrogatory seeks information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs refer the defendants to comparative data of other companies such as Cerner in the same area of business indicated a much higher price to earnings multiple over the period of years prior to the filing of the complaint in this case, and information available to plaintiffs from the Grossman litigation.

<u>Interrogatory No. 2</u>

In what year was Meditech stock first valued by Defendants at less than fair market value, stating your basis for contending that the stock was undervalued in that year, and not in the preceding year(s).

<u>Response to Interrogatory No. 2</u>

The plaintiffs object to this Interrogatory on the grounds that this interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs state that they do not have this information within their possession and or control, and will rely upon an expert to assist them in this area. Based upon comparative company data, Plaintiffs submit Meditech Stock has been undervalued

since 1996. The Plaintiffs further submit that the basis for their contention that the stock has been undervalued is supported by the statements made by Grossman in his lawsuit, as well as HUB 255, 302-30, and 489-516.

**Interrogatory No. 3**

Identify all years in which Defendants valued Meditech stock at less than fair market value, stating your basis for contending that the stock was undervalued in those years.

**Response to Interrogatory No. 3**

The plaintiffs object to this Interrogatory on the grounds that this interrogatory seeks on the grounds that this interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs state that the only years at issue in this litigation at the moment are the trustee's valuation of Meditech stock for the year 1998 and 2004 (done as of 12/31 of the year prior). Thus at the moment there is no contention as to other years, although evidence may be offered at trial as to a pattern of undervaluation beginning at least in 1996. As to the years at issue, the basis for contending the stock was undervalued would be the same as set forth in plaintiffs' answer to interrogatory number one, plus the information in the Willamette report prepared for Grossman in 2005 and information disclosed by Grossman during the course of his litigation with Meditech beginning with his filing of a form 13 D with the Securities and Exchange Commission in 2002. The plaintiffs also refer the defendants to information from within the defendants' custody and control including but not limited to financial statements and projections. Additional facts and or documents responsive to the Interrogatory may be identified during discovery and the plaintiffs

4

expressly reserve the right to supplement this response if additional facts and/or documents are

discovered.

**Interrogatory No. 4**

State the basis for your allegation in Paragraph *58* of the Amended Complaint that "one of the reasons that the defendants knowingly undervalue the stock is to ensure that stock prices remain low enough for insiders such as defendant Pappalardo to purchase large amounts of company stock and thereby retain tight control of the Company."

**Response to Interrogatory No. 4**

The plaintiffs object to this Interrogatory on the grounds that this interrogatory seeks on the grounds that this interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs refer the defendants to declarations in letters and other material sent out by Grossman in 2002 and 2003, the low PE basis compared with competitors, Pappalardo's repeated purchases of stock at a price he claimed to be at the low end of the allowable range set by him and other Board members, and a price designed to benefit buyers, to discourage sales of stock, and discourage diversification. The plaintiffs also refer the defendants to information from within the defendants' custody and control including but not limited to financial statements and projections. Additional facts and or documents responsive to the Interrogatory may be identified during discovery and the plaintiffs expressly reserve the right to supplement this response if additional facts and/or documents are discovered.

5

**Interrogatory No. 5**

Identify all persons with whom Plaintiffs, including but not limited to counsel for Plaintiffs, have discussed any methodology for valuing the stock of non-publicly traded corporations.

**Response to Interrogatory No. 5**

The plaintiffs object to this Interrogatory on the grounds that it is vague and overly broad. The plaintiffs further object to this Interrogatory on the grounds that this Interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs state that Plaintiffs Hinchliffe and Trainor have had no such discussions with any such person. In the last two years, Plaintiff Hubert spoke with his business partner, Bob Caspe, about the under valuation. He spoke with Bob Caspe in February 2007 in person, while they were in New Orleans.

Plaintiff Hubert spoke also with Scott Adelson, a Director at Houlihan, Lokey, Howard & Zakin in or around 2003 and 2006. They spoke via telephone. Plaintniff Hubert called Scott Adelson when he learned that he was a key person involved in the valuation of the stock for SAIC. They generally discussed the valuation of stock for private companies.

Mr. Hubert also spoke to a woman at the SEC, April Keyes. His communication with Ms. Keyes was conducted over the phone and email in February and March of 2006. Their communications discussed price fixing of the stock, comparison to public companies and a brief description of the methodology used by Science Application International Corporation.

Mr. Hubert also spoke to an individual at the Massachusetts Attorney General's Office in or around 2005 over the telephone. The general topic discussed during that conversation was that

6

MEDITECH was setting the stock price too low, benefiting stock buyers, at the expense of employees retirement funds. He does not recall the individual's name.

Plaintiff Hubert spoke to Jeff Turner at the Department of Labor in or about 1999 by telephone. They discussed the valuation of the stock, specifically that the rules require an independent valuation of private stock held in a qualified plan. He also drafted and mailed a letter to James Benages at the Department of Labor in July of 2001 and received a response from Anne George of the Department of Labor. The communication was about a pending regulation concerning valuation of stock of privately held companies.

**Interrogatory No. 6**

Do Plaintiffs contend, as part of their claim in this Action, that Pappalardo should not have been permitted, as part of the Company's annual share offering to officers and employees, to purchase Meditech stock from the Company at the same per share price that other Meditech officers and employees purchased Meditech stock from the Company, and if so, state the basis for that contention.

**Response to Interrogatory No. 6**

The plaintiffs object to this Interrogatory on the grounds that this Interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs state yes, and contend that Pappalardo got a bargain price, set by him, to benefit himself and a small group of others at the expense of those terminating their interest in the Plan. The plaintiffs refer the defendants to materials issued by Grossman, and other materials made available during discovery and obtained from the Defendants. Specifically, the Plaintiffs refer the defendants to Exhibit 24 to the Grossman Deposition.

7

**Interrogatory No. 7**

Do Plaintiffs contend, as part of their claim in this Action, that Defendants violated the Employee Retirement Income Security Act by valuing plan assets held by the Trust once each year and paying terminating plan participants the value of their Trust balance as of the last valuation date plus interest from that date, and if so, state the basis for that contention.

**Response to Interrogatory No. 7**

No.

**Interrogatory No. 8**

Do Plaintiffs contend, as part of their claim in this Action, that it is not permissible, under the Employee Retirement Income Security Act, for the Plan to provide a voluntary mechanism for participants to withdraw their Trust balances in excess of $1 million, and if so, state the basis for that contention.

**Response to Interrogatory No. 8**

No, assuming that the withdrawals were completely voluntary and not forced by the

Trustee.

**Interrogatory No. 9**

Describe in detail all communications, if any, between Plaintiffs and/or Plaintiffs' Counsel, on the one hand, and Grossman and/or counsel for Grossman, on the other, concerning this Action or the subject matter of this Action.

**Response to Interrogatory No. 9**

The plaintiffs object to this Interrogatory on the grounds that it is vague and overly broad.

The plaintiffs further object to this Interrogatory on the grounds that this Interrogatory seeks

information that is better obtained through an alternative means of discovery and information

obtained in anticipation for litigation and information protected by the attorney client privilege

and the attorney work product doctrine. Subject to and without waiving the forgoing objection

and the General Objections above, the plaintiffs state that Plaintiffs Hinchliffe and Trainor had

8

no such communication, and refer the defendants to the depositions of Michael Hubert for a discussion of his communications with Mr. Grossman.

**Interrogatory No. 10**

Describe in detail every valuation or other analysis of the value of Meditech stock performed by or an behalf of any Plaintiff since January 1, 1996, excluding any putative expert valuation performed for purposes of this Action.

**Response to Interrogatory No. 10**

Plaintiffs object to Interrogatory 10 on the grounds that portions of the Interrogatory exceed the scope of discovery permitted by the rules. The plaintiffs further object to this Interrogatory on the grounds that this Interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs state that they will produce an expert report for the defendants at the appropriate time. (Mike- what other analysis did you do prior to the litigation that would be responsive to this question?) Plaintiff Hubert periodically checked the SAIC formula in their SEC filings and used it to compute a valuation for MEDITECH. He also watched companies in the industry which were purchased and noted the purchase price on a per share basis. He created a spreadsheet regarding this analysis; that document regarding other companies and the purchase price was on his MEDITECH PC and is no longer available to him. The PC file was about industry mergers and acquisitions.

**Interrogatory No. 11**

Identify and describe in detail every occasion since January 1, 1996 on which each Plaintiff has asserted, or made statements or representations concerning, a per share value for Meditech stock, the value of Plaintiffs aggregate holdings of Meditech stock, or the value of Plaintiffs' Trust

account balance, including, but not limited to, with respect to any sale or offer to sell Meditech stock; any calculation of or statement of or concerning, assets of a Plaintiff for purposes of an application for college financial aid, a mortgage, or other loan; and/or any calculation of, or statement of or concerning, assets of a Plaintiff for purposes of a divorce, custody, or support proceeding, or any other civil, criminal, or administrative proceeding.

## Response to Interrogatory No. 11

The plaintiffs object to this Interrogatory on the grounds that it is vague and overly broad. The plaintiffs further object to this Interrogatory on the grounds that this Interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs refer the defendants to the documents previously produced by the plaintiffs in this litigation. Plaintiffs Hinchliffe and Trainor did not value their Meditech shares in the time period designated. Further, plaintiff Hubert represented the then stated value of his Meditech stock as of January 21, 2003 in his divorce papers negotiated during 2002 and signed on January 21, 2003, and may have represented the then stated value of his Meditech stock in 2001 on an application for an education loan for his son. In 2005, Plaintiff Hubert also had inquiries from two persons who expressed interest in acquiring the stock at $50 per share. No transaction ever occurred.

## Interrogatory No. 12

Identify all documents and information that Plaintiffs and/or Plaintiffs' Counsel referred to, reviewed, consulted, or relied upon in responding to any of the foregoing interrogatories, and each person with whom Plaintiffs and/or Plaintiffs' Counsel consulted or discussed any of the foregoing interrogatories.

**Response to Interrogatory No. 12**

The plaintiffs object to this Interrogatory on the grounds that it is vague and overly broad. The plaintiffs further object to this Interrogatory on the grounds that this Interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, Plaintiffs Hinchliffe and Trainor consulted no documents in connection with answering these interrogatories, and Plaintiff Hubert consulted emails that he previously wrote to SEC.

As to Objections,
**Michael P. Hubert**
**William Trainor, and**
**David Hinchliffe,**
By their attorneys,

/s/ Michael A. Collora
Michael A. Collora (BBO #092940)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210
671-371-1000
671-371-1037

Dated: December 27, 2007

11

As to all Interrogatories,
I certify under penalty of perjury that the foregoing
is true and correct as it pertains to me,


_____/s/ Michael Hubert_____
Michael Hubert

Dated:  December 27, 2007


As to all Interrogatories,
I certify under penalty of perjury that the foregoing
is true and correct as it pertains to me,


_/s/ David Hinchliffe_____
David Hinchliffe

Dated: December 27, 2007


As to all Interrogatories,
I certify under penalty of perjury that the foregoing
is true and correct as it pertains to me,



_/s/ William Trainor_____
William Trainor

Dated: December 27, 2007

## Certificate of Service

I, Jennifer M. Ryan, hereby certify that I have, on this 27 day of December, 2007, caused the above document to be served by hand upon all counsel of record.


_____/s/ Jennifer M. Ryan_____
Jennifer M. Ryan


12

# EXHIBIT 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually And On Behalf Of All Persons Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO, <br><br> Defendants. | Civil Action No. 05-10269RWZ |

## AFFIDAVIT OF A. NEIL PAPPALARDO

I, A. Neil Pappalardo, do hereby depose and state:

1.    I am the founder, Chairman and Chief Executive Officer ("CEO") of Medical Information Technology, Inc. ("Meditech" or the "Company").

2.    I also serve as the trustee (the "Trustee") of the Medical Information Technology, Inc. Profit Sharing Trust (the "Trust"), which was established pursuant to the Medical Information Technology, Inc. Profit Sharing Plan (the "Plan," and together with myself and Meditech, the "Defendants"). I have served as Trustee since the Trust's inception in 1973.

3.    I submit this affidavit, which is based on my personal knowledge and review of Company files, in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification.

1

## MEDITECH

4.      I founded Meditech in 1969, together with four other individuals, to develop and market information system software for the hospital industry. The Company today is a leading provider of software used in hospitals around the globe. Meditech currently has more than 2400 employees, spread across 6 facilities, all in Massachusetts.

5.      It is important to myself and the other members of the Board of Directors of Meditech that the Company's employees have a stake in its growth and in its future. To this end, we have for decades voted to have the Company sell shares of Meditech stock to the Company's employees at the fair value for the stock determined by the Board. We do not wish to take advantage of our employees, so in determining the fair value for purposes of these sales we seek to arrive at a reasonable value that is neither aggressively high, nor aggressively low.

6.      We also indirectly provide for employee share ownership through the Plan, to which (as described below) the Company has been contributing Meditech stock and cash for over 30 years. In valuing our contribution of stock to the Trust, we use the same fair value per share that we use in selling shares to employees. This valuation of the contribution is the basis for a tax deduction by the Company, another reason why the Board of Directors seeks to determine a reasonable, not aggressively high fair value for the stock.

7.      Through contributions of stock to the Trust and sales of shares to employees, the percentage of shares held directly or indirectly by Meditech's current and former employees (excluding myself, although as CEO I am an employee) has increased dramatically over time. By 1985 year end, the Trust and current and former employees owned 18.6% of the Company. By 1995 year end, this figure had grown to 25.6%, and by 2005 year end, the Trust and current and former employees owned 32.2% of the Company. While this has diluted myself and the

2

other founders of the Company (despite my having purchased shares from the Company like other employees, my percentage ownership of the Company has declined from 26.8% at 1996 year end to 25.7% at 2005 year end), we believe that continued growth in employee ownership of the Company is essential to the Company's long-term well being, and it is an important part of our employment and retention strategy.

## THE PLAN

8.    The Plan was established by the Board of Directors of Meditech in 1973. The stated purpose of the Plan is to provide "retirement and other benefits to the employees of the Company," and the Plan explicitly states that it was "designed to invest substantially in shares of the Common Stock of the Company so as to permit the participating employees to share in any growth of the Company."

9.    Under the Plan, the Trust was formed to hold contributions made by the Company for the sole benefit of the Plan's employee participants. The Plan was specifically drafted so that, although as CEO I am an employee of Meditech, I am not a participant in the Plan and do not derive any direct financial benefit from it in any way.

10.    The Plan is entirely voluntary: it was not established pursuant to any collective bargaining agreement or employment contract, and the Plan provides that the Company may terminate the Plan at any time. Moreover, the Plan provides that all contributions by the Company to the Trust are voluntary; in any given year, the Board of Directors could vote not to contribute anything to the Trust.

11.    Although the Plan explicitly provides that the Trust may hold up to 100% Meditech stock, contributions by the Company to the Trust have historically been made in the form of cash and Meditech stock.

3

12. Pursuant to the terms of the Plan, the Trust pays out the value of a participant's account in a lump sum payment upon termination of the participant's employment with Meditech, either directly to the participant or (more commonly) to another retirement account of the participant's choosing. We also permit participants to withdraw some (or even all) of their account balance prior to termination of their employment if they establish that they are facing a hardship, or if the employee has more than 20 years of service with the Company. Each of these "in-service withdrawal" mechanisms is entirely voluntary on the part of participants. With respect to those participants with more than 20 years service, I encourage them to withdraw their Trust balance in excess of $1 million each year and to invest it themselves, in preparation for the day when they leave Meditech and must become responsible for investing their entire distribution from the Trust, but make very clear that no one is required to make such an in-service withdrawal.

## VALUATION OF MEDITECH STOCK

13. Because Meditech stock is not publicly traded, the Meditech Board of Directors, in deciding what to contribute to the Trust each year end, must determine a per share value for the stock. Under the explicit terms of the Plan, the Board first sets an overall contribution amount, and then decides how much of that overall contribution will be in stock, and how much in cash. The number of shares contributed to the Plan is therefore dependent upon the value determined for those shares by the Board. For example, if the Board voted to make an overall contribution to the Trust of $4 million, it could not then vote to donate 80,000 shares at $75 per share (*i.e.*, $6 million worth of stock).

14. As the Trustee, I must also determine a fair value per share for the stock as of December 31 of each year for purposes of establishing the overall value of the Trust; this overall

value is then used in determining the value of the accounts of individual Plan participants. In determining the fair value of the stock for purposes of the Trust, I consider many of the same factors considered by the Board of Directors of the Company when it makes its determination, but am not bound by the Board's determination.

15.    In valuing Meditech stock in my capacity as Trustee and as a member of the Board, I consider many factors, including Meditech's total revenue, net income, total equity, dividends paid and the growth rate of each. I also compare Meditech's market capitalization to that of Meditech's competitors. Typically however, the year-end share value determined by the Board and myself as Trustee is determined primarily in concert with the dividend that Meditech will pay the following year. The current dividend yield on Meditech stock is 6.75%, based on the fair value determined as of December 31, 2005 ($32), and the current dividend rate for 2006 ($2.16). This dividend yield compares favorably with the approximately 5% yield paid by the U.S. government on long-term Treasury notes, and is justified based on Meditech's illiquid stock and the higher risk inherent in an investment in Meditech compared to an investment in the Federal government.

16.    As demonstrated in the affidavit of Barbara A. Manzolillo, Meditech's CFO and the Plan's administrator, which is also being submitted in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, the year-end values I have determined for Meditech stock have been steadily increasing over time. The values I have determined reflect an appreciation in Meditech's stock value greater than the growth in Meditech's earnings per share during the period in which Plaintiffs claim I have been intentionally undervaluing the stock, and are consistent with the growth in dividends paid per share. My valuation methodology has made many millionaires of Meditech's employees, including each of the named Plaintiffs.

5

17.    It is my understanding Plaintiffs assert that if their method of valuing Meditech stock had been used, the Trust would quickly run out of cash.    Such a result would be undesirable from the perspective of the Plan's participants, as well as Meditech's shareholders (most of whom are or were Plan participants).  If the Trust lacked any cash, it could not make a cash distribution to terminating employees, nor would it be able to fund in-service withdrawals or make loans to Plan participants.  Under the terms of the Plan, when the Trust lacks sufficient cash to make distributions, it may defer distributions to participants by up to three years and distribute stock instead of cash.  A three-year delay in receiving Trust distributions would no doubt be undesirable to most if not all Plan participants.  Moreover, although Meditech stock has been an excellent investment, a distribution of stock would be problematic because the most significant market for small amounts of non-publicly traded Meditech stock is the Trust itself – it has typically purchased stock from shareholders (including each of the Plaintiffs) who wish to liquidate some or all of their holdings.  If the Trust were to distribute stock because it lacked any cash, the same lack of cash would prevent it from purchasing any stock from Meditech's shareholders.  Plan participants would thus receive a distribution of stock that they may not be able to sell, and existing shareholders might be unable to find a buyer should they wish to liquidate some or all of their holdings.  For Plan participants and existing shareholders who need to raise cash to pay expenses (such as college tuition, a down payment for a residence, or medical bills), an inability to sell their Meditech stock to the Trust could cause hardship.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 15, 2006.

/s/ A. Neil Pappalardo
A. Neil Pappalardo

6

# EXHIBIT 13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually And On Behalf Of All Persons Similarly Situated,<br><br>      Plaintiffs,<br><br>v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO,<br><br>      Defendants. | Civil Action No. 05-10269RWZ |

## AFFIDAVIT OF BARBARA A. MANZOLILLO

I, Barbara A. Manzolillo, do hereby depose and state:

1.    I am the Chief Financial Officer ("CFO"), Treasurer, and Clerk of Medical Information Technology, Inc. ("Meditech" or the "Company"). I have served as the Treasurer since 1986, the CFO since 1996, and the Clerk since 2002. I have been employed at Meditech since 1975.

2.    I also serve on behalf of Meditech as the Administrator of the Medical Information Technology, Inc. Profit Sharing Plan (the "Plan"), and the trust (the "Trust") established pursuant to the Plan. I assumed this role in 1990. As Administrator, it is my duty to assist the Plan's Trustee, A. Neil Pappalardo, in the day-to-day operation of the Plan and the Trust.

3.    I submit this affidavit, which is based on my personal knowledge and review of Company files, in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification.

1

## MEDITECH STOCK

4.    Meditech is a privately held company. Meditech's stock has never been traded on any public exchange. There are, however, transactions in Meditech Stock. Among other transactions, the Company has sold stock to most eligible employees, and the Trust creates a market for Meditech stock by purchasing shares from employees or prior employees who wish to liquidate some or all of their holdings.

5.    Each of the named plaintiffs in this lawsuit – Michael Hubert, David Hinchliffe, and William Trainor (the "Plaintiffs") – has purchased stock from the Company, and sold stock to the Trust when he wanted to liquidate some or all of his holdings.

### MICHAEL HUBERT'S BENEFITS FROM MEDITECH STOCK

6.    Mr. Hubert was an active purchaser of Meditech stock until his termination from the Company in 2004.

7.    Between 1985, when Mr. Hubert first purchased shares from the Company, and 2004, when his employment with Meditech was terminated, Mr. Hubert purchased a total of 24,300 split-adjusted shares from the Company, for which he paid a total of $197,425.

8.    Mr. Hubert has earned a significant return on his purchases of Meditech stock. In 2003, Mr. Hubert sold 1,000 shares of Meditech stock to the Trust for $23,000. He still holds 23,300 shares. At the current fair value of Meditech stock determined by the Board of Directors as well as the Trustee at year end 2005 ($32), those shares are worth a total of $745,600. Between his sale in 2003 and the increase in value on his remaining shares, Mr. Hubert has gained $571,175 on his initial investment of $197,425, a return of about 289%.

9.    In addition, Meditech pays a dividend on its stock. Over the years, Mr. Hubert has been paid more than $310,000 in dividends on his shares of Meditech stock, including

2

$46,600 in 2005 alone. Between these dividends, Mr. Hubert's sale of stock to the Trust, and the appreciation in value of Mr. Hubert's remaining shares, Mr. Hubert has gained approximately $881,000 on his $197,425 investment in Meditech stock.

10.    In addition to the large sums Mr. Hubert has earned through his personal investment in Meditech stock, Mr. Hubert received a substantial payout from the Trust. Mr. Hubert's 2004 Trust distributions were based in large part both on the voluntary contributions of Meditech stock to the Trust by the Company, and on the appreciation in the value of that stock while Mr. Hubert was a Plan participant. Mr. Hubert made a voluntary in-service withdrawal from the Trust in early 2004 in the amount of $39,086.04 plus interest of $390.86. When his employment with Meditech was later terminated, Mr. Hubert also received a payout of his remaining balance in the Trust, $1,000,000, plus interest of $40,000. Thus, Mr. Hubert received total distributions from the Trust of $1,079,476.90, for which he paid nothing.

11.    Altogether, between his distributions from the Trust, and the returns Mr. Hubert has earned through his own investments in Meditech stock, Mr. Hubert has gained over $1.9 million dollars, an amount that continues to increase through Mr. Hubert's continued receipt of tens of thousands in dividends each year on his remaining 23,300 shares of Meditech stock.

12.    I find it noteworthy that Mr. Hubert continued purchasing Meditech stock, at the fair values determined by the Company's Board of Directors, even after he decided that the stock was being undervalued, and even after he decided to sue the Defendants based on this alleged undervaluation.

13.    It is my understanding that Mr. Hubert first came to believe that Meditech stock was undervalued at least by the mid-1990s. During the class period alleged in the Plaintiffs' Amended Complaint in this lawsuit (1998 and forward), during which Plaintiffs allege that the

3

Defendants have undervalued Meditech stock, Mr. Hubert purchased a total of 5,800 split-adjusted shares of Meditech stock for a total of $97,100. Those shares, at the year-end 2005 fair value for Meditech stock determined by the Trustee, are worth $185,600.

14.    It is my understanding that on February 18, 2002, Mr. Hubert sent an anonymous email to various lawyers offering to provide them details concerning a potential lawsuit against the Trustee based on the alleged undervaluation of Meditech stock. Following that email, Mr. Hubert continued buying shares from the Company at prices that he believed had been intentionally set too low. Two days after sending the email, on February 20, 2002, Mr. Hubert purchased 400 shares of Meditech stock from the Company at $19 per share. In February 2003 Mr. Hubert purchased 1,000 shares from the Company at the $22 per share value determined at year-end 2002; in their Amended Complaint, Plaintiffs allege that the per share value was actually $41 at year-end 2002. In February 2004, Mr. Hubert purchased an additional 200 shares from the Company at the $26 per share value determined at year-end 2003; in their Amended Complaint, Plaintiffs allege that the per share value was actually at least $74 at year end 2003.

### DAVID HINCHLIFFE'S BENEFITS FROM MEDITECH STOCK

15.    Mr. Hinchliffe, like Mr. Hubert, earned significant returns on purchases of Meditech stock from the Company.

16.    During his tenure with Meditech, which ended in 1998, Mr. Hinchliffe purchased shares of Meditech stock from the Company for a total of $16,400. He eventually sold all of these shares to the Trust, which paid him $301,100, a profit of $284,700 representing a gain of 1736% on his investment.

17.    Mr. Hinchliffe also received dividends on his stock while he held it. Mr. Hinchliffe received $92,899.50 in dividends, which, together with the appreciation in the value

of the stock before he sold it to the Trust, provided him a total return of approximately $377,000 on an investment of $16,400.

18.     Also like Mr. Hubert, Mr. Hinchliffe received a significant distribution from the Trust. When his employment with Meditech terminated in 1998, Mr. Hinchliffe received a distribution from the Trust in the amount of $1,123,639.39, for which he paid nothing. This distribution, together with the returns on his personal investment in Meditech stock from dividends and the sale to the Trust, provided Mr. Hinchliffe approximately $1.5 million.

## WILLIAM TRAINOR'S BENEFITS FROM MEDITECH STOCK

19.     Mr. Trainor, like Mr. Hubert and Mr. Hinchliffe, benefited handsomely from his association with Meditech, which ended in 1998.

20.     Mr. Trainor purchased shares from the Company for a total of $16,950. Mr. Trainor then sold all of these shares to the Trust, which paid him a total of $310,150. Mr. Trainor thus earned a profit of $293,200 just on the purchase and sale, representing a gain of 1730%.

21.     Mr. Trainor, like the other shareholders, also received a dividend on his shares while he held them. All told, Mr. Trainor received $114,384.75 in dividends. These dividends, together with the appreciation on his stock, provided Mr. Trainor a total return of approximately $407,000 on his $16,950 investment.

22.     Mr. Trainor, of course, also received a significant distribution from the Trust upon termination of his employment with Meditech in 1998: $929,943.41, for which he paid nothing. This distribution, together with the returns Mr. Trainor received on his personal investment in Meditech stock, provided Mr. Trainor with more than $1.3 million.

### VALUE OF MEDITECH STOCK DETERMINED BY THE TRUSTEE

23.    Plaintiffs allege that the Trustee has intentionally undervalued Meditech stock held by the Trust.  The year-end value of Meditech stock, however, as determined by the Trustee for purposes of valuing the Trust and, thereby, the value of the account of each individual Plan participant, has been on a consistent upward trajectory, and, as evidenced by the distributions provided to the Plaintiffs, has resulted in substantial benefits being paid to Plan participants.

24.    The following chart reflects, for each year beginning in 1992, six years before the putative class period begins, and 2006 (all data is not available for all years): (a) Meditech's earnings per share, (b) the dividend per share, (c) the year-end value of Meditech stock determined by the Trustee, which was used for valuing the Trust and thereby determining distributions in the following year, and (d) the year-end value of Meditech stock that Plaintiffs allege in their Amended Complaint should have been used in each year.

| YEAR | Meditech Earnings Per Share | Dividend per Share | Year End Fair Value per Trustee | Year End Fair Value per Plaintiffs |
|------|------|------|------|------|
| 1992 | $0.75 | $0.34 | $6.33 | N/A |
| 1993 | $0.96 | $0.43 | $7.00 | N/A |
| 1994 | $1.03 | $0.52 | $8.50 | N/A |
| 1995 | $1.18 | $0.62 | $10.00 | N/A |
| 1996 | $1.40 | $0.70 | $12.00 | N/A |
| 1997 | $1.57 | $0.84 | $13.50 | $75.00 |
| 1998 | $1.64 | $0.94 | $14.50 | $75.00 |
| 1999 | $1.83 | $1.00 | $16.00 | N/A |
| 2000 | $1.66 | $1.16 | $17.00 | $25.50 |
| 2001 | $1.70 | $1.24 | $19.00 | N/A |
| 2002 | $1.89 | $1.36 | $22.00 | $41.00 |
| 2003 | $1.98 | $1.56 | $26.00 | $74.00 |
| 2004 | $2.08 | $1.80 | $29.00 | N/A |
| 2005 | $2.24 | $2.00 | $32.00 | N/A |
| 2006 | N/A | $2.16 | N/A | N/A |

25.    Notably, the fair value determined by the Trustee between year end 1997 (as relevant to distributions made to Plan participants in 1998, the beginning of the class period) and year end 2005, increased from $13.50 to $32, a gain of 137%. Between 1997 and 2005, Meditech's earnings per share grew by 43%, from $1.57 to $2.24. It is my understanding that in determining a year-end fair value for Meditech stock, the Trustee takes into consideration the per-share dividends to be paid by the Company in the following year. Between 1998 and 2006, the dividends paid per share on Meditech stock grew from $0.94 to $2.16, a gain of 129%. Thus, the Trustee has been increasing the value of Meditech stock at a rate in excess of the rate of Meditech's earnings growth per share, and consistent with the growth in dividends paid per share, during the period in which Plaintiffs allege the value of the stock has been artificially depressed.

26.    Indeed, the year-end value of Meditech stock determined by the Trustee has been increasing at a rate exceeding growth in earnings per share, and consistent with dividends paid per share in the following year, since well before the class period began. For example, between year-end 1992, five years before the start of the putative class period, and year-end 2005, the value of Meditech stock used by the Trustee increased from $6.33 to $32 (an increase of 405%), while Meditech's earnings per share increased from $0.75 in 1992 to $2.24 in 2005 (an increase of 198%), and the dividends paid per share grew from $0.43 in 1993 to $2.16 in 2006 (an increase of 402%).

27.    The Trust has also avoided the negative volatility that, Plaintiffs allege, should have been present during the class period. As reflected in the above chart, the Amended Complaint specifically alleges that the "actual" fair value of Meditech stock was $75 at year end 1997 (used for distributions to Plan participants in 1998), dropping to $25.50 at year end 2000,

7

and $41 at year end 2002, before finally returning to $74 at year end 2003. Thus, under the valuation method employed by the Amended Complaint, employees would not only fail to share in the Company's growth in earnings per share between 1997 and 2003 (from $1.57 to $1.98, an increase of 26%), but employees in years such as 2001 and 2003 would receive distributions from the Trust based on year-end fair values lower than the year-end fair value in 1997, even though Meditech's earnings per share were higher in 2000 and 2002 than they were in 1997.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 15, 2006.

/s/ Barbara A. Manzolillo
Barbara A. Manzolillo

8

# EXHIBIT 14

## MEDICAL INFORMATION TECHNOLOGY, INC.

### STATEMENT OF STOCK OWNERSHIP

#### June 28, 2006

EXHIBIT

Hinchliffe 11
AHB  7/27/06

The shares represented by this statement have not been registered under the Securities Act of 1933 and may not be transferred except pursuant to an effective registration or exemption from registration, under said Act. Furthermore, these shares are subject to restrictions on transfer, a copy of which will be furnished by the Company to the shareholder upon written request and without charge.

| Shareholder | David W. Hinchliffe |
| --- | --- |
| Address | 13 Newsome Pk, Jamaica Plain, MA 02130 |
| Tax Id # | |

| Date of Transaction | # of Shares | Share Price | Amount Bought | Amount Sold | Transaction Description |
| --- | --- | --- | --- | --- | --- |
| 1981 02 05 | 100 | 6.00 | $600.00 | | From MEDITECH |
| 1981 02 05 | 300 | 6.00 | $1,800.00 | | From MEDITECH |
| 1981 02 09 | (100) | 15.00 | | $1,500.00 | To MEDITECH Profit Sharing Trust |
| 1983 02 01 | 50 | 25.00 | $1,250.00 | | From MEDITECH |
| 1983 05 11 | 700 | | | | 3 for 1 Stock Split |
| 1984 02 06 | 225 | 20.00 | $4,500.00 | | From MEDITECH |
| 1985 02 04 | 100 | 30.00 | $3,000.00 | | From MEDITECH |
| 1986 02 05 | 125 | 42.00 | $5,250.00 | | From MEDITECH |
| 1986 05 12 | 1,500 | | | | 2 for 1 Stock Split |
| 1989 03 10 | (1,000) | 41.00 | | $41,000.00 | To MEDITECH Profit Sharing Trust |
| 1989 03 13 | 2,000 | | | | 2 for 1 Stock Split |
| 1991 03 28 | (700) | 30.00 | | $21,000.00 | To MEDITECH Profit Sharing Trust |
| 1993 11 09 | 6,600 | | | | 3 for 1 Stock Split |
| 1994 03 25 | (2,100) | 14.00 | | $29,400.00 | To MEDITECH Profit Sharing Trust |
| 1997 05 09 | (1,200) | 25.00 | | $30,000.00 | To MEDITECH Profit Sharing Trust |
| 1998 03 06 | (6,600) | 27.00 | | $178,200.00 | To MEDITECH Profit Sharing Trust |
| Total | 0 | | $16,400.00 | $301,100.00 | |

# EXHIBIT 15



DEPOSITION
EXHIBIT
Trainor  4
A#13  7/24/06

# MEDICAL INFORMATION TECHNOLOGY, INC.

## STATEMENT OF STOCK OWNERSHIP

### June 28, 2006

The shares represented by this statement have not been registered under the Securities Act of 1933 and may not be transferred except pursuant to an effective registration or exemption from registration, under said Act.  Furthermore, these shares are subject to restrictions on transfer, a copy of which will be furnished by the Company to the shareholder upon written request and without charge.

| Shareholder | William G. Trainor |
|---|---|
| Address | 485 West St, Wrentham, MA 02093 |
| Tax Id # | ████████ |

| Date of Transaction | # of Shares | Share Price | Amount Bought | Amount Sold | Transaction Description |
|---|---|---|---|---|---|
| 1980 08 19 | 100 | 10.00 | $1,000.00 | | From MEDITECH |
| 1981 11 03 | 100 | 15.00 | $1,500.00 | | From Curtis W. Marble |
| 1983 02 01 | 25 | 25.00 | $625.00 | | From MEDITECH |
| 1983 05 11 | 450 | | | | 3 for 1 Stock Split |
| 1984 02 06 | 100 | 20.00 | $2,000.00 | | From MEDITECH |
| 1985 02 05 | 100 | 30.00 | $3,000.00 | | From MEDITECH |
| 1986 02 05 | 75 | 42.00 | $3,150.00 | | From MEDITECH |
| 1986 05 12 | 950 | | | | 2 for 1 Stock Split |
| 1987 02 27 | 100 | 26.00 | $2,600.00 | | From MEDITECH |
| 1988 02 23 | 25 | 34.00 | $850.00 | | From MEDITECH |
| 1989 02 28 | 25 | 41.00 | $1,025.00 | | From MEDITECH |
| 1989 03 13 | 2,050 | | | | 2 for 1 Stock Split |
| 1990 02 28 | 50 | 24.00 | $1,200.00 | | From MEDITECH |
| 1993 11 09 | 8,300 | | | | 3 for 1 Stock Split |
| 1994 03 25 | (2,000) | 14.00 | | $28,000.00 | To MEDITECH Profit Sharing Trust |
| 1998 05 11 | (10,450) | 27.00 | | $282,150.00 | To MEDITECH Profit Sharing Trust |
| Total | 0 | | $16,950.00 | $310,150.00 | |

# EXHIBIT 16

## MEDICAL INFORMATION TECHNOLOGY, INC.

## STATEMENT OF STOCK OWNERSHIP

### June 28, 2006

EXHIBIT

MH 16
AHB 7/26/06

The shares represented by this statement have not been registered under the Securities Act of 1933 and may not be transferred except pursuant to an effective registration or exemption from registration, under said Act. Furthermore, these shares are subject to restrictions on transfer, a copy of which will be furnished by the Company to the shareholder upon written request and without charge.

| Shareholder | Michael Hubert |
|---|---|
| Address | 48 Narragansett Rd, Quincy, MA 02169 |
| Tax Id # | |

| Date of Transaction | # of Shares | Share Price | Amount Bought | Amount Sold | Transaction Description |
|---|---|---|---|---|---|
| 1985 02 15 | 50 | 30.00 | $1,500.00 | | From MEDITECH |
| 1986 02 13 | 50 | 42.00 | $2,100.00 | | From MEDITECH |
| 1986 05 12 | 100 | | | | 2 for 1 Stock Split |
| 1987 02 27 | 50 | 26.00 | $1,300.00 | | From MEDITECH |
| 1988 02 23 | 200 | 34.00 | $6,800.00 | | From MEDITECH |
| 1989 02 28 | 125 | 41.00 | $5,125.00 | | From MEDITECH |
| 1989 03 13 | 575 | | | | 2 for 1 Stock Split |
| 1990 02 28 | 250 | 24.00 | $6,000.00 | | From MEDITECH |
| 1991 02 28 | 250 | 30.00 | $7,500.00 | | From MEDITECH |
| 1992 02 28 | 250 | 32.00 | $8,000.00 | | From MEDITECH |
| 1993 02 25 | 250 | 38.00 | $9,500.00 | | From MEDITECH |
| 1993 11 09 | 4,300 | | | | 3 for 1 Stock Split |
| 1994 02 28 | 700 | 14.00 | $9,800.00 | | From MEDITECH |
| 1995 02 28 | 700 | 17.00 | $11,900.00 | | From MEDITECH |
| 1996 02 29 | 700 | 20.00 | $14,000.00 | | From MEDITECH |
| 1997 02 25 | 700 | 24.00 | $16,800.00 | | From MEDITECH |
| 1998 02 20 | 700 | 27.00 | $18,900.00 | | From MEDITECH |
| 1999 02 25 | 700 | 29.00 | $20,300.00 | | From MEDITECH |
| 2000 02 28 | 350 | 32.00 | $11,200.00 | | From MEDITECH |
| 2001 02 27 | 350 | 34.00 | $11,900.00 | | From MEDITECH |
| 2001 05 08 | 11,350 | | | | 2 for 1 Split |
| 2002 02 20 | 400 | 19.00 | $7,600.00 | | From MEDITECH |
| 2003 02 20 | 1,000 | 22.00 | $22,000.00 | | From MEDITECH |
| 2003 08 08 | (1,000) | 23.00 | | $23,000.00 | To MEDITECH Profit Sharing Trust |
| 2004 03 25 | 200 | 26.00 | $5,200.00 | | From MEDITECH |
| Total | 23,300 | | $197,425.00 | $23,000.00 | |

# EXHIBIT 17

# MEDITECH

Medical Information Technology, Inc.    MEDITECH Circle, Westwood, Massachusetts 02090   (617) 821-3000  FAX (617) 329-9977

January 30, 1998

We are pleased to announce the total 1997 cash bonus is $10,150,000, being 19% more than last year.  This amount is being distributed to all year-end employees as individual amounts approximating 4.6% of their cumulative salary and cash bonus compensation for the past five calendar years.

As you know, MEDITECH uses a variety of methods to reward the efforts of its employees.  We are furnishing below a summary of the various components that make up your MEDITECH compensation.

**Cash Compensation:**

| | |
|---|---|
| Current Annual Salary | $55,200.00 |
| 1997 Cash Bonus Paid on January 30, 1998 | $11,903.00 |

**MEDITECH Profit Sharing Trust:**

| | |
|---|---|
| Your Account Balance at December 31, 1996 | $80,796.76 |
| 1997 Share of Income and Revaluation | $11,970.45 |
| 1997 Share of Contribution and Forfeitures | $3,954.72 |
| Your Account Balance at December 31, 1997 | $96,721.93 |

Your Date of Hire was 08/20/84.  You are 100% vested in the MEDITECH Profit Sharing Trust.

**MEDITECH Stock:**

| | |
|---|---|
| Value of 330 shares at $27.00 per share | $8,910.00 |
| 1998 Estimated Dividends at $1.88 per share | $620.40 |

You may now purchase up to 700 shares of MEDITECH's common stock at $27.00 per share.

Please refer to the MEDITECH Intranet for all company related year-end documents and Stock Purchase Instructions.

In addition to the above you receive paid holidays, vacation time and various group-type fringe benefits which include medical, dental, disability and life insurance coverage.

The above amounts represent conditions as they exist at the present time.  Your contribution to the company's growth and success is greatly appreciated and we seek your continued dedication in the future.  As a consequence, your participation in the company's future prosperity should continue to escalate.

With warmest personal regards,

MEDICAL INFORMATION TECHNOLOGY, INC.


A. Neil Pappalardo, Chairman & CEO

**Confidential-Subject to Protective Order**

# Year End Financial/Bonus Package

The following year end information which used to be placed in your "Bonus Package" is instead now available on the Intranet. Printed copies will no longer be distributed.

<u>Annual Letter to Staff</u>

<u>Financial History</u>

<u>Stock Purchase Instructions</u>

<u>Profit Sharing Trust Financial Report</u>

<u>Profit Sharing Trust Condensed Description of Plan</u>

<u>Important Notice Regarding Withholding Taxes</u>

Your year end package will be distributed on January 30 by a colleague within your division, and will include an Individual Compensation Letter, Direct Deposit Confirmations or Payroll and Bonus Checks, and other applicable Tax information such as a W-2 or a 1099-DIV. Direct Deposit Confirmations will NOT be mailed home for January 1998.

http://intranet/ES/esprofitsharingsplit.htm    1/29/98

Confidential-Subject to Protective Order    DEF001397

# Annual Letter to Staff

**January 30, 1998**

Dear Staff,

1997 culminated the 21st consecutive record year for our company. Total revenues were $193.8M, operating income was $78.3M and net profit was $50.3M, up 15%, 13% and 13% compared to the prior year. Product bookings were $137M, down 12%, and the resultant backlog was $130M, up 4%. We extend our deep gratitude to all of you for your effort, dedication and loyalty.

1998 will be an excellent year for us as well. While 1997 bookings were down as compared to the prior year, we are not overly concerned. 1996 was in some ways an anomaly. The growth of our largest customer, Columbia/HCA, peaked during 1996 and in addition, we had 2 individual sales that year that represented $18M. Our backlog represents about 10 months of product revenue and, as far as we can tell, is still in relative terms the largest in the industry.

We are proud and grateful for some of the significant accomplishments of 1997:

- Record revenues, operating income, net profit and product backlog
- Reorganizing the MAGIC division to ensure that the MAGIC products will continue to serve our customers for many years to come
- Delivering new client/server nursing and medical record products with an emphasis on medical content and modern presentation
- Renewed international interest as evidenced by 3 new sales in the United Kingdom
- Establishing an exciting presence on the Internet/Intranet as evidenced by this letter
- Completing the hardware transition to desktop PCs
- The acquisition of an additional property in Westwood

The growth of MEDITECH, combined with the introduction of the Intranet, has caused us to rethink our usual practice of having formal, mandatory meetings for the entire staff on the last working day of January. (Not to mention the fact that one of us ran off the road 2 years ago in his haste to get from meeting to meeting!) Instead, we will now be having smaller, more focused quarterly meetings. Attendance will be limited at these meetings, but everyone will have the opportunity to attend at least one during the course of a year. In addition, we will have notes of the presentation/discussion taken and posted on the Intranet shortly after the meeting.

The first meeting will take place next Wednesday, February 4th at 3PM in the Framingham lunchroom. All staff whose birthdays occur in January, February, or March are invited to attend. Bob Gale will give a short presentation on the MEDITECH/ Columbia relationship (a topic in which many have expressed interest) and then we will open the discussion.

Last year, we began investigating new technologies and software to serve the communications needs of our staff whether they are here in the office, on the road, or at their homes. In 1998, we will roll out a new service to improve remote access to the MEDITECH data network. We will bring on line a new office automation system, complete with electronic delivery of incoming faxes. In addition, upgrades will be made to our phone switches to pave the way for new communications services, such as voice messaging and improved call routing.

**Confidential-Subject to Protective Order**                                        **DEF001398**

Case 1:05-cv-10269-RWZ    Document 135-18    Filed 04/18/2008    Page 5 of 11

One of the biggest challenges remaining for MEDITECH is finding, attracting, training, and retaining quality staff to meet the needs of our customers. A year ago, there was much discussion about the turnover rate at MEDITECH. We are pleased that it has stabilized at a rate far lower than other high tech companies. Nonetheless, we want to emphasize this area in 1998. Our most successful source of new employees is staff referrals. We are very pleased at this and are happy to announce another increase from $1,500 to $2,000 for all referrals whose employment date begins in 1998.

Training for existing staff has also become an increasingly important priority. We expect to devote more resources to this over the coming year, both in terms of product training, general education, and, perhaps most importantly, training for new supervisors. In addition, we continue to encourage you to seek outside educational opportunities. To facilitate this, we are raising the tuition reimbursement limits from $750/semester and $1500/year to $1000/semester and $2000/year for all courses started in 1998.

Again, thanks for all of the dedication and hard work that resulted in such a marvelous year. We look forward to working with all of you for a long time to come.

With warmest personal regards,



A. Neil Pappalardo
Chairman & CEO



Lawrence A. Polimeno
President & COO



Howard Messing
Executive Vice President

Confidential-Subject to Protective Order    DEF001399

# MEDITECH Financial History



## In Millions Except for per Share Data

| Year | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Revenue | 24.3 | 31.5 | 49.5 | 54.2 | 64.0 | 71.3 | 84.2 | 98.7 | 115.7 | 131.8 |
| Service Revenue | 15.2 | 17.4 | 19.4 | 23.5 | 28.3 | 34.0 | 40.0 | 45.0 | 52.2 | 62.0 |
| Total Revenue | 39.5 | 48.9 | 68.8 | 77.7 | 92.3 | 105.3 | 124.2 | 143.7 | 167.9 | 193.8 |
| Operating Expense | 21.8 | 27.4 | 38.5 | 47.3 | 55.4 | 64.0 | 73.0 | 85.2 | 98.3 | 115.5 |
| Operating Income | 17.7 | 21.5 | 30.3 | 30.4 | 36.9 | 41.3 | 51.3 | 58.5 | 69.6 | 78.3 |
| Other Income | 2.0 | 2.3 | 0.9 | 1.7 | 1.8 | 8.2 | 2.9 | 6.4 | 8.9 | 12.2 |
| Other Expense | 0.1 | 1.0 | 1.5 | 1.6 | 0.6 | 0.2 | 0.2 | 5.2 | 4.5 | 5.9 |
| Pre-tax Income | 19.6 | 22.8 | 29.7 | 30.5 | 38.1 | 49.3 | 54.0 | 59.7 | 74.0 | 84.6 |
| Income Taxes | 7.4 | 8.5 | 11.3 | 11.7 | 14.9 | 19.7 | 21.8 | 22.6 | 29.6 | 34.4 |
| Net Profit | 12.2 | 14.3 | 18.4 | 18.8 | 23.2 | 29.6 | 32.2 | 37.1 | 44.4 | 50.3 |
| Dividends Paid | 4.3 | 6.1 | 7.1 | 10.2 | 10.3 | 13.4 | 16.3 | 19.6 | 22.2 | 26.9 |
| Total Assets | 47.5 | 69.6 | 92.1 | 94.2 | 99.3 | 118.9 | 137.8 | 198.0 | 218.3 | 263.1 |
| Total Liabilities | 8.9 | 22.0 | 33.3 | 25.7 | 16.9 | 18.9 | 20.0 | 60.2 | 55.9 | 73.6 |
| Shareholder Equity | 38.6 | 47.6 | 58.8 | 68.5 | 82.4 | 100.0 | 117.8 | 137.8 | 162.4 | 189.5 |
| Common Shares | 15.2 | 15.3 | 15.3 | 15.4 | 15.5 | 15.6 | 15.7 | 15.8 | 15.9 | 16.1 |
| Earnings/share | 0.81 | 0.94 | 1.21 | 1.23 | 1.50 | 1.90 | 2.05 | 2.34 | 2.78 | 3.13 |
| Divs Paid/share | 0.29 | 0.40 | 0.47 | 0.67 | 0.67 | 0.87 | 1.04 | 1.24 | 1.40 | 1.68 |
| Book Value/share | 2.54 | 3.11 | 3.85 | 4.46 | 5.33 | 6.43 | 7.51 | 8.71 | 10.19 | 11.78 |
| Fair Value/share | 6.83 | 8.00 | 10.00 | 10.67 | 12.67 | 14.00 | 17.00 | 20.00 | 24.00 | 27.00 |

Confidential-Subject to Protective Order

DEF001400

# 1998 Stock Purchase Instructions

# For the MEDITECH Staff

# Hired Prior to January 30, 1995

In recognition of your individual contribution to the success of MEDITECH, we are pleased to offer you the opportunity to share in the equity of the company by becoming a direct shareholder of MEDITECH's common stock. To the extent that you may already be a shareholder, you may now increase your holdings in the company. The amount of shares offered to you individually are indicated in your compensation letter.

A condition of this offer is that payment for the purchase be received by Thursday, February 12 and that the purchase be for a minimum of 40 shares.

There will be a meeting in the auditorium at Canton on Monday, February 2 at 3PM and in the lunchroom at Framingham on Tuesday, February 3 at 3PM to discuss the implications of buying stock in MEDITECH. This meeting is especially intended for those employees who are considering becoming a shareholder for the first time, although any existing shareholder is welcome.

To aid you in your investment decision, we provide a 7 Year Financial History. All information for years through 1996 reflect audited financial information. Audited financial statements for 1997 will not be available until March.

Please note that MEDITECH is a closely-held private company and there is no public market for its shares. Thus there can be no absolute assurance of a future re-sale. However, each year the Profit Sharing Trust customarily offers to purchase shares from existing shareholders, creating a limited market for anyone wishing to sell. It is also noted there are restrictions on the transfer of the company's shares, requiring a holder to first offer the shares to the company at the same price as would be applicable to a potential sale to some other party.

If you wish to take advantage of this opportunity please make out your personal check payable to MEDICAL INFORMATION TECHNOLOGY, INC. for the appropriate amount and note on the check the number of shares purchased.

This year we ask that you stop by either the Canton or Framingham office between February 2 and February 12. In Canton see JoAnne Cody at ext 4523 between the hours of 8AM and 2PM. JoAnne is located in our Accounting Department on the third floor, upper cafeteria area. In Framingham see Robert Morse at ext 5973 between the hours of 8AM and 10AM. Robert will be located on the sixth floor in the Clarendon Room, between the elevator banks.

If we have not received a check from you by 5:30PM Thursday, February 12 we will assume you are not interested in purchasing any shares this year.

The MEDITECH Profit Sharing Trust is available to finance this type of stock purchase. If you need assistance in this regard, please contact Robert Morse for a copy of the Trust's Loan Request Guidelines/Application as soon as possible.

Confidential-Subject to Protective Order                                              DEF001401

# MEDITECH Profit Sharing Trust

# Financial Report for 1997

We are pleased to note that the assets held by the Trust at the end of 1996 for the benefit of the presently active members increased in value during 1997 by $8,044,544 or 14.8%. This increase consisted of interest income, dividend income and the revaluation of MEDITECH stock previously owned by the Trust.

During 1997 the company contributed $2,320,000 in cash and $1,080,000 in MEDITECH stock to the trust for a total of $3,400,000. This amount, combined with terminee forfeitures of $221,193, for a total of $3,621,193, has been allocated to active member accounts in amounts approximating 6.0% of their qualifying 1997 compensation.

At December 31, 1997 the Trust owned 1,469,010 shares of MEDITECH stock (9.1% of the company).  Also, at that same date, there were 1,393 members in the Trust.

## Trust Assets on December 31, 1996

| | |
|---|---:|
| Cash in Checking and Savings Accounts | 85,569 |
| US Treasury Notes | 21,127,245 |
| Accrued Interest Receivable | 287,499 |
| 1,408,745 Shares MEDITECH Stock @$24/share | 33,809,880 |
| Member Loans Receivable | 1,257,200 |
| **Total Assets** | 56,567,393 |

## Trust Activity During 1997

| | Employees | Terminees | Combined |
|---|---:|---:|---:|
| Assets on December 31, 1996 | 56,567,393 | | 56,567,393 |
| Segregated Assets for Terminees | (2,269,269) | 2,269,269 | |
| Interest Income | 1,375,407 | 63,208 | 1,438,615 |
| Dividend Income | 2,389,447 | | 2,389,447 |
| Revaluation of MEDITECH Stock | 4,279,690 | | 4,279,690 |
| Distribution to Terminees | | (2,111,284) | (2,111,284) |
| Forfeitures by Terminees | 221,193 | (221,193) | |
| Company Contributions | 3,400,000 | | 3,400,000 |
| **Assets on December 31, 1997** | 65,963,861 | | 65,963,861 |

## Trust Assets on December 31, 1997

| | |
|---|---:|
| Cash in Checking and Savings Accounts | 82,104 |
| U.S. Treasury Notes | 24,544,316 |
| Accrued Interest Receivable | 326,221 |
| 1,469,010 Shares MEDITECH Stock @ $27/share | 39,663,270 |
| Member Loans Receivable | 1,347,950 |
| **Total Assets** | 65,963,861 |

Confidential-Subject to Protective Order

DEF001402

# MEDITECH Profit Sharing Trust

## Condensed Description of Plan

The Trust's financial activity is governed by the legal document which created the Trust and operates as follows:

Membership is effective on the first day of the month following twelve full months of employment with the Company. Each member's beneficial interest in the Trust becomes vested (i.e. non-forfeitable) based upon years of service with the Company as follows:

| | |
|---|---|
| Less than 2 years | 0% vested |
| 2 or more years | 10% vested |
| 3 or more years | 30% vested |
| 4 or more years | 60% vested |
| 5 or more years | 100% vested |

The Trust's asset appreciation for each year is prorated in the ratio of account balances at the preceding January 1st belonging to members who are still actively employed by the Company at December 31st. Those who become members during any given year do not participate in this asset appreciation for the year.

Company contributions and forfeitures by terminees are prorated to the accounts of members who are active employees of the company at each December 31st, including newer employees who first become eligible for membership during the year. This proration is made in the ratio of qualifying compensation paid to each member by the company in the year, excluding any amounts paid prior to a new member's eligibility date. "Qualifying compensation" is limited to a maximum of $100,000 for the year.

Upon termination of employment, the vested portions of account balances of terminees are credited with interest from the preceding January 1st to the last day of the month that occurs prior to the date of distribution.

The Trustee is permitted to make interest-bearing loans to members for up to, and secured by, 50% of the vested portion of a member's account balance in the Trust. A member's loan balance can never exceed $50,000 and all such loans must be repaid within five years. The amount of any particular loan and the repayment period must be approved by the Trustee.

Members who have at least 20 years of service or who have incurred a "financial hardship" may make withdrawals, in accordance with procedures established by the Trustee. Such distributions are credited with interest from the preceding January 1st to the last day of the month that occurs prior to the date of distribution.

No income tax is payable by members on amounts credited to their accounts until such time as a distribution is actually received by them from the Trust. In this situation the tax might by further deferred by rolling over the proceeds of the distribution into some other form of qualifying plan such as an IRA. This can be accomplished by way of a Trustee to Trustee transfer not subject to tax withholding. Otherwise a direct distribution transfer to a member is

http://intranet/ES/ESPstPlannSummary.htm

1/29/98

Confidential-Subject to Protective Order

DEF001403

subject to 20% Federal and 5.95% Mass mandatory withholding tax.

Membership in the Trust generally disqualifies one from contributing to a separate Individual Retirement Account on a tax-deductible basis.  There are some exceptions to this latter rule depending upon marital status and upon the amount of adjusted gross income appearing on one's personal income tax return.

Confidential-Subject to Protective Order

DEF001404

# Important Notice Regarding

# Withholding Taxes

**Federal Income Tax:** As mandated by the IRS, 28% is withheld for the bonus payroll. On the monthly payroll the amount is determined based on exemptions claimed on your W-4 form and Federal Tax Tables.

**State Income Tax:** As mandated by the Commonwealth of Massachusetts, 5.95% is withheld for the bonus payroll. On the monthly payroll the amount is determined based on exemptions claimed on your M-4 form and State Tax Tables.

**Federal Insurance Contribution Act:** As mandated by the IRS, 6.2% on wages up to $68,400 is deducted for Social Security and 1.45% on all wages is deducted for Medicare.

In regard to withholding taxes, your own individual circumstances will determine if the mandated deduction used for bonus type payrolls is appropriate to cover your income tax liability. Please review your withholding status for the remainder of 1998 after preparing your Income Tax return for the year 1997.

If your total projected withholding is over or under your projected 1998 tax liability you can adjust your withholding from regular monthly salary for the remainder of 1998. If you wish to make a tax withholding change for the remainder of 1998, please leave a message for Mary Edwards-Gordon, Mike Metivier, or Bob Lucci.

Confidential-Subject to Protective Order

DEF001405

# EXHIBIT 18

# MEDITECH

Medical Information Technology, Inc.    MEDITECH Circle, Westwood, Massachusetts 02090   (617) 821-3000  FAX (617) 329-9977

January 30, 1998

David W. Hinchliffe

Dear David,

**VGI IMAGING**

**FEB 1 9 1998**

We are pleased to announce the total 1997 cash bonus is $10,150,000, being 19% more than last year. This amount is being distributed to all year-end employees as individual amounts approximating 4.6% of their cumulative salary and cash bonus compensation for the past five calendar years.

As you know, MEDITECH uses a variety of methods to reward the efforts of its employees. We are furnishing below a summary of the various components that make up your MEDITECH compensation.

**Cash Compensation:**

| | |
|---|---|
| Current Annual Salary | $99,600.00 |
| 1997 Cash Bonus Paid on January 30, 1998 | $26,820.00 |

**MEDITECH Profit Sharing Trust:**

| | |
|---|---|
| Your Account Balance at December 31, 1996 | $954,457.55 |
| 1997 Share of Income and Revaluation | $141,407.75 |
| 1997 Share of Contribution and Forfeitures | $6,042.27 |
| Your Account Balance at December 31, 1997 | $1,101,907.57 |

Your Date of Hire was 11/10/75. You are 100% vested in the MEDITECH Profit Sharing Trust.

**MEDITECH Stock:**

| | |
|---|---|
| Value of 6,600 shares at $27.00 per share | $178,200.00 |
| 1998 Estimated Dividends at $1.88 per share | $12,408.00 |

Please refer to the MEDITECH Intranet for all company related year-end documents.

In addition to the above you receive paid holidays, vacation time and various group-type fringe benefits which include medical, dental, disability and life insurance coverage.

The above amounts represent conditions as they exist at the present time. Your contribution to the company's growth and success is greatly appreciated and we seek your continued dedication in the future. As a consequence, your participation in the company's future prosperity should continue to escalate.

With warmest personal regards,

MEDICAL INFORMATION TECHNOLOGY, INC.

A. Neil Pappalardo, Chairman & CEO

DEF001341
Confidential-Subject
to Protective Order

# EXHIBIT 19

# MEDITECH Profit Sharing Trust

# Financial Report for 1997

We are pleased to note that the assets held by the Trust at the end of 1996 for the benefit of the presently active members increased in value during 1997 by $8,044,544 or 14.8%. This increase consisted of interest income, dividend income and the revaluation of MEDITECH stock previously owned by the Trust.

During 1997 the company contributed $2,320,000 in cash and $1,080,000 in MEDITECH stock to the trust for a total of $3,400,000. This amount, combined with terminee forfeitures of $221,193, for a total of $3,621,193, has been allocated to active member accounts in amounts approximating 6.0% of their qualifying 1997 compensation.

We note that at December 31, 1997 the Trust owned 1,469,010 shares of MEDITECH stock or approximately 9.1% of the company. Also, at that same date, there were 1,393 members in the Trust.

### Trust Assets on December 31, 1996

| | |
|---|---:|
| Cash in Checking and Savings Accounts | 85,569 |
| US Treasury Notes | 21,127,245 |
| Accrued Interest Receivable | 287,499 |
| 1,408,745 Shares MEDITECH Stock @$24/share | 33,809,880 |
| Member Loans Receivable | 1,257,200 |
| Total Assets | 56,567,393 |

### Trust Activity During 1997

| | Employees | Terminees | Combined |
|---|---:|---:|---:|
| Assets on December 31, 1996 | 56,567,393 | | 56,567,393 |
| Segregated Assets for Terminees | (2,269,269) | 2,269,269 | |
| Interest Income | 1,375,407 | 63,208 | 1,438,615 |
| Dividend Income | 2,389,447 | | 2,389,447 |
| Revaluation of MEDITECH Stock | 4,279,690 | | 4,279,690 |
| Distribution to Terminees | | (2,111,284) | (2,111,284) |
| Forfeitures by Terminees | 221,193 | (221,193) | |
| Company Contributions | 3,400,000 | | 3,400,000 |
| Assets on December 31, 1997 | 65,963,861 | | 65,963,861 |

### Trust Assets on December 31, 1997

| | |
|---|---:|
| Cash in Checking and Savings Accounts | 82,104 |
| U.S. Treasury Notes | 24,544,316 |
| Accrued Interest Receivable | 326,221 |
| 1,469,010 Shares MEDITECH Stock @ $27/share | 39,663,270 |
| Member Loans Receivable | 1,347,950 |
| Total Assets | 65,963,861 |

**HUB 079**

# EXHIBIT 20

# MEDITECH

**Medical Information Technology, Inc.** MEDITECH Circle, Westwood, Massachusetts 02090  (781) 821-3000 Fax (781) 329-9977

April 15, 1998                                                      SS# ~~████████~~
                                                                   D.O.H. 05/15/75
William G. Trainor                                                 D.O.T. 03/13/98
485 West St
Wrentham, MA   02093

Dear Billy,

In conjunction with the contemplated lump-sum distribution of your vested account
balance of $911,957.78 (plus interest) by the Profit Sharing Trust please provide
us with the enclosed **Benefit Election Form** and W4-P and M4-P tax withholding
certificates within 30 days (by May 15, 1998).

A summary of your options is as follows:

I) A **Trustee-to-Trustee distribution made payable** directly to a qualified plan or IRA:
   Such a transfer will assure the tax-free status of your total eligible rollover.
   You must provide us with the name and address of said trustee together with a
   statement from such plan that it is a qualified section 401(a) or 403(a) or 403(b)
   plan willing to accept your rollover, otherwise, we are obligated to deduct 20%
   Federal and 5.95% Mass income tax withholding (total 25.95%) from your distribution.

II) A **Trust distribution made Payable Directly to You:** You receive your vested
    balance less the 25.95% income taxes we are required to withhold.  You have 60
    days from date of receipt of this distribution to roll it over tax-free but you
    must provide the 25.95% deducted from your own personal funds.  If you are unable
    to do so any portion of your vested balance not rolled over becomes taxable
    income to you that year and is subject to early withdrawal penalties as well.
    Consequently, it is strongly advised that you plan for your retirement fund
    accordingly.

III) A **Divided Distribution if your vested balance is $500.00 or more:** You may
     roll over a specified portion to a qualified plan or an IRA (See Option #I) and
     have the remainder made payable directly to you, subject to the 25.95% income
     tax withholding on the latter portion (See Option #II).

If we have not received your **Benefit Election Form** and W4-P and M4-P tax
withholding certificates by May 15, 1998 we will distribute your vested balance
as summarized under Option II.

**\*\*This is a qualified plan.  All distributions are 100% taxable funds.\*\***

For a more detailed explanation of your alternatives, see the attached
"NOTICE OF ROLLOVER TREATMENT INCOME TAX WITHHOLDING AND OTHER SPECIAL
FEDERAL INCOME TAX TREATMENT".

Sincerely,
Medical Information Technology, Inc.

*Barbara*

Barbara A. Manzolillo
Chief Financial Officer and Treasurer
Plan Administrator

*Bill
- Please give me a call if/when
you'd like to review)
Barb*

**DEF001047**
**Confidential-Subject**
**to Protective Order**

# EXHIBIT 21

May 28, 1998                                                    Check # 002289

William G. Trainor                    SS# ████████
485 West St
Wrentham, MA    02093

Dear Billy,

The Medical Information Technology, Inc. Profit Sharing Trust has distributed the
following check dated 05/28/98 for your benefit:

   Ck#002289 to American Express Trust Company          $929,943.41

This represents a Trustee-to-Trustee payment, as per your request, and is a lump-sum
payment in full of the vested portion of your account in the Trust, calculated as follows:

|  |  |
|---|---|
| Your account Balance at 12-31-97 | $911,957.78 |
| Less: Forfeiture          (0%) | (0.00) |
| Vested Portion Due You     (100%) | $911,957.78 |
| Interest Calculated in 1998 on Vested Portion | 17,985.63 |
| Total Amount Due You | $929,943.41 |

- Void if not printed with lavender background - Void if not printed with lavender background -

**MEDICAL INFORMATION TECHNOLOGY, INC.**
   PROFIT SHARING TRUST                             May 28, 1998      CK#002289
   A. NEIL PAPPALARDO, TRUSTEE
                                        Fleet Bank of Massachusetts    5-13/110

Pay: *NINE HUNDRED TWENTY-NINE THOUSAND NINE HUNDRED FORTY-THREE AND*        Amount: $929,943.41
*41/100 DOLLARS*

To the        American Express Trust Company
Order of:     Custodian of William G. Trainor IRA
              Client ID # 17727644-1
              Attn:  Asset Transfers
              PO Box 6                             **This is a qualified plan.**
              Minneapolis, MN  55440               **All distributions are 100% taxable funds.**

Lump Sum Distribution: Trainor,William G. SS# ████████

   ⑈002289⑈   ⑉011000138⑈ 00188 07495⑈

DEF001045
Confidential-Subject
to Protective Order

# EXHIBIT 22

# MEDITECH

Medical Information Technology, Inc.  MEDITECH Circle, Westwood, Massachusetts 02090  (781) 821-3000 Fax (781) 329-9977

April 15, 1998

SS# ~~████████~~
D.O.H. 11/10/75
D.O.T. ~~04/13/98~~ *NOT YET DETERMINED*

David W. Hinchliffe
13 Newsome Pk
Jamaica Plain, MA   02130

Dear Dave,

In conjunction with the contemplated lump-sum distribution of your vested account balance of $1,101,907.57 (plus interest) by the Profit Sharing Trust please provide us with the enclosed **Benefit Election Form** and **W4-P** and **M4-P** tax withholding certificates within 30 days (by May 15, 1998).

A summary of your options is as follows:

I) **A Trustee-to-Trustee distribution made payable directly to a qualified plan or IRA:** Such a transfer will assure the tax-free status of your total eligible rollover. You must provide us with the name and address of said trustee together with a statement from such plan that it is a qualified section 401(a) or 403(a) or 403(b) plan willing to accept your rollover, otherwise, we are obligated to deduct 20% Federal and 5.95% Mass income tax withholding (total 25.95%) from your distribution.

II) **A Trust distribution made Payable Directly to You:** You receive your vested balance less the 25.95% income taxes we are required to withhold.  You have 60 days from date of receipt of this distribution to roll it over tax-free but you must provide the 25.95% deducted from your own personal funds.  If you are unable to do so any portion of your vested balance not rolled over becomes taxable income to you that year and is subject to early withdrawal penalties as well. Consequently, it is strongly advised that you plan for your retirement fund accordingly.

III) **A Divided Distribution if your vested balance is $500.00 or more:** You may roll over a specified portion to a qualified plan or an IRA (See Option #I) and have the remainder made payable directly to you, subject to the 25.95% income tax withholding on the latter portion (See Option #II).

If we have not received your **Benefit Election Form** and W4-P and M4-P tax withholding certificates by May 15, 1998 we will distribute your vested balance as summarized under Option II.

**\*\*This is a qualified plan.  All distributions are :**

For a more detailed explanation of your alternative: "NOTICE OF ROLLOVER TREATMENT INCOME TAX WITHHOLDIN( FEDERAL INCOME TAX TREATMENT".

Sincerely,
Medical Information Technology, Inc.

Barbara A. Manzolillo
Chief Financial Officer and Treasurer
Plan Administrator

*Dave*
*I'll need paperwork*
*from Vanguard —*
*Specifically for accepting*
*This roll-over.*
*Call me if you have*
*any questions. Thanks*
*Jen*

DEF001053
Confidential-Subject
to Protective Order

# EXHIBIT 23

**MEDICAL INFORMATION TECHNOLOGY, INC.**
PROFIT SHARING TRUST
A. NEIL PAPPALARDO, TRUSTEE

May 28, 1998                                                           Check # 002290

David W. Hinchliffe                    SS# 
13 Newsome Pk
Jamaica Plain, MA    02130

Dear Dave,

The Medical Information Technology, Inc. Profit Sharing Trust has distributed the
following check dated 05/28/98 for your benefit:

        Ck#002290 to Vanguard Fiduciary Trust Company        $1,123,639.39

This represents a Trustee-to-Trustee payment, as per your request, and is a lump-sum
payment in full of the vested portion of your account in the Trust, calculated as follows:

           Your account Balance at 12-31-97        $1,101,907.57
             Less: Forfeiture          (0%)                (0.00)
             Vested Portion Due You    (100%)      $1,101,907.57
             Interest Calculated in 1998 on Vested Portion   21,731.82
           Total Amount Due You                    $1,123,639.39

---

- Void if not printed with lavender background - Void if not printed with lavender background -

**MEDICAL INFORMATION TECHNOLOGY, INC.**
PROFIT SHARING TRUST
A. NEIL PAPPALARDO, TRUSTEE                    May 28, 1998    CK#002290

                                               Fleet Bank of Massachusetts    5-13/110

Pay: *ONE MILLION ONE HUNDRED TWENTY-THREE THOUSAND SIX HUNDRED*         Amount: $1,123,639.39
     *THIRTY-NINE AND 39/100 DOLLARS*

To the        Vanguard Fiduciary Trust Company
Order of:     Custodian of David W. Hinchliffe IRA
              Direct Rollover Unit
              PO Box 2600
              Valley Forge, PA  19482
                                               **This is a qualified plan.**
                                               **All distributions are 100% taxable funds.**

Lump Sum Distribution: Hinchliffe,David W. SS#

     ⑈002290⑈   ⑆011000138⑆  00188 07495⑈

**DEF001051**
**Confidential-Subject**
**to Protective Order**

# EXHIBIT 24

# MEDITECH

Medical Information Technology, Inc.

35

thirty five years

1969-2004

*Mailed 8/11/2004*
*return receipt requested*

SS# ▮▮▮▮▮▮▮
D.O.H. 08/03/1981
D.O.T. 07/26/2004

August 11, 2004

Michael Hubert
48 Narragansett Rd
Quincy, MA   02169

Dear Mike,

In conjunction with the contemplated lump-sum distribution of your vested account balance of $1,000,000.00 (plus interest) by the Profit Sharing Trust please provide us with the enclosed **Benefit Election Form** within 30 days **(by September 10, 2004)**.

A summary of your options is as follows:

I) A **Trustee-to-Trustee Distribution made payable directly to a Qualified Plan or TRADITIONAL IRA (not eligible for rollover into Roth IRA's):** Such a transfer will assure the tax-free status of your total eligible rollover. You must provide us with the name, address and telephone number of said trustee together with a statement from such plan that it is either a qualified section 401(a), 403(a), 403(b), 457(b), or a TRADITIONAL IRA plan willing to accept your rollover. Otherwise, we are obligated to deduct 20% Federal and 5.3% MA income tax withholding (total 25.3%) from your distribution.

II) A **Trust Distribution made Payable Directly to You:** You receive your vested balance less the 25.3% income taxes we are required to withhold. You have 60 days from date of receipt of this distribution to roll it over tax-free but you must provide the 25.3% deducted from your own personal funds. If you are unable to do so any portion of your vested balance not rolled over becomes taxable income to you that year and is subject to early withdrawal penalties as well. It is strongly advised that you plan for your retirement fund accordingly.

III) A **Divided Distribution if your vested balance is $500.00 or more:** You may roll over a specified portion to a Qualified Plan or TRADITIONAL IRA (See Option #I) and have the remainder made payable directly to you, subject to the 25.3% income tax withholding on the latter portion (See Option #II).

**\*\*This is a Qualified Plan. All account balances are pre-tax funds, thus all distributions are 100% taxable funds.\*\***

For a more detailed explanation of your alternatives, see the attached "SPECIAL TAX NOTICE REGARDING PLAN PAYMENTS: SAFE HARBOR EXPLANATION FOR PLANS QUALIFIED UNDER SECTION 401(a), 403(a), or 403(b)".

Sincerely,
Medical Information Technology, Inc.

Barbara A. Manzolillo
Chief Financial Officer and Treasurer
Plan Administrator

MEDITECH Circle, Westwood, Massachusetts 02090
Tel (781) 821-3000  Fax (781) 821-2199  www.meditech.com

DEF001041
Confidential-Subject
to Protective Order

# EXHIBIT 25

MEDICAL INFORMATION TECHNOLOGY, INC.
PROFIT SHARING TRUST
A. NEIL PAPPALARDO, TRUSTEE

September 16, 2004

Michael Hubert            SS#
48 Narragansett Rd
Quincy, MA   02169

Check # 004998

D.O.H. 08/03/1981
D.O.T. 07/26/2004

Dear Mike,

The Medical Information Technology, Inc. Profit Sharing Trust has distributed the
following check dated September 16, 2004 for your benefit:

Ck#004998 to E-Trade Securities                    $1,040,000.00

This represents a Trustee-to-Trustee payment, as per your request, and is a lump-sum
payment in full of the vested portion of your account in the Trust, calculated as follows:

| | |
|---|---|
| Your account Balance at 12-31-2003 | $1,039,086.04 |
| Less: 3-1-2004 In-Service Withdrawal | (39,086.04) |
| Vested Portion Due You     (100%) | $1,000,000.00 |
| Interest Calculated in 2004 on Vested Portion | 40,000.00 |
| Total Amount Due You | $1,040,000.00 |

- Void if not printed with lavender background - Void if not printed with lavender background -

**MEDICAL INFORMATION TECHNOLOGY, INC.**
PROFIT SHARING TRUST
A. NEIL PAPPALARDO, TRUSTEE

September 16, 2004      CK#004998

Fleet Bank of Massachusetts     5-13/110

Pay:  *ONE MILLION FORTY THOUSAND AND 00/100 DOLLARS*
**

Amount:  $1,040,000.00

To the
Order of:

E-Trade Securities
FBO Michael Hubert - IRA rollover
Account #6829-4611
60 State Street Suite 130
Boston, MA 02109

**This is a qualified plan.**
**All distributions are 100% taxable funds.**

Lump Sum Distribution Hubert,Michael SS#

⑈004998⑈  ⑆011000138⑆ 00188 07495⑈

DEF001040
Confidential-Subject
to Protective Order

# EXHIBIT 26

# MEDITECH
Medical Information Technology, Inc.



1969-2004

July 26, 2004

Michael Hubert
48 Narragansett Road
Quincy, MA 02169

Dear Michael:

I am writing to advise you that your employment with MEDITECH is being terminated effective immediately.

You are being terminated because you offered to sell information about the Company for your personal profit. Specifically, you sent a proposal in writing to Jerry Grossman on October 1, 2002, in which you offered to provide him with a MEDITECH document and information which you believed he did not possess in exchange for a seven figure payment. This blatant misconduct has caused us to lose all trust and confidence in our ability to have you work for MEDITECH and mandates your termination from employment.

Last month on June 3 the Company placed you on a paid leave of absence as soon as it was authorized to make any business use of the proposal which you sent to Grossman and which was obtained from Grossman as part of pending litigation. When we spoke last week you admitted making the proposal to Grossman, but offered no acceptable explanation. Today, the Board of Directors was appraised of my decision to terminate your employment, which is based solely upon your conduct in offering to sell Company information for personal profit.

The direct deposit of your final paycheck which covers your salary through July 31, 2004 and your sales bonus for the 2nd quarter will be made on the last business day of this month. We are providing you with information about your COBRA rights which will allow you to continue your medical benefits at your own expense as well as your rights to apply for unemployment benefits. You will be advised of your rights under the MEDITECH Profit Sharing Trust by separate correspondence. You should direct any questions to me.

We are profoundly disturbed by your conduct, which has left us with no alternative but to terminate your employment.

Sincerely,

Howard Messing, President and COO

cc: A. Neil Pappalardo and Lawrence A. Polimeno

MEDITECH Circle, Westwood, Massachusetts 02090
Tel (781) 821-3000  Fax (781) 821-2199  www.meditech.com

HU PF 000015

# EXHIBIT 27

EXHIBIT
HUBERT  16
JTY   7-14-05

September 7, 2004
48 Narragansett Rd.
Quincy, MA  02169

Barbara Manzolillo
Chief Financial Officer and Treasurer
Medical Information Technology, Inc
MEDITECH Circle
Westwood, MA  02190

Dear Barbara·

Enclosed is my signed Benefit Election Form authorizing you to rollover my funds from
the Medical Information Technology Profit Sharing Trust to my E*Trade account.
I appreciate your administrative management of the Trust over the years  It has done
well, but I have two concerns that I hope that you could provide assistance and/or insight.

First, I have been concerned that MEDITECH has been reluctant to use an independent
valuation for the MEDITECH stock. It is my belief that the MEDITECH stock is
undervalued and thus my distribution will be less than what I should be receiving.
Second, distributions are based upon an individual's account balance of the prior
December 31st (plus 0.5% monthly interest, minus recent distributions) and not the most
recent quarterly valuation

There is now more than $107,000,000 of MEDITECH stock in the trust (based on
$27/share). This is 84% of all assets. Since the value of the MEDITECH stock has a
major impact on distributions, I find it surprising that an independent valuation is has not
been used.

I am also concerned that my distribution will be based upon my account balance of
December 31, 2003, and not the current value. It is acknowledged that the condensed
description of the Trust describes how the distribution will be made, but it disregards the
subsequent contributions to the plan and increase in the valuation of the MEDITECH
stock. I find it interesting that when I sold MEDITECH stock on the August 6, 2003,
Neil Pappalardo had determined the price of $23/share. By January 2004, the stock value
had increased 13% to $26/share. Interestingly, from the second to the fourth quarter
2003, equity per share went down 5% and net income went down 6%. Employees that
took distributions from the Trust as late as December 2003, would have received a
distribution based upon the price of $22 per share determined around November 2002.
Employees receiving distributions in December 2003 would receive six percent more
than their December 2002 account balance, but those receiving distribution two months
later would receive about 24% more. This increase is mostly due to the revaluation of the
MEDITECH stock and not the 2003 share of contributions and forfeitures ($4,255 in my
account). By making nominal increases in stock value throughout the year, and then

Confidential-Subject
to Protective Order

M0002357

making a large increase in the stock valuation at the end of the year, penalizes those that sell stock or receive distributions from the Trust throughout the year

The recent letter that you sent me regarding the Special Meeting of Shareholders notes that since June of this year, the Trust has been paying $27/share for MEDITECH stock. (This notice was also filed with the SEC.) If Neil has already determined that $27/share is the fair price for the MEDITECH stock, then my distribution, at a minimum, should be based on the June price of $27/share. It appears that the stock value is considered periodically, and if needed it is adjusted up about three times a year. I believe it would be reasonable to recalculate individual account balances each quarter (using the most current stock value) and then making appropriate distributions.

For example, my account balance within the Trust was $1,039,086, on December 31, 2003. As you recall, I and other long-term employees were informed in November that we were to roll over funds in excess of $1,000,000. On March, I rolled over $39,086 (plus one percent interest) into my E*Trade IRA. Since January, the Trust assets have grown significantly more than the 0.5% monthly interest provided to subsequent distributions. The Trust has received at least $4,100,000 in contributions from the company. In addition, the Trust has received at least $3,000,000 in dividends. According to the recent filing with the SEC, the Trust has been purchasing MEDITECH stock at $27/share since June. The Trust owns at least 3,986,286 shares of MEDITECH stock. If each share went up by one dollar, the Trust would have additional assets of $3,986,286. (Of course, I would not know about the fund distributions or other transactions made during the same time.) It would be reasonable to estimate that the Trust assets have grown by about $10,000,000 since December 31st. The largest growth in the Trust assets each year is always the revaluation of the MEDITECH stock. The policy of determining the plan assets once each year, even though the Trust increases the funds paid for MEDITECH stock throughout the year, is detrimental to those employees that receive distributions later within a calendar year. I estimate that my Trust balance at the end of August should be close to $1,100,000 (at $27/share). If an independent valuation of the stock were utilized, my Trust balance might be $1,300,000 or even more.

I do not expect that this matter will be resolved quickly. In the interim, please transfer my funds as authorized on the attached form. My acceptance of the transfer of these funds does not limit my ability to seek further resolution to these matters.

Sincerely,

Michael Hubert

Cc: Neil Pappalardo, Chairman and CEO, Medical Information Technology

Confidential-Subject
to Protective Order

M0002358

# EXHIBIT 28

# MEDITECH Financial History



**10 Year Financial History**

## In Millions Except for per Share Data

*# 23.8 M*

*INCREASED OPERATIONS INVESMENT ↓*

| Year | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | *1997* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Revenue | 24.3 | 31.5 | 49.5 | 54.2 | 64.0 | 71.3 | 84.2 | 98.7 | 115.7 | 131.8 | *131.8* |
| Service Revenue | 15.2 | 17.4 | 19.4 | 23.5 | 28.3 | 34.0 | 40.0 | 45.0 | 52.2 | 62.0 | *62* |
| Total Revenue | 39.5 | 48.9 | 68.8 | 77.7 | 92.3 | 105.3 | 124.2 | 143.7 | 167.9 | 193.8 | *193.8* |
| Operating Expense | 21.8 | 27.4 | 38.5 | 47.3 | 55.4 | 64.0 | 73.0 | 85.2 | 98.3 | 115.5 | *138.7* |
| Operating Income | 17.7 | 21.5 | 30.3 | 30.4 | 36.9 | 41.3 | 51.3 | 58.5 | 69.6 | 78.3 | *55.1* |
| Other Income | 2.0 | 2.3 | 0.9 | 1.7 | 1.8 | 8.2 | 2.9 | 6.4 | 8.9 | 12.2 | *12.2* |
| Other Expense | 0.1 | 1.0 | 1.5 | 1.6 | 0.6 | 0.2 | 0.2 | 5.2 | 4.5 | 5.9 | *5.9* |
| Pre-tax Income | 19.6 | 22.8 | 29.7 | 30.5 | 38.1 | 49.3 | 54.0 | 59.7 | 74.0 | 84.6 | *73.2* |
| Income Taxes | 7.4 | 8.5 | 11.3 | 11.7 | 14.9 | 19.7 | 21.8 | 22.6 | 29.6 | 34.4 | *29.6* |
| Net Profit | 12.2 | 14.3 | 18.4 | 18.8 | 23.2 | 29.6 | 32.2 | 37.1 | 44.4 | 50.3 | *43.5* |
| Dividends Paid | 4.3 | 6.1 | 7.1 | 10.2 | 10.3 | 13.4 | 16.3 | 19.6 | 22.2 | 26.9 | *26.9* |
| Total Assets | 47.5 | 69.6 | 92.1 | 94.2 | 99.3 | 118.9 | 137.8 | 198.0 | 218.3 | 263.1 | *239.2* |
| Total Liabilities | 8.9 | 22.0 | 33.3 | 25.7 | 16.9 | 18.9 | 20.0 | 60.2 | 55.9 | 73.6 | *73.6* |
| Shareholder Equity | 38.6 | 47.6 | 58.8 | 68.5 | 82.4 | 100.0 | 117.8 | 137.8 | 162.4 | 189.5 | *166.3* |
| Common Shares | 15.2 | 15.3 | 15.3 | 15.4 | 15.5 | 15.6 | 15.7 | 15.8 | 15.9 | 16.1 | *16.1* |
| Earnings/share | 0.81 | 0.94 | 1.21 | 1.23 | 1.50 | 1.90 | 2.05 | 2.34 | 2.78 | 3.13 | *2.70* |
| Divs Paid/share | 0.29 | 0.40 | 0.47 | 0.67 | 0.67 | 0.87 | 1.04 | 1.24 | 1.40 | 1.68 | *1.68* |
| Book Value/share | 2.54 | 3.11 | 3.85 | 4.46 | 5.33 | 6.43 | 7.51 | 8.71 | 10.19 | 11.78 | *10.33* |
| Fair Value/share | 6.83 | 8.00 | 10.00 | 10.67 | 12.67 | 14.00 | 17.00 | 20.00 | 24.00 | 27.00 | *27.00* |

*P/E  Ratio  → 8.5  8.5   83   86   84   74   8.3   8.5   86   87     10.0*

*% Return  on Revenue  ↳  25.8  26.4  (25.9)     22.4*

*'81  '82  '83  '84  '85  '86  '87*
*5.6  5.9  6.4  7.8  8.1  8.7  8.5*

**HUB 475**

# EXHIBIT 29

# FORTUNE 5 HUNDRED RANKED BY PERFORMANCE

## HIGHEST RETURNS ON... REVENUES

| RANK | | 500 REVENUES RANK | 1997 PROFITS as % of revenues |
|---|---|---|---|
| 1 | MICROSOFT | 137 | |
| 2 | INTEL | 38 | |
| 3 | COCA-COLA | 68 | |
| 4 | SCHERING-PLOUGH | 236 | |
| 5 | MERCK | 46 | |
| 6 | BANK OF NEW YORK CO. | 279 | |
| 7 | BRISTOL-MYERS SQUIBB | 78 | |
| 8 | CORESTATES FINANCIAL CORP. | 340 | |
| 9 | EMC | 477 | |
| 10 | BERKSHIRE HATHAWAY | 150 | |
| 11 | PFIZER | 124 | |
| 12 | ABBOTT LABORATORIES | 129 | |
| 13 | TEXAS INSTRUMENTS | 148 | |
| 14 | COMERICA | 451 | |
| 15 | CENDANT | 295 | |
| 16 | CISCO SYSTEMS | 253 | 16.3 |
| 17 | FLEET FINANCIAL GROUP | 193 | 16.1 |
| 18 | UNITED SERVICES AUTO ASSN. | 207 | 16.0 |
| 19 | BELLSOUTH | 56 | 15.9 |
| 20 | NATIONAL CITY CORP. | 305 | 15.7 |
| 21 | ALLTEL | 437 | |
| 22 | PNC BANK CORP. | 231 | |
| 23 | FIRST CHICAGO NBD CORP. | 154 | |
| 24 | GANNETT | 322 | |
| 25 | MELLON BANK CORP. | 306 | |
| 26 | JOHNSON & JOHNSON | 45 | 14.6 |
| 27 | SUNTRUST BANKS | 331 | |
| 28 | LINCOLN NATIONAL | 254 | |
| 29 | ORACLE | 280 | |
| 30 | MCDONALD'S | 135 | |
| 31 | AMERICAN HOME PRODUCTS | 98 | |
| 32 | AMERITECH | 82 | |
| 33 | GILLETTE | 155 | |
| 34 | NATIONSBANK CORP. | 54 | |
| 35 | MINNESOTA MINING & MFG. | 89 | |
| 36 | KEYCORP | 248 | |
| 37 | NORWEST CORP. | 157 | |
| 38 | NORFOLK SOUTHERN | 304 | |
| 39 | MBNA | 333 | |
| 40 | BANKAMERICA CORP. | 47 | |
| 41 | SLM HOLDING | 385 | |
| 42 | FIRST UNION CORP. | 96 | |
| 43 | KNIGHT-RIDDER | 457 | |
| 44 | BANKBOSTON CORP. | 238 | |
| 45 | CAROLINA POWER & LIGHT | 469 | |
| 46 | PITNEY BOWES | 361 | 12.9 |
| 47 | AUTOMATIC DATA PROCESSING | 359 | 12.5 |
| 48 | HOUSEHOLD INTERNATIONAL | 287 | 12.5 |
| 49 | AIRTOUCH COMMUNICATIONS | 406 | 12.5 |
| 50 | ALLSTATE | 39 | 12.4 |
| | THE 500 MEDIAN | | 4.9 |

## HIGHEST RETURNS ON... ASSETS

| RANK | | 500 REVENUES RANK | 1997 PROFITS as % of assets |
|---|---|---|---|
| 1 | COCA-COLA | 68 | |
| 2 | INTEL | 38 | |
| 3 | MICROSOFT | 137 | |
| 4 | SCHERING-PLOUGH | 236 | |
| 5 | DELL COMPUTER | 125 | |
| 6 | BRISTOL-MYERS SQUIBB | 78 | 21.4 |
| 7 | WESTERN DIGITAL | 350 | 20.5 |
| 8 | CISCO SYSTEMS | 253 | |
| 9 | LYONDELL PETROCHEMICAL | 484 | |
| 10 | MERCK | 46 | 17.9 |
| 11 | ORACLE | 280 | |
| 12 | ABBOTT LABORATORIES | 129 | |
| 13 | TEXAS INSTRUMENTS | 148 | |
| 14 | 3COM | 455 | |
| 15 | SUN MICROSYSTEMS | 184 | |
| 16 | MINNESOTA MINING & MFG. | 89 | 16.0 |
| 17 | GAP | 249 | 16.0 |
| 18 | EMC | 477 | 15.0 |
| 19 | JOHNSON & JOHNSON | 49 | 15.0 |
| 20 | AVON PRODUCTS | 308 | 14.0 |
| 21 | NIKE | 168 | |
| 22 | PFIZER | 124 | |
| 23 | FLEETWOOD ENTERPRISES | 485 | |
| 24 | GILLETTE | 155 | |
| 25 | COMPAQ COMPUTER | 42 | |
| 26 | GENUINE PARTS | 271 | 12. |
| 27 | PROCTER & GAMBLE | 20 | 12. |
| 28 | DOVER | 332 | 12. |
| 29 | US AIRWAYS GROUP | 186 | 12. |
| 30 | MORTON INTERNATIONAL | 403 | 12. |
| 31 | AUTOMATIC DATA PROCESSING | 359 | |
| 32 | DUN | 208 | |
| 33 | W.W. GRAINGER | 355 | |
| 34 | ALLEGHENY TELEDYNE | 389 | |
| 35 | GENERAL MILLS | 284 | |
| 36 | PHILIP MORRIS | 9 | 11 |
| 37 | KELLOGG | 233 | 11 |
| 38 | CAMPBELL SOUP | 195 | 11 |
| 39 | ILLINOIS TOOL WORKS | 302 | 10 |
| 40 | WARNER-LAMBERT | 192 | 10 |
| 41 | PUBLIX SUPER MARKETS | 139 | |
| 42 | PEPSICO | 31 | |
| 43 | VF | 301 | |
| 44 | ESTÉE LAUDER | 425 | |
| 45 | ROHM & HAAS | 371 | |
| 46 | PPG INDUSTRIES | 209 | 10.4 |
| 47 | HOME DEPOT | 44 | 10.4 |
| 48 | WALGREEN | 108 | 10.4 |
| 49 | GANNETT | 322 | 10.3 |
| 50 | RICHFOOD HOLDINGS | 420 | 10.2 |
| | THE 500 MEDIAN | | |

## HIGHEST RETURNS ON... STOCKHOLDERS' EQUITY

| RANK | | 500 REVENUES RANK | 1997 PROFITS as % of equity |
|---|---|---|---|
| 1 | AMERISOURCE HEALTH | 198 | |
| 2 | US AIRWAYS GROUP | 186 | |
| 3 | AVON PRODUCTS | 308 | |
| 4 | CSX | 486 | |
| 5 | GENERAL MILLS | 284 | |
| 6 | SLM HOLDING | 385 | 75.2 |
| 7 | DELL COMPUTER | 125 | 73. |
| 8 | COCA-COLA | 68 | 56.5 |
| 9 | W.R. GRACE | 426 | 55. |
| 10 | KELLOGG | 233 | 54.7 |
| 11 | SCHERING-PLOUGH | 236 | |
| 12 | CAMPBELL SOUP | 195 | |
| 13 | LYONDELL PETROCHEMICAL | 484 | |
| 14 | RALSTON PURINA | 252 | |
| 15 | BRISTOL-MYERS SQUIBB | 78 | |
| 16 | WESTERN DIGITAL | 350 | 43.2 |
| 17 | PHILIP MORRIS | 9 | 42.3 |
| 18 | CONTINENTAL AIRLINES | 218 | 42.0 |
| 19 | ABBOTT LABORATORIES | 129 | 41.9 |
| 20 | UAL | 75 | 40.6 |
| 21 | ARAMARK | 261 | |
| 22 | HERSHEY FOODS | 345 | |
| 23 | READER'S DIGEST ASSOCIATION | 490 | |
| 24 | GENERAL MOTORS | 1 | |
| 25 | BORDEN | 414 | |
| 26 | MERCK | 46 | 38.6 |
| 27 | INTEL | 38 | 38.0 |
| 28 | MINNESOTA MINING & MFG. | 89 | 35.8 |
| 29 | CATERPILLAR | 66 | 35. |
| 30 | CORNING | 356 | 35.3 |
| 31 | ITT | 48 | |
| 32 | ORACLE | 280 | |
| 33 | COLGATE-PALMOLIVE | 171 | |
| 34 | VF | 249 | |
| 35 | NEXTFOODS | 156 | |
| 36 | MICROSOFT | 137 | 32. |
| 37 | ESTÉE LAUDER | 425 | 31. |
| 38 | MBNA | 333 | 31. |
| 39 | SERVICEMASTER | 373 | 31. |
| 40 | PEPSICO | 31 | |
| 41 | INTL. BUSINESS MACHINES | 6 | |
| 42 | WARNER-LAMBERT | 192 | |
| 43 | TEXAS INSTRUMENTS | 148 | |
| 44 | ALLEGHENY TELEDYNE | 389 | |
| 45 | GILLETTE | 155 | |
| 46 | MAYTAG | 421 | 29. |
| 47 | ANHEUSER-BUSCH | 141 | 29. |
| 48 | TIMES MIRROR | 434 | 29. |
| 49 | PPG INDUSTRIES | 209 | 29. |
| 50 | PROCTER & GAMBLE | 20 | 28. |
| | THE 500 MEDIAN | | |

CONTINUED

SUBSCRIBE
LOG ON

# EXHIBIT 30

**FORBES MAGAZINE**                    **DECEMBER 01, 1997**

**MANAGEMENT STRATEGIES TRENDS**

## The Biggest Private Companies
### The Top 500 Private Companies

Though he owns just 1.5% of SAIC's stock, J. Robert Beyster doesn't have to worry about what Wall Street analysts think of his company. His bosses work for him.

# Turning employees into stakeholders

### By Carolyn T. Geer

J ROBERT BEYSTER, 73, founder and chief executive officer of Science Applications International Corp. in San Diego, Calif., has built one hell of a company. He opened the doors in 1969 as a scientific consulting firm with a dozen employees. Today SAIC is a 25,000-employee, high-tech powerhouse that recently brought its revenues to $3.4 billion by acquiring Bellcore, the Morristown, N.J.-based research arm of the regional Bell operating companies.

Had Beyster kept 100% of SAIC, he'd be worth nearly $2 billion today. Instead he owns just 1.5%, cashable for about $27 million. Most of the rest belongs to employees at all levels. How does Beyster feel about leaving so much money on the table? Pretty good. "How much money can you spend anyway?" asks the nuclear physicist, who carries work home in brown paper bags.

SAIC is a high-technology research and engineering firm, the 55th-largest private company in America before the Bellcore deal. Include that, and SAIC rises to number 41 in the rankings. SAIC sets up and integrates computer and telecommunications networks. It is also on the cutting edge of employee compensation and motivation.

"We turn employees into stakeholders," Beyster says. "I really believe it makes a difference, and I think it's fair." Beyster walks like he talks. Employees own 90% of the company; the other 10% is held by consultants or employees who left in the early days before SAIC instituted a requirement that departing owners sell their shares back to the company.

**December 01, 1997**
**Table of Contents:**
**On The Cover:**
-The Biggest Private Companies: Spread the wealth
-The Biggest Private Companies: Capitalist populista
-The Biggest Private Companies: Sweaty equity
-The Biggest Private Companies: American original
-The Biggest Private Companies: Wall Street? No way.

**Management, Strategies, Trends:**
-Companies: Dr. Ranieri on call
-Technology: Dell dives
-Leisure: High noon in Vegas
-Profile: Blue-box special

-"Prices are insane"
-Taking lunch
-Panned out?
-Starting Your Own Business: Bytes and billboards
-Up & Comers: Kiddie dollars
-Something blue
-Hot off the press
-The Kinko's empire
-Prostate problems

**International:**
-Cyber malaise
-Capitalist czars

**Law & Issues:**
-The swampmakers
-The law: Log on and litigate
-G-men as gestapo
-Defeating stereotypes
-Nuclear farce

**Technology:**
-Checkmate!
-Quick-change chips
-Tale of the tape

**Departments:**
-Side Lines
-Follow-Through
-On My Mind
-Readers Say
-Fact and Comment
-Other Comments

**HUB 503**

Beyster conducted a study a few years ago and found that among employees who had been at SAIC at least three years, those who had never bought stock had a turnover rate of 12% while those who had bought stock—no matter how little—had a turnover rate of just 5%.

Land a new contract for the firm and you get a chance to buy additional shares, in proportion to the value of the contract. This is just one part of an elaborate system of retirement, stock purchase and stock incentive plans at SAIC; its four different employee-ownership programs are among the most sophisticated in the country.

The retirement plans serve as a base for broad employee ownership. The company's 401(k) plan allows employees to choose between various Vanguard funds and SAIC stock; the company's matching contribution is made in SAIC stock. There's also an Employee Stock Ownership Plan (ESOP) that covers everyone.

Then there are stock incentive programs designed to reward and retain particularly good workers. SAIC sets aside shares each year to be offered as stock options and stock bonuses to employees based on their individual performances—as with the rewards for landing new contracts. By year-end, about half of the employees receive shares. Options and bonuses vest after four years.

Finally, every year 200 employees—identified as future leaders—each get $25,000 in SAIC stock in a trust that vests over seven years. The vesting provides the "glue," as Beyster calls it: what they'd forfeit if they left the company.

Unlike other private companies that require employees to sell their shares back to the company, SAIC-ites can trade with each other through Bull, Inc., SAIC's registered broker-dealer. In short, the company maintains an internal stock market where employees can buy or sell shares; the only restriction is that the market is limited to people who work at SAIC.

The SAIC board sets its company's stock price four times a year, using a formula based on net income, shares outstanding and a "market factor" monitored by investment bank Houlihan

-Commentary
-Transparent Eyeball
-On-Line Pulse
-Flashbacks
-Thoughts

**Columnists:**
-Business Strategy:
Brand-name buildup
-Ideas Matter: The
exuberant Wade Cook
-Backseat Driver: The
worm in the apple
-The Software Horizon:
The Best Multimedia
-Insights: Reno Rewrites
Your Operating System

**Money & Investments:**
-The Funds: Stratton
Small-Cap
-The Funds: Supply and
demand
-The Funds: Bond fund
buying
-The Forbes/Barra Wall
Street Review
-Streetwalker
-A time to short?

**Investment Columnists:**
-The Contrarian:
Volatility is not risk
-Portfolio Strategy: Go
slow: inflation ahead
-Stock Trends:
Diagnosticians who can't
prescribe
-Market Trends: If it
ain't controversial, don't
buy it

**The Forbes Life:**
-Outdoors: Tarpon
rangers
-Collecting: Not the
everyday silver
-The Flamologist
-Pablo Picasso
-The Arts: Los Angeles
gets arty
-Journeys: No lazy river
-Re-viewing: Turkish
delight

**Charticle:**
-Bond with bonds

**Management,
Strategies, Trends:**
-Jerky turkey

HUB 504

factor" monitored by investment bank Houlihan Lokey Howard &Zukin. The market factor values the stock at a multiple consistent with publicly traded peers such as Computer Sciences and Electronic Data Systems.



One thing SAIC stakeholders need not worry about: sudden market crashes. During the 1987 crash, when the stock market fell 20%, SAIC shares dropped only 5%. After this year's October swoon, SAIC stock programs' director Karen Garsson didn't get a single shareholder call.

Whether because of the nature of ownership or despite it, SAIC has been a terrific growth stock. In the fiscal year ended Jan. 31, 1997, SAIC shares returned 34%, beating the S&P's 26% gain. Over the past five and ten years, the stock posted annualized returns of 18.4% and 14.3%, respectively, in line with the S&P's 17% and 14.5% returns for the same periods.

Several hundred of SAIC's 25,000 employees are millionaires. Many more, undoubtedly, will become rich.

Narri Cooper, 34, a director in SAIC's management information systems' department, has worked at the company for more than a decade. She explains what ownership in the firm means to her: "When I'm making a decision, I don't just make it as an information technology manager, I make it as an owner."

SAIC makes sure she feels like an owner, too. "You have to have a program of participation for the employees as well, whereby they can ask questions, help solve problems, help direct the company," says Beyster. At SAIC, 9 employees sit on the 22-person board, alongside former Defense Department heavyweights like retired U.S. Navy Admiral B.R. Inman. Employees at all levels regularly discuss SAIC's business opportunities in areas such as wireless technology, the year-2000 problem, electronic commerce, computer security and the Internet.

"There is a certain Darwinian chaos that exists within SAIC," explains Brian Weaver, a health care technology expert who joined SAIC three years ago after working at IBM and running his own biotechnology company. "SAIC is an enormous enterprise incubator," Weaver says.

*Handwritten notes:*

P/E
SAIC          30
Comp Sciences  12
EDS            29

**HUB 505**

Forbes (12-1-97) The Biggest Private Companies                    Page 5 of 5

"Good ideas quickly rise to the top of the
organization, and you are permitted absolute
latitude to assemble the necessary resources and
go forward and build your idea. Ultimately you
are judged by your performance in the
marketplace."

Dr. B., as Beyster is known by close associates,
rarely sits for interviews. But he talked with
FORBES in good part because he wants to
propagate his concepts of employee-ownership.
In 1986 he set up a nonprofit organization to
promote the idea of employee-owned
companies. His La Jolla, Calif. Foundation for
Enterprise Development helps companies set up
equity compensation plans. Recent
private-company converts include two
temporary placement agencies that specialize in
engineering and financial jobs, a travel agency
and a paging company, according to associate
director Ronald Bernstein.

Beysterism is spreading. "In the last few years
we've seen a dramatic increase in privately held
companies that give everybody stock options,"
reports Corey Rosen, director of the National
Center for Employee Ownership. What are
these companies finding? That sharing the
wealth with their workers works wonders.

Sidebars:

- A scientific journey
- The book on Dr. B.

| back to top |

Read more:

- BY Carolyn T. Geer
- On The Cover
- The Biggest Private Companies
- From December 01, '97 issue



© 1998 Forbes Inc. Terms, Conditions and Notices

**HUB 506**

http://www.forbes.com/forbes/97/1201/6012154a.htm                    4/21/98

# EXHIBIT 31

P/E Ratio
4/18/98
58
34
30
sold
48
8.7
150

# 1997 Top 100

| Rank | Company Name Location Phone Web Site | Revenues (m) 1996 1995 1994 | Year Founded Ownership Employees | Top Company Executives | Revenues outside US Spending on R&D |
|---|---|---|---|---|---|
| 2 | HBOC Atlanta (800) 981-8601 www.hboc.com | 796.6 607.2 454 | 1974 Public 4,500+ | Charles W. McCall Pres./CEO Jay P. Gilbertson Senior VP/CFO | 3% 11% |
| 1 | SMS Malvern, Pa. (610) 219-6300 www.smed.com | 767.4 650.6 550.8 | 1969 Public 5,000 | R. James Macaleer Chairman Marvin S. Cadwell Pres./CEO | 13% 54.6m |
| 4 | SAIC San Diego (619) 535-4450 www.saic.com | 300 | 1969 Private 26,000 | David A. Cox Sector VP D.A. Brooks Group VP | 5m |
| 9 | Medic Computer Systems, Inc. Raleigh, N.C. (800) 334-8534 www.medcmp.com | 191.7 153.5 115 | 1982 Public 1,200+ | John P. McConnell Pres./CEO Alan Winchester Pres. Clinical Division | 10m |
| 6 | Cerner Corp. Kansas City, Mo. (816) 221-1024 www.cerner.com | 189.1 186.9 156 | 1979 Public 1,575 | Neal L. Patterson Chairman/CEO Clifford W. Illig Pres./COO | <10% 23% |
| 8 | MEDITECH Westwood, Mass. (617) 821-3000 www.meditech.com | 168 144 124.2 | 1969 Private 1,650+ | Lawrence A. Polimeno Pres./CEO Howard Messing Executive VP | 10% |
| 11 | IDX Systems Corp. Burlington, Vt. (802) 862-1022 www.idx.com | 157.6 128.1 104.7 | 1969 Public 1,200+ | Richard Tarrant CEO Robert Hoehl Chairman | 0 24m |
| 7 | Lanier Healthcare Atlanta (770) 496-9500 www.lanier.com/ healthcare | 150 | 1934 Public 6,600 | Tom Stampiglia VP, GM Larry Hoot Dir., Sales/Marketing | 0 22m |
| 10 | Eclipsis Corp. Atlanta (800) 869-8300 www.eclipsys.com | 140 | 1969 Private 800+ | Harvey J. Wilson Chairman/CEO Terrence MacAleer Senior VP | 18% |
| 12 | CSC Healthcare Farmington Hills, Mich. (800) CSC-HS99 www.csc.com | 85 | 1974 Public 900 | George S. Huntzinger Pres. Mel Von Howe VP Marketing/Applied Technologies | |
| 23 | Physician Computer Network, Inc. Morris Plains, N.J. (800) 221-1476 www.pcn.com | 84.8 39.6 20.5 | 1983 Public 742 | Hank Green Pres./CEO Jack Mortell Executive VP/COO | 0 5.8m |
| 3 | Medaphis Corp. Atlanta (770) 444-5300 www.medaphis.com | 81.6 60.5 50.4 | 1985 Public 9,375 | David E. McDowell Chairman/CEO Jerome H. Baglien Senior VP, Finance/CFO | 3.2m |
| 16 | Sunquest Info. Systems, Inc. Tucson, Ariz. (520) 570-2000 www.sunquest.com | 81 61.5 62.6 | 1979 Public 600+ | Sidney A. Goldblatt Pres./CEO Rich Wesson COO | <10% 10m |

Healthcare Infor

EXHIBIT 32

*science applications international corp*

*0000353 394*

SAIC STOCK VALUE FROM FORMULA  - FORM 8-K, April 1998

On April 10, 1998 the Board of Directors established the price of the Class A Common Stock of the Registrant at $47.22.  Pursuant to the Registrant's Certificate of Incorporation, the price applicable to shares of Class B Common Stock of the Registrant is equal to five times the price of the Class A Common Stock.

The price of the Class A Common Stock is established by the Board of Directors pursuant to a valuation process which includes a stock price formula. The following table sets forth information concerning the formula price for the Class A Common Stock, the applicable price for the Class B Common Stock and each of the variables contained in the formula, including the market factor, in effect for the periods beginning on the dates indicated.  The Board of Directors sets the market factor at the value which causes the formula to yield the price which the Board of Directors believes reflects a fair market value.

| Date | Market Factor | "E" or Stockholders Equity(1) | "W1" or Shares Outstanding(2) | "P" or Earnings(3) | "W" or Weighted Avg. Shares Outstanding(4) | Price Per Share of Class A Common Stock | Price Per Share of Class B Common Stock |
|------|------|------|------|------|------|------|------|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> $ | <C> $ |
| January 10, 1997 | 2.40 | 507,235,000 | 52,094,779 | 62,008,000 | 52,003,218 | 25.96 | 129.80 |
| April 11, 1997 | 2.40 | 527,459,000 | 52,688,394 | 63,680,000 | 52,308,789 | 26.55 | 132.75 |
| July 11, 1997 | 2.70 | 559,284,000 | 53,556,198 | 67,459,000 | 52,695,291 | 30.01 | 150.05 |
| October 10, 1997 | 3.20 | 583,211,000 | 54,369,492 | 70,701,000 | 53,229,203 | 34.78 | 173.90 |
| January 9, 1998 | 3.60 | 663,811,000 | 55,148,817 | 71,804,000 | 53,993,996 | 39.13 | 195.65 |
| April 10, 1998 | 3.90 | 754,778,000 | 57,511,742 | 84,794,000 | 54,889,045 | 47.22 | 236.10 |

(1) "E" or Stockholders Equity = the stockholders' equity of the Registrant at the end of the fiscal quarter immediately preceding the date on which a price determination is to occur.

(2) "W1" or Shares Outstanding = the number of outstanding common shares and common share equivalents at the end of that fiscal quarter.

(3) "P" or Earnings = the earnings of the Registrant for the four fiscal quarters immediately preceding the price determination.

(4) "W" or Weighted Average Shares Outstanding = the weighted average number of outstanding common shares and common share equivalents for the four fiscal quarters immediately preceding the price determination, as used by the Registrant in computing diluted earnings per share.

Formula Price =  $\dfrac{E}{W1} + \dfrac{5.66 \times N \times P}{W}$

*same is 2004*
*market factor now 2.20*

*Jan 9 2004  Market Factor " 2.2*

HUB 507

# EXHIBIT 33

DUFF & PHELPS, LLC ▪ 311 SOUTH WACKER DRIVE, SUITE 4200 ▪ CHICAGO, IL 60606 ▪ TEL 312-697-4600 ▪ FAX 312-697-4994

# DUFF&PHELPS

February 19, 2008

Michael Collora, Esq.
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA  02210

**Subject:** ***Estimation of Damages for Participants in the Meditech Profit Sharing Trust***
***Michael P. Hubert, et al., v. Medical Information Technology Profit Sharing***
***Plan, et al.***

Dear Mr. Collora:

I was retained as a consulting expert to assist Dwyer & Collora, LLP ("Dwyer & Collora" or
"you") in your rendering of legal services in connection with the above referenced matter.

I was asked to estimate the fair market value of the common stock of Medical Information
Technology, Inc. (the "Company" or "Meditech") as of December 31, 1997 (the "Valuation
Date") and to prepare an expert report (the "Report") related to my work on this matter.

The Report was prepared and issued on February 18, 2008 and provided my opinion of the fair
market value of the common stock of Meditech at $21.62 per share.

I also reviewed the following documents related to the administration of the Meditech Profit
Sharing Trust (the "Trust"):

- Meditech Profit Sharing Trust Financial Report for 1998;

- Meditech Profit Sharing Trust Condensed Description of Plan;

- memorandum from A. Neil Pappalardo (trustee of the Trust and CEO of Meditech) to
  Barbara A. Manzolillo related to the annual valuation of trust assets and dated January
  2, 1998;

- the Company's Securities and Exchange Commission Form 10-K for the fiscal year
  ended December 31, 1997; and

- the Report to the Board of Directors, Quarter Ended December 31, 1997, Board of
  Directors Meeting, January 26, 1998.

Michael Collora, Esq.
February 19, 2008
Page 2

The January 2, 1998 memorandum from the trustee to Barbara A. Manzolillo briefly describes the thought process related to the valuation of the Company's common stock as follows:

> "FMV share has been set at about 8 to 8 1/2 times earnings and averages 2.3 times book value in recent years. (See 10 Yr Historical Summary). These ratios for capitalization purposes are realistic for a closely held private company with continued moderate growth and lack of instant liquidity of privately held stock. Comparing ourselves to public companies serves no useful purpose. All such companies operate in multiple market segments such as hardware, software, facilities management, and consulting services while we operate in only one; software. In addition, the current environment among such public corporations is one of constant merging, downsizing, and consolidation, as opposed to our unchanged organizational structure."

Based on my review of information and documents related to this matter, it does not appear that the trustee of the Trust or the Board of Directors ("Board") of the Company used generally accepted business valuation approaches or methods in reaching an opinion as to the fair market value of the Company's common stock as of December 31, 1997.

No empirical justification for the selection of the "8 to 8 1/2 times earnings" or the "2.3 times book value" used in the analysis of the Company's common stock contained in the Trust is presented or discussed. The selection of these multiples appears to be arbitrary and based on unsupported personal opinion rather than sound valuation analytics. Furthermore, an "8 1/2 times earnings" multiple equates to an earnings before interest, taxes, depreciation and amortization (EBITDA) multiple of 4.4. An EBITDA multiple of 4.4 for a growing and highly profitable software development company in 1997 would be considered abnormally low by any objective measure.

My Report provides my estimate of the fair market value of the Company as of the Valuation Date. Based on information presented my Report, the fair market value of the Company as of the Valuation Date was $21.62 per share. This $21.62 price per share is over 60 percent higher than the $13.50 per share number used by the trustee to estimate the fair market value of the Company's common stock contained in the Trust.

According to the *Meditech Profit Sharing Trust Financial Report for 1998*, the assets contained in the Trust as of the Valuation Date were as follows:

| Trust Assets | | |
|---|---|---|
| Cash | $ | 82,104 |
| US Treasury Notes | $ | 24,544,316 |
| Accrued Interest | $ | 326,221 |
| Meditech Stock | $ | 39,663,270 |
| Employee Loans | $ | 1,347,950 |
| Total Assets of the Trust | $ | 65,963,861 |

Michael Collora, Esq.
February 19, 2008
Page 3

As of the Valuation Date, the Trust contained 2,938,020 shares of common stock of Meditech valued as $13.50 per share for a total of $39,663,270. If the stock of the Company contained in the Trust had been valued at the $21.62 fair market value price per share as opposed to the $13.50 price per share, the total assets of the Trust would have increased by 36.2 percent to $89,820,583. The following table demonstrates the effect on the value of the total assets of the Trust if the fair market value of $21.62 per share had been used in the analysis by the trustee:

| Trust Assets | | |
|---|---|---:|
| Cash | $ | 82,104 |
| US Treasury Notes | $ | 24,544,316 |
| Accrued Interest | $ | 326,221 |
| Meditech Stock | $ | 63,519,992 |
| Employee Loans | $ | 1,347,950 |
| Total Assets of the Trust | $ | 89,820,583 |

Based on my analysis as briefly described above, it is my opinion that the value of ownership interests in the Trust that were surrendered and subjected to the December 31, 1997 valuation of Trust assets by the trustee were undervalued by 26.560 percent. Consequently, in order to estimate damages suffered in this matter, it is necessary the multiply the amount received by the individuals surrendering their ownership interests in the Trust by 36.166 percent.

Please refer to my expert report dated February 18, 2008 for important information related to the valuation of the Company's common stock.

Yours sincerely,

Daniel R. Van Vleet, ASA, CBA
Managing Director
Duff & Phelps, LLC

## DUFF&PHELPS

### EXPERT REPORT OF DANIEL R. VAN VLEET

**PROFESSIONAL QUALIFICATIONS**

1.     I am a Managing Director in the Chicago office of Duff & Phelps, LLC ("Duff & Phelps). My practice includes the valuation of businesses and fractional equity interests for corporate transactions, taxation and litigation purposes. Prior to my employment with Duff & Phelps, LLC, I was the Managing Director of the Chicago Office of Willamette Management Associates; a business valuation, transaction advisory and economic analysis consulting firm. I earned my Master of Business Administration (MBA), with a concentration in finance, from the Graduate School of Business at the University of Chicago.

2.     I am an Accredited Senior Appraiser of the American Society of Appraisers (ASA), certified in business valuation and a Certified Business Appraiser (CBA) of The Institute of Business Appraisers. I am a former president of the Chicago Chapter of the ASA and currently serve on the International Board of Governors representing the ASA business valuation profession worldwide. I currently sit on the International Business Valuation Committee of the ASA. I have also served as Subcommittee Co-chairman of the Business Valuation Education Committee and Subcommittee Co-chairman of the Business Valuation Standards Committee. I also currently sit on the Board of Directors of the Business Valuation Association of Chicago.

3.     I have served as an adjunct professor of finance—teaching business valuation coursework—at the Kellstadt Graduate School of Business of DePaul University in Chicago. I have also taught graduate business valuation courses in the continuing education program of Northwestern University in Chicago. I currently teach advanced business valuation courses for the Center for Advanced Valuation Studies as well as the foundational business valuation courses for the American Society of Appraisers. I am a contributing author to the following business valuation textbooks: *Financial Valuation: Businesses and Business Interests*; *Valuing Small Businesses and Professional Practices*; *Business Valuation Discounts and Premiums*; *The Handbook of Business Valuation and Intellectual Property Analysis*; *Business Valuation & Taxes: Procedure, Law & Perspective*; and *Financial Valuation: Applications and Models*. I currently serve on the Valuation Editorial Committee of *Trusts & Estates* magazine. I am a frequent speaker and author in the areas of business valuation. A summary of my experience and credentials are provided in my curriculum vitae located in Appendix A.

4.     I have conducted business valuations, economic analysis, and corporate transaction advisory services for a variety of clients and purposes for approximately 19 years. I have served as a business valuation expert witness in federal and state litigated matters and have provided expert testimony in federal and state courts and arbitration hearings. A log of my testimony experience is provided in Appendix A.

5.    I was retained by the law firm of Dwyer & Collora, LLP to conduct the analysis described in this appraisal report. It is my understanding that my report is to be used in connection with the litigated matter styled *Michael P. Hubert, et al., v. Medical Information Technology Profit Sharing Plan, et al.* as of December 31, 1997 (the "Valuation Date"). Other individuals working under my direction have participated in the preparation of the information and analysis contained herein. Information prepared by others was reviewed and edited by me as necessary in the preparation of this report.

## BACKGROUND OF THE DISPUTE

6.    Medical Information Technology, Inc. ("Meditech" or the "Company") engages in the development and licensing of computer software products and related services for use by various health care organizations such as hospitals and ambulatory care centers. Meditech was founded in 1969 and is based in Westwood, Massachusetts.

7.    In 1973, Meditech established a profit sharing trust (the "Trust") on behalf of its employees to provide pension benefits upon retirement. At the end of each year, the Company made contributions of Meditech common stock and cash to the Trust. The fair market value of the shares contained in the Trust was determined by A. Neil Pappalardo—sole trustee of the Trust and a founder and CEO of Meditech.

8.    Upon retirement or termination of employment, employees were required to surrender their interest in the Trust at the value determined by the trustee. Employees then typically received a lump-sum cash payment in the amount of that employee's vested interest in the Trust.

## OBJECTIVE AND PURPOSE OF THE ANALYSIS

9.    The objective of my analysis is to estimate the fair market value (as defined in paragraph 11) of the common stock of Meditech as the Valuation Date. My analysis estimates the value of the common stock of the Company on a non-marketable and non-controlling ownership interest basis.

10.   It is my understanding that the results of my analysis are to be used in connection with the litigated matter styled *Michael P. Hubert, et al., v. Medical Information Technology Profit Sharing Plan, et al.* My analysis and work product were prepared and provided in connection with this litigated matter. No other purpose is intended or should be inferred.

## STANDARD OF VALUE

11.   The standard of value used in my valuation analysis is *fair market value*. Fair market value is defined as the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of

the relevant facts. This definition of value was derived from the *International Glossary of Business Valuation Terms*.[1]

12.  My valuation analysis was conducted using generally accepted business valuation approaches and methods pursuant to standards of professional conduct and analysis as described in *Standard 9* and *Standard 10* of the *Uniform Standards of Professional Appraisal Practice* (USPAP) as well as the *Business Valuation Standards, Principles of Appraisal Practice,* and *Code of Ethics* of the American Society of Appraisers.

## SOURCES OF INFORMATION

13.  A non-comprehensive list of the sources of information considered in my analysis is provided in Appendix B.

## FUNDAMENTAL CHARACTERISTICS OF THE COMPANY [2]

14.  Initially, Meditech developed software to automate hospital clinical departments. Eventually, however, it progressed into the financial area, by developing hospital billing and accounts receivable applications, as well as various general accounting applications.

15.  Meditech bases its product fees on the total number of beds a hospital operates and sets its implementation fees on the total number of sites where the software is used. Monthly service fees are also assessed based on a rate of 1 percent of total product fees. Additionally, licensing agreements preclude any direct ownership of the software by the hospitals and mandates that the hospital hold Meditech harmless from any liability arising from incorrect operation of the software.

16.  As of the Valuation Date, Meditech had more than 1,800 employees and over 1,050 active hospital customers. Employees are organized into functional groups consisting of product development, sales and marketing, implementation, customer service, accounting and facility operations. All Meditech staff work in five company owned facilities in the greater Boston area.

17.  As of the Valuation Date, Meditech reported a product backlog of $130 million, as well as a backlog of almost 100 hospitals waiting implementation. The implementation process consisted of instructing hospital personnel to use Meditech software, as well as training them on how to use it as part of their daily operations. The software was maintained and updated by Meditech.

---

[1] The International Glossary of Business Valuation Terms has been adopted by each of the five North American business valuation organizations and societies. These organizations and societies are as follows: (1) American Institute of Certified Public Accountants, (2) American Society of Appraisers, (3) Canadian Institute of Chartered Business Valuators, (4) National Association of Certified Valuation Analysts, and (5) The Institute of Business Appraisers.

[2] As derived from the 12/31/1997 SEC Form 10-K.

## CAPITALIZATION AND OWNERSHIP

18. As of the Valuation Date, there were 16,087,212 shares of common stock outstanding and 747 shareholders of record. On May 8, 2001, the Company underwent a 2-for-1 stock split. Consequently, the split adjusted number of shares as of the Valuation Date was 32,174,424.

19. Pursuant to securities regulations as defined by the Securities and Exchange Commission (SEC), Meditech is required to file various SEC disclosure documents. However, Meditech's stock is not registered for public trading and the Company is considered to be privately held.

## PRIOR TRANSACTIONS IN THE COMPANY'S SECURITIES

20. The Board sets the stock price each year—with the guidance of its CEO Mr. Pappalardo—for purposes of donating shares of Meditech to the Trust. Certain factors such as earnings, dividend rates, net worth, and prospects for future growth have been mentioned as components used in the determination of value. However, it appears that no generally accepted business valuation approaches or methods were used in the analysis.

21. The following summarizes the value of Meditech shares—as determined by the Board— for 1996 and 1997 (per share values adjusted for the May 8, 2001 2-for-1 stock split):

| Valuation Date | Value Per Share |
|---|---|
| 12/31/1996 | $  12.50 |
| 12/31/1997 | $  13.50 |

## HISTORICAL FINANCIAL STATEMENT ANALYSIS

22. Summaries of the Company's historical balance sheets are provided in Appendix C on Exhibit II.

23. During the period from December 31, 1994 to December 31, 1997 (the "observed period") the Company's current assets increased from $80.0 million at December 31, 1994 to $97.1 million at December 31, 1997.

24. As of December 31, 1997, 26.9 percent of the Company's total assets were in the form of cash and marketable securities.

25. Property, plant, and equipment, net of depreciation ("Net PP&E") increased significantly during the observed period. Net PP&E increased from $54.9 million at December 31, 1994 to $164.0 million at December 31, 1997, a compounded annual growth rate (CAGR) of 44.0 percent.

26. During the observed period, total liabilities increased from $20.0 million at December 31, 1994 to $73.6 million at December 31, 1997. This increase was primarily attributable to increases in interest bearing debt.

27.   The stockholders' equity of the Company increased during the observed period at a CAGR of 17.2 percent.

28.   Summaries of the Company's historical income statements are provided in Appendix C on Exhibit III.

29.   During the observed period, the Company's revenues increased at a CAGR of 16.0 percent from $124.2 million during the year ended December 31, 1994 to $193.8 million for the year ended December 31, 1997.

30.   During the observed period, operating expenses remained relatively stable at approximately 59 percent of total revenues.

31.   Net income increased at a CAGR of 16.0 percent from $32.2 million in 1994 to $50.3 million in 1997. The net income profit margin remained relatively stable during the observed period at approximately 26.0 percent.

## GENERALLY ACCEPTED APPROACHES TO BUSINESS VALUATION

32.   There are three generally accepted approaches to business valuation: (1) income approach, (2) market approach and (3) asset approach. Within each approach are several generally accepted business valuation methods. The valuation methods used in my analysis are as follows:

- Income Approach: Discounted Cash Flow Method

- Market Approach: Guideline Public Company Method

33.   I did not use the asset approach for the following reasons: (1) the company was a profitable going-concern business enterprise, (2) appraisals of the Company's tangible and intangible assets were not available, (3) the objective of the assignment is to estimate the value of a fractional equity interest that did not have the unilateral authority to liquidate the assets of the Company, and (4) the Company was not operating as an asset holding company.

34.   Summary descriptions of my analysis using the generally accepted business valuation methods are provided in the following sections of my report.

## DISCOUNTED CASH FLOW METHOD

35.   The discounted cash flow (DCF) method estimates the value of a business based on what an investor would be willing to pay today to have the right to receive the cash flows that the business is expected to generate in the future. When using the DCF method, I estimated the value of the common stock of the Company based on projected future cash flows of the Company and discounting these projected cash flows back to the present using a present value discount rate ("discount rate").

36.   The DCF method is principally comprised of four steps: (1) estimate the projected cash flows of the Company for a discrete (i.e., finite) time period, (2) estimate the present value of these discrete cash flows as of the Valuation Date using a discount rate that reflects business risk and the time value of money, (3) estimate the present value of the

terminal year cash flows that are expected to be earned subsequent to the discrete projection period, and (4) combine the present value of the discrete cash flows with the present value of the residual cash flows to estimate the value of total equity.

37.     I used the four-year projected financial statements provided in the 1997 Report to the Board of Directors. The projected financial statements—which include certain income statement and balance sheet line items—are referred to herein as the "Management Projections".

38.     The Management Projections include various revenue and expense line items for a four-year discrete period subsequent to the Valuation Date. The Management Projections also include various balance sheet line items such as cash, accounts receivable, equipment/fixtures, buildings, land, accounts payable, accrued taxes, accrued expenses, and bank debt.

39.     I prepared five additional years of discrete income statement and cash flow projections beyond the four-year Management Projections. This analysis was conducted in order to trend the revenue growth rates expected at the end of the four-year Management Projection period to a long-term sustainable growth rate of four percent by the terminal year. This was accomplished by subtracting the long-term sustainable growth rate of four percent from the 2001 revenue growth rate of 14.6 percent. This number was then divided by 6 to estimate the annual reduction in revenue growth during the six year period subsequent to the Management Projection period.

40.     Accordingly, I projected that revenue growth would decline from the 14.6 percent rate used in the Management Projections for 2001 to 12.8 percent for 2002. The revenue growth rates for each subsequent projected year were reduced in a similar manner. The terminal year growth rate used in the analysis was 4.0 percent. It is my opinion that this is a long-term sustainable growth rate for a company like Meditech given inflationary expectations as evidenced by long-term changes in the Consumer Price Index as well as changes in expected population growth and general industry growth expectations in the software industry.

41.     The net income profit margins are projected to remain consistent with Management Projections and the Company's historical profitability performance. The projected common size income statements[3] provided in Appendix C on Exhibit VIII demonstrate the projected profit margins included in my analysis.

42.     The provisions for income taxes for the 1998 through 2001 period were provided by the Management Projections. The provisions for income taxes for the 2002 through terminal year period were based on an assumed income tax rate of 40.0 percent.

43.     Exhibit VII in Appendix C provides a summary of my cash flow adjustments to the projected net income of the Company. These adjustments convert the projected measurements of net income into measurements of cash flow available to the Company's investors.

---

[3] A common size income statement presents all line items in the projected income statement as a percent of revenues.

44.    I made cash flow adjustments to projected net income for the following items: (1) interest expense, (2) depreciation expense, (3) capital expenditures, and (4) incremental working capital requirements. A summary discussion of these adjustments is provided in paragraphs 45 through 49.

45.    Estimated interest expense was added back to cash flows to reflect the fact that my analysis was conducted on a debt-free basis. In other words, my cash flow analysis was based on the analytical assumption that the Company did not maintain interest bearing debt on the balance sheet. Consequently, it is necessary to remove the effect of the interest expense inherently included in the projected income statements.

46.    My estimate of the interest expense included in the Management Projections was calculated based on projected bank debt balances. I calculated the average projected bank debt balances for each year and applied a 7.5 percent interest rate[4] to this amount. I then tax-affected the expense to reflect the fact that interest expense is tax deductible. My estimate of the interest expense for the 2002 through terminal year period was calculated based on the assumption that interest expense will remain a constant percent of projected revenues.

47.    Depreciation expense is a non-cash expense that reduces net income. Consequently, it is necessary to add back projected depreciation expense to projected net income in order to estimate available cash flow. The Management Projections did not include specific projections of depreciation expense. Therefore, I estimated depreciation expense by calculating the annual change in accumulated depreciation provided in the Management Projections. Accordingly, depreciation expense was projected to increase from $10.0 million in 1998 to $15.9 million by 2001. For the 2002 through terminal year period, I estimated that depreciation expense would be 4.0 percent of total revenues. The 4.0 percent is consistent with the Company's historical income statements and Management Projections.

48.    Capital expenditures are cash expenditures that do not reduce net income. Consequently, it is necessary to subtract projected capital expenditures from projected net income in order to estimate available cash flow. The Management Projections did not include specific projections of capital expenditures. Therefore, I estimated annual capital expenditures by calculating the annual change in projected equipment/fixtures, buildings, and land included in the Management Projections. Accordingly, capital expenditures were projected to increase from $5.0 million in 1998 to $83.4 million in 2000 and then back down to $9.6 million during 2001. During the 2002 through terminal year period, I estimated that capital expenditures would increase at the same rate of growth as projected revenues.

49.    Changes in projected working capital assets and liabilities can be either a source or a use of cash. Consequently, it is necessary to adjust projected net income by the incremental changes in working capital assets and liabilities in order to estimate available cash flow. The Management Projections contained estimates of projected working capital assets and liabilities. I used the projected annual changes in these line items to estimate the amount of cash to be used or provided by incremental changes in working capital assets and

---

[4] The 7.5 percent interest rate was the rate reported by the Company in its 1997 SEC Form 10-K.

liabilities. For the 2002 through terminal year period, I estimated the cash provided by working capital by multiplying the incremental change in projected revenues by 4.0 percent. The 4.0 percent figure is consistent with the projected incremental working capital cash flow benefit presented in the Management Projections.

50. I converted the discrete projected cash flows to their present value equivalents using a discount rate that reflects the relative risk of achieving the projected cash flows as well as the time value of money. The discount rate was estimated using a weighted average cost of capital (WACC) analysis. The WACC analysis requires the estimation of the required rates of return for equity and debt capital for a company like Meditech.

51. I used three sources of data to estimate the required rate of return on equity capital: (1) *Ibbotson Associates, SBBI Valuation Edition, 1998 Yearbook*; (2) Duff & Phelps Size/Return Study, and (3) Duff & Phelps Risk/Return Study.

52. To estimate the required rate of return on debt capital, I used the Moody's BAA 20-year bond yield as of the Valuation Date.

53. I used an assumed capital structure in my WACC analysis of 5.0 percent debt capital and 95.0 percent equity capital. This capital structure was consistent with the Company's capital structure as well as the capital structure of the guideline public companies used in my analysis.

54. Based on my WACC analysis, I estimated a range of discount rates from a low of 12.5 percent to a high of 15.5 percent. I selected the average present value discount rate of 13.8 percent to use as the discount rate in my DCF method analysis. A summary of my WACC analysis is provided in Appendix C on Exhibit IX.

55. The residual value represents the price an investor would pay for the right to the cash flows of a business for all years subsequent to the discrete projection period. I estimated the residual value by capitalizing the terminal year cash flow by a 9.8 percent capitalization rate. The 9.8 percent capitalization rate is estimated by subtracting the long-term growth rate of 4.0 percent from the discount rate of 13.8 percent. I then estimated the present value of the residual value by applying the discount rate.

56. As presented in Appendix C on Exhibit VI, I added the present value of the discrete net cash flows to the present value of the residual value to arrive at the value of the invested capital of the Company of $918.2 million. I then subtracted the interest bearing debt reported on the Company's balance sheet of $37.5 million to arrive at a market value of the total equity of the Company, on a marketable, non-controlling ownership interest basis, of $880.7 million.

### GUIDELINE PUBLIC COMPANY METHOD

57. I used the guideline public company method to estimate the value of the common stock of the Company as of the Valuation Date. My analysis was conducted using the stock price—as reported on the relevant stock market exchange—and the reported earnings before interest, taxes, depreciation and amortization (EBITDA) of the guideline public companies used in my analysis.

58.    My analysis involved the calculation and application of a "price/earnings" or "P/E" multiple. P/E multiples of publicly traded companies are often used to estimate the value of privately held companies. The P/E multiple used in my analysis was essentially calculated based on the stock price per share of the guideline public companies divided by the earnings per share of those same companies. These multiples were then used to estimate the value of the common stock of Meditech as though it were a publicly traded company. This indication of value was then adjusted downward to reflect the fact that the common stock of Meditech was not publicly traded.

59.    When conducting my analysis, I identified four publicly traded companies that were sufficiently similar to Meditech to classify them as guideline companies as of the Valuation Date. Additionally, I ensured that the common stocks of these public companies were actively traded as of the Valuation Date. The following companies are used in my analysis (corporate descriptions of each company listed below are provided in Appendix D):

- Advent Software, Inc.

- Aspen Technology, Inc.

- Cerner Corp.

- Shared Medical Systems Corp.

60.    I considered the companies listed above to be useful guideline companies for the following reasons: (1) the companies all operate in the software development and consulting businesses; (2) Cerner Corp. and Shared Medical Corp. were identified in certain Meditech documents as being competitors of the Company; (3) three of the four guideline companies developed operational and financial software for companies operating in the pharmaceutical/medical/healthcare industries; (4) the 1997 revenues of the guideline companies ranged from a low of $48.6 million to a high of $896.2 million – the 1997 revenues of Meditech were reported at $193.8 million; and (5) the 1997 EBITDA of the guideline companies ranged from a low $12.6 million to a high of $139.6 million – Meditech reported 1997 EBITDA of $96.1 million.

61.    In addition to the companies listed in paragraph 59, I also considered using HBO & Company in the analysis. However, this company reported 1997 revenues in excess of $1.2 billion and total assets in excess of $1.3 billion. Consequently, I eliminated this company from my analysis due to financial size characteristics.

62.    Summaries of my guideline public company method are provided in Appendix C on Exhibits XIII through XIX. As demonstrated on Exhibit XIV, I calculated the market value of invested capital (MVIC) for each of the guideline companies used in my analysis. The MVIC is calculated by adding the market value of the common stock (i.e., the "market capitalization" of total equity) to the total interest bearing debt reported on each public company's balance sheet. The market capitalization of total equity is calculated by multiplying the stock price—as reported on the relevant stock market exchange—by the total common shares outstanding of each company. The MVIC is essentially the "price" part of the P/E multiple.

63.   The P/E multiples are calculated by dividing the MVIC by the EBITDA reported by each public company during the latest 12 months (LTM) period. For example, the MVIC of Advent Software, Inc. ("Advent") was $217.0 million as of the Valuation Date. During the twelve months prior to the Valuation Date, Advent reported EBITDA of $12.6 million. I divided the MVIC of $217.0 million by the LTM EBITDA of $12.6 million to calculate a multiple of 17.2.

64.   I then adjusted the multiples of each of the guideline public companies to reflect the differences in expected earnings growth[5] between each public company and Meditech. This adjustment resulted in an EBITDA multiple of 12.9 for Advent. Similar calculations were performed for each of the guideline companies. A summary of the adjustments performed for each company is provided on Exhibit XV.

65.   As demonstrated on Exhibit XIII, the adjusted LTM EBITDA multiples ranged from a low of 10.0 to a high of 12.9 with an average and median of 11.4. I selected a multiple slightly above the average and median of 11.5 to use in my analysis. Given the superior profitability performance of Meditech when compared to the guideline public companies, an EBITDA multiple slightly above the average is appropriate.

66.   Exhibit XIII demonstrates my valuation analysis of the total equity of Meditech using the guideline public company method. For the year ended December 31, 1997, Meditech reported EBITDA of $96.1 million. I multiplied the Company's EBITDA by the 11.5 multiple to derive an indicated value of the debt and equity capital of Meditech of $1,105.4 million. I then subtracted the Company debt of $37.5 million to arrive at a value of total equity of $1,067.9 million on a marketable, non-controlling ownership interest basis.


**VALUATION SYNTHESIS**

67.   During the course of my analysis, I used the DCF method and the guideline public company method to arrive at indications of value of $880.7 million and $1,067.9 million respectively. I weighted the indication of values provided by the DCF method and the guideline public company method at 75 percent and 25 percent, respectively. I placed greater emphasis on the indication of value provided by the DCF method due to the differences in corporate descriptions, expected growth, and profitability of the Company and the guideline public companies.

68.   Based on my analysis, the indicated value of the total common equity of Meditech, on a marketable, non-controlling ownership interest basis, as of the Valuation Date, was $927.5 million. A summary of my valuation synthesis calculation is provided in Appendix C on Exhibit I.

69.   The indicated value of total equity was derived from empirical studies of publicly traded equity securities. Consequently, my analysis concludes the value of total equity of Meditech as though it were a publicly traded company. Meditech was a privately held

---

[5] Growth expectations were estimated based on information provided by Thompson's Institutional Brokers Investment System (I/B/E/S), which monitors the earnings estimates on companies of interest to institutional investors.

company as of the Valuation Date. Consequently, it is necessary to make a valuation adjustment for the lack of marketability (i.e., liquidity) that a privately held company security suffers from when compared to publicly traded equity securities. An explanation of the analysis used to estimate this adjustment is provided in paragraphs 70 through 81.

## DISCOUNT FOR LACK OF MARKETABILITY

70.     All other factors being equal, an investment is more valuable if it can be converted into cash easily (i.e., liquid) and, conversely, less valuable if it cannot be converted into cash easily (i.e., illiquid). Simply stated, investors prefer liquidity to lack of liquidity. Generally speaking, an investment in the common stock of a privately held company like Meditech is a relatively illiquid investment compared to other investments, and particularly compared to publicly traded common stocks.

71.     The presence of illiquidity, or lack of marketability, creates additional investment risk. Generally, a price concession is required to equate the risk/return relationship of the privately held security to that of comparable alternative publicly traded equity securities.

72.     I considered empirical studies of the discount for lack of marketability (DLOM) as reported in *Valuing a Business: The Analysis and Appraiser of Closely Held Companies*[6]. I also examined several studies conducted by John D. Emory[7] of Robert W. Baird & Company. I considered the information related to marketability discounts that included the 1980 through 1997 time period. The indicated marketability discounts provided by these studies are summarized in Appendix C on Exhibits XX through XXII.

73.     The studies of the DLOM for the 1980 through 1997 time period cover literally hundreds of transactions and indicate average discounts for lack of marketability that range from 22.6 percent to 43.8 percent.

74.     In selecting the DLOM, I considered the level of cash dividends historically paid by the Company as well as the prospects for future cash dividends. This was done because the equity securities of a private company that pays cash dividends are considered more desirable than the equity securities of an identical company that does not pay cash dividends. This is due to the fact that cash dividends represent a liquid form of investment return to the shareholders. If a company retains its income—rather than pay it out in cash dividends—the investment return is less liquid and therefore the company's equity securities are less marketable.

75.     With respect to historical dividends, Meditech has paid substantial and increasing levels of annual cash dividends during the 10 years prior to the valuation date. The following table summarizes the historical dividend payout ratio of Meditech from fiscal year 1988 through 1997.[8]

---

[6] Shannon Pratt, Robert F. Reilly, and Robert P. Schweihs, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, Fourth Edition, McGraw-Hill, New York, 2000, p. 391.
[7] Mr. Emory was formerly with Robert W. Baird & Co. where the DLOM studies through April 1997 were conducted. Subsequent to April 1997, the studies continued to be performed by Mr. Emory, at a different firm, and are generally referred to as the Emory Studies.
[8] The table does not reflect the 2-for-1 stock split that occurred on May 8, 2001.

Expert Report of Daniel R. Van Vleet    Page 12

| | Year-Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
| Earnings / Share | 0.81 | 0.94 | 1.21 | 1.23 | 1.50 | 1.90 | 2.05 | 2.34 | 2.78 | 3.13 |
| Dividends Paid / Share | 0.29 | 0.40 | 0.47 | 0.67 | 0.67 | 0.87 | 1.04 | 1.24 | 1.40 | 1.68 |
| Dividend Payout Ratio | 35.8% | 42.6% | 38.8% | 54.5% | 44.7% | 45.8% | 50.7% | 53.0% | 50.4% | 53.7% |

76.    It is my understanding that—as of the Valuation Date—the Company expected to continue to pay cash dividends in the foreseeable future in a manner consistent with its history. In the 1997 Report to the Board of Directors[9], the Company stated the following:

> Based on the 1997 performance and expectations for 1998, we recommend increasing the dividend from $1.68 to $1.88 per share. The new rate is 60% of last year's earnings and would be paid out quarterly.

77.    This level of dividend payments is substantial when compared with many other privately held companies and supports a DLOM at the lower end of the relevant range.

78.    In addition to the dividend attributes, I also considered the fact that the Company derives 21 percent of its revenues from a single customer. The following statement was contained in the Company's 1997 SEC Form 10-K related to this matter:

> Columbia/HCA owns and operates over 350 hospitals in the U.S., Canada, and the U.K. and is Meditech's largest customer. By the end of 1997 Meditech had implemented approximately 300 of their hospitals. They represented about 21% of revenue in 1996 and 1997. In the 3rd quarter of 1997 Columbia/HCA underwent a major change in leadership and since then they have made public statements to the effect that they are undergoing a transition in business strategy and will be downsizing. While it is difficult to predict how this will affect Meditech, it may result in a decline in the revenue generated from them.

79.    It is my opinion that the customer concentration risk associated with the Company's business with Columbia/HCA needs to be reflected in my analysis. In order to ensure that this characteristic was reflected, I reviewed the nature of the income statement projections contained in the 1997 Report to the Board of Directors. According to this document, the Company was concerned about a possible decline in business derived from Columbia/HCA and therefore reduced the 1998 expected revenue growth rate from approximately 15 percent to 10 percent. Since this reduction in revenue growth is applied to the first year of the projection, the subsequent revenues for each year are also less than what they would have been otherwise if a 15 percent growth rate had been used for 1998. Since the Company explicitly reflected the customer concentration risk in the choice of the revenue growth rates used in the projected income statements, I made no further adjustments to reflect this risk factor.

80.    I also reviewed the SEC Forms 10-K of the public companies used in my guideline public company method analysis. Based on my review, the public companies used in my analysis are not subject to the same level of customer concentration risk as Meditech. Accordingly, it is my opinion that an adjustment should be made to reflect the customer concentration risk of Meditech. I contemplated this risk characteristic when I reduced the

---

[9] Report to the Board of Directors, Quarter Ended December 31, 1997.

market multiples of the public companies by an average of 27.0 percent to account for the differences in expected growth rates for Meditech and the guideline public companies used in my analysis. In other words, the revenue growth rate assumed in my analysis of Meditech reflects the lower growth rate expectations associated with the loss of some portion of the Columbia/HCA business. Consequently, it is my opinion that my guideline public company method reflects this potential risk characteristic and no further adjustment is necessary.

81.  Based on the empirical DLOM studies, the prospects for future cash dividends to be paid by the Company, and the customer concentration risk of Meditech, I selected a DLOM of 25 percent to use in my DCF method and guideline company method analysis.

## VALUATION CONCLUSION

82.  During the course of my analysis, I developed indications of value of the total equity of the Company from the DCF method and the guideline public company method. I synthesized the values provided by these methods by weighting each indication of value and adding the weighted values together. I then applied a DLOM of 25 percent to the $927.5 million indicated value to estimate the value of the total equity of Meditech on a non-marketable, non-controlling ownership interest basis.

83.  Based on my analysis as described in this report, it is my opinion that the fair market value of the total equity of Meditech, on a non-marketable, non-controlling ownership interest basis, as of the Valuation Date, was $695.7 million.

84.  As of the Valuation Date, Meditech was capitalized with 16,087,212 shares of common stock outstanding. However, on May 8, 2001, the Company underwent a 2-for-1 stock split that essentially doubled the total number of shares outstanding. Consequently, I divided the indicated fair market value of total equity of $695.7 million by the split-adjusted 32,174,424 shares outstanding to conclude the fair market value of the common stock of Meditech.

85.  Based on my analysis, it is my opinion that the fair market value of the common stock of the Company, on a non-marketable, non-controlling ownership interest basis, as of the Valuation Date, was (rounded):

## $21.62 Per Share

86.  The employees of Duff & Phelps who worked on this engagement have no present or contemplated future interest in Meditech. Further, my compensation for this engagement is neither based nor contingent on the value I estimated.

87.  During my appraisal, I was provided with both audited and internally prepared financial and operational data. I have relied upon these data, without independent verification or confirmation, as accurately reflecting the operational and financial position of the Company.

88.    In accordance with guidelines set by the American Society of Appraisers, I am independent of Medical Information Technology, Inc. and Dwyer & Collora, LLP.

89.    The attached appendices are integral parts of my valuation report and should be considered. I have considered the general economic conditions that prevailed as of the Valuation Date. A summary discussion of these conditions is provided in Appendix E.

**APPENDIX A**

**QUALIFICATIONS OF THE PRINCIPAL ANALYST**

### DANIEL R. VAN VLEET, ASA, CBA

Daniel R. Van Vleet is a Managing Director in the Chicago office of Duff & Phelps, LLC. His practice includes valuation consulting, economic analysis and financial advisory services.

Mr. Van Vleet has performed the following types of valuation and economic analyses: business enterprise and fractional interest valuations, debt securities valuations, divestiture and spin off appraisals, economic damages, equity security design, ESOP feasibility and formation analysis, fairness opinions, intangible asset valuations, litigation support appraisals, merger and acquisition appraisals, option and warrant valuations, post-acquisition purchase price allocation appraisals, professional practice valuations, restricted stock valuations and restructuring and work out analysis.

These valuation and economic analyses engagements have been performed for the following purposes: eminent domain, employee corporate ownership, federal taxation (income, gift, and estate), fiduciary and financial counseling, financial accounting reporting, financing (recapitalization, restructuring, and asset collateral valuations), litigation support and dispute resolution, management information and planning, state taxation (income and ad valorem), strategic information and planning, and transaction pricing and structuring (merger, acquisition, divestiture, and reorganization).

Mr. Van Vleet has valued the following types of business entities and fractional ownership interests: closely held corporations, publicly traded corporations, restricted stock, complex capital structures (various classes of common equity, preferred equity, and warrants, grants, rights), general and limited partnership interests, joint ventures, proprietorships, professional service corporations, professional practices, license agreements, franchises, and inter-company transfer pricing agreements.

He has performed economic analyses, valuation analyses, remaining useful life analyses, and/or transfer price analyses on the following types of intangible assets and intellectual properties: bank customers, broadcast licenses, computer software, computer databases, copyrights, customer lists, employment contracts, franchise contracts and rights, going-concern value, goodwill, leasehold interests, licenses, management contracts, medical charts and records, non-compete covenants, patent applications, patents, patent files and records, possessory interests, procedural manuals, production backlogs, proprietary technology, subscriber lists, technical libraries, trained and assembled workforces, trade names, trademarks, and training manuals.

Mr. Van Vleet has performed business valuations, asset valuations, economic analyses, and financial advisory services for companies in the following industries: advertising, aerospace, agriculture, apparel, architecture, automotive dealerships, automotive manufacturing, automotive OEM and aftermarket parts, aviation, beer and wine distributorships, business consulting services, biotechnology, cable television, cable television programming, camping equipment, cardiology, caskets, chemical engineering, chemical manufacturing, commercial banking, commercial packaging, computer software and hardware, computer consulting, contract employment services, construction, container manufacturing, day care, dental equipment, direct

marketing, e-commerce retailing, e-commerce consulting, education, electrical contracting, emergency medical services, engineering, fast food restaurants, food brokerage and distribution, food processing, forest products, funeral services and equipment, furniture manufacturing and distribution, genetic engineering, gold mining and exploration, HMO, HVAC, hotels, insurance, investment banking, investment broker/dealers, investment management services, law, management consulting, marine, medical equipment, medicine, merchandise vending, metal fabrication, mobile data communications, mortgage banking, motion pictures, multi-level marketing, newspapers, office equipment, operations consulting, pari-mutuel racing, petrochemical, pharmaceuticals, plastics, precious metals, publishing, pulp and paper machinery manufacturing, radiology, real estate brokerage, real estate development, refrigeration, resort/recreation, restaurants, retail, securities, soft drinks and beverages, storage and retrieval systems, television and radio broadcasting, tobacco, transportation and trucking, and wholesale distribution.

Mr. Van Vleet has provided expert witness testimony in both state and federal courtrooms. These litigations related to business, stock, and asset valuation matters and to economic damages matters. He has been retained as an expert witness in the following types of litigations: bankruptcy, breach of contract, corporate dissolution, economic damages, federal gift and estate tax, federal income tax, lost profits analysis, marital dissolution, minority shareholder rights, option exercise price analysis, stockholder suits, tortious damages, and reasonableness of royalty rates and/or transfer prices.

### EDUCATION

Master of Business Administration, Graduate School of Business, University of Chicago

Bachelor of Science, Finance and Law, Portland State University

### PROFESSIONAL AFFILIATIONS

Accredited Senior Appraiser (ASA), Business Valuation, American Society of Appraisers

Adjunct Professor, Finance, Kellstadt Graduate School of Business, DePaul University

Board of Directors, Business Valuation Association of Chicago

Board of Governors, American Society of Appraisers

Certified Business Appraiser (CBA), The Institute of Business Appraisers

Chairman, Strategic Planning Task Force, BV Committee, American Society of Appraisers

Co-Chairman, Business Valuation Education Committee, American Society of Appraisers

Co-Chairman, Business Valuation Standards Committee, American Society of Appraisers

Instructor, Business Valuation Education, American Society of Appraisers

Instructor, Business Valuation, School of Continuing Education, Northwestern University

International Business Valuation Committee, American Society of Appraisers

Expert Report of Daniel R. Van Vleet                                    Page 18

International Public Relations Task Force, American Society of Appraisers

President, Chicago Chapter, American Society of Appraisers

Valuation Committee Member, *Trusts & Estates* magazine


**PUBLICATIONS—BOOK CHAPTERS AND PROFESSIONAL JOURNALS**

"What's an S Corp Really Worth?", *Trusts & Estates* Magazine, December 2007

"The Van Vleet Model", Financial Valuation: Application and Models, 2nd ed., Hitchner, James R., New Jersey: John Wiley & Sons, Inc., 2006.

"Valuation of S Corporations and Other Pass-Through Entities", Business Valuation & Taxes: Procedure, Law and Perspective, Pratt, Shannon P. and U.S. Tax Court Judge Laro, David, 1st ed., New York: John Wiley & Sons, Inc., 2005.

"The S Corporation Economic Adjustment Model", *Business Valuation Review*, Business Valuation Committee of the American Society of Appraisers, December 2004.

"Appraisers: An Important Resource", American Bankruptcy Institute, *Law Review*, July/Aug 2004.

"The S Corporation Economic Adjustment Model Revisited", Willamette Management Associates *Insights*, Winter 2004.

"The S Corporation Economic Adjustment", The Handbook of Business Valuation and Intellectual Property Analysis, Reilly, Robert F. and Schweihs, Robert P., 2nd ed., New York: McGraw-Hill, 2003.

"The Valuation of S Corporation Stock: The Equity Adjustment Multiple", Pennsylvania Bar Association, *Pennsylvania Family Lawyer*, May-June 2003.

"A New Way to Value S Corporation Securities", *Trusts & Estates Magazine*, March 2003.

"Valuing a Hedge Fund", *Family Advocate*, American Bar Association, January 2003.

"The Valuation of S Corporation Stock: The Equity Adjustment Multiple", Willamette Management Associates *Insights*, Winter 2003.

"Intangible Asset Valuation Issues Under SFAS 142", Willamette Management Associates *Insights, Winter 2002.*

"Valuation of Copyright Intellectual Property", Willamette Management Associates *Insights, Summer 2002.*

"Discounts and Premiums in Undivided Interest Valuations", <u>Business Valuation Discounts and Premiums</u>, Pratt, Shannon P., 1st ed., New York: John Wiley & Sons, Inc., 2001.

"Application of Daubert-Related Decisions on Economic Damages Expert Testimony" <u>Intellectual Property Infringement Damages: A Litigation Support Handbook</u>, Parr, Russell L. and Smith, Gordon V., 2nd ed., New York: John Wiley & Sons, Inc., 2000.

"Valuation Analysis of Restricted Stocks of Public Companies", *Mergers & Acquisitions*, January 1999.

"Application of Daubert-Related Decisions on Economic Damages Expert Testimony" Willamette Management Associates *Insights, Autumn 1999.*

"Economic Analysis Related to Controversy Matters" Willamette Management Associates *Insights, 30th Anniversary Issue, 1999.*

"Revised Edition of *Valuation Training for Appeals Officers* Coursebook" Willamette Management Associates *Insights, Summer 1998.*

"Valuation Analysis of Restricted Stocks of Public Companies" Willamette Management Associates *Insights, Winter 1999.*

"Litigation", <u>Valuing Small Businesses and Professional Practices</u>, Pratt, Shannon P., 3rd ed. New York: McGraw-Hill, 1998.

"Fair Value in Dissenter Actions", <u>Financial Valuation: Businesses and Business Interests, 1997 Update</u>, Zukin, James H., New York: Warren, Gorham & Lamont, 1997.

"Fair Value in Dissenting Shareholder Disputes" Willamette Management Associates *Insights, Winter 1997.*

"Business Plans and Financing Memorandums" Willamette Management Associates *Insights, Spring 1997.*

"Murphy and Frank Provide Insight on Minority Interest Discounts" Willamette Management Associates *Insights, Autumn 1996.*

"Estate of Bonner: Court of Appeals Allows Valuation Discount for Fractional Undivided Interests" Willamette Management Associates *Insights, Autumn 1996.*

"Final Regulations Issued regarding Section 2701 Valuation Rule Gift and Estate Tax Adjustments" Willamette Management Associates *Valuation Insights, Winter 1995.*

"Quantitative and Qualitative Considerations in the Valuation of Medical Practices" Willamette Management Associates *Insights, Fall 1995.*

"IRS Letter Ruling Requires Different Valuation on Closely Held Stock for Estate Tax Purposes and for Marital Deduction Purposes" Willamette Management Associates *Insights, Summer 1994.*

### PRESENTATIONS AND LECTURES

12/07 "Tax Affecting is Not the Issue – Never Was"
The American Institute of Certified Public Accountants
National Business Valuation Conference
New Orleans, Louisiana

6/07 "Valuing Pass-through Entities"
The Institute of Business Appraisers
National Business Valuation Conference
Denver, Colorado

6/07 "The S Corporation Economic Adjustment Model"
National Association of Certified Valuation Analysts
National Business Valuation Conference
Washington, DC

5/07 "Valuation of S Corporations"
Center for Advanced Valuation Studies
American Society of Appraisers
Washington, DC

9/06 "Valuation of a Privately Owned Business"
School of Continuing Studies
Northwestern University, Chicago, Illinois

5/06 "The Valuation of Pass Through Entities"
The Standard Club, Chicago, Illinois
Sponsor: The Illinois Institute of Certified Public Accountants

2/06 "Marketing Your Practice and Yourself"
UBS Tower, Chicago, Illinois
Sponsor: The American Society of Appraisers

11/05 "S Corporations and Pass Through Entities"
Bellagio Hotel, Las Vegas, Nevada
Sponsors: The American Institute of Certified Public Accountants
        The American Society of Appraisers

10/05   "The S Corporation Economic Adjustment Model"
        Massachusetts Institute of Technology, Endicott House, Boston, Massachusetts
        Sponsor: The National Association of Certified Valuation Analysts

10/05   "Quantifying Marketability and Liquidity Discounts"
        The Tower Club at the Civic Opera House, Chicago, Illinois
        Sponsors: The American Society of Appraisers
                  The Business Valuation Society of Chicago

5/05    "Quantifying Discounts for Lack of Marketability and Lack of Liquidity"
        Metropolitan Hotel New York, New York
        Sponsor: The New York Chapter of the American Society of Appraisers

11/04   "The Valuation of Pass Through Entities: The Plot Thickens"
        JW Marriott Orlando Grande Lakes, Orlando, Florida
        The AICPA National Business Valuation Conference
        Sponsor: The American Institute of Certified Public Accountants

10/04   Business Valuation Made Understandable for Estate Planners
        The UBS Tower, Chicago, Illinois
        14th Annual Estate Planning with the Masters Series
        Sponsor: The Illinois Institute of Continuing Legal Education

9/04    "The S Corporation Economic Adjustment Model"
        The Tower Club, Chicago, Illinois
        Sponsor: The Business Valuation Association of Chicago

6/04    "S Corporation Valuation Issues: Tax Affecting Income and Minority vs. Control"
        Internet National Conference
        Sponsor: Business Valuation Resources, LLC

6/04    "The S Corporation Economic Adjustment Model"
        2004 Annual Business Valuation Conference
        The Paris Hotel, Las Vegas, Nevada
        Sponsor: The Institute of Business Appraisers

10/03   "The Value of Pass Through Entities"
        Valuation and Litigation Support Conference
        Mayfair Farms, West Orange, New Jersey
        Sponsor: The New Jersey Society of Certified Public Accountants

10/03   "The S Corporation Economic Adjustment Model"
        The 22nd Advanced Business Valuation Conference
        The Hyatt Regency, Chicago, Illinois
        Sponsor: American Society of Appraisers

Expert Report of Daniel R. Van Vleet                                    Page 22

7/03    "The Valuation of Limited Partnership Interests"
        The Hyatt – Printers Row, Chicago, Illinois
        Sponsor: The Center for Professional Education

7/03    "S Corporations vs. C Corporations: Important New Valuation Issues"
        The 9th Annual SuperConference
        The Westin Michigan Avenue, Chicago, Illinois
        Sponsor: Alliance of Mergers and Acquisitions Advisors

10/02   "Panel Review of New Research Articles in the Field of Business Valuation"
        The 21st Advanced Business Valuation Conference
        Walt Disney World Resort, Orlando, Florida
        Sponsor: American Society of Appraisers

4/01    *Finance 798: Business Valuation*
        Kellstadt Graduate School of Business
        DePaul University, Chicago, Illinois

1/01    *Finance 798: Business Valuation*
        Kellstadt Graduate School of Business
        DePaul University, Chicago, Illinois

5/00    "International Business Valuation Analysis and Non-Performing Loans"
        Sponsors:     Comprehensive Financial Management Program, Chicago, Illinois
                      The Chicago Institute of Futures and Options, Chicago, Illinois
                      The Hanvitt Bank, Seoul, Korea

10/99   "Valuation of Independent Trust Companies"
        Sponsor: Association of Independent Trust Companies, San Francisco, California

11/98   "Recent Court Case Developments in Business Valuation"
        Sponsor: American Society of Appraisers, Chicago, Illinois

8/98    "Recent Court Case Developments in Business Valuation"
        Sponsor: Estate Planning Council of Greater Joliet, Joliet, Illinois

7/98    "Expert Witness Training for General Engineers and Appraisers"
        Sponsor: Internal Revenue Service, Office of Chief Counsel, Chicago, Illinois

5/98    "Current Issues in Business Valuation"
        Sponsor: Illinois Association of Certified Public Accountants, Chicago, Illinois

2/98    "How to Value a Business—Reconciling Theory with Real World Practice"
        Sponsor: Twin Cities Society of Securities Analysts, Minneapolis, Minnesota

Expert Report of Daniel R. Van Vleet                                                      Page 23

1/97    "Distinguishing Professional & Enterprise Goodwill in Dissolutions"
        Sponsor: Kentucky Bar Association, Lexington, Kentucky

10/96   "The Asset Accumulation Approach to Business Valuation"
        Sponsor: Venture Club of Indiana, Indianapolis, Indiana

4/96    "The Adjusted Present Value Method"
        Sponsor: American Society of Appraisers, Chicago, Illinois

10/95   "Introduction to the Valuation of Businesses and Professional Practices"
        Sponsor: Arizona Society of Certified Public Accountants, Phoenix, Arizona

11/94   "Theoretical Concepts Concerning the Determination of Optimal Capital Structure"
        Sponsor: University of Chicago, Chicago, Illinois

4/92    "Estate & Gift Tax Vignettes"
        Sponsor: Business Valuation Association, Chicago, Illinois

### EXPERT TESTIMONY – TRIALS, ARBITRATIONS AND DEPOSITIONS

Mark Boyce, Plaintiff v. Soundview Technology, Inc., Defendant
United States District Court / Southern District of New York
Case No. 03 Civ. 2159 (HB)(FM)
Equity Security Valuation Analysis

In re Tomahawk Limited Partnership
United States Bankruptcy Court for the Northern District of Illinois
Case No. 02 B 38857
Interest Rate Analysis

Warren E. Shoulders v. J.A. Knight and Heat Controller, Inc.
Jackson County Circuit Court, Jackson, Michigan
No. 9573120CK
Shareholder Dispute

Telechron of Florida, Inc. v. General Electric Company
American Arbitration Association, Indiana District
AAA No. 524890007498
Economic Damages Related to a Business Combination

Dye v. Dye
Whitley Circuit Court, Columbia City, Indiana
Cause No. 92C019712DR411
Marital Dissolution

Mary Keough Lyman v. Herbert M. Lyman, Sr.
Iowa District Court for Johnson County, Iowa City, Iowa
No. 10171
Dissolution of Marriage

E. Jerome McCarthy v. Lyle W. Miller
Ingham County Circuit Court, Lansing, Michigan
No. 9683948CZ
Shareholder Dispute

In the Marriage of: Eda Eisenberg and Jeffrey Eisenberg
Circuit Court of Cook County, Illinois
No. 01D1797
Valuation of a Hedge Fund
Dissolution of Marriage

James Bronner and Robert Gilhooley and SFX Sports Group, Inc., et al.
Arbitration Hearing Testimony
American Arbitration Association
AAA No. 51160005801
Economic Damages Related to a Business Combination

Align Risk Analysis, Inc. v. Robin Robinson
Circuit Court of Cook County, Illinois
Case No. 99 L 012289
Economic Damages Related to an Equity Capital Infusion

William Harison Crabel and Lori Marie Crabel
Case No. 03-FA-043-B2
Circuit Court for Ozaukee County, Wisconsin
Valuation of a Hedge Fund
Marital Dissolution

Salt Lake Tribune Publishing Co., LLC v. Management Planning, Inc.
Civil No. 2:03-CV-565-PGC
United States District Court for the District of Utah
Dispute Related to the Strike Price of an Option on a Newspaper Property

In the Matter of the Revocable Trust Agreement of Kay Joan Brown
Cause No. 35C01-0404-TR-00012
Huntington Circuit Court, Huntington County, Indiana
Shareholder Dispute

**APPENDIX B**

**SOURCES OF INFORMATION**

## SOURCES OF INFORMATION

The sources of information considered in my analysis included—but were not limited to—the following:

- Bloomberg's online database covering financial markets, commodities, and news;

- *Blue Chip Econometric Detail,* December 10, 1997;

- *Blue Chip Economic Indicators*, December 10, 1997;

- Ibbotson Associates' SBBI Valuation Edition 1997 Yearbook;

- Duff & Phelps Size/Return Study;

- Duff & Phelps Risk/Return Study;

- Medical Information Technology, Inc. SEC 10-K for the fiscal year ended December 31, 1997;

- Meditech historical balance sheets as of December 31, 1994 through 1997;

- Meditech historical income statements for fiscal years ended December 31, 1994 through 1997;

- Report to the Board of Directors for quarters ended March 31, 1997, June 30, 1997, September 30, 1997, and December 31, 1997;

- SEC Forms 10-K and 10-Q for the guideline public companies used in my analysis;

- Standard & Poor's Capital IQ database of publicly traded companies;

- *Trends & Projections, Standard & Poor's Industry Surveys*, December 11, 1997;

- United States District Court, District of Massachusetts, "Michael P. Hubert, et. al. v. Medical Information Profit Sharing Plan, et. al.," Amended Class Action Complaint and Demand for Jury Trial, Civil Case No. 05-10269-RWZ; and

- Company internal documents regarding its competitors for the 1996 through 1998 period.

**APPENDIX C**

**QUANTITATIVE EXHIBITS**

## MEDICAL INFORMATION TECHNOLOLGY
## TABLE OF EXHIBITS

| Description | Exhibit |
| --- | --- |
| Summary | |
| Results of Analysis and Indicated Value | I |
| Historical Financial Statements | |
| Historical and Common Size Balance Sheets | II |
| Historical and Common Size Income Statements | III |
| Historical Statements of Cash Flow | IV |
| Historical Ratio Analysis | V |
| Income Approach: Discounted Cash Flow Method | |
| Summary Calculations and Indicated Value | VI |
| Projected Income Statements and Cash Flow Analysis | VII |
| Projected Income Statements Common Size Analysis | VIII |
| Rate of Return Determination | |
| Summary of Concluded Weighted Average Cost of Capital | IX |
| Capital Asset Pricing Model | X |
| Duff & Phelps Size/Return Study | XI |
| Duff & Phelps Risk/Return Study | XII |
| Market Approach: Guideline Public Company Method | |
| Summary Calculations and Indicated Value | XIII |
| Financial Detail of Guideline Public Companies | XIV |
| Adjustment Factor Analysis | XV |
| Comparable Company Tearsheet - Advent Software, Inc. | XVI |
| Comparable Company Tearsheet - Aspen Technology, Inc. | XVII |
| Comparable Company Tearsheet - Cerner Corp. | XVIII |
| Comparable Company Tearsheet - Shared Medical Systems Corp. | XIX |
| Indication of Discount for Lack of Marketability | |
| Summary of Restricted Stock Studies | XX |
| Summary of Emory Initial Public Offering Studies | XXI |
| Summary of Willamette Initial Public Offering Studies | XXII |

Expert Report of Daniel R. Van Vleet                                                    Page 29

**EXHIBIT I**
**MEDICAL INFORMATION TECHNOLOLGY**
**SUMMARY**
**RESULTS OF ANALYSIS AND INDICATED VALUE**

| Valuation Method | Indicated Value | Method Weighting | ($000) (1) |
|---|---|---|---|
| Income Approach: Discounted Cash Flow Method | 880,739 | 75% | 660,555 |
| Market Approach: Guideline Public Company Method | 1,067,890 | 25% | 266,973 |
| Indicated Fair Market Value of the Equity (Marketable, Non-Controlling Basis) | | | 927,527 |
| Less: Discount for Lack of Marketability @ 25% | | | 231,882 |
| Indicated Fair Market Value of the Equity (Non-marketable, Non-Controlling Basis) | | | 695,645 |
| Divided by: Total Common Shares Outstanding (3) | | | 32,174 |
| **Indicated Fair Market Value of Common Stock of Medical Information Technology Per Share** | | | **$  21.62** |

Notes:
(1) Dollars in thousands, except for per share values.
(2) Total Meditech debt from the December 31, 1997 balance sheet.
(3) As of the Valuation Date, there were approximately 16,087,212 shares; equal to 32,174,424 after stock split adjustment.

Expert Report of Daniel R. Van Vleet                                    Page 30

**EXHIBIT II**
**MEDICAL INFORMATION TECHNOLOLGY**
**HISTORICAL FINANCIAL STATEMENTS**
**HISTORICAL AND COMMON SIZE BALANCE SHEETS**

| | At December 31: | | | | At December 31: | | | |
| | 1994 ($000) | 1995 ($000) | 1996 ($000) | 1997 ($000) | 1994 (%) | 1995 (%) | 1996 (%) | 1997 (%) |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| | | | | | | | | |
| Current Assets | | | | | | | | |
| Cash | 12,907 | 6,512 | 18,063 | 8,379 | 9.4 | 3.3 | 8.3 | 3.2 |
| Marketable Securities | 49,992 | 54,072 | 61,142 | 62,349 | 36.3 | 27.3 | 28.0 | 23.7 |
| Accounts Receivable | 13,939 | 20,183 | 21,816 | 26,260 | 10.1 | 10.2 | 10.0 | 10.0 |
| Prepaid Expenses | 3,122 | 103 | 90 | 99 | 2.3 | 0.1 | 0.0 | 0.0 |
| Total Current Assets | 79,961 | 80,870 | 101,111 | 97,088 | 58.0 | 40.8 | 46.3 | 36.9 |
| | | | | | | | | |
| Property, Plant, and Equipment | | | | | | | | |
| Land and Improvements | | 20,500 | 10,927 | 11,887 | - | 10.4 | 5.0 | 4.5 |
| Buildings and Improvements | | 98,825 | 99,655 | 143,126 | - | 49.9 | 5.9 | 7.0 |
| Office Furniture and Equipment | | 10,533 | 12,779 | 18,507 | - | 5.3 | 45.6 | 54.4 |
| Computer Equipment | | 8,571 | 20,404 | 26,604 | - | 4.3 | 9.3 | 10.1 |
| Total PP&E | | 138,429 | 143,764 | 200,123 | - | 69.9 | 65.8 | 76.1 |
| Less: Accumulated Depreciation | | 23,811 | 28,648 | 36,155 | - | 12.0 | 13.1 | 13.7 |
| Total Net PP&E | 54,889 | 114,618 | 115,117 | 163,968 | 39.8 | 57.9 | 52.7 | 62.3 |
| | | | | | | | | |
| Investments | 2,905 | 2,511 | 2,111 | 2,052 | 2.1 | 1.3 | 1.0 | 0.8 |
| | | | | | | | | |
| Total Assets | 137,755 | 197,999 | 218,339 | 263,108 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | | | | | | | |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | | | | |
| | | | | | | | | |
| Current Liabilities | | | | | | | | |
| Current Portion of Notes Payable | - | 12,000 | 12,000 | 18,000 | - | 6.1 | 5.5 | 6.8 |
| Accounts Payable | 199 | 321 | 837 | 695 | 0.1 | 0.2 | 0.4 | 0.3 |
| Accrued Taxes | 1,838 | 1,688 | 2,455 | 1,748 | 1.3 | 0.9 | 1.1 | 0.7 |
| Accrued Expenses | 10,059 | 11,400 | 13,609 | 15,598 | 7.3 | 5.8 | 6.2 | 5.9 |
| Customer Deposits | 7,154 | 7,887 | 11,837 | 16,135 | 5.2 | 4.0 | 5.4 | 6.1 |
| Total Current Liabilities | 19,251 | 33,296 | 40,739 | 52,177 | 14.0 | 16.8 | 18.7 | 19.8 |
| | | | | | | | | |
| Long Term Liabilities | | | | | | | | |
| Notes Payable | - | 26,000 | 14,000 | 19,500 | - | 13.1 | 6.4 | 7.4 |
| Deferred Taxes | 755 | 874 | 1,132 | 1,900 | 0.5 | 0.4 | 0.5 | 0.7 |
| Total Long Term Liabilities | 754.9 | 26,874 | 15,132 | 21,400.0 | 0.5 | 13.6 | 6.9 | 8.1 |
| | | | | | | | | |
| Total Liabilities | 20,006 | 60,170 | 55,871 | 73,577 | 14.5 | 30.4 | 25.6 | 28.0 |
| | | | | | | | | |
| Stockholders' Equity | | | | | | | | |
| Common Stock | | 3,958 | 3,985 | 4,022 | | | | |
| Additional Paid in Capital | | 5,221 | 7,680 | 11,335 | | | | |
| Retained Earnings | | 128,649 | 150,803 | 174,174 | | | | |
| Total Stockholders' Equity | 117,749 | 137,828 | 162,468 | 189,531 | 85.5 | 69.6 | 74.4 | 72.0 |
| | | | | | | | | |
| Total Liabilities & Stockholders' Equity | 137,755 | 197,999 | 218,339 | 263,108 | 100.0 | 100.0 | 100.0 | 100.0 |

Sources:
Medical Information Technology Form 10-Ks.

**EXHIBIT III**
**MEDICAL INFORMATION TECHNOLOGY**
**HISTORICAL FINANCIAL STATEMENTS**
**HISTORICAL AND COMMON SIZE INCOME STATEMENTS**

| | Period Ended December 31: | | | | Period Ended December 31: | | | |
|---|---|---|---|---|---|---|---|---|
| | 1994 ($000) | 1995 ($000) | 1996 ($000) | 1997 ($000) | 1994 (%) | 1995 (%) | 1996 (%) | 1997 (%) |
| **Operating Revenues** | | | | | | | | |
| Software Products | 79,794 | 94,356 | 109,317 | 126,575 | 64.2 | 65.7 | 65.1 | 65.3 |
| Software Services | 40,000 | 44,963 | 52,154 | 62,029 | 32.2 | 31.3 | 31.1 | 32.0 |
| Other | 4,429 | 4,401 | 6,413 | 5,200 | 3.6 | 3.1 | 3.8 | 2.7 |
| Total Operating Revenue | 124,223 | 143,721 | 167,884 | 193,805 | 100.0 | 100.0 | 100.0 | 100.0 |
| *% annual growth* | NM | 15.7% | 16.8% | 15.4% | | | | |
| **Costs and Expenses** | | | | | | | | |
| Operating and Product Development | 41,502 | 48,067 | 55,298 | 65,582 | 33.4 | 33.4 | 32.9 | 33.8 |
| Depreciation and Amortization | 3,294 | 4,809 | 6,156 | 9,084 | 2.7 | 3.3 | 3.7 | 4.7 |
| Selling, General, and Administrative | 28,172 | 32,331 | 36,880 | 40,853 | 22.7 | 22.5 | 22.0 | 21.1 |
| Total Costs and Expenses | 72,968 | 85,208 | 98,334 | 115,519 | 58.7 | 59.3 | 58.6 | 59.6 |
| Gross Profit | 51,255 | 58,513 | 69,550 | 78,286 | 41.3 | 40.7 | 41.4 | 40.4 |
| **Other Income/(Expenses)** | | | | | | | | |
| Dividend, Interest & Other Income | 2,911 | 6,401 | 8,938 | 12,236 | 2.3 | 4.5 | 5.3 | 6.3 |
| Interest Expenses | - | (3,947) | (2,733) | (2,394) | - | (2.7) | (1.6) | (1.2) |
| Other Expenses | (220) | (1,302) | (1,794) | (3,485) | (0.2) | (0.9) | (1.1) | (1.8) |
| Total Other Income/(Expense) | 2,691 | 1,152 | 4,411 | 6,357 | 2.2 | 0.8 | 2.6 | 3.3 |
| Income Before Taxes | 53,946 | 59,665 | 73,961 | 84,643 | 43.4 | 41.5 | 44.1 | 43.7 |
| Provision for Income Taxes | 21,756 | 22,580 | 29,611 | 34,359 | 17.5 | 15.7 | 17.6 | 17.7 |
| Net Income | 32,190 | 37,085 | 44,350 | 50,284 | 25.9 | 25.8 | 26.4 | 25.9 |
| Dividends Paid | 16,259 | 19,588 | 22,195 | 26,914 | | | | |
| Dividend Payout Ratio | 50.5% | 52.8% | 50.0% | 53.5% | | | | |

Sources:
Medical Information Technology Form 10-Ks.

**EXHIBIT IV**
**MEDICAL INFORMATION TECHNOLOLGY**
**HISTORICAL FINANCIAL STATEMENTS**
**HISTORICAL STATEMENTS OF CASH FLOW**

|  | *Period Ended December 31:* | | | |
|---|---|---|---|---|
|  | 1994 | 1995 | 1996 | 1997 |
|  | ($000) | ($000) | ($000) | ($000) |
| Cash Flows From Operating Activities |  |  |  |  |
| Net income | 32,190 | 37,085 | 44,350 | 50,284 |
|  |  |  |  |  |
| Adjustments to Reconcile Net Income: |  |  |  |  |
| Depreciation | 3,294 | 4,809 | 6,156 | 9,084 |
| Deferred Income Taxes | 178 | 119 | 258 | 768 |
| Profit Sharing Plan | 510 | 600 | 840 | 1,080 |
| Net (Gain) Loss on Sale of Securities | (14) | 9 | (4) | (6) |
| Net (Gain) Loss on Sale of Fixed Assets | - | - | (1,409) | - |
| Write-down of Investments | 1,000 | - | 400 | - |
| Allowance for Doubtful Accounts | - | - | 50 | 60 |
|  |  |  |  |  |
| Changes in Assets and Liabilities: |  |  |  |  |
| Accounts Receivable | 100 | (6,244) | (1,682) | (4,504) |
| Prepaid Expenses | (2,998) | 3,019 | 13 | (9) |
| Accounts Payable | (54) | 122 | 517 | (143) |
| Accrued Expenses | 1,855 | 1,191 | 2,976 | 1,282 |
| Customer Deposits | (843) | 733 | 3,950 | 4,298 |
|  |  |  |  |  |
| Net Cash Provided by Operating Activities | 35,218 | 41,443 | 56,413 | 62,195 |
|  |  |  |  |  |
|  |  |  |  |  |
| Cash Flows From Investing Activities |  |  |  |  |
| Purchases of Property, Plant, and Equipment | (1,509) | (64,539) | (6,838) | (57,936) |
| Sales of Property, Plant and Equipment | (35,406) | - | 1,592 | - |
| Purchases of Marketable Securities | 26,392 | (4,589) | (11,823) | (18,374) |
| Sales of Marketable Securities | (2,975) | 500 | 4,756 | 17,173 |
| Decrease in Investments | - | 394 | - | 59 |
|  |  |  |  |  |
| Net Cash Used in Investing Activities | (13,498) | (68,233) | (12,312) | (59,077) |
|  |  |  |  |  |
|  |  |  |  |  |
| Cash Flows From Financing Activities |  |  |  |  |
| Borrowings on Note Payable to a Bank | - | 50,000 | - | 43,000 |
| Payments of Note Payable to a Bank | - | (12,000) | (12,000) | (31,500) |
| Sale of Common Stock | 1,255 | 1,953 | 2,139 | 2,612 |
| Purchase of Trreasury Stock | - | - | (4,838) | - |
| Sale of Treasury Stock | - | - | 4,345 | - |
| Dividends Paid | (16,259) | (19,558) | (22,195) | (26,914) |
|  |  |  |  |  |
| Net Cash Provided by (Used In) Financing Activities | (15,004) | 20,394 | (32,550) | (12,801) |

Sources:
Medical Information Technology Form 10-Ks.

Expert Report of Daniel R. Van Vleet                                         Page 33

---

**EXHIBIT V**
**MEDICAL INFORMATION TECHNOLOLGY**
**HISTORICAL FINANCIAL STATEMENTS**
**HISTORICAL RATIO ANALYSIS**

| | Fiscal Years Ended October 31, | | | |
| --- | --- | --- | --- | --- |
| | 1994 | 1995 | 1996 | 1997 |
| **LIQUIDITY** | | | | |
| Current Ratio | 4.2 | 2.4 | 2.5 | 1.9 |
| Quick Ratio | 4.0 | 3.8 | 3.5 | 2.8 |
| Operating Working Capital ($000) [a] | (2,189) | (1,010) | (6,833) | (7,818) |
| **ACTIVITY** | | | | |
| Average Operating Working Capital / Revenues (%) [a] | NM | (1.1) | (2.3) | (3.8) |
| D&A / PY Prop., Plant & Equip., Net (excl. Land) (%) | NM | 8.8 | 6.5 | 8.7 |
| Turnover: | | | | |
| Receivables | NM | 8.4 | 8.0 | 8.1 |
| Total Asset | NM | 0.9 | 0.8 | 0.8 |
| Capital Expenditures/PY Gross PP&E Less Land (%) | NM | 76.1 | 6.0 | 41.5 |
| **PERFORMANCE** | | | | |
| Revenues/Net Property, Plant and Equipment | NM | 1.7 | 1.5 | 1.4 |
| Revenues/Stockholder Equity | NM | 1.1 | 1.1 | 1.1 |
| **PROFITABILITY (%)** | | | | |
| Operating Margin Before Depreciation | 43.9 | 63.2 | 45.1 | 45.1 |
| Operating Margin After Depreciation | 41.3 | 40.7 | 41.4 | 40.4 |

---

Footnote:
[a] Excludes cash, cash equivalents and interest bearing debt.

Sources:
Exhibit I, Exhibit II, Exhibit III, and D&P calculations.

Expert Report of Daniel R. Van Vleet                                              Page 34

---

**EXHIBIT VI**
**MEDICAL INFORMATION TECHNOLOLGY**
**INCOME APPROACH: DISCOUNTED CASH FLOW METHOD**
**SUMMARY CALCULATIONS AND INDICATED VALUE**

---

|                                                                              | ($000)  |
|------------------------------------------------------------------------------|---------|
| Sum of Present Value of Available Cash Flow During Projection Period          | 444,088 |
| Plus:  Present Value of Residual Available Cash Flow                          | 474,152 |
| Indicated Business Enterprise Value (Marketable, Non-Controlling Basis)       | 918,239 |
| Less:  Interest-Bearing Obligations as of Valuation Date (1)                  | 37,500  |
| Indicated Fair Market Value of the Equity (Marketable, Non-Controlling Basis) | 880,739 |

---

Notes:
(1) Total Meditech debt from the December 31, 1997 balance sheet.

**EXHIBIT VII**
**MEDICAL INFORMATION TECHNOLOGY**
**INCOME APPROACH: DISCOUNTED CASH FLOW METHOD**
**PROJECTED INCOME STATEMENTS AND CASH FLOW ANALYSIS**

| | Management Projections | | | | Trended to Long Term Sustainable Growth | | | | | Terminal Year |
| | 1998 ($000) | 1999 ($000) | 2000 ($000) | 2001 ($000) | 2002 ($000) | 2003 ($000) | 2004 ($000) | 2005 ($000) | 2006 ($000) | ($000) |
|---|---|---|---|---|---|---|---|---|---|---|
| Operating Revenue | 213,075 | 243,744 | 279,065 | 319,734 | 360,695 | 400,548 | 437,746 | 470,684 | 497,805 | 517,718 |
| Revenue Growth | 9.9% | 14.4% | 14.5% | 14.6% | 12.8% | 11.0% | 9.3% | 7.5% | 5.8% | 4.0% |
| **Costs and Expenses** | | | | | | | | | | |
| Operating and Product Development | 72,446 | 82,873 | 94,882 | 108,710 | 122,636 | 136,186 | 148,834 | 160,032 | 169,254 | 176,024 |
| Depreciation Expense | 9,980 | 11,011 | 12,542 | 15,930 | 14,428 | 16,022 | 17,510 | 18,827 | 19,912 | 20,709 |
| Selling, General, and Administrative | 44,450 | 52,022 | 60,368 | 68,321 | 77,550 | 86,118 | 94,115 | 101,197 | 107,028 | 111,309 |
| Total Costs and Expenses | 126,875 | 145,906 | 167,792 | 192,961 | 214,614 | 238,326 | 260,459 | 280,057 | 296,194 | 308,042 |
| Gross Margin | 86,200 | 97,838 | 111,273 | 126,773 | 146,082 | 162,222 | 177,287 | 190,627 | 201,611 | 209,676 |
| Other Income | 16,440 | 15,910 | 17,615 | 19,323 | 21,642 | 24,033 | 26,265 | 28,241 | 29,868 | 31,063 |
| Other Expense | (8,697) | (6,124) | (4,717) | (8,182) | (9,017) | (10,014) | (10,944) | (11,767) | (12,445) | (12,943) |
| Pre-tax Income | 93,943 | 107,624 | 124,171 | 137,914 | 158,706 | 176,241 | 192,608 | 207,101 | 219,034 | 227,796 |
| Income Taxes (Benefit) | 38,410 | 43,050 | 49,668 | 55,166 | 63,482 | 70,496 | 77,043 | 82,840 | 87,614 | 91,118 |
| Net Income after Taxes | 55,533 | 64,574 | 74,503 | 82,748 | 95,224 | 105,745 | 115,565 | 124,261 | 131,421 | 136,678 |
| **Cash Flow** | | | | | | | | | | |
| Net Income after Taxes | 55,533 | 64,574 | 74,503 | 82,748 | 95,224 | 105,745 | 115,565 | 124,261 | 131,421 | 136,678 |
| Plus: Estimated Tax Affected Interest Expense | 1,283 | 473 | 1,159 | 1,710 | 1,929 | 2,142 | 2,341 | 2,517 | 2,662 | 2,769 |
| Plus: Depreciation Expense | 9,980 | 11,011 | 12,542 | 15,930 | 14,428 | 16,022 | 17,510 | 18,827 | 19,912 | 20,709 |
| Less: Capital Expenditures | (5,000) | (7,295) | (83,390) | (9,648) | (10,884) | (12,087) | (13,209) | (14,203) | (15,021) | (21,537) |
| Incremental Working Capital Investment | (2,648) | 6,041 | 1,820 | 1,874 | 1,638 | 1,594 | 1,488 | 1,318 | 1,085 | 796 |
| Available Cash Flow | 59,148 | 74,804 | 6,634 | 92,614 | 102,335 | 113,416 | 123,695 | 132,720 | 140,059 | 139,415 |
| Present Value Factor | 0.9374 | 0.8237 | 0.7238 | 0.6361 | 0.5589 | 0.4912 | 0.4316 | 0.3793 | 0.3333 | |
| Present Value of Available Cash Flow | 55,445 | 61,616 | 4,802 | 58,912 | 57,195 | 55,710 | 53,387 | 50,341 | 46,682 | |
| Sum of Present Value of Available Cash Flow | 444,088 | | | | | | | | | |

| Residual Calculation | |
|---|---|
| Residual Cash Flow | 139,415 |
| Divided By: Cap Rate (r-g) | 9.8% |
| Equal: Residual Value | 1,422,597 |
| Times: PV Factor | 0.3333 |
| PV of Residual Value | 474,152 |

Expert Report of Daniel R. Van Vleet

**EXHIBIT VIII**
**MEDICAL INFORMATION TECHNOLOLOGY**
**INCOME APPROACH: DISCOUNTED CASH FLOW METHOD**
**PROJECTED INCOME STATEMENTS COMMON SIZE ANALYSIS**

| | Management Projections | | | | Trended to Long Term Sustainable Growth | | | | | Terminal Year |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 1998 (%) | 1999 (%) | 2000 (%) | 2001 (%) | 2002 (%) | 2003 (%) | 2004 (%) | 2005 (%) | 2006 (%) | (%) |
| Operating Revenue | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Costs and Expenses | | | | | | | | | | |
| Operating and Product Development | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 |
| Depreciation Expense | 4.7 | 4.5 | 4.5 | 5.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| Selling, General, and Administrative | 20.9 | 21.3 | 21.6 | 21.4 | 21.5 | 21.5 | 21.5 | 21.5 | 21.5 | 21.5 |
| Total Costs and Expenses | 59.5 | 59.9 | 60.1 | 60.4 | 59.5 | 59.5 | 59.5 | 59.5 | 59.5 | 59.5 |
| Gross Margin | 40.5 | 40.1 | 39.9 | 39.6 | 40.5 | 40.5 | 40.5 | 40.5 | 40.5 | 40.5 |
| Other Income | 7.7 | 6.5 | 6.3 | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 |
| Other Expenses | (4.1) | (2.5) | (1.7) | (2.6) | (2.5) | (2.5) | (2.5) | (2.5) | (2.5) | (2.5) |
| Pre-Tax Income | 44.1 | 44.2 | 44.5 | 43.1 | 44.0 | 44.0 | 44.0 | 44.0 | 44.0 | 44.0 |
| Income Taxes (Benefit) | 18.0 | 17.7 | 17.8 | 17.3 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 |
| Net Income after Taxes | 26.1 | 26.5 | 26.7 | 25.9 | 26.4 | 26.4 | 26.4 | 26.4 | 26.4 | 26.4 |

Expert Report of Daniel R. Van Vleet                                    Page 37

---

**EXHIBIT IX**
**MEDICAL INFORMATION TECHNOLOLGY**
**INCOME APPROACH: DISCOUNTED CASH FLOW METHOD**
**RATE OF RETURN DETERMINATION**
**SUMMARY OF CONCLUDED WEIGHTED AVERAGE COST OF CAPITAL**

| WACC Methodology | | Reference |
|---|---|---|
| Capital Asset Pricing Model | 13.5% | EXHIBIT X |
| Duff & Phelps Size/Return Study | 15.5% | EXHIBIT XI |
| Duff & Phelps Risk/Return Study | 12.5% | EXHIBIT XII |
| **Concluded WACC** | 13.8% | |

Notes:
(1) Concluded WACC based upon Capital Asset Pricing Model.

EXHIBIT X
MEDICAL INFORMATION TECHNOLOGY
INCOME APPROACH: DISCOUNTED CASH FLOW METHOD
RATE OF RETURN DETERMINATION
CAPITAL ASSET PRICING MODEL

**Assumptions:**

| | | | Source |
|---|---|---|---|
| Risk-free Rate (20 Year Government Bond) | $R_f$ = | 6.0% | U.S. 20 Year Treasury Yield as of 12/31/97 |
| Pretax Cost of Debt (Moody's Long-Term Corporate Baa Interest Rate) | $i$ = | 7.2% | Moody's BAA 20 Year Bond Yield as of 12/31/97 |
| Equity Risk Premium (Consensus Equity Risk Premium) | $R_p$ = | 6.0% | Consensus |
| Small Stock Premium | $S_{sp}$ = | 1.5% | SBBI 1998 Yearbook 6th Decile |
| Effective Tax Rate | $t$ = | 39.3% | Blended U.S. Tax Rate |
| Beta (Based on Industry Average) | $\beta$ = | 1.06 | Relevered Industry Beta |
| Long-Term Debt as a % of Total Capitalization (Based on Industry Average) | $D$ = | 5.0% | |
| Market Value of Equity as a % of Total Capitalization (Based on Industry Average) | $E$ = | 95.0% | |

**Tax Rate Calculation**

Effective Income Tax Rate - Based on Average Comparable Company Tax Rates    39.3%

**Comparable Company Analysis (in $000)**

| | Barra Betas | Debt + Preferred | Equity | Total Capital | Debt/Equity | Debt/Capital | Tax Rate | Unlevered Beta |
|---|---|---|---|---|---|---|---|---|
| Advent Software, Inc. | 0.83 | - | 217,035 | 217,035 | 0.0% | 0.0% | 39.3% | 0.83 |
| Aspen Technology Inc. | 0.98 | 1,914 | 725,624 | 727,538 | 0.3% | 0.3% | 39.3% | 0.98 |
| Cerner Corp. | 1.36 | 30,061 | 688,998 | 719,059 | 4.4% | 4.2% | 39.3% | 1.33 |
| SMS | 1.01 | 66,691 | 1,655,696 | 1,722,387 | 4.0% | 3.9% | 39.3% | 0.98 |
| Average (Rounded) | 1.04 | | | | 2.1% | 2.1% | | 1.03 |

Relevering Calculations

Unlevered Beta = Beta (Observed) / ( 1 + D/E (1 - t))
Relevered Beta = Unlevered Beta * [ 1 + D/E (1 - t)]

| | Weighting |
|---|---|
| | 5.0% |
| | 95.0% |

**Relevered Beta Analysis**

| | |
|---|---|
| Beta (Unlevered) | 1.03 |
| D/E | 5.3% |
| Tax Rate | 39.3% |
| Beta (Relevered) | 1.06 |

**Weighted Average Cost of Capital – Capital Asset Pricing Model**

| | | WACC |
|---|---|---|
| After Tax Cost of Debt [ (i) * (1 - t) ] = | 4.4% | 0.2% |
| Cost of Equity [ $R_f$ + CRP + $\beta$ ($R_p$) ($R_v$) + $S_{sp}$ ] = | 13.8% | 13.1% |
| | | 13.4%   Rounded   13.5% |

Expert Report of Daniel R. Van Vleet                                    Page 39

---

**EXHIBIT XI**
**MEDICAL INFORMATION TECHNOLOLGY**
**INCOME APPROACH: DISCOUNTED CASH FLOW METHOD**
**RATE OF RETURN DETERMINATION**
**DUFF & PHELPS SIZE/RETURN STUDY**

---

| Financial Criteria | Subject Company Results ($000) | Applied Portfolio | Smoothed Premium |
|---|---|---|---|
| Net Income (1) | 40,977 | 13 | 9.0% |
| Total Assets | 263,108 | 21 | 10.7% |
| EBITDA (2) | 76,158 | 17 | 10.1% |
| Sales | 193,805 | 23 | 11.0% |
| | | | |
| Equity Risk Premium | | | 10.2% |
| Risk-free Rate (20 Year Government Bond) | | | 6.0% |

| OTHER ASSUMPTIONS | |
|---|---|
| Pretax Cost of Debt (Moody's Long-Term Corporate Baa Interest Rate) | 7.2% |
| Effective Tax Rate | 39.3% |
| | |
| Industry Capital Structure: | |
| Debt/Total Capital | 5.0% |
| Equity/Total Capital | 95.0% |

| CALCULATION OF WEIGHTED AVERAGE COST OF CAPITAL | | | | | |
|---|---|---|---|---|---|
| | Implied Cost | | Weighting (3) | | Calculation |
| After Tax Cost of Debt [ (i) * (1 - t) ] = | 4.4% | X | 5.0% | = | 0.2% |
| Cost of Equity [ Rf + CRP + ERP ] = | 16.2% | X | 95.0% | = | 15.4% |
| Weighted Average Cost of Capital | | | | | 15.6% |
| | | | **Rounded** | | **15.5%** |

Notes:
(1) Average Net Income was included using historical 1994-1997.
(2) Average EBITDA was included using historical 1994-1997.
(3) The capital structure estimated in this calculation reflects the average capital structure for companies with similar operations as the subject company.

Expert Report of Daniel R. Van Vleet

Page 40

---

**EXHIBIT XII**
**MEDICAL INFORMATION TECHNOLOLGY**
**INCOME APPROACH: DISCOUNTED CASH FLOW METHOD**
**RATE OF RETURN DETERMINATION**
**DUFF & PHELPS RISK/RETURN STUDY**

---

RETURN ON EQUITY CALCULATION

| Financial Criteria (1) | Applied Portfolio | Smoothed Premium |
|---|---|---|
| 4-Year Average Operating Margin | 1 | 5.5% |
| Coefficient of Variation - Operating Margin | 23 | 7.8% |
| Coefficient of Variation - Return on Equity | 25 | 6.9% |
| Equity Risk Premium | | 6.7% |
| Risk-Free Rate | | 6.0% |

| OTHER ASSUMPTIONS | |
|---|---|
| Pretax Cost of Debt (Moody's Long-Term Corporate Baa Interest Rate) | 7.2% |
| Effective Tax Rate | 39.3% |
| Industry Capital Structure: | |
| Debt/Total Capital | 5.0% |
| Equity/Total Capital | 95.0% |

| CALCULATION OF WEIGHTED AVERAGE COST OF CAPITAL | | | |
|---|---|---|---|
| | Required Return | Weighting (3) | WACC |
| After Tax Cost of Debt [ (i) * (1 - t) ] = | 4.4% | 5.0% | 0.2% |
| Cost of Equity [ Rf + CRP + ERP (Rv) ] ≈ | 12.7% | 95.0% | 12.1% |
| Weighted Average Cost of Capital | | | 12.3% |
| | | **Rounded,** | **12.5%** |

---

Notes:

(1) Financial criteria is based on the years 1994, 1995, 1996, and 1997.

(2) The capital structure estimated in this calculation reflects the average capital structure for companies with similar operations as the subject company.

Expert Report of Daniel R. Van Vleet                                              Page 41

---

**EXHIBIT XIII**
**MEDICAL INFORMATION TECHNOLOLGY**
**MARKET APPROACH: GUIDELINE PUBLIC COMPANY METHOD**
**SUMMARY CALCULATIONS AND INDICATED VALUE**

---

| GUIDELINE PUBLIC COMPANY | Adjustment Factor (1) | MVIC / EBITDA |
|---|---|---|
| Advent Software, Inc. | 0.7509 | 12.9 |
| Aspen Technology Inc. | 0.6818 | 10.6 |
| Cerner Corp. | 0.6846 | 12.2 |
| Shared Medical Systems Corp. | 0.8088 | 10.0 |
| Min | | 10.0 |
| Max | | 12.9 |
| Average | | 11.4 |
| Median | | 11.4 |
| Indicated EBITDA Multiple, Rounded (2) | | 11.5 |

|  | ($000) |
|---|---|
| Subject Company Last Twelve Months EBITDA | 96,121 |
| Times: Indicated EBITDA Multiple | 11.5 |
| Indicated Business Enterprise Value (Marketable, Non-Controlling Basis) | 1,105,390 |
| Less:  Book Value of Interest-Bearing Debt (1) | 37,500 |
| Indicated Fair Market Value of Equity (Marketable, Non-Controlling basis) | 1,067,890 |

---

Notes:
(1) Total Meditech debt from the December 31, 1997 balance sheet.

Expert Report of Daniel R. Van Vleet　　　　　　　　　　　　　　　　Page 42

**EXHIBIT XIV**
**MEDICAL INFORMATION TECHNOLOGY**
**MARKET APPROACH: GUIDELINE PUBLIC COMPANY METHOD**
**FINANCIAL DETAIL OF GUIDELINE PUBLIC COMPANIES**

| | Meditech ($000) | Advent Software, Inc. ($000) | Aspen Technology Inc. ($000) | Cerner Corp. ($000) | Shared Medical Systems Corp. ($000) |
|---|---|---|---|---|---|
| **Comparable Company Financial Information (Latest Twelve Months)** | | | | | |
| Stock Price as of the Valuation Date (in actual dollars) | N/A | 28.63 | 34.25 | 21.13 | 66.00 |
| Common Shares Outstanding (in 1000s) | N/A | 7,582 | 21,186 | 32,615 | 25,086 |
| Equals: Market Value of Equity | N/A | 217,035 | 725,624 | 688,998 | 1,655,696 |
| Plus: Total Debt (including preferred) | N/A | - | 1,914 | 30,061 | 66,691 |
| Equals: MVIC | N/A | 217,035 | 727,538 | 719,059 | 1,722,387 |
| | | | | | |
| Revenue | 193,805 | 48,613 | 201,990 | 245,057 | 896,235 |
| Last Twelve Months EBITDA | 87,370 | 11,368 | 41,438 | 40,245 | 139,550 |
| Other Income / Expense | 8,751 | 1,236 | 5,195 | - | - |
| Adjusted EBITDA | 96,121 | 12,604 | 46,633 | 40,245 | 139,550 |
| | | | | | |
| EBITDA Margin | 45.1% | 23.4% | 20.5% | 16.4% | 15.6% |
| | | | | | |
| **Indicated Multiples** | | | | | |
| MVIC / EBITDA | N/A | 17.2 | 15.6 | 17.9 | 12.3 |

Notes & Definitions:
　MVIC = Market Value of Total Invested Capital (i.e., Debt + Equity)
　EBITDA = Earnings Before Interest, Taxes, Depreciation & Amortization
　N/A = Not Applicable

Expert Report of Daniel R. Van Vleet                                               Page 43

**EXHIBIT XV**
**MEDICAL INFORMATION TECHNOLGY**
**MARKET APPROACH: GUIDELINE PUBLIC COMPANY METHOD**
**ADJUSTMENT FACTOR ANALYSIS**

Subject Company's Estimated MVE (1)                     $ 1,000,000
Subject Company's Estimated Long-Term Growth (2)          13.2%

| Adjustment Factor Analysis | MVE ($000) | Est. LTG (3) | Relative Size | Relative Growth | Average Adjusted Ratio (4) | Ind. Avg. Equity/ MVIC | Adjustment Factor (5) |
|---|---|---|---|---|---|---|---|
| Advent Software, Inc. | 217,035 | 30.0% | 4.6 | 0.9 | 0.8 | 100.0% | 0.7509 |
| Aspen Technology Inc. | 725,624 | 30.0% | 1.4 | 0.9 | 0.7 | 100.0% | 0.6818 |
| Cerner Corp. | 688,998 | 30.0% | 1.5 | 0.9 | 0.7 | 100.0% | 0.6846 |
| Shared Medical Systems Corp. | 1,655,696 | 20.0% | 0.6 | 0.9 | 0.8 | 100.0% | 0.8088 |

Notes:

(1) Rounded value of equity before any adjustments.
(2) Equal to the five-year compound annual growth rate in revenue as presented in Exhibit VII.
(3) Per I/B/E/S Monthly Summary Data, January 15, 1998.
(4) Adjusted Ratio = (Relative Size)^.08 x (Relative Growth)^2.959
(5) MVIC Adjustment Factor = [(Industry Average Equity/MVIC) * (Relative Adjusted Ratio)] + [1 - (Industry Average Equity/MVIC)]

**EXHIBIT XVI**
**MEDICAL INFORMATION TECHNOLOGY**
**MARKET APPROACH: GUIDELINE PUBLIC COMPANY METHOD**
**COMPARABLE COMPANY TEARSHEET - ADVENT SOFTWARE, INC.**

Company Name:   Advent Software, Inc.
Stock Ticker:   NASDAQNM:ADVS

## DESCRIPTION (1)

Advent Software, Inc. offers integrated software solutions for automating, and integrating data and work flows across investment management organizations, as well as the information flows between the investment management organization and external parties primarily in the United States. It develops, markets, and sells stand-alone and client/server software products, data and data interfaces, and related maintenance and services that automate, integrate, and support the functions of the front, middle, and back offices of investment management organizations. The company also sells software and services for grant management, matching gifts, and volunteer tracking for the grantmaking community. In addition, Advent Software provides professional services such as consulting, project management, implementation, integration, custom report writing, and training. Further, the company provides brokerage services to institutional investors and registered investment advisors. Its clients include asset managers, investment advisors, prime brokers, fund administrators, hedge funds, family offices, banks, and trusts, as well as corporations, public funds, founder management functions. Advent Software was founded in 1983 and is headquartered in San Francisco, California.

## HISTORICAL FINANCIAL INFORMATION (in $000)

| | Latest-Twelve Months Ended | Historical Year Ended | | | |
| | Dec-97 | Dec-96 | Dec-95 | Dec-94 | Average |
|---|---|---|---|---|---|
| Revenue | 48,613 | 36,744 | 25,957 | 20,101 | |
| Revenue Growth | 32.3% | 41.6% | 29.1% | | |
| EBITDA | 11,368 | 7,767 | 5,174 | 3,880 | |
| As a % of Revenue | 23.4% | 21.1% | 19.9% | 19.3% | 20.9% |
| EBIT | 9,398 | 6,239 | 4,158 | 3,053 | |
| As a % of Revenue | 19.3% | 17.0% | 16.0% | 15.2% | 16.9% |
| Net Income | 6,713 | (1,099) | 2,819 | 1,064 | |
| As a % of Revenue | 13.8% | -3.0% | 10.9% | 5.3% | 6.7% |

**Stock Price 12/31/95 - 9/30/07**



## MARKET VALUE OF INVESTED CAPITAL (in $000)

| Number of Shares Outstanding | Stock Price as of 12/31/1997 | Market Value of Equity | Market Value of Debt | Total Market Value of Invested Capital |
|---|---|---|---|---|
| 7,582 | 28.63 | 217,035 | 0 | 217,035 |

Notes:
(1) Company Descriptions and Financial Information from S&P Capital IQ Database.

Expert Report of Daniel R. Van Vleet                                                                 Page 45

**EXHIBIT XVII**
**MEDICAL INFORMATION TECHNOLOGY**
**MARKET APPROACH: GUIDELINE PUBLIC COMPANY METHOD**
**COMPARABLE COMPANY TEARSHEET - ASPEN TECHNOLOGY INC.**

Company Name:    Aspen Technology Inc.
Stock Ticker:    NASDAQNM:AZPN

## DESCRIPTION (1)

Aspen Technology, Inc. and its subsidiaries provide software and professional services that enable process companies to model, manage, and control their operations. Its integrated aspenONE solutions are aligned with primary industry business processes, providing manufacturers the capability to optimize operational performance, make real-time decisions, and synchronize the plant and supply chain. The company offers Aspen HYSYS, Aspen Icarus, and Aspen Plus for process simulation and optimization; Aspen DMCplus for advanced process control; Aspen PIMS for advanced planning and scheduling; Aspen InfoPlus.21 for plant information management; and Aspen Plant Scheduler for sales and operations planning. Its professional services include implementation and configuration services, consulting services, and modeling, and design services. The company supplies its integrated software and services to companies in the oil and gas, petroleum, chemicals, pharmaceuticals, and other industries that manufacture and produce products from a chemical process. It has strategic alliances with Accenture, Intergraph, Microsoft, and Schlumberger. The company installed at the facilities of approximately 1,500 customers worldwide. Aspen Technology, Inc. was founded in 1981 and is headquartered in Burlington, Massachusetts.

## HISTORICAL FINANCIAL INFORMATION (in $000)

| | Latest-Twelve Months Ended Dec-97 | Dec-96 | Dec-95 | Dec-94 | Average |
|---|---|---|---|---|---|
| | | *Historical Year Ended,* | | | |
| Revenue | 201,990 | 151,469 | 57,498 | 44,975 | |
| Revenue Growth | 33.4% | 163.4% | 27.8% | | |
| EBITDA | 41,438 | 17,873 | 7,504 | 4,622 | |
| As a % of Revenue | 20.5% | 11.8% | 13.1% | 10.3% | 13.9% |
| EBIT | 29,282 | 17,864 | 7,501 | 4,620 | |
| As a % of Revenue | 14.5% | 11.8% | 13.0% | 10.3% | 12.4% |
| Net Income | 22,133 | (18,436) | 5,416 | 3,698 | |
| As a % of Revenue | 11.0% | -12.2% | 9.4% | 8.2% | 4.1% |



**Stock Price (12/31/94 - 12/31/97)**

## MARKET VALUE OF INVESTED CAPITAL (in $000)

| Number of Shares Outstanding | Stock Price as of 12/31/1997 | Market Value of Equity | Market Value of Debt | Total Market Value of Invested Capital |
|---|---|---|---|---|
| 21,186 | 34.25 | 725,624 | 1,914 | 727,538 |

Notes:
(1) Company Descriptions and Financial Information from S&P Capital IQ Database.

**EXHIBIT XVIII**
**MEDICAL INFORMATION TECHNOLOGY**
**MARKET APPROACH: GUIDELINE PUBLIC COMPANY METHOD**
**COMPARABLE COMPANY TEARSHEET - CERNER CORP.**

Company Name:    Cerner Corp.
Stock Ticker:    NASDAQNM:CERN

## DESCRIPTION (1)

Cerner Corporation provides healthcare information technology solutions, healthcare devices, and related services in the Americas, Europe, the Middle East, and the Asia Pacific region. It offers Cerner Millennium healthcare information technology architecture, which provides access to an individual's electronic medical record at the point of care, and organizes and delivers information for physicians, nurses, pharmacists, front and back-office professionals, laboratory technicians, and consumers. The company provides Lights On Network, a surveillance system and service that monitors client-hosted and company-hosted systems to prevent future system issues; remote-hosting services; and Millennium Lighthouse, a consulting practice that works with clients to determine previously unidentified and unconnected relationships among healthcare processes and outcomes. It also offers analysis services to pharmaceutical companies; and Health Facts, a data warehouse solution that captures and stores healthcare data, as well as develops reports that enable healthcare organizations to identify areas for intervention and improvement. In addition, Cerner Corporation provi medical devices and patient information from various devices to the clinician workflow and el

### HISTORICAL FINANCIAL INFORMATION (in $000)

| | Latest-Twelve Months Ended Dec-97 | Historical Year Ended, Dec-96 | Dec-95 | Dec-94 | Average |
|---|---|---|---|---|---|
| Revenue | 245,057 | 189,107 | 186,901 | | |
| Revenue Growth | 29.6% | 1.2% | | | |
| EBITDA | 40,245 | 10,616 | 37,277 | | |
| As a % of Revenue | 16.4% | 5.6% | 19.9% | | 14.0% |
| EBIT | 22,170 | 10,601 | 37,265 | | |
| As a % of Revenue | 9.0% | 5.6% | 19.9% | | 11.5% |
| Net Income | 15,148 | 8,251 | 22,521 | | |
| As a % of Revenue | 6.2% | 4.4% | 12.0% | | 7.5% |

### MARKET VALUE OF INVESTED CAPITAL (in $000)

| Number of Shares Outstanding | Stock Price as of 12/31/1997 | Market Value of Equity | Market Value of Debt | Total Market Value of Invested Capital |
|---|---|---|---|---|
| 32,615 | 21.13 | 688,998 | 30,061 | 719,059 |



Stock Price (12/31/94 - 12/31/97)

Notes:
(1) Company Descriptions and Financial Information from S&P Capital IQ Database.

EXHIBIT XIX
MEDICAL INFORMATION TECHNOLOGY
MARKET APPROACH: GUIDELINE PUBLIC COMPANY METHOD
COMPARABLE COMPANY TEARSHEET - SHARED MEDICAL SYSTEMS CORP.

Company Name:   Shared Medical Systems Corp.
Stock Ticker:   1Q303058

## DESCRIPTION (1)

Shared Medical Systems Corp. (SMS) provides information service and system solutions to the health industry in North America, Europe, and Asia Pacific. The Company's services and systems are offered to integrated health networks, multi-entity health corporations, community health information networks, hospitals, physician offices, clinics, and other health providers. These services and systems include a full range of clinical, financial, patient management, electronic data interchange, managed care, management solutions, and integrated multimedia solutions that use diverse computing and networking technologies, ranging from remote processing, to client/server networks, to distributed processing systems, to onsite systems. The Company also provides professional services related to its information systems business. SMS was founded in 1969 and is headquartered in Malvern, Pennsylvania.

## HISTORICAL FINANCIAL INFORMATION (in $000)

| | Latest Twelve Months Ended Dec-97 | Historical Year Ended Dec-96 | Dec-95 | Dec-94 | Average |
|---|---|---|---|---|---|
| Revenue | 896,235 | 806,950 | 662,111 | 550,769 | |
| Revenue Growth | 11.1% | 21.9% | 20.2% | | 11.7% |
| EBITDA | 139,550 | 81,790 | 69,526 | 59,015 | |
| As a % of Revenue | 15.6% | 10.1% | 10.5% | 10.7% | 11.7% |
| EBIT | 101,385 | 81,751 | 69,489 | 58,983 | |
| As a % of Revenue | 11.3% | 10.1% | 10.5% | 10.7% | 10.7% |
| Net Income | 60,422 | 48,774 | 41,009 | 35,099 | |
| As a % of Revenue | 6.7% | 6.0% | 6.2% | 6.4% | 6.3% |

## MARKET VALUE OF INVESTED CAPITAL (in $000)

| Number of Shares Outstanding | Stock Price as of 12/31/1997 | Market Value of Equity | Market Value of Debt | Total Market Value of Invested Capital |
|---|---|---|---|---|
| 25,086 | 66.00 | 1,655,696 | 66,691 | 1,722,387 |



Stock Price (12/31/94 - 12/31/97)

Notes:
(1) Company Descriptions and Financial Information from S&P Capital IQ Database.

**EXHIBIT XX**
**MEDICAL INFORMATION TECHNOLOGY**
**INDICATION OF DISCOUNT FOR LACK OF MARKETABILITY**
**SUMMARY OF RESTRICTED STOCK STUDIES**

| Studies Based on Restricted Stock (From Pratt) (1) | Years Covered In Study | Average Discount |
|---|---|---|
| Management Planning, Inc. (i) | 1980-1996 | 27.1% |
| FMV Opinions, Inc. (j) | 1980-1997 | 22.3% |
| Bruce Johnson Study (k) | 1991-1995 | 20.0% |
| Columbia Financial Advisors (l) | Jan '1996- April 1997 | 21.0% |

| | |
|---|---|
| Average | 22.6% |
| Median | 21.7% |
| Low | 20.0% |
| High | 27.1% |

Notes:

a.   "Discounts Involved in Purchases of Common Stock (1966-1969)," Institutional Investor Study Report of the Securities and Exchange Commission,
     H.R. Doc. No. 64, Part 5, 92nd Congress, 1st Session, 1971, pp. 2444-56.
b.   Gelman, Milton, "An Economist-Financial Analyst's Approach to Valuing Stock in a Closely Held Company," Journal of Taxation, June 1972, p. 353.
c.   Trout, Robert R., "Estimation of the Discount Associated with the Transfer of Restricted Securities," Taxes, June 1977, pp. 381-85.
d.   Moroney, Robert E., "Most Courts Overvalue Closely Held Stocks," Taxes, March 1973, pp. 144-55
e.   Maher, J. Michael, "Discounts for Lack of Marketability for Closely Held Business Interests," Taxes, September 1976, pp. 562-71.
f.   Pittock, William F., and Charles H. Stryker, "Revenue Ruling 77-276 Revisited," SRC Quarterly Reports, Spring 1983, pp. 1-3.
g.   Willamette Management Associates study (unpublished).
h.   Silber, William L., "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," Financial Analysts Journal, July-August 1991, pp. 60-64.
i.   Oliver, Robert P., and Roy H. Meyers, "Discounts Seen in Private Placements of Restricted Stock: The Management Planning, Inc. Long-Term Stud
     (1980-1996)" (Chapter 5) in Robert F. Reilly and Robert P. Schweihs, eds. The Handbook of Advanced Business Valuation (New York: McGraw-Hill, 2000).
j.   Hall, Lance, and Timothy Polacek, "Strategies for Obtaining the Largest Valuation Discounts," Estate Planning (Jan./Feb. 1994) pp. 38-44
k.   Johnson, Bruce, "Restricted Stock Discounts: 1991-95," Shannon Pratt's Business Valuation Update (March 1999): 1-3; and "Quantitative Support for
     Discounts for Lack of Marketability," Business Valuation Review (Dec. 1999): 152-155.
l.   Aschwald, Kathryn F., "Restricted stock discounts decline as result of 1-year holding period," Shannon Pratt's Business Valuation Update (May 2000): 1-5
m.   Ibid

Source:

(1) Shannon P. Pratt, Robert F. Reilly & Robert P. Schweihs, *Valuing Small Businesses & Professional Practices*, Fourth Edition, (New York: McGraw Hill, 2000), p. 404.

**EXHIBIT XXI**
**MEDICAL INFORMATION TECHNOLOLGY**
**INDICATION OF DISCOUNT FOR LACK OF MARKETABILITY**
**SUMMARY OF EMORY INITIAL PUBLIC OFFERING STUDIES**

| Study | Number of IPO Prospectuses Reviewed | Number of Qualifying Transactions | Average Discount |
|-------|------|------|------|
| 1990-1992 | 266 | 35 | 42.0% |
| 1991-1993 | 443 | 54 | 45.0% |
| 1994-1995 | 318 | 46 | 45.0% |
| 1995-1997 | 732 | 91 | 43.0% |
| All 9 Studies | 1,759 | 226 | 43.8% |

|  | Mean Discount |
|---------|------|
| Average | 43.8% |
| Median | 44.0% |
| Low | 42.0% |
| High | 45.0% |

Notes:
*1997-2000 study was for "dot-com" companies.

Source:
Stock (Eighth in a Series) November 1995 through April 1997," Business Valuation Review, vol. 16, no.3 (September 1997): 125, © 1997, American Society of Appraisers; John D. Emory Sr., F.R. Dengel, III and John D. Emory Jr., "The Value of Marketability as Illustrated in Dot.Com IPOs: May 1997-March 2000, Shannon Pratt's Business Valuation Update, vol. 6, no. 7 (July 2000): 1-2. © Emory Business Valuation, LLC.

**EXHIBIT XXII**
**MEDICAL INFORMATION TECHNOLOLGY**
**INDICATION OF DISCOUNT FOR LACK OF MARKETABILITY**
**SUMMARY OF WILLAMETTE INITIAL PUBLIC OFFERING STUDIES**

**Summary of Discounts for Private Transaction P/E**
**Multiples Compared to Public Offering P/E Multiples**
**Adjusted for Changes in Industry P/E Multiples**

| Time Period | Number of Companies Analyzed | Number of Transactions Analyzed | Standard Average Discount |
|---|---|---|---|
| 1992 | 36 | 75 | 41.9% |
| 1993 | 51 | 110 | 46.9% |
| 1994 | 31 | 48 | 31.9% |
| 1995 | 42 | 66 | 32.2% |
| 1996 | 17 | 22 | 31.5% |
| 1997 | 34 | 44 | 28.4% |

| | Standard Mean Discount |
|---|---|
| Average | 35.5% |
| Median | 32.1% |
| Low | 28.4% |
| High | 46.9% |

Notes:
(1) Excludes the highest and lowest deciles of indicated discounts.

Source:
Willamette Management Associates.  Used with permission.

**APPENDIX D**

**DESCRIPTION OF THE GUIDELINE PUBLIC COMPANIES**

## DESCRIPTION OF THE GUIDELINE PUBLIC COMPANIES [10]

### ADVENT SOFTWARE, INC.

Advent Software, Inc. offers integrated software solutions for automating, and integrating data and work flows across investment management organizations, as well as the information flows between the investment management organization and external parties primarily in the United States. It develops, markets, and sells stand-alone and client/server software products, data and data interfaces, and related maintenance and services that automate, integrate, and support the functions of the front, middle, and back offices of investment management organizations. The company also sells software and services for grant management, matching gifts, and volunteer tracking for the grant making community. In addition, Advent Software provides professional services, such as consulting, project management, implementation, integration, custom report writing, and training. Further, the company provides brokerage services to institutional investors and registered investment advisors. Its clients include asset managers, investment advisors, prime brokers, fund administrators, hedge funds, family offices, banks, and trusts, as well as corporations, public funds, foundations, universities, and nonprofit organizations that perform portfolio management functions. Advent Software was founded in 1983 and is headquartered in San Francisco, California.

### ASPEN TECHNOLOGY, INC.

Aspen Technology, Inc. and its subsidiaries provide software and professional services that enable process companies to model, manage, and control their operations. Its integrated aspenONE solutions are aligned with primary industry business processes, providing manufacturers with the capability to optimize operational performance, make real-time decisions, and synchronize the plant and supply chain. The company offers Aspen HYSYS, Aspen Icarus, and Aspen Plus for process simulation and optimization; Aspen DMCplus for advanced process control; Aspen PIMS for advanced planning and scheduling; Aspen InfoPlus.21 for plant information management; and Aspen Plant Scheduler for sales and operations planning. Its professional services include implementation and configuration services, consulting services, and modeling and design services. The company supplies its integrated software and services to companies in the oil and gas, petroleum, chemicals, pharmaceuticals, and other industries that manufacture and produce products from a chemical process. It has strategic alliances with Accenture, Intergraph, Microsoft, and Schlumberger. The company's software solutions are installed at the facilities of approximately 1,500 customers worldwide. Aspen Technology, Inc. was founded in 1981 and is headquartered in Burlington, Massachusetts.

### CERNER CORP.

Cerner Corporation provides healthcare information technology solutions, healthcare devices, and related services in the Americas, Europe, the Middle East, and the Asia Pacific region. It

---

[10] Per Capital IQ.

offers Cerner Millennium healthcare information technology architecture, which provides access to an individual's electronic medical record at the point of care, and organizes and delivers information for physicians, nurses, pharmacists, front and back-office professionals, laboratory technicians, and consumers. The company provides Lights On Network, a surveillance system and service that monitors client-hosted and company-hosted systems to prevent future system issues; remote-hosting services; and Millennium Lighthouse, a consulting practice that works with clients to determine previously unidentified and unconnected relationships among healthcare processes and outcomes. It also offers analysis services to pharmaceutical companies; and Health Facts, a data warehouse solution that captures and stores healthcare data, as well as develops reports that enable healthcare organizations to identify areas for intervention and improvement. In addition, Cerner Corporation provides CareAware healthcare device architecture to bridge the gap between medical devices and patient information by connecting information from various devices to the clinician workflow and electronic medical record; MDBus technology, a USB for healthcare; RxStation automated medication dispensing devices; and Healthe, a family of solutions and services for employers and governments. It serves integrated delivery networks, physician groups and networks, managed care organizations, hospitals, medical centers, reference laboratories, home health agencies, blood banks, imaging centers, pharmacies, pharmaceutical manufacturers, employer coalitions, government agencies, and public health organizations. The company was founded in 1979 and is headquartered in North Kansas City, Missouri.

## SHARED MEDICAL SYSTEMS CORPORATION

Shared Medical Systems Corporation supplied information solutions to the health industry. The company provided information solutions, process and structural consulting, and application services. It offered its services in approximately 20 countries and territories in North America, Europe, and New Zealand. The company's customers included hospitals and public health institutions; physician groups, clinics, and diagnostic and treatment centers; home health, assisted living, and hospice care providers; rehabilitation, behavioral, and long-term care facilities; and health enterprises.

**APPENDIX E**
**ECONOMIC CONDITIONS**

## ECONOMIC CONDITIONS

The following paragraphs discuss the condition of the United States economy as of December 31, 1997.

- A deteriorating real trade deficit, coupled with lower rates of inventory accumulation, is expected to slow real Gross Domestic Product ("GDP") growth from its anticipated 3.7 percent rate in 1997 to 2.5 percent growth in 1998.

- Actual third-quarter real GDP growth was revised down to 3.3 percent this month from 3.5 percent last month, while expectations for the fourth quarter improved slightly, from 2.6 percent to 2.7 percent. In line with overall expectations for 1998, the forecasts for each quarter's real GDP growth have been lowered from November's expectations by one-tenth of a percentage point, to 2.3 percent for the first quarter of 1998 and 2.2 percent for the last three quarters.

- The anticipated year-over-year percent change in the consumer price index ("CPI") for 1997 remains at 2.4 percent for the third consecutive month and 1998's forecast has again been lowered by one-tenth of a percentage point, to 2.4 percent.

- All of this points to a stable economy, though the CPI is expected to tick upward in the last two quarters of 1998 (to 2.6 percent from 2.5 percent) as real GDP declines.

- The already low unemployment rate fell an additional tenth of a percentage point to 4.6 percent, its lowest level since October 1973. The expected rate of unemployment for 1997 as a whole remains at 5.0 percent for the fifth consecutive month, while expectations for 1998 have fallen to 4.9 percent (from 5.0 percent).

- Annualized third-quarter personal consumption expenditures ("PCE") growth was revised upward this month to 5.8 percent (from 5.7 percent) and the consensus forecast for fourth-quarter PCE growth improved to 2.7 percent from 2.4 percent.

- The consensus continues to forecast slower PCE growth in 1998, though factors such as recent burgeoning job growth, increasing incomes, and the rebound of U.S. equity prices have led to improved expectations of 2.7 percent growth (compared to a 2.6 percent forecast last month).

- The forecast for year-over-year growth in disposable personal income ("DPI") fell by one-tenth of a percentage point for the second month in a row. The current expectation of 2.8 percent real DPI growth in 1997 reflects lower than expected annualized third-quarter DPI growth of 2.7 percent (revised down from 2.9 percent and the slowest quarterly rate of the year). The forecast for 1998 DPI growth is unchanged this month at 2.7 percent.

- The expectation for average year-over-year change in nonresidential fixed investments (capital expenditures) continued its year-long climb this month, reaching 10.4 percent (compared to 10.2 percent in November). This forecast surpasses by more than a percentage point the actual year-over-year change achieved in 1996. Growth in

nonresidential fixed investments continues to be fueled by businesses' heavy capital investments in new plant and equipment, primarily in information processing. The forecast for nonresidential fixed investments growth in 1998 improved this month to 8.5 percent after climbing by an entire percentage point in November to 8.4 percent, evidence that this year's high-growth trend is expected to continue.

- The consensus forecast for 1997 housing starts improved slightly this month to 1.46 million from 1.45 million. Inventories of unsold homes are at historically low levels, while permits for new construction have risen to their highest rate all year. Year-over-year housing starts grew by 8.6 percent in October compared to 2.5 percent in September and sales of existing homes rose by 2.1 percent in October (the highest level since 1968), though new home sales were down 2.0 percent. Housing activity is expected to remain healthy in 1998, with housing starts now forecast at 1.42 million (up from 1.40 million last month).

- The forecast for net exports in 1997 continues to deteriorate, with the anticipated deficit now at $146.3 billion compared to $142.2 billion a month ago. Net exports in 1998 are currently forecast to register a deficit of $177.3 billion, a nearly $15.0 billion increase from November's expectation and close to $35.0 billion higher than October's forecast.

- Government consumption and gross investment as a percentage of real GDP has fallen by about one-tenth of a percentage point in each of the first three quarters of 1997. This trend is expected to continue throughout 1998, with government spending dropping to 15.1 percent of real GDP by year-end. Thus far in 1997, federal spending has accounted for approximately 36.0 percent of government consumption and gross investment with state and local spending accounting for 64.0 percent.

- The overall inflationary outlook remains positive, based on estimated CPI growth of 2.4 percent for both 1997 and 1998. The estimated average rates for three-month Treasury bills and ten-year Treasury notes in 1997 were both unchanged this month at 5.1 percent and 6.4 percent, respectively. The forecast for the average rate of Treasury bills in 1998 remains at 5.2 percent, while the forecast for the average rate of Treasury notes has fallen to 6.1 percent from 6.2 percent.

Expert Report of Daniel R. Van Vleet                                    Page 57

**APPENDIX F**

**STATEMENT OF CONTINGENT AND LIMITING CONDITIONS**

Expert Report of Daniel R. Van Vleet                                                    Page 58

## CONTINGENT AND LIMITING CONDITIONS

This appraisal is made subject to the following general contingent and limiting conditions:

1. I assume no responsibility for the legal description or matters including legal or title considerations. Title to the subject business interest is assumed to be good and marketable unless otherwise stated.

2. The subject business interest is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3. I assume responsible ownership and competent management with respect to the subject business interest.

4. The information furnished by others is believed to be reliable. However, I issue no warranty or other form of assurance regarding its accuracy.

5. I assume no hidden or unapparent conditions regarding the subject business interest.

6. I assume that there is full compliance with all applicable federal, state, and local regulations and laws unless the lack of compliance is stated, defined, and considered in the appraisal report.

7. I assume that all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state, or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in this report is based.

8. Unless otherwise stated in this report, I have no knowledge of, the existence of hazardous materials with regard to the subject business interest. However, I am not qualified to detect such substances. I assume no responsibility for such conditions or for any expertise required to discover them.

9. Possession of this report does not carry with it the right of publication. This report may not be used for any purpose or by any person other than the client to whom it is addressed, without my written consent, and, in any event, only with proper written qualifications and only in its entirety.

10. I, by reason of this opinion and valuation report, am not required to give testimony or to be in attendance in court with reference to the business interest in question unless arrangements have been previously made.

11. Neither all nor any part of the contents of this report shall be disseminated to the public through advertising, public relations, news, sales, or other media without my prior written consent and approval.

12. The analyses, opinions, and conclusions presented in this report apply to this engagement only and may not be used out of the context presented herein. This report is valid only for the effective date specified herein and only for the purpose specified herein.

Expert Report of Daniel R. Van Vleet    Page 59

**APPENDIX G**

**CERTIFICATION**

Expert Report of Daniel R. Van Vleet                                        Page 60

## CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.

- I have not personally inspected the assets that are the subject of this report.

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

- The names of the individuals that provided business valuation appraisal assistance to the person signing this certification are listed below.

- This certification was signed on February 19, 2008 in Chicago, IL

Daniel R. Van Vleet, ASA, CBA
Managing Director

**Contributing Appraisers:**
Chris Bordener, Vice President, Duff & Phelps, LLC
John Lee, Analyst, Duff & Phelps, LLC

# EXHIBIT 34
# (Part 1)

Confidential: Subject To Protective Order

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MICHAEL P. HUBERT, et al.

        Plaintiff,

v.

MEDICAL INFORMATION TECHNOLOGY
PROFIT SHARING PLAN, et al.

        Defendants.

Civil Action No. 05-10269-RWZ

## EXPERT REPORT OF RICK S. NATHAN AND CHRISTOPHER C. BARRY

# TABLE OF CONTENTS

EXECUTIVE SUMMARY OF FINDINGS .................................................................................1

INTRODUCTIONS ...............................................................................................................5

AREAS OF INQUIRY ..........................................................................................................7

DOCUMENTS & OTHER INFORMATION RELIED UPON .........................................................9

MEDITECH BACKGROUND AS OF DECEMBER 31, 1997 ....................................................10

INDUSTRY BACKGROUND ................................................................................................13

DETAILED REVIEW OF THE VAN VLEET REPORT'S APPROACH AND RESULTS .....14

   A.   THE VAN VLEET REPORT'S USE OF A SINGLE POINT VALUE ESTIMATE IS SPECIOUSLY PRECISE ......14
   B.   THE VAN FLEET REPORT FAILED TO CONSIDER ACTUAL TRANSACTIONS IN MEDITECH STOCK ........15
   C.   THE VAN VLEET REPORT IMPROPERLY OMITS A DISCOUNT FOR LACK OF CONTROL ..........................16
   D.   THE VAN VLEET REPORT INCORRECTLY USES "WHAT IF" SCENARIOS AS PROJECTIONS IN ITS
       INCOME APPROACH (DCF METHOD) .................................................................................................18
   E.   THE VAN VLEET REPORT FAILS TO PROPERLY INCLUDE INDUSTRY AND/OR COMPANY SPECIFIC
       RISK PREMIUM IN ITS WACC CALCULATIONS .................................................................................20
   F.   THE VAN VLEET REPORT SELECTED TOO SMALL A DISCOUNT FOR LACK OF MARKETABILITY ........22
   G.   FLAWS IN CHOICES OF GUIDELINE PUBLICLY TRADED COMPANIES ................................................24
   H.   FLAWS IN SELECTION OF MARKET DERIVED PRICING MULTIPLES ...................................................27
   I.   CONCLUSION .................................................................................................................................30

THE BOARD'S AND TRUSTEES' VALUATION PROCESS & RESULTING SHARE
VALUE ARE REASONABLE ................................................................................................31

COMPARISON OF MEDITECH'S RETURN TO INDEXES AND SELECTED
COMPANIES .....................................................................................................................33

COMPARISON OF PLAINTIFFS' PERSONAL RETURN ON MEDITECH TO BEST
PERFORMING SELECTED HIGH PROFILE COMPANY .........................................................35

OBSERVATIONS REGARDING VOLATILITY OF MARKET INDEXES AND VAN
VLEET'S GUIDELINE PUBLIC COMPANIES .......................................................................36

EXAMPLES OF DIFFERENTIAL IMPACT ON PARTICIPANTS FROM PLAINTIFFS'
PROPOSED VALUATION METHODOLOGY ..........................................................................38

CHANGE IN CASH POSITION OF THE TRUST FROM 1997 - 2000 USING VAN
VLEET'S 1997 STOCK PRICE AND MARKET APPROACH VALUES .......................................39

## EXECUTIVE SUMMARY OF FINDINGS

1.  We were asked to comment on the expert report submitted on behalf of plaintiffs by Daniel R. Van Vleet (the "Van Vleet Report"), particularly with respect to its estimate of the fair market value ("FMV") as of December 31, 1997 (the "Valuation Date") of Medical Information Technology, Inc. ("Meditech") common stock (the "Stock") contributed by Meditech and held by a trust ("Trust") set up under the Medical Information Technology Inc. Profit Sharing Plan ("Plan"). In our opinion, the Van Vleet Report's estimate of $21.62 per share (split-adjusted) does not reflect a reasonable estimate for the value of the Meditech stock held by the Trust.

2.  The methodology used in the Van Vleet Report and its estimate of the fair market value of Meditech stock suffer from at least the following failures and flaws:

    a.  The Van Vleet Report concludes that the value of Meditech Stock was precisely $21.62. As the Court has recognized, valuation is an art and not a science and reasonable appraisers can disagree by wide margins over the fair market value of a non-publicly traded company. By providing a single-point estimate of $21.62 rather than a range of reasonable values, the Van Vleet Report lends an air of specious precision to what is by its nature an inexact process. Given the uncertainties, estimates and assumptions built into the valuation of a non-publicly-traded company, the Van Vleet Report should have opined on what range of values for Meditech Stock would have been reasonable.

    b.  The best evidence of the fair *market* value of the stock of a company is the price at which the stock has actually traded hands in transactions between willing buyers and sellers. The Van Vleet Report, however, ignored the many actual transactions in Meditech Stock between arm's-length buyers and sellers in the years leading up to the Valuation Date. These transactions, including voluntary sales by venture capitalists and by two of the plaintiffs in this case, were at or around the values determined by Defendants, and nowhere near the "fair market value" estimated by the Van Vleet Report. The Van Vleet Report's failure to address and reconcile these transactions with its conclusion renders it unreliable.

    c.  For many reasons a non-controlling ("minority") ownership stake in any company, public or private, is not as valuable as a controlling ownership stake. For instance, a minority shareholder, unlike a controlling shareholder, cannot guarantee that any corporate income will be distributed to shareholders or that the company will ever go public or be sold. For that reason, appraisers valuing a company on the basis of its income will apply a necessary discount for lack of control ("DLOC") to any estimate of value arrived at under an income approach. Van Vleet did not. We conclude that a reasonable DLOC of 25%, based on widely referenced data from Mergerstat, should have been used in the Van Vleet Report. The use of a proper DLOC would considerably lower the Van Vleet Report's value conclusion.

d.  In valuing a non-publicly-traded company under an income approach, a crucial variable is a forecast of how much income the company will have in future years. In order to maximize expected income, the Van Vleet Report improperly relies on a section of a Meditech board of directors ("BOD," or the "Board") board package entitled *Forecast through 2001* as being "Management Projections" of anticipated 1998-2001 performance. That section of the board package, however, states that the projection is not expected to be accurate, and the deposition transcripts of multiple board members – which do not appear to have been provided to or considered by Van Vleet[1] – confirm that the figures only were used as hypothetical "what-ifs" for illustration purposes and were never intended to be used as actual forecasts.[2] The Van Vleet report compounds this error by extending the already speculative 1998-2001 forecast another six years by "trending down" from the simply illustrative 2001 figure. The Van Vleet Report should either have capitalized the single-period cash flow for 1998 (the only real management projection), or if it was going to proceed with a conjectural 10-year forecast built off management "what if" scenarios, it should have incorporated additional risk, above and beyond general equity market risk and company size risk, into the discount rate, as discussed in the next point. In either case, there is a significant effect on the Van Vleet Report's ultimate value estimate.

e.  The Van Vleet Report does not account for the incremental risk borne by an investor such as the Trust in holding Meditech Stock in its determination of the cost of equity for Meditech when using the capital asset pricing model ("CAPM") and Duff & Phelps build-up methods.[3] Our analysis using a Total Beta approach indicates that this risk premium for Meditech is at least 3%. As a result, the Van Vleet Report's determination of the return on equity component of its weighted average cost of capital ("WACC" or "discount rate") is under risk-adjusted by about 3%, resulting in a restated WACC of about 16.4%. Using this corrected WACC alone would lower the Van Vleet Report's overall estimate of the value of Meditech Stock by $3.57 per share, or approximately one-sixth.

f.  The Van Vleet Report's selection of guideline public companies ("GPC") is defective, and our own search suggests that there simply are not any public companies that are truly comparable to Meditech. Two of the Van Vleet Report's four GPCs, Aspen Technology, Inc. and Advent Software, Inc., do not even sell software in the healthcare industry, let alone compete with Meditech in the market for hospital information management systems. And none of the other comparable companies that either we or the Van Vleet Report identify are any more than minimally comparable because all offer products and services (for example, hardware and consulting) and compete in markets (for example, non-hospital healthcare markets or international markets) that Meditech does not.

---

[1] See the Van Vleet Report, p. 26.

[2] The only period management actually projects is one year out, based on current backlog.

[3] Despite the fact that the formulas for cost of equity on pages 38-41 of the Van Vleet Report call for this risk factor to be quantified and taken into account.

g. The Van Vleet Report uses a 25% <u>discount for lack of marketability</u> ("DLOM"), reflecting the lower value in the market for non-publicly traded stock that the investor has no (relative to publicly-traded stock) guarantee of being able to sell. This 25% figure is at the low end of three cited studies' ranges despite the fact that Meditech's board of directors has evidenced an intention to remain non-public for the long term, a factor that ordinarily requires use of a relatively higher marketability discount. Using more appropriate studies and analyses yields a median DLOM of 30%, the use of which would lower the Van Vleet Report's value conclusion.

h. The Van Vleet Report assumes its estimate of Meditech value in determining a size premium for use in its determination of an appropriate WACC using the CAPM methodology, and its GPC market adjustment factor analysis. This represents results-oriented reasoning, and puts the cart (conclusion) before the horse (analysis to reach conclusion).

Correcting these flaws, the Van Vleet Report's estimate of Meditech's FMV per share at December 31, 1997 would be adjusted as follows:

| Van Vleet Report value conclusion (non-marketable, non-controlling basis) | $21.62 |
|---|---|
| • Correcting the discount rate to include company/industry specific risk | (3.57) |
| • Applying necessary discount for lack of control to the Income Approach | (3.85) |
| • Increasing the discount for lack of marketability to 30% from 25% | (1.44) |
| • Selecting more appropriate guideline public companies, measures of central tendency, and multiples adjustment factors | (2.43) |
| **Cumulative effect of above corrections[4]** | **(9.81)** |
| **Corrected Van Vleet Report conclusion of value** | **$11.81** |

2. We were asked to comment on the reasonableness of the Meditech Board's process for setting the annual share price. In our opinion the method used by the Board is a reasonable approach, consistent with the widely-accepted dividend discount model. In fact, as seen in the chart above, the Board's valuation methodology yielded a value higher for December 31, 1997 ($13.50) than that obtained using the more "rigorous" approach advocated by plaintiffs and carried out by the Van Vleet Report, once errors in the Van Vleet Report's analysis are corrected ($11.81).

---

[4] Does not equal the sum of the component parts due to interaction among those elements in the cumulative calculation.

3.  We were asked to compare the return on Meditech's Stock with that of high profile stocks in which plaintiffs could have invested, as well as broad indexes of stock market returns such as the NASDAQ, DJIA and S&P 500. This comparison shows that Meditech's internal rate of return ("IRR") far exceeded any of the alternate investments evaluated, both over the plaintiff's Plan eligibility period and the period of their elective personal investments in Meditech Stock. (The IRR is a time and dollar-weighted rate of return and reflects how much these investment dollars returned on average.)

4.  We were asked to evaluate Meditech's share price at December 31, 1998, 1999 and 2000, using the Van Vleet Report's Market Approach (via GPCs), then use those values to determine the pro forma effect on the Plan's assets, rolled forward from their January 1, 1997 levels. This analysis demonstrates that the Plan's cash balance would have gone negative in 2000, causing the need to borrow cash or (at least temporarily) halt distributions of benefits to Plan participants. This analysis also demonstrates the flaw in the assumption that simply increasing the valuation of Stock held by the Trust would increase distributions of benefits to Plan participants; at least by 2004 we show any increase in the value of Stock held in the Trust would be outweighed by the decrease in the Plan's holdings of cash and equivalents.

5.  We were asked to quantify and/or chart the volatility of various stock market indexes including NASDAQ, DJIA and S&P 500 and the Van Vleet Report's GPCs over various time periods and compare all of these to Meditech's Stock price movements. These charts show that Meditech's Stock, as valued by Meditech's Board and the Trust, was consistently moving upward over time, whereas all of the market indexes and the Van Vleet Report's GPCs had severe and erratic upward and downward price changes over these timeframes.

6.  Finally, although we understand that the Plaintiffs have not disclosed Mr. Reilly as an expert in this action, we were asked to review his report from the Grossman v. Meditech case and our rebuttal thereof. We stand by the findings and critiques noted in our August 30, 2005 Expert Report filed in that prior case, a copy of which accompanies this Expert Report.

## INTRODUCTIONS

7.  I, Rick Nathan, am a Managing Director with Trenwith Group, LLC ("Trenwith"), an affiliate of BDO Seidman, LLP ("BDO"). I am responsible for the development and provision of financial-valuation and transaction-consulting services within both product- and service- based industries where intellectual property and intangible assets are particularly important to overall value. My expertise involves the valuation of enterprises, business interests, capital stock, and assets in connection with business combination decision support, statutory tax compliance, international transfer pricing, dispute analysis, asset exploitation, business plan development, capital sourcing, and strategic partnering.

8.  I have 14 years of experience in performing such valuation work, at Trenwith / BDO, PricewaterhouseCoopers, LLP ("PwC"), Cambridge Technology Partners, Inc. and KPMG, LLP. Additionally, I worked in the medical software field for four years with Siemens Medical Systems as the Associate Director of Product Marketing and Corporate Development. During that time, ending in 1994, I was Siemens' voting representative to ACR-NEMA (American College of Radiology – National Electrical Manufacturers Association), a software standards setting body for healthcare information systems and their interface with medical imaging applications. My professional credentials also include being a Chartered Financial Analyst (CFA), an Accredited Senior Appraiser (ASA) in Business Valuation, and an MBA in Finance from the University of Chicago. My C.V. with publications and Schedule of Testimony Provided are attached as Exhibit 1.

9.  I, Christopher C. Barry, am a partner in the Dispute Analysis and Investigations ("DA&I") practice of PwC. I have over 27 years of business experience, including three years with other "Big-Four" accounting firms in audit services and over 24 years with PwC. I am a CPA, licensed in California and Massachusetts, and have an undergraduate degree in accounting from Franklin & Marshall College, as well as a master's degree in business administration from the University of California at Berkeley. My C.V. with publications is attached as Exhibit 2.

10. Over my 24 years with PwC's DA&I practice, I have worked on hundreds of litigation, investigation and other consulting matters, covering a wide variety of industries (including software) and circumstances. Many of my litigation cases involve questions of valuation, including non-publicly traded businesses, non-compete covenants and intellectual property assets. I have been accepted by various courts as an expert witness on six occasions to testify regarding valuation matters. The list of my testimony for the last four years is attached as Exhibit 3.

11. Our observations and findings related to this matter are based on the analyses summarized below, the documents we[5] reviewed in this matter and depositions of certain Defendants and Meditech management personnel, a site visit to Meditech's facility in Westwood, Massachusetts, discussions with Meditech Management personnel, including Neil Pappalardo, Barbara Manzolillo, Howard Messing, Hoda Sayed-Friel and Stu Lefthes, as well as our education, training and professional experience.

12. We charged fees at our normal hourly rates for the work on this engagement, as follows:
    • Trenwith staff: from $185 to $550 per hour
    • PricewaterhouseCoopers staff: from $225 to $595 per hour

13. Our Services were performed in accordance with Standards for Consulting Services established by the American Institute of Certified Public Accountants ("AICPA"). Accordingly, we are providing no attestation on financial statements, as we did not audit any information provided to us. This information has been prepared solely in connection with the Hubert et al. v. Meditech, et al. litigation and is not intended for reliance in any other context.

---

[5] References herein to the first person may include various Trenwith & PwC staff working under our direction and supervision.

## AREAS OF INQUIRY

14. We were asked by Goodwin Procter LLP on behalf of its clients, Meditech, the Plan, and A. Neil Pappalardo ("Defendants"), to evaluate the findings and conclusions summarized in the Van Vleet Report, which offered an estimate of $21.62 for the FMV[6] of Meditech Stock contributed by Meditech to and held by the Trust as of the Valuation Date (December 31, 1997). We were also asked to illustrate the sensitivity of the Van Vleet Report's valuation conclusion by demonstrating the effect on that conclusion of correcting certain of the noted errors therein.

15. We were asked to opine on the appropriateness of the process by which Meditech's Board determined the FMV of Meditech's Stock as of the Valuation Date, as well as the reasonableness of the value conclusion reached thereby.

16. We were asked to calculate and compare historical returns on Meditech Stock to the returns on certain equity indexes (Dow Jones Industrial Average ("DJIA"), NASDAQ Composite Index ("NASDAQ") and S&P 500 Index ("S&P 500")), as well as well-known highly profitable software and technology companies we selected (Apple Computer Inc. ("Apple"), Hewlett-Packard Company ("HP") and International Business Machines Corp. ("IBM")) and other well-known companies we selected (General Electric ("GE"), Johnson & Johnson ("J&J"), Procter & Gamble ("P&G") and Bank of America ("B of A"), over the life of the Trust and the time periods each of the Plaintiffs participated in the Trust.

17. We were asked to calculate and compare the return on the Plaintiffs' personal investments in Meditech Stock with the best-performing of the selected high profile companies named above, during the time period of Plaintiffs' elective investments in Meditech. We were also asked to graph the Plaintiffs' accumulated Meditech holdings and dividends in their Trust accounts.

18. We were asked to quantify and/or chart the volatility and/or returns of various stock market indexes including NASDAQ, DJIA and S&P 500, Meditech's Stock and the Van Vleet Report's GPCs over various periods of time.

19. We were asked to compare and chart certain measures of Meditech Stock price over 1997-2004, including the Defendants' determinations, the values used in Plaintiffs' complaint and using Mr. Van Vleet's and Mr. Reilly's opinions and methodology. See Exhibits 40-41.

---

[6] FMV is defined by the American Society of Appraisers as the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.

20. Finally, we were asked to estimate Meditech's share values as of December 31, 1998, 1999 and 2000 using the Van Vleet Report's Guideline Public Company (Market) Method. Using these share values and the Van Vleet Report's opinion of share value as of December 31, 1997, we were asked to calculate the cash position of the Trust from 1997 through 2000, assuming for sake of argument no changes to valuations were made in any earlier years.

## DOCUMENTS & OTHER INFORMATION RELIED UPON

21. In forming our findings herein we considered documents and other information, including the following:

   a.  Discussions with Messers. Edward Roberts, Morton Ruderman and Ronald Driscoll, all members of Meditech's Board of Directors;

   b.  Site visit to Meditech's facility in Westwood, Massachusetts and discussions with Meditech Management personnel, including Neil Pappalardo, Barbara Manzolillo, Howard Messing, Hoda Sayed-Friel and Stu Lefthes;

   c.  The Meditech Profit Sharing Plan;

   d.  Excerpts of transcripts of the following witnesses' depositions in this matter:
      • Roland Driscoll Deposition dated October 17, 2007
      • Howard Messing Deposition dated November 13, 2007
      • A. Neil Pappalardo Deposition dated November 27, 2007
      • Edwards B. Roberts Deposition dated November 8, 2007;

   e.  Selected pleadings filed by the parties with the Court;

   f.  The Van Vleet Report dated February 19, 2008;

   g.  A report on the valuation of the Medical Information Technology, Inc. Common Stock as of December 31, 2001, 2002, 2003, 2004 and June 2, 2005, by Robert F. Reilly, dated June 15, 2005[7]; and

   h.  Various other documents produced in discovery in this matter and certain publicly available information, as listed in Exhibit 4.

22. It may be necessary to supplement and revise our opinions based upon additional information that becomes available such as, for example, court rulings, parties' stipulations, and future testimony by others. Further, we may provide additional opinions on other areas, if requested.

---

[7] This report was prepared on behalf of plaintiffs in the Grossman v. Meditech shareholder litigation.

## MEDITECH BACKGROUND AS OF DECEMBER 31, 1997

*Nature of the Business:*

23.  Meditech is engaged in the development, licensing and maintenance of healthcare management information software used by hospitals. The principal markets for the company's products are hospitals primarily located in the U.S. and Canada. Meditech's total revenues for the year ending December 31, 1997 were $194 million of which 65% were derived from software products; it had approximately 1,050 customers worldwide as of December 31, 1997. Meditech does not provide hardware, third party software, or system consulting services.[8]

*State of Meditech's Business in 1997*

24.  In 1997, Meditech's revenues grew by 15.4% over 1996 and its net income by 13.4%. However, heading into 1998, Meditech management had reason to believe that they were entering periods of slower growth

25.  In 1997, Meditech software was installed at 180 new sites, half of which were owned by one customer, Columbia HCA Healthcare Corporation ("HCA"). In the previous two years, Meditech averaged a similar 195 new sites, with the proportion for HCA being consistently about half.[9] As the Valuation Date approached, Meditech had been expecting a slow decrease in future years' revenues from HCA based on certain changes that were happening to its business and strategic direction. However, the company's message to the Board in January 1998 was that there would be significantly less revenue from HCA in 1998 than the prior year. In fact, new installations for HCA would be ending soon.[10]

26.  In 1997, no large integrated healthcare delivery systems, *i.e.* hospital/physician group practices that provide comprehensive neonatal to aged care, with potential large enterprise projects selected Meditech as their software provider, a critically important industry segment for Meditech to penetrate.[11] Further, Meditech was then in the midst of a conversion from a prior generation of software ("Magic") to one based on client/server technology, which was expected to cause some loss of efficiency.[12] Such a change in technology platforms can often cause inefficiency during the transition.

27.  While Meditech was finally able to offer a client-server and distributed systems solution in the marketplace, other industry players were already exploring open systems, browser based

---

[8] Meditech's 10-K for 1997

[9] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 49.

[10] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 35 and 44.

[11] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 50.

[12] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 30.

technology, Intranets, and the Internet, all next generation platforms more conducive to lowering the cost of information access from the desktop.[13]

*The Profit Sharing Plan:*

28. During the 1970s, Meditech's Board created the Plan as a retirement vehicle for its employees, with the Plan's assets held in a Trust. The Plan specifically states that it is "designed to invest substantially in shares of the common Stock of the Company so as to permit the participating employees to share in any growth of the Company".

29. Meditech has the discretion to voluntarily annually contribute Stock and/or cash to the Trust. Under the Plan, the Board votes for an overall dollar amount contribution to be made by the Company to the Trust and then determines how much cash and how many shares of Stock, respectively, will be used to fund the contribution. Because the Stock is not publicly traded, to value the shares Meditech contributes to the Trust the Board is required at each October board meeting to determine what the FMV of the Stock will be as of December 31 of that year.

30. Under the Plan, the Trustee is responsible each year for valuing the assets held by the Trust, including its Meditech Stock. The Trustee's determination of the value of the Trust assets as of December 31 each year is used the following year to determine the distributions to be paid to any departing Plan participants.

*The Market for Meditech Stock*

31. Meditech has been a privately held company since its creation and the Stock has never been publicly traded on any stock exchange.

32. While Meditech Stock is not publicly traded, each year there are multiple transactions in the Stock. For example, each year Meditech makes Stock available for purchase by its officers and employees, at a price equal to the FMV determined by the Board. In January of 1997 and 1998, 250,000 and 300,000 shares were offered for sale to employees at split-adjusted prices of $12.00 and $13.50. Employees did not purchase all of these shares offered at those prices, instead purchasing approximately 217,000 and 277,000 shares, respectively.[14]

33. There is also a limited market for Meditech Stock. The Plan, although not obligated to, has historically purchased Stock back from small stockholders (who likewise are under no obligation to sell). For example, during 1997 and 1998, the Trust bought 39,580 and 72,342 split-adjusted shares back from employees at prices ranging from $12-14 per share.[15] Of

---

[13] "Buyers and sellers - Healthcare Information and Management Systems Society 1997 conference - Industry Trend or Event," Mark Hagland, 1997

[14] Report to the Board of Directors; Quarter Ended Sept 30, 1997 and 1998.

[15] Ibid.

particular relevance, two of the Plaintiffs, Hinchliffe and Trainor, voluntarily sold 13,200 and 20,900 of their personal shares to the Trust in 1998 at a split-adjusted price of $13.50.[16]

34.   In addition, at various points, particularly early in its history, Meditech sold Stock to large sophisticated purchasers such as EG&G Inc. and Greylock Investments LTD Partnership, a private-equity firm. In the years preceding the valuation date, these investors, although under no obligation to do so, sold their Stock at prices equal to the values then assigned to the Stock by Defendants. In December 1995 EG&G sold Neil Pappalardo 150,000 split-adjusted shares at a split-adjusted price of $10 per share.[17] And in June 1996 Greylock sold 460,800 split-adjusted shares back to Meditech at split-adjusted prices of $10.50 per share.[18] In each case, the value at which the investor sold the Stock was at or around the value assigned the Stock by Defendants.

---

[16] Statements of Stock Ownership at June 28, 2006 for Trainor and Hinchliffe.

[17] Report to Board of Directors; Quarter Ended December 31, 1995, p 15.

[18] June 20, 1996 letter from Howard Cox of Greylock to Neil Pappalardo, citing a price of $21/share for 230,400 shares; there has since been a 2:1 split. Bates DEF 007104.

## INDUSTRY BACKGROUND

35.  As described above, Meditech focuses its sales in the narrow market of information systems software for use by hospitals.

36.  The 1997 hospital market was believed to be fewer than 1,000 entities and this figure continued to decline.[19] This industry consolidation reduced the number of potential customers in the market, and increased competition for this smaller number of clients was an increasing force driving market prices. Key success factors for players such as Meditech in the hospital information technology industry were: large or rapidly growing installed base, distribution, and breadth and depth of product line.[20]

37.  As government (Medicare, Medicaid) funding of healthcare became more prevalent during the 1990s, margins tightened, thus leaving less room for elective technology improvements. Also, by 1997 many hospitals already had an information management system, thus the market for new information systems was becoming more competitive.[21]

38.  Meditech competed in only a narrow slice of the health care technology sector – information management software for hospitals. Thus, while in 1997 and 1998 the broader industry was looking for growth in an international market of 1.5 times the size of the U.S. market and an emerging medium to large physician group segment,[22] Meditech was not.

---

[19] "The Health Care Industry: Changing Environment Creates New Opportunities," George K. Baum & Company, Cerner Corporation: Equity Research Report, October 29, 1997, p 5.

[20] "Industry Background," Hanifen Imhoff Inc. Investment Bankers, Healthcare Information Technology: Investment Opinion-Cerner Corporation, October 16, 1997, p 11-12.Ibid.

[21] Ibid.

[22] "The Health Care Industry: Changing Environment Creates New Opportunities," George K. Baum & Company, Cerner Corporation: Equity Research Report, October 29, 1997, p 5.

## DETAILED REVIEW OF THE VAN VLEET REPORT'S APPROACH AND RESULTS

39.  The Van Vleet Report provides a single point estimate of $21.62 for Meditech Stock as of December 31, 1997. It arrives at this estimate by valuing Meditech under two approaches - a discounted cash flow ("DCF") method (its "Income Approach") and a guideline public company ("GPC") method (its "Market Approach"). In the DCF method, it forecasts 10 years' available cash flow from operations, discounted to present value at a WACC of 13.8%, without considering a DLOC. In the market approach, it uses four GPCs to derive a multiple of earnings. Interest bearing debt is subtracted from both methods to yield equity value. The results of these two methods are weighted 75% and 25% respectively, with the blended amount reduced by 25% to account for a DLOM.

### A.    THE VAN VLEET REPORT'S USE OF A SINGLE POINT VALUE ESTIMATE IS SPECIOUSLY PRECISE

40.  The Court's Memorandum of Decision dated March 20, 2007 denying class certification noted that, "Valuing the equity of a private company is an "art," not simply a matter of plugging numbers into a formula," and that "[d]ifferent appraisers can come to significantly different valuations based on the same set of facts." We agree.

41.  Notably, even the values of the publicly-traded companies upon which the Van Vleet Report relies reflect the inexact nature of valuation. Simply looking at a share price chart for the Van Vleet Report's GPCs, Exhibits XV through XIX demonstrates the share price volatility over the period December 31, 1994 – December 31, 1997, and therefore, the false precision of any single point estimate of value that would result from the approaches advocated by the Van Vleet Report. For example, in the summer of 1997, the value of Cerner stock rose by 48% from $20.75 on June 30 to $30.75 on September 2, a period of about two months. It then fell by 31% in just four months, back to $21.12 on December 29, virtually the point it had started six months earlier. At the end of the day, during this period the value of Cerner's stock only moved by 1.8% from where it had started, but throughout the period perceptions of the value of the stock were, as just shown, subject to far more dramatic swings.[23]

42.  The need to account for the inexact nature of private-company valuations is well recognized by practitioners in the field. As stated in *Valuing a Business* (which was coauthored by plaintiff's expert in the Grossman case, Mr. Reilly):[24] "The discounted economic income methods are extremely sensitive to changes in the input variables – that is, the projected cash flows and the discount rate. Because such large impacts may result from relatively small changes in input variables, it is often enlightening to perform some sensitivity analysis in

---

[23] Cerner's stock prices are depicted in the Van Vleet Report at Exhibit XVIII.
[24] Pratt, Shannon P., et al, Valuing A Business, 4th Edition, page 191

conjunction with a discounted economic income method. This could take the form of a sensitivity table showing the impact of a range of discount rates, terminal value multiples, growth rates, and cash flow projections."

43.   Because there really is no single "right" price for the stock of a company, those asked to opine on fairness of a given price offered for stock typically ask whether that price falls within a *range* of fair values.  For instance, it is standard practice in corporate mergers, acquisitions, divestitures, and certain other intercompany matters for boards of directors to solicit a "fairness opinion" opining on the fairness of a transaction from a financial point of view. A fairness opinion rarely presents a single point estimate of value.  In fact, the fairness opinion's underlying analysis will typically be based on a range of values.

44.   In this case, where we understand the question to be whether the value selected by the Trustee was a reasonable value for the Stock, we believe the Van Vleet Report should have approached this assignment in a fashion similar to a fairness opinion, *i.e.* asked whether the Board's price was within a reasonable range of value. That it did not, and instead opined that the value of Meditech Stock on the valuation date was precisely $21.62, lends an air of specious precision to what is by its very nature an exercise filled with judgment calls and uncertainty.

## B.   THE VAN FLEET REPORT FAILED TO CONSIDER ACTUAL TRANSACTIONS IN MEDITECH STOCK

45.   Ultimately, the best evidence of the fair market value of a stock - the price at which a willing buyer and willing seller would transact - is the price at which *actual* buyers and sellers have engaged in transactions. While Meditech Stock is not traded on a public exchange, there were transactions in Meditech Stock in the period leading up to the valuation date. While the Van Vleet Report does not address the existence of these transactions, they are revealing as to the relative merits of the Defendants' and Van Vleet's valuations.

46.   There is no requirement that an employee ever sell his or her personal holdings of Meditech Stock, including once he or she leaves the company.  (Plaintiff Hubert, for example, still holds 23,100 Meditech shares despite having been fired by the company in 2004.) Nonetheless, employees voluntarily sold (all split-adjusted) 39,580 shares to the Trust in 1997 and 72,342 shares to the Trust in 1998 at prices ranging from $12-$14.[25]  These prices at which employees were willing to voluntarily sell their shares of Meditech Stock to the Trust were similar to the values ($12 and $13.50) determined by Defendants in those years, and well below the $21.62 value the Van Vleet Report estimates.

47.   Of particular relevance, two of the Plaintiffs, Hinchliffe and Trainor, sold 13,200 and 20,900 of their personal shares to the Trust in 1998 at a split adjusted price of $13.50.[26]  It does not

---

[25] Report to the Board of Directors; Quarter Ended Sept 30, 1997 and 1998.

[26] Statements of Stock Ownership at June 28, 2006 for Trainor and Hinchliffe.

appear, from the Van Vleet Report, that Mr. Van Vleet was ever told that Hinchliffe and Trainor had voluntarily sold their stock to the Trust at the value determined by defendants and roughly $8 below the $21.62 value determined by Van Vleet.

48. In addition to these transactions involving individual employees, there were transactions involving large, sophisticated investors in the period preceding the Valuation Date at values identical to those being contemporaneously determined by the Defendants. In December 1995, for example, EG&G Inc., one of the original investors in Meditech, sold Neil Pappalardo 150,000 split-adjusted shares at a split-adjusted price of $10 per share.[27] Closer to the Valuation Date, in June 1996 private equity firm Greylock sold 460,800 split-adjusted shares back to the company at split-adjusted prices of $10.50 per share.

49. All of these transactions, including transactions in which large, sophisticated investors were willing to sell their Stock, at values at or near the values determined by Defendants, are evidence that the values assigned to the Stock by Defendants' fairly approximate the Stock's fair *market* value.

50. In contrast to these transactions at values either at or very close to the values determined by Defendants, there were no transactions during this period at or anywhere close to the $21.62 value that the Van Vleet Report claims for the Stock. As we explain in the next sections, that is unsurprising, because the Van Vleet Report contains numerous methodological errors which resulted in it arriving at an insupportably high value. In fact, it wasn't until several years later that any third party transaction took place around that value. On December 20, 2001, T.A. Associates offered to acquire a substantial portion (up to 90%) of Meditech at a purchase price of $24-26 per share.[28] This arms-length price for a controlling interest corresponds to $18-20 per share after deducting a 25% DLOC (consistent with the Board determined price of $19 at December 31, 2001) and is lower than the $21.62 the Van Vleet Report determines four years prior.

## C.  THE VAN VLEET REPORT IMPROPERLY OMITS A DISCOUNT FOR LACK OF CONTROL

51. Among the most important considerations in valuing an interest in a closely held or non-publicly-traded enterprise are the legal and operating rights embodied in the interest to be valued. As stated in *Valuing a Business*,[29] "Considering the economic unattractiveness of non-controlling ownership interests in closely held companies to most investors, the lack of control discount from a proportionate share of enterprise value under the fair market value standard may be quite large."

---

[27] Report to Board of Directors; Quarter Ended December 31, 1995, p 15.

[28] Letter dated December 20, 2001 by TA Associates to the special committee of the Meditech's Board.

[29] Pratt, Shannon P., et al, Valuing A Business, 4th Edition, p 349.

52. A controlling investor generally has certain prerogatives of control, including the ability to: (i) change terms of governing documents/agreements; (ii) elect/remove management; (iii) set policy; (iv) determine strategic course of business; (v) acquire and liquidate assets; (vi) determine distribution policy; (vii) dissolve any entity; (viii) determine management compensation and perquisites; (ix) select people with whom to conduct business and award contracts; (x) sell the company or register the company's stock for public offering; and (xi) block all aforementioned actions. Of these, the ability of a controlling shareholder in a non-publicly traded company to put the company up for sale or to bring it public (or to block such actions) is arguably the most important. The minority-interest holder in a non-publicly traded company lacks these prerogatives, and therefore cannot guarantee that a market will ever exist for his or her stock.

53. Given the advantages enjoyed by a controlling shareholder and corresponding disadvantages felt by a minority shareholder, appraisers valuing a company will generally apply a "discount for lack of control" or DLOC to the overall company value in order to determine the value of a non-controlling interest. The Van Vleet Report errs in not applying a DLOC in determining the fair market value of the Meditech Stock contributed to and held by the Trust under its Income Approach.[30] Under that approach, the Van Vleet Report calculates the present value of all forecasted cash flows that are *potentially available* for distribution to all investors, including priority claims by debt holders and subordinate claims by equity holders such as the Trust. This *potentially available* cash flow ("ACF") does not reflect the reduced cash flows *expected to be received* by minority equity holders. In fact, Meditech's earnings per share ("EPS") payout ratio averaged less than 50% from 1989-1997 (Van Vleet Report, p. 12).[31]

54. To determine the effect of the Van Vleet Report's omission of a DLOC on its ultimate estimate of $21.62, we looked at several possible approaches for determining an appropriate DLOC. First, we looked at industry control premium studies where stock prices are compared prior to and after a merger, acquisition, or other business combination. The empirical data used in determining control premiums is based primarily on the public markets for stock ownership interests and the premiums paid for acquisitions of companies when compared with the public market minority trading prices prior to the acquisition announcement. Second, we also reviewed the control premiums paid in 43 transactions occurring in 1998 within the computer software industry.[32]

55. A summary of the information we obtained through both approaches for determining a DLOC can be found at Exhibit 5. These studies over 1991-1998 show the median DLOC over all merged companies ranged from 22-26%, whereas the median for computer software companies ranged from 27-38%. A group of 43 transactions in 1998 in the computer software industry for SIC codes 7371, 7372 and 7373 had a median DLOC of 26%.

---

[30] It is unnecessary to apply DLOC to the GPC approach because stock market prices are already non-controlling interests.

[31] The ratio of dividends to ACF per share would be slightly lower, as ACF per share is higher than EPS.

[32] The database sourced for this information did not compile transaction information prior to 1998.

56. Based on this data, we believe that Mr. Van Vleet should have applied a DLOC of at least 25% to apply to Meditech equity value under his DCF method. This is based on overall median control premiums observed across multiple industries as well as within the computer software industry between 1991 and 1997.

57. Applying this discount to the Van Vleet Report's Income Approach, and not making any other changes to his approach, would decrease his $880.7 million valuation under the Income Approach by roughly $220.2 million, to $660.5 million. Incorporating this revised Income Approach value, the Van Vleet Report's estimate of the value of Meditech Stock would fall by nearly $4, to $17.77, holding all else equal and not making any of the other changes that we opine elsewhere in this Report are necessary.

## D. THE VAN VLEET REPORT INCORRECTLY USES "WHAT IF" SCENARIOS AS PROJECTIONS IN ITS INCOME APPROACH (DCF METHOD)

58. In valuing a non-publicly-traded company under an income approach, a crucial variable is a forecast of how much income the company may have in future years. Ultimately, earnings or cash flow is what investors pay for, so it stands to reason that this is central to any valuation. The importance of future expected growth to value estimates cannot be overestimated; as stated in *Valuing a Business*,[33] "Changes in the growth rate projected, sometimes seemingly small, can result in striking changes ....Obviously, the closer the growth rate to the discount rate, the greater the sensitivity."

59. In setting forth an estimate of future income and ACF for Meditech, the Van Vleet Report purports to rely on a section of a Meditech board of directors ("BOD," or the "Board") package entitled *Forecast through 2001* as being "Management Projections" of anticipated 1998-2001 performance. [34] The scenario set forth in that board package assumed revenue growth of 9.9% in 1998 and about 14.5% for the later years. The Van Vleet Report then further forecasts Meditech's results for 2002 to 2006, assuming growth rates trending down from 12.8% - 5.8%, and from there to a terminal growth rate of 4%.

60. The *Forecast Through 2001* that the Van Vleet Report relies on is not the kind of projection that is properly used in valuing a company. The *Forecast* appear to be nothing more than a "what-if" scenario to show what the income statement and balance sheet would be like if certain growth happens to be achieved. The Board package from which the Van Vleet Report drew its projections explicitly states that management did not expect its forecast for later years to be accurate, but rather meant for the forecast to reflect the company's financial

---

[33] Pratt, Shannon P., et al, Valuing A Business, 4th Edition, p 208 - 209.

[34] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 20

position when certain revenue levels were achieved.[35]  Neil Pappalardo, the author of the multiyear *Forecast*, testified that the growth rate it reflected was simply an assumption the Board asked him to use.  He also testified that the *Forecast* was not the same as the company's customary one-year forecast (which, as opposed to the *Forecast*, was based heavily on actual orders placed with Meditech by real customers), and was only intended to show what the balance sheet looks like whenever certain revenues are achieved.[36]  Edward Roberts, a member of the Board, also testified that these "forecasts" were not expected to be accurate.[37]

61.  In fact, Meditech's management has consistently stated that it only projects operating results one year ahead, which is in fact the standard presentation in its BOD packages. Roland Driscoll, a member of the Board of Directors, stated that it was uncommon for Management to provide the Board with long-term forecasts.[38]

62.  Page 26 of the Van Vleet Report lists the sources of information used in its analysis. It does not appear that Mr. Van Vleet was provided access to or relied upon any of the deposition testimony explaining the purpose and significance of the four-year projections.  In our opinion, this is an important fact that should have been considered by Mr. Van Vleet. The Van Vleet Report's failure to consider and address the source of the *Projection* renders its growth estimate based on that *Projection* wholly unreliable.

63.  In addition to incorrectly using management's four-year "what-if" scenario as if it constituted an estimate of growth during that period, the Van Vleet Report further errs by projecting Meditech's income statement and ACF for 2002 - 2006 by "trending" down the growth rate to a perpetual long-term level of 4% beginning in 2007, while assuming constant margins and cash flow ratios. The result is a DCF analysis extending another five years past the end of management's hypothetical "what-ifs," plus a terminal year forecast for the tenth period post-1997 actual results. Such trending derived from "what if" scenarios yield speculative results, and nothing management would embrace as an expectation for those years.

64.  Moreover, management viewed 1998 as a "challenge" due to reduced business with its largest and most critical customer (HCA); and continued turnover in staff as a result of the competitive job market.[39]  As stated previously, as of December 31, 1997 Meditech was expecting a slow decrease in future revenues from HCA based on changes in HCA's business and strategic direction. Further, Meditech was expecting some loss of efficiency due to its conversion from a prior "Magic" system to one based on client/server technology.

---

[35] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 15. Consistent with that, Meditech's President, Howard Messing, testified that the forecasts were too aggressive, Deposition dated November 13, 2007, p. 47-8.
[36] Neil Pappalardo Deposition dated November 27, 2007, p.11-13 33.
[37] Edward Roberts Deposition dated November 8, 2007, p. 84-5.
[38] Roland Driscoll Deposition dated October 17, 2007, p. 69-70.
[39] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 14.

65.   All told, by relying on his six years of forecasts beyond any management representations (which themselves were merely "what if" scenarios), the Van Vleet Report continued high rates of growth in its trended five-year extension, leading to terminal revenues at 267% of 1997's actual results. This is improperly aggressive and highly unrealistic. In fact, the Van Vleet Report's projections for 2002-2006 revenue, upon which that Report partly relied for its estimate of value, were about *50% higher* than actually achieved by Meditech.

66.   As opposed to its flawed approach, if the Van Vleet Report had simply capitalized projected 1998 ACF based on its WACC and long-term growth rate assumptions,[40] it would have avoided some of the problems and complications from a speculative long-term forecast. Applying this methodology to the Van Vleet Report's Income Approach, and leaving all other variables intact, would decrease his estimate of the value of the company from $880.7 million to $566 million, a decrease of roughly $314.7 million. Moreover, making this change would decrease in the Van Vleet Report's final composite estimate of FMV of the company from $695.6 million to $518.6 million, a decrease of $177 million. This reduces the Meditech Stock value by $5.50 per share, or 25%, to $16.12. This major decrease in the value arrived at under Mr. Van Vleet's methodology is the result simply of decreasing his growth estimate, holding everything else he did equal and not making any of the other changes that we opine elsewhere in this Report are necessary.

67.   Given the limitations and uncertainties in managements' forecasts and the challenging future Meditech management clearly expected, alternatively the Van Vleet Report should have added an appropriate company-specific risk factor to his WACC,[41] to account for the highly speculative nature of its resulting 10-year projection. As stated in *Valuing a Business,*[42] "for a given level of expected future returns, the market will pay more to the extent that realization of those returns is more certain and less to the extent that their realization is less certain. In other words for a given level of expected prospective economic income, the lower the risk, the higher the present value, or conversely the higher the risk, the lower the present value."]    As shown in the next section, if the Van Vleet Report had included an appropriate company-specific risk factor this would have similarly reduced its deemed value for Meditech Stock.

## E.   THE VAN VLEET REPORT FAILS TO PROPERLY INCLUDE INDUSTRY AND/OR COMPANY SPECIFIC RISK PREMIUM IN ITS WACC CALCULATIONS

68.   In our opinion, the Van Vleet Report fails to give proper consideration to the specific risks faced by companies operating in Meditech's market – information management software for

---

[40] A methodology used for example by Robert F. Reilly, plaintiff's expert in the Grossman litigation, in his 2005 report.

[41] The WACC is used to convert a monetary sum, payable or receivable in the future, into present value. It is determined by the weighted average, at market value, of the cost of all financing sources in the business enterprise's capital structure, i.e. various debt and equity capital.

[42] Pratt, Shannon P., et al, Valuing A Business, 4th Edition, p 161.

use in hospitals – when compared with other industries or the public market in general, as well as the unique risks faced by Meditech. Examples of company specific risk include key person dependence, key customer dependence, key product dependence, obsolescence of technology, etc.[43]

69. The Van Vleet Report relies on two techniques (the traditional CAPM and build-up methods, described below) to develop the return on equity component for its WACC, or discount rate, of 13.8%. It then uses that WACC to convert its forecasted and terminal years of ACF to a present value. The Van Vleet Report states that its selection of a discount rate reflects the relative risk of achieving the projected cash flows as well as the time value of money. Under neither approach, however, does the Van Vleet Report actually consider company or industry-specific risk.

70. Under one such method, the Van Vleet Report develops an overall WACC in part based on the CAPM[44], which relies on the risk profile of selected guideline public companies deemed comparable to Meditech in order to account for, in part, industry risk. However, as explained further herein in Section G, two of the Van Vleet Report's four selected guideline public companies do not even operate in the market for information software for hospitals, and hence the risk borne by those companies is not at all reflective of risk borne by Meditech. And even those companies selected by the Van Vleet Report that do sell information management software to hospitals operate in a number of different product and geographical markets that Meditech does not, providing them with diversification that Meditech does not enjoy.

71. Under a second method, the Van Vleet Report seemingly relies on two separate sources of Duff & Phelps data to estimate the equity component of WACC.[45] In actuality, both sources of data come from the same Duff & Phelps report, and reflect a "build-up" methodology in determining the cost of equity component of the WACC. Under this build-up methodology, the Van Vleet Report does not include any risk component due to industry and/or Meditech specific factors. Although its formula recognizes the need to include company-specific risk, it does not quantify any such risks in arriving at its conclusion.

72. To gauge an appropriate risk premium for Meditech's specific factors, we calculated the correlation of returns between a broad market index and each of four GPCs, two of which were also selected by the Van Vleet Report and the other two by us.[46] This correlation reflects a relative measure and is used to scale Meditech's Beta, which reflects the expected volatility of Meditech equity based on overall Market risk, if Meditech were a publicly traded company. From this, we estimated the company specific risk of Meditech which considers

---

[43] Pratt, Shannon P., et al, Valuing A Business, 4th Edition, p 431.

[44] CAPM is a common method of estimating cost of equity. It is based on the risk-free rate plus a risk premium that is proportionate to the systematic risk of the security or portfolio.

[45] See the Van Vleet Report, ¶ 51 which references Duff & Phelps Size/Return Study and Duff & Phelps Risk/Return Study. Mr. Van Vleet is a Managing Director with Duff & Phelps.

[46] See Section G, on guideline company selection.

the non-diversifiable nature of Meditech equity risk for Stock held by the Trust. Our analysis is based on a Total Beta methodology ascribed to by both academics and practitioners in the business valuation field.[47]

73. We quantified a 3% equity risk premium to capture specific risks faced by Meditech through the Total Beta methodology (see Exhibit 6). Had the Van Vleet Report included such a risk premium in its calculation of an appropriate WACC (by correcting the cost of equity capital component of the resulting WACC), it would have determined an overall WACC of 16.35%[48] as opposed to its conclusion of 13.8%.

74. Using the more appropriate WACC, while holding all else equal and not making any of the other changes that we opine elsewhere in this Report are necessary, the Van Vleet Report's $880.7 million conclusion under the Income Approach would be decreased by $204.5 million to $676.2 million, and its $695.6 million composite estimate would decrease by $115 million to $580.6 million, resulting in a share value of $18.05. However as explained elsewhere in our report, the Van Vleet Report suffers from other deficiencies that if corrected, would lower the derived share value further still.

## F. THE VAN VLEET REPORT SELECTED TOO SMALL A DISCOUNT FOR LACK OF MARKETABILITY

75. Generally speaking investors are less willing to buy and hold stock in a non-publicly traded company than they are stock in a company whose shares are traded on a public exchange such as the New York Stock Exchange or NASDAQ. Shares in a non-publicly traded company, in comparison to exchange-traded shares, are relatively illiquid: finding a buyer for non-publicly traded shares is less certain, more complicated, and involves greater transaction costs. To account for this, appraisers generally apply a discount for lack of marketability or "DLOM" to the shares of a non-publicly traded company, to reflect their relative undesirability.[49]

76. Meditech Stock can not be readily converted to cash, as it is not publicly traded. The Van Vleet Report recognizes this and does apply a DLOM. In our opinion, however, the Van

---

[47] See "Estimating the cost of equity for a private company" by Professor Aswath Damodaran at http://pages.stern.nyu.edu/~adamodar/New_Home_Page/valquestions/totalbeta.htm. Also, see "Quantifying Company Specific Risk: A New, Empirical Framework With Practical Applications," Peter J. Butler, et al, Business Valuation Update, Vol 13., No. 2, February 2007.

[48] The Van Vleet Report's Exhibit IX states that Concluded WACC was based on CAPM method from its Exhibit X. Exhibit X indicates a 13.5% rounded conclusion; adding 2.85% (3% X 95% equity weighting) yields 16.35%.

[49] The notion of a DLOC or minority interest discount is separate and distinct from any DLOM. In fact, a DLOM may exist, regardless of whether a controlling or minority interest is being valued.

Vleet Report's selection of a 25% DLOM[50] is too low, and consequently overestimates the FMV of Meditech Stock to a non-controlling investor.

77.  There were several flaws with the Van Vleet Report's approach to selecting a DLOM. First, the Van Vleet Report inappropriately relies on studies of private transactions in the common stock of companies that subsequently had initial public offerings (the "IPO Studies"). In many cases these companies were known to be poised to soon conduct an IPO, and hence their discounts for lack of marketability were relatively muted. Even still, the Van Vleet Report notes an average discount of 43.8% based on four such IPO studies.[51] In fact, for 65 private transactions between 1980 and 1997 with subsequent IPOs between 121 and 153 days later, the average discount observed was 51%.[52]

78.  In comparison to these pre-IPO companies, in 1997 Meditech had no plans to issue Stock in a public market for the foreseeable future – indeed, as of 2008, more than a decade later, it still has not done so. The pre-IPO studies relied upon by Mr. Van Vleet, accordingly, are not directly applicable to Meditech's situation, and, all else being equal, Meditech Stock would warrant a deeper discount for lack of marketability than seen in those studies and deeper than the 25% selected by the Van Vleet Report.

79.  The Van Vleet Report also inappropriately relies on studies covering 1980 to 1997 of restricted stock in determining a DLOM (Van Vleet Exhibit XX). A restricted stock is one which is identical to its company's publicly-traded issue, but carries a short-term restriction on marketability. Because holders of such stock know they can obtain public liquidity once the restrictions lapse (usually no more than one to three years),[53] there is often an established underlying market for restricted stock. Such is not the case with Meditech Stock.

80.  Moreover, it is generally accepted that restricted stock "studies conducted after 1990 are not relevant for purposes of determining discounts for lack of marketability for privately held stock, because they reflect the increased liquidity in the market for restricted securities. Such increase in liquidity is not present in privately held securities."[54] The Van Vleet Report, however, only observes two restricted stock studies covering periods both prior to and after 1990, with resulting average discounts between 22% and 27%.[55]

---

[50] The Van Vleet Report, p 13 and 29.

[51] The Van Vleet Report, Exhibit XXI. Note that the figure characterizes a summary average based on nine studies, yet only four are shown.

[52] Data available at http://www.emorybizval.com/valuation-studies.shtml. Additionally, in Exhibit XXII the Van Vleet Report notes an average discount of 35.5% based on another set of six IPO studies. However, there is not enough transparency in the data to determine the appropriateness of the results, and therefore these IPO studies should not have been relied upon. See Pratt, Shannon P., et al, Valuing A Business, 5th Edition , p 436-438.

[53] Pratt, Shannon P., et al, Valuing A Business, 5th Edition, p 430-431.

[54] Kathryn F. Aschwald, "Restricted Stock Discounts Decline as a Result of a 1-Year Holding Period" Shannon Pratt's Business Valuation, vol. 6, no. 5 (May 2000): p 1-5.

[55] The Van Vleet Report, Exhibit XX. Note that the figure cites footnotes for eight additional studies for which no discount data is presented.

81. We used several approaches to determine a reasonably conservative alternative DLOM that Van Vleet should have used. First, we show in Exhibit 7 our analysis of 13 restricted stock studies and isolate those periods prior to 1983, when Rule 144(k) of the Securities and Exchange Commission was instituted requiring anyone not affiliated with an issuer to be permitted to sell their *entire block* after three years. These restricted stock studies show an overall median discount of 33%.

82. We also quantified an estimate for a reasonably conservative discount for marketability based on an option pricing model in Exhibit 8, where the holder of a privately held security without ready marketability can be viewed as being short a put option. The owner of a put option has the right, but not the obligation to sell his or her interest in the underlying security, while an investor that does not have a put option lacks this right. As such, the price of the put option is indicative of the cost of liquidity.

83. Based on our restricted stock analysis and put option analysis on the one hand, and considering as well the size of dividends on Meditech Stock (which tends to suggest a lower discount for lack of marketability than otherwise called for), the prospects for Meditech Stock becoming publicly traded (extremely low), the pool of potential buyers of Meditech Stock, and the future growth prospects for the company, we believe a reasonably conservative DLOM for Meditech Stock would be 30%.

84. As a further check on reasonableness, we reviewed academic research,[56] which shows that marketability discounts of 30% are possible with holding periods of only one year even when the volatility in price for a given company's stock is just 25%. In the instant case, the median guideline public company volatility is 59%.

85. Applying this discount to the Van Vleet Report's income and market approaches' aggregate conclusion, holding all else equal and not making any of the other changes that we opine elsewhere in this Report are necessary, would decrease its indicated $695.6 million FMV of Equity (non-marketable, non-controlling) to approximately $649.3 million, a decrease of approximately $46.3, with resulting share value declining to $20.18. Again, this effect on the Van Vleet Report's overall estimate of the value of Meditech stock does not take into account any of the other corrections that we believe are necessary in that Report's analysis.

## G.  FLAWS IN CHOICES OF GUIDELINE PUBLICLY TRADED COMPANIES

86. The Van Vleet Report identified four public companies that it claims are comparable to Meditech: namely, Advent Software, Inc., Aspen Technology, Inc., Cerner Corporation, and Shared Medical Systems Corporation.

---

[56] Francis A. Longstaff, "How Much Can Marketability Affect Security Prices," The Journal of Finance, Volume 50, Issue 5, 1995

87.  A good GPC would require comparability with Meditech across many dimensions, including industry similarity, products and/or services provided, customer profiles, intellectual property rights, market share, size, historical trends, growth prospects, financial and operating risk, management depth and dividend paying capacity.

88.  The comparable companies to Meditech selected by Van Vleet either do not meet these criteria at all or do so only minimally,  Meditech sells only a limited set of products (information management software) to a limited set of customers (hospitals) in a limited geographic market (almost entirely the United States, and to a lesser extent Canada and Britain).  As explained further below,  the supposedly comparable companies selected by Van Vleet can be differentiated from Meditech on at least the following bases:

   •  Some participate in industries other than healthcare information software for hospitals – in fact, some do not sell healthcare information software at all;
   •  Some sell hardware and facilities outsourcing, whereas Meditech does not;
   •  Some provide professional services on a consulting basis, whereas Meditech does not; and
   •  Some serve markets outside of the U.S. and are expanding internationally, while Meditech largely is not.

89.  Advent Software, Inc. ("Advent") is a provider of software products, data interfaces and related services that automate and integrate functions of *investment management* organizations.[57] Advent does not even operate in the healthcare information software industry. Unlike Meditech, Advent also offers professional services including, consulting, systems integration and custom programming which makes up a significant portion of its revenue. Augmenting software development, sales, and maintenance with the provision of professional services requires a different business model than Meditech's model, which is based simply on software development, sales, and maintenance. Specifically, the addition of professional services changes the overall profit and its allocation to underlying business units and introduces new competitors and potential cyclicality to the business.

90.  Aspen Technology, Inc. ("Aspen") is a supplier of software and service solutions used to design, operate and manage *manufacturing processes for industries* that manufacturer chemicals, petrochemicals, petroleum products, pharmaceuticals, pulp and paper, electric power, food and beverages, consumer products, and metals and minerals.[58] Like Advent, Aspen does not operate in the same industry, even broadly defined, as Meditech.  Unlike Meditech, Aspen operates in a cyclical industry which makes its revenues and profits sensitive to the economic outlook. Also unlike Meditech, Aspen also offers a range of consulting services for implementation, advanced process control and real-time optimization. Additionally, Aspen does not operate in the healthcare information software industry, nor within an industry that is highly government regulated, nor self-scrutinized with multi-constituent standards bodies.

---

[57] Advent 's 10-K for 1997.
[58] Aspen's 10-K for 1997.

91. Cerner Corporation ("Cerner") designs, develops, markets and installs clinical and management information systems that are capable of being implemented on an individual, combined or enterprise-wide basis. Cerner's systems are designed and developed using the Health Network Architecture ("HNA"); its market is the healthcare industry. As of December 31, 1997, Cerner is developing its newest generation of HNA products known as "Millennium." In addition to competing with Meditech in the market for information management software for hospitals, Cerner *also* derives a significant portion of its revenue from consulting services and provides health care claims processing and facilities outsourcing.[59] None of these additional service offerings, which provide Cerner additional avenues for growth and diversify Cerner's risk from a downturn in the information software market, are provided by Meditech. In addition to the factors cited above concerning the lack of comparability between Meditech and a firm that provides professional services, the provision of claims processing introduces additional governmental regulation, risk management and new stakeholders, including third party payers.

92. As with Cerner, Meditech only competes with Shared Medical Systems Corporation ("SMS") in one product line. SMS also provides a much broader portfolio of software product, service and solution offerings to the healthcare industry, including a full range of clinical, financial, patient management, electronic data interchange, managed care, management solutions, and integrated multimedia solutions. And, unlike Meditech, SMS also provides specialized consulting services for the design and integration of software in addition to outsourcing, hardware and education services.[60] SMS is significantly more capitalized than Meditech and as a result, can more readily fund new initiatives. As a provider of computer hardware, SMS is subject to much greater operating leverage given its holdings in fixed asset equipment.

93. In light of the foregoing, Advent and Aspen are not comparable to Meditech, and Cerner and SMS are only minimally comparable. To be considered minimally comparable requires at least having (a) similar industry segment, (b) similar products and/or services (c) an installed base in diverse geographic markets, and (d) similar customer profiles. Advent and Aspen fail all screens, whereas Cerner and SMS arguably only meet some elements of (a), (b), and (d). Because the Van Vleet Report's selection of GPCs arrived at only two minimally comparable companies, we do not consider his GPC analysis to be reliable.

94. In an effort to see whether there were any publicly-traded companies to Meditech that Mr. Van Vleet missed, we conducted our own review of possible matches. Like Van Vleet, we were unable to find any companies that we would consider truly comparable to Meditech, with its narrow focus on information management software for hospitals. However, we did find two additional public companies that we would consider minimally comparable to Meditech, specifically, Creative Computer Applications, Inc. (now known as Aspyra, Inc.) and QuadraMed Corporation.

---

[59] Cerner's 10-K for 1997
[60] SMS's 10-K for 1997

95. Creative Computer Applications, Inc. ("CCA") develops, assembles, markets, installs, and services computer based clinical information systems for use in hospitals, clinics, reference laboratories, and other healthcare institutions. CCA's business consists of three operational areas: (1) clinical information systems products, (2) service of its customer's installations, and (3) data acquisition products.[61] CCA derives roughly 70% of its revenue from software system sales, which includes data acquisition products, an offering Meditech does not have. Unlike Meditech, CCA also sells hardware and provides field service for hardware repair. Thus, at best, it is only minimally comparable to Meditech.

96. QuadraMed Corporation ("QuadraMed") develops, markets and sells software products and services designed to increase operational efficiency, improve cash flow, measure the cost of care and effectively administer managed care contracts. QuadraMed has a suite of products including an integrated offering of EDI, financial management, decision support, and compliance solutions. Like Meditech, a substantial portion of their revenues are derived from the sale of software products and services to hospitals. However, unlike Meditech, QuadraMed also provides compliance, consulting and business office outsourcing services.[62] As of the Valuation Date, the large majority of QuadraMed's sales pertained to physician practice management software, which Meditech did not provide. QuadraMed had only recently gained electronic medical records software capability through its 1996 acquisition of Clinitec International, Inc. We consider QuadraMed as only minimally comparable to Meditech. However, its uncharacteristic financial performance - after a period of losses, it had just returned to profitability, and resulting growth rates were therefore not meaningful - precluded its full use under the GPC method.

97. In view of the foregoing, and in the absence of identifying any guideline publicly traded companies sharing enough similarity with Meditech across the factors discussed above, there is not sufficient basis to employ a GPC method as an indication of Meditech Stock value on the Valuation Date. At minimum, the Van Vleet Report should have placed little weight on the GPC method in its determination of value, and not 25% as it did.

98. Notwithstanding, below we quantify the effect on the Van Vleet Report's indication of value under this approach, in part, based on eliminating Advent and Aspen due to non-comparability while including CCA as a minimally comparable GPC.

## H.  FLAWS IN SELECTION OF MARKET DERIVED PRICING MULTIPLES

99. In addition to selecting an improper set of comparables against which to compare Meditech, the Van Vleet Report's guideline public company analysis suffers from a number of technical flaws all of which served to inflate its ultimate estimate of the value of Meditech Stock.

---

[61] CCA's 10-K for 1997

[62] Quadramed's 10-K for 1997

100. As an initial matter, the Van Vleet Report miscalculated Cerner's earnings before interest, taxes, depreciation and amortization ("EBITDA") and resulting ratio of MVIC to Cerner's 12 preceding months of EBIDTA. Whereas that Report's calculation of Meditech's "Adjusted EBITDA" at $96.1 million includes interest income (as is the case of all but one GPC), for Cerner it does not. When deriving multiples from GPCs, it is essential that they be constructed on a consistent basis with the subject company's metrics to which they will be applied. Correcting the Van Vleet Report's GPCs' EBITDA calculations to be consistent with how it calculated Meditech's EBITDA results in a lower MVIC/EBITDA[63] ratio of 16.0 for Cerner, as opposed to 17.9 as originally stated.

101. The Van Vleet Report adjusted market-derived multiples of EBITDA to "reflect the differences in expected earnings growth between each public company and Meditech."[64] However, the Van Vleet Report did not adjust market-derived multiples of EBITDA for any differences in the risk of investing in one or more of the guideline public companies versus Meditech, with its own unique risks discussed previously.[65] While the Van Vleet Report adjusts the market-derived multiples for differences in size and expected earnings growth, he fails to provide the source or the methodology behind his stated adjustments. There are several factors on his Exhibit XV which are unsubstantiated, specifically (i) the derivation of the Adjusted Ratio formula in footnote 4, (ii) the same 0.9 relative growth factor for all guideline public companies, and (iii) the same "Ind. Avg. Equity/MVIC" ratio of 100% for all guideline public companies.

102. As a result, the Van Vleet Report's GPC multiples are adjusted only by their relative market value of equity amounts; this is circular since the whole purpose of the valuation is to estimate Meditech's equity value. Further, the difference in relative growth between its GPCs and Meditech does not appear to be accurately determined.

103. Moreover, The Van Vleet Report states "[g]iven the superior profitability performance of Meditech when compared to the guideline public companies, an EBITDA multiple slightly above the average is appropriate." The Van Vleet Report implies that it incorporated differences in profitability between the guideline public companies and Meditech through its choice of an EBITDA multiple. Higher profit margins will lead to higher value, but increased profitability is already reflected in higher EBITDA against which the multiple will be applied. Adjusting the multiple under the same rationale essentially double-counts the effect.

104. Like the Van Vleet Report, we separately quantified required adjustments to market-derived pricing multiples of GPC EBITDA based on differences in size and growth. However, we also quantified an appropriate adjustment for differences in company risk to an otherwise unadjusted EBITDA multiple. Under our methodology, we capture a consolidated adjustment

---

[63] MVIC is market value of invested capital, including debt and equity. MVIC/EBITDA is a type of price/ earnings ratio commonly used in valuing closely-held stocks.

[64] The Van Vleet Report, pg. 10, ¶ 64.

[65] Mr. Van Vleet provides no explanation for his quantification of adjustment for size and growth, specifically, the derivation of his "Adjusted Ratio."

# EXHIBIT 34
# (Part 2)

for size, risk, and growth through differences in the underlying WACC requirements for each guideline public company and Meditech, and their impact on future growth.

105. Finally, the Van Vleet Report concludes that an appropriate MVIC/EBIDTA multiple to use under the GPC method is slightly above the *average*.[66] Company valuations based on the simple average (or mean) of GPC multiples will consistently overstate value; the harmonic mean is the best among common multiples.[67] The harmonic mean effectively averages the yields, which are the inverse of the multiples. By averaging the yields, the harmonic mean gives equal weight to equal dollar investments.

106. Correcting the Van Vleet Report's market approach elements – selected guideline companies and multiples adjustment factors on a harmonic mean basis – and holding all else equal and not making any of the other changes that we opine elsewhere in this Report are necessary, lowers the multiple of Adjusted EBITDA to 7.1 as shown on Exhibit 9. As a result, the indicated market approach's $1,067.9 million FMV of Meditech Stock (marketable, non-controlling basis) decreases by $418 million, to $649.9 million. Moreover, on an overall composite basis the fair market value of equity of $695.6 would decrease by approximately $78.3 million to $617.3 million, resulting in a share value of $19.19.

---

[66] The Van Vleet Report, p 10, para 65.

[67] "Estimating Industry Multiples" Malcolm Baker, et al, Harvard University, 1999.

## CONCLUSION

107. Correcting the Van Vleet Report's determination of the fair market value of Meditech Stock as of December 31, 1997 for all the above-noted flaws in Sections C, E, F, G & H concurrently yields a value of $11.81.[68]

| Van Vleet Report value conclusion (non-marketable, non-controlling basis) | $21.62 |
|---|---|
| • Correcting the discount rate to include company/industry specific risk | (3.57) |
| • Applying necessary discount for lack of control to the Income Approach | (3.85) |
| • Increasing the discount for lack of marketability to 30% from 25% | (1.44) |
| • Selecting more appropriate guideline public companies, central measures of tendency, and multiples adjustment factors | (2.43) |
| **Cumulative effect of above corrections** | **(9.81)** |
| **Corrected Van Vleet Report conclusion of value** | **$11.81** |

108. This value is derived by fixing the errors in the Van Vleet Report, and is not our estimate of the FMV of the Meditech Stock held by the Trust. We do not mean to suggest, for instance, that the value of $13.50 determined by the Trustee was in some way "too high". We do believe, however, that this exercise demonstrates the flaws in the Van Vleet Report's approach of suggesting that the true value of Meditech stock can be determined to a penny with scientific precision. And, as with the multiple transactions involving sophisticated institutional investors, Meditech officers and employees, and even Plaintiffs at values at or near the FMV determined by Defendants, it also demonstrates, as we discuss further in next section of our report, that the valuation determined by Defendants was reasonable.

---

[68] Alternatively, taking into effect Sections C, D, F, G & H concurrently reduces the Van Vleet Report's FMV conclusion to $10.46.

## THE BOARD'S AND TRUSTEE'S VALUATION PROCESS & RESULTING SHARE VALUE ARE REASONABLE

109. We were asked to opine on the reasonableness of the process by which Meditech's Board and the Trustee of the Trust determined the FMV of Meditech's Stock as of the Valuation Date, as well as the reasonableness of the value conclusion reached thereby.

110. Based on our review of deposition transcripts, board packages, other documents produced during discovery, and interviews with Meditech board members and the Trustee, our understanding is that the Board primarily determines the value of Meditech Stock by first determining what dividend will be paid to shareholders in the upcoming year. Once the dividend has been determined, the Board, based on a belief that a holder of Meditech Stock should be provided a 7% dividend for holding the illiquid Stock, higher than the interest rate paid on long-term government bonds, determines a value for the Stock to yield approximately a 7% dividend. The Trustee similarly considers the dividend paid on Meditech Stock in valuing the Stock held by the Trust.

111. In addition to this primary consideration given the dividend, the Board and Trustee also appear to consider a number of additional factors. For instance, the Chairman's Comments in the October 1997 board package, written by defendant Pappalardo who is also the Trustee, list the following information for consideration in determining the value of Meditech stock: Meditech's actual 1996 earnings per share and book value per share; the company's estimated annual earnings for 1997 and estimated year-end book value; the value per share determined the previous year by the Board and the number of shares that the Company offered to and that were actually purchased by officers and employees at that price; and the number of shares sold by shareholders to the Trust and the prices at which those transactions occurred.

112. In our opinion, the Board's and Trustee's methodology views the value of Meditech Stock as being best reflected in expected future benefits, consistent with the widely-accepted Dividend Discount Model. The methodology employed by the Board and Trustee is based on a priority distribution of dividends to stock holders, which enables greater near term participation in the value of Meditech when compared with the future monetization of underlying common stock. As explained further herein, this methodology based on the dividend set by the Board also has historically avoided the volatility seen in public markets generally and among the Van Vleet Report's elected GPCs.

113. Given the impact of factors discussed previously on a reasonable range of value for Meditech Stock on the Valuation Date, we find the Board's and Trustee's determination of the value of Meditech Stock to be reasonable and consistent with the aforementioned considerations. In fact, the compounding of all the adjustments to the Van Vleet Report's method discussed above, specifically, adjustments to the WACC, considerations related to the comparability of public guideline companies, adjusted market pricing multiples derived there from, and the

application of an appropriate DLOC and DLOM, results in the Board's and Trustee's estimate of Meditech Stock value, as of the Valuation Date, being higher than the value using the Van Vleet Report's valuation methods, as corrected.

## COMPARISON OF MEDITECH'S RETURN TO INDEXES AND SELECTED COMPANIES

114. We were asked to calculate and compare historical returns on Meditech Stock to the returns on the three most-widely known equity indexes – the Dow Jones Industrial Average, the NASDAQ, and the S&P 500 – as well as a selection of well-known software and technology and other well-known companies over the life of the Trust and the time periods each of the Plaintiffs participated in the Trust.

115. For the well-known companies against which to compare Meditech, we selected Apple Computer, Bank of America, Hewlett Packard, International Business Machines, General Electric, Johnson & Johnson and Procter & Gamble.   We selected these companies judgmentally as well-known, successful public companies and without considering in advance what the results of their comparison to Meditech might be.

116. Meditech's Stock has provided its shareholders with extraordinary rates of return (considering share price appreciation plus dividends), which compare favorably to most indexes and the selected high-profile successful companies over the Plaintiff's employment periods and the life of Meditech's Profit Sharing Trust.

117. Over the life of Meditech's Profit Sharing Trust – approximately 34 years from December 31, 1973[69] to December 31, 2007 – Meditech's Stock provided an IRR of about 25%, compared to 11-12% for three such indexes and 8-14% for the five selected high profile companies as charted in Exhibit 10.  This difference in the IRR is substantial; under the well-established "rule of 72," an investment in a stock with an IRR of 25% will double in a little under three years, while an investment in an index or stock with an IRR of 14% will take slightly more than five years to double and an investment at an IRR of 12% will take six years to double – twice as long as for Meditech.

118. Hubert was employed by Meditech from 1981 through 2004.[70] Employees are eligible for participation in the Trust on January 1st after their first full year of employment.[71] We calculated Meditech's IRR for the time period Hubert was a participant in the Trust - approximately 21 years from December 31, 1982 to December 31, 2003. Meditech's Stock provided an IRR of 36%, compared to 20% for Bank of America which was the best performing selected high profile company during this time period. The IRRs for the three indexes ranged from 12-15% and for the remaining five high profile companies public throughout that timeframe ranged from 6%-17% as charted in Exhibit 11.  Exhibit 42 graphs Hubert's accumulated holdings in his Trust account.

---

[69] First calendar year end after the initiation of the Trust

[70] Memorandum in Support of Plaintiffs' Motion for Class Certification pg. 6.

[71] Amended Class Action Complaint and Demand for Jury Trial dated May 23, 2005

119. Trainor and Hinchliffe were employed by Meditech from 1975 through 1998. We calculated Meditech's IRR for the time period Trainor and Hinchliffe were participants in the Trust - approximately 21 years from December 31, 1976 to December 31, 1997. Meditech's Stock provided an IRR of 36%, compared to 18% for General Electric which was the best performing high profile company during this time period. The IRRs for the three indexes were approximately 15% and for the remaining four high profile companies ranged from 9-17%, as charted in Exhibit 12.  Exhibits 43 and 44 graph Trainor's and Hinchliffe's accumulated holdings in their Trust account.

## COMPARISON OF PLAINTIFFS' PERSONAL RETURN ON MEDITECH TO BEST PERFORMING SELECTED HIGH PROFILE COMPANY

120. We were asked to calculate and compare the return on Plaintiff's personal investments in Meditech Stock with the best-performing of the selected high-profile companies, during the time period of their elective investments in Meditech.

121. In addition to being participants in the Trust, each of the three Plaintiff's personally invested in Meditech's Stock. Hubert started investing in Meditech's Stock in 1985 and still owns 23,100 shares as of the date of our report[72]. If Hubert sold all of his shares on December 31, 2007, his IRR would have been 22%. If Hubert had invested the same amount of money in Bank of America, the best performing selected high profile company, instead of Meditech over the same time period, his IRR would have been only 13%. Exhibit 13 graphs Hubert's accumulated holdings and dividends in his personal holdings of Meditech Stock.

122. Trainor started investing in Meditech's Stock in 1980 and sold all of his shares by 1998[73]. This personal investment in Meditech Stock resulted in an IRR of 36%. If Trainor had invested the same amount of money in General Electric, the best performing selected high profile company, instead of Meditech over the same time period, his IRR would have been 23%. Exhibit 14 graphs Trainor's accumulated holdings and dividends in his personal holdings of Meditech Stock.

123. Hinchliffe started investing in Meditech's Stock in 1981 and sold all of his shares by 1998[74]. This personal investment in Meditech Stock resulted in an IRR of 55%. If Hinchliffe had invested the same amount of money in General Electric, the best performing selected high profile company, instead of Meditech over the same time period, his IRR would have been 20%. Exhibit 15 graphs Hinchliffe's accumulated holdings and dividends in his personal holdings of Meditech Stock. The IRRs of the Plaintiffs' personal investment in Meditech Stock as compared with an alternate investment is depicted in Exhibit 16.

---

[72] Per Michael Hubert's Statement of Stock Ownership dated August 8, 2003 (Bates MH 0234) and updated per Counsel.
[73] Per William G. Trainor's Statement of Stock Ownership dated June 28, 2006.
[74] Per David Hinchliffe's Statement of Stock Ownership dated June 28, 2006.

## OBSERVATIONS REGARDING VOLATILITY OF MARKET INDEXES AND VAN VLEET'S GUIDELINE PUBLIC COMPANIES

124. We were asked to quantify and/or chart the volatility of various stock market indexes over the last six months (October 1, 2007 through March 31, 2008), as well as over the 13-year period January 1995 - 2008, plus the life of the Plan (January 1974 through March 31, 2008), comparing all of these to Meditech's Stock price movements. We were also asked to chart the volatility of the Van Vleet Report's GPCs over the 13-year period January 1995 - 2008 as well as the four-year period January 1995 - 1999 plus the three-year period January 2002 - 2005.

125. Meditech's Stock price follows a consistent escalation year-to-year, per the Trustee's determination of value which is based on the dividend. In contrast, the various stock market indexes all exhibit significant price volatility, as demonstrated by the following chart:

| Time Period: | Volatility Measure: | NASDAQ | DJIA | S&P 500 | Cerner |
|---|---|---|---|---|---|
| 6 Months (daily): 10/1/07 - 3/31/08 | Standard deviation | 1.6% | 1.3% | 1.4% | 2.2% |
| | Maximum daily movement | 4.0% | 3.4% | 4.1% | 10.3% |
| 13 Years (weekly): 1/4/95 - 1/6/08 | Standard deviation | 3.5% | 2.2% | 2.2% | 7.5% |
| | Maximum daily movement | 25.3% | 14.3% | 11.6% | 44.4% |
| | Worst one-year decline % | -36.4% | -19.1% | -25.3% | -39.3% |
| 34+ Yrs (weekly): 1/1/74 - 3/31/08 | Standard deviation | 2.8% | 2.2% | 2.2% | n/a |
| | Maximum daily movement | 25.3% | 16.6% | 14.1% | n/a |

126. Exhibits 17-19 show the movement of stock prices and dividends over time for Meditech against the three selected indexes, NASDAQ, DJIA and S&P 500, all normalized to begin at 100. For each index we split annual dividends equally into quarterly components. Because we could not find dividend data for NASDAQ pre-2007, we applied 2007's dividend yield of 0.74% to all periods.

127. In Exhibits 20-29, we charted the stock price volatility of the Van Vleet Report's public guideline companies (i.e. Aspen, Advent, Cerner & SMS) over the 13-year period January 1995 - 2008, four-year period January 1995 - 1999, as well as the three-year period January 2002 - 2005 plus the last six months (October 1, 2007 - March 31, 2008) and compared it to Meditech's Stock price & dividend. In Exhibits 30-33 we separately charted price volatility of Cerner in comparison with Meditech for the last two years (March 1, 2006 through March 1, 2008), the three-year period January 2002 - 2005 as well as the four-year period January 1995 - 1999 plus the 13-year period January 1995 - 2008. As is demonstrated, the comparable companies selected by Van Vleet are, in comparison to Meditech, characterized by severe volatility.

128. As discussed earlier, Cerner's stock price in the last half of 1997 had wild swings, up by about $10 per share (48%) then down by about $10 per share (-36%), ultimately landing very near its starting price six months earlier. Another of the Van Vleet Report's GPCs, Advent Software, had a similar price swing - increasing over $15 from its April 1, 1996 value of $19.00 per share to peak at $34.25 about six months later in October, then falling over the next six months by a similar amount, back down to $20.75 on March 31, 1997. Over the course of this one-year period, Advent's price increased by 80%, then fell by 40%, ending up very close to its starting price.

129. The lack of volatility in Meditech Stock in comparison to market indexes and the comparable companies identified in the Van Vleet Report has thus far avoided Plan participants seeing the value of their retirement accounts decline precipitously from one year to the next. As shown in the above chart, if Meditech stock were characterized by the volatility of a Cerner since 1995, a retiree might see the value of his or her retirement benefits drop by nearly 40% in one year. Indeed, even if Meditech stock were only characterized by the volatility of a very broad, diversified market index such as the S&P 500 during that time, a retiring Meditech employee might be exposed to a 25% drop in benefits in a single year.

## EXAMPLES OF DIFFERENTIAL IMPACT ON PARTICIPANTS FROM PLAINTIFFS' PROPOSED VALUATION METHODOLOGY

130. We were asked to consider some hypothetical impacts on Plan participants' distributions of benefits from the Trust from using a valuation methodology characterized by initially higher, but more volatile, share valuations. In connection with this part of our assignment, we reviewed the Amended Complaint, the Plan, the Class Certification pleadings and the Court's Order Denying Class Certification dated March 20, 2007.

131. The valuation methodology proposed by Plaintiffs in their Amended Complaint would produce wild swings in exit values for similarly vested employees in the Plan, depending simply on what year the employee elected to terminate. For example, using the values alleged in the Amended Compliant, two employees, both of whose Trust accounts have a value based on a beneficial allocation of 100 vested Meditech shares upon departure in 1999 and 2001, would have received \$7,500 and \$2,550,[75] respectively, despite the fact that the company's sales and earnings had increased about 3% between the intervening last 12 months' operations (1998 to 2000).

132. In addition, and as the Court recognized in the Order Denying Class Certification dated March 20, 2007 (pages 14-15 and associated footnotes), moving to a different valuation methodology could also differentially affect even Plan participants who receive Trust distributions the same year, depending upon when the Plan participants first entered the Plan and their relative earnings over time.

133. Furthermore, unless Plaintiffs are suggesting that they should receive the benefit of simply switching valuation methodologies mid-stream, it would be inappropriate to merely adjust the exiting values as the Plaintiffs assert and as the Van Vleet Report's valuation would propose, while not recalibrating the number of vested shares an employee would hold based on the reduced shares contributed to the Plan over the years due to higher share values. Under their own theory, Plaintiffs would have accumulated substantially fewer Plan shares during their tenure with Meditech, thus the higher share values would be applied to a smaller number of shares upon departure.

134. In other words, in order for Plaintiffs' market-based valuations to be fairly applied, they would have to be consistently applied throughout the existence of the Plan. Under varying assumptions for entrance and exit timing, participants could benefit, or be hurt, quite differentially under the Plaintiffs' proposed valuation methodology.

---

[75] Based on Amended Complaint's assertions of proper share values for those dates, paragraphs 70 and 81.

## CHANGE IN CASH POSITION OF THE TRUST FROM 1997 - 2000 USING VAN VLEET'S 1997 STOCK PRICE AND MARKET APPROACH VALUES

135. The Van Fleet Report proposes determining the benefits for those who received distributions from the Trust in 1998 simply by applying the higher share value it determines to the number of shares held by the Trust on December 31, 1997. As a result of this approach, the Van Vleet Report opines that payments to the two plaintiffs should have increased by hundreds of thousands of dollars each. These increased payments to the plaintiffs (and others who received distributions in 1998) necessarily diminish the amount of cash available in the Trust, as relevant both to the overall value of the Trust and the availability of cash to pay distributions to Plan participants in subsequent years.

136. Based on this observation, we were asked to use the Van Vleet methodology to estimate Meditech's share values as of December 31, 1998, 1999 & 2000 and using these share values and the Van Vleet Report's opinion of share value as of December 31, 1997, to calculate the pro forma cash position of the Trust from 1997 through 2000.

137. In performing this analysis, we focused on the Van Vleet Report's GPC (Market) Method.[76] Using this approach, in Exhibit 34-5, we estimated Stock prices of $22.06, $46.92 and $43.36 for December 31, 1998, 1999 and 2000, respectively. The very high values for 1999 and 2000 reflect the influence of the internet-fueled stock market bubble (demonstrating another problem with using public company multiples as suggested by Plaintiffs and Mr. Van Vleet).

138. Under the Plan, each year the Board has the option of making contributions to the Trust in the form of cash and Meditech Stock. Under the terms of the Plan, the Board decides the total dollar amount (if any) that it will contribute into the Trust and then how much of the total amount will be in the form of cash versus Meditech Stock. The number of shares to be contributed to the Plan thus depends upon the dollar value of the overall contribution and the value of the Stock component voted by the Board.

139. We understand Plaintiffs have argued that the number of Meditech shares contributed to the Trust would remain unchanged no matter what share value was used by the Board in making its contribution.[77] We further understand based on the Court's order dated March 20, 2007, that the Court has rejected this view. For sake of argument, assuming that the Board's total contribution amount and the number of shares would remain unchanged no matter the Stock price, the higher Stock prices under the Van Vleet Report's GPC method would necessarily lead to a lower cash portion of the total contribution to the Plan.

---

[76] The DCF method in the Van Vleet Report's income approach had too many subjective variables and judgments for us to replicate each year.

[77] Plaintiffs' Memorandum Supporting Motion for Reconsideration of Denial of Class Certification, p. 10.

140. We calculated the adjusted cash position and total assets of the Trust using Meditech Profit Sharing Trust Financial Reports and the estimated Stock prices for the years 1998-2000 in Exhibits 36-39. For calculating the year end adjusted cash position we recalculated the:
   - interest income to reflect the change in the cash position as of the beginning of the year;
   - distribution to terminees based on the estimated Stock price as of the beginning of the year; and
   - cash portion of the Board's total contribution to the Trust.

141. If the Board and Trustee had set Meditech Stock prices based on the Van Vleet Report's GPC method, as of December 31, 2000 the Trust would have a negative cash balance of $24.4 million as indicated in Exhibit 39. This represents a decline in cash of $42 million between 1997 and 2000. As relevant to plaintiff Hubert who received a distribution from the Trust in 2004, this decrease in cash from 1997-2000 (which would continue in following years based on using Reilly's valuations) would far exceed the $27.3 million increase in the value of the Trust's Meditech Stock holdings as of December 31, 2003, based on the Reilly valuation premium of $7 per share and the 3.9 million shares held by the Trust.[78] In other words, Plaintiffs' assumption that increasing the price of the Stock held by the Trust and holding the number of shares contributed to the Trust constant would necessarily result in the overall value of the Trust going up and hence increased distributions to the Plaintiffs is incorrect.

142. We did not extend our analysis before 1997, but to the extent use of the Van Vleet methodology would indicate higher Stock valuations in those years compared to Defendants' valuations, the effect on the Trusts' cash balances would begin sooner and be even more pronounced. Accordingly, it is not even clear that the Van Vleet valuation for December 31, 1997 would benefit plaintiffs Hinchliffe and Trainor. As with Hubert, any benefit they derive from increased share valuations could potentially be outweighed by decreased Trust cash.

Respectfully Submitted,

_____
Rick S. Nathan, ASA, CFA, MBA

April 7, 2008
Date

_____
Christopher C. Barry, CPA, MBA

April 7, 2008
Date

---

[78] The Profit Sharing Trust Financial Report for the year ended December 31, 2003.

**Rick S. Nathan**
**Managing Director**
**Trenwith Group, LLC**

### PROFESSIONAL EXPERIENCE

#### <u>2006 to Present</u>, Trenwith Group, LLC

Managing Director, responsible for business and intellectual property valuation, transaction, and dispute advisory services.

#### <u>2002 to 2006; and 1997-2000</u>, PricewaterhouseCoopers LLP

Director, Tax & Legal Services ; Director, Corporate Value Consulting Services - leading the valuation of business interests, capital stock, intangible assets, and intellectual property in connection with business combination decision support, statutory tax compliance, international transfer pricing, dispute analysis and investigations, asset exploitation, business plan development, capital sourcing, and strategic partnering.

#### <u>2000-2002</u>, Cambridge Technology Partners, Inc.

Director of Strategic Services & Principal Strategist, leading corporate strategy and financial value advisory services.

#### <u>1994-1997</u>, KPMG Peat Marwick LLP

Senior Manager of Corporate Transactions Services, leading business and intangible asset appraisal services related to financial reporting, tax compliance, dispute advisory, and corporate planning.

#### <u>1991-1994</u>, Siemens Medical Systems, Inc.

Associate Director, reporting to CEO of $250MM divisional entity, responsible for product marketing, strategic planning, and corporate development of diagnostic imaging information systems.

**<u>Prior Professional Experience:</u>** IBM Corporation; Hughes Aircraft Company

Research, Development, & Engineering of software based technology systems for both national defense and commercial fields of use.

### EDUCATION & ACCREDITATION

**The University of Chicago Graduate School of Business**
MBA, with Honors, Finance, Behavioral Science, 1993

**The University of Texas at Austin**
MSE, Electrical Engineering, 1982
*Eta Kappa Nu* - National Electrical Engineering Honorarium

**Tulane University**
BSE, Biomedical Engineering, 1980

**American Society of Appraisers**
Accredited Senior Appraiser in Business Valuation, 1998

**The CFA Institute**
Chartered Financial Analyst, 1998

## PUBLICATIONS & PRESENTATIONS WITHIN THE PAST TEN YEARS

1. *Intellectual Property – Issues For Distressed Firms and Bankruptcy Considerations*, Association of Insolvency & Restructuring Advisors - 23rd Annual Bankruptcy and Restructuring Conference, 2007

2. *Obtaining The True Value of Intellectual Property*, The Beard Group, 2007

3. *Obtaining The True Value of Intellectual Property*, Gerson Lehrman Group Institute, 2007

4. *Obtaining The True Value of Intellectual Property*, Intellectual Property Today, 2007

5. *A Triple Play in IP Valuation*, CFO.com, 2006

6. *What's It Worth*, Growing Your Business, 2003

7. *CRM: The New Frontier*, eSolutions World Expo, 2001

8. *More for Your Money: Valuation Techniques for Intellectual Assets*, American Conference Institute, Chicago, 1999

9. *Valuation of Software Inventions: What Are They Worth in Economic Terms*, American Law Institute- American Bar Association, Washington, D.C., 1998

10. *Economics of Technology Exploitation*, Corporate Patent Seminar, Phoenix, AZ, 1998

11. *High Technology M&A: Panel Discussion on Valuation Issues*: High Technology M&A Conference, Austin, TX, 1998

12. Valuation: Key Issues and Considerations, Venture Finance Conference, Minneapolis, 1998

13. What is your Intellectual Property Worth: Methods for Determining Value, American Conference Institute, New York, 1998

## OTHER AUTHORSHIP OR ATTRIBUTION WITHIN THE PAST TEN YEARS

1. Inventor of Record, *United States Patent No. 7,308,417 B1*, Method For Creating and Displaying A Multi-Dimensional Business Model Comparative Static, 2007

## OTHER PUBLICATIONS & PRESENTATIONS

1. *A Strategic Framework for Profit Oriented IP Asset Management, IBC Seminars,* Philadelphia, PA, 1997

2. *Effective IP strategies and tax planning for maximizing revenues*, Managing Intellectual Property, Euromoney Publications PLC, 1997

3. *Your Intellectual Capital: Protecting and Sharing Knowledge*, High Technology CEO Roundtable, Santa Monica, CA, 1997

4. *Maximizing Intellectual Property Value*, Coopers & Lybrand, 1997

5. *The Valuation of Acquired In-Process Research and Development*, Benchmark Quarterly, 1996

6. *Creative Financing through Intellectual Property Leverage*, Growth Capital '96, Austin, TX, 1996

7. *The Valuation and Exploitation of In-Process Research and Development*, Intellectual Property Law Seminar, Lorman Education Services, Denver, CO, 1995

8. *Emerging Company Valuation: Key Issues and Considerations,* Ninth Annual Venture Finance Conference, Minnesota Venture Capital Association and The Collaborative, Minneapolis, MN, 1995

9. *Establishing Value in Biotechnology Companies, Financing Strategies & Establishing Value,* Wisconsin Biotechnology Association, Madison, WI, 1995

10. *Business Combinations & Acquired Software,* Chicago Bar Association Computer Law Committee, Chicago, IL, 1995

11. *A Comparison Between Fourier and Walsh Spectral Estimation of EEG Signals,* Thesis, The University of Texas At Austin, 1982

12. *A Proposed Standard Target for Ultrasound Doppler Gain Calibration,* Ultrasound In Medicine & Biology, 8:3, 1982 (cited as prior art in U.S. Patent No. 4894013)

## TRIAL OR DEPOSITION TESTIMONY WITHIN THE PAST FOUR YEARS

1. *United States Bankruptcy Court,* In Re: Muth Mirror Systems, LLC, et al v. Gentex Corporation, Adversary No. 06-02470-MDM, 2007

2. *American Arbitration Association,* In Re: RGII Technologies, Inc. v. The User's Friend, Inc. et al., 16 117 00181 04., 2004

## OTHER TRIAL, DEPOSITION, OR ADMINISTRATIVE APPEARANCES

1. *State of Illinois, Circuit Court of Cook Count,* In Re: Centioli v. Centioli, Cause No. 98D00807., 2003

2. *United States District Court,* In Re: Concetta Bruno et al v. Smartalk Teleservices, Inc. et al., MDL Docket No. 00-1315., 2002

3. *United States District Court,* In Re: Micro Data Base Systems, Inc. v. Nellcor Puritan Bennett, Inc. and Puritan-Bennet Corp., Cause No.: 4:97 CV-004 AS., 1999

4. Office of the Chief Accountant, United States Securities and Exchange Commission, In Re: Physician Computer Network, Inc., 1995

## OTHER EXPERT SERVICES (in process or settled prior to deposition and/or trial)

1. *United States District Court For The District of Massachusetts,* In Re: Michael P. Hubert, et al v. Medical Information Technology, Inc., et al, Civil Action No. 05-10269-RWZ,2008

2. *Circuit Court, Fourth Judicial District, State of Idaho,* In Re: Holmes Lundt, et al, vs. Mobility Electronics, Inc. et al, Case No. CV OC -0302562D, 2005

3. *Circuit Court, Milwaukee County, State of Wisconsin,* In Re: Linda C. Wright v. Charles F. Wright, Case No. 04-FA-003184, 2005

4. *Superior Court, Suffolk County, Commonwealth of Massachusetts,* In Re: Dr. Jerome H. Grossman v. Medical Information Technology, Inc., et al, Civil Action No. 03-1872-B.L.S., 2005

5. *Circuit Court, Montgomery County, Maryland,* In Re: RGII Technologies, Inc. vs. The User's Friend, Inc. et al., Civil No. 254913V., 2005

6. *United States Tax Court,* In Re: Van Der Aa Investments, Inc., et al, v. Commissioner of Internal Revenue, Docket No. 21342-03., 2005

## REPRESENTATIVE IP STRATEGY SERVICES

1. Directed an assessment of IP rights value and exploitation alternatives for broad based biotechnologies related to lipid science.

2. Developed novel valuation methodologies in use by several Fortune 1000 enterprises concerning the pricing of intercompany trademark use.

3. Conducted an international IP rights identification, categorization, management, and valuation services project for a Fortune 50 provider of technology solutions to the energy industry.

4. Retained by a thinly capitalized firm with to exploit proprietary technology dealing with the neutralization of chemical and biological waste.

5. Reviewed specific patents and software technology know how for a multi-national manufacturer of products used within broadcast media markets in order to improve IP portfolio exploitation and cost control.

6. Retained by a Fortune 1000 technology skunk-works organization to assess proprietary technology dealing with short peripheral catheterization.

7. Retained by a global leader in data communications and telephony to determine value of foreign spectrum use rights in support of initial company capitalization within certain former Soviet republics.

8. Retained by a U.S. manufacturer of diagnostic medical imaging systems to identify and value certain proprietary software to be sold off-shore.

9. Directed a long-range enterprise information technology strategy for an international systems engineering and integration firm serving both classified national security and commercial markets.

10. On behalf of an international chemical distribution company, developed a comprehensive IT and economic viability analysis related to forming a digital marketplace of allied chemical industry producers and customers.

11. On behalf of an international consortium's interest in digital media related patents, software, and related know how, directed analysis and recommendations related to alternative global economic rights sharing and remuneration schemas.

12. Developed an intellectual property rights strategy for expanding a telecommunication firm's proprietary software and communication solutions to eradicate consumer fraud within the emerging consumer Internet e-commerce market.

13. For a major national defense contractor that had developed substantial computer software technology and domain knowledge pertaining to asset management, reviewed new commercial exploitation opportunities within derivative commercial fields of use.

14. Directed yearly inter-company software pricing studies on behalf of an international software and data services provider in compliance with both U.S. and International tax law.

15. Directed the valuation of specific software systems encompassing mainframe, distributed workstation, and wide area network applications, in support of a structured financing solution for an international airline and global travel reservation systems operative.

16. Led the identification, valuation, and resulting licensing recommendations of software technology utilized by an international manufacturer of data collection information systems.

17. Retained by a commercial bank to value specific healthcare animation software and information media rights to be securitized into a corporate credit instrument.



# Christopher C. Barry, CPA, MBA

## Professional History

- PricewaterhouseCoopers: Financial Advisory Services, 1984 to present
  - ➤ San Francisco 1984 - 1987
  - ➤ Boston 1987 - present
- Other Big-4 Accounting: Accounting and Auditing Services, 1979 to 1982
- CPA since 1982

## Experience

Several years' experience in auditing financial statements for a wide variety of companies, including some in manufacturing, franchising, retailing, banking, publishing and agribusiness. Handled accounting issues concerning financial statement reporting, including classification, recognition and disclosure.

Consulting experience in financial matters, with an emphasis on business valuation, accounting investigations and various litigation support matters. Assisted management in the areas of quantifying damages/claims related to litigation, evaluating appropriateness of financial and cost accounting procedures, financial modeling and other analytical procedures.

Substantial damage quantification experience, including cases involving intellectual property, antitrust, breach of contract, forensic accounting investigation, dealer termination, valuation of closely-held businesses, securities fraud, wrongful death/personal injury, post-closing disputes and accountant's liability. Testimony in both Federal and State courts, as well as in arbitrations.

## Education and Affiliations

- B.A., Accounting, Franklin & Marshall College, cum laude, 1979
- M.B.A., University of California at Berkeley, 1984
- Certified Public Accountant (CPA) (licensed in Massachusetts and California)
- Member, American Institute of CPAs
- Member, Massachusetts Society of CPAs
- Member, Licensing Executive Society

- Faculty Member, Massachusetts Continuing Legal Education
- Presenter to the Boston Bar Association and New Hampshire Bar Association
- Instructor to the U.S. Attorney General's Advocacy Institute
- Director – Discovering Justice (St. Clair Court Education Project)

## Publications

- Thirteen Glossary Articles on Business Topics, Encyclopedia of Business, Gale Research, Fall 1995
- *Punitive Damage Awards Against Corporations: An Overview, A Strategy,* PW Review, Spring 1995
- *Forensic Accountants Dig Up Buried Financial Misdeeds,* Boston Business Journal, February 7-13, 1997.

Christopher C. Barry
PricewaterhouseCoopers, LLP
125 High Street
Boston, MA 02110
617.530.6304
christopher.c.barry@us.pwc.com

Exhibit 3

## Testimony of Christopher C. Barry - Last Four Years

1.  Scanner Technologies v. ICOS Vision System
    U.S. District Court, S.D.N.Y.
    Case No.: 00-CIV-4992 (Chin)

2.  Fiberlock Technologies, Inc. v. Coating Removal Technology Limited, et al.
    Massachusetts Superior Court, Suffolk
    Case No.: 99-2933

3.  Chris E. Maling v. Maui Jim, Inc.
    US District Court, Massachusetts
    Case No.: 00-12593-PBS

4.  Colleen Howes v. Brian Wiegand
    Wisconsin Circuit Court, Dane County
    Case No.: 98-FA-1131

5.  Williamsville v. Stainsafe
    US District Court, Massachusetts
    Case No.: 01-10936DPW

6.  Fonten Corp., et al. v. Ocean Spray Cranberries, Inc.
    US District Court, Massachusetts
    Case No.: 03-CV-10293WGY

7.  Condon v. Astoria Financial Corp.
    American Arbitration Association, Boston
    Case No. 11 Y 168 00420 04

8.  Lomon v. Laage, et. Al.
    Massachusetts Superior Court, Middlesex
    Case No.: 00-03771

9.  DEKA Products v. Cytyc Corp.
    AAA, Boston
    Case No.: 11-Y-133-02624-03

12. Plasma Physics Corp. v. Analog Devices
    U.S. District Court, EDNY
    Case No.: 02-3484 (LDW/WDW)

13. Akeva LLC v. adidas America, Inc.
    U.S. District Court, Middle District, N. Carolina
    Case No.: 1:03-CV-01207

14. Black Diamond Sportswear Inc. v. Black Diamond, Ltd.
    U.S. District Court, Vermont
    Case No.: 1:03-CV-278

Exhibit 3

## Testimony of Christopher C. Barry - Last Four Years

15.  Municipal District Commission v. Connecticut Resources Recovery Authority
     Arbitration, Hartford
     Case No.: 29-111-04

16.  Andersen Corp. v. Fiber Composites, LLC
     USDC, Minnesota
     Case No.: 00-CN-2548

17.  Harvest Technologies Corp. v. Cytomedix, Inc.
     USDC, Massachusetts
     Case No.: CV 02-12077 PBS

18.  CimCore/Romer/Hexagon v. FARO Technologies, Inc.
     USDC, Southern California
     Case No.: 03-CV-2355 B (WMC)

19.  Barron v. Barron
     Arizona Superior Court, Yavapei County
     Case No.: D08 2002-0144

20.  Repligen/MIT v. ImClone
     USDC, Massachusetts
     Case No.: 04-10884-RGS

21.  Sensitech Inc. v. TNT Co.
     USDC, Central California
     Case No.: CV05-4674R

22.  Analog Devices, Inc. v. Linear Technology Corp.
     USDC, Massachusetts
     Case No.: 00CV10841-EFH

23.  C.E.A. v. Chi Mei Optoelectronics Corp., et al.
     USDC, Delaware
     Case No.: 03-484 (KAJ)

24.  Hypertherm Inc. v. American Torch Tip Company
     USDC, New Hampshire
     Case No.: 1:05-CV-373-JD

Exhibit 4

## Documents Relied Upon

- The Van Vleet Report dated February 19, 2008;
- A report on the valuation of the Medical Information Technology, Inc. Common Stock as of December 31, 2001, 2002, 2003, 2004 and June 2, 2005, by Robert F. Reilly, dated June 15, 2005;
- Excerpts from Roland Driscoll's Deposition dated October 17, 2007;
- Excerpts from Howard Messing's Deposition dated November 13, 2007;
- Excerpts from A. Neil Pappalardo's Deposition dated November 27, 2007;
- Excerpts from Edwards B. Roberts Deposition dated November 8, 2007;
- Dividends Paid to Plaintiffs (1871788-1);
- Plaintiffs' Holding in the Trust 1977-2003;
- Michael Hubert's Statement of Stock Ownership dated August 8, 2003 (Bates MH 0234);
- William G. Trainor's Statement of Stock Ownership dated June 28, 2006;
- David Hinchliffe's Statement of Stock Ownership dated June 28, 2006;
- Letter dated June 20, 1996 from GreyLock Investments Limited Partnership to Neil Pappalardo with regard to selling of Grey Lock's shares of Meditech Stock (Bates DEF007104-8);
- "The Health Care Industry: Changing Environment Creates New Opportunities," George K. Baum & Company, Cerner Corporation : Equity Research Report, October 29, 1997;
- "Industry Background," Hanifen Imhoff Inc. Investment Bankers, Healthcare Information Technology: Investment Opinion-Cerner Corporation, October 16, 1997;
- "Buyers and Sellers - Healthcare Information and Management Systems Society 1997 Conference - Industry Trend or Event," Mark Hagland, 1997;
- Kathryn F. Aschwald, "Restricted Stock Discounts Decline as a Result of a 1-Year Holding Period" - *Shannon Pratt's Business Valuation*, vol. 6, no. 5 (May 2000): p 1-5;
- Pratt, Shannon P., et al, Valuing A Business, 5th & 4th Editions;
- Francis A. Longstaff, "How Much Can Marketability Affect Security Prices," The Journal of Finance, Volume 50, Issue 5, 1995;
- "Estimating the cost of equity for a private company" by Professor Aswath Damodaran at http://pages.stern.nyu.edu/~adamodar/New_Home_Page/valquestions/totalbeta.htm 3/18/200;
- "Quantifying Company Specific Risk: A New, Empirical Framework With Practical Applications," Peter J. Butler, et al, Business Valuation Update, Vol 13., No. 2, February 2007;
- Business Valuation Discounts and Premiums, Shannon P. Pratt, 2001, John Wiley & Sons, Inc;
- "Estimating Industry Multiples" Malcolm Baker, et al, Harvard University, 1999;
- Identification and quantification of company specific risk, by Robert Reilly - AICPA National Business Valuation Conference, December 3-5, 2006;
- Mergerstat Review Database;
- Mergerstat/BVR Control Premium Study (www.bvmarketdata.com);
- Ibbotson Associates Stock, Bonds, Bills & Inflation 1998 Yearbook;
- FactSet Database;
- Capital IQ Database;
- www.NASDAQ.com;
- Bloomberg Database;
- www.Factiva.com;
- http://www.federalreserve.gov;
- http://www.emorybizval.com/valuation-studies.shtml;
- http://www.meditech.com/;
- http://www.cerner.com;
- www.aspentech.com;

Exhibit 4

- www.advent.com;
- www.edgaronline.com;
- Meditech's 10Ks 1996-2001;
- Advent Software, Inc 's. 10-Ks 1997-2001;
- Aspen Technology, Inc.'s 10-Ks & 10-Qs 1996-2001;
- Cerner Corp.'s 10-Ks 1996-2001;
- Shared Medical Systems' 10-Ks 1995-1999;
- QuadraMed's 10-Ks 1996-2001;
- Creative Computer Applications, Inc.'s 10-Ks & 10-Qs 1997-2001;
- Plaintiffs' Memorandum Supporting Motion for Reconsideration of Denial of Class Certification;
- The Profit Sharing Trust Financial Report for the year ended December 31, 1996-2003;
- Report to Board of Directors; Quarter Ended Dec 31, 1995, 1996 & 1997;
- Report to the Board of Directors; Quarter Ended Sept 1995,1996, 1997, 1998 & 1999;
- Amended Class Action Complaint and Demand for Jury Trial dated May 23, 2005;
- Memorandum in Support of Plaintiff's Motion for Class Certification.

Exhibit 5

## Hubert, Trainor & Hinchliffe v Medical Information Technology
### Discount For Lack of Control Summary
### As of December 31, 1997

| | Mergerstat® Review [1] | | | | | | Mergerstat/BVR Control Premium Study [3] | | | Conclusion |
|---|---|---|---|---|---|---|---|---|---|---|
| | Overall | | | Computer Software, Supplies & Services | | | Select Transactions - SIC: 7371, 7372, 7373 | | | |
| | No. of Transactions | Average | Median | No. of Transactions | Average [2] | | No. of Transactions | Average | Median | |
| 1991 | 137 | 26.0% | 22.7% | 7 | 30.8% | | | | | |
| 1992 | 142 | 29.1% | 25.8% | 3 | 37.8% | | | | | |
| 1993 | 173 | 27.9% | 24.8% | 4 | 30.3% | | | | | |
| 1994 | 260 | 29.5% | 25.9% | 12 | 37.1% | | | | | |
| 1995 | 324 | 30.9% | 22.6% | 19 | 30.2% | | | | | |
| 1996 | 381 | 26.8% | 21.4% | 22 | 28.1% | | | | | |
| 1997 | 487 | 26.3% | 21.6% | 39 | 27.1% | | | | | |
| 1998 | | | | | | | 43 | 28.7% | 25.6% | |
| **Average** | | 28.1% | 23.5% | | 31.6% | | | 28.7% | 25.6% | |
| **Median** | | 27.9% | 22.7% | | 30.3% | | | 28.7% | 25.6% | **25.0%** |

Notes:
[1] Mergerstat Review 1996, 1997, and 1998.
[2] Median statistic not reported.
[3] Mergerstat/BVR Control Premium Study (www.bvmarketdata.com). Database did not compile transaction data prior to 1998.

Exhibit 6

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Total Beta Analysis**

| Guideline Companies | $R_f$ [1] | $R_m=R_f$ [2] | Rs (Size Premium) [3] | LTM Net Sales (000) [4] | Effective Tax Rate [4] | $\beta_e$ [8] | Book Value of Debt (000) [4] | Market Value of Equity (000)[4] [13] | $\beta_u$ [14] | $\mu$ [16] | $\beta_r$ [18] | $K_r$ (Total Cost of Equity) [19] | ACAPM [20] | Industry/ Company Specific Risk) [22] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Creative Computer | 6.02% | 6.00% | 3.3% | $7,200 [5] | 34% [6] | 0.54 | $173 [11] | $5,014 | 0.52 | 12% | | | 12.5% | |
| Qualdramed | 6.02% | 6.00% | 1.7% | $140,800 [23] | 34% [6] | 0.51 [9] | $24,246 [24] | $461,230 [24] | 0.49 | 22% | | | 10.7% | |
| Cerner Corp. | 6.02% | 6.00% | 1.7% | $245,057 | 38% | 0.85 | $30,061 | $689,165 | 0.82 | 20% | | | 12.8% | |
| Shared Medical Systems | 6.02% | 6.00% | 0.9% | $896,235 | 38% | 0.88 | $66,691 | $1,655,696 | 0.86 | 31% | | | 12.2% | |
| **Meditech** | **6.02%** | **6.00%** | **1.7%** | | **41%** [7] | **0.65** [10] | **5.0%** [12] | **95.0%** [12] | **0.63** [15] | **31%** [17] | **2.09** | **18.5%** | **15.1%** [21] | **3.00%** |

Notes:

[1] 20-year treasury yield as of 12/31/97 per http://www.federalreserve.gov

[2] Consensus

[3] Ibbotson Associates SBBI 1998 Yearbook

[4] Respective Companies' Fiscal year ending 1997 10-K, unless otherwise noted.

[5] From the 12 months ended November 1997. Information per FactSet.

[6] Used a statutory rate of 34% as the effective rate for this company is 0% or negative

[7] Company's effective tax rate per the 1997 Fiscal year ending 10-K

[8] Levered beta determined from statistical regression of guideline company stock returns against S&P 500 index using daily observations between 1/1/93 and 12/31/1997

[9] Levered beta determined from statistical regression of guideline company stock returns against S&P 500 index using daily observations between 10/11/96 and 12/31/1997

[10] $\beta_u$ = $\beta_e$ *(1/(1+(1-t)*(w_d/w_e))$

[11] November 1997 10-Q

[12] Expected capital structure going forward

[13] Share Price per Factiva, SMS prices per Capital IQ

[14] $\beta_e$ = $\beta_u$ *(1+(1-t)*(w_d/w_e))

[15] Harmonic Mean of Guideline Company βU

[16] Correlation Coefficient of Returns with S&P Market Index

[17] Selected Based on Highest Correlation With Market

[18] $\beta_r$ = $\beta_u/\rho$

[19] $K_r = R_f + \beta_r *(R_m-R_f)$

[20] ACAPM = $R_f + \beta_r *(R_m-R_f) + R_s$

[21] Based on Size-Risk Premium Study

[22] $K_r$ - ACAPM; Rounded down to the nearest whole number

[23] Respective Company's 1999 10-K.

[24] Respective Company's 1998 10-K.

Exhibit 7

## Hubert, Trainor & Hinchliffe v Medical Information Technology
### Restricted Stock Studies Summary
### Discount for Lack of Marketability
### As of December 31, 1997

| | Years Covered | Average Discount [3] Pre-1983 | Average Discount [3] Span 1983 | Average Discount [3] Post-1983 | Conclusion |
|---|---|---|---|---|---|
| 1 SEC Institutional Investor Study | 1966 - 1969 | 25.8% | | | |
| 2 SEC Non Reporting OTC Companies | 1966 - 1969 | 32.6% | | | |
| 3 Gelman Study | 1968 - 1970 | 33.0% | | | |
| 4 Trout Study | 1968 - 1972 | 33.5% | | | |
| 5 Moroney Study | [1] | 35.6% | | | |
| 6 Maher Study | 1969 - 1973 | 35.4% | | | |
| 7 Standard Research Consultants | 1978 - 1982 | 45.0% [2] | | | |
| 8 Willamette Management Associates | 1981 - 1984 | | 31.2% [2] | | |
| 9 Silber Study | 1981 - 1988 | | 33.8% | | |
| 10 FMV Opinions Study | 1979 - 1992 | | 23.0% | | |
| 11 Management Planning Study | 1980 - 1996 | | 27.1% | | |
| 12 Johnson Study | 1991 - 1995 | | | 20.0% | |
| 13 Columbia Financial Advisors | 1996 - 1997 | | | 21.0% | |
| **Average** | | 34.4% | 28.8% | 20.5% | |
| **Median** | | 33.5% | 29.2% | 20.5% | 33.0% [4] |

**Notes:**
[1] Although the years covered in this study are likely to be 1969-1972, no specific years were given in the published account.
[2] Study reports median not average discounts.
[3] Pratt, Shannon P., et al, Valuing A Business, 5th Edition, page 431.
[4] Overall median for studies prior to 1983.

Exhibit 8

### Hubert, Trainor & Hinchliffe v Medical Information Technology
### Discount for Lack of Marketability
### Option Pricing Model
### As of December 31, 1997

| Illiquidity Period (Yrs.) | RF [1] | GPC σ [2] | DLOM [3] | Cumulative Median DLOM — Minimum Illiquidity (Yrs.) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 1 | 5.5% | 58% | 20% | 20% | | | | | | | | | |
| 2 | 5.7% | 56% | 26% | 23% | 26% | | | | | | | | |
| 3 | 5.7% | 51% | 24% | 24% | 25% | 24% | | | | | | | |
| 4 | 5.7% | 54% | 27% | 25% | 26% | 26% | 27% | | | | | | |
| 5 | 5.7% | 52% | 27% | 26% | 27% | 27% | 27% | 27% | | | | | |
| 6 | 5.7% | 60% | 32% | 27% | 27% | 27% | 27% | 30% | 32% | | | | |
| 7 | 5.7% | 60% | 33% | 27% | 27% | 27% | 30% | 32% | 33% | 33% | | | |
| 8 | 5.8% | 76% | 41% | 27% | 27% | 30% | 32% | 33% | 33% | 37% | 41% | | |
| 9 | 5.8% | 75% | 40% | 27% | 30% | 32% | 33% | 33% | 37% | 40% | 41% | 40% | |
| 10 | 5.8% | 83% | 42% | 30% | 32% | 33% | 33% | 37% | 40% | 41% | 41% | 41% | 42% |
| **Median** | 6% | 59% | 30% | 26% | 27% | 27% | 30% | 32% | 33% | 39% | 41% | 41% | 42% |

Median Min DLOM: 32%

**Notes:**
[1] Risk free rates correspond to constant maturity U.S. Treasury Rates, with interpolation.
[2] Volatility calculated from guideline public company stock data.
[3] DLOM calculated as value of Put option.

Exhibit 9

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Market Approach: Guideline Public Company Method**
**Guideline Public Company Multiple Adjustment**

| | Cerner ('000) | Shared Medical Systems Corp. ('000) | Creative Computer ('000) | Quadramed ('000) | Harmonic Mean | Overall [4] Mean | Median |
|---|---|---|---|---|---|---|---|
| BEV [2] | $711,685 | $1,693,223 | $4,893 [5] | $440,810 [6] | | | |
| EBITDA-LTM [2] | $45,032 | $139,550 | $818 [1] | $2,386 [7] | | | |
| BEV / EBITDA Multiple - LTM | 15.80 | 12.13 | 5.98 | 184.75 | | | |
| Size, Risk, Growth Adjustment [3] | 89.2% | 81.4% | 66.2% | 2.5% | | | |
| Adjusted EBITDA Multiple | 14.1 | 9.9 | 4.0 | 4.5 | 7.1 | 9.3 | 9.9 |

Notes:
[1] Per Fiscal Year Ending August 31, 1997 10-K.
[2] Respective Company's 1997 fiscal year ending 10-K, unless otherwise noted. BEV is calculated using book value of debt and subtracting cash. Share prices from Factiva and Capital IQ.
[3] Equal to the ratio of net present values of Meditech to each guideline pubic company using historical growth rates and cost of capital for each company.
[4] Excludes Quadramed.
[5] Per November 30, 1997 10-Q.
[6] BEV as of December 31, 1997 per the respective Companies 1998 fiscal year ending 10-K.
[7] EBITDA as of December 31, 1997 per the respective Company's 1999 fiscal year ending 10-K.

Exhibit 10

**IRR - December 31, 1973 to December 31, 2007 - Life of the Plan**



Source: Factiva, Bloomberg and Meditech Information
[1] Assumed NASDAQ Index dividend to be 0.74% based on dividend yield for 2007
[2] S+P 500/DJIA including gross dividends reinvested

Exhibit 11

IRR - December 31, 1982 to December 31, 2003 - Hubert's Plan Participation Period



Source: Factiva, Bloomberg and Meditech Information
[1] Assumed NASDAQ Index dividend to be 0.74% based on dividend yield for 2007
[2] S+P 500/DJIA including gross dividends reinvested

Exhibit 12

**IRR - December 31, 1976 to December 31, 1997 - Trainor & Hinchliffe's Plan Participation Period**



Source: Factiva, Bloomberg and Meditech Information
[1] Assumed NASDAQ Index dividend to be 0.74% based on dividend yield for 2007
[2] S+P 500/DJIA including gross dividends reinvested

# EXHIBIT 34
# (Part 3)



Exhibit 13

**Hubert Personal Meditech Holdings & Cummulative Dividend**
**15-Feb-1985 to 31-Dec-2007**
**U.S. Dollars**



Source: Statement of Stock Ownership

Confidential

Exhibit 14

**Trainor Personal Meditech Holdings & Cummulative Dividend**
**19-Aug-1980 to 11-May-1998**
**U.S. Dollars**



Source:  Statement of Stock Ownership

Confidential

Exhibit 15

**Hinchliffe Personal Meditech Holdings & Cummulative Dividend**
**5-Feb-1981 to 6-Mar-1998**
**U.S. Dollars**



Source:  Statement of Stock Ownership

Confidential



Exhibit 16

Plaintiffs' Personal Return (IRR) on Meditech Shares v. Alternate Investment



Source: Plaintiff's Statement of Stock Ownership, Dividends Paid (1871788-1), Prices/Factiva and Meditech Information.
[1] Meditech dividends paid quarterly at the respective quarter end.
[2] Assumed that Mr. Hubert had sold all his remaining shares on 12/31/2007.

Confidential



**Exhibit 17**

**Meditech and Indexes**
**Jan-1974 to March-2008 (Weekly-Friday)**
**Normalized Prices & Dividends U.S. Dollars**



Source: Factiva, Bloomberg and Meditech Information.
Assumed NASDAQ dividends to be 0.74% based on dividend yield for 2007.
Assumed that dividends were paid quarterly

Exhibit 18

Summary - Meditech and Indexes
Jan-1995 to Jan-2008 (Weekly -Friday)
Normalized Prices & Dividends U.S. Dollars



Source: Factiva, Bloomberg and Meditech Information.
Assumed NASDAQ dividends to be 0.74% based on dividend yield for 2007.
Assumed that dividends were paid quarterly



Exhibit 19



Summary - Meditech and Indexes
1-Oct-2007 to 31-Mar-2008 (Daily)
Normalized Prices & Dividends U.S. Dollars

Source: Factiva, Bloomberg and Meditech Information.
Assumed NASDAQ dividends to be 0.74% based on dividend yield for 2007.
Assumed S&P that Q1 2008 dividends were same as 2007 quarterly dividends
Assumed that dividends were paid quarterly

Exhibit 20

**Meditech and Van Vleet Guideline Public Companies**
Jan-1995 to Jan-2008 (Weekly-Friday)
Normalized Prices & Dividend U.S. Dollars



Source: Prices/Factiva,Bloomberg, Meditech Information and CapitalIQ

Exhibit 21

**Meditech and Cerner Corp.**
**Jan-1995 to Jan-2008 (Weekly-Friday)**
**Normalized Prices & Dividend U.S. Dollars**



Source: Prices/Factiva and Meditech Information

**Exhibit 22**

**Meditech and Aspen Technology**
**Jan-1995 to Jan-2008 (Weekly-Friday)**
**Normalized Price & Dividend U.S. Dollars**



Source: Prices/Factiva and Meditech Information

Exhibit 23

**Meditech and Advent Software**
**Jan-1995 to Jan-2008 (Weekly-Friday)**
**Normalized Prices & Dividend U.S. Dollars**



Source: Prices/Factiva and Meditech Information

Exhibit 24

**Meditech and Shared Medical Systems**
**Jan-1995 to Jan-2008 (Weekly-Friday)**
**Normalized Prices & Dividend U.S. Dollars**



Source: Meditech Information, Bloomberg and CapitalIQ

Exhibit 25

**Meditech and Van Vleet Guideline Public Companies**
**Jan-1995 to Jan-1999 (Weekly-Friday)**
**Normalized Prices & Dividend U.S. Dollars**



Source: Prices/Factiva, Meditech Information and CapitalIQ



Exhibit 26

Meditech and Cerner Corp.
Jan-1995 to Jan-1999 (Weekly-Friday)
Normalized Prices & Dividend U.S. Dollars

Source: Prices/Factiva and Meditech Information

Exhibit 27

**Meditech and Van Vleet Guideline Public Companies**
**Jan-2002 to Jan-2005 (Weekly-Friday)**
**Normalized Prices & Dividend U.S. Dollars**



Source: Prices/Factiva and Meditech Information

Exhibit 28

**Meditech and Cerner Corp.**
**Jan-2002 to Jan-2005 (Weekly-Friday)**
**Normalized Prices & Dividend U.S. Dollars**



Source: Prices/Factiva and Meditech Information

Exhibit 29

Meditech and Cerner Corp.
1-Oct-2007 to 31-Mar-2008 (Daily)
Normalized Prices & Dividend U.S. Dollars



Source: Prices/Factiva and Meditech Information

Exhibit 30

**Meditech and Cerner Corp.**
**Jan-1995 to Jan-2008 (Weekly-Friday)**
**Normalized Prices U.S. Dollars**



Source: Prices/Factiva and Meditech Information

Exhibit 31

**Meditech and Cerner Corp.**
Jan-1995 to Jan-1999 (Weekly-Friday)
Normalized Prices U.S. Dollars



Source: Prices/Factiva and Meditech Information



Exhibit 32

**Meditech and Cerner Corp.**
**Jan-2002 to Jan-2005 (Weekly-Friday)**
**Normalized Prices U.S. Dollars**



Source: Prices/Factiva and Meditech Information

Exhibit 33

**Meditech and Cerner Corp.**
**Mar-2006 to Mar- 2008 (Weekly-Friday)**
**Normalized Prices U.S. Dollars**



Source: Prices/Factiva and Meditech Information

Exhibit 34

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Market Approach: Adjustment Factor Analysis using Van Vleet's Methodology**
**1998-2000**

Subject Company's Estimated MVE    $1,000,000 [1]
Subject Company's Long Term Growth    13.20%

### 1998

| Adjustment Factor Analysis | MVE ($000) | Est. LTG [1] | Relative Size | Relative Growth [1] | Average Adjusted Ratio [2] | Ind. Avg. Equity/MVIC | Adjustment Factor [3] |
|---|---|---|---|---|---|---|---|
| Advent Software, Inc | 386,890 | 30% | 2.58 | 0.9 | 0.79 | 100% | 0.79 |
| Aspen Technology Inc | 358,434 | 30% | 2.79 | 0.9 | 0.79 | 100% | 0.79 |
| Cerner Corp. | 895,393 | 30% | 1.12 | 0.9 | 0.74 | 100% | 0.74 |
| Shared Medical Systems Corp | 1,327,094 | 20% | 0.75 | 0.9 | 0.72 | 100% | 0.72 |

### 1999

| Adjustment Factor Analysis | MVE ($000) | Est. LTG [1] | Relative Size | Relative Growth [1] | Average Adjusted Ratio [2] | Ind. Avg. Equity/MVIC | Adjustment Factor [3] |
|---|---|---|---|---|---|---|---|
| Advent Software, Inc | 942,435 | 30% | 1.06 | 0.9 | 0.74 | 100% | 0.74 |
| Aspen Technology Inc | 669,449 | 30% | 1.49 | 0.9 | 0.76 | 100% | 0.76 |
| Cerner Corp. | 664,167 | 30% | 1.51 | 0.9 | 0.76 | 100% | 0.76 |
| Shared Medical Systems Corp | 1,370,861 | 20% | 0.73 | 0.9 | 0.71 | 100% | 0.71 |

### 2000

| Adjustment Factor Analysis | MVE ($000) | Est. LTG [1] | Relative Size | Relative Growth [1] | Average Adjusted Ratio [2] | Ind. Avg. Equity/MVIC [1] | Adjustment Factor [3] |
|---|---|---|---|---|---|---|---|
| Advent Software, Inc | 1,221,749 | 30% | 0.82 | 0.9 | 0.72 | 100% | 0.72 |
| Aspen Technology Inc | 990,503 | 30% | 1.01 | 0.9 | 0.73 | 100% | 0.73 |
| Cerner Corp. | 1,607,927 | 30% | 0.62 | 0.9 | 0.70 | 100% | 0.70 |

Notes:
[1] Based off the Van Vleet Report assumptions
[2] Relative Size^.08 x (Relative Growth^2.959 (Van Vleet's assumption
[3] (Average Adjusted Ratio/MVE * Average Adjusted Ratio)+(1-Industry Average Equity/MVIC)

Exhibit 35

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Fair Value of Meditech Stock for 1998 - 2000 Using The Van Vleet Report's Guideline Public Company Methodology**

### 1998

| Guideline Public Company | MVIC/EBITDA Unadjusted | Adjustment Factor [5] | MVIC/EBITDA Adjusted |
|---|---|---|---|
| Advent Software, Inc | 21.1 | 0.79 | 16.7 |
| Aspen Technology Inc | 11.4 | 0.79 | 9.1 |
| Cerner Corp. | 14.0 | 0.74 | 10.3 |
| Shared Medical Systems Corp | 8.9 | 0.72 | 6.4 |
| Selected Multiple | | | 9.7 |

### 1999

| Guideline Public Company | MVIC/EBITDA Unadjusted | Adjustment Factor [5] | MVIC/EBITDA Adjusted |
|---|---|---|---|
| Advent Software, Inc | 30.4 | 0.74 | 22.4 |
| Aspen Technology Inc | 64.7 | 0.76 | 48.9 |
| Cerner Corp. | 20.6 | 0.76 | 15.6 |
| Shared Medical Systems Corp | 8.6 | 0.71 | 6.2 |
| Selected Multiple | | | 19.0 |

### 2000

| Guideline Public Company [3] | MVIC/EBITDA Unadjusted | Adjustment Factor [5] | MVIC/EBITDA Adjusted |
|---|---|---|---|
| Advent Software, Inc | 27.1 | 0.72 | 19.5 |
| Aspen Technology Inc | 29.7 | 0.73 | 21.7 |
| Cerner Corp. | 21.7 | 0.70 | 15.3 |
| Selected Multiple | | | 19.3 |

### Fair Market Value of Meditech Stock

| | 1998 | 1999 | 2000 |
|---|---|---|---|
| Meditech Last Twelve Months EBITDA [4] | $100,277 | $108,534 | $98,643 |
| Times: Indicated EBITDA Multiple | 9.7 | 19.0 | 19.5 |
| Indicated Business Value | 971,838 | 2,058,979 | 1,922,597 |
| Less: Book Value of Interest-Bearing Debt [4] | 15,000 | 0 | 0 |
| Fair Market Value of Equity | 956,838 | 2,058,979 | 1,922,597 |
| Less: 25% Discount for Lack of Marketability [1] | 239,209 | 514,745 | 480,649 |
| Fair Market Value of Equity (Non-marketable basis) | $717,628 | $1,544,235 | $1,441,948 |
| Meditech Shares Outstanding [2] | 32,531 | 32,915 | 33,255 |
| Fair Maket Value of Meditech Stock | $22.06 | $46.92 | $43.36 |

**Notes:**
[1] Per the Van Vleet Report
[2] Shares adjusted for stock splits
[3] Shared Medical Systems data unavailable
[4] Per Meditech's 1998-2000 10Ks
[5] Per Exhibit 34

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Adjusted Cash Position of Meditech Profit Sharing Trust**
**As of December 31, 1997**

| Trust Assets on December 31, 1997 | | | | |
|---|---|---|---|---|
| Cash in Checking and Savings Account | | | $82,104 | [1] |
| US Treasury Notes | | | 23,894,716 | [3] |
| Accrued Interest Receivable | | | 326,221 | [1] |
| Shares Meditech Stock | 2,938,020 [7] | $21.6 | 63,519,992 | [4] |
| Member Loans Receivable | | | 1,347,950 | [1] |
| Total Assets | | | $89,170,983 | |

| Shares Reconciliation for 1997 | | | |
|---|---|---|---|
| Description | No.of shares [7] | SP | $ |
| Beginning Shares | 2,817,490 | $12.0 | $33,809,880 |
| Additional Shares Contributed in 97 | 80,000 [5] | $21.6 | 1,729,600 |
| Additional Shares Purchased from employees | 40,530 | $12.2 | 493,700 [6] [7] |
| Revaluation of Meditech Stock - Opening shares | | | 27,104,254 |
| Revaluation of Meditech Stock - Purchased from employees | | | 382,559 |
| Ending Shares | 2,938,020 | | $63,519,992 |

| Cash Reconciliation for 1997 | |
|---|---|
| Description | $ |
| Beginning balance of cash | $21,212,814 |
| Change in working capital | (129,472) |
| Interest income | 1,438,615 |
| Dividend income | 2,389,447 |
| Distribution to terminees | (2,111,284) |
| Company contribution of cash | 1,670,400 |
| Additional stock purchased from employees | (493,700) |
| Closing balance of cash | $23,976,820 |

| Adjusted Stock & Cash Contribution in 1997 | |
|---|---|
| Number of Shares Contributed | 80,000 [2] |
| Van Vleets 12/31/97 Share Price | $21.6 |
| Dollar value of Stock Contributed | $1,729,600 |
| Total Contribution | $3,400,000 [1] |
| Cash Contribution | $1,670,400 |
| Original Cash Contribution | $2,320,000 [1] |
| Difference in Cash Contribution | $649,600 |

**Notes:**

[1] Per the Meditech Profit Sharing Trust Financial Report for 1997.

[2] Includes both revaluation of Meditech Stock-Opening shares and Purchased from employees.

[3] US T-Notes per the Meditech Profit Sharing Trust Financial Report for 1997 less change in cash contributed.

[4] Price per the Van Vleet Report

[5] Number of shares calculated per Meditech Profit Sharing Trust Financial Report for 1997.

[6] Share Price Calculated as:

| | |
|---|---|
| Revaluation of Meditech beginning shares | $4,226,235 |
| Less: Revaluation per Financial Report | 4,279,690 |
| Revaluation of Meditech shares purchased during the year | 53,455 |
| Per Share Revaluation of Meditech stock purchased during the year | 2.64 |
| Purchase Price Per Share of Meditech stock purchased during the year | $24.36 |
| Split Adjusted | $12.18 |

[7] Shares of Stock adjusted to reflect stock split.

Confidential

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Adjusted Cash Position of Meditech Profit Sharing Trust**
**As of December 31, 1998**

| Trust Assets on December 31, 1997 | | | | |
|---|---|---|---|---|
| Cash in Check and Savings Account | | | | $82,104 |
| US Treasury Notes | | | | 23,894,716 |
| Accrued Interest Receivable | | | | 326,221 |
| Shares Meditech Stock | 2,938,020 | [7] | $21.6 | 63,519,992 |
| Member Loans Receivable | | | | 1,347,950 |
| Total Assets | | | | $89,170,983 |

| Trust Activity During 1998 | | |
|---|---|---|
| Beginning Assets | $89,170,983 | |
| Interest Income | 1,481,825 | [3] |
| Dividend Income | 2,805,490 | [4] |
| Revaluation of Meditech Stock | 1,324,691 | [2] |
| Distribution to Terminees | (7,651,182) | [5] |
| Company Contributions | 3,500,000 | [1] |
| | $90,631,808 | |

| Trust Assets on December 31, 1998 | | | | |
|---|---|---|---|---|
| Cash in Checking and Savings Account | | | | $106,169 | [1] |
| US Treasury Notes | | | | 20,744,085 | |
| Accrued Interest Receivable | | | | 364,650 | [1] |
| Shares Meditech Stock | 3,090,662 | [7] | $22.1 | 68,180,004 | |
| Member Loans Receivable | | | | 1,236,900 | [1] |
| Total Assets | | | | $90,631,808 | |

| Shares Reconciliation for 1998 | | | | |
|---|---|---|---|---|
| Description | No.of shares [7] | | SP | $ |
| Beginning Shares | 2,938,020 | | $21.6 | $63,519,992 |
| Additional Shares Contributed in '98 | 80,000 | [6] | $22.1 | 1,764,800 |
| Additional Shares Purchased from employees | 72,642 | | $21.6 | 1,570,520 |
| Revaluation of Meditech Stock - Opening shares | | | | 1,292,729 |
| Revaluation of Meditech Stock - Purchased from employees | | | | 31,962 |
| Ending Shares | 3,090,662 | | | $68,180,004 |

| Cash Reconciliation for 1998 | |
|---|---|
| Description | $ |
| Beginning balance of cash | $23,976,820 |
| Change in working capital | 72,621 |
| Interest income | 1,481,825 |
| Dividend income | 2,805,490 |
| Distribution to terminees | (7,651,182) |
| Company contribution of cash | 1,735,200 |
| Additional stock purchased from employees | (1,570,520) |
| Closing balance of cash | $20,850,254 |

| Adjusted Stock & Cash Contribution in 1998 | |
|---|---|
| Number of Shares Contributed | 80,000 [6] |
| 12/31/98 Share Price using Van Vleet's assumptions | $22.1 |
| Dollar value of Stock Contributed | $1,764,800 |
| Total Contribution | $3,500,000 [1] |
| Cash Contribution | $1,735,200 |

**Notes:**

[1] Per the Meditech Profit Sharing Trust Financial Report for 1998.
[2] Includes both revaluation of Meditech Stock-Opening shares and Purchased from employees.
[3] Interest Income calculated by interest rate derived from the Meditech Profit Sharing Trust Financial Report for 1998
times the adjusted cash position and Treasury Note Position.
[4] Dividend Income will remain unchanged as the overall % of shares in Meditech will remain unchanged.
[5] Number of shares distributed to terminated by employees times the 12/31/97 calculated share price.
[6] Number of shares calculated per Meditech Profit Sharing Trust Financial Report for 1998.
[7] Shares of Stock adjusted to reflect stock split.

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Adjusted Cash Position of Meditech Profit Sharing Trust**
**As of December 31, 1999**

| Trust Assets on December 31, 1998 | | | |
|---|---|---|---|
| Cash in Check and Savings Account | | | $106,169 |
| US Treasury Notes | | | 20,744,085 |
| Accrued Interest Receivable | | | 364,650 |
| Shares Meditech Stock | 3,090,662  [7] | $22.1 | 68,180,004 |
| Member Loans Receivable | | | 1,236,900 |
| Total Assets | | | $90,631,808 |

| Trust Activity During 1999 | |
|---|---|
| Beginning Assets | $90,631,808 |
| Interest Income | 1,182,126  [3] |
| Dividend Income | 3,111,627  [4] |
| Revaluation of Meditech Stock | 77,836,365  [2] |
| Distribution to Terminees | (10,817,955) [5] |
| Company Contributions | 4,000,000  [1] |
| | $165,943,972 |

| Trust Assets on December 31, 1999 | | | |
|---|---|---|---|
| Cash in Checking and Savings Account | | | $94,461  [1] |
| US Treasury Notes | | | 13,351,975 |
| Accrued Interest Receivable | | | 401,053  [1] |
| Shares Meditech Stock | 3,211,618  [7] | $46.9 | 150,673,058 |
| Member Loans Receivable | | | 1,423,425  [1] |
| Total Assets | | | $165,943,972 |

| Shares Reconciliation for 1999 | | | |
|---|---|---|---|
| Description | No.of shares [7] | SP | $ |
| Beginning Shares | 3,090,662 | $22.1 | $68,180,004 |
| Additional Shares Contributed in '99 | 80,000  [6] | $46.9 | 3,753,200 |
| Additional Shares Purchased from employees | 40,956 | $22.1 | 903,489 |
| Revaluation of Meditech Stock - Opening shares | | | 76,818,404 |
| Revaluation of Meditech Stock - Purchased from employees | | | 1,017,961 |
| Ending Shares | 3,211,618 | | $150,673,058 |

| Cash Reconciliation for 1999 | |
|---|---|
| Description | $ |
| Beginning balance of cash | $20,850,254 |
| Change in working capital | (222,928) |
| Interest income | 1,182,126 |
| Dividend income | 3,111,627 |
| Distribution to terminees | (10,817,955) |
| Company contribution of cash | 246,800 |
| Additional stock purchased from employees | (903,489) |
| Closing balance of cash | $13,446,436 |

| Adjusted Stock & Cash Contribution in 1999 | |
|---|---|
| Number of Shares Contributed | 80,000  [6] |
| 12/31/99 Share Price using Van Vleet's assumptions | $46.9 |
| Dollar value of Stock Contributed | $3,753,200 |
| Total Contribution | $4,000,000  [1] |
| Cash Contribution | $246,800 |

**Notes:**

[1] Per the Meditech Profit Sharing Trust Financial Report for 1999

[2] Includes both revaluation of Meditech Stock-Opening shares and Purchased from employees

[3] Interest Income calculated by interest rate derived from the Meditech Profit Sharing Trust Financial Report for 1999 times the adjusted cash position and Treasury Note Position

[4] Dividend Income will remain unchanged as the overall % of shares in Meditech will remain unchanged

[5] Number of shares distributed to terminated by employees times the 12/31/98 calculated share price

[6] Number of shares calculated per Meditech Profit Sharing Trust Financial Report for 1999

[7] Shares of Stock adjusted to reflect stock split.

Confidential

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Adjusted Cash Position of Meditech Profit Sharing Trust**
**As of December 31, 2000**

| Trust Assets on December 31, 1999 | | | |
|---|---|---|---|
| Cash in Check and Savings Account | | | $94,461 |
| US Treasury Notes | | | 13,351,975 |
| Accrued Interest Receivable | | | 401,053 |
| Shares Meditech Stock | 3,211,618 [7] | $46.9 | 150,673,058 |
| Member Loans Receivable | | | 1,423,425 |
| Total Assets | | | $165,943,972 |

| Trust Activity During 2000 | |
|---|---|
| Beginning Assets | $165,943,972 |
| Interest Income | 652,427 [3] |
| Dividend Income | 3,757,105 [4] |
| Revaluation of Meditech Stock | (11,591,597) [2] |
| Distribution to Terminees | (40,200,631) [5] |
| Company Contributions | 3,500,000 [1] |
| | $122,061,276 |

| Trust Assets on December 31, 2000 | | | |
|---|---|---|---|
| Cash in Checking and Savings Account | | | $357,778 [1] |
| US Treasury Notes | | | (24,747,434) |
| Accrued Interest Receivable | | | 252,072 [1] |
| Shares Meditech Stock | 3,340,646 [7] | $43.4 | 144,850,411 |
| Member Loans Receivable | | | 1,348,450 [1] |
| Total Assets | | | $122,061,276 |

| Shares Reconciliation for 2000 | | | |
|---|---|---|---|
| Description | No.of shares [7] | SP | $ |
| Beginning Shares | 3,211,618 | $46.9 | $150,673,058 |
| Additional Shares Contributed in '00 | 80,000 [6] | $43.4 | 3,468,800 |
| Additional Shares Purchased from employees | 49,028 | $46.9 | 2,300,149 |
| Revaluation of Meditech Stock - Opening shares | | | (11,417,302) |
| Revaluation of Meditech Stock - Purchased from employees | | | (174,295) |
| Ending Shares | 3,340,646 | | $144,850,411 |

| Cash Reconciliation for 2000 | |
|---|---|
| Description | $ |
| Beginning balance of cash | $13,446,436 |
| Change in working capital | 223,956 |
| Interest income | 652,427 |
| Dividend income | 3,757,105 |
| Distribution to terminees | (40,200,631) |
| Company contribution of cash | 31,200 |
| Additional stock purchased from employees | (2,300,149) |
| Closing balance of cash | ($24,389,656) |

| Adjusted Stock & Cash Contribution in 2000 | |
|---|---|
| Number of Shares Contributed | 80,000 [6] |
| 12/31/00 Share Price using Van Vleet's assumptions | $43.4 |
| Dollar value of Stock Contributed | $3,468,800 |
| Total Contribution | $3,500,000 [1] |
| Cash Contribution | $31,200 |

**Notes:**

[1] Per the Meditech Profit Sharing Trust Financial Report for 2000.

[2] Includes both revaluation of Meditech Stock-Opening shares and Purchased from employees.

[3] Interest Income calculated by interest rate derived from the Meditech Profit Sharing Trust Financial Report for 2000 times the adjusted cash position and Treasury Note Position.

[4] Dividend Income will remain unchanged as the overall % of shares in Meditech will remain unchanged.

[5] Number of shares distributed to terminated by employees times the 12/31/99 calculated share price.

[6] Number of shares calculated per Meditech Profit Sharing Trust Financial Report for 2000.

[7] Shares of Stock adjusted to reflect stock split.

Exhibit 40

Meditech Share Prices - Board v. Amended Compliant, Van Vleet & Reilly



Source: Meditech Board Minutes, Van Vleet Reilly Reports Amended Compliant

Exhibit 41

## Meditech Share Prices - Board v. Amended Compliant, Van Vleet Methodology/Reilly



Source: Meditech Board Minutes, Van Vleet Reilly Reports Amended Compliant

Exhibit 42

Hubert's Meditech Profit Sharing Trust Balance
31-Dec-1982 to 31-Dec-2003
U.S. Dollars



Confidential

**Exhibit 43**

**Trainor's Meditech Profit Sharing Trust Balance**
**31-Dec-1977 to 31-Dec-1997**
**U.S. Dollars**



Exhibit 44

**Hinchliffe's Meditech Profit Sharing Trust Balance**
**31-Dec-1977 to 31-Dec-1997**
**U.S. Dollars**



Confidential

# EXHIBIT 35

EXHIBIT

MH 3

AHB 7/26/06

-----Original Message-----
**From:** ERISA [mailto:erisa@mediaone.net]
**Sent:** Monday, February 18, 2002 3:01 AM
**To:** marcia@mwagner.net; aliazos@mwe.com; info@dwyercollora.com;
cmontilio@dwyercollora.com; jdeary@goodwinprocter.com; mtse@goodwinprocter.com;
kbilezerian@mwe.com; ajbianchi@MirickOConnell.com; tkolb@erisaboston.com;
wfitzgerald@mbbf.com; isunshine@sandw.com; edwards@mc-ed.com; friedler@aol.com
**Subject:** ERISA Suit

Dear Sir or Madam:

I believe a have a case against a Massachusetts employer that could settle for more than
$20,000,000.

My employer is a private company with qualified contribution plan. The plan judiciary is also
the founder and the major stockholder of the company. The plan is mostly invested in
company stock. The judiciary sets the value of the stock, despite the fact they have no
experience in this matter. The auditors simply accept the value of "fair market value". It is
acknowledged by all that the stock value is set low so that employees will purchase the

stock. When the plan makes distributions, employees receive much less than they should. If the real "fair market value" was used to compute the distribution, the plan would have no cash.

The plan has distributed more than $20,000,000 within the last five years, and the stock value is set at about one-third of companies our size in our industry. The fudiciary has assets of more than $50,000,000.

I hope that you or your firm would be interested in reviewing this case on a contingency basis. As an employee of this firm, bringing this case to you, and willing to be active in the case, I wish be receive financial consideration for my efforts. If you wish further information, please respond to this email. Since I am still working at this firm, and wish to remain so, I regret that I cannot yet identify myself or my company.

Thank you for your consideration.

Bob

# EXHIBIT 36

```
<DOCUMENT>
<TYPE>SC 13D
<SEQUENCE>1
<FILENAME>b42145misc13d.txt
<DESCRIPTION>MEDICAL INFORMATION TECHNOLOGY, INC.
<TEXT>
<PAGE>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

SCHEDULE 13D

Under the Securities Exchange Act of 1934

Medical Information Technology, Inc.
--------------------------------------------------------------------
(Name of Issuer)

Common Stock, Par Value $1.00 Per Share
--------------------------------------------------------------------
(Title of Class of Securities)

N/A
--------------------------------------------------------------------
(CUSIP Number)

Thomas C. Chase, Esq.
Hill & Barlow
One International Place
Boston, MA 02110
617-428-3000
--------------------------------------------------------------------
(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

February 27, 2002
--------------------------------------------------------------------
(Date of Event which Requires Filing of this Statement)


If the filing person has previously filed a statement on Schedule 13G to report
the acquisition that is the subject of this Schedule 13D, and is filing this
schedule because of Rules 13d-1(e), 13d-1(f) or 13d-1(g), check the following
box. [ ]

<PAGE>


Page 2 of 16


--------------------------------------------------------------------

(1)     Name of Reporting Person

        Jerome H. Grossman, M.D.

```
--------------------------------------------------------------------
(2)    Check the Appropriate Box if a Member of a Group
                                                  (a)    [X]
                                                  (b)    [ ]
--------------------------------------------------------------------
(3)    SEC Use Only


--------------------------------------------------------------------
(4)    SOURCE OF FUNDS

       PF (See Item 2 of Schedule 13D.)
--------------------------------------------------------------------
(5)    CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED
       PURSUANT TO ITEMS 2(d) OR 2(e)                         [ ]

--------------------------------------------------------------------
(6)    Citizenship or Place of Organization

       United States of America
--------------------------------------------------------------------
                          (7)    Sole Voting Power
        NUMBER OF
         SHARES                  1,011,350
      BENEFICIALLY       --------------------------------------------
        OWNED BY         (8)     Shared Voting Power
          EACH
       REPORTING                 876,598
         PERSON          --------------------------------------------
          WITH           (9)     Sole Dispositive Power

                                 1,011,350
                         --------------------------------------------
                         (10)    Shared Dispositive Power

                                 876,598
--------------------------------------------------------------------
(11)   Aggregate Amount Beneficially Owned by Each Reporting Person

       1,887,948*
--------------------------------------------------------------------
(12)   Check if the Aggregate Amount in Row (11) Excludes Certain Shares
                                                              [ ]

--------------------------------------------------------------------
(13)   Percent of Class Represented by Amount in Row (11)

       5.64%
--------------------------------------------------------------------
(14)   Type of Reporting Person

       IN
--------------------------------------------------------------------
```

*Includes 602,500 shares owned of record by Jerome H. Grossman's wife, Barbara
N. Grossman; 187,500 shares held in trust by the Grossman Family 2000
Irrevocable Trust, of which Barbara N. Grossman is the co-trustee and shares
beneficial ownership with Thomas C. Chase; and 86,598 shares held in trust by
The Elizabeth Grossman 1990 Trust, of which Barbara N. Grossman is co-trustee
and shares beneficial ownership with Elizabeth Grossman. Dr. J. Grossman

disclaims beneficial ownership of all shares other than the 1,011,350 directly owned by him.

<PAGE>

---

| (1) | Name of Reporting Person |
| | Barbara N. Grossman |

---

| (2) | Check the Appropriate Box if a Member of a Group | (a) | [X] |
| | | (b) | [ ] |

---

| (3) | SEC Use Only |

---

| (4) | SOURCE OF FUNDS |
| | OO (See Item 2 of Schedule 13D.) |

---

| (5) | CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED | |
| | PURSUANT TO ITEMS 2(d) OR 2(e) | [ ] |

---

| (6) | Citizenship or Place of Organization |
| | United States of America |

---

|  | NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | (7) | Sole Voting Power |
| | | (8) | Shared Voting Power |
| | | | 876,598 |
| | | (9) | Sole Dispositive Power |
| | | (10) | Shared Dispositive Power |
| | | | 876,598 |

---

| (11) | Aggregate Amount Beneficially Owned by Each Reporting Person |
| | 876,598* |

---

| (12) | Check if the Aggregate Amount in Row (11) Excludes Certain Shares | |
| | | [ ] |

---

| (13) | Percent of Class Represented by Amount in Row (11) |
| | 2.62% |

---

(14)    Type of Reporting Person

    IN

---

*Includes 602,500 shares that the Reporting Person owns of record, and to which she has shared voting and disposition power with her husband, Jerome H. Grossman; 187,500 shares as to which the Reporting Person has shared voting and disposition power with her husband, Jerome H. Grossman, pursuant to her position as the co-trustee for the Grossman Family 2000 Irrevocable Trust (Thomas C. Chase is also co-trustee); and 86,598 shares as to which the Reporting Person has shared voting and disposition power with her husband, Jerome H. Grossman, pursuant to her position as co-trustee of The Elizabeth Grossman 1990 Trust (her daughter, Elizabeth Grossman is also co-trustee).


<PAGE>

Page 4 of 16

---

(1)    Name of Reporting Person

    Thomas C. Chase, as co-trustee of the Grossman Family 2000
    Irrevocable Trust

---

(2)    Check the Appropriate Box if a Member of a Group

                                  (a)    [X]
                                    (b)    [ ]

---

(3)    SEC Use Only

---

(4)    SOURCE OF FUNDS

    OO (See Item 2 of Schedule 13D.)

---

(5)    CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED
    PURSUANT TO ITEMS 2(d) OR 2(e)                  [ ]

---

(6)    Citizenship or Place of Organization

    United States of America

---

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | (7) | Sole Voting Power |
| | (8) | Shared Voting Power |
| | | 187,500 |
| | (9) | Sole Dispositive Power |

                    (10)    Shared Dispositive Power

                            187,500
--------------------------------------------------------------------------
(11)    Aggregate Amount Beneficially Owned by Each Reporting Person

        187,500*
--------------------------------------------------------------------------
(12)    Check if the Aggregate Amount in Row (11) Excludes Certain Shares
                                                                     [ ]

--------------------------------------------------------------------------
(13)    Percent of Class Represented by Amount in Row (11)

        .56%
--------------------------------------------------------------------------
(14)    Type of Reporting Person

        IN
--------------------------------------------------------------------------

*The Reporting Person shares voting and disposition power with Barbara N.
Grossman, as co-trustee of the Grossman Family 2000 Irrevocable Trust as to
these 187,500 shares.


<PAGE>

                                                          Page 5 of 16


--------------------------------------------------------------------------
(1)     Name of Reporting Person

        Elizabeth Grossman, as co-trustee of The Elizabeth Grossman 1990 Trust
--------------------------------------------------------------------------
(2)     Check the Appropriate Box if a Member of a Group
                                                    (a)      [X]
                                                    (b)      [ ]
--------------------------------------------------------------------------
(3)     SEC Use Only


--------------------------------------------------------------------------
(4)     SOURCE OF FUNDS

        OO (See Item 2 of Schedule 13D.)
--------------------------------------------------------------------------
(5)     CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED
        PURSUANT TO ITEMS 2(d) OR 2(e)                                [ ]

--------------------------------------------------------------------------
(6)     Citizenship or Place of Organization

        United States of America
--------------------------------------------------------------------------
                            (7)    Sole Voting Power
        NUMBER OF
        SHARES
        BENEFICIALLY        ----------------------------------------------

```
        OWNED BY          (8)    Shared Voting Power
          EACH
        REPORTING                86,598
         PERSON           ---------------------------------------------------
          WITH           (9)    Sole Dispositive Power

                          ---------------------------------------------------
                          (10)   Shared Dispositive Power

                                 86,598
----------------------------------------------------------------------------
(11)   Aggregate Amount Beneficially Owned by Each Reporting Person

       86,598*
----------------------------------------------------------------------------
(12)   Check if the Aggregate Amount in Row (11) Excludes Certain Shares
                                                                        [ ]

----------------------------------------------------------------------------
(13)   Percent of Class Represented by Amount in Row (11)

       .26%
----------------------------------------------------------------------------
(14)   Type of Reporting Person

       IN
----------------------------------------------------------------------------
```

*The Reporting Person shares voting and disposition power with Barbara N. Grossman, as co-trustee of the Elizabeth Grossman 1990 Trust as to these 86,598 shares.


<PAGE>


Page 6 of 16


```
----------------------------------------------------------------------------
(1)    Name of Reporting Person

       Seymour Grossman, M.D., as trustee of The Katherine Grossman Minor's
       Trust and The Amelia Grossman Minor's Trust
----------------------------------------------------------------------------
(2)    Check the Appropriate Box if a Member of a Group
                                                     (a)      [X]
                                                     (b)      [ ]
----------------------------------------------------------------------------
(3)    SEC Use Only


----------------------------------------------------------------------------
(4)    SOURCE OF FUNDS

       OO (See Item 2 of Schedule 13D.)
----------------------------------------------------------------------------
(5)    CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED
       PURSUANT TO ITEMS 2(d) OR 2(e)                               [ ]
```

---

(6)    Citizenship or Place of Organization

    United States of America

---

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | | |
|---|---|---|
| | (7) | Sole Voting Power |
| | | 173,196 |
| | (8) | Shared Voting Power |
| | (9) | Sole Dispositive Power |
| | | 173,196 |
| | (10) | Shared Dispositive Power |

---

(11)    Aggregate Amount Beneficially Owned by Each Reporting Person

    173,196*

---

(12)    Check if the Aggregate Amount in Row (11) Excludes Certain Shares

    [ ]

---

(13)    Percent of Class Represented by Amount in Row (11)

    .52%

---

(14)    Type of Reporting Person

    IN

---

*Includes 86,598 shares as to which the Reporting Person has sole voting and
disposition power as the trustee of the Katherine Grossman Minor's Trust, and
86,598 shares as to which the Reporting Person has sole voting and disposition
power as the trustee of the Amelia Grossman Minor's Trust.

&lt;PAGE&gt;

.

Item 1.  Security and Issuer

    This Statement on Schedule 13D relates to the Common Stock, par value $1.00
per share, (the "Common Stock") of Medical Information Technology, Inc., a
Massachusetts corporation (the "Issuer"). The principal executive offices of the
Issuer are located at Meditech Circle, Westwood, MA 02090.

Item 2.  Identity and Background

(a) This Schedule 13D is being filed on behalf of each of the following persons (collectively, the "Reporting Persons"):

    (i)     Jerome H. Grossman, M.D.;

    (ii)    Barbara N. Grossman, individually and as co-trustee of the Grossman Family 2000 Irrevocable Trust, and co-trustee of The Elizabeth Grossman 1990 Trust;

    (iii)   Thomas C. Chase, as co-trustee of the Grossman Family 2000 Irrevocable Trust;

    (iv)   Elizabeth Grossman, as co-trustee of The Elizabeth Grossman 1990 Trust; and

    (v)    Seymour Grossman, M.D., as trustee of The Katherine Grossman Minor's Trust, and The Amelia Grossman Minor's Trust.

    (b)    The principal addresses of the Reporting Persons are as follows:

    (i)     The principal business address of Jerome H. Grossman is: c/o Lion Gate Management Corporation, 104 Mt. Auburn Street, 3R, Cambridge, MA 02138;

    (ii)    The principal residence address of Barbara N. Grossman is 72 Spooner Road, Chestnut Hill, MA 02167;

    (iii)   The principal business address of Thomas C. Chase is Hill & Barlow, One International Place, Boston, MA 02110.

    (iv)   The principal residence address of Elizabeth Grossman is 3808 W St., N.W., Washington, D.C. 20007; and

    (v)    The principal residence address of Seymour Grossman is 2661 Cedar Street, Berkeley, CA 94708.

    (c)    The principal occupation and business address of the Reporting Persons are as follows:

<PAGE>

    (i)     The principal occupation of Jerome H. Grossman is Chief Executive Officer of Lion Gate Management Corporation, with a business address of: 104 Mt. Auburn Street, 3R, Cambridge, MA 02138. Dr. J. Grossman is also a director of the Issuer;

    (ii)    The principal occupation of Barbara N. Grossman is that of full time volunteer in the area of urban health and education;

    (iii)   The principal occupation of Thomas C. Chase is that of attorney;

    (iv)   The principal occupation of Elizabeth Grossman is that of science policy analyst; and

    (v)    The principal occupation of Seymour Grossman is that of physician.

(d)     During the past five years, none of the Reporting Persons has been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors).

(e)     During the past five years, none of the Reporting Persons has been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction as a result of which he or she was or is subject to a judgment, decree, or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities law, or finding any violation with respect to such laws.

(f)     All of the Reporting Persons are citizens of the United States of America.

Item 3.  Source and Amount of Funds or Other Consideration

Jerome H. Grossman ("Dr. J. Grossman") originally purchased 627 shares of Common Stock, using personal funds, for an aggregate amount of $1,254 in 1969. The Common Stock has split numerous times since then. The shares beneficially owned by Barbara N. Grossman (Dr. J. Grossman's wife), Thomas C. Chase (an attorney for Dr. and Mrs. J. Grossman), Elizabeth Grossman (Dr. J. Grossman's daughter), and Seymour Grossman, M.D. (Dr. J. Grossman's brother), were transferred by gift from shares owned by Dr. J. Grossman or Barbara N. Grossman, who originally obtained her shares by gift from Dr. J. Grossman. Dr. J. Grossman disclaims beneficial ownership of any shares other than the 1,011,350 shares owned outright by him.

Item 4.  Purpose of Transaction

The Reporting Persons filing this Schedule 13D initially acquired the Common Stock for investment purposes. However, the Reporting Persons have become increasingly concerned with the management of the business and finances of the Issuer. As a director of the Issuer, Dr. J. Grossman is particularly concerned with the value of the Issuer's Common Stock, and believes

<PAGE>

Page 9 of 16

that management, as well as the Board of Directors, are not discharging their fiduciary duties to the stockholders for the reasons set forth more fully below. Dr. J. Grossman has expressed his dissatisfaction to the other Board members, along with other key members of management. However, Dr. J. Grossman believes that neither management nor the Board has taken the steps necessary to correct these problems.

Subsequently, the Reporting Persons discussed the issues described above, and orally agreed to form a group, comprised of the shares held individually by Dr. and Mrs. J. Grossman, along with the shares held in trust by Barbara N. Grossman, Thomas C. Chase, Elizabeth Grossman, and Seymour Grossman for the benefit of the Grossman Family 2000 Irrevocable Trust, The Elizabeth Grossman 1990 Trust, The Katherine Grossman Minor's Trust, and The Amelia Grossman Minor's Trust. The purpose of forming the group is to influence the business and affairs of the Issuer with the intent of maximizing stockholder value. To that end, the Reporting Persons may furnish information to and solicit support from other stockholders of the Issuer in furtherance of the goals of the group and will request from the Issuer a list of such stockholders to permit such process of information and solicitation.

Accordingly, the Reporting Persons have decided to consider and possibly promote appropriate methods to maximize stockholder value and the profitability and liquidity of his/her investment, including, without limitation, a number of potential actions described below.

(i)     The Reporting Persons may suggest that the Issuer obtain and utilize professional appraisals to value the Issuer properly both for stock plan purposes, to protect the Issuer from tax exposure to the extent the Company is being valued at an artificially low price, and to provide an advantage to stockholders who, it is believed by the Reporting Persons, are currently led to believe by the Issuer that this artificially low price is an appropriate sales price in the event that such stockholders wish to sell shares. Currently, the Reporting Persons believe that the Issuer is relying on an outdated valuation methodology that does not properly reflect the Issuer's current fair value.

(ii)    Since the 1996 registration of the Issuer's common stock on Form 10, pursuant to Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act"), the Issuer has been a public company, and as such, the Reporting Persons may suggest that the Issuer comply with proxy rules applicable to public companies pursuant to Section 14 of the Exchange Act. These rules generally require the filing of a copy of the proxy statement with the SEC if proxies are solicited, or an equivalent information statement if proxies are not solicited. It is the belief of the Reporting Persons that no proxy statements or information statements have been filed with the SEC since the Issuer became a public company.

(iii)   In order to create liquidity for the Issuer's common stock, as well as to maximize stockholder value, including the value of the shares of the Issuer held in the employee retirement trust referred to in (viii) below, the Reporting Persons may suggest that the Issuer evaluate the possibility of listing its common stock on Nasdaq or a national exchange. To that end, the Reporting Persons may also suggest that the Issuer remove the references to transfer restrictions that are currently being placed on share certificates and on Statements of Stock Ownership, as it

<PAGE>

Page 10 of 16

does not appear to the Reporting Persons that the Articles of Amendment to the Issuer's Articles of Organization, containing the purported transfer restrictions on the Issuer's stock, were ever filed with the Massachusetts Secretary of State, and as such, the Issuer's common stock is in fact unrestricted and freely transferable (except for any applicable federal or state securities law restrictions). The Reporting Persons may also suggest that the Issuer amend its current Schedule 10-K to correct the following inaccuracy contained therein: "The Company's Common Stock is subject to right of first refusal restrictions upon sale, assignment, transfer, pledge or other disposition of any of its shares," and either delete or correct the Exhibits that contain the Articles of Organization and Articles of Amendment thereto. Dr. J. Grossman may also file a civil action against the Issuer requesting a declaration by a court to the effect that the purported transfer restrictions are not effective. The Issuer has, from time to time, made limited repurchases of the Issuer's common stock (typically, less than 1% of its issued and outstanding shares per annum). The Reporting Persons may also suggest that the Issuer evaluate the possibility of implementing a more extensive and more frequent stock buyback program, at appropriate prices, with funds otherwise invested in illiquid investments, as referred to in (vi) below. The Reporting Persons may also seek one or more buyers (other than the Issuer) for all or a

portion of their shares in the Issuer or may seek to promote interest in purchasing shares of the Issuer generally.

(iv) Dr. J. Grossman has learned that he will not be re-elected to the Board in 2002 as a result of the proposal of certain members of management to reduce the size of the Board. Dr. J. Grossman has reason to believe that this decision was in response to the efforts of Dr. J. Grossman to raise some or all of the issues described in this Schedule 13D. Dr. J. Grossman believes that his efforts to raise these issues have incorrectly been characterized by management in communications with the Board as "disloyal" and "troublemaking." The Reporting Persons may request that management cease engaging in behavior which misuses its voting power with respect to the election of directors and which breaches its fiduciary duties to the stockholders of the Issuer by attempting to perpetuate management policies contrary to the best interests of the stockholders.

(v) The Reporting Persons may also suggest that the Issuer adopt procedures by which to evaluate expressions of interest from third parties relating to possible acquisitions of equity in the Issuer. In March 2001, a third party expressed to management its interest in acquiring the Issuer. This interest was subsequently reflected in a letter from the Chief Executive Officer of that potential acquirer addressed to the Chief Executive Officer of the Issuer, who, without consulting the Board, indicated that the Issuer would not be interested in such a transaction. It came to the attention of Dr. J. Grossman, in his capacity as a director of the Issuer, that a number of the other Board members were not apprised on a timely basis of that expression of interest, and therefore did not have the opportunity to evaluate the fairness or advisability of a potential transaction or to instruct management to obtain more information about the possible offer.

A similar expression of interest was received by the Issuer (addressed to a purported Special Committee of the Board) in December 2001. The Reporting persons believe that no such Special Committee has been constituted and that the Board has not appropriately considered such expression of interest.

<PAGE>

Section 65 of Chapter 156B of the Massachusetts General Laws requires each officer and director of a corporation to "perform his duties as such, including. . . his duties as a member of a committee. . .[1] in good faith, . . . [2] in a manner he reasonably believes to be in the best interests of the corporation, and [3] with such care as an ordinarily prudent person in a like position would use under similar circumstances." The Reporting Persons believe that, in the context of a potential acquisition by a third party, the board has a fiduciary duty to consider the offer.

The Reporting Persons understand that, in evaluating the offer, a board of directors may also consider the interests of all stockholders, as well as the interests of employees, creditors and customers. A board may also consider the long-term and short-term interests of the corporation and its stockholders, including the possibility that these interests may be best served by the continued independence of the corporation. However, it is the belief of the Reporting Persons that the decision in such matters is to be made by the board or a special committee of the board, and not merely by the officers, of the Issuer.

As the board is under a fiduciary duty to consider any such offer, the

Reporting Persons may suggest that the Issuer appoint a special committee to evaluate any potential overtures, and that the committee should have the benefit of professional advice, including that of accountants, attorneys and financial advisors. It should not, however, be assumed that the Reporting Persons are advocating or seeking to cause the Issuer to pursue any particular course of action or pursue any particular strategic alternative.

(vi) The Reporting Persons may also suggest that the Issuer refrain in the future from investing its excess cash (i.e., it cash in excess of the amounts needed for the Issuer's intended business activities) in potentially illiquid investments such as the purchase of office space in quantities greatly in excess of the actual facilities needs of the Issuer. The Reporting Persons may suggest that the implications of such an investment program be reviewed by the independent auditors and counsel of the Issuer. The Reporting Persons may suggest that management seek approval of the stockholders of the Issuer if there is a plan to enter into a business segment (namely, the real estate investment business) which is materially different from the business of the Issuer, as reported in the Issuer's latest Report on Form 10-K (the development of the "hospital information system," a cohesive set of software products designed from the onset to work in conjunction with the overall operation of the hospital and to minimize the need for specialized interfaces).

(vii) The Reporting Persons may suggest that the management of the Issuer refrain from causing the Issuer to employ or enter into business arrangements with persons members of the immediate family of or are otherwise associated with management, except upon terms no less favorable than those obtainable from unrelated third parties and following approval of a majority of the disinterested members of the Board. The Reporting Persons may suggest that the Issuer disclose in appropriate filings any such transactions in excess of $60,000 in any year and any other direct or indirect business relationships between or among directors of the Issuer or their affiliates.

<PAGE>

(viii) The Reporting Persons may suggest that the Board reassess its policies with respect to the employee retirement trust maintained by the Issuer. This reassessment would entail the requirement of diversification of investments by the trust. It is believed that the trust is currently invested approximately 77% in the common stock of the Issuer (or a higher percentage, if the stock is currently undervalued, as suggested in (i) above). Except to the limited extent referred to in the third from the last sentence of (iii) above, there has not been provided a ready market or resale mechanism for such investments in the Issuer's stock, and the underlying assets of the issuer may themselves be potentially illiquid, in large part because of the devotion of a significant portion thereof to real estate investments not required for the operations of the Issuer. In addition, it may be suggested that professional investment management be secured by the trust and that the trustee be a person or firm engaged in the business of managing similar trust entities. It may be suggested that there is an inherent and impermissible conflict of interest between management, which wishes to maintain the illiquid nature of the Issuer's securities and possibly to vote the trust's shares in the Issuer to perpetuate the policies of the management, and the trust, the participants of which will look largely to the investments of the trust for retirement income and who are the employees whose financial well being is key to the continued success of the Issuer. It may also be suggested that it is inappropriate that a member of management of the Issuer be the trustee of the trust and thereby have the power to direct the voting and investment of its shares in the Issuer in a way which

may potentially further the interests of management at the expense of the participants in the trust.

(ix) The Reporting Persons may also suggest or take any other actions deemed by the Reporting Persons to be effective for the purpose of influencing the business and affairs of the Issuer, including the possibility of contacting other stockholders, with the intent of maximizing stockholder value. At this time, the Reporting Persons do not seek to acquire control of the Issuer.

Item 5.   Interest in Securities of the Issuer

(a)  Based on information included in the Issuer's most recent 10-Q filed for the quarter ended September 30, 2001, there were 33,500,566 shares of Common Stock outstanding as of that date. The Reporting Persons are the beneficial owners of the following shares of common Stock, which represents the following percentage of the total shares of outstanding Common Stock:

(i)  Jerome H. Grossman is the beneficial owner of 1,011,350 shares of Common Stock which he owns outright, and is the indirect owner of the 602,500 shares owned by his wife, Barbara N. Grossman, the 274,098 shares held by her as co-trustee of the Grossman Family 2000 Irrevocable Trust (187,500 shares), and as co-trustee of The Elizabeth Grossman 1990 Trust (86,598 shares), representing 5.64% of the total shares of outstanding Common Stock. Dr. J. Grossman disclaims beneficial ownership of the 876,598 shares held by his wife, and this report shall not be deemed an admission that Dr. J. Grossman is the beneficial owner of such securities for purposes of Section 13(d) or 13(g) of the Securities Act of 1934, as amended.

<PAGE>

Page 13 of 16

(ii)  Barbara N. Grossman, the wife of Jerome H. Grossman, is the beneficial owner of 602,500 shares of Common Stock which she owns of record, and is the beneficial owner of (i) 187,500 shares of Common Stock held as co-trustee of the Grossman Family 2000 Irrevocable Trust, for which Barbara N. Grossman shares voting and disposition power with Thomas C. Chase; and (ii) is the beneficial owner of the 86,598 shares of Common Stock held in trust for The Elizabeth Grossman 1990 Trust, for which Barbara N. Grossman is the co-trustee, and shares voting and disposition power with Elizabeth Grossman, representing approximately 2.62% of the total number of shares of Common Stock outstanding. Barbara N. Grossman shares voting and disposition power of all of her shares of Common Stock with Dr. J. Grossman.

(iii) Thomas C. Chase, an attorney for Dr. and Mrs. J. Grossman, shares beneficial ownership of 187,500 shares of Common Stock held in trust for the Grossman Family 2000 Irrevocable Trust, as to which Thomas C. Chase is co-trustee, and shares voting and disposition power with Barbara N. Grossman, representing .56% of the total shares of Common Stock outstanding. To avoid double-counting, this .56% is not included in calculating the group's total ownership percentage; rather the 187,500 shares held for the benefit of the Grossman Family 2000 Irrevocable Trust are calculated as part of Barbara N. Grossman's total ownership percentage.

(iv)  Elizabeth Grossman, the daughter of Jerome H. Grossman and Barbara N.

Grossman, is the beneficial owner of 86,598 shares of Common Stock held in trust for The Elizabeth Grossman 1990 Trust, as to which Elizabeth Grossman is co-trustee, and shares voting and disposition power with Barbara N. Grossman, representing .26% of the total shares of Common Stock outstanding. To avoid double-counting, this .26% is not included in calculating the group's total ownership percentage; rather the 86,598 shares held for the benefit of The Elizabeth Grossman 1990 Trust are calculated as part of Barbara N. Grossman's total ownership percentage.

(v)    Seymour Grossman, the brother of Jerome H. Grossman, is the beneficial owner of (i) 86,598 shares of Common Stock held in trust for The Katherine Grossman Minor's Trust, and (ii) 86,598 shares of Common Stock held in trust for The Amelia Grossman Minor's Trust, representing .52% of the total number of shares of Common Stock outstanding.

As a group, the Reporting Persons own 6.15% of the total outstanding shares of Common Stock of the Issuer.

(b)    As of the date of this Statement on Schedule 13D, the Reporting Persons have the power to vote and dispose of the following shares of Common Stock:

<PAGE>

Page 14 of 16

(i)    Jerome H. Grossman has the sole power to direct the voting and disposition of the 1,011,350 shares of Common Stock held by him directly, and has shared power to direct the voting and disposition of the 876,598 shares held by his wife, Barbara N. Grossman;

(ii)   Barbara N. Grossman has shared power with her husband, Jerome H. Grossman, to direct the voting and disposition of the 602,500 shares of Common Stock held by her of record, and the 187,500 shares held by her as trustee of the Grossman Family 2000 Irrevocable Trust. Barbara N. Grossman also shares the power to direct the voting and disposition of the 86,598 shares held by her as co-trustee of The Elizabeth Grossman 1990 Trust with her daughter, Elizabeth Grossman;

(iii)  Thomas C. Chase has the shared power to direct the voting and disposition of the 187,500 shares held by her as co-trustee of the Grossman Family 2000 Irrevocable Trust with Barbara N. Grossman;

(iv)   Elizabeth Grossman has the shared power to direct the voting and disposition of the 86,598 shares held by her as co-trustee of The Elizabeth Grossman 1990 Trust with her mother, Barbara N. Grossman; and

(v)    Seymour Grossman has the sole power to direct the voting and disposition of 173,196 shares held by him as trustee of The Katherine Grossman Minor's Trust and The Amelia Grossman Minor's Trust.

(c)    There have been no transactions effected with respect to the Common Stock since November 15, 2001 by any of the Reporting Persons.

(d)    Not applicable.

(e)      Not applicable.

Item 6.  Contracts, Arrangements, Understandings, or Relationships with Respect
to Securities of the Issuer.

     As described more fully in Item 4, the Reporting Persons listed in Item 2,
have orally agreed to form a group for the purpose of influencing the business
and affairs of the Issuer, including the possibility of contacting other
stockholders, with the intent of maximizing stockholder value. At present, there
are no contracts, voting agreements or other formal agreements between the
Reporting Persons.

Item 7.  Material to Be Filed as Exhibits

Exhibit 1 - Joint Filing Agreement


<PAGE>

                                                            Page 15 of 16



                              SIGNATURES

After reasonable inquiry and to the best of my knowledge and belief, I certify
that the information set forth in this statement is true, complete and correct.

Date:  February 27, 2002

By:
          /s/ Jerome S. Grossman
          ---------------------------
          Jerome H. Grossman, M.D.


          /s/ Barbara N. Grossman
          ---------------------------
          Barbara N. Grossman


          /s/ Thomas C. Chase
          ---------------------------
          Thomas C. Chase


          /s/ Elizabeth Grossman
          ---------------------------
          Elizabeth Grossman


          /s/ Seymour Grossman
          ---------------------------
          Seymour Grossman, M.D.

<PAGE>

EXHIBIT 1

### JOINT FILING AGREEMENT

Pursuant to Rule 13d-1(f) under the Securities Exchange Act of 1934, as amended, the undersigned hereby agree to the joint filing on behalf of each of them of a Statement on Schedule 13D (including amendments thereto) with respect to the Common Stock, par value $1.00 per share, of Medical Information Technology, Inc., and that this Agreement be included as an Exhibit to such joint filing.

IN WITNESS WHEREOF, the undersigned hereby execute this Agreement this 27th day of February, 2002.

By:

/2/ Jerome S. Grossman
--------------------------
Jerome H. Grossman, M.D.


/s/ Barbara N. Grossman
--------------------------
Barbara N. Grossman


/s/ Thomas C. Chase
--------------------------
Thomas C. Chase


/s/ Elizabeth Grossman
--------------------------
Elizabeth Grossman


/s/ Seymour Grossman
--------------------------
Seymour Grossman, M.D.

</TEXT>
</DOCUMENT>

# EXHIBIT 37

**Martin, Kevin P**

| | |
|---|---|
| **From:** | Collora, Michael [mcollora@dwyercollora.com] |
| **Sent:** | Friday, April 04, 2008 10:40 AM |
| **To:** | Martin, Kevin P |
| **Cc:** | Ryan, Jennifer |
| **Subject:** | Parties Pre Trial Memorandum |
| **Follow Up Flag:** | Review |
| **Flag Status:** | Flagged |
| **Attachments:** | 94424_1.doc |

Kevin: Please review the attached. This is our first shot at what we think should be submitted to the Court, but of course it does not contain your comments. If you agree that the plaintiffs exhibits are admissible as business records under the federal rules referred to in our admissions(aside from the obvious non business ones such as pleadings), then we will resend only those admissions related to other matters. Please advise us also as to what if any of the proposed exhibits you will object to on relevency or any other grounds, and all of the rest of the items can then be marked as trial exhibits, and can just go into evidence. We do not yet have MHubert's permission to drop his portion of the claim and it may be an issue at the hearing. I will further advise you as to that

# EXHIBIT 38

January 24, 1996                Page 1     Profit Sharing Trust: Philosophies

## BASIC PHILOSOPHIES



### The Type of Plan Offered

The MEDITECH Profit Sharing Plan is classified as a defined contribution plan. This means that upon distribution, members will be paid the value of the account established for them under the Plan. Furthermore, the Plan's charter states that all contributions made will be made from the company.

All contributions and all income earned on Plan investments are tax deferred until distribution. This deferral of income tax is an important benefit of the Plan as it allows fast appreciation of its assets. In addition, our plan was designed to hold MEDITECH's common stock, thus giving employees the opportunity to share in the profitability of the company. This opportunity provides employees with direct incentive to be more efficient and productive in order to generate increased profits. The formula which determines the company contribution to members' Trust accounts is based upon a standard percent of the company's operating profits. The presumption is that employees will work harder to generate profits if they know the company has made a commitment to share a part of those profits with them. MEDITECH's Profit Sharing Plan is the company's sole retirement income plan.

### Relationship to MEDITECH Stock

The Trust was intentionally chartered to hold up to 100% of its assets in the MEDITECH's common stock. Typically however, the company's contribution made to the Trust is a combination of stock and cash. At the time the contribution is made, the amount of cash contributed is far greater than the value of the stock that is contributed. However, over time the stock's revaluation has proven to far surpass the value of the cash contributions made and the interest earned on that cash. (Revaluation is the process of determining the current market value.) In actuality, the yearly revaluation of MEDITECH stock consistently results in being the largest portion of the Trust's total asset appreciation (increase in value).

Through membership in the Profit Sharing Trust, employees share in the favorable investment earnings of Plan assets. And, because a significant portion of the Plan's assets are invested in company stock, members are participating to a great extent in the success of the company.

### Commingled Assets vs Individual Accounts

Even though the total value of the Profit Sharing Trust is frequently referred to as being the sum of individual member "accounts", it is important to understand that assets are not segregated for investment purposes. Contributions to the Trust are received, administered, and invested on an aggregated basis by the Plan Trustee. Consequently, the balance in each participant's "account" simply represents a current share of the commingled assets of the Trust. The determination of each participant's share of total Trust assets is made for record keeping purposes as well as for the benefit of members to be aware of the share to which they are entitled.

Confidential-Subject to Protective Order

DEF001251

## OVERVIEW

### What is a Profit Sharing Plan?

A Profit Sharing Plan is a type of plan which allows employers to share company profits with its employees. The primary purpose of any Profit Sharing Plan is to provide income to employees during their retirement.

Like many Profit Sharing Plans, MEDITECH's Plan exists as the company's sole retirement income plan. The Plan provides a means for accumulating substantial amounts of assets that are tax deferred in order to provide a primary source of retirement income.

There is no fixed minimum level of contribution that must be made by the employer. Employer contributions to Profit Sharing Plans are augmented by both the tax deferred investment earnings of plan assets and by the forfeited amounts from partially vested account balances of terminees.

### Asset Appreciation

As stated in the Philosophies section, asset appreciation represents the increase in value of Trust assets. In MEDITECH's Profit Sharing Trust, the most significant portion of asset appreciation comes from the increase in value of MEDITECH stock. Asset appreciation is also represented by dividend income from company stock and by interest income from the cash invested in U.S. Treasuries. One of the primary benefits of any qualified pension plan is that this appeciation occurs unencumbered by taxation, and the compound effect is quite significant. Trust earnings only become taxable to plan members upon distribution of funds.

Trust asset appreciation is allocated to member accounts on an annual basis. Allocation is made only to the accounts of employees who were active members (ie: had an account balance) of the plan at December 31st of the prior plan year. Consequently, any employee who became a member of the Trust during the plan year is not eligible for any allocation of the Trust's asset appreciation.

The allocation of the Trust's asset appreciation is prorated based upon each member's individual account balance at December 31 of the prior year, prorated to the total investment earnings of the Plan for that year. Thus, if an employee's account represents 10% of the total of all account balances, the employee will be credited with 10% of the total amount of asset appreciation. This approach is viewed as the most equitable method for allocating earnings to those who are long-term members of our Plan.

### Annual Contributions to Plan Members

The actual contributions made to member accounts are a combination of company contributions and the forfeited account balances of terminees. The allocation formula for the contribution of these amounts is based upon the ratio of each member's (including newer employees who first became eligible for membership during the year) qualifying compensation for that year compared to the qualifying compensation for the year of all active members of the Plan for the year. Thus, if an employee's total qualifying compensation for the plan year is $20,000 and the total qualifying compensation for all members is $400,000, the employee would

January 24, 1996                    Page 2          *Profit Sharing Trust: Overview*

then be eligible for 5% of the total contribution and forfeiture amount. If the amount of company contributions and terminee forfeitures is equal to $50,000, the employee would receive a contribution of $2500.00.

Qualifying compensation includes all MEDITECH related W2 earnings (salaries, wages, bonuses, and overtime), but excludes any amounts paid prior to a new member's eligibility date. In addition, qualifying compensation is limited to a maximum of $100,000 for the plan year.

## Employee Rights Under ERISA

ERISA is an acronym for Employee Retirement Income Security Act which was enacted in 1974. Under ERISA, plan members are entitled to the following:

1. examine without charge, at Plan Administrator's office, all plan documents and copies of documents filed with the US Department of Labor, such as annual reports and plan descriptions. The information contained on these documents is essentially provided for all employees each year on January 31st.

2. obtain copies of all plan documents and other plan information by writing the Plan Administrator. There may be reasonable charge for the copies.

3. receive a summary of the Plan's annual financial report. The Plan Administrator distributes a copy of this report each year on January 31.

4. obtain a statement telling you whether you would have a right to a vested benefit under the Plan and how much that benefit would be. If you do not have the right to a vested benefit, the statement will tell you how many more years you have to work before you do have a vested benefit. You can write for a benefit statement once a year and the Plan Administrator will provide one free of charge, however the Plan Administrator does provide this statement each year on January 31st.

**Confidential-Subject to Protective Order**

**DEF001253**

January 24, 1996                    Page 1        *Profit Sharing Trust: Guidelines*

## GUIDELINES

### Membership

Employees automatically become members of the Profit Sharing Trust on the first day of the month following one complete year of service. Because the company contribution is based upon earnings during the plan year, for Accounting purposes, entire months' earnings are included as opposed to prorating earnings during the employee's anniversary month.

Employees are not permitted **NOT** to participate in MEDITECH's Profit Sharing Trust.

### Vesting

Vesting is the term used to explain how much of a participant's accrued balance cannot be forfeited should the participant terminate employment with MEDITECH. A vesting schedule provides a gradual entitlement to benefits based upon years of service and, unlike the initial membership date, vesting percentages increase on the employee's actual anniversary date.

MEDITECH's vesting schedule is as follows:

|                    |              |
|--------------------|--------------|
| Less than 2 Years  | 0% Vested    |
| Two Years          | 10% Vested   |
| Three Years        | 30% Vested   |
| Four Years         | 60% Vested   |
| Five Years         | 100% Vested  |

Whatever portion of an employee's account balance that is not vested at the time of termination is redistributed to the accounts of members who are still actively employed by the company at December 31 of the Plan year.

### Beneficiary Designation

Even though employees do not become members of the Profit Sharing Trust until the first of the month following one full year of employment, employees are required to complete a Beneficiary Designation Form upon their start of employment. On the form, employees must designate the person(s) whom they wish to receive the full value of their account balance in the event of their death.

If the employee is married, by law, the primary beneficiary named must be the employee's spouse. If the employee is single and later marries, the spouse automatically becomes the sole beneficiary, unless the spouse gives written consent (witnessed by a notary) for another individual(s) else to be named.

Employees wishing to view or make changes to their Beneficiary Designation Forms may contact the Payroll Department at any time.

Confidential-Subject to Protective Order

### Assignment of Account Balances

Employees may not assign their account balances, nor may they pledge any part of
it as security of a loan (other than a loan from the Trust - see below).
This rule does not prevent the payment of any portion of the account to a spouse,
former spouse, or dependent under a qualified domestic relations order upon
retirement and/or distribution of the account balance.

### Interest Bearing Loans

Employees are permitted to take loans from the Trust.  The maximum amount of the
loan must be the lesser of $50,000 or one half of the employee's vested
account balance.  All loans are made at a reasonable rate of interest and must be
adequately secured (generally by the vested portion remaining in the employee's
account balance).  Loans must be repaid within five years, ~~~~~~~~~~~~~~~~~~~~~~~~
~~~~~~ extended if used in connection with the purchase of a principal residence.~~
It should be noted, however, that the amount of any particular loan, the interest
rate, and the repayment period are determinable by the Trustee.

Loans are generally required to be repaid by payroll deduction, however, if an
account becomes payable (due to termination or retirement) while a loan is
outstanding the Trustee will deduct the loan balance plus interest due from the
employee's account balance upon distribution.

Any employee interested in taking a loan from the Trust must contact Barbara
Manzolillo via an OA message.  Loan applications are to be obtained from Barbara
directly and intentionally are not found in the OA Library.

### Taxability

No income tax is payable by members on amounts credited to their accounts until
such time as a distribution is actually received from the Trust.  If distribution
is due to termination of employment prior to age 60, taxes might be further
deferred by "rolling over" the proceeds into some other form of qualifying plan
such as an "IRA".  However, if proceeds are distributed directly to the former
employee instead of by way of a "Trustee to Trustee" transfer (see below), the
proceeds are then subject not only to 20% Federal and 5.95% Mass mandatory
withholding tax, but to penalty taxes as well.  Taxation and penalties can be
avoided if the employee elects to roll over the vested account balance into a
qualified plan within 60 days.

Membership in the Trust generally disqualifies one from contributing to a
separate Individual Retirement Account on a tax-deductible basis.  There are some
exceptions to this rule depending upon marital status and upon the amount of
adjusted gross income appearing on one's personal income tax return.

### Terminations

Upon termination of employment, the vested portions of terminee account balances
are credited with an interest factor applicable to the period from the preceding
January 1 to the last day of the calendar month that occurs prior to the date of
distribution.

Confidential-Subject to Protective Order

Under the Plan's charter, distributions to terminees are required to be made within 1 year of termination, however distributions typically occur within the first few months following termination.  To ensure that distributions are made promptly, terminees are given 30 days to notify the Trustee of where they would like the proceeds of their accounts to be deposited.   To avoid subjection to Federal and State income taxes, as well as any accompanying penalties that may apply as a result of a direct transfer (as described above), terminees are encouraged to have our Trustee perform a Trustee to Trustee transfer of their account balance.  If terminees are unsure of where they would like their balances to be transferred, it is recommended that they elect a temporary transfer to a qualified bank IRA until the decision can be made where the balance should be placed for the long term.  Once the terminee informs the Trustee of how proceeds should be deposited, the Trustee will take action within 90 days.

### *Supervisor's Role Regarding Terminations*

When an employee with a vested account balance terminates employment, the supervisor should make sure that he/she contacts Barbara Manzolillo directly before the employee departs on his/her final day to ensure that any outstanding issues (ie: loans due to the Trust, rollover options, etc.) are covered.

Confidential-Subject to Protective Order