UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL P. HUBERT, WILLIAM
TRAINOR, and DAVID HINCHLIFFE,

        Plaintiffs,

        v.

MEDICAL INFORMATION TECHNOLOGY,
INC. PROFIT SHARING PLAN, MEDICAL
INFORMATION TECHNOLOGY, INC., and
A. NEIL PAPPALARDO,

        Defendants.

Civil Action No. 05-10269RWZ

## DEFENDANTS' PRETRIAL MEMORANDUM

Defendants Medical Information Technology, Inc, ("Meditech" or the "Company") the Medical Information Technology, Inc. Profit Sharing Plan (the "Plan") and A. Neil Pappalardo, hereby submit this Pretrial Memorandum pursuant to the Court's Order of March 20, 2008.

In preparing this pretrial memorandum, Defendants have been materially prejudiced by three last-minute motions filed by Plaintiffs. First, this case has been proceeding as an individual action by the three Plaintiffs since this Court denied Plaintiffs' class certification motion on March 20, 2007. More than one year later, however, on March 25, 2008, Plaintiffs unexpectedly filed an "Amended Motion for Class Certification," seeking certification of a class of all individuals who received a distribution of benefits under the Plan in 1998. Defendants have opposed the "amended" class certification motion on the bases, *inter alia*, that it is tardy under the Rules of Civil Procedure and this Court's scheduling orders; that it fails to address the class-conflict grounds given by this Court in denying Plaintiffs' first motion for class certification; and that the proposed class representatives, plaintiffs Hinchliffe and Trainor, as well as proposed

class counsel, are inadequate representatives under the Rules. If, however, the "amended" motion for class certification were to be granted, Defendants would need the opportunity not only to take discovery concerning the absent class members, but to have their expert witnesses opine on the claims of those class members and, as appropriate, to move for summary judgment against those class members. As a consequence, any pretrial memorandum submitted in a case in which a class has been certified and this additional discovery taken necessarily would look very different than this pretrial memorandum.

Second, on April 17, 2008, Plaintiffs filed a motion to voluntarily dismiss the claim of plaintiff Hubert without prejudice, a motion that contains no explanation why this drastic step should be permitted three years into this litigation, on the eve of the pretrial conference and with a summary judgment motion from Defendants pending. Defendants intend to oppose this motion to dismiss as improper under the rules, prejudicial to Defendants, and frivolous because it provides no reason why Hubert's claim should be dismissed without prejudice after three years of proceedings and discovery and Defendants are (for the reasons given in their motion for summary judgment) entitled to judgment in this case. In the meantime, and again, a pretrial memorandum in a case in which Hubert has been dismissed (either with or without prejudice) would look very different than one in which Hubert is still a Plaintiff.

Third, Plaintiffs have informed us that they intend to move the Court for leave to submit a "rebuttal" expert report, potentially from a different expert. Defendants would oppose any such motion, as the Court's scheduling order has never provided for Plaintiffs' submission of rebuttal expert testimony. If, however, Plaintiffs were to file such a motion and the Court were to grant it, then Defendants would need the opportunity potentially to submit their own rebuttal expert testimony and to take additional discovery. Any new expert testimony would also require

that Defendants submit a new pretrial memorandum, as the additional expert testimony would undoubtedly raise additional issues of fact and law, require the identification of additional witnesses and documents, and necessitate that Defendants supplement the summary of the evidence herein.

Until the issue of Plaintiffs' "amended" motion for class certification, Plaintiffs' motion to dismiss Hubert's claim, and Plaintiffs' nascent motion for leave to file a "rebuttal" expert all have been resolved, any pretrial memorandum cannot be regarded as anything more than provisional (and, Defendants would submit, ultimately unnecessary, as Defendants are entitled to summary judgment for the reasons given in their motion filed on April 18, 2008). This pretrial memorandum addresses the case as it currently stands, with all three Plaintiffs proceeding on their individual claims, not as a class action. Defendants respectfully reserve the right, should the Court make any rulings that change this posture, to submit a new pretrial memorandum (after, in the event that the Court were to grant class certification, additional fact discovery and expert discovery takes place concerning the claims of absent class members).

## (1)    <u>DEFENDANTS' SUMMARY OF THE EVIDENCE</u>

Meditech established the Plan as a retirement vehicle for its employees in 1973. By its terms, the Plan is designed to invest substantially in Meditech's non-publicly traded stock to enable employees to share in the growth of the company. In this the Plan has been a success, making millionaires of many employees including two of the three Plaintiffs, all three of whom received at least $900,000 from the trust ("Trust") established under the Plan to hold voluntary stock and cash contributions from Meditech. Many employees, including each of the three Plaintiffs, each have also made hundreds of thousands of dollars by personally purchasing

Meditech stock from the Company, receiving large annual dividends on the stock, and then selling the stock to the Trust at appreciated values.

The Plaintiffs have the burden of proving that the Defendants violated the law. The Plaintiffs cannot and will not meet that burden. Under the Plan, Meditech is not required to make any contributions to the Trust, but has the option each year of voluntarily contributing cash and stock. The number of shares contributed each year by Meditech to the Trust depends upon the overall dollar contribution (if any) Meditech's board wants to make to the Trust that year, the amount of that contribution the Board wants to be in stock, and the per share value the Board determines for Meditech's non-publicly traded stock. Under this mechanism, if the Board had been undervaluing the stock, as Plaintiffs allege, it would also have been contributing more shares than necessary or authorized to make up the stock component of the overall contribution; the Trust would have received "too much" stock.

In light of this fact, the Court already has held that Plaintiffs cannot establish that they were denied benefits by Defendants' valuation method unless Plaintiffs use their same alternate valuation method – even if such a method was correct, which it is not – to revalue the stock for each year they were in the Plan, to see what the effect of the different valuations would be on the number of shares and amount of cash held by the Trust. Plaintiffs did not have their putative valuation expert do this, and thus they have provided no evidence of what effect their alternate valuation method would have on the Trust and their own receipt of benefits from the Trust. Thus Plaintiffs, who have the burden of proof, have not met that burden, and cannot prevail on any of the claims.

The evidence will show that Plaintiffs have failed to meet their burden of proving that Defendants were undervaluing the "fair market value" of Meditech stock. The record is devoid

4

of any transactions in Meditech stock, or even offers to buy the stock, at the valuations Plaintiffs, in hindsight, assert represent the fair *market* value of the stock. Conversely, the record will show that Hinchliffe and Trainor each voluntarily sold their own stock to the Trust in 1998 at the price they now claim does not reflect the market value of the stock. The record will also show that sophisticated investors, such as private equity funds, and even members of Meditech's board have also been willing to sell their stock at the values determined by Defendants. As demonstrated by Defendants' valuation experts, Rick Nathan and Chris Barry, the report tendered by Plaintiffs' putative expert suffers from numerous methodological errors that, if corrected, would reduce its value estimate to *below* that determined by Defendants.

The evidence will also show that Plaintiffs have failed to meet their burden of demonstrating that the Trustee acted arbitrarily and capriciously in determining the value each year of Meditech stock. The evidence will show that in determining that value the Trustee considered numerous factors including primarily the dividend being paid on Meditech stock, a well-accepted method of stock valuation known as the dividend discount model. The Trustee also considered Meditech's earnings per share and book value per share; Meditech's expected earnings in the coming year; the prior year's valuation and the number of shares offered by Meditech to, and actually purchased by, Meditech's officers and employees at that price; the number of shares purchased by the Trust from employees over the prior year and at what prices; the price at which Meditech stock changed hands in other transactions, such as sales by private equity funds, other sophisticated outside investors, and Meditech board members; and the fact that the Trust had previously passed audits by both the United States Department of Labor and the United States Internal Revenue Service. Notably, Plaintiffs failed to place much of this

highly relevant information, such as the purchases and sales involving sophisticated outside investors, in front of their own putative expert.

