UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE,<br><br>Plaintiffs,<br><br>v.<br><br>MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO,<br><br>Defendants. | Civil Action No. 05-10269 (RWZ) |

**AFFIDAVIT OF KEVIN P. MARTIN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF MICHAEL HUBERT'S MOTION FOR VOLUNTARY DISMISSAL OF CLAIM**

I, Kevin P. Martin, depose and state as follows:

1.     I am an attorney admitted to practice in the Commonwealth of Massachusetts.  I am a Partner at Goodwin Procter LLP, counsel for Defendants Medical Information Technology, Inc. Profit Sharing Plan (the "Plan"), Medical Information Technology, Inc. ("Meditech" or the "Company") and A. Neil Pappalardo ("Pappalardo," and together with the Plan and Meditech, the "Defendants") in this matter.

2.     I make this Affidavit in support of Defendants' Opposition to Plaintiff Michael Hubert's Voluntary Dismissal of Claim.

3.     I have personal knowledge of the matters described in this Affidavit.

4.     Attached as Exhibit 1 is a true and accurate copy of an email from erisa@mediaone.net, signed by "Bob," to a list of recipients, dated February 18, 2002, as

introduced as Exhibit 3 at the deposition of Michael Hubert dated July 26, 2006 in this action and authenticated by Mr. Hubert at pages 29-30 of his deposition transcript.

5.      Attached as Exhibit 2 is a true and accurate copy of an email with attachments sent from Michael Hubert to Dr. Jerome Grossman, dated October 1, 2002.

6.      Attached as Exhibit 3 is a true and accurate copy of the Medical Information Technology, Inc. Form 10-Q for the quarter ended March 31, 2005.

7.      Attached as Exhibit 4 is a true and accurate copy of the Medical Information Technology Inc. Form 10-Q for the quarter ended March 31, 2006.

8.      Attached as Exhibit 5 are true and accurate copies of all written discovery requests submitted by both parties in this action

9.      Attached as Exhibit 6 is a true and accurate copy of excerpts from the deposition of A. Neil Pappalardo in the above-captioned action, conducted on July 21, 2006.

10.      Attached as Exhibit 7 is a true and accurate copy of excerpts from the deposition of A. Neil Pappalardo in the above-captioned action, conducted on November 27, 2007.

11.      Attached as Exhibit 8 is a true and accurate copy of excerpts from the deposition of Barbara A. Manzolillo in the above-captioned action, conducted on August 8, 2006.

12.      Attached as Exhibit 9 is a true and accurate copy of excerpts from the deposition of Jerome Grossman in the above-captioned action, conducted on February 21, 2008.

13.      Attached as Exhibit 10 is a true and accurate copy of Plaintiffs' Supplemental Response to Defendants' Second Set of Interrogatories.

14.      Attached as Exhibit 11 is a true and accurate copy of the Expert Report of Rick S. Nathan and Christopher C. Barry dated April 7, 2008, as disclosed by Defendants in this action.

15.     During discovery, Plaintiffs subpoenaed third party investors in Meditech, including the Massachusetts Institute of Technology, Summit Partners, and  TA Associates, concerning actual and potential purchases and sales of Meditech stock that occurred after Hinchliffe and Trainor left the Company and the Plan in 1998.  Defendants reviewed these documents and prepared their witnesses to be deposed on the subject of these transactions.

16.     On Friday, April 4, 2008, three days before Defendants' expert reports were due to be served on Monday, April 7, 2008, Plaintiffs' counsel sent me an email stating "We do not yet have MHubert's permission to drop his portion of the claim and it may be an issue at the hearing. I will further advise you as to that."  This was the first indication that Plaintiffs' counsel might be seeking to dismiss Hubert's claim, and it came after Defendants had already incurred significant expert fees preparing reports addressing, *inter alia*, Hubert's individual claim.

17.     Attached hereto as Exhibit 12 is a true and accurate copy of the email sent to me by Michael Collora, counsel for Plaintiffs, on April 4, 2008, referenced in Paragraph 16, *supra*.

18.     Although Mr. Collora's April 4 email stated that Plaintiffs' counsel would be providing further information concerning Hubert's status in this case, no information was ever forthcoming.  Accordingly, on Monday, April 14, 2008, I sent Mr. Collora an email asking that Plaintiffs' counsel to "please let me know by the end of the day whether you will be moving to dismiss Michael Hubert as a party from this action."  I further noted that "[t]he uncertainty on this question is causing Defendants great prejudice in preparing for the pretrial conference."  No response was provided by the end of the day, or at any time before Thursday, April 17.  Attached hereto as Exhibit 13 is a true and accurate copy of the email sent by me to Michael Collora, counsel for Plaintiffs, on April 14, 2008.

19.    Defendants long have indicated to Plaintiffs' counsel that they intended to file a motion for summary judgment.    More recently, in Defendants' Opposition to Plaintiffs' Amended Motion for Class Certification, filed on April 8, 2008 (Docket No. 125), Defendants stated (at pg. 19) that they "will be filing a motion for summary judgment based, among other reasons, on Plaintiffs' failure to come forward with a viable theory of the case."    And on April 11, 2008, the parties negotiated mutual consent to reply briefs on Plaintiffs' Amended Motion for Class Certification and Defendants' anticipated summary judgment motion.

20.    On the morning of Thursday, April 17, 2008, Plaintiffs counsel called me to ask if Defendants would consent to the dismissal of Hubert's claim without prejudice.    I stated that Defendants would not agree to that request.    A few minutes later Plaintiffs filed their Motion to Voluntarily Dismiss Hubert's claim (the "Motion to Voluntarily Dismiss").    The Motion to Voluntarily Dismiss was not accompanied by any affidavit or memorandum in support, in violation of Local Rule 7.1(b)(1), and itself provides no explanation why Plaintiffs are seeking to voluntarily dismiss Hubert's claim.

21.    Later in the morning of April 17, after receiving the Motion to Voluntarily Dismiss, I attended a previously scheduled meet and confer with Plaintiffs' counsel pursuant to this Court's March 20, 2008 Procedural Order regarding Pretrial Conference/Trial (the "March 20, 2008 Order").    At the meet and confer I repeatedly asked Plaintiffs' counsel whether any further explanation why they were seeking to voluntarily dismiss Hubert's claim would be provided.    I was at first told that no explanation would be given to us, and that if the Court were to inquire into the basis for the Motion, Plaintiffs' counsel would seek an *in camera* conversation with the Court with Defendants excluded.    I told counsel for Plaintiffs that Defendants would object to any such *in camera* or *ex parte* communication with the Court.    I subsequently was told

that I might be provided the basis for the Motion on Friday, April 18, but no explanation was ever provided.

22.     At the meet and confer on April 17, Plaintiffs' counsel reserved the right to object, on the basis of relevance, to the introduction of any valuation-related documents pertaining to periods after Plaintiffs Hinchliffe and Trainor left Meditech.  Plaintiffs' counsel also reserved the right to object to the introduction of any materials pertaining to Hubert. Defendants do not consent to these objections.

23.     In accordance with the Court's March 20, 2008 Order, and in light of the uncertainty concerning Hubert's claim, Defendants spent considerable time and effort drafting a pretrial memorandum, filed on April 21, 2007, reflecting the current status of the case, which includes Hubert as a plaintiff.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 22, 2008.

/s/  Kevin P. Martin

**CERTIFICATE OF SERVICE**

    I, Kevin P. Martin, hereby certify that I caused a true copy of the above document to be served upon the counsel of record for each other party via this Court's ECF System on April 22, 2008.

                       /s/  Kevin P. Martin

# EXHIBIT 1

EXHIBIT

MH 3

AHB 7/26/06

-----Original Message-----
**From:** ERISA [mailto:erisa@mediaone.net]
**Sent:** Monday, February 18, 2002 3:01 AM
**To:** marcia@mwagner.net; aliazos@mwe.com; info@dwyercollora.com;
cmontillo@dwyercollora.com; jcleary@goodwinprocter.com; mtse@goodwinprocter.com;
kbilezerian@mwe.com; ajbianchi@MirickOConnell.com; tkolb@erisaboston.com;
wfitzgerald@mbbf.com; lsunshine@sandw.com; edwards@mc-ed.com; friedler@aol.com
**Subject:** ERISA Suit

Dear Sir or Madam:

I believe a have a case against a Massachusetts employer that could settle for more than
$20,000,000.

My employer is a private company with qualified contribution plan. The plan judiciary is also
the founder and the major stockholder of the company. The plan is mostly invested in
company stock. The judiciary sets the value of the stock, despite the fact they have no
experience in this matter. The auditors simply accept the value of "fair market value". It is
acknowledged by all that the stock value is set low so that employees will purchase the

stock. When the plan makes distributions, employees receive much less than they should. If the real "fair market value" was used to compute the distribution, the plan would have no cash.

The plan has distributed more than $20,000,000 within the last five years, and the stock value is set at about one-third of companies our size in our industry. The fudiciary has assets of more than $50,000,000.

I hope that you or your firm would be interested in reviewing this case on a contingency basis. As an employee of this firm, bringing this case to you, and willing to be active in the case, I wish be receive financial consideration for my efforts. If you wish further information, please respond to this email. Since I am still working at this firm, and wish to remain so, I regret that I cannot yet identify myself or my company.

Thank you for your consideration.

Bob

# EXHIBIT 2

Thursday 7 PM Meeting

**EXHIBIT**
MH 5
AHB 7/26/06

**Subject: Thursday 7 PM Meeting**
**Date:** Tue, 1 Oct 2002 00:16:59 -0400
**From:** "mikehubert" <mikehubert@attbi.com>
**To:** "Jerome Grossman" <jgrossman@liongatecorp.com>

Hi Jerry.  Thanks for returning my call this evening.  I hope you have a
safe trip back.  As we discussed, I stop by your home at 7:00 PM on
Wednesday.  Attached is the draft document we discussed.

I'll see you then.

Mike

| Proposal to Grossman rev 2.doc | Name: Proposal to Grossman rev 2.doc<br>Type: WINWORD File (application/msword)<br>Encoding: base64 |

**EXHIBIT**
HUBERT 1
JJY 7-14-05

CONFIDENTIAL
SUBJECT TO
PROTECTIVE ORDER
JG 001684

1 of 1

10/1/02 9:56 AM

Hi Jerry. I have met with my lawyer. He believes that you and I should have a better understanding of our plan prior to his discussing this matter with your lawyer.

The following is a draft proposal that I created. It describes how we can work together to achieve a common goal. It is expected that after we have a better understanding of our plan, that our lawyers will create a document that meets both our needs.

My lawyer is Michael Collora, 617-371-1002 of:

Dwyer & Collora,
600 Atlantic Avenue
Boston, Massachusetts 02210
Tel: (617) 371-1000
Fax: (617) 371-1037

Michael Hubert Draft Proposal to
Dr. Jerome Grossman

It is proposed that Michael Hubert will provide Dr. Jerome Grossman with a definitive and reasonable plan for MEDITECH to accept an independent valuation for MEDITECH stock. It is reasonable to expect that the information that Michael Hubert can provide and actions taken by Michael Hubert, Dr. Grossman and his lawyer would result in MEDITECH accepting an independent valuation of the company stock.

Michael Hubert has also had multiple discussions with Michael Collora of Dwyer and Collora over the last three months. Michael Hubertas also spoke to another lawyer repeatedly for more than a year. This other laywer works outside of New England for a major employer with more than 100 full time attorneys. This attorney has informed Michael Hubert that this plan is reasonable. This attorney is an expert in this specific field. (Upon searching the Internet, you will not find more than ten attorneys in the country that are known to be more knowledgeable of this legal matter.) His identity will be provided.

If proper steps are taken, it is likely that with seven days of a signed agreement, MEDITECH can be presented with documents that describe, in detail, why MEDITECH should accept an independent appraisal for the MEDITECH stock. Most reasonable companies, when presented with the facts provided, would agree to an independent appraisal of the company stock, or risk serious financial consequences, legal expenses, demoralized employees and public scorn. (The MEDITECH board of directors meets in October and sets the value of the MEDITECH stock. There is till time to provide the board members with the information that Michael Hubert possesses.) If MEDITECH does not provide a satisfactory response within a desired time (perhaps 14 days?), Dr. Grossman will be free to file suit, armed with the information, actions and assistance that

CONFIDENTIAL
SUBJECT TO
PROTECTIVE ORDER
JG 001685

Michael Hubert can provide. Dr. Grossman should reasonably expect that a committed effort would be successful.

These actions are based on the fact that Dr. Grossman, and others believe that Neil Pappalardo, Chairman of the Board, and/or other MEDITECH board members, have collectively agreed to set the value of MEDITECH below fair market value. Since there is no market for this stock, and the company has the rights of first refusal for all stock sales, this reduced stock price benefits those that wish to purchase stock. This policy is at the expense of those that wish to sell stock. The company has always stated that the value of the stock, set by the board of directors, represents fair market value.

Michael Hubert has agreed to provide a MEDITECH document by a Neil Pappalardo, Larry Polimeno or Howard Messing (current Chairman of the Board, Vice Chairman of the Board, and President, respectively). This document contains the name of the author. This document informs readers that MEDITECH keeps the value of the MEDITECH stock low. It states that keeping the stock value low servers as an alternative to providing stock options to employees.

This document acknowledges MEDIECH uses the low stock value as an alternative to stock options for employees. MEDITECH rewards employees with the chance to purchase stock at a low price. This policy contradicts the much broader message that the company sets the stock value at "fair market value". It is likely that most board members have not seen this document, but it is very likely that most company officers have seen this document.

Recently Neil Pappalardo shared with Michael Hubert and others of the equations that he has used to determine the value of the stock this year. At the October 2002 board of directors meeting, Neil Pappalardo will recommend that the stock be valued at $23/share. These equations and information regarding Neil Pappalardo's expected recommendation to the board for the value of the MEDITECH stock and the dividend will be shared with Jerome Grossman. These same equations do not support the price of the stock in prior years. This demonstrates the inconsistency of how Neil Pappalardo determines the value of the stock and suggests that he may be unqualified and/or has conflicting interests.

It is agreed that Michael Hubert's identity will not be released unless absolutely necessary. It is possible that Dr. Grossman's objectives can be achieved with releasing the identity of Michael Hubert

The information described here, should result in the objective of MEDITECH accepting an independent valuation of the stock. In the event that this does not occur, Michael Hubert also has reason to file suit against MEDITECH, Neil Pappalardo and/or the board of directors. In the event that none of information or events listed here result in MEDITECH accepting an independent valuation of company stock, Michael Hubert agrees to be a plaintiff, or provide an appropriate employee or former employee in a separate suit. It is expected that this suit would result in the removal of Neil Pappalardo as trustee of the profit sharing plan and replacing him with an independent trustee. It

CONFIDENTIAL
SUBJECT TO
PROTECTIVE ORDER
JG 001686

would be expected that an independent trustee, managing a plan with more than 75% of assets in MEDITECH stock, to support efforts for increased liquidity of MEDITECH stock and broad acceptance of independent appraisal of MEDITECH stock.

Both parties agree to keep all matters confidential. Dr. Grossman agrees that neither he, his associated "Reporting Persons" of the February 27, 2002 SEC filings or their attorneys will purchase any additional shares (or cause to be purchased) of Medical Information Technology, MEDITECH, for a period of two years.

It is acknowledged that Dr. Grossman and the Reporting Persons, collectively own almost 1,900,000 shares of MEDITECH stock. The company places a value of $19 per share on this stock, but here is no ready market for this stock. Dr. Grossman has had this stock independently appraised and believed that the true value per share is double to triple the value of $23/share to be set by board of directors in October 2002. If as a result of Michael Hubert's knowledge and effort, the stock price were to double, the potential benefit to Dr. Grossman and the Reporting Persons would be over $43,000,000.

It is also acknowledged that Michael Hubert is has been employed at MEDTIECH since August 1981. He was first employed as a marketing consultant. He later became a Regional Sales Manager and currently is the Director of Regional Sales for the Eastern United States. He has received more sales awards than any sales person, in the history of MEDITECH. By assisting Dr. Grossman, he is at risk of loosing a job that he finds personally and financially rewarding. His total compensation this year will be about $165,000. His future earnings, at the same position, would be about $2,000,000 over the next ten years. This would be greatly increased if he were to be come vice president.

In addition, his personnel holding of 23,100 shares of MEDITECH stock will be worth about $531,300 in December. Historically, employees with a comparable number of shares have been able to sell stock back to the company or the trust. In the event Michael Hubert was to assist Dr. Grossman, he may not be able to sell these shares to the company or the trust. If this stock grew at a modest 13% per year for ten years, Michael Hubert would have $2,030,000 of MEDITECH stock that he might not be able to sell.

If he lost his job, he would also no longer received allocations to the profit sharing plan. In December his portion of the profit sharing plan was $689,000. His portion of the trust has increased by 18%/year on average over the last 10 years. If his portion of the trust continued to grow at 18% per year, it would be worth about $3,606,000 in 2012.

If Michael Hubert were to continue to purchase stock over the next ten years, this additional stock would also provide dividend and additional equity. If $12,000 of MEDITECH stock were purchased over the next ten years, it could average 20% return (growth plus dividend). In contrast, the same funds invested in other stock would likely only return less than 10% return. The difference would be more than $650,000.

CONFIDENTIAL
SUBJECT TO
PROTECTIVE ORDER
JG 001687

These potential losses do not take into account, the increased value of the MEDITECH stock when it becomes independently valuated, or if it should be publicly traded or if the company should be purchased.

It is understood that when this agreement is reached $x,xxx,xxx will be paid to Michael Hubert. He will immediately share with Jerry Grossman the information listed in this agreement. He will also assist with efforts to help achieve the goal of having MEDITECH accept an independent valuation of the MEDITECH stock.

CONFIDENTIAL
SUBJECT TO
PROTECTIVE ORDER
JG 001888

The following document was prepared for my lawyer, Mike Collera. You might find it helpful.

It is believed that keeping the stock value low benefits Neil Pappalardo in several ways:

He can purchase stock at low cost to himself (and he has been purchasing stock).

It gives the illusion that shareholders are receiving 7% annual dividend. If independent valuation caused the stock to double, shareholders would be receiving only 3 ½ % dividends. If stockholders were receiving only 3 ½ % dividends, many more would want to sell their stock. Neil is very much against this.

Neil is also trustee for the Employee Profit Sharing Plan. The plan is 77% invested in MEDITECH stock. If the stock value were to double, some employees may want to leave and "cash in". Employees with more than 20 years employment have the right to remain employed but transfer some or all of their assets out of the plan. If the stock value doubled, and consequently dividends were cut in half, many long time employees (including myself) would want to diversify and remove most of their funds from the plan. If many employees wanted distributions, there would not be enough cash in the plan. The trust would need to sell stock. It has never done this. If the company or Neil Pappalardo were to purchase stock, they would need to pay the new high stock price. If the company purchased the stock back, profits would be reduced.

Neil has no choice, but to defend the current pricing of the stock. If it were proven that the stock was undervalued, every employee that ever received a distribution from the plan would feel cheated, and could sue Neil Pappalardo (not the company). Current employees would also feel mislead by Neil Pappalardo's statements and actions.

If it was shown that Neil Pappalardo had undervalued the stock, one could claim that he should not longer be trustee for the Employee Profit Sharing Plan. If he were no longer trustee, he would be personally devastated. He also would not have the ability to vote the 11% of MEDITECH stock held in the plan. Any new trustee would want to maximize the value and liquidity of the plan. A new trustee would vote for any efforts to increase the value or marketability of the company stock.

A new trustee might request a position on the board. Neil would be against this, but publicly he would have a difficult time voting against this.

CONFIDENTIAL
SUBJECT TO
PROTECTIVE ORDER
JG 001689

# EXHIBIT 3

# MEDICAL INFORMATION TECHNOLOGY INC

## FORM 10-Q
(Quarterly Report)

## Filed 4/29/2005 For Period Ending 3/31/2005

| | |
|---|---|
| Address | MEDITECH CIRCLE |
| | WESTWOOD, Massachusetts 02090 |
| Telephone | 781-821-3000 |
| CIK | 0001011452 |
| Fiscal Year | 12/31 |

Powered By  EDGAR Online

http://www.edgar-online.com
© Copyright 2005  All Rights Reserved
Distribution and use of this document restricted under EDGAR Online's Terms of Use

DEF003704

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-Q

QUARTERLY REPORT
PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE QUARTER ENDED MARCH 31, 2005

0-28092
(Commission file number)

Medical Information Technology, Inc.
(Exact Name of Registrant as Specified in Its Charter)

Massachusetts
(State of Incorporation)

04-2455639
(IRS Employer Identification Number)

Meditech Circle, Westwood, MA
(Address of Principal Executive Offices)

02090
(Zip Code)

781-821-3000
(Registrant's Telephone Number)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant is an accelerated filer as defined in Rule 12b-2 of the Exchange Act. Yes [ ] No [X]

There were 34,750,437 shares of Common Stock, $1.00 par value, outstanding at March 31, 2005.

Page 1 of 11

| Index to Form 10-Q | Page |
| --- | --- |
| Part I - Financial Information | |
| Item 1 - Financial Statements (Unaudited) | |
| Balance Sheet as of December 31, 2004 and March 31, 2005 | 3 |
| Statement of Income for the Three Months Ended March 31, 2004 and 2005 | 4 |
| Statement of Cash Flow for the Three Months Ended March 31, 2004 and 2005 | 5 |
| Notes To Financial Statements (Unaudited) | 6 |
| Item 2 - Management's Discussion and Analysis of Financial Condition and Results of Operations | 7 |
| Item 4 - Controls and Procedures | 9 |
| Part II - Other Information | |

Item 1 - Legal Proceedings                                                                9
Item 2 - Unregistered Sales of Equity Securities and Use of Proceeds                     10
Item 4 - Submission of Matters to a Vote of Shareholders                                 10
Item 6 - Exhibits                                                                        11
Signatures                                                                               11

Page 2 of 11

---

Part I - Financial Information

Item 1 - Financial Statements (Unaudited)

### Balance Sheet as of December 31, 2004 and March 31, 2005
### (000 omitted)

|                                                                      | Dec 31, 2004 | Mar 31, 2005 |
|----------------------------------------------------------------------|-------------:|-------------:|
| Cash and equivalents                                                 | $14,566      | $21,512      |
| Marketable securities                                                | 192,701      | 177,122      |
| Accounts receivable less reserve                                     | 32,082       | 30,798       |
| Current assets                                                       | 239,349      | 229,432      |
| Computer equipment                                                   | 7,797        | 8,046        |
| Furniture & fixtures                                                 | 28,960       | 29,005       |
| Buildings                                                            | 139,670      | 139,670      |
| Land                                                                 | 26,604       | 26,604       |
| Accumulated depreciation                                             | (68,558)     | (70,448)     |
| Fixed assets                                                         | 134,473      | 132,877      |
| Marketable securities                                                | 45,000       | 54,990       |
| Investments                                                          | 8,493        | 8,433        |
| Total assets                                                         | $427,315     | $425,732     |
| Accounts payable                                                     | $282         | $2,711       |
| Taxes payable                                                        | 3,134        | 10,491       |
| Accrued expenses                                                     | 25,272       | 11,035       |
| Customer deposits                                                    | 14,585       | 12,925       |
| Deferred taxes & tax reserves                                        | 13,992       | 12,387       |
| Total liabilities                                                    | 57,265       | 49,549       |
| Common stock $1.00 par value, authorized 40,000,000 shares, issued and outstanding 34,514,544 in 2004 and 34,750,437 in 2005 | 34,514 | 34,750 |
| Additional paid-in capital                                           | 24,269       | 30,874       |
| Retained income                                                      | 298,131      | 299,830      |

DEF003706

| Net unrealized gain on securities | 13,136 | 10,729 |
|---|---|---|
| Shareholder equity | 370,050 | 376,183 |
| Total liabilities and shareholder equity | $427,315 | $425,732 |

Page 3 of 11

Statement of Income for the Three Months Ended March 31, 2004 and 2005
(000 omitted)

|  | 3 months ended Mar 31 | |
|---|---|---|
|  | 2004 | 2005 |
| Product revenue | $36,876 | $38,650 |
| Service revenue | 31,924 | 34,872 |
| Total revenue | 68,800 | 73,522 |
| Operations, development | 29,197 | 30,216 |
| Selling, G & A | 14,697 | 16,162 |
| Operating expense | 43,894 | 46,378 |
| Operating income | 24,906 | 27,144 |
| Other income | 5,149 | 6,481 |
| Other expense | 1,892 | 2,281 |
| Pretax income | 28,163 | 31,344 |
| State income tax | 2,489 | 2,883 |
| Federal income tax | 8,626 | 9,505 |
| Income tax | 11,115 | 12,388 |
| Net income | $17,048 | $18,956 |

Page 4 of 11

Statement of Cash Flow for the Three Months Ended March 31, 2004 and 2005
(000 omitted)

|  | 3 months ended Mar 31 | |
|---|---|---|
|  | 2004 | 2005 |
| Net income | $17,048 | $18,956 |

DEF003707

| | | |
|---|---:|---:|
| Gain on sales of marketable securities | -- | (929) |
| Depreciation expense | 1,916 | 1,890 |
| Change in accounts receivable | 2,188 | 1,284 |
| Change in accounts payable | 2,650 | 2,429 |
| Change in taxes payable | 5,873 | 7,357 |
| Change in accrued expenses | (14,012) | (14,237) |
| Change in customer deposits | 926 | (1,660) |
| Net effect of non-cash adjustments | 397 | -- |
| | | |
| Net cash from operations | 16,986 | 15,090 |
| | | |
| Purchases of marketable securities | (2,662) | (11,240) |
| Sales of marketable securities | -- | 13,746 |
| Purchases of equipment, furniture & fixtures | (364) | (294) |
| Proceeds from mortgage note receivable | 60 | 60 |
| | | |
| Net cash (used in) from investing | (2,966) | 2,272 |
| | | |
| Sales of common stock | 5,544 | 6,841 |
| Dividends paid | (15,400) | (17,257) |
| | | |
| Net cash used in financing | (9,856) | (10,416) |
| | | |
| Net change in cash and equivalents | 4,164 | 6,946 |
| Cash and equivalents at beginning | 18,691 | 14,566 |
| | | |
| Cash and equivalents at end | $22,855 | $21,512 |

Page 5 of 11

Notes To Financial Statements (unaudited):

1. The unaudited financial statements presented herein have been prepared in accordance with the instructions to Form 10-Q and do not include all of the information and note disclosures required by generally accepted accounting principles. These statements should be read in conjunction with the financial statements and notes thereto for the year ended December 31, 2004 included in the Company's Form 10-K filed January 31, 2005. The unaudited financial statements presented herein have not been audited by independent accountants in accordance with generally accepted auditing standards, but in the opinion of management such financial statements include all normal recurring adjustments necessary to summarize fairly the Company's financial position and results of operations.

2. During the quarter new GAAP interpretations on the classification of deferred taxes were adopted. The underlying assets or liabilities associated with deferrals are considered current in nature. Thus, the March 31, 2005 deferred taxes and tax reserves of $12,387 thousand are now recorded as current and the corresponding amount of $13,992 thousand at December 31, 2004 has been reclassified for comparative purposes.

3. The Company follows the provisions of Statement of Financial Accounting Standards No. 128 (SFAS 128), Earnings per Share. SFAS 128 requires reporting both basic and diluted earnings per share (EPS). The Company has no common share equivalents such as preferred stock, warrants or stock options which would dilute EPS. Thus, EPS is computed by dividing net income by the weighted average number of common shares outstanding during the applicable period.

DEF003708

Earnings per Share Calculations for the Three Months Ended March 31, 2004 and 2005
(in thousands where applicable)

|  | 3 months ended Mar 31 | |
|  | 2004 | 2005 |
|---|---|---|
| Net income | $17,048 | $18,956 |
| Average number of shares | 34,221 | 34,593 |
| Earnings per share | $0.50 | $0.55 |

The average number of shares outstanding during the periods reflects the issuance of 213,221 shares in March 2004 and 235,893 shares in February 2005 pursuant to the 2004 Stock Purchase Plan.

4. The Company follows the provisions of Statement of Financial Accounting Standards No. 130 (SFAS 130), Reporting Comprehensive Income. SFAS 130 establishes standards for reporting and display of comprehensive income and its components in financial statements. Comprehensive income is the total of net income and all other non-owner changes in equity including items such as net unrealized gains/losses on securities classified as available for sale, foreign currency translation adjustments and minimum pension liability adjustments. For the three months ended March 31, 2004 and 2005, the Company's net unrealized gain on marketable securities increased by $2,753 thousand and decreased by $2,407 thousand repectively.

Comprehensive Income for the Three Months Ended March 31, 2004 and 2005
(in thousands where applicable)

|  | 3 months ended Mar 31 | |
|  | 2004 | 2005 |
|---|---|---|
| Net income | $17,048 | $18,956 |
| Net unrealized gains (losses) | 2,753 | (2,407) |
| Comprehensive income | $19,801 | $16,549 |

Page 6 of 11

5. At March 31, 2005 the Company's marketable securities had a fair market value of $232,112,315 which includes a gross unrealized gain of $19,294,202 and a gross unrealized loss of $1,412,339. The gross unrealized loss is composed of 5 equities with an original cost of $25,180,664 and a fair market value of $23,768,325. These 5 equities have been in an unrealized loss status for less than 3 months. The Company considered the effect of rising interest rates and the issuer's current financial position in order to reach its conclusion that these impairments are temporary at March 31, 2005. The details are as follows:

| Description of Securities | Fair Market Value | Unrealized Loss |
|---|---|---|
| 1 common equity | $6,579,360 | $309,035 |
| 4 preferred equities | $17,188,965 | $1,103,304 |

6. The Company follows the provisions of Statement of Financial Accounting Standards No. 131 (SFAS 131), Disclosure About Segments of an Enterprise and Related Information. Based on the criteria set forth in SFAS 131 the Company currently operates in one operating segment, medical software and services. The Company derives substantially all of its operating revenue from the sale and support of one group of similar products and services. All of the Company's assets are located within the United States. During the first three months of 2005, 89% of our operating revenue was derived from the United States, 10% from Canada and 1% from other countries.

7. During the month of February from 1997 through 2003, the Company offered and sold shares of its common

DEF003709

stock to its staff members in a manner which may not have complied with the registration requirements of certain federal and state securities laws. During the 4th quarter of 2004 the Company made a recision offer to these individuals so as to extinguish its liability, if any, for these potential securities law violations. None of these individuals accepted the recision offer.

Prior to the 4th quarter of 2004 the shares subject to recision rights were considered and treated as redeemable common stock for financial accounting purposes until such time as the recision rights terminated or were exercised. Therefore the recision amount and the related shares were classified as Temporary Equity. In late December, when the recision offer expired, the Company transferred the recision amount and related shares from Temporary Equity to Shareholder Equity.

Item 2 - Management's Discussion and Analysis of Financial Condition and Results of Operations

### Results of Operations for 3 Months Ended March 31, 2004 and 2005
#### (in thousands where applicable)

|  | 3 months ended Mar 31 | | |
|  | 2004 | 2005 | Change |
|---|---|---|---|
| Total revenue | $68,800 | $73,522 | 6.9% |
| Operating income | 24,906 | 27,144 | 9.0% |
| Net income | 17,048 | 18,956 | 11.2% |
| Average number of shares | 34,221 | 34,593 | 1.1% |
| Earnings per share | $0.50 | $0.55 | 10.0% |
| Cash dividends per share | $0.45 | $0.50 | 11.1% |

Page 7 of 11

Total revenue from both existing and new customers increased by $4.7 million. It was composed of a $1.8 million increase in product revenue and a $2.9 million increase in service revenue.

Operating expense increased by $2.5 million or 5.7% due primarily to an increase in product development, sales and marketing staff levels along with their associated costs. The resultant operating income increased by $2.2 million.

Other income increased by $1.3 million or 25.9% due primarily to a $0.9 million marketable securities gain. Other expense increased by $0.4 million or 20.6% due primarily to higher rental costs and increased lawsuit related legal expenses. The resultant pretax income increased by $3.2 million or 11.3%.

The Company's effective tax rate remained at 39.5%. Net income increased by $1.9 million due primarily to the greater increase in revenue compared to expense.

### Financial Condition as of December 31, 2004 and March 31, 2005
#### (in thousands where applicable)

|  | Dec 31, 2004 | Mar 31, 2005 |
|---|---|---|
| Cash and equivalents | $14,566 | $21,512 |
| Total assets | 427,315 | 425,732 |
| Total liabilities | 57,265 | 49,549 |
| Shareholder equity | 370,050 | 376,183 |
| Outstanding number of shares | 34,514 | 34,750 |
| Shareholder equity per share | $10.72 | $10.83 |

DEF003710

At December 31, 2004 the Company had no payroll tax withholding outstanding while $2.2 million was outstanding at March 31, 2005. This is the primary reason accounts payable increased by $2.4 million during the quarter.

Taxes payable increased by $7,357 thousand during the quarter primarily as a result of the federal tax payment schedule which calls for payment of both the first and second quarter's tax expense during the second quarter.

Accrued expenses decreased by $14.2 million during the quarter as a result of the payment of $21.3 million in bonuses applicable to 2004, offset by the accrual of $6.9 million in bonus expenses applicable to 2005.

---

Page 8 of 11

---

Liquidity and Capital Resources:

At March 31, 2005 the Company's cash, cash equivalents and marketable securities totaled $253.6 million. Marketable securities consisted of preferred equities, common equities and government notes which can easily be converted to cash. For the first three months of 2005 cash flow from operations was $15.1 million, cash flow from investing was $2.3 million and cash flow used in financing was $10.4 million. The payment of $17.3 million in dividends to shareholders was the primary use of cash generated by operating activities during the quarter.

MEDITECH has no long-term debt. Shareholder equity at March 31, 2005 was $376.2 million. Management anticipates additions to property, plant and equipment will continue, including new facilities and computer systems for product development, sales and marketing, implementation, service and administrative staff. Management believes existing cash, cash equivalents and marketable securities together with funds generated from operations will be sufficient to meet operating and capital expense requirements for the foreseeable future.

Item 4 - Controls and Procedures

An evaluation was conducted under the supervision and with the participation of the Company's management, including the Chief Executive Officer and Chief Financial Officer, on the effectiveness of the Company's disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)14(c) under the Securities Exchange Act of 1934) as of the end of the period covered by this report. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded the Company's disclosure controls and procedures are, to the best of their knowledge, effective to ensure information requiring disclosure by the Company in reports which it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms.

There were no changes in the Company's internal control over financial reporting occurring during the fiscal quarter covered by this report which have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.

Part II - Other Information

Item 1 - Legal Proceedings

On April 18, 2003, a shareholder and former Director of the Company filed a complaint in the Suffolk County, Massachusetts Superior Court against the Company and five of its six Directors. The complaint is summarized in the 2004 Annual Report on Form 10-K.

On February 10, 2005, a former employee filed a complaint in the United States District Court for the District of Massachusetts against the Medical Information Technology Profit Sharing Plan and all six of the Company's Directors. The complaint is summarized in the 2005 Definitive Proxy Statement on Schedule 14A.

---

Page 9 of 11

---

Item 2 - Unregistered Sales of Equity Securities and Use of Proceeds

DEF003711

The Company did not repurchase any of its shares of common stock during the first quarter of 2005. However, during the quarter the Medical Information Technology, Inc. Profit Sharing Trust purchased 3,470 shares of the Company's common stock for a total of $100,630 in individual private transactions. Below is a table showing the purchases of common stock by the Trust during each month of the first quarter of 2005.

| 1st quarter of 2005 | shares purchased | price per share |
|---|---|---|
| January | none | -- |
| February | 2,050 | $29.00 |
| March | 1,420 | $29.00 |

Item 4 - Submission of Matters to a Vote of Shareholders

The Annual Meeting of Shareholders of Medical Information Technology, Inc. was held on Monday, April 25, 2005. The meeting was convened at 9am with the Chairman, A. Neil Pappalardo, presiding and the Clerk, Barbara A. Manzolillo, keeping the minutes.

On the March 25, 2004 record date there were outstanding a total of 34,750,437 shares of Common Stock, par value $1.00 per share. A total of 33,435,266 shares or 96.2% of the outstanding shares, constituting a quorum, were represented at the meeting by proxy or by ballot.

The following six directors of the Company were elected to serve until the 2006 Annual Meeting of Shareholders and thereafter until their successors are chosen and qualified, with votes cast as follows:

| | shares in favor | shares withheld |
|---|---|---|
| A. Neil Pappalardo | 31,653,042 | 1,782,224 |
| Lawrence A. Polimeno | 31,653,042 | 1,782,224 |
| Roland L. Driscoll | 31,653,042 | 1,782,224 |
| Edward B. Roberts | 31,653,042 | 1,782,224 |
| Morton E. Ruderman | 31,653,042 | 1,782,224 |
| L. P. Dan Valente | 31,653,042 | 1,782,224 |

Page 10 of 11

A proposal to ratify the selection of Ernst & Young LLP as the Company's Independent Registered Public Accounting Firm for the fiscal year ending December 31, 2005 was approved, with 33,343,001 shares in favor, 36,750 shares against and 55,515 shares abstaining.

A shareholder proposal relating to the valuation of the Company's common stock was defeated, with 3,188,384 shares in favor, 29,912,720 shares against and 334,162 shares abstaining.

Item 6 - Exhibits

Exhibit 3.1: MEDITECH's Articles of Organization, as amended to date, is incorporated by reference to an exhibit to the Form 10 filed with the SEC on March 28, 1996, an exhibit to the annual report on Form 10-K for the year ended December 31, 2001 and an exhibit to the quarterly report on Form 10-Q for the quarter ended September 30, 2004.

Exhibit 3.2: MEDITECH's By-laws, as amended to date, is incorporated by reference to an exhibit to the annual report on Form 10-K for the year ended December 31, 2001.

DEF003712

Exhibit 31, Rule 13a-14(a) Certifications, and Exhibit 32, Section 1350 Certifications, are appended to this report.

There were no reports filed on Form 8-K during the quarter ended March 31, 2005.

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Medical Information Technology, Inc.
(Registrant)

April 29, 2005
(Date)

By: Barbara A. Manzolillo, Chief Financial Officer and Treasurer
(Signature)

Page 11 of 11

Exhibit 31, Rule 13a-14(a) Certifications

CERTIFICATION PURSUANT TO RULE 13A-14 OR 15D-14 OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Barbara A. Manzolillo, Chief Financial Officer and Treasurer, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Medical Information Technology, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) [Paragraph omitted in accordance with SEC transition instructions];

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of

DEF003713

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

April 29, 2005
(Date)

Barbara A. Manzolillo, Chief Financial Officer and Treasurer
(Signature)

I, A. Neil Pappalardo, Chief Executive Officer and Chairman, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Medical Information Technology, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) [Paragraph omitted in accordance with SEC transition instructions];

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

April 29, 2005
(Date)

(Signature)

Exhibit 32, Section 1350 Certifications

I, Barbara A. Manzolillo, Chief Financial Officer and Treasurer, certify this quarterly report on Form 10-Q of Medical Information Technology, Inc. for the period ended March 31, 2005, fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of the Company.

April 29, 2005
(Date)

Barbara A. Manzolillo, Chief Financial Officer and Treasurer
(Signature)

I, A. Neil Pappalardo, Chief Executive Officer and Chairman, certify this quarterly report on Form 10-Q of Medical Information Technology, Inc. for the period ended March 31, 2005, fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of the Company.

April 29, 2005
(Date)

A. Neil Pappalardo, Chief Executive Officer and Chairman
(Signature)

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

DEF003715

# EXHIBIT 4

# MEDICAL INFORMATION TECHNOLOGY INC

## FORM 10-Q
(Quarterly Report)

## Filed 4/28/2006 For Period Ending 3/31/2006

| Address | MEDITECH CIRCLE |
| --- | --- |
| | WESTWOOD, Massachusetts 02090 |
| Telephone | 781-821-3000 |
| CIK | 0001011452 |
| Fiscal Year | 12/31 |

Powered By EDGAROnline

http://www.edgar-online.com/
© Copyright 2006, All Rights Reserved
Distribution and use of this document restricted under EDGAR Online's Terms of Use.

DEF004091

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-Q

QUARTERLY REPORT
PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE QUARTER ENDED MARCH 31, 2006

0-28092
(Commission file number)

Medical Information Technology, Inc.
(Exact Name of Registrant as Specified in Its Charter)

Massachusetts
(State of Incorporation)

04-2455639
(IRS Employer Identification Number)

Meditech Circle, Westwood, MA
(Address of Principal Executive Offices)

02090
(Zip Code)

781-821-3000
(Registrant's Telephone Number)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of accelerated filer and large accelerated filer in Rule 12b-2 of the Exchange Act. Large accelerated filer [ ] Accelerated filer [ ] Non accelerated filer [X]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes [ ] No [X]

There were 35,088,133 shares of Common Stock, $1.00 par value, outstanding at March 31, 2006.

Page 1 of 11

| Index to Form 10-Q | Page |
|---|---|

Part I - Financial Information
  Item 1 - Financial Statements (Unaudited)

| | Page |
|---|---|
| Balance Sheet as of December 31, 2005 and March 31, 2006 | 3 |
| Statement of Income for the Three Months Ended March 31, 2005 and 2006 | 4 |
| Statement of Cash Flow for the Three Months Ended March 31, 2005 and 2006 | 5 |

DEF004092

Notes To Financial Statements                                                        6
  Item 2 - Management's Discussion and Analysis of Financial Condition and Results of    7
Operations
  Item 4 - Controls and Procedures                                                   9
Part II - Other Information
  Item 1 - Legal Proceedings                                                         9
  Item 2 - Unregistered Sales of Equity Securities and Use of Proceeds          ·    10
  Item 4 - Submission of Matters to a Vote of Shareholders                           10
  Item 6 - Exhibits                                                                  11
Signatures                                                                           11

Page 2 of 11

Part I - Financial Information

Item 1 - Financial Statements (Unaudited)

Balance Sheet as of December 31, 2005 and March 31, 2006

|  | Dec 31, 2005 | Mar 31, 2006 |
|---|---|---|
| Cash and equivalents | $16,749,452 | $30,949,687 |
| Marketable securities | 216,955,323 | 207,969,043 |
| Accounts receivable, less reserve | 36,480,661 | 34,173,847 |
| Current assets | 270,185,436 | 273,092,577 |
| Computer equipment | 8,163,198 | 8,753,563 |
| Furniture and fixtures | 30,855,824 | 31,183,757 |
| Buildings | 140,326,869 | 141,030,297 |
| Land | 26,603,703 | 29,148,703 |
| Accumulated depreciation | (74,806,735) | (76,828,897) |
| Fixed assets | 131,142,859 | 133,287,423 |
| Marketable securities | 39,990,000 | 39,990,000 |
| Investments | 8,252,604 | 9,192,604 |
| Total assets | $449,570,899 | $455,562,604 |
| Accounts payable | $468,727 | $3,161,560 |
| Taxes payable | 3,422,826 | 10,481,181 |
| Accrued expenses | 27,789,307 | 12,623,997 |
| Customer deposits | 21,004,270 | 22,056,867 |

DEF004093

| Deferred taxes and tax reserves | 12,873,497 | 13,189,489 |
| --- | --- | --- |
| **Total liabilities** | **65,558,627** | **61,513,094** |

| Common stock $1.00 par value, authorized 40,000,000 shares, issued and outstanding 34,830,437 in 2005 and 35,088,133 in 2006 | 34,830,437 | 35,088,133 |
| --- | --- | --- |
| Additional paid-in capital | 33,353,809 | 41,342,385 |
| Retained income | 306,423,742 | 307,815,719 |
| Unrealized security gains, net of tax | 9,404,284 | 9,803,273 |
| **Shareholder equity** | **384,012,272** | **394,049,510** |
| **Total liabilities and shareholder equity** | **$449,570,899** | **$455,562,604** |

Page 3 of 11

---

Statement of Income for the Three Months Ended March 31, 2005 and 2006

|  | 3 months ended Mar 31 | |
| --- | --- | --- |
|  | 2005 | 2006 |
| Product revenue | $38,650,359 | $43,746,790 |
| Service revenue | 34,871,883 | 38,442,868 |
| **Total revenue** | **73,522,242** | **82,189,658** |
| Operations, development | 30,216,164 | 34,749,443 |
| Selling, G & A | 16,161,709 | 18,267,154 |
| **Operating expense** | **46,377,873** | **53,016,597** |
| **Operating income** | **27,144,369** | **29,173,061** |
| Other income | 6,481,325 | 5,725,256 |
| Other expense | 2,281,616 | 2,163,903 |
| **Pretax income** | **31,344,078** | **32,734,414** |
| State income tax | 2,883,000 | 2,824,000 |
| Federal income tax | 9,505,000 | 9,710,000 |

DEF004094

| | | |
|---|---|---|
| Income tax | 12,388,000 | 12,534,000 |
| Net income | $18,956,078 | $20,200,414 |

Page 4 of 11

Statement of Cash Flow for the Three Months Ended March 31, 2005 and 2006

| | 3 months ended Mar 31 | |
|---|---|---|
| | 2005 | 2006 |
| Net income | $18,956,078 | $20,200,414 |
| Depreciation expense | 1,890,200 | 2,022,162 |
| Gain on sales of marketable securities | (928,231) | (8,230) |
| Deferred taxes on unrealized securities (gains) losses | 1,604,562 | (265,992) |
| Change in accounts receivable | 1,284,080 | 2,306,814 |
| Change in accounts payable | 2,429,549 | 2,692,833 |
| Change in taxes payable | 7,355,630 | 7,058,355 |
| Change in accrued expenses | (14,237,516) | (15,165,310) |
| Change in customer deposits | (1,659,817) | 1,052,597 |
| Change in deferred taxes and tax reserves | (1,604,562) | 315,992 |
| Net cash from operations | 15,089,973 | 20,209,635 |
| Purchases of marketable securities | (11,240,500) | (13,340,510) |
| Sales of marketable securities | 13,746,318 | 23,000,000 |
| Purchases of fixed assets | (293,663) | (4,166,726) |
| Increase in investments | -- | (1,000,000) |
| Proceeds from mortgage note receivable | 60,000 | 60,000 |
| Net cash from investing | 2,272,155 | 4,552,764 |
| Sales of common stock | 6,840,897 | 8,246,272 |
| Dividends paid | (17,257,272) | (18,808,436) |
| Net cash used in financing | (10,416,375) | (10,562,164) |
| Net change in cash and equivalents | 6,945,753 | 14,200,235 |
| Cash and equivalents at beginning | 14,565,840 | 16,749,452 |
| Cash and equivalents at end | $21,511,593 | $30,949,687 |

DEF004095

Notes To Financial Statements:

1. The unaudited financial statements presented herein have been prepared in accordance with the instructions to Form 10-Q and do not include all of the information and note disclosures required by generally accepted accounting principles. These statements should be read in conjunction with the financial statements and notes thereto for the year ended December 31, 2005 included in the Company's Form 10-K filed January 31, 2006. The unaudited financial statements presented herein have not been audited by our Independent Registered Public Accounting Firm in accordance with the standards of the Public Company Accounting Oversight Board (United States), but in the opinion of management such financial statements include all normal recurring adjustments necessary to present fairly the Company's financial position, results of operations and cash flow.

2. The Company follows the provisions of Statement of Financial Accounting Standards No. 128 (SFAS 128), Earnings per Share. SFAS 128 requires reporting both basic and diluted earnings per share (EPS). The Company has no common share equivalents such as preferred stock, warrants or stock options which would dilute EPS. Thus, EPS is computed by dividing net income by the weighted average number of common shares outstanding during the applicable period.

|  | 3 months ended Mar 31 | |
|---|---|---|
|  | 2005 | 2006 |
| Net income | $18,956,078 | $20,200,414 |
| Average number of shares | 34,671,806 | 34,988,901 |
| Earnings per share | $0.55 | $0.58 |

The average number of shares outstanding during the periods reflects the issuance of 235,893 shares in February 2005 and 257,696 shares in February and March 2006 pursuant to the 2004 Stock Purchase Plan.

3. The Company follows the provisions of Statement of Financial Accounting Standards No. 130 (SFAS 130), Reporting Comprehensive Income. SFAS 130 establishes standards for reporting and display of comprehensive income and its components in financial statements. Comprehensive income is the total of net income and all other non-owner changes in equity including items such as net unrealized gains/losses/reclassifications on marketable securities classified as available for sale, foreign currency translation adjustments and minimum pension liability adjustments.

|  | 3 months ended Mar 31 | |
|---|---|---|
|  | 2005 | 2006 |
| Net income | $18,956,078 | $20,200,414 |
| Net unrealized security gains (losses) | (2,406,844) | 398,989 |
| Comprehensive income | $16,549,234 | $20,599,403 |

Page 6 of 11

4. At March 31, 2006 the Company's marketable securities had a fair market value of $247,959,043 which includes a gross unrealized gain of $18,340,581 and a gross unrealized loss of $2,001,793. The gross unrealized loss is composed of 6 equities with an original cost of $40,351,900 and a fair market value of $38,350,107. None

DEF004096

of these 6 equities have been in loss status for more than 10% of cost for longer than 30 consecutive days. The Company considered the effect of rising interest rates and the issuers' current financial position in order to reach its conclusion that these impairments are temporary at March 31, 2006. The details are as follows:

| Description of Securities | Fair Market Value | Unrealized Loss |
|---|---|---|
| 2 common equities | $8,784,700 | $886,175 |
| 4 preferred equities | $29,565,407 | $1,115,618 |

5. The Company follows the provisions of Statement of Financial Accounting Standards No. 131 (SFAS 131), Disclosure About Segments of an Enterprise and Related Information. Based on the criteria set forth in SFAS 131 the Company currently operates in one operating segment, medical software and services. The Company derives substantially all of its operating revenue from the sale and support of one group of similar products and services. All of the Company's assets are located within the United States. During the first 3 months of 2006, 83% of our operating revenue was derived from the United States, 16% from Canada and 1% from other countries, all of which is similar to prior years.

6. During March of 2006, the Company issued a note receivable to a company which the Company holds an equity investment in for up to $3,000,000. As of March 31, 2006, $1,000,000 had been borrowed against the $3,000,000 commitment. The note bears interest at a rate of 8.0% per annum and is repayable in equal monthly installments over a ten year period commencing on January 31, 2007. The note is fully collateralized by a building, which is owned by the company and used as its corporate headquarters.

Item 2 - Management's Discussion and Analysis of Financial Condition and Results of Operations

| Results of Operations | 3 months ended Mar 31 | | |
|---|---|---|---|
| | 2005 | 2006 | Change |
| Total revenue | $73,522,242 | $82,189,658 | 11.8% |
| Operating income | 27,144,369 | 29,173,061 | 7.5% |
| Net income | 18,956,078 | 20,200,414 | 6.6% |
| Average number of shares | 34,671,806 | 34,988,901 | 0.9% |
| Earnings per share | $0.55 | $0.58 | 5.6% |
| Cash dividends per share | $0.50 | $0.54 | 8.0% |

Page 7 of 11

Total revenue from both existing and new customers increased by $8.7 million. It was composed of a $5.1 million increase in product revenue and a $3.6 million increase in service revenue.

Operating expense increased by $6.6 million or 14.3% due to an overall increase in staff and additional bonus expense accruals. The resultant operating income increased by $2.0 million.

Other income decreased by $0.8 million or 11.7% due primarily to decreased realized gains in marketable securities. Other expense decreased by $0.1 million or 5.2% due primarily to decreased legal expenses. The resultant pretax income increased by $1.4 million or 4.4%.

The Company's effective tax rate decreased from 39.5% to 38.3% due primarily to decreased taxes on customer deposits. Net income increased by $1.2 million due primarily to the greater increase in revenue compared to expense.

| Financial Condition | Dec 31, 2005 | Mar 31, 2006 |
|---|---|---|

| | | |
|---|---|---|
| Cash and equivalents | $16,749,452 | $30,949,687 |
| Total assets | 449,570,899 | 455,562,604 |
| Total liabilities | 65,558,627 | 61,513,094 |
| Shareholder equity | 384,012,272 | 394,049,510 |
| Outstanding number of shares | 34,830,437 | 35,088,133 |
| Shareholder equity per share | $11.03 | $11.23 |

At December 31, 2005 the Company had no payroll tax withholding outstanding while $2.5 million was outstanding at March 31, 2006. This is the primary reason accounts payable increased by $2.7 million during the quarter.

Taxes payable increased by $7.1 million during the quarter primarily as a result of the federal tax payment schedule which calls for payment of both the first and second quarter's tax expense during the second quarter.

Accrued expenses decreased by $15.2 million during the quarter primarily as a result of the payment of $23.6 million in bonuses applicable to 2005, offset by the accrual of $7.6 million in bonus expenses applicable to 2006.

Page 8 of 11

Liquidity and Capital Resources:

At March 31, 2006 the Company's cash, cash equivalents and marketable securities totaled $278.9 million. Marketable securities consisted of preferred equities, common equities and government notes which can easily be converted to cash. For the first three months of 2006 cash flow from operations was $20.2 million, cash flow from investing was $4.6 million and cash flow used in financing was $10.6 million. The payment of $18.8 million in dividends to shareholders was the primary use of cash generated by operating activities during the quarter.

MEDITECH has no long-term debt. Shareholder equity at March 31, 2006 was $394.0 million. Management anticipates additions to fixed assets will continue, including new facilities and computer systems for product development, sales and marketing, implementation, service and administrative staff. Management believes existing cash, cash equivalents and marketable securities together with funds generated from operations will be sufficient to meet operating and capital expense requirements for the foreseeable future.

Item 4 - Controls and Procedures

An evaluation was conducted under the supervision and with the participation of the Company's management, including the Chief Executive Officer and Chief Financial Officer, on the effectiveness of the Company's disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)14(c) under the Securities Exchange Act of 1934) as of the end of the period covered by this report. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded the Company's disclosure controls and procedures are, to the best of their knowledge, effective to ensure information requiring disclosure by the Company in reports which it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms.

There were no changes in the Company's internal control over financial reporting occurring during the fiscal quarter covered by this report which have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.

Part II - Other Information

Item 1 - Legal Proceedings

On February 10, 2005, a former employee filed a complaint in the United States District Court for the District of Massachusetts against the Medical Information Technology Profit Sharing Plan and all six of the Company's Directors. The substance of the complaint is summarized in the 2005 Annual Report on Form 10-K. The complaint

DEF004098

was subsequently amended to add the Company as a defendant. On March 20, the judge dismissed the breach of fiduciary duty claims brought against the individual defendants. The remaining claim is an ERISA benefits claim against the Plan, the Plan's trustee, and the Company. The judge did not rule on the plaintiff's request for the complaint to be a class action.

Page 9 of 11

Item 2 - Unregistered Sales of Equity Securities and Use of Proceeds

The Company did not repurchase any of its shares of common stock during the first quarter of 2006. However, during the quarter the Medical Information Technology, Inc. Profit Sharing Trust purchased 2,400 shares of the Company's common stock for a total of $76,800 in individual private transactions. Below is a table showing the purchases of common stock by the Trust during each month of the first quarter of 2006.

| 1st quarter of 2006 | shares purchased | price per share |
|---|---|---|
| January | none | -- |
| February | 2,400 | $32.00 |
| March | none | -- |

Item 4 - Submission of Matters to a Vote of Shareholders

The Annual Meeting of Shareholders of Medical Information Technology, Inc. was held on Monday, April 24, 2006. The meeting was convened at 9am with the Chairman, A. Neil Pappalardo, presiding and the Clerk, Barbara A. Manzolillo, keeping the minutes.

On the March 24, 2006 record date there were outstanding a total of 35,088,133 shares of Common Stock, par value $1.00 per share. A total of 33,187,584 shares or 94.6% of the outstanding shares, constituting a quorum, were represented at the meeting by proxy or by ballot.

The following six directors of the Company were elected to serve until the 2007 Annual Meeting of Shareholders and thereafter until their successors are chosen and qualified, with votes cast as follows:

| | shares in favor | shares withheld |
|---|---|---|
| A. Neil Pappalardo | 31,682,525 | 1,505,059 |
| Lawrence A. Polimeno | 31,682,525 | 1,505,059 |
| Roland L. Driscoll | 31,682,565 | 1,505,019 |
| Edward B. Roberts | 31,682,565 | 1,505,019 |
| Morton E. Ruderman | 31,682,565 | 1,505,019 |
| L. P. Dan Valente | 31,682,565 | 1,505,019 |

Page 10 of 11

A proposal to ratify the selection of Ernst & Young LLP as the Company's Independent Registered Public Accounting Firm for the fiscal year ending December 31, 2006 was approved, with 33,120,633 shares in favor, 23,500 shares against and 43,451 shares abstaining.

A shareholder proposal relating to the valuation of the Company's common stock was defeated, with 1,846,374 shares in favor, 31,240,046 shares against and 101,164 shares abstaining.

Item 6 - Exhibits

Exhibit 3.1: MEDITECH's Articles of Organization, as amended to date, is incorporated by reference to an exhibit to the Form 10 filed with the SEC on March 28, 1996, an exhibit to the annual report on Form 10-K for the year ended December 31, 2001 and an exhibit to the quarterly report on Form 10-Q for the quarter ended September 30, 2004.

Exhibit 3.2: MEDITECH's By-laws, as amended to date, are incorporated by reference to an exhibit to the annual report on Form 10-K for the year ended December 31, 2001.

Exhibit 31: Rule 13a-14(a) Certifications and Exhibit 32: Section 1350 Certifications are appended to this report.

There were no reports filed on Form 8-K during the quarter ended March 31, 2006.

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Medical Information Technology, Inc.
(Registrant)

April 28, 2006
(Date)

By: Barbara A. Manzolillo, Chief Financial Officer and Treasurer
(Signature)

·

DEF004100

CERTIFICATION PURSUANT TO RULE 13A-14 OR 15D-14 OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Barbara A. Manzolillo, Chief Financial Officer and Treasurer, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Medical Information Technology, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) [Paragraph omitted in accordance with SEC transition instructions];

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

April 28, 2006
(Date)

Barbara A. Manzolillo, Chief Financial Officer and Treasurer
(Signature)

I, A. Neil Pappalardo, Chief Executive Officer and Chairman, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Medical Information Technology, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) [Paragraph omitted in accordance with SEC transition instructions];

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

April 28, 2006
(Date)


A. Neil Pappalardo, Chief Executive Officer and Chairman
(Signature)

DEF004102

I, Barbara A. Manzolillo, Chief Financial Officer and Treasurer, certify this quarterly report on Form 10-Q of Medical Information Technology, Inc. for the period ended March 31, 2006, fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of the Company.

April 28, 2006
(Date)

Barbara A. Manzolillo, Chief Financial Officer and Treasurer
(Signature)

I, A. Neil Pappalardo, Chief Executive Officer and Chairman, certify this quarterly report on Form 10-Q of Medical Information Technology, Inc. for the period ended March 31, 2006, fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of the Company.

April 28, 2006
(Date)

A. Neil Pappalardo, Chief Executive Officer and Chairman
(Signature)

# EXHIBIT 5 – PART 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually and On Behalf Of All Persons Similarly Situated )<br><br>Plaintiffs, )<br><br>v. )<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, et al. )<br><br>Defendants. ) | Civil Case No. 05-10269-RWZ |

## PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

This document request incorporates the definitions set forth in Local Rule 26.5.

### I.   ADDITIONAL DEFINITIONS AND INSTRUCTIONS

A.   Additional Definitions

1.   "Defendants" means A. Neil Pappalardo, the Medical Information Technology Profit Sharing Plan, and Medical Information Technology, Inc.

2.   "You" means the Defendants and all agents, officers, employees, representatives, attorneys, and/or any other persons who at any time acted or purported to act on behalf of any of the Defendants.

3.   "Corporation" means Medical Information Technology, Inc.

4.   "Plan" means the Medical Information Technology Profit Sharing Plan.

5.   "Trust" means the trust holding the assets of the Plan; and the term "Trust Agreement" means the agreement with the Trustees of the Plan pursuant to which the Trust is established.

6.    "Administrator" means the Administrator of the Plan, as the term "administrator" is defined by the Employee Retirement Income Security Act of 1974, 19 U.S.C. § 1001 et seq. ("ERISA"), and includes any person or entity acting on behalf of the Administrator.

7.    "Plan Sponsor" means the sponsor of the Plan, as the term "plan sponsor" is defined by ERISA.

8.    "Trustee" means the trustee of the Plan, as the term "trustee" is defined by ERISA.

9.    "Participant" means any person working as an employee for Meditech who participated in the Plan.

10.    "Summary Plan Description" means the summary description of the Plan as defined in and required by ERISA.

11.    "Summary of Material Modifications" means the summary of material modifications of the terms of the Plan, as defined in and required by ERISA.

12.    "Statement of participant's benefit rights" means a statement given to a participant or beneficiary of the plan setting forth benefit information as required by ERISA.

13.    "Person" means any natural person, corporation, partnership, company, sole proprietorship, association, institute, joint venture, trust, firm, or other entity.

14.    "Identify" means, in reference to a document, the date, author(s) (where applicable), recipient(s) (where applicable), the nature of the document (i.e., whether a letter, memorandum, etc.), the title of the document (where applicable), whether any

other document(s) was attached to or included with such document, and the number of pages in such document and any attachments or enclosures.

15.     "Identify" means, with respect to a person or entity, the person or entity's full name, present resident address, present business affiliation and position, present business address, and present business telephone number. If you do not know the person or entity's current location, identify the person's last known residence and the person or entity's last known business address and telephone number.

16.     "Complaint" means the amended complaint filed in this matter.

17.     "Answer" means the answer filed by the Defendants.

18.     "Communication" means any documents, oral statements, meetings, or conferences, formal or informal, at any time and place, and under any circumstances whatsoever, whereby information of any nature was stated, written, recorded or in any manner transmitted or transferred.

19.     "Document" means any kind of written, recorded, or graphic matter, however produced or reproduced, of any kind or description, whether sent or received or neither, including original, identical, or non-identical copies (whether different from the original because of marginal notes or other material inserted or attached, or otherwise), and drafts, and including but not limited to: (1) contracts; (2) agreements; (3) policies; (4) checks; (5) periodic bank statements; (6) papers; (7) books; (8) letters; (9) correspondence; (10) telegrams; (11) cables; (12) telex messages; (13) telecopier or fax messages; (14) memoranda; (15) notes; (16) reports and recordings of telephone and other conversations or interviews, or of conferences or other meetings; (17) affidavits; (18) statements; (19) summaries; (20) opinions; (21) reports; (22) studies; (23)

evaluations; (24) ledgers; (25) journals; (26) statistical records; (27) desk calendars; (28) appointment books; (29) diaries; (30) listings; (31) tabulations; (32) sound recordings; (33) computer printouts; (34) data processing records; (35) microfilm; (36) photographs; (37) maps; (38) charts; (39) accounts; (40) all records kept by electronic, magnetic, photographic, or mechanical means; (41) pleadings; (42) analyses; (43) financial statements and records thereof; (44) videos; and (45) things similar to any of the foregoing, however denominated.

20.     "Evidencing" or "Evidences" means proving, tending to prove, or indicating the existence or nature of.

21.     "Concerning" means relating to, constituting, discussing, describing, comprising, reflecting, summarizing, referring to, or evidencing.

21.     "Including" means including but not limited to.

22.     "Any" means any and all.  "All" also means any and all.

23.     "Person" includes any natural person, firm, association, organization, partnership, limited partnership, sole proprietorship, trust, corporation or governmental body.

24.     "And" and "or" shall be construed either conjunctively or disjunctively to bring within the scope of these interrogatories any information which might otherwise be construed to be outside their scope.

25.     The singular of any term shall include the plural, and the plural of any term shall include the singular.

4

B.    Instructions

1.    These requests require you to produce all responsive documents that are in your actual or constructive possession, custody, or control.

2.    These requests are continuing so as to require supplementation.

3.    If any document is withheld on the basis of a claim of privilege, the claim is to be made expressly, and shall be supported by a description of the nature of the document not produced that is sufficient to enable the plaintiffs to evaluate the claim. Such information shall include the following:

(a)    a description of the general type of document (e.g., letter, memorandum, etc.), including the number of pages;

(b)    the date of the document;

(c)    the author of the document, and his or her title and employer;

(d)    all addressees or recipients of the document, and their titles and employers;

(e)    a general summary of the subject matter of the document; and

(f)    the grounds for refusing to produce the document.

4.    If you object to any request or part of any request, please produce all documents to which your objection does not apply.

5.    If you know of the existence, past or present, of any document described in these requests, but such document is not presently in your possession, custody, or control, please identify the document and the individual or entity in whose possession, custody, or control the document was last known to reside. If the document no longer exists, please state when, how, and why the document ceased to exist.

6.    The documents produced in response to these requests shall be either (a) organized and designated to correspond to the requests specified below, or (b) produced as they are maintained in the normal course of business.  In either event:

(a)    all associated file labels, file headings, and file folders shall be produced together with the responsive documents from each file and each file shall be identified as to its owner or custodian;

(b)    all photocopies shall be stapled or clipped as the originals; and

(c)    each page shall be given a discrete production number.

7.    You are requested to identify any documents that fall within this production request that you do not turn over on the basis of objection or an asserted privilege.

8.    Production of documents by each Defendant shall be made separately (in segregated groups) from the production of each other Defendant.

## II.    DOCUMENTS TO BE PRODUCED

Plaintiffs request that Defendants produce each of the following documents.

1.    All documents identified, used or referred to when responding to Plaintiffs' Interrogatories to Defendants.

2.    All version of the Plan that were in effect and all resolutions or instruments of adoption since January 1, 1996..

3.    All versions of the Trust Agreement that were in effect and all amendments to said Trust Agreement adopted since January 1, 1996.

4.    All versions of the Summary Plan Description, and all Summaries of Material Modifications issued by the Plan.

6

5.      All Annual Reports of Form 5500 (together with all Schedules and attachments thereto) of the Plan for each year since January 1, 1995.

6.      All Summary Annual Reports of the Plan for each year since January 1, 1995.

7.      All regulations established by the Trustee pursuant to section 11.10 of the Trust Agreement.

8.      All written communications between the Defendants (or any representative) on the one hand and any participant, terminating participant or terminated participant (or his or her representative) on the other since January 1, 1996 concerning:

        (a)      the participant's interest in the Plan and how that interest was calculated;

        (b)      the value of the Plan or its assets and how that value was calculated;

        (c)      how the participant's interest in the Plan is or was determined;

        (d)      a participant or former participant's rights of appeal from benefit determinations, including the process by which appeals could be made; and

        (e)      any denials of benefits (partial or full) sent under section 11.10 of the Plan or otherwise.

10.      All documents sent as a matter of course to a participant upon termination of their interest in the Plan since January 1, 1996.

11      All documents produced and/or exchanged between the parties in the matter of *Grossman v. Medical Information Technology, Inc,. et al.* concerning the valuation of Meditech stock, including but not limited to documents produced during

7

discovery by the defendants in that case, answers to requests for admissions, answers to interrogatories, deposition transcripts and the exhibits thereto, expert reports and the material provided to experts, and pleadings whether or not the pleadings were ultimately filed by either party.

Respectfully submitted,

**Michael P. Hubert,**
**William Trainor, and**
**David Hinchliffe,**
By their attorneys,

_/s/ Sara Noonan_
Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Sara Noonan (BBO #645293)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210
671-371-1000
671-371-1037

Dated: May 5, 2006

## Certificate of Service

I, Sara E. Noonan, hereby certify that I have, on this 5th day of May, 2006, caused the above document to be served by hand upon all counsel of record.

_/s/ Sara Noonan_
Sara E. Noonan

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually and On Behalf Of All Persons Similarly Situated<br><br>     Plaintiffs,<br><br>     v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, et al.<br><br>     Defendants. | Civil Case No. 05-10269-RWZ |

## PLAINTIFFS' INITIAL SET OF INTERROGATORIES TO DEFENDANTS

These interrogatories incorporate the definitions set forth in Local Rule 26.5.

## I.     ADDITIONAL DEFINITIONS AND INSTRUCTIONS

A.     Additional Definitions

1.     "Defendants" means A. Neil Pappalardo, the Medical Information Technology Profit Sharing Plan, and Medical Information Technology, Inc.

2.     "You" means the Defendants and all agents, officers, employees, representatives, attorneys, and/or any other persons who at any time acted or purported to act on behalf of any of the Defendants.

3.     "Corporation" or "Defendant Corporation" means Medical Information Technology, Inc.

4.     "Plan" means the Medical Information Technology Profit Sharing Plan.

5.    "Trust" means the trust holding the assets of the Plan; and the term "Trust Agreement" means the agreement with the Trustees of the Plan pursuant to which the Trust is established.

6.    "Administrator" means the Administrator of the Plan, as the term "administrator" is defined in the Employee Retirement Income Security Act of 1974, 19 U.S.C. § 1001 et seq. ("ERISA"), and includes any person or entity acting on behalf of the Administrator.

7.    "Plan Sponsor" means the sponsor of the Plan, as the term "plan sponsor" is defined by ERISA.

8.    "Trustee" means the trustee of the Plan, as the term "trustee" is defined by ERISA.

9.    "Participant" means any person working as an employee for Meditech who participated in the Plan.

10.    "Vested" means fully or partially vested.

11.    "Concerning" means relating to, constituting, discussing, describing, comprising, reflecting, summarizing, referring to, or evidencing.

12.    "Including" means including but not limited to.

13.    "Any" means any and all. The term "all" also means any and all.

14.    "Person" includes any natural person, firm, association, organization, partnership, limited partnership, sole proprietorship, trust, corporation or governmental body.

15.    "Document" means any kind of written, recorded, or graphic matter, however produced or reproduced, of any kind or description, whether sent or received or

2

neither, including original, identical, or non-identical copies (whether different from the original because of marginal notes or other material inserted or attached, or otherwise), and drafts, and including but not limited to: (1) contracts; (2) agreements; (3) policies; (4) checks; (5) periodic bank statements; (6) papers; (7) books; (8) letters; (9) correspondence; (10) telegrams; (11) cables; (12) telex messages; (13) telecopier or fax messages; (14) memoranda; (15) notes; (16) reports and recordings of telephone and other conversations or interviews, or of conferences or other meetings; (17) affidavits; (18) statements; (19) summaries; (20) opinions; (21) reports; (22) studies; (23) evaluations; (24) ledgers; (25) journals; (26) statistical records; (27) desk calendars; (28) appointment books; (29) diaries; (30) listings; (31) tabulations; (32) sound recordings; (33) computer printouts; (34) data processing records; (35) microfilm; (36) photographs; (37) maps; (38) charts; (39) accounts; (40) all records kept by electronic, magnetic, photographic, or mechanical means; (41) pleadings; (42) analyses; (43) financial statements and records thereof; (44) videos; and (45) things similar to any of the foregoing, however denominated.

16.    "Identify" means, with respect to a person or entity, the person or entity's full name, present resident address, present business affiliation and position, present business address, and present business telephone number.  If you do not know the person or entity's current location, identify the person's last known residence and the person or entity's last known business address and telephone number.

17.    "Identify" means, in reference to a document, the date, author(s) (where applicable), recipient(s) (where applicable), the nature of the document (i.e., whether a letter, memorandum, etc.), the title of the document (where applicable), whether any

3

other document(s) was attached to or included with such document, and the number of pages in such document and any attachments or enclosures.

18.    "And" and "or" shall be construed either conjunctively or disjunctively to bring within the scope of these interrogatories any information which might otherwise be construed to be outside their scope.

19.    The singular of any term shall include the plural, and the plural of any term shall include the singular.

B.    Instructions

1.    For each person consulted in order to answer these interrogatories (other than counsel), please list the person's name and position with the Company and describe the person's duties.

2.    When responding to each interrogatory, identify all documents relied upon in formulating the response.

## II.    INTERROGATORIES

1.    For the period between January 1, 1996 and January 1, 2006, please identify the following information:

(a)    All criteria or rules regarding eligibility to participate in the Plan, identified separately per year.

(b)    All criteria or rules regarding terminating participation in the Plan, identified separately per year.

(c)    The number of Meditech employees who participated in the Plan, identified separately per year.

4

(d)     The number of vested Plan participants who terminated their participation in the Plan, identified separately per year.

(e)     The number of vested Plan participants who were required to file a claim for benefits when terminating their participation in the Plan as a condition to receiving a distribution of their benefits, identified separately per year.

(f)     The number of vested Plan participants whose interest in the Plan was terminated and who received notice of a denial or partial denial of benefits, identified separately per year. If any, please identify the reasons for each denial or partial denial.

(g)     The number of vested Plan participants who appealed from a denial or partial denial of benefits, identified separately per year. If there were any, please identify the methods or means by which each appeal was filed, the person(s) involved in reviewing each appeal, the reasons given for each appeal, and the outcome of each appeal. If any documents were used in preparing this answer, please produce all such documents pursuant to Plaintiffs' First Document Requests of this same date.

(h)     The total dollar amount, identified separately by year, paid to Plan participants who terminated participation in the Plan.

(i)     The number of participants whose share of the Plan was calculated at $1,000,000 (one million) or more at any time during their participation in the Plan and who as a consequence were asked to rollover or withdraw a part of their interest in the Plan.

(j)     All communications to current, departing and former Plan participants concerning how the assets in the Plan are valued, including but not limited to communications advising who determines the value, the valuation methodology, and the

5

valuation amount. If any documents were used in preparing this answer, please produce all such documents pursuant to Plaintiffs' First Document Requests of this same date.

(k)     All communications to shareholders and/or employees concerning how Meditech stock is valued, from January 1, 1996 to January 30, 2006 including but not limited to communications advising who determines the value, the valuation methodology, and the valuation amount. If any documents were used in preparing this answer, please produce all such documents pursuant to Plaintiffs' First Document Requests of this same date.

(l)     All communications to current, departing and former Plan participants between January 1, 1996 and January 1, 2006 concerning their rights to appeal any decisions related to the valuation of the assets held by the Plan or the calculation of their individual interest in the Plan.

2.     For the period between January 1, 1995 and January 1, 2006, please identify the following information:

(a)     The total property belonging to the Plan in each year, whether held by the Trust or otherwise, separately identifying the value of each asset owned by the Plan and/or its participants, whether held by the Trust or otherwise, identified separately by year.

(b)     The total yearly contributions to the Plan by the Corporation, separately identifying cash contributions as well as each asset, including stock, contributed to the Plan and the asserted value of each asset at the time of contribution.

(c)     With respect to the contribution of Meditech stock to the Plan, set forth in full every methodology employed or used by the Corporation or any other

6

defendant to determine the value of Meditech stock at or about the time of contribution, including who was involved, the value determined, the dates upon which that methodology was employed, and identify all documents used to prepare the answer to this Interrogatory and produce same in response to Document Request Number One of even date.

(d)    Set forth the methodology employed to determine the value of each Participant's interest in the Plan, and the dates when that methodology was employed, and identify who was involved and produce and identify all documents used in preparing the answer to this Interrogatory.

(e)    As to each time when the value of Meditech stock was adjusted by any of the Defendants for any reason on or after January 1, 1995, set forth the date of each such adjustment, the person(s) involved in or responsible for the adjustment, the reason for the valuation adjustment if known, and the value assigned to the stock following the adjustment. If any documents were used in preparing this answer, please produce all such documents pursuant to Plaintiffs' First Document Requests of this same date.

(f)    Identify all regulations established pursuant to section 11.10 of the Plan. If any documents were used in preparing this answer, please produce all such documents pursuant to Plaintiffs' First Document Requests of this same date.

3.    State whether the value of the Meditech stock held by the Plan from January 1, 1995 to the present was calculated using the same methodology per Plan participant per year. If not, state the differences and identify each document that purports to show that the valuation methodology varied amongst participants.

7

4.      Describe under what circumstances Plan documents (including any version or portion of the Trust Agreement or Summary Plan Description) were distributed to participants (including departing participants or former participants), and identify for each such distribution the documents that were distributed, the person(s) responsible for distributing them, the date of distribution, the reason for the distribution, and the recipient(s) of the distribution.

5.      State whether the Plan had a standard document or set of documents that were provided in the normal course to participants at or near the time that the participant terminated his or her participation in the Plan from January 1, 1996 through January 1, 2006. If so, identify each such document. If not, identify the document(s) that were so distributed and identify and explain all differences between the documents or sets of documents per recipient.

6.      State the name, current address and title, and years of involvement of those individuals who had any role in deciding valuation issues pertaining to the Plan or any assets held by the Plan between January 1, 1995 and the present.

7.      Describe the role, duties and title of the following individuals with regard to the Plan since January 1, 1995 and give their current or last known home and business addresses:

A. Neil Pappalardo
Lawrence Polimeno
Edward B. Roberts
Roland L. Driscoll
Morton E. Ruderman
L.P. Dan Valente
Howard Messing
Barbara Manzolillo
Dr. Jerome H. Grossman
Curt Marble

8

8.    Identify all communications with the Department of Labor concerning the value of Meditech stock in the Plan.

Respectfully submitted,

**Michael P. Hubert,**
**William Trainor, and**
**David Hinchliffe,**
By their attorneys,


_____/s/ Sara Noonan_____
Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Sara Noonan (BBO #645293)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210
671-371-1000
671-371-1037


Dated: May 5, 2006


## Certificate of Service

I, Sara E. Noonan, hereby certify that I have, on this 5th day of May, 2006, caused the above document to be served by hand upon all counsel of record.


_____/s/ Sara Noonan_____
Sara E. Noonan


9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL P. HUBERT, WILLIAM
TRAINOR, and DAVID HINCHLIFFE,
Individually And On Behalf Of All Persons
Similarly Situated,

        Plaintiffs,

    v.

MEDICAL INFORMATION TECHNOLOGY,
INC. PROFIT SHARING PLAN, MEDICAL
INFORMATION TECHNOLOGY, INC., and
A. NEIL PAPPALARDO,

        Defendants.

Civil Action No. 05-10269RWZ

## DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFFS

Defendants Medical Information Technology, Inc. Profit Sharing Plan (the "Plan"),

Medical Information Technology, Inc. ("Meditech" or the "Company"), and A. Neil Pappalardo

(together with the Plan and Meditech, the "Defendants"), by their undersigned counsel, hereby

direct the following interrogatories to plaintiffs Michael P. Hubert, William Trainor, and David

Hinchliffe (each a "Plaintiff" and collectively the "Plaintiffs") to be answered fully under the

penalties of perjury, in accordance with Federal Rule of Civil Procedure 33. Answers to these

interrogatories are to be sent by the Plaintiffs to Stephen D. Poss, P.C., at the offices of Goodwin

Procter LLP, 53 State Street, Exchange Place, Boston, Massachusetts 02109, within thirty days

of the date of service.

## INSTRUCTIONS

A.      Responses to these interrogatories shall be supplemented and/or amended to the

extent required by Fed. R. Civ. P. 26(e). These interrogatories shall be deemed to impose a

continuing duty upon the Plaintiffs to properly serve upon Defendants supplemental and/or

1

amended responses if any Plaintiff acquires further knowledge and/or information relating to these interrogatories.

B.     If the attorney-client privilege and/or work-product exemption is claimed with respect to a communication requested herein, a separate list of all such communications shall be served with the responses to these interrogatories. Such separate list shall identify each such communication by author; date; recipient, including, but not limited to, recipients of copies (providing the titles of such recipients and identifying whether or not they are attorneys); privilege claimed; and a brief summary of the subject matter of the communication.

C.     If any one of the interrogatories herein is claimed to be objectionable, (a) identify the portion of such interrogatory that is claimed to be objectionable and set forth the nature and the basis of the objection in sufficient detail to permit the Court to rule on the validity of the objection, and (b) answer in full any portion of the interrogatory that is not claimed to be objectionable.

**DEFINITIONS**

For the purpose of these interrogatories and answers thereto, the following definitions shall apply:

A.     The definitions set forth in Rule 26.5 of the Local Rules of the United States District Court for the District of Massachusetts are incorporated herein by reference.

B.     The terms "you," "your," and "Plaintiffs" as used herein refer to and include each of the plaintiffs, Michael P. Hubert, William Trainor, and David Hinchliffe; their present and past family members, attorneys (including Plaintiffs' Counsel as that term is defined below), agents, representatives, and all persons now or previously under their control; and all persons currently or previously acting or purporting to act on their behalf.

2

C.    The term "family member" means, refers to, and includes spouse, son, son-in-law, daughter, daughter-in-law, brother, brother-in-law, sister, sister-in-law, grandfather, grandmother, grandson, granddaughter, uncle, aunt, nephew, niece, and cousin.

D.    The term "Plan" as used herein refers to defendant Medical Information Technology, Inc. Profit Sharing Plan, as currently in force pursuant to the Amended and Restated Trust Agreement dated as of January 1, 1998, as well as the Medical Information Technology, Inc. Profit Sharing Trust, as established on December 31, 1973 (the "Trust").

E.    The term "Meditech" as used herein means, refers to, and includes Medical Information Technology, Inc., a Massachusetts corporation with a principal place of business in Westwood, Massachusetts, its parents or predecessors, subsidiaries, affiliates and each of their present and former officers, directors, employees, agents, attorneys, and any and all persons acting and/or purporting to act for or on their behalf.

F.    The terms "Pappalardo" and "Trustee" as used herein mean, refer to, and include defendant A. Neil Pappalardo.

G.    The term "Defendants" as used herein refers to and includes defendants the Plan, Meditech, and Pappalardo.

H.    The term "Dismissed Defendants" as used herein means Lawrence A. Polimeno, Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman, and L.P. Dan Valente.

I.    The term "Plaintiffs' Counsel" as used herein includes Michael A. Collora, Esq.; Sara E. Noonan, Esq.; and the law firm Dwyer & Collora LLP, including any of the firm's attorneys, employees, agents, and any and all persons acting and/or purporting to act for or on the firm's behalf.

3

J.       The term "this Litigation," "this Case," "this Lawsuit," "this Action" and/or "this Suit" as used herein refers to <u>Michael P. Hubert, William Trainor, and David Hinchliffe, individually and on behalf of all persons similarly situated</u> v. <u>Medical Information Technology Inc. Profit Sharing Plan, Medical Information Technology, Inc., and A. Neil Pappalardo</u>, Civil Action No. 05 CV 10269 RWZ, filed in the United States District Court for the District of Massachusetts.

K.       The terms "and," "or," and "and/or" are used herein in their general conjunctive sense and are not intended to limit the scope of any interrogatories. The terms shall be construed as broadly as possible to bring within their scope all discoverable information which might otherwise be excluded.

L.       The term "date" as used herein means the exact day, month and year, if ascertainable, or if not, the best approximation (including relationships to other events).

M.       The term "identify," when used in reference to a communication other than a document, means to state its date, the communicator(s), the communicatee(s), the type of communication (i.e. in-person conversation, telephone call, etc.), the location of the communication, and a brief description of its subject matter.

N.       The term "describe in detail" as used herein means to set forth the substance, including but not limited to, where applicable, the time(s); place(s); person(s) involved or in any way concerned; and the manner or means of any fact, occurrence, conduct, communication or event concerning the matter in question.

O.       To the extent necessary to bring within the scope of the interrogatories contained herein any information or document that might otherwise be construed to be outside their scope, (i) the word "any" means "any and all"; and (ii) the word "all" means "any and all."

4

P.    To the extent necessary to bring within the scope of the interrogatories contained herein any information or document that might otherwise be construed to be outside their scope, the singular includes the plural and the plural includes the singular.

Q.    The term "Putative Class" as used herein means any person or persons whom you contend are or may potentially be a part of the putative class and/or subclass in this Action.

R.    The term "Trustee" as used herein means the trustee of the Trust as defined under the Plan.

S.    The term "Amended Complaint" as used herein means the Amended Complaint filed in this Action on or about May 23, 2005.

T.    The term "Grossman Litigation" as used herein refers to <u>Jerome H. Grossman</u> v. <u>Medical Information Technology, Inc., A. Neil Pappalardo, Edward B. Roberts, Morton E. Ruderman, Roland L. Driscoll, and Lawrence Polimeno</u>, Civil Action No. 03-1872, filed in the Business Litigation Session of the Superior Court of Massachusetts, Suffolk County, and voluntarily dismissed by the plaintiff subject to a Stipulation of Dismissal on or about January 11, 2006.

U.    The term "Grossman" as used herein refers to Jerome H. Grossman; his present and past family members, attorneys (including his attorneys in the Grossman Litigation), agents, representatives, and all persons now or previously under their control; and all persons currently or previously acting or purporting to act on their behalf.

## INTERROGATORIES

## INTERROGATORY NO. 1

State the basis for your allegations in Paragraph 40 of the Amended Complaint.

5

INTERROGATORY NO. 2

For each year in which the Trust has held Meditech stock, describe in detail the methodology(ies) that Plaintiffs claim should have been used in valuing shares of Meditech stock held by the Trust, including, but not limited to the sources supporting the methodology(ies) identified, including, but not limited to, each book, treatise, article, paper, publication, communication, expert opinion, or other document from which Plaintiffs have obtained or derived the methodology.

INTERROGATORY NO. 3

For each Plaintiff, identify and describe in detail any communications with any other person concerning the subject matter of this Litigation, including but not limited to communications concerning (a) the valuation and value of Meditech stock; (b) the value of the Trust; (c) any methodology(ies) for valuing a corporation and/or the shares of a corporation; (d) this Action; (e) the Grossman Litigation; (f) any proposal by any of the Plaintiffs to sell or otherwise provide Grossman any documents or information prepared by any officer, director or employee of Meditech; (g) the contribution of stock by Meditech to the Trust and/or the sale of Meditech stock by Meditech to Meditech employees; (h) any proposal for a vote by the shareholders of Meditech at any annual shareholders meeting, whether submitted for consideration by the shareholders or not, concerning the valuation of Meditech stock, the Plan, any right of first refusal by the Company with respect to Meditech stock, and/or the establishment of a process to evaluate offers to acquire Meditech; (i) the person's participation in this Action and/or any other proposed or potential lawsuit against the Defendants and/or the Dismissed Defendants; and/or (j) the distribution of benefits from the Trust.

6

INTERROGATORY NO. 4

Identify and describe in detail any communications between any of the Plaintiffs and Grossman, and/or Plaintiffs' Counsel and Grossman, concerning the subject matter of this Litigation, including but not limited to communications concerning (a) the Defendants; (b) the valuation and value of Meditech stock; (c) the value of the Trust; (d) any methodology(ies) for valuing a corporation and/or the shares of a corporation; (e) this Action; (f) the Grossman Litigation; (g) any proposal by any of the Plaintiffs to sell or otherwise provide Grossman any documents or information prepared by any officer, director or employee of Meditech; (h) the contribution of stock by Meditech to the Trust and/or the sale of Meditech stock by Meditech to Meditech employees; (i) any proposal for a vote by the shareholders of Meditech at any annual shareholders meeting, whether submitted for consideration by the shareholders or not, concerning the valuation of Meditech stock, the Plan, any right of first refusal by the Company with respect to Meditech stock, and/or the establishment of a process to evaluate offers to acquire Meditech; (j) Grossman's participation in this Action and/or any other proposed or potential lawsuit against the Defendants and/or the Dismissed Defendants; and/or (k) the distribution of benefits from the Trust.

INTERROGATORY NO. 5

Describe in detail how each Plaintiff claims to have gained an understanding that Meditech stock has been undervalued by the board of directors of Meditech and/or by the Trustee, including, but not limited to, (a) the date on which the Plaintiff purports to have gained such understanding; (b) the circumstances under which the Plaintiff purports to have gained such understanding; (c) the basis for the Plaintiff's understanding; (d) any documents, communications, and/or other

7

information that informed the Plaintiff's understanding; and (e) any communications in which each Plaintiff informed any other person of having gained his understanding.

INTERROGATORY NO. 6

Describe in detail the terms by which Plaintiffs have agreed to compensate or be compensated by Plaintiffs' Counsel, including, but not limited to, all fee agreements, arrangements or other understandings between Plaintiffs and Plaintiffs' Counsel as to the payment of attorneys' fees and expenses and/or the division of expenses and legal expenses in this Action, and/or any agreement, arrangement or other understanding whereby any of the Plaintiffs will be compensated for their service as named plaintiffs in the alleged class action and/or for any actions taken in the prosecution of the Action, and identifying each source of funds to be used in prosecuting this Action on behalf of the Putative Class.

INTERROGATORY NO. 7

Identify each civil action upon which Plaintiffs' Counsel intends to rely as evidence of Plaintiffs' Counsel's adequacy to serve as counsel for the Putative Class in the Action, and for each (a) identify the caption; (b) identify the court in which the action was docketed and/or tried; (c) state the result of any motion for class certification; (d) state the disposition of the action; (e) describe in detail Plaintiffs' Counsel's role in the action; and (e) describe in detail the subject matter of the claims brought by the plaintiffs in the action.

INTERROGATORY NO. 8

Describe in detail the circumstances under which each Plaintiff has at any point obtained, seen, reviewed, been provided with, or had access to a copy of any document(s) concerning the terms of the Plan or a summary plan description of the Plan, including but not limited to (a) the date(s)

8

on which Plaintiff obtained, saw, reviewed, was provided, or had access to the document(s); and (b) the method whereby the Plaintiff obtained, saw, reviewed, was provided, or had access to the document(s).

## INTERROGATORY NO. 9

For each Plaintiff, identify and describe in detail each communication by the Plaintiff with any Defendant with respect to (a) the valuation of the Trust by the Trustee, including but not limited to the valuation of Meditech stock by the Trustee; (b) the distribution of benefits received by the Plaintiff from the Trust, including but not limited to the amount of benefits received; and (c) the additional amount of benefits, if any, to which the Plaintiff claimed or claims to be entitled.

## INTERROGATORY NO. 10

State the basis for your allegations in Paragraph 29 of the Amended Complaint.

## INTERROGATORY NO. 11

State the basis for your allegations in Paragraph 41 of the Amended Complaint that "[i]n the absence of a class action, many participants harmed by the Plan's conduct will not be compensated for their injuries because it is too expensive to prosecute litigation individually."

## INTERROGATORY NO. 12

Identify all documents and information that Plaintiffs and/or Plaintiffs' Counsel referred to, reviewed, consulted, or relied upon in responding to any of the foregoing interrogatories, and each person with whom Plaintiffs and/or Plaintiffs' Counsel consulted or discussed any of the foregoing interrogatories.

9

MEDICAL INFORMATION TECHNOLOGY,
INC. PROFIT SHARING PLAN, MEDICAL
INFORMATION TECHNOLOGY, INC., and A.
NEIL PAPPALARDO

By their attorneys,

/s/ Stephen D. Poss, P.C.
Stephen D. Poss, P.C. (BBO # 551760)
Kevin P. Martin (BBO # 655222)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
Dated: June 16, 2006                    (617) 570-1000

10

**CERTIFICATE OF SERVICE**

I, Kevin P. Martin, hereby certify that I have on this 16th day of June, 2006, caused the above document to be served by facsimile and by hand upon all counsel of record.

/s/ Kevin P. Martin
Kevin P. Martin

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually And On Behalf Of All Persons Similarly Situated, | |
| Plaintiffs, | |
| v. | Civil Action No. 05-10269RWZ |
| MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO, | |
| Defendants. | |

## DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

Defendants Medical Information Technology, Inc. Profit Sharing Plan (the "Plan"), Medical Information Technology, Inc. ("Meditech" or the "Company"), and A. Neil Pappalardo (together with the Plan and Meditech, the "Defendants"), by their undersigned counsel, hereby request that plaintiffs Michael P. Hubert, William Trainor, and David Hinchliffe (each a "Plaintiff" and collectively the "Plaintiffs") produce for inspection and copying the documents and things described herein. The documents and things specified are to be produced, pursuant to Federal Rule of Civil Procedure 34, by the Plaintiffs for inspection and copying to Stephen D. Poss, P.C., at the offices of Goodwin Procter LLP, 53 State Street, Exchange Place, Boston, Massachusetts 02109, within thirty days of the date of service.

## INSTRUCTIONS

A.    Responses to these requests for production shall be supplemented and/or amended to the extent required by Fed. R. Civ. P. 26(e). These requests for production shall be deemed to impose a continuing duty upon the Plaintiffs to properly serve upon Defendants supplemental

1

and/or amended responses if any Plaintiff acquires further documents or things relating to these requests for production.

B.    If the attorney-client privilege and/or work-product exemption is claimed with respect to a document and/or thing requested herein, a separate list of all such documents and things shall be served with the responses to these requests for production. Such separate list shall identify each document and communication by author; date; recipient, including recipients of copies (providing the titles of such recipients and identifying whether or not they are attorneys); privilege claimed; and a brief summary of the subject matter of the document or communication.

C.    If any Plaintiff is aware that any requested documents and things (or groups of documents and/or things) once existed, but has been destroyed, each such Plaintiff is requested to specifically identify each such document and/or thing, when the document or thing was destroyed, the reason for such destruction, and the circumstances under which such destruction occurred.

## DEFINITIONS

For the purpose of these requests for production and responses thereto, the following definitions shall apply:

A.    The definitions set forth in Rule 26.5 of the Local Rules of the United States District Court for the District of Massachusetts are incorporated herein by reference.

B.    The terms "you," "your," and "Plaintiffs" as used herein refer to and include the plaintiffs, Michael P. Hubert, William Trainor, and David Hinchliffe; their present and past family members, attorneys (including Plaintiffs' Counsel as that term is defined below), agents, representatives, and all persons now or previously under their control; and all persons currently or previously acting or purporting to act on their behalf.

2

C.  The term "family member" means, refers to, and includes spouse, son, son-in-law, daughter, daughter-in-law, brother, brother-in-law, sister, sister-in-law, grandfather, grandmother, grandson, granddaughter, uncle, aunt, nephew, niece, and cousin.

D.  The term "Plan" as used herein refers to defendant Medical Information Technology, Inc. Profit Sharing Plan, as currently in force pursuant to the Amended and Restated Trust Agreement dated as of January 1, 1998, as well as the Medical Information Technology, Inc. Profit Sharing Trust, as established on December 31, 1973 (the "Trust").

E.  The term "Meditech" as used herein means, refers to, and includes Medical Information Technology, Inc., a Massachusetts corporation with a principal place of business in Westwood, Massachusetts, its parents or predecessors, subsidiaries, affiliates and each of their present and former officers, directors, employees, agents, attorneys and any and all persons acting and/or purporting to act for or on their behalf.

F.  The terms "Pappalardo" and "Trustee" as used herein refers to defendant A. Neil Pappalardo.

G.  The term "Defendants" as used herein refers to and includes defendants the Plan, Meditech, and Pappalardo.

H.  The term "Dismissed Defendants" as used herein means Lawrence A. Polimeno, Roland L. Driscoll, Edward B. Roberts, Morton E. Ruderman, and L.P. Dan Valente.

I.  The term "Plaintiffs' Counsel" as used herein includes Michael A. Collora, Esq.; Sara E. Noonan, Esq.; and the law firm Dwyer & Collora LLP, including any of the firm's attorneys, employees, agents, and any and all persons acting and/or purporting to act for or on the firm's behalf.

3

J.      The term "this Litigation," "this Case," "this Lawsuit," "this Action" and/or "this Suit" as used herein refers to Michael P. Hubert, William Trainor, and David Hinchliffe, individually and on behalf of all persons similarly situated v. Medical Information Technology, Inc. Profit Sharing Plan, Medical Information Technology, Inc., and A. Neil Pappalardo, Civil Action No. 05 CV 10269 RWZ, filed in the United States District Court for the District of Massachusetts.

K.      The terms "and," "or," and "and/or" are used herein in their general conjunctive sense and are not intended to limit the scope of any requests for production. The terms shall be construed as broadly as possible to bring within their scope all discoverable information which might otherwise be excluded.

L.      The term "date" as used herein means the exact day, month and year, if ascertainable, or if not, the best approximation (including relationships to other events).

M.      To the extent necessary to bring within the scope of the requests for production contained herein any information or document that might otherwise be construed to be outside their scope, (i) the word "any" means "any and all"; and (ii) the word "all" means "any and all."

N.      To the extent necessary to bring within the scope of the requests for production contained herein any information or document that might otherwise be construed to be outside their scope, the singular includes the plural and the plural includes the singular.

O.      The term "Putative Class" as used herein means any person or persons whom Plaintiffs contend are or may potentially be a part of the putative class and/or subclass in this Action.

P.      The term "Trustee" as used herein means the trustee of the Trust as defined under the Plan.

4

Q.    The term "Amended Complaint" as used herein means the Amended Complaint filed in this Action on or about May 23, 2005.

R.    The term "Grossman Litigation" as used herein refers to <u>Jerome H. Grossman</u> v. <u>Medical Information Technology, Inc., A. Neil Pappalardo, Edward B. Roberts, Morton E. Ruderman, Roland L. Driscoll, and Lawrence Polimeno</u>, Civil Action No. 03-1872, filed in the Business Litigation Session of the Superior Court of Massachusetts, Suffolk County, and voluntarily dismissed by the plaintiff subject to a Stipulation of Dismissal on or about January 11, 2006.

S.    The term "Grossman" as used herein refers to Jerome H. Grossman; his present and past family members, attorneys (including his attorneys in the Grossman Litigation), agents, representatives, and all persons now or previously under their control; and all persons currently or previously acting or purporting to act on their behalf.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1

All documents and/or things concerning the Plan, including but not limited to all documents constituting a copy of the Plan and or a summary plan description of the Plan.

### REQUEST FOR PRODUCTION NO. 2

All documents and/or things upon which Plaintiffs base their allegations in Paragraph 40 of the Amended Complaint.

REQUEST FOR PRODUCTION NO. 3

All documents and/or things concerning methodologies for valuing a corporation and/or the shares of a corporation, including but not limited to the methodology(ies) Plaintiffs claim should have been used in valuing shares of Meditech stock held by the Trust.

REQUEST FOR PRODUCTION NO. 4

All documents and/or things concerning the valuation by the Trustee of Meditech stock held by the Trust.

REQUEST FOR PRODUCTION NO. 5

For each Plaintiff, all documents and/or things concerning the Plaintiff's employment and termination of employment at Meditech.

REQUEST FOR PRODUCTION NO. 6

For each Plaintiff, all documents and/or things concerning the distribution of benefits received by the Plaintiff from the Trust.

REQUEST FOR PRODUCTION NO. 7

All documents and/or things concerning any communication between any Plaintiff and Grossman, and/or Plaintiffs' Counsel and Grossman, concerning the subject matter of this Litigation, including but not limited to communications concerning (a) the Defendants; (b) the valuation and value of Meditech stock; (c) the value of the Trust; (d) any methodology(ies) for valuing a corporation and/or the shares of a corporation; (e) this Action; (f) the Grossman Litigation; (g) any proposal by any of the Plaintiffs to sell or otherwise provide Grossman any documents or information prepared by any officer, director or employee of Meditech; (h) the contribution of stock by Meditech to the Trust and/or the sale of Meditech stock by Meditech to

6

Meditech employees; (i) any proposal for a vote by the shareholders of Meditech at any annual shareholders meeting, whether submitted for consideration by the shareholders or not, concerning the valuation of Meditech stock, the Plan, any right of first refusal by the Company with respect to Meditech stock, and/or the establishment of a process to evaluate offers to acquire Meditech; (j) Grossman's participation in this Action and/or any other proposed or potential lawsuit against the Defendants and/or the Dismissed Defendants; and/or (k) the distribution of benefits from the Trust.

REQUEST FOR PRODUCTION NO. 8

For each Plaintiff, all documents and/or things concerning communications between the Plaintiff and Plaintiffs' Counsel prior to the establishment of an attorney-client relationship, concerning the subject matter of this Litigation, including but not limited to communications concerning (a) the Defendants; (b) the valuation and value of Meditech stock; (c) the value of the Trust; (d) any methodology(ies) for valuing a corporation and/or the shares of a corporation; (e) this Action; (f) the Grossman Litigation; (g) any proposal by any of the Plaintiffs to sell or otherwise provide Grossman any documents or information prepared by any officer, director or employee of Meditech; (h) the contribution of stock by Meditech to the Trust and/or the sale of Meditech stock by Meditech to Meditech employees; (i) any proposal for a vote by the shareholders of Meditech at any annual shareholders meeting, whether submitted for consideration by the shareholders or not, concerning the valuation of Meditech stock, the Plan, any right of first refusal by the Company with respect to Meditech stock, and/or the establishment of a process to evaluate offers to acquire Meditech; (j) the distribution of benefits from the Trust; and/or (k) the Plaintiff's participation in this Action and/or any other proposed or potential lawsuit against the Defendants and/or the Dismissed Defendants.

7

## REQUEST FOR PRODUCTION NO. 9

For each Plaintiff, all documents and/or things concerning communications by the Plaintiff or Plaintiffs' Counsel with any other person, including but not limited to any other Plaintiff, concerning the subject matter of this Litigation, including but not limited to communications concerning (a) the valuation and value of Meditech stock; (b) the value of the Trust; (c) any methodology(ies) for valuing a corporation and/or the shares of a corporation; (e) the Grossman Litigation; (f) any proposal by any of the Plaintiffs to sell or otherwise provide Grossman any documents or information prepared by any officer, director or employee of Meditech; (g) the contribution of stock by Meditech to the Trust and/or the sale of Meditech stock by Meditech to Meditech employees; (h) any proposal for a vote by the shareholders of Meditech at any annual shareholders meeting, whether submitted for consideration by the shareholders or not, concerning the valuation of Meditech stock, the Plan, any right of first refusal by the Company with respect to Meditech stock, and/or the establishment of a process to evaluate offers to acquire Meditech; (i) the person's participation in this Action and/or any other proposed or potential lawsuit against the Defendants and/or the Dismissed Defendants; and/or (j) the distribution of benefits from the Trust.

## REQUEST FOR PRODUCTION NO. 10

All documents and/or things concerning the terms by which Plaintiffs have agreed to compensate or be compensated by Plaintiffs' Counsel, including, but not limited to, all fee agreements, arrangements or other understandings between Plaintiffs and Plaintiffs' Counsel as to the payment of attorneys' fees and expenses and/or the division of expenses and legal expenses in this Action, and/or any agreement, arrangement or other understanding whereby any of the Plaintiffs will be compensated for their service as putative named plaintiffs in the alleged class

action and/or for any actions taken in the prosecution of the Action, and identifying each source of funds to be used in prosecuting this Action on behalf of the Putative Class.

REQUEST FOR PRODUCTION NO. 11

All documents and/or things concerning Science Applications International Corporation, Cerner Corp., and/or any other company Plaintiffs contend is comparable to Meditech for purposes of valuation and/or relevant to the value of Meditech.

REQUEST FOR PRODUCTION NO. 12

For each Plaintiff, all documents and/or things concerning communications with the United States Department of Labor, including but not limited to all documents sent to or obtained from the United States Department of Labor, concerning the subject matter of this Litigation, including but not limited to communications concerning (a) the Defendants; (b) the valuation and value of Meditech stock; (c) the value of the Trust; (d) this Action; (e) the Grossman Litigation; (f) the contribution of stock by Meditech to the Trust and/or the sale of Meditech stock by Meditech to Meditech employees; (g) any proposal for a vote by the shareholders of Meditech at any annual shareholders meeting, whether submitted for consideration by the shareholders or not, concerning the valuation of Meditech stock, the Plan, any right of first refusal by the Company with respect to Meditech stock, and/or the establishment of a process to evaluate offers to acquire Meditech; and/or (h) the distribution of benefits from the Trust.

REQUEST FOR PRODUCTION NO. 13

To the extent not otherwise requested, all documents and/or things upon which Plaintiffs may rely in support of any motion for class certification.

9

REQUEST FOR PRODUCTION NO. 14

For each Plaintiff, all pleadings and other documents and/or things concerning any civil lawsuits, criminal proceedings, administrative proceedings, or similar actions (not including this Action) in which the Plaintiff has been or is currently a party, including but not limited to class actions in which the Plaintiff was a class representative or member of a class certified under Federal Rules of Civil Procedure 23 or other similar state rules, or putative class actions in which the Plaintiff was a proposed class representative but a class was not or has not yet been certified.

REQUEST FOR PRODUCTION NO. 15

For each civil action identified in Plaintiffs' response to Interrogatory No. 7, copies of all pleadings concerning motions for class certification, including but not limited to motions for class certification, memoranda of law in support of motions for class certification, oppositions to motions for class certification, reply briefs in support of motions for class certification, affidavits submitted in support or opposition to the motions for class certification, and all court orders, decisions or opinions concerning class certification.

REQUEST FOR PRODUCTION NO. 16

For each Plaintiff, all documents and/or things concerning any purchases and/or sales of Meditech stock by the Plaintiff, and/or any offer by or to the Plaintiff to purchase and/or sell shares of Meditech stock.

REQUEST FOR PRODUCTION NO. 17

To the extent not otherwise requested, all documents and/or things identified in Plaintiffs' response to Defendants' First Set of Interrogatories to Plaintiffs, and all documents and/or things

that Plaintiffs or Plaintiffs' Counsel referred to, reviewed, consulted, or relied upon in answering

Defendants' First Set of Interrogatories to Plaintiffs.

MEDICAL INFORMATION TECHNOLOGY,
INC. PROFIT SHARING PLAN, MEDICAL
INFORMATION TECHNOLOGY, INC., and A.
NEIL PAPPALARDO

By their attorneys,

/s/  Stephen D. Poss, P.C.
Stephen D. Poss, P.C. (BBO # 551760)
Kevin P. Martin (BBO # 655222)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated: June 16, 2006

11

## CERTIFICATE OF SERVICE

I, Kevin P. Martin, hereby certify that I have on this 16th day of June, 2006, caused the above document to be served by facsimile and by hand upon all counsel of record.

/s/ Kevin P. Martin
Kevin P. Martin

12

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, )<br>and DAVID HINCHLIFFE, Individually and )<br>On Behalf Of All Persons Similarly Situated )<br> )<br>    Plaintiffs, )<br> )<br>    v. )<br> )<br>MEDICAL INFORMATION TECHNOLOGY )<br>PROFIT SHARING PLAN, et al. )<br> )<br>    Defendants. )<br> ) | Civil Case No. 05-10269-RWZ |

### PLAINTIFFS' THIRD REQUEST FOR PRODUCTION OF DOCUMENTS

This document request incorporates the definitions set forth in Local Rule 26.5.

### I.    ADDITIONAL DEFINITIONS AND INSTRUCTIONS

A.    Additional Definitions

1.    "Defendants" means A. Neil Pappalardo, the Medical Information Technology Profit Sharing Plan, and Medical Information Technology, Inc.

2.    "You" means the Defendants and all agents, officers, employees, representatives, attorneys, and/or any other persons who at any time acted or purported to act on behalf of any of the Defendants.

3.    "Corporation" means Medical Information Technology, Inc.

4.    "Plan" means the Medical Information Technology Profit Sharing Plan.

5.    "Trust" means the trust holding the assets of the Plan; and the term "Trust Agreement" means the agreement with the Trustees of the Plan pursuant to which the Trust is established.

6.    "Administrator" means the Administrator of the Plan, as the term "administrator" is defined by the Employee Retirement Income Security Act of 1974, 19 U.S.C. § 1001 et seq. ("ERISA"), and includes any person or entity acting on behalf of the Administrator.

7.    "Plan Sponsor" means the sponsor of the Plan, as the term "plan sponsor" is defined by ERISA.

8.    "Trustee" means the trustee of the Plan, as the term "trustee" is defined by ERISA.

9.    "Participant" means any person working as an employee for Meditech who participated in the Plan.

10.    "Summary Plan Description" means the summary description of the Plan as defined in and required by ERISA.

11.    "Summary of Material Modifications" means the summary of material modifications of the terms of the Plan, as defined in and required by ERISA.

12.    "Statement of participant's benefit rights" means a statement given to a participant or beneficiary of the plan setting forth benefit information as required by ERISA.

13.    "Person" means any natural person, corporation, partnership, company, sole proprietorship, association, institute, joint venture, trust, firm, or other entity.

14.    "Identify" means, in reference to a document, the date, author(s) (where applicable), recipient(s) (where applicable), the nature of the document (i.e., whether a letter, memorandum, etc.), the title of the document (where applicable), whether any

other document(s) was attached to or included with such document, and the number of pages in such document and any attachments or enclosures.

15.    "Identify" means, with respect to a person or entity, the person or entity's full name, present resident address, present business affiliation and position, present business address, and present business telephone number. If you do not know the person or entity's current location, identify the person's last known residence and the person or entity's last known business address and telephone number.

16.    "Complaint" means the amended complaint filed in this matter.

17.    "Answer" means the answer filed by the Defendants.

18.    "Communication" means any documents, oral statements, meetings, or conferences, formal or informal, at any time and place, and under any circumstances whatsoever, whereby information of any nature was stated, written, recorded or in any manner transmitted or transferred.

19.    "Document" means any kind of written, recorded, or graphic matter, however produced or reproduced, of any kind or description, whether sent or received or neither, including original, identical, or non-identical copies (whether different from the original because of marginal notes or other material inserted or attached, or otherwise), and drafts, and including but not limited to: (1) contracts; (2) agreements; (3) policies; (4) checks; (5) periodic bank statements; (6) papers; (7) books; (8) letters; (9) correspondence; (10) telegrams; (11) cables; (12) telex messages; (13) telecopier or fax messages; (14) memoranda; (15) notes; (16) reports and recordings of telephone and other conversations or interviews, or of conferences or other meetings; (17) affidavits; (18) statements; (19) summaries; (20) opinions; (21) reports; (22) studies; (23)

evaluations; (24) ledgers; (25) journals; (26) statistical records; (27) desk calendars; (28) appointment books; (29) diaries; (30) listings; (31) tabulations; (32) sound recordings; (33) computer printouts; (34) data processing records; (35) microfilm; (36) photographs; (37) maps; (38) charts; (39) accounts; (40) all records kept by electronic, magnetic, photographic, or mechanical means; (41) pleadings; (42) analyses; (43) financial statements and records thereof; (44) videos; and (45) things similar to any of the foregoing, however denominated.

20.     "Evidencing" or "Evidences" means proving, tending to prove, or indicating the existence or nature of.

21.     "Concerning" means relating to, constituting, discussing, describing, comprising, reflecting, summarizing, referring to, or evidencing.

21.     "Including" means including but not limited to.

22.     "Any" means any and all. "All" also means any and all.

23.     "Person" includes any natural person, firm, association, organization, partnership, limited partnership, sole proprietorship, trust, corporation or governmental body.

24.     "And" and "or" shall be construed either conjunctively or disjunctively to bring within the scope of these interrogatories any information which might otherwise be construed to be outside their scope.

25.     The singular of any term shall include the plural, and the plural of any term shall include the singular.

4

B.    Instructions

1.    These requests require you to produce all responsive documents that are in your actual or constructive possession, custody, or control.

2.    These requests are continuing so as to require supplementation.

3.    If any document is withheld on the basis of a claim of privilege, the claim is to be made expressly, and shall be supported by a description of the nature of the document not produced that is sufficient to enable the plaintiffs to evaluate the claim. Such information shall include the following:

(a)    a description of the general type of document (e.g., letter, memorandum, etc.), including the number of pages;

(b)    the date of the document;

(c)    the author of the document, and his or her title and employer;

(d)    all addressees or recipients of the document, and their titles and employers;

(e)    a general summary of the subject matter of the document; and

(f)    the grounds for refusing to produce the document.

4.    If you object to any request or part of any request, please produce all documents to which your objection does not apply.

5.    If you know of the existence, past or present, of any document described in these requests, but such document is not presently in your possession, custody, or control, please identify the document and the individual or entity in whose possession, custody, or control the document was last known to reside. If the document no longer exists, please state when, how, and why the document ceased to exist.

5

6.    The documents produced in response to these requests shall be either (a) organized and designated to correspond to the requests specified below, or (b) produced as they are maintained in the normal course of business.  In either event:

(a)    all associated file labels, file headings, and file folders shall be produced together with the responsive documents from each file and each file shall be identified as to its owner or custodian;

(b)    all photocopies shall be stapled or clipped as the originals; and

(c)    each page shall be given a discrete production number.

7.    You are requested to identify any documents that fall within this production request that you do not turn over on the basis of objection or an asserted privilege.

8.    Production of documents by each Defendant shall be made separately (in segregated groups) from the production of each other Defendant.

## II.    DOCUMENTS TO BE PRODUCED

Plaintiffs request that Defendants produce each of the following documents.

1.    All depositions taken in <u>Grossman v. Meditech</u> et al. 03-1872 BLS (Suffolk County) not previously produced, including a non redacted version of Jerome Grossman's ("Grossman") testimony.

2.    All correspondence or communications including enclosures or attachments between Meditech and the following entities (or individuals at such entities) concerning the value of Meditech stock, its financials (not already produced) and/or the purchase and sale of Meditech stock:

(a)    Massachusetts Institute of Technology

6

    (b)    Summit Partners

    (c)    T.A. Associates

    (d)    Greylock Partners

3.    A document labeled "Mainsail" prepared by Thomas Weisel Partners for Grossman.

4.    Meditech's answers to Grossman's interrogatories in the above mentioned litigation.

5.    Any and all documents relating to valuation produced to Grossman (and not already produced to Plaintiff's in the initial litigation).

6.    Unredacted Report of chairman re quarter ending 3/2004 beginning with DEF003146.

Respectfully submitted,

**Michael P. Hubert,**
**William Trainor, and**
**David Hinchliffe,**
By their attorneys,


    /s/ Jennifer Ryan
Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Jennifer Ryan(BBO # 661498)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210
671-371-1000
671-371-1037


Dated: August 2, 2007

## Certificate of Service

I, Jennifer Ryan, hereby certify that I have, on this 2[st] day of August, 2007, caused the above document to be served by hand upon all counsel of record.

_____/s/ Jennifer Ryan_____
Jennifer Ryan

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE,<br><br>       Plaintiffs,<br><br>    v.<br><br>MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO,<br><br>       Defendants. | Civil Action No. 05-10269RWZ |

## DEFENDANTS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

Defendants Medical Information Technology, Inc. Profit Sharing Plan (the "Plan"), Medical Information Technology, Inc. ("Meditech" or the "Company"), and A. Neil Pappalardo (together with the Plan and Meditech, the "Defendants"), by their undersigned counsel, hereby request that plaintiffs Michael P. Hubert, William Trainor, and David Hinchliffe (each a "Plaintiff" and collectively the "Plaintiffs") produce for inspection and copying the documents and things described herein. The documents and things specified are to be produced, pursuant to Federal Rule of Civil Procedure 34, by the Plaintiffs for inspection and copying to Stephen D. Poss, P.C., at the offices of Goodwin Procter LLP, 53 State Street, Exchange Place, Boston, Massachusetts 02109, within thirty days of the date of service.

## INSTRUCTIONS

A.    Responses to these requests for production shall be supplemented and/or amended to the extent required by Fed. R. Civ. P. 26(e). These requests for production shall be deemed to impose a continuing duty upon the Plaintiffs to properly serve upon Defendants supplemental

1

and/or amended responses if any Plaintiff acquires further documents or things relating to these requests for production.

B.     If the attorney-client privilege and/or work-product exemption is claimed with respect to a document and/or thing requested herein, a separate list of all such documents and things shall be served with the responses to these requests for production.  Such separate list shall identify each document and communication by author; date; recipient, including recipients of copies (providing the titles of such recipients and identifying whether or not they are attorneys); privilege claimed; and a brief summary of the subject matter of the document or communication.

C.     If any Plaintiff is aware that any requested documents and things (or groups of documents and/or things) once existed, but has been destroyed, each such Plaintiff is requested to specifically identify each such document and/or thing, when the document or thing was destroyed, the reason for such destruction, and the circumstances under which such destruction occurred.

## DEFINITIONS

For the purpose of these requests for production and responses thereto, the following definitions shall apply:

A.     The definitions set forth in Rule 26.5 of the Local Rules of the United States District Court for the District of Massachusetts are incorporated herein by reference.

B.     The terms "you," "your," and "Plaintiffs" as used herein refer to and include the plaintiffs, Michael P. Hubert, William Trainor, and David Hinchliffe; their present and past family members, attorneys (including Plaintiffs' Counsel as that term is defined below), agents, representatives, and all persons now or previously under their control; and all persons currently or previously acting or purporting to act on their behalf.

2

# EXHIBIT 5 – PART 2

C.    The term "family member" means, refers to, and includes spouse, son, son-in-law, daughter, daughter-in-law, brother, brother-in-law, sister, sister-in-law, grandfather, grandmother, grandson, granddaughter, uncle, aunt, nephew, niece, and cousin.

D.    The term "Plan" as used herein refers to defendant Medical Information Technology, Inc. Profit Sharing Plan, as currently in force pursuant to the Amended and Restated Trust Agreement dated as of January 1, 1998, as well as the Medical Information Technology, Inc. Profit Sharing Trust, as established on December 31, 1973 (the "Trust").

E.    The term "Meditech" as used herein means, refers to, and includes Medical Information Technology, Inc., a Massachusetts corporation with a principal place of business in Westwood, Massachusetts, its parents or predecessors, subsidiaries, affiliates and each of their present and former officers, directors, employees, agents, attorneys and any and all persons acting and/or purporting to act for or on their behalf.

F.    The terms "Pappalardo" and "Trustee" as used herein refers to defendant A. Neil Pappalardo.

G.    The term "Defendants" as used herein refers to and includes defendants the Plan, Meditech, and Pappalardo.

H.    The term "Plaintiffs' Counsel" as used herein includes Michael A. Collora, Esq.; Sara E. Noonan, Esq.; and the law firm Dwyer & Collora LLP, including any of the firm's attorneys, employees, agents, and any and all persons acting and/or purporting to act for or on the firm's behalf.

I.    The term "this Litigation," "this Case," "this Lawsuit," "this Action" and/or "this Suit" as used herein refers to <u>Michael P. Hubert, William Trainor, and David Hinchliffe</u> v. <u>Medical Information Technology, Inc. Profit Sharing Plan, Medical Information Technology,</u>

3

Inc., and A. Neil Pappalardo, Civil Action No. 05 CV 10269 RWZ, filed in the United States District Court for the District of Massachusetts.

J.      The terms "and," "or," and "and/or" are used herein in their general conjunctive sense and are not intended to limit the scope of any requests for production. The terms shall be construed as broadly as possible to bring within their scope all discoverable information which might otherwise be excluded.

K.      The term "date" as used herein means the exact day, month and year, if ascertainable, or if not, the best approximation (including relationships to other events).

L.      To the extent necessary to bring within the scope of the requests for production contained herein any information or document that might otherwise be construed to be outside their scope, (i) the word "any" means "any and all"; and (ii) the word "all" means "any and all."

M.      To the extent necessary to bring within the scope of the requests for production contained herein any information or document that might otherwise be construed to be outside their scope, the singular includes the plural and the plural includes the singular.

N.      The term "Trustee" as used herein means the trustee of the Trust as defined under the Plan.

O.      The term "Amended Complaint" as used herein means the Amended Complaint filed in this Action on or about May 23, 2005.

P.      The term "Grossman Litigation" as used herein refers to Jerome H. Grossman v. Medical Information Technology, Inc., A. Neil Pappalardo, Edward B. Roberts, Morton E. Ruderman, Roland L. Driscoll, and Lawrence Polimeno, Civil Action No. 03-1872, filed in the Business Litigation Session of the Superior Court of Massachusetts, Suffolk County, and

4

voluntarily dismissed by the plaintiff subject to a Stipulation of Dismissal on or about January 11, 2006.

Q.      The term "Grossman" as used herein refers to Jerome H. Grossman; his present and past family members, attorneys (including his attorneys in the Grossman Litigation), agents, representatives, and all persons now or previously under their control; and all persons currently or previously acting or purporting to act on their behalf.

## REQUESTS FOR PRODUCTION

REQUEST FOR PRODUCTION NO. 1

All documents and/or things constituting or concerning communications between Plaintiffs and/or Plaintiffs' counsel with any non-party concerning the value of Meditech stock.

REQUEST FOR PRODUCTION NO. 2

All documents and/or things concerning the value of Meditech stock.

REQUEST FOR PRODUCTION NO. 3

For each Plaintiff, documents and/or things sufficient to demonstrate investments by Plaintiff other than investments in Meditech stock, including but not limited to any purchases, sales and holdings of stocks, bonds, mutual funds, or any other investments, during the period in which Plaintiff was a participant in the Plan.

REQUEST FOR PRODUCTION NO. 4

All documents and/or things concerning methods for valuing a non-publicly traded corporation and/or the shares of a non-publicly traded corporation.

REQUEST FOR PRODUCTION NO. 5

All documents and/or things concerning any determination of the value of Meditech stock by the Trustee of the Trust.

REQUEST FOR PRODUCTION NO. 6

All documents and/or things concerning any determination of the value of Meditech stock by the board of directors of Meditech.

REQUEST FOR PRODUCTION NO. 7

For each Plaintiff, all transcripts, audio recordings and/or video recordings of any sworn testimony by Plaintiff in any civil, criminal, administrative, or other adjudicative proceeding.

REQUEST FOR PRODUCTION NO. 8

For each Plaintiff, all documents and/or things constituting, containing or otherwise concerning any representation, assertion or other communication by Plaintiff concerning the value of Plaintiff's Meditech stock and/or Plaintiff's Trust account balance, including but not limited to any federal or state income tax forms, applications for loans, applications for college financial aid, wills, testaments, prenuptial agreements, or submissions made in connection with any divorce, custody, support or civil, criminal, administrative, or other proceeding.

REQUEST FOR PRODUCTION NO. 9

All documents and/or things concerning any damages and/or any benefits claimed by Plaintiffs in this Action.

## REQUEST FOR PRODUCTION NO. 10

All documents and/or things constituting or concerning communications between Plaintiffs and/or Plaintiffs' counsel with any non-party concerning methods for valuing a non-publicly traded corporation and/or the shares of a non-publicly traded corporation.

## REQUEST FOR PRODUCTION NO. 11

All documents and/or things constituting or concerning communications between Plaintiffs' Counsel, on the one hand, and Grossman and/or counsel for Grossman, on the other.

## REQUEST FOR PRODUCTION NO. 12

For each Plaintiff, all documents and/or things concerning any purchases and/or sales of Meditech stock by the Plaintiff, and/or any offer by or to the Plaintiff to purchase and/or sell shares of Meditech stock.

## REQUEST FOR PRODUCTION NO. 13

To the extent not previously produced, all documents and/or things responsive to Defendants' First Set of Requests for Production of Documents and Things.

## REQUEST FOR PRODUCTION NO. 14

To the extent not otherwise requested or previously produced, all documents and/or things Plaintiffs may introduce at any trial in this Action.

## REQUEST FOR PRODUCTION NO. 15

To the extent not otherwise requested or previously produced, all documents and/or things identified in Plaintiffs' response to Defendants' Second Set of Interrogatories to Plaintiffs, and

7

all documents and/or things that Plaintiffs or Plaintiffs' Counsel referred to, reviewed, consulted,

or relied upon in answering Defendants' Second Set of Interrogatories to Plaintiffs.

MEDICAL INFORMATION TECHNOLOGY,
INC. PROFIT SHARING PLAN, MEDICAL
INFORMATION TECHNOLOGY, INC., and A.
NEIL PAPPALARDO

By their attorneys,

/s/  Stephen D. Poss
Stephen D. Poss (BBO # 551760)
Kevin P. Martin (BBO # 655222)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
Dated: September 28, 2007                     (617) 570-1000

## CERTIFICATE OF SERVICE

I, Kevin P. Martin, hereby certify that I have on this 28th day of September, 2007, caused
the above document to be served by facsimile and by hand upon all counsel of record.

/s/  Kevin P. Martin
Kevin P. Martin

8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually And On Behalf Of All Persons Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO,<br><br>Defendants. | Civil Action No. 05-10269RWZ |

## DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS

Defendants Medical Information Technology, Inc. Profit Sharing Plan (the "Plan"), Medical Information Technology, Inc. ("Meditech" or the "Company"), and A. Neil Pappalardo (together with the Plan and Meditech, the "Defendants"), by their undersigned counsel, hereby direct the following interrogatories to plaintiffs Michael P. Hubert, William Trainor, and David Hinchliffe (each a "Plaintiff" and collectively the "Plaintiffs") to be answered fully under the penalties of perjury, in accordance with Federal Rule of Civil Procedure 33. Answers to these interrogatories are to be sent by the Plaintiffs to Stephen D. Poss at the offices of Goodwin Procter LLP, 53 State Street, Exchange Place, Boston, Massachusetts 02109, within thirty days of the date of service.

## INSTRUCTIONS

A.      Responses to these interrogatories shall be supplemented and/or amended to the extent required by Fed. R. Civ. P. 26(e). These interrogatories shall be deemed to impose a continuing duty upon the Plaintiffs to properly serve upon Defendants supplemental and/or

1

amended responses if any Plaintiff acquires further knowledge and/or information relating to these interrogatories.

      B.     If the attorney-client privilege and/or work-product exemption is claimed with respect to a communication requested herein, a separate list of all such communications shall be served with the responses to these interrogatories. Such separate list shall identify each such communication by author; date; recipient, including, but not limited to, recipients of copies (providing the titles of such recipients and identifying whether or not they are attorneys); privilege claimed; and a brief summary of the subject matter of the communication.

      C.     If any one of the interrogatories herein is claimed to be objectionable, (a) identify the portion of such interrogatory that is claimed to be objectionable and set forth the nature and the basis of the objection in sufficient detail to permit the Court to rule on the validity of the objection, and (b) answer in full any portion of the interrogatory that is not claimed to be objectionable.

## DEFINITIONS

     For the purpose of these interrogatories and answers thereto, the following definitions shall apply:

      A.     The definitions set forth in Rule 26.5 of the Local Rules of the United States District Court for the District of Massachusetts are incorporated herein by reference.

      B.     The terms "you," "your," and "Plaintiffs" as used herein refer to and include each of the plaintiffs, Michael P. Hubert, William Trainor, and David Hinchliffe; their present and past family members, attorneys (including Plaintiffs' Counsel as that term is defined below), agents, representatives, and all persons now or previously under their control; and all persons currently or previously acting or purporting to act on their behalf.

2

C.    The term "family member" means, refers to, and includes spouse, son, son-in-law, daughter, daughter-in-law, brother, brother-in-law, sister, sister-in-law, grandfather, grandmother, grandson, granddaughter, uncle, aunt, nephew, niece, and cousin.

D.    The term "Plan" as used herein refers to defendant Medical Information Technology, Inc. Profit Sharing Plan, as currently in force pursuant to the Amended and Restated Trust Agreement dated as of January 1, 1998, as well as the Medical Information Technology, Inc. Profit Sharing Trust, as established on December 31, 1973 (the "Trust").

E.    The term "Meditech" as used herein means, refers to, and includes Medical Information Technology, Inc., a Massachusetts corporation with a principal place of business in Westwood, Massachusetts, its parents or predecessors, subsidiaries, affiliates and each of their present and former officers, directors, employees, agents, attorneys, and any and all persons acting and/or purporting to act for or on their behalf.

F.    The terms "Pappalardo" and "Trustee" as used herein mean, refer to, and include defendant A. Neil Pappalardo.

G.    The term "Defendants" as used herein refers to and includes defendants the Plan, Meditech, and Pappalardo.

H.    The term "Plaintiffs' Counsel" as used herein includes Michael A. Collora, Esq.; Sara E. Noonan, Esq.; and the law firm Dwyer & Collora LLP, including any of the firm's attorneys, employees, agents, and any and all persons acting and/or purporting to act for or on the firm's behalf.

I.    The term "this Litigation," "this Case," "this Lawsuit," "this Action" and/or "this Suit" as used herein refers to Michael P. Hubert, William Trainor, and David Hinchliffe, individually and on behalf of all persons similarly situated v. Medical Information Technology

3

<u>Inc. Profit Sharing Plan, Medical Information Technology, Inc., and A. Neil Pappalardo</u>, Civil Action No. 05 CV 10269 RWZ, filed in the United States District Court for the District of Massachusetts.

J.      The terms "and," "or," and "and/or" are used herein in their general conjunctive sense and are not intended to limit the scope of any interrogatories. The terms shall be construed as broadly as possible to bring within their scope all discoverable information which might otherwise be excluded.

K.      The term "date" as used herein means the exact day, month and year, if ascertainable, or if not, the best approximation (including relationships to other events).

L.      The term "identify," when used in reference to a communication other than a document, means to state its date, the communicator(s), the communicatee(s), the type of communication (i.e. in-person conversation, telephone call, etc.), the location of the communication, and a brief description of its subject matter.

M.      The term "describe in detail" as used herein means to set forth the substance, including but not limited to, where applicable, the time(s); place(s); person(s) involved or in any way concerned; and the manner or means of any fact, occurrence, conduct, communication or event concerning the matter in question.

N.      To the extent necessary to bring within the scope of the interrogatories contained herein any information or document that might otherwise be construed to be outside their scope, (i) the word "any" means "any and all"; and (ii) the word "all" means "any and all."

O.      To the extent necessary to bring within the scope of the interrogatories contained herein any information or document that might otherwise be construed to be outside their scope, the singular includes the plural and the plural includes the singular.

4

P.      The term "Trustee" as used herein means the trustee of the Trust as defined under the Plan.

Q.      The term "Amended Complaint" as used herein means the Amended Complaint filed in this Action on or about May 23, 2005.

R.      The term "Grossman Litigation" as used herein refers to <u>Jerome H. Grossman</u> v. <u>Medical Information Technology, Inc., A. Neil Pappalardo, Edward B. Roberts, Morton E. Ruderman, Roland L. Driscoll, and Lawrence Polimeno</u>, Civil Action No. 03-1872, filed in the Business Litigation Session of the Superior Court of Massachusetts, Suffolk County, and voluntarily dismissed by the plaintiff subject to a Stipulation of Dismissal on or about January 11, 2006.

S.      The term "Grossman" as used herein refers to Jerome H. Grossman; his present and past family members, attorneys (including his attorneys in the Grossman Litigation), agents, representatives, and all persons now or previously under their control; and all persons currently or previously acting or purporting to act on their behalf.

## INTERROGATORIES

INTERROGATORY NO. 1

State the basis for your allegation in paragraph 49 of the Amended Complaint that "For at least eight years, the defendants have knowingly valued MEDITECH stock at less than fair market value."

INTERROGATORY NO. 2

In what year was Meditech stock first valued by Defendants at less than fair market value, stating your basis for contending that the stock was undervalued in that year, and not in the preceding year(s).

5

## INTERROGATORY NO. 3

Identify all years in which Defendants valued Meditech stock at less than fair market value, stating your basis for contending that the stock was undervalued in those years.

## INTERROGATORY NO. 4

State the basis for your allegation in Paragraph 58 of the Amended Complaint that "one of the reasons that the defendants knowingly undervalue the stock is to ensure that stock prices remain low enough for insiders such as defendant Pappalardo to purchase large amounts of company stock and thereby retain tight control of the Company."

## INTERROGATORY NO. 5

Identify all persons with whom Plaintiffs, including but not limited to counsel for Plaintiffs, have discussed any methodology for valuing the stock of non-publicly traded corporations.

## INTERROGATORY NO. 6

Do Plaintiffs contend, as part of their claim in this Action, that Pappalardo should not have been permitted, as part of the Company's annual share offering to officers and employees, to purchase Meditech stock from the Company at the same per share price that other Meditech officers and employees purchased Meditech stock from the Company, and if so, state the basis for that contention.

## INTERROGATORY NO. 7

Do Plaintiffs contend, as part of their claim in this Action, that Defendants violated the Employee Retirement Income Security Act by valuing plan assets held by the Trust once each year and paying terminating plan participants the value of their Trust balance as of the last valuation date plus interest from that date, and if so, state the basis for that contention.

6

INTERROGATORY NO. 8

Do Plaintiffs contend, as part of their claim in this Action, that it is not permissible, under the Employee Retirement Income Security Act, for the Plan to provide a voluntary mechanism for participants to withdraw their Trust balances in excess of $1 million, and if so, state the basis for that contention.

INTERROGATORY NO. 9

Describe in detail all communications, if any, between Plaintiffs and/or Plaintiffs' Counsel, on the one hand, and Grossman and/or counsel for Grossman, on the other, concerning this Action or the subject matter of this Action.

INTERROGATORY NO. 10

Describe in detail every valuation or other analysis of the value of Meditech stock performed by or an behalf of any Plaintiff since January 1, 1996, excluding any putative expert valuation performed for purposes of this Action.

INTERROGATORY NO. 11

Identify and describe in detail every occasion since January 1, 1996 on which each Plaintiff has asserted, or made statements or representations concerning, a per share value for Meditech stock, the value of Plaintiff's aggregate holdings of Meditech stock, or the value of Plaintiffs' Trust account balance, including, but not limited to, with respect to any sale or offer to sell Meditech stock; any calculation of, or statement of or concerning, assets of a Plaintiff for purposes of an application for college financial aid, a mortgage, or other loan; and/or any calculation of, or statement of or concerning, assets of a Plaintiff for purposes of a divorce, custody, or support proceeding, or any other civil, criminal, or administrative proceeding.

7

INTERROGATORY NO. 12

Identify all documents and information that Plaintiffs and/or Plaintiffs' Counsel referred to, reviewed, consulted, or relied upon in responding to any of the foregoing interrogatories, and each person with whom Plaintiffs and/or Plaintiffs' Counsel consulted or discussed any of the foregoing interrogatories.

MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO

By their attorneys,

/s/ Stephen D. Poss
Stephen D. Poss (BBO # 551760)
Kevin P. Martin (BBO # 655222)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated: September 28, 2007

CERTIFICATE OF SERVICE

I, Kevin P. Martin, hereby certify that I have on this 28th day of September, 2007, caused the above document to be served by facsimile and by hand upon all counsel of record.

/s/ Kevin P. Martin
Kevin P. Martin

8

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually and On Behalf Of All Persons Similarly Situated<br><br>Plaintiffs,<br><br>v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Case No. 05-10269-RWZ<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' SECOND SET OF INTERROGATORIES TO DEFENDANTS

These interrogatories incorporate the definitions set forth in Local Rule 26.5.

## I.    ADDITIONAL DEFINITIONS AND INSTRUCTIONS

A.    Additional Definitions

1.    "Defendants" means A. Neil Pappalardo, the Medical Information Technology Profit Sharing Plan, and Medical Information Technology, Inc.

2.    "You" means the Defendants and all agents, officers, employees, representatives, attorneys, and/or any other persons who at any time acted or purported to act on behalf of any of the Defendants.

3.    "Corporation" or "Defendant Corporation" means Medical Information Technology, Inc.

4.    "Plan" means the Medical Information Technology Profit Sharing Plan.

5.    "Trust" means the trust holding the assets of the Plan; and the term "Trust Agreement" means the agreement with   the Trustees of the Plan pursuant to which the Trust is established.

6.    "Administrator" means the Administrator of the Plan, as the term "administrator" is defined in the Employ ee Retirement Income Security Act of 1974, 19 U.S.C. § 1001 et seq. ("ERI SA"), and includes any person or entity acting on behalf of the Administrator.

7.    "Plan Sponsor" means the sponsor of t he Plan, as the term "plan spons or" is defined by ERISA.

8.    "Trustee" means the trustee of the Plan, as  the term "trustee" is defined b y ERISA.

9.    "Participant" means an y person working as an employee for Meditec    h who participated in the Plan.

10.    "Vested" means fully or partially vested.

11.    "Concerning" means relating to, constituting, discussing, describing, comprising, reflecting, summarizing, referring to, or evidencing.

12.    "Including" means including but not limited to.

13.    "Any" means any and all.  The term "all" also means any and all.

14.    "Person" includes an  y natural person, firm, association, organization, partnership, limited  partnership, sole proprietorship, trust, corporation or governmental body.

15.    "Document" means an  y kind of written, recorded, or graphic matter, however produced or reproduced, of an y kind or description, whether sent or received or

2

neither, including o riginal, identical, or non -identical copies (whether different from the
original because of marginal notes or other material inserted or attached, or otherwise),
and drafts, and including but not limited to: (1) contracts; (2) agreements; (3) policies; (4)
checks; (5) periodic bank statements; (6) papers; (7) books; (8) letters; (9)
correspondence; (10) telegrams; (11) cables; (12) telex messages; (13) telecopier or fax
messages; (14) memoranda; (15) notes; (16) reports and recordings of telephone and
other conversations or interviews, or of conferences or other meetings; (17) affidavits;
(18) statements; (19) summaries; (20) opinions; (21) reports; (22) studies; (23)
evaluations; (24) ledgers; (25) journals; (26) statistical records; (27) desk calendars; (2 8)
appointment books; (29) diaries; (30) listings; (31) tabulations; (32) sound recordings;
(33) computer printouts; (34) data processing records; (35) microfilm; (36) photographs;
(37) maps; (38) charts; (39) accounts; (40) all records kept b     y electronic,  magnetic,
photographic, or mechanical means; (41) pleadings; (42) anal          yses; (43) financial
statements and records thereof; (44) videos; and (45) things similar to any         of the
foregoing, however denominated.

 16. "Identify" means, with respect to a person o r entity, the person or entity 's
full name, present resident address, present business affiliation and position, present
business address, and present business telephone number. If you do not know the person
or entity's current location, identify the person's last known residence and the person or
entity's last known business address and telephone number.

 17. "Identify" means, in reference to a document, the date, author(s) (where
applicable), recipient(s) (where applicable), the nature of the document (i  .e., whether a
letter, memorandum, etc.), the title of the document (where applicable), whether any

other document(s) was attached to or included with such document, and the number of pages in such document and any attachments or enclosures.

18.    "And" and "or" shall be construed either conjunctively or disjunctively to bring within the scope of these interrogatories an y information which might otherwise be construed to be outside their scope.

19.    The singular of an y t erm shall include the plural, and the     plural of an y term shall include the singular.

B.    <u>Instructions</u>

1.    For each person consulted in order to answer these interrogatories (other than counsel), please list the person's name and position with the Company  and describe the person's duties.

2.    When responding to each interrogatory, identify all documents relied upon in formulating the response.

## II.    INTERROGATORIES

1.    Identify each expert witness who has been retained by Defendant in this litigation and who is expected to be called as an expert witness at trial, including as part of your answer:

      a.    each expert's name, business address, occupation, and area of expertise;

      b.    the subject matter on which each expert is expected to testify;

      c.    the substance of the facts and opinions to which each expert is expected testify;

      d.    a summary of the ground for each such opinion;

      e.    the qualifications of the expert, including a list of all publications authored by the expert within the last ten year;

4

f.    the compensation to be paid for the study and testimony; and

g.    a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Respectfully submitted,

**Michael P. Hubert,**
**William Trainor, and**
**David Hinchliffe,**
By their attorneys,


_/s/ Jennifer M. Ryan_
Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Jennifer M. Ryan (BBO #661498)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210
671-371-1000
671-371-1037

Dated: October 29, 2007


## Certificate of Service

I, Jennifer M. Ryan, hereby certify that I have, on this 29th day of October, 2007, caused the above document to be served by email upon all counsel of record.

_/s/  Jennifer M. Ryan_
Jennifer M. Ryan

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually and On Behalf Of All Persons Similarly Situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., A. NEIL PAPPALARDO, LAWRENCE A. POLIMENO, ROLAND L. DRISCOLL, EDWARD B. ROBERTS, MORTON E. RUDERMAN, AND L.P. DAN VALENTE,<br><br>    Defendants. | C.A. No. 05-10269-RWZ |

## PLAINTIFFS REQUEST FOR ADMISSIONS

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, plaintiffs hereby request defendants admit, pursuant to the following instructions, and definitions, to the truth of the matters set forth below for purpose of this action.

## INSTRUCTIONS

A.    Rule 36 provides that each matter requested to be admitted is conclusively established and admitted for the purposes of this unless, within 30 days after service of this Request, you serve upon the party making those requests either (a) a written statement signed by you under the pains and penalties of perjury specifically (i) denying the matter or (ii) setting forth in details why you cannot truthfully admit or deny the matter; or (b) a written objection addressed to the matter, signed by you or your attorney.



B.      You may not give lack of information or knowledge as a reason for your failure to admit or deny a matter unless you state in writing that you have made reasonable inquiry and that the information known or readily obtainable by you is insufficient to enable you to admit or deny. Your enquiry is reasonable when (a) you make inquiry of your principals, agents, employees, attorneys, representatives, any person acting or purporting to act on your behalf, and any other persons in active concert and participation with you, whether past or present and without regard to whether or not their relationship with you currently exists or has been terminated, and (b) you examine any and all documents or tangible things in your possession, custody, or control that in any way refer or relate to the matter requested to be admitted. Any assertion or lack of information or knowledge as a reason for failure to admit or deny must be signed by you under the penalties of perjury.

C.      Rule 36 requires any denial by you of a matter requested to be admitted must fairly meet the substance of the requested admission and that when good faith requires that an answer be qualified or a part of the request be denied such qualification or denial must be specific and admit that part of the requested admission that is true. It is not a sufficient answer that a request presents a genuine issue for trial. If you deny any matter requested to be admitted and the truth of the request is eventually proved at trial, Rule 37( c) provides that you may be ordered to pay to the party making these requests the reasonable expenses incurred in proving the matters requested to be admitted, including reasonable attorney's fee. Each denial of a request for admission or a qualification must be made under the penalties of perjury.

D.      Rule 36 requires that each admission, denial, objection, or statement shall be preceded by the request to which it responds.

2

## DEFINITIONS

For the purpose of this request for admission, the following definitions shall apply:

A.    The term "Plan" as used herein refers to defendant Medical Information Technology, Inc. Profit Sharing Plan, as currently in force pursuant to the Amended and Restated Trust Agreements dated as of January 1, 1989 and 1998, as well as the Medical Information Technology, Inc. Profit Sharing Trust, as established on December 31, 1973 (the "Trust").

B.    The term "Meditech" as used herein means, refers to, and includes Medical Information Technology, Inc., a Massachusetts corporation with a principal place of business in Westwood, Massachusetts, its parents or predecessors, subsidiaries, affiliates and each of their present and former officers, directors, employees, agents, attorneys and any and all persons acting and/or purporting to act for or on their behalf.

C.    The term "Trustee" as used herein means the Trustee of the Trust as defined under the Plan.

D.    The term "Participant" as used herein means any person working as an employee for Meditech who participated in the Plan.

E.    Deposition  Exhibit refers to the wording on a document at depositions taken by the plaintiffs in this action.

## ADMISSIONS[1]

A.    With respect to each of the below listed documents, do you admit (a) you produced  such document to the plaintiffs during the course of discovery in this case; (b) such document is a true and correct copy of the original; (c) each document constitutes a "record of regularly conducted activity" as described in FRE 803 (6); (d) each document is authentic and

---

[1] Please note a deposition exhibit number is given as guidance to you.

satisfies the requirements of FRE 901; and (e) where noted, was marked as a deposition exhibit by plaintiffs:

1.     a document dated 12/31/96, DEF 001337-001340, (exhibit 20 to depositions);

2.     a document dated 01/02/98, DEF 001333-001336, (exhibit 21 to depositions);

3.     a document dated 01/05/99, DEF 001329-001332, (exhibit 22 to depositions);

4.     a document dated 01/05/00, DEF 001326-001328, (exhibit 23 to depositions);

5.     a document dated 12/29/00, DEF 001321-001325, (exhibit 24 to depositions);

6.     a document dated 12/31/01, DEF 001316-001320, (exhibit 25 to depositions);

7.     a document dated 03/03/03, DEF 001313-001315, (exhibit 26 to depositions);

8.     a document dated 01/24/05, DEF 001305-001308, (exhibit 27 to depositions);

9.     a document dated 01/26/04, DEF 001309-001312, (exhibit 28 to depositions);

10.    a document dated 01/23/06, DEF 001301-001304, (exhibit 29 to depositions);

11.    letter to staff dated 01/31/97, DEF 0001389-90, (exhibit 10 to depositions);

12.    sample letter to staff dated 01/30/98 with attachments, DEF 001396-001401;

13.    letter to David Hinchliffe dated 01/30/98, plus attachments to his withdrawal from the Plan, DEF 001341 and DEF 001051-001057;

14.    letter to William Trainor dated 04/15/98 and other documents relating to his withdrawal from the Plan, DEF 001045-001050;

15.    letter to Michael Hubert regarding his distribution  from the plan dated 09/16/04, and related document, DEF 001040-001044;

16.    chairman's comments to the Meditech Board of Directors for the quarters ending:

      (i)     03/31/99, DEF 002514-002519 (exhibit 44 to depositions);

      (ii)    12/31/00, DEF 002120-002125 (part of exhibit 80 to depositions);

(iii)    12/31/01, DEF 001859-001864 (exhibit 52);

17.    report to the Board of Directors of Meditech for the quarter ending 12/31/95, DEF 000334-000390;

18.    report to the Board of Directors of Meditech for the quarter ending 09/30/96, DEF 006858-006908;

19.    report to the Board of Directors of Meditech for the quarter ending 12/31/96, DEF 006909-006965;

20.    report to the Board of Directors of Meditech for the quarter ending 06/30/97, DEF 0028941-002949

21.    report to the Board of Directors of Meditech for the quarter ending 09/30/97, DEF 002840-002893 (Exhibit 37 to depositions);

22.    report to the Board of Directors of Meditech for the quarter ending 12/31/97, DEF 002779-002839 (Exhibit 79 to depositions);

23.    report to the Board of Directors of Meditech for the quarter ending 03/31/98, DEF 002723-002778;

24.    report to the Board of Directors  of Meditech for the  quarter ending  09/30/03, DEF 003001-003053 (Exhibit 56 to depositions);

25.    report to the Board of Directors of Meditech for the quarter ending 12/31/03, DEF 003054-003137 (Exhibit 75 to depositions);

26.    president's Report to the Board of Directors of Meditech  for the quarter ending 06/30/98, DEF 012487-012498 (part of Exhibit 68 to depositions);

27.    president's Report to the Board of Directors of Meditech for the quarter ending 09/30/96, DEF 006898-006908;

28. president's Report to the Board of Directors of Meditech for the quarter ending 12/31/98, DEF 002557-002606 (part of Exhibit 69 to depositions);

29. president's Report to the Board of Directors of Meditech for the quarter ending 03/31/99, DEF 002544-002545 (part of Exhibit 70 to depositions);

30. sales & Marketing Report to the Board of Directors of Meditech for the quarter ending 03/31/03, DEF 001608-001609 (part of Exhibit 72 to depositions);

31. sales & Marketing Report to the Board of Directors of Meditech for the quarter ending 09/30/03, DEF 003026-003027 (part of Exhibit 73 to depositions);

32. Meditech Profit Sharing Plan as of 01/01/1989, DEF 000001-000071;

33. Summary Plan Description of Meditech Profit Sharing Plan, DEF 001524-001536 (Exhibit 5 to depositions);

34. Meditech Profit Sharing Plan as of 01/01/98, DEF 000084-000143 (Exhibit 6 to depositions);

35. Summary Plan Description of the Meditech Profit Sharing Plan dated 01/01/98, DEF 000072-000083;

36. Meditech Profit Sharing Trust Financial Report for the following years:

- 1996 – DEF 001393;

- 1997 – DEF 001402;

- 1998 – DEF 001415-001416

- 2003 – DEF 001479-001488;

- 2004 – DEF 001493

  (all part of Exhibit 12 to depositions)

37.     Meditech 5500 Annual Return for the Plan filed with the Department of Labor for
the following years:

- 1996 – DEF 000818-000860;

- 1997 – DEF 000861-000879;

- 1998 – DEF 000880-000886;

- 2003 – DEF 000956-000970;

- 2004 – DEF 000971-000984;

        (all part of Exhibit 14 to depositions)

38.     Schedule 13D dated 02/27/02, consisting of 16 pages filed with Securities and
Exchange Commission by Jerome Grossman et al (Exhibit 30 to deposition);

39.     Form 10K filed by Medical Information Technology Inc with the Securities and
Exchange Commission for the period ending:

(a)     12/31/96, DEF 003646-003073;

(b)     12/31/97, DEF 003619-003645;

(c)     12/31/98, DEF 003674-003699;

(d)     12/31/03, DEF 004411-004466, and amended DEF 003700-003703

(e)     12/31/04, DEF 004448-004479

        (all part of Exhibit 82 to depositions, some without bates number);

(f)     2002 Proxy Statement, DEF 004253-004283;

B.      Do you further admit that the below listed  transcripts of testimony of the
following individuals: (a) were taken in the litigation captioned *Grossman, et al v. Medical
Information Technology, Inc et al* (03-1872-BLS) (Suffolk County), (b) were produced by you to
the plaintiffs in discovery and (c) are complete and accurate copies of the individual's testimony:

7

40.   Roland Driscoll, 01/13/05, DEF 008205-008325;

41.   Morton E. Ruderman, 06/22/05, DEF 008326-008454 (exhibit 62 to depositions);

42.   Lawrence Polimeno, 04/12/05, DEF 008455-008204 (exhibit 66 to depositions);

43.   Edward Roberts, 01/28/04, DEF 08926-089196 (exhibit 76 to depositions);

44.   A. Neil Pappalardo, 05/16/05, DEF 009712-010001 (exhibit 86 to depositions);

C.   Do you further admit that:

45.   The Trustee for the Meditech Profit Sharing Plan did not consult with an outside or independent expert on the fair market value of privately held company stock before selecting a value for the shares of Meditech common stock in the Plan in any of the years between 1995 through 2004.

46.   The Trustee purchased shares of common stock of Meditech individually in the period from 1995 through 2004;

47.   The Trustee did not disclose the methodology of how he valued the shares of Meditech stock in the Plan with the Plan participants at any time prior to 12/31/01;

48.   The Trustee did not disclose in writing to any plan participant what percentage interest he or she had in the Plan.

D.   Do you further admit that the form 10K of Meditech for the calendar years 2002 marked as part of deposition exhibit 82 is an accurate copy of the form 10K filed by Meditech for that year with the Securities & Exchange Commission, is authentic, and satisfies the evidentiary requirement of FRE 901.

E.   Do you admit that Howard Messing during the time he was an officer of Meditech wrote the answers to the questions in the document entitled Question Box Special Edition last updated June 9, 2000. MH 0006-0007

F.     Do you admit that A. Neil Pappalardo wrote the document labeled DEF 012917.

G.     Do you admit that the attached 15 page report (plus cover and back page) entitled

The Financial Systems Hospital IT Market, 1998-2005 is an accurate copy of a report issued by

the HIMSS Foundation in 2006.

Respectfully submitted,

**Michael P. Hubert,**
**William Trainor, and**
**David Hinchliffe,**
By their attorneys,


Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Jennifer M. Ryan (BBO #661498)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA  02210
671-371-1000
671-371-1037

Dated: January 25, 2008


### Certificate of Service


I, Michael A. Collora, hereby certify that I have, on this 25th day of January, 2008, caused the above document
to be served by hand upon all counsel of record.


Michael A. Collora

9

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005



*Foundation*

RESEARCH PROVIDED BY THE DORENFEST INSTITUTE FOR HEALTH
INFORMATION TECHNOLOGY RESEARCH AND EDUCATION,
THROUGH THE HIMSS FOUNDATION, CHICAGO, ILLINOIS.
© 2006 BY THE DORENFEST INSTITUTE.

# The Financial Systems Hospital IT Market, 1998-2005

## In This Report

| | |
|---|---|
| INTRODUCTION: THE VIEW FROM ABOVE | 2 |
| ACCOUNTS PAYABLE | 4 |
| BENEFITS ADMINISTRATION | 5 |
| CASE MIX MANAGEMENT | 6 |
| COST ACCOUNTING | 7 |
| CREDIT/COLLECTIONS | 8 |
| ELECTRONIC CLAIMS | 9 |
| EXECUTIVE INFORMATION SYSTEMS | 10 |
| GENERAL LEDGER | 11 |
| MATERIALS MANAGEMENT | 12 |
| PATIENT BILLING | 13 |
| PAYROLL | 14 |
| REGISTRATION/ADT | 15 |

## INTRODUCTION: THE VIEW FROM ABOVE

The market for software used by hospital financial departments has been growing increasingly concentrated over the last seven years. These applications fall into the 12 basic categories that are examined in this paper, each of which is dominated by that segment's top 10 suppliers.

In fact, several major companies are listed repeatedly in most categories' top 10 rankings, though over a span of years they tend to jockey for positioning in the rankings. The top four software companies—along with a major subset of hospitals that "self-develop" their own financial applications—usually represent more than 50 percent of the combined market in the various categories.

This should come as no surprise. Many vendors have highly integrated suites available for clients. Lawson, MEDITECH, McKesson Provider Technologies, Siemens Medical Solutions, CPSI and many others have modules for the applications highlighted in this white paper.

If a hospital selects a financial systems vendor, we have found that it is probable the institution will implement several modules of a financial suite of applications. That is an example of the types of issues that this white paper outlines.

The paper surveys each of the 12 common applications within the financial systems arena: accounts payable, benefits administration, case mix management, cost accounting, credit/collections, electronic claims, executive information systems, general ledger, materials management, payroll, patient billing and registration/ADT.

The white paper offers a closer look at each application area in detail, while highlighting any noteworthy developments, such as acquisitions or significant increases in market share. Accompanying charts provide snapshots of the ever-changing positioning of the top 10 vendors in each segment.

The data, in aggregate, tells several stories. For instance, the vast majority of hospitals have all or most of the applications commonly followed by Dorenfest & HIMSS Analytics, with one exception—executive information systems. Slightly more than 63 percent of hospitals have deployed that application,



# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

the lowest penetration of any of the financial software categories. The rest of the segments—with only one other exception—have installation rates of more than 92 percent. (Cost accounting has a penetration rate of 82 percent.)

That might lead one to conclude that financial systems is a "mature" software market. But that may not quite be true. A closer look at the data reveals that "self-developed" applications—those created in-house by hospital information technology departments and subcontractors—occupies one of the top five positions in every segment. Almost 22 percent of executive information systems are developed in-house, the highest rate among any financial applications (in fact, ranking first in that category). Self-developed applications range from 6 percent to 14 percent of the overall market in various segment, ranking from first to fifth on various lists.

This suggests there are opportunities for software firms to sell their products to hospitals that still use in-house systems. This white paper does not investigate the reasons why self-developed systems are so prevalent. Factors like price, quality, interfacing issues and customization likely play a role. It is also possible that there remains a lingering lack of confidence in some corners toward commercially available products.

The data reveals a second story: The top 10 suppliers (here we include "self-developed") utterly dominate their markets, ranging in 2005 from a 76.23 percent share in electronic claims, to 89.84 percent in patient billing. Vendors holding down positions 11 to 15 on these lists rarely control more than 2 percent of the market; most own between 1 and 2 percent. Nor is top 10 market share evenly dispersed—in most cases the leading three or four companies, plus self-developed systems, control 50 percent of the market or more. While each category might contain as many

as 30 vendors overall, that is no indication that these segments are as robust as they might appear. Most vendors maintain less than a 1 percent market share.

The data gives one final insight: A handful of industry-leading companies have demonstrated staying power throughout the years in this survey—CPSI, Dairyland Healthcare Solutions, Healthcare Management Systems, Inc., Lawson Software, IDX, MEDITECH, McKesson, PeopleSoft and Siemens Medical Solutions among them. Several others (Cerner Corp., Eclipsys Corp., Epic Systems Corp., QuadraMed and SSA Global Technologies Inc.) occupy top 10 slots in just a few segments.

Two important acquisitions occurred between 1998 and 2005 that transformed the financial healthcare software market. When McKesson Corp. acquired HBOC, Inc. in 1999 and Siemens merged with Shared Medical Systems (SMS) to form Siemens Medical Solutions in 2000, both became dominant in nearly every financial services category. Both hold one of the top six positions in every segment.

As might be expected, companies with smaller market shares often change places among the top 10. In some years, companies occupying 11th to 15th place on various lists might slip briefly into the top 10, only to slip out again in subsequent years as acquisitions or aggressive marketing pushes their competitors further up the ranks. Some may appear in the top four spots in several segments yet fail to rank in other markets.

The good news for providers is that no one dominant corporation holds a monopoly share in all applications—there are no Microsofts here. MEDITECH leads or is near the top in every category, but Lawson has overtaken it in several categories over the seven year arc of this report. Competition for the top slots remains fierce.

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

## ACCOUNTS PAYABLE

Vendors in this category distribute software that provides control over cash flow, with specific information on disbursement and invoices. It includes online entry, inquiry and reporting capabilities, and may be part of an enterprise resource planning (ERP) suite of applications.

The top 10 accounts payable suppliers accounted for 82.92 percent of the market in 2005. Top vendors include Lawson Software (16.90 percent), MEDITECH (16.83 percent) and McKesson Provider Technologies (12.78 percent). Siemens Medical Solutions, PeopleSoft, CPSI, Healthcare Management Systems, Inc., SAP and Dairyland Healthcare round out the top 10. Each of these vendors holds between 7.33 and 2.68 percent of the market. In addition, 9.95 percent of the market uses self-developed applications.

In 2005, 3,937 hospitals had either installed patient billing software or had signed a contract to do so. This represents 98.18 percent of the hospitals tracked in the sample, compared to 94.27 percent in 1998.

## HIGHLIGHTS

- Lawson overtook MEDITECH for first place in 2005 after MEDITECH held that position for six straight years.

- Healthcare Management joined the top 10 list in 2002. Before that, it had not appeared among the top entries.

- Several companies have previously appeared on the top 10 list, but have since fallen down a few positions. These include Global Software, Inc. and GEAC.

- The track of self-developed applications in this segment has been a bit unusual. In 1998, self-developed applications were third on the top 10 list, before falling as low as sixth place in 2000. But by 2003, they rebounded to fourth place, where they remain.

- SAP Healthcare's market share rose spectacularly over the past two years, jumping from 16th place on the list with an 0.81 percent market share in 2004, to ninth place with a 2.75 percent share in 2005.



**Accounts Payable**
Aggregate Top Ten Vendor Market Share

*Data from 1998 to 2003 comes from the Dorenfest IHDS+ Database™.*
*Data from 2004 and 2005 comes from the HIMSS Analytics™ Database (derived from the Dorenfest IHDS+ Database™).*

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

## BENEFITS ADMINISTRATION

Benefits administration software is an application that manages human resources benefits, including defined contributions, defined benefits, flexible benefits, and health and welfare plans.

The top 10 benefits administration suppliers accounted for 78.52 percent of the market in 2005. Top vendors include Lawson Software (20.45 percent), MEDITECH (15.25 percent) and PeopleSoft (12.06 percent). McKesson Provider Technologies, Siemens Medical Solutions, Healthcare Management Systems, Inc., CPSI, Automatic Data Processing, Inc. (ADP) and SSA Global Technologies, Inc. round out the top 10. Each holds between 5.94 and 2.54 percent of the market. In addition, 6.43 percent of the market uses self-developed applications.

In 2005, 3,971 hospitals had either installed benefits administration software or had signed a contract to do so. This represents 94.54 percent of the hospitals tracked in the sample, compared to 82.06 percent in 1998.

## HIGHLIGHTS

- Lawson has gradually gained market share since 1998, starting in seventh place and moving to the top of the list in 2003. That might have to do with the 1999 acquisition of Ijob, an Edmond, Okla.-based benefits-tracking and employee-training software

provider. Improved integration of its financial suite likely also played a role.

- MEDITECH, PeopleSoft and Siemens have been in the top 10 for seven years straight, as have self-developed applications. McKesson has been in the top 10 the past six years.

- Lawson, MEDITECH and PeopleSoft collectively own slightly more than 48 percent of the market. No other vendor rises above a 6 percent market share.

- SSA Global made its first appearance in the top 10 in 2003. The reason? The company has acquired 11 enterprise software firms since 2001. SSA says the acquisitions enhance the value of its ERP offerings.



**Benefits Administration**
Aggregate Top Ten Vendor Market Share

*Data from 1998 to 2003 comes from the Dorenfest IHDS+ Database™.*
*Data from 2004 and 2005 comes from the HIMSS Analytics™ Database (derived from the Dorenfest IHDS+ Database™).*

 © 2006, THE DORENFEST INSTITUTE

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

## CASE MIX MANAGEMENT

Vendors in this category provide software that provides integrated information from admission, discharge, transfer, utilization review, patient billing and abstracting to monitor and understand the mix of patient types and patient services delivered.

The top 10 case mix management suppliers accounted for 85.67 percent of the market in 2005. Top vendors include MEDITECH (24.46 percent), McKesson (19.92 percent) and Siemens (12.31 percent). Eclipsys Corp., CPSI, Healthcare Management Systems, Inc., Dairyland Healthcare Solutions, ACS Healthcare Solutions and QuadraMed round out the top 10. Each of these vendors holds between 5.98 and 1.74 percent of the market.

In addition, 8.97 percent of the market uses self-developed applications.

In 2005, 3,597 hospitals had either installed benefits administration software or had signed a contract to do so. This represents 89.70 percent of the hospitals tracked in the sample, compared to 84.93 percent in 1998.

## HIGHLIGHTS

- Of the top 10 vendors, all except Eclipsys and ACS have been on the list since 1998. Eclipsys joined the list in 1999, jumping from 19th place to fifth place, a position it has maintained for six straight years.

- ACS made its first appearance in the top 10 in 2005, after being in the bottom half of the top 20 since 2002.

- 3M and Keane have lost market share since 1998, falling into 15th place and 12th place, respectively, in 2005.

- While there has been movement among individual companies in and out of the top 10, the aggregate market strength of the largest case mix management vendors held relatively steady between 1998 and 2005. Top 10 companies held 84.62 percent of the market in 1998, compared to 85.67 in 2005.

- Top 10 vendors' aggregate share spiked in 1999 at 87.42 percent.



**Case Mix Management**
Aggregate Top Ten Vendor Market Share

*Data from 1998 to 2003 comes from the Dorenfest IHDS+ Database™.
Data from 2004 and 2005 comes from the HIMSS Analytics™ Database (derived from the Dorenfest IHDS+ Database™).*

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

## COST ACCOUNTING

Vendors in this category provide software that attempts to match the exact cost of specific resources utilized with the associated revenue generating services. Examples include supplies, physical facilities costs, specific procedure costs, etc.

The top 10 benefits cost accounting suppliers represented 83.68 percent of the market in 2005. Top vendors include McKesson (19.77 percent), MEDITECH (16.65 percent), and Eclipsys (9.79 percent). Eclipsys, Siemens, CPSI, Lawson, Healthcare Management Solutions, Avega Health Systems and Dairyland Healthcare round out of the top 10. Each of these vendors holds between 5.98 and 2.25 percent of the market. In addition, 13.75 percent of the market uses self-developed applications, making it the third most popular solution for this application.

In 2005, 3,320 hospitals had either installed cost accounting software or had signed a contract to do so. This represents 82.79 percent of the hospitals tracked in the sample, compared to 69.21 percent in 1998.

## HIGHLIGHTS

- McKesson (formerly HBOC) has led consistently over the past seven years. But its share has remained relatively static—ranging from 19.77 to 23.36 percent—while the segment itself has grown substantially.

- Utilization of self-developed applications have fluctuated over the past seven years, falling as low as 6.06 percent of the market in 1999, and rising as high as 14.85 percent in 2003. However, self-developed applications have never dropped lower than fifth place on the cost accounting systems top 10 list.

- Avega Health Systems (formerly Healthcare Microsystems) has held a spot on the top 10 list since 1998, fluctuating between the sixth and ninth positions. Since 2004, CPSI and Lawson have gained the largest market share.

- The year 2000 was the only time between 1998 and 2005 that the top 10 vendors controlled less than a combined 80 percent of the cost accounting market segment.



**Cost Accounting**
Aggregate Top Ten Vendor Market Share

Top 10 Vendors   Rest of market

*Data from 1998 to 2003 comes from the Dorenfest IHDS+ Database™.*
*Data from 2004 and 2005 comes from the HIMSS Analytics™ Database (derived from the Dorenfest IHDS+ Database™).*

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

## CREDIT/COLLECTIONS

Vendors in this category provide software that manages the collection of billed services and debt. This application may automatically produce letters for overdue accounts and record collection data and terms of payments.

The top 10 credit/collections suppliers accounted for 87.41 percent of the market in 2005. Top vendors include MEDITECH (20.85 percent), McKesson (18.46 percent) and Siemens (17.10 percent). CPSI, Healthcare Management Systems, IDX, Cerner Corp., Dairyland Healthcare and QuadraMed round out the top 10. Each of these vendors holds between 4.80 and 1.90 percent of the market. In addition, 12.27 percent of the market uses self-developed applications.

In 2005, 3,711 hospitals had either installed credit/collections software or had signed a contract to do so. This represents 92.54 percent of the hospitals tracked in the sample, compared to 79.44 percent in 1998.

## HIGHLIGHTS

- The credit/collections top 10 list has been stable. The only newcomer to the list is Cerner, which moved into eighth position in 2005 after three years of being just a few places short of the top 10.

- In 2005, MEDITECH took over as the top vendor in the category. McKesson had been in the number one slot for six years.

- Though maintaining a place among the top 10 vendors, QuadraMed controlled less than 2 percent of the credit/collections market in 2005. In fact, it had only two more hospital installations than 11th place Epic Systems.

- The market penetration of the top 10 credit/collections vendors peaked in 2003 and 2004, when the top vendors' market share surpassed 88.60 percent. They fell back slightly in 2005.

- Top 10 vendors saw a slight dip in their fortunes in 2005, controlling slightly less of the market (87.41 percent) than they held during the prior three years. But that's less than a 1 percentage point aggregate shift.



Credit/Collections
Aggregate Top Ten Vendor Market Share

*Data from 1998 to 2003 comes from the Dorenfest IHDS+ Database™. Data from 2004 and 2005 comes from the HIMSS Analytics™ Database (derived from the Dorenfest IHDS+ Database™).*

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

## ELECTRONIC CLAIMS

Electronic claims vendors offer software that provides electronic transactions for eligibility, authorizations and referrals. They help automate the collection process from all types of physicians, dentists, other professional providers, healthcare facilities, independent laboratories, vision care, ambulance services and suppliers.

The top 10 electronic claims software suppliers accounted for 76.23 percent of the market in 2005. Top vendors include SSI Group (13.76 percent) MEDITECH (12.08 percent), McKesson (10.04 percent) and Siemens (9.31 percent). NDC, Blue Cross Blue Shield Association, CPSI, Dairyland Healthcare and IDX round out the top 10. Each of these vendors holds between 8.35 percent and 1.71 percent of the market. In addition, 10.37 percent of the market uses self-developed applications.

In 2005, 3,830 hospitals had either installed electronic claims software or had signed a contract to do so. This represents 95.51 percent of the hospitals tracked in the sample, compared to 86.06 percent in 1998.

## HIGHLIGHTS

- The SSI Group reached the top position for the first time in 2005 after several years in fifth position. It acquired National EDI Systems Corp. in 2004.

- SSI Group specializes in electronic claims

management and does not appear in many other categories, unlike its competitors.

- Self-developed applications occupied the number three slot four of the past seven years.

- This category has the smallest aggregate market share among top 10 vendors in any of the 12 financial systems categories. The market share of the top 10 declined in 2005 to 76.23 percent after being above 78 percent for three consecutive years.

- Combined, non-top 10 vendors owned 23.77 percent of the market in 2005, narrowly missing the one-quarter mark. The last time these vendors combined to control 25 percent of the market was in 2000.



**Electronic Claims**
Aggregate Top Ten Vendor Market Share

Legend: Top 10 Vendors — Rest of market

*Data from 1998 to 2003 comes from the Dorenfest IHDS+ Database™. Data from 2004 and 2005 comes from the HIMSS Analytics™ Database (derived from the Dorenfest IHDS+ Database™).*

© 2006.THE DORENFEST INSTITUTE

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

## EXECUTIVE INFORMATION SYSTEMS

Vendors in this category offer applications that provide sophisticated tools to integrate, process, and present key operational performance data to executives in an easy-to-learn format. These systems may provide cost, budget, facility utilization, staffing ratios, or revenue and profit figures.

Fully 21.71 percent of the market uses self-developed applications, while the overall top 10 executive information systems suppliers accounted for 87.43 percent of the market in 2005. Top vendors include MEDITECH (20.23 percent), McKesson (16.99 percent) and Siemens (7.50 percent).

Eclipsys, CPSI, Healthcare Management, Hyperion Solutions and Dairyland Healthcare round out the top 10. Each holds between 6.33 and 1.56 percent of the market.

In 2005, 2,543 hospitals had either installed executive information systems software or had signed a contract to do so. This represents 63.42 percent of the hospitals tracked in the sample, compared to 47.58 percent in 1998.

## HIGHLIGHTS

- Lawson joined the top 10 in 2005, with 40 hospital installations and a 1.56 percent share of the segment. It first appeared in the top 20 in 2000, when it had just 24 installations.

- For the past three years—with the exception

of Lawson—the list has largely retained the same names. QuadraMed, after several years in the 10th spot, dropped to 13th place in 2005.

- The top 10 executive information systems vendors controlled less than 80 percent of the executive information systems market in 1998. But they have since gained market share, reaching an aggregate peak of 88.58 percent in 2002, before leveling off.

- Self-developed applications topped the list in 1998, but fell to third place behind MEDITECH and McKesson in 1999 and 2000. However, these noncommercial applications rebounded to number one in the segment in 2001, and have continued to hold down the top ranking since that time.



**Executive Information Systems**
Aggregate Top Ten Vendor Market Share

*Data from 1998 to 2003 comes from the Dorenfest IHDS+ Database™.*
*Data from 2004 and 2005 comes from the HIMSS Analytics™ Database (derived from the Dorenfest IHDS+ Database™).*

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

## GENERAL LEDGER

These vendors provide software that automates general ledger accounting and provides the information necessary for financial analysis and planning. It aids healthcare organizations in the management of the chart of accounts.
It may be an application component of an enterprise resource planning suite.

The top 10 general ledger suppliers accounted for 85.07 percent of the market in 2005. Top vendors include MEDITECH (16.91 percent), Lawson (16.70 percent) and McKesson Provider Technologies (11.68 percent). Siemens Medical Solution, PeopleSoft, CPSI, Healthcare Management Systems Inc., GEAC and SAP Healthcare round out the top 10. Each holds between 7.69 and 2.77 percent of the market. Fully 12.39 percent of the market uses self-developed applications.

In 2005, 3,920 hospitals had either installed general ledger software or had signed a contract to do so. This represents 97.76 percent of the hospitals tracked in the sample—the second highest of any application—compared to 93.96 percent in 1998.

## HIGHLIGHTS

- MEDITECH has maintained the number one position for seven years.

- In 2002 Healthcare Management advanced from 15th to eighth place.

- The list has largely remained the same for a number of years. Dairyland Healthcare fell off the top 10 list in 2005 after seven straight years before moving to 11th place; Global Software Inc. had been on the list for four years before dropping off in 2003.

- SAP joined the top 10 list in 2005, with 2.77 percent of the market. It first appeared in the top 20 in 1999, when it possessed less than a 0.5 percent share.

- Self-developed applications have followed a counter-intuitive path, falling to as low as sixth place on the top 10 list in 1999, before rising back up to third place in 2002. Self-developed applications have retained that number three position for the past five years.



**General Ledger**
Aggregate Top Ten Vendor Market Share

*Data from 1998 to 2003 comes from the Dorenfest IHDS+ Database™.
Data from 2004 and 2005 comes from the HIMSS Analytics™ Database (derived from the Dorenfest IHDS+ Database™).*

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

## MATERIALS MANAGEMENT

Vendors in this category offer software that supports the procurement and inventory functions for all hospital departments and operations.

The top 10 materials management suppliers accounted for 84.06 percent of the market in 2005. Top vendors include McKesson Provider Technologies (18.97 percent), Lawson (17.42 percent) and MEDITECH (15.79 percent).

Siemens Medical Solution, PeopleSoft, CPSI, Healthcare Management Systems Inc., Dairyland Healthcare Solutions and Choice Systems Inc. round out the top 10. Each holds between 5.06 and 2.22 percent of the market. Another 10.05 percent of the market uses self-developed applications.

In 2005, 3,829 hospitals had either installed materials management software or had signed a contract to do so.

This represents 95.55 percent of the hospitals tracked in the sample, compared to 89.65 percent in 1998.

## HIGHLIGHTS

- McKesson has been in the first position for seven straight years. Nine other companies have appeared on the top 10 list for the past four years.

- Choice Systems joined the top 10—ranking in the 10th spot—in 2005. GEAC, for the first time since 1998, tumbled out of the top 10 and into 14th place.

- Self-developed applications are strong in this market segment, holding a fourth place position for the past four years.

- Lawson has made steady progress in this market over the past several years. In 1998, Lawson held 4.88 percent of the market; in 2005, it held 17.42 percent of the segment.

- The top 10 materials management vendors have consistently held between 80 percent and 85 percent of the market.



Materials Management
Aggregate Top Ten Vendor Market Share

Top 10 Vendors ▪ Rest of market

*Data from 1998 to 2003 comes from the Dorenfest IHDS+ Database™.*
*Data from 2004 and 2005 comes from the HIMSS Analytics™ Database (derived from the Dorenfest IHDS+ Database™).*

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

## PATIENT BILLING

These applications automate institutional and professional billing inpatient and outpatient services and discharged accounts receivable. They automate billing and collection procedures daily, thus providing information in areas such as posting and audit, billing receivable management, and revenue and management reporting.

The top 10 patient billing suppliers accounted for 89.84 percent of the market in 2005. Top vendors include MEDITECH (21.01 percent), McKesson Provider Technologies (20.25 percent) and Siemens Medical Solutions (19.01 percent). CPSI, Healthcare Management Systems Inc., IDX, Dairyland Healthcare Solutions, Cerner Corp. and Epic Systems Corp. round out the top 10. Each holds between 4.64 and 2.13 percent of the market. Additionally, another 10.72 percent of the market uses self-developed applications.

In 2005, 3,915 hospitals had either installed patient billing software or had signed a contract to do so. This represents 97.63 percent of the hospitals tracked in the sample, compared to 87.29 percent in 1998.

## HIGHLIGHTS

- MEDITECH took the number one spot in 2005 after McKesson held it for six of the past eight years.

- Cerner and Epic joined the top 10 in 2005 after several years in the 11th and 15th spots.

- QuadraMed dropped to 11th in 2005 after six years in the top 10; Keane dropped to 12th place in 2005 after seven years on the top 10.

- Non-top 10 vendors are dominated in the patient billing segment as in no other financial systems market. The dominant top 10 vendors lost their 90 percent market share in 2004, but just barely. In 2005, top 10 suppliers controlled fully 89.84 percent of the market.

- Self-developed software use peaked in 1998, at 13.75 percent. It declined to 7.55 percent in 1999, but rose to 10.72 percent in 2005.



**Patient Billing**
**Aggregate Top Ten Vendor Market Share**

Top 10 Vendors    Rest of market

*Data from 1998 to 2003 comes from the Dorenfest IHDS+ Database™.*
*Data from 2004 and 2005 comes from the HIMSS Analytics™ Database (derived from the Dorenfest IHDS+ Database™).*

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

## PAYROLL

Vendors in this category offer software that manages payroll processing. This application keeps records of all employees for timely compensation payment and processes employees' paychecks.

The top 10 payroll system suppliers accounted for 78.55 percent of the market in 2005. Top vendors include Lawson Software (20.37 percent), MEDITECH (14.97 percent) and PeopleSoft (11.28 percent).

McKesson Provider Technologies, Siemens Medical Solutions, Automatic Data Processing, CPSI, Healthcare Management Systems Inc. and SSA Global Technologies Inc. round out the top 10. Each holds between 6.45 and 2.66 percent of the market. Another 6.30 percent of the market uses self-developed applications.

In 2005, 3,941 hospitals had either installed patient billing software or had signed a contract to do so. This represents 98.28 percent of the hospitals tracked in the sample, compared to 95.45 percent in 1998.

## HIGHLIGHTS

- For the past three years the top 10 list has involved the same companies.

- Only two new companies have joined the top 10 since 2001 – Healthcare Management, in 2002, and SSA Global, in 2003.

- Unusual among the financial systems categories, the top 10 payroll system vendors steadily lost market share between 1998 and 2001.

- Those fortunes reversed in 2002, at the same time that Lawson Software doubled its own share of sales from the previous year, landing it in the top slot where it has remained.

- The number of hospitals using self-developed applications has declined by nearly half since 1998, when 12.72 percent of hospitals developed their own solutions.

- In 2005, only 6.30 percent of hospitals utilized self-developed payroll systems.



**Payroll**
**Aggregate Top Ten Vendor Market Share**

Top 10 Vendors ▦    Rest of market ■

*Data from 1998 to 2003 comes from the Dorenfest IHDS+ Database™.*
*Data from 2004 and 2005 comes from the HIMSS Analytics™ Database (derived from the Dorenfest IHDS+ Database™).*

# THE FINANCIAL SYSTEMS HOSPITAL IT MARKET, 1998-2005

## REGISTRATION/ADT

These are applications that automate the hospital's patient registration function in an online, real-time mode. The system includes online census, preregistration, patient history, patient admission, discharge, and admission discharge transfer functions.

The top 10 registration/ADT system suppliers accounted for 89.37 percent of the market in 2005. Top vendors include MEDITECH (26.20 percent), McKesson Provider Technologies (18.97 percent) and Siemens (17.38 percent). Cerner Corp., CPSI, Healthcare Management Systems Inc., IDX, Epic Systems Corp., and Dairyland Healthcare Solutions round out the top 10. Each holds between 4.89 and 2.80 percent of the market. Another 4.08 percent of the market uses self-developed applications.

In 2005, 3,941 hospitals had either installed patient billing software or had signed a contract to do so. This represents 98.28 percent of the hospitals tracked in the sample, compared to 95.45 percent in 1998.

## HIGHLIGHTS

- The only newcomer to the top 10 in the past several years has been Epic, which captured ninth place in 2005 with 2.87 percent of the market. Cerner Corp. joined the list in 2002.

- In 2005, Eclipsys fell off the top 10 list for the first time since 1998. Last year, Eclipsys dropped to 12th place.

- The registration/ADT market has remained remarkably static over the years surveyed in this report. The top 10 registration/ADT vendors controlled 88.65 percent of the market in 1998, and 89.37 percent in 2005. There has never been a fluctuation as great as 2 percent during the intervening years.

- MEDITECH, McKesson and Siemens dominate, collectively holding 62.55 percent of the market. There is a sizable gap between Siemens and the remaining vendors in the top 10, none of which has more than 5 percent.

- Self-developed applications are in decline. In 2005, they represented just a 4.08 percent share, down from 8.48 percent in 1999.



**Registration/ADT**
Aggregate Top Ten Vendor Market Share

Top 10 Vendors   ■ Rest of market

*Data from 1998 to 2003 comes from the Dorenfest IHDS+ Database™.*
*Data from 2004 and 2005 comes from the HIMSS Analytics™ Database (derived from the Dorenfest IHDS+ Database™).*



RESEARCH PROVIDED BY THE DORENFEST INSTITUTE FOR HEALTH INFOR-
MATION TECHNOLOGY RESEARCH AND EDUCATION, THROUGH THE HIMSS
FOUNDATION, CHICAGO. ILLINOIS. © 2006 BY THE DORENFEST INSTITUTE.

REQUESTS FOR PERMISSION TO REPRODUCE OR PHOTOCOPY ANY PART OF THIS REPORT
SHOULD BE SENT TO JENNIFER HOROWITZ AT JENNIFER.HOROWITZ@HIMSSANALYT-
ICS.ORG. FOR MORE INFORMATION ON THE DORENFEST INSTITUTE AND THE HIMSS
FOUNDATION, VISIT WWW.HIMSS.ORG/ASP/ABOUTHIMSSFOUNDATION.ASP, OR CON-
TACT ERICA PANTUSO, HIMSS FOUNDATION, AT EPANTUSO@HIMSS.ORG.

# EXHIBIT 6

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

1

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS

 3

 4                          Civil Case No. O5-10269-RWZ

 5

 6

 7    * * * * * * * * * * * * * * * * * * * * * * * * )

 8    MICHAEL P. HUBERT, WILLIAM TRAINOR,            )

 9    AND DAVID HINCHLIFFE, INDIVIDUALLY AND         )

10    ON BEHALF OF ALL PERSONS SIMILARLY SITUATED,   )

11                    Plaintiffs                     )

      vs.

12                                                   )

13    MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING  )

14    PLAN, MEDICAL INFORMATION TECHNOLOGY, INC.,    )

15    A. NEIL PAPPALARDO, LAWRENCE A. POLIMENO,      )

16    ROLAND L. DRISCOLL, EDWARD B. ROBERTS,         )

17    MORTON E. RUDERMAN, AND L.P. DAN VALENTE,      )

18                    Defendants.                    )

19    * * * * * * * * * * * * * * * * * * * * * * * * )

20

21

22

23

24
```

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

2

1

2       DEPOSITION OF: A. NEIL PAPPALARDO, a witness in the

3  above-entitled cause, taken before CINDY BERGLUND, CSR,

4  Registered Professional Reporter and Notary Public pursuant

5  to the applicable provisions of the Massachusetts Rules of

6  Civil Procedure, at the offices of DWYER & COLLORA, LLP, 600

7  Atlantic Avenue, Boston, MA  02210, on the 21st day of JULY,

8  2006, commencing at 10:06 A.M.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

3

```
 1    APPEARANCES:

 2

      REPRESENTING THE PLAINTIFFS:

 3

 4    DWYER & COLLORA, LLP

 5    600 Atlantic Avenue

 6    Boston, MA   02210

 7    (617) 371-1000

 8    BY: MICHAEL COLLORA, ESQ.

 9        SARA NOONAN, ESQ.

10

11    REPRESENTING THE DEFENDANTS:

12    GOODWIN PROCTER

13    Exchange Place

14    Boston, MA 02109

15    (617) 570-1000

16    BY:  STEPHEN D. POSS, P.C.

      MICHAEL P. SUGRUE, ESQ.

17

18

19

20

21

22

23

24
```

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

141

1        vested account balance of $911,957 plus interest,

2        please provide us with the enclosed benefit election

3        form," and so on and so forth.  Then the election form

4        is attached, is it not, a draft of it?

5        A.    I don't know for a fact if it was attached to the

6        letter, but I believe it would normally be customarily

7        attached to the letter.

8        Q.    All right.  And then the third page of this

9        Exhibit is a note back from Mr. Trainor to Barbara

10       Manzolillo indicating a trustee-to-trustee transfer and

11       another document presumably originating outside your

12       company?

13       A.    It appears to be.

14       Q.    And then you signed a check to --

15       A.    Plus the last page probably accompanied the first

16       two.

17       Q.    That's his election form?

18       A.    What it appears to be.

19       Q.    And then you cause a distribution to be made from

20       the trust?

21       A.    Yes.

22       Q.    I have no more questions of this.

23            ATTY. COLLORA:  The next set relate to a Michael

24       Hubert.  The first of which is dated September 16, 2004

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

142

1       on Meditech Profit Sharing Trust stationery, DEF

2       001040, 1041, 1042, 1043, 1044, and then 4497 and 4498.

3           (Exhibit 18, MEDITECH LETTERS AND BENEFIT FORMS,

4           marked for identification.)

5

6           ATTY. COLLORA:  I would like to show that to the

7       witness.

8       Q.    Can you identify that set of documents?

9       A.    Yes, I can.

10      Q.    What do they relate to?

11      A.    Presumably having to do with the termination of

12      Michael Hubert, the normal documentation that goes back

13      and forth between the company and Michael Hubert.

14      Q.    All right.  Now, the first page of this Exhibit,

15      1040, is essentially a note with a picture of the check

16      at the bottom.

17      A.    Yes.

18      Q.    Is that fair to say?

19      A.    I think it's fair to say.

20      Q.    Now, he is getting a distribution of 1,040,000.

21      Do you see that?

22      A.    Yes, I do.

23      Q.    According to this document, his interest as of the

24      12/31/2003 was 1,039,000 and some change.  Do you see

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

143

1       that?

2       A.    I do.

3       Q.    And then he had an in-service withdrawal,

4       apparently, on 3/1/2004?

5       A.    That's what it says here.

6       Q.    Is that something you told him to do?

7       A.    No.

8       Q.    That reduced the amount to one million.  Is that a

9       coincidence as -- do all your in-service withdrawals

10      reduce the amount to one million?

11      A.    Not all, but most of them.

12      Q.    How is it that that magic sum is picked?

13            ATTY. POSS:  Objection.  You don't have to

14      answer that question.

15      Q.    Isn't it you that picks the amount, the one

16      million?

17      A.    Not necessarily.

18      Q.    Have you on occasion?

19      A.    Have I picked an amount for someone?

20      Q.    Yes.

21      A.    No.  They get to pick their own amount.

22      Q.    So if Mr. Hubert were to testify that he was told

23      you expected all of the in-service withdrawals to be in

24      amounts above one million, he would be wrong?

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

144

1      A.    We don't give amounts over one million.  If you
2      ask the question correctly, I might be able to answer
3      it.
4      Q.    Were these persons who had an interest in the
5      trust greater than one million dollars advised that
6      they should remove in excess of --
7      A.    In excess of one million?
8      Q.    Yes.
9      A.    I would not advise them on what to do.  I would
10      explain all of their options.  I would certainly say,
11      for instance, if indeed you received the excess over a
12      million dollars, that is a perfectly valid thing to do
13      and here is possible reasons what you might consider
14      whether you want to do this or not.
15      Q.    What were the reasons?
16      A.    There is at least four or five reasons.  Sometimes
17      I discuss, not necessarily any priority, many of these
18      people this is the only viable assets they have.  They
19      are all in Meditech.  They either are employed by
20      Meditech.  Their pension, this trust fund is obviously
21      based on Meditech.  They may own Meditech stock, and
22      since many financial advisors suggest to people that
23      diversification is an important thing to consider, I
24      would explain to them that that is a perfectly valid

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

145

1      reason for taking some of the money out.

2          They are entitled to take -- if they have been

3      with the company over twenty years, they are entitled

4      to take all of their money out of the trust.  I suggest

5      to them if diversification is important, they may

6      consider taking some amount out.

7          The second reason I would discuss with them is

8      sometimes they have never had the opportunity to invest

9      any money personally in any kind of IRA or any other

10     kind of deferred concept and they may want to practice

11     a little bit before they actually retire and receive

12     the bulk of their money, and, therefore, it might make

13     sense to take out a small amount and perhaps the amount

14     over a million dollars would make sense for them.

15         I might consider that -- receiving that every

16     year, taking little bit out and investing it with

17     another entity and learning a little bit how to manage

18     their own money because I've obviously been managing

19     this asset for them up to now.

20         Third, I would point out that to some extent this

21     is their money.  It's not my money and they have rights

22     to do anything they want with it and maybe they want at

23     this stage of their life to buy a new car or do this

24     with it or that with it and they should feel free to

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

151

1       indicating that he did have legal representation prior

2       to receiving this letter.

3       Q.    Would you look at the paragraph that begins, "For

4       example" on the second page?

5       A.    Starting with, "The recent letter"?

6       Q.    Well, let's start with that.  That's fine.  "The

7       recent letter that you sent me regarding the special

8       meeting of shareholders notes that since June of this

9       year the trust has been paying $27 a share for Meditech

10      stock."

11          Now, he was getting a distribution, he claims,

12      based upon the share value being less than that from

13      the previous year, $26.

14      A.    Are you asking me that question?

15      Q.    Do you value the stock on an intermittent basis

16      acting as trustee aside from --

17      A.    I'm only obligated to value the assets of the

18      trust including any stock that it owns once a year on

19      the last day of the Plan year, that being December 31,

20      as the Plan document clearly states.

21      Q.    Have you caused the trust to purchase stock at a

22      price greater than that value arrived at at the end of

23      the year, 12/31 of a particular year, during the course

24      of the next calendar year?

Case 1:05-cv-10269-RWZ    Document 140-8    Filed 04/22/2008    Page 11 of 16
A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

152

1        A.    Yes, I have.

2        Q.    And what do you do to reach a different figure?

3    Do you go through the same methodology that you do to

4    value it?

5        A.    No.  I do not do a full valuation of the net

6    assets or the assets and liabilities of the Plan.  I

7    have already answered the question on how I do it.

8        Q.    In the paragraph of Mr. Hubert's letter which

9    begins, "For example," on Page 2, he says, Quote, "For

10    example, my account balance within the trust was

11    1,039,000 on December 31, 2003.  As you recall, I and

12    other long-term employees were informed in November

13    that we were to roll over funds in excess of one

14    million," end quote.

15        Did you cause certain long-term employees to be

16    informed that they were to roll over funds in excess of

17    one million?

18        ATTY. POSS:  Objection.  You've asked it about

19    ten times.

20        THE WITNESS:  Same answer.  I'm not changing my

21    answer.

22        Q.    You made reference this morning to the fact --

23        A.    Are you through with this document?

24        Q.    Yes.

153

1    A.    I don't know what order they were in.  I'm

2    guessing.  I put this on top.  You can ask your

3    question.

4    Q.    You made reference this morning to the fact that

5    the board of directors in the fall of a particular

6    year --

7    A.    I think I said the fourth Monday in October.

8    Q.    -- values the common stock for the purposes of

9    contribution to the trust and other purposes, perhaps?

10   A.    I said they value it as of and it will be on

11   December 31 of that year for two purposes; for the

12   contribution of stock that may be contributed to the

13   trust, and for the selling of stock to employees which

14   would take place later in the first or second week of

15   February of the following year.

16   Q.    And does anyone within the board take on the task

17   of suggesting that value and methodology?

18   A.    Yes.

19   Q.    Who is that?

20   A.    Myself.

21   Q.    And when you -- do you do so before a certain

22   meeting?  Is it the third quarter meeting or --

23   A.    I said again, and I'll repeat it because you

24   didn't hear the answer, the fourth Monday of October is

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

191

1      and I'm not going to change the date of that meeting.

2      Q.    Okay.  So was there a meeting before that where

3      the employees of the company met where you stood up and

4      discussed valuation of the company stock?

5      A.    Before what?

6      Q.    Before this --

7      A.    Which meeting are we talking about?

8            ATTY. POSS:  I think he told you he does this

9      every year.

10     Q.    Every year you discuss the valuation of the

11     company stock?

12     A.    I said, and I'll repeat it once again, the first

13     and second week of February every year I have a meeting

14     specifically for those people interested in purchasing

15     Meditech stock because I, of course, invite anybody in

16     the company to attend that meeting.  That is one class

17     of meetings I've had with those people who are

18     interested in purchasing stock.  Are you referring to

19     those meetings or not?  And if you are, I'll answer any

20     question about those meetings.  If you are referring to

21     some other meetings I might have had, I'm more than

22     happy to answer any question about any other meetings

23     I've had if you will somehow convey to me what meetings

24     you are talking about.

Case 1:05-cv-10269-RWZ    Document 140-8    Filed 04/22/2008    Page 14 of 16
A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

192

```
 1            ATTY. COLLORA:  May I see the Amended Complaint?

 2       It's here.  I don't know where it is.

 3            ATTY. NOONAN:  I'll find it.

 4       Q.   Did you publish a document on the internet in or

 5       around September 2002 with respect to valuation of the

 6       company stock?

 7            ATTY. POSS:  Did you say intranet?

 8       Q.   Intranet?

 9       A.   Most likely I did, but I'm not sure unless you

10       want to show me the document and let me read it and

11       understand what it is and then I can probably tell you

12       if I definitely did or not.  I publish documents like

13       that all the time.

14       Q.   Well, do you recall publishing a document like

15       that before September 2002?

16       A.   I recall publishing information all the time.  I

17       just said that.

18       Q.   Well, if Mr. Hubert were to take the position he

19       did not know how you valued the company stock until you

20       made a presentation in or around September 2002 --

21       A.   Do you want to talk about that presentation?

22       Q.   Yes.  Before I do that, do you ever remember

23       making a presentation similar to that before that date?

24       A.   Similar to what?
```

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

193

1          Q.    Valuing the company stock, what methodology you

2     used?

3          A.    That wasn't the whole purpose of that meeting.  It

4     was one of the topics that I talked about in that

5     meeting and I've had company meetings all along for the

6     last 37 years on various subjects.

7          Q.    Well, with respect to that topic in

8     September 2002, what did you discuss regarding

9     valuation?

10         A.    What did I discuss, among other things, I did

11    discuss a number of things about the way Meditech's

12    balance sheet is, what the various terms of their

13    balance sheet, what they mean, the various terms of our

14    income statement and in particular because a number of

15    the salespeople had asked me how do I compare our

16    financial status with our competitors, I talked about

17    all the various competitors of the company and how they

18    keep their financial statements.

19             And in addition, during that meeting I also

20    touched upon the various ways that various companies

21    which are privately held and not traded stock might

22    choose to value their stock and I would have told them

23    given our price of our stock, if you want to translate

24    it as a multiple of sales, it might mean this.  If you

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

194

1       want to translate it to a multiple of earnings, it

2       might mean this.  If you want to translate it to a

3       multiple book value, it might mean this -- blah, blah,

4       blah, blah.

5       Q.   Was the reason for this September intranet and

6       discussion because of the Grossman litigation?

7       A.   I didn't say the intranet.  I said exactly the

8       reason that prompted that meeting.

9       Q.   Was it the Grossman litigation?

10      A.   That's not what I said.  I said it was prompted by

11      salespeople asking me about competitors and what their

12      financial statements meant.

13      Q.   Did the Grossman litigation inspire questions

14      addressed to you about the valuation of the company

15      stock?

16      A.   Not that I'm aware of.

17      Q.   Did you offer to purchase the Grossman stock at

18      twice the then stated value?

19      A.   Do you want to give me a time frame?

20      Q.   2001?

21      A.   I'm not sure when I offered to purchase the

22      Grossman stock.

23      Q.   Did you do so at that price, twice the stated

24      value?

# EXHIBIT 7

Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3

4

5                          C.A. NO.:  05-10269-RWZ

6

7

8

9    * * * * * * * * * * * * * * * * * * * * * *

10   MICHAEL P. HUBERT, WILLIAM TRAINOR,

11   AND DAVID HINCHLIFFE, INDIVIDUALLY AND

12   ON BEHALF OF ALL PERSONS SIMILARLY SITUATED,

13            Plaintiffs

14   vs.

15

16   MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING

17   PLAN, ET AL.,

18            Defendants

19   * * * * * * * * * * * * * * * * * * * * * *

20

21

22

23

24

Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

2

 1          DEPOSITION OF A. NEIL PAPPALARDO, taken on

 2     behalf of the plaintiffs, pursuant to the

 3     Massachusetts Rules of Civil Procedure, before

 4     Debra M. Lopes, Professional Shorthand Reporter

 5     and Notary Public, within and for the Commonwealth

 6     of Massachusetts, at the law offices of

 7     Dwyer & Collora, LLP, 600 Atlantic Avenue,

 8     Boston, Massachusetts, commencing at 9:54 a.m.,

 9     on Tuesday, November 27, 2007.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

3

```
 1      APPEARANCES:

 2

 3      DWYER & COLLORA, LLP

 4      by Michael A. Collora, Esquire

 5      600 Atlantic Avenue

 6      Boston, Massachusetts 02210

 7      (617) 371-1000

 8          Counsel for the plaintiffs

 9

10      GOODWIN PROCTER, LLP

11      by Stephen D. Poss, Esquire

12      Exchange Place

13      Boston, Massachusetts 02109

14      (617) 570-1000

15          Counsel for the defendants

16

17

18

19

20

21

22

23

24
```

Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

167

```
 1   A.    Page 6 is the formal minutes of the 2003 meeting.

 2         Page 5 -- sorry.  Page 6.  We both can't read.

 3         Sorry.  What was the question?

 4   Q.    There's a section devoted to -- well, let me

 5         backup.  Again, you have a 3rd quarter performance

 6         review, and then you revise your forecast for

 7         2003, do you not?

 8   A.    I do.

 9   Q.    And in your revision of your forecast for 2003,

10         you say "We now forecast total revenue of

11         270 million, operating income of 99 million and

12         net income of 68 million, up 5.6 percent,

13         5.0 percent and 6.8 percent compared to last

14         year."  You say that, do you not?

15   A.    You're a good reader.

16   Q.    At this point.  And then you have a section

17         devoted to the "Valuation of MEDITECH Stock," and

18         the second -- the first portion of that is

19         financial information you typically furnished to

20         the Board, historical information, do you not?

21   A.    Is that a fact, or you're asking me a question?

22   Q.    Question.

23   A.    Yes, I typically furnish this information.

24   Q.    Then on the next page, is information that you
```

Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

168

```
 1              don't normally give to them?
 2    A.        No.  I always give the same kind of information.
 3              I just quite often did it on a blackboard or on
 4              projections.
 5    Q.        Rather than in a report?
 6    A.        Rather that writing it down.  In preparation for a
 7              meeting, I did it verbally or through blackboard
 8              or through slide presentation.
 9    Q.        Now, in this, you compared Meditech's financial
10              information to that of Cerner, IDX and Eclipsys.
11              Do you see that?
12    A.        I see that.
13    Q.        Were these companies that were competing with
14              Meditech at that time?
15    A.        These were some of the competitors.  In
16              particular, some of them public competition.
17    Q.        And then at the top of Page 8 -- well, you say --
18    A.        Page 8?
19    Q.        Yes.  You indicate what you're going to recommend
20              as the 2004 annual dividend and "This would be an
21              increase of 15.4 percent compared to 5.7 increase
22              in net income per share."  Just stopping there for
23              the moment.
24                   Was it your belief at the time, that you had
```

Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

169

```
 1              excess equity which you could devote to paying

 2              dividend?

 3     A.       It was my belief that going forward in the future,

 4              since our growth rate was slowing down, we could

 5              afford to pay more, a higher increase in

 6              dividends.

 7     Q.       And you believed your growth rate was slowing down

 8              for some foreseeable --

 9     A.       It had slowed down and didn't know for a fact what

10              might happen in the future.  We only know what

11              happened in the last year.

12     Q.       Then you recommended the fair share value to be

13              $26.  Do you see that?

14     A.       Yes.

15     Q.       Would you look at Exhibit 28.  Fair to say that

16              this is your report valuing the trust's assets for

17              the year ending 2003?

18     A.       I don't consider this a report.  Certainly my

19              annual valuation of the trust's assets, which I

20              have done every year.

21     Q.       This time, unlike previous times, you do not put

22              in historical information or refer to fair market

23              value, do you?

24     A.       You have to repeat that question.
```

Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

170

```
 1    Q.    Sure.  Unlike previous reports or whatever you

 2          call this, "valuation," you do not put in

 3          historical information or refer to fair market

 4          value.  Instead, you appended -- at least what it

 5          appears to be to me -- a report of the Chairman

 6          for the previous quarter to the Board.  Do you see

 7          that?  Can you tell me what explains your change

 8          in methodology?

 9                    MR. POSS:  Objection.

10    A.    I think I've indicated that I started putting in

11          into my bullet reports, and I have included in

12          here, the additional written information that I

13          had compiled before, and I choose to include it

14          here.

15    Q.    Did you prepare the same type of report for 2004

16          as you did for 2003, attaching what you reported

17          to the Board back in the previous October?

18    A.    Yes.  It appears I did.  Not only what I did in

19          the previous October, but it also includes votes

20          that were taken subsequent to that.

21    Q.    Let's see.  You, on this valuation, attached your

22          report to the Board for October 25th -- for its

23          October 25, 2004 meeting?

24    A.    I said also something from the next meeting in
```

Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

171

```
 1              January.

 2    Q.        You compare growth rates of Cerner, IDX, Eclipsys

 3              and Meditech on the third page of this document.

 4              Do you see that?  About the middle?

 5    A.        Third page?

 6    Q.        It starts off the past five year?

 7    A.        Yes.  I see it.

 8    Q.        So the past five year average annual growth rate

 9              of Cerner is over 20 percent, that of IDX and

10              Eclipsys is almost 10 percent and that of Meditech

11              is almost 5 percent.  So did you go back and just

12              average the growth rate of each of these

13              companies?  Where did you get this information

14              from?

15    A.        I'm sure I would have a five point best fit growth

16              rate on the numbers that are publicly available.

17    Q.        Do you think the low growth rate or relatively low

18              growth rate of Meditech, affects its stock value

19              at all?

20    A.        It has an indirect affect on it because it can pay

21              more out in dividends, and the more out we pay in

22              dividends, the more we recommend the price of

23              stock be raised, so that the dividend rate of

24              7 percent -- dividend yield of 7 percent would
```

Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

172

```
 1              still be down.

 2    Q.        When you say, you try to explain why -- why do you

 3              think Cerner was growing at 20 percent and IDX at

 4              30 percent and Meditech at 5 percent?  This, of

 5              course, is only revenues, but --

 6    A.        IDX wasn't growing at 30 percent.

 7    Q.        Well, that's what you say.

 8    A.        Well, at first, you're talking about five year

 9              average.  Now, you're talking about an

10              instantaneous growth rate?

11    Q.        Yes.

12    A.        That's a future one.  You used the past tense.  So

13              I would only assume you must have meant the past.

14    Q.        So you said analysts are projecting future growth

15              rate to be over 20 percent, IDX 30 percent,

16              Eclipsys is over 40 percent.  Why were they

17              growing faster than Meditech, do you know?

18    A.        Why were they growing faster?  I don't know, but I

19              certainly know they're in a different kind of

20              business than we're in overall.

21    Q.        What's different from their business than yours,

22              since you list them as competitors?

23    A.        We only make software for hospitals.  All of these

24              companies, in addition to making software for
```

Case 1:05-cv-10269-RWZ    Document 140-9    Filed 04/22/2008    Page 11 of 11
Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

173

```
 1              hospitals, make software for other entities, also

 2              offer hardware, also offer consulting services,

 3              and a whole variety of other things.

 4      Q.      You go on to say, "We note Meditech's future of

 5              earnings per share growth rate will most likely

 6              remain less than 10 percent."  You wrote that at

 7              the end of '04 approximately, didn't you?

 8      A.      No.

 9      Q.      When did you write it?

10      A.      I wrote it from the October meeting.  This is a

11              copy of what was in the October meeting before

12              that, so that's when I would have written it.

13      Q.      Has that, in fact, turned out to be the case?

14      A.      By and large, yes.

15      Q.      Do you recall what the growth rate was in 2005 and

16              2006 in numbers?

17      A.      If you show me the documents, I'd be more than

18              happy to tell you.

19      Q.      I'm just asking you if you recall.

20      A.      I don't recall exactly, and I would prefer to give

21              you an exact answer, and can say, I do not know

22              exact percentage growth rates.  I also don't know

23              from your term, what growth rate means?  Are you

24              talking about revenue growth rate, equity growth
```

# EXHIBIT 8

1

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3

 4      --------------------------------x

 5      MICHAEL P. HUBERT, WILLIAM

        TRAINOR, and DAVID HINCHLIFFE,

 6      Individually and On Behalf of

        All Persons Similarly Situated,

 7                           Plaintiffs

                                         Civil Action

 8      vs.                      No. 05-10269-RWZ

 9      MEDICAL INFORMATION TECHNOLOGY

        PROFIT SHARING PLAN, et al.,

10                           Defendants

11      --------------------------------x

12

13

14      DEPOSITION OF BARBARA MANZOLILLO, a

15          witness called by and on behalf of the

16          Plaintiffs, taken pursuant to Massachusetts

17          Rules of Civil Procedure, before

18          Nicole E. Guilbert, a Notary Public in and for

19          the Commonwealth of Massachusetts, at Dwyer &

20          Collora, 600 Atlantic Avenue, Boston,

21          Massachusetts  02210, on Tuesday, August 8,

22          2006, commencing at 10:20 a.m.

23

24
```

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

2

```
 1                    A P P E A R A N C E S

 2

 3          MICHAEL A. COLLORA, ESQUIRE

 4          Dwyer & Collora

 5          600 Atlantic Avenue

 6          Boston, Massachusetts   02210

 7          (617) 371-1000

 8             Counsel for the Plaintiffs

 9

10          STEPHEN D. POSS, ESQUIRE

11          Goodwin Procter

12          Exchange Place

13          Boston, Massachusetts   02109

14          (617) 570-1000

15             Counsel for the Defendant

16

17

18

19

20

21

22

23

24
```

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

92

```
 1              recollect correctly, again, because we

 2              haven't run into this situation, if the

 3              balance is over 5,000, I would simply

 4              segregate it within the profit sharing

 5              trust.

 6                   It would no longer participate in the

 7              valuation each year.  It would sit in a

 8              separate account and earn interest at the

 9              rate that the trustee has determined until

10              we are -- we have some way to give them

11              their money or funds.

12         Q.   (By Mr. Collora)  So aside from what you've just

13    described, you don't send them something called a claims

14    form?

15         A.   No.

16         Q.   Are they advised at that point in any document

17    that if they do not agree -- they do not agree with the

18    amount that you suggest in your letter is their interest in

19    the trust, that they may dispute this?

20         A.   They have that --

21                   MR. POSS:  Objection.

22                   THE WITNESS:  -- already.

23         Q.   (By Mr. Collora)  And how do they have that?

24         A.   In their summary plan description.
```

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

93

1        Q.    And that's where they would get the information?

2        A.    Correct.

3        Q.    I have no further questions on this area.  Would

4    you look at Exhibit 18.  Now, do you recall that -- prior

5    to the plaintiff Mr. Hubert terminating employment at the

6    company, did you ever get a letter from any other person

7    terminating their employment at the company questioning

8    what they had gotten or were to get?

9        A.    Not to my recollection, no.

10       Q.    Now, can you identify the first page of Exhibit

11   18.

12       A.    First page is a copy of the check with the advice

13   -- deposit advice --

14       Q.    All right.  Now --

15       A.    -- to Mike Hubert or for Mike Hubert's benefit as

16   a distribution.

17       Q.    Now, that summarizes his withdrawals for the year

18   2004?

19       A.    No.  This summarizes his lump sum distribution

20   upon termination.

21       Q.    How much is that?

22       A.    The total amount is 1,040,000.

23       Q.    Does it make reference to the fact he had gotten a

24   previous distribution?

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

94

1      A.    Yes, it does.

2      Q.    When did he get that?

3      A.    He got that January -- excuse me, March 1, 2004.

4      Q.    Why did he get the first distribution as opposed

5  to the final lump sum one?

6      A.    I'm sorry, why did he get --

7      Q.    Why did he get --

8      A.    -- the in-service withdrawal?

9      Q.    Yes.

10     A.    Because he received an in-service withdrawal.

11     Q.    Was he one of these people who had passed the

12  magic mark of one million?

13     A.    He passed one million dollars.

14     Q.    And did you attend that meeting --

15           MR. POSS:  Objection.

16     Q.    (By Mr. Collora)  -- where he attended in or

17  around November of the previous year, 2003?

18     A.    Yes, I did.

19     Q.    How many people were there?

20     A.    My best recollection would be approximately seven

21  or eight.

22     Q.    And these were all people who had in excess or

23  would have in excess of one million dollars at year end?

24     A.    Correct.

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

95

1      Q.    And this was for the purpose of this discussion

2    that you previously testified about where Mr. Pappalardo

3    encouraged them to learn investing on their own; is that

4    right?

5      A.    This is in regards to the previously described

6    meeting where Neil discussed in-service withdrawals.

7      Q.    Did every person that was at that meeting reduce

8    the amount they had in the trust to one million dollars?

9      A.    They did.

10     Q.    And Mr. Hubert as well?

11     A.    That is correct.

12     Q.    And that's the 39,000 or so he received in March?

13     A.    Correct.

14     Q.    With respect to the million dollars, could you

15   look at the rest of Exhibit 18.  What would have been the

16   initial document triggering the amount going out to him?

17   Is that part of Exhibit 18?

18     A.    Yes, it is.

19     Q.    What is it?

20     A.    I sent to him the notification of distribution of

21   benefits letter with the benefit election form, which are

22   DEF1014, 101 -- excuse me, 1041, 1042, and 1043.

23     Q.    And at some point, did he get back a version of

24   one of those documents to you electing to have it

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

96

```
 1    transferred to an IRA of some sort?

 2         A.   1043 is a piece of what I received back.

 3         Q.   Did you advise him in your cover letter that he

 4    was entitled to interest?

 5         A.   "In conjunction with the contemplated lump sum

 6    distribution of your vested account balance of one million

 7    plus interest by the profit sharing trust plan, please

 8    provide us with the enclosed benefit election form within

 9    30 days."

10         Q.   Do you tell him what the interest is or what the

11    rate is?

12         A.   I did not in this form.

13         Q.   Do you in any form advise people of that?

14         A.   In this -- this is the only form I send out for

15    distribution of benefits.

16         Q.   So is it fair to say nobody finds out what the

17    rate of interest is?

18                   MR. POSS:  Objection.

19                   THE WITNESS:  It's more of a fair

20              statement to state that everyone is aware

21              that the amount that you can take a loan

22              out is equivalent to the amount that we pay

23              interest on for any distributions to the

24              trust.  That has been the practice.
```

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

97

1      Q.    (By Mr. Collora)  So the interest rate for people

2   borrowing from the trust is the same rate of interest you

3   use to add to the person's withdrawal?

4      A.    Correct.

5      Q.    Now, did you get a letter back from Mr. Hubert?

6      A.    I did.

7      Q.    When you got the letter, what did you do with it?

8      A.    I read it, and along with it, he makes the

9   statement that he would like us to proceed with his lump

10  sum distribution.  I prepared the paperwork for the lump

11  sum distribution, and I gave a copy of this letter to the

12  trustee.

13     Q.    Did you discuss it with the trustee?

14     A.    I don't really recall if I actually discussed it

15  with him.

16     Q.    Did you discuss with him -- I'm just trying to

17  refresh your memory -- whether you should reply to the

18  letter or whether he should reply to the letter?

19     A.    I vaguely recall that but I can't be specific.

20     Q.    Well, in the first full paragraph of the letter,

21  he questions how the stock is valued, does he not?

22              MR. POSS:  Objection.

23              THE WITNESS:  I'm sorry.  Where are

24          you looking?

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

98

1     Q.   (By Mr. Collora)  The first full paragraph of the

2  letter.

3     A.   The first paragraph, Enclosed the benefit election

4  form --

5     Q.  I mean after the --

6     A.   Okay.  I have concern -- "I have been concerned

7  that Meditech has been reluctant to use an independent

8  valuation for the Meditech stock.  It is my belief that

9  Meditech stock is undervalued, and thus my distributions

10  will be less than I should be receiving."

11     Q.  Okay.  Stop right there.

12     A.  Okay.

13     Q.  You read that sentence, did you not?

14     A.  Yes, I did.

15     Q.  Did you consider that to be a claim?

16     A.  No.

17     Q.  What did you -- how would it have to have been

18  phrased to be a claim?

19     A.  It would have had to have said, I believe my

20  balance should be X, and I claim that my value should be Y.

21     Q.  That's the way you -- well, did you --

22     A.  This is not stated it's a claim.  It states a

23  concern.

24     Q.  I see.

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

99

1       A.    And it goes on.

2       Q.    Well, was there a claims procedure that you could

3    send him saying, Listen, if you have some claim, here's

4    what you're supposed to do?

5       A.    That is not how I interpreted this letter given

6    the rest of it.

7       Q.    Well, the rest of it goes on to talk about, you

8    know, the interest and how that -- that part of the plan,

9    correct?

10      A.    If I recall -- let me read this a minute, okay.

11      Q.    Sure.  Go ahead.

12      A.    "I do not expect that this matter will be resolved

13   quickly.  In the interim, please transfer my funds as

14   authorized on the attached form.  My acceptance of the

15   transfer of these funds do not limit my ability to seek

16   further resolution of these matters."  My interpretation

17   was that this document was telling me he disagrees or he

18   has concerns with two facets:  The way the plan is actually

19   written, because he disagrees with an annual valuation

20   date; and the way the trustee values the common stock that

21   it holds.

22           And he's put -- I read this that he's putting us

23   on alert.  He's going to decide what his claim will be or

24   how he wants to proceed, and he will notify us in the

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

100

1     future.

2         Q.    Did you ever send out to him the amendments

3     regarding the claims procedure?

4         A.    Specifically?

5         Q.    Yes.

6         A.    Did I send Michael Hubert specifically claims

7     procedures?

8         Q.    Right.

9         A.    No, I did not.

10        Q.    Let me drop back to the valuation of the stock.

11    Would you go to Exhibit 19 again.  Would you go to the

12    meeting of quarter ended December 31, 1999 and that's

13    DEF2330 at the bottom.

14        A.    1999?

15        Q.    Well, it's for the quarter ended December 31,

16    1999.

17               MR. POSS:  Why don't you pull out

18            what you want her to look at, Mike.

19               THE WITNESS:  It's not on the end.

20            2004 is on the end.

21        Q.    (By Mr. Collora)  With me?

22        A.    Yes.

23        Q.    Just referencing that document, which begins, as I

24    said, DEF2330 at the end, first on page 13, which is

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

101

```
 1    DEF2342 --

 2        A.   Yes.

 3        Q.   -- there's a reference to the Meditech profit

 4    sharing trust?

 5        A.   Yes.

 6        Q.   And if we referred to this previously, my

 7    forgiveness, I hope, will be granted.  It says, does it

 8    not, "By the end of this quarter, we will complete the

 9    process of making in-service distributions to active

10    members so as to limit their account balance to one

11    million"; do you see that?

12        A.   Yes.

13        Q.   And that's a comment by the chairman for this

14    quarter?

15        A.   Yes.

16        Q.   Turning, then, to the next page, which will be

17    page 14, "Established Traditions and Practices"?

18        A.   Yes.

19        Q.   And that consists of about a page and a half.  Who

20    wrote this, do you know?

21        A.   This is part of the chairman's -- I don't know

22    specifically but I would have to assume.

23        Q.   The chairman?

24        A.   Yes.
```

# EXHIBIT 9

1

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3                C.A. NO. 05-10269-RWZ

 4     -----------------------------------x

 5     MICHAEL P. HUBERT, WILLIAM TRAINOR,

 6     and DAVID HINCHLIFFE, Individually

 7     and on Behalf of All Persons Similarly

 8     situated,

 9                    Plaintiffs

10            vs.

11     MEDICAL INFORMATION TECHNOLOGY

12     PROFIT SHARING PLAN, ET AL.

13                    Defendants

14     -----------------------------------x

15     UNCERTIFIED CONFIDENTIAL PURSUANT TO

16     PROTECTIVE ORDER DEPOSITION OF JEROME H.

17     GROSSMAN, M.D., a witness called on behalf of

18     the Defendants, taken pursuant to the Federal

19     Rules of Civil Procedure, before Deborah G.

20     Rumson, Registered Professional Reporter and

21     Notary Public, in and for the Commonwealth of

22     Massachusetts, at the Offices of Dwyer &

23     Collora, 600 Atlantic Avenue, Boston,

24     Massachusetts, on Thursday, February 21,
```

Case 1:05-cv-10269-RWZ   Document 140-11   Filed 04/22/2008   Page 3 of 18
Jerome H. Grossman, M.D. 2-21-2008
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

2

1      2008, commencing at 9:30 a.m.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Case 1:05-cv-10269-RWZ    Document 140-11    Filed 04/22/2008    Page 4 of 18
Andrew Grossman, M.D. 2-21-2008
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

3

```
1                    A P P E A R A N C E S
2       STEPHEN D. POSS, ESQUIRE
3       KEVIN P. MARTIN, ESQUIRE
4       Goodwin Procter LLP
5       Exchange Place
6       Boston, MA 02109
7       617.570.1000
8       sposs@goodwinprocter.com
9       kmartin@goodwinprocter.com
10             Counsel for the Plaintiffs
11
12      MICHAEL A. COLLORA, ESQUIRE
13      Dwyer & Collora, LLP
14      600 Atlantic Avenue
15      Boston, MA 02210-2211
16      617.371.1000
17      mcollora@dwyercollora.com
18             Counsel for the Defendants
19
20
21
22             (Continued on Next Page)
23
24
```

Case 1:05-cv-10269-RWZ    Document 140-11    Filed 04/22/2008    Page 5 of 18
Jerome H. Grossman, M.D. 2-21-2008
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

4

```
 1              A P P E A R A N C E S
 2    MARK D. SELWYN, ESQUIRE
 3    Wilmer Cutler Pickering Hale and Dorr, LLP
 4    1117 California Avenue
 5    Palo Alto, CA 94304
 6    1.650.858.6031
 7    mark.selwyn@wilmerhale.com
 8              Counsel for the Witness
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Case 1:05-cv-10269-RWZ    Document 140-11    Filed 04/22/2008    Page 6 of 18
Jerome H. Grossman, M.D. 11/20/2008
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

91

1          period?

2    A.    From time to time, and, remember, that in the

3          case of the large companies, they are

4          completely hidden, so there is no real number

5          for HBO or SMS.  And more recently a private

6          company called Epic has become a important

7          competitor.

8    Q.    Well, did you notice the price earnings

9          ratios of these companies, whether they were

10         comparable or near comparable and compare

11         that to the price earnings ratio of Meditech?

12              MR. POSS:  Objection.

13              MR. SELWYN:  Objection.

14              MR. POSS:  Which company?

15   Q.    Cerner, for example.

16   A.    There is a general rule of thumb which says

17         that when you look at publicly traded stocks

18         and then you look at nonpublicly traded

19         stocks, they get haircuts of significant

20         amounts.

21   Q.    But that's what you do with them.  My

22         question to you is, were you looking at these

23         prices?

24   A.    From time to time.

Case 1:05-cv-10269-RWZ    Document 140-11    Filed 04/22/2008    Page 7 of 18
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

92



1    Q.    Did you make any note of this to the board

2          that the prices of the other companies

3          appeared to be higher than that of Meditech?

4    A.    I did not.

5    Q.    Did anyone in your presence make that

6          notation at the board level?

7    A.    No.

8    Q.    Would you look at Exhibit 43.  Again, this is

9          limited to chairman's comments.  This is for

10         the fourth quarter of 1998 for a board

11         meeting in 1999.  Do you have that in front

12         of you?

13   A.    I do indeed.

14   Q.    Did the chairman on Page 12, which was just

15         the second page of this document, indicate

16         what happened with respect to Columbia?  And

17         there is a bullet point toward the bottom

18         underneath 1998 milestones.  Do you see that?

19   A.    Where is that?

20   Q.    The bullet point says, "Major milestones in

21         1998 include absorbing the impact of a sudden

22         decrease in business from Columbia."  And a

23         comment by the chairman, "This last item is

24         especially gratifying."  And he goes on to

Case 1:05-cv-10269-RWZ    Document 140-11    Filed 04/22/2008    Page 8 of 18
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

93

1        say, among other things, "By now we can

2        safely say the loss in business from

3        Columbia/HCA has been absorbed and from now

4        on we expect to once again grow." Do you see

5        that?

6    A.  Yes.

7    Q.  Do you remember him talking about this at

8        this board meeting?

9    A.  Again, these are the conversations in the

10       chairman's report are quite -- they are not

11       standing up at a podium and making a written

12       report.

13              So I would say that, all I could say

14       is that, in the course of his comments, he

15       would cover that, but I have no recollection

16       whether that was in what form or with what

17       discussion.

18   Q.  On the next page at the top, under 1999

19       forecast, do you see that?

20   A.  Yes.

21   Q.  He says, "Still it will be a challenge to

22       grow in 1999 by our desired 15 percent"?

23   A.  Yes.

24   Q.  Do you remember that being a goal of

Case 1:05-cv-10269-RWZ    Document 140-11    Filed 04/22/2008    Page 9 of 18
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

94



1        management, to grow by 15 percent?  Does this

2        refresh your memory.

3                MR. POSS:  Objection.

4   A.   I think if you read on, I believe there's a

5        bogey.  As you can see by reading these,

6        there's a set of bogeys that are set.

7   Q.   Targets?

8   A.   As targets.  But they are not, they are, as I

9        said, they redone quarter by quarter to

10       reflect what we reality is.

11  Q.   And then there is a long-term forecast as

12       well underneath 1999 forecasts, is there not?

13       Do you see that, where he says, "We have

14       included a forecast through the end of 2002"?

15  A.   Yes.

16  Q.   He says, "The basic assumptions of this

17       forecast for 2000 through 2002 are a

18       15 percent growth rate in product revenues, a

19       15 percent growth rate in operating expenses,

20       and 60 percent of prior year's profits paid

21       as dividends.  Do you see that?

22  A.   I do.

23  Q.   So it does not appear, at least from

24       management's point of view, they would like

Case 1:05-cv-10269-RWZ   Document 140-11   Filed 04/22/2008   Page 10 of 18

Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

Deposition of Grossman, M.D. 12-1-2008

.95

1          to grow by 15 percent?

2                    MR. POSS:  Objection.

3    Q.   You may answer.

4                    MR. POSS:  Are you asking him,

5          whether reading this seems to make it appear?

6          Why don't we ask people on the sidewalk.

7    Q.   There has been an objection as to the form of

8          the question, I think, but you may go ahead

9          and answer.

10   A.   As I think I have said, that's management's

11         frame of a number of variables, cash,

12         forecast all of those things.  They are set

13         probably based on where we are at the

14         beginning of the year and then we redo them

15         quarterly.  So that by the third quarter,

16         you're closer to where the reality will come

17         out.  So I see them as a framework by which

18         management is watching the balance of

19         business.

20   Q.   Thank you.  Would you turn to Exhibit 44, and

21         this appears to be the chairman's comments

22         for the end of the quarter, March 1999, for a

23         board meeting in April of 1999?

24   A.   Yes.

Case 1:05-cv-10269-RWZ    Document 140-11 M.D. 2/25/2008 Filed 04/22/2008    Page 11 of 18
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

96



1    Q.    And in his comments on Page 12, toward the
2          bottom, there is a section entitled "Share
3          Price and Dividend Policy."  Do you see that?
4    A.    Yes.
5    Q.    At the beginning he writes, "Based on the
6          heated discussion at the last board meeting
7          (for which I apologize to all board members)
8          I thought it would be good to summarize and
9          justify both our share price and dividend
10         policy."  Do you have any memory of the
11         heated discussion he is referring to, which
12         would have been back in, presumably, in
13         January of 1999?
14   A.    No.  I would say that discussions were heated
15         sometimes and not heated other times.  So
16         there was no called out.  Although, clearly,
17         this must have been a little more engaging.
18   Q.    He then writes, "In regard to the share price
19         policy, we purposely keep the share price on
20         the low end of the range the IRS and our
21         auditors would allow."  Do you see that?
22   A.    I do.
23   Q.    Now, he wrote that document, correct?  He
24         wrote this; you did not?

Case 1:05-cv-10269-RWZ    Document 140-11    Filed 04/22/2008    Page 12 of 18
Jerome P. Grossman, M.D.
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

97

1    A.    Right.

2    Q.    Do you remember discussing this price with

3          him at all in 1999?

4    A.    No, because I had come to not believe that

5          there was a benefit from engaging in

6          discussions.

7    Q.    With him?

8    A.    With other members of the board.

9    Q.    Did you understand that in this period of

10         time it was the policy to keep the share

11         price low?

12               MR. POSS:  Objection.

13   Q.    For the reasons stated?

14               MR. POSS:  Objection.

15   A.    I don't have any recollection.  My guess

16         is --

17               MR. SELWYN:  Don't guess.  If you

18         have recollection, you can tell him.

19   A.    I have a recollection that the discussion

20         became more heated as relating to the share

21         price policy and the dividend policy as the

22         disparities grew.  And I did not participate

23         in those discussions and certainly don't

24         recall what anybody said during the course of

Case 1:05-cv-10269-RWZ    Document 140-11    Filed 04/22/2008    Page 13 of 18
Jerome D. Grossman, M.D. 2-21-2008
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

98

```
 1           those discussions.

 2   Q.      Do you remember who did participate in those

 3           discussions?

 4   A.      No.

 5   Q.      Was there anyone, putting yourself aside,

 6           that was advocating a higher share price in

 7           this period of time?

 8   A.      I'm sorry.  I have no recollection.

 9   Q.      Do you know why Mr. Pappalardo put this

10           portion entitled "Share Price and Dividend

11           Policy" in his report?

12   A.      I can only assume that it was a heated

13           discussion.

14   Q.      As a result of a heated discussion?

15   A.      Yes.

16   Q.      Well, he puts in a reason for keeping the

17           share price low.  He says, "The obvious

18           benefit with this approach is to create an

19           incentive for employees to buy and hold onto

20           Meditech stock"?

21   A.      Right.

22   Q.      Did you agree with that benefit?

23   A.      I would say that that's only one benefit that

24           might be called out in making an assessment
```

Case 1:05-cv-10269-RWZ    Document 140-11 M.D. Filed 06/22/2008    Page 14 of 18
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

99



```
 1              of the values and their various impacts.  But
 2         I didn't -- I don't recall getting into a
 3         discussion on that item.
 4    Q.   In this period of time, 1999/2000, were you
 5         interested in selling some of your shares?
 6    A.   I don't think so.
 7    Q.   Did you ever try to sell your shares?
 8    A.   I don't think so.
 9    Q.   Did you ever try to buy additional shares?
10    A.   I don't think so.
11    Q.   Would you look at Exhibit 47.
12    A.   (Witness reviews document)
13    Q.   This, again, I will represent to you, Dr.
14         Grossman, is a report for the year-end 1999
15         for the board meeting of January 2000.  You
16         were still on the board at that time, were
17         you not?
18    A.   Yes.
19    Q.   And, again, this appears to be the chairman's
20         comments for the year-end, summarizing the
21         fourth quarter, and the milestones for 1999
22         on Page 11.  Do you see that?
23    A.   I do.
24    Q.   And according to his report, the major
```

Case 1:05-cv-10269-RWZ    Document 140-11    Filed 04/22/2008    Page 15 of 18
Jerome H. Grossman, M.D. 2-21-2008
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

100



```
1              milestones include record total revenues,

2              operating income, and net profit.  Do you see

3              that under a bullet point under 1999

4              milestones?

5    A.    Not really.

6    Q.    Are you on Page 11?

7    A.    Yes.  Okay.

8    Q.    Then he gives a forecast for 2000, does he

9              not?

10   A.    Yes.

11   Q.    Midway down that paragraph, he says, "It will

12             be a challenge to grow in 2000 by our desired

13             15 percent."  Do you see that?

14   A.    Yes.

15   Q.    He points out then he has a long-term

16             forecast on the next page?

17   A.    Yes.

18   Q.    If you can turn to Page 12.

19   A.    Yes.

20   Q.    And there he says, "We have included two

21             different long-term forecasts through the end

22             of 2003"?

23   A.    Right.

24   Q.    And he says, "The first assumes the current
```

Case 1:05-cv-10269-RWZ   Document 140-11   Filed 04/22/2008   Page 16 of 18
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

101



1        forecast revenue in 2000 and a 15 percent

2        revenue growth thereafter.  The second

3        assumes a 15 percent revenue growth rate in

4        2000 and thereafter.  Both forecasts presume

5        a 40 percent operating margin."  Do you see

6        that?

7   A.   Right.

8   Q.   Is it fair to say that typically at this

9        point in time in the year-end you would get

10       long-term forecasts from management?

11  A.   I believe, if you look at the year in front,

12       Y2K was occurring.  Y2K put many software

13       companies in a sense of uncertainty.  So that

14       my guess is that there was quite careful

15       month-to-month valuation of where we're

16       going, where the potential is, is it going to

17       last three years, one year.  So there is a

18       lot of trying to assess the impact of Y2K.

19  Q.   Do you see in this same document, but further

20       back, Page 14, there's a heading to his

21       report entitled "Established Traditions and

22       Practices"?

23  A.   Yes.

24  Q.   Do you remember getting this at the time and

Case 1:05-cv-10269-RWZ   Document 140-11   Filed 04/22/2008   Page 17 of 18
Jerome P. Grossman, M.D.   2/21/2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

102

1          reading it?

2    A.    I wouldn't say that I would have necessarily

3          called this out and read it in detail.  In

4          that, as I just talked about, my concern was

5          about the performance of the company during

6          Y2K.

7    Q.    This is a different topic, is it not?  It is

8          share price?

9    A.    Could be.

10   Q.    Was share price a topic of interest to you at

11         that time?

12   A.    Less.

13   Q.    Less than at some other time?

14   A.    Yeah.

15   Q.    When did it become of more interest to you?

16   A.    After we began to sort out Y2K, if you will.

17         Look at our numbers.  They went up and down

18         and down and up, so there wasn't a stable

19         regular performance during the years around

20         2000.

21   Q.    You mean after 2000?

22   A.    Yeah.

23   Q.    So how did that affect your interest in the

24         stock price?

Case 1:05-cv-10269-RWZ    Document 140-11 M.D Filed 06/22/2008    Page 18 of 18
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

103



1    A.    In that, my interest in the stock price had

2          to take a bit of second place while we looked

3          at how we were going to perform in growth,

4          were we going to make the 15 percent.  So

5          that I changed my focus to the operating

6          characteristics of the company.

7    Q.    Now, aside from going out to a board meeting

8          four times a year, did you go out there on

9          other occasions in this period of time?

10                   MR. POSS:  Objection.

11                   MR. SELWYN:  2000ish?

12   Q.    Yes, 1999, 2000.

13   A.    To give you a recollection of what I did and

14         didn't do in that year by going out there or

15         not, I would be asked to give a talk.  I

16         would be asked to meet with someone, so that

17         there wasn't a regular interchange, but I did

18         indeed come when asked or it seemed

19         appropriate.

20   Q.    In this period 1999/2000 what was the product

21         of Meditech that it was selling and to whom?

22                   MR. POSS:  Objection.

23   A.    Well, let's see, I have a point of view that

24         it was selling hospital information systems.

# EXHIBIT 10

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually and On Behalf Of All Persons Similarly Situated <br><br> Plaintiffs, <br><br> v. <br><br> MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, et al. <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Case No. 05-10269-RWZ<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs Michael Hubert ("Mr. Hubert"). David Hinchliffe ("Mr. Hinchliffe"), and William Trainor ("Mr. Trainor") (collectively, "the Plaintiffs") hereby object and respond to the First Set of Interrogatories ("the Interrogatories") by defendants Medical Information Technology, Inc. ("Meditech"), the Medical Information Technology Profit Sharing Plan ("the Plan"), and A. Neil Pappalardo ("Mr. Pappalardo") (collectively, "the Defendants") as follows.

**A.    GENERAL OBJECTIONS**

1.    The Plaintiffs object generally to the entirety of the Interrogatories as overbroad, unduly burdensome, unreasonably duplicative, and redundant and unreasonable in scope.

2.    The Plaintiffs object generally to each paragraph of the Interrogatories (including the Definitions and Instructions) to the extent that it seeks to impose obligations on the Plaintiffs

1

beyond those required by the Federal Rules of Civil Procedure and the Local Rules of the District of Massachusetts.

3.    The Plaintiffs object generally to each paragraph of the Interrogatories (including the Definitions and Instructions) to the extent that it seeks information and/or documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

4.    The Plaintiffs object generally to each paragraph of the Interrogatories (including the Definitions and Instructions) to the extent that it seeks information not limited in time to dates relevant to this litigation on the ground that it is unduly burdensome, oppressive, and not reasonably calculated to lead to the discovery of admissible evidence.    Because the Interrogatories were not limited in time in any way, the Plaintiffs have applied the same timeframe to these Responses as were set forth in their discovery requests to the Defendants, with the exception that the Plaintiffs have included information from prior to January 1, 1995 if it is responsive to the Interrogatories.

5.    Information and/or documents provided by the Plaintiffs are those located, known or discovered after a reasonable search.  The Plaintiffs reserve the right to supplement their answers if any additional responsive information and/or documents are later discovered or otherwise become known to the Plaintiffs.

6.    All objections, including without limitation objections as to relevance, authenticity, or admissibility, are expressly reserved.

2

**B.    RESPONSES AND OBJECTIONS TO SPECIFIC INTERROGATORIES**

**Interrogatory No. 1**

State the basis for your allegation in paragraph 49 of the Amended Complaint that "For at least eight years, the defendants have knowingly valued MEDITECH stock at less than fair market value."

**Response to Interrogatory No. 1**

The plaintiffs object to this Interrogatory on the grounds that this interrogatory seeks information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs refer the defendants to comparative data of other companies such as Cerner in the same area of business indicated a much higher price to earnings multiple over the period of years prior to the filing of the complaint in this case, and information available to plaintiffs from the Grossman litigation.

**Interrogatory No. 2**

In what year was Meditech stock first valued by Defendants at less than fair market value, stating your basis for contending that the stock was undervalued in that year, and not in the preceding year(s).

**Response to Interrogatory No. 2**

The plaintiffs object to this Interrogatory on the grounds that this interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs state that they do not have this information within their possession and or control, and will rely upon an expert to assist them in this area. Based upon comparative company data, Plaintiffs submit Meditech Stock has been undervalued

3

since 1996. The Plaintiffs further submit that the basis for their contention that the stock has

been undervalued is supported by the statements made by Grossman in his lawsuit, as well as

HUB 255, 302-30, and 489-516.

**Interrogatory No. 3**

Identify all years in which Defendants valued Meditech stock at less than fair market value,
stating your basis for contending that the stock was undervalued in those years.

**Response to Interrogatory No. 3**

The plaintiffs object to this Interrogatory on the grounds that this interrogatory seeks on

the grounds that this interrogatory seeks information that is better obtained through an alternative

means of discovery and information obtained in anticipation for litigation and information

protected by the attorney client privilege and the attorney work product doctrine. Subject to and

without waiving the forgoing objection and the General Objections above, the plaintiffs state that

the only years at issue in this litigation at the moment are the trustee's valuation of Meditech

stock for the year 1998 and 2004 (done as of 12/31 of the year prior). Thus at the moment there

is no contention as to other years, although evidence may be offered at trial as to a pattern of

undervaluation beginning at least in 1996. As to the years at issue, the basis for contending the

stock was undervalued would be the same as set forth in plaintiffs' answer to interrogatory

number one, plus the information in the Willamette report prepared for Grossman in 2005 and

information disclosed by Grossman during the course of his litigation with Meditech beginning

with his filing of a form 13 D with the Securities and Exchange Commission in 2002. The

plaintiffs also refer the defendants to information from within the defendants' custody and

control including but not limited to financial statements and projections. Additional facts and or

documents responsive to the Interrogatory may be identified during discovery and the plaintiffs

4

expressly reserve the right to supplement this response if additional facts and/or documents are

discovered.

### Interrogatory No. 4

State the basis for your allegation in Paragraph 58 of the Amended Complaint that "one of the reasons that the defendants knowingly undervalue the stock is to ensure that stock prices remain low enough for insiders such as defendant Pappalardo to purchase large amounts of company stock and thereby retain tight control of the Company."

### Response to Interrogatory No. 4

The plaintiffs object to this Interrogatory on the grounds that this interrogatory seeks on

the grounds that this interrogatory seeks information that is better obtained through an alternative

means of discovery and information obtained in anticipation for litigation and information

protected by the attorney client privilege and the attorney work product doctrine. Subject to and

without waiving the forgoing objection and the General Objections above, the plaintiffs refer the

defendants to declarations in letters and other material sent out by Grossman in 2002 and 2003,

the low PE basis compared with competitors, Pappalardo's repeated purchases of stock at a price

he claimed to be at the low end of the allowable range set by him and other Board members, and

a price designed to benefit buyers, to discourage sales of stock, and discourage diversification.

The plaintiffs also refer the defendants to information from within the defendants' custody and

control including but not limited to financial statements and projections. Additional facts and or

documents responsive to the Interrogatory may be identified during discovery and the plaintiffs

expressly reserve the right to supplement this response if additional facts and/or documents are

discovered.

5

**Interrogatory No. 5**

Identify all persons with whom Plaintiffs, including but not limited to counsel for Plaintiffs, have discussed any methodology for valuing the stock of non-publicly traded corporations.

**Response to Interrogatory No. 5**

The plaintiffs object to this Interrogatory on the grounds that it is vague and overly broad. The plaintiffs further object to this Interrogatory on the grounds that this Interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs state that Plaintiffs Hinchliffe and Trainor have had no such discussions with any such person. In the last two years, Plaintiff Hubert spoke with his business partner, Bob Caspe, about the under valuation. He spoke with Bob Caspe in February 2007 in person, while they were in New Orleans.

Plaintiff Hubert spoke also with Scott Adelson, a Director at Houlihan, Lokey, Howard & Zakin in or around 2003 and 2006. They spoke via telephone. Plaitniff Hubert called Scott Adelson when he learned that he was a key person involved in the valuation of the stock for SAIC. They generally discussed the valuation of stock for private companies.

Mr. Hubert also spoke to a woman at the SEC, April Keyes. His communication with Ms. Keyes was conducted over the phone and email in February and March of 2006. Their communications discussed price fixing of the stock, comparison to public companies and a brief description of the methodology used by Science Application International Corporation.

Mr. Hubert also spoke to an individual at the Massachusetts Attorney General's Office in or around 2005 over the telephone. The general topic discussed during that conversation was that

6

MEDITECH was setting the stock price too low, benefiting stock buyers, at the expense of employees retirement funds. He does not recall the individual's name.

Plaintiff Hubert spoke to Jeff Turner at the Department of Labor in or about 1999 by telephone. They discussed the valuation of the stock, specifically that the rules require an independent valuation of private stock held in a qualified plan. He also drafted and mailed a letter to James Benages at the Department of Labor in July of 2001 and received a response from Anne George of the Department of Labor. The communication was about a pending regulation concerning valuation of stock of privately held companies.

#### Interrogatory No. 6

Do Plaintiffs contend, as part of their claim in this Action, that Pappalardo should not have been permitted, as part of the Company's annual share offering to officers and employees, to purchase Meditech stock from the Company at the same per share price that other Meditech officers and employees purchased Meditech stock from the Company, and if so, state the basis for that contention.

#### **Response to Interrogatory No. 6**

The plaintiffs object to this Interrogatory on the grounds that this Interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs state yes, and contend that Pappalardo got a bargain price, set by him, to benefit himself and a small group of others at the expense of those terminating their interest in the Plan. The plaintiffs refer the defendants to materials issued by Grossman, and other materials made available during discovery and obtained from the Defendants. Specifically, the Plaintiffs refer the defendants to Exhibit 24 to the Grossman Deposition.

7

**Interrogatory No. 7**

Do Plaintiffs contend, as part of their claim in this Action, that Defendants violated the Employee Retirement Income Security Act by valuing plan assets held by the Trust once each year and paying terminating plan participants the value of their Trust balance as of the last valuation date plus interest from that date, and if so, state the basis for that contention.

**Response to Interrogatory No. 7**

No.

**Interrogatory No. 8**

Do Plaintiffs contend, as part of their claim in this Action, that it is not permissible, under the Employee Retirement Income Security Act, for the Plan to provide a voluntary mechanism for participants to withdraw their Trust balances in excess of $1 million, and if so, state the basis for that contention.

**Response to Interrogatory No. 8**

No, assuming that the withdrawals were completely voluntary and not forced by the

Trustee.

**Interrogatory No. 9**

Describe in detail all communications, if any, between Plaintiffs and/or Plaintiffs' Counsel, on the one hand, and Grossman and/or counsel for Grossman, on the other, concerning this Action or the subject matter of this Action.

**Response to Interrogatory No. 9**

The plaintiffs object to this Interrogatory on the grounds that it is vague and overly broad.

The plaintiffs further object to this Interrogatory on the grounds that this Interrogatory seeks

information that is better obtained through an alternative means of discovery and information

obtained in anticipation for litigation and information protected by the attorney client privilege

and the attorney work product doctrine. Subject to and without waiving the forgoing objection

and the General Objections above, the plaintiffs state that Plaintiffs Hinchliffe and Trainor had

8

no such communication, and refer the defendants to the depositions of Michael Hubert for a
discussion of his communications with Mr. Grossman.

**Interrogatory No. 10**

Describe in detail every valuation or other analysis of the value of Meditech stock performed by
or an behalf of any Plaintiff since January 1, 1996, excluding any putative expert valuation
performed for purposes of this Action.

**Response to Interrogatory No. 10**

Plaintiffs object to Interrogatory 10 on the grounds that portions of the Interrogatory
exceed the scope of discovery permitted by the rules. The plaintiffs further object to this
Interrogatory on the grounds that this Interrogatory seeks information that is better obtained
through an alternative means of discovery and information obtained in anticipation for litigation
and information protected by the attorney client privilege and the attorney work product doctrine.
Subject to and without waiving the forgoing objection and the General Objections above, the
plaintiffs state that they will produce an expert report for the defendants at the appropriate time.
(Mike- what other analysis did you do prior to the litigation that would be responsive to this
question?) Plaintiff Hubert periodically checked the SAIC formula in their SEC filings and used
it to compute a valuation for MEDITECH. He also watched companies in the industry which
were purchased and noted the purchase price on a per share basis. He created a spreadsheet
regarding this analysis; that document regarding other companies and the purchase price was on
his MEDITECH PC and is no longer available to him. The PC file was about industry mergers
and acquisitions.

**Interrogatory No. 11**

Identify and describe in detail every occasion since January 1, 1996 on which each Plaintiff has
asserted, or made statements or representations concerning, a per share value for Meditech stock,
the value of Plaintiffs aggregate holdings of Meditech stock, or the value of Plaintiffs' Trust

9

account balance, including, but not limited to, with respect to any sale or offer to sell Meditech stock; any calculation of or statement of or concerning, assets of a Plaintiff for purposes of an application for college financial aid, a mortgage, or other loan; and/or any calculation of, or statement of or concerning, assets of a Plaintiff for purposes of a divorce, custody, or support proceeding, or any other civil, criminal, or administrative proceeding.

### Response to Interrogatory No. 11

The plaintiffs object to this Interrogatory on the grounds that it is vague and overly broad. The plaintiffs further object to this Interrogatory on the grounds that this Interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, the plaintiffs refer the defendants to the documents previously produced by the plaintiffs in this litigation. Plaintiffs Hinchliffe and Trainor did not value their Meditech shares in the time period designated. Further, plaintiff Hubert represented the then stated value of his Meditech stock as of January 21, 2003 in his divorce papers negotiated during 2002 and signed on January 21, 2003, and may have represented the then stated value of his Meditech stock in 2001 on an application for an education loan for his son. In 2005, Plaintiff Hubert also had inquiries from two persons who expressed interest in acquiring the stock at $50 per share. No transaction ever occurred.

### Interrogatory No. 12

Identify all documents and information that Plaintiffs and/or Plaintiffs' Counsel referred to, reviewed, consulted, or relied upon in responding to any of the foregoing interrogatories, and each person with whom Plaintiffs and/or Plaintiffs' Counsel consulted or discussed any of the foregoing interrogatories.

10

**Response to Interrogatory No. 12**

The plaintiffs object to this Interrogatory on the grounds that it is vague and overly broad. The plaintiffs further object to this Interrogatory on the grounds that this Interrogatory seeks information that is better obtained through an alternative means of discovery and information obtained in anticipation for litigation and information protected by the attorney client privilege and the attorney work product doctrine. Subject to and without waiving the forgoing objection and the General Objections above, Plaintiffs Hinchliffe and Trainor consulted no documents in connection with answering these interrogatories, and Plaintiff Hubert consulted emails that he previously wrote to SEC.

As to Objections,
**Michael P. Hubert**
**William Trainor, and**
**David Hinchliffe,**
By their attorneys,


    /s/ Michael A. Collora
Michael A. Collora (BBO #092940)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210
671-371-1000
671-371-1037

Dated: December 27, 2007

11

As to all Interrogatories,
I certify under penalty of perjury that the foregoing
is true and correct as it pertains to me,


_____/s/ Michael Hubert_____
Michael Hubert

Dated:  December 27, 2007


As to all Interrogatories,
I certify under penalty of perjury that the foregoing
is true and correct as it pertains to me,


_/s/ David Hinchliffe_____
David Hinchliffe

Dated: December 27, 2007


As to all Interrogatories,
I certify under penalty of perjury that the foregoing
is true and correct as it pertains to me,



_/s/ William Trainor_____
William Trainor

Dated: December 27, 2007

## Certificate of Service

I, Jennifer M. Ryan, hereby certify that I have, on this 27 day of December, 2007, caused the above document to be served by hand upon all counsel of record.

_____/s/ Jennifer M. Ryan_____
Jennifer M. Ryan

12

# EXHIBIT 11 – PART 1

Confidential: Subject To Protective Order

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MICHAEL P. HUBERT, et al.                )
                                         )
       Plaintiff,               )
                                         )         Civil Action No. 05-10269-RWZ
v.                                       )
                                         )
MEDICAL INFORMATION TECHNOLOGY           )
PROFIT SHARING PLAN, et al.              )
                                         )
       Defendants.              )

## EXPERT REPORT OF RICK S. NATHAN AND CHRISTOPHER C. BARRY

# TABLE OF CONTENTS

EXECUTIVE SUMMARY OF FINDINGS .................................................................................1

INTRODUCTIONS .........................................................................................................5

AREAS OF INQUIRY .....................................................................................................7

DOCUMENTS & OTHER INFORMATION RELIED UPON .......................................................9

MEDITECH BACKGROUND AS OF DECEMBER 31, 1997 ....................................................10

INDUSTRY BACKGROUND ...........................................................................................13

DETAILED REVIEW OF THE VAN VLEET REPORT'S APPROACH AND RESULTS .....14

    A.   THE VAN VLEET REPORT'S USE OF A SINGLE POINT VALUE ESTIMATE IS SPECIOUSLY PRECISE ......14
    B.   THE VAN FLEET REPORT FAILED TO CONSIDER ACTUAL TRANSACTIONS IN MEDITECH STOCK ........15
    C.   THE VAN VLEET REPORT IMPROPERLY OMITS A DISCOUNT FOR LACK OF CONTROL ..........................16
    D.   THE VAN VLEET REPORT INCORRECTLY USES "WHAT IF" SCENARIOS AS PROJECTIONS IN ITS
        INCOME APPROACH (DCF METHOD) ....................................................................................18
    E.   THE VAN VLEET REPORT FAILS TO PROPERLY INCLUDE INDUSTRY AND/OR COMPANY SPECIFIC
        RISK PREMIUM IN ITS WACC CALCULATIONS ......................................................................20
    F.   THE VAN VLEET REPORT SELECTED TOO SMALL A DISCOUNT FOR LACK OF MARKETABILITY ........22
    G.   FLAWS IN CHOICES OF GUIDELINE PUBLICLY TRADED COMPANIES ..........................................24
    H.   FLAWS IN SELECTION OF MARKET DERIVED PRICING MULTIPLES ............................................27
    I.   CONCLUSION ......................................................................................................................30

THE BOARD'S AND TRUSTEES' VALUATION PROCESS & RESULTING SHARE
VALUE ARE REASONABLE ...........................................................................................31

COMPARISON OF MEDITECH'S RETURN TO INDEXES AND SELECTED
COMPANIES ...............................................................................................................33

COMPARISON OF PLAINTIFFS' PERSONAL RETURN ON MEDITECH TO BEST
PERFORMING SELECTED HIGH PROFILE COMPANY .....................................................35

OBSERVATIONS REGARDING VOLATILITY OF MARKET INDEXES AND VAN
VLEET'S GUIDELINE PUBLIC COMPANIES ...................................................................36

EXAMPLES OF DIFFERENTIAL IMPACT ON PARTICIPANTS FROM PLAINTIFFS'
PROPOSED VALUATION METHODOLOGY ......................................................................38

CHANGE IN CASH POSITION OF THE TRUST FROM 1997 - 2000 USING VAN
VLEET'S 1997 STOCK PRICE AND MARKET APPROACH VALUES ....................................39

## EXECUTIVE SUMMARY OF FINDINGS

1.  We were asked to comment on the expert report submitted on behalf of plaintiffs by Daniel R. Van Vleet (the "Van Vleet Report"), particularly with respect to its estimate of the fair market value ("FMV") as of December 31, 1997 (the "Valuation Date") of Medical Information Technology, Inc. ("Meditech") common stock (the "Stock") contributed by Meditech and held by a trust ("Trust") set up under the Medical Information Technology Inc. Profit Sharing Plan ("Plan"). In our opinion, the Van Vleet Report's estimate of $21.62 per share (split-adjusted) does not reflect a reasonable estimate for the value of the Meditech stock held by the Trust.

2.  The methodology used in the Van Vleet Report and its estimate of the fair market value of Meditech stock suffer from at least the following failures and flaws:

    a.  The Van Vleet Report concludes that the value of Meditech Stock was precisely $21.62. As the Court has recognized, valuation is an art and not a science and reasonable appraisers can disagree by wide margins over the fair market value of a non-publicly traded company. By providing a single-point estimate of $21.62 rather than a range of reasonable values, the Van Vleet Report lends an air of specious precision to what is by its nature an inexact process. Given the uncertainties, estimates and assumptions built into the valuation of a non-publicly-traded company, the Van Vleet Report should have opined on what range of values for Meditech Stock would have been reasonable.

    b.  The best evidence of the fair *market* value of the stock of a company is the price at which the stock has actually traded hands in transactions between willing buyers and sellers. The Van Vleet Report, however, ignored the many actual transactions in Meditech Stock between arm's-length buyers and sellers in the years leading up to the Valuation Date. These transactions, including voluntary sales by venture capitalists and by two of the plaintiffs in this case, were at or around the values determined by Defendants, and nowhere near the "fair market value" estimated by the Van Vleet Report. The Van Vleet Report's failure to address and reconcile these transactions with its conclusion renders it unreliable.

    c.  For many reasons a non-controlling ("minority") ownership stake in any company, public or private, is not as valuable as a controlling ownership stake. For instance, a minority shareholder, unlike a controlling shareholder, cannot guarantee that any corporate income will be distributed to shareholders or that the company will ever go public or be sold. For that reason, appraisers valuing a company on the basis of its income will apply a necessary discount for lack of control ("DLOC") to any estimate of value arrived at under an income approach. Van Vleet did not. We conclude that a reasonable DLOC of 25%, based on widely referenced data from Mergerstat, should have been used in the Van Vleet Report. The use of a proper DLOC would considerably lower the Van Vleet Report's value conclusion.

d.  In valuing a non-publicly-traded company under an income approach, a crucial variable is a forecast of how much income the company will have in future years. In order to maximize expected income, the Van Vleet Report improperly relies on a section of a Meditech board of directors ("BOD," or the "Board") board package entitled *Forecast through 2001* as being "Management Projections" of anticipated 1998-2001 performance. That section of the board package, however, states that the projection is not expected to be accurate, and the deposition transcripts of multiple board members – which do not appear to have been provided to or considered by Van Vleet[1] – confirm that the figures only were used as hypothetical "what-ifs" for illustration purposes and were never intended to be used as actual forecasts.[2] The Van Vleet report compounds this error by extending the already speculative 1998-2001 forecast another six years by "trending down" from the simply illustrative 2001 figure. The Van Vleet Report should either have capitalized the single-period cash flow for 1998 (the only real management projection), or if it was going to proceed with a conjectural 10-year forecast built off management "what if" scenarios, it should have incorporated additional risk, above and beyond general equity market risk and company size risk, into the discount rate, as discussed in the next point. In either case, there is a significant effect on the Van Vleet Report's ultimate value estimate.

e.  The Van Vleet Report does not account for the incremental risk borne by an investor such as the Trust in holding Meditech Stock in its determination of the cost of equity for Meditech when using the capital asset pricing model ("CAPM") and Duff & Phelps build-up methods.[3] Our analysis using a Total Beta approach indicates that this risk premium for Meditech is at least 3%. As a result, the Van Vleet Report's determination of the return on equity component of its weighted average cost of capital ("WACC" or "discount rate") is under risk-adjusted by about 3%, resulting in a restated WACC of about 16.4%. Using this corrected WACC alone would lower the Van Vleet Report's overall estimate of the value of Meditech Stock by $3.57 per share, or approximately one-sixth.

f.  The Van Vleet Report's selection of guideline public companies ("GPC") is defective, and our own search suggests that there simply are not any public companies that are truly comparable to Meditech. Two of the Van Vleet Report's four GPCs, Aspen Technology, Inc. and Advent Software, Inc., do not even sell software in the healthcare industry, let alone compete with Meditech in the market for hospital information management systems. And none of the other comparable companies that either we or the Van Vleet Report identify are any more than minimally comparable because all offer products and services (for example, hardware and consulting) and compete in markets (for example, non-hospital healthcare markets or international markets) that Meditech does not.

---

[1] See the Van Vleet Report, p. 26.

[2] The only period management actually projects is one year out, based on current backlog.

[3] Despite the fact that the formulas for cost of equity on pages 38-41 of the Van Vleet Report call for this risk factor to be quantified and taken into account.

g. The Van Vleet Report uses a 25% <u>discount for lack of marketability</u> ("DLOM"), reflecting the lower value in the market for non-publicly traded stock that the investor has no (relative to publicly-traded stock) guarantee of being able to sell. This 25% figure is at the low end of three cited studies' ranges despite the fact that Meditech's board of directors has evidenced an intention to remain non-public for the long term, a factor that ordinarily requires use of a relatively higher marketability discount. Using more appropriate studies and analyses yields a median DLOM of 30%, the use of which would lower the Van Vleet Report's value conclusion.

h. The Van Vleet Report assumes its estimate of Meditech value in determining a size premium for use in its determination of an appropriate WACC using the CAPM methodology, and its GPC market adjustment factor analysis. This represents results-oriented reasoning, and puts the cart (conclusion) before the horse (analysis to reach conclusion).

Correcting these flaws, the Van Vleet Report's estimate of Meditech's FMV per share at December 31, 1997 would be adjusted as follows:

| Van Vleet Report value conclusion (non-marketable, non-controlling basis) | $21.62 |
|---|---|
| • Correcting the discount rate to include company/industry specific risk | (3.57) |
| • Applying necessary discount for lack of control to the Income Approach | (3.85) |
| • Increasing the discount for lack of marketability to 30% from 25% | (1.44) |
| • Selecting more appropriate guideline public companies, measures of central tendency, and multiples adjustment factors | (2.43) |
| **Cumulative effect of above corrections[4]** | **(9.81)** |
| **Corrected Van Vleet Report conclusion of value** | **$11.81** |

2. We were asked to comment on the reasonableness of the Meditech Board's process for setting the annual share price. In our opinion the method used by the Board is a reasonable approach, consistent with the widely-accepted dividend discount model. In fact, as seen in the chart above, the Board's valuation methodology yielded a value higher for December 31, 1997 ($13.50) than that obtained using the more "rigorous" approach advocated by plaintiffs and carried out by the Van Vleet Report, once errors in the Van Vleet Report's analysis are corrected ($11.81).

---

[4] Does not equal the sum of the component parts due to interaction among those elements in the cumulative calculation.

3. We were asked to compare the return on Meditech's Stock with that of high profile stocks in which plaintiffs could have invested, as well as broad indexes of stock market returns such as the NASDAQ, DJIA and S&P 500. This comparison shows that Meditech's internal rate of return ("IRR") far exceeded any of the alternate investments evaluated, both over the plaintiff's Plan eligibility period and the period of their elective personal investments in Meditech Stock. (The IRR is a time and dollar-weighted rate of return and reflects how much these investment dollars returned on average.)

4. We were asked to evaluate Meditech's share price at December 31, 1998, 1999 and 2000, using the Van Vleet Report's Market Approach (via GPCs), then use those values to determine the pro forma effect on the Plan's assets, rolled forward from their January 1, 1997 levels. This analysis demonstrates that the Plan's cash balance would have gone negative in 2000, causing the need to borrow cash or (at least temporarily) halt distributions of benefits to Plan participants. This analysis also demonstrates the flaw in the assumption that simply increasing the valuation of Stock held by the Trust would increase distributions of benefits to Plan participants; at least by 2004 we show any increase in the value of Stock held in the Trust would be outweighed by the decrease in the Plan's holdings of cash and equivalents.

5. We were asked to quantify and/or chart the volatility of various stock market indexes including NASDAQ, DJIA and S&P 500 and the Van Vleet Report's GPCs over various time periods and compare all of these to Meditech's Stock price movements. These charts show that Meditech's Stock, as valued by Meditech's Board and the Trust, was consistently moving upward over time, whereas all of the market indexes and the Van Vleet Report's GPCs had severe and erratic upward and downward price changes over these timeframes.

6. Finally, although we understand that the Plaintiffs have not disclosed Mr. Reilly as an expert in this action, we were asked to review his report from the Grossman v. Meditech case and our rebuttal thereof. We stand by the findings and critiques noted in our August 30, 2005 Expert Report filed in that prior case, a copy of which accompanies this Expert Report.

## INTRODUCTIONS

7. I, Rick Nathan, am a Managing Director with Trenwith Group, LLC ("Trenwith"), an affiliate of BDO Seidman, LLP ("BDO"). I am responsible for the development and provision of financial-valuation and transaction-consulting services within both product- and service- based industries where intellectual property and intangible assets are particularly important to overall value. My expertise involves the valuation of enterprises, business interests, capital stock, and assets in connection with business combination decision support, statutory tax compliance, international transfer pricing, dispute analysis, asset exploitation, business plan development, capital sourcing, and strategic partnering.

8. I have 14 years of experience in performing such valuation work, at Trenwith / BDO, PricewaterhouseCoopers, LLP ("PwC"), Cambridge Technology Partners, Inc. and KPMG, LLP. Additionally, I worked in the medical software field for four years with Siemens Medical Systems as the Associate Director of Product Marketing and Corporate Development. During that time, ending in 1994, I was Siemens' voting representative to ACR-NEMA (American College of Radiology – National Electrical Manufacturers Association), a software standards setting body for healthcare information systems and their interface with medical imaging applications. My professional credentials also include being a Chartered Financial Analyst (CFA), an Accredited Senior Appraiser (ASA) in Business Valuation, and an MBA in Finance from the University of Chicago. My C.V. with publications and Schedule of Testimony Provided are attached as Exhibit 1.

9. I, Christopher C. Barry, am a partner in the Dispute Analysis and Investigations ("DA&I") practice of PwC. I have over 27 years of business experience, including three years with other "Big-Four" accounting firms in audit services and over 24 years with PwC. I am a CPA, licensed in California and Massachusetts, and have an undergraduate degree in accounting from Franklin & Marshall College, as well as a master's degree in business administration from the University of California at Berkeley. My C.V. with publications is attached as Exhibit 2.

10. Over my 24 years with PwC's DA&I practice, I have worked on hundreds of litigation, investigation and other consulting matters, covering a wide variety of industries (including software) and circumstances. Many of my litigation cases involve questions of valuation, including non-publicly traded businesses, non-compete covenants and intellectual property assets. I have been accepted by various courts as an expert witness on six occasions to testify regarding valuation matters. The list of my testimony for the last four years is attached as Exhibit 3.

11. Our observations and findings related to this matter are based on the analyses summarized below, the documents we[5] reviewed in this matter and depositions of certain Defendants and Meditech management personnel, a site visit to Meditech's facility in Westwood, Massachusetts, discussions with Meditech Management personnel, including Neil Pappalardo, Barbara Manzolillo, Howard Messing, Hoda Sayed-Friel and Stu Lefthes, as well as our education, training and professional experience.

12. We charged fees at our normal hourly rates for the work on this engagement, as follows:
   • Trenwith staff: from $185 to $550 per hour
   • PricewaterhouseCoopers staff: from $225 to $595 per hour

13. Our Services were performed in accordance with Standards for Consulting Services established by the American Institute of Certified Public Accountants ("AICPA"). Accordingly, we are providing no attestation on financial statements, as we did not audit any information provided to us. This information has been prepared solely in connection with the Hubert et al. v. Meditech, et al. litigation and is not intended for reliance in any other context.

---

[5] References herein to the first person may include various Trenwith & PwC staff working under our direction and supervision.

## AREAS OF INQUIRY

14. We were asked by Goodwin Procter LLP on behalf of its clients, Meditech, the Plan, and A. Neil Pappalardo ("Defendants"), to evaluate the findings and conclusions summarized in the Van Vleet Report, which offered an estimate of $21.62 for the FMV[6] of Meditech Stock contributed by Meditech to and held by the Trust as of the Valuation Date (December 31, 1997). We were also asked to illustrate the sensitivity of the Van Vleet Report's valuation conclusion by demonstrating the effect on that conclusion of correcting certain of the noted errors therein.

15. We were asked to opine on the appropriateness of the process by which Meditech's Board determined the FMV of Meditech's Stock as of the Valuation Date, as well as the reasonableness of the value conclusion reached thereby.

16. We were asked to calculate and compare historical returns on Meditech Stock to the returns on certain equity indexes (Dow Jones Industrial Average ("DJIA"), NASDAQ Composite Index ("NASDAQ") and S&P 500 Index ("S&P 500")), as well as well-known highly profitable software and technology companies we selected (Apple Computer Inc. ("Apple"), Hewlett-Packard Company ("HP") and International Business Machines Corp. ("IBM")) and other well-known companies we selected (General Electric ("GE"), Johnson & Johnson ("J&J"), Procter & Gamble ("P&G") and Bank of America ("B of A"), over the life of the Trust and the time periods each of the Plaintiffs participated in the Trust.

17. We were asked to calculate and compare the return on the Plaintiffs' personal investments in Meditech Stock with the best-performing of the selected high profile companies named above, during the time period of Plaintiffs' elective investments in Meditech. We were also asked to graph the Plaintiffs' accumulated Meditech holdings and dividends in their Trust accounts.

18. We were asked to quantify and/or chart the volatility and/or returns of various stock market indexes including NASDAQ, DJIA and S&P 500, Meditech's Stock and the Van Vleet Report's GPCs over various periods of time.

19. We were asked to compare and chart certain measures of Meditech Stock price over 1997-2004, including the Defendants' determinations, the values used in Plaintiffs' complaint and using Mr. Van Vleet's and Mr. Reilly's opinions and methodology. See Exhibits 40-41.

---

[6] FMV is defined by the American Society of Appraisers as the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.

20. Finally, we were asked to estimate Meditech's share values as of December 31, 1998, 1999 and 2000 using the Van Vleet Report's Guideline Public Company (Market) Method. Using these share values and the Van Vleet Report's opinion of share value as of December 31, 1997, we were asked to calculate the cash position of the Trust from 1997 through 2000, assuming for sake of argument no changes to valuations were made in any earlier years.

## DOCUMENTS & OTHER INFORMATION RELIED UPON

21. In forming our findings herein we considered documents and other information, including the following:

   a. Discussions with Messers. Edward Roberts, Morton Ruderman and Ronald Driscoll, all members of Meditech's Board of Directors;

   b. Site visit to Meditech's facility in Westwood, Massachusetts and discussions with Meditech Management personnel, including Neil Pappalardo, Barbara Manzolillo, Howard Messing, Hoda Sayed-Friel and Stu Lefthes;

   c. The Meditech Profit Sharing Plan;

   d. Excerpts of transcripts of the following witnesses' depositions in this matter:
      • Roland Driscoll Deposition dated October 17, 2007
      • Howard Messing Deposition dated November 13, 2007
      • A. Neil Pappalardo Deposition dated November 27, 2007
      • Edwards B. Roberts Deposition dated November 8, 2007;

   e. Selected pleadings filed by the parties with the Court;

   f. The Van Vleet Report dated February 19, 2008;

   g. A report on the valuation of the Medical Information Technology, Inc. Common Stock as of December 31, 2001, 2002, 2003, 2004 and June 2, 2005, by Robert F. Reilly, dated June 15, 2005[7]; and

   h. Various other documents produced in discovery in this matter and certain publicly available information, as listed in Exhibit 4.

22. It may be necessary to supplement and revise our opinions based upon additional information that becomes available such as, for example, court rulings, parties' stipulations, and future testimony by others. Further, we may provide additional opinions on other areas, if requested.

---

[7] This report was prepared on behalf of plaintiffs in the Grossman v. Meditech shareholder litigation.

## MEDITECH BACKGROUND AS OF DECEMBER 31, 1997

*Nature of the Business:*

23.   Meditech is engaged in the development, licensing and maintenance of healthcare management information software used by hospitals. The principal markets for the company's products are hospitals primarily located in the U.S. and Canada. Meditech's total revenues for the year ending December 31, 1997 were $194 million of which 65% were derived from software products; it had approximately 1,050 customers worldwide as of December 31, 1997. Meditech does not provide hardware, third party software, or system consulting services.[8]

*State of Meditech's Business in 1997*

24.   In 1997, Meditech's revenues grew by 15.4% over 1996 and its net income by 13.4%. However, heading into 1998, Meditech management had reason to believe that they were entering periods of slower growth

25.   In 1997, Meditech software was installed at 180 new sites, half of which were owned by one customer, Columbia HCA Healthcare Corporation ("HCA"). In the previous two years, Meditech averaged a similar 195 new sites, with the proportion for HCA being consistently about half.[9] As the Valuation Date approached, Meditech had been expecting a slow decrease in future years' revenues from HCA based on certain changes that were happening to its business and strategic direction. However, the company's message to the Board in January 1998 was that there would be significantly less revenue from HCA in 1998 than the prior year. In fact, new installations for HCA would be ending soon.[10]

26.   In 1997, no large integrated healthcare delivery systems, *i.e.* hospital/physician group practices that provide comprehensive neonatal to aged care, with potential large enterprise projects selected Meditech as their software provider, a critically important industry segment for Meditech to penetrate.[11] Further, Meditech was then in the midst of a conversion from a prior generation of software ("Magic") to one based on client/server technology, which was expected to cause some loss of efficiency.[12] Such a change in technology platforms can often cause inefficiency during the transition.

27.   While Meditech was finally able to offer a client-server and distributed systems solution in the marketplace, other industry players were already exploring open systems, browser based

---

[8] Meditech's 10-K for 1997

[9] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 49.

[10] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 35 and 44.

[11] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 50.

[12] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 30.

technology, Intranets, and the Internet, all next generation platforms more conducive to lowering the cost of information access from the desktop.[13]

*The Profit Sharing Plan:*

28. During the 1970s, Meditech's Board created the Plan as a retirement vehicle for its employees, with the Plan's assets held in a Trust. The Plan specifically states that it is "designed to invest substantially in shares of the common Stock of the Company so as to permit the participating employees to share in any growth of the Company".

29. Meditech has the discretion to voluntarily annually contribute Stock and/or cash to the Trust. Under the Plan, the Board votes for an overall dollar amount contribution to be made by the Company to the Trust and then determines how much cash and how many shares of Stock, respectively, will be used to fund the contribution. Because the Stock is not publicly traded, to value the shares Meditech contributes to the Trust the Board is required at each October board meeting to determine what the FMV of the Stock will be as of December 31 of that year.

30. Under the Plan, the Trustee is responsible each year for valuing the assets held by the Trust, including its Meditech Stock. The Trustee's determination of the value of the Trust assets as of December 31 each year is used the following year to determine the distributions to be paid to any departing Plan participants.

*The Market for Meditech Stock*

31. Meditech has been a privately held company since its creation and the Stock has never been publicly traded on any stock exchange.

32. While Meditech Stock is not publicly traded, each year there are multiple transactions in the Stock. For example, each year Meditech makes Stock available for purchase by its officers and employees, at a price equal to the FMV determined by the Board. In January of 1997 and 1998, 250,000 and 300,000 shares were offered for sale to employees at split-adjusted prices of $12.00 and $13.50. Employees did not purchase all of these shares offered at those prices, instead purchasing approximately 217,000 and 277,000 shares, respectively.[14]

33. There is also a limited market for Meditech Stock. The Plan, although not obligated to, has historically purchased Stock back from small stockholders (who likewise are under no obligation to sell). For example, during 1997 and 1998, the Trust bought 39,580 and 72,342 split-adjusted shares back from employees at prices ranging from $12-14 per share.[15] Of

---

[13] "Buyers and sellers - Healthcare Information and Management Systems Society 1997 conference - Industry Trend or Event," Mark Hagland, 1997

[14] Report to the Board of Directors; Quarter Ended Sept 30, 1997 and 1998.

[15] Ibid.

particular relevance, two of the Plaintiffs, Hinchliffe and Trainor, voluntarily sold 13,200 and 20,900 of their personal shares to the Trust in 1998 at a split-adjusted price of $13.50.[16]

34.  In addition, at various points, particularly early in its history, Meditech sold Stock to large sophisticated purchasers such as EG&G Inc. and Greylock Investments LTD Partnership, a private-equity firm.  In the years preceding the valuation date, these investors, although under no obligation to do so, sold their Stock at prices equal to the values then assigned to the Stock by Defendants.  In December 1995 EG&G sold Neil Pappalardo 150,000 split-adjusted shares at a split-adjusted price of $10 per share.[17]  And in June 1996 Greylock sold 460,800 split-adjusted shares back to Meditech at split-adjusted prices of $10.50 per share.[18]  In each case, the value at which the investor sold the Stock was at or around the value assigned the Stock by Defendants.

---

[16] Statements of Stock Ownership at June 28, 2006 for Trainor and Hinchliffe.

[17] Report to Board of Directors; Quarter Ended December 31, 1995, p 15.

[18] June 20, 1996 letter from Howard Cox of Greylock to Neil Pappalardo, citing a price of $21/share for 230,400 shares; there has since been a 2:1 split. Bates DEF 007104.

## INDUSTRY BACKGROUND

35.  As described above, Meditech focuses its sales in the narrow market of information systems software for use by hospitals.

36.  The 1997 hospital market was believed to be fewer than 1,000 entities and this figure continued to decline.[19] This industry consolidation reduced the number of potential customers in the market, and increased competition for this smaller number of clients was an increasing force driving market prices. Key success factors for players such as Meditech in the hospital information technology industry were: large or rapidly growing installed base, distribution, and breadth and depth of product line.[20]

37.  As government (Medicare, Medicaid) funding of healthcare became more prevalent during the 1990s, margins tightened, thus leaving less room for elective technology improvements. Also, by 1997 many hospitals already had an information management system, thus the market for new information systems was becoming more competitive.[21]

38.  Meditech competed in only a narrow slice of the health care technology sector – information management software for hospitals. Thus, while in 1997 and 1998 the broader industry was looking for growth in an international market of 1.5 times the size of the U.S. market and an emerging medium to large physician group segment,[22] Meditech was not.

---

[19] "The Health Care Industry: Changing Environment Creates New Opportunities," George K. Baum & Company, Cerner Corporation: Equity Research Report, October 29, 1997, p 5.

[20] "Industry Background," Hanifen Imhoff Inc. Investment Bankers, Healthcare Information Technology: Investment Opinion-Cerner Corporation, October 16, 1997, p 11-12.Ibid.

[21] Ibid.

[22] "The Health Care Industry: Changing Environment Creates New Opportunities," George K. Baum & Company, Cerner Corporation: Equity Research Report, October 29, 1997, p 5.

# DETAILED REVIEW OF THE VAN VLEET REPORT'S APPROACH AND RESULTS

39. The Van Vleet Report provides a single point estimate of $21.62 for Meditech Stock as of December 31, 1997. It arrives at this estimate by valuing Meditech under two approaches - a discounted cash flow ("DCF") method (its "Income Approach") and a guideline public company ("GPC") method (its "Market Approach"). In the DCF method, it forecasts 10 years' available cash flow from operations, discounted to present value at a WACC of 13.8%, without considering a DLOC. In the market approach, it uses four GPCs to derive a multiple of earnings. Interest bearing debt is subtracted from both methods to yield equity value. The results of these two methods are weighted 75% and 25% respectively, with the blended amount reduced by 25% to account for a DLOM.

## A. THE VAN VLEET REPORT'S USE OF A SINGLE POINT VALUE ESTIMATE IS SPECIOUSLY PRECISE

40. The Court's Memorandum of Decision dated March 20, 2007 denying class certification noted that, "Valuing the equity of a private company is an "art," not simply a matter of plugging numbers into a formula," and that "[d]ifferent appraisers can come to significantly different valuations based on the same set of facts." We agree.

41. Notably, even the values of the publicly-traded companies upon which the Van Vleet Report relies reflect the inexact nature of valuation. Simply looking at a share price chart for the Van Vleet Report's GPCs, Exhibits XV through XIX demonstrates the share price volatility over the period December 31, 1994 – December 31, 1997, and therefore, the false precision of any single point estimate of value that would result from the approaches advocated by the Van Vleet Report. For example, in the summer of 1997, the value of Cerner stock rose by 48% from $20.75 on June 30 to $30.75 on September 2, a period of about two months. It then fell by 31% in just four months, back to $21.12 on December 29, virtually the point it had started six months earlier. At the end of the day, during this period the value of Cerner's stock only moved by 1.8% from where it had started, but throughout the period perceptions of the value of the stock were, as just shown, subject to far more dramatic swings.[23]

42. The need to account for the inexact nature of private-company valuations is well recognized by practitioners in the field. As stated in _Valuing a Business_ (which was coauthored by plaintiff's expert in the Grossman case, Mr. Reilly):[24] "The discounted economic income methods are extremely sensitive to changes in the input variables – that is, the projected cash flows and the discount rate. Because such large impacts may result from relatively small changes in input variables, it is often enlightening to perform some sensitivity analysis in

---

[23] Cerner's stock prices are depicted in the Van Vleet Report at Exhibit XVIII.

[24] Pratt, Shannon P., et al, Valuing A Business, 4th Edition, page 191

conjunction with a discounted economic income method. This could take the form of a sensitivity table showing the impact of a range of discount rates, terminal value multiples, growth rates, and cash flow projections."

43. Because there really is no single "right" price for the stock of a company, those asked to opine on fairness of a given price offered for stock typically ask whether that price falls within a *range* of fair values.  For instance, it is standard practice in corporate mergers, acquisitions, divestitures, and certain other intercompany matters for boards of directors to solicit a "fairness opinion" opining on the fairness of a transaction from a financial point of view. A fairness opinion rarely presents a single point estimate of value.  In fact, the fairness opinion's underlying analysis will typically be based on a range of values.

44. In this case, where we understand the question to be whether the value selected by the Trustee was a reasonable value for the Stock, we believe the Van Vleet Report should have approached this assignment in a fashion similar to a fairness opinion, *i.e.* asked whether the Board's price was within a reasonable range of value. That it did not, and instead opined that the value of Meditech Stock on the valuation date was precisely $21.62, lends an air of specious precision to what is by its very nature an exercise filled with judgment calls and uncertainty.

## B.  THE VAN FLEET REPORT FAILED TO CONSIDER ACTUAL TRANSACTIONS IN MEDITECH STOCK

45. Ultimately, the best evidence of the fair market value of a stock - the price at which a willing buyer and willing seller would transact - is the price at which *actual* buyers and sellers have engaged in transactions. While Meditech Stock is not traded on a public exchange, there were transactions in Meditech Stock in the period leading up to the valuation date. While the Van Vleet Report does not address the existence of these transactions, they are revealing as to the relative merits of the Defendants' and Van Vleet's valuations.

46. There is no requirement that an employee ever sell his or her personal holdings of Meditech Stock, including once he or she leaves the company.  (Plaintiff Hubert, for example, still holds 23,100 Meditech shares despite having been fired by the company in 2004.) Nonetheless, employees voluntarily sold (all split-adjusted) 39,580 shares to the Trust in 1997 and 72,342 shares to the Trust in 1998 at prices ranging from $12-$14.[25]  These prices are at which employees were willing to voluntarily sell their shares of Meditech Stock to the Trust were similar to the values ($12 and $13.50) determined by Defendants in those years, and well below the $21.62 value the Van Vleet Report estimates.

47. Of particular relevance, two of the Plaintiffs, Hinchliffe and Trainor, sold 13,200 and 20,900 of their personal shares to the Trust in 1998 at a split adjusted price of $13.50.[26]  It does not

---

[25] Report to the Board of Directors; Quarter Ended Sept 30, 1997 and 1998.

[26] Statements of Stock Ownership at June 28, 2006 for Trainor and Hinchliffe.

appear, from the Van Vleet Report, that Mr. Van Vleet was ever told that Hinchliffe and Trainor had voluntarily sold their stock to the Trust at the value determined by defendants and roughly $8 below the $21.62 value determined by Van Vleet.

48. In addition to these transactions involving individual employees, there were transactions involving large, sophisticated investors in the period preceding the Valuation Date at values identical to those being contemporaneously determined by the Defendants. In December 1995, for example, EG&G Inc., one of the original investors in Meditech, sold Neil Pappalardo 150,000 split-adjusted shares at a split-adjusted price of $10 per share.[27] Closer to the Valuation Date, in June 1996 private equity firm Greylock sold 460,800 split-adjusted shares back to the company at split-adjusted prices of $10.50 per share.

49. All of these transactions, including transactions in which large, sophisticated investors were willing to sell their Stock, at values at or near the values determined by Defendants, are evidence that the values assigned to the Stock by Defendants' fairly approximate the Stock's fair *market* value.

50. In contrast to these transactions at values either at or very close to the values determined by Defendants, there were no transactions during this period at or anywhere close to the $21.62 value that the Van Vleet Report claims for the Stock. As we explain in the next sections, that is unsurprising, because the Van Vleet Report contains numerous methodological errors which resulted in it arriving at an insupportably high value. In fact, it wasn't until several years later that any third party transaction took place around that value. On December 20, 2001, T.A. Associates offered to acquire a substantial portion (up to 90%) of Meditech at a purchase price of $24-26 per share.[28] This arms-length price for a controlling interest corresponds to $18-20 per share after deducting a 25% DLOC (consistent with the Board determined price of $19 at December 31, 2001) and is lower than the $21.62 the Van Vleet Report determines four years prior.

## C. THE VAN VLEET REPORT IMPROPERLY OMITS A DISCOUNT FOR LACK OF CONTROL

51. Among the most important considerations in valuing an interest in a closely held or non-publicly-traded enterprise are the legal and operating rights embodied in the interest to be valued. As stated in *Valuing a Business*,[29] "Considering the economic unattractiveness of non-controlling ownership interests in closely held companies to most investors, the lack of control discount from a proportionate share of enterprise value under the fair market value standard may be quite large."

---

[27] Report to Board of Directors; Quarter Ended December 31, 1995, p 15.

[28] Letter dated December 20, 2001 by TA Associates to the special committee of the Meditech's Board.

[29] Pratt, Shannon P., et al, Valuing A Business, 4th Edition, p 349.

52. A controlling investor generally has certain prerogatives of control, including the ability to: (i) change terms of governing documents/agreements; (ii) elect/remove management; (iii) set policy; (iv) determine strategic course of business; (v) acquire and liquidate assets; (vi) determine distribution policy; (vii) dissolve any entity; (viii) determine management compensation and perquisites; (ix) select people with whom to conduct business and award contracts; (x) sell the company or register the company's stock for public offering; and (xi) block all aforementioned actions. Of these, the ability of a controlling shareholder in a non-publicly traded company to put the company up for sale or to bring it public (or to block such actions) is arguably the most important. The minority-interest holder in a non-publicly traded company lacks these prerogatives, and therefore cannot guarantee that a market will ever exist for his or her stock.

53. Given the advantages enjoyed by a controlling shareholder and corresponding disadvantages felt by a minority shareholder, appraisers valuing a company will generally apply a "discount for lack of control" or DLOC to the overall company value in order to determine the value of a non-controlling interest. The Van Vleet Report errs in not applying a DLOC in determining the fair market value of the Meditech Stock contributed to and held by the Trust under its Income Approach.[30] Under that approach, the Van Vleet Report calculates the present value of all forecasted cash flows that are *potentially available* for distribution to all investors, including priority claims by debt holders and subordinate claims by equity holders such as the Trust. This *potentially available* cash flow ("ACF") does not reflect the reduced cash flows *expected to be received* by minority equity holders. In fact, Meditech's earnings per share ("EPS") payout ratio averaged less than 50% from 1989-1997 (Van Vleet Report, p. 12).[31]

54. To determine the effect of the Van Vleet Report's omission of a DLOC on its ultimate estimate of $21.62, we looked at several possible approaches for determining an appropriate DLOC. First, we looked at industry control premium studies where stock prices are compared prior to and after a merger, acquisition, or other business combination. The empirical data used in determining control premiums is based primarily on the public markets for stock ownership interests and the premiums paid for acquisitions of companies when compared with the public market minority trading prices prior to the acquisition announcement. Second, we also reviewed the control premiums paid in 43 transactions occurring in 1998 within the computer software industry.[32]

55. A summary of the information we obtained through both approaches for determining a DLOC can be found at Exhibit 5. These studies over 1991-1998 show the median DLOC over all merged companies ranged from 22-26%, whereas the median for computer software companies ranged from 27-38%. A group of 43 transactions in 1998 in the computer software industry for SIC codes 7371, 7372 and 7373 had a median DLOC of 26%.

---

[30] It is unnecessary to apply DLOC to the GPC approach because stock market prices are already non-controlling interests.

[31] The ratio of dividends to ACF per share would be slightly lower, as ACF per share is higher than EPS.

[32] The database sourced for this information did not compile transaction information prior to 1998.

56.  Based on this data, we believe that Mr. Van Vleet should have applied a DLOC of at least 25% to apply to Meditech equity value under his DCF method. This is based on overall median control premiums observed across multiple industries as well as within the computer software industry between 1991 and 1997.

57.  Applying this discount to the Van Vleet Report's Income Approach, and not making any other changes to his approach, would decrease his $880.7 million valuation under the Income Approach by roughly $220.2 million, to $660.5 million. Incorporating this revised Income Approach value, the Van Vleet Report's estimate of the value of Meditech Stock would fall by nearly $4, to $17.77, holding all else equal and not making any of the other changes that we opine elsewhere in this Report are necessary.

## D. THE VAN VLEET REPORT INCORRECTLY USES "WHAT IF" SCENARIOS AS PROJECTIONS IN ITS INCOME APPROACH (DCF METHOD)

58.  In valuing a non-publicly-traded company under an income approach, a crucial variable is a forecast of how much income the company may have in future years. Ultimately, earnings or cash flow is what investors pay for, so it stands to reason that this is central to any valuation. The importance of future expected growth to value estimates cannot be overestimated; as stated in *Valuing a Business,*[33] "Changes in the growth rate projected, sometimes seemingly small, can result in striking changes ....Obviously, the closer the growth rate to the discount rate, the greater the sensitivity."

59.  In setting forth an estimate of future income and ACF for Meditech, the Van Vleet Report purports to rely on a section of a Meditech board of directors ("BOD," or the "Board") package entitled *Forecast through 2001* as being "Management Projections" of anticipated 1998-2001 performance. [34] The scenario set forth in that board package assumed revenue growth of 9.9% in 1998 and about 14.5% for the later years. The Van Vleet Report then further forecasts Meditech's results for 2002 to 2006, assuming growth rates trending down from 12.8% - 5.8%, and from there to a terminal growth rate of 4%.

60.  The *Forecast Through 2001* that the Van Vleet Report relies on is not the kind of projection that is properly used in valuing a company. The *Forecast* appear to be nothing more than a "what-if" scenario to show what the income statement and balance sheet would be like if certain growth happens to be achieved. The Board package from which the Van Vleet Report drew its projections explicitly states that management did not expect its forecast for later years to be accurate, but rather meant for the forecast to reflect the company's financial

---

[33] Pratt, Shannon P., et al, Valuing A Business, 4th Edition, p 208 - 209.
[34] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 20

position when certain revenue levels were achieved.[35]  Neil Pappalardo, the author of the multiyear *Forecast*, testified that the growth rate it reflected was simply an assumption the Board asked him to use.  He also testified that the *Forecast* was not the same as the company's customary one-year forecast (which, as opposed to the *Forecast*, was based heavily on actual orders placed with Meditech by real customers), and was only intended to show what the balance sheet looks like whenever certain revenues are achieved.[36]  Edward Roberts, a member of the Board, also testified that these "forecasts" were not expected to be accurate.[37]

61.  In fact, Meditech's management has consistently stated that it only projects operating results one year ahead, which is in fact the standard presentation in its BOD packages. Roland Driscoll, a member of the Board of Directors, stated that it was uncommon for Management to provide the Board with long-term forecasts.[38]

62.  Page 26 of the Van Vleet Report lists the sources of information used in its analysis. It does not appear that Mr. Van Vleet was provided access to or relied upon any of the deposition testimony explaining the purpose and significance of the four-year projections.  In our opinion, this is an important fact that should have been considered by Mr. Van Vleet. The Van Vleet Report's failure to consider and address the source of the *Projection* renders its growth estimate based on that *Projection* wholly unreliable.

63.  In addition to incorrectly using management's four-year "what-if" scenario as if it constituted an estimate of growth during that period, the Van Vleet Report further errs by projecting Meditech's income statement and ACF for 2002 - 2006 by "trending" down the growth rate to a perpetual long-term level of 4% beginning in 2007, while assuming constant margins and cash flow ratios. The result is a DCF analysis extending another five years past the end of management's hypothetical "what-ifs," plus a terminal year forecast for the tenth period post-1997 actual results. Such trending derived from "what if" scenarios yield speculative results, and nothing management would embrace as an expectation for those years.

64.  Moreover, management viewed 1998 as a "challenge" due to reduced business with its largest and most critical customer (HCA); and continued turnover in staff as a result of the competitive job market.[39]  As stated previously, as of December 31, 1997 Meditech was expecting a slow decrease in future revenues from HCA based on changes in HCA's business and strategic direction. Further, Meditech was expecting some loss of efficiency due to its conversion from a prior "Magic" system to one based on client/server technology.

---

[35] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 15. Consistent with that, Meditech's President, Howard Messing, testified that the forecasts were too aggressive, Deposition dated November 13, 2007, p. 47-8.

[36] Neil Pappalardo Deposition dated November 27, 2007, p.11-13 33.

[37] Edward Roberts Deposition dated November 8, 2007, p. 84-5.

[38] Roland Driscoll Deposition dated October 17, 2007, p. 69-70.

[39] Report to the Board of Directors; Quarter Ended December 31, 1997, p. 14.

65.    All told, by relying on his six years of forecasts beyond any management representations (which themselves were merely "what if" scenarios), the Van Vleet Report continued high rates of growth in its trended five-year extension, leading to terminal revenues at 267% of 1997's actual results. This is improperly aggressive and highly unrealistic. In fact, the Van Vleet Report's projections for 2002-2006 revenue, upon which that Report partly relied for its estimate of value, were about *50% higher* than actually achieved by Meditech.

66.    As opposed to its flawed approach, if the Van Vleet Report had simply capitalized projected 1998 ACF based on its WACC and long-term growth rate assumptions,[40] it would have avoided some of the problems and complications from a speculative long-term forecast. Applying this methodology to the Van Vleet Report's Income Approach, and leaving all other variables intact, would decrease his estimate of the value of the company from $880.7 million to $566 million, a decrease of roughly $314.7 million. Moreover, making this change would decrease in the Van Vleet Report's final composite estimate of FMV of the company from $695.6 million to $518.6 million, a decrease of $177 million. This reduces the Meditech Stock value by $5.50 per share, or 25%, to $16.12. This major decrease in the value arrived at under Mr. Van Vleet's methodology is the result simply of decreasing his growth estimate, holding everything else he did equal and not making any of the other changes that we opine elsewhere in this Report are necessary.

67.    Given the limitations and uncertainties in managements' forecasts and the challenging future Meditech management clearly expected, alternatively the Van Vleet Report should have added an appropriate company-specific risk factor to his WACC,[41] to account for the highly speculative nature of its resulting 10-year projection. As stated in *Valuing a Business*,[42] "for a given level of expected future returns, the market will pay more to the extent that realization of those returns is more certain and less to the extent that their realization is less certain. In other words for a given level of expected prospective economic income, the lower the risk, the higher the present value, or conversely the higher the risk, the lower the present value.["]    As shown in the next section, if the Van Vleet Report had included an appropriate company-specific risk factor this would have similarly reduced its deemed value for Meditech Stock.

## E.    THE VAN VLEET REPORT FAILS TO PROPERLY INCLUDE INDUSTRY AND/OR COMPANY SPECIFIC RISK PREMIUM IN ITS WACC CALCULATIONS

68.    In our opinion, the Van Vleet Report fails to give proper consideration to the specific risks faced by companies operating in Meditech's market – information management software for

---

[40] A methodology used for example by Robert F. Reilly, plaintiff's expert in the Grossman litigation, in his 2005 report.

[41] The WACC is used to convert a monetary sum, payable or receivable in the future, into present value. It is determined by the weighted average, at market value, of the cost of all financing sources in the business enterprise's capital structure, i.e. various debt and equity capital.

[42] Pratt, Shannon P., et al, Valuing A Business, 4th Edition, p 161.

use in hospitals – when compared with other industries or the public market in general, as well as the unique risks faced by Meditech. Examples of company specific risk include key person dependence, key customer dependence, key product dependence, obsolescence of technology, etc.[43]

69. The Van Vleet Report relies on two techniques (the traditional CAPM and build-up methods, described below) to develop the return on equity component for its WACC, or discount rate, of 13.8%. It then uses that WACC to convert its forecasted and terminal years of ACF to a present value. The Van Vleet Report states that its selection of a discount rate reflects the relative risk of achieving the projected cash flows as well as the time value of money. Under neither approach, however, does the Van Vleet Report actually consider company or industry-specific risk.

70. Under one such method, the Van Vleet Report develops an overall WACC in part based on the CAPM[44], which relies on the risk profile of selected guideline public companies deemed comparable to Meditech in order to account for, in part, industry risk. However, as explained further herein in Section G, two of the Van Vleet Report's four selected guideline public companies do not even operate in the market for information software for hospitals, and hence the risk borne by those companies is not at all reflective of risk borne by Meditech. And even those companies selected by the Van Vleet Report that do sell information management software to hospitals operate in a number of different product and geographical markets that Meditech does not, providing them with diversification that Meditech does not enjoy.

71. Under a second method, the Van Vleet Report seemingly relies on two separate sources of Duff & Phelps data to estimate the equity component of WACC.[45] In actuality, both sources of data come from the same Duff & Phelps report, and reflect a "build-up" methodology in determining the cost of equity component of the WACC. Under this build-up methodology, the Van Vleet Report does not include any risk component due to industry and/or Meditech specific factors. Although its formula recognizes the need to include company-specific risk, it does not quantify any such risks in arriving at its conclusion.

72. To gauge an appropriate risk premium for Meditech's specific factors, we calculated the correlation of returns between a broad market index and each of four GPCs, two of which were also selected by the Van Vleet Report and the other two by us.[46] This correlation reflects a relative measure and is used to scale Meditech's Beta, which reflects the expected volatility of Meditech equity based on overall Market risk, if Meditech were a publicly traded company. From this, we estimated the company specific risk of Meditech which considers

---

[43] Pratt, Shannon P., et al, Valuing A Business, 4th Edition, p 431.

[44] CAPM is a common method of estimating cost of equity. It is based on the risk-free rate plus a risk premium that is proportionate to the systematic risk of the security or portfolio.

[45] See the Van Vleet Report, ¶ 51 which references Duff & Phelps Size/Return Study and Duff & Phelps Risk/Return Study. Mr. Van Vleet is a Managing Director with Duff & Phelps.

[46] See Section G, on guideline company selection.

the non-diversifiable nature of Meditech equity risk for Stock held by the Trust. Our analysis is based on a Total Beta methodology ascribed to by both academics and practitioners in the business valuation field.[47]

73.  We quantified a 3% equity risk premium to capture specific risks faced by Meditech through the Total Beta methodology (see Exhibit 6). Had the Van Vleet Report included such a risk premium in its calculation of an appropriate WACC (by correcting the cost of equity capital component of the resulting WACC), it would have determined an overall WACC of 16.35%[48] as opposed to its conclusion of 13.8%.

74.  Using the more appropriate WACC, while holding all else equal and not making any of the other changes that we opine elsewhere in this Report are necessary, the Van Vleet Report's $880.7 million conclusion under the Income Approach would be decreased by $204.5 million to $676.2 million, and its $695.6 million composite estimate would decrease by $115 million to $580.6 million, resulting in a share value of $18.05. However as explained elsewhere in our report, the Van Vleet Report suffers from other deficiencies that if corrected, would lower the derived share value further still.

## F.   THE VAN VLEET REPORT SELECTED TOO SMALL A DISCOUNT FOR LACK OF MARKETABILITY

75.  Generally speaking investors are less willing to buy and hold stock in a non-publicly traded company than they are stock in a company whose shares are traded on a public exchange such as the New York Stock Exchange or NASDAQ.  Shares in a non-publicly traded company, in comparison to exchange-traded shares, are relatively illiquid:  finding a buyer for non-publicly traded shares is less certain, more complicated, and involves greater transaction costs.  To account for this, appraisers generally apply a discount for lack of marketability or "DLOM" to the shares of a non-publicly traded company, to reflect their relative undesirability.[49]

76.  Meditech Stock can not be readily converted to cash, as it is not publicly traded.  The Van Vleet Report recognizes this and does apply a DLOM.  In our opinion, however, the Van

---

[47] See "Estimating the cost of equity for a private company" by Professor Aswath Damodaran at http://pages.stern.nyu.edu/~adamodar/New_Home_Page/valquestions/totalbeta.htm. Also, see
"Quantifying Company Specific Risk: A New, Empirical Framework With Practical Applications," Peter J. Butler, et al, Business Valuation Update, Vol 13., No. 2, February 2007.

[48] The Van Vleet Report's Exhibit IX states that Concluded WACC was based on CAPM method from its Exhibit X. Exhibit X indicates a 13.5% rounded conclusion; adding 2.85% (3% X 95% equity weighting) yields 16.35%.

[49] The notion of a DLOC or minority interest discount is separate and distinct from any DLOM. In fact, a DLOM may exist, regardless of whether a controlling or minority interest is being valued.

Vleet Report's selection of a 25% DLOM[50] is too low, and consequently overestimates the FMV of Meditech Stock to a non-controlling investor.

77.  There were several flaws with the Van Vleet Report's approach to selecting a DLOM. First, the Van Vleet Report inappropriately relies on studies of private transactions in the common stock of companies that subsequently had initial public offerings (the "IPO Studies"). In many cases these companies were known to be poised to soon conduct an IPO, and hence their discounts for lack of marketability were relatively muted. Even still, the Van Vleet Report notes an average discount of 43.8% based on four such IPO studies.[51] In fact, for 65 private transactions between 1980 and 1997 with subsequent IPOs between 121 and 153 days later, the average discount observed was 51%.[52]

78.  In comparison to these pre-IPO companies, in 1997 Meditech had no plans to issue Stock in a public market for the foreseeable future – indeed, as of 2008, more than a decade later, it still has not done so. The pre-IPO studies relied upon by Mr. Van Vleet, accordingly, are not directly applicable to Meditech's situation, and, all else being equal, Meditech Stock would warrant a deeper discount for lack of marketability than seen in those studies and deeper than the 25% selected by the Van Vleet Report.

79.  The Van Vleet Report also inappropriately relies on studies covering 1980 to 1997 of restricted stock in determining a DLOM (Van Vleet Exhibit XX). A restricted stock is one which is identical to its company's publicly-traded issue, but carries a short-term restriction on marketability. Because holders of such stock know they can obtain public liquidity once the restrictions lapse (usually no more than one to three years),[53] there is often an established underlying market for restricted stock. Such is not the case with Meditech Stock.

80.  Moreover, it is generally accepted that restricted stock "studies conducted after 1990 are not relevant for purposes of determining discounts for lack of marketability for privately held stock, because they reflect the increased liquidity in the market for restricted securities. Such increase in liquidity is not present in privately held securities."[54] The Van Vleet Report, however, only observes two restricted stock studies covering periods both prior to and after 1990, with resulting average discounts between 22% and 27%.[55]

---

[50] The Van Vleet Report, p 13 and 29.

[51] The Van Vleet Report, Exhibit XXI. Note that the figure characterizes a summary average based on nine studies, yet only four are shown.

[52] Data available at http://www.emorybizval.com/valuation-studies.shtml. Additionally, in Exhibit XXII the Van Vleet Report notes an average discount of 35.5% based on another set of six IPO studies. However, there is not enough transparency in the data to determine the appropriateness of the results, and therefore these IPO studies should not have been relied upon. See Pratt, Shannon P., et al, Valuing A Business, 5th Edition , p 436-438.

[53] Pratt, Shannon P., et al, Valuing A Business, 5th Edition, p 430-431.

[54] Kathryn F. Aschwald, "Restricted Stock Discounts Decline as a Result of a 1-Year Holding Period" Shannon Pratt's Business Valuation, vol. 6, no. 5 (May 2000): p 1-5.

[55] The Van Vleet Report, Exhibit XX. Note that the figure cites footnotes for eight additional studies for which no discount data is presented.

81. We used several approaches to determine a reasonably conservative alternative DLOM that Van Vleet should have used. First, we show in Exhibit 7 our analysis of 13 restricted stock studies and isolate those periods prior to 1983, when Rule 144(k) of the Securities and Exchange Commission was instituted requiring anyone not affiliated with an issuer to be permitted to sell their *entire block* after three years. These restricted stock studies show an overall median discount of 33%.

82. We also quantified an estimate for a reasonably conservative discount for marketability based on an option pricing model in Exhibit 8, where the holder of a privately held security without ready marketability can be viewed as being short a put option. The owner of a put option has the right, but not the obligation to sell his or her interest in the underlying security, while an investor that does not have a put option lacks this right. As such, the price of the put option is indicative of the cost of liquidity.

83. Based on our restricted stock analysis and put option analysis on the one hand, and considering as well the size of dividends on Meditech Stock (which tends to suggest a lower discount for lack of marketability than otherwise called for), the prospects for Meditech Stock becoming publicly traded (extremely low), the pool of potential buyers of Meditech Stock, and the future growth prospects for the company, we believe a reasonably conservative DLOM for Meditech Stock would be 30%.

84. As a further check on reasonableness, we reviewed academic research,[56] which shows that marketability discounts of 30% are possible with holding periods of only one year even when the volatility in price for a given company's stock is just 25%. In the instant case, the median guideline public company volatility is 59%.

85. Applying this discount to the Van Vleet Report's income and market approaches' aggregate conclusion, holding all else equal and not making any of the other changes that we opine elsewhere in this Report are necessary, would decrease its indicated $695.6 million FMV of Equity (non-marketable, non-controlling) to approximately $649.3 million, a decrease of approximately $46.3, with resulting share value declining to $20.18. Again, this effect on the Van Vleet Report's overall estimate of the value of Meditech stock does not take into account any of the other corrections that we believe are necessary in that Report's analysis.

## G.   FLAWS IN CHOICES OF GUIDELINE PUBLICLY TRADED COMPANIES

86. The Van Vleet Report identified four public companies that it claims are comparable to Meditech: namely, Advent Software, Inc., Aspen Technology, Inc., Cerner Corporation, and Shared Medical Systems Corporation.

---

[56] Francis A. Longstaff, "How Much Can Marketability Affect Security Prices," The Journal of Finance, Volume 50, Issue 5, 1995

87. A good GPC would require comparability with Meditech across many dimensions, including industry similarity, products and/or services provided, customer profiles, intellectual property rights, market share, size, historical trends, growth prospects, financial and operating risk, management depth and dividend paying capacity.

88. The comparable companies to Meditech selected by Van Vleet either do not meet these criteria at all or do so only minimally, Meditech sells only a limited set of products (information management software) to a limited set of customers (hospitals) in a limited geographic market (almost entirely the United States, and to a lesser extent Canada and Britain). As explained further below, the supposedly comparable companies selected by Van Vleet can be differentiated from Meditech on at least the following bases:

   • Some participate in industries other than healthcare information software for hospitals – in fact, some do not sell healthcare information software at all;
   • Some sell hardware and facilities outsourcing, whereas Meditech does not;
   • Some provide professional services on a consulting basis, whereas Meditech does not; and
   • Some serve markets outside of the U.S. and are expanding internationally, while Meditech largely is not.

89. Advent Software, Inc. ("Advent") is a provider of software products, data interfaces and related services that automate and integrate functions of *investment management* organizations.[57] Advent does not even operate in the healthcare information software industry. Unlike Meditech, Advent also offers professional services including, consulting, systems integration and custom programming which makes up a significant portion of its revenue. Augmenting software development, sales, and maintenance with the provision of professional services requires a different business model than Meditech's model, which is based simply on software development, sales, and maintenance. Specifically, the addition of professional services changes the overall profit and its allocation to underlying business units and introduces new competitors and potential cyclicality to the business.

90. Aspen Technology, Inc. ("Aspen") is a supplier of software and service solutions used to design, operate and manage *manufacturing processes for industries* that manufacturer chemicals, petrochemicals, petroleum products, pharmaceuticals, pulp and paper, electric power, food and beverages, consumer products, and metals and minerals.[58] Like Advent, Aspen does not operate in the same industry, even broadly defined, as Meditech. Unlike Meditech, Aspen operates in a cyclical industry which makes its revenues and profits sensitive to the economic outlook. Also unlike Meditech, Aspen also offers a range of consulting services for implementation, advanced process control and real-time optimization. Additionally, Aspen does not operate in the healthcare information software industry, nor within an industry that is highly government regulated, nor self-scrutinized with multi-constituent standards bodies.

---

[57] Advent 's 10-K for 1997.
[58] Aspen's 10-K for 1997.

91.  Cerner Corporation ("Cerner") designs, develops, markets and installs clinical and management information systems that are capable of being implemented on an individual, combined or enterprise-wide basis. Cerner's systems are designed and developed using the Health Network Architecture ("HNA"); its market is the healthcare industry. As of December 31, 1997, Cerner is developing its newest generation of HNA products known as "Millennium." In addition to competing with Meditech in the market for information management software for hospitals, Cerner *also* derives a significant portion of its revenue from consulting services and provides health care claims processing and facilities outsourcing.[59] None of these additional service offerings, which provide Cerner additional avenues for growth and diversify Cerner's risk from a downturn in the information software market, are provided by Meditech. In addition to the factors cited above concerning the lack of comparability between Meditech and a firm that provides professional services, the provision of claims processing introduces additional governmental regulation, risk management and new stakeholders, including third party payers.

92.  As with Cerner, Meditech only competes with Shared Medical Systems Corporation ("SMS") in one product line. SMS also provides a much broader portfolio of software product, service and solution offerings to the healthcare industry, including a full range of clinical, financial, patient management, electronic data interchange, managed care, management solutions, and integrated multimedia solutions. And, unlike Meditech, SMS also provides specialized consulting services for the design and integration of software in addition to outsourcing, hardware and education services.[60]  SMS is significantly more capitalized than Meditech and as a result, can more readily fund new initiatives. As a provider of computer hardware, SMS is subject to much greater operating leverage given its holdings in fixed asset equipment.

93.  In light of the foregoing, Advent and Aspen are not comparable to Meditech, and Cerner and SMS are only minimally comparable. To be considered minimally comparable requires at least having (a) similar industry segment, (b) similar products and/or services (c) an installed base in diverse geographic markets, and (d) similar customer profiles. Advent and Aspen fail all screens, whereas Cerner and SMS arguably only meet some elements of (a), (b), and (d). Because the Van Vleet Report's selection of GPCs arrived at only two minimally comparable companies, we do not consider his GPC analysis to be reliable.

94.  In an effort to see whether there were any publicly-traded companies to Meditech that Mr. Van Vleet missed, we conducted our own review of possible matches. Like Van Vleet, we were unable to find any companies that we would consider truly comparable to Meditech, with its narrow focus on information management software for hospitals. However, we did find two additional public companies that we would consider minimally comparable to Meditech, specifically, Creative Computer Applications, Inc. (now known as Aspyra, Inc.) and QuadraMed Corporation.

---

[59] Cerner's 10-K for 1997
[60] SMS's 10-K for 1997

95. Creative Computer Applications, Inc. ("CCA") develops, assembles, markets, installs, and services computer based clinical information systems for use in hospitals, clinics, reference laboratories, and other healthcare institutions. CCA's business consists of three operational areas: (1) clinical information systems products, (2) service of its customer's installations, and (3) data acquisition products.[61] CCA derives roughly 70% of its revenue from software system sales, which includes data acquisition products, an offering Meditech does not have. Unlike Meditech, CCA also sells hardware and provides field service for hardware repair. Thus, at best, it is only minimally comparable to Meditech.

96. QuadraMed Corporation ("QuadraMed") develops, markets and sells software products and services designed to increase operational efficiency, improve cash flow, measure the cost of care and effectively administer managed care contracts. QuadraMed has a suite of products including an integrated offering of EDI, financial management, decision support, and compliance solutions. Like Meditech, a substantial portion of their revenues are derived from the sale of software products and services to hospitals. However, unlike Meditech, QuadraMed also provides compliance, consulting and business office outsourcing services.[62] As of the Valuation Date, the large majority of QuadraMed's sales pertained to physician practice management software, which Meditech did not provide. QuadraMed had only recently gained electronic medical records software capability through its 1996 acquisition of Clinitec International, Inc. We consider QuadraMed as only minimally comparable to Meditech. However, its uncharacteristic financial performance - after a period of losses, it had just returned to profitability, and resulting growth rates were therefore not meaningful - precluded its full use under the GPC method.

97. In view of the foregoing, and in the absence of identifying any guideline publicly traded companies sharing enough similarity with Meditech across the factors discussed above, there is not sufficient basis to employ a GPC method as an indication of Meditech Stock value on the Valuation Date. At minimum, the Van Vleet Report should have placed little weight on the GPC method in its determination of value, and not 25% as it did.

98. Notwithstanding, below we quantify the effect on the Van Vleet Report's indication of value under this approach, in part, based on eliminating Advent and Aspen due to non-comparability while including CCA as a minimally comparable GPC.

## H. FLAWS IN SELECTION OF MARKET DERIVED PRICING MULTIPLES

99. In addition to selecting an improper set of comparables against which to compare Meditech, the Van Vleet Report's guideline public company analysis suffers from a number of technical flaws all of which served to inflate its ultimate estimate of the value of Meditech Stock.

---

[61] CCA's 10-K for 1997

[62] Quadramed's 10-K for 1997

100. As an initial matter, the Van Vleet Report miscalculated Cerner's earnings before interest, taxes, depreciation and amortization ("EBITDA") and resulting ratio of MVIC to Cerner's 12 preceding months of EBIDTA. Whereas that Report's calculation of Meditech's "Adjusted EBITDA" at $96.1 million includes interest income (as is the case of all but one GPC), for Cerner it does not. When deriving multiples from GPCs, it is essential that they be constructed on a consistent basis with the subject company's metrics to which they will be applied. Correcting the Van Vleet Report's GPCs' EBITDA calculations to be consistent with how it calculated Meditech's EBITDA results in a lower MVIC/EBITDA[63] ratio of 16.0 for Cerner, as opposed to 17.9 as originally stated.

101. The Van Vleet Report adjusted market-derived multiples of EBITDA to "reflect the differences in expected earnings growth between each public company and Meditech."[64] However, the Van Vleet Report did not adjust market-derived multiples of EBITDA for any differences in the risk of investing in one or more of the guideline public companies versus Meditech, with its own unique risks discussed previously.[65] While the Van Vleet Report adjusts the market-derived multiples for differences in size and expected earnings growth, he fails to provide the source or the methodology behind his stated adjustments. There are several factors on his Exhibit XV which are unsubstantiated, specifically (i) the derivation of the Adjusted Ratio formula in footnote 4, (ii) the same 0.9 relative growth factor for all guideline public companies, and (iii) the same "Ind. Avg. Equity/MVIC" ratio of 100% for all guideline public companies.

102. As a result, the Van Vleet Report's GPC multiples are adjusted only by their relative market value of equity amounts; this is circular since the whole purpose of the valuation is to estimate Meditech's equity value. Further, the difference in relative growth between its GPCs and Meditech does not appear to be accurately determined.

103. Moreover, The Van Vleet Report states "[g]iven the superior profitability performance of Meditech when compared to the guideline public companies, an EBITDA multiple slightly above the average is appropriate." The Van Vleet Report implies that it incorporated differences in profitability between the guideline public companies and Meditech through its choice of an EBITDA multiple. Higher profit margins will lead to higher value, but increased profitability is already reflected in higher EBITDA against which the multiple will be applied. Adjusting the multiple under the same rationale essentially double-counts the effect.

104. Like the Van Vleet Report, we separately quantified required adjustments to market-derived pricing multiples of GPC EBITDA based on differences in size and growth. However, we also quantified an appropriate adjustment for differences in company risk to an otherwise unadjusted EBITDA multiple. Under our methodology, we capture a consolidated adjustment

---

[63] MVIC is market value of invested capital, including debt and equity. MVIC/EBITDA is a type of price/earnings ratio commonly used in valuing closely-held stocks.

[64] The Van Vleet Report, pg. 10, ¶ 64.

[65] Mr. Van Vleet provides no explanation for his quantification of adjustment for size and growth, specifically, the derivation of his "Adjusted Ratio."

# EXHIBIT 11 – PART 2

for size, risk, and growth through differences in the underlying WACC requirements for each guideline public company and Meditech, and their impact on future growth.

105. Finally, the Van Vleet Report concludes that an appropriate MVIC/EBIDTA multiple to use under the GPC method is slightly above the *average*.[66]   Company valuations based on the simple average (or mean) of GPC multiples will consistently overstate value; the harmonic mean is the best among common multiples.[67]   The harmonic mean effectively averages the yields, which are the inverse of the multiples.  By averaging the yields, the harmonic mean gives equal weight to equal dollar investments.

106. Correcting the Van Vleet Report's market approach elements – selected guideline companies and multiples adjustment factors on a harmonic mean basis – and holding all else equal and not making any of the other changes that we opine elsewhere in this Report are necessary, lowers the multiple of Adjusted EBITDA to 7.1 as shown on Exhibit 9. As a result, the indicated market approach's $1,067.9 million FMV of Meditech Stock (marketable, non-controlling basis) decreases by $418 million, to $649.9 million. Moreover, on an overall composite basis the fair market value of equity of $695.6 would decrease by approximately $78.3 million to $617.3 million, resulting in a share value of $19.19.

---

[66] The Van Vleet Report, p 10, para 65.
[67] "Estimating Industry Multiples" Malcolm Baker, et al, Harvard University, 1999.

## CONCLUSION

107. Correcting the Van Vleet Report's determination of the fair market value of Meditech Stock as of December 31, 1997 for all the above-noted flaws in Sections C, E, F, G & H concurrently yields a value of $11.81.[68]

| Van Vleet Report value conclusion (non-marketable, non-controlling basis) | $21.62 |
|---|---|
| • Correcting the discount rate to include company/industry specific risk | (3.57) |
| • Applying necessary discount for lack of control to the Income Approach | (3.85) |
| • Increasing the discount for lack of marketability to 30% from 25% | (1.44) |
| • Selecting more appropriate guideline public companies, central measures of tendency, and multiples adjustment factors | (2.43) |
| **Cumulative effect of above corrections** | **(9.81)** |
| **Corrected Van Vleet Report conclusion of value** | **$11.81** |

108. This value is derived by fixing the errors in the Van Vleet Report, and is not our estimate of the FMV of the Meditech Stock held by the Trust. We do not mean to suggest, for instance, that the value of $13.50 determined by the Trustee was in some way "too high". We do believe, however, that this exercise demonstrates the flaws in the Van Vleet Report's approach of suggesting that the true value of Meditech stock can be determined to a penny with scientific precision. And, as with the multiple transactions involving sophisticated institutional investors, Meditech officers and employees, and even Plaintiffs at values at or near the FMV determined by Defendants, it also demonstrates, as we discuss further in next section of our report, that the valuation determined by Defendants was reasonable.

---

[68] Alternatively, taking into effect Sections C, D, F, G & H concurrently reduces the Van Vleet Report's FMV conclusion to $10.46.

## THE BOARD'S AND TRUSTEE'S VALUATION PROCESS & RESULTING SHARE VALUE ARE REASONABLE

109. We were asked to opine on the reasonableness of the process by which Meditech's Board and the Trustee of the Trust determined the FMV of Meditech's Stock as of the Valuation Date, as well as the reasonableness of the value conclusion reached thereby.

110. Based on our review of deposition transcripts, board packages, other documents produced during discovery, and interviews with Meditech board members and the Trustee, our understanding is that the Board primarily determines the value of Meditech Stock by first determining what dividend will be paid to shareholders in the upcoming year. Once the dividend has been determined, the Board, based on a belief that a holder of Meditech Stock should be provided a 7% dividend for holding the illiquid Stock, higher than the interest rate paid on long-term government bonds, determines a value for the Stock to yield approximately a 7% dividend. The Trustee similarly considers the dividend paid on Meditech Stock in valuing the Stock held by the Trust.

111. In addition to this primary consideration given the dividend, the Board and Trustee also appear to consider a number of additional factors. For instance, the Chairman's Comments in the October 1997 board package, written by defendant Pappalardo who is also the Trustee, list the following information for consideration in determining the value of Meditech stock: Meditech's actual 1996 earnings per share and book value per share; the company's estimated annual earnings for 1997 and estimated year-end book value; the value per share determined the previous year by the Board and the number of shares that the Company offered to and that were actually purchased by officers and employees at that price; and the number of shares sold by shareholders to the Trust and the prices at which those transactions occurred.

112. In our opinion, the Board's and Trustee's methodology views the value of Meditech Stock as being best reflected in expected future benefits, consistent with the widely-accepted Dividend Discount Model. The methodology employed by the Board and Trustee is based on a priority distribution of dividends to stock holders, which enables greater near term participation in the value of Meditech when compared with the future monetization of underlying common stock. As explained further herein, this methodology based on the dividend set by the Board also has historically avoided the volatility seen in public markets generally and among the Van Vleet Report's elected GPCs.

113. Given the impact of factors discussed previously on a reasonable range of value for Meditech Stock on the Valuation Date, we find the Board's and Trustee's determination of the value of Meditech Stock to be reasonable and consistent with the aforementioned considerations. In fact, the compounding of all the adjustments to the Van Vleet Report's method discussed above, specifically, adjustments to the WACC, considerations related to the comparability of public guideline companies, adjusted market pricing multiples derived there from, and the

application of an appropriate DLOC and DLOM, results in the Board's and Trustee's estimate of Meditech Stock value, as of the Valuation Date, being higher than the value using the Van Vleet Report's valuation methods, as corrected.

## COMPARISON OF MEDITECH'S RETURN TO INDEXES AND SELECTED COMPANIES

114. We were asked to calculate and compare historical returns on Meditech Stock to the returns on the three most-widely known equity indexes – the Dow Jones Industrial Average, the NASDAQ, and the S&P 500 – as well as a selection of well-known software and technology and other well-known companies over the life of the Trust and the time periods each of the Plaintiffs participated in the Trust.

115. For the well-known companies against which to compare Meditech, we selected Apple Computer, Bank of America, Hewlett Packard, International Business Machines, General Electric, Johnson & Johnson and Procter & Gamble. We selected these companies judgmentally as well-known, successful public companies and without considering in advance what the results of their comparison to Meditech might be.

116. Meditech's Stock has provided its shareholders with extraordinary rates of return (considering share price appreciation plus dividends), which compare favorably to most indexes and the selected high-profile successful companies over the Plaintiff's employment periods and the life of Meditech's Profit Sharing Trust.

117. Over the life of Meditech's Profit Sharing Trust – approximately 34 years from December 31, 1973[69] to December 31, 2007 – Meditech's Stock provided an IRR of about 25%, compared to 11-12% for three such indexes and 8-14% for the five selected high profile companies as charted in Exhibit 10. This difference in the IRR is substantial; under the well-established "rule of 72," an investment in a stock with an IRR of 25% will double in a little under three years, while an investment in an index or stock with an IRR of 14% will take slightly more than five years to double and an investment at an IRR of 12% will take six years to double – twice as long as for Meditech.

118. Hubert was employed by Meditech from 1981 through 2004.[70] Employees are eligible for participation in the Trust on January 1st after their first full year of employment.[71] We calculated Meditech's IRR for the time period Hubert was a participant in the Trust - approximately 21 years from December 31, 1982 to December 31, 2003. Meditech's Stock provided an IRR of 36%, compared to 20% for Bank of America which was the best performing selected high profile company during this time period. The IRRs for the three indexes ranged from 12-15% and for the remaining five high profile companies public throughout that timeframe ranged from 6%-17% as charted in Exhibit 11. Exhibit 42 graphs Hubert's accumulated holdings in his Trust account.

---

[69] First calendar year end after the initiation of the Trust

[70] Memorandum in Support of Plaintiffs' Motion for Class Certification pg. 6.

[71] Amended Class Action Complaint and Demand for Jury Trial dated May 23, 2005

119. Trainor and Hinchliffe were employed by Meditech from 1975 through 1998. We calculated
Meditech's IRR for the time period Trainor and Hinchliffe were participants in the Trust -
approximately 21 years from December 31, 1976 to December 31, 1997. Meditech's Stock
provided an IRR of 36%, compared to 18% for General Electric which was the best
performing high profile company during this time period. The IRRs for the three indexes
were approximately 15% and for the remaining four high profile companies ranged from 9-
17%, as charted in Exhibit 12.  Exhibits 43 and 44 graph Trainor's and Hinchliffe's
accumulated holdings in their Trust account.

## COMPARISON OF PLAINTIFFS' PERSONAL RETURN ON MEDITECH TO BEST PERFORMING SELECTED HIGH PROFILE COMPANY

120. We were asked to calculate and compare the return on Plaintiff's personal investments in Meditech Stock with the best-performing of the selected high-profile companies, during the time period of their elective investments in Meditech.

121. In addition to being participants in the Trust, each of the three Plaintiff's personally invested in Meditech's Stock. Hubert started investing in Meditech's Stock in 1985 and still owns 23,100 shares as of the date of our report[72]. If Hubert sold all of his shares on December 31, 2007, his IRR would have been 22%. If Hubert had invested the same amount of money in Bank of America, the best performing selected high profile company, instead of Meditech over the same time period, his IRR would have been only 13%. Exhibit 13 graphs Hubert's accumulated holdings and dividends in his personal holdings of Meditech Stock.

122. Trainor started investing in Meditech's Stock in 1980 and sold all of his shares by 1998[73]. This personal investment in Meditech Stock resulted in an IRR of 36%. If Trainor had invested the same amount of money in General Electric, the best performing selected high profile company, instead of Meditech over the same time period, his IRR would have been 23%. Exhibit 14 graphs Trainor's accumulated holdings and dividends in his personal holdings of Meditech Stock.

123. Hinchliffe started investing in Meditech's Stock in 1981 and sold all of his shares by 1998[74]. This personal investment in Meditech Stock resulted in an IRR of 55%. If Hinchliffe had invested the same amount of money in General Electric, the best performing selected high profile company, instead of Meditech over the same time period, his IRR would have been 20%. Exhibit 15 graphs Hinchliffe's accumulated holdings and dividends in his personal holdings of Meditech Stock. The IRRs of the Plaintiffs' personal investment in Meditech Stock as compared with an alternate investment is depicted in Exhibit 16.

---

[72] Per Michael Hubert's Statement of Stock Ownership dated August 8, 2003 (Bates MH 0234) and updated per Counsel.
[73] Per William G. Trainor's Statement of Stock Ownership dated June 28, 2006.
[74] Per David Hinchliffe's Statement of Stock Ownership dated June 28, 2006.

## OBSERVATIONS REGARDING VOLATILITY OF MARKET INDEXES AND VAN VLEET'S GUIDELINE PUBLIC COMPANIES

124. We were asked to quantify and/or chart the volatility of various stock market indexes over the last six months (October 1, 2007 through March 31, 2008), as well as over the 13-year period January 1995 - 2008, plus the life of the Plan (January 1974 through March 31, 2008), comparing all of these to Meditech's Stock price movements. We were also asked to chart the volatility of the Van Vleet Report's GPCs over the 13-year period January 1995 - 2008 as well as the four-year period January 1995 - 1999 plus the three-year period January 2002 - 2005.

125. Meditech's Stock price follows a consistent escalation year-to-year, per the Trustee's determination of value which is based on the dividend. In contrast, the various stock market indexes all exhibit significant price volatility, as demonstrated by the following chart:

| Time Period: | Volatility Measure: | NASDAQ | DJIA | S&P 500 | Cerner |
|---|---|---|---|---|---|
| 6 Months (daily): 10/1/07 - 3/31/08 | Standard deviation | 1.6% | 1.3% | 1.4% | 2.2% |
| | Maximum daily movement | 4.0% | 3.4% | 4.1% | 10.3% |
| 13 Years (weekly): 1/4/95 - 1/6/08 | Standard deviation | 3.5% | 2.2% | 2.2% | 7.5% |
| | Maximum daily movement | 25.3% | 14.3% | 11.6% | 44.4% |
| | Worst one-year decline % | -36.4% | -19.1% | -25.3% | -39.3% |
| 34+ Yrs (weekly): 1/1/74 - 3/31/08 | Standard deviation | 2.8% | 2.2% | 2.2% | n/a |
| | Maximum daily movement | 25.3% | 16.6% | 14.1% | n/a |

126. Exhibits 17-19 show the movement of stock prices and dividends over time for Meditech against the three selected indexes, NASDAQ, DJIA and S&P 500, all normalized to begin at 100. For each index we split annual dividends equally into quarterly components. Because we could not find dividend data for NASDAQ pre-2007, we applied 2007's dividend yield of 0.74% to all periods.

127. In Exhibits 20-29, we charted the stock price volatility of the Van Vleet Report's public guideline companies (i.e. Aspen, Advent, Cerner & SMS) over the 13-year period January 1995 - 2008, four-year period January 1995 - 1999, as well as the three-year period January 2002 - 2005 plus the last six months (October 1, 2007 - March 31, 2008) and compared it to Meditech's Stock price & dividend. In Exhibits 30-33 we separately charted price volatility of Cerner in comparison with Meditech for the last two years (March 1, 2006 through March 1, 2008), the three-year period January 2002 - 2005 as well as the four-year period January 1995 - 1999 plus the 13-year period January 1995 - 2008. As is demonstrated, the comparable companies selected by Van Vleet are, in comparison to Meditech, characterized by severe volatility.

128. As discussed earlier, Cerner's stock price in the last half of 1997 had wild swings, up by about $10 per share (48%) then down by about $10 per share (-36%), ultimately landing very near its starting price six months earlier. Another of the Van Vleet Report's GPCs, Advent Software, had a similar price swing - increasing over $15 from its April 1, 1996 value of $19.00 per share to peak at $34.25 about six months later in October, then falling over the next six months by a similar amount, back down to $20.75 on March 31, 1997. Over the course of this one-year period, Advent's price increased by 80%, then fell by 40%, ending up very close to its starting price.

129. The lack of volatility in Meditech Stock in comparison to market indexes and the comparable companies identified in the Van Vleet Report has thus far avoided Plan participants seeing the value of their retirement accounts decline precipitously from one year to the next. As shown in the above chart, if Meditech stock were characterized by the volatility of a Cerner since 1995, a retiree might see the value of his or her retirement benefits drop by nearly 40% in one year. Indeed, even if Meditech stock were only characterized by the volatility of a very broad, diversified market index such as the S&P 500 during that time, a retiring Meditech employee might be exposed to a 25% drop in benefits in a single year.

## EXAMPLES OF DIFFERENTIAL IMPACT ON PARTICIPANTS FROM PLAINTIFFS' PROPOSED VALUATION METHODOLOGY

130. We were asked to consider some hypothetical impacts on Plan participants' distributions of benefits from the Trust from using a valuation methodology characterized by initially higher, but more volatile, share valuations. In connection with this part of our assignment, we reviewed the Amended Complaint, the Plan, the Class Certification pleadings and the Court's Order Denying Class Certification dated March 20, 2007.

131. The valuation methodology proposed by Plaintiffs in their Amended Complaint would produce wild swings in exit values for similarly vested employees in the Plan, depending simply on what year the employee elected to terminate. For example, using the values alleged in the Amended Compliant, two employees, both of whose Trust accounts have a value based on a beneficial allocation of 100 vested Meditech shares upon departure in 1999 and 2001, would have received $7,500 and $2,550,[75] respectively, despite the fact that the company's sales and earnings had increased about 3% between the intervening last 12 months' operations (1998 to 2000).

132. In addition, and as the Court recognized in the Order Denying Class Certification dated March 20, 2007 (pages 14-15 and associated footnotes), moving to a different valuation methodology could also differentially affect even Plan participants who receive Trust distributions the same year, depending upon when the Plan participants first entered the Plan and their relative earnings over time.

133. Furthermore, unless Plaintiffs are suggesting that they should receive the benefit of simply switching valuation methodologies mid-stream, it would be inappropriate to merely adjust the exiting values as the Plaintiffs assert and as the Van Vleet Report's valuation would propose, while not recalibrating the number of vested shares an employee would hold based on the reduced shares contributed to the Plan over the years due to higher share values. Under their own theory, Plaintiffs would have accumulated substantially fewer Plan shares during their tenure with Meditech, thus the higher share values would be applied to a smaller number of shares upon departure.

134. In other words, in order for Plaintiffs' market-based valuations to be fairly applied, they would have to be consistently applied throughout the existence of the Plan. Under varying assumptions for entrance and exit timing, participants could benefit, or be hurt, quite differentially under the Plaintiffs' proposed valuation methodology.

---

[75] Based on Amended Complaint's assertions of proper share values for those dates, paragraphs 70 and 81.

## CHANGE IN CASH POSITION OF THE TRUST FROM 1997 - 2000 USING VAN VLEET'S 1997 STOCK PRICE AND MARKET APPROACH VALUES

135. The Van Fleet Report proposes determining the benefits for those who received distributions from the Trust in 1998 simply by applying the higher share value it determines to the number of shares held by the Trust on December 31, 1997. As a result of this approach, the Van Vleet Report opines that payments to the two plaintiffs should have increased by hundreds of thousands of dollars each. These increased payments to the plaintiffs (and others who received distributions in 1998) necessarily diminish the amount of cash available in the Trust, as relevant both to the overall value of the Trust and the availability of cash to pay distributions to Plan participants in subsequent years.

136. Based on this observation, we were asked to use the Van Vleet methodology to estimate Meditech's share values as of December 31, 1998, 1999 & 2000 and using these share values and the Van Vleet Report's opinion of share value as of December 31, 1997, to calculate the pro forma cash position of the Trust from 1997 through 2000.

137. In performing this analysis, we focused on the Van Vleet Report's GPC (Market) Method.[76] Using this approach, in Exhibit 34-5, we estimated Stock prices of $22.06, $46.92 and $43.36 for December 31, 1998, 1999 and 2000, respectively. The very high values for 1999 and 2000 reflect the influence of the internet-fueled stock market bubble (demonstrating another problem with using public company multiples as suggested by Plaintiffs and Mr. Van Vleet).

138. Under the Plan, each year the Board has the option of making contributions to the Trust in the form of cash and Meditech Stock. Under the terms of the Plan, the Board decides the total dollar amount (if any) that it will contribute into the Trust and then how much of the total amount will be in the form of cash versus Meditech Stock. The number of shares to be contributed to the Plan thus depends upon the dollar value of the overall contribution and the value of the Stock component voted by the Board.

139. We understand Plaintiffs have argued that the number of Meditech shares contributed to the Trust would remain unchanged no matter what share value was used by the Board in making its contribution.[77] We further understand based on the Court's order dated March 20, 2007, that the Court has rejected this view. For sake of argument, assuming that the Board's total contribution amount and the number of shares would remain unchanged no matter the Stock price, the higher Stock prices under the Van Vleet Report's GPC method would necessarily lead to a lower cash portion of the total contribution to the Plan.

---

[76] The DCF method in the Van Vleet Report's income approach had too many subjective variables and judgments for us to replicate each year.
[77] Plaintiffs' Memorandum Supporting Motion for Reconsideration of Denial of Class Certification, p. 10.

140. We calculated the adjusted cash position and total assets of the Trust using Meditech Profit Sharing Trust Financial Reports and the estimated Stock prices for the years 1998-2000 in Exhibits 36-39. For calculating the year end adjusted cash position we recalculated the:
    • interest income to reflect the change in the cash position as of the beginning of the year;
    • distribution to terminees based on the estimated Stock price as of the beginning of the year; and
    • cash portion of the Board's total contribution to the Trust.

141. If the Board and Trustee had set Meditech Stock prices based on the Van Vleet Report's GPC method, as of December 31, 2000 the Trust would have a negative cash balance of $24.4 million as indicated in Exhibit 39. This represents a decline in cash of $42 million between 1997 and 2000. As relevant to plaintiff Hubert who received a distribution from the Trust in 2004, this decrease in cash from 1997-2000 (which would continue in following years based on using Reilly's valuations) would far exceed the $27.3 million increase in the value of the Trust's Meditech Stock holdings as of December 31, 2003, based on the Reilly valuation premium of $7 per share and the 3.9 million shares held by the Trust.[78] In other words, Plaintiffs' assumption that increasing the price of the Stock held by the Trust and holding the number of shares contributed to the Trust constant would necessarily result in the overall value of the Trust going up and hence increased distributions to the Plaintiffs is incorrect.

142. We did not extend our analysis before 1997, but to the extent use of the Van Vleet methodology would indicate higher Stock valuations in those years compared to Defendants' valuations, the effect on the Trusts' cash balances would begin sooner and be even more pronounced. Accordingly, it is not even clear that the Van Vleet valuation for December 31, 1997 would benefit plaintiffs Hinchliffe and Trainor. As with Hubert, any benefit they derive from increased share valuations could potentially be outweighed by decreased Trust cash.

Respectfully Submitted,

_____
Rick S. Nathan, ASA, CFA, MBA

April 7, 2008
Date

_____
Christopher C. Barry, CPA, MBA

April 7, 2008
Date

---

[78] The Profit Sharing Trust Financial Report for the year ended December 31, 2003.

**Rick S. Nathan**
**Managing Director**
**Trenwith Group, LLC**

### PROFESSIONAL EXPERIENCE

#### 2006 to Present, Trenwith Group, LLC

Managing Director, responsible for business and intellectual property valuation, transaction, and dispute advisory services.

#### 2002 to 2006; and 1997-2000, PricewaterhouseCoopers LLP

Director, Tax & Legal Services ; Director, Corporate Value Consulting Services - leading the valuation of business interests, capital stock, intangible assets, and intellectual property in connection with business combination decision support, statutory tax compliance, international transfer pricing, dispute analysis and investigations, asset exploitation, business plan development, capital sourcing, and strategic partnering.

#### 2000-2002, Cambridge Technology Partners, Inc.

Director of Strategic Services & Principal Strategist, leading corporate strategy and financial value advisory services.

#### 1994-1997, KPMG Peat Marwick LLP

Senior Manager of Corporate Transactions Services, leading business and intangible asset appraisal services related to financial reporting, tax compliance, dispute advisory, and corporate planning.

#### 1991-1994, Siemens Medical Systems, Inc.

Associate Director, reporting to CEO of $250MM divisional entity, responsible for product marketing, strategic planning, and corporate development of diagnostic imaging information systems.

**Prior Professional Experience:** IBM Corporation; Hughes Aircraft Company

Research, Development, & Engineering of software based technology systems for both national defense and commercial fields of use.

### EDUCATION & ACCREDITATION

**The University of Chicago Graduate School of Business**
MBA, with Honors, Finance, Behavioral Science, 1993

**The University of Texas at Austin**
MSE, Electrical Engineering, 1982
*Eta Kappa Nu* - National Electrical Engineering Honorarium

**Tulane University**
BSE, Biomedical Engineering, 1980

**American Society of Appraisers**
Accredited Senior Appraiser in Business Valuation, 1998

**The CFA Institute**
Chartered Financial Analyst, 1998

## PUBLICATIONS & PRESENTATIONS WITHIN THE PAST TEN YEARS

1. *Intellectual Property – Issues For Distressed Firms and Bankruptcy Considerations,* Association of Insolvency & Restructuring Advisors - 23rd Annual Bankruptcy and Restructuring Conference, 2007

2. *Obtaining The True Value of Intellectual Property,* The Beard Group, 2007

3. *Obtaining The True Value of Intellectual Property,* Gerson Lehrman Group Institute, 2007

4. *Obtaining The True Value of Intellectual Property,* Intellectual Property Today, 2007

5. *A Triple Play in IP Valuation,* CFO.com, 2006

6. *What's It Worth,* Growing Your Business, 2003

7. *CRM: The New Frontier,* eSolutions World Expo, 2001

8. *More for Your Money: Valuation Techniques for Intellectual Assets,* American Conference Institute, Chicago, 1999

9. *Valuation of Software Inventions: What Are They Worth in Economic Terms,* American Law Institute- American Bar Association, Washington, D.C., 1998

10. *Economics of Technology Exploitation,* Corporate Patent Seminar, Phoenix, AZ, 1998

11. *High Technology M&A: Panel Discussion on Valuation Issues:* High Technology M&A Conference, Austin, TX, 1998

12. Valuation: Key Issues and Considerations, Venture Finance Conference, Minneapolis, 1998

13. What is your Intellectual Property Worth: Methods for Determining Value, American Conference Institute, New York, 1998

## OTHER AUTHORSHIP OR ATTRIBUTION WITHIN THE PAST TEN YEARS

1. Inventor of Record, *United States Patent No. 7,308,417 B1,* Method For Creating and Displaying A Multi-Dimensional Business Model Comparative Static, 2007

## OTHER PUBLICATIONS & PRESENTATIONS

1. *A Strategic Framework for Profit Oriented IP Asset Management,* IBC Seminars, Philadelphia, PA, 1997

2. *Effective IP strategies and tax planning for maximizing revenues,* Managing Intellectual Property, Euromoney Publications PLC, 1997

3. *Your Intellectual Capital: Protecting and Sharing Knowledge,* High Technology CEO Roundtable, Santa Monica, CA, 1997

4. *Maximizing Intellectual Property Value,* Coopers & Lybrand, 1997

5. *The Valuation of Acquired In-Process Research and Development,* Benchmark Quarterly, 1996

6. *Creative Financing through Intellectual Property Leverage,* Growth Capital '96, Austin, TX, 1996

7. *The Valuation and Exploitation of In-Process Research and Development,* Intellectual Property Law Seminar, Lorman Education Services, Denver, CO, 1995

8. *Emerging Company Valuation: Key Issues and Considerations*, Ninth Annual Venture Finance Conference, Minnesota Venture Capital Association and The Collaborative, Minneapolis, MN, 1995

9. *Establishing Value in Biotechnology Companies, Financing Strategies & Establishing Value*, Wisconsin Biotechnology Association, Madison, WI, 1995

10. *Business Combinations & Acquired Software*, Chicago Bar Association Computer Law Committee, Chicago, IL, 1995

11. *A Comparison Between Fourier and Walsh Spectral Estimation of EEG Signals*, Thesis, The University of Texas At Austin, 1982

12. *A Proposed Standard Target for Ultrasound Doppler Gain Calibration*, Ultrasound In Medicine & Biology, 8:3, 1982 (cited as prior art in U.S. Patent No. 4894013)

## TRIAL OR DEPOSITION TESTIMONY WITHIN THE PAST FOUR YEARS

1. *United States Bankruptcy Court*, In Re: Muth Mirror Systems, LLC, et al v. Gentex Corporation, Adversary No. 06-02470-MDM, 2007

2. *American Arbitration Association*, In Re: RGII Technologies, Inc. v. The User's Friend, Inc. et al., 16 117 00181 04., 2004

## OTHER TRIAL, DEPOSITION, OR ADMINISTRATIVE APPEARANCES

1. *State of Illinois, Circuit Court of Cook Count*, In Re: Centioli v. Centioli, Cause No. 98D00807., 2003

2. *United States District Court*, In Re: Concetta Bruno et al v. Smartalk Teleservices, Inc. et al., MDL Docket No. 00-1315., 2002

3. *United States District Court*, In Re: Micro Data Base Systems, Inc. v. Nellcor Puritan Bennett, Inc. and Puritan-Bennet Corp., Cause No.: 4:97 CV-004 AS., 1999

4. Office of the Chief Accountant, United States Securities and Exchange Commission, In Re: Physician Computer Network, Inc., 1995

## OTHER EXPERT SERVICES (in process or settled prior to deposition and/or trial)

1. *United States District Court For The District of Massachusetts*, In Re: Michael P. Hubert, et al v. Medical Information Technology, Inc., et al, Civil Action No. 05-10269-RWZ,2008

2. *Circuit Court, Fourth Judicial District, State of Idaho*, In Re: Holmes Lundt, et al, vs. Mobility Electronics, Inc. et al, Case No. CV OC -0302562D, 2005

3. *Circuit Court, Milwaukee County, State of Wisconsin*, In Re: Linda C. Wright v. Charles F. Wright, Case No. 04-FA-003184, 2005

4. *Superior Court, Suffolk County, Commonwealth of Massachusetts*, In Re: Dr. Jerome H. Grossman v. Medical Information Technology, Inc., et al, Civil Action No. 03-1872-B.L.S., 2005

5. *Circuit Court, Montgomery County, Maryland*, In Re: RGII Technologies, Inc. vs. The User's Friend, Inc. et al., Civil No. 254913V., 2005

6. *United States Tax Court,* In Re: Van Der Aa Investments, Inc., et al, v. Commissioner of Internal Revenue, Docket No. 21342-03., 2005

## REPRESENTATIVE IP STRATEGY SERVICES

1. Directed an assessment of IP rights value and exploitation alternatives for broad based biotechnologies related to lipid science.

2. Developed novel valuation methodologies in use by several Fortune 1000 enterprises concerning the pricing of intercompany trademark use.

3. Conducted an international IP rights identification, categorization, management, and valuation services project for a Fortune 50 provider of technology solutions to the energy industry.

4. Retained by a thinly capitalized firm with to exploit proprietary technology dealing with the neutralization of chemical and biological waste.

5. Reviewed specific patents and software technology know how for a multi-national manufacturer of products used within broadcast media markets in order to improve IP portfolio exploitation and cost control.

6. Retained by a Fortune 1000 technology skunk-works organization to assess proprietary technology dealing with short peripheral catheterization.

7. Retained by a global leader in data communications and telephony to determine value of foreign spectrum use rights in support of initial company capitalization within certain former Soviet republics.

8. Retained by a U.S. manufacturer of diagnostic medical imaging systems to identify and value certain proprietary software to be sold off-shore.

9. Directed a long-range enterprise information technology strategy for an international systems engineering and integration firm serving both classified national security and commercial markets.

10. On behalf of an international chemical distribution company, developed a comprehensive IT and economic viability analysis related to forming a digital marketplace of allied chemical industry producers and customers.

11. On behalf of an international consortium's interest in digital media related patents, software, and related know how, directed analysis and recommendations related to alternative global economic rights sharing and remuneration schemas.

12. Developed an intellectual property rights strategy for expanding a telecommunication firm's proprietary software and communication solutions to eradicate consumer fraud within the emerging consumer Internet e-commerce market.

13. For a major national defense contractor that had developed substantial computer software technology and domain knowledge pertaining to asset management, reviewed new commercial exploitation opportunities within derivative commercial fields of use.

14. Directed yearly inter-company software pricing studies on behalf of an international software and data services provider in compliance with both U.S. and International tax law.

15. Directed the valuation of specific software systems encompassing mainframe, distributed workstation, and wide area network applications, in support of a structured financing solution for an international airline and global travel reservation systems operative.

16. Led the identification, valuation, and resulting licensing recommendations of software technology utilized by an international manufacturer of data collection information systems.

17. Retained by a commercial bank to value specific healthcare animation software and information media rights to be securitized into a corporate credit instrument.



# Christopher C. Barry, CPA, MBA

## Professional History

- PricewaterhouseCoopers: Financial Advisory Services, 1984 to present
  - ➢ San Francisco 1984 - 1987
  - ➢ Boston 1987 - present
- Other Big-4 Accounting: Accounting and Auditing Services, 1979 to 1982
- CPA since 1982

## Experience

Several years' experience in auditing financial statements for a wide variety of companies, including some in manufacturing, franchising, retailing, banking, publishing and agribusiness. Handled accounting issues concerning financial statement reporting, including classification, recognition and disclosure.

Consulting experience in financial matters, with an emphasis on business valuation, accounting investigations and various litigation support matters. Assisted management in the areas of quantifying damages/claims related to litigation, evaluating appropriateness of financial and cost accounting procedures, financial modeling and other analytical procedures.

Substantial damage quantification experience, including cases involving intellectual property, antitrust, breach of contract, forensic accounting investigation, dealer termination, valuation of closely-held businesses, securities fraud, wrongful death/personal injury, post-closing disputes and accountant's liability. Testimony in both Federal and State courts, as well as in arbitrations.

## Education and Affiliations

- B.A., Accounting, Franklin & Marshall College, cum laude, 1979
- M.B.A., University of California at Berkeley, 1984
- Certified Public Accountant (CPA) (licensed in Massachusetts and California)
- Member, American Institute of CPAs
- Member, Massachusetts Society of CPAs
- Member, Licensing Executive Society

- Faculty Member, Massachusetts Continuing Legal Education
- Presenter to the Boston Bar Association and New Hampshire Bar Association
- Instructor to the U.S. Attorney General's Advocacy Institute
- Director – Discovering Justice (St. Clair Court Education Project)

## Publications

- Thirteen Glossary Articles on Business Topics, Encyclopedia of Business, Gale Research, Fall 1995
- *Punitive Damage Awards Against Corporations: An Overview, A Strategy,* PW Review, Spring 1995
- *Forensic Accountants Dig Up Buried Financial Misdeeds,* Boston Business Journal, February 7-13, 1997.

Christopher C. Barry
PricewaterhouseCoopers, LLP
125 High Street
Boston, MA 02110
617.530.6304
christopher.c.barry@us.pwc.com

Exhibit 3

## Testimony of Christopher C. Barry - Last Four Years

1.  Scanner Technologies v. ICOS Vision System
    U.S. District Court, S.D.N.Y.
    Case No.: 00-CIV-4992 (Chin)

2.  Fiberlock Technologies, Inc. v. Coating Removal Technology Limited, et al.
    Massachusetts Superior Court, Suffolk
    Case No.: 99-2933

3.  Chris E. Maling v. Maui Jim, Inc.
    US District Court, Massachusetts
    Case No.: 00-12593-PBS

4.  Colleen Howes v. Brian Wiegand
    Wisconsin Circuit Court, Dane County
    Case No.: 98-FA-1131

5.  Williamsville v. Stainsafe
    US District Court, Massachusetts
    Case No.: 01-10936DPW

6.  Fonten Corp., et al. v. Ocean Spray Cranberries, Inc.
    US District Court, Massachusetts
    Case No.: 03-CV-10293WGY

7.  Condon v. Astoria Financial Corp.
    American Arbitration Association, Boston
    Case No. 11 Y 168 00420 04

8.  Lomon v. Laage, et. Al.
    Massachusetts Superior Court, Middlesex
    Case No.: 00-03771

9.  DEKA Products v. Cytyc Corp.
    AAA, Boston
    Case No.: 11-Y-133-02624-03

12. Plasma Physics Corp. v. Analog Devices
    U.S. District Court, EDNY
    Case No.: 02-3484 (LDW/WDW)

13. Akeva LLC v. adidas America, Inc.
    U.S. District Court, Middle District, N. Carolina
    Case No.: 1:03-CV-01207

14. Black Diamond Sportswear Inc. v. Black Diamond, Ltd.
    U.S. District Court, Vermont
    Case No.: 1:03-CV-278

1

Exhibit 3

## Testimony of Christopher C. Barry - Last Four Years

15.   Municipal District Commission v. Connecticut Resources Recovery Authority
      Arbitration, Hartford
      Case No.:  29-111-04

16.   Andersen Corp. v. Fiber Composites, LLC
      USDC, Minnesota
      Case No.: 00-CN-2548

17.   Harvest Technologies Corp. v. Cytomedix, Inc.
      USDC, Massachusetts
      Case No.:  CV 02-12077 PBS

18.   CimCore/Romer/Hexagon v. FARO Technologies, Inc.
      USDC, Southern California
      Case No.:  03-CV-2355 B (WMC)

19.   Barron v. Barron
      Arizona Superior Court, Yavapei County
      Case No.:  D08 2002-0144

20.   Repligen/MIT v. ImClone
      USDC, Massachusetts
      Case No.:  04-10884-RGS

21.   Sensitech Inc. v. TNT Co.
      USDC, Central California
      Case No.:  CV05-4674R

22.   Analog Devices, Inc. v. Linear Technology Corp.
      USDC, Massachusetts
      Case No.:  00CV10841-EFH

23.   C.E.A. v. Chi Mei Optoelectronics Corp., et al.
      USDC, Delaware
      Case No.:  03-484 (KAJ)

24.   Hypertherm Inc. v. American Torch Tip Company
      USDC, New Hampshire
      Case No.:  1:05-CV-373-JD

Exhibit 4

## Documents Relied Upon

- The Van Vleet Report dated February 19, 2008;
- A report on the valuation of the Medical Information Technology, Inc. Common Stock as of December 31, 2001, 2002, 2003, 2004 and June 2, 2005, by Robert F. Reilly, dated June 15, 2005;
- Excerpts from Roland Driscoll's Deposition dated October 17, 2007;
- Excerpts from Howard Messing's Deposition dated November 13, 2007;
- Excerpts from A. Neil Pappalardo's Deposition dated November 27, 2007;
- Excerpts from Edwards B. Roberts Deposition dated November 8, 2007;
- Dividends Paid to Plaintiffs (1871788-1);
- Plaintiffs' Holding in the Trust 1977-2003;
- Michael Hubert's Statement of Stock Ownership dated August 8, 2003 (Bates MH 0234);
- William G. Trainor's Statement of Stock Ownership dated June 28, 2006;
- David Hinchliffe's Statement of Stock Ownership dated June 28, 2006;
- Letter dated June 20, 1996 from GreyLock Investments Limited Partnership to Neil Pappalardo with regard to selling of Grey Lock's shares of Meditech Stock (Bates DEF007104-8);
- "The Health Care Industry: Changing Environment Creates New Opportunities," George K. Baum & Company, Cerner Corporation : Equity Research Report, October 29, 1997;
- "Industry Background," Hanifen Imhoff Inc. Investment Bankers, Healthcare Information Technology: Investment Opinion-Cerner Corporation, October 16, 1997;
- "Buyers and Sellers - Healthcare Information and Management Systems Society 1997 Conference - Industry Trend or Event," Mark Hagland, 1997;
- Kathryn F. Aschwald, "Restricted Stock Discounts Decline as a Result of a 1-Year Holding Period" - *Shannon Pratt's Business Valuation*, vol. 6, no. 5 (May 2000): p 1-5;
- Pratt, Shannon P., et al, Valuing A Business, 5th & 4th Editions;
- Francis A. Longstaff, "How Much Can Marketability Affect Security Prices," The Journal of Finance, Volume 50, Issue 5, 1995;
- "Estimating the cost of equity for a private company" by Professor Aswath Damodaran at http://pages.stern.nyu.edu/~adamodar/New_Home_Page/valquestions/totalbeta.htm 3/18/200;
- "Quantifying Company Specific Risk: A New, Empirical Framework With Practical Applications," Peter J. Butler, et al, Business Valuation Update, Vol 13., No. 2, February 2007;
- Business Valuation Discounts and Premiums, Shannon P. Pratt, 2001, John Wiley & Sons, Inc;
- "Estimating Industry Multiples" Malcolm Baker, et al, Harvard University, 1999;
- Identification and quantification of company specific risk, by Robert Reilly - AICPA National Business Valuation Conference, December 3-5, 2006;
- Mergerstat Review Database;
- Mergerstat/BVR Control Premium Study (www.bvmarketdata.com);
- Ibbotson Associates Stock, Bonds, Bills & Inflation 1998 Yearbook;
- FactSet Database;
- Capital IQ Database;
- www.NASDAQ.com;
- Bloomberg Database;
- www.Factiva.com;
- http://www.federalreserve.gov;
- http://www.emorybizval.com/valuation-studies.shtml;
- http://www.meditech.com/;
- http://www.cerner.com;
- www.aspentech.com;

**Exhibit 4**

- www.advent.com;
- www.edgaronline.com;
- Meditech's 10Ks 1996-2001;
- Advent Software, Inc 's. 10-Ks 1997-2001;
- Aspen Technology, Inc.'s 10-Ks & 10-Qs 1996-2001;
- Cerner Corp.'s 10-Ks 1996-2001;
- Shared Medical Systems' 10-Ks 1995-1999;
- QuadraMed's 10-Ks 1996-2001;
- Creative Computer Applications, Inc.'s 10-Ks & 10-Qs 1997-2001;
- Plaintiffs' Memorandum Supporting Motion for Reconsideration of Denial of Class Certification;
- The Profit Sharing Trust Financial Report for the year ended December 31, 1996-2003;
- Report to Board of Directors; Quarter Ended Dec 31, 1995, 1996 & 1997;
- Report to the Board of Directors; Quarter Ended Sept 1995,1996, 1997, 1998 & 1999;
- Amended Class Action Complaint and Demand for Jury Trial dated May 23, 2005;
- Memorandum in Support of Plaintiff's Motion for Class Certification.

**Exhibit 5**

## Hubert, Trainor & Hinchliffe v Medical Information Technology
## Discount For Lack of Control Summary
### As of December 31, 1997

| | Mergerstat® Review [1] | | | | | | Mergerstat/BVR Control Premium Study [3] | | | Conclusion |
|---|---|---|---|---|---|---|---|---|---|---|
| | Overall | | | Computer Software, Supplies & Services | | | Select Transactions - SIC: 7371, 7372, 7373 | | | |
| | No. of Transactions | Average | Median | No. of Transactions | Average [2] | | No. of Transactions | Average | Median | |
| 1991 | 137 | 26.0% | 22.7% | 7 | 30.8% | | | | | |
| 1992 | 142 | 29.1% | 25.8% | 3 | 37.8% | | | | | |
| 1993 | 173 | 27.9% | 24.8% | 4 | 30.3% | | | | | |
| 1994 | 260 | 29.5% | 25.9% | 12 | 37.1% | | | | | |
| 1995 | 324 | 30.9% | 22.6% | 19 | 30.2% | | | | | |
| 1996 | 381 | 26.8% | 21.4% | 22 | 28.1% | | | | | |
| 1997 | 487 | 26.3% | 21.6% | 39 | 27.1% | | | | | |
| 1998 | | | | | | | 43 | 28.7% | 25.6% | |
| Average | | 28.1% | 23.5% | | 31.6% | | | 28.7% | 25.6% | |
| Median | | 27.9% | 22.7% | | 30.3% | | | 28.7% | 25.6% | 25.0% |

**Notes:**
[1] Mergerstat Review 1996, 1997, and 1998.
[2] Median statistic not reported.
[3] Mergerstat/BVR Control Premium Study (www.bvmarketdata.com). Database did not compile transaction data prior to 1998.

Exhibit 6

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Total Beta Analysis**

| Guideline Companies | $R_f$ [1] | $R_m$-$R_f$ [2] | Rs (Size Premium) [3] | LTM Net Sales (000) [4] | Effective Tax Rate [4] | $\beta_L$ [8] | Book Value of Debt (000) [4] | Market Value of Equity (000) [4] [13] | $\beta_U$ [14] | $\rho$ [16] | $\beta_T$ [18] | $K_e$ (Total Cost of Equity) [19] | ACAPM [20] | Industry/Company Specific Risk) [22] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Creative Computer | 6.02% | 6.00% | 3.3% | $7,200 [5] | 34% [6] | 0.54 | $173 [11] | $5,014 | 0.52 | 12% | | | 12.5% | |
| Qualramed | 6.02% | 6.00% | 1.7% | $140,800 [23] | 34% [6] | 0.51 [9] | $24,246 [24] | $461,230 [24] | 0.49 | 22% | | | 10.7% | |
| Cerner Corp. | 6.02% | 6.00% | 1.7% | $245,057 | 38% | 0.85 | $30,061 | $689,165 | 0.82 | 20% | | | 12.8% | |
| Shared Medical Systems | 6.02% | 6.00% | 0.9% | $896,235 | 38% | 0.88 | $66,691 | $1,655,696 | 0.86 | 31% | | | 12.2% | |
| **Meditech** | 6.02% | 6.00% | 1.7% | | 41% [7] | 0.65 [10] | 5.0% [12] | 95.0% | 0.63 [15] | 31% [17] | 2.09 | 18.5% | 15.1% [21] | 3.00% |

**Notes:**

[1] 20-year treasury yield as of 12/31/97 per http://www.federalreserve.gov

[2] Consensus

[3] Ibbotson Associates SBBI 1998 Yearbook

[4] Respective Companies' Fiscal year ending 1997 10-K, unless otherwise noted.

[5] From the 12 months ended November 1997. Information per FactSet.

[6] Used a statutory rate of 34% as the effective rate for this company is 0% or negative

[7] Company's effective tax rate per the 1997 Fiscal year ending 10-K

[8] Levered beta determined from statistical regression of guideline company stock returns against S&P 500 index using daily observations between 1/1/93 and 12/31/1997

[9] Levered beta determined from statistical regression of guideline company stock returns against S&P 500 index using daily observations between 10/11/96 and 12/31/1997

[10] $\beta_L = \beta_U * (1+(1-t)*(w_d/w_e))$

[11] November 1997 10-Q.

[12] Expected capital structure going forward

[13] Share Price per Factiva, SMS prices per Capital IQ

[14] $\beta_U = \beta_L/(1+(1-t)*(w_d/w_e))$

[15] Harmonic Mean of Guideline Company $\beta_U$

[16] Correlation Coefficient of Returns with S&P Market Index

[17] Selected Based on Highest Correlation With Market

[18] $\beta_T = \beta_U/\rho$

[19] $K_e = R_f + \beta_T*(R_m-R_f)$

[20] $ACAPM = R_f + \beta_L*(R_m-R_f) + R_s$

[21] Based on Size-Risk Premium Study

[22] $K_f$ - ACAPM; Rounded down to the nearest whole number

[23] Respective Company's 1999 10-K.

[24] Respective Company's 1998 10-K.

Exhibit 7

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Restricted Stock Studies Summary**
**Discount for Lack of Marketability**
**As of December 31, 1997**

| | | Years Covered | Average Discount [3] | | | Conclusion |
|---|---|---|---|---|---|---|
| | | | Pre-1983 | Span 1983 | Post-1983 | |
| 1 | SEC Institutional Investor Study | 1966 - 1969 | 25.8% | | | |
| 2 | SEC Non Reporting OTC Companies | 1966 - 1969 | 32.6% | | | |
| 3 | Gelman Study | 1968 - 1970 | 33.0% | | | |
| 4 | Trout Study | 1968 - 1972 | 33.5% | | | |
| 5 | Moroney Study | [1] | 35.6% | | | |
| 6 | Maher Study | 1969 - 1973 | 35.4% | | | |
| 7 | Standard Research Consultants | 1978 - 1982 | 45.0% [2] | | | |
| 8 | Willamette Management Associates | 1981 - 1984 | | 31.2% [2] | | |
| 9 | Silber Study | 1981 - 1988 | | 33.8% | | |
| 10 | FMV Opinions Study | 1979 - 1992 | | 23.0% | | |
| 11 | Management Planning Study | 1980 - 1996 | | 27.1% | | |
| 12 | Johnson Study | 1991 - 1995 | | | 20.0% | |
| 13 | Columbia Financial Advisors | 1996 - 1997 | | | 21.0% | |
| | **Average** | | 34.4% | 28.8% | 20.5% | |
| | **Median** | | 33.5% | 29.2% | 20.5% | 33.0% [4] |

**Notes:**
[1] Although the years covered in this study are likely to be 1969-1972, no specific years were given in the published account.
[2] Study reports median not average discounts.
[3] Pratt, Shannon P., et al, Valuing A Business, 5th Edition, page 431.
[4] Overall median for studies prior to 1983.

Exhibit 8

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Discount for Lack of Marketability**
**Option Pricing Model**
**As of December 31, 1997**

| Illiquidity Period (Yrs.) | RF [1] | GPC σ [2] | DLOM [3] | | Cumulative Median DLOM — Minimum Illiquidity (Yrs.) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 1 | 5.5% | 58% | 20% | 1 | 20% | | | | | | | | | |
| 2 | 5.7% | 56% | 26% | 2 | 23% | 26% | | | | | | | | |
| 3 | 5.7% | 51% | 24% | 3 | 24% | 25% | 24% | | | | | | | |
| 4 | 5.7% | 54% | 27% | 4 | 25% | 26% | 26% | 27% | | | | | | |
| 5 | 5.7% | 52% | 27% | 5 | 26% | 27% | 27% | 27% | 27% | | | | | |
| 6 | 5.7% | 60% | 32% | 6 | 27% | 27% | 27% | 27% | 30% | 32% | | | | |
| 7 | 5.7% | 60% | 33% | 7 | 27% | 27% | 30% | 30% | 32% | 33% | 33% | | | |
| 8 | 5.8% | 76% | 41% | 8 | 27% | 27% | 32% | 32% | 33% | 33% | 37% | 41% | | |
| 9 | 5.8% | 75% | 40% | 9 | 27% | 30% | 32% | 33% | 33% | 37% | 40% | 41% | 40% | |
| 10 | 5.8% | 83% | 42% | 10 | 30% | 32% | 33% | 33% | 37% | 40% | 41% | 41% | 41% | 42% |
| **Median** | 6% | 59% | 30% | | 26% | 27% | 27% | 30% | 32% | 33% | 39% | 41% | 41% | 42% |

Median Min DLOM — 32%

**Notes:**
[1] Risk free rates correspond to constant maturity U.S. Treasury Rates, with interpolation.
[2] Volatility calculated from guideline public company stock data.
[3] DLOM calculated as value of Put option.

Exhibit 9

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Market Approach: Guideline Public Company Method**
**Guideline Public Company Multiple Adjustment**

| | Cerner ('000) | Shared Medical Systems Corp. ('000) | Creative Computer ('000) | Quadramed ('000) | Overall [4] Harmonic Mean | Mean | Median |
|---|---|---|---|---|---|---|---|
| BEV [2] | $711,685 | $1,693,223 | $4,893 [5] | $440,810 [6] | | | |
| EBITDA-LTM [2] | $45,032 | $139,550 | $818 [1] | $2,386 [7] | | | |
| BEV / EBITDA Multiple - LTM | 15.80 | 12.13 | 5.98 | 184.75 | | | |
| Size, Risk, Growth Adjustment [3] | 89.2% | 81.4% | 66.2% | 2.5% | | | |
| Adjusted EBITDA Multiple | 14.1 | 9.9 | 4.0 | 4.5 | 7.1 | 9.3 | 9.9 |

**Notes:**
[1] Per Fiscal Year Ending August 31, 1997 10-K.
[2] Respective Company's 1997 fiscal year ending 10-K, unless otherwise noted. BEV is calculated using book value of debt and subtracting cash. Share prices from Factiva and Capital IQ.
[3] Equal to the ratio of net present values of Meditech to each guideline pubic company using historical growth rates and cost of capital for each company.
[4] Excludes Quadramed.
[5] Per November 30, 1997 10-Q.
[6] BEV as of December 31, 1997 per the respective Companies 1998 fiscal year ending 10-K.
[7] EBITDA as of December 31, 1997 per the respective Company's 1999 fiscal year ending 10-K.

Exhibit 10

**IRR - December 31, 1973 to December 31, 2007 - Life of the Plan**



Source: Factiva, Bloomberg and Meditech Information
[1] Assumed NASDAQ Index dividend to be 0.74% based on dividend yield for 2007
[2] S+P 500/DJIA including gross dividends reinvested

Exhibit 11

IRR - December 31, 1982 to December 31, 2003 - Hubert's Plan Participation Period



Source: Factiva, Bloomberg and Meditech Information
[1] Assumed NASDAQ Index dividend to be 0.74% based on dividend yield for 2007
[2] S+P 500/DJIA including gross dividends reinvested

Exhibit 12

IRR - December 31, 1976 to December 31, 1997 - Trainor & Hinchliffe's Plan Participation Period



Source: Factiva, Bloomberg and Meditech Information
[1] Assumed NASDAQ Index dividend to be 0.74% based on dividend yield for 2007
[2] S+P 500/DJIA including gross dividends reinvested

# EXHIBIT 11 – PART 3

Exhibit 13

**Hubert Personal Meditech Holdings & Cummulative Dividend**
**15-Feb-1985 to 31-Dec-2007**
**U.S. Dollars**



Source:  Statement of Stock Ownership

Confidential

Exhibit 14

Trainor Personal Meditech Holdings & Cummulative Dividend
19-Aug-1980 to 11-May-1998
U.S. Dollars



Source:  Statement of Stock Ownership

Confidential

Exhibit 15

**Hinchliffe Personal Meditech Holdings & Cummulative Dividend**
**5-Feb-1981 to 6-Mar-1998**
**U.S. Dollars**



Source:  Statement of Stock Ownership

Confidential

Exhibit 16

Plaintiffs' Personal Return (IRR) on Meditech Shares v. Alternate Investment



Source: Plaintiff's Statement of Stock Ownership, Dividends Paid (1871788-1), Prices/Factiva and Meditech Information.
[1] Meditech dividends paid quarterly at the respective quarter end.
[2] Assumed that Mr. Hubert had sold all his remaining shares on 12/31/2007.

Confidential



**Meditech and Indexes**
**Jan-1974 to March-2008 (Weekly-Friday)**
**Normalized Prices & Dividends U.S. Dollars**



Source: Factiva, Bloomberg and Meditech Information.
Assumed NASDAQ dividends to be 0.74% based on dividend yield for 2007.
Assumed that dividends were paid quarterly





Summary - Meditech and Indexes
Jan-1995 to Jan-2008 (Weekly -Friday)
Normalized Prices & Dividends U.S. Dollars

Source: Factiva, Bloomberg and Meditech Information.
Assumed NASDAQ dividends to be 0.74% based on dividend yield for 2007.
Assumed that dividends were paid quarterly



Exhibit 19



Summary - Meditech and Indexes
1-Oct-2007 to 31-Mar-2008 (Daily)
Normalized Prices & Dividends U.S. Dollars

Source: Factiva, Bloomberg and Meditech Information.
Assumed NASDAQ dividends to be 0.74% based on dividend yield for 2007.
Assumed S&P that Q1 2008 dividends were same as 2007 quarterly dividends
Assumed that dividends were paid quarterly

Exhibit 20

**Meditech and Van Vleet Guideline Public Companies**
**Jan-1995 to Jan-2008 (Weekly-Friday)**
**Normalized Prices & Dividend U.S. Dollars**



Source: Prices/Factiva,Bloomberg, Meditech Information and CapitalIQ

**Exhibit 21**

**Meditech and Cerner Corp.**
**Jan-1995 to Jan-2008 (Weekly-Friday)**
**Normalized Prices & Dividend U.S. Dollars**



Source:  Prices/Factiva and Meditech Information

Exhibit 22

**Meditech and Aspen Technology**
**Jan-1995 to Jan-2008 (Weekly-Friday)**
**Normalized Price & Dividend U.S. Dollars**



Source: Prices/Factiva and Meditech Information

Exhibit 23

**Meditech and Advent Software**
**Jan-1995 to Jan-2008 (Weekly-Friday)**
**Normalized Prices & Dividend U.S. Dollars**



Source: Prices/Factiva and Meditech Information

Exhibit 24

Case 1:05-cv-10269-RWZ     Document 140-15     Filed 04/22/2008     Page 13 of 33

Meditech and Shared Medical Systems
Jan-1995 to Jan-2008 (Weekly-Friday)
Normalized Prices & Dividend U.S. Dollars

Source: Meditech Information, Bloomberg and CapitalIQ

Exhibit 25

Meditech and Van Vleet Guideline Public Companies
Jan-1995 to Jan-1999 (Weekly-Friday)
Normalized Prices & Dividend U.S. Dollars



Source: Prices/Factiva, Meditech Information and CapitalIQ

Exhibit 26

Meditech and Cerner Corp.
Jan-1995 to Jan-1999 (Weekly-Friday)
Normalized Prices & Dividend U.S. Dollars



Source: Prices/Factiva and Meditech Information

Exhibit 27

Meditech and Van Vleet Guideline Public Companies
Jan-2002 to Jan-2005 (Weekly-Friday)
Normalized Prices & Dividend U.S. Dollars



Source: Prices/Factiva and Meditech Information

Exhibit 28

**Meditech and Cerner Corp.**
**Jan-2002 to Jan-2005 (Weekly-Friday)**
**Normalized Prices & Dividend U.S. Dollars**



Source: Prices/Factiva and Meditech Information

Exhibit 29

Meditech and Cerner Corp.
1-Oct-2007 to 31-Mar-2008 (Daily)
Normalized Prices & Dividend U.S. Dollars



Source: Prices/Factiva and Meditech Information

Exhibit 30

Meditech and Cerner Corp.
Jan-1995 to Jan-2008 (Weekly-Friday)
Normalized Prices U.S. Dollars



Source: Prices/Factiva and Meditech Information

Exhibit 31



**Meditech and Cerner Corp.**
**Jan-1995 to Jan-1999 (Weekly-Friday)**
**Normalized Prices U.S. Dollars**

Source: Prices/Factiva and Meditech Information

Exhibit 32

**Meditech and Cerner Corp.**
**Jan-2002 to Jan-2005 (Weekly-Friday)**
**Normalized Prices U.S. Dollars**



Source: Prices/Factiva and Meditech Information

Exhibit 33

**Meditech and Cerner Corp.**
**Mar-2006 to Mar-2008 (Weekly-Friday)**
**Normalized Prices U.S. Dollars**



Source: Prices/Factiva and Meditech Information

Exhibit 34

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Market Approach: Adjustment Factor Analysis using Van Vleet's Methodology**
**1998-2000**

Subject Company's Estimated MVE $1,000,000 [1]
Subject Company's Long Term Growth 13.20%

### 1998

| Adjustment Factor Analysis | MVE ($000) | Est. LTG [1] | Relative Size | Relative Growth [1] | Average Adjusted Ratio [2] | Ind. Avg. Equity/MVIC | Adjustment Factor [3] |
|---|---|---|---|---|---|---|---|
| Advent Software, Inc | 386,890 | 30% | 2.58 | 0.9 | 0.79 | 100% | 0.79 |
| Aspen Technology Inc | 358,434 | 30% | 2.79 | 0.9 | 0.79 | 100% | 0.79 |
| Cerner Corp. | 895,393 | 30% | 1.12 | 0.9 | 0.74 | 100% | 0.74 |
| Shared Medical Systems Corp | 1,327,094 | 20% | 0.75 | 0.9 | 0.72 | 100% | 0.72 |

### 1999

| Adjustment Factor Analysis | MVE ($000) | Est. LTG [1] | Relative Size | Relative Growth [1] | Average Adjusted Ratio [2] | Ind. Avg. Equity/MVIC | Adjustment Factor [3] |
|---|---|---|---|---|---|---|---|
| Advent Software, Inc | 942,435 | 30% | 1.06 | 0.9 | 0.74 | 100% | 0.74 |
| Aspen Technology Inc | 669,449 | 30% | 1.49 | 0.9 | 0.76 | 100% | 0.76 |
| Cerner Corp. | 664,167 | 30% | 1.51 | 0.9 | 0.76 | 100% | 0.76 |
| Shared Medical Systems Corp | 1,370,861 | 20% | 0.73 | 0.9 | 0.71 | 100% | 0.71 |

### 2000

| Adjustment Factor Analysis | MVE ($000) | Est. LTG [1] | Relative Size | Relative Growth [1] | Average Adjusted Ratio [2] | Ind. Avg. Equity/MVIC [1] | Adjustment Factor [3] |
|---|---|---|---|---|---|---|---|
| Advent Software, Inc | 1,221,749 | 30% | 0.82 | 0.9 | 0.72 | 100% | 0.72 |
| Aspen Technology Inc | 990,503 | 30% | 1.01 | 0.9 | 0.73 | 100% | 0.73 |
| Cerner Corp. | 1,607,927 | 30% | 0.62 | 0.9 | 0.70 | 100% | 0.70 |

Notes:
[1] Based off the Van Vleet Report assumptions
[2] Relative Size^.08 x (Relative Growth^2.959 (Van Vleet's assumption
[3] (Average Adjusted Ratio/MVE * Average Adjusted Ratio)+(1-Industry Average Equity/MVIC)

Exhibit 35

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Fair Value of Meditech Stock for 1998 - 2000 Using The Van Vleet Report's Guideline Public Company Methodology**

| Guideline Public Company | 1998 MVIC/EBITDA Unadjusted | Adjustment Factor [5] | MVIC/EBITDA Adjusted |
|---|---|---|---|
| Advent Software, Inc | 21.1 | 0.79 | 16.7 |
| Aspen Technology Inc | 11.4 | 0.79 | 9.1 |
| Cerner Corp. | 14.0 | 0.74 | 10.3 |
| Shared Medical Systems Corp | 8.9 | 0.72 | 6.4 |
| Selected Multiple | | | 9.7 |

| Guideline Public Company | 1999 MVIC/EBITDA Unadjusted | Adjustment Factor [5] | MVIC/EBITDA Adjusted |
|---|---|---|---|
| Advent Software, Inc | 30.4 | 0.74 | 22.4 |
| Aspen Technology Inc | 64.7 | 0.76 | 48.9 |
| Cerner Corp. | 20.6 | 0.76 | 15.6 |
| Shared Medical Systems Corp | 8.6 | 0.71 | 6.2 |
| Selected Multiple | | | 19.0 |

| Guideline Public Company [3] | 2000 MVIC/EBITDA Unadjusted | Adjustment Factor [5] | MVIC/EBITDA Adjusted |
|---|---|---|---|
| Advent Software, Inc | 27.1 | 0.72 | 19.5 |
| Aspen Technology Inc | 29.7 | 0.73 | 21.7 |
| Cerner Corp. | 21.7 | 0.70 | 15.3 |
| Selected Multiple | | | 19.5 |

**Fair Market Value of Meditech Stock**

| | 1998 | 1999 | 2000 |
|---|---|---|---|
| Meditech Last Twelve Months EBITDA [4] | $100,277 | $108,534 | $98,643 |
| Times: Indicated EBITDA Multiple | 9.7 | 19.0 | 19.5 |
| Indicated Business Value | 971,838 | 2,058,979 | 1,922,597 |
| Less: Book Value of Interest-Bearing Debt [4] | 15,000 | 0 | 0 |
| Fair Market Value of Equity | 956,838 | 2,058,979 | 1,922,597 |
| Less: 25% Discount for Lack of Marketability [1] | 239,209 | 514,745 | 480,649 |
| Fair Market Value of Equity (Non-marketable basis) | $717,628 | $1,544,235 | $1,441,948 |
| Meditech Shares Outstanding [2] | 32,531 | 32,915 | 33,255 |
| Fair Maket Value of Meditech Stock | $22.06 | $46.92 | $43.36 |

Notes:
[1] Per the Van Vleet Report
[2] Shares adjusted for stock splits
[3] Shared Medical Systems data unavailable
[4] Per Meditech's 1998-2000 10Ks
[5] Per Exhibit 34

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Adjusted Cash Position of Meditech Profit Sharing Trust**
**As of December 31, 1997**

| Trust Assets on December 31, 1997 | | | | |
|---|---|---|---|---|
| Cash in Checking and Savings Account | | | | $82,104 [1] |
| US Treasury Notes | | | | 23,894,716 [3] |
| Accrued Interest Receivable | | | | 326,221 [1] |
| Shares Meditech Stock | 2,938,020 [7] | | $21.6 | 63,519,992 [4] |
| Member Loans Receivable | | | | 1,347,950 [1] |
| Total Assets | | | | $89,170,983 |

| Shares Reconciliation for 1997 | | | |
|---|---|---|---|
| **Description** | **No.of shares [7]** | **SP** | **$** |
| Beginning Shares | 2,817,490 | $12.0 | $33,809,880 |
| Additional Shares Contributed in 97 | 80,000 [5] | $21.6 | 1,729,600 |
| Additional Shares Purchased from employees | 40,530 | $12.2 | 493,700 [6] [7] |
| Revaluation of Meditech Stock - Opening shares | | | 27,104,254 |
| Revaluation of Meditech Stock - Purchased from employees | | | 382,559 |
| Ending Shares | 2,938,020 | | $63,519,992 |

| Cash Reconciliation for 1997 | |
|---|---|
| **Description** | **$** |
| Beginning balance of cash | $21,212,814 |
| Change in working capital | (129,472) |
| Interest income | 1,438,615 |
| Dividend income | 2,389,447 |
| Distribution to terminees | (2,111,284) |
| Company contribution of cash | 1,670,400 |
| Additional stock purchased from employees | (493,700) |
| Closing balance of cash | $23,976,820 |

| Adjusted Stock & Cash Contribution in 1997 | |
|---|---|
| Number of Shares Contributed | 80,000 [2] |
| Van Vleets 12/31/97 Share Price | $21.6 |
| Dollar value of Stock Contributed | $1,729,600 |
| Total Contribution | $3,400,000 [1] |
| Cash Contribution | $1,670,400 |
| Original Cash Contribution | $2,320,000 [1] |
| Difference in Cash Contribution | $649,600 |

**Notes:**

[1] Per the Meditech Profit Sharing Trust Financial Report for 1997.

[2] Includes both revaluation of Meditech Stock-Opening shares and Purchased from employees.

[3] US T-Notes per the Meditech Profit Sharing Trust Financial Report for 1997 less change in cash contributed.

[4] Price per the Van Vleet Report

[5] Number of shares calculated per Meditech Profit Sharing Trust Financial Report for 1997.

[6] Share Price Calculated as:

| | |
|---|---|
| Revaluation of Meditech beginning shares | $4,226,235 |
| Less: Revaluation per Financial Report | 4,279,690 |
| Revaluation of Meditech shares purchased during the year | 53,455 |
| Per Share Revaluation of Meditech stock purchased during the year | 2.64 |
| Purchase Price Per Share of Meditech stock purchased during the year | $24.36 |
| Split Adjusted | $12.18 |

[7] Shares of Stock adjusted to reflect stock split.

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Adjusted Cash Position of Meditech Profit Sharing Trust**
**As of December 31, 1998**

| Trust Assets on December 31, 1997 | | | | |
|---|---|---|---|---|
| Cash in Check and Savings Account | | | | $82,104 |
| US Treasury Notes | | | | 23,894,716 |
| Accrued Interest Receivable | | | | 326,221 |
| Shares Meditech Stock | 2,938,020 | [7] | $21.6 | 63,519,992 |
| Member Loans Receivable | | | | 1,347,950 |
| Total Assets | | | | $89,170,983 |

| Trust Activity During 1998 | | |
|---|---|---|
| Beginning Assets | $89,170,983 | |
| Interest Income | 1,481,825 | [3] |
| Dividend Income | 2,805,490 | [4] |
| Revaluation of Meditech Stock | 1,324,691 | [2] |
| Distribution to Terminees | (7,651,182) | [5] |
| Company Contributions | 3,500,000 | [1] |
| | $90,631,808 | |

| Trust Assets on December 31, 1998 | | | | |
|---|---|---|---|---|
| Cash in Checking and Savings Account | | | | $106,169 | [1] |
| US Treasury Notes | | | | 20,744,085 | |
| Accrued Interest Receivable | | | | 364,650 | [1] |
| Shares Meditech Stock | 3,090,662 | [7] | $22.1 | 68,180,004 | |
| Member Loans Receivable | | | | 1,236,900 | [1] |
| Total Assets | | | | $90,631,808 | |

| Shares Reconciliation for 1998 | | | | |
|---|---|---|---|---|
| Description | No.of shares [7] | | SP | $ |
| Beginning Shares | 2,938,020 | | $21.6 | $63,519,992 |
| Additional Shares Contributed in '98 | 80,000 | [6] | $22.1 | 1,764,800 |
| Additional Shares Purchased from employees | 72,642 | | $21.6 | 1,570,520 |
| Revaluation of Meditech Stock - Opening shares | | | | 1,292,729 |
| Revaluation of Meditech Stock - Purchased from employees | | | | 31,962 |
| Ending Shares | 3,090,662 | | | $68,180,004 |

| Cash Reconciliation for 1998 | |
|---|---|
| Description | $ |
| Beginning balance of cash | $23,976,820 |
| Change in working capital | 72,621 |
| Interest income | 1,481,825 |
| Dividend income | 2,805,490 |
| Distribution to terminees | (7,651,182) |
| Company contribution of cash | 1,735,200 |
| Additional stock purchased from employees | (1,570,520) |
| Closing balance of cash | $20,850,254 |

| Adjusted Stock & Cash Contribution in 1998 | |
|---|---|
| Number of Shares Contributed | 80,000 [6] |
| 12/31/98 Share Price using Van Vleet's assumptions | $22.1 |
| Dollar value of Stock Contributed | $1,764,800 |
| Total Contribution | $3,500,000 [1] |
| Cash Contribution | $1,735,200 |

**Notes:**

[1] Per the Meditech Profit Sharing Trust Financial Report for 1998.

[2] Includes both revaluation of Meditech Stock-Opening shares and Purchased from employees.

[3] Interest Income calculated by interest rate derived from the Meditech Profit Sharing Trust Financial Report for 1998
times the adjusted cash position and Treasury Note Position.

[4] Dividend Income will remain unchanged as the overall % of shares in Meditech will remain unchanged.

[5] Number of shares distributed to terminated by employees times the 12/31/97 calculated share price.

[6] Number of shares calculated per Meditech Profit Sharing Trust Financial Report for 1998.

[7] Shares of Stock adjusted to reflect stock split.

Confidential

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Adjusted Cash Position of Meditech Profit Sharing Trust**
**As of December 31, 1999**

| Trust Assets on December 31, 1998 | | | |
|---|---|---|---|
| Cash in Check and Savings Account | | | $106,169 |
| US Treasury Notes | | | 20,744,085 |
| Accrued Interest Receivable | | | 364,650 |
| Shares Meditech Stock | 3,090,662 [7] | $22.1 | 68,180,004 |
| Member Loans Receivable | | | 1,236,900 |
| Total Assets | | | $90,631,808 |

| Trust Activity During 1999 | |
|---|---|
| Beginning Assets | $90,631,808 |
| Interest Income | 1,182,126 [3] |
| Dividend Income | 3,111,627 [4] |
| Revaluation of Meditech Stock | 77,836,365 [2] |
| Distribution to Terminees | (10,817,955) [5] |
| Company Contributions | 4,000,000 [1] |
| | $165,943,972 |

| Trust Assets on December 31, 1999 | | | |
|---|---|---|---|
| Cash in Checking and Savings Account | | | $94,461 [1] |
| US Treasury Notes | | | 13,351,975 |
| Accrued Interest Receivable | | | 401,053 [1] |
| Shares Meditech Stock | 3,211,618 [7] | $46.9 | 150,673,058 |
| Member Loans Receivable | | | 1,423,425 [1] |
| Total Assets | | | $165,943,972 |

| Shares Reconciliation for 1999 | | | |
|---|---|---|---|
| Description | No.of shares [7] | SP | $ |
| Beginning Shares | 3,090,662 | $22.1 | $68,180,004 |
| Additional Shares Contributed in '99 | 80,000 [6] | $46.9 | 3,753,200 |
| Additional Shares Purchased from employees | 40,956 | $22.1 | 903,489 |
| Revaluation of Meditech Stock - Opening shares | | | 76,818,404 |
| Revaluation of Meditech Stock - Purchased from employees | | | 1,017,961 |
| Ending Shares | 3,211,618 | | $150,673,058 |

| Cash Reconciliation for 1999 | |
|---|---|
| Description | $ |
| Beginning balance of cash | $20,850,254 |
| Change in working capital | (222,928) |
| Interest income | 1,182,126 |
| Dividend income | 3,111,627 |
| Distribution to terminees | (10,817,955) |
| Company contribution of cash | 246,800 |
| Additional stock purchased from employees | (903,489) |
| Closing balance of cash | $13,446,436 |

| Adjusted Stock & Cash Contribution in 1999 | |
|---|---|
| Number of Shares Contributed | 80,000 [6] |
| 12/31/99 Share Price using Van Vleet's assumptions | $46.9 |
| Dollar value of Stock Contributed | $3,753,200 |
| Total Contribution | $4,000,000 [1] |
| Cash Contribution | $246,800 |

**Notes:**

[1] Per the Meditech Profit Sharing Trust Financial Report for 1999

[2] Includes both revaluation of Meditech Stock-Opening shares and Purchased from employees

[3] Interest Income calculated by interest rate derived from the Meditech Profit Sharing Trust Financial Report for 1999 times the adjusted cash position and Treasury Note Position

[4] Dividend Income will remain unchanged as the overall % of shares in Meditech will remain unchanged

[5] Number of shares distributed to terminated by employees times the 12/31/98 calculated share price

[6] Number of shares calculated per Meditech Profit Sharing Trust Financial Report for 1999

[7] Shares of Stock adjusted to reflect stock split.

Confidential

**Hubert, Trainor & Hinchliffe v Medical Information Technology**
**Adjusted Cash Position of Meditech Profit Sharing Trust**
**As of December 31, 2000**

| Trust Assets on December 31, 1999 | | | |
|---|---|---|---|
| Cash in Check and Savings Account | | | $94,461 |
| US Treasury Notes | | | 13,351,975 |
| Accrued Interest Receivable | | | 401,053 |
| Shares Meditech Stock | 3,211,618 [7] | $46.9 | 150,673,058 |
| Member Loans Receivable | | | 1,423,425 |
| Total Assets | | | $165,943,972 |

| Trust Activity During 2000 | |
|---|---|
| Beginning Assets | $165,943,972 |
| Interest Income | 652,427 [3] |
| Dividend Income | 3,757,105 [4] |
| Revaluation of Meditech Stock | (11,591,597) [2] |
| Distribution to Terminees | (40,200,631) [5] |
| Company Contributions | 3,500,000 [1] |
| | $122,061,276 |

| Trust Assets on December 31, 2000 | | | |
|---|---|---|---|
| Cash in Checking and Savings Account | | | $357,778 [1] |
| US Treasury Notes | | | (24,747,434) |
| Accrued Interest Receivable | | | 252,072 [1] |
| Shares Meditech Stock | 3,340,646 [7] | $43.4 | 144,850,411 |
| Member Loans Receivable | | | 1,348,450 [1] |
| Total Assets | | | $122,061,276 |

| Shares Reconciliation for 2000 | | | |
|---|---|---|---|
| Description | No.of shares [7] | SP | $ |
| Beginning Shares | 3,211,618 | $46.9 | $150,673,058 |
| Additional Shares Contributed in '00 | 80,000 [6] | $43.4 | 3,468,800 |
| Additional Shares Purchased from employees | 49,028 | $46.9 | 2,300,149 |
| Revaluation of Meditech Stock - Opening shares | | | (11,417,302) |
| Revaluation of Meditech Stock - Purchased from employees | | | (174,295) |
| Ending Shares | 3,340,646 | | $144,850,411 |

| Cash Reconciliation for 2000 | |
|---|---|
| Description | $ |
| Beginning balance of cash | $13,446,436 |
| Change in working capital | 223,956 |
| Interest income | 652,427 |
| Dividend income | 3,757,105 |
| Distribution to terminees | (40,200,631) |
| Company contribution of cash | 31,200 |
| Additional stock purchased from employees | (2,300,149) |
| Closing balance of cash | ($24,389,656) |

| Adjusted Stock & Cash Contribution in 2000 | |
|---|---|
| Number of Shares Contributed | 80,000 [6] |
| 12/31/00 Share Price using Van Vleet's assumptions | $43.4 |
| Dollar value of Stock Contributed | $3,468,800 |
| Total Contribution | $3,500,000 [1] |
| Cash Contribution | $31,200 |

**Notes:**

[1] Per the Meditech Profit Sharing Trust Financial Report for 2000.

[2] Includes both revaluation of Meditech Stock-Opening shares and Purchased from employees.

[3] Interest Income calculated by interest rate derived from the Meditech Profit Sharing Trust Financial Report for 2000 times the adjusted cash position and Treasury Note Position.

[4] Dividend Income will remain unchanged as the overall % of shares in Meditech will remain unchanged.

[5] Number of shares distributed to terminated by employees times the 12/31/99 calculated share price.

[6] Number of shares calculated per Meditech Profit Sharing Trust Financial Report for 2000.

[7] Shares of Stock adjusted to reflect stock split.

**Exhibit 40**

## Meditech Share Prices - Board v. Amended Compliant, Van Vleet & Reilly



Source: Meditech Board Minutes, Van Vleet Reilly Reports Amended Complaint

Exhibit 41

Meditech Share Prices - Board v. Amended Compliant, Van Vleet Methodology/Reilly



Source: Meditech Board Minutes, Van Vleet Reilly Reports Amended Compliant

Exhibit 42

Hubert's Meditech Profit Sharing Trust Balance
31-Dec-1982 to 31-Dec-2003
U.S. Dollars



Confidential

Exhibit 43

**Trainor's Meditech Profit Sharing Trust Balance**
**31-Dec-1977 to 31-Dec-1997**
**U.S. Dollars**



Confidential

Exhibit 44

**Hinchliffe's Meditech Profit Sharing Trust Balance**
**31-Dec-1977 to 31-Dec-1997**
**U.S. Dollars**



Confidential

# EXHIBIT 12

**Martin, Kevin P**

| | |
|---|---|
| **From:** | Collora, Michael [mcollora@dwyercollora.com] |
| **Sent:** | Friday, April 04, 2008 10:40 AM |
| **To:** | Martin, Kevin P |
| **Cc:** | Ryan, Jennifer |
| **Subject:** | Parties Pre Trial Memorandum |
| **Follow Up Flag:** | Review |
| **Flag Status:** | Flagged |
| **Attachments:** | 94424_1.doc |

Kevin: Please review the attached. This is our first shot at what we think should be submitted to the Court, but of course it does not contain your comments. If you agree that the plaintiffs exhibits are admissible as business records under the federal rules referred to in our admissions(aside from the obvious non business ones such as pleadings), then we will resend only those admissions related to other matters. Please advise us also as to what if any of the proposed exhibits you will object to on relevency or any other grounds, and all of the rest of the items can then be marked as trial exhibits, and can just go into evidence. We do not yet have MHubert's permission to drop his portion of the claim and it may be an issue at the hearing. I will further advise you as to that

# EXHIBIT 13

**Martin, Kevin P**

| | |
|---|---|
| **From:** | Martin, Kevin P |
| **Sent:** | Monday, April 14, 2008 11:31 AM |
| **To:** | 'Collora, Michael' |
| **Cc:** | Ryan, Jennifer; Poss, Stephen D |

**Subject:** RE:

Michael,

I do not think there is any need for you to file the motion to compel. Our objection to the RFAs was based in significant part on the unreasonable burden they impose in analyzing the admissibility of documents on several criteria when the court already has a much more reasonable and streamlined process in place for the parties to meet and confer on the very subject of admissibility. Many of the documents we will have no objection to, but some, to give one example those that consist of only portions of board reports, we will likely have some issue with, but one that probably can be addressed by use of the proper authentic document (i.e., the full report).

I agree we should meet this week to discuss the documents. Wednesday does not work for me; how about Thursday? Furthermore, please let me know by the end of the day whether you will be moving to dismiss Michael Hubert as a party from this action. The uncertainty on this question is causing Defendants great prejudice in preparing for the pretrial conference.

In the meantime, if you would like to resend those requests for admission that do not pertain to the admissibility of documents, you should.

Kevin

---

**From:** Collora, Michael [mailto:mcollora@dwyercollora.com]
**Sent:** Monday, April 14, 2008 10:02 AM
**To:** Martin, Kevin P
**Cc:** Ryan, Jennifer
**Subject:**

You have not gotten back to me re stipulating to admissibility of the various documents furnished to you more than a week ago on our suggested pretrial submittal. I would like to file the motion to compel today, if you do not agree, or if you do agree, then I will resend you a limited number of admissions confined to non ducument addmissions. Also, do you want to come over on Wednesday, to see what we can stipulate to re admissibility of documents etc. Please advise

.