# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MICHAEL P. HUBERT, WILLIAM TRAINOR, and
DAVID HINCHLIFFE, Individually and On Behalf
Of All Persons Similarly Situated,

      Plaintiffs,

          v.

MEDICAL INFORMATION TECHNOLOGY
PROFIT SHARING PLAN, MEDICAL
INFORMATION TECHNOLOGY, INC., A. NEIL
PAPPALARDO, LAWRENCE A. POLIMENO,
ROLAND L. DRISCOLL, EDWARD B. ROBERTS,
MORTON E. RUDERMAN, AND L.P. DAN
VALENTE,
      Defendants.

C.A. No. 05-10269-RWZ

*Oral Argument Requested*

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Michael A. Collora
Jennifer M. Ryan
**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, MA  02210
(617) 371-1000

*Attorneys for Michael P. Hubert, William Trainor,
and David Hinchliffe*

<u>Summary of Argument</u>

The Complaint at issue here alleges that Defendants deliberately undervalued the shares of Meditech common stock in an ERISA Trust to benefit themselves and other buyers of the stock to the detriment of sellers, including those liquidating their interests in the Trust. Defendants—the Trustee of Meditech's ERISA Profit Sharing Trust, the Plan and its administrator, Meditech itself—have moved for summary judgment, arguing that, as to two Plaintiffs their claims are beyond the statute of limitations; and as to all they failed to explain how they have been damaged and that they failed to exhaust their administrative remedies. Yet the evidence demonstrates that the Trustee, a major stockholder and the CEO of Meditech, convinced his docile Board of Directors to adopt his version of the share price of Meditech, while concealing his methodology from all others. The Trustee candidly admitted that his valuation method victimized sellers of stock. <u>See</u> Plaintiffs' 56.1 Statement of Contested and Additional Facts ("Contested Facts") ¶80. The concealment of his methodology continued until a dissident director filed a Form 13D in February 2002 with the SEC noting the internal disagreement over valuation. Thus, Plaintiffs could not have known there was an undervaluation issue (and indeed an underpayment of benefits to them) until such time. Plaintiffs' claims for additional unpaid benefits do not require a restatement of the Plan's assets, as only two Plan years are involved. Further, had the Plaintiffs sought an administrative remedy, their efforts would have been futile—no claim form existed, they did not know they were underpaid, and undisputed facts demonstrate that the Trustee would never have changed his methodology. For all these reasons, summary judgment should be denied.

<u>Background</u>

The Meditech Profit Sharing Plan ("Plan") is protected by ERISA, 29 U.S.C 1054 et. seq. and as such, its statutes and decisions are applicable here.  Plaintiffs have sued for unpaid benefits due them resulting from Defendants' deliberate policy of underpricing a major asset in the Plan:  shares of Meditech common stock.  Both the Plan and ERISA impose a duty on the Trustee to value this asset for the exclusive purpose of providing a benefit to participants and their beneficiaries.  In doing so, he should  act "…with the care, skill, prudence and diligence under the circumstances then prevailing, that a prudent man…would use in the conduct of an enterprise or a like character."  <u>See</u> 29 U.S.C. §1104 <u>et. seq</u>.  ERISA thus essentially imposes upon the fiduciary a duty of loyalty and care.  <u>See</u> <u>e.g.</u> <u>Mohler, et al v. Unger, et al</u>, 1994 W.L. 1860578, *12 (S.D. Ohio 1994).  This Trustee failed in this duty, in part because he was the CEO of Meditech and in part because he, himself, was a purchaser of Meditech's common stock.  Due to the conflicts imposed by these roles, the undisputed evidence demonstrates that he breached his duty to the Trust and its departing members.

<u>The Company</u>

Meditech was a highly prosperous company in the 1990s, growing roughly 15% a year in revenues and net income.  <u>See</u> 1998 Sample letter to Staff (Martin Aff., Ex. 17).  Its shares were not traded on an exchange, but by 1998 it had over 750 shareholders.  For a number of years Meditech contributed 6-7% of its net income to the Plan.  Note the following contributions:

| Year | Stock | Cash | Total |
|------|-------|------|-------|
| 1995 | $600,000 | $1,800,000 | $2,400,000 |
| 1996 | $840,000 | $2,060,000 | $2,900,000 |
| 1997 | $1,080,000 | $2,320,000 | $3,400,000 |

See 1997 10K, note (7). (Martin Aff., Ex. 10).

Meditech valued its common stock in October for purposes of a year end contribution to the Trust. Per usual, the CEO, Neil Pappalardo, suggested a common stock value in his Comments to the Board, and it was invariably followed. For example, in 1997, he suggested $27 per share ($13.50 post-split) and in support of this value, he merely mentioned some Meditech statistics with negligible analysis. See Contested Facts, ¶56-61. When asked how he arrived at that figure, Pappalardo stated that he capitalized the potential dividend for the upcoming year, explaining it was a form of discounted cash flow. See Contested Facts, ¶75. If that was his method, it went unmentioned in the Company's reports. Id. Further, Pappalardo seemed to employ no standard capitalization rate; in his valuation analysis the rates ranged from a high of 18.9 to a low of 15.2 for the relevant period. Id. The other Directors were unaware of his method and relied mainly on price to earnings (P/E) information. See Contested Facts, ¶73-74.

When Pappalardo acted as the Trustee valuing the Meditech stock in the Trust, he always used the same value he had originally proposed when wearing the hat of CEO. See Contested Facts, ¶23. Yet, Defendants concede that the Trustee was required to do an *independent* valuation. Id. His internal report as to valuation, unavailable to Trust members, did not refer to the dividend valuation method either; it referenced a book value and a P/E ratio along with statistical information. See, e.g., Trustee's Report for 1996 and 1997 (Collora Aff., Ex. 26-27). Finally, he did not consult an outside expert in making his valuations. See Contested Facts, ¶15.

The dividend method is not normally used by experts in the field. See e.g. Wertheimer, The Shareholders Appraisal of Remedies and How Courts Determine Fair Value, 47 Duke L.Rev. 613-627 (Feb. 1998) (citing discounted cash flow method as the preeminent valuation methodology). Indeed, limiting FMV to a dividend model makes little sense: dividends can be

paid or not, whereas earnings are not manipulable.  In 2000, Meditech increased its dividend, and thus the stock's FMV, even though the Company's income dropped.  <u>See</u> Contested Facts, ¶77.

While acting as both CEO and Trustee, Pappalardo bought vast quantities of stock.  From 1995-1999, he bought over 250,000 shares.  <u>See</u> Statement of Stock Ownership (Collora Aff., Ex. 14).  By 1997, he owned 26.5% of the company and controlled voting as he also voted the Trust's shares (9.13%).  <u>See</u> 1997 10K, Martin Aff., Ex. 10).  He deliberately kept the stock price low so that he could buy large quantities and retain control of the company.

Members of the Trust were unaware of Pappalardo's methodology, or lack thereof, for valuing the stock.  They received a letter indicating their dollar interest in the Trust, but not the percentage owned.  A one-page Trust assets summary was also sent to members.  It noted the value ascribed to the Meditech shares, but not the valuation methodology nor who did it.  A financial history of Meditech made available to Trust members noted the "fair share" of the stock, but again, no one was told how the Directors or Trustees reached this figure.[1]

Pappalardo's philosophy was to keep value low to favor buyers, not sellers.  He candidly admitted this:

> Q.  So by selling at the low end, you are doing a benefit for the employees
> A.  Yes.
> Q.  And you are doing a benefit for you.
> A.  Yes.
> Q.  So you are a beneficiary of the policy decision to set it with the low end of the range.
> A.  Yes…If I was to sell stock I might be…a victim.

<u>See</u> Contested Facts, ¶78, and his testimony, ¶80.

---

[1] "Fair value" misleads the member.  The Plan requires the Trustee to use "fair market value."  <u>See</u> Contested Facts, ¶15, Plan ¶5.04 (Exhibit 6 to Martin Affidavit).  The two terms are not synonymous. <u>See</u> <u>e.g.</u> <u>Boettcher v. IMC Mortgage Company</u>. 821 So. 2d 1047, 1052-53 (D. Ct. App., Fla. 2004).

His plan was to "force" employees to buy Meditech stock, not permit them to diversify, and to keep them happy with dividends. Id., ¶47. A participant could not have an IRA; there was no 401K plan and no encouragement of diversity. See id., ¶15 and ¶46; see also Hubert Depo. pgs. 218-220 (Collora Aff., Ex. 2). No one knew or could know of his valuation process.

I.     Standard for Summary Judgment

A motion for summary judgment will only be granted if the court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where there are issues of fraud, notice, intent and the like, the court should be wary of granting summary judgment. See Foltz v. U.S. News & World Report Inc., 627 F.Supp. 1143, 1150 (D.D.C. 1986). Moreover, the court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir.1993).

II.    The Claims Are Timely

This Court determined the applicable statute of limitations to be six years. Defendants claim that Hinchliffe's and Trainor's claims are untimely, asserting that Plaintiffs knew the stock was undervalued and that they were obligated to undertake reasonable diligence at the time that they received their checks. Defendants fail to appreciate that Plaintiffs did not have reason for suspicion at the time they received their checks. Moreover, Defendants ignore the fact that their self-dealing and concealment rendered superflouous the need for diligence that they demand.

The moment when a cause of action accrues is determined using federal common law. See Romero v. The Allstate Corp., 404 F.3d 212, 221 (3rd Cir. 2005); Laurenzano v. Blue Cross and Blue Shield of Mass. Inc. Retirement Income Trust, 134 F.Supp.2d 189, 207 (D. Mass.

2001).  In federal question cases, courts typically employ the federal "discovery rule" to determine when the federal claim accrues.  404 F.3d at 222.  Under the discovery rule, a limitations period begins to run when the plaintiff knew or should have known *all* of the facts giving rise to a claim for benefits.  Id.  With respect to a claim for unpaid benefits, this is typically when the claim for benefits is formally denied.  Laurenzano, 134 F.Supp.2d at 207; Salcedo v. John Hancock Mut. Life Ins. Co., 38 F.Supp.2d 37, 42 (D. Mass. 1998).  In this district, the "formal denial" that initiates the statute of limitations's running is the completion of statutorily-required administrative review procedures.  Salcedo, 38 F.Supp.2d at 42.

Here, the clock never started running because Defendants never provided the Plaintiffs (or indeed, any putative class members) with a formal denial.  See Contested Facts, ¶ 20.  To the contrary, Defendants wholly failed to comply with ERISA's statutory provisions and regulations, which require, at a minimum, that employers notify an employee in writing of any adverse decision on a claim, giving specific reasons for the adverse determination, referring to specific plan provisions on which the decision was based, describing the additional material or information necessary to perfect the claim (with an explanation of why), and providing a description of the review procedures, applicable time limits, and rights to file a lawsuit.  See 29 U.S.C. § 1133; 29 C.F.R. §§ 1560.503-1(f)-(g).  Because Defendants failed to establish and comply with *any* of these procedures, a formal denial of benefits never occurred.  Accordingly, as a matter of law, Plaintiffs' claim never began to accrue.  See Salcedo, 38 F.Supp.2d at 44 ("Since it seems that [the plaintiff] did not receive notice consonant with the goals of § 1133 until 1994, it is fitting to hold that this is the date on which her cause of action arose."); see also Veltri v. Building Service 32B-J Pension Fund, 393 F.3d 318, 325 (2nd Cir. 2004) (court need

not decide when plaintiff's claim actually accrued because employer's failure to comply with 29 C.F.R. § 2560.503-1's notice requirements equitably tolls the limitations period).

Defendants assume that Plaintiffs ought to have known that their interest in the Plan had been undervalued when they received their distributions. Although such an approach might be justified in a case where the plaintiff asks for and does not receive a benefit, it is not applicable here. Here, the Plaintiffs each received a benefits check, albeit in an amount far less than what they were entitled to receive under the Plan. In situations such as this – where there is no objective indication that defendants "denied" any portion of what plaintiffs were entitled to receive under the Plan – before the clock is triggered under the federal discovery rule, Defendants must show at the least that Plaintiffs were aware of their rights under the Plan and that Defendants' conduct potentially implicated those rights. Typically, this means that Plaintiffs must, at a minimum, have seen the plan documents granting the rights at issue before the limitations period can begin to accrue. See, e.g., Thomas v. SmithKline Beecham Corp., 297 F.Supp.2d 773, 786 (E.D. Penn. 2003) (statute of limitations for plaintiffs alleging wrongful exclusion from plan did not begin running until plaintiffs saw plan documents, despite exclusion years before; knowledge of rights under plan was essential for plaintiffs' suit because exclusion was not per se a violation of ERISA).

As in Thomas, nothing in the act of calculating and paying out profit-sharing benefits is inherently suspect and should have put the Plaintiffs on notice. To the contrary, to know that Defendants breached their statutory and Plan-based obligations to evaluate, allocate and pay the fair market value of their vested interests, Plaintiffs would had to know that they were entitled to have their interest calculated at fair market value and that Defendants were instead calculating their interest at less than that amount. Yet the evidence demonstrates that Plaintiffs (like all

other participants) were never given the Trust Agreement, never told how their interest was calculated, and never offered the opportunity to question that calculation (i.e., through an appeals procedure). See Contested Facts ¶¶ 20; Trainor Aff. and Hinchliffe Aff. Thus, there are no undisputed facts that indicate that Plaintiffs were on actual or inquiry notice of the alleged wrongful acts.

Concluding wrongly that Plaintiffs had notice of the alleged wrongful acts, Defendants then move to the position that Plaintiffs knew or could have found out through reasonable due diligence that the stock was undervalued. Both of their positions are wrong. Defendants first rely on the 1998 Plaintiffs's deposition testimony that they thought the stock was undervalued at some point prior to receiving their distribution checks. The fact that Plaintiffs, amongst their fellow employees, grumbled about the value of the company stock, is simply not sufficient. A prospective plaintiff is not obligated to file suit as a result of a hunch or workplace chatter. See Kling v. Fidelity Management Trust Co., 323 F.Supp.2d 132, 136-37 (D. Mass. 2004) (when determining beginning of limitations period for breach of fiduciary claim under ERISA, "it is not enough that [plaintiffs] had notice that something was awry; [plaintiffs] must have had *specific knowledge of the actual breach of duty* upon which [they sue]") (citation omitted) (emphasis and brackets in original); see also Foltz, 627 F.Supp. 1143 at ("a prospective plaintiff does not have to file suit on a hunch."). Moreover, the requirement is for "actual knowledge" not for mere speculation. See Edes v. Verizon Communications, Inc., 417 F.3d 133, 142 (1st Cir. 2005) ("there cannot be actual knowledge of a violation for purposes of the limitation period unless a plaintiff knows the essential facts of the transaction or conduct constituting the violation") (citations omitted). Despite Defendants' assertions, there is a genuine dispute of material fact as to when Plaintiffs had "actual knowledge" of the stock being undervalued. For example, in the

same deposition that Defendants cite to as providing conclusive evidence that Trainor knew that the stock was undervalued, Trainor also testified that he had no way of knowing that the distribution he received was too low.  See Contested Facts ¶ 29.  Trainor went on to state that it was not until he heard that former Board member, Jerry Grossman, was suing the company because the stock was undervalued that he even thought about the value of the stock as set by the Trustee. Id., ¶ 41.  Similarly, Hinchliffe testified that he made the decision that the stock was undervalued after speaking to Michael Hubert, after this suit was filed and after Mr. Grossman filed both his 13D statement with the SEC and his lawsuit, that.  See id., ¶ 40.

Second, Defendants argue that through reasonable diligence Plaintiffs could have acquired the facts constituting the violation.  Defendants contend that Plaintiffs should have essentially engaged in independent valuation of the stock by identifying appropriate industry competitors, calculating P/E ratios and comparing those with the financial information of Meditech.  There are several flaws in Defendants' position.

At the time Plaintiffs received their benefits, they had no reason to doubt that the Trustee in good faith appropriately and accurately valued the stock.  "Reasonable reliance upon the competence and good faith of others who have assumed legal responsibilities towards [plaintiffs] have not infrequently been held sufficient to toll the running of the applicable statute of limitations."  Niehoff v. Maynard, 299 F.3d 41, 50 (1st Cir. 2002).  Moreover, the failure of plaintiffs to detect the existence of a claim can be excused where, as here, Plaintiffs reasonably relied on the competence and good faith of one with knowledge who accepts a legal responsibility towards the plaintiffs.  See id.; see also In re Dean Witter P'ship Litig., 1998 WL 442456, at *6 (Del. Ch. July 17, 1998) (noting that wrongful self-dealing may warrant equitable tolling "even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies

on the competence and good faith of a fiduciary."). Mr. Pappalardo, as Trustee, was obligated to

ascertain the fair market value of the stock. During the 1995-1998 time period, Mr. Pappalardo

purchased over 250,000 shares of Meditech stock. See ¶ 82. Moreover, he refused to share how

the stock was valued during the 1998-2002 time period. See Contested Facts, ¶84-86. Because

Defendants engaged in wrongful self dealing, Plaintiffs are entitled to equitable tolling of the

statute of limitations and their claims are still viable. See Niehoff, 299 F.3d at 50.

Further, Defendants engaged in a pattern of fraudulent concealment which acted to toll

the statute of limitations. The evidence clearly demonstrates that Plaintiffs (like all other

participants) were never given the Trust Agreement, never told how their interest was calculated,

and never offered the opportunity to question that calculation. See Contested Facts, ¶20, 84-87,

94. Even after Plaintiffs received their benefit, Defendants continued to shield information as to

how the value of the stock was calculated from Plan recipients. Id. Moreover, when Hubert

wrote a letter questioning the value of the stock at the time he received his interest in the Plan,

Defendants did not reply. Id., ¶ 38. Defendants engaged in a strategy of concealing any basis for

a claim that could have arisen by not providing the information necessary to support actual

knowledge of a claim. Thus, Plaintiffs' claims are not stale.

Finally, Defendants contend that Plaintiffs could have engaged in an independent

valuation and discovered that the stock was indeed undervalued. That contention assumes that

Plaintiffs were on inquiry notice at the time that they received their checks for benefits, which

they were not. "A plaintiff is on inquiry notice when there exists sufficient suspicion of fraud to

cause a reasonable investor to investigate the matter further. . .The facts constituting inquiry

notice must be sufficiently probative of fraud sufficiently advanced beyond the stage of a mere

suspicion. . .to incite the victim to investigate." Betz v. Trainor Wortham & Co. Inc., 504 F.3d

1017, 1024 (9th Cir. 2007) (internal quotations omitted).  At the time Plaintiffs received their

benefit check, there were no facts supporting a suspicion of fraud.  It was not until Dr.

Grossman's 13D filing that facts sufficiently probative of fraud placed Plaintiffs on notice.

Moreover, the question of notice of fraud is for the trier of fact; summary judgment could only

be appropriate if uncontroverted evidence demonstrates that Plaintiffs discovered or should have

discovered the fraudulent conduct, here, the purposeful undervaluation of Meditech stock.  See

id. at 1035; see also Lawson v. Affirmative Equities Co., 341 F.Supp.2d 51, 68-69 (D. Mass.

2004) (collecting cases for the proposition that whether plaintiff knew or should have known of

an injury so as to trigger the running of a statute of limitations is, with rare exception, a jury

issue).  Here, the evidence demonstrates that there was no suspicion of fraud.

      Even if Plaintiffs had been on inquiry notice, the steps outlined by Defendants are not

those of a reasonable investor.  Defendants assert that "reasonable diligence" would include the

following tasks: computing P/E ratios for Meditech from financial statements, identifying proper

competitors,[2] utilizing publicly available financial information to compute the P/E ratios for

competitors and then engaging in a comparative analysis.  Defendants contend that Plaintiffs

should have been able to engage in such analysis.  The record disputes their contentions.  In his

deposition, Trainor testified that he did not know what a P/E ratio was. Contested Facts, ¶7.

Hinchliffe's affidavit similarly clarifies that he did not know how to compute a P/E ratio. Id.

Trainor testified that he had no reason to believe at the time that he received his distribution that

the stock was low. Id. ¶29.  Both Trainor and Hinchliffe trusted the Company to engage in good

---

[2] Ironically, the Defendants' experts have opined that SMS and Cerner are not true competitors of Meditech and that
a comparison to them is not appropriate.  They go so far as to contend that there simply are no public companies that
are truly comparable to Meditech.  Thus, any effort made by the Plaintiffs to engage in valuation by comparison to
these companies would not have yielded "actual knowledge" according to the Defendants' experts.  The court,
however, can look at the Plaintiff's expert report which contains an alternative method of valuation, discounted cash
flow, which also resulted in a finding of undervaluation of the Meditech stock.

faith and due diligence in assigning the proper valuation of stock. <u>See</u> Trainor and Hinchliffe

Aff.  For the court to find that they had possessed an obligation to learn how to read and interpret

financial information, calculate ratios, determine company competitors, and engage in a

comparative process would place an undue burden on every stockholder and Plan participant.

Defendants' suggestion strains reasonableness.

Regardless of whether engaging in a P/E analysis is reasonable, it still would not have

provided Plaintiffs with actual knowledge of a claim.  While the difference in P/E ratios is

suggestive of a claim, it does not take into account the plethora of factors necessary for

conclusive stock valuation.  Thus, even if Plaintiffs engaged in a thorough P/E analysis, they

would not possess the actual knowledge necessary to start the accrual of their claims.  Rather,

Dr. Grossman's February 2002 Form 13-D filing establishes a floor for the running of the

limitations period because it marked the first time that anyone with a basis of knowledge

publicly accused Defendants with any wrongdoing in the setting of Meditech stock value.  Up

until this point, reasonable diligence on the part of Plaintiffs would have served just to

demonstrate that something was "awry".  <u>See</u>  <u>Kling</u>, 323 F.Supp.2d at 136-7 (when determining

beginning of limitations period for breach of fiduciary claim under ERISA, "it is not enough that

[plaintiffs] had notice that something was awry; [plaintiffs] must have had *specific knowledge of*

*the actual breach of duty* upon which [they sue]") (citation omitted) (emphasis and brackets in

original).  At the time of Dr. Grossman's filing, an insider noted that the process was flawed and

provided the essential facts of the transaction or conduct constituting the violation.

    III.    <u>Hubert May Give an Opinion On Value</u>

Defendants claim that Hubert's failure to obtain an expert as to value entitles them to

summary judgment.  Hubert, by his affidavit filed herewith, admits he has not engaged an expert

on valuation.  Instead, he offered his own opinion on value as to 2003 Meditech stock, supported

by the expert opinion of Willamette, filed in a related matter.  Hubert educated himself in the art

of valuation.  The First Circuit has held that lay opinion is admissible if the witness has acquired

sufficient experience to testify;  Hubert's own opinion is sufficient to defeat summary judgment.

See U.S. v. Maher, 454 F.3d 13, 24 (1st Cir. 2006).

     Meditech valued its stock in October 2003, as did the Trustee in December 2003, at $26.

This value represented a P/E ratio of 13.3 compared that of 28 for its principal competitor

Cerner.  Hubert is of the opinion Meditech is equal to, or has more value than Cerner due to its

dividend, backlog and cash position.  While Meditech is privately held, he submits that given the

ready market for its stock, i.e. purchases by the Trust, there should be little or no "lack of

marketability discount."

     In Downeast Ventures, Ltd. v. Washington County, 450 F.Supp.2d 106 (D. Me., 2006) a

corporate employee was permitted to testify as to the value of corporate property, the Court

saying the primary limitation on a witness' opinion is foundational under F.R.Evid. 701—the

opinion must be rationally based.  Hubert is not an expert, but the First Circuit has permitted

owners of businesses to give opinions as to value, or projected profits, without qualifying the

witness, citing the Advisory Committee's illustration to the same effect. Id. at 110.   The

Downeast court also cited the First Circuit's Opinion in U.S. v. Maher, 454 F.3d 13, 24 (1st Cir.

2006) as permitting a lay opinion testimony if the witness has acquired sufficient experience to

testify about the matter.  Non-experts have also given testimony as to the value of land,

Montgomery v. Gooding, Hullman, Kelly & Beckey, 163 F.Supp.2d , 831 (N.D. Ohio), and

leases, MCI Telecommunications Corp. v. Warner, 897 F.2d 703 (4th Cir. 1990).  See also

Glosband v. Watts Detective Agency, Inc., 21 B.R. 963, 981-982 (D. Mass. 1981) (admitting lay

opinion as to value of business).  Hubert should be allowed to testify as to value.

    IV.    <u>A Restatement of the Values in Trust Is Not Necessary</u>

    Defendants claim that since Plaintiffs have not revalued the Trust assets (or at least

Meditech stock) since its inception in 1973, they have not complied with the Court's directive,

and Defendants must be granted summary judgment as a consequence (Defendants'

Memorandum, pp. 16-18.)  This Court, in denying class certification, stated:

> "The only way to calculate the proper payout under any alternate valuation
> methodology is to revalue the shares from the <u>beginning</u> of the Plan.  This
> is because differing year-to-year values result in differing percentage
> ownerships of the shares in the Plan at redemption.[8]  Thus, the only
> employees guaranteed to have identical interests in choosing a valuation
> methodology are those who entered the Plan in the same year and who later
> exited the Plan in the same year.[9]"

---

[9]Even this oversimplifies the analysis, since employees have an interest in the lowest share valuation in years in which they had the highest dollar contributions to the Plan.  To the extent two employees entering and exiting in the same years have differing high earning years (and thus larger Plan contributions), they might prefer different valuation methodologies.

March 20, 2007 Memorandum of Decision, pp. 14-15.

    The Court fails to appreciate the mechanics of the Plan and has created an issue where

none should exist.  At year end, the Trustee values all the assets in the Plan, including cash,

marketable securities, note receivables, and Meditech stock, and includes the company's

intended contribution to the Plan for that year.  Thus, at the end of 1997, the total Plan assets

were $65,963,861, of which $39,366,288 consisted of Meditech stock.  That total included a

1997 company contribution of $3,400,000 of cash and stock.  <u>See</u> Trustee's Report for 1997

(Collora Aff., Ex. 27).  The 5500 Department of Labor Form indicated that there were 1,392

employees participating in the Plan for year end 1997.  <u>See</u> Meditech 5500 Form for year end,

1997 (Collora Aff., Ex. 37).  The Trustee then sends a year-end report to all members setting

forth their previous year-end account, the changes in the Trust per their own financial interest

during the year, and their total dollar interest in the Trust at year-end.  Members also receive a

one-page financial summary of the Trust.  See, e.g., sample letter dated January 1998.  (Martin

Aff., Ex. 17).  Hinchliffe, for example, was told his interest in the trust at year-end 1997 was

$1,101,507, up from $954,457 the previous year, due to the company's annual contribution, and

a revaluation of assets and forfeitures.  See, e.g., Martin Aff., Ex. 18.  He was not told his

percentage interest in the Trust.  The Trustee testified:

> "We do not tell [members] a percentage interest.  We give them a dollar
> value as we are required to, and at the same time I give them the total net
> assets of the plan.  If they divided the two numbers, they could quickly
> ascertain what their percentage interest of the Plan would be on December
> 31, only."

Contested Facts, ¶87.

Thus, members do not own any particular asset in the Trust.  They have a percentage

interest only, which changes from year to year.  The Trustee must revalue all assets in the Trust

and reallocate a member's interest on an annual basis.

Plaintiffs' expert, VanVleet, has opined that had the Trustee used a widely accepted

valuation method, such as the discounted cash flow method or comparative company method, to

value the Meditech shares for year-end 1997, he would have valued the stock at $21.60 per share

instead of $13.50 (all figures post-split).  See Plaintiffs' Expert Opinion, Martin Aff., Ex. 33.  It

is clear that the Trustee was heavily influenced by his own financial interest in Meditech (he

bought shares in 1996 and 1997; see Contested Facts, ¶82) and his philosophy of favoring buyers

and holders (see Contested Facts, ¶78 to 81); the Trustee was unable to meet his fiduciary duties

because he impermissibly undervalued the stock.  The Court, instead of the Trustee, must decide

what the correct value was for 1998 and 2003.

Revaluing the Trust or its stock from inception is not necessary and would add nothing to the claim. The Trustee could have been low one year and high the next; at the very least, in 1997, he was supposed to fairly value the assets for those leaving in 1998. He did not. Assume as a hypothetical, that the Trustee negligently missed $500,000 in adding up the pool of assets for 1997. He finds the mistake in early 1999 and telling no one, puts the amount back in the Trust. The primary persons affected are those withdrawing in 1998—the pool of assets would be smaller for them—and thus their financial withdrawal in dollars would be smaller. No calculation of value for years before 1997 is needed in that example.

Here, the Trustee is alleged to have manipulated the price of the stock, favoring buyers over sellers, while he purchases many shares. Plaintiffs do not know if his manipulation materially affected other years—but it did so for those terminating in 1998, and Hubert believes it did so for 2003. See generally Hubert Affidavit filed herewith.

Defendants assert that if the FMV were $21.60 in 1997, the Company's stock contribution would have been smaller (Defendant's Memo, pp. 18-19.) This is sheer speculation. In 1997 the Company contributed $1,340,000 and 80,000 shares at $13.50. While a 50% higher stock value may have affected the number of shares, or cash, contributed by the Company, any of the following may have instead happened: (a) the number of shares could have been reduced to about 52,000; (b) the amount contributed could have been reduced by $560,000; (c) the Company could have contributed the same amount of stock, but added $560,000 in cash; or (d) nothing could have changed. In a typical year, the Company contributes between 6-7% of net income to the Trust, but there is no evidence it might not contribute more cash or more shares. See chart showing ratio of dollars to shares, Contested Facts, ¶22. A contribution of $560,000 was equivalent to approximately 1% of the profits, an insignificant amount for this Company.

16

V.    Compliance With Administrative Remedies Were Not Required

Defendants argue that they are entitled to summary judgment because Plaintiffs did not exhaust their administrative remedies.  Plaintiffs were not required to exhaust their administrative claims for two reasons: 1) they were denied meaningful access to a claim and review procedure because one was never established in accordance with the statute and regulations, and 2) exhaustion of the internal procedures would have been futile.  As the facts and the law demonstrate, Plaintiffs were not required to comply with administrative remedies and thus their claims are still viable.

First, ERISA does not explicitly require plaintiffs to exhaust their administrative remedies.  See Drinkwater v. Metropolitan Life Ins. Co., 846 F.2d 821, 825 (1st Cir. 1988); Conley v. Pitney Bowes, 34 F.3d 714, 716 (8th Cir. 1994).  Rather, exhaustion's parameters are governed by the specific language of the particular plan involved.  Conley, 34 F.3d at 716.  Where plan documents confer upon a claimant a right to information about an appeals procedure, that information must be included with the notice of denial of benefits.  Id. at 718; see also 29 U.S.C. § 1133.  "Because the exhaustion requirement rests on the assumption that notice of denial has been provided, a fiduciary who has not provided notice that benefits have been denied is foreclosed from insisting upon exhaustion of administrative remedies." Corsini v. United Healthcare Corp., 965 F. Supp. 265, 269 (D. R.I. 1997).

Under the Trust Agreement's plain language, Plan participants were not required to "file a claim for benefits" to receive their distribution.  To the contrary, in the section entitled "Payments to or for the Accounts of Members or Terminated Members," the Trust Agreement directs that "whenever a Member's account becomes distributable pursuant to [retirement, disability, death, or separation from employment], distribution of said account balance *shall be*

17

*made* by the payment, in cash, of either one lump sum, a direct Rollover (as described in Section 6.11), or a combination of both." See Martin Aff., Ex. 6 at ¶ 6.06(a) (emphasis added). Paragraph 6.06(a) further provides that such distributions "*shall be made* within a reasonable time" after the separation from employment. Id. (emphasis added).

In addition, nothing in that section addresses how or to whom a participant should appeal a benefits claim. The only discussion of the issue can be found in ¶ 6.04(b), which states, "[t]he determination of the amount to which a terminated Member is entitled shall be made in accordance with the rules set forth in this Article, and the Trustee's determination shall be conclusive and binding on all persons." See id. If anything, this provision suggests that there are *no* appeal procedures. To be sure, in the back of the Trust Agreement, which Plaintiffs did *not* receive, boilerplate language states, "All claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such regulations as the Trustee shall reasonably establish" and provides general information on how to appeal a decision from such a claim. See id. at ¶ 11.10. In practice, however, Pappalardo never established *any* regulations for filing a claim. See Contested Facts at ¶ 94.

Indeed, despite the fact that ERISA requires such procedures to be incorporated into any employee benefit plan, see 29 U.S.C. § 1133, the claims procedure established by Defendants is woefully inadequate. Defendants never advised Plaintiffs of claims procedures nor did they adopt regulations to effectuate it. ¶ 20. Moreover, Defendants did not provide Plaintiffs nor other members with copies of the Trust Agreement, nor did they devise and distribute a claim form. ¶ 20, 97, 99. The Department of Labor has interpreted § 1133 to require, at a minimum, that a plan fiduciary notify a claimant in writing of any adverse decision, giving specific reasons for the adverse determination, referring to the specific plan provision on which the decision was

based, describing the additional material or information necessary to perfect the claim (with an explanation of why it is necessary), and describing of the review procedures, applicable time limits, and rights to file a law suit.  See 29 C.F.R. §§ 2560.503-1(f)-(g).  The regulations go on to provide a detailed list of requisite appeals procedure processes to comply with § 1133's requirement for a "full and fair review".  29 C.F.R. § 2560.503-1(h).

Defendants never established procedures for "filing a claim," much less provided any information on how to make a claim for any "denied" benefits or otherwise challenge the calculation of their interest in the Plan.  See Contested Facts at ¶20; cf. 29 U.S.C. § 1133; 29 C.F.R. § 2560.530-1.  Because Defendants wholly failed to comply with the governing regulations, Plaintiffs have exhausted their remedies as a matter of law.  See 29 C.F.R. § 2560.503-1(l) ("In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of [29 C.F.R. § 2560.503-1], a claimant shall be deemed to have exhausted the administrative remedies under the plan and shall be entitled to pursue all available remedies under [29 U.S.C. § 1132(a)"); see also Corsini, 965 F.Supp. at 269 ("a fiduciary who has not provided notice that benefits have been denied is foreclosed from insisting upon exhaustion of administrative remedies").

Finally, even if Defendants were able to raise a defense of exhaustion, "an ERISA plan subscriber need not exhaust the plan's administrative remedies when such action would be futile."  Corsini, 965 F.Supp. at 269.  In Corsini, the Court held that it would be futile to require the plaintiffs to pursue an administrative appeal for two reasons.  First, "the challenged practice represents a long-standing policy that has been applied consistently in calculating the co-payment obligations of all Plan participants."  Id.  Second, "by vigorously defending that policy in this litigation and in similar litigation pending in other jurisdictions, the defendants have made

it clear that there is virtually no possibility that they will voluntarily abandon the policy." Id.  As a result of these two factors, the Court found it "inconceivable that resort to the administrative review process would result in anything other than a denial." Id. at 269-70.

As in Corsini, Plaintiffs challenged a long-standing practice by Defendants to undervalue the Plan's assets and distribute to participants far less than the fair market value of their vested interest in those assets.  Defendants have vigorously defended this lawsuit, ignored requests to stop valuing the stock at an artificially low price and have yet to hire an independent appraiser to or otherwise establish safeguards against abuse.  Defendants also vigorously defended a lawsuit brought by ousted former Board member, Dr. Grossman, who complained about their valuation methodology over four years ago.  See Am. Compl. at Ex. C.  The two Corsini factors, coupled with Defendants' failure to establish appeal procedures other than a vague offer that Plan participants will have an opportunity for a "full and fair review" by Defendant Pappalardo, militate in favor of a finding that any requirement of exhaustion, even if otherwise appropriate, would be futile.  See Corsini, 965 F.Supp. at 269; see also Berger v. Edgewater Steel Co., 911 F.2d 911, 917 (3d Cir. 1990) (exhaustion would be futile where plaintiffs challenged company-wide policy regarding retirement benefits and responsible company officials were aware of plaintiffs' concerns prior to suit).  Moreover, Plaintiff Hubert did write a letter indicating that the stock was undervalued and Defendants did not respond.  Defendants' lack of response in the face of a claim illustrates the futility of requiring Plaintiffs to engage in administrative exhaustion of an ill defined and empty process.  Plaintiffs' claims are viable and must be prosecuted at trial.

Conclusion

For all these reasons, the Plaintiffs respectfully request that this Court deny the Defendants' motion for summary judgment.

Respectfully submitted,
**Michael Hubert,**
**David Hinchliffe, and**
**William Trainor**
Individually and as representatives of a class of all
others similarly situated,
By their attorneys,


   /s/ Jennifer M. Ryan
Michael A. Collora (BBO #092940)
David A. Bunis (BBO #550570)
Jennifer M. Ryan (BBO #661498)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA  02210
671-371-1000
671-371-1037

Dated: May 27, 2008

## CERTIFICATE OF SERVICE

I, Jennifer M. Ryan, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on this 27 day of May, 2008.


     /s/ Jennifer M. Ryan

Jennifer M. Ryan