**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

MICHAEL P. HUBERT, WILLIAM TRAINOR, and
DAVID HINCHLIFFE, Individually and On Behalf
Of All Persons Similarly Situated,

      Plaintiffs,

          v.                                C.A. No. 05-10269-RWZ

MEDICAL INFORMATION TECHNOLOGY
PROFIT SHARING PLAN, MEDICAL
INFORMATION TECHNOLOGY, INC., A. NEIL
PAPPALARDO, LAWRENCE A. POLIMENO,
ROLAND L. DRISCOLL, EDWARD B. ROBERTS,
MORTON E. RUDERMAN, AND L.P. DAN
VALENTE,
      Defendants.

---

**AFFIDAVIT OF MICHAEL A. COLLORA IN SUPPORT OF**
**PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

I, Michael A. Collora, depose and state as follows:

1.      I am an attorney admitted to practice in the Commonwealth of Massachusetts.  I

am a partner at Dwyer & Collora LLP, counsel for Plaintiffs Michael Hubert ("Hubert"),

William Trainor ("Trainor") and David Hinchliffe ("Hinchliffe").

2.      I make this Affidavit in support of Plaintiffs' Opposition To Motion For Summary

Judgment.

3.      I have personal knowledge of the matters described in this Affidavit.  The

documents referred to herein marked by numbers beginning with the prefix DEF were produced

by Defendants and are believed to be accurate business records of Meditech, the Trustee, or the Plan.

### Deposition Transcripts

4.      Attached as Exhibit 1 is a true and accurate copy of excerpts from the deposition transcript of William Trainor in the above-captioned action, conducted on July 24, 2006.

5.      Attached as Exhibit 2 is a true and accurate copy of excerpts from the deposition transcript of Michael Hubert in Grossman v. Meditech, conducted on July 14, 2005.

6.      Attached as Exhibit 3 is a true and accurate copy of excerpts from the deposition transcript of Michael Hubert in the above-captioned action, conducted on July 26, 2006.

7.      Attached as Exhibit 4 is a true and accurate copy of excerpts from the deposition transcript of David Hinchliffe in the above-captioned action, conducted on July 27, 2006.

8.      Attached as Exhibit 5 is a true and accurate copy of excerpts from the deposition transcript of Barbara Manzolillo ("Manzolillo") in the above-captioned action, conducted on August 8, 2006.

9.      Attached as Exhibit 6 is a true and accurate copy of excerpts from the deposition transcript of A. Neil Pappalardo in Grossman v. Meditech, conducted on May 16, 2005.

10.     Attached as Exhibit 7 is a true and accurate copy of excerpts from the deposition transcript of A. Neil Pappalardo in the above-captioned action, conducted on July 21, 2006.

11.     Attached as Exhibit 8 is a true and accurate copy of excerpts from the deposition transcript of A. Neil Pappalardo in the above-captioned action, conducted on November 27, 2007.

12.     Attached as Exhibit 9 is a true and accurate copy of excerpts from the deposition transcript of Edward Roberts in the above-captioned action, conducted on November 8, 2007.

**Meditech Public Filings**

13.     Attached as Exhibit 10 is a true and accurate copy of the Meditech Form 10-K for the period ending December 31, 1996, DEF003646-DEF003673

14.     Attached as Exhibit 11 is a true and accurate copy of the Meditech Form 10-K for the period ending December 31, 1998, DEF003674-DEF003699.

15.     Attached as Exhibit 12 is a true and accurate copy of the Meditech Form 10-K for the period ending December 31, 2003, marked as part of Exhibit 82 at Howard Messing's deposition on November 13, 2007 in this matter.

16.     Attached as Exhibit 13 is a true and accurate copy of the Form 5500 of Meditech for the year ending December, 1997, DEF000861-DEF000879.

**Defendants' Statements of Stock Ownership**

17.     Attached as Exhibit 14 is a true and accurate copy of the Statement of Stock Ownership of Defendant Pappalardo dated September 26, 2003, DEF011655-DEF011656.

**Correspondence Between Meditech and Plaintiffs**

18.     Attached as Exhibit 15 is a true and accurate copy of a letter from Manzolillo to Hinchliffe dated April 15, 1998, DEF001054.

19.     Attached as Exhibit 16 is a true and accurate copy of a letter from Pappalardo dated January 30, 2004, DEF001372.

**Meditech Internal Documents**

20.     Attached as Exhibit 17 is a true and accurate copy of the Chairman's Comments to the Board for its meeting dated October 28, 1996, DEF006858-DEF006859, DEF006865-DEF006870.

21.     Attached as Exhibit 18 is a true and accurate copy of the Minutes of a Regular Meeting of the Board of Directors dated October 28, 1996, DEF006909, DEF006914-DEF006917.

22.     Attached as Exhibit 19 is a true and accurate copy of the Chairman's Comments to the Board for its meeting dated October 27, 1997, DEF002840, DEF002848-DEF002853.

23.     Attached as Exhibit 20 is a true and accurate copy of the Minutes of a Regular Meeting of the Board of Directors dated October 27, 1997, DEF 002779, DEF002785-DEF002788.

24.     Attached as Exhibit 21 is a true and accurate copy of the Chairman's Comments to the Board for its meeting dated January 26, 1998, DEF002779, DEF002792-DEF002799.

25.     Attached as Exhibit 22 is a true and accurate copy of the Chairman's Comments to the Board for its meeting dated April 26, 1999, DEF002505, DEF002514-DEF002519.

26.     Attached as Exhibit 23 is a true and accurate copy of the Chairman's Comments to the Board for its meeting dated January 28, 2002, DEF001848, DEF001859-DEF001864.

27.     Attached as Exhibit 24 is a true and accurate copy of the Chairman's Report to the Board for its meeting dated October 27, 2003, DEF003001, DEF003007-DEF003013.

28.     Attached as Exhibit 25 is a true and accurate copy of the Formal Minutes of the October 27, 2003 Board Meeting, DEF003054, DEF003058-DEF003059.

29.     Attached as Exhibit 26 is a true and accurate copy of a memo from Pappalardo to Manzolillo re: Annual Valuation of the Trust's Assets dated December 31, 1996, DEF001337-DEF001340.

30.     Attached as Exhibit 27 is a true and accurate copy of a memo from Pappalardo to Manzolillo re: Annual Valuation of the Trust's Assets dated January 2, 1998, DEF001333-DEF001336.

31.     Attached as Exhibit 28 is a true and accurate copy of a memo from Pappalardo to Manzolillo re: Annual Valuation of the Trust's Assets dated January 5, 1999, DEF001329-DEF001332.

32.     Attached as Exhibit 29 is a true and accurate copy of a memo from Pappalardo to Manzolillo re: Annual Valuation of the Trust's Assets dated December 29, 2000, DEF001321-DEF001325.

33.     Attached as Exhibit 30 is a true and accurate copy of a memo from Pappalardo to Manzolillo re: Annual Valuation of the Trust's Assets dated December 31, 2001, DEF001316-DEF001320.

34.     Attached as Exhibit 31 is a true and accurate copy of a memo from Pappalardo to Manzolillo re: Annual Valuation of the Trust's Assets dated January 26, 2004, DEF001309-DEF001312.

35.     Attached as Exhibit 32 is a true and accurate copy of a Memo from Howard Messing dated June 9, 2000, MH 0006-MH 0007.

<u>**Other**</u>

36.     Attached as Exhibit 33 is a true and accurate copy of excerpts from the Valuation of the Meditech Common Stock for the year limited to 2003 created by Willamette Management Associates, as produced to them by attorneys for former Director Grossman, DEF005245-DEF005249, DEF005249-DEF005314.

37.    Attached as Exhibit 34 is a true and accurate copy of the Form 5500 for 1997 filed by Meditech with the Department of Labor.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 27, 2008.

                                        _____/s/ Michael A. Collora_____
                                        Michael A. Collora


## CERTIFICATE OF SERVICE

I, Michael A. Collora, hereby certify that I caused a true copy of the above document to be served upon the counsel of record for each other party via this Court's ECF System on May 27, 2008

                                        _____/s/ Michael A. Collora_____
                                        Michael A. Collora

**EXHIBIT 1**

Page 1

Volume 1, Pages 1-112, Exhibits: 1-8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------

MICHAEL P. HUBERT, WILLIAM

TRAINOR, and DAVID HINCHLIFFE,

individually and on behalf of all

persons similarly situated et al.,

           Plaintiffs

vs.                    Docket No. 05-10269-RWZ

MEDICAL INFORMATION TECHNOLOGY

PROFIT SHARING PLAN, MEDICAL

INFORMATION TECHNOLOGY, INC., and

A. NEIL PAPPALARDO

           Defendants

VIDEOTAPED DEPOSITION OF WILLIAM TRAINOR

Monday, July 24, 2006, 10:08 a.m.

Goodwin Procter LLP

53 State Street - 17th Floor

Boston, Massachusetts

-------Reporter:  Alan H. Brock -- RDR, CRR-------

Farmer Arsenault Brock LLC, 50 Congress Street,

Suite 415, Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

William Trainor
Volume 1 - July 24, 2006

Page 2

1    APPEARANCES:

2         Dwyer & Collora, LLP

3         Sara E. Noonan, Esq.

4         600 Atlantic Avenue

5         Boston, Massachusetts 02210-2211

6         617.371.1000  fax: 617.371.1037

7         senoonan@dwyercollora.com

8         for Plaintiffs

9

10        Goodwin Procter LLP

11        Stephen D. Poss, Esq.

12        Kevin P. Martin, Esq.

13        Exchange Place

14        53 State Street

15        Boston, Massachusetts 02109

16        617.750.1000  fax: 617.523.1231

17        sposs@goodwinprocter.com

18        kmartin@goodwinprocter.com

19        for Defendants

20

21    ALSO PRESENT:

22        Adam Cook, Videograph, National Video Reporters

23

24

af080ac9-9366-43c8-aeef-0542d2c15804

William Trainor
Volume 1 - July 24, 2006

Page 12

1    you called to inquire about the lawsuit, he told you

2    the stock was undervalued, in his view.

3        A.  Uh-huh.

4        Q.  He asked you to join the lawsuit; and you

5    in that conversation said that you would.  Is that

6    correct?

7        A.  Yes.

8        Q.  Is there anything else you can recall you

9    said to Mr. Hubert or he said to you in that

10   conversation?

11       A.  No.  I've only talked to Mike probably

12   twice since this started.

13       Q.  Well, sticking with that first

14   conversation, have you now told me everything you

15   recall Mr. Hubert saying to you and you saying to

16   Mr. Hubert in that first conversation?

17       A.  Yes.

18       Q.  Why did you tell Mr. Hubert you would join

19   in his lawsuit in that first conversation?

20       A.  Because I wondered if the stock was

21   undervalued and maybe I had something coming to me.

22       Q.  Did you believe at the time you first spoke

23   to Mr. Hubert about the lawsuit that MEDITECH stock

24   was undervalued?

af080ac9-9366-43c8-aeef-0542d2c15804

William Trainor
Volume 1 - July 24, 2006

1    A.   I didn't know whether it was or it wasn't.

2    Q.   Had you ever thought of suing any of the

3    defendants in this case before you spoke to

4    Mr. Hubert about this lawsuit?

5    A.   No.

6    Q.   Did Mr. Hubert tell you anything in that

7    first conversation about why he thought MEDITECH

8    stock was undervalued or how much he thought it was

9    undervalued?

10    A.   I don't believe so.

11    Q.   Was there anyone else -- did anyone else

12    participate in that initial phone call that you've

13    discussed between you and Mr. Hubert?

14    A.   No.

15    Q.   Had you spoken to Mr. Hubert before he

16    filed this lawsuit about his plans to file the

17    lawsuit?

18              MS. NOONAN:   Objection.

19    A.   No.

20    Q.   What happened next, after that initial

21    phone call, in terms of steps leading up to your

22    becoming a named plaintiff in this lawsuit?

23    A.   I think he gave me the phone number of

24    Dwyer & Collora, and I called them.

William Trainor
Volume 1 - July 24, 2006

1    settlement of the Grossman litigation with no money

2    involved and no stock involved might have on your

3    lawsuit against MEDITECH?

4        A.   No.

5        Q.   Do you believe that the stock of MEDITECH

6    is or has been undervalued?

7        A.   I really don't know.

8        Q.   If you and the other plaintiffs win this

9    lawsuit, what do you expect to get out of it?

10       A.   I don't really know.

11       Q.   Mr. Trainor, since you became a plaintiff

12   in this lawsuit, have you adopted a habit of

13   maintaining files or notebooks or keeping track of

14   your activities involved in the lawsuit?

15       A.   I've only received a few packages, which

16   are in my desk at home.  That's about the extent.

17   There really isn't a lot of paper work.

18       Q.   What have you received?

19           MS. NOONAN:  Objection.  I'm going to

20   instruct you not to answer that.

21           MR. POSS:   What's the basis for the

22   instruction?

23           MS. NOONAN:  It's attorney-client

24   privileged.  I think he already testified that he

William Trainor
Volume 1 - July 24, 2006

Page 54

1    maybe to Dave Hinchliffe about the value.

2       Q.  And what did you say to Mr. Hinchliffe and

3    what did Mr. Hinchliffe say to you about the value

4    of MEDITECH stock?

5       A.  I certainly can't remember the

6    conversations, but just about wondering how the

7    stock got its value, how did that number come about,

8    you know.

9       Q.  Can you recall anything else about

10   conversations you had with Mr. Hinchliffe about the

11   value or valuation of MEDITECH stock?

12      A.  It wasn't something we'd talk about very

13   often.  It might be something we talked about during

14   stockholders' meetings or something -- you know, a

15   time like that.  But it's not a subject that we

16   dwelled on.

17      Q.  Did you ever tell Mr. Hinchliffe that you

18   believed that the MEDITECH stock was valued too low?

19      A.  I never told him that.  We wondered if it

20   was.

21      Q.  Did Mr. Hinchliffe ever tell you he

22   believed that MEDITECH stock was valued too low?

23      A.  No.

24      Q.  If you look at the next sentence of this

FARMER  ARSENAULT  BROCK  LLC

af080ac9-9366-43c8-aeef-0542d2c15804

William Trainor
Volume 1 - July 24, 2006

Page 55

1    paragraph, (a), in response to Interrogatory No. 3

2    on Page 6 of Exhibit No. 3, it says, quote, "In

3    addition, Mr. Hinchliffe and Mr. Trainor each had

4    communications with various coworkers at MEDITECH in

5    which they and the other participants would wonder

6    how the defendants and/or the dismissed defendants

7    had arrived at the assigned value, but neither

8    recalls the details of those conversations," period,

9    close quote.  Do you see that sentence?

10        A.  Yes, uh-huh.

11        Q.  What communications did you have with

12    coworkers at MEDITECH in which you and they would

13    wonder how the defendants and/or the dismissed

14    defendants had arrived at the assigned value of

15    MEDITECH stock?

16        A.  I certainly can't recall conversations, but

17    we wondered how the value was placed on it.  Nobody

18    ever came up with that answer.  Nobody ever really

19    knew how it was valued.  I don't think to this day

20    anybody knows how it's valued.

21        Q.  What is the basis for your statement that

22    you don't think to this day that anyone knows how

23    the stock is valued?

24        A.  I don't know how it is.

af080ac9-9366-43c8-aeef-0542d2c15804

William Trainor
Volume 1 - July 24, 2006

Page 59

1    A.  Oh, probably at least a couple of years.

2    Q.  So at least back into the 1996 time frame,

3    then.

4    A.  Yeah.

5    Q.  Did you do anything to investigate or look

6    into the valuation issue you've told me about, that

7    of the competitors being valued more highly?

8    A.  No.

9    Q.  Did you ever ask anyone in MEDITECH

10   management how the company or the trust valued

11   MEDITECH stock?

12   A.  No.

13   Q.  Do you have any expertise, Mr. Trainor, in

14   how stock of companies is to be valued?

15   A.  No.

16            (Mr. Martin left the deposition room.)

17   Q.  I'd like to direct your attention to Page 9

18   of Exhibit 3, Mr. Trainor.  At the top of the page

19   there's a little paragraph -- a paragraph with a

20   little letter (g) in front of it.  Do you see that?

21   A.  Yes.

22   Q.  It says, quote, "In addition to the annual

23   communications reflected in the defendants' document

24   production, the plaintiffs had numerous

af080ac9-9366-43c8-aeef-0542d2c15804

William Trainor
Volume 1 - July 24, 2006

Page 62

1      Q.  Any other reasons?

2      A.  They paid dividends.

3      Q.  Anything else?

4      A.  Not really.

5      Q.  Did you think the MEDITECH stock you

6  bought -- strike that.  At the time you bought

7  MEDITECH stock, did you think you were paying a fair

8  price for it?

9           MS. NOONAN:  Objection.  You can answer.

10     A.  We paid what it was valued at.

11     Q.  Did you think you were paying a fair price

12  for the stock when you bought it?

13     A.  I never really thought about whether it was

14  fair or unfair.  I was offered so many shares, and I

15  paid for it and bought it.

16     Q.  Did you invest in other stocks, other than

17  MEDITECH, during the period when you were buying

18  MEDITECH stock?

19     A.  No.

20     Q.  Why not?

21     A.  Mainly because I didn't have the money, and

22  I was not a stock person.  It wasn't something I was

23  pursuing.

24     Q.  Well, when you had a choice to spend your

FARMER  ARSENAULT  BROCK  LLC

af080ac9-9366-43c8-aeef-0542d2c15804

William Trainor
Volume 1 - July 24, 2006

Page 70

1  wife ever submitted a shareholder proposal to

2  MEDITECH?

3      A.  I don't know.  I don't know them.  I don't

4  know the Grossmans.

5      Q.  Setting aside whether you know the

6  Grossmans or not, do you know whether they ever

7  submitted any shareholder proposals?

8      A.  No, I don't.

9      Q.  What is your educational background,

10 Mr. Trainor?

11     A.  High school.

12     Q.  What year did you graduate from high

13 school?

14     A.  1964.

15     Q.  From what high school did you graduate?

16     A.  Revere.

17     Q.  Revere?

18     A.  Yes.

19     Q.  And have you had any formal education

20 following high school?

21     A.  No.

22     Q.  What positions did you hold at MEDITECH?

23     A.  I started as a technician, repairing the

24 computers; worked my way up to being director of

William Trainor
Volume 1 - July 24, 2006

Page 79

1        A.   Yes.

2        Q.   At the time you received this payment, did

3    you understand how the value of your account balance

4    as of 12/31/97 was calculated?

5        A.   No.

6        Q.   Did you ask anyone?

7        A.   No.

8        Q.   Did you understand at the time you received

9    this distribution upon leaving the company from the

10   trust what value had been assigned to MEDITECH's

11   stock by the trustee of the profit sharing trust as

12   of December 31, 1997?

13       A.   No.

14       Q.   Did you ask anyone?

15       A.   No.

16       Q.   Did you believe at the time you received

17   this $929,943.41 distribution that the distribution

18   was too low?

19       A.   I had no way of knowing.

20       Q.   Did you believe it was too low?

21       A.   I believed it was what was due to me.

22       Q.   Did you believe at that time that you were

23   owed more by the trust than what you were paid?

24       A.   I only knew what the value of the stock was

William Trainor
Volume 1 - July 24, 2006

Page 88

1    Do you know what a P/E ratio is?

2        A.  No.

3        Q.  Have you ever heard of a price/earnings

4    ratio?

5        A.  It sounds familiar.

6        Q.  Do you know what that means, a

7    price/earnings ratio?

8        A.  No.

9        Q.  Did you ever calculate a P/E ratio for

10   MEDITECH stock?

11       A.  No.

12       Q.  Did you ever compare the P/E ratio of

13   MEDITECH stock to other companies?

14       A.  No.

15       Q.  Have you ever looked at any of MEDITECH's

16   filings with the Securities and Exchange Commission?

17       A.  No.

18       Q.  Are you aware that at some point in time

19   while you were employed at MEDITECH that MEDITECH

20   started making filings with the SEC?

21       A.  No.

22       Q.  Did you ever look at financial statements

23   for MEDITECH?

24       A.  Just what they gave us.

William Trainor
Volume 1 - July 24, 2006

Page 102

1    Q.  Do you care what the proper value of

2    MEDITECH's stock was in 2001?

3    A.  No.

4    Q.  Would that affect you in any way?

5    A.  No.

6    Q.  What about 2000?

7    A.  No.

8    Q.  So I take it for any years after the last

9    year at which you worked at the company, the fair

10   value of MEDITECH's stock as set by the trustee is

11   not something that concerns you.

12   A.  It didn't until I heard that Jerry

13   Grossman, who was a member of the board of

14   directors, was suing the company for what I

15   understand is he felt the stock was undervalued, and

16   I think that was the first time that I even thought

17   about it.

18   Q.  Maybe my question wasn't clear.  Let me try

19   and ask it again, because that wasn't what I was

20   asking.

21   A.  Okay.

22   Q.  You left MEDITECH in 1998, and you received

23   a payout from the trust in 1998 --

24   A.  Yes.

**EXHIBIT 2**

# ORIGINAL

Exhibits 1 to 23          Volume 1, Pages 1 - 182

## COMMONWEALTH OF MASSACHUSETTS

Suffolk County                          Superior Court

Docket No. 03-1872-BLS2

----------------------------------------

DR. JEROME H. GROSSMAN

       Plaintiff

vs.

MEDICAL INFORMATION TECHNOLOGY, INC.,

A. NEIL PAPPALARDO, EDWARD B. ROBERTS,

MORTON E. RUDERMAN, ROLAND L. DRISCOLL

AND LAWRENCE A. POLIMENO

       Defendants

----------------------------------------

### TRANSCRIPT DESIGNATED CONFIDENTIAL

### UNDER PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF MICHAEL PETER HUBERT

Thursday, July 14, 2005, 12:10 p.m.

Dwyer & Collora, LLP

600 Atlantic Avenue

Boston, Massachusetts

--------- Janis T. Young, RDR, CRR ---------

Farmer Arsenault Brock LLC

Boston, MA    |    617-728-4404    |    Fax 617-728-4403

DEF009529
Confidential/Attorneys - Subject to Protective Order

DESIGNATED CONFIDENTIAL UNDER PROTECTIVE ORDER

39

| 13:23:13 | 1 | worked with had that opinion. |
| 13:23:16 | 2 | Q. Can you give me any of their names? |
| 13:23:20 | 3 | A. I'll say Paul Kingston. And that's all. |
| 13:23:40 | 4 | Q. What about William Trainor or David |
| 13:23:52 | 5 | Hinchliff? Did they express that view to you? |
| 13:23:54 | 6 | MR. POSS: Objection. |
| 13:23:56 | 7 | A. No. Both those employees left Meditech |
| 13:24:00 | 8 | some five, six years ago, and I think they left |
| 13:24:04 | 9 | prior to people becoming so concerned about the |
| 13:24:09 | 10 | valuation of the stock. So no, we did not discuss |
| 13:24:13 | 11 | the value of the stock when they were employees. |
| 13:24:16 | 12 | Q. Subsequent to their leaving the company, |
| 13:24:19 | 13 | have they expressed to you a view that the company's |
| 13:24:27 | 14 | shares are underpriced? |
| 13:24:28 | 15 | MR. POSS: Objection. |
| 13:24:33 | 16 | A. When the suit occurred where I was suing |
| 13:24:38 | 17 | Meditech, or the trust, I should say, on behalf of |
| 13:24:42 | 18 | other employees, I did contact Mr. Hinchliff and |
| 13:24:49 | 19 | Mr. Trainor to make them aware of the suit, and they |
| 13:24:54 | 20 | agreed, yes, the stock in their opinion was |
| 13:24:56 | 21 | undervalued, and they elected to participate in my |
| 13:25:00 | 22 | suit. |
| 13:25:02 | 23 | Q. So they share your view as you express it |
| 13:25:06 | 24 | in that lawsuit? |

FARMER ARSENAULT BROCK LLC

DEF009567
Confidential/Attorneys - Subject to Protective Order

DESIGNATED CONFIDENTIAL UNDER PROTECTIVE ORDER

40

| | | |
|---|---|---|
| 13:25:07 | 1 | A.   Yes. |
| 13:25:09 | 2 | Q.   Now, you mentioned that the discussions |
| 13:25:10 | 3 | over the undervaluation of the stock became more |
| 13:25:19 | 4 | heightened in later years. |
| 13:25:23 | 5 | A.   Yes. |
| 13:25:23 | 6 | Q.   During what period of time did you notice |
| 13:25:25 | 7 | that concern over the undervaluation of Meditech |
| 13:25:29 | 8 | stock increased? |
| 13:25:31 | 9 | MR. POSS:   Objection. |
| 13:25:32 | 10 | A.   I believe when Dr. Grossman filed his first |
| 13:25:36 | 11 | filing with the SEC, a 13-G -- or you perhaps know |
| 13:25:42 | 12 | the number; I'm not sure what it's called, 13-D -- I |
| 13:25:46 | 13 | think that's when people really took notice. |
| 13:25:49 | 14 | Q.   And there were discussions in which people |
| 13:25:52 | 15 | said they had a similar concern about the |
| 13:25:54 | 16 | undervaluation of the stock? |
| 13:25:56 | 17 | MR. POSS:   Objection. |
| 13:25:56 | 18 | A.   Yes. |
| 13:26:03 | 19 | Q.   During your tenure at the company, did you |
| 13:26:07 | 20 | work directly for Mr. Pappalardo? |
| 13:26:10 | 21 | A.   Never directly, no. |
| 13:26:12 | 22 | Q.   What, if any, dealings did you have with |
| 13:26:17 | 23 | him in the course of your ordinary work duties with |
| 13:26:19 | 24 | Mr. Pappalardo?   Was he someone that you interacted |

FARMER ARSENAULT BROCK LLC

DEF009568
Confidential/Attorneys - Subject to Protective Order

**EXHIBIT 3**

# Michael P. Hubert
## Volume 1 - July 26, 2006

Page 1

Volume 1, Pages 1-240, Exhibits: 1-35

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------

MICHAEL P. HUBERT, et al.,

        Plaintiffs

vs.               Docket No. 05-10269-RWZ

MEDICAL INFORMATION TECHNOLOGY

PROFIT SHARING PLAN, MEDICAL

INFORMATION TECHNOLOGY, INC., and

A. NEIL PAPPALARDO

        Defendants

----------------------------

VIDEOTAPED DEPOSITION OF MICHAEL P. HUBERT

Wednesday, July 26, 2006, 10:11 a.m.

Goodwin Procter LLP

53 State Street - 17th Floor

Boston, Massachusetts

-------Reporter:  Alan H. Brock, RDR, CRR-------

abrock@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

184e7f67-1cf9-4554-903c-a73252e03114

Michael P. Hubert
Volume 1 - July 26, 2006

Page 2

1    APPEARANCES:

2        Dwyer & Collora, LLP

3        Michael A. Collora, Esq.

4        600 Atlantic Avenue

5        Boston, Massachusetts 02210-2211

6        617.371.1000  fax: 617.371.1037

7        mcollora@dwyercollora.com

8        for Plaintiffs

9

10       Goodwin Procter LLP

11       Stephen D. Poss, Esq.

12       Michael P. Sugrue, Esq.

13       53  State Street, Exchange Place

14       Boston, Massachusetts 02109

15       617.750.1000  fax: 617.523.1231

16       sposs@goodwinprocter.com

17       msugrue@goodwinprocter.com

18       for Defendants

19

20   ALSO PRESENT:

21       Adam Cook, Videograph, National Video Reporters

22

23

24

FARMER ARSENAULT BROCK LLC

Michael P. Hubert
Volume 1 - July 26, 2006

Page 117

1  defendants of intentionally undervaluing the stock,"

2  close quote.  Do you see that?

3      A.  Yes, I do.

4      Q.  Is that an accurate statement?

5      A.  Yes, it is.

6      Q.  And this talks about your suspicions being

7  confirmed.

8      A.  Right.

9      Q.  When did you first have suspicions that the

10  MEDITECH stock was being undervalued?

11      A.  Well, I never really understood much about

12  valuation of stock until I was working at MEDITECH,

13  and we would buy the stock, and we wouldn't know,

14  you know, what value would seem right, but we were

15  told it was being offered at such-and-such a price,

16  because we would pretty much buy the stock because

17  everyone always seemed to think it was a good idea.

18          I never knew how the value of the stock

19  was set, and I don't think I ever got suspicious

20  until when I saw Howard Messing's memo saying that

21  the value of the stock was intentionally kept low.

22  Those weren't the words exactly, but Mr. Messing's

23  memo mentioning how the value of the stock was set

24  low for the sake of some benefit for employees.  In

FARMER  ARSENAULT  BROCK  LLC

Michael P. Hubert
Volume 1 - July 26, 2006

Page 120

1  was more than double of what the SAIC filing was.  I

2  thought that was interesting, but for all I knew,

3  SAIC is too high or too low or it's different.

4  They're not in the exact same business.  I really

5  didn't know anything about it.

6          And sometime later -- it could have been

7  actually a couple of years later -- I happened to be

8  in the lunchroom cafeteria having lunch with a few

9  people, including Howard Messing, who at the time

10 was senior VP at MEDITECH, and we were talking about

11 different things -- I don't remember exactly.  But

12 when other people left the table, I had mentioned to

13 Howard that, you know, I owned stock and he owned

14 stock and I was interested in how the stock was

15 valued, and I plugged in the numbers from MEDITECH

16 into the SAIC formula and got a number that was

17 approximately twice or more than what MEDITECH said

18 the value of the stock was.

19          And he seemed, you know, a little

20 interested, but he simply said, "Well, they have

21 their way of doing it and we have ours."  And I

22 simply accepted that.  I simply thought, you know,

23 isn't that an interesting little piece of

24 information.  But that's the only time I ever went

184e7f67-1cf9-4554-903c-a73252e03114

Michael P. Hubert
Volume 1 - July 26, 2006

Page 125

1    Q.  Is the handwriting on this document yours?

2    A.  Yes, it is.

3    Q.  Is this something you looked at in or about

4  the year 1998?

5    A.  It could have been '99.  This report comes

6  out once a year, and I probably -- I might have

7  gotten the most current Fortune 500 document.  It

8  could have been '99.  No later than that.

9    Q.  Why did you make a notation on this

10  document?

11    A.  Well, I was interested -- I'm a

12  salesperson, or sales manager, and I'm always

13  interested in knowing how MEDITECH ranks in the

14  world and how we compare to other vendors.  And

15  sometimes I might use this information for my own

16  benefit.  Sometimes I'd use this information that I

17  might use to present to a customer, to say we're a

18  successful, viable company.  People always question

19  should they buy products from a small company like

20  MEDITECH compared to our much larger competitors.

21  And I thought it would be an interesting thing to go

22  and see how MEDITECH compares against other

23  companies in terms of their profits, assets, and

24  shareholder equity.  That's it.

FARMER  ARSENAULT  BROCK  LLC

184e7f67-1cf9-4554-903c-a73252e03114

Michael P. Hubert
Volume 1 - July 26, 2006

Page 126

1    Q.  Did you keep this document in a file or

2    folder or some other method, such that you still

3    have it from 1998?

4    A.  Yes.

5    Q.  And what file or folder was that?

6    A.  Just in my desk, with all my MEDITECH, you

7    know, stock reports and things.

8    Q.  Now, 1998 was the time frame you've

9    testified you believe you first started using the

10   SAIC formula to compare the MEDITECH stock valuation

11   as well; is that correct?

12   A.  No, I don't think I said '98.  Sometime --

13   it could have been later than that.  It could have

14   been '99.  It could have been 2000.  I don't know

15   exactly when.  I don't know when I started doing

16   that.

17           MR. POSS:  Let me ask the reporter to

18   mark as Exhibit No. 13 a document stamped HUB 516.

19           (Exhibit MH 13 marked for

20   identification.)

21   Q.  This is from your files, Mr. Hubert, is it

22   not?

23   A.  Yes, it is.

24   Q.  And this is a document that you printed out

FARMER ARSENAULT BROCK LLC

184e7f67-1cf9-4554-903c-a73252e03114

Michael P. Hubert
Volume 1 - July 26, 2006

Page 127

1    in April of 1998?

2        A.  Yes.  Well -- yes.

3        Q.  Does this refresh your recollection as to

4    this being the time frame when you started looking

5    at the SAIC formula and plugging in MEDITECH's

6    numbers?

7        A.  Not necessarily.  This is probably when

8    MEDITECH was first looking to build its relationship

9    with SAIC.  It was sometime after that that I

10   started plugging the numbers in the formula; I don't

11   even remember when.

12       Q.  Why do you say that it's sometime after

13   April 21 of 1998 that you started plugging the

14   numbers into the formula?

15       A.  Well, that's the date printed on the

16   document.  I don't know -- I can't imagine it doing

17   sooner than that, because this is probably when I

18   first found out about SAIC.

19       Q.  What makes you think that April 21, 1998,

20   is when you first found out about SAIC?

21       A.  Because when I went to their Web page, I

22   thought, "Gee, this is interesting information," and

23   I printed it out, because what you see today might

24   not be there next week or next month, and I thought

FARMER ARSENAULT BROCK LLC

184e7f67-1cf9-4554-903c-a73252e03114

Michael P. Hubert
Volume 1 - July 26, 2006

Page 212

1    Q.   Every year Mr. Pappalardo invites employees
2  to a meeting to discuss purchasing MEDITECH stock,
3  does he not?
4    A.   I would say yes.
5    Q.   And each year all employees are told
6  they're welcome to attend that meeting, isn't that
7  the case?  When you were there.
8    A.   Yeah.
9    Q.   In those meetings did Mr. Pappalardo
10 discuss MEDITECH stock and its valuation and how it
11 was valued?
12   A.   Well, I only went to one of those meetings.
13   Q.   Which one did you go to?
14   A.   Probably around 1984, when I was first
15 offered a chance to buy stock.  Because the meetings
16 were really for first-time shareholders.  Anyone was
17 welcome to attend -- I don't want to say they were
18 invited, but they were welcome to attend.  But it
19 was really meant for first-time shareholders or
20 people considering buying stock for the first time.
21   Q.   Well, in 1998 and 1999 and 2000, when you
22 were concerned about the valuation of MEDITECH stock
23 and talking to the Department of Labor and
24 underlining what Mr. Messing said, why didn't you go

FARMER ARSENAULT BROCK LLC

184e7f67-1cf9-4554-903c-a73252e03114

Michael P. Hubert
Volume 1 - July 26, 2006

Page 218

1    but it was in that time frame.  It was probably

2    2000, but it could have been the year prior or the

3    year later.

4        Q.  And was this a private discussion, just you

5    and Mr. Pappalardo?

6        A.  Just the two of us.

7        Q.  Tell me about this conversation.

8        A.  We were talking, and I had mentioned a

9    concern of mine that so much of my assets in the

10   trust were all tied up in MEDITECH stock, and I

11   wanted to know why it was that perhaps there wasn't

12   a 401(k) plan, where I'd have the ability to invest

13   my assets in other stocks -- and not that I was

14   against MEDITECH, but by, you know, a little bit of

15   spreading of the money around amongst multiple

16   stocks, diversification is a good idea, and could

17   that happen or why wouldn't that happen.

18            And his response, according to No. 1, it

19   says here, is that he thought the employees would

20   not want to purchase as much stock if they had a

21   choice, meaning if he made the choice, it's going

22   into MEDITECH stock, but if employees had the choice

23   to buy MEDITECH stock or a number of other items,

24   they might decide not to invest 85 percent of their

FARMER ARSENAULT BROCK LLC

184e7f67-1cf9-4554-903c-a73252e03114

Michael P. Hubert
Volume 1 - July 26, 2006

Page 219

1    assets in MEDITECH stock, they might invest more of

2    their stock in other companies.

3             Should I go down the list?

4    Q.  Yep.

5    A.  Okay.  No. 2, "He said he already thinks

6    that he sells the stock at a bargain."  If he's

7    already given employees a good deal by selling the

8    stock at a bargain, why do more?  Meaning why should

9    he offer a 401(k)?  He's already giving employees a

10   good deal by investing the money in the stock at the

11   low price and giving them a chance to buy the stock

12   at the low price, and he thought that that was, you

13   know, a lot that he was doing for his employees.

14            These weren't necessarily questions

15   coming up, but he just elaborated.  And he said

16   that, you know, the decisions of the trust -- and I

17   wrote "ESOP trust," but I think more the trust

18   decisions that he makes is based on what's good for

19   the company, not individuals.  He thinks that it's

20   good for the company to have a lot of ownership of

21   the stock by employees rolled in the plan, as part

22   of their assets, and he makes his decisions based on

23   what's good for the trust, as opposed to what's good

24   for the individual.

184e7f67-1cf9-4554-903c-a73252e03114

Michael P. Hubert
Volume 1 - July 26, 2006

Page 220

1     I was raising this question as an

2  individual, wouldn't it be better to diversify; and

3  his answer was, "Well, you know, it may be good for

4  you, but it's not good for the company.  It's better

5  for the company," and he was looking at the company

6  as a whole, "to have a lot of stock invested in the

7  company in the hands of the trust."

8     No. 4, if the stock value went up, the

9  return on dividends would be lower.  So if the

10  dividends were the same amount as they are now --

11  let's say, for example, dividends are $2 a share and

12  the stock is $20 a share, you're getting a nice

13  return of $5 a share.

14     MR. COLLORA:  5 dollars?

15     THE WITNESS:  5 percent.

16  A.  If the stock were $40 -- now, I'm saying

17  this today.  We didn't discuss this in detail.

18     MR. COLLORA:  I've kind of lost the

19  question.  Do you want him to explain each item --

20     MR. POSS:  Yes, I do.

21  Q.  But I think you were explaining what this

22  meant.  So go ahead.

23     MR. COLLORA:  Stay with what it meant,

24  then.  If you want to repeat anything that you've

184e7f67-1cf9-4554-903c-a73252e03114

**EXHIBIT 4**

David W. Hinchliffe
Volume 1 - July 27, 2006

Page 1

Volume 1, Pages 1-62, Exhibits: 1-12

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL P. HUBERT, WILLIAM

TRAINOR, and DAVID HINCHLIFFE,

individually and on behalf of all

persons similarly situated, et

al.,

Plaintiffs

vs.                    Docket No. 05-10269-RWZ

MEDICAL INFORMATION TECHNOLOGY

PROFIT SHARING PLAN, MEDICAL

INFORMATION TECHNOLOGY, INC., and

A. NEIL PAPPALARDO,

Defendants

VIDEOTAPED DEPOSITION OF DAVID W. HINCHLIFFE

Thursday, July 27, 2006, 10:06 a.m.

Goodwin Procter LLP

53 State Street - 17th Floor

Boston, Massachusetts

-------Reporter:  Alan H. Brock, RDR, CRR-------

Farmer Arsenault Brock LLC, 50 Congress Street,

Suite 415, Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

1b26d29c-0cab-4497-be2e-da09d34beb70

David W. Hinchliffe
Volume 1 - July 27, 2006

Page 2

1    APPEARANCES:

2        Dwyer & Collora, LLP

3        Sara E. Noonan, Esq.

4        600 Atlantic Avenue

5        Boston, Massachusetts 02210-2211

6        617.371.1000  fax: 617.371.1037

7        senoonan@dwyercollora.com

8        for Plaintiffs

9

10       Goodwin Procter LLP

11       Stephen D. Poss, Esq.

12       Michael P. Sugrue, Esq.

13       53 State Street, Exchange Place

14       Boston, Massachusetts 02109

15       617.750.1000  fax: 617.523.1231

16       sposs@goodwinprocter.com

17       msugrue@goodwinprocter.com

18       for Defendants

19

20    ALSO PRESENT:

21       Adam Cook, Videographer, National Video

22           Reporters

23

24

1b26d29c-0cab-4497-be2e-da09d34beb70

David W. Hinchliffe
Volume 1 - July 27, 2006

Page 13

1    exactly when.  And he told me about what Michael

2    Hubert was doing, and he mentioned that we could

3    possibly join the action and to give Michael a call,

4    which I subsequently did.

5              I had a long conversation with Michael

6    Hubert.  I got the basics of what was happening.

7    And then I called Michael Collora and had a long

8    conversation with him.  And he told me to --

9              MS. NOONAN:  Dave, I'm going to ask you

10   not to disclose any conversations you had with me or

11   with Michael; okay?

12        A.  I just want to say that I took my time

13   deciding whether I wanted to join or not, and I

14   decided to join.

15        Q.  When did you have your conversation with

16   Mr. Hubert about the possibility of joining the

17   lawsuit?

18        A.  It was between the time the original

19   complaint was filed and the amended complaint.

20   There's been a lot going on in my life, so it's hard

21   to say the exact time.  So, I don't know, a year,

22   year and a half ago, something like that.

23        Q.  What did you say to Mr. Hubert and what did

24   he say to you in that conversation?

1b26d29c-0cab-4497-be2e-da09d34beb70

David W. Hinchliffe
Volume 1 - July 27, 2006

Page 15

1    it was a long time ago, and we talked for a long

2    time.  But, you know, I can assure you that we

3    talked about our feelings about the stock and

4    whether we thought it was low or high or whatever.

5        Q.  What feelings did you have about the stock

6    that you expressed to Mr. Hubert?

7        A.  I always felt that it was valued low.  We

8    all did.  Everybody in the company did.  It's just,

9    you know, you couldn't do anything about it.

10       Q.  Now, when you say you always felt that the

11   stock was valued low, when did you first come to

12   have that belief?

13       A.  Well, first of all, I mean, none of us ever

14   knew how they decided to value the stock.

15       Q.  Well, that's not the question I asked you.

16   So when did you first come to the belief that the

17   stock was valued low?  In other words, I'm trying to

18   put a time frame around your use of the word

19   "always."

20       A.  Well, I mean, it's always a general

21   feeling.  There is never anything like, you know, I

22   feel this is so low I want to try to do anything

23   about it.  It's just, you know, general office talk.

24   It goes back a while.

1b26d29c-0cab-4497-be2e-da09d34beb70

David W. Hinchliffe
Volume 1 - July 27, 2006

Page 19

1    believed that the stock was low; is that your

2    testimony?

3         A.   They questioned the value of the stock.

4         Q.   When you say they questioned the value, do

5    you mean they questioned that it was too high or

6    they questioned that it perhaps might be valued too

7    low?

8         A.   They questioned how it was valued and

9    whether it was valued properly.

10        Q.   And was it your sense that, at least among

11   your circle of acquaintances when you were employed

12   at MEDITECH, that the people you knew questioned

13   whether the stock was valued too low?

14             MS. NOONAN:   Objection.

15        A.   There were certainly questions about how it

16   was valued, and obviously, if we have questions

17   about its value, we think it's valued too low.

18        Q.   When you spoke with Mr. Hubert about the

19   possibility of joining this lawsuit a year and a

20   half ago, did you tell Mr. Hubert you believed that

21   MEDITECH stock was undervalued?

22        A.   I'm sure I agreed with him at that time.

23        Q.   And when you say you agreed with him, does

24   that mean you agreed with him that the MEDITECH

1b26d29c-0cab-4497-be2e-da09d34beb70

David W. Hinchliffe
Volume 1 - July 27, 2006

Page 20

1  stock was undervalued?

2      A.  He gave me some information on research

3  that he had done, and after our conversation I was

4  convinced that, yeah, it was low.

5      Q.  What information --

6      A.  But that's the first time that I had some

7  fairly conclusive information that would help me

8  make that decision.

9      Q.  What was the fairly conclusive information

10  that Mr. Hubert gave you in that phone call that

11  helped you make that decision that the stock was

12  undervalued?

13      A.  He just told me some research that he did.

14  I don't remember the specific terms, the specific

15  company that he cited, or anything like that.  But

16  it was something that was quite interesting.

17      Q.  Again, I want to focus on this fairly

18  conclusive information that you've testified

19  Mr. Hubert gave you in that phone call.  Did that

20  information include a comparison of P/E or price/

21  earnings ratios of MEDITECH to some other company or

22  companies?

23      A.  Yes.  It compared earnings of other

24  companies and their assets and what their stock was

FARMER  ARSENAULT  BROCK  LLC

1b26d29c-0cab-4497-be2e-da09d34beb70

David W. Hinchliffe
Volume 1 - July 27, 2006

Page 58

1     A.  I became generally aware of that at some

2  point in the last few years.

3     Q.  I take it you never sought to obtain copies

4  of or to look at any of those SEC filings.

5     A.  No, sir.

6     Q.  No further questions, Mr. Hinchliffe.

7  Thank you.

8  BY MS. NOONAN:

9     Q.  Mr. Hinchliffe, I just have one question.

10  In the entire time that you worked at MEDITECH, did

11  anyone from the company ever explain to you how the

12  stock price was valued?

13     A.  No.  The closest thing is a meeting -- it

14  was way back early in my employment.  Mr. Pappalardo

15  made some -- somebody asked a question, and he made

16  some vague reference to it was based on company

17  assets and profits.  And that's the extent that I

18  know of.

19     Q.  Okay.  Thank you.

20     A.  You're welcome.

21          MR. POSS:  Thank you very much.

22          THE VIDEOGRAPHER:  The time is 11:32

23  a.m.  This is the end of Cassette No. 1 and the

24  conclusion of the deposition.  We are off the

1b26d29c-0cab-4497-be2e-da09d34beb70

**EXHIBIT 5**

1

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3

4        --------------------------------x

5    MICHAEL P. HUBERT, WILLIAM

     TRAINOR, and DAVID HINCHLIFFE,

6    Individually and On Behalf of

     All Persons Similarly Situated,

7                          Plaintiffs

                                          Civil Action

8    vs.                                  No. 05-10269-RWZ

9    MEDICAL INFORMATION TECHNOLOGY

     PROFIT SHARING PLAN, et al.,

10                        Defendants

11       --------------------------------x

12

13

14       DEPOSITION OF BARBARA MANZOLILLO, a

15           witness called by and on behalf of the

16           Plaintiffs, taken pursuant to Massachusetts

17           Rules of Civil Procedure, before

18           Nicole E. Guilbert, a Notary Public in and for

19           the Commonwealth of Massachusetts, at Dwyer &

20           Collora, 600 Atlantic Avenue, Boston,

21           Massachusetts  02210, on Tuesday, August 8,

22           2006, commencing at 10:20 a.m.

23

24

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

2

```
 1              A P P E A R A N C E S

 2

 3         MICHAEL A. COLLORA, ESQUIRE

 4         Dwyer & Collora

 5         600 Atlantic Avenue

 6         Boston, Massachusetts   02210

 7         (617) 371-1000

 8            Counsel for the Plaintiffs

 9

10         STEPHEN D. POSS, ESQUIRE

11         Goodwin Procter

12         Exchange Place

13         Boston, Massachusetts   02109

14         (617) 570-1000

15            Counsel for the Defendant

16

17

18

19

20

21

22

23

24
```

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

6

1    address I've given you; the only mailing address.

2         Q.    There are five buildings owned by Meditech or five

3    buildings at that location?

4         A.    Five buildings owned by Meditech.

5         Q.    At that location?

6         A.    No.  Owned --

7         Q.    Overall, how many buildings are at that business

8    address you just gave?

9         A.    One.

10        Q.    Who do you work for?  What's the full name?

11        A.    I work for Neil Pappalardo.

12        Q.    What is the name of the company?

13        A.    I'm sorry.  Medical Information Technology

14   Incorporated.

15        Q.    And is that commonly known as Meditech?

16        A.    Yes, it is.

17        Q.    Your position there?

18        A.    I'm the treasurer, clerk, and CFO.

19        Q.    How long have you held the position of CFO?

20        A.    Ten years.

21        Q.    Who did you replace?

22        A.    No one at the time I became the CFO.  Ten years

23   prior or several years prior to that, I replaced Roland

24   Driscoll, who was the former CFO.

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

16

| | |
|---|---|
| 1 | MR. COLLORA:  You're claiming it's |
| 2 | irrelevant? |
| 3 | MR. POSS:  I'm claiming that -- well, |
| 4 | if you know what a dominant personality is |
| 5 | -- I think the question is objectionable. |
| 6 | It calls for -- this is a fact deposition, |
| 7 | not an exercise in guessing about what you |
| 8 | mean. |
| 9 | But you can answer that, if you want. |
| 10 | THE WITNESS:  Well, that is a |
| 11 | difficult -- that's a personal trait or |
| 12 | characteristic.  I don't find him to be |
| 13 | that way. |
| 14 | Q.    (By Mr. Collora)  Do you find that people are |
| 15 | afraid of Mr. Pappalardo at the company? |
| 16 | A.    No, I do not. |
| 17 | Q.    Does the company provide any form of pension plan? |
| 18 | A.    Yes, it does. |
| 19 | Q.    What is that plan or plans? |
| 20 | A.    There is one plan. |
| 21 | Q.    What is that called? |
| 22 | A.    It is called the Medical Information Technology, |
| 23 | Inc., Profit Sharing Plan. |
| 24 | Q.    Can we call it "the plan" for purposes -- |

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

17

```
1        A.    Correct.

2        Q.    -- of this deposition?

3              MR. POSS:  Let him finish the

4        question before you answer.

5              THE WITNESS:  I'm sorry.

6        Q.    (By Mr. Collora)  So is it fair to say there's no

7   pension plan other than that?

8        A.    Correct.

9        Q.    And there's no 401(k)?

10       A.    Correct.

11       Q.    Are people permitted to have an IRA?

12       A.    Excuse me?

13       Q.    Are people permitted to have an IRA under this

14   plan, to your knowledge?

15       A.    No.

16       Q.    So is it fair to say this is it in terms of

17   retirement planning for most employees of the company?

18             MR. POSS:  Objection.  Do you mean

19        that the company provides or --

20             MR. COLLORA:  Yeah, that the company

21        provides.

22             THE WITNESS:  I was just going to

23        say, which the company provides.  Yes, it's

24        the only plan the company provides.
```

18

1     Q.   (By Mr. Collora)  Who is the administrator of the

2  plan?

3     A.   The company is the administrator of the plan.

4     Q.   And who's the trustee?

5     A.   The trustee is Neil Pappalardo.

6     Q.   Has he always been the trustee, to your knowledge?

7     A.   Yes.

8     Q.   Do you play, if any, role in terms of the

9  administration of the plan?

10    A.   I am the administrator of the plan.

11    Q.   You're the company's designee?

12    A.   Right.

13    Q.   When did you have or assume that position?

14    A.   In approximately the late '80s or 1990.

15    Q.   Who did you replace?

16    A.   I replaced Roland Driscoll.

17    Q.   Can you describe what your duties are as the

18  administrator of the plan.

19    A.   I oversee all of the plans financials, documents,

20  reporting to Department of Labor, any field and audit

21  questions, the audit itself by our internal auditors,

22  providing benefits to employees for the plan, fielding any

23  questions.

24    Q.   Does anyone help you in this regard?

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

19

```
 1        A.    Yes.

 2        Q.    Who is that?

 3        A.    Joanne Gately.

 4        Q.    Does she have an office near yours?

 5        A.    In the same building, yes.

 6        Q.    And where are the records of the trust kept?

 7        A.    The records of the trust are kept in -- the

 8   electronic records are kept in a locked room in our

 9   department with access only by myself, Joanne Gately, and

10   payroll people, because there's so much association with

11   payroll.

12        Q.    Are you a participant in the plan?

13        A.    Yes, I am.

14        Q.    Have you always been since you were eligible?

15        A.    Yes.

16        Q.    Has anyone, to your knowledge, declined to become

17   a member of the plan if -- assuming they were eligible?

18        A.    The plan document is written in such a way that

19   that is not allowable.

20        Q.    As a participant, what do you get in the ordinary

21   course during a year from the plan?

22        A.    I'm sorry --

23              MR. POSS:  Objection.  Are you

24              talking paper?  Money?
```

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

20

1              MR. COLLORA:  Paper.

2        Q.    (By Mr. Collora)  What kind of information do you

3   receive from the plan?

4        A.    Once a year upon its annual valuation date, the

5   trustee provides information that is posted on the intranet

6   for the basic information revolving around the plan's

7   assets, its financial statements, a condensed plan --

8   summary condensed plan; and at the same time, each

9   individual receives what's called, part of their January

10  31st compensation package, an individual letter that

11  includes the summary of a participant's account from --

12  starting with their prior year's account balance, their

13  allocation of the current year's activity from the

14  valuation, and the company's contribution forfeitures

15  bringing it down to the current balance at the end of

16  December 31st of that year.

17       Q.    For each individual?

18       A.    Correct.  Each individual gets their own letters

19  signed.

20       Q.    And they have available to them on the intranet --

21  is it an intranet?

22       A.    Yes, it is.

23       Q.    -- more general information --

24       A.    Yes.

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

25

```
 1        Q.    Now, up at the top, there's a Question 23(a)

 2    through (e).  Do you see that?

 3        A.    Yes, I do.

 4        Q.    And then it has a question, "Does the plan hold

 5    any assets that have a fair market value that is not

 6    readily determinable on an established market?  If yes,

 7    Complete 23(b)."  And apparently you marked the answer yes;

 8    is that fair to say?

 9        A.    Correct.

10        Q.    And then on (b), you were asked, "What was the

11    value of the assets that were not valued by an independent

12    third-party appraiser for the 1996 year?"  And you insert

13    $33,760,720; is that right?

14        A.    Correct.

15        Q.    What asset is that?

16        A.    That is the common stock that the trust holds in

17    the company.

18        Q.    Now, down further with respect to 26(a) -- sorry.

19    It asks you on Question (d) of 23(d), "Enter the most

20    recent date the assets" -- line 23(c), that's the 33

21    million -- "were valued by an independent third-party

22    appraiser."  And you put as an answer, "Not required"?

23        A.    Correct.

24        Q.    And where did you get that information from that
```

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

58

```
 1      19 -- February 1992 or back earlier, had you given that

 2   document out to any plan participant?

 3        A.    This particular document?

 4        Q.   Yes.

 5        A.    I don't recall if this is the particular document

 6   I might have given.

 7        Q.    Can you recall ever giving out the plan to any

 8   participant?

 9        A.    I have had one request and I have provided the

10   plan.

11        Q.    Who was that person?

12        A.    Is that something I should provide?

13              MR. POSS:  You can answer that.

14              THE WITNESS:  Robert Soultania.

15        Q.   (By Mr. Collora)  When did you give it to him?

16        A.   Approximately within the last year or two.

17        Q.    Prior to that, have you ever been asked for the

18   plan?

19        A.    No.

20        Q.    If Mr. Hubert said he asked for a copy of the plan

21   and you discouraged him, would he be inaccurate?

22        A.    Yes.

23        Q.    Did anyone ever come in and read the plan in your

24   presence?
```

59

1      A.    I don't recall anyone asking to read the plan.

2      Q.    How many copies of the plan do you have, Xeroxed

3   copies?

4      A.    I can't answer that question specifically.

5      Q.    More than one?

6      A.    Well, there's one original.

7      Q.    Right.  And how about beyond the one original?

8      A.    I have a working copy in my office, which is

9   marked up.

10      Q.    Which is marked up?

11      A.    Yes.

12      Q.    Besides that, do you have any other copies that

13   are available to be read by participants?

14      A.    No.  I would need to probably Xerox them, but I

15   can't give you an exact specific answer.

16      Q.    So there's no stack of them that are available

17   near or around your office?

18      A.    Correct.

19      Q.    Why not?

20      A.    Why?

21      Q.    Okay.  Now, is there a summary that went along

22   with this particular version of the plan; and by "this

23   version," I'm referring to the 1989 version set forth in

24   Exhibit 4.  Was there --

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

61

```
 1      January 1989.

 2          Q.   Could it have been as late as 1992?

 3          A.   Yes.

 4          Q.   How did one get a copy of that document, Exhibit

 5      5?

 6          A.   This specific document, the 1989 --

 7          Q.   Yes.

 8          A.   Once this document was approved and submitted to

 9      the Department of Labor and okayed by our lawyers, this

10      would have been the document that would be given to all new

11      hires upon employment of the company.  There may or may not

12      have been a mass distribution to all employees at that

13      point.  I don't have a hundred percent recollection.

14          Q.    Is the claims procedure summarized on Exhibit 5 or

15      in Exhibit 5?

16          A.   I would have to take a look.  On page 9 there is a

17      claims procedure.

18          Q.    And what is the claims procedure as you understand

19      it from that document?

20          A.   Do you want me to read this?

21          Q.    Not read it into the record but how does one file

22      a claim?

23          A.    One writes to someone in the plan, myself, as the

24      plan administrator, or the trustee, and states a claim.
```

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

62

1        Q.    Have you ever received one?

2        A.    No.

3        Q.    Is there a claims procedure; that is, is there a

4   little package that's given out so that one's rights or

5   lack of rights, if you want, is spelled other than the

6   document you've just referred to?

7        A.    This is the claims procedure.

8        Q.    That is it.  So there's no ancillary documents --

9        A.    Correct.

10       Q.    -- that you know of?  Are there any regulations

11  that supplement the claims procedure to spell out any

12  further detail what one must do?

13       A.    No.

14       Q.    Suppose one, one being a participant who's

15  departing, perhaps, or changing employment, doesn't like

16  the mathematical calculations or doesn't understand them.

17  Has anyone ever come to you with a question about the

18  mathematical application of the plan?

19       A.    I don't recall specifically if I've had anyone

20  come into my office and say, Barbara, how does this work.

21  Probably at some point in time, there probably -- somebody

22  who has.

23       Q.    Now, did the plan get amended in 1998?

24       A.    Yes, it did.

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

88

1    have a loan from the profit sharing trust and their date of

2    hire and date of termination is then recorded in our

3    payroll system and a report is automatic and comes out and

4    once -- once a month, I review that.

5    Q.    So once a month, at least, you know who's left for

6    one reason or another and --

7    A.    Well, once a month I know --

8    Q.    Well, I'm just trying to find --

9    A.    I'm sorry.

10    Q.    When do you know when to pay out of benefit to

11    someone who's departed?

12    A.    On a monthly basis, I receive a report off of our

13    profit sharing trust system.  I also correlate that with

14    the report off of our payroll system with a listing of all

15    people who have left, with their date of hire, their date

16    of termination, their full name, the account balance that

17    they had at December 31st of the prior year, and their

18    vesting percentage.

19    Q.    What do you do next once you get that

20    information -- and it could be, I assume, somebody in your

21    department -- what's the next step?

22    A.    Generally speaking, the next step is to create

23    notification for distribution of benefits letter and then

24    that letter is mailed to the terminating employee starting

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

89

```
 1     the process.

 2         Q.    Are they giving -- given some information about

 3     whether they might want to roll the amount over to another

 4     kind of plan where they would not have to pay taxes?

 5         A.    Correct.   There is a form called a Benefit

 6     Election Form attached asking them to fill it out.

 7         Q.    Besides that, is there anything else that they

 8     get?

 9         A.    There's the safety -- IRS Safe Harbor taxation

10     document.

11         Q.    Anything else?

12         A.    No.

13         Q.    Then, typically, what happens next?  You hope to

14     get the form back indicating where the money should go?

15         A.    Correct.

16         Q.    If you don't get the form after a period of time,

17     what happens?

18         A.    One of the staff members would tend to call.

19         Q.    Do you try to chase them first to see if they want

20     to put the money into an IRA or equivalent before you

21     actually send them a check?

22              MR. POSS:  Objection.

23              THE WITNESS:  There are different

24              rules and regulations based on the balances
```

90

1            that are forthcoming to the employee for

2            benefits.

3       Q.   (By Mr. Collora)  Well, that didn't quite answer

4   the question.  You say a staff member --

5       A.   Well, then I'm not sure I understand the question.

6       Q.   -- calls.  What are they calling for?

7       A.   Oh, I didn't hear you say "call."

8       Q.   No.  You said, "call."  What happens next, I said,

9   if you don't hear from them.  You said a staff member

10  calls.  What are they calling about?

11      A.   They call the individual to find out if they have

12  received their paperwork and if they have processed it and

13  when would we expect the paperwork.

14      Q.   If you never get any paperwork, what do you do?

15  You just don't get any paperwork back from the person?

16      A.   We haven't run into that situation.

17      Q.   Well, don't you just send a check?

18      A.   No.

19      Q.   You don't?

20      A.   No.  It depends on their balance, what we are

21  required to do.

22      Q.   Well, they are entitled to a check from the plan,

23  correct?

24      A.   Right.

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

91

1    Q.    Why wouldn't you just send them a check?

2              MR. POSS:  Hold on.  Objection.

3         You're asking her about a hypothetical?

4              MR. COLLORA:  Well, I don't think it

5         is a hypothetical.

6              MR. POSS:  Well, she said it never

7         happened.  So you're asking her about

8         something that's never happened?

9              THE WITNESS:  Let me give you an

10        example.  For instance, if the balance of

11        their benefit is $200 or less, we

12        distribute it automatically in cash because

13        there is no taxation requirement to be

14        taken out, okay.  If the balance is between

15        200 and approximately 1,000, there's a

16        different set of rules.  Between 1,000 and

17        5,000, there's a different set of rules.

18              Right now I believe it's between the

19        1,000 and 5,000, if you don't ever hear

20        from them, you then roll it over into a

21        bank IRA for them, and you relieve yourself

22        of responsibility of overseeing the plan.

23        There are -- then there's different --

24        different requirements thereafter, if I

92

```
 1                recollect correctly, again, because we

 2                haven't run into this situation, if the

 3                balance is over 5,000, I would simply

 4                segregate it within the profit sharing

 5                trust.

 6                     It would no longer participate in the

 7                valuation each year.  It would sit in a

 8                separate account and earn interest at the

 9                rate that the trustee has determined until

10                we are -- we have some way to give them

11                their money or funds.

12        Q.    (By Mr. Collora)  So aside from what you've just

13      described, you don't send them something called a claims

14      form?

15        A.    No.

16        Q.    Are they advised at that point in any document

17      that if they do not agree -- they do not agree with the

18      amount that you suggest in your letter is their interest in

19      the trust, that they may dispute this?

20        A.    They have that --

21                     MR. POSS:  Objection.

22                     THE WITNESS:  -- already.

23        Q.    (By Mr. Collora)  And how do they have that?

24        A.    In their summary plan description.
```

93

1      Q.    And that's where they would get the information?

2      A.    Correct.

3      Q.    I have no further questions on this area.  Would

4   you look at Exhibit 18.  Now, do you recall that -- prior

5   to the plaintiff Mr. Hubert terminating employment at the

6   company, did you ever get a letter from any other person

7   terminating their employment at the company questioning

8   what they had gotten or were to get?

9      A.    Not to my recollection, no.

10     Q.    Now, can you identify the first page of Exhibit

11  18.

12     A.    First page is a copy of the check with the advice

13  -- deposit advice --

14     Q.    All right.  Now --

15     A.    -- to Mike Hubert or for Mike Hubert's benefit as

16  a distribution.

17     Q.    Now, that summarizes his withdrawals for the year

18  2004?

19     A.    No.  This summarizes his lump sum distribution

20  upon termination.

21     Q.    How much is that?

22     A.    The total amount is 1,040,000.

23     Q.    Does it make reference to the fact he had gotten a

24  previous distribution?

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

128

```
 1     you talk about what might be the price for the upcoming

 2     year?

 3          A.   No.

 4          Q.   Do the two of you ever sit down and discuss what

 5     might be an appropriate price prior to the board of

 6     directors meeting?

 7          A.   No.

 8          Q.   Do you know who he consults with prior to the -- I

 9     guess it would be the third quarter board of directors

10     meeting, if anyone, regarding price?

11          A.   No.

12          Q.   Does this document, and by "this" I mean any one

13     of these annual valuations, Exhibits 22 through -- what's

14     the last one in this series?

15          A.   Twenty-nine.

16          Q.    Do any of these documents circulate to members of

17     the trust?

18          A.   No.

19          Q.   Did anyone ever come in and ask for one of these?

20          A.   No.

21          Q.   Would they know it exists?

22          A.   No.

23          Q.   Did anyone ever come to you and say, a member of

24     the trust, How do you get $30 a share or 32 or 34?
```

Barbara Manzolillo 8-8-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

129

```
 1        A.    No.

 2        Q.    Did you ever ask the trustee?

 3        A.    I work on the financials.  Did I ask specifically

 4    what exactly?

 5        Q.    How do you get to 34, Mr. Pappalardo?

 6        A.    No, I have not.

 7        Q.    What would have been available to the participants

 8    or members of the trust before the disagreements with

 9    Mr. Grossman, if anything, explaining how Mr. Pappalardo

10    valued the stock that was in the trust?

11        A.    Before, during, or after?

12        Q.    Before.

13        A.    Before 2002?

14        Q.    Yes.

15        A.    What information was given on how he valued the

16    stock?

17        Q.    The methodology.

18        A.    The methodology.

19        Q.    The method.

20        A.    No.

21        Q.    You know of nothing?

22        A.    I do not know of anything.

23              MR. COLLORA:  I have no further

24              questions.
```

**EXHIBIT 6**

A. Neil Pappalardo                                    05/16/2005

1

00:56:56  1          VOLUME: I

2          PAGES: 1 to 265

3          EXHIBITS: See Index

4          COMMONWEALTH OF MASSACHUSETTS

5  Suffolk, ss.                    Superior Court

6  - - - - - - - - - - - - - - - - - x

7  DR. JEROME H. GROSSMAN

8          Plaintiff

9  v.                        Civil Action

10                        No. 03-1872-BLS2

11  MEDICAL INFORMATION TECHNOLOGY,

12  INC., A. NEIL PAPPALARDO, EDWARD B.

13  ROBERTS, MORTON E. RUDERMAN,

14  ROLAND L. DRISCOLL and

15  LAWRENCE A. POLIMENO

16          Defendants

17  - - - - - - - - - - - - - - - - - x

18     VIDEOTAPED DEPOSITION OF A. NEIL PAPPALARDO

19          Monday, May 16, 2005

20             10:15 a.m.

21     Wilmer Cutler Pickering Hale and Dorr, LLP

22          60 State Street

23          Boston, Massachusetts

24     Michelle Keegan, Court Reporter
              LegaLink Boston

DEF009712
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                          05/16/2005

2

```
 1    A P P E A R A N C E S

 2

 3         WILMER CUTLER PICKERING HALE AND DORR, LLP

 4              By Jeffrey B. Rudman, Esq. and

 5              Mark Selwyn, Esq. and

 6              Daniel Gold, Esq.

 7              60 State Street

 8              Boston, Massachusetts 02109

 9              (617) 526-6912

10              Counsel for the Plaintiff

11

12         GOODWIN PROCTER, LLP

13              By Stephen D. Poss, P.C.

14              Exchange Place

15              Boston, Massachusetts 02109

16              (617) 570-1000

17              Counsel for the Defendants

18

19    Also Present:

20              Jodi Urbati, Videographer

21              Dr. Jerome H. Grossman

22

23

24                        LegaLink Boston
```

DEF009713
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                    05/16/2005

156

| | | |
|---|---|---|
| 02:13:36 | 1 | Q.  What is the range to which you're referring |
| 02:13:37 | 2 | there, sir? |
| 02:13:39 | 3 | A.  There could never be any absolute number at |
| 02:13:42 | 4 | any point in time which says the fair value of share |
| 02:13:47 | 5 | of stock is X. |
| 02:13:48 | 6 | Q.  Correct. |
| 02:13:49 | 7 | A.  There can only be a range of values.  And |
| 02:13:53 | 8 | depending on who you're looking at and who's |
| 02:13:57 | 9 | analyzing, it would always come up with a range of |
| 02:14:00 | 10 | values. |
| 02:14:01 | 11 | So if you ask me what is the range I'm |
| 02:14:03 | 12 | talking about, this range of values that an informed |
| 02:14:10 | 13 | analytical person or an outside person, inside |
| 02:14:13 | 14 | person, might determine the share price would fall |
| 02:14:15 | 15 | within. |
| 02:14:15 | 16 | Q.  At the time you wrote the words which appear |
| 02:14:18 | 17 | on page 12, did you have a particular range in mind? |
| 02:14:22 | 18 | A.  No. |
| 02:14:23 | 19 | Q.  Well, what was the current valuation of |
| 02:14:26 | 20 | Meditech as of the date you wrote these words? |
| 02:14:29 | 21 | A.  I'd have to go find the page in here to find |
| 02:14:43 | 22 | the number. |
| 02:14:44 | 23 | Q.  Take your time, Mr. Pappalardo. |
| 02:14:45 | 24 | A.  This, again, the March of -- |

LegaLink Boston

DEF009867
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                      05/16/2005

157

| | | |
|---|---|---|
| 02:14:49 | 1 | Q.  '99.  This is the board of directors -- |
| 02:14:51 | 2 | A.  I understand.  I can figure it out.  It's |
| 02:14:54 | 3 | April of 1999. |
| 02:14:59 | 4 | At the end of 1999, the share price that |
| 02:15:05 | 5 | was established in October of 1998 to be effective |
| 02:15:17 | 6 | on December 31st of 1998 was $13 -- sorry -- was $29 |
| 02:15:29 | 7 | per share. |
| 02:15:30 | 8 | Q.  So what would the price have been as of the |
| 02:15:32 | 9 | date of these words on page 12? |
| 02:15:35 | 10 | MR. POSS:  Objection. |
| 02:15:36 | 11 | A.  What do you mean, "the price"? |
| 02:15:37 | 12 | Q.  What would be the value at which you had set |
| 02:15:40 | 13 | Meditech's price? |
| 02:15:41 | 14 | MR. POSS:  Objection. |
| 02:15:41 | 15 | A.  We didn't set a value at that date.  What I |
| 02:15:46 | 16 | said earlier, and I'll repeat it again for your |
| 02:15:48 | 17 | benefit, that in October of 1998 the board of |
| 02:15:52 | 18 | directors unanimously determined the value of |
| 02:15:55 | 19 | Meditech stock to be $29 a share effective December |
| 02:15:59 | 20 | 31st, 1998. |
| 02:16:00 | 21 | Q.  Okay.  So no different value had been set as |
| 02:16:04 | 22 | of the date of this minute? |
| 02:16:05 | 23 | A.  Correct. |
| 02:16:06 | 24 | Q.  Now, as of December the 31st, 1998 -- |

LegaLink Boston

LegaLink Boston
(617) 542-0039

DEF009868
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                        05/16/2005

158

| 02:16:10 | 1 | A. December 31st, 1998, got it. |

Q. That's the date you just told me you were

talking about.

A. I understand.

Q. -- was the $29 price a price that fit

somewhere in a range of fairness?

A. Yes.

Q. All right. Where in the range?

A. As I said, the low end of that range.

Q. And what would the high end of the range be?

A. I didn't ascertain at that time the high end

of that range. Many people would have an opinion on

the high end of that range. You asked me my

opinion. I might venture an opinion, but I didn't

explicitly state what the high end of that range is.

Q. So as of the time you wrote the words on

page 12, you thought Meditech's price had been set

at the low end of the range, but you didn't have an

opinion as to the high end of the range?

A. I did have an opinion. You didn't ask me

for an opinion.

Q. Okay. What was your opinion?

A. I would say, in general, I asked for an

opinion. It might be as much as 20 percent higher.

LegaLink Boston

DEF009869
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                    05/16/2005

159

| 02:17:07 | 1 | Q.  No more than 20 percent higher? |
| 02:17:09 | 2 | A.  It depends on the circumstances.  It depends |
| 02:17:12 | 3 | on who is the buyer, who is the seller. |
| 02:17:13 | 4 | Q.  Did Mr. Roberts ever tell you that the fair |
| 02:17:16 | 5 | value of Meditech's price -- share price should have |
| 02:17:20 | 6 | been twice what it was? |
| 02:17:20 | 7 | A.  Twice?  I don't remember.  He has said many, |
| 02:17:24 | 8 | many times it should be higher. |
| 02:17:26 | 9 | Q.  Did he ever tell you it should be a multiple |
| 02:17:28 | 10 | of 20 and not a multiple of 10? |
| 02:17:31 | 11 | A.  What do you mean by the word "multiple"? |
| 02:17:32 | 12 | Q.  Price earnings multiple. |
| 02:17:34 | 13 | A.  Mr. Roberts from day zero has always had |
| 02:17:38 | 14 | this fixation on PE ratios.  To be honest with you, |
| 02:17:41 | 15 | I couldn't recall one way or the other what his then |
| 02:17:43 | 16 | current feeling about PE ratios. |
| 02:17:47 | 17 | Whenever he mentioned such a thing, I'd |
| 02:17:50 | 18 | always point out that PE ratios are an effect and |
| 02:17:53 | 19 | not a cause of anything.  And you don't start with |
| 02:17:55 | 20 | that as a basis to try to determine the price. |
| 02:17:58 | 21 | And we, as a company, have never used |
| 02:17:59 | 22 | that as our determining factor in determining what |
| 02:18:02 | 23 | the fair value of the company's stock should be. |
| 02:18:04 | 24 | Q.  What is the determining factor? |

LegaLink Boston

DEF009870
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                    05/16/2005

160

| | | |
|---|---|---|
| 02:18:06 | 1 | A. Primarily the cash flow and the dividends is |
| 02:18:12 | 2 | considered. We have illiquid stock. And when you |
| 02:18:18 | 3 | have illiquid stock, you're hard-pressed to figure |
| 02:18:21 | 4 | out exactly what the price should be because there |
| 02:18:24 | 5 | isn't a significant amount of trading that would |
| 02:18:27 | 6 | happen between willing buyers and willing sellers, |
| 02:18:31 | 7 | so instead you look for other things. |
| 02:18:33 | 8 | And of course, among the things you look |
| 02:18:34 | 9 | at is certainly company growth, company |
| 02:18:37 | 10 | profitability, net worth. You name it. |
| 02:18:41 | 11 | And in particular, my feeling has been, |
| 02:18:45 | 12 | is now and probably always will be, with illiquid |
| 02:18:48 | 13 | stock that is paying a dividend, that we should look |
| 02:18:51 | 14 | at the dividend payout as the primary -- primary way |
| 02:18:54 | 15 | to determine what the value of the stock should be. |
| 02:19:00 | 16 | And that's been my position and still is my |
| 02:19:04 | 17 | position. |
| 02:19:04 | 18 | If you want some detail, I'm more than |
| 02:19:06 | 19 | happy to share with you the detail. |
| 02:19:07 | 20 | Q. Let me just make sure I heard what you said |
| 02:19:10 | 21 | correctly. In your view, the most important |
| 02:19:11 | 22 | indication of value is the stock's dividend payout? |
| 02:19:16 | 23 | A. In Meditech's case. |
| 02:19:17 | 24 | Q. In Meditech's case. And the reason it is |

LegaLink Boston

DEF009871
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                    05/16/2005

161

| 02:19:20 | 1 | the most important indicator, in your view, of value |
| 02:19:24 | 2 | is that? |
| 02:19:25 | 3 | A.  When you have an illiquid stock -- in other |
| 02:19:29 | 4 | words, no readily tradable market -- most people |
| 02:19:32 | 5 | that I've talked to over the years, be they |
| 02:19:34 | 6 | investment bankers, be they other companies who are |
| 02:19:37 | 7 | in a similar situation, you always tend to say the |
| 02:19:40 | 8 | cash flow is the only meaningful -- it's the primary |
| 02:19:44 | 9 | meaningful thing that you should try to base a value |
| 02:19:46 | 10 | on. |
| 02:19:46 | 11 | Q.  When you say "cash flow," you mean dividend |
| 02:19:48 | 12 | payout?  You don't mean discounted cash flow? |
| 02:19:51 | 13 | A.  Of course I mean discounted cash flow. |
| 02:19:54 | 14 | Q.  Oh, all right.  Fine.  So you think the most |
| 02:19:56 | 15 | meaningful way to value Meditech stock is using the |
| 02:20:00 | 16 | discounted cash flow method? |
| 02:20:02 | 17 | A.  Of course. |
| 02:20:02 | 18 |     MR. POSS:  Objection. |
| 02:20:04 | 19 | Q.  Pardon? |
| 02:20:04 | 20 | A.  Of course. |
| 02:20:05 | 21 | Q.  All right.  So that if I applied a |
| 02:20:07 | 22 | discounted cash flow methodology to Meditech, I |
| 02:20:11 | 23 | would achieve at most a value that is 20 percent |
| 02:20:16 | 24 | higher than the value the board fixes? |

LegaLink Boston

DEF009872
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                          05/16/2005

162

02:20:18   1        A.  I would say correct because, again, the

02:20:21   2    dividend rate is 7 percent, which is the same

02:20:24   3    percentage that you'd use in a discounted cash flow

02:20:30   4    statement.

02:20:30   5            And therefore, since I tend to compare

02:20:33   6    that to the -- what a secure entity like treasuries

02:20:40   7    might be paying -- a treasury might have been 5 and

02:20:44   8    a half percent, et cetera -- that would be a

02:20:45   9    reasonable number, but people could always argue, if

02:20:49  10    they wish, that the discounted cash flow percentage

02:20:52  11    would be less than 7 percent.  Closer to, let's say,

02:20:57  12    6 percent.

02:20:57  13        Q.  Why would they argue that?

02:20:59  14        A.  Well, they would argue it because everybody

02:21:02  15    has a different perception of what the percentage to

02:21:04  16    be used in any discounted cash flow statement would

02:21:08  17    be used.

02:21:08  18            That's not -- There's no way you can

02:21:11  19    pick up -- know for a fact what is the proper

02:21:14  20    percentage.  You look at interest rates, you look at

02:21:17  21    the borrowing rates, you look at saving rates, you

02:21:20  22    look at treasuries, you look at long-term, short-

02:21:22  23    term, and you try to compare the -- If you take the

02:21:29  24    extreme, our Government will probably last a long

                            LegaLink Boston

DEF009873
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                        05/16/2005

163

| | | |
|---|---|---|
| 02:21:32 | 1 | longer than Meditech would; therefore, that would be |
| 02:21:35 | 2 | a very secure investment.  Meditech might be a |
| 02:21:38 | 3 | little bit less secure; and therefore, you'd |
| 02:21:40 | 4 | discount it at a higher percentage than the same |
| 02:21:45 | 5 | percentage with treasuries. |
| 02:21:46 | 6 | Q.  What I'm trying to figure out, because I |
| 02:21:49 | 7 | just don't quite understand it, is, what is the |
| 02:21:51 | 8 | relationship of the coupon to the right number for |
| 02:21:54 | 9 | purposes of DCF analysis? |
| 02:21:56 | 10 | MR. POSS:  Objection. |
| 02:21:58 | 11 | A.  You really don't know that? |
| 02:21:59 | 12 | Q.  I really don't know that. |
| 02:22:01 | 13 | A.  They're equivalent numbers.  You can either |
| 02:22:04 | 14 | express -- Given a -- You really want me to educate |
| 02:22:08 | 15 | you? |
| 02:22:09 | 16 | Q.  I do.  I'd love to be educated.  I'm just a |
| 02:22:12 | 17 | lawyer. |
| 02:22:16 | 18 | A.  If there was an income stream from any |
| 02:22:19 | 19 | source, doesn't matter what the source is, but let's |
| 02:22:22 | 20 | say it's specifically shares of stock that are |
| 02:22:24 | 21 | paying the dividend, given the dividend rate -- Pick |
| 02:22:32 | 22 | any number you want.  I'll say $2 a share, that |
| 02:22:36 | 23 | being our current rate we are paying. |
| 02:22:40 | 24 | If you then take a discount rate, I'll |

LegaLink Boston

DEF009874
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                    05/16/2005

165

02:24:02  1    you come up with the same number.

02:24:05  2            So as I said, the two are equivalent

02:24:07  3    concepts.  I've said that before at board meetings.

02:24:11  4    But the dilemma is, like many people, they don't

02:24:16  5    understand the mathematical equivalent of those two.

02:24:22  6    They somehow think there's magic in those numbers.

02:24:27  7        Q.  When you say they don't understand, are you

02:24:28  8    talking about the board?

02:24:29  9        A.  As I said, I talk to people in general.

02:24:31  10   They don't understand the equivalence of those two

02:24:33  11   numbers.

02:24:34  12       Q.  Does the board not understand as well?

02:24:36  13       A.  I can't tell you for a fact.  I do know

02:24:40  14   this, that there have been certain people, Ed

02:24:44  15   Roberts in particular, who always wanted to think of

02:24:48  16   things as PE ratios.

02:24:49  17           I said, That's not the way you should

02:24:51  18   think of valuation.  You should think of that as a

02:24:54  19   cash flow of dividends.  And we have consistently

02:24:58  20   used the methodology on our dividends for just a

02:25:03  21   long period of time, 20 some-odd years.

02:25:05  22       Q.  Has any investment banker ever said to you,

02:25:09  23   The way you value Meditech is exactly right, and you

02:25:12  24   should not receive advice from anyone else on the
                              LegaLink Boston

DEF009876
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                    05/16/2005

166

02:25:16   1    topic?

02:25:17   2             MR. POSS:  Objection.

02:25:17   3       A.  No.

02:25:17   4       Q.  Has any investment professional ever said to

02:25:20   5    you, The way you value Meditech is exactly right.

02:25:23   6    Your methodology cannot be improved upon.  And you

02:25:26   7    should not receive advice from any investment

02:25:28   8    professional?

02:25:29   9       A.  No.

02:25:29  10       Q.  Has any auditor ever said to you, Your

02:25:32  11    methodology for valuing Meditech shares is

02:25:35  12    unassailable, and you should never consider any

02:25:37  13    other methodology?

02:25:38  14       A.  No.

02:25:39  15       Q.  Would you agree with me, sir, that the

02:25:42  16    methodology you use is a methodology which you, Neil

02:25:46  17    Pappalardo, happens to believe is the best

02:25:48  18    methodology?

02:25:49  19       A.  No.

02:25:50  20       Q.  Is it your view that the methodology you use

02:25:54  21    is the one which all reasonable persons would

02:25:56  22    absolutely use, no ifs, ands or buts about it?

02:26:00  23       A.  I would say most would use that methodology.

02:26:03  24       Q.  And that methodology consists of taking the
                                LegaLink Boston

DEF009877
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                      05/16/2005

174

| | |
|---|---|
| 02:32:37 | 1 |

obligation.

02:32:38    2   Did I explicitly ask him that question?

02:32:42    3 I don't know.  There isn't quite often I do because

02:32:44    4 I always discuss it with him.

02:32:45    5  Q.  So Mr. Mackie told you the range was

02:32:48    6 appropriate?

02:32:49    7  A.  Uh-hmm.  I told you before, I have not

02:32:52    8 indicated to him a range.  I've only indicated to

02:32:54    9 him a particular price.

02:32:56    10  Q.  And he told you that price was at the low

02:32:58    11 end of the range?

02:32:59    12  A.  No.

02:33:04    13  Q.  At some point you formed the impression that

02:33:07    14 the price was on the low end of the range your

02:33:08    15 auditors would allow?

02:33:09    16  A.  That's correct.

02:33:10    17  Q.  How did you know it was on the low end of

02:33:12    18 the range they would allow?

02:33:13    19  A.  Because the way I determined the value of

02:33:19    20 the stock I argue is not within the low end of the

02:33:23    21 range, but it's within the range that they would

02:33:26    22 allow.

02:33:26    23   I'm not concerned with our auditors

02:33:29    24 whether I'm at the low end or not.  All I want to

LegaLink Boston

DEF009885
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                    05/16/2005

175

| | |
|---|---|
| 02:33:30 | 1 |
| 02:33:32 | 2 |
| 02:33:33 | 3 |
| 02:33:37 | 4 |
| 02:33:40 | 5 |
| 02:33:43 | 6 |
| 02:33:44 | 7 |
| 02:33:46 | 8 |
| 02:33:47 | 9 |
| 02:33:49 | 10 |
| 02:33:51 | 11 |
| 02:33:54 | 12 |
| 33:55 | 13 |
| 02:33:57 | 14 |
| 02:33:58 | 15 |
| 02:33:59 | 16 |
| 02:34:00 | 17 |
| 02:34:05 | 18 |
| 02:34:07 | 19 |
| 02:34:09 | 20 |
| 02:34:09 | 21 |
| 02:34:13 | 22 |
| 02:34:15 | 23 |
| 02:34:18 | 24 |

1  make sure is they think our price is within an

2  acceptable range of values.

3      Q.  Well, you say you're not concerned, but you

4  write the following words:  "We purposely keep the

5  share price on the low end of the range" --

6      A.  Correct.

7      Q.  -- "the IRS and our auditors would allow."

8      A.  Correct.

9      Q.  Now, if you know your price is on the low

10  end of the range, you must know what the range is.

11      A.  I already said, I think I have a handle on

12  what I think the range is.

13      Q.  But do you know what the auditors think the

14  range is?

15      A.  I don't know that.  I've already answered

16  that.  I don't know what they think the range is.

17      Q.  Okay.  So you keep the share price on the

18  low end of the range the auditors would allow, but

19  you don't know what the range is?

20      A.  Correct.

21      Q.  And the same thing is true for the Internal

22  Revenue Service.  You keep the price on the low end

23  of the range the IRS would allow, but you don't know

24  what the range is?

                    LegaLink Boston

DEF009886
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                    05/16/2005

177

| | | |
|---|---|---|
| 02:35:14 | 1 | range of prices, because there's always a range of |
| 02:35:17 | 2 | prices. |
| 02:35:18 | 3 | Q.  So the reference to low end in your words, |
| 02:35:21 | 4 | that you wrote, is simply irrelevant.  It's simply |
| 02:35:24 | 5 | within a range of reasonableness? |
| 02:35:25 | 6 | A.  No, it's not.  It's important for the board |
| 02:35:28 | 7 | to always recognize that if you're selling stock to |
| 02:35:30 | 8 | employees or making a contribution to a trust for |
| 02:35:33 | 9 | the benefit of employees, you should be very, very |
| 02:35:38 | 10 | careful and not ever push the envelope. |
| 02:35:41 | 11 | I.e., if it was our policy to set the |
| 02:35:43 | 12 | price at the high end of the range, we would be |
| 02:35:47 | 13 | perhaps doing a disservice to our employees and to |
| 02:35:52 | 14 | our -- who are either buying stock and/or receiving |
| 02:35:56 | 15 | a value in their -- in the trust. |
| 02:35:58 | 16 | Q.  So by setting at the low end you're doing a |
| 02:36:01 | 17 | benefit for your employees? |
| 02:36:03 | 18 | A.  Yes. |
| 02:36:04 | 19 | Q.  And you're doing a benefit for you? |
| 02:36:07 | 20 | A.  Yes. |
| 02:36:07 | 21 | Q.  Okay.  So you are a beneficiary of the |
| 02:36:10 | 22 | policy decision to set it at the low end of the |
| 02:36:13 | 23 | range? |
| 02:36:13 | 24 | A.  Yes, only to the extent that I buy stock. |

LegaLink Boston

LegaLink Boston
(617) 542-0039

DEF009888
Confidential/Attorneys - Subject to Protective Order

A. Neil Pappalardo                                05/16/2005

178

| | | |
|---|---|---|
| 02:36:17 | 1 | If I was to sell stock, I might be at a -- what the |
| 02:36:21 | 2 | opposite of a beneficiary is. |
| 02:36:23 | 3 | Q.  A victim? |
| 02:36:23 | 4 | A.  A victim, because I have far more stock than |
| 02:36:27 | 5 | I would ever purchase. |
| 02:36:29 | 6 | Q.  So depending on whether you're a buyer or a |
| 02:36:31 | 7 | seller, you're either a beneficiary or a victim, |
| 02:36:34 | 8 | right? |
| 02:36:34 | 9 | A.  Correct. |
| 02:36:35 | 10 | MR. RUDMAN:  Off the record. |
| 02:36:36 | 11 | THE VIDEOGRAPHER:  Off the record.  2:36 |
| 02:36:38 | 12 | p.m. |
| 02:40:38 | 13 | (Recess taken) |
| 02:42:17 | 14 | THE VIDEOGRAPHER:  Here begins videotape |
| 02:42:18 | 15 | number 3 in today's deposition of A. Neil |
| 02:42:23 | 16 | Pappalardo.  Back on the record.  2:42 p.m. |
| 02:42:26 | 17 | Q.  Could you turn, please, to page 13 of |
| 02:42:29 | 18 | Roberts 8. |
| 02:42:33 | 19 | A.  Roberts 8 is the same one we've been |
| 02:42:37 | 20 | referring to, March '99? |
| 02:42:38 | 21 | Q.  Correct. |
| 02:42:39 | 22 | A.  Yup. |
| 02:42:43 | 23 | Eight, you said? |
| 02:42:44 | 24 | Q.  Please turn to page 13 of Roberts Exhibit 8. |

LegaLink Boston

DEF009889
Confidential/Attorneys - Subject to Protective Order

**EXHIBIT 7**

# O'BRIEN & LEVINE

Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

## Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

Transcript of the Testimony of:

# A. Neil Pappalardo

# July 21, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

# ORIGINAL

Cindy Berglund   1-20274

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

1

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3

4                          Civil Case No. 05-10269-RWZ

5

6

7    * * * * * * * * * * * * * * * * * * * * * * * )

8    MICHAEL P. HUBERT, WILLIAM TRAINOR,              )

9    AND DAVID HINCHLIFFE, INDIVIDUALLY AND           )

10   ON BEHALF OF ALL PERSONS SIMILARLY SITUATED,     )

11                    Plaintiffs                      )

     vs.

12                                                    )

13   MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING    )

14   PLAN, MEDICAL INFORMATION TECHNOLOGY, INC.,      )

15   A. NEIL PAPPALARDO, LAWRENCE A. POLIMENO,        )

16   ROLAND L. DRISCOLL, EDWARD B. ROBERTS,           )

17   MORTON E. RUDERMAN, AND L.P. DAN VALENTE,        )

18                    Defendants.                     )

19   * * * * * * * * * * * * * * * * * * * * * * * )

20

21

22

23

24

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

2

1

2          DEPOSITION OF: A. NEIL PAPPALARDO, a witness in the

3     above-entitled cause, taken before CINDY BERGLUND, CSR,

4     Registered Professional Reporter and Notary Public pursuant

5     to the applicable provisions of the Massachusetts Rules of

6     Civil Procedure, at the offices of DWYER & COLLORA, LLP, 600

7     Atlantic Avenue, Boston, MA  02210, on the 21st day of JULY,

8     2006, commencing at 10:06 A.M.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

3

1    APPEARANCES:

2

     REPRESENTING THE PLAINTIFFS:

3

4    DWYER & COLLORA, LLP

5    600 Atlantic Avenue

6    Boston, MA   02210

7    (617) 371-1000

8    BY: MICHAEL COLLORA, ESQ.

9        SARA NOONAN, ESQ.

10

11   REPRESENTING THE DEFENDANTS:

12   GOODWIN PROCTER

13   Exchange Place

14   Boston, MA 02109

15   (617) 570-1000

16   BY:  STEPHEN D. POSS, P.C.

     MICHAEL P. SUGRUE, ESQ.

17

18

19

20

21

22

23

24

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

48

1       the assets in the Plan were valued?

2       A.    I don't know what you mean by the word "how".

3       Q.    How?

4       A.    You got to give me a little more.

5       Q.    The methodology?  For example, it says here that,

6       "A substantial portion of the Trust assets are invested

7       in the employers' common stock," correct?

8       A.    Correct.

9       Q.    You have advised me that the employer's common

10      stock is not publicly traded?

11      A.    Correct.

12      Q.    Are the members told in some document how that

13      common stock is valued and who does it?

14      A.    They may or -- who does what?  Telling them?  Who

15      does --

16      Q.    Let's break it up.  Are they told who does the

17      valuation?

18      A.    They would -- I think the document says it very

19      clearly that the trustee is responsible for valuing the

20      assets of the trust.

21      Q.    Are they told how it is done?

22      A.    I don't -- do not recall anything that -- what the

23      word "how" means in this thing.  Do I tell them, I sit

24      on December 31 and I go to my desk and go through a

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

49

1      step by step, I think the only thing they generally

2      would know is that I am responsible to evaluate the

3      assets of the Trust on the last day of the year and I

4      give them a published financial statement thereafter.

5      Q.    And the published financial statement has a value

6      ascribed to the common stock, does it not?

7      A.    Yes, it does.

8      Q.    Do you tell them in that statement how you got to

9      that figure --

10     A.    No.

11     Q.    -- as trustee?

12         ATTY. POSS:   Objection.   Are you speaking now

13     present tense?   Because you said do you tell them so I

14     don't know what time frame you're referring.

15     Q.    In this time period, focusing on this Summary

16     Plan.

17     A.    I do not go through a detailed methodology of how

18     I do it.   When I value the stock, the number that I use

19     for the value of the stock coincides with another

20     number that they are aware of for the value of the

21     stock.

22     Q.    And that other number is what?

23     A.    The price of the stock that the board of directors

24     is willing to sell stock to its employees at.

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

51

1       Q.    Well, you said other documents, but can you give a

2       title or a name or?

3       A.    I said the Plan document and other summary things

4       like this that we give to our employees at the time of

5       their employment.

6       Q.    Roman Numeral VIII, the next page, 10, states,

7       quote, "Your rights under ERISA," end quote.  Do you

8       see that?

9       A.    I do.

10      Q.    It says, in part, "ERISA provides that all Plan

11      member shall be entitled to, One, examine without

12      charge at the Plan administrator's office all Plan

13      documents and copies of documents filed with the U.S.

14      Department of Labor such as annual reports and Plan

15      descriptions."  Do you know of anyone who did so?

16      A.    I believe I do.

17      Q.    Can you give me any names?

18      A.    I think Michael Hubert would be one.

19      Q.    Any others?

20      A.    There has been very few, if any, people that have

21      actually wanted to look at the actual Plan documents.

22      Q.    It says in 2 that, One, a member may, quote,

23      "Obtain copies of all Plan documents and other Plan

24      information by writing the Plan administrator.  There

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

52

1          may be a reasonable charge for the copies," end quote.

2          Have you ever received a written request?

3          A.    I'm not aware of receiving any written request.

4          Q.    I have no further questions on this document.

5                ATTY. COLLORA:  Can we take a five-minute break?

6                ATTY. POSS:  Sure.

7

8                (Recess taken.)

9

10               (Exhibit 6, MEDITECH PROFIT SHARING PLAN, marked

11               for identification.)

12

13               ATTY. COLLORA:  We've marked for identification

14         Exhibit 6, a Medical Information Technology Inc. Profit

15         Sharing Plan as of January 1, 1998.

16         Q.    I would ask you to look at that and ask if you can

17         identify it?

18         A.    Do you want to quote your DEF number?

19               ATTY. POSS:  Yes, it's stamped Defendants 84

20         through 143.

21               THE WITNESS:  Do you have a question?

22         Q.    Yes, identify it.  By identify, I mean can you

23         recognize it?

24         A.    It appears to be the actual Plan document labeled,

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

57

```
1        A.    I do not think we have insurance for this, "we"
2        being the company.
3        Q.    Correct.  Would you go to Article 11 entitled,
4        Miscellaneous, on Page 50 of the Plan.  That's the
5        article, but actually I would like to go over just to
6        the claims procedure which is Paragraph 11.10.
7        A.    Which page is that on?
8        Q.    On Page 52.  Now, this language is somewhat
9        similar to the previous Plan in that it says, quote,
10       "All claims for benefits under this Plan shall be filed
11       in writing with the trustee in accordance with such
12       regulations as trustee shall reasonably establish."
13       End quote.
14            Is it -- is it fair to say there have been no
15       regulations --
16            ATTY. POSS:  Objection.
17       Q.    -- established?
18            ATTY. POSS:  Objection.
19            THE WITNESS:  Are you going to give me a time
20       frame?
21       Q.    At anytime?
22       A.    I'm not aware of any additional regulations other
23       than what it says here filed in writing with the
24       trustee.
```

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

64

```
1              (Exhibit 9, SUMMARY PLAN DESCRIPTION, marked for
2              identification.)

3

4    Q.   My question to you, sir, is:  Can you identify
5    this document?
6    A.   It appears to be the Summary Plan Description of
7    the Medical Information Technology, Inc. Profit Sharing
8    Plan as of January 1, 1998.
9    Q.   Is this document still in circulation or available
10   to members through today?
11   A.   I believe the answer is yes.  If this covers the
12   third amendment, the answer will be yes because there's
13   a third amendment and I would have to go study this to
14   determine if it incorporates the changes of the third
15   amendment.
16   Q.   Would you go to the claims procedure in this
17   document which is on Pages 8 and 9.
18   A.   I'm there.
19   Q.   I'm going to skip over the first paragraph.  You
20   could use that -- sorry.  Withdraw that.
21        As part of the claims procedure according to this
22   document, the last sentence of the first full paragraph
23   says, quote, "Your claim -- referring to I guess a
24   departing member's claim -- quote, "Your claim must be
```

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

65

1       filed in writing with the trustee in accordance with

2       the rules he establishes for filing a claim," end

3       quote.  Do you see that, and that's at the top of Page

4       9?

5       A.    Yes.

6       Q.    Is it fair to say there are no rules in addition

7       to what's here?

8       A.    It is fair to say there is no specific rules in

9       addition to what it says here.

10      Q.    All right.  Do you remember there was a reference

11      in the second amendment to the fact that if a departing

12      member does not comply with these procedures, they have

13      no further right of appeal?  Do you see language to

14      that effect in this document?

15      A.    Yes.

16            ATTY. POSS:  Objection.

17      Q.    Where is that, sir?

18      A.    It's the last paragraph of that section.

19      Q.    All right.  It says, quote, "If after receiving

20      the trustee's explanation of his denial you still

21      believe you have a right to benefits which have been

22      denied, you may request in writing within a reasonable

23      period of time after the denial that the trustee review

24      his decision.  Trustee will within 60 days of receipt

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

79

1      Q.    And just staying with this document which is DEF

2      1400, do you see down there you have fair value/share,

3      and we had previously referred to a value as 24.  That

4      would perhaps have been the year before and now it's

5      27.  Do you see that?

6      A.    No.  That's a year-end number.

7      Q.    That's a year-end number.  What is fair value?

8      A.    That's the fair market value of Meditech stock.

9      Q.    You don't have --

10     A.    Those numbers are year-end numbers.

11     Q.    All right.  And then the next document would be

12     stock purchase instructions if they are eligible, DEF

13     1401?

14     A.    Yes.

15     Q.    I have no further questions on these letters.

16          ATTY. COLLORA:  Steve, I'll certainly give you a

17     break and if any of them you feel have been incorrectly

18     identified or are not documents that you provided to us

19     in the category that Mr. Pappalardo just described,

20     we'll be glad to remove it.

21          ATTY. POSS:  Thanks.  I would have to check them

22     against our production set.  The firm appears to have

23     exceeded its stapling budget for the year, and,

24     therefore, this stuff is clipped and I would have to

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

80

1          see how we produced it.

2                  ATTY. COLLORA:  Okay.  Fair enough.

3          Q.    Is there a way a member who has received this type

4          of letter and told what their interest in the Plan is

5          could check the calculations to see if they are

6          accurate?

7          A.    Yes.

8          Q.    How would they do that?

9          A.    They would refer to the prior letter they had

10         received from me and look at the quoted percentages

11         that I have published on either the internet or in

12         letters that I have sent to them directly and compare

13         the prior numbers with those percentages and ascertain

14         if the numbers are correct.

15         Q.    Do you tell a member what their percentage

16         interest in the Plan is?

17         A.    No.  We do not tell them a percentage interest.

18         We give them a dollar value as we are required to and

19         obviously at the same time, I give them the total net

20         assets of the plan.  If they divided the two numbers,

21         they could quickly ascertain what their percentage

22         interest of the Plan would be on December 31 only.

23         Q.    If they withdraw during that coming year, would

24         that percentage as of December 31 be frozen?

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

90

1    Q.    And since 1997 has the Profit Sharing Trust

2    customarily purchased shares from shareholders who wish

3    to sell?

4    A.    I don't know what the word "customarily" means.

5    Did it actually purchase, if you leave out the word

6    customarily, I would say yes.  Has it purchased shares

7    from people willing to sell at the price the trust is

8    willing to pay for it, yes.

9    Q.    How does the trust arrive at a price it's willing

10    to pay?

11    A.    It's an arm's length transaction between the trust

12    and the person willing to say under the assumption that

13    the price that this transaction could take place is

14    somewhere between the fair market value at the end of

15    the prior year and within the fair market value most

16    likely determined by the board of directors for the end

17    of the year, a transaction would go through.

18    Q.    And who is the person who on behalf of the trust

19    arrives at a dollar figure that they are willing to

20    pay?

21    A.    Me.

22    Q.    Now, there are restrictions on the sale of company

23    stock, are there not?

24    A.    Yes.

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

91

1    Q.    Are they customarily waived when someone wishes to

2    sell to the trust?

3    A.    Yes.

4    Q.    Is there a procedure one has to go through to get

5    the waver?

6    A.    Yes.

7    Q.    What is that procedure?

8    A.    We furnish the potential seller with a document

9    that is a right of first refusal document.  The person

10   wanting to sell their stock has to fill out the

11   document or we will fill it out for them and they would

12   sign that document, submit it to the company and as CEO

13   of the company, I customarily would approve such a

14   sale.

15   Q.    And in the case of sales to the trust, have you

16   customarily approved them?

17   A.    Yes.

18   Q.    And have you refused ever?

19   A.    Never.

20   Q.    Have you refused other sales that is where --

21   aside from ones to be purchased by the trust?

22   A.    Give me a -- you got to be more specific of what

23   you are looking for.

24   Q.    In your position -- I would rather go into this

149

1      amount, correct?

2      A.    I believe so.

3      Q.    He has indicated in this letter he thinks it will

4      be insufficient because the stock has been undervalued,

5      correct?

6            ATTY. POSS:   Objection.

7      Q.    Is that a fair reading of it?

8      A.    I can't understand exactly what his real concerns

9      are.  So I really don't -- I'm not going to try to

10     answer what is going on in his mind.  The letter speaks

11     for itself.

12     Q.    Did you reply to the letter?

13     A.    I did not.

14     Q.    Did you have anyone reply to it on your behalf for

15     the trust?

16     A.    I did not.

17     Q.    There was no particular form, was there, for

18     someone to dispute a benefit?

19     A.    There wasn't any particular form, that is a

20     correct statement.

21     Q.    So how is someone supposed to know how to write a

22     letter questioning what the trustee is doing or about

23     to do?  Did you give anyone any instructions as to how

24     they should write a benefit claim for benefit?

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

162

1       totally familiar with the methodology, it's doubtful

2       that it was written in this time, but it was certainly

3       eluded to during the presentation on the board or the

4       presentation verbally or the presentation by a set of

5       slides, and, certainly, any of them could have come up

6       with the same $20 valuation based on that methodology

7       because every board member was acutely aware of the

8       methodology we used.

9       Q.    I think we're going to reserve for another

10      deposition going into that.

11            What I would like to ask you, was that methodology

12      available to members of the trust?

13      A.    Available, they all knew -- members of the trust?

14      Q.    Yes.

15      A.    Not that I know of per se.  Available you mean in

16      writing because you used writing?

17      Q.    Yes.

18      A.    Right.  I'm not aware of any writing that had the

19      methodology.

20      Q.    I would like to refer you to DEF 000515.  That

21      would be the next year, the next year for October of

22      1996.  It's about four down, maybe.  October 1996.

23            ATTY. POSS:  So it's 502?

24            ATTY. COLLORA:  Yes.

A. Neil Pappalardo 7-21-2006
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

196

```
 1            ATTY. NOONAN:  Fine.  His is identical to mine.
 2            ATTY. COLLORA:  Why don't we give that to the
 3       reporter.
 4       Q.   Exhibit next, Exhibit 20 a document dated
 5       January 2, 1998 Meditech Profit Sharing Trust at the
 6       top to Barbara Manzolillo from A. Neil Pappalardo,
 7       Trustee.
 8            ATTY. POSS:  Is there a Bates number for Exhibit
 9       20?
10            ATTY. COLLORA:  Yes.  Let's see if I can -- hold
11       on a second.  1337 through 1340.
12            (Exhibit 20, ANNUAL VALUATION, marked for
13            identification.)
14
15       Q.   Can you identify that document?
16       A.   This document seems to be the annual memorandum I
17       would send to Barbara Manzolillo.  It's usually
18       sometime near the end of the year, sometime actually in
19       the first week of January to instruct her about how I
20       want the assets of the trust valued.
21       Q.   Do you value the common stock of Meditech that's
22       in the trust at that time?
23       A.   Yes, I do.
24       Q.   And is that independent of your -- of the
```

197

1    valuation set by the board of directors previous to

2    that?

3    A.    No, not necessarily independent.

4    Q.    All right.  Do you use the same methodology and

5    thinking in reaching this value?

6    A.    Not exactly the same methodology and thinking

7    because first and foremost, it's three months later or

8    actually two months, two and a half months later and I

9    have more information at my disposal.  I'm certainly

10   readily aware of how the board of directors valued

11   Meditech stock.  That is certainly one of the data

12   points that I would use in my consideration of how I

13   would value it.

14   Q.    Is this document circulated beyond Barbara?

15   A.    Not that I know of, other than we do circulate it

16   to lawyers representing plaintiffs who are suing us.

17   So we gave it to you.

18   Q.    Was this made available to the members of the

19   trust?

20   A.    I'm not aware of it being made to members of the

21   trust.

22   Q.    I would like to show you the one for 199 -- I

23   guess it's dated January 2, 1998.  Presumably it's for

24   1997, I guess.

**EXHIBIT 8**

# O'BRIEN &amp; LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

## Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

Transcript of the Testimony of:

# Neil Pappalardo

# November 27, 2007

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL

Debra M. Lopes   26743

Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

17

```
 1              doing, I have some idea of what the share price

 2              might be at the end of the year.

 3                   Therefore, it's always been my practice to

 4              pick numbers at, apparently, approximate the price

 5              that it might be set, if you drew a line from the

 6              beginning price, the beginning of the year, to the

 7              ending price.

 8    Q.   At the bottom of this paragraph, you say "Based on

 9         prior evaluation practice, we recommend fixing the

10         fair market value at $24 per share effective on

11         December 31, 1996.  We have included an

12         appropriate draft resolution for your review."

13         What was the evaluation practice, if you would

14         recall, at that point?

15    A.   The evaluation practice at that point, as well as

16         has been consistently, is I was asked to recommend

17         a price per share, and the methodology I primarily

18         would rely on was a discounted cash flow of

19         dividends being paid to shareholders, and that's

20         what I would always use in my recommendation.

21    Q.   When you say the "discounted cash flow," in your

22         mind, would the Board pick the dividend first and

23         then you would set the stock price, or vice versa?

24    A.   I can't answer the question first or second.  I
```

Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

114

```
 1              to last year."
 2                    Is that the first year that you recall
 3              suggesting that your year-end might be down from
 4              the previous year?
 5     A.       Suggesting?
 6     Q.       Yeah.
 7     A.       The first year in a long time that our annual
 8              revenue would be down from the prior year, as well
 9              as operating income down, as well as net income
10              down.
11     Q.       Under "Valuation of MEDITECH Stock," which is
12              Page 10 of this document, you provide some
13              financial information to the board, and then you
14              say, according to the document, "Based on an
15              expected increase in the dividend rate to 2.48 per
16              share for next year, we recommend fixing the fair
17              market value at $34 per share effective on
18              December 31, 2000."
19                    Now, do you see the previous year's valuation
20              as set forth in this document was 32?
21     A.       I see that.
22     Q.       Why are you suggesting an increase in the stock
23              value, given that the revenues income, et cetera,
24              will be down --
```

Neil Pappalardo 11-27-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

115

```
 1   A.      I've answered you numerous times --

 2                   MR. POSS:  Just answer the question.

 3   A.      I've answered it numerous times.  I'll answer it

 4           once again for your benefit.  My recommendation

 5           the price of the stock only has to do with the

 6           discounted cash flow associated with the

 7           dividends.

 8               Since we could afford to pay an increase in

 9           dividends, it would be entirely appropriate,

10           therefore, to increase the price of the stock,

11           accordingly, so that the yield from the -- the

12           dividend yield for the price of the stock set at

13           the end of the year would then, for the next year,

14           become approximately 7 percent.

15   Q.      And do you -- you apparently had to explain this

16           to the Board.  I'll refer you to 49A, which is the

17           informal minutes?  49A?

18   A.      I don't have that in front of me.

19   Q.      No.  I'm going to give that to you and ask you to

20           look at the top of Page 5 of this exhibit.  You

21           can familiarize yourself with that, if you wish.

22   A.      What page you want me to look at?

23   Q.      Top of Page 5.  Does that accurately summarize

24           your comments to the board, as far as cash
```

**EXHIBIT 9**

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

**Transcript of the Testimony of:**

# Edward B. Roberts

# November 8, 2007

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

## ORIGINAL

James A. Scally   26740

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

1      Q.   But generally upward, correct?

2      A.   Always upward.

3      Q.   And that's because each year the company has been

4   doing better than the year before?

5      A.   In general.

6      Q.   With perhaps the exception of the year 2000 or so.

7   There was a year in which you had a downward slip.

8      A.   We had downward -- depending on what measures you

9   use, we've had stable or downward shifts on a few

10  occasions.  But in no occasion has the stock price or the

11  dividend been reduced.

12     Q.   Although if you look at the company's progress

13  that year, you could, in your own mind, have said, "It

14  didn't do as well as last year; we should not go up,"

15  right?

16          MR. MARTIN:  Objection.

17     A.   We are free to do what we choose to do, and we

18  have adhered to a very strong desire to maintain as smooth

19  a rate of change in price and in dividends as we seem -- as

20  we feel is justified by the overall situation, and we don't

21  do short-term thinking.  We do longer-term thinking, and

22  consequently, while a given year could show either a sharp

23  upward or not a very sharp downward, but some downward

24  thing, we would take that into account, but we would take

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

43

1    into account as well what has been happening generally over

2    a longer period backwards and anticipating where are we

3    going forward.

4        Q.   For a period of time, and I ask you to focus on

5    the period '95 through '99 or so, did the board appear to

6    focus on using a formula of a price-to-earnings ratio as

7    something that they would use as a benchmark?

8                MR. MARTIN:  Objection.

9        A.   A price-to-earnings ratio.

10       Q.   A P/E ratio, yes.

11       A.   No, we never formally used a price-to-earnings

12   ratio as a way of doing things.  Price-to-earnings ratio

13   would have been a measure after the fact of what we had

14   done, not a determinant of what we were going to do.

15       Q.   Well, you would know what the price-to-earnings

16   ratio was for the previous year, correct?

17       A.   We know how to make the calculation, but that's

18   not to say the price-to-earnings ratio was something that

19   was influencing us.

20       Q.   You also have a suggestion typically from the

21   chairman as to what he thinks the appropriate price will

22   be.  Do you not get that?

23                MR. MARTIN:  Objection.

24       A.   Appropriate price to be.  The chairman will

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

44

1    recommend what he regards as the fair market value in his

2    presentation of his report in the October meeting.

3        Q.    And is it fair to say that for a number of years

4    in the '90s, the price-to-earnings ratio of the stock was

5    around 8 or a bit more?

6        A.    That's a correct statement, but as I indicate,

7    that's a resultant calculation made, not an influencing

8    statement that says what we're supposed to be doing about

9    it.

10       Q.    No one on the board was using that as a formula

11   for that board member to arrive at a price?

12                  MR. MARTIN:   Objection.

13       A.    I don't know what individuals were doing in their

14   brain.  So they could be or could not be.

15                  MR. MARTIN:   Can we take five

16        minutes?

17                  MR. COLLORA:   Five minutes, that's

18        great.

19              (Recess:  10:27 a.m. to 10:39 a.m.)

20   BY MR. COLLORA:

21       Q.    If I could refer you, sir, to your deposition

22   given in the previous case, Exhibit 76 to these

23   depositions.

24       A.    May I ask what I'm to do with this document?

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

45

```
 1                    MR. MARTIN:  I'll take that.

 2        A.    Yes.

 3                    MR. MARTIN:  Just to clarify, you're

 4              referring to the first day of his

 5              deposition?

 6                    MR. COLLORA:  Yes.

 7                    MR. MARTIN:  Not the entire

 8              deposition?

 9                    MR. COLLORA:  Right.

10                    THE WITNESS:  What page would you

11              like me to turn to?

12        BY MR. COLLORA:

13        Q.    Would you turn to page 101.

14        A.    Yes.

15        Q.    And I'm just going to ask you if you gave this

16        answer to these questions, and then afterwards, I may ask

17        you some questions about your answers.

18              "Question" -- and do you recall being questioned

19        by the attorney for Mr. Grossman?

20        A.    I do.

21        Q.    Right.  And you attempted to be accurate at that

22        time as best you could, did you not?

23        A.    I did.

24        Q.    The question addressed to you on page 101 was as
```

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

46

```
 1    follows, quote, "Do you ever have a recollection of telling

 2    folks, 'The multiple we're using is much too low measured

 3    against comparables'?

 4            "Answer:  I suspect I would have said that from

 5    time to time.

 6            "Question:  All right.  From time to time you

 7    insisted that the multiple Meditech was using was

 8    inappropriately low?

 9            "Answer:  I championed that point of view over an

10    extended period of time."

11            "Did you champion that point of view in bad

12    faith?"

13            "Answer:  No."

14            Do you see that?

15    A.    I do.

16    Q.    Were your answers to those questions accurate?

17    A.    Were my answers accurate?

18            MR. MARTIN:  Objection.  Do you mean

19            is that a correct transcript?

20    Q.    Did you give those answers to those questions?

21    A.    Yes.

22    Q.    What period of time were you referring to when you

23    said, quote, "I championed that point of view over an

24    extended period of time"?
```

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

47

1      A.   I don't know.  I would have to look back to try to
2   figure out what it was.
3      Q.   Was it sometime in the '90s, though?
4      A.   I don't know.  I don't know what -- I don't know
5   what the context of the questioning was.
6      Q.   All right.
7      A.   I'd have to go back and look.
8      Q.   At the top of page 2, do you give --
9      A.   Top of page?
10     Q.   102.
11     A.   102, yes.
12     Q.   In response to this question, quote, "In fact,
13  sir, at a time when Meditech was using a multiple of about
14  10, you told folks you thought the fair multiple was about
15  20?
16          "Answer:  I don't know that I did tell them it was
17  20.  It wouldn't surprise me that when it was 10 I told
18  them that it should be more.  That's been consistent."
19          Right?
20     A.   Right.
21     Q.   Then you answer further, quote, "When it was 8, I
22  thought it should be higher.  When it was 10, I thought it
23  should be higher.  It's now 13.  I'm not so sure anymore
24  that it should be higher.  But, you know -- maybe it should

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

48

```
 1    be.  I don't know -- I'm not sure anymore," end quote.

 2              Did you give that answer to those questions?

 3        A.    I did.

 4        Q.    And would you turn now to a little further down in

 5    that same page, 102.

 6        A.    Uh-huh.

 7        Q.    You were asked, "Would you agree with me that on

 8    multiple occasions you urged a gradual doubling of the

 9    multiple by which the company valued Meditech for purposes

10    of issuance to the trust?"

11              Your answer, quote:  "I can't agree that I urged

12    doubling.  I can agree that I urged increasing.  I don't

13    know --

14              "Question:  Significant increases?

15              "Answer:  Increasing.  I don't know what's

16    significant."

17              Did you give those answers to those questions?

18        A.    I did.

19        Q.    Would you turn to page 106 -- I'm sorry.  The

20    bottom of page 105 to give some context.

21        A.    Uh-huh.

22        Q.    "Question:  And do you recollect the board

23    adopting your suggestion of using the higher multiple?

24              "Answer:  The fact is that over the years the
```

49

1    board has indeed adopted that.

2            "Question:  Well, it's gone from say 10 to 13,"

3    and you reply:

4            "Answer:  It's gone from 8 and less to 13, and

5    it's gone rather steadily until relatively recent years

6    when the steadiness has accelerated in line with the

7    arguments that I and Dr. Grossman have made for many years.

8    So this was a successful advocacy over a period of patient

9    advocacy, of educating the board and persuading the board

10   to move toward higher multiples of the stock."

11           Did you give those answers to those questions?

12       A.   I did.

13       Q.   Do you have a recollection of when you began

14   urging the board to go from 8 to some higher multiple?

15               MR. MARTIN:  Objection.

16       A.   No.

17       Q.   You were then asked on top of page 106:  "So in

18   1996 what multiple did you tell the board it should use?

19           "Answer:  I don't know what I told in 1996."

20       A.   You're at the top of page 106?

21       Q.   Yes.

22       A.   Yes, I'm with you.

23       Q.   You gave that answer to that question?

24       A.   Yes, I gave that answer.

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

50

```
 1        Q.    You were asked, quote, "What multiple did the

 2   board use in '96?"

 3              Your answer:  "I don't know, but I'd guess 8.

 4              "Question:  Do you have a memory whether you

 5   thought 8 was fair in '96?"

 6              "Answer:  I probably -- I don't, but I probably

 7   consistent with me would have thought that a higher number

 8   would be a nicer number."

 9              Is that an accurate --

10                   MR. MARTIN:  What's the question,

11              Mike?

12        Q.    -- answer?  Did you give that answer to that

13   question?

14        A.    Yes, I gave that answer.

15        Q.    Why did you think a higher number would be a nicer

16   number?

17        A.    During that period of time, that was my general

18   thought about the overall valuation process.

19        Q.    Aside from what you learned at board meetings,

20   were you learning anything outside board meetings that made

21   you think perhaps Meditech stock was not appropriately

22   valued?

23                   MR. MARTIN:  Are you asking at that

24              time?
```

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

51

1      A.    Not at that time period.

2      Q.    Were you looking at how other companies were doing

3   and wondering to yourself perhaps the price-earnings ratio

4   of Meditech is low compared to those other companies?

5      A.    At that point in time?

6      Q.    Yes.

7      A.    When you say what other companies were doing, do

8   you mean what --

9      Q.    In terms of their P/E ratio that were comparable

10  or competitive with Meditech.

11     A.    Well, all the other companies that I could have

12  looked at would have been public companies.

13     Q.    All right.

14     A.    Is that what you mean?  Was I looking at them?

15     Q.    Yes.

16     A.    I don't -- I don't recall especially looking at

17  them.

18     Q.    Well, would you define the price-earnings ratio

19  for me?  Tell me how it's made up.

20     A.    The price-earnings ratio?

21           MR. MARTIN:  Objection.

22     Q.    Yes.

23     A.    Price-earnings ratio takes whatever the price is

24  and divides it by the annual earnings of the company and --

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

52

1      Q.    Per share?

2      A.    Per share.

3      Q.    Per share.

4      A.    -- and determines what that result is.

5      Q.    So if the company made $2 per share --

6      A.    Yes.

7      Q.    -- and you thought it desirable that it have a P/E

8   of 10, you might have a fair market value of 20, if that's

9   all you had in mind; is that fair to say?

10              MR. MARTIN:  Objection.

11     A.    If I worked formulaically, from a P/E ratio basis,

12  your facts would lead one from $2 per share earnings, it

13  would then produce a 20-dollar price per share.

14     Q.    All right.  Would you turn to page 108 of your

15  previous deposition.

16     A.    Yes.

17     Q.    Exhibit 76.  Well, maybe, to be fair, just to put

18  the answers there in context, let's go to 107.

19     A.    Yes.

20     Q.    You were asked toward the top, "You believed that

21  using a multiple is entirely appropriate," question mark.

22              Your answer:  "Using a multiple is --

23              "Question:  Yes.  To value shares.

24              "Answer:  I believe that using a multiple is

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

53

1    entirely appropriate?  Is that what you're saying?"

2            The question becomes:  "Yes."

3    A.    I'm sorry.  I'm missing --

4    Q.    We're on 107.

5    A.    Yes.  "I believe in good faith that the

6    multiple" -- is that where it is?

7    Q.    Yes.

8    A.    Or are you someplace else?

9    Q.    There's a series of questions asking you whether

10   you think a multiple is appropriate.

11   A.    Oh, I see.  "Do I believe that using a multiple is

12   entirely appropriate?  Is that what you're saying?"

13   Q.    Yes.

14           MR. MARTIN:  Mike, why don't we read

15           the entire --

16           THE WITNESS:  I've got it.  Right.

17   Q.    You eventually say, quote, "It is one of many

18   benchmarks that are usable."  Do you not say that at the

19   bottom?

20   A.    Yes.

21   Q.    Okay.  And going over to the top of page 108 --

22           MR. MARTIN:  For the record, many of

23           the answers he was giving had question

24           marks at the end.

54

1                    MR. COLLORA:  That's true.

2        Q.   You were actually trying to find out, were you

3    not, on that page what was the question?

4        A.   Right.

5        Q.   And having a hard time pinning down the

6    questioner; isn't that fair to say?

7        A.   Given who the questioner was, yes.

8        Q.   All right.  But at the end of the day on page 107,

9    ultimately you said in reply to whether using a multiple is

10   appropriate, you said, quote, "It is one of many benchmarks

11   that are usable."  Do you see that?

12       A.   Right.

13       Q.   And do you believe that today?

14       A.   And I also say it's one simple approach to setting

15   a valuation.

16       Q.   Yes, that's right.

17                    MR. MARTIN:  Again -- sorry.  Go

18            ahead.  Finish.

19                    THE WITNESS:  Go ahead.

20                    MR. MARTIN:  For the record, the

21            questioning on the subject continues on the

22            next page.

23                    MR. COLLORA:  That's where I'm going,

24            if you let me get there.

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

55

1              MR. MARTIN:  I'll let you get there,

2         but it's not the end of the day, so go

3         ahead.

4              MR. COLLORA:  It's the end of that

5         morning, that page, though, wasn't it?

6    BY MR. COLLORA:

7         Q.   Now, at the top, then, you're asked, "Well, yeah,

8    but in a world that is full of imperfect benchmarks, you

9    thought this was a pretty good one?

10             "Answer:  I thought it was one."

11        A.   Right.

12        Q.   You gave that answer to that question, didn't you?

13        A.   Right.

14        Q.   "Question:  And it's one that you kept coming back

15   to board meeting after board meeting?

16             "Answer:  'Cause at a period of time Meditech was

17   using primarily a multiple as its approach to setting

18   valuation.

19             "Question:  Right.  Meditech thought it was the

20   more important variable, too, right?

21             "Answer:  The Meditech board used primarily a

22   multiple as a way of setting price for a valuation as --

23   for a period of time.

24             "Question:  And you weren't quarreling with the

56

```
 1     methodology of using a multiple as the principal

 2     methodology?

 3            "Answer:  At that period of time that's a correct

 4     statement that I wasn't quarrelling with that as a

 5     methodology.

 6            "Question:  You thought that methodology was fine;

 7     you thought the number was wrong?

 8            "Answer:  At that period of time, that's right."

 9            And then the question:  "That was true in '95,

10     '96, '97, '98, '99, 2000, and 2001, wasn't it, sir?

11            "Answer:  No, it wasn't."

12            And I don't think the questioner ever nails down

13     which years you thought the methodology was fine, but can

14     you tell me today, of those years that was given to you by

15     that questioner at that time, '95 through 2001, when did

16     you think the methodology was fine?

17                  MR. MARTIN:  Let's just ask directly

18                  whether he thinks the methodology was fine,

19                  rather than trying to do it through his

20                  transcript.

21                  MR. COLLORA:  I'm going to do it my

22                  way, thank you.

23     A.    Would you repeat your question?

24     Q.    Yes.  Of those years that were suggested to you --
```

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

57

1      A.    Yes.

2      Q.    -- in which of those years did you think the

3  methodology was fine?

4      A.    I don't know.

5      Q.    And in which years did you -- did the board use

6  that methodology?

7              MR. MARTIN:  Objection.

8      A.    It really is difficult to say that the board ever

9  used that as its methodology.  It considered price-earnings

10 ratio as one of the influences to determine what it needed

11 to determine.  But even using the term that it used that as

12 a methodology I think is an overstatement.

13     Q.    Well, on page 110 --

14     A.    Yes.

15     Q.    -- well, at the bottom of page 109, you were

16 asked:

17              "Question:  And your quarrel with Meditech was,

18 no, the methodology's not wrong; it's change the multiple,"

19 question mark.

20              "Answer:  At that period of time when we were

21 using a multiple as the primary way of valuation --

22              "Question:  Right.

23              "Aswer:  -- you are correct that I

24              thought the P/E that should be used should

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

58

1          be higher.

2                  "Question:  Was that true in '96?

3                  "Answer:  Was it true in 1996?  I

4          think so, yes."

5                  "Ninety-seven?

6                  "Probably.

7                  "Ninety-eight?

8                  "Probably.

9                  "Ninety-nine?

10                 "Probably.  But by then we were

11         already going away from the use of a

12         multiple as -- as a stand-alone measure.

13         We really had become considerably more

14         thoughtful, engaged in examining many other

15         kinds of approaches," et cetera.

16                 Did you give those answers to those

17         questions?

18    A.   I did give those answers, yes.

19    Q.   All right.  So is it fair to say that at least by

20    1999, based upon your memory, you were using something

21    other than a P/E ratio to arrive at a price for fair market

22    value?

23         A.   We were using more considerations than just a P/E

24    ratio to arrive at a fair market valuation.

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

59

1      Q.    Okay.  Now, typically when you meet as a board and

2    focus on arriving at a fair market value, do you start with

3    the report of the chairman?

4      A.    Typically, yes, we do.

5      Q.    All right.  I'm going to start with --

6              MR. MARTIN:  Mike, are you done with

7          this exhibit?

8              MR. COLLORA:  Yes.

9      Q.    Would you take a look -- these are more or less in

10    numerical order.  63 I would like to start with.

11              (Discussion off the record.)

12      Q.    I'll represent to you this is a portion of a board

13    report.

14      A.    Right.

15      Q.    For the board meeting of January 22, 1996, and

16    I've just isolated the chairman's comments.

17      A.    Right.

18      Q.    Is it common that he will give you a forecast for

19    the year?  And I point out page 11 where he says the 1996

20    forecast.

21      A.    Page 11, well, it's common that someone will give

22    you a forecast.  It could be him or it could be the CFO.

23      Q.    Now, he also has in this report a long-term cash

24    flow forecast, next page?

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

60

1       A.    Right.

2       Q.    And it appears from this that he is forecasting

3   growth of 15 percent.

4       A.    Right.

5       Q.    Was this a goal of the company if it could be

6   achieved of trying to increase each year 15 percent?

7       A.    The fact that he gave a long-term cash flow

8   forecast is in my recollection an unusual thing.  We seldom

9   engaged in long-range forecasts.  So seeing this is an

10  interesting thing that I would indicate we don't usually

11  do.  But that was not your question.  Your question was

12  what?

13      Q.    Was it the goal of the company, as you recall from

14  reports and board meetings, of trying to grow 15 percent a

15  year at that point in time in revenue?

16      A.    Your use of the word "goal" is the problem that I

17  have.  It may have been a desire of the company to do that,

18  but I don't know what you mean by the term "goal."  Were we

19  doing something special to try to get to 15 percent growth?

20  If that's what you mean, I think the answer would have been

21  no.  Would we have been extremely happy had we achieved 15

22  percent?  I think we would have been.  So I don't know what

23  the word "goal" means.

24      Q.    At the end of this chairman's report, page 15 of

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

61

1    the typed portion, it says "end of an era."

2        A.    End of an era, yes.

3        Q.    It says, quote, "During December EG&G indicated it

4    wanted to sell the remaining Meditech shares that it owned

5    (presumably to boost their earnings for the quarter).  In

6    spite of my insistence at the prior transaction that we

7    wanted them to always remain a shareholder, I acquiesced.

8    In late December I purchased for cash the remaining 75,000

9    shares at $20 per share.  The next day I sold 25,000 of

10   these shares to Dan Valente in recognition of continued

11   contribution to Meditech and another 25,000 shares to

12   Howard Messing to emphasize the trust we have in him for

13   the future."

14            Do you remember receiving that report?

15       A.    I do.

16       Q.    Did you play any role in approving this

17   transaction, the one, not the Meditech -- well, in

18   approving the purchase by Mr. Pappalardo and the subsequent

19   resale?

20       A.    My recollection is that we had a telephone

21   discussion that preceded this, but I'm not certain of that,

22   nor am I certain of the timing.

23       Q.    Did you regard this as a perk, like a car, but --

24   a perk that Mr. Pappalardo could purchase shares of stock

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

62

```
 1    either from the company or from a shareholder?

 2              MR. MARTIN:  Objection.

 3    A.   No, I didn't regard that.

 4    Q.   It was a no event, in your opinion?

 5              MR. MARTIN:  Objection.

 6    A.   No, it was not a no event.

 7    Q.   Did you have to as a member of the audit

 8    committee --

 9    A.   I was not a member of the audit committee.

10    Q.   Sorry.  The committee approving compensation for

11    the chairman, were you asked to review these purchases?

12    A.   It was not a compensation issue.

13    Q.   It was not?

14    A.   No.

15    Q.   So the answer is no?

16    A.   The answer's no, I was not asked to review it as a

17    member of the compensation committee.

18    Q.   At what price did he purchase stock when he did

19    so; do you know?

20              MR. MARTIN:  Objection.

21    A.   I do not know the exact price, but I know that it

22    would have been at the then fair market value, whatever

23    that was.

24    Q.   And --
```

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

63

```
1        A.    That was our practice.

2        Q.    Well, just referring you to your deposition.

3        A.    Uh-huh.

4        Q.    You were asked, "So I take it" -- this is page 47

5    at the bottom.   "So I take it it is your" --

6                    MR. MARTIN:  Mike, hold on.  You said

7              you were done with that exhibit, so we have

8              to find it.

9                    MR. COLLORA:  I'm just going to ask

10             him if he recalls giving this testimony.

11                   MR. MARTIN:  Let me grab it so I can

12             follow along.

13                   MR. COLLORA:  You can follow.  47.

14                   MR. MARTIN:  Hold on, Ed.

15                   THE WITNESS:  Okay.

16   BY MR. COLLORA:

17       Q.    Question at the bottom of 47:  "So I take it it is

18   your testimony that simultaneously with Mr. Pappalardo

19   acquiring additional shares, the comp committee knew about

20   it?

21             "Answer:  Absolutely.  Comp committee

22   authorized it."

23       A.    This is page 48?

24       Q.    Yes.
```

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

64

1      A.    "Simultaneously," yes.  Yes.

2      Q.    And then you go on to say in response to

3   questions, "And that there are written documents reflecting

4   this fact?

5          "Answer:  I believe in each and every case.  There

6   should be.

7          "Now has anyone at any time offered you the

8   opportunity to purchase additional shares?

9          "Answer:  No.

10         "Question:  Do you know why nobody offered you

11  that opportunity?

12         "Answer:  It wouldn't have been appropriate.

13         "Question:  Why?

14         "Answer:  I was in a way adequately compensated

15  relative to compensation by the amount of shares that I

16  received at the founding of the company and for my ongoing

17  contribution by the board of directors' fees that I

18  received periodically for my services as a board member."

19         Did you give those answers to those questions?

20     A.    Yes.

21     Q.    Did you regard, then, that Mr. Pappalardo's

22  opportunity to acquire shares from the company was a part

23  of his compensation?

24              MR. MARTIN:  Objection.

Edward B. Roberts 11-8-2007
Michael P. Hubert, et al. v. Medical Information Technology Profit Sharing Plan, et al.

65

1      A.    Your question is not relating to what you were

2    questioning in the other thing.

3      Q.    Okay.

4      A.    You understand there's a discontinuity.

5      Q.    Go ahead.

6      A.    On the one hand, you were asking about a

7    transaction with EG&G, and the discussion that you're

8    asking about in this transcript here is about the purchase

9    of company shares from the company.

10     Q.    Okay.

11     A.    From Meditech itself.  So these are very unrelated

12   kinds of considerations.

13     Q.    So when Mr. Pappalardo either seeks or is

14   authorized to buy shares from the company --

15     A.    Yes.

16     Q.    -- directly --

17     A.    This is a compensation committee action.

18     Q.    Why is that?

19     A.    Why is that?

20     Q.    Yes.

21     A.    Because the compensation committee has, I use the

22   word "control"; the compensation committee is the committee

23   that acts in regard to compensation elements of the chief

24   executive officer of the company.  That's our

**EXHIBIT 10**

# MEDICAL INFORMATION TECHNOLOGY INC

## FORM 10-K
(Annual Report)

### Filed 4/15/1997 For Period Ending 12/31/1996

| | |
|---|---|
| Address | MEDITECH CIRCLE |
| | WESTWOOD, Massachusetts 02090 |
| Telephone | 781-821-3000 |
| CIK | 0001011452 |
| Fiscal Year | 12/31 |

Generated by EDGAR Online Pro
http://pro.edgar-online.com

EDGAR Online

Contact EDGAR Online
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200



EXHIBIT
82
11-13-07

DEF003646

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT
OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 1996

*Commission file number 0-28092*

# Medical Information Technology, Inc.
(Exact Name of Registrant as Specified in Its Charter)

**Massachusetts**
(State or Other Jurisdiction of Incorporation or Organization)

04-2455639
(I.R.S. Employer Identification No.)

Meditech Circle, Westwood, MA
(Address of Principal Executive Offices)

02090
(Zip Code)

617-821-3000
(Registrant's Telephone Number)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

The number of shares of Common Stock, $.25 par value, outstanding at December 31, 1996 was 15,938,365

DEF003647

Part I

Item 1 - Business Page 3

Item 2 - Properties Page 5

Item 3 - Legal Proceedings Page 6

Item 4 - Submission of Matters to a Vote of Security Holders Page 6

Part II

Item 5 - Market for Registrant's Common Equity and Related Stockholder Matters Page 6

Item 6 - Selected Financial Data Page 6

Item 7 - Management's Discussion and Analysis of Financial Condition and Results of Operations Page 7

Item 8 - Financial Statements and Supplementary Data Page 8

Item 9 - Changes in and Disagreements with Accountants on Accounting and Financial Disclosure Page 8

Part III

Item 10 - Directors and Executive Officers of the Registrant Page 8

Item 11 - Executive Compensation Page 10

Item 12 - Security Ownership of Certain Beneficial Owners and Management Page 11

Item 13 - Certain Relationships and Related Transactions Page 11

Part IV

Item 14 - Exhibits, Financial Statement Schedules, and Reports on Form 8-K Page 12

Signatures Page 12

DEF003648

Item 1 - Business

COMPANY OVERVIEW

Medical Information Technology, Inc. (MEDITECH or the Company) was founded in 1969 to develop and market information system software for the hospital industry. 1996 revenues reached $168 million and at year-end MEDITECH had a product backlog of $125 million and more than 1,600 employees.

By the end of 1996 MEDITECH had over 850 active hospital customers throughout the U.S., Canada and the U.K., as well as a backlog of almost 100 hospitals waiting implementation. The implementation process consists of teaching hospital personnel about the operation of the software as well as training them on how to use it in their daily activity. Once the hospital goes live, MEDITECH maintains and updates the software thereafter.

HOSPITAL SOFTWARE

Initially MEDITECH developed a software product to automate one of the main hospital departments, the clinical laboratory that performs various diagnostic tests on blood and urine specimens. Within a few years, this product became standardized, thereby requiring minimal adaptation to meet the individual needs of a typical customer. MEDITECH extended the concept and developed additional software products for the rest of a hospital's clinical departments. Eventually, it moved into the financial area by developing a hospital billing and accounts receivable product as well as various general accounting products.

Although the individual products could be operated in a stand alone fashion, a hospital achieved maximum effectiveness when they were used in an integrated mode, sharing access to the common clinical and financial records of the hospital. This concept ultimately led to MEDITECH developing the so-called hospital information system, a cohesive set of software products designed from the onset to work in conjunction with the overall operation of the hospital and to minimize the need for specialized interfaces.

COMPUTER HARDWARE

Software requires extensive computer and communication equipment to function. In spite of this, MEDITECH continues to be a pure software company, limiting itself to specifying the aggregate components needed as well as suggesting typical configurations from certain hardware vendors. The responsibility is left to the hospital to purchase the requisite hardware and secure a continuing source of maintenance service for it.

The hardware components traditionally consist of a small set of central medium- sized computers and a large set of display terminals and printers distributed throughout the hospital. All of these elements are interconnected by means of a standard high speed communication network. The computers execute the software and include large disk subsystems containing the permanent and common clinical and financial records of the hospital.

DEF003649

Hardware technology evolves rapidly, and the current trend is to replace the display terminals with desktop computers, thereby regaining a client-server network. In this mode of operation, the central computers become the file servers while software is executed locally on the client computer which makes common file requests to the servers.

## LICENSED SOFTWARE

MEDITECH requires a customer to sign a standard software license agreement prior to product delivery, implementation and subsequent service of the software. This agreement specifies a front end product fee and a front end implementation fee both of which are payable over the implementation process, and a monthly service fee after the site goes live. In addition to precluding ownership and restricting transfer, the license mandates the hospital hold MEDITECH harmless from any liability arising from incorrect operation of the software.

MEDITECH bases its product fee on the total number of hospital beds that a customer operates at all of its sites, and sets its implementation fee on the total number of sites. Large hospitals pay more than small hospitals, but incremental fees continue to diminish. The monthly service fees are always 1% of the product fees. A typical 250 bed acute care hospital might incur a $500,000 product fee, $100,000 implementation fee and a $5,000 monthly service fee. An order is booked and goes into the backlog when a signed software license and 10% of both front end fees are received.

## STAFF ORGANIZATION

MEDITECH is organized into functional units grouped around product development, sales and marketing, implementation, customer service, accounting and facility operations. All MEDITECH staff work in company owned buildings located in the greater Boston area.

From its inception, MEDITECH utilized communication technology which allowed much of its business activities to be performed by remote access. MEDITECH staff sitting at their desks may access client hospitals, both personnel and computers. The need for remote offices is thereby negated. Although most customer contact is through the phone, certain of the sales and implementation staff travel to customer sites.

## PRODUCT DEVELOPMENT

Most of the product development staff is working on the incremental evolution of the current product line, as well as creating a few more new products each year. The rest of the staff is developing a set of replacement products utilizing a new technology. Approximately every seven years, the company introduces the next generation of products based on the new technology and gradually updates existing customers.

Most of the direct sales staff, organized into regions, concentrate on new prospects. In addition, some of the sales staff monitor existing customers to expose them to the Company's entire product line. Marketing activities and promotion are low key because hospitals are easily identified, finite in number and generally send an RFP to vendors when they are contemplating the purchase of a hospital information system.

During the sales process, prospects generally visit MEDITECH to talk to product specialists and to view product demonstrations. Thereafter they are encouraged to visit various MEDITECH customer sites to observe first hand the software in actual operation and to discuss issues of concern with hospital personnel.

## IMPLEMENTATION PROCESS

To ensure a successful implementation, the staff must properly train a core group of hospital personnel. To preclude interruptions from normal hospital activities, MEDITECH mandates that the hospital personnel come to Boston for intensive training sessions.

As training proceeds, the implementation staff will customize certain dictionaries to fit the specific need of the hospital's environment, provide interfaces to non-MEDITECH systems and to assist the hospital in converting data from legacy systems. In addition, the licensed software will be delivered, installed and tested on the customer's hardware. MEDITECH will utilize remote access communication technology to minimize or eliminate the need to travel.

## CUSTOMER SERVICE

Once a hospital goes live, the responsibility of maintaining the customer is transferred to the service staff. MEDITECH provides 24 hour a day service coverage to these customers in order to respond to problem calls. In addition, the staff updates customers with new releases of the software products as they become available. To ensure the continuing education of the hospital staff, MEDITECH runs seminars on the use of its products.

## COLUMBIA HEALTH CARE

Columbia owns and operates over 350 hospitals in the U.S., Canada, and the U.K. and is MEDITECH's biggest customer. Through 1996 almost 200 Columbia hospitals have been implemented by MEDITECH. Columbia provided 28% of 1996's total revenue and accounts for 33% of our product backlog.

## ITEM 2 - Properties

As of December 31, 1996 the Company owned four facilities containing approximately 845,000 square feet of usable space, all being well maintained Class A properties in the greater Boston area. The Company leases no real estate and has adequate space for its reasonable needs over the next couple of years.

DEF003651

ITEM 3 - Legal Proceedings

There are no material pending legal proceedings against the Company, nor were any initiated during the year 1996.

ITEM 4 - Submission of Matters to a Vote of Security Holders

None.

PART II

ITEM 5 - Market for Registrant's Common Equity and Related Stockholder Matters

No trading market exists for the Company's Common Stock, and accordingly no high and low bid information or quotations are available with respect to the Company's Common Stock.

The Company's Common Stock is subject to right of first refusal restrictions upon sale, assignment, transfer, pledge or other disposition of any of its shares.

At December 31, 1996 there were 686 holders of record of its Common Stock and 15,938,365 shares outstanding.

The Company paid quarterly cash dividends totaling the following amounts in the most recent three fiscal years:

1994 1995 1996 Per Share $1.04 $1.24 $1.40

ITEM 6 - Selected Financial Data

For the Five Years Ended December 31, 1996 (in thousands where applicable):

|  | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|
| **Operations:** |  |  |  |  |  |
| Revenue | $92,302 | $105,325 | $124,223 | $143,721 | $167,884 |
| Operating Income | 36,897 | 41,285 | 51,255 | 58,513 | 69,550 |
| Net Income | 23,196 | 29,625 | 32,190 | 37,085 | 44,350 |
| Average shares | 15,418 | 15,523 | 15,641 | 15,782 | 15,863 |
| Earnings per share | 1.50 | 1.91 | 2.06 | 2.35 | 2.80 |
|  |  |  |  |  |  |
| **Financial Position:** |  |  |  |  |  |
| Cash and cash equivalents | $8,299 | $6,191 | $12,907 | $6,512 | $18,063 |
| Total assets | 99,266 | 118,923 | 137,755 | 197,998 | 218,339 |
| Total liabilities | 16,855 | 18,870 | 20,006 | 60,170 | 55,871 |
| Shareholders' equity | 82,412 | 100,053 | 117,749 | 137,828 | 162,468 |
| Book Value per share | 5.33 | 6.43 | 7.51 | 8.71 | 10.19 |
| Shares outstanding | 15,454 | 15,567 | 15,686 | 15,831 | 15,938 |
|  |  |  |  |  |  |
| **Other Data:** |  |  |  |  |  |
| Working Capital | $23,211 | $43,027 | $60,711 | $47,573 | $60,373 |
| Cash flows from operations | 28,232 | 26,615 | 35,218 | 41,443 | 56,413 |
| Depreciation | 3,558 | 3,459 | 3,294 | 4,809 | 6,155 |
| Cash dividends per share | $0.67 | $0.87 | $1.04 | $1.24 | $1.40 |

DEF003652

Case 1:05-cv-10269-RWZ   Document 142-7   Filed 05/27/2008   Page 9 of 30

**Comparison of Fiscal Years Ended December 31, 1995 and 1996:**

Revenue increased 17% from $143.7 million in 1995 to $167.9 million in 1996. This increase is a result of increased orders from both existing and new customers, with 38% of the increase attributable to Columbia Health Care, the Company's largest customer.

Expenses increased 15% from $85.2 million in 1995 to $98.3 million in 1996. The primary reason for higher operating expenses is higher costs associated with a 14% increase in staff from 1995 to 1996.

Other Income, net of Other Expense, increased from $1.2 million in 1995 to $4.4 million in 1996 due primarily to: a decrease in interest expense on the scheduled paydown of a bank note ($1.2 million); an increase in rental income ($0.9 million) and a gain on the sale of our Cambridge facility ($1.4 million).

Income Tax Expense increased from $22.6 million in 1995 to $29.6 million in 1996. 1995's effective tax rate of 38% was a result of an investment tax credit earned in 1995 on property purchased. 1996's effective tax rate was at the normal 40% rate.

**Comparison of Fiscal Years ended December 31, 1994 and 1995:**

Revenues increased 16%, from $124.2 million in 1994 to $143.7 million in 1995. Over half of this increase was due to additional orders from Columbia Health Care, the Company's largest customer.

Expenses increased 17%, from $73.0 million in 1994 to $85.2 million in 1995. The primary reason for higher operating expenses is associated with the purchase of a new facility during 1995, which doubled office capacity and, in the nine months of operation, added about $2 million of depreciation to the Company's 1995 operating expenses.

Other Income, net of Other Expense, decreased from $2.7 million in 1994 to $1.2 million in 1995. The primary cause is associated with the additional interest and expense incurred with the ownership of the new facility in 1995.

Income Tax Expense increased by only 4%, from $21.8 million to $22.6 million in 1995, due to an investment tax credit of $1.7 million earned on 1995 property purchases. This credit reduced the effective tax rate from 40% in 1994 to 38% in 1995.

DEF003653

ITEM 8 - Financial Statements and Supplementary Data

The Financial Statements are included as part of Exhibit 13 (Annual Report to Shareholders)

```
OPERATING RESULTS BY QUARTER:

For the Two Years Ended December 31, 1996 (in thousands where applicable):
                        Mar 31     Jun 30     Sep 30     Dec 31
1995
    Revenue           $33,965    $35,459    $34,750    $39,547
    Operating income   14,164     14,397     13,475     16,477
    Net Income          9,385      9,219      8,636      9,845
    Earnings per share    .60        .58        .55        .62
1996
    Revenue           $38,843    $40,309    $41,856    $46,876
    Operating income   15,575     16,163     17,278     20,534
    Net income          9,745     10,232     11,126     13,247
    Earnings per share    .61        .65        .70        .84
```

ITEM 9 - Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## PART III

ITEM 10 - Directors and Executive Officers of the Registrant

The positions held by each Director and Officer of the Company are shown below. There are no family relationships among the following persons.

| Name of Director or Executive Officer | Age | Position with the Company |
|---|---|---|
| A. Neil Pappalardo | 54 | Chief Executive Officer, Chairman of the Board and Director |
| Lawrence A. Polimeno | 55 | Chief Operating Officer, President and Director |
| Morton E. Ruderman | 60 | Director |
| Jerome H. Grossman | 57 | Director |
| Edward B. Roberts | 61 | Director |
| Roland L. Driscoll | 66 | Director |
| L.P. Dan Valente | 66 | Director |
| Howard Messing | 44 | Executive Vice President |
| Barbara A. Manzolillo | 44 | Chief Financial Officer, Treasurer and Assistant Clerk |
| Christopher J. Anschuetz | 44 | Vice President |
| Robert S. Gale | 50 | Vice President |
| Roberta E. Grigg | 53 | Vice President |
| Edward G. Pisinski | 53 | Vice President |
| Joanne Wood | 43 | Vice President |
| Jane E. Currier | 44 | Chief Corporate Counsel and Clerk |

DEF003654

All Directors are elected each year at the annual meeting of shareholders, and all executive officers are elected at the first meeting of the Board following the annual meeting of shareholders and hold office for one year or until their successors are chosen and qualified.

The Board of Directors has appointed an Audit Committee, Executive Compensation Committee, and a Charitable Contribution Committee.

The following is a description of the business experience during the past five years of each Director and Officer.

A. Neil Pappalardo, founder of the Company, is the Chairman of the Board, Chief Executive Officer, and has been a Director since 1969.

Lawrence A. Polimeno is the President, Chief Operating Officer, and has been a Director since 1985. He has been with the Company since 1969.

Morton E. Ruderman, Chief Executive Officer of CRES Development, has been a Director since 1969.

Jerome H. Grossman, Chief Executive Officer of Health Quality, Inc., has been a Director since 1970.

Edward B. Roberts, Professor at Sloan School, Massachusetts Institute of Technology, has been a Director since 1969.

Roland L. Driscoll, retired Chief Financial Officer of the Company, has been a Director since 1985.

L.P. Dan Valente, retired Senior Vice President of EG&G Inc., has been a Director since 1972.

Howard Messing has been the Executive Vice President since 1995, was a Vice President prior to that, and has been with the Company since 1974.

Barbara A. Manzolillo has been the Chief Financial Officer since 1996, was the Treasurer prior to that, and has been with the Company since 1975.

Christopher J. Anschuetz has been a Vice President since 1995, was a Senior Manager prior to that, and has been with the Company since 1975.

Robert S. Gale has been a Vice President since 1995, was a Senior Manager prior to that, and has been with the Company since 1976.

Roberta E. Grigg has been a Vice President since 1984, and has been with the Company since 1975.

Edward G. Pisinski has been a Vice President since 1984, and has been with the Company since 1973.

Joanne Wood has been a Vice President since 1995, was a Senior Manager prior to that, and has been with the Company since 1983.

Jane E. Currier is the Chief Corporate Counsel, has been the Clerk since 1986, and has been with the Company since 1983.

There were no failures to file or late filings under Section 16(a)

DEF003655

The following table sets forth the compensation received by the Company's Chief Executive Officer and the four most highly compensated other Officers for the three fiscal years ended December 31, 1994, 1995 and 1996.

SUMMARY COMPENSATION TABLE

Name and Principal Position Year Salary ($) Bonus ($) Other ($)

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Other ($) |
|---|---|---|---|---|
| A. Neil Pappalardo | 1996 | 360,000 | 725,000 | 0 |
| Chairman and Chief | 1995 | 360,000 | 725,000 | 0 |
| Executive Officer | 1994 | 360,000 | 745,000 | 0 |
| Lawrence A. Polimeno | 1996 | 240,000 | 625,000 | 5,962 |
| President and Chief | 1995 | 240,000 | 575,000 | 6,130 |
| Operating Officer | 1994 | 240,000 | 558,000 | 6,070 |
| Howard Messing | 1996 | 156,000 | 375,000 | 5,962 |
| Executive Vice President | 1995 | 156,000 | 275,000 | 6,130 |
| | 1994 | 156,000 | 229,000 | 6,070 |
| Edward G. Pisinski | 1996 | 156,000 | 300,000 | 5,962 |
| Vice President - Marketing | 1995 | 156,000 | 225,000 | 6,130 |
| | 1994 | 156,000 | 241,000 | 6,070 |
| Barbara A. Manzolillo | 1996 | 132,000 | 225,000 | 5,962 |
| Chief Financial Officer | 1995 | 132,000 | 175,000 | 6,130 |
| and Treasurer | 1994 | 132,000 | 169,000 | 6,070 |

Compensation of Executive Officers: There are no employment contracts or agreements in effect for any Officer of the Company. The Board of Directors authorizes and directs the bonus program instituted for the recognition of services rendered by employees. The total amount of the bonus pool is based on a fixed percentage of operating income as set by the Board of Directors. This philosophy aligns the interest of all with the interests of the Company's shareholders.

The Board of Director's Executive Compensation Committee (composed of Mr. Roberts, Mr. Ruderman, and Mr. Valente) sets Mr. Pappalardo's bonus compensation based upon the same criteria for awarding bonuses to all officers and employees.

Pension Plan: The Company maintains a qualified defined contribution plan for all employees known as the Medical Information Technology, Inc. Profit Sharing Plan. All employees of the Company who have completed one year of service participate in the plan. The Company's annual contribution is allocated in proportion to total compensation (capped at $100,000) of all eligible members for the plan year. No allocation is allowable under this plan to owners of 10% or more of the Company's common stock. Contributions by members are not permitted. Benefits under the plan become fully vested after five years of continuous service with the Company. Lump sum cash payment is made upon retirement, death, disability, or termination of employment.

DEF003656

Compensation of Directors: The members of the Board of Directors who are not Officers of the Company currently receive a fee of $6,000 for each fully attended quarterly meeting, with such fee being deemed to also cover any incidental expenses or directorial conference or committee time expended by such directors in behalf of the Company during the year.

ITEM 12 - Security Ownership of Certain Beneficial Owners and Management

The following table provides information as of December 31, 1996 with respect to the shares of Common Stock beneficially owned by each person known by the Company to own more than 5% of the Company's outstanding Common Stock, each Director of the Company, each Executive Officer named in the Summary Compensation Table and by all Directors and Executive Officers of the Company as a group. The number of shares beneficially owned is determined according to rules of the Securities and Exchange Commission. Under such rules, a person's beneficial ownership includes any shares as to which such person has sole or shared voting power or investment power.

| Name | Number of Shares of Common Stock Beneficially Owned | % of Shares of Common Stock |
|---|---|---|
| A. Neil Pappalardo | 4,271,406 | 26.80% |
| Morton E. Ruderman | 2,357,919 | 14.79% |
| Jerome Grossman | 600,675 | 3.77% |
| Lawrence A. Polimeno | 580,100 | 3.64% |
| Edward B. Roberts | 381,416 | 2.39% |
| Roland L. Driscoll | 264,000 | 1.66% |
| Edward G. Pisinski | 145,500 | <1% |
| Howard Messing | 125,000 | <1% |
| Barbara A. Manzolillo | 75,000 | <1% |
| L. P. Dan Valente | 42,500 | <1% |
| Directors and Executive Officers as a Group (10 persons) | 8,843,516 | 55.49% |
| Curtis W. Marble | 1,865,052 | 11.70% |
| Medical Information Technology Inc. Profit Sharing Trust | 1,408,745 | 8.84% |

The address of all Executive Officers and Directors is in care of the Company, MEDITECH Circle, Westwood, MA 02090.

ITEM 13 - Certain Relationships and Related Transactions

None.

DEF003657

PART IV

ITEM 14 - Exhibits, Financial Statement Schedules, and Reports on Form 8-K

Exhibit 3i (Articles of Incorporation) and Exhibit 3ii (By-Laws) are incorporated by reference from the registration statement on Form 10 effective April 27, 1996, File # 0-28092.

Exhibit 13 (Annual Report to Shareholders) and Exhibit 27 (Financial Data Schedule) are appended to this document.

There were no reports filed on Form 8-K during the quarter ended December 31, 1996.

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Medical Information Technology, Inc.
(Registrant)

March 31, 1997
(Date)

Barbara A. Manzolillo, Chief Financial Officer and Treasurer

(Signature)

DEF003658

FINANCIAL STATEMENTS
AS OF DECEMBER 31, 1995 AND 1996
TOGETHER WITH AUDITORS' REPORT

DEF003659

MEDICAL INFORMATION TECHNOLOGY, INC.

INDEX TO FINANCIAL STATEMENTS

|  | PAGE |
|---|---|
| REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS | 1 |
| BALANCE SHEETS AS OF DECEMBER 31, 1995 AND 1996 | 2 |
| STATEMENTS OF INCOME FOR THE YEARS ENDED DECEMBER 31, 1994, 1995 AND 1996 | 3 |
| STATEMENTS OF STOCKHOLDERS' INVESTMENT FOR THE YEARS ENDED DECEMBER 31, 1994, 1995 AND 1996 | 4 |
| STATEMENTS OF CASH FLOWS FOR THE YEARS ENDED DECEMBER 31, 1994, 1995 AND 1996 | 5 |
| NOTES TO FINANCIAL STATEMENTS | 6-11 |

DEF003660

REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Stockholders and Board of Directors of
Medical Information Technology, Inc.:

We have audited the accompanying balance sheets of Medical Information Technology, Inc. (a Massachusetts corporation) as of December 31, 1995 and 1996, and the related statements of income, stockholders' investment and cash flows for each of the three years in the period ended December 31, 1996. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Medical Information Technology, Inc. as of December 31, 1995 and 1996, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 1996, in conformity with generally accepted accounting principles.

**Arthur Andersen LLP**

Boston, Massachusetts
February 10, 1997

DEF003661

BALANCE SHEETS

|  | December 31, | |
| --- | --- | --- |
|  | 1995 | 1996 |

ASSETS

| CURRENT ASSETS: | | |
| --- | --- | --- |
| Cash and cash equivalents (Note 1) | $ 6,511,805 | $ 18,063,262 |
| Marketable securities (Note 2) | 54,071,744 | 61,142,110 |
| Accounts receivable, less reserve of $160,000 in 1995 and $210,000 in 1996 | 20,183,379 | 21,815,789 |
| Prepaid expenses | 102,955 | 90,308 |
| Total current assets | 80,869,883 | 101,111,469 |

| PROPERTY, PLANT AND EQUIPMENT, AT COST (Note 1): | | |
| --- | --- | --- |
| Land and improvements | 20,499,775 | 20,403,703 |
| Buildings and improvements | 98,824,986 | 99,654,797 |
| Office furniture and equipment | 10,532,865 | 12,778,543 |
| Computer equipment | 8,571,196 | 10,927,224 |
|  | 138,428,822 | 143,764,267 |
| Less-Accumulated depreciation | 23,811,053 | 28,647,632 |
|  | 114,617,769 | 115,116,635 |

| INVESTMENTS (Note 5) | 2,510,884 | 2,110,883 |
| --- | --- | --- |
|  | $197,998,536 | $218,338,987 |

LIABILITIES AND STOCKHOLDERS' INVESTMENT

| CURRENT LIABILITIES: | | |
| --- | --- | --- |
| Current maturities of note payable to a bank (Note 7) | $ 12,000,000 | $ 12,000,000 |
| Accounts payable | 320,914 | 837,495 |
| Accrued taxes | 1,688,073 | 2,454,951 |
| Accrued expenses (Note 6) | 11,400,252 | 13,609,433 |
| Customer deposits | 7,887,215 | 11,837,423 |
| Total current liabilities | 33,296,454 | 40,739,302 |

| NOTE PAYABLE TO A BANK, LESS CURRENT MATURITIES (Note 7) | 26,000,000 | 14,000,000 |
| --- | --- | --- |

| DEFERRED FEDERAL AND STATE INCOME TAXES (Note 9) | 873,813 | 1,131,663 |
| --- | --- | --- |

| STOCKHOLDERS' INVESTMENT: | | |
| --- | --- | --- |
| Common stock, $.25 par value, Authorized-17,000,000 shares, Issued and outstanding-15,831,402 shares in 1995 and 15,938,365 shares in 1996 | 3,957,851 | 3,984,591 |
| Additional paid-in capital | 5,221,423 | 7,680,143 |
| Retained earnings | 128,648,995 | 150,803,288 |
| Total stockholders' investment | 137,828,269 | 162,468,022 |
|  | $197,998,536 | $218,338,987 |

The accompanying notes are an integral part of these financial statements.

DEF003662

MEDICAL INFORMATION TECHNOLOGY, INC.

STATEMENTS OF INCOME

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 1994 | 1995 | 1996 |
| OPERATING REVENUE: | | | |
| Software products | $ 79,794,102 | $ 94,356,333 | $109,316,654 |
| Software services | 40,000,374 | 44,962,747 | 52,154,032 |
| Other | 4,428,750 | 4,401,480 | 6,413,111 |
| Total operating revenue | 124,223,226 | 143,720,560 | 167,883,797 |
| COSTS AND EXPENSES: | | | |
| Operating and product development | 44,795,788 | 52,876,661 | 61,453,443 |
| Selling, general and administrative | 28,172,289 | 32,331,072 | 36,880,437 |
| Total costs and expenses | 72,968,077 | 85,207,733 | 98,333,880 |
| Income from operations | 51,255,149 | 58,512,827 | 69,549,917 |
| DIVIDEND, INTEREST AND OTHER INCOME | 2,911,157 | 6,400,717 | 8,937,691 |
| INTEREST AND OTHER EXPENSE | 220,337 | 5,248,811 | 4,526,848 |
| Income before provision for income taxes | 53,945,969 | 59,664,733 | 73,960,760 |
| PROVISION FOR INCOME TAXES (Note 9): | | | |
| State | 5,052,753 | 3,835,010 | 6,457,439 |
| Federal | 16,702,890 | 18,744,928 | 23,153,534 |
| Net income | $ 32,190,326 | $ 37,084,795 | $ 44,349,787 |
| NET INCOME PER COMMON SHARE | $ 2.06 | $ 2.35 | $ 2.80 |
| SHARES USED IN COMPUTING NET INCOME PER SHARE | 15,641,266 | 15,782,259 | 15,862,838 |

The accompanying notes are an integral part of these financial statements.

DEF003663

MEDICAL INFORMATION TECHNOLOGY, INC.

STATEMENTS OF STOCKHOLDERS' INVESTMENT

| | Common Stock | | Additional | | Treasury Stock | | |
| | Number of Shares | $.25 Par Value | Paid-in Capital | Retained Earnings | Number of Shares | Cost | Stockholders' Investment |
|---|---|---|---|---|---|---|---|
| BALANCE, DECEMBER 31, 1993 | 15,566,877 | $3,891,719 | $ 969,631 | $ 95,191,499 | - | $ - | $100,052,849 |
| Sale of 89,667 shares of common stock | 89,667 | 22,417 | 1,232,921 | - | - | - | 1,255,338 |
| Issuance of 30,000 shares of common stock to qualified employee profit sharing trust | 30,000 | 7,500 | 502,500 | - | - | - | 510,000 |
| Net income | - | - | - | 32,190,326 | - | - | 32,190,326 |
| Dividends | - | - | - | (16,259,492) | - | - | (16,259,492) |
| BALANCE, DECEMBER 31, 1994 | 15,686,544 | 3,921,636 | 2,705,052 | 111,122,333 | - | - | 117,749,021 |
| Sale of 114,858 shares of common stock | 114,858 | 28,715 | 1,923,871 | - | - | - | 1,952,586 |
| Issuance of 30,000 shares of common stock to qualified employee profit sharing trust | 30,000 | 7,500 | 592,500 | - | - | - | 600,000 |
| Net income | - | - | - | 37,084,795 | - | - | 37,084,795 |
| Dividends | - | - | - | (19,558,133) | - | - | (19,558,133) |
| BALANCE, DECEMBER 31, 1995 | 15,831,402 | 3,957,851 | 5,221,423 | 128,648,995 | - | - | 137,828,269 |
| Sale of 106,963 shares of common stock | 106,963 | 26,740 | 2,112,520 | - | - | - | 2,139,260 |
| Purchase of 230,400 shares of treasury stock | - | - | - | - | (230,400) | (4,838,400) | (4,838,400) |
| Sale of 195,400 shares of treasury stock | - | - | 241,200 | - | 195,400 | 4,103,400 | 4,344,600 |
| Issuance of 35,000 shares of treasury stock to qualified employee profit sharing trust | - | - | 105,000 | - | 35,000 | 735,000 | 840,000 |
| Net income | - | - | - | 44,349,787 | - | - | 44,349,787 |
| Dividends | - | - | - | (22,195,494) | - | - | (22,195,494) |
| BALANCE, DECEMBER 31, 1996 | 15,938,365 | $3,984,591 | $7,680,143 | $150,803,288 | - | $ - | $162,468,022 |

DEF003664

The accompanying notes are an integral part of these financial statements.

DEF003665

MEDICAL INFORMATION TECHNOLOGY, INC.

STATEMENTS OF CASH FLOWS

|  | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 1994 | 1995 | 1996 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net income | $ 32,190,326 | $ 37,084,795 | $ 44,349,787 |
| Adjustments to reconcile net income to net cash provided by operating activities- | | | |
| Depreciation | 3,293,831 | 4,809,482 | 6,155,719 |
| Deferred income taxes | 177,674 | 118,897 | 257,850 |
| Stock bonus to employee profit sharing plan | 510,000 | 600,000 | 840,000 |
| (Gain) loss on sale of securities, net | (13,645) | 9,302 | (3,852) |
| Gain on sale of fixed assets, net | - | - | (1,409,475) |
| Write-down of investments | 1,000,000 | - | 400,000 |
| Allowance for doubtful accounts | - | - | 50,000 |
| Changes in assets and liabilities- | | | |
| Accounts receivable | 100,035 | (6,244,288) | (1,682,409) |
| Prepaid expenses | (2,998,446) | 3,019,353 | 12,647 |
| Accounts payable | (54,070) | 121,894 | 516,581 |
| Accrued expenses | 1,854,934 | 1,190,952 | 2,976,059 |
| Customer deposits | (842,506) | 732,835 | 3,950,208 |
| Net cash provided by operating activities | 35,218,133 | 41,443,222 | 56,413,115 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Purchases of property, plant and equipment, net | (1,508,781) | (64,538,650) | (6,837,576) |
| Purchases of marketable securities | (35,406,064) | (4,588,567) | (11,822,721) |
| Sales of marketable securities | 26,392,308 | 500,000 | 4,756,207 |
| (Increase) decrease in investments | (2,975,000) | 393,867 | - |
| Sales of property, plant and equipment | - | - | 1,592,466 |
| Net cash used in investing activities | (13,497,537) | (68,233,350) | (12,311,624) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Note payable to a bank | - | 50,000,000 | - |
| Payments of note payable to a bank | - | (12,000,000) | (12,000,000) |
| Sale of common stock | 1,255,338 | 1,952,586 | 2,139,260 |
| Purchase of treasury stock | - | - | (4,838,400) |
| Sale of treasury stock | - | - | 4,344,600 |
| Dividends paid | (16,259,492) | (19,558,133) | (22,195,494) |
| Net cash (used in) provided by financing activities | (15,004,154) | 20,394,453 | (32,550,034) |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 6,716,442 | (6,395,675) | 11,551,457 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF YEAR | 6,191,038 | 12,907,480 | 6,511,805 |
| CASH AND CASH EQUIVALENTS, END OF YEAR | $ 12,907,480 | $ 6,511,805 | $ 18,063,262 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION: | | | |
| Cash paid for income taxes | $ 21,836,452 | $ 22,739,708 | $ 28,761,470 |
| Cash paid for interest | $ - | $ 3,946,750 | $ 2,733,229 |

The accompanying notes are an integral part of these financial statements.

DEF003666

MEDICAL INFORMATION TECHNOLOGY, INC.

NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 1996

(1) OPERATIONS AND ACCOUNTING POLICIES

Medical Information Technology, Inc. (the Company) is engaged in the development, manufacture and licensing of computer software products and related services used principally in the medical field. The principal market for the Company's products are health care providers primarily located in the U.S. and Canada.

The accompanying financial statements reflect the application of certain accounting policies discussed below. The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

(a) Revenue Recognition

The Company enters into software product contracts which provide for a customer deposit upon contract execution, milestone billings and fixed monthly service fees thereafter. Product revenue is recognized at the completion of each milestone and service revenue is recognized as rendered.

(b) Software Development and Production Costs

In accordance with Statement of Financial Accounting Standards (SFAS) No. 86, Accounting for the Costs of Computer Software To Be Sold, Leased or Otherwise Marketed, the Company will capitalize software development costs incurred after technological feasibility of the software development projects is established and the realizability of such capitalized costs through future operations is expected if such costs become material. To date, all of the Company's costs for research and development of software products have been charged to operations as incurred, as the amount of software development costs incurred subsequent to the establishment of technological feasibility has been immaterial.

DEF003667

(1) OPERATIONS AND ACCOUNTING POLICIES (Continued)

(c) Depreciation

The Company provides for depreciation on its property, plant and equipment in amounts estimated to allocate the costs thereof under various depreciation methods over the following estimated useful lives:

| Description | Useful Life |
|---|---|
| Building and improvements | 15-40 Years |
| Office furniture and equipment | 7 Years |
| Computer equipment | 5 Years |

(d) Cash and Cash Equivalents

The Company considers all highly liquid investments purchased with original maturities of three months or less to be cash equivalents.

Cash equivalents include certificates of deposit of approximately $6,000,000 and $17,650,000 at December 31, 1995 and 1996, respectively.

(e) Concentration of Credit Risk

Financial instruments that potentially subject the Company to concentrations of credit risk are principally cash, cash equivalents, short-term investments and accounts receivable. The Company places its investments in highly rated institutions. Concentration of credit risk with respect to accounts receivable is limited to certain customers to whom the Company makes substantial sales. To reduce risk, the Company routinely assesses the financial strength of its customers and, as a result, believes that its accounts receivable credit risk exposure is limited. The Company maintains an allowance for potential credit losses but historically has not experienced any significant credit losses related to an individual customer or groups of customers.

(f) Net Income per Common Share

Net income per common share is computed using the weighted average number of shares of common stock outstanding during each year. The Company has no common stock equivalents.

DEF003668

(2) MARKETABLE SECURITIES

The Company accounts for investments in accordance with SFAS No. 115, Accounting for Certain Investments in Debt and Equity Securities. SFAS No. 115 requires companies to classify their short-term investments as either trading, available-for-sale or held-to-maturity. The Company's marketable securities consist primarily of preferred equity securities that are callable by the issuer. The Company has classified them as available for sale, and as such, they should be carried at fair market value. The fair market value of these equity securities as of December 31, 1995 and 1996 was approximately $57,985,000 and $65,952,000, respectively. The Company, however, has elected to record these investments at amortized cost as the amounts approximate fair market value.

(3) ALLOWANCE FOR DOUBTFUL ACCOUNTS

A summary of the allowance for doubtful accounts activity is as follows:

|                            | 1994      | 1995      | 1996      |
|----------------------------|-----------|-----------|-----------|
| Balance, beginning of period | $100,000 | $160,000 | $160,000 |
| Amounts charged to expense | 82,203    | 19,200    | 50,000    |
| Amounts written off        | (22,203)  | (19,200)  | -         |
| Balance, end of period     | $160,000  | $160,000  | $210,000  |

(4) SALE OF REAL ESTATE

In June 1996, the Company sold real property consisting of 31,500 square feet of office space and a parking lot located on 3/4 acre in Cambridge, Massachusetts for proceeds of $1,700,000. This sale resulted in a realized gain of approximately $1,409,000, which is included in other income on the statement of income for the year ended December 31, 1996.

(5) INVESTMENTS

During the years 1981 through 1994, the Company made a series of equity investments in three technology companies that represent minority interests. Although realization is not assured, management believes that the carrying amount of these investments at December 31, 1995 and 1996 represents their fair value. The amount of these investments, which is considered realizable, could be changed in the near term if estimates made by management of their fair value are altered.

DEF003669

(6) ACCRUED EXPENSES

Accrued expenses consist of the following:

|  | 1995 | 1996 |
|---|---|---|
| Accrued vacation | $ 1,314,885 | $ 1,314,885 |
| Accrued bonus | 9,300,000 | 11,100,000 |
| Other accruals | 785,367 | 1,194,548 |
|  | $11,400,252 | $13,609,433 |

(7) NOTE PAYABLE TO A BANK

In January 1995, the Company entered into an unsecured $50,000,000 note payable with a bank of which $26,000,000 was outstanding at December 31, 1996. The note is payable in monthly installments of $1,000,000 plus accrued interest. Interest on the outstanding principal balance is payable at the bank's prime rate (8.25% at December 31, 1996). In connection with this note, the Company must comply with certain restrictive covenants, including, among other things, maintaining defined levels of net worth, marketable securities and the ratio of current assets to current liabilities. At December 31, 1996, the Company was in compliance with all required covenants.

(8) QUALIFIED PROFIT SHARING PLAN AND RELATED PARTY TRANSACTIONS

The Company has no obligation for postemployment or postretirement benefits. The Company maintains a qualified profit sharing plan that provides deferred compensation to substantially all of its employees. Contributions to the plan are at the discretion of the Board of Directors and may be in the form of Company stock or cash. A summary of contributions made during the last three years is as follows:

|  | 1994 | 1995 | 1996 |
|---|---|---|---|
| Cash | $1,595,000 | $1,800,000 | $2,060,000 |
| Company common stock- |  |  |  |
| 30,000 shares at $17/share | 510,000 | - | - |
| 30,000 shares at $20/share | - | 600,000 | - |
| 35,000 shares at $24/share | - | - | 840,000 |
|  | $2,105,000 | $2,400,000 | $2,900,000 |

DEF003670

(8) QUALIFIED PROFIT SHARING PLAN AND RELATED PARTY TRANSACTIONS (Continued)

In December of 1996, a director, officer and stockholder of the Company purchased a total of 80,400 shares of common stock from the Company's treasury at a purchase price of $1,929,600 and subsequently resold 41,350 of these shares to various officers of the Company for $992,400. The price for both transactions was $24 per share, which represents fair market value, as determined by the Company's Board of Directors.

(9) INCOME TAXES

The Company follows the provisions of SFAS No. 109, Accounting for Income Taxes. The components of the net deferred tax liability recognized in the accompanying balance sheets are as follows (a valuation allowance has not been provided, as the Company expects to realize all deferred tax amounts):

|  | 1995 | 1996 |
|---|---|---|
| Depreciation | $1,436,386 | $1,490,064 |
| Nondeductible accruals and reserves | (654,239) | (676,254) |
| Deferred revenue | (396,627) | (519,725) |
| Other temporary differences | 488,293 | 837,578 |
| Total net deferred tax liability | $ 873,813 | $1,131,663 |

The components of the provision for income taxes shown on the accompanying statements of income consist of the following:

|  | 1994 | 1995 | 1996 |
|---|---|---|---|
| State- | | | |
| Current | $ 5,005,768 | $ 3,807,824 | $ 6,508,839 |
| Deferred | 46,985 | 27,186 | (51,400) |
|  | $ 5,052,753 | $ 3,835,010 | $ 6,457,439 |
| Federal- | | | |
| Current | $16,572,201 | $18,653,218 | $22,844,284 |
| Deferred | 130,689 | 91,710 | 309,250 |
|  | $16,702,890 | $18,744,928 | $23,153,534 |

DEF003671

(9) INCOME TAXES (Continued)

The effective income tax rate varies from the amount computed using the statutory U.S. income tax rate as follows:

|  | 1994 | 1995 | 1996 |
|---|---|---|---|
| Statutory tax rate | 35.0% | 35.0% | 35.0% |
| Increase in taxes resulting from state income taxes, net of federal income tax benefit | 6.1 | 4.2 | 5.7 |
| Dividend income exclusion | (1.5) | (1.7) | (1.4) |
| Other nondeductible expenses | 0.7 | 0.3 | 0.7 |
|  | 40.3% | 37.8% | 40.0% |

(10) EXPORT SALES

Export sales (primarily to Canada) accounted for approximately 13%, 11% and 13% of operating revenue during the years ended December 31, 1994, 1995 and 1996, respectively.

(11) SIGNIFICANT CUSTOMERS

During the fiscal years ended December 31, 1994, 1995 and 1996, one customer accounted for approximately 15%, 20% and 21% of operating revenue,

respectively.

DEF003672

ARTICLE 5

MULTIPLIER: 1,000

| | |
|---|---:|
| PERIOD TYPE | 12 MOS |
| FISCAL YEAR END | DEC 31 1996 |
| PERIOD END | DEC 31 1996 |
| CASH | 18,063 |
| SECURITIES | 61,142 |
| RECEIVABLES | 19,229 |
| ALLOWANCES | 210 |
| INVENTORY | 0 |
| CURRENT ASSETS | 101,111 |
| PP&E | 143,764 |
| DEPRECIATION | 28,648 |
| TOTAL ASSETS | 218,339 |
| CURRENT LIABILITIES | 40,739 |
| BONDS | 14,000 |
| PREFERRED MANDATORY | 0 |
| PREFERRED | 0 |
| COMMON | 3,984 |
| OTHER SE | 158,483 |
| TOTAL LIABILITY AND EQUITY | 218,339 |
| SALES | 109,317 |
| TOTAL REVENUES | 167,884 |
| CGS | 0 |
| TOTAL COSTS | 98,334 |
| OTHER EXPENSES | 1,794 |
| LOSS PROVISION | 0 |
| INTEREST EXPENSE | 2,733 |
| INCOME PRETAX | 73,961 |
| INCOME TAX | 29,611 |
| INCOME CONTINUING | 44,350 |
| DISCONTINUED | 0 |
| EXTRAORDINARY | 0 |
| CHANGES | 0 |
| NET INCOME | 44,350 |
| EPS PRIMARY | 2.80 |
| EPS DILUTED | 2.80 |

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

DEF003673

**EXHIBIT 11**

# MEDICAL INFORMATION TECHNOLOGY INC

### FORM 10-K
(Annual Report)

## Filed 5/13/1999 For Period Ending 12/31/1998

| | |
|---|---|
| Address | MEDITECH CIRCLE |
| | WESTWOOD, Massachusetts 02090 |
| Telephone | 781-821-3000 |
| CIK | 0001011452 |
| Fiscal Year | 12/31 |

Generated by EDGAR Online Pro
http pro edgar-online com



Contact EDGAR Online
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200

DEF003674

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT
OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 1998

*Commission file number 0-28092*

# Medical Information Technology, Inc.
(Exact Name of Registrant as Specified in Its Charter)

**Massachusetts**
(State or Other Jurisdiction of Incorporation or Organization)

04-2455639
(I.R.S. Employer Identification No.)

Meditech Circle, Westwood, MA
(Address of Principal Executive Offices)

02090
(Zip Code)

781-821-3000
(Registrant's Telephone Number)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

The number of shares of Common Stock, $.25 par value, outstanding at December 31, 1998 was 16,265,711

DEF003675

Part I

Item 1 – Business Page 3

Item 2 – Properties Page 5

Item 3 – Legal Proceedings Page 6

Item 4 – Submission of Matters to a Vote of Security Holders Page 6

Part II

Item 5 – Market for Registrant's Common Equity and Related Stockholder Matters Page 6

Item 6 – Selected Financial Data Page 6

Item 7 – Management's Discussion and Analysis of Financial Condition and Results of Operations Page 7

Item 8 – Financial Statements and Supplementary Data Page 8

Item 9 – Changes in and Disagreements with Accountants on Accounting and Financial Disclosure Page 8

Part III

Item 10 – Directors and Executive Officers of the Registrant Page 8

Item 11 – Executive Compensation Page 10

Item 12 – Security Ownership of Certain Beneficial Owners and Management Page 11

Item 13 – Certain Relationships and Related Transactions Page 11

Part IV

Item 14 – Exhibits, Financial Statement Schedules, and Reports on Form 8-K Page 12

Signatures Page 12

DEF003676

Item 1 - Business

## COMPANY OVERVIEW

Medical Information Technology, Inc. (MEDITECH or the Company) was founded in 1969 to develop and market information system software for the hospital industry. 1998 revenues reached $204 million and at year-end MEDITECH had a product backlog of $144 million and more than 1,900 employees.

By the end of 1998 MEDITECH had over 1,175 active hospital customers throughout the U.S., Canada and the U.K., as well as a backlog of over 100 hospitals waiting implementation. The implementation process consists of teaching hospital personnel about the operation of the software as well as training them on how to use it in their daily activity. Once the hospital goes live, MEDITECH maintains and updates the software thereafter.

## HOSPITAL SOFTWARE

Initially MEDITECH developed a software product to automate one of the main hospital departments, the clinical laboratory that performs various diagnostic tests on blood and urine specimens. Within a few years, this product became standardized, thereby requiring minimal adaptation to meet the individual needs of a typical customer. MEDITECH extended the concept and developed additional software products for the rest of a hospital's clinical departments. Eventually, it moved into the financial area by developing a hospital billing and accounts receivable product as well as various general accounting products.

Although the individual products could be operated in a stand alone fashion, a hospital achieved maximum effectiveness when they were used in an integrated mode, sharing access to the common clinical and financial records of the hospital. This concept ultimately led to MEDITECH developing the so-called hospital information system, a cohesive set of software products designed from the onset to work in conjunction with the overall operation of the hospital and to minimize the need for specialized interfaces.

## COMPUTER HARDWARE

Software requires extensive computer and communication equipment to function. In spite of this, MEDITECH continues to be a pure software company, limiting itself to specifying the aggregate components needed as well as suggesting typical configurations from certain hardware vendors. The responsibility is left to the hospital to purchase the requisite hardware and secure a continuing source of maintenance service for it.

The hardware components traditionally consist of a small set of central medium- sized computers and a large set of display terminals and printers distributed throughout the hospital. All of these elements are interconnected by means of a standard high speed communication network. The computers execute the software and include large disk subsystems containing the permanent and common clinical and financial records of the hospital.

DEF003677

Hardware technology evolves rapidly, and the central computers are able to display terminals with backup computers thereby acting as a server network. In this mode of operation, the central computers become the file servers while software is executed locally on the client computer which makes common file requests to the servers.

## LICENSED SOFTWARE

MEDITECH requires a customer to sign a standard software license agreement prior to product delivery, implementation and subsequent service of the software. This agreement specifies a front end product fee and a front end implementation fee both of which are payable over the implementation process, and a monthly service fee after the site goes live. In addition to precluding ownership and restricting transfer, the license mandates the hospital hold MEDITECH harmless from any liability arising from incorrect operation of the software.

MEDITECH bases its product fee on the total number of hospital beds that a customer operates at all of its sites, and sets its implementation fee on the total number of sites. Large hospitals pay more than small hospitals, but incremental fees continue to diminish. The monthly service fees are always 1% of the product fees. A typical 250 bed acute care hospital might incur a $500,000 product fee, $100,000 implementation fee and a $5,000 monthly service fee. An order is booked and goes into the backlog when a signed software license and 10% of both front end fees are received.

## STAFF ORGANIZATION

MEDITECH is organized into functional units grouped around product development, sales and marketing, implementation, customer service, accounting and facility operations. All MEDITECH staff work in company owned buildings located in the greater Boston area.

From its inception, MEDITECH utilized communication technology which allowed much of its business activities to be performed by remote access. MEDITECH staff sitting at their desks may access client hospitals, both personnel and computers. The need for remote offices is thereby negated. Although most customer contact is through the phone, certain of the sales and implementation staff travel to customer sites.

## PRODUCT DEVELOPMENT

Most of the product development staff is working on the incremental evolution of the current product line, as well as creating a few more new products each year. The rest of the staff is developing a set of replacement products utilizing a new technology. Approximately every seven years, the company introduces the next generation of products based on the new technology and gradually updates existing customers.

DEF003678

Most of the direct sales staff, organized into regions, concentrate on new prospects. In addition, some of the sales staff monitor existing customers to expose them to the Company's entire product line. Marketing activities and promotion are low key because hospitals are easily identified, finite in number and generally send an RFP to vendors when they are contemplating the purchase of a hospital information system.

During the sales process, prospects generally visit MEDITECH to talk to product specialists and to view product demonstrations. Thereafter they are encouraged to visit various MEDITECH customer sites to observe first hand the software in actual operation and to discuss issues of concern with hospital personnel.

## IMPLEMENTATION PROCESS

To ensure a successful implementation, the staff must properly train a core group of hospital personnel. To preclude interruptions from normal hospital activities, MEDITECH mandates that the hospital personnel come to Boston for intensive training sessions.

As training proceeds, the implementation staff will customize certain dictionaries to fit the specific need of the hospital's environment, provide interfaces to non-MEDITECH systems and to assist the hospital in converting data from legacy systems. In addition, the licensed software will be delivered, installed and tested on the customer's hardware. MEDITECH will utilize remote access communication technology to minimize or eliminate the need to travel.

## CUSTOMER SERVICE

Once a hospital goes live, the responsibility of maintaining the customer is transferred to the service staff. MEDITECH provides 24 hour a day service coverage to these customers in order to respond to problem calls. In addition, the staff updates customers with new releases of the software products as they become available. To ensure the continuing education of the hospital staff, MEDITECH runs seminars on the use of its products.

## COLUMBIA HEALTH CARE

Columbia/HCA owns and operates over 300 hospitals in the U.S., Canada, and the U.K. and is MEDITECH's largest customer. By the end of 1998 MEDITECH had implemented clinical systems in most of their hospitals. They represented 21% of our revenues in 1997 and 17% of our revenues in 1998. In the 3rd quarter 1997 Columbia/HCA underwent a major change in leadership and since then have made public statements to the effect that they are undergoing a transition in business strategy and will be downsizing. During 1998 we saw a decline in revenues generated from them and a decline in new orders received. This trend is expected to continue indefinitely.

## ITEM 2 - Properties

As of December 31, 1998 the Company owned five facilities containing about 1.1 million square feet of space, all being well maintained Class A properties in the greater Boston area. The Company occupies 60% of the space and the remaining 40% is leased to various tenants. The Company has adequate space for its reasonable needs over the next few years.

DEF003679

There are no material pending legal proceedings against the Company, nor were any initiated during the year 1998.

ITEM 4 - Submission of Matters to a Vote of Security Holders

None.

PART II

ITEM 5 - Market for Registrant's Common Equity and Related Stockholder Matters

No trading market exists for the Company's Common Stock, and accordingly no high and low bid information or quotations are available with respect to the Company's Common Stock.

The Company's Common Stock is subject to right of first refusal restrictions upon sale, assignment, transfer, pledge or other disposition of any of its shares.

At December 31, 1998 there were 790 holders of record of its Common Stock and 16,265,711 shares outstanding.

The Company has paid quarterly cash dividends continuously since 1980.

ITEM 6 - Selected Financial Data

For the Five Years Ended December 31, 1998 (in thousands where applicable):

| | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|
| **Operations:** | | | | | |
| Revenue | $124,223 | $143,721 | $167,884 | $193,805 | $203,813 |
| Operating income | 51,255 | 58,513 | 69,550 | 78,286 | 79,583 |
| Net income | 32,190 | 37,085 | 44,350 | 50,284 | 53,281 |
| Average shares | 15,641 | 15,782 | 15,863 | 16,029 | 16,203 |
| Earnings per share | $2.06 | $2.35 | $2.80 | $3.14 | $3.29 |
| | | | | | |
| **Financial Position:** | | | | | |
| Cash and cash equivalents | $12,907 | $6,512 | $18,063 | $8,379 | $10,014 |
| Total assets | 137,755 | 197,998 | 218,339 | 263,108 | 266,600 |
| Total liabilities | 20,006 | 60,170 | 55,871 | 73,577 | 49,328 |
| Shareholders' equity | 117,749 | 137,828 | 162,468 | 189,531 | 217,272 |
| Shares outstanding | 15,686 | 15,831 | 15,938 | 16,087 | 16,266 |
| Book value per share | $7.51 | $8.71 | $10.19 | $11.78 | $13.36 |
| | | | | | |
| **Other Data:** | | | | | |
| Working capital | $60,711 | $47,573 | $60,373 | $44,911 | $59,032 |
| Cash flow from operations | 35,218 | 41,443 | 56,413 | 62,195 | 59,788 |
| Depreciation | 3,294 | 4,809 | 6,155 | 9,084 | 10,078 |
| Cash dividends per share | $1.04 | $1.24 | $1.40 | $1.68 | $1.88 |

DEF003680

**Comparison of Fiscal Years ended December 31, 1997 and 1998:**

1998 Revenue increased 5% to $203.8 million, while 1998 Operating Income increased only 2% to $79.6 million. During the year the Company experienced a decrease in the product revenue attributable to a decline in implementations for Columbia/HCA. Staff size was not reduced in response as new orders requiring future implementations increased significantly during the second half of the year. The result of this caused growth in Operating Expenses to exceed growth in Revenue. 1998 Operating Expenses increased 8% to $124.2M due to a 6% increase in staff size and a continued moderate increase in employee salaries.

Other Income, net of Other Expense, increased from $6.4 million in 1997 to $8.5 million in 1998 due primarily to an increase in rental income ($0.9 million) and a gain on redemptions and sales of marketable securities ($1.4 million).

The Company's effective tax rate decreased from 41% to 40% in 1998.

**Comparison of Fiscal Years Ended December 31, 1996 and 1997:**

1997 Revenue increased 15% to $193.8 million, while 1997 Operating Income increased by 13% to $78.3 million. During the 4th quarter the Company experienced a decrease in the product revenue attributable to a slowdown in implementations for Columbia/HCA. During the quarter staff size was not reduced in response. The result of this caused growth in Operating Expenses to exceed growth in Revenue. 1997 Operating Expenses increased 17% to $115.5 million due to a 12% increase in staff size, a moderate increase in employee salaries and a significant increase in depreciation.

1997 Other Income, net of Other Expense, increased from $4.4 million to $6.4 million due to an increase of $3.3 million in rental income offset by a one-time gain of $1.4 million on the 1996 sale of our Cambridge facility.

The Company's effective tax rate increased from 40% to 41% in 1997.

DEF003681

The Financial Statements are included as part of Exhibit 13 (Annual Report to Shareholders)

```
OPERATING RESULTS BY QUARTER:

For the Two Years Ended December 31, 1998 (in thousands where applicable):
                              Mar 31      Jun 30      Sep 30      Dec 31
1997
   Revenue                   $46,705     $49,462     $51,184     $46,454
   Operating income           19,310      20,448      20,998      17,530
   Net income                 12,201      12,838      13,507      11,738
   Earnings per share           $.76        $.80        $.84        $.73
1998
   Revenue                   $48,493     $48,933     $49,922     $56,465
   Operating income           18,756      18,719      18,855      23,253
   Net income                 12,137      12,353      12,387      16,404
   Earnings per share           $.75        $.76        $.77       $1.01
```

## ITEM 9 - Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## PART III

## ITEM 10 - Directors and Executive Officers of the Registrant

The positions held by each Director and Officer of the Company are shown below. There are no family relationships among the following persons.

```
Name of Director or Officer    Age    Position with the Company

A. Neil Pappalardo             56     Chief Executive Officer, Chairman of
                                      the Board and Director
Lawrence A. Polimeno           57     Chief Operating Officer, President and
                                      Director
Morton E. Ruderman             62     Director
Jerome H. Grossman             59     Director
Edward B. Roberts              63     Director
Roland L. Driscoll             69     Director
L.P. Dan Valente               68     Director
Howard Messing                 46     Executive Vice President
Barbara A. Manzolillo          46     Chief Financial Officer, Treasurer and
                                      Assistant Clerk
Edward G. Pisinski             55     Senior Vice President
Roberta E. Grigg               55     Senior Vice President
Christopher J. Anschuetz       46     Vice President
Robert S. Gale                 52     Vice President
Steven B. Koretz               46     Vice President
Stuart N. Lefthes              45     Vice President
Joanne Wood                    45     Vice President
Jane E. Currier                46     Chief Corporate Counsel and Clerk
```

DEF003682

All Directors are elected each year at an annual shareholders' meeting. Officers are elected once a year following the annual meeting of shareholders and hold office for one year. The Board of Directors has an Audit Committee, an Executive Compensation Committee, and a Charitable Contribution Committee.

The following is a description of the business experience during the past five years of each Director and Officer.

A. Neil Pappalardo, founder of the Company, is the Chief Executive Officer and Chairman of the Board, and has been a Director since 1969.

Lawrence A. Polimeno is the President and Chief Operating Officer, has been a Director since 1985, and has been with the Company since 1969.

Morton E. Ruderman, Chief Executive Officer of CRES Development, has been a Director since 1969.

Jerome H. Grossman, Chief Executive Officer of Health Quality, Inc., has been a Director since 1970.

Edward B. Roberts, Professor at Sloan School, Massachusetts Institute of Technology, has been a Director since 1969.

Roland L. Driscoll, retired Chief Financial Officer of the Company, has been a Director since 1985.

L.P. Dan Valente, Chief Executive Officer of Palomar Medical Technologies, Inc., has been a Director since 1972.

Howard Messing has been the Executive Vice President since 1995, was a Vice President prior to that, and has been with the Company since 1974.

Barbara A. Manzolillo has been the Chief Financial Officer since 1996, was the Treasurer prior to that, and has been with the Company since 1975.

Edward G. Pisinski has been a Senior Vice President since 1997, was a Vice President prior to that, and has been with the Company since 1973.

Roberta E. Grigg has been a Senior Vice President since 1997, was a Vice President prior to that, and has been with the Company since 1975.

Christopher J. Anschuetz has been a Vice President since 1995, was a Senior Manager prior to that, and has been with the Company since 1975.

Robert S. Gale has been a Vice President since 1995, was a Senior Manager prior to that, and has been with the Company since 1976.

Steven B. Koretz has been a Vice President since 1997, was a Senior Manager prior to that, and has been with the company since 1982.

Stuart N. Lefthes has been a Vice President since 1997, was a Senior Manager prior to that, and has been with the company since 1983.

Joanne Wood has been a Vice President since 1995, was a Senior Manager prior to that, and has been with the Company since 1983.

Jane E. Currier has been the Chief Corporate Counsel and the Clerk since 1986, and has been with the Company since 1983.

DEF003683

ITEM 11 - Executive Compensation

The following table sets forth the compensation received by the Company's Chief Executive Officer and the four most highly compensated other Officers for the three fiscal years ended December 31, 1996, 1997 and 1998.

SUMMARY COMPENSATION TABLE

| Name and Position | Year | Salary | Bonus | Other |
|---|---|---|---|---|
| A. Neil Pappalardo | 1998 | $360,000 | $725,345 | 0 |
| Chairman and Chief | 1997 | 360,000 | 727,676 | 0 |
| Executive Officer | 1996 | 360,000 | 725,000 | 0 |
| | | | | |
| Lawrence A. Polimeno | 1998 | $240,000 | $625,345 | $5,816 |
| President and Chief | 1997 | 240,000 | 627,676 | 6,042 |
| Operating Officer | 1996 | 240,000 | 625,000 | 5,962 |
| | | | | |
| Howard Messing | 1998 | $180,000 | $375,345 | $5,816 |
| Executive Vice President | 1997 | 180,000 | 377,676 | 6,042 |
| | 1996 | 156,000 | 375,000 | 5,962 |
| | | | | |
| Edward G. Pisinski | 1998 | $156,000 | $300,345 | $5,816 |
| Senior Vice President | 1997 | 156,000 | 302,676 | 6,042 |
| Sales and Marketing | 1996 | 156,000 | 300,000 | 5,962 |
| | | | | |
| Barbara A. Manzolillo | 1998 | $144,000 | $225,345 | $5,816 |
| Chief Financial Officer | 1997 | 144,000 | 227,676 | 6,042 |
| and Treasurer | 1996 | 132,000 | 225,000 | 5,962 |

Compensation of Executive Officers: There are no employment contracts or agreements in effect for any officer of the Company. The Board of Directors annually sets the total amount to be allocated in the General Bonus Program instituted for the recognition of services rendered by all officers and employees. In addition, the Board of Directors annually sets the total amount to be allocated in the Officer Bonus Program instituted for the recognition of services rendered exclusively by the officers. Finally, the Executive Compensation Committee (composed of Mr. Roberts and Mr. Ruderman) sets Mr. Pappalardo's annual salary and individual bonus.

Pension Plan: The Company maintains a qualified defined contribution plan for all employees known as the Medical Information Technology, Inc. Profit Sharing Plan. All employees of the Company who have completed one year of service participate in the Plan. The Board of Directors sets the annual contribution which is allocated in proportion to total compensation (capped at $100,000) of all eligible members for the Plan year. No allocation is allowable under this Plan to owners of 10% or more of the Company's common stock. Contributions by members are not permitted. Benefits under the plan become fully vested after five years of continuous service with the Company. Lump sum cash payment is made upon retirement, death, disability, financial hardship or termination of employment.

Compensation of Directors: The members of the Board of Directors who are not Officers of the Company currently receive a fee of $7,000 for each fully attended quarterly meeting, with such fee being deemed to also cover any incidental expenses or directorial conference or committee time expended by such directors in behalf of the Company during the year.

DEF003684

The following table provides information as of December 31, 1998 with respect to the shares of Common Stock beneficially owned by each person known by the Company to own more than 5% of the Company's outstanding Common Stock, each Director of the Company, each Executive Officer named in the Summary Compensation Table and by all Directors and Officers of the Company as a group. The number of shares beneficially owned is determined according to rules of the Securities and Exchange Commission. Under such rules, a person's beneficial ownership includes any shares as to which such person has sole or shared voting power or investment power.

| Name | Number of Shares of Common Stock Beneficially Owned | Percentage of Shares of Common Stock |
|------|-----------------------------------------------------|--------------------------------------|
| A. Neil Pappalardo | 4,300,000 | 26.44% |
| Morton E. Ruderman | 2,207,919 | 13.57% |
| Jerome Grossman | 600,675 | 3.69% |
| Lawrence A. Polimeno | 560,630 | 3.45% |
| Edward B. Roberts | 366,713 | 2.25% |
| Roland L. Driscoll | 264,000 | 1.62% |
| Edward G. Pisinski | 147,500 | <1% |
| Howard Messing | 125,000 | <1% |
| Barbara A. Manzolillo | 84,500 | <1% |
| L. P. Dan Valente | 42,500 | <1% |
| Directors and Executive Officers as a Group (16 persons) | 8,924,437 | 54.87% |
| Curtis W. Marble | 1,865,052 | 11.47% |
| Medical Information Technology Inc. Profit Sharing Trust | 1,545,331 | 9.50% |

The address of all Officers and Directors is in care of the Company, MEDITECH Circle, Westwood, MA 02090.

**ITEM 13 - Certain Relationships and Related Transactions**

None.

DEF003685

ITEM 14 - Exhibits, Financial Statement Schedules, and Reports on Form 8-K

Exhibit 3i (Articles of Incorporation) and Exhibit 3ii (By-Laws) are incorporated by reference from the registration statement on Form 10 effective April 27, 1996 and from exhibit under Item 6 on Form 10-Q for the quarter ended June 10, 1997 (Amendment to By-Laws), File # 0-28092.

Exhibit 13 (Annual Report to Shareholders) and Exhibit 27 (Financial Data Schedule) are appended to this document.

There were no reports filed on Form 8-K during the quarter ended December 31, 1998.

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Medical Information Technology, Inc.
(Registrant)

March 24, 1999
(Date)

Barbara A. Manzolillo, Chief Financial Officer and Treasurer

(Signature)

DEF003686

Financial Statements
as of December 31, 1997 and 1998
Together with Auditors' Report

DEF003687

Index

|  | Page |
|---|---|
| Report of Independent Public Accountants | 1 |
| Balance Sheets as of December 31, 1997 and 1998 | 2 |
| Statements of Income for the Years Ended December 31, 1996, 1997 and 1998 | 3 |
| Statements of Shareholders' Investment for the Years Ended December 31, 1996, 1997 and 1998 | 4 |
| Statements of Cash Flows for the Years Ended December 31, 1996, 1997 and 1998 | 5 |
| Notes to Financial Statements | 6-10 |

DEF003688

Report of Independent Public Accountants

To the Shareholders and Board of Directors of

Medical Information Technology, Inc.:

We have audited the accompanying balance sheets of Medical Information Technology, Inc. (a Massachusetts corporation) as of December 31, 1997 and 1998, and the related statements of income, shareholders' investment and cash flows for each of the three years in the period ended December 31, 1998. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Medical Information Technology, Inc. as of December 31, 1997 and 1998, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 1998, in conformity with generally accepted accounting principles.

Arthur Andersen LLP

Boston, Massachusetts
February 3, 1999

DEF003689

Balance Sheets

|  | December 31, | |
| --- | --- | --- |
|  | 1997 | 1998 |

**Assets**

Current Assets:

| | | |
| --- | --- | --- |
| Cash and cash equivalents (Note 1) | $ 8,379,358 | $ 10,013,957 |
| Marketable securities (Note 2) | 62,348,881 | 67,923,022 |
| Accounts receivable, less reserve of $270,000 in 1997 and 1998 | 26,259,940 | 27,770,548 |
| Prepaid expenses and other current assets | 99,487 | 152,667 |
| Total current assets | 97,087,666 | 105,860,194 |

Property, Plant and Equipment, at cost (Note 1):

| | | |
| --- | --- | --- |
| Computer equipment | 11,887,006 | 9,693,702 |
| Furniture and fixtures | 18,506,896 | 19,976,372 |
| Buildings and improvements | 143,125,594 | 143,125,594 |
| Land | 26,603,703 | 26,603,703 |
| | 200,123,199 | 199,399,371 |
| Less Accumulated depreciation | 36,154,751 | 40,416,433 |
| | 163,968,448 | 158,982,938 |
| Investments | 2,051,752 | 1,757,293 |
| | $263,107,866 | $266,600,425 |

**Liabilities and Shareholders' Investment**

Current Liabilities:

| | | |
| --- | --- | --- |
| Current maturities of note payable to a bank (Note 5) | $ 18,000,000 | $ 15,000,000 |
| Accounts payable | 694,869 | 589,511 |
| Accrued taxes | 1,748,464 | 2,642,654 |
| Accrued expenses (Note 4) | 15,598,342 | 16,510,518 |
| Customer deposits | 16,135,386 | 12,085,748 |
| Total current liabilities | 52,177,061 | 46,828,431 |

| | | |
| --- | --- | --- |
| Note Payable to a Bank, less current maturities (Note 5) | 19,500,000 | - |
| Deferred Federal and State Income Taxes (Note 7) | 1,900,000 | 2,500,000 |

Shareholders' Investment:

| | | |
| --- | --- | --- |
| Common stock, $.25 par value, Authorized 17,000,000 shares Issued and outstanding 16,087,212 shares in 1997 and 16,265,711 shares in 1998 | 4,021,803 | 4,066,428 |
| Additional paid-in capital | 11,335,259 | 16,190,107 |
| Retained earnings | 174,173,743 | 197,015,459 |
| Total shareholders' investment | 189,530,805 | 217,271,994 |
| | $263,107,866 | $266,600,425 |

The accompanying notes are an integral part of these financial statements.

DEF003690

Statements of Income

|  | For the Years Ended December 31, | | |
|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| **Operating Revenue:** | | | |
| Software products | $115,729,765 | $131,775,141 | $133,635,527 |
| Software services | 52,154,032 | 62,029,361 | 70,177,095 |
| Total operating revenue | 167,883,797 | 193,804,502 | 203,812,622 |
| **Costs and Expenses:** | | | |
| Operating and product development | 61,453,443 | 74,666,248 | 81,046,899 |
| Selling, general and administrative | 36,880,437 | 40,852,721 | 43,182,408 |
| Total costs and expenses | 98,333,880 | 115,518,969 | 124,229,307 |
| Income from operations | 69,549,917 | 78,285,533 | 79,583,315 |
| Dividend, Interest and Other Income | 8,937,691 | 12,236,282 | 16,723,587 |
| Interest and Other Expense | 4,526,848 | 5,879,160 | 8,228,173 |
| Income before provision for income taxes | 73,960,760 | 84,642,655 | 88,078,729 |
| **Provision for Income Taxes (Note 7):** | | | |
| State | 6,457,439 | 6,343,141 | 7,795,428 |
| Federal | 23,153,534 | 28,015,459 | 27,002,343 |
| Net income | $ 44,349,787 | $ 50,284,055 | $ 53,280,958 |
| Basic and Diluted Net Income per Common Share | $2.80 | $3.14 | $3.29 |
| Shares Used in Computing Basic and Diluted Net Income per Share | 15,862,838 | 16,029,071 | 16,202,628 |

The accompanying notes are an integral part of these financial statements.

DEF003691

Statements of Shareholders' Investment

| | Common Stock Number of Shares | Common Stock Paid-in Capital | Retained Earnings | Total Shareholders Investment |
|---|---|---|---|---|
| Balance, December 31, 1995 | 15,831,402 | $ 9,179,274 | $128,648,995 | $137,828,269 |
| Sale of 106,963 shares of common stock | 106,963 | 2,139,260 | - | 2,139,260 |
| Purchase of 230,400 shares of treasury stock | (230,400) | (4,838,400) | - | (4,838,400) |
| Sale of 195,400 shares of treasury stock | 195,400 | 4,344,600 | - | 4,344,600 |
| Issuance of 35,000 shares of treasury stock to qualified employee profit sharing trust | 35,000 | 840,000 | - | 840,000 |
| Net income | - | - | 44,349,787 | 44,349,787 |
| Dividends | - | - | (22,195,494) | (22,195,494) |
| Balance, December 31, 1996 | 15,938,365 | $11,664,734 | $150,803,288 | $162,468,022 |
| Sale of 108,847 shares of common stock | 108,847 | 2,612,328 | - | 2,612,328 |
| Issuance of 40,000 shares of common stock to qualified employee profit sharing trust | 40,000 | 1,080,000 | - | 1,080,000 |
| Net income | - | - | 50,284,055 | 50,284,055 |
| Dividends | - | - | (26,913,600) | (26,913,600) |
| Balance, December 31, 1997 | 16,087,212 | $15,357,062 | $174,173,743 | $189,530,805 |
| Sale of 138,499 shares of common stock | 138,499 | 3,739,473 | - | 3,739,473 |
| Issuance of 40,000 shares of common stock to qualified employee profit sharing trust | 40,000 | 1,160,000 | - | 1,160,000 |
| Net income | - | - | 53,280,958 | 53,280,958 |
| Dividends | - | - | (30,439,242) | (30,439,242) |
| Balance, December 31, 1998 | 16,265,711 | $20,256,535 | $197,015,459 | $217,271,994 |

The accompanying notes are an integral part of these financial statements.

DEF003692

Statements of Cash Flows

| | For the Years Ended December 31, | | |
| | 1996 | 1997 | 1998 |
|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | |
| Net income | $44,349,787 | $50,284,055 | $53,280,958 |
| Adjustments to reconcile net income to net cash provided by operating activities | | | |
| Depreciation | 6,155,719 | 9,084,216 | 10,078,344 |
| Deferred income taxes | 257,850 | 768,337 | 600,000 |
| Stock contributions to employee profit sharing plan | 840,000 | 1,080,000 | 1,160,000 |
| Gain on sale of securities, net | (3,852) | (6,361) | (1,419,291) |
| Gain on sale of fixed assets, net | (1,409,475) | - | - |
| Write-down of investments | 400,000 | - | - |
| Allowance for doubtful accounts | 50,000 | 60,000 | - |
| Changes in assets and liabilities | | | |
| Accounts receivable | (1,682,409) | (4,504,151) | (1,510,608) |
| Prepaid expenses and other current assets | 12,647 | (9,179) | (53,180) |
| Accounts payable | 516,581 | (142,626) | (105,357) |
| Accrued expenses | 2,976,059 | 1,282,422 | 1,806,367 |
| Customer deposits | 3,950,208 | 4,297,963 | (4,049,638) |
| Net cash provided by operating activities | 56,413,115 | 62,194,676 | 59,787,595 |
| **Cash Flows from Investing Activities:** | | | |
| Purchases of property, plant and equipment | (6,837,576) | (57,936,029) | (5,092,834) |
| Sales of property, plant and equipment | 1,592,466 | - | - |
| Purchases of marketable securities | (11,822,721) | (18,373,509) | (52,312,705) |
| Sales of marketable securities | 4,756,207 | 17,173,099 | 48,157,854 |
| Decrease in investments resulting from distributions | - | 59,131 | 294,458 |
| Net cash used in investing activities | (12,311,624) | (59,077,308) | (8,953,227) |
| **Cash Flows from Financing Activities:** | | | |
| Borrowings on note payable to a bank | - | 43,000,000 | - |
| Payments of note payable to a bank | (12,000,000) | (31,500,000) | (22,500,000) |
| Sale of common stock | 2,139,260 | 2,612,328 | 3,739,473 |
| Purchase of treasury stock | (4,838,400) | - | - |
| Sale of treasury stock | 4,344,600 | - | - |
| Dividends paid | (22,195,494) | (26,913,600) | (30,439,242) |
| Net cash used in financing activities | (32,550,034) | (12,801,272) | (49,199,769) |
| Net (Decrease) Increase in Cash and Cash Equivalents | 11,551,457 | (9,683,904) | 1,634,599 |
| Cash and Cash Equivalents, beginning of year | 6,511,805 | 18,063,262 | 8,379,358 |
| Cash and Cash Equivalents, end of year | $18,063,262 | $ 8,379,358 | $10,013,957 |
| **Supplemental Disclosure of Cash Flow Information:** | | | |
| Cash paid for Income taxes | $28,761,470 | $34,482,284 | $33,224,366 |
| Cash paid in Interest | $ 2,733,229 | $ 2,394,030 | $ 2,119,642 |

The accompanying notes are an integral part of these financial statements.

DEF003693

Notes to Financial Statements
December 31, 1998

(1) Operations and Accounting Policies

Medical Information Technology, Inc. (the Company) is engaged in the development, manufacture and licensing of computer software products and related services used in the medical field. The principal market for the Company's products consists of health care providers primarily located in the United States and Canada.

The accompanying financial statements reflect the application of certain accounting policies discussed below. The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

(a) Revenue Recognition

During 1998, the Company adopted the provisions of the American Institute of Certified Public Accountants (AICPA) Statement of Position 97-2, Software Revenue Recognition (SOP 97-2). The Company enters into software product contracts that provide for a customer deposit upon contract execution, milestone billings and fixed monthly service fees thereafter. As a result, SOP 97-2 requires the Company to recognize product and service revenue using the percentage-of-completion method prescribed by SOP 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts. Accordingly, product revenue is recognized at the completion of each milestone and service revenue, including maintenance, is recognized as services are rendered.

(b) Software Development and Production Costs

In accordance with Statement of Financial Accounting Standards (SFAS) No. 86, Accounting for the Costs of Computer Software To Be Sold, Leased or Otherwise Marketed, the Company capitalizes software development costs incurred after technological feasibility of the software development projects is established and the realizability of such capitalized costs through future operations is expected if such costs become material. To date, all of the Company's costs for research and development of software products have been charged to operations as incurred, because the amount of software development costs incurred subsequent to the establishment of technological feasibility has been immaterial.

(c) Depreciation

The Company provides for depreciation on its property, plant and equipment in amounts estimated to allocate the costs thereof under various depreciation methods over the following estimated useful lives:

| Description | Useful Life |
| --- | --- |
| Computer equipment | 5 years |
| Furniture and fixtures | 7-10 years |
| Buildings and improvements | 15-40 years |

DEF003694

(d) Cash and Cash Equivalents

The Company considers all highly liquid investments purchased with original maturities of ninety days or less to be cash equivalents.

Cash equivalents include short-term time deposits of approximately $5,700,000 and $8,600,000 at December 31, 1997 and 1998, respectively.

(e) Concentration of Credit Risk

Financial instruments that potentially subject the Company to concentrations of credit risk are principally cash, cash equivalents and accounts receivable. The Company places its cash and cash equivalents in highly rated institutions. Concentration of credit risk with respect to accounts receivable is limited to certain customers to whom the Company makes substantial sales. To reduce risk, the Company routinely assesses the financial strength of its customers and, as a result, believes that its accounts receivable credit risk exposure is limited. The Company maintains an allowance for potential credit losses but historically has not experienced any significant credit losses related to an individual customer or groups of customers.

(f) Net Income per Common Share

In accordance with SFAS No. 128, Earnings Per Share, the Company reports both basic and diluted earnings per share (EPS). The Company has no common stock equivalents, thus both basic EPS and diluted EPS are the same and computed by dividing net income by the weighted-average number of common shares outstanding during the year.

(g) Comprehensive Income

In June 1997, the Financial Accounting Standards Board (FASB) issued SFAS No. 130, Reporting Comprehensive Income. SFAS No. 130 requires disclosure of all components of comprehensive income on an annual and interim basis. Comprehensive income is defined as the change in equity of a business enterprise during a period from transactions and other events and circumstances from nonowner sources. For the years ended December 31, 1996, 1997 and 1998, the Company had no items of comprehensive income.

(h) Segment and Enterprise-Wide Reporting

In July 1997, the FASB issued SFAS No. 131, Disclosures About Segments of an Enterprise and Related Information. SFAS No. 131 requires certain financial and supplementary information to be disclosed on an annual and interim basis for each reportable operating segment of an enterprise, as defined. Based on the criteria set forth in SFAS No. 131, the Company currently operates in one operating segment, medical software and services.

DEF003695

SFAS No. 131 also requires that certain enterprise-wide disclosures be made related to products and services, geographic areas and major customers. The Company derives substantially all of its operating revenue from the sale and support of one group of similar products and services. All of the Company's assets are located within the United States. During 1996, 1997 and 1998, the Company derived its operating revenue from the following countries (as a percentage of total operating revenue):

|               | 1996 | 1997 | 1998 |
|---------------|------|------|------|
| United States | 87%  | 86%  | 90%  |
| Canada        | 10   | 10   | 8    |
| Other         | 3    | 4    | 2    |
|               | 100% | 100% | 100% |

During the years ended December 31, 1996, 1997 and 1998, one customer accounted for approximately 21%, 21% and 17% of operating revenue, respectively.

(2) Marketable Securities

The Company accounts for its investments in accordance with SFAS No. 115, Accounting for Certain Investments in Debt and Equity Securities. SFAS No. 115 requires companies to classify their short-term investments as either trading, available-for-sale or held-to-maturity. The Company's marketable securities consist of preferred equity securities that are callable by the issuer and common equity securities. The Company has classified the securities as available for sale and, as such, they should be carried at fair market value. The fair market value of these equity securities as of December 31, 1997 and 1998 was approximately $68,773,000 and $74,401,000, respectively. The Company, however, has elected to record these investments at cost since the differences between fair market value and cost are not material to the financial statements.

(3) Allowance for Doubtful Accounts

A summary of the allowance for doubtful accounts activity is as follows at December 31, 1996, 1997 and 1998:

|                            | 1996      | 1997      | 1998      |
|----------------------------|-----------|-----------|-----------|
| Balance, beginning of period | $160,000  | $210,000  | $270,000  |
| Amounts charged to expense   | 50,000    | 66,900    | 9,826     |
| Amounts written off          | -         | (6,900)   | (9,826)   |
| Balance, end of period       | $210,000  | $270,000  | $270,000  |

(4) Accrued Expenses

Accrued expenses consist of the following at December 31, 1997 and 1998:

|                  | 1997        | 1998        |
|------------------|-------------|-------------|
| Accrued bonus    | $13,100,000 | $13,550,000 |
| Accrued vacation | 1,500,000   | 1,650,000   |
| Other accruals   | 998,342     | 1,310,518   |
|                  | $15,598,342 | $16,510,518 |

DEF003696

(5) Note Payable to a Bank

In connection with the purchase of real estate in August 1997, the Company amended its loan agreement and entered into an unsecured note payable with a bank. The amount of the note payable was $54,000,000, of which $15,000,000 was outstanding at December 31, 1998. The note is payable in monthly installments of $1,500,000 plus accrued interest. Interest on the outstanding principal balance is payable at the bank's prime rate less 1% (6.75% at December 31, 1998). In connection with this note, the Company must maintain certain levels of net income, as defined. At December 31, 1998, the Company was in compliance with the required covenant.

(6) Qualified Profit Sharing Plan

The Company has no obligation for postemployment or postretirement benefits. The Company maintains a qualified profit sharing plan that provides deferred compensation to substantially all of its employees. Contributions to the plan are at the discretion of the Board of Directors and may be in the form of Company stock or cash. A summary of contributions made during the years ended December 31, 1996, 1997 and 1998 is as follows:

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| Cash | $2,060,000 | $2,320,000 | $2,340,000 |
| Company common stock |  |  |  |
| 35,000 shares at $24/share | 840,000 | - | - |
| 40,000 shares at $27/share | - | 1,080,000 | - |
| 40,000 shares at $29/share | - | - | 1,160,000 |
|  | $2,900,000 | $3,400,000 | $3,500,000 |

(7) Income Taxes

The Company follows the provisions of SFAS No. 109, Accounting for Income Taxes. The components of the net deferred tax liability recognized in the accompanying balance sheets are as follows:

|  | 1997 | 1998 |
|---|---|---|
| Tax reserves | $3,133,000 | $3,886,700 |
| Deferred revenue | (1,195,500) | (618,700) |
| Other reserves and expenses | (708,000) | (768,000) |
| Depreciation | 670,500 | - |
| Total net deferred tax liability | $1,900,000 | $2,500,000 |

DEF003697

The components of the provision for income taxes shown on the accompanying statements of income consist of the following:

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| **State** | | | |
| Current | $ 6,508,839 | $ 6,151,057 | $ 7,645,428 |
| Deferred | (51,400) | 192,084 | 150,000 |
|  | $ 6,457,439 | $ 6,343,141 | $ 7,795,428 |
| **Federal** | | | |
| Current | $22,844,284 | $27,439,206 | $26,552,343 |
| Deferred | 309,250 | 576,253 | 450,000 |
|  | $23,153,534 | $28,015,459 | $27,002,343 |

The effective income tax rate varies from the amount computed using the statutory U.S. income tax rate as follows:

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| Statutory tax rate | 35.0% | 35.0% | 35.0% |
| Increase in taxes resulting from state income taxes, net of federal income tax benefit | 5.7 | 4.9 | 5.8 |
| Dividend income exclusion | (1.4) | (1.4) | (1.2) |
| Other | 0.7 | 2.1 | (0.1) |
|  | 40.0% | 40.6% | 39.5% |

DEF003698

ARTICLE 5

MULTIPLIER: 1,000

| | |
|---|---:|
| PERIOD TYPE | 12 MOS |
| FISCAL YEAR END | DEC 31 1998 |
| PERIOD END | DEC 31 1998 |
| CASH | 10,014 |
| SECURITIES | 67,923 |
| RECEIVABLES | 25,922 |
| ALLOWANCES | 270 |
| INVENTORY | 0 |
| CURRENT ASSETS | 105,860 |
| PP&E | 199,399 |
| DEPRECIATION | 40,416 |
| TOTAL ASSETS | 266,600 |
| CURRENT LIABILITIES | 46,829 |
| BONDS | 0 |
| PREFERRED MANDATORY | 0 |
| PREFERRED | 0 |
| COMMON | 4,066 |
| OTHER SE | 213,206 |
| TOTAL LIABILITY AND EQUITY | 266,600 |
| SALES | 133,636 |
| TOTAL REVENUES | 203,813 |
| CGS | 0 |
| TOTAL COSTS | 124,229 |
| OTHER EXPENSES | 6,149 |
| LOSS PROVISION | 0 |
| INTEREST EXPENSE | 2,120 |
| INCOME PRETAX | 88,079 |
| INCOME TAX | 34,798 |
| INCOME CONTINUING | 53,281 |
| DISCONTINUED | 0 |
| EXTRAORDINARY | 0 |
| CHANGES | 0 |
| NET INCOME | 53,281 |
| EPS PRIMARY | 3.29 |
| EPS DILUTED | 3.29 |

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

DEF003699

**EXHIBIT 12**

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT
OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2003

Commission file number 0-28092

Medical Information Technology, Inc.
(Exact Name of Registrant as Specified in Its Charter)

Massachusetts
(State or Other Jurisdiction of Incorporation or Organization)

04-2455639
(I.R.S. Employer Identification No.)

MEDITECH Circle, Westwood, MA
(Address of Principal Executive Offices)

02090
(Zip Code)

781-821-3000
(Registrant's Telephone Number)

Securities registered pursuant to Section 12(b) of the Exchange Act: None

Securities registered pursuant to Section 12(g) of the Exchange Act: Common
Stock, par value $1.00 per share

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [X]

Indicate by check mark whether the registrant is an accelerated filer as defined
in Rule 12b-2 of the Exchange Act. Yes [X] No [ ]

The market value of common stock, $1.00 par value, held by non-affiliates at
June 30, 2003, was approximately $378 million.

There were 34,221,323 shares of common stock, $1.00 par value, outstanding at
March 12, 2004.

Page 2

Index to Form 10-K

Part I

Item 1 - Business                                                          Page 3

Item 2 - Properties                                                        Page 6

Item 3 - Legal Proceedings                                                 Page 6

Item 4 - Submission of Matters to a Vote of Security Holders               Page 6

Part II

Item 5 - Market for Registrant's Common Equity, Related Shareholder
         Matters and Issuer Purchases of Equity Securities                 Page 6

Item 6 - Selected Financial Data                                           Page 7

Item 7 - Management's Discussion and Analysis of Financial
         Condition and Results of Operations                               Page 7

Item 8 - Financial Statements and Supplementary Data                       Page 10

Item 9A - Controls and Procedures                                          Page 25

Part III

Item 10 - Directors and Executive Officers of the Registrant              Page 26

Item 11 - Executive Compensation                                           Page 28

Item 12 - Security Ownership of Certain Beneficial Owners
          and Management and Related Shareholder Matters                   Page 29

Item 13 - Certain Relationships and Related Transactions                   Page 29

Item 14 - Principal Accountant Fees and Services                           Page 30

Item 15 - Exhibits and Reports on Form 8-K                                 Page 30

Signatures                                                                 Page 30

Page 3

Part I

Item 1 - Business

COMPANY OVERVIEW

Medical Information Technology, Inc. (MEDITECH) was founded in 1969 to develop
and market information system software for the hospital industry. During 2003
combined product and service revenue was $270.8M, operating income was $99.7M
and net income was $67.4M, up 5.7%, 5.0% and 5.6% compared to the prior year.
Product bookings were $158.3M and the resultant product backlog was $114.8M, up
10.2% and 6.8% compared to the prior year. By the year's end MEDITECH had more
than 2,000 employees, and over 1,700 active hospital customers throughout the
U.S., Canada and the U.K.

HOSPITAL SOFTWARE

Initially MEDITECH developed a software product to automate one of the main
hospital departments, the clinical laboratory which performs various diagnostic

tests on blood and urine specimens. Within a few years, this product became standardized, thereby requiring minimal adaptation to meet the individual needs of a typical customer. MEDITECH extended the concept and developed additional software products for the rest of a hospital's clinical departments. Eventually, it moved into the financial area by developing a hospital billing and accounts receivable product as well as various general accounting products.

Although the individual products could be operated in a stand alone fashion, a hospital achieved maximum effectiveness when they were used in an integrated mode, sharing access to the common clinical and financial records of the hospital. This concept ultimately led to MEDITECH developing the so-called hospital information system, a cohesive set of software products designed from the outset to work in conjunction with the overall operation of the hospital and to minimize the need for specialized interfaces.

COMPUTER HARDWARE

Sophisticated software, such as MEDITECH's, requires extensive computer and communication equipment to function. In spite of this, MEDITECH continues to be a pure software company, limiting itself to specifying the aggregate components needed as well as suggesting typical configurations from certain hardware vendors. The responsibility is left to the hospital to purchase the requisite hardware and secure a continuing source of maintenance service for it.

The hardware components traditionally consist of a small set of central medium-sized computers and a large set of display terminals and printers distributed throughout the hospital. All of these elements are interconnected by means of a standard high speed communication network. The computers execute the software and include large disk subsystems containing the permanent and common clinical and financial records of the hospital.

Hardware technology evolves rapidly, and the current trend is to replace the display terminals with desktop and handheld computers, thereby forming a client server network. In this mode of operation, the central computers become the file servers while software is executed locally on the client computer which makes file requests to the servers.

Page 4

LICENSED SOFTWARE

MEDITECH requires a customer to sign a standard software license agreement prior to product delivery, implementation and subsequent service of the software. This agreement specifies a front end product fee and a front end implementation fee both of which are payable over the implementation process, and a monthly service fee after the site goes live. In addition to precluding hospital ownership and restricting transfer, the license mandates the hospital hold MEDITECH harmless from any liability arising from incorrect operation of the software.

MEDITECH bases its product fee on the total number of hospital beds a customer operates at all of its sites, and sets its implementation fee on the total number of sites. Large hospitals pay more than small hospitals, but incremental fees continue to diminish. The monthly service fees are always 1% of the product fees. A typical 250 bed acute care hospital might incur a $500,000 product fee, $100,000 implementation fee and a $5,000 monthly service fee. An order is booked when a signed software license and a 10% deposit are received.

STAFF ORGANIZATION

MEDITECH is organized into functional units grouped around product development,

sales and marketing, implementation, customer service, accounting and facility operations. All MEDITECH staff work in five company owned facilities in the greater Boston area.

From its inception, MEDITECH utilized communication technology which allowed much of its business activities to be performed by remote access. MEDITECH staff sitting at their desks may access client hospitals, both personnel and computers. The need for remote offices is thereby negated. Although most customer contact is through the phone or e-mail, certain of the sales and implementation staff travel to customer sites.

PRODUCT DEVELOPMENT

Most of the product development staff is working on the incremental evolution of the current product line, as well as the creation of new products each year. The rest of the staff is developing a set of replacement products utilizing a new technology. Approximately every ten years, MEDITECH introduces the next generation of products based on the new technology and gradually updates existing customers.

SALES AND MARKETING

Most of the direct sales staff, organized into regions, concentrate on new prospects. In addition, some of the sales staff monitor existing customers to expose them to MEDITECH's entire product line. Marketing activities and promotion are low key because hospitals are easily identified, finite in number and generally send a request for proposal to vendors when they contemplate the purchase of a hospital information system.

During the sales process, prospects generally visit MEDITECH to talk to product specialists and to view product demonstrations. Thereafter they are encouraged to visit various MEDITECH customer sites to observe first hand the software in actual operation and to discuss issues of concern with hospital personnel.

Page 5

IMPLEMENTATION PROCESS

To ensure a successful implementation, the staff must properly train a core group of hospital personnel about the operation of the software and how to use it in their daily activity. To preclude interruptions from normal hospital activities, MEDITECH mandates the hospital personnel come to the Boston area for intensive training sessions.

As training proceeds, the implementation staff customizes certain dictionaries to fit the specific need of the hospital's environment, provide interfaces to non-MEDITECH systems and to assist the hospital in converting data from legacy systems. In addition, the licensed software will be delivered, installed and tested on the customer's hardware. MEDITECH will utilize remote access communication technology to minimize or eliminate the need to travel.

CUSTOMER SERVICE

Once a hospital goes live, the responsibility of maintaining the customer is transferred to the service staff. MEDITECH provides 24 hour a day service coverage to these customers in order to respond to problem calls. In addition, the staff updates customers with new releases of the software products as they become available. To ensure the continuing education of the hospital staff, MEDITECH runs seminars on the use of its products.

HCA-THE HEALTHCARE COMPANY

HCA-The Healthcare Company owns or operates over 300 hospitals in the U.S., Canada, and the U.K. and has been MEDITECH's largest customer for some time. All of their hospitals operate with MEDITECH's clinical systems. They represented 10% of MEDITECH revenues in 2001, 10% in 2002 and 9% in 2003.

COMPETITION

The market for health care information systems is subject to the technological imperative. Accordingly, MEDITECH has a completely integrated set of application products, implements them successfully, provides ongoing maintenance including updates and continues the developmental process. The Company's competitors who make similar claims include Siemens Corporation, McKesson Corporation, Cerner Corporation, IDX Systems Corporation and Eclipsys Corporation. MEDITECH does not offer the breadth of products and services which the competition offers to hospitals as well as the products and services which the competition offers to related medical enterprises. Instead MEDITECH focuses exclusively in the hospital information system software market and believes it competes favorably with respect to the software offering of the competition.

ACCESS TO SEC FILINGS

"www.meditech.com" is the Company's website address which provides access to its annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K, and all amendments thereof just as soon as such reports are filed with or furnished to the SEC. The links so provided allow access to copies of the reports stored on MEDITECH's website, but a link is also provided to allow access to all of the Company's filings stored on the SEC's website as well.

"http://www.sec.gov/cgi-bin/browse-edgar?CIK=1011452&action=getcompany" may be used to access all of the Company's filings stored on the SEC's website instead.

In addition the Company will provide paper copies of these filings free of charge to its shareholders upon request.

Page 6

  Item 2 - Properties

As of December 31, 2003 the Company owned five facilities containing about 1.1 million square feet of space, all being well maintained Class A properties in the greater Boston area. The Company occupies 60% of the space and the remaining 40% is leased to various tenants. The Company has adequate space for its reasonable needs over the near future.

  Item 3 - Legal Proceedings

On April 18, 2003, Jerome H. Grossman, a shareholder and former Director of the Company, filed a complaint in the Suffolk County, Massachusetts Superior Court against the Company and five of its six Directors: A. Neil Pappalardo, Edward B. Roberts, Morton E. Ruderman, Roland L. Driscoll and Lawrence A. Polimeno. The complaint alleges: (1) the Directors have violated a duty of good faith and loyalty to Grossman by terminating him as a consultant to the Company in 2001, by failing to nominate him for re-election as a Director in 2002, and by enforcing the Company's right of first refusal against him; (2) the Directors have "rigged" the market for the Company's common stock in favor of buyers and against sellers by establishing an artificially low price for the stock; (3) the Directors have established an artificially low price for the stock so Pappalardo

can purchase shares from the Company at a price less than the "fair value" of those shares; and (4) Pappalardo, as the controlling shareholder of the Company, has violated a fiduciary duty to shareholders by dominating the Board of Directors, artificially depressing the price of stock, and personally benefiting from the depressed price by purchasing tens of thousands of shares of stock from the Company each year. On July 11, 2003, the Company filed a motion to dismiss the complaint. On September 12, 2003, the motion to dismiss the complaint was denied. The case is now in discovery.

    Item 4 - Submission of Matters to a Vote of Security Holders

None.

PART II

    Item 5 - Market for Registrant's Common Equity, Related Shareholder
            Matters and Issuer Purchases of Equity Securities

No trading market exists for the Company's common stock, and accordingly no high and low bid information or quotations are available with respect to the Company's common stock.

The sale, assignment, transfer, pledge or other disposition of any of the Company's common stock is subject to right of first refusal restrictions set forth in the Company's charter.

There are no shareholder agreements of any kind with the Company.

In February 2003, the Company sold a total of 263,884 shares of its common stock to certain employees for an aggregate consideration of $5,805,448. This sale may not have complied with the registration requirements of certain securities laws. See the section on Temporary Equity in Management's Discussion and Analysis of Financial Condition and Results of Operations.

At March 12, 2004, there were 1,216 shareholders of record of the Company's common stock and 34,221,323 shares outstanding.

The Company has paid quarterly cash dividends continuously since 1980. Dividends paid per share in the last five years are set forth within the table in Item 6.

Page 7

    Item 6 - Selected Financial Data

For the Five Years Ended December 31, 2003 (in thousands where applicable)

|  | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|
| Full Year Operations: |  |  |  |  |  |
| Total revenue | $225,630 | $216,873 | $223,831 | $256,197 | $270,781 |
| Operating income | 91,553 | 79,193 | 81,565 | 94,907 | 99,685 |
| Net income | 59,956 | 55,146 | 56,841 | 63,871 | 67,424 |
| Average shares | 32,784 | 33,132 | 33,460 | 33,760 | 34,097 |
| Net income per share | $1.83 | $1.66 | $1.70 | $1.89 | $1.98 |
| Year End Position: |  |  |  |  |  |
| Total assets | $288,278 | $306,093 | $331,284 | $354,809 | $402,407 |
| Total liabilities | 41,583 | 32,315 | 35,758 | 36,813 | 50,709 |
| Temporary equity* | 10,475 | 14,294 | 17,962 | 21,435 | 26,080 |
| Shareholder equity* | 236,220 | 259,484 | 277,564 | 296,561 | 325,618 |

| | | | | | |
|---|---|---|---|---|---|
| Shares outstanding | 32,915 | 33,255 | 33,576 | 33,877 | 34,221 |
| Net assets per share** | $7.49 | $8.23 | $8.80 | $9.39 | $10.28 |

Other Financial Data:

| | | | | | |
|---|---|---|---|---|---|
| Working capital | $92,130 | $121,950 | $145,778 | $165,613 | $214,764 |
| Cash flow from operations | 74,158 | 59,333 | 66,253 | 81,967 | 83,228 |
| Depreciation | 7,900 | 7,987 | 8,257 | 8,634 | 8,422 |
| Cash dividends per share | $1.00 | $1.16 | $1.24 | $1.36 | $1.56 |

*Temporary Equity and Shareholder Equity have been restated for the years 1999 through 2002.

**Net assets is defined as total assets less total liabilities.

Item 7 - Management's Discussion and Analysis of Financial
         Condition and Results of Operations

Results of Operations:

Comparison of Fiscal Years ended December 31, 2002 and 2003:

Total revenue increased 5.7% from $256.2 million in 2002 to $270.8 million in 2003 as a result of increased products and services provided to both existing and new customers.

Operating expenses increased 6.1% from $161.3 million in 2002 to $171.1 million in 2003 due primarily to a greater increase in product development staff compared to the increase in the rest of the staff. The resultant operating income increased 5.0% from $94.9 million in 2002 to $99.7 million in 2003.

Other income, net of other expense, increased from $7.6 million in 2002 to $11.3 million in 2003 due primarily to a smaller $1.5 million write-down of certain marketable security costs compared to the prior year. This difference was partially offset by $0.5 million in legal expenses incurred in relation to the lawsuit noted in Item 3 of this report.

The Company's effective tax rate increased from 37.7% in 2002 to 39.3% in 2003 primarily as a result of increased tax reserves for unrealized gains on marketable securities.

Page 8

Comparison of Fiscal Years ended December 31, 2001 and 2002:

Total revenue increased 14.5% from $223.8 million in 2001 to $256.2 million in 2002 as a result of increased products and services provided to both existing and new customers.

Operating expenses increased 13.4% from $142.3 million in 2001 to $161.3 million in 2002 due primarily to an increase in staff size and an increase in associated costs. The resultant operating income increased 16.4% from $81.6 million in 2001 to $94.9 million in 2002.

Other income, net of other expense, decreased from $11.2 million in 2001 to $7.6 million in 2002 due primarily to a $5.8 million write-down of certain marketable security costs. This difference was partially offset by a $2.3 million increase in rental and dividend income earnings.

The Company's effective tax rate decreased from 38.7% in 2001 to 37.7% in 2002 primarily as a result of higher tax credit benefits.

Liquidity and Capital Resources:

At December 31, 2003, the Company's cash, cash equivalents and marketable securities totaled $222.9 million. The marketable securities consisted of preferred or common equities and government notes which can easily be converted to cash. Cash flows from operations were $83.2 million in fiscal 2003, an increase of $1.2 million from the prior year. The increase was primarily attributable to the growth in revenue and other changes in working capital. The primary use in fiscal 2003 of cash generated by operating activities was the payment of $53.2 million in dividends, with the majority of the remaining $30.0 million invested in marketable securities.

MEDITECH has no long-term debt. Net assets at December 31, 2003 was $351.7 million. Additions to property, plant and equipment will continue, including new facilities and computer systems for product development, sales and marketing, implementation, service and administrative staff. Management believes existing cash, cash equivalents and marketable securities together with funds generated from operations will be sufficient to meet operating and capital expense requirements.

Risk Factors Which May Affect Future Results of Operations:

The health care industry is highly regulated and is subject to changing economic and political influences. Federal and state legislatures could modify the health care system in respect to reimbursement and financing. Hospitals may respond to these pressures by delaying the purchase of new information systems. Previous volatility in the market place due to Y2K concerns and September 11th could reappear and cause delays. The Health Insurance Portability and Accounting Act of 1996 will directly impact the industry by specifying standards to protect the security and confidentiality of patient information. It may be possible for patients to bring claims against software providers regarding injuries due to errors. Hospitals consolidating into an integrated health care delivery system may be able to negotiate price reductions. Finally, the Company is dependent on a cohesive group of long time senior managers and staff with vast experience in the hospital industry and software technology.

Page 9

Temporary Equity:

During each of the years from 1997 to 2003, the Company offered and sold shares of its common stock to certain of its employees in a manner which may not have complied with the registration requirements of certain securities laws. Assuming such sales did not comply with those requirements, the individuals who purchased the Company's common stock from 1997 through 2003 in such offerings would have the right to return the shares to the Company and obtain a refund equal to the recision amount, as defined below, or if they have sold the stock, to seek from the Company damages, if any, resulting from their purchases.

The recision amount payable to an individual would be equal to the original purchase price increased annually by an amount equal to 6% interest and decreased annually by the amount of dividends received. Because the dividends received have always exceeded the amount of the interest, the recision amount is less than the original purchase price. In addition, each year since 1997 the fair value of the common stock as determined by the Company's Board of Directors in connection with a year-end contribution of stock to the MEDITECH Profit Sharing Trust has increased over that determined in the prior year. Accordingly, the Company does not expect any of these individuals to seek recision or damages with respect to any such purchases. However, if dividend

payments and/or the fair value of the common stock should decrease, individuals may elect to seek recision in the future.

The right of these individuals to receive a refund of the recision amount is not completely within the control of the Company. As a result, these shares are considered and treated as redeemable common stock for financial accounting purposes until such time as the recision rights lapse or are exercised. Therefore the recision amount and the related shares have been removed from Shareholder Equity and classified as Temporary Equity. As a result, the Company has restated its financial statements for the years ended December 31, 1999 through 2002. The restatement was made solely to reflect this reclassification and did not affect the Company's previously reported net income, net income per share, assets or liabilities.

Critical Accounting Policies:

All of our significant accounting policies are described in the notes to the financial statements included in Item 8 of this report. We believe four of these constitute our most critical policies requiring estimates and judgments by management which are significant in terms of materiality. Reference Note 1(a) for revenue recognition, Note 1(e) for allowance for doubtful accounts, Note 3 for marketable securities and Note 10 for income taxes.

Page 10

    Item 8 - Financial Statements and Supplementary Data

MEDICAL INFORMATION TECHNOLOGY, INC.

Financial Statements
As of December 31, 2002 and 2003
Together with Auditors' Report

Index to Financial Statements

Reports of Independent Public Accountants                      Page 11

Balance Sheets as of December 31, 2002 (as restated) and 2003    Page 13

Statements of Income for the Years Ended
December 31, 2001, 2002 and 2003
                                                              Page 14

Statements of Shareholder Equity for the Years Ended
December 31, 2001 (as restated), 2002 (as restated) and 2003    Page 15

Statements of Cash Flows for the Years Ended
December 31, 2001, 2002 and 2003
                                                              Page 16

Notes to Financial Statements                              Pages 17-24

Page 11

MEDICAL INFORMATION TECHNOLOGY, INC.

Reports of Independent Public Accountants

To the Shareholders and Board of Directors of
Medical Information Technology, Inc.:

We have audited the accompanying balance sheets of Medical Information

Technology, Inc. (a Massachusetts corporation) as of December 31, 2002 (as restated) and 2003, and the related statements of income, shareholder equity and cash flows for each of the two years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit. The financial statements of Medical Information Technology, Inc. for the year ended December 31, 2001 were audited by other auditors who have ceased operations and whose report, dated January 30, 2002, expressed an unqualified opinion of those financial statements.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Medical Information Technology, Inc. as of December 31, 2002 and 2003, and the results of its operations and its cash flows for each of the two years then ended, in conformity with accounting principles generally accepted in the United States.

The financial statements of Medical Information Technology, Inc. as of December 31, 2001 and for the year then ended were audited by other auditors who have ceased operations. As described in Note 2, these financial statements have been restated to reclassify certain shares of common stock and the related recision amounts from Shareholder Equity to Temporary Equity. Our audit procedures with respect to the restated amounts with respect to 2001 included (i) agreeing the restatement adjustments to a schedule prepared by the Company and obtained from management and (ii) testing the mathematical accuracy of the schedule and tracing certain amounts from the schedule to the Company's underlying records. In our opinion, the amounts restated for 2001 are appropriate. However, we were not engaged to audit, review, or apply any procedures to the 2001 financial statements of the Company other than with respect to such restatement and, accordingly, we do not express an opinion or any other form of assurance on the 2001 financial statements taken as a whole.

Ernst & Young LLP

Boston, Massachusetts
January 27, 2004

Page 12

MEDICAL INFORMATION TECHNOLOGY, INC.

The following is a copy of the report previously issued by Arthur Andersen LLP for the years ended December 31, 2000 and 2001. Arthur Andersen LLP has not reissued this report.

To the Shareholders and Board of Directors of
Medical Information Technology, Inc.:

We have audited the accompanying balance sheets of Medical Information Technology, Inc. (a Massachusetts corporation) as of December 31, 2000 and 2001, and the related statements of income, shareholder equity and cash flows for

each of the three years in the period ended December 31, 2001. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Medical Information Technology, Inc. as of December 31, 2000 and 2001, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2001, in conformity with accounting principles generally accepted in the United States.

Arthur Andersen LLP

Boston, Massachusetts
January 30, 2002

Page 13

MEDICAL INFORMATION TECHNOLOGY, INC.

Balance Sheets

|  | December 31, | |
|  | 2002 | 2003 |
| --- | --- | --- |
| Assets | | |
| | | |
| Current Assets: | | |
| Cash and cash equivalents (Note 1) | $ 16,906,849 | $ 18,690,986 |
| Marketable securities (Note 3) | 154,338,807 | 204,192,366 |
| Accounts receivable, less reserves of | | |
| $700,000 in 2002 and $800,000 in 2003 | 28,380,523 | 30,720,136 |
| Total current assets | 199,626,179 | 253,603,488 |
| | | |
| Property, Plant and Equipment, at cost (Note 1): | | |
| Computer equipment | 9,929,056 | 8,709,930 |
| Furniture and fixtures | 32,820,124 | 29,948,576 |
| Buildings | 139,669,962 | 139,669,962 |
| Land | 26,603,703 | 26,603,703 |
| | 209,022,845 | 204,932,171 |
| Accumulated depreciation | (63,030,113) | (64,861,487) |
| | 145,992,732 | 140,070,684 |
| | | |
| Investments (Note 1) | 9,190,389 | 8,732,604 |
| | $354,809,300 | $402,406,776 |

Liabilities and Equity

Current Liabilities:

|  |  |  |
|---|---:|---:|
| Accounts payable | $ 89,782 | $ 158,214 |
| Accrued taxes | 2,147,809 | 2,599,821 |
| Accrued expenses (Note 5) | 21,826,604 | 24,065,768 |
| Customer deposits | 9,949,218 | 12,015,644 |
| Total current liabilities | 34,013,413 | 38,839,447 |
| Deferred Income Taxes (Note 10) | 2,800,000 | 11,869,316 |
| Total liabilities | 36,813,413 | 50,708,763 |

Temporary Equity: (as restated, Notes 2 & 7)
   Redeemable common stock $1.00 par value
   Issued and outstanding 1,525,709 shares
     in 2002 and 1,789,593 shares in 2003     21,434,540     26,079,769

Shareholder Equity: (as restated, Notes 2 & 7)
   Common stock $1.00 par value
   Authorized 35,000,000 shares
   Issued and outstanding 32,351,730 shares

|  |  |  |
|---|---:|---:|
|     in 2002 and 32,431,730 shares in 2003 | 21,599,615 | 24,839,834 |
| Unrealized gain on marketable securities | 651,828 | 12,202,459 |
| Retained earnings | 274,309,904 | 288,575,951 |
| Total shareholder equity | 296,561,347 | 325,618,244 |
|  | $354,809,300 | $402,406,776 |

The accompanying notes are an integral part of these financial statements.

Page 14

MEDICAL INFORMATION TECHNOLOGY, INC.

Statements of Income

| | For the Years Ended December 31, | | |
|---|---:|---:|---:|
|  | 2001 | 2002 | 2003 |
| Operating Revenue: | | | |
| Software products | $123,698,228 | $146,827,089 | $151,001,866 |
| Software services | 100,132,616 | 109,369,734 | 119,778,837 |
| Total operating revenue | 223,830,844 | 256,196,823 | 270,780,703 |
| Costs and Expenses: | | | |
| Operating and product development | 96,558,320 | 108,454,991 | 114,933,942 |
| Selling, general and administrative | 45,707,764 | 52,834,845 | 56,162,058 |
| Total costs and expenses | 142,266,084 | 161,289,836 | 171,096,000 |
| Income from operations | 81,564,760 | 94,906,987 | 99,684,703 |
| Other Income (Note 9) | 17,840,206 | 14,133,775 | 18,753,624 |
| Other Expense (Note 9) | 6,648,369 | 6,544,805 | 7,410,608 |
| Income before provision | | | |

|                              |               |               |               |
|------------------------------|--------------:|--------------:|--------------:|
| for income taxes             | 92,756,597    | 102,495,957   | 111,027,719   |

Provision for Income Taxes (Note 10):

|          |              |              |              |
|----------|-------------:|-------------:|-------------:|
| State    | 7,757,140    | 8,651,161    | 9,901,578    |
| Federal  | 28,158,263   | 29,973,857   | 33,702,545   |
|          | ------------ | ------------ | ------------ |
| Net income | $ 56,841,194 | $ 63,870,939 | $ 67,423,596 |
|          | ============ | ============ | ============ |

| Basic and Diluted Net Income per Share | $ 1.70 | $ 1.89 | $ 1.98 |
|----------------------------------------|-------:|-------:|-------:|

Shares Used in Computing Basic and

|                              |               |               |               |
|------------------------------|--------------:|--------------:|--------------:|
| Diluted Net Income per Share | 33,459,652    | 33,760,459    | 34,097,342    |
|                              | ============  | ============  | ============  |

The accompanying notes are an integral part of these financial statements.

Page 15

MEDICAL INFORMATION TECHNOLOGY, INC.

Statements of Shareholder Equity

|                                                                          | Common Stock Number of Shares | Paid-in Capital | Retained Earnings | Total Shareholder Equity |
|--------------------------------------------------------------------------|------------:|------------:|------------:|------------:|
|                                                                          | ---------- | ----------- | ------------ | ------------ |
| Balance, December 31, 2000 (as restated)                                 | 32,196,730 | $17,167,093 | $240,951,456 | $259,483,804 |
| Decrease in recision amount related to redeemable common stock           | –          | 504,236     | –            | 504,236      |
| Issuance of 75,000 shares of common stock to qualified profit sharing plan | 75,000   | 1,425,000   | –            | 1,425,000    |
| Net income                                                               | –          | –           | 56,841,194   | 56,841,194   |
| Unrealized gain, net of tax, on marketable securities                    | –          | –           | –            | 774,637      |
| Dividends                                                                | –          | –           | (41,464,608) | (41,464,608) |
|                                                                          | ---------- | ----------- | ------------ | ------------ |
| Balance, December 31, 2001 (as restated)                                 | 32,217,730 | $19,096,329 | $256,328,042 | $277,564,263 |
| Decrease in recision amount related to redeemable common stock           | –          | 743,286     | –            | 743,286      |
| Issuance of 80,000 shares of common stock to qualified profit sharing plan | 80,000   | 1,760,000   | –            | 1,760,000    |
| Net income                                                               | –          | –           | 63,870,939   | 63,870,939   |
| Unrealized loss, net of tax, on marketable securities                    | –          | –           | –            | (1,488,064)  |

| | | | |
|---|---|---|---|
| Dividends | - | - | (45,889,077) | (45,889,077) |
| | ---------- | ----------- | ------------ | ------------ |
| Balance, December 31, 2002 (as restated) | 32,351,730 | $21,599,615 | $274,309,904 | $296,561,347 |
| Decrease in recision amount related to redeemable common stock | - | 1,160,219 | - | 1,160,219 |
| Issuance of 80,000 shares of common stock to qualified profit sharing plan | 80,000 | 2,080,000 | - | 2,080,000 |
| Net income | - | - | 67,423,596 | 67,423,596 |
| Unrealized gain, net of tax, on marketable securities | - | - | - | 11,550,631 |
| Dividends | - | - | (53,157,549) | (53,157,549) |
| | ---------- | ----------- | ------------ | ------------ |
| Balance, December 31, 2003 | 32,431,730 | $24,839,834 | $288,575,951 | $325,618,244 |
| | ========== | =========== | ============ | ============ |

The accompanying notes are an integral part of these financial statements.

Page 16

MEDICAL INFORMATION TECHNOLOGY, INC.

Statements of Cash Flows

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2001 | 2002 | 2003 |
| | ----------- | ----------- | ----------- |
| Cash Flows from Operating Activities: | | | |
| Net income | $56,841,194 | $63,870,939 | $67,423,596 |
| Cumulative tax liability adjustment on unrealized securities gains | - | (434,552) | (7,700,421) |
| Write-down of marketable securities | - | 5,812,355 | 1,462,074 |
| Net (gain) loss on sale of securities | (90,211) | 699 | (233,088) |
| Stock contributions to qualified profit sharing plan | 1,425,000 | 1,760,000 | 2,080,000 |
| Allowance for doubtful accounts | 120,000 | 110,000 | 100,000 |
| Allowance for investment valuations | | | 217,784 |
| Change in accounts receivable | (3,741,614) | 1,157,408 | (2,439,613) |
| Change in accumulated depreciation | 8,257,117 | 8,633,862 | 8,421,929 |
| Change in accounts payable | (361,062) | (24,041) | 68,431 |
| Change in accrued expenses | 743,675 | 3,734,492 | 2,239,166 |
| Change in accrued taxes | 148,736 | (339,468) | 452,012 |
| Change in customer deposits | 1,710,548 | (414,917) | 2,066,427 |
| Change in deferred income taxes | 1,200,000 | (1,900,000) | 9,069,316 |
| | ----------- | ----------- | ----------- |
| Net cash provided by operating activities | 66,253,383 | 81,966,777 | 83,227,613 |
| | ----------- | ----------- | ----------- |
| Cash Flows from Investing Activities: | | | |
| Purchases of property, plant and equipment | (5,908,103) | (4,193,382) | (2,499,881) |
| Purchases of marketable securities | (28,763,722) | (42,008,650) | (49,082,494) |
| Sales of marketable securities | 9,375,023 | 9,829,799 | 17,251,000 |
| Purchases of investments | (1,490,104) | (5,175,625) | - |

| | | | |
|---|---:|---:|---:|
| Decrease in investments resulting<br>from payments or distributions | 37,844 | – | 240,000 |
| Net cash used in<br>investing activities | (26,749,062) | (41,547,858) | (34,091,375) |
| **Cash Flows from Financing Activities:** | | | |
| Sales of redeemable common stock | 4,172,208 | 4,215,777 | 5,805,448 |
| Dividends paid | (41,464,608) | (45,889,077) | (53,157,549) |
| Net cash used in<br>financing activities | (37,292,400) | (41,673,300) | (47,352,101) |
| Net Increase in Cash and<br>Cash Equivalents | 2,211,921 | (1,254,381) | 1,784,137 |
| Cash and Cash Equivalents,<br>beginning of year | 15,949,309 | 18,161,230 | 16,906,849 |
| Cash and Cash Equivalents,<br>end of year | $18,161,230 | $16,906,849 | $18,690,986 |
| **Supplemental Disclosure:** | | | |
| Cash paid for Income taxes | $35,470,141 | $41,832,173 | $42,161,306 |
| Cash paid for Interest | $        0 | $        0 | $        0 |

The accompanying notes are an integral part of these financial statements.

Page 17

MEDICAL INFORMATION TECHNOLOGY, INC.

Notes to Financial Statements
December 31, 2003

(1) Operations and Accounting Policies

Medical Information Technology, Inc. (the Company) is engaged in the
development, manufacture and licensing of computer software products and related
services used in the medical field. The principal market for the Company's
products consists of health care providers primarily located in the United
States and Canada.

The accompanying financial statements reflect the application of certain
accounting policies discussed below. The preparation of financial statements in
conformity with generally accepted accounting principles requires management to
make estimates and assumptions that affect the reported amounts of assets and
liabilities and disclosure of contingent assets and liabilities at the date of
the financial statements and the reported amounts of revenues and expenses
during the reporting period. Actual results could differ from those estimates.

(a) Revenue Recognition

The Company follows the provisions of the American Institute of Certified
Public Accountants (AICPA) Statement of Position (SOP) 97-2, Software Revenue
Recognition. The Company enters into perpetual software license contracts which
provide for a customer deposit upon contract execution, milestone billings and
fixed monthly service fees thereafter. The Company classifies product and
related implementation fees together as software products in the statement
of income and recognizes these fees as revenue upon completion of each contract

milestone, which approximates the percentage-of-completion method prescribed by SOP 81-1, Accounting for Performance of Construction-type and Certain Production-type Contracts. Software services represent post-implementation support services, which are recognized as the related services are rendered.

The Company follows the provisions of Emerging Issues Task Force's No. 01-14 (EITF 01-14), which requires reimbursements received for out-of-pocket expenses to be characterized as revenue with offsetting operating expenses in the income statement. Comparative financial statements for prior periods are reclassified for all periods presented.

(b) Software Development Costs

In accordance with Statement of Financial Accounting Standards (SFAS) No. 86, Accounting for the Costs of Computer Software to Be Sold, Leased or Otherwise Marketed, the Company is required to capitalize software development costs incurred after technological feasibility of the software development projects is established and the realizability of such capitalized costs through future operations is expected if such costs become material. To date, development costs incurred by the Company after technological feasibility has been established have been immaterial and as such have been charged to operations as incurred.

Page 18

MEDICAL INFORMATION TECHNOLOGY, INC.

Notes to Financial Statements
December 31, 2003

(c) Property, Plant and Equipment

The Company carries all property, plant and equipment on a cost basis and provides for depreciation in amounts estimated to allocate the costs thereof under the following depreciation methods and estimated useful lives:

| Description | Method | Useful Life |
|---|---|---|
| Computer equipment | MACRS | 3-5 years |
| Furniture and fixtures | MACRS | 7 years |
| Furniture and fixtures | SL | 10 years |
| Buildings | SL | 31.5-40 years |

(d) Cash and Cash Equivalents

The Company considers all highly liquid investments purchased with original maturities of 90 days or less to be cash equivalents.

(e) Fair Value of Financial Instruments and Concentration of Credit Risk

The carrying value of the Company's cash and cash equivalents, accounts receivable and accounts payable approximates their fair value due to the short-term nature of these financial instruments. The Company's marketable securities are carried at fair value (see Note 3). The Company's long-term investments are carried at cost, less a valuation reserve, which approximates fair value based on management's assessment.

Financial instruments that potentially subject the Company to concentrations of credit risk are principally cash, cash equivalents, marketable securities and accounts receivable. The Company places its cash and cash equivalents in

highly rated institutions. Concentration of credit risk with respect to accounts receivable is limited to certain customers to whom the Company makes substantial sales. To reduce risk, the Company routinely assesses the financial strength of its customers and, as a result, believes that its accounts receivable credit risk exposure is limited. The Company maintains an allowance for potential credit losses but historically has not experienced any significant credit losses related to an individual customer or groups of customers. As of December 31, 2002 and 2003 there were no individual customers who accounted for greater than 10% of the outstanding accounts receivable.

(f) Investments

The Company accounts for its equity investments in Patient Care Technologies Inc., LSS Data Systems Inc. and MEDITECH South Africa in accordance with the cost method. All three companies license the Company's software technology and relicense it to their respective customers. Each serves a market niche which is part of the overall medical market but is outside of the hospital market which the Company serves. The Company believes the fair value of these investments approximates its carrying value of $8,732,604 at December 31, 2003.

(g) Net Income per Common Share

In accordance with SFAS No. 128, Earnings per Share, the Company reports both basic and diluted earnings per share (EPS). The Company has no common stock equivalents, thus both basic EPS and diluted EPS are computed by dividing net income by the weighted-average number of common shares outstanding during the year.

Page 19

MEDICAL INFORMATION TECHNOLOGY, INC.

Notes to Financial Statements
December 31, 2003

(h) Comprehensive Income

SFAS No. 130, Reporting Comprehensive Income, establishes standards for reporting and display of comprehensive income and its components in the financial statements. Comprehensive income is the total of net income and all other nonowner changes in equity including items such as unrealized holding gains/losses on securities classified as available-for-sale and foreign currency translation adjustments. The Company's only comprehensive income for the years ended December 31, 2001, 2002 and 2003 is unrealized gains or losses on marketable securities and is as follows:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Net income | $56,841,194 | $63,870,939 | $67,423,596 |
| Unrealized gains (losses) | 774,637 | (1,488,064) | 11,550,631 |
| Comprehensive income | $57,615,831 | $62,382,875 | $78,974,227 |

(i) Segment, Geographic and Enterprise-Wide Reporting

SFAS No. 131, Disclosures about Segments of an Enterprise and Related Information, requires certain financial and supplementary information to be disclosed on an annual and interim basis for each reportable operating segment of an enterprise, as defined. Based on the criteria set forth in SFAS No. 131,

the Company currently operates in one operating segment, medical software and services.

SFAS No. 131 also requires that certain enterprise-wide disclosures be made related to products and services, geographic areas and major customers. The Company derives substantially all of its operating revenue from the sale and support of one group of similar products and services. All of the Company's assets are located within the United States. During 2001, 2002 and 2003, the Company derived its operating revenue from the following countries, based on location of customer (as a percentage of total operating revenue):

|  | 2001 | 2002 | 2003 |
| --- | --- | --- | --- |
| United States | 86% | 89% | 88% |
| Canada | 12 | 10 | 10 |
| Other | 2 | 1 | 2 |
|  | 100% | 100% | 100% |

During the years ended December 31, 2001, 2002 and 2003, one customer accounted for approximately 10%, 10% and 9% of operating revenue, respectively.

Page 20

MEDICAL INFORMATION TECHNOLOGY, INC.

Notes to Financial Statements
December 31, 2003

(2) RESTATED FINANCIAL STATEMENTS

The Company's Financial Statements as of December 31, 2001 and for the year then ended were previously audited by other auditors who have ceased operations. The Company decided during 2004 that the offering and sale of shares of its common stock to certain employees from 1997 through 2003 may not have complied with the registration requirements of certain securities laws. Assuming such sales did not comply with those requirements, the individuals who purchased the Company's common stock in such offerings would have the right to return the shares to the Company and obtain a refund from the Company equal to the recision amount or, if they have sold the stock, to seek from the Company damages, if any, resulting from their purchases of the stock.

These shares are considered and treated as redeemable common stock for financial accounting purposes until such time as the recision rights lapse or are exercised. Therefore the recision amount and the related shares should have been removed from Shareholder Equity and classified as Temporary Equity during each of the periods. As a result, the Company has restated its financial statements for the years ended December 31, 2001 and 2002. The restatement was made solely to reflect this reclassification and did not affect the Company's previously reported net income, net income per share, assets or liabilities.

A summary of the impact of such restatement on the financial statements for the years ended December 31, 2001 and 2002 is as follows:

|  | 2001 previously reported | 2001 as restated |
| --- | --- | --- |
| Temporary Equity | - | $17,962,049 |

```
Shareholder Equity        $295,526,312  $277,564,263

                             2002          2002
                          previously        as
                           reported       restated
                          ------------   ------------
   Temporary Equity             -        $21,434,540
   Shareholder Equity     $317,995,887   $296,561,347
```

Page 21

MEDICAL INFORMATION TECHNOLOGY, INC.

Notes to Financial Statements
December 31, 2003

(3) MARKETABLE SECURITIES

The Company accounts for its marketable securities in accordance with SFAS No.
115, Accounting for Certain Investments in Debt and Equity Securities. SFAS No.
115 requires companies to classify their investments as either trading,
available-for-sale or held-to-maturity.  The Company's marketable securities
consist of common and preferred equities which have been classified as
available-for-sale. These are recorded in the financial statements at fair
market value and any unrealized gains (losses) are reported as a component of
Shareholder Equity. In addition the Company holds U.S. government agency issues
which have been classified as held-to-maturity. These are recorded in the
financial statements at their cost which is also their fair value. The fair
market value of marketable securities was determined based on quoted market
prices. At December 31, 2002 and 2003, the cost basis, unrealized gains,
unrealized losses and fair market value of the Company's holdings are as
follows:

```
                             2002          2003
                          ------------   ------------
   Cost of equities       $153,252,427   $148,854,935
   Unrealized Gains          6,200,767     20,762,666
   Unrealized Losses        (5,114,387)      (425,235)
   Cost of agency issues          -        35,000,000
                          ------------   ------------
   Fair Market Value      $154,338,807   $204,192,366
                          ============   ============
```

The Company sold certain available-for-sale securities resulting in a realized
loss of $699 during the year ended December 31, 2002 and a realized gain of
$233,038 during the year ended December 31, 2003.

SFAS No. 115 requires that for each individual security classified as
available-for-sale, a company shall determine whether a decline in fair value
below the amortized cost basis is other than temporary. If the decline in fair
value is judged as such, the cost basis of the individual security shall be
written down to fair value as a new cost basis and the amount of the write-down
shall be included in earnings. During the years ended December 31, 2002 and
2003, the Company determined that the decline in value for certain securities
was other than temporary. Accordingly, the Company recorded unrealized losses
related to these securities in the accompanying statements of income of
$5,812,355 and $1,462,074 respectively.

Page 22

MEDICAL INFORMATION TECHNOLOGY, INC.

Notes to Financial Statements
December 31, 2003

(4) ALLOWANCE FOR DOUBTFUL ACCOUNTS

A summary of the allowance for doubtful accounts activity for the years ended
December 31, 2001, 2002 and 2003 is as follows:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Balance, beginning of year | $470,000 | $590,000 | $700,000 |
| Amounts charged to expense | 120,700 | 110,000 | 100,000 |
| Amounts written off | (700) | - | - |
| Balance, end of year | $590,000 | $700,000 | $800,000 |

(5) ACCRUED EXPENSES

Accrued expenses consist of the following at December 31, 2002 and 2003:

|  | 2002 | 2003 |
|---|---|---|
| Accrued bonuses | $18,500,000 | $20,000,000 |
| Accrued vacation | 2,100,000 | 2,175,000 |
| Other accrued | 1,226,604 | 1,890,768 |
|  | $21,826,604 | $24,065,768 |

(6) COMMON STOCK

Dividend Policy

The Company's Board of Directors has full discretion regarding the timing and
amounts of dividends paid on common stock. During the years ended December 31,
2001, 2002, and 2003, the annual dividend rate per share was $1.24, $1.36 and
$1.56, respectively, paid quarterly on shares then outstanding.

(7) REDEEMABLE SECURITIES

The Company has decided that its offering and sale of its common stock from
1997 through 2003 to certain of its employees may not have complied with the
registration requirements of certain securities laws.  Assuming such sales did
not comply with those requirements, the individuals who purchased the Company's
common stock in such offerings would have the right to return the shares to the
Company and obtain a refund from the Company equal to the recision amount or if
they have sold the stock, to seek from the Company damages, if any, resulting
from their purchases of the stock. The recision amount payable to an individual
would be equal to the original purchase price increased annually by an amount
equal to 6% interest and decreased annually by the amount of dividends received.

The rights of these individuals to receive a refund of the recision amount is
not completely within the control of the Company.  As a result, these shares
are considered and treated as redeemable common stock for financial accounting
purposes until such time as the recision rights lapse or are exercised.
Therefore the recision amount and the related shares have been removed from
Shareholder Equity and classified as Temporary Equity at each of the periods

ended on December 31 as follows:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Recision amount | $17,962,049 | $21,434,540 | $26,079,769 |
| Related shares | 1,303,826 | 1,525,709 | 1,789,593 |

Page 23

MEDICAL INFORMATION TECHNOLOGY, INC.

Notes to Financial Statements
December 31, 2003

(8) QUALIFIED PROFIT SHARING PLAN

The Company has no obligation for post-employment or post-retirement benefits. The Company maintains a qualified profit sharing plan that provides deferred compensation to substantially all of its employees. Contributions to the plan are at the discretion of the Board of Directors and may be in the form of Company stock or cash. A summary of contributions made during the years ended December 31, 2001, 2002 and 2003 is as follows:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Cash | $2,075,000 | $2,340,000 | $2,020,000 |
| Company common stock |  |  |  |
| 75,000 shares at $19/share | 1,425,000 | – | – |
| 80,000 shares at $22/share | – | 1,760,000 | – |
| 80,000 shares at $26/share | – | – | 2,080,000 |
|  | $3,500,000 | $4,100,000 | $4,100,000 |

(9) OTHER INCOME AND EXPENSE

Other Income consists of rental, dividend, interest income and both realized and unrealized marketable security gains or losses:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Rental income | $ 9,925,825 | $10,601,442 | $10,029,758 |
| Dividend income | 7,072,726 | 8,697,302 | 8,792,134 |
| Interest income | 751,444 | 648,085 | 1,378,502 |
| Gains (losses) | 90,211 | (5,813,054) | (1,446,780) |
| Other Income | $17,840,206 | $14,133,775 | $18,753,614 |

Other Expense consists of rental, charitable contribution, and certain legal expenses incurred in relation to a lawsuit:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Rental expense | $6,217,369 | $5,359,805 | $6,390,608 |
| Charitable contributions | 431,000 | 485,000 | 520,000 ✓ |
| Certain legal expenses | – | – | 500,000 |
| Other Expense | $6,648,369 | $5,844,805 | $7,410,608 |

Page 24

MEDICAL INFORMATION TECHNOLOGY, INC.

Notes to Financial Statements
December 31, 2003

(10) INCOME TAXES

The Company follows the provisions of SFAS No. 109, Accounting for Income Taxes. The components of the net deferred tax liability recognized in the accompanying balance sheets are as follows:

|  | 2002 | 2003 |
|---|---|---|
| Tax reserves | $6,688,833 | $ 8,521,028 |
| Deferred revenue | (878,163) | (686,913) |
| Other reserves and expenses | (3,010,670) | 4,035,201 |
| Total net deferred tax liability | $2,800,000 | $11,869,316 |

The components of the provision for income taxes shown in the accompanying statements of income consist of the following:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| State |  |  |  |
| Current | $ 7,457,140 | $ 9,126,161 | $ 7,634,249 |
| Deferred | 300,000 | (475,000) | 2,267,329 |
|  | $ 7,757,140 | $ 8,651,161 | $ 9,901,578 |
| Federal |  |  |  |
| Current | $27,258,263 | $31,398,857 | $26,900,558 |
| Deferred | 900,000 | (1,425,000) | 6,801,987 |
|  | $28,158,263 | $29,973,857 | $33,702,545 |

The effective income tax rate varies from the amount computed using the statutory U.S. income tax rate as follows:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Statutory tax rate | 35.0% | 35.0% | 35.0% |
| Increase in taxes resulting from state income taxes, net of federal income tax benefit | 5.4 | 5.5 | 5.8 |
| Dividend income exclusion | (1.9) | (2.1) | (1.9) |
| Other | 0.2 | (0.7) | 0.4 |
|  | 38.7% | 37.7% | 39.3% |

Page 25

OPERATING RESULTS BY QUARTER (Unaudited):

For the Two Years Ended December 31, 2003 (in thousands where applicable)

|                        | 1st Q     | 2nd Q     | 3rd Q     | 4th Q     | Year      |
| ---------------------- | --------- | --------- | --------- | --------- | --------- |
| **Results for 2002:**  |           |           |           |           |           |
| Total revenue          | $61,130   | $65,103   | $64,567   | $65,397   | $256,197  |
| Operating income       | 22,833    | 24,569    | 24,126    | 23,379    | 94,907    |
| Net income             | 15,725    | 16,915    | 16,545    | 14,686    | 63,871    |
| Net income per share   | $.47      | $.50      | $.49      | $.43      | $1.89     |
| **Results for 2003:**  |           |           |           |           |           |
| Total revenue          | $67,281   | $67,511   | $67,686   | $68,303   | $270,781  |
| Operating income       | 25,119    | 25,009    | 24,939    | 24,618    | 99,685    |
| Net income             | 16,997    | 17,211    | 17,207    | 16,008    | 67,424    |
| Net income per share   | $.50      | $.50      | $.50      | $.47      | $1.98     |

Net income was negatively affected by write-downs of certain marketable security costs specifically by $5.8 million in the 4th quarter of 2002.

    Item 9A - Controls and Procedures

Based on their evaluation of the Company's disclosure controls and procedures as of December 31, 2003, the Chief Executive Officer and Chief Financial Officer have concluded such controls and procedures are effective.

There were no changes in the Company's internal control over financial reporting in the fourth quarter which have materially affected, or are reasonably likely to materially affect, such internal control.

Page 26

PART III

    Item 10 - Directors and Executive Officers of the Registrant

All Directors are elected each year at the annual meeting of shareholders. All Officers are elected at the first meeting of the Board following the annual meeting of shareholders and hold office for one year. The positions held by each Director and Officer of the Company on March 12, 2004, are shown below. There are no family relationships among the following persons.

| Director or Officer    | Age | Position with the Company                          |
| ---------------------- | --- | -------------------------------------------------- |
| A. Neil Pappalardo     | 61  | Chairman, Chief Executive Officer and Director     |
| Lawrence A. Polimeno   | 62  | Vice Chairman and Director                         |
| Roland L. Driscoll     | 75  | Director                                           |
| Edward B. Roberts      | 68  | Director                                           |
| Morton E. Ruderman     | 67  | Director                                           |
| L. P. Dan Valente      | 73  | Director                                           |
| Howard Messing         | 51  | President and Chief Operating Officer              |
| Barbara A. Manzolillo  | 51  | Treasurer, Chief Financial Officer and Clerk       |
| Edward G. Pisinski     | 60  | Senior Vice President                              |
| Christopher Anschuetz  | 51  | Vice President                                     |
| Robert G. Gale         | 57  | Vice President                                     |
| Steven B. Koretz       | 51  | Vice President                                     |
| Stuart N. Lefthes      | 50  | Vice President                                     |
| Joanne Wood            | 50  | Vice President                                     |
| Hoda Sayed-Friel       | 46  | Vice President                                     |

The following is a description of the business experience during the past five years of each Director and Officer.

A. Neil Pappalardo, founder of the Company, is the Chairman and Chief Executive Officer, and has been a Director since 1969. He is also a Director of Palomar Medical Technologies, Inc.

Lawrence A. Polimeno has been the Vice Chairman since 2002, was President and Chief Operating Officer prior to that, has been a Director since 1985, and has been with the Company since 1969.

Roland L. Driscoll, retired Chief Financial Officer of the Company, has been a Director since 1985.

Edward B. Roberts, co-founder of the Company, is a Sloan School Professor at the Massachusetts Institute of Technology, and has been a Director since 1969. He is also a Director of Advanced Magnetics Inc., Pegasystems Inc. and Sohu.com Inc.

Morton E. Ruderman, co-founder of the Company, is Chief Executive Officer of CRES Development, a real estate developer, and has been a Director since 1969.

L. P. Dan Valente is Chairman of Palomar Medical Technologies, Inc., and has been a Director since 1972. He is also a Director of MKS Instruments and SurgiLight Inc.

Howard Messing has been President and Chief Operating Officer since 2002, was the Executive Vice President prior to that, and has been with the Company since 1974.

Barbara A. Manzolillo has been the Treasurer, Chief Financial Officer and Clerk since 1996, was the Treasurer prior to that, and has been with the Company since 1975.

Page 27

Edward G. Pisinski has been a Senior Vice President since 1997, was a Vice President prior to that, and has been with the Company since 1973.

Christopher Anschuetz has been a Vice President since 1995, was a Senior Manager prior to that, and has been with the Company since 1975.

Robert G. Gale has been a Vice President since 1995, was a Senior Manager prior to that, and has been with the Company since 1976.

Steven B. Koretz has been a Vice President since 1997, was a Senior Manager prior to that, and has been with the company since 1982.

Stuart N. Lefthes has been a Vice President since 1997, was a Senior Manager prior to that, and has been with the company since 1983.

Joanne Wood has been a Vice President since 1995, was a Senior Manager prior to that, and has been with the Company since 1983.

Hoda Sayed-Friel has been a Vice President since 2003, was a Senior Manager prior to that, and has been with the Company since 1986.

The address of all Officers and Directors is in care of the Company, MEDITECH Circle, Westwood, MA 02090.

THE BOARD OF DIRECTORS AND ITS COMMITTEES

The Board of Directors oversees the Company's business affairs and monitors the performance of management, but is not involved in the day-to-day operations. The

Directors meet regularly with the CEO, the COO, the CFO, other officers and our independent auditors; read reports and other materials; and participate in Board and committee meetings. The Board currently consists of 6 members. The Board held 4 regularly scheduled quarterly meetings and 2 special meetings during the fiscal year ended December 31, 2003 and each of the Directors attended all meetings of the Board of Directors.

The Board of Directors has an Audit Committee and an Executive Compensation Committee. The Company also has a Charitable Contribution Committee. During 2003 each committee member attended all committee meetings. The following is a description of the committees.

The Audit Committee consists of Roland L. Driscoll and L. P. Dan Valente. Both members are former CPA's and Mr. Driscoll is "independent" as defined by the rules which govern the NYSE and NASDAQ. The Board of Directors of MEDITECH has determined that Mr. Driscoll and Mr. Valente are both audit committee financial experts within the meaning of applicable rules under the Securities Exchange Act of 1934, as amended. This committee meets at least six times a year to review accounting practices and advise the Company's CFO. In addition, the committee meets and consults with the Company's outside auditors with respect to the Company's business operations, industry, financial performance, business and financial risks, processes and controls, key policies, legal and regulatory requirements, code of ethical conduct and new or unusual transactions. The Committee does not have a written charter. The Committee submits its annual report to the Board of Directors each April.

The Executive Compensation Committee consists of Morton E. Ruderman and Edward B. Roberts. This committee meets once a year to recommend the Chairman and Chief Executive Officer's annual salary, the criteria and amount for his bonus. The full Board of Directors annually approves the salary and bonus amount for each of the officers.

The Charitable Contribution Committee consists of Morton E. Ruderman, A. Neil Pappalardo and Howard Messing. This committee meets at least six times a year to review the criteria for the year's charitable contribution program, meet and evaluate each organization under consideration and determine the amount to be contributed to each organization for the year.

The Board of Directors does not have a nominating committee.  Instead, the entire Board participates in the nomination process.

Page 28

   Item 11 - Executive Compensation

The following table sets forth the compensation received by the Company's Chief Executive Officer and the four most highly compensated other Officers for the three fiscal years ended December 31, 2001, 2002 and 2003.

| Name and Position | Year | Salary | Bonus | Deferred |
|---|---|---|---|---|
| A. Neil Pappalardo | 2003 | $360,000 | $723,965 | 0 |
| Chairman and Chief | 2002 | 360,000 | 724,251 | 0 |
| Executive Officer | 2001 | 360,000 | 721,736 | 0 |
| | | | | |
| Lawrence A. Polimeno | 2003 | $180,000 | $473,965 | $4,255 |
| Vice Chairman | 2002 | 240,000 | 624,251 | 4,847 |
| | 2001 | 240,000 | 621,736 | 4,615 |
| | | | | |
| Howard Messing | 2003 | $240,000 | $473,965 | $4,255 |

| | | | | |
|---|---|---|---|---|
| President and Chief | 2002 | 240,000 | 474,251 | 4,847 |
| Operating Officer | 2001 | 216,000 | 371,736 | 4,615 |
| | | | | |
| Barbara A. Manzolillo | 2003 | $204,000 | $273,965 | $4,255 |
| Treasurer and Chief | 2002 | 204,000 | 274,251 | 4,847 |
| Financial Officer | 2001 | 180,000 | 221,736 | 4,615 |
| | | | | |
| Edward G. Pisinski | 2003 | $204,000 | $273,965 | $4,255 |
| Senior Vice President | 2002 | 204,000 | 324,251 | 4,847 |
| Sales and Marketing | 2001 | 192,000 | 271,736 | 4,615 |

Profit Sharing Plan: The Company maintains a qualified defined contribution plan for all of the Company's staff known as the Medical Information Technology, Inc. Profit Sharing Plan. All of the staff who have completed one year of service participate in the Plan. The Board of Directors sets the annual contribution which is allocated in proportion to total compensation (capped at $100,000) of all eligible members for the Plan year. No allocation is allowable under this Plan to owners of 10% or more of the Company's common stock. Contributions by members are not permitted. Benefits under the Plan are considered deferred compensation and become fully vested after five years of continuous service with the Company. Members who have at least 20 years of service or who have incurred financial hardship may make in service withdrawals. Lump sum cash payment is made upon retirement, death, disability or termination of employment.

Compensation of Directors: The members of the Board of Directors who are not Officers of the Company currently receive a fee of $8,000 for each quarterly meeting attended, with such fee being deemed to also cover any special meetings, conference or committee time, and incidental expenses expended by such directors on behalf of the Company during the year.

CODE OF CONDUCT AND ETHICS

The Board of Directors has directed management to prepare a Code of Conduct and Ethics for MEDITECH's staff, officers and directors for submittal and approval by the Board.

Page 29

Item 12 - Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters

The following table provides information as of March 12, 2004 with respect to the shares of common stock beneficially owned by each person known by the Company to own more than 5% of the Company's outstanding common stock, each Director of the Company, each Executive Officer named in the Compensation Table and by all Directors and Officers of the Company as a group. The number of shares beneficially owned is determined according to rules of the Securities and Exchange Commission. Under such rules, a person's beneficial ownership includes any shares as to which such person has sole or shared voting power or investment power.

| Name of Shareholder, Director or Officer | Number of Shares of Common Stock Beneficially Owned | Percentage of Shares of Common Stock |
|---|---|---|
| A. Neil Pappalardo* | 12,799,957 | 37.40% |
| Morton E. Ruderman | 5,494,469 | 16.06% |
| MEDITECH Profit Sharing Trust* | 3,899,957 | 11.40% |
| Curtis W. Marble | 3,500,000 | 10.23% |

| | | |
|---|---:|---:|
| Grossman Group** | 2,061,144 | 6.02% |
| Lawrence A. Polimeno | 981,366 | 2.87% |
| Edward B. Roberts | 975,110 | 2.85% |
| Roland L. Driscoll | 528,000 | 1.54% |
| Edward G. Pisinski | 297,000 | 0.87% |
| Howard Messing | 285,000 | 0.83% |
| Barbara A. Manzolillo | 200,000 | 0.58% |
| L. P. Dan Valente | 85,000 | 0.25% |
| 15 Directors and Officers as a Group* | 21,989,452 | 64.26% |

*The number of shares indicated for Mr. Pappalardo includes the shares owned by the MEDITECH Profit Sharing Trust. Mr. Pappalardo is the sole Trustee of the MEDITECH Profit Sharing Trust and therefore is entitled to vote its 3,899,957 shares. Likewise the number of shares indicated for the 15 Directors and Officers as a Group includes the shares owned by the MEDITECH Profit Sharing Trust.

**Based on a Schedule 13D filed by Jerome Grossman and other individuals on February 27, 2002.

    Item 13 - Certain Relationships and Related Transactions

A. Neil Pappalardo, Chairman, Chief Executive Officer and Director of the Company, purchased for cash 50,000 shares of Company stock from the Company at $22 per share in February 2003.

Howard Messing, President and Chief Operating Officer of the Company, purchased for cash 15,000 shares of Company stock from the Company at $22 per share in February 2003.

Barbara A. Manzolillo, Treasurer, Chief Financial Officer and Clerk of the Company, purchased for cash 4,000 shares of Company stock from the Company at $22 per share in February 2003.

Edward G. Pisinski, Senior Vice President of the Company, purchased for cash 1,000 shares of Company stock from the Company at $22 per share in February 2003.

On December 31, 2003, the Company contributed 80,000 shares at $26 per share of Company stock to the MEDITECH Profit Sharing Trust.

Philip Polimeno, a son of a Director, is employed as a senior manager of the Company and received W-2 compensation of $91,564 in 2003.

Page 30

SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

To the Company's knowledge, based solely on a review of the reports given to the Company, all Section 16(a) filing requirements applicable to its executive officers, Directors and greater-than-10% shareholders were satisfied in 2003.

    Item 14 - Principal Accountant Fees and Services

Fees paid for audit services rendered by Ernst & Young, LLP, the Company's only independent auditors, are as follows:

| | 2002 | 2003 |
|---|---|---|
| Annual audit and quarterly reviews | $60,000 | $142,500 |

| | | |
|---|---|---|
| Audit related to Profit Sharing Trust | 10,000 | 10,000 |
| Tax or all other matters | - | - |
| | $70,000 | $152,500 |

Item 15 - Exhibits and Reports on Form 8-K

Exhibit 10: MEDITECH 2004 Stock Purchase Plan, Exhibit 31: Rule 13a-14(a)
Certifications and Exhibit 32: Section 1350 Certifications are appended to
this report. There were no reports filed on Form 8-K during the quarter ended
December 31, 2003.

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned, thereunto duly authorized.

Medical Information Technology, Inc.
(Registrant)

By: Barbara A. Manzolillo, Chief Financial Officer and Treasurer
(Signature)

March 12, 2004
(Date)

Pursuant to the requirements of the Securities Exchange Act of 1934, this
report has been signed below by the following persons on behalf of the
registrant and in the capacities indicated on March 12, 2004.

A. Neil Pappalardo, Chief Executive Officer, Chairman and Director
(Signature)

Lawrence A. Polimeno, Vice Chairman and Director
(Signature)

Roland L. Driscoll, Director
(Signature)

Edward B. Roberts, Director
(Signature)

Morton E. Ruderman, Director
(Signature)

L. P. Dan Valente, Director
(Signature)

--------------------------------------------------------------

Exhibit 10: MEDITECH 2004 Stock Purchase Plan

The objective of the Stock Purchase Plan is to provide the Company's staff
with an opportunity to purchase shares of the Company's stock and thereby
individually become shareholders or increase their share holdings. Stock
ownership is an important part of the Company's employment and retention
strategy. Furthermore, stock ownership motivates the staff and more closely
aligns the interest of the staff with that of the shareholders. The Plan will

be implemented through annual offering of shares of the Company's stock to the staff.

Authorization:  At the beginning of each year, the Board of Directors shall review the Stock Purchase Plan and amend it if the Board believes it necessary or appropriate. The Board shall then vote to set the total number of shares to be offered to the Company's staff under the Plan for that year. In setting the number of shares to be offered, the Board shall take into account the objective of the Plan and the potential dilution to existing shareholders.

Administration:  Except as otherwise specified in the Plan, and subject to such conditions and limitations as the Board may establish or as may be imposed by law, the Plan shall be administered by a group of Plan Administrators consisting of the Company's Chairman and Chief Executive Officer, its President and Chief Operating Officer and its Treasurer and Chief Financial Officer, acting together. Subject to any interpretation or decision by the Board, the Plan Administrators' interpretations and decisions regarding the Plan shall be final, conclusive and binding on all staff members.

Staff Eligibility:  Except as provided below, all the Company's staff members with at least 3 years of continuous full or part time employment with the Company shall be eligible to purchase shares in accordance with such rules as may be prescribed by the Board or the Plan Administrators. In the event of a staff member's retirement or termination of employment before the purchase of any shares, the staff member shall no longer be eligible to purchase shares under the Plan. Rights under the Plan are not transferable by a staff member to anyone else. The Company does not have any employment contracts with its staff members, and participation in the Plan shall not constitute a promise of continued employment to any staff member.

Offering Period:  The Plan Administrators shall specify the beginning date and duration of the annual Offering Period for the sale and purchase of the Company's stock. The Offering Period usually will begin promptly after the Company has filed with the SEC its annual report on Form 10-K for the preceding year, including its audited financial statements. The Offering Period ordinarily will not extend beyond the first quarter.

Share Price:  Unless otherwise determined by the Board, the per share price for such shares in any year shall be the value previously specified by the Board in connection with the prior year end contribution of Company stock to the MEDITECH Profit Sharing Trust.

Shares Offered:  The desire of the Board is for the Company's officers to increase their ownership of Company stock so that they will have a significant equity investment in the Company. To this end, the Board shall specify the maximum number of shares the officers individually may purchase during the Offering Period.

The Plan Administrators shall determine the maximum number of shares of the Company's stock which each non-officer staff member eligible to participate in the Plan shall be permitted to purchase during the Offering Period. The Plan Administrators may consider one or more factors, including the current compensation of such staff member, in determining the maximum number of shares offered. The number of shares offered to such staff member for purchase shall be indicated in an annual compensation letter to the staff member.

Oversubscription: The aggregate shares purchased by the staff including the officers shall not exceed the total number of shares approved by the Board. If the shares are oversubscribed, the Plan Administrators will seek Board approval to sell more shares or, short of this, devise an equitable allocation method to

rectify the situation, such as a pro rata cutback.

Shareholder Education:  The Company will provide to prospective shareholders any prospectus or other documents required to be furnished to them under applicable law. In addition, the Company will provide information to prospective shareholders concerning the implications of buying stock in MEDITECH. Meetings shall be held during the Offering Period, especially for those staff members who are considering becoming a shareholder for the first time. To aid them in their investment decision, the Company will indicate MEDITECH is a private company, there is no public market for its shares, and there can be no assurance they will be able to resell their shares in the future. The Company will also explain there are restrictions on the transfer of the Company's shares, requiring a holder to first offer the shares to the Company at the same price and terms as would be applicable to a potential sale to some other party.

Cash Purchase:  The Company's officers and staff must purchase the stock for cash during the Offering Period by issuing a check payable to Medical Information Technology, Inc. for the complete amount of the shares to be purchased.

Record Keeping:  Upon purchase of shares, the Company shall update the shareholder records to reflect the shares purchased at that time by the individual staff members. In lieu of stock certificates, a statement of stock ownership shall be provided upon completion of any transaction or at any other time upon a shareholder's request.

Board Reporting:  After the completion of the Offering Period, the Plan Administrators shall report to the Board summarizing the outcome of the staff's stock transactions.

Available Shares:  The amount of common stock, $1.00 par value, currently authorized by the Company's shareholders, is 35,000,000 shares. The amount of common stock issued and outstanding is currently less than the authorized shares. Thus, the Board is empowered to sell the remaining unissued shares to the staff of the Company. Shares for the Plan may also come from treasury shares.

Capital Structure:  Should any change to the Company's capital structure, such as a stock split, occur during the Offering Period, an adjustment shall be made in the number of shares being offered and/or the purchase price per share as may be deemed equitable by the Board to give proper effect to such event.

Fund Application:  All funds received by the Company under this Plan may be used for any corporate purpose.

Governmental Approval:  The Company shall use reasonable efforts to seek and obtain the approval of, or registration with, any required governmental entity needed to sell and issue MEDITECH stock under the Plan.

Amendment or Termination:  The Plan and all rights of staff members under any offering hereunder may be amended or terminated at any time at the discretion of the Board.

----------------------------------------------------------------

Exhibit 31: Rule 13a-14(a) Certifications

I, Barbara A. Manzolillo, Chief Financial Officer and Treasurer, certify that:

1. I have reviewed this annual report on Form 10-K of Medical Information

Technology, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) [Paragraph omitted in accordance with SEC transition instructions];

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

March 12, 2004
(Date)

Barbara A. Manzolillo, Chief Financial Officer and Treasurer
(Signature)

I, A. Neil Pappalardo, Chief Executive Officer and Chairman, certify that:

1. I have reviewed this annual report on Form 10-K of Medical Information Technology, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) [Paragraph omitted in accordance with SEC transition instructions];

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

March 12, 2004
(Date)

A. Neil Pappalardo, Chief Executive Officer and Chairman
(Signature)

--------------------------------------------------------------

Exhibit 32: Section 1350 Certifications

I, Barbara A. Manzolillo, Chief Financial Officer and Treasurer, certify this annual report on Form 10-K of Medical Information Technology, Inc. for the year ended December 31, 2003, fully complies with the requirements of section

13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of the Company.

March 12, 2004
(Date)

Barbara A. Manzolillo, Chief Financial Officer and Treasurer
(Signature)

I, A. Neil Pappalardo, Chief Executive Officer and Chairman, certify this annual report on Form 10-K of Medical Information Technology, Inc. for the year ended December 31, 2003, fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of the Company.

March 12, 2004
(Date)

A. Neil Pappalardo, Chief Executive Officer and Chairman
(Signature)

**EXHIBIT 13**

| Form **5500** | **Annual Return/Report of Employee Benefit Plan** | OMB Nos. 1210-0016 1210-0089 |
|---|---|---|
| Department of the Treasury Internal Revenue Service Department of Labor Pension and Welfare Benefits Administration Pension Benefit Guaranty Corporation | **(With 100 or more participants)** This form is required to be filed under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 and sections 6039D, 6047(e), 6057(b), and 6058(a) of the Internal Revenue Code, referred to as the Code. ► See separate instructions. | **1997** This Form is Open to Public Inspection. |

For the calendar plan year 1997 or fiscal plan year beginning _____, 1997, and ending DECEMBER , 19 97

| | | For IRS Use Only |
|---|---|---|
| If A(1) through A(4), B, C, and/or D, do not apply to this year's return/report, leave the boxes unmarked. | | EP-ID    JD-042455639-001-199712 |

A  This return/report is:    (1) ☐ the first return/report filed for the plan;    (3) ☐ the final return/report filed for the plan; or
    (2) ☐ an amended return/report;    (4) ☐ a short plan year return/report (less than 12 months).

**IF ANY INFORMATION ON A PREPRINTED PAGE 1 IS INCORRECT, CORRECT IT. IF ANY INFORMATION IS MISSING, ADD IT. PLEASE USE RED INK WHEN MAKING THESE CHANGES AND INCLUDE THE PREPRINTED PAGE 1 WITH YOUR COMPLETED RETURN/REPORT.**

B  Check here if any information reported in 1a, 2a, 2b, or 5a changed since the last return/report for this plan . . . . . . . ► ☐
C  If your plan year changed since the last return/report, check here . . . . . . . . . . . . . . . . . . . ► ☐
D  If you filed for an extension of time to file this return/report, check here and attach a copy of the approved extension . . . . . . ► ☐

| 1a  Name and address of plan sponsor (employer, if for a single-employer plan) (Address should include room or suite no.) | 1b  Employer identification number (EIN) 04:2455639 |
|---|---|
| ****************************3-DIGIT 020 MEDICAL INFORMATION TECHNOLOGY INC MEDITECH CIR WESTWOOD, MA  02090 ‖‖....‖..‖....‖..‖.‖ | 1c  Sponsor's telephone number (781) (617)-821-3000 |
| | 1d  Business code (see instructions, page 20) 7370 |
| | 1e  CUSIP issuer number |

| 2a  Name and address of plan administrator (if same as plan sponsor, enter "Same") | 2b  Administrator's EIN |
|---|---|
| MEDICAL INFORMATION TECHNOLOGY INC MEDITECH CIR WESTWOOD, MA  02090 | 04:2455639 |
| | 2c  Administrator's telephone number (781) (617)-821-3000 |

3  If you are filing this page without the preprinted historical plan information and the name, address, and EIN of the plan sponsor or plan administrator has changed since the last return/report filed for this plan, enter the information from the last return/report in line 3a and/or line 3b and complete line 3c.
a  Sponsor........................................................... EIN ................... Plan number ...........
b  Administrator........................................................ EIN ...................
c  If line 3a indicates a change in the sponsor's name, address, and EIN, is this a change in sponsorship only? (See line 3c on page 8 of the instructions for the definition of sponsorship.) Enter "Yes" or "No." ►

| 4  **ENTITY CODE.** (If not shown, enter the applicable code from page 8 of the instructions.) ► | A - SINGLE-EMPLOYER PLAN |
|---|---|

| 5a  Name of plan ►  MEDICAL INFORMATION TECHNOLOGY INC    PROFIT SHARING PLAN | 5b  Effective date of plan (mo., day, yr.) 12 / 31 / 1973 |
|---|---|
| | 5c  Three-digit plan number ►    001 |

All filers must complete 6a through 6d, as applicable.

6a ☐ Welfare benefit plan    6b ☒ Pension benefit plan
    (If the correct codes are not preprinted below, enter the applicable codes from page 8 of the instructions in the boxes.)

2 - DEF-CON - PROFIT SHARING

6c  Pension plan features. (If the correct codes are not preprinted below, enter the applicable pension plan feature codes from page 8 of the instructions in the boxes.)

1 - PERMITTED DISPARITY

6d ☐ Fringe benefit plan. Attach Schedule F (Form 5500). See instructions.

**Caution:** A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete.

by: _Barbara A. Manzolillo_
Signature of employer/plan sponsor ►  MEDICAL INFORMATION TECHNOLOGY, INC. _____ Date ► 6/15/98
Type or print name of individual signing above  BARBARA A. MANZOLILLO
Signature of plan administrator ►  MEDICAL INFORMATION TECHNOLOGY, INC. by _Barbara A. Manzolillo_  6/15/98
Type or print name of individual signing above  BARBARA A. MANZOLILLO

For Paperwork Reduction Act Notice, see the instructions for Form 5500.    Cat. No. 13505M    Form **5500** (1997)

DEF000861

Form 5500 (1997)                                                                                                    Page **2**

**6e** Check all applicable investment arrangements below (see instructions on page 9):

   *(1)* ☐ Master trust          *(2)* ☐ 103-12 investment entity

   *(3)* ☐ Common/collective trust   *(4)* ☐ Pooled separate account

...........................................................................................................

...........................................................................................................

...........................................................................................................

...........................................................................................................

| | | | | |
|---|---|---|---|---|
| **f** | Single-employer plans enter the tax year end of the employer in which this plan year ends ► Month ..12. Day .31. Year ..97. | | | |
| **g** | Is any part of this plan funded by an insurance contract described in Code section 412(i)? . . . . . . ► | | ☐ Yes | ☒ No |
| **h** | If line 6g is "Yes," was the part subject to the minimum funding standards for either of the prior 2 plan years? . . . | | ☐ Yes | ☐ No |

| **7** | Number of participants as of the end of the plan year (welfare plans complete only lines 7a(4), 7b, 7c, and 7d): | | | |
|---|---|---|---|---|
| **a** | Active participants: *(1)* Number fully vested . . . . . . . . . | **a(1)** | 622 | |
| | *(2)* Number partially vested . . . . . . | **a(2)** | 444 | |
| | *(3)* Number nonvested . . . . . . . | **a(3)** | 326 | |
| | *(4)* Total . . . . . . . . . . . . . . . . . . . | **a(4)** | 1392 | |
| **b** | Retired or separated participants receiving benefits . . . . . . . . . . | **b** | 0 | |
| **c** | Retired or separated participants entitled to future benefits . . . . . . . | **c** | 0 | |
| **d** | Subtotal. Add lines 7a(4), 7b, and 7c . . . . . . . . . . . . | **d** | 1392 | |
| **e** | Deceased participants whose beneficiaries are receiving or are entitled to receive benefits . . | **e** | 0 | |
| **f** | Total. Add lines 7d and 7e . . . . . . . . . . . . . . . . . | **f** | 1392 | |
| **g** | Number of participants with account balances. (Defined benefit plans do not complete this line item.) . | **g** | 1392 | |
| **h** | Number of participants that terminated employment during the plan year with accrued benefits that were less than 100% vested . . . . . . . . . . . . . | **h** | 120 | |

| | | | Yes | No |
|---|---|---|---|---|
| **i** | *(1)* Was any participant(s) separated from service with a deferred vested benefit for which a Schedule SSA (Form 5500) is required to be attached? (See instructions.) . . . . . . . . . . . . | **i(1)** | | X |
| | *(2)* If "Yes," enter the number of separated participants required to be reported ► | | | |

| | | | Yes | No |
|---|---|---|---|---|
| **8a** | Was this plan ever amended since its effective date? If "Yes," complete line 8b . . . . . . . | **8a** | X | |
| | If the amendment was adopted in this plan year, complete lines 8c through 8e. | | | |
| **b** | If line 8a is "Yes," enter the date the most recent amendment was adopted ► Month ..11. Day .23. Year .94. | | | |
| **c** | Did any amendment during the current plan year result in the retroactive reduction of accrued benefits for any participants? | **c** | | |
| **d** | During this plan year did any amendment change the information contained in the latest summary plan descriptions or summary description of modifications available at the time of amendment? . . . . . . . . . . | **d** | | |
| **e** | If line 8d is "Yes," has a summary plan description or summary description of modifications that reflects the plan amendments referred to on line 8d been furnished to participants? (see instructions) . . . . . . . . . | **e** | | |

| | | | Yes | No |
|---|---|---|---|---|
| **9a** | Was this plan terminated during this plan year or any prior plan year? If "Yes," enter the year ► | **9a** | | X |
| **b** | Were all the plan assets either distributed to participants or beneficiaries, transferred to another plan, or brought under the control of PBGC? . . . . . . . . . . . . . . . . . | **b** | | N/A |
| **c** | Was a resolution to terminate this plan adopted during this plan year or any prior plan year? . . . | **c** | | X |
| **d** | If line 9a or line 9c is "Yes," have you received a favorable determination letter from the IRS for the termination? | **d** | | |
| **e** | If line 9d is "No," has a determination letter been requested from the IRS? . . . . . . . | **e** | | |
| **f** | If line 9a or line 9c is "Yes," have participants and beneficiaries been notified of the termination or the proposed termination? | **f** | | |
| **g** | If line 9a is "Yes" and the plan is covered by PBGC, is the plan continuing to file a PBGC Form 1 and pay premiums until the end of the plan year in which assets are distributed or brought under the control of PBGC? . . . | **g** | | |
| **h** | During this plan year, did any trust assets revert to the employer for which the Code section 4980 excise tax is due? | **h** | | X |
| | If line 9h is "Yes," enter the amount of tax paid with Form 5330 ► $ | | | |

| | | | | |
|---|---|---|---|---|
| **10a** | In this plan year, was this plan merged or consolidated into another plan(s), or were assets or liabilities transferred to another plan(s)? If "Yes," complete lines 10b through 10e . . . . . . . . . . . . . . ► | ☐ Yes | ☒ No | |
| | If "Yes," identify the other plan(s) | **c** Employer identification number(s) | **d** Plan number(s) | |
| **b** | Name of plan(s) ► | | | |
| **e** | If required, has a Form 5310-A been filed? . . . . . . . . . . . . . . . . . . ► ☐ Yes ☐ No | | | |

| | | | | |
|---|---|---|---|---|
| **11** | Enter the plan funding arrangement code from page 10 of the instructions . . . . . . ► 1 | **12** | Enter the plan benefit arrangement code from page 10 of the instructions ► 1 | |

| | | | Yes | No |
|---|---|---|---|---|
| **13a** | Is this a plan established or maintained pursuant to one or more collective bargaining agreements? . . . | **13a** | | X |
| **b** | If line 13a is "Yes," enter the appropriate six-digit LM number(s) of the sponsoring labor organization(s) (see instructions): | | | |
| | *(1)*        *(2)*        *(3)* | | | |

| | | |
|---|---|---|
| **14** | If any benefits are provided by an insurance company, insurance service, or similar organization, enter the number of Schedules A (Form 5500). Insurance information attached. If none, enter "-0-" ► | 0 |

DEF000862

Form 5500 (1997)                                                                                                    Page **3**

**Welfare Plans Do Not Complete Lines 15 Through 24. Go To Line 25 On Page 4.**

| | | | | Yes | No |
|---|---|---|---|---|---|
| **15a** | If this is a defined benefit plan subject to the minimum funding standards for this plan year, is **Schedule B** (Form 5500) required to be attached? (If this is a defined contribution plan leave blank.) . **N/A** . . . . . . . . . . . **15a** | | | | |
| **b** | If this is a defined contribution plan (i.e., money purchase or target benefit), is it subject to the minimum funding standards? (If a waiver was granted, see instructions.) (If this is a defined benefit plan, leave blank.). . . . . . . . . **b** | | | | X |
| | If "Yes," complete (1), (2), and (3) below: | | | | |
| | (1) Amount of employer contribution required for the plan year under Code section 412 | **b(1)** $ | | | |
| | (2) Amount of contribution paid by the employer for the plan year . . . . . | **b(2)** $ | | | |
| |       Enter date of last payment by employer ► Month......... Day....... Year...... | | | | |
| | (3) If (1) is greater than (2), subtract (2) from (1) and enter the funding deficiency here; otherwise, enter -0-. (If you have a funding deficiency, file Form 5330.) | **b(3)** $ | | | |
| **16** | Has the annual compensation of each participant taken into account under the current plan year been limited as required by section 401(a)(17)? (See instructions.) . . . . . . . . . . . . . . . . . **16** | | | X | |
| **17a** | (1) Did the plan distribute any annuity contracts this year? (See instructions.) NO SUCH DISTRIBUTIONS . **a(1)** | | | | X |
| | (2) If (1) is "Yes," did these contracts contain a requirement that the spouse consent before any distributions under the contract are made in a form other than a qualified joint and survivor annuity? . . . . . . . . **a(2)** | | | | |
| **b** | Did the plan make distributions or loans to married participants and beneficiaries without the required consent of the participant's spouse? . . . . . . . . . . . . . . . . . . . . . . . **b** | | | | X |
| **c** | Upon plan amendment or termination, do the accrued benefits of every participant include the subsidized benefits that the participant may become entitled to receive subsequent to the plan amendment or termination? . . . **c** | | | X | |
| **18** | Is the plan administrator making an election under section 412(c)(8) for an amendment adopted after the end of the plan year? (See instructions.) . . . . . . . . . . . . . . . . . . . . . . . **18** | | | | X |
| **19** | If a change in the actuarial funding method was made for the plan year pursuant to a Revenue Procedure providing automatic approval for the change, indicate whether the plan sponsor agrees to the change N/A . . . . **19** | | | | |
| **20** | Is the employer electing to compute minimum funding for the plan year using the Transition rule of Code section 412(l)(11)?N/A **20** | | | | |

| **21** | Check if you are applying the substantiation guidelines from Revenue Procedure 93-42, in completing lines 21a through 21o (see instructions) . . . . . . . . . . . . . . . . . . . . . . ☐ | | Number |
|---|---|---|---|
| | If you checked the box, enter the first day of the plan year for which data is being submitted ► Month ........Day .......Year ....... | | |
| **a** | Does the employer apply the separate line of business rules of Code section 414(r) when testing this plan for the coverage and discrimination tests of Code sections 410(b) and 401(a)(4)? . . . . . . . . . . . **21a** | | X |
| **b** | If line 21a is "Yes," enter the total number of separate lines of business claimed by the employer ► ---------------- If more than one separate line of business, see instructions for additional information to attach. | | |
| **c** | Does the employer apply the mandatory disaggregation rules under Income Tax Regulations section 1.410(b)-7(c)? If "Yes," see instructions for additional information to attach. **c** | | X |
| **d** | In testing whether this plan satisfies the coverage and discrimination tests of Code sections 410(b) and 401(a), does the employer aggregate plans? . ONLY ONE PLAN . . . . . . . . . . . . . . . . **d** | | X |
| **e** | Does the employer restructure the plan into component plans to satisfy the coverage and discrimination tests of Code sections 410(b) and 401(a)(4)? . . . . . . . . . . . . . . . . . . . . . **e** | | X |
| **f** | If you meet either of the following exceptions, check the applicable box to tell us which exception you meet and do NOT complete the rest of question 21: | | |
| | (1) ☐ No highly compensated employee benefited under the plan at any time during the plan year; | | |
| | (2) ☐ This is a collectively bargained plan that benefits only collectively bargained employees, no more than 2% of whom are professional employees. | | |
| **g** | Did any leased employee perform services for the employer at any time during the plan year?NO SUCH EMPLOYEES **g** | | X |
| **h** | Enter the total number of employees of the employer. Employer includes entities aggregated with the employer under Code section 414(b), (c), or (m). Include leased employees and self-employed individuals . . . . . . **h** | 1 814 |
| **i** | Enter the total number of employees excludable because of: (1) failure to meet requirements for minimum age and years of service; (2) collectively bargained employees; (3) nonresident aliens who receive no earned income from U.S. sources; and (4) 500 hours of service/last day rule . . . . . . . . . . . . . . . . . . . . **i** | 422 |
| **j** | Enter the number of nonexcludable employees. Subtract line 21i from line 21h . . . . . . . . . . **j** | 1392 |
| **k** | Do 100% of the nonexcludable employees entered on line 21j benefit under the plan? . . . . ☒ Yes ☐ No If line 21k is "Yes," do NOT complete lines 21l through 21o. | | |
| **l** | Enter the number of nonexcludable employees (line 21j) who are highly compensated employees . . . . . . **l** | |
| **m** | Enter the number of nonexcludable employees (line 21j) who benefit under the plan . . . . . . . . **m** | |
| **n** | Enter the number of employees entered on line 21m who are highly compensated employees . . . . . . **n** | |
| **o** | This plan satisfies the coverage requirements on the basis of (check one): | | |
| | (1) ☐ The average benefits test    (2) ☐ The ratio percentage test—Enter percentage ► ⎡ ⎤ . ⎡ ⎤ % | | |

DEF000863

Form 5500 (1997)                                                                                                           Page **4**

| Welfare Plans Go To Line 25 On This Page. | | Yes | No |
|---|---|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| **22a** | Is it or was it ever intended that this plan qualify under Code section 401(a)? If "Yes," complete lines 22b and 22c. | **22a** | X | |
| **b** | Enter the date of the most recent IRS determination letter . . . . . . . ► Month APRIL . . Year . 1993 . | | | |
| **c** | Is a determination letter request pending with the IRS? | **c** | | X |
| **23a** | Does the plan hold any assets that have a fair market value that is not readily determinable on an established market? (If "Yes," complete line 23b) (See instructions) . . . . . . . . . | **23a** | X | |
| **b** | Were all the assets referred to in line 23a valued for the 1997 plan year by an independent third-party appraiser? . . | **b** | | X |
| **c** | If line 23b is "No," enter the value of the assets that were not valued by an independent third-party appraiser for the 1997 plan year. ► _39,366,288.—_ | | | |
| **d** | Enter the most recent date the assets on line 23c were valued by an independent third-party appraiser. (If more than one asset, see instructions.) ► Month . . . . . . . . . Day . . . . . . . . Year . . . . . . . . N/A = NOT REQUIRED (If this plan does not have ESOP features leave line 23e blank and go to line 24.) | | | |
| **e** | If dividends paid on employer securities held by the ESOP were used to make payments on ESOP loans, enter the amount of the dividends used to make the payments . . . | **23e** | N/A | |
| **24** | Does the employer/sponsor listed on line **1a** of this form maintain other qualified pension benefit plans? . . . . If "Yes," enter the total number of plans, including this plan ► | **24** | | X |
| **25a** | Did any person who rendered services to the plan receive directly or indirectly $5,000 or more in compensation from the plan during the plan year (except for employees of the plan who were paid less than $1,000 in each month)? . If "Yes," complete Part I of **Schedule C** (Form 5500). | **25a** | | X |
| **b** | Did the plan have any trustees who must be listed in Part II of **Schedule C** (Form 5500)? | **b** | X | |
| **c** | Has there been a termination in the appointment of any person listed on line 25d below? . . . . . . . . | **c** | | X |
| **d** | If line 25c is "Yes," check the appropriate box(es), answer lines 25e and 25f, and complete Part III of **Schedule C** (Form 5500): (1) ☐ Accountant   (2) ☐ Enrolled actuary   (3) ☐ Insurance carrier   (4) ☐ Custodian (5) ☐ Administrator   (6) ☐ Investment manager   (7) ☐ Trustee | | | |
| **e** | Have there been any outstanding material disputes or matters of disagreement concerning the above termination?. . | **e** | | X |
| **f** | If an accountant or enrolled actuary has been terminated during the plan year, has the terminated accountant/actuary been provided a copy of the explanation required by Part III of **Schedule C** (Form 5500) with a notice advising them of their opportunity to submit comments on the explanation directly to the DOL?. . . . . . . . . | **f** | | |
| **g** | Enter the number of **Schedules C** (Form 5500) that are attached. If none, enter -0- ► ___1___ | | | |
| **26a** | Is this plan exempt from the requirement to engage an independent qualified public accountant? (see instructions). | **26a** | | X |
| **b** | If line 26a is "No," attach the accountant's opinion to this return/report and check the appropriate box. This opinion is: (1) ☐ Unqualified (2) ☐ Qualified/disclaimer per Department of Labor Regulations 29 CFR 2520.103-8 and/or 2520.103-12(d) (3) ☐ Qualified/disclaimer other   (4) ☐ Adverse   (5) ☒ Other (explain) SUBJECT TO ACCOUNTANT'S COMMENTS WITH RESPECT TO VALUATION OF EMPLOYER'S SECURITIES | | | |
| **c** | If line 26a is "No," does the accountant's report, including the financial statements and/or notes required to be attached to this return/report disclose (1) errors or irregularities; (2) illegal acts; (3) material internal control weaknesses; (4) a loss contingency indicating that assets are impaired or a liability incurred; (5) significant real estate or other transactions in which the plan and (A) the sponsor, (B) the plan administrator, (C) the employer(s), or (D) the employee organization(s) are jointly involved; (6) that the plan has participated in any related party transactions; or (7) any unusual or infrequent events or transactions occurring subsequent to the plan year end that might significantly affect the usefulness of the financial statements in assessing the plan's present or future ability to pay benefits? | **c** | | X |
| **d** | If line 26c is "Yes," provide the total amount involved in such disclosure ► | | | |
| **27** | If line 26a is "No," complete the following questions. (You may NOT use "N/A" in response to lines 27a through 27i): If line 27a, 27b, 27c, 27d, 27e, or 27f is checked "Yes," schedules of these items in the format set forth in the instructions are required to be attached to this return/report. **Schedule G** (Form 5500) may be used as specified in the instructions. During the plan year: | | | |
| **a** | Did the plan have assets held for investment? . . . . . . . . . . . . . . . . . . . . . | **27a** | X | |
| **b** | Were any loans by the plan or fixed income obligations due the plan in default as of the close of the plan year or classified during the year as uncollectible? . . . . . . . . . . . . . . . . . . . . | **b** | | X |
| **c** | Were any leases to which the plan was a party in default or classified during the year as uncollectible? . . . . | **c** | | X |
| **d** | Were any plan transactions or series of transactions in excess of 5% of the current value of plan assets? . . . . | **d** | | X |
| **e** | Do the notes to the financial statements accompanying the accountant's opinion disclose any nonexempt transactions with parties-in-interest? . . . . . . . . . . . . . . . . . . . . . . . . | **e** | | X |
| **f** | Did the plan engage in any nonexempt transactions with parties-in-interest not reported on line 27e?. . . . . | **f** | | X |
| **g** | Did the plan hold qualifying employer securities that are not publicly traded? . . . . . . . . . | **g** | X | |
| **h** | Did the plan purchase or receive any nonpublicly traded securities that were not appraised in writing by an unrelated third party within 3 months prior to their receipt? . . . . . . . . . . . . . . . . | **h** | X | |
| **i** | Did any person manage plan assets who had a financial interest worth more than 10% in any party providing services to the plan or receive anything of value from any party providing services to the plan? . . . . . . . | **i** | | X |

Form 5500 (1997)                                                                 Page **6**

**32**  Plan income, expenses, and changes in net assets for the plan year. *Include all income and expenses of the plan, including any trust(s) or separately maintained fund(s), and any payments/receipts to/from insurance carriers. Round off amounts to the nearest dollar; any other amounts are subject to rejection.*

### Income

| | | | | | (a) Amount | (b) Total |
|---|---|---|---|---|---|---|
| a | **Contributions:** | | | | | |
| | (1) | Received or receivable from: | | | | |
| | | (A) | Employers | a(1)(A) | 3,400,000 | |
| | | (B) | Participants | (B) | 0 | |
| | | (C) | Others | (C) | 0 | |
| | (2) | Noncash contributions | | (2) | 0 | |
| | (3) | Total contributions. Add lines 32a(1)(A), (B), (C) and line 32a(2) ▶ | | (3) | | 3,400,000 |
| b | **Earnings on investments:** | | | | | |
| | (1) | Interest | | | | |
| | | (A) | Interest-bearing cash (including money market funds) | b(1)(A) | 3,752 | |
| | | (B) | Certificates of deposit | (B) | 0 | |
| | | (C) | U.S. Government securities | (C) | 1,334,801 | |
| | | (D) | Corporate debt instruments | (D) | 0 | |
| | | (E) | Mortgage loans | (E) | 0 | |
| | | (F) | Other loans . . . ON PARTICIPANT LOANS | (F) | 100,062 | |
| | | (G) | Other interest | (G) | 0 | |
| | | (H) | Total interest. Add lines 32b(1)(A) through (G) ▶ | (H) | | 1,438,615 |
| | (2) | Dividends: (A) Preferred stock | b(2)(A) | | 0 | |
| | | (B) | Common stock . . . EMPLOYER'S COMMON STOCK | (B) | 2,389,447 | |
| | | (C) | Total dividends. Add lines 32b(2)(A) and (B) ▶ | (C) | | 2,389,447 |
| | (3) | Rents | | (3) | | 0 |
| | (4) | Net gain (loss) on sale of assets: (A) Aggregate proceeds | (4)(A) | | 0 | |
| | | (B) | Aggregate carrying amount (see instructions) | (B) | | 0 | |
| | | (C) | Subtract (B) from (A) and enter result | (C) | | 0 |
| | (5) | Unrealized appreciation (depreciation) of assets | (5) | | 4,279,690 |
| | (6) | Net investment gain (loss) from common/collective trusts | (6) | | 0 |
| | (7) | Net investment gain (loss) from pooled separate accounts | (7) | | 0 |
| | (8) | Net investment gain (loss) from master trusts | (8) | | 0 |
| | (9) | Net investment gain (loss) from 103-12 investment entities | (9) | | 0 |
| | (10) | Net investment gain (loss) from registered investment companies | (10) | | 0 |
| c | Other income | | c | | 0 |
| d | Total income. Add all amounts in column (b) and enter total ▶ | | d | | 11,507,752 |

### Expenses

| | | | | | (a) Amount | (b) Total |
|---|---|---|---|---|---|---|
| e | Benefit payment and payments to provide benefits: | | | | | |
| | (1) | Directly to participants or beneficiaries | e(1) | 2,111,284 | |
| | (2) | To insurance carriers for the provision of benefits | (2) | 0 | |
| | (3) | Other | (3) | 0 | |
| | (4) | Total payments. Add lines 32e(1) through 32e(3) ▶ | (4) | | 2,111,284 |
| f | Interest expense | | f | | 0 |
| g | Administrative expenses: (1) Salaries and allowances | g(1) | | 0 | |
| | (2) | Accounting fees | (2) | 0 | |
| | (3) | Actuarial fees | (3) | 0 | |
| | (4) | Contract administrator fees | (4) | 0 | |
| | (5) | Investment advisory and management fees | (5) | 0 | |
| | (6) | Legal fees | (6) | 0 | |
| | (7) | Valuation/appraisal fees | (7) | 0 | |
| | (8) | Trustees fees/expenses (including travel, seminars, meetings, etc.) | (8) | 0 | |
| | (9) | Other | (9) | 0 | |
| | (10) | Total administrative expenses. Add lines 32g(1) through 32g(9) | (10) | | 0 |
| h | Total expenses. Add lines 32e(4), 32f, and 32g(10) ▶ | | h | | 2,111,284 |
| i | Net income (loss). Subtract line 32h from line 32d | | i | | 9,396,468 |
| j | Transfers to (from) the plan (see instructions) | | j | | 0 |
| k | Net assets at beginning of year (line 31l, column (a)) | | k | | 56,567,393 |
| l | Net assets at end of year (line 31l, column (b)) ▶ | | l | | 65,963,861 |

| | | Yes | No |
|---|---|---|---|
| **33** | Did any employer sponsoring the plan pay any of the administrative expenses of the plan that were not reported on line 32g? | | X |

DEF000865

Form 5500 (1997)                                                                                           Page **5**

| | | | | Yes | No |
|---|---|---|---|---|---|
| **28** | Did the plan acquire individual whole life insurance contracts during the plan year? . . . . . . . | | 28 | | X |
| **29** | During the plan year: | | | | |
| a | (1) | Was this plan covered by a fidelity bond? If "Yes," complete lines 29a(2) and 29a(3) | 29a(1) | X | |
| | (2) | Enter amount of bond ▶ $ ........500,000 | | | |
| | (3) | Enter the name of the surety company ▶ ....FEDERAL INSURANCE COMPANY............................ | | | |
| b | (1) | Was there any loss to the plan, whether or not reimbursed, caused by fraud or dishonesty? . | 29b(1) | | X |
| | (2) | If line 29b(1) is "Yes," enter amount of loss ▶ $ | | | |

**30a** Is the plan covered under the Pension Benefit Guaranty Corporation termination insurance program?

    ☐ Yes    ☒ No    ☐ Not determined

  b If line 30a is "Yes" or "Not determined," enter the identification number and the plan number used to identify it.

    Employer identification number ▶                      Plan number ▶

**31** Current value of plan assets and liabilities at the beginning and end of the plan year. Combine the value of plan assets held in more than one trust. Allocate the value of the plan's interest in a commingled trust containing the assets of more than one plan on a line-by-line basis unless the trust meets one of the specific exceptions described in the instructions. Do not enter the value of that portion of an insurance contract that guarantees, during this plan year, to pay a specific dollar benefit at a future date. Round off amounts to the nearest dollar; any other amounts are subject to rejection. Plans with no assets at the beginning and the end of the plan year, enter -0- on line 31f.

| Assets | | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|---|
| a | Total noninterest-bearing cash . . . . . . . . . . . | a | 1,594,766 | 190 |
| b | Receivables: (1) Employer contributions . . . . . . . . | b(1) | 0 | 0 |
| | (2) Participant contributions . . . . . . . . | (2) | 0 | 0 |
| | (3) Income . . ACCRUED INTEREST . . . . . | (3) | 287,499 | 326,221 |
| | (4) Other . . . . . . . . . . . . . | (4) | 0 | 0 |
| | (5) Less allowance for doubtful accounts . . . . . | (5) | 0 | 0 |
| | (6) Total. Add lines 31b(1) through 31b(4) and subtract line 31b(5) . . . ▶ | (6) | 287,499 | 326,221 |
| c | General Investments: (1) Interest-bearing cash (including money market funds) . . | c(1) | 80,093 | 81,914 |
| | (2) Certificates of deposit . . . . . . . . . | (2) | 0 | 0 |
| | (3) U.S. Government securities . . . . . . . | (3) | 21,176,405 | 24,841,298 |
| | (4) Corporate debt instruments: (A) Preferred . . . | (4)(A) | 0 | 0 |
| | (B) All other . . . . . . . . | (4)(B) | 0 | 0 |
| | (5) Corporate stocks: (A) Preferred . . . . . . | (5)(A) | 0 | 0 |
| | (B) Common . . . . . . . . | (5)(B) | 0 | 0 |
| | (6) Partnership/joint venture interests . . . . . | (6) | 0 | 0 |
| | (7) Real estate: (A) Income-producing . . . . . | (7)(A) | 0 | 0 |
| | (B) Nonincome-producing . . . . . | (7)(B) | 0 | 0 |
| | (8) Loans (other than to participants) secured by mortgages: (A) Residential | (8)(A) | 0 | 0 |
| | (B) Commercial . . . . . . . | (8)(B) | 0 | 0 |
| | (9) Loans to participants: (A) Mortgages . . . . | (9)(A) | 0 | 0 |
| | (B) Other . . . . . . . | (9)(B) | 1,257,200 | 1,347,950 |
| | (10) Other loans . . . . . . . . . . . | (10) | 0 | 0 |
| | (11) Value of interest in common/collective trusts . . . | (11) | 0 | 0 |
| | (12) Value of interest in pooled separate accounts . . . | (12) | 0 | 0 |
| | (13) Value of interest in master trusts . . . . . . | (13) | 0 | 0 |
| | (14) Value of interest in 103-12 investment entities . . | (14) | 0 | 0 |
| | (15) Value of interest in registered investment companies . | (15) | 0 | 0 |
| | (16) Value of funds held in insurance company general account (unallocated contracts) . | (16) | 0 | 0 |
| | (17) Other . . . . . . . . . . . . . . . | (17) | 0 | 0 |
| | (18) Total. Add lines 31c(1) through 31c(17) . . . . . . ▶ | (18) | 22,513,698 | 26,271,162 |
| d | Employer-related investments: (1) Employer securities COMMON STOCK | d(1) | 33,760,720 | 39,366,288 |
| | (2) Employer real property . . . . . . . . . . | (2) | 0 | 0 |
| e | Buildings and other property used in plan operation . . . . | e | 0 | 0 |
| f | Total assets. Add lines 31a, 31b(6), 31c(18), 31d(1), 31d(2), and 31e . . . . ▶ | f | 56,567,393 | 65,963,861 |
| **Liabilities** | | | | |
| g | Benefit claims payable . . . . . . . . . . . . . | g | 0 | 0 |
| h | Operating payables . . . . . . . . . . . . . . | h | 0 | 0 |
| i | Acquisition indebtedness . . . . . . . . . . . . | i | 0 | 0 |
| j | Other liabilities . . . . . . . . . . . . . . . | j | 0 | 0 |
| k | Total liabilities. Add lines 31g through 31j . . . . . . . ▶ | k | 0 | 0 |
| **Net Assets** | | | | |
| l | Subtract line 31k from line 31f . . . . . . . . . . ▶ | l | 56,567,393 | 65,963,861 |

DEF000866

| SCHEDULE C (Form 5500)<br>Department of the Treasury<br>Internal Revenue Service<br>Department of Labor<br>Pension and Welfare Benefits Administration<br>Pension Benefit Guaranty Corporation | Service Provider and Trustee Information<br>This schedule is required to be filed under section 104 of the<br>Employee Retirement Income Security Act of 1974.<br>► File as an attachment to Form 5500.<br>Additional Schedules C (Form 5500) may be used, if needed, to<br>provide additional information for Parts I, II, and/or III. | OMB No. 1210-0016<br>**1997**<br>This Form is<br>Open to Public<br>Inspection |
|---|---|---|

For the calendar year 1997 or fiscal plan year beginning _____ , 1997, and ending _____ , 19 __

| Name of plan sponsor as shown on line 1a of Form 5500 | Employer Identification number |
|---|---|
| MEDICAL INFORMATION TECHNOLOGY, INC. | 04 : 2455639 |

| Name of plan | |
|---|---|
| MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN | Three-digit plan number ► 0 0 : 1 |

**Part I** Service Provider Information (see instructions)

1 Enter the total dollar amount of compensation paid by the plan to all persons receiving less than $5,000 during the plan year . . . . . . . . . . . . . . . . . . . . . **1**

2

| | (a) Name | (b) Employer identification number (see instructions) | (c) Official plan position | (d) Relationship to employer, employee organization, or person known to be a party-in-interest | (e) Gross salary or allowances paid by plan | (f) Fees and commissions paid by plan | (g) Nature of service code (see instructions) |
|---|---|---|---|---|---|---|---|
| (1) | | | | Contract administrator | | | 12 |
| (2) | | | | | | | |
| (3) | | | | | | | |
| (4) | | | | | | | |
| (5) | | | | | | | |
| (6) | | | | | | | |
| (7) | | | | | | | |
| (8) | | | | | | | |
| (9) | | | | | | | |
| (10) | | | | | | | |
| (11) | | | | | | | |
| (12) | | | | | | | |
| (13) | | | | | | | |
| (14) | | | | | | | |
| (15) | | | | | | | |
| (16) | | | | | | | |
| (17) | | | | | | | |
| (18) | | | | | | | |
| (19) | | | | | | | |
| (20) | | | | | | | |
| (21) | | | | | | | |
| (22) | | | | | | | |
| (23) | | | | | | | |
| (24) | | | | | | | |
| (25) | | | | | | | |
| (26) | | | | | | | |
| (27) | | | | | | | |
| (28) | | | | | | | |
| (29) | | | | | | | |
| (30) | | | | | | | |
| (31) | | | | | | | |
| (32) | | | | | | | |
| (33) | | | | | | | |
| (34) | | | | | | | |
| (35) | | | | | | | |
| (36) | | | | | | | |
| (37) | | | | | | | |
| (38) | | | | | | | |
| (39) | | | | | | | |
| (40) | | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 5500.    Cat. No. 13515E    Schedule C (Form 5500) 1997

DEF000867

Schedule C (Form 5500) 1997                                                                 Page **2**

**Part II**    Trustee Information    Enter the name and address of all trustees who served during the plan year. If more space is required to supply this information, attach additional Schedules C (Form 5500).

| | |
|---|---|
| Name ...A...NEIL.PAPPALARDO............................ | Name ................................................ |
| Address .MEDICAL.INFORMATION.TECHNOLOGY,.INC., | Address ............................................. |
| .MEDITECH.CIRCLE,.WESTWOOD,.MA.02090........ | |
| Name ................................................ | Name ................................................ |
| Address ............................................. | Address ............................................. |
| Name ................................................ | Name ................................................ |
| Address ............................................. | Address ............................................. |
| Name ................................................ | Name ................................................ |
| Address ............................................. | Address ............................................. |
| Name ................................................ | Name ................................................ |
| Address ............................................. | Address ............................................. |
| Name ................................................ | Name ................................................ |
| Address ............................................. | Address ............................................. |
| Name ................................................ | Name ................................................ |
| Address ............................................. | Address ............................................. |
| Name ................................................ | Name ................................................ |
| Address ............................................. | Address ............................................. |

**Part III**    Termination Information (see instructions)

| (a) Name | (b) EIN | (c) Position | (d) Address | (e) Telephone No. |
|---|---|---|---|---|

**(1)**   Explanation: ..................................................................................

| (a) Name | (b) EIN | (c) Position | (d) Address | (e) Telephone No. |
|---|---|---|---|---|

**(2)**   Explanation: ..................................................................................

| (a) Name | (b) EIN | (c) Position | (d) Address | (e) Telephone No. |
|---|---|---|---|---|

**(3)**   Explanation: ..................................................................................

DEF000868

| SCHEDULE P (Form 5500) | Annual Return of Fiduciary of Employee Benefit Trust | OMB No. 1210-0016 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | ► File as an attachment to Form 5500, 5500-C/R, or 5500-EZ. ► For the Paperwork Reduction Notice, see the Form 5500 instructions. | **1997** This Form Is Open to Public Inspection. |

For trust calendar year 1997 or fiscal year beginning _____, 1997, and ending _____, 19___

**Please type or print**

**1a** Name of trustee or custodian

    A. NEIL PAPPALARDO

**b** Number, street, and room or suite no. (If a P.O. box, see the instructions for Form 5500, 5500-C/R, or 5500-EZ.)

    MEDITECH CIRCLE

**c** City or town, state, and ZIP code

    WESTWOOD        MA        02090

**2a** Name of trust

    MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING TRUST

**b** Trust's employer identification number

    004 : 2455639

**3** Name of plan if different from name of trust

    MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN

**4** Have you furnished the participating employee benefit plan(s) with the trust financial information required to be reported by the plan(s)? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    [X] Yes   ☐ No

**5** Enter the plan sponsor's employer identification number as shown on Form 5500, 5500-C/R, or 5500-EZ . . . . . . . . . . . . . . . . . . . . . ►

Under penalties of perjury, I declare that I have examined this schedule, and to the best of my knowledge and belief it is true, correct, and complete.

Signature of fiduciary ► _____ TRUSTEE   Date ► 6/15/98

## Instructions

*Section references are to the Internal Revenue Code.*

### Purpose of Form

You may use this schedule to satisfy the requirements under section 6033(a) for an annual information return from every section 401(a) organization exempt from tax under section 501(a).

Filing this form will start the running of the statute of limitations under section 6501(a) for any trust described in section 401(a), which is exempt from tax under section 501(a).

### Who May File

1. Every trustee of a trust created as part of an employee benefit plan as described in section 401(a).

2. Every custodian of a custodial account described in section 401(f).

### How To File

File Schedule P (Form 5500) for the trust year ending with or within any participating plan's plan year. Attach it to the Form 5500, 5500-C/R, or 5500-EZ filed by the plan for that plan year. A separately filed Schedule P (Form 5500) will not be accepted.

If the trust or custodial account is used by more than one plan, file one Schedule P (Form 5500). If a plan uses more than one trust or custodial account for its funds, file one Schedule P (Form 5500) for each trust or custodial account.

### Trust's Employer Identification Number

Enter the trust employer identification number (EIN) assigned to the employee benefit trust or custodial account, if one has been issued to you. The trust EIN should be used for

transactions conducted for the trust. If you do not have a trust EIN, enter the EIN you would use on Form 1099-R to report distributions from employee benefit plans and on Form 945 to report withheld amounts of income tax from those payments.

**Note:** *Trustees who do not have an EIN may apply for one on Form SS-4, Application for Employer Identification Number. You must be consistent and use the same EIN for all trust reporting purposes.*

### Signature

The fiduciary (trustee or custodian) must sign this schedule. If there is more than one fiduciary, the fiduciary authorized by the others may sign.

### Other Returns and Forms That May Be Required

● **Form 990-T**—For trusts described in section 401(a), a tax is imposed on income derived from business that is unrelated to the purpose for which the trust received a tax exemption. Report this income and tax on **Form 990-T**, Exempt Organization Business Income Tax Return. (See sections 511 through 514 and the related regulations.)

● **Form 1099-R**—If you made payments or distributions to individual beneficiaries of a plan, report those payments on Form 1099-R. (See the instructions for Forms 1099, 1098, 5498, and W-2G.)

● **Form 945**—If you made payments or distributions to individual beneficiaries of a plan, you may be required to withhold income tax from those payments. Use **Form 945**, Annual Return of Withheld Federal Income Tax, to report taxes withheld from nonpayroll items. (See Circular E, Employer's Tax Guide (Pub. 15), for more information.)

Cat. No. 13504X            Schedule P (Form 5500) 1997

DEF000869

| SCHEDULE G (Form 5500) | | Financial Schedules | | OMB No. 1210-0016 |
|---|---|---|---|---|
| Department of the Treasury Internal Revenue Service | | This schedule may be filed as an attachment to the Annual Return/Report Form 5500 under Section 104 of the Employee Retirement Income Security Act of 1974, referred to as ERISA. | | **1997** |
| Department of Labor Pension and Welfare Benefits Administration | | See the instructions for item 27 of the Form 5500. ► Attach to Form 5500. | | This Form Is Open to Public Inspection |

For calendar plan year 1997 or fiscal plan year beginning                , 1997, and ending                , 19

Name of plan sponsor as shown on line 1a of Form 5500

MEDICAL INFORMATION TECHNOLOGY, INC.

Employer identification number

04 : 2455639

Name of plan

MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN

Three-digit plan number ►   0 : 0 : 1

**Part I**    Schedule of Assets Held for Investment Purposes—See Form 5500, Item 27a.

| (a) | (b) Identity of issue, borrower, lessor, or similar party | (c) Description of investment including maturity date, rate of interest, collateral, par or maturity value | | | (d) Cost | (e) Current value |
|---|---|---|---|---|---|---|
| | | MATURITY DATE | RATE | FACE | | |
| | U.S. TREASURY NOTE | 5/15/98 | 6 1/8 | $525,000 | 524,508 | 525,984 |
| | " " " | 5/31/98 | 6 | 1,900,000 | 1,908,312 | 1,902,375 |
| | " " " | 8/31/98 | 4 3/4 | 2,400,000 | 2,388,750 | 2,385,750 |
| | " " " | 10/15/98 | 7 1/8 | 1,000,000 | 1,000,469 | 1,010,938 |
| | " " " | 4/15/98 | 7 | 475,000 | 478,414 | 482,570 |
| | " " " | 7/15/99 | 6 3/8 | 350,000 | 347,266 | 353,391 |
| | " " " | 10/15/99 | 6 | 1,350,000 | 1,320,258 | 1,356,750 |
| | " " " | 10/15/99 | 6 | 1,100,000 | 1,125,781 | 1,105,500 |
| | " " " | 10/31/98 | 5 7/8 | 700,000 | 701,312 | 700,875 |
| | " " " | 9/30/99 | 5 3/4 | 800,000 | 801,000 | 800,750 |
| | " " " | 3/31/00 | 6 7/8 | 900,000 | 902,812 | 921,937 |
| | " " " | 5/15/00 | 6 3/8 | 650,000 | 650,406 | 659,548 |
| | " " " | 9/30/00 | 6 1/8 | 2,650,000 | 2,674,430 | 2,677,328 |
| | " " " | 12/31/00 | 5 1/2 | 300,000 | 301,641 | 298,219 |
| | " " " | 3/31/01 | 6 3/8 | 800,000 | 800,000 | 815,000 |
| | " " " | 5/31/01 | 6 1/2 | 775,000 | 773,547 | 793,164 |
| | " " " | 11/15/01 | 7 1/2 | 700,000 | 707,875 | 742,219 |
| | " " " | 12/31/01 | 6 1/8 | 1,200,000 | 1,204,125 | 1,215,750 |
| | " " " | 5/15/02 | 7 1/2 | 1,175,000 | 1,257,617 | 1,253,578 |
| | " " " | 8/15/02 | 6 3/8 | 300,000 | 312,891 | 307,594 |
| | " " " | 8/15/02 | 6 3/8 | 350,000 | 337,312 | 358,859 |
| | " " " | 2/15/03 | 6 1/4 | 500,000 | 508,516 | 511,094 |
| | " " " | 2/15/03 | 6 1/4 | 350,000 | 363,398 | 357,766 |
| | " " " | 8/15/03 | 5 3/4 | 1,350,000 | 1,356,539 | 1,350,422 |
| | " " " | 8/15/03 | 5 3/4 | 350,000 | 345,023 | 350,109 |
| | " " " | 8/15/05 | 6 1/2 | 625,000 | 623,242 | 651,953 |
| | " " " | 5/15/05 | 6 1/2 | 400,000 | 402,375 | 416,875 |
| | " " " | 5/15/06 | 6 7/8 | 500,000 | 501,641 | 535,000 |
| | U.S. TREASURY TOTALS | | | 24,475,000 | 24,619,460 | 24,841,298 |
| | | | | | | |
| | MEDICAL INFORMATION TECHNOLOGY, INC. | 1,469,010 shs COMMON STOCK | | | 7,625,771 | 39,366,288 |
| | 223 PLAN PARTICIPANTS | MAT. DATES RANGE 1/98-10/02 | | | | 1,347,950 |
| | | INT. RATE 7.2% – COLLATERAL= | | | | |
| | | 50% VESTED ACCOUNT BALANCE | | | | |
| | | | | | | |
| | TOTAL ASSETS HELD FOR INVESTMENT AT 12-31/97 | | | | | 65,555,536 |

For Paperwork Reduction Act Notice, see the Instructions for Form 5500.      Cat. No. 14739A      Schedule G (Form 5500) 1997

DEF000870

Schedule G (Form 5500) 1997                                                                 Page **2**

**Part II**  Schedule of Assets Held for Investment Purposes That Were Both Acquired And Disposed of Within The Plan Year—See Form 5500, Item 27a.

| (a)<br>Identity of issue, borrower, lessor, or similar party | (b)<br>Description of investment including maturity date, rate of interest, collateral, par or maturity value | (c)<br>Costs of acquisitions | (d)<br>Proceeds of dispositions |
|---|---|---|---|
| 40 PLAN PARTICIPANTS | LOANS @ 7.2% INTEREST<br>$277,300 – BORROWED AND<br>PAID DURING 1997 | 0 | 0 |
| | | | |
| | | | |

**Part III**  Schedule of Loans or Fixed Income Obligations—See Form 5500, Item 27b

| (a) | (b)<br>Identity and address of obligor | (c)<br>Original amount of loan | Amount received during reporting year | | (f)<br>Unpaid balance at end of year | (g)<br>Detailed description of loan including dates of making and maturity, interest rate, the type and value of collateral, any renegotiation of the loan and the terms of the renegotiation and other material items | Amount overdue | |
|---|---|---|---|---|---|---|---|---|
| | | | (d)<br>Principal | (e)<br>Interest | | | (h)<br>Principal | (i)<br>Interest |
| | | | | | | | | |
| | | | | | | | | |

DEF000871

Schedule G (Form 5500) 1997

Page **3**

## Part IV  Schedule of Leases in Default or Classified as Uncollectible—See Form 5500, Item 27c.

| (a) | (b) Identity of lessor/lessee | (c) Relationship to plan, employer, employee organization, or other party-in-interest | (d) Terms and description (type of property, location and date it was purchased, terms regarding rent, taxes, insurance, repairs, expenses, renewal options, date property was leased) | (e) Original cost | (f) Current value at time of lease | (g) Gross rental receipts during the plan year | (h) Expenses paid during the plan year | (i) Net receipts | (j) Amount in arrears |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

## Part V  Schedule of Reportable Transactions—See Form 5500, Line 27d.

| (a) Identity of party involved | (b) Description of asset (include interest rate and maturity in case of a loan) | (c) Purchase price | (d) Selling price | (e) Lease rental | (f) Expense incurred with transaction | (g) Cost of asset | (h) Current value of asset on transaction date | (i) Net gain or (loss) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

DEF000872

Schedule G (Form 5500) 1997

**Part VI**    Schedule of Nonexempt Transactions—See Form 5500, Item 27e.

If a nonexempt prohibited transaction occurred with respect to a disqualified person, file Form 5330 with the IRS to pay the excise tax on the transaction.

| (a) Identity of party involved | (b) Relationship to plan, employer, or other party-in-interest | (c) Description of transactions including maturity date, rate of interest, collateral, par or maturity value | (d) Purchase price | (e) Selling price | (f) Lease rental | (g) Expenses incurred in connection with transaction | (h) Cost of asset | (i) Current value of asset | (j) Net gain or (loss) on each transaction |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**Part VII**    Schedule of Nonexempt Transactions—See Form 5500, Item 27f.

If a nonexempt prohibited transaction occurred with respect to a disqualified person, file Form 5330 with the IRS to pay the excise tax on the transaction.

| (a) Identity of party involved | (b) Relationship to plan, employer, or other party-in-interest | (c) Description of transactions including maturity date, rate of interest, collateral, par or maturity value | (d) Purchase price | (e) Selling price | (f) Lease rental | (g) Expenses incurred in connection with transaction | (h) Cost of asset | (i) Current value of asset | (j) Net gain or (loss) on each transaction |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

DEF000873

| Form **5500**<br>Department of the Treasury<br>Internal Revenue Service<br>Department of Labor<br>Pension and Welfare Benefits<br>Administration<br>Pension Benefit Guaranty Corporation | **Annual Return/Report of Employee Benefit Plan**<br>**(With 100 or more participants)**<br>This form is required to be filed under sections 104 and 4065 of the Employee<br>Retirement Income Security Act of 1974 and sections 6039D, 6047(e), 6057(b),<br>and 6058(a) of the Internal Revenue Code, referred to as the Code.<br>▶ See separate instructions. | OMB Nos. 1210-0016<br>1210-0089<br>**1998**<br>This Form Is Open to<br>Public Inspection. |

**For the calendar plan year 1998 or fiscal plan year beginning** _____ **, 1998, and ending** _____ **, 19** ____

|  |  |
|---|---|
| If A(1) through A(4), B, C, and/or D, do not apply to this year's<br>return/report, leave the boxes unmarked. | **For IRS Use Only**<br>EP-ID |

**A**  This return/report is:  (1) ☐ the first return/report filed for the plan;  (3) ☐ the final return/report filed for the plan; or
(2) ☐ an amended return/report;  (4) ☐ a short plan year return/report (less than 12 months).

**B**  Check here if any information reported in 1a, 2a, 2b, or 5a changed since the last return/report for this plan . . . . . . . . . ▶ ☐

**C**  If your plan year changed since the last return/report, check here . . . . . . . . . . . . . . . . . . ▶ ☐

**D**  If you filed for an extension of time to file this return/report, check here and attach a copy of the extension . . . . ▶ ☐

| **1a**  ***** P10 PK1234 ******************3-DIGIT 020<br><br>    JD 04-2455639 P  001 199812 SC19<br>    MEDICAL INFORMATION TECHNOLOGY INC<br>    MEDITECH CIRCLE<br>    WESTWOOD, MA  02090<br><br>    ‖lll‖‖‖ll‖ll‖ll‖l‖l‖l | I<br>R<br>S | **1b** Employer identification number (EIN)<br>04 : 2455639<br>**1c** Sponsor's telephone number<br>(781) 821-3000<br>**1d** Business code (see instructions, page 20)<br>339900<br>**1e** CUSIP issuer number |

| **2a**  Name and address of plan administrator (if same as plan sponsor, enter "Same")<br><br>        SAME | **2b**  Administrator's EIN<br>04 : 2455639<br><br>**2c**  Administrator's telephone number<br>(781) 821-3000 |

**3**  If the name, address, and EIN of the plan sponsor or plan administrator has changed since the last return/report filed for this plan, enter the information from the last return/report in line 3a and/or line 3b and complete line 3c.

**a**  Sponsor.....................................................  EIN ...................  Plan number ...........

**b**  Administrator..............................................  EIN ..................................

**c**  If line 3a indicates a change in the sponsor's name, address, and EIN, is this a change in sponsorship only? (See line 3c on page 8 of the instructions for the definition of sponsorship.) Enter "Yes" or "No." ▶

**4**  **ENTITY CODE.** (If not shown, enter the applicable code from page 8 of the instructions.) ▶ | A-Single-employer plan

| **5a**  Name of plan ▶ Medical Information Technology, Inc.<br>        Profit Sharing Plan | **5b**  Effective date of plan (mo., day, yr.)<br>12/31/73<br>**5c**  Three-digit<br>plan number ▶  001 |

**All filers must complete 6a through 6d, as applicable.**

**6a** ☐ Welfare benefit plan  **6b** ☒ Pension benefit plan
(Enter the applicable codes from page 8 of the instructions in the boxes.)  | 2 |
2 - Defined Contribution - Profit Sharing

**6c**  Pension plan features. (Enter the applicable pension plan feature codes from page 8 of the instructions in the boxes.)

**6d** ☐ Fringe benefit plan. Attach Schedule F (Form 5500). See instructions.

**Caution:** A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete.
By: _~signature~_

Signature of employer/plan sponsor ▶ Medical Information Technology, Inc. ............ Date ▶ 7/22/99

Type or print name of individual signing above  Barbara A. Manzolillo

Signature of plan administrator ▶ Medical Information Technology, Inc. By: _~signature~_

Type or print name of individual signing above  Barbara A. Manzolillo

**For Paperwork Reduction Act Notice, see the instructions for Form 5500.**  Cat. No. 13500F  Form **5500** (1998)

DEF000874

Form 5500 (1998)      Page **2**

**6e** Check all applicable investment arrangements below (see instructions on page 9):
    *(1)* ☐ Master trust      *(2)* ☐ 103-12 investment entity
    *(3)* ☐ Common/collective trust      *(4)* ☐ Pooled separate account

**f** Single-employer plans enter the tax year end of the employer in which this plan year ends ► Month ..12.. Day .31.. Year .98....
**g** Is any part of this plan funded by an insurance contract described in Code section 412(i)? . . . ☐ Yes  ☒ No
**h** If line 6g is "Yes," was the part subject to the minimum funding standards for either of the prior 2 plan years? . . ☐ Yes  ☐ No

**7** Number of participants as of the end of the plan year (welfare plans complete only lines 7a(4), 7b, 7c, and 7d):

| | | | |
|---|---|---|---|
| **a** Active participants: *(1)* Number fully vested . . . . . . . . . . . . | **a(1)** | 661 | |
| *(2)* Number partially vested . . . . . . . . . | **a(2)** | 552 | |
| *(3)* Number nonvested . . . . . . . . . . . . | **a(3)** | 336 | |
| *(4)* Total . . . . . . . . . . . . . . . . . | **a(4)** | 1549 | |
| **b** Retired or separated participants receiving benefits . . . . . . . . . . . . . . . . . . | **b** | 0 | |
| **c** Retired or separated participants entitled to future benefits . . . . . . . . . . . . . . | **c** | 0 | |
| **d** Subtotal. Add lines 7a(4), 7b, and 7c . . . . . . . . . . . . . . . . . . . . . | **d** | 1549 | |
| **e** Deceased participants whose beneficiaries are receiving or are entitled to receive benefits . . | **e** | 0 | |
| **f** Total. Add lines 7d and 7e . . . . . . . . . . . . . . . . . . . . . . . . . | **f** | 1549 | |
| **g** Number of participants with account balances. (Defined benefit plans do not complete this line item.) . | **g** | 1549 | |
| **h** Number of participants that terminated employment during the plan year with accrued benefits that were less than 100% vested . . . . . . . . . . . . . . . . . . . . . . . . . . | **h** | 125 | |

| | | Yes | No |
|---|---|---|---|
| **i** *(1)* Was any participant(s) separated from service with a deferred vested benefit for which a Schedule SSA (Form 5500) is required to be attached? (See instructions.) . . . . . . . . . . | **I(1)** | | X |
| *(2)* If "Yes," enter the number of separated participants required to be reported ► | | | |

| | | | Yes | No |
|---|---|---|---|---|
| **8a** Was this plan ever amended since its effective date? If "Yes," complete line 8b . . . . . . | **8a** | | X | |
| If the amendment was adopted in this plan year, complete lines 8c through 8e. | | | | |
| **b** If line 8a is "Yes," enter the date the most recent amendment was adopted ►   Month 7   Day 27   Year 98 | | | | |
| **c** Did any amendment during the current plan year result in the retroactive reduction of accrued benefits for any participants? | **c** | | | X |
| **d** During this plan year did any amendment change the information contained in the latest summary plan descriptions or summary description of modifications available at the time of amendment? . . . . . . . . | **d** | | X | |
| **e** If line 8d is "Yes," has a summary plan description or summary description of modifications that reflects the plan amendments referred to on line 8d been furnished to participants? (see instructions) . . . . . . | **e** | | X | |
| **9a** Was this plan terminated during this plan year or any prior plan year? If "Yes," enter the year ►.................... | **9a** | | | X |
| **b** Were all the plan assets either distributed to participants or beneficiaries, transferred to another plan, or brought under the control of PBGC? (see instructions.) . . . . . . . . . . . . . . . . . . . | **b** | | N/A | |
| **c** Was a resolution to terminate this plan adopted during this plan year or any prior plan year? . . . | **c** | | | X |
| **d** If line 9a or line 9c is "Yes," have you received a favorable determination letter from the IRS for the termination? | **d** | | | |
| **e** If line 9d is "No," has a determination letter been requested from the IRS? . . . . . . . . | **e** | | | |
| **f** If line 9a or line 9c is "Yes," have participants and beneficiaries been notified of the termination or the proposed termination? | **f** | | | |
| **g** If line 8a is "Yes" and the plan is covered by PBGC, is the plan continuing to file a PBGC Form 1 and pay premiums until the end of the plan year in which assets are distributed or brought under the control of PBGC? . . . | **g** | | | |
| **h** During this plan year, did any trust assets revert to the employer for which the Code section 4980 excise tax is due? | **h** | | | X |
| **i** If line 9h is "Yes," enter the amount of tax paid with Form 5330 ► $ | | | | |

| | | Yes | No |
|---|---|---|---|
| **10a** In this plan year, was this plan merged or consolidated into another plan(s), or were assets or liabilities transferred to another plan(s)? If "Yes," complete lines 10b through 10e . . . . . . . . . . . . . . . . ☐ Yes ☒ No | | | |

If "Yes," identify the other plan(s)     **c** Employer identification number(s)     **d** Plan number(s)
**b** Name of plan(s) ►

| | Yes | No |
|---|---|---|
| **e** If required, has a Form 5310-A been filed? . . . . . . . . . . . . . . ► ☐ Yes ☐ No | | |

**11** Enter the plan funding arrangement code from page 10 of the instructions . . . . . . ► 1      **12** Enter the plan benefit arrangement code from page 10 of the instructions ► 1

| | | Yes | No |
|---|---|---|---|
| **13a** Is this a plan established or maintained pursuant to one or more collective bargaining agreements? . . . . | **13a** | | X |
| **b** If line 13a is "Yes," enter the appropriate six-digit LM number(s) of the sponsoring labor organization(s) (see instructions): | | | |
| *(1)*      *(2)*      *(3)* | | | |

**14** If any benefits are provided by an insurance company, insurance service, or similar organization, enter the number of **Schedules A (Form 5500)**, Insurance Information, attached. If none, enter "-0-." ► 0

DEF000875

Form 5500 (1998)                                                                                    Page **3**

**Welfare Plans Do Not Complete Lines 15 Through 24. Go To Line 25 On Page 4.**

|  |  |  | Yes | No |
|---|---|---|---|---|
| **15a** | If this is a defined benefit plan subject to the minimum funding standards for this plan year, is **Schedule B** (Form 5500) required to be attached? (If this is a defined contribution plan leave blank.) N/A (Defined Plan) . . . . | **15a** | | |
| **b** | If this is a defined contribution plan (i.e., money purchase or target benefit), is it subject to the minimum funding standards? (If a waiver was granted, see instructions.) (If this is a defined benefit plan, leave blank.) . . . . . . . . . | **b** | | X |
| | If "Yes," complete (1), (2), and (3) below: | | | |
| | (1)  Amount of employer contribution required for the plan year under Code section 412 | **b(1)** $ | | |
| | (2)  Amount of contribution paid by the employer for the plan year. . . . . . . | **b(2)** $ | | |
| |      Enter date of last payment by employer ▶ Month......... Day....... Year...... | | | |
| | (3)  If (1) is greater than (2), subtract (2) from (1) and enter the funding deficiency here; otherwise, enter -0-. (If you have a funding deficiency, file Form 5330.) | **b(3)** $ | | |
| **16** | Has the annual compensation of each participant taken into account under the current plan year been limited as required by section 401(a)(17)? (See instructions.) . . . . . . . . . . . . . . . . . . | **16** | X | |
| **17a** (1) | Did the plan distribute any annuity contracts this year? (See instructions.) No such distribution . | **a(1)** | | X |
| (2) | If (1) is "Yes," did these contracts contain a requirement that the spouse consent before any distributions under the contract are made in a form other than a qualified joint and survivor annuity? . . . . . . . . | **a(2)** | | |
| **b** | Did the plan make distributions or loans to married participants and beneficiaries without the required consent of the participant's spouse? . . . . . . . . . . . . . . . . . . . . . . | **b** | | X |
| **c** | Upon plan amendment or termination, do the accrued benefits of every participant include the subsidized benefits that the participant may become entitled to receive subsequent to the plan amendment or termination? . . . . . . | **c** | X | |
| **18** | Is the plan administrator making an election under section 412(c)(8) for an amendment adopted after the end of the plan year? (See instructions.) . . . . . . . . . . . . . . . . . . . . . . . | **18** | | X |
| **19** | If a change in the actuarial funding method was made for the plan year pursuant to a Revenue Procedure providing automatic approval for the change, indicate whether the plan sponsor agrees to the change . N/A . . . . | **19** | | |
| **20** | Is the employer electing to compute minimum funding for the plan year using the Transition rule of Code section 412(l)(11)?N/A | **20** | | |
| **21** | Check if you are applying the substantiation guidelines from Revenue Procedure 93-42, in completing lines 21a through 21o (see instructions) . . . . . . . . . . . . . . . . . . . . ☐ | | | |
| | If you checked the box, enter the first day of the plan year for which data is being submitted ▶ Month ........Day .......Year ....... | | | |
| **a** | Does the employer apply the separate line of business rules of Code section 414(r) when testing this plan for the coverage and discrimination tests of Code sections 410(b) and 401(a)(4)? . . . . . . . . . . . . | **21a** | | X |
| **b** | If line 21a is "Yes," enter the total number of separate lines of business claimed by the employer ▶ ................... If more than one separate line of business, see instructions for additional information to attach. | | | |
| **c** | Does the employer apply the mandatory disaggregation rules under Income Tax Regulations section 1.410(b)-7(c)? If "Yes," see instructions for additional information to attach. | **c** | | X |
| **d** | In testing whether this plan satisfies the coverage and discrimination tests of Code sections 410(b) and 401(a), does the employer aggregate plans? Only one plan . . . . . . . . . . . . . . . . . | **d** | | X |
| **e** | Does the employer restructure the plan into component plans to satisfy the coverage and discrimination tests of Code sections 410(b) and 401(a)(4)? . . . . . . . . . . . . . . . . . . . . . | **e** | | X |
| **f** | If you meet either of the following exceptions, check the applicable box to tell us which exception you meet and do NOT complete the rest of question 21: | | | |
| | (1)  ☐  No highly compensated employee benefited under the plan at any time during the plan year; | | | |
| | (2)  ☐  This is a collectively bargained plan that benefits only collectively bargained employees, no more than 2% of whom are professional employees. | | | |
| **g** | Did any leased employee perform services for the employer at any time during the plan year? No such employee | **g** | | X |
| | | | **Number** | |
| **h** | Enter the total number of employees of the employer. Employer includes entities aggregated with the employer under Code section 414(b), (c), or (m). Include leased employees and self-employed individuals . . . . . . . . | **h** | 1918 | |
| **i** | Enter the total number of employees excludable because of: (1) failure to meet requirements for minimum age and years of service; (2) collectively bargained employees; (3) nonresident aliens who receive no earned income from U.S. sources; and (4) 500 hours of service/last day rule . . . . . . . . . . . . . . . . . | **i** | 369 | |
| **j** | Enter the number of nonexcludable employees. Subtract line 21i from line 21h . . . . . . . . . . | **j** | 1549 | |
| **k** | Do 100% of the nonexcludable employees entered on line 21j benefit under the plan? . . . ☒ Yes ☐ No If line 21k is "Yes," do NOT complete lines 21l through 21o. | | | |
| **l** | Enter the number of nonexcludable employees (line 21j) who are highly compensated employees . . . . . | **l** | | |
| **m** | Enter the number of nonexcludable employees (line 21j) who benefit under the plan . . . . . . . . | **m** | | |
| **n** | Enter the number of employees entered on line 21m who are highly compensated employees . . . . . . | **n** | | |
| **o** | This plan satisfies the coverage requirements on the basis of (check one): | | | |
| | (1) ☐  The average benefits test    (2) ☐  The ratio percentage test—Enter percentage ▶ [        .        ]% | | | |

DEF000876

Form 5500 (1998)    Page **4**

**Welfare Plans Go To Line 25 On This Page.**

|  |  |  | Yes | No |
|---|---|---|---|---|
| **22a** | Is it or was it ever intended that this plan qualify under Code section 401(a)? If "Yes," complete lines 22b and 22c. | **22a** | X | |
| b | Enter the date of the most recent IRS determination letter . . . . . . . . ▶ Month 11 Year 98 | | | |
| c | Is a determination letter request pending with the IRS? . . . . . . . . . . . . . | **c** | | X |
| **23a** | Does the plan hold any assets that have a fair market value that is not readily determinable on an established market? (If "Yes," complete line 23b) (See instructions) | **23a** | X | |
| b | Were all the assets referred to in line 23a valued for the 1998 plan year by an independent third-party appraiser? . | **b** | | X |
| c | If line 23b is "No," enter the value of the assets that were not valued by an independent third-party appraiser for the 1998 plan year. ▶ 44,153,945.00 | | | |
| d | Enter the most recent date the assets on line 23c were valued by an independent third-party appraiser. (If more than one asset, see instructions.) ▶ Month .........Day .........Year.......  N/A = Not required (If this plan does not have ESOP features leave line 23e blank and go to line 24.) | | | |
| e | If dividends paid on employer securities held by the ESOP were used to make payments on ESOP loans, enter the amount of the dividends used to make the payments . . . **23e** | N/A | | |
| **24** | Does the employer/sponsor listed on line **1a** of this form maintain other qualified pension benefit plans? . . . . . If "Yes," enter the total number of plans, including this plan ▶ | **24** | | X |
| **25a** | Did any person who rendered services to the plan receive directly or indirectly $5,000 or more in compensation from the plan during the plan year (except for employees of the plan who were paid less than $1,000 in each month)? . . If "Yes," complete Part I of **Schedule C** (Form 5500). | **25a** | | X |
| b | Did the plan have any trustees who must be listed in Part II of **Schedule C** (Form 5500)? . . . . . . . . | **b** | X | |
| c | Has there been a termination in the appointment of any person listed on line 25d above? . . . . . . . | **c** | | X |
| d | If line 25c is "Yes," check the appropriate box(es), answer lines 25e and 25f, and complete Part III of **Schedule C** (Form 5500): (1) ☐ Accountant    (2) ☐ Enrolled actuary    (3) ☐ Insurance carrier    (4) ☐ Custodian (5) ☐ Administrator    (6) ☐ Investment manager    (7) ☐ Trustee | | | |
| e | Have there been any outstanding material disputes or matters of disagreement concerning the above termination? . | **e** | | |
| f | If an accountant or enrolled actuary has been terminated during the plan year, has the terminated accountant/actuary been provided a copy of the explanation required by Part III of **Schedule C** (Form 5500) with a notice advising them of their opportunity to submit comments on the explanation directly to the DOL? . . . . . . . . . . . | **f** | | |
| g | Enter the number of **Schedules C** (Form 5500) that are attached. If none, enter -0- ▶  1 | | | |
| **26a** | Is this plan exempt from the requirement to engage an independent qualified public accountant? (see instructions). | **26a** | | X |
| b | If line 26a is "No," attach the accountant's opinion to this return/report and check the appropriate box. This opinion is: (1) ☐ Unqualified (2) ☐ Qualified/disclaimer per Department of Labor Regulations 29 CFR 2520.103-8 and/or 2520.103-12(d) (3) ☐ Qualified/disclaimer other    (4) ☐ Adverse    (5) ☒ Other (explain) Subject to Accountant's comments with respect to valuation of Employer's Securities | | | |
| c | If line 26a is "No," does the accountant's report, including the financial statements and/or notes required to be attached to this return/report disclose (1) errors or irregularities; (2) illegal acts; (3) material internal control weaknesses; (4) a loss contingency indicating that assets are impaired or a liability incurred; (5) significant real estate or other transactions in which the plan and (A) the sponsor, (B) the plan administrator, (C) the employer(s), or (D) the employee organization(s) are jointly involved; (6) that the plan has participated in any related party transactions; or (7) any unusual or infrequent events or transactions occurring subsequent to the plan year end that might significantly affect the usefulness of the financial statements in assessing the plan's present or future ability to pay benefits? | **c** | | X |
| d | If line 26c is "Yes," provide the total amount involved in such disclosure ▶ | | | |
| **27** | If line 26a is "No," complete the following questions. (You may NOT use "N/A" in response to lines 27a through 27i): If line 27a, 27b, 27c, 27d, 27e, or 27f is checked "Yes," schedules of these items in the format set forth in the instructions are required to be attached to this return/report. **Schedule G** (Form 5500) may be used as specified in the instructions. During the plan year: | | | |
| a | Did the plan have assets held for investment? . . . . . . . . . . . . . . . . . . | **27a** | X | |
| b | Were any loans by the plan or fixed income obligations due in default as of the close of the plan year or classified during the year as uncollectible? . . . . . . . . . . . . . . . . . . . . . . | **b** | | X |
| c | Were any leases to which the plan was a party in default or classified during the year as uncollectible? . . . . | **c** | | X |
| d | Were any plan transactions or series of transactions in excess of 5% of the current value of plan assets? . . . | **d** | X | |
| e | Do the notes to the financial statements accompanying the accountant's opinion disclose any nonexempt transactions with parties-in-interest? . . . . . . . . . . . . . . . . . . . . . . . | **e** | | X |
| f | Did the plan engage in any nonexempt transactions with parties-in-interest not reported on line 27e? . . . . . | **f** | | X |
| g | Did the plan hold qualifying employer securities that are not publicly traded? . . . . . . . . . . | **g** | X | |
| h | Did the plan purchase or receive any nonpublicly traded securities that were not appraised in writing by an unrelated third party within 3 months prior to their receipt? . . . . . . . . . . . . . . . . | **h** | X | |
| i | Did any person manage plan assets who had a financial interest worth more than 10% in any party providing services to the plan or receive anything of value from any party providing services to the plan? . . . . . . | **i** | | X |

DEF000877

Form 5500 (1998)                                                                          Page **5**

| | | | | Yes | No |
|---|---|---|---|---|---|
| 28 | Did the plan acquire individual whole life insurance contracts during the plan year? . . . . . . . . . . | | 28 | | X |
| 29 | During the plan year: | | | | |
| a | (1) | Was this plan covered by a fidelity bond? If "Yes," complete lines 29a(2) and 29a(3) . . . . . . . | 29a(1) | X | |
| | (2) | Enter amount of bond ► $ 500,000 | | | |
| | (3) | Enter the name of the surety company ►  Federal Insurance Company | | | |
| b | (1) | Was there any loss to the plan, whether or not reimbursed, caused by fraud or dishonesty? . . . . | 29b(1) | | X |
| | (2) | If line 29b(1) is "Yes," enter amount of loss ► $ | | | |

**30a** Is the plan covered under the Pension Benefit Guaranty Corporation termination insurance program?

   ☐ Yes   ☒ No   ☐ Not determined

**b** If line 30a is "Yes" or "Not determined," enter the employer identification number and the plan number used to identify it.
Employer identification number ►        Plan number ►

**31** Current value of plan assets and liabilities at the beginning and end of the plan year. Combine the value of plan assets held in more than one trust. Allocate the value of the plan's interest in a commingled trust containing the assets of more than one plan on a line-by-line basis unless the trust meets one of the specific exceptions described in the instructions. Do not enter the value of that portion of an insurance contract that guarantees, during this plan year, to pay a specific dollar benefit at a future date. **Round off amounts to the nearest dollar; any other amounts are subject to rejection. Plans with no assets at the beginning and the end of the plan year, enter -0- on line 31f.**

## Assets

| | | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|---|
| a | Total noninterest-bearing cash . . . . . . . . . . . . . . . | a | 190 | 62 |
| b | Receivables: (1) Employer contributions . . . . . . . . . . | b(1) | 0 | 0 |
| | (2) Participant contributions . . . . . . . . . . . . . . | (2) | 0 | 0 |
| | (3) Income  . .  Accrued Interest . . . . . . . . . | (3) | 326,221 | 364,650 |
| | (4) Other . . . . . . . . . . . . . . . . . . . . . | (4) | 0 | 0 |
| | (5) Less allowance for doubtful accounts . . . . . . . . | (5) | 0 | 0 |
| | (6) Total. Add lines 31b(1) through 31b(4) and subtract line 31b(5) . . ► | (6) | 326,221 | 364,650 |
| c | General Investments: (1) Interest-bearing cash (including money market funds) . . | c(1) | 81,914 | 106,107 |
| | (2) Certificates of deposit . . . . . . . . . . . . . . | (2) | 0 | 0 |
| | (3) U.S. Government securities . . . . . . . . . . . . | (3) | 24,841,298 | 26,161,437 |
| | (4) Corporate debt instruments: (A) Preferred . . . . . . | (4)(A) | 0 | 0 |
| | (B) All other . . . . . . . . . . . . . . . . . . | (4)(B) | 0 | 0 |
| | (5) Corporate stocks: (A) Preferred . . . . . . . . . . | (5)(A) | 0 | 0 |
| | (B) Common . . . . . . . . . . . . . . . . . . | (5)(B) | 0 | 0 |
| | (6) Partnership/joint venture interests . . . . . . . . . | (6) | 0 | 0 |
| | (7) Real estate: (A) Income-producing . . . . . . . . . | (7)(A) | 0 | 0 |
| | (B) Nonincome-producing . . . . . . . . . . . . | (7)(B) | 0 | 0 |
| | (8) Loans (other than to participants) secured by mortgages: (A) Residential | (8)(A) | 0 | 0 |
| | (B) Commercial . . . . . . . . . . . . . . . . | (8)(B) | 0 | 0 |
| | (9) Loans to participants: (A) Mortgages . . . . . . . . | (9)(A) | 0 | 0 |
| | (B) Other . . . . . . . . . . . . . . . . . . . | (9)(B) | 1,347,950 | 1,236,900 |
| | (10) Other loans . . . . . . . . . . . . . . . . . . | (10) | 0 | 0 |
| | (11) Value of interest in common/collective trusts . . . . . | (11) | 0 | 0 |
| | (12) Value of interest in pooled separate accounts . . . . . | (12) | 0 | 0 |
| | (13) Value of interest in master trusts . . . . . . . . . | (13) | 0 | 0 |
| | (14) Value of interest in 103-12 investment entities . . . . | (14) | 0 | 0 |
| | (15) Value of interest in registered investment companies . . | (15) | 0 | 0 |
| | (16) Value of funds held in insurance company general account (unallocated contracts) . | (16) | 0 | 0 |
| | (17) Other . . . . . . . . . . . . . . . . . . . . | (17) | 0 | 0 |
| | (18) Total. Add lines 31c(1) through 31c(17) . . . . . ► | (18) | 26,271,162 | 27,504,444 |
| d | Employer-related investments: (1) Employer securities  Common stock . | d(1) | 39,366,288 | 44,153,945 |
| | (2) Employer real property . . . . . . . . . . . . . | (2) | 0 | 0 |
| e | Buildings and other property used in plan operation . . . . . | e | 0 | 0 |
| f | Total assets. Add lines 31a, 31b(6), 31c(18), 31d(1), 31d(2), and 31e . . ► | f | 65,963,861 | 72,023,101 |

## Liabilities

| | | | | |
|---|---|---|---|---|
| g | Benefit claims payable . . . . . . . . . . . . . . . . | g | 0 | 0 |
| h | Operating payables . . . . . . . . . . . . . . . . . | h | 0 | 0 |
| i | Acquisition indebtedness . . . . . . . . . . . . . . . | i | 0 | 0 |
| j | Other liabilities . . . . . . . . . . . . . . . . . . | j | 0 | 0 |
| k | Total liabilities. Add lines 31g through 31j . . . . . . ► | k | 0 | 0 |

## Net Assets

| | | | | |
|---|---|---|---|---|
| l | Subtract line 31k from line 31f . . . . . . . . . . ► | l | 65,963,861 | 72,023,101 |

DEF000878

Form 5500 (1998)                                                                                     Page **6**

**32** Plan income, expenses, and changes in net assets for the plan year. Include all income and expenses of the plan, including any trust(s) or separately maintained fund(s), and any payments/receipts to/from insurance carriers. Round off amounts to the nearest dollar; any other amounts are subject to rejection.

| | | | (a) Amount | (b) Total |
|---|---|---|---|---|
| **Income** | | | | |
| a | **Contributions:** | | | |
| (1) | Received or receivable from: | | | |
| | (A) Employers | a(1)(A) | 3,500,000 | |
| | (B) Participants | (B) | 0 | |
| | (C) Others | (C) | 0 | |
| (2) | Noncash contributions | (2) | 0 | |
| (3) | Total contributions. Add lines 32a(1)(A), (B), (C) and line 32a(2) ▶ | (3) | | 3,500,000 |
| b | **Earnings on investments:** | | | |
| (1) | Interest | | | |
| | (A) Interest-bearing cash (including money market funds) | b(1)(A) | 9,419 | |
| | (B) Certificates of deposit | (B) | 19,051 | |
| | (C) U.S. Government securities | (C) | 1,393,121 | |
| | (D) Corporate debt instruments | (D) | | |
| | (E) Mortgage loans | (E) | | |
| | (F) Other loans   On Participant Loans | (F) | 100,382 | |
| | (G) Other interest | (G) | | |
| | (H) Total interest. Add lines 32b(1)(A) through (G) ▶ | (H) | | 1,521,973 |
| (2) | Dividends: (A) Preferred stock | b(2)(A) | | |
| | (B) Common stock   Employer's Common Stock | (B) | 2,805,490 | |
| | (C) Total dividends. Add lines 32b(2)(A) and (B) ▶ | (C) | | 2,805,490 |
| (3) | Rents | (3) | | 0 |
| (4) | Net gain (loss) on sale of assets: (A) Aggregate proceeds | (4)(A) | 0 | |
| | (B) Aggregate carrying amount (see instructions) | (B) | 0 | |
| | (C) Subtract (B) from (A) and enter result | (C) | | 0 |
| (5) | Unrealized appreciation (depreciation) of assets | (5) | | 3,009,342 |
| (6) | Net investment gain (loss) from common/collective trusts | (6) | | 0 |
| (7) | Net investment gain (loss) from pooled separate accounts | (7) | | 0 |
| (8) | Net investment gain (loss) from master trusts | (8) | | 0 |
| (9) | Net investment gain (loss) from 103-12 investment entities | (9) | | 0 |
| (10) | Net investment gain (loss) from registered investment companies | (10) | | 0 |
| c | Other income | c | | 0 |
| d | Total income. Add all amounts in column (b) and enter total ▶ | d | | 10,836,805 |
| | **Expenses** | | | |
| e | Benefit payment and payments to provide benefits: | | | |
| (1) | Directly to participants or beneficiaries | e(1) | 4,777,565 | |
| (2) | To insurance carriers for the provision of benefits | (2) | 0 | |
| (3) | Other | (3) | 0 | |
| (4) | Total payments. Add lines 32e(1) through 32e(3) ▶ | (4) | | 4,777,565 |
| f | Interest expense | f | | 0 |
| g | Administrative expenses: (1) Salaries and allowances | g(1) | 0 | |
| (2) | Accounting fees | (2) | 0 | |
| (3) | Actuarial fees | (3) | 0 | |
| (4) | Contract administrator fees | (4) | 0 | |
| (5) | Investment advisory and management fees | (5) | 0 | |
| (6) | Legal fees | (6) | 0 | |
| (7) | Valuation/appraisal fees | (7) | 0 | |
| (8) | Trustees fees/expenses (including travel, seminars, meetings, etc.) | (8) | 0 | |
| (9) | Other | (9) | 0 | |
| (10) | Total administrative expenses. Add lines 32g(1) through 32g(9) | (10) | | 0 |
| h | Total expenses. Add lines 32e(4), 32f, and 32g(10) ▶ | h | | 4,777,565 |
| i | Net income (loss). Subtract line 32h from line 32d | i | | 6,059,240 |
| j | Transfers to (from) the plan (see instructions) | j | | 0 |
| k | Net assets at beginning of year (line 31f, column (a)) | k | | 65,963,861 |
| l | Net assets at end of year (line 31f, column (b)) ▶ | l | | 72,023,101 |

| | | Yes | No |
|---|---|---|---|
| **33** | Did any employer sponsoring the plan pay any of the administrative expenses of the plan that were not reported on line 32g? | | X |

DEF000879

**EXHIBIT 14**

MEDICAL INFORMATION TECHNOLOGY, INC.

STATEMENT OF STOCK OWNERSHIP

September 26, 2003



The shares represented by this statement have not been registered under the Securities Act of 1933 and may not be transferred except pursuant to an effective registration or exemption from registration, under said Act. Furthermore, these shares are subject to restrictions on transfer, a copy of which will be furnished by the Company to the shareholder upon written request and without charge.

| Shareholder | A. Neil Pappalardo |
| --- | --- |
| Address | 10 Rowes Wharf, Boston, MA 02110 |
| Tax Id # | 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 |

| Date of Transaction | # of Shares | Share Price | Amount Bought | Amount Sold | Transaction Description |
| --- | --- | --- | --- | --- | --- |
| 1969 07 30 | 2,161 | 2.00 | $4,322.00 | | From MEDITECH |
| 1972 11 21 | 105,889 | | | | 50 for 1 split |
| 1978 11 01 | (2,000) | 5.475 | | $10,950.00 | To EG&G, Inc |
| 1981 11 02 | (429) | 15.00 | | $6,435.00 | To Curtis W. Marble |
| 1983 05 11 | 211,242 | | | | 3 for 1 Stock Split |
| 1986 05 12 | 316,863 | | | | 2 for 1 Stock Split |
| 1989 03 13 | 633,726 | | | | 2 for 1 Stock Split |
| 1990 06 26 | 135,000 | 28.00 | $3,780,000.00 | | From EG&G, Inc. |
| 1993 11 09 | 2,804,904 | | | | 3 for 1 Stock Split |
| 1995 12 12 | 75,000 | 20.00 | $1,500,000.00 | | From EG&G, Inc. |
| 1995 12 13 | (25,000) | 20.00 | | $500,000.00 | To Howard Messing |
| 1995 12 13 | (25,000) | 20.00 | | $500,000.00 | To L.P. Dan Valente |
| 1996 12 20 | 80,400 | 24.00 | $1,929,600.00 | | From MEDITECH (Treasury Shares) |
| 1996 12 30 | (10,000) | 24.00 | | $240,000.00 | To Christopher J. Anschuetz |
| 1996 12 30 | (7,350) | 24.00 | | $176,400.00 | To Robert G. Gale |
| 1996 12 30 | (18,000) | 24.00 | | $432,000.00 | To Joanne Wood |
| 1996 12 30 | (6,000) | 24.00 | | $144,000.00 | To Howard Messing |
| 1998 02 27 | 56,944 | 27.00 | $1,537,488.00 | | From MEDITECH |
| 1998 02 27 | (3,000) | 27.00 | | $81,000.00 | To Christopher J Anschuetz |
| 1998 02 27 | (10,750) | 27.00 | | $290,250.00 | To Stuart N. Lefthes |
| 1998 02 27 | (14,600) | 27.00 | | $394,200.00 | To Steven B. Koretz |
| 1999 02 26 | 75,000 | 29.00 | $2,175,000.00 | | From MEDITECH |
| 1999 02 26 | (10,000) | 29.00 | | $290,000.00 | To Howard Messing |
| 1999 02 26 | (5,000) | 29.00 | | $145,000.00 | To Joanne Wood |
| 1999 02 26 | (10,000) | 29.00 | | $290,000.00 | To Steven B. Koretz |
| 1999 02 26 | (10,000) | 29.00 | | $290,000.00 | To Stuart N. Lefthes |
| 1999 05 28 | (5,000) | 29.00 | | $145,000.00 | To Scott M. Radner |
| 2000 02 29 | 60,000 | 32.00 | $1,920,000.00 | | From MEDITECH |
| 2000 03 24 | (1,000) | 32.00 | | $32,000.00 | To Christopher J. Anschuetz |
| 2000 03 24 | (5,000) | 32.00 | | $160,000.00 | To Linda G. Byrnes |
| 2000 03 24 | (5,000) | 32.00 | | $160,000.00 | To Kathleen M. LeBlanc |
| 2000 03 24 | (4,000) | 32.00 | | $128,000.00 | To Thomas R. Newman |
| 2000 03 24 | (5,000) | 32.00 | | $160,000.00 | To Michelle I. O'Connor |

Confidential - Subject
to Protective Order

M0000150

DEF011655
Confidential/Attorneys - Subject to Protective Order

- Page 2 -

| Date of Transaction | # of Shares | Share Price | Amount Bought | Amount Sold | Transaction Description |
|---|---|---|---|---|---|
| 2000 03 24 | (5,000) | 32.00 | | $160,000.00 | To Helen M. Waters |
| 2001 02 28 | 60,000 | 34.00 | $2,040,000.00 | | From MEDITECH |
| 2001 03 15 | (5,000) | 34.00 | | $170,000.00 | To Richard Michael Belkner |
| 2001 03 15 | (5,000) | 34.00 | | $170,000.00 | To Donald R. Branca |
| 2001 03 15 | (5,000) | 34.00 | | $170,000.00 | To C. Michael Manolagas |
| 2001 03 15 | (5,000) | 34.00 | | $170,000.00 | To James W. Merlin |
| 2001 03 15 | (5,000) | 34.00 | | $170,000.00 | To Hoda Sayed-Friel |
| 2001 03 15 | (5,000) | 34.00 | | $170,000.00 | To Kenneth P. Jasper |
| 2001 05 08 | 4,400,000 | | | | 2 for 1 Split |
| 2002 02 27 | 50,000 | 19.00 | $950,000.00 | | From MEDITECH |
| 2003 02 28 | 50,000 | 22.00 | $1,100,000.00 | | From MEDITECH |
| 2003 02 28 | 2,500 | 22.00 | $55,000.00 | | From MEDITECH |
| 2003 02 28 | (2,500) | 22.00 | | $55,000.00 | To Allan S Bufferd |
| Total | 8,900,000 | | $16,991,410.00 | $5,810,235.00 | |

Confidential - Subject
to Protective Order

M0000151

DEF011656
Confidential/Attorneys - Subject to Protective Order

**EXHIBIT 15**

# MEDITECH

Medical Information Technology, Inc.  MEDITECH Circle, Westwood, Massachusetts 02090  (781) 821-3000 Fax (781) 329-9977

April 15, 1998

SS# 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
D.O.H. 11/10/75
D.O.T. ~~04/13/98~~ *NOT YET DETERMINED*

David W. Hinchliffe
13 Newsome Pk
Jamaica Plain, MA   02130

Dear Dave,

In conjunction with the contemplated lump-sum distribution of your vested account balance of $1,101,907.57 (plus interest) by the Profit Sharing Trust please provide us with the enclosed **Benefit Election Form** and W4-P and M4-P tax withholding certificates within 30 days (by May 15, 1998).

A summary of your options is as follows:

 I) A **Trustee-to-Trustee distribution made payable directly to a qualified plan or IRA:** Such a transfer will assure the tax-free status of your total eligible rollover. You must provide us with the name and address of said trustee together with a statement from such plan that it is a qualified section 401(a) or 403(a) or 403(b) plan willing to accept your rollover, otherwise, we are obligated to deduct 20% Federal and 5.95% Mass income tax withholding (total 25.95%) from your distribution.

 II) A **Trust distribution made Payable Directly to You:** You receive your vested balance less the 25.95% income taxes we are required to withhold.  You have 60 days from date of receipt of this distribution to roll it over tax-free but you must provide the 25.95% deducted from your own personal funds.  If you are unable to do so any portion of your vested balance not rolled over becomes taxable income to you that year and is subject to early withdrawal penalties as well. Consequently, it is strongly advised that you plan for your retirement fund accordingly.

III) A **Divided Distribution if your vested balance is $500.00 or more:** You may roll over a specified portion to a qualified plan or an IRA (See Option #I) and have the remainder made payable directly to you, subject to the 25.95% income tax withholding on the latter portion (See Option #II).

If we have not received your **Benefit Election Form** and W4-P and M4-P tax withholding certificates by May 15, 1998 we will distribute your vested balance as summarized under Option II.

**\*\*This is a qualified plan.  All distributions are 100% taxable funds.\*\***

For a more detailed explanation of your alternatives, see the attached "NOTICE OF ROLLOVER TREATMENT INCOME TAX WITHHOLDING AND OTHER SPECIAL FEDERAL INCOME TAX TREATMENT".

Sincerely,
Medical Information Technology, Inc.

Barbara A. Manzolillo
Chief Financial Officer and Treasurer
Plan Administrator

DEF001054
Confidential-Subject
to Protective Order

**EXHIBIT 16**

# MEDITECH

Medical Information Technology, Inc.    MEDITECH Circle, Westwood, Massachusetts 02090 · (781) 821-3000  FAX (781) 821-2199

January 30, 2004

Dear

We are pleased to announce the total 2003 cash bonus is $16,500,000. This amount is being distributed to all year-end employees as individual amounts approximating 4.0% of their W-2 compensation for the past five calendar years.

MEDITECH uses a variety of methods to reward the efforts of its employees. We are furnishing below a summary of the various components that make up your MEDITECH compensation.

**Cash Compensation:**

| | |
|---|---|
| Current Annual Salary | $204,000.00 |
| 2003 Cash Bonus Paid on January 30, 2004 | $23,965.00 |

**MEDITECH Profit Sharing Trust:**

| | |
|---|---|
| Your Account Balance at December 31, 2002 | $1,213,611.15 |
| 2003 In-Service Distribution | ($213,611.15) |
| 2003 Share of Income and Revaluation | $235,142.49 |
| 2003 Share of Contribution and Forfeitures | $4,255.03 |
| Your Account Balance at December 31, 2003 | $1,239,397.52 |

Your Date of Hire was 06/05/1975. You are 100% vested in the MEDITECH Profit Sharing Trust.

**MEDITECH Stock:**

| | |
|---|---|
| Value of 200,000 shares at $26.00 per share | $5,200,000.00 |
| 2004 Estimated Dividends at $1.80 per share | $360,000.00 |

You will be entitled to purchase up to 5000 shares of MEDITECH's stock later this quarter.

Please refer to the MEDITECH Intranet for all company related year-end documents and Stock Purchase Instructions.

In addition to the above you receive paid holidays, vacation time and various group-type fringe benefits which include medical, dental, disability and life insurance coverage.

The above amounts represent conditions as they exist at the present time. Your contribution to the company's growth and success is greatly appreciated and we seek your continued dedication in the future. As a consequence, your participation in the company's future prosperity should continue to escalate.

With warmest personal regards,

MEDICAL INFORMATION TECHNOLOGY, INC.

A. Neil Pappalardo, Chairman & CEO

DEF001372
Confidential-Subject
to Protective Order

**EXHIBIT 17**

**REPORT TO THE BOARD OF DIRECTORS**

**QUARTER ENDED SEPTEMBER 30, 1996**

**BOARD OF DIRECTORS MEETING**

**OCTOBER 28, 1996**

**MEDICAL INFORMATION TECHNOLOGY, INC.**

–1–



EXHIBIT 19-A
WIT: Pasqu
DATE: 10/17/07
Victoria S. Reade

DEF006858
Confidential/Attorneys-
Subject to Protective Order

## TABLE OF CONTENTS

I.  AGENDA

II.  MINUTES OF THE JULY 22, 1996 DIRECTORS MEETING

III..  CHAIRMAN'S COMMENTS

IV.  DRAFT VOTES

V.  CHIEF FINANCIAL OFFICER'S REPORT

VI.  EXECUTIVE VICE-PRESIDENT'S REPORT

VII.  PRESIDENT'S REPORT

-2-

DEF006859
Confidential/Attorneys-
Subject to Protective Order

## CHAIRMAN'S COMMENTS

### 3rd Quarter Performance

The financial results for the 3rd quarter were better than the prior forecast. Total revenues were $41.9M, operating income was $17.3M and net income was $11.1M, up 20%, 28% and 29% compared to last year. For the nine months, total revenues were $121.0M, operating income was $49.0M and net income was $31.1M, up 16%, 17% and 14% compared to last year.

Product bookings were $32.4M for the 3rd quarter and $77.7M for the nine months, down 34% and 1% compared to last year. At the end of the quarter, the resultant product backlog was $79.8M, up 3% compared to last year. We note that the apparent downward trend is due solely to a delay in the Columbia booking from the 3rd quarter to the 4th quarter. The significant increase in non-Columbia hospital bookings continues a trend started early this year and is expected to repeat in the 4th quarter.

### 1996 Revised Forecast

As can be seen in the revised forecast contained in the financial section of this report, we now forecast total revenues of $167.8M, operating income of $69.8M and net income of $44.8M up 17%, 19% and 21% compared to last year. This is a significant increase from the prior forecast but is justified in light of the higher level of bookings that have occurred already.

### Dividends

Based on the 3rd quarter performance and expectations for the remainder of the year, we recommend declaring the regular quarterly dividend of $0.35 per share. A draft vote is enclosed for your review.

DEF006865
Confidential/Attorneys-
Subject to Protective Order

## Valuation of MEDITECH Stock

As in the past years, it is necessary for the Board to fix the fair market value of MEDITECH

stock in anticipation of a contribution of stock to the Trust or in contemplation of a sale of stock

to employees or directors. We furnish the following information as an aid to the valuation:

> o  Actual 1995 earnings were $2.34/share and actual year-end book
>    value was $8.71/share.
>
> o  A year-end fair market value of $20.00/share was last set by the
>    Board during the October 23, 1995 meeting in anticipation of a
>    contribution of 30,000 shares to the Trust on December 31, 1995
>    and sale of up to 125,000 shares to employees and directors during
>    February 1996 (actual sold were 106,963 shares).
>
> o  Current annual dividend rate of $1.40/share set on January 22,
>    1996.
> o  June Greylok m.
> o  Between February and October of 1996, the Trust purchased a total
>    of 8,700 shares from 20 shareholders at prices between $20 and
>    $22 per share.
>
> o  Estimated 1996 earnings are $2.81/share and estimated year-end
>    book value is $10.22/share.

Based on prior evaluation practice we recommend fixing the fair market value at $24 per share

effective on December 31, 1996. We have included an appropriate draft resolution for your

review.

## Profit Sharing Bonus Distribution

Last year's profit sharing bonus distribution of $11.7M represented about 20% of last year's

$58.5M in operating profit. It was allocated among three pools as follows:

> o  a general cash bonus of $7.0M for all employees as we have always
>    done by prorating the last 5 years of compensation, but capped at
>    $25K.
>
> o  a bonus of $1.8M in cash and $600K in stock (30K shares at
>    $20/share) for the MEDITECH Profit Sharing Trust, and
>
> o  a discretionary cash bonus of $2.3M for 10 officers.

DEF006866
Confidential/Attorneys-
Subject to Protective Order

This year we will be accruing $14.0M which represents 20% of the revised operating income forecast of $69.8M. At the meeting we can decide on the allocation. A draft vote is enclosed for your review.

## Charitable Contributions

In December 1995 we contributed a total of $240K to 30 cultural, educational and charitable institutions in the greater Boston area. At the upcoming meeting we will review the contribution committee's recommendation for this year's contribution (we are accruing $286K). We have included a draft vote for your review.

## Purchase of Remaining Treasury Stock

In June we repurchased 230,400 shares of MEDITECH stock at $21/share from Greylock and shortly thereafter resold 130,000 shares at $21/share to two of the Greylock partners. This transaction left 130,400 shares as Treasury Stock. Some of this Treasury Stock valued at $24/share will be contributed to the MEDITECH Profit Sharing Trust at year-end. The remainder also valued at $24/share could be purchased by myself at year-end, with the understanding that much of the shares would be immediately resold to certain officers at favorable long term repayment terms.

## Opportunity for Employees to Purchase MEDITECH Stock

We would like to offer approximately 125,000 shares of MEDITECH stock at $24 per share for sale to various employees as we have done in prior years. It is expected that the offer will be made at the end of January, 1997 for purchase by the end of February, 1997. We have included an appropriate draft vote for your review, but we note that this action could be delayed until the January board meeting.

–10–

DEF006867
Confidential/Attorneys-
Subject to Protective Order

## Founder's Retirement

We note that Curt Marble retired last month after 27 years of dedicated service to the company. As you know I have worked with Curt since 1964 and together we have been writing and rewriting the same piece of software for all those years. Curt has been instrumental in developing our basic software technology as well as converting it to operate on PC's in the early 80's. I wish him the best on his well deserved retirement.

## Board Meeting

The board meeting is scheduled to convene at 9:00 AM, Monday, October 28, 1996 at the Company's Canton facility. Lunch will be served during the meeting. Thank you in anticipation of your prompt attendance.

DEF006868
Confidential/Attorneys-
Subject to Protective Order



10 Year History and 1996 Forecast

-12-

DEF006869
Confidential/Attorneys-
Subject to Protective Order

| Year | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Revenue | 16,524 | 19,403 | 24,276 | 31,524 | 49,484 | 54,238 | 63,998 | 71,311 | 84,223 | 98,758 | 115,661 |
| Service Revenue | 10,857 | 12,738 | 15,242 | 17,349 | 19,351 | 23,491 | 28,304 | 34,014 | 40,000 | 44,963 | 52,097 |
| Total Revenue | 27,381 | 32,141 | 39,518 | 48,873 | 68,835 | 77,729 | 92,302 | 105,325 | 124,223 | 143,721 | 167,758 |
| Operating Expense | 15,317 | 18,179 | 21,846 | 27,411 | 38,568 | 47,271 | 55,405 | 64,040 | 72,968 | 85,208 | 97,993 |
| Operating Income | 12,064 | 13,962 | 17,672 | 21,462 | 30,267 | 30,458 | 36,897 | 41,285 | 51,255 | 58,513 | 69,765 |
| Other Income | 2,000 | 3,801 | 2,039 | 2,368 | 931 | 1,667 | 1,822 | 8,178 | 2,911 | 6,410 | 9,761 |
| Other Expense | 530 | 244 | 112 | 981 | 1,499 | 1,626 | 614 | 197 | 220 | 5,258 | 5,372 |
| Pre-tax Income | 13,534 | 17,519 | 19,599 | 22,849 | 29,699 | 30,499 | 38,105 | 49,266 | 53,946 | 59,665 | 74,154 |
| Income Taxes | 6,042 | 7,509 | 7,376 | 8,520 | 11,251 | 11,654 | 14,909 | 19,641 | 21,756 | 22,580 | 29,354 |
| Net Profit | 7,492 | 10,010 | 12,223 | 14,329 | 18,448 | 18,845 | 23,196 | 29,625 | 32,190 | 37,085 | 44,800 |
| Dividends Paid | 2,392 | 2,908 | 4,338 | 6,091 | 7,114 | 10,213 | 10,276 | 13,447 | 16,260 | 19,558 | 22,195 |
| Total Assets | 34,150 | 36,757 | 47,549 | 69,573 | 92,138 | 94,233 | 99,266 | 118,923 | 137,755 | 197,999 | 218,638 |
| Total Liabilities | 12,207 | 6,637 | 8,998 | 22,032 | 33,318 | 25,707 | 16,854 | 18,870 | 20,006 | 60,171 | 55,719 |
| Shareholder Equity | 21,943 | 30,120 | 38,551 | 47,541 | 58,820 | 68,526 | 82,412 | 100,053 | 117,749 | 137,828 | 162,919 |
| Common Shares | 14,990 | 15,081 | 15,172 | 15,277 | 15,263 | 15,369 | 15,454 | 15,567 | 15,686 | 15,831 | 15,938 |
| Earnings/share | 0.50 | 0.66 | 0.81 | 0.94 | 1.21 | 1.23 | 1.50 | 1.90 | 2.05 | 2.34 | 2.81 |
| Divs Paid/share | 0.16 | 0.19 | 0.29 | 0.40 | 0.47 | 0.67 | 0.67 | 0.87 | 1.04 | 1.24 | 1.40 |
| Book Value/share | 1.46 | 2.00 | 2.54 | 3.11 | 3.85 | 4.46 | 5.33 | 6.43 | 7.51 | 8.71 | 10.22 |
| Fair Value/share | 4.33 | 5.67 | 6.83 | 8.00 | 10.00 | 10.67 | 12.67 | 14.00 | 17.00 | 20.00 | 24.00 |

10 Year History and 1996 Forecast

-13-

DEF006870
Confidential/Attorneys-
Subject to Protective Order

**EXHIBIT 18**

REPORT TO THE BOARD OF DIRECTORS

QUARTER ENDED DECEMBER 31, 1996

BOARD OF DIRECTORS MEETING

JANUARY 27, 1996

MEDICAL INFORMATION TECHNOLOGY, INC.

-1-

DEF006909
Confidential/Attorneys-
Subject to Protective Order

MEDICAL INFORMATION TECHNOLOGY, INC.

Minutes of a Regular Meeting of the
Board of Directors

Canton, Massachusetts
October 28, 1996

The meeting convened at 9:00 A.M. at the Company's Canton offices.  Present were A. Neil Pappalardo, Roland L. Driscoll, Jerome Grossman, Lawrence A. Polimeno, Edward B. Roberts, Morton E. Ruderman and Louis P. Valente, being all of the directors and constituting a quorum.  Also in attendance were the Company's Executive Vice President, Howard Messing, the Chief Financial Officer, Barbara A. Manzolillo and Vice President, Edward Pisinski.

Upon motion duly made and seconded it was unanimously

VOTED:    That a regular quarterly cash dividend of thirty-five cents per share is hereby declared on all of the Company's outstanding common shares, payable to holders of record at the close of business on October 28, 1996 with payment of such dividend to be made on November 12, 1996 and that the Chairman and Chief Financial Officer are authorized and directed to make such cash dividend disbursement on November 12, 1996.

Upon motion duly made and seconded it was unanimously

VOTED:    That the Chairman is authorized to have the company make charitable contributions out of earnings for the year 1996, in a total sum not to exceed $300,000, to various non-profit organizations in the Greater Boston area, with the individual amounts and particular organizations being determined in the Chairman's sole discretion, with advice from the Charitable Contributions Committee of the Board of Directors.  Any such contributions must qualify as federal tax-deductible expenditures and must be disbursed on or before March 15, 1997.

–6–

DEF006914
Confidential/Attorneys-
Subject to Protective Order

Upon motion duly made and seconded it was unanimously

RESOLVED:    That based upon statistical data submitted by the Chairman and
upon projections of income for the fourth quarter of 1996
submitted by the Chief Financial Officer, the fair market value
of the company's common stock is hereby stipulated to be $24.00
per share as of the Company's forthcoming year-end date of
December 31, 1996.

Upon motion duly made and seconded it was unanimously

VOTED:    That in the absence of any modifying vote or resolution action by
the Board of Directors prior to December 31, 1996, the Chairman
is authorized and directed to appropriate on behalf of the Company,
certain sums of cash applicable to each of the Company's various
bonus programs in recognition of services rendered by employees,
including officers, during the calendar year 1996. The bonus programs
for which appropriations are hereby authorized and the sums for each
are:

| | |
|---|---|
| Employees Profit Sharing Trust | $2,060,000 |
| General Cash Bonus for All Employees,Including Officers | $8,500,000 |
| Special Discretionary Cash Bonus | $2,600,000 |

The individual portion of the General Cash Bonus payable to each
employee, including officers, shall be determined solely by the
Chairman. If he elects the company's usual and customary five
year earnings history formula, subject to a maximum of $25,000 for
any one employee, as the basis for determination of such individual
amounts then the amount so payable to the Chairman is hereby
approved. If any other method is used then any amount payable to the
Chairman under the General Cash Bonus shall be subject to
confirmation by the Compensation Committee of the Board of
Directors. Any amount payable to the Chairman under the Special
Discretionary Cash Bonus shall be determined by the
Compensation Committee of the Board of Directors, which
determination shall be conveyed to the Company in writing prior to
December 31, 1996. It is a condition of this VOTE that all
appropriations for all of the Company's bonus programs be paid to the
designated recipients on or before March 15, 1997 and the
Chief Financial Officer is therefore authorized and directed to
accrue as a liability on the Company's books at December 31, 1996
any portion thereof not yet paid on that latter date.

–7–

DEF006915
Confidential/Attorneys-
Subject to Protective Order

Upon motion duly made and seconded it was unanimously

VOTED       That, in the absence of any modifying vote or resolution action by
the Board of Directors prior to December 31, 1996, the Chairman
is authorized and directed to have the Company make a
contribution of 35,000 shares of the company's common stock,
presently held by the Company as treasury stock, at a fair market
value of $24.00 per share, as stipulated in a preceding RESOLUTION,
for a total fair market value of $840,000 to the Medical Information
Technology, Inc. Profit Sharing Trust on or before December 31,
1996 as a part of the Company's contribution to the Trust for
calendar year 1996. The Chairman and the Treasurer are hereby
authorized to issue an appropriate certificate for such shares of the
Company's common stock, par value twenty-five cents per share, to
the Trust, with such issue to be made from shares of common stock
presently held by the Company as treasury stock.

The contribution of 35,000 shares of stock to the Trust per this
VOTE is in addition to the contribution of $2,060,000 in cash
authorized and directed by a separate preceding VOTE at this
meeting.

Upon motion duly made and seconded it was unanimously

VOTED:      That the Company is authorized to sell for cash on or about
December 31, 1996 up to 80,400 shares of the Company's common
stock, presently held by the Company as treasury stock, at a fair
market value of $24.00 per share, as stipulated in a preceding
RESOLUTION, to A. Neil Pappalardo, Chairman & Chief
Executive Officer of the Company. The Chairman and the Treasurer
are hereby authorized to issue appropriate certificates for such shares
of the Company's common stock, par value twenty-five cents per
share, with such issues to be made from shares presently held by
the Company as treasury stock.

Upon motion duly made and seconded it was unanimously

VOTED:      That the Chairman is authorized on behalf of the Company to sell
for cash 125,000 shares of the Company's common stock
to various employees of the Company at a fair market value of $24.00
per share, as stipulated in a preceding RESOLUTION, with the
selection of such employees and the number of shares to be made
available to each of them being determined by the Chairman in his sole
discretion. It is a condition of this VOTE that any such sales shall be
consummated on or before February 28, 1997. The Chairman and

DEF006916
Confidential/Attorneys-
Subject to Protective Order

the Treasurer are hereby authorized to issue appropriate certificates for such shares of the Company's common stock, par value twenty-five cents per share, to such employees, with such issues to be made first from any shares then held by the Company as treasury stock and with the remainder coming from previously authorized but unissued shares of the common stock of the Company.

There being no further business to come before the meeting, upon motion duly made and seconded, and by affirmative vote of all directors present, it was:

VOTED:         To adjourn.

A true record.

ATTEST:

Barbara A. Manzolillo, Assistant Clerk

–9–

DEF006917
Confidential/Attorneys-
Subject to Protective Order

**EXHIBIT 19**

**REPORT TO THE BOARD OF DIRECTORS**

**QUARTER ENDED SEPTEMBER 30, 1997**

**BOARD OF DIRECTORS MEETING**

**OCTOBER 27, 1997**

**MEDICAL INFORMATION TECHNOLOGY, INC.**

Confidential – Subject
to Protective Order

M0001517

–1–

DEF002840
Confidential/Attorneys-
Subject to Protective Order

## CHAIRMAN'S COMMENTS

### 3rd Quarter Performance

The financial results for the 3rd quarter were in line with the prior forecast. Total revenues were $51.2M, operating income was $21.0M and net income was $13.5M, up 22%, 21% and 22% compared to last year. For the nine months, total revenues were $147.4M, operating income was $60.8M and net income was $38.5M, up 22%, 24% and 24% compared to last year.

Product bookings were $54.6M for the 3rd quarter and $106.4M for the nine months, up 68% and 37% compared to last year. At the end of the quarter, the resultant product backlog was $129.4M, up 62% compared to last year. The significant increase is due solely to getting the annual Columbia booking in the 3rd quarter rather than the 4th quarter as happened last year. Moreover because of the confusion at Columbia, we expect the $36M received thus far from Columbia to be all that we will receive for the year and therefore much less than the $44M received last year. For the next few quarters we expect the magnitude of the backlog to stabilize at 9 months.

### 1997 Revised Forecast

As can be seen in the revised forecast contained in the financial section of this report, we now forecast total revenues of $193.7M, operating income of $78.1M and net income of $50.0M up 15%, 12% and 13% compared to last year. This is a significant decrease from the prior forecast but is justified in light of the uncertainty associated with Colombia.

### Dividends

Based on the 3rd quarter performance and expectations for the remainder of the year, we recommend declaring the regular quarterly dividend of $0.42 per share. A draft vote is enclosed for your review.

Confidential – Subject to Protective Order

M0001525

DEF002848
Confidential/Attorneys-
Subject to Protective Order

**Charitable Contributions**

In December 1996 we contributed a total of $288K to 31 cultural, educational and charitable institutions in the greater Boston area.  At the upcoming meeting we will review the contribution committee's recommendation for this year's contribution (we are accruing $325K).  We have included a draft vote for your review.

**Valuation of MEDITECH Stock**

As in the past years, it is necessary for the Board to fix the fair market value of MEDITECH stock in anticipation of a contribution of stock to the Trust or in contemplation of a sale of stock to employees or directors.  We furnish the following information as an aid to the valuation:

- o  Actual 1996 earnings were $2.78/share and actual year-end book value was $10.19/share.
- o  A year-end fair market value of $24.00/share was last set by the Board during the October 28, 1996 meeting in anticipation of a contribution of 35,000 shares to the Trust on December 31, 1996 and sale of up to 125,000 shares to employees during February 1997 (actual sold were 108,847 shares).
- o  Current annual dividend rate of $1.68/share set on January 27, 1997.
- o  Between January and August of 1997, the Trust purchased a total of 19,790 shares from 23 shareholders at prices between $24 and $26 per share.
- o  Estimated 1997 earnings are $3.11/share and estimated year-end book value is $11.76/share.

Based on prior evaluation practice we recommend fixing the fair market value at $27 per share effective on December 31, 1997.  We have included an appropriate draft resolution for your review.

Confidential - Subject
to Protective Order

–10–

M0001526

DEF002849
Confidential/Attorneys-
Subject to Protective Order

**Profit Sharing Bonus Distribution**

Last year's bonus distributions totaled $14M which represented about 20% of last year's $69.6M in operating profit. It was allocated among three programs as follows:

- o a General Cash Bonus of $8.5M for all employees as we have always done by prorating the last 5 years of compensation, but capped at $25K,
- o a Profit Sharing Bonus of $2,060K in cash and $840K in stock (35K shares at $24/share) for the MEDITECH Profit Sharing Trust, and
- o a Special Cash Bonus of $2.6M for 9 officers.

This year we will be accruing $16.5M which represents 21% of the revised operating income forecast of $78.1M. The percentage is higher than prior years to compensate for the additional depreciation expense included in the operating expense category due to the alignment of certain book and tax assets. This time we expect to modify the General Cash Bonus cap method to make the calculation simpler. At the meeting we can decide on the allocation. A draft vote is enclosed for your review.

**MEDITECH Stock Purchase Program**

In regard to the Stock Purchase Program we would like to offer approximately 150,000 shares of MEDITECH stock at $27 per share for sale to various employees and officers. It is expected that the offer will be made at the end of January, 1998 for purchase by the end of February, 1998. We have included an appropriate draft vote for your review, but we note that this action could be delayed until the January board meeting.

**Amendment to Trust**

We enclose the finalized third amendment to the MEDITECH Profit Sharing Trust, which was discussed and approved by the Board at the April 28 meeting. The amendment has been filed with the IRS and we await approval.

Confidential - Subject
to Protective Order

-11-

M0001527

DEF002850
Confidential/Attorneys-
Subject to Protective Order

**Board Meeting**

The board meeting is scheduled to convene at 9:00 AM, Monday, October 27, 1996 at the Company's

Canton facility.  Lunch will be served during the meeting.  Thank you in anticipation of your prompt

attendance.

-12-

Confidential - Subject
to Protective Order

M0001528

DEF002851
Confidential/Attorneys-
Subject to Protective Order



Confidential – Subject
to Protective Order

–13–

M0001529

DEF002852
Confidential/Attorneys-
Subject to Protective Order

| Year | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Revenue | 19,403 | 24,276 | 31,524 | 49,484 | 54,238 | 63,998 | 71,311 | 84,223 | 98,758 | 115,730 | 131,659 |
| Service Revenue | 12,738 | 15,242 | 17,349 | 19,351 | 23,491 | 28,304 | 34,014 | 40,000 | 44,963 | 52,154 | 61,992 |
| Total Revenue | 32,141 | 39,518 | 48,873 | 68,835 | 77,729 | 92,302 | 105,325 | 124,223 | 143,721 | 167,884 | 193,651 |
| Operating Expense | 18,179 | 21,846 | 27,411 | 38,568 | 47,271 | 55,405 | 64,040 | 72,968 | 85,208 | 98,334 | 115,535 |
| Operating Income | 13,962 | 17,672 | 21,462 | 30,267 | 30,458 | 36,897 | 41,285 | 51,255 | 58,513 | 69,550 | 78,116 |
| Other Income | 3,801 | 2,039 | 2,368 | 931 | 1,667 | 1,822 | 8,178 | 2,911 | 6,410 | 8,938 | 12,016 |
| Other Expense | 244 | 112 | 981 | 1,499 | 1,626 | 614 | 197 | 220 | 5,258 | 4,527 | 5,847 |
| Pre-tax Income | 17,519 | 19,599 | 22,849 | 29,699 | 30,499 | 38,105 | 49,266 | 53,946 | 59,665 | 73,961 | 84,285 |
| Income Taxes | 7,509 | 7,376 | 8,520 | 11,251 | 11,654 | 14,909 | 19,641 | 21,756 | 22,580 | 29,611 | 34,300 |
| Net Profit | 10,010 | 12,223 | 14,329 | 18,448 | 18,845 | 23,196 | 29,625 | 32,190 | 37,085 | 44,350 | 49,985 |
| Dividends Paid | 2,908 | 4,338 | 6,091 | 7,114 | 10,213 | 10,276 | 13,447 | 16,260 | 19,558 | 22,195 | 26,914 |
| Total Assets | 36,757 | 47,549 | 69,573 | 92,138 | 94,233 | 99,266 | 118,923 | 137,755 | 197,999 | 218,339 | 261,060 |
| Total Liabilities | 6,637 | 8,998 | 22,032 | 33,318 | 25,707 | 16,854 | 18,870 | 20,006 | 60,171 | 55,871 | 71,963 |
| Shareholder Equity | 30,120 | 38,551 | 47,541 | 58,820 | 68,526 | 82,412 | 100,053 | 117,749 | 137,828 | 162,468 | 189,097 |
| Common Shares | 15,081 | 15,172 | 15,277 | 15,263 | 15,369 | 15,454 | 15,567 | 15,686 | 15,831 | 15,938 | 16,082 |
| Earnings/share | 0.66 | 0.81 | 0.94 | 1.21 | 1.23 | 1.50 | 1.90 | 2.05 | 2.34 | 2.78 | 3.11 |
| Divs Paid/share | 0.19 | 0.29 | 0.40 | 0.47 | 0.67 | 0.67 | 0.87 | 1.04 | 1.24 | 1.40 | 1.68 |
| Book Value/share | 2.00 | 2.54 | 3.11 | 3.85 | 4.46 | 5.33 | 6.43 | 7.51 | 8.71 | 10.19 | 11.76 |
| Fair Value/share | 5.67 | 6.83 | 8.00 | 10.00 | 10.67 | 12.67 | 14.00 | 17.00 | 20.00 | 24.00 | 27.00 |

**10 Year History and 1997 Forecast**

Confidential - Subject
to Protective Order

-14-

M0001530

DEF002853
Confidential/Attorneys-
Subject to Protective Order

**EXHIBIT 20**

EXHIBIT 79
Roberts
JAS  11/8/07

# REPORT TO THE BOARD OF DIRECTORS

## QUARTER ENDED DECEMBER 31, 1997

## BOARD OF DIRECTORS MEETING

## JANUARY 26, 1998

## MEDICAL INFORMATION TECHNOLOGY, INC.

Confidential - Subject
to Protective Order

–1–

M0001456

DEF002779
Confidential/Attorneys-
Subject to Protective Order

MEDICAL INFORMATION TECHNOLOGY, INC.

Minutes of a Regular Meeting of the
Board of Directors

Canton, Massachusetts
October 27, 1997

The meeting convened at 9:00 A.M. at the Company's Canton offices. Present were A. Neil Pappalardo, Roland L. Driscoll, Jerome Grossman, Lawrence A. Polimeno, Edward B. Roberts, Morton E. Ruderman and Louis P. Valente, being all of the directors and constituting a quorum. Also in attendance were the Company's Executive Vice President, Howard Messing, and the Chief Financial Officer, Barbara A. Manzolillo.

Upon motion duly made and seconded it was unanimously

RESOLVED: That the minutes of the July 28, 1997 board meeting are hereby approved and ratified.

Upon motion duly made and seconded it was unanimously

VOTED: That a regular quarterly cash dividend of forty-two cents per share is hereby declared on all of the Company's outstanding common shares, payable to holders of record at the close of business on October 27, 1997 with payment of such dividend to be made on November 10, 1997 and that the Chairman and Chief Financial Officer are authorized and directed to make such cash dividend disbursement on November 10, 1997.

Upon motion duly made and seconded it was unanimously

VOTED: That the Chairman is authorized and directed to have the Company make charitable contributions out of earnings for the year 1997, in a total sum not to exceed $350,000, to various qualified non-profit organizations in the Greater Boston area, with the individual amounts and particular organizations being determined in the Chairman's sole discretion, with advice from the Charitable Contributions Committee of the Board of Directors. Any such contributions must qualify as federal tax-deductible expenditures and must be disbursed on or before March 15, 1998.

Confidential - Subject
to Protective Order

M0001462

DEF002785
Confidential/Attorneys-
Subject to Protective Order

Upon motion duly made and seconded it was unanimously

RESOLVED:  That based upon statistical data submitted by the Chairman and upon projections of income for the fourth quarter of 1997 submitted by the Chief Financial Officer, the fair market value of the company's common stock is hereby stipulated to be $27.00 per share as of the Company's forthcoming year-end date of December 31, 1997.

Upon motion duly made and seconded it was unanimously

VOTED:  That the Chairman is authorized and directed to appropriate on behalf of the Company, the sum of $10,150,000 to be paid as a General Cash Bonus to all employees, in recognition of services rendered by them during the calendar year 1997. The individual portion of the General Cash Bonus payable to each employee shall be determined by prorating the sum of the employee's last five years of cash compensation but capped at $600,000. It is a condition of this VOTE that all appropriations be paid to the designated recipients on or before January 31, 1998 and the Chief Financial Officer is therefore authorized and directed to accrue as a liability on the Company's books at December 31, 1997 any portion thereof not yet paid on that date.

Upon motion duly made and seconded it was unanimously

VOTED:  That the Chairman is authorized and directed to appropriate on behalf of the Company, the sum of $2,950,000 to be paid as a Special Cash Bonus to certain officers, in recognition of services rendered by them during the calendar year 1997. The individual portion of the Special Cash Bonus payable to each officer shall be determined solely by the Chairman, except for the amount to be paid to the Chairman. It is a condition of this VOTE that all appropriations be paid to the designated recipients on or before January 31, 1998 and the Chief Financial Officer is therefore authorized and directed to accrue as a liability on the Company's books at December 31, 1997 any portion thereof not yet paid on that date.

Confidential - Subject
to Protective Order

M0001463

–8–

DEF002786
Confidential/Attorneys-
Subject to Protective Order

Upon motion duly made and seconded it was unanimously

VOTED:    That the Chairman is authorized and directed to have the
Company make a contribution on or before December 31, 1997 to
the Medical Information Technology, Inc. Profit Sharing Trust of
$2,320,000 in cash and $1,080,000 in shares of the Company's
presently authorized but unissued common stock. The number of
shares shall be 40,000 shares based on a fair market value of
$27.00 per share, as stipulated in a preceding RESOLUTION. The
Chairman and the Chief Financial Officer are hereby authorized
and directed to issue appropriate shares of the Company's common
stock, par value twenty-five cents per share, to the Trust, with such
issue to be made from previously authorized but unissued shares of
common stock of the Company.

Upon motion duly made and seconded it was unanimously

VOTED:    That the Chairman is authorized and directed on behalf of the
Company's Stock Purchase Program to offer for sale 150,000
shares of the Company's presently authorized but unissued
common stock to various employees of the Company at the fair
market value of $27.00 per share, as stipulated in a preceding
RESOLUTION. The selection of such employees and the number
of shares to be offered for sale to each of them shall be determined
by the Chairman in his sole discretion, except for the shares to be
sold to the Chairman. It is a condition of this VOTE that any such
sales shall be consummated for cash on or before February 28,
1998. The Chairman and Chief Financial Officer are hereby
authorized and directed to issue appropriate shares of the
Company's common stock, par value twenty-five cents per share,
to such employees, with such issues to be made from previously
authorized but unissued shares of common stock of the Company.

Upon motion duly made and seconded it was unanimously

VOTED:    The amount payable to the Chairman under the General Cash
Bonus shall be subject to confirmation by the Compensation
Committee of the Board of Directors. The amount payable to the
Chairman under the Special Cash Bonus shall be determined by the
Compensation Committee of the Board of Directors, which
determination shall be conveyed to the Company in writing prior to
December 31, 1997. The number of shares of Company stock
offered to the Chairman under the Stock Purchase Program shall be
determined by the Compensation Committee of the Board of
Directors, which determination shall be conveyed to the Company
in writing prior to January 31, 1998.

Confidential - Subject
to Protective Order

M0001464

DEF002787
Confidential/Attorneys-
Subject to Protective Order

–9–

Upon motion duly made and seconded it was unanimously

VOTED:    To ratify the finalized form of the Third Amendment to the
Medical Information Technology, Inc. Profit Sharing Plan
and Trust as Amended and Restated January 1, 1989 and
subsequently amended by the First and Second Amendments
(The "Plan"), which Third Amendment was previously adopted
by this Board by a vote at its April 28, 1997 meeting and to
ratify the execution of said finalized form, a copy of which is
attached hereto, by the Chief Financial Officer on behalf of the
Corporation.

There being no further business to come before the meeting, upon motion duly
made and seconded, and by affirmative vote of all directors present it was:

VOTED:    To adjourn.

A true record.

ATTEST:

_Barbara A. Manzolillo_

Barbara A. Manzolillo, Assistant Clerk

Confidential - Subject
to Protective Order

M0001465

–10–

DEF002788
Confidential/Attorneys-
Subject to Protective Order

**EXHIBIT 21**

EXHIBIT 79
Roberts
JAS 11/8/07

REPORT TO THE BOARD OF DIRECTORS

QUARTER ENDED DECEMBER 31, 1997

BOARD OF DIRECTORS MEETING

JANUARY 26, 1998

MEDICAL INFORMATION TECHNOLOGY, INC.

Confidential – Subject
to Protective Order

M0001456

DEF002779
Confidential/Attorneys-
Subject to Protective Order

## CHAIRMAN'S COMMENTS

### 4TH QUARTER PERFORMANCE

This quarter culminated the 21st record year in a row for the company. For the quarter, total revenues were $46.5M, operating income was $17.5M and net income was $11.7M, down 0.9%, 14.6% and 11.4% compared to the same quarter of the prior year. For the year, total revenues were $193.8M, operating income was $78.3M and net income was $50.3M, up 15.4%, 12.6% and 13.4% compared to the prior year.

Product bookings for the quarter were $30.6M and for the year were $137.0M, down 61% and 12% compared to the prior year. The resultant product backlog was $130.0M, up 4.2% compared to the end of the prior year.

We extend our gratitude to all those whose efforts produced these results:

  o to those who design and develop our products,
  o to those who market and sell our products and services,
  o to those who install our products and provide our services,
  o to those who send out the bills and collect the money, and
  o to the clerical, administrative and maintenance staffs supporting the above.

In addition, we thank the company's officers and managers for their efforts, dedication and loyalty as well as the company's directors for their valued advice and active participation.

### 1997 Milestones

Major milestones in 1997 include:

  o record revenues, operating income, net profit and product backlog,
  o increasing the number of officers by adding two more vice-presidents,
  o completing the technological imperative to move our products to client-server,
  o enlarging the product backlog sufficiently to fuel future growth,
  o renovating 100K square feet of existing office space, and
  o buying another Westwood site increasing our total space to 1.1M square feet

With all of these accomplishments, 1998 will be a challenge. The impact of diminished business with Columbia will slow down our overall growth. Turnover in staff due to the competitive job market continues to trouble us.

Confidential – Subject
to Protective Order

M0001469

DEF002792
Confidential/Attorneys-
Subject to Protective Order

## 1998 FORECAST

As can be seen from the 1998 forecast contained in the financial section of this report we are currently projecting total revenues of $213.1M, operating income of $86.2M and net income of $55.5M, all up 10% compared to the prior year.

Our goal for product bookings in 1998 is $150M while the corresponding product revenues would be $142M and the resultant backlog would be $138M.

## LONG-TERM FORECAST

We have included a forecast through the end of 2001. The basic assumptions of this forecast for 1999 through 2001 are a 15% growth rate in product revenues, a 15% growth rate in operating expenses, 60% of prior year's profit paid as dividends and purchasing $75M of real estate in 2000 with a $50M bank loan. Because this forecast is long-term in nature, we do not expect it to be accurate in later years. Instead we hope that it will reflect consistent figures whenever certain revenues are achieved.

## DIVIDENDS

Based on the 1997 performance and expectations for 1998, we recommend increasing the dividend from $1.68 to $1.88 per share. The new rate is 60% of last year's earnings and would be paid out quarterly. A draft vote is enclosed for your review.

## COLUMBIA HEALTHCARE CORPORATION

Since first becoming a customer in late 1990, Columbia had grown at such a fast rate that they quickly became our largest customer. The last 3 years and estimates for 1998 are shown below:

|                   | 1995  | 1996  | 1997  | 1998  |
|-------------------|-------|-------|-------|-------|
| Product Revenues  | 27.3M | 32.0M | 33.0M | 30.0M |
| Service Revenues  | 1.9M  | 3.9M  | 7.7M  | 9.8M  |
| Product Bookings  | 36.8M | 44.0M | 36.6M | 0.0M  |
| Ending Backlog    | 30.5M | 42.4M | 46.0M | 16.0M |

Because of the continuation of confusion and uncertainty at Columbia, we expect at most $30M of the current $46M backlog to be implemented as revenues in 1998. We note as of today only $15M is scheduled. Service revenues should stabilize at $10M annually. We expect no further bookings directly from Columbia but anticipate bookings indirectly as they sell off some of their hospitals.

Confidential - Subject
to Protective Order

M0001470

DEF002793
Confidential/Attorneys-
Subject to Protective Order

## PROFIT SHARING BONUS DISTRIBUTION

This year's profit sharing bonus distribution of $16.5M represented 21% of the operating profit for 1997 of $78.3M. It was allocated among three pools as follows:

- o $10.15M for the general cash bonus to all employees
- o $3.4M for the MEDITECH Profit Sharing Trust
- o $2.95M for the discretionary bonus for officers

In regard to the general cash bonus, at the end of this month we intend to distribute an amount to each employee by prorating the last 5 years of compensation (capped at $600K). In regard to the Trust, the $3.4M composed of $2.32M in cash and 40,000 shares of MEDITECH stock valued at $27 per share, was transferred in December. In regard to the discretionary bonus, we intend to distribute at the end of this month the 2.95M among the Company's 11 officers. On behalf of the company officers and employees we thank you for your continued generosity.

We are furnishing historical data to indicate the trend over the past five years.

|                                          | 1993 | 1994 | 1995 | 1996 | 1997 |
|------------------------------------------|------|------|------|------|------|
| Cash Bonus as % of last 5 Year W2        | 3.8  | 4.1  | 4.1  | 4.4  | 4.6  |
| Trust Revaluation as annual % Increase   | 13.8 | 20.2 | 17.8 | 19.3 | 14.8 |
| Trust Contribution as % of 1997 W2       | 6.2  | 6.1  | 6.1  | 6.0  | 6.0  |

6.4  6.6

## EMPLOYEE PURCHASES OF MEDITECH STOCK

We will be extending an offer to various employees including officers at the end of January to purchase 150,000 shares of MEDITECH stock valued at $27 per share. Employees can use part of their cash bonus and/or arrange a loan from the Trust to buy however many shares they wish to purchase.

## CHARITABLE CONTRIBUTIONS

Of the $350K approved at the board meeting, $325K was distributed among 34 designated organizations during the year. We have included a breakdown in this report and pass on their appreciation to the board members. Special thanks to Mort Ruderman for ensuring that once again we met with each and every donee in 1997.

Confidential - Subject
to Protective Order

M0001471

DEF002794
Confidential/Attorneys-
Subject to Protective Order

## MEDITECH PROFIT SHARING TRUST

Year-end assets and other year-end statistics of the Trust are as follows:

|  | 1995 | 1996 | 1997 |
|---|---|---|---|
| Cash | $124K | $86K | $82K |
| U.S. Treasury Notes | 18,402K | 21,127K | 24,545K |
| Accrued Interest Thereon | 259K | 287K | 326K |
| MEDITECH Stock | 27,301K | 33,810K | 39,663K |
| Employee Loans | 1,104K | 1,257K | 1,348K |
| Total Assets of the Trust | $47,190K | $56,567K | 65,964K |
|  |  |  |  |
| MEDITECH shares | 1,365,045 | 1,408,745 | 1,469,010 |
| MEDITECH members | 1,085 | 1,222 | 1,393 |

We just received notification from the IRS that the last set of amendments have been approved by them. As you recall the intent of the amendments was to allow distributions to members during their employment.

## BOARD MEETING

The Board Meeting is scheduled to convene at 9:00 AM Monday morning, January 26, 1998 at the Company's Canton facility. We will limit the discussion about the Super Bowl to the first 5 minutes. We have asked the other officers to join us at the board meeting to review the last year and more importantly to indicate their plans for 1998. Lunch will be served during the meeting. Thank you in anticipation of your prompt attendance.

–17–

Confidential – Subject
to Protective Order

M0001472

DEF002795
Confidential/Attorneys-
Subject to Protective Order

### 10 Year History and 1998 Forecast

| Year | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
|------|------|------|------|------|------|------|------|------|------|------|------|
| Product Revenue | 24,276 | 31,524 | 49,484 | 54,238 | 63,998 | 71,311 | 84,223 | 98,758 | 115,730 | 131,775 | 142,000 |
| Service Revenue | 15,242 | 17,349 | 19,351 | 23,491 | 28,304 | 34,014 | 40,000 | 44,963 | 52,154 | 62,030 | 71,075 |
| Total Revenue | 39,518 | 48,873 | 68,835 | 77,729 | 92,302 | 105,325 | 124,223 | 143,721 | 167,884 | 193,805 | 213,075 |
| Operating Expense | 21,846 | 27,411 | 38,568 | 47,271 | 55,405 | 64,040 | 72,968 | 85,208 | 98,334 | 115,519 | 126,875 |
| Operating Income | 17,672 | 21,462 | 30,267 | 30,458 | 36,897 | 41,285 | 51,255 | 58,513 | 69,550 | 78,286 | 86,200 |
| Other Income | 2,039 | 2,368 | 931 | 1,667 | 1,822 | 8,178 | 2,911 | 6,410 | 8,938 | 12,236 | 16,440 |
| Other Expense | 112 | 981 | 1,499 | 1,626 | 614 | 197 | 220 | 5,258 | 4,527 | 5,879 | 8,697 |
| Pre-tax Income | 19,599 | 22,849 | 29,699 | 30,499 | 38,105 | 49,266 | 53,946 | 59,665 | 73,961 | 84,643 | 93,943 |
| Income Taxes | 7,376 | 8,520 | 11,251 | 11,654 | 14,909 | 19,641 | 21,756 | 22,580 | 29,611 | 34,359 | 38,410 |
| Net Profit | 12,223 | 14,329 | 18,448 | 18,845 | 23,196 | 29,625 | 32,190 | 37,085 | 44,350 | 50,284 | 55,533 |
| Dividends Paid | 4,338 | 6,091 | 7,114 | 10,213 | 10,276 | 13,447 | 16,260 | 19,558 | 22,195 | 26,913 | 30,424 |
| Total Assets | 47,549 | 69,573 | 92,138 | 94,233 | 99,266 | 118,923 | 137,755 | 197,999 | 218,339 | 263,108 | 278,204 |
| Total Liabilities | 8,998 | 22,032 | 33,318 | 25,707 | 16,854 | 18,870 | 20,006 | 60,171 | 55,871 | 73,577 | 59,029 |
| Shareholder Equity | 38,551 | 47,541 | 58,820 | 68,526 | 82,412 | 100,053 | 117,749 | 137,828 | 162,468 | 189,531 | 219,175 |
| Common Shares | 15,172 | 15,277 | 15,263 | 15,369 | 15,454 | 15,567 | 15,686 | 15,831 | 15,938 | 16,087 | 16,250 |
| Earnings/share | 0.81 | 0.94 | 1.21 | 1.23 | 1.50 | 1.90 | 2.05 | 2.34 | 2.78 | 3.13 | 3.42 |
| Divs Paid/share | 0.29 | 0.40 | 0.47 | 0.67 | 0.67 | 0.87 | 1.04 | 1.24 | 1.40 | 1.68 | 1.88 |
| Book Value/share | 2.54 | 3.11 | 3.85 | 4.46 | 5.33 | 6.43 | 7.51 | 8.71 | 10.19 | 11.78 | 13.49 |
| Fair Value/share | 6.83 | 8.00 | 10.00 | 10.67 | 12.67 | 14.00 | 17.00 | 20.00 | 24.00 | 27.00 | 30.00 |

Confidential – Subject
to Protective Order

-18-

M0001473

DEF002796
Confidential/Attorneys-
Subject to Protective Order



10 Year History and 1998 Forecast

Confidential - Subject
to Protective Order

M0001474

DEF002797
Confidential/Attorneys-
Subject to Protective Order

1997 Actual and Forecast through 2001

| Year | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| Product Revenue | 131,775 | 142,000 | 163,300 | 187,795 | 215,964 |
| Service Revenue | 62,030 | 71,075 | 80,444 | 91,270 | 103,770 |
| Total Revenue | 193,805 | 213,075 | 243,744 | 279,065 | 319,734 |
| Operating Expense | 115,519 | 126,875 | 145,906 | 167,792 | 192,961 |
| Operating Income | 78,286 | 86,200 | 97,838 | 111,273 | 126,773 |
| Other Income | 12,236 | 16,440 | 15,910 | 17,615 | 19,323 |
| Other Expense | 5,879 | 8,697 | 6,124 | 4,717 | 8,182 |
| Pretax Income | 84,643 | 93,943 | 107,624 | 124,171 | 137,914 |
| Income Taxes | 34,359 | 38,410 | 43,050 | 49,668 | 55,166 |
| Net Profit | 50,284 | 55,533 | 64,575 | 74,503 | 82,748 |
| Dividends Paid | 26,913 | 30,424 | 33,320 | 38,745 | 44,702 |
| Stock Purchased | 3,692 | 4,535 | 4,892 | 5,564 | 6,339 |
| Cash | 18,063 | 10,830 | 21,105 | 19,840 | 20,798 |
| Securities | 61,142 | 74,474 | 93,093 | 116,366 | 145,457 |
| Receivables | 21,906 | 31,860 | 32,770 | 37,564 | 43,083 |
| Equipment/Fixtures | 24,535 | 35,393 | 42,688 | 51,078 | 60,726 |
| Buildings | 98,826 | 143,126 | 143,126 | 208,126 | 208,126 |
| Land | 20,404 | 26,604 | 26,604 | 36,604 | 36,604 |
| Depreciation | (28,648) | (46,135) | (57,146) | (69,688) | (85,618) |
| Investments | 2,111 | 2,052 | 1,812 | 1,572 | 1,332 |
| Assets | 218,339 | 278,204 | 304,052 | 401,461 | 430,508 |
| Payables | 837 | 695 | 1,459 | 1,678 | 1,930 |
| Accrued Taxes | 2,455 | 3,957 | 4,305 | 4,967 | 5,517 |
| Accrued Expenses | 13,610 | 16,742 | 21,886 | 25,169 | 28,944 |
| Deposits | 11,837 | 15,635 | 16,330 | 18,780 | 21,596 |
| Bank Debt | 26,000 | 19,500 | 1,500 | 50,000 | 26,000 |
| Deferred Taxes | 1,132 | 2,500 | 3,250 | 4,225 | 5,493 |
| Liabilities | 55,871 | 59,029 | 48,730 | 104,818 | 89,479 |
| Capital | 11,665 | 19,892 | 24,784 | 30,348 | 36,686 |
| Retained Earnings | 150,803 | 199,283 | 230,538 | 266,296 | 304,342 |
| Equity | 162,468 | 219,175 | 255,322 | 296,643 | 341,029 |

Confidential - Subject to Protective Order

M0001475

-20-

Confidential/Attorneys-
Subject to Protective Order

**MEDICAL INFORMATION TECHNOLOGY, INC.**
**CHARITABLE CONTRIBUTIONS HISTORY**

| Donees | Year Donation Started | Cumulative Total | 1995 Donation Amount | 1996 Donation Amount | 1997 Donation Amount |
|---|---|---|---|---|---|
| American Cancer Society | 1988 | $   58,000 | $   7,000 | $   10,000 | $ 10,000 |
| Bentley College | 1985 | 76,000 | 8,000 | 10,000 | 10,000 |
| Boston Lyric Opera | 1996 | 8,000 | | 3,000 | 5,000 |
| Boston Philharmonic Orchestra | 1991 | 32,000 | 4,000 | 6,000 | 10,000 |
| Boston Symphony Orchestra | 1993 | 17,000 | 3,000 | 4,000 | 5,000 |
| Bridge Over Troubled Waters | 1981 | 174,000 | 16,000 | 18,000 | 18,000 |
| Cambridge Partnership for Public Education | 1991 | 13,000 | 2,000 | 2,000 | 2,000 |
| Cape Cod Hospital Foundation | 1995 | 3,000 | 3,000 | | |
| Children's Museum | 1979 | 147,000 | 12,000 | 15,000 | 15,000 |
| Computer Museum | 1984 | 44,000 | 5,000 | 10,000 | 10,000 |
| Cystic Fibrosis Foundation | 1997 | 3,000 | | | 3,000 |
| Fair Environment (Prowse Farm) | 1993 | 65,000 | 10,000 | 10,000 | 10,000 |
| Federated Dorchester Neighborhood Houses, Inc. | 1995 | 18,000 | 3,000 | 5,000 | 10,000 |
| Goddard House | 1982 | 119,500 | 10,000 | 10,000 | 10,000 |
| Huntington Theatre Company, Inc. | 1993 | 24,000 | 5,000 | 7,000 | 7,000 |
| Jennifer Creed Foundation | 1989 | 48,000 | 6,000 | 6,000 | 8,000 |
| Lesley College | 1994 | 16,000 | 3,000 | 5,000 | 5,000 |
| Massachusetts Horticultural Society | 1990 | 45,000 | 6,000 | 8,000 | 10,000 |
| Massachusetts Institute of Technology | 1984 | 143,500 | 14,000 | 16,000 | 16,000 |
| Multiple Sclerosis Society | 1988 | 54,000 | 7,000 | 7,000 | 10,000 |
| Museum of Fine Arts | 1979 | 119,000 | 10,000 | 12,000 | 12,000 |
| Museum of Science | 1979 | 119,000 | 10,000 | 12,000 | 12,000 |
| N.A.A.C.P. | 1993 | 29,000 | 5,000 | 5,000 | 10,000 |
| National Kidney Foundation of MA & RI | 1997 | 3,000 | | | 3,000 |
| Neurofibromatosis Inc. | 1987 | 71,000 | 10,000 | 10,000 | 10,000 |
| New England Aquarium | 1979 | 121,000 | 12,000 | 12,000 | 12,000 |
| North Shore Music Theatre | 1996 | 8,000 | | 3,000 | 5,000 |
| Northeastern University | 1984 | 93,500 | 10,000 | 12,000 | 12,000 |
| Pine Street Inn | 1990 | 63,000 | 10,000 | 12,000 | 12,000 |
| Prevent Blindness Massachusetts | 1997 | 3,000 | | | 3,000 |
| Ronald McDonald House | 1991 | 120,000 | 10,000 | 12,000 | 12,000 |
| Straight, Inc. (closed 1992) | 1985 | 37,000 | | | |
| Trinity Hospice of Greater Boston | 1991 | 61,000 | 10,000 | 15,000 | 15,000 |
| USO Council of New England, Inc. | 1990 | 32,000 | 4,000 | 4,000 | 6,000 |
| Vision Foundation | 1982 | 106,500 | 10,000 | 12,000 | 12,000 |
| WGBH Educational Foundation | 1979 | 181,000 | 15,000 | 15,000 | 15,000 |
| Wilson Fund (closed 1987) | 1984 | 10,500 | | | |
| | | | | | |
| TOTALS | | $ 2,285,500 | $ 240,000 | $ 288,000 | $ 325,000 |

Confidential - Subject
to Protective Order

-21-

M0001476

DEF002799
Confidential/Attorneys-
Subject to Protective Order

**EXHIBIT 22**

EXHIBIT 44
WIT: Driscoll
DATE: 10/19/07
Victoria S. Reade

# REPORT TO THE BOARD OF DIRECTORS

## QUARTER ENDED MARCH 31, 1999

## BOARD OF DIRECTORS MEETING

## APRIL 26, 1999

## MEDICAL INFORMATION TECHNOLOGY, INC.

Confidential - Subject
to Protective Order

–1–

M0001172

DEF002505
Confidential/Attorneys-
Subject to Protective Order

# CHAIRMAN'S COMMENTS

## 1st Quarter Performance

The financial results for the 1st quarter approximated forecast. Total revenues were $54,456K, operating income was $21,709K and net profit was $13,915K, up 12.3%, 15.7% and 14.6% compared to last year.

Product bookings received during the quarter were $19,396K, down 15.2% compared to last year. At the end of the quarter, the resultant product backlog was $128,048K, up 5.7% compared to last year.

## 1999 Forecast

As can be seen in the revised forecast, we are making only minor adjustments from the prior forecast in spite of the weak product bookings received in the first quarter. We now forecast total revenues of $234.9M, operating income of $94.5M and net profit of $60.9M, up 15.2%, 18.7% and 14.3% compared to the prior year. Our goal for product bookings in 1999 has decreased to $140M, the corresponding product revenues is $154.9M and the resultant backlog is $129.2M.

## Election of Officers

We recommend the re-election of the existing officers as follows:

|  |  |
|---|---|
| A. Neil Pappalardo | Chairman and Chief Executive Officer |
| Lawrence A. Polimeno | President and Chief Operating Officer |
| Howard Messing | Executive Vice-President |
| Edward G. Pisinski | Senior Vice-President |
| Roberta E. Grigg | Senior Vice-President |
| Barbara A. Manzolillo | Treasurer, Chief Financial Officer, Controller and Assistant Clerk |
| Chris Anschuetz | Vice-President |
| Bob Gale | Vice-President |
| Joanne Wood | Vice-President |
| Steve Koretz | Vice-President |
| Stuart Lefthes | Vice-President |
| Jane E. Currier | Clerk |

A draft vote is enclosed for your review.

Confidential - Subject
to Protective Order

M0001181

DEF002514
Confidential/Attorneys-
Subject to Protective Order

## Dividends

Based on the 1st quarter performance and expectations for the remainder of the year, we recommend declaring the regular quarterly dividend of $0.50 per share. A draft vote is enclosed for your review.

## MEDITECH Trust

Year-end assets and other year-end statistics of the Trust are as follows:

|  | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|
| Cash | $124K | $86K | $82K | $106K |
| U.S. Treasury Notes | 18,402K | 21,127K | 24,545K | 25,501K |
| Accrued Interest Thereon | 259K | 287K | 326K | 365K |
| MEDITECH Stock | 27,301K | 33,810K | 39,663K | 44,814K |
| Employee Loans | 1,104K | 1,257K | 1,348K | 1,237K |
| Total Assets of the Trust | $47,190K | $56,567K | 65,964K | $72,023K |
| | | | | |
| Total number of members | 1,085 | 1,222 | 1,393 | 1,549 |
| with balances > $125K | 62 | 74 | 81 | 102 |
| with balances > $250K | 37 | 42 | 46 | 51 |
| with balances > $500K | 22 | 24 | 23 | 23 |
| with balances > $1.0M | 8 | 8 | 12 | 14 |
| with balances > $2.0M | 1 | 1 | 2 | 3 |

*(handwritten annotations in right margin: S/B, 99, 48, 20, 13, ✓)*

Decreasing balances of older members by in-service distributions will be a benefit for all.

## Employee Purchases of Meditech Stock

During the quarter 151,575 shares of Meditech stock at $29 per share for a total of $4,395,675 were purchased by 346 employees and officers. For this and for the generosity in regard to the year-end bonuses we extend our sincere gratitude to the Board. Because the shares sold exceeded the prior authorization we need a ratification vote.

For information we furnish a synopsis of recent stock offerings to the non-officer staff:

| Year | Approved | Offered | # of emp's | Bought | # of emp's | per emp |
|---|---|---|---|---|---|---|
| 1992 | $960K | $1,555K | 293 | $589K | 165 | $3,570 |
| 1993 | $1,140K | $2,430K | 396 | $940K | 247 | $3,804 |
| 1994 | $1,470K | $3,135K | 565 | $1,082K | 323 | $3,349 |
| 1995 | $2,125K | $4,571K | 653 | $1,764K | 420 | $4,200 |
| 1996 | $2,500K | $6,084K | 709 | $1,928K | 405 | $4,761 |
| 1997 | $3,000K | $8,314K | 776 | $2,392K | 420 | $5,694 |
| 1998 | $4,050K | $10,889K | 868 | $2,075K | 351 | $5,913 |
| 1999 | $4,350K | $13,981K | 975 | $2,022K | 338 | $5,982 |

Confidential - Subject
to Protective Order

-11-

M0001182

DEF002515
Confidential/Attorneys-
Subject to Protective Order

## Ownership Distribution of Meditech Stock

The following is a recap of total shares outstanding at Mar 31, 1997:

| Type | # | Shares | % |
|---|---|---|---|
| Founders/Family | 40 | 11,609,682 | 72.35 |
| Officers/Directors/Family | 15 | 1,461,250 | 9.11 |
| Profit Sharing Trust | 1 | 1,423,845 | 8.87 |
| Active Employees | 587 | 1,121,659 | 6.99 |
| Retirees/Terminees | 105 | 315,776 | 1.96 |
| Investors | 4 | 115,000 | 0.72 |
| Total | 752 | 16,047,212 | 100.00 |

The following is a recap of total shares outstanding at Mar 31, 1998:

| Type | # | Shares | % |
|---|---|---|---|
| Founders/Family | 40 | 11,638,276 | 71.73 |
| Officers/Directors/Family | 16 | 1,505,155 | 9.27 |
| Profit Sharing Trust | 1 | 1,490,876 | 9.19 |
| Active Employees | 606 | 1,127,261 | 6.95 |
| Retirees/Terminees | 132 | 349,143 | 2.15 |
| Investors | 4 | 115,000 | 0.71 |
| Total | 799 | 16,225,711 | 100.00 |

The following is a recap of total shares outstanding at Mar 31, 1999:

| Type | # | Shares | % |
|---|---|---|---|
| Founders/Family | 41 | 11,678,276 | 71.13 |
| Officers/Directors/Family | 16 | 1,545,627 | 9.41 |
| Profit Sharing Trust | 1 | 1,554,734 | 9.47 |
| Active Employees | 640 | 1,144,186 | 6.97 |
| Retirees/Terminees | 158 | 379,463 | 2.31 |
| Investors | 4 | 115,000 | 0.71 |
| Total | 860 | 16,417,286 | 100.00 |

## Share Price and Dividend Policy

Based on the heated discussion at the last Board meeting (for which I apologize to all board members) I thought it would be good to summarize and justify both our share price and dividend policy.

In regard to the share price policy we purposely keep the share price on the low end of the range the IRS and our auditors would allow. The obvious benefit with this approach is to create an incentive for employees to buy and hold onto MEDITECH stock. More shares

Confidential - Subject
to Protective Order

M0001183

DEF002516
Confidential/Attorneys-
Subject to Protective Order

can be purchased with the same amount of money, the subsequent dividend yield will be high and our employees will own a larger percentage of MEDITECH stock sooner.

Should we become a public company and the share price subsequently escalate, the benefits mentioned above will diminish. There will be less incentive to buy because the dividend yield will be smaller. In fact, the high price might induce employees to sell. In addition, as the share price fluctuates due to the vagaries of the market rather than our performance, some employees will see a price drop soon after they made a purchase.

A low share price does disproportionally dilute the large shareholders who are not offered the opportunity to purchase additional shares. It also severely limits their ability to diversify, so it is with their concurrence that we continue this tradition. On the plus side, more shares can be passed on to heirs both annually as well as upon death, if a low share price is maintained.

In regard to the dividend policy we have made a concerted effort to keep the equity growth rate in line with the revenue or expense growth rates. If equity were allowed to grow faster, cash would build up in excess of the needs of the business. Conversely if equity were allowed to grow slower, the business would eventually run out of cash. Equity growth comes from net profit plus sales of additional company stock minus paidout dividends. We note, of course, that as our growth rate slows, we could justify paying out a larger percentage of the prior year's profit as dividends so as to slow down the equity growth rate as well. But we suspect that our shareholders would prefer a higher growth rate instead.

## Board Meeting

The annual shareholders' meeting is scheduled to convene at 8:30 AM, Monday, April 26, 1999 at the Company's Canton facility. The board meeting will convene immediately thereafter. Lunch will be served during the meeting. Thank you in anticipation of your prompt attendance. Due to a late start please allow for a longer meeting this year if possible.

Confidential - Subject
to Protective Order

M0001184

DEF002517
Confidential/Attorneys-
Subject to Protective Order

## 10 Year History and 1999 Forecast

| Full Year | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Revenue | 31,524 | 49,484 | 54,238 | 63,998 | 71,311 | 84,223 | 98,758 | 115,730 | 131,775 | 133,636 | 154,870 |
| Service Revenue | 17,349 | 19,351 | 23,491 | 28,304 | 34,014 | 40,000 | 44,963 | 52,154 | 62,030 | 70,177 | 79,986 |
| Total Revenue | 48,873 | 68,835 | 77,729 | 92,302 | 105,325 | 124,223 | 143,721 | 167,884 | 193,805 | 203,813 | 234,856 |
| Operating Expense | 27,411 | 38,568 | 47,271 | 55,405 | 64,040 | 72,968 | 85,208 | 98,334 | 115,519 | 124,230 | 140,397 |
| Operating Income | 21,462 | 30,267 | 30,458 | 36,897 | 41,285 | 51,255 | 58,513 | 69,550 | 78,286 | 79,583 | 94,459 |
| Other Income | 2,368 | 931 | 1,667 | 1,822 | 8,178 | 2,911 | 6,410 | 8,938 | 12,236 | 16,724 | 14,993 |
| Other Expense | 981 | 1,499 | 1,626 | 614 | 197 | 220 | 5,258 | 4,527 | 5,879 | 8,228 | 7,925 |
| Pretax Income | 22,849 | 29,699 | 30,499 | 38,105 | 49,266 | 53,946 | 59,665 | 73,961 | 84,643 | 88,079 | 101,527 |
| Income Taxes | 8,520 | 11,251 | 11,654 | 14,909 | 19,641 | 21,756 | 22,580 | 29,611 | 34,359 | 34,798 | 40,637 |
| Net Profit | 14,329 | 18,448 | 18,845 | 23,196 | 29,625 | 32,190 | 37,085 | 44,350 | 50,284 | 53,281 | 60,890 |
| Dividends Paid | 6,091 | 7,114 | 10,213 | 10,276 | 13,447 | 16,260 | 19,558 | 22,195 | 26,913 | 30,439 | 32,759 |
| Common Shares | 15,235 | 15,250 | 15,325 | 15,418 | 15,523 | 15,641 | 15,782 | 15,863 | 16,029 | 16,203 | 16,392 |
| Net Profit / share | 0.94 | 1.21 | 1.23 | 1.50 | 1.91 | 2.06 | 2.35 | 2.80 | 3.14 | 3.29 | 3.71 |
| Dividends / share | 0.40 | 0.47 | 0.67 | 0.67 | 0.87 | 1.04 | 1.24 | 1.40 | 1.68 | 1.88 | 2.00 |

| Year End | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Assets | 69,573 | 92,138 | 94,233 | 99,266 | 118,923 | 137,755 | 197,999 | 218,339 | 263,108 | 266,600 | 287,718 |
| Total Liabilities | 22,032 | 33,318 | 25,707 | 16,854 | 18,870 | 20,006 | 60,171 | 55,871 | 73,577 | 49,329 | 36,639 |
| Shareholder Equity | 47,541 | 58,820 | 68,526 | 82,412 | 100,053 | 117,749 | 137,828 | 162,468 | 189,531 | 217,271 | 251,079 |
| Common Shares | 15,277 | 15,263 | 15,369 | 15,454 | 15,567 | 15,686 | 15,831 | 15,938 | 16,087 | 16,266 | 16,457 |
| Equity / share | 3.11 | 3.85 | 4.46 | 5.33 | 6.43 | 7.51 | 8.71 | 10.19 | 11.78 | 13.36 | 15.26 |
| Fair Value / share | 8.00 | 10.00 | 10.67 | 12.67 | 14.00 | 17.00 | 20.00 | 24.00 | 27.00 | 29.00 | 32.00 |

Confidential – Subject
to Protective Order

M0001185

-14-

DEF002518
Confidential/Attorneys-
Subject to Protective Order



10 Year History and 1999 Forecast

Confidential – Subject
to Protective Order

M0001186

DEF002519
Confidential/Attorneys-
Subject to Protective Order

**EXHIBIT 23**



EXHIBIT 52
WIT: DM508U
DATE: 10/17/07
Victoria S. Reade

**REPORT TO THE BOARD OF DIRECTORS**

**QUARTER ENDED DECEMBER 31, 2001**

**BOARD OF DIRECTORS MEETING**

**JANUARY 28, 2002**

**MEDICAL INFORMATION TECHNOLOGY, INC.**

Confidential – Subject
to Protective Order

M0000510

—1—

DEF001848
Confidential/Attorneys-
Subject to Protective Order

## CHAIRMAN'S COMMENTS

### 4TH QUARTER PERFORMANCE

This quarter culminated a good year for the company. For the quarter, total revenues were $60.2M, operating income was $23.6M and net profit was $16.7M, up 13.4%, 17.5% and 13.9% compared to the same quarter of the prior year. For the year, total revenues were $217.9M, operating income was $81.6M and net profit was $56.8M, up 3.5%, 3.0% and 3.1% compared to the prior year.

Product bookings for the quarter were $39.5M and for the year were $152.9M, up 15.8% and 40.6% compared to the prior year. The resultant product backlog was $110.6M, up 44.3% compared to the end of the prior year.

We extend our gratitude to all those whose efforts produced these results:

- o to those who design and develop our products,
- o to those who market and sell our products and services,
- o to those who install our products and provide our services,
- o to those who send out the bills and collect the money, and
- o to the clerical, administrative and maintenance staffs supporting the above.

In addition, we thank the company's officers and managers for their efforts, dedication and loyalty as well as the company's directors for their valued advice and active participation.

### PROFIT SHARING BONUS DISTRIBUTION

This year's profit sharing bonus distribution of $18.4M represented 22.5% of the operating income for 2001 of $81.6M. It was allocated among three pools as follows:

- o $11.9M for the general cash bonus to all employees
- o $3.5M for the Meditech Profit Sharing Trust
- o $3.0M for the discretionary bonus for officers

In regard to the general cash bonus, at the end of this month we intend to distribute an amount to each employee in proportion to such employee's last 5 years of compensation (capped at $600K). In regard to the Trust, the $3.5M composed of $2.075M in cash and $1.425M in Meditech stock (75,000 shares valued at $19 per share), was transferred in December. In regard to the discretionary bonus, we intend to distribute at the end of this month the $3.0M among the Company's 10 officers as indicated at the last Board Meeting. On behalf of the company's officers and employees we thank you for your continued generosity.

We are furnishing historical data to indicate the trend over the past five years.

IN TRUTH

Confidential - Subject
to Protective Order

–12–

M0000521

DEF001859
Confidential/Attorneys-
Subject to Protective Order

We are furnishing historical data to indicate the trend over the past five years.

|                                    | 1997 | 1998 | 1999 | 2000 | 2001 |
|------------------------------------|------|------|------|------|------|
| Cash Bonus as % of 5 year W2       | 4.61 | 4.22 | 4.24 | 3.75 | 3.62 |
| Trust Contribution as % of 1 year W2 | 6.04 | 5.82 | 5.81 | 5.02 | 4.61 |
| Trust Revaluation annual percentage | 14.82 | 11.82 | 13.96 | 12.29 | 16.90 |

## MEDITECH PROFIT SHARING TRUST

Year-end assets and other year-end statistics of the Trust are as follows:

|                          | 1999      | 2000      | 2001      |
|--------------------------|-----------|-----------|-----------|
| Cash                     | $94K      | $358K     | $2,112K   |
| U.S. Treasury Notes      | 24,857K   | 17,427K   | 16,173K   |
| Accrued Interest Thereon | 401K      | 252K      | 216K      |
| Meditech Stock           | 51,386K   | 56,791K   | 65,903K   |
| Employee Loans           | 1,423K    | 1,348K    | 1,338K    |
| Total Assets of the Trust | $78,161K | $76,176K  | $85,742K  |
|                          |           |           |           |
| Meditech shares          | 3,211,618 | 3,340,646 | 3,468,568 |
| Meditech members         | 1,664     | 1,580     | 1,521     |

We continue to make in service distributions to active members so as to limit their account balance to $1M.  *1999 was first yr done*

## EMPLOYEE PURCHASES OF MEDITECH STOCK

As part of our effort to promote stock ownership by employees, we will be extending an offer to various employees including officers at the end of January to purchase up to 300,000 shares of Meditech stock valued at $19 per share. Employees can use part of their cash bonus and/or arrange a loan from the Trust to buy the shares they wish to purchase.

## CHARITABLE CONTRIBUTIONS

$431K of the $450K approved at the board meeting was distributed among 44 designated organizations during the year. We have included a breakdown in this report and pass on their appreciation to the board members. Special thanks to Mort Ruderman for ensuring that we met with most of our donees in 2001.

## 2002 FORECAST

We have fully recovered from HCA's lack of new business orders and the slowdown in orders due to the Y2K hysteria. We now are returning to normal growth for Meditech. During 2001 it was important to rebuild the product backlog so as to sustain this growth

Confidential - Subject
to Protective Order

M0000522

DEF001860
Confidential/Attorneys-
Subject to Protective Order

–13–

in 2002 and thereafter. As can be seen from the 2002 forecast contained in the financial section of this report we are currently projecting total revenues of $254.5M, operating income of $98.0M and net profit of $66.3M, up 16.8%, 20.1% and 16.6% compared to the prior year. This forecast is based on an initial product backlog of $110.6M. Our product booking goal for 2002 will be in excess of $160M, an amount needed to sufficiently increase the resultant product backlog for 15% growth in 2003.

## REVENUE AND EQUITY GROWTH

We include a table indicating annual revenue and year end equity from 1993 through forecasted 2002. The table also includes respective growth rates and the ratio of revenue to equity. As you can easily see, we have attempted for many years to set the dividend payout to keep this ratio at one. Because of a less than desired revenue growth from 1998 through 2001, the ratio has fallen below unity in 1998 and continued to fall thereafter. The projection for 2002 reverses the trend and a few more years of 15% percent revenue growth will get us back to a ratio of one.

| Fiscal Year | Full Year Revenue | Annual Growth | Year End Equity | Annual Growth | Rev/Equ Ratio |
|---|---|---|---|---|---|
| 1993 | 105,325 | 14.11% | 100,053 | 21.41% | 1.053 |
| 1994 | 124,223 | 17.94% | 117,749 | 17.69% | 1.055 |
| 1995 | 143,721 | 15.70% | 137,828 | 17.05% | 1.043 |
| 1996 | 167,884 | 16.81% | 162,468 | 17.88% | 1.033 |
| 1997 | 193,805 | 15.44% | 189,531 | 16.66% | 1.023 |
| 1998 | 203,813 | 5.16% | 217,271 | 14.64% | 0.938 |
| 1999 | 225,630 | 10.70% | 246,695 | 13.54% | 0.915 |
| 2000 | 210,638 | -6.64% | 273,778 | 10.98% | 0.769 |
| 2001 | 217,942 | 3.47% | 295,526 | 7.94% | 0.737 |
| 2002 | 254,500 | 16.77% | 322,359 | 9.08% | 0.789 |

## DIVIDENDS

Based on the 2001 performance and expectations for 2002, we recommend increasing the annual dividend 9.7% from $1.24 to $1.36 per share. The new dividend represents a yield of 7.2% on the share price of $19. A draft vote is enclosed for your review.

## FAIR VALUE

At the last Board Meeting, I agreed to have a full board discussion on the fair value of Meditech stock. The following are my thoughts on this matter and I welcome everyone's participation in a discussion of the issue.

Meditech sets an internal share price annually when selling its stock to the staff or contributing its stock to the Meditech Profit Sharing Trust. In setting the price for this

Confidential - Subject to Protective Order

-14-

M0000523

DEF001861
Confidential/Attorneys-
Subject to Protective Order

purpose, the intent is to establish a reasonable price that is not so high as to discourage purchases of Meditech stock by eligible employees. Moreover, because Meditech has historically paid significant dividends on its stock, purchasing the stock has been attractive to our staff. As a result, many of our employees have bought and held onto Meditech stock. Not only have they benefited from Meditech's success, but also, such stock ownership is an incentive for employees to continue to make significant contributions to that success.

There have been numerous transactions between willing sellers and willing buyers over the years to support the process of establishing the internal share price. In addition, the IRS has repeatedly accepted the internal share price during their audit examinations of Meditech. They test the price when the company creates an expense for a contribution of stock to the Meditech Profit Sharing Trust to make sure it is not too high. They also test the price when the company sells stock to its employees to make sure it is not too low. Recently, the process to determine the internal share price has yielded a higher value, in spite of a decline in net profit. This process weighed dividend yield more than earnings and resulted in the P/E ratio rising from 8.5 to 11.2 in 6 years.

Some argue that the internal share price should be higher. However, if the internal share price were to be increased, the benefits mentioned above would diminish. There would be less incentive for employees to buy stock because the dividend yield would be lower. In fact, a high price might even induce employee shareholders to attempt to sell some or all of their holdings, if the Company, or the Trust or anyone else were willing to buy at that higher price.

Meditech remains a private company with no intention of becoming a public company or being acquired by another company, and therefore a control premium or a public company multiple is not appropriate for use in valuing its stock. Moreover, Meditech has no intention, let alone any legal obligation, to buy back its stock from shareholders who wish to sell. This being the case, shareholders have always had the right to sell their stock at whatever price can be realized. While shareholders are free to sell their stock to whomever and at any price they wish, in practice the price realized in such transactions has been generally the same as the internal share price established by the Company for the purposes described above.

Some might argue that shareholders should be allowed to cash in their stock at a higher price. Perhaps, it is argued, the company should buy back the stock at a higher price. However, if the company were to offer to do so, I believe that it should offer such a buy back to all shareholders. Presumably, the company would reserve a fixed amount of money for such a buy back. Most likely, such an offer would be oversubscribed and only a pro rata purchase from substantially all shareholders would be made. In this case, the IRS might be able to characterize the redemption as a dividend and tax it accordingly.

Confidential - Subject
to Protective Order

M0000524

-15-

DEF001862
Confidential/Attorneys-
Subject to Protective Order

In summary, fixing the internal share price at a reasonable level and the significant employee stock ownership that has resulted from that approach have helped motivate and reward the staff. If any shareholders believe that this price is too low, they are of course free to sell their stock to whomever and at any price they wish.

## ANOTHER COMMITTEE

Up to now the primary purchaser of outstanding Meditech stock has been the Meditech Profit Sharing Trust. I am aware of *at* least one shareholder who wishes to sell some or all of his Meditech stock to a potential buyer other than the Trust. I believe that we should consider appointing another Board Committee to help with this issue. The purpose of the Committee would be to interact with the seller and potential buyer by representing Meditech. I will continue to interact with any shareholders who wish to sell their stock to the Trust.

I believe the Committee should limit the discussion with a potential buyer to an explanation of Meditech operations, financial data and other pertinent information found in our 10Q and 10K filings to help the potential buyer make an informed decision. The Committee's authority should be limited to responding to inquiries from a potential buyer and engaging in follow-up discussions with the seller and potential buyer. The Committee must not negotiate share price or terms and conditions of the proposed sale. Should any member of this Committee wish to sell his stock to a potential buyer other than the Trust, he must step off the Committee. Finally, the Committee should inform the full Board from time to time about any discussions.

I would like to discuss this issue with the full Board at our upcoming meeting. If the Board is in favor of the Committee as well as the guidelines mentioned above, I am prepared to appoint Ed Roberts, Mort Ruderman and Dan Valente as members.

## UPCOMING ANNUAL SHAREHOLDER MEETING

REDACTED

The most significant change in our practice is that we will deliver to our shareholders a formal Proxy Statement along with the Form 10K. This will provide an opportunity for shareholders who do not attend the annual meeting to nonetheless have their shares voted at the meeting. The primary disadvantage of adopting this practice is more paperwork for Meditech. In connection with this approach, the Board will explicitly recommend that the shareholders fix the number of Directors and will select a slate of nominees for Director.

Confidential - Subject
to Protective Order

M0000525

DEF001863
Confidential/Attorneys-
Subject to Protective Order

I hope it is clear to all of you by now that I want to reduce the number of Directors to six. I wish to thank Jerry Grossman for many valued years of service to Meditech as a Director. Hopefully he will continue to remain a shareholder for many years to come.

In conjunction with this the Board will be required to vote on recommendations for the Annual Shareholder Meeting. A series of draft votes is enclosed for your review. I have also enclosed in this report a work in progress version of the Proxy Statement.

## BOARD MEETING

The Board Meeting is scheduled to convene at 9:00 AM Monday morning, January 28, 2002 at the Company's Canton facility. Lunch will be served during the meeting. Thank you in anticipation of your prompt attendance.

Confidential - Subject
to Protective Order

M0000526

–17–

DEF001864
Confidential/Attorneys-
Subject to Protective Order

**EXHIBIT 24**

MEDICAL INFORMATION TECHNOLOGY, INC.

REPORT TO THE BOARD OF DIRECTORS

QUARTER ENDED SEPTEMBER 30, 2003

BOARD MEETING OF OCTOBER 27, 2003

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

M0001954

## CHAIRMAN'S REPORT
### A. Neil Pappalardo

**3rd Quarter Performance**

The financial results for the 3rd quarter were slightly less than the prior forecast. Total revenue was $67.7M, operating income was $24.9M and net income was $17.2M, up 4.8%, 3.4% and 4.0% compared to last year. For the nine months, total revenue was $202.5M, operating income was $75.1M and net income was $51.4M, up 6.1%, 4.9% and 4.5% compared to last year.

Product bookings were $31.5M for the 3rd quarter and $89.9M for the nine months, down 2.5% and 28.0% compared to last year. At the end of the quarter, the resultant product backlog was $83.7M, down 24.3% compared to last year. We do note the $10M contract from Stellaris came in but was not booked due to a contingency.

**2003 Revised Forecast**

As can be seen in the financial section of this report, we have lowered the forecast somewhat based on the 3rd quarter product bookings. We now forecast total revenue of $270.5M, operating income of $99.6M and net income of $68.2M, up 5.6%, 5.0% and 6.8% compared to last year.

The product bookings section in the Sales report suggests a possibility of $50.0M for the 4th quarter. Should we realize this optimistic amount our year-end product backlog would approach $100M and dictate what we could expect for 2004 product revenue.

**Valuation of MEDITECH Stock**

During the October Board meeting, it is necessary for the Directors to fix the fair share value of MEDITECH stock as of December 31, 2003 in connection with a year-end contribution of stock to the MEDITECH Profit Sharing Trust and in anticipation of a subsequent sale of stock to the staff under the 2004 Stock Purchase Plan. We provide the following information to aid the Board in its deliberations:

- Actual 2002 net income was $1.89 per share and actual year-end shareholder equity was $9.39 per share.

- A year-end fair share value of $22.00 per share was last set by the Board during the October 28, 2002 meeting in anticipation of a year-end contribution of 80,000 shares to the MEDITECH Profit Sharing Trust on December 31, 2002 and the sale of up to 300,000 shares to the staff during February 2003.

- Current annual dividend rate of $1.56 per share set on January 27, 2003.

- The staff purchased 263,884 shares at $22 per share during February 2003.

- During February, 2003 a founding shareholder sold 225,000 shares of his stock to MIT at a price of $22 per share and another 217,391 shares of his stock to Summit Partners at a price of $23 per share.

- Between January and April of 2003, the Trust purchased 4,420 shares from 7 shareholders at a price of $22 per share. Between May and August of 2003, the Trust purchased an additional 6,220 shares from 12 shareholders at a price of $23 per share. In September of 2003, the Trust purchased an additional 550 shares from 1 shareholder at a price of $24 per share.

- Forecasted 2003 net income is $2.00 per share and forecasted year-end shareholder equity is $10.23 per share.

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

M0001960

DEF003007
Confidential/Attorneys-
Subject to Protective Order

The following table shows multiples of MEDITECH's forecasted total revenue, net income and operating income plus shareholder equity at three different share prices, $25, $26 and $27.

|  | Forecast | Per share | $25 | $26 | $27 |
|---|---|---|---|---|---|
| Total revenue | $270.5M | $7.93 | 3.15 | 3.28 | 3.40 |
| Net income | $68.2M | $2.00 | 12.50 | 13.00 | 13.50 |
| Operating income plus | $99.6M | $2.92 | 5.06 | 5.40 | 5.74 |
| Shareholder equity | $350.0M | $10.23 | 1.00 | 1.00 | 1.00 |

The following table compares MEDITECH with our public competition. The figures for MEDITECH are based on the revised forecast and assume $26 per share for market value. The figures for the competition are based on the most recent 12 months and the latest market value.

|  | Total Revenue | Net Income | Market Value |
|---|---|---|---|
| MEDITECH | 270.5M | 68.2M | 888M |
| Cerner Corporation | 801.9M | 38.2M | 1,330M |
| IDX Systems Corporation | 458.8M | 39.1M | 707M |
| Eclipsys Corporation | 221.2M | (56.1M) | 544M |

We note MEDITECH is 3rd in total revenue, 1st in net income and 2nd in market value. It is difficult to believe the competitive information furnished above will guide us in our deliberations. Apparently no consistent relationship exists between revenue or net income and market value. Extreme share price volatility also has plagued our public competition. The low and high share prices for the past few years and the latest share price are shown in the following table. Estimated EPS for 2003 and 2004 and the resultant P/E ratio are shown in the subsequent table.

|  | 2000 | 2001 | 2002 | 2003 | Latest |
|---|---|---|---|---|---|
| Cerner Corporation | $18-$62 | $28-$60 | $28-$57 | $16-$39 | $36.20 |
| IDX Systems Corporation | $12-$42 | $9-$31 | $10-$18 | $13-$27 | $24.30 |
| Eclipsys Corporation | $6-$31 | $12-$28 | $4-$19 | $5-$18 | $18.28 |

|  | 2003 EPS | 2003 P/E | 2004 EPS | 2004 P/E |
|---|---|---|---|---|
| Cerner Corporation | $1.14 | 31.75 | $1.52 | 23.82 |
| IDX Systems Corporation | $0.73 | 33.29 | $0.91 | 26.70 |
| Eclipsys Corporation | ($0.91) | -- | ($0.43) | -- |

We believe the market valuation of our competition is due solely to prior revenue growth rates and continued expectation of the same. The 5-year average annual revenue growth rate of Cerner is over 20%, that of IDX and Eclipsis is almost 10% and that of MEDITECH is 5.8%. We note their higher growth rates are achieved through acquisitions and the offering of barely profitable additional services. Looking ahead to 2004, the dividend payout should be increased much more than the increase in net income would initially suggest. As the following table shows, shareholder equity growth continues to exceed total revenue growth. Therefore equity growth can be reduced by paying out more in dividends.

| Year | Revenue | Growth | Equity | Growth | Ratio |
|---|---|---|---|---|---|
| 1993 | $105,325K | 14.11% | $100,053K | 21.41% | 1.053 |
| 1994 | $124,223K | 17.94% | $117,749K | 17.69% | 1.055 |
| 1995 | $143,721K | 15.70% | $137,828K | 17.05% | 1.043 |
| 1996 | $167,884K | 16.81% | $162,468K | 17.88% | 1.033 |
| 1997 | $193,805K | 15.44% | $189,531K | 16.66% | 1.023 |
| 1998 | $203,813K | 5.16% | $217,271K | 14.64% | 0.938 |
| 1999 | $225,630K | 10.70% | $246,695K | 13.54% | 0.915 |
| 2000 | $216,873K | -3.88% | $273,778K | 10.98% | 0.792 |
| 2001 | $223,831K | 3.21% | $295,526K | 7.94% | 0.757 |
| 2002 | $256,197K | 14.46% | $317,996K | 7.60% | 0.806 |
| 2003 | $270,478K | 5.57% | $349,964K | 10.05% | 0.773 |

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

M0001961

DEF003008
Confidential/Attorneys-
Subject to Protective Order

At the January Board meeting, we will recommend setting the 2004 annual dividend rate at $1.80 per share. This would be an increase of 15.4% compared to 5.7% increase in net income per share. Based primarily on this dividend rate, we recommend fixing the fair share value at $26 effective on December 31, 2003. This would be an increase of 18.2% and, assuming a dividend rate of $1.80 per year, would result in a 6.9% dividend yield. A draft resolution for fixing the fair share value of MEDITECH stock is enclosed for your review.

**Charitable Contributions**

In December 2002 we contributed a total of $485K to 46 cultural, educational and charitable institutions in the greater Boston area. The list is appended to this report. At the upcoming meeting we will review the contribution committee's recommendation for this year's contribution (we are accruing $500K). A draft resolution is enclosed for your review.

**Stock Purchase Plan**

As indicated at the prior Board meeting we would be preparing a 2004 Stock Purchase Plan for submittal to and approval by the Board. We have prepared such a Plan which is appended to this report. We urge the Board members to specifically review this Plan. Hopefully there will be agreement on the Plan or at most minor revisions to it. We expect the Board to act upon the Plan at the upcoming January Board meeting and to vote a total number of approximately 260,000 shares to be offered to the Company's staff including the maximum number of shares to be offered to individual officers. We will then file an appropriate registration statement with the SEC. The maximum offered shares would be conveyed to the staff including officers at the end of January for purchase during the month of March, 2004.

**Profit Sharing Bonus**

Last year's bonus distributions totaled $22.6M which represented almost 24% of last year's $94.9M in operating profit. It was allocated among three programs as follows:

- a Cash Bonus of $15.0M for all the staff including officers by prorating the last 5 years of compensation capped at $600K,

- a Trust Bonus of $4.1M ($2.34M in cash and 80,000 shares of stock at $22 per share) by prorating the last year of compensation capped at $100K, and

- a Cash Bonus of $3.5M for the Company's 10 officers.

This year we have been accruing $24.1M which represents 24.2% of the forecasted operating income forecast of $99.6M. At the meeting we will finalize the total amount and the various allocations. Our recommendations for the Cash bonus, Trust bonus and Officer bonus are shown in the following table.

| Year | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| Cash Bonus | $10,500K | $12,000K | $11,250K | $11,900K | $15,000K | $16,500K |
| Five Year W-2 | 4.22% | 4.24% | 3.75% | 3.62% | 4.04% | 3.98% |
| Trust Bonus | $3,500K | $4,000K | $3,500K | $3,500K | $4,100K | $4,100K |
| One Year W-2 | 5.82% | 5.81% | 5.02% | 4.61% | 4.85% | 4.49% |
| Officer Bonus | $3,050K | $3,500K | $3,000K | $3,000K | $3,500K | $3,500K |
| Total Bonus | $17,050K | $19,500K | $17,750K | $18,400K | $22,600K | $24,100K |
| Operating Income | $79,583K | $91,553K | $79,193K | $81,565K | $94,907K | $99,642K |
| Bonus Ratio | 21.42% | 21.30% | 22.41% | 22.56% | 23.81% | 24.19% |

Draft resolutions for the bonus program are enclosed for your review.

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

M0001962

DEF003009
Confidential/Attorneys-
Subject to Protective Order

**Individual Officer Bonus**

The salary history of the individual officers is shown in the following table. We do not expect to make any changes in 2004 with the possible exception of Hoda.

| Year | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|------|------|------|------|------|------|------|
| Pappalardo | $360K | $360K | $360K | $360K | $360K | $360K |
| Polimeno | $240K | $240K | $240K | $240K | $240K | $180K |
| Messing | $180K | $216K | $216K | $216K | $240K | $240K |
| Pisinski | $156K | $192K | $192K | $192K | $204K | $204K |
| Manzolillo | $144K | $180K | $180K | $180K | $204K | $204K |
| Anschuetz | $120K | $144K | $144K | $144K | $168K | $168K |
| Gale | $120K | $144K | $144K | $144K | $168K | $168K |
| Wood | $120K | $144K | $144K | $144K | $168K | $168K |
| Koretz | $120K | $144K | $144K | $144K | $168K | $168K |
| Lefthes | $120K | $144K | $144K | $144K | $168K | $168K |
| Sayed-Friel | $77K | $77K | $84K | $84K | $92K | $120K |

Our bonus recommendation for the 11 officers is shown in the following table, but will probably change somewhat based on the booking results for the 4th quarter among other factors. This is in addition to the $24K they will receive from the cash bonus applicable to all the staff.

| Year | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|------|------|------|------|------|------|------|
| Pappalardo | $700K | $775K | $700K | $700K | $700K | $700K |
| Polimeno | $600K | $650K | $600K | $600K | $600K | $450K |
| Messing | $350K | $400K | $350K | $350K | $450K | $450K |
| Pisinski | $275K | $300K | $250K | $250K | $300K | $250K |
| Manzolillo | $200K | $250K | $200K | $200K | $250K | $250K |
| Anschuetz | $150K | $175K | $150K | $175K | $225K | $250K |
| Gale | $150K | $200K | $175K | $175K | $250K | $250K |
| Wood | $150K | $200K | $150K | $175K | $250K | $250K |
| Koretz | $150K | $200K | $150K | $175K | $250K | $250K |
| Lefthes | $150K | $175K | $150K | $200K | $225K | $250K |
| Sayed-Friel | | | | | | $150K |

The stock ownership history of the individual officers is shown in the next table. At the upcoming January Board meeting we will make a specific recommendation for the maximum number of shares to be offered to individual officers in conjunction with the adoption of the 2004 Stock Purchase Plan.

| Year | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|------|------|------|------|------|------|------|
| Pappalardo | 8,600K | 8,670K | 8,740K | 8,800K | 8,850K | 8,900K |
| Polimeno | 1,121K | 1,117K | 1,112K | 1,104K | 993K | 986K |
| Messing | 250K | 270K | 270K | 270K | 270K | 285K |
| Pisinski | 295K | 295K | 295K | 296K | 296K | 297K |
| Manzolillo | 169K | 180K | 184K | 190K | 196K | 200K |
| Anschuetz | 80K | 82K | 84K | 84K | 84K | 84K |
| Gale | 60K | 60K | 60K | 60K | 60K | 60K |
| Wood | 50K | 60K | 60K | 61K | 62K | 65K |
| Koretz | 40K | 60K | 60K | 60K | 60K | 61K |
| Lefthes | 40K | 60K | 60K | 61K | 61K | 62K |
| Sayed-Friel | 2K | 3K | 3K | 13K | 13K | 13K |

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

M0001963

DEF003010
Confidential/Attorneys-
Subject to Protective Order

## Dividends

Based on the 3rd quarter performance and expectations for the remainder of the year, we recommend declaring the regular quarterly dividend of $0.39 per share. A draft resolution is enclosed for your review.

## Motion to Dismiss Denied

On July 16 the presiding judge (Margot Botsford) met with the lawyers to hear arguments concerning our motion to dismiss the complaint or consider merging most of the complaint into the derivative action. REDACTED . We received her determination on September 12 indicating she will not dismiss the complaint. Stephen Poss is prepared to attend the upcoming Board meeting and discuss what we might do next.

Grossman has consistently indicated through his lawyers that he wants to be bought out. He proposes the Company select an appraiser and he do the same. If the appraisals differ, they would seek out a third and final appraiser. The Company would then be obligated to buy all his shares at the appraised price. We have indicated strong disagreement with such a concept. We would expect the appraisals to come in at our fair share value because of the illiquidity of the stock. But even so, should the Company repurchase that much stock at that price, it would reduce future dividends accordingly. It would also set a bad precedent because any shareholder could then probably force the Company to buy back stock under a similar arrangement.

A final point worth noting is that Grossman is always free to seek out and engage an appraiser of his choice to ascertain a price for his stock. The Company need not be involved in this process as all the information about MEDITECH necessary for such an appraisal is publicly available in SEC filings.

## Board Meeting

The Board meeting is scheduled to convene at 9:00am, Monday, October 27, 2003 at the Company's Canton facility. Lunch will be served during the meeting. Thank you in anticipation of your prompt attendance.

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

M0001964

DEF003011
Confidential/Attorneys-
Subject to Protective Order

## 10 Year History and 2003 Forecast

| Full Year | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Revenue | 71,311 | 84,223 | 98,758 | 115,730 | 131,775 | 133,636 | 144,671 | 125,197 | 123,698 | 146,827 | 150,391 |
| Service Revenue | 34,014 | 40,000 | 44,963 | 52,154 | 62,030 | 70,177 | 80,959 | 91,667 | 100,133 | 109,370 | 120,087 |
| Total Revenue | 105,325 | 124,223 | 143,721 | 167,884 | 193,805 | 203,813 | 225,630 | 216,864 | 223,831 | 256,197 | 270,478 |
| Operating Expense | 64,040 | 72,968 | 85,208 | 98,334 | 115,519 | 124,230 | 134,077 | 137,671 | 142,266 | 161,290 | 170,836 |
| Operating Income | 41,285 | 51,255 | 58,513 | 69,550 | 78,286 | 79,583 | 91,553 | 79,193 | 81,565 | 94,907 | 99,642 |
| Other Income | 8,178 | -2,911 | 6,410 | 8,938 | 12,236 | 16,724 | 15,680 | 17,826 | 17,840 | 14,134 | 18,816 |
| Other Expense | 197 | 220 | 5,258 | 4,527 | 5,879 | 8,228 | 7,080 | 6,363 | 6,648 | 6,545 | 7,526 |
| Pretax Income | 49,266 | 53,946 | 59,665 | 73,961 | 84,643 | 88,079 | 100,153 | 90,656 | 92,757 | 102,496 | 110,932 |
| Income Tax | 19,641 | 21,756 | 22,580 | 29,611 | 34,359 | 34,798 | 40,197 | 35,510 | 35,916 | 38,625 | 42,742 |
| Net Income | 29,625 | 32,190 | 37,085 | 44,350 | 50,284 | 53,281 | 59,956 | 55,146 | 56,841 | 63,871 | 68,190 |
| Dividends Paid | 13,447 | 16,260 | 19,558 | 22,195 | 26,913 | 30,439 | 32,759 | 38,408 | 41,465 | 45,889 | 53,158 |
| Average Shares | 31,046 | 31,282 | 31,565 | 31,726 | 32,058 | 32,405 | 32,784 | 33,132 | 33,460 | 33,760 | 34,097 |
| Net Income/share | 0.95 | 1.03 | 1.17 | 1.40 | 1.57 | 1.64 | 1.83 | 1.66 | 1.70 | 1.89 | 2.00 |
| Dividends/share | 0.43 | 0.52 | 0.62 | 0.70 | 0.84 | 0.94 | 1.00 | 1.16 | 1.24 | 1.36 | 1.56 |
| **Year End** | **1993** | **1994** | **1995** | **1996** | **1997** | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** |
| Total Assets | 118,923 | 137,755 | 197,999 | 218,339 | 263,108 | 266,600 | 288,278 | 306,093 | 331,284 | 354,809 | 396,596 |
| Total Liabilities | 18,870 | 20,006 | 60,171 | 55,871 | 73,577 | 49,329 | 41,583 | 32,315 | 35,758 | 36,813 | 46,632 |
| Shareholder Equity | 100,053 | 117,749 | 137,828 | 162,468 | 189,531 | 217,271 | 246,695 | 273,778 | 295,526 | 317,996 | 349,964 |
| Outstanding Shares | 31,134 | 31,373 | 31,663 | 31,877 | 32,174 | 32,531 | 32,915 | 33,255 | 33,576 | 33,877 | 34,221 |
| Equity/share | 3.21 | 3.75 | 4.35 | 5.10 | 5.89 | 6.68 | 7.49 | 8.23 | 8.80 | 9.39 | 10.23 |
| Fair Value/share | 7.00 | 8.50 | 10.00 | 12.00 | 13.50 | 14.50 | 16.00 | 17.00 | 19.00 | 22.00 | |

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

M0001965

DEF003012
Confidential/Attorneys-
Subject to Protective Order



**10 Year History and 2003 Forecast**

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

M0001966

DEF003013
Confidential/Attorneys-
Subject to Protective Order

**EXHIBIT 25**

MEDICAL INFORMATION TECHNOLOGY, INC.

REPORT TO THE BOARD OF DIRECTORS

QUARTER ENDED DECEMBER 31, 2003

BOARD MEETING OF JANUARY 26, 2004

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

M0002007

DEF003054
Confidential/Attorneys-
Subject to Protective Order

**MEDICAL INFORMATION TECHNOLOGY, INC.**
**Formal Minutes of the October 27, 2003 Board Meeting**

The meeting convened at 9:00am at the Company's Canton offices. Present were A. Neil Pappalardo, Roland L. Driscoll, Lawrence A. Polimeno, Edward B. Roberts, Morton E. Ruderman and Louis P. Valente, being all of the directors and constituting a quorum. Also in attendance were Howard Messing, Chief Operating Officer and President, and Barbara A. Manzolillo, Chief Financial Officer, Treasurer and Clerk.

Upon motion made and seconded it was unanimously

RESOLVED: That the minutes of the July 28, 2003 board meeting are hereby approved and confirmed.

Upon motion made and seconded it was unanimously

RESOLVED: That based upon the information presented by the Chairman and submitted by the Chief Financial Officer, all of which was reviewed and analyzed by the Board, the fair value of the Company's common stock is hereby stipulated to be $26.00 per share as of the Company's forthcoming year-end date of December 31, 2003.

Upon motion made and seconded it was unanimously

VOTED: That the Chairman is authorized and directed to have the Company make charitable contributions out of earnings for the year 2003 in a total sum not to exceed $525,000 to various qualified non-profit organizations in the Greater Boston area, with the individual amounts and particular organizations being determined by the Charitable Contributions Committee. Any such contributions must qualify as federal tax-deductible expenditures and must be disbursed on or before December 31, 2003.

Upon motion made and seconded it was unanimously

VOTED: That the Chairman is authorized and directed to appropriate on behalf of the Board, the sum of $16,500,000 to be paid as the Cash Bonus to all the staff including officers, in recognition of services rendered by them during the calendar year 2003. The individual portion of the Cash Bonus payable to each staff member shall be determined by prorating the sum of the recipient's last five years of cash compensation but capped at $600,000. It is a condition of this VOTE that all appropriations be paid to the designated recipients on or before January 31, 2004. The Treasurer is therefore authorized and directed to accrue as a liability on the Company's books at December 31, 2003 any portion thereof not yet paid on that date.

Upon motion made and seconded it was unanimously

VOTED: That the Chairman is authorized and directed to have the Company make a contribution of $4,100,000 comprised of cash and presently authorized but unissued common stock to the Medical Information Technology, Inc. Profit Sharing Trust on or before December 31, 2003. The cash amount shall be $2,020,000 and the stock shall be 80,000 shares valued at $26.00 per share, as stipulated in a preceding RESOLUTION, for a value of $2,080,000. The Treasurer is authorized and directed to issue appropriate shares of the Company's common stock, par value one dollar per share, to the Trust, with such issue to be made from previously authorized but unissued shares of the common stock of the Company.

Upon motion made and seconded it was unanimously

VOTED: That the Chairman is authorized and directed to appropriate on behalf of the Board, the sum of $3,500,000 to be paid as the Cash Bonus solely to the officers, in recognition of services rendered by them during the calendar year 2003. The individual portion of the Cash Bonus payable to each

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

M0002011

DEF003058
Confidential/Attorneys-
Subject to Protective Order

officer shall be determined by the Board. It is a condition of this VOTE that all appropriations be paid to the designated recipients on or before January 31, 2004. The Treasurer is therefore authorized and directed to accrue as a liability on the Company's books at December 31, 2003 any portion thereof not yet paid on that date.

Upon motion made and seconded it was unanimously

VOTED:  That the amount payable to the Chairman as the Cash Bonus to all the staff including officers, and the amount payable to the Chairman as the Cash Bonus solely to the officers shall be confirmed by the Compensation Committee of the Board and conveyed to the Company in writing prior to December 31, 2003.

Upon motion made and seconded it was unanimously

VOTED:  That a regular quarterly cash dividend of thirty-nine cents per share is hereby declared on all of the Company's outstanding common shares, payable to holders of record at the close of business on October 27, 2003, with payment of such dividend to be made on November 10, 2003 and that the Treasurer is authorized and directed to make such cash dividend disbursement on November 10, 2003.

There being no further business to come before the meeting, upon motion made and seconded and by affirmative vote of all directors present, it was

VOTED:  To adjourn.

A true record.

ATTEST: _____
            Barbara A. Manzolillo, Clerk

CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

M0002012

DEF003059
Confidential/Attorneys-
Subject to Protective Order

**EXHIBIT 26**

MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING TRUST

To:       Barbara A. Manzolillo

From:     A. Neil Pappalardo, Trustee   

Subject:  Annual Valuation of the Trust's Assets

Date:     December 31, 1996

In accordance with Article 5.04 of the Trust Agreement, I hereby instruct you
to value the Trust's two major asset holdings on the Trust's annual valuation
date of December 31st as follows:

U.S. Treasury Notes:  All notes are purchased for investment purposes
and held to maturity.  As such, value the notes at the purchase price,
adjusted for amortized premium or discount that was paid or received at
the time of purchase.

Medical Information Technology, Inc. Common Stock:  All shares are purchased
and held for growth and investment purposes.  I deem the current fair market
value that provides adequate consideration to plan members and beneficiaries
to be $24.00 per share (up $4.00 per share from 12/31/95's valuation of $20.00
per share).  This valuation is based on my good faith assessment of all
relevant economic and financial factors, of which a few are:

o  Actual 1995 earnings were $2.34/share and actual year-end book value
   was $8.71/share

o  A year-end fair market value of $20.00/share was set by the Board
   during the October 23, 1995 meeting in anticipation of a contribution
   of 30,000 shares to the Trust on December 31, 1995 and a sale of up
   to 125,000 shares to employees and directors during February 1996 (shares
   actually sold were 106,963)

o  Annual dividend rate of $1.40/share set on January 22, 1996

o  During the first five months of 1996 the Trust purchased 6,750 shares at
   $20.00 per share from 15 shareholders. During June, July and August the
   Trust purchased 1,550 shares at $21.00 per share from 6 shareholders.  In
   October the Trust purchased 400 shares at $22.00 per share from another
   shareholder.

o  During June of 1996 at total of 230,400 shares of the company's common
   stock was purchased by the Company at $21.00 per share, with 115,000 shares
   simultaneously sold to 2 shareholders at $21.00 per share and 115,400
   shares held by the Company as Treasury shares.

o  A year-end fair market value of $24.00/share was set by the Board
   during the October 28, 1996 meeting in anticipation of a contribution
   of 35,000 shares to the Trust on December 31, 1996 and a possible sale
   of up to 80,400 treasury shares to officers of the Company at year-end, and
   up to 125,000 shares to employees during February 1997.

o  During December certain officers purchased an aggregate of 80,400 shares
   from the company at $24.00 per share.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER                M 0002851

DEF001337
Confidential-Subject
to Protective Order

o Company Contributions to Profit Sharing Trust:

| Year | Stock | Cash | Total |
|------|-------|------|-------|
| 1987 | 24,000 shs @ $ 5.67/sh = $136,000 | 564,000 | 700,000 |
| 1988 | 24,000 shs @ $ 6.83/sh = $164,000 | 736,000 | 900,000 |
| 1989 | 30,000 shs @ $ 8.00/sh = $240,000 | 835,000 | 1,075,000 |
| 1990 | 30,000 shs @ $10.00/sh = $300,000 | 1,213,000 | 1,513,000 |
| 1991 | 30,000 shs @ $10.67/sh = $320,000 | 1,100,000 | 1,420,000 |
| 1992 | 30,000 shs @ $12.67/sh = $380,000 | 1,320,000 | 1,700,000 |
| 1993 | 30,000 shs @ $14.00/sh = $420,000 | 1,480,000 | 1,900,000 |
| 1994 | 30,000 shs @ $17.00/sh = $510,000 | 1,595,000 | 2,105,000 |
| 1995 | 30,000 shs @ $20.00/sh = $600,000 | 1,800,000 | 2,400,000 |
| 1996 | 35,000 shs @ $24.00/sh = $840,000 | 2,060,000 | 2,900,000 |

o As of this date estimated 1996 earnings are $2.81/share and estimated year-end book value is $10.22/share.

o FMV share has been set at about 8 to 8 1/2 times earnings and averages 2.2 times book value in recent years. (See 10 Yr Historical Summary). These ratios for capitalization purposes are realistic for a closely held private company with continued moderate growth and lack of instant liquidity of privately held stock. Comparing ourselves to public companies serves no useful purpose. All such companies operate in multiple market segments such as hardware, software, facilities management, and consulting services while we operate in only one - software. In addition, the current environment among such public corporations is one of constant merging, downsizing, and consolidation, as opposed to our unchanged organizational structure.

o IRS exam of 1988, 1989 & 1990 company tax returns accepted stock valuation.

o DOL exam of 1987, 1988 & 1989 trust tax returns accepted stock valuation.

o MASS exam of 1990, 1991 & 1992 company tax returns accepted stock valuation.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M 0002852

DEF001338
Confidential-Subject
to Protective Order

| Year | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Revenue | 19,403 | 24,276 | 31,524 | 49,484 | 54,238 | 63,998 | 71,311 | 84,223 | 98,758 | 115,730 | 131,659 |
| Service Revenue | 12,738 | 15,242 | 17,349 | 19,351 | 23,491 | 28,304 | 34,014 | 40,000 | 44,963 | 52,154 | 61,992 |
| Total Revenue | 32,141 | 39,518 | 48,873 | 68,835 | 77,729 | 92,302 | 105,325 | 124,223 | 143,721 | 167,884 | 193,651 |
| Operating Expense | 18,179 | 21,846 | 27,411 | 38,568 | 47,271 | 55,405 | 64,040 | 72,968 | 85,208 | 98,334 | 115,535 |
| Operating Income | 13,962 | 17,672 | 21,462 | 30,267 | 30,458 | 36,897 | 41,285 | 51,255 | 58,513 | 69,550 | 78,116 |
| Other Income | 3,801 | 2,039 | 2,368 | 931 | 1,667 | 1,822 | 8,178 | 2,911 | 6,410 | 8,938 | 12,016 |
| Other Expense | 244 | 112 | 981 | 1,499 | 1,626 | 614 | 197 | 220 | 5,258 | 4,527 | 5,847 |
| Pre-tax Income | 17,519 | 19,599 | 22,849 | 29,699 | 30,499 | 38,105 | 49,266 | 53,946 | 59,665 | 73,961 | 84,285 |
| Income Taxes | 7,509 | 7,376 | 8,520 | 11,251 | 11,654 | 14,909 | 19,641 | 21,756 | 22,580 | 29,611 | 34,300 |
| Net Profit | 10,010 | 12,223 | 14,329 | 18,448 | 18,845 | 23,196 | 29,625 | 32,190 | 37,085 | 44,350 | 49,985 |
| Dividends Paid | 2,908 | 4,338 | 6,091 | 7,114 | 10,213 | 10,276 | 13,447 | 16,260 | 19,558 | 22,195 | 26,914 |
| Total Assets | 36,757 | 47,549 | 69,573 | 92,138 | 94,233 | 99,266 | 118,923 | 137,755 | 197,999 | 218,339 | 261,060 |
| Total Liabilities | 6,637 | 8,998 | 22,032 | 33,318 | 25,707 | 16,854 | 18,870 | 20,006 | 60,171 | 55,871 | 61,963 |
| Shareholder Equity | 30,120 | 38,551 | 47,541 | 58,820 | 68,526 | 82,412 | 100,053 | 117,749 | 137,828 | 162,468 | 189,097 |
| Common Shares | 15,081 | 15,172 | 15,277 | 15,263 | 15,369 | 15,454 | 15,567 | 15,686 | 15,831 | 15,938 | 16,082 |
| Earnings/share | 0.66 | 0.81 | 0.94 | 1.21 | 1.23 | 1.50 | 1.90 | 2.05 | 2.34 | 2.78 | 3.11 |
| Divs Paid/share | 0.19 | 0.29 | 0.40 | 0.47 | 0.67 | 0.67 | 0.87 | 1.04 | 1.24 | 1.40 | 1.68 |
| Book Value/share | 2.00 | 2.54 | 3.11 | 3.85 | 4.46 | 5.33 | 6.43 | 7.51 | 8.71 | 10.19 | 11.76 |
| Fair Value/share | 5.67 | 6.83 | 8.00 | 10.00 | 10.67 | 12.67 | 14.00 | 17.00 | 20.00 | 24.00 | 27.00 |

10 Year History and 1997 Forecast

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

–14–

M  0002853

DEF001339
Confidential-Subject
to Protective Order



- 13 -



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M  0002854

DEF001340
Confidential-Subject
to Protective Order

**EXHIBIT 27**

MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING TRUST

To:        Barbara A. Manzolillo

From:      A. Neil Pappalardo, Trustee

Subject:   Annual Valuation of the Trust's Assets for ~~[redacted]~~

Date:      January 2, 1998

**EXHIBIT**
*Pappalardo*
*7-21-07*

In accordance with Article 5.04 of the Trust Agreement, I hereby instruct you to value the Trust's two major asset holdings on the Trust's annual valuation date of December 31st as follows:

- Medical Information Technology, Inc. Common Stock:  All shares are purchased and held for growth and investment purposes.  I deem the current fair market value that provides adequate consideration to plan members and beneficiaries to be $27.00 per share (up $3.00 per share from 12/31/96's valuation of $24.00 per share).  This valuation is based on my good faith assessment of all relevant economic and financial factors, of which a few are:

o  Actual 1996 earnings were $2.78/share and actual year-end book value was $10.19/share

o  A year-end fair market value of $24.00/share was set by the Board during the October 28, 1996 meeting in anticipation of a contribution of 35,000 shares to the Trust on December 31, 1996 and a sale of up to 125,000 shares to employees and directors during February 1997 (shares actually sold were 108,847)

o  Annual dividend rate of $1.68/share set on January 27, 1997

o  During the first three months of 1997 the Trust purchased 15,100 shares at $24.00 per share from 17 shareholders. During the second quarter the Trust purchased 2,990 shares at $25.00 per share from 5 shareholders.  In August and October the Trust purchased 2,175 shares at $26.00 per share from 4 shareholders.

o  A year-end fair market value of $27.00/share was set by the Board during the October 27, 1997 meeting in anticipation of a contribution of 40,000 shares to the Trust on December 30, 1997 and a possible sale of up to 150,000 shares to employees during February 1998.

CONFIDENTIAL -- SUBJECT
TO PROTECTIVE ORDER

M  0002847

DEF001333
Confidential-Subject
to Protective Order

o  Company Contributions to Profit Sharing Trust:

| Year | Stock | | | | Cash | Total |
|------|-------|--|--|--|------|-------|
| 1987 | 24,000 shs @ $ 5.67/sh = $ | 136,000 | 564,000 | 700,000 |
| 1988 | 24,000 shs @ $ 6.83/sh = $ | 164,000 | 736,000 | 900,000 |
| 1989 | 30,000 shs @ $ 8.00/sh = $ | 240,000 | 835,000 | 1,075,000 |
| 1990 | 30,000 shs @ $10.00/sh = $ | 300,000 | 1,213,000 | 1,513,000 |
| 1991 | 30,000 shs @ $10.67/sh = $ | 320,000 | 1,100,000 | 1,420,000 |
| 1992 | 30,000 shs @ $12.67/sh = $ | 380,000 | 1,320,000 | 1,700,000 |
| 1993 | 30,000 shs @ $14.00/sh = $ | 420,000 | 1,480,000 | 1,900,000 |
| 1994 | 30,000 shs @ $17.00/sh = $ | 510,000 | 1,595,000 | 2,105,000 |
| 1995 | 30,000 shs @ $20.00/sh = $ | 600,000 | 1,800,000 | 2,400,000 |
| 1996 | 35,000 shs @ $24.00/sh = $ | 840,000 | 2,060,000 | 2,900,000 |
| 1997 | 40,000 shs @ $27.00/sh = $ | 1,080,000 | 2,320,000 | 3,400,000 |

o  As of this date estimated 1997 earnings are $3.11/share and estimated
   year-end book value is $11.76/share.

o  FMV share has been set at about 8 to 8 1/2 times earnings and averages 2.3
   times book value in recent years. (See 10 Yr Historical Summary). These
   ratios for capitalization purposes are realistic for a closely held private
   company with continued moderate growth and lack of instant liquidity of
   privately held stock. Comparing ourselves to public companies serves no
   useful purpose. All such companies operate in multiple market segments
   such as hardware, software, facilities management, and consulting services
   while we operate in only one - software. In addition, the current
   environment among such public corporations is one of constant merging,
   downsizing, and consolidation, as opposed to our unchanged organizational
   structure.

o  IRS exam of 1988, 1989 & 1990 company tax returns accepted stock valuation.

o  DOL exam of 1987, 1988 & 1989 trust tax returns accepted stock valuation.

o  MASS exam of 1994 & 1995  company tax returns accepted stock valuation.

o  IRS exam of 1994 trust tax return accepted stock valuation

- U.S. Treasury Notes: All notes are purchased for investment purposes
  and held to maturity. As such, value the notes at the purchase price,
  adjusted for amortized premium or discount that was paid or received at
  the time of purchase, a.k.a. the amortized value.

The Fair Market Value of our holdings in U.S. Treasury Notes at 12/31/97,
as per closing bid quote reported by the Wall Street Journal, of $24,841,297
is $296,981 higher than the amortized value of $24,544,316 at 12/31/97.
Due to IRS/DOL reporting requirements, the FMV will be used for Audited
Statements, but will be offset by a reduction in the Company's common stock
valuation in like kind. The $27.00 per share will be reduced by
approximately $0.202 per share to $26.798 on holdings of $1,469,010 shares
or by $296,981.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M 0002848

DEF001334
Confidential-Subject
to Protective Order

| Year | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Revenue | 16,524 | 19,403 | 24,276 | 31,524 | 49,484 | 54,238 | 63,998 | 71,311 | 84,223 | 98,758 | 115,661 |
| Service Revenue | 10,857 | 12,738 | 15,242 | 17,349 | 19,351 | 23,491 | 28,304 | 34,014 | 40,000 | 44,963 | 52,097 |
| Total Revenue | 27,381 | 32,141 | 39,518 | 48,873 | 68,835 | 77,729 | 92,302 | 105,325 | 124,223 | 143,721 | 167,758 |
| Operating Expense | 15,317 | 18,179 | 21,846 | 27,411 | 38,568 | 47,271 | 55,405 | 64,040 | 72,968 | 85,208 | 97,993 |
| Operating Income | 12,064 | 13,962 | 17,672 | 21,462 | 30,267 | 30,458 | 36,897 | 41,285 | 51,255 | 58,513 | 69,765 |
| Other Income | 2,000 | 3,801 | 2,039 | 2,368 | 931 | 1,667 | 1,822 | 8,178 | 2,911 | 6,410 | 9,761 |
| Other Expense | 530 | 244 | 112 | 981 | 1,499 | 1,626 | 614 | 197 | 220 | 5,258 | 5,372 |
| Pre-tax Income | 13,534 | 17,519 | 19,599 | 22,849 | 29,699 | 30,499 | 38,105 | 49,266 | 53,946 | 59,665 | 74,154 |
| Income Taxes | 6,042 | 7,509 | 7,376 | 8,520 | 11,251 | 11,654 | 14,909 | 19,641 | 21,756 | 22,580 | 29,354 |
| Net Profit | 7,492 | 10,010 | 12,223 | 14,329 | 18,448 | 18,845 | 23,196 | 29,625 | 32,190 | 37,085 | 44,800 |
| Dividends Paid | 2,392 | 2,908 | 4,338 | 6,091 | 7,114 | 10,213 | 10,276 | 13,447 | 16,260 | 19,558 | 22,195 |
| Total Assets | 34,150 | 36,757 | 47,549 | 69,573 | 92,138 | 94,233 | 99,266 | 118,923 | 137,755 | 197,999 | 218,636 |
| Total Liabilities | 12,207 | 6,637 | 8,998 | 22,032 | 33,318 | 25,707 | 16,854 | 18,870 | 20,006 | 60,471 | 55,719 |
| Shareholder Equity | 21,943 | 30,120 | 38,551 | 47,541 | 58,820 | 68,526 | 82,412 | 100,053 | 117,749 | 137,828 | 162,919 |
| Common Shares | 14,990 | 15,081 | 15,172 | 15,277 | 15,263 | 15,369 | 15,454 | 15,567 | 15,686 | 15,831 | 15,938 |
| Earnings/share | 0.50 | 0.66 | 0.81 | 0.94 | 1.21 | 1.23 | 1.50 | 1.90 | 2.05 | 2.34 | 2.81 |
| Divs Paid/share | 0.16 | 0.19 | 0.29 | 0.40 | 0.47 | 0.67 | 0.67 | 0.87 | 1.04 | 1.24 | 1.40 |
| Book Value/share | 1.46 | 2.00 | 2.54 | 3.11 | 3.85 | 4.46 | 5.33 | 6.43 | 7.51 | 8.71 | 10.22 |
| Fair Value/share | 4.33 | 5.67 | 6.83 | 8.00 | 10.00 | 10.67 | 12.67 | 14.00 | 17.00 | 20.00 | 24.00 |

10 Year History and 1996 Forecast

-13-

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M  0002849

DEF001335
Confidential-Subject
to Protective Order

-12-



10 Year History and 1996 Forecast

■ Total Revenue   ▨ Operating Income   ▨ Net Profit

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M 0002850

DEF001336
Confidential-Subject
to Protective Order

**EXHIBIT 28**

MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING TRUST

To:        Barbara A. Manzolillo

From:      A. Neil Pappalardo, Trustee

Subject:   Annual Valuation of the Trust's Assets for December 31, 1998

Date:      January 5, 1999

In accordance with Article 5.04 of the Trust Agreement, I hereby instruct you
to value the Trust's two major asset holdings on the Trust's annual valuation
date of December 31st as follows:

- Medical Information Technology, Inc. Common Stock:  All shares are purchased
  and held for growth and investment purposes.  I deem the current fair market
  value that provides adequate consideration to plan members and beneficiaries
  to be $29.00 per share (up $2.00 per share from 12/31/97's valuation of $27.00
  per share).  This valuation is based on my good faith assessment of all
  relevant economic and financial factors, of which a few are:

  o  Actual 1997 earnings were $3.14/share and actual year-end book value
     was $11.78/share

  o  A year-end fair market value of $27.00/share was set by the Board
     during the October 27, 1997 meeting in anticipation of a contribution
     of 40,000 shares to the Trust on December 31, 1997 and a sale of up
     to 150,000 shares to employees and directors during February 1998 (shares
     actually sold were 138,499)

  o  Annual dividend rate of $1.88/share set on January 26, 1998

  o  During the first half of 1998 the Trust purchased 35,001 shares at $27.00
     per share from 45 shareholders.  Between August and December 4th the Trust
     purchased 1,320 shares at $28.00 per share from 5 shareholders.

  o  A year-end fair market value of $29.00/share was set by the Board during
     the October 26, 1998 meeting in anticipation of a contribution of 40,000
     shares to the Trust on December 30, 1998 and a possible sale of up to
     150,000 shares to employees during February 1999.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M 6002843

DEF001329
Confidential-Subject
to Protective Order

o Company Contributions to Profit Sharing Trust:

| Year | Stock | | | Cash | Total |
|------|-------|---|---|------|-------|
| 1988 | 24,000 shs @ $ 6.83/sh = $ | 164,000 | | 736,000 | 900,000 |
| 1989 | 30,000 shs @ $ 8.00/sh = $ | 240,000 | | 835,000 | 1,075,000 |
| 1990 | 30,000 shs @ $10.00/sh = $ | 300,000 | | 1,213,000 | 1,513,000 |
| 1991 | 30,000 shs @ $10.67/sh = $ | 320,000 | | 1,100,000 | 1,420,000 |
| 1992 | 30,000 shs @ $12.67/sh = $ | 380,000 | | 1,320,000 | 1,700,000 |
| 1993 | 30,000 shs @ $14.00/sh = $ | 420,000 | | 1,480,000 | 1,900,000 |
| 1994 | 30,000 shs @ $17.00/sh = $ | 510,000 | | 1,595,000 | 2,105,000 |
| 1995 | 30,000 shs @ $20.00/sh = $ | 600,000 | | 1,800,000 | 2,400,000 |
| 1996 | 35,000 shs @ $24.00/sh = $ | 840,000 | | 2,060,000 | 2,900,000 |
| 1997 | 40,000 shs @ $27.00/sh = $1,080,000 | | | 2,320,000 | 3,400,000 |
| 1998 | 40,000 shs @ $29.00/sh = $1,160,000 | | | 2,340,000 | 3,500,000 |

o As of this date estimated 1998 earnings are $3.29/share and estimated
  year-end book value is $13.36/share.

o FMV share has been set at about 8 to 8 1/2 times earnings and averages 2.3
  times book value in recent years. (See 10 Yr Historical Summary). These
  ratios for capitalization purposes are realistic for a closely held private
  company with continued moderate growth and lack of instant liquidity of
  privately held stock. Comparing ourselves to public companies serves no
  useful purpose. All such companies operate in multiple market segments
  such as hardware, software, facilities management, and consulting services
  while we operate in only one - software. In addition, the current
  environment among such public corporations is one of constant merging,
  downsizing, and consolidation, as opposed to our unchanged organizational
  structure.

o IRS exam of 1996 & 1997 company tax returns accepted stock valuation.

o DOL exam of 1987, 1988 & 1989 trust tax returns accepted stock valuation.

o MASS exam of 1994 & 1995 company tax returns accepted stock valuation.

o IRS exam of 1994 trust tax return accepted stock valuation

- U.S. Treasury Notes: All notes are purchased for investment purposes
  and held to maturity. As such, value the notes at the purchase price,
  adjusted for amortized premium or discount that was paid or received at
  the time of purchase, a.k.a. the amortized value.

The Fair Market Value of our holdings in U.S. Treasury Notes at 12/31/98,
as per closing bid quote reported by the Wall Street Journal, of $26,161,437
is $660,654 higher than the amortized value of $25,500,783 at 12/31/98.
Due to IRS/DOL reporting requirements, the FMV will be used for Audited
Statements, but will be offset by a reduction in the Company's common stock
valuation in like kind. The $29.00 per share will be reduced by
approximately $0.4275 per share to $28.5725 on holdings of $1,545,331 shares
or by $660,654.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M 0002844

DEF001330
Confidential-Subject
to Protective Order



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M  0002845

DEF001331
Confidential-Subject
to Protective Order

## 10 Year History and 1999 Forecast

| Full Year | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Revenue | 31,524 | 49,484 | 54,238 | 63,998 | 71,311 | 84,223 | 98,758 | 115,730 | 131,775 | 133,636 | 156,000 |
| Service Revenue | 17,349 | 19,351 | 23,491 | 28,304 | 34,014 | 40,000 | 44,963 | 52,154 | 62,030 | 70,177 | 79,000 |
| Total Revenue | 48,873 | 68,835 | 77,729 | 92,302 | 105,325 | 124,223 | 143,721 | 167,884 | 193,805 | 203,813 | 235,000 |
| Operating Expense | 27,411 | 38,568 | 47,271 | 55,405 | 64,040 | 72,968 | 85,208 | 98,334 | 115,519 | 124,230 | 141,000 |
| Operating Income | 21,462 | 30,267 | 30,458 | 36,897 | 41,285 | 51,255 | 58,513 | 69,550 | 78,286 | 79,583 | 94,000 |
| Other Income | 2,368 | 931 | 1,667 | 1,822 | 8,178 | 2,911 | 6,410 | 8,938 | 12,236 | 16,724 | 14,875 |
| Other Expense | 981 | 1,499 | 1,626 | 614 | 197 | 220 | 5,258 | 4,527 | 5,879 | 8,228 | 7,875 |
| Pretax Income | 22,849 | 29,699 | 30,499 | 38,105 | 49,266 | 53,946 | 59,665 | 73,961 | 84,643 | 88,079 | 101,000 |
| Income Taxes | 8,520 | 11,251 | 11,654 | 14,909 | 19,641 | 21,756 | 22,580 | 29,611 | 34,359 | 34,798 | 40,750 |
| Net Profit | 14,329 | 18,448 | 18,845 | 23,196 | 29,625 | 32,190 | 37,085 | 44,350 | 50,284 | 53,281 | 60,250 |
| Dividends Paid | 6,091 | 7,114 | 10,213 | 10,276 | 13,447 | 16,260 | 19,558 | 22,195 | 26,913 | 30,439 | 32,719 |
| Common Shares | 15,235 | 15,250 | 15,325 | 15,418 | 15,523 | 15,641 | 15,782 | 15,863 | 16,029 | 16,203 | 16,349 |
| Net Profit / share | 0.94 | 1.21 | 1.23 | 1.50 | 1.91 | 2.06 | 2.35 | 2.80 | 3.14 | 3.29 | 3.69 |
| Dividends / share | 0.40 | 0.47 | 0.67 | 0.67 | 0.87 | 1.04 | 1.24 | 1.40 | 1.68 | 1.88 | 2.00 |

| Year End | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Assets | 69,573 | 92,138 | 94,233 | 99,266 | 118,923 | 137,755 | 197,999 | 218,339 | 263,108 | 266,600 | 288,979 |
| Total Liabilities | 22,032 | 33,318 | 25,707 | 16,854 | 18,870 | 20,006 | 60,171 | 55,871 | 73,577 | 49,329 | 39,272 |
| Shareholder Equity | 47,541 | 58,820 | 68,526 | 82,412 | 100,053 | 117,749 | 137,828 | 162,468 | 189,531 | 217,271 | 249,707 |
| Common Shares | 15,277 | 15,263 | 15,369 | 15,454 | 15,567 | 15,686 | 15,831 | 15,938 | 16,087 | 16,266 | 16,431 |
| Equity / share | 3.11 | 3.85 | 4.46 | 5.33 | 6.43 | 7.51 | 8.71 | 10.19 | 11.78 | 13.36 | 15.20 |
| Fair Value / share | 8.00 | 10.00 | 10.67 | 12.67 | 14.00 | 17.00 | 20.00 | 24.00 | 27.00 | 29.00 | 32.00 |

–16–

M 0002846

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

DEF001332
Confidential-Subject
to Protective Order

**EXHIBIT 29**

**MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING TRUST**

To:         Barbara A. Manzolillo

From:       A. Neil Pappalardo, Trustee

Subject:    Annual Valuation of the Trust's Assets for December 31, 2000

Date:       December 29, 2000

In accordance with Article 5.04 of the Trust Agreement, I hereby instruct you to value the Trust's two major asset holdings on the Trust's annual valuation date of December 31st as follows:

Medical Information Technology, Inc. Common Stock:

- All shares are purchased and held for growth and investment purposes. I deem the current fair market value that provides adequate consideration to plan members and beneficiaries to be $34.00 per share (up $2.00 per share from 12/31/99's valuation of $32.00 per share). This valuation is based on my good faith assessment of all relevant economic and financial factors, of which a few are:

- Actual 1999 earnings were $3.66/share and actual year-end book value was $16.40 share

- A year-end fair market value of $32.00/share was set by the Board during the October 25, 1999 meeting in anticipation of a contribution of 40,000 shares to the Trust on December 31, 1999 and a sale of up to 150,000 shares to employees and directors during February 2000 (shares actually sold were 130,280)

- Annual dividend rate of $2.32/share set on January 24, 2000

- During the first 3 months of 2000, the Trust purchased 16,055 shares at $32.00 per share from 33 shareholders in response to the Trust's letter offer (copy attached). From April thru October an additional 5,334 shares were purchased at $32.00 per share from 18 shareholders. A final 3,125 shares were purchased at $33 per share from 7 shareholders in November.

- A year-end fair market value of $34.00/share was set by the Board during the October 30, 2000 meeting in anticipation of a contribution of 40,000 shares to the Trust on December 31, 2000 and a possible sale of up to 150,000 shares to employees during February 2001.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M 0002838

DEF001321
Confidential-Subject
to Protective Order

- Company Contributions to Profit Sharing Trust our prior 10 years:

| Year | Stock | Cash | Total |
|------|-------|------|-------|
| 1991 | 30,000 shs @ $10.67/sh = $ 320,000 | 1,100,000 | 1,420,000 |
| 1992 | 30,000 shs @ $12.67/sh = $ 380,000 | 1,320,000 | 1,700,000 |
| 1993 | 30,000 shs @ $14.00/sh = $ 420,000 | 1,480,000 | 1,900,000 |
| 1994 | 30,000 shs @ $17.00/sh = $ 510,000 | 1,595,000 | 2,105,000 |
| 1995 | 30,000 shs @ $20.00/sh = $ 600,000 | 1,800,000 | 2,400.000 |
| 1996 | 35,000 shs @ $24.00/sh = $ 840,000 | 2,060,000 | 2,900,000 |
| 1997 | 40,000 shs @ $27.00/sh = $ 1,080,000 | 2,320,000 | 3,400,000 |
| 1998 | 40,000 shs @ $29.00/sh = $ 1,160,000 | 2,340,000 | 3,500,000 |
| 1999 | 40,000 shs @ $32.00/sh = $ 1,280,000 | 2,720,000 | 4,000,000 |
| 2000 | 40,000 shs @ $34.00/sh = $ 1,360,000 | 2,140,000 | 3,500,000 |

- During 4th quarter, estimated 2000 earnings are $3.33/share and estimated year-end book value is $16.33/share.

- FMV share has been set at about 9 to 10 times earnings and averages 2 to 3 times book value in recent years (see 10 Yr Historical Summary). These ratios for capitalization purposes are realistic for a closely held private company with continued moderate growth and lack of instant liquidity of privately held stock. Comparing ourselves to public companies serves no useful purpose. All such companies operate in multiple market segments such as hardware, software, facilities management, and consulting services while we operate in only one - software. In addition, the current environment among such public corporations is one of constant merging, downsizing, and consolidation, as opposed to our unchanged organizational structure.

- IRS exam of 1988, 1989 & 1990 company tax returns accepted stock valuation. IRS exam of 1996 & 1997 company tax returns accepted stock valuation.

- DOL exam of 1987, 1988 & 1989 trust tax returns accepted stock valuation.

- MASS exam of 1994 & 1995 company tax returns accepted stock valuation. MASS exam of 1996 & 1997 company tax returns accepted stock valuation.

- IRS exam of 1994 Trust tax return accepted stock valuation

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M  0002839

DEF001322
Confidential-Subject
to Protective Order

<u>U.S. Treasury Notes</u>:

- All notes are purchased for investment purposes and held to maturity. As such, value the notes at the purchase price adjusted for amortized premium or discount that was paid or received at the time of purchase, a.k.a. the amortized value.

- The Fair market value of our holdings in U.S. Treasury Notes at 12/29/00, as per closing bid quote reported by the Wall Street Journal, of $17,633,109.39 is $205,905.64 higher than the amortized value of $17,427,203.75 at 12/29/00. Due to IRS/DOL reporting requirements, the FMV will be used for Audited Statements, but will be offset by a decrease in the Company's common stock valuation in like kind. The $34.00 per share will be decreased by approximately $0.123273 per share to $33.876727 on holdings of 1,670,323 shares.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M  0002840

DEF001323
Confidential-Subject
to Protective Order

# MEDICAL INFORMATION TECHNOLOGY, INC.

## 10 Year Financial History



All numbers are in millions except for per share data

| Full Year | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Revenue | 54.2 | 64.0 | 71.3 | 84.2 | 98.7 | 115.7 | 131.8 | 133.6 | 144.7 | 120.1 |
| Service Revenue | 23.5 | 28.3 | 34.0 | 40.0 | 45.0 | 52.2 | 62.0 | 70.2 | 80.9 | 90.5 |
| Total Revenue | 77.7 | 92.3 | 105.3 | 124.2 | 143.7 | 167.9 | 193.8 | 203.8 | 225.6 | 210.6 |
| Operating Expense | 47.3 | 55.4 | 64.0 | 73.0 | 85.2 | 98.3 | 115.5 | 124.2 | 134.0 | 131.4 |
| Operating Income | 30.4 | 36.9 | 41.3 | 51.3 | 58.5 | 69.6 | 78.3 | 79.6 | 91.6 | 79.2 |
| Other Income | 1.7 | 1.8 | 8.2 | 2.9 | 6.4 | 8.9 | 12.2 | 16.7 | 15.7 | 17.8 |
| Other Expense | 1.6 | 0.6 | 0.2 | 0.2 | 5.2 | 4.5 | 5.9 | 8.2 | 7.1 | 6.4 |
| Pre-tax Income | 30.5 | 38.1 | 49.3 | 54.0 | 59.7 | 74.0 | 84.6 | 88.1 | 100.2 | 90.6 |
| Income Taxes | 11.7 | 14.9 | 19.7 | 21.8 | 22.6 | 29.6 | 34.4 | 34.8 | 40.2 | 35.5 |
| Net Profit | 18.8 | 23.2 | 29.6 | 32.2 | 37.1 | 44.4 | 50.3 | 53.3 | 60.0 | 55.1 |
| Dividends Paid | 10.2 | 10.3 | 13.4 | 16.3 | 19.6 | 22.2 | 26.9 | 30.4 | 32.8 | 38.4 |
| Average Shares | 15.3 | 15.4 | 15.5 | 15.6 | 15.8 | 15.9 | 16.0 | 16.2 | 16.4 | 16.6 |
| Net Profit per Share | 1.23 | 1.50 | 1.91 | 2.06 | 2.35 | 2.80 | 3.14 | 3.29 | 3.66 | 3.33 |
| Dividends per Share | 0.67 | 0.67 | 0.87 | 1.04 | 1.24 | 1.40 | 1.68 | 1.88 | 2.00 | 2.32 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

http://intranet/pchelp/YearEnd/2001/10YearHistory01.htm                2/6/01

M 0002841

DEF001324
Confidential-Subject
to Protective Order

| Year End | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Assets | 94.2 | 99.3 | 118.9 | 137.8 | 198.0 | 218.3 | 263.1 | 266.6 | 288.3 | 306.1 |
| Total Liabilities | 25.7 | 16.9 | 18.9 | 20.0 | 60.2 | 55.9 | 73.6 | 49.3 | 41.6 | 32.3 |
| Shareholder Equity | 68.5 | 82.4 | 100.0 | 117.8 | 137.8 | 162.4 | 189.5 | 217.3 | 246.7 | 273.8 |
| Outstanding Shares | 15.4 | 15.5 | 15.6 | 15.7 | 15.8 | 15.9 | 16.1 | 16.3 | 16.5 | 16.6 |
| Equity per Share | 4.46 | 5.33 | 6.43 | 7.51 | 8.71 | 10.19 | 11.78 | 13.36 | 14.99 | 16.47 |
| Fair Value per Share | 10.67 | 12.67 | 14.00 | 17.00 | 20.00 | 24.00 | 27.00 | 29.00 | 32.00 | 34.00 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M 0002842

DEF001325
Confidential-Subject
to Protective Order

**EXHIBIT 30**

**MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING TRUST**

To:         Barbara A. Manzolillo

From:       A. Neil Pappalardo, Trustee

Subject:    Annual Valuation of the Trust's Assets for December 31, 2001

Date:       December 31, 2001

In accordance with Article 5.04 of the Trust Agreement, I hereby instruct you to value the Trust's two major asset holdings on the Trust's annual valuation date of December 31st as follows:

Medical Information Technology, Inc. Common Stock (all numbers adjusted for 2:1 stock split effective 5/8/01):

- All shares are purchased and held for growth and investment purposes. I deem the current fair market value that provides adequate consideration to plan members and beneficiaries to be $19.00 per share (up $2.00 per share from 12/31/00's valuation of $17.00 per share). This valuation is based on my good faith assessment of all relevant economic and financial factors, of which a few are:

- Actual 2000 earnings were $1.66/share and actual year-end book value was $8.23 share.

- A year-end fair market value of $17.00/share was set by the Board during the October 30, 2000 meeting in anticipation of a contribution of 80,000 shares to the Trust on December 31, 2000 and a sale of up to 300,000 shares to employees and directors during February 2001 (shares actually sold were 245,424).

- Annual dividend rate of $1.24/share set on January 22, 2001.

- During the first 3 months of 2001, the Trust purchased 45,570 shares at $17.00 per share from 39 shareholders in response to the Trust's letter offer (copy attached). From April through September an additional 4,786 shares were purchased at $17.00 per share from 10 shareholders. In October, an additional 1,330 shares were purchased at $17.50 per share from 3 shareholders. A final 1,236 shares were purchased at $18.00 per share from 4 shareholders in November.

- A year-end fair market value of $19.00/share was set by the Board during the October 22, 2001 meeting in anticipation of a contribution of 75,000 shares to the Trust on December 31, 2001 and a possible sale of up to 300,000 shares to employees during February 2002.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M  0002833

DEF001316
Confidential-Subject
to Protective Order

- Company Contributions to Profit Sharing Trust our prior 10 years:

| Year | Stock | | Cash | Total |
|------|-------|---|------|-------|
| 1992 | 60,000 shs @ $ 6.33/sh = $ | 380,000 | 1,320,000 | 1,700,000 |
| 1993 | 60,000 shs @ $ 7.00/sh = $ | 420,000 | 1,480,000 | 1,900,000 |
| 1994 | 60,000 shs @ $ 8.50/sh = $ | 510,000 | 1,595,000 | 2,105,000 |
| 1995 | 60,000 shs @ $10.00/sh = $ | 600,000 | 1,800,000 | 2,400,000 |
| 1996 | 70,000 shs @ $12.00/sh = $ | 840,000 | 2,060,000 | 2,900,000 |
| 1997 | 80,000 shs @ $13.50/sh = $ 1,080,000 | | 2,320,000 | 3,400,000 |
| 1998 | 80,000 shs @ $14.50/sh = $ 1,160,000 | | 2,340,000 | 3,500,000 |
| 1999 | 80,000 shs @ $16.00/sh = $ 1,280,000 | | 2,720,000 | 4,000,000 |
| 2000 | 80,000 shs @ $17.00/sh = $ 1,360,000 | | 2,140,000 | 3,500,000 |
| 2001 | 75,000 shs @ $19.00/sh = $ 1,425,000 | | 2,075,000 | 3,500,000 |

- During the 4th quarter, estimated 2001 earnings are $1.70/share and estimated year-end book value is $8.80/share.

- FMV share has been set at about 9 to 11 1/2 times earnings and averages 2 to 3 times book value in recent years (see 10 Yr Historical Summary). These ratios for capitalization purposes are realistic for a closely held private company with continued moderate growth and lack of instant liquidity of privately held stock. Comparing ourselves to public companies serves no useful purpose. All such companies operate in multiple market segments such as hardware, software, facilities management, and consulting services while we operate in only one - software. In addition, the current environment among such public corporations is one of constant merging, downsizing, and consolidation, as opposed to our unchanged organizational structure.

- IRS exam of 1988, 1989 & 1990 company tax returns accepted stock valuation.
  IRS exam of 1996 & 1997 company tax returns accepted stock valuation.
  IRS exam of 1998, 1999 & 2000 company tax returns accepted stock valuation.

- IRS exam of 1994 Trust tax return accepted stock valuation.

- DOL exam of 1987, 1988 & 1989 Trust tax returns accepted stock valuation.
  DOL limited review (focus on stock value as no outside appraisal is done) of 1996,1997 & 1998 accepted stock valuation.

- MA exam of 1994 & 1995 company tax returns accepted stock valuation.
  MA exam of 1996 & 1997 company tax returns accepted stock valuation.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M  0002834

DEF001317
Confidential-Subject
to Protective Order

U.S. Treasury Notes:

- All notes are purchased for investment purposes and held to maturity. As such, value the notes at the purchase price adjusted for amortized premium or discount that was paid or received at the time of purchase, a.k.a. the amortized value.

- The Fair market value of our holdings in U.S. Treasury Notes at 12/31/01, as per closing bid quote reported by the Wall Street Journal, of $16,540,117.19 is $367,277.39 higher than the amortized value of $16,172,839.80 at 12/31/01. Due to IRS/DOL reporting requirements, the FMV will be used for Audited Statements, but will be offset by a decrease in the Company's common stock valuation in like kind. The $19.00 per share will be decreased by approximately $0.105887 per share to $18.894113 on holdings of 3,468,568 shares.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M 0002835

DEF001318
Confidential-Subject
to Protective Order

# MEDICAL INFORMATION TECHNOLOGY, INC.

## 10 Year Financial History



All numbers are in millions except for per share data

| Full Year | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Revenue | 64.0 | 71.3 | 84.2 | 98.7 | 115.7 | 131.8 | 133.6 | 144.7 | 120.1 | 119.0 |
| Service Revenue | 28.3 | 34.0 | 40.0 | 45.0 | 52.2 | 62.0 | 70.2 | 80.9 | 90.5 | 99.0 |
| Total Revenue | 92.3 | 105.3 | 124.2 | 143.7 | 167.9 | 193.8 | 203.8 | 225.6 | 210.6 | 218.0 |
| Operating Expense | 55.4 | 64.0 | 73.0 | 85.2 | 98.3 | 115.5 | 124.2 | 134.0 | 131.4 | 136.4 |
| Operating Income | 36.9 | 41.3 | 51.3 | 58.5 | 69.6 | 78.3 | 79.6 | 91.6 | 79.2 | 81.6 |
| Other Income | 1.8 | 8.2 | 2.9 | 6.4 | 8.9 | 12.2 | 16.7 | 15.7 | 17.8 | 17.8 |
| Other Expense | 0.6 | 0.2 | 0.2 | 5.2 | 4.5 | 5.9 | 8.2 | 7.1 | 6.4 | 6.6 |
| Pre-tax Income | 38.1 | 49.3 | 54.0 | 59.7 | 74.0 | 84.6 | 88.1 | 100.2 | 90.6 | 92.7 |
| Income Taxes | 14.9 | 19.7 | 21.8 | 22.6 | 29.6 | 34.4 | 34.8 | 40.2 | 35.5 | 35.9 |
| Net Profit | 23.2 | 29.6 | 32.2 | 37.1 | 44.4 | 50.3 | 53.3 | 60.0 | 55.1 | 56.8 |
| Dividends Paid | 10.3 | 13.4 | 16.3 | 19.6 | 22.2 | 26.9 | 30.4 | 32.8 | 38.4 | 41.5 |
| Average Shares | 30.8 | 31.0 | 31.3 | 31.6 | 31.7 | 32.1 | 32.4 | 32.8 | 33.2 | 33.5 |
| Net Profit per Share | .75 | .95 | 1.03 | 1.17 | 1.40 | 1.57 | 1.64 | 1.83 | 1.66 | 1.70 |
| Dividends per Share | .33 | .43 | .52 | .62 | .70 | .84 | .94 | 1.00 | 1.16 | 1.24 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M 0002836

DEF001319
Confidential-Subject
to Protective Order

| Year End | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Assets | 99.3 | 118.9 | 137.8 | 198.0 | 218.3 | 263.1 | 266.6 | 288.3 | 306.1 | 331.3 |
| Total Liabilities | 16.9 | 18.9 | 20.0 | 60.2 | 55.9 | 73.6 | 49.3 | 41.6 | 32.3 | 35.8 |
| Shareholder Equity | 82.4 | 100.0 | 117.8 | 137.8 | 162.4 | 189.5 | 217.3 | 246.7 | 273.8 | 295.5 |
| Outstanding Shares | 30.8 | 31.0 | 31.3 | 31.6 | 31.7 | 32.1 | 32.4 | 32.8 | 33.2 | 33.6 |
| Equity per Share | 2.67 | 3.21 | 3.75 | 4.35 | 5.10 | 5.89 | 6.68 | 7.49 | 8.23 | 8.80 |
| Fair Value per Share | 6.33 | 7.00 | 8.50 | 10.00 | 12.00 | 13.50 | 14.50 | 16.00 | 17.00 | 19.0 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

M  0002837

DEF001320
Confidential-Subject
to Protective Order

**EXHIBIT 31**

**Medical Information Technology, Inc. Profit Sharing Trust**
**Annual Valuation of the Trust's Assets for the Year Ended 2003 Dec 31**

EXHIBIT 28
Pappalardo
7-21-06

To:       Barbara Manzolillo
From:     A. Neil Pappalardo, Trustee
Date:     2004 Jan 26

In accordance with Article 5.04 of the Trust Agreement, I hereby instruct you to value the Trust's two major asset holdings on the Trust's annual valuation date of 2003 Dec 31 as follows:

**U.S. Treasury Notes**

In prior years the Company's U.S.Treasury Notes were valued at an amortized cost basis. Starting with this valuation, they are to be valued at year end fair market value. I understand this amount to be $18,042,515.62

**MEDITECH Common Stock**

The 3,896,057 shares of MEDITECH Common Stock are to be valued at $26.00 per share for a total of $101,297,482. This valuation is based on my good faith assessment of all relevant economic and financial factors.

Appended to this memorandum is relevant information concerning valuation process performed by the MEDITECH Board of Directors. In addition to this information I add the following:

> Between October and November of 2003, the Trust purchased an additional 3,720 shares from 3 shareholders at a price of $24 per share. In December of 2003, the Trust purchased an additional 600 shares from 1 shareholder at a price of $25 per share.

All IRS exams (audited thru 2000) and MASS exams (audited thru 1997) have accepted the company's stock valuations. All DOL exams (full audits completed thru 1989 and limited review audits focused on our stock valuation for the years 1996 thru 2000) have accepted the Trust's stock valuation

The following table shows the value of all Trust assets:

| | |
|---|---|
| Cash in Checking and Savings Accounts | $2,270,711.10 |
| U.S. Treasury Notes at Fair Market Value | 18,042,515.62 |
| Accrued Interest Receivable | 162,008.41 |
| 3,896,057 Shares of MEDITECH Stock at $26 Per Share | 101,297,482.00 |
| Member Loans Receivable | 1,458,450.00 |
| Total Assets on December 31, 2003 | $123,231,167.13 |

Please note that all MEDITECH Stock whether contributed by MEDITECH or purchased from individuals in private transactions are to be held for growth and investment purposes.

Confidential-Subject
to Protective Order

The following information was included in the Chairman's report and presented to the Board at the October 27, 2003 meeting:

## Valuation of MEDITECH Stock

During the October Board meeting, it is necessary for the Directors to fix the fair share value of MEDITECH stock as of December 31, 2003 in connection with a year-end contribution of stock to the MEDITECH Profit Sharing Trust and in anticipation of a subsequent sale of stock to the staff under the 2004 Stock Purchase Plan. We provide the following information to aid the Board in its deliberations:

- Actual 2002 net income was $1.89 per share and actual year-end shareholder equity was $9.39 per share.

- A year-end fair share value of $22.00 per share was last set by the Board during the October 28, 2002 meeting in anticipation of a year-end contribution of 80,000 shares to the MEDITECH Profit Sharing Trust on December 31, 2002 and the sale of up to 300,000 shares to the staff during February 2003.

- Current annual dividend rate of $1.56 per share set on January 27, 2003.

- The staff purchased 263,884 shares at $22 per share during February 2003.

- During February, 2003 a founding shareholder sold 225,000 shares of his stock to MIT at a price of $22 per share and another 217,391 shares of his stock to Summit Partners at a price of $23 per share.

- Between January and April of 2003, the Trust purchased 4,420 shares from 7 shareholders at a price of $22 per share. Between May and August of 2003, the Trust purchased an additional 6,220 shares from 12 shareholders at a price of $23 per share. In September of 2003, the Trust purchased an additional 550 shares from 1 shareholder at a price of $24 per share.

- Forecasted 2003 net income is $2.00 per share and forecasted year-end shareholder equity is $10.23 per share.

The following table shows multiples of MEDITECH's forecasted total revenue, net income and operating income plus shareholder equity at three different share prices, $25, $26 and $27.

|  | Forecast | Per share | $25 | $26 | $27 |
|---|---|---|---|---|---|
| Total revenue | $270.5M | $7.93 | 3.15 | 3.28 | 3.40 |
| Net income | $68.2M | $2.00 | 12.50 | 13.00 | 13.50 |
| Operating income plus | $99.6M | $2.92 | 5.06 | 5.40 | 5.74 |
| Shareholder equity | $350.0M | $10.23 | 1.00 | 1.00 | 1.00 |

The following table compares MEDITECH with our public competition. The figures for MEDITECH are based on the revised forecast and assume $26 per share for market value. The figures for the competition are based on the most recent 12 months and the latest market value.

|  | Total Revenue | Net Income | Market Value |
|---|---|---|---|
| MEDITECH | 270.5M | 68.2M | 888M |
| Cerner Corporation | 817.8M | 36.5M | 1,409M |
| IDX Systems Corporation | 458.8M | 39.1M | 732M |
| Eclipsys Corporation | 241.8M | (50.0M) | 552M |

We note MEDITECH is 3rd in total revenue, 1st in net income and 2nd in market value. It is difficult to believe the competitive information furnished above will guide us in our deliberations. Apparently no consistent relationship exists between revenue or net income and market value. Extreme share price

DEF001310
Confidential-Subject
to Protective Order

volatility also has plagued our public competition. The low and high share prices for the past few years and the latest share price are shown in the following table. Estimated EPS for 2003 and 2004 and the resultant P/E ratio are shown in the subsequent table.

|  | 2000 | 2001 | 2002 | 2003 | Latest |
|---|---|---|---|---|---|
| Cerner Corporation | $18-$62 | $28-$60 | $28-$57 | $16-$40 | $39.91 |
| IDX Systems Corporation | $12-$42 | $9-$31 | $10-$18 | $13-$28 | $24.92 |
| Eclipsys Corporation | $6-$31 | $12-$28 | $4-$19 | $4-$19 | $12.10 |

|  | 2003 EPS | 2003 P/E | 2004 EPS | 2004 P/E |
|---|---|---|---|---|
| Cerner Corporation | $1.16 | 34.41 | $1.57 | 25.42 |
| IDX Systems Corporation | $0.73 | 34.14 | $0.91 | 27.38 |
| Eclipsys Corporation | ($0.91) | -- | ($0.38) | -- |

We believe the market valuation of our competition is due solely to prior revenue growth rates and continued expectation of the same. The 5-year average annual revenue growth rate of Cerner is over 20%, that of IDX and Eclipsis is almost 10% and that of MEDITECH is 5.8%. We note their higher growth rates are achieved through acquisitions and the offering of barely profitable additional services. Looking ahead to 2004, the dividend payout should be increased much more than the increase in net income would initially suggest. As the following table shows, shareholder equity growth continues to exceed total revenue growth. Therefore equity growth can be reduced by paying out more in dividends.

| Year | Revenue | Growth | Equity | Growth | Ratio |
|---|---|---|---|---|---|
| 1993 | $105,325K | 14.11% | $100,053K | 21.41% | 1.053 |
| 1994 | $124,223K | 17.94% | $117,749K | 17.69% | 1.055 |
| 1995 | $143,721K | 15.70% | $137,828K | 17.05% | 1.043 |
| 1996 | $167,884K | 16.81% | $162,468K | 17.88% | 1.033 |
| 1997 | $193,805K | 15.44% | $189,531K | 16.66% | 1.023 |
| 1998 | $203,813K | 5.16% | $217,271K | 14.64% | 0.938 |
| 1999 | $225,630K | 10.70% | $246,695K | 13.54% | 0.915 |
| 2000 | $216,873K | -3.88% | $273,778K | 10.98% | 0.792 |
| 2001 | $223,831K | 3.21% | $295,526K | 7.94% | 0.757 |
| 2002 | $256,197K | 14.46% | $317,996K | 7.60% | 0.806 |
| 2003 | $270,478K | 5.57% | $349,964K | 10.05% | 0.773 |

At the January Board meeting, we will recommend setting the 2004 annual dividend rate at $1.80 per share. This would be an increase of 15.4% compared to 5.7% increase in net income per share. Based primarily on this dividend rate, we recommend fixing the fair share value at $26 effective on December 31, 2003. This would be an increase of 18.2% and, assuming a dividend rate of $1.80 per year, would result in a 6.9% dividend yield. A draft resolution for fixing the fair share value of MEDITECH stock is enclosed for your review.

DEF001311
Confidential-Subject
to Protective Order

The following motions were made, seconded and unanimously approved at the October 27, 2003 Board meeting.

RESOLVED:  That based upon the information presented by the Chairman and submitted by the Chief Financial Officer, all of which was reviewed and analyzed by the Board, the fair value of the Company's common stock is hereby stipulated to be $26.00 per share as of the Company's forthcoming year-end date of December 31, 2003.

VOTED:  That the Chairman is authorized and directed to have the Company make a contribution of $4,100,000 comprised of cash and presently authorized but unissued common stock to the Medical Information Technology, Inc. Profit Sharing Trust on or before December 31, 2003. The cash amount shall be $2,020,000 and the stock shall be 80,000 shares valued at $26.00 per share, as stipulated in a preceding RESOLUTION, for a value of $2,080,000. The Treasurer is authorized and directed to issue appropriate shares of the Company's common stock, par value one dollar per share, to the Trust, with such issue to be made from previously authorized but unissued shares of the common stock of the Company.

The following motion was made, seconded and unanimously approved at the January 26, 2004 Board meeting.

VOTED: That the Company's previous quarterly cash dividend rate of thirty-nine cents per share be raised to forty-five cents per share and that a regular quarterly cash dividend of said forty-five cents per share is hereby declared on all of the Company's outstanding common shares payable to holders of record at the close of business on January 26, 2004 with payment of such dividend to be made on February 9, 2004 and that the Chairman and Treasurer are authorized and directed to make such cash dividend disbursement on February 9, 2004.

DEF001312
Confidential-Subject
to Protective Order

**EXHIBIT 32**





# Question Box
# Special Edition
### Last Updated June 9, 2000

*Executive V.P.*

### From Howard Messing:

I read every resignation letter that MEDITECH receives. The vast majority are perfunctory, just announcing the resignees impending departure. Recently, however, I read a letter from someone who had been here a short time and had a few comments about his experience. While I don't think that this individual could have been convinced to stay, others probably share his opinions. His letter was well written, complimentary to his supervisors, and intended, I think, to be constructive. Rather than ignore it, I feel that it might be instructive to share his questions and comments, so I have excerpted them and replied below:

### From Terminee:

**I will explain my reasons for leaving in greater detail, however, my primary motive is that I have an incredible opportunity awaiting me that I simply could not refuse at this point in my life...**

**I do not have one main reason for leaving the group or MEDITECH. Instead, I would say that there are a number of little reasons that have built up to the point where I began looking in a new direction. Some of these reasons include the following:**

**1. I have problems understanding the rationality in some of MEDITECH's company policies. Foremost, I do not understand why the company neglects to address the high turnover rate. With employees leaving at a steady rate, I'm not sure if management realizes that this not only weakens our product, but it also lowers group moral. Why has this trend not been addressed at the root, and why do we run day to day with such a seemly "lean" staff?**

**Response:** We do not have an inordinately high turnover rate. For the last few years our turnover has been approximately 15% annually. This compares to an average in the high tech industry in the low 20's with many companies reporting significantly higher turnover than that. (Cambridge Technology Partners, a high profile company in the Boston area has a turnover rate approaching 50%). We do what we can to keep it as low as possible consistent with our long term view of MEDITECH. Perhaps the anecdotal impression that the turnover rate is high is the end result of our policy of promoting from within. This results in a higher turnover amongst newer employees. Long term employees leave at a slower than average rate. At other companies, turnover of senior people is generally as high or higher than that of newer staff. In regards to being lean, I am aware of certain groups in the company that are understaffed but in general all measures that we have to determine workload have not changed significantly over the years (e.g. tasks per staff member, turn around time on problems, accounts receivable, number of people working late, available implementation and delivery dates, etc.).

**2. I do not understand why MEDITECH only pays for certain graduate courses and not others such as Microsoft Certification. Our HCIS runs on a Microsoft network, doesn't it?**

**Response:** In general, we reimburse for those courses that the tax laws allow us to reimburse you for without declaring it's cost as income to you. Microsoft Certification does not qualify. We have looked at the Microsoft Certification program and do not believe that is has any value to what we do here. I would question why any particular employee who intends to stay employed by MEDITECH feels the need to get a Microsoft Certificate. We don't require it for anything or think it has any great value.

**3. I feel it is frustrating that we must wait five years till we are fully vested into this company. Are we not fully recognized as true employees until we have been here half a decade? Also, we must wait three years in order to be able to buy stock into the company, but the company has no plans of going public anytime soon. This makes it difficult today, especially when numerous companies are offering lucrative stock options and signing bonuses.**

**Response:** While I am sympathetic to the impatience expressed here, we have repeatedly emphasized that our policies are intended to reward long term loyalty and commitment. When you are vested should make no difference if you stay...it only has impact if you leave before the five years are up. Signing bonuses to lure new employees are hardly fair to people who are currently employed by MEDITECH. (By the way, we give the 'signing bonus' to the current employee who refers someone new, not to the new employee we barely know who may not even work out). Yes, in a hot stock market it does appear that everyone can get rich with stock options. However, this is simply not true in the long run (& in fact, since the NASDAQ meltdown in March, many, many people that have left MEDITECH for 'lucrative' stock options now find themselves 'under water'). Our plan of keeping our stock at a relatively modest price and offering a substantial dividend works equivalently to stock options for those who plan to buy and hold for an extended period of time. (Incidentally, even though we are not public, the stock price does track the value of the company. In general, people who want/need to sell stock they have held onto for awhile can do so through sales to our profit sharing trust).

**4. I feel that I am restricted here, and not allowed to voice my opinion on issues. People are always reminding me to watch what I say because it goes against MEDITECH policy. I feel that MEDITECH should listen to its newer employees more, sometimes that is where the best ideas come from. It seems like every question submitted to the Question Box on our Intranet is shot down with sarcasm and ridicule. These sort of policies are disheartening, and I am not the only person who feels this way, yet maybe the only one who has spoken up about it.**

**Response:** I don't believe this is true. People should feel free to express their opinions, but, of course, it should be done in a constructive way. Grousing at the cafeteria table is not productive. In general in life, if you have a complaint about something you should take your complaint to someone who can fix it. It's even better if you can suggest a reasonable solution. We do try to listen to everyone and have a variety of mechanisms to try to encourage dialog. Anyone at anytime can come and speak with me or any of the other officers; we only ask that you be courteous to your own supervisor in doing so. If you are being prevented from expressing your opinion, please come see me.

I have to say that since I am personally responsible for the Question Box, I do take exception to the sentiment expressed here. I would like examples of answers that have been "shot down with sarcasm and ridicule". I try very hard to give straight answers, even if they are not what the submitter wanted to hear. If we are not going to change a policy, I will say so rather than give a phony, 'we'll take it into consideration' kind of answer. Perhaps I have not done a good enough job in thanking people for their suggestions and for thinking about how to make MEDITECH a better company; I apologize for that and will work on it in the future. I certainly hope that I have not offended anyone with the answers, and if so, I would sincerely like to know about it.

I hope that I have begun to address the issues raised here and would welcome the opportunity to continue the discussion with any and all of you who choose to do so.

Howard

The "Question Box" is your opportunity to talk with MEDITECH's senior management. If you have any questions regarding our company, its strategic direction, procedures and policies, etc., send us a message. Once in the "compose" screen in RATmail, click on "services" on the right hand side, then type "news" in the "to" field and send your message. Howard Messing or one of the other MEDITECH officers will answer your question. The name of the senior MEDITECHer primarily responsible for answering the question will be included in the response. Please note that even when his name does not specifically appear, Howard Messing still initially receives all questions and still reviews all answers. If you'd like to know the status of your question, send a message to NEWS.

All MEDITECH Daily articles and Intranet content are provided by MEDITECH employees. Copyright © 2000.

**EXHIBIT 33**

VALUATION OF THE
MEDICAL INFORMATION TECHNOLOGY, INC.
COMMON STOCK
AS OF
DECEMBER 31, 2001;
DECEMBER 31, 2002;
DECEMBER 31, 2003;
DECEMBER 31, 2004;
AND
JUNE 2, 2005



Willamette Management Associates

DEF005245
Confidential-Subject
to Protective Order

**VALUATION OF THE
MEDICAL INFORMATION TECHNOLOGY, INC.
COMMON STOCK
AS OF
DECEMBER 31, 2001;
DECEMBER 31, 2002;
DECEMBER 31, 2003;
DECEMBER 31, 2004;
AND
JUNE 2, 2005**



Willamette Management Associates

DEF005246
Confidential-Subject
to Protective Order



## Willamette Management Associates

8600 West Bryn Mawr Avenue, Suite 950-N
Chicago, Illinois 60631-3505
773 · 399 · 4300/(Fax) 773 · 399 · 4310

June 16, 2005

Mark D. Selwyn, Esq.
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, Massachusetts 02109

Dear Mr. Selwyn:

At your request, we performed a valuation analysis of Medical Information Technology, Inc. ("Meditech" or the "Company"), a Massachusetts corporation.

We understand that Dr. Jerome Grossman is a co-founder, former consultant and director, and shareholder of Meditech. We understand that Dr. Grossman is a plaintiff in the matter cited as *Dr. Jerome H. Grossman v. Medical Information Technology, Inc, et al.* (the "Litigation").

We understand that, as part of the Litigation, you represent Dr. Grossman who asserted a claim for breach of fiduciary duty.

### OBJECTIVES AND PURPOSE OF THE ANALYSIS

The objectives of our analysis are twofold. The first objective of our analysis is to estimate the fair market value of the Meditech common stock (the "subject common stock"), on a nonmarketable, noncontrolling ownership interest basis, as of December 31, 2001; December 31, 2002; December 31, 2003; and December 31, 2004.

The second objective of our analysis is to estimate the fair value of the Meditech common stock as of a contemporaneous date, or June 2, 2005.

The purpose of our analysis is to provide an independent valuation opinion to assist you with your representation of Dr. Grossman in the Litigation.

### STANDARDS OF VALUE AND PREMISE OF VALUE

For purposes of this analysis, fair market value is defined as the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a

*San Francisco, California  ·  Portland, Oregon  ·  Chicago, Illinois  ·  New York, New York  ·  Washington, D.C.  ·  Atlanta, Georgia*

DEF005247
Confidential-Subject
to Protective Order

Mark D. Selwyn, Esq.
June 16, 2005
Page 2

hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.[1]

It is our understanding that fair value, in Massachusetts, is defined as the intrinsic value of the business as a whole, undiscounted for lack of marketability or lack of controlling interest.

We valued the subject common stock based on the premise of value in continued use, as a going concern business enterprise. Based on our analysis, and in our opinion, this premise of value represents the highest and best use of the subject common stock.

## SUMMARY DESCRIPTION OF MEDITECH

Meditech was founded in 1969 to develop and market information system software for the hospital industry. Meditech provides integrated software solutions to meet the information needs of health care organizations around the world.

From large integrated delivery networks to community hospitals, Meditech software solutions support the entire continuum of health care, including physician practices, clinics, hospitals, long-term care facilities, home health agencies, and behavioral health facilities.

## VALUATION ANALYSIS AND CONCLUSION

As part of our analysis, we considered the three generally accepted approaches to business enterprise valuation: (1) the market approach, (2) the income approach, and (3) the asset-based approach. In conducting the subject analyses, we relied on (1) the market approach, and specifically the guideline publicly traded company method and (2) the income approach, and specifically the direct capitalization method.

Based on our analysis, it is our opinion that the fair market value of the Meditech common stock, on a nonmarketable, noncontrolling ownership interest basis, as of December 31, 2001, was (rounded):

### $30 per share.

Based on our analysis, it is our opinion that the fair market value of the Meditech common stock, on a nonmarketable, noncontrolling ownership interest basis, as of December 31, 2002, was (rounded):

### $30 per share.

Based on our analysis, it is our opinion that the fair market value of the Meditech common stock, on a nonmarketable, noncontrolling ownership interest basis, as of December 31, 2003, was (rounded):

---

[1] American Society of Appraisers, Business Valuation Standards—Definitions, p. 24.

## Willamette Management Associates

DEF005248
Confidential-Subject
to Protective Order

Mark D. Selwyn, Esq.
June 16, 2005
Page 3

### $33 per share.

Based on our analysis, it is our opinion that the fair market value of the Meditech common stock, on a nonmarketable, noncontrolling ownership interest basis, as of December 31, 2004, was (rounded):

### $35 per share.

Based on our analysis, it is our opinion that the fair value of the Meditech common stock, as of June 2, 2005, was (rounded):

### $66 per share.

A narrative appraisal report, which describes the analytical procedures performed and the valuation conclusions reached during this analysis, accompanies this opinion.

During our analysis, we were provided with financial and operational data with respect to Meditech. We relied upon these data, without independent verification or confirmation, as accurately reflecting the operational and financial position of the Company.

In accordance with professional standards, we are independent of Meditech and the parties to the Litigation. We have no current or prospective financial interest in the Company. Our fee for this analysis was in no way influenced by the results of our valuation analyses.

We reserve the right to modify or supplement this valuation opinion upon the receipt of new information.

The attached narrative appraisal report, statement of appraisal certification, statement of contingent and limiting conditions, and professional qualifications of the principal analyst are integral parts of this valuation opinion.

Very truly yours,

**WILLAMETTE MANAGEMENT ASSOCIATES**

*Robert Reilly*

Robert F. Reilly

Attachment

Willamette Management Associates

DEF005249
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                                Page 55

## VIII.  MEDITECH VALUATION ANALYSIS AS OF DECEMBER 31, 2003

### GUIDELINE PUBLICLY TRADED COMPANY METHOD AS OF DECEMBER 31, 2003

We used the guideline publicly traded company method to value the Meditech common stock as of December 31, 2003.

Exhibits 33 through 38 of Appendix A present the guideline publicly traded company financial fundamentals and empirical market pricing evidence that we used in the December 31, 2003 fair market valuation of the Meditech common stock. From this empirical market evidence, we selected market-derived pricing multiples to apply to the Meditech (1) LTM and (2) five-year average financial fundamentals as of December 31, 2003.

In selecting the appropriate pricing multiples, we considered the following observations and factors to be the most relevant in our analysis.

- As presented on Exhibit 34, Meditech exhibited lower historical growth in EBITDA than the historical EBITDA growth exhibited by the guideline publicly traded companies as a whole. Meditech exhibited compound annual growth in EBITDA of 2.0 percent over the five-year period of fiscal 1999 through fiscal 2003. In comparison, the guideline publicly traded companies reported mean and median compound annual growth in EBITDA over a similar period of 25.6 percent and 37.3 percent, respectively.[28]

- Meditech exhibited lower volatility in EBITDA than each of the guideline publicly traded companies. The COV of the Meditech EBITDA over the five-year period of fiscal 1999 through fiscal 2003 was 8.9 percent. In contrast, the COV of the guideline publicly traded companies' EBITDA ranged from a low of 33.2 percent to a high of 362.3 percent over the five-year period of fiscal 1999 through fiscal 2003.

- Meditech was larger than all but one of the guideline publicly traded companies as measured by LTM EBITDA. Meditech had adjusted EBITDA for the LTM ended December 31, 2003, of $114.8 million. The mean and median EBITDA of the guideline publicly traded companies for the LTM ended December 31, 2003, was $34.8 million and $16.2 million, respectively.

- As presented on Exhibit 35, Meditech exhibited higher historical growth in revenue than the historical revenue growth exhibited by three of the guideline publicly traded companies. Meditech exhibited compound annual growth in revenue of 4.7 percent over the five-year period of fiscal 1999 through fiscal 2003. In comparison, the guideline publicly traded companies reported mean and median compound annual growth in revenue over a similar period of 7.2 percent and 8.3 percent, respectively.

- Meditech was larger than four of the six guideline publicly traded companies as measured by LTM revenue. Meditech had revenue for the LTM ended December 31, 2003, of $270.8 million. The

---

[28] It should be noted that the Eclipsys EBITDA declined from $41.5 million in fiscal 1999 to negative $32.9 million in fiscal 2003. This rate of decline was not used in the calculation of the mean and median EBITDA growth of the guideline publicly traded companies.

## Willamette Management Associates

DEF005301
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                                    Page 56

mean and median revenue of the guideline publicly traded companies for the LTM ended December 31, 2003, was $282.1 million and $154.7 million, respectively.

- The following Table 11 presents a comparison of the five-year historical growth in EBITDA and revenue of (1) Meditech and (2) each of the guideline publicly traded companies.

**Table 11**
**Comparison of Five-Year Compound Annual Growth**
**As of December 31, 2003**

| Company | Five-Year Compound Annual Growth | |
|---|---|---|
| | EBITDA % | Revenue % |
| Cerner Corporation | 39.7 | 25.3 |
| Eclipsys Corporation | NM | (5.6) |
| Computer Programs and Systems, Inc. | 10.7 | 12.6 |
| IDX Systems Corporation | 47.3 | 4.0 |
| Quality Systems, Inc. | 37.3 | 14.1 |
| VitalWorks, Inc. | (7.0) | (7.0) |
| LOW | (7.0) | (7.0) |
| HIGH | 47.3 | 25.3 |
| MEAN | 25.6 | 7.2 |
| MEDIAN | 37.3 | 8.3 |
| Medical Information Technology, Inc. | 2.0 | 4.7 |

- The following Table 12 presents a comparison of the LTM EBITDA and LTM revenue of (1) Meditech and (2) each of the guideline publicly traded companies.

**Willamette Management Associates**

DEF005302
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                          Page 57

### Table 12
### Comparison of Financial Fundamentals Based on Size
### As of December 31, 2003

| Company | Comparison Based on Size | |
|---|---|---|
| | LTM EBITDA $000 | LTM Revenue $000 |
| Cerner Corporation | 148,788 | 839,587 |
| Eclipsys Corporation | (32,862) | 197,843 |
| Computer Programs and Systems, Inc. | 14,345 | 81,303 |
| IDX Systems Corporation | 45,907 | 399,181 |
| Quality Systems, Inc. | 16,958 | 63,223 |
| VitalWorks, Inc. | 15,396 | 111,519 |
| LOW | (32,862) | 63,223 |
| HIGH | 148,788 | 839,587 |
| MEAN | 34,755 | 282,109 |
| MEDIAN | 16,177 | 154,681 |
| Medical Information Technology, Inc. | 114,767 | 270,781 |

- As presented on Exhibit 36, the Meditech LTM and five-year average EBITDA return on revenue of 42.4 percent and 43.6 percent, respectively, were higher than the LTM and five-year average EBITDA return on revenue of the guideline publicly traded companies. The guideline publicly traded companies reported a mean and median LTM EBITDA return on revenue of 17.5 percent and 17.6 percent, respectively. The guideline publicly traded companies reported a mean and median five-year average EBITDA return on revenue of 12.9 percent and 14.1 percent, respectively.

- The following Table 13 presents a comparison of the LTM and the five-year average EBITDA return on revenue of (1) Meditech and (2) each of the guideline publicly traded companies.

## Willamette Management Associates

DEF005303
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                          Page 58

**Table 13**
**Comparison Based on EBITDA Return on Revenue**
**As of December 31, 2003**

| Company | EBITDA Return on Revenue | |
| --- | --- | --- |
| | LTM<br>% | Five-Year Average<br>% |
| Cerner Corporation | 17.7 | 18.0 |
| Eclipsys Corporation | DF | 3.8 |
| Computer Programs and Systems, Inc. | 17.6 | 16.9 |
| IDX Systems Corporation | 11.5 | 3.8 |
| Quality Systems, Inc. | 26.8 | 23.5 |
| VitalWorks, Inc. | 13.8 | 11.2 |
| LOW | 11.5 | 3.8 |
| HIGH | 26.8 | 23.5 |
| MEAN | 17.5 | 12.9 |
| MEDIAN | 17.6 | 14.1 |
| Medical Information Technology, Inc. | 42.4 | 43.6 |

- As presented on Exhibit 37, the Meditech LTM and five-year average EBITDA return on TBVIC of 59.9 percent and 54.4 percent, respectively, were higher than the LTM and five-year average EBITDA return on TBVIC of the guideline publicly traded companies. The guideline publicly traded companies reported a mean and median LTM EBITDA return on TBVIC of 35.9 percent and 35.1 percent, respectively. The guideline publicly traded companies reported a mean and median five-year average EBITDA return on TBVIC of 22.1 percent and 23.5 percent, respectively.

- The following Table 14 presents a comparison of the LTM and the five-year average EBITDA return on TBVIC of (1) Meditech and (2) each of the guideline publicly traded companies.

**Willamette Management Associates**

DEF005304
Confidential-Subject
to Protective Order

*Medical Information Technology, Inc.*                                      Page 59

### Table 14
### Comparison Based on EBITDA Return on TBVIC
### As of December 31, 2003

| Company | EBITDA Return on TBVIC | |
|---|---|---|
| | LTM % | Five-Year Average % |
| Cerner Corporation | 35.1 | 24.9 |
| Eclipsys Corporation | DF | 7.6 |
| Computer Programs and Systems, Inc. | 55.7 | 41.3 |
| IDX Systems Corporation | 18.0 | 5.2 |
| Quality Systems, Inc. | 33.4 | 22.1 |
| VitalWorks, Inc. | 37.4 | 31.8 |
| LOW | 18.0 | 5.2 |
| HIGH | 55.7 | 41.3 |
| MEAN | 35.9 | 22.1 |
| MEDIAN | 35.1 | 23.5 |
| Medical Information Technology, Inc. | 59.9 | 54.4 |

- As of December 31, 2003, Meditech was a well-established business with over thirty years of operating history. At year-end 2003, Meditech had more than 1,700 active hospital customers throughout the U.S., Canada, and the U.K.[29]

Based on our analysis of the above-mentioned quantitative and qualitative factors, we selected an LTM EBITDA pricing multiple to apply to the Meditech LTM EBITDA that was near the mean and median market pricing multiple of the guideline publicly traded companies. In our opinion, the lower EBITDA growth of Meditech, as compared to the EBITDA growth of the guideline publicly traded companies, is offset by positive factors such as the Meditech long operating history, sizable customer base, low volatility in EBITDA, and high profit margins.

Based on the low historical EBITDA growth rate of Meditech, as compared to the historical EBITDA growth rate of the guideline publicly traded companies, we selected a five-year average EBITDA pricing multiple to apply to the Meditech five-year average EBITDA that was between the low end and the median market pricing multiples of the guideline publicly traded companies.

As presented above, the Meditech LTM and five-year average EBITDA return on revenue were well above the high end EBITDA profit margins of the guideline publicly traded companies. In our opinion, the lower revenue growth of Meditech, as compared to the revenue growth of three of the guideline publicly traded companies, is more than offset by the Meditech higher EBITDA profit margins. Based on our analysis of the above-mentioned quantitative and qualitative factors, we selected an LTM revenue pricing multiple to apply to the Meditech LTM revenue that was above the high end market pricing multiple of the guideline publicly traded companies. We selected a five-year average revenue pricing multiple to apply to the Meditech five-year average revenue that was just below the high end market pricing multiples of the guideline publicly traded companies.

---

[29] Meditech SEC Form 10-K for the fiscal year ended December 31, 2003.

## Willamette Management Associates

DEF005305
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                                    Page 60

Based on our analysis of the above-mentioned quantitative and qualitative factors, we selected a TBVIC pricing multiple to apply to the Meditech TBVIC that was just below the high end market pricing multiple of the guideline publicly traded companies. As presented above, the Meditech LTM EBITDA return on TBVIC and five-year average return on TBVIC were higher than the LTM and the five-year average EBITDA returns on TBVIC reported by all of the guideline publicly traded companies.

Exhibit 39 presents a summary of (1) our market pricing multiple selection and (2) the value indications provided by the guideline publicly traded company method as of December 31, 2003.

## Value Conclusion

As presented on Exhibit 39, we weighted evenly the value indications based on (1) LTM and (2) five-year average financial performance. The selected weighting is based on the fact that a buyer of the Meditech common stock would not only consider the most recent performance of the Company but would also consider its performance over the immediate past.

In our synthesis, we weighted the value indications based on (1) EBITDA, (2) revenue, and (3) TBVIC, 50 percent, 25 percent, and 25 percent. The selected weighting is based on our opinion that companies such as Meditech are more accurately valued in the market based on their EBITDA, rather than their revenue or TBVIC.

The weighting of the value indications results in a marketable, noncontrolling ownership interest value for the Meditech MVIC of $1.563 billion. Since Meditech did not have any debt on December 31, 2003, the indicated value of the Meditech equity, on a nonmarketable, noncontrolling ownership interest basis, was also $1.563 billion as of December 31, 2003.

## DIRECT CAPITALIZATION METHOD AS OF DECEMBER 31, 2003

We used a single period direct capitalization method in estimating the MVIC of Meditech as of December 31, 2003. Within this particular method, a projected level of net cash flow is capitalized into perpetuity using a risk-adjusted capitalization rate that incorporates a long-term growth rate.

## Projected Net Cash Flow

Exhibit 40 presents the Meditech historical income statements for the fiscal years ended December 31, 2002 and 2003. Also presented on Exhibit 40 is the Meditech projected income statement for the fiscal year ended December 31, 2004. This projected income statement was prepared by Company management and included in the Report to the Meditech Board of Directors for the Quarter Ended December 31, 2003.[30] More specifically, this income statement projection represents Company management's financial expectations for the Meditech business for the next fiscal year, as of December 31, 2003.

---

[30] Medical Information Technology, Inc., Report to the Board of Directors, Quarter Ended December 31, 2003, Board Meeting of January 26, 2004 (M0002017).

**Willamette Management Associates**

DEF005306
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                    Page 61

As presented on Exhibit 40, Company management was projecting an increase in (1) product revenue and (2) service revenue of 1.3 percent and 9.8 percent, respectively, in fiscal 2004. This compares to an increase in (1) product revenue of 2.8 percent and (2) service revenue of 9.5 percent in fiscal 2003.

Company management projected total Meditech revenue to increase by 5.1 percent from $270.8 million in fiscal 2003 to $284.5 million in fiscal 2004. This increase compares to an increase in total revenue of 5.7 percent in fiscal 2003 and 14.5 percent in fiscal 2002.

Company management projected operating income to increase from $99.7 million, or 36.8 percent of total revenue in fiscal 2003, to $104.7 million, or 36.8 percent of total revenue in fiscal 2004.

Company management projected net income to increase from $67.4 million, or 24.9 percent of total revenue in fiscal 2003, to $71.6 million, or 25.2 percent of total revenue in fiscal 2004.

Exhibit 41 presents the Meditech (1) adjusted historical EBIT and EBITDA for fiscal 2002 and fiscal 2003 and (2) the projected, adjusted EBIT and EBITDA for fiscal 2004. Similar to the adjustment we made to the historical income statements, we excluded from the Meditech projected 2004 pretax earnings the estimated income that would be earned on nonoperating or "excess" cash, investments, and securities in fiscal 2004. After this adjustment, we estimated that Meditech had fiscal 2004 projected EBIT and EBITDA of $111.6 million and $120.5 million, respectively.

On Exhibit 42, we estimated the Meditech projected net cash flow to invested capital. First, we applied a corporate income tax rate of 39.5 percent to adjusted EBIT to arrive at an estimate of fiscal 2004 adjusted net income.[31] We subtracted estimated income taxes of approximately $44.1 million from projected adjusted EBIT of $111.6 million to arrive at fiscal 2004 adjusted net income of $67.6 million. The income tax rate of 39.5 percent was based on data included in the Company management-prepared projection.

Second, we considered the effect of (1) noncash expenses (i.e., cash inflows) and (2) capital expenditures (i.e., cash outflows) on the fiscal 2004 estimate of net cash flow. In estimating net cash flow, it is common to (1) add noncash expenses such as depreciation and amortization expense and (2) subtract capital expenditures from estimated net income.

Given that we are using a single period cash flow valuation model, we estimated that noncash expenses would be offset by capital expenditures over the long-term and, as a whole, would have a neutral effect on net cash flow.

Third, we considered annual changes in the Company operating working capital and their effect on projected net cash flow. Our estimate of the projected change in operating working capital from fiscal 2003 to fiscal 2004 was based on an operating working capital to total revenue ratio of negative 2.0 percent. This rate equates to the Meditech average operating working capital to total revenue ratio for fiscal 1999 through fiscal 2003.

After consideration of adjustments for (1) noncash expenses, (2) capital expenditures, and (3) changes in operating working capital, we projected the Meditech fiscal 2004 net cash flow to invested capital at $67.9 million.

---

[31] It should be noted that, in the case of Meditech, projected net income is synonymous with projected debt-free net income because the Company was not expected to have any debt in fiscal 2004.

DEF005307
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                        Page 62

The next step of our direct capitalization method involved estimating the appropriate direct capitalization rate to use in our analysis. Our direct capitalization rate was based on the estimated required rate of return for the Meditech invested capital.

## Required Rate of Return

The rate of return used (in the direct capitalization rate) to capitalize projected net cash flow represents the investment return that holders of invested capital expect for assuming the risk inherent in the projected net cash flow. Given Meditech's debt-free status, the rate of return is calculated as an unlevered cost of equity capital. This rate of return equates to the return that an investor would expect to earn on an investment in the Meditech common stock.

We estimated the Meditech unlevered cost of equity capital using a build-up model. As previously stated, the build-up model estimates a required rate of return on equity capital through a rate building process. The components of the build-up model include: (1) the risk-free rate of return, (2) the long-term equity risk premium, (3) the size equity risk premium, and (4) an unsystematic equity risk adjustment.

We selected a risk-free rate of return of 5.1 percent based on the yield of 20-year U.S. government bonds as of December 31, 2003, as presented in the *Federal Reserve Statistical Release*.

Our selected equity risk premium of 7.0 percent was based on data included in the Ibbotson Associates *Stocks, Bonds, Bills, and Inflation Valuation Edition 2003 Yearbook*.[32] The empirical evidence in the Ibbotson Associates publication includes a long-term equity risk premium. This equity risk premium represents the incremental rate of return realized on large capitalization common stocks over the risk-free rate based on market evidence for the period of 1926 through 2002.

Given that Meditech was smaller than the publicly traded companies used to calculate the above-mentioned equity risk premium, it was necessary to use a size equity risk premium in our estimation of the Meditech cost of equity capital. The size equity risk premium represents the expected incremental rate of return over the long-term equity risk premium afforded to companies with lower market capitalizations that trade on the public markets.

Based on our estimates, Meditech is most similar in size—based on estimated equity market capitalization—to companies in the Ibbotson Associates' mid-cap size category. The Ibbotson Associates' mid-cap size category included companies with an equity market capitalization between $1.1 billion and $5.0 billion. The size equity risk premium for companies in the Ibbotson Associates mid-cap size category was 0.8 percent.

Lastly, we incorporated an unsystematic equity risk adjustment of negative 2 percent in our estimation of the Meditech unlevered cost of equity capital. This equity risk adjustment takes into account Company-specific factors, which in the case of Meditech, decrease the estimated cost of equity capital. These Company-specific factors include the Meditech (1) lack of leverage and (2) low volatility in earnings and cash flow and (3) high profit margins.

---

[32] *Stocks, Bonds, Bills, and Inflation Valuation Edition 2003 Yearbook*, See Key Variables in Estimating the Cost of Capital.

Willamette Management Associates

DEF005308
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                                    Page 63

Based on the variables described above—and using the build-up model—we estimated that Meditech had an unlevered cost of equity capital of 11.0 percent (rounded) as of December 31, 2003. This calculation is presented on Exhibit 43.

We subtracted a long-term expected annual growth rate of 6 percent from the estimated unlevered cost of equity capital of 11 percent. This calculation resulted in a direct capitalization rate for the Meditech invested capital of 5 percent.

The selected long-term growth rate of 6 percent was based on our review of (1) security analyst projected long-term annual net earnings growth for the industry, (2) security analyst projected long-term annual net earnings growth for the guideline publicly traded companies, (3) the historical compound average annual growth of the Meditech cash flow, and (4) the historical compound average annual growth in the "fair market value" of the Meditech common stock as estimated by the Meditech board of directors.

As of December 31, 2003, security analysts were projecting five-year average annual growth rates of approximately 14 percent to 18 percent for companies that operate in the computer programming, data processing, and software industries.[33] As of December 31, 2003, security analysts were projecting five-year average annual growth rates of approximately 15 percent to 23 percent for the net earnings of the guideline publicly traded companies.[34] These projected growth rates support the fact that analysts were optimistic about the growth potential of the companies that operate in the same industry as Meditech.

As previously mentioned, the historical compound annual growth rate in the Meditech adjusted EBITDA was 2.0 percent from fiscal 1999 through fiscal 2003. On an unadjusted basis, the Meditech EBITDA increased at a compound annual rate of 2.4 percent from fiscal 1999 through fiscal 2003. These growth rates indicate that the Meditech cash flow has increased at a slower rate that what is expected for the industry as a whole.

The long-term compound annual increase in the "fair market value" of the Meditech common stock, as estimated by the Meditech board of directors, was (1) 14.0 percent from fiscal 1993 through fiscal 2003 and (2) 12.4 percent from fiscal 1998 through fiscal 2003. These growth rates indicate that the Meditech board of directors was of the opinion that the increase in the Company market capitalization in recent years was in excess of the increase in the Company cash flow.

Based on the growth estimates identified above, we selected a long-term growth rate of 6 percent to use within our direct capitalization rate. Our selected growth rate considers that the growth in the Meditech EBITDA has been lower than the historical and projected growth of other companies in the industry.

The selected growth rate equates to (1) less than one-half of the projected growth rate for the industry, (2) approximately one-third of the projected median growth rate of the guideline publicly traded companies, and (3) approximately one-half of the implied growth of the "fair market value" of the Meditech common stock, as estimated by the Meditech board of directors.

**Value Conclusion**

As presented on Exhibit 42, we applied the direct capitalization rate of 5 percent to the projected fiscal 2004 net cash flow to invested capital of $67.9 million. This calculation resulted in a marketable,

---

[33] Industry earnings estimates were compiled by I/B/E/S for companies in SIC 7371, 7372, 7373, and 7374.
[34] Earnings estimates were compiled by I/B/E/S.

Willamette Management Associates

DEF005309
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                                    Page 64

noncontrolling ownership interest value for the Meditech MVIC of $1.357 billion. Since Meditech did not have any debt on December 31, 2003, the indicated value of the Meditech equity, on a nonmarketable, noncontrolling ownership interest basis, was also $1.357 billion as of December 31, 2003.

## VALUATION SYNTHESIS AND CONCLUSION AS OF DECEMBER 31, 2003

Exhibit 44 presents the indicated value of the Meditech equity using (1) the guideline publicly traded company method and (2) the direct capitalization method.

The guideline publicly traded company method indicated a value for the Meditech equity—excluding nonoperating assets—of $1.563 billion. The direct capitalization method indicated a value for the Meditech equity—excluding nonoperating assets—of $1.357 billion.

In our opinion, both methods provide a reliable indication of value for the Company equity. As a result, we applied an equal weighting to the two indications of value to estimate a marketable, noncontrolling ownership interest value for the Meditech equity—excluding nonoperating assets—of $1.460 billion.

## Nonoperating Assets

Based on our review of the Company's financial statements, we determined that Meditech had nonoperating assets as of December 31, 2003.

As previously mentioned, Meditech holds a high amount of working capital as compared to other companies in the medical software industry. At December 31, 2003, Meditech held $218.6 million of current assets and $38.8 million of current liabilities. Of the total current assets, $187.9 million consisted of cash and cash equivalents and marketable securities.

Based on our analysis of (1) the Meditech liquidity ratios and (2) the liquidity ratios of the guideline publicly traded companies, we estimated that Meditech had excess working capital of approximately $116.5 million as of December 31, 2003. More specifically, this excess working capital consisted of excess cash and cash equivalents and short-term marketable securities.

We estimated the Meditech level of excess working capital by comparing the Meditech current ratio of 5.63 to the median current ratio of the guideline publicly traded companies of 2.63. These ratios are presented on Exhibit 32.

We calculated the amount of "excess" short-term assets by multiplying the median industry current ratio of 2.63 by the Meditech current liabilities of $38.8 million. This calculation resulted in an adjusted level of current assets of $102.1 million (rounded). The difference between the Company total current assets of $218.6 million and the adjusted level of current assets of $102.1 million, or $116.5 million, represented the amount of excess working capital as of December 31, 2003.

As previously mentioned, the adjustment for excess working capital was necessary because the market pricing multiples used in our guideline publicly traded company method reflect the working capital levels of the guideline publicly traded companies. These market pricing multiples are based on the notion that the publicly traded companies typically operate with a normalized or optimal level of working capital. To the extent Meditech has a level of working capital that is in excess of the working capital held by the

## Willamette Management Associates

DEF005310
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                                    Page 65

guideline publicly traded companies, an adjustment should be made to reflect the incremental value of the excess working capital.

As of December 31, 2003, Meditech held long-term investments and securities with a market value of $43.7 million. For purposes of our analysis, we treated these investments as nonoperating, excess assets.

The objective of our analysis is to estimate the fair market value of a nonmarketable, noncontrolling ownership interest in the Meditech common stock. As a result, we needed to adjust the value of the excess assets to reflect the lack of control that a noncontrolling investor in the Meditech common stock would have over these assets.

We applied a discount to the value of the excess (1) working capital (i.e., excess cash and cash equivalents and marketable securities) and (2) long-term investments and securities of 10 percent. The selected discount for lack of control was based on market pricing data of closed-end mutual funds.

We reviewed the market pricing of several closed-end mutual funds as of year-end 2003. We specifically reviewed the market pricing data of closed-end mutual funds that were invested in (1) U.S. government obligations and (2) general equity securities. We selected these funds because their underlying assets were most similar to the excess assets held by Meditech.[35]

As of December 31, 2003, the median price to net asset value discount for the closed-end funds invested in U.S. government obligations was 0.4 percent. As of December 31, 2003, the median price to net asset value discount for the closed-end funds invested in equities was 5.7 percent.

As of December 31, 2003, the Meditech cash and cash equivalents, marketable securities, and investments totaled $231.6 million. Of these assets, approximately (1) 77 percent was invested in equity investments (common and preferred) and (2) 23 percent was invested in cash, cash equivalents, and U.S. government/agency securities.

Based on (1) the market-derived discounts from net asset value for the selected closed-end mutual funds and (2) the composition of the Meditech cash and cash equivalents, securities, and investments, we selected a discount for lack of control of 10 percent to apply to the Company excess assets.

As presented on Exhibit 44, we added (1) the discounted value of the Meditech excess cash and marketable securities of $104.8 million and excess long-term investments and securities of $39.3 million to (2) the indicated value of the Meditech equity of $1.460 billion. This calculation resulted in a marketable, noncontrolling value for the Meditech equity of $1.604 billion.

## Marketability Considerations

Similar to our valuations as of December 31, 2001 and 2002, we considered a variety of factors in our selection of the appropriate discount for lack of marketability for a noncontrolling ownership interest in the Meditech common stock as of December 31, 2003. These factors include: (1) historical dividends; (2) prospects for future dividends; (3) historical transactions in the stock; (4) the presence of a shareholders' agreement or other language that restricts the transferability of the stock; (5) the likelihood of a public offering of the stock or other liquidity event; (6) information access; and (7) information reliability.

---

[35] Given their risk-free nature, the funds holding U.S. government obligations were used as a proxy for investments in cash and cash equivalents.

### Willamette Management Associates

DEF005311
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                    Page 66

With respect to historical dividends, Meditech has paid a consistently high level of annual dividends. The following Table 15 summarizes the historical dividend payout ratio of Meditech from fiscal 1999 through fiscal 2003.

**Table 15**
**Medical Information Technology, Inc.**
**Historical Dividend Payout Analysis**

**Fiscal Year Ending December 31,**
**(in $000s)**

|  | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| Net Income | $67,424 | $63,871 | $56,841 | $55,146 | $59,956 |
| Dividends | $53,158 | $45,889 | $41,465 | $38,408 | $32,759 |
| Payout Ratio[36] | 78.8% | 71.8% | 72.9% | 69.6% | 54.6% |

As presented in Table 15, Meditech consistently paid a significant amount of its net income as a dividend each of the past five years. Furthermore, the payout ratio has generally increased over the five-year period. This consistently high level of current return paid to the shareholders on an annual basis supports a below average discount for lack of marketability, all other factors being equal.

In terms of future dividends, there was no reason to believe, as of December 31, 2003, that the Meditech dividend payments would be reduced or discontinued in the foreseeable future. This belief is supported by the Company management-prepared projection that presents an estimated increase in the Meditech dividend per share of approximately 15.4 percent in fiscal 2004.[37] This factor supports a below average discount for lack of marketability, all other factors being equal.

As previously mentioned, several transactions in the Meditech common stock occur each year. Many of these transactions occur between (1) the Company, (2) certain Meditech employees, and (3) the Meditech profit sharing trust. To some extent, Meditech creates a limited market in its common stock. This is in contrast to many nonpublicly traded companies, which have stock that is rarely bought or sold. The historical transaction activity demonstrates the Company's willingness to redeem noncontrolling ownership interests in the Meditech stock. This is generally a positive factor in assessing the illiquidity of the subject common stock.

However, it should be noted that the transactions primarily occur at the price set by the Meditech board of directors each year, rather than a price freely negotiated in the open market between a willing buyer and a willing seller without reference to the price set by the board. This nonmarket-based price for the transactions would offset the benefit of having a limited market for the common stock. As a whole, it is our opinion that (1) the transaction activity in the Meditech common stock coupled with (2) the prices at which the transactions often occur are neutral factors in the estimation of the discount for lack of marketability.

---

[36] The dividend payout ratio is calculated by dividing dividends by net income.
[37] Medical Information Technology, Inc., Report to the Board of Directors, Quarter Ended December 31, 2003, Board Meeting of January 26, 2004 (M0002017).

**Willamette Management Associates**

DEF005312
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                                    Page 67

It is our understanding that, as of December 31, 2003, the transferability of the Meditech common stock was not restricted by the terms of a buy-sell agreement, stock purchase agreement, or shareholder agreement. However, we understand that the transferability of the Meditech common stock was subject to a right of first refusal. The right of first refusal specifies that a shareholder may not sell, assign, transfer, pledge, otherwise dispose of any Meditech shares, subject to certain exceptions, without first giving written notice to the Company. Within 30 days after receipt of the notice, the Company may purchase all shares subject to transfer upon the same terms and conditions as set forth in the notice. If the shares are not purchased by the Company within the 30-day period, then the selling shareholder may transfer the shares to the intended transferee within a 60-day period following the expiration of the original 30 day period.

The right of first refusal language provides a restriction on the transferability of the Meditech common stock. Such a restriction normally supports an above average discount for lack of marketability. However, it should be noted that the right of first refusal does not preclude a shareholder from realizing fair market value upon a sale of his stock. This is because the Company's right of first refusal is exercisable at the same price and upon the same terms as the price and terms negotiated between the selling shareholder and the intended transferee. Consequently, the right of first refusal language is a neutral factor in the estimation of the discount for lack of marketability.

As of December 31 2003, there was no expectation of an initial public offering of the Meditech stock, a sale of the Company, or some other liquidity event. These factors support a higher than average discount for lack of marketability, all other factors being equal.

Given that Meditech is an SEC registrant, all of its shareholders (and prospective shareholders) have access to various company documents (e.g. annual reports, quarterly reports, proxies, etc.). Access to this information allows current shareholders to monitor the performance of their investment. The information also allows prospective shareholders to evaluate the attractiveness of an investment in Meditech. Given that the information is subject to SEC oversight, the reliability of the Meditech information is greater than the reliability of the information issued by many nonpublicly traded companies. The access to Company documents and the reliability of these documents supports a below average discount for lack of marketability.

In summary, we considered the following evidence in our selection of the appropriate discount for lack of marketability for a noncontrolling ownership interest in the Meditech common stock: (1) empirical market evidence presented in Appendix D, which supports illiquidity discounts for noncontrolling ownership interests in common stock; (2) the Meditech historical dividend payout ratio during the past five fiscal years; (3) the prospect for future dividend payments; (4) the historical transaction activity in the Meditech stock and the prices at which the transactions have occurred; (5) the transferability restriction on the Meditech common stock; (6) the improbability of a public offering of the Meditech common stock or a sale of the Company; and (7) the access to and the reliability of Meditech information.

Based on our analysis of these factors, it is our opinion that a discount for lack of marketability of 30 percent is appropriate in the estimation of the fair market value of a nonmarketable, noncontrolling ownership interest in the Meditech common stock.

## Willamette Management Associates

DEF005313
Confidential-Subject
to Protective Order

Medical Information Technology, Inc.                                      Page 68

### Value Conclusion

As presented on Exhibit 44, we applied the selected discount for lack of marketability of 30 percent to the indicated marketable, noncontrolling value for the Meditech equity of $1.604 billion. This calculation resulted in a nonmarketable, noncontrolling ownership interest value for the Meditech equity of $1.123 billion.

Meditech had 34.221 million common shares outstanding as of December 31, 2003. We divided the nonmarketable, noncontrolling ownership interest value of the Meditech equity of $1.123 billion by the number of outstanding common shares. This calculation resulted in a concluded fair market value of $33 per share (rounded).

Based on our analysis, and in our opinion, the fair market value of the Meditech common stock, on a nonmarketable, noncontrolling ownership interest basis, as of December 31, 2003, was:

<u>**$33 per share.**</u>

Willamette Management Associates

DEF005314
Confidential-Subject
to Protective Order

**EXHIBIT 34**

Form **5500**
Department of the Treasury
Internal Revenue Service
**Department of Labor**
Pension and Welfare Benefits
Administration
Pension Benefit Guaranty Corporation

## Annual Return/Report of Employee Benefit Plan
(With 100 or more participants)
This form is required to be filed under sections 104 and 4065 of the Employee
Retirement Income Security Act of 1974 and sections 6039D, 6047(e), 6057(b),
and 6058(a) of the Internal Revenue Code, referred to as the Code.
► **See separate instructions.**

OMB Nos. 1210-0016
1210-0089

**1997**

This Form is Open to
Public Inspection.

For the calendar plan year 1997 or fiscal plan year beginning _____ , 1997, and ending DECEMBER ___ , 19 97

| | | | For IRS Use Only |
|---|---|---|---|
| If A(1) through A(4), B, C, and/or D, do not apply to this year's return/report, leave the boxes unmarked. | | | EP–ID       JD–042455639-001-199712 |

A    This return/report is:    (1) ☐ the first return/report filed for the plan;    (3) ☐ the final return/report filed for the plan; or
(2) ☐ an amended return/report;    (4) ☐ a short plan year return/report (less than 12 months).

**IF ANY INFORMATION ON A PREPRINTED PAGE 1 IS INCORRECT, CORRECT IT. IF ANY INFORMATION IS MISSING, ADD IT. PLEASE USE RED INK WHEN MAKING THESE CHANGES AND INCLUDE THE PREPRINTED PAGE 1 WITH YOUR COMPLETED RETURN/REPORT.**

B    Check here if any information reported in 1a, 2a, 2b, or 5a changed since the last return/report for this plan . . . . . . . . ► ☐

C    If your plan year changed since the last return/report, check here . . . . . . . . . . . . . . . . . . . . . . . . . ► ☐

D    If you filed for an extension of time to file this return/report, check here and attach a copy of the approved extension . . . . ► ☐

| 1a   Name and address of plan sponsor (employer, if for a single-employer plan) (Address should include room or suite no.) | 1b   Employer identification number (EIN) |
|---|---|
| | 04:2455639 |
| \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*3-DIGIT 020 MEDICAL INFORMATION TECHNOLOGY INC MEDITECH CIR WESTWOOD, MA 02090 | 1c   Sponsor's telephone number (781) (617)-821-3000 |
| | 1d   Business code (see instructions, page 20) 7370 |
| | 1e   CUSIP issuer number |

| 2a   Name and address of plan administrator (if same as plan sponsor, enter "Same") | 2b   Administrator's EIN |
|---|---|
| MEDICAL INFORMATION TECHNOLOGY INC MEDITECH CIR WESTWOOD, MA 02090 | 04:2455639 |
| | 2c   Administrator's telephone number (781) (617)-821-3000 |

3    If you are filing this page without the preprinted historical plan information and the name, address, and EIN of the plan sponsor or plan administrator has changed since the last return/report filed for this plan, enter the information from the last return/report in line 3a and/or line 3b and complete line 3c.

a    Sponsor _____    EIN _____    Plan number _____

b    Administrator _____    EIN _____

c    If line 3a indicates a change in the sponsor's name, address, and EIN, is this a change in sponsorship only? (See line 3c on page 8 of the instructions for the definition of sponsorship.) Enter "Yes" or "No." ► _____

4    **ENTITY CODE.** (If not shown, enter the applicable code from page 8 of the instructions.) ►    A - SINGLE-EMPLOYER PLAN

| 5a   Name of plan ►   MEDICAL INFORMATION TECHNOLOGY INC PROFIT SHARING PLAN | 5b   Effective date of plan (mo., day, yr.) 12 / 31 / 1973 |
|---|---|
| | 5c   Three-digit plan number ►     001 |

All filers must complete 6a through 6d, as applicable.

6a   ☐ Welfare benefit plan    6b ☒ Pension benefit plan
(If the correct codes are not preprinted below, enter the applicable codes from page 8 of the instructions in the boxes.)

2 - DEF-CON, - PROFIT SHARING

6c   Pension plan features. (If the correct codes are not preprinted below, enter the applicable pension plan feature codes from page 8 of the instructions in the boxes.)

1 - PERMITTED DISPARITY

6d   ☐ Fringe benefit plan. Attach Schedule F (Form 5500). See instructions.

**Caution:** *A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.*

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules and statements, and to the best of my knowledge and belief it is true, correct, and complete.
by: *Barbara A Manzolillo*

Signature of employer/plan sponsor ►   MEDICAL INFORMATION TECHNOLOGY, INC.    Date ►   6/15/98
Type or print name of individual signing above    BARBARA A. MANZOLILLO

Signature of plan administrator ►   MEDICAL INFORMATION TECHNOLOGY, INC. by *Barbara Manzolillo*    6/15/98
Type or print name of individual signing above    BARBARA A. MANZOLILLO

For Paperwork Reduction Act Notice, see the instructions for Form 5500.    Cat. No. 13505P    Form **5500** (1997)

DEF000861

Form 5500 (1997)                                                                                        Page **2**

**6e** Check all applicable investment arrangements below (see instructions on page 9):

    *(1)* ☐ Master trust        *(2)* ☐ 103-12 investment entity

    *(3)* ☐ Common/collective trust     *(4)* ☐ Pooled separate account

.................................................................................................................

.................................................................................................................

.................................................................................................................

.................................................................................................................

**f** Single-employer plans enter the tax year end of the employer in which this plan ends ► Month ..12.. Day ..31.. Year ..97..

**g** Is any part of this plan funded by an insurance contract described in Code section 412(i)? . . . . . . ☐ Yes ☒ No

**h** If line 6g is "Yes," was the part subject to the minimum funding standards for either of the prior 2 plan years? . . ☐ Yes ☐ No

**7** Number of participants as of the end of the plan year (welfare plans complete only lines 7a(4), 7b, 7c, and 7d):

| | | | |
|---|---|---|---|
| **a** Active participants: *(1)* Number fully vested . . . . . . . | a(1) | 622 | |
|      *(2)* Number partially vested . . . . . . | a(2) | 444 | |
|      *(3)* Number nonvested . . . . . . . . | a(3) | 326 | |
|      *(4)* Total . . . . . . . . . . . | a(4) | | 1392 |
| **b** Retired or separated participants receiving benefits . . . . . . . . . . | b | | 0 |
| **c** Retired or separated participants entitled to future benefits . . . . . . . | c | | 0 |
| **d** Subtotal. Add lines 7a(4), 7b, and 7c . . . . . . . . . . . . . | d | | 1392 |
| **e** Deceased participants whose beneficiaries are receiving or are entitled to receive benefits . . . | e | | 0 |
| **f** Total. Add lines 7d and 7e . . . . . . . . . . . . . . . | f | | 1392 |
| **g** Number of participants with account balances. (Defined benefit plans do not complete this line item.). | g | | 1392 |
| **h** Number of participants that terminated employment during the plan year with accrued benefits that were less than 100% vested. . . . . . . . . . . . . . . . . . | h | | 120 |

| | | Yes | No |
|---|---|---|---|
| **i** *(1)* Was any participant(s) separated from service with a deferred vested benefit for which a Schedule SSA (Form 5500) is required to be attached? (See instructions.) . . . . . . . . . . . | i(1) | | X |
|     *(2)* If "Yes," enter the number of separated participants required to be reported ► | | | |

| | | Yes | No |
|---|---|---|---|
| **8a** Was this plan ever amended since its effective date? If "Yes," complete line 8b. If the amendment was adopted in this plan year, complete lines 8c through 8e. | 8a | X | |
| **b** If line 8a is "Yes," enter the date the most recent amendment was adopted ► Month ..11.. Day .23... Year .94... | | | |
| **c** Did any amendment during the current plan year result in the retroactive reduction of accrued benefits for any participants? | c | | |
| **d** During this plan year did any amendment change the information contained in the latest summary plan descriptions or summary description of modifications available at the time of amendment?. . . . . . . . . . | d | | |
| **e** If line 8d is "Yes," has a summary plan description or summary description of modifications that reflects the plan amendments referred to on line 8d been furnished to participants? (see instructions) . . . . . . . | e | | |

| | | Yes | No |
|---|---|---|---|
| **9a** Was this plan terminated during this plan year or any prior plan year? If "Yes," enter the year ► .......................... | 9a | | X |
| **b** Were all the plan assets either distributed to participants or beneficiaries, transferred to another plan, or brought under the control of PBGC? . . . . . . . . . . . . . . . . . . . . . . . . . . | b | | N/A |
| **c** Was a resolution to terminate this plan adopted during this plan year or any prior plan year? . . . . . | c | | X |
| **d** If line 9a or line 9c is "Yes," have you received a favorable determination letter from the IRS for the termination? . | d | | |
| **e** If line 9d is "No," has a determination letter been requested from the IRS? . . . . . . . . . | e | | |
| **f** If line 9a or line 9c is "Yes," have participants and beneficiaries been notified of the termination or the proposed termination? | f | | |
| **g** If line 9a is "Yes" and the plan is covered by PBGC, is the plan continuing to file a PBGC Form 1 and pay premiums until the end of the plan year in which assets are distributed or brought under the control of PBGC? . . . | g | | |
| **h** During this plan year, did any trust assets revert to the employer for which the Code section 4980 excise tax is due? | h | | X |
| **i** If line 9h is "Yes," enter the amount of tax paid with Form 5330 ► $ | | | |

**10a** In this plan year, was this plan merged or consolidated into another plan(s), or were assets or liabilities transferred to another plan(s)? If "Yes," complete lines 10b through 10e. . . . . . . . . . . . . . . ► ☐ Yes ☒ No

| | | |
|---|---|---|
| If "Yes," identify the other plan(s) | **c** Employer identification number(s) | **d** Plan number(s) |
| **b** Name of plan(s) ► | | |

**e** If required, has a Form 5310-A been filed? . . . . . . . . . . . . . . . . . . ► ☐ Yes ☐ No

| | | |
|---|---|---|
| **11** Enter the plan funding arrangement code from page 10 of the instructions . . . . . . . . ►   1 | **12** Enter the plan benefit arrangement code from page 10 of the instructions ►   1 | |

| | | Yes | No |
|---|---|---|---|
| **13a** Is this a plan established or maintained pursuant to one or more collective bargaining agreements? . . . . . | 13a | | X |
| **b** If line 13a is "Yes," enter the appropriate six-digit LM number(s) of the sponsoring labor organization(s) (see instructions): | | | |
|     *(1)*             *(2)*             *(3)* | | | |

**14** If any benefits are provided by an insurance company, insurance service, or similar organization, enter the number of Schedules A (Form 5500). Insurance information. attached. If none, enter "-0-." ►   0

DEF000862

Form 5500 (1997)

Page **3**

**Welfare Plans Do Not Complete Lines 15 Through 24. Go To Line 25 On Page 4.**

| | | | Yes | No |
|---|---|---|---|---|
| 15a | If this is a defined benefit plan subject to the minimum funding standards for this plan year, is **Schedule B (Form 5500)** required to be attached? (If this is a defined contribution plan leave blank.). . N/A . . . . . . . . | 15a | | |
| b | If this is a defined contribution plan (i.e., money purchase or target benefit), is it subject to the minimum funding standards? (If a waiver was granted, see instructions.) (If this is a defined benefit plan, leave blank.). . . . . . . . | b | | X |
| | If "Yes," complete (1), (2), and (3) below: | | | |
| | (1)  Amount of employer contribution required for the plan year under Code section 412    b(1) $ | | | |
| | (2)  Amount of contribution paid by the employer for the plan year.    b(2) $ | | | |
| | | Enter date of last payment by employer ► Month......... Day........ Year...... | | | |
| | (3)  If (1) is greater than (2), subtract (2) from (1) and enter the funding deficiency here; otherwise, enter -0-. (If you have a funding deficiency, file Form 5330.)    b(3) $ | | | |
| 16 | Has the annual compensation of each participant taken into account under the current plan year been limited as required by section 401(a)(17)? (See instructions.) . . . . . . . . . . . . . . . . . . . . . . . | 16 | X | |
| 17a | (1)  Did the plan distribute any annuity contracts this year? (See instructions.) NO SUCH DISTRIBUTIONS . | a(1) | | X |
| | (2)  If (1) is "Yes," did these contracts require a requirement that the spouse consent before any distributions under the contract are made in a form other than a qualified joint and survivor annuity? . . . . . . . | a(2) | | |
| b | Did the plan make distributions or loans to married participants and beneficiaries without the required consent of the participant's spouse? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | b | | X |
| c | Upon plan amendment or termination, do the accrued benefits of every participant include the subsidized benefits that the participant may become entitled to receive subsequent to the plan amendment or termination? . . . . . . | c | X | |
| 18 | Is the plan administrator making an election under section 412(c)(8) for an amendment adopted after the end of the plan year? (See instructions.) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 | | X |
| 19 | If a change in the actuarial funding method was made for the plan year pursuant to a Revenue Procedure providing automatic approval for the change, indicate whether the plan sponsor agrees to the change  N/A . . . . . | 19 | | |
| 20 | Is the employer electing to compute minimum funding for the plan year using the Transition rule of Code section 412(l)(11)? N/A | 20 | | |
| 21 | Check if you are applying the substantiation guidelines from Revenue Procedure 93-42, in completing lines 21a through 21o (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . ☐ | | | |
| | If you checked the box, enter the first day of the plan year for which data is being submitted ► Month ........Day ........Year ....... | | | |
| a | Does the employer apply the separate line of business rules of Code section 414(r) when testing this plan for the coverage and discrimination tests of Code sections 410(b) and 401(a)(4)? . . . . . . . . . . . . . . | 21a | | X |
| b | If line 21a is "Yes," enter the total number of separate lines of business claimed by the employer ► .................... If more than one separate line of business, see instructions for additional information to attach. | | | |
| c | Does the employer apply the mandatory disaggregation rules under Income Tax Regulations section 1.410(b)-7(c)? If "Yes," see instructions for additional information to attach. | c | | X |
| d | In testing whether this plan satisfies the coverage and discrimination tests of Code sections 410(b) and 401(a), does the employer aggregate plans? . ONLY ONE PLAN . . . . . . . . . . . . . . . . . . . . | d | | X |
| e | Does the employer restructure the plan into component plans to satisfy the coverage and discrimination tests of Code sections 410(b) and 401(a)(4)? . . . . . . . . . . . . . . . . . . . . . . . . . . . . | e | | X |
| f | If you meet either of the following exceptions, check the applicable box to tell us which exception you meet and do NOT complete the rest of question 21: | | | |
| | (1) ☐  No highly compensated employee benefited under the plan at any time during the plan year; | | | |
| | (2) ☐  This is a collectively bargained plan that benefits only collectively bargained employees, no more than 2% of whom are professional employees. | | | |
| g | Did any leased employee perform services for the employer at any time during the plan year? NO SUCH EMPLOYEES | g | | X |

| | | | Number |
|---|---|---|---|
| h | Enter the total number of employees of the employer. Employer includes entities aggregated with the employer under Code section 414(b), (c), or (m). Include leased employees and self-employed individuals | h | 1,814 |
| i | Enter the total number of employees excludable because of: (1) failure to meet requirements for minimum age and years of service; (2) collectively bargained employees; (3) nonresident aliens who receive no earned income from U.S. sources; and (4) 500 hours of service/last day rule . . . . . | i | 422 |
| j | Enter the number of nonexcludable employees. Subtract line 21i from line 21h . . . . . . . . . . | j | 1392 |

| | | | | |
|---|---|---|---|---|
| k | Do 100% of the nonexcludable employees entered on line 21j benefit under the plan? . . . . ☒ Yes  ☐ No If line 21k is "Yes," do NOT complete lines 21l through 21o. | | | |
| l | Enter the number of nonexcludable employees (line 21j) who are highly compensated employees . . . . . | l | |
| m | Enter the number of nonexcludable employees (line 21j) who benefit under the plan . . . . . . . . | m | |
| n | Enter the number of employees entered on line 21m who are highly compensated employees . . . . . . | n | |
| o | This plan satisfies the coverage requirements on the basis of (check one): | | | |
| | (1) ☐  The average benefits test    (2) ☐  The ratio percentage test—Enter percentage ► | | | % |

DEF000863

Form 5500 (1997)                                                                                     Page **4**

**Welfare Plans Go To Line 25 On This Page.**

|  |  | | Yes | No |
|---|---|---|---|---|
| **22a** | Is it or was it ever intended that this plan qualify under Code section 401(a)? If "Yes," complete lines 22b and 22c. | **22a** | X | |
| **b** | Enter the date of the most recent IRS determination letter . . . . . . ▶ Month APRIL  Year 1993 | | | |
| **c** | Is a determination letter request pending with the IRS? . . . . . . . . . . . . . . | **c** | | X |
| **23a** | Does the plan hold any assets that have a fair market value that is not readily determinable on an established market? (If "Yes," complete line 23b) (See instructions) | **23a** | X | |
| **b** | Were all the assets referred to in line 23a valued for the 1997 plan year by an independent third-party appraiser? . | **b** | | X |
| **c** | If line 23b is "No," enter the value of the assets that were not valued by an independent third-party appraiser for the 1997 plan year. ▶ 39,366,288.− | | | |
| **d** | Enter the most recent date the assets on line 23c were valued by an independent third-party appraiser. (If more than one asset, see instructions.) ▶ Month ____ Day ____ Year ____ N/A = NOT REQUIRED (If this plan does not have ESOP features leave line 23e blank and go to line 24.) | | | |
| **e** | If dividends paid on employer securities held by the ESOP were used to make payments on ESOP loans, enter the amount of the dividends used to make the payments . . . **23e** N/A | | | |
| **24** | Does the employer/sponsor listed on line 1a of this form maintain other qualified pension benefit plans? . . . . . If "Yes," enter the total number of plans, including this plan ▶ | **24** | | X |
| **25a** | Did any person who rendered services to the plan receive directly or indirectly $5,000 or more in compensation from the plan during the plan year (except for employees of the plan who were paid less than $1,000 in each month)? . . If "Yes," complete Part I of Schedule C (Form 5500). | **25a** | | X |
| **b** | Did the plan have any trustees who must be listed in Part II of Schedule C (Form 5500)? . . . . . . . . . | **b** | X | |
| **c** | Has there been a termination in the appointment of any person listed on line 25d below? . . . . . . . . . | **c** | | X |
| **d** | If line 25c is "Yes," check the appropriate box(es), answer lines 25e and 25f, and complete Part III of Schedule C (Form 5500):<br>(1) ☐ Accountant   (2) ☐ Enrolled actuary   (3) ☐ Insurance carrier   (4) ☐ Custodian<br>(5) ☐ Administrator   (6) ☐ Investment manager   (7) ☐ Trustee | | | |
| **e** | Have there been any outstanding material disputes or matters of disagreement concerning the above termination?. . | **e** | | X |
| **f** | If an accountant or enrolled actuary has been terminated during the plan year, has the terminated accountant/actuary been provided a copy of the explanation required by Part III of Schedule C (Form 5500) with a notice advising them of their opportunity to submit comments on the explanation directly to the DOL?. . . . . . . . . . . . . . | **f** | | |
| **g** | Enter the number of Schedules C (Form 5500) that are attached. If none, enter -0- ▶        1 | **g** | | |
| **26a** | Is this plan exempt from the requirement to engage an independent qualified public accountant? (see instructions). . | **26a** | | X |
| **b** | If line 26a is "No," attach the accountant's opinion to this return/report and check the appropriate box. This opinion is:<br>(1) ☐ Unqualified<br>(2) ☐ Qualified/disclaimer per Department of Labor Regulations 29 CFR 2520.103-8 and/or 2520.103-12(d)<br>(3) ☐ Qualified/disclaimer other   (4) ☐ Adverse   (5) ☒ Other (explain) SUBJECT TO ACCOUNTANT'S COMMENTS WITH RESPECT TO VALUATION OF EMPLOYER'S SECURITIES | | | |
| **c** | If line 26a is "No," does the accountant's report, including the financial statements and/or notes required to be attached to this return/report disclose (1) errors or irregularities; (2) illegal acts; (3) material internal control weaknesses; (4) a loss contingency indicating that assets are impaired or a liability incurred; (5) significant real estate or other transactions in which the plan and (A) the sponsor, (B) the plan administrator, (C) the employer(s), or (D) the employee organization(s) are jointly involved; (6) that the plan has participated in any related party transactions; or (7) any unusual or infrequent events or transactions occurring subsequent to the plan year end that might significantly affect the usefulness of the financial statements in assessing the plan's present or future ability to pay benefits? | **c** | | X |
| **d** | If line 26c is "Yes," provide the total amount involved in such disclosure ▶ | | | |
| **27** | If line 26a is "No," complete the following questions. (You may NOT use "N/A" in response to lines 27a through 27i):<br>If line 27a, 27b, 27c, 27d, 27e, or 27f is checked "Yes," schedules of these items in the format set forth in the instructions are required to be attached to this return/report. Schedule G (Form 5500) may be used as specified in the instructions.<br>During the plan year: | | | |
| **a** | Did the plan have assets held for investment? . . . . . . . . . . . . . . . . . . . . . | **27a** | X | |
| **b** | Were any loans by the plan or fixed income obligations due the plan in default as of the close of the plan year or classified during the year as uncollectible? . . . . . . . . . . . . . . . . . . . . . . . . . | **b** | | X |
| **c** | Were any leases to which the plan was a party in default or classified during the year as uncollectible? . . . . . | **c** | | X |
| **d** | Were any plan transactions or series of transactions in excess of 5% of the current value of plan assets? . . . . | **d** | | X |
| **e** | Do the notes to the financial statements accompanying the accountant's opinion disclose any nonexempt transactions with parties-in-interest? . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **e** | | X |
| **f** | Did the plan engage in any nonexempt transactions with parties-in-interest not reported on line 27e? . . . . . | **f** | | X |
| **g** | Did the plan hold qualifying employer securities that are not publicly traded? . . . . . . . . . . . . . | **g** | X | |
| **h** | Did the plan purchase or receive any nonpublicly traded securities that were not appraised in writing by an unrelated third party within 3 months prior to their receipt? . . . . . . . . . . . . . . . . . . . | **h** | X | |
| **i** | Did any person manage plan assets who had a financial interest worth more than 10% in any party providing services to the plan or receive anything of value from any party providing services to the plan? . . . . . . . . . . | **i** | | X |

DEF000864

Form 5500 (1997)

Page **6**

**32** Plan income, expenses, and changes in net assets for the plan year. Include all income and expenses of the plan, including any trust(s) or separately maintained fund(s), and any payments/receipts to/from insurance carriers. Round off amounts to the nearest dollar; any other amounts are subject to rejection.

## Income

| | | | (a) Amount | (b) Total |
|---|---|---|---|---|
| **a** | **Contributions:** | | | |
| | (1) Received or receivable from: | | | |
| | (A) Employers | a(1)(A) | 3,400,000 | |
| | (B) Participants | (B) | 0 | |
| | (C) Others | (C) | 0 | |
| | (2) Noncash contributions | (2) | 0 | |
| | (3) Total contributions. Add lines 32a(1)(A), (B), (C) and line 32a(2) ▶ | (3) | | 3,400,000 |
| **b** | **Earnings on investments:** | | | |
| | (1) Interest | | | |
| | (A) Interest-bearing cash (including money market funds) | b(1)(A) | 3,752 | |
| | (B) Certificates of deposit | (B) | 0 | |
| | (C) U.S. Government securities | (C) | 1,334,801 | |
| | (D) Corporate debt instruments | (D) | | |
| | (E) Mortgage loans | (E) | | |
| | (F) Other loans . . ON PARTICIPANT LOANS | (F) | 100,062 | |
| | (G) Other interest | (G) | 0 | |
| | (H) Total interest. Add lines 32b(1)(A) through (G) ▶ | (H) | | 1,438,615 |
| | (2) Dividends: (A) Preferred stock | b(2)(A) | 0 | |
| | (B) Common stock . . EMPLOYER'S COMMON STOCK | (B) | 2,389,447 | |
| | (C) Total dividends. Add lines 32b(2)(A) and (B) ▶ | (C) | | 2,389,447 |
| | (3) Rents | (3) | | 0 |
| | (4) Net gain (loss) on sale of assets: (A) Aggregate proceeds | (4)(A) | 0 | |
| | (B) Aggregate carrying amount (see instructions) | (B) | 0 | |
| | (C) Subtract (B) from (A) and enter result | (C) | | 0 |
| | (5) Unrealized appreciation (depreciation) of assets | (5) | | 4,279,690 |
| | (6) Net investment gain (loss) from common/collective trusts | (6) | | 0 |
| | (7) Net investment gain (loss) from pooled separate accounts | (7) | | 0 |
| | (8) Net investment gain (loss) from master trusts | (8) | | 0 |
| | (9) Net investment gain (loss) from 103-12 investment entities | (9) | | 0 |
| | (10) Net investment gain (loss) from registered investment companies | (10) | | 0 |
| **c** | Other income | c | | 0 |
| **d** | Total income. Add all amounts in column (b) and enter total ▶ | d | | 11,507,752 |

## Expenses

| | | | (a) Amount | (b) Total |
|---|---|---|---|---|
| **e** | Benefit payment and payments to provide benefits: | | | |
| | (1) Directly to participants or beneficiaries | e(1) | 2,111,284 | |
| | (2) To insurance carriers for the provision of benefits | (2) | 0 | |
| | (3) Other | (3) | 0 | |
| | (4) Total payments. Add lines 32e(1) through 32e(3) ▶ | (4) | | 2,111,284 |
| **f** | Interest expense | f | | 0 |
| **g** | Administrative expenses: (1) Salaries and allowances | g(1) | 0 | |
| | (2) Accounting fees | (2) | 0 | |
| | (3) Actuarial fees | (3) | 0 | |
| | (4) Contract administrator fees | (4) | 0 | |
| | (5) Investment advisory and management fees | (5) | 0 | |
| | (6) Legal fees | (6) | 0 | |
| | (7) Valuation/appraisal fees | (7) | 0 | |
| | (8) Trustees fees/expenses (including travel, seminars, meetings, etc.) | (8) | 0 | |
| | (9) Other | (9) | 0 | |
| | (10) Total administrative expenses. Add lines 32g(1) through 32g(9) | (10) | | 0 |
| **h** | Total expenses. Add lines 32e(4), 32f, and 32g(10) ▶ | h | | 2,111,284 |
| **i** | Net income (loss). Subtract line 32h from line 32d | i | | 9,396,468 |
| **j** | Transfers to (from) the plan (see instructions) | j | | 0 |
| **k** | Net assets at beginning of year (line 31l, column (a)) | k | | 56,567,393 |
| **l** | Net assets at end of year (line 31l, column (b)) ▶ | l | | 65,963,861 |

| | | Yes | No |
|---|---|---|---|
| **33** | Did any employer sponsoring the plan pay any of the administrative expenses of the plan that were not reported on line 32g? | X | |

DEF000865

Form 5500 (1997)

Page **5**

|  |  | | Yes | No |
|---|---|---|---|---|
| 28 | Did the plan acquire individual whole life insurance contracts during the plan year? . . . . . . . | 28 | | X |
| 29 | During the plan year: | | | |
| a | (1) Was this plan covered by a fidelity bond? If "Yes," complete lines 29a(2) and 29a(3) . . . . . . | 29a(1) | X | |
|  | (2) Enter amount of bond ► $ ......500,000........ | | | |
|  | (3) Enter the name of the surety company ►...FEDERAL INSURANCE COMPANY................. | | | |
| b | (1) Was there any loss to the plan, whether or not reimbursed, caused by fraud or dishonesty? . . . . . | 29b(1) | | X |
|  | (2) If line 29b(1) is "Yes," enter amount of loss ► $ | | | |

**30a** Is the plan covered under the Pension Benefit Guaranty Corporation termination insurance program?

☐ Yes  ☒ No  ☐ Not determined

**b** If line 30a is "Yes" or "Not determined," enter the employer identification number and the plan number used to identify it.

Employer identification number ►                    Plan number ►

**31** Current value of plan assets and liabilities at the beginning and end of the plan year. Combine the value of plan assets held in more than one trust. Allocate the value of the plan's interest in a commingled trust containing the assets of more than one plan on a line-by-line basis unless the trust meets one of the specific exceptions described in the instructions. Do not enter the value of that portion of an insurance contract that guarantees, during this plan year, to pay a specific dollar benefit at a future date. Round off amounts to the nearest dollar; any other amounts are subject to rejection. Plans with no assets at the beginning and the end of the plan year, enter -0- on line 31f.

### Assets

|  |  |  | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|---|
| a | Total noninterest-bearing cash . . . . . . | a | 5,554,766 | 190 |
| b | Receivables: (1) Employer contributions . . . . . . . . | b(1) | 0 | 0 |
|  | (2) Participant contributions . . . . . . . | (2) | 0 | 0 |
|  | (3) Income . . ACCRUED INTEREST . . . . . | (3) | 287,499 | 326,221 |
|  | (4) Other . . . . . . . . . . . . . | (4) | 0 | 0 |
|  | (5) Less allowance for doubtful accounts . . . | (5) | 0 | 0 |
|  | (6) Total. Add lines 31b(1) through 31b(4) and subtract line 31b(5) ► | (6) | 287,499 | 326,221 |
| c | General Investments: (1) Interest-bearing cash (including money market funds) | c(1) | 80,093 | 81,914 |
|  | (2) Certificates of deposit . . . . . . . | (2) | 0 | 0 |
|  | (3) U.S. Government securities . . . . . . | (3) | 21,176,405 | 24,841,298 |
|  | (4) Corporate debt instruments: (A) Preferred . . . . . . | (4)(A) | 0 | 0 |
|  | (B) All other . . . . . . | (4)(B) | 0 | 0 |
|  | (5) Corporate stocks: (A) Preferred . . . . | (5)(A) | 0 | 0 |
|  | (B) Common . . . . . . . . . | (5)(B) | 0 | 0 |
|  | (6) Partnership/joint venture interests . . . . | (6) | 0 | 0 |
|  | (7) Real estate: (A) Income-producing . . . . | (7)(A) | 0 | 0 |
|  | (B) Nonincome-producing . . . . | (7)(B) | 0 | 0 |
|  | (8) Loans (other than to participants) secured by mortgages: (A) Residential | (8)(A) | 0 | 0 |
|  | (B) Commercial . . . | (8)(B) | 0 | 0 |
|  | (9) Loans to participants: (A) Mortgages . . . . | (9)(A) | 0 | 0 |
|  | (B) Other . . . . . . . . . | (9)(B) | 1,257,200 | 1,347,950 |
|  | (10) Other loans . . . . . . . . . . | (10) | 0 | 0 |
|  | (11) Value of interest in common/collective trusts . . | (11) | 0 | 0 |
|  | (12) Value of interest in pooled separate accounts . . | (12) | 0 | 0 |
|  | (13) Value of interest in master trusts . . . . | (13) | 0 | 0 |
|  | (14) Value of interest in 103-12 investment entities . . | (14) | 0 | 0 |
|  | (15) Value of interest in registered investment companies | (15) | 0 | 0 |
|  | (16) Value of funds held in insurance company general account (unallocated contracts) . | (16) | 0 | 0 |
|  | (17) Other . . . . . . . . . . . . . | (17) | 0 | 0 |
|  | (18) Total. Add lines 31c(1) through 31c(17) . . . . ► | (18) | 22,513,698 | 26,271,162 |
| d | Employer-related investments: (1) Employer securities COMMON STOCK . . | d(1) | 33,760,720 | 39,366,288 |
|  | (2) Employer real property . . . . . . . | (2) | 0 | 0 |
| e | Buildings and other property used in plan operation . . | e | 0 | 0 |
| f | **Total assets. Add lines 31a, 31b(6), 31c(18), 31d(1), 31d(2), and 31e** . . . ► | f | 56,567,393 | 65,963,861 |

### Liabilities

|  |  |  | | |
|---|---|---|---|---|
| g | Benefit claims payable . . . . . . . . | g | 0 | 0 |
| h | Operating payables . . . . . . . . . | h | 0 | 0 |
| i | Acquisition indebtedness . . . . . . . . | i | 0 | 0 |
| j | Other liabilities . . . . . . . . . . | j | 0 | 0 |
| k | Total liabilities. Add lines 31g through 31j . . . . ► | k | 0 | 0 |

### Net Assets

|  |  |  | | |
|---|---|---|---|---|
| l | Subtract line 31k from line 31f . . . . . . . ► | l | 56,567,393 | 65,963,861 |

DEF000866

| SCHEDULE C (Form 5500) Department of the Treasury Internal Revenue Service | **Service Provider and Trustee Information** | OMB No. 1210-0016 |
|---|---|---|

**SCHEDULE C**
**(Form 5500)**
Department of the Treasury
Internal Revenue Service

Department of Labor
Pension and Welfare Benefits Administration

Pension Benefit Guaranty Corporation

**Service Provider and Trustee Information**

This schedule is required to be filed under section 104 of the
Employee Retirement Income Security Act of 1974.

▶ File as an attachment to Form 5500.

Additional Schedules C (Form 5500) may be used, if needed, to
provide additional information for Parts I, II, and/or III.

OMB No. 1210-0016

**1997**

**This Form is
Open to Public
Inspection**

For the calendar year 1997 or fiscal plan year beginning _____ , 1997, and ending _____ , 19 _____

Name of plan sponsor as shown on line 1a of Form 5500

MEDICAL INFORMATION TECHNOLOGY, INC.

Employer Identification number

04 2455639

Name of plan

MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN

Three-digit
plan number ▶ 0 0 1

**Part I** Service Provider Information (see instructions)

1 Enter the total dollar amount of compensation paid by the plan to all persons receiving less than $5,000 during the plan year . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |

| 2 (a) Name | (b) Employer identification number (see instructions) | (c) Official plan position | (d) Relationship to employer, employee organization, or person known to be a party-in-interest | (e) Gross salary or allowances paid by plan | (f) Fees and commissions paid by plan | (g) Nature of service code (see instructions) |
|---|---|---|---|---|---|---|
| (1) | | Contract administrator | | | | 12 |
| (2) | | | | | | |
| (3) | | | | | | |
| (4) | | | | | | |
| (5) | | | | | | |
| (6) | | | | | | |
| (7) | | | | | | |
| (8) | | | | | | |
| (9) | | | | | | |
| (10) | | | | | | |
| (11) | | | | | | |
| (12) | | | | | | |
| (13) | | | | | | |
| (14) | | | | | | |
| (15) | | | | | | |
| (16) | | | | | | |
| (17) | | | | | | |
| (18) | | | | | | |
| (19) | | | | | | |
| (20) | | | | | | |
| (21) | | | | | | |
| (22) | | | | | | |
| (23) | | | | | | |
| (24) | | | | | | |
| (25) | | | | | | |
| (26) | | | | | | |
| (27) | | | | | | |
| (28) | | | | | | |
| (29) | | | | | | |
| (30) | | | | | | |
| (31) | | | | | | |
| (32) | | | | | | |
| (33) | | | | | | |
| (34) | | | | | | |
| (35) | | | | | | |
| (36) | | | | | | |
| (37) | | | | | | |
| (38) | | | | | | |
| (39) | | | | | | |
| (40) | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 5500.        Cat. No. 13515E        Schedule C (Form 5500) 1997

DEF000867

Schedule C (Form 5500) 1997    Page **2**

## Part II    Trustee Information

Enter the name and address of all trustees who served during the plan year. If more space is required to supply this information, attach additional Schedules C (Form 5500).

| | |
|---|---|
| Name ...A. NEIL PAPPALARDO............ <br> Address MEDICAL INFORMATION TECHNOLOGY, INC., <br> MEDITECH CIRCLE, WESTWOOD, MA 02090 | Name ....................................................... <br> Address ................................................... |
| Name ................................................... <br> Address ................................................ | Name ....................................................... <br> Address ................................................... |
| Name ................................................... <br> Address ................................................ | Name ....................................................... <br> Address ................................................... |
| Name ................................................... <br> Address ................................................ | Name ....................................................... <br> Address ................................................... |
| Name ................................................... <br> Address ................................................ | Name ....................................................... <br> Address ................................................... |
| Name ................................................... <br> Address ................................................ | Name ....................................................... <br> Address ................................................... |
| Name ................................................... <br> Address ................................................ | Name ....................................................... <br> Address ................................................... |
| Name ................................................... <br> Address ................................................ | Name ....................................................... <br> Address ................................................... |

## Part III    Termination Information (see instructions)

| (a) Name | (b) EIN | (c) Position | (d) Address | (e) Telephone No. |
|---|---|---|---|---|
| | | | | |

(1)  Explanation: ............................................................................................................
.........................................................................................................................
.........................................................................................................................
.........................................................................................................................
.........................................................................................................................

| (a) Name | (b) EIN | (c) Position | (d) Address | (e) Telephone No. |
|---|---|---|---|---|
| | | | | |

(2)  Explanation: ............................................................................................................
.........................................................................................................................
.........................................................................................................................
.........................................................................................................................
.........................................................................................................................

| (a) Name | (b) EIN | (c) Position | (d) Address | (e) Telephone No. |
|---|---|---|---|---|
| | | | | |

(3)  Explanation: ............................................................................................................
.........................................................................................................................
.........................................................................................................................
.........................................................................................................................
.........................................................................................................................

DEF000868

**SCHEDULE P**
**(Form 5500)**

Department of the Treasury
Internal Revenue Service

**Annual Return of Fiduciary**
**of Employee Benefit Trust**

► File as an attachment to Form 5500, 5500-C/R, or 5500-EZ.
► For the Paperwork Reduction Notice, see the Form 5500 instructions.

OMB No. 1210-0016

**1997**

This Form is Open to
Public Inspection.

For trust calendar year 1997 or fiscal year beginning _____, 1997, and ending _____, 19____

| | |
|---|---|
| **1a** Name of trustee or custodian | |
| A. NEIL PAPPALARDO | |
| **b** Number, street, and room or suite no. (If a P.O. box, see the instructions for Form 5500, 5500-C/R, or 5500-EZ.) | |
| MEDITECH CIRCLE | |
| **c** City or town, state, and ZIP code | |
| WESTWOOD         MA         02090 | |

Please type or print

| **2a** Name of trust | **b** Trust's employer identification number |
|---|---|
| MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING TRUST | 04 2455639 |

**3** Name of plan if different from name of trust

MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN

**4** Have you furnished the participating employee benefit plan(s) with the trust financial information required to be reported by the plan(s)? . . . . . . . . . . . . . . . . . .    [X] Yes   [ ] No

**5** Enter the plan sponsor's employer identification number as shown on Form 5500, 5500-C/R, or 5500-EZ . . . . . . . . . . ►

Under penalties of perjury, I declare that I have examined this schedule, and to the best of my knowledge and belief it is true, correct, and complete.

Signature of fiduciary ►  *[signature]*   TRUSTEE   Date ►  6/15/98

## Instructions

*Section references are to the Internal Revenue Code.*

### Purpose of Form

You may use this schedule to satisfy the requirements under section 6033(a) for an annual information return from every section 401(a) organization exempt from tax under section 501(a).

Filing this form will start the running of the statute of limitations under section 6501(a) for any trust described in section 401(a), which is exempt from tax under section 501(a).

### Who May File

**1.** Every trustee of a trust created as part of an employee benefit plan as described in section 401(a).

**2.** Every custodian of a custodial account described in section 401(f).

### How To File

File Schedule P (Form 5500) for the trust year ending with or within any participating plan's plan year. Attach it to the Form 5500, 5500-C/R, or 5500-EZ filed by the plan for that plan year. A separately filed Schedule P (Form 5500) will not be accepted.

If the trust or custodial account is used by more than one plan, file one Schedule P (Form 5500). If a plan uses more than one trust or custodial account for its funds, file one Schedule P (Form 5500) for each trust or custodial account.

### Trust's Employer Identification Number

Enter the trust employer identification number (EIN) assigned to the employee benefit trust or custodial account, if one has been issued to you. The trust EIN should be used for

transactions conducted for the trust. If you do not have a trust EIN, enter the EIN you would use on Form 1099-R to report distributions from employee benefit plans and on Form 945 to report withheld amounts of income tax from those payments.

**Note:** *Trustees who do not have an EIN may apply for one on Form SS-4, Application for Employer Identification Number. You must be consistent and use the same EIN for all trust reporting purposes.*

### Signature

The fiduciary (trustee or custodian) must sign this schedule. If there is more than one fiduciary, the fiduciary authorized by the others may sign.

### Other Returns and Forms That May Be Required

● **Form 990-T**—For trusts described in section 401(a), a tax is imposed on income derived from business that is unrelated to the purpose for which the trust received a tax exemption. Report this income and tax on **Form 990-T**, Exempt Organization Business Income Tax Return. (See sections 511 through 514 and the related regulations.)

● **Form 1099-R**—If you made payments or distributions to individual beneficiaries of a plan, report those payments on Form 1099-R. (See the instructions for Forms 1099, 1098, 5498, and W-2G.)

● **Form 945**—If you made payments or distributions to individual beneficiaries of a plan, you may be required to withhold income tax from those payments. Use **Form 945**, Annual Return of Withheld Federal Income Tax, to report taxes withheld from nonpayroll items. (See **Circular E**, Employer's Tax Guide (Pub. 15), for more information.)

Cat. No. 13504X                    Schedule P (Form 5500) 1997

| SCHEDULE G (Form 5500) | **Financial Schedules** | OMB No. 1210-0016 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | This schedule may be filed as an attachment to the Annual Return/Report Form 5500 under Section 104 of the Employee Retirement Income Security Act of 1974, referred to as ERISA. | **1997** |
| Department of Labor Pension and Welfare Benefits Administration | See the instructions for Item 27 of the Form 5500.  ▶ Attach to Form 5500. | This Form Is Open to Public Inspection |

| For calendar plan year 1997 or fiscal plan year beginning | , 1997, and ending | , 19 |
|---|---|---|

| Name of plan sponsor as shown on line 1a of Form 5500 | Employer identification number |
|---|---|
| MEDICAL INFORMATION TECHNOLOGY, INC. | 04 : 2455639 |

| Name of plan | Three-digit plan number ▶ |
|---|---|
| MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN | 0 : 0 : 1 |

**Part I**  Schedule of Assets Held for Investment Purposes—See Form 5500, Item 27a.

| (a) | (b) Identity of issue, borrower, lessor, or similar party | (c) Description of investment including maturity date, rate of interest, collateral, par or maturity value | (d) Cost | (e) Current value |
|---|---|---|---|---|
| | | MAT.DATE  RATE  FACE | | |
| | U.S. TREASURY NOTE | 5/15/98   6 1/8   $525,000 | 524,508 | 525,984 |
| | "    "    " | 5/31/98   6   1,900,000 | 1,908,312 | 1,902,375 |
| | "    "    " | 8/31/98   4 3/4   2,400,000 | 2,388,750 | 2,385,750 |
| | "    "    " | 10/15/98   7 1/8   1,000,000 | 1,000,469 | 1,010,938 |
| | "    "    " | 4/15/99   7   475,000 | 478,414 | 482,570 |
| | "    "    " | 7/15/99   6 3/8   350,000 | 347,266 | 353,391 |
| | "    "    " | 10/15/99   6   1,350,000 | 1,320,258 | 1,356,750 |
| | "    "    " | 10/15/99   6   1,100,000 | 1,125,781 | 1,105,500 |
| | "    "    " | 10/31/98   5 7/8   700,000 | 701,312 | 700,875 |
| | "    "    " | 9/30/99   5 3/4   800,000 | 801,000 | 800,750 |
| | "    "    " | 3/31/00   6 7/8   900,000 | 902,812 | 921,937 |
| | "    "    " | 5/15/00   6 3/8   650,000 | 650,406 | 659,548 |
| | "    "    " | 9/30/00   6 1/8   2,650,000 | 2,674,430 | 2,677,328 |
| | "    "    " | 12/31/00   5 1/2   300,000 | 301,641 | 298,219 |
| | "    "    " | 3/31/01   6 3/8   800,000 | 800,000 | 815,000 |
| | "    "    " | 5/31/01   6 1/2   775,000 | 773,547 | 793,164 |
| | "    "    " | 11/15/01   7 1/2   700,000 | 707,875 | 742,219 |
| | "    "    " | 12/31/01   6 1/8   1,200,000 | 1,204,125 | 1,215,750 |
| | "    "    " | 5/15/02   7 1/2   1,175,000 | 1,257,617 | 1,253,578 |
| | "    "    " | 8/15/02   6 3/8   300,000 | 312,891 | 307,594 |
| | "    "    " | 8/15/02   6 3/8   350,000 | 337,312 | 358,859 |
| | "    "    " | 2/15/03   6 1/4   500,000 | 508,516 | 511,094 |
| | "    "    " | 2/15/03   6 1/4   350,000 | 363,398 | 357,766 |
| | "    "    " | 8/15/03   5 3/4   1,350,000 | 1,356,539 | 1,350,422 |
| | "    "    " | 8/15/03   5 3/4   350,000 | 345,023 | 350,109 |
| | "    "    " | 8/15/05   6 1/2   625,000 | 623,242 | 651,953 |
| | "    "    " | 5/15/05   6 1/2   400,000 | 402,375 | 416,875 |
| | "    "    " | 5/15/06   6 7/8   500,000 | 501,641 | 535,000 |
| | U.S. TREASURY TOTALS | 24,475,000 | 24,619,460 | 24,841,298 |
| | | | | |
| | MEDICAL INFORMATION TECHNOLOGY, INC. | 1,469,010 shs COMMON STOCK | 7,625,771 | 39,366,288 |
| | 223 PLAN PARTICIPANTS | MAT. DATES RANGE 1/98–10/02 | | 1,347,950 |
| | | INT. RATE 7.2% – COLLATERAL= | | |
| | | 50% VESTED ACCOUNT BALANCE | | |
| | | | | |
| | TOTAL ASSETS HELD FOR | | | |
| | INVESTMENT AT 12–31/97 | | | 65,555,536 |

For Paperwork Reduction Act Notice, see the Instructions for Form 5500.    Cat. No. 14739A    Schedule G (Form 5500) 1997

DEF000870

Schedule G (Form 5500) 1997

Page 2

**Part II**  Schedule of Assets Held for Investment Purposes That Were Both Acquired And Disposed of Within The Plan Year—See Form 5500, Item 27a.

| (a) Identity of issue, borrower, lessor, or similar party | (b) Description of investment including maturity date, rate of interest, collateral, par or maturity value | (c) Costs of acquisitions | (d) Proceeds of dispositions |
|---|---|---|---|
| 40 PLAN PARTICIPANTS | LOANS @ 7.2% INTEREST | 0 | 0 |
| | $277,300 - BORROWED AND | | |
| | PAID DURING 1997 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Part III**  Schedule of Loans or Fixed Income Obligations—See Form 5500, Item 27b

| (a) | (b) Identity and address of obligor | (c) Original amount of loan | (d) Principal | (e) Interest | (f) Unpaid balance at end of year | (g) Detailed description of loan including dates of making and maturity, interest rate, the type and value of collateral, any renegotiation of the loan and the terms of the renegotiation and other material items | (h) Principal | (i) Interest |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

DEF000871

Schedule G (Form 5500) 1997

### Part IV  Schedule of Leases in Default or Classified as Uncollectible—See Form 5500, Item 27c.

| (a) | (b) Identity of lessor/lessee | (c) Relationship to plan, employer, employee organization, or other party-in-interest | (d) Terms and description (type of property, location and date it was purchased, terms regarding rent, taxes, insurance, repairs, expenses, renewal options, date property was leased) | (e) Original cost | (f) Current value at time of lease | (g) Gross rental receipts during the plan year | (h) Expenses paid during the plan year | (i) Net receipts | (j) Amount in arrears |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

### Part V  Schedule of Reportable Transactions—See Form 5500, Line 27d.

| (a) Identity of party involved | (b) Description of asset (include interest rate and maturity in case of a loan) | (c) Purchase price | (d) Selling price | (e) Lease rental | (f) Expense incurred with transaction | (g) Cost of asset | (h) Current value of asset on transaction date | (i) Net gain or (loss) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

DEF000872

Schedule G (Form 5500) 1997                                                                                    Page **4**

**Part VI**    Schedule of Nonexempt Transactions—See Form 5500, Item 27e.

If a nonexempt prohibited transaction occurred with respect to a disqualified person, file Form 5330 with the IRS to pay the excise tax on the transaction.

| (a) Identity of party involved | (b) Relationship to plan, employer, or other party-in-interest | (c) Description of transactions including maturity date, rate of interest, collateral, par or maturity value | (d) Purchase price | (e) Selling price | (f) Lease rental | (g) Expenses incurred in connection with transaction | (h) Cost of asset | (i) Current value of asset | (j) Net gain or (loss) on each transaction |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**Part VII**    Schedule of Nonexempt Transactions—See Form 5500, Item 27f.

If a nonexempt prohibited transaction occurred with respect to a disqualified person, file Form 5330 with the IRS to pay the excise tax on the transaction.

| (a) Identity of party involved | (b) Relationship to plan, employer, or other party-in-interest | (c) Description of transactions including maturity date, rate of interest, collateral, par or maturity value | (d) Purchase price | (e) Selling price | (f) Lease rental | (g) Expenses incurred in connection with transaction | (h) Cost of asset | (i) Current value of asset | (j) Net gain or (loss) on each transaction |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

DEF000873