**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE, Individually and On Behalf Of All Persons Similarly Situated,<br><br>     Plaintiffs,<br><br>         v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., A. NEIL PAPPALARDO, LAWRENCE A. POLIMENO, ROLAND L. DRISCOLL, EDWARD B. ROBERTS, MORTON E. RUDERMAN, AND L.P. DAN VALENTE,<br>     Defendants. | C.A. No. 05-10269-RWZ |

**PLAINTIFFS' 56.1 STATEMENT OF CONTESTED AND ADDITIONAL
FACTS PRECLUDING SUMMARY JUDGMENT**

Michael A. Collora
Jennifer M. Ryan
**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, MA  02210
(617) 371-1000

*Attorneys for Michael P. Hubert, William Trainor,
and David Hinchliffe*

**PLAINTIFFS' RESPONSE TO DEFENDANTS' 56.1 STATEMENT**

Pursuant to Federal Rule of Civil Procedure *56* and Local Rule of Civil Procedure *56.1,* Plaintiffs submit this Reply to Defendants' Statement of Undisputed Material Facts in support of their Motion for Summary Judgment, and in support of their motion. All pleadings, deposition transcripts, deposition exhibits, and other documents cited to herein are either attached to the Affidavit of Michael A. Collora, submitted herewith or are already before the Court in the Appendix to Defendants' Motion For Summary Judgment.

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| 1. | Meditech, a software company, was founded in 1969, and currently employs over 2,800 individuals. *See* Medical Information Technology, Inc. Form 10-K for the Fiscal Year Ended December 31, 2007 at page 3 of 30 (hereinafter "2007 Form 10-K") (Martin Affidavit, Ex. 9). | Not disputed; however 2007 figures are irrelevant to matters under consideration. |
| 2. | Meditech is a privately-held company, its shares are not traded on any stock exchange and, therefore, have no price set by a public market. *See* 2007 Form 10-K at page 7 of 30. | Not disputed; however the Company through the ERISA Trust has always purchased Meditech stock from employees and others at the then Fair Market Value for cash. *See* ¶¶ 13 and 66 below. |
| 3. | While Meditech is a privately-held company, nonetheless it has been a public reporting company since 1996, and thus is required to submit, among other things, Forms 10-Q and 10-K to the SEC, which are then available to anyone in the public wishing to view a copy. *See generally, e.g.,* 2007 Form 10-K. | Not disputed. The Company filed the 1996 Form 10-K on April 15, 1997 (Ex. 10 to Collora Affidavit), the 1997 Form 10-K on March 26, 1998 (Ex. 10 to Martin Affidavit), and the 2003 10-K on March 12, 2004 (Ex. 12 to Collora Affidavit. |
| 4. | Meditech's Form 10-K for 1997, filed publicly on March 26, 1998, contains a chart reporting, inter *alia,* the Company's revenue, operating income, net income, earnings per share, cash and cash equivalents, total assets, | Not disputed. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | total liabilities, book value per share, working capital, cash flows, and cash dividends per share as of December 31 for each year 1993 through 1997. *See* Medical Information Technology, Inc. Form 10-K for the Fiscal Year Ended December 31, 1997, DEF003619 at DEF003625 (hereinafter "1997 Form 10-K") (Martin Affidavit, Ex. 10). | |
| 5. | Meditech's 1997 Form 10-K contained a section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," discussing factors influencing the business such as "a decrease in the product revenue attributable to a slowdown in implementations for Columbia/RCA," a major customer. *See* 1997 Form 10-K at DEF003626. ' | Not disputed: The 10K further reveals revenue increased 15% to $193.8 million from $167.9 million, and net income increased from $44 million to $50 million; earnings per share increased from $2.80 to $3.14, all compared to 1996. The dividend in 1997 was $1.68/sh. up from $1.40 the previous year. |
| | | There is no evidence the Trustee considered information regarding Columbia in arriving at his opinion of the fair market value of Meditech's stocks as of December 31, 1997. *See* his Report dated January 2, 1998 (Ex. 27 to Collora Affidavit). In the CEO's comments to the Board for year end December 31, 1997, he writes, "The impact of diminished business with Columbia will slow down our overall growth," but he also notes that the 1998 projected net income is $55.5 million, up 10% compared to the prior year *See* Chairman's Comments at DEF002792-DEF002793 (Ex. 21 to Collora Affidavit). |
| | | The Annual Letter to Staff in January 1998 sent by defendant Pappalardo minimized any Columbia disruptions. It stated: "1998 will be an excellent year for us as well. While 1997 bookings were down as compared to the prior year <u>we</u> <u>are</u> <u>not</u> <u>overly</u> <u>concerned</u>. 1996 was in some ways an anomaly . . . our |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | | backlog represents about ten (10) months of product revenue and, as far as we can tell, is still in relative terms the largest in the industry." (Martin Affidavit, Ex. 17 at DEF001398). |
| 6. | Meditech's 1997 Form 10-K contained the audited financials of the company, which include among other things a three-year history of Company contributions to the trust set up under the Plan (the "Trust"). *See* 1997 Form 10-K at DEF003642. | Not disputed. |
| 7. | The price-earnings ratios ("P/E ratio") of publicly traded companies can be computed using publicly available information. | Disputed:  Neither plaintiff for the class year 1998 could compute the P/E of Meditech to any other company.  *See* Hinchliffe and Trainor Affidavits filed herewith.<br><br>Even at the date of his deposition in 2006, Trainor did not know what a P/E ratio was, and had never calculated it for Meditech stock.  *See* Trainor Depo. at 88 (Ex. 1 to Collora Affidavit). |
| 8. | In 1998 Plaintiffs could have calculated Meditech's PIE ratio as of December 31, 1997, using information made available to them by the company and/or the 1997 Form 10-K. | Disputed: *See* Plaintiffs' Affidavits filed herewith. |
| 9. | The Company has sold Meditech stock to most employees, including each of the named Plaintiffs.  *See* Affidavit of Barbara A. Manzolillo (hereinafter "Manzolillo Affidavit") ¶¶ 4, 5 (Martin Affidavit, Ex. 13). | Not disputed. |
| 10. | Plaintiff David Hinchliffe (hereinafter "Hinchliffe") purchased shares of Meditech stock from the Company for a total payment of $16,400.  *See* Statement of Stock Ownership of David Hinchliffe ("Hinchliffe Statement of Stock Ownership," marked as Exhibit 11 at Hinchliffe's Deposition in this | Not disputed. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
|  | action) (Martin Affidavit, Ex. 14). Hinchliffe later sold all of the Meditech stock he purchased to the Trust for a total of $301,100.  *See id.* Among other sales, Hinchliffe sold 13,200 split-adjusted shares to the Trust in 1998 at a split-adjusted price of $13.50 per share. *See Id.* |  |
| 11. | Plaintiff William Trainor (hereinafter "Trainor") purchased shares of Meditech stock from the Company for a total payment of *$16,950.*  *See* Statement of Stock Ownership of William Trainor ("Trainor Statement of Stock Ownership," marked as Exhibit 4 at Trainor's Deposition in this action) (Martin Affidavit, Ex. 15).  Trainor later sold all of the Meditech stock he purchased to the Trust for a total of $3 10,150.  *See Id.*  Among other sales, Trainor sold 20,900 split-adjusted shares to the Trust in 1998 at a split-adjusted price of $13.50 per share. *See Id.* | Not disputed. |
| 12. | Plaintiff Michael P. Hubert (hereinafter "Hubert") purchased shares of Meditech stock from the Company for a total payment of $197,425. *See* Statement of Stock Ownership of Michael Hubert ("Hubert Statement of Stock Ownership," marked as Exhibit 16 at Hubert's deposition in this action) (Martin Affidavit, Ex. 16).  Hubert sold 1,000 of his shares to the Trust for $23,000. *See id.* Hubert continues to hold 23,300 shares, worth a total of $862,100 at the $37 per share valuation last determined by the Company's board of directors as of December 3 1, 2007.  *See Id.; see also* 2007 Form 10-K at 21 of 30. | Not disputed. |
| 13. | During the years they were eligible to purchase stock (including 1998), Plaintiffs received "Stock Purchase Instructions" from the Company.   *See, e.g.,*  1998 Stock Purchase Instructions, DEF001396-DEF001405 at DEF001401 ("1998 Stock | Disputed (in part).  The information set forth is incomplete, and thus misleading. The Staff letter sent out in early 1998 for those hired prior to 1995 states more completely: |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | Purchase Instructions") (Martin Affidavit, Ex. 17). The 1998 Stock Purchase Instructions stated on their face " Please note that MEDITECH is a closely-held private company and there is no public market for its shares. Thus there can be no absolute assurance of a future re-sale." *See Ed.* They invited the recipient to a "meeting ... to discuss the implications of buying stock in MEDITECH," to which "any existing shareholder is welcome." *Id.* And they were accompanied by a "10 Year Financial History" intended to "aid you in your investment decision." *Id.* at DEF001400. | "In recognition of your individual contribution to the success of Meditech, we are pleased to offer you the opportunity to share in the equity of the company by becoming a direct shareholder of Meditech's common stock . . . . there will be a meeting . . . to discuss the implications of buying stock in Meditech for those employees <u>who are considering becoming a shareholder for the first time</u>." *(emphasis supplied)*. "Please note that Meditech is a closely held private company and there is no public market for its shares. There can be no absolute assurance of a future re-sale. <u>However, each year the Profit Sharing Trust customarily offers to purchase shares from existing shareholders, creating a limited market for anyone wishing to sell</u>." *(emphasis supplied)*. (Exh. 17 to Martin Affidavit at DEF001401). |
| 14. | Trainor does not recall ever attending one of the annual meetings held in conjunction with Meditech's annual share offer to employees. *See* Deposition of William Trainor at 84-85 ("Trainor Depo.") (Martin Affidavit, Ex. 1). Beginning in at least 1994 Hinchliffe did not attend any of these meetings. Q. Mr. Hinchliffe, why did you not attend the meeting that you were invited too? A. Because I already knew that it was mainly for — the meeting was mainly for new purchasers of the stock. That that have already purchased stock already knew everything, knew what they were getting into, knew what it | Not disputed. Note however, that the annual letter to staff emphasized the meetings were primarily intended for new members. (Martin Affidavit, Ex. 17, DEF001398). Hubert testified he went to only one meeting with Pappalardo to discuss Meditech stock, around 1984, declaring: "…it was really meant for first-time shareholders or people considering buying stock for the first time." *See* Hubert Depo. dated July 26, 2006 at 212 (Ex. 3 to Collora Affidavit). |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | was all about, and had no need to attend the meeting.<br><br>Deposition of David Hinchliffe at 52-54 ("Hinchliffe Depo.") (Martin Affidavit, Ex. 2). Hubert attended a meeting only in or around 1984. *See* Deposition of Michael Hubert at 212 ("Hubert Depo.") (Martin Affidavit, Ex. 3) | |
| 15. | In 1973 the Company established the Plan for the stated purpose of providing "retirement and other benefits to the employees of the Company." *See, e.g.,* Medical Information Technology, Inc. Profit Sharing Plan, Amended and Restated Trust Agreement (As of January 1, 1998) at ¶ 1.02. ("Plan Document") (Martin Affidavit., Ex. 6). The Plan is "designed to invest substantially in shares of the Common Stock of the Company so as to permit the participating employees to share in any growth of the Company." *See id.* | Not disputed. Other key portions of the Plan are as follows:<br><br>According to the Plan, employees of Meditech who have been employed for more than one year are eligible to join the Plan, and are fully vested after five years of service with the company. Employees make no monetary contributions to the Trust.<br><br>As of each Valuation Date, the Trustee shall determine the total net worth of the Trust by evaluating all of its assets and liabilities as of that date exclusive of any amounts segregated into separate accounts for terminated Members pursuant to Section 6.06(b) and the contribution made by the Company with respect to its Plan Year current with or ending on said Valuation Date. In determining the net worth of the Trust or any portion thereof, the Trustee shall value the Trust assets at their fair market value. (Ex. 6 to Martin Affidavit, ¶5.04).<br><br>Upon receiving such schedule and the total contribution made by the Company for the Plan Year, and after the account balances of the Members have been adjusted as provided in Section 5.05 and forfeitures determined under Section 6.04, the Trustee shall credit to the account of each Member listed on such schedule a portion of the Company's |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | | contribution and a portion of the total amount of forfeitures arising from the accounts of terminated Members pursuant to Section 6.04 which bears the same ratio to such total amounts as the Member's Compensation listed on such schedule bears to the Compensation listed on said schedule for all such Members. *Id.* at ¶5.03.<br><br>The Company is the Administrator in administering the Plan. Barbara Manzolillo, the CFO for Meditech, acts for the Company. The only Trustee has been A. Neil Pappalardo. *See* Manzolillo Depo. at 18 (Ex. 5 to Collora Affidavit).<br><br>The Meditech stock in the Plan is not valued by an independent third party. *Id.* at 25.<br><br>This is the only retirement plan of the Company. There is no 401(k) profit sharing plan. No one participating in the Plan can have an IRA. *Id.* at 16-17. |
| 16. | Pursuant to the Plan, the Trust was created to hold contributions of cash and stock received from the Company. *See* Plan Document ¶1.01. Individual employees are neither required nor permitted to make contributions to the Trust. *See Id, ¶ 4.05.* | Not disputed. But *see* ¶ 15 above. |
| 17. | The Plan is entirely voluntary on the Company's part. The Plan document provides that the Company may terminate the Plan at any time. *See* Plan Document ¶ 7.01. The Plan provides that all contributions by the Company to the Trust are voluntary; in any given year, the Company could elect to contribute nothing. *See Id., ¶ 9.02.* | Not disputed. But *see* ¶ 15 above. |
| 18. | The value of each year's contribution to the | Not disputed. But *see* ¶ 15 above. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | Trust is allocated to the accounts of participants according to a formula based on the income of each participant. Plan Document ¶ *5.03.* Each year the Trustee revalues the Plan's existing assets, and the pro-rata increase in the value of those assets is allocated to the account of each plan participant. See *Id., ¶5.05.* | |
| 19. | Under the terms of the Plan, the Trust makes payments to Plan participants in a lump sum cash payment upon termination of the participant's employment with Meditech. *See* Plan Document ¶ 6.04.  The Plan provides, however, that if the Trust lacks sufficient cash to make a payment, the Trust may defer payment by up to three years and, if still necessary, distribute Meditech stock instead of cash. *See Id,* ¶¶ 6.06(d), 6.12(a)(2).  There is no requirement under the Plan that the Company make any contributions to the Trust to fund Trust cash shortfalls. | Not disputed.  But *see* ¶ 15 above. |
| 20. | The Plan contains a claims procedure, which is described (in relevant part) in the summary plan descriptions distributed to Plan participants, including each of the Plaintiffs.  *See e.g.,* Summary Plan Description of the Medical Information Technology, Inc., Profit Sharing Plan (as Amended through August 1, 1983), HUB 052 ("1983 Summary Plan Description") (Martin Affidavit, Ex. 7) (produced by Hubert during discovery); Summary Plan Description of the Medical Information Technology, Inc. Profit Sharing Plan (January 1, 1998) HUB 081 ("1998 Summary Plan Description") (Martin Affidavit, Ex. 8) (produced by Hubert during discovery); *see also* Trainor Depo. at 91 (admitting receiving a summary plan description at least in *1975);* Hinchliffe Depo. at 35-36 (admitting receiving and reading the summary plan description | Not disputed.  Plaintiffs have testified and averred that they were never advised of a claims procedure at time of termination.  *See* Hinchliffe Affidavit, ¶ 3, 4; Trainor Affidavit, ¶ 3, 4.  There is no standard letter sent to a terminating member of the Trust describing what the claims procedure is.  In fact, the departing member only receives a notification of their financial interest in the Trust and a request to designate a successor Trustee if they wish to roll over their interest in the Trust to another tax deferred vehicle.  *See e.g.* Letter to Hinchliffe dated April 15, 1998, DEF001054 (Ex. 15 to Collora Affidavit). *See also* Manzolillo Depo. at 61-62 and 88-93 (Ex. 5 to Collora Affidavit).<br><br>There is a claims procedure set forth in a |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | including the 1983 Summary Plan Description). The 1983 Summary Plan Description and 1998 Summary Plan Description both state, in substantively similar language: "if you receive notice from the Trustee with regard to the amount and form of payment of your benefits and you believe there is an error in the notice, then you may submit a claim to the Trustee Your claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim." 1983 Summary Plan Description at HUB 061; 1998 Summary Plan Description at HUB 090-91. | Summary Plan Description dated as of January 1, 1998. The Summary states the Plan itself is available at the Administrator's office *See* Summary Plan Description, Part VIII, HUB 090-HUB 091 (Ex. 8 to Martin Affidavit) <br><br> The Trustee has testified only one person to his knowledge ever asked to examine the Plan at the office or asked for a copy. *See* Pappalardo Depo. dated July 21, 2006 at 51-52 (Ex. 7 to Collora Affidavit); Manzolillo Depo. at 58-59, (Ex. 5 to Collora Affidavit). <br><br> The Plan itself provides "All claims for benefits under this Plan shall be filed in writing with the Trustee in accordance with such regulations as the Trustee shall reasonably establish". *See* Plan (Ex. 6 to Martin Affidavit, DEF000140). <br><br> In the 1998 Summary Plan Description, the claims procedure states in part: <br><br> "Your claim must be filed in writing with the Trustee in accordance with the rules he establishes for filing a claim." <br><br> (Ex. 8 to Martin Affidavit, HUB 091). <br><br> The Trustee has n e v e r adopted regulations pursuant to that provision of the Plan and no claims have ever been filed. Pappalardo testified, "I'm not aware of any additional regulations other than what it says here filed in writing with the trustee." *See* Pappalardo Depo. dated July 21, 2006 at 57 (Ex. 7 to Collora Affidavit). <br><br> There was no form in use for someone to dispute a benefit. *Id.* at 149. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | | Pappalardo testified: |
| | | Q: As part of the claims procedure according to this document, the last sentence of the first full paragraph says, quote, 'Your claim – referring to I guess a departing member's claim – quote, 'Your claim must be filed in writing with the trustee in accordance with the rules he establishes for writing a claim,' end quote. Do you see that, and that's at the top of Page 9? |
| | | A: Yes. |
| | | Q: Is it fair to say there are no rules in addition to what's here? |
| | | A: It is fair to say there is no specific rules in addition to what it says here. |
| | | *Id.* at 64-65. |
| 21. | While they were employed at the Company, Hinchliffe and Trainor never sought to obtain a copy of the Plan document. *See* Hinchliffe Depo. at 37; Trainor Depo. at 92. Hubert, Hinchliffe, nor Trainor ever asked Defendants if there were any rules established by the Trustee for filing a claim in writing for additional benefits. | Not disputed.  *See also* Hinchliffe and Trainor Affidavits, filed herewith. |
| 22. | Two valuations of Meditech stock are made at year end for purposes of the Plan. First, Meditech's Board of Directors determines a value for the stock.  Under the terms of the Plan, the Board sets an overall dollar contribution amount, then decides how much of that overall contribution, if any, will be in cash, and how much in stock.  The Board's valuation for Meditech stock is used by the Board in calculating how many shares of stock will make up any stock portion of the Company's voluntary contribution to the Trust in a given year.  *See* Affidavit of A. Neil Pappalardo dated September *15, 2006,* ¶ 13 (Docket No. 68) ("Pappalardo | Not disputed to the first two sentences, disputed as to sentence three.  The Board votes to contribute cash, and contribute a number of shares at a certain value at the same meeting, in no particular sequence. *See* Votes for 1996 and 1997 (Exs. 19 and 21 to Collora Affidavit). |
| | | There is no fixed percentage of net earnings which is contributed to the Plan set forth in the philosophies. |
| | | While the cash component of the contribution was traditionally greater in value than the stock, it has been declining. *See* the following: |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
|  | Affidavit") (Martin Aff, Ex. 12); *see also* Plan Document, ¶ 4.01 ("The amount of the Company's contribution shall be paid to the Trustee in cash and/or that number of shares of Common Stock having a fair market value on the date of contribution equal to the contribution amount (or portion thereof to be contributed in shares of Common Stock) voted by the Board of Directors as provided herein"); *cf* Profit Sharing Trust: Philosophies, January 24, 1996, DEFOO 1251 (Martin Aff, Ex. 38) ("The formula which determines the company contribution to members' Trust accounts is based upon a standard percent of the company's operating profits"); *see also Id.* ("Typically, however, the company's contribution to the Trust is a combination of stock and cash. At the time of contribution is made, the amount of cash contributed is far greater than the value of the stock that is contributed"). This same per share value is also used by the Company in selling Meditech stock early the next year to employees. *See Id.,* ¶ 6. | <table><tr><td></td><td>**Amount Contributed**</td><td>**Cash Portion**</td><td>**%**</td></tr><tr><td>1994</td><td>$2,105,000</td><td>$1,595,000</td><td>73</td></tr><tr><td>1995</td><td>2,400,000</td><td>1,800,000</td><td>75</td></tr><tr><td>1996</td><td>2,900,000</td><td>2,060,000</td><td>71</td></tr><tr><td>1997</td><td>3,400,000</td><td>2,320,000</td><td>68</td></tr><tr><td>1998</td><td>4,000,000</td><td>1,160,000</td><td>29</td></tr></table> *See* Annual Valuation of the Trust's Assets for December 31, 1998, DEF001329-DEF001332 (Ex. 28 to Collora Affidavit). |
| 23. | Each year end the Trustee also values the Trust's shares in order to determine the value of the Trust and, thereby, the Trust account 5.04, *5.05.* Under the Plan, the Trustee is independently obligated to value stock held by the Trust, and he is not obliged to use the Board's value. *Id.; see also* Pappalardo Affidavit, ¶ 14. The Trustee's valuations, however, historically have been the same as those determined by the Board. For example, as of December 31, 1997, both the Board and Trustee determined the value of Meditech stock to be $13.50 on a split-adjusted basis. | Not disputed, except the Board reached its opinion as to FMV in October 1997. *See* Votes of the Regular Meeting of the Board of Directors, October 27, 1997, DEF002786 (Ex. 20 to Collora Affidavit). While the Plan requires the Trustee to independently value the Meditech stock at year end, the Trustee has testified: |

A:      When I value the stock [as Trustee] the number that I use for the value of the stock coincides with another number that they are aware of for the value of the stock.

Q:      And that other number is what?

A:      The price of the stock that the board of directors is willing to sell stock to its employees at.

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | | *See* Pappalardo Depo. dated July 21, 2006 at 48-49 (Ex. 7 to Collora Affidavit).<br><br>The Trustee does not tell the Members how he values the Meditech shares in the Trust. *Id.* |
| 24. | The Trustee determined a value for Meditech stock of $13.50 as of December 31, 1997. The Trustee determined a value for Meditech stock of $26 as of December 31, 2003. Between December 31, 1997 and December 31, 2003, the value for Meditech stock as determined by the Trustee increased by 93%. *See* Manzolillo Affidavit ¶ 24. | Not disputed. Such increase did not match the much slower increase in revenue and income growth. Meditech's revenues went from $193,805,000 at the end of 1997 to $270,478,000 at the end of 2003, only a 39.56% increase.<br><br>Meditech's net income went from $50,284,000 at the end of 1993 to $67,424,000 at the end of 2003, only a 34.09% increase. |
| 25. | Plaintiffs' putative expert Daniel Van Vleet estimated a value for Meditech stock of $21.62 as of December 31, 1997. *See* Van Vleet Report at 13 (Martin Aff., Ex. 33) Plaintiffs expert in *Grossman v. Medical Information Technology, Inc., et al.,* Civil Action No. 03-1872 (Mass. Superior), Robert Reilly, determined a value for Meditech stock of $33 as of December 31, 2003. Between December 31, 1997 and December 31, 2003, the value for Meditech stock as determined by Van Vleet for December 31, 1997 and Reilly for December 31, 2003 increased by 53%. | Not disputed. *See* portion of Willamette Management Associates Report (Ex. 33 to Collora Affidavit).<br><br>The Trustee valued the Meditech shares in the Trust at $13.50 in late 1997 and $26 in late 2003, both well under these expert opinions. |
| 26. | Each year, Defendants provide Plan participants (including, while they were eligible, each of the Plaintiffs) a report on the status of their Trust account balances. On or about January 30, 1998, Defendants sent each of the Plaintiffs a document informing him of his account balance as of December 31, 1996; his share of Trust income and revaluations during 1997; his share of Company contributions to the Trust and forfeitures during 1997; and his | Not disputed as to sentence one and part of sentence two, except it is unclear if Trainor received a copy – none could be located. Sentence two should have the date "December 31, 1997" instead of "December 21, 1996". *See* also Plaintiffs' Additional Facts Regarding Trustee's Valuation, ¶¶ 75 to 81 below. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
|  | resulting account balance as of December 31, 1997. *See, e.g.,* Letter from Meditech to David Hinchliffe dated January 30, 1998, DEF001341 ("Hinchliffe 1998 Benefits Letter") (Martin Affidavit, Ex. 18); *see also, e.g.,* Hinchliffe Depo. at 31 (admitting receiving "a communication as to the value of [his] proportionate interest in the trust assets"). The same form also included the value of Meditech stock as determined by Defendants of December 31, 1997, and the estimated dividend to be paid on Meditech stock in 1998. *See id.* |  |
| 27. | Defendants also provided to Plan participants each year a "Financial Report" for the Trust. For example, in 1998 each Plaintiff received a "Meditech Profit Sharing Trust Financial Report for 1997." Hubert also printed the report from the Company intranet on January 28, 1998. *See* Meditech Profit Sharing Trust Financial Report for 1997, HUB 079 ("1997 Trust Financial Report") (Martin Affidavit, Ex. 19); *see also, e.g.,* Hinchliffe Depo. at 31 (admitting receiving "an annual report each year ... that told [him] the value of the trust's assets); *Ed.* at *55—56* (admitting receiving this report on an annual basis while employed at Meditech); Trainor Depo. at 100 (admitting receiving Trust financial reports while employed by Meditech). The Report noted, among other things, the amount of the Company's contribution to the Trust in 1997, including the breakdown between cash and stock, and contained three charts: one showing the Trusts assets as of December 31, 1996 (broken down into cash, U.S. Treasuries, interest and outstanding loans, and shares of Meditech stock including the per share value); a second showing Trust activity during the year (income, revaluation of Meditech stock, distributions and forfeitures, and the Company's contribution); and a third showing the | Not disputed. *See also* Plaintiff's Additional Facts, ¶¶75-78. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | resulting Trust assets as of December 31, 1997 (again showing the number of shares of Meditech stock held and the per share value assigned to them). *See generally* 1997 Trust Financial Report. | |
| 28. | Trainor began working at Meditech in 1975. *See* Trainor Trust Distribution at DEF001047 (Martin Affidavit, Ex. 20). Over the years, the value of Trainor's Trust account increased through, *inter alia,* contributions of cash and Meditech stock by Meditech to the Trust, increases in the value of the Meditech stock and other assets held by the Trust and the Trust's receipt of dividends from the Company and other income on investments. In accordance with the terms of the Plan, Trainor did not make any contributions into the Trust. Trainor's employment with Meditech terminated in March 1998. *Ibid.* On May 28, 1998, Trainor received a distribution from the Trust in the amount of $929,943. *See* Trainor Trust Distribution Check at DEFOO 1045 (Martin Affidavit, Ex. 21). Under the terms of the Plan, the amount of this distribution was based on the value of Trainor's Trust account as of December 31, 1997, plus interest through the date of the distribution. | Not disputed. However, William Trainor was advised by letter in January 1998 of his financial interest in the plan. He was not advised in that letter as to how the amount was calculated. He was also told Meditech stock was then valued at $27 ($13.50 post split) but not how it was valued, or by whom. *See* standard sample letter, January 1998 (Ex. 17 to Martin Affidavit, DEF001396). |
| 29. | Trainor never filed any claim with Defendants seeking any benefits beyond those paid to him on May 28, 1998, and never told Defendants that he thought he should have received more from the Trust, before the Complaint was filed in February 2005. *See* Trainor Depo. at 80. | Not disputed. However, Trainor had no way of knowing if the distribution he received was too low. *See* Trainor Depo. at 79 (Ex. 1 to Collora Affidavit). *See also* Trainor's Affidavit, filed herewith. |
| 30. | Hinchliffe began working at Meditech in 1975, and his employment with Meditech terminated in early 1998. *See* Hinchliffe Trust Distribution at DEF001053 (Martin Affidavit, Ex. 22). Over the years, the value of Hinchliffe's Trust account increased through, *inter alia,* contributions of cash and | Not disputed. *See also* Hinchliffe's Affidavit, filed herewith. David Hinchliffe was advised as of January 30, 1998 that his financial interest in the Trust was $1,101,907. He was not told how that amount was |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | Meditech stock by Meditech to the Trust, increases in the value of the Meditech stock and other assets held by the Trust and the Trust's receipt of dividends from the Company and other income on investments. In accordance with the terms of the Plan, Hinchliffe did not make any contributions into the Trust. On May 28, 1998, Hinchliffe received a distribution from the Trust in the amount of $1,123,639.  *See* Hinchliffe Trust Distribution Check at DEF001051 (Martin Affidavit, Ex. 23).  Under the terms of the Plan, the amount of this distribution was based on the value of Hinchliffe's Trust account as of December 31, 1997, plus interest through the date of the distribution. | calculated.  He was also told Meditech stock was then valued at $27 ($13.50 post split) but not how it was valued, or by whom.  (Ex. 18 to Martin Affidavit). |
| 31. | Hinchliffe never filed any claim with Defendants seeking any benefits beyond those paid to him on May 28, 1998, and never informed Defendants that the amount of his distribution was incorrect, before the Complaint was filed in February 2005.  *See* Hinchliffe Depo. at 37, 44. | Not disputed. |
| 32. | Hinchliffe and Trainor each received their distributions of benefits from the Trust more than six years before the Complaint was filed in this lawsuit.  *Compare* Trainor Trust Distribution Check at DEF001045 (dated May 28, 1998) *and* Hinchliffe Trust Distribution Check at DEF001051 (dated May 28, 1998) *with* Complaint (Docket No. 1) (dated February 10, 2005). | Not disputed. |
| 33. | Hinchliffe and Trainor knew the amount of their distributions of benefits when they received their checks from the company in 1998. *See* Trainor Trust Distribution Check at DEF001045 (dated May 28, 1998); Hinchliffe Trust Distribution Check at DEF001051 (dated May 28, 1998).  No action taken by any Defendant after 1998 has had any effect on Hinchliffe's and | Disputed.  Plaintiffs did not know key information about the Defendants' actions that would have affected their distribution and may have demonstrated the undervaluation.  *See* Trainor and Hinchliffe Affidavits.  *See* Plaintiffs' Additional Facts Regarding Valuation in ¶¶56 to 79 below. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | Trainor's distributions of benefits.<br><br>Q.  Do you care what the proper value of Meditech's stock was in 2001?<br><br>A.  No.<br><br>Q.  Would that affect you in any way?<br><br>A.  No.<br><br>Trainor Depo. at 102. | |
| 34. | Hubert began working at Meditech in 1981. *See* Hubert Trust Distribution at DEF001041 (Martin Affidavit, Ex. 24).  Over the years, the value of Hubert's Trust account increased through, *inter alia,* contributions of cash and Meditech stock by Meditech to the Trust, increases in the value of the Meditech stock and other assets held by the Trust and the Trust's receipt of dividends from the Company and other income on investments.  In accordance with the terms of the Plan, Hubert did not make any contributions into the Trust. | Not disputed. |
| 35. | On March 1, 2004, Hubert withdrew $39,086 from the Trust.  *See* Hubert Trust Distribution Check at DEFOO 1040 (Martin Affidavit, Lx. 25) ("Hubert Distribution") | Not disputed.<br><br>Hubert testified the CEO required him to withdraw these funds. |
| 36. | Hubert was fired by Meditech on July 26, 2004, for offering to sell confidential Meditech information to a third party involved in a dispute with Meditech.  *See* Letter to Hubert from Howard Messing, dated July 26, 2004, at HU PF 000015 (Martin Affidavit LEx. 26). | Not disputed that Hubert received a letter dated July 26, 2004. |
| 37. | On September 16, 2004, Hubert received a final distribution from the Trust in the | Not disputed. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
|  | amount of $1,040,000. *See* Hubert Distribution. The amount of this distribution was based on the value of his Trust account as of December 31, 2003 plus interest. *Id.* |  |
| 38. | On September 7, 2004, Hubert sent a letter to the Plan administrator noting that he thought the Trust had undervalued the stock held by the Trust. The letter also complains that distributions were based on the value of Trust assets as of December 31; Hubert suggested that a better method would be to revalue the Trust assets as of the time of the distribution. *See* Hubert Depo. at 92; *see also* Letter from Michael Hubert to Barbara Manzolillo dated September 7, 2004, DEF01 1911 (the "September 7, 2004 Letter") (Martin Affidavit, Ex. 27). | Not disputed. |
| 39. | Hinchliffe believed by the late 1980s to early 1990s that Meditech stock was "valued too low" and "perhaps should be valued higher." <br><br> Q.   What feelings did you have about the stock that you expressed to Mr. Hubert? <br><br> A.   I always felt that it was valued low. We all did. Everybody in the company did. It's just, you know, you couldn't do anything about it. <br><br> Q.   Do you recall when you first came to believe that Meditech stock, in your words, valued low? <br><br> A.   In what kind of way? I never got to the point where I would think that I | Disputed in part. The testimony quoted, while not inaccurate, distorts the conclusion Defendants seek to draw. Hinchliffe testified that "...none of us ever knew how they decided to value the stock.". *See* Hinchliffe Depo. at 15 (Ex. 4 to Collora Affidavit). At no time that Hinchliffe worked at Meditech did anyone from the company ever explain to him how it was valued. *Id.* at 58. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | would want to try to do something about it or thought that I ever could do something about it.<br><br>Q. That's not the question I asked you Mr. Hinchliffe?<br><br>A. As far as a very general answer, I don't know. Sometime in the late '80s, early '90s; I don't know, something like that<br><br>Q. So in the late '80s to early '90s, you had a convenient feeling that the stock was low and should be valued higher; is that correct?"<br><br>A. Perhaps should be valued higher; yes, that's correct.<br><br>Q. And was it your sense that, at least among your circle of acquaintances when you were employed at Meditech, that the people you knew questioned whether the stock was valued too low?<br><br>Ms. Noonan: Objection.<br><br>A. There were certainly questions about how it was valued, and obviously, if we have questions about its value, we think it's valued too low. | |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | Hinchliffe Depo. at 15—19. | |
| 40. | Hinchliffe admitted at his deposition that one could "fairly conclusive[ly]" determine that Meditech stock was undervalued by comparing the earnings and assets and stock prices of other companies to those of Meditech. | Disputed.    The testimony speaks for itself. |
| | | Hinchliffe had this conversation in 2005, after Hubert had filed his original Complaint. *See* Hinchliffe Depo. at 13 and 19-20 (Ex. 4 to Collora Affidavit). |
| | Q.   [D]oes that mean that you agreed with [Hubert that the Meditech stock was undervalued? | The Company told individuals in the Plan that the stock had a fair value, otherwise undescribed. *See* Pappalardo Depo. dated July 21, 2006 at 79 (Ex. 7 to Collora Affidavit). |
| | A.  He gave me some information on research that he had done, and after our conversation I was convinced that, yeah, it was low. | |
| | Q.   What information — | |
| | A.  But that's the first time that I had some fairly conclusive information that would help me make that decision. | |
| | Q.   What was the fairly conclusive information that Mr. Hubert gave you in that phone call that helped you make that decision that the stock was undervalued? | |
| | A.  He just told me some research that he did. I don't remember the specific terms, the specific company that he cited, or anything like that. But it was something that was quite interesting. | |
| | Q.   Again, I want to focus | |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | on this fairly conclusive information that you've testified Mr. Hubert gave you in that phone call. Did that information include a comparison of P/E or price/earnings ratios of Meditech to some other company or companies?<br><br>A. Yes. It compared earnings of other companies and their assets and what their stock was versus what Meditech's was.<br><br>Q. [lit was a comparison of earnings, assets, and stock values of other companies versus Meditech stock; correct?<br><br>A. That's my recollection; yes.<br><br>Q. Aside from not recalling the names, it was a comparison of earnings, assets and stock values of other companies versus Meditech stock; correct?<br><br>A. That's my recollection, yes.<br><br>Q. And was that the information that you've told me was fairly conclusive that helped you make the decision that the stock was undervalued?<br><br>A. That's correct. | |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | Hinchliffe Depo. at 19-21. | |
| 41. | By approximately 1996, Trainor had compared the value of Meditech stock to that of Meditech's competitors and wondered why Meditech stock was valued lower than the competitors' stock. | Disputed. |
| | | Before speaking to Mr. Hubert in 2005, Trainor had no opinion on whether the stock was undervalued. *See* Trainor Depo. at 12-13 and 18 (Ex. 1 to Collora Affidavit). |
| | Q. When you were employed at the company and having these conversations in which you were wondering about the value of the stock, did you think the stock was valued too low? | Trainer had no formal education following high school. (*Id.* at 70). He did not invest in stocks other than Meditech, partly because he was "not a stock person." (*Id.* at 62). |
| | A. My only observation was that our competitors' stock was higher, and I thought we were a better company. And that led me to wonder why our stock was lower than their stock. | While he worked at Meditech Trainor talked with Hinchliffe about how the stock got its value (*Id.* at 54). He wondered if the stock price was too low but "nobody ever really knew how it was valued." (*Id.* at 55). He noticed the stock of competitors was valued more highly, but did not investigate the issue and 'had no' expertise in valuation. (*Id.* at 59). |
| | Q. When did you first notice or consider that, as you've put it, that you observed that the stock of Meditech's competitors was valued more highly? | It wasn't until Trainor heard that Jerry Grossman was suing the company for the stock being undervalued that he even thought about the fair value of Meditech's stock as set by the Trustee. (*Id.* at 102). |
| | A. While I was working there. | |
| | Q. So sometime before you left the company in 1998? | |
| | A. Yes. | |
| | Q. How long before you left? | |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | A.   Oh, probably at least a couple of years.<br><br>Q.   So at least back into the 1996 time frame?<br><br>A.   Yeah.<br><br>Trainor Depo. at 57-59. | |
| 42. | Among the companies whose values Trainor compared to Meditech's value was Cerner.<br><br>Q.   Do you remember a competitor called Cerner?<br><br>A.   Cerner.<br><br>Q.   Was that one that you thought of?<br><br>A.   Now that you say the name, yes, I remember Cerner.<br><br>Q.   And was that one of the competitors that you thought at the time you were employed at Meditech that its stock was valued more highly and you wondered why Meditech's was not valued as much?<br><br>A.   I believe so.<br><br>Trainor Depo. at 58. | Testimony quoted is accurate. |
| 43. | For Trainor, wondering whether Meditech stock was undervalued was a reason to join this lawsuit.<br><br>Q.   Now, you've said several times today that | Disputed as to the precatory comment; the testimony is quoted accurately. |

22

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | you loved Meditech.<br><br>A.   Uh-huh.<br><br>Q.  So  why  are  you bringing this lawsuit?<br><br>A.   I don't think one has anything  to  do  with  the other.<br><br>Q. Why not?<br><br>A.   Well, I still believe it was a great company when I  worked  there,  with  a great  product.    The question that was presented to me about this case was strictly  about  did  I  ever wonder  if  the  stock  was undervalued,   and   my answer  to  that  was  yes. And  my  understanding  is that's  what  this  case  is  all about, and only that.<br><br>Trainor Depo. at 97-98. | |
| 44. | Neither Hinchliffe nor Trainor ever asked anyone in Meditech management how the Board  or  Trust  valued  Meditech  stock. Neither Hinchliffe nor Trainor did anything to investigate or look into any claim based on the undervaluation of Meditech stock until after Hubert filed the Complaint in this case in February *2005*.<br><br>Q.   Did  you  do  anything to  investigate  or  look  into the  valuation  issue  you've told  me  about,  that  of  the competitors  being  valued more highly? | Undisputed.    But *see*  Plaintiffs' Affidavits. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | A.  No.<br><br>Q.  Did you ever ask anyone in Meditech management how the company or the trust valued Meditech stock?<br><br>A.  No.<br><br>Trainor Depo. at *59*. | |
| 45. | Hubert was comparing Meditech's P/E ratio to that of public companies by the mid-1980s.<br><br>Q.  When did you first compare the price/earnings ratio of Meditech to other companies?<br><br>A. Oh, I don't know. I'm going to say 20 years ago.<br><br>Hubert Depo. at 122. | Testimony quoted is accurate. |
| 46. | In April 1998, the month before Hinchliffe and Trainor received their distributions of benefits *from* the Trust, and more than six years before the Complaint was filed in this case, Hubert calculated the P/E ratio of Meditech and compared it to those of Meditech's competitors.  In particular, on or about April 18, 1998**,** Hubert calculated the *P/E* ratios as of that date for Meditech and several other companies, including Meditech competitors such as 1-IBOC**,** SMS, and Cerner. *See* HUB 490 (Martin Affidavit, Ex. 31).   He calculated, *inter alia,* that Meditech's *P/E* ratio was 8.7 and Cerner's was 48. *See Id.* | Not disputed, but irrelevant to notice.  Note, however, Meditech's own experts have opined that SMS and Cerner are <u>not</u> truly competitors of Meditech and a comparison to them is not appropriate.  Specifically they wrote:<br><br>"The Van Vleet Report's selection of guidelines public companies ('GPC') is defective, and our own search suggests that there simply are not any public companies that are truly comparable to Meditech…none of the other comparable companies that either we or the Van Vleet Report |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | | identify are any more than minimally comparable because all offer products and services (for example, hardware and consulting) and compete in markets (for example, non-hospital healthcare markets or international markets) that Meditech does not." *See* portion of Meditech's Expert Report dated April 7, 2008 at p.2, ¶f (Ex. 34 to Martin Affidavit). |
| 47. | On April 21, 1998, Hubert printed a document from the Meditech intranet entitled "Meditech Financial History." *See* HUB 475 (Martin Affidavit, Ex. 28). This document contained a chart showing, for each year 1988 through 1997, Meditech's product revenue, service revenue, total revenue, operating expense, operating income, other income, other expense, pre-tax income, income taxes, net profit, dividends paid, total assets, total liabilities, shareholder equity, common shares of Meditech stock, earnings per share, dividends per share, book value per share, and the value of the shares determined by Defendants. *See id.* On or about April 21, Hubert used this document to calculate the P/E ratio for Meditech stock each year from 1988 through 1997. *See id.* | Not disputed; however Hubert started looking at how another privately held company, SAIC, valued its stock "...sometime...it could have been '99. It could have been 2000." *See* Hubert Depo. dated July 26, 2006 at 126-127 (Ex. 3 to Collora Affidavit). Hubert had no suspicions that the value of the stock was intentionally kept low until he saw the Howard Messing memo. (*Id.* at 117). Messing was then an executive vice president of Meditech. The memo issued on June 9, 2000 stated in part: "Our plan of keeping our stock at a relatively modest price and offering a substantial dividend works equivalently to stock options for those who plan to buy and hold for an extended period of time." *See* memo at MH 0007 (Ex. 32 to Collora Affidavit). Hubert testified that he had made an inquiry of Messing. "...I had mentioned to Howard, that, you know, I owned stock and he owned stock and I was interested in how the stock was valued, and I plugged in |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
|  |  | the numbers from Meditech into the SAIC formula and got a number that was approximately twice or more than what Meditech said the value of the stock was. And he seemed, you know, a little interested, but he simply said, 'Well, they have their way of doing it and we have ours.' And I simply accepted that. I simply thought, you know, isn't that an interesting little piece of information." *See* Hubert Depo. dated July 26, 2006 at 120 (Ex. 3 to Collora Affidavit).<br><br>Hubert spoke with Defendant Pappalardo in or about 2000 asking him why there was no 401(k) Plan at Meditech. Pappalardo told Hubert he thought employees would not want to purchase as much stock if they had a choice. *Id.* at 218.<br><br>Pappalardo told Hubert he already thinks that he sells the stock as a bargain.  He also said the trust decisions are based on what's good for the company.  *Id.* at 218-219.<br><br>In response to the question by Hubert, "Wouldn't it be better to diversify?"  Pappalardo replied that "…it may be good for you, but it's not good for the company." *Id.* at 220. |
| 48. | That same day, April 21, 1998, Hubert also printed from the *Forbes* website a story entitled "Turning employees into stakeholders," concerning another non-publicly traded company, SAIC Corp. *See* HUB 503 (Martin Affidavit, Ex. 30). On his copy of this story Hubert made notes calculating the P/E ratios for SAIC and two | Not disputed. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | other companies, "Comp. Sciences" and "EDS." *See id.* | |
| 49. | Hubert also collected a Form 8-K publicly filed by SAIC with the SEC, discussing the "SAIC Stock Value From Formula," dated "April 1998." *See* HUB 507 (Martin Affidavit, Ex. 32). At this point, Hubert was thinking about how SAIC valued its stock compared with how Meditech valued its stock. *See* Hubert Depo. at 130. | Not disputed. |
| 50. | On or about the date of its release, Hubert obtained the April 27, 1998 issue of *Fortune* magazine, which contained charts ranking the Fortune 500 by performance. *See* HUB 489 (Martin Affidavit, Ex. 29). Hubert noted Meditech's performance relative to the Fortune 500 on such characteristics as profits as percentage of revenues, profits as percentage of assets, and profits as percentage of equity. See *id.* | Disputed. Hubert could not recall when he saw that copy, but thought that it may have been in 1999. *See* Hubert Depo. dated July 26, 2006 at 125 (Ex. 3 to Collora Affidavit). |
| 51. | All of the materials collected by Hubert in or about April 1998, more than six years before the Complaint was filed in this case, and discussed in paragraphs 46 – 50, *supra*, were publicly available and/or available to Meditech employees, and were either in the possession of, or could have been obtained by, Hinchliffe and Trainor. | Disputed in part. There is no evidence that Hubert shared this information with any other employee. In fact, he testified: Q: What about William Trainor or David Hinchliffe? Did they express that view to you [low valuation]? A: No. Both those employees left Meditech some five, six years ago, and I think they left prior to people becoming so concerned about the valuation of the stock. So no, we did not discuss the value of the stock when they were employees. Q: Subsequent to their leaving the company, have they expressed to you a view that the company's shares are underpriced?... A: When the suit occurred where I was suing Meditech, or the trust, I should say, on behalf of other employees, I did contact Mr. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
|  |  | Hinchliffe and Mr. Trainor to make them aware of the suit, and they agreed, yes, the stock in their opinion was undervalued, and they elected to participate in my suit.<br>Q: So they share your view as you express it in that lawsuit?<br>A: Yes.<br>Q: Now, you mentioned that the discussions over the undervaluation of the stock became more heightened in later years.<br>A: Yes.<br>Q: During what period of time did you notice that concern over the undervaluation of Meditech stock increased?...<br>A: I believe when Dr. Grossman filed his first filing with the SEC, a 13-G – or you perhaps know the number; I'm not sure what it's called, 13-D – I think that's when people really took notice.<br>Q: And there were discussions in which people said they had a similar concern about the undervaluation of the stock?...<br>A: Yes.<br>*See* <u>Grossman v. Meditech</u> Hubert Depo. dated July 14, 2005 at 39-40 (Ex. 2 to Collora Affidavit). |
| 52. | Hubert calculated P/E ratios for Meditech and various of its competitors and other companies, and explored how SAIC valued its stock.   However, he never asked Defendants how they valued Meditech stock while he was employed at the company.<br><br>Q.   Why didn't you think you would learn anything new?<br><br>A.   [I] had never heard of any explanation as to how the stock was valued in a | Disputed in part.   *See* Plaintiffs' counterstatement, ¶47, above. |

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | meaningful way over the many years I was there. I couldn't imagine I would change my mind in 2000 or 2001.<br><br>Q.  But you never asked, did you?<br><br>A.  I never asked.<br><br>Hubert Depo. at 213. | |
| 53. | On February 18, 2002, Hubert sent an anonymous email to more than a dozen lawyers and/or law firms, including Dwyer & Collora, seeking counsel to bring an ERISA action against Meditech (which is not named in the email) based on the alleged undervaluation of Meditech stock held by the Trust.  *See* Email from erisa@mediaone.net dated February 18, 2002 ("February 18, 2002 Email") (Martin Aft, Ex. 35); Hubert Depo. at 29 (admitting sending this anonymous email, which he authenticated as Exhibit 3 at his deposition). | Undisputed. |
| 54. | The February 18, 2002 Email states, inter alia: "It is acknowledged by all that the stock value is set low so that employees will purchase the stock. When the plan makes distributions, employees receive much less than they should. If the real 'fair market value' was used to compute the distribution, the plan would have no cash." *Id.*  In the email, Hubert went on to write "As an employee of this firm, bringing this case to you, and willing to be active in the case, I wish be [sic] receive financial consideration for my efforts." *Id.* | Undisputed. |
| 55. | Hubert sent the February 18, 2002 Email before Jerome Grossman filed a form 13D with the SEC on February 27, 2002, | Undisputed. |

29

| ¶ | Defendants' Statement | Plaintiffs' Response |
|---|---|---|
| | concerning the valuation of Meditech stock. *See* Martin Affidavit, Ex. 36 ("Grossman Form 13D"). | |

## ADDITIONAL FACTS OFFERED BY PLAINTIFF

## VALUATION OF STOCK

56.    In his capacity as CEO, Defendant Pappalardo wrote in his comments to the

Meditech Board for its upcoming meeting in October, 1996, regarding value of Meditech stock:

> As in the past years, it is necessary for the Board to fix the fair market value of Meditech stock in anticipation of a contribution of stock to the Trust or in contemplation of a sale of stock to employees or directors.  We furnish the following information as an aid to the valuation:

> - Actual 1995 earnings were $2.34/share and actual year-end book value was $8.71/share.

> - A year-end fair market value of $20.00/share was last set by the Board during the October 23, 1995 meeting in anticipation of a contribution of 30,000 shares to the Trust on December 31, 1995 and sale of up to 125,000 shares to employees and directors during February 1996 (actual sold were 106,963 shares).

> - Current annual dividend rate of $1.40/share set on January 22, 1996.

> - Between February and October of 1996, the Trust purchased a total of 8,700 shares from 20 shareholders at prices between $20 and $22 per share.

> - Estimated 1996 earnings are $2.81/share and estimated year-end book value is $10.22/share.

> Based on prior evaluation practice we recommend fixing the fair market value at $24 per share effective on December 31, 1996.  We have included an appropriate draft resolution for your review.

*See* Chairman's Comments to the Board for its meeting dated October 28, 1996 at DEF006866

(Ex. 17 to Collora Affidavit).

57.     The vote taken by the Board in their October, 1996 meeting regarding value was:

Upon Motion duly made and seconded it was unanimously

RESOLVED:  That based upon statistical data submitted by the Chairman and upon projections of income for the fourth quarter of 1996 submitted by the Chief Financial Officer, the fair market value of the company's common stock is hereby stipulated to be $24.00 per share as of the Company's forthcoming year-end date of December 31, 1996.

*See* Minutes of a Regular Meeting of the Board of Directors dated October 28, 1996 at

DEF006915 (Ex. 18 to Collora Affidavit).

58.     The Board then voted to make a contribution to the Plan at year end:

Upon Motion duly made and seconded it was unanimously

VOTED:  That, in the absence of any modifying vote or resolution action by the Board of Directors prior to December 31, 1996, the Chairman is authorized and directed to have the Company make a contribution of 35,000 shares of the company's common stock, presently held by the Company as treasury stock, at a fair market value of $24.00 per share, as stipulated in a preceding RESOLUTION, for a total fair market value of $840,000 to the Medical Information Technology, Inc. Profit Sharing Trust on or before December 31, 1996 as a part of the Company's contribution to the Trust for calendar year 1996.  The Chairman and the Treasurer are hereby authorized to issue an appropriate certificate for such shares of the Company's common stock, par value twenty-five cents per share, to the Trust, with such issue to be made from shares of common stock presently held by the Company as treasury stock.

The contribution of 35,000 shares of stock to the Trust per this VOTE is in addition to the contribution of $2,060,000 in cash authorized and directed by a separate preceding VOTE at this meeting.

*See* Minutes of a Regular Meeting of the Board of Directors dated October 28, 1996 at

DEF006916 (Ex. 18 to Collora Affidavit).

59.    Defendant Pappalardo adopted the same dollar value of $24 ($12 post split), for the FMV of Meditech stock and in his Trustee's report at year end wrote in part:

> …As of this date estimated 1996 earnings are $2.81/share and estimated year-end book value is $10.22/share.  FMV share has been set at about 8 to 8 ½ times earnings and averages 2.2 times book value in recent years…These ratios for capitalization purposes are realistic for a closely held company with continued moderate growth and a lack of instant liquidity of privately held stock.

*See* Annual Valuation of the Trust's Assets dated December 31, 1996 at DEF001338 (Ex. 26 to Collora Affidavit).

60.    That same report indicates 22 shareholders sold Meditech stock to the Trust.  *Id.*

61.    In his capacity as CEO, Defendant Pappalardo wrote in his Comments to the Meditech Board for its upcoming meeting in October, 1997, regarding value of Meditech stock:

> As in the past years, it is necessary for the Board to fix the fair market value of Meditech stock in anticipation of a contribution of stock to the Trust or in contemplation of a sale of stock to employees or directors.  We furnish the following information as an aid to the valuation:
>
> - Actual 1996 earnings were $2.78/share and actual year-end book value was $10.19/share.
>
> - A year-end fair market value of $24.00/share was last set by the Board during the October 28, 1996 meeting in anticipation of a contribution of 35,000 shares to the Trust on December 31, 1996 and sale of up to 125,000 shares to employees during February 1997 (actual sold were 108,847 shares).
>
> - Current annual dividend rate of $1.68/share set on January 27, 1997.
>
> - Between January and August of 1997, the Trust purchased a total of 19,790 shares from 23 shareholders at prices between $24 and $26 per share.
>
> - Estimated 1997 earnings are $3.11/share and estimated year-end book value is $11.76/share.

> Based on prior evaluation practice we recommend fixing the fair market value at $27 per share effective on December 31, 1997. We have included an appropriate draft resolution for your review.

*See* Chairman's Comments to the Board for its meeting dated October 27, 1997 at DEF002849

(Ex. 19 to Collora Affidavit).

62.    The vote taken by the Board in their October, 1997 meeting regarding value was:

> Upon Motion duly made and seconded it was unanimously
>
> RESOLVED: That based upon statistical data submitted by the Chairman and upon projections of income for the fourth quarter of 1997 submitted by the Chief Financial Officer, the fair market value of the company's common stock is hereby stipulated to be $27.00 per share as of the Company's forthcoming year-end date of December 31, 1997.

*See* Minutes of a Regular Meeting of the Board of Directors dated October 27, 1997 at

DEF002786 (Ex. 20 to Collora Affidavit).

63.    In the same meeting, the Board also voted

> That the Chairman is authorized and directed to have the Company make a contribution on or before December 31, 1997 to the . . . Trust of $2,320,000 in cash and $1,080,000 in shares of the Company's presently authorized but unissued common stock. The number of shares shall be 40,000 shares based on a fair market value of $27.00 per share, as stipulated in a preceding Resolution. . . .

*Id.* at 9 (DEF002787).

64.    Defendant Pappalardo adopted the same dollar figure of $27 ($13.50 post split)

for the FMV of Meditech stock, and in his Trustee's report at year end 1997 wrote in part:

> As of this date estimated 1997 earnings are $3.11/share and estimated year-end book value is $11.76/share. FMV share has been set at about 8 to 8 ½ times earnings and averages 2.3 times book value in recent years…These ratios for capitalization purposes are realistic for a closely held private company with continued moderate growth and lack of instant liquidity of privately held stock.

*See* Annual Valuation of the Trust's Assets dated January 2, 1998 at DEF001334 (Ex. 27 to

Collora Affidavit).

65. That same report indicates 26 shareholders sold Meditech stock to the Trust. *Id*.

66. Purchase prices by the Trustee for the Trust during the year from stock holders

occasionally varied from the stated fair market value. Defendant Pappalardo explained.

> Q:    How does the trust arrive at a price it's willing to pay?
>
> A:    It's an arm's length transaction between the trust and the person willing to say under the assumption that the price that this transaction could take place is somewhere between the fair market value at the end of the prior year and within the fair market value most likely determined by the board of directors for the end of the year, a transaction would go through.
>
> Q:    And who is the person who on behalf of the trust arrives at a dollar figure that they are willing to pay?
>
> A:    Me.
>
> Q:    Now, there are restrictions on the sale of the company stock, are there not?
>
> A:    Yes.
>
> Q:    Are they customarily waived when someone wishes to sell to the trust?
>
> A:    Yes.
>
> Q:    Is there a procedure one has to go through to get the waver?
>
> A:    We furnish the potential seller with a document that is a right of first refusal document. The person wanting to sell their stock has to fill out the document or we will fill it out for them and they would sign that document, submit it to the company and as CEO of the company, I customarily would approve such a sale.
>
> Q:    And in the case of sales to the trust, have you customarily approved them?
>
> A:    Yes.
>
> Q:    And have you refused ever?
>
> A:    Never.

*See* Pappalardo Depo. dated July 21, 2006 at 90-91 (Ex. 7 to Collora Affidavit).

67.    Defendant Pappalardo wrote in his Chairman's Report for its upcoming meeting

in October, 2003:

> At the January Board meeting, we will recommend setting the 2004 annual
> dividend rate at $1.80 per share. This would be an increase of 15.4% compared to
> 5.7% increase in net income per share. Based primarily on this dividend rate, we
> recommend fixing the fair share value at $26 effective on December 31, 2003.
> This would be an increase of 18.2% and, assuming a dividend rate of $1.80 per
> year, would result in a 6.9% dividend yield. A draft resolution for fixing the fair
> share value of Meditech stock is enclosed for your review.

*See* Chairman's Report to the Board for its meeting dated October 27, 2003 at DEF003009 (Ex.

24 to Collora Affidavit).

68.    The vote taken by the Board in their October, 2003 meeting regarding value was:

> Upon Motion duly made and seconded it was unanimously
>
> RESOLVED: That based upon the information presented by the Chairman and
> submitted by the Chief Financial Officer, all of which was reviewed and analyzed
> by the Board, the fair value of the Company's common stock is hereby stipulated
> to be $26.00 per share as of the Company's forthcoming year-end date of
> December 31, 2003.

*See* Formal Minutes of the October 27, 2003 Board Meeting at DEF003058 (Ex. 25 to Collora

Affidavit).

69.    In the same meeting, the Board also voted

> That the Chairman is authorized and directed to have the Company make a
> contribution of $4,100,000 comprised of cash and presently authorized but
> unissued common stock to the …Trust on or before December 31, 2003. The
> cash amount shall be $2,020,000 and the stock shall be 80,000 shares valued at
> $26.00 per share, as stipulated in a preceding resolution, for a value of
> $2,080,000.

*Id.* at DEF003058.

70.     Defendant Pappalardo adopted the same dollar figure of $26 ($13.00 post split)

for the FMV of Meditech stock, and in his Trustee's report at year end 2003 wrote in part:

> At the January Board meeting, we will recommend setting the 2004 annual dividend rate at $1.80 per share. This would be an increase of 15.4% compared to 5.7% increase in net income per share.  Based primarily on this dividend rate, we recommend fixing the fair share value at $26 effective on December 31, 2003. This would be an increase of 18.2% and, assuming a dividend rate of $1.80 per year, would result in a 6.9% dividend yield.  A draft resolution for fixing the fair share value of Meditech stock is enclosed for your review.

*See* Annual Valuation of the Trust's Assets for the Year Ended 2003 Dec 31 at DEF001311 (Ex.

31 to Collora Affidavit)

71.     That same report indicates 24 shareholders sold Meditech stock to the Trust. *Id.*

72.     A typical letter sent to an employee in early 2004 is attached as Ex. 16 to Collora

Affidavit.

73.     Mr. Edward Roberts, a long time member of the Meditech Board, testified

Meditech at one time used primarily a multiple as its approach to setting valuation.  *See* Roberts

Depo. at 42-65 (Ex. 9 to Collora Affidavit).

74.     A fair reading of his testimony is that up to at least 1999, the P/E ratio was used to

arrive at a fair market value for Meditech stock. *Id.*

75.     Defendant Pappalardo testified that as CEO he suggested a value for the FMV of

Meditech shares to the Meditech Board at its October meeting using a capitalization of the

dividend for the upcoming year.  Specifically, he said:

> Q:     . . . You say, 'based on prior evaluation practice we recommend fixing the fair market value at $24 per share effective on December 31, 1996 . . .'
> What was the evaluation practice, if you would recall, at that point?

A:      The evaluation practice at that point . . . is I was asked to recommend a price per share and the methodology I primarily would rely on was a discounted cash flow of dividends being paid to shareholders.

*See* Pappalardo Depo. dated November 27, 2007 at 17 (Ex. 8 to Collora Affidavit).

### TRUSTEE'S VALUATION

(a)  There is no reference to the above method of valuation in his written comments to the Board in 1995, 1996, 1997, 1998 or 1999.

(b)  Using his method, one observes the following:

| Year | Stock Price | Dividend | % of Stock Price | Cap Rate |
|------|-------------|----------|------------------|----------|
| 1992 | 12.67/sh | .67/sh | 5.2% | 18.9 |
| 1993 | 14.00/sh | .87/sh | 6.2% | 16.1 |
| 1995 | 20.00/sh | 1.24/sh | 6.2% | 16.1 |
| 1996 | 24.00/sh | 1.40/sh | 5.8% | 17.15 |
| 1997 | 27.00/sh | 1.68/sh | 6.4% | 15.5 |
| 1998 | 29.00/sh | 1.88/sh | 6.5% | 15.4 |
| 2000 | 34.00/sh | 2.32/sh | 6.8% | 15.2 |

*See* Annual Valuation of the Trust's Assets for December 31, 2000 at DEF001324-DEF001325, Ten Year History chart (Ex. 29 to Collora Affidavit).

76.      There was no standard capitalization rate used by Pappalardo.

77.      Such method of valuation was unrelated to the Company's performance for the year.  In 2000, the Company's net profit was $55,140,000, down 8% from 1999.  Nonetheless, the Company and the Trustee changed the FMV of the stock upward from $32 to $34.  *See* Annual Valuation of the Trust's Assets for December 31, 2001, (Ex. 30 to Collora affidavit) DEF001316-DEF001320.

Mr. Pappalardo explained:

Q:    Is that the first year (2000) that your year end might be down from the previous year?

A:    The first year in a long time that our annual revenue would be down from the prior year as well as . . . net income.

Q:    You say - - - 'based on an expected increase in the dividend rate to $2.48 per share for next year, we recommend fixing the fair market value at $34 per share effective on December 31, 2000.' Now, do you see the previous year's valuation as set forth in this document was $32?

A:    I see that.

Q:    Why are you suggesting an increase in the stock value, given that the revenue's income, et cetera, will be down --

A:    . . . My recommendation [for] the price of the stock only has to do with the discounted cash flow associated with the dividends. Since we could afford to pay an increase in dividends, it would be entirely appropriate to increase the price of the stock.

*See* Pappalardo Depo. dated November 27, 2007 at 114-115 (Ex. 8 to Collora Affidavit).

78.    Pappalardo wrote the following as part of his Comments to the Board:

Share Price and Dividend Policy

Based on the heated discussion at the last Board meeting (for which I apologize to all board members) I thought it would be good to summarize and justify both our share price and dividend policy.

In regard to the share price policy we purposely keep the share price on the low end of the range the IRS and our auditors would allow. The obvious benefit with this approach is to create an incentive for employees to buy and hold onto Meditech stock. More shares can be purchased with the same amount of money, the subsequent dividend yield will be high and our employees will own a larger percentage of Meditech stock sooner. *(emphasis supplied)*.

Should we become a public company and the share price subsequently escalate, the benefits mentioned above will diminish. There will be less incentive to buy because the dividend yield will be smaller. In fact, the high price might induce employees to sell. In addition, as the share price fluctuates due to the vagaries of the market rather than our performance, some employees will see a price drop soon after they made a purchase.

A low share price does disproportionally dilute the large shareholders who are not offered the opportunity to purchase additional shares. It also severely limits their ability to diversify, so it is with their concurrence that we continue this tradition. On the plus side, more shares can be passed on to heirs both annually as well as upon death, if a low share price is maintained.

*See* Chairman's Comments to the Board for its meeting dated April 26, 1999 at DEF002516-DEF002517 (Ex. 22 to Collora Affidavit).

79. In the deposition he gave to the Grossman attorneys, Pappalardo elaborated on the low end of the range:

Q:    What is the range to which you're referring there, sir?

A:    There could never be any absolute number at any point in time which says the fair value of share of stock is x.

Q:    Correct.

A:    There can only be a range of values. And depending on who you're looking at and who's analyzing, it would always come up with a range of values. So, if you ask me what is the range I'm talking about, this range of values that an informed analytical person or an outside person, inside person, might determine the share price would fall within.

Q:    Was the $29 price [1998 FMV] a price that fits somewhere in a range of fairness?

A:    Yes.

Q:    All right. Where in the range?

A:    As I said, the low end of that range.

Q:    And what would the high end of the range be?

A:    I didn't ascertain at that time the high end of that range. Many people would have an opinion on the high end of that range. You asked me my opinion. I might venture an opinion, but I didn't explicitly state what the high end of that range is.

Q:    So as of the time you wrote the words on page 12, you thought Meditech's price had been set at the low end of the range, but you didn't have an opinion as to the high end of the range?

A:    I did have an opinion. You didn't ask me for an opinion.

Q:    Okay. What was your opinion?

A:    I would say, in general, I asked for an opinion. <u>It might be as much as 20 percent higher</u>. *(emphasis supplied)*.

Q:    No more than 20 percent higher.

A:    It depends on the circumstances. It depends on who is the buyer, who is the seller.

Q:    Did Mr. Roberts [a director] ever tell you that the fair value of Meditech's price – share price should have been twice what it was?

A:    Twice? I don't remember. He has said many, many times it should be higher.

Q:    Did he ever tell you it should be a multiple of 20 and not a multiple of 10?

A:    What do you mean by the word "multiple"?

Q:    Price earnings multiple.

A:    Mr. Roberts from day zero has always had this fixation on PE ratios. To be honest with you, I couldn't recall one way or the other what his then current feeling about PE ratios. Whenever he mentioned such a thing, I'd always point out that PE ratios are an effect and not a cause of anything. And you don't start with that as a basis to try to determine the price. And we, as a company, have never used that as our determining factor in determining what the fair value of the company's stock should be.

Q:    What is the determining factor?

A:    Primarily the cash flow and the dividends is considered. We have illiquid stock. And when you have illiquid stock, you're hard-pressed to figure out exactly what the price should be because there isn't a significant amount of trading that would happen between willing buyers and willing sellers, so instead you look for other things. And of course, among the things you look at is certainly company growth, company profitability, net worth. You name it. And in particular, my feeling has been, is now and probably always will be, with illiquid stock that is paying a dividend, that

we should look at the dividend payout as the primary – primary way to determine what the value of the stock should be. And that's been my position and still is my position. If you want some detail, I'm more than happy to share with you the detail.

Q:    Let me just make sure I heard what you said correctly. In your view, the most important indication of value is the stock's dividend payout?

A:    In Meditech's case.

Q:    In Meditech's case. And the reason it is the most important indicator, in your view of value is that?

A:    When you have an illiquid stock – in order words, no readily tradable market – most people that I've talked to over the years, be they investment bankers,, be they other companies who are in a similar situation, you always tend to say the cash flow is the only meaningful – it's the primary meaningful thing that you should try to base a value on.

Q:    When you say "cash flow," you mean dividend payout? You don't mean discounted cash flow?

A:    Of course I mean discounted cash flow.

Q:    Oh, all right. Fine. So you think the most meaningful way to value Meditech stock is using the discounted cash flow method?

A:    Of course…

Q:    …All right. So that if I applied a discounted cash flow methodology to Meditech, I would achieve at most a value that is 20 percent higher than the value the board fixes?

A:    I would say correct because, again, the dividend rate is 7 percent, which is the same percentage that you'd use in a discounted cash flow statement. And therefore, since I tend to compare that to the – what a secure entity like treasuries might be paying – a treasury might have been 5 and a half percent, et cetera – that would be a reasonable number, but people could always argue, if they wish, that the discounted cash flow percentage would be less than 7 percent. Closer to, let's say, 6 percent.

Q:    Why would they argue that?

A:    Well, they would argue it because everybody has a different perception of what the percentage to be used in any discounted cash flow statement would be used. That's not – there's no way you can pick up – know for a

fact what is the proper percentage. You look at interest rates, you look at the borrowing rates, you look at savings rates, you look at treasuries, you look at long-term, short-term, and you try to compare the – If you take the extreme, our Government will probably last a long longer than Meditech would; therefore, that would be a very secure investment. Meditech might be a little bit less secure; and therefore, you'd discount it at a higher percentage than the same percentage with treasuries…

Q:    …Has any investment banker ever said to you, The way you value Meditech is exactly right, and you should not receive advice from anyone else on the topic?...

A:    No.

Q:    Has any investment professional ever said to you, The way to value Meditech is exactly right. Your methodology cannot be improved upon. And you should not receive advice from any investment professional?

A:    No.

Q:    Has any auditor ever said to you, Your methodology for valuing Meditech shares is unassailable, and you should never consider any other methodology?

A:    No.


*See* Grossman v. Meditech Pappalardo Depo. dated May 16, 2005 at 156-163 and 165-166 (Ex. 6

to Collora Affidavit).

80.    Pappalardo went on to testify:

Q:    At some point you formed the impression that the price was on the low end of the range your auditors would allow?

A:    That's correct.

Q:    How did you know it was on the low end of the range they would allow?

A:    Because the way I determined the value of the stock I argue is not within the low end of the range, but it's within the range that they would allow. I'm not concerned with our auditors whether I'm at the low end or not. All I want to make sure is they think our price is within an acceptable range of values.

Q:    Well, you say you're not concerned, but you write the following words 'We purposely keep the share price on the low end of the range' –

A:    Correct.

Q:    -- 'the IRS and our auditors would allow.'

A:    Correct.

Q:    Now, if you know your price is on the low end of the range, you must know what the range is.

A:    I already said, I think I have a handle on what I think the range is.

Q:    But do you know what the auditors think the range is.

A:    I don't know that.  I've already answered that.  I don't know what they think the range is…

Q:    …So the reference to low end in your words, that you wrote, is simply irrelevant.  It's simply within a range of reasonableness?

A:    No, it's not.  It's important for the board to always recognize that if you're selling stock to employees or making a contribution to a trust for the benefit of employees, you should be very, very careful and not ever push the envelope. I.e., if it was our policy to set the price at the high end of the range, we would be perhaps doing a disservice to our employees and to our – who are either buying stock and/or receiving a value in their – in the trust.

Q:    So by setting at the low end you're doing a benefit for the employees?

A:    Yes.

Q:    And you're doing a benefit for you?

A:    Yes.

Q:    Okay.  So you are a beneficiary of the policy decision to set it at the low end of the range?

A:    Yes, only to the extent that I buy stock.  If I was to sell stock, I might be at a – what the opposite of a beneficiary is.

Q:    A victim?

A:      A victim, because I have far more stock than I would ever purchase.

Q:      So depending on whether you're a buyer or a seller, you're either a beneficiary or a victim, right?

A:      Correct.

See Grossman v. Meditech Pappalardo Depo. dated May 16, 2005 at 174-175 and 177-178 (Ex. 6 to Collora Affidavit).

81.     In response to continued Board inquiry as to price, Pappalardo wrote in his Comments to the Board for early 2002:

Fair Value

At the last Board Meeting, I agreed to have a full board discussion on the fair value of Meditech stock. The following are my thoughts on this matter and I welcome everyone's participation in a discussion of the issue.

Meditech sets an internal share price annually when selling its stock to the staff or contributing its stock to the Meditech Profit Sharing Trust. In setting the price for this purpose, the intent is to establish a reasonable price that is not so high as to discourage purchases of Meditech stock by eligible employees. Moreover, because Meditech has historically paid significant dividends on its stock, purchasing the stock has been attractive to our staff. As a result, many of our employees have bought and held onto Meditech stock. Not only have they benefited from Meditech's success, but also, such stock ownership is an incentive for employees to continue to make significant contributions to that success.

There have been numerous transactions between willing sellers and willing buyers over the years to support the process of establishing the internal share price. In addition, the IRS has repeatedly accepted the internal share price during their audit examinations of Meditech. They test the price when the company creates an expense for a contribution of stock to the Meditech Profit Sharing Trust to make sure it is not too high. They also test the price when the company sells stock to its employees to make sure it is not too low. Recently, the process to determine the internal share price has yielded a higher value, in spite of a decline in net profit. This process weighed dividend yield more than earnings and resulted in the P/E ratio rising from 8.5 to 11.2 in 6 years.

Some argue that the internal share price should be higher. However, if the internal share price were to be increased, the benefits mentioned above would diminish. There would be less incentive for employees to buy stock because the

dividend yield would be lower. In fact, a high price might even induce employee shareholders to attempt to sell some or all of their holdings, if the Company, or the Trust or anyone else were willing to buy at that higher price.

Meditech remains a private company with no intention of becoming a public company or being acquired by another company, and therefore a control premium or a public company multiple is not appropriate for use in valuing stock. Moreover, Meditech has no intention, let alone any legal obligation, to buy back its stock from shareholders who wish to sell. This being the case, shareholders have always had the right to sell their stock at whatever price can be realized. While shareholders are free to sell their stock to whomever and at any price they wish, in practice the price realized in such transactions has been generally the same as the internal share price established by the Company for the purposes described above.

Some might argue that shareholders should be allowed to cash in their stock at a higher price. Perhaps, it is argued, the company should buy back the stock at a higher price. However, if the company were to offer to do so, I believe that it should offer such a buy back to all shareholders. Presumably, the company would reserve a fixed amount of money for such a buy back. Most likely, such an offer would be oversubscribed and only a pro rata purchase from substantially all shareholders would be made. In this case, the IRS might be able to characterize the redemption as a dividend and tax it accordingly.

In summary, fixing the internal share price at a reasonable level and the significant employee stock ownership that has resulted from that approach have helped motivate and reward the staff. If any shareholders believe that this price is too low, they are of course free to sell their stock to whomever and at any price they wish.

*See* Chairman's Comments to the Board for its meeting dated January 28, 2002 at DEF001861-

DEF001862 (Ex. 23 to Collora Affidavit).

### TRUSTEE'S STOCK PURCHASES

82.     During the period 1996-1998, Defendant Pappalardo was buying up Meditech

shares at the then claimed FMV. Specifically:

    75,000 shares in December 1995
    80,400 shares in December, 1996
    56,944 shares in February, 1998

75,000 shares in February, 1996

*See* Statement of Stock Ownership dated September 26, 2003 (Ex. 14 to Collora Affidavit).

83.    These purchases were not revealed on the Form 10-Ks filed by Meditech for

1996, 1997 and 1998.   *See* 1996 Form 10-K (Ex. 10 to Collora Affidavit), 1997 Form 10-K (Ex.

10 to Martin Affidavit), 1998 Form 10-K (Ex. 11 to Collora Affidavit).


## INFORMATION AVAILABLE TO MEMBERS OF TRUST

84.    The methodology used by Pappalardo to suggest a Meditech stock value to the

Board in October was not made available to members of the Trust. Pappalardo testified to the

following.

Q:    What I would like to ask you, was that methodology available to members
of the trust?

A:    Available, they all knew – members of the trust?

Q:    Yes.

A:    Not that I know of per se.  Available you mean in writing because you
used writing?

Q:    Yes.

A:    Right. I'm not aware of any writing that had the methodology.

*See* Pappalardo Depo. dated July 21, 2006 at 162 (Ex. 7 to Collora Affidavit).

85.    The methodology used by the Trustee in valuing Meditech stock in the Trust at

year end was not shared with the members of the Trust.  Pappalardo testified:

Q:    Are the members told in some document how that common stock is valued
and who does it?

A:    They may or – who does what? Telling them?  Who does –

Q:    Let's break it up.  Are they told who does the valuation?

A:    They would – I think the document says it very clearly that the trustee is responsible for valuing the assets of the trust.

Q:    Are they told how it is done?

A:    I don't – do not recall anything that – what the word 'how' means in this thing.  Do I tell them, I sit on December 31 and I go to my desk and go through a step by step, I think the only thing they generally would know is that I am responsible to evaluate the assets of the Trust on the last day of the year and I give them a published financial statement thereafter.

Q:    And the published financial statement has a value ascribed to the common stock, does it not?

A:    Yes, it does.

Q:    Do you tell them in that statement how you got to that figure –

A:    No.

Q:    --- as trustee?...In this time period, focusing on this Summary Plan.

A:    I do not go through a detailed methodology of how I do it…

See Pappalardo Depo. dated July 21, 2006 at 48-49 (Ex. 7 to Collora Affidavit).

86.    The Trustee's Year End Report as to his valuation of the assets in the Trust, including Meditech shares, was likewise not available to members of the Trust.  Pappalardo testified:

Q:    Can you identify that document?

A:    This document seems to be the annual memorandum I would send to Barbara Manzolillo.  It's usually sometime near the end of the year, sometime actually in the first week of January to instruct her about how I want the assets of the trust valued.

Q:    Do you value the common stock of Meditech that's in the trust at that time?

A:    Yes, I do.

Q:    And is that independent of your – of the valuation set by the board of directors previous to that?

A:    No, not necessarily independent.

Q:    All right.  Do you use the same methodology and thinking in reaching this value?

> A:    Not exactly the same methodology and thinking because first and foremost, it's three months later or actually two months, two and a half months later and I have more information at my disposal. I'm certainly readily aware of how the board of directors valued Meditech stock. That is certainly one of the data points that I would use in my consideration of how I would value it.
>
> Q:    Is this document circulated beyond Barbara?
>
> A:    Not that I'm aware of, other than we do circulate it to lawyers representing plaintiffs who are suing us. So we gave it to you.
>
> Q:    Was this made available to members of the trust?
>
> A:    I'm not aware of it being made to members of the trust.

*Id.* at 196-197.

87.    Members of the Trust were not told their percentage interest in the Trust. *Id.* at 80.

88.    The Trust received dividends with respect to the Meditech shares it owned.

89.    The Trustee was authorized to vote the shares of Meditech stock in the Trust.

(Ex. 6 to Martin Affidavit at DEF000124).


## ADDITIONAL FACTS RE: CLAIMS PROCEDURE

90.    Barbara Manzolillo is the Chief Financial Officer of Meditech, and acts as the Administrator for its profit sharing plan. *See* Manzolillo Depo. at 6 and 18 (Ex. 5 to Collora Affidavit).

91.    She testified there is no 401K plan at Meditech, nor is an IRA plan permitted for participants. *Id.* at 16-17.

92.    She testified all eligible employees participate in the Plan. *Id* at 19.

93.    Employees annually receive an individual letter detailing their interest in the Plan. *Id.* at 20.

94.    While the Plan's claims procedures permit the adoption of regulations to guide claims, no regulations have ever been adopted. *Id.* at 62.

95.    No claims for additional benefits have ever been filed under the Plan. *Id.* at 61-62.

96.    No one has come to Barbara Manzolillo's office to read the Plan.  *Id.* at 58-59.

97.    Barbara Manzolillo has one working copy of the Plan; the original of the Plan is in her office.  *Id.* at 59.

98.    A terminating employee receives three communications from the Plan:

(1)    Letter re: notification of benefits;

(2)    Benefits election form; and

(3)    IRS Safe Harbor Taxation Document.

*Id.* at 88-89.

99.    A terminating employee does not receive a claim form.  *Id.* at 92.

100.    Such an employee would not know how the Trustee valued the Meditech shares in the Trust. *Id.* at 128-129.


Dated:  May 27, 2008

Respectfully submitted,
**Michael Hubert,**
**David Hinchliffe, and**
**William Trainor**
Individually and as representatives of a class of all others similarly situated,
By their attorneys,

 /s/ Michael A. Collora
Michael A. Collora
Jennifer M. Ryan
**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, MA  02210
(617) 371-1000

**CERTIFICATE OF SERVICE**

I, Michael A. Collora, hereby certify that I caused a true copy of the above document to be served upon the counsel of record for each other party via this Court's ECF System on May 27, 2008

_____/s/ Michael A. Collora_____
Michael A. Collora