UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL P. HUBERT, WILLIAM TRAINOR, and DAVID HINCHLIFFE,<br><br>    Plaintiffs,<br><br>    v.<br><br>MEDICAL INFORMATION TECHNOLOGY PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC., and A. NEIL PAPPALARDO,<br><br>    Defendants. | Civil Action No. 05-10269RWZ<br><br>(Leave to file reply granted April 22, 2008; assented-to motion for leave to file overlength reply pending) |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

<br>

|  |  |
|---|---|
| Dated: June 3, 2008 | Stephen D. Poss (BBO # 551760)<br>Kevin P. Martin (BBO # 655222)<br>GOODWIN PROCTER LLP<br>Exchange Place<br>Boston, Massachusetts 02109-2881<br>(617) 570-1000<br>(617) 523-1231 (fax)<br>sposs@goodwinprocter.com<br>kmartin@goodwinprocter.com |

Plaintiffs' Opposition fails to rebut any of the bases for summary judgment put forward by Defendants. Plaintiffs' arguments – such as that a previous ruling of this Court can simply be ignored – are wholly frivolous. For the reasons given in Defendants' Memorandum in Support ("Def. Memo") and herein, summary judgment should enter for Defendants.

(1) No doubt recognizing the weakness of their positions, Plaintiffs resort to egregious misrepresentations of the record to try to strengthen their case. For example, Plaintiffs suggest that Pappalardo somehow conceded that Plaintiffs are "victims" of Defendants' valuation policies. *See, e.g.*, Opp. at 4. In doing so, however, Plaintiffs crop Pappalardo's testimony – without showing all of the cropping – to completely change its meaning. Read in context, Pappalardo was testifying only about *himself*, answering the question whether *he* was a beneficiary of Defendants' valuation policies by explaining that, because he obtained most of his Meditech shares at the Company's founding, instead of later buying them from Meditech at prices set using Defendants' valuation method, he is a "victim" – a word suggested by Plaintiff's counsel – "because I have far more stock than I would ever purchase." *See* Plaintiffs' 56.1 Statement of Contested and Additional Facts Precluding Summary Judgment ¶ 80 ("Pls. 56.1 Statement"). Obviously, someone who buys shares at prices set using Defendants' valuation method, and later sells those shares at prices also determined using that same method, is not a "victim" in any sense. Indeed, Pappalardo testified that it would be a "disservice" to Plan participants, and to employees purchasing stock from the Company, to use higher values. *See id*. In any event, the idea that Pappalardo testified that Plaintiffs are "victims" is utterly false.

(2) By failing to produce any evidence concerning valuations under their method before December 31, 1997, Plaintiffs flouted this Court's prior ruling that, even assuming Defendants have been undervaluing the stock, "'the only proper way to calculate the proper payout under

any alternate valuation methodology is to revalue the shares from the <u>beginning</u> of the Plan.'" *See* Def. Memo. at 16 (quoting Class Cert. Decision) (underlining in original); *see also* Opp. at 16 (Plaintiffs "do not know if [Pappalardo's] manipulation materially affected earlier years" than 1998). This failure of proof alone is sufficient grounds to grant summary judgment.

Seeking to avoid the law of the case, Plaintiffs simply declare that this Court made a mistake, that "[t]he Court fails to appreciate the mechanics of the Plan and has created an issue where none should exist," and that "[r]evaluing the Trust or its stock from inception is not necessary …." Opp. at 14, 16. Yet Plaintiffs point to nothing contradicting the Court's correct holding that benefits paid to an employee under the Plan depend, *inter alia*, upon the number of shares contributed to the Trust during the years the employee participated in the Plan, and that the number of shares contributed in those years depended upon the then-value of Meditech's stock. Plaintiffs' only argument why prior-year valuations are unnecessary – based on a hypothetical in which a trustee makes a math error in calculating trust assets in one year and corrects the error the following year, *see* Opp. at 16 – is wholly inapposite; this case concerns a valuation method for stock that was used across a span of years in which additional shares were contributed each year, and dividends per share paid each year, not an isolated math error in one year that could be "corrected." All told, Plaintiffs make no argument – nor could they – why they can satisfy their burden of proof on injury without showing what effect substitution of their own valuation method for Defendants' method would have on the number of shares in the Trust.

To the contrary, Plaintiffs make a concession demolishing their theory of the case, *admitting* that the number of shares contributed could decrease if higher valuations are used:

> Defendants assert that if the FMV were $21.60 in 1997, the Company's stock contribution would have been smaller. This is sheer speculation. In 1997 the Company contributed $1,340,000 and 80,000 shares valued at $13.50. While a 50% higher stock

2

> value *may have affected the number of shares*, or cash, contributed by the Company, any of the following may have instead happened: (a) *the number of shares could have been reduced to about 52,000*; (b) the amount contributed could have been reduced by $560,000; (c) the Company could have contributed the same amount of stock, but added $560,000 in cash; or (d) nothing could have changed.

Opp. at 16 (emphases added).[1] It is Plaintiffs' burden to prove that they were denied benefits. The only way they have proposed to do this is to apply their higher share value for December 31, 1997 to the number of shares in the Trust on that date. Yet, as quoted above, Plaintiffs now admit that "the number of shares could have been reduced" had Defendants used Plaintiffs' valuation method in prior years, such that it is "sheer speculation" whether the number of shares would have been the same or not. Such speculation cannot survive a motion for summary judgment. *See* Def. Memo. at 9, 17, 19. Accordingly, because Plaintiffs' entire theory of injury hinges on an assumption – that the number of shares would not have changed, even if the valuations increased – that Plaintiffs now admit is a matter of "speculation," and that was previously (and correctly) rejected by this Court, summary judgment must enter.[2]

(3) Plaintiffs make the outrageous accusation that Pappalardo undervalues Meditech's stock in order to purchase "vast quantities of stock" from Meditech in order to "retain control of the company." Opp. at 4.[3] Even if true, this would not absolve Plaintiffs' of their failure to

---

[1] Plaintiffs' explication of what "may instead have happened" is hopelessly muddled. Defendants assume Plaintiffs meant to say that "(b) the cash contribution amount might have been reduced by $560,000; (c) the overall contribution amount might have been increased by $560,000." As quoted, Plaintiffs' hypotheticals make no sense.

[2] That conclusion is strengthened by the fact that Plaintiffs have no "back-up plan" – no argument that, if the number of shares is decreased, they still can prove they were denied benefits. In their Memorandum in Support, Defendants demonstrated that, even if one assumes the number of shares remained the same, Plaintiffs had failed to account for the effect of higher valuations on the cash holdings of the Trust. *See* Def. Memo. at 18-19. As block-quoted above (*see also* n. 1, *supra*), Plaintiffs now concede that one effect of higher valuations could be to decrease cash contributions to the Trust. Plaintiffs, however, make no argument that they would have received more in benefits under their valuation method even taking the cash effects into account. Once again, that leaves their claim of injury wholly speculative.

[3] Plaintiffs attempt to insinuate something sinister because Pappalardo, in valuing Meditech stock as the Trustee, used the same value he recommended in his role as a member of Meditech's Board. *See* Opp. at 3. This is nonsense

demonstrate injury, for the reasons given above. But this accusation is, in any event, inconsistent with the undisputed facts. Pappalardo, as the principal founder of Meditech, has always owned a large amount of its stock since the Company was formed in 1969. As shown in Pappalardo's statement of stock ownership, other than his receipt of shares at the founding of the Company, Pappalardo did not purchase any more shares from Meditech until 1996 – *more than 20 years after the inception of the Plan*. *See* Collora Affidavit, Ex. 14. Since 1996 Meditech's share value as determined by Defendants has continued to grow faster than many high-flying public companies; indeed, since December 31, 1997 (the only point for which Plaintiffs have provided a valuation) the growth in Meditech's stock value (as determined by Defendants) has far outstripped the growth in Meditech's earnings, resulting in an *increase* in Meditech's P/E ratio. *See* Affidavit of Barbara A. Manzolillo ¶¶ 24–25 (Martin Aff., Ex. 13); *see also id*. at ¶ 26 (noting that the same is true since 1992 as well).[4] These indisputable facts belie any argument that Pappalardo's valuations are motivated by a desire to purchase stock cheaply from Meditech.[5]

(4)  Plaintiffs never address, much less dispute, the fact that the rate of growth in the value of Meditech stock between December 31, 1997 and December 31, 2003 using Defendants'

---

– why on earth would the same person ascribe different values to the same stock at the same time? To the contrary, a person acting in good faith and with due care would do exactly what Pappalardo did – value the stock consistently.

[4]  Indeed, Plaintiffs themselves seem to *complain* that Pappalardo did not recommend decreasing the share price in 2000 even though Meditech's earnings fell. *See* Opp. at 3-4. This undisputed fact is wholly inconsistent with Plaintiffs' argument that Pappalardo's share price recommendations are motivated by a desire to buy cheap stock. Plaintiffs, on the other hand, having benefited from "low" share values throughout their time at Meditech through contributions of stock to the Trust and their own purchases of stock from the Company, s*ee* Martin Aff., Exhs. 14-16, only want the share value to be maximized when it comes to determining their own distribution of benefits.

[5]  Plaintiffs' characterization of Pappalardo purchases from Meditech as "vast" is also contradicted by the undisputed facts. When Pappalardo began buying more shares from the Company in 1996 he already owned over *four million* shares (more than eight million as currently split-adjusted). *See* Collora Affidavit, Ex. 14. Compared to Pappalardo's existing holdings of Meditech stock, his recent net purchases from the Company have not been "vast," but insignificant. Indeed, it is indisputable that his ownership of Meditech has been diluted as a result of stock sales to employees and contributions to the Trust; from 1995 through 2005 the percentage of the Company owned directly and indirectly (through the Trust) by employees has grown from 25.6% to 32.2%, while Pappalardo's ownership actually has decreased from 26.8% to 25.7%. *See* Affidavit of A. Neil Pappalardo ¶ 7 (Martin Affidavit, Ex. 12).

valuations is greater than the rate of growth using Plaintiffs' method. *See* Def. Memo. at 15; Pls. 56.1 Statement ¶¶ 24, 25). This alone disposes of Hubert's claim. *See* Def. Memo. at 15.[6]

(5)  In an effort to avoid the statute of limitations, Plaintiffs argue that because they never filed a formal claim for benefits before receiving their Trust distributions, there was never a "denial" of the additional benefits they now seek, and hence the running of the statute of limitations was never triggered. *See* Opp. at 5-8. Plaintiffs ignore this Court's prior rejection of this very argument. *See* Motion to Dismiss Order at 10. Plaintiffs cite no new precedent calling that ruling into question; to the contrary, more recent cases confirm that no formal denial of benefits is required. *See*, *e.g.*, *Romero v. Allstate Corp.*, 404 F.3d 212, 222-23 (3d Cir. 2005).[7]

(6)  Plaintiffs argue that they were incapable of exercising reasonable diligence by "computing P/E ratios for Meditech from financial statements, identifying proper competitors, utilizing publicly available financial information to compute P/E ratios for competitors and then engaging in comparative analysis" and that it would be unreasonable to expect them to do so. *See* Opp. at 11. But it is undisputed that Hubert was calculating Meditech's P/E ratio by the 1980s, that he took precisely the steps outlined by Plaintiffs in or about April 1998, and that Hinchliffe and Trainor had access to all the same underlying information. *See* Def. Mem. at 12-13; Pls. 56.1 Statement ¶¶ 45-49, 51. The concept of a P/E ratio is well known to a "reasonable

---

[6]  Plaintiffs do argue that their failure to retain an expert to testify concerning the stock's value as of December 31, 2003, as relevant to Hubert's claim, is not fatal because Hubert has taught himself valuation to such an extent that he is qualified to offer lay testimony on the subject. Opp. at 12-14. Needless to say, after three years of proceedings in which Plaintiffs have alleged that Pappalardo, the founder, Chairman and CEO of Meditech, and the other members of the Meditech board (most of whom have been associated with the Company for decades), are unqualified to value the Company, this argument is stunning because it undercuts a central thesis of Plaintiffs' case – that Defendants acted arbitrarily and capriciously because they did not consult an outside valuation expert.

[7]  Plaintiffs also argue that the limitations period could not begin to run unless and until they viewed the Plan document. *See* Opp. at 7. The case on which Plaintiffs rely is inapposite; plaintiff in that case was not aware that, under the plan, he was eligible for benefits. *See Thomas v. SmithKline Beecham Corp.*, 297 F.supp.2d 773, 786 (E.D. Pa. 2003). It is undisputed that Plaintiffs here annually were told the value of their Trust accounts and the value assigned to Meditech stock. *See* Pls. 56.1 Statement ¶¶ 26, 27.

investor," Opp. at 11; companies' P/E ratios are publicly reported; and dividing a company's stock price by its publicly-reported earnings per share is not unreasonably burdensome.

(7) Remarkably, Plaintiffs assert that "[r]egardless whether engaging in a P/E analysis is reasonable, it still would not have provided Plaintiffs with actual knowledge of a claim." Opp. at 12. That is wholly contradicted by Plaintiffs' own Amended Complaint, where they alleged "Defendants have not fairly valued the MEDITECH stock in the Plan. This can be demonstrated by comparison to publicly traded companies … whose stock trades at much higher multiples of earnings to that of MEDITECH." Amended Complaint ¶ 63; *see also* Def. Memo. at 11.[8]

(8) Plaintiffs argue that they "could [not] have known there was an undervaluation issue (and indeed an underpayment of benefits to them)," until February 2002, when a Meditech director filed a Schedule 13D with the SEC expressing disagreement with the Board's valuation practices. *See* Opp. at 1.[9] Plaintiffs ignore the undisputed fact that Hubert sent an anonymous email to Dwyer & Collora and others seeking counsel to bring an ERISA action based on undervaluation of the stock *before* the 13D filing, *see* Def. Memo. at 13 & n.2; Pls. 56.1 Statement ¶¶ 53-55, thus negating any argument based on the 13D. Similarly, Plaintiffs' assertion that Hinchliffe and Trainor "did not have reason for suspicion at the time they received

---

[8] Plaintiffs cite *Romero*, 404 F.3d at 222, a cause of action accrues under the discovery rule when plaintiff "knew or should have known *all* the facts giving rise to a claim for benefits." Opp. at 6 (emphasis in original). *Romero* actually says that a claim accrues "when the plaintiff discovers, or with due diligence could have discovered, the injury that forms the basis for the claim." *Romero*, 404 F.3d at 222. Here, Hinchliffe and Trainor knew the amount of their benefits more than six years before the Complaint was filed, and as discussed above could have, with the exercise of reasonable diligence, easily discovered the "undervaluation" alleged in the Complaint. Plaintiffs also cite numerous cases for the proposition that a "hunch" does not constitute actual knowledge, and that the statute of limitations here should be subject to equitable tolling. *See* Opp. at 8, 9. Those cases do not involve a benefits claim where plaintiff had already received his distribution of benefits, with plaintiff asking for the limitations period to begin sometime after the date of receipt. Instead, they involve either defendants asking the court to move up the accrual date to some point before the distribution of benefits, or breach of fiduciary duty claims.

[9] Plaintiffs attempt to create a dispute of fact by submitting affidavits from Hinchliffe and Trainor in which each swears "I had no reason to believe that the trustee and the board of Meditech were not engaging in a proper valuation of the stock." These affidavits cannot be used to create a genuine issue of fact because they contradict Plaintiffs' sworn deposition testimony. *See* Def. Memo. at 10-11; *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).

their checks," Opp. at 5, is disproved by the undisputed fact that Hinchliffe thought Meditech stock was undervalued before then. *See* Def. Memo. at 10-11; Pls. 56.1 Statement ¶ 39.

(9) Plaintiffs' argument that "concealment" occurred is frivolous. *See* Opp. at 10.[10] Annually, Plaintiffs were told, *inter alia*, their Trust account value, the Trust's total value, and the value Defendants assigned Meditech stock, while Meditech's public filings with the SEC (and documents given to Meditech employees) showed Meditech's financial information. *See* Def. Memo. at 4-5, 7-8; Pls. 56.1 Statement ¶¶ 4, 5, 6, 26, 27. All of the data about Meditech's stock value and finances cited in Plaintiffs' Complaint with respect to the December 31, 1997 valuation was available to them more than six years before the Complaint was filed. *See* Def. Memo. at 11-12. It is undisputed that in April 1998, more than six years before the Complaint was filed, Hubert compared Meditech's P/E and Cerner's P/E, the same analysis forming the basis for the Amended Complaint. *See* Def. Memo. at 12-13; Pls. 56.1 Statement ¶ 46. Plaintiffs did not need to know exactly how Defendants valued Meditech stock to know that it was undervalued according to Plaintiffs' own method. *See Edes v. Verizon Comm., Inc*., 417 F.3d 133, 142 (1st Cir. 2005) ("Plaintiffs need not have had actual knowledge of the plans' eligibility criteria to start the statute of limitations running"; knowledge that they were not classified as employees and were not receiving benefits was sufficient). And it is undisputed that Hinchliffe and Trainor never asked Meditech management how the stock was valued, despite believing that the stock either was or might be undervalued. *See* Pls. 56.1 Statement ¶ 44.[11]

---

[10] Plaintiffs note that ERISA imposes a fiduciary duty on plan trustees, assert that Pappalardo "breached his duty to the Trust," and suggest that they could not have been on inquiry notice because "there were no facts supporting a suspicion of fraud." Opp. at 2, 11. This is a complete non-*sequitor*. "Fraud" is not an element of Plaintiffs' claim for additional benefits; indeed, "fraud" and "fraudulent concealment" never appear in the Amended Complaint. And this Court long ago dismissed Plaintiffs' claim for breach of fiduciary duty. *See generally* Motion to Dismiss Order.

[11] Plaintiffs oddly insist that they were not told their percentage interest in the Trust. *See* Opp. at 4, 15. It is undisputed, however, that each year Defendants told Plaintiffs the value of their Trust accounts and the Trust's overall value. Pls. 56.1 Statement ¶¶ 26, 27. Dividing the former by the latter shows the percentage interest.

<table>
<tr><td></td><td>Respectfully submitted,<br><br>MEDICAL INFORMATION TECHNOLOGY, INC. PROFIT SHARING PLAN, MEDICAL INFORMATION TECHNOLOGY, INC. and A. NEIL PAPPALARDO.<br><br>By their attorneys,<br><br>/s/ Stephen D. Poss<br>Stephen D. Poss (BBO # 551760)<br>Kevin P. Martin (BBO # 655222)<br>GOODWIN PROCTER LLP<br>Exchange Place<br>Boston, Massachusetts 02109-2881<br>(617) 570-1000<br>(617) 523-1231 (fax)<br>sposs@goodwinprocter.com</td></tr>
<tr><td>Dated: June 3, 2008</td><td>kmartin@goodwinprocter.com</td></tr>
</table>

**CERTIFICATE OF SERVICE**

      I, Stephen D. Poss, hereby certify that I caused a true copy of the above document to be served upon the counsel of record for each other party via this Court's ECF System on June 3, 2008.

                                        /s/ Stephen D. Poss
                                        Stephen D. Poss