The evidence will show that the claims of Hinchliffe and Trainor, who received their benefits from the Trust in 1998, more than six years before the Complaint was filed in 2005, are barred by the six-year statute of limitations the Court held is applicable to Plaintiffs' benefits claim.[1] Each of these plaintiffs believed that Meditech stock was being undervalued at the latest by 1996, more than six years before the Complaint was filed in 2005. And, even if they did not, the Amended Complaint relies solely on a comparison of Meditech's price-to-earnings ratio to that of a Meditech competitor. The evidence will show that Hinchliffe and Trainor could have performed those simply comparisons from information readily available to them more than six years before the Complaint was filed, a simple calculation that plaintiff Hubert had been performing since the 1980s. Thus, Plaintiffs could have discovered, through the exercise of reasonable diligence, the claim brought in this case more than six years before the Complaint was filed.

The evidence will show that none of the Plaintiffs exhausted his claim before this lawsuit was filed, as required under ERISA. The Plaintiffs all received Summary Plan Descriptions explaining that any claim for additional benefits should be filed in writing with the Trust, but no Plaintiff did so.

Finally, the evidence will demonstrate that Plaintiffs' claims also are barred by equitable doctrines such as unclean hands, estoppel, and laches. Each of the Plaintiffs believed that Meditech stock was being undervalued by at 1996 at the latest, but they continued accepting

---

[1]    Defendants argued in their motions to dismiss, and continue to believe, that the appropriate limitations periods is three years, not six, but for purposes of Hinchliffe and Trainor the difference should be immaterial. To the extent necessary, however, Defendants intend to press the three-year limitations period.

contributions of stock to the Trust and purchasing stock from Meditech at the "too low" values without saying or doing anything. Hubert also attempted, in exchange for a multi-million dollar payoff, to sell confidential Meditech information to a third-party engaged in a dispute with the Company over the stock price.

**(2)    FACTS ESTABLISHED BY PLEADINGS AND BY STIPULATION**

For a list of facts to which Plaintiffs have agreed to stipulate, *see* Exhibit A hereto.

**(3)    CONTESTED ISSUES OF FACT**

1.    Whether the Trustee acted arbitrarily and capriciously in determining values for Meditech stock during the life of the Trust.

2.    Whether the value determined by the Trustee for Meditech stock as of December 31, 1997 and/or December 31, 2003 was less than the fair market value of the stock, and if so by how much.

3.    Whether, even if the Trustee's valuation methodology did undervalue Meditech stock as of December 31, 1997, and/or December 31, 2003, Plaintiffs received any less in benefits from the Trust than they were due.

4.    Whether Plaintiffs Hinchliffe and Trainor knew, or in the alternative could have learned through the exercise of reasonable diligence, that Meditech stock was being undervalued under the theory alleged in the Amended Complaint more than 6 years before the Complaint was filed in February 2005.

5.    Whether Plaintiffs failed to comply with the Plan's administrative claims procedure.

**(4)    JURISDICTIONAL QUESTIONS**

None

**(5)    DEFENDANTS' PENDING MOTIONS**

1.    Whether Defendants are entitled to summary judgment on the claims of all three Plaintiffs.

**(6)    DEFENDANTS' ISSUES OF LAW**

1.    Whether the decisions of the Trustee in valuing Meditech stock are entitled to be reviewed under the arbitrary and capricious standard normally applicable to benefits decisions made by an ERISA trustee. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989); *Winninger v. Wilcox Fuel, Inc.*, 2004 WL 97626 (D.Conn. 2004); *Giannone v. Metropolitan Life Ins. Co.*, 311 F.Supp.2d 168, 176 (D. Mass. 2004) (Stearns, J.).

2.    Whether the Trustee is entitled to utilize a valuation methodology that avoids volatility benefiting one group of beneficiaries at the expense of others. *See Foltz v. U.S. News & World Report, Inc.*, 663 F.Supp. 1494, 1533–34 (D.D.C. 1987), aff'd, 865 F.2d 364 (D.C. Cir. 1989); *Jasper v. M.H. & B.L. Jasper D.D.S., P.C. Profit Sharing Trust*, 340 F.Supp.2d 1017 (E.D. Mo. 2004).

3.    Whether Plaintiffs were required to comply with the Plan's claim procedure as described in the summary plan description before filing suit. *See Terry v. Bayer Corp.*, 145 F.3d 28 (1st Cir. 1998); *Davenport v. Harry N. Abrams, Inc.*, 249 F.3d 130, 132-33 (2d Cir. 2001).

4.    Whether only the Plan will be liable for a judgment, if any, in this case. *See, e.g., Brandon v. Aetna Servs., Inc.*, 156 F.Supp.2d 167, 171 (D. Conn. 2000).

5.    Whether Plaintiffs' claims are subject to the equitable defense of laches. *See Teamsters & Employers Welfare Trust of Illinois v. Gorman Brothers Ready Mix*, 283 F.3d 877,

883 (7th Cir. 2002); *Preston v. Am. Fed. of Television & Radio Artists*, 2002 WL 1009458, at *3 (S.D.N.Y. 2002).

6.     Whether Hinchliffe's and Trainor's claims are barred by the statute of limitations where Hinchliffe and Trainor testified that they believed the stock was undervalued more than six years before the Complaint in this action was filed, and, in the alternative, all of the information relevant to their claims was provided to these Plaintiffs by Defendants and/or publicly available more than six years before the Complaint was filed. *See, e.g., Union Pacific R. Co. v. Beckham*, 138 F.3d 325, 330 (8th Cir. 1998); *Knight & Co., Inc. v. Watson Wyatt & Co.*, 170 F.3d 210 (1st Cir. 1999); *Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H & Co. KG*, 510 F.3d 77, 91 (1st Cir. 2007); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 423 (S.D.N.Y. 2003); *Cole v. Cox*, 41 Fed. Appx. 826, 2002 WL 1832722, *1 (6th Cir 2002); *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1258 (1st Cir. 1996).

7.     Whether, under the facts of this case, the absence of any expert support for Hubert's claim requires entry of judgment for Defendants. *See, e.g., Imperial Credit Indus., Inc. v. Securities Litig.*, 252 F. Supp. 2d 1005, 1012-1014 (C.D. Cal. 2003); *see also Cotton v. Washington Metro. Area Transp. Auth.*, 2004 WL 473658, *7 (D.D.C. 2004); *Plymouth Rubber Co. v. Uniroyal, Inc.*, 1992 WL 93223, *7 & n.5 (D. Mass. 1992).

8.     Whether the "Reilly Report" – an expert report commissioned by a different plaintiff in a separate state court case, from an expert not retained in this case – is admissible in support of Hubert's claim. *See, e.g., Stock v. Integrated Health Plan, Inc.*, 2007 WL 2304055, *1 (N.D. Ill. 2007).

9.      Whether the putative expert report of Daniel Van Vleet submitted by Plaintiffs in this action complies with Fed. R. Civ. P. 26(a)(2), with the requirements of the Federal Rules of Evidence, and with precedent concerning the necessary reliability of expert opinions. *See Kumhoe Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

**(7)    ANY REQUESTED AMENDMENTS TO THE PLEADINGS**

None

**(8)    ANY ADDITIONAL MATTERS TO AID IN THE DISPOSITION OF THE ACTION**

None.

**(9)    PROBABLE LENGTH OF TRIAL**

Defendants anticipate at least a ten-day non-jury trial.

**(10)    DEFENDANTS' WITNESSES**

Defendants anticipate calling the following witnesses at trial:

1.      Plaintiff David Hinchliffe, 13 Newsome Park, Jamaica Plain, MA 02130 – Defendants anticipate calling Plaintiff Hinchliffe as an adverse witness.  Hinchliffe will testify concerning the information provided by Meditech and the Plan each year to employees and Plan participants, such as Hinchliffe, concerning the valuation of the Trust's assets, the amount of his Trust account, and the financial status of Meditech's business.  Hinchliffe will testify that he believed Meditech stock was undervalued more than 6 years before the Complaint was filed in 2005, and that while he received Plan documents stating that a claim for additional benefits could be filed with the Trust, he never did so.  He will testify that he purchased Meditech stock from the Company, made hundreds of thousands of dollars doing so, and voluntarily sold some back

to the Trust at $13.50 in 1998, the price he now claims did not fairly represent the "market" price for the stock that year. Hinchliffe will further testify that he received more than $1 million from the Trust despite not contributing any money to it.

2.      Plaintiff William Trainor, 485 West Street, Wrentham, MA 02093 – Defendants anticipate calling Plaintiff Trainor as an adverse witness. Trainor will testify concerning the information provided by Meditech and the Plan each year to employees and Plan participants, such as Trainor, concerning the valuation of the Trust's assets, the amount of his Trust account, and the financial status of Meditech's business. Trainor will also that he believed Meditech stock was undervalued more than 6 years before the Complaint was filed in 2005, and that while he received Plan documents stating that a claim for additional benefits could be filed with the Trust, he never did so. He will testify that he purchased Meditech stock from the Company, made hundreds of thousands of dollars doing so, and voluntarily sold some back to the Trust at $13.50 in 1998, the price he now claims did not fairly represent the "market" price for the stock that year. And Trainor will testify that he received more than $900,000 from the Trust despite not contributing any money to it.

3.      Plaintiff Michael Hubert, 48 Narragansett Road, Quincy, MA 02169 – Defendants anticipate calling Plaintiff Hubert as an adverse witness. Hubert will testify concerning the information provided by Meditech and the Plan each year to employees and Plan participants, such as Hubert, the valuation of the Trust's assets, the amount of his Trust account, and the financial status of Meditech's business. Hubert will testify that he believed Meditech stock was undervalued more than 6 years before the Complaint was filed in 2005, and in and around April 1998 performed the very comparisons using publicly-available information between Meditech's price-earnings ratio and that of Meditech's competitors that the Complaint alleges "demonstrate"

that Meditech stock is undervalued. He will testify that in 1999 he unsuccessfully wrote and spoke to numerous politicians and government officials seeking legislative changes and investigations relevant to the valuation of Meditech stock. He will also testify that in February 2002 he anonymously sent an email to numerous counsel, including at Dwyer & Collora, to bring a lawsuit against Meditech over the very alleged undervaluation of Meditech stock at issue here. Hubert will testify that later in 2002 he sought, with the assistance of Plaintiffs' counsel Michael Collora, to sell confidential Meditech information to a third-party engaged in a dispute with Meditech for a personal payout in the millions of dollars. And he will testify that he never filed a claim with the Trust seeking additional benefits in the amount sought in this case. Hubert will testify that he purchased Meditech stock from the Company, made hundreds of thousands of dollars doing so, and continues to hold hundreds of thousands of dollars of the stock because he believes there is no better investment out there. And he will testify that he repeatedly has used Defendants' valuations for Meditech stock to his benefit, for example in negotiating a divorce settlement with his ex-wife and in filling out his children's college financial aid applications. Hubert will further testify that he received more than $1 million from the Trust despite not contributing any money to it.

    4.    Michael Collora, Dwyer & Collora, 600 Atlantic Ave,, Boston, MA 02110 – Plaintiffs' counsel Michael Collora will testify concerning Hubert's effort to sell confidential Meditech information to a third party engaged in a dispute with Meditech.

    5.    A. Neil Pappalardo, 10 Rowes Wharf, Boston, MA 02110 – Defendant Pappalardo will testify concerning the history of Meditech and of the Plan, and how the Company's voluntary contributions to the Plan and sales of shares by Meditech to employees have made millionaires of many employees, including each of the Plaintiffs. He will testify as to

how stock is valued in good faith by the Board of Directors each October and by him as Trustee of the Plan. He will explain that if the Company had used the valuation methodology favored by Plaintiffs the Company never would have contributed the number of shares it did to the Trust, and that the volatility seen in Plaintiffs method would be detrimental to many employees, participants, future participants, and the company, and hence to all participants. Pappalardo will testify that the culture of employee ownership fostered by the Plan, employee stock purchases, and a non-volatile valuation method has been to the long-term benefit of shareholders and employees alike, including participants in the Plan. He will testify that there has never been a market for Meditech stock at the prices sought by Plaintiffs. And he will testify concerning challenges facing Meditech's business in the mid-to-late 1990s.

6.     Barbara Manzolillo, 43 Mount Vernon Street, Boston, MA 02108 – Meditech's CFO Barbara Manzolillo will testify that no Plaintiff filed any claim with the Trust for the additional benefits they now seek in this lawsuit. She will also testify concerning the wealth of information concerning the Plan and Trust that was made available to Plan participants, including each of the Plaintiffs, on an annual basis. And she will testify concerning the assets held by the Trust, the operation of the Trust, and concerning Meditech's finances.

7.     Edward Roberts, 300 Boylston Street, Boston, MA 02116 – Meditech board member Edward Roberts will explain the Board's methodology for valuing Meditech stock and the manner in which contributions from the Company to the Trust are determined. He will also testify that there has never been a market for Meditech stock at the prices sought by Plaintiffs.

8.     Roland Driscoll, 20 Colby Road, Braintree, MA 02184 – Meditech board member Roland Driscoll will explain the Board's methodology for valuing Meditech stock and the manner in which contributions from the Company to the Trust are determined.

9. Howard Messing, 41 Martingale Lane, Westwood, MA 02090 – Meditech President Howard Messing will testify concerning the termination of Hubert for offering to sell confidential company information to a third party engaged in a dispute with Meditech. He = will also testify concerning challenges facing Meditech's business in the mid-to-late 1990s.

10. Rick Nathan, Trenworth Group LLC, 233 N. Michigan Avenue, Suite 2500, Chicago, IL 60601 – Defendants' valuation expert Rick Nathan will testify concerning errors in Plaintiffs' putative expert's report that, if corrected, would lower the value estimate of that report to below that determined by Defendants. He will also testify that the Defendants' valuation methodology is reasonable.

11. Chris Barry, PricewaterhouseCoopers LLC, 125 High Street, Boston, MA 02110 -- Defendants' valuation expert Chris Barry will testify concerning errors in Plaintiffs' putative expert's report that, if corrected, would lower the value estimate of that report to below that determined by Defendants. He will testify that the Defendants' valuation methodology is reasonable. He will also testify concerning the returns earned by Plaintiffs on their personal holdings of Meditech stock and on their Trust account balances. Barry will testify that if Plaintiffs' valuation methodology had been used Plaintiffs may have received less than they actually did in benefits due to the adverse effect that methodology would have on the Trust's holdings of cash and government Treasuries.

12. Charles Wheeler, Jr. – PricewaterhouseCoopers LLP, Suite 1800, 2001 Ross Avenue, Dallas, TX 75201 – Defendants' compensation expert Charles Wheeler will testify that the compensation earned by Meditech's CEO and Trustee Neil Pappalardo was reasonable, and that his compensation package, including stock purchases from the Company, is not indicative of the conflicts of interest alleged by Plaintiffs.

13.    L.P. Dan Valente, 44 Concord Road, Weston, MA 02493.   Meditech board member L.P. Dan Valente will explain the Board's methodology for valuing Meditech stock and the manner in which contributions from the Company to the Trust are determined.

14.    Howard Cox, Jr., Greylock Management Corp., 880 Winter Street, Suite 300, Waltham, MA 02451.   Howard Cox, a representative of Meditech investor Greylock Management, will testify concerning purchases and sales of Meditech stock by Greylock and affiliated entities.

15.    Alan Bufferd, Massachusetts Institute of Technology, 238 Main Street, Suite 200, Cambridge, MA 02142.  Alan Bufferd, formerly of MIT, will testify concerning purchases of Meditech stock by MIT.

16.    John Carroll, Summit Partners, 222 Berkley St., 18th Floor, Boston, MA 02116. John Carroll of Summit Partners will testifying concerning purchases of MIT stock by Summit Partners.

17.    David S. B. Lang, Advisor, John Hancock Tower, 56th Floor, 200 Clarendon Street, Boston, MA 02116.  David Lang of TA Associates will testify concerning TA's analysis of a potential purchase of Meditech stock.

## (11)    DEFENDANTS' PROPOSED EXHIBITS

### PLEADINGS

| Exhibit No. | Description | Bates No./Deposition Exhibit | Plaintiffs Reserved Right to Object? |
|---|---|---|---|
| | Amended Class Action Complaint and Demand for Trial | | X |
| | Plaintiffs' Response to Defendants' First Set of Interrogatories | | |

| | Plaintiffs' Supplemental Responses to Defendants' Second Set of Interrogatories | | |
|---|---|---|---|

## DEPOSITION TRANSCRIPTS AND VIDEOS

| Exhibit No. | Description | Bates No./Deposition Exhibit | Plaintiffs Reserved Right to Object? |
|---|---|---|---|
| | Deposition of David Hinchliffe, dated July 27, 2006 | | |
| | Deposition of Michael P. Hubert, dated July 26, 2006 | | |
| | Deposition of Michael P. Hubert in *Grossman v. Medical Information Technology, Inc. et al.*, No. 03-1872-BLS2 (Mass. Super.) | | |
| | Deposition of William Trainor, dated July 24, 2006 | | |
| | Deposition of Jerome H. Grossman, dated February 21, 2008 | | |
| | Deposition of Jerome H. Grossman, dated May 5, 2005, in *Grossman v. Medical Information Technology, Inc. et al.*, No. 03-1872-BLS2 (Mass. Super.) | | |
| | Deposition of Jerome H. Grossman, dated May 17, 2005, in *Grossman v. Medical Information Technology, Inc. et al.*, No. 03-1872-BLS2 (Mass. Super.) | | |
| | Deposition of Jerome H. Grossman, dated July 8, 2005, in *Grossman v. Medical Information Technology, Inc. et al.*, No. 03-1872-BLS2 (Mass. Super.) | | |

## PLAN DOCUMENTS

| Exhibit No. | Description | Bates No./Deposition Exhibit | Plaintiffs Reserved Right to Object? |
|---|---|---|---|
| | Medical Information Technology, Inc. Profit Sharing Plan Amended and Restated Trust Agreement as of January 1, 1989, including amendments | DEF000001 *et seq.* | |

16

| | | |
|---|---|---|
| Medical Information Technology, Inc. Profit Sharing Plan Amended and Restated Trust Agreement as of January 1, 1998, including amendments through December 15, 2005 | DEF000084 *et seq.;* DEF 13494-DEF13497 | |
| Summary Plan Description of the Medical Information Technology, Inc. Profit Sharing Plan, as amended through August 1, 1983 | HUB052 *et seq.* | |
| Summary Plan Description of the Medical Information Technology, Inc. Profit Sharing Plan, Plan Amended and Restated as of January 1, 1989 | DEF001524 *et seq.* | |
| Summary Plan Description of the Medical Information Technology, Inc. Profit Sharing Plan, January 1, 1998 | HUB001 *et seq.* | |
| Statement of Stock Ownership, Medical Information Technology, Inc. Profit Sharing Trust | DEF001015 *et seq.* | X |
| Profit Sharing Trust:  Philosophies, January 24, 1996 | DEF001251 *et seq.* | |
| Profit Sharing Trust:  Philosophies, May 5, 1999 | DEF001257 *et seq.* | X |
| Profit Sharing Trust Philosophies, 4/16/03 | DEF001268 *et seq.* | X |
| Profit Sharing Trust | DEF001274 *et seq.* | X |
| Profit Sharing Trust | DEF001279 *et seq.* | X |
| Annual Valuation of the Trust's Assets, December 31, 1996 | DEF001337 *et seq.* | |
| Annual Valuation of the Trust's Assets, January 2, 1998 | DEF001333 *et seq.* | |
| Annual Valuation of the Trust's Assets, January 5, 1999 | DEF001329 *et seq.* | X |
| Annual Valuation of the Trust's Assets, January 5, 2000 | DEF001326 *et seq.* | X |
| Annual Valuation of the Trust's Assets, December 29, 2000 | DEF001321 *et seq.* | X |

| | | | |
|---|---|---|---|
| | Annual Valuation of the Trust's Assets, December 31, 2001 | DEF001316 *et seq.* | X |
| | Annual Valuation of the Trust's Assets, March 3, 2003 | DEF001313 *et seq.* | X |
| | Annual Valuation of the Trust's Assets, January 26, 2004 | DEF001309 *et seq.* | X |
| | Annual Valuation of the Trust's Assets, January 24, 2005 | DEF001305 *et seq.* | X |
| | Annual Valuation of the Trust's Assets, January 23, 2006 | DEF001301 *et seq.* | X |
| | Sample year-end compensation package, January 31, 1997 | DEF001388-DEF001395 | |
| | Sample year-end compensation package, January 30, 1998 | DEF001396-DEF001405 | |
| | Sample year-end compensation package, January 30, 2004 | DEF001473-DEF001486 | X |
| | Medical Information Technology, Inc. Profit Sharing Trust Financial Report for Calendar Year 1994 | HUB073 *et seq.* | |
| | Medical Information Technology, Inc. Profit Sharing Trust Financial Report for Calendar Year 1995 | HUB075 *et seq.* | |
| | Medical Information Technology, Inc. Profit Sharing Trust Financial Report for Calendar Year 1996 | HUB077 *et seq.* | |
| | Meditech Profit Sharing Trust Financial Report for 1997 | HUB079 | |
| | Meditech Profit Sharing Trust Financial Report for 1998 | HUB080 | |
| | Profit Sharing Trust Financial Report | HUB095 *et seq.* | X |
| | Profit Sharing Trust Financial Report | HUB116 *et seq.* | X |
| | Profit Sharing Trust Financial Report | HUB 144 | X |
| | Medical Information Technology, Inc. Profit Sharing Plan Trust Financial Report | DEF001293 *et seq.* | X |
| | Medical Information Technology, Inc. Profit Sharing Plan Trust Financial Report | DEF001291 *et seq.* | X |

| | Meditech Profit Sharing Trust Financial Report for 2004 | | X |

## TRUST AUDIT DOCUMENTS

| Exhibit No. | Description | Bates No./Deposition Exhibit | Plaintiffs Reserved Right to Object? |
|---|---|---|---|
| | Arthur Andersen, Meditech Information Technology, Inc. Profit Sharing Trust, Financial Statements and Schedules as of December 31, 1995 and 1996, Together with Auditor's Report | DEF006990 *et seq.* | |
| | Arthur Andersen, Meditech Information Technology, Inc. Profit Sharing Trust, Financial Statements and Schedules as of December 31, 1996 and 1997, Together with Auditor's Report | DEF007002 *et seq.* | |
| | Arthur Andersen, Meditech Information Technology, Inc. Profit Sharing Trust, Financial Statements and Schedules as of December 31, 1997 and 1998, Together with Auditor's Report | DEF007013 *et seq.* | |
| | Arthur Andersen, Meditech Information Technology, Inc. Profit Sharing Trust, Financial Statements and Schedules as of December 31, 1998 and 1999, Together with Auditor's Report | DEF007025 *et seq.* | X |
| | Arthur Andersen, Meditech Information Technology, Inc. Profit Sharing Trust, Financial Statements and Schedules as of December 31, 1999 and 2000, Together with Auditor's Report | DEF007034 *et seq.* | X |
| | Arthur Andersen, Meditech Information Technology, Inc. Profit Sharing Trust, Financial Statements and Schedules as of December 31, 1999 and 2000, Together with Auditor's Report | HUB097 | X |
| | Arthur Andersen, Meditech Information Technology, Inc. Profit Sharing Trust, Financial Statements and Schedules as of December 31, 2000 and 2001, Together with | DEF007043 *et seq.* | X |

| | Auditor's Report | | |
|---|---|---|---|
| | Ernst & Young, Financial Statements and Supplemental Schedules, Medical Information Technology, Inc. Profit Sharing Plan Years ended December 31, 2001 and 2002 | DEF007052 *et seq.* | X |
| | Ernst & Young, Financial Statements and Supplemental Schedules, Medical Information Technology, Inc. Profit Sharing Plan Years ended December 31, 2001 and 2002 | DEF007065 *et seq.* | X |
| | Ernst & Young, Financial Statements and Supplemental Schedules, Medical Information Technology, Inc. Profit Sharing Plan Years ended December 31, 2001 and 2002 | DEF007078 *et seq.* | X |
| | Ernst & Young, Financial Statements and Supplemental Schedules, Medical Information Technology, Inc. Profit Sharing Plan Years ended December 31, 2001 and 2002 | DEF007091 *et seq.* | X |
| | Letter, U.S. Department of Labor to Plan Trustee, November 28, 1990 | DEF001179 *et seq.* | |
| | Letter, U.S. Department of Labor to A. Neil Pappalardo, September 4, 1991 | DEF001169 *et seq.* | |
| | Letter, Barbara Manzolillo to U.S. Department of Labor, September 17, 1991 | DEF001173 | |
| | Letter, Barbara Manzolillo to U.S. Department of Labor, November 13, 1991 | DEF001174 *et seq.* | |
| | Letter, U.S. Department of Labor to A. Neil Pappalardo, January 30, 1992 | DEF001177 | |
| | Letter, U.S. Department of Labor to Medical Information Technology, Inc. Profit Sharing Plan, February 23, 2001 | DEF001216 | X |

## BOARD OF DIRECTORS REPORTS AND MINUTES

| Exhibit No. | Description | Bates No./Deposition Exhibit | Plaintiffs Reserved Right to Object? |
|---|---|---|---|
| | Minutes of a Regular Meeting of the Board of Directors, December 3, 1973 | DEF004554 | |

| | | | |
|---|---|---|---|
| | Consent in Lieu of Meeting of the Board of Directors dated December 31, 1974 | DEF004576 | |
| | Minutes of a Regular Meeting of the Board of Directors dated November 24, 1975 | DEF004619 | |
| | Board of Directors Minutes dated October 24, 1977 | DEF004642 | |
| | Minutes of a Regular Meeting of the Board of Directors dated October 24, 1977 | DEF004640 | |
| | Report to the Board of Directors, Quarter Ended September 30, 1995, Board of Directors Meeting October 23, 1995, Medical Information Technology, Inc. | DEF000289 *et seq.* | |
| | Report to the Board of Directors, Quarter Ended September 30, 1996, Board of Directors Meeting October 28, 1996, Medical Information Technology, Inc. | DEF000502 *et seq.* | |
| | Report to the Board of Directors, Quarter Ended September 30, 1997, Board of Directors Meeting October 27, 1997, Medical Information Technology, Inc. | DEF002840 *et seq.* | |
| | Report to the Board of Directors, Quarter Ended September 30, 1998, Board of Directors Meeting October 26, 1998, Medical Information Technology, Inc. | DEF002618 *et seq.* | X |
| | Report to the Board of Directors, Quarter Ended September 30, 1999, Board of Directors Meeting October 25, 1999, Medical Information Technology, Inc. | DEF002399 *et seq.* | X |
| | Report to the Board of Directors, Quarter Ended September 30, 2000, Board of Directors Meeting October 30, 2000, Medical Information Technology, Inc. | DEF002171 *et seq.* | X |
| | Report to the Board of Directors, Quarter Ended September 30, 2001, Board of Directors Meeting October 22, 2001, Medical Information Technology, Inc. | DEF001918 *et seq.* | X |
| | Report to the Board of Directors, Quarter Ended September 30, 2002, Board of Directors Meeting October 28, 2002, Medical Information Technology, Inc. | DEF001670 *et seq.* | X |

| | | | |
|---|---|---|---|
| | Report to the Board of Directors, Quarter Ended September 30, 2003, Board of Directors Meeting October 27, 2003, Medical Information Technology, Inc. | DEF003001 *et seq.* | X |
| | Report to the Board of Directors, Quarter Ended September 30, 2004, Board of Directors Meeting October 25, 2004, Medical Information Technology, Inc. | DEF003236 *et seq.* | X |
| | Report to the Board of Directors, Quarter Ended September 30, 2005, Board of Directors Meeting October 24, 2005, Medical Information Technology, Inc. | DEF003463 *et seq.* | X |
| | Report to the Board of Directors, Quarter Ended December 31, 1995, Board of Directors Meeting October January 22, 1996, Medical Information Technology, Inc. | DEF000334 *et seq.* | |
| | Report to the Board of Directors, Quarter Ended March 31, 1996, Board of Directors Meeting April 22, 1996, Medical Information Technology, Inc. | DEF000391 *et seq.* | |
| | Report to the Board of Directors, Quarter Ended June 30, 1996, Board of Directors Meeting July 22, 1996, Medical Information Technology, Inc. | DEF000456 *et seq.* | |
| | Report to the Board of Directors, Quarter Ended December 31, 1996, Board of Directors Meeting January 27, 1996 [sic], Medical Information Technology, Inc. | DEF003535 *et seq.* | |
| | Report to the Board of Directors, Quarter Ended December 31, 1999, Board of Directors Meeting January 24, 2000, Medical Information Technology, Inc. | DEF002330 *et seq.* | X |
| | Report to the Board of Directors, Quarter Ended December 31, 2000, Board of Directors Meeting January 22, 2001, Medical Information Technology, Inc. | DEF002111 *et seq.* | X |
| | Report to the Board of Directors, Quarter Ended June 30, 2001, Board of Directors Meeting July 23, 2001, Medical Information Technology, Inc. | DEF001974 *et seq.* | X |

| | Report to the Board of Directors, Quarter Ended December 31, 2001, Board of Directors Meeting January 28, 2002, Medical Information Technology, Inc. | DEF001848 *et seq.* | X |
|---|---|---|---|
| | Report to the Board of Directors, Quarter Ended March 31, 2002, Board of Directors Meeting April 22, 2002, Medical Information Technology, Inc. | DEF001780 *et seq.* | X |
| | Report to the Board of Directors, Quarter Ended June 30, 2002, Board of Directors Meeting July 22, 2002, Medical Information Technology, Inc. | DEF001734 *et seq.* | X |
| | Report to the Board of Directors, Quarter Ended December 31, 2002, Board of Directors Meeting January 27, 2003, Medical Information Technology, Inc. | DEF001625 *et seq.* | X |
| | Report to the Board of Directors, Quarter Ended March 31, 2003, Board of Directors Meeting April 28, 2003, Medical Information Technology, Inc. | DEF001584 *et seq.* | X |

## MEDICAL INFORMATION TECHNOLOGY, INC. SEC FILINGS

| Exhibit No. | Description | Bates No./Deposition Exhibit | Plaintiffs Reserved Right to Object? |
|---|---|---|---|
| | Medical Information Technology, Inc. Form 10-K for Period Ending 12/31/1996 | DEF003646 *et seq.* | |
| | Medical Information Technology, Inc. Form 10-K for Period Ending 12/31/1997 | DEF003619 *et seq.* | |
| | Medical Information Technology, Inc. Form 10-K for Period Ending 12/31/1998 | DEF003674 *et seq.* | |
| | Medical Information Technology, Inc. Form 10-K for Period Ending 12/31/1999 | DEF004288 *et seq.* | X |
| | Medical Information Technology, Inc. Form 10-K for Period Ending 12/31/2000 | DEF004317 *et seq.* | X |
| | Medical Information Technology, Inc. Form 10-K for Period Ending 12/31/2001 | DEF004342 *et seq.* | X |
| | Medical Information Technology, Inc. Form 10-K for Period Ending 12/31/2002 | DEF004381 *et seq.* | X |

| | | | |
|---|---|---|---|
| | Medical Information Technology, Inc. Form 10-K for Period Ending 12/31/2003 | DEF004411 *et seq.* | X |
| | Medical Information Technology, Inc. Form 10-K for Period Ending 12/31/2004 | DEF004448 *et seq.* | X |
| | Medical Information Technology, Inc. Form 10-Q for Period Ending 3/31/2005 | DEF003704 *et seq.* | X |
| | Medical Information Technology, Inc. Form 10-Q for Period Ending 3/31/2006 | DEF004091 *et seq.* | X |
| | Medical Information Technology, Inc. Form DEF 14A for Period Ending 3/31/2005 | DEF004045 *et seq.* | X |
| | Medical Information Technology, Inc. Form DEF 14A for Period Ending 3/31/2006 | DEF004029 *et seq.* | X |
| | Medical Information Technology, Inc. Form 10-K for Period Ending 12/31/2007 | | X |

## COMPENSATION AND PLAN DOCUMENTS PRODUCED BY PLAINTIFFS

| Exhibit No. | Description | Bates No./Deposition Exhibit | Plaintiffs Reserved Right to Object? |
|---|---|---|---|
| | Hubert compensation and Plan documents from 1982 | HUB040-HUB044, HUB230 | X |
| | Hubert compensation and Plan documents from 1983 | HUB037-HUB039, HUB 229 | X |
| | Hubert compensation and Plan documents from 1984 | HUB033-HUB036, HUB228 | X |
| | Hubert compensation and Plan documents from 1985 | HUB030-HUB032, HUB227 | X |
| | Hubert compensation and Plan documents from 1986 | HUB024-HUB026, HUB226, HUB045, HUB420-HUB421 | X |
| | Hubert compensation and Plan documents from 1987 | HUB225, HUB390 | X |

| | | |
|---|---|---|
| Hubert compensation and Plan documents from 1988 | HUB021-HUB023, HUB224, | X |
| Hubert compensation and Plan documents from 1989 | HUB019-HUB020, HUB223, HUB393, HUB400 | X |
| Hubert compensation and Plan documents from 1990 | HUB017-HUB018, HUB222, HUB391 | X |
| Hubert compensation and Plan documents from 1991 | HUB015, HUB220-HUB221, HUB399, HUB402 | X |
| Hubert compensation and Plan documents from 1992 | HUB014, HUB218, HUB394 | X |
| Hubert compensation and Plan documents from 1993 | HUB013, HUB217 | X |
| Hubert compensation and Plan documents from 1994 | HUB216 | X |
| Hinchliffe compensation and Plan documents from 1994 | HIN009, HIN011, HIN019 | |
| Hubert compensation and Plan documents from 1995 | HUB197, HUB215-HUB216 | X |
| Hubert compensation and Plan documents from 1996 | HUB214 | X |
| Hinchliffe compensation and Plan documents from 1996 | HIN 009 | |
| Hubert compensation and Plan documents from 1997 | HUB213 | X |
| Hubert compensation and Plan documents from 1998 | HUB212 | X |

| | Hubert compensation and Plan documents from 1999 | HUB211 | X |
|---|---|---|---|
| | Hubert compensation and Plan documents from 2000 | HUB209 *et seq.* | X |
| | Hubert compensation and Plan documents from 2001 | HUB208 | X |
| | Hubert compensation and Plan documents from 2002 | HUB207 | X |
| | Hubert compensation and Plan documents from 2003 | HUB206, HUB389 | X |

### OTHER DOCUMENTS PERTAINING TO PLAINTIFFS

| Exhibit No. | Description | Bates No./Deposition Exhibit | Plaintiffs Reserved Right to Object? |
|---|---|---|---|
| | Trainor Contingent Fee Agreement | TRN001 *et seq.* | |
| | Trainor Statement of Stock Ownership | William Trainor Deposition, 7/24/2006, Exhibit 4 | |
| | Trainor Trust Distribution | DEF001045 *et seq.* | |
| | Share offer letter to Hubert, January 31, 1991 | William Trainor Deposition, 7/24/2006, Exhibit 6 | |
| | Medical Information Technology, Inc. 1997 Stock Purchase Instructions | William Trainor Deposition, 7/24/2006, Exhibit 7 | |
| | Meditech Profit Sharing Trust Financial Report for 1997 | William Trainor Deposition, 7/24/2006, Exhibit 8 | |
| | Hinchliffe Contingent Fee Agreement | HIN020 *et seq.* | |
| | Compensation Letter to Hinchliffe dated January 30, 1998 | DEF001341 | |

| | | | |
|---|---|---|---|
| | Letter from David Hinchliffe to A. Neil Pappalardo dated February 9, 1998 | DEF001056 | |
| | Hinchliffe Trust Distribution | DEF001051 *et seq.* | |
| | Letter from David Hinchliffe to A. Neil Pappalardo dated June 30, 1998 | HI PF 000005 | |
| | Letter from David Hinchliffe to Barbara Manzolillo dated February 9, 1998 | HI PF 000006 | |
| | Hinchliffe Statement of Stock Ownership | David Hinchliffe Deposition, July 27, 2006, Exhibit 11 | |
| | Letter to Personnel File from David Hinchliffe, March 16, 1995 | T PF 00026 | |
| | Documents produced by David Hinchliffe | HIN001-HIN019 | |
| | Hubert Contingent Fee Agreement | HUB517 *et seq.* | X |
| | Hubert Statement of Stock Ownership | Michael Hubert Deposition, 7/26/2006, Exhibit 16 | X |
| | Hubert Trust Distribution, March 1, 2004 | HUB223 | X |
| | Hubert Trust Distribution, September 16, 2004 | HUB249 | X |
| | Letter from Michael Hubert to Barbara Manzolillo dated September 7, 2004 | HUB238 | X |
| | *Subpoena to Michael Hubert in Grossman v. Medical Information Technology, Inc., et al.,* No. 03-1872-BLS (Mass. Super) | Michael Hubert Deposition, 7/26/2006, Exhibit 2 | X |

## EXPERT REPORTS

| Exhibit No. | Description | Bates No./Deposition Exhibit | Plaintiffs Reserved Right to Object? |
|---|---|---|---|
| | Expert Report of Rick S. Nathan and Christopher C. Barry, dated August 30, 2005, and documents cited therein | | X |
| | Expert Report of Rick S. Nathan and Christopher C. Barry, dated April 8, 2008, and documents cited therein | | X |
| | Expert Report of Charles E. Wheeler, Jr. dated April 4, 2008 and documents cited therein | | X |

## MISCELLANEOUS

| Exhibit No. | Description | Bates No./Deposition Exhibit | Plaintiffs Reserved Right to Object? |
|---|---|---|---|
| | Question Box, Special Edition, June 9, 2000 | HUB184 *et seq.* | |
| | Question Box, Special Edition, June 9, 2000 | DEF001157 *et seq.* | |
| | Handwritten notes | HUB181 | X |
| | A Memo the Meditech Staff from Howard Messing | MH0004 *et seq.* | X |
| | A Message from the Chairman | MH0245 *et seq.* | X |
| | Handwritten notes | HUB187 *et seq.* | |
| | A Message from the Trustee | DEF001163 *et seq.* | |
| | Valuation of Meditech Stock | HUB195 *et seq.* | X |
| | The Determination of Meditech's Fair Share Value | DEF001285 *et seq.* | |
| | Meditech Financial History | HUB475 | X |
| | Fortune 5 Hundred Ranked by Performance | HUB489 | X |
| | 1997 Top 100 | HUB490 | X |
| | Who Owns SAIC Stock | HUB516 | X |
| | Turning Employees into Stakeholders | HUB503 *et seq.* | X |

| | | | |
|---|---|---|---|
| | SAIC Stock Value from Formula | HUB507 | X |
| | SAIC Stock Ownership Principles | HUB508 *et seq.* | X |
| | SAIC Stock Pricing | HUB511 | X |
| | SAIC 10K (excerpt) | HUB512 *et seq.* | X |
| | Handwritten notes | HUB437 | X |
| | Handwritten notes | HUB377 *et seq.* | X |
| | Correspondence with Department of Labor | HUB319 *et seq.* | X |
| | Handwritten notes | HUB438 | X |
| | Handwritten notes | HUB469 *et seq.* | X |
| | SAIC 10-K | HUB496 *et seq.* | X |
| | Cast Study: Science Applications International Corporation | HUB491 *et seq.* | X |
| | Letter from Hubert to Rep. Joe Moakley, November 20, 1999 | HUB433 *et seq.* | X |
| | Letter from Hubert to Department of Labor, July 8, 2001 | HUB304 *et seq.* | X |
| | Anonymous email from Hubert to various lawyers | Michael Hubert Deposition, 7/26/2006, Exhibit 3 | X |
| | Hubert employment agreement with Meditech | HU PF 000209 *et seq.* | X |
| | Hubert employment agreement with Meditech | HU PF 000103 | X |
| | Email, Michael Hubert to Jerome Grossman, dated October 1, 2002 | Michael Hubert Deposition, 7/26/2006, Exhibit 5 | X |
| | Email, Michael Hubert to Jerome Grossman, dated November 26, 2002 | Michael Hubert Deposition, 7/26/2006, Exhibit 6 | X |
| | Letter from Howard Messing to Michael Hubert, dated July 26, 2004 | HUB231 | X |
| | Findings and Order under M.G.L. Ch. 208, Sec 1 A | HUB 563 *et seq.* | X |

| | | |
|---|---|---|
| Docket and Separation Agreement, Michael Hubert and Melissa Hubert | | X |
| Printouts from Meditechstock.com | Michael Hubert Deposition, 7/26/2006, Exhibit 17 | X |
| Email from account of Michael Hubert | HUB520 *et seq.* | X |
| Letter to Rescission Offer Recipients | HUB467 | X |
| Letter from TA Associates to Ed Roberts dated December 20, 2001 | TA000052 | X |
| Stock Purchase Agreement dated November 2002 between Mort Ruderman and MIT | Not numbered; produced by MIT | X |

Respectfully submitted,

MEDICAL INFORMATION
TECHNOLOGY INC. PROFIT
SHARING
PLAN, MEDICAL INFORMATION
TECHNOLOGY, INC. and A. NEIL
PAPPALARDO.

By their attorneys,

*Is!* Stephen D. Poss

Stephen D. Poss (BBO # 551760)
Kevin P. Martin (BBO # 655222)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated April 21, 2008

## EXHIBIT A[2]

1.      Medical Information Technology, Inc. ("Meditech" or the "Company") was founded in 1969 and currently employs over 2,800 individuals.

2.      Meditech is a privately held company, its shares are not traded on any stock exchange and, therefore, have no price set by a public market.

3.      While Meditech is a privately-held company, nonetheless it is a public reporting company, and thus is required to submit, among other things, Forms 10-Q and 10-K to the SEC, which are then available to anyone in the public wishing to view a copy.

4.      Meditech's Form 10-K for the year ended 1997, which was publicly filed with the SEC on or about March 26, 1998 ("Meditech's Form 10-K for 1997"), contains a chart reporting, *inter alia*, the Company's revenue, operating income, net income, earnings per share, cash and cash equivalents, total assets, total liabilities, book value per share, working capital, cash flows, and cash dividends per share as of December 31 for each year 1993 through 1997. The same type of information was also available in Meditech's Form 10-K for 1996.

5.      Meditech's Form 10-K for 1997 contained a section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," discussing factors influencing the business such as "a decrease in the product revenue attributable to a slowdown in implementations for Columbia/HCA," a major customer.

6.      Meditech's 1997 Form 10-K contained the audited financials of the company, which include among other things a three-year history of Company contributions to the Meditech Information Technology, Inc. Profit Sharing Trust (the "Trust").

---

[2]     Plaintiffs have requested that Defendants note that Plaintiffs reserve the right to challenge the relevance of facts after 1998 should Hubert be dismissed from this action.

7.    The price-earnings ratios ("P/E ratio") of publicly traded companies can be computed using publicly available information.

8.    The Company has sold Meditech stock to most employees, including each of the named Plaintiffs.

9.    David Hinchliffe purchased Meditech stock from the Company for a total payment of $16,400.  Hinchliffe later sold all of the Meditech stock he purchased to the Trust for a total of $301,100.  Among other sales, Hinchliffe sold 13,200 split-adjusted shares to the Trust in 1998 at a split-adjusted price of $13.50 per share.

10.    William Trainor purchased Meditech stock from the Company for a total payment of $16,950.  Trainor later sold all of the Meditech stock he purchased to the Trust for a total of $310,150. Among other sales, Trainor sold 20,900 split-adjusted shares to the Trust in 1998 at a split-adjusted price of $13.50 per share.

11.    During the years they were eligible to purchase stock (including 1998), Plaintiffs received "Stock Purchase Instructions" from the Company. The 1998 Stock Purchase Instructions stated on their face "Please note that MEDITECH is a closely-held private company and there is no public market for its shares.  Thus there can be no absolute assurance of a future re-sale."

12.    Trainor did not recall attending any of the annual meetings held in conjunction with Meditech's annual share offer to employees.  Beginning in at least 1994 Hinchliffe did not attend any of these meetings.  Hubert only attended the meeting in or around 1984.

13.    In 1973 the Company established the Medical Information Technology, Inc. Profit Sharing Plan (the "Plan") for the stated purpose of providing "retirement and other benefits to the employees of the Company."  The Plan is "designed to invest substantially in shares of the

Common Stock of the Company so as to permit the participating employees to share in any growth of the Company."

14.     Pursuant to the Plan, the Trust was created to hold contributions of cash and stock received from the Company.

15.     The Plan is entirely voluntary on the Company's part, providing that the Company may terminate the Plan at any time.  The Plan provides that all contributions by the Company to the Trust are voluntary; in any given year, the Company could elect to contribute nothing.  The Plan does not require or permit employees to make contributions into the Trust.

16.     The value of each year's contribution to the Trust is allocated to the accounts of participants according to a formula based on the income of each participant.  Each year the Trustee revalues the Plan's existing assets, and the pro-rata increase in the value of those assets is allocated to the account of each plan participant.

17.     Under the terms of the Plan, the Trust makes payments to Plan participants in a lump sum cash payment upon termination of the participant's employment with Meditech.  The Plan provides, however, that if the Trust lacks sufficient cash to make a payment, the Trust may defer payment by up to three years and, if still necessary, distribute Meditech stock instead of cash.  The Plan does not require Meditech or any third party to provide cash to the Trust to fund any Trust cash shortfall.

18.     The Plan contains a claims procedure, which is described (in relevant part) in the summary plan descriptions distributed to Plan participants, including each of the Plaintiffs.  The 1983 Summary Plan Description and 1998 Summary Plan Description both state, in substantively similar language:  "if you receive notice from the Trustee with regard to the amount and form of payment of your benefits and you believe there is an error in the notice, then

you may submit a claim to the Trustee. ... Your claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim."

19.    The Board's valuation for Meditech stock is used by the Board in calculating how many shares of stock will make up any stock portion of the Company's voluntary contribution to the Trust in a given year  This same per share value is also used by the Company in selling Meditech stock early the next year to employees.

20.    At year end the Trustee values the Trust's shares in order to determine the value of the Trust and, thereby, the Trust account balance of Plan participants.  Under the Plan, the Trustee is independently obligated to value stock held by the Trust, and he is not obliged to use the Board's value.

21.    Each year, Defendants provide Plan participants a report on the status of their Trust account balances.  On or about January 30, 1998, Defendants sent each of the Plaintiffs a document informing him of his account balance as of December 31, 1996; his share of Trust income and revaluations during 1997; his share of Company contributions to the Trust and forfeitures during 1997; and his resulting account balance as of December 31, 1997.  The same form also noted the value of Meditech stock as determined by Defendants of December 31, 1997 (the split-adjusted $13.50), and the estimated dividend to be paid on Meditech stock in 1998.

22.    Defendants annually provide Plan participants a "Financial Report" for the Trust. For example, in 1998 each of the Plaintiffs received a "Meditech Profit Sharing Trust Financial Report for 1997."  The Report noted, among other things, the amount of the Company's contribution to the Trust in 1997, including the breakdown between cash and stock, and contained three charts: one showing the Trusts assets as of December 31, 1996 (broken down into cash, U.S. Treasuries, interest and outstanding loans, and shares of Meditech stock including

the per share value); a second showing Trust activity during the year (income, revaluation of Meditech stock, distributions and forfeitures, and the Company's contribution); and a third showing the resulting Trust assets as of December 31, 1997 (again showing the number of shares of Meditech stock held and the per share value assigned to them).

23.    Trainor began working at Meditech in 1975.    Over the years, the value of Trainor's Trust account increased through contributions of cash and stock by Meditech to the Trust, increases in the value of the Meditech stock and other assets held by the Trust and the Trust's receipt of dividends from the Company and other income on investments.    Trainor's employment with Meditech terminated in March 1998.    On or about May 28, 1998, Trainor received a distribution from the Trust in the amount of $929,943.    Under the terms of the Plan, the amount of this distribution was based on the value of Trainor's Trust account as of December 31, 1997, plus interest through the date of the distribution.

24.    Hinchliffe began working at Meditech in 1975, and his employment with Meditech terminated in early 1998.    Over the years, the value of Hinchliffe's Trust account increased through contributions of cash and stock by Meditech to the Trust, increases in the value of the Meditech stock and other assets held by the Trust and the Trust's receipt of dividends from the Company and other income on investments.    On or about May 28, 1998, Hinchliffe received a distribution from the Trust in the amount of $1,123,639.    Under the terms of the Plan, the amount of this distribution was based on the value of Hinchliffe's Trust account as of December 31, 1997, plus interest through the date of the distribution.

25.    Hubert began working at Meditech in 1981.    Over the years, the value of his Trust account increased through contributions of cash and stock by Meditech to the Trust, increases in

the value of the Meditech stock and other assets held by the Trust and the Trust's receipt of dividends from the Company and other income on investments.

26.    On or about September 16, 2004, Hubert received a final distribution from the Trust in the amount of $1,040,000. The amount of this distribution was based on the value of his Trust account as of December 31, 2003 plus interest.

27.    Neither Hinchliffe nor Trainer ever asked anyone in Meditech management how the Trust valued Meditech stock.

28.    In 1973, Meditech's Board of Directors voted to contribute $9,470 to the Trust. The Board voted that the contribution have a $100 cash component and a $9,370 stock component consisting of 72,000 split-adjusted shares valued at $.13 per split-adjusted share.

29.    In 1974, Meditech's Board of Directors voted to contribute $7,496 to the Trust. The Board voted that the contribution have no cash component and a $7,496 stock component, consisting of 57,600 split-adjusted shares valued at $.13 per split-adjusted share.

30.    In 1975, Meditech's Board of Directors voted to contribute $10,000 to the Trust. The Board voted that the contribution be comprised of $10,000 cash and no stock.

31.    In 1976, Meditech made no contribution to the Trust.

32.    In 1977, Meditech's Board of Directors voted to contribute $29,100 to the Trust. The Board voted that the contribution be comprised of $29,100 cash and no stock.

33.    In 1978, Meditech's Board of Directors voted to contribute $60,000 to the Trust. The Board voted that the contribution be comprised of a $54,000 cash component and a $6000 stock component consisting of 72,000 split-adjusted shares valued at $.083 per split-adjusted share.

34.    In 1979, Meditech's Board of Directors voted to contribute $80,000 to the Trust. The Board voted that the contribution be comprised of a $60,000 cash component and a $20,000 stock component consisting of 144,000 split-adjusted shares valued at $.138 per split-adjusted share.

35.    In 1980, Meditech's Board of Directors voted to contribute $100,000 to the Trust. The Board voted that the contribution be comprised of a $70,000 cash component and a $30,000 stock component consisting of 144,000 split-adjusted shares valued at $.208 per split-adjusted share.

36.    In 1981, Meditech's Board of Directors voted to contribute $120,000 to the Trust. The Board voted that the contribution be comprised entirely of cash, with no contribution of Meditech stock.

37.    In 1982, Meditech's Board of Directors voted to contribute $185,000 to the Trust. The Board voted that the contribution be comprised of a $155,000 cash component and a $30,000 stock component consisting of 108,000 split-adjusted shares valued at $.277 per split-adjusted share.

38.    In 1983, Meditech's Board of Directors voted to contribute $350,000 to the Trust. The Board voted that the contribution be comprised entirely of cash, with no contribution of Meditech stock.

39.    In 1984, Meditech's Board of Directors voted to contribute $450,000 to the Trust. The Board voted that the contribution be comprised of a $225,000 cash component and a $225,000 stock component consisting of 180,000 split-adjusted shares valued at $1.25 per split-adjusted share.

40.    In 1985, Meditech's Board of Directors voted to contribute $575,000 to the Trust. The Board voted that the contribution be comprised of a $260,000 cash component and a $315,000 stock component consisting of 180,000 split-adjusted shares valued at $1.75 per split-adjusted share.

41.    In 1986, Meditech's Board of Directors voted to contribute $610,000 to the Trust. The Board voted that the contribution be comprised of a $506,000 cash component and a stock component consisting of 48,000 split-adjusted shares valued at $2.167 per split-adjusted share.

42.    In 1987, Meditech's Board of Directors voted to contribute $700,000 to the Trust. The Board voted that the contribution be comprised of a $564,000 cash component and a $136,000 stock component consisting of 48,000 split-adjusted shares valued at $2.833 per split-adjusted share.

43.    In 1988, Meditech's Board of Directors voted to contribute $900,000 to the Trust. The Board voted that the contribution be comprised of a $736,000 cash component and $164,000 stock component consisting of 48,000 split-adjusted shares valued at $3.417 per split-adjusted share.

44.    In 1989, Meditech's Board of Directors voted to contribute $1,075,000 to the Trust. The Board voted that the contribution be comprised of a $835,000 cash component and a $240,000 stock component consisting of 60,000 split-adjusted shares valued at $4.00 per split-adjusted share.

45.    In 1990, Meditech's Board of Directors voted to contribute $1,513,000 to the Trust. The Board voted that the contribution be comprised of a $1,213,000 cash component and a $300,000 stock component consisting of 60,000 split-adjusted shares valued at $5.00 per split-adjusted share.

46.    In 1991, Meditech's Board of Directors voted to contribute $1,420,000 to the Trust. The Board voted that the contribution be comprised of a $1,100,000 cash component and a $320,000 stock component consisting of 60,000 split-adjusted shares valued at $5.33 per split-adjusted share.

47.    In 1992, Meditech's Board of Directors voted to contribute $1,700,000 to the Trust. The Board voted that the contribution be comprised of a $1,320,000 cash component and a $380,000 stock component consisting of 60,000 split-adjusted shares valued at $6.33 per split-adjusted share.

48.    In 1993, Meditech's Board of Directors voted to contribute $1,900,000 to the Trust. The Board voted that the contribution be comprised of a $1,480,000 cash component and a $420,000 stock component consisting of 60,000 split-adjusted shares valued at $7 per split-adjusted share.

49.    In 1994, Meditech's Board of Directors voted to contribute $2,105,000 to the Trust. The Board voted that the contribution be comprised of a $1,595,000 cash component and a $510,000 stock component consisting of 60,000 split-adjusted shares valued at $8.50 per split-adjusted share.

50.    In 1995, Meditech's Board of Directors voted to contribute $2,400,000 to the Trust. The Board voted that the contribution be comprised of a $1,800,000 cash component and a $600,000 stock component consisting of 60,000 split-adjusted shares valued at $10 per split-adjusted share.

51.    In 1996, Meditech's Board of Directors voted to contribute $2,900,000 to the Trust. The Board voted that the contribution be comprised of a $2,060,000 cash component and

a $840,000 stock component consisting of 70,000 split-adjusted shares valued at $12 per split-adjusted share.

52.     In 1997, Meditech's Board of Directors voted to contribute $3,400,000 to the Trust. The Board voted that the contribution be comprised of a $2,320,000 cash component and a $1,080,000 stock component consisting of 80,000 split-adjusted shares valued at $13.50 per split-adjusted share.

53.     In 1998, Meditech's Board of Directors voted to contribute $3,500,000 to the Trust. The Board voted that the contribution be comprised of a $2,340,000 cash component and a $1,160,000 stock component consisting of 80,000 split-adjusted shares valued at $14.50 per split-adjusted share.

54.     In 1999, Meditech's Board of Directors voted to contribute $4,000,000 to the Trust. The Board voted that the contribution be comprised of a $2,720,000 cash component and a $1,280,000 stock component consisting of 80,000 split-adjusted shares valued at $16 per split-adjusted share.

55.     In 2000, Meditech's Board of Directors voted to contribute $3,500,000 to the Trust. The Board voted that the contribution be comprised of a $2,140,000 cash component and a $1,360,000 stock component consisting of 80,000 split-adjusted shares valued at $17 per split-adjusted share.

56.     In 2001, Meditech's Board of Directors voted to contribute $3,500,000 to the Trust. The Board voted that the contribution be comprised of a $2,075,000 cash component and a $1,425,000 stock component consisting of 75,000 shares valued at $19 per share.

57.   In 2002, Meditech's Board of Directors voted to contribute $4,100,000 to the Trust.  The Board voted that the contribution be comprised of a $2,340,000 cash component and a $1,760,000 stock component consisting of 80,000 shares valued at $22 per share.

58.   In 2003, Meditech's Board of Directors voted to contribute $4,100,000 to the Trust.  The Board voted that the contribution be comprised of a $2,020,000 cash component and a $2,080,000 stock component consisting of 80,000 shares valued at $26 per share.

## CERTIFICATE OF SERVICE

I, Stephen D. Poss, hereby certify that I caused a true copy of the above document to be served upon the counsel of record for each other party via this Court's ECF System on April 21, 2008.

/s/  Stephen D. Poss _